**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

## FIRST AMENDED COMPLAINT

Plaintiffs Texas Bankers Association (TBA), Rio Bank, McAllen, Texas (Rio Bank), and American Bankers Association (ABA) bring this action for declaratory and injunctive relief against Defendants Consumer Financial Protection Bureau (CFPB) and Rohit Chopra (in his official capacity as Director of the CFPB). Plaintiffs specifically challenge the Final Rule issued by the CFPB on March 30, 2023 to amend Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).

## INTRODUCTION

1. Bank loans to small businesses serve a critical role in the American economy. The total estimated value of the U.S. small business lending market is in excess of $1 trillion. And

according to recent Federal Reserve data, almost 70 percent of small businesses seeking a loan applied to a bank for that type of credit.[1]

2.  Importantly—and has been consistently ignored by the CFPB during this rule-making—small business loans play a larger role in the portfolios of smaller banks, like Rio Bank, than they do in the portfolios of large institutions.  For example, the average banking organization with $1 billion or less in total assets held over 13 percent of its portfolio as small business loans in June 2021.  By contrast, those with assets greater than $10 billion only held approximately 6 percent of their assets as such loans.

3.  In an effort to bolster the loans made to minority and women-owned businesses, the Dodd-Frank Act added a limited list of reporting requirements to banks and other small business lenders in 2010.

4.  Rather than advancing the goal of growing the number of loans made to minority and women-owned businesses, though, the CFPB has now issued a rule that will hinder that aim.

5.  That is because the agency took the original three pages of legislation with only 13 reporting data points required by the statute and turned them into almost 900 pages of rulemaking— a new Final Rule that requires banks to develop and implement new software and compliance mechanisms to address over 80 reporting requirements that have been exponentially grown by the CFPB since the Act requiring this Rule was passed.

6.  Unable to effectively comply with these burdensome and overreaching new reporting requirements, the Final Rule will drive smaller providers from the market, causing a

---

[1] *Availability of Credit to Small Businesses,* Federal Reserve Board, p. 33 (Oct. 2022).

decrease in the products available to all customers including minority and women-owned small businesses.

7.    While the CFPB was alerted to this concern during the pendency of the Rule, it chose to ignore such concerns and paper over the lending community's legitimate apprehensions with the Rule as it was formulated.

8.    The Supreme Court has recognized that the CFPB exercises "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2210 (2020).

9.    In addition to the breadth of its authority and the concentration of policy-making power, the Fifth Circuit recently observed that the CFPB's "funding scheme is unique across the myriad independent executive agencies across the federal government.  It is not funded with periodic congressional appropriations." *Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022).

10.    This funding structure is not just unique, though—"Congress's decision to abdicate its appropriations power under the Constitution, i.e., to cede its power of the purse to the Bureau, violates the Constitution's structural separation of powers." *Id.* at 623.

11.    Because of the CFPB's unconstitutional structure, Rules promulgated by the Bureau are invalid and have been vacated (or enjoined) as a result.  *Id.* at 643.[2]

12.    Plaintiffs now seek an order and judgment holding unlawful, enjoining, and setting aside the ECOA Final Rule at issue in this case.  The unconstitutional nature of the CFPB's funding

---

[2] A petition for a writ of certiorari to review *Community Financial* was granted on Feb. 27, 2023 (U.S. No. 22-448) and the CFPB's opening brief was filed on May 8, 2023.  The general expectation is that a Supreme Court decision will occur at some point in 2024.  Following *Community Financial*'s determination that the CFPB is unconstitutional, numerous stay orders in other CFPB cases have already been issued in the Fifth Circuit—*see, e.g.*, *CFPB v. Active Network, LLC*, 22-cv-898, ECF No.14 (E.D. Tex. Nov. 29, 2022)—and in other Circuits as well—*see, e.g.*, *CFPB v. Rosen*, 21-cv-7492, ECF No. 123 (C.D. Cal. Jan. 3, 2023).

infects every aspect of the Rule at issue here as it would not have taken place—and certainly would not have grown into the crushing behemoth just released by the CFPB—if the agency had not been funded inappropriately and thereby lacked oversight.

13.     The intervention of this Court is necessary to preserve the *status quo* with respect to the subject matter of the Final Rule because the unconstitutionally promulgated Rule will irreparably harm both Rio Bank and the covered memberships of the banking associations here—overwhelmingly community banks—if allowed to go into effect.

14.     In addition to the Constitutional infirmities that are fatal to the ECOA Final Rule, portions of the Rule also violate various requirements of the Administrative Procedure Act (APA). 5 U.S.C. §§ 551–559.

15.     Separately, then, the ECOA Final Rule should be invalidated or stayed under the APA.

16.     Absent immediate relief on these claims, the Associations' community and mid-size bank members will be forced into a compliance regime that will drive some members out of the small business loan industry and that will force all members remaining in the industry to spend significant sums of money preparing to comply with an illegitimate Rule—money that cannot be recovered.

## PARTIES

17.     Plaintiff Texas Bankers Association (TBA) is America's oldest and largest state banking organization in the United States.  TBA advocates in both Austin and Washington D.C. for its 400 member banks across Texas.  The Association also invests directly in Texas communities through financial literacy, scholarships, and other charitable activities.  TBA's membership consists of mostly small to medium size banks with a median asset size of

approximately $357 million.   While its banks employ over 200,000 individuals, the median employment of its member banks is fewer than 50.  As a bankers' organization, TBA has standing as an adversely affected party to appear on behalf of its members.

18.     Plaintiff Rio Bank is Minority Depository Institution (MDI) bank in McAllen, Texas.  Its Board of Directors is a majority Hispanic and approximately 90% to 95% of its market is Hispanic.  The bank has approximately $900 million in total assets with 14 locations throughout the Rio Grande Valley—extending from Roma to Brownsville—and employs about 200 people. Rio Bank makes small business and agricultural loans to small businesses in the Valley, allowing them to expand their operations, add new customers, hire more employees, and, most importantly, promote the economic opportunities for the growing population in those counties the bank serves. In 2022, Rio Bank made 409 small business and agricultural loans in a total amount of $117 million.

19.     Plaintiff American Bankers Association (ABA) serves as the voice of the nation's $23.6 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2 million people, safeguard $19.2 trillion in deposits, and extend $12.2 trillion in loans.  ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive.   ABA regularly advocates before the CFPB to promote regulatory and supervisory policies that protect consumers, while also ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

20.     Defendant CFPB is an agency of the United States.  12 U.S.C. § 5491(a).

21.     Defendant Rohit Chopra is the Director of the CFPB.  Director Chopra is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States.  U.S. Const. Art III, § 2; 28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701–706.

23.     This Court is authorized to award the requested relief under 5 U.S.C. § 706; 28 U.S.C. § 1361; and 28 U.S.C. §§ 2201–2202.

24.     Venue is proper in this district because Defendants include a United States agency and an officer sued in his official capacity and because Plaintiff Rio Bank—a member of TBA—is located in this district and in this division (along with other member institutions).  28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

### I.     The History And Unconstitutional Funding Structure Of The CFPB.

25.     Congress passed the Dodd-Frank Act in 2010 as a response to the 2008 financial crisis.  Pub. L. No. 111-203.  Title X of the Act is the Consumer Financial Protection Act of 2010 (CFPA).

26.     Title X established the CFPB and placed it in charge of regulating individuals and entities that provide financial products and services such as loans for small businesses.

27.     The CFPB was given broad authority to create and enforce U.S. consumer protection laws.  The Agency possesses the power to "prescribe rules or issue orders or guidelines pursuant to" nineteen distinct consumer protection laws whose implementation was transferred to the Bureau from seven different government agencies.  12 U.S.C. § 5581(a).

28.     Section 1021(a) of the CFPA requires the CFPB to implement and enforce consumer financial law "consistently for the purpose of ensuring that all consumers have access

to markets for consumer financial products," and to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions."

29.    Moreover, Section 1022(a) of the Act provides that, in exercising its rulemaking authority, the Bureau must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons … and the impact on consumers in rural areas."

30.    While courts have recognized the "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director" at the agency—*CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 221–22 (5th Cir. 2021) (Jones, J., concurring)—the Fifth Circuit recently commented that the "[m]ost anomalous" aspect of the CFPB "is the Bureau's self-actualizing, perpetual funding mechanism." *Community Financial*, 51 F.4th at 638.  "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not.  Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount 'determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Id.* (citing 12 U.S.C. § 5497(a)).

31.    The Bureau thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Id.* (citing *Seila Law*, 140 S. Ct. at 2194).

32.    This means, however, that "Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations.  It also ceded *indirect* control by providing that the Bureau's self-determined funding be drawn from a source

that is itself outside the appropriations process—a double insulation from Congress's purse strings that is 'unprecedented' across the government." *Id.* at 638–39 (quoting *All American Check Cashing*, 33 F.4th at 225 (Jones, J., concurring)).

33.     "But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books.  Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains 'a separate fund, . . . the "Bureau of Consumer Financial Protection Fund,"' which 'shall be maintained and established at a Federal [R]eserve bank.'  This fund is 'under the control of the Director,' and the monies on deposit are permanently available to him without any further act of Congress.  Thus, contra the Federal Reserve, the Bureau may 'roll over' the self-determined funds it draws *ad infinitum*." *Id.* at 639 (citations omitted).

34.     Because of this funding scheme, the Fifth Circuit has concluded that "the Bureau's funding is double-insulated on the front end from Congress's appropriations power.  And Congress relinquished its jurisdiction to review agency funding on the back end.  In between, Congress gave the Director its purse containing an off-books charge card that rings up '[un]appropriated monies.'  Wherever the line between a constitutionally and unconstitutionally funded agency may be, this unprecedented arrangement crosses it." *Id.*

35.     As a result, "[t]he Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id.* at 642.[3]

---

[3] Because "without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule," and because "the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue" caused the plaintiffs harm, the remedy was to "vacate the [rule] as the product of the Bureau's unconstitutional funding scheme." *Id.* at 643.

## II.       The Proposed ECOA Rule.

36.       Section 1071 of the Dodd-Frank Act consists of three pages of statutory text amending the ECOA to "inquire whether the business is a women-owned, minority-owned, or small business" and require that the accumulated data be submitted annually to the CFPB.  Public Law No: 111-203, 124 Stat. 2056 (in part)–2059 (in part) (July 21, 2010).

37.       The legislation further directed financial institutions to collect and report 13 specific credit data points such as the amount of the credit application and the action taken on the application.

38.       On September 1, 2021, the CFPB issued a Proposed Rule implementing these statutory directives from § 1071.

39.       Rather than hewing closely to the text of the Act, though, the CFPB's proposed rule looked to vastly expand the categories of information on which data would be sought from banks and other financial institutions.

40.       The Proposed Rule added almost 70 additional categories to § 1071's list of data and sub-data points.  These included, among other things, census tract for use of loan proceeds, loan guarantees, loan terms, counteroffer, denial reasons, comprehensive pricing information, origination charge, any annual fees, any broker fee, prepayment penalty, number of workers, and time in business.

41.       During the notice and comment period, the overwhelming number of comments submitted by parties subject to the rule characterized it as excessively overbroad in terms of its data points, the impact it would have on the small business lending market, and the costs it would impose on banks and other small business lenders.

42.    In their combined letter, the National Association of Federal Credit Unions and the Credit Union National Association commented that "the Proposed Rule's complexity and significant costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers." Letter from Nat'l Ass'n of Fed. Credit Unions (Jan. 6, 2022).

43.    The American Financial Services Association commented to the CFPB that, while the proposed rule stated that it is intended to "help small businesses drive inclusive and equitable growth," the overly burdensome data collection requirements that exceeded the Congressional mandate could result in a reduction of available credit, thus having the opposite effect of what Congress intended.

44.    Echoing that concern, the § 1071 comment letter of the U.S. Small Business Administration's Office of Advocacy said that the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to *a decrease in lending to small, minority- and women-owned businesses*."

45.    Importantly, the Conference of State Bank Supervisors (CSBS)—an organization consisting of state-government officials "charged with protecting consumers and ensuring the safety and soundness of the financial institutions they supervise" in addition to "fostering economic development opportunities within their states"—also spoke out against the overreach of the Proposed Rule.

46.    The CSBS warned that the Proposed Rule "will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country."

47.     The CSBS Jan. 6, 2022 Comment Letter thus recommended that the Bureau "limit the reportable data to the statutorily mandated data points required by section 1071.  The Bureau should refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071."

## III.     The Cost/Benefit Analysis Performed On The Proposed ECOA Rule.

48.     For decades, federal agencies have been required to consider the costs and benefits of certain regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs.  *See, e.g.*, Executive Order 12291; Executive Order 12866.

49.     In response to this requirement, the CFPB undertook a purported cost-benefit analysis of the Proposed Rule.  The result, however, was incomprehensible.  A fundamental flaw can be seen in the explanation provided for its methodology: "In particular, we use a Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model.  We can use a Bayesian multiple OLS regression model because the data are missing at random (MAR).  We need to impute data for multiple variables, origination number and dollar volume.  Because the missing variables are monotone, we can use an independent univariate conditional model to generate the multivariate imputations."  CFPB *Supplemental Estimation* at 4 (September 2021).[4] This methodology is not only indecipherable, it fails to account for the higher proportion of small business loans generated by rural, small, and other community banks.

50.     Methodology aside, it later became evident that the CFPB did not even attempt to estimate the full extent of lenders' cost in terms of implementing the ECOA Final Rule.  This was evident in three ways.

---

[4]  Available  at  https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.

51.     First, the CFPB has admitted that its Cost Survey was limited to only 13 of the eventual 81 data fields.

52.     Second, and providing no added basis, "the Bureau c[ould] only estimate how ongoing costs would be different," but suggested that "going from 13 statutory data points to 81 in the Final Rule would increase compliance costs by $10,000,000 per year."  86 *Fed. Reg.* 56354.

53.     Third, and as previously noted, the CFPB did not differentiate aggregate industry numbers between banks of various sizes to account for the fact that total small-business loans as a percentage of total loans decline as bank size increases (even though this consideration was brought to the CFPB's attention by researchers at Texas Tech University).

54.     In a comment letter to the CFPB, the Texas Tech researchers submitted data indicating that for banks with $100 million or less in total assets, small-business loans comprised about 40 percent of their total loan portfolio but for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios.  *A Comment on Implementing Section 1071 of the Dodd-Frank Act*, Texas Tech University Rawls College of Business (Dec. 16, 2021).

55.     In other words, compliance costs for the Rule would affect community banks and smaller lending institutions disproportionately because of the greater percentage of small-business loans that make up the business of those lenders.

## IV.     The ECOA Final Rule.

56.     The CFPB's ECOA Final Rule was promulgated on March 30, 2023.

57.     In the exercise of its discretionary authority, the CFPB transformed its three-page statutory mandate into an 887-page, single-spaced Final Rule.[5]

---

[5] Available at https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf.

58.     Concurrent with the publication of the Final Rule, the CFBP issued a "Small Business Lending Rule: Data Points Chart" that sets forth 81 separate data or sub-data points. Small Business Lending Rule: Data Points Chart (consumerfinance.gov) (Version 1, Mar. 30, 2023).

59.     This represents an enlargement of the requisite data points by over 600 percent.

60.     In the supplementary material accompanying publication of the Final Rule, the CFPB acknowledged that, during the rulemaking process, it considered *but rejected* an alternative approach that would have limited data collection only "to the statutorily required data points enumerated in section 1071."

61.     When expanding the statutorily-required data set, the CFPB ostensibly claimed to have considered the costs associated with the expanded data set it would be requiring of financial institutions.

62.     Tellingly, though, the CFPB did not dispute the comments of the U.S. Small Business Administration's Office of Advocacy, but merely dismissed them with a notation that "it expects the variable portion of ongoing costs *to be passed on to small business credit borrowers in the form of higher interest rates and fees*."  Final Rule at 780 (emphasis added).

63.     The CFPB similarly ignored the other outside comment letters, issuing a Final Rule in substantially the same form as was proposed without justification why it was dismissing the concerns made known in the notice and comment period.

64.     The CFPB also disclosed that the respondents to its "One-Time Cost Survey were instructed to assume that they would only be reporting on the mandatory (i.e., statutory) data fields."  86 *Fed. Reg.* 56356, 56564 (Oct. 8, 2021).

65.     In terms of justifying the regulatory enlargement, the CFPB baldly asserted that expanding the collection requirements with an additional 68 (non-statutory) data points "would aid in fulfilling the purposes of section 1071." 86 *Fed. Reg.* at 56356.

**V.     Immediate And Irreparable Harms Caused By The ECOA Final Rule.**

66.     A Final Rule becomes law when duly prescribed, regardless of when it goes into effect and is actionable under the APA.  5 U.S.C. § 551(4).

67.     As a result, the Associations' members must begin immediately to undertake substantial expenses in preparation for the scheduled 2024 implementation of the ECOA Final Rule.  *See* Exhibit A, Declaration of Celeste M. Embrey; Exhibit B, Declaration of Ford Sasser; & Exhibit C, Declaration of Virginia O'Neill.

68.      For Rio Bank—like almost all of the TBA and ABA members, mostly community banks—this compliance activity will include selecting new computer software systems (that are yet to be created to address the requirements of the Rule); training employees; and hiring outside managers for the implementation of the information collection, report preparation, intra-company segmentation procedures, and overall privacy protection needed to safeguard the extensive accumulation of personal, demographic, and sexual orientation data mandated by the ECOA Final Rule.

69.     The over-reaching ECOA Final Rule will force small and rural banks with limited staff and resources to put more resources into government reporting rather than lending in the community.

70.      In addition, federal and state financial regulatory authorities will, per standard examination practices, require the Association's members to demonstrate their progress toward

14

identifying and initiating compliance with the ECOA Final Rule during examinations and other agency communications.

71.     These compliance costs—spent in service of a Rule that was improperly promulgated, *see Community Financial*, 51 F.4th at 642–43—are not recoverable.   (The compliance costs would also be unrecoverable under the APA claims at issue in this case.)

72.     These initial compliance costs will be approximately $100,000 per community bank—an unrecoverable loss of hundreds of millions of dollars to TBA and ABA members.

73.     The ABA survey results further indicate, from a personnel standpoint, that 88% of respondents will need to hire more full-time employees (FTEs) to comply with the data collection and submission requirements of the proposed rule and to conduct fair lending analysis of the data. The mean number of new FTEs required was three, but some community banks indicated they would need to hire 10 FTEs.  Exhibit C.

74.     As the Fifth Circuit has recognized, "a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

75.     Compounding the harms caused by the Final Rule itself is the CFPB's inability to handle the type of information it seeks from its regulated entities.  The Bureau recently had a data breach involving sensitive information on dozens of financial institutions and potentially hundreds of thousands of customers.  *CFPB's 'Disturbing' Data Breach Sparks Ire, Credibility Doubts*, Law 360 (Apr. 26, 2023).[6]

---

[6] Available at https://www.law360.com/banking/articles/1601072?nl_pk=399f8e17-84ef-4f0d-8aa7-7bfd983d0ef5&utm_source=newsletter&utm_medium=email&utm_campaign=banking&utm_content=2023-0426&nlsidx=0&nlaidx=0.

76.     Two months after the breach, *American Banker* reported that CFPB has still not notified affected consumers.  This demonstrates that CFPB is not prepared to quickly and effectively respond to a data breach in its larger operations, further indicating that CFPB is unable to adequately assess the security and privacy impacts of its massive § 1071 data collection on small businesses.

77.     This is both made possible and exacerbated by the agency's unconstitutional funding structure under which Congress does not have the ability to perform proper oversight nor hold the agency accountable.

### COUNT I
CFPB Funding Structure
Violation of the Constitution and APA
(Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A))

78.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

79.     As seen in *Community Financial*, the CFPB's funding structure violates the U.S. Constitution's structural separation of powers.

80.     The ECOA Final Rule here was promulgated under precisely the same procedures as the rule that was voided in *Community Financial*, *i.e.,* reliance upon the same CFPB funding mechanism which compelled the voiding the rule in *Community Financial* as the product of the Bureau's unconstitutional funding scheme.

81.     Because the ECOA Final Rule was issued with funds derived from unconstitutional sources, it violates the Constitution (and, as a result, also the APA).  *Community Financial*, 51 F.4th at 642.  Because the Final Rule was promulgated in violation of the U.S. Constitution, and because it directly harms TBA and ABA member institutions—including Rio Bank—it is invalid and must be set aside.  *See id.* at 643.

16

82.     Additionally, under the APA, agency action must be vacated if it is "not in accordance with law."  5 U.S.C. § 706(2)(A).

83.     Per *Community Financial*, the Final Rule—as a final action taken by the CFPB— is "not in accordance with law" and must be "h[e]ld unlawful and set aside" for that reason, too. *See* 51 F.4th at 643.

**COUNT II**
Abuse of Discretion
Promulgating a Final Rule Beyond the Statutory Scope
(5 U.S.C. § 706(2)(C))

84.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

85.     The APA provides that agency actions are to be set aside when found to be an abuse of agency discretion.  5 U.S.C. § 706.

86.     Defendants acted in excess of their authority and short of statutory right by expanding 13 data points prescribed in § 1071 of the Dodd-Frank Act to 81 in the Final Rule without any basis in the administrative record to do so.

87.     While claiming the CFPB is authorized under § 1071 to compile "any additional data that the Bureau determines would aid in fulfilling the purpose of the statute," the additional information now sought by the expanded Final Rule far outstrip the statute's purposes.

88.     Moreover, the Final Rule will—in fact—operate to undermine the express purpose of the statute.

89.     By adding even more burdensome compliance requirements on institutions such as MDI Rio Bank, it will work to decrease the number of banks willing to participate in this lending space.  Many banks simply cannot afford the compliance costs and will thus abandon the field.

90.     As noted by commenters to the Proposed Rule, the result will be less money available to minority and women-owned businesses stemming from the Bureau's overzealousness in drafting requirements that exceed the scope of § 1071.

91.     Because the Final Rule violates the APA, all data points in excess of the 13 specified in the underlying statute should be invalidated and be set aside.

## COUNT III
Arbitrary & Capricious
Failure to Account for Comments Relevant to the Statute's Purpose
(5 U.S.C. § 706(2)(A))

92.     Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

93.     The APA requires that federal agencies such as the CFPB respond to relevant and significant issues that are raised by interested parties.

94.     And a reviewing court "must set aside agency action if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

95.     The notice and comment period alerted the CFPB to the alarming costs that would be imposed on the small to mid-sized banks if the Final Rule were to expand the statutory categories at issue.

96.     As set forth above, however, Defendants acted arbitrarily and capriciously by failing to consider and respond to significant comments raised by adversely affected parties.

97.     But when an agency determines to go beyond its specifically prescribed powers, the APA necessitates that it must first "examine the relevant data and articulate a satisfactory explanation for its action."  *State Farm*, 463 U.S. at 30.

98.     While claiming the CFPB is authorized under § 1071 to compile "any additional data that the Bureau determines would aid in fulfilling the purpose of the statute," the agency did not attempt to square that authority with the purposes of the statute to encourage additional lending—especially to minority and women-owned businesses.  Thus any "determination" that the statute's purposes are aided by the significant expansion of the Rule is without support in the administrative record.

99.     Because the Final Rule violates the APA, it should be invalidated and be set aside.

**COUNT IV**
Arbitrary & Capricious
Improper Cost/Benefit Analysis
(5 U.S.C. § 706(2)(A))

100.    Plaintiff adopts by reference the preceding paragraphs of this Complaint as if fully set forth herein.

101.    Since the 1970s, federal agencies have been required to consider the costs and benefits of certain regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs.  *See, e.g.*, Executive Order 12866.

102.    Defendants promulgated the Final Rule without undertaking a proper cost/benefit analysis.

103.    Indeed, the CFPB failed to account for both: (1) the disproportionate cost of the Final Rule on small banks (that make the most loans to small businesses); and (2) the fact that the Final Rule would likely cause a decrease in loan availability to women and minority owned businesses.

104.    And rather than undertaking a proper accounting, the agency took the costs associated with collecting the 13 statutory data points and substituted it for the costs associated with collecting 81 different types of information.

105.    Moreover, the CFPB conceded that additional costs would be "passed on to small business credit borrowers in the form of higher interest rates and fees."  Final Rule at 780.

106.    Yet § 1022(a) of the Act commands that the Bureau consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

107.    The available information indicated that the Final Rule would increase costs and lower product accessibility to small business owners.  But the Bureau forged ahead with the Rule anyway, failing to articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

108.    Indeed, "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action."  *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).

109.    Without meaningful distinctions with respect to separating cost estimates based on the differential in the size of the small business loan portfolio per the size of a given bank's assets, the compliance costs which have been factored into the Final Rule are unsubstantiated.

110.    Because the CFPB "entirely failed to consider [this] important aspect of the problem," its action adopting the Final Rule must be set aside.  *See Southwestern Electric*, 920 F.3d at 1013.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide the following relief:

    A.  a declaration that the CFPB's ECOA Final Rule adopted on March 30, 2023 relies on the same unconstitutional grounds as *Community Financial* and was also adopted in substantial non-compliance with the APA;

    B.  both a preliminary and permanent injunction setting aside and holding unlawful the CFPB's ECOA Final Rule;

    C.  attorney's fees and costs incurred in relation to this case; and

    D.  such other and further relief as the Court deems just and proper.


May 14, 2023                         Respectfully submitted,

                                      */s/ John C. Sullivan*
                                      John C. Sullivan
                                      Texas Bar No. 24083920
                                      **S|L LAW PLLC**
                                      610 Uptown Boulevard, Suite 2000
                                      Cedar Hill, TX 75104
                                      Telephone: (469) 523-1351
                                      Facsimile: (469) 613-0891
                                      john.sullivan@the-sl-lawfirm.com

                                      James J. Butera*
                                      Ryan Israel*
                                      **MEEKS, BUTERA & ISRAEL PLLC**
                                      2020 Pennsylvania Avenue, NW
                                      Washington, DC 20006
                                        Telephone: (202) 795-9714
                                      jbutera@meeksbi.com
                                      risrael@meeksbi.com

                                      Counsel for Plaintiffs
                                      * *admitted pro hac vice*