IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144<br><br>**ORAL ARGUMENT AND HEARING REQUESTED** |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii
INTRODUCTION .......................................................................................................................... 1
BACKGROUND ............................................................................................................................ 2
STANDARD OF REVIEW ............................................................................................................ 5
ARGUMENT .................................................................................................................................. 5
   I. Plaintiffs Are Likely To Succeed On The Merits Of Their Constitutional Claim. ................. 6
   II. Plaintiffs Will Be Irreparably Harmed Without A Stay. ........................................................ 6
   III. Granting An Injunction Serves The Public Interest. ............................................................ 9
CONCLUSION ............................................................................................................................. 10
CERTIFICATE OF CONFERENCE ............................................................................................ 11
CERTIFICATE OF SERVICE ..................................................................................................... 11
CERTIFICATE OF COMPLIANCE ............................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**

*BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ............................................................ 9

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022),
  *cert. granted*, U.S. 22–448 (Feb. 27, 2023) ................................................................... *passim*

*Denton v. City of El Paso, Tex.*, 861 F. App'x. 836 (5th Cir. 2021) ............................................... 5

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ....................................................................... 5

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) .................................................................... 1, 8

*Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017) ............................................................... 5

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) ..................... 9

*Rest. L. Ctr. v. Dept. of Lab.*, 66 F.4th 593 (5th Cir. 2023) ................................................... 1, 6, 8

*Seila L., LLC v. CFPB*, 140 S. Ct. 2183 (2020) ............................................................................ 2

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) .................................................................................. 8

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ................................................................... 9

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................... 5

**Statutes**

§ 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank
  Act") ........................................................................................................................................ 1

**Rules**

Small Business Lending under the Equal Credit Opportunity Act (Regulation B),
  Consumer Financial Protection Bureau, 12 C.F.R. § 1002 (2023) .................................... *passim*

## INTRODUCTION

At the end of March, the Consumer Financial Protection Bureau ("CFPB") released a new Final Rule requiring banks to begin reporting to the Bureau certain data on applications for small business credit. The Rule amends Regulation B to implement changes to the Equal Credit Opportunity Act ("ECOA") made by § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").[1]

The Rule is invalid, though, because the CFPB employed funds to promulgate the Rule that were wholly drawn through the agency's unconstitutional funding scheme. *See Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 643 (5th Cir. 2022), *cert. granted*, U.S. 22–448 (Feb. 27, 2023).[2] Yet as it stands now, each bank around the country will be forced to spend more than $100,000 to prepare for the coming reporting deadlines established by the CFPB's new demands. That means Plaintiffs and the financial institutions they represent will expend millions of dollars preparing to comply with the invalid Rule. Fifth Circuit precedent is clear, however, that the nonrecoverable costs of complying with an invalid regulation constitute irreparable harm. *Rest. L. Ctr. v. Dept. of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022).

As a result, and because the other preliminary injunction factors also weigh in Plaintiffs' favor, this Court should grant the Motion and enjoin enforcement of the Rule.

---

[1] Small Business Lending under the Equal Credit Opportunity Act (Regulation B), Consumer Financial Protection Bureau, 12 C.F.R. § 1002 (2023) ("Final Rule" or "Rule"), a*vailable at* https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf.

[2] Plaintiffs have also challenged the Final Rule under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559. *See* First Am. Complaint, ECF No. 12 at 17–20. Because it is undisputed that Plaintiffs succeed on the Constitutional challenge presented, the APA claims are not briefed here. Plaintiffs will continue to litigate their APA claims at the direction of this Court.

## BACKGROUND

The Supreme Court has recognized that the CFPB exercises "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila L., LLC v. CFPB*, 140 S. Ct. 2183, 2210 (2020).  Along with the breadth of its authority and the concentration of policy-making power, the Fifth Circuit recently observed that the CFPB's "funding scheme is unique across the myriad independent executive agencies across the federal government.  It is not funded with periodic congressional appropriations." *Community Financial*, 51 F.4th at 643.  This funding structure is not just unique—it's unconstitutional.  "Congress's decision to abdicate its appropriations power under the Constitution, i.e., to cede its power of the purse to the [CFPB], violates the Constitution's structural separation of powers." *Id.* at 623.  Consequently, rules promulgated by the Bureau using funds drawn through this scheme are invalid and have been vacated (or enjoined) as a result when such rules "inflict[] harm." *Id.* at 643.

The CFPB published the Rule at issue on March 30, 2023, using appropriations from its unconstitutional funding mechanism.[3]  In the Rule, the CFPB transformed a three-page statutory mandate (requiring thirteen data points to be collected for new small business loans), into an 887-page, single-spaced Rule, which requires a bank to collect and report 81 separate data and subdata points for each reportable application or loan.[4]  Indeed, the CFPB's Filing Instructions Guide,

---

[3] A Bureau report indicates that it spent over $39 million for "Research, Markets & Regulations" during the first three quarters of the fiscal year just prior to the quarter in which the rule was issued.  *See* CONSUMER PROTECTION FINANCIAL BUREAU, CFO UPDATE FOR THE THIRD QUARTER OF FISCAL YEAR 2022 (2022), available at https://files.consumerfinance.gov/f/documents/cfpb_cfo-update_report_fy-2022_q3.pdf.  And in all events, the CFPB would have been unable to promulgate any rules "without its unconstitutional funding" and thus would not have issued the Final Rule here absent that scheme. *See Community Financial*, 51 F.4th at 643.

[4] *See* Final Rule, available at https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf; *see also* Small Business Lending Rule: Data Points Chart (consumerfinance.gov) (Version 1, Mar. 30, 2023) (issued by the CFPB concurrent with the publication of the Rule).

which sets forth all the fields and all the possible codes a bank will have to use to collect and submit data, is 124 pages long.[5]

Although the Rule was meant to promote lending to women and minority-owned businesses, it will have the opposite effect. And while the CFPB concedes that the Rule's 600% expansion in data reporting requirements will increase compliance costs, the Bureau states it expects those costs "*to be passed on to small business credit borrowers in the form of higher interest rates and fees*." Final Rule at 780 (emphasis added).

The Final Rule has rolling deadlines for compliance; depending on the size of the financial institution, those dates are October 1, 2024; April 1, 2025; and January 1, 2026. Final Rule at 1. While those dates might at first blush seem remote, the complexity and breadth of the new Rule's demands will require banks to struggle to meet those deadlines—that is why the Texas Bankers Association ("TBA") and the American Bankers Association ("ABA") (collectively "Associations") have advised banks to begin preparations immediately. ECF No. 12-1, Exhibit A, Declaration of Celeste M. Embrey at 2, ¶ 5; ECF No. 12-3, Exhibit C, Declaration of Virginia O'Neill at 4, ¶ 9.

Following that advice, Plaintiff Rio Bank "has already commenced compliance preparation as a consequence of the implementation dates established under the Final Rule." ECF No. 12-2, Exhibit B, Declaration of Ford Sasser at 2, ¶ 7. Indeed, Rio Bank expects to spend at least $20,000 through the remainder of this year preparing to comply with the Rule. *Id.* at 3, ¶ 11. Along with Rio Bank, the Associations' members across the country are immediately beginning to undertake

---

[5] Available at https://www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/2024-guide/#1.

substantial expenses in preparation for the scheduled 2024 implementation of the ECOA Rule. *See* ECF No. 12-1, Exhibit A at 3, ¶¶ 6–7; ECF No. 12-3, Exhibit C at 4, ¶ 10.

Compliance activities will include professional staff time reviewing the 887-page final rule; engaging consultants and/or attorneys to advise on requirements and operational changes required to ensure compliance; searching for and purchasing new software (*e.g.*, loan origination software systems); integrating the new software with existing software and systems; updating existing computer systems; testing and validating systems; engaging vendors to assist with data quality control and analysis; developing forms and applications; training staff and third parties (*e.g.*, brokers); drafting new policies and procedures, and amending existing policies and procedures; conducting legal and compliance review; and hiring new employees. *See* ECF No. 12-1, Exhibit A at 3, ¶ 7.

Banks will also need to hire more full-time employees to comply with the data collection and submission requirements together with outside consultants, attorneys, and other experts. ECF No. 12-3, Exhibit C at 3, ¶ 7.a; ECF No. 12-2, Exhibit B at 3 ¶ 12. Some 88% of respondents to an ABA survey on the cost of complying with the proposed rule indicated they would need to hire more full-time employees (FTEs) to comply with the data collection and submission requirements of the proposed rule and to conduct fair lending analysis of the data. The mean number of new FTEs required was 3. However, some community banks indicated they would need to hire 10 FTE. ECF No. 12-3, Exhibit C at 3, ¶ 7.a.

These initial compliance costs will be at least $100,000 per community bank—an unrecoverable loss of hundreds of millions of dollars to TBA and ABA members. ECF No. 12-1, Exhibit A at 3, ¶ 7. The Bureau itself estimates the initial compliance costs for banks and credit unions combined to be between $147,000,000 to $159,000,000. Final Rule at 756.

Again, the costs are not future expenditures incurred at some point after the compliance deadlines. Not only must banks use the preparation window provided in the Rule to prepare now for requirements that kick in in less than 18 months, regulators will be inspecting banks between now and the compliance deadlines to ensure that adequate preparations are being made to follow the Final Rule.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008); *Denton v. City of El Paso, Tex.*, 861 F. App'x. 836, 838 (5th Cir. 2021) (quoting *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017)). "Likelihood of success and irreparable injury to the movant are the most significant factors." *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021).

## ARGUMENT

Plaintiffs meet each of the four prongs set forth by the Supreme Court for evaluating a request for a preliminary injunction. Fifth Circuit precedent shows that Plaintiffs succeed on the merits of their constitutional claim and that spending money to prepare for an invalid agency rule is an irreparable harm. Because there is no harm to stopping an agency from enforcing an invalid rule, and because the public interest favors following the Constitution, the remaining injunction factors favor Plaintiffs as well. The Motion should be granted.

## I. Plaintiffs Are Likely To Succeed On The Merits Of Their Constitutional Claim.

As the Fifth Circuit held in *Community Financial v. CFPB*, Congress violated the Constitution's structural separation of powers when it ceded is power of the purse to the CFPB. 51 F.4th at 623. Because of the CFPB's unconstitutional self-funding structure, Rules promulgated by the Bureau employing unconstitutionally requisitioned funds are invalid and have been vacated (or enjoined) when those rules cause harm. *Id.* at 643.

Just as the rule in *Community Financial* was invalid due to the CFPB's unconstitutional funding mechanism, so too the Rule here is invalid because it relies on the same unconstitutional funding scheme. The Rule was promulgated under precisely the same procedures as the rule the Fifth Circuit voided in *Community Financial* and the unconstitutional nature of the CFPB's funding infects every aspect of the Rule. *Compare id.* at 643 & n.17, with note 3 *supra*. Because the Rule was issued through the use of unconstitutionally derived funds and because it harms Plaintiffs through its burdensome compliance costs, it too violates the Constitution and must be set aside. *See Community Financial*, 51 F.4th at 642–43 (noting the "straightforward" analysis in showing the connection between the "infirm provision" and the "challenged action").

Under *Community Financial*, Plaintiffs are not only likely to succeed on the merits of their claim, they certainly will. The first prong of the preliminary injunction test is thus satisfied.

## II. Plaintiffs Will Be Irreparably Harmed Without A Stay.

An injunction is also warranted because Plaintiffs have shown that they (and their members) will be irreparably harmed without a stay, thus satisfying the second prong of the preliminary injunction analysis. *See Restaurant Law Center*, 66 F.4th at 597.

Absent immediate relief on their claims, Plaintiffs and their members will be forced to spend significant sums preparing to comply with this illegitimate Rule—money that cannot be

6

recovered.  That is because the Associations' members must begin immediately to undertake substantial expenses in preparation for the scheduled 2024 and 2025 mandatory compliance dates of the Rule.  *See* ECF No. 12-1, Exhibit A; ECF No. 12-2, Exhibit B; & ECF No. 12-3, Exhibit C.

For Rio Bank—like almost all of the TBA and ABA members, which are mostly community banks—this compliance activity will include professional staff time reviewing the 887-page final rule; engaging consultants and/or attorneys to advise on requirements and operational changes required to ensure compliance; searching for and purchasing new software (*e.g.*, loan origination software systems); integrating the new software with existing software and systems; updating existing computer systems; testing and validating systems; engaging vendors to assist with data quality control and analysis; developing forms and applications; training staff and third parties (*e.g.*, brokers); drafting new policies and procedures, and amending existing policies and procedures; conducting legal and compliance review; and hiring new employees.  ECF No. 12-2, Exhibit B at 2–3, ¶¶ 8–12.

The over-reaching Rule will force small and rural banks to reallocate with limited staff and resources for government reporting than lending in the community.  And this reallocation must begin now—not when the reporting deadline kicks in—because the banks need time to build and test systems and processes to capture and report the bulk data that the CFPB now demands in the Final Rule.  *See, e.g.*, ECF No. 12-2, Exhibit B at 2, ¶ 7.  In addition, federal and state financial regulatory authorities will, per standard examination practices, require the Association's members to show their progress toward identifying and initiating compliance with the Rule during examinations and other agency communications long before the compliance deadlines arrive.

The Fifth Circuit has long-recognized that "a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."  *Texas v. EPA*, 829 F.3d 405,

7

433 (5th Cir. 2016). Just so here. All these compliance costs—spent in service of a Rule that was improperly promulgated, *see Community Financial*, 51 F.4th at 642–43—are not recoverable. To be sure, the alleged compliance costs cannot be merely "speculative." *Louisiana*, 55 F.4th at 1035. But as Plaintiffs have shown, the costs here are real, imminent, and substantial. *See, e.g.*, ECF No. 12-1, Exhibit A at 3, ¶¶ 6–7; ECF No. 12-2, Exhibit B at 3, ¶ 11; & ECF No. 12-3, Exhibit C at 4, ¶ 10. Thus, even Plaintiffs' "purely economic costs may count as irreparable harm" because, as preparatory compliance costs, "they cannot be recovered in the ordinary course of litigation." *Restaurant Law Center*, 66 F.4th at 597 (quoting *Texas*, 829 F.3d at 434 & n.41).[6]

At the same time, there are impending non-economic harms at play here, too. Absent immediate relief, the Associations' community and mid-size bank members will be forced into a compliance regime that will drive some members out of the small business loan industry altogether. The result will be lost business for banks and, more importantly, lost borrowing opportunities for the very women and minority-owned businesses that Congress set out to help in the Dodd-Frank Act. All these harms are irreparable as well.[7]

---

[6] While the CFPB estimates the compliance costs to be less than those set forth by Plaintiffs, that argument is irrelevant to the preliminary injunction analysis here for two reasons. First, the CFPB conceded that there would be compliance costs that were significant enough to warrant passing them on to customers. Final Rule at 780. And "[Fifth Circuit] precedent requires only that alleged compliance costs be 'more than de minimus.'" *Rest. L. Ctr.*, 66 F.4th at 597 (quoting *Louisiana*, 55 F.4th at 1035). Second, the CFPB has also admitted that it failed to account in its analysis for the jump from collecting thirteen data points to collecting eighty-one data points. ECF No. 12 at 12 ¶ 51; Final Rule at 790. The proper analysis thus reveals a much larger amount than CFPB has initially published.

[7] In addition to these immediate harms, the CFPB's inability to control the type of information it seeks to gather through the Rule may also lead to further irreparable injury in the future. As noted in the Complaint, the Bureau recently had a data breach involving sensitive information on dozens of financial institutions and potentially hundreds of thousands of customers. ECF No. 12 at 15 ¶ 75. As of this filing, the Bureau has yet to even notify—much less rectify—those effected by the breach. Yet rather than seeking *less* sensitive information (related to things such as race, gender identity, etc.) from banks, the Rule is seeking *600% more* than Congress directed the agency to collect—information of the very type at issue in the CFPB's data breach.

### III. Granting An Injunction Serves The Public Interest.

The third and fourth prongs of the preliminary injunction analysis may be considered together as they overlap considerably and "merge when the Government is the opposing party." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015). In this case, Plaintiffs easily satisfy both.

Because the CFPB seeks to enforce an invalid rule, the balance of the equities leans heavily in Plaintiffs' favor. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("In contrast, a stay will do OSHA no harm whatsoever. Any interest OSHA may claim in enforcing an unlawful (and likely unconstitutional) [regulation] is illegitimate."). Additionally, the Fifth Circuit has recognized that once irreparable harm is shown, the government actor "need[s] to present *powerful* evidence of harm to its interests to prevent [the moving party] from meeting [the third prong of the preliminary injunction inquiry]." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012) (emphasis added). In this case, the Dodd-Frank Act that underpins the Rule was passed more than a decade before the Rule was promulgated. Given the delay of more than 10 years, there is *no* evidence—let alone "powerful evidence"—that a delay in implementing the unconstitutional Rule will harm CFPB's interests whatsoever.

At the same time, the final prong of the preliminary injunction analysis is met because the public interest is clearly "served by maintaining our constitutional structure." *BST Holdings*, 17 F.4th at 618. Moreover, given the pending resolution of the CFPB's funding question and the continued viability of the *Community Financial* precedent, the interests of judicial efficiency also weigh heavily in favor of a stay until at least such time as the Supreme Court definitively resolves the constitutionality of the CFPB's actions.

## CONCLUSION

The Motion for Preliminary Injunction should be granted.

May 26, 2023                    Respectfully submitted,

/s/ John C. Sullivan
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Counsel for Plaintiffs
*admitted pro hac vice*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(D), I hereby certify that I conferred with Kevin Friedl, Senior Counsel for the CFPB, by phone and email regarding this Motion. The parties were unable to reach an agreement on the relief sought in the Motion and thus Defendants oppose this Motion.

*/s/ John C. Sullivan*
John C. Sullivan

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on May 26, 2023, via the CM/ECF system and via email courtesy copy to Counsel for Defendants.

*/s/ John C. Sullivan*
John C. Sullivan

Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in 12-point Times New Roman font and is less than 25 pages.

*/s/ John C. Sullivan*
John C. Sullivan

Counsel for Plaintiffs
