IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK; and AMERICAN BANKERS<br>ASSOCIATION,<br><br>                  Plaintiffs,<br><br>       v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU and ROHIT CHOPRA, in his<br>official capacity as Director of the Consumer<br>Financial Protection Bureau,<br><br>                  Defendants. | Case No. 7:23-cv-00144 |

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A.    The Consumer Financial Protection Bureau ............................................... 2

    B.    Section 1071 of the Consumer Financial Protection Act of 2010 ............................ 2

    C.    The Bureau is sued for not having issued rules to implement Section 1071. ............ 4

    D.    The Bureau issues the Small Business Lending Rule implementing Section 1071... 4

    E.    The plaintiff bank and banking associations file this suit to challenge the Rule. ....... 6

LEGAL STANDARD................................................................................................ 8

ARGUMENT ........................................................................................................... 8

I.     Plaintiffs have not established their standing for preliminary relief or that venue is proper in this District. .................................................................................... 8

II.    Plaintiffs do not satisfy the factors necessary for preliminary relief. ................................. 12

    A.    Plaintiffs have not shown an imminent likelihood of irreparable injury. ............... 12

    B.    The balance of equities weighs against preliminary relief........................................ 18

    C.    A likelihood of success on the merits is not enough on its own to justify preliminary relief. ............................................................................... 20

III.    In the alternative, any preliminary relief should be appropriately tailored.......................... 21

    A.    Constitutional and equitable principles require that relief be limited to Plaintiffs. . 22

    B.    Any preliminary relief should terminate automatically upon a reversal in *CFSA*... 24

CONCLUSION........................................................................................................ 24

## INTRODUCTION

A section of the Dodd-Frank Act aims to help small businesses by requiring creditors to compile and report data about their small business lending, in accordance with rules issued by the Consumer Financial Protection Bureau. The Bureau issued those rules in March 2023.

A bank and two trade groups representing banks filed this suit challenging the Bureau's regulation, seeking to avoid—or at least delay—their obligations under the statute and the rule to gather data for the benefit of small businesses. Plaintiffs have moved for preliminary relief, asking the Court to effectively toll the time before they must begin complying with the rule until the Supreme Court decides *CFPB v. Community Financial Services Ass'n of Am., Ltd.*, No. 22-448 (U.S. cert. granted Feb. 27, 2023) ("*CFSA*"). That case, which will be heard next term, concerns the validity of the Bureau's statutory method of funding.

This Court should deny Plaintiffs' motion. Plaintiffs have failed to establish their standing for preliminary relief, including because they have not demonstrated that the individual bank plaintiff will have to comply with the rule at all. Plaintiffs also have not satisfied all four factors required for preliminary relief. Among other things, they have not shown that irreparable harm is imminent or that the balance of equities favors the requested relief, which would postpone implementation of the reporting requirements that Congress mandated more than a decade ago in the Dodd-Frank Act. And even assuming that Plaintiffs have shown a likelihood of ultimately succeeding on the merits—even though the Supreme Court has already agreed to review in *CFSA* the only decision that supports their merits argument—that factor standing alone would not be enough to warrant preliminary relief.

If the Court does not deny the motion, it should at least tailor the relief to apply only to those of Plaintiffs and their members who would be imminently harmed absent such relief.

1

## BACKGROUND

### A.  The Consumer Financial Protection Bureau

Congress established the Bureau in the Consumer Financial Protection Act of 2010 (CFPA)—Title X of the Dodd-Frank Act. *See* Pub. L. 111-203, 124 Stat. 1955. The CFPA generally tasks the Bureau with implementing and enforcing "Federal consumer financial law," a category that includes the Equal Credit Opportunity Act (ECOA). 12 U.S.C. § 5511(a)-(b); *id.* § 5481(14), (12)(D). The Bureau does so by, among other things, prescribing rules and issuing guidance to administer and carry out the purposes of these laws. *Id.* § 5512(b).

As it has long done for numerous other agencies and programs, Congress elected to fund the Bureau through the Bureau's organic statute rather than through annual spending bills. The Bureau's funds come from the receipts of the Federal Reserve System, of which the Bureau is a part. *Id.* § 5491(a). For fiscal years 2013 and later, Congress set the cap on the amount that the Bureau can draw at approximately $597.6 million, which is 12% of the total operating expenses of the Federal Reserve System as they were reported in 2009. *Id.* § 5497(a)(2)(A). The capped amount is adjusted annually only for inflation. *Id.* § 5497(a)(2)(B). In fiscal year 2022, the inflation-adjusted cap was approximately $734 million.

### B.  Section 1071 of the Consumer Financial Protection Act of 2010

Small businesses play a key role in fostering community development and fueling economic growth. Access to credit in turn is critical for helping small businesses get off the ground and prosper. However, data on loans to small businesses have historically been limited, making it difficult to answer even basic questions about the state of small business lending, such as whether small businesses are able to access the loans they need on terms that reflect their credit risk.

To address this issue, Congress amended ECOA through Section 1071 of the CFPA in order to set up a system for collecting and sharing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1955, 2056-59 (codified at 15 U.S.C. § 1691c-2). Section 1071's express purposes are to enable communities, governments, and creditors "to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and "to facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

As amended by Section 1071, ECOA requires financial institutions to gather certain information about their small business lending. *Id.* § 1691c-2(b), (e). Specifically, it directs them to compile, "in accordance with regulations of the Bureau," several enumerated data points such as the amount of credit applied for, the action taken on the application, the business's annual revenue, and (unless the applicant chooses not to provide this information) the race, sex, and ethnicity of the principal owners of the business. *Id.* § 1691c-2(e)(1)-(2), (c). It further requires that they collect "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." *Id.* § 1691c-2(e)(2)(H). Financial institutions must submit the data they gather to the Bureau each year. *Id.* § 1691c-2(f)(1). The Bureau must make public the data obtained, subject to deletions or modifications for privacy. *Id.* § 1691c-2(f)(2), (e)(4).

Section 1071 requires the Bureau to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to [Section 1071]." *Id.* § 1691c-2(g)(1). It further provides that the Bureau "may" issue rules "adopt[ing] exceptions to any requirement of [Section 1071]" or "exempt[ing] any financial institution or class of financial institutions from [those] requirements …, as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]." *Id.* § 1691c-2(g)(2).

**C.  The Bureau is sued for not having issued rules to implement Section 1071.**

By 2019, the Bureau had undertaken a number of pre-rule outreach efforts, including publishing a request for information about the small business lending market. *See* 82 Fed. Reg. 22318 (May 15, 2017). But owing to numerous other pressing obligations, including the need to complete other rulemakings required by the CFPA, the Bureau had not yet proposed rules to implement Section 1071.

Several nonprofit organizations and individuals sued the Bureau, seeking an order compelling the Bureau to issue the regulations. *See Calif. Reinvestment Coalition v. CFPB*, No. 4:19-cv-02572 (N.D. Cal. filed June 27, 2019) ("*CRC*"). That litigation resulted in a settlement under which the court ultimately directed the Bureau to issue a final rule by March 31, 2023. *See* Stipulated Settlement Agreement and Order, *CRC* (N.D. Cal. Feb. 20, 2020), ECF No. 53; Stipulation and Order, *CRC* (N.D. Cal. July 11, 2022), ECF No. 68.

**D.  The Bureau issues the Small Business Lending Rule implementing Section 1071.**

The Bureau issued the Small Business Lending Rule on March 30, 2023 via publication on its website. *See* 12 C.F.R. § 1074.1(a). The Rule appeared in the Federal Register on May 31. *See* 88 Fed. Reg. 35150. The Federal Register notice provides a thorough account of the small business lending market, the comments received on the Bureau's proposal, and the reasoning behind the final rule, among other relevant (and sometimes statutorily required) analysis. The regulatory text itself, however, is just six pages long. *See id.* at 35527-33.

The Rule clarifies the requirements under Section 1071 for financial institutions to compile and report data regarding covered applications for credit for small businesses, including

those that are owned by women and minorities.[1] Congress enumerated certain data points that must be compiled and reported, *see* 15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G), and further required financial institutions to gather "any additional data that the Bureau determines would aid in fulfilling the purposes of this section," *id.* § 1691c-2(e)(2)(H). The Rule sets out several additional data points (not all of which apply to every covered application) that the Bureau determined would aid in fulfilling the purposes of Section 1071. These include: the means by which the application was submitted; pricing information for credit transactions that are originated or approved but not accepted; and, for applications that are denied, the principal reasons for the denial. 88 Fed. Reg. at 35530 (to be codified at 12 C.F.R. § 1002.107(a)).[2]

The Rule further fills in Section 1071's requirements by providing definitions of key terms such as "covered credit transactions," "covered financial institutions," and "small business." *Id.* at 35529-30. It specifies how financial institutions can comply with Section 1071's

---

[1] The Rule does not require financial institutions to collect and report data regarding applications for women-owned and minority-owned businesses that are *not* small. Because more than 99 percent of women-owned and minority-owned businesses are small businesses, covering small businesses necessarily means nearly all women-owned and minority-owned businesses will also be covered. 88 Fed. Reg. at 35150.

[2] Plaintiffs try to inflate the supposed burden of the Rule with obvious stat-padding. They compare the 13 data points listed in Section 1691c-2(e)(2)(A)-(G) with the "81 separate data and subdata points" they claim the Rule requires. Mem. at 2. That is apples to oranges. The latter figure represents not the number of different categories of information that institutions need to gather but the number of *data fields* they will use when reporting that information to the Bureau. *Cf.* CFPB, Small Business Lending Rule: Data Points Chart, https://files.consumerfinance.gov/f/documents/cfpb_small-business-lending-data-points-chart.pdf. In order to transmit the information in a clear and usable format, institutions will in some cases use multiple data fields to report a single data point. For example, institutions will report the amount of credit applied for (1 data point) via 2 data fields: one indicating whether the applicant applied for a specific amount and a second reporting that amount. *See id.* at 6-7. Similarly, Section 1071 requires institutions to compile information about the race, sex, and ethnicity of the principal owners of an applicant-business (3 data points). Institutions will have 36 data fields they can use (as relevant) to transmit that information for up to four different principal owners. *See id.* at 34-35. The use of multiple fields to ensure data integrity is a technical feature of the reporting system and does not itself increase the substantive burden on institutions to gather additional information.

5

requirement that they keep in place a firewall between the demographic data they are required to collect and those employees who are involved in making determinations on covered applications. *Id.* at 35531; *see also* 15 U.S.C. § 1691c-2(d). And it sets forth both how financial institutions report lending data to the Bureau and how the Bureau intends to make available such information to the general public, subject to modifications to protect privacy. 88 Fed. Reg. at 35531-32.

The Rule has an effective date of August 29, 2023. *See id.* at 35533. That date determines when the Rule is published in the Code of Federal Regulations, but not when financial institutions must begin complying with the Rule. *That* question depends on the number of covered credit transactions that an institution originates to small businesses. The Rule sets out three tiers of compliance dates. Financial institutions that originate at least 2,500 covered transactions in 2022 and again in 2023 begin compliance on October 1, 2024 ("Tier 1"). *Id.* Institutions that originate at least 500 covered transactions in each of those two years but are not in Tier 1 begin compliance on April 1, 2025 ("Tier 2"). *Id.* Institutions that originate at least 100 covered transactions in each of those years and are not in Tiers 1 or 2 begin compliance on January 1, 2026 ("Tier 3"). *Id.* An institution is not covered by the Rule if it did not originate at least 100 covered transactions in each of the two preceding calendar years. *Id.* at 35529.

**E.  The plaintiff bank and banking associations file this suit to challenge the Rule.**

Plaintiffs the Texas Bankers Association (TBA) and Rio Bank, later joined by the American Bankers Association (ABA), filed this suit to challenge the Small Business Lending Rule and delay their obligations to gather and report small business lending data.

The banks allege that the Rule is invalid in light of current Circuit precedent as established in *Community Financial Services Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir.

2022), *cert. granted*, No. 22-448 (Feb. 27, 2023). *See* Am. Compl. ¶¶ 78-83.[3] In *CFSA*, the Fifth

Circuit held that the statutory provisions by which Congress funded the Bureau violate the

Appropriations Clause and, on that basis, vacated a regulation that the Bureau had issued (but

that had not yet gone into effect) while it was receiving such funding. 51 F.4th at 635-43. In

doing so, the Fifth Circuit recognized that "every [other] court to consider [the Bureau's] funding

structure has deemed it constitutionally sound." *Id.* at 641 & n.15 (citing, among numerous

others, *PHH Corp. v. CFPB*, 881 F.3d 75, 95-96 (D.C. Cir. 2018) (en banc), *abrogated on other

grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020)); *see also CFPB v. Law Offices of

Crystal Moroney, P.C.*, 63 F.4th 174, 181-83 (2d Cir. 2023) (rejecting similar challenge to

Bureau's funding and finding "no support" for the Fifth Circuit's holding "in Supreme Court

precedent," "the Constitution's text," or "the history of the Appropriations Clause").

    The Bureau filed a petition for a writ of certiorari asking the Supreme Court to review

and reverse the Fifth Circuit's unprecedented ruling. The Supreme Court granted the petition. It

will hear the case next term and is expected to issue a decision by June 2024.

    Plaintiffs' motion seeks an order providing that the Rule "is enjoined … from

enforcement" and "that all deadlines and corresponding preparation timeframes set forth in the

Rule to allow for compliance with the requirements thereof are stayed until" the Supreme Court

decides *CFSA*. Pls.' Proposed Order, ECF No. 13-2.

---

[3] Plaintiffs' Amended Complaint also includes several non-constitutional claims, *see* Am.
Compl. ¶¶ 84-110, but Plaintiffs do not rely on these claims in seeking preliminary relief and
have offered no argument that these claims are likely to succeed on the merits, *see* Pls.' Mem.
at 1 n.2. Because Plaintiffs have waived any such argument for purposes of this motion, the
Bureau does not address the substance of Plaintiffs' non-constitutional claims here.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* To show irreparable harm, the party must demonstrate "that the injury is imminent." *Texas v. Biden*, No. 3:21-cv-309, 2022 WL 18436750, at *1 (S.D. Tex. Oct. 20, 2022) (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)).

"A plaintiff must establish all four of those requirements, not just one or two." *Div. 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454, at *6 (S.D. Tex. Aug. 23, 2022); *accord Winter*, 555 U.S. at 21-24 (reversing preliminary injunction—without upsetting the lower court's determination that "plaintiffs have … established a likelihood of success on the merits"—where lower court applied wrong standard to irreparable injury and public interest weighed against relief); *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) ("[A] preliminary injunction … should not be granted unless the party seeking it has clearly carried the burden of persuasion *on all four requirements*." (emphasis added; quotation marks omitted)).

The same standard governs a request to stay agency action under 5 U.S.C. § 705. *See Texas v. Biden*, No. 2:21-cv-067, 2022 WL 17718634, at *10 (N.D. Tex. Dec. 15, 2022).

## ARGUMENT

I. **Plaintiffs have not established their standing for preliminary relief or that venue is proper in this District.**

Plaintiffs have not shown that they have standing to stay the Rule because the individual bank plaintiff has not established that it will be covered by the Rule and the two trade-association plaintiffs have not identified any member who would be covered.

8

"Plaintiffs always have the burden to establish standing." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported ... *with the manner and degree of evidence required at the successive stages of litigation*." *Id.* (emphasis added). "Because a preliminary injunction may only be awarded upon a clear showing that the plaintiff is entitled to such relief, the plaintiffs must make a clear showing that they have standing to maintain the preliminary injunction." *Id.* (quotation marks omitted). "Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations, [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence specific facts." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quotation marks omitted).

Plaintiff Rio Bank sues on its own behalf. To establish its standing, it must show that it "has suffered (1) an injury in fact, (2) that is fairly traceable to the defendant's challenged conduct, (3) which is likely to be redressed by a favorable judicial decision." *Texas v. United States*, 328 F. Supp. 3d 662, 690 (S.D. Tex. 2018). Rio Bank has failed to satisfy any of these elements because it has not "set forth by affidavit or other evidence specific facts" demonstrating that it is subject to the challenged Rule at all. *Cacchillo*, 638 F.3d at 404.

While Rio Bank says it is "fully covered by the CFPB Final Rule," Decl. of Ford Sasser ¶ 6, ECF No. 12-2 ("Sasser Decl."), it fails to support that conclusion with the specific facts needed for preliminary relief, *see Barber*, 860 F.3d at 352. Coverage under the Rule is determined by the number of "covered credit transactions" a financial institution originates in each of two consecutive years. *See supra* at 6; 88 Fed. Reg. at 35533 (to be codified at 12 C.F.R § 1002.114). Rio Bank says that it made "409 small business and agricultural loans" in 2022. Sasser Decl. ¶ 5. But Rio Bank fails to establish, or even allege, that any of these loans meet the

Rule's definition of covered credit transactions. *See* 88 Fed. Reg. at 35529 (to be codified at 12 C.F.R § 1002.104). And even assuming that at least 100 of the loans *were* covered transactions, Rio Bank would be covered by the Rule only if it also originates at least 100 covered transactions in 2023. Rio Bank does not assert that it has done so, or even that it expects to do so. Rio Bank's declaration therefore fails to establish that it will be subject to the Rule at all and so does not establish the bank's standing for preliminary relief.

Plaintiffs TBA and ABA are trade groups that do not identify any injury they themselves have suffered. They may nonetheless proceed on behalf of their members, under the doctrine of associational standing, if (among other things) they name a particular member that "would independently meet the Article III standing requirements." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (holding that Article III "require[s] plaintiff-organizations to make specific allegations establishing that at least one *identified member* had suffered or would suffer harm" (emphasis added)).

Neither TBA nor ABA offer any specific facts "establishing that at least one *identified member* ha[s] suffered or would suffer harm" as a result of the challenged Rule. *Summers*, 555 U.S. at 498 (emphasis added); *see also League of United Latin Am. Citizens v. Abbott*, No. 1:21-cv-1006, 2022 WL 1631301, at *6 (W.D. Tex. May 23, 2022) (decision by three-judge panel holding that associations lacked standing because, although they claimed to represent members harmed by redistricting plan, they had "identifie[d] none of those members with specificity"). Their declarations refer generically to unidentified "members," "member banks," and "survey respondents." *See* Decl. of Celeste M. Embrey, ECF No. 12-1 ("Embrey Decl."); Decl. of Virginia O'Neill

¶ 7, ECF No. 12-3 ("O'Neill Decl."). While that approach might suffice "*at the pleading stage,*" *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) (emphasis in original), it is not enough when seeking the extraordinary remedy of preliminary relief, *see Barber*, 860 F.3d at 352; *Cacchillo*, 638 F.3d at 404.[4]

At this point, a party cannot show standing merely by claiming that "some (unidentified) members" will suffer harm. *Summers*, 555 U.S. at 497-98; *see also Do No Harm v. Pfizer Inc.*, No. 1:22-cv-07908, 2022 WL 17740157, at *7-10 (S.D.N.Y. Dec. 16, 2022) (denying preliminary relief where the plaintiff association failed to name a specific member with standing and collecting cases from six different courts of appeals generally "reaffirm[ing] that at least one member must be named for associational standing"), *appeal pending*, No. 23-15 (2d Cir.); *cf. FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (holding that affidavit failed to demonstrate petitioner's standing because it did not specifically identify individuals harmed by the challenged ordinance). That would "make a mockery" of the requirement that Plaintiffs must show "that at least one *identified* member" has been harmed. *Summers*, 555 U.S. at 498 (emphasis added). And it would make it impossible for a court to fulfill its duty "to assure itself" of its jurisdiction and to "verify[] the facts upon which . . . standing depends." *Id.* at 499. Plaintiffs' approach of referring to unknown "member banks," leaves the Bureau (and the Court) with no way to test Plaintiffs' assertions.

Plaintiffs' failure to provide the details needed to establish standing deprives the Court of the ability to assess not only its jurisdiction, but the propriety of this Court as a venue. Plaintiffs' main basis for claiming that venue is proper in this District is that "Rio Bank … is located in this

---

[4] Although the Amended Complaint identifies Rio Bank as a member of TBA, *see* Am. Compl. ¶ 24, Plaintiffs have failed to establish that Rio Bank "would independently meet the Article III standing requirements," *Ctr. for Biological Diversity*, 937 F.3d at 536.

district and in this division." Am. Compl. ¶ 24 (citing 28 U.S.C. § 1391(e)(1)). Crucially, the

plaintiff on whom venue is based must have standing to sue. *See Immigrant Assistance Project of*

*the L.A. Cnty. Fed'n of Lab. v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002) ("The issue of

plaintiff Washington Association of Churches' standing is particularly important because it is the

only plaintiff, other than plaintiff John Doe 8, who is a resident of Washington and on whom,

therefore, venue in the Western District of Washington could be based."); *Cohen v. Smith*, 534 F.

Supp. 618, 622 (S.D. Tex. 1982) (holding "that plaintiff Cohen has standing to pursue this

action, and consequently, her residence can be considered for purposes of determining whether

venue is proper in this district"); *Ctr. for Biological Diversity v. Spellmon*, No. 21-cv-47, 2022

WL 3541879, at *3 (D. Mont. Aug. 18, 2022) ("When venue is based [on] a plaintiff's residence,

that particular plaintiff must have standing to bring the claims asserted."). Because Plaintiffs do

not meet their burden to establish that any Plaintiff residing in this District has standing, they

also have not shown that venue is proper here.

## II.    Plaintiffs do not satisfy the factors necessary for preliminary relief.

Even if Plaintiffs had established standing, the Court should deny their motion because

they have not clearly carried their burden on all four elements needed for preliminary relief.

### A.  Plaintiffs have not shown an imminent likelihood of irreparable injury.

To secure preliminary relief, Plaintiffs must demonstrate that they are likely to suffer

irreparable injury without it. Such injury must be "actual and imminent"—not "speculative []or

remote." *W. Alabama Quality of Life Coal. v. Fed. Highway Admin*., 302 F. Supp. 2d 672, 683-

84 (S.D. Tex. 2004); *accord United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) ("[A]

preliminary injunction will not be issued simply to prevent the possibility of some remote future

injury. A presently existing actual threat must be shown."). "Importantly, … conclusory and

vague allegations are not sufficient to show entitlement to injunctive relief." *Bush v. Monroe*, No. 6:17-cv-541, 2017 WL 9989140, at *2 (E.D. Tex. Dec. 4, 2017) (collecting cases), *report and recommendation adopted*, 2018 WL 3729765 (E.D. Tex. Aug. 5, 2018).

None of the three plaintiffs has provided specific evidence establishing a likelihood that they will be imminently harmed without preliminary relief.

*1. Rio Bank*

As described above, Rio Bank has not put forward the facts necessary to show that it will be covered by the Rule in the first place. For this reason alone, it has failed to demonstrate that irreparable injury is likely without the relief it seeks.

Even assuming that the bank will be subject to the Rule—which would require that at least 100 of the loans it made in 2022 were covered transactions and that it also makes at least 100 covered transactions in 2023—under the Rule's three-tiered compliance regime, Rio Bank would not be required to begin compliance until January 1, *2026*. *See* 88 Fed. Reg. at 35533 (to be codified at 12 C.F.R. § 1002.114(b)(3)).

Rio Bank bears the burden in this case to identify a specific irreparable injury that is "imminent" without preliminary relief. It could not, for example, justify preliminary relief in 2023 by pointing to an expense that it expected to incur in 2025. Yet Rio Bank's declaration fails to meet its burden to identify any specific cost that the bank is actually required to incur *now* in order to be able to begin complying with the Rule in January 2026.

The bank states that it "has already commenced compliance preparations" and that these preparations have resulted and will continue to result in "employee costs." Sasser Decl. ¶¶ 7-8. It estimates that the cost of (unspecified) "employee and supervisory time" will be at least $20,000 for the remainder of 2023. Sasser Decl. ¶ 11. But, again, Rio Bank does not explain why it

necessary to expend those resources now rather than later on. That matters here because it is fundamental that "self-inflicted harm is not irreparable." *Texas v. EPA*, No. 3:23-cv-17, 2023 WL 2574591, at *10 (S.D. Tex. Mar. 19, 2023) (citing *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021)), *appeal pending*, No. 23-40306 (5th Cir.); *accord* Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."). Rio Bank is not entitled to preliminary relief based on asserted injuries that it has made no effort to show could not be deferred until later—assuming that Rio Bank will be required to comply at all.[5]

### 2. Texas Bankers Association

TBA fares no better. Its declaration states that it recently polled its members and that some said they "must begin collecting … [small business lending] data … by June 2024" and some that they "are about to incur direct economic injuries caused by the promulgation of the Final Rule." Embrey Decl. ¶¶ 4(b), 6. TBA further states that "[c]onsumer compliance experts"—only one of which it identifies—have advised some banks to begin preparing for the Rule immediately and that these preparations will require things like "forms," "flowcharts," and "signage." *Id.* ¶ 5. TBA estimates that its member banks will incur costs of "approximately $100,000" each preparing to comply with the Rule. *Id.* ¶ 7. TBA does not suggest that it itself will be irreparably harmed by the Rule.

---

[5] Rio Bank appears to assert in one paragraph that its eventual compliance costs will "exceed $250,000" and in another paragraph that they will "amount to around $100,000." Sasser Decl. ¶¶ 10, 12. These conclusory estimates are undermined not only by their inconsistency but by Rio Bank's failure to support them with any specifics. And because Rio Bank does not even suggest that these figures reflect its immediate costs, they do nothing to satisfy Rio Bank's burden to identify some specific irreparable harm that would be "imminent" without preliminary relief. For much the same reason, the Bureau's estimate in the Rule of the "overall … one-time costs for depository institutions" does not help Rio Bank meet its burden to identify costs it must incur now in order to comply with the Rule in 2026. *See* 88 Fed. Reg. at 35509 (cited in Mem. at 4).

TBA's generalized and conclusory assertions do not satisfy its burden to establish imminent irreparable injury. TBA does not identify any particular member bank that it believes is facing irreparable harm. *Cf. Summers*, 555 U.S. at 498. It does not identify any specific costs that a member bank is currently incurring. It does not attempt to quantify the amount of such currently incurred costs. It does not attempt to establish that it is necessary for the bank to incur those costs now, as opposed to at some point in the future. Nor does it explain why any member bank would need to begin collecting the required lending data "by June 2024," Embrey Decl. ¶ 4(b), when the first compliance date is not until October 2024.

TBA comes closest to offering specifics when it lists some categories of "start-up processes" that banks may need to prepare for the Rule. *Id.* ¶ 5. But even here, TBA falls short. The "processes" it lists are simply generic nouns offered without explanation (*e.g.*, "forms," "videos," "matrices"). TBA, again, does not tie these "processes" to any specific requirements in the Rule or attempt to estimate their costs. TBA does not even directly aver that its members will need to incur these costs; it merely notes that "compliance experts" (only one of which TBA even identifies) have listed these items as part of their "standard recommendations" (which TBA does not provide) to "their bank customers" (none of which TBA identifies). *Id.*

These kinds of "conclusory and vague allegations are not sufficient to show entitlement to injunctive relief." *Bush*, 2017 WL 9989140, at *2; *see also, e.g.*, *Coleman v. Bank of New York Mellon*, No. 3:12-cv-04783, 2013 WL 1187158, at *8-9 (N.D. Tex. Mar. 4, 2013) (denying preliminary injunction and holding that "Plaintiff's unsupported, conclusory statements, even though verified under oath, are not sufficient to show entitlement to preliminary injunctive relief"), *report and recommendation adopted*, 2013 WL 1189264 (N.D. Tex. Mar. 21, 2013); *Consol. Restaurant Operations, Inc. v. Nat'l Processing Co., LLC*, No. 3:02-cv-1278, 2002 WL

1432469, at *5 (N.D. Tex. June 28, 2002) (dissolving temporary restraining order where "allegations of irreparable harm … [we]re conclusory in nature" and the movant "failed to provide th[e] court with any specific evidence"). This Court has rightly cautioned against simply "presum[ing]" any of the elements required for preliminary relief. *Sheffield v. Bush*, 604 F. Supp. 3d 586, 610 (S.D. Tex. 2022). Instead, "each must be established separately." *Id.* TBA has not done so here.

### 3. American Bankers Association

ABA offers somewhat more specifics but likewise fails to carry its burden—let alone to "clearly" do so. Its declaration describes a survey of its members conducted after the Bureau's notice of proposed rulemaking. O'Neill Decl. ¶ 7. It lists several obligations that its members reported they would incur in preparing to comply with the rule and estimates the cost of certain one-time implementation expenses. *Id.* ABA further states that it "has advised its members to begin implementation immediately" and that some unidentified members have begun doing so. *Id.* ¶ 9-10. Like its co-plaintiffs, however, ABA fails to identify any specific costs that any particular member bank is required to incur now, as opposed to in the future. (And ABA, like TBA, does not claim that the Rule will cause *it* any irreparable harm.) For much the same reasons described above, ABA thus has not carried its burden to show that irreparable harm is imminent without an injunction.

Like the requirement that plaintiffs must provide facts sufficient to demonstrate their standing, the requirement that ABA and its co-plaintiffs come forward with specific evidence of imminent irreparable harm is no mere formality. Without "specific details regarding the extent to which [a plaintiff's] business will suffer," courts have no way to meaningfully "evaluate the nature and extent of the alleged irreparable injury." *Calif. Ass'n of Priv. Postsecondary Sch. v.*

*DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018). For example, ABA's failure to identify a specific member bank deprives both the Bureau and the Court of information necessary to determine when the bank will be required to comply with the Rule and thus to evaluate its claims of imminent harm. Similarly, the failure to quantify any specific costs that an identified bank must incur *now* makes it impossible to assess whether any such expenses are "more than de minim[i]s," as Plaintiffs themselves recognize they are required to show. Mem. at 8 n.6 (quoting *Restaurant Law Ctr. v. Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023). To be sure, Plaintiffs need not "convert each allegation of harm into a specific dollar amount." *Restaurant Law Ctr.*, 66 F.4th at 600. But they do need to provide facts sufficient to demonstrate that irreparable harm is imminent without the extraordinary relief they seek.

Plaintiffs' motion strays even further from the facts when it asserts in passing that, "[a]bsent immediate relief," ABA's members (and TBA's) "will be forced into a compliance regime that will drive some members out of the small business loan industry altogether." Mem. at 8. That *ipse dixit* is unsupported by any citation or by anything in Plaintiffs' declarations. For that reason alone, the Court should simply discount it. What's more, the Bureau specifically considered this claim when it promulgated the Rule and found "little evidence to indicate that lenders would exit the small business credit market." 88 Fed. Reg. at 35514-15. Among other reasons for that conclusion, just one lender stated during the comment period that it "might consider" exiting the market, and a survey of financial institutions found that "no longer offer[ing] small business credit" was the *least* likely action (among seven options that were

provided) that financial institutions said they expected to take in response to the compliance costs of implementing Section 1071. *Id.* at 35513-15.[6]

### B. The balance of equities weighs against preliminary relief.

Two factors—whether the balance of equities tips in the movant's favor and whether an injunction is in the public interest—"merge when the federal government is the opposing party." *Div. 80, LLC*, 2022 WL 3648454, at \*2. These factors to not support preliminary relief here.

Congress enacted Section 1071 more than a decade ago—in the wake of a financial crisis that hit small businesses and small business lending particularly hard, *see* 88 Fed. Reg. at 35153—in order to help small businesses by increasing transparency in the small business lending market and facilitating equal access to credit. 15 U.S.C. § 1691c-2(a). As noted above, the statute requires financial institutions to compile and report key information about applications for credit from small businesses. *Id.* § 1691c-2(b), (e)-(f). It further requires the Bureau to issue rules to implement Section 1071's requirements. *Id.* § 1691c-2(g)(1). The Bureau did so when it issued the Small Business Lending Rule, which allows financial institutions to understand and meet the requirements in Section 1071.

---

[6] Plaintiffs also claim concern about "further irreparable harm in the future" if the data they gather and report to the Bureau were to someday be the subject of a data breach. Mem. at 8 n.7. The Bureau takes its data-security obligations seriously and maintains a comprehensive cybersecurity program to safeguard Bureau systems and the data maintained on those systems. Moreover, the statute and Rule specifically forbid financial institutions from compiling and reporting names, addresses, or any other personally identifiable information concerning individuals who are or are connected with small business applicants, beyond what is expressly required by the statute or Rule. *See* 15 U.S.C. § 1691c-2(e)(3); 88 Fed. Reg. at 35532 (to be codified at 12 C.F.R. § 1002.111(c)). What matters here, however, is that Plaintiffs' purported concern involves wholly speculative and remote injuries of the kind that Plaintiffs themselves acknowledge are not enough to justify preliminary relief. *See* Mem. at 8; *see also, e.g.*, *W. Alabama Quality of Life*, 302 F. Supp. 2d at 683-84.

By challenging that Rule, Plaintiffs seek to avoid—or at least postpone—their obligations not only under the Rule (which they claim is invalid) but under Section 1071 itself (the validity of which not even they dispute). The balance of equities weighs against that delay. There is a strong public interest in Section 1071's requirements coming into effect without undue delay so that they may begin producing the benefit for small businesses—and the communities those businesses serve—that Congress intended. *See, e.g.*, 88 Fed. Reg. at 35503-07 (describing myriad benefits of the Rule to small businesses, financial institutions, and others, including "help[ing] creditors identify potentially profitable opportunities to extend credit" and allowing communities to "identify gaps in access to credit for small businesses"); *cf. Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."). While Plaintiffs note that the statute "that underpins the Rule was passed more than a decade [ago]," Mem. at 9, they get the import of that fact exactly backwards. Past delay in the standing up of the data-sharing regime that Congress mandated counsels *against*—not in favor of—the further delay that Plaintiffs seek.

Because Plaintiffs seek preliminary relief to excuse themselves and their members from having to comply not only with the Rule but with indisputably valid statutory requirements, this case is materially different from *BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021), on which Plaintiffs rely, *see* Mem. at 9. That case involved a challenge to an OSHA emergency work standard that the court held was likely invalid. The court stayed the standard, explaining that there would be no harm to the public interest if the agency could not enforce an invalid standard. *BST Holdings*, 17 F.4th at 618-19. In contrast, the public interest plainly *would* be harmed if Plaintiffs here were able to secure preliminary relief that delayed by as long as one

19

year their obligations to comply with statutory requirements that not even they suggest are

invalid and that do not themselves implicate any constitutional (or other) concern.

### C.  A likelihood of success on the merits is not enough on its own to justify preliminary relief.

In seeking preliminary relief, Plaintiffs rely solely on their claim that the method by

which Congress chose to fund the Bureau's operations violates the Appropriations Clause and

that, because the Bureau drew and spent money pursuant to that congressional authorization in

issuing the Small Business Lending Rule, the Rule is invalid. *See* Mem. at 6.

Plaintiffs' funding argument tracks the Fifth Circuit's holding in *CFSA*. While the Bureau

recognizes that this Court is bound by the decision in *CFSA*, it respectfully maintains that that

decision—like Plaintiffs' argument based on that decision—is mistaken, and the Bureau has

urged the Supreme Court to reverse. *See generally* Br. for Pets., *CFSA*, 2023 WL 3385418.

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury,

but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The

"command of the Appropriations Clause" is "straightforward and explicit": "'It means simply

that no money can be paid out of the Treasury unless it has been appropriated by an act of

Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v.

United States*, 301 U.S. 308, 321 (1937)). That "straightforward and explicit" command was

satisfied when Congress appropriated money for the Bureau by passing a statute authorizing the

Bureau to spend money on its operations and making a source of funds available for it to do so.

Plaintiffs, following *CFSA*, go further astray in arguing that any issue with the Bureau's

funding would undermine the validity of the Rule. For example, they object to particular portions

of the Bureau's funding provisions, *see* Am. Compl. ¶ 33 (quoting 12 U.S.C. § 5497(b)(1)), but

fail to consider whether those pieces could simply be severed from the rest of the funding

provisions in Section 5497, *see* 12 U.S.C. § 5302 (providing that if "any provision of this Act" is "held to be unconstitutional," "the remainder of this Act" should "not be affected"). Plaintiffs also offer no explanation why traditional remedial principles would justify unwinding past Bureau actions (including the Rule) when such an order would not cure the supposed Appropriations Clause violation by, for example, returning any money to the federal fisc.

In any event, merely establishing a likelihood of success on the merits is not enough, on its own, to justify preliminary relief. *See, e.g.*, *Winter*, 555 U.S. at 21-24; *Div. 80, LLC*, 2022 WL 3648454, at *6 (denying preliminary injunction where plaintiff "seem[ed] convinced it has made a good case for its likelihood to succeed on the merits, and that that should be enough"). (And that is particularly true when the Supreme Court has already agreed to review the sole decision supporting Plaintiffs' claim.) Instead, Plaintiffs must "clearly carr[y] the burden of persuasion on all four requirements." *PCI Transp., Inc.*, 418 F.3d at 545 (quotation marks omitted). They have not done so here.

## III.    In the alternative, any preliminary relief should be appropriately tailored.

Plaintiffs seek preliminary relief in the form of an injunction against the Rule that would stay its compliance dates—thus effectively tolling the compliance period set out in the Rule—until the Supreme Court issues its decision in *CFSA*. The Bureau vigorously disputes that Plaintiffs have established their standing or the elements needed to justify preliminary relief. If the Court were to disagree, however, and conclude that Plaintiffs have carried their burden, then (and only then) the form of preliminary relief that Plaintiffs have requested—an order that tolls the obligation to comply with the Rule until *CFSA* is decided—would be appropriate so long as it is properly tailored to Plaintiffs and to the substantive claim they have relied on here.

**A.  Constitutional and equitable principles require that relief be limited to Plaintiffs.**

Plaintiffs appear to request relief that would extend far beyond themselves and their members. *See* Pls.' Proposed Order at 2 (asking that "all deadlines and corresponding preparation timeframes set forth in the Rule to allow for compliance … are stayed"). Yet there is no dispute that preliminary relief limited solely to those Plaintiffs who have shown an entitlement to it—*i.e.*, a stay of the Rule's compliance dates applicable only to such Plaintiffs and their members—would fully remedy any injury to Plaintiffs. Both Article III standing requirements and basic equity principles thus require that any relief in this case be so limited.

An Article III court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018). Thus, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *id.* at 1934, and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Universal relief of the kind Plaintiffs apparently seek is inconsistent with these Article III and traditional equitable limits.

Universal relief also "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring) (lamenting the "gamesmanship and chaos" created by "conflicting nationwide injunctions"); *Arizona v. Biden*, 31 F.4th 469, 483-85 (6th Cir. 2022) (Sutton, J., concurring) (explaining that "universal remedies … seem to take the judicial power beyond its traditionally understood uses" and "create practical problems").

22

The Fifth Circuit recently came to a similar conclusion in granting a partial stay of a preliminary-injunction order, prohibiting application of that order outside the boundaries of the plaintiff states that had sought relief. *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021). In doing so, the panel explained that "[p]rinciples of judicial restraint" counseled against granting relief to non-parties. *Id.* at 263. And the court of appeals specifically distinguished the nationwide injunction that it had affirmed in *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), as having been based on a "constitutional uniformity principle" unique to immigration law, as well as "that case's concern that patchwork rulings would undermine an injunction limited to certain jurisdictions." *Louisiana v. Becerra*, 20 F.4th at 263-64.

The concerns at issue in *Texas v. United States* are not present here. Nor would any other consideration in this case warrant granting relief that is any broader than necessary to remedy Plaintiffs' claimed injuries to themselves and their members. *See Div. 80, LLC*, 2022 WL 3648454, at *5 (holding that even if the plaintiff had shown an entitlement to an injunction, "it has failed to explain why that relief must be nationwide in scope"); *Texas v. EPA*, No. 3:23-cv-17, 2023 WL 2574591, at *12-13 (S.D. Tex. Mar. 19, 2023) (rejecting request for nationwide injunction and emphasizing that "the circumstances must justify an injunction's scope"); *VanDerStok v. Garland,* No. 4:22-cv-00691, 2022 WL 4809376, at *2, 10 (N.D. Tex. Oct. 1, 2022) (rejecting "invitation to issue a nationwide injunction" and explaining that "a broad injunction would far exceed the 'particular' tailoring necessary to redress [Plaintiffs'] injuries and afford them complete relief" (quoting *Gill*, 138 S. Ct. at 1934)), *appeal pending*, No. 22-11071 (5th Cir.); *Texas v. Becerra*, 623 F. Supp. 3d 696, 738-39 (N.D. Tex. 2022) (concluding that "the circumstances do not justify or require a nationwide injunction" and explaining that the court would "follow Fifth Circuit precedent and limit the injunction based on the parties, issues,

23

and evidence before it" (citing *Louisiana v. Becerra*, 20 F.4th at 263-64)), *appeal pending*, No. 22-11037 (5th Cir.).

Thus, if the Court were to grant Plaintiffs' request and toll the compliance period under the Rule, it should do so only with respect to those Plaintiffs or their members who Plaintiffs have shown would be irreparably harmed without such relief. For example, if the Court were to conclude that Rio Bank—but not the two trade associations—had shown irreparable harm, it should toll the compliance period only as to Rio Bank (or, at the very most, stay only the Tier 3 compliance date that might apply to Rio Bank).

**B.  Any preliminary relief should terminate automatically upon a reversal in *CFSA*.**

As noted, the sole argument that Plaintiffs put forward to satisfy the success-on-the-merits element concerns their claim that, per *CFSA*, the Bureau's funding is invalid and somehow renders the Rule invalid as well. It follows that any preliminary relief the Court might order depends entirely on the continued vitality of that claim. Thus, if the Supreme Court reverses either the Fifth Circuit's merits or remedial analysis in *CFSA*, any preliminary relief in this case should expire automatically with that decision. The onus would then be on Plaintiffs to show their entitlement to any additional preliminary relief.

Appearing to recognize this logic, Plaintiffs' Proposed Order asks that the Rule's compliance obligations be stayed only "until after the Supreme Court's final decision" in *CFSA*. The Bureau respectfully submits that, should the Court order preliminary relief, it should make explicit that the relief will expire automatically upon a reversal of the Fifth Circuit in *CFSA*.

**CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' motion.

Dated:  June 16, 2023                                  Respectfully submitted,

24

*/s/ Kevin E. Friedl*

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*

Kevin E. Friedl (NY #5240080)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9268 (phone)
(202) 435-7024 (facsimile)
kevin.friedl@cfpb.gov

25

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2023, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kevin E. Friedl*
Kevin E. Friedl