IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**ORAL ARGUMENT AND HEARING
REQUESTED**

**REPLY BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii
ARGUMENT ........................................................................................................................................ 2
   I. Plaintiffs Plaintiffs Have Shown Injury Sufficient to Confer Standing. .................................. 2
   II. Plaintiffs Meet the Criteria for a Preliminary Injunction—Including Showing Irreparable Harm. ............................................................................................................................................... 8
   III. Fifth Circuit Caselaw Directs the Remedy in this Case. ...................................................... 12
CONCLUSION ................................................................................................................................... 13
CERTIFICATE OF SERVICE .......................................................................................................... 15
CERTIFICATE OF COMPLIANCE ................................................................................................ 15

## TABLE OF AUTHORITIES
**Cases**

*Advocates for Highway & Auto Safety v. F. Motor Carrier Safety Admin.*,
   41 F.4th 586 (D.C. Cir. 2022) ................................................................................ 11

*AFPF v. Bonta*,
   141 S. Ct. 2373 (2021) ........................................................................................... 6

*American Trucking Associations, Inc. v. Federal Motor Carrier Safety Admin.*,
   724 F.3d 243 (D.C. Cir. 2013) ................................................................................ 5

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Medical Board*,
   627 F.3d 547 (5th Cir. 2010) ................................................................................ 11

*Cacchillo v. Insmed*,
   638 F.3d 401 (2d Cir. 2011) ................................................................................... 3

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) .............................................................................................. 13

*Church of Scientology of Calif. v. Cazares*,
   638 F.2d 1272 (5th Cir. 1981) ................................................................................. 5

*Community Financial Services Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022), *cert. granted*, No. 22-448 (Feb. 27, 2023) .................. 1, 12, 13, 14

*Congress of Racial Equality v. Douglas*,
   318 F.2d 95 (5th Cir. 1963) .................................................................................... 5

*Ctr. for Biological Diversity v. EPA*,
   937 F.3d 533 (5th Cir. 2019) .................................................................................. 7

*DHS v. Regents of the Univ. of Calif.*,
   140 S. Ct. 1891 (2020) ........................................................................................... 6

*Doe v. Stincer*,
   175 F.3d 879 (11th Cir. 1999) ................................................................................ 5

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) .............................................................................. 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .............................................................................................. 4

*Hunter v. Branch Banking & Tr. Co.*,
   No. 3:12-cv-2437-D, 2013 WL 4052411 (N.D. Tex. Aug. 12, 2013) ....................... 6

*Int'l Bhd. Of Teamsters v. U.S. Dep't of Transp.*,
   724 F.3d 206 (D.C. Cir. 2013) .................................................................................................. 5

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................................. 7

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .................................................................................................................. 4

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) .................................................................................................................. 6

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C.) ................................................................................................... 6

*New York v. U.S. Dep't of Comm.* (*Census Case*),
   351 F.Supp.3d 502 (S.D.N.Y. 2019) ......................................................................................... 6

*Restaurant Law Center v. Dept. of Labor*,
   66 F.4th 593 (5th Cir. 2023) .............................................................................................. 10, 11

*Retired Chi. Police Ass'n v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993) ........................................................................................................ 6

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ................................................................................................ 3, 4

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) .............................................................................................................. 5, 7

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................................................................ 10, 11, 12

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .................................................................................................. 13

*Three Expo Events, LLC v. City of Dallas*, 907 F.3d 333, 341 (5th Cir. 2018) .............................. 7

**Rules**

Small Business Lending under the Equal Credit Opportunity Act (Regulation B),
   Consumer Financial Protection Bureau, 12 C.F.R. § 1002 (2023) ("Final Rule") ............ *passim*


**Other Authorities**

*Bank Listing*, Texas Bankers Association,
https://www.texasbankers.com/TBA/TBA_Store/Bank_Listing.aspx?WebsiteKey=9f18097c-5001-4795-8b22-1b51e3842096 ................................................................................................................ 8

*ABA Members Offering Bank On-Certified Accounts*, American Bankers Association,
https://www.aba.com/banking-topics/consumer-banking/inclusive-banking/bank-on/bank-on-members ................................................................................................................................................ 8

*Small Business Lending Rule, Small Entity Compliance Guide*, Consumer Financial Protection Bureau (May 2023),
https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_small-business-lending-rule_small-entity-compliance-guide.pdf ......................................................................... 9

The Consumer Financial Protection Bureau ("CFPB") concedes that this case is controlled by the Fifth Circuit's ruling in *Community Financial Services Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, No. 22-448 (Feb. 27, 2023). But despite the looming questions of the Bureau's constitutionality hanging over the agency, the CFPB pushed ahead with a massive new regulation (hereafter, "Final Rule")—a Rule that outpaces the statute exponentially.[1]

The CFPB also concedes that the Final Rule will force the creditors standing behind the small business market to spend millions of dollars to change the way they are making loans. Final Rule at 752–64. The necessary changes to reporting, software, compliance training, and related tasks must be undertaken immediately and are already resulting in substantial costs to both the banks represented here and others across the country. But when asked to pause the Rule for the Supreme Court to decide *Community Financial* without the regulated community potentially wasting millions of dollars, the Bureau's (incredible) answer is "no." The disregard for the Fifth Circuit's ruling is apparent. Defendants are intent on compelling regulated entities to spend millions of dollars on compliance costs for an invalid Rule—money that will be squandered if the Supreme Court affirms the Fifth Circuit in *Community Financial*.[2]

Recognizing that the Final Rule at issue fails under binding precedent and must therefore be enjoined, the CFPB is left primarily with complaints about how Plaintiffs described their harms. Defendants' arguments challenging both standing and the irreparable harm element of the preliminary injunction test ring hollow, however, in the face of both the facts of the case and common sense. Not only have Plaintiffs already adequately established their immediate and

---

[1] 88 *Fed. Reg.* 35150 (May 31, 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf.

[2] Those costs will also be wasted if Plaintiffs succeed on their challenge to the Final Rule under the Administrative Procedure Act. Those claims were not included in the Motion for Preliminary Injunction since Plaintiffs unquestionably succeed on the merits of the constitutional claim made under *Community Financial*, but Plaintiffs still seek to enjoin the Final Rule under the APA.

irreparable harms, the CFPB should not be heard to argue that a Rule it admits will lead to significantly increased compliance costs for banks across the country would somehow not apply to Plaintiffs and their members. The CFPB's own words demonstrate that the costs for implementing the new Final Rule are substantial and immediate. *See* Final Rule at 780 ("[T]he Bureau notes in part IX.F.4 above that it expects the variable portion of ongoing costs to be passed on to small business credit borrowers in the form of higher interest rates and fees."). And unlike the environmental standing cases that the Bureau relies on, there is no danger of the harm here not applying directly Plaintiffs or that this Court might somehow be unable "to test Plaintiffs' assertions." Resp. Br. at 11. Plaintiffs have demonstrated real and immediate harms warranting an injunction, and Defendants' arguments should be seen for what they are—a transparent attempt to allow the Bureau to continue pressing forward with implementation of a void Rule that will cause irreparable harm to those the Bureau *already knows* will be injured.

## ARGUMENT

As shown in Plaintiffs' Motion for a Preliminary Injunction and Memorandum in Support, Plaintiffs meet each of the four prongs set forth by the Supreme Court for evaluating a request for a preliminary injunction. In response, Defendants offer three primary arguments against the motion: (1) a supposed lack of standing; (2) a theoretical lack of irreparable harm; and (3) a plea for this Court to narrow the relief requested. Controlling precedent defeats each of these claims.

**I.     Plaintiffs Have Shown Injury Sufficient to Confer Standing.**

The CFPB first attempts to dodge accountability for enforcement of the flawed Final Rule by challenging Plaintiffs' standing. Defendants assert (at 9–10) that Rio Bank lacks standing because it did not state that "it expects to [originate at least the regulatory minimum of 100 covered transactions in 2023]," and that Plaintiffs Texas Bankers Association and American Bankers Association ("Bankers Associations") lack "associational" standing since they have not named a

particular member that "would independently meet the Article III standing requirements." Both arguments fail, though. "At the preliminary injunction stage, the movant must clearly show only that each element of standing is *likely* to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (emphasis added). Plaintiffs have far surpassed that bar.

First, it is difficult to understand how the CFPB can argue Rio Bank's standing, regardless of whether the Bank said the magic words that it will make more than 100 covered loans in 2023. *See* Resp. Br. at 9. The Bank's CEO directly stated that the Bank is "fully covered by the CFPB Final Rule which is the subject matter of this civil action." ECF No. 12-2, Exhibit B at 2, ¶ 6. And in explaining why it is "fully covered" by the Rule, Rio Bank noted the specific fact that it made 409 of the relevant loans in 2022. Logically, the Bank could only be fully covered by the Final Rule if it was going to continue making the requisite number of loans, both in 2023 and beyond. ECF No. 12-2, Exhibit B at 2, ¶ 5.

Rio Bank's CEO also testified that "costs have already been incurred and will continue to be incurred throughout the implementation period . . . as a consequence of the implementation dates established under the Final Rule." ECF No. 12-2, Exhibit B at 2, ¶¶ 7–8. This includes spending "at least $20,000.00" in the remainder of this year on the "cost[s] of employee and supervisory time alone." *Id.* at 3, ¶ 11. The Bank is spending real dollars in 2023 as a direct consequence of the Final Rule. That is known as "injury in fact" (*i.e.*, harm) everywhere outside of the CFPB and the Bureau's creative challenge to Rio Bank's standing may be easily rejected.[3]

Second, the CFPB is also wrong concerning the ability of both the Texas Bankers Association and the American Bankers Association to bring this case on behalf of their members.

---

[3] Tellingly, CFPB's authority does not support its argument. Citing a Second Circuit case, Defendants complain that Rio Bank did not offer "specific facts" to support its standing. Resp. Br. at 9 (citing *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)). Yet Rio Bank provided a signed declaration—as *Cacchillo* suggests—detailing precise costs the Final Rule will force the Bank to incur, both now and in the future. ECF No. 12-2 at 2–3, ¶¶ 8–12.

3

Associations can sue on behalf of their members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Associational standing exists if the organization has a member with standing, the lawsuit is germane to an organization's mission, and the relief sought makes the members' participation unnecessary. *Id.* at 342–43. Defendants dispute only the first requirement. *See* Resp. Br. at 10. But the Bankers Associations meet that requirement if, for any one of their members, they can show injury, causation, and redressability. *Speech First*, 979 F.3d at 330; *see Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("Only one [plaintiff] needs to have standing.").

The Bankers Associations easily made the required showing. Their members—which include Rio Bank—comprise a wide swath of industry that must comply with regulations promulgated by the CFPB, including the Final Rule. ECF No. 12-1, Exhibit A at 2, ¶ 3; ECF No. 12-3, Exhibit C at 2, ¶ 5. Members are directly harmed because implementation of the Final Rule imposes heavy compliance costs on them. ECF No. 12-1, Exhibit A at 2, ¶¶ 3–4; ECF No. 12-3, Exhibit C at 2–4, ¶¶ 7–10 (detailing how members establish harm, causation, and redressability). That injury would undoubtedly be redressed by abrogation of the Final Rule. Because such a lawsuit "is germane to the organization[s'] purpose"—which involves regulatory policy advocacy on behalf of financial institutions—the Bankers Associations have standing to sue for injunctive and declaratory relief on their members' behalf. *See Int'l Bhd. Of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211 (D.C. Cir. 2013) (finding associational standing when regulatory action causes economic harm to members); *see also American Trucking Associations, Inc. v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (noting association's "obvious interest in challenging . . . rulemaking that directly—and negatively—impacts its . . . members").

---

Additionally, Rio Bank would be available to offer testimony regarding these facts at any hearing (though it would not be necessary). Because the declaration offered by Rio Bank establishes injury in fact, caused by the Final Rule, that would be redressed if the Rule were vacated, CFPB's protest to Rio Bank's standing is illusory.

4

Defendants do not dispute that these injuries count, that Defendants caused them, or that Plaintiffs' requested relief would remedy them. Defendants offer only one argument about the Bankers Associations' standing: relying heavily on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) and its progeny, Defendants claim that Plaintiffs must "identif[y]" a specific member who would have standing on its own. *See* Resp. Br. at 10–11. And by "identify," Defendants read *Summers* to require associations not only to identify a member with standing, but also give that member's actual name. This argument fails for at least two reasons.

One, the law does not require associations to disclose members' actual names. As the Eleventh Circuit has explained, binding Fifth Circuit precedent has long rejected the notion that an association "must specifically name the individual on whose behalf the suit is brought." *Doe v. Stincer*, 175 F.3d 879, 884–85 (11th Cir. 1999) (citing *Church of Scientology of Calif. v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1981), and *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 102 (5th Cir. 1963)). In *Speech First*, for example, the Fifth Circuit found that the plaintiff had associational standing to seek a preliminary injunction, even though its standing members were identified only by pseudonyms (*e.g.*, "Student A"). 979 F.3d at 335. Similarly, the district court in *NAACP v. Trump* found that the plaintiff had associational standing to seek summary judgment on behalf of its members—DACA beneficiaries whose identities were withheld. 298 F. Supp. 3d 209, 225 & n.10 (D.D.C.). The Supreme Court affirmed on the merits without questioning standing. *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1916 (2020).

Such a rule makes sense. Associations and their members have a First Amendment right to keep their membership anonymous from the government. *AFPF v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). So "to hold that Article III requires an organization to name those of its members who would have standing would be in

5

tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." *New York v. U.S. Dep't of Comm.* (*Census Case*), 351 F.Supp.3d 502, 606 n.48 (S.D.N.Y. 2019) (citing *Patterson,* 357 U.S. at 458–60), *aff'd in relevant part*, 139 S. Ct. 2551, 2565–66 (2019). Indeed, the "specific" names of Plaintiffs' members are "unnecessary to determine whether [they] would have Article III standing." *Census Case*, 351 F.Supp.3d at 606 n.48. Defendants do not identify a single fact relevant to standing that they do not know now but would know if they had the names of specific members. Standing here "depends on the facts of" a member's regulation by the CFPB and the activities and costs of implementing that regulation—"not on [its] name." *Id.*; *see also Hunter v. Branch Banking & Tr. Co.*, No. 3:12-cv-2437-D, 2013 WL 4052411, at *7 (N.D. Tex. Aug. 12, 2013) ("[R]equests for declaratory or injunctive relief rarely require individual determinations." (*citing Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 603 (7th Cir. 1993))).

Two*, Summers* does not require associations to identify specific members in every case. The associations lacked standing in *Summers* because their members were not directly regulated by the challenged regulations, which made standing "'substantially more difficult' to establish." 555 U.S. at 493 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). The challenged regulations allowed the Forest Service to undergo certain projects without first doing an environmental assessment. A member would be harmed only if a project was imminent, the project would affect an area that the member imminently planned to visit, and the project threatened the member's ability to enjoy that area. *See id*. at 494. Additionally, the associations did not show that they had any member who satisfied these criteria. *See id.* at 497–98. There were no affidavits establishing that any of the members would be harmed by the challenged policy—the only affidavit proving standing concerned a part of the case that had settled. *Id.* at 494–95. The associations

6

instead argued that, given the sheer size of their membership, it was a "statistical probability" that they had at least one member with standing. *Id*. at 497. The Court rejected this theory of "probabilistic standing." *Id*. at 499; *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019) ("In environmental cases, courts must carefully distinguish between injury to the petitioner and injury to the environment. . . . Injury to the environment is insufficient.").

The Bankers Associations do not have any of the problems that plagued the associations in *Summers*. The Bankers Associations' members are directly regulated by the Final Rule. Thus, in the Fifth Circuit's words, those members are "the direct object of the government action." *Three Expo Events, LLC v. City of Dallas*, 907 F.3d 333, 341 (5th Cir. 2018). Standing in this context is not "more difficult to establish"; rather, there is "little question" that the Final Rule is injuring Plaintiffs' members because they are the target of the CFPB's action. *Id*. (quoting *Lujan*, 504 U.S. at 562). Further, the Bankers Associations are not relying on statistical probabilities. Their declarations swear that they do have, among other things, members who are directly regulated by the CFPB. The declarations then proceed to explain how the Final Rule *is currently* injuring these members. No additional information is needed to prove standing because *Summers* requires no more. It is thus irrelevant to the standing inquiry whether the associations name specific members—especially when the Bureau *already knows* precisely which banks are affected.[4]

Here, of course, Plaintiffs have gone beyond what is required for associational standing with the inclusion of Rio Bank—a member of both TBA and ABA—as a co-plaintiff. *See Bank*

---

[4] *See, e.g.*, *Census Case*, 351 F.Supp.3d at 606 n.48 ("[A]n organization can satisfy the first prong of the associational standing analysis by offering proof 'establishing that at least one identified member ha[s] suffered or would suffer harm.' It would overread the word "identified" in that context to require an organization to *name* the member who might have standing in his or her own right." (quoting *Summers*, 555 U.S. at 498) (alterations in original)); *Fl. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F.Supp.3d 111, 120 (D.D.C. 2014), *judgment vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) ("Here, the Government contends that Plaintiffs have not submitted an affidavit identifying by name a specific member who has been injured. . . . Defendants, however, ask too much.").

7

*Listing*, Texas Bankers Association[5]; *ABA Members Offering Bank On-Certified Accounts*, American Bankers Association.[6] This only further cements Plaintiffs' standing and underscores the frivolousness of CFPB's arguments.[7]

## II. Plaintiffs Meet the Criteria for a Preliminary Injunction—Including Showing Irreparable Harm.

Forced to concede (at 20–21) that Plaintiffs succeed on the merits of their case, the CFPB next seeks to attack (at 12–18) the irreparable injury prong of the preliminary injunction analysis. In an attempt to dodge the straightforward harms catalogued by Plaintiffs in their Exhibits, the Bureau recycles its faulty standing arguments against Rio Bank and accuses the Bankers Associations of failing to explain precisely what Plaintiffs' Exhibits show. But even more critically, the Bureau fails to engage with the relevant caselaw from the Fifth Circuit and arguments set forth previously by Plaintiffs. Memo. in Support of Mot. at 6–8. As a result, both of Defendants' arguments regarding irreparable harm fail as well.[8]

First, the CFPB asserts (at 13) that Rio Bank has not demonstrated its injury. As seen above, however, that claim fails on its face. The CFPB does acknowledge—as it must—that the Bank is spending money in 2023, and that it will continue to do so as it prepares to meet the applicable mandatory compliance date set forth in the Final Rule. Yet the CFPB faults Rio Bank (at 13–14) for not explaining why it is spending money *now* rather than at some point in the future.

---

[5] *Available at* https://www.texasbankers.com/TBA/TBA_Store/Bank_Listing.aspx?WebsiteKey=9f18097c-5001-4795-8b22-1b51e3842096.

[6] *Available at* https://www.aba.com/banking-topics/consumer-banking/inclusive-banking/bank-on/bank-on-members.

[7] The obvious standing for Rio Bank—in addition to the presence of TBA and ABA in both this District and Division—also forecloses CFPB's venue argument. *See* Resp. Br. at 11–12.

[8] The Bureau also offers (at 18–20) an argument regarding the balance of the equities, but completely ignores the fact that the Final Rule is invalid. *See Community Financial*, 51 F.4th at 643. Indeed, the CFPB's claim fails to respond to Plaintiffs' arguments on this point at all, merely begging the question as to the constitutionality of the Final Rule and attempting to rely on the *statutory* requirements on which the Rule was *supposed* to be based. But as the CFPB admits (at 19), the Fifth Circuit has been clear: there is "no harm to the public interest if the agency [can]not enforce an invalid" regulation. As a result, there is no argument against Plaintiffs on the equities prong of the analysis.

8

The Bureau adds that the harm is thus "self-inflicted" since the Bank—in the CFPB's (litigation posture) approximation—could theoretically hold off on preparing to follow the Final Rule.

Setting aside the fact that the CFPB expects banks to begin working toward compliance now, this sleight of hand fails to mention that smaller banks—such as Rio Bank—get more time under the regulation precisely because they are the financial institutions that need the most time to prepare for the new Rule. As the Rio Bank affidavit notes, "the bank will be required to hire outside consultants, specialist attorneys, and other experts to interpret, apply, and audit the CFPB Final Rule to its small business lending programs." ECF No. 12-2, Exhibit B at 3, ¶ 12. Moreover, Rio Bank will have to develop (or at least purchase and train its employees to use) software that does not yet exist but that will be necessary to fulfill the overreaching whims of the CFPB. *Id.* at 2, ¶ 10. The CFPB also fails to inform the Court that its regulators will be measuring the progress of financial institutions to ensure that they are meeting preparatory milestones.

At base, Rio Bank does not yet know all of the unknowns for implementation of the Final Rule and, as a responsible financial institution, is working to prepare for the future. These are the obvious reasons *why* Rio Bank is spending money now to comply with the Final Rule. Indeed, this is exactly the type of behavior that the CFPB expects from banks and that it would be lauding if not for this case.[9]

Rio Bank's "economic costs may count as irreparable harm" because, as preparatory compliance costs, "they cannot be recovered in the ordinary course of litigation." *Restaurant Law Center v. Dept. of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. EPA*, 829 F.3d 405,

---

[9] Defendants discredit their own argument here by having already published a Small Entity Compliance Guide on the CFPB website designed to help smaller banks—like Rio Bank—begin implementing the Final Rule. *Small Business Lending Rule, Small Entity Compliance Guide*, Consumer Financial Protection Bureau (May 2023), *available at* https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_small-business-lending-rule_small-entity-compliance-guide.pdf.

434 & n.41 (5th Cir. 2016)). And given that the Bank is currently subject to the Final Rule, those costs cannot be credibly recast as "self-inflicted." Rio Bank has shown irreparable harm.

Second, the Bankers Associations have likewise demonstrated irreparable harm. But the CFPB, again, challenges the irreparability of the harm by disingenuously inferring (at 15) that financial institutions need not begin complying now. This defies the regulated community's experience with the Bureau, as well as the expectations of the Rule and the CFPB itself. *See* Final Rule at 1 (noting compliance dates beginning October 1, 2024). Unsurprisingly, then, it was not difficult for the Associations to set forth specific evidence for why their members are suffering immediate harms. The members—who, again, need not be identified by name—are beginning compliance this month to ensure that they will be able to satisfy the Bureau's demands next Fall. ECF No. 12-1, Exhibit A at 2, ¶ 4; ECF No. 12-3, Exhibit C at 4, ¶ 10. And TBA went even further, identifying a consumer compliance expert Compliance Alliance as a known source that is "advis[ing] their bank customers to commence compliance preparation steps immediately." ECF No. 12-1, Exhibit A at 2, ¶ 5.

Revealingly, while Defendants repeatedly complain that the Associations have not provided enough facts, they do not challenge the fact that the costs to Plaintiffs are significant. And while the CFPB refers to Plaintiffs' estimates as "conclusory" and unsupported in a footnote (at 14 n.5), there is no argument that the costs are speculative since even the Bureau expects those costs to be passed on to customers. Final Rule at 780. But even if Defendants were correct that Plaintiffs' estimates were wrong (and they are not), the Fifth Circuit has noted time and again that the magnitude of the harm is not what makes the injury irreparable—it is the fact that the costs of complying with an invalid regulation are nonrecoverable. *Restaurant Law Center*, 66 F.4th at 597; *Texas*, 829 F.3d at 433.

10

These amounts were not fashioned out of thin air, though; they have been calculated over the past three years while the regulated community was considering and commenting on the Proposed Rule and awaiting the Final Rule. The figures are also based on surveys of the member institutions subject to the Final Rule and, as such, represent a reasonable estimation of the actual costs that the banks will incur. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Medical Board*, 627 F.3d 547, 551 (5th Cir. 2010) (accepting Third Circuit's approach of "allow[ing] standing if an associational plaintiff can prove its case with a sampling of evidence from its members"); *Advocates for Highway & Auto Safety v. F. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (recognizing "survey responses evidencing the concrete injuries that individual members expected the [challenged] rule would cause them to suffer"). The uncontroverted testimony offered by Plaintiffs' Exhibits that the Final Rule is forcing them to spend money complying with an invalid regulation is more than enough to support a preliminary injunction.

Associations speak on behalf of their members and, when necessary, they bring litigation against governmental agencies that regulate those members daily without identifying particular members. That is what the Bankers Associations have done here. Additionally, they have identified specific harms—even providing more information than necessary by offering the Court precise dollar amounts the banks will be forced to spend. *See* ECF No. 12-1, Exhibit A at 3, ¶ 7. And as the Fifth Circuit has long recognized, the enforcement of invalid regulations "almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas*, 829 F.3d at 433. Because those costs here are immediate and more than *de minimis*, an injunction is warranted.[10]

---

[10] While Defendants now complain (at 17) that they supposedly lack the information to evaluate whether the costs will be more than *de minimus*, the CFPB already knows the costs to be substantial enough that they warrant banks passing them on to consumers. Final Rule at 780.

11

**III.     Fifth Circuit Caselaw Directs the Remedy in this Case.**

Defendants' final argument (at 21–24) seeks a narrowing of the relief sought in the Motion so that an injunction would apply only to Plaintiffs and would last only until *Community Financial* is decided. This argument fails to address the controlling precedent in *Community Financial* and seeks to make the relief sought by Plaintiffs illusory by forcing them to begin complying with the Final Rule even during the pendency of an injunction. The first argument should be rejected and the second clarified.

First, the Bureau seeks to artificially limit the relief sought by Plaintiffs. To be sure, the Motion asks that the Court enjoin the Final Rule from enforcement at all. This request stems directly from the Fifth Circuit's decision to vacate the Bureau's Payday Lending Rule in *Community Financial* once it was determined that the CFPB is unconstitutionally funded and that the Rule at issue would not have been issued were it not for the unconstitutional funding. 51 F.4th at 644. Defendants have not challenged Plaintiffs' argument on that point, *see* Memo. in Support of Mot. at 6, and thus the Final Rule here must also be *vacated* under *Community Financial*. 51 F.4th at 644; *see also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

A vacated rule has no force of law—anywhere. The CFPB's request for an injunction to be limited to Plaintiffs, then, makes little sense. The judicial power of this Court "is not limited to the district wherein the court sits but extends across the country," and "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015). In addition, it is the extent of the legal violation that determines the scope of injunctive relief, not the "geographical extent" of the plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

In all events, the American Bankers Association has members across the country. Artificially attempting to limit an injunction to Plaintiffs would result in only more confusion. Contrary to Defendants' assertions (at 22), it is not as if this case is one where the legal questions must "percolat[e] through the federal courts"—the Supreme Court has already granted *certiorari* on the very question underlying this request for an injunction. And as in *Texas v. United States*, (somehow) limiting the relief to certain jurisdictions or parties would create patchwork rulings that would undermine the injunction and create unequal enforcement of an agency Rule that is invalid. Thus, the problems associated with "nationwide injunctions" are neither present here nor a consideration after *Community Financial* anyway.

Second, Defendants ask that any preliminary injunction terminate automatically upon a reversal of *Community Financial*. While it is correct that the injunction here is only based on *Community Financial*, it is important that the injunction stay the associated compliance timeframes. That will ensure banks have the same opportunity to comply with the Final Rule should it eventually be upheld after a reversal in *Community Financial* and Plaintiffs' challenge under the APA. If this Court's relief does not extend the corresponding deadlines for banks to ramp up compliance, any relief now will be illusory as banks will be coerced into continuing to prepare now for a Rule that could become suddenly active in less than one year.

## CONCLUSION

The Motion for Preliminary Injunction should be granted.

June 23, 2023                                        Respectfully submitted,

/s/ John C. Sullivan
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Counsel for Plaintiffs
*admitted pro hac vice*

14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on June 23, 2023, via the CM/ECF system and via email courtesy copy to Counsel for Defendants.

*/s/ John C. Sullivan*
John C. Sullivan

Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in Times New Roman font with the text in 12-point font and footnotes in 10-point font. The Reply Brief contains 4635 words.

*/s/ John C. Sullivan*
John C. Sullivan

Counsel for Plaintiffs