# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

**SUPPLEMENTAL DECLARATION OF VIRGINIA O'NEILL**

In accordance with 28 U.S.C. § 1746, I, Virginia O'Neill, declare as follows:

1. I am an Executive Vice President of the American Bankers Association ("ABA"). I lead our Regulatory Compliance and Policy group, which is responsible for consumer regulatory policy advocacy.

2. ABA is the voice of the nation's $23.7 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2.1 million people, safeguard $18.7 trillion in deposits, and extend $12.2 trillion in loans. ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive. ABA regularly advocates before the Consumer Financial Protection Bureau ("CFPB") to promote regulatory and supervisory policies that protect consumers, while ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

1

3. The purpose of this declaration is to describe our members' efforts to implement the rule finalized by the CFPB on March 30, 2023, which implements section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Final Rule"). Section 1071 amended the Equal Credit Opportunity Act ("ECOA") to require financial institutions to collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses. 15 U.S.C. §1691c-2.

4. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

5. ABA's membership covers depository institutions that fall within each of the "tiers" that determine the compliance dates of Final Rule—i.e., the date a lender must begin to collect the data and the date it must begin to report the data. Compliance tiers are delineated by the number of covered loans an institution originated in both 2022 and 2023. A bank is in Tier 1 if it originates 2,500 covered loans or more in each of 2022 and 2023, and must begin collecting data on October 1, 2024, and must report the data on June 1, 2025. A bank is in Tier 2 if it originates 500 to 2,499 covered loans in each of 2022 and 2023, and must begin collecting data on January 1, 2025, and must report the data on June 1, 2026. A bank is in Tier 3 if it originates 100 to 499 covered loans and must begin collecting data on January 1, 2026, and must report the data on June 1, 2027.

6. I have worked closely with many ABA members, including members of ABA's 1071 Working Group, to understand the substantial costs that they are and will incur to implement the Final Rule. For example:

2

- Member A, a Tier 2 bank with assets of approximately $6.4 billion, has incurred costs of $60,000 for 1,000 project team hours spent in planning and preparation since publication of the Final Rule. In addition, the bank has paid a consultant $8,000 for guidance. The bank's implementation planning has yielded a project plan with over 110 specific tasks, many with multiple steps. The bank has identified necessary system enhancements to the bank's commercial Loan Operating System ("LOS") and the sales system, which will be one-time costs of at least $30,000. In addition, the bank will need to replace its existing software solutions for Home Mortgage Disclosure Act ("HMDA") and Community Reinvestment Act ("CRA") data collection, submission, and analysis to accommodate the 1071 data; initial estimates are $25,000, which does not include costs for internal staff hours incurred for installation, testing and training. The bank also reports that members of the implementation team with expertise in fair lending and compliance are experiencing their workload increase about 25%, which is expected to continue for the next two years as the bank prepares for its compliance date on June 1, 2025. Other members of the team will experience a 15% workload increase.

- Member B, a Tier 2 bank with assets of approximately $57 billion, estimates that it will incur $165,000 in one-time implementation costs, many of which the bank is currently incurring. These include: $20,000 for 200 project planning staff hours; $30,000 for testing and validating computer and software systems; $4,000 for staff time spent developing forms and applications; $15,000 for staff time spent developing policies and procedures; $36,000 for staff training; $40,000 for legal and compliance review; and $20,000 for post-implementation review.

- Member C, a Tier 3 bank with assets of approximately $3.5 billion, has assigned staff to review the Final Rule and conduct a gap analysis and implementation project plan for implementation. Based on staff hours expended to date, the bank estimates it will incur $75,000 for preparation and planning. In addition, staff are preparing to draft policies and procedures (estimated to cost $35,000) and to draft forms and applications (estimated to cost $50,000). The bank's implementation plan identifies a need to hire two full-time employees ("FTEs") at an estimated cost of at least $140,000.

- Member D, a Tier 1 bank with assets of approximately $1.74 billion, has assigned five staff to a team that is reviewing the Final Rule and establishing an implementation plan. To date, team members have participated in 20 meetings, and the bank estimates the team members will spend a total of at least 320 hours on implementation by the October 2024 compliance deadline. In addition, the bank estimates that the team will spend: (1) at least 50 hours developing forms and applications; (2) 65 hours creating and administering training to bank employees and staff of an affiliated finance company; and (3) 200 hours developing policies/procedures for each department or affiliated company that will have to comply with the Final Rule.

- Member E, a Tier 1 bank with assets of approximately $27 billion, has also created a team that projects implementation costs of at least $600,000. This includes expenditures to update two LOS platforms, expanded databases, and to purchase a 1071 reporting module in their existing CRA/HMDA reporting software. The bank anticipates hiring 4 FTEs for data collection and analysis. Also included in the bank's

total implementation costs are $44,000 for training staff and third parties; $8,000 for developing policies and procedures; and $4,000 for legal and compliance reviews.

7. I have participated in ABA's 1071 Working Group "meetings," which have occurred via Zoom every two weeks since the CFPB finalized the rule on March 30. During these Zoom calls, which each last an hour, ABA staff and bankers discuss provisions of the Final Rule and bankers can ask (and help answer) interpretive questions. The number of bankers that attend the calls consistently exceeds 500; 714 bankers participated in the working group call held on July 17.

8. On May 30, ABA hosted a webinar titled "ABA's Guide to Section 1071 – the Fundamentals," where 1,386 bankers joined that webinar. Participation on working group calls and webinars shows that bankers are actively working to understand and implement the Final Rule.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 24th day of July, 2023 in Washington, DC.

*Virginia O'Neill*

Virginia O'Neill