Case 7:23-cv-00144 Document 25 Filed on 07/31/23 in TXSD Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
July 31, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 7:23-CV-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, | § § § § | |
| Defendants. | § § | |

## ORDER GRANTING IN-PART AND DENYING IN-PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Now before the Court is Plaintiffs' Motion for Preliminary Injunction filed by the three Plaintiffs—Texas Bankers Association, Rio Bank, McAllen, Texas, and American Bankers Association (collectively "Plaintiffs"). (Dkt. No. 13). This action arises in response to the "Small Business Lending Rule Under the Equal Opportunity Act (Regulation B)" ("the Final Rule") issued by Defendant Consumer Financial Protection Bureau ("the Bureau"). *See* 88 Fed. Reg. 35,150 (May 31, 2023). The Final Rule requires covered financial institutions to collect and report to the Bureau data on applications for credit for small businesses. *Id.*

However, in 2022, the Fifth Circuit held that the Bureau's funding structure is unconstitutional. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 215 L. Ed. 2d 104, 143 S. Ct. 978 (2023). That court did so because Congress funded the Bureau directly from the Federal Reserve, which is funding that contradicts the Constitution's Appropriations Clause. *Id.* at 638-42. As a result, in *Community Financial*, the Fifth Circuit also held that a rule promulgated by the Bureau is invalid when it harms a plaintiff through its improper use of unappropriated funds to engage in rulemaking. *Id.* at 643. The Bureau appealed the Fifth Circuit's decision. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, Ltd., 215 L. Ed. 2d 104,

143 S. Ct. 978 (2023) (granting the Bureau's petition for a writ of certiorari to the United States Court of Appeals for the Fifth Circuit).

Plaintiffs—a private bank and two trade associations—bring this action on behalf of themselves or their members. Plaintiffs challenge the Final Rule's validity and ask the Court to enjoin it nationwide until the Supreme Court resolves the constitutionality of the Bureau's funding structure in *Community Financial*. After considering the Motion, the Memorandum in Support of the Motion (Dkt. No. 13, Exh. 1), the responsive briefing (Dkt. No. 16), the reply (Dkt No. 17), and the relevant law, the Court is of the opinion that the Motion should be **GRANTED IN-PART** and **DENIED IN-PART** for the following reasons.

I.      Background

A.      Statutory and Regulatory Background

Plaintiffs' motion for preliminary injunction involves the Equal Credit Opportunity Act of 1974 ("ECOA"), the Dodd-Frank Wallstreet Reform and Consumer Protection Act of 2010 ("CPA"), and section 1071 of the CPA. The ECOA protects individuals and businesses against discrimination in accessing and using credit. *See Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 707 (5th Cir. 2017). Congress originally tasked the Board of Governors of the Federal Reserve System ("Board") with prescribing the ECOA's implementing regulations, which the Board carried out by rulemaking. 40 Fed. Reg. 49,298 (Oct. 22, 1975). As tasked, the Board issued those rules as Regulation B. 12 C.F.R. § 202.

The CPA protects American consumers, investors, and businesses by eliminating certain loopholes that led to the 2008 financial crisis by, among other things, creating the Bureau. *See* 12 U.S.C. §§ 5481–5603; *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 at 623. In the CPA, "the Bureau is charged with 'implement[ing]' and 'enforce[ing]' consumer protection laws to 'ensur[e] that all consumers have access to markets for consumer financial products and services" that "are fair,

transparent, and competitive.'" *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th at 623 (quoting 12 U.S.C. § 5511(a)). "Congress [also] transferred to the Bureau administrative and enforcement authority over 18 federal statutes which prior to the [CPA] were overseen by seven different agencies." *Id.* (citing 12 U.S.C. §§ 5512(a), 5481(12), (14)). For example, Congress revoked the Board's rulemaking responsibility under the ECOA and transferred the responsibility to the Bureau. *See* 12 U.S.C. § 5481(b)(1)(A); *see also* 15 U.S.C. § 1691(b). Correspondingly, the Bureau republished Regulation B as Title VII of the CPA. *See* 12 C.F.R. § 1002.1(a).

Plaintiffs' motion for preliminary injunction relates to section 1071 of the CPA, which requires financial institutions to collect and report to the Bureau data on applications for credit for small businesses. *See* PL 111-203, July 21, 2010, 124 Stat 1376, at Section 1071(e)(2). The Bureau issued a Final Rule amending Regulation B to implement changes to the ECOA made by Section 1071. *See* 88 Fed. Reg. 35,150. Consistent with section 1071, the Final Rule requires covered financial institutions to collect and report to the Bureau data on applications for credit for small businesses. *Id.*

The CPA defines the term "small business" as "small business concern" is defined by the Small Business Act ("SBA"). PL 111-203, July 21, 2010, 124 Stat 1376, at Section 1071(h)(2). The SBA defines "small business concern" as "including but not limited to enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries . . . deemed to be one which is independently owned and operated." 15 U.S.C. § 632(1). "However, in lieu of using the SBA's size standards for defining a small business concern, the definition in this final rule looks to whether the business had $5 million or less in gross annual revenue for its preceding fiscal year." 88 Fed. Reg. at 35,151.

The Final Rule goes into effect August 29, 2023. *Id*. at 35,150. However, the Bureau does not require covered institutions' compliance until October 1, 2024, April 1, 2025, or January 1, 2026, depending on the number of credit transactions originated for small businesses in the last two years. *Id*. "A covered financial institution is defined as a financial institution that originated at least 100 covered credit transactions . . . for small businesses in each of the two preceding calendar years." *Id*. at 35,151. Specifically, financial institutions are required to begin compliance in: Tier 1 with 2,500 or more originations—October 1, 2024; Tier 2 with 500 or more originations—April 1, 2025; and Tier 3 with 100 or more originations—January 1, 2026. *Id*. at 35,438.

**B.     The Bureau's Funding Structure**

The Bureau's funding structure is also relevant to Plaintiff's motion. 12 U.S.C. § 5497(A)(1) describes the Bureau's funding structure as "[e]ach year (or quarter of such year) . . . the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(A)(1). This means that "[t]o request funds, the [Bureau] Director need only send a perfunctory letter to the Federal Reserve with the amount requested." *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 223 n.7 (5th Cir. 2022) (Jones, J., concurring). The Federal Reserve must grant the Director's request "so long as it does not exceed 12% of the Federal Reserve's total operating expenses." *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 638 (citing 12 U.S.C. § 5497(a)(1)–(2)) (cleaned up). "The Bureau thus receives funding directly from the Federal Reserve." *Id*. (cleaned up).

The statute also provides that "[f]unds obtained by or transferred to the Bureau Fund shall not be construed to be Government funds or appropriated monies." 12 U.S.C. § 5497(c)(2). Further, "funds derived from the Federal Reserve System . . . shall not be subject to review by the

Committees on Appropriations of the House of Representatives and the Senate." *Id*. § 5497(a)(2)(C). The Fifth Circuit conceptualizes this structure as one where "Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded *indirect* control by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process—a double insulation from Congress'[] purse strings." *Cmty. Fin. Servs. Ass'n of Am., Ltd*., 51 F.4th at 638-39 (emphasis original). Accordingly, the Fifth Circuit summarized the Bureau's funding as a "self-actualizing, perpetual funding mechanism." *Id*. at 638.

C. **The Fifth Circuit Deems the Bureau's Funding Structure Unconstitutional**

The Appropriations Clause of the U.S. Constitution cabins Congress' spending power by specifying that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." U.S. CONST. art. I, § 9, cl. 7. However, "the Bureau's funding is double-insulated on the front end from Congress'[] appropriations power." *Cmty. Fin. Servs. Ass'n of Am., Ltd*., 51 F.4th at 639. This is because, as discussed *supra*, the Bureau "receives funding directly from the Federal Reserve, which is itself outside the appropriations process." *Id*. at 638. "The Bureau's perpetual insulation from Congress'[] appropriations power, including the express exemption from congressional review of its funding, renders the Bureau 'no longer dependent and, as a result, no longer accountable' to Congress and, ultimately, to the people." *Id*. at 639 (quoting *All Am. Check Cashing*, 33 F.4th at 232 (Jones, J., concurring)).

Congress has "*exclusive power* over the federal purse." *Cmty. Fin. Servs. Ass'n of Am., Ltd*., 51 F.4th at 637 (citing *OPM v. Richmond*, 496 U.S. 414, 424 (1990)) (emphasis original). The Appropriations Clause "makes clear that [a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id*. (citing *OPM*, 496 U.S. at 425). "Of equal importance is

what the clause 'takes away from Congress: the option not to require legislative appropriations prior to expenditure.'" *Id*. (quoting Kate Stith, *Congress' Power of the Purse*, 97 YALE L.J. 1343, 1349 (1988)).

*Community Financial Services* dealt with a lawsuit where the plaintiffs challenged the Bureau's 2017 Payday Lending Rule, which regulated payday, vehicle title, and certain high-cost installment loans. 51 F.4th at 625. The relevant question in *Community Financial Services* was: Is the Payday Lending Rule invalid because the Bureau's funding structure violates the Appropriations Clause of the Constitution? *Id*. at 235. The Fifth Circuit disagreed with the decisions of other courts that found the Bureau's funding structure was constitutionally sound. *See id*. at 641 (citing *PHH Corp. v. CFPB*, 881 F.3d 75, 95–96 (D.C. Cir. 2018); *CFPB v. Citizens Bank*, N.A., 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020); *CFPB v. Think Finance LLC*, No. 17-cv-127, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp*., No. 3:17-cv-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Services, Inc*., 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc*., 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014)). Instead, the Fifth Circuit held that "[t]he Bureau's funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id*. at 642. Consequently, the Fifth Circuit determined that the 2017 Payday Lending Rule was invalid not only because the Bureau's funding structure was unconstitutional, but also because "without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule. Plaintiffs were thus harmed by the Bureau's improper use of unappropriated funds to engage in the rulemaking at issue." *Id*. at 643.

**D.     The Parties**

Plaintiff Texas Bankers Association ("TBA") "is America's oldest and largest state banking organization in the United States. TBA advocates in both Austin and Washington D.C. for its 397 member banks across Texas." (Dkt. No. 12, Exh. A at p. 2). The TBA claims to have polled 125 of its members to determine the effect of the Final Rule. *See* (*id.* at p. 3). The results showed 70% make 100 or more small business loans on an annual basis, and 10% of those must begin to comply with the Final Rule in June 2024. (*Id.*). TBA estimates compliance costs will be $100,000 per bank, and report that the Compliance Alliance as advised commencement of compliance preparation steps. (*Id.* at pp. 3-4).

Plaintiff Rio Bank, McAllen, Texas "is a state-chartered community bank founded in in South Texas along the Texas and Mexico border." (Dkt. No. 12, Exh. B at p. 2). According to Rio Bank's CEO, "[i]n the year 2022, Rio Bank made 409 small business and agricultural loans in a total amount of $117 million." (*Id.* at p. 3). Also, "Rio Bank has already commenced compliance preparation as a consequence of the implementation dates established under the Final Rule." (*Id.*). "For example, the bank assigned its employees to attend a seminar to comply with the Final Rule at which the . . . information collection form was distributed." (*Id.*). Rio Bank "estimate[s] the costs of purchasing, installing, and conducting employee training to implement this data collection program to exceed $250,000.00." (*Id.*).

Plaintiff American Bankers Association ("ABA") "is the voice of the nation's $23.6 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2 million people, safeguard $19.2 trillion in deposits, and extend $12.2 trillion in loans." (Dkt No. 12, Exh. C at p. 2). "ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive." (*Id.*). "ABA's membership covers depository institutions offering small business loans in each

compliance tier category covered by Final Rule (e.g.—2,500 hundred loans or more; 500 to 2,499 business loans; and 100 to 499 small business loans)." (*Id*. at p. 3). "ABA members currently are taking steps to implement the Final Rule. As a result, [ABA] members are already incurring or are about to incur direct economic injury caused by the Final Rule." (*Id*. at 5). For example, according to a survey conducted by the ABA, 88% of respondents would need to hire more full-time employees, 73% would need to update commercial loan software at a median estimated cost of $29,029, 33% said they would need to purchase commercial loan software at a median estimated cost of $131,133, and 67% said they would need to purchase software for data submission at a median estimated cost of $23,927. (*Id*. at 4).

Plaintiffs sued the Bureau and the Bureau Director over the Final Rule. (Dkt No. 12 at 3-4). Plaintiffs now move for a nationwide preliminary injunction to prevent Defendants from enforcing the rule. (Dkt No. 13-1 at 4). Plaintiffs argue that the Final Rule is invalid because "employed funds to promulgate the Rule . . . were wholly drawn through the agency's unconstitutional funding scheme." (*Id*.). Plaintiffs assert that compliance with the Final Rule will cost more than $100,000 per bank. (*Id*.). According to Plaintiffs, "the nonrecoverable costs of complying with an invalid regulation constitute irreparable harm." (*Id*.).

## II.     Legal Standard

"A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (quoting *Planned Parenthood of Hous. & S.E. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)); *see also* FED. R. CIV. P. 65. The Court should issue a preliminary injunction only if the movants establish the following:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir.2013)) (cleaned up). The last two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363–64 (5th Cir. 2003) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985)). Also, "[t]he decision to grant or deny a preliminary injunction lies within the discretion of the district court." *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996) (quoting *DSC Communications Corp. v. DGI Technologies, Inc.*, 81 F.3d 597, 600 (5th Cir. 1996)).

### III. Preliminary Injunction

### A. Standing

To begin, Defendants argue Plaintiffs have not shown standing for requesting a preliminary injunction. (Dkt. No. 16 at § 1). Plaintiffs contend they have. (Dkt. No. 17 at § 1). The Court agrees with Plaintiffs.

A plaintiff must have standing to request a preliminary injunction. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."). To establishing standing, Plaintiffs must show: (1) an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision. *Id*. at 330. "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff[s] [are] entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). This means that Plaintiffs "must clearly show only

that each element . . . is likely to obtain in the case at hand." *Speech First, Inc.*, 979 F.3d at 329. When, as here, there is more than one plaintiff, "[t]he presence of one party with standing is sufficient." *Texas v. United States*, 809 F.3d at 151 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)) (cleaned up).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* (cleaned up).

To argue that Plaintiff Rio Bank does not have standing under the three elements, Defendants assert Plaintiffs have not demonstrated it is subject to the Final Rule. (Dkt. No. 16 at § 1). According to Defendants, Rio Bank's statement that "it made '409 small business and agricultural loans' in 2022" does not "establish, or even allege, that any of these loans meet the [Final] Rule's definition of covered transactions." (*Id.*) In reply, Plaintiffs contend the statement is sufficient to establish Rio Bank is likely subject to the Final Rule. (Dkt. No. 17 at § 1). The Court agrees with Plaintiffs. The Final Rule, which applies to covered financial institutions receiving applications for credit for small businesses. *See* 88 Fed. Reg. 35,150. The Final Rule defines "small business" as "including but not limited to enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries . . . deemed to be one which is independently owned and operated." 15 U.S.C. § 632(1). "A covered financial institution is defined as a financial institution that originated at least 100 covered credit transactions . . . for small businesses in each of the two preceding calendar years." *Id.* at 35,151. Specifically, financial institutions are required to begin compliance in: Tier 1 with 2,500 or more originations—October 1, 2024; Tier 2 with 500

or more originations—April 1, 2025; and Tier 3 with 100 or more originations—January 1, 2026. *Id.* at 35,438. Here, Plaintiff Rio Bank indeed established that it had 409 small business and agricultural loans in calendar year 2022, which under the Final Rule's broad definition of covered originations makes it likely Rio Bank will be subject to the Final Rule. (Dkt. No. 12, Exh. B at 3). Based on this number, Rio Bank will likely be considered a Tier 3 institution and will need to begin reporting under the Final Rule until January 1, 2026. *See* 88 Fed. Reg. at 35,438.

The Court recognizes that, given compliance with the Final Rule becomes effective on January 1, 2026, there is a question as to whether or not Rio Bank's alleged injury is "imminent." As the Supreme Court has instructed, for an injury to be imminent, it must be "certainly impending." *Lujan*, 504 U.S. at 564 n.2. Parties often lack standing when an injury is speculative. *See, e.g.*, *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (finding injury speculative when the party's claim of injury was not supported by any facts). Here, although compliance is not yet required, the Bureau has already specified in the Final Rule on what dates the compliance—for which preparation costs will produce the alleged injury—is required. *See Texas v. ATF*, No. 6:23-CV-00013, 2023 WL 3763895, at *2 (S.D. Tex. May 31, 2023) (compliance costs satisfy the injury element for Article III standing); *c.f. Lujan*, 504 U.S. at 564 ("[S]ome day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that our cases require."). Furthermore, Plaintiffs also estimate Rio Bank's compliance costs will total $250,000, of which $20,000 will be spent in 2023. *See* (Dkt. No. 12, Exh. B at 3-4). Therefore, the Court concludes that those compliance dates and costs are not speculative; that lead-time for compliance was built into the Final Rule does not make Plaintiffs' claim unripe. Because Plaintiff Rio Bank has standing, the Court does not address the Parties arguments regarding Plaintiffs ABA and TBA's standing. *See Texas v. United States*, 809 F.3d at 151.

B.      **Likelihood of Success on the Merits**

First of all, a substantial likelihood exists that Plaintiffs will prevail on the merits of their case. "If the party requesting a preliminary injunction cannot show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (quoting *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020)). As discussed *supra*, to succeed on the merits of their claim that the Final Rule is invalid based on the Bureau's unconstitutional funding structure, Plaintiffs must show the Bureau's "unconstitutional . . . funding inflicted harm." *Cmty. Fin. Servs. Ass'n of Am., Ltd*., 51 F.4th at 643 (quoting *Collins v. Yellen*, 210 L. Ed. 2d 432, 141 S. Ct. 1761, 1788–89 (2021)). When "the funding employed by the Bureau to promulgate [a] . . . Rule [is] wholly drawn through the agency's unconstitutional funding scheme, there is a linear nexus between the infirm provision (the Bureau's funding mechanism)" and an action that challenges the promulgation. *Id*. This is so because "without its unconstitutional funding, the Bureau lacked any other means to promulgate the rule." *Id*. Here, the parties do not dispute Plaintiffs' likelihood of success on the merits of their claim. *See* (Dkt. Nos. 13, Exh. 1 at § 1, 16 at § II.C, 17 at § II). This is because Plaintiffs in the present case have asserted the Final Rule is invalid because it was promulgated through the Bureau's unconstitutional funding scheme. *See* (Dkt. No. 13, Exh. 1 at § 1). Accordingly, this Court finds that a substantial likelihood exists that Plaintiffs would prevail in asserting that the Final Rule is invalid. Therefore, the "substantial likelihood" factor favors Plaintiffs.

C.   **Substantial Threat of Irreparable Harm**

Plaintiffs raise unrecoverable compliance costs as irreparable harm. (Dkt. No. 13, Exh. 1 at § II). Defendants respond that Plaintiffs have not submitted declarations that sufficiently detail compliance costs that are immediate. (Dkt. No. 16 at § II.A).

The Parties however do not dispute compliance with the Final Rule involves some costs. *See* (Dkt. Nos. 14, Exh. 1 at § II, 16 at § II.A). Plaintiffs have indeed produced three declarations that detail specific costs of complying with the Final Rule. *See* (Dkt. No. 12, Exhs. A-C). Specifically, Rio Bank anticipates Final Rule compliance costs of $250,000, with $20,000 to be incurred in 2023. (Dkt. No. 12, Exh. B at ¶¶10-11). TBA has submitted a declaration predicting that the Final Rule would cost $100,000 per community bank. (Dkt. No. 12, Exh. A at ¶7). ABA has also submitted a declaration with results of a survey of their members including: 88% would need to hire a mean of 3 more full-time employees; 73% would need to update commercial operating software at a median cost of $29,029; 33% would need to purchase commercial software at a median cost of $131,133; and 67% would need to purchased software to assist with data submission at a median cost of $23,297. (Dkt. No. 12, Exh. C at ¶7). Furthermore, Plaintiffs highlight that the Bureau has stated that it expects the costs of compliance with the Final Rule "to be passed on to small business credit borrowers in the form of higher interest rates and fees." (Dkt. No. 13, Exh. 1 at p. 6).

These compliance costs are likely unrecoverable. "[C]osts imposed on parties are irreparable where they cannot be recovered 'in the ordinary course of litigation.'" *Texas v. EPA*, 829 F.3d 405, 434 n.41(5th Cir. 2016) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Indeed, complying with a [rule] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id*. at 433 (cleaned up) (emphasis original); *see also Rest. L. Ctr. v. United States Dep't of Lab*., 66 F.4th 593, 597 (5th Cir. 2023) ("[T]he

nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."). Here, Defendants do not contend that Plaintiffs have a way to recover costs from complying with the Final Rule. "That's probably because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Plaintiffs "lack of a 'guarantee of eventual recovery' is [the] reason that [their] alleged harm is irreparable." *Id*.

According to Defendants, the main issue is that the Final Rule does not require compliance costs to be incurred *now*. (Dkt. No. 16 at § II.A.1-3). Contrary to what Defendants argue, the Fifth Circuit has accepted projected compliance costs as constituting irreparable harm. *See Texas v. EPA*, 829 F.3d at 433-34 (noting the fact that "compliance with the Final Rule [at issue] would impose $2 billion in costs on power companies, businesses, and consumers" demonstrates one irreparable injury, as "[n]o mechanism . . . exists for the power companies to recover the compliance costs they will incur if the Final Rule is invalidated."). Although Plaintiffs' costs are not as substantial as in *Texas v. EPA*, compliance costs and substantial financial injury are two independent reasons an economic injury may be irreparable. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142. The Fifth Circuit "requires only that alleged compliance costs must be 'more than de minimis.'" *Rest. L. Ctr.*, 66 F.4th at 600 (quoting *Louisiana v. Biden*, 55 F.4th at 1035). Since "it is not so much the magnitude but the irreparability that counts," 829 F.3d at 433-34, the Court concludes Plaintiffs have shown the likely costs of compliance under the Final Rule are more than de minimis and thus constitute irreparable harm. Therefore, the "irreparable harm" factor favors Plaintiffs.

### D.   Equities and Public Interest

Here, the balance of harms and public interest favor a stay. "The equities favor a stay if it would benefit the [movant] more than it would harm the nonmovants." *Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). Once a court has "concluded that [the movant's] harm is irreparable . . . [the nonmovant] would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Plaintiffs in this case argue that "the public interest is clearly 'served by maintaining our constitutional structure.'" (Dkt. No. 13, Exh. 1 at p. 12). As to Defendants, although they contend that "the public interest plainly would be harmed if Plaintiffs here were able to secure preliminary relief that delayed [the Final Rule] by as long as one year" as it "produc[es] [a] benefit for small businesses," (Dkt. No. 16 at pp. 21-22), Defendants do not show any evidence that a stay of the Final Rule will cause harm. Without more, the Court cannot conclude that a stay would harm more than benefit the public interest. Therefore, these factors favor Plaintiffs.

### E.   Injunction's Scope

Defendants contend that the injunction should be limited to the parties in this case because "[u]niversal relief of the kind Plaintiffs apparently seek is inconsistent with . . . Article III and traditional equitable limits." (Dkt. No. 16 at p. 24). In reply, Plaintiffs assert that the injunction should be nationwide otherwise "limiting the relief to certain jurisdictions or parties would create patchwork rulings that would undermine the injunction and create unequal enforcement of an agency Rule that is invalid." (Dkt. No. 17 at p. 18).

This Court finds a limited injunction appropriate. "[T]he Constitution vests the District Court with 'the judicial power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in

appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d at 188 (quoting U.S. CONST. art. III, § 1). However, "[a]s is true for all injunctive relief, the scope of the injunction must be justified based on the 'circumstances.'" *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). Examples of circumstances warranting nationwide relief include a "constitutional uniformity principle" and "concern that patchwork rulings would undermine an injunction limited to certain jurisdictions." *Id*. at 264. However, generic reasons such as "nationwide scope" or "need for uniformity" without more are insufficient. *Id*. Here, Plaintiffs state that "the American Bankers Association has members across the country." (Dkt. No. 17 at p. 18). According to Plaintiffs, as a result of this sprawl, "[a]rtificially attempting to limit an injunction to Plaintiffs would result in only more confusion." (*Id*.). The "possible confusion" here is more akin to the circumstances insufficient for nationwide relief. *See Becerra*, 20 F.4th 260 at 264. Therefore, the Court finds the Final Rule's invalidity as alleged by Plaintiffs is limited to Plaintiffs and their members.

**IV.     Conclusion**

For the foregoing reasons, the Court **ORDERS** that Plaintiffs' Motion (Dkt. No. 13) is **GRANTED IN-PART** and **DENIED IN-PART**. The Court **DENIES** Plaintiffs' request for nationwide injunctive relief, and **GRANTS** Plaintiffs' request for relief as to Plaintiffs and their members.

Accordingly, the Court **ORDERS** that Defendants are preliminarily enjoined from implementing and enforcing the Final Rule, 88 Fed. Reg. 35,150 (May 31, 2023), against Plaintiffs and their members pending the Supreme Court's reversal of *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 215 L. Ed. 2d 104, 143 S. Ct. 978 (2023), a trial on the merits of this action, or until further order of this Court. Defendants shall immediately cease all implementation or enforcement of the Final Rule against Plaintiffs and their members.

The Court further **ORDERS** that all deadlines for compliance with the requirements of the Final Rule are stayed for Plaintiffs and their members until after the Supreme Court's final decision in *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 215 L. Ed. 2d 104, 143 S. Ct. 978 (2023). In the event of a reversal in that case, Defendants are **ORDERED** to extend Plaintiffs and their members' deadlines for compliance with the requirements of the Final Rule to compensate for the period stayed.

The Court also **ORDERS** that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

SO ORDERED July 31, 2023, at McAllen, Texas.

*/s/ Randy Crane*
Randy Crane
Chief United States District Judge