# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, <br><br> Defendants. | Case No: 7:23-cv-00144 |

## COMPLAINT IN INTERVENTION

TO THE HONORABLE RANDY CRANE, CHIEF UNITED STATES DISTRICT JUDGE:

Intervenors Texas First Bank ("Texas First"), Independent Community Bankers of America ("ICBA"), and Independent Bankers Association of Texas ("IBAT") (collectively, "Intervenors") file this Complaint in Intervention, and they respectfully would show the Court as follows:

### INTRODUCTION

1. On March 30, 2023, Defendants (collectively, "CFPB") published a final rule (the "Final Rule") amending Regulation B governing small business lending under the Equal Credit Opportunity Act ("ECOA").[1] *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150, 2023 WL 3723408 (May 31, 2023). According to CFPB, the Final Rule implemented changes to the ECOA made 13 years earlier by Congress in § 1071 of the

---
[1] 15 U.S.C. §§ 1691 *et seq.*

1

Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").[2] 88 Fed. Reg. 35,150.

2. Congress enacted the Dodd-Frank Act in part to bolster and encourage loans made to women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691; 15 U.S.C. § 1691c-2(a). The Act requires financial institutions to gather and report certain data from applications for credit by those businesses, including the type, purpose, and amount of the loan or other credit being applied for, the census tract in which the principal place of business of the applicant is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the principal owners of the business. 15 U.S.C. § 1691c-2(e).

3. The Final Rule, which transforms 3 pages of text in the Dodd-Frank Act into more than 880 pages of regulations and commentary, requires financial institutions to develop and implement systems and compliance mechanisms to gather and report more than eighty (80) "data points" to be reported in accordance with a 40 page "Small Business Lending Rule: Data Points Chart." 88 Fed. Reg. 35, 545-35, 561 (to be codified at 12 C.F.R. § 1002.107); *see also* https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf.[3]

4. The Final Rule will irreparably harm community banks, including Texas First and ICBA and IBAT's members, and ultimately the women-owned, minority-owned, and small businesses that the Dodd-Frank Act was designed to benefit. Community banks will be required either to exit or curtail their small business lending and/or dedicate more staff and financial resources into government reporting rather than lending. Community banks also will face

---

[2] Pub. L. 111-203, tit. X, Section 1071, 124 Stat. 1376, 2056 (2010), codified at 15 U.S.C. § 1691c-2.

[3] According to the Federal Reserve, almost 70 percent of small businesses seeking loans applied to a bank for credit. *Availability of Credit to Small Businesses,* Federal Reserve Board, p. 33 (Oct. 2022), https://www.federalreserve.gov/publications/2022-october-availability-of-credit-to-small-businesses.htm.

2

requirements from federal and state financial regulatory authorities to demonstrate their progress in identifying and initiating compliance with the Final Rule and other agency communications. The Final Rule, however, is invalid and unenforceable.

5. First, the Final Rule is unconstitutional because CFPB lacked the authority to issue the Final Rule. As the Fifth Circuit and this Court have held, CFPB's "funding apparatus cannot be reconciled with the Appropriations Clause [of the U.S. Constitution] and the clause's underpinning, the constitutional separation of powers." *Community Fin. Servs. Ass'n of Am., Ltd. v. Consumer Financial Protection Bureau,* 41 F.4th 616, 642 (5th Cir. 2022), *cert. granted*, 215 L. Ed. 2d 104, 143 S. Ct. 978 (2023); s*ee also* the July 31, 2023 Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction (the "Preliminary Injunction"), at 1 (Dkt. 25). "[W]ithout its unconstitutional funding, the [CFPB] lacked any other means to promulgate" the Final Rule. *Community Fin.*, 41 F. 4th Ct. at 643.

6. Second, in promulgating the Final Rule, CFPB violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, in multiple ways. More specifically, CFPB exceeded its statutory authority, failed to account for comments relevant to the implementation of the Final Rule, and failed to properly consider the costs and benefits of the Final Rule.

7. Financial institutions covered by the Final Rule, including Texas First and members of ICBA and IBAT, are implementing the Final Rule, and, in doing so, are incurring costs and significant burden to comply with the CFPB's new data collection requirements.

8. The Court's July 31, 2023 Preliminary Injunction enjoins the CFPB from implementing and enforcing the Final Rule only against Plaintiffs and their members pending the U.S. Supreme Court's ruling in the *Community Financial* case. Texas First, however, is not a member of either the Texas Bankers Association ("TBA") or American Bankers Association

3

("ABA"), and it therefore remains subject to CFPB's enforcement of the Final Rule. Further, although some members of ICBA and IBAT are members of TBA and/or ABA, most are not. Like Texas First, those community banks and others face immediate irreparable harm arising from their compliance with the unconstitutional and unenforceable Final Rule. Accordingly, Intervenors seek judgment vacating the Final Rule, as well as preliminary and permanent injunctive relief.

## PARTIES

9. ICBA is a national association dedicated to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. ICBA's membership consists of thousands of community banks located throughout the United States, including in the Southern District of Texas – more than half of the total depository institutions in the country – as well as state and regional community bankers association affiliate members such as IBAT. ICBA's members collectively operate 50,000 locations nationwide, employ nearly 700,000 Americans, hold $5.8 trillion in assets, hold $4.8 trillion in deposits, and make $3.8 trillion in loans to consumers, small businesses, and the agricultural community.

10. IBAT is an association representing Texas community banks. IBAT is the largest state community banking organization in the nation, with membership comprised of more than 2,000 banks and branches in 700 Texas communities, including in the Southern District of Texas, ranging in size from $27 million to $39 billion.

11. Texas First is a Texas chartered bank with its headquarters in Galveston County, Texas. Founded in 1972, Texas First operates 27 banking centers in Southeast Texas and has approximately 250 employees. As a community bank, Texas First places value on giving back to the communities it serves. Texas First frequently makes loans to Texas women-owned, minority-owned, and small businesses, and it is a "covered financial institution" subject to the requirements

of the Final Rule in that it made at least 100 "covered credit transactions" in each of 2021 and 2022, and it expects to make at least 100 "covered credit transactions" in 2023. *See* 88 Fed. Reg. at 35,529 - 30 (to be codified at 12 C.F.R. §§ 1002.102, 1002.104, and 1002.105). Texas First is a member of both ICBA and IBAT.

12. CFPB is an Executive agency, as defined in 5 U.S.C. § 105, and an independent bureau in the Federal Reserve System regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). CFPB has appeared in this action, and it therefore may be served pursuant to FED. R. CIV. P. 5(a) via the Court's electronic case filing system.

13. Defendant Rohit Chopra is the Director of the CFPB, and he is sued in that capacity. Mr. Chopra has appeared in this action, and he therefore may be served pursuant to FED. R. CIV. P. 5(a) via the Court's electronic case filing system.

## JURISDICTION AND VENUE

14. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.

15. Venue is proper in this Court because Defendants include a United States agency and an officer sued in his official capacity and because Intervenor Texas First – a member of ICBA and IBAT – is located in this district. 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

**CFPB**

16. Congress passed the Dodd-Frank Act in 2010 in response to the 2008 financial crisis. Pub. L. No. 111-203. Title X of the Act is the Consumer Financial Protection Act of 2010. Title X established the CFPB and placed it in charge of regulating individuals and entities that provide financial products and services such as loans for small businesses. Congress gave the

CFPB authority to create and enforce U.S. consumer protection laws. Among other things, CFPB has the power to "prescribe rules or issue orders or guidelines pursuant to" nineteen distinct consumer protection laws whose implementation were transferred to CFPB from seven different government agencies. 12 U.S.C. § 5581(a).

17. Section 1021(a) of the Dodd-Frank Act requires CFPB to implement and enforce consumer finance law "consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products" and to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions." Section 1022(a) provides that, in exercising its rulemaking authority, CFPB must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

**CFPB's Unconstitutional Funding Structure**

18. Recognizing the "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director," the Fifth Circuit recently noted that the "[m]ost anomalous" aspect of CFPB "is the Bureau's self-actualizing, perpetual funding mechanism." *Community Financial*, 51 F.4th at 638 (quoting *CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 221–22 (5th Cir. 2021) (Jones, J., concurring,)). "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not. Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Community Fin.*, 51 F.4th at 638 (citing 12 U.S.C. § 5497(a)). CFPB thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Id.* According to the Fifth Circuit,

"Congress did not merely cede direct control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded indirect control by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process— a double insulation from Congress's purse strings that is unprecedented across the government." *Id.* at 638–39.

19. "But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books. Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains 'a separate fund,' the 'Bureau of Consumer Financial Protection Fund,' which shall be maintained and established at a Federal Reserve bank. 'This fund is under the control of the Director,' and the monies on deposit are permanently available to him without any further act of Congress. Thus, contra the Federal Reserve, the Bureau may 'roll over' the self-determined funds it draws *ad infinitum*." *Id.* at 639 (citations omitted). For those reasons, the Fifth Circuit held that CBPB's "funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id.* at 642.

**The Proposed CFPB Rule**

20. Section 1071 of the Dodd-Frank Act consists of three pages of statutory text amending the ECOA to "inquire whether the business is a women-owned, minority-owned, or small business" and require that accumulated data be submitted annually to the CFPB. 15 U.S.C. 1691c-2(b). To that end, the Act directed financial institutions to collect only limited information specified in § 1071.

21. On September 1, 2021, the CFPB issued a Proposed Rule that, according to CFPB, implemented these statutory directives from § 1071. *Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56,356, 2021 WL 4636032

(Oct. 8, 2021). Rather than complying with the Dodd-Frank Act, the CFPB's proposed rule would vastly expand the categories of information to be reported by lenders. Indeed, the Proposed Rule added almost 70 additional categories to § 1071's list of data and sub-data points. Those included, among other things, loan guarantees, loan terms, counteroffer, denial reasons, comprehensive pricing information, origination charges, annual fees, broker fees, prepayment penalties, number of workers, and time in business. *Id.*

22. During the notice and comment period, the overwhelming number of comments submitted by parties subject to the rule characterized it as excessively overbroad in terms of its data points and pointed out the negative impact and substantial costs it would have on the small business lending market. For example, ICBA, in a January 6, 2022 letter, provided section by section comments, pointing out, among other things, the extraordinary costs and other burdens the proposed rule would have on community banks, especially the smallest community banks, and their small business customers. ICBA's January 6, 2022 letter at 32, https://www.icba.org/advocacy/letters-testimony (emphasis in original).

23. ICBA further explained the results of its membership survey that demonstrated that the largest cost associated with the Final Rule would be the necessity for community banks to hire additional employees:

> In contrast to large banks that employ thousands of employees to manage compliance, approximately 80% of community banks surveyed reported employing 25 or fewer full-time employees ("FTEs") dedicated to small business lending. 50% employed 10 or fewer FTEs in a small business lending role. These small staffs are already stretched thin and will require significant retraining to comply with the proposed rule. As a result, **58% of community banks surveyed reported that they will likely be required to hire additional FTEs in order to comply with the rule**.
>
> If a bank is required to hire even one additional FTE, the cost estimate would exceed the Bureau's own estimated time commitment to 716 staff hours per year for small . . . depository

8

>institutions. This time estimate amounts to 17.9 weeks of full-time work per year, or about 1/3 of a single FTE.

*Id*.

24. In their comment, the Community Development Bankers Association ("CDBA") pointed out that, "[w]hile the cost of any single new regulation . . . is manageable for many large institutions, the sheer volume of the many new regulations that have gone into effect since the law's passage is overwhelming – particularly for small institutions." *See* https://www.cdbanks.org/advocacy. According to CDBA, the Final Rule could have the "unintended negative outcome of forcing the smallest lenders to abandon [women-owned, minority-owned, and small business lending] because it is no longer profitable and/or the compliance risks are too great." *Id.*

25. The American Financial Services Association commented to the CFPB that, while the proposed rule stated that it is intended to "help small businesses drive inclusive and equitable growth," the overly burdensome data collection requirements that exceeded the Congressional mandate could result in a reduction of available credit, thus having the opposite effect of what Congress intended. *See* https://afsaonline.org/2022/01/06/afsa-submits-comment-letter-regarding-small-business-lending-data-collection/. Echoing that concern, the U.S. Small Business Administration's Office of Advocacy commented that the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses." *See* https://advocacy.sba.gov/2022/01/20/advocacy-submits-response-to-cfpbs-notice-of-proposed-rulemaking-on-small-business-lending-data-collection/.

26. Further, the Conference of State Bank Supervisors ("CSBS") – an organization consisting of state-government officials who regulate and supervise ICBA and IBAT member banks and is "charged with protecting consumers and ensuring the safety and soundness of the financial institutions they supervise" in addition to "fostering economic development opportunities within their states" – also

9

spoke out against the overreach of the Proposed Rule.  *See* https://www.csbs.org/policy/statements-comments/small-business-lending-data-collection-under-equal-credit-opportunity.  The CSBS warned that the Proposed Rule "will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country." *Id.*  The CSBS thus urged the CFPB to "limit the reportable data to the statutorily mandated data points required by section 1071 . . . [and] refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071." *Id.*

**The CFPB's Failure to Perform a Cost/Benefit Analysis**

27.     Federal agencies like the CFPB are required to consider the costs and benefits of regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs.  *See, e.g.*, Executive Order 12291 (46 Fed. Reg. 13,193 (Feb. 17, 1981)); Executive Order 12866 (58 Fed. Reg. 51,735 (Sept. 30, 1993)).  CFPB claims to have undertaken a cost-benefit analysis of the Proposed Rule. The analysis and the results it produced, however, were incomprehensible.

28.     First, CFPB claimed to have used an analysis that it described as "[a] Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model."  CFPB *Supplemental Estimation* at 4 (September 2021), https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.  According to CFPB, it used that model "because the data are missing at random," and it "need[ed] to impute data for multiple variables, origination number and dollar volume."  *Id.*  CFPB further claimed that the missing variables are "monotone," and it therefore used "an independent univariate conditional model to generate the multivariate imputations."  *Id.*  That methodology not only is incomprehensible, but also it fails to account for the higher proportion of small business loans generated by rural, small, and other community banks.

10

29. It later became evident that the CFPB did not even attempt to estimate the full extent of lenders' costs. This was evident in three ways. First, CFPB admitted that its Cost Survey was limited to only 13 of the eventual 81 data fields. Second, CFPB claimed that it "c[ould] only estimate how ongoing costs would be different," but suggested that "going from 13 statutory data points to 81 in the Final Rule would increase compliance costs by $10,000,000 per year." 86 Fed. Reg. 56,354. Third, CFPB did not differentiate aggregate industry numbers between banks of different sizes to account for the fact that total small-business loans as a percentage of total loans decline as bank size increases as established by researchers at Texas Tech University.

30. In their comment letter to CFPB, the Texas Tech researchers submitted data indicating that, for banks with $100 million or less in total assets, small-business loans comprised approximately 40 percent of the total loan portfolio, but for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. *A Comment on Implementing Section 1071 of the Dodd-Frank Act*, Texas Tech University Rawls College of Business (Dec. 16, 2021), https://www.depts.ttu.edu/rawlsbusiness/news/posts/2021/12/bankers_digest_dodd_frank.php. In other words, compliance costs for the Final Rule would affect community banks and smaller lending institutions like Texas First's and ICBA's and IBAT's membership disproportionately because of the greater percentage of small-business loans that make up the business of those lenders.

**The Final Rule**

31. In the Final Rule, CFPB expanded Congress' three-page mandate in the Dodd-Frank Act into an 887-page, single-spaced Final Rule, including commentary. Concurrent with the publication of the Final Rule, the CFPB issued a "Small Business Lending Rule: Data Points Chart" that sets forth 81 separate data or sub-data points. *See* https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf.

32. In the supplementary material accompanying publication of the Final Rule, CFPB acknowledged that, during the rulemaking process, it rejected "an alternative approach that would have limited data collection only to the statutorily required data points enumerated in section 1071." Tellingly, CFPB did not dispute the comments of the U.S. Small Business Administration's Office of Advocacy, but merely dismissed them with a notation that "it expects the variable portion of ongoing costs to be passed on to small business credit borrowers in the form of higher interest rates and fees." 88 Fed. Reg. 35,521. The CFPB similarly ignored other outside comments, issuing the Final Rule in substantially the same form as was proposed without even attempting to justify why it dismissed the concerns made known during the notice and comment period.

33. The CFPB also disclosed that the respondents to its "One-Time Cost Survey were instructed to assume that they would only be reporting on the mandatory (i.e., statutory) data fields." 88 Fed. Reg. 35,517. In terms of justifying the regulatory enlargement, the CFPB baldly and without justification asserted that expanding the collection requirements with an additional 68 (non-statutory) data points "would aid in fulfilling the purposes of section 1071." 88 Fed. Reg. 35,526.

**Immediate And Irreparable Harm Caused By the Final Rule**

34. The Final Rule is effective August 29, 2023. 88 Fed. Reg. 35,150. As a result, Texas First and ICBA and IBAT's other members must begin immediately to incur substantial expenses in preparation for the implementation of the Final Rule.

35. For Texas First, like all or almost all of the ICBA and IBAT's other community bank members, that compliance activity will include selecting new computer software systems (that are yet to be created to address the requirements of the Rule); training employees; and hiring outside managers for the implementation of the information collection, report preparation, intra-company segmentation procedures, and overall privacy protection needed to safeguard the

12

extensive accumulation of personal, demographic, and sexual orientation data mandated by the Final Rule. The over-reaching Final Rule will force small and rural banks with limited staff and resources to put more resources into government reporting rather than lending in the community. In addition, federal and state financial regulatory authorities will require community banks, including Texas First and ICBA and IBAT's other community bank members, to demonstrate their progress toward identifying and initiating compliance with the Final Rule during examinations and other agency communications.

36. Compounding the harm caused by the Final Rule itself is the CFPB's inability to safeguard the information it seeks from its regulated entities, much of which is personal and confidential. *See* 15 U.S.C. § 5512(c)(8) (requiring CFPB to protect proprietary, personal, and confidential information). Indeed, CFPB recently experienced a data breach involving sensitive information on dozens of financial institutions and potentially hundreds of thousands of customers. *CFPB's 'Disturbing' Data Breach Sparks Ire, Credibility Doubts*, Law 360 (Apr. 26, 2023), https://www.law360.com/articles/1601072/cfpb-s-disturbing-data-breach-sparks-ire-credibility-doubts. According to the *American Banker,* CFPB still has not notified affected consumers. https://www.americanbanker.com/news/cfpb-still-has-not-notified-consumers-about-data-breach. That demonstrates that CFPB is not prepared to respond to a data breach, further indicating that CFPB is unable to adequately assess the security and privacy impacts of its massive data collection required by the Final Rule.

**FIRST CLAIM FOR RELIEF**
Violation of the Constitution and APA
(Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A))

37. Intervenors adopt by reference the preceding paragraphs as if fully set forth herein.

38. As the Fifth Circuit held in *Community Financial* and this Court recognized in its Preliminary Injunction, CFPB's funding structure violates the U.S. Constitution's separation of

powers. Further, CFPB promulgated the Final Rule under precisely the same procedures as the rule that the Fifth Circuit set aside in *Community Financial.*

39. Because CFPB issued the Final Rule with funds derived from unconstitutional sources, it violates the Constitution. *Community Financial*, 51 F.4th at 642. Accordingly, the Final Rule is invalid, and the Court should set it aside. *See id.* at 643.

40. Under the APA, agency action must be vacated if it is "not in accordance with law," 5 U.S.C. § 706(2)(A). For the reasons described above, the Final Rule is not in accordance with law and therefore must be set aside. *See Community Fin.,* 51 F.4th at 643.

## SECOND CLAIM FOR RELIEF
Violation of 5 U.S.C. § 706(2)(C)

41. Intervenors adopt by reference the preceding paragraphs as if fully set forth herein.

42. The APA provides that agency actions are to be set aside when found to exceed or contravene the agency's statutory authority. 5 U.S.C. § 706. By expanding 13 data points mandated by Congress in § 1071 of the Dodd-Frank Act to 81 data points in the Final Rule, CFPB violated 5 U.S.C. § 706.

43. Although CFPB claims to be merely collecting "additional data that [it] determine[d] would aid in fulfilling section 1071's statutory purposes" (88 Fed. Reg. 35,150), the additional information demanded by the Final Rule far outstrips the statute's purposes. In fact, the Final Rule will operate to undermine the express purpose of the statute. By adding even more burdensome compliance requirements on institutions such as Texas First and IBCA's and IBAT's other member banks, the Final Rule will work to decrease the number of banks willing to make loans to women-owned, minority-owned, and small businesses. Many banks simply cannot afford the compliance costs, nor can they pass those costs on to women-owned, minority-owned, and

14

small business customers. The result of the Final Rule will be less money available to those businesses.

44. Because the Final Rule violates the terms of the statute, all data points in excess of the 13 specified in the underlying statute should be invalidated and set aside.

### THIRD CLAIM FOR RELIEF
Violation of 5 U.S.C. § 706(2)(A)

45. Intervenors adopt by reference the preceding paragraphs as if fully set forth herein.

46. The APA requires that federal agencies such as the CFPB respond to relevant and significant issues that are raised by interested parties. Further, a reviewing court "must set aside agency action if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). The notice and comment period alerted the CFPB to the alarming costs that would be imposed on the small to mid-sized banks if the Final Rule were to expand the statutory categories. As set forth above, however, CFPB acted arbitrarily and capriciously by failing to consider and respond to significant comments raised by adversely affected parties.

47. Because the Final Rule is arbitrary and capricious within the meaning of the APA, the Court should invalidate and set aside the Final Rule.

### FOURTH CLAIM FOR RELIEF
Violation of 5 U.S.C. § 706(2)(A) and (C)

48. Intervenors adopt by reference the preceding paragraphs as if fully set forth herein.

49. Federal agencies for decades have been required to consider the costs and benefits of regulations that are expected to have large economic effects to ensure that the benefit of a

15

regulatory initiative justifies its costs. Moreover, section 1022(a) of the Dodd-Frank Act commands that CFPB consider "the potential benefits and costs to consumer and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

50. But, CFPB promulgated the Final Rule without undertaking a proper cost/benefit analysis. To begin, CFPB failed to account for the disproportionate cost of the Final Rule on small banks (that make the most loans to small businesses) and the fact that the Final Rule likely will cause a decrease in loan availability to women and minority owned businesses. Instead, it merely conceded that additional costs would be "passed on to small business credit borrowers in the form of higher interest rates and fees" (88 Fed. Reg. 35,521), thus harming women-owned, minority-owned, and small businesses.

51. Further, instead of undertaking a proper accounting, the agency took the costs associated with collecting only the 13 statutory data points required by § 1071, ignoring the costs and burden associated with collecting 81 different types of information. Regardless, CFPB forged ahead with the Final Rule.

52. "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). Without meaningful distinctions with respect to separating cost estimates based on the differential in the size of the small business loan portfolio per the amount of a given bank's assets, the compliance costs which have been factored into the Final Rule are unsubstantiated. Accordingly CFPB "entirely failed to consider [this] important aspect of the problem," and, at a minimum, it failed to articulate a "rational connection between the facts found and the choice

made." *State Farm,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). In addition, the Final Rule conflicts with the Dodd-Frank Act's express command that the agency evaluate costs and benefits in promulgating rules.

53. The Court therefore should set aside the Final Rule both as arbitrary and capricious within the meaning of the APA and in violation of CFPB's statutory authority.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Intervenors respectfully request that the Court:

(1) enter a final judgment declaring that the Final Rule is invalid and unenforceable;

(2) preliminarily and permanently enjoin enforcement of the Final Rule;

(3) award Intervenors their attorney's fees and costs incurred in this case; and

(4) grant Intervenors such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/*
James W. Bowen
*attorney-in-charge*
jbowen@HuntonAK.com
Texas Bar No. 02723305
S.D. Tex. Bar No. 16337
Jennifer L. Clyde
jclyde@HuntonAK.com
Texas Bar No. 24101032
S.D. Tex. Bar No. 3644312
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: (214) 979-3000
Facsimile: (214) 880-0011

Elbert Lin
elin@HuntonAK.com
VA Bar No. 92740
*pro hac vice motion pending*
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street, East Tower
Richmond, VA 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218

Erica Peterson
epeterson@HuntonAK.com
D.C. Bar No. 1686244
*pro hac vice motion pending*
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1932
Facsimile: (202) 778-2201

**ATTORNEYS FOR INTERVENORS**