IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION, <br><br> Plaintiffs, <br><br> CREDIT UNION NATIONAL ASSOCIATION, CORNERSTONE CREDIT UNION LEAGUE, RALLY CREDIT UNION, TEXAS FIRST BANK, INDEPENDENT BANKERS ASSOCIATION OF TEXAS, and INDEPENDENT COMMUNITY BANKERS OF AMERICA, <br><br> Intervenor-Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity aa Director of the Consumer Financial Protection Bureau, <br><br> Defendants. | Case No: 7:23-cv-00144 |

**COMPLAINT IN INTERVENTION**

Intervenor-Plaintiffs Credit Union National Association (CUNA), Cornerstone Credit Union League (Cornerstone) and Rally Credit Union (Rally) (collectively, Credit Union Intervenors), file this complaint in intervention and allege as follows:

**INTRODUCTION**

1. Loans to small businesses are critical to the functioning of the United States' economy.

2. These loans also form a core portion of the business of credit unions.

3. On March 30, 2023, Defendants (collectively referred to as the CFPB or Bureau) published a final rule (Final Rule) amending Regulation B governing small business lending under the federal Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, *et seq.* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35,150 (May 31, 2023).

4. Ostensibly, the Final Rule is intended to implement changes to the ECOA made by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the Dodd-Frank Act).

5. The Final Rule takes three pages of text in the Dodd-Frank Act as the basis for more than 880 pages of regulations and commentary.

6. Critically, the Final Rule requires financial institutions to develop and implement systems and compliance mechanisms to gather and report more than eighty "data points" to be reported in accordance with a 40 page "Small Business Lending Rule: Data Points Chart." 88 Fed. Reg. 35,545-35, 561 (to be codified at 12 C.F.R. § 1002.107); *see also* https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf.

7. The Final Rule will irreparably harm credit unions, including Intervenor Rally and other members of Intervenors CUNA and Cornerstone. Moreover, by disincentivizing the loans it purports to encourage, the Final Rule will also harm women-owned, minority-owned, and small businesses in contravention of the Dodd-Frank Act. Credit unions like Rally will be required either to exit or curtail their small business lending and/or dedicate more staff and financial resources into government reporting rather than lending.

8. The Final Rule is also unconstitutional and unenforceable. The Final Rule is unconstitutional in the first instance because the CFPB lacked the authority to issue it. Both the Fifth Circuit and this Court have held that the CFPB's "funding apparatus cannot be reconciled with the Appropriations Clause [of the U.S. Constitution] and the clause's underpinning, the constitutional separation of powers." *Community Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 41

F.4th 616, 642 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023); *see also* the July 31, 2023 Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction (the "Preliminary Injunction"), at 1 (Doc. 25). "[W]ithout its unconstitutional funding, the [CFPB] lacked any other means to promulgate" the Final Rule. *Community Fin.*, 41 F.4th at 643.

9. The Final Rule is also unenforceable because it was promulgated in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559.

10. Nevertheless, financial institutions covered by the Final Rule, including credit unions like Rally and other members of Intervenors CUNA and Cornerstone, are implementing the Final Rule, and, in doing so, are incurring significant compliance costs.

11. This Court's July 31 preliminary injunction enjoins the CFPB from implementing and enforcing the Final Rule only against the original Plaintiffs and their members pending the U.S. Supreme Court's ruling in the *Community Financial* case. As a credit union, Rally is not a member of either the Texas Bankers Association or American Bankers Association and it therefore remains subject to CFPB's enforcement of the Final Rule. Indeed, as credit unions, none of CUNA or Cornerstone's members are eligible for membership in the Texas Bankers Association or American Bankers Association.

12. Nevertheless, the immediate and real harms to banks identified by this Court in its Preliminary Injunction apply equally to credit unions. Intervenors seek judgment vacating the Final Rule, as well as preliminary and permanent injunctive relief.

**PARTIES**

13. CUNA is the largest trade association in the United States serving America's credit unions and the only national association representing the entire credit union movement. CUNA represents nearly 5,000 federal and state credit unions, which collectively serve more than 135 million members nationwide. CUNA's mission, in part, is to advocate for the responsible regulation of credit unions to ensure market stability, while eliminating needless regulatory burden that interferes with the efficient and effective administration of financial services of credit unions to their millions of members.

14. Cornerstone is a non-profit corporation organized in accordance with the laws of Texas. Cornerstone is the largest regional credit union trade association in the United States, serving over 700 credit unions in Arkansas, Kansas, Missouri, Oklahoma and Texas. Cornerstone provides resources for credit unions and credit union staff including federal and state policy advocacy, compliance assistance and research, and statistics affecting the markets its member credit unions participate in.

15. Chartered in 1955 and headquartered in Corpus Christi, Rally is the largest credit union in South Texas. Rally serves over 200,000 members and operates 20 branches in the region. As a credit union, Rally is owned by its members. Rally frequently makes loans to small businesses, including woman-owned and minority-owned businesses. Because it made at least 100 "covered credit transactions" in each of 2021 and 2022, and because consistent with its mission as a member-owned credit union, it expects to continue to make over 100 such transactions in coming years, it is a "covered financial institution" subject to the requirements of the Final Rule. *See* 88 Fed. Reg. at 35,529-30 (to be codified at 12 C.F.R. §§ 1002.102, 1002.104, and 1002.105). Rally is a member of both CUNA and Cornerstone.

16. CFPB is a federal executive agency and an independent bureau in the Federal Reserve System. It regulates the offering and provision of consumer financial products and services throughout the United States. *See* 5 U.S.C. § 105, 12 U.S.C. § 5491(a).

17. Rohit Chopra is the Director of the CFPB and is sued in his official capacity only.

## JURISDICTION AND VENUE

18. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.

19. Venue is proper in this Court because Defendants include a federal agency and an officer of that federal agency sued in his official capacity. Venue is also proper because Rally is headquartered in this district. 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

**The CFPB's Creation, Authority and Constitutionally Dubious Structure**

20. The CFPB was created by Title X of the Dodd-Frank Act. This legislation assigned to the CFPB the responsibility—previously divided among seven other federal agencies—for regulating almost all individuals and companies providing financial products and services in the United States pursuant to federal consumer protection laws. *See* Pub. L. No. 111-203.

21. Unlike virtually all other federal agencies, the CFPB was created with a single Director who did not serve at the pleasure of the President, but rather was removable only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. §§ 5491(c)(1), (3). This functioned to insulate the Director from Presidential oversight. Similarly, the CFPB was authorized to receive funding outside the normal Congressional appropriations process, being funded instead by a direct requisition from the Director of the CFPB to the Federal Reserve. 12 U.S.C. § 5497(a). Once these funds are received they are held in a Federal Reserve bank rather than the Treasury and these funds are permanently at the disposal of the CFPB Director. This has functioned to insulate the CFPB from Congressional oversight.

22. In June 2020, the Supreme Court held that Title X's requirement that a CFPB Director be removed only for cause violated the Constitution's separation of powers by imposing an unconstitutional limit on the President's oversight of the CFPB. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). Indeed, the Court noted that when Congress created the CFPB it "deviated from the structure of nearly every other independent administrative agency in our history." *Seila Law*, 140 S. Ct. at 2191.

23. Now, the CFPB's funding outside the Congressional appropriations is being similarly scrutinized on separation of powers grounds. The Fifth Circuit recently held that the CFPB's "funding apparatus cannot be reconciled with the Appropriations Claus and the clause's underpinning, the constitutional separation of powers." *Community Fin. Servs. Ass'n of Am., Ltd.*

*v. CFPB*, 41 F.4th 616, 642 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023). The Supreme Court will conclusively determine the issue of the CFPB's funding in the next year.

**The Final Rule and its Adoption**

24. The CFPB issued the Proposed Rule that would become the Final Rule on September 1, 2021.

25. The Proposed Rule purported to implement § 1071 of the Dodd-Frank Act. This section directs financial institutions, including credit unions, to collect and report 13 specific data points.

26. The Proposed Rule expanded these 13 data points to 81 data points.

27. During the notice and comment period, the vast majority of comments by financial institutions subject to the rule argued the rule was overbroad, particularly in its expansion of data points to be collected, and noted the disincentivizing effect this would have on such institutions making loans to woman and minority-owned businesses.

28. In a comment letter dated January 6, 2022, CUNA provided detailed comments. In its letter, CUNA noted that "[i]t is not evident how the proposed discretionary data points would benefit the Bureau or consumers to justify the cost and resources required for their collection." *See* https://downloads.regulations.gov/CFPB-2021-0015-1514/attachment_1.pdf.

29. Despite these comments, the CFPB failed to perform a meaningful cost/benefit analysis of the Proposed Rule.

30. CFPB claimed to have used an analysis that it described as "[a] Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model." CFPB Supplemental Estimation at 4 (September 2021), https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.

31. According to CFPB, it used this model "because the data are missing at random," and it "need[ed] to impute data for multiple variables, origination number and dollar volume."

6

*Id.* CFPB further claimed that the missing variables are "monotone," and it therefore used "an independent univariate conditional model to generate the multivariate imputations." *Id.*

32. Leaving aside the incomprehensibility of the CFPB's model for its purported cost/benefit analysis, the CFPB did not even attempt to estimate the full extent of lenders' costs.

33. The CFPB admitted that its Cost Survey was limited to only the 13 data points required by section 1071 of the Dodd-Frank Act and not the 81 data points required by the rule.

34. The CFPB claimed that it "c[ould] only estimate how ongoing costs would be different," but suggested that "going from 13 statutory data points to 81 in the Final Rule would increase compliance costs by $10,000,000 per year." 86 Fed. Reg. 56,354.

35. The CFPB did not differentiate between lenders of different sizes to account for the fact that total small-business loans as a percentage of total loans decline as lender size increases.

36. The CFPB nevertheless issued the Final Rule on March 30, 2023. The Final Rule is effective August 29, 2023. 88 Fed. Reg. 35,150.

37. Rally, along with CUNA and Cornerstone's other credit union members are now and will continue to incur costs to prepare to comply with the Final Rule.

38. At Rally, these will include updating computer software systems (that are yet to be available to address the requirements of the Rule); hiring and training additional employees for the implementation of new policy and procedures; and securing additional internal audit resources to ensure policy and procedures are adequate for the information collection, report preparation, intracompany segmentation procedures, and overall privacy protection needed to safeguard the extensive accumulation of personal, demographic, and sexual orientation data mandated by the Final Rule.

39. Indeed, the Final Rule will force credit unions including Rally and other members of CUNA and Cornerstone to demonstrate their progress toward identifying and initiating compliance with the Final Rule during examinations and other agency communications.

**FIRST CLAIM FOR RELIEF**
Violation of Constitution and APA
(Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A))

40. Credit Union Intervenors incorporate by reference the preceding paragraphs as if fully set forth here.

41. As the Fifth Circuit held in *Community Financial* and this Court recognized in its Preliminary Injunction, CFPB's funding structure violates the U.S. Constitution's separation of powers. Further, CFPB promulgated the Final Rule using the same procedure as the rule set aside in *Community Financial*.

42. Because CFPB issued the Final Rule with funds derived from unconstitutional sources, it violates the Constitution. *Community Fin.*, 51 F.4th at 642. Accordingly, the Final Rule is invalid, and the Court should set it aside. *See id.* at 643.

43. Further, under the APA, agency action must be vacated if it is "not in accordance with law." 5 U.S.C. § 706(2)(A). For the reasons described above, the Final Rule is not in accordance with law and therefore must be set aside. *See Community Fin.*, 51 F.4th at 643.

**SECOND CLAIM FOR RELIEF**
Violation of APA
(5 U.S.C. § 706(2)(C))

44. Credit Union Intervenors incorporate by reference the preceding paragraphs as if fully set forth here.

45. Agency actions must be set aside where they exceed an agency's statutory authority or contravene that authority. 5 U.S.C. § 706.

46. By requiring lenders like Rally to collect 68 categories of data in excess of the 13 required by § 1071, the CFPB exceeded and simultaneously contravened its statutory authority in adopting the Final Rule. The reporting requirements are so burdensome as to defeat the intent of § 1071: they will disincentivize loans to minority- and women-owned businesses.

### THIRD CLAIM FOR RELIEF
Violation of APA
(5 U.S.C. § 706(2)(A))

47. Credit Union Intervenors incorporate by reference the preceding paragraphs as if fully set forth here.

48. Agency actions must be taken in response to relevant and significant issues raised by interested parties.

49. During the notice and comment period for the Final Rule, many interested parties, including CUNA and Cornerstone, informed the CFPB of the outsized costs and resulting disincentives to loan to woman and minority-owned businesses that would result from the Final Rule's then-proposed expansion of the § 1071 reporting requirements.

50. Defendants acted arbitrarily and capriciously in failing to even consider and respond to comments raised to this effect by interested parties.

51. Courts reviewing agency actions "must set aside agency action if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

52. Because the CFPB entirely failed to consider the inherent conflict between the perverse disincentive created by the Final Rule's expanded reporting requirements and the purposes of § 1071, it acted arbitrarily and capriciously in violation of the APA. Hence the Final Rule should be set aside.

### FOURTH CLAIM FOR RELIEF
Violation of APA
(5 U.S.C. § 706(2)(A) and (C))

53. Credit Union Intervenors incorporate by reference the preceding paragraphs as if fully set forth here.

54.  In adopting regulations like the Final Rule, federal agencies must consider whether the costs of the proposed regulation are justified by its benefits.

55.  Section 1022(a) of the Dodd-Frank Act requires the CFPB to consider "the potential benefits and costs to consumer and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons … and the impact on consumers in rural areas."

56.  The CFPB failed to undertake the required cost/benefit analysis in adopting the Final Rule. Specifically, the CFPB did not properly consider the cost of compliance to smaller lenders (like Rally) and the necessary consequence of these costs: a decrease in loans available to woman and minority-owned businesses.

57.  The CFPB even conceded that additional costs of compliance with the Final Rule would be "passed on to small business credit borrowers in the form of higher interest rates and fees." CFPB *Supplemental Estimation* at 870 (Sept. 2021).[1]

58.  Despite this concession, the CFPB did not articulate how or why these increased costs of compliance—and their necessarily deleterious effect on the availability of loans to woman and minority-owned businesses—were consistent with the Dodd-Frank Act or even the CFPB's stated purpose of increasing the availability of such loans.

59.  "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).

60.  Because the CFPB failed to engage in the required cost/benefit analysis for the Final Rule, it must be set aside.

---

[1] *Available at*: https://files.consumerfinance.gov/f/documents/cfpb_1071-final-rule.pdf.

**PRAYER FOR RELIEF**

WHEREFORE, Credit Union Intervenors ask this Court to enter judgment in their favor and to provide the following relief:

A. a declaration that the Final Rule is invalid and unenforceable;

B. both a preliminary and permanent injunction setting aside and holding unlawful the Final Rule;

C. attorney's fees and costs incurred in relation to this case; and

D. such other and further relief as the Court deems just and proper.

Dated: August 15, 2023.                    Respectfully submitted,

*/s/ Christopher O. Murray*
Christopher O. Murray
Julian R. Ellis, Jr. (admitted *pro hac vice*)
BROWNSTEIN HYATT
  FARBER SCHRECK, LLP
675 15th Street, Suite 2900
Denver, Colorado 80202
Email: cmurray@bhfs.com
       jellis@bhfs.com
Ph: (303) 223-1100

***Attorneys for Credit Union Intervenors***