# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

|  |  |  |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No: 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | § § § § § § | |
| Defendants. | § § | |

## DECLARATION OF ANNE M. BALCER

1.      My name is Anne M. Balcer.  I am over the age of eighteen (18) years, have never been convicted of a crime, and am otherwise competent to execute this Declaration.  I am employed by Independent Community Bankers of America ("ICBA") as Senior Executive Vice President, Chief of Government Relations & Public Policy.  My job duties include leading ICBA's congressional and government relations teams and overseeing ICBA's advocacy initiatives in the legislative, regulatory, lending, account and payment system areas.  In performing my job duties on behalf of ICBA, I have worked closely with ICBA staff and members to understand the requirements of the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150, (May 31, 2023) (the "Final Rule").  I have

also worked closely with ICBA staff and members to gain an understanding of the costs and burdens that will be imposed on ICBA members to comply with the Final Rule.  Unless otherwise stated, I have gained personal knowledge of the facts stated in this Declaration in the course of performing my duties for ICBA.

2.      ICBA is a national association dedicated to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services.  ICBA's membership consists of thousands of community banks – more than one half of the total depository institutions in the United States – including several in the Southern District of Texas, as well as state and regional community bankers association affiliate members such as the Independent Bankers Association of Texas ("IBAT").  ICBA's members collectively operate 50,000 locations nationwide, employ nearly 700,000 Americans, hold approximately $5.8 trillion in assets, hold approximately $4.8 trillion in deposits, and make approximately $3.8 trillion in loans to consumers, small businesses, and the agricultural community.

3.      Many of ICBA's members are not members of the American Bankers Association ("ABA") or Texas Bankers Association ("TBA").

4.      The overwhelming majority of ICBA's members made a sufficient number of small business loans in 2021 and 2022, respectively, and likely will make a sufficient number of those loans in 2023, such that they will be required to comply with the data collection, reporting, and other requirements set forth in the Final Rule.

5.      I have reviewed the declarations and supplemental declarations filed previously in this case.  Because ICBA's members primarily are small community banks with fewer employees, assets, and deposits compared to ABA's and TBA's member banks, the costs and

burdens of complying with Final Rule will have a more significant impact on the majority of ICBA's members than on many of ABA's and TBA's members.

6.      On or about September 1, 2021, the CFPB published a Proposed Rule (the "Proposed Rule") entitled *Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)*.  During the notice and comment period, many comments submitted by parties subject to the Final Rule and others characterized it as excessively overbroad in terms of the data points that financial institutions must gather and report and pointed out the negative impact and substantial costs it would have on the small business lending market.  Attached hereto as exhibit "1" is a true and correct copy of a letter, dated January 6, 2022, that ICBA sent to CFPB with respect to the Proposed Rule.  To my knowledge, each fact stated in the letter is true and correct, and the Final Rule includes many of the same requirements and obligations that will cause the same or very similar expense and burden on ICBA's members as the Proposed Rule.

7.      Researchers at Texas Tech University also submitted a comment letter to CFPB, a copy of which may be found at https://www.depts.ttu.edu/rawlsbusiness/news/posts/2021/12/bankers_digest_dodd_frank.php.      I have reviewed that letter, and the concerns expressed therein are equally applicable to the Final Rule.

8.      I understand that the Final Rule requires financial institutions to begin collecting data by specific dates based on the number of  qualifying loans – "covered credit transactions" – made in the previous two years as follows:  (a) banks that have made at least 2500 qualifying loans must begin collecting data by October 1, 2024 ("tier 1 banks"); (b) banks that have made between 500 and 2500 qualifying loans must begin collecting data by April 1, 2025 ("tier 2 banks"); and (c) banks that have made at least 100, but less than 500, qualifying loans must begin collecting data by January 1, 2026 ("tier 3 banks").  I further understand that tier 1 banks

must begin reporting collected data by June 1, 2025, tier 2 banks must begin reporting collected data by January 1, 2026, and tier 3 banks must begin reporting collected data by June 1, 2027.

9.      ICBA has sent letters to CFPB urging it to delay and/or not require compliance with the Final Rule at least until the Supreme Court of the United States rules on whether CFPB's funding structure is constitutional.  Exhibits "2" and "3" are true and correct copies of those letters.  To my knowledge, CFPB has not agreed.

10.      Accordingly, ICBA's members who are not protected by this Court's preliminary injunction must immediately begin, and, to my understanding, have begun, to incur substantial expenses and undertake burdensome actions in preparation for the enforcement of the Final Rule, including training employees, hiring outside professionals for the implementation of the information collection, updating reporting applications, templates, and systems, revising intra-company segmentation procedures, and managing privacy protections needed to safeguard the large volumes of information collected as a result of the Final Rule.  Further, in the future, ICBA's members likely will be required to purchase new computer software systems (that are yet to be created to address the requirements of the Final Rule) and pay for technical support to integrate these new systems with existing systems.  The Final Rule will require small and rural banks with limited staff and resources, including ICBA's members, to devote additional resources to data collection and government reporting with respect to small business lending in the communities that they serve, and the Final Rule will require some ICBA members to hire additional staff.  In addition, federal and state financial regulatory authorities likely will require community banks, including ICBA's members, to demonstrate their progress toward identifying and initiating compliance with the Final Rule during examinations and other agency communications.

11.    Based on information gathered by my team, the following are examples of the costs and burdens of the Final Rule on ICBA members:

- Community Bank A ("Bank A") is a tier 3 bank that is not a member of the ABA or TBA with assets of approximately $240 million. Bank A estimates it will incur approximately $35,000 for one-time implementation costs, including more than $26,000 in researching, creating new policies, developing new processes, and drafting new application forms. Bank A also estimates that it will incur roughly $73,000 per year in additional costs collecting data from applicants, reviewing the data, correcting deficiencies, and reporting data to the CFPB;

- Community Bank B ("Bank B") is a tier 3 bank that is not a member of the ABA or TBA with assets of approximately $710 million. Bank B estimates it will incur approximately $29,000 for one-time implementation costs to conduct research and to write new policies and procedures. Bank B also estimates that it will incur roughly $72,000 per year in additional costs complying with the Final Rule, including the cost of hiring an additional full-time employee who Bank B estimates will spend approximately ½ of his or her time on compliance with the Final Rule;

- Community Bank C ("Bank C") is a tier 2 bank that is not a member of the ABA or TBA with assets of approximately $554 million. Bank C estimates it will need to hire additional employees to implement the Final Rule and that hiring pressures and ongoing implementation costs will increase over time. For example, Bank C estimates that: (a) in 2023, it will need to create a ¼ full time employee position; (b) in 2024, it will need to maintain this ¼ full time employee and create an additional ¼ full time auditor; and (c) in 2025 and on an ongoing basis thereafter, it will need to maintain at least a full-time employee and ½ full time auditor. Bank C estimates that its one-time implementation costs in 2023 will exceed $19,000 and will grow to approximately $40,000 per year in 2024 and $72,000 per year in 2025 and thereafter;

- Community Bank D ("Bank D") is a tier 2 bank that is not a member of the ABA or TBA with assets of approximately $1.6 billion, and it estimates that, on an ongoing basis, compliance with and implementation of the Final Rule will increase the cost per loan by approximately 35% (roughly $270 per loan). Bank D also estimates it will need to dedicate 10 employees to work exclusively on implementing the new rule and the one-time costs for those employees plus a compliance consultant, training, software

evaluation and initial costs, and training staff will be approximately $80,000. Additionally, Bank D estimates it will need to hire and retain at least 2 additional full-time employees. On an ongoing basis, Bank D estimates the costs to comply with the Final Rule will be approximately $259,000 each year;

- Community Bank E ("Bank E") is a tier 2 bank that is not a member of the ABA or TBA with assets of approximately $3 billion. Bank E estimates it will incur approximately $67,000 for one-time implementation costs, including more than $36,000 in researching, creating new policies, developing new processes, and drafting new application forms. Bank E also estimates that its one-time costs are roughly 49% higher than the costs the CFPB estimated banks of this size would incur. Additionally, Bank E estimates it will spend an additional $98,400 for annual recurring costs, approximately 145% higher than the costs the CFPB estimated banks of this size would incur; and

- Community Bank F ("Bank F") is a tier 1 bank that is not a member of the ABA or TBA with assets of approximately $7.9 billion. Bank F estimates that it will spend approximately $100,000 to purchase and install new software to comply with the Final Rule and that it will spend at least $50,000 each year in recurring costs to pay for software maintenance and at least an additional $160,000 each year for the hiring and training of 2 additional full-time employees.

- Community Bank G ("Bank G") is a tier 1 bank that is not a member of the ABA or TBA with assets of approximately $6.8 billion. Bank G estimates that it will spend approximately $100,000 to purchase and install new software to comply with the Final Rule and that it will spend at least $50,000 each year in recurring costs to pay for software maintenance and at least an additional $160,000 each year for the hiring and training of 2 additional full-time employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2023.

Anne M. Balcer

---

**DECLARATION OF ANNE BALCER**                                    Page 6

# EXHIBIT 1



Robert M. Fisher, *Chairman*
Brad M. Bolton, *Chairman-Elect*
Russell L. Laffitte, *Vice Chairman*
Gregory S. Deckard, *Treasurer*
Tim R. Aiken, *Secretary*
Noah W. Wilcox, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

*Via Electronic Submission*

January 6, 2022

Comment Intake—Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20552

RE: [Docket No. CFPB-2021-0015] — Small Business Lending Data Collection Under the Equal
Credit Opportunity Act (Regulation B)

Dear Sir or Madam:

The Independent Community Bankers of America ("ICBA")[1] welcomes the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Proposed Rule on Small Business Lending Data Collection ("Proposal"). Among other requirements, Section 1071 of the Dodd Frank Act requires financial institutions ("FIs") to collect certain data regarding applications for credit from women-owned, minority-owned, and small businesses, and to report that data to the Bureau on an annual basis. While ICBA firmly supports the intention behind the Proposal and the desire to expand access to credit for minority-owned, women-owned, and small businesses, we remain deeply concerned that the proposal's overly broad coverage will uniquely disadvantage the business customers of community banks.

Specifically, we believe that the Proposal will threaten the privacy of small business customers, increase the cost of credit, discourage "loan shopping" for the best product, increase

---

[1]*The Independent Community Bankers of America® creates and promotes an environment where community banks flourish. ICBA is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services.*

*With nearly 50,000 locations nationwide, community banks constitute roughly 99 percent of all banks, employ nearly 700,000 Americans and are the only physical banking presence in one in three U.S. counties. Holding nearly $5.9 trillion in assets, over $4.9 trillion in deposits, and more than $3.5 trillion in loans to consumers, small businesses and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation and fueling their customers' dreams in communities throughout America. For more information, visit ICBA's website at www.icba.org.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

compliance costs, and most unfortunately – erode the customized, relationship-banking model in which community banks take pride.

### GENERAL COMMENTS

Small business lending is complex and cannot be "commoditized" in the same way as consumer lending. Each small business loan has customized terms based on an analysis of numerous factors. Complex lending should not be subject to simplified, rigid analysis, which might give rise to unfounded fair lending complaints. For this reason, the proposed rules under Section 1071 will have a chilling effect on community banks' ability to price for risk, unless the Bureau can properly tailor a rule that excludes community banks from coverage.

The application of this consumer protection law is grossly incongruous with the underlying nature of small business lending. Unlike consumer loan products, such as mortgages and credit cards, small business loans are non-homogenous and do not lend themselves to standardized recordkeeping or comparative analysis.

### EXECUTIVE SUMMARY

As explained more fully below, ICBA has the following main concerns and recommendations.

1. The smallest community banks will inappropriately be covered by the scope of the rule.
   **The CFPB should exclude community banks with assets of $1.3 billion or less from coverage. By providing partial or full exemption from this rulemaking, the Bureau will still overwhelmingly meet the objectives of the law while mitigating the associated costs.**

2. The Proposal's coverage of nearly every existing business will disproportionally increase the cost of, and decrease access to, credit for truly small businesses.
   **The CFPB should define a "small business" as a business with gross annual revenue of $1 million or less.**

3. Nearly doubling the number of data points will greatly increase the burden of complying with the congressional intent of the law while also increasing the threat to small business applicants' privacy.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

**The final rule should only require the collection and reporting of statutorily mandated data points.**

4. The Proposal will unnecessarily risk the privacy of small business applicants. **The CFPB should publish a full privacy balancing test after one year's collection of data and provide an opportunity for notice and comment before determining which data to make public.**

5. Community banks will not have ample time to comply in good faith with this rule. **The final rule should provide at least three years for FIs to comply, or in the alternative, stagger the implementation dates based on asset size.**

6. The firewall requirement cannot feasibly be met by community banks, and the proposed solution will create a chilling effect for community banks, granting larger FIs and fintech companies a competitive advantage. **The inability to firewall information is additional justification to exclude smaller, federally supervised FIs from this rulemaking. Alternatively, the CFPB should establish a platform where applicants can anonymously input their demographic information for all FIs.**

7. Compliance with this rulemaking will be an entirely new environment for many community banks. **While ICBA supports the proposed safe harbors and allowance that bona fide errors are not Equal Credit Opportunity Act ("ECOA") violations, ICBA recommends that the Bureau additionally provide for a 12-month grace period after the compliance date.**

8. Though recordkeeping is a necessary part of any data collection rulemaking, it will nonetheless prove difficult for many community banks. **ICBA recommends that the Bureau provide banks with options to report annually or as loan applications are received.**

9. Verifying small business applicant information presents additional burdens beyond the mere collection of information. **Though ICBA welcomes the Bureau's proposal not to require FIs to verify applicant-provided information, ICBA urges the Bureau not to require FIs to provide separately verified information.**

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC                SAUK CENTRE, MN
1615 L Street NW              518 Lincoln Road
Suite 900                     P.O. Box 267              866-843-4222
Washington, DC 20036          Sauk Centre, MN 56378    www.icba.org

## SECTION-BY-SECTION COMMENTS

1) **A coverage threshold of $1.3 billion for federally supervised FIs would collect information for more than 90 percent of all business loans made.**

The Proposal defines a "Financial Institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity."[2] This is a broad definition which covers any bank, credit union, financial technology company, or non-bank lender that is engaged in small business lending. We believe the breadth of this definition is appropriate because it tends towards regulatory parity for larger participants in the small business lending market, regardless of what type of business form they take. **We recommend the adoption of this proposed definition without revision**.

By contrast, we strenuously object to the proposed §1002.105(b), which defines what constitutes a *covered* financial institution, and therefore determines the scope of the rule. **The rule proposes to cover any FI that "originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years."[3]** In other words, any FI that originated fewer than 25 covered small business loans in the two preceding calendar years is exempt from the rule. **This exemption threshold is inappropriately low; and if §1002.105(b) is implemented as proposed, it will almost certainly raise the cost of credit for the small business borrowers that Section 1071 is designed to protect, as thousands of small lenders would be forced to shoulder the significant compliance costs associated with a major new data collection requirement.**

We have heard from the smallest community banks in the country, and there is significant consternation about the collection and reporting requirements of this rule. Our analysis of publicly available Call Report data substantiates this concern. **If the proposed 25 loan threshold is finalized, we conclude that at least 780 banks with less than $100 million in assets will be subject to the rule,[4] yet would only provide an incremental increase in the number of business loans reported. For context:**

- **the average bank of less than $100 million in assets has 13.1 employees working at 1.6 branches.**

---

[2] 86 Fed. Reg. 56577.

[3] *Id.*

[4] Based on analysis of the number of "loans to small business" reported on Schedule RC-C, part II of the Call Report in the four quarters ending with Q3 2021, this category includes "loans secured by nonfarm nonresidential properties" and "commercial and industrial loans" in amounts less than $1 million. While this is not a perfect match for the requirements of Section 1071 because borrower revenue is not reported (no such data is currently reported), we believe it is a sufficiently close proxy to demonstrate the broad scope of the proposed rule.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

- Banks below $200 million in assets have an average 20.8 employees at 2.2 branches.
- Banks below $750 million in assets have an average of 36.4 employees at 3.4 branches.

**To reiterate, the final rule should capture the supermajority of the number of small business loans – more than 90 percent of the market – that burdens the fewest number of community banks.**

a) Asset-Based Thresholds

**We urge the Bureau to exempt all community banks with less than $1.322 billion in assets, which is the current threshold used by the FDIC, the Federal Reserve Board, and the Office of the Comptroller of the Currency to define a "small bank" in the agencies' Community Reinvestment Act ("CRA") regulations.**[5] This threshold is currently recognized by federal banking regulators and within the banking industry as a delineating line between small banks and larger banks with increased compliance capacity and regulatory obligation. Using the CRA threshold would also focus the rule on those banks that already have more advanced compliance systems, particularly for data collection, as the result of their coverage under CRA.

Alternatively, we propose that the Bureau exempt all community banks defined as small businesses under the Small Business Administration's North American Industry Classification System ("NAICS") size standards. Currently, that threshold is set at $600 million in assets.[6] According to the regulations, "SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns."[7] Because Section 1071 is a law designed to protect small businesses, the CFPB should not implement regulations which substantially burden banks below $600 million in assets and are themselves legally defined as small business concerns.

Either of these thresholds would burden many fewer banks than the proposed rule – without substantially altering the data on small business lending reported to the government. **Based on the Call Report data, if the $1.322 billion exemption threshold is used, the CFPB will collect data on 91.27% of all small business loans made by banks.** The actual percentage of small business lending data collected will likely be even greater because the Bureau is also proposing to collect data from non-bank lenders. **If the $600 million threshold is used instead, the CFPB will capture 95.78% of small business lending data.**

---

[5] 12 CFR 345.12; 12 CFR 228.12; 12 CFR 25.12.
[6] 13 CFR 121.201.
[7] 13 CFR 121.101.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

**To subject thousands of additional small depository institutions to a complex and costly rule to collect data on 4.22% of the small business lending market is unreasonable.** If the exemption threshold is not raised, this rule will harm small lenders and their borrowers. It will lead to additional compliance costs which the smallest lenders will disproportionately bear and be forced to pass on to customers. It will drive consolidation in underserved and rural areas as lenders clamor for economies of scale. It will lead some banks to scale back or discontinue small business lending. The proposed rule, with its capriciously low exemption threshold, favors large institutions with large compliance teams and has a disproportionate negative impact on small lenders that genuinely understand their communities and local small businesses. **The exemption threshold must be raised to prevent these highly foreseeable negative effects.**

    b) <u>Volume-Based Threshold</u>
We do not favor the use of a volume-based threshold for depository institutions and instead favor an asset-based threshold. In general, an asset-based threshold is a better solution because lending volume can vary from year to year, leading to potential uncertainty about whether the bank must comply, or to situations where a bank vacillates between being a covered FI or an exempt one from year to year.

While bank assets can also vary, once a bank crosses an asset threshold, it is less likely to cross below it in subsequent years. Additionally, because banks can forecast when they are likely to surpass an asset threshold well in advance, they are better able to plan and budget for the necessary investments in software, training, and personnel in advance of required compliance.

Community banks are not the "Too Big To Fail" Wall Street banks with compliance staff numbering in the thousands. They are small, locally owned, and locally managed institutions, with a of employees. Many of these employees perform multiple roles within the bank and are already responsible for complying with a myriad of complicated regulations.

The CFPB's proposal is in excess of 200,000 words and fills 251 pages in the Federal Register. Given the complexity of the issue and of the federal rulemaking process, this may be an appropriate length, and we appreciate the depth of the Bureau's analysis. Nevertheless, the reality is that the proposed rule is a massive document that will create significant and ongoing compliance burdens for covered FIs. For community banks, this burden will be particularly onerous and costly, and it may force some institutions to recoup those onerous costs by assessing additional fees to small business borrowers or scale back or eliminate their presence in the small business lending market.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267                      866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378             www.icba.org

**Therefore, in the strongest possible terms, we urge the CFPB to exercise its statutory authority to exempt small community banks from compliance with this proposed regulation.**[8] The CFPB is proposing to utilize this authority to exempt FIs which make less than 25 loans. We oppose this threshold and instead, urge the CFPB to implement an asset-based exemption threshold for small banks. An asset-based exemption is less prone to annual fluctuation than an activity threshold and would allow the Bureau to align its regulations with existing regulatory requirements.

If the Bureau opts to use a volume-based threshold for FIs, we must renew our objection that the proposed threshold of 25 is too low. It would require compliance by many of the smallest banks in America. We recommend a 1,500-loan exemption threshold. This threshold would exempt an average community bank with less than $750 million in assets, while still collecting more than 90% of small business lending data.

   c) FI Characteristics

Apart from using asset size or loan volume to determine the rule's coverage, ICBA recommends that the Bureau also consider the underlying characteristics and activities of the FI. Specifically, ICBA recommends that the Bureau provide partial or total exemption for FIs that are (1) community development financial institutions ("CDFI"), (2) Minority Depository Institutions ("MDI"), or (3) located in rural areas or underserved areas.

       i) CDFI

CDFIs, accredited by the U.S. Department of the Treasury, are FIs that are committed to community-focused lending but have difficulty raising the capital needed to provide affordable financial services. Among other requirements, a FI with a CDFI designation must demonstrate and prove that it: (1) has a primary mission of promoting community development, (2) primarily serves a target market, such as a predominantly low-and-moderate income ("LMI") community, and (3) maintains accountability to that target market.

The Bureau decided to exempt CDFIs when implementing the Qualified Mortgage ("QM") rule, finding that CDFIs that provide mortgage loans generally employ underwriting guidelines tailored to the needs of LMI consumers.[9] In providing this exemption, the Bureau explained

---

[8] *See* 12 USC 5512(b)(3), which gives the CFPB authority to "unconditionally exempt any class of covered persons … from any provision of this title, or from any rule issued under this title, as the Bureau determines necessary or appropriate to carry out the purposes and objectives of this title." This provision unambiguously gives the CFPB the authority to exempt community banks below a designated asset threshold if the Bureau conducts a cost-benefit analysis and concludes that the cost to community banks and their customers outweigh the benefits of requiring community banks to comply.
[9] 78 Fed. Reg. 35464

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267              866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378    www.icba.org

that because CDFIs are more likely to consider non-standard factors and do not typically underwrite to industry-wide standards, that they can better account for the unique credit characteristics of LMI consumers.

At the time, the CFPB exempted CDFIs because LMI consumers "have difficulty obtaining responsible and affordable credit, and that the burdens imposed by the ability-to-repay requirements would significantly impair the ability of these creditors to continue serving this market."[10] The same logic would hold here if the Bureau were to exempt CDFIs from coverage under a 1071 rule. CDFIs should not be additionally burdened by complying with this rule when they are already serving LMI populations. They already document many of the data points being proposed, and if the Bureau does not provide whole exemption, then partial exemption from redundant data points would be prudent.

    ii)  <u>MDI</u>

MDIs were designated under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), when Congress recognized that minority banks can play an important role in serving the financial needs of historically underserved communities and minority populations. The Federal Deposit Insurance Corporation ("FDIC") defines an MDI as any federally insured depository institution for which 51 percent or more of the voting stock is owned by minority individuals or a majority of the board of directors is minority, and the community that the institution serves is predominantly minority.

Since Congress has determined that MDIs already play an important role in serving underserved communities and minority populations, the intent behind Section 1071 is already met by MDIs, and therefore, should not redundantly be applied to this special class of FIs. As such, ICBA urges the Bureau to exempt MDIs from the 1071 rule's coverage.

    iii)  <u>Rural and Underserved Areas</u>

The Bureau should exempt small lending institutions and those operating entirely outside of metropolitan statistical areas ("MSA"), such as community banks that operate in rural or underserved areas. This exemption would mirror the Home Mortgage Disclosure Act's ("HMDA") exemption for similarly situated banks.[11] Exempting these community banks from

---

[10] 78 Fed. Reg. 35464
[11] 12 CFR 1003.2(g)(1)(ii)

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

coverage would simplify and maintain congruency between Section 1071 and HMDA. Ultimately, no regulatory compliance is costless, and if these community banks are not exempted from Section 1071, those costs will be passed on to business borrowers. In some cases, this increase may make loans unaffordable and reduce access to credit.

**2)   While ICBA welcomes the use of Gross Annual Revenue as the determining factor of covered business applicants, the threshold should be $1 million rather than $5 million.**
Though the statute uses section 3 of the Small Business Act to define a small business, the CFPB proposes to use a business's gross annual revenue ("GAR") to determine which businesses are covered by the law. The Bureau believes that using a GAR threshold to define a "small business" would facilitate compliance for FIs applying "a simple, broad definition…that would be practical…in the market."[12] The Bureau proposes to define the term as a business with gross annual revenue the preceding fiscal year of $5 million or less.

ICBA supports the Bureau's approach and agrees that using the bright line of a business's GAR is a convenient way for a bank to quickly determine whether an applicant will be covered by the rule. It is an efficient way for banks to comply. ICBA supports adopting a definition that is less complex than Small Business Administration's ("SBA") size standards based on 6-digit NAICS codes. However, ICBA does <u>not</u> support the proposed GAR threshold of $5 million, but instead, urges the Bureau to use a $1 million threshold, which will streamline compliance, cover the vast majority of businesses, and correspond to the public's general understanding of a "small business."

   a)   <u>A $1 million threshold promotes simplicity and ease of compliance.</u>
As part of its justification for setting a $5 million GAR threshold, the Bureau notes that larger FIs categorize loans made to businesses based on GAR, with loans to businesses up to $5 million categorized as small/retail customers. If the Bureau was willing to limit the coverage of this rule to those larger FIs, then perhaps a $5 million GAR threshold would be appropriate. However, since the Bureau is proposing to cover smaller FIs, then consideration of how larger FIs treat small business loans should not bear weight on regulations applying to community banks.

Instead of considering how larger FIs categorize their commercial lending, the Bureau should review existing regulations that use a $1 million threshold and align 1071's definition with those requirements. For example, Regulation B uses a $1 million GAR threshold to determine how a bank provides adverse action notifications to business applicants,[13] and CRA regulations use a

---

[12] 86 Fed. Reg. 56426
[13] 12 CFR 202.9(a)(3).

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

$1 million GAR threshold to determine which commercial loans meet community development loan requirements.[14]

In this analysis, the Bureau rightly focuses on ease of compliance, certainty of coverage, and bright-line assessments. The Bureau should truly prioritize these attributes and create a bright-line GAR of $1 million – in large part, due to the reasons laid out above. It is a threshold that is already widely understood and accounted for by community banks. Existing regulations already hinge on the $1 million GAR threshold. Creating a new "small business" threshold standard will almost certainly create confusion and difficulty with compliance, thus undercutting the benefits the Bureau outlines above.

b) A $1 million GAR threshold covers the vast majority of all businesses.

ICBA contends that not only does a $1 million threshold cover **most small businesses**, but a $1 million definition covers nearly **every business**, which should be more than sufficient to meet Congressional intent.

From the 2012 Census Survey of Business Owners, cited in the Bureau's own research on setting an appropriate threshold, approximately 95 percent of all businesses had less than $1 million in annual revenues.[15] Roughly, 97.7 percent of all minority-owned businesses and 98.3 percent of all women-owned businesses were similarly under $1 million in annual receipts.[16] A portion of this is worth emphasizing – a $1 million threshold would cover 95 percent of **all** firms, not just "small" ones. This context is important when considering the common usage and understanding of "small" businesses, which is discussed below.

c) Common usage of a "small business" implies a GAR of $1 million or less.

Apart from the simplicity and ease of compliance of using a $1 million threshold, the common understanding of a "small business" is one with revenues under $1 million. According to a research poll, commissioned by ICBA and conducted by Morning Consult, nearly 90 percent of respondents indicated that a "small business" is one with GAR of $1 million or less, with the

---

[14] 12 CFR 25.12(g)(3); 12 CFR 195.12(g)(3); and 12 CFR 228.12(g)(3).
[15] U.S. Census Bureau, Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012 More Information 2012 Survey of Business Owners, American Fact Finder, (last visited Feb 27,2017), available at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodTyp e =table/.
[16] *Id.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267              866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378    www.icba.org

vast majority of respondents indicating that a small business is one with less than $500,000 in revenue.[17]



As several consumer groups noted in response to the Small Business Regulatory Enforcement Fairness Act ("SBREFA") Outline, the Bureau must align its definition of a "small business" with congressional intent. Although the Bureau is not using the exact definition prescribed in the statute, its approach to use a simple revenue threshold should be lauded, but only as far as it retains a semblance to the general understanding of a "small business." As it deviates further from the common usage of the term "small business," the Bureau tacks father from congressional intent. Indeed, by setting a threshold that covers nearly *every* business, let alone "small," the Bureau diminishes the importance that Congress placed on the modifier "small."

   d)   Small farm and agricultural loans should be exempt from coverage.
ICBA recommends that the Bureau exclude small farm and agricultural loans from coverage. Not only is it unlikely that Section 1071 was enacted to cover small farm and agricultural lending, but their underwriting criteria are distinct and different from small business loans. The distinction is already codified in several laws and regulations. For example, the definition of small business loans and small farm loans under CRA have two different definitions, revealing the distinction between the two. HMDA also exempts rural lenders located in nonmetropolitan areas.

Because large banks often do not engage in significant agricultural lending, community banks are often the only option for small farms. If the burden of Section 1071 compliance forces small lenders to reduce their lending below the exemption threshold it may limit the access to credit

---

[17] This poll was conducted between November 1st and November 4th, 2021 among a national sample of 1996 voters. The interviews were conducted online, and the data were weighted to approximate a target sample of voters based on age, gender, educational attainment, race, and region. Results from the full survey have a margin of error of plus or minus 2 percentage points.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

for these agriculture businesses unless farm loans are exempted from coverage under the definition of "small business."

**3) The CFPB should limit the compilation of reportable data to that which is required by statute.**

Although the statute requires FIs to "compile and maintain" records of information provided by applicants on enumerated data points,[18] the Bureau is using its authority[19] to require additional data points that the Bureau determines would aid in fulfilling the purpose of [section 1071] (hereinafter, "discretionary data points").

The Bureau is proposing to require collection and reporting of discretionary data points that it considered in the SBREFA Outline, including pricing, time in business, NAICS code, and number of workers. Further, the Bureau is proposing several additional discretionary data points that were not considered in the SBREFA Outline nor discussed among small entity representatives ("SERs"), including application method, application recipient, denial reasons, and number of principal owners.

While ICBA supports the Bureau's goal of eliminating illegal discrimination, we are concerned that many of the discretionary data points, such as number of workers, the application method and recipient, are not currently collected by community banks and will be an entirely new burden for them. Not only are many of these discretionary data points not relevant to creditworthiness, ICBA is concerned that the inclusion of these data points will increase the occurrence of misinterpretations or incorrect conclusions drawn from the data. If the Bureau is concerned about fair lending violations, then it should acknowledge that the prudential banking agencies conducting fair lending exams have the majority of these data points, along *with* the contextual information that would correct for otherwise erroneous conclusions. Community banks are already examined for compliance with fair lending laws – the collection of all these data points duplicates, or worse usurps, those prudential agency efforts.

Further, given the unprecedented nature of this regulation, it is uncertain whether the burden of collecting this new information will provide the benefit that the Bureau anticipates. If the Bureau opts to require some or all of the proposed discretionary data points, then ICBA urges

---

[18] Section 704B(e) of the Equal Credit Opportunity Act ("ECOA").
[19] Section 704B(e)(2)(H) of ECOA.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

the Bureau to consider partial collection of data for community banks and other, similarly small FIs that are least likely to afford the additional burden that such collection would create. Requiring all 21 proposed data points for only the largest FIs would provide a mechanism for the Bureau to establish a baseline of data that could better inform future efforts to decide whether greater coverage or applicability to smaller FIs is warranted.

The cost of collecting and reporting the data points will include expensive data quality scrubs to avoid negative examination findings, costs that will be disproportionately borne by smaller FIs, such as community banks.

Given that much of this data is not currently collected by community banks, there are concerns that compliance with this rule will require the standardization and homogenization of small business lending, which is anathema to the customized and relationship-based lending for which community banks are valued. While some FIs already automate and standardize their small business lending departments, community banks will be left with a choice: standardize their small business lending to comply with this proposed rule or incur disproportionate costs to continue their customized and relationship-based approach.

Distinct from larger market participants that base their business models on scale and repeatability, community banks are relationship lenders. Community banks design products and services that are tailored to their small business customers' needs. These unique products and services are near-impossible to standardize, but they are often the only product or service available to small businesses – especially the small businesses that are most vulnerable and in need.

If all the proposed data points are uniformly required of all covered FIs, then many community banks will be forced to choose the standardization route. This harms community bank lending, but it most harms the small businesses that most benefit from the high-touch, relationship-based lending that community banks offer.

a) <u>Ethnicity, Race, and Sex of Principal Owners</u>
The Bureau is proposing to require FIs to collect and report the ethnicity, race, and sex of the applicant's principal owners as well as whether this information is being reported based on previously collected data. It is also proposing to require FIs to conduct a visual observation or surname analysis to determine the race and ethnicity of an applicant who declines to respond to the collection request. Proposed appendix G would include a requirement that a FI inform an applicant that the applicant is not required to respond to the FI's questions regarding its principal owners' ethnicity, race, or sex.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

ICBA notes that the visual observation and surname analysis for applicants that do not self-report is one of the most controversial provisions of the proposed rule. We strongly recommend that the Bureau rescind the proposed requirement to conduct a visual observation and surname analysis, and instead, implement the approach that was contemplated in the SBREFA Outline.

Specifically, the Bureau should require that the collection and reporting of the race, sex, and ethnicity of small businesses' principal owners be based solely on applicant self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the FI would report this information and would have no obligation to verify it.

Not only would this proposed requirement be extraordinarily uncomfortable for the bank employee conducting the visual observation, but it would be in direct contradiction to the applicant's wishes not to identify their race or ethnicity. This right is clearly stipulated in law, and the Bureau's proposed requirement would be an end-run around that right.

Further, and as noted in the SBREFA Outline, requiring reporting based on visual observation or surname could create unwarranted compliance burdens in the context of small business lending. These burdens may include the costs to create and maintain policies and procedures; costs of applying such policies and procedures in a consistent manner; costs to conduct ongoing training; and costs to audit compliance.

Finally, if the public is going to rely upon this dataset for policy decisions and a better understanding of the market, then the Bureau should do its best to ensure that the data is accurate and not subjective. Including guesses and hunches in a dataset do not lead to sound conclusions. ICBA strongly urges the Bureau to rescind its proposed requirement for banks to conduct visual observations and surname analyses of applicants.

The CFPB should allow for self-identification and not require FIs to supplant applicant wishes with their own guesses. Instead, if response rates to demographic inquiries are so low due to fear of discrimination, a better method of gathering data would be to provide the applicants with an online portal to self-identify that ensures their demographic anonymity (discussed further, below, in the firewall section).

b) <u>Pricing Information</u>

Also not required by statute, the CFPB is proposing to require FIs to report:

(1) the interest rate that is or would be applicable to the covered credit transaction;
(2) the total origination charges for a covered credit transaction;

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

(3) the broker fees for a covered credit transaction;
(4) the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction;
(5) the difference between the amount advanced and the amount to be repaid for merchant cash advances; and
(6) information about any prepayment penalties applicable to the covered credit transaction.

The Bureau is proposing to include these discretionary data points because it believes that heightened risks to fair lending and small business development may arise from different pricing for the same products and the selective marketing of higher-priced or even predatory and unsustainable products.

ICBA has an issue with these proposed data points on two fronts discussed more fully below. First, though different pricing for the same products may evidence predatory or discriminatory lending, the proposed data points will not be gathering pricing for the same products. Second, pricing will not accurately capture the ancillary products and services that community banks offer to their customers, where a pricing premium is acceptable for the higher quality product and services.

    i)   Comparison of heterogeneous commercial products will not yield significant findings.

The Bureau believes pricing data are important because the statutory data points alone offer: (1) limited insight into underwriting disparities and (2) no insight into predatory prices or pricing disparities. The Bureau notes that pricing data in HMDA has been critical in identifying disparate pricing among protected classes.

However, instead of giving the Bureau and researchers the data set to make statistically sound findings, the collection of pricing information is much more likely to increase unsound findings and allegations. Pricing could be publicly reported with the assumption that like products are being compared against other like products, but without contextual information that would explain the pricing variations due to factors such as the nature of the collateral, credit scores, size of down payment, compensating deposit balances, bundled services, etc.

Unlike other types of consumer credit, each small business has its own distinctive characteristics with unique credit needs. Existing business lending practices do not conform to a standard data collection practice and would require extraordinary change to comply. Unlike the residential mortgage market, where there is a standard portfolio of products, each small

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

business is different from others, each has its own needs, and as such, each small business loan is similarly distinct from other small business loans.

Discerning discrimination based on pricing for consumer products is a much more established and tenable proposition.  There are many fewer variables, and the market has largely been homogenized and standardized through a robust secondary market. Such a market does not exist to the same degree for commercial lending. ICBA is concerned that efforts to collect pricing data, as well as several other data points in this proposal, will push the industry in that direction. Thus, the customized, high-touch relationship bank model that community banks offer will be eradicated.

> ii) <u>Pricing premium data point would not reflect small business customers' preference for community banks.</u>

Apart from providing credit to their small business customers, community banks overwhelmingly provide valuable ancillary services to their customers, such as acting as advisor or consultant. For example, community banks often know commercial zoning laws in their local community just as well as an official at city hall. They have the familiarity and local knowledge that is unparalleled, and small business customers depend on and benefit from that knowledge. As such, pricing data from a community bank may appear inflated when compared to other FIs, but that price premium includes these ancillary services. This is a data point, that like many other discretionary data points proposed, will lead to erroneous conclusions.

Apart from ICBA's objection to including pricing terms as a data point, ICBA stresses that the Bureau should eliminate pricing data points that are uniformly assessed to all credit applicants, or fees assessed from third parties. For example, if all applicants are charged a $50 annual fee or 0.25 percent broker fee, there is no disparate allocation of those fees, and as such, would not aid the Bureau or the public in determining fair lending violations. Therefore, if certain pricing data will not be useful toward the Bureau's goals, then it should not be collected.

> c) <u>NAICS Code</u>

Even though it is not required by statute, the Bureau is proposing that FIs collect and report an applicant's 6-digit NAICS code. ICBA objects to the inclusion of this data point. Not only is it not required by statute, but it does not provide information that would inform fair lending scrutiny. Further, many community banks have expressed an unfamiliarity with NAICS or do not currently collect it - this would be an additional burden placed upon them.

The Bureau cites the identification of high-risk industries, such as those with high rates of businesses leaving the market or that deal primarily in cash transactions, as potential evidence

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

in determining fair lending violations. The Bureau should acknowledge that these decisions are indicative of risk tolerance – not of fair lending violations. Collecting this information could present disparities of lending to industries, but it would not portend disparate treatment of protected classes of borrowers.

Separately, and as discussed below, the combination of NAICS code with statutorily mandated data points is the most significant risk to customer privacy.

### d) Application Method

The CFPB is proposing to require FIs to collect and report application method or the means by which the applicant submitted the application to the FI. ICBA strongly opposes this proposed requirement. Not only is this data point not mandated by statute, but it was also not considered in the SBREFA Outline and was only requested by <u>one</u> SER panel participant.

Currently, the vast majority of community banks do not collect nor record the application method. This would be a new data construct if finalized. The complexity of this data point will likely lead to unintentional errors. Additionally, including this data point is unlikely to achieve the CFPB's stated goals. This suggests that the Bureau should remove this proposed data point. This data point is needlessly complex and unlikely to provide the Bureau or public with meaningful evidence of discrimination. Other stated policy goals can be achieved by combining other statutorily mandated data points.

### i) Needless Complexity

Though complying with "application method" by selecting in-person, telephone, online, or mail seems simple on its face, the lengthy official comments indicate that compliance will almost certainly not be simple. Proposed comment 107(a)(3)-1 would explain how FIs are to choose which application method to report, including via "waterfall approach" when they have contact with an applicant in multiple ways. The official comments then provide detail in the "waterfall approach" at which point the complexity of compliance becomes apparent.

- Proposed comment 107(a)(3)-1.i would provide that a FI reports the application method as "in-person" if the FI, or another party acting on the FI's behalf, meets with the applicant in person (for example, in a branch office, at the applicant's place of business, or via electronic media with a video component).
- Proposed comment 107(a)(3)-1.ii would provide that a FI reports the application method as "telephone" if the FI, or another party acting on the FI's behalf, did not meet with the applicant in person but communicated with the applicant by telephone or via electronic media, without a video component.

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

- Proposed comment 107(a)(3)-1.iii would provide that a FI reports the application method as "online" if it, or another party acting on the FI's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone but communicated with the applicant through an online application, electronic mail, text message, and/or some other form of online communication.
- Proposed comment 107(a)(3)-1.iv would provide that a FI reports the application method as "mail" if the FI, or another party acting on the FI's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone but communicated with the applicant in writing via United States mail, courier or overnight service, or hand-delivery (including hand-delivery of documents via an overnight drop box or at a teller window).
- Proposed comment 107(a)(3)-2 would provide guidance on what application method a FI would report for interactions with applicants, both online and by mail. A FI would report application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners.

Though likely intended to be comprehensive and illustrative, this "waterfall approach" is very complicated and prone to unintended errors. Apart from the subjectivity and differing trigger of "application" from FI to FI, there will undoubtedly be situations where the applicant initially meets with the FI telephonically, "submits the application" via mail or email, but only meets with the FI in-person at some point before a credit decision is made but after the "application" was submitted.

This is an incredibly complex data point that presents limited value. The CFPB should not include this data point in the final rule.

ii)  <u>Unlikely to Provide Evidence of Discrimination from Bad Actors</u>

The Bureau contends that this data point will monitor for discouragement of applicants. This contention is reasonably based on the "bad actor theory" – that certain bad actors will discriminate against protected classes of people based on their appearance, and that correlating certain application methods (in-person or remote) with adverse credit decisions can ferret out that illegal discrimination. That theory, though, is based on the faulty assumption that bad actors will accurately report this data point.

For example, if a bad actor were indeed discouraging certain protected classes of applicants, it is likely that the bad actor would misreport other data points of this rule that would evidence their illegal activity. Only the good actors that do <u>not</u> illegally discriminate will accurately record

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

this data point, and therefore, the data is unlikely to show a correlation between application method and discouragement.

The Bureau also explains that data on application method would assist in analyzing data reported under, and assessing compliance with, proposed §1002.107(a)(20), which requires FIs to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances. Yet, here again, the Bureau uses the faulty logic that a bad actor will accurately report the data that will evidence their non-compliance with other portions of the rule.

### iii) Achieving Stated Policy Goals by Combining Already Collected Information

Finally, the Bureau believes that application method may help users of 1071 data analyze the extent to which FIs may be providing access to credit online or by telephone in "credit deserts" where FIs do not have branch operations. However, this data could easily be inferred by matching portions of 1071 statutorily mandated data with other publicly available data.

For example, collecting the census tract of the loan proceeds will indicate whether the loan was indeed originated in a credit desert or in an area where the FI does not have a branch presence. In either such case, the Bureau would be able to analyze the extent to which applicants are receiving credit online or by telephone without creating the additional burdensome data point.

### e) Denial Reasons

Though not required by statute, the Bureau is proposing to require FIs to report the principal reason or reasons the FI denied the covered application. Proposed comment 107(a)(11)-1 explains that a FI complies with proposed §1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons. The Bureau notes that its proposed approach for this data point largely mirrors the Regulation C approach for denial reasons.

Apart from the privacy concerns (noted below), ICBA continues to recommend that this data point should not be required but should be optional for FIs. If the Bureau believes that including denial reasons might reduce the risk of erroneous conclusions and fair lending actions, then the Bureau should grant FIs the discretion of including those data points, dependent on their own risk appetite and mitigation strategies.

However, if the Bureau elects to include this data point, ICBA believes that the denials reason categories listed constitute a full picture of reasons that credit is typically denied.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267              866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378    www.icba.org

f)   Number of Workers

Another data point not required by statute but being proposed by the Bureau is the number of workers that the small business applicant employs. The Bureau believes that this data point would aid in fulfilling the business and community development purpose of section 1071.

Once again, ICBA objects to the proposed inclusion of this discretionary data point. The Bureau is correct in recognizing that many banks that do not originate SBA loans do not typically collect the number of employees in a company. Making this more difficult, the Bureau has changed the SBREFA Outline contemplated "employee" data point and is now proposing "workers," which would include contractors and others that are not necessarily employed by the applicant. This information is not necessarily known by the applicant, will have little value toward enforcing fair lending laws, and will likely generate error and bad data.

If the Bureau proceeds to retain this proposed data point, ICBA recommends that the final rule allow principal owners to report themselves as workers, which would be more in line with common parlance and avoid confusion.

g)   Time in Business

Though not required in statute, the Bureau believes that data providing the time in business of a small business applicant would aid in fulfilling both the business and community development and fair lending purposes of section 1071. The proposed rule would require a FI to collect and report the time the applicant has been in business, described in whole years, as relied on or collected by the FI.

The Bureau explains that time in business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the section 1071 dataset. However, this rationale is undercut by the Bureau's proposed requirement for the FI to report time in business using owner or management experience rather than the age of the business itself. Similarly, the Bureau's rationale is diminished by the proposed requirement that the owner with the greatest number of years is reported when the applicant has multiple owners with different numbers of years operating that business.

While ICBA agrees with the Bureau that the inclusion of time in business data could help mitigate the concerns of data misrepresentation, the proposed rule provides an example where data indicating that a small business applicant is a start-up with little experience, or financial history could provide a legitimate business explanation for why the FI denied the application or approved it for less credit than was applied for. ICBA urges the Bureau to make such data optional as a mitigant, not a requirement.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267              866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378    www.icba.org

h) Application Recipient

The Bureau is proposing to require FIs to collect and report the application recipient, meaning whether the applicant submitted the covered application directly to the FI or its affiliate, or whether the applicant submitted the covered application indirectly to the FI via a third party. Proposed comment 107(a)(4)-1 would clarify that if a FI is reporting actions taken by its agent consistent with proposed comment 109(a)(3)-3, then the agent is considered the FI for the purposes of proposed §1002.107(a)(4).

Once again, this data point is not required by statute nor was it considered in the SBREFA Outline. The Bureau believes that the proposed collection of application recipient may help users of the data understand whether FIs making credit decisions are directly interacting with the applicant and/or generally operate in the same community as the applicant.

Though the Bureau might believe that this data point would "improve the public's understanding of the structure of small business lending originations across the market," it is a data point that, in the vast majority of cases, is not currently collected by community banks and would be an undue burden to achieve the Bureau's aspirational goal, contrary to the Bureau's belief that this data point should not be difficult to collect and report. Further, application recipient would not be dispositive evidence of fair lending violations. ICBA strongly recommends that the CFPB use their discretionary authority wisely and establish a compelling nexus between the statutory goals and discretionary data points.

i) Credit Type

The Bureau believes that three additional data fields should spring from "credit type," which is explicitly enumerated in statute. The Bureau is proposing to require FIs to collect and report the following information regarding the type of credit applied for or originated: (i) the credit product; (ii) the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction was originated; and (iii) the length of the loan term, in months, if applicable.

Despite the added complexity of requiring three data points for the one listed in statute, ICBA believes that the Bureau has accounted for and addressed some of the concerns that community banks have raised related to this data point. In particular, ICBA appreciates that the data points allow for the simple reporting of counter offers and the ability to mark fields as "not provided by applicant" in the case of incomplete applications.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

However, ICBA continues to object to additional credit amounts, such as line increases, counting as a separate credit product. Not only will it be duplicative to capture the same information in a line increase as was captured from the initial origination, but it will also artificially inflate a FI's loan volume activity, thereby significantly increasing the number of community banks that would be covered FIs.

j)  Credit Purpose

Section 1071 requires FIs to collect and report the type and purpose of the loan or other credit for which the applicant is applying. The Bureau is proposing to require that FIs collect and report the purpose or purposes of the credit applied for or originated. The Bureau is also proposing to add "not applicable" to the purposes list for use when an application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card. Proposed comment 107(a)(6)-5 would also explain the use of "not applicable" as a response.

ICBA supports the proposed compilation of credit purpose, especially the flexibility of "not applicable" fields or "not provided by applicant and otherwise undetermined" options. ICBA also appreciates that FIs would be able to order the "credit purposes" according to their own discretion. ICBA believes that these accommodations will facilitate compliance while still achieving the policy goals of the law.

k)  Amount Applied for

Section 1071 requires FIs to collect and report "the amount of the credit or credit limit applied for," and the Bureau is proposing in § 1002.107(a)(7) to require that a FI collect and report "the initial amount of credit or the initial credit limit requested by the applicant." Proposed comment 107(a)(7)-1 would explain that a FI is not required to report credit amounts or limits discussed before an application is made but must capture the amount initially requested at the application stage or later.

As ICBA discussed in response to the SBREFA Outline, an applicant will often state a specific amount early in the application process, but the amount will usually change during the process for various appropriate reasons. Arriving at an applied for amount is a complex, iterative process, and the reporting requirement should be flexible. As such, ICBA appreciates that the proposed rule accounts for this iterative process by not requiring FIs to report the amounts discussed before the application is made, thereby accommodating preliminary informal interactions.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267             866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378   www.icba.org

However, it should be noted that applicants' stated credit desires can be arbitrary, and comparing the initial amount requested against the amount approved could be misleading and is not a reliable measure of the health or efficacy of small business lending. Though this cannot be addressed in the data reporting field, ICBA stresses that the Bureau should incorporate these concerns when determining which data to publish on a loan-level basis (discussed further, below).

l)   <u>Amount Approved or Originated</u>

Section 1071 requires FIs to collect and report "the amount of the credit transaction or the credit limit approved." The Bureau is proposing that the amount approved or originated be collected and reported as follows:

> (i) for an application for a closed-end credit transaction that is approved but not accepted, the FI collects and reports the amount approved by the FI;
> (ii) for a closed-end credit transaction that is originated, the FI collects and reports the amount of credit originated; and
> (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the FI collects and reports the amount of the credit limit approved.

This proposed treatment closely tracts with what was contemplated in the SBREFA Outline, and as such, ICBA has no suggested changes. It is important to highlight, though, ICBA's support for the proposed treatment of counteroffers pursuant to proposed comment 107(a)(8)-5. The proposed comment explains that if an applicant agrees to proceed with consideration of a counteroffer for an amount or a limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the FI reports the amount granted.

In contrast, if an applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the action taken on the application as denied and reports "not applicable" for the amount approved or originated. ICBA believes that this treatment of counteroffers appropriately allows for the negotiations that are prevalent in small business lending.

m)  <u>Action Taken</u>

ECOA section 704B(e)(2)(D) requires FIs to report the "type of action taken" on an application. As such, the Bureau is proposing in §1002.107(a)(9) to require reporting of the action taken by

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267              866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378    www.icba.org

the FI on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete, which is largely consistent with Regulation C. [20]

ICBA supports the Bureau's proposal to categorize all incomplete applications as a single category of "incomplete," rather than incomplete denials separate from notices of incompleteness. This should provide FIs with easier compliance and less opportunity for error.

Regarding the treatment of counteroffers that are not accepted, ICBA believes that they should be reported as "approved but not accepted," as that classification would appropriately capture the situation where the applicant was approved for credit yet declined to accept the credit offer. This approach also more appropriately reflects the availability of credit in the market.

n) <u>Action Taken Date</u>

ECOA section 704B(e)(2)(D) requires FIs to collect and report the "date of such action." The Bureau is proposing to require "action taken date" to be reported as the date of the action taken by the FI, largely in coordination with Home Mortgage Disclosure Act implementing Regulation C approaches.

While ICBA has no recommendations related to the proposed treatment of "action taken date", ICBA strongly opposes the additional data points contemplated in the section-by-section analysis of the proposed rule. Specifically, ICBA objects to the requirement for FIs to record separate data points for the date the application was approved and the date of disbursement of funds (for term loans) or funds availability (for lines of credit). ICBA believes that to do so, the Bureau would be chasing ever-increasingly de minimis data points that have diminishing value. Reporting the time elapsed between when an application is approved, when the closing occurred or the account was opened, and when the applicant actually received the loan funds or access to funds adds inordinate degrees of complexity that draws out the compliance process much longer than needed to meet the objectives of the law.

o) <u>Census Tract</u>

Section 1071 requires FIs to collect and report "the census tract in which is located the principal place of business of the . . . applicant." The Bureau is proposing to require FIs to collect and report the census tract data point using a "waterfall" approach. Under the Proposal, FIs would report the census tract of the address or location where the proceeds of the credit applied for

---

[20] 12 CFR 1003.4(a)(8).

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

or originated will be or would have been principally applied. If that information is unknown, then the FI reports the address or location of the main office or headquarters of the applicant. Finally, if even that information is unknown, then the FI reports another address or location associated with the applicant.

This approach is similar to the one contemplated in the SBREFA Outline and of which ICBA is supportive. It adequately reflects banks' preference to match existing regulatory requirements, such as Regulation C and CRA. ICBA also welcomes the Bureau's proposed safe harbor, which would state that an incorrect entry for census tract is not a violation of ECOA or Subpart B if the FI obtained the census tract by correctly using a geocoding tool provided by the Federal Financial Institutions Examination Council ("FFIEC") or the Bureau. However, as discussed below, ICBA is significantly concerned about the risk to small business customer privacy if census tract and other data points are publicly reported.

p)  <u>Gross Annual Revenue</u>

Section 1071 requires FIs to collect and report "the gross annual revenue of the business in the last fiscal year of the . . . applicant preceding the date of the application," and the proposed rule would require reporting of the gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected.

ICBA supports the proposed comments that would clarify that a FI need not verify gross annual revenue information provided by the applicant and is permitted – not required – to report the gross annual revenue for the applicant that includes the revenue of affiliates as well.

q)  <u>Minority-owned and Women-owned Business Status</u>

Consistent with its approach during the SBREFA process, the Bureau is proposing to require FIs to collect and report whether an applicant is a minority-owned business and/or a women-owned business. Proposed appendix F includes a requirement that a FI inform an applicant that the applicant is not required to respond to the FI's questions regarding the applicant's minority-owned and women-owned business status, and a prohibition on FIs requiring applicants to provide this information. Proposed appendix E, which is a sample data collection form, would include a question about minority-owned and women-owned business status and related information to assist applicants with responding to the question.

ICBA supports the Bureau's proposed approach in collecting this information and particularly welcomes the model forms in appendix F and E. ICBA also appreciates that the Bureau is keeping with the spirit of the law by allowing applicants to refuse to answer the question and permitting FIs to reflect that refusal in the data collection field.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

   r)  Number of Principal Owners

The Bureau is proposing that FIs collect and report the number of principal owners of a business, defined as a natural person who directly owns 25 percent or more of the equity interests of the business. Additionally, while the ownership interest of a small business may be straightforward in certain cases and specified in a legal organizational document in other cases, certain legal structures make determining ownership equity extremely difficult, at best. ICBA questions the utility of this information, especially in cases that might inadequately describe or erroneously imply the ownership structure of the applicants.

   s)  Application Date

ECOA section 704B(e)(2)(A) requires FIs to collect and report the "date on which the application was received." Here, the Bureau is proposing to require reporting of the application date as the date the covered application was received by the FI, or the date on a paper or electronic application form. Proposed comments 107(a)(2)-1 and -2 would clarify the need for a FI to take a consistent approach when reporting application date and provide guidance on how to report application date for indirect applications.

Additionally, the Bureau is proposing a safe harbor, which would provide that a FI does not violate proposed subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date.

Given community banks' familiarity with Regulation C, ICBA supports the proposal's treatment of application date. However, while ICBA welcomes safe harbors, the utility of this safe harbor is difficult to envision. For example, it is not clear who would determine, or how it would be determined, that the "actual" application occurred on a date other than the one recorded by the FI. Given that the definition of "application" provides an inherent degree of flexibility and subjectivity, ICBA contends that the date the FI provides is the "actual" date. In the alternative, ICBA requests the Bureau to provide additional official commentary that illustrates how this safe harbor would operate.

   t)  Unique Identifier

Given that the ECOA section 704B(e)(2)(A) requires FIs to collect and report "the number of the application," the Bureau is proposing to require that FIs report an alphanumeric identifier starting with the legal entity identifier ("LEI") of the FI. This unique alphanumeric identifier would be required to be unique within the FI to the specific covered application and would be required to be usable to identify and retrieve the specific file corresponding to the application for an extension of credit.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

Community banks have noted their preference not to be required to create this identifier too early in the credit origination process.

**4)  The Proposed Rule presents grave concerns regarding customer privacy.**

The Bureau is required to annually make the data it receives from FIs available to the public in such form and in such manner as the Bureau determines by regulation[21]; however, the Bureau may, "at its discretion, delete or modify data collected under [section 1071] which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."

ICBA believes that the Bureau must be aggressive in protecting the privacy interests of small businesses and err on the side of caution. Publishing certain data points in unedited, application-level format will likely lead to the re-identification of small businesses and create risks to the privacy interests of applicants.

a)  Sensitivity of Data Points When Combined

After the Bureau receives at least one full year of 1071 data from FIs following the compliance date of the final rule, the Bureau intends to issue a policy statement in which the Bureau would set forth its intended modifications and deletions of data that will be subject to public release. Before conducting the balancing test or collecting a year of data, the Bureau should run preliminary tests to understand the reidentification potential of NAICS codes and census tract data. These data create a unique set of records that can be accurately matched to records in other publicly available datasets identifying an applicant or a related natural person. It is illustrative to provide an example of how powerful the combination of NAICS code and census tract is in reidentifying small businesses.

For example, census tract 9668 has 3,726 residents in which the town of Lewisville, OH is located, with a population of 176 residents. In the town of Lewisville is the "Lewisville Vintage Farmhouse," with a Yelp page that describes it as an antique store. This implies it has a NAICS code of 453310 – used merchandise store. After searching Yelp and US Census Bureau websites, it does not appear as if another business with NAICS code 453310 exists in Lewisville, OH or anywhere else in census tract 9668. Therefore, if "Lewisville Vintage Farmhouse" sought a loan, the combination of its census tract and NAICS code makes reidentification a near certainty,

---

[21] Section 704B(f)(2)(C) of ECOA.

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

along with the owner's gross annual income, potential reason for denial, and sensitive demographic information.

Once again, the Bureau does not need to collect a year of data to determine the potential of reidentification from certain data points.

   b)  Opportunity to Comment on the Privacy-Balancing Test

The CFPB states its intention to issue a policy statement that addresses privacy concerns after the rule is in effect for at least one year. The Bureau states it does not intend to allow for or consider public comments in response to the policy statement, but in lieu, asks for comments on a partial and incomplete description of the privacy-balancing test.

A full explanation of the balancing test design and its application would help stakeholders consider the potential reputational risks associated with data disclosure. Additionally, the Bureau should issue the policy statement subject to public comment to provide opportunities for public feedback on privacy issues.

**5)  FIs should have a minimum of three years to comply, or the rule should be implemented on a staggered basis.**

The Bureau is proposing a compliance date of 18 months after the rule's effective date. We do not believe 18 months provides community banks sufficient time to comply with a rule this complex. Compliance with Section 1071 will require significant investment in training and technology. For small banks, this process is made more difficult because they will be dependent on third party vendors to develop new systems, platforms and training modules, rather than developing them internally.

In our view, a compliance date three years after the rule's effective date is more appropriate. This will allow banks and their third-party processors to develop compliance systems – a process that they cannot begin in earnest until the rule is final. Having these systems in place will provide banks an opportunity to integrate new systems into their existing frameworks.

In the alternative, we advocate a tiered timeline for compliance. Larger FIs, those with assets in excess of $10 billion, could have a compliance date set two years after the rule's effective date, while smaller, lower volume lenders would be given 36 months to comply with the rule. This approach would allow the Bureau to collect a significant amount of small business data earlier, while also providing third party processors additional time to develop and integrate their compliance products.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

**6) The "Firewall" provision demonstrates the need to exclude community banks from coverage.**

ECOA section 704B(d)(1) states that "[w]here feasible," underwriters and other officers and employees of a FI or its affiliates "involved in making any determination concerning an application for credit" cannot have access to any information provided by the applicant pursuant to a request under 704B(b).[22] Additionally, under ECOA section 704B(d)(2), if the FI determines that an underwriter, employee, or officer involved in making a determination "should have access" to any information provided by the applicant pursuant to a request under 704B(b), the FI must provide a notice to the applicant of the underwriter's access to such information.

ICBA is concerned that small community banks will be disproportionately burdened by this firewall provision, as they are the most likely to have a limited sized staff that cannot feasibly firewall the information. Apart from the additional burden, smaller community banks might be adversely impacted from a competitive perspective if they are covered by this rule. For example, the notice to the applicant will presumably not be provided by large FIs or fintechs that could more easily create firewalls, and as such, there might be a perception among applicants that those FIs are less likely to discriminate because they have firewalled the information. This could lead applicants to seek credit only from larger FIs or fintechs.

Similarly, applicants might be uncomfortable in providing demographic information to banks if they receive notice that their information will not be firewalled, resulting in more applicants at community banks opting not to disclose their demographic information, and in turn, more community bank employees having to guess the applicant's race and ethnicity based on visual appearance or surname.

The Bureau should exempt small FIs, such as community banks, from the firewall requirement for the reasons discussed above. Alternatively, the CFPB could require all FIs to provide the notice to all applicants, regardless of whether the information is firewalled. This option would remove the regulatory, market, and misperceived reputational advantage that larger FIs would hold over smaller ones.

---

[22] This includes information regarding the women-owned and minority-owned business status and the race, sex, and ethnicity of the principal owners.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267              866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378    www.icba.org

ICBA suggests that the Bureau establish an online system or portal, where borrowers could input their sensitive, demographic information that is matched with a unique identifier. The unique identifier is used to match the applicant demographic with loan information.  Not only would such a portal solve for the notice requirements, but it would also solve for the sensitivity of the data, providing applicants with assurance of confidentiality, and promoting self-reporting. If the Bureau chooses to not provide this portal, then it should allow for a private market solution that could facilitate this option that demonstrates compliance with these proposed provisions.

Finally, if the Bureau creates or allows for the use of a portal, it is imperative that FIs be able to match their records with the portal's records after a final decision has been made on the application so that FIs can perform back testing and internal audits to determine whether their operations are complying with fair lending laws. This would support the long-held tenet that self-identification and remediation are encouraged in the supervisory space.

## 7)  Cost-Benefit Analysis
Section 1022 of the Dodd-Frank Act requires the Bureau to consider the costs and benefits of the regulations it prescribes.[23]

Certain regulations run the risk of becoming too costly and burdensome, and therefore frustrating their own purpose. If Bureau regulations impose costs on lenders that are too high, those lenders will inevitably be compelled to (1) pass costs on to consumers and/or (2) exit the market entirely. Both outcomes result in harming the consumers that the Bureau intends to protect and may leave them worse off than if the regulation had never been promulgated.

We do not contend that Section 1022 requires the Bureau to abstain from prescribing a regulation if it concludes that the costs outweigh the benefits. Indeed, as we believe is the case with Section 1071, the Bureau may be required by a separate provision to finalize a rule that results in costs that are self-frustratingly high. However, as a matter of public policy, it is incumbent on the Bureau to minimize the costs associated with implementing the law. **In the case of this rulemaking, that means not requiring the collection of data points that are not statutorily required and exercising its Section 1022(b)(3) authority to exempt certain small institutions that will be disproportionately impacted by new compliance obligations.**

---

[23] *See* 12 USC 5512(b)(2).

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

Having made the preceding general observations regarding the Bureau's cost-benefit analysis requirements, ICBA's comments regarding the analysis of cost and benefits for the Bureau's implementation of Section 1071 follow below.

a) Costs to Covered FIs

We agree with the Bureau's decision to analyze costs in two categories: "one-time" and "ongoing," with one-time expenses defined as "expenses that the FI would incur initially and only once to implement changes required in order to comply with the requirements of the new rule" and ongoing costs defined as "expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis."[24] Both categories are significant because the one-time costs of compliance may force existing small business lenders to exit the market and prevent new small business lenders from entering the market, both of which reduce consumer choice. Ongoing costs may also contribute to the decision to exit the small business lending market but are significant because they are most likely to be partially or wholly passed on to consumers in the form of application or origination fees or higher interest rates.

To estimate the cost to FIs, the Bureau relies on its previous experience with HMDA".[25] We agree that the HMDA data collection is the closest existing parallel to Section 1071 data collection but emphasize that there are significant differences between the mortgage lending and small business lending lines of business. Specifically, for community banks with a relationship lending business model, small business lending is likely to be much more individualized than mortgage lending.

Very few community banks have a standard small business application form or process, and every loan is unique. Some small businesses frequently borrow relatively small amounts from community banks. In these cases, so long as the business is healthy and is current on paying its outstanding loans, the amount of paperwork may be very low. On the other hand, where a business is new, or where the loan amount is high, the bank may conduct significant due diligence, far beyond what would be required to originate a home mortgage loan. Because of these differences, the point at which reporting requirements are triggered will vary from loan to loan. Additionally, bankers may collect much of the required information from some

---

[24] 86 Fed. Reg. 56542.
[25] See 86 Fed. Reg. 56545.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

borrowers already, but not for others. This will require additional data collection from some borrowers, therefore complexifying the application process.

While it is difficult to estimate the one-time costs of compliance, which will vary significantly from institution to institution, the Bureau's estimate of $58,400 for small depository institutions is very likely on the low-end. We believe that one-time costs will likely be in the high-tens to low-hundreds of thousands of dollars for the smallest banks and will cost mid-sized community banks several times more (not less, as the Bureau estimates).[26] **It is likely that a significant portion of these startup costs for small lenders can be avoided if the Bureau exempts community banks under $1.3 billion, provides partial exemption from discretionary data points, or adopts tiered compliance dates, allowing third party providers time to bring their products to market.**

To estimate the ongoing costs of this regulation, ICBA surveyed its membership. Based on this survey, we believe that being required to hire new employees to manage compliance obligations will be the biggest cost associated with Section 1071. In contrast to large banks that employ thousands of employees to manage compliance, approximately 80% of community banks surveyed reported employing 25 or fewer full-time employees ("FTEs") dedicated to small business lending. 50% employed 10 or fewer FTEs in a small business lending role. These small staffs are already stretched thin and will require significant retraining to comply with the proposed rule. As a result, **58% of community banks surveyed reported that they will likely be required to hire additional FTEs to in order comply with the rule.**

If a bank is required to hire even one additional FTE, the cost estimate would exceed the Bureau's own estimated time commitment of 716 staff hours per year for small (Type A) depository institutions.[27] This time estimate amounts to 17.9 weeks of full-time work per year, or about 1/3 of a single FTE. Therefore, we believe the Bureau's estimate significantly understates the cost to small community banks.

  b)  Costs to Small Businesses
According to the NPR, "[t]he Bureau expects the direct costs of the proposed rule to small businesses will be negligible, especially compared to the overall cost of credit."[28] **We strongly disagree with the Bureau's characterization of the proposed rule's cost to small businesses.** If Section 1071 is implemented as proposed, it will result in fewer credit options for small businesses and a reduction in their ability to shop around for credit. To the extent that Section

---

[26] 86 Fed. Reg. 56556.
[27] *See* 86 Fed. Reg. 56556, Table 10.
[28] 86 Fed. Reg. 56543.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

1071 prompts market exit or consolidation, small business borrowers may lose access to local lenders that understand their business and are willing to provide financial advice and tailored loan products. In addition, if lenders implement an application fee to offset the costs of 1071 compliance, borrowers will be less likely and less able to shop around for a loan with the best interest rate. This can result in significant long-run expense for the business.

In our survey of community banks, **64% of bank respondents indicated that they would be likely to charge a small business loan application fee to offset the cost of compliance.** This illustrates that the direct costs to small businesses are very real and not remote and speculative. **Fifty-five percent of bankers, who reported that they would charge an application fee, indicated that the fee would likely need to be $100 or more.** For the smallest businesses, a fee of this size is substantial enough to discourage shopping around for the best rate.

Additionally, small business borrowers will be required to provide additional data about their business which may require significant additional time to compile. Lenders will be unwilling or unable to proceed with loans without collecting the data required for Section 1071 reporting, and a portion of the burden of compiling this information will fall on small businesses themselves. In addition, borrowers will be asked questions about their race and demographic information that they may be uncomfortable with, chilling their desire to seek credit from a regulated institution.

However, the biggest cost to small businesses by far is the reduction of privacy this regulation will create. The data points required to be reported and disclosed by this regulation create the potential for re-identification of small business borrowers and public disclosure of sensitive financial and other information relating to their business. Community banks have repeatedly heard from their small business customers that privacy is a major concern. This concern is evident in the overwhelming pushback from small businesses to the IRS reporting provision recently proposed in Congress and by the Biden Administration, and from bankers' experience with PPP, where rates of compliance with the voluntary demographic disclosure were below 20%.

c) <u>Benefits to Small Businesses and Covered FIs</u>
On the other side of the ledger are the benefits supposedly created by the proposed rule. As the Bureau concedes, "[q]uantifying benefits to small businesses presents substantial

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

challenges."[29] The NPR goes on to say that the Bureau "is unable to readily quantify any of [the benefits of the proposed regulation] with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits."[30]

In our view, the issue is starker. Section 1071 was enacted to ensure the credit needs of women-owned, minority-owned, and small businesses are being met in accordance with fair lending laws. This is a worthy policy objective, but it is poorly served by mandatory collection of demographic information that has been illegal to collect previously and that small business customers may prefer to keep private. We believe this regulation will ultimately decrease the willingness of small business customers to seek credit and increase the cost of credit for the small business borrowers it is intended to protect.

As for the benefits to FIs, we are skeptical of the Bureau's claim that this regulation will help them to "better understand the demand for small business credit products and the conditions under which they are being supplied by other covered FIs."[31] Community banks already have a high understanding of the small business credit markets in their local communities. Disclosure of Section 1071 data will not meaningfully increase this understanding because of the individualized nature of each small business loan. Important information about how competitors made credit decisions will still be missing from Section 1071 disclosures, therefore the additional market insight gained will be limited. Because the Bureau will not capture or publish all significant contextual information – arguably, rightfully so – there's no significant market benefit from the data's publication.

## 8)  Enforcement

For banks $10 billion or less in assets, the requirements of Section 1071 will be enforced under Section 8 of the Federal Deposit Insurance Act by the appropriate Federal banking agency.[32] Enforcement actions can include the termination or suspension of deposit insurance, cease and desist orders, the removal, prohibition, or suspension of bank officers, directors, or affiliated parties, and civil money penalties.[33]

While we view these potential enforcement actions as appropriate and in-line with other regulations, we would urge them to be used sparingly in the 12 months following the rule's compliance date. Once systems are developed and integrated into small banks' framework,

---

[29] 86 Fed. Reg. 56543.
[30] *Id.*
[31] 86 Fed. Reg. 56543.
[32] 15 USC 1691c(a)(1).
[33] *See* 12 USC 1818.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

good faith errors may occur while they adapt to new complex collection and reporting requirements.

a) <u>112(b) Bona Fide Errors</u>

The proposed regulation includes a provision that says an error in compiling, maintaining, or reporting data is a bona fide error if it was "unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error."[34] Bona fide errors are not a violation of ECOA. **ICBA supports the inclusion of this provision.**

b) <u>112(c) Safe Harbors</u>

The Bureau is proposing to provide several safe harbors, creating a set of errors that would not constitute violations of ECOA. These safe harbors are:

i) Incorrect entry for census tract – Listing an incorrect census tract is not a violation if the FI obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. We support the inclusion of this provision but observe that it is quite narrow. It will be difficult to prove whether a geocoding tool was used correctly. Furthermore, we believe that latitude should be given if a census tract is reported for a business where that business has a physical location, even if it is not the business's main address or census tract where loan funds are spent.

ii) Incorrect entry for NAICS code – Entry of the wrong NAICS code is not a violation "provided that the first two digits of the NAICS code are correct and the FI maintains procedures reasonably adapted to correctly identify the subsequent four digits."[35] Once again, we strongly urge the Bureau not to require collection of NAICS data. However, if NAICS data is collected, the proposed tolerance level is appropriate. **We also urge the Bureau to allow lenders to rely on NAICS codes provided by the borrower, even if one of the first two digits of a borrower provided code is incorrect.**

iii) Incorrect determination of small business status – A bank that initially determines that an applicant for a covered credit transaction is a small business, but later concludes the applicant is not a small business does not violate ECOA if it collects information about whether the applicant is a minority-owned business or a women-owned business, or the ethnicity, race, and sex of the applicant's principal owners.

---

[34] 86 Fed. Reg. 56579.
[35] 86 Fed. Reg. 56580.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

**ICBA supports the inclusion of this provision as it will prevent punishments for banks that inadvertently collect sensitive demographic information about a larger business. We also urge the CFPB to allow banks to rely on revenue information supplied by borrowers when determining whether data collection under Section 1071 is required.**

iv) Incorrect application date – Banks do not violate ECOA if the application date reported is within three calendar days of the actual application. ICBA believes this safe harbor is appropriate.

## 9) Section 1002.111 – Recordkeeping
### a) 111(a) Record Retention

The small business loan data collected pursuant to the requirements of Section 1071 is required to be: retained for at least three years; made available to the public, upon request, in a form and manner prescribed by the Bureau; and made available to the public annually by the Bureau in a form and manner they prescribe by regulation.[36] According to the Proposal, FIs would be required to "retain a copy of its small business lending application register for three years after the register is submitted to the Bureau."[37] The Bureau is seeking comment on how to implement recordkeeping requirements "in a manner that minimizes cost and burden particularly on small FIs while implementing all statutory obligations."[38]

We believe that the Bureau could minimize the compliance burden on small institutions – while still satisfying all of the requirements imposed by statute – by creating a centralized database of small business loan data to which banks could report in real time. **We propose a system by which banks could, at their option, maintain a small business lending application register internally, reporting annually to the CFPB OR report small business loan applications as they are received through a secure online portal, so that records could be stored and maintained at the CFPB.**

---

[36] *See* 15 USC 1691c-2(f)(2).
[37] 86 Fed. Reg. 56501.
[38] *Id.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

Small lenders may favor this latter approach because it would reduce the cost and risk associated with maintaining a register internally. Additionally, reporting small business loan applications to the Bureau could be integrated into the normal course of processing an application, potentially reducing the compliance cost.

Information on an online portal should be analyzed and published annually and not as data is submitted. Because banks cannot control the order that loan applications are submitted, inadvertent disparities may occur in partial year data that would disappear as more applications are submitted. The agency and members of the public should, of course, be able to view and bring actions based on lending data from banks that publish in real time from previous whole years.

Additionally, banks that choose to publish their data in real time should be able to view their own lending data in real time. This would allow them the opportunity to correct erroneous submissions and ensure more accurate data. It would also allow them to view their own record of small business lending and to self-correct before a fair lending violation based on discriminatory effect (also called disparate impact) occurs.

   b)  111(b) Certain Information Kept Separate from the Application

According to the Bureau's interpretation of ECOA section 704B(b)(2),[39] information about "whether the applicant is a minority-owned business or a women-owned business and the ethnicity, race, and sex of the applicant's principal owners"[40] is required to be kept separate from the rest of the application. We agree with the Bureau's interpretation that this statutory provision should be understood to refer to applicants' responses to the inquiries regarding minority-owned and women-owned business status in proposed § 1002.107(a)(18) and (19), as well as the ethnicity, race, and sex of applicant's principal owners in proposed §1002.107(a)(20)."[41]

As the Bureau observes, these data points have no bearing on the creditworthiness of an applicant, and no FI would legally be permitted to inquire about this demographic information but for Section 1071. For institutions that are required to comply with Section 1071, these data points must be kept separate from the rest of the application to comply with the requirements of the statute.

---

[39] 15 USC 1691c-2(b)(2).
[40] 86 Fed. Reg. 56501.
[41] 86 Fed. Reg. 56501-02.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267              866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378    www.icba.org

The Bureau's proposed regulation notes that "such information could be collected on a piece of paper that is separate from the rest of the application form. To satisfy the requirement in §1002.111(b), an applicant's responses to the FI's request pursuant to §1002.107(a)(18) through (20) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application. However, the FI may, nonetheless, need to keep this information in a different electronic or physical file to satisfy the requirements of §1002.108."[42] This section of the proposal is unclear, and we believe that the Bureau should further clarify the requirements around when lenders will need to maintain separate systems.

In considering implementation of this rule, we urge the Board to consider the implications of the requirements noted above for the smallest lenders. When describing such processes, it is easy to reduce, in the mind's eye, the idea of compliance to simply another form or another file. But in reality, the requirement to create and organize additional digital and physical files requires a significant investment of time, technology, and training. This investment of time imposes a real monetary cost, and once such a rule is implemented, the cost never goes away. It recurs, year after year, application after application.

In a rule like this, where the consumer benefit of incremental data collection from small lenders will be minimal, we strongly urge the Bureau not to dismiss these recurring costs to small lenders when conducting their cost-benefit analyses. To the extent that this rule drives consolidation and causes small, local lenders to merge or vanish, we believe a significant cohort of small business borrowers, including women-owned and minority-owned businesses, will be less well-served.

**10) Use of previously collected data will provide efficiencies but will likely provide regulatory advantage to larger FIs and fintechs.**
In the SBREFA Outline, the Bureau emphasized that it was seeking to provide FIs with discretion and flexibility in the timing of 1071 data collection considering their relationships with applicants and the need to avoid unnecessary costs.

Proposed comment 107(b)-1 explains that, depending on the circumstances and the FI's procedures, certain applicant-provided data could be collected without a specific request from

---

[42] 86 Fed. Reg. 56605.

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

the applicant. For example, gross annual revenue could be collected from tax return documents.

While this proposed comment and provision appears to be an accommodation, ICBA notes that this provision will mostly accrue benefit to the largest FIs and fintechs that are able to employ the use of data intermediaries to automatically populate much of the required data being proposed, thereby quickening the time it will take for a small business applicant to apply for credit compared to a traditional FI that will need to ask for and record every single data field. This essentially creates a competitive advantage for certain FIs, based on nothing more than a regulatory construct. If the Bureau cannot provide an appropriate remedy for this agency-created advantage, then it should serve as another rationale to exempt community banks.

**11) The Bureau should not require the verification of applicant-provided information.**
The Bureau is proposing that the FI would be able to rely on statements of the applicant when compiling data unless it verifies the information provided, in which case it would be required to collect and report the verified information.[43] ICBA proposes that the Bureau remove the second clause of this proposal and limit the requirement to the submission of applicant-provided information, regardless of whether it is verified by the FI.

As the Bureau notes, section 1071 does not speak to verification; rather it refers only to compiling and maintaining a record of certain information provided by an applicant. Though the Bureau believes that requiring FIs to collect and report information that they have already verified would not add operational difficulty, ICBA contests that belief. Requiring the reporting of verified data would increase operational difficulty, in that if data is verified, it would be done at a point in time that could be weeks removed from the date that the information was initially collected on the application. Additionally, information may be collected by different staff for different purposes on different platforms.

Though ICBA appreciates that the Bureau is not requiring FIs to verify information, compliance burdens would greatly be eased if the Bureau's final rule does not require the reporting of subsequently verified information unless the FI opts to do so.

---

[43] § 1002.107(b).

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

## **CONCLUSION**

While ICBA supports the stated goal and intent of section 1071 and the Bureau's proposed rule, we cannot support this rule in its proposed form. While the concerns we raised are on community banks' behalf, the ramifications of this rule will adversely affect community banks' small business customers. Should you have any questions or would like to discuss this further, please do not hesitate to contact us at Michael.Emancipator@icba.org or Michael.Marshall@icba.org.

Sincerely,

/s/

Michael Emancipator
Vice President and Regulatory Counsel

/s/

Michael Marshall
Director, Regulatory Legal Affairs

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

# EXHIBIT 2



Derek B. Williams, *Chairman*
Lucas White, *Chairman-Elect*
Jack E. Hopkins, *Vice Chairman*
Sarah Getzlaff, *Treasurer*
James H. Sills, III, *Secretary*
Brad M. Bolton, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

March 24, 2023

*Via Electronic Mail*

The Honorable Rohit Chopra
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**RE: Petition to Stay the Effective Date of the 1071 Rule**

Dear Director Chopra:

In light of the U.S. Court of Appeals for the Fifth Circuit's October 2022 decision that the Bureau's funding structure[1] violates the Appropriations Clause of the U.S. Constitution,[2] and given the Supreme Court's recent grant of certiorari to review the Fifth Circuit's decision, ICBA respectfully requests that the Bureau stay the effective date of its Section 1071 rule, pending the Supreme Court's final decision on the matter. Granting a stay will preserve the *status quo* until the Supreme Court can provide small businesses and community banks with more certainty as to the final disposition and validity of the Section 1071 rule.

<u>**Background**</u>

The CFPB entered into a stipulated settlement agreement with the California Reinvestment Coalition ("CRC") in March 2020, in response to the CRC's lawsuit against the Bureau, which argued that the Bureau's failure to promulgate a 1071 rule violated the Administrative Procedure Act ("APA"). Among other matters, the stipulated settlement agreement set forth a mutually agreed upon timeline for the Bureau to promulgate 1071, including the periodic

---

[1] As authorized under 12 U.S.C. 5497.
[2] Under U.S. Const. Art. I, section 9, Cl. 7.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

setting of deadlines for the convening of a SBREFA panel, publication of a proposed rule, and finalization of the rule.

Pursuant to that agreement, the Bureau is expected to finalize its 1071 rule no later than March 31, 2023. Compliance with the finalized rule may be required as soon as 18 months after its effective date, approximately October 2024, depending on publication in the Federal Register.

Separately, the Community Financial Services Association of America ("CFSA") challenged the Bureau's ability to promulgate the payday lending rule, arguing, in part, that the Bureau is unconstitutionally funded. Ultimately, the 5th Circuit agreed with CFSA's argument and issued an opinion in October 2022 that vacated the CFPB's payday lending rule as the result of its unconstitutional funding structure.

Soon after, the CFPB filed a certiorari petition with the Supreme Court, seeking a review of the 5th Circuit's decision. The Supreme Court granted the Bureau's petition for certiorari and has agreed to hear the case in its next term. Due to the complexity and wide sweeping implications of the matter, it is likely that the Court will issue an opinion later in its next term, approximately in May or June 2024.

<u>Maintaining the *status quo* pending the Supreme Court decision</u>

So long as the validity of this rulemaking is called into question, pending the Supreme Court's review – and decidedly so for community banks in the 5th Circuit, ICBA believes that the Bureau should retain the *status quo.* Declining to do so would give rise to a number of undesirable consequences.

1. *Irreparable harm from immediate efforts to comply with a rule that might ultimately be vacated*

Although the final rule is expected to provide community banks at least 18 months to adequately train staff and establish systems to comply with the rule, ICBA contends that it will take several years for community banks to set up systems and train staff to comply with 1071 requirements. Given the complexity of the rule and the long period of time needed to establish the system, this multi-year effort will commence in earnest as soon as the rule is final and effective.

If the effective date is not stayed, one likely scenario is that thousands of community banks will begin efforts to comply with the rule immediately upon finalization, on or

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

around March 31, 2023. Should the Supreme Court affirm the 5th Circuit's decision, thousands of community banks and millions of their small business customers will have suffered irreparable harm if the Supreme Court rules 14 months later that the Bureau's funding structure is unconstitutional.

2.  *Portions of the Country under conflicting obligations*

If the Bureau declines to stay the effective date of this rule, another scenario will create an environment where marketplace confusion would be exacerbated. As the Bureau noted in its petition for certiorari, "new challenges to the Bureau's rules and other actions can be expected to multiply in the weeks and months to come."[3]

For example, if a challenge to the 1071 is filed in the fifth circuit, as the Bureau's petition suggests, then the court will be bound to the precedent in the CFSA case and will vacate the 1071 rule. This would result in large portions of the country following one set of rules while other parts would not.

Justice requires certainty

These unprecedented and extremely disruptive scenarios are the primary reasons why the Bureau sought the Court to hear the case this term – to instill certainty in the marketplace. Unfortunately, the Court will not issue its opinion on this matter until Spring 2024. However, the Bureau has an avenue under the Administrative Procedure Act ("APA") to alleviate this disruption, independent of a court mandate.

Under Section 705 of the APA, agencies may issue a stay on action while judicial review is pending if "justice so requires." Here, ICBA believes that "justice so requires" a stay to provide certainty. The purpose of a stay is not meant to amend or repeal a rule, but "to maintain the status quo to allow judicial review of the underlying regulation to proceed in a 'just' manner.[4] District courts have generally allowed agencies to invoke Section 705 only to postpone rules that are not yet in effect, rather than compliance dates after the rule's effective date.[5]

---

[3] Petition for Writ of Certiorari, *Consumer Financial Protection Bureau et al. v. Consumer Financial Services Association of America, Limited, et al.*, No. 22-448, at 29.
[4] *Bauer v. DeVos, 325 F. Supp. 3d 74, 106-07* (D.D.C. 2018).
[5] *Becerra v. U.S. Department of the Interior*, 276 F. Supp. 3d 953, 965 (N.D. Cal. 2017) (holding that Department of Interior could not delay oil and gas valuation rule's compliance deadlines after effective date had passed); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1121 (N.D. Cal. 2017) (discussing Becerra, and noting that "[e]ffective and compliance dates have distinct meanings"); *Nat. Res. Def. Council v. U.S. Department of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019).

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

### Conclusion

ICBA is not asking the Bureau to cease enforcement of existing rules, suspend supervision of major market participants, or even pause ongoing promulgation of other rules. But given the uniqueness of the current situation and the number of uncertainties, we ask the Bureau to maintain a status quo as a meaningful way to inject certainty and confidence until the Supreme Court can come to its decision. If you would like to discuss this further, please contact me.

Sincerely,

/s/

Rebeca Romero Rainey
President and CEO

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC       SAUK CENTRE, MN
1615 L Street NW      518 Lincoln Road
Suite 900             P.O. Box 267          866-843-4222
Washington, DC 20036  Sauk Centre, MN 56378  www.icba.org

# EXHIBIT 3



Derek B. Williams, *Chairman*
Lucas White, *Chairman-Elect*
Jack E. Hopkins, *Vice Chairman*
Sarah Getzlaff, *Treasurer*
James H. Sills, III, *Secretary*
Brad M. Bolton, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

August 4, 2023

The Honorable Rohit Chopra
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**RE: Second Petition to Stay the Effective Date of the 1071 Rule**

Dear Director Chopra:

The Independent Community Bankers of America respectfully requests that the Bureau stay the effective date of its Section 1071 rule.  Earlier this year, we wrote the agency and requested a stay following the Supreme Court's grant of certiorari to review the U.S. Court of Appeals for the Fifth Circuit's October 2022 decision that the Bureau's funding structure violates the Appropriations Clause of the U.S. Constitution.  This week, the U.S. District Court for the Southern District of Texas entered an order enjoining the CFPB from implementing and enforcing the Section 1071 rule against members of the Texas Bankers Association and American Bankers Association until the Supreme Court makes a ruling in the *Community Financial Services* case.  At the CFPB's request, the scope of the injunction was limited to members of the TBA and ABA – meaning only some community banks are protected by the District Court's injunction.  In light of these troubling events, ICBA renews our calls for the CFPB to issue a nationwide stay of the effective date of its Section 1071 rule for all community banks.

The CFPB should not allow some, but not all, community banks covered by the Section 1071 rule to enjoy relief from implementing this onerous and complex rule.  As such, ICBA strongly encourages the CFPB to exercise its nationwide authority to stay the Section 1071 rule for all covered institutions until the Supreme Court can provide all small businesses, community banks, and covered financial institutions with the needed certainty as to the final disposition and validity of the Section 1071 rule.  The CFPB should move swiftly to provide this relief. It is deeply concerning  that banks and trade associations must litigate this issue when the CFPB has full authority to resolve confusion, avoid arbitrary and unjust results about which banks can or cannot stay implementation of the Section 1071 rule pending a Supreme Court ruling, and can defer to the nation's highest court pending a decision in the *Community Financial Services* case*.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

Notably, ICBA is not asking the Bureau to cease enforcement of existing rules, suspend supervision of major market participants, or even pause ongoing promulgation of other rules. However, given the uniqueness of the current situation and the number of uncertainties, we again ask the Bureau to ensure an even playing field for all banks and restore certainty and confidence until the Supreme Court can come to its decision. If you would like to discuss this further, please contact me.

Sincerely,

/s/

Rebeca Romero Rainey
President and CEO

Cc: Seth Frotman, Acting Assistant General Counsel

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
|---|---|---|
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |