# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION, | § § § § § | |
| Plaintiffs, | § § § | |
| CREDIT UNION NATIONAL ASSOCIATION, CORNERSTONE CREDIT UNION LEAGUE, RALLY CREDIT UNION, TEXAS FIRST BANK, INDEPENDENT BANKERS ASSOCIATION OF TEXAS, and INDEPENDENT COMMUNITY BANKERS OF AMERICA, | § § § § § § § § § | Case No: 7:23-cv-00144 |
| Intervenor-Plaintiffs, | § § § | |
| v. | § § | |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity aa Director of the Consumer Financial Protection Bureau, | § § § § § | |
| Defendants. | § | |

**JONATHAN JARED IHRIG'S DECLARATION IN SUPPORT**
**OF CREDIT UNION INTERVENORS' JOINDER TO**
**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

I, Jonathan Jared Ihrig, declare:

1.      I am the Chief Compliance Officer at Credit Union National Association (CUNA). The statements in this declaration are based on my own personal knowledge and are true and correct. If called to testify to their accuracy, I could and would do so.

2.      As CUNA's Chief Compliance Officer, and I am responsible for providing compliance information and training to credit union leagues and credit unions. I also assist CUNA's advocacy team members in assessing the impact of federal legislation and regulation on credit union operations.

3.      CUNA is the voice of the nation's $2.23 trillion credit union industry, which is composed of community-based, not-for-profit financial institutions that together employ more than 330,000 full-time employees, safeguard $1.91 trillion in deposits, and extend $1.55 trillion in loans. CUNA advocates for credit unions before Congress, regulatory agencies, and the courts to drive common sense policies that help customers, clients, and communities thrive. CUNA regularly advocates before the Consumer Financial Protection Bureau (CFPB) to promote regulatory and supervisory policies that protect members, while ensuring that markets for consumer financial products and services are fair, transparent, and competitive.

4.      CUNA's credit union members are neither members of the American Bankers Association (ABA) nor Texas Bankers Association (TBA). In fact, the ABA's and TBA's membership limitations bar credit unions from joining the organizations.

5.      As part of its advocacy before the CFPB, CUNA submitted a response to the CFPB's proposed rule to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. A copy of CUNA's response is attached as **Exhibit 1**.

6.      The purpose of this declaration is to discuss the effects of the rule finalized by the CFPB on March 30, 2023, to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Final Rule). Section 1071 amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses.

2

7.    CUNA's membership covers not-for-profit depository institutions offering small business loans in each compliance tier category covered by Final Rule (e.g., 2,500 hundred or more small-business loans; 500 to 2,499 loans; and 100 to 499 loans). For instance, of the nearly 5,000 credit unions, 200 credit unions originate between 100–499 qualifying transactions in 2022; 29 originate between 500–2,499 qualifying transactions in 2022; and at least one credit union originates 2,500 or more qualifying transactions in 2022. As of March 2023, the average outstanding commercial loan balance held by credit unions was $499,270, evidencing credit union's small-business focus.

8.    I have worked closely with many CUNA members, including the association's Compliance & Risk Council and Consumer Protection Subcommittee, to understand how the Final Rule will affect member credit unions. I have also discussed with CUNA members the substantial costs that they will incur to implement and comply on an annual basis with the Final Rule.

9.    The types of costs already incurred, and to be incurred, include costs for new infrastructure and technology to capture, aggregate, and report new data points, which is an extensive overhaul of the current application processes; additional FTE expense to meet the new minimum compliance requirements; segregation technology to "firewall" the information from those in the credit-decision process; the cost to train employees on new software, technology, and reporting requirements; the ongoing costs to regularly train employees on the compliance requirements in the Final Rule; and the cost to hire scores of vendors to advise on the Final Rule and its implementation. In fact, CUNA has dedicated approximately 300 hours of staff time and incurred expenses to evaluate the Final Rule's cost on credit union members, including engaging a third-party consultant to evaluate and advise on the burden to credit union operations.

10.   Based on information gathered by my team and through my interactions with affected credit unions, the following are examples of the costs and burdens of the Final Rule on CUNA members. One CUNA member that originated 177 qualifying transactions in a reporting year reported that it spent approximately $30,000 in upfront on necessary software and systems to collect and report on the volumes of data points targeted by the Final Rule. Another member

that originated 211 qualifying transactions in a recent calendar year expects to spend $250,000 alone in software upgrades associated with compliance with the Final Rule. Yet another member that originated approximately 150 qualifying transactions explained that it currently manually processes business and commercial loans, but to comply with the robust requirements of the Final Rule, it would have to spend $100,000 to reconfigure or replace vendors and automate systems, with additional annual compliance costs expected to be between $25,000 to $50,000. And another member with a one-person compliance department and only $80 million in assets reported the Final Rule would chill its small-business lending because a lack of available manpower, the unavailability of necessary training and the cost to provide such training, the difficulty of separating underwriting from data collection and reporting, and the enormous relative cost for infrastructure. Ultimately, CUNA members report that small businesses will be the ones who bear much of the costs through increased origination feed or the suspension of certain leading altogether.

11.    The overwhelming majority of CUNA's members that originate qualifying transactions are in similar situations to the credit unions described in paragraph 10. The Final Rule will require an upfront spend between $25,000 and $250,000 depending on the size of the credit union, how many employees are dedicated to small-business leading, and the processes in place before the CFPB drastically expanded the collection and reporting requirement under Section 1071. Because such expenditures are taxing on smaller financial institutions like credit unions, CUNA has been proactive in alerting members the scope and impact of the Final Rule and has advised its members to begin implementation immediately to meet the compliance dates established by the Final Rule while maintaining the necessary capital.

12.    Accordingly, CUNA members currently are taking steps to implement the Final Rule. As a result, CUNA's members are already incurring or are about to incur direct economic injury caused by the Final Rule.

13.    I also have reviewed the declarations and supplemental declarations filed previously in this case by Plaintiffs. Because CUNA's members primarily are community-based

credit unions with fewer employees, assets, and deposits compared to ABA's and TBA's member banks, the costs and burdens of complying with Final Rule generally will have a more significant impact on CUNA's members than on many of ABA's and TBA's members. In fact, most credit unions are small, local financial institutions with limited staff and resources. Over 40% of all credit unions employ five or fewer full-time employees, more than 25% have less than $10 million in assets, and almost 75% have less than $100 million in assets. Additionally, credit unions do not issue stock. Their capitalization is based on member deposits and retained earnings, meaning members' deposits may be at risk from these increased compliance costs due to the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed on August 16, 2023

_____

Jared Ihrig

# Exhibit 1

**Credit Union National Association**
CUNA

**WASHINGTON, D.C.**

99 M Street SE
Suite 300
Washington, D.C. 20003-3799

**Phone:** 202-638-5777
**Fax:** 202-638-7734

January 6, 2022

Comment Intake
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

> Re: Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B); Docket No. CFPB-2021-0015

Dear Sir or Madam:

The Credit Union National Association (CUNA) represents America's credit unions and their 120 million members. On behalf of our members, we are writing in response to the Consumer Financial Protection Bureau's (CFPB or Bureau) proposed rule (proposal) to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act or the Act).[1]

**General Comment**

Credit unions are unique in the financial services industry as not-for-profit financial cooperatives with a statutory mission to promote thrift and provide access to credit for provident purposes. The member-owned structure of credit unions ensures they provide products and services to members in a manner that is fundamentally different than for-profit financial service providers. In fact, in many cases, the credit union may have been formed to meet the specific financial needs of their geographic community, select employer group, or other field of membership. As a result, credit unions have a vested interest in helping the members and small businesses they serve succeed by meeting their credit needs and providing low-cost financial services.

Section 1071 of the Dodd-Frank Act is intended to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses.[2] Credit unions support the goals of section 1071 and seek to provide all members with fair and equitable financial opportunities. That said, we are concerned about the potential for unintended consequences and substantial costs of compliance associated with the creation of a broad data

---

[1] Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B), 86 Fed. Reg. 56356 (Oct. 8, 2021).

[2] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376, 2056 (2010).

collection where one does not currently exist. In addition, as entities bound to serve a specific field of membership, the data collected from credit unions would likely be incomparable to other lenders that are legally permitted to serve anyone walking through its doors or accessing its websites.

In developing the 1071 rule, the Bureau should keep in mind that credit unions are subject to strict requirements and rules for business lending as compared to for-profit financial institutions. In 1998, Congress passed the Credit Union Membership Access Act, which capped credit unions' ability to offer member business loans (MBLs).[3] While credit unions operate in every U.S. state and provide an array of financial services, not all credit unions provide business loans and the choice to do so is based on the regulatory environment and the individual credit unions' membership. While the National Credit Union Administration (NCUA) and relevant state regulators have made positive changes to business lending rules over the years, credit unions' business loans are nevertheless subject to additional hurdles and limitations that other lenders' business loans are not. Despite these limitations, NCUA has noted credit unions' "long history of meeting [the] business lending needs of their members," and such commitment proved essential during the 2007 financial crisis and its recovery.[4] This trend continues to this day as credit unions have stepped up to serve struggling businesses during the COVID-19 pandemic.

As community-based financial institutions, the section 1071 data collection will likely add substantial strain on credit unions' finite compliance resources but provide an unknown tangible benefit. It is important for the Bureau to keep its rule as manageable and tailored as possible to avoid creating unintended barriers for small business borrowers seeking credit while also ensuring community lenders can maintain the privacy of their members' data.

In the interest of effectively balancing consumer protection and the availability of credit for small businesses, CUNA urges the Bureau to consider several revisions to the proposed rule:

- Increase the covered financial institution threshold to *at least* 500 covered credit transactions in each of the two preceding calendar years coupled with a size-based exemption for entities of $600 million assets or less;
- Reduce the gross annual revenue threshold used to determine which businesses are "small businesses" for purposes of the rule to *no more than* $1 million in gross annual revenue in the preceding fiscal year;
- Exempt several types of credit transactions from the definition of covered credit transactions, including agriculture-purpose credit, HMDA-reportable transactions, consumer-designated credit, loans under $50,000, and government guaranteed loans;
- Exclude credit line increases from the definition of covered application for purposes of the rule;
- Consider the firewalling requirement's potential for negative impacts on smaller lenders serving business borrowers;
- Reduce the section 1071 data set to only data points that are statutorily required and avoid unnecessary discretionary data points;

---

[3] Credit Union Membership Access Act, Pub. L. 105-219 (August 7, 1998).
[4] 81 Fed. Reg. at 13,532 (stating "while lending at banks contracted during the recent recession, credit unions continued to lend").

- Rescind the requirement for covered financial institutions to conduct a visual observation and surname analysis on applicants declining to provide responses to demographic questions;
- Consider the privacy and reidentification concerns in finalizing the rule and conduct a notice and comment period on the Bureau's "balancing test" for publication of 1071 data; and
- Adopt a phased mandatory compliance schedule that begins *no sooner than* three years following the issuance of a final rule.

## Background

Section 1071 of the Dodd-Frank Act requires financial institutions collect and report certain data regarding applications for credit for women-owned, minority-owned, and small businesses. The statutory purposes of this data collection are to (1) facilitate the enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[5]

The Act specifies several data points covered financial institutions are required to collect and report and permits – but does not require – the Bureau to collect additional data points consistent with 1071's two statutory purposes. Section 1071 also specifies additional requirements, including restricting the access of underwriters and other persons to certain 1071 data and the publication of 1071 data. In addition, section 1071 permits the Bureau, at its discretion, to modify or delete data prior to publication if it determines that such a deletion or modification would advance privacy interests.

Section 1071 directs the Bureau to prescribe rules and issue guidance necessary to carry out, enforce, and compile data pursuant to its statutory requirements. It also permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from requirements as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. In addition, section 1071 directs the Bureau to issue guidance designed to facilitate compliance with the rule's requirements.

## Definition of a Covered Financial Institution

As stated in prior letters to the Bureau on section 1071, we believe the Bureau should ensure credit unions remain well-positioned to provide access to safe and affordable loans to small businesses.[6] When the Bureau's rules make it expensive or difficult to access safe and affordable products and services from credit unions, consumers pay the price. As a result, we recommend the CFPB consider taking full advantage of its statutory exemption authority in a meaningful way by exempting all credit unions from collecting and reporting 1071 data. Credit unions have no pattern of unfair lending and alternatively, are seeking ways to provide more business loans to consumers, not fewer.

---

[5] See Proposal, 86 Fed. Reg. at 56356.
[6] CUNA Comment Letter to CFPB in response to the SBREFA Outline, *available at* https://news.cuna.org/articles/print/118841-small-biz-lending-data-collection-likely-to-add-substantial-strain (December 14, 2012).

That said, the Bureau has chosen not to propose exempting credit unions as a class, but rather has proposed in § 1002.105(b) to define the term "covered financial institution" as a financial institution that originated at least 25 covered credit transactions for small businesses, as defined in the rule, in each of the two preceding calendar years.[7] Financial institutions that meet this loan-volume threshold would be required to collect and report small business lending data to the Bureau. While we support the Bureau establishing a clear threshold for exempting smaller lenders from the rule, the proposed 25 covered credit transactions threshold is far too low and would unjustifiably impact many smaller participants, particularly credit unions, in the commercial lending market.

The potential impact on small business borrowers of establishing an unnecessarily low coverage threshold is significant, as smaller lenders are not as easily positioned to absorb the increased costs associated with originating commercial loans and may either reduce offerings, establish minimum loan amounts, or pull out from the market entirely. This type of lending environment, which the Bureau could avoid by establishing a more robust threshold, would clearly limit small lenders' ability to serve the businesses in their communities and drive small business borrowers to higher cost lenders or lenders with dubious track-records of consumer protection.

The Bureau is correct to be concerned that the 1071 rule's cost of compliance may result in a decrease in credit availability for small businesses and establishing an exemption for small lenders is justified to avoid substantial market disruption. However, the Bureau should amend its approach to this exclusion by adopting a "hybrid" exemption as considered in the Small Business Regulatory Enforcement Fairness Act (SBREFA) Outline of Proposals Under Consideration (SBREFA Outline).[8] Specifically, CUNA recommends the Bureau finalize *both* a volume-based exemption of *at least* 500 covered credit transactions in each of the two preceding calendar years *and* a size-based exemption for entities of $600 million assets or less, the standard for a "small" credit union according to the Small Business Administration's (SBA) Table of Size Standards.[9] A financial institution would be excluded from the rule if they fall under *either* of these exemption thresholds.

We believe this hybrid approach would safeguard continued credit availability for small businesses served by community-based lenders. For example, a community-based lender may be over $600 million in assets but, due to a small volume of business loans originated, the cost of compliance on a per loan basis could mean an asset-based exemption alone is insufficient and could cause the lender to reduce its business credit offerings. The same may be true for a mere activity-based exemption alone, which may not properly account for a small-size lender that focuses on meeting the small business lending needs of its members.

---

[7] See Proposal, 86 Fed. Reg. at 56543.

[8] Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered ("SBREFA Outline"), *available at* https://files.consumerfinance.gov/f/documents/cfpb_1071- sbrefa_outline-of-proposals-under-consideration_2020-09.pdf (Sept. 15, 2020).

[9] *See* Small Bus. Admin., Table of Small Business Size Standards Matched to North American Industry Classification System Codes (effective Aug. 19, 2019), *available at* https://www.sba.gov/sites/default/files/2019-08/SBA%20Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.

## Definition of Financial Institution

The Bureau is proposing in § 1002.105(a) to define the term "financial institution" as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. Under this definition, the rule's requirements would apply to a broad range of entities engaged in small business lending, including depository institutions (i.e., banks, savings associations, and credit unions), online lenders, platform lenders, community development financial institutions (CDFIs), lenders involved in equipment and vehicle financing, commercial finance companies, governmental lending entities, and nonprofit non-depository lenders. While CUNA's primary preference is for the Bureau to use its statutory exemption authority to exempt credit unions from this rulemaking, we, alternatively, can work with this proposed definition if the rule includes proper exemptions for smaller or less complex lenders such as non-profit credit unions. We agree that the Bureau should ensure all types of for-profit entities offering commercial loans are *initially* covered so as not to favor one business model or charter type over any other.

## Definition of a Small Business

Under the proposal, lenders would collect and report data, including the identification of women-owned and minority-owned businesses, for all applicants that satisfy the rule's definition of a small business. However, covered financial institutions would *not* be required to collect and report section 1071 data on women-owned and minority-owned businesses that are *not* small businesses, as defined in the rule. We agree a business' status as a "small business" is the most important factor when considering the intent and purpose of section 1071 and we support the Bureau's proposed approach to its section 1071 rule. In addition, given the highly complex nature of lending to businesses that are not "small," we believe the Bureau's rulemaking is better suited focusing exclusively on the small business lending market.

The Bureau is proposing in § 1002.106 to adopt the SBA definitions of "business" and "small business" as set out in the Small Business Act and SBA regulations. The Bureau is also proposing that, notwithstanding the small business size standards established by SBA regulations, for purposes of the proposed rule, a business is a small business if and only if its gross annual revenue is $5 million or less for its preceding fiscal year. The Bureau is seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act but has not yet obtained approval. We support the Bureau's use of a gross annual revenue standard for determining which businesses are considered small and therefore covered under the rule. The revenue approach is preferred to the alternatives considered in the SBREFA Outline such as the irrelevant number of employees standard or the overly complex North American Industry Classification System (NAICS) code groupings.[10]

Nevertheless, we believe the proposed revenue threshold of $5 million or less in the preceding fiscal year is far too high. This threshold would unreasonably classify some clearly large businesses as small for purposes of the rule and vastly increase the size of the 1071 data collection,

---

[10] See SBREFA Outline 16 (providing alternatives under consideration for the definition of "small business" applicants).

the risk to data privacy, and the costs associated with compliance for covered financial institutions. In the interest of properly scoping the rule, we recommend the Bureau reduce the gross annual revenue standard used to determine which businesses are "small businesses" to no more than $1 million in gross annual revenue in the preceding fiscal year. A $1 million gross annual revenue threshold would be more than sufficient to achieve the goals of the statute without creating the unnecessary drawbacks highlighted above.

In addition, the Bureau should provide clear guidance on how covered financial institutions should treat start-ups with no track record of revenue or other special considerations.

**Covered Credit Transactions**

The Bureau is proposing to require covered financial institutions to collect and report data for all covered applications from small businesses for transactions that meet the definition of business credit under Regulation B, with some exceptions. In particular, the Bureau is proposing § 1002.104(a) define the term covered credit transaction as an extension of business credit that is not expressly excluded under proposed § 1002.104(b). Under this proposed definition, loans, lines of credit, credit cards, merchant cash advances (MCAs), agricultural-purpose loans, and Home Mortgage Disclosure Act (HMDA)-reportable loans would all fall within the scope of the rule. The Bureau is proposing, in § 1002.104(b), to exclude trade credit, public utilities credit, securities credit, and incidental credit. Factoring, leases, consumer-designated credit used for business purposes, and credit secured by certain investment properties would also not be covered credit transactions.

CUNA generally supports the intent behind using Regulation B as a guide for defining business credit in the section 1071 rule. As entities required to comply with the Equal Credit Opportunity Act (ECOA), a covered credit transaction definition aligned with Regulation B would be both familiar to credit unions and represent the most common business credit products aimed at small business borrowers.

However, in the interest of furthering the mission of section 1071, we strongly recommend the Bureau exempt several classes of credit transactions from the definition scope of covered credit transactions:

*Agricultural-purpose credit*

The Bureau states that covering agricultural credit in the 1071 rule is important for both of section 1071's statutory purposes and is not proposing to define covered credit in a way that would exclude agricultural credit from the rule.[11] We urge the Bureau to reconsider this decision and adopt a final rule expressly excluding agricultural credit given the outsized impact the 1071 rule could have on the market for agriculture loans.

Over the past several decades, larger national banks have reduced their presence in the agriculture lending market and community-based lenders – including many credit unions – have stepped up

---

[11] See Proposal, 86 Fed. Reg. at 56433.

to serve these borrowers. It's become clear that agriculture lending is best served by local community-based financial institutions because these lenders are willing to make the small loans needed by farmers and can assess farmers' financial situations based on information gained from their presence in the community. While the Bureau's intent in including agriculture lending is understandable, the consequences of doing so could result in more harm to this niche market than good – especially considering the proposed *extremely low* threshold for a covered financial institution. Ultimately, the disruption and increased costs associated with section 1071's data collection and reporting requirements would result in a reduction in the availability of credit for farmers. These costs would roll back the progress made by community-based lenders in serving agriculture communities, which are already some of the nation's most underserved areas.

### HMDA-reportable transactions

By adopting Regulation C's definition of dwelling and its commentary regarding investment properties, the Bureau has sought to create consistency and minimize compliance burdens for financial institutions that must also report credit transactions covered by HMDA (that is, HMDA-reportable transactions). According to the Bureau's analysis, the number of HMDA-reportable transactions that would also be covered under section 1071 would be "a relatively small but not insignificant overlap."[12] As a principle of regulatory action, CUNA has encouraged regulators to avoid the creation of duplicative or redundant compliance burdens.

Therefore, CUNA urges the Bureau to exclude all HMDA-reportable transactions from the definition of covered credit transactions under the 1071 rule, to avoid establishing an obviously duplicative reporting requirement. There is no benefit in requiring financial institutions to collect and report data on the same transaction for two separate regulatory data collections. Rather, if the Bureau believes some financial institutions *may* want the option to report these HMDA-reportable transactions in their section 1071 filings, then the Bureau should provide exactly that – a voluntary option to report these loans, not a mandated requirement.

### Consumer-designated credit

The Bureau is proposing the section 1071 rule exclude from its covered credit transactions products designated by the creditor as having a consumer purpose (i.e., consumer-designated credit). Proposed comment 104(b)-3 clarifies that the term covered credit transaction does not include consumer-designated credit used for business purposes, because such transactions are not typically considered business credit.[13] The proposed comment would state that a transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes.[14] The Bureau acknowledges that some small business owners may use consumer-designated credit to finance their small businesses—such as taking out a home equity line of credit or charging business expenses on their personal credit cards.

---

[12] *See* Proposal, 86 Fed. Reg. at 56372.
[13] See Proposal, 86 Fed. Reg. at 56408.
[14] For example, an open-end credit account used for both personal and business purposes is not business credit for the purpose of the rule unless the financial institution designated or intended for the primary purpose of the account to be business-related.

Regardless, this use of credit in this manner was not intended to be included within section 1071 and the Bureau's exclusion of consumer-designated credit recognizes that fact.

CUNA agrees with the Bureau's interpretation that section 1071 is not intended to apply to consumer credit used for business purposes. While some of the smallest businesses may blur the line between personal credit and business credit, the inclusion of consumer- designated credit within the rule would dramatically expand the size of the data collected beyond the purpose of section 1071, circumvent the clear intent of Congress, and significantly increase the rule's impact on the availability of credit for all consumers – not just business borrowers.

We also recommend the Bureau draw a clear line in its section 1071 rule and not permit the voluntary reporting of consumer-designated credit when there is reason to believe the credit might be used for business purposes. Such a caveat would create confusion, introduce the possibility of error, and put financial institutions in a position to question their members' intentions. The Bureau should be clear on this distinction and completely exclude personal loans from the rule.

*Voluntary Reporting for Loans under $50,000*

The NCUA defines a credit union MBL as any loan, line of credit, or letter of credit (including any unfunded commitments) where the borrower uses the proceeds for the following purposes: commercial, corporate, other business investment property or venture, or agricultural.[15] The NCUA further exempts certain secured loans and loans the total of which to an individual fall under a specified dollar amount. Specifically, under §701.21(h)(1)(i)(C) of NCUA's regulations, a loan, otherwise meeting the definition of an MBL, is not considered a business loan if the loan amount, when added to other business loans of a borrower, is less than $50,000.

The NCUA has interpreted loans less than $50,000 not to be considered MBLs and not reported as such, even if they may be business-purpose loans, for nearly three decades.[16] For most of that time, credit union business loans made for business purposes, but that aggregate to less than $50,000 for a particular borrower, have generally been reported as either consumer loans, mortgage loans, or "other" loans. NCUA refers to these as "business purpose loans" but does not require credit unions to report them in a separate category on the call report.

Because of NCUA's long-standing interpretation, many credit unions do not maintain readily identifiable loan files on business purpose loans falling outside of the definition of an MBL. There has not been any *regulatory* reason to maintain the same sort of detailed data on these loans that credit unions maintain for their MBLs. These loans are treated differently than the business-purpose loans intended to be covered under the section 1071 rule and the Bureau's rule should account for that difference. We believe this is an important issue for three reasons. First, subjecting credit unions' non-MBL loans to section 1071 coverage could potentially affect the availability of these smaller size loans due to the increased costs associated with 1071 regulatory compliance. Second, subjecting these non-MBL loans to section 1071 coverage would create a material inconsistency with NCUA's treatment of these loans – an inconsistency that should be avoided. And lastly, the Bureau's failure to fully account for these non-MBLs may have resulted in a

---

[15] 12 CFR § 723.2.
[16] 58 Fed. Reg. 40,040 (July 27, 1993).

substantial underestimation of the full impact of an extremely low covered financial institution threshold. The proposal's 25 covered credit transaction threshold may have a much larger impact on credit unions than the Bureau fully understands if loans under $50,000 are included in determining 1071 coverage. As a result, CUNA recommends the Bureau establish an exemption for loans under $50,000 from the definition of covered credit transactions with an option for financial institutions to voluntarily report these loans to the Bureau. If the Bureau is concerned about the effects a *de minimis* loan exemption would have on section 1071 reporting if applied to all classes of covered financial institutions, then it should apply this exemption to only credit union lenders in recognition of the unique laws and regulations governing their commercial lending.

*Government Guaranteed Loans*

The Bureau is proposing complete exclusions for public utilities credit, securities credit, and incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b). However, the Bureau is not proposing to exclude government credit because governmental entities would not constitute small businesses under the proposed rule. We generally support the Bureau's treatment of government credit but urge the Bureau to also exempt business loans guaranteed by governmental entities, especially the SBA.

As proven time and time again, credit unions are eager to serve their members and communities, and they want to help small businesses succeed through partnerships with the SBA and other governmental entities. In particular, the SBA government guaranteed lending programs epitomize a successful public-private partnership. SBA's lending programs, such as the 7(a) Loan Program and the Paycheck Protection Program (PPP), allow small businesses to work with local lenders throughout the loan process. The SBA guarantees these loans ensuring that financial institutions are made whole in an instance of default by the borrower. We witnessed exactly how critical these programs can be in meeting the needs of local businesses when the government turned to financial institutions to assist in rolling out the PPP initiative. The failure to exclude these types of loans within the scope of the rule may ultimately discourage lender participation in these public-private programs in the future and effectively punish lenders for successfully implementing assistance in the best interest of the government, communities, and small business borrowers. We recommend the Bureau exclude certain government guaranteed loans from the definition of a covered credit transaction so these programs can continue to help small businesses.

**Definition of Application**

The receipt of a covered application, as defined in the rule, would trigger the section 1071 data collection and reporting requirements for covered financial institutions. The Bureau is proposing to define a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. The proposed definition of a covered application does not include reevaluation, extension, or renewal requests on an existing business credit account and inquiries and prequalification requests. However, these "excluded" events *would* be considered a covered application if the borrower's request seeks additional credit amounts (i.e. line of credit increases).

We support the Bureau adopting a clear exclusion for inquiries and prequalification requests from the definition of covered applications. The inclusion of these types of events would effectively punish borrowers for inquiring about qualification requirements, available products, or available interest rates. In addition, the Bureau should exclude requests for credit line increases from the definition of covered application under the 1071 rule. Credit line increases are substantially different in process and underwriting from an initial credit request, as these line increases may be based on performance data and the borrower's relationship with the creditor. The Bureau should also avoid disrupting the experience of borrowers by adding additional data collection hurdles for those that have already gone through the application process prior to the 1071 rule's existence.

**Firewall Requirement**

The Bureau is proposing § 1002.108 to implement the requirement in section 1071 that certain data collected be shielded from underwriters and certain other persons; the Bureau refers to this requirement as the "firewall."[17] Under the firewall provision, an employee or officer of a financial institution or a financial institution's affiliate that is involved in making any determination concerning the application would be prohibited from accessing an applicant's responses to inquiries that the financial institution makes pursuant to section 1071 regarding whether the applicant is a minority-owned or women-owned business, and the ethnicity, race, and sex of the applicant's principal owners. However, this prohibition would not apply to an employee or officer if the financial institution determines this limitation is not feasible. In such an instance, the financial institution would be required to provide the applicant with a notice or, alternatively, the financial institution could provide the notice to all applicants whose information could be accessed.

We acknowledge the intent (and statutory requirement) behind requiring a firewall between certain section 1071 information and personnel making credit decisions. However, according to CUNA research, nearly half of all credit unions have five or fewer full-time employees. As a result, credit unions and other community-based lenders may find it difficult to comply with the firewall requirements given their small staff size, and the CFPB's proposed notice requirement may put these smaller lenders at a disadvantage.

We recommend the Bureau provide clear guidance on its understanding of when the firewall may not be "feasible" and how a covered financial institution may determine the feasibility of the firewall requirement. The firewalling requirement is likely to impact a disproportionate number of small financial institutions. Borrowers may be skeptical of a lender that provides the firewall notice and become concerned that their 1071 data could be used to discriminate – despite no specific basis for that concern. This could result in some borrowers seeking alternative entities for credit or declining to provide their 1071 demographic information in the first place. This practical concern highlights the importance of setting the rule's threshold for a covered financial institution at the appropriate level to exempt smaller providers while focusing on lenders better equipped to absorb the rule's costs and implement these provisions as the Bureau envisions.

---

[17] *See generally* Proposal, 86 Fed. Reg. 56380-56381.

**Data Points**

Section 1071(b) requires lenders to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. If the answer is yes, then the statute requires lenders to clearly and conspicuously collect several items enumerated in the statute. The Bureau refers to these items as "mandatory data points." As a general principle, we believe the Bureau should finalize a rule that sticks to the statutorily required data points and avoid adding discretionary data points that may not further the purposes of section 1071 in a material way.

It is not evident how the proposed discretionary data points would benefit the Bureau or consumers to justify the cost and resources required for their collection. In fact, the addition of unnecessary discretionary data points may ultimately add to the already significant privacy concerns of both lenders and small business borrowers. The Bureau can look as far as recent history, with the 2015 HMDA Rule, to find a situation where the addition of unnecessary discretionary data points created substantial costs of compliance. Those discretionary data points were previously under review for possible reduction or modification.[18]

In developing an entirely new data collection, as a starting point, the Bureau should limit its set to data points that are statutorily required, and not add discretionary data points indiscriminately. In doing so, the Bureau could revisit its data set in the future and, if the collection of additional data proves to be justified, build out additional data points from there. In the alternative, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters – such as the partial data point exemption approach taken in the HMDA context.

*Ethnicity, Race, and Sex of Principal Owners*

The Bureau is proposing to require covered financial institutions to collect and report the ethnicity, race, and sex of the applicant's principal owners. It is also proposing to require financial institution employees to conduct a visual observation or surname analysis to determine the race and ethnicity of an applicant if the applicant declines to respond to the collection request. Proposed Appendix G would also include a requirement that a financial institution inform an applicant that the applicant is not required to respond to the collection questions regarding its principal owners' ethnicity, race, or sex.

We strongly recommend that the Bureau rescind the proposed requirement to conduct a visual observation and surname analysis. In the alternative, the Bureau should implement the approach that was contemplated in the SBREFA Outline and require the collection and reporting of this data to be based *solely* on the applicant's self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the financial institution would be required to report this information and would have no additional obligation to verify that response.

The Bureau's proposed approach would not only create a particularly uncomfortable situation for employees of covered financial institutions required to conduct these visual observations, but it

---

[18] Home Mortgage Disclosure (Regulation C) Data Points and Coverage, 84 Fed. Reg. 20049 (May 8, 2019).

would directly contradict the applicant's wishes to not identify their race or ethnicity. The right for borrowers to refuse answering demographic questions is clearly contemplated in law, and the Bureau's proposal would be an end-run around this right. In addition, a requirement to report based on visual observation or surname would clearly undermine the accuracy of information reported and the CFPB's analysis of that data.

## Compiling, Maintaining and Reporting 1071 Data to the Bureau

The Bureau is proposing in § 1002.109(a) for section 1071 data to be collected on a calendar year basis and reported to the Bureau on or before June 1 of the following year. We generally support calendar year collecting and reporting. However, we caution the Bureau against aligning the annual reporting dates of section 1071 with the reporting dates for HMDA. The Bureau should recognize that for many small reporters, complying with two large complex data collection and reporting regimes at the same time could strain their finite resources.

### *Reporting – Loan Participations*

The Bureau's proposal also addresses collection and reporting requirements of subsidiaries of financial institutions or instances where multiple financial institutions are involved in a transaction. Under the rule, a partial purchase of a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. Rather, the financial institution receiving the covered application is the entity originating a covered credit transaction and, therefore, the reporting financial institution for purposes of section 1071. For example, Financial Institution A receives an application for a covered credit transaction and approves the loan, and then Financial Institution A elects to organize a loan participation agreement where Financial Institutions B and C agree to purchase a partial interest. This is a covered credit transaction for Financial Institution A, but it is not a covered credit transaction for Financial Institutions B and C. We generally support the Bureau's approach to loan participations and agree the originating lender is best positioned to obtain the 1071 information from the borrower. In fact, participating lenders would be hard pressed to comply with 1071 given their distance from the borrower, and the data they provide would likely be duplicative of the originating lender.

The Bureau is also proposing to address technical instructions for the submission of data, including information about the Filing Instructions Guide, which the Bureau anticipates later providing for the appropriate year. We appreciate the Bureau recognizing the importance of the technical specifications in preparing for rule compliance and encourage it to publish these specifications quickly and account for the delayed nature of the technical specifications when setting the rule's compliance date.

## Privacy Considerations Involving Bureau Publication of Section 1071 Data

The Bureau is proposing in § 1002.110 to address several issues regarding the publication of section 1071 data. Under the proposal, the Bureau plans to make available to the public, on an annual basis and on the Bureau's website, the data submitted to it by financial institutions. The

Bureau is proposing to make the data available subject to deletions or modifications made by the Bureau, at its discretion, if it determines that such deletions or modifications would advance a privacy interest. To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, it has plans to use a "balancing test" that assesses the risks and benefits of public disclosure. However, the Bureau does not plan to permit any notice and comment period on the balancing test itself. We strongly recommend the Bureau publish its planned balancing test methodology after the first year of collecting 1071 data, and provide interested parties an opportunity to comment before determining which data to make public.

In addition, CUNA is greatly concerned about the heightened risks associated with a broad collection of financial data about consumers that could be used in ways not intended by the Dodd-Frank Act. For example, since not all credit unions participate in commercial lending, any localized data made available to the public may be traceable to consumers in certain areas. A consumer seeking a small business loan to create a new business, or for another reason, may have concerns about their information becoming public. To mitigate these concerns, the Bureau should avoid releasing data based on census tract or NAICS code, only publicly release lending data at the state-wide level and in aggregated form, and conduct a robust analysis of reidentification risks prior to releasing data to the public.

Furthermore, requiring the encrypting of this data could present liability and cost concerns to credit unions that could harm their participation in this market. Data breaches and protecting members' privacy are a top priority of credit unions, and new regulations making this issue more complex could negatively impact their ability to serve their members.

**Recordkeeping**

The Bureau is proposing § 1002.111 to require a covered financial institution to retain evidence of compliance with the rule, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the Bureau. The Bureau is also proposing to require a financial institution to maintain, separately from the rest of an application for credit and accompanying information, an applicant's responses to a financial institution's inquiries regarding the applicant's protected demographic information. We recommend the Bureau avoid establishing recordkeeping requirements that would necessitate the acquisition of costly record retention systems and align section 1071's recordkeeping requirement with ECOA's 25-month retention period rather than HMDA's three-year retention period.

**Implementation Period**

The Bureau is proposing in § 1002.114 for the final rule to become effective 90 days after publication in the *Federal Register*, but *compliance* with the final rule would not be required until approximately 18 months after publication in the *Federal Register*. In addition, the Bureau is also proposing to permit covered financial institutions to *begin collecting* protected applicants' demographic information beginning 12 months prior to the compliance date, and would permit financial institutions to use a different time period to determine whether they will be covered by

the rule as of the compliance date. We disagree with the proposed 18-month compliance timeline and strongly urge the Bureau to adopt a compliance period of at least three years.

In the SBREFA Outline, the Bureau considered permitting covered financial institutions to have a period of approximately two calendar years for implementation following the issuance of the section 1071 rule. We generally agreed a two-year timeframe could be sufficient but noted the complexity and scope of the rule would be a relevant factor. Unfortunately, the Bureau has chosen to propose a section 1071 rule that is not only more complex than the SBREA Outline envisioned, but would also cover a substantially larger pool of financial institutions, including smaller lenders. Barring a change of course, CUNA recommends the Bureau adopt a compliance timeframe of no less than three years after publication in the *Federal Register*. Based on feedback from credit unions and vendors, only a three-year timeframe would be sufficient for covered entities to revise their systems and processes in coordination with vendors and to make additional changes necessary to meet the requirements of the new section 1071 rule. The Bureau would also be warranted in adopting a staggered implementation period with the largest lenders being subject to the rule before community-based providers. This staggered implementation strategy has been deployed for complex rules like the Financial Accounting Standards Board's current expected credit loss accounting standard in recognition of certain rules' high one-time costs and the advantages larger financial institutions have in negotiating with vendors.

Regardless, during the period prior to implementation, the Bureau should regularly communicate with vendors and covered entities to ensure compliance preparations are progressing as expected and consider reasonable extensions if issues that could affect industry preparedness arise.

**Conclusion**

On behalf of America's credit unions and their 120 million members, thank you for your consideration of our recommendations and feedback. If you have questions or require additional information related to our comments, please do not hesitate to contact me at (202) 508-3629 or amonterrubio@cuna.coop.

Sincerely,

Alexander Monterrubio
Senior Director of Advocacy & Counsel