# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION, | § § § § | |
| *Plaintiffs*, | § § | |
| TEXAS FIRST BANK; INDEPENDENT BANKERS ASSOCIATION OF TEXAS; and INDEPENDENT COMMUNITY BANKERS OF AMERICA, | § § § § § | |
| *Proposed Intervenor Plaintiffs*, | § § | |
| CREDIT UNION NATIONAL ASSOCIATION; CORNERSTONE CREDIT UNION LEAGUE; and RALLY CREDIT UNION, | § § § § | Case No. 7:23-cv-00144 |
| *Proposed Intervenor Plaintiffs*, | § § § | |
| v. | § § | |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | § § § § § | |
| *Defendants*. | § § | |

## COMPLAINT IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

Intervenor-Plaintiffs XL FUNDING, LLC d/b/a Axle Funding, LLC ("Axle") and the Equipment Leasing and Finance Association ("ELFA," collectively with Axle "ELFA Intervenors") file this Complaint in Intervention, and in support thereof would respectfully show the Court as follows:

## I. INTRODUCTION

1.      On March 30, 2023, Defendants the Consumer Financial Protection Bureau and Rohit Chopra, in his capacity as Director (collectively, the "CFPB" or "Defendants") published a final rule (the "Final Rule") amending Regulation B governing small business lending under the Equal Credit Opportunity Act ("ECOA"). *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35150, 2023 WL 3723408 (May 31, 2023). According to CFPB, the Final Rule implemented changes to the ECOA made 13 years earlier by Congress in § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Act").[1] 88 Fed. Reg. 35150.

2.      Congress enacted the Act, in part, to bolster and encourage loans made to women-owned, minority-owned, and small businesses. *See* 15 U.S.C. § 1691; 15 U.S.C. § 1691c-2(a). The Act requires covered financial institutions to gather and report certain data from applications for credit by those businesses. 15 U.S.C. § 1691c-2(e).

3.      The Final Rule morphs three pages of the Act into more than 880 pages of regulations and commentary, requiring all "covered financial institutions" to develop and implement systems and compliance mechanisms to gather 81 data points including demographic points to be reported. 88 Fed. Reg. 5, 35, 107-108, 545–35, 561, 640, 707-708 (to be codified at 12 C.F.R. § 1002.107); *see also* https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf.

4.      The Final Rule, issued in the face of a finding that the CFPB's funding structure is unconstitutional, will irreparably harm Axle and other member entities of ELFA, as "covered

---

[1] Pub. L. 111-203, tit. X, Section 1071, 124 Stat. 1376, 2056 (2010), codified at 15 U.S.C. § 1691c-2.

financial institutions" subject to the Final Rule, and ultimately the women-owned, minority-owned, and small businesses the Act was designed to benefit. Axle and numerous other members of ELFA that qualify as "covered financial institutions" will be required to incur actual and opportunity costs by dedicating more staff and financial resources into government reporting than actual lending to comply with the Final Rule which is invalid and unenforceable.

5.      Beyond being harmful to financial institutions and borrowers alike, the Final Rule is unconstitutional and was promulgated in violation of the Administrative Procedure Act (the "APA"). *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) 5 U.S.C. §§ 551–59. This led both to criticism by the Fifth Circuit and entry of the Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction, at 1 [Doc. # 25] (the "Injunction"), which enjoins the Final Rule as it pertains to only certain parties as described therein. The party-specific nature of the Injunction necessitates the ELFA Intervenors' intervention in this action in order to protect Axle and numerous other ELFA members who qualify as "covered financial institutions" under the Final Rule.

6.      In an abundance of caution, covered financial institutions, including the ELFA Intervenors, are implementing the Final Rule and incurring significant costs in furtherance of the same, which may ultimately affect availability and increase the cost of their products and services.

7.      This Court's Injunction enjoins the CFPB from implementing and enforcing the Final Rule only against the original Plaintiff and their associated members pending the Supreme Court's determination of *Community Financial*. Axle and many of ELFA's other members qualify as covered financial institutions, but are not members of any other complaining organization ("Exposed ELFA Covered Financial Institutions") and, thus, are not protected by

the Injunction in its current form. Like the other claimants, Axle and the Exposed ELFA Covered Financial Institutions are subject to irreparable harm arising from their forced compliance with the unconstitutional Final Rule. They file this Complaint in Intervention to seek such protection.

## II. PARTIES[2]

8.      ELFA is a national trade association dedicated to representing the interests of financial services companies and manufacturers in the equipment finance sector. ELFA's membership consists of more than 630 member companies located throughout the United States, including in the Southern District of Texas. These include independent leasing and finance companies, captive finance companies, investment banks, commercial banks, service providers, inventory lenders, diversified financial services companies, brokers and packagers, and multinational financial and manufacturing companies operating within the United States. ELFA members collectively operate thousands of locations nationwide, and employ tens of thousands of Americans.  Of the $2 trillion that American businesses, nonprofits, and government agencies invest in capital goods and software each year, 57.3%, or $1.16 trillion of that investment, is financed through loans, leases, and other financial instruments.  ELFA member companies finance the acquisition of assets, including without limitation, all types of capital equipment; software; agricultural equipment; IT equipment and software; aircraft; manufacturing and mining machinery; rail cars and rolling stock; vessels and containers; trucks and transportation equipment; construction and off-road equipment; motor vehicles; business, retail, and office equipment; and

---

[2] ELFA Intervenors do not assert claims against (1) Plaintiffs Texas Bankers Association, Rio Bank, McAllen, Texas, and American Bankers Association (collectively, "Original Plaintiffs"); (2) Proposed Intervenor-Plaintiffs Texas First Bank, Independent Community Bankers of America, and Independent Bankers Association of Texas (collectively, "Banker Intervenors"); or (3) Proposed Intervenor-Plaintiffs Credit Union National Association, Cornerstone Credit Union League, and Rally Credit Union (collectively, "Credit Union Intervenors"). Each of the Original Plaintiffs, Banker Intervenors, and Credit Union Intervenors (collectively, "Prior Plaintiffs") have appeared in the instant action through counsel. Accordingly, each may be served through their counsel of record via the Court's electronic filing system.

medical technology and equipment.  The customers of ELFA members range from Fortune 100 companies to small and medium sized enterprises to governments and nonprofits.

9.    Axle is a limited liability company duly organized and existing under and by virtue of the laws of the State of Indiana, with its principal office located at 15301 N. Dallas Parkway Addison, Texas 75001. Axle operates as a floorplan lender that provides financing for motor vehicle dealerships. Axle operates from brick-and-mortar branches located in Texas and fourteen (14) other states, including two branches located in the Southern District of Texas at 1440 FM 3083, Conroe, Texas 77301 and 1826 Almeda Genoa, Houston, Texas 77047, employing more than a dozen citizens within the Southern District of Texas. Axle has existing loans with hundreds of motor vehicle dealers located within the State of Texas, including numerous active borrower dealerships located within the Southern District of Texas, and hundreds of others operating nationwide, many of which purchase vehicles in Texas.[3] Axle frequently extends credit to, and increases credit lines of, Texas women-owned, minority-owned, and small businesses, specifically those with less than $5 million in gross annual revenue. The volume of such loans exceeded one hundred (100) in each of 2021 and 2022, and Axle projects it will maintain (or increase) such volume in 2023 and 2024. Axle is a member of ELFA.

10.    Consumer Financial Protection Bureau ("CFPB" or "Bureau") is a federal executive agency and an independent bureau in the Federal Reserve System, which regulates the offering and provision of certain financial products or services throughout the United States. 12 U.S.C. § 5491(a). CFPB has appeared in the instant action; therefore, it may be served through its counsel of record via the Court's electronic filing system.

---

[3] These include more than 50 dealer borrowers located within—and selling vehicles to customers located within—the Southern District of Texas.

11.     Rohit Chopra ("Mr. Chopra") is the Director of CFPB, and he is sued in such capacity, only. Mr. Chopra has appeared in the instant action; therefore, he may be served through his counsel of record via the Court's electronic filing system.

## III. JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.

13.     Venue is proper in this Court because Defendants include CFPB, a United States agency, and Mr. Chopra, an officer sued in his official capacity, and because Defendants and Prior Plaintiffs' have submitted to the venue of this Court. Additionally, venue is proper pursuant to 228 U.S.C. § 1391(e)(1). Axle conducts significant business within the Southern District of Texas, as represented by its more than fifty borrower dealerships located in the counties within the Southern District of Texas, has many employees located in the Southern District of Texas, and has a compelling interest relating to the subject of the action due the disparate effects the Final Rule will have on its business in the Southern District of Texas. Such interest may only be protected by intervening in the instant action and obtaining injunctive relief similar to the Original Plaintiffs. Accordingly, a substantial part of the events or omissions giving rise to Axle's claim occurred in the Southern District of Texas. Further, the ELFA Intervenors are so situated that disposing of the action will impair Axle and the Exposed ELFA Covered Financial Institutions' ability to protect their interests as the Injunction, in its current form, excludes Axle and the Exposed ELFA Covered Financial Institutions.[4] Finally, ELFA Intervenors' intervention will not cause undue prejudice or delay and furthers the interests of justice and judicial economy.

---

[4] Some member entities of ELFA may be members of the Original Plaintiffs and, therefore, protected by the Injunction. However, many members, such as Axle and other lenders, are not, requiring the ELFA Intervenors to file this intervention to protect their interests.

COMPLAINT IN INTERVENTION                                                          PAGE 6

14.     ELFA shares a similar interest in that its membership is comprised of both financial institutions nationwide, including four (4) different financial institutions with their principal offices in the Southern District of Texas and more than 100 member institutions who will be covered financial institutions under the Final Rule with a nexus to Texas by either lending in Texas or having employees located in Texas. Of those more than 100, many are going to be subject to the first compliance deadline of October 2024 and are not covered by the current Injunction. Those members located within or conducting business in the Southern District of Texas finance the acquisition of over $84 billion in capital equipment to customers within Texas.

## IV. FACTUAL BACKGROUND

**A.  The CFPB's Unconstitutional Funding Mechanism**

15.     Congress passed the Act in 2010 in response to the 2008 financial crises. Pub. L. No. 111-203. Title X of the Act is the Consumer Financial Protection Act of 2010 ("CFPA"), which established the CFPB as the regulator for individuals and entities that provide financial products and services, including loans for small businesses.

16.     The CFPB has the power to "prescribe rules or issue orders or guidelines pursuant to" nineteen distinct consumer protection laws. 12 U.S.C. § 5581(a). These include rules, orders, and guidelines applicable to commercial loans in certain contexts.

17.     Pursuant to § 1021(a) of the CFPA, the CFPB must implement and enforce consumer financial law "consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products," and to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions."

18.     While exercising its rulemaking and enforcement authority, the CFPB must weigh "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons… and the impact on consumers in rural areas." 12 U.S.C. § 5512.

19.     Recognizing the vast power delegated by Congress, the Fifth Circuit recently took issue with the CFPB's "self-actualizing, perpetual funding mechanism." *Cmty. Fin. Servs.*, 51 F.4th at 638 (quoting *CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 221– 22 (5th Cir. 2021) (Jones, J., concurring,)). "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not. Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Cmty. Fin.,* 51 F.4th at 638 (internal citations omitted). Accordingly, as described by the Fifth Circuit:

> Congress did not merely cede *direct* control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded *indirect control* by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process— a double insulation from Congress's purse strings that is unprecedented across the government. *Id.* at 638–39 (quoting *All American Check Cashing*, 33 F.4th at 225 (Jones, J., concurring)).

20.     This cession alone gave the Fifth Circuit "grave pause," *Id*. at 639. "But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books. Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains 'a separate fund,' the 'Bureau of Consumer Financial Protection Fund,' which shall be maintained and established at a Federal Reserve bank. 'This fund is under the control of the

Director,' and the monies on deposit are permanently available to him without any further act of Congress. Thus, contra the Federal Reserve, the Bureau may 'roll over' the self-determined funds it draws *ad infinitum*," resulting in, essentially, blank check authority. *Id.* at 639 (citations omitted).

21.    For these reasons, the Fifth Circuit held that CFPB's funding mechanism is irreconcilable with both the Appropriations Clause and the separation of powers, thereby invalidating the rule before it. *Id.* at 642–43.

**B.  Proposal of the Rule**

22.    Section 1071 of the Act amends the ECOA to "inquire whether the business is a women-owned, minority-owned, or small business" and require that accumulated data be submitted annually to the CFPB. 15 U.S.C. 1691c-2(b). To that end, the Act directed financial institutions to collect only the following limited information specified in § 1071:[5]

(A) the number of the application;

(B) the date on which the application was received;

(C) the type and purpose of the loan or other credit being applied for;

(D) the amount of the credit or credit limit applied for or the amount of the credit transaction;

(E) the amount of the credit limit approved for such applicant;

(F) the type of action taken with respect to such application;

(G) the date of such action;

(H) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan applicant;

---

[5] The Act also provides for amendment to include disclosure of "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." 12 U.S.C. 1071; 15 U.S.C. 1691c-2(e). But such inquiry is limited only to data that aids in fulfilling the purposes of § 1071.

    (I)   the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application; and

    (J)   the race, sex, and ethnicity of the principal owners of the business.

23.    On September 1, 2021, the CFPB proposed a rule that, according to CFPB, implemented these statutory directives from § 1071. *Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356, 2021 WL 4636032 (Oct. 8, 2021).

24.    In reality, the CFPB's proposed rule would vastly expand the categories of information to be reported by lenders, adding nearly 70 additional data points to § 1071's list. Those included, *inter alia*, data concerning loan guarantees, loan terms, counteroffers, reasons for denials, comprehensive pricing information, origination charges, annual fees, broker fees, prepayment penalties, number of workers, time in business and demographic data points. *Id.*

25.    During the notice and comment period, most commenters characterized the proposed rule as excessively overbroad in terms of its data points and complained of the negative impact and substantial costs implementation of the proposed rule would have on the small business lending market.

26.    For example, the American Financial Services Association ("AFSA"), by letter data January 6, 2022, provided section by section comments, describing, among other things, the significant harm the proposed rule would have on financial institutions and their customers. Letter from Am. Fin. Servs. Assoc. to Rohit Chopra, Director, CFPB (Jan. 6, 2022), https://afsaonline.org/wp-content/uploads/2022/01/AFSA-Comment-Letter-on-DFA-Sec-1071-Jan-6-2022.pdf. Those harms include increased costs for programming, training and re-training, data collection (with

inevitable errors arising from factors beyond the financial institutions control, yet nonetheless resulting in enforcement actions), monitoring, and reporting, and potential violations of applicants' privacy and lending relationships. *Id*. at 3. These harms are magnified when viewed in connection with the nature of Axle's business—to provide financing for motor vehicle dealers. Such financing requires "very flexible timing and pricing terms, as merchants' inventory needs are dynamic with shifting and sometimes seasonal demand for goods." *Id*. at 5. AFSA requested clarification that the motor vehicle loans made by those similar to Axle be deemed "trade credit" outside the scope of the rule, but that request has been ignored. *Id*.

27.     AFSA also commented that, while the proposed rule stated it is intended to "help small businesses drive inclusive and equitable growth," the overly burdensome data collection requirements that exceeded the Congressional mandate could result in a reduction of available credit, thus having the opposite effect of what Congress intended—harming both financial institutions and borrowers. *Id*. at 1. Similarly, the U.S. Small Business Administration's Office of Advocacy commented that the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses." Letter from SBA, Office of Advocacy, to Rohit Chopra, Director, CFPB (Jan. 6, 2022), https://advocacy.sba.gov/2022/01/20/advocacy-submits-response-to-cfpbs-notice-of-proposed-rulemaking-on-small-business-lending-data-collection/.

28.     ELFA echoed this sentiment in its own comment, advising the CFPB that, "[h]istory indicates, however, that when costly regulatory burdens are laid upon a highly competitive industry, the costs to the consumer go up and market participants exit." Letter from Equipment Finance and Leasing Association, to CFPB (Jan. 4, 2022), https://www.elfaonline.org/docs/default-source/advocacy/fed/elfacmnts_docketnocfpb-2021-0015.pdf?sfvrsn=b39420c_2.

29.    Beyond providing a similar section-by-section analysis, the Independent Community Bankers of America also explained the results of its membership survey, which demonstrated that the largest cost associated with the proposed final rule would be the necessity for community banks to hire additional employees:

> In contrast to large banks that employ thousands of employees to manage compliance, approximately 80% of community banks surveyed reported employing 25 or fewer full-time employees ("FTEs") dedicated to small business lending. 50% employed 10 or fewer FTEs in a small business lending role. These small staffs are already stretched thin and will require significant retraining to comply with the proposed rule. As a result, **58% of community banks surveyed reported that they will likely be required to hire additional FTEs in order to comply with the rule**.

> If a bank is required to hire even one additional FTE, the cost estimate would exceed the Bureau's own estimated time commitment to 716 staff hours per year for small . . . depository institutions. This time estimate amounts to 17.9 weeks of full-time work per year, or about 1/3 of a single FTE.

Letter from Independent Cmt'y Bankers of Am., to CFPB (Jan. 6, 2022), https://www.icba.org/advocacy/letters-testimony.

30.    In their comment, the Community Development Bankers Association ("CDBA") pointed out that, "[w]hile the cost of any single new regulation… is manageable for many large institutions, the sheer volume of the many new regulations that have gone into effect since the law's passage is overwhelming—particularly for small institutions." Letter from Cmt'y Dev. Bankers Assoc. to CFPB (Dec. 14, 2020), http://www.cdbanks.org/sites/default/files/pdfs/2020%20CDBA%20Letter%20on%201071%20Small%20Business%20Lending_12_14_Final.pdf. According to CDBA, the Final Rule could have the "unintended negative side effect of forcing the smallest lenders to abandon [women-owned, minority-owned, and small business lending] because it is no longer profitable and/or the compliance risks are too great." *Id.*

**C.  The Grossly Insufficient Cost-Benefit Analysis Utilized by the CFPB.**

31.     The CFPB, as a federal agency governed by the APA, is required to consider the costs and benefits of regulations to ensure that the benefit of a regulatory initiative justifies the associated costs.  *See, e.g.*, Executive Order 12291 (46 Fed. Reg. 13193 (Feb. 17, 1981)); Executive Order 12866 (58 Fed. Reg. 51735 (Sept. 30, 1993)). While the CFPB claims to have undertaken a cost-benefit analysis of its proposed rule, the supporting results it produced were incomprehensible.

32.     Specifically, with regard to data, the CFPB claims to have used "[a] Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model." CFPB      *Supplemental      Estimation*      at      4      (September      2021), https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.

33.     According to the CFPB, such model was utilized "because the data are missing at random," and it "need[ed] to impute data for multiple variables, origination number and dollar volume." *Id.* The CFPB further claimed that the missing variables are "monotone," and it therefore used "an independent univariate conditional model to generate the multivariate imputations." *Id.* That methodology is simultaneously incomprehensible, while also failing to account for the higher proportion of small business loans generated by smaller financial institutions across the commercial finance industry with a larger relative cost of compliance, such as the ELFA Intervenors.

34.     It has since become evident that the CFPB did not attempt to estimate the full extent of financial institutions' costs. The CFPB admitted that its "cost survey" was limited to only 13 of the eventual 81 data fields—those actually prescribed by the Act—and that the CFPB can only "estimate how ongoing costs would be different" with additional data points. 88 Fed. Reg. 35517.

Even still, the CFPB estimates, without true justification, that a "Type A" financial institution (those with lower levels of complexity, projected to receive between 100 and 300 applications per year) will incur start-up costs of $59,400.00, plus ongoing costs of $83.00 for every application received. 88 Fed. Reg. 35510. Beyond ignoring 68 omitted data points, the CFPB failed to differentiate aggregate data between financial institutions of different sizes and industries to account the fact that the percentage of a lender's total small-business loans typically declines as the portfolio size increases.

35. An actual analysis indicates that, for financial institutions with $100 million or less in total assets, small-business loans comprised approximately 40 percent of the total loan portfolio, but for financial institutions with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. *A Comment on Implementing Section 1071 of the Dodd-Frank Act*, Texas Tech University Rawls College of Business (Dec. 16, 2021), https://www.depts.ttu.edu/rawlsbusiness/news/posts/2021/12/bankers_digest_dodd_frank.php. But again, the CFPB has failed to articulate any cost-benefit analysis for the rule's impact on non-traditional lenders, such as Axle and ELFA's membership.

**D. The CFPB's Final Rule**

36. The CFPB expanded Congress' three-page mandate in the Dodd-Frank Act into a Final Rule of more than 880 pages, including commentary. Concurrent with the publication of the Final Rule, the CFPB issued a "Small Business Lending Rule: Data Points Chart," which sets forth the 81 separate data or sub-data points. *See* 12 C.F.R. § 1002.107 and https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf.

37. In supplementary material accompanying publication of the Final Rule, the CFPB acknowledged that, during the rulemaking process, it rejected an alternative approach that would

have limited data collection only to the statutorily required data points enumerated in section 1071, which it acknowledged would reduce costs. *See* Small Business Advisory Review Panel, Outline of Proposals Under Consideration and Alternatives Considered, Consumer Financial Protection Bureau (Sept. 15, 2020). https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf Rather than dispute the comments raising concerns, the CFPB dismissed them with a notation that "it expects the variable portion of ongoing costs to be passed on to small business credit borrowers in the form of higher interest rates and fees." 88 Fed. Reg. 35521. The CFPB ultimately issued the Final Rule in substantially the same form as originally proposed disregarding valid comments made by interested parties.

38.    CFPB also disclosed that the respondents to its "One-Time Cost Survey were instructed to assume that they would only be reporting on the mandatory (i.e., statutory) data fields." 88 Fed. Reg. 35517. In terms of justifying the regulatory enlargement, the CFPB blindly asserted that expanding the collection requirements with an additional 68 (non-statutory) data points "would aid in fulfilling the purposes of section 1071," without weighing the cost through an appropriate cost-benefit analysis. 86 Fed. Reg. 56356.

**E. Immediate and Irreparable Harm to the ELFA Intervenors Caused by the Final Rule**

39.    The Final Rule becomes effective August 29, 2023. 88 Fed. Reg. 35150. As a result, Axle and ELFA's other members must immediately incur substantial expenses in preparation for the implementation of the Final Rule.

40.    For Axle, like all of ELFA's other members subject to the Final Rule, that compliance activity will include selecting new computer software systems (that are yet to be created to address the requirements of the Rule); training employees; and hiring outside managers for the implementation of the information collection, report preparation, intra-company

segmentation procedures, and overall privacy protection needed to obtain and safeguard the extensive invasive, personal, demographic, and sexual orientation data mandated by the Final Rule.

41.    The over-reaching Final Rule, issued in the face of rulings questioning the legitimacy of the CFPB's funding structure, will force commercial finance companies, including Axle and other members of ELFA, with limited staff and resources to put more resources into government reporting rather than lending in their communities. Those costs will necessarily be passed on to those the Act is meant to benefit—the borrowers.

42.    Compounding the harm caused by mere implementation of structures and protocols to ensure compliance with the Final Rule itself is the CFPB's inability to safeguard the information financial institutions collect, much of which is invasive, personal and confidential. *See* 15 U.S.C. § 5512(c)(8) (requiring the CFPB to protect proprietary, personal, and confidential information). This is all the more concerning due to a recent data breach suffered by the CFPB. *CFPB's 'Disturbing' Data Breach Sparks Ire, Credibility Doubts*, Law 360 (Apr. 26, 2023), https://www.law360.com/articles/1601072/cfpb-s-disturbing-data-breach-sparks-ire-credibility-doubts. The CFPB admits a now-former employee transferred records containing confidential information to a personal email account, but says nothing of protocols implemented to prevent such disclosure from happening again. *See* Doc. # 19 at ¶ 75. According to the *American Banker,* the CFPB **still** has not notified affected consumers. *CFPB still has not Notified Consumers about Data Breach*, American Banker (Apr. 24, 2023), https://www.americanbanker.com/news/cfpb-still-has-not-notified-consumers-about-data-breach. Such failure to ensure adequate protections are in place to safeguard confidential information demonstrates that the CFPB is not prepared to adequately assess the security and privacy impacts

of its massive data collection required by the Final Rule.

43.     Further, the disparity of treatment of the covered financial institution will result in differing credit application processes for otherwise similarly situation covered financial institutions.  Plainly stated, this will result in otherwise similarly-situated covered financial institutions, which serve identical markets, asking for different information during the application process.  One group will have a more traditional application process and the other's application process would include asking the applicant for highly sensitive and private personal information required under Subpart B of the Rule.  This would cause irreparable harm to the group having to ask for additional information (the ELFA Intervenors) and will result in perceived discrimination by applicants, all of which is contrary to the statutory objectives of the CFPB.

44.     However, this appears to be of little concern to the CFPB, which has failed to respond to requests by various associations to issue a voluntary stay of the Rule until the Supreme Court of the United States issues a final determination concerning the validity of the CFB's funding structure. Moreover, following entry of the Injunction by this Court on July 31, 2023 in favor of the Original Plaintiffs, ELFA requested that the CFPB voluntarily agree to stay enforcement of the Final Rule consistent with the Injunction, thereby extending relief to all "covered financial institutions." Thus far, the CFPB has remained steadfast in its refusal.

## V. RELIEF SOUGHT

### COUNT I – Violations of the United States Constitution and Administrative Procedure Act
### Unconstitutional Funding – Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A)

45.     ELFA Intervenors re-allege and incorporate by reference the allegations of paragraphs 1 through 44, the same as if set forth verbatim herein.

46.     At this point, there can be no dispute that CFPB's funding structure, which it admits it utilized (and will continue utilizing) to issue and enforce the Rule, violates the U.S. Constitution. *See* Doc. # 19 at ¶ 80.

47.     CFPB's reliance on its unconstitutional funding mechanism to issue and enforce another CFPB-issued rule has already resulted in a finding of unconstitutionality. *Cmty. Fin.*, 41 F. 4th Cir. at 643.

48.     Because the Rule was issued as a result of the same unconstitutional mechanism, it violates the U.S. Constitution and the APA. Accordingly, it harms the ELFA Intervenors and must be declared invalid and set aside.

### COUNT II – Violation of the Administrative Procedure Act
### Exceeding the Statutory Scope – 5 U.S.C. § 706(2)(C)

49.     ELFA Intervenors re-allege and incorporate by reference the allegations of paragraphs 1 through 48, the same as if set forth verbatim herein.

50.     Agency actions resulting from an abuse of discretion must be set aside. 5 U.S.C § 706.

51.     Defendants abused their discretion by vastly expanding the original 13 data points prescribed by Congress in § 1071 of the Dodd-Frank Act to ***81 separate points***.

52.     Defendants' expansion of the original scope prescribed by statute is a clear example of an agency taking action beyond the statutory scope—an action directly contrary to the authority governing Defendants.

53.     As noted by commenters—which Defendants wholly ignored—the expansion caused by the Rule will result in less participation in the lending industry and, by extension, less available funding. Moreover, the exorbitant costs associated with compliance will ultimately be

partially passed down to the very groups the statute was enacted to protect—minority and women-owned businesses, among all other borrowers.

54.     Accordingly, the Rule should be invalidated and set aside.

### COUNT III – Violation of the Administrative Procedure Act
### Failure to Consider Relevant Commentary – 5 U.S.C. § 706(2)(A)

55.     ELFA Intervenors re-allege and incorporate by reference the allegations of paragraphs 1 through 54, the same as if set forth verbatim herein.

56.     CFPB, as a federal agency governed by the APA, must respond to relevant and significant issues raised by interested parties.

57.     It must also first examine relevant data and articulate a satisfactory reason for its actions that go beyond its express powers.

58.     Should an agency governed by the APA fail to consider important issues raised by commenters or offer an explanation for its unilateral action, a reviewing court must set aside the agency's action.

59.     The CFPB was alerted to the unsustainable costs and harsh risks associated with enactment of the Rule during the notice and comment period.

60.     Despite such knowledge and numerous commenters raising their concerns, CFPB acted arbitrarily and capriciously by failing to consider and respond to relevant and significant issues raised by interested parties.

61.     Further, CFPB has failed to justify its desire to compile voluminous, burdensome data in light of the statute's purpose of encouraging addition lending. This, despite CFPB bearing the burden of showing its actions are taken in furtherance of the statute.

62.     Accordingly, the Rule should be invalidated and set aside.

### Count IV – Violation of the Administrative Procedure Act
### <u>Insufficient Cost-Benefit Analysis – 5 U.S.C. § 706(2)(A) and (C)</u>

63.      ELFA Intervenors re-allege and incorporate by reference the allegations of paragraphs 1 through 62, the same as if set forth verbatim herein.

64.      Pursuant to § 1022(a) of the Dodd-Frank Act, the CFPB is required to consider benefits and costs associated with its actions, including the impact on the availability to financial products or services resulting from the action and the impacts associated with compliance. Again, the CFPB ignored the requirement.

65.      Instead, it enacted a rule that over burdens the institutions forced to comply, thereby reducing the availability of financial products and services and damaging downstream borrowers. As further described by the other complaining parties, the CFPB failed to account for the disproportionate costs of the Rule on smaller lenders and the fact that the Rule will likely cause decreased availability of funding for minority and women-owned small businesses. Incredulously, it *__acknowledged__* such impact, but elected to proceed in the face of the costs heavily outweighing any benefit. *See* 88 Fed. Reg. 35521.

66.      Perhaps costs were of little concern to the Defendants, as evidenced by their failure to properly account for costs associated with obtaining and reporting 68 data points beyond those prescribed by statute. But such wanton disregard for realities is the precise reason a cost-benefit analysis is required. Without an analysis of accurate costs, no one—neither borrowers nor lenders—receives a benefit.

67.      "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018). It makes little sense why the CFPB would promulgate the Rule without analyzing costs

based upon the size of lenders' portfolios in relation to the given lender's assets or the impact on lenders conducting business in industries beyond stereotypical small business loans. Accordingly, the CFPB's failure to adequately consider the costs associated with the Rule, which were pointed out by many commenters, is reflective of the arbitrary, unreasonable, and illogical nature of the Rule, thereby requiring a finding it is invalid and void.

## VI. CONCLUSION AND PRAYER

68.    The actions of the CFPB, especially when taken in light of the ruling in *Community Financial,* the ambiguities surrounding implementation of protocols to satisfy the Final Rule's requirements, and the numerous comments raising concerns of interested parties, could not be further from Congress's intended purposes. Instead of ensuring that consumers have access to markets for financial products and services that are fair, transparent, and competitive, the Rule blindly imposes expansive data collection requirements and draconian reporting burdens on financial institutions that will provide zero or suspect benefit while increasing costs and drastically reducing the availability of financial products and services. Promulgation of the Rule through the CFPB's unconstitutional funding structure is alone sufficient to justify a finding of invalidity and an order of enjoinment. Its wanton disregard of the costs to financial institutions and consumers only worsens matters.

69.    For the reasons set forth herein, ELFA Intervenors respectfully request that the Court:

(A) Enter a final judgment declaring that the Final Rule is invalid and unenforceable;

(B) Preliminarily and permanently enjoin enforcement of the Final Rule as it pertains to Axle and ELFA's other members and associated entities;

(C) Award ELFA Intervenors their attorney fees and costs incurred in this cause; and

(D) Grant ELFA Intervenors such other and further relief to which they show themselves justly entitled.

Dated: August 29, 2023          Respectfully Submitted,

PADFIELD & STOUT, LLP
420 Throckmorton Street, Ste. 1210
Fort Worth, TX 76102
817-338-1616 – Telephone
817-338-1610 – Facsimile

  /s/ *Alan B. Padfield*
Alan B. Padfield
State Bar I.D. #00784712
abp@padfieldstout.com
Mark W. Stout
State Bar I.D. #24008096
mstout@padfieldstout.com
Owen C. Babcock
State Bar I.D. #24104585
obabcock@padfieldstout.com
Kelsey N. Linendoll
State Bar I.D. #24120975
klinendoll@padfieldstout.com

*Attorneys for ELFA Intervenors*