## EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | § § § § § | |
| *Defendants*. | § § | |

## DECLARATION OF ANDREW FISHBURN

1.      My name is Andrew Fishburn.  I am over the age of eighteen (18) years, have never been convicted of a crime, and am otherwise competent and qualified to make this Declaration.  I have personal knowledge of the facts stated herein based upon the performance of my duties as Vice President, Federal Government Relations, for the Equipment Leasing and Finance Association ("ELFA") and the facts stated herein are true and correct.  I affirm under penalties for perjury that the statements contained herein are true and correct and within my personal knowledge as a result of my duties as Vice President, Federal Government Relations, for ELFA. My duties include oversight of all business activities of ELFA, as well as regulatory compliance of ELFA and its member financial institutions.

2.      I am one of the custodians of records, books, files and records of ELFA as those records, books, files and records pertain to its compliance and dealings with regulatory agencies, including the Consumer Financial Protection Bureau ("CFPB").  I have personally worked on said records, books, files and records, and, as to the following facts, I know them to be true of my own

knowledge or I have gained knowledge of them from the ELFA's business records, which are kept by ELFA in the regular course of its business, and it was the regular course of business of ELFA for an employee or a representative of said business, with knowledge of the acts, conditions, or opinions recorded, to make those records or to transmit the information to be included in such records; and such records were made at or near the time or reasonably soon after the acts, conditions or opinions recorded. Attached hereto are Exhibits "1" through "2," which include twelve (12) pages of records from ELFA. The records attached hereto are the originals or exact duplicates of the originals.

3.    ELFA is a national trade association dedicated to representing the interests of financial services companies and manufacturers in the equipment finance sector. ELFA's membership consists of more than 630 member companies located throughout the United States, including in the Southern District of Texas. These include independent leasing and finance companies, captive finance companies, investment banks, commercial banks, service providers, inventory lenders, diversified financial services companies, brokers and packagers, and multinational financial and manufacturing companies operating within the United States. ELFA members collectively operate thousands of locations nationwide, and employ tens of thousands of Americans. Of the $2 trillion that American businesses, nonprofits, and government agencies invest in capital goods and software each year, 57.3%, or $1.16 trillion of that investment, is financed through loans, leases, and other financial instruments. ELFA member companies finance the acquisition of assets, including without limitation, all types of capital equipment; software; agricultural equipment; IT equipment and software; aircraft; manufacturing and mining machinery; rail cars and rolling stock; vessels and containers; trucks and transportation equipment; construction and off-road equipment; motor vehicles; business, retail, and office equipment; and

medical technology and equipment. The customers of ELFA members range from Fortune 100 companies to small and medium sized enterprises to governments and nonprofits.

4.      ELFA shares a similar interest in that its membership is comprised of both financial institutions nationwide, including four (4) different financial institutions with their principal offices in the Southern District of Texas and more than 100 member institutions who will be covered financial institutions under the Final Rule with a nexus to Texas by either lending in Texas or having employees located in Texas. Of those more than 100, many are going to be subject to the first compliance deadline of October 2024 and are not covered by the current Injunction. Those members located within or conducting business in the Southern District of Texas finance the acquisition of over $84 billion in capital equipment to customers within Texas.

5.      I have reviewed and familiarized myself with the collection and reporting requirements to be imposed on "covered financial institutions" pursuant to the rule promulgated by the Consumer Financial Protection Bureau (the "CFPB"), entitled *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule"). In my role for ELFA, I have worked closely with ELFA staff and its member financial institutions to gain an understanding of the financial and other practical impacts the Final Rule will have on both ELFA and its member financial institutions.

6.      I have also reviewed the affidavit of Edward Tremblay, Vice President of Collection/Compliance for XL Funding, LLC d/b/a Axle Funding, LLC ("Axle") submitted in the instant action. I agree with the statements made in said affidavit and understand that they reflect sentiments similar to other ELFA member financial institutions subject to the Final Rule. Axle is a member of ELFA, and I understand it will be required to comply with the Final Rule and, accordingly, has already began incurring costs in preparing for this compliance. I understand that

many of ELFA's other member financial institutions have taken similar measures and incurred costs associated with the same. It is also my understanding that the incurrence of such costs is not limited to members of ELFA or the Texas Bankers Association, American Bankers Association, Independent Community Bankers of America, Independent Bankers Association of Texas, Credit Union National Association, and Cornerstone Credit Union League (collectively, the "Appearing Associations") but is applicable to all covered financial institutions across countless industries, many of which are independent or members of other organizations. This lack of representation is the cause of ELFA's intervention in the instant action, as many of its members are left without the protection from the Final Rule provided the Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction [Doc. # 25] (the "Order") previously entered by this Court.

7.      Based on my personal knowledge gained through my role with ELFA, including through review of the financial information provided by its member institutions during the application process and thereafter, many of ELFA's member institutions made a sufficient number of qualifying small-business loans in 2021 and 2022, and likely will continue doing so in 2023 and beyond, to require their compliance with the Final Rule.

8.      Beyond the direct economic costs incurred by preparing for timely compliance with the Final Rule, ELFA's member institutions also now face additional costs in the form of loss of business given the competitive advantage given to member-institutions of the Texas Bankers Association and American Bankers Association, or any other institution protected from the Final Rule. The equipment leasing and finance industry occupied by ELFA's member institutions is highly competitive, and a substantial portion of their business results from referrals by equipment manufacturers, distributors, dealers of their customers to multiple financing providers. ELFA anticipates that said sources of business will be more likely to refer a customer to financial

institutions that do not require the applicant to answer an additional set of inquiries. Further, given the costs incurred and anticipated to be incurred, ELFA anticipates that its member institutions will be forced to decrease the availability of loans or modify the terms of existing loans to share costs with their customers. This, too, will likely in unfair competition with those financial institution protected from the Final Rule.

9.      I also have reviewed the declarations and supplemental declarations filed by the Appearing Associations in this case. Most members of the Appearing Associations have a long history of required compliance with regulatory schemes and have adopted relatively agile compliance workflows in responding to new requirements. Yet, even with those workflows and experience with regulations in the same vein as the Final Rule, they have suffered and project to continue suffering from the Final Rule. While some of ELFA's non-bank financial institutions are subject to certain of these regulatory rules, they do not have a comparable compliance history that a federally insured depository institution or credit union maintains. This lack of experience and established history with regulators, such as the CFPB, represents another unfair disadvantage and will likely increase the costs beyond those incurred, and projected to be incurred, by members of the Appearing Associations in complying with the Final Rule.

10.     ELFA previously raised these issues and other, more detailed deficiencies in the Final Rule to the CFPB by way of letters dated January 4, 2022 and August 8, 2023. True and correct copies of said letters are attached hereto as Exhibit "1" and Exhibit "2," respectively. Through its August 8, 2023 letter, ELFA requested that the CFPB voluntarily stay enforcement of the Final Rule consistent with the Order. Thus far, the CFPB has remained steadfast in its refusal.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this the 30th day of August, 2023.

**EQUIPMENT LEASING AND FINANCE ASSOCIATION**

By:  Andrew Fishburn
Its:  Vice President, Federal Government Relations



EQUIPMENT LEASING AND FINANCE ASSOCIATION

1625 Eye Street NW          P 202.238.3400
Suite 850                  F 202.238.3401
Washington, DC 20006       www.elfaonline.org

**EXHIBIT 1**

January 4, 2022

Comment Intake
Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552

Docket No. CFPB-2021-0015 or RIN 3170- AA09

To Whom it May Concern:

On behalf of the Equipment Leasing and Finance Association, I am pleased to submit the following comments regarding the Consumer Financial Protection Bureau's (CFPB) notice of proposed rulemaking implementing Section 1071 of the Dodd Frank Wall Street Reform Act.

## Summary

ELFA appreciates the positive relationship that we have built with the CFPB and the work that the CFPB has done regarding the lease exemption and balancing the costs and benefits of making Section 1071 information available to the public.  We do, however, have significant concerns with major portions of the proposed rule and would reiterate all of the comments that we have previously submitted.  We believe that had the CFPB adopted more of the comments ELFA submitted as part of the CFPB's 2017 RFI, this would be a better rule from the borrower's, the lender's, and the CFPB's perspectives.  We would especially highlight the benefit we continue to see in setting up a portal structure whereby small businesses could report their demographic information directly to the CFPB and receive a unique identifying number.  Lenders would then report loan level information associated with any application received from a customer that provides the lender with its identifier number.  It is instructive that in the intervening time since the passage of Dodd-Frank, the regulatory structure for collecting beneficial ownership information shifted from one where the institution was required to collect the information to one where small businesses will soon be required to report their corporate structure directly to the government.  ELFA believes that the government, as a whole, should closely examine whether there are synergies among these regulatory efforts that could be harnessed.

Since ELFA has provided comments extensively in previous submissions in 2017 and 2019, rather than repeat those matters here, ELFA has focused our comments on several areas:

- Definition of a Lease
- Data Availability
- Compliance Deadline
- 1071 Information Collection Timing
- Collection on Customers Who Opt Out

- Ethnicity Surmising
- Exemption for Small Institutions
- Anti-Competitive Issues
- Support for Trade Credit Exemption

A background on ELFA is provided in the penultimate section of this comment submission.

## Definition of Lease

ELFA commends the CFPB for the recognition that leases are a different type of financial product from lending and are not treated as an extension of credit in the U.S. regulatory structure. ELFA also commends the CFPB for the usage of the widely accepted Uniform Commercial Code definition of a lease which clearly delineates what is and what is not a lease for purposes of Section 1071.

## CFPB Database Fulfilling Requirement to Make Data Available

ELFA greatly appreciates that the CFPB has incorporated ELFA's previous comments regarding making collected/submitted data under Section 1071 available to the public upon request. The approach that the CFPB has taken in this regard strikes an appropriate balance between the statutory requirement that the data be available to members of the general public and the burden that making this information available directly would place on financial institutions. Allowing financial institutions to direct members of the general public to the CFPB website accomplishes the same goal that direct provision would, but at a significantly less cost to stakeholders.

## Compliance Deadline

The CFPB has proposed an implementation timeline of 18 months after the rule is published in final form. ELFA believes that this is an insufficient amount of time due to several factors.

The first is that there are too many important provisions of the rule that remain under consideration by the CFPB, thereby preventing its proper implementation as currently written. There are many areas on which the CFPB is asking for further comment that will, by definition, change significantly. It is not realistic to expect institutions to implement such a complex rule in only 18 months given the number of unknowns and unanticipated changes that will occur and which financial institutions will only be seeing for the first time when the rule is made final. One example is that the CFPB is asking for comment on the possibility of collecting sexual orientation information as part of a final rule. This would obviously be a major shift from the statute which did not contemplate the collection of such information, was not contemplated by the SBREFA panel, and is not currently contemplated by the current proposed rule. The implementation of a change of this magnitude in a rule from the NPRM stage to the final rule stage, without an opportunity for comment, would be unprecedented.

The second is that the technical specifications for the transfer of the collected data to the CFPB have not yet been published and, when they are published, should be published in a form that allows for comments. Given that more than 25 million transactions per year will be submitted through this system if the rule is finalized in something approximating its current form, it is

imperative that the industry be given time to respond to the technical specifications that the CFPB proposes. For this reason, we think that the implementation period needs to be dependent upon the issuance of final technical specifications given that every financial institution subject to Section 1071 cannot reliably begin to build their systems until the specifications are finalized.

ELFA believes that the CFPB should choose January 1st of a year that is approximately two years after the technical specifications are published in final form (following a reasonable opportunity for comment and feedback). A compliance start date of January 1st makes sense for a variety of reasons, including making the lookbacks simple. For example, if the technical specifications were published in November of 2022, we believe that January 1, 2025 should be the earliest date for required compliance with the rule. If, however, the final specifications were published, for example, in February of 2023, it would not be unreasonable for the CFPB to maintain that same January 1, 2025 compliance date.

Lastly, an extended compliance deadline is warranted given that many lenders in the equipment finance space do not have the experience with a federal functional regulator that federally-insured depository institutions have. While ELFA has repeatedly recommended that the CFPB contemplate staged compliance with this rule either by transaction type, institution size, or institution type, the CFPB has chosen not to pursue any of those options, notwithstanding the fact that they have frequently been utilized in other regulatory settings (e.g., the CECL standards). It is an entirely different calculation for a financial institution that has little to no experience with an OCC/Federal Reserve/FDIC compliance regime to implement a rule of the magnitude of, and as complex as, Section 1071. Inasmuch as the CFPB has chosen a single compliance timeframe for all institutions, it is imperative that this timeframe accommodate the institutions that will be challenged the most in building the necessary compliance infrastructure.

Two particular challenges that institutions that are not federally-insured depository institutions will face is the need to conduct training before a 1071 regulatory compliance program is brought on line, and the need to hire staff who can combine existing information technology (IT) systems with a 1071 compliance system that contains compartmentalization and audit capabilities. For a federally-insured depository institution, training requirements that apply across broad swaths of employee classifications already exist for regulatory purposes such as compliance with the Bank Secrecy Act. A financial institution that is not a federally-insured depository institution will need to start this training program from scratch. With regards to the IT systems needs, it is a unique challenge in today's economy to find and hire sufficient staff with coding expertise, and this will be more of a challenge for a company that has no robust regulatory IT systems already in place and the corresponding staff to maintain them. Both of these factors argue for a prolonged implementation period and highlight the wisdom of contemplating a staged compliance timeframe.

## Collection After Application Stage

In the NPRM, the CFPB indicates that it believes that allowing for collection of the required demographic information after the application has been submitted will reduce the amount of information collected. ELFA believes that the opposite is in fact true. ELFA has commented

formally multiple times to the CFPB that many equipment finance transactions are completed in a matter of minutes and often times the person actually completing the application is neither the business owner nor at all familiar with the specifics of the ownership of the borrower. Examples we have provided include the office manager arranging for office equipment financing and the loading dock manager arranging for materials handling equipment. ELFA believes in those situations that, if the only time the business is given the opportunity to provide the demographic information about borrower ownership is during the application process, very little demographic information will be collected from the borrower due to the importance that the customer places on the speed of the transaction and the fact that the person completing the application may simply not know the information, and furthermore will have no motivation to lengthen the transaction timeline in order to obtain it.

In contrast, if the financial institution had the ability to follow-up via electronic or other means with the borrower, the request could then be directed to the borrower representative in the best position to provide the requested information. ELFA believes that this is especially true in the vendor finance space, where the vendor (which is the "face" to the borrower and collecting the application) has no regulatory requirement to collect the information and, therefore, no incentive to take the time to gather the information and risk further delaying the transaction. For these reasons, ELFA believes that the CFPB should allow for collection of the demographic information after the application stage and, given that credit decisions are very often made within minutes of the application being received, after the credit decision has been made.

## **Reporting on Transactions Where Customer Opts Out**

Section 1071 clearly sets out a statutory framework that requires financial institutions to *inquire* whether their customers are a small business, women-owned business, or a minority-owned business. Further, Section 1071 clearly intended to allow for customers to decline to participate in this collection effort, when it states, "[a]ny applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit."

The CFPB has proposed a rule that would require financial institutions to report on covered credit applications, even if the customer declined to provide the demographic information in response to the financial institution's inquiry. Requiring collection in this context is problematic on multiple levels, even assuming such requirement is permissible under the statute, which is not at all clear.

It is possible, and potentially likely, that there will be statistical significance to classes of credit applications that will not have demographic information collected. For example, certain types of credit applications are for smaller dollar amounts and completed multiple times per year (e.g., small-ticket construction equipment, office equipment, golf carts, etc.). As ELFA has discussed in previous submissions, the person completing the credit application may not be the business owner or otherwise know the 1071 information being requested, and, therefore, will likely not provide the information out of fear of delaying the transaction by spending the extra time obtaining the information and filling out another form. ELFA believes that combining the data from applications where the customer declines to provide demographic information with

applications where the customer voluntarily provides such information will potentially lead to any conclusions based on such data being inaccurate and misleading. Just like customer satisfaction surveys are most likely to be filled out by those who are either very satisfied or very dissatisfied, ELFA believes that there will likely be statistically significant differences between those customers that will voluntarily provide the demographic information and those that will not. Absent the CFPB having looked into these issues more carefully, the CFPB runs a significant risk of creating a database that, at its onset, will contain a significant amount of information that is presumed to be comparable to all of the other information in the database, but which, in reality, is almost certainly not. For this reason and those that follow, ELFA believes that the CFPB should not collect information regarding applications where the customer has declined to provide any information.

Secondly, ELFA has commented to the CFPB at several stages during the 1071 rulemaking process that many lenders in the equipment finance space do not currently collect, in the normal course of business, many of the data points that are proposed for application-level collection (annual revenues is one of the best examples). This was also borne out during the SBREFA process. If, in the normal course of business, a financial institution would make a credit decision based upon, for example, business name and address, and the customer declines to provide section 1071 information, the CFPB is creating a significant regulatory challenge for the financial institution by requiring it to submit application level information regarding that application when it will not know for certain whether the business is a small business nor have any reliable way of obtaining annual revenue information absent a third-party provider, which do not exist for many industries.

Lastly, the SBREFA process led by the CFPB clearly delineated a multitude of scenarios where the customer may wish to not have its loan information reported. For example, the customer may not want its neighbors to know that they need credit, or alternatively, they may not want its competitors to know how well it is doing as shown by annual revenues or interest rates received. In large metropolitan areas, it may be difficult to ferret out which application belongs to which customer, but in more rural areas it will not be difficult to figure out which pipe fitting company applied for financing for a new $500,000 piece of equipment in any given year. Section 1071 was specifically designed to allow customers to opt out; the CFPB should respect the clear statutory language of Section 1071 and allow customers to decline to have their application-level data collected.

**Ethnicity Surmising**

ELFA believes that the CFPB's proposal to require financial institutions to surmise the ethnicity of principal owners if the customer does not provide demographic information is inherently problematic for many reasons. As we note above, ELFA believes that, if the customer chooses to opt-out of providing 1071 information, financial institutions should not be required to report on that transaction at all. If ELFA's comments in that regard are heeded, our comments below on ethnicity surmising are mooted.

Many family names have been handed down over multiple generations and have no connection to the ethnicity of their current holder. Therefore, any attempt to surmise race or ethnicity based on last name will lead to statistically unreliable data. For example, a Filipino family may carry a last name from generations ago that is Spanish in derivation, leading to that customer being reported as Hispanic rather than Asian.

A particular issue also presents itself for women-owned businesses, as women are statistically more likely than men to have changed their last name at some point in their life. A woman-owned business may be owned by a woman with a last name that leads the institution to assess her ethnicity as that of her husband or that of her father, regardless of whether that matches the ethnicity that she self identifies as, again leading to misleading and unreliable data. This same argument applies to hyphenated names which may have a complicating factor of having lower frequencies in databases of last names when a combination of original ethnicities is combined into a new last name.

More importantly, inherent in the analysis of the issue of surmising race or ethnicity is that Section 1071 clearly intends that a customer's decision of whether to provide Section 1071 information be voluntary. By requiring financial institutions to surmise their customers race and ethnicity, the bureau will have forced financial institutions to insert ethnicity and race related matters into a transaction in which, firstly, the customer chose to not have that information collected, and secondly, the financial institution is inevitably going to get it wrong due to the imprecise nature of race and ethnicity surmising based on an individual's appearance or last name. Lastly, the CFPB has publicly acknowledged that it utilizes surname analysis in its enforcement cases. Since the CFPB will have all the information once it is reported anyway, it is difficult to see the value of having every financial institution do work that the CFPB could easily do on its own once the data has been reported.

Should the CFPB pursue the requirement that financial institutions provide race and ethnicity information through surmising, it is critical that the CFPB provide significant and detailed guidance to financial institutions. There are thousands of financial institutions that are subject to 1071 that have never conducted any regulatory implementation exercise of this magnitude or complexity. The CFPB is now asking them to accurately surmise the ethnicity of surnames that may lead to dramatically different outcomes based on the addition or subtraction of one letter, or other names that lead to ambiguous and inaccurate results. For example, if one looks up the last name "Person" in the Census Bureau's database of last names, there is a 46% chance that they are white, a 36% chance that they are black, and a 12% chance they are Hispanic. Therefore, ELFA believes that should the CFPB pursue the requirement of race/ethnicity surmising, significant and detailed guidance will be necessary to enable financial institutions to address scenarios such as those described above, as well as the types of databases that will be acceptable for them to use for such purpose and those that will not.

It is important to note that this is not just a regulatory challenge for institutions to comply with, there are real costs should an institution guess incorrectly regarding someone's ethnicity. These range from insulting a customer to litigation and compliance risk. In a commercial credit transaction, if the customer declines to provide the 1071 information the institution is expected to

surmise the ethnicity of the person sitting across the table from them. One can easily see situations where the customer sees that the sales representative has filled in additional information immediately after they specifically declined to provide that same information.

Additionally, even if an institution makes a good faith effort to correctly surmise their declining customers' ethnicity, should they get it wrong this information could then be used by regulators to pursue disparate impact cases. Furthermore, this information could be incorrectly interpreted by third parties and used to push litigation at the state level.

Lastly, if a customer can reverse engineer what the financial institution surmised their ethnicity to be, they could pursue a direct discrimination case against the institution whether or not that discrimination actually occurred. Put another way, the customer would bring action against the institution because the institution thought they were not in a protected class even if they were, and vice versa.

## Exemption for Small Institutions

The history of Section 1071 has its genesis in two documents issued in mid-2009. The original Administration's proposal for regulatory reform issued in June of 2009 indicated that the CFPB should have authority to collect information on small business lending, and gave no mention to the collection of information regarding minority-owned or women-owned businesses. A GAO report the following month found challenges to fair lending enforcement efforts due to lenders not being "required to report data on the race, ethnicity, and sex of nonmortgage loan borrowers—such as small businesses, which limits oversight of such lending." Importantly, the GAO report went on to say that "[w]hile requiring lenders to report additional data would impose costs on them, particularly smaller institutions, options exist to mitigate such costs to some degree, such as limiting the reporting requirements to larger institutions."

Section 1071 follows through on the GAO report's recommendations and gives the Bureau wide discretion to "adopt exceptions to any requirement," including "conditionally or unconditionally exempting any financial institution or class of financial institutions" from Section 1071's data collection requirements. ELFA has recommended a series of exemptions in the past, and still believes that those would all be prudent; we would, however, reiterate our recommendation that the CFPB pursue an exemption for small financial institutions.

Small providers of commercial credit are often the very providers who are able to provide financing that larger lenders may shy away from due to their size or possibly the risk profile of the asset class. These entities are also the ones that are the least able to absorb additional regulatory costs. Accordingly, ELFA recommends an exemption for financial institutions with either:

      i.    Less than $500 million in annual new business volume, or

     ii.    Fewer than 500 transactions per year

If this exemption were put into place, ELFA estimates that the 50 largest equipment finance companies would still be required to report under Section 1071. By comparison, ELFA has

approximately 350 members actively engaged in equipment finance, many of them small lenders. ELFA historical data also indicates that these thresholds would capture more than 80% of new business volume in the equipment finance sector.

## Anti-Competitive Issues

There are several areas in the proposed rule that raise issues relating to the antitrust and competitive landscape in the U.S. For these reasons, ELFA believes that it is imperative that the CFPB not publish pricing information on the public portal that is developed once the rule is implemented.

The United States has a long-standing prohibition on market participants colluding on pricing or agreeing to set prices in an anti-competitive manner. This is especially true for industries where prices are not placed on a sticker on the physical item for sale for everyone to see. In equipment finance, a significant amount of the pricing is dependent upon what the financial institution estimates the value of the equipment to be over the term of the loan. Many times, different institutions will make different assumptions in this regard. These differences could be based upon different levels of knowledge of the effects of a specific intended usage (e.g., equipment that will be left outside will depreciate faster). Different institutions may make differing assumptions about market conditions in the future should the equipment be returned. Additionally, different institutions may be more efficient at managing losses when defaults occur through remarketing agreements or effectively managing deal modifications to allow the customer to keep the equipment under modified terms. Much of this is proprietary and built on years of experience. By proposing to publish detailed pricing information, the CFPB is upsetting years of the U.S. competition laws and regulations protecting consumers and borrowers in promoting competition by prohibiting companies from colluding on prices, and devaluing the experience and proprietary pricing and valuation models of lenders who have honed their craft over many years.

A secondary and potentially more troublesome issue that the publishing of detailed pricing information creates is the impact on the customer. Oftentimes there is included in an equipment financing transaction some level of service, which could be anything from maintenance on a piece of heavy equipment to providing toner for a copier. By publishing detailed pricing information, but no information about what is included for that price, a customer may "shop around" and go with the institution that appears to provide the lowest interest rate, but lose one or more services that they never knew were being offered by another institution.

Ultimately, there may be a belief that disclosing pricing information will lead to borrowers paying less for the same level of service. History indicates, however, that when costly regulatory burdens are laid upon a highly competitive industry, the costs to the consumer go up and market participants exit. Additionally, when all market participants know what other participants are charging, the assumption that costs will go down ignores the fact that in many cases the costs will go up because lower cost providers realize they can charge more. ELFA believes that these anti-competitive aspects of the rule will ultimately lead to borrowers paying more for the same

level of service. As such, ELFA would advocate that no pricing information be included in any 1071 data made available to the public.

## Trade Credit

ELFA appreciates that the CFPB has correctly exempted trade credit transactions from reporting under Section 1071 and we strongly encourage the maintenance of this position. We believe that this exemption will allow manufacturers to continue to provide credit to their customers. However, it is important that this provision be crafted in a way that it is actually usable by the original equipment manufacturers (OEM). To this end, we see little distinction between the types of credit transaction that would be deployed by a manufacturer who provides the credit under the same corporate entity and those that may do so under a subsidiary, such as a captive finance company of the manufacturing parent company. Accordingly, we would encourage the CFPB to broaden their view of trade credit to include captive finance companies when they are financing equipment manufactured by their parent company. We believe that these companies exist solely to facilitate the acquisition of the OEM's products, and their existence provides the customer a financing option that is intimately familiar with the equipment that they are financing. Importantly, we believe that this exemption should apply to equipment purchased through a dealer, as long as the financing is provided by the captive finance arm of the OEM.

ELFA also believes that this section should be fleshed out further with several specific transaction examples so that covered financial institutions can readily identify the transactions that they must report on, and those that are exempted.

## Background on ELFA

ELFA is the trade association representing financial services companies and manufacturers in the nearly $1 trillion U.S. equipment finance sector. Equipment finance not only contributes to businesses' success, but to U.S. economic growth, manufacturing, and jobs. Nearly 8 in 10 U.S. companies (79%) use some form of financing when acquiring equipment, including loans, leases, and lines of credit (excluding credit cards). Each year American businesses, nonprofits, and government agencies invest nearly $2 trillion in capital goods and software (excluding real estate). Approximately 50%, or nearly $1 trillion of that investment, is financed through loans, leases, and other financial instruments. America's equipment finance companies are the source of such financing, providing access to capital.

ELFA represents more than 575 member companies, including many of the nation's largest financial services companies and manufacturers and their associated service providers, as well as regional and community banks and independent, medium, and small finance companies throughout the country. ELFA member companies finance the acquisition of all types of capital equipment and software, including agricultural equipment; IT equipment and software; aircraft; manufacturing and mining machinery; rail cars and rolling stock; vessels and containers; trucks and transportation equipment; construction and off-road equipment; business, retail, and office equipment; and medical technology and equipment. The customers of ELFA members range from Fortune 100 companies to small and medium sized enterprises to governments and nonprofits.

ELFA represents virtually all sectors of the equipment finance market and its members see virtually every type of equipment financing transaction conducted in the United States and every type of funding available to providers of equipment finance.  ELFA members who are service providers to the equipment finance industry (such as lawyers, accountants, trustees, and vendors) have a unique vantage point of seeing scores of financial transactions from initial concept to final payout and from the perspective of both the borrower/issuer and lender/investor/funding source. ELFA truly is at the heart of equipment finance in the United States and our member companies provide lease, debt, and equity funding to companies of all sizes.

## Conclusion

ELFA appreciates our positive and cooperative relationship with the CFPB and we look forward to working with the CFPB staff during the implementation of this rule.  Should you have any questions regarding this submission, please address them to Andy Fishburn, ELFA's Vice President of Federal Government Relations, at afishburn@elfaonline.org.

Respectfully Submitted,

Ralph Petta
President and CEO

**ΞLFA**
EQUIPMENT LEASING AND FINANCE ASSOCIATION

EQUIPMENT LEASING AND FINANCE ASSOCIATION
1625 Eye Street NW          P 202.238.3400
Suite 850                  F 202.238.3401
Washington, DC 20006       www.elfaonline.org

August 8, 2023

```
┌─────────────────────┐
│     EXHIBIT 2       │
└─────────────────────┘
```

Rohit Chopra, Director
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**RE:    *Section 1071 of the Dodd-Frank Act***
**       *Texas Bankers Association, et al. vs. Consumer Financial Protection Bureau***

Dear Director Chopra,

The Equipment Leasing and Finance Association (ELFA) is the trade association that represents companies in the $1 trillion equipment finance sector, which includes financial services companies and manufacturers engaged in financing capital goods.  ELFA members are a driving force behind the growth in the commercial equipment finance market and contribute to capital formation in the U.S.  and abroad.  ELFA's nearly 600 members include independent and captive leasing and finance companies, banks, financial services corporations, brokers, investment banks, manufacturers, and service providers.

Throughout the CFPB's rule-making process regarding Section 1071 of the Dodd-Frank Act, the ELFA proactively engaged in both the legislative and regulatory arenas to advocate for its members' interests.  We appreciate the collegiality of bureau staff through this process even if we didn't end up in agreement on every matter.

We write to you concerning the Texas Court's Order published on July 31 in the above-referenced case.  Currently, the injunction imposed in the Order applies only as to the members of the Texas Bankers Association (TBA) and the American Bankers Association (ABA).  It is our understanding that plaintiffs have subsequently requested that the CFPB extend the stay to all banks.  While some of those banks are members of the ELFA, we respectfully request that the CFPB extend the compliance deadlines under the final rule nationwide to cover all financial institutions covered by the CFPB's final rule to match the revised deadlines resulting from the stay issued by Judge Crane.

In particular, the July 31st Order extends all deadlines for compliance with the requirements of the CFPB's final rule to compensate for the period stayed.  In its pleadings, the CFPB acknowledges that the Supreme Court's final decision in *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB* is not expected until June 2024.  This means that the members of the TBA and ABA are expected to have an approximate 10-month delay in their compliance dates.

Accordingly, not only will non-bank independent and captive leasing and finance companies continue to incur the direct economic costs incurred by preparing for timely compliance with the CFPB's final rule, but they will now also face additional costs incurred in the form of loss of business given the unfair competitive advantage this Order will give to most banks.  The

equipment leasing and financing market is highly competitive, and a substantial portion of the financing activity results from referrals by equipment manufacturers, distributors, and dealers (vendors) of their customers to one or more financing providers for financing. If a vendor is choosing between referring its customers to a financing provider who will be asking the applicant to answer the list of questions called for by the rule and a bank who will not be asking those questions, we would anticipate that the referral decision is likely to be impacted by whether the application process will be lengthened by the processing required to be compliant with the rule. This could have a drastic impact on the competitive positions of financing providers.

Additionally, we are very concerned that software providers, arguably the linchpin of compliance with this rule, will have dramatically different economics for software development if the compliance timeframes are bifurcated. Logic and economics dictate that a significant portion of the development costs would be covered by the biggest, earliest contracts that software developers are going to enter into for Section 1071 compliance software and software upgrades. If the largest banks who process the most small business loans enter the marketplace a year after non-bank financial institutions, the economics of software development for those non-bank financial institutions changes dramatically. There are other aspects of the compliance ecosystem that also fall into this category such as compliance training and even mundane items like compliance user groups.

Lastly, federally insured depository institutions have a long regulatory history over many years adopting new regulations and have built compliance workflows that are relatively agile in responding to new requirements compared to non-bank financial institutions. While non-bank financial institutions are subject to certain of these rules, such as OFAC compliance, they do not have anything close to the compliance history that a federally insured depository institution has. To have the cohort of the covered financial institutions who have the least familiarity with compliance programs go first simply doesn't make sense.

In order to maintain the current competitive landscape of the equipment finance, ELFA, on behalf of its members, asks the CFPB to please issue a fair and reasonable nationwide stay for all commercial financing providers consistent with the Texas Court's Order.

Should you have questions regarding this request, please contact Andy Fishburn, ELFA's Vice President of Federal Government Relations, at afishburn@elfaonline.org. We certainly appreciate your consideration of our request.

Sincerely,

Ralph Petta

Ralph Petta
President and CEO