# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**THE FARM CREDIT INTERVENORS' EMERGENCY MOTION FOR
<u>PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT</u>**

## <u>TABLE OF CONTENTS</u>

<u>INTRODUCTION</u> ........................................................................................................ 1

<u>EVIDENCE</u>................................................................................................................ 2

<u>FARM CREDIT INTERVENORS AND THEIR INTERESTS</u> .................................. 2

<u>RELEVANT BACKGROUND</u> ................................................................................. 4

<u>ARGUMENT AND AUTHORITIES</u> ....................................................................... 8

I.      The Farm Credit Intervenors Are Entitled To A Preliminary Injunction Enjoining The CFPB From Implementing The Final Rule Against TFC, CFC, And All Of The Council's Members ........................................................................................ 8

        A.      The Farm Credit Intervenors Are Likely To Succeed On The Merits Of Their Constitutional Claim, As This Court Has Already Held ............................ 8

        B.      The Council's Members, Including TFC, CFC, And All Other Farm Credit System Institutions, Will Be Irreparably Harmed Absent An Injunction ............. 9

        C.      The Balance Of The Equities Favors An Injunction, And Granting An Injunction Serves The Public Interest ................................................................. 14

II.     This Court Should Consider This Motion On An Expedited Basis ................................ 14

<u>CONCLUSION</u>........................................................................................................ 15

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

*All Coast, LLC v. Shore Offshore Servs.*,
  2023 WL 4993360 (E.D. La. Jan. 25, 2023) ........................................................6, 14

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ....................................................................14

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) .......................................................................14

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  No. 22-448 (U.S. Nov. 14, 2022) ...................................................................5

*Cmty. Fin. Servs. Ass'n of Am. Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ............................................................... *passim*

*Harris v. City of Balch Springs*,
  22 F. Supp. 3d 730 (N.D. Tex. 2014) .............................................................14

*Hodnett v. Smurfit-Stone Container Enters., Inc.*,
  2010 WL 3522497 (W.D. La. Sept. 2, 2010) ......................................................15

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ......................................................................14

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) .......................................................................8

*Moore v. Brown*,
  868 F.3d 398 (5th Cir. 2017) .......................................................................8

*Opulent Life Church v. City of Holly Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) .......................................................................8

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ....................................................................9, 10

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ......................................................................10

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..............................................................8, 10, 14

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ..................................................................10

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ..................................................................................8

**Statutes and Rules**

12 U.S.C. § 2001 ......................................................................................3

12 U.S.C. § 5497 ......................................................................................5

12 U.S.C. § 5511 ......................................................................................4

12 U.S.C. § 5517 ......................................................................................3

15 U.S.C. § 1691c .....................................................................................3

15 U.S.C. § 1691c-2 ..................................................................................4

**Regulations**

86 Fed. Reg. 56,356 (Oct. 8, 2021) ...........................................................4

88 Fed. Reg. 35,150 (May 31, 2023) ..........................................................1

**Other Authorities**

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................................4

U.S. Const. art. I, § 9, cl. 7 .......................................................................5, 9

The Farm Credit Council (the "Council"), Texas Farm Credit ("TFC"), and Capital Farm Credit ("CFC") (collectively, the "Farm Credit Intervenors"), pursuant to Federal Rule of Civil Procedure 65, hereby submit this Motion For Preliminary Injunction And Brief In Support, and state as follows:

## INTRODUCTION

On July 31, 2023, this Court entered its Order Granting In-Part And Denying In-Part Plaintiffs' Motion For Preliminary Injunction (the "Injunction Order"), Dkt.25, barring the Consumer Financial Protection Bureau and its Director, Rohit Chopra (collectively, the "CFPB") from implementing the final rule (the "Final Rule") issued on March 30, 2023, *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023), as against the original Plaintiffs in this case: the American Bankers Association ("ABA"), the Texas Bankers Association ("TBA"), Rio Bank, McAllen, Texas ("Rio Bank"), and their members.  The Final Rule amended Regulation B governing small business lending under the Equal Credit Opportunity Act ("ECOA"), to implement certain small-business lender reporting requirements contained in Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").  The Council's members, including TFC and CFC, are incurring and will continue to incur costs in their efforts to ensure compliance with the Final Rule by their respective compliance dates.  Although the Council, on behalf of its members, asked the CFPB to stay the Final Rule as to all covered financial institutions following this Court's Injunction Order, including as to the Council's members, the CFPB recently denied the Council's request. Thus, the Farm Credit Intervenors file this Motion requesting a preliminary injunction extending to the Council's members, on largely the same grounds asserted by the original Plaintiffs.

Each of the preliminary injunction factors favors injunctive relief.  The Farm Credit Intervenors have substantial likelihood of succeeding on the merits of their constitutional claim,

as this case is directly governed by binding precedent from the U.S. Court of Appeals for the Fifth Circuit, as this Court has already held.  Dkt.25 at 12 (citing *Cmty. Fin. Servs. Ass'n of Am. Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) ("*Community Financial*")).  The Council's members, including TFC and CFC, will, moreover, be irreparably harmed absent an injunction.  Indeed, the Council's members are disproportionately affected by the Final Rule, as nearly all of the loans they originate to farmers, ranchers, and agribusinesses fall within the Final Rule's terms.  As such, the Council's members project to incur substantial compliance costs and hundreds of hours in staff time to ensure compliance with the Final Rule, costs that they will never be able to recover, even if they succeed in this lawsuit.  Finally, the balance of the equities favors granting injunctive relief to the Council's members, which injunction will serve the public interest.

## EVIDENCE

In support of this Motion, the Farm Credit Intervenors rely upon and incorporate the Declaration of Robert P. Boone, III, attached hereto as Exhibit A, the Declaration of Wesley D. Sutton, attached hereto as Exhibit B, the Declaration of Lori V. Graham, attached hereto as Exhibit C, the Declaration of Paul Kohls, attached hereto as Exhibit D, and the Declaration of Amie Pala, attached hereto as Exhibit E.

## FARM CREDIT INTERVENORS AND THEIR INTERESTS

***Farm Credit Council.*** The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of customer-owned financial institutions with a specific mission to support rural communities and agriculture.  Over 100 years ago, Congress designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses

necessary for efficient farm operations."  12 U.S.C. § 2001(a).  As of September 1, 2023, the Farm Credit System included four banks and 67 associations, which together provide roughly 45% of all agricultural lending in the United States.  Each Farm Credit institution is structured as a cooperative, and is owned by its customers.

The Farm Credit System is supervised and examined by the Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, based upon the Farm Credit Act of 1971, as amended, and regulations issued by that agency.  With respect to Farm Credit institutions, the FCA examines and enforces compliance with consumer-finance laws, including the Final Rule. Accordingly, although Farm Credit lenders must comply with the Final Rule, the FCA, and not the CFPB, will be the agency responsible for examining Farm Credit lenders for compliance with the Final Rule and bringing any administrative enforcement actions.[1]

The Council seeks preliminary injunctive relief on behalf of each of its members, which are currently incurring and will continue to incur substantial costs in ensuring that the Farm Credit System is capable of complying with the Final Rule.

***Capital Farm Credit.*** CFC is a Farm Credit System association and Council member that provides loans to support rural farmers, ranchers, and agribusinesses.  CFC is a covered financial

---

[1] ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration."  15 U.S.C. § 1691c(a)(6).  Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration." 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration."  *Id.*  Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration."  *Id.* § 5514(f).

institution under the Final Rule, and expects to be a "Tier 2" institution, meaning that CFC's current deadline for beginning data collection pursuant to the Final Rule is April 1, 2025.

**Texas Farm Credit.** TFC is a Farm Credit association and Council member that provides loans to support rural farmers, ranchers, and agribusinesses. TFC is a covered financial institution under the Final Rule, and expects to be a "Tier 3" institution, meaning that TFC's current deadline for beginning data collection pursuant to the Final Rule is January 1, 2026.

## RELEVANT BACKGROUND[2]

In 2010, Congress passed Title X of the Dodd-Frank Act and, in so doing, established the CFPB, Pub. L. No. 111-203, 124 Stat. 1376 (2010), which agency has broad statutory authority to regulate individuals and entities that provide financial products and services, *see* 12 U.S.C. § 5511(a). The Dodd-Frank Act contains numerous provisions intended to promote the CFPB's implementation of fair lending laws. As relevant here, Section 1071 of the Dodd-Frank Act added a new Section 704B to ECOA that requires banks and other small business lenders to report on a limited universe of data points from credit applications by small businesses, including, for instance, "the number of the application and the date on which the application was received" and "the type and purpose of the loan or other credit being applied for." 15 U.S.C. § 1691c-2(e)(2). The new ECOA provision then authorizes the CFPB to impose additional reporting requirements that "would aid in fulfilling the purposes of this section." *Id.* § 1691c-2(e)(2)(H).

On September 1, 2021, the CFPB published a proposed rule purporting to implement Section 1071 of the Dodd-Frank Act, which significantly expanded the Dodd-Frank Act's short list of enumerated data points. 86 Fed. Reg. 56,356 (Oct. 8, 2021). Several interested parties,

---

[2] To avoid duplicative briefing, the Farm Credit Intervenors recite substantially the same Relevant Background in the Brief In Support Of Emergency Motion To Intervene and Brief In Support Of Emergency Motion For Preliminary Injunction.

including the Council, submitted comments to the CFPB critiquing the proposed rule as overbroad. In its comment, the Council detailed the significant costs and burdens the Final Rule would impose on the Council's members, in particular, as opposed to other financial institutions. *See generally* Ex.F.

On October 19, 2022, while the proposed rule was still pending, the Fifth Circuit issued its decision in *Community Financial*, holding that the CFPB's funding structure violates the U.S. Constitution's Appropriations Clause and the constitutional separation of powers. 51 F.4th at 642. The Fifth Circuit further determined that there was a "linear nexus" between the CFPB's unconstitutional funding structure and the CFPB rule challenged there (namely, the Payday Lending Rule), given that the CFPB relied upon its unlawfully unappropriated funds to promulgate the rule. *Id.* at 643. Thus, the court concluded that the remedy for this constitutional violation was to "rewind[ ]" the CFPB's unlawful action and set aside the challenged rule. *Id.* (quoting *Collins v. Yellen*, 141 S. Ct. 1761, 1801 (2021) (Kagan, J., concurring)). A few months later, on February 27, 2023, the U.S. Supreme Court granted the CFPB's petition for a writ of certiorari to address whether the Fifth Circuit "erred in holding that the statute providing funding to the Consumer Financial Protection Bureau, 12 U.S.C. § 5497, violates the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and in vacating a regulation promulgated at a time when the CFPB was receiving such funding." Petition for Writ of Certiorari at I, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, No. 22-448 (U.S. Nov. 14, 2022). The Court is scheduled to hear oral argument on this case on October 3, 2023.

Despite the Fifth Circuit's decision and the U.S. Supreme Court's grant of certiorari, the CFPB issued the Final Rule on March 30, 2023. 88 Fed. Reg. 35,150. The original Plaintiffs—Texas Bankers Association ("TBA"), Rio Bank, McAllen, Texas ("Rio Bank"), and American

Bankers Association ("ABA")—then filed this suit challenging the Final Rule on constitutional and statutory grounds and seeking preliminary and permanent injunctive relief.  Dkt.12.

Upon considering the original Plaintiffs' preliminary injunction motion, this Court, on July 31, 2023, entered the Injunction Order and enjoined the CFPB from implementing and enforcing the Final Rule against the original Plaintiffs and their members pending the Supreme Court's *Community Financial* decision.  The Court held that the original Plaintiffs were likely to succeed on the merits of their claim that the Final Rule is invalid because it was promulgated through the CFPB's unconstitutional funding structure, in light of the Fifth Circuit's binding decision saying as much.  Dkt.25 at 12 (citing *Community Financial*, 51 F.4th at 643).  It also determined that the original Plaintiffs faced a substantial threat of irreparable harm, given the unrecoverable compliance costs they were projected to sustain absent injunctive relief.  *Id.* at 13–14.  Finally, this Court concluded that the equities and public interest also favored injunctive relief, as the CFPB failed to offer any evidence suggesting that a brief stay of the Final Rule would cause the public any harm.  *Id.* at 15.  Although this Court concluded that every stay factor weighed in favor of relief, it declined to issue a nationwide injunction and instead tailored its injunctive remedy solely to the original parties in the case.  *Id.* at 15–16.

Shortly thereafter, on August 10, 2023, the Council, on behalf of its members, the Farm Credit institutions, delivered a letter to the Honorable Rohit Chopra, Director of the CFPB, asking that the CFPB voluntarily stay the Final Rule as to *all* covered financial institutions pending the Supreme Court's *Community Financial* decision, including as to the Council's members.  Ex.G. The CFPB denied the Council's request via letter dated August 24, 2023, Ex.H, and the Final Rule became effective on August 29, 2023, 88 Fed. Reg. 35,150.

The Council's members have incurred and will continue to incur significant costs in ensuring compliance with the Final Rule. TFC, an exemplary "Tier 3" lender, expects to spend many staff hours and $10,000 in 2023 alone in analyzing the Final Rule's requirements and engaging with its vendors to assess the best methods for complying with those requirements. Ex.C ¶ 7. Prior to its compliance date of January 1, 2026, TFC projects expending approximately $75,000 in staff time and $20,000 in costs associated with outside consulting and software licensing to ensure that it is capable of complying with the Final Rule. Ex.C ¶ 9. CFC, an exemplary "Tier 2" lender, projects greater compliance costs: during 2023 alone, it expects to devote over 200 hours of staff time to develop operational procedures, data collection and reporting, and training documentation relating to the Final Rule. Ex.B ¶ 7. Before its compliance date of April 1, 2025, CFC expects to spend several hundred more hours of staff time, as well as funds relating to outside counseling and software licensing. Ex.B ¶ 8.

Other Council members will suffer similar harms over the next several months and years, as they work toward their respective compliance dates. For instance, Farm Credit association Compeer Financial ("Compeer"), an exemplary "Tier 1" lender, expects to expend as much as $100,000 during the balance of 2023 in outside counsel, consultant, and technology expenses relating to the Final Rule. Ex.D ¶ 6. These costs are projected to grow substantially in 2024, as Compeer projects spending roughly $400,000 and 1500 hours of staff time to, among other things, build or purchase new technology and provide the necessary training for its staff members by its compliance date of October 1, 2024. *Id.* ¶ 7. Another Farm Credit institution, the Farm Credit Bank of Texas ("FCBT"), has similarly expended and will continue to expend substantial staff hours working with affiliated Farm Credit institutions to estimate compliance timeframes, identify

and analyze the systems affected by the Final Rule, and engage with outside technology vendors to prepare for data collection.  Ex.E ¶¶ 8–9.

## ARGUMENT AND AUTHORITIES

I.    **The Farm Credit Intervenors Are Entitled To A Preliminary Injunction Enjoining The CFPB From Implementing The Final Rule Against TFC, CFC, And All Of The Council's Members**

A movant is entitled to a preliminary injunction upon showing: (1) a substantial likelihood of success on the merits of its claim; (2) a substantial threat that the movant or its members will suffer irreparable harm absent relief; (3) that the movant's threatened injury outweighs any threatened harm to the party to be enjoined; and (4) that granting the preliminary injunction will not disserve the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Moore v. Brown*, 868 F.3d 398, 402–03 (5th Cir. 2017).  The "most significant" of these factors are the movant's likelihood of success on the merits and threat of irreparable harm.  *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021).  Further, the third and fourth prongs of this inquiry "merge" where, as here, "the Government is the opposing party."  *Texas v. United States*, 809 F.3d 134, 187 n.204 (5th Cir. 2015).  When the moving party shows that it is likely to suffer irreparable harm, the Government must "present powerful evidence of harm to its interests to prevent" the movant from meeting the public interest prong.  *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012).

A.    **The Farm Credit Intervenors Are Likely To Succeed On The Merits Of Their Constitutional Claim, As This Court Has Already Held**

The Farm Credit Intervenors are likely to success on the merits of their constitutional claim that the Final Rule was promulgated in violation of the U.S. Constitution's Appropriations Clause.  As this Court has already held, this constitutional claim is governed by binding Fifth Circuit precedent.  Dkt.25 at 12 (citing *Community Financial*, 51 F.4th at 643).  In *Community Financial*,

the Fifth Circuit expressly held that the CFPB's funding structure violates the Appropriations Clause, U.S. const. art. I, § 9, cl. 7, and that CFPB rules promulgated using unconstitutionally unappropriated funds—such as the Payday Lending Rule at issue in that case—are unconstitutional. 51 F.4th at 643. The Fifth Circuit concluded that the only remedy for this constitutional violation was to "rewind[ ]" the CFPB's action and vacate the challenged rule. *Id.* (quoting *Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring)). Applying that holding to the Final Rule here, this Court determined that the original Plaintiffs were likely to succeed on the merits of their constitutional claim, given that the Final Rule was, like the Payday Lending Rule, promulgated using unconstitutionally unappropriated funds. Dkt.25 at 12. For that same reason, the Farm Credit Intervenors are likely to succeed on the merits of their constitutional claim.[3]

## B.    The Council's Members, Including TFC, CFC, And All Other Farm Credit System Institutions, Will Be Irreparably Harmed Absent An Injunction

This Court's Injunction Order does not protect TFC, CFC, or the vast majority of the Council's members, who will suffer irreparable harm absent injunctive relief, as the Council's members continue to incur substantial costs in their efforts to comply with the Final Rule that cannot be recouped.

As this Court has recognized, Dkt.25 at 13–14, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm," *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see id.* ("Even purely economic costs may count as irreparable harm where they cannot be recovered in the ordinary course of litigation" (citation and quotation marks omitted)). Indeed, "a regulation later held invalid almost *always* produces

---

[3] In their Proposed Complaint, the Farm Credit Intervenors also raise claims that the Final Rule exceeds the CFPB's statutory authority and is arbitrary and capricious in various other respects under the Administrative Procedure Act, 5 U.S.C. § 706. The Farm Credit Intervenors do not rely upon those claims at this time, in light of the Fifth Circuit's binding decision directly governing their constitutional claim, *see Community Financial*, 51 F.4th at 643, but intend to fully brief all of their claims when appropriate, if necessary.

the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).  That is so because "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  Unrecoverable compliance costs need only be "more than de minimis," as the primary inquiry is "not so much the magnitude but the irreparability." *Rest. L. Ctr.*, 66 F.4th at 597, 600 (quoting *Texas*, 829 F.3d at 433–34).  Further, projected compliance costs also constitute irreparable harm.  *Texas*, 829 F.3d at 433–34 ("compliance with the Final Rule [at issue] would impose $2 billion" in unrecoverable costs "on power companies, businesses, and consumers," establishing irreparable harm); *see* Dkt.25 at 14.

For these reasons, in ruling on the original Plaintiffs' preliminary injunction motion, this Court properly concluded that the compliance costs the original Plaintiffs and their members would suffer with respect to the Final Rule constituted irreparable harm.  Dkt.25 at 13–14.  Specifically, this Court highlighted the costs and burdens the original Plaintiffs and their members would incur hiring new staff and updating and/or purchasing operating software.  *Id.*  The Court explained that those institutions would need to expend thousands of dollars relating to the Final Rule prior to their compliance dates, which costs the original Plaintiffs and their members would be unable to recover in the event they prevail in the litigation.  *Id.* at 13.  Further, and as this Court noted, the CFPB itself has acknowledged that "it expects the costs of compliance with the Final Rule to be passed on to small business credit borrowers in the form of higher interest rates and fees."  *Id.* at 13 (citation omitted).  It did not matter whether certain institutions would suffer compliance costs "*now*."  *Id.* at 14.  That the original Plaintiffs and their members projected incurring significant

and unrecoverable costs over the coming months and years to comply with the Final Rule was sufficient to establish irreparable harm and support their request for injunctive relief. *Id.*

That same result should obtain here, where the Council's members must undertake substantially similar actions over the next several months to ensure compliance with the Final Rule and will suffer substantially similar—indeed, potentially greater—compliance costs absent injunctive relief. The vast majority of the Farm Credit institutions are covered financial institutions under the Final Rule. Ex.A ¶ 6. Further, the Final Rule covers nearly all of each Farm Credit lender's loans. *Id.* As such, the Farm Credit institutions are currently expending and project to expend substantial financial resources in ensuring that all Farm Credit lenders are capable of complying with the Final Rule, costs that are shared by every Farm Credit institution, regardless of whether that institution is covered under the Final Rule. *Id.*; *see* Ex.E ¶ 7.

The evidence submitted with this Motion details the costs for the Council's members of complying with the Final Rule. *See* Ex.A (Declaration of Robbie Boone, III); Ex.B (Declaration of Wesley D. Sutton); Ex.C (Declaration of Lori V. Graham); Ex.D (Declaration of Paul Kohls); Ex.E (Declaration of Amie Pala). The Final Rule will require the Council's members, many of which are rural associations with limited staff and resources, to devote a greater proportion of their resources to gathering, analyzing, and reporting the data that they must collect under the Final Rule. *See* Ex.B ¶¶ 6–8; Ex.C ¶¶ 7–9; Ex.D ¶¶ 5–7; Ex.E ¶¶ 8–9. Given the complexity of the Final Rule, many of the Council's members are already starting their efforts to ensure compliance. Farm Credit institutions are, among other things, analyzing the Final Rule's technical requirements; identifying affected systems; assessing the technical requirements necessary to update affected systems; working with outside technology vendors to implement the Final Rule's data collection requirements; updating their reporting applications and templates; revising their

11

internal procedures; licensing new computer software systems; and managing the privacy protections needed to safeguard the large amount of additional data that the Farm Credit institutions will now need to collect and report pursuant to the Final Rule.  Ex.E ¶¶ 8–9; *see* Ex.B ¶¶ 6–8; Ex.C ¶¶ 7–9; Ex.D ¶ 8–9.

The Council's members also project that they will incur imminent, substantial staff time and thousands upon thousands of dollars in complying with the Final Rule, which costs are representative of the costs each of the Council's members will incur, *see* Ex.A ¶ 15, depending upon the member's compliance Tier:

*Tier 1.*   Farm Credit institution Compeer is an exemplary "Tier 1" lender, with a likely compliance date of October 1, 2024.  Ex.D ¶ 4.  Compeer has already begun incurring costs to comply with the Final Rule, including in analyzing how it will operationalize the Final Rule's data collection and reporting requirements.  *Id.* ¶ 5.  In 2023, Compeer projects spending 500 or more hours of staff time and roughly $100,000 in compliance costs to assemble an internal compliance team and evaluate the technology tools that Compeer will utilize to comply with the Final Rule. *Id.* ¶ 6.  To successfully meet its anticipated compliance date, Compeer expects to expend an additional 1500 staff hours and as much as $400,000 in additional compliance costs arising from, among other things, Compeer's efforts to update its policies and procedures; build or purchase new technology to assist with its data collection and reporting efforts; and train hundreds of new team members regarding the Final Rule.  *Id.* ¶ 7.  These compliance costs are representative of other Tier 1 Council members' costs.  Ex.A ¶ 15.

*Tier 2.*   Intervenor-Plaintiff and Farm Credit institution CFC is an exemplary "Tier 2" lender, with a likely compliance date of April 1, 2025.  Ex.B ¶ 5.  CFC has also already begun its efforts to comply with the Final Rule, and is incurring costs associated with these compliance

12

efforts.  *Id.* ¶¶ 6–7.  Its staff is currently analyzing the Final Rule's requirements, and engaging with CFC's technology vendor as well as outside compliance vendors to prepare for CFC's compliance deadline.  *Id.* ¶ 6.  CFC is also incurring costs to develop operational procedures and prepare documentation relating to the Final Rule, including training and compliance documentation.  *Id.* ¶ 7.  CFC anticipates expending several hundred hours of staff time in these efforts, and expects to incur costs associated with hiring outside consultants and licensing the tools and software necessary to comply with the Final Rule.  *Id.* ¶ 8.  These compliance costs are representative of other Tier 2 Council members' costs.  Ex.A ¶ 15.

*Tier 3.*  Intervenor-Plaintiff and Farm Credit institution TFC is an exemplary "Tier 3" lender, with a likely compliance date of January 1, 2026.  Ex.C ¶ 5.  TFC, too, has already begun its compliance efforts, including by dedicating staff members to analyze the Final Rule's requirements and explore with TFC's vendors the various options for ensuring TFC is capable of collecting and reporting the large amount of data required under the Final Rule.  *Id.* ¶ 7.  Indeed, TFC has already incurred compliance costs with respect to its third-party technology vendors, *id.* ¶ 8, and anticipates spending roughly $10,000 on its compliance efforts this year, *id.* ¶ 7.  To ensure it is capable of meeting its compliance deadline, TFC anticipates expending anywhere between an additional 300 and 400 hours of staff time at a cost of roughly $75,000, as well as over $20,000 in additional expenses relating to outside consulting and tool and third-party software licensing.  *Id.* ¶ 9.  These compliance costs are representative of other Tier 3 Council members' costs.  Ex.A ¶ 15.

These material compliance costs are representative of the compliance costs that the Council's members have incurred and will continue to incur to ensure that Farm Credit lenders are capable of meeting their respective compliance deadlines under the Final Rule, *id.*, and will not be

recoverable in the event the Farm Credit Intervenors succeed on their claims in this litigation, Dkt.25 at 13–14 (citing *Texas*, 829 F.3d at 434 n.41; *Wages & White Lion*, 16 F.4th at 1142). Accordingly, these costs constitute irreparable harm. *Id.*

### C.   The Balance Of The Equities Favors An Injunction, And Granting An Injunction Serves The Public Interest

Finally, the public interest favors enjoining the Final Rule as to the Council's members, including TFC and CFC. *See Texas*, 809 F.3d at 187 n.204. As the Court recognized in issuing the Injunction Order, the CFPB and the public have no interest in enforcing an invalid rule. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Rather, the public interest is "served by maintaining our constitutional structure." Dkt.25 at 15; *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (an injunction does not "disserve the public interest" where the injunction "will prevent constitutional deprivations"); *see also Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). The CFPB cannot show that a brief stay of the Final Rule during this litigation or, at minimum, pending the Supreme Court's decision in *Community Financial* would result in any harm to the public interest, especially given that 13 years have transpired since Congress enacted the Dodd-Frank Act.

## II.   This Court Should Consider This Motion On An Expedited Basis

Courts have "inherent authority" to ensure the "orderly and expeditious disposition of cases" on their dockets, *Harris v. City of Balch Springs*, 22 F. Supp. 3d 730, 733–34 (N.D. Tex. 2014) (quoting *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir. 1995)), which authority is reflected in this Court's local rules, *see* S.D. Tex. Loc. R. 7.8 (the court "may in its discretion . . . shorten or extend time periods"). To that end, courts routinely grant requests to expedite motion practice when doing so serves the interests of justice. *See, e.g.*, *All Coast, LLC v. Shore Offshore*

*Servs.*, 2023 WL 4993360, at *1–2 (E.D. La. Jan. 25, 2023) (granting request to expedite consideration of motion to compel deposition); *Hodnett v. Smurfit-Stone Container Enters., Inc.*, 2010 WL 3522497, at *1 (W.D. La. Sept. 2, 2010) (granting request to expedite consideration of motion for a protective order).

As explained above, the Farm Credit System is suffering ongoing and irreparable harm. Further, this Motion presents only issues that this Court, after full briefing, has already considered and ruled upon. Accordingly, the Farm Credit Intervenors respectfully request that this Court order a condensed briefing schedule on the Farm Credit Intervenors' Motion as this Court deems appropriate.

## **CONCLUSION**

For the foregoing reasons, the Farm Credit Intervenors respectfully request that this Court (a) grant this Motion; (b) enter a preliminary injunction prohibiting CFPB from implementing the Final Rule against the CFC, TFC, and the Council's members; staying all deadlines for the CFC, TFC, and the Council's members to comply with the requirements of the Final Rule until after the Supreme Court's final decision in *Community Financial*; and, in the event of a reversal in *Community Financial*, extending all deadlines for compliance with the Final Rule for CFC, TFC, and the Council's members to compensate for the period stayed; and (c) grant such other relief as this Court deems just and proper.

Dated: September 8, 2023

Respectfully submitted,

*/s/ Daniel G. Gurwitz*
Daniel G. Gurwitz
State Bar No. 00787608
Southern Dist. ID No. 16895
Email: dgurwitz@atlashall.com

Attorney in charge for Farm Credit Council,
Texas Farm Credit, and Capital Farm Credit

OF COUNSEL:
Atlas, Hall & Rodriguez, LLP
818 Pecan Blvd.
P.O. Box 3725
McAllen, Texas 78501/ 78502-3725
Tel: 956-682-5501
Fax: 956-682-6109

Misha Tseytlin (pending *pro hac vice*)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(312) 759-5947
misha.tseytlin@troutman.com

Joseph J. Reilly (pending *pro hac vice*)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
(202) 274-2908
joseph.reilly@troutman.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROBERT P. BOONE, III

I, Robert P. Boone, III, hereby declare as follows:

1.      The statements below are based on my personal knowledge.

2.      I am the Senior Vice President for Regulatory Affairs & General Counsel at the Farm Credit Council (the "Council").  I have been at the Council for approximately 14 years.  In my role as Senior Vice President for Regulatory Affairs & General Counsel, I lead the Council's efforts to achieve a regulatory environment favorable to Farm Credit's mission of supporting the credit needs of rural communities and agriculture, as well as conduct the Council's legal affairs.

3.      The Council is the national trade association representing the institutions of the Farm Credit System (the "System"), a nationwide network of customer-owned financial institutions with a specific mission to provide credit and other support to rural communities and agriculture.  The Council therefore has members located across the country, including in the Southern District of Texas.

1

4.      Farm Credit institutions do not receive any government funding and instead raise funds by selling debt securities on the nation's money markets through the Federal Farm Credit Banks Funding Corporation (the "Funding Corporation").  After the Funding Corporation issues debt securities on behalf of all System-institutions, the System's four regional wholesale banks—AgFirst, AgriBank, CoBank, and Farm Credit Bank of Texas—then fund the System's 67 individual associations, with each Farm Credit regional wholesale bank funding the associations in its particular district.  The individual associations, in turn, make loans to support farmers, ranchers, and rural agribusinesses.  One Farm Credit institution, CoBank, is unique:  it effectively functions both as the Farm Credit Bank for associations in its district, and as another association in that it makes loans to retail borrowers.

5.      In my position at the Council, I have had discussions with many of the Council's members to understand how they are impacted by the Consumer Financial Protection Bureau's ("CFPB") Final Rule as set forth in *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").  I have also discussed with Council members the substantial compliance costs that they will incur to implement the Rule.

6.      The vast majority of Farm Credit institutions are covered under the Final Rule. Further, the Final Rule covers almost every single loan that Farm Credit lenders originate.  Because of the cooperative structure of the Farm Credit System, the costs each Farm Credit institution incurs in complying with the Final Rule will be shared by every Farm Credit institution.

7.      It is my understanding that the Final Rule requires financial institutions to begin collecting data by specific dates, which dates depend upon the number of qualifying small business loans the institution originated in 2022 and will originate in 2023.  "Tier 1" institutions, that is, institutions that originate least 2,500 small business loans per year, must begin collecting data by

2

October 1, 2024.  "Tier 2" institutions, that is, institutions that originate between 500 and 2,500 small business loans per year, must begin collecting data by April 1, 2025.  And "Tier 3" institutions, that is, institutions that originate at least 100 but fewer than 500 small business loans per year, must begin collecting data by January 1, 2026.  Members of the Council fall into each of these three Tiers.

8.      I have been informed that on July 31, 2023, this Court enjoined the CFPB from enforcing the Final Rule against the original plaintiffs in this action—the American Bankers Association ("ABA"), the Texas Bankers Association ("TBA") and Rio Bank—and against members of the ABA and TBA.

9.      On August 10, 2023, the Council, on behalf of its members, submitted a letter to the Honorable Rohit Chopra, Director of the CFPB, requesting that the CFPB voluntarily stay implementation of the Final Rule for *all* covered financial institutions—not just the ABA, TBA, and their members—pending the U.S. Supreme Court's decision in *Community Financial Services Association of America, Ltd. v. CFPB*, No. 22-448 (U.S. Feb. 27, 2023).

10.      Two weeks later, the CFPB denied the Council's request by letter dated August 24, 2023.

11.      Members of the Council have incurred and will continue to incur substantial costs and burdens in preparing to implement the Final Rule.  These costs and burdens will have a significant impact on and result in irreparable harm to the Council's members.

12.      For example, as stated in the Declaration of Paul Kohls, Compeer Financial, a representative Tier 1 Farm Credit lender, reports that it has already begun its efforts to comply with the Final Rule, including by analyzing the Final Rule and identifying staff to begin assessing how Compeer will operationalize the Final's data collection and reporting requirements.  In 2023,

3

Compeer anticipates expending as much as $100,000 in outside counsel, consultant, and technology expenses related to the Final Rule, as well as at least 500 staff hours. Beyond this year, Compeer projects expending up to an additional $400,000 as well as 1,500 staff hours in its efforts to ensure that it is capable of complying with the Final Rule by the Tier 1 compliance date

13.    As stated in the Declaration of Wesley D. Sutton, Capital Farm Credit, a representative Tier 2 Farm Credit lender, reports that it will incur substantial compliance costs in 2023, including more than 200 staff hours spent analyzing and operationalizing the Final Rule's data collection and reporting requirements. Capital Farm Credit anticipates expending several hundred additional staff hours to ensure compliance with the Final Rule by the Tier 2 compliance date. In addition, Capital Farm Credit projects to expend funds for outside consulting and for tool and software licensing.

14.    As stated in the Declaration of Lori V. Graham, Texas Farm Credit, a representative Tier 3 lender, reports that it will incur significant compliance costs in 2023, including costs relating to researching the Final Rule and identifying and working with vendors to determine how best to implement the Final's data collection and reporting requirements. Texas Farm Credit expects to spend roughly $10,000 on these compliance efforts in 2023. It will then continue to incur compliance costs, including costs relating to its third-party technology vendors and staff training. As it continues its compliance efforts, Texas Farm Credit expects to incur approximately an additional $75,000 in staff time and $20,000 in outside consulting and software licensing by the Tier 3 compliance date. Because the Council's members are not covered by the preliminary injunction issued in this case, which currently applies only to the ABA, TBA and their members, the Council's members will (absent an injunction that applies to them) be forced to continue incurring costs to meet the Final Rule's compliance deadlines. By contrast, members of the

4

ABA—which include some of the country's largest banks—will have their compliance deadlines extended to compensate for the length of the stay.  To take an example, Tier 1 Farm Credit lenders will be required to implement the Final Rule in October of 2024, whereas Tier 1 ABA members will have many more months to comply.  In light of the substantial costs that the Council's members will incur in complying with the Final Rule, the Council's members will be placed at an unjustified disadvantage as compared to the ABA and TBA banks with which they compete in the agricultural-credit market.

15.    These compliance costs and burdens are representative of the compliance costs and burdens other Council members in Tiers 1, 2, and 3 are incurring and will incur to comply with the Final Rule.

16.    In addition to these representative direct costs, at least some of the Council's members will incur indirect costs as cooperative owners of the Farm Credit Bank of Texas, which provides technology services to certain Farm Credit associations.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:    _____September 8, 2023_____

_____
Robert P. Boone, III
Senior Vice President of Regulatory Affairs
& General Counsel
Farm Credit Council

5

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, )<br><br>Defendants. ) | Case No. 7:23-cv-00144 |

## DECLARATION OF WESLEY D. SUTTON

I, Wesley D. Sutton, hereby declare as follows:

1.      The statements below are based on my personal knowledge. I am the General Counsel at Capital Farm Credit ("CFC") and have served in that role for the past 5 years. I oversee the legal and compliance functions for CFC and in performing my job responsibilities, I have familiarized myself with the data collection, reporting, and other requirements that will be imposed on CFC in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

2.      CFC is headquartered in Bryan, Texas and chartered to serve 192 counties across Texas, including the area that encompasses the Southern District of Texas. More specifically, CFC is a Farm Credit association that provides loans to support rural farmers, ranchers, and agribusinesses.

1

3.     CFC is a member of the Farm Credit Council (the "Council") but is not a member of the American Bankers Association ("ABA") or the Texas Bankers Association ("TBA").

4.     CFC does not have readily accessible information regarding which of its covered credit transactions were originated to small businesses prior to October 1, 2023. As such, CFC will use a reasonable method to estimate its covered originations for both 2022 and 2023.

5.     Based on our estimates, CFC believes that we have a sufficient number of covered credit transactions to be included in Compliance Tier 2 under the Final Rule and, absent a stay, CFC is conservatively preparing for a compliance date that correlates to Tier 2 institutions. Absent any contravening information, CFC estimates that it will begin data collection on April 1, 2025 – if not sooner.

6.     CFC has already started its efforts to comply with the Final Rule by dedicating compliance team members to study the requirements and application of the Final Rule, its accompanying commentary and policy statement issued by CFPB. We are working with our technology vendor at the Farm Credit Bank of Texas ("FCBT") to ascertain the ability to collect the required data elements and be prepared to properly report that information.

7.     During the balance of this year, 2023, CFC will continue to incur substantial costs and burdens to comply with the Final Rule, including over 200 hours of internal staff time allocated to this effort. These hours include development of operational processes and procedures, data collection and reporting, training and compliance documentation. We are also working to implement a contract with an outside compliance vendor that can provide resources and expertise to supplement our internal staff.

8.     In order to comply with the Final Rule by our compliance date of April 1, 2025, CFC expects to incur several hundred hours of internal staff time allocated to this effort. In

2

addition, we expect to expend funds for outside consulting and/or licensing of tools or software. We also are aware that FCBT, as our primary technology vendor, has already commenced its efforts to comply with the Final Rule, and has expended a material number of hours in collaboration with its affiliated associations to estimate compliance timeframes; identifying and reviewing systems impacted; analysis of the technical requirements necessary to update impacted systems; and meeting with and engaging outside technology vendors to implement information collection.

9.    We also are aware that FCBT, as our primary technology vendor, has already commenced its efforts to comply with the Final Rule, and has expended a material number of hours in collaboration with its affiliated associations to estimate compliance timeframes; identifying and reviewing systems impacted; analysis of the technical requirements necessary to update impacted systems and meeting with and engaging outside technology vendors to implement information collection.

10.    The above costs will be significant to CFC, and I understand that CFC will not be able to recover these costs, either in whole or in large part.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9 / 8 / 23

Wesley D. Sutton
General Counsel, Capital Farm Credit

3

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>DECLARATION OF LORI V. GRAHAM</u>**

I, Lori V. Graham, hereby declare as follows:

1.     The statements below are based on my personal knowledge.

2.     I am the SVP, General Counsel at Texas Farm Credit ("TFC"). I have been at TFC for approximately 9 years. In my role as SVP, General Counsel, I advise on all legal and regulatory matters that may impact TFC and oversee the compliance function for TFC. In performing my job responsibilities on behalf of TFC, I have familiarized myself with the data collection, reporting, and other requirements that will be imposed on TFC in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

3.     TFC is a member of the Farm Credit Council (the "Council"), with headquarters in Nueces County, Texas and chartered across 100 counties in the state of Texas but with offices in

1

DocuSign Envelope ID: E69D76C5-DD3B-42A1-88DB-DE2BC0CEEB38

Raymondville and Weslaco Texas.  More specifically, TFC is a Farm Credit association that provides loans to support rural farmers, ranchers, and agribusinesses.

4.      TFC is not a member of the American Bankers Association ("ABA") or the Texas Bankers Association ("TBA").

5.      TFC does not have readily accessible information regarding which of its covered credit transactions were originated to small businesses prior to October 1, 2023.  As such, TFC will use a reasonable method to estimate its covered originations for both 2022 and 2023.  In 2022, TFC originated approximately 860 loans that would likely qualify as "covered credit transactions" for "small businesses" under the Final Rule.  In 2023, TFC expects to originate approximately 450 loans that will likely qualify as "covered transactions" for "small businesses."  TFC will likely be in Compliance Tier 3, but potentially Compliance Tier 2, under the Final Rule and, absent a stay, TFC is   preparing for a compliance date that correlates to Tier 3 institutions.  Absent any contravening information, TFC estimates that it will begin data collection on January 1, 2026.

6.      TFC has already started its efforts to comply with the Final Rule.

7.      During the balance of this year, 2023, TFC will continue to incur substantial costs and burdens to comply with the Final Rule.  These include dedicated personnel to research the requirements and applications of the Final Rule, and all commentary or guidance issued by the CFPB in relation to the Final Rule.  TFC is also exploring options with its vendors to determine the best methods of collecting the required data elements and reporting that information.  TFC believes that in 2023, it may spend approximately $10,000 on preparation for compliance on the Final Rule, analysis and training by internal staff on the Final Rule, and outside assistance in order to comply with the Final Rule.

DocuSign Envelope ID: E6BD78C5-DD3B-42A1-88DB-DE2BC0CEED38

8.      TFC will continue to incur substantial costs to comply with the Final Rule.  These include but are not limited to creation and implementation of policies and procedures, training on the Final Rule and the practical applicability of the Final Rule, and potential hiring of additional staff to collect, analyze and submit the required data.  TFC has incurred expenses relating to its third party technology vendors in anticipation of its compliance with the Final Rule.  These expenses will continue to increase as TFC's compliance date gets closer.  Prior to reporting, TFC may be required to work with an independent compliance vendor to assist and advise its internal staff.

9.      In order to comply with the Final Rule by the compliance date of January 1, 2026, TFC expects to incur the following, additional costs: approximately three to four hundred hours of internal staff time allocated to this effort at an expense of approximately $75,000.00.  In addition, TFC expects to spend in excess of $20,000 in outside consulting and/or licensing of tools and third-party software.

10.     The above costs are significant to TFC, and I understand that TFC will not be able to recover these costs, either in whole or in large part.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____
Sep-08-2023 | 14:07 CDT

*Lori Graham*

Lori V. Graham
SVP, General Counsel
Texas Farm Credit

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) ) | Case No. 7:23-cv-00144 |
| Defendants. | ) ) | |

<u>**DECLARATION OF PAUL KOHLS**</u>

I, Paul Kohls, hereby declare as follows:

1.      The statements below are based on my personal knowledge.

2.      I am the Chief Administrative Officer & General Counsel at Compeer Financial, ACA ("Compeer").  I have been at Compeer for approximately 13 years.  In my role, I am a member of Compeer's executive leadership team and have functional responsibility for Compeer's legal and compliance team as well as its lending operations teams.  In performing my job responsibilities on behalf of Compeer, I have begun to familiarize myself with the data collection, reporting, and other requirements that will be imposed on Compeer in complying with the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business*

*Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

3.     Compeer is a member of the Farm Credit Council (the "Council"), with headquarters in Sun Prairie, Wisconsin.  More specifically, Compeer is a Farm Credit association that provides loans and certain other financial services to support farmers, ranchers, and agribusinesses.

4.     In 2022, Compeer originated more than 4,500 "covered credit transactions" for "small businesses" (as such terms are defined in the Final Rule).  In 2023, Compeer expects to originate a similar number of covered credit transactions for small businesses.  Accordingly, Compeer likely will be a Tier 1 institution under the Final Rule and, absent a stay, Compeer's deadline for beginning data collection would be October 1, 2024

5.     Compeer has already started its efforts to comply with the Final Rule.  These efforts include reviewing the text of the Final Rule and CFPB commentary as well as beginning the process of identifying an internal team to determine how Compeer will operationalize the data collection and reporting required by the Final Rule.  Compeer has also begun conversations with technology providers, including its loan origination vendor, to evaluate what tools may become available to assist with the data collection and reporting.

6.     During the balance of 2023, Compeer will continue to incur substantial costs and burdens to comply with the Final Rule.  These include assembling a cross-functional group from our sales, credit, finance, compliance, technology, data, business process, and operations teams to determine the processes and procedures Compeer will implement to comply with the Final Rule and to evaluate various technology tools that may be utilized.  We anticipate these efforts will

likely consume 500 or more hours of team member time and as much as $100,000 for outside counsel, consultant, and technology expenses.

7.     In order to comply with the Final Rule by our compliance date of October 1, 2024, we expect to incur in calendar year 2024 up to an additional 1,500 hours of team member time and as much as another $400,000 in expenses. The time and expenses associated with preparing for our compliance date include, but are not likely limited to, Compeer's efforts to make significant changes to its policies and procedures; building or purchasing new technology to facilitate data collection and reporting; moving functional responsibilities and job duties currently done by some team members or job families to other team members to facilitate the further segregation of information collected pursuant to the Final Rule; and providing significant training of hundreds of team members to help them understand and be prepared to aid in compliance with the Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   9/7/2023

Paul Kohls
Chief Administrative Officer & General Counsel
Compeer Financial, ACA

**DocuSign**

| Certificate Of Completion |
|---|

Envelope Id: C6D4983C9FF04052ADD192BCC50BAA04                          Status: Completed
Subject: Complete with DocuSign: Compeer - Declaration.docx
Source Envelope:
Document Pages: 3                    Signatures: 1                        Envelope Originator:
Certificate Pages: 3                 Initials: 0                          Kari Hartman
AutoNav: Enabled                                                         1921 Premier Drive
EnvelopeId Stamping: Enabled                                            Mankato, MN  56001
Time Zone: (UTC-06:00) Central Time (US & Canada)                       kari.hartman@compeer.com
                                                                        IP Address: 208.88.229.253

| Record Tracking |
|---|

Status: Original                    Holder: Kari Hartman                Location: DocuSign
        9/7/2023 11:19:32 AM                kari.hartman@compeer.com

| Signer Events | Signature | Timestamp |
|---|---|---|

Paul Kohls                                                              Sent: 9/7/2023 11:20:25 AM
Paul.kohls@compeer.com              *Paul Kohls*                        Viewed: 9/7/2023 11:31:11 AM
Chief Lending Operations Officer and General        26D50D37607E48E...  Signed: 9/7/2023 11:33:34 AM
Counsel
Security Level: Email, Account Authentication   Signature Adoption: Pre-selected Style
(None)                              Using IP Address: 208.88.229.253

Electronic Record and Signature Disclosure:
    Accepted: 9/7/2023 11:31:11 AM
    ID: 19e19247-b01d-45ae-817b-ec86389921ab

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/7/2023 11:20:25 AM |
| Certified Delivered | Security Checked | 9/7/2023 11:31:11 AM |
| Signing Complete | Security Checked | 9/7/2023 11:33:34 AM |
| Completed | Security Checked | 9/7/2023 11:33:34 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

ELECTRONIC RECORD & SIGNATURE DISCLOSURE From time to time, Compeer
Financial, ACA and its subsidiary entities, Compeer FLCA and Compeer PCA ("Compeer,"
"we," or "us"), may be required by law to provide to you notices, disclosures, authorizations,
acknowledgements and other documents during the course of our relationship with you
("Records"). Described below are the terms and conditions for providing to you such Records
electronically. Please read the information below carefully and thoroughly, and if you can access
this information electronically to your satisfaction and agree to these terms and conditions,
please confirm your agreement by clicking the "I AGREE" button at the bottom of this webpage.
1. You Consent to Use Electronic Records and Signatures. By signing this document, you agree
that you have reviewed these terms and conditions and consent to receive Records electronically
and to utilize electronic signatures in lieu of using traditional "wet ink" signatures. You
understand electronic signatures are equivalent to traditional signatures, and equally binding.
You are not required to sign documents electronically. If you prefer not to electronically sign
documents, you may request to receive paper copies. 2. You Have the Option to Obtain Paper
Copies. After you provide your consent, you may receive, without charge, a paper copy of any
Records that have been provided to you electronically by requesting paper copies. You may
obtain paper copies of Records previously provided to you by us to you electronically one of two
ways. a. Contact Compeer. You may fill out the webform at https://www.compeer.com/contact
and use the "Comments" field to let us know which Records you would like sent to the address
you provide in the webform. b. Obtain Through DocuSign. By creating a DocuSign account, you
may also obtain Records and other documents we send to you through the DocuSign electronic
signature system for a limited period of time during the signing session and after the signing
session (usually 30 days). If you have access to a printer, you may print copies of these Records
and documents directly from your computer. After such time you may request delivery of such
paper copies from us by following the procedure described in the paragraph above. 3. You May
Withdraw Your Consent. If you decide to receive Records electronically, you have the right at
any time to change your mind and notify us thereafter that you want to receive Records only in
paper format. We do not charge for providing you a Record in paper format. You may withdraw
your consent to receive Records electronically by filling out the webform at
https://www.compeer.com/contact and using the "Comments" field to let us know that you want
to withdraw your consent to receive Records electronically. 4. You May Advise Compeer of
Your New Email Address. To inform us of a change in your email address where we should send
Records electronically to you, you must fill out the webform at
https://www.compeer.com/contact and use the "Comments" field to let us know that you want to
change your email address. In addition, you must notify DocuSign, Inc. to arrange for your new
email address to reflect in your DocuSign account by following the process for changing email in
DocuSign. 5. Required Hardware and Software Requirements. To receive electronic Records,
you need: a. A current version of an Internet browser we support - please click the link below for
supported Internet Browsers https://support.docusign.com/guides/signer-guide-signing-
systemrequirements; b. Connection to the Internet; c. A current version of a program that
accurately reads and displays PDF files (such as Adobe® Acrobat® Reader); d. A computer and
operating system capable of supporting all of the above; e. An active e-mail address; and f. A
printer if you wish to print out and retain records on paper, and electronic storage if you wish to
retain records electronically 6. Acknowledging Your Access and Consent to Receive Materials
Electronically. To confirm that you can access this information electronically, please verify that
you were able to read this document and that you also were able to print on paper or

electronically save this document for your future reference and access, or that you were able to email this document to an email address where you will be able to print on paper or save it for your future reference and access. If you consent to receiving Records exclusively in electronic format on the terms and conditions described above, please let us know by clicking the "I AGREE" button below. By checking the "I AGREE" box, I confirm that: • I can access and read this Electronic Record & Signature Disclosure document; and • I can print on paper this document or save or send this document to a place where I can print it, for future reference and access; and • Until or unless I notify Compeer as described above, I consent to receive from Compeer exclusively through electronic means all Records that are required to be provided or made available to me by Compeer during the course of my relationship with Compeer.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 7:23-cv-00144

## DECLARATION OF AMIE PALA

I, Amie Pala, hereby declare as follows:

1.     The statements below are based on my personal knowledge.

2.     I am the Chief Executive Officer at the Farm Credit Bank of Texas (the "Bank"). I have been at the Bank for approximately 36 years.

3.     The Bank is headquartered in Austin, Texas and is a member of the Farm Credit Council (the "Council"). The Bank is not a member of the American Bankers Association or the Texas Bankers Association.

4.     The Bank is one of four federally chartered Farm Credit System Banks created by the U.S. Congress as part of the Farm Credit System (the 'System") in 1916. The System's mission is to support rural communities and agriculture with reliable, consistent credit and financial services.

1

5.      As one of four System regional wholesale banks (the other banks being AgFirst Farm Credit Bank, AgriBank and CoBank), the Bank raises funds through the sale of debt securities by the Federal Farm Credit Banks Funding Corporation on behalf of all System-institutions, and uses those funds to fund fourteen of the System's sixty-seven individual associations that are located in Texas, Alabama, Mississippi, Louisiana and New Mexico.

6.      These affiliated associations originate real estate mortgage loans, production and intermediate-term loans, agribusiness loans and rural residential real estate loans to support farmers, ranchers, and rural agribusinesses, including "covered credit transactions" for "small businesses" (as such terms are defined in the Final Rule issued by the Consumer Financial Protection Bureau ("CFPB") set forth in the *Small Business Lending Under the Equal Credit Opportunity Act* (Regulation B), 88 Fed. Reg. 35,150 (May 31, 2023) (the "Final Rule").

7.      In addition to the funding that the Bank provides its affiliated associations, the Bank provides integrated technology solutions for loan origination, underwriting, loan accounting and servicing. A large majority of the associations rely on the Bank, in whole or in large part, to provide technology support that will aid the associations in complying with the Final Rule. Because the Bank is a cooperative primarily owned by its affiliated associations, the Bank's compliance costs are ultimately borne by all fourteen affiliated associations.

8.      The Bank has already commenced its efforts to comply with the Final Rule and has expended a material number of hours in collaboration with affiliated associations to estimate compliance timeframes; analyze the technical requirements necessary to operationalize the data collection and reporting required by the Final Rule; identify and review systems impacted; and meet with and engage outside technology vendors to evaluate tools available to implement information data collection and reporting requirements.

9.    During the balance of this year, 2023, and I estimate that the Bank will continue to incur substantial costs and labor hours to comply with the Final Rule including work to configure its loan origination system; update reporting applications, templates, and systems; revise procedures; manage privacy protections needed to safeguard the large volumes of information collected; purchase new computer software systems and technical support; integrate multiple systems to facilitate data collection and reporting; and devote additional resources to create system documentation and training for the associations as technology users. These costs and burdens will have a significant impact on and result in irreparable harm to the Bank and its affiliated associations.

10.    Because the Bank's affiliated associations are not covered by the preliminary injunctions issued in this case, the Bank and its affiliated associations will (absent an injunction that applies to them) be forced to continue incurring costs to meet the Final Rule's compliance deadlines.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 8, 2023

_Amie Pala_

Amie Pala
Chief Executive Officer
Farm Credit Bank of Texas

3

# Exhibit F



January 4, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**Re:    Proposed rule - *Small Business Lending Data Collection Under the Equal Credit
Opportunity Act (Regulation B)* - Docket No. CFPB–2021–0015, RIN 3170–AA09, 86
Fed. Reg. 56336**

The Farm Credit Council ("Council"), on behalf of its membership, appreciates the
opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau")
proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit
Opportunity Act (Regulation B)" (the "Proposal").[1]  The Proposal would amend Regulation B to
implement an amendment to the Equal Credit Opportunity Act ("ECOA") made by section 1071
of the Consumer Financial Protection Act of 2010.[2]

The Council is the national trade association for the institutions of the Farm Credit
System, a nationwide network of customer-owned financial institutions with a specific mission
to support rural communities and agriculture.  The Council supports enforcement of fair lending
laws and appreciates the Bureau's dedication to better supporting small farming businesses.  As
described in detail below, however, we are concerned about some aspects of the Proposal as
applied to agricultural-purpose credit generally and the Farm Credit System in particular.
Indeed, much of this letter may be viewed as a response to the Bureau's specific request for
"comment on the potential costs and complexities associated with covering" agricultural-purpose
credit in the rule.[3]

To be clear, the Farm Credit System does not oppose the collection and reporting of
demographic data on our customers, provided that those customers provide such data voluntarily.
The proposed rule, however, goes far beyond simple collection and reporting and would impose
significant burden on Farm Credit institutions that would ultimately impose additional costs on
Farm Credit customers.

The comments in this letter were developed after soliciting input from all Farm Credit
System banks and associations.  Due to the significance of this Proposal to each bank and
association, we anticipate that many of them will submit their own comments on various aspects
of the Proposal.  Additionally, given the significant impact of the proposed rule on Farm Credit

---

[1]     CFPB, Proposed rule; request for comment, *Small Business Lending Data Collection
Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (Oct. 8, 2021)
("*Proposal*").

[2]     Section 1071's amendment added § 704B to ECOA, 15 U.S.C. § 1691c-2.

[3]     *Proposal*, 86 Fed. Reg. at 56407.

customers, we anticipate that some might also provide individual comments.  We begin below with some background on the Farm Credit System and how the Proposal would impact the System generally.

## I.    Background

### A.    The Farm Credit System

Congress originally designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations."[4]  As of January 1 of 2021, the Farm Credit System included four banks and 67 associations, which together provide about 40% of agricultural lending in the United States.  These 71 institutions serve all 50 states and the Commonwealth of Puerto Rico.  Each institution is structured as a cooperative, owned by its customers — farmers, ranchers, farmer-owned cooperatives and other rural businesses.  Each Farm Credit institution has a board of directors chosen by the customers it supports.

Unlike commercial banks and many non-bank lenders, Farm Credit institutions cannot lend to any creditworthy applicant.  Federal law limits which customers are "eligible" for credit from a Farm Credit lender as well as the "scope" of lending that may be provided to an eligible customer.  In most cases, the applicant must either be, or must somehow be related to, a "bona fide farmer, rancher, or producer or harvester of aquatic products."[5]  Federal law also identifies several other classes of eligible Farm Credit borrowers, including agricultural cooperatives, rural infrastructure providers, and some rural home buyers.

The net income that Farm Credit institutions generate can be used in only two ways: (1) retained within the Farm Credit institution as capital to build financial strength to serve customers; or (2) passed on to customer-owners by way of patronage dividends (a practice that effectively reduces those customers' costs of borrowing).  Thus, compliance costs are ultimately borne by each institution's customers.

The Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, supervises and examines the Farm Credit System, based on the Farm Credit Act of 1971, as amended, and regulations issued by that agency.  With respect to Farm Credit institutions, the FCA also examines and enforces compliance with consumer-finance laws, including ECOA and rules issued thereunder.  Thus, when the Proposal is finalized, the FCA will be the agency responsible for examining Farm Credit lenders for compliance with the final rule, and for bringing any administrative actions to enforce compliance with that rule.[6]

---

[4]    12 U.S.C. § 2001(a).

[5]    *See* 12 C.F.R. §§ 613.3000 to 613.3020.

[6]    ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration," ECOA § 704(a)(6), 15 U.S.C.

*(continued …)*

## B.    The Proposal's Coverage of Farm Credit Lenders

To place the Council's comments on the Proposal in context, we note that the Proposal would cover a greater proportion of Farm Credit lenders than any other category of lenders identified in the Proposal.  Different parts of the Proposal estimate the number or percentage of lenders in specific categories that would be covered.  We have put those estimates together into the following table, which makes clear how broadly the Proposal would impact the lenders of the Farm Credit System:

### CFPB Estimates of the Proposed Rule's Coverage[7]

| Type of Lender | Coverage (at 25 small business loans / year) |
| --- | --- |
| All Depository Institutions | 38-40% |
| Banks & Thrifts | 70-73% |
| Credit Unions | 7% |
| Farm Credit Lenders | 100% |

---

§ 1691c(a)(6), as the Proposal recognizes, *Proposal*, 86 Fed. Reg. at 56371 & n.176.  Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration."  CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration."  *Id.* CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).  Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration."  CFPA § 1024(f), 12 U.S.C. § 5514(f).

[7]    For coverage of depository institutions, *see Proposal*, 86 Fed. Reg. at 56421.  For coverage of Farm Credit institutions, *compare Proposal*, 86 Fed. Reg. at 56369 ("as of December 2019, the Farm Credit System contains a total of 72 banks and associations"), *with id.* at 56570  (estimating that all "72 members of the Farm Credit System (banks and associations)" then in existence would be covered by the proposed rule).  *See also id.* at 56544, 56569 (also estimating that all 72 institutions would be covered).

The Council agrees that every Farm Credit bank and association engaged in retail lending would be covered.  Note that three of the four banks are primarily wholesale lenders and may not be covered.

One reason why every Farm Credit lender would be covered is that Farm Credit lenders are statutorily structured primarily to provide agricultural-purpose credit, which would be considered "business credit" under the Proposal.[8]  A second reason, further discussed in the next section below, is that the overwhelming majority of Farm Credit borrowers would be "small businesses" under the expansive definition of that term in the Proposal.  In other words, the Proposal as written would not only cover every Farm Credit lender; it also would cover nearly all of each lender's loans.

## II.    Comments

### A.    Definition of "Small Business"

Based on the Proposal's discussion of whether the rule should cover agricultural-purpose credit ("agricultural credit") at all, the Bureau appears to recognize that agricultural credit is different from business-purpose credit ("business credit") generally.[9]  We agree agricultural credit is unique within the broader category of "business credit."  We therefore believe that agricultural credit and other credit to farmers by Farm Credit lenders should be treated differently, particularly in regard to the definition of a "small business."

Under the Proposal, the definition of "small business" largely determines whether a loan (or loan application) will be covered by the rule.[10]  In relevant part, that definition provides that "a business is a small business if, and only if, its gross annual revenue … for its preceding fiscal year is $5 million or less."[11]  As applied to the Farm Credit System, we submit that the $5 million threshold is vastly too high.  For the reasons described in detail below, we urge that in the Farm Credit System, the CFPB's definition of "small business" should align with the FCA's well-settled definition of "small farmer, rancher, or producer or harvester of aquatic products." ("small farmer"): "A farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products."[12]  *Aligning the "small business" and "small farmer" definitions would still mean that about half of all Farm Credit loans would be covered by a final Bureau rule.*  Further, the existing "small farmer" definition could be applied to other providers of credit to farmers.

We have several reasons for proposing this alternative definition of "small business." First, the profile of "small" agricultural businesses is different from the profile of small businesses generally.  As the Proposal itself reported, nearly 98% of farms in this country are in fact "family farms (where the majority of the business is owned by the operator and individuals related to the operator)."  That is not true of businesses generally.  Moreover, "*[s]mall* family

---

[8]      Reg. B, Proposed § 102(d) (referencing existing Reg. B, § 2(g)).

[9]      *Proposal*, 86 Fed. Reg. at 56406-07 (concluding that the Proposal should cover agricultural-purpose credit but seeking comment "on the potential costs and complexities associated with covering such credit").

[10]     *E.g.*, Proposed § 1002.107(a) ("A covered financial institution shall compile and maintain data regarding covered applications from small businesses.").

[11]     Proposed § 1002.106(b).

[12]     FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

farms (less than $350,000 in gross cash farm income (GCFI)) accounted for 90 percent of *all U.S. farms*."[13]

Other law already recognizes the difference between farming credit and business credit generally.  For example, on bank call reports and in Community Reinvestment Act data, a "small farm loan" is defined to be only half the size of a general "small business loan."[14]

Given the data above, we believe that a $5 million threshold is substantially over-inclusive as applied to the farming community.  According to a source cited in the Proposal, the USDA's *2017 Census of Agriculture*, 99.6% of U.S. farms sell less than $5 million in agricultural products per year.  Indeed, even a $1 million threshold would be too high:  96% of farms had less than $1 million in annual sales of agricultural products.[15]  Informal reviews by Council members of their customer bases — using annual GCFI as the metric — show similarly enormous percentages of borrowers falling within the $5 million and $1 million thresholds, respectively.  In sum, both a $5 million and $1 million threshold would likely cover something close to *all* farmers who borrow from Farm Credit institutions, rather than only those that are in fact "small."

To capture only farming enterprises that are "small," then, the dollar threshold in a "small business" definition should be lower than $1 million.  And for an alternative "small business" definition to prove workable, it would obviously help if the standard was already in use by compliance professionals and familiar to the agency that will examine for compliance. Considering those factors, the Council suggests that the Bureau adopt for farmers the FCA's pre-existing definition of a "small farmer."

Some background on the concept of "small farmers" in the Farm Credit System would be appropriate here.  In the Farm Credit Act, Congress requires Farm Credit lenders to furnish "sound and constructive credit and related services to young, beginning, and *small* ["YBS"] farmers."[16]  The category of "small farmers" is independent and distinct from the other two categories ("young" and "beginning") in the statute.  The FCA has implemented this statutory

---

[13]    *Proposal*, 86 Fed. Reg. at 56407 (emph. added) (citing Econ. Research Serv., USDA, *Farming and Farm Income* (updated May 10, 2021), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/ ("*ERS Farm Income Report*"))).  GCFI is an approximation of "gross annual revenue"; it means "annual gross cash farm income before expenses."  *See ERS Farm Income Report* (updated Sep. 2, 2021).

[14]    *Proposal*, 86 Fed. Reg. at 56421 n.474.

[15]    USDA, 2017 Census of Agriculture at 9 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf.  Using GCFI rather than value of products sold, the USDA's Economic Research Service reached a similar conclusion:  at least 95% of all U.S. farms have a GCFI of less than $1 million.  *ERS Report*.  The *ERS Report* does not report the percentage of farms below the higher, $5 million threshold, but that figure obviously would be very high.

[16]    Farm Credit Act of 1971, § 4.19(a), 12 U.S.C. § 2207(a) (emph. added).

mandate with regulations.[17]   As of December 31, 2020, 49.8% of System loans outstanding were to such "small farmers."[18]

The Council submits that a final small business data collection rule that covers fully half of all loans (on average) made by every Farm Credit lender would more than accomplish Congress' twin aims for the rule:  to "facilitate the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[19]  The Council also submits that adopting the FCA's "small farmer" definition would facilitate compliance because staff at Farm Credit lenders already are very familiar with the standard.  Indeed, we believe that it would be confusing for staff to manage two competing regulatory definitions of "small" customers.  Further, examiners at the FCA — who will also examine for compliance with the Bureau's rule — have years of experience with the "small farmer" definition.[20]

## B.      Demographic Data and the "Firewall" Provision

Particularly if the definition of "small business" can be appropriately tailored to the farming context, we have no objection to collecting appropriate demographic data on covered loans, provided that customers are afforded the option to provide that information on a voluntary basis.

As a cooperative, owned by our customers, we strongly object to any requirement that would require our lenders to override the wishes of a customer to not report their individual ethnicity or race.  We ask the Bureau to reconsider its proposal to require lenders in some cases to report the ethnicity and race of "principal owners" based on visual observation or surname.  The inherently subjective nature of identifying a person's ethnicity and race by visual observation or surname will distort the resulting data.

---

[17]      12 C.F.R. § 614.4165.

[18]      FCA, *2020 Annual Report of the Farm Credit Administration*, at 30 (Aug. 2021), https://www.fca.gov/template-fca/about/2020AnnualReport.pdf.  Of new loans made in 2020, 44.8% were made to "small" farmers and ranchers.

[19]      ECOA § 704B(a), 15 U.S.C. § 1691c-2(a).

[20]      In requesting alignment of the "small business" and "small farmer" definitions, we note that the underlying statute gives the CFPB, in drafting this rule, broad authority to take account of the unique characteristics of a particular "class of financial institutions," such as Farm Credit lenders, up to and including the "exempt[ion of] any … class of financial institutions from" the rule entirely.  ECOA § 704B(g)(2) ("The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."), 15 U.S.C. § 1691c-2(g)(2).

Unlike similar requirements for home mortgage lenders, where the lending relationship is often a one-time transaction, agricultural lending is usually a long-term relationship covering many different loans over a very many years. The relationship between the customer and the lenders is critical to building the understanding and trust necessary to fulfill the customer's credit needs in a wide range of macro- and micro-economic situations. Requiring lenders to override a customer's decision to withhold demographic data would be a significant afront to those customers and damage the relationship unnecessarily.

Moreover, the disclosure to every customer in the "Sample data collection form" of the lender's obligation to report by visual observation or surname will be direct notification of the lender's intent to directly contradict the customer's choice. The desire of Farm Credit customers was made clear on this issue most recently during the lending done by Farm Credit institutions under the Small Business Administration's Paycheck Protection Program, where our customers specifically declined to identify their race or ethnicity for approximately 80% of the PPP loans Farm Credit institutions made.

*Additionally*, the Council strongly urges the Bureau not to adopt proposed § 1002.108, the so-called "firewall" provision for demographic data.

We recognize that the firewall provision largely arises from the underlying statute, ECOA § 704B(d).[21] We believe, however, that in this instance the Bureau should exercise the separate "exceptions" authority granted by ECOA § 704B, which states that the Bureau "may adopt exceptions to any requirement of this section and may … exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."[22]

As proposed, the "firewall" provision would create a "prohibit-or-disclose" regime. It generally would prohibit, where "feasible," any employee of a lender who may "participat[e] in" the credit decision ("underwriters") from having access to applicant responses regarding demographic information. It generally would not be "feasible" for a lender to restrict an underwriter's access where that employee "may need" to view, refer to or otherwise use an applicant's demographic responses to perform that employee's "assigned job duties." When it is not "feasible" for a lender to prohibit access to any underwriter, the lender would be required to make the following, "no firewall" disclosure to customers: "Employees making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form [*i.e.*, the form used to collect demographic information]."[23]

Council members see two substantial obstacles to making the firewall prohibition "feasible." First, some lenders simply do not have enough lending staff to accomplish the separation-of-functions contemplated by the prohibition.[24] Second, lenders with larger staffs

---

[21]     15 U.S.C. § 1691c-2(d).

[22]     ECOA § 704B(g)(2), 15 U.S.C. § 1691c-2(g)(2).

[23]     Proposed § 1002.108 & associated commentary.

[24]     We note that of the 72 Farm Credit lenders reviewed by the Bureau, 18 were determined to be "small entities" under the Regulatory Flexibility Act. *Proposal*, 86 Fed. Reg. at 56569.

report that in order to implement the prohibition, they would have to make substantial investments in IT infrastructure to effectively "mask" or segregate demographic responses from all other applicant data viewable by underwriters. Many of those larger lenders, we think, will simply determine a firewall is not "feasible" before they incur substantial IT infrastructure costs that, in the Farm Credit System, would ultimately have to be borne by the borrowers.

As a result of these obstacles, we think that many lenders would be left with no choice but to make the "no firewall" disclosure. It is critical to note that the "no firewall" disclosure would be made in conjunction with the disclosure that the lender "cannot discriminate" on the basis of demographic information. In other words, *a customer will be told what is illegal, then be told that some employees are particularly well-positioned to commit the illegal act*. We think that many reasonable customers, seeing these twin disclosures on the same form, will simply decline to provide demographic information, substantially undermining the objectives of the rule. We also believe that having to make the twin disclosures will harm the disclosing lenders' relationships with their customers. Some customers, particularly minority customers, may even choose to apply for credit elsewhere, reducing customer choice and perhaps access to credit.

We have not been able to devise a workable method for improving the firewall provision's prohibit-or-disclose regime. As a result, we think there is no alternative to the Bureau exercising its statutory "exceptions" authority to eliminate the provision from a final rule. Doing so would align that rule with HMDA, which has required collection of demographic information for decades, without incident to our knowledge, despite the absence of any firewall.

### C.    Non-Demographic Data

#### 1.    Generally:  Reconsider Requiring Data Elements Not Identified in the Statute

In addition to the collection of detailed demographic data, the Proposal would require collection of up to 17 discrete, non-demographic data elements on each covered loan. That is substantially more than the nine elements specified by the underlying statute.[25]

As a general matter, the Council urges the Bureau to reconsider requiring such a substantial array of additional data in an initial final rule, particularly the many non-statutory elements described by the Proposal. The collection of detailed demographic data, alone, will require substantial changes to loan processes, systems, and compliance protocols. Based on the experience of Farm Credit lenders with the analogous data-reporting regime mandated by the Home Mortgage Disclosure Act ("HMDA"), lenders report that adding as many as 17 additional elements to the demographic data will substantially increase the costs of compliance with a final small business rule. In that regard, it is worth noting again that because Farm Credit lenders are customer-owned, the costs of compliance will ultimately be borne by those customers.

In considering the number of non-demographic data elements to require in an initial final rule, we think it is also instructive to review the evolution of HMDA and its implementing rule, Regulation C. As enacted in 1975, HMDA applied only to loans actually originated or purchased. It was not until 1989 that amendments to HMDA and Regulation C expanded the law

---

[25]    ECOA § 704B(e)(2), 15 U.S.C. § 1691c-2(e)(2).

to cover applications as well.[26]  Further, it was only in 2002 that the Federal Reserve amended Regulation C to require mortgage lenders to report information about the pricing of their loans.[27] It then took another 13 years before the Bureau, responding to a statutory amendment, implemented the full array of HMDA data reporting requirements in existence today.[28]

The Council is not suggesting that the Bureau wait 45 years before requiring small business lenders to report every data element described in the Proposal.  We do, however, counsel against the "all at once" approach envisioned by the Proposal.  We think there is value in beginning with a more modest set of data reporting requirements, to allow small business lenders time to adjust to this new collection-and-reporting regime, and to allow time for consideration of the actual marginal value of expanding that regime further.  The "all at once" approach is particularly burdensome to the majority of Farm Credit lenders that do not make loans subject to HMDA compliance and have not already established those types of compliance systems and procedures.

### 2.    Specific Elements

We urge the Bureau to reconsider imposing the cost of collecting the following data elements that *are not described in the statute*:

- *Pricing information.*  If Farm Credit lenders reported pricing information on their loans, the data would be misleading.  The reason is that the actual cost to the Farm Credit borrowers is usually less the loan's pricing would indicate because the borrowers, as owners of the lender, separately receive patronage dividends from the lender's profits.  Thus, a Farm Credit loan priced more steeply than a bank loan may actually be cheaper for the borrower once patronage dividends are considered.

- *Six-digit NAICS Code.*  We agree with the comments of the small entity representatives, reflected in the Proposal, who uniformly "expressed concern about the difficulties in determining the appropriate NAICS code for businesses." And as the Bureau recognized, this aspect of the Proposal would mean that "all financial institutions subject to reporting would need to gain familiarity with the NAICS code system [and] refer to NAICS classifications for all relevant applications."[29]  We believe that this requirement would slow the loan-application process, placing an unwarranted burden on both customers and lenders.

---

[26]    Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 54 Fed. Reg. 51356 (Dec. 15, 1989).

[27]    Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 67 Fed. Reg. 7222 (Feb. 15, 2002).

[28]    CFPB, Final Rule, *Home Mortgage Disclosure (Regulation C)*, 80 Fed. Reg. 66128 (Oct. 28, 2015).

[29]    *Proposal*, 86 Fed. Reg. at 56467.

- *Number of non-owner workers*.  Given the prevalence of seasonal and non-U.S. workers in agriculture, it would be administratively very difficult to collect this data in any consistent manner.

  Counting non-owner workers also would be difficult because there are many "non-standard" borrowers in agriculture.  One example would be neighbors, who ordinarily farm separately and separately employ others, deciding to seek credit jointly for a specific project.  Another example would be multiple corporations, partnerships, individuals, and perhaps a trust, all with their own farming operations, forming a partnership to apply for a loan.  It would be very challenging to write guidelines for consistently capturing the number of non-owner workers in the case of joint applicants who also operate farms separately, or in the case of applicants owned by separate farming operations.

- *Time in business*.  If this non-statutory element is not dropped, we suggest that for farming it be tied to an established Farm Credit data point, "Year began farming." Farm Credit lenders already collect "Year began farming" in connection with the mandate discussed above to serve "beginning farmers," which the FCA defines as a "farmer, rancher, or producer or harvester of aquatic products who has 10 years or less farming, ranching, or aquatic experience as of the loan transaction date."[30] The Council submits that needless confusion would arise in the context of farming if there were separate and competing definitions of "Time in business" and "Year began farming."

We have one further comment on a specific data element, though this one is mentioned in the statute:  the "*gross annual revenue* of the applicant for its preceding full fiscal year prior to when the information is collected."  The Proposal suggests the following language to elicit this information from an applicant: "What was the gross annual revenue of the business applying for credit in its last full fiscal year?"[31]  For three reasons, we urge the Bureau to use its "exceptions" authority to eliminate this element for farming customers.

First, most farmers in this country only farm on a part-time basis.[32]  As a result, when they apply for agricultural purpose credit, their W-2 and other off-farm income can be and often

---

[30]    FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

[31]    Proposed § 1002.107(a)(14) & Cmt. 1002.107(a)(14)-1.

[32]    In 2019, 96 percent of farm households derived some income from off-farm sources. And on average, "small family farms" — which as noted make up 90% of all U.S. farms — derive more than half of their total household income from off-farm income in 2019.  Econ. Research Serv., USDA, *Off-Farm Income a Major Component of Total Income for Most Farm Households in 2019* (updated Sep. 7, 2021), https://www.ers.usda.gov/amber-waves/2021/september/off-farm-income-a-major-component-of-total-income-for-most-farm-households-in-2019/; *see also* Econ. Research Serv., USDA, *America's Diverse Family Farms*, at 3 (Dec. 2020) (on 41.4% of U.S. farms, principal operators report a primary occupation other than farming), https://www.ers.usda.gov/webdocs/publications/100012/eib-220.pdf?v=8038.7; *ERS Farm Income Report* (updated Sep. 2, 2021) ("Most farmers receive off-farm income, but small-scale operators depend on it").

is more important to the credit decision than any "revenue of the business." If off-farm income is to be reported in connection with this data element (since the rule text refers to "revenue of the applicant"), we believe the data would paint a misleading picture of the size of the "business" applying for a loan. But if it is not reported, we believe the data would be misleading from the standpoint of fair lending analysis, for it would show many loans approved to farmers with low "business" revenue (where they have sufficient W-2 income) and other loans denied to farmers with higher "business" revenue (where they have insufficient W-2 income). Either way, we think this data element is flawed as applied to farming and should be eliminated for that type of credit.

Second, the "gross annual revenue" element would pose substantial challenges given the prevalence of the "non-standard" agricultural borrowers described above, *i.e.*, customers applying jointly even though they have separate farming operations. Of course, many of those customers will have relevant off-farm income as well, further complicating the picture.

Third, many Farm Credit loans are currently decisioned without considering either off-farm income or revenue from farming; instead, lenders often rely principally on credit scores to decide whether a loan will be offered.

If the Bureau retains an element like "gross annual revenue," we suggest — in line with our comments on the definition of "small business" — that for farming, the appropriate metric should instead be "gross sales of agricultural or aquatic products" in the prior year.

### D.    Reporting When Multiple Institutions are Involved

We urge the Bureau to consider several modifications to § 1002.109(a)(3), which specifies which institution[s] have obligations under the rule when multiple institutions are involved in a credit transaction.

We are particularly concerned with how Proposed § 1002.109(a)(3) could apply to loan participations. Farm Credit institutions frequently enter into loan participation agreements with a "lead lender," sometimes referred to as an "originating lender."[33] There can be multiple participants on a lead lender's loan or just one. Under these agreements, the borrower's contractual relationship remains solely with the lead lender. Thus, a loan participation is significantly different from the purchase of a loan, as the FCA has explained in detail.[34]

---

[33]    *See* 12 C.F.R. § 614.4325 ("Purchase and sale of interests in loans") and § 614.4330 ("Loan participations").

[34]    In the FCA's words:

> Loan participations are a type of funding arrangement separate and distinct from either partial or whole loan purchases. The distinction centers around who retains the legal relationship with the borrower. In a loan purchase, part or all of the lending relationship transfers to the purchasing institution. By definition, a whole loan purchase includes not only the purchase of the asset, but its cashflows, the legal relationship, and the servicing requirements. The relationship in a loan participation, regardless of the participation amount (100

*(continued …)*

We strongly urge the CFPB to clarify that in a loan participation, the obligations imposed by the rule should always rest solely with the lead lender, which FCA regulations define as the "lending institution having a direct contractual relationship with [the] borrower to advance funds, which institution sells or assigns an interest or interests in such loan to one or more other lenders."[35]  There are convincing practical reasons to designate the lead lender for compliance with the rule.  As the only party in a participation with a direct relationship with the applicant or borrower, the lead lender is in the best position by far to collect and report on the demographic and other data specified in the Proposal.  Requiring any participant to collect and report on that data, from its second-hand vantage point, would make little sense and could lead to more inaccuracies in the data.  Indeed, such a requirement would be akin to requiring a trust in a mortgage securitization to report HMDA data.

We note further that a customer never applies for any lender to participate a covered credit transaction; the customer applies for the covered credit transaction itself, solely from the lead lender.  For that reason, another option for addressing loan participations may be to exclude them, along with leases and factoring, from the definition of "covered credit transaction" in Proposed § 1002.104.

We also ask for clarification of the rule with respect to syndicated loans, which differ from participations in that multiple lenders enter into a contractual relationship with the borrower.  On syndicated loans, there is typically an administrative agent, which is primarily responsible for interacting with the applicant or borrower.  For the same reasons provided above with respect to participations, we ask the CFPB to clarify that in the syndicated loan context, the administrative agent is the sole lender with responsibility under the rule.

Lastly on this topic, we ask for confirmation that the rule would not apply at all to any credit decisions made *after* a customer's loan application has been approved.  Farm Credit institutions are required to make an independent "judgment on the creditworthiness of the borrower" even in secondary market transactions,[36] so it would be helpful to make clear that

---

> percent or some amount less than 100 percent), consists only of cashflows from the loan and possibly the servicing rights for the loan. The legal lending relationship stays with the originating lender.
>
> … In addition, courts have recognized the legal distinction between participations and loan purchases and the separate legal effects of loan participation agreements.  Finally, other financial regulators recognize the legal distinctions between loan participations and selling whole loans, which involves the transfer of title.

FCA, Final rule, *Loan Policies and Operations; Definitions; Loan Purchases and Sales*, 67 Fed. Reg. 1281, *1282-83 (Jan. 10, 2002) (footnotes omitted).

[35]    12 C.F.R. § 614.4325(a)(2).

[36]    12 C.F.R. § 614.4325(e).

those judgments are not subject to collection and reporting obligations.  We believe that this point is already implicit in portions of the Proposal.[37]

### E.    Publication of Data

The Proposal provides that the Bureau would make public the data reported to it under a final rule, "subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[38]  To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a "balancing test" that would assess the risks and benefits of public disclosure.[39]

As the Bureau refines the balancing test, the Council asks that it consider the impact of publishing the data of smaller institutions in particular.  Smaller Council members are concerned that some customers, recognizing that data about their business will be published, may gravitate to larger lenders on the theory that the additional data about a larger lender will make it more difficult for the public to identify one customer in particular.

The Council also objects to making loan "pricing information" public.  Farm Credit lenders consider pricing information to be commercially sensitive.  In addition, as noted above, Farm Credit lenders believe that the publication of pricing information would be misleading without an appropriate notation that Farm Credit borrowers (unlike borrowers outside the Farm Credit System) also receive off-setting benefits in the form of patronage dividends.

Lastly in regard to publication, the Council believes that published data about Farm Credit lenders should always be accompanied by an appropriate statement indicating that they — unlike many other lenders — can only lend to business that are eligible under the Farm Credit Act and its implementing regulations.  The Council would be pleased to work with the Bureau on an appropriate disclosure of the legal limitations on eligibility.

*        *        *

---

[37]    Most importantly, the Proposal would require compilation only of data "regarding covered applications," and there is no longer an "application" once it is approved.  Proposed § 107(a).  Further, Comment 109(a)(3)-1.i, regarding reporting when multiple institutions are involved, refers to the reporting of approvals "*prior to* closing or account opening" (emph. added).

[38]    Proposed § 1002.110(a).

[39]    *Proposal*, 86 Fed. Reg. at 56510-40.

As noted, the Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to improving data collection for loans to small farmers.  We think, however, that a final rule would be improved if the above comments are incorporated.  Please do not hesitate to contact me if the Council may be of further assistance.

Sincerely,

Todd Van Hoose
President & CEO, Farm Credit Council

# Exhibit G



August 10, 2023

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**RE:**   ***Texas Bankers Association, et al. vs. Consumer Financial Protection Bureau –
Request for Stay***

Dear Director Chopra:

The Farm Credit Council ("Council"), on behalf of its membership, would like to draw your attention to significant issues raised by the recent Order of the U.S. District Court for the Southern District of Texas, which stayed implementation of the Final Rule on Small Business Lending Under the Equal Credit Opportunity Act ("Rule") at least until the U.S. Supreme Court renders a decision in *Community Financial Services Association of America, Ltd. v. CFPB*.[1]  The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of government-sponsored enterprises dedicated to serving the credit needs of farmers, ranchers and others in rural areas.

As you know, the Order's stay of the Rule applies only to plaintiffs in the Texas litigation, specifically the American Bankers Association ("ABA"), the Texas Bankers Association and their members.  For reasons more fully discussed below, the Council would like to join other non-bank trade associations in asking you to stay implementation of the Rule for all covered financial institutions — including the many Farm Credit lenders covered by the Rule — until after the Supreme Court renders its decision in *Community Financial Services Association*.[2]

Under the Order, if the Supreme Court rules in favor of the CFPB, banks that are members of the ABA — including some of the nation's largest banks — will have their compliance deadlines under the Rule "extend[ed] … to compensate [them] for the period stayed," i.e., the period from the date of the Order until the Supreme Court's decision.[3]  This would mean, for example, that "Tier 1" Farm Credit lenders would be required to implement the Rule in October of 2024, whereas Tier 1 ABA members would be allowed an additional six months or so before having to comply.  The same would be true for Tier 2 and Tier 3 Farm Credit lenders versus their ABA-member peers in Tiers 2 and 3.  Given the substantial costs of

---

[1]    See Order Granting In-Part and Denying In-Part Plaintiffs' Motion for Preliminary Injunction, *Texas Bankers Ass'n, et al. v. CFPB*, No. 7:23-cv-00144 (S.D. Tex. July 31, 2023).
[2]  Letter from the National Association of Federally-Insured Credit Unions and the Credit Union National Association to Rohit Chopra, CFPB Director (Aug. 7, 2023).
[3]    Order at 17.

complying with the Rule, that regime would put Farm Credit lenders at an unjustified disadvantage versus the ABA banks with which they compete in the market for agricultural credit.  It would also be confusing for agricultural borrowers, who would be asked for detailed demographic information by Farm Credit lenders but not by banks.  Further, we question the utility of data collected by Farm Credit lenders during periods when no comparable data is being collected by their bank competitors.

Oral argument in *Community Financial Services Association* will occur less than two months from now, on October 3.  With a decision expected a few months later, we believe that granting our request would also not unduly disrupt the CFPB's own plans for implementation.

Thank you for considering our request.  If you have any questions, please do not hesitate to contact us.

Sincerely,

Robert Paul Boone, III
Senior Vice President of Regulatory Affairs & General Counsel
Farm Credit Council

# Exhibit H



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

August 24, 2023

Robert Paul Boone, III
Senior Vice President of Regulatory Affairs & General Counsel
Farm Credit Council

Dear Mr. Boone:

Thank you for your letter.

To prevent discrimination on prohibited bases and to gain greater insight on small business lending in America, Congress in section 1071 of the Consumer Financial Protection Act required financial institutions to collect and publish data on small business credit applications. Additionally, Congress in section 1071 required the CFPB to "prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section."

Congress enacted this provision in 2010, but the CFPB did not promulgate rules in a timely manner. In 2019, the CFPB was sued for failing to implement this Congressional directive. A federal court ordered the CFPB to issue such rules by March 2023. The CFPB did so.

As you note, a group of financial industry trade associations and individual financial institutions recently sued the CFPB about these rules. Among the allegations are that the CFPB's funding mechanism is unconstitutional, based on a decision of the U.S. Court of Appeals for the Fifth Circuit. The CFPB and the Solicitor General of the United States disagree with this allegation, and the Supreme Court has granted review of that decision and has scheduled oral argument for this fall.

In light of the pending matter before the Supreme Court, the district court stayed the compliance date of the rules that the CFPB issued under section 1071 with respect to the parties that brought the lawsuit. The court's decision was based entirely on the Fifth Circuit decision regarding the CFPB's funding that is only binding in that Circuit. In issuing the order, the court rejected the plaintiffs' request to delay the compliance date of the rules with respect to parties not before the court in the litigation. Additional parties have now intervened in the case.

The CFPB continues to provide assistance to financial institutions that are planning for implementation, and we welcome your involvement. For instance, some have expressed concern that one result of the financial industry association's lawsuit will be reduced demand from large institutions for third-party services to comply with the rules, and hence reduced supply of such services for smaller institutions. We would be eager to work with you on the availability of third-party services. In fact, in issuing the rule, the CFPB specifically made clear that the rules permit financial institutions to use service providers to submit data, and institutions may cooperate, including through trade associations, on efficient means for submission. The CFPB continues to be interested in engaging with you as well as all other relevant stakeholders about these rules mandated by Congress.

Thank you, again, for your letter. We appreciate your perspective and input on these issues.


Sincerely,


Seth Frotman

General Counsel

Consumer Financial Protection Bureau

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

|  |  |  |
|---|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; AMERICAN BANKERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

Before the Court is the Emergency Motion for Preliminary Injunction (the "Motion) filed by Farm Credit Council (the "Council"), Texas Farm Credit ("TFC'), and Capital Farm Credit ("CFC") (collectively, the "Farm Credit Intervenors").  The Court finds that the Farm Credit Intervenors are likely to succeed on the merits of their claims and that, if the Motion is not granted, the Council's members, including TFC and CFC, will be irreparably harmed by Defendants' implementation of the final rule (the "Final Rule") entitled *Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)*, 88 Fed. Reg. 35,150 (May 31, 2023), because, under the ruling by the U.S. Court of Appeals for the Fifth Circuit in *Community Financial Services Association of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023) ("*Community Financial*"), the Final Rule is unconstitutional and unenforceable.  The Court further finds that the balance of the equities favors a preliminary injunction.  Accordingly, it is hereby

ORDERED that the Motion is granted; it is further

ORDERED that Defendants are hereby preliminarily enjoined from implementing the Final Rule against CFC, TFC, and the Council's members pending the U.S. Supreme Court's final decision in *Community Financial*, a trial on the merits of this action, or until further order of this Court; it is further

ORDERED that Defendants shall immediately cease all implementation of the Final Rule against CFC, TFC, and the Council's members; it is further

ORDERED that all deadlines for the CFC, TFC, and the Council's members to comply with the requirements of the Final Rule are hereby stayed until after the Supreme Court's final decision in *Community Financial*; it is further

ORDERED that, in the event of a reversal in *Community Financial*, Defendants shall extend all deadlines for compliance with the Final Rule for CFC, TFC, and the Council's members to compensate for the period stayed;  it is further

ORDERED that no security bond shall be required under Federal Rule of Civil Procedure 65(c).

Entered on this ___ day of _____, 2023.


_____
The Honorable Randy Crane
United States Chief District Judge

2