# Exhibit F



January 4, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re:   Proposed rule - *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)* - Docket No. CFPB–2021–0015, RIN 3170–AA09, 86 Fed. Reg. 56336

The Farm Credit Council ("Council"), on behalf of its membership, appreciates the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)" (the "Proposal").[1] The Proposal would amend Regulation B to implement an amendment to the Equal Credit Opportunity Act ("ECOA") made by section 1071 of the Consumer Financial Protection Act of 2010.[2]

The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of customer-owned financial institutions with a specific mission to support rural communities and agriculture. The Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to better supporting small farming businesses. As described in detail below, however, we are concerned about some aspects of the Proposal as applied to agricultural-purpose credit generally and the Farm Credit System in particular. Indeed, much of this letter may be viewed as a response to the Bureau's specific request for "comment on the potential costs and complexities associated with covering" agricultural-purpose credit in the rule.[3]

To be clear, the Farm Credit System does not oppose the collection and reporting of demographic data on our customers, provided that those customers provide such data voluntarily. The proposed rule, however, goes far beyond simple collection and reporting and would impose significant burden on Farm Credit institutions that would ultimately impose additional costs on Farm Credit customers.

The comments in this letter were developed after soliciting input from all Farm Credit System banks and associations. Due to the significance of this Proposal to each bank and association, we anticipate that many of them will submit their own comments on various aspects of the Proposal. Additionally, given the significant impact of the proposed rule on Farm Credit

---

[1]   CFPB, Proposed rule; request for comment, *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (Oct. 8, 2021) ("*Proposal*").

[2]   Section 1071's amendment added § 704B to ECOA, 15 U.S.C. § 1691c-2.

[3]   *Proposal*, 86 Fed. Reg. at 56407.

customers, we anticipate that some might also provide individual comments. We begin below with some background on the Farm Credit System and how the Proposal would impact the System generally.

### I. Background

#### A. The Farm Credit System

Congress originally designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations."[4] As of January 1 of 2021, the Farm Credit System included four banks and 67 associations, which together provide about 40% of agricultural lending in the United States. These 71 institutions serve all 50 states and the Commonwealth of Puerto Rico. Each institution is structured as a cooperative, owned by its customers — farmers, ranchers, farmer-owned cooperatives and other rural businesses. Each Farm Credit institution has a board of directors chosen by the customers it supports.

Unlike commercial banks and many non-bank lenders, Farm Credit institutions cannot lend to any creditworthy applicant. Federal law limits which customers are "eligible" for credit from a Farm Credit lender as well as the "scope" of lending that may be provided to an eligible customer. In most cases, the applicant must either be, or must somehow be related to, a "bona fide farmer, rancher, or producer or harvester of aquatic products."[5] Federal law also identifies several other classes of eligible Farm Credit borrowers, including agricultural cooperatives, rural infrastructure providers, and some rural home buyers.

The net income that Farm Credit institutions generate can be used in only two ways: (1) retained within the Farm Credit institution as capital to build financial strength to serve customers; or (2) passed on to customer-owners by way of patronage dividends (a practice that effectively reduces those customers' costs of borrowing). Thus, compliance costs are ultimately borne by each institution's customers.

The Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, supervises and examines the Farm Credit System, based on the Farm Credit Act of 1971, as amended, and regulations issued by that agency. With respect to Farm Credit institutions, the FCA also examines and enforces compliance with consumer-finance laws, including ECOA and rules issued thereunder. Thus, when the Proposal is finalized, the FCA will be the agency responsible for examining Farm Credit lenders for compliance with the final rule, and for bringing any administrative actions to enforce compliance with that rule.[6]

---

[4]  12 U.S.C. § 2001(a).

[5]  *See* 12 C.F.R. §§ 613.3000 to 613.3020.

[6]  ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration," ECOA § 704(a)(6), 15 U.S.C.

*(continued …)*

B.     The Proposal's Coverage of Farm Credit Lenders

To place the Council's comments on the Proposal in context, we note that the Proposal would cover a greater proportion of Farm Credit lenders than any other category of lenders identified in the Proposal. Different parts of the Proposal estimate the number or percentage of lenders in specific categories that would be covered. We have put those estimates together into the following table, which makes clear how broadly the Proposal would impact the lenders of the Farm Credit System:

**CFPB Estimates of the Proposed Rule's Coverage[7]**

| Type of Lender | Coverage (at 25 small business loans / year) |
|---|---|
| All Depository Institutions | 38-40% |
| Banks & Thrifts | 70-73% |
| Credit Unions | 7% |
| Farm Credit Lenders | 100% |

---

§ 1691c(a)(6), as the Proposal recognizes, *Proposal*, 86 Fed. Reg. at 56371 & n.176. Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration." CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration." *Id.* CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1). Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration." CFPA § 1024(f), 12 U.S.C. § 5514(f).

[7]    For coverage of depository institutions, *see Proposal*, 86 Fed. Reg. at 56421. For coverage of Farm Credit institutions, *compare Proposal*, 86 Fed. Reg. at 56369 ("as of December 2019, the Farm Credit System contains a total of 72 banks and associations"), *with id.* at 56570 (estimating that all "72 members of the Farm Credit System (banks and associations)" then in existence would be covered by the proposed rule). *See also id.* at 56544, 56569 (also estimating that all 72 institutions would be covered).

The Council agrees that every Farm Credit bank and association engaged in retail lending would be covered. Note that three of the four banks are primarily wholesale lenders and may not be covered.

One reason why every Farm Credit lender would be covered is that Farm Credit lenders are statutorily structured primarily to provide agricultural-purpose credit, which would be considered "business credit" under the Proposal.[8] A second reason, further discussed in the next section below, is that the overwhelming majority of Farm Credit borrowers would be "small businesses" under the expansive definition of that term in the Proposal. In other words, the Proposal as written would not only cover every Farm Credit lender; it also would cover nearly all of each lender's loans.

## II.     Comments

### A.     Definition of "Small Business"

Based on the Proposal's discussion of whether the rule should cover agricultural-purpose credit ("agricultural credit") at all, the Bureau appears to recognize that agricultural credit is different from business-purpose credit ("business credit") generally.[9] We agree agricultural credit is unique within the broader category of "business credit." We therefore believe that agricultural credit and other credit to farmers by Farm Credit lenders should be treated differently, particularly in regard to the definition of a "small business."

Under the Proposal, the definition of "small business" largely determines whether a loan (or loan application) will be covered by the rule.[10] In relevant part, that definition provides that "a business is a small business if, and only if, its gross annual revenue … for its preceding fiscal year is $5 million or less."[11] As applied to the Farm Credit System, we submit that the $5 million threshold is vastly too high. For the reasons described in detail below, we urge that in the Farm Credit System, the CFPB's definition of "small business" should align with the FCA's well-settled definition of "small farmer, rancher, or producer or harvester of aquatic products." ("small farmer"): "A farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products."[12] *Aligning the "small business" and "small farmer" definitions would still mean that about half of all Farm Credit loans would be covered by a final Bureau rule.* Further, the existing "small farmer" definition could be applied to other providers of credit to farmers.

We have several reasons for proposing this alternative definition of "small business." First, the profile of "small" agricultural businesses is different from the profile of small businesses generally. As the Proposal itself reported, nearly 98% of farms in this country are in fact "family farms (where the majority of the business is owned by the operator and individuals related to the operator)." That is not true of businesses generally. Moreover, "*[s]mall* family

---

[8]    Reg. B, Proposed § 102(d) (referencing existing Reg. B, § 2(g)).

[9]    *Proposal*, 86 Fed. Reg. at 56406-07 (concluding that the Proposal should cover agricultural-purpose credit but seeking comment "on the potential costs and complexities associated with covering such credit").

[10]   *E.g.*, Proposed § 1002.107(a) ("A covered financial institution shall compile and maintain data regarding covered applications from small businesses.").

[11]   Proposed § 1002.106(b).

[12]   FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

-4-

farms (less than $350,000 in gross cash farm income (GCFI)) accounted for 90 percent of *all U.S. farms*."[13]

Other law already recognizes the difference between farming credit and business credit generally. For example, on bank call reports and in Community Reinvestment Act data, a "small farm loan" is defined to be only half the size of a general "small business loan."[14]

Given the data above, we believe that a $5 million threshold is substantially over-inclusive as applied to the farming community. According to a source cited in the Proposal, the USDA's *2017 Census of Agriculture*, 99.6% of U.S. farms sell less than $5 million in agricultural products per year. Indeed, even a $1 million threshold would be too high: 96% of farms had less than $1 million in annual sales of agricultural products.[15] Informal reviews by Council members of their customer bases — using annual GCFI as the metric — show similarly enormous percentages of borrowers falling within the $5 million and $1 million thresholds, respectively. In sum, both a $5 million and $1 million threshold would likely cover something close to *all* farmers who borrow from Farm Credit institutions, rather than only those that are in fact "small."

To capture only farming enterprises that are "small," then, the dollar threshold in a "small business" definition should be lower than $1 million. And for an alternative "small business" definition to prove workable, it would obviously help if the standard was already in use by compliance professionals and familiar to the agency that will examine for compliance. Considering those factors, the Council suggests that the Bureau adopt for farmers the FCA's pre-existing definition of a "small farmer."

Some background on the concept of "small farmers" in the Farm Credit System would be appropriate here. In the Farm Credit Act, Congress requires Farm Credit lenders to furnish "sound and constructive credit and related services to young, beginning, and *small* ["YBS"] farmers."[16] The category of "small farmers" is independent and distinct from the other two categories ("young" and "beginning") in the statute. The FCA has implemented this statutory

---

[13]   *Proposal*, 86 Fed. Reg. at 56407 (emph. added) (citing Econ. Research Serv., USDA, *Farming and Farm Income* (updated May 10, 2021), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/ ("*ERS Farm Income Report*"))). GCFI is an approximation of "gross annual revenue"; it means "annual gross cash farm income before expenses." *See ERS Farm Income Report* (updated Sep. 2, 2021).

[14]   *Proposal*, 86 Fed. Reg. at 56421 n.474.

[15]   USDA, 2017 Census of Agriculture at 9 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf. Using GCFI rather than value of products sold, the USDA's Economic Research Service reached a similar conclusion: at least 95% of all U.S. farms have a GCFI of less than $1 million. *ERS Report*. The *ERS Report* does not report the percentage of farms below the higher, $5 million threshold, but that figure obviously would be very high.

[16]   Farm Credit Act of 1971, § 4.19(a), 12 U.S.C. § 2207(a) (emph. added).

mandate with regulations.[17]   As of December 31, 2020, 49.8% of System loans outstanding were to such "small farmers."[18]

The Council submits that a final small business data collection rule that covers fully half of all loans (on average) made by every Farm Credit lender would more than accomplish Congress' twin aims for the rule:  to "facilitate the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[19]   The Council also submits that adopting the FCA's "small farmer" definition would facilitate compliance because staff at Farm Credit lenders already are very familiar with the standard.  Indeed, we believe that it would be confusing for staff to manage two competing regulatory definitions of "small" customers.  Further, examiners at the FCA — who will also examine for compliance with the Bureau's rule — have years of experience with the "small farmer" definition.[20]

### B. Demographic Data and the "Firewall" Provision

Particularly if the definition of "small business" can be appropriately tailored to the farming context, we have no objection to collecting appropriate demographic data on covered loans, provided that customers are afforded the option to provide that information on a voluntary basis.

As a cooperative, owned by our customers, we strongly object to any requirement that would require our lenders to override the wishes of a customer to not report their individual ethnicity or race.  We ask the Bureau to reconsider its proposal to require lenders in some cases to report the ethnicity and race of "principal owners" based on visual observation or surname.  The inherently subjective nature of identifying a person's ethnicity and race by visual observation or surname will distort the resulting data.

---

[17]    12 C.F.R. § 614.4165.

[18]    FCA, *2020 Annual Report of the Farm Credit Administration*, at 30 (Aug. 2021), https://www.fca.gov/template-fca/about/2020AnnualReport.pdf.  Of new loans made in 2020, 44.8% were made to "small" farmers and ranchers.

[19]    ECOA § 704B(a), 15 U.S.C. § 1691c-2(a).

[20]    In requesting alignment of the "small business" and "small farmer" definitions, we note that the underlying statute gives the CFPB, in drafting this rule, broad authority to take account of the unique characteristics of a particular "class of financial institutions," such as Farm Credit lenders, up to and including the "exempt[ion of] any … class of financial institutions from" the rule entirely.  ECOA § 704B(g)(2) ("The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."), 15 U.S.C. § 1691c-2(g)(2).

Unlike similar requirements for home mortgage lenders, where the lending relationship is often a one-time transaction, agricultural lending is usually a long-term relationship covering many different loans over a very many years. The relationship between the customer and the lenders is critical to building the understanding and trust necessary to fulfill the customer's credit needs in a wide range of macro- and micro-economic situations. Requiring lenders to override a customer's decision to withhold demographic data would be a significant afront to those customers and damage the relationship unnecessarily.

Moreover, the disclosure to every customer in the "Sample data collection form" of the lender's obligation to report by visual observation or surname will be direct notification of the lender's intent to directly contradict the customer's choice. The desire of Farm Credit customers was made clear on this issue most recently during the lending done by Farm Credit institutions under the Small Business Administration's Paycheck Protection Program, where our customers specifically declined to identify their race or ethnicity for approximately 80% of the PPP loans Farm Credit institutions made.

*Additionally*, the Council strongly urges the Bureau not to adopt proposed § 1002.108, the so-called "firewall" provision for demographic data.

We recognize that the firewall provision largely arises from the underlying statute, ECOA § 704B(d).[21] We believe, however, that in this instance the Bureau should exercise the separate "exceptions" authority granted by ECOA § 704B, which states that the Bureau "may adopt exceptions to any requirement of this section and may … exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."[22]

As proposed, the "firewall" provision would create a "prohibit-or-disclose" regime. It generally would prohibit, where "feasible," any employee of a lender who may "participat[e] in" the credit decision ("underwriters") from having access to applicant responses regarding demographic information. It generally would not be "feasible" for a lender to restrict an underwriter's access where that employee "may need" to view, refer to or otherwise use an applicant's demographic responses to perform that employee's "assigned job duties." When it is not "feasible" for a lender to prohibit access to any underwriter, the lender would be required to make the following, "no firewall" disclosure to customers: "Employees making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form [*i.e.*, the form used to collect demographic information]."[23]

Council members see two substantial obstacles to making the firewall prohibition "feasible." First, some lenders simply do not have enough lending staff to accomplish the separation-of-functions contemplated by the prohibition.[24] Second, lenders with larger staffs

---

[21]    15 U.S.C. § 1691c-2(d).

[22]    ECOA § 704B(g)(2), 15 U.S.C. § 1691c-2(g)(2).

[23]    Proposed § 1002.108 & associated commentary.

[24]    We note that of the 72 Farm Credit lenders reviewed by the Bureau, 18 were determined to be "small entities" under the Regulatory Flexibility Act. *Proposal*, 86 Fed. Reg. at 56569.

report that in order to implement the prohibition, they would have to make substantial investments in IT infrastructure to effectively "mask" or segregate demographic responses from all other applicant data viewable by underwriters. Many of those larger lenders, we think, will simply determine a firewall is not "feasible" before they incur substantial IT infrastructure costs that, in the Farm Credit System, would ultimately have to be borne by the borrowers.

As a result of these obstacles, we think that many lenders would be left with no choice but to make the "no firewall" disclosure. It is critical to note that the "no firewall" disclosure would be made in conjunction with the disclosure that the lender "cannot discriminate" on the basis of demographic information. In other words, *a customer will be told what is illegal, then be told that some employees are particularly well-positioned to commit the illegal act*. We think that many reasonable customers, seeing these twin disclosures on the same form, will simply decline to provide demographic information, substantially undermining the objectives of the rule. We also believe that having to make the twin disclosures will harm the disclosing lenders' relationships with their customers. Some customers, particularly minority customers, may even choose to apply for credit elsewhere, reducing customer choice and perhaps access to credit.

We have not been able to devise a workable method for improving the firewall provision's prohibit-or-disclose regime. As a result, we think there is no alternative to the Bureau exercising its statutory "exceptions" authority to eliminate the provision from a final rule. Doing so would align that rule with HMDA, which has required collection of demographic information for decades, without incident to our knowledge, despite the absence of any firewall.

### C. Non-Demographic Data

#### 1. Generally: Reconsider Requiring Data Elements Not Identified in the Statute

In addition to the collection of detailed demographic data, the Proposal would require collection of up to 17 discrete, non-demographic data elements on each covered loan. That is substantially more than the nine elements specified by the underlying statute.[25]

As a general matter, the Council urges the Bureau to reconsider requiring such a substantial array of additional data in an initial final rule, particularly the many non-statutory elements described by the Proposal. The collection of detailed demographic data, alone, will require substantial changes to loan processes, systems, and compliance protocols. Based on the experience of Farm Credit lenders with the analogous data-reporting regime mandated by the Home Mortgage Disclosure Act ("HMDA"), lenders report that adding as many as 17 additional elements to the demographic data will substantially increase the costs of compliance with a final small business rule. In that regard, it is worth noting again that because Farm Credit lenders are customer-owned, the costs of compliance will ultimately be borne by those customers.

In considering the number of non-demographic data elements to require in an initial final rule, we think it is also instructive to review the evolution of HMDA and its implementing rule, Regulation C. As enacted in 1975, HMDA applied only to loans actually originated or purchased. It was not until 1989 that amendments to HMDA and Regulation C expanded the law

---

[25]   ECOA § 704B(e)(2), 15 U.S.C. § 1691c-2(e)(2).

to cover applications as well.[26] Further, it was only in 2002 that the Federal Reserve amended Regulation C to require mortgage lenders to report information about the pricing of their loans.[27] It then took another 13 years before the Bureau, responding to a statutory amendment, implemented the full array of HMDA data reporting requirements in existence today.[28]

The Council is not suggesting that the Bureau wait 45 years before requiring small business lenders to report every data element described in the Proposal. We do, however, counsel against the "all at once" approach envisioned by the Proposal. We think there is value in beginning with a more modest set of data reporting requirements, to allow small business lenders time to adjust to this new collection-and-reporting regime, and to allow time for consideration of the actual marginal value of expanding that regime further. The "all at once" approach is particularly burdensome to the majority of Farm Credit lenders that do not make loans subject to HMDA compliance and have not already established those types of compliance systems and procedures.

### 2. Specific Elements

We urge the Bureau to reconsider imposing the cost of collecting the following data elements that *are not described in the statute*:

- *Pricing information.* If Farm Credit lenders reported pricing information on their loans, the data would be misleading. The reason is that the actual cost to the Farm Credit borrowers is usually less the loan's pricing would indicate because the borrowers, as owners of the lender, separately receive patronage dividends from the lender's profits. Thus, a Farm Credit loan priced more steeply than a bank loan may actually be cheaper for the borrower once patronage dividends are considered.

- *Six-digit NAICS Code.* We agree with the comments of the small entity representatives, reflected in the Proposal, who uniformly "expressed concern about the difficulties in determining the appropriate NAICS code for businesses." And as the Bureau recognized, this aspect of the Proposal would mean that "all financial institutions subject to reporting would need to gain familiarity with the NAICS code system [and] refer to NAICS classifications for all relevant applications."[29] We believe that this requirement would slow the loan-application process, placing an unwarranted burden on both customers and lenders.

---

[26]     Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 54 Fed. Reg. 51356 (Dec. 15, 1989).

[27]     Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 67 Fed. Reg. 7222 (Feb. 15, 2002).

[28]     CFPB, Final Rule, *Home Mortgage Disclosure (Regulation C)*, 80 Fed. Reg. 66128 (Oct. 28, 2015).

[29]     *Proposal*, 86 Fed. Reg. at 56467.

- *Number of non-owner workers*. Given the prevalence of seasonal and non-U.S. workers in agriculture, it would be administratively very difficult to collect this data in any consistent manner.

  Counting non-owner workers also would be difficult because there are many "non-standard" borrowers in agriculture. One example would be neighbors, who ordinarily farm separately and separately employ others, deciding to seek credit jointly for a specific project. Another example would be multiple corporations, partnerships, individuals, and perhaps a trust, all with their own farming operations, forming a partnership to apply for a loan. It would be very challenging to write guidelines for consistently capturing the number of non-owner workers in the case of joint applicants who also operate farms separately, or in the case of applicants owned by separate farming operations.

- *Time in business*. If this non-statutory element is not dropped, we suggest that for farming it be tied to an established Farm Credit data point, "Year began farming." Farm Credit lenders already collect "Year began farming" in connection with the mandate discussed above to serve "beginning farmers," which the FCA defines as a "farmer, rancher, or producer or harvester of aquatic products who has 10 years or less farming, ranching, or aquatic experience as of the loan transaction date."[30] The Council submits that needless confusion would arise in the context of farming if there were separate and competing definitions of "Time in business" and "Year began farming."

We have one further comment on a specific data element, though this one is mentioned in the statute: the "*gross annual revenue* of the applicant for its preceding full fiscal year prior to when the information is collected." The Proposal suggests the following language to elicit this information from an applicant: "What was the gross annual revenue of the business applying for credit in its last full fiscal year?"[31] For three reasons, we urge the Bureau to use its "exceptions" authority to eliminate this element for farming customers.

First, most farmers in this country only farm on a part-time basis.[32] As a result, when they apply for agricultural purpose credit, their W-2 and other off-farm income can be and often

---

[30]   FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

[31]   Proposed § 1002.107(a)(14) & Cmt. 1002.107(a)(14)-1.

[32]   In 2019, 96 percent of farm households derived some income from off-farm sources. And on average, "small family farms" — which as noted make up 90% of all U.S. farms — derive more than half of their total household income from off-farm income in 2019. Econ. Research Serv., USDA, *Off-Farm Income a Major Component of Total Income for Most Farm Households in 2019* (updated Sep. 7, 2021), https://www.ers.usda.gov/amber-waves/2021/september/off-farm-income-a-major-component-of-total-income-for-most-farm-households-in-2019/; *see also* Econ. Research Serv., USDA, *America's Diverse Family Farms*, at 3 (Dec. 2020) (on 41.4% of U.S. farms, principal operators report a primary occupation other than farming), https://www.ers.usda.gov/webdocs/publications/100012/eib-220.pdf?v=8038.7; *ERS Farm Income Report* (updated Sep. 2, 2021) ("Most farmers receive off-farm income, but small-scale operators depend on it").

is more important to the credit decision than any "revenue of the business." If off-farm income is to be reported in connection with this data element (since the rule text refers to "revenue of the applicant"), we believe the data would paint a misleading picture of the size of the "business" applying for a loan. But if it is not reported, we believe the data would be misleading from the standpoint of fair lending analysis, for it would show many loans approved to farmers with low "business" revenue (where they have sufficient W-2 income) and other loans denied to farmers with higher "business" revenue (where they have insufficient W-2 income). Either way, we think this data element is flawed as applied to farming and should be eliminated for that type of credit.

Second, the "gross annual revenue" element would pose substantial challenges given the prevalence of the "non-standard" agricultural borrowers described above, *i.e.*, customers applying jointly even though they have separate farming operations. Of course, many of those customers will have relevant off-farm income as well, further complicating the picture.

Third, many Farm Credit loans are currently decisioned without considering either off-farm income or revenue from farming; instead, lenders often rely principally on credit scores to decide whether a loan will be offered.

If the Bureau retains an element like "gross annual revenue," we suggest — in line with our comments on the definition of "small business" — that for farming, the appropriate metric should instead be "gross sales of agricultural or aquatic products" in the prior year.

### D. Reporting When Multiple Institutions are Involved

We urge the Bureau to consider several modifications to § 1002.109(a)(3), which specifies which institution[s] have obligations under the rule when multiple institutions are involved in a credit transaction.

We are particularly concerned with how Proposed § 1002.109(a)(3) could apply to loan participations. Farm Credit institutions frequently enter into loan participation agreements with a "lead lender," sometimes referred to as an "originating lender."[33] There can be multiple participants on a lead lender's loan or just one. Under these agreements, the borrower's contractual relationship remains solely with the lead lender. Thus, a loan participation is significantly different from the purchase of a loan, as the FCA has explained in detail.[34]

---

[33] *See* 12 C.F.R. § 614.4325 ("Purchase and sale of interests in loans") and § 614.4330 ("Loan participations").

[34] In the FCA's words:

> Loan participations are a type of funding arrangement separate and distinct from either partial or whole loan purchases. The distinction centers around who retains the legal relationship with the borrower. In a loan purchase, part or all of the lending relationship transfers to the purchasing institution. By definition, a whole loan purchase includes not only the purchase of the asset, but its cashflows, the legal relationship, and the servicing requirements. The relationship in a loan participation, regardless of the participation amount (100

*(continued …)*

-11-

We strongly urge the CFPB to clarify that in a loan participation, the obligations imposed by the rule should always rest solely with the lead lender, which FCA regulations define as the "lending institution having a direct contractual relationship with [the] borrower to advance funds, which institution sells or assigns an interest or interests in such loan to one or more other lenders."[35] There are convincing practical reasons to designate the lead lender for compliance with the rule. As the only party in a participation with a direct relationship with the applicant or borrower, the lead lender is in the best position by far to collect and report on the demographic and other data specified in the Proposal. Requiring any participant to collect and report on that data, from its second-hand vantage point, would make little sense and could lead to more inaccuracies in the data. Indeed, such a requirement would be akin to requiring a trust in a mortgage securitization to report HMDA data.

We note further that a customer never applies for any lender to participate a covered credit transaction; the customer applies for the covered credit transaction itself, solely from the lead lender. For that reason, another option for addressing loan participations may be to exclude them, along with leases and factoring, from the definition of "covered credit transaction" in Proposed § 1002.104.

We also ask for clarification of the rule with respect to syndicated loans, which differ from participations in that multiple lenders enter into a contractual relationship with the borrower. On syndicated loans, there is typically an administrative agent, which is primarily responsible for interacting with the applicant or borrower. For the same reasons provided above with respect to participations, we ask the CFPB to clarify that in the syndicated loan context, the administrative agent is the sole lender with responsibility under the rule.

Lastly on this topic, we ask for confirmation that the rule would not apply at all to any credit decisions made *after* a customer's loan application has been approved. Farm Credit institutions are required to make an independent "judgment on the creditworthiness of the borrower" even in secondary market transactions,[36] so it would be helpful to make clear that

---

> percent or some amount less than 100 percent), consists only of cashflows from the loan and possibly the servicing rights for the loan. The legal lending relationship stays with the originating lender.
>
> … In addition, courts have recognized the legal distinction between participations and loan purchases and the separate legal effects of loan participation agreements. Finally, other financial regulators recognize the legal distinctions between loan participations and selling whole loans, which involves the transfer of title.

FCA, Final rule, *Loan Policies and Operations; Definitions; Loan Purchases and Sales*, 67 Fed. Reg. 1281, *1282-83 (Jan. 10, 2002) (footnotes omitted).

[35]   12 C.F.R. § 614.4325(a)(2).

[36]   12 C.F.R. § 614.4325(e).

those judgments are not subject to collection and reporting obligations. We believe that this point is already implicit in portions of the Proposal.[37]

### E. Publication of Data

The Proposal provides that the Bureau would make public the data reported to it under a final rule, "subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[38] To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a "balancing test" that would assess the risks and benefits of public disclosure.[39]

As the Bureau refines the balancing test, the Council asks that it consider the impact of publishing the data of smaller institutions in particular. Smaller Council members are concerned that some customers, recognizing that data about their business will be published, may gravitate to larger lenders on the theory that the additional data about a larger lender will make it more difficult for the public to identify one customer in particular.

The Council also objects to making loan "pricing information" public. Farm Credit lenders consider pricing information to be commercially sensitive. In addition, as noted above, Farm Credit lenders believe that the publication of pricing information would be misleading without an appropriate notation that Farm Credit borrowers (unlike borrowers outside the Farm Credit System) also receive off-setting benefits in the form of patronage dividends.

Lastly in regard to publication, the Council believes that published data about Farm Credit lenders should always be accompanied by an appropriate statement indicating that they — unlike many other lenders — can only lend to business that are eligible under the Farm Credit Act and its implementing regulations. The Council would be pleased to work with the Bureau on an appropriate disclosure of the legal limitations on eligibility.

\* \* \*

---

[37] Most importantly, the Proposal would require compilation only of data "regarding covered applications," and there is no longer an "application" once it is approved. Proposed § 107(a). Further, Comment 109(a)(3)-1.i, regarding reporting when multiple institutions are involved, refers to the reporting of approvals "*prior to* closing or account opening" (emph. added).

[38] Proposed § 1002.110(a).

[39] *Proposal*, 86 Fed. Reg. at 56510-40.

As noted, the Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to improving data collection for loans to small farmers.  We think, however, that a final rule would be improved if the above comments are incorporated.  Please do not hesitate to contact me if the Council may be of further assistance.

Sincerely,

Todd Van Hoose
President & CEO, Farm Credit Council