# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; and RIO BANK, MCALLEN, TEXAS<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

## **DECLARATION OF KATHLEEN RYAN**

In accordance with 28 U.S.C. § 1746, Kathleen Ryan offers the following declaration executed in support of Plaintiffs' Motion to Supplement the Administrative Record:

1. I am the American Bankers Association's Senior Vice President for Fair and Responsible Banking and am responsible for regulatory policy advocacy as it relates to fair lending.

2. The American Bankers Association is the voice of the nation's $23.6 trillion banking industry, which is composed of small, regional and large banks that together employ more than 2 million people, safeguard $19.2 trillion in deposits and extend $12.2 trillion in loans. ABA advocates for banks before Congress, regulatory agencies, including the Consumer Financial Protection Bureau (CFPB), and the courts to drive pro-growth policies that help customers, clients, and communities thrive.

3. The purpose of this declaration is to attest to information about the costs of the CFPB's final rule issued on March 30, 2023 (Final Rule) to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd Frank Act). Section 1071 amended the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect and report to the CFPB 13 data points regarding applications for credit by women-owned, minority-owned, and small businesses. 15 U.S.C. § 1691c-2. The Final Rule expanded on the 13 statutorily-mandated data points and requires financial institutions to collect and report 81 data fields.

4. Unless otherwise stated, this Declaration is based upon my personal knowledge and belief and/or upon my review of business records of ABA. If called as a witness, I could and would testify competently thereto.

5. ABA's membership covers depository institutions offering small business loans in each compliance tier category covered by Final Rule (*e.g.*—2,500 hundred loans or more; 500 to 2,499 business loans; and 100 to 499 small business loans).

6. I have worked closely with many bankers, including members of ABA's 1071 Working Group, to understand how the Final Rule will affect banks. I have also discussed with ABA members the substantial costs that they will incur to implement and comply on an annual basis with the Final Rule.

7. Section 1022(b)(2)(A) of the Dodd-Frank Act requires the CFPB, when promulgating a rule, to consider the potential benefits and costs to consumers and "covered persons" (in this case, financial institutions that lend to small businesses), including the potential reduction of access by consumers to consumer financial products or services

2

resulting from such rule. Because § 1071 relates to business credit, rather than consumer credit, the CFPB discussed the potential benefits and costs to small businesses, and the potential reduction in credit access for small businesses.

8. Accordingly, the CFPB sought to estimate the implementation cost ("one-time cost") and the annual ongoing cost of compliance with the Final Rule. The CFPB estimated one-time costs based on a 2020 survey it conducted before issuing the notice of proposed rulemaking. That survey instructed respondents to estimate costs assuming the CFPB would require institutions to collect only the 13 statutorily-mandated data points. 105 financial institutions responded to the survey, with 42 banks and credit unions responding.

9. In February 2024, the ABA conducted an anonymous survey of bank members to quantify both the one-time cost and the annual ongoing cost of collecting and reporting the Final Rule's 81 data fields. 297 banks responded to the survey. The asset size of the survey respondents ranged from banks with assets of less than $500 million to banks with assets of more than $75 billion. The survey responses banks provided to ABA in February 2024 reflect bankers' actual experience with project management planning, initial implementation of the Final Rule, and conversations and estimates from IT, operations, compliance, and legal staff, as well as third-party vendors. These can be contrasted with responses to the 2020 CFPB survey that were estimates offered before banks knew what the rule would require.

10. The results of that survey have now been documented in the ABA Banking Journal. *See* Dan Brown & Kathleen Ryan, *The true cost of too much data*, ABA Banking Journal

(Feb. 26, 2024), available at https://bankingjournal.aba.com/2024/02/the-true-cost-of-too-much-data/.

11. I verify that these survey results are the true and accurate representation of the answers received by the ABA to questions regarding both the start-up and ongoing costs that would be experienced by banks under the expanded Final Rule. I also attest that the document attached for purposes of supplementing the Administrative Record with the survey results (Supplement) is a true and accurate copy of the version posted online reflecting those numbers.

12. ABA's anonymous survey results show that the CFPB's one-time cost estimate based on collection of 13 data points significantly underestimated the one-time costs. The CFPB's flawed methodology led to significant differences between the CFPB's and the ABA's survey results on the scale of several multiples. For example, as the table below illustrates, while the Bureau estimated that updating computer systems would cost between $6,900 and $17,400, banks told the ABA that updating computer systems could cost over $2.2 million for some banks. Similarly, the Bureau estimated that preparing and planning—which includes reviewing hundreds of pages of rules and instructions and multiple meetings with bank staff and executives in compliance, legal, operations, risk, loan production, and IT—would cost banks between $6,500 and $20,500. However, the ABA survey shows this subcomponent could cost some banks more than $1.9 million.

| One Time Cost Component Survey Comparison | | |
|---|---|---|
| One Time Cost Component | CFPB Range | ABA Range |
| Developing forms and applications | ($3,200-$4,600) | ($4,640-$1,010,470) |
| Developing policies and procedures | ($2,500-$4,200) | ($6,368-$233,923) |
| Legal/compliance review | ($3,000-$7,700) | ($11,948-$347,772) |
| Post-implementation review | ($4,300-$18,000) | ($13,100-$191,069) |
| Preparing/planning | ($6,500-$20,500) | ($22,867-$1,945,203) |
| Testing/validating systems | ($3,200-$11,400) | ($7,750-$885,374) |
| Training staff and third parties | ($3,500-$5,300) | ($13,069-$593,436) |
| Updating computer systems | ($6,900-$17,400) | ($19,244-$2,266,939) |
| TOTAL | ($44,800-$77,800) | ($112,685-$7,474,186) |

13.   Given the estimates the ABA received for one-time costs, the ABA's estimate of the overall market impact of the one-time costs is significantly higher than the CFPB's. The CFPB estimated the one-time costs would result in a market impact on banks and credit unions of between $147,000,000 and $159,000,000. Using the average impact from the ABA survey, ABA estimates that the one-time costs are expected to have a $6,871,203,000 impact on the banking industry. It should be noted that while the CFPB's market estimate includes roughly 100 credit unions that would be impacted by the rule, the ABA's analysis only looks at impacted banks.

5

14.     The CFPB did not conduct a survey to estimate the annual ongoing cost of the Final Rule with its 81 data fields.  Instead, the CFPB relied on its estimates for the number of hours required to report data under its 2015 Home Mortgage Disclosure Act (HMDA) final rule.  Next, the CFPB "adjusted" these estimates to the number of data points required under the 1071 Final Rule.

15.     The cost estimates for the 2015 HMDA final rule were not based on a survey of covered financial institutions.  Instead, the CFPB identified the tasks involved in collecting and reporting HMDA data by interviewing 20 financial institutions, 9 vendors, and 15 government agencies.  Based on these interviews, the CFPB estimated the hours needed for each task and multiplied the hours by the average salary of compliance officers.  In contrast, the ABA received survey responses from 297 banks that reported their estimated ongoing costs.

16.     The CFPB asserts that "the Bureau received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071." 1071 Final Rule, 88 Fed. Reg. 35150, 35496 (2023).  The Bureau's cost estimates spanned 75 pages in the proposed rule.  The ABA, the Texas Bankers Association, and 50 other State banking associations asked the Bureau to extend the public comment period to allow banks to meaningfully comment on the Bureau's cost estimates.  The Bureau refused the request.

17.     Regarding the Bureau's reliance on HMDA cost estimates, ABA's comment letter noted significant differences between home mortgage and small business lending, which calls into question the CFPB's reliance on HMDA cost estimates to generate estimates of

6

ongoing costs for the 1071 Final Rule. HMDA requires the collection and reporting of data from applications for home mortgage credit, which for many lenders, involves a single line of business, a single loan origination system, and a common application used by nearly all lenders. In addition, the majority of mortgage lenders have long used loan origination systems from which the HMDA data can be extracted and reported to the CFPB.

18.     In contrast to home mortgage operations and data collection, small business lending typically involves a more complex and diverse set of loan products offered by multiple lines of business, each of which may use a unique loan origination system or no loan origination system at all. There is no widely used standard application form for small business lending, as compared to mortgage lending.

19.     The CFPB's annual ongoing cost estimates for 1071 compliance based on HMDA estimates are inaccurate, as the ABA's survey shows, vastly underestimating the annual cost of compliance. The table below highlights the significant cost estimate differences for subcomponents of ongoing costs between the CFPB's estimates and the ABA survey. Notably, the CFPB claimed "resolving question responses" would cost respondents $0, while banks told the ABA it could cost them between $4,009 and $106,896 to resolve question responses. Other gross underestimations by the Bureau include its statement that exam preparation could cost an institution as little as $14 and that "Geocoding Data" would only cost institutions between $139–$300. In contrast, banks told the ABA that exam preparation could cost over $150,000, and geocoding data could cost more than $200,000.

| Ongoing Cost Estimates Survey Comparison | | |
|---|---|---|
| Ongoing Cost Component | CFPB Range | ABA Range |
| Exam Prep | ($14-$26,592) | ($6,242-$151,369) |
| Geocoding Data | ($139-$300) | ($3,521-$206,870) |
| Internal Audit | ($0-$127,642) | ($9,167-$123,759) |
| Researching Questions | ($275-$826) | ($5,579-$160,875 |
| Resolving Question Responses | ($0-$0) | ($4,009-$106,896) |
| Resolving Reportability Questions | ($222-$665) | ($4,504-$226,606) |
| Standard Annual Edit and Internal Checks | ($510-$27,972) | ($6,524-$343,344) |
| Transcribing Data | ($1,108-$31,657) | ($11,033-$222,688) |
| Transferring to 1071 Data Management Software | ($0-$1,108) | ($9,662-$259,722) |
| Checking Post Submissions | ($7-$105) | ($3,245-$207,996) |
| TOTAL | ($8,349-$278,618) | ($71,944-$2,010,125) |

20. Based on its flawed data, the CFPB calculated the overall market impact from ongoing costs as between $297,000,000 and $313,000,000 for banks and credit unions together. The ABA's survey reflects a market impact of as much as $ 1,949,310,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 29, 2024 in California.

*Kathleen C. Ryan*
_____
Kathleen Ryan

8