# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS'/INTERVENORS' CONSOLIDATED
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities......................................................................................................... ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 3

    I.   Congress Creates The CFPB And Directs It To Implement A New Small Business
        Data Collection Regime................................................................................... 3

    II.  The Bureau Proposes A Vast Expansion Of The Statute's Data Disclosure Mandate,
        Prompting Warnings Of Reduced Access To Small Business Credit................................ 4

    III. The CFPB Issues A Final Rule Adopting The Onerous Requirements Of The
        Proposed Rule Without Substantiating That The Benefits Justified The Costs. ................. 6

    IV. Procedural History ....................................................................................... 8

Summary of Argument..................................................................................................... 9

Argument ...................................................................................................................... 10

    I.   The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data
        Collection Requirements................................................................................. 10

        A.  The Expanded Set of Data Points Will Not Advance § 1071's Purposes
             Because the Information Sought Has Little Benefit in the Commercial
             Lending Context.................................................................................11

            1.   Mortgage loans are standardized, but small business loans are not..................... 13

            2.   Low response rates to demographic questions—not an issue with
               HMDA—will render the data unreliable. ............................................... 15

        B.  The Expanded Set of Data Points Will Undermine § 1071's Purposes as the
             True Costs of the Rule Will be a Decrease in Credit Availability for
             Women-Owned and Minority-Owned Small Businesses. ......................................... 18

        C.  The Expanded Set of Data Points Disregards Textual Constraints of the Act. ........... 20

    II.  The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Adequately
        Consider The Significant Real-World Costs To The Regulated Community.................... 22

    III. The CFPB's Cost/Benefit Analysis Of The Final Rule Was Arbitrary and Capricious. ... 26

        A.  The Bureau Underestimated the Cost of Implementing the Final Rule
             Because it Failed to Collect the Relevant Cost Information from Lenders. ............... 28

        B.  The Bureau Underestimated the Ongoing Costs of the Final Rule
             Because it Used Flawed and Unsupported Assumptions to Support
             Predetermined Conclusions. ..................................................................... 29

        C.  The Bureau Failed to Demonstrate that the Additional Data Would
             Provide Benefits Justifying the Increased Costs....................................................... 34

Conclusion ................................................................................................................... 35

**T**ABLE OF **A**UTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013)...................................................... 25

*Business Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011) ............................................ 26, 33

*Carlson v. Postal Regul. Comm'n*,
  938 F.3d 337 (D.C. Cir. 2019)............................................... 23, 26

*Chamber of Comm. v. U.S. Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018) ................................................ 21, 25

*Chamber of Comm. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) .......................... 27, 31, 33, 34, 35

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007)............................................... 23, 25

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ........................................................ 9

*D.R. Horton, Inc. v. NLRB*,
  737 F.3d 344 (5th Cir. 2013) .....................................................11

*Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB*,
  462 F.2d 364 (5th Cir. 1972) .....................................................11

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................... 15, 23, 33

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ................................................... 27

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ............................................................... 10

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ................................................. 26

*Michigan v. EPA*,
  576 U.S. 743 (2015) ............................................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
  463 U.S. 29 (1983) ......................................... 19, 23, 25, 26, 29

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012)............................................. 27

*Price v. U.S. Dep't of Educ.*,
  209 F. Supp. 3d 925 (S.D. Tex. 2016) .................... 23, 25, 29, 33

*Pub. Citizen v. EPA,*
   343 F.3d 449 (5th Cir. 2003) ................................................................... 27

*Seila Law, LLC v. CFPB,*
   140 S. Ct. 2183 (2020)............................................................................... 3

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ................................................................... 26

*Tesla, Inc. v. NLRB,*
   86 F.4th 640 (2023) ..................................................................................11

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) ....................................................................11

*Whitman v. American Trucking Ass'n,*
   531 U.S. 457 (2001) ................................................................................. 20

**Statutes**

12 U.S.C § 5512(b)(2)(A) ................................................................... 26, 31

15 U.S.C. § 634b(7) ............................................................................... 6

Administrative Procedure Act (APA),
   5 U.S.C. § 706 .............................................................................. *passim*

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act),
   Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2) ...................................... *passim*

Equal Credit Opportunity Act (ECOA),
   15 U.S.C. § 1691, *et seq.* ....................................................... 1, 3, 14, 32

Home Mortgage Disclosure Act (HMDA),
   12 U.S.C. § 2801, *et seq.* .............................................................. *passim*

Small Business Regulatory Enforcement Fairness Act (SBREFA) ......................................... 7, 24

Truth in Lending Act (TILA),
   15 U.S.C. § 1601, *et seq.* ........................................................ 13, 14, 30

**Regulations**

12 C.F.R. Part 1003 - Home Mortgage Disclosure (Regulation C) ...........................11, 13, 14, 16

12 C.F.R. Part 1026 - Truth in Lending (Regulation Z)................................................ 14

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
88 Fed. Reg. 35150 (May 31, 2023) (the Final Rule)[1].......................................................*passim*

**OTHER AUTHORITIES**

CFPB ECOA Examination Procedures,
https://files.consumerfinance.gov/f/documents/201510_cfpb_ecoa-narrative-and-
procedures.pdf ............................................................................................................ 14

Dan Brown & Kathleen Ryan, *The true cost of too much data*,
ABA Banking Journal (Feb. 26, 2024),
https://bankingjournal.aba.com/2024/02/the-true-cost-of-too-much-data/ .............................. 8

Fannie Mae Single Family Selling Guide (Feb. 7, 2024),
https://singlefamily.fanniemae.com/media/38001/display ...................................................... 14

Interagency Fair Lending Procedures,
https://www.ffiec.gov/pdf/fairlend.pdf................................................................................... 14

National Consumer Reinvestment Coalition, 2020 HMDA Preliminary Analysis,
https://ncrc.org/2020-hmda-preliminary-analysis/ .............................................................. 16

---

[1] The Final Rule is available at AR.000001–000422. All "AR." cites are to the Administrative Record prepared by the CFPB. The parties have agreed to assemble a Joint Appendix to be filed with the Court that will catalogue all documents from the Administrative Record cited in their respective briefs.

## INTRODUCTION

In 2010, Congress instructed the Consumer Financial Protection Bureau (CFPB or Bureau) to promulgate a rule requiring financial institutions to disclose a small set of data points from women-owned, minority-owned, or small businesses applying for loans.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2).  In § 1071, Congress identified 13 pieces of basic information about an application for small business credit and the race, sex, and ethnicity of the business owners that lenders would be required to compile and disclose to the CFPB.  The stated goal of this provision, an amendment to the Equal Credit Opportunity Act (ECOA), was to obtain a data set that would "facilitate enforcement of fair lending laws and enable communities, government entities, and creditors to identify business and community development needs and opportunities for credit for women-owned, minority-owned, and small businesses." *Id.* § 1691c–2(a).

But when the CFPB published its Final Rule implementing this directive in the Spring of 2023, *see* 88 Fed. Reg. 35150 (May 31, 2023) (hereinafter, the "Final Rule"), it vastly expanded the amount of data lenders would be required to disclose, requiring *81 data fields* from financial institutions.  Unlike the statute, the Final Rule requires lenders to venture far outside the application process—and far beyond the scope of the CFPB's rulemaking authority—in a fruitless attempt to capture the complexity of small business lending.  And ultimately, any marginal benefit achieved by those additional data fields cannot justify the enormous costs that the CFPB ignored.

As stressed to the Bureau by commenters, commercial underwriting decisions are made for a host of legitimate reasons—*e.g.*, the strength of the applicant's product or service, the applicant's addressable market, the value of collateral securing the loan—that will not be captured by the Final Rule.  Thus, the extra data points will not allow the type of "apples to apples" comparisons that would enable a regulator to determine that lenders were denying applications for small business

1

credit on a discriminatory basis, as opposed to a legitimate reason. Key underwriting factors will not (and, realistically, could not) be collected or recorded in the expanded data set. Moreover, there is no reason to believe the demographic data collected from applicants will be representative for accurate statistical analysis. Applicants are not required to comply with requests to provide demographic data. 15 U.S.C. § 1691c-2(c). Based on recent experience with the Paycheck Protection Program, it should be expected that most (nearly 75%) will not. As a result, the additional information will provide minimal, if any, benefit.

Despite the fact that the additional data will not be useful, the requirement to collect the additional fields will impose massive costs in terms of software, forms, and time (not to mention the litigation and reputational risks associated with the "false positives" for fair lending violations the new data will generate). As a result, even if the Court were to defer to the Bureau's judgment that the additional data points *might* provide some marginal benefit to the purposes of the statute, that benefit is grossly outweighed by the costs imposed on lenders and, ultimately, small businesses. The CFPB purported to conduct a cost-benefit analysis, but it relied on flawed assumptions and inadequate or cherry-picked data to justify its predetermined conclusions while ignoring or discounting comments from industry, academia, and the Small Business Administration's Office of Advocacy warning of the negative consequences of the Final Rule.

The only consequence, then, of the vastly expanded obligations under the Final Rule will be the imposition of a staggering compliance burden on lenders. This, in turn, will increase the cost of small business credit and cause some lenders to exit the markets altogether, thereby reducing the availability of credit for the very small businesses the Act aims to protect. Thus, the Final Rule will not serve the laudable purposes of the statute—it will only undermine them. The Final Rule is government run amok.

BACKGROUND

**I.      Congress Creates The CFPB And Directs It To Implement A New Small Business Data Collection Regime.**

Title X of the Dodd-Frank Act established the CFPB and gave it "vast rulemaking, enforcement, and adjudicatory authority over" the market for *consumer* financial products and services. *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2210 (2020). As its name suggests, the agency is primarily (indeed, almost exclusively) a regulator of consumer financial products and services. The agency has very limited authority over commercial lending, which is largely regulated at the state level and differs from consumer lending in fundamental respects.

ECOA is the exception that proves the rule. The statute prohibits lenders from discriminating on the basis of, among other things, sex, race, or ethnicity, and applies both to consumer lenders and business lenders. *See* 15 U.S.C. §§ 1691, 1691a(d), (e). Modeled on the Home Mortgage Disclosure Act (HMDA), a 1970s era statute requiring the collection of data about mortgage loans and borrowers, *see* 12 U.S.C. § 2801 *et seq.*, Section 1071 of the Dodd-Frank Act amended the ECOA to add a provision directing the CFPB to implement a requirement that commercial lenders ask "whether the business [seeking a loan] is a women-owned, minority-owned, or small business." 15 U.S.C. § 1691c–2(b)(1). The Act then identifies 13 pieces of readily-identifiable data for lenders to disclose.[2] Finally, the statute authorizes the CFPB to use so-called "discretionary authority" to require disclosure of "additional data," but *only if* it "would aid in fulfilling the purposes" of § 1071. 15 U.S.C. § 1691c-2(a), (e)(2)(H).

---

[2] *See* 15 U.S.C. § 1691c–2(e)(2) (listing for disclosure: (1) the number of the application; (2) the date on which the application was received; (3) the type of credit applied for; (4) the purpose of the credit; (5) the amount of credit applied for; (6) the amount of credit approved; (7) the type of action taken on the application; (8) the date of action on the application; (9) the census tract in which the business is located; (10) the gross annual revenue of the business in the last fiscal year; (11) the race of the principal owners of the business; (12) the sex of the principal owners of the business; and (13) the ethnicity of the principal owners of the business).

3

## II.    The Bureau Proposes A Vast Expansion Of The Statute's Data Disclosure Mandate, Prompting Warnings Of Reduced Access To Small Business Credit.

On September 1, 2021, the CFPB issued a Proposed Rule implementing § 1071. The CFPB proposed to rely on its discretionary authority to dramatically increase the data points that lenders would be required to compile and disclose, forcing collection of items never before gathered by lenders. *See* AR.001055–69. The additional data covered a range of information not contemplated by Congress, including: the type of guarantee; the term to maturity; the application method; denial reasons; and most significantly, comprehensive pricing information. The pricing information included a host of granular questions, including the interest rate, whether the rate is fixed or variable, if variable what index and margin are used, the value of the index at loan closing, the origination charge, any fees to be charged in the first year of the loan, any broker fee, and information about prepayment penalties. AR.001061–62. The proposal also required lenders to collect information regarding a business's number of employees, North American Industry Classification System (NAICS) code, and time in business. *See* AR.001055–69.

In response, the regulated community expressed grave concerns about the compliance costs and resulting impact the rule would have on the price and supply of small business credit.[3] For instance, Plaintiff Texas Bankers Association pointed out that "if implemented as proposed, this additional layer of excessive regulation will limit the availability of small business credit." AR.019173. Plaintiff American Bankers Association (ABA) warned that "unless the Bureau revises the proposed rule, it will impose significant costs on banks—costs that will be felt most acutely by community banks—that will negatively affect their small business customers." AR.

---

[3] Commenters also pointed out that the rule would impose costs beyond those associated with compliance, including additional analysis and explanation of credit decisions (in light of the loan pricing requirement) as well as costs associated with reputational injuries and even lawsuits from inevitable misinterpretations of the pricing information. *See, e.g.*, AR.019328; AR.002239.

019305.  The Independent Community Bankers of America relatedly noted the rule would "limit the availability of credit to small business borrowers and have a significant negative impact upon borrowers in rural areas."  AR.015654.  The American Financial Services Association observed that while the rule was "intended to 'help small businesses drive inclusive and equitable growth,' . . . overly burdensome data collection requirements that exceed the Congressional mandate could result in a reduction of available credit, which would have the opposite effect" of what Congress intended.  AR.018117.  Finally, the National Association of Federally-Insured Credit Unions (NAFCU) commented that "the Proposed Rule's complexity and significant one-time and ongoing compliance costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers."  AR.018499.[4]

Academics agreed.  Researchers from Texas Tech University Rawls College of Business pointed out that small community banks make a disproportionate amount of small business loans and that, as a result, the rule's burdens would be "biggest for the small banks."  AR.002238.  The researchers cautioned that "[i]f we are going to increase the burden on small banks, we should clearly understand the public policy benefit of the rule."  AR.002238.  And, on this score, they warned the Bureau that, given the complexity of small business lending, the additional data points identified in the proposed rule would not provide regulators with "the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analysis on HMDA data."  Instead, it would only create "an additional burden, especially for small banks."  AR.002239.

Federal and state regulators with actual expertise in small business lending submitted comments expressing the same concerns.  The U.S. Small Business Administration's (SBA) Office

---

[4] In fact, according to a 2021 Federal Reserve Survey by NAFCU, nearly one-third of respondents said they would be likely or very likely to reconsider their participation in the business lending market if the proposed rule was implemented.  AR.014347–48.

of Advocacy—the agency within the U.S. Federal government specifically tasked with "evaluat[ing] the efforts of Federal agencies . . . to assist minority enterprises," 15 U.S.C. § 634b(7)— said the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses, and may lead to *a decrease in lending to small, minority- and women-owned businesses*." AR.018385 (emphasis added). Likewise, the Conference of State Bank Supervisors (CSBS)—an organization consisting of state-government officials responsible for "fostering economic development opportunities within their states"— warned that the proposed rule would "hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country." AR.017973. Like the SBA Office of Advocacy, AR.018392, CSBS thus recommended the Bureau "limit the reportable data to the statutorily mandated data points required by section 1071," and "refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071." AR.017975.

III.    **The CFPB Issues A Final Rule Adopting The Onerous Requirements Of The Proposed Rule Without Substantiating That The Benefits Justified The Costs.**

On March 30, 2023, the Bureau promulgated the Final Rule, adopting the proposed rule's expansion of data points, and even adding another additional requirement that lenders ask whether a majority of the small business is owned by someone who identifies as LGBTQI+. *Compare* AR.001638–77 (data point chart accompanying Final Rule); *with* AR.001055–69 (data point chart accompanying proposed rule). As a result of the CFPB's exercise of its discretionary authority, lenders subject to the Final Rule would now have to disclose 81 separate pieces of information, rather than the 13 data fields required by Congress. AR.001638–77.

Although the CFPB claimed it had examined the costs and benefits of this massive expansion of lenders' data collection obligations, it admitted that it had not obtained data that

would allow it to quantitatively account for the costs or benefits of the Final Rule.  AR.000343 ("[T]he data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule."); AR.000344 ("The Bureau is *unable to readily quantify any of these benefits* with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits." (emphasis added)); AR.000344 ("The Bureau believes that such benefits to financial institutions could be substantial.  *However, quantifying them would require data that are currently unavailable*." (emphasis added)).

The hard data available to the Bureau consisted primarily of the results of a survey it conducted in 2020 "to measure the one-time costs of compliance with an eventual small business lending data collection rule."  AR.000023.  But the survey did not address the "on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required *only for the 13 statutorily required data points* and that compliance with the statutory firewall requirement was not required."  AR.000444 (emphasis added).  The survey was completed by only 105 lenders, including only 42 depository institutions (out of 6,200).  AR.000614–15.  Notwithstanding these obvious limitations, the CFPB chose not to resurvey lenders to assess estimated implementation costs for the significantly expanded proposed rule, either before or after its release.  This was so even though Plaintiff ABA previously warned—in response to a 2017 Request for Information from the CFPB—that "HMDA-like reporting is not appropriate for small business lending, and now is the time for the Bureau to begin estimating the costs of a new reporting regime so that the public can more accurately weigh how these costs will affect small businesses."  AR.023869.[5]

---

[5] The ABA also cautioned that actual cost data for the § 1071 rule would be essential to the Small Business Regulatory Enforcement Fairness Act (SBREFA) review process.  AR.023871.

With its only empirical evidence limited to an inapplicable estimate of one-time implementation costs, the Bureau admitted it could "only estimate how ongoing costs would be different." AR.000631. In an attempt to fill this gap, the CFPB looked to its estimates for the ongoing compliance costs of entities fulfilling the requirements of HMDA, a statute that requires collection of data regarding (the very different) mortgage lending market. AR.000347. The "Bureau expect[ed] that the tasks required for data collection, checking for accuracy, and reporting under the final rule will be similar to those under the 2015 HMDA final rule." *Id.* Finally, although the CFPB acknowledged that "industry commenters and an office of a Federal agency generally asserted that the Bureau's cost estimates were too low," it favored another opinion: "[s]everal community groups described the Bureau's estimates as 'well-considered' or described the costs of the proposed rule as being outweighed by the benefits." AR.000345.[6]

## IV.    Procedural History

After publication of the Final Rule, the Texas Bankers Association and Rio Bank, soon joined by the American Bankers Association, filed this lawsuit alleging that the rule exceeded the CFPB's authority and was otherwise arbitrary and capricious, and also alleging that the CFPB's funding structure was unconstitutional. After the Court's initial injunction of the rule (limited to

---

[6] After the Final Rule's publication, lenders have begun to plan for compliance and now have a far better sense of the costs that it will impose. In light of that information, Plaintiff American Bankers Association conducted a comprehensive survey of almost 300 financial institutions of varying sizes to gather data on the implementation and ongoing costs for the § 1071 Final Rule. Those costs are astronomically higher than the estimates in the CFPB's Final Rule, amounting to more than $6.8 billion in one-time implementation costs and annual ongoing costs of almost $2 billion *for the banking industry alone.* Dan Brown & Kathleen Ryan, *The true cost of too much data*, ABA Banking Journal (Feb. 26, 2024), https://bankingjournal.aba.com/2024/02/the-true-cost-of-too-much-data/. The information now available—which the SBA Office of Advocacy advised the CFPB would be forthcoming, AR.018388 n.10—confirms the woeful inadequacy of the Bureau's cost estimates. While this data was not before the CFPB when it finalized the rule, Plaintiffs ask that the information be considered by the Court for the reasons set forth in their Motion to Supplement the Administrative Record. ECF No. 78.

Plaintiffs and their members), several additional plaintiffs—representing a wide swath of the small business lending industry—intervened and the Court extended its injunction nationwide. Those parties now seek summary judgment on their non-constitutional claims.[7]

SUMMARY OF ARGUMENT

In the Final Rule, the CFPB radically expanded the amount and nature of information that lenders would be obligated to disclose relative to Congress's express direction. While Congress granted the Bureau discretion to add data points to the disclosure list, the exercise of that discretion must aid the purposes of § 1071 and must represent a reasonable (*i.e.*, not arbitrary or capricious) exercise of that discretion. The Final Rule fails both these tests. As commenters repeatedly warned, the excessive costs imposed by the rule will have the effect of discouraging loans to small businesses, reducing access to small business credit, and undermining—rather than aiding—the purposes of § 1071. When warned about this exact problem, the CFPB just shrugged.

The CFPB's exercise of its discretionary authority was also unreasonable as the Final Rule significantly underestimates the costs it will impose. In a careless rush to its predetermined objective, the CFPB ignored the industry, academics, and even the federal agency responsible for advocating on behalf of small businesses, all of whom raised concerns with the exponentially increased costs triggered by the expanded rule. Indeed, the SBA Office of Advocacy plainly told the CFPB: "disregard the discretionary data points." AR.018392 (noting the costly and problematic nature of forging beyond the statute). But rather than heed those warnings or collect

---

[7] As the Court is aware, the Supreme Court is currently reviewing the Fifth Circuit's decision holding the CFPB's funding scheme unconstitutional. *See Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616 (5th Cir. 2022). The parties are briefing the summary judgment issues included here to provide arguments for the Court on the APA shortcomings of the Final Rule under a regular briefing schedule while *Community Financial* is pending. The parties do not expect a ruling on this Motion prior to the Supreme Court's ruling and will seek leave to amend their filings consistent with any applicable direction provided by the Supreme Court in *Community Financial*.

applicable cost information to make an informed decision, the Bureau chose to lean on an inapplicable survey completed by a tiny fraction (less than 1%) of lenders more than a year before the expanded data points were proposed.  The Bureau then analogizes its expanded data points to the HMDA data collection rule without considering the fact that collection of home mortgage lending data is standardized in a way that small business lending is not.

At the same time, the CFPB significantly overestimates the benefits of the Final Rule.  The Bureau consistently claims that the increased data points will aid in fair lending enforcement, but does not adequately consider that the complexity of small business lending and/or the strong likelihood of low response rates to demographic questions that loan applicants can dodge will result in a vast trove of worthless data.  Under the Final Rule, lenders are required to collect a significant amount of information, even when the applicant fails to respond to requests for demographic information or declines to provide it (as is their right).  The predictable (and predicted) result is a huge, costly compliance regime that will serve no real-world purpose.

In short, the Final Rule: (1) exceeds the CFPB's statutory authority; (2) fails to consider significant aspects of the problem; and (3) accounts for the costs and benefits of the rule in an arbitrary and capricious manner.  It should be set aside.  *See* 5 U.S.C. § 706.

ARGUMENT

I.    **The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data Collection Requirements.**

A federal agency is a creature of statute.  It has only those powers conferred upon it by Congress.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  To protect Congress's legislative prerogatives, the Administrative Procedure Act (APA) "allows courts to set aside agency action found to be, among other things, 'in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right.'" *VanDerStok v. Garland*, 86 F.4th 179, 187–88 (5th Cir. 2023) (quoting 5 U.S.C. § 706(2)(C)).

Accordingly, when evaluating an agency's assertion of rulemaking authority, a court must "confirm that the [agency's] interpretation is 'rational and consistent with the Act.'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013)). Any deference to agency rulemaking authority "cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *Id.* at 647–48 & n.11 (quoting *Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB*, 462 F.2d 364, 372 (5th Cir. 1972)). Here, the Final Rule goes beyond the authority provided by Congress in § 1071, both in terms of the purposes of the statute and its text.

A.    **The Expanded Set of Data Points Will Not Advance § 1071's Purposes Because the Information Sought Has Little Benefit in the Commercial Lending Context.**

The Bureau's significant expansion of the data lenders must collect is based on its mistaken view that the collection of this data (whatever the cost) will allow it to fulfill the purposes of § 1071, *see* 15 U.S.C. § 1691c-2(e)(2)(H), in the way HMDA data is used to advance that statute's similar purposes. *See* 12 C.F.R. § 1003.1(b) (identifying HMDA's purposes). But commenters repeatedly and persistently warned the CFPB that no data collection regime could possibly capture the complexity of small business lending. AR.002238 ("CFPB wants the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analyses on HMDA data. However, this is unnecessary and likely of little economic benefit."). As the ABA noted, "[s]mall business lending is highly individualized and underwriting and loan pricing depend on many heterogeneous variables that are inherently unsuitable for aggregate analysis to determine whether discrimination occurred." AR.019328; *see also* AR.002238 (academics warning that "expanding

11

the data collection will not fix the statistical issues for the analysis of the proposed data"). Commenters pointed out that "small business lending is not 'cookie-cutter,' is not automated, and is highly relationship driven," and, as a result, "it would be impossible to derive any meaningful or statistically valid conclusions from a comparison of small business loans."  AR.000029. Another commenter similarly explained that it will be difficult to perform "comparative analysis on small business loans because they are unique and manually underwritten."  AR.000030.

Nevertheless, the Bureau claimed that "HMDA data have provided lenders, community groups, and others the tools to identify and address fair lending risks" in the mortgage market, and believes the data the Final Rule requires lenders to collect would, "[i]n a similar way, . . . allow diverse stakeholders to analyze lending patterns that are potentially discriminating."  AR.000022. Thus, to understand the misguided logic motivating the Final Rule, it is first important to understand the data collection regime applicable to mortgage lending under HMDA, how that data is used for fair lending enforcement, and why the data collection regime established by the Final Rule *will not* provide comparable aid in facilitating fair lending enforcement.

As implemented by the CFPB's Regulation C, HMDA requires mortgage lenders to collect the following categories of information about mortgage applicants and mortgage loans:

- Information about the applicant and the collateral that lenders can legitimately consider when extending mortgage credit, including: the applicant's debt-to-income ratio; the applicant's credit score; and other detailed information regarding the collateral for the loan.

- Information about other factors that would otherwise legitimately impact the price or availability of mortgage credit, including: the date the application was received; whether the loan is or would have been insured by a federal agency; and the purpose of the loan (*e.g.*, purchase, refinance, cash out refinance, etc.).

- Information about applicants that lenders *cannot* consider, or can consider only in certain circumstances, including: the applicant's ethnicity, race, and sex, which creditors cannot consider; the applicant's age (except as it relates to creditworthiness); and the location of the property that will secure the loan, which creditors cannot consider if they use it to make credit decisions based on demographic characteristics of the neighborhood.

- Information about the lenders' decisions on mortgage applications, including: the action taken by the creditor on the application and the date of that action; if the loan was denied, the principal reason(s) for the denial; the interest rate, fees, and other borrower-paid costs; the term of the loan, in months; and various other terms of the loan.

*See generally* 12 C.F.R. § 1003.4(a). This information is collected by lenders and submitted to regulators, later verified through examination, and ultimately made public (in large part). Enforcement agencies, financial institutions, fair housing advocates, and others use this data to determine whether lenders are treating applicants with similar credit risk profiles similarly. Importantly, no private right of action exists against the reporting lenders.

But the HMDA data differs from the data that will be collected under the Final Rule in two critical ways: (1) the underwriting factors in mortgage credit are largely standardized, whereas the factors considered in small business lending are far more diverse; and (2) HMDA captures demographic data at a high enough rate to ensure the data is representative of a lenders' actual conduct. As a result, the Final Rule's massive expansion of data points will not facilitate fair lending or otherwise advance the purposes of § 1071.

### 1.    Mortgage loans are standardized, but small business loans are not.

The warnings provided by the regulated community were driven by the fact that, due to the requirements of secondary market purchasers, government insurers, and the Truth in Lending Act

(TILA), *mortgage lending underwriting is standardized*.  For example, if a mortgage originator intends to sell a loan to Fannie Mae, it will ensure that the loan meets Fannie Mae's loan criteria— which are the same factors captured by HMDA.  *See generally* Fannie Mae Single Family Selling Guide (Feb. 7, 2024), https://singlefamily.fanniemae.com/media/38001/display.  The originator generally would not, however, consider other factors that Fannie Mae does not consider, even if they are legitimate non-discriminatory factors bearing on an applicant's creditworthiness.

TILA also has the effect of standardizing residential mortgage lending.  It requires lenders to calculate and disclose to consumers a host of data points about loan costs and features that overlap significantly with those that must be collected under HMDA.  *See, e.g.,* 12 C.F.R. pt. 1026, App. H-24(A) (Mortgage Loan Transaction Loan Estimate – Model Form); H-25(A) (Mortgage Loan Transaction Closing Disclosure – Model Form).  Additionally, TILA's requirement to consider an applicant's ability to repay the mortgage often *requires* lenders to consider the same underwriting factors reported under HMDA.  *Compare* 12 C.F.R. § 1026.43; *with* § 1003.4.

Given this standardization—and the breadth of Regulation C's requirements—the information collected for each mortgage loan will capture most, if not all, of the major factors considered by mortgage lenders and allow regulators to employ statistical analyses to make "apples to apples" comparisons of "control group" loans and "prohibited basis loans."[8]

By contrast, the data that lenders will have to collect and submit to regulators under the Final Rule will not capture the factors lenders legitimately consider when underwriting and pricing small business loans.  As the CFPB acknowledges, "the market [small] businesses turn to for credit

---

[8] *See generally* CFPB ECOA Examination Procedures at 2, https://files.consumerfinance.gov /f/documents/201510_cfpb_ecoa-narrative-and-procedures.pdf ("For fair lending scoping and examination procedures, the CFPB is temporarily adopting the FFIEC Interagency Fair Lending Examination Procedures that are referenced in the examination program."); Interagency Fair Lending Procedures at 18–22, https://www.ffiec.gov/pdf/fairlend.pdf.

is vast, varied, and complex." AR.000112. Indeed, the small business loans subject to the CFPB's Final Rule could range from an unsecured line of credit to an entrepreneur starting a smoothie bar, to the refinancing of an unsecured closed-end loan to the owner of a snow removal business, to an agricultural loan secured by a future harvest of soybeans—and everything in between. Lenders considering these loans might legitimately consider, respectively, the fact that there are six other smoothie bars in the neighborhood, that it has not snowed in three years, or the prospects for the price of soybeans on the global commodities market. None of these factors will be captured in the Final Rule's vastly expanded data collection regime, nor could they be. In fact, the expanded regime seeks to collect data that is not even considered by significant portions of the industry. For example, many lenders in the equipment finance space do not currently collect, in the normal course of business, many of the revenue-focused data points contemplated by the Final Rule. When the CFPB was notified that these historically uncollected data points were *not* critical for loan underwriting, the Bureau, again, shrugged its shoulders and proceeded on. *See* AR. 017203.[9]

## 2. Low response rates to demographic questions—not an issue with HMDA—will render the data unreliable.

Even if the expanded data collection requirements captured the actual factors that bear on small business underwriting or pricing decisions (they don't), the data will only "facilitate fair lending enforcement" if a sufficient number of applicants actually respond to questions regarding owners' demographics. If only a fraction of applicants respond to these questions (as predicted), the data is unreliable as there is no reason to believe that the loans with demographic data are representative of all loans. A simplified example of this problem can be seen in the following:

---

[9] The CFPB's response to these concerns is to assert, without explanation, that the data might be useful. AR.000031 ("[T]he Bureau disagrees . . . ."). "Because I say so" is not enough to satisfy the CFPB's obligation to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see* Part II *infra*.

|  | Minority-Owned Businesses that Report Demographic Data | All Minority-Owned Businesses | White-Owned Businesses that Report Demographic Data | All White-Owned Businesses |
|---|---|---|---|---|
| Total Applicants | 100 | 500 | 1000 | 5000 |
| Approved | 80 | 425 | 900 | 4250 |
| Denied | 20 | 75 | 100 | 750 |
| Denial Rate | 20% | 15% | 10% | 15% |

Even assuming regulators could compare all these loans on an "apples to apples" basis—and they cannot—differences in reporting rates alone could suggest that minority-owned businesses are twice as likely to be denied credit when, in reality, minority-owned businesses are being approved for credit at exactly the same rate as similarly situated white-owned businesses.

The concern that reported data is not representative of all lending decisions is significantly less with HMDA, where demographic data has historically been reported in 85–90% of all mortgage transactions (excluding purchased loans).[10]  When there is demographic data for 90% of a lender's loans, there is a reasonable basis to assume that those transactions are representative of the whole.  But there is good reason to think that reporting rates will be far lower under the Final Rule's regime.  Small business loan applicants will be specifically informed that they "are not required to provide this information." *See* 12 C.F.R. pt. 1002, App. E; *see also* 15 U.S.C. § 1691c-2(e) ("Any applicant for credit may refuse to provide any information requested . . . .").  And unlike with HMDA, lenders are not required to assess a small business owners' race, sex, or ethnicity based on "visual observation or [an applicant's] surname." *Compare* AR.000002; with 12 C.F.R. pt. 1003, App. B.  Indeed, as the ABA pointed out in its comment letter, experience with

---

[10]  *See* National Consumer Reinvestment Coalition, 2020 HMDA Preliminary Analysis, https://ncrc.org/2020-hmda-preliminary-analysis/ ("Loans lacking demographic information continued to increase.  From 2018 to 2020, that figure rose from 10.8% to 13.6% of all originations.").

the Paycheck Protection Program (PPP), another government lending program where demographic information was requested but not required, suggests that response rates might be as low as 25%, or less than a third of the response rates in mortgage lending.  AR.019317.  The ABA warned that "[t]hese problems call into question the benefit of the data collection, which is troubling in light of the costs the rule would impose."  *Id.*

The ABA was not alone.  In fact, this concern was raised repeatedly and by multiple commenters.  AR.000198.  But, while "the Bureau acknowledge[d] concerns raised by commenters about the potential for low applicant response rates" to the demographic questions, it did not actually address the concern that data collected would be unrepresentative.  Instead, it promised to "continue to assess" response rates and consider ways it could improve them in the future.  AR.000203.  The APA—indeed § 1071 itself—requires more.  The expanded data will not advance the purposes of § 1071, and therefore the CFPB has exceeded its discretionary authority under 15 U.S.C. § 1691c-2(e)(2)(H).

The Bureau simultaneously improperly limits an applicant's ability to refuse to provide requested information by restricting the "opt-out" to only demographic information, requiring that all applicants provide responses to other, non-demographic inquiries.  AR.000040.  This, despite the Act expressly providing all applicants the right to "refuse to provide any information requested."  15 U.S.C. § 1691c-2(c).  The Bureau was warned of this overstep, as the Equipment Leasing and Finance Association commented: "Section 1071 was specifically designed to allow customers to opt out; the CFPB should respect the clear statutory language of Section 1071 and allow customers to decline to have their application level-data collected."  AR.017203.  But again, the Bureau ignored the suggestion by a trade association intimately involved in the industry.  Thus, the Final Rule represents the worst possible result—it skews the data by allowing applicants to

refuse to provide responses while also exceeding its statutory authority and the clear language of the Act to require financial institutions to provide all other non-demographic information.

**B.    The Expanded Set of Data Points Will Undermine § 1071's Purposes as the True Costs of the Rule Will be a Decrease in Credit Availability for Women-Owned and Minority-Owned Small Businesses.**

The Final Rule also exceeds the statutory authority granted by Congress by working at odds with the purpose of § 1071. As the Bureau acknowledges, § 1071 was intended to increase access to credit for women-owned and minority-owned small businesses. Yet the careless manner in which the Final Rule expanded on Congress's mandate will have the opposite effect: less credit will be available to all small businesses, thus harming the women-owned and minority-owned businesses Congress sought to help.

Commenters noted that the exponentially increased costs of the Final Rule would "reduce competition in the small business credit market, despite the Director's statements about the importance of competition in financial services." AR.019306. Specifically, they warned that the rule would result in a loss of lenders and that "[r]educed competition will lead to fewer choices and higher prices for small businesses." AR.019306. The researchers from Texas Tech agreed, observing that the proposed rule—as structured—would be an "attack on relationship banking . . . [and] create a barrier for credit for truly small businesses that are less sophisticated, but essential to the community." AR.019175. After all, passage of the Dodd-Frank Act had already accelerated community bank consolidation, and thus it was incumbent on the CFPB to promulgate a rule implementing § 1071 that imposed as little burden as possible if it was sincere about wanting to promote competition and better pricing for small business loans. AR.019173.

In assessing this problem, however, the CFPB failed to consider that each new data point it added would substantially increase the burden on all institutions, especially community banks

that are responsible for a disproportionate share of small business lending. AR.002239. That is caused by multiple elements that will drive up ongoing compliance costs, especially in light of the increased regulatory burden brought on by the data point expansion. *See* Part III *infra*. When, for example, it is known that one-third of the federally-insured credit unions will seriously consider leaving the business lending market based on a rule taking effect, AR.014347-48, that is a significant blow to the purposes of the Act and the proposed data point expansion should have been reconsidered in light of the statute's purposes.[11]

The answer was not merely to exempt smaller lenders that originated fewer than 100 small business loans in each of the preceding two years. *See* AR.000106. Rather, the obvious answer was to decrease the regulatory burden for all non-depository and smaller lenders—those financial institutions making substantial amounts of small business loans but that would not be able to absorb the compliance costs, forcing them to curtail small business lending and/or leave the market altogether, a result that is directly at odds with the community development purposes of § 1071. As the researchers at Texas Tech pointed out, the "consequence of this one-size-fits-all approach— which is punitive to smaller community banks—to data collection will be the cost of compliance and risk of non-compliance to implement section 1071." *See* AR.002239. For example, many non-depository institutions, including equipment finance companies, lack historical relationships with regulators, as they have not previously been required to collect or report data concerning their customers, and do not regularly collect the information sought by the Final Rule. *See* AR.001210– 18; AR.023460–64; AR.024295.

---

[11] As shown below, failure to reconsider the data point expansion based on these concerns was arbitrary and capricious. *See* Part II *infra* (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)).

Going on, the researchers warned that "[a] cost-benefit analysis will lead many community banks to cease making small-businesses loans. We find that Texas banks in our sample that are $10 billion and under in total assets have about $32 billion of small-business loans outstanding on their books. A disruption to the small-business loan process, especially as the state is still working through issues that were created by COVID-19, would be devastating to the overall Texas economy and to many underserved rural communities." *Id.*

By failing to engage the problem created by its exponential expansion of the statutory data points, the CFPB undermined the purpose of § 1071. Allowing (or rather forcing) such a decrease of available credit to small businesses is neither rational nor consistent with the Act's purposes. The rule should be set aside as a result.

**C.    The Expanded Set of Data Points Disregards Textual Constraints of the Act.**

Finally, all this erosion of the Act by the Final Rule rests on the faulty assumption that the Bureau was endowed with the authority to require financial institutions to collect information (other than the race, sex, and ethnicity information the statute explicitly requires them to collect) that they would not otherwise gather as part of the loan application process. It was not.

The Bureau's claimed authority for adding the additional data points comes from the catch-all provision in 15 U.S.C. § 1691c-2(e)(2)(H). CFPB believes there is a multi-billion dollar elephant in the mousehole at the end of that subsection. *See Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). The Bureau's interpretation of subparagraph (H), however, overlooks the textual constraints of the statute itself. It also disregards the fact that subparagraph (H) falls under a "Form and manner of information" subsection (addressing only what should be "disclose[d]") while ignoring that the "Information gathering" provision several subsections earlier (that instructs

20

financial institutions what to "inquire" about) is much more constrained. The statute itself thus foreclosures the CFPB's massive expansion of data points in the Final Rule.

To determine the extent of the Bureau's statutory authority, the Court should "rely on the conventional standards of statutory interpretation." *Chamber of Comm. v. U.S. Dep't of Lab.*, 885 F.3d 360, 369 (5th Cir. 2018). A quick read of the text shows that financial institutions must "clearly and conspicuously *disclose*—any additional data that the Bureau determines would aid in fulfilling the purposes of this section." § 1691c-2(e)(2)(H) (emphasis added). But closer inspection reveals that this grant of authority does not permit the CFPB to require lenders *to require collection* of anything and everything potentially capable of "fulfilling the purposes of the statute." Instead, all of the information being disclosed under § 1691c-2(e)(2) comes from the "[i]nformation compiled and maintained under paragraph (1)" listed just above the "Itemization" required in paragraph (2). Textually, then, any information the Bureau seeks disclosure of under subparagraph (H) is constrained to the information in paragraph (1).

Paragraph (1), in turn, commands that "[e]ach financial institution shall compile and maintain, in accordance with the regulations of the Bureau, a record of the information provided by any loan applicant pursuant to a request under subsection (b)" found above in the text. § 1691c-2(e)(1). Subsection (b) is Congress's instructions regarding "Information Gathering" and requires financial institutions to "inquire whether the business is a woman-owned, minority-owned, or small business . . . and whether or not such application is in response to a solicitation by the financial institution." § 1691c-2(b)(1). Thus, the textual limitation on the CFPB's discretion in subparagraph (H) is that all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data

Congress mandated in subsection (b)).  *See* § 1691c-2(e)(1) (requiring collection and disclosure of information "pursuant to a [loan] request under subsection (b)").

When the CFPB promulgated its Final Rule, however, it demanded copious amounts of information that lenders do not collect as part of the loan application process.  For example, data points about sexual orientation, NAICS code, number or employees, time in business, and certain pricing information are typically not something already compiled and maintained "pursuant to a [loan] request under subsection (b)."  Because such information is not also part of the "Information gathering" ordered by Congress in § 1691c-2(b), it cannot separately be required under the disclosure provision of § 1691c-2(e)(2)(H).  In other words, the discretion of the Bureau relates only to the disclosures of information that already exists with respect to loan applications but has not already been demanded by Congress.  Any "additional data the Bureau determines would aid in fulfilling the purposes of the section" must come from the application itself—either the direct information provided by the applicant, or the type of action taken by the financial institution (a readily available piece of information attached to the application).  Thus, information demanded by the CFPB in the Final Rule that is not collected by lenders as part of the loan application process falls outside the statutory grant of authority and must be stricken from the Final Rule.

## II.    The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Adequately Consider The Significant Real-World Costs To The Regulated Community.

In addition to exceeding its statutory authority, the CFPB did not adequately address the warnings from the regulated community on the effects of increasing the data collection effort exponentially.  Rather than address the problem, the CFPB papered over the issue and failed to answer the concerns.  As a result, the Final Rule must be set aside as arbitrary and capricious.

The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

22

An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Said differently, a court must review an agency's action to determine whether the agency "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. An agency violates the arbitrary and capricious standard "if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019). Comments are "significant" if—assuming they are correct—they "would require a change in an agency's proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 714–15 (D.C. Cir. 2007). Where an agency avoids key facts, cherry-picking the data under consideration, it is evidence that the agency has "entirely failed to consider an important aspect of the problem." *Price v. U.S. Dep't of Educ.*, 209 F. Supp. 3d 925, 932 (S.D. Tex. 2016) (quoting *State Farm*, 463 U.S. at 43).

Here, the agency "studiously avoided" a key aspect of the problem—the real-world costs to the regulated community. *See Price*, 209 F. Supp. 3d at 932. As noted above, commenters warned the Bureau that going beyond the blueprint set forth by Congress would have the exact opposite effect of the statute's purpose—it would decrease lending to small businesses and protected communities. *See, e.g.*, AR.014323–24. That is because the Final Rule, in seeking vast amounts of information outside the statute, creates compliance costs insurmountable for some lenders, which will result in an attendant loss of credit access for small businesses, including those owned by minorities or women. AR.019306 ("Reduced competition will lead to fewer choices

and higher prices for small businesses."); AR.019173 (noting that the transformation of 4 pages in the Dodd-Frank Act into a 900+ page rule "is indicative of a complex regulatory paradigm that may be designed to target banks but will, ironically, impact consumers").  Indeed, the Texas Tech researchers specifically noted that the "cost of compliance combined with the risk of non-compliance will lead many community banks to cease making business loans."  AR.019175.

The CFPB's primary response to this problem was referencing its One-Time Cost Survey. *See* AR.000365.  The Bureau simply assumes compliance costs will be minimal, that they will be passed on to small business borrowers, and argues that the SBREFA panel did not find that lenders would leave the small business lending market in response to the increased costs.  AR.000372; AR.000365 n.959; *but see* AR.014324 (noting that financial institutions would modify their credit portfolio so that lending was affected, even if they did not leave the market altogether).  But setting aside the problem with knowingly planning to impose at least $200–300 million in costs on small businesses for a rule with dubious benefits, the One-Time Cost Survey considered only start-up costs for disclosing the original 13 data points sought by Congress—not the regulatory behemoth of 81 points rolled out by the CFPB in its Final Rule.  Likewise, the SBREFA review lacked the appropriate data commenters noted would be needed for legitimate review of § 1071's costs. AR.023871.  The CFPB made no meaningful response to commenters' significant concern that exponentially increased compliance costs would drive lenders—especially community banks and non-depository institutions—from the market and thus injure small business borrowers.

The Texas Tech researchers also noted that the Bureau's proposed rule failed to account for the fact that small banks were both: (1) making the largest percentage of small business loans; and (2) going to be impacted most by the ongoing compliance costs (that were not of the same sort as the HMDA data).  AR.002238; AR.019175.  The CFPB did not attempt to justify this oversight in

the Final Rule.  Instead, it referenced aspects of the rule that would reduce compliance burdens on

"small volume lenders," while declining to address the impact on smaller lenders who make more

than 100 small business loans per year.  AR.000031.  And so, because the agency did not "examine

the relevant data and articulate a satisfactory explanation for its action," its decision could not have

been "based on a consideration of the relevant factors."  *10 Ring Precision, Inc. v. Jones*, 722 F.3d

711, 723 (5th Cir. 2013) (quoting *State Farm*, 463 U.S. at 43).

Without considering the additional burdens created by the vast number of new data points,

the CFPB forged ahead in demanding lenders provide anything and everything on the Bureau's

wish list.  In response to warnings that the costs associated with this pointless exercise will drive

some lenders from the market or cause them to lend less, the CFPB simply asserted: "The Bureau

does not believe that the effects on the small business credit market from the [additional] data

points . . . will be so pronounced."  AR.130.  The Bureau does not explain why the "numerous

industry commenters" (or agencies) making these claims are wrong; it offers only a naked hope

that things won't really be that bad.  The commenters' concern is significant, though, because

addressing it "would require a change in an agency's proposed rule."  *City of Portland*, 507 F.3d

at 715.  Namely, the CFPB would need to hew closely to the original data points set forth by

Congress to keep the market from contracting and thus harming the small businesses Congress

intended to help.  As it stands, though, the agency cherry-picked the data under consideration and

"entirely failed to consider an important aspect of the problem."  *Price*, 209 F. Supp. 3d at 932.

This is the type of arbitrary and capricious action that the APA was designed to address.

As the Fifth Circuit has recognized, "[i]llogic and internal inconsistency are characteristic of

arbitrary and unreasonable agency action."  *Chamber of Commerce*, 885 F.3d at 382.  And review

of an agency rule cannot be "toothless"—the Court "must set aside agency action if the agency

'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43). The CFPB failed to respond to "significant points" or consider "all relevant factors raised by the public comments" (especially those from informed sources)—the Final Rule must therefore be set aside as arbitrary and capricious. *See Carlson*, 938 F.3d at 344.

**III.    The CFPB's Cost/Benefit Analysis Of The Final Rule Was Arbitrary and Capricious.**

The CFPB's failure to undertake a proper cost/benefit analysis provides yet another ground for vacating the rule. When engaging in rulemaking, the Bureau is required to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." 12 U.S.C § 5512(b)(2)(A) (emphasis added). Because the CFPB failed to do that here, its Final Rule must be set aside.[12]

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). That "includes, of course, considering the costs and benefits associated with the regulation." *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)). A cost/benefit analysis is inadequate if the agency "duck[s] serious evaluation of" certain costs or engages in internally inconsistent reasoning. *Business Roundtable v. SEC*, 647 F.3d 1144,

---

[12] While the CFPB states (at AR.000343) that it was "electing" to conduct a cost/benefit analysis "with respect to small businesses and the financial institutions"—in addition to its "statutorily required analysis with respect to the rule's effects on consumers and covered persons"—it is still required to conduct such analysis in a reasonable—that is, not arbitrary and capricious—manner.

1150–55 (D.C. Cir. 2011). "[A]s part of that cost-benefit analysis, the agency must identify benefits that 'bear a rational relationship to the . . . costs imposed.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (quoting *Pub. Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)). "An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The CFPB's cost/benefit analysis rests on numerous serious flaws.

First, the Bureau underestimated the costs of the rule by: (1) failing to collect actual cost data from the regulated community on real implementation or ongoing costs; and (2) ignoring authoritative sources regarding costs in favor of a flawed "one-time" cost survey and cost estimates based on the HMDA rule that is different in kind from the § 1071 Final Rule. Compounding the errors in the CFPB's assumptions, the Bureau did not consider the additional costs related to increased fair lending supervision and enforcement (arising from false positives suggested by the data) as well as unmerited reputational injuries to lenders.

Second, the CFPB failed to justify the costs in comparison to any supposed benefit of the Final Rule. The Bureau started by overestimating the benefits of the rule by assuming that the "data could lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending investigations." AR.000355. But as discussed above, this optimistic conclusion was reached without evidence and in spite of numerous comments explaining to the Bureau that the collected data would only allow for a marginal benefit—at best—that could not justify the enormous costs the CFPB had already underestimated. Unsurprisingly, the Bureau failed to identify any benefits that would justify the costs imposed because it never considered the real ongoing costs or likely lack of responses. This, in turn,

prevented the agency from justifying the expansion of the data collection effort because it could not account for (let alone justify) any hypothetical marginal benefit from expanding the statute.

### A.    The Bureau Underestimated the Cost of Implementing the Final Rule Because it Failed to Collect the Relevant Cost Information from Lenders.

The CFPB concedes it cannot account for the costs or benefits of the Final Rule. AR.000343 ("[T]he data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule."); AR.000344 ("The Bureau believes that such benefits to financial institutions could be substantial. *However, quantifying them would require data that are currently unavailable.*" (emphasis added)). Of course, the CFPB had *thirteen* years, and ample opportunity to collect relevant data on at least costs; it simply declined to do so before blindly and recklessly exercising its discretionary authority. And the Bureau did this despite the SBA Office of Advocacy noting that trade associations representing small financial institutions could provide "authoritative information about the costs associated with the NPRM." AR.018388 n.10. Those very trade associations now appear as litigants combatting the Final Rule—an outcome that could have been avoided had the Bureau heeded the SBA Office of Advocacy's advice.

Due to its arbitrary and capricious action in failing to seek information on costs of the actual rule, the closest thing to empirical data the Bureau had was the survey sent out "to measure the one-time costs of compliance with an eventual small business lending data collection rule." AR.000023. But "[t]he survey did not cover potential on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required only for the 13 statutorily required data points and that compliance with the statutory firewall requirement was not required." AR.000444. Moreover, it was not a representative sample of the institutions that will be required to collect data under the new rule—indeed, only 42 depository institutions and 7 non-depository institutions responded to the survey. AR.000614–15. The CFPB makes no attempt to suggest that

28

these anemic numbers are statistically representative of the thousands of financial institutions it estimates to be active in the small business lending market.  AR.000015.

"Such an upside-down process easily qualifies as arbitrary and capricious."  *Price*, 209 F. Supp. 3d at 932.  The Bureau never attempted to collect relevant information regarding the costs of implementing the expanded data set "from the one place most likely to have them—the [regulated community] itself."  *Id.*  And when an agency does not "seek[] the most relevant evidence . . . from the most logical source," it has "entirely failed to consider an important aspect of the problem."  *Id.* (quoting *State Farm*, 463 U.S. at 43).  This is arbitrary and capricious.

**B.    The Bureau Underestimated the Ongoing Costs of the Final Rule Because it Used Flawed and Unsupported Assumptions to Support Predetermined Conclusions.**

While the "One-Time Cost Survey" provided some data on the start-up costs for lenders beginning to collect information on the statutory data points, the CFPB admitted it could "only estimate how ongoing costs [for collecting that information] would be different."  AR.000631.  To get around that fact, the CFPB turned to a flawed and subjective "qualitative" analysis, as well as a self-serving evaluation of public comments on the costs and benefits.

First, the CFPB sought to rely on its 2015 HMDA final rule estimates as a basis for the § 1071 Final Rule.  AR.000347.  But as previously discussed, there are multiple reasons why that reliance is misplaced.  Unlike mortgage banking, "[s]mall-business financial reports and small-business lending documentation are not standardized."  AR.002239.  And while the CFPB claimed that it "received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071," AR.000347, that is not right either.  Commenters specifically noted that HMDA requires the collection of data "for mortgage products that are not complex and don't differ much between different types of lenders."

AR.019174.  As a result, "[a]n 'apples to apples' comparison in mortgage lending is relatively straightforward." *Id.*  By contrast, small business loans "are more complex and differ based on the type of local economics that are served and, to a certain extent, bank business plans." *Id.*; *see also* AR.002239 (noting that HMDA data collection is qualitatively different from § 1071 data collection).  Because the § 1071 data relates to a more diverse and complex set of products than the mortgage loans in HMDA, CFPB's heavy reliance on HMDA collection costs was misplaced.

In addition, the CFPB failed to account for the fact that much of the information that must be reported under HMDA is already collected and disclosed by mortgage lenders pursuant to TILA. 15 U.S.C. § 1601, *et seq.*  Because TILA requires calculation and disclosure of pricing information that is required to be reported in HMDA, it is much easier for a lender to extract the pricing information from the TILA disclosures in HMDA.  AR.019329.  But Congress has specifically exempted business credit from TILA's requirements.  *See* 15 U.S.C. § 1603(1); AR.019329.  With the exception of nonbanks operating in California and New York, the small business lenders subject to the Final Rule are not already required to disclose that information and therefore do not track pricing information.  Small business lenders will have to start doing so to comply with the Final Rule—a more daunting task than reporting pricing information that HMDA requires. Therefore, the CFPB did not have a cognizable "apples to apples" comparison for the on-going cost estimates, as consumer lenders' experience with HMDA cannot capture the qualitatively different information sought in the § 1071 expanded data points (and the CFPB does not attempt to account for collecting the extra information anyway).

Moreover, the CFPB failed to adequately "consider . . . the impact" of the Final Rule on small business borrowers "in rural areas," as the Act requires. 12 U.S.C. § 5512(b)(2)(A)(ii).[13]  In particular, the agency's assessment ignored that a predominant supplier of rural credit—the nation's network of Farm Credit System lenders, who supply 40% of all agricultural credit—are customer-owned cooperatives.  This means that their customers, 99% of which are small businesses, will bear *all* of the Final Rule's staggering compliance costs.  AR 017211–18.  The CFPB did not consider the unique cooperative structure of agricultural lending at all (let alone explain how the Final Rule's benefits could possibly outweigh such substantial costs to rural small businesses).  Instead, the agency simply assumed those costs would be "negligible." AR.000368–69.  This failure to consider that a large share of rural small businesses will bear all the costs of compliance was arbitrary and capricious. *See Chamber of Commerce*, 85 F.4th at 777–79.

Even if the Bureau had accurate estimates, the CFPB (wrongly) chose only to consider "the tasks required for data collection, checking for accuracy, and reporting under the final rule" to conclude that the costs would be similar to those under the 2015 HMDA final rule.  AR.000347.  The CFPB never considered the additional burdens that would be imposed on lenders in the form of increased fair lending compliance programs and the need to respond to increased fair lending supervision and enforcement based on data that fails to capture the basis for small business loan underwriting and pricing decisions (not to mention the increased exposure for reputational risk that is not easily quantifiable).  *See, e.g.*, AR.019328.  Similarly, the Bureau ignored costs associated with the Final Rule's "firewall" requirement, explicitly instructing survey respondents to omit such projected amounts from their responses.  AR.000444; AR.004201–14.

---

[13] Though the statute refers to the impact on "*consumers* in rural areas," the CFPB appropriately interpreted "consumer" to refer to small businesses seeking credit in the context of the Final Rule.  AR.000343; AR.000368.

The CFPB also never considered that HMDA has no private right of action, 12 U.S.C. § 2804, and therefore mortgage lenders do not have to bear the expense of private lawsuits alleging inaccuracies in HMDA reporting. By contrast, ECOA has a private right of action that allows a lender to be sued by a private party for any inaccurate or incomplete data, while the Bureau simultaneously skews data by allowing partial opting out of participation by applicants. 15 U.S.C. § 1691e. This additional risk—and the statistical certainty of additional litigation against lenders based on flawed analysis of the "voluntary" data—will force small business lenders to spend even more to prepare for and defend themselves in meritless lawsuits. Thus, even if the CFPB were right that the additional data to be collected was just like the HMDA data—and it isn't—there are significant additional costs that the CFPB ignored.[14]

Second, while the Bureau was permitted—indeed, required—to consider commenters' feedback on costs associated with the proposed rule, it acted arbitrarily and capriciously by ignoring comments from lenders that actually understood those costs and relying instead on consumer advocates and others who will not bear the costs. The Bureau's "explanation"—if it can be called that—speaks for itself. According to the CFPB, "[s]everal community groups described the Bureau's estimates as 'well-considered' or described the costs of the proposed rule as being outweighed by the benefits." AR.000345. On the other hand, "some industry commenters and an office of a Federal agency[—specifically, the SBA Office of Advocacy—]generally asserted that the Bureau's cost estimates were too low." AR.000345. In the end, the CFPB sided with the "community groups" over the lenders and the SBA Office of Advocacy, even though the Bureau's

---

[14] These failures in counting the cost do not even account for a significant problem raised by many commenters: the loss of relationship with their small business customers. *See, e.g.*, AR.019175. Repeatedly, lenders lamented that the overwrought rule would cause friction with customers that would invariably be blamed on the financial institution. AR.014323–24. While CFPB has repeatedly trumpeted the benefits of "relationship banking," it appears that was mere lip service.

estimates could not have been "well-considered" given the fact that the CFPB had not collected the relevant cost data. Moreover, there was no indication that the "community groups" had any basis to estimate the costs to be borne by lenders forced to comply with the expanded Final Rule nor did the CFPB provide a justification for crediting those groups' opinion over the informed position of a federal agency tasked with advocacy for small businesses. Thus, as in *Business Roundtable*, the CFPB acted arbitrarily by "ducking serious evaluation of the costs that could be imposed upon companies." 647 F.3d at 1151–52.

Given that both the qualitative methodology and the Bureau's assessment of public comment regarding the likely costs of the Final Rule were flawed, the CFPB was left with no reliable basis for its estimations. Failing to consider seriously the cost estimates offered by both the industry (which has direct access to regulatory cost information) *and another federal agency* is arbitrary and capricious. *See Prometheus Radio Project*, 592 U.S. at 423 (noting that arbitrary-and-capricious review requires that the agency "has reasonably considered the relevant issues and reasonably explained the decision"). Failing to provide a reason for ignoring the estimates from informed commenters is also arbitrary and capricious. *See Chamber of Commerce*, 85 F.4th at 776 (faulting agency for failing to consider data it chose to ignore). And certainly, failing to collect the relevant data itself from the source most likely to have it was arbitrary and capricious. *See Price*, 209 F.Supp.3d at 932; *see also* AR.018388 n.10 (noting the SBA Office of Advocacy's representation that trade associations representing small financial institutions could provide "authoritative information about the costs associated with the NPRM").

As noted above, the unreasonableness of the CFPB's decision to expand the data categories without serious consideration of costs is underscored by the decreased loan availability to the groups Congress intended to help. As pointed out to the agency, the increased costs of data

collection will decrease credit, especially for small businesses that may pose more risk (including women-owned and minority-owned businesses).

### C.    The Bureau Failed to Demonstrate that the Additional Data Would Provide Benefits Justifying the Increased Costs.

Finally, as previously discussed, the vast expansion of data points that the Final Rule will force lenders to collect will not "facilitate enforcement of fair lending laws."  15 U.S.C. § 1692c-2(a).  The problem of the "omitted [underwriting] variable," AR.002239, and the likelihood of low reporting rates, AR.019317, will ensure that the data obtained from lenders—at great cost—will not be useful in identifying discriminatory lending patterns.  *See* Part I.A *supra*.  Nor will it advance opportunities for women-owned, minority-owned, or small businesses.  15 U.S.C. § 1691c-2(a).  In fact, it will have the opposite effect, harming the very enterprises Congress intended to assist.  *See* Part I.B *supra*.  The burden was thus on the CFPB to explain how its dubious "benefits" could ever be justified by the enormous costs at stake here.  That explanation was just wishful thinking.

The Bureau concedes that "[q]uantifying benefits to small businesses presents substantial challenges."  AR.000344.  While it acknowledges that the costs of the rule will be "passed on in full to small business credit applicants in the form of higher prices or fees," AR.000364, the purported benefit of the Final Rule—"enhanced transparency"—will only "benefit small businesses in indirect ways."  AR.000344.  The CFPB cannot satisfy its obligation to demonstrate that these "benefits . . . bear a rational relationship to the costs imposed."  *Chamber of Commerce*, 85 F.4th at 777 (internal alterations and quotations omitted).  In fact, the Bureau does not even try, instead acknowledging: "Quantifying and monetizing these benefits would require identifying all possible uses of data collected under this rule, establishing causal links to the resulting public benefits, and then quantifying the magnitude of these benefits."  AR.000344.

And at the same time, the "qualitative" benefits the Bureau identifies are overstated. For example, as shown above, the expanded data is not likely to "lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending examinations and investigations," and certainly not to an extent that could approach the costs imposed on the very same small businesses. AR.000355. Similarly, optimistic predictions that the data could help with "community development" or "disaster relief" are not substantiated (even by reference to how data collected under other regimes—*e.g.*, HMDA or the PPP with its minimal response rate—have been used to support those goals). And in any event, the Bureau does not explain how these purported benefits cannot be accomplished by collection of only the statutory data points. *See* 15 U.S.C. § 1692c-2(e)(2)(A)-(G). Similarly, the supposed benefit that the data will "facilitate rigorous research by academics and advocates" is cold comfort to the small businesses forced to fund it. AR.000355. That is why the SBA Office of Advocacy "encourage[d] the CFPB to disregard the discretionary data points," and suggested that "a less costly alternative would be to restrict the collection of data to the statutorily required data points." AR.018392.

The CFPB decided to ignore all of the warnings regarding costs and instead to require the collection and reporting of 81 data points, whatever the cost and however dubious the benefit. The CFPB did not substantiate that the Final Rule's requirement that lenders collect 68 additional data points would serve any benefit, and it certainly did not provide a reasonable basis for concluding that any "qualitative benefit" justified the costs. *See Chamber of Commerce*, 85 F.4th at 777. For this reason, the Final Rule is arbitrary and capricious and should be set aside.

## CONCLUSION

For the foregoing reasons, the Final Rule should be set aside.

March 1, 2024                                    Respectfully submitted.

                                                 */s/ John C. Sullivan*
                                                 John C. Sullivan
                                                 Attorney-in-Charge
                                                 Texas Bar No. 24083920
                                                 **S|L LAW PLLC**
                                                 610 Uptown Boulevard, Suite 2000
                                                 Cedar Hill, TX 75104
                                                 Telephone: (469) 523-1351
                                                 Facsimile: (469) 613-0891
                                                 john.sullivan@the-sl-lawfirm.com

                                                 James J. Butera*
                                                 Ryan Israel*
                                                 **MEEKS, BUTERA & ISRAEL PLLC**
                                                 2020 Pennsylvania Avenue, NW
                                                 Washington, DC 20006
                                                 Telephone: (202) 795-9714
                                                 jbutera@meeksbi.com
                                                 risrael@meeksbi.com

                                                 Thomas Pinder*
                                                 Andrew Doersam*
                                                 **AMERICAN BANKERS ASSOCIATION**
                                                 1333 New Hampshire Avenue, NW
                                                 Washington, DC 20036
                                                 tpinder@aba.com
                                                 adoersam@aba.com

                                                 *Counsel for Plaintiffs Texas Bankers*
                                                 *Association, Rio Bank, and American*
                                                 *Bankers Association*

                                                 *\* admitted pro hac vice*

36

*/s/ James Bowen*
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com

*Counsel for Intervenors Texas First Bank,
Independent Bankers Association of Texas,
and Independent Community Bankers of
America*

*/s/ Owen Colin Babcock*
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com

*Counsel for Intervenors XL Funding, LLC,
and Equipment Leasing and Finance
Association*

*/s/ Misha Tseytlin*
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS
LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
joseph.reilly@troutman.com

Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com

*Counsel for Intervenors Texas Farm Credit,
Farm Credit Council, and Capital Farm
Credit*

*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK,
LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com

*Counsel for Intervenors Rally Credit Union,
America's Credit Unions (formerly Credit
Union National Association), and
Cornerstone Credit Union League*

37

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on March 1, 2024, via the CM/ECF system and served via CM/ECF on all Counsel of record.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*

### CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in Times New Roman typeface with 12-point font. As set forth in this Court's Order, Plaintiffs/Intervenors' Combined Motion for Summary Judgment is 35 pages.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*