IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

Texas Bankers Association, *et al.*,

                Plaintiffs,

     v.

Consumer Financial Protection Bureau, *et al.*,

                Defendants.

Case No. 7:23-cv-00144

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'-INTERVENORS' MOTION TO
SUPPLEMENT THE ADMINISTRATIVE RECORD**

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................. 1

**BACKGROUND** .............................................................................................................. 2

     a.   Section 1071 and the Small-Business Lending Rule ................................. 2

     b.   Plaintiffs' Motion to Supplement the Administrative Record ................... 5

**ARGUMENT** .................................................................................................................. 6

I.   It is a bedrock principle of administrative law that review of agency action takes place on the record that was before the agency at the time it acted. ................................. 6

II.  Plaintiffs fail to identify any "unusual circumstance" that could justify departing from that bedrock principle in this case. ............................................................................. 7

     a.   The Bureau's assessment of benefits and costs properly considered the relevant factors. ................................................................................................. 8

     b.   Plaintiffs' new cost estimates do not show that the Bureau failed to consider all relevant factors. ............................................................................. 11

          i.   Plaintiffs' new cost figures demonstrate only that Plaintiffs disagree with the Bureau's reasonable judgments in issuing the Rule—and even with their own prior estimates. ................................................................................. 11

          ii.  Plaintiffs had the opportunity to, and did, submit their cost estimates during the notice-and-comment process. .......................................................... 13

     **CONCLUSION** ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ................................................................................... 7, 8

*Asarco, Inc. v. EPA*,
  616 F.2d 1153 (9th Cir. 1980) ..................................................................................... 12

*Ass'n of Pac. Fisheries v. EPA*,
  615 F.2d 794 (9th Cir. 1980) ....................................................................................... 15

*Camp v. Pitts*,
  411 U.S. 138 (1973) ........................................................................................................ 7

*Chamber of Com. of United States v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ........................................................................................ 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................................ 6

*City of Dania Beach v. F.A.A.*,
  628 F.3d 581 (D.C. Cir. 2010) ..................................................................................... 10

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................................................ 6

*Frank's Nursery, LLC v. Walsh*,
  2022 WL 2757373 (S.D. Tex. July 14, 2022) ............................................................... 7

*Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*,
  2015 WL 1883522 (S.D. Tex. Apr. 20, 2015) .......................................................... 7, 12

*Indep. Turtle Farmers of La., Inc. v. United States*,
  703 F. Supp. 2d 604 (W.D. La. 2010) .................................................................... 12, 13

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012) ......................................................................................... 6

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
  602 F.3d 687 (5th Cir. 2010) ...................................................................................... 7, 8

*OnPath Fed. Credit Union v. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*,
  73 F.4th 291 (5th Cir. 2023) ................................................................................. 1, 7, 8

**Statutes**

5 U.S.C. § 706 ....................................................................................................................... 6

i

12 U.S.C. § 5512 ............................................................................................................... 8

15 U.S.C. § 1691c-2 .......................................................................................................... 2

15 U.S.C. § 1691c-2(b)(1) ................................................................................................ 2

15 U.S.C. § 1691c-2(e)(2)(A)-(G) .................................................................................... 2

15 U.S.C. § 1691c-2(e)(2)(H) ........................................................................................... 2

15 U.S.C. § 1691c-2(g)(1) ................................................................................................ 2

Pub. L. 111-203, § 1071, 124 Stat. 1367 ........................................................................ 2

**Regulations**

Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B), Proposed Rule, request for public comment,
86 Fed. Reg. 56,356 (Oct. 8, 2021)............................................................... 4, 11, 14

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule,
88 Fed. Reg. 35,150 (May 31, 2023)................................................................. *passim*

**Other Authorities**

CFPB, *Proposed Rule, Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)* (Sept. 1, 2021) ........................................................ 4

*Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020) .......................................................... 3

## INTRODUCTION

It is a basic principle of administrative law that review of agency action takes place on the record that was before the agency at the time it acted. Plaintiffs-Intervenors[1] ask the Court to discard that principle here and take account of new cost estimates that Plaintiffs generated long after the Consumer Financial Protection Bureau issued the Small-Business Lending Rule that they challenge—and even after the Court had entered a schedule for summary judgment briefing in this case. Plaintiffs' self-serving, *post hoc* analysis sheds no light on whether the Bureau acted reasonably when it issued the Rule in March 2023 and is not part of the record on which this case must be decided. Indeed, Plaintiffs helped shape the very record on the expected costs of the Rule that they now attack in moving to supplement the record.

Plaintiffs invoke a "rarely granted" exception under which the record may be supplemented with information necessary "to determine whether the agency considered all of the relevant factors." *OnPath Fed. Credit Union v. Dep't of Treasury, Cmty. Dev. Fin. Insts. Fund*, 73 F.4th 291, 299 (5th Cir. 2023). But their new cost estimates do not show that the Bureau failed to consider any "relevant factor[]" or that it overlooked any of the evidence or comments that were before it when it issued the Rule. Plaintiffs' new submission merely shows that they disagree with the Bureau's reasonable assessment of the Rule's likely benefits, costs, and impacts. (The new submission also departs significantly from estimates that Plaintiffs themselves produced and submitted to the Bureau during the notice and comment period, and which the Bureau carefully considered in its analysis of the impacts of the Rule.) If that sort of disagreement were enough to justify supplementing the record, then resolving Administrative

---

[1] This brief refers to Plaintiffs-Intervenors as "Plaintiffs" throughout this opposition for the sake of brevity.

Procedure Act cases based on the record that was actually before the agency would be the exception, not the rule. The Court should deny Plaintiffs' motion.

## BACKGROUND

### A. Section 1071 and the Small-Business Lending Rule

Section 1071 of the Dodd-Frank Act amends the Equal Credit Opportunity Act (ECOA) to create a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (codified at 15 U.S.C. § 1691c-2). It directs financial institutions to "inquire whether the business is a women-owned, minority-owned, or small business," *id.* § 1691c-2(b)(1), and to collect and report a number of other specified data points, *id.* § 1691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). And it directs the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to [Section 1071]." *Id.* § 1691c-2(g)(1).

The Bureau engaged in several years of outreach and study before even proposing a rule to implement Section 1071's requirements. *See* Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150, 35,171-72 (May 31, 2023). In 2020, for example, the Bureau convened a Small Business Advisory Review Panel under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), as is required when the Bureau considers proposing a rule that could have a significant economic impact on a substantial number of small entities. *Id.* at 35,171. The Panel, which included a representative from the Office of Advocacy of the Small Business Administration, consulted with representatives from 20 small financial institutions likely to be directly affected by the rule, including community banks, credit unions, and commercial finance companies. *Id.*

As part of that process, the Bureau published a detailed outline of the proposals it was considering for the rule to implement Section 1071 and included an economic analysis of the potential impacts of those proposals under consideration on directly affected small entities. *Id.* That analysis described eight specific categories of one-time costs (*i.e.*, upfront expenses that a covered financial institution would incur initially to comply with the rule) and 15 compliance activities that would impose ongoing costs. *See Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered*, at 49-50, A.R. 001607-08 (Sept. 15, 2020).[2]

The Bureau convened the SBREFA panel across four sessions and sought input on its outline of proposals from the small entity representatives. 88 Fed. Reg. at 35,172. The Bureau also solicited feedback from additional stakeholders on its outline of the proposals. *Id.* Plaintiffs American Bankers Association, the Independent Bankers Association of Texas, Credit Union National Association, and the Independent Community Bankers of America, among others, submitted comments in response. *See, e.g.*, A.R. 022645,[3] A.R. 015650,[4] A.R. 022315,[5] A.R. 022208.[6] Around the same time, the Bureau conducted a voluntary survey of more than 100 financial institutions to measure the one-time costs of compliance. 88 Fed. Reg. at 35,172.

After considering all of the feedback received from small entity representatives and other stakeholders, the Bureau published its proposed rule and invited all interested parties to submit relevant information and feedback during the notice and comment process. The Bureau

---

[2] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf.
[3] *Available at* https://www.regulations.gov/document/CFPB-2021-0015-0039.
[4] *Available at* https://www.regulations.gov/document/CFPB-2021-0015-0071.
[5] *Available at* https://www.regulations.gov/document/CFPB-2021-0015-0077.
[6] *Available at* https://www.regulations.gov/document/CFPB-2021-0015-0061.

published its proposed rule online on September 1, 2021, *see* Consumer Financial Protection Bureau, *Proposed Rule, Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)* (Sept. 1, 2021);[7] and it appeared in the Federal Register more than a month later, on October 8, 2021, 86 Fed. Reg. 56,356 (Oct. 8, 2021); *see also* 88 Fed. Reg. at 35,173 n. 270. The comment period closed on January 6, 2022, 90 days from the date of publication in the Federal Register and 128 days after the public release of the proposed rule.

The proposed rule contained a detailed analysis of the expected benefits and costs of the rule, as well as the Bureau's methodology for estimating specific categories of one-time and ongoing costs. 86 Fed. Reg. at 56,542-65. The Bureau received approximately 2,100 comments on the proposed rule, including from Plaintiffs American Bankers Association, Texas Bankers Association, Texas Farm Credit Services, Independent Community Bankers of America, Equipment Leasing and Finance Association, Credit Union National Association, and the Farm Credit Council. *See* A.R. 019304,[8] A.R. 019172,[9] A.R. 017306,[10] A.R. 018556,[11] A.R. 017198,[12] A.R. 018477,[13] A.R. 017209.[14]

Many of these comments discussed the proposed rule's cost estimates and methodology in detail. *See, e.g.*, Independent Community Bankers of America Comment, at 30-32, A.R. 018586-88;[15] American Bankers Association Comment, at 9-12, A.R. 019313-16.[16] Particularly relevant to the present motion, the American Bankers Association's (ABA) comment provided

---

[7] *Available at* https://www.consumerfinance.gov/rules-policy/notice-opportunities-comment/archive-closed/small-business-lending-data-collection-under-equal-credit-opportunity-act-regulation-b/.
[8] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1715.
[9] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1692.
[10] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1563.
[11] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1528.
[12] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1228.
[13] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1514.
[14] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1229.
[15] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1528.
[16] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1715.

4

an analysis of a member survey of 479 financial institutions. *See* ABA Comment, at 8 n.15, A.R. 019312 n.15.[17] The survey solicited estimates for each of the 15 activities that impose ongoing costs listed in the Bureau's SBREFA Outline and its proposed rule. *Id.* at 11, A.R. 019315. The ABA's comment also provided feedback on the Bureau's proposed one-time cost categories based on its survey results. *Id.* at 10, A.R. 019314. And the ABA's comment letter flagged costs associated with hiring new employees as a potential "gap" in the Bureau's estimates of one-time costs. *Id*.

After considering comments received, the Bureau published the final rule on May 31, 2023. 88 Fed. Reg. 35,150 (May 31, 2023). Among the modifications made to the final rule incorporating feedback from the comments received in response to the proposed rule, the Bureau added the cost of hiring new staff to its estimates of one-time costs. *Id.* at 35,513.

### B.  Plaintiffs' Motion to Supplement the Administrative Record

Plaintiffs sued to challenge the Rule. On January 19, 2024, Plaintiffs and the Bureau jointly moved for a scheduling order to govern briefing on the parties' cross-motions for summary judgment. ECF No. 72. The Court entered that order. ECF No. 73.

On February 13, several days before Plaintiffs' opening brief was due, Plaintiffs moved for an extension of the briefing schedule "due to the coordination of schedules for all Plaintiffs' and Intervenors' counsel." ECF No. 75 at 2. The Court granted the motion.

On February 29, the day before their opening brief was due, Plaintiffs filed the present Motion to Supplement the Administrative Record. ECF No. 78. The motion asks the Court to "supplement" the record with Plaintiff ABA's analysis of a cost survey that it conducted of its

---

[17] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1715.

members "[d]uring the week of Feb. 5, 2024" and published on its website on February 26. ECF No. 78-2 at 2-3.

The survey asked respondents to estimate the same eight one-time cost categories listed in the Bureau's SBREFA Outline, proposed rule, and final rule. Doc 78-2 at 4. It also sought estimates for 10 of the 15 activities imposing ongoing costs listed in the Bureau's SBREFA Outline, proposed rule, and final rule (and that the ABA had addressed in its 2022 comment letter and prior cost estimates). Doc 78-2 at 5. The survey and ABA's analysis do not address any specific costs not previously considered by the Bureau.

## ARGUMENT

The record demonstrates that the Bureau thoroughly considered all relevant factors and the evidence before it during the rulemaking process. The material Plaintiffs would have the Court admit does not show otherwise. The Court should, accordingly, deny Plaintiffs' motion to consider extra-record material in this APA case.

**I.     It is a bedrock principle of administrative law that review of agency action takes place on the record that was before the agency at the time it acted.**

When reviewing an agency action under the APA, "[t]he task of the reviewing court is to apply the appropriate APA standard of review [] to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)); *see also* 5 U.S.C. § 706 (the court "shall review the whole record or those parts of it cited by a party").

The "record" is the "administrative record that was before the [agency] at the time [it] made [the] decision." *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 420; *accord, e.g.*, *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record

made initially in the reviewing court." (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973))).

Departing from the administrative record "is not allowed unless the moving party demonstrates

'unusual circumstances justifying a departure' from the general presumption that review is

limited to the record compiled by the agency." *Medina Cnty. Env't Action Ass'n v. Surface

Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d

991, 1002 (D.C. Cir. 2008)).

This foundational principle of APA review reflects the fact that "it is the role of the

agency to resolve factual issues to arrive at a decision that is supported by the administrative

record, whereas 'the function of the district court is to determine whether or not as a matter of

law the evidence in the administrative record permitted the agency to make the decision it did.'"

*Frank's Nursery, LLC v. Walsh*, 2022 WL 2757373, at *5 (S.D. Tex. July 14, 2022) (citing

cases). Limiting review to the record before the agency at the time it acted is also consistent with

another "venerable principle of administrative law": that "[a]n agency must defend its actions

based on the reasons it gave when it acted." *OnPath Fed. Credit Union*, 73 F.4th at 298.

## II.    Plaintiffs fail to identify any "unusual circumstance" that could justify departing from that bedrock principle in this case.

"Motions to supplement the record are rarely granted." *OnPath Fed. Credit Union*, 73

F.4th at 299; *see also Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, 2015

WL 1883522, at *1 (S.D. Tex. Apr. 20, 2015) (explaining that "[a] request for a reviewing court

to consider extra-record evidence not considered by the agency is … at odds with 'record rule'"

that typically governs APA litigation).

The Fifth Circuit has recognized "three situations where such motions [to supplement the

record] might be granted:

(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, …
(2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or
(3) the agency failed to explain administrative action so as to frustrate judicial review."

*OnPath Fed. Credit Union*, 73 F.4th at 299 (cleaned up); *see also Medina Cnty. Env't Action Ass'n*, 602 F.3d at 706.

Plaintiffs invoke only the second scenario, alleging that "the Bureau[] fail[ed] to consider all of the relevant factors" when issuing the Rule, specifically with respect to the Rule's likely benefits and costs. ECF No. 78 at 15. But in fact, the Bureau thoroughly considered those expected benefits and costs, the relevant comments the Bureau received, and the evidence before the agency when it issued the Rule. Plaintiffs' new cost figures—which they generated only after this litigation began, and even after the Court had entered a schedule for summary-judgment briefing—identify no new factor that the Bureau failed to consider.

### a. The Bureau's assessment of benefits and costs properly considered the relevant factors.

As the Bureau will explain in more detail in its forthcoming cross-motion for summary judgment, the Bureau fully considered the expected benefits, costs, and impacts of the Rule. In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons … and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. 88 Fed. Reg. at 35,492.

As described above, *see supra* at 2-3, the Bureau engaged in extensive outreach and study even before proposing a rule, including convening a SBREFA panel specifically intended to understand the potential impact of the rule on small entities. 88 Fed. Reg. at 35,171-72 (describing some of these activities).

When it issued the final rule, the Bureau provided an extensive account of the expected benefits, costs, and impacts of the rule. The Bureau estimated the specific number of financial institutions likely to be required to report under the final rule, *id.* at 35,495, and developed a cost methodology estimating both one-time and ongoing costs likely to be incurred by those institutions, *id.* at 35,496-503. The Bureau appropriately accounted for variation in costs by assuming different cost structures based on differences in financial institutions' level of complexity in compliance operations. *Id.* at 35,497. The Bureau's estimates were informed by comments it solicited, received, and considered after specifically seeking feedback on its methodology for estimating one-time and ongoing costs, the estimates of the specific costs themselves, and any information that would help it better quantify the costs, benefits, and potential impacts on industry. *Id.* at 35,494.

The Bureau's analysis included consideration of all of the relevant factors set out in the statute and of the information submitted by commenters. That information included a cost survey conducted by the ABA in November and December of 2021, after the Bureau issued its proposed rule, and that the ABA discussed in its 2022 comment letter. The ABA reported that its 2021 survey reflected responses from "479 banks and savings associations across 40 states. The respondents ranged from banks with assets of less than $500 million to more than $75 billion." ABA Comment, at 8 n.15, A.R. 019312 n.15.[18] The survey asked respondents to estimate

---

[18] *Available at* https://www.regulations.gov/comment/CFPB-2021-0015-1715.

ongoing costs of complying with the proposed rule arising from 15 different activities—such as "transcribing data," and "checking post-submission edits"—identified in the Bureau's SBREFA Outline and its proposed rule. *Id.* at 11, A.R. 019315.

In assessing the likely benefits, costs, and impacts of the Rule, the Bureau specifically considered the ABA's survey. *Compare* 88 Fed. Reg. at 35,512 (describing a survey "by a national trade association" that "found that 88 percent of respondents would need to hire an additional FTE [full time equivalent] and, on average, institutions would have to hire 2-3 FTEs") *with* ABA Comment at 10, A.R. 019314 ("In ABA's survey, 88% of respondents stated that they would have to hire more FTEs, with community banks, on average estimating they would hire 2-3 additional FTEs."). And in response to the ABA survey and input from other commenters, the Bureau increased its cost estimates in the final rule by adding a new category of one-time cost estimates to its model to account for the one-time cost of hiring new employees. *See* 88 Fed. Reg. at 35,513.

Plaintiffs thus can hardly complain that the Bureau failed to consider relevant factors in assessing the costs of the rule. *Accord City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590-91 (D.C. Cir. 2010) (denying supplementation where "[p]etitioners' positions … have by no means been scanted" because they submitted "comments and objections" that were "properly considered" by the agency). Rather, Plaintiffs themselves participated in the creation of an extensive record concerning expected costs of the rule, including by conducting their original cost survey and identifying an additional category of cost that they advocated the Bureau adopt. The Bureau in turn considered the information Plaintiffs and others submitted and made modifications to its own consideration of costs.

**b.  Plaintiffs' new cost estimates do not show that the Bureau failed to consider all relevant factors.**

The new, higher cost figures that Plaintiffs now seek to submit do not show that the Bureau failed to consider all relevant factors when it issued the Rule nearly a year ago.

**i.  Plaintiffs' new cost figures demonstrate only that Plaintiffs disagree with the Bureau's reasonable judgments in issuing the Rule—and even with their own prior estimates.**

Though Plaintiffs claim that their new cost estimates reveal "factors" that the Bureau purportedly missed in its rulemaking, their estimates simply offer a different account of the same set of costs that the Bureau thoroughly considered when it issued the Rule.

Plaintiffs disagree not only with the Bureau but with their own prior cost estimates, which the ABA submitted during notice and comment (and which go unmentioned in Plaintiffs' motion). Neither Plaintiffs' disagreement with the Bureau nor with their own past statements demonstrates that the Bureau missed some relevant "factor" that might justify deviating from the strong background principle that APA review takes place on the record that was before the agency.

A comparison of the Bureau's SBREFA outline, the proposed rule, the final rule, and Plaintiffs' new submission shows that Plaintiffs fail to offer any new cost factors that the Bureau had not already considered. The Bureau's SBREFA outline (at 49, A.R. 001607) and the proposed rule (at 86 Fed. Reg. at 56,556) both put forward eight one-time cost categories. ABA's 2024 survey uses the exact same categories. ECF Doc. 78-2 at 4.The Bureau's SBREFA outline (at 50, A.R. 001608) and proposed rule (at 86 Fed. Reg. 56,559) contain 15 activities generating ongoing costs. ABA's 2021 survey used the same 15 categories, ABA Comment at 11, A.R. 019315; its 2024 survey uses 10 of the 15 and gives no explanation for omitting the remaining five. ECF Doc. 78-2 at 5. Failing to identify any new factors that the Bureau hasn't considered,

Plaintiffs' survey is limited to only offering elevated estimates of the same cost factors that the Bureau and industry, including the ABA, have deliberated since the SBREFA process.

At bottom, Plaintiffs offer these figures simply to argue that the agency's cost estimates were incorrect. But extra-record documents are "not [to be used] as evidence that the Court believes the agency should have relied on at the time of its decision or that could show that the agency's decision was arbitrary." *Gulf Coast Rod Reel & Gun Club, Inc.*, 2015 WL 1883522, at *6; *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("Consideration of [extra-record] evidence to determine the correctness or wisdom of the agency's decision is not permitted[.]"); *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604, 613 (W.D. La. 2010) (denying supplementation of the record with documents that were nothing more than "redundant … expressions of disagreement with the FDA decision written by [the plaintiff's] representatives"). This is particularly true for documents created after a final agency action, as "they could not have been information the [agency] neglected to consider" at the time it acted. *Gulf Coast Rod Reel & Gun Club, Inc.*, 2015 WL 1883522, at *6.

Indeed, Plaintiffs' approach to supplementing the record would render meaningless the basic principle that APA review takes place on the record actually before the agency. If mere disagreement with an agency's reasoned analysis were enough to justify "supplementing" the record—even with newly created material generated only after litigation began—then it would be the rare case that was actually decided on the administrative record. *Cf. Gulf Coast Rod Reel and Gun Club, Inc.*, 2015 WL 1883522, at *6 (rejecting request to supplement record that "would render the record rule meaningless.").

Plaintiffs cite no authority that warrants the Court considering the extra-record figures they now belatedly attempt to submit. Their reliance on the district court's decision in

*Independent Turtle Farmers of Louisiana, Inc. v. United States* provides them no cover. That

case dealt with the denial of a petition to lift or amend a longstanding rule, which had been in

effect for decades, banning the sale of baby turtles. *Indep. Turtle Farmers of La.*, 703 F. Supp. 2d

at 612 n.7 ("Our review is not of the FDA's initial decision to implement the Turtle Ban. Instead,

the Court is considering the validity of the FDA's decision to deny the ITFL's petition, which

sought to lift the Turtle Ban."). The court admitted limited extra-record documents, which

postdated the adoption of the ban, in response to the plaintiff's argument that the documents

were relevant not just to the agency's initial issuance of the ban but to "the rationale to continue

the ban." *Id.* at 612. The circumstances of this case differ dramatically: Plaintiffs challenge only

the Bureau's decision to issue the Rule and seek to submit analysis they created long after that

decision was made.

Plaintiffs' true quarrel does not appear to be with whether the Bureau considered relevant

costs, but rather with Plaintiffs' own prior cost estimates, which in many instances were

substantially lower than the numbers they now put forward. For example, the ABA told the

Bureau in its 2022 comment letter that institutions with less than $500 million in assets would

need to spend $2,585 for exam preparation. It now estimates the cost of the same task at *$68,900*.

The ABA stated in 2022 that those institutions would spend $1,904 on checking post-submission

edits, but now claims the task will cost $14,117. And in 2022 the ABA estimated costs of $2,059

for geocoding data, but now claims $12,289 for the same task. *Compare* ABA Comment at 11,

A.R. 019315 *with* ECF Doc. 78-2 at 6.

### ii. Plaintiffs had the opportunity to, and did, submit their cost estimates during the notice-and-comment process.

Plaintiffs' assertion that they were foreclosed from furnishing cost information to the

Bureau during the rule's comment period, *see* ECF Doc. 78 at 9, is incorrect. As noted,

13

commenters had 128 days from when the proposed rule was made public—and 90 days from

when it appeared in the Federal Register—to provide comment. That period was nearly three

times the 45-day period that the Fifth Circuit recently approved in *Chamber of Commerce of*

*United States v. Securities & Exchange Commission*. 85 F.4th 760, 779 (5th Cir. 2023) (rejecting

claim that 45 days "was so short as to deprive petitioners of a meaningful opportunity to

comment"). Plaintiffs fail to show that this lengthy comment period was insufficient for them to

have completed and submitted the same analysis they now offer (and that is apparently based on

a survey that Plaintiffs conducted in a week or less).

And, in fact, the ABA and others did submit detailed cost estimates during the comment

period. In particular, the ABA submitted an analysis of what it expected would be the likely costs

of the rule, based on a survey of its members, addressing the same categories of costs that are

addressed in Plaintiffs' new submission and that the Bureau thoroughly analyzed when it issued

the Rule. The fact that Plaintiffs apparently now wish they had offered higher cost figures in

their analysis does not show that they were unable to provide the Bureau with relevant cost

information through the ordinary notice and comment process.

Likewise, Plaintiffs' assertion that they had insufficient notice of the rule's substantive

requirements is contrary to the facts, as the proposed and final rules contained substantially

similar data reporting requirements. *Compare* 107(a)(1)-107(a)(201) at 86 Fed. Reg. at 56,577-

78 *with* 107(a)(1)-107(a)(20) at 88 Fed. Reg. at 35,530-31. Moreover, changes the Bureau made

to the final data points were intended to make the final rule's data requirements less burdensome.

*See* 88 Fed. Reg. at 35,486 (noting modification of 107(a)(19) and (20) in the final rule to

remove proposed requirements). Notably, Plaintiffs do not identify any change from the

proposed rule to the final rule that would have prevented them from providing accurate cost figures during the comment process.

That the ABA's 2024 submission includes figures for some kinds of cost that it did not include in its 2022 comment letter is of no moment—what matters is that the ABA had ample opportunity to comment (and did comment) on proposed cost categories that were substantially similar to those in the final rule. As discussed above, *see supra* at 11, the SBREFA Outline, proposed rule, and final rule differ in only minor ways with respect to the cost categories that the Bureau estimated. The ABA did not lack the opportunity to inform the Bureau's estimates when the comment period was open, and the fact that its 2022 comment letter provided some cost figures and not others does not grant it license to relitigate the record.[19] Industry cannot "sit back and wait until the regulations [are] published in final form before coming forth and contending that the agency had failed to consider (certain facts)." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 809-12 (9th Cir. 1980) (parentheses in original).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion to supplement the record.

Dated:  March 21, 2024

Respectfully submitted,

*/s/ Karen Bloom*

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Kevin Friedl

---

[19] Although unnecessary to resolve Plaintiffs' motion, the Bureau notes that there is reason to doubt the new estimates Plaintiffs urge the Court to consider. For example, Plaintiffs allege one-time costs of $6.8 billion across the banking industry, yet nothing approaching this total follows from ABA's own 2024 numbers and the number of banks that existed as of the end of 2023. Neither the ABA's article nor the affidavit attached to Plaintiffs' motion explains the math.

15

*Acting Assistant General Counsel*
Andrea Matthews (*pro hac vice* pending)
(MA #694538)
   *Senior Counsel*
Karen Bloom (NY #4438917)
   *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 407-2324 (phone)
(202) 435-7024 (facsimile)
andrea.matthews@cfpb.gov

16

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Karen Bloom*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK; and AMERICAN BANKERS ASSOCIATION, <br><br>                   Plaintiffs, <br><br>     v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, <br><br>                   Defendants. | Case No. 7:23-cv-00144 |

**[PROPOSED] ORDER**

Having considered the parties' submissions and applicable law, it is ordered that

Plaintiffs-Intervenors' Motion to Supplement the Administrative Record is DENIED.


SO ORDERED this _____ day of _____, 2024.



                                                   _____

                                                   HON. RANDY CRANE

                                                   UNITED STATES DISTRICT JUDGE