IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

                      *Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

                      *Defendants*.

Case No: 7:23-cv-00144

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'/INTERVENORS'
MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................................... ii

**INTRODUCTION** ...................................................................................................................... 1

**ARGUMENT** .............................................................................................................................. 3

    **I.   The CFPB, Not Plaintiffs, Had The Obligation To Adequately Consider The Costs Imposed By The Final Rule** ...................................................................... 3

    **II.  The Court May (And Should) Consider The ABA Cost Survey Results** ............ 7

**CONCLUSION** .......................................................................................................................... 9

**CERTIFICATE OF SERVICE** ............................................................................................... 12

**CERTIFICATE OF COMPLIANCE** ..................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Asarco, Inc. v. EPA*,
  616 F.2d 1153 (9th Cir. 1980) ........................................................................................... 9

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) .......................................................................................................... 9

*Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*,
  No. 3:13-CV-126, 2015 WL 1883522 (S.D. Tex. Apr. 20, 2015) .................................... 7

*La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*,
  141 F. Supp. 3d 681 (S.D. Tex. 2015) .......................................................................... 7, 9

*Medina Cnty. Env't Action Association v. Surface Transp. Board*,
  602 F.3d 687 (5th Cir. 2010) ..................................................................................... 2, 6, 8

*National Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1977) ................................................................................................. 7

*OnPath Fed. Credit Union v. U.S. Dep't of Treas.*,
  73 F.4th 291 (5th Cir. 2023) ............................................................................................. 8

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ............................................................................................ 9

*Sierra Club v. Peterson*,
  185 F.3d 349 (5th Cir. 1999) ............................................................................................ 7

*Texas v. Biden*,
  No. 2:21-CV-067-Z, 2021 WL 4552547 (N.D. Tex. July 19, 2021) ............................ 6, 8

**Statutes**

§ 1071 of the Dodd-Frank Act .................................................................................... 1, 3, 4

12 U.S.C. § 5511 ............................................................................................................... 9

12 U.S.C. § 5512 ....................................................................................................... 3, 4, 6

Administrative Procedure Act, 5 U.S.C. § 706 ................................................................. 7

Pub. L. No. 111-203, §§ 1029A ........................................................................................ 3

Small Business Regulatory Enforcement Fairness Act (SBREFA) ............................... 4, 5

**Other Authorities**

ABA Comment on SBREFA (Dec. 14, 2020), available at
  https://www.regulations.gov/document/CFPB-2021-0015-0039) ................................... 4

CUNA Comment on SBREFA (Dec. 14, 2020), available at
    https://www.regulations.gov/document/CFPB-2021-0015-0077) ............................................. 4

ICBA Comment on SBREFA (Dec. 14, 2020), available at
    https://www.regulations.gov/document/CFPB-2021-0015-0061) ............................................. 4

Letter from CFPB General Counsel regarding Section 1071 of the Dodd-Frank Act (April 11,
    2011), available at https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf ............ 4

Small Business Compliance Cost Survey (July 2020), available at
    https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf ....................... 4

#### INTRODUCTION

Before issuing the Final Rule for § 1071 of the Dodd-Frank Act (Act), the Consumer Financial Protection Bureau (CFPB or Bureau) was repeatedly warned by the industry, academics, state small business regulators, and even another Federal agency that its cost estimates were too low. But CFPB underselling the burden it now looks to impose on the regulated community should be unsurprising—the Bureau was purposefully dodging the relevant numbers. And now that such cost information is available, the CFPB still looks to sidestep the issue, claiming that it conducted a "reasonable" analysis in the first instance (that should, according to the Bureau's logic, never be reassessed). Without considering the real costs, though, the analysis had no hope of being reasonable. In the end, the CFPB's opposition to Plaintiffs' and Intervenors' (collectively, "Plaintiffs") motion to supplement the record fails to contest the two fundamental points underlying Plaintiffs' request that the Court consider extra-record evidence.

*First*, evidence regarding institutions' *actual costs* of complying with the CFPB's vastly expanded data collection requirements is central to this lawsuit. The CFPB has an express statutory obligation to consider such costs, and a particular obligation to consider the costs its rules impose on smaller community banks, credit unions, and other financial institutions, as well as consumers in rural areas. Further, whether the costs imposed by the CFPB's addition of dozens of data points—costs the CFPB concedes will be passed along to small businesses—can be justified by the supposed benefits is central to Plaintiffs' claim that the CFPB acted arbitrarily and capriciously when it imposed those obligations. Accordingly, evidence regarding *actual costs* of the CFPB's rule is central to the claims that the CFPB failed to adequately consider those costs.

*Second*, the ABA Cost Survey Results demonstrate that the CFPB's estimates of the costs of compliance with the Final Rule are wildly understated. The ABA Cost Survey Results "reflect bankers' actual experience with project management planning, initial implementation of the Final

Rule, and conversations and estimates from IT, operations, compliance, and legal staff, as well as third-party vendors." Ryan Decl. ¶ 9, ECF No. 78-1.  Common sense dictates that lenders are far better able to understand the costs of compliance now that they have had the opportunity over the past year to understand what actually is required by the rule and have begun to incur those costs.  Indeed, the CFPB's response does not seriously dispute that the *actual costs* imposed by its rule are orders of magnitude greater than its estimates.  Accordingly, the ABA Cost Survey Results do not represent a mere "disagreement" with some subjective judgment, nor are they a *post hac* justification for some prior position.  Rather, the ABA Cost Survey Results represent the best evidence available of the *actual costs* imposed by the rule and, by extension, the inadequacy of the CFPB's cost estimates.  Broad references to estimates—supposedly equivalent because they were made on the same number of categories or activities on which the CFPB would eventually seek information—are both misleading and inadequate.  Not only did the regulated community not know the actual rule that would be in effect when the initial estimates were made, the Bureau asked for qualitatively different information in its Final Rule than it did in the earlier proposals.

  Plaintiffs do not disagree with the proposition that challenges to rules brought under the Administrative Procedure Act are ordinarily reviewed on the basis of the record before the agency when it finalized the rule.  But, as the CFPB concedes, this is not an ironclad rule, and courts will admit extra-record evidence when necessary to consider whether the agency "considered all of the relevant factors." *Medina Cnty. Env't Action Association v. Surface Transp. Board*, 602 F.3d 687, 706 (5th Cir. 2010).  Here, Plaintiffs' central claim is that the CFPB failed to comply with *its obligation* to consider all the relevant factors—specifically, its obligation to consider the costs associated with its vast expansion of lenders' data collection obligations.  And the evidence Plaintiffs ask the Court to consider is clearly relevant to this inquiry—indeed, it is the best evidence

2

available. Accordingly, in order to ensure that the Court adequately can assess the CFPB's compliance with its statutory obligations, Plaintiffs' Motion to Supplement the Administrative Record should be granted.

### ARGUMENT

**I.      The CFPB, Not Plaintiffs, Had The Obligation To Adequately Consider The Costs Imposed By The Final Rule.**

The CFPB is required to consider the costs and benefits of any rule it promulgates, including the costs imposed on smaller banks and credit unions and upon consumers in rural areas. 12 U.S.C. § 5512(b)(2)(A). The CFPB had both the tools and the time to ensure adequate consideration of these costs before finalizing its rule to implement § 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection of 2010. Congress granted the agency broad authority to collect data and information from market participants to "support its rulemaking . . . functions." 12 U.S.C. § 5512(c)(1). This authority includes the right to request information through "voluntary surveys," as well as the right to compel market participants to submit "special reports" or "answers in writing to specific questions." 12 U.S.C. § 5512(c)(4). The CFPB had plenty of opportunity to use this authority to adequately assess the costs associated with its rule, including its decision to significantly expand the scope of the rule. Congress made sure that the CFPB's rulemaking obligations under § 1071 would not become effective until well after the agency obtained its authority to gather data to support its rulemaking.[1] And the CFPB delayed the rulemaking until well past the statute's effective date on July 21, 2011, by opining in April 2011 that the statutory

---

[1] *See* Pub. L. No. 111-203, §§ 1029A (making the CFPB's authority to collect data effective on July 21, 2010), 1071(d) (making the amendments to the ECOA effective on the designated transfer date, July 21, 2011).

3

requirement would not go into effect until the Bureau had promulgated implementing rules, which it promised to do "expeditiously."[2]

But while the CFPB would not issue a proposed rule for over a decade, it did not use that time or its broad authority to adequately assess "the potential benefits and costs" of the real rule, and in particular the costs imposed by its vast expansion of the statutory obligations. 12 U.S.C. § 5512(b)(2). The CFPB recounts its outreach to assess costs before issuance of the proposed rule, specifically its voluntary survey of one-time costs in 2020, but it fails to mention that the survey specifically directed lenders to assume that the CFPB would only require collection of "the 13 statutorily-mandated data points."[3]

Likewise, while the CFPB mentions that it solicited comment on its Small Business Regulatory Enforcement Fairness Act (SBREFA) outline and received comments from certain Plaintiffs, it fails to note that those comments uniformly advised the CFPB to eliminate any discretionary data points due to the unnecessary burden they would impose.[4] Nor does it mention

---

[2] *See* Letter from CFPB General Counsel regarding Section 1071 of the Dodd-Frank Act (April 11, 2011), available at https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.

[3] *See* Survey: Small Business Compliance Cost Survey (July 2020), available at https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf ("While completing the survey please answer all questions under assumptions that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of the Equal Credit Opportunity Act . . . *for the 13 statutorily-mandated data points*." (emphasis added)).

[4] *See, e.g.*, ABA Comment on SBREFA (Dec. 14, 2020), available at https://www.regulations.gov/document/CFPB-2021-0015-0039 ("[T]hese [discretionary] data elements would be extremely burdensome to collect."); CUNA Comment on SBREFA (Dec. 14, 2020), available at https://www.regulations.gov/document/CFPB-2021-0015-0077 ("In developing an entirely new data collection, as a starting point, the Bureau should limit its data set to data points that are statutorily required, and not add discretionary data points merely for the sake of collecting more data."); ICBA Comment on SBREFA (Dec. 14, 2020), available at https://www.regulations.gov/document/CFPB-2021-0015-0061 ("ICBA strongly objects to the addition of any discretionary datapoints - additional fields that may increase burden or the risk of misinterpretation.").

that the Panel of small entity representatives formed pursuant to SBREFA recommended "that the Bureau continue to explore ways to minimize the burden to small [financial institutions] of collecting and reporting these data points," should they be part of the rule. AR.001195. And in all events, the CFPB should not credibly be heard to boast (at 9) about its "extensive outreach and study" before proposing the rule or the thoroughness of its SBREFA panel analysis. Any supposed study on that front was conducted before the Bureau changed the game.[5]

Before the CFPB's issuance of the proposal, lenders did not know whether the CFPB would include discretionary data points at all, let alone which discretionary data points, or the precise form in which they would be required to be collected. The CFPB faults Plaintiffs—and by extension their members—for failing to provide evidence of the costs associated with the discretionary data points during the comment period, or by failing to accurately assess the costs of the CFPB's rule during the comment period. In effect, the CFPB suggests that Plaintiffs' members, including small community banks, had the obligation to divine which discretionary data points the Bureau would include in its final rule and accurately estimate the costs imposed by such requirements all during the brief comment period.

Of course, the industry knew it would be difficult to accurately assess the costs of the proposal during the comment period, which is precisely why Plaintiffs, joined by the Small Business Administration's Office of Advocacy, implored the CFPB to provide more time. AR.014370; AR.014407. The CFPB refused this request—an action that, as Plaintiffs predicted,

---

[5] The CFPB's citations (at 5) to comments on the SBREFA Outline are incorrect. The Bureau actually cited to comments on the Equal Credit Opportunity Act Request for Information and one comment from the proposed rule, not comments on the SBREFA Outline. The correct citations are hyperlinked above in footnote 4 because it was just discovered that these comments the CFPB was attempting to cite were apparently not included in the Administrative Record. They should also be added now along with the ABA Cost Survey Results.

"preclude[d] the development of a sufficiently broad and complete factual record." AR.014370. Having declined lenders' reasonable request for an extension, the CFPB now seeks to shift responsibility for its own underestimation of costs onto the public for having failed to develop cost estimates in a matter of weeks that the CFPB could not manage to develop in over a decade.[6] But the rulemaking process is not the place for such gamesmanship, and the Court need not judge the adequacy of the CFPB's cost estimates on the basis of a record the CFPB itself artificially limited. *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *2 (N.D. Tex. July 19, 2021) ("[A]n adequate record can sometimes only be determined 'by looking outside the [administrative record] to see what the agency may have ignored.'"); *cf. Medina*, 602 F.3d at 706 (permitting admission of extra-record evidence with the agency "deliberately . . . excluded documents that may have been adverse to its decision.").

In any event, the obligation to consider costs, and to ensure that costs could be justified by the benefits of the rule, belongs to the CFPB only. 12 U.S.C. § 5512(b)(2). It had ample authority and ample time to assess the costs of the rule, including the incremental costs imposed by its discretionary data points. The CFPB refused to use that authority or take that time before saddling lenders (and, by extension, small businesses borrowers) with the costs of its vastly expanded rule. The ABA Cost Survey Results show that the CFPB's cost estimates were grossly inadequate. The only question is whether the Court must blind itself to this reality when adjudicating Plaintiffs' claims. As further explained below, the answer to that question is clearly "no."

---

[6] The ABA freely concedes that its members, and in particular its smaller community bank members, may have underestimated the costs of compliance with the proposed rule during the initial weeks after it was released.

**II.     The Court May (And Should) Consider The ABA Cost Survey Results.**

Claims under the Administrative Procedure Act must be reviewed under the "whole record," 5 U.S.C. § 706, but the record need not be limited to the record compiled by the agency before it made its decision. *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-126, 2015 WL 1883522, at *1 (S.D. Tex. Apr. 20, 2015). Indeed, courts have recognized a number of circumstances in which the record may be supplemented with "extra-record" evidence, including when, as here, the evidence will help the court "determine whether the agency has considered all relevant factors," or when the agency itself has taken steps to limit the record. *La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 141 F. Supp. 3d 681, 694 (S.D. Tex. 2015) (citing *Davis Mountain* factors, including instances where "evidence arising after the agency action shows whether the decision was correct or not").

Even if rarely exercised, courts' ability to consider such "extra-record" evidence is essential to the judicial review of administrative action because it discourages agencies from either failing to collect and consider evidence that runs contrary to their preconceived policy judgments, or from denying the public an adequate opportunity to present evidence that runs contrary to that judgment. These concerns are especially significant when the agency is not just making a policy judgment (*e.g.*, the resolution of some statutory ambiguity) but has a *statutory duty* to consider some empirical factor before making a decision. As the Fifth Circuit has observed in the context of the National Environmental Policy Act (NEPA), when the agency has "a duty . . . to compile a comprehensive analysis of the environmental impacts of its proposed action, . . . review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record." *Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999) (quoting *National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14–15 (2d Cir. 1977)). Indeed, "[t]o limit the

judicial inquiry regarding the completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA." *Id.*

There is no sound reason for the principle articulated in *Peterson* to apply differently when the statutory duty is the consideration of economic, as opposed to environmental, impacts. The CFPB's "statutory duty" was not just to make a reasonable (that is, not arbitrary and capricious) judgment based on the record before it. It had an independent obligation to consider the benefits and costs of the rule, including the benefits and costs of the vast expansion of lenders' data collection obligations under its discretionary authority, regardless of the comments it received. As described above, the CFPB had both the time and tools to adequately consider that empirical question, and Plaintiffs allege that it failed to carry out its "statutory duty."

While the ABA Cost Results Survey is "extra-record" evidence, a court may consider such evidence when doing so is necessary to determine whether the agency adequately considered "all of the relevant factors." *Medina*, 602 F.3d at 706. The relevant factors Plaintiffs allege the CFPB failed to adequately consider here are "the potential benefits and costs of the rule" including "potential reduction of access" to credit, the impact on smaller banks and credit unions, and "the impact on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A). Consideration of the ABA Cost Results Survey—the best evidence of the *actual costs* of the rule—will aid the Court in its determination of whether Plaintiffs are right, and therefore the survey results should be included in the record. Because the CFPB intentionally chose to avoid collecting the most relevant data (that would have conflicted with the Bureau's assumptions about costs), supplementation of the record is appropriate. *See Texas v. Biden*, 2021 WL 4552547, at *2; *cf. OnPath Fed. Credit Union v. U.S. Dep't of Treas.*, 73 F.4th 291, 299 (5th Cir. 2023) (allowing administrative record to be supplemented where an agency "deliberately or negligently excluded documents that may have

8

been adverse to its decision"); *La Union del Pueblo*, 141 F.Supp.3d at 694 (noting supplementation is appropriate where agency has shown bad faith or improper behavior).[7]

The CFPB's opposition to the motion to supplement does not contest that the ABA's Cost Results Survey will aid the Court; instead, the Bureau argues the merits of the claim that it failed to adequately consider the costs its rule will impose on lenders and small business borrowers. But that is what the summary judgment briefing is for, and the CFPB will have an opportunity to explain in that briefing why its consideration of the costs and benefits of the rule fulfilled its statutory obligations even though its estimates turned out to be orders of magnitude below what the parties now know are the *actual costs* of the Final Rule.[8]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court supplement the administrative record with the ABA Cost Survey Results in Supplement provided or, in the alternative, remand for the agency to consider the ABA Cost Survey Results in the first instance. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

---

[7] The CFPB cites *Asarco* to argue that courts cannot consider extra-record evidence to consider the correctness of the agency's decision. The Bureau fails to recognize, however, *Asarco*'s warning that a "court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). Rather, as the Ninth Circuit stated elsewhere, the information sought to be added here is not to judge the wisdom of the agency's action—it merely "permits [this Court] to consider extra-record evidence to develop a background against which it can evaluate the integrity of the agency's analysis." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014). The logic of *Asarco* is no obstacle to supplementing the record here.

[8] Notably, Congress specifically charged the CFPB with ensuring that "outdated, unnecessary, or *unduly burdensome regulations* are regularly identified and addressed in order to *reduce unwarranted regulatory burdens.*" 12 U.S.C. § 5511(b)(3) (emphasis added). It is curious, therefore, that the CFPB's response to the ABA Cost Survey Results is not only to suggest that the court must ignore them but that it will ignore them as well.

9

March 28, 2024

Respectfully submitted.

*/s/ John C. Sullivan*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

James J. Butera*
Ryan Israel*
**MEEKS, BUTERA & ISRAEL PLLC**
2020 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 795-9714
jbutera@meeksbi.com
risrael@meeksbi.com

Thomas Pinder*
Andrew Doersam*
**AMERICAN BANKERS ASSOCIATION**
1333 New Hampshire Avenue, NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Counsel for Plaintiffs Texas Bankers Association, Rio Bank, and American Bankers Association*

* admitted pro hac vice

10

*/s/ James Bowen*
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com

*Counsel for Intervenors Texas First Bank, Independent Bankers Association of Texas, and Independent Community Bankers of America*

*/s/ Misha Tseytlin*
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
misha.tseytlin@troutman.com

Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com

*Counsel for Intervenors Texas Farm Credit, Farm Credit Council, and Capital Farm Credit*

*/s/ Owen Colin Babcock*
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com

*Counsel for Intervenors XL Funding, LLC, and Equipment Leasing and Finance Association*

*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com

*Counsel for Intervenors Rally Credit Union, America's Credit Unions, and Cornerstone Credit Union League*

11

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on March 28, 2024, via the CM/ECF system and via email courtesy copy to Counsel for Defendants.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This document was prepared using Microsoft Word 365, 2022 Version. It is written in Times New Roman typeface using 12-point font and contains 2562 words.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*