# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS'/INTERVENORS' REPLY IN SUPPORT OF
CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

### TABLE OF CONTENTS

Table of Authorities...................................................................................................... ii

Argument ......................................................................................................................... 3

I. The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's
Discretionary Data Points. ....................................................................................... 3

   A. The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the
Costs of the Expanded Data Collection Requirements. .................................. 4

   B. The Bureau's Benefits Analysis Does Not Reflect a Reasonable
Consideration of the Hypothetical Benefits of the Expanded Rule
or Justify the Need for It. .............................................................................. 13

     1. The Bureau's "expected" benefits of the additional data points
are unsupported. ....................................................................................... 13

       a. The Final Rule's data point expansion relies on unfounded assumptions
about the commercial lending market. ............................................... 14

       b. The Final Rule does not demonstrate that response rates will be sufficient
to allow meaningful analysis of the data........................................... 16

     2. The Bureau did not show that the benefits of the additional data points
outweigh the significant costs. ................................................................. 18

II. The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data
Collection Requirements........................................................................................ 20

   A. Unlimited Bureaucratic Discretion is Not Supported by the Text of the
Statute. ........................................................................................................ 20

     1. The plain meaning of the text refutes the CFPB's bid for broad discretion
on what financial institutions are forced to "inquire" about from applicants. ...... 21

     2. Statutory context also prohibits the Bureau's overzealous interpretation............ 23

   B. The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes
as the True Costs of the Rule Will be a Decrease in Credit Availability for
Women-Owned and Minority-Owned Small Businesses........................... 25

III. The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To
Reasonably Consider The Warnings Presented By Federal And State Agencies,
Academics, And The Regulated Community. ......................................................... 28

Conclusion ..................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones*,
   722 F.3d 711 (5th Cir. 2013) .................................................... 29

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998) .................................................... 23

*Bailey v. United States*,
   516 U.S. 137 (1995) .................................................... 21

*Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*,
   331 U.S. 519 (1947) .................................................... 23

*Bus. Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011) .................................................... 3, 10, 28

*Chamber of Commerce v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) .................................................... 9

*Chamber of Commerce v. SEC*,
   85 F.4th 760 (5th Cir. 2023) .................................................... *passim*

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................................... 25

*D.R. Horton, Inc. v. NLRB*,
   737 F.3d 344 (5th Cir. 2013) .................................................... 20

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) .................................................... 23

*Duncan v. Walker*,
   533 U.S. 167 (2001) .................................................... 21

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) .................................................... 7, 8, 28

*Huawei Technologies USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) .................................................... 7, 8, 9, 25

*Huntington Ingalls, Inc. v. Director, OWCP*,
   70 F.4th 245 (5th Cir. 2023) .................................................... 25

*Loper Bright Enters., Inc. v. Raimondo*,
   45 F.4th 359 (D.C. Cir. 2022), *cert granted*, 2023 WL 3158352 (2023) .................................................... 25

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .................................................... 2

*Mexican Gulf Fishing v. U.S. Dep't of Commerce*,
   60 F.4th 956 (5th Cir. 2023) .................................................... *passim*

*Michigan v. EPA*,
   576 U.S. 743 (2015) .................................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*,
  463 U.S. 29 (1983) .............................................................. 3, 28, 29, 30

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ........................................................ 9

*Perrin v. United States*,
  444 U.S. 37 (1979) ......................................................................... 21

*Price v. U.S. Dep't of Educ.*,
  209 F. Supp. 3d 925 (S.D. Tex. 2016) ................................... 9, 18, 28, 30

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ........................................................ 9

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ....................................................................... 18

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ......................................................... 30

*Tesla, Inc. v. NLRB*,
  86 F.4th 640 (2023) ....................................................................... 20

*Univ. of Tex. M.D. Anderson Cancer Center v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ........................................................... 2

**Statutes**

12 U.S.C. § 1811 ............................................................................ 25

12 U.S.C. § 5512 ............................................................................ 11

15 U.S.C. § 634 ............................................................................... 5

Administrative Procedure Act (APA),
  5 U.S.C. § 706 ...................................................... 1, 2, 10, 21, 28

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act),
  Pub. L. No. 111-203, § 1071 (codified at 15 U.S.C. § 1691c–2) ..................... *passim*

Equal Credit Opportunity Act (ECOA),
  15 U.S.C. § 1691, *et seq.* ................................................... 12, 25

Home Mortgage Disclosure Act (HMDA),
  12 U.S.C. § 2801, *et seq.* ....................................................... *passim*

Regulatory Flexibility Act (RFA),
  5 U.S.C. § 601, *et seq* ................................................................. 29

Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) ......................... *passim*

Truth in Lending Act (TILA),
  15 U.S.C. § 1601, *et seq.* ....................................................... 6, 10

**Regulations**

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B),
88 Fed. Reg. 35150 (May 31, 2023) (the Final Rule)[1] ....................................................... *passim*

**Other Authorities**

Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
(Aug. 13, 2002) ................................................................................................................ 1

Merriam-Webster.com Dictionary ...................................................................................... 22

U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY,
*Background Paper on the Office of Advocacy, 2017-2020* (January 2021),
*available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-
Paper-Office-of-Advocacy-2017-2020-web.pdf ........................................................ 5

---

[1] The Final Rule is available at AR.000001–000422.  All "AR." cites are to the Administrative Record prepared by the CFPB.

In their Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment, Defendants (CFPB or Bureau) concede an obligation to reasonably consider the costs and benefits imposed by the Final Rule, including the Final Rule's vast expansion of lenders' data collection obligations beyond the information that Congress specifically required. The Bureau's defense of its cost/benefit analysis, however, relies heavily on a consideration of the rule's potential impacts conducted *before* it significantly increased lenders' data collection requirements, and it largely dismisses commenters' significant concerns with the rule's consequences.

For example, the Final Rule mentions that the CFPB received a comment from "an association of State bank supervisors," AR.000126, but it does not seriously address these state agencies' concern "that the regulatory burdens and costs associated with implementing the data collection and reporting requirements, as proposed, will have a disproportionate impact on smaller financial institutions that provide the majority of small business credit in rural and underserved areas"—even though these very agencies directly supervise the vast majority of small business lenders.  AR017973.  And while the Final Rule catalogues concerns from the SBA Office of Advocacy—because Executive Order 13272 requires agencies to "[g]ive every appropriate consideration to any comments provided by Advocacy regarding a draft rule"—it fails substantively to address the most significant arguments.  *See* AR.000372 (providing beliefs rather than rationales for why the SBA Office of Advocacy was incorrect).  In similar fashion, the CFPB simply brushed aside arguments from academia and financial institutions indicating that the Bureau was not considering all the costs that expanding the rule would impose.

Even under a generous reading of the Administrative Procedure Act (APA), this is arbitrary and capricious.  The CFPB is not entitled to blind deference; arbitrary and capricious review is

1

still "searching and careful." *Univ. of Tex. M.D. Anderson Cancer Center v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The APA does not give the CFPB "free license to interpret comments in a manner that ducks the hard questions. Indeed, too much deference would essentially allow the Government to bury its head in the sand. The Administrative Procedure Act demands more than this." *Mexican Gulf Fishing v. U.S. Dep't of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023).

Just as it discounts the costs, the Bureau consistently extols the potential benefits of the Final Rule without pointing to any record evidence to justify this blind faith. For example, the CFPB states that it considered the differences between mortgage lending and small business lending, but it can only point to consideration of differences in potential costs (not benefits). Likewise, the CFPB discounts the only evidence on the likely response rates of small business loan applicants—suggesting they will be too low for the data to be meaningful—by pointing to measures the Bureau hopes (but cannot demonstrate) will improve those response rates. That is an unreasonable response to the problem, especially when a reasonable approach was repeatedly provided by commenters: require only the statutory data points until response rates are known.

The Bureau looks to paint Plaintiffs' challenge to the CFPB's discretionary actions as a mere policy dispute with Congress. But Plaintiffs have not challenged the statute, and specifically requested that the Bureau promulgate a rule that imposed only the statutory data collection requirements. Rather, Plaintiffs challenge the Bureau's vast expansion of lenders' data collection obligations beyond those imposed by the statute, and its failure to adequately consider or justify the costs of that expansion relative to the benefits. Plaintiffs have explained, repeatedly, why the addition of discretionary data points will not justify the costs, while the CFPB simply asserts that the costs will be worth it. This is not enough. The Bureau's *ipse dixit* is not a sufficient basis for

imposing a staggering compliance burden on lenders.  As explained previously, the Final Rule will not serve the laudable purposes of the statute—it will only undermine them.

ARGUMENT

## I.    The CFPB Did Not Reasonably Address The Costs Or Benefits Of The Rule's Discretionary Data Points.

Given the CFPB's failure to address the arguments previously made concerning the faulty cost/benefit analysis, Plaintiffs begin with this dispositive claim.  Administrative law is clear: "a regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'"  *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)).  This "includes, of course, considering the costs and benefits associated with the regulation."  *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)).  And a cost/benefit analysis is inadequate if the agency "duck[s] serious evaluation of" certain costs.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150–55 (D.C. Cir. 2011).  Merely saying a cost is "expected" to be less does not provide a reasoned analysis for why or how it will be so.  The Final Rule did not provide a reasoned, non-arbitrary discussion of the significant added costs and questionable benefits.

Commenters—including Plaintiffs, academics, state regulators, and the SBA's Office of Advocacy—raised serious concerns with the costs and benefits of forcing financial institutions to inquire about a trove of additional information, extending far beyond the statutory list.  *See* Plaintiffs' Motion at 26–35.  In response to Plaintiffs' Motion, the Bureau offers two basic arguments (at 21–39): (1) the Final Rule mentions the various costs raised by Plaintiffs (and took steps intended to reduce *some* of those costs); and (2) the CFPB did not want to miss out on any *potential* benefit it believes could result from expanding the amount of data lenders would be required to collect.  Both arguments fail.  First, simply mentioning a point raised by commenters

3

does not satisfy the Bureau's obligation to provide a reasoned analysis why commenters' concerns should be rejected.  The Bureau's failure to address these comments is even more significant because the comments came from the federal agency responsible for protecting small business.  Second, listing hypothetical benefits, without providing an evidentiary basis for concluding that those benefits will actually be realized, is insufficient to satisfy Congress's directive that the CFPB consider the costs and benefits of a rule before promulgating it.  Simply put, the Final Rule does not provide a reasoned explanation for why financial institutions and small businesses alike must shoulder the burden the CFPB looks to impose for unknown (and unknowable) potential benefits.

While the Bureau claims (at 22–23) that the SBREFA panel and its 2020 survey support the reasonableness of the agency's cost/benefit analysis, those facts only underscore the deficiencies in the Bureau's approach.  The SBREFA panel and the survey were based on the collection of only the data points identified in the statute; but the Bureau chose, after a change in leadership, to set aside straightforward adherence to § 1071's congressional mandate in favor of a radically expanded and costly rule.  Far from a "run-of-the-mill policy disagreement," Resp. Br. at 22, Plaintiffs have shown—and the CFPB has not persuasively countered—that the CFPB failed to perform a reasoned analysis of both the costs and the supposed benefits of the additional information gathering obligations.

### A.   The Bureau's Analysis Does Not Reflect a Reasonable Estimation of the Costs of the Expanded Data Collection Requirements.

The CFPB's cost estimates for the Final Rule are unreasonable.  As Plaintiffs previously demonstrated, Motion at 28–33, the Bureau underestimated the costs of the rule by: (1) failing to collect cost data from financial institutions regarding their expected implementation or ongoing costs associated with the discretionary data points; (2) ignoring authoritative sources in favor of a flawed "one-time" cost survey and estimates based on lenders' experience with very different

obligations under the Home Mortgage Disclosure Act (HMDA); and (3) failing to account for the additional costs related to reputational harm and increased fair lending litigation arising from false positives suggested by the data (even though the Final Rule does note the existence of those costs).

To avoid these troubling facts, the Bureau relies on a host of unsupported assumptions about what it *expects*. But it is no surprise that the SBA Office of Advocacy told the CFPB its cost estimates were too low and encouraged the Bureau not to impose the expanded version of the rule. AR.000345. When another part of the federal government warns that something will be too costly, an obvious problem exists.[2]

As Plaintiffs have shown, the CFPB's cost estimates cannot be credited because:

- the estimates rely on a 2020 survey that estimated costs under the assumption that lenders would only have to collect the statutorily-mandated data points, and did not survey a broad enough sample of lenders to be representative of lenders' costs even with that exercise— AR.000023, AR.000444, AR.000614–15;

---

[2] In an attempt to downplay the significance of Advocacy's warnings, the CFPB quibbles (at 31 n.15) that the SBA Office of Advocacy is not itself a federal agency. This is both a red herring and inconsistent with how the Office operates. Certainly, Advocacy is an office "within the Small Business Administration." 15 U.S.C. § 634a. But the SBA Office of Advocacy has a congressionally-mandated duty to "represent the views and interests of small businesses before *other* Federal agencies whose policies and activities may affect them." *Id.* § 634c(a)(4) (emphasis added). This indicates that Congress views the Office as either equivalent to an agency or speaking on behalf of the SBA—otherwise the statue would say "any" instead of "other" federal agencies. Additionally, the Chief Counsel for Advocacy is appointed by the President and confirmed by the Senate. *Id.* § 634a. Also relevant, Advocacy views itself as primarily an independent body. *See* U.S. SMALL BUSINESS ADMINISTRATION OFFICE OF ADVOCACY, *Background Paper on the Office of Advocacy, 2017-2020*, at 111–19 (January 2021), *available at* https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf. In all events, the Office speaks authoritatively for the SBA in the area at issue here; thus, the CFPB's quibble is, at best, irrelevant. When Advocacy told CFPB not to impose the new version of § 1071 because it would harm small businesses—and to wait for authoritative cost numbers—it was an agency of the federal government providing significant warnings the Bureau ignored.

- the estimates address the likelihood of lenders lending less, or exiting the market altogether, based on unrepresentative survey data—AR.000365–66;

- the estimates are based on an extrapolation of data collection costs in the inapplicable HMDA context—*compare* AR.000347; *with* AR.019174, AR.002239 (noting HMDA data collection is qualitatively different from § 1071 data collection), and AR.019329;[3]

- the estimates discount the Final Rule's negative impact on the availability of small business credit by relying on a 2020 SBREFA panel report that did not assess the rule proposed in 2021 and finalized in 2023—AR.000444, AR.000614–15, and AR.023869–71;

- the estimates acknowledge the lack of actual cost estimates for the discretionary data points, but the CFPB refused to develop non-arbitrary estimates or allow commenters sufficient time to develop better estimates, even though another federal agency informed the CFPB that the data could be obtained from lenders and encouraged the Bureau to "disregard the discretionary data points" due, in large part, to costs—AR.000343, AR.000023, AR.000444, and AR.018385–92;[4]

---

[3] The Bureau argues (at 35) that the overlap between the Truth in Lending Act (TILA) and HMDA does not undermine the agency's analysis here. That is wrong. As Plaintiffs explained previously, Plaintiffs' Motion at 30, costs associated with HMDA data collection are not an accurate comparison for the Final Rule because TILA requires overlapping data collection (and creation) for consumer lending but not business lending; HMDA costs are thus much less than § 1071 costs. The Bureau only confirms this when it argues that, under the new rule, "lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect."

[4] Even though the CFPB has access to what the SBA Office of Advocacy said would be "authoritative" data concerning the rule that was promulgated (not the version at issue when CFPB conducted its own survey), the Bureau resists the consideration of those numbers in an attempt to safeguard its preordained conclusion. *See* ECF Nos. 78, 85, & 87.

 The Bureau characterizes (at 24 n.12) the numbers in the 2024 survey—conducted once the regulated community had time to assess what the rule required and what compliance would cost—as merely a disagreement with the Bureau's analysis. But that survey—considering only the costs for depository institutions—underscores that the CFPB failed to consider the SBA's advice that the cost estimates were too low.

- the estimates omit a calculation of costs associated with the impact of misleading data that does not accurately reflect the complexity of small business lending or (due to low response rates) the demographics of lenders' applicants, including ignoring the costs of defending lawsuits that will be brought under the Equal Credit Opportunity Act by private actors— AR.002239, AR.018385, and AR.019328;

- the estimates ignore additional costs such as the security firewall and related expenses, and the CFPB does not address this required cost except to say that some (unidentified) institutions will not have to pay for it—AR.000361, AR.000444, and AR.004201–14.

1.    To sidestep the cost argument, the CFPB first claims (at 30–31) that it reasonably considered data from regulated entities.  The Bureau focuses on the cost survey from 2020, attempting to support it with caselaw granting agency deference on questions of cost analysis.  But the Bureau's 2020 survey was based on only the statutorily-required data points and so could not capture even the one-time compliance costs accurately; it is thus is entirely unresponsive to the point that the additional, non-statutory costs are unjustified.  Nothing in the record suggests that the obligation to request, collect, and report a host of additional data will be costless.  Indeed, there is plenty of evidence to the contrary—especially given that much of the additional data is fundamentally different (*e.g.*, pricing) than the data Congress directed lenders to collect.[5]

Contrary to the Bureau's arguments (at 30), the present situation is unlike the analyses upheld in *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and *Huawei Technologies*

---

[5] One example of those costs is the 2021 NAFCU survey (conducted after the expanded rule was introduced), indicating that one-third of federally-insured credit unions would consider leaving the market because of the rule.  Plaintiffs' Motion at 5 n.4.  This is at odds with the Bureau's conclusions based on the outdated SBREFA panel results—a panel in which the Small Entity Representatives told the CFPB that its cost estimates were too low.  AR.018388.  Without irony, the CFPB now argues (at 29) that "it is not clear that the [NAFCU] survey results remain meaningful."  The CFPB should have applied that logic to its own 2020 survey.

*USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021). In *Prometheus Radio*, the FCC repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it) and received none. 592 U.S. at 425. There was thus no counter evidence to the FCC's conclusion, and there was even some evidence supporting the agency's conclusion. *Id.* at 424. Moreover, the only potentially conflicting data available to the FCC supported the agency's conclusion on the effects of the rule. *Id.* at 426. The Fifth Circuit recently rejected the same flawed argument the Bureau advances here, noting that "[c]ritical to the holding in *Prometheus* was the FCC's reliance on both 'the data it had' and 'the absence of any countervailing evidence.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) (quoting *Prometheus Radio*, 592 U.S. at 425)). As in *Chamber of Commerce*, the CFPB cannot rely on *Prometheus Radio*—the data the Bureau had was known to be inadequate and there was countervailing evidence forthcoming—which Plaintiffs' have now asked the Court to consider, ECF No. 78—that would confirm Advocacy's cost concerns.

Similarly, in *Huawei Technologies*, the FCC provided reasoned arguments for the exclusion of two Chinese providers from the market and the agency had no evidence that suggested increased costs would result from taking that action. 2 F.4th at 453. Because the company challenging the FCC's order could not point to such evidence, the agency "reasonably relied on 'the evidence it had'—extensive data about the costs of excluding Huawei and ZTE from the market." *Id.* Again, the Fifth Circuit has refuted the argument the Bureau advances here. *See Chamber of Commerce*, 85 F.4th at 775 ("Such datasets and academic studies are a far cry from the comments at issue in *Huawei* that failed to 'identify relevant cost data the agency ignored.' The *Huawei* comments were 'asserted without evidence,' 'speculative,' and devoid of any 'factual basis.'" (quoting *Huawei*, 2 F.4th at 453–54)). The Plaintiffs—and a federal agency—have pointed directly to relevant cost

data that the CFPB was choosing to ignore; their arguments were hardly "asserted without evidence," "speculative," or devoid of any "factual basis."

To be sure, an agency need not account for evidence it does not have or "respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Huawei*, 2 F.4th at 454 (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). But because of the extensive factual and policy bases that were provided to the agency regarding costs, there is no reasoned justification for the agency to have avoided those numbers. As the Fifth Circuit has recognized, "[a]n agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Id.* at 452 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). The serious flaws here—outlined above—include "studiously avoid[ing]" the actual costs of the additional data points, *Price v. U.S. Dep't of Educ.*, 209 F. Supp. 3d 925, 932 (S.D. Tex. 2016), rationalizing the costs with a defective survey and flawed rationale, and not accounting for at least two costs commenters highlighted—lawsuits and the firewall requirement.

The CFPB admits that "the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule." AR.000343. Yet the SBA Office of Advocacy told the Bureau that authoritative cost estimates would become available if the Bureau allowed industry the necessary time. Instead of waiting for those reliable, non-arbitrary cost estimates, the CFPB chose instead to finalize its rule without resurveying lenders or otherwise obtaining reliable cost data. AR.014369. This case is therefore closer to the D.C. Circuit case *Chamber of Commerce v. SEC*, where the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs." 412 F.3d 133, 144 (D.C. Cir. 2005) (internal quotation marks and citation omitted). In short, the agency sought to bury its head in the sand and duck the hard questions on

cost—a clear violation of the APA.  *See Mexican Gulf Fishing*, 60 F.4th at 973; *Business Roundtable*, 647 F.3d at 1150–55.[6]

2. The CFPB closes the merits portion of its brief (at 31–39) with a series of flawed arguments aimed at defending against the charge that the Bureau ignored certain types of costs.[7]

The initial cost argument (at 31–32)—that the real-world costs of expanding the rule were reasonably considered—blinks reality. The Bureau seeks (again) to paint this as a policy disagreement where the agency merely insufficiently considered a single commenter's concern that the rule would limit small businesses' access to credit and raise those costs. As Plaintiffs showed previously (at 29–34), however, the Administrative Record reflects otherwise. It was, of course, not just one commenter—numerous groups, academics, and agencies all opposed the addition of discretionary data points. And the CFPB miscalculated the real-world costs because it failed to accurately account for things such as: (1) the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources or information already being collected and disclosed, such as that required by TILA); (2) the fact that the SBREFA panel provided feedback on a rule that was different in kind from the Final Rule due to the much more limited scope of the rule considered by the panel; and (3) the expected decrease in small businesses' access to credit even if lenders do not leave the market.

The CFPB repeatedly trumpets its shift from 25 to 100 covered transactions for reporting to be triggered as the panacea for this problem. *See, e.g.*, Resp. Br. at 25. But that revision does

---

[6] This is also the problem with the Bureau's "methodology" argument. Resp. Br. at 35–36. Plaintiffs do not argue that the CFPB can never use reasonable predictive judgments. Instead, Plaintiffs take issue with the unreasonable manner in which the Bureau framed the issue, including using unrepresentative samples and using estimates when actual numbers could have been available (at any point during the prior 13 years or after the agency decided to expand the rule).

[7] Some of these arguments also go to the consideration of benefits and the Bureau's use of estimates in calculating the costs and benefits.

nothing to relieve the burden (and cost) for the vast majority of lenders, and the decision to exempt the smallest volume lenders does not change the fact that commenters repeatedly warned that the Final Rule will limit the availability of small business credit and increase its cost. The Final Rule mentions (at AR.000365) the fact that some institutions will lend less but does not explain why that will not "significantly decrease aggregate credit" or even attempt to account for institutions that will choose not to expand lending to stay on the non-reporting side of 100 transactions.

The Bureau also argues (at 32) that it adequately considered the cost the Final Rule would have on small lenders. This argument fails, too. The CFPB ducks the academics' argument that small lenders would feel the effects of the rule expansion most. The Bureau complains this is a relative argument without acknowledging that the researchers from Texas Tech were already explaining how the rule would be bad for all lenders. Above all, if the rule is bad for all lenders, then the increased bad effects on small lenders is not just a relative harm, rather it is an absolute one. To be sure, the CFPB's shift from 25 to 100 transactions will help reduce compliance burdens on *some* "small volume lenders," but Plaintiffs' actual argument here aligns with the researchers' conclusions: the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year. AR.000031.

The Bureau also failed to adequately "consider . . . the impact of [its] *proposed* rule[]" on small business borrowers "in rural areas," as the Congress required it to do. 12 U.S.C. § 5512(b)(2)(A)(ii) (emphasis added). Indeed, the Final Rule is entirely bereft of any discussion of how the principal innovation of the "proposed rule"—the addition of numerous data points to those in the statute—would impact rural small businesses. AR.000368–69. Yet the predominant suppliers of rural small business credit (Farm Credit System lenders) vigorously opposed the addition of those data points (along with other rural lenders) and explained that, as cooperatives,

100% of the cost of those added data points would be borne by their small business customers. AR.017211, 017217–19.  The Final Rule nonetheless failed to account for the unique prevalence of cooperatives in rural lending and how that structure impacts borrowers themselves.  Instead, in the Final Rule's rural analysis, the Bureau mainly relied on its assumption that lenders everywhere generally "absorb one-time costs and increased fixed costs in the short run."  AR.000368.

The Bureau likewise argues (at 34–35) that it reasonably ignored the costs of implementing the firewall—having excluded its cost from the 2020 survey—because the agency ultimately permitted the cost to be avoided by some financial institutions.  *See* AR.000361.  While that may be true of some lenders, the Bureau does not explain which institutions will be subject to the requirement (so as to provide an accurate cost estimate).  The Final Rule states that a financial institution may provide a notice to loan applicants regarding who has access to their financial information rather than implementing a firewall if "it would not be feasible . . . to implement the firewall."  *Id.*  The obvious problem is that many—if not most—financial institutions would find it "feasible" to implement a firewall, but it "would be very costly."  *Id.*  Setting aside what "feasibility" means, the CFPB will doubtless expect most of its reporting lenders to abide by the requirement—even though it has apparently exempted some unknown group.  That additional cost will thus be imposed on financial institutions along with the rest of the Bureau's expanded rule. Because the CFPB concedes that it excluded this cost from the analysis, and because it is another significant cost not factored into the overall equation that the CFPB continually touts as reasonable, its omission underscores that the cost analysis is arbitrary and capricious.

Finally, the CFPB claims (at 35) that the "bona fide error" and "safe harbor" provisions of the regulation address industry concerns about frivolous lawsuits against financial institutions.  *See* Plaintiffs' Motion at 32.  They do not.  Those two provisions only "limit private liability"—

AR.000273—when a lender makes an innocent mistake in collecting, compiling, and recording data under Subpart B of Regulation B (*i.e.*, the rule implementing § 1071). Neither provides any help for lenders wrongly accused of discrimination in private actions based on flawed and misleading data sets. And, of course, even if the bona fide error or safe harbor provisions apply, that does not amount to immunity from suit; it merely provides an affirmative defense. Thus, increased litigation is yet another in a long list of costs for which the Bureau failed to accurately account, rendering the Final Rule arbitrary and capricious.

> **B.    The Bureau's Benefits Analysis Does Not Reflect a Reasonable Consideration of the Hypothetical Benefits of the Expanded Rule or Justify the Need for It.**

In addition to its flawed cost assessment, the CFPB mishandled the benefits analysis. The Bureau repeatedly claims that the additional information sought in the Final Rule will enable business and community development and facilitate enforcement of fair lending laws. *See* Resp. Br. at 14. The Final Rule, however, overestimates any supposed benefits by assuming that more data will automatically be useful and fails to justify the need for the expanded rule.[8]

> **1.    The Bureau's "expected" benefits of the additional data points are unsupported.**

As Plaintiffs showed in their Motion (at 11–20, 34–35), the Final Rule will not have the benefits "expected" by the CFPB because the information being collected will not capture the factors lenders consider when underwriting and pricing small business loans, particularly relative

---

[8] The CFPB downplays (at 38) the significance of the numerical expansion of data points from 13 to 81. The Bureau fails to acknowledge, however, that Plaintiffs are only using the CFPB's own "Data Points Chart" as a reference. AR.001638–77. But the CFPB's point here is another red herring. More important than the number of new categories added is the substance of some of those categories. Pricing information for loans, for example, is not something currently collected in any reportable form by financial institutions. IT systems to collect and report this data will have to be entirely constructed, at great cost, merely for the purposes of the Final Rule. Moreover, pricing information is based on proprietary factors that financial institutions use to compete, and the Bureau now wants that intellectual property shared publicly.

to HMDA's better (though by no means perfect) ability to capture the factors considered in mortgage lending. This is so for two primary reasons. First, underwriting factors considered in commercial lending are non-standard (*e.g.*, the value of collateral, type of guarantee, the track record of a serial entrepreneur, etc.), while mortgage lending is based largely on standardized underwriting factors dictated or influenced by the secondary market (*e.g.*, Fannie Mae, Freddie Mac) and for that reason can be more readily compared from loan to loan. Second, the only evidence on voluntary demographic reporting—indeed, the only evidence in the record since the Bureau introduced none—suggests that borrowers will not divulge their demographic information at a rate suitable for meaningful analysis.

> a. **The Final Rule's data point expansion relies on unfounded assumptions about the commercial lending market.**

In response to the first argument, the CFPB claims (at 17–19) that it did consider the greater variability in underwriting factors considered in small business lending—a marketplace where the *consumer*-finance agency has little background. But while the Bureau can point to the Final Rule's identification of the problem, AR.000112, what it cannot do is show a solution. Instead, the CFPB complains this argument is merely an attack on the statute, without acknowledging Plaintiffs' actual claim is that the expanded rule imposes costs but does not add any benefit *beyond* whatever can be gleaned from the statutory points. To be sure, the Final Rule will generate more data—but that data will add little to the overall picture even though it comes at great cost.

For example, consider the collection of loan pricing information required by the Final Rule (but not § 1071). The Bureau seeks to justify this significant expansion of the rule by asserting that the data will be "less meaningful" without it. Resp. Br. at 15 (citing AR.000160). That does not pass arbitrary and capricious muster. If data without pricing information is only 0.0001% less

meaningful, then it is unreasonable to impose costs related to its collection. But the CFPB never answered that question of how much—just a "trust us…it will be more meaningful if we have it." As it turns out, the answer to that question matters. *See Chamber of Commerce*, 85 F.4th at 778 (recognizing that the probability of something taking place must factor into a reasoned response). Elsewhere, the Bureau states that not having the pricing information would "significantly reduce the ability . . . to understand credit conditions available to small businesses." AR.000367. Yet the CFPB does not substantiate this claim or define what significantly reduce means.

But even if the "*less* meaningful" or "*significantly* reduce" arguments are credited as providing a substantive metric for how much is enough to matter, the Bureau's claim is still suspect. Such an assertion could only be true if the additional data gained allowed for "apples-to-apples" comparisons of commercial loans, but the CFPB did not show this in the Final Rule. The Bureau repeats its assertions (at 15) that pricing data will help it identify "predatory pricing" or "pricing disparities," but does not grapple with the fact that the pricing data, divorced from the actual underwriting factors lenders rely upon, cannot reliably demonstrate that a loan was priced in a "predatory" fashion or that differences in prices were not due to legitimate factors. *See* Motion at 14–15. It is uncontested that the small business lending market covered by § 1071 is far more complex than the more standardized mortgage market covered by HMDA. And while the Final Rule briefly notes the "vast, varied, and complex" nature of the commercial lending market, it never accounts for how those variables work, or seeks to defend its assumptions regarding the usefulness of such data.

Still elsewhere, the Bureau argues that, if pricing information was not collected, the CFPB "would not be able to evaluate potential discriminatory lending practices." Resp. Br. at 37. Setting aside the hyperbole, the flaw is the same: the Bureau *assumes* (without showing) that the additional

data will be useful in the same way that HMDA data is used to look for discriminatory mortgage lending. Moreover, if pricing data were essential to ferreting out discriminatory lending, Congress would have mandated its collection, instead of conspicuously declining to do so. But while Congress may not have to justify the costs it imposes on companies with identifiable benefits, it required the CFPB to do so (and also provided the CFPB with broad exemption authority that could be used to eliminate statutory obligations that were not justified by the benefits, *see* 15 U.S.C. § 1692c-2(g)(2)). Because the pricing information will do little (if anything) to advance the purposes of the statute, the Bureau cannot carry its burden here. *See Chamber of Commerce*, 85 F.4th at 777–78 (finding a proper analysis of costs and benefits requires substantiation of the benefits by the agency, not merely showing they are more than hypothetical).

The Bureau's decision to require the collection of the other discretionary data points suffers from the same fundamental flaw. *See* Resp. Br. at 15–16. Though not as expensive to gather or intrusive to reveal as the pricing information, data points such as the method of application, the NAICS code, number of persons working for a small business, numerous "disaggregated" categories of race and ethnicity, and the LGBTQ+ status of the applicants all rely on the same unjustified assumption: that more information about the loans will necessarily permit "apples-to-apples" comparisons and thereby promote the purposes of the statute. While the costs of the additional data are undeniable, the Bureau failed to adequately defend its assumption that the additional data will advance the purposes of the statute.

        **b.**     **The Final Rule does not demonstrate that response rates will be sufficient to allow meaningful analysis of the data.**

In response to Plaintiffs' point that response rates to demographic questions will be too low for the data to be representative of a lenders' actual conduct, the CFPB makes three assertions (at 19–21): First, the Bureau complains that Plaintiffs do not address the "other statutory purpose" of

16

"identifying business and community development needs and opportunities."  Second, the CFPB claims that the argument was answered by the Final Rule's directive to lenders to pose demographic questions at the optimal time and to inform applicants why they should disclose that information.  Third, the Bureau argues that evidence regarding the SBA's experience with similar voluntary requests for demographic data as part of the Paycheck Protection Program (PPP)—the only evidence available—is not probative.  Each of these arguments lacks reasonable support.

As for the Bureau's first point, it would be nonsensical to claim that business and community development needs and opportunities could be identified based on faulty data.  Whether it is for fair lending enforcement or general data compilation to show "credit deserts" or whatever justification the CFPB attempts to muster, all of the Bureau's rationales fail for the same reason.  The Congressionally mandated data points would have been sufficient to identify if there was a lack of lending in certain areas or to women-owned or minority-owned businesses.  The Bureau has not demonstrated that the added data will further advance the statute's purpose of "identify[ing] community and business development needs."

The Bureau's suggestion that the rule has features to encourage applicant responses to demographic questions is similarly far-fetched.  The model form itself instructs applicants that they need not answer the questions (consistent with the statute, 15 U.S.C. § 1691c-2(c)), and the CFPB conducted no studies and cites no evidence to support a claim that applicants will answer the demographic questions at a high enough rate to be representative.  Indeed, the Final Rule never even grapples with this question.  Instead, the CFPB merely added some requirements that "the Bureau believes . . . will improve applicant response rates."  AR.000203.  Not only is this mere *belief* not supported by evidence, by its own terms it does not even answer the operative question:

will the data be collected at a high enough rate to be useful, or will it be collected at just a high enough rate to be dangerous?  Even if the response rate is improved, that does not show validity.

Finally, as for the usefulness of the PPP demographic data, it is the only data in the record on this question.  When federal forms were used to collect demographic data on a voluntary basis, it produced a 25% response rate—far too low to be useful for fair lending or community development needs.  AR.019317.  And while the Bureau now offers the Court reasons (at 20) to discount the PPP's response rate (such as the COVID-19 pandemic), those reasons were not offered in the Final Rule and this Court cannot accept an agency's *post hoc* rationalizations.  *Price*, 209 F.Supp.3d at 934 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  The only evidence in the record on this point, which the Bureau does not rebut, is the experience with the PPP.  That evidence indicates that the demographic data responses will be too low for a proper comparison, thus undermining CFPB's arguments that additional expanded data points will further *any* of the purposes of the statute.[9]

### 2.    The Bureau did not show that the benefits of the additional data points outweigh the significant costs.

"[A]s part of a cost-benefit analysis, the agency must identify benefits that 'bear a rational relationship to the . . . costs imposed.'"  *Chamber of Commerce*, 85 F.4th at 777 (quoting *Mexican Gulf Fishing*, 60 F.4th at 973).  Because the CFPB could not provide reasonable estimates for

---

[9] The Bureau also discounts Plaintiffs' complaints concerning the "opt-out" provision (at 20 n.10), thereby disregarding the privacy rights of every American forced to respond to inquiries contemplated by the Final Rule.  As detailed by Plaintiffs, the Bureau improperly limits the opt-out provision to demographic information, requiring responses to all other inquiries and eliminating the spirit of the provision altogether.  Rather than address Plaintiffs' complaints substantively, the Bureau merely claims (at 20, citing AR.000040) that Congress could not possibly have intended the clear, unambiguous protections to apply to other data points.  But there is no evidence in the record to support the Bureau's position, which callously ignores why a small business might want to opt out (including that their private information is published for free viewing by customers and competitors).

either the costs or the benefits of expanding the Final Rule, it had no hope of offering a rational reason for how the benefits outweighed the costs. As a result, requiring financial institutions to inquire and report on the expanded data points was arbitrary and capricious.

To justify the enormous costs of the Final Rule, the Bureau claims (at 23, citing AR.000354–56) that the increased transparency from the discretionary data points may lead to increased credit opportunities for small businesses. There are multiple problems with this assertion. First, it assumes—without proof—that the increased data automatically means increased transparency. As explained previously, that is not the case because the data will not paint an accurate picture. Second, even if the increased data increased transparency, the Bureau cannot say how much it increases transparency. When there is good reason to believe—per record evidence— that the increased data will cause more harm than good, it becomes less plausible that claims of increased transparency matter at all. But third, and most importantly, the Bureau does not— because it cannot—explain how some minuscule (and hypothetical) benefit can be justified in the face of the enormous costs that the Final Rule will impose, which the Bureau *concedes* will lead to more expensive small business credit. *See* AR.000364–65.

The SBA Office of Advocacy "encourage[d] the CFPB to disregard the discretionary data points," and suggested that "a less costly alternative would be to restrict the collection of data to the statutorily required data points." AR.018392. Even by the CFPB's *intentionally*-low cost estimates, hundreds of millions of dollars will be spent inquiring about and then reporting unhelpful data. *See* AR.000362 (estimating $297,000,000 to $313,000,000 merely in *ongoing* costs for depository institutions and $48,700,000 for nondepository institutions). And ignoring such a warning is hardly in keeping with providing a reasonable basis for concluding that any "qualitative benefit" justified the costs. *See Chamber of Commerce*, 85 F.4th at 777. As the Final

Rule admits, the Bureau is unable "to assess completely how effective the implementation of section 1071 will be in achieving those benefits." AR.000344. Because that was true, the CFPB should not have required numerous data points beyond those in the statute.

The Fifth Circuit has explained that "insignificant benefits do not bear a rational relationship to . . . serious financial and privacy costs imposed" by an agency's action. *Mexican Gulf Fishing*, 60 F.4th at 973. Because the Final Rule's additional points have, at most, a marginal hypothetical benefit (that was not demonstrated) over the statutory data points, the serious financial and privacy costs at issue cannot be justified, and imposing the expanded data point regime is thus arbitrary and capricious.

## II.    The CFPB Exceeded Its Statutory Authority In Imposing The Additional Data Collection Requirements.

As Plaintiffs have explained, this Court must "confirm that the [agency's] interpretation is 'rational and consistent with the Act.'" *Tesla, Inc. v. NLRB*, 86 F.4th 640, 647 (2023) (quoting *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013)). Yet as the Bureau's brief shows, the Final Rule is neither. First, the text of the statute does not provide the CFPB discretionary authority to require lenders to collect additional information they do not already possess. Second, even if the CFPB had the authority to require the collection of additional data, it can only do so if it reasonably concludes that the additional data will advance the purposes of the statute, and the Final Rule's vast expansion of lenders' data collection obligations will undermine the purposes of § 1071 by making small business credit more expensive and less available.

### A.  Unlimited Bureaucratic Discretion is Not Supported by the Text of the Statute.

As shown in Plaintiffs' Motion (at 20–22), the text of the statute obligates lenders to "inquire" about applicants' status as a women-owned or minority-owned business, 15 U.S.C. § 1691c-2(b)(1), and to compile, maintain, and itemize that same information, 15 U.S.C. § 1691c-

20

2(e)(1), but does not authorize the CFPB to require regulated entities to "inquire" about any other information. Instead, it authorizes the CFPB to require lenders to itemize "any additional data" that lenders independently have collected as part of the application process. The Bureau's response (at 10–13) does not show otherwise. Further, while the CFPB's answer is to misrepresent Plaintiff's argument as a challenge to the statute, Plaintiffs only argue here that the Bureau cannot force financial institutions to "inquire" about information other than the limited data set forth in the statute.[10]

### 1. The plain meaning of the text refutes the CFPB's bid for broad discretion on what financial institutions are forced to "inquire" about from applicants.

The Bureau mainly justifies its authority to issue the expansive rule by conflating the term "inquire" in 15 U.S.C. § 1691c-2(b)(1) with the terms "compile and maintain" in 15 U.S.C. § 1691c-2(e)(1). As this Court is aware, though, each word and clause of a statute should be given operative effect, if possible. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). And so, when faced with different statutory terms, a court generally will read each term to convey some distinct meaning. *See, e.g.*, *Bailey v. United States*, 516 U.S. 137, 146 (1995) (assuming "that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning").

The terms "inquire," "maintain," and "compile" are not defined in the statute; therefore, one must look to their ordinary meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979). *Inquire* means: "to put a question: seek for information by questioning" or "to ask about." Merriam-

---

[10] The Bureau also claims (at 13) that this argument did not appear previously in Plaintiffs' complaints or at the SBREFA panel or in previous comments to the rule. First, Plaintiffs allege in their Amended Complaint that the CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." ECF No. 12, ¶ 86. Second, it is not surprising that this textual argument was not made to the SBREFA panel since the Bureau had not yet proposed adding all of the discretionary data points. In all events, the CFPB must defend its textual authority to issue the Final Rule, 5 U.S.C. § 706(2)(C)—and it cannot.

Webster.com Dictionary. Only § 1691c–2(b)(1) uses the term "inquire" when it directs that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business… and whether or not such application is in response to a solicitation by the financial institution."

Then, as seen in § 1691c–2(b)(2), once the financial institution has made an inquiry, it must "maintain" the information. *Maintain*, in relation to data, means: "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." Merriam-Webster.com Dictionary. The term maintain appears six times in the statute, each time recognizing that the data to be maintained has already been gathered by the financial institution. *Compile* can mean: (1) "to compose out of materials from other documents;" (2) "to collect and edit into a volume;" (3) "to build up gradually;" and (4) "to run (something, such as a program) through a compiler." *Id.* The plain meaning of the term does not include the act of inquiring, soliciting, or requesting—it presumes that the information already exists rather than needing to be created.

The statute instructs financial institutions—in subsection (e)—to "compile and maintain . . . a record of the information provided by any loan applicant pursuant to a request under subsection (b)." 15 U.S.C. § 1691c–2(e)(1). Importantly, subsection (e) is the textual source of CFPB's claimed discretionary authority to expand the data points. Applying the plain meaning of those terms, however, the "compil[ing] and maintain[ing]" in subsection (e) must be limited to information already provided as part of an "application to a financial institution for credit" referenced in 15 U.S.C. § 1691c-2(b) or else pursuant to the "inquir[y]" required by § 1691c-2(b)(1). As a result, while the CFPB has discretionary authority to require financial institutions to "itemize[] . . . additional data" that the financial institution has independently "compiled and maintained," it cannot require lenders to make additional "inquiries" of their applicants.

## 2. Statutory context also prohibits the Bureau's overzealous interpretation.

When interpreting a statute, the words must also "be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Besides conflating statutory terms, the Bureau also fails to show that the Final Rule's interpretation fits within the overall statutory scheme. That includes ignoring the statutory headers treating "Information Gathering" as a separate process from "Itemization" of that information. This failure confirms the CFPB's flawed statutory analysis. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (*quoting Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co*., 331 U.S. 519, 529 (1947))).

The basis for CFPB's assumption that it is entitled to any "additional data" it desires appears in a subsection entitled, "Itemization." § 1691c–2(e)(2). This appears three subsections below the "Information Gathering" section where financial institutions are instructed on what to "inquire" about from loan applicants. That information—the "information provided by the applicant pursuant to subsection (b)"—is then discussed in subsections (c), (d), and (e). Subsection (e), however, addresses only how the information already collected will be "clearly and conspicuously disclose[d]" to the Bureau. *Id.* It is solely in this context of "Itemization" that Congress mentions: "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). Therefore, the Bureau may ask for itemization of data in a certain format or manner, but that authority does not allow the Bureau to require financial institutions to make inquiries beyond what is allowed under § 1691c-2(b)(1). This logically indicates that the discretionary authority can only be applied to things financial institutions already collect in the normal course *or* the points added by Congress under the

23

"inquiry" portion of the statute (*i.e.*, under 1691c-2(b)(1))—existing data can be ordered by the CFPB to be itemized, but non-existent data cannot be ordered to be created.

Neither can the Bureau argue that its discretion to add data points is supported by its authority in subsection (g) to promulgate rules to "carry out, enforce, and compile data." § 1691c-2(g). Subsection (g) only authorizes the Bureau to regulate its *own* conduct with regard to data points turned over to the agency. Since the term "compile" is used in a series describing the rules for the Bureau's own conduct, the direction at § 1691c-2(g)(1) must also refer to the Bureau's own data compilation—not that of financial institutions. This interpretation is bolstered by the preceding subsection. Subsection (f) directs financial institutions to submit their compiled data to the Bureau and says: "The Bureau may, at its discretion—(A) compile and aggregate data collected under this section for its own use; and (B) make public such compilations of aggregate data." § 1691c-2(f)(3). Thus, subsection (f) contemplates that the Bureau will receive and compile data for its own purposes. Accordingly, subsection (g) merely directs the Bureau to make rules about how it carries out these responsibilities.

While the CFPB argues (at 12 & n.7) that Plaintiffs do not distinguish between the information in § 1691c-2(e)(2) that Congress listed and the information that the Bureau is attempting to add, that argument is a red herring. It seems likely that Congress simply assumed the information listed for "Itemization" was being collected in loan applications anyway. *See* § 1691c-2(b)(2) (referencing the "application and accompanying information" as separate from the "responses to such inquiry"). Most of it is. It would thus be available to "compile and maintain" along with the data collected under the "Information Gathering" process in § 1691c-2(b)(1). That is not at issue here, though. Plaintiffs challenge only the Bureau's intrusive and expensive expansion of the statute that demands financial institutions "inquire" about data points

that are not part of the "Information Gathering" portion of the statute or even listed among those things Congress assumed would be available from lenders' application processes.[11]

In short, Congress knew how to list information it wanted gathered under the statute. Had Congress intended a catch-all provision granting the CFPB unfettered discretion in that area, it would be found in subsection (b), not at the end of subsection (e). Thus the statute does not authorize the Final Rule's significant expansion of the CFPB's power. For these reasons, the Bureau's textual argument does not pass muster.[12]

### B. The Final Rule's Expansion of Data Points Will Undermine § 1071's Purposes as the True Costs of the Rule Will be a Decrease in Credit Availability for Women-Owned and Minority-Owned Small Businesses.

As Plaintiffs showed (at 18–19), the Final Rule also strays from the statutory purpose of creating credit for women- and minority-owned small businesses. In promulgating the rule, the

---

[11] As one specific example of the CFPB's textual overreach, the Final Rule demands information on sexuality that it is clearly beyond the authority of the agency to request. The CFPB concedes that it is prohibited from seeking any type of demographic data—such as that listed in § 1071—absent an express statutory license to do so. AR.000039 (noting Regulation B of the ECOA). And because the statutory authorization to "inquire" about sex or minority status applies only to the categories of sex and minority, there is no license to ask for anything except whether the applicant is women-owned or minority-owned ("minority" is defined in 12 U.S.C. § 1811 as "any Black American, Native American, Hispanic American, or Asian American"). Yet the Final Rule claims it may require lenders to inquire about the sexuality and gender of prospective clients without any authority for imposing such an intrusive obligation. Because sexual practices and gender identity are not among the categories Congress expressly listed for data gathering, the CFPB has plainly exceeded its authorization for inquiring into such demographic data.

[12] The Bureau belatedly makes an appeal to "deference" in interpreting the statute (at 13, citing *Huntington Ingalls, Inc. v. Director, OWCP*, 70 F.4th 245, 252 n.2 (5th Cir. 2023), seemingly asking for deference under *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). But as the cited footnote from *Huntington* points out, *Chevron* may soon be overturned. *See Loper Bright Enters., Inc. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert granted*, 2023 WL 3158352 (2023). Moreover, the statute would need to be ambiguous and the Bureau's interpretation would have to be "based on a permissible construction of the statute" in order for the agency's interpretation to warrant *Chevron* deference. *Mexican Gulf Fishing*, 60 F.4th at 963 (quoting *Huawei*, 2 F.4th at 433). Here, the text plainly precludes the expansion offered by the CFPB and thus deference is not applicable.

CFPB did not reasonably consider the concerns raised by commenters—including the SBA Office of Advocacy, state regulators, and academics—that the rule would impair credit access for the small businesses § 1071 was meant to assist.[13]

In response, the Bureau states (at 27) that it considered things such as "a reduction in market participation by financial institutions" but that it "does not expect these effects to be large enough to significantly impact the availability of small businesses credit."  AR.000366.  The problem is that the CFPB never explained *why* the effects would not be large enough to matter. Now, the Bureau claims (at 27) the 2020 survey supports its argument that lenders will not leave the market.  Because the survey was based on a different rule with very different costs, it does not.

The only response in the Final Rule addressing the reduction in access to credit was the Bureau's shift from 25 to 100 covered transactions per year as a minimum threshold for applicability of the rule.  Again, though, Plaintiffs' actual complaint (in line with the researchers' conclusions) is that the Bureau did not consider the impact on smaller lenders who make more than 100 small business loans per year.  AR.000031.  Indeed, while the Bureau celebrates the

---

[13] The CFPB argues that Plaintiffs focus primarily on addressing how the Final Rule does not assist the "fair lending" purpose of the statute rather than also showing how the Final Rule does not aid in the "community development/information gathering" purpose of the statute.  Setting aside the fact that Dodd-Frank was primarily concerned about the fair lending aspect, the Bureau's argument is both wrong and misleading.  The stated "purpose" of the statute is: "to facilitate enforcement of fair lending laws *and* enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."  15 U.S.C. § 1691c-2(a) (emphasis added).  The Bureau, however, wants to treat the two parts of the identified "purpose" as disjunctive—as if satisfying either part would be acceptable as fulfilling a stand-alone purpose no matter what else took place.  That would make no sense, of course.  The purpose is singular because the underlying goal is increased credit for the identified groups—as the CFPB recognizes elsewhere in its brief—not just information.  *See* Resp. Br. at 12 (arguing that the data requested under the statute is needed "in order to reveal credit opportunities and needs and facilitate the enforcement of fair lending laws").  An agency action that decreases credit opportunities for women-owned, minority-owned, and small businesses cannot be in line with the purpose of the statute.

number of covered institutions exempted from the Final Rule, the Final Rule fails to describe how moving the limit would matter to the number of loans. If, for example, the smallest institutions (less than 100 covered transactions) only comprise a tiny fraction of the total amount of loans, it is not clear that exempting them will really matter. The Final Rule also claims to account for financial institutions reducing their lending—rather than leaving the market—to fall below the reporting threshold, but never says why the CFPB "does not anticipate that this will significantly decrease aggregate credit supply." AR.000365. Indeed, it is just as likely that many small lenders could be making several loans just above the 100-transaction threshold but then decide to drop below that reporting threshold if the Final Rule were left in place. That reduction in available credit was not considered by the Bureau in the Final Rule.

The CFPB likewise attempts to discredit (at 29) the NAFCU survey—indicating a potentially large drop in available credit—by arguing the Final Rule may have resolved the problem by raising the covered transaction threshold. Not only is this explanation not offered in the Final Rule, the survey further discredits the CFPB's dubious claim (at 27) that it did not "receive[] much evidence that the Rule would significantly impact the availability of small business credit." The only credible evidence points in that direction. *See* AR.018385 (SBA Office of Advocacy); AR.017973 (Conference of State Bank Supervisors); AR.002238–39 (Texas Tech University Rawls College of Business researchers).

Any additional information gathered through the § 1071 rule is not worth it if the CFPB's rulemaking is, at the same time, undermining the ability of women and minorities to obtain business credit. The Final Rule certainly does not attempt to justify itself in terms of sacrificing credit opportunities for the sake of identifying more information. Because the only evidence in

the record shows that a reduction in available credit is likely to be the case, the Final Rule undermines the overall purposes of the statute and is thus outside CFPB's authority to promulgate.

III.   **The Final Rule Is Arbitrary And Capricious Because The CFPB Failed To Reasonably Consider The Warnings Presented By Federal And State Agencies, Academics, And The Regulated Community.**

APA review requires an agency to have "*reasonably* considered the relevant issues and *reasonably* explained the decision." *Prometheus Radio*, 592 U.S. at 423 (emphases added). The caselaw uniformly condemns agency action that purposefully avoids key facts, thereby demonstrating the agency "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932 (quoting *State Farm*, 463 U.S. at 43). Such behavior is unreasonable and must be invalidated under the APA. *See Chamber of Commerce*, 412 F.3d at 144 (finding agency action arbitrary and capricious where it "stopped its cost analysis after asserting it had no reliable basis for estimating those costs" (internal quotation marks and citation omitted)). Here, the CFPB sought to bury its head in the sand and duck the hard questions on cost—a clear violation of the APA. *See Mexican Gulf Fishing*, 60 F.4th at 973; *Business Roundtable*, 647 F.3d at 1150–55.

The Final Rule states more than 50 times what the Bureau "expects" will take place with regard to comments made—but it rarely, if ever, says why that expectation is accurate. For example, the Bureau had evidence for assuming that "the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial institutions' variable costs to small businesses credit applicants." AR.000366. But then the CFPB assumed that, while the Final Rule would create "the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions, the Bureau does not expect these effects to be large enough to significantly impact the availability of small business credit." AR.000366.

The Final Rule, however, provides no evidence and no rationale for that expectation, even though parties with expertise on the subject had warned the CFPB that these were serious consequences that should make the Bureau rethink its decision to expand the statutory data points. *See* AR.018385 ("Advocacy is concerned that the CFPB's approach may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses."); AR.017973 ("The Bureau's proposal will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country."); AR.002238–39 ("[The Texas Tech University] analysis suggests that the implementation of Section 1071 . . . will create a barrier for credit for the truly small businesses that are less sophisticated, but essential to the community. . . . A cost-benefit analysis will lead many community banks to cease making small-businesses loans.").   This is not the hallmark of reasoned or reasonable action.[14]

The Bureau points to no source for its expectation that the small-business credit market will not be significantly diminished, let alone explain what a "large enough" impact would be to count as "significant" in the CFPB's eyes.  This type of failure to address major problems with the rule is precisely what courts deem arbitrary and capricious.  *See 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (quoting *State Farm*, 463 U.S. at 43) (noting that an agency's

---

[14] Relatedly, the Bureau does not provide a reasoned analysis for why the comment period could not be extended—as the SBA Office of Advocacy and other commenters asked—while the real costs of the rule were established.  *See* AR.018385 ("On November 23, 2021, the Office of Advocacy submitted a request for extension of the comment period for this rulemaking.  As noted in the letter, the proposed rule is over 900 pages and seeks important information about the potential costs of the proposal.  The small entities that will be required to comply with the regulation are in the best position to provide the CFPB with information about the potential costs associated with the proposal, but the amount of time provided for the comments is insufficient.  This information is crucial for determining the economic impact of the rule and for considering less costly alternatives as required by the Regulatory Flexibility Act (RFA).").

decision must have been "based on a consideration of the relevant factors"). It is hardly enough to reference, *ex post*, the flawed 2020 survey or the inapplicable SBREFA panel. The Final Rule also failed to explain why the SBREFA panel did not need—as commenters, including the SBA Office of Advocacy, had stated—appropriate data on the real costs of the rule before reaching a conclusion on the likely effects of the rule. *See* AR.023871. The CFPB thus made no meaningful response to commenters' significant concern that a significant increase in compliance costs would drive lenders—especially community banks and non-depository institutions—from the market and thereby injure small business borrowers. Instead, the CFPB continued to cherry-pick any data it could and "entirely failed to consider an important aspect of the problem." *Price*, 209 F. Supp. 3d at 932. The Court must therefore set aside the agency's action since it "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43).

## CONCLUSION

For the foregoing reasons, the Final Rule should be set aside.[15]

---

[15] The Bureau complains (at 39–40) that Plaintiffs ignore severability principles by asking that the Final Rule be set aside. Plaintiffs believe the appropriate remedy is to set aside the Final Rule because the Bureau's failure to appropriately assess costs and benefits renders it unlawful. At the same time, Plaintiffs are mindful that the Court may impose other remedies based on its reasons for holding the Final Rule unlawful, including excising the offending portions of the Final Rule that stray beyond the statutorily identified data points or remanding for further consideration and justification by the agency.

May 10, 2024                                    Respectfully submitted.

                                                */s/ John C. Sullivan*
                                                John C. Sullivan
                                                Attorney-in-Charge
                                                Texas Bar No. 24083920
                                                **S|L LAW PLLC**
                                                610 Uptown Boulevard, Suite 2000
                                                Cedar Hill, TX 75104
                                                Telephone: (469) 523-1351
                                                Facsimile: (469) 613-0891
                                                john.sullivan@the-sl-lawfirm.com

                                                James J. Butera*
                                                Ryan Israel*
                                                **MEEKS, BUTERA & ISRAEL PLLC**
                                                2020 Pennsylvania Avenue, NW
                                                Washington, DC 20006
                                                Telephone: (202) 795-9714
                                                jbutera@meeksbi.com
                                                risrael@meeksbi.com

                                                Thomas Pinder*
                                                Andrew Doersam*
                                                **AMERICAN BANKERS ASSOCIATION**
                                                1333 New Hampshire Avenue, NW
                                                Washington, DC 20036
                                                tpinder@aba.com
                                                adoersam@aba.com

                                                *Counsel for Plaintiffs Texas Bankers*
                                                *Association, Rio Bank, and American*
                                                *Bankers Association*

                                                *\* admitted pro hac vice*

31

*/s/ James Bowen*
James Bowen
Elbert Lin
Erica Nicole Peterson
Jennifer Lauren Clyde
**HUNTON ANDREWS KURTH LLP**
1445 Ross Avenue, Suite 3700
Dallas, TX 75202
Telephone: (214) 468-3309
Facsimile: (214) 880-0011
jbowen@huntonak.com


*Counsel for Intervenors Texas First Bank,*
*Independent Bankers Association of Texas,*
*and Independent Community Bankers of*
*America*


*/s/ Misha Tseytlin*
Misha Tseytlin
Joseph J. Reilly
**TROUTMAN PEPPER HAMILTON SANDERS**
**LLP**
401 9th Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 274-2908
joseph.reilly@troutman.com


Daniel Gordon Gurwitz
**ATLAS HALL RODRIGUEZ LLP**
818 West Pecan Boulevard
McAllen, TX 78501
Telephone: (956) 682-5501
dgurwitz@atlashall.com


*Counsel for Intervenors Texas Farm Credit,*
*Farm Credit Council, and Capital Farm*
*Credit*

*/s/ Owen Colin Babcock*
Alan Bartlett Padfield
Kelsey Nicole Linendoll
Owen Colin Babcock
**PADFIELD & STOUT LLP**
421 West Third Street, Suite 910
Fort Worth, TX 76102
Telephone: (817) 338-1616
Facsimile: (817) 338-1610
obabcock@padfieldstout.com


*Counsel for Intervenors XL Funding, LLC,*
*and Equipment Leasing and Finance*
*Association*


*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie
**BROWNSTEIN HYATT FARBER SCHRECK,**
**LLP**
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: (602) 362-0034
Facsimile: (303) 223-1111
sja@bhfs.com


*Counsel for Intervenors Rally Credit Union,*
*America's Credit Unions (formerly Credit*
*Union National Association), and*
*Cornerstone Credit Union League*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been filed on May 10, 2024, via the CM/ECF system and served via CM/ECF on all Counsel of record.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document was prepared using Microsoft Word 365, 2022 Version.  It is written in Times New Roman typeface with 12-point font.  As set forth in this Court's Order, Plaintiffs/Intervenors' Reply/Response Brief is 30 pages.

*/s/ John C. Sullivan*
John C. Sullivan

*Counsel for Plaintiffs*
