# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

# JOINT APPENDIX
# OF ADMINISTRATIVE RECORD DESIGNATIONS
# VOLUME I

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| --- | --- |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

## CONSUMER FINANCIAL PROTECTION BUREAU

**12 CFR Part 1002**

**[Docket No. CFPB–2021–0015]**

**RIN 3170–AA09**

## Small Business Lending Under the Equal Credit Opportunity Act (Regulation B)

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Final rule.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB or Bureau) is amending Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). Consistent with section 1071, covered financial institutions are required to collect and report to the CFPB data on applications for credit for small businesses, including those that are owned by women or minorities. The final rule also addresses the CFPB's approach to privacy interests and the publication of data; shielding certain demographic data from underwriters and other persons; recordkeeping requirements; enforcement provisions; and the rule's effective and compliance dates.

**DATES:**

*Effective date:* This final rule is effective August 29, 2023.

*Compliance dates:* Covered financial institutions must comply with the final rule beginning October 1, 2024, April 1, 2025, or January 1, 2026, as set forth in § 1002.114(b).

**FOR FURTHER INFORMATION CONTACT:** Camille Gray, Paralegal Specialist; Kris Andreassen, Pavitra Bacon, Joseph Devlin, Amy Durant, Angela Fox, Caroline Hong, David Jacobs, Kathryn Lazarev, Lawrence Lee, Adam Mayle, Kristen Phinnessee, or Melissa Stegman, Senior Counsels, Office of Regulations, at 202–435–7700 or *https:// reginquiries.consumerfinance.gov/.* If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Final Rule

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act [1] amended ECOA [2] to require that

financial institutions collect and report to the CFPB certain data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the CFPB to require any additional data that it determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain data; recordkeeping; publication of small business lending data; and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits it to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as it deems necessary or appropriate to carry out the purposes of section 1071. The CFPB is adding a new subpart B to Regulation B to implement the requirements of section 1071. Key aspects of the CFPB's final rule are summarized below.

As envisioned by Congress, the small business lending rule will create our nation's first consistent and comprehensive database regarding lending to small businesses, including small farms. This will fulfill section 1071's statutory purposes by allowing Federal, State, and local enforcement agencies to assess potential areas for fair lending enforcement and by enabling a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. The database, again as dictated by Congress, will not reveal privacy-protected information about any particular small business applicant, and small businesses will retain control over how much of their demographic information they choose to divulge. In addition, the CFPB believes that its final rule will help to sharpen competition in credit supply by creating greater

transparency around small business lending.

*Scope.* The CFPB is requiring financial institutions to collect and report data regarding applications for credit for small businesses, including those that are owned by women and minorities. The CFPB is not requiring financial institutions to collect and report data regarding applications for women-owned and minority-owned businesses that are *not* small. Because more than 99 percent of women-owned and minority-owned businesses are small businesses, covering small businesses necessarily means nearly all women-owned and minority-owned businesses will also be covered. The CFPB believes that this scope is consistent with the statute and will allow the rule to carry out section 1071's purposes without requiring collection of data that would be of limited utility.

*Covered financial institutions.* Consistent with language from section 1071, a "financial institution" is defined to include any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. The rule thus applies to a variety of entities that engage in small business lending, including depository institutions (*i.e.,* banks, savings associations, and credit unions),[3] online lenders, platform lenders, community development financial institutions (both depository and nondepository institutions), Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders.[4]

---

[1] Public Law 111–203, tit. X, section 1071, 124 Stat. 1376, 2056 (2010), codified at ECOA section 704B, 15 U.S.C. 1691c–2.

[2] 15 U.S.C. 1691 *et seq.*

[3] For purposes of this document, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, 12 U.S.C. 1751 *et seq.,* as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1811 *et seq.;* there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this document, unless otherwise specified.

[4] The Bureau's rules, including this final rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

The rule uses the term "covered financial institution" to refer to those financial institutions that are required to comply with its data collection and reporting requirements. A covered financial institution is defined as a financial institution that originated at least 100 covered credit transactions (rather than 25, as proposed) for small businesses in each of the two preceding calendar years. The CFPB is not adopting an asset-based exemption threshold for depository institutions, or any other general exemptions for particular categories of financial institutions.

The final rule also permits creditors that are not covered financial institutions to voluntarily collect and report small business lending data in certain circumstances.

*Covered credit transactions.* Covered financial institutions are required to collect and report data regarding covered applications from small businesses for covered credit transactions. A "covered credit transaction" is one that meets the definition of business credit under existing Regulation B, with certain exceptions. Transactions within the scope of the rule include loans, lines of credit, credit cards, merchant cash advances, and credit products used for agricultural purposes. The CFPB is excluding trade credit, public utilities credit, securities credit, and incidental credit as proposed. In addition, the CFPB has added exclusions for transactions that are reportable under the Home Mortgage Disclosure Act of 1975 (HMDA)[5] and insurance premium financing. Consistent with the CFPB's proposal, factoring, leases, and consumer-designated credit that is used for business or agricultural purposes are also not covered credit transactions. In addition, the CFPB has made clear that purchases of originated covered credit transactions are not reportable.

*Covered applications.* A "covered application"—which triggers data collection, reporting, and related requirements when submitted by a small business—is defined as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. This definition of covered application is largely consistent with the existing Regulation B definition of that term. However, certain circumstances are not covered applications for purposes of this rule, even if they are considered applications under existing Regulation B.

Specifically, covered applications for purposes of this rule do not include (1) reevaluation, extension, or renewal requests on existing business credit accounts, unless the request seeks additional credit amounts; or (2) inquiries and prequalification requests.

*Small business definition.* A covered financial institution is required to collect and report data on a covered application from a "small business," which the rule defines in accordance with the meaning of "business concern or concern" and "small business concern" under the Small Business Act[6] and Small Business Administration (SBA) regulations. However, in lieu of using the SBA's size standards for defining a small business concern, the definition in this final rule looks to whether the business had $5 million or less in gross annual revenue for its preceding fiscal year. The CFPB believes that a straightforward $5 million threshold strikes the right balance in terms of broadly covering the small business credit market to fulfill section 1071's statutory purposes while meeting the SBA's criteria for an alternative size standard.[7] The final rule also anticipates updates to this size standard, not more than every five years, to account for inflation. The SBA Administrator has approved the CFPB's use of this alternative size standard pursuant to the Small Business Act.[8]

*Data to be collected and reported.* The rule addresses the data points that must be collected and reported by covered financial institutions for covered applications from small businesses. Congress specifically enumerated many of these data points in ECOA section 704B(e)(2); for the others, the Congress granted the CFPB express authority in 704B(e)(2)(H) to require financial institutions to compile and maintain, along with enumerated data points, a record of "any additional data that the Bureau determines would aid in fulfilling the purposes" of section 1071. Certain of these data points are or could be collected from the applicant; other data points are based on information within the financial institution's control. Covered financial institutions must not discourage an applicant from responding to requests for applicant-provided data and must otherwise maintain procedures to collect such data at a time and in a manner that are reasonably designed to obtain a response; when collecting data directly from the applicant, the rule identifies certain minimum provisions that must

be included within financial institutions' procedures in order for them to be considered "reasonably designed." The rule also addresses what financial institutions should do if, despite having such procedures in place, they are unable to obtain certain data from an applicant. Furthermore, the rule makes clear that a financial institution may rely on information from the applicant, or appropriate third-party sources, when compiling data. If the financial institution verifies particular information, however, it must report that verified information. Financial institutions are permitted to reuse previously collected data in certain circumstances, rather than having to request it from the applicant for each covered application.

As noted above, the rule includes data points that are, or could be, provided by the applicant. Some data points specifically relate to the credit being applied for: the credit type (which includes information on the credit product, types of guarantees, and loan term); the credit purpose; and the amount applied for. There are also data points that relate to the applicant's business: census tract based on an address or location provided by the applicant; gross annual revenue for the applicant's preceding full fiscal year; the 3-digit North American Industry Classification System (NAICS) code for the applicant; the number of workers that the applicant has; the applicant's time in business; and the number of principal owners the applicant has.

There are also applicant-provided data points on the demographics of the applicant's ownership: first, whether the applicant is a minority-owned business or a women-owned business, along with a new data field capturing whether the applicant is an LGBTQI+-owned business; and second, the ethnicity, race, and sex of the applicant's principal owners. The CFPB refers to these data points collectively as an applicant's "protected demographic information." Principal owners' ethnicity and race will be collected from applicants using aggregate categories as well as disaggregated subcategories. Principal owners' sex/gender will be collected from applicants without using pre-defined response categories.

The CFPB is not finalizing its proposed requirement to have financial institutions collect race and ethnicity via visual observation or surname if an in-person applicant does not provide any ethnicity, race, or sex information for any principal owners; instead, the final rule requires that these data be reported based only on information provided by the applicant.

---

[5] 12 U.S.C. 2801 *et seq.*

[6] 15 U.S.C. 631 *et seq.*
[7] *See* 15 U.S.C. 632(a)(2)(C); 13 CFR 121.903.
[8] *See* 15 U.S.C. 632(a)(2)(C).

AdminRecord-000002

The CFPB is providing lenders with a sample data collection form, in both digital and paper form, to assist them in collecting protected demographic data from applicants. Although the contents of the sample form reflect certain legal requirements that financial institutions must follow, their use of the sample form is not itself required under the final rule. Rather, it is an available resource to financial institutions.

In addition, the rule includes data points that will be generated or supplied solely by the financial institution. These data points include, for all applications: a unique identifier for each application for or extension of credit; the application date; the application method (that is, the means by which the applicant submitted the application); the application recipient (that is, whether the financial institution or its affiliate received the application directly, or whether it was received by the financial institution via a third party); the action taken by the financial institution on the application; and the action taken date. For denied applications, there is also a data point for denial reasons. For applications that are originated or approved but not accepted, there is a data point for the amount originated or approved, and a data point for pricing information (which includes, as applicable, interest rate, total origination charges, broker fees, initial annual charges, additional cost for merchant cash advances or other sales-based financing, and prepayment penalties).

*Firewall.* The CFPB's rule implements a requirement in section 1071 that certain data collected from applicants be shielded from underwriters and certain other persons (or, if a firewall is not feasible, a notice is given instead); the CFPB refers to this as the "firewall."

Generally, an employee or officer of a financial institution or a financial institution's affiliate that is involved in making any determination concerning a covered application is prohibited from accessing the applicant's responses to the inquiries about protected demographic information that the financial institution makes pursuant to the rule. This prohibition does not apply to an employee or officer, however, if the financial institution determines that employee or officer should have access to an applicant's responses to its inquiries regarding the applicant's protected demographic information and the financial institution provides a notice to the applicant regarding that access. The notice must be provided to each applicant whose information will be accessed or, alternatively, the financial institution

could provide the notice to all applicants. The final rule does not require specific language for this notice but does provide sample language that a covered financial institution may use. The final rule also clarifies several key points of the firewall provision.

*Reporting data to the CFPB; publication of data by the CFPB and other disclosures; and privacy considerations.* Financial institutions must collect small business lending data on a calendar year basis and report it to the CFPB on or before June 1 of the following year. Financial institutions reporting data to the CFPB are required to provide certain identifying information about themselves as part of their submission. The CFPB is releasing, concurrently with this final rule, technical instructions for the submission of small business lending data in a Filing Instructions Guide.[9]

The CFPB will make available to the public, on an annual basis, the application-level data submitted to it by financial institutions, subject to modifications or deletions made by the CFPB, to advance privacy interests. To ease burden on covered entities, CFPB publication of application-level data will satisfy financial institutions' statutory obligation to make data available to the public upon request. At this time, the CFPB is not making a final decision on the best way to protect privacy interests through pre-publication modification and deletion of reported data. Assessing the many comments it received in this area, the CFPB is preliminarily of the view that its privacy assessment will focus primarily on whether (and, if so, how) small business lending data, individually or in combination with other data, pose re-identification risk for small businesses and, as a result, for their owners. The CFPB also anticipates taking account of compelling risks to financial institution privacy interests. The CFPB does not anticipate that it can carry out the necessary analysis of pre-publication modifications and deletions without at least one full year of application-level data. The CFPB intends to further engage with stakeholders on the issue of data publication before it resolves on a particular approach to protecting privacy interests through modifications and deletions. Finally, the CFPB anticipates publishing select aggregate data—*i.e.,* data that does not include

application-level information—before it publishes application-level data.

In addition, the final rule prohibits a financial institution or third party from disclosing protected demographic information, except in limited circumstances. Specifically, the final rule prohibits financial institutions from disclosing or providing to third parties the protected demographic information collected pursuant to the rule, except to further compliance with ECOA or Regulation B or as required by law. The final rule also limits third parties' disclosure of protected demographic information.

*Recordkeeping, enforcement, and severability.* The rule addresses issues related to recordkeeping, enforcement of violations, and severability. The CFPB is also finalizing provisions regarding treatment of bona fide errors under the rule in general along with several safe harbors for particular kinds of errors. Relatedly, as explained in part VII below, covered financial institutions will also have a 12-month grace period during which the CFPB—for institutions under its jurisdiction—will not assess penalties for errors in data reporting, and will conduct examinations only to assist institutions in diagnosing compliance weaknesses, to the extent that these institutions engaged in good faith compliance efforts.

*Effective and compliance dates, transitional provisions.* This final rule will become effective 90 days after publication in the **Federal Register**. The CFPB is adopting a tiered compliance date schedule because it believes that smaller and mid-sized lenders would have particular difficulties complying within the single 18-month compliance period proposed in the NPRM. Compliance with the rule beginning October 1, 2024 is required for financial institutions that originate the most covered credit transactions for small businesses. However, institutions with a moderate transaction volume have until April 1, 2025 to begin complying with the rule, and those with the lowest volume have until January 1, 2026. Covered financial institutions may begin collecting applicants' protected demographic information one year prior to their compliance date to help prepare for coming into compliance with this final rule. The CFPB is also adopting a new provision to permit financial institutions that do not have ready access to sufficient information to determine their compliance tier (or whether they are covered by the rule at all) to use reasonable methods to estimate their volume of originations to small businesses for this purpose.

---

[9] *See* CFPB, *Small Business Lending Filing Instructions Guide, https:// www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/.*

AdminRecord-000003

*Compliance and technical assistance.* The CFPB is supporting small business lenders with a variety of compliance and technical tools to help them determine if they are covered by this new rule, and if so when their obligations arise. For lenders that are covered, the agency is also making available a range of resources to assist with effective implementation of the rule, including a small entity compliance guide. These materials are available at *https:// www.consumerfinance.gov/compliance/ compliance-resources/small-business-lending-resources/small-business-lending-collection-and-reporting-requirements.* The CFPB is also launching a dedicated regulatory and technical support program that can provide oral and written assistance in response to stakeholder questions about collection and reporting obligations, and a range of technical resources to make it easier to report data to the CFPB. The support program and related materials are available at *https:// www.consumerfinance.gov/data-research/small-business-lending-data/.* To further assist covered financial institutions that serve small business customers in their preferred languages, the CFPB will make the sample data collection form available in several languages. The CFPB is also planning to develop resources to help small businesses understand how their data are treated, the availability of the dataset, and the broader purposes of the rule.

*Use of technology partners and industry consortia for accurate, cost-efficient data collection and reporting.* The final rule broadly permits financial institutions to work with third parties, including industry consortia, to develop services and technologies to aid in collecting and reporting data. So long as they meet the obligations stated in the rule, including collecting data in a manner that does not discourage small businesses from providing it, financial institutions are free to work with third parties to assist them with their compliance obligations, whether that is with respect to data collection, maintenance or reporting. The CFPB plans to work with consortia or other entities seeking to assist financial institutions to deploy industry-identified solutions. For example, the CFPB plans to provide Application Programming Interfaces in an open-source environment to assist financial institutions' technology partners to develop accurate and efficient data reporting tools.

## II. Background

As discussed above, in 2010, Congress enacted the Dodd-Frank Act. Section 1071 of the Dodd-Frank Act, which amended ECOA, requires financial institutions to collect and report to the CFPB data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071 was adopted for the dual purposes of facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses. Section 1071 complements other Federal efforts to ensure fair lending and to promote community development for small businesses, including through ECOA, the Community Reinvestment Act of 1977 (CRA),[10] and the Community Development Financial Institutions (CDFI) Fund.[11]

The collection and subsequent publication of more robust and granular data regarding credit applications for small businesses will provide much-needed transparency to the small business lending market. The COVID–19 pandemic has shown that transparency is essential, particularly at a time of crisis, when small businesses are in urgent need of credit to recover from economic shocks.

In addition to informing policymaking, data collected under the final rule can help creditors identify potentially profitable opportunities to extend credit. As a result, small business owners stand to benefit from increased credit availability. More transparency will also allow small business owners to more easily compare credit terms and evaluate credit alternatives, helping them to find the credit product that best suits their needs at the best price. In these different ways, the data will help stakeholders to enhance business and community development, boosting broad-based economic activity and growth. Furthermore, in the years and decades to come, the collection and publication of these data will be helpful in identifying potential fair lending violations and otherwise facilitating the enforcement of anti-discrimination laws.

[10] 12 U.S.C. 2901 *et seq.*

[11] The Riegle Community Development Banking and Financial Institutions Act of 1994, 12 U.S.C. 4701 *et seq.,* authorized the Community Development Financial Institution Fund (CDFI Fund). The CDFI Fund is discussed in more detail in part II.F.2.ii below.

*Overview*

Small businesses are a cornerstone of the U.S. economy. There were over 33 million small businesses in the U.S. in 2019, employing almost half of all private sector employees.[12] Small businesses, particularly start-ups, also generated 62 percent of new jobs since 1995.[13] Small businesses were hit hard by two major shocks in the last two decades. First, the Great Recession, which began in 2007, disproportionately affected small businesses.[14] Between 2007 and 2009, employment at businesses with under 50 employees fell by 10.4 percent, compared with 7.5 percent at larger firms,[15] while between 2008 and 2011, lending to small firms fell by 18 percent, compared with 9 percent for all firms.[16] Small businesses suffered again because of the COVID–19 pandemic. Around 40 percent of small businesses were at least temporarily closed in late March and early April 2020, due primarily to demand shocks and employee health concerns.[17] Across the first year of the pandemic, some

[12] Off. of Advocacy, Small Bus. Admin., *2022 Small Business Profile,* at 2, 4 (Aug. 2022), *https:// cdn.advocacy.sba.gov/wp-content/uploads/2022/ 08/30121338/Small-Business-Economic-Profile-US.pdf* (estimating 33.2 million small businesses in the United States, accounting for 46.4 percent of employees) (2022 Small Business Profile).

[13] Off. of Advocacy, Small Bus. Admin., *Frequently Asked Questions About Small Business,* at 1 (Dec. 2021), *https://cdn.advocacy.sba.gov/wp-content/uploads/2021/12/06095731/Small-Business-FAQ-Revised-December-2021.pdf* (SBA OA 2021 FAQs). *See generally* Cong. Rsch. Serv., *Small Business Administration and Job Creation* (updated Jan. 4, 2022), *https://fas.org/sgp/crs/misc/ R41523.pdf* (discussing small business job creation); John Haltiwanger *et al., Who Creates Jobs? Small Versus Large Versus Young,* 95 Rev. Econ. Stat. 347, 347–48 (May 2013), *https://direct.mit.edu/rest/ article/95/2/347/58100/Who-Creates-Jobs-Small-versus-Large-versus-Young* (finding that young firms, which are generally small, contribute disproportionately to both gross and net job creation).

[14] Jason Dietrich *et al.,* CFPB, *Data Point: Small Business Lending and the Great Recession,* at 9 (Jan. 23, 2020), *https://files.consumerfinance.gov/f/ documents/cfpb_data-point_small-business-lending-great-recession.pdf* (finding that small business lending fell sharply during the Great Recession and recovered slowly, still not reaching pre-Recession levels by 2017).

[15] Ayşegül Şahin *et al.,* Fed. Rsrv. Bank of N.Y., 17 Current Issues in Econ. & Fin., *Why Small Businesses Were Hit Harder by the Recent Recession,* at 1 (2011), *https://www.newyorkfed.org/ medialibrary/media/research/current_issues/ci17-4.pdf.*

[16] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did the Financial Crisis Affect Small Business Lending in the United States?,* at 25–26 (Nov. 2012), *https://www.microbiz.org/wp-content/ uploads/2014/04/SBA-SmallBizLending-and-FiscalCrisis.pdf.*

[17] Alexander W. Bartik *et al., The Impact of COVID–19 on Small Business Outcomes and Expectations,* 117 Proc. Nat'l Acad. Sci. 17656, 17656 (July 2020), *https://www.pnas.org/content/ pnas/117/30/17656.full.pdf.*

AdminRecord-000004

200,000 more businesses exited the market relative to historic levels.[18] It took until July 2021 for non-farm private sector jobs at establishments with fewer than 50 employees to recover to pre-pandemic levels.[19] As of mid-2022, small business loan approvals (other than for government emergency programs) still remained below pre-pandemic levels.[20]

During the last two decades, the small business lending landscape has also transformed. Traditional providers—namely banks—consolidated, leading to branch closures. The number of banks in the U.S. has declined from over 18,000 in 1986 to under 4,800 as of June 30, 2022 and the number of branches declined by 14 percent from 2009 to 2020.[21] Meanwhile, new providers and products, such as online lenders and merchant cash advances, have become increasingly prevalent in the small business lending market. Financing by merchant cash advance providers is estimated to have increased from $8.6 billion in volume in 2014 to $15.3 billion in 2017.[22] From 2017 to 2019, the volume may have increased further to $19 billion.[23] Meanwhile, financing provided by online "fintech"[24] lenders is estimated to have increased from $1.4 billion[25] in outstanding balances in 2013 to approximately $25 billion[26] in 2019.

Regarding trends in the small business financing landscape, the shift away from traditional providers of small business credit toward newer types of providers gives rise to both potential harm and opportunity. In terms of potential harms, bank closures may have made it more difficult for small businesses, particularly those that are already underserved, to access credit and remain open—especially in low- and moderate-income areas and rural communities. Newer providers, often offering newer products, have less experience complying with both Federal and State lending laws and regulations than traditional providers. Differences in funding models may also make non-traditional credit providers less resilient than depository banks or credit unions during shocks to the financial system such as the onset of the COVID–19 pandemic.[27] Additionally, they may use complex algorithms and artificial intelligence, which may create or heighten "risks of unlawful discrimination, unfair, deceptive, or abusive acts or practices . . . or privacy concerns."[28] Opaque product terms and high costs can also trap business owners in cycles of debt. In terms of opportunity, some newer approaches may help applicants with low or nonexistent personal or business credit scores—including women and minorities who own or seek to start small businesses but on average have lower personal credit scores than male and white business owners[29]—to access credit.[30] Non-traditional credit providers as well as digital offerings by traditional financial institutions may also help offset decreases in lending

[18] Leland D. Crane *et al.*, Bd. of Governors of the Fed. Rsrv. Sys., Finance and Economics Discussion Series, 2020–089, *Business Exit During the COVID-19 Pandemic: Non-Traditional Measures in Historical Context*, at 4 (2020), *https://www.federalreserve.gov/econres/feds/files/2020089r1pap.pdf* (estimating excess establishment exits and analyzing other estimates of small business exits during the pandemic). The paper defines "exit" as permanent shutdown and calculates "excess" exits by comparing the number of exits during the 12-month period from March 2020 to February 2021 with previous years. *Id.* at 2–4. *See also* Ryan A. Decker & John Haltiwanger, Bd. of Governors of the Fed. Rsrv. Sys., FEDS Notes, *Business Entry and Exit in the COVID-19 Pandemic: A Preliminary Look at Official Data* (May 6, 2022), *https://www.federalreserve.gov/econres/notes/feds-notes/business-entry-and-exit-in-the-covid-19-pandemic-a-preliminary-look-at-official-data-20220506.html* (estimating excess establishment exits to be roughly 181,000).

[19] *ADP Rsch. Inst., ADP National Employment Report, https://adpemploymentreport.com/* (last visited Mar. 20, 2023) (seasonally adjusted non-farm private sector jobs at establishments with between 1–49 employees as of July 1, 2021 as compared to March 1, 2020).

[20] Biz2Credit, *Biz2Credit Small Business Lending Index Finds April 2021 Non-PPP Loan Approval Rates Move Little for All Types of Lenders* (Apr. 2021), *https://www.biz2credit.com/small-business-lending-index/april-2021*; Biz2Credit, *Biz2Credit Small Business Lending Index Finds Business Loan Approval Rates Rose at Small Banks, dipped at Big Banks in July 2022* (July 2022), *https://www.biz2credit.com/small-business-lending-index/july-2022* (approvals as of July 2022).

[21] Cong. Rsch. Serv., *Small Business Credit Markets and Selected Policy Issues*, at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45878.pdf* (decline since 1986); Fed. Deposit Ins. Corp., *Quarterly Banking Profile*, at 6 (Aug. 2022), *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/2022jun/qbp.pdf* (number of banks as of June 30, 2022); Bruce C. Mitchell *et al.*, Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations* (Mar. 2021), *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (branch closures).

[22] PYMNTS, *How Long Can MCAs Avoid the 'Loan' Label?* (Jan. 20, 2016), *https://www.pymnts.com/in-depth/2016/how-long-can-mcas-avoid-the-loan-label/*.

[23] Paul Sweeney, *Gold Rush: Merchant Cash Advances are Still Hot*, deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*. Although the article does not specify one way or the other, estimates by the underlying source, Bryant Park Capital, appear to reference origination volumes rather than outstanding balances. *See* Nimayi Dixit, S&P Glob. Mkt. Intel., *Payment Fintechs Leave Their Mark On Small Business Lending* (Aug. 28, 2018), *https://www.spglobal.com/marketintelligence/en/news-insights/research/payment-fintechs-leave-their-mark-on-small-business-lending*. Depending on credit multiplier effects, the value of annual origination volumes could be smaller or greater than outstanding balances. Without information on outstanding balances and for the purposes of calculating a market size for small business financing in 2019, the Bureau assumes in this paper a 1:1 ratio between annual origination volumes and outstanding balances for merchant cash advance products. See part II.D below for discussion of credit multiplier effects and for market size calculations for merchant cash advance and other small business financing products in 2019.

[24] "Fintechs" have been defined as "technology companies providing alternatives to traditional banking services, most often exclusively in an online environment," and may overlap in part with other categories of financial institutions, such as commercial finance companies and/or providers of specialized products, including factoring and merchant cash advances. Brett Barkley & Mark Schweitzer, *The Rise of Fintech Lending to Small Businesses: Businesses' Perspectives on Borrowing*, 17 Int'l J. Cent. Banking 35, 35–36 (Mar. 2021), *https://www.ijcb.org/journal/ijcb21q1a2.pdf*.

[25] *Id.* (citing Katie Darden *et al.*, S&P Glob. Mkt. Intel., *2018 US Fintech Market Report*, at 5, *https://www.spglobal.com/marketintelligence/en/documents/2018-us-fintech-market-report.pdf* (2018 US Fintech Market Report)). This figure annualizes $121 million in estimated 2013 quarterly originations to $484 million in annual originations and scales up to estimated outstanding balances using the ratio between the FFIEC Call Report and the CRA data discussed in part II.D below.

[26] 2018 US Fintech Market Report at 6. This figure scales up $9.3 billion in estimated 2019 credit originations for small- to medium-sized enterprise borrowers to outstanding balances using the ratio methodology discussed in part II.D below.

[27] Itzhak Ben-David *et al.*, Nat'l Bureau of Econ. Res., *Why Did Small Business Fintech Lending Dry Up During March 2020*, at 1–7 (Sept. 2021), *https://www.nber.org/system/files/working_papers/w29205/w29205.pdf* (discussing how nondepository lenders faced a credit crunch in March 2020 that impaired their ability to continue funding small business borrowers despite increased demand due to the COVID–19 shock).

[28] 86 FR 16837, 16839 (Mar. 31, 2021); *see also* Rohit Chopra, CFPB, *Remarks of Director Rohit Chopra at a Joint DOJ, CFPB, and OCC Press Conference on the Trustmark National Bank Enforcement Action* (Oct. 22, 2021), *https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/* (discussing risks of discriminatory bias from black box underwriting algorithms).

[29] Geng Li, Bd. of Governors of the Fed. Rsrv. Sys., *FEDS Notes: Gender-Related Differences in Credit Use and Credit Scores* (June 22, 2018), *https://www.federalreserve.gov/econres/notes/feds-notes/gender-related-differences-in-credit-use-and-credit-scores-20180622.htm* (finding that single women on average have lower credit scores than single men); Alicia Robb, Off. of Advocacy, Small Bus. Admin., *Minority-Owned Employer Businesses and their Credit Market Experiences in 2017*, at 4 (July 22, 2020), *https://cdn.advocacy.sba.gov/wp-content/uploads/2020/07/22172533/Minority-Owned-Employer-Businesses-and-their-Credit-Market-Experiences-in-2017.pdf* (finding that Black and Hispanic small business borrowers are disproportionately denied credit or discouraged from applying for credit on the basis of their credit score).

[30] *See* Jessica Battisto *et al.*, *Who Benefited from PPP Loans by Fintech Lenders?*, Liberty St. Econ. (May 27, 2021), *https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders.html* (Who Benefited from PPP Loans) (showing that online lenders were an important source of credit for Black owners during the COVID–19 pandemic).

AdminRecord-000005

associated with the closure of bank branches.[31]

The precise impacts of these broader trends are not well understood at present because there are no comprehensive, comparable, and application-level data across the fragmented and complex small business lending market. Some small business lending data exist, provided in data reported to Federal regulators, but available data are incomplete in certain ways. Some do not include lending by certain categories of institutions, such as smaller depository institutions. And none include lending by nondepository institutions, which comprises almost half of all small business financing.[32]

The datasets that do exist both over- and underestimate small business lending in certain respects by including small dollar loans to non-small businesses and by excluding larger loans to small businesses.[33] Further, these datasets almost exclusively concern originated loans; they do not include information on applications that do not result in originated loans. Nor do they generally include borrower demographics. Other public, private, and nonprofit datasets offer only partial snapshots of particular areas of the market. Finally, much of the publicly available data are aggregated, which does not permit more granular, loan- or application-level analysis that would facilitate fair lending or business and community development analysis by stakeholders other than those that collected the data. See part II.B below for a detailed discussion on existing data on small business financing.

The remainder of this part II focuses on several broad topics that explain, in more detail, the need for the small business lending data that the CFPB's rule to implement section 1071 will provide: (A) improved understanding of the role of small businesses in the U.S. economy; (B) existing data on small business financing; (C) the landscape of small business financing; (D) estimating the size of the small business financing market despite limited data; (E) the particular challenges faced by women-owned, minority-owned, and LGBTQI+-owned small businesses; and (F) the purposes and impact of section 1071.

*A. Small Businesses in the United States*

Small businesses are an important, dynamic, and widely diverse part of the U.S. economy. They are critical to employment, innovation, and economic growth and stability, both overall and specifically for minority, women, and LGBTQI+ entrepreneurs.

The Small Business Act, as implemented by the Small Business Administration (SBA), defines a small business using size standards that generally hinge on the average number of employees or average annual receipts of the business concern and are customized industry by industry across 1,012 six-digit North American Industry Classification System (NAICS) codes.[34] Size standards based on average number of employees are used in all industries in the manufacturing and wholesale trade sectors, as well as in certain industries across a variety of other sectors. Employee-based size standards range from 100 employees (used almost entirely in certain industries within the wholesale trade sector) to 1,500 employees (used in industries across a variety of sectors including, for example, petroleum refineries, automobile manufacturing, and greeting card publishers).[35] Size standards based on average annual receipts are used in nearly all other industries, and range from $2.25 million (used in several industries in the crop production and animal production and aquaculture subsectors) to $47 million (used in industries across a variety of sectors including, for example, passenger car leasing, television broadcasting, and general medical and surgical hospitals).[36]

Simpler definitions of what constitutes a small business are used in certain contexts. For example, in certain annual research releases the SBA Office of Advocacy defines a small business as one that has fewer than 500 employees.[37] According to the Office of Advocacy, and based on this definition of a small business, in 2018 there were 32.5 million such businesses in the U.S. that represent 99.9 percent of all U.S. firms and employ over 60 million Americans.[38] Over six million of these small businesses have paid employees, while 26.5 million are non-employer businesses (*i.e.,* the owner(s) are the only people involved in the business).[39] From 1995 to 2020, small businesses, particularly young businesses and start-ups, created 12.7 million net new jobs in the U.S., while large businesses created 7.9 million.[40]

Nearly one third of all businesses are minority-owned and more than one third are women-owned, though minorities and women own a smaller share of employer firms. As of 2019, minorities owned around 1.1 million employer firms in the U.S. (amounting to 18.7 percent of all employer firms)[41] and, as of 2018, approximately 8.7 million non-employer firms (33.6 percent of all non-employer firms).[42] Likewise, as of 2019, women owned about 1.2 million employer firms (20.9 percent of all employer firms)[43] and, as of 2018, approximately 10.9 million non-employer firms (41.0 percent of all non-employer firms).[44] Additionally, in

[31] *See* Cong. Rsch. Serv., *Fintech: Overview of Innovative Financial Technology and Selected Policy Issues,* at 1 (Apr. 28, 2020), *https://crsreports.congress.gov/product/pdf/R/R46332.*

[32] The Bureau estimates that nondepository private business financing totaled approximately $550 billion out of around $1.2 billion in total private outstanding balances in 2019 (47 percent). This $550 billion figure includes estimated financing by fintechs (around $25 billion), commercial finance companies (around $160 billion), nondepository CDFIs (around $1.5 billion), merchant cash advance providers (around $19 billion), factors (around $100 billion), equipment leasing providers (around $160 billion), nondepository mortgage lenders originating loans for 5+ unit residential developments (around $30 billion), and non-financial trade creditors (around $50 billion). There may additionally be lending that is not captured here by equipment and vehicle dealers originating loans in their own names. Public lenders include SBA, the Federal Housing Administration, Fannie Mae and Freddie Mac, and the Farm Credit System, with public lending totaling around $210 billion in traditional lending programs plus $1 trillion in emergency COVID–19 SBA lending programs. See part II.D below for methodology and sources regarding market size estimates for each lending category.

[33] *See* part II.B below.

[34] *See* Small Bus. Admin., *Table of Small Business Size Standards Matched to North American Industry Classification System Codes* (effective Mar. 17, 2023), *https://www.sba.gov/sites/default/files/2023-03/Table%20of%20Size%20Standards_Effective%20March%2017%2C%202023%20%281%29%20%281%29_0.pdf.*

[35] *See id.*

[36] A small number of industries use a size standard based on a metric other than average annual receipts or average number of employees. For example, the commercial banking industry

(NAICS 522110) is subject to an asset-based size standard. *See id.*

[37] *See* SBA OA 2021 FAQs at 1.

[38] *See id.*

[39] *See id.*

[40] *See id.; see also* Haltiwanger *et al.,* 95 Rev. Econ. Stat. at 347–48 (finding that young firms, which are generally small, contribute disproportionately to both gross and net job creation).

[41] *See* Press Release, U.S. Census Bureau, *Census Bureau Releases New Data on Minority-Owned, Veteran-Owned and Women-Owned Businesses* (Oct. 28, 2021), *https://www.census.gov/newsroom/press-releases/2021/characteristics-of-employer-businesses.html* (Census Bureau 2021 Minority- and Women-Owned Businesses Data).

[42] Minority Bus. Dev. Agency, U.S. Dep't of Com., *All Minority-Owned Firms: Fact Sheet* (June 10, 2022), *https://www.mbda.gov/sites/default/files/2022-06/All%20Minority%20Owned%20Firms%20Fact%20Sheet%20-%20FINAL%206.10.2022.pdf* (stating that the nearly 8.7 million minority non-employer firms in the U.S. generated $306.1 billion in revenues in 2018).

[43] *See* Census Bureau 2021 Minority- and Women-Owned Businesses Data.

[44] *See* Press Release, U.S. Census Bureau, *Nonemployer Statistics by Demographics* (Dec. 16, 2021), *https://www.census.gov/newsroom/press-releases/2021/nonemployer-statistics-by-demographics.html* (also stating that these firms collectively generated $300 billion in annual receipts). In 2017, nearly half of all women-owned

Continued

2016 there were an estimated 1.4 million LGBTQI+ business owners in the United States.[45]

Businesses are legally structured in several ways. In 2018, 87 percent of non-employer businesses were sole proprietorships, which means that the business is not distinguishable from the owner for tax and legal purposes; the owner receives profits directly but is also legally responsible for the business's obligations.[46] Seven percent of non-employer businesses were partnerships, which can be structured to limit the personal liability of some or all owners; limited partners may exchange control for limited liability, while general partners that run the business may remain personally liable.[47] Six percent of non-employer businesses were structured as corporations—4.5 percent are S-corporations and 1.5 percent are C-corporations—which are independent legal entities owned by shareholders who are not personally liable for the corporation's obligations.[48] In 2018, most small employer businesses were corporations, with 52.1 percent choosing to be S-corporations and 15.3 percent preferring C-corporation status, although sole proprietorship and partnership structures remained relatively popular at 13.7 percent and 11.9 percent, respectively.[49] By contrast, in 2017, 74.2 percent of large employer businesses chose to be C-corporations, with 9.3 percent preferring a partnership structure and 8.1 percent S-corporation status.[50]

Small businesses are particularly important in specific sectors of the economy. In 2019, in the services sector, small businesses supplied 9.2 million healthcare and social services jobs (44 percent of all healthcare and social services jobs), 8.8 million accommodation and food services jobs

(61 percent), and 5.7 million construction jobs (81 percent).[51] In the same year, in manufacturing, small businesses supplied 5.1 million manufacturing jobs (42 percent of all manufacturing jobs).[52] Finally, in 2016, family farms with annual gross sales under $500,000 totaled over 91 percent out of 2.2 million farms,[53] and small businesses provided over 137,000 agriculture, forestry, fishing and hunting jobs (84 percent of all agriculture, forestry, fishing and hunting jobs).[54] As such, the financial health of small businesses is essential to the U.S. economy, especially to the supply of critical and basic goods and services—from producing food to serving it at restaurants, and from home building to healthcare.

Small businesses were especially hard-hit by the onset of the COVID–19 pandemic. At one point in the pandemic in April 2020, 20 percent of self-employed workers had temporarily exited the labor market.[55] Industries in which small businesses played a large role have been particularly impacted. For example, comparing April 2020 with April 2019, employment declined by almost 50 percent in the leisure and hospitality businesses (also declining by almost 50 percent among food services and drinking establishments within the leisure and hospitality industry), in which small businesses employ over 60 percent of workers.[56] Women-, minority-, and LGBTQI+-owned small businesses were hit particularly hard. Between February and April 2020, some 373,000 jobs were lost in child daycare

services, a sector in which women-ownership predominates and minority-ownership is very significant. Only 54 percent of these jobs were recovered by the end of 2020.[57] In 2021, 85 percent of LGBTQI+-owned small businesses reported the pandemic was having a negative effect on their business, compared to 76 percent of non-LGBTQI+-owned small businesses.[58] Since 2022, small businesses have faced different economic shocks, including inflation and a shortage of labor, as the economy reopened and resurgent consumer demand has stretched still-fragile supply chains.[59]

*B. Existing Data on Small Business Lending*

While small businesses are a critical part of the U.S. economy and require financial support, it is still true—as it was in 2017 when the CFPB published its White Paper on small business lending—that it is not possible with current data to confidently answer basic questions regarding the state of small business lending. This limitation is especially the case with regard to the ethnicity, race, and sex of small business owners, applications as opposed to originations, and for small business financing products that are not currently reported in Call Report data.[60]

Data on small business lending is fragmented, incomplete, and not standardized, making it difficult to

---

non-employer firms generated less than $10,000 in annual receipts, while only 0.05 percent generated $1 million or more in receipts. *See* Press Release, Nat'l Women's Bus. Council, *NWBC Shares 2017 Nonemployer Statistics by Demographics Estimates for Women-Owned Businesses* (Dec. 17, 2020), *https://www.nwbc.gov/2020/12/17/nwbc-shares-2017-nonemployer-statistics-by-demographics-estimates-for-women-owned-businesses/*.

[45] Nat'l Gay & Lesbian Chamber of Com., *America's LGBT Economy: The Premiere Report on the Impact of LGBT-Owned Businesses*, at 2 (Jan. 2017), *https://nglcc.org/wp-content/uploads/2022/02/REPORT-NGLCC-Americas-LGBT-Economy-1-1.pdf*.

[46] *See* SBA OA 2021 FAQs at 3.

[47] *Id.* at 4.

[48] *Id.*

[49] *Id.*

[50] Off. of Advocacy, Small Bus. Admin., *Frequently Asked Questions About Small Business*, at 4 (Oct. 2020), *https://cdn.advocacy.sba.gov/wp-content/uploads/2020/11/05122043/Small-Business-FAQ-2020.pdf* (SBA OA 2020 FAQs).

[51] *See* 2022 Small Business Profile at 4.

[52] *Id.*

[53] Nat'l Inst. of Food & Agric., U.S. Dep't of Agric., *Family Farms, https://nifa.usda.gov/family-farms* (last visited Mar. 20, 2023) (classifying family farms as any farm organized as a sole proprietorship, partnership, or family corporation. Family farms exclude farms organized as non-family corporations or cooperatives, as well as farms with hired managers).

[54] 2022 Small Business Profile at 4.

[55] Daniel Wilmoth, Off. of Advocacy, Small Bus. Admin., *The Effects of the COVID–19 Pandemic on Small Businesses* (Issue Brief No. 16), at 5 (Mar. 2021), *https://cdn.advocacy.sba.gov/wp-content/uploads/2021/03/02112318/COVID-19-Impact-On-Small-Business.pdf*.

[56] *Id.* at 4. *By the third quarter of 2020 many of these jobs had since returned as mandatory closure orders ended and the economy began to recover. Cf.* Robert W. Fairlie *et al.*, Nat'l Bureau of Econ. Res., *Were Small Businesses More Likely to Permanently Close in the Pandemic*, at 3, 14 (July 2022), *https://www.nber.org/system/files/working_papers/w30285/w30285.pdf* (finding a sharp increase in California business closures in the first and second quarters of 2020 that reversed in the third quarter of 2020). However, small businesses still appear to have suffered more than large businesses. *See id.* (finding that small businesses experienced substantially higher closure rates than large businesses).

[57] Bureau of Labor Stat., *COVID–19 Ends Longest Employment Recovery and Expansion in CES History, Causing Unprecedented Job Losses in 2020* (June 2021), *https://www.bls.gov/opub/mlr/2021/article/covid-19-ends-longest-employment-expansion-in-ces-history.htm*. An estimated 90 percent of childcare businesses are women-owned and over half of these owners are minority women. Cindy Larson & Bevin Parker-Cerkez, *Investing in Child Care Fuels Women-owned Businesses & Racial Equity*, Loc. Initiatives Support Corp. (Mar. 8, 2022), *https://www.lisc.org/our-stories/story/investing-child-care-fuels-women-owned-businesses-racial-equity/*.

[58] Spencer Watson *et al.*, *LGBTQ-Owned Small Businesses in 2021*, Ctr. for LGBTQ Econ. Advancement & Rsch. And Movement Advancement Project, at 9 (July 2022), *https://www.lgbtmap.org/file/LGBTQ-Small-Businesses-in-2021.pdf* (using data from the Federal Reserve's Small Business Credit Survey, which began collecting demographic data on LGBTQ small business ownership in 2021).

[59] *See* William C. Dunkelberg & Holly Wade, *Small Business Economic Trends*, Nat'l Fed'n of Indep. Bus., at 2, 11, 19 (Aug. 2022), *https://assets.nfib.com/nfibcom/SBET-August-2022.pdf* (finding that, out of 622 small businesses polled, 29 percent considered inflation their biggest problem, 49 percent had at least one unfilled job opening, and 32 percent reported that supply chain disruptions had a significant impact on their business).

[60] CFPB, *Key dimensions of the small business lending landscape*, at 39–40 (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf* (White Paper).

conduct meaningful comparisons across products and over time. Against this background, it is not hard to see why Congress believed that the collection of small business application data would serve to identify business and community development needs and opportunities. The lack of data hinders attempts by policymakers and other stakeholders to understand the size, shape, and dynamics of the small business lending marketplace, including the interaction of supply and demand, as well as potentially problematic lending practices, gaps in the market, or trends in funding that may be holding back some communities.[61] For example, absent better data, it is hard to determine if relatively lower levels of bank loans to small businesses in the decade before the pandemic began were reflective of a net relative decline in lending to small businesses as compared to large businesses or rather a shift within small business lending from banks to nondepository lenders.[62] To the extent there may have been a relative decline, it is difficult to assess if that decline affected certain types of small businesses more than others, including women-owned and minority-owned small businesses.[63]

The primary sources of information on lending by depository institutions are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports), as well as reporting under the Community Reinvestment Act (CRA). Under the FFIEC and CRA reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those

originated under $500,000).[64] The CRA currently requires banks and savings associations with assets over a specified threshold to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[65] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[66] There are no similar sources of information about lending to small businesses by nondepository institutions. The SBA also releases loan-level data concerning some of its loan programs, but these typically do not include demographic information, and cover only a small portion of the overall small business financing market.

These public data sources provide some of the most extensive information currently available on small business lending. However, they suffer from four material limitations: namely that the data capture only parts of the market, are published at a high level of aggregation, do not permit detailed analysis across the market, and lack standardization across different agencies.

First, these datasets exclude entire categories of lenders. For example, banks under $1.384 billion in assets, as of 2022, do not have to report under the CRA.[67] The FFIEC and NCUA Call Reports and CRA data do not include

lending by nondepository financial institutions, which the CFPB estimates to represent 37 percent of the small business financing market and is rapidly growing.[68]

Second, Federal agencies publish summary data at a high level in a manner that does not facilitate independent analysis by other agencies or stakeholders. The FFIEC and NCUA Call Reports and the CRA data are all available at a higher level of aggregation than loan-level, limiting fair lending and detailed geographic analyses since ethnicity, race, and sex as well as business location data are rarely disclosed.

Third, the detailed data collected by these Federal sources have significant limitations as well, preventing any analysis into certain issues or types of borrowers, even by the regulators possessing these data. Neither Call Report nor CRA data include applications, which limits insights into any potential discrimination or discouragement in application processes as well as into the interaction between credit supply and demand. The FFIEC Call Report and CRA data separately identify loans of under $1 million in value and, among loans of under $1 million in value, CRA data also identify loans to businesses with annual revenues of $1 million or less (if the lender collects borrower revenue information).[69] However, the Call Report definition of "small business loans" as those with a loan size of $1 million or less at origination is both overinclusive, as it counts small loans to businesses of all sizes, and underinclusive, as it excludes loans over $1 million made to small businesses. Credit unions report any loans under $50,000 as consumer loans and not as commercial loans on the NCUA Call Report,[70] potentially excluding from measurement an important source of funding for many small businesses, particularly the smallest and often most underserved.

Finally, the Federal sources of small business lending data are not

---

[61] While Call Report and CRA data provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess, including with respect to local markets or protected classes.

[62] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?*, at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008 to 2015 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. Fed. Deposit Ins. Corp., *Quarterly Banking Profile*, *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited Mar. 20, 2023).

[63] White Paper at 40.

[64] *See* Fed. Fin. Insts. Examination Council, *Reporting Forms 31, 41, and 51* (last updated Mar. 16, 2023), *https://www.ffiec.gov/ffiec_report_forms.htm* (FFIEC Call Report).

[65] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11, 13 (2015), *https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf* (2015 FFIEC CRA Guide). Small business loans are currently defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are currently defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11. The Federal agencies responsible for implementing the CRA have proposed to amend the CRA regulations to adopt the Bureau's definition of small business. 87 FR 33884 (June 3, 2022).

[66] *See* Nat'l Credit Union Admin., *Call Report Form 5300 Instructions*, at 74–84 (Mar. 31, 2022), *https://www.ncua.gov/files/publications/regulations/call-report-instructions-march-2022.pdf* (Call Report Form 5300 Instructions).

[67] Joint Press Release, Bd. of Governors of the Fed. Rsrv. Sys. & Fed. Deposit Ins. Corp., *Agencies Release Annual Asset-Size Thresholds Under Community Reinvestment Act Regulations* (Dec. 16, 2021), *https://www.federalreserve.gov/newsevents/pressreleases/bcreg20211216a.htm.*

[68] Nondepository lending is estimated to total approximately $550 billion out of $1.5 trillion in total lending, excluding $1 trillion in COVID–19 emergency program lending. *See* part II.D below (providing a detailed breakdown and methodology of estimates across lending products).

[69] Fed. Fin. Insts. Examination Council, *Schedule RC–C, Part II Loans to Small Businesses and Farms* (2017), at 1, *https://www.fdic.gov/regulations/resources/call/crinst-031-041/2017/2017-03-rc-c2.pdf* (detailing the Call Report loan size threshold of $1 million at origination for loans to small businesses); 2015 FFIEC CRA Guide at 11 (detailing the CRA size thresholds of $1 million both for loan amount at origination and for revenue of small business borrowers).

[70] Call Report Form 5300 Instructions at 44.

**35158**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

standardized across agencies and cannot be easily compared. For example, as noted above, the FFIEC Call Report collects small loans to businesses as a proxy for small business lending, whereas the NCUA Call Report collects loans to members for commercial purposes above $50,000 but with no upper limit. The loan-level data for the Paycheck Protection Program offer an unprecedented level of insight into small business lending, but this dataset is a one-off snapshot into the market for a specific lending program at an acute moment of crisis and is also limited in utility by relatively low response levels to demographic questions concerning borrowers.[71]

The Federal government also conducts and releases a variety of statistics, surveys, and research reports on small business lending through the member banks for the Federal Reserve System, the FDIC, CDFI Fund, and the U.S. Census Bureau. These data sources offer insights into broad trends and specific small business lending issues but are less useful for detailed fair lending analyses or identification of specific areas, industries, or demographic groups being underserved. Periodic changes in survey methodology, sample sizes, and questions can also limit comparability and the ability to track developments over time.

There are also a variety of non-governmental data sources, issued by both private and nonprofit entities, that cover small businesses and/or the small business financing market. These include datasets and surveys published by commercial data and analytics firms, credit reporting agencies, trade associations, community groups, and academic institutions. Certain of these data sources are publicly available and track specific topics, such as small business optimism,[72] small business employment,[73] rates of small business

credit application approvals,[74] and small business lending and delinquency levels.[75] Other databases have more granularity and provide detailed information on individual businesses, including revenue, credit utilization, industry, and location.[76]

While these non-public sources of data on small businesses may provide a useful supplement to existing Federal sources of small business lending data, these private and nonprofit sources often do not have the lending information, may rely in places on unverified self-reporting or research based on public internet sources, and/or narrowly limit use cases for parties accessing data. Further, commercial datasets are generally not free to public users and can be costly as well as have restrictions on their use, raising equity issues for stakeholders who cannot afford access or are not permitted to use the data for their desired purposes.

### C. The Landscape of Small Business Finance

Notwithstanding the lack of data on the market, it is clear that financing plays an important role in enabling small businesses to grow and contribute to the economy. When it is available, financing not only provides resources for small businesses to smooth cash flows for current operations, but also affords business owners the opportunity to invest in business growth. A study by a small business trade group found a correlation between small business owners' ability to access credit and their ability to hire.[77] This same study found that, while not the sole cause, the inability to secure financing may have led 16 percent of small businesses to reduce their number of employees and approximately 10 percent of small businesses to reduce employee benefits. Lack of access to financing also contributed to a further 10 percent of small businesses being unable to increase store inventory in order to meet existing demand.[78]

To support their growth or to make it through harder times, small businesses

look to a variety of funding sources. Especially when starting out, entrepreneurs often rely on their own savings and help from family and friends. If a business generates a profit, its owners may decide to reinvest retained earnings to fund further growth. However, for many aspiring business owners—and their personal networks—savings and retained earnings may not be sufficient to fund a new venture or grow it, leading owners to seek other sources of funding. This is particularly true for minority households and women-led households, which on average have less wealth than white households and male-led households.[79]

One such source of funding comes from others besides family and friends, whether high net worth individuals or "angel investors," venture capital funds, or, in a more recent development usually facilitated by online platforms, via crowdsourcing from retail investors. Often, these early investments take the form of equity funding, which business owners are not obligated to repay to investors. However, equity funding requires giving up some ownership and control to investors, which some entrepreneurs may not wish to do. For small businesses, equity funding also tends to be somewhat more expensive than debt financing in the long run. This is for a number of reasons, including that loan interest payments, unlike capital gains, are tax-deductible.[80] Finally, equity investments from others besides family and friends are available to only a small fraction of small businesses.

Many small businesses instead seek debt financing from a wide range of

---

[71] Zachary Warmbrodt, *Tracking the Money: Bid to Make Business Rescue More Inclusive Undercut by Lack of Data*, Politico (Mar. 2, 2021), *https://www.politico.com/news/2021/03/02/businesses-inclusive-coronavirus-relief-money-data-472539* (reporting that 75 percent of Paycheck Protection Program loan recipients did not report their ethnicity and 58 percent did not reveal their gender); *see also* Rachel Atkins et al., *Discrimination in Lending? Evidence from the Paycheck Protection Program*, 58 Small Bus. Econ. 843, 844 (Feb. 2022), *https://link.springer.com/article/10.1007/s11187-021-00533-1* (finding that borrower business owner race was reported for only 10 percent of Paycheck Protection Program loans).

[72] Nat'l Fed'n of Indep. Bus., *Small Business Optimism Index* (July 2022), *https://www.nfib.com/surveys/small-business-economic-trends/*.

[73] ADP Rsch. Inst., *Employment Reports*, *https://adpemploymentreport.com/* (last visited Mar. 20, 2023).

[74] Biz2Credit, *Biz2Credit Small Business Lending Index*, *https://www.biz2credit.com/small-business-lending-index* (last visited Mar. 20, 2023).

[75] PayNet, *Small Business Lending Index*, *https://sbinsights.paynetonline.com/lending-activity/* (last visited Mar. 20, 2023).

[76] *See, e.g.*, Dun & Bradstreet, *https://www.dnb.com/* (data provider and credit reporter); Data Axle, *https://www.data-axle.com/* (data provider); Equifax, *https://www.equifax.com/business/product/business-credit-reports-small-business/* (credit reporter); Experian, *https://www.experian.com/small-business/business-credit-reports* (credit reporter).

[77] White Paper at 17.

[78] *Id.*

[79] Emily Moss et al., *The Black-White Wealth Gap Left Black Households More Vulnerable*, Brookings Inst. (Dec. 8, 2020), *https://www.brookings.edu/blog/up-front/2020/12/08/the-black-white-wealth-gap-left-black-households-more-vulnerable/* (detailing wealth gaps in 2019 by race and sex that show white male households with more wealth than white female or Black male or female households at all age brackets); *See also* Erin Ruel & Robert Hauser, *Explaining the Gender Wealth Gap*, 50 Demography 1155, 1165 (Dec. 2012), *https://read.dukeupress.edu/demography/article/50/4/1155/169553/Explaining-the-Gender-Wealth-Gap* (finding a gender wealth gap of over $100,000 in a longitudinal study over 50 years of a single age cohort in Wisconsin); Neil Bhutta et al., Bd. of Governors of the Fed. Rsrv. Sys., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances* (Sept. 28, 2020), *https://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.htm* (finding median white family wealth in 2019 of $188,200 compared with $24,100 for Black families and $36,100 for Hispanic families).

[80] Jim Woodruff, *The Advantages and Disadvantages of Debt and Equity Financing*, CHRON (updated Mar. 4, 2019), *https://smallbusiness.chron.com/advantages-disadvantages-debt-equity-financing-55504.html*.

providers. These providers include depository institutions, such as banks, savings associations, and credit unions,[81] as well as online lenders and commercial finance companies, specialized providers of specific financing products, nonprofits, and a range of government and government-sponsored enterprises, among others.

In the past, small businesses principally sought credit from banks; however, as banks have merged and consolidated, particularly in the wake of the Great Recession, they have provided less financing to small businesses.[82] As noted earlier, the number of banks has declined significantly since a post-Great Depression peak in 1986 of over 18,000 institutions to under 4,800 institutions as of June 30, 2022,[83] while 13,500 branches closed from 2009 to mid-2020, representing a 14 percent decrease.[84] Although nearly half of counties either gained bank branches or retained the same number between 2012 and 2017, the majority lost branches over this period.[85] Out of 44 counties that were

deeply affected by branch closures, defined as having 10 or fewer branches in 2012 and seeing five or more of those close by 2017, 39 were rural counties.[86] Of rural counties, just over 40 percent lost bank branches in that period; the rural counties that experienced substantial declines in bank branches tend to be lower-income and with a higher proportion of African American residents relative to other rural counties,[87] raising concerns about equal access to credit.

As banks have merged and the number of branches reduced, the share of banking assets has also become increasingly concentrated in the largest institutions, with banks of over $10 billion in assets representing 86 percent of all industry assets in 2021, totaling $20.3 trillion out of $23.7 trillion.[88] Nevertheless, banks of under $10 billion in assets continue to hold approximately half of all small business loans (using the FFIEC Call Report definition of loans of under $1 million), highlighting the importance of smaller banks to the small business lending market.[89] Since smaller bank credit approvals have traditionally been close to 50 percent, while large banks approve only 25–30 percent of applications, bank consolidation may have implications for small business credit access.[90] Since institutions under

$1.384 billion in assets currently are not required to report on lending under the CRA,[91] it is difficult to precisely quantify the negative impact of bank consolidation and shuttered branches on small business lending and access to credit in local areas.[92] Qualitatively, community banks typically receive high satisfaction scores among small business borrowers, reflecting their greater commitment to relationship banking, a model of banking "used to serve families, businesses, and communities as individuals, with an emphasis on providing customized help, rather than assembly line service."[93]

In contrast to banks, credit unions increased their small business lending from $30 billion in 2008 to $71 billion in 2021.[94] Like community banks, credit

[81] For purposes of this document, the Bureau is using the term depository institution to mean any bank or savings association defined by section 3(c)(1) of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). The Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this document, unless otherwise specified, to facilitate analysis and discussion.

[82] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?*, at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008 to 2015 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a tough in 2012–13 that represented the lowest amount of lending since 2005. Fed. Deposit Ins. Corp., *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited Mar. 20, 2023).

[83] Cong. Rsch. Serv., *Small Business Credit Markets and Selected Policy Issues*, at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45876.pdf* (decline since 1986); Fed. Deposit Ins. Corp., *Quarterly Banking Profile*, at 7 (Aug. 2022), *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/2022jun/qbp.pdf* (number of banks as of June 30, 2022).

[84] Bruce C. Mitchell *et al.*, Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations*, at 6 (2020), *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (stating that in 2009 there were 95,596 brick and mortar full-service branches or retail locations but, as of June 30, 2020, that number had fallen to 82,086).

[85] Bd. of Governors of the Fed. Rsrv. Sys., *Perspectives from Main Street: Bank Branch Access in Rural Communities*, at 1, 3–4, 19 (Nov. 2019),

*https://www.federalreserve.gov/publications/files/bank-branch-access-in-rural-communities.pdf*.

[86] *Id.*

[87] *Id.*

[88] Fed. Deposit Ins. Corp., *Bank Data and Statistics*, *https://www.fdic.gov/bank/statistical/* (last visited Mar. 20, 2023); *see also* Cong. Rsch. Serv., *Small Business Credit Markets and Selected Policy Issues*, at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45876.pdf* (stating that banks over $10 billion held 84 percent of all industry assets in 2018).

[89] Speech by Board Governor Lael Brainard: *Community Banks, Small Business Credit, and Online Lending* (Sept. 30, 2015), *https://www.federalreserve.gov/newsevents/speech/brainard20150930a.htm*. Banks with under $10 billion in assets are often referred to as "community banks." Cong. Rsch. Serv., *Over the Line: Asset Thresholds in Bank Regulation*, at 2–3 (May 3, 2021), *https://fas.org/sgp/crs/misc/R46779.pdf* (noting that the Board of Governors of the Federal Reserve System (Board) and the Office of the Comptroller of the Currency (OCC) define community banks as having under $10 billion in assets, although there may be other criteria, with the FDIC considering also geographic footprint and a relative emphasis on making loans and taking deposits as opposed to engaging in securities and derivatives trading).

[90] Biz2Credit, *Biz2Credit Small Business Lending Index*, *https://www.biz2credit.com/small-business-lending-index* (last visited Mar. 20, 2023). These historical approval rates are reflected in pre-pandemic Small Business Lending Index releases by Biz2Credit. *See, e.g.*, Biz2Credit, *Small Business Loan Approval Rates at Big Banks Remain at Record High in February 2020: Biz2Credit Small Business Lending Index*, *https://www.biz2credit.com/small-business-lending-index/*

*february-2020* (last visited Mar. 20, 2023) (showing large bank approvals of 28.3 percent in February 2020 and of 27.2 percent in February 2019 and smaller bank approvals of 50.3 percent in February 2020 and of 48.6 percent in February 2019).

[91] *See* part II.B above.

[92] Bruce C. Mitchell *et al.*, Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations* (Mar. 2021), *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/*.

[93] Rohit Chopra, CFPB, *Prepared Remarks of CFPB Director Rohit Chopra in Great Falls, Montana on Relationship Banking and Customer Service* (June 14, 2022), *https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-in-great-falls-montana-on-relationship-banking-and-customer-service/*; *see also* 87 FR 36828, 36829 (June 21, 2022) (stating that relationship banking is "an aspirational model of banking that meets its customers' needs through strong customer service, responsiveness, and care"); Cong. Rsch. Serv., *Over the Line: Asset Thresholds in Bank Regulation*, at 3 (May 3, 2021), *https://fas.org/sgp/crs/misc/R46779.pdf* (stating that community banks are more likely to engage in relationship-based lending).

[94] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?*, at 51 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf ($30 billion in lending in 2008)*; Calculated from NCUA Call Report data accessed on October 18, 2022 ($71 billion in lending in 2021). The Bureau notes that, as discussed in part II.B above, credit unions only report credit transactions made to members for commercial purposes with values over $50,000. The Bureau uses this value as a proxy for small business credit. The Bureau acknowledges that the true value of small business credit extended by credit unions may be different than what is presented here. For example, this proxy may overestimate the value of outstanding small business credit because some members are taking out loans for large businesses. Alternatively, this proxy may underestimate the value of outstanding small business credit if credit unions originate a substantial number of small business loans with origination values of under $50,000. For this analysis, the Bureau includes all types of commercial loans to members except construction and development loans and multifamily residential property. This includes loans secured by farmland; loans secured by owner-occupied, non-farm, non-residential property; loans secured by non-owner occupied, non-farm, non-residential property; loans to finance agricultural

Continued

unions typically receive high satisfaction scores among small business borrowers, reflecting more high-contact, relationship-based lending models.[95]

Certain banks and credit unions choose to be mission-based lenders, as CDFIs or minority depository institutions.[96] Mission-based lenders focus on providing credit to traditionally underserved and low-income communities and individuals to promote community development and expand economic opportunity, making them a relatively smaller by dollar value but essential part of the small business lending market. There were almost 1,400 CDFIs (over half of which are depository institutions) as of August 2022 and over 140 minority depository institutions as of March 2022.[97]

During a period in which depository institutions have been providing relatively less funding to small businesses,[98] some small businesses have increasingly relied on nondepository institutions for financing. Since nondepositories typically do not report their small business financing

activities to regulators, there are no authoritative sources for either the number of such entities or the dollar value of financing they provide to small businesses.[99] However, what data are available make clear that nondepository online lenders are increasing their share of the small business financing market.[100]

Whether depository or nondepository, each provider of small business financing may assess a variety of different criteria to determine whether and on what terms to grant an extension of credit or other financing product, including business and financial performance, the credit history of the business and its owner(s), the time in business, and the industry, among other factors. Protections such as guarantees, collateral, and insurance can mitigate perceived risks, potentially enabling a lender to offer better terms or facilitating an extension of credit that would otherwise not meet lending limit or underwriting criteria. Often, government agencies—including the SBA, Federal Housing Administration, and USDA—guarantee or insure loans to encourage lenders to provide credit to borrowers that may not otherwise be able to obtain credit, either on affordable terms and conditions or at all.[101] Different lenders also employ diverse methods for assessing risk, with smaller banks generally relying more on traditional underwriting methods and typically managing multi-product relationships. Online lenders increasingly use complex algorithms, automation, and even artificial intelligence to assess risk and make underwriting decisions, with originations typically being less relationship-based in nature.

As well as diversity in underwriting methodology and criteria, there are also considerable differences across small business financing products and providers with respect to pricing methods and repayment structures. As a result, it can be challenging to compare the competitiveness of product pricing

and terms. Term loans, lines of credit, and credit cards typically disclose annualized interest rates; leases often take into account depreciation; factoring products discount an invoice's value and add a fee; and merchant cash advances apply a multiple to the value of the up-front payment.[102] Moreover, providers may add additional fees that are not standardized within industries, much less across them.

### D. Estimating the Size and Scope of the Small Business Financing Market

In light of the lack of data and the heterogeneity of products and providers within the small business financing market, it can be difficult to get a clear sense of the size and scope of the market. In this part, the CFPB describes its estimates of the total outstanding balances of credit in the market, the number of institutions that are active in the small business financing market, and how the CFPB arrived at these estimates. Where possible, the CFPB tries to estimate the state of the small business financing market at the end of 2019 in order to estimate the state of the market during the year prior to the onset of the COVID–19 pandemic.

One challenge is that some of the data report the dollar value of originations and some report outstanding balances. For the purposes of this exercise and for most, but not all, products, the CFPB assumes that for every $1 originated in the market in a given year, there is approximately a corresponding $3 of outstanding balances. This assumption is based on the ratio of the 2019 FFIEC Call Report data, which totaled $721 billion in outstanding balances on bank loans to small businesses and small farms, and the 2019 CRA data, which recorded $264 billion in bank loan originations to small businesses and small farms.[103] This assumption is limited by the extent to which other small business financing products differ from loans and lines of credit, which make up the majority of financing products captured by the FFIEC Call Report data and the CRA data.[104]

---

production and other loans to farmers; commercial and industrial loans; unsecured commercial loans; and unsecured revolving lines of credit for commercial purposes.

[95] Fed. Rsrv. Banks, *Small Business Credit Survey, 2021 Report On Employer Firms*, at 28 (2021), *https://www.fedsmallbusiness.org/survey/2021/report-on-employer-firms*.

[96] Minority depository institutions are depository institutions that are majority-owned by socially and economically disadvantaged individuals or that have a majority-minority board of directors and serve a predominantly minority community. Fed. Deposit Ins. Corp., *Minority Depository Institutions: Structure, Performance, and Social Impact*, at 1 (2019), *https://www.fdic.gov/regulations/resources/minority/2019-mdi-study/full.pdf*. Minority depository institutions focus more than other banks on minority and low- and moderate-income communities. *See id.* at 1, 5. CDFI banks are certified through the U.S. Department of the Treasury by demonstrating they serve low-income communities. CDFI Fund, *CDFI Certification, https://www.cdfifund.gov/programs-training/certification/cdfi* (last visited Mar. 17, 2023).

[97] CDFI Fund, *CDFI Certification, https://www.cdfifund.gov/programs-training/certification/cdfi* (last visited Mar. 20, 2023); Fed. Deposit Ins. Corp., *Minority Depository Institutions Program* (last visited Mar. 20, 2023), *https://www.fdic.gov/regulations/resources/minority/mdi.html*.

[98] *See* Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?*, at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008–15 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. *See also* Fed. Deposit Ins. Corp., *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited Mar. 20, 2023) (tabulating outstanding balances for credit extended to small- and non-small business lending by banks and thrifts over time).

[99] *See* part II.B above.

[100] *See* part II.B below.

[101] Cong. Rsch. Serv., *Small Business Administration 7(a) Loan Guaranty Program* (updated June 30, 2022), *https://fas.org/sgp/crs/misc/R41146.pdf* (discussing the SBA's flagship 7(a) loan guarantee program); U.S. Dep't of Hous. & Urban Dev., *Descriptions Of Multifamily Programs, https://www.hud.gov/program_offices/housing/mfh/progdesc* (last visited Mar. 20, 2023) (listing Federal Housing Administration mortgage insurance programs for 5+ unit residential developments); Farm Serv. Agency, U.S. Dep't of Agric., *Guaranteed Loan Program Fact Sheet* (Mar. 2020), *https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/guaranteed_loan_program-factsheet.pdf* (discussing the USDA's Farm Service Agency guaranteed loan program).

[102] See part II.D below for definitions of the different product categories.

[103] FFIEC Call Report data records outstanding balances on loans with origination amounts less than $1 million across Commercial & Industrial, Nonfarm Nonresidential, Agricultural, and Secured by Farmland lending categories. *See* FDIC Quarterly Banking Profile Time Series, *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited Mar. 20, 2023).

[104] FFIEC Call Report data and CRA data on small business credit products also include business credit card products, but loans and lines of credit made up $713 billion out of $775 billion in outstanding balances on bank, savings association, and credit union loans to small businesses in 2019.

AdminRecord-000011

As detailed in this section, the CFPB estimates that the market for small business financing products totaled $1.4 trillion in outstanding balances in 2019. The CFPB estimates that small business financing by depository institutions makes up just over half of small business financing by private institutions. In 2020 and 2021, COVID–19 emergency lending programs added a further $1 trillion to this value, bringing the overall size of the small business financing market up to $2.4 trillion. However, by July 2022, over $740 billion in Paycheck Protection Program loans had been forgiven, bringing the total market size back below $1.7 trillion.[105] Below, the CFPB estimates the market share for different small business financing products.

Since the available data regarding depository institutions' small loans to businesses address term loans, lines of credit, and credit cards together, the respective shares of these three products in the overall small business financing market are difficult to assess. As detailed in this part, the CFPB estimates that together, private term loans and lines of credit constitute the largest small business credit product by value, totaling approximately $770 billion in outstanding balances in 2019. As of July 2022, outstanding balances for Economic Impact Disaster Loan Program and Paycheck Protection Program loans totaled $260 billion, bringing the total value of all outstanding loans and lines of credit to around $1 trillion.[106]

Lending by banks, saving associations, and credit unions comprises the largest part of this total amount for private term loans and lines of credit. Using FFIEC Call Report data for December 2019, the CFPB estimates that banks and savings associations accounted for a total of about $721 billion in outstanding credit to small

businesses and small farms as of December 2019.[107] Using NCUA Call Report data for December 2019, the CFPB estimates that credit unions accounted for a total of about $55 billion in outstanding credit to members for commercial purposes.[108] From this value, the CFPB subtracts $62 billion in credit card lending to arrive at $713 billion in outstanding balances for term loans and lines of credit. From this value, the CFPB further subtracts $134 billion in SBA guaranteed loans to arrive at $580 billion in outstanding balances for private term loans and lines of credit extended by depository institutions (*i.e.*, banks, savings associations, and credit unions) as of December 2019.

The remaining $190 billion in outstanding balances for private term loans and lines of credit was extended by various nondepository institutions, namely commercial finance companies, online lenders, and nondepository CDFIs.[109]

Commercial finance companies specialize in financing equipment and vehicle purchases. The CFPB estimates that the value of outstanding balances on credit extended by commercial finance companies totaled approximately $160 billion. Using data from the Board's Finance Company Business Receivables data on owned assets as of December 2019, the CFPB estimates commercial finance credit for commercial purposes as the value of retail motor vehicle loans plus equipment loans and other business receivables, which totaled about $215 billion.[110] The CFPB further assumes

that about 75 percent of this value, or $162 billion, can be attributed to loans to small businesses.[111]

Typical "fintech" providers are characterized primarily by providing financial services exclusively in an online environment.[112] The CFPB estimates that total outstanding loan balances for such providers reached around $25 billion in 2019. Using this estimate, the CFPB scales up an estimated $9.3 billion in credit originations by online platform lenders to small and medium enterprises in 2019 to $25 billion in estimated outstanding balances, under the assumptions discussed above.[113] At the beginning of the COVID–19 pandemic and associated financial crisis, these lenders originated around $22 billion in Paycheck Protection Program loans to small businesses from March to August 2020[114] and likely continued to originate billions more during the third wave of Paycheck Protection Program loans in 2021, which represents an almost 90 percent increase or more in outstanding balances since 2019.[115] This follows already rapid growth from $1.4 billion in estimated outstanding balances in 2013.[116]

[112] Barkley & Schweitzer, 17 Int'l J. Cent. Banking at 35–36.

[113] *See* 2018 US Fintech Market Report at 6. The Bureau notes that this figure may underestimate the total value of such lending because it focuses on platform lenders and may overestimate the value of lending to small businesses because it also includes credit to medium businesses. Additionally, the Bureau notes that fintechs often offer products besides loans and lines of credit, and that there is no clear demarcation between fintech, commercial finance company, and merchant cash advance provider, limiting the precision of market size estimates. Finally, fintechs often sell loans once originated to other entities, securitize their originations, or purchase loans that banks have originated, which may further present challenges to the precision of market size estimates for this market segment.

[114] Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through 12 p.m. EST Apr. 16, 2020), *https://www.sba.gov/sites/default/files/2020-06/PPP%20Deck%20copy-508.pdf*; Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through Aug. 8, 2020), *https://www.sba.gov/sites/default/files/2020-08/PPP_Report%20-%202020-08-10-508.pdf*.

[115] Per the program's intent, many Paycheck Protection Program loans have been forgiven since the program began, which likely means that outstanding balances on Paycheck Protection Program loans extended by online lenders have since declined. *See* Pandemic Response Accountability Comm., *Paycheck Protection Program: Loan Forgiveness by the Numbers* (July 2022), *https://www.pandemicoversight.gov/media/file/ppp-loan-forgiveness-fact-sheet-july-2022-updatepdf* (reporting that $742 billion in Paycheck Protection Program loans had been forgiven by July 2022).

[116] Barkley & Schweitzer, 17 Int'l J. Cent. Banking at 35–36 (citing 2018 US Fintech Market Report at
Continued

One important caveat to this assumption is that products with materially shorter average term lengths, for example credit cards, factoring products, and merchant cash advances, may have an inverse ratio of originations to outstanding balances. For example, top issuers of general-purpose credit cards recorded purchase volumes of two to seven times their outstanding balances in 2020. Nilson Report, Issue 1192, at 6 (Feb. 2021), *https://nilsonreport.com/publication_newsletter_archive_issue.php?issue=1192*. If business-purpose credit cards, factoring products, and merchant cash advances behaved similarly with respect to the ratio of originations to outstanding balances, then for every $1 originated in the market in a given year, there could be a corresponding $0.14–0.50 in outstanding balances for such products ($1 divided by two to seven).

[105] Pandemic Response Accountability Comm., *Paycheck Protection Program: Loan Forgiveness by the Numbers* (July 2022), *https://www.pandemicoversight.gov/media/file/ppp-loan-forgiveness-fact-sheet-july-2022-updatepdf*.

[106] *Id.*

[107] Calculated from FFIEC Call Report data accessed on October 18, 2022. The CFPB notes that, as discussed in part II.B above, these estimates rely on small loans to businesses as a proxy for loans to small businesses. As such, the CFPB acknowledges that the true outstanding value of credit extended to small businesses by such institutions may be different than what is presented here. For example, the small loans to businesses proxy would overestimate the value of outstanding credit if a significant number of small loans to businesses and farms are to businesses or farms that are actually large. Alternatively, the proxy would underestimate the value of outstanding credit to small businesses if a significant number of businesses and farms that are small under the rule take out loans that are larger than $1 million or $500,000, for businesses and farms, respectively.

[108] Calculated from NCUA Call Report data accessed on October 18, 2022.

[109] There may additionally be lending that is not captured here by equipment and vehicle dealers originating loans in their own names.

[110] Bd. of Governors of the Fed. Rsrv. Sys., *Finance Companies—G.20* (updated Aug. 17, 2022), *https://www.federalreserve.gov/releases/g20/hist/fc_hist_b_levels.html*. The Bureau does not include leases, since they are already counted within the product category of equipment and vehicle leasing, or wholesale loans, which it assumes are typically made to non-small businesses.

The CFPB estimates the value of outstanding balances on credit extended by nondepository CDFIs to small business borrowers to be around $1.5 billion. Using reporting by the CDFI Fund for 2019, the CFPB scales down the outstanding balances for loan funds of $13.8 billion and for venture capital funds of $0.3 billion by the proportion of all CDFI lending attributable to business borrowers, which totaled $15.4 billion out of $141.2 billion.[117]

Categorized here separately so as to distinguish residential from non-residential loans, the CFPB estimates outstanding balances for loans on 5+ unit residential dwellings to total over $30 billion.[118] The CFPB scales up $11 billion in 2019 annual originations on loans of under $1 million in value at origination for 5+ unit residential dwellings to $30 billion in estimated outstanding balances, using the ratio between the FFIEC Call Report and the CRA data discussed above.[119]

Also categorized separately from depository institution totals so as to distinguish private from government and government-sponsored loans, the CFPB estimates that outstanding balances for loans extended by the SBA and the Farm Credit System totaled around $200 billion in 2019.[120]

The SBA, through its traditional 7(a), 504, and microloan programs as well as the Economic Impact Disaster Loan Program and funding for Small Business Investment Companies, is the largest governmental lender by value, with $143.5 billion in outstanding balances at the end of fiscal 2019.[121] As part of the Federal government's response to the COVID–19 pandemic, during 2020 and 2021 SBA lending increased in size by over $1 trillion due to the Paycheck Protection Program, which totaled almost $800 billion, and the Economic Impact Disaster Loan Program, which totaled $210 billion.[122] However, as noted above, over $740 billion in Paycheck Protection Program loans had been forgiven as of July 2022, bringing SBA outstanding loan balances back down.[123]

The Farm Credit System is another important government-related part of the small business credit landscape. The CFPB estimates that Farm Credit System lenders had around $55 billion in outstanding balances of credit extended to small farms in 2019. Using the same small loan to farms proxy as is used in the FFIEC Call Report, the CFPB estimates credit to farms with an

origination value of less than $500,000. Based on the Farm Credit System's 2019 Annual Information Statement of the Farm Credit System, the CFPB estimates that outstanding balances of such small credit to farms totaled $55 billion at the end of 2019.[124] The CFPB notes that, as with the FFIEC Call Report proxy, this number may include credit to non-small farms and may exclude larger credit transactions extended to small farms. Considering credit extended with an origination value of between $500,000 and $5 million would increase the market size by $86 billion to $141 billion.[125]

Mostly extended by depository institutions, the CFPB estimates that the market for small business credit cards totaled over $60 billion in outstanding balances for 2020.[126] Using data from Y–14 Form submissions to the Federal Reserve Board, the CFPB estimates the value of outstanding balances for small business credit card accounts where the loan is underwritten with the sole proprietor or primary business owner as an applicant.[127]

Equipment and vehicle leasing, whereby businesses secure the right to possess and use a piece of equipment or vehicle for a term in return for consideration, is another important product category that is estimated to value roughly $160 billion in outstanding balances in 2019. The CFPB estimates the total size of the equipment and vehicle leasing market for all sized businesses in 2019 to be approximately $900 billion.[128] The CFPB further assumes that small businesses comprise around 18 percent of the total

---

5). This figure annualizes $121 million in estimated 2013 quarterly originations to $484 million in annual originations and scales up to estimated outstanding balances using the ratio between the FFIEC Call Report and the CRA data discussed above.

[117] CDFI Fund, *CDFI Annual Certification and Data Collection Report (ACR): A Snapshot for Fiscal Year 2019*, at 17, 22 (Oct. 2020), *https://www.cdfifund.gov/sites/cdfi/files/2021-01/ACR-Public-Report-Final-10292020-508Compliant.pdf*. To the extent that CDFI loan funds and venture capital funds extend credit to business customers at different rates than CDFI banks and credit unions, this calculation may over- or underestimate the value of lending to small businesses by nondepository CDFIs. This figure also assumes that all CDFI lending is for small businesses.

[118] Depository institutions, discussed above, extend a sizeable proportion of loans for 5+ unit residential dwellings; both nondepository and depository institutions are included in the total for 5+ unit outstanding balances.

[119] *See* Mortg. Bankers Ass'n, *Annual Report on Multi-Family Lending—2019*, at 5 (2020), *https://www.mba.org/store/products/research/general/report/2019-annual-report-on-multifamily-lending*. This includes both private loans, estimated at around $18 billion, and loans extended by Fannie Mae, Freddie Mac, and the Federal Housing Administration, estimated at around $13 billion. The share of the 5+ unit residential dwelling loans of all sizes extended by governmental or government-sponsored entities was 41 percent. The Bureau assumes for the purposes of this exercise that the same share is reflected in loans of under $1 million in value at origination, although arguably this share would be higher if government and government-sponsored entities extended disproportionately smaller dollar value loans on average. There is also a substantial market for commercial real estate besides 5+ unit residential dwellings not captured here due to a lack of data on loans of small size or to small businesses. *See* Mortg. Bankers Ass'n, *MBA: Commercial, Multifamily Mortgage Bankers Originated $683B in 2021; Total Lending Tally Reaches $891B* (Apr. 15, 2022), *https://newslink.mba.org/mba-newslinks/2022/april/mba-newslink-friday-apr-15-2022/mba-commercial-multifamily-mortgage-bankers-originated-683b-in-2021-total-lending-tally-reaches-891b/* (estimating the volume of commercial real estate lending of any size to be $890.6 billion in 2021, of which multifamily lending accounted for $376 billion).

[120] The grand total for lending by government and government-sponsored entities would be approximately $210 billion, including 5+ unit residential dwelling loans extended by Fannie Mae, Freddie Mac, and the Federal Housing Administration, which are separately recorded within the 5+ unit residential dwelling loan product category.

[121] Small Bus. Admin., *Small Business Administration Loan Program Performance* (effective Mar. 31, 2022), *https://www.sba.gov/document/report-small-business-administration-loan-program-performance*. SBA guaranteed loans comprised $134 billion out of this total, which amount has been deducted from the totals for depository institutions to avoid double counting.

[122] Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through May 31, 2021), *https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf*; Small Bus. Admin., *Disaster Assistance Update—Nationwide COVID EIDL, Targeted EIDL Advances, Supplemental Targeted Advances* (June 3, 2021), *https://www.sba.gov/sites/default/files/2021-06/COVID-19%20EIDL%20TA%20STA_6.3.2021_Public-508.pdf*; Small Bus. Admin., *Disaster Assistance Update—Nationwide EIDL Loans* (Nov. 23, 2020), *https://www.sba.gov/sites/default/files/2021-02/EIDL%20COVID-19%20Loan%2011.23.20-508_0.pdf*.

[123] Pandemic Response Accountability Comm., *Paycheck Protection Program: Loan Forgiveness by the Numbers* (July 2022), *https://www.pandemicoversight.gov/media/file/ppp-loan-forgiveness-fact-sheet-july-2022-updatepdf*.

[124] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System*, at 54 (Feb. 28, 2020), *https://www.farmcreditfunding.com/ffcb_live/investorResources/informationStatements.html*.

[125] *Id.*

[126] *See* Bd. of Governors of the Fed. Rsrv. Sys., Report Forms FR Y-14M, *https://www.federalreserve.gov/apps/reportingforms/Report/Index/FR_Y-14M* (last updated Sept. 12, 2022). The Board's data are received from bank holding companies over $50 billion in assets, which represent 70 percent of outstanding balances for consumer credit cards; the corresponding percent of balances captured for small business cards is not known, so the total small business-purpose credit card market could be substantially higher or lower. *See* CFPB, *The Consumer Credit Card Market*, at 18 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2019.pdf*.

[127] Off. of Mgmt. & Budget, *Instructions for the Capital Assessments and Stress Testing Information Collection (Reporting Form FR–Y14M)*, OMB No. 7100–0341, at 148 (Mar. 2020), *https://omb.report/icr/202101-7100-006/doc/108187801*.

[128] *See* Equip. Leasing & Fin. Found., *Horizon Report*, *https://www.leasefoundation.org/industry-resources/horizon-report/* (last updated Apr. 22, 2021).

equipment and vehicle leasing market.[129]

Factoring is a similarly significant product type, estimated at around $100 billion in market size for 2019.[130] In a factoring transaction, factors purchase, at a discount, a legally enforceable claim for payment (i.e., accounts receivables or invoices) for goods already supplied or services already rendered by a business for which payment has not yet been made in full; hence, a factor's risk related to repayment lies with the business's customer and not the business itself. In most cases, specific companies, called factors, provide factoring products.

The market for merchant cash advances continues to develop rapidly and data are even more scarce than for other segments of the small business lending market. This limits the reliability of estimates as to the merchant cash advance market's size. The CFPB estimates the 2019 market size to be around $20 billion.[131] The merchant cash advance market is also of

particular significance for smaller and traditionally underserved businesses that may not qualify for other types of credit.[132] Merchant cash advances are typically structured to provide a lump sum payment up front (a cash advance) in exchange for a share of future revenue until the advance, plus an additional amount, is repaid. Unlike the majority of other small business financing products, merchant cash advances typically purport to be for short durations.[133] The CFPB understands that merchant cash advances also tend to be relatively high-cost products.[134] Several States, including New York and California, are implementing laws that will require providers of "sales-based financing," such as merchant cash advances, as well as other nondepositories to provide disclosures (including estimated APR in some States) similar to those required under the Truth in Lending Act (TILA),[135] which generally only applies to consumer credit.[136]

Finally, trade credit is another significant market, which the Bureau estimates to total $51 billion in outstanding balances in 2019. The Bureau estimates the trade credit market size by adding the total accounts payable for businesses under $1 million in annual revenue.[137] Considering the total value of accounts payable for businesses between $1 million and $5 million would increase the market size by $88 billion.[138] Trade credit is an often informal, business-to-business transaction, usually between non-financial firms whereby suppliers allow their customers to acquire goods and/or services without requiring immediate payment.

The CFPB estimates that there were approximately 8,200 financial institutions extending small business financing in 2019, almost 80 percent of which were depository institutions.[139]

---

[129] See Karen Mills, Harvard Bus. Sch., *State of Small Business Lending*, at 29 (July 2014), *https://www.hbs.edu/ris/Supplemental%20Files/15-004%20HBS%20Working%20Paper%20Chart%20Deck_47695.pdf* (estimating equipment leasing outstanding balances for small business borrowers at approximately $160 billion at Dec. 31, 2013); Monitor Daily, *SEFI Report Finds Strong Performance Despite Challenges* (Oct. 21, 2014), *https://www.monitordaily.com/news-posts/sefi-report-finds-strong-performance-despite-challenges/* ($903 billion market in 2014, commensurate with an 18 percent market share for small business borrowers at the time of the Karen Mills report).

[130] See Secured Fin. Found., *2019 Secured Finance: Market Sizing & Impact Study Extract Report*, at 7 (June 2019), *https://www.sfnet.com/docs/default-source/data-files-and-research-documents/sfnet_market_sizing__impact_study_extract_f.pdf?sfvrsn=72eb7333_2*. This study estimated the total volume of the U.S. factoring market to be $101 billion. To the extent that factoring volumes differ from outstanding balances, the value of outstanding balances may be higher or lower than this estimate. Also, this estimate captures factoring for business borrowers of all sizes, not just small business borrowers. The CFPB assumes that most factoring is provided to small business customers.

[131] Paul Sweeney, *Gold Rush: Merchant Cash Advances are Still Hot*, deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*. BPC estimates appear to reference origination volumes rather than outstanding balances. See Nimayi Dixit, S&P Glob. Mkt. Intel., *Payment Fintechs Leave Their Mark On Small Business Lending* (Aug. 28, 2018), *https://www.spglobal.com/marketintelligence/en/news-insights/research/payment-fintechs-leave-their-mark-on-small-business-lending*. Depending on credit multiplier effects, the value of annual origination volumes could be smaller or greater than outstanding balances. Without information on outstanding balances and for the purposes of calculating a market size for small business financing in 2019, the CFPB assumes in this paper a 1:1 ratio between annual origination volumes and outstanding balances for merchant cash advance products. See above for discussion of credit multiplier effects.

[132] Cf. Barbara Lipman & Ann Marie Wiersch, Bd. of Governors of the Fed. Rsrv. Sys., *Uncertain Terms: What Small Business Borrowers Find When Browsing Online Lender websites*, at 3 (Dec. 2019), *https://www.federalreserve.gov/publications/files/what-small-business-borrowers-find-when-browsing-online-lender-websites.pdf* (observing that online lenders, including providers of merchant cash advance products, position themselves as offering financing to borrowers underserved by traditional lenders).

[133] See id. (stating that merchant cash advances are generally repaid in three to 18 months).

[134] Id. (stating that annual percentage rates on merchant cash advance products can exceed 80 percent or rise to triple digits). See also Fed. Trade Comm'n, *'Strictly Business' Forum, Staff Perspective*, at 5 (Feb. 2020), *https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-ftcs-strictly-business-forum/strictly_business_forum_staff_perspective.pdf* (observing stakeholder concern about the high-cost of merchant cash advances that can reach triple digit annual percentage rates).

[135] 15 U.S.C. 1601 et seq.

[136] New York State law requires that providers of "sales-based financing" provide disclosures to borrowers that include calculations of an estimated annual percentage rate in accordance with the CFPB's Regulation Z, 12 CFR part 1026. See N.Y. S.898, section 803(c) (signed Jan. 6, 2021) (amending S.5470–B), *https://legislation.nysenate.gov/pdf/bills/2021/s898*. The New York Department of Financial Services is currently developing regulations to implement the law. See N.Y. Dep't of Fin. Servs., *Proposed Financial Services Regulations*, *https://www.dfs.ny.gov/industry_guidance/regulations/proposed_fsl*. Similarly, California's Department of Financial Protection and Innovation has adopted regulations to implement a California law requiring disclosures by commercial financing companies, including those providing sales-based financing. See 10 Cal. Code Reg. 900(a)(28) (effective Dec. 9, 2022) (defining sales-based financing as "a commercial financing transaction that is repaid by a recipient to the financer as a percentage of sales or income, in which the payment amount increases and decreases according to the volume of sales made or income received by the recipient" and including "a true-up mechanism"); 10 Cal. Code Reg. 914 and

[137] See Fundbox/PYMNTS.com, *The Trade Credit Dilemma*, at 11 (May 2019), *https://www.pymnts.com/wp-content/uploads/2019/05/Trade-Credit-Dilemma-Report.pdf* (estimating accounts payable for businesses with revenue of under $250,000 at $6.7 billion and for businesses with revenue of $250,000 to $999,000 at $44.6 billion).

[138] Id. The trade credit market is estimated to total $1.6 trillion across all business sizes in the United States. In the overall $1.4 trillion market size total for all small business financing products, the CFPB has included only the trade credit market for businesses of up to $1 million in revenue for consistency with its White Paper.

[139] This number has increased from 8,100 financial institutions estimated in the NPRM for two reasons related to the number of nondepository financial institutions participating in the credit market for 5+ unit residential dwellings in 2019. First, the CFPB revised its methodology for excluding depository institutions from the total number of participants active in the credit market for 5+ unit residential dwellings, as detailed below. Second, the NPRM total for all financial institutions active in the small business financing market

940 (requiring sales-based financing providers disclosure estimated annual percentage rate according to Regulation Z, 12 CFR part 1026). Under these laws, providers of commercial financing generally will be required to disclose: (1) the total amount financed, and the amount disbursed if it is different from the total amount financed; (2) the finance charge; (3) the APR (or the estimated APR for sales-based financing and factoring transactions), calculated in accordance with TILA and Regulation Z; (4) the total repayment amount; (5) the term (or the estimated term for sales-based financing) of the financing; (6) periodic payment amounts; (7) prepayment charges; (8) all other fees and charges not otherwise disclosed; and (9) any collateral requirements or security interests. See Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*. Other States, including Virginia and Utah, have passed commercial financing disclosure laws that no require disclosure of the APR. See Virginia H. 1027 (enacted Apr. 11, 2022), *https://lis.virginia.gov/cgi-bin/legp604.exe?221+ful+CHAP0516*; Utah S.B. 183 (enacted Mar. 24, 2022), *https://le.utah.gov/~2022/bills/static/SB0183.html*.

Continued

Based on FFIEC Call Report data for December 2019, the CFPB estimates that about 5,100 banks and savings associations were active in the small business lending market, out of a total of about 5,200 banks and savings associations.[140] The CFPB assumes that a bank or savings association is "active" in the market if it reports a positive outstanding balance of small loans, lines of credit, and credit cards to businesses.

Based on the NCUA Call Report data for December 2019, the CFPB estimates that about 1,200 out of 5,300 total credit unions were active in the small business lending market.[141] The CFPB defines a credit union as "active" in the market if it reported a positive number of originations of loans, lines of credit, and credit cards to members for commercial purposes in 2019.

The CFPB estimates that there were about 1,900 nondepository institutions active in the small business financing market in 2019,[142] accounting for around $550 billion in outstanding credit to small businesses. This total number of nondepository institutions includes approximately 300 commercial finance companies, 30 or more online lenders, 340 nondepository CDFIs, 150 nondepository mortgage lenders in the multifamily market, 100 merchant cash advance providers, 700–900 factors, at least 100 government lenders, and 72 Farm Credit System institutions.

The Bureau estimates that about 300 commercial finance companies were engaged in small business lending in 2019.[143] The Bureau also estimates there to be about 30 or more online lenders that were active in the small business lending market in 2019, not including merchant cash advance providers.[144]

The Bureau estimates that 340 nondepository CDFIs were engaged in small business lending in 2019. Both depository and nondepository institutions can be CDFIs. Depository CDFIs are counted in the numbers of banks, savings associations, and credit unions engaged in small business lending. According to the CDFI Fund, 487 nondepository funds (*i.e.*, loan funds and venture capital funds) reported as CDFIs in 2019.[145] Of these, 340 institutions reported that business finance or commercial real estate finance were a primary or secondary line of business in 2019.[146]

The Bureau estimates that about 150 nondepository mortgage lenders participated in the credit market for 5+ unit residential dwellings in 2019.[147] In its *2019 Multifamily Lending Report*, the Mortgage Bankers Association lists annual multifamily lending volumes by institution, including a distinction for loans of under $1 million in value at origination.[148] Using the same small loan to business proxy as is used in the FFIEC Call Report, the Bureau estimates the number of nondepository mortgage lenders by counting the number of institutions that appear on this list that are not depository institutions and that extended at least two loans in 2019.[149]

Data from UCC filings indicates that about 100 institutions were active in the market for providing merchant cash advances to small businesses in 2021.[150]

---

included only those nondepository financial institutions participating in the credit market for 5+ unit residential dwellings estimated to be covered by the proposed rule rather than all those active in the market at all.

[140] Calculated from FFIEC Call Report data accessed on October 18, 2022. Although 2019 figures are used here for consistency across types of lenders, consolidation among depository institutions has continued since 2019. As of June 30, 2022, 4,692 commercial banks or savings associations and 1,575 credit unions reported a positive outstanding balance of small loans, lines of credit, and credit cards to businesses. Calculated from FFIEC Call Report data accessed on October 14, 2022.

[141] Nat'l Credit Union Admin., *2019 Call Report Quarterly Data, https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last updated Mar. 8, 2023). (One hundred twelve credit unions were not federally insured as of December 2019 but are included here as depository institutions. Calculated from NCUA Call Report data accessed on June 8, 2021.) Although 2019 figures are used here for consistency across types of lenders, consolidation among depository institutions has continued since 2019. As of June 30, 2022, 1,120 credit unions reported a positive number of originations of loans, lines of credit, and credit cards to members for commercial purposes during the first half of 2022. This number was calculated from NCUA Call Report data accessed on October 14, 2022.

[142] There may also be cooperative or nonprofit lenders as well as equipment and vehicle finance dealers originating in their own name that are not captured by the CFPB in these figures. For example, by searching Uniform Commercial Code (UCC) filings, Manasa Gopal and Philipp Schnabl identified 19 cooperative lenders that originated at least 1,500 loans over the period from 2006 to 2016. Manasa Gopal & Philipp Schnabl, *The Rise of Finance Companies and FinTech Lenders in Small Business Lending*, N.Y.U. Stern Sch. of Bus., at 18 (May 13, 2019), *https://ssrn.com/abstract=3600068*. Additionally, these figures do not include trade creditors, which are non-companies that extend credit by allowing customers a period of time in which to pay and which are much greater in number since the practice is widespread across the economy. This number has increased from 1,800 financial institutions estimated in the NPRM for two reasons related to the number of nondepository

[143] See id. By searching UCC filings, Manasa Gopal and Philipp Schnabl identified almost 300 commercial finance companies, including both independent and captive finance companies, with at least 1,500 small business loans between 2006 and 2016. This figure combines 192 independent finance companies with 95 captive finance companies. Since this estimate captures only those commercial finance companies averaging at least 150 loans per year over the 2006 to 2016 period, it may exclude smaller volume lenders and should be considered conservative.

[144] Id. Using the same methodology as for commercial finance companies, Gopal and Schnabl identified 19 fintech lenders. The CFPB conservatively increases this estimate to 30 to account for rapid growth in the industry from 2016 to 2019. Since this estimate captures only those fintechs averaging at least 150 loans per year over the 2006 to 2016 period, it may exclude smaller volume lenders and should be considered conservative. On the other hand, the COVID–19 economic shock may have led to some fintechs scaling back or exiting the small business financing market. See, e.g., Ingrid Lunden, *Amex Acquires SoftBank-backed Kabbage After Tough 2020 for the SMB Lender*, TechCrunch (Aug. 17, 2020), *https://techcrunch.com/2020/08/17/amex-acquires-softbank-backed-kabbage-after-tough-2020-for-the-smb-lender/* (noting that Kabbage temporarily shut down credit lines to small businesses during April 2020 and then spun off its small business loan portfolio when it was subsequently acquired by American Express).

[145] CDFI Fund, *CDFI Annual Certification and Data Collection Report (ACR): A Snapshot for Fiscal Year 2019*, at 8 (Oct. 2020), *https://www.cdfifund.gov/sites/cdfi/files/2021-01/ACR-Public-Report-Final-10292020-508Compliant.pdf*.

[146] Id. at 15–16.

[147] Nondepository lenders providing financing for commercial real estate transactions besides 5+ unit residential dwellings are not separately captured here but often overlap with those lenders providing financing for 5+ unit residential dwellings. See Com. Prop. Exec., *Top 20 Commercial Mortgage Banking and Brokerage Firms of 2022* (Jan. 3, 2022), *https://www.commercialsearch.com/news/top-20-commercial-mortgage-banking-and-brokerage-firms-of-2022/* (listing top commercial real estate lenders and identifying sectors financed by lender).

[148] See Mortg. Bankers Ass'n, *Annual Report on Multi-Family Lending—2019*, at 9–66 (2020), *https://www.mba.org/store/products/research/general/report/2019-annual-report-on-multifamily-lending*. In the Notice of Proposed Rulemaking, the CFPB had estimated nondepository financial institutions participating in the credit market for 5+ unit residential dwellings by excluding financial institutions included in the above-cited report with the word "bank" or "credit union" in the institution name and further manually removing around ten more institutions that appeared to be depository institutions at first glance. To improve accuracy, for the Final Rule the CFPB has manually coded all 2,588 institutions in the above-cited report to exclude any institutions that are banks, savings associations, credit unions, or farm credit associations but which do not have the word "bank" or "credit union" in the institution name as recorded in the report. As a result, the total number of nondepository financial institutions active in this market fell from 270 to 150.

[149] The CFPB counts institutions extending at least two loans of any size in order to estimate institutions extending at least one small loan, based on the assumption that some 50 percent of these loans may have been for values greater than $1 million.

[150] deBanked, *UCC–1 and UCC–3 Filings by Merchant Cash Advance Companies & Alternative Business Lenders, https://debanked.com/merchant-cash-advance-resource/merchant-cash-advance-ucc/* (last visited Mar. 20, 2023).

The Bureau estimates the number of factors in 2019 to be between 700–900 and assumes that most factors were providing financing to small business.[151]

Finally, many government agencies and government-sponsored enterprises provide or facilitate a significant proportion of small business credit. As the flagship government lender, the SBA managed in 2019 a portfolio of over $140 billion in loans to small businesses, to which it added over $1 trillion in loans extended as part of the COVID–19 emergency lending programs. (As noted above, over $740 billion in Paycheck Protection Program loans had been forgiven as of July 2022, bringing SBA outstanding loan balances back down.[152]) Across Federal, State, and municipal governments, the Bureau estimates that there are likely over 100 government small business lending programs.[153] Additionally, the Farm Credit System reports that, as of December 2019, the Farm Credit System contained a total of 72 banks and associations.[154] All of these Farm Credit System institutions were engaged in lending to small farms in 2019.[155]

*E. Challenges for Women-Owned, Minority-Owned, and LGBTQI+-Owned Small Businesses*

Within the context of small business financing, women-owned, minority-owned, and LGBTQI+-owned small businesses often face relatively challenges than their counterparts to obtain credit. In line with congressional purpose, information collected about these businesses may provide opportunities for community development lending, and the information collected may be particularly important to support fair lending analysis and enforcement.

Women-owned, minority-owned, and LGBTQI+-owned small businesses have smaller cash reserves on average, leaving them less able to weather credit crunches. For example, in February 2021, 39 percent of women-owned businesses had one month or less in cash reserves, compared with 29 percent of men-owned firms.[156] And in around 90 percent of majority Black and Hispanic communities, most businesses have fewer than 14 days of cash buffer, while this is true of only 35 percent of majority white communities.[157] As a result, many small businesses, especially those owned by women, minorities, and LGBTQI+ individuals, may have a greater need for financing in general and particularly during economic downturns.

Policy responses to support small businesses in economic downturns may struggle to reach small businesses owned by women, minorities, and LGBTQI+ individuals. For example, although LGBTQI+-owned small businesses were more likely to apply for Paycheck Protection Program loans, they were less likely to receive all of the funds that they applied for, and more likely to have gotten none of the funding they applied for.[158]

Established relationships between applicants and lenders were often critical to approvals in the earliest period of Paycheck Protection Program underwriting;[159] many minority-owned[160] and women-owned[161] businesses did not have such relationships. Minority borrowers with limited English proficiency may also have faced difficulties overcoming language barriers,[162] particularly during the first round of the Paycheck Protection Program in April 2020 when application materials had not yet been translated into English.[163] Further, many minority-owned and women-owned firms are sole proprietorships and independent contractors, both of which received delayed access to Paycheck Protection Program loans.[164]

[151] *See* Secured Fin. Found., *2019 Secured Finance: Market Sizing & Impact Study Extract Report*, at 15 (June 2019), *https://www.sfnet.com/docs/default-source/data-files-and-research-documents/sfnet_market_sizing__impact_study_extract_1.pdf?sfvrsn=72eb7333_2* [estimating the number of factors at between 700 and 900).

[152] Pandemic Response Accountability Comm., *Paycheck Protection Program: Loan Forgiveness by the Numbers* (July 2022), *https://www.pandemicoversight.gov/media/file/ppp-loan-forgiveness-fact-sheet-july-2022-updatepdf*.

[153] In addition to several Federal small business lending programs, States and major municipalities also often have one or more programs of their own. One State and one municipal program in each State would already total 100 government lending programs across Federal, State, and municipal governments.

[154] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System*, at 7 (Feb. 28, 2020), *https://www.farmcreditfunding.com/ffcb_live/serve/public/pressre/finin/report.pdf?assetId=395570*. The CFPB notes that Farm Credit System banks do not report FFIEC Call Reports and are thus not counted in the number of banks and savings associations discussed above.

[155] Calculated from Young, Beginning, and Small Farmer Report data accessed on June 17, 2022, *https://reports.fca.gov/CRS/search-institution.aspx*.

[156] Eric Groves, *Cash Strapped SMBs, While 75% Of PPP Is Still Available*, Alignable (Feb. 9, 2021), *https://www.alignable.com/forum/alignable-road-to-recovery-report-february-2021*.

[157] JPMorgan Chase Inst., *Place Matters: Small Business Financial Health in Urban Communities*, at 5 (Sept. 2019), *https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-place-matters.pdf*. *See also* Diana Farrell *et al.*, JP Morgan Chase Inst., *Small Business Owner Race, Liquidity, and Survival*, at 5 (July 2020), *https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-small-business-owner-race-report.pdf* (finding in a sample of firms founded in 2013 and 2014 that after one year in business white-owned firms had on average 19 cash buffer days compared to 14 for Hispanic-owned firms and 12 for Black-owned firms).

[158] Spencer Watson *et al.*, LGBTQ-Owned Small Businesses in 2021, Ctr. for LGBTQ Econ. Advancement & Rsch. and Movement Advancement Project, at 8 (July 2022), *https://www.lgbtmap.org/file/LGBTQ-Small-Businesses-in-2021.pdf* (using data from the Federal Reserve's Small Business Credit Survey, which began collecting demographic data on LGBTQ small business ownership in 2021).

[159] Sara Savat, *Who you know matters, even when applying for PPP loans*, The Source, Newsroom, Wash. Univ. in St. Louis (Feb. 15, 2021), *https://source.wustl.edu/2021/02/who-you-know-matters-*
even-when-applying-for-ppp-loans/ (previous lender relationship increased likelihood of obtaining a Paycheck Protection Program loan by 57 percent). *See generally* 86 FR 7271, 7280 (Jan. 27, 2021) (noting that many lenders restricted access to Paycheck Protection Program loans to existing customers, which may run a risk of violating ECOA and Regulation B).

[160] Claire Kramer Mills, Fed. Rsrv. Bank of N.Y., *Double Jeopardy: COVID-19's Concentrated Health and Wealth Effects in Black Communities*, at 6 (Aug. 2020), *https://www.newyorkfed.org/medialibrary/media/smallbusiness/DoubleJeopardy_COVID19andBlackOwnedBusinesses* (arguing that a lack of strong banking relationships among Black-owned firms may have led to relatively lower rates of access to Paycheck Protection Program loans for such firms); Fed. Rsrv. Banks, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color*, at ii (Apr. 15, 2021), *https://www.fedsmallbusiness.org/survey/2021/2021-report-on-firms-owned-by-people-of-color* (Small Business Credit Survey of Firms Owned by People of Color) (finding that "firms owned by people of color tend to have weaker banking relationships").

[161] *Cf.* Mariel Padilla, *'I feel like I'm drowning': Women Business Owners Keep Hitting New Barriers to Federal Loan Aid*, 19th (Apr. 23, 2021), *https://19thnews.org/2021/04/women-small-businesses-loan/* (stating that historically higher rates of loan denials for women of color than for white men result in less established banking relationships and thereby reduced access to Federal support disbursed through banks).

[162] *See* Emily Ryder Perlmeter, Fed. Rsrv. Bank of Dallas, *How PPP Loans Eluded Small Businesses of Color* (Nov. 29, 2021), *https://www.dallasfed.org/cd/communities/2021/1129* (detailing language barriers among small business owners of color seeking Paycheck Protection Program loans, particularly Hispanic and Asian owners who were not fluent in English).

[163] *See* Press Release, Rep. Judy Chu, *House Dems Urge SBA to Translate Resources into 10 Most Common Languages* (Apr. 9, 2020), *https://chu.house.gov/media-center/press-releases/house-dems-urge-sba-translate-resources-10-most-common-languages*.

[164] Greg Iacurci, *Coronavirus loan program delayed for independent contractors and self-employed workers*, CNBC (Apr. 3, 2020), *https://www.cnbc.com/2020/04/03/delays-in-sba-loans-for-independent-contractors-self-employed-workers.html*; see also Mariel Padilla, 'I feel like I'm drowning': Women Business Owners Keep Hitting New Barriers to Federal Loan Aid, 19th (Apr. 23, 2021), *https://19thnews.org/2021/04/women-small-businesses-loan/* (stating that non-employer businesses affected by restrictions on sole proprietor and independent contractor access to Paycheck Protection Program loans are disproportionately owned by women and minorities).

AdminRecord-000016

Applicants whose owners belong to protected categories may have received different program outcomes when applying for Paycheck Protection Program loans, although limitations in demographic information for Paycheck Protection Program loans have hindered fair lending analyses.[165] Even for such firms that did obtaining Paycheck Protection Program loans, they may have faced different outcomes with respect to loan forgiveness.[166]

As demonstrated by the impact of the COVID–19 pandemic on small businesses, small business lending data are essential to better understand the small business financing landscape to maintain and expand support for this key part of the U.S. economy.

### F. The Purposes and Impact of Section 1071

The Dodd-Frank Act sets forth the Bureau's purposes and mission. It provides that a key component of the Bureau's fair lending work is to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[167] And in passing section 1071, Congress articulated two purposes for requiring the Bureau to collect data on small business credit applications and loans—to "facilitate enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[168] Although the Dodd-Frank Act does not further explain or clarify these dual statutory purposes, other Federal laws shed light on both purposes. That is, a set of existing Federal laws form the backdrop for the use of small business lending data collected and reported pursuant to section 1071 to facilitate the enforcement of fair lending laws, and to identify business and community development needs and opportunities across the United States.

#### 1. Facilitating Enforcement of Fair Lending Laws

Congress intended for section 1071 to "facilitate enforcement of fair lending laws,"[169] which include ECOA, the Home Mortgage Disclosure Act of 1975 (HMDA),[170] the Fair Housing Act,[171] and other Federal and State anti-discrimination laws.

##### i. Equal Credit Opportunity Act (ECOA)

ECOA, which is implemented by Regulation B, applies to all creditors. Congress first enacted ECOA in 1974 to require financial institutions and other firms engaged in the extension of credit to "make credit equally available to all creditworthy customers without regard to sex or marital status."[172] Two years later, Congress expanded ECOA's scope to include age, race, color, religion, national origin, receipt of public assistance benefits, and exercise of rights under the Federal Consumer Credit Protection Act.[173]

ECOA makes it unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction (1) on the basis of race, color, religion, national origin, sex (including sexual orientation, gender identity, and sex characteristics),[174] marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) because the applicant has in good faith exercised any right under the Federal Consumer Credit Protection Act.[175]

Multiple Federal regulators can enforce ECOA and Regulation B and apply various penalties for violations. The enforcement provisions and penalties for those who violate ECOA and Regulation B are set forth in 15 U.S.C. 1691e(b) and 12 CFR 1002.16. Violations may also result in civil money penalties, which are governed by 12 U.S.C. 5565(c)(3). The CFPB and multiple other Federal regulators have the statutory authority to bring actions to enforce the requirements of ECOA.[176] These regulators have the authority to engage in research, conduct investigations, file administrative complaints, hold hearings, and adjudicate claims through the administrative enforcement process regarding ECOA. Regulators also have independent litigation authority and can file cases in Federal court alleging violations of fair lending laws under their jurisdiction. Like other Federal regulators who are assigned enforcement authority under section 704 of ECOA, the CFPB is required to refer matters to the Department of Justice (DOJ) when it has reason to believe that a creditor has engaged in a pattern or practice of lending

---

[165] Rocio Sanchez-Moyano, Fed. Rsrv. Bank of S.F., *Paycheck Protection Program Lending in the Twelfth Federal Reserve District* (Mar. 3, 2021), *https://www.frbsf.org/community-development/publications/community-development-research-briefs/2021/february/ppp-lending-12th-district/* (citing matched-pair audit studies that found discouragement and provision of incomplete information for minority business owners seeking Paycheck Protection Program loans); 86 FR 7271, 7280 (Jan. 27, 2021) (noting that facially neutral Paycheck Protection Program policies such as limiting loans to businesses with pre-existing relationships may run a risk of violating ECOA and Regulation B due to a disproportionate impact on a prohibited basis).

[166] For example, Black-owned firms applied to fintechs for Paycheck Protection Program loans at a high rate and certain fintechs or banks that partnered with fintechs have also had a high rate of unforgiven Paycheck Protection Program loans. *See* Max Reyes, *Bank Behind Fintech's Rise Reels in Billions in Pandemic's Wake*, Bloomberg (Aug. 22, 2022), *https://www.bloomberg.com/news/articles/2022-08-21/bank-behind-fintech-s-rise-reels-in-billions-in-pandemic-s-wake* [reporting that, as of July 2021, the share of unforgiven Paycheck Protection Program loans at Kabbage, a fintech, and at Cross River, a bank that partnered with fintechs, was 34 percent and 16 percent, respectively; Who Benefited from PPP Loans (showing that Black-owned firms applied to fintechs at higher rates than other firms).

[167] *See* 12 U.S.C. 5493(c)(2)(A) (directing the Office of Fair Lending and Equal Opportunity to provide "oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau," including ECOA and the Home Mortgage Disclosure Act).

[168] ECOA section 704B(a).

[169] *Id.*

[170] 12 U.S.C. 2801 *et seq.*

[171] 42 U.S.C. 3601 through 3619.

[172] Public Law 93–495, tit. V, section 502, 88 Stat. 1500, 1521 (1974).

[173] *See* Equal Credit Opportunity Act Amendments of 1976, Public Law 94–239, section 701(a), 90 Stat. 251, 251 (1976).

[174] In March 2021, the CFPB issued an interpretive rule clarifying that the scope of ECOA's and Regulation B's prohibition on credit discrimination on the basis of sex encompasses discrimination based on sexual orientation and gender identity, including discrimination based on actual or perceived nonconformity with sex-based or gender-based stereotypes and discrimination based on an applicant's associations. 86 FR 14363 (Mar. 16, 2021). *See also* Press Release, CFPB, *CFPB Clarifies That Discrimination by Lenders on the Basis of Sexual Orientation and Gender Identity Is Illegal* (Mar. 9, 2021), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-clarifies-discrimination-by-lenders-on-basis-of-sexual-orientation-and-gender-identity-is-illegal/*. The interpretive rule states that an example of discriminatory sex-based or gender-based stereotyping occurs if a small business lender discourages a small business owner appearing at its office from applying for a business loan and tells the prospective applicant to go home and change because, in the view of the creditor, the small business customer's attire does not accord with the customer's gender. 86 FR 14363, 14365 (Mar. 16, 2021). As discussed further in the section-by-section analysis of § 1002.102(k) and (*l*), regarding the definitions of LGBTQI+ individual and LGBTQI+-owned business, respectively, the CFPB interprets ECOA's and Regulation B's prohibitions on the basis of sex to also include sex characteristics, including intersex traits.

[175] 15 U.S.C. 1601 *et seq.*

[176] These regulators include the OCC, the Board, the FDIC, the NCUA, the Surface Transportation Board, the Civil Aeronautics Board, the Secretary of Agriculture, the Farm Credit Administration, the Securities and Exchange Commission, the SBA, the Secretary of Transportation, the CFPB, and the FTC. *See* 15 U.S.C. 1691c; Regulation B § 1002.16(a). Motor vehicle dealers are subject to the Board's Regulation B (12 CFR part 202); the CFPB's rules, including this rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

discrimination.[177] Private parties may also bring claims under the civil enforcement provisions of ECOA, including individual and class action claims against creditors for actual and punitive damages for any violation of ECOA.[178]

### ii. Home Mortgage Disclosure Act (HMDA)

HMDA, implemented by the CFPB's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to report detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. These reported data are a valuable resource for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There is potential overlap between what is required to be reported under HMDA and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses.

A violation of HMDA and Regulation C is subject to administrative sanctions, including civil money penalties. Compliance is enforced by the CFPB, the U.S. Department of Housing and Urban Development (HUD), the FDIC, the Board, the National Credit Union Administration (NCUA), or the Office of the Comptroller of Currency (OCC). These regulators have the statutory authority to bring actions to enforce the requirements of HMDA and to engage in research, conduct investigations, file administrative complaints, hold hearings, and adjudicate claims through the administrative enforcement process regarding HMDA.

### iii. Fair Housing Act

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion, sex (including sexual orientation and gender identity),[179] disability,[180] familial status, or national origin.[181] The Fair Housing Act [182] and its implementing regulations specifically prohibit discrimination in the making of loans,[183] the purchasing of loans,[184] and in setting the terms and conditions for making loans available,[185] without reference to consumers, legal entities, or the purpose of the loan being made, although these prohibitions relate exclusively to dwellings.[186]

The DOJ and HUD are jointly responsible for enforcing the Fair Housing Act. The Fair Housing Act authorizes the HUD Secretary to issue a Charge of Discrimination on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.[187] The DOJ may bring lawsuits where there is reason to believe that a person or entity is engaged in a "pattern or practice" of discrimination or where a denial of rights to a group of persons raises an issue of general public importance,[188] or where a housing discrimination complaint has been investigated by HUD, HUD has issued a Charge of Discrimination, and one of the parties to the case has "elected" to go to Federal court.[189] In Fair Housing Act cases, HUD and the DOJ can obtain injunctive relief, including affirmative requirements for training and policy changes, monetary damages and, in pattern or practice cases, civil penalties.[190]

Upon receipt of a complaint alleging facts that may constitute a violation of the Fair Housing Act or upon receipt of information from a consumer compliance examination or other source suggesting a violation of the Fair Housing Act, Federal executive agencies forward such facts or information to HUD and, where such facts or information indicate a possible pattern or practice of discrimination in violation of the Fair Housing Act, to the DOJ.[191] Private parties may also bring claims under the civil enforcement provisions of the Fair Housing Act.[192]

### iv. Other Fair Lending Laws

Several other Federal statutes seek to promote fair lending. The CRA affirmatively encourages institutions to help to meet the credit needs of the entire community served by each institution covered by the statute, and CRA ratings take into account lending discrimination by those institutions.[193] (See part II.F.2.i below for additional discussion of the CRA.) The Americans with Disabilities Act of 1990 prohibits discrimination against persons with disabilities in the provision of goods and services, including credit services.[194] Sections 1981 [195] and 1982 [196] of the Federal Civil Rights Acts are broad anti-discrimination laws that have been applied to many aspects of credit transactions.[197]

---

[177] See 15 U.S.C. 1691e(h).

[178] 15 U.S.C. 1691e(a); Regulation B § 1002.16(b)(1).

[179] See U.S. Dep't of Hous. & Urban Dev., *Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act* [Feb. 11, 2021], *https://www.hud.gov/sites/dfiles/PA/ documents/HUD_Memo_EO13988.pdf*.

[180] The CFPB uses the term "disability" to refer to what the Fair Housing Act and its implementing regulations describe as a "handicap" because that is the preferred term. *See, e.g., Hunt* v. *Aimco Props., L.P.,* 814 F.3d 1213, 1218 n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[181] 42 U.S.C. 3601 through 3619, 3631.

[182] 42 U.S.C. 3605(b) (noting that for purposes of 3605(a), a "residential real estate-related transaction" includes the making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling, or transactions secured by residential real estate).

[183] 24 CFR 100.120.

[184] 24 CFR 100.125.

[185] 24 CFR 100.130.

[186] A "dwelling," as defined by the Fair Housing Act, is any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof. 42 U.S.C. 3602(b).

[187] 42 U.S.C. 3610(g)(1) and (2).

[188] See 42 U.S.C. 3614(a).

[189] 42 U.S.C. 3612(o)(1).

[190] See 42 U.S.C. 3612, 3614.

[191] 59 FR 2939, 2939 (Jan. 17, 1994).

[192] See 42 U.S.C. 3613.

[193] See 12 U.S.C. 2901 et seq.

[194] See 42 U.S.C. 12101 et seq.

[195] 42 U.S.C. 1981(a).

[196] 42 U.S.C. 1982.

[197] See, e.g., *Juarez* v. *Soc. Fin., Inc.,* No. 20–CV–03386–HSG, 2021 WL 1375868, at *7 (N.D. Cal. Apr. 12, 2021) (denying motion to dismiss section 1981 claim and finding that "the ECOA was not intended to limit any of the broad protections afforded by § 1981"); *Perez* v. *Wells Fargo & Co.,* No. 17–CV–00454–MMC, 2017 WL 3314797, at *3 (N.D. Cal. Aug. 3, 2017) (denying motion to dismiss for section 1981 claim and rejecting contention that ECOA superseded section 1981, noting that, although ECOA was a more specific statute, ECOA did not conflict with the section 1981 claims because "[a] creditor can comply with § 1981 and the ECOA by not discriminating on the basis of any of the categories listed in the two statutes"); *Jackson* v. *Novastar Mortg., Inc.,* 645 F. Supp. 2d 636 (W.D. Tenn. 2007) (motion to dismiss claim that defendants violated sections 1981 and 1982 by racial targeting and by offering credit on less favorable terms on the basis of race denied); *Johnson* v. *Equicredit Corp.,* No. 01–CIV–5197, 2002 U.S. Dist. LEXIS 4817 (N.D. Ill. Mar. 22, 2002] (predatory lending/reverse redlining case brought pursuant to section 1981); *Hargraves* v. *Cap. City Mortg. Corp.,* 140 F. Supp. 2d 7 (D.D.C. 2000) (predatory lending/reverse redlining case brought under both sections 1981 and 1982], *reconsideration granted in part, denied in part,* 147 F. Supp. 2d 1 (D.D.C. 2001) (section 1981 claim dismissed for lack of standing, but not section 1982 claim); *Doane* v. *Nat'l Westminster Bank USA,* 938 F. Supp. 149 (E.D.N.Y. 1996) (mortgage redlining case brought under sections 1981 and 1982); *Fairman* v. *Schaumburg Toyota, Inc.,* No. 94–CIV–5745, 1996 U.S. Dist. LEXIS 9669 (N.D. Ill. July 10, 1996) (section 1981 suit over allegedly predatory credit scheme targeting African Americans and Hispanics); *Steptoe* v. *Sav. of Am.,* 800 F. Supp. 1542 (N.D. Ohio 1992) (mortgage redlining case

Continued

Many States and municipalities have also enacted fair lending, fair housing, and/or civil rights laws (often modeled on their Federal counterparts) that broadly prohibit credit discrimination, including protections for business credit.[198]

#### v. Facilitating Enforcement

To achieve the congressionally mandated purpose of facilitating enforcement of fair lending laws, the Bureau must collect and make available sufficient data to help the public and regulators identify potentially discriminatory lending patterns that could constitute violations of fair lending laws. Financial regulators and enforcement agencies need a consistent and comprehensive dataset for all financial institutions subject to reporting in order to also use these data in their prioritization, peer analysis, redlining reviews, and screening processes to select institutions for monitoring, examination, or investigation. Data collected pursuant to section 1071 will facilitate more efficient fair lending examinations. For example, regulators will be able to use pricing and other data to prioritize fair lending examinations—without such data, some financial institutions might face unnecessary examination burden while others whose practices warrant closer review may not receive sufficient scrutiny.

Moreover, as discussed in part V below, the Bureau believes specific aspects of the rule offer particular benefits for the enforcement of fair lending laws. For example, the inclusion of pricing data such as interest rate and fees will provide information on disparities in pricing outcomes, and data such as gross annual revenue, denial reasons, and time in business will enable a more refined analysis and understanding of disparities in both underwriting and pricing outcomes. While these data alone generally will not establish compliance with fair lending laws, regulators, community groups, researchers, and financial institutions will be able to use the data to identify potential disparities in small business lending based on disaggregated categories of race and ethnicity. Overall, the data collected and reported under the rule will allow, for the first time, for comprehensive and market-wide fair lending risk analysis that enables a better understanding of disparities in both underwriting and pricing outcomes.

#### 2. Identifying Business and Community Development Needs and Opportunities

The second congressionally mandated purpose of section 1071 is to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[199] While section 1071 does not expressly define the phrase "business and community development needs," other Federal statutes and regulations, including the CRA and the Riegle Community Development and Regulatory Improvement Act of 1994,[200] reference or define the phrases "business development" and "community development" and can help explain what it means to enable communities, governmental entities, and creditors to "identify business and community development needs and opportunities."

The Bureau believes, based on its consideration of these other Federal statutes and regulations, that its rule implementing section 1071 will provide more data to the public—including communities, governmental entities, and creditors—for analyzing whether financial institutions are serving the credit needs of their small business customers. In addition, with data provided under this rule, the public will be better able to understand access to and sources of credit in particular communities or industries, such as a higher concentration of risky loan products in a given community, and to identify the emergence of new loan products, participants, or underwriting practices. The data will not only assist in identifying potentially discriminatory practices, but will contribute to a better understanding of the experiences that members within certain communities may share in the small business financing market.

Increased transparency about application and lending practices across different communities will improve credit outcomes, and thus community and business development. Lenders will be able to better understand small business lending market conditions and determine how best to provide credit to borrowers, where currently they cannot conduct very granular or comprehensive analyses because the data on small business lending are limited. As reduced uncertainty helps lenders to identify potentially profitable opportunities to extend responsible and affordable credit, small businesses stand to benefit from increased credit availability. Transparency will also allow small business owners to more easily compare credit terms and evaluate credit alternatives; without these data, small business owners are limited in their ability to shop for the credit product that best suits their needs at the best price.

#### i. Community Reinvestment Act (CRA)

The CRA, a part of the Housing and Community Development Act, was passed by Congress in 1977, which found that "regulated financial institutions have continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered."[201] As such, one of the statutory purposes of the CRA is to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions.[202]

The legislative history for the CRA suggests that the concerns motivating its passage included certain practices by banks including redlining (*i.e.,* declining to extend credit in neighborhoods populated by ethnic or racial minorities)[203] and community disinvestment (*i.e.,* taking deposits from lower-income areas, often populated by ethnic or racial minorities, without

brought under sections 1981 and 1982 and the Fair Housing Act); *Evans v. First Fed. Sav. Bank of Ind.,* 669 F. Supp. 915 (N.D. Ind. 1987) (section 1982 can be used in mortgage lending discrimination case); *Assocs. Home Equity Servs. v. Troup,* 778 A.2d 529 (N.J. 2001) (predatory lending/reverse redlining case brought pursuant to section 1981).

[198] *See, e.g.,* Cal. Civ. Code 51 and 51.5 and Cal. Gov't Code 12955; Colo. Rev. Stat. 24–34–501(3) and 5–3–210; Conn. Gen. Stat. 46a–81e, 46a–81f, and 46a–98; Del. Code Ann. tit. 6, 4604; D.C. Code 2–1402.21; Haw. Rev. Stat. 515–3 and 515–5; 775 Ill. Comp. Stat. 5/1–102, 5/1–103, 5/4–102, 5/3–102, and 5/4–103; Iowa Code 216.8A and 216.10; Me. Rev. Stat. tit. 5, 4553(5–C) and (9–C), 4595 to 4598, and 4581 to 4583; Md. Code Ann. State Gov't 20–705, 20–707, and 20–1103; Mass. Gen. Laws ch. 151B, 4(3B), (14); Minn. Stat. 363A.03 (Subd. 44), 363A.09(3), 363A.16 (Subds. 1 and 3), and 363A.17; N.H. Rev. Stat. Ann. 354–A:10; N.J. Stat. Ann. 10:5–12(i); N.M. Stat. Ann. 28–1–7; N.Y. Civ. Rights Law 40–c(2); N.Y. Exec. Law 296–A; Or. Rev. Stat. 174.100(7) and 659A.421; R.I. Gen. Laws 34–37–4(a) through (c), 34–37–4.3, and 34–37–5.4; Va. Code Ann. 6.2–501(B)(1), 15.2–853, and 15.2–965; Vt. Stat. Ann. tit. 8, 10403 and tit. 9, 2362, 2410, and 4503(a)(6); Wash. Rev. Code 49.60.030, 49.60.040 (14), (26), and (27), 49.60.175, and 49.60.222; Wis. Stat. 106.50 and 224.77. There are also a number of municipalities that have enacted credit discrimination ordinances. *See, e.g.,* Austin City Code 5–1–1 *et seq.;* N.Y.C. Admin. Code 8–101 and 8–107 *et seq.;* S.F. Police Code 3304(a) *et seq.*

[199] ECOA section 704B(a).

[200] Public Law 103–325, tit. I, section 102, 108 Stat. 2160, 2163 (1994) (12 U.S.C. 4701 through 4719).

[201] 12 U.S.C. 2901(a)(3).

[202] 12 U.S.C. 2901(b).

[203] *See* H.R. Rep. No. 561, 94th Cong., 1st Sess. 4 (1975) ("[The practice of redlining] increasingly has served to polarize elements of our society . . . . As polarization intensifies, neighborhood decline accelerates."), *reprinted in* 1975 U.S.C.C.A.N. 2303, 2305–06.

extending credit or banking services to residents of those areas).[204] The CRA requires the "appropriate Federal financial supervisory agency" of a given depository institution to "prepare a written evaluation of the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods."[205] These requirements were first implemented by a 1978 rulemaking,[206] and were amended in 1995[207] and 2005.[208] These rulemakings, adopted by each of the agencies responsible for ensuring compliance with the CRA, established specific performance measures,[209] requiring banks to disclose information about their efforts to meet community credit needs via small business, small farm, and community development lending.[210]

The agencies tasked with ensuring compliance—including the OCC,[211] the Board,[212] and the FDIC[213]—evaluate each insured depository institution's record in helping meet the credit needs of its entire community.[214] Overall, the CRA and its regulations generate data that help agencies and the public at large identify instances of redlining, community disinvestment, and geographical areas that are "banking deserts."[215] The CRA regulations of the Board and the FDIC currently have the same definitions of "community development" that include banking and

credit services that support the following: (1) affordable housing for low- and moderate-income individuals;[216] (2) community services for low- and moderate-income individuals;[217] (3) activities that promote economic development by financing small business and small farms;[218] and (4) activities that revitalize or stabilize low- and moderate-income geographies, disaster areas, and certain distressed or underserved middle-income areas based on other factors.[219]

In May 2022, the Board, FDIC and OCC issued an interagency notice of proposed rulemaking for amendments to update and expand the existing CRA regulations (2022 CRA NPRM).[220] In the 2022 CRA NPRM, these three agencies proposed a number of revisions to the agencies' CRA rules, including a number of key changes relating to how the agencies defined community development and how the agencies intended to measure the community development activity of depository institutions.[221]

In the 2022 CRA NPRM, the agencies recognized the value of data to be collected under the Bureau's small business lending rule for assessing efforts at addressing community small business and small farm credit needs, proposing to incorporate aspects of the Bureau's rule into their CRA rules. First, the agencies proposed to define the terms "small business" and "small farm" consistent with the Bureau's proposal under section 1071, *i.e.,* as those having gross annual revenues of $5 million or less in the preceding fiscal year.[222]

Further, the 2022 CRA NPRM proposed to eliminate the current CRA small business and small farm data collection and reporting requirements,[223] to be replaced in the long term by the Bureau's small business lending data collection and reporting requirements.[224] The agencies noted that this proposed approach is responsive to various stakeholders' requests that the agencies coordinate the small business and small farm definitions across the CRA and section

1071 rulemakings. The agencies also observed that their proposal would reduce burden related to data collection and reporting, particularly if institutions could submit data for CRA purposes under the format of the Bureau's small business lending rule.[225] Data collected pursuant to section 1071 would be used to measure individual bank performance in CRA assessments, and to establish the agencies' benchmarks against which bank CRA performance would be measured for purposes of the small farm and small business portions of the retail lending tests.[226]

Finally, the agencies proposed that if both the CRA and section 1071 rulemakings were finalized, the agencies would make the compliance date for the CRA amendments that hinge upon the Bureau's section 1071 rulemaking similar to the compliance date for the Bureau's final rule.[227]

ii. Community Development Financial Institution Fund (CDFI Fund)

The Riegle Community Development and Regulatory Improvement Act of 1994 authorized the CDFI Fund.[228] In passing that statute, Congress found that many of the Nation's urban, rural, and Native American communities face "critical social and economic problems arising in part from the lack of economic growth, people living in poverty, and the lack of employment and other opportunities."[229]

To address these problems, Congress created the CDFI Fund to "promote economic revitalization and community development" through investment in and assistance to CDFIs, including enhancing the liquidity of CDFIs.[230]

The concept of community development is central to the operation of the CDFI Fund. While CDFI Fund regulations do not directly define that term, any entity applying for CDFI certification must have "promoting community development" as its "primary mission."[231] In making this determination, the CDFI Fund considers whether the activities of the entity are purposefully directed toward improving the social and/or economic conditions of underserved people, which may include low-income persons or persons who lack adequate access to capital and financial services and residents of

[204] Robert C. Art, *Social Responsibility in Bank Credit Decisions: The Community Reinvestment Act One Decade Later,* 18 Pac. L.J. 1071, 1076–77 & n.23 (1987) (citing 123 Cong. Rec. S8958 (daily ed. June 6, 1977), which stated that Sen. Proxmire, the congressional sponsor of the Act described redlining as "the fact that banks and savings and loans will take their deposits from a community and instead of reinvesting them in that community, they will invest them elsewhere, and they will actually or figuratively draw a red line on a map around the areas of their city," further noting that those lines are drawn "sometimes in the inner city, sometimes in the older neighborhoods, sometimes ethnic and sometimes black . . . .").

[205] 12 U.S.C. 2906(a)(1).

[206] 43 FR 47144 (Oct. 12, 1978).

[207] 60 FR 22156 (May 4, 1995).

[208] 70 FR 44256 (Aug. 2, 2005).

[209] 12 CFR 228.11.

[210] *See, e.g.,* 12 CFR 25.42, 228.11.

[211] 12 CFR part 25.

[212] 12 CFR part 228.

[213] 12 CFR parts 345, 195.

[214] Most specifically, that record is taken into account in considering an institution's application for deposit facilities, including mergers and acquisitions with other financial institutions and the opening of bank branches.

[215] OCC regulations define "CRA desert" as an area that has "significant unmet community development or retail lending needs" and where: (1) Few banks have branches or non-branch deposit-taking facilities, (2) There is "less retail or community development lending than would be expected based on demographic or other factors," or (3) The area "lacks community development organizations or infrastructure." 12 CFR 25.03.

[216] 12 CFR 228.12(g)(1), 345.12(g)(1).

[217] 12 CFR 228.12(g)(2), 345.12(g)(2).

[218] 12 CFR 228.12(g)(3), 345.12(g)(3).

[219] 12 CFR 228.12(g)(4), 345.12(g)(4).

[220] Bd. of Governors of the Fed. Rsrv. Sys.; Fed. Deposit Ins. Corp.; and Off. of the Comptroller of the Currency, Treasury, Community Reinvestment Act, Joint Proposed Rule, 87 FR 33884 (June 3, 2022).

[221] 87 FR 33884, 33885 (June 3, 2022).

[222] *Id.* at 33890.

[223] *Id.* at 33930.

[224] *Id.* at 33997.

[225] *Id.* at 33928.

[226] *Id.* at 33941.

[227] *Id.* at 33930.

[228] 12 U.S.C. 4701(b).

[229] 12 U.S.C. 4701(a)(1).

[230] 12 U.S.C. 4701(b).

[231] 12 CFR 1805.201(b)(1).

economically distressed communities.[232]

The CDFI Fund collects data from the recipients of its financial and technical assistance, shedding some light on the extent of community development in the areas where CDFIs operate.[233] The CDFI Fund also publishes the data it receives with appropriate redactions to protect privacy interests.[234] However, given that CDFIs comprise a relatively small share of the overall small business lending market, 1071 data will materially enhance understanding of the broader extent of community development outside of areas where CDFIs already operate. These data will also likely augment the data the CDFI Fund already receives.

In May 2020, the CDFI Fund issued a request for comment on several aspects of its CDFI program, including proposed changes to the application for certification, as well as proposed changes to the data collection and reporting processes of the CDFI Fund. The RFI proposed a number of other revisions to the data collection and reporting regime in May 2020, including the automation of key elements of existing reporting and improvements to data quality.[235]

In October and November 2022, the CDFI Fund announced that based on public comments, it had revised its proposed changes to the application for certification, and data collection and reporting requirements, subject to another round of public comment prior to the anticipated implementation of changes in April 2023.[236] The CDFI Fund released a preview of changes to the application requirements.[237] One change to the Primary Mission portion of the application, which asks whether an applicant is focused on the mission of community development, would be the addition of bright-line questions related to an organization's lending and financing practices.[238] Specifically, an applicant can be disqualified from CDFI certification if financial products or practices it offers are harmful to low-income and underserved communities.[239] The bright-line questions the new certification application would ask include whether, amongst other things, applicants consider a small business borrower's ability to repay a loan on its terms,[240] whether they have accommodative or concessionary policies or programs for struggling borrowers, and whether loans priced above 36 percent APR meet certain safety and consumer protection standards.

In October 2022, the CDFI Fund also published revisions to the Target Market requirements of the application for CDFI certification.[241] Currently, an applicant must demonstrate that it serves at least one eligible Target Market (either an Investment Area or a Targeted Population). The revisions, if finalized, would eliminate the geographical boundaries and mapping requirements for most Target Markets, replacing these requirements with customized investment areas. In late October 2022, the CDFI Fund published a proposed list of pre-approved methodologies to identify target markets.[242] These methodologies include determining whether most recipients of a CDFI applicant's funds—whether individuals, for-profit entities, or non-profit entities—are members of certain demographic groups (African American, Hispanic, Native American, Native Hawaiian, Native Alaskan, Other Pacific Islanders, people with disabilities, certified CDFIs, low-income targeted populations).[243] These data are collected using a variety of overlapping methods specific to each demographic status, including self-reporting,[244] in-person or photo-identification-based visual observation,[245] surname analysis,[246] government-issued or Tribal-issued identification to demonstrate affiliation,[247] and/or income and residence or business location.[248]

The most recently published amendments to the application requirements remain under consideration by the CDFI Fund.[249]

### 3. Impact of Small Business Lending Data Under Section 1071

The Bureau's implementation of section 1071 will provide on an annual basis application-level data on small business credit, including certain protected demographic information. This will include information on applications for credit that are originated, as well as those that are denied, withdrawn, incomplete, or approved by the financial institution but not accepted by the applicant. This information will enable stakeholders of all kinds in the small business lending market to gain insight into trends in small business lending. It will also provide insight into the interaction of supply and demand for small business credit over time.

In terms of facilitating fair lending enforcement, interested government agencies and other stakeholders will be able to use data collected and reported under this final rule to identify possible fair lending risks using statistical methods.

Regarding the identification of business and community development needs, small business lending data collected and reported under this final rule will help government entities and

---

[232] Id.

[233] 12 CFR 1805.803(e) (requiring recipients of technical and financial assistance to provide to the CDFI Fund certain information and documentation).

[234] 12 CFR 1805.803(e)[4].

[235] CDFI Fund, *Annual Certification and Data Collection Report Changes* (2020), https://www.cdfifund.gov/sites/cdfi/files/documents/annual-certification-report-2020-final.pdf.

[236] The CDFI Fund released a preview of the final certification application, pending OMB approval. CDFI Fund, *CDFI Certification Application Preview* (Oct. 2022), https://www.cdfifund.gov/sites/cdfi/files/2022-10/CDFI_Certification_Application_Preview_Final_10322.pdf.

[237] CDFI Fund, *CDFI Fund Advance Look: Preview the Revisions to the New CDFI Certification Application* (Oct. 4, 2022), https://www.cdfifund.gov/news/487.

[238] CDFI Fund, *Community Development Financial Institution Certification Application:*

*Overview of Final Revisions and Modifications* (Oct. 5, 2022), https://www.cdfifund.gov/sites/cdfi/files/2022-10/CDFI_Certification_Application_Overview_FINAL.pdf.

[239] Id. at 23–31.

[240] Id. at 27.

[241] CDFIs must service either certain investment areas or targeted populations.

[242] CDFI Fund, *CDFI Target Market Assessment Methodologies*, Notice and Request for Comment. 87 FR 63852 (Oct. 20, 2022). Comments were due by December 19, 2022. The notice refers to a separate document with the target market methodologies. CDFI Fund, Proposed Pre-Approved Target Market Assessment Methodologies (Oct. 19, 2022), https://www.cdfifund.gov/sites/cdfi/files/2022-10/Proposed_PreApproved_TM_Assessment_Methodologies_FINAL.pdf.

[243] Id.

[244] See, e.g., id. at 1 (African American), 3 (Hispanic), 10 (non-Hawaiian Pacific Islander), 12 (disability status).

[245] See, e.g., id. at 1 (African American), 3 (Hispanic), 12 (disability status).

[246] See, e.g., id. at 3 (Hispanic); see also List of Hispanic Surnames for OTP-Hispanic Pre-Approved Assessment Methodology, https://www.cdfifund.gov/sites/cdfi/files/2022-10/OTP_Hisp_HispanicSurnameList_2010Census.xlsx (list of qualifying Hispanic surnames).

[247] See, e.g., CDFI Fund, *Proposed Pre-Approved Target Market Assessment Methodologies*, at 1 (Oct. 19, 2022), https://www.cdfifund.gov/sites/cdfi/files/2022-10/Proposed_PreApproved_TM_Assessment_Methodologies_FINAL.pdf (reporting for African American recipients of funds).

[248] Id. at 14 (low-income individuals or entities).

[249] The CDFI Fund paused acceptance of new applications for CDFI certification in October 2022 and will reopen for new applications once the revisions to the application for certification and the transaction-level data collection and reporting regimes are finalized. While initially anticipating that it would finalize changes to the application process in April 2023 after receiving public comments, the CDFI Fund issued a statement in January 2023 that it had received a robust response to the request for comments on the revised application and reporting tools, and that consideration of these comments, while not requiring a lengthy delay, would require postponement of the new application and associated reporting tools beyond April 2023. CDFI Fund, *An Update on the CDFI Fund's Certification Application Review Process* (Jan. 24, 2023), https://www.cdfifund.gov/news/501.

public and private lenders identify and target sub-segments of the market that remain underserved, facilitating entrepreneurship and business development in those communities. By reducing uncertainty about the conditions of the small business lending market, data collected under the final rule can help creditors identify potentially profitable opportunities to extend responsible and affordable credit, potentially increasing credit availability to small businesses. Increased transparency, in turn, will also help small business borrowers to understand what credit is available and on what terms, thereby improving their ability to access the credit they need and further serving community and business development goals.

The Bureau believes that small business lending data will come to play an important role for the small business lending market, as HMDA data have done for the mortgage market. HMDA data have provided lenders, community groups, and others the tools to identify and address fair lending risks and strengthen fair lending oversight and enforcement. In a similar way, these data will allow diverse stakeholders to analyze lending patterns that are potentially discriminatory. By identifying and addressing discriminatory small business lending practices, the Bureau will help to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[250]

HMDA data have also proven effective in creating transparency in the mortgage market that improves the understanding of credit needs, where they may remain unmet, and the relationship between mortgage lending and community development. The Bureau believes that small business lending data collected and reported under this final rule will provide the Bureau and other stakeholders with critical insights into the small business lending market. The COVID–19 pandemic has shown that transparency is essential at a time of crisis, when small businesses may be in urgent need of credit in order to recover from economic shocks.

The advancement of both statutory purposes of section 1071—facilitating fair lending enforcement and identifying business and community development needs—in turn will support small businesses across all sectors of the economy, which are fundamental to the economic health of the U.S. and which have been hard hit by recent economic and financial crises. Given the critical importance of small businesses to

economic growth and wealth creation, that will also help the economy as a whole.

## III. Summary of the Rulemaking Process

In the years leading up to the release of the CFPB's NPRM to implement section 1071 of the Dodd-Frank Act, the CFPB held over 100 outreach meetings regarding the rulemaking with financial institutions, trade associations, community groups, researchers, governmental entities, and other stakeholders. The CFPB also took a number of other steps, beyond individual stakeholder meetings, to solicit feedback more broadly from the public on a rule to implement section 1071. Most recently, the CFPB received public comments on its NPRM. Each of these efforts are discussed in turn below.

### A. Pre-Proposal Outreach and Engagement

*Request for information, field hearing, and white paper on small business lending.* On May 10, 2017, the CFPB published a request for information regarding the small business lending market [251] in which it sought public comment to understand more about the products that are offered to small businesses, the financial institutions that offer such credit, the small business lending data that currently are used and may be maintained by financial institutions, the potential complexity and cost of small business data collection and reporting, and privacy concerns related to the disclosure purposes of section 1071.[252] On the same date, the CFPB held a field hearing regarding section 1071 at which the request for information was announced and then-Director Richard Cordray noted the importance of a section 1071 rulemaking given the absence of systematic data on how small businesses are faring and whether or how much they are being held back by financing constraints.[253] Finally, at the same time, the CFPB also published its

White Paper on small business lending,[254] which reflected the initial findings of its research providing a preliminary understanding of the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses.

*1071 symposium.* In November 2019, the CFPB held a symposium on section 1071 to assist it in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and government experts in the small business lending arena.[255] The symposium had two panels. The first panel focused on the evolution in the small business lending marketplace. The second panel included a discussion surrounding the implementation of section 1071, including issues raised in response to the CFPB's request for information.

*Small Business Advisory Review Panel.* Under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[256] which amended the Regulatory Flexibility Act (RFA), the CFPB must convene and chair a Small Business Advisory Review Panel (Panel) if it is considering a proposed rule that could have a significant economic impact on a substantial number of small entities.[257] The Panel considers the impact of the proposals under consideration by the CFPB and obtains feedback from representatives of the small entities that would likely be subject to the rule. The Panel is comprised of a representative from the CFPB, the Chief Counsel for Advocacy of the Small Business Administration (SBA), and a representative from the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB). Representatives from 20 small businesses were selected as small entity representatives for this SBREFA process. These individuals represented small businesses that are financial institutions—including community banks, credit unions, community development financial institutions (CDFIs), financial technology firms, and commercial finance companies—that

---

[250] *See* 12 U.S.C. 5493(c)(2)(A).

[251] 82 FR 22318 (May 15, 2017).

[252] In response to the request for information, the CFPB received over 2,000 comments in total, and over 100 unique comments offering detailed substantive responses on the topics raised in the request for information. These comments from the public helped to inform the CFPB's approach in its SBREFA Outline. *See* CFPB, *Request for Information Regarding the Small Business Lending Market,* Docket ID CFPB–2017–0011, *https://www.regulations.gov/docket/CFPB-2017-0011.*

[253] *See* CFPB, *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017), *https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.*

[254] CFPB, *Key dimensions of the small business lending landscape* (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf* (White Paper).

[255] CFPB, *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), *https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.*

[256] Public Law 104–121, 110 Stat. 857 (1996).

[257] 5 U.S.C. 609(b).

would likely be directly affected by a rule implementing section 1071.

On September 15, 2020, the CFPB issued its *Outline of Proposals under Consideration and Alternatives Considered* (SBREFA Outline) for its rulemaking pursuant to section 1071, a detailed document that discusses (1) the relevant law, (2) the regulatory process, (3) the rule proposals the CFPB was considering, and (4) an economic analysis of the potential impacts of those proposals on directly affected small entities.[258]

The CFPB convened the Panel for this proposed rule on October 15, 2020 and held a total of four meetings with small entity representatives during October 19–22, 2020, conducted online via video conference (Panel Outreach Meetings). In preparation for the Panel Outreach Meetings and to facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the small entity representatives were included throughout the SBREFA Outline.[259]

In advance of the Panel Outreach Meetings, the CFPB, SBA Office of Advocacy, and OIRA held a series of video conferences with the small entity representatives to describe the Small Business Review Process, obtain important background information about each small entity representative's current business practices, and begin discussions on selected portions of the proposals under consideration.

All 20 small entity representatives participated in the Panel Outreach Meetings. Representatives from the CFPB, SBA Office of Advocacy, and OIRA provided introductory remarks. The meetings were then organized around discussions led by the CFPB about each aspect of the proposals under consideration and the potential impact on small businesses. The CFPB

also invited small entity representatives to submit written feedback by November 9, 2020; most did so.

On December 15, 2020, the CFPB released the *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (SBREFA Panel Report).[260] This report includes a summary of the feedback received from small entity representatives during the panel process (including oral feedback received during the pre-Panel video conferences and Panel Outreach Meetings, as well as timely submitted written feedback) and findings and recommendations made by the Panel.[261] As required by the RFA, the CFPB considered the Panel's findings in its initial regulatory flexibility analysis, as set out in part VIII of the NPRM.

The CFPB also invited other stakeholders to submit feedback on the SBREFA Outline by December 14, 2020. The CFPB received approximately 60 submissions from a variety of other stakeholders, including financial institutions, trade associations, community groups, a think tank, and a government agency.[262]

The CFPB considered the feedback it received from small entity representatives, the findings and recommendations of the Panel, and the feedback from other stakeholders in preparing the NPRM. The feedback, findings, and recommendations were summarized throughout the NPRM where relevant.

*One-Time Cost Survey.* On July 22, 2020, the CFPB released a voluntary survey to measure the one-time costs of compliance with an eventual small

business lending data collection rule.[263] The objective of the survey was to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. The deadline for responses was October 16, 2020. The CFPB received responses from 105 financial institutions.[264] The results of the survey inform the CFPB's analyses of the potential impacts of the rule as set out in parts IX and X below.

*ECOA request for information.* On July 28, 2020, the CFPB issued a request for information to seek public input on ECOA and Regulation B.[265] In this request for information, the CFPB sought public comment on a number of topics, including small business lending and the ways that the CFPB, in light of its authority under ECOA and Regulation B, might support efforts to meet the credit needs of small businesses, particularly those that are minority-owned and women-owned.[266]

### B. Ongoing Outreach and Engagement

*Ongoing outreach.* The CFPB conducts outreach to industry and other stakeholders to understand their experiences with the small business finance market, economic conditions, and the collection and reporting of data regarding that market. A particular near-term priority in the CFPB's recent outreach has been the impacts of the pandemic and the effectiveness of the Federal government's response. Findings from outreach activities inform the CFPB on matters affecting the small business sector.

*Technical outreach.* In the months before the publication of the NPRM, the CFPB began conducting technical outreach with third-party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report small business lending data to the CFPB. With these software vendors and technical staff, the CFPB has held and, after publication of this final rule, will continue to hold discussions concerning

---

[258] CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf* (SBREFA Outline). *See also* CFPB, *Consumer Financial Protection Bureau Releases Outline of Proposals Under Consideration to Implement Small Business Lending Data Collection Requirements* (Sept. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-releases-outline-proposals-implement-small-business-lending-data-collection-requirements/*.

[259] These questions also appeared in a shorter Discussion Guide for Small Entity Representatives. *See* CFPB, *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Discussion Guide for Small Entity Representatives* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_discussion-guide_2020-09.pdf*.

[260] CFPB, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf* (SBREFA Panel Report). *See also* CFPB, *Consumer Financial Protection Bureau Releases Report on Implementing the Dodd-Frank Act's Small Business Lending Data Collection Requirement* (Dec. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-report-on-implementing-the-dodd-frank-acts-small-business-lending-data-collection-requirement/*. The CFPB's SBREFA Outline and related materials, as well as the CFPB's presentation slides framing the discussion during the Panel Outreach Meetings, are appended to the SBREFA Panel Report. *See* SBREFA Panel Report at app. C through F.

[261] The written feedback from small entity representatives is appended to the SBREFA Panel Report. *See id.* at app. A.

[262] Feedback received from these stakeholders on the SBREFA Outline is available on the public docket for the NPRM. *See https://www.regulations.gov/docket/CFPB-2021-0015/document?documentTypes=Supporting%20%26%20Related%20Material*.

[263] CFPB, *Survey: Small Business Compliance Cost Survey* (July 22, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf*.

[264] See part VI below for additional details regarding this survey.

[265] CFPB, *Consumer Financial Protection Bureau Requests Information on Ways to Prevent Credit Discrimination and Build a More Inclusive Financial System* (July 28, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-rfi-prevent-credit-discrimination-build-more-inclusive-financial-system/*.

[266] 85 FR 46600, 46602 (Aug. 3, 2020).

AdminRecord-000023

the technical systems and procedures the CFPB will provide for financial institutions to submit their data. The CFPB intends to understand the technology solutions currently provided by vendors to support the small business lending activities of financial institutions, as well as their experience in providing financial institutions with technical support for previous data collection regulations. The CFPB believes this information will be helpful in informing the CFPB in its design and implementation of a platform for intake and processing of data to help the platform integrate, to the extent possible, with existing systems and data collection procedures. These discussions also serve to raise awareness of technology providers as to their potential future role in supporting the rule as well as the lead time that may be necessary for some or all affected financial institutions to come into compliance with the requirements of this final rule. This outreach process is ongoing and will continue after the publication of this final rule.

*Sample data collection form usability testing.* After the NPRM was released, the CFPB, after the appropriate notice in the **Federal Register**, and a 30-day comment period, sought and received OMB approval to conduct several rounds of message and user testing research related to the sample form.[267] The CFPB conducted qualitative research to learn about the experience of filling out the sample data collection form and to explore design options. The CFPB engaged a vendor to conduct interviews with small business stakeholders and listening sessions with small business owners to test different versions of the introductory language on the sample data collection form. The CFPB also conducted qualitative user interviews with small business owners to test their reactions to different versions of the sample data collection form. In addition to comments received in response to the CFPB's proposed sample data collection form as part of the NPRM, the feedback gathered as part of these testing efforts was also considered by the CFPB in finalizing the sample data collection form issued with this final rule. The CFPB is releasing a report, simultaneously with the issuance of this final rule, summarizing the findings from all three rounds of qualitative research testing.[268]

## C. Notice of Proposed Rulemaking

On September 1, 2021, the CFPB issued its proposal to implement section 1071. The NPRM was published in the **Federal Register** on October 8, 2021,[269] and the public comment period closed on January 6, 2022.[270] The CFPB received approximately 2,100 comments on the proposal during the comment period.[271] Approximately 650 of these comments were unique, detailed comment letters representing diverse interests. These commenters included lenders such as banks and credit unions, CDFIs, community development companies, Farm Credit System lenders, online lenders, and others; national and regional industry trade associations; software vendors; business advocacy groups; community groups; research, academic, and other advocacy organizations; members of Congress; Federal and State government offices/agencies; small businesses; and individuals.

The remaining comments included some duplicate submissions (*i.e.,* letters with the same content from the same commenter submitted through multiple channels, or letters with the same content submitted by multiple people on behalf of the same commenting organization) as well as comments that were part of several comment submission campaigns organized by industry or community groups. Such comment campaigns typically advocated for or against particular provisions in the NPRM and urged additional changes. These comments were considered by the CFPB along with all other comments received, including any additional remarks included in otherwise identical comment letters.

In addition, the CFPB also considered comments received after the comment period closed via approximately 17 ex parte submissions and meetings.[272] Materials on the record, including all ex parte submissions and summaries of ex

parte meetings, are available on the public docket for this rulemaking.[273]

The CFPB received comments on all aspects of the proposed rule, as well as on the proposed approach to protecting privacy interests via modification or deletion of data prior to publication, and on its analyses of the proposed rule's impacts. Relevant information received via comment letters, as well as ex parte submissions, is discussed below in the section-by-section analysis and subsequent parts of this document, as applicable. The CFPB considered all the comments it received regarding the proposal, made certain modifications, and is adopting the final rule as described in part V below. Comments relevant to the CFPB's approach to privacy are discussed in part VIII and regarding its impact analyses in parts IX to XI.

## IV. Legal Authorities

The Bureau is issuing this final rule pursuant to its authority under section 1071. Some aspects of this rule are also adopted under the Bureau's more general rulemaking authorities in ECOA. Congress enacted ECOA to prohibit discrimination against any applicant, regarding any aspect of a credit transaction, on the basis of, amongst other characteristics, race, color, religion, national origin, and sex.[274] The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.

ECOA is implemented in Regulation B.[275] Among other things, Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including if it is required by law.[276]

As discussed above, in the Dodd-Frank Act Congress amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. Specifically, section 1071 requires financial institutions to collect and report to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[277] Congress enacted section 1071 for the purpose of (1) facilitating enforcement of fair lending laws and (2) enabling communities, governmental entities, and creditors to identify business and

---

[267] 87 FR 37504 (June 23, 2022).

[268] CFPB, *User testing for sample data collection form for the small business lending final rule* (Mar. 2023), *https://www.consumerfinance.gov/data-research/research-reports/user-testing-for-sample-data-collection-form-for-the-small-business-lending-final-rule/*.

[269] 86 FR 56356 (Oct. 8, 2021).

[270] The CFPB set the length of the comment period on the proposal at 90 days from the date on which it was published in the **Federal Register**. The CFPB received several written requests to extend the comment period. The CFPB believes that the 90-day comment period set forth in the NPRM (along with the 38 days that elapsed between the CFPB's issuance of the NPRM on September 1, 2021 and its publication in the **Federal Register** on October 8, 2021) gave interested parties sufficient time to consider the CFPB's proposal and prepare their responses, and thus did not extend the comment period beyond January 6, 2022.

[271] *See https://www.regulations.gov/docket/CFPB-2021-0015/comments.*

[272] CFPB, *Policy on Ex Parte Presentations in Rulemaking Proceedings,* 82 FR 18687 (Apr. 21, 2017).

[273] *See https://www.regulations.gov/docket/CFPB-2021-0015/comments.*

[274] 15 U.S.C. 1691a(1).

[275] 12 CFR part 1002.

[276] Regulation B § 1002.5(a)(2).

[277] ECOA section 704B.

AdminRecord-000024

community development needs and opportunities of women-owned, minority-owned, and small businesses.[278] The Bureau often refers to these as section 1071's fair lending purpose and its business and community development purpose, respectively.

To advance these statutory purposes, section 1071 grants the Bureau general rulemaking authority for section 1071, providing that the Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.[279] ECOA section 704B(g)(2) also permits the Bureau to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau principally relies on its 704B(g)(1) authority in this proposed rule and relies on 704B(g)(2) when proposing specific exceptions or exemptions to section 1071's requirements. Section 704B(g)(3) directs the Bureau to issue guidance designed to facilitate compliance with the requirements of section 1071.

In addition, section 703(a) of ECOA gives the Bureau broad authority to prescribe regulations to carry out the purposes of ECOA, including provisions that in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. That section also states that the Bureau may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

Section 1071 establishes requirements or obligations for financial institutions that the Bureau is implementing in this final rule. These provisions include the requirement in ECOA section 704B(b) that a financial institution shall inquire whether an applicant for credit is a women-owned, minority-owned, or small business; that a financial institution must maintain a record of responses to such inquiry, separate from the application; that an applicant may refuse to provide any information requested regarding the inquiry under

704B(b); that a financial institution must limit access of loan underwriters, or other officers or employees of the financial institution or any affiliate, to applicant responses to inquiries under 704B(b); and that if a financial institution determines that a loan underwriter or other officer or employee should have access to any information provided by the applicant pursuant to a request under 704B(b) that the financial institution shall provide notice to the applicant of the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information.[280]

ECOA section 704B(e)(1) directs financial institutions to compile and maintain, in accordance with regulations of the Bureau, records of the information provided by applicants for credit pursuant to a request under 704B(b). Section 704B(e)(2) requires that the information compiled and maintained under 704B(e)(1) be itemized in order to clearly and conspicuously disclose an enumerated list of data points. Section 704B(e)(2)(H) requires financial institutions to compile and maintain any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071.

Several provisions of section 1071 expressly refer to regulations to be promulgated by the Bureau to implement certain requirements, including in ECOA section 704B(e)(1) regarding how financial institutions must compile and maintain data pursuant to section 1071, and in 704B(f)(2)(B) and (C) regarding the form of information made available by financial institutions to the public and the form and manner in which the Bureau itself should make data available to the public generally.

Two provisions expressly give the Bureau discretion with respect to public availability of small business lending data. Specifically, ECOA section 704B(e)(4) states that the Bureau may, at its discretion, delete or modify data before making it available to the public if the Bureau determines that the deletion or modification of the data would advance a privacy interest. Section 704B(f)(3) gives the Bureau the discretion to compile and aggregate data for its own use, as well as to make public such compilations of aggregate data.

## V. Section-by-Section Analysis

### Overview

In this *Overview* of part V, the CFPB first provides some background regarding section 1071, a discussion of the Home Mortgage Disclosure Act of 1975 (HMDA), and a brief summary of the final rule. Each regulatory provision of the final rule, along with its rationale and relevant feedback received through the public comment process, is discussed in detail in the section-by-section analyses that follow. The CFPB has made several major, and a number of minor, adjustments to the rule in response to comments received on the proposal. Major changes are noted in the summary of the final rule below; all changes are discussed in detail in the section-by-section analyses that follow.

Next, the CFPB discusses the high-level and general comments received in response to the NPRM. The CFPB also addresses several issues for which there is no corresponding regulatory text or commentary. Finally, the CFPB discusses the conforming amendments it is making to existing Regulation B.

### A. Introduction to Section 1071

As discussed above, section 1071 of the Dodd-Frank Act requires that financial institutions collect and report to the CFPB certain data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the CFPB to require any additional data that it determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain data and publication of data. In addition, section 1071 permits the CFPB to modify or delete data prior to publication if it determines that such a deletion or modification would advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules, and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. It also permits the CFPB to adopt exceptions to any requirement

---

[278] ECOA section 704B(a).

[279] ECOA section 704B(g)(1).

[280] ECOA section 704B(b)(1) and (2), (c), (d)(1) and (2).

or to exempt financial institutions from the requirements of section 1071 as it deems necessary or appropriate to carry out the purposes of section 1071. Section 1071 also directs the CFPB to issue guidance designed to facilitate compliance with the requirements of section 1071. As discussed in part IV above and throughout this part V, the CFPB's rule implements these statutory provisions.

### B. Section 1071 and HMDA

HMDA is a data collection and reporting statute that requires certain depository institutions and for-profit nondepository institutions to collect, report, and disclose data about originations and purchases of mortgage loans, as well as mortgage loan applications that do not result in originations (for example, applications that are denied or withdrawn).[281] The CFPB's Regulation C, 12 CFR part 1003, implements HMDA. In light of certain similarities between section 1071 and HMDA as data collection and reporting statutes with different markets but similar fair lending enforcement and community development purposes, the CFPB's section-by-section analyses in this part V sometimes discusses how similar provisions are addressed in the context of HMDA. Of course, the markets to which HMDA and section 1071 apply are also different in significant respects, and those differences are reflected between the present rule and Regulation C, as discussed further in the section-by-section analyses in this part V.

HMDA and Regulation C's purposes are: (1) to help determine whether financial institutions are serving their communities' housing needs; (2) to assist public officials in distributing public investment to attract private investment; and (3) to assist in identifying potential discriminatory lending patterns and enforcing antidiscrimination statutes.

A covered institution for purposes of HMDA reporting is a depository or nondepository institution that meets the relevant coverage criteria set forth in the regulation. A covered transaction under HMDA is generally a loan or line of credit secured (or, for applications, proposed to be secured) by a lien on a dwelling, that is not specifically excluded under Regulation C § 1003.3(c). The data points generally required to be reported about each covered transaction can be grouped into

four broad categories: [282] information about the applicants, borrowers, and underwriting process, information about the property securing the loan or proposed to secure the loan, information about the features of the loan, certain unique identifiers.

Covered institutions are required to submit their HMDA data by March 1 following the calendar year for which data are collected. Covered institutions with larger volumes of covered loans and applications are required to submit their HMDA data for each of the first three quarters of the year in addition to their annual submission.

Following the calendar year in which HMDA data are collected, a covered institution's disclosure statement [283] and modified loan/application register become publicly available on the FFIEC's HMDA Platform.[284] Aggregate reports for each Metropolitan Statistical Area and Metropolitan Division that show lending patterns by property location, age of housing stock, and income level, sex, ethnicity, and race are also publicly available on the same platform, which also allows users to create custom datasets, reports, and visualizations from the HMDA data.

HMDA data are the primary source of information for regulators, researchers, economists, industry, and advocates analyzing the mortgage market both for HMDA's purposes and for general market monitoring. HMDA data are used by the Federal supervisory agencies to support a variety of activities. For example, Federal supervisory agencies use HMDA data as part of their fair

lending [285] examination process, and also use HMDA data in conducting CRA [286] performance evaluations. HMDA data provide the public with information on the home mortgage lending activities of particular reporting entities and on activity in their communities. These data are used by local, State, and Federal officials to evaluate housing trends and issues and by community organizations to monitor financial institution lending patterns.

### C. Summary of the Final Rule

The CFPB is adding a new subpart B to Regulation B to implement the requirements of section 1071. The CFPB is also making some conforming amendments to existing Regulation B. The CFPB's final rule is summarized below, in the order of the section-by-section analyses in this part V that follow.

1. General Provisions (§§ 1002.5(a)(4), 1002.101, and 1002.102)

*Changes to existing Regulation B.* The CFPB is amending existing § 1002.5(a)(4) to expressly permit voluntary collection and reporting of information regarding the ethnicity, race, and sex of applicants' principal owners, or whether the applicant is a minority-owned, women-owned, or LGBTQI+-owned business, in certain circumstances.

The Bureau is also making other nonsubstantive conforming edits in existing Regulation B to maintain consistency and avoid confusion.

*Authority, purpose, and scope (§ 1002.101).* Section 1002.101 sets forth the authority, purpose, and scope for subpart B. Among other things, this section states section 1071's two statutory purposes of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

*Definitions (§ 1002.102).* Section 1002.102 includes a number of definitions for terms used in subpart B, which generally fall into several categories. First, some definitions refer to terms defined elsewhere in subpart B—specifically, terms of particular importance including business, covered application, covered credit transaction, covered financial institution, financial institution, and small business. Second,

---

[281] 12 U.S.C. 2801 *et seq.*

[282] Under the Economic Growth, Regulatory Relief, and Consumer Protection Act, Public Law 115–174, 132 Stat. 1296 (2018), as implemented in Regulation C § 1003.3(d), certain HMDA-covered institutions may be eligible for partial exemptions from some of the HMDA reporting requirements and only certain covered loans and applications are covered under partial exemptions. If a covered loan or application is covered under a partial exemption, the covered institution is not required to collect, record, and report certain data points.

[283] A disclosure statement contains aggregated data derived from loan-level data.

[284] A HMDA loan/application register contains the record of information required to be collected and the record submitted annually or quarterly, as applicable. A modified loan/application register is a covered institution's loan/application register modified by the CFPB, on its website, to protect applicant and borrower privacy. The CFPB interprets HMDA, as amended by the Dodd-Frank Act, to call for the use of a balancing test to determine whether and how HMDA data should be modified prior to its disclosure to the public in order to protect applicant and borrower privacy while also fulfilling HMDA's public disclosure purposes. *See* 80 FR 66127, 66133–34 (Oct. 28, 2015). In December 2018, the CFPB issued final policy guidance describing the modifications the CFPB intends to apply to the loan-level HMDA data that covered institutions report before the data are disclosed publicly. *See* 84 FR 649 (Jan. 31, 2019).

[285] *See* ECOA (15 U.S.C. 1691 through 1691f), Regulation B (12 CFR part 1002), and the Fair Housing Act (42 U.S.C. 3605, 24 CFR part 100).

[286] 12 U.S.C. 2901 through 2908, and 12 CFR parts 25, 195, 228, and 345.

**35176**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

some definitions refer to terms defined elsewhere in existing Regulation B (*i.e.,* business credit, credit, and State) or other regulations (*i.e.,* a portion of the definitions of small business and affiliate reference an SBA regulation). Finally, the remaining terms are defined in § 1002.102, including applicant, closed-end credit transaction, LGBTQI+ individual, LGBTQI++-owned business, minority-owned business, open-end credit transaction, principal owner, small business lending application register, women-owned business, and a portion of the definition of affiliate.

2. Coverage (§§ 1002.103 Through 1002.106)

*Covered applications (§ 1002.103).* Section 1002.103 defines what is, and is not, a covered application under subpart B; this definition triggers data collection and reporting requirements under subpart B for covered financial institutions. The CFPB is defining a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. A covered application does not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; and (2) inquiries and prequalification requests.

*Covered credit transactions and excluded transactions (§ 1002.104).* The CFPB is requiring that covered financial institutions collect and report data for all covered applications from small businesses for transactions that meet the definition of business credit under existing Regulation B, with certain exceptions. Section 1002.104(a) defines the term covered credit transaction as an extension of business credit that is not an excluded transaction under § 1002.104(b). Loans, lines of credit, credit cards, and merchant cash advances (including credit transactions for agricultural purposes) all fall within the scope of the rule. Section 1002.104(b) excludes from the requirements of subpart B trade credit, HMDA-reportable transactions, insurance premium financing, public utilities credit, securities credit, and incidental credit. Factoring, leases, consumer-designated credit used for business or agricultural purposes, and credit transaction purchases, purchases in a pool of credit transactions, and purchases of a partial interest in a credit transaction also are not covered credit transactions.

*Covered financial institutions and exempt institutions (§ 1002.105).* The CFPB is defining in § 1002.105(a) the term financial institution, consistent with the definition in section 1071, as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. Under this definition, subpart B's requirements apply to a variety of entities that engage in small business lending, including depository institutions (*i.e.,* banks, savings associations, and credit unions), online lenders, platform lenders, CDFIs, Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders. Subpart B does not cover motor vehicle dealers.[287] Section 1002.105(b) defines the term covered financial institution as a financial institution that originated at least 100 covered credit transactions for small businesses in each of the two preceding calendar years. Only financial institutions that meet this loan-volume threshold are required to collect and report small business lending data under subpart B.

*Business and small business definitions (§ 1002.106).* Section 1002.106 adopts the SBA's definitions of "business concern or concern" and "small business concern" as set out in the Small Business Act and SBA regulations. Notwithstanding the small business size standards established by SBA regulations, for purposes of subpart B, a business is a small business if its gross annual revenue is $5 million or less for its preceding fiscal year. The SBA Administrator has approved the CFPB's use of this alternate small business size standard pursuant to the Small Business Act. Every five years after January 1, 2025, the need to adjust the gross annual revenue threshold for inflation or deflation will be determined using the Consumer Price Index for all Urban Consumers.

3. Compiling, Maintaining, and Reporting Small Business Lending Data (§§ 1002.107 Through 1002.111)

*Compilation of reportable data (§ 1002.107).* Section 1002.107 addresses several aspects of collecting data on covered applications from small businesses. Section 1002.107(a) requires

financial institutions to compile and maintain the data points enumerated in § 1002.107(a)(1) through (20). These data points must be collected and reported in accordance with the rule and the Filing Instructions Guide that the CFPB will provide for the appropriate filing year. Certain of these data points are or could be collected from the applicant (or otherwise determined based on information from appropriate third-party sources); other data points are based on information within the financial institution's control. Appendix E provides a sample data collection form for requesting protected demographic information. Although the form reflects a number of legal requirements applicable to collection, use of the form itself is not mandatory. It is intended as an available implementation resource for lenders, who can make use of it if they so choose.

Section 1002.107(c)(1) provides that covered financial institutions must not discourage an applicant from responding to requests for applicant-provided data and must otherwise maintain procedures to collect such data at a time and in a manner that are reasonably designed to obtain a response. Where data are collected directly from the applicant, § 1002.107(c)(2) identifies certain minimum provisions that must be included within financial institutions' procedures in order for them to be considered "reasonably designed." The rule also addresses what financial institutions should do if, despite having such procedures in place, they are unable to obtain certain data from an applicant. Pursuant to § 1002.107(b), financial institutions are permitted to rely on information from the applicant or appropriate third-party sources, although for most data points if the financial institution verifies the information provided it must report the verified information. Section 1002.107(d) permits financial institutions to reuse certain previously collected data in certain circumstances.

*Firewall (§ 1002.108).* Section 1002.108 implements section 1071's requirement that certain data collected pursuant to section 1071 be shielded from certain persons if feasible; the CFPB refers to this as the "firewall." Pursuant to § 1002.108(b), if an employee or officer of a covered financial institution or a covered financial institution's affiliate is involved in making any determination concerning a covered application from a small business, that employee or officer is prohibited from accessing the applicant's responses to regarding

---

[287] Regulation B does not apply to a person excluded from coverage by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

AdminRecord-000027

protected demographic information requested under this final rule.

However, pursuant to § 1002.108(c), this prohibition does not apply to an employee or officer if the financial institution determines that employee or officer should have access to the applicant's responses to the financial institution's inquiries regarding the applicant's protected demographic information, and the financial institution provides a notice to the applicant regarding that access. The notice must be provided to each applicant whose information will be accessed or, alternatively, the financial institution may also provide the notice to applicants whose responses will not or might not be accessed. For example, a financial institution could provide the notice to all applicants or all applicants for a specific type of product. The CFPB is providing sample language that a financial institution can, but is not required to, use for this notice.

*Reporting of data to the Bureau (§ 1002.109).* Section 1002.109 addresses several aspects of covered financial institutions' obligations to report small business lending data to the CFPB. First, § 1002.109(a) provides that data must be collected on a calendar year basis and reported to the CFPB on or before June 1 of the following year. Section 1002.109(a) also addresses collection and reporting requirements of subsidiaries of financial institutions and reporting requirements of financial institutions where multiple financial institutions are involved in a transaction. Second, the CFPB lists in § 1002.109(b) the information that financial institutions are required to provide about themselves when reporting data to the CFPB, including the financial institution's name, headquarters address, contact person, Federal prudential regulator, institutional identifiers, parent entity information, as well as information on the type of financial institution it is, and whether it is reporting covered applications voluntarily. Finally, § 1002.109(c) addresses technical instructions for the submission of data to the CFPB, including information about the Filing Instructions Guide, which the CFPB will provide for the appropriate year.

*Publication of data and other disclosures (§ 1002.110).* Section 1002.110 addresses several issues regarding the publication of small business lending data. Section 1002.110(a) provides that the CFPB will make available to the public, on an annual basis, the data submitted to it by financial institutions. These data will be made available subject to deletions or

modifications made by the CFPB, if the CFPB determines that such deletions or modifications would advance a privacy interest. Part VIII below discusses the CFPB's preliminary assessment of how best to determine appropriate pre-publication modifications and deletions, particularly in light of re-identification risk to small businesses and their owners. Section 1002.110(b) provides that the CFPB may compile and aggregate data submitted by financial institutions and may publish such compilations or aggregations.

Section 1002.110(c) requires a covered financial institution to publish on its website a statement that its small business lending data, as modified by the CFPB, are or will be available from the CFPB. Section 1002.110(d) sets forth when a covered financial institution shall make this statement available and how long the financial institution shall maintain the statement on its website. These requirements satisfy financial institutions' statutory obligation to make data available to the public upon request.

Finally, § 1002.110(e) prohibits a financial institution or third party from disclosing protected demographic information, except in limited circumstances. Section 1002.110(e)(1) prohibits a financial institution from disclosing or providing to a third party the protected demographic information it collects pursuant to the rule, except to further compliance with ECOA or Regulation B or as required by law. Section 1002.110(e)(2) prohibits a third party that obtains protected demographic information for the purpose of furthering compliance with ECOA and Regulation B from any further disclosure of such information, except to further compliance with ECOA and Regulation B or as required by law.

*Recordkeeping (§ 1002.111).* Section 1002.111 addresses several aspects of the recordkeeping requirements for small business lending data. First, § 1002.111(a) requires a covered financial institution to retain evidence of compliance with subpart B, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the CFPB pursuant to § 1002.109. Second, § 1002.111(b) requires a covered financial institution to maintain, separately from the rest of an application for credit and accompanying information, an applicant's responses to a financial institution's inquiries regarding the applicant's protected demographic information. Finally, § 1002.111(c) requires that, in compiling, maintaining,

and reporting its small business lending application register, as well as the separately maintained protected demographic information pursuant to § 1002.111(b), a financial institution may not include any personally identifiable information concerning any individual who is, or is connected with, an applicant.

### 4. Other Provisions (§§ 1002.112 Through 1002.114)

*Enforcement (§ 1002.112).* Section 1002.112 addresses several issues related to the enforcement of subpart B. First, § 1002.112(a) states that a violation of section 1071 or subpart B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA. Second, § 1002.112(b) provides that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. Such an error is presumed not to violate ECOA or subpart B if the number of such errors do not exceed the thresholds set forth in appendix F. Third, § 1002.112(c) identifies four safe harbors under which certain errors—specifically those regarding the application date, census tract, and NAICS code data point, along with incorrect determinations of small business status, covered transaction, and covered application—do not constitute violations of ECOA or subpart B. Relatedly, in part VII below, the CFPB discusses its intention to consider, for financial institutions subject to the CFPB's jurisdiction, good faith efforts to comply with the rule and will not generally assess penalties for errors in data reporting. The CFPB will conduct examinations on data during the grace period to assist institutions in diagnosing compliance weaknesses.

*Severability (§ 1002.113).* Section 1002.113 provides that any provision of subpart B, or any application of a provision, is stayed or determined to be invalid, it is the CFPB's intent that the remaining provisions shall continue in effect.

*Effective date, compliance date, and special transitional rules (§ 1002.114).* Section 1002.114 addresses several issues related to the rule's effective date, when covered financial institutions are required to comply with the rule, and associated transitional rules. Section 1002.114(a) provides that this final rule will become effective 90 days after publication in the **Federal Register**. However, pursuant to § 1002.114(b) compliance with the final rule is based on a tiered compliance date schedule.

AdminRecord-000028

Compliance with the rule beginning October 1, 2024 is required for covered financial institutions that originate the most covered credit transactions for small businesses. However, institutions with a moderate transaction volume have until April 1, 2025 to begin complying with the rule, and those with the lowest volume have until January 1, 2026. Next, § 1002.114(c) provides certain transitional provisions that permit covered financial institutions to begin collecting protected applicants' demographic information beginning 12 months prior to their applicable compliance dates. Finally, § 1002.114(c) also permits financial institutions that do not have ready access to sufficient information to determine their compliance tier (or whether they are covered by the rule at all) to use any reasonable method to estimate their volume of originations to small businesses for this purpose.

### D. High-Level and General Comments

#### 1. High-Level and General Comments on the NPRM

High-level and general comments received on the NPRM are discussed here, followed by a discussion of comments specifically addressing implementation issues and comments regarding section 1071's overlap with other data reporting regimes. Comments received on specific aspects of the Bureau's proposed rule are discussed in the section-by-section analyses that follow in this part V. Comments regarding the privacy analysis are addressed in part VIII below, and regarding the Bureau's analysis of impacts in parts IX through XI.

#### Comments Received

Support for section 1071's statutory purposes was nearly universal amongst commenters, at least at a high level of generality. (See also the section-by-section analysis of § 1002.101 below.) The vast majority of industry commenters praised the purposes of the rule, and the intentions behind section 1071 and ECOA generally, while offering criticisms of specific provisions of the proposed rule.

*Broad support.* A number of commenters offered general support for the rule, including its scope and its purposes. For example, a trade association stated its appreciation for the comprehensive nature of the proposed rule, noting that the Bureau conducted extensive outreach and worked at ensuring proper and effective rulemaking consistent with legislative intent while allowing for technical improvements and practical

considerations. A community group stated that to achieve the community development and fair lending purposes of the statute, the data collected and reported under the rule needs to be comprehensive in its coverage of lenders and must capture key credit underwriting factors as controls for analyses of gender and racial disparities in lending. The commenter also stated that the Bureau recognized that annual disclosure of lending data by the vast majority of small business lenders is a prerequisite for adequate oversight, given that existing data are insufficient. The commenter further explained that existing data consist of periodic surveys that are not usually lender specific and that are inconsistent in the amount of detail provided on key underwriting variables needed for analyses of community needs and fair lending compliance.

A number of commenters offered more specific support for the rule's purposes. One trade association noted that its members have been active in the development of policy supporting section 1071, including participation as small entity representatives during the SBREFA process. A number of banks, a credit union, and several trade associations expressed support for the statutory purposes of section 1071 and the Bureau's proposed rule. One trade association stated that the NPRM was a key opportunity to explore lending data and expand responsible small business lending, which was important to the financial well-being in the communities served by its members, as well as stability of the overall financial system.

A cross-sector group of lenders, community groups, and small business advocates stated that it is critical to require lenders to collect and report applicant data for as many small minority-owned and small women-owned businesses as possible, to uphold congressional intent and establish a comprehensive database.

Several commenters focused on the importance of the fair lending purpose of section 1071. One trade association stated its unequivocal agreement with the purpose of preventing discrimination on the basis of ethnicity, race, and sex, and noted that CDFI lenders share the Bureau's core value of protecting consumers by providing fair and transparent financial products and services to all customers.

A number of commenters, including community banks, credit unions, and trade associations, offered their appreciation for the stated intentions of the rule in the NPRM—to support fair lending and business and community development—but expressed concern

about the effect of the rule as proposed on lending and compliance costs. A bank stated that, while it supported the statutory goals of section 1071, the proposed rule would result in restricted, higher-priced credit for the groups the proposal is meant to benefit. A trade association for community banks likewise supported the proposed rule and the congressional intent behind section 1071, but asserted it was necessary to fine-tune specific proposed provisions to mitigate costs and ensure small business lenders remain active, particularly those serving the most underserved markets. Another trade association supported the goals of the NPRM, but worried that the proposed would unduly burden credit unions and would discourage them from offering business credit.

*Broad criticisms.* Some industry commenters expressed disagreement with the enactment of section 1071 and therefore opposed the rule in its entirety. One lender opposed the rule on the grounds that it already complies with fair lending laws, and that the rule would force a choice between compliance and market exit. Another argued that the Dodd-Frank Act may have intended that section 1071 create a HMDA-like data reporting mechanism, but warned that small business lending is not "cookie-cutter," is not automated, and is highly relationship driven. Another commenter claimed that it would be impossible to derive any meaningful or statistically valid conclusions from a comparison of small business loans.

A credit union stated that the publication of data collected and reported pursuant to section 1071 would not permit it to better identify its members' unmet small business lending needs aside from confirming if there is a significant difference in the number of business borrowers that are female or of a specific race.

One trade association noted that credit unions may only serve their members and are limited by Federal statute in their ability to offer business loans; as a result, data collected from them would not be comparable to data collected from lenders without similar limitations in who they may serve.

Other commenters, without specifically opposing the enactment of section 1071, expressed more general concerns about the NPRM. Trade associations for online lenders supported the policy goals of the NPRM and also believed that modifications should be made to support responsible innovation in banking without unintentionally stifling the efficiency and innovation that digital lending

AdminRecord-000029

platforms can provide. A bank supported the enforcement of fair lending laws and appreciated the Bureau's dedication to better supporting small businesses, but was concerned about aspects of the NPRM. A One commenter inquired as to why the Bureau, in charge of consumer financial protection, was concerned with business loans, and claimed that the Bureau was engaged in overreach.

*The role of online lenders.* Two trade associations suggested that online and "fintech" lenders were important to expanding access to financing, particularly for Black- and Hispanic-owned businesses. These commenters expressed their support for greater transparency and expanding access to sustainable and fair credit in small business lending. They also asserted that women-owned and minority-owned small businesses were disadvantaged in applying for small business lending at traditional banks, and that nontraditional online lenders play a crucial role in modernizing financial services and improving access and outcomes for small businesses. One of the commenters noted that, in particular, the use of artificial intelligence, machine learning, and alternative data would expand lending to minority-owned small businesses.

*Uniqueness of small business lending.* One bank stated that it was hard to perform comparative analysis on small business loans because they are unique and manually unwritten. Further, the commenter stated that the absence of certain credit criteria or metrics—such as collateral, loan-to-value, debt-to-income, debt service coverage ratio and the like—in the data points to be collected by the rule could cause reviewers of published data, such as consumer groups and agency examiners, to draw incorrect conclusions on variances in rates and terms of loans.

*Data accuracy.* A bank and a trade association asserted that the Bureau's final rule should focus on ensuring the collection and reporting of high-quality data that maximizes data accuracy and reliability. These commenters noted that inaccurate, unreliable, and poor-quality data could undermine the statutory purposes of section 1071, which the commenters said were to promote access to credit for minority-owned and women-owned small businesses. They further stated that poor data quality could also lead to misguided and factually unsupported fair lending allegations, which could damage the reputations of responsible lenders and subject them to unnecessary investigative burdens and lawsuits, all of which could undermine the Bureau's

credibility and waste the Bureau's time and resources. Based on these premises, the commenters sought the elimination of certain provisions which they believed would undermine the collection of accurate, reliable, high-quality data (discussed in the applicable section-by-section analyses that follows).

*Specific uses of small business lending data.* Two trade associations urged the Bureau to explain how it would use the data collected under this rule, including how it would analyze data collected by the rule. One claimed that the NPRM did not outline potential uses for small business lending data, and asserted that the Bureau should provide notice and comment on potential uses of the rule, even after the issuance of the final rule. The commenter stated that it is important for the Bureau to issue guidance on how it plans to analyze data reported under the rule, including how it will assess whether lenders appropriately serve relevant markets, which can vary significantly by lending product.

The other commenter stated that the Bureau should clearly indicate how implementing the proposed framework will advance fairness and understanding of small business credit needs, that requirements should tie to satisfying stated objectives and designed no more broadly than necessary to reduce unnecessary costs to small business lenders. The commenter stated its belief that by clearly indicating how it will use data it collects, including whether and how it will make such information public, the Bureau will allow stakeholders to assess better the costs and benefits of the overall framework. Additionally, the Bureau should carefully consider potential unintended consequences—especially related to data publication—that could reduce small business credit access and chill further innovation aimed at better serving small businesses.

Responses to Comments Received

The Bureau agrees with the general comments made in favor of keeping the scope of the proposed rule broad. In general, the Bureau believes that broad coverage of institutions and products as requested by a number of commenters is consistent with the statutory purposes of section 1071. The Bureau does not believe that a more limited approach to scope—including the various limitations on the coverage of certain types of financial institutions and products—would be consistent with the statutory purposes of section 1071. The Bureau addresses these issues directly in the section-by-section analyses of

proposed §§ 1002.104 and 1002.105 below.

*Broad support.* Regarding the comment on the scope of the rule, that the Bureau should continue to monitor U.S. Census data to ensure that its definition of small business in this rule continues in the future to be inclusive enough such that the proportion of non-small minority-owned businesses do not exceed 1 percent of all businesses, the Bureau believes that its adoption of an inflation-adjustment for the gross annual revenue threshold in the definition of small business under § 1002.106(b) should help ensure that, over time, the proportion of businesses covered by the rule does not decline. In any case, the Bureau will monitor data concerning the prevalence of small businesses in the context of the economy at large.

*Broad criticism.* Regarding the comment of a lender that it already complies with fair lending laws, the Bureau notes that continuing enforcement of fair lending laws, and tools such as this data collection rule that facilitate such enforcement, remains necessary because while the commenter may comply with fair lending laws, some lenders may not and a subset of those may repeatedly violate fair lending laws. Additionally, enabling identification of business and community development needs and opportunities is an independent purpose of the statute. Compliance with fair lending laws does not necessarily permit creditors, communities, and governmental entities to identify business and community development needs and opportunities. As to the assertion that the rule would force a choice between compliance and market exit, the Bureau's decision to increase the originations threshold from 25 to 100 transactions will mitigate any risk of such disruptions, even if slight or speculative. Regarding the comment that small business lending is more individualized and highly relationship driven, the Bureau agrees this is true for much small business lending and the final rule is crafted to acknowledge this, as discussed in the section-by-section analyses that follow. But that does not prevent small business lending data from facilitating fair lending enforcement and identifying business and community development needs and opportunities.

As to comments that quarrel with the statutory mandate and question the utility of the data in general terms, the Bureau is bound by the statute and congressional intent. Additionally, many described potentially helpful uses of the data.

AdminRecord-000030

Regarding the assertion that the Dodd-Frank Act was only intended to regulate larger institutions, and that smaller lenders should be exempted from the rule to avoid harming those the Act was intended to protect, the Bureau notes that while much of the Dodd-Frank Act explicitly addresses larger entities, section 1071 does not contain such limitations. Nonetheless, Bureau has made changes in the final rule in response to public comment that will have the effect of reducing compliance burden on small lenders. For example, the Bureau has raised the coverage threshold from 25 to 100 originations for purposes of determining which financial institutions must comply with the rule, provided longer compliance periods for lenders with lower volumes of small business lending, and provided for a variety of safe harbors and a good faith error provision which will provide some leeway to smaller-volume lenders. The Bureau implemented these changes in the final rule to limit its impact on institutions with lower volumes of lending to small businesses. The Bureau has also complied with the Dodd-Frank Act requirements under SBREFA and the RFA to assess and mitigate any impact on smaller financial institutions.

The Bureau addresses the effect of the rule on lending and compliance costs, in its impact analyses in parts IX and X below. Regarding the commenter that stated that the rule would not meet its purposes and would result in restricted, higher-priced credit to the very groups the proposal is meant to benefit, the Bureau's analysis suggests that any changes in the cost of credit would be small and unlikely to lead to a significant change in the per-unit cost of loans to individual applicants even from the smallest lenders. The Bureau has made various changes from the proposal in finalizing this rule intended to mitigate costs for smaller-volume lenders serving small businesses in response to comments expressing concern that credit unions and other financial institutions remain active small business lenders.

Regarding the concern that data from credit unions would not be comparable to data collected from other kinds of lenders, the Bureau observes that, under § 1002.109(b), lenders must provide information on financial institution type. Credit unions thus must self-identify themselves in submitting data to the Bureau, and the various limitations on lending by credit unions can be taken into account in analyses of data collected and reported under this rule.

Regarding the comment that the rule should be modified to support responsible innovation in banking without unintentionally stifling the efficiency and innovation that online lenders may provide, the Bureau agrees that it does not wish to stifle responsible innovation. The Bureau has endeavored to be responsive to these concerns in the final rule; to the extent that specific concerns were raised, they are addressed in other provisions of this preamble. Regarding the comment that the rule as proposed was too complex even for most forward-leaning, technologically adept financial institutions, the Bureau disagrees, noting that while this rule is new, it is not dissimilar to other similar data collection regulations in complexity, such as those for HMDA, CRA, and the CDFI Fund. Further, the Bureau has made a number of changes to this final rule to make compliance easier for smaller-volume lenders, or to exclude them from reporting requirements entirely.

Regarding the comment asserting that the Bureau was overreaching by regulating business loans, the Bureau notes that section 1071 explicitly requires the Bureau promulgate a rule to collect data on applications for business credit.

*The role of online lenders.* Regarding assertions made that nonbank online lenders were important to expanding access to financing for Black- and Hispanic-owned businesses in particular, that traditional lenders provided fewer loans to women-owned and minority-owned small businesses, and that technology improved access and outcomes for small businesses, the Bureau believes that the broader conclusion to draw from these assertions is that the data that will be collected under this rule is needed to assess and further analyze such claims.

*Uniqueness of small business lending.* Regarding the comment that it is not possible to perform comparative analysis on small business loans because they are unique and manually unwritten, the Bureau disagrees. Other commenters, as set out in the section-by-section analysis of § 1002.101, stated that the data points proposed in the NPRM are fulsome and can contribute to sophisticated analysis and comparison of small business loans. Regarding the comment that the Bureau cannot make comparisons absent additional credit metrics beyond those it proposed to collect and that other reviewers of published data could draw incorrect conclusions, the Bureau does not agree that additional credit metrics are necessary in order to draw meaningful analyses from the data. While the Bureau believes, all things equal, that additional data points would enrich the analysis for users of the data, the Bureau also believes that certain of these metrics can be derived, at least in part, from other data points, and it notes that other commenters varyingly opposed any data points proposed pursuant to ECOA section 704B9(e)(2)(H) or requested that the Bureau collect as few data points as possible. Industry comments were also contradictory on this point; while many commenters suggested the Bureau had proposed too many data points, commenters also asserted that the Bureau was not collecting enough data to draw proper conclusions. The Bureau believes its final rule strikes an appropriate balance between comprehensiveness and minimizing burden and complexity to financial institutions.

*Data accuracy.* Regarding comments that the final rule should focus on ensuring the collection and reporting of high-quality data, the Bureau agrees. To this end, it has adjusted various provisions in the final rule in response to comments received. In addition, other changes, while made for other reasons, render moot certain comments on accuracy concerns. For example, the decision not to finalize the proposed visual observation and surname requirement, discussed in the section-by-section analysis of § 1002.107(a)(19)), moots the relevance of comments about the accuracy of visual observation.

*Specific uses of small business lending data.* Regarding the comment that the Bureau should have explained and provided an opportunity for notice and comment for its intended uses of the data collected under this rule, the Bureau disagrees, both that it did not explain what the data would be used for, and that it is obligated to identify specific uses of the data or to provide the public an opportunity to comment on proposed specific uses of the data. Initially, section 1071 itself establishes the intended purposes and uses of the collection and publication of the data—namely, the facilitation of fair lending enforcement and the identification of business and community development needs and opportunities. Next, while section 1071 requires the Bureau to collect and publish data on small business lending applications, it does not require the Bureau to identify its intended uses of the data. Moreover, even if the Bureau articulates specific uses of the data, as the statute explicitly provides, the Bureau is not the only intended user of the data. Enforcement of fair lending laws includes ECOA, which is enforced not only by the Bureau but by many other Federal

agencies.[288] Further, for purposes of identifying business and community development needs and opportunities, the statute specifically names communities, governmental entities, and creditors as potential users of the data collected under this rule. Thus, even if the Bureau disclosed its intended uses—which could change over time depending on the data received and the needs identified— other stakeholders could make different use of the data.

Regarding comments about how the Bureau intends to make the data public, including whether and how it will make such information public, and that the Bureau should carefully consider potential unintended consequences especially related to data publication, the Bureau describes its intended privacy analysis in part VIII below. Regarding concerns that the Bureau might reduce small business credit access and chill further innovation aimed at better serving small businesses, the Bureau has considered various comments concerning access to credit and innovation, which it addresses throughout the section-by-section analyses below.

## 2. Comments Regarding Implementation

### Comments Received

Several commenters said that the Bureau should provide additional implementation or guidance resources about the final rule, specific parts of the rule, or regarding how the rule applies in specific situations. Some of these commenters requested specific forms of guidance or specific resources, such as frequently asked questions, guides, or templates. One commenter said that the final rule should have a table of contents. Some commenters said that the Bureau should provide training on collecting and reporting data or training on how to comply with the rule generally. One commenter said the Bureau should develop a data literacy program. Another commenter said that the Bureau should use all of its available tools to educate and support lenders and their vendors, including no-action letters, advisory opinions, webinars, guides, and other materials.

Some commenters requested specific content in implementation and guidance resources. Many commenters requested additional guidance on specific requirements or data points, and those comments generally are

addressed in the relevant section-by-section analyses later in this part V. Additionally, one commenter said that the Bureau should develop materials showing how to do the research needed to find appropriate regulation sections and related commentary. The same commenter said that implementation and guidance resources should provide examples. Another commenter said that implementation resources should address matters not typically addressed in supervision guides. A few other commenters said that implementation materials should be detailed and/or comprehensive.

A few commenters said that implementation materials and guidance should be provided at specific points in time. Two commenters requested that the Filing Instructions Guide be provided at least six months before data collection is required, and another commenter said that the Filing Instructions Guide should be provided early in the implementation process. This commenter also said that the compliance date should take into account the delayed availability of the Filing Instructions Guide. A different commenter said that guidance should be provided before, during, and after the compliance date.

A few commenters said that the Bureau should develop outreach programs or provide additional access to Bureau staff to address questions or issues that arise during implementation of the rule. One commenter said that the Bureau should commit to a formal request for comments on all facets of implementation and compliance with the rule. This commenter also said that the Bureau should dedicate staff to provide definitive answers to industry members that contact the Bureau and that it should not be possible for community banks to be criticized or penalized for following the instructions or answers obtained from Bureau staff. Another commenter said that, during the implementation period, the Bureau should regularly communicate with vendors and covered financial institutions and consider reasonable extensions of the rule's compliance date if issues that could affect industry preparedness arise.

Another commenter said that the Bureau should create a compliance liaison office that has the primary goal of supporting industry in their regulatory submissions and fair lending analyses. This commenter said that this liaison office would require multiple types of specialists in order to function properly and would need ties to other teams so that feedback loops work properly. This commenter further said

that questions on specific data entry topics should be saved and communicated to the Office of Regulations and others at the Bureau. The commenter said that Bureau guidance provided to individual industry members should be converted into frequently asked questions and tagged for purposes of amending existing regulations. The commenter further said providing verbal guidance is helpful, but slow, and potentially inconsistent. This commenter also alleged that the Bureau does not track data related to questions received and asserted that such lack of tracking limits the responsiveness of the Bureau in adapting regulations to properly include current industry practices. A different commenter said that the Bureau should consider holding a series of public meetings or hearings to take testimony from small businesses, lenders, and trade associations regarding the impact that implementation of the proposed rule will have on each group as well as on the privacy risks inherent in the proposed data collection and public reporting by the Bureau.

Finally, there were two comments on supervision and enforcement related issues. These commenters said that the Bureau should coordinate with other Federal agencies to develop model examination procedures in advance of the Bureau publishing a final rule. One of these commenters further predicted that, absent a clear description of the methodologies that might be employed to perform fair lending analysis, there would likely be a period where prudential regulators' examination expectations are in flux and, perhaps, materially inconsistent.

### Responses to Comments Received

The CFPB aims to provide a wide variety of guidance about the legislative rules it issues pursuant to the Administrative Procedure Act. Although this guidance may include materials such as advisory opinions, interpretive rules, and general statements of policy, the CFPB's guidance more often includes other materials and activities that generally reiterate requirements or positions that previously have been announced in a legislative rule or elsewhere (hereinafter "implementation resources"). These implementation resources include such documents and materials as rule summaries, compliance guides, checklists, factsheets, frequently asked questions, institutional and transactional coverage charts, webinars, and other compliance aids directed to regulated entities, the general public, or agency staff (*e.g.*, staff manuals). In recent years, the CFPB has

---

[288] *See* 15 U.S.C. 1691c (listing Federal agencies with authority to enforce ECOA), 1691e (providing private attorneys, the Department of Justice, and the Department of Housing and Urban Development the authority to bring civil suits to enforce ECOA).

AdminRecord-000032

developed a process for preparing and releasing these implementation resources. For rules such as this one, the CFPB generally engages in a phased approach and attempts to provide various implementation resources throughout the implementation period and for some period after the compliance date.

The CFPB has provided, simultaneously with this rule's release, a Filing Instructions Guide, an executive summary, and other resources to help financial institutions understand and comply with the final rule. These materials are available on the CFPB's website.[289]

Additionally, the CFPB is planning to release a Small Entity Compliance Guide. This Small Entity Compliance Guide will provide a detailed and comprehensive summary of the rule's requirements, will include examples, and will be separate from and different than any examination manuals or other supervisory materials. The CFPB also anticipates providing other written implementation resources to assist industry, vendors, and others. When providing implementation resources, the CFPB will consider all of its available tools and select the tool that it believes is best suited to the content that the CFPB is addressing in the guidance as well as the timing of the guidance. Individuals who would like to be notified when the CFPB releases additional implementation resources or other guidance can sign up to receive notifications. However, with regard to one commenter's request, the CFPB does not anticipate developing materials attempting to show members of industry how to conduct research. The CFPB believes that such materials are outside the scope of the CFPB's implementation and guidance function and are regularly provided by other sources.

With regard to the comments addressing outreach, the CFPB notes that it has and anticipates that it will continue to engage in ongoing outreach related to this rulemaking. As discussed in part III above, the CFPB engaged in considerable outreach to industry and other stakeholders in the years leading up to issuing this final rule, and intends to continue to engage with industry, along with vendors and other stakeholders, as they prepare to comply with the rule. With regard to one commenter's request that the CFPB hold a series of public meetings or hearings to take testimony from small businesses,

lenders, and trade associations regarding the impact that implementation of the proposed rule will have on each group prior to issuance of the final rule, the CFPB did not believe this was needed given the number of substantive comment letters it received and the opportunity provided to stakeholders to submit comments on the proposed rule and its potential impact. Nonetheless, as described in part III.B above, the CFPB has been conducting technical outreach with third-party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report small business lending data to the CFPB. With these software vendors and technical staff, the CFPB has held and, after publication of this final rule, will continue to hold discussions concerning the technical systems and procedures the CFPB will provide for financial institutions to submit data. The CFPB expects that its outreach efforts will provide a channel of communication for industry, vendors, and other parties to constructively provide feedback on the CFPB's existing implementation resources as well as provide direction for future implementation resources.

As set out in more detail above, some commenters said that the CFPB should provide staff to address questions or issues that arise during implementation of the rule. One commenter suggested that the CFPB develop a compliance liaison office. Similar to what it has done with inquiries about HMDA/Regulation C, the CFPB anticipates that it will use its regulatory inquiries function to assist individual inquirers who have specific questions about the rule or how to submit data pursuant to the rule. This function is designed to provide inquirers with brief, informal assistance on regulatory or technical issues. However, in part because of Administrative Procedure Act constraints, the CFPB cannot provide binding or official interpretations through this informal function. In addition, there are other limits on the regulatory inquiries function and on the CFPB's other implementation resources. For example, the CFPB does not provide legal advice through the regulatory inquiries function.

In addition, the CFPB already reviews the inquiries it receives and uses information gleaned from those reviews to help the CFPB prioritize provision of various other types of guidance. Thus, when the CFPB receives multiple individual inquiries about the same topic, the CFPB often prioritizes that topic for webinars and various forms of written guidance, potentially

culminating in revisions to the Official Interpretations or the regulatory text after a notice-and-comment process. Thus, as requested by one commenter, the CFPB already tracks data regarding the inquiries it receives and, as appropriate given the nature of the inquiries and the CFPB's resources, uses them as a basis for frequently asked questions, other implementation resources, or other action. The CFPB anticipates doing the same with inquiries received about this rule.

With regard to the comments related to supervision, the CFPB notes that it will coordinate with other Federal agencies to develop examination procedures in connection with the rule, and anticipates publishing such procedures in advance of the rule's first compliance date.

### 3. Comments Regarding Overlaps With Other Data Reporting Regimes

#### Comments Received

*General comments.* Several commenters cast the overlap between this rule and other Federal data collection rules in a positive light. A community group and a CDFI lender observed that small business lending data are collected piecemeal and haphazardly across multiple agencies—including the Federal bank agencies, the SBA, and the CDFI Fund—and that this rule could be used to consolidate small business lending data reporting across agencies to reduce administrative burden by satisfying requirements across programs for various CRA and fair lending uses.

Two commenters noted that the existence of other data collection regimes, including Federal reporting requirements and private-sector reporting (such as HMDA; the SBA 7(a), 504, and Community Advantage Loan programs; CDFI Fund reporting; the Wells Fargo Diverse Community Capital Program; and the Paycheck Protection Program) suggested that compliance with this rule is feasible because these other data collections make this rule well-understood in conceptual, technological, and procedural terms. One commenter noted that these other data collections cover all but three of the data points in the NPRM (application method, application recipient, and denial reasons).

Several commenters stated their appreciation for the Bureau's attempts to harmonize this rule with others and avoid duplicative data reporting. One bank noted that avoiding duplicative reporting was critical for community banks, for which even slight differences in reporting rules would be

---

[289] See *https://www.consumerfinance.gov/ compliance/compliance-resources/small-business-lending-resources/small-business-lending-collection-and-reporting-requirements.*

burdensome, taking away from time that could be spent with customers.

Many other commenters, including lenders, trade associations, a business advocacy group, and a group of State banking regulators, noted the overlap between this rule and other data collection regimes, and requested that the Bureau harmonize this rule with other similar data reporting regulations, with which lenders were familiar, to minimize challenges, complexity, duplication, potential burden on lenders, and potential errors in the data. These commenters named HMDA/ Regulation C, CRA, FFIEC Call Reports, Regulation B/ECOA, and FinCEN's Beneficial Ownership Rule as specific examples of other rules that the required harmonization with this rule and that, in many cases, the Bureau itself identified as overlapping.

Commenters argued that, by borrowing from existing frameworks or systems, the Bureau could reduce complexity and facilitate industry compliance, allowing financial institutions to leverage existing processes, training and institutional knowledge. For instance, some commenters suggested that the thresholds in this rule be aligned with those of HMDA and CRA. Other commenters suggested that the Bureau could adopt the framework in FinCEN's beneficial ownership rule for this rule's method of determining minority-owned and women-owned status, rather than layering on a new definition of ''primary owners,'' which they suggested would add unneeded complexity to the loan origination process.

Industry commenters also asserted that by aligning this rule with existing rules, such as HMDA and CRA, the Bureau could avoid imposing inconsistent or duplicative reporting requirements to avoid errors from regulatory confusion and urged the Bureau to avoid requiring lenders to report different data for the same transaction.

Several other commenters identified other concerns with overlapping reporting. One bank noted that, while the Bureau tried to harmonize its requirements with other rules, even slight deviations between rules cause problems, which may confuse customers and make them more likely to refuse to provide data. Another bank noted that some HMDA and CRA data aggregation and submission systems rely upon identifiers to separate and process these different datasets, which the bank suggested was another reason to keep loans reportable under this rule separate from those reportable with HMDA.

A number of industry commenters and a group of State banking regulators requested that the Bureau not require financial institutions to duplicate their work. One stated that banks already report a significant amount of data to prudential regulators, and that the Bureau should eliminate duplicative reporting. Other commenters asked that the Bureau work with Federal agencies to align this rule with the FFIEC Call Report, and CRA and HMDA regulations to avoid duplication, reduce compliance burden, and reduce the potential for data errors. Two banks urged the Bureau to exempt loans reportable under other data reporting regimes, such as HMDA- and CRA-reportable loans. Another noted that its staff is trained on the established requirements of HMDA and CRA, and that removing duplicative or inconsistent requirements would reduce compliance costs, providing savings that could be passed on to the borrowers. Two community-oriented lenders suggested that the Bureau exempt all credit applications under Federal agency programs, as the data points proposed in this rule are already collected by that loan program's oversight agency (*i.e.*, SBA, USDA, etc.).

Two industry commenters suggested that the Bureau should first use existing small business lending data published by the government and private sector before collecting additional data, thereby assessing the small business finance market without negatively impacting providers of capital to entrepreneurs. One bank asserted that the Bureau itself admitted it had enough data to analyze the small business lending market, and that the rule should focus on collecting data from non-depository institutions, as it would be duplicative to collect data from depositories, which provide data via the FFIEC and NCUA Call Reports and already have a history of being regulated.

Some industry commenters generally requested that the Bureau work out inconsistencies between this rule and other data collection regimes. Some offered more specific requests for harmonization. One suggested more alignment in terms of scope, coverage and exemptions between this rule, HMDA and CRA. Another commenter identified inconsistencies with existing Regulation B, citing the difference between its small business definition ($1 million or less in revenue) and the NPRM's proposed definition ($5 million or less). A CDFI lender observed that CDFIs report lending activity to the CDFI Fund, SBA, CRA, Opportunity Finance Network's annual member survey, and credit reporting agencies, and requested that the Bureau standardize data formats to match those used in CDFI Fund reporting to streamline data collection and minimize burden on CDFIs.

*HMDA.* A number of commenters identified overlap between this rule and HMDA/Regulation C, and noted that duplicative data would published in two places. Some industry commenters requested that the Bureau avoid inconsistent and duplicative reporting by excluding from HMDA reporting transactions reportable under this rule. Two trade association suggested a parallel rulemaking to amend Regulation C, timed with the release of this final rule.

On the other hand, other commenters suggested that HMDA-reportable loans should be excluded from this rule to avoid duplicative reporting, undue compliance burden, and regulatory confusion. A business advocacy group noted that the Bureau itself identified the overlap between HMDA-reportable loans and loans covered by this rule. A trade association suggested the Bureau could narrowly tailor an exemption by apply the rule only to financial institutions that report data under HMDA, without an exclusion for HMDA-reportable loans by lenders that are not HMDA reporters, arguing that a narrowly tailored exclusion would serve the statutory purposes of the rule because commercial mortgage loans for small businesses would be captured under HMDA or this rule. A bank believed that duplicative reporting of HMDA-reportable applications did not serve the statutory purposes of the rule. A large bank disagreed with the Bureau's assertion that excluding HMDA-reportable transactions from this rule would add complexity to the analysis of data by requiring lenders to find and delete HMDA-reportable transactions from its submission to the Bureau; the bank argued that duplicative reporting was more complex. One lender stated that farm credit data are already collected from Farm Credit System lenders subject to HMDA.

A number of commenters identified, generally, inconsistencies between the proposed requirements for this rule and those of HMDA/Regulation C. Many industry commenters pointed out that many proposed data points in the NPRM would be similar to data points in Regulation C, and expressed concern that any differences in reporting requirements for these data points would lead to confusion and data errors. Two trade associations asserted that the overlap in data would create significant

AdminRecord-000034

and needless complexities for covered lenders, and noted that there were inconsistencies between the rules despite the Bureau's attempts to limit them.

Several lenders requested that the Bureau harmonize this rule with Regulation C to the extent possible if no exemptions were possible. A large bank asked that the Bureau harmonize several data points—action taken, application date, and ethnicity, race, and sex of principal owners—because lenders would be able to collect these data just once for each small business applicant, increasing efficiency in the application process and facilitating compliance.

Some commenters addressed overlap between specific data points proposed in the NPRM and existing data point requirements under Regulation C. A number of industry commenters noted that for census tract, HMDA uses the tract where collateral is located while the Bureau proposed to use a waterfall approach of several addresses. Two lenders pointed out that HMDA does not have the firewall requirement proposed for this rule in the NPRM; one of these commenters suggested that the final rule follow the HMDA approach (no firewall) for HMDA-reportable loans.

On the reporting of ethnicity, race, and sex of principal owners, two lenders noted that this rule and HMDA offer different answer choices. One of the commenters noted that lenders would provide two separate questionnaires regarding ethnicity, race, and sex for a single loan application, which could confuse applicants and make them decline to answer either one.

Several lenders noted that the proposed visual observation and surname provision, which does not require its use to determine the sex of a principal owner, was not aligned with the visual observation and surname requirement under Regulation C, which does require its use to determine the sex of a mortgage applicant. One stated that this disparity would cause confusion and errors in data collection. Another stated that for a loan application covered by both rules, the disparity would mean complying with one rule and violating the other.

Regarding credit purpose, a bank noted that a loan to a small business to purchase, improve, or refinance an apartment building would require different information to be collected and reported under both rules.

On action taken, one bank noted a disparity between the approaches of the proposed rule (one option for "incomplete" as an action taken) and of Regulation C (two different

incompleteness options—one for a loan denial and the other for file closure) that it believed would cause difficulty, despite agreeing with the proposed rule's approach. Another bank noted that the proposed rule would require collection of gross annual revenue for the past fiscal year, while Regulation C requires the income used for the credit decision.

*Community Reinvestment Act.* A number of commenters noted the similarities between the small business and small farm data collected under CRA and this rule and suggested eliminating duplication. One community group stated that the data for this rule should replace CRA data, noting that this rule could replace the inconsistent, duplicative and inefficient collection of small business lending data with a comprehensive database. The commenter stated that lenders and community groups both would prefer to consult with one database than to contend with two or more that are collected annually, and that this rule is likely to capture more data than the current CRA system. A bank suggested eliminating CRA reporting requirement as data collected under this rule would duplicate and surpass the CRA data points, but would not be interoperable as each rule would require different formatting, rounding, or coding. A minority business advocacy group and a joint letter from community and business advocacy groups requested that 1071 data be used for CRA examinations, just as HMDA data are. These commenters noted that current small business small farm data for CRA examinations is limited and not a good indication of whether lenders serve the most vulnerable businesses, and that the more robust dataset to be collected under this rule would be a better indicator.

One bank asked that the Bureau work with other Federal regulators to eliminate duplication with CRA data reporting, noting that CRA data already provides a good picture of lending to small business including agriculture. Another bank suggested that the Bureau, rather than create a new data collection requirement, exempt federally insured depositories and work with other Federal regulators to enrich existing CRA reporting to include the data the Bureau wants to collect under section 1071. The commenter noted that insured depositories already have robust CRA reporting systems, and generally already collect and report data required by the NPRM to meet CRA obligations. The bank stated that the use of CRA systems to report 1071 data would result in the faster delivery of information the

Bureau needs at lower cost to reporters. The bank also suggested that the CFPB should focus this rule on non-depository institutions that do not now have robust reporting requirements. The commenter also stated that institutions are already comfortable with CRA reporting and understand how regulators use such information, but noted that they did not understand how data collected pursuant to section 1071 would be used and was concerned the Bureau would use it to retaliate and micromanage lenders, as it did in the consumer lending space.

A number of lenders asked that the Bureau work collaboratively with the prudential regulators to eliminate inconsistencies and duplication with CRA data reporting. A CDFI lender asserted that successful implementation of this rule would necessitate coordination of data requirements and encouraged the Bureau to coordinate with the CRA agencies to align rules to ensure that lenders covered by CRA continue to meet credit and community development needs of small businesses, particularly those owned by women and minorities. One bank noted that duplicate and inconsistent requirements would increase the compliance burden on lenders as well as data errors, and that inconsistent data reporting would require more resources without adding value. A bank stated that inconsistent definitions could cause community stakeholders to misinterpret data and draw incorrect conclusions regarding a lender's performance.

One bank supported a more streamlined approach taking advantage of existing CRA processes and definitions to reduce costs and burdens related to this rule, which in turn would ease burdens on lenders and reduce costs that would ultimately be passed on to the borrower. Another commenter suggested that the Bureau work closely with the agencies working on the modernization of CRA rules to reduce duplication and the friction caused by differences between the rules.

A number of commenters identified specific areas of inconsistency between the CRA and this rule. Several banks and a trade association noted that the small business definition proposed in the NPRM, businesses with gross annual revenue greater than $5 million, was inconsistent with the CRA definition, which included an asset threshold and originated loans less than $1 million. One bank stated that this discrepancy was likely to cause staff confusion and possible data integrity issues. A trade association requested that the Bureau adopt the CRA's small business definition using a loan size of $1 million

and other Federal laws to create alignment for those lenders that already comply with existing regulations, and that a focus on businesses with $1 million in revenues would support the Bureau's goal of promoting small business lending in underserved areas to underserved small businesses, that are more likely to be closer to $1 million rather than $5 million in revenue. Two banks stated that banks may receive more CRA credit for small business loans originated to businesses with $1 million or less in gross annual revenues.

Several commenters noted that the rule proposed a waterfall approach to using addresses to determine census tract, while CRA regulations inquire only about where loan funds are used. One bank commented that this meant that a single loan could result in the reporting of different census tracts for purposes of the two rules. Another bank suggested that a better way to achieve consistency with CRA was to allow lenders reporting under this rule to choose which of the three addresses to use and require the institution to report which address type it used.

Some industry commenters noted that the Bureau reduce its gross annual revenue threshold for its small business definition under this rule from $5 million to $1 million to align with CRA. A trade association noted that the $1 million threshold would align with the threshold for FFIEC Call Reports and for existing Regulation B, which requires tracking of loans to businesses with $1 million or less in revenue for purposes of sending adverse action notices under § 1002.9(a)(3). The commenter also stated that using this threshold would also mean that other data from this rule could be compared with CRA data, leading to a better evaluation of a bank's small business lending performance.

One bank stated that a discrepancy between this rule and CRA on the revenue threshold could lead to errors, given the many manual processes still used. Another bank asserted that a $5 million threshold would capture applications from businesses it did not consider small.

Several trade associations claimed that the proposed rule did not treat renewals and extensions the way CRA regulations do.

*SBA.* Several commenters stated that SBA-reportable loans should be exempt from the rule, including loans under the SBA 7(a) and 504 programs. One commenter stated that the Bureau should work with SBA to select reportable data elements and then obtain them from the SBA on loans and application denials to ease the reporting burden of SBA lenders, and that the

majority of applications are already captured by third-party lending partners in the 504 program.

One bank stated that the Bureau's proposed small business definition is too broad and may capture entities that are not true small businesses. The commenter originated many multi-family loans to entities formed for the sole purpose of investing in real estate, not to run a small business, and asserted that the proposed definition would capture entities not consistent with SBA's definition of small business based on number of employees by industry and would be consistent with the spirit of section 1071, and that this would skew data.

*FinCEN.* One bank stated that data reported under this rule would be better provided through other means, such as FinCEN's recent business database and registry.

*CDFI Fund.* Some commenters, including a number of community-oriented lenders and community groups, stated that the Bureau should work with the CDFI Fund to streamline integrating the data from this rule with that of the CDFI Fund. Several commenters stated that new requirements from the CDFI Fund will likely expand transaction level reporting requirements to all certified CDFIs. One CDFI lender noted that the CDFI Fund's review and improvement to its current annual reporting process could create an opportunity to harmonize its definition, types of data collection, and timing of reporting with the Bureau. Another CDFI lender stated that the Bureau should work with the CDFI Fund to ensure that reporting requirements are aligned; CDFIs are currently required by Federal law to collect, maintain, and report specific demographic data about small businesses and consumers to ensure they serve their target communities. Several others stated that the Bureau should work with the CDFI Fund and loan software providers to streamline the process of integrating new data collection processes into existing systems. Some commenters noted that certain CDFIs must report data points such as interest rate, origination, points and fees, amortization type, loan term, and payment dates to the CDFI Fund. Several also pointed out that some CDFIs also report on loans to the SBA, to Federal prudential banking regulators pursuant to the CRA, and to a non-profit's annual member survey.

One lender stated that CDFIs have long sought guidance from the Bureau on compliance with overlapping statutory requirements from the CDFI Fund, ECOA, and Regulation B, and

recommended that the Bureau use this rulemaking process to clarify data collection requirements in coordination with the CDFI Fund to avoid potential conflicts.

Several commenters said that some CDFIs will have to adjust processes and systems to comply with this rule, that the CDFI industry uses several different loan software products, and providers continually modify systems to comply with the CDFI Fund's reporting requirements.

One commenter stated that the Bureau should collect credit score, as CDFI Fund does, because it permits an "apples-to-apples" comparison of loans to help determine if small businesses that have historically struggled to access responsible loans receive credit on identical terms as white-owned businesses. The commenter also said that the burden to collect this would be minimal, as many CDFIs already report it to the CDFI Fund.

*Farm Credit.* An agricultural lender stated that a lack of understanding of the Farm Credit System by the Bureau would have unintended and detrimental consequences for those lenders' customers. The lender noted that these lenders institutions already report lending on Young, Beginning and Small lending efforts and volume (12 CFR 614.4165) to the Farm Credit Administration.

*Agency cooperation.* One bank suggested that the Bureau work with SBA to create more women-owned and minority-owned business programs, such as diversity loan programs to help the underserved, noting that the Dodd-Frank Act was passed as a reaction to the practices of larger lenders but would affect smaller lenders disproportionately.

A State financial regulator requested that the Bureau work with State regulators to provide them data. The commenter noted that the NPRM proposed modifications or deletions to protect privacy interests but was silent on whether the Bureau would share unredacted data with State regulators, and urged the Bureau to include in the final rule express language permitting the Bureau to share data collected under this rule with State regulators in accordance with information sharing agreements. The commenter noted that such data will help State regulators identify fair lending violations and enforce anti-discrimination laws.

Responses to Comments Received

*General comments on overlap.* The CFPB acknowledges the general comments concerning the overlap between this rule and other data

AdminRecord-000036

collection regimes, and general requests that the Bureau harmonize this rule with other similar data reporting regulations. The CFPB recognizes the overlap with other rules and in this final rule has made attempts to minimize the challenges, complexity, and duplication of effort, as well as potential errors in the data. In some instances, duplicate reporting will be eliminated—this rule will not require the reporting of any HMDA-reportable applications, and proposed amendments to CRA regulations would eliminate reporting on small business and small farm reporting to be replaced exclusively by data from this rule. In addition, the CFPB attempted wherever possible (*i.e.,* consistent with its statutory authorities under this rule) to borrow concepts or structures from other rules, such as FinCEN's customer due diligence rule. The CFPB also intends to continue to coordinate with other agencies to further harmonize this final rule with other similar regulations.

Regarding the requests that the Bureau not require financial institutions that already report data to duplicate their work, or that the Bureau exempt all loan applications under Federal agency programs, the CFPB has made certain adjustments in the final rule. As noted above, duplicate reporting will be eliminated for HMDA-reportable loans and, pursuant to proposed amendments to CRA regulations, under the CRA. However, other data reporting regulations have purposes sufficiently different from those of this rule such that the regulations are not completely overlapping, and that the simple elimination of one of the two reporting requirements would not advance both regulations. For instance, data reported via FFIEC Call Reports are not motivated only by considerations of fair lending and community development. In addition, such other reporting requirements address only originations, while section 1071 requires reporting on applications.

Regarding the comment that the Bureau should first use existing small business lending data generated by the government and private sector before collecting additional data, Congress disagreed when it passed section 1071 calling for data on small business lending applications. Existing data capture only limited application-level data on lending to small businesses by depository institutions, and hardly any application-level data on lending to small businesses by non-depository institutions.

Regarding requests that the CFPB work out inconsistencies between this rule and other data collection regimes,

and that the Bureau standardize data formats to match those used in other data reporting, especially for CDFIs, the CFPB has attempted to do so in this final rule where consistent with section 1071's statutory purposes. In addition, the CFPB intends to work with agencies and other sources of small business lending data to explore other possible avenues for additional standardization.

*HMDA.* Regarding the identification of overlap between this rule and HMDA/Regulation C, and the requests to avoid duplicative reporting, the CFPB is exempting HMDA-reportable transactions from the requirements of this rule. This new provision would have the effect of eliminating inconsistencies between the two rules, the duplication of data collection and reporting, and potential data errors. However, the Bureau is not adopting a more narrowly tailored exclusion that would not apply to HMDA-reportable loans by financial institutions that are not HMDA reporters. For the reasons set out in the section-by-section analysis of § 1002.104(b)(2), the CFPB has determined that trying to close all potential data gaps would defeat the purpose of trying to alleviate concerns from commenters about having to implement and maintain two separate reporting systems. The CFPB's decision to exempt HMDA-reportable transactions also renders moot comments concerning inconsistencies between specific data points in Regulation C and those proposed for this rule, along with the firewall requirement.

*Community Reinvestment Act.* Regarding the comments identifying the similarities between the data required by this rule and the requirements of the CRA, and the request that the data of this rule replace the data for the CRA, the CFPB notes that, as stated in part II.F.2.i above, the CRA agencies have issued a proposed rule that, amongst other things, would exclusively rely on 1071 data for its assessment of the small business and small farm lending activities of banks, replacing the existing CRA data requirements based on Call Reports and other sources. The CFPB believes that when the final rule amending the CRA requirements is issued, duplication between the CRA and this rule will be eliminated, as requested by numerous commenters, including industry and community groups. As some community groups suggested, the CRA proposal contemplates using 1071 data for CRA examinations in the manner that HMDA data are currently used in CRA examinations. The CFPB agrees with these commenters that 1071 data would

be more robust than the data currently collected under existing CRA rules.

Regarding the various request that the Bureau work with other Federal regulators to eliminate duplication, the CFPB observes that the CRA agencies appear to intend with their proposed rule to eliminate duplicative reporting by both relying on the Bureau's small business lending data and eliminating any independent data collection requirement. The CFPB intends to continue cooperating with the CRA agencies to ensure coordination between this rule and amendments to the CRA regulations, especially those concerning potentially duplicative reporting.

Regarding the comments that the Bureau should exempt lenders that report under the CRA, the CFPB does not believe such an exemption would be appropriate. In addition, in light of the CRA's proposal to use data collected and reported pursuant to section 1071, the result of such an exemption might be that no small business lending data would be collected for such institutions.

Regarding the comments that identified specific inconsistencies between the CRA and this rule, the CFPB does not disagree that the inconsistencies identified exist but notes that the CRA's proposal that the CRA agencies rely exclusively on 1071 data for their analysis of small business and small farm lending would render these inconsistencies moot because only 1071 data would exist. Regarding the comment that the Bureau should reduce its gross annual revenue threshold for its small business definition under this rule from $5 million to $1 million to align with FFIEC Call Reports and for Regulation B, the CFPB is not doing so for the reasons set out in the section-by-section analysis of § 1002.106(b). The CFPB believes that a small business definition with a lower threshold would not further the statutory purposes of the rule because it would reduce the amount of data collected concerning lending to many businesses that, according to other metrics would still be considered small though above $1 million in revenue. In addition, the Bureau believes that analyses seeking to match or compare data from this rule that are interoperable with small business lending data from FFIEC need only screen this rule's data for gross annual revenue of less than $1 million, which this rule requires as a data point. For instance, the CRA NPRM proposes screening the 1071 data for loans to small businesses and small farms under $1 million revenue for purposes of certain parts of CRA examinations.

*SBA.* The CFPB is not exempting SBA-guaranteed loans from reporting

AdminRecord-000037

under this rule. For its 7(a) and 504 programs, the SBA only collects and publishes a subset of the data required by this rule for originations. Still, the CFPB intends to coordinate with SBA to try to reduce duplicative reporting.

*FinCEN.* Regarding the comment that the data reported under this rule would be better provided through other means, such as via FinCEN's recent business database and registry, the CFPB understands that database is not set up to receive small business lending data.

*CDFI Fund.* Regarding comments that the Bureau should work with the CDFI Fund to harmonize reporting under the CDFI Fund's Transaction Level Report requirements with this rule, the CFPB agrees to coordinate with the CDFI Fund to determine where it is possible to avoid duplicative or inconsistent reporting of data and how to resolve any overlapping statutory requirements. The CFPB observes that it may not be possible to simply eliminate duplicate reporting, as with HMDA or CRA reporting, given the differences in purposes and the requirements of the CDFI Fund compared to those of this rule. Regarding comments that the Bureau should work with loan software providers, the CFPB agrees and intends to meet with software providers as it develops the small business lending data submission platform to determine how reporting can be streamlined for CDFIs that must report small business lending data to various agencies, such as the CFPB under this rule, the SBA, and the CDFI Fund.

Regarding the comment that the Bureau should collect credit score, as CDFI Fund does, the CFPB notes that, as stated in the section-by-section analysis of § 1002.107(a), the CFPB believes that this data point—which the CFPB would also have to collect from other financial institutions that may have operations quite different from CDFIs—could be quite complicated and involve complex sub-fields, which could pose operational difficulties for financial institutions in collecting and reporting this information.

*Farm Credit.* Regarding the comments that the Bureau's lack of understanding of the Farm Credit System would have unintended and detrimental consequences for FCS customers, and that the FCS lenders already report data to the Farm Credit Administration, the CFPB has consulted with FCS lenders, and believes that its approach will result in consistency across the data collected under this rule, more robust fair lending analyses and transparency into opportunities for small farms, and a more even playing field for

compliance across all financial institutions.

*Agency cooperation.* Regarding the comment that the Bureau work with SBA to create more women-owned and minority-owned business programs, the CFPB regularly engages with other Federal regulators on a range of work that implicates its statutory mission; that includes, as appropriate, the SBA. Regarding the request that the Bureau provide small business lending data to State regulators, the CFPB agrees that doing so would likely be consistent with the statutory purposes of the rule. The CFPB will engage with State and Federal regulators regarding their access to small business lending data collected under this final rule, while ensuring that data security and data privacy are appropriately protected.

### E. Cross-Cutting Interpretive Issues

1. The Bureau's Approach to Non-Small Women-Owned and Minority-Owned Businesses in This Rulemaking

ECOA section 704B(b) states that ''in the case of any application to a financial institution for credit for [a] women-owned, minority-owned, or small business,'' the financial institution must ''inquire whether the business is a women-owned, minority-owned or small business. . . .'' As explained below, the Bureau proposed to require financial institutions to collect and report data regarding applications for credit for small businesses; the Bureau did not, however, propose to require financial institutions to collect and report data with respect to applicants that are *not* small businesses.

The Bureau believed that section 1071 was ambiguous with respect to its coverage of applications for credit for non-small women- or minority-owned businesses, and the Bureau therefore proposed to interpret this ambiguity pursuant to ECOA section 704B(g)(1). The Bureau acknowledged that the plain language of 704B(b) could be read to require financial institutions to collect information from all women-owned and minority-owned businesses, including those that are not small businesses. But based on a close consideration of the text, structure, and purpose of the statute, and the interactions between section 1071 and other provisions of ECOA and Regulation B, the Bureau believed that the statute's coverage of, and Congress's intent with respect to, data regarding non-small businesses was ambiguous. The Bureau proposed this approach as an interpretation of the statute pursuant to its authority under 704B(g)(1), and, in the alternative, pursuant to both its authority under

704B(g)(2) to adopt exceptions to any requirement of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071 and its implied *de minimis* authority.

The Bureau sought comment on its proposed approach to limiting the scope of data collection pursuant to subpart B to covered applications for small businesses, but not women- or minority-owned businesses that are not small.

Several commenters, including industry and community groups, supported limiting the scope of data collection as the Bureau proposed. In particular, a cross-sector group of lenders, community groups, and small business advocates stated that the Bureau had taken a reasonable and adequately comprehensive approach in proposing to include only minority- and women-owned businesses that are ''small,'' as this would cover 99.9 percent of all minority- and women-owned businesses. The group further noted that the Bureau should continue to monitor the U.S. Census Bureau's Annual Business Survey and adjust this requirement if minority- or women-owned businesses that are not considered ''small'' exceed 1 percent. In contrast, a State financial regulator commented that data collection on non-small women- or minority-owned businesses was important for fair lending enforcement purposes and would provide for better consistency with States pursuing similar information collection requirements. In response to the latter comment, the Bureau notes that such data collection would be of limited utility in light of section 1071's statutory purposes because, as discussed below, the lack of a control group (*i.e.,* data on non-small businesses that are neither women-owned nor minority-owned) would limit such data's utility for fair lending enforcement purposes. For the reasons set forth herein, the Bureau is finalizing the approach to non-small women-owned and minority-owned businesses as proposed.

The Bureau interprets ECOA section 704B(b) and (b)(1) to require that financial institutions first determine whether an applicant is a small business within the scope of the rule's data collection before making the required inquiries that would otherwise be prohibited by existing Regulation B. There is a general prohibition in existing Regulation B (in § 1002.5(b)) which states that a ''creditor shall not *inquire* about the race, color, religion, national origin, or sex of an applicant or any other person in connection with a credit transaction, except if expressly permitted to do so by law or regulation.

AdminRecord-000038

In the introductory language to ECOA section 704B(b), Congress instructed that section 1071's data collection regime applies only "*in the case of* any application to a financial institution for credit for women-owned, minority-owned, or small business" (emphasis added). The Bureau believes that "in the case of" indicates Congress's intent to limit application of section 1071 to these types of businesses, rather than requiring financial institutions to make 1071-related inquiries of all business applicants for credit.[290] The next paragraph (704B(b)(1)) does not use the conditional phrase "in the case of" used in 704B(b); rather, it instructs a financial institution to "inquire." The Bureau believes that the instruction to "inquire" in 704B(b)(1) is intended to provide the necessary exception to Regulation B's general prohibition against "inquir[ing]" as to protected demographic information in connection with a credit transaction.[291] Indeed, absent section 1071's lifting of the prohibition, generally, a financial institution could not determine, or even ask about, an applicant's women- or minority-owned business status, because doing so would necessarily constitute "inquir[ing] about the race, color, religion, national origin, or sex of an applicant" in violation of existing § 1002.5(b). The Bureau believes that Congress likely intended to ensure that financial institutions could determine whether section 1071's data collection and reporting requirements apply to an applicant without risking a violation of other provisions of ECOA and Regulation B.

However, unlike with women- and minority-owned business status, there is no legal impediment to a financial institution determining whether an applicant is a small business, and financial institutions can make that determination as a threshold matter without risking running afoul of ECOA and Regulation B. Therefore, the Bureau believes that the scope of the introductory "in the case of" language in ECOA section 704(b) is ambiguous as to coverage of non-small women- and minority-owned businesses. To resolve this ambiguity, the Bureau applies its expertise in interpreting the language and structure of section 1071 within the context of the general prohibition on inquiring into protected demographic information in existing § 1002.5(b), and concludes that ECOA section 704B(b)(1) is best read as only referring to questions about applicants' protected demographic information (*i.e.,* women- and minority-owned business status as well as the ethnicity, race, and sex of the principal owners of the business). The Bureau believes 704B(b)'s more general "in the case of" language should be understood to indicate the conditions under which data collection should take place, and requires financial institutions to make a threshold determination that an applicant is a small business before proceeding with an inquiry into the applicant's protected demographic information.

A requirement to collect and report data on applications for women-owned and minority-owned businesses that are not small businesses could affect all aspects of financial institutions' commercial lending operations while resulting in limited information beyond what would already be collected and reported about women-owned and minority-owned small businesses. Indeed, as a cross-sector group of lenders, community groups, and small business advocates highlighted, approximately 99.9 percent of women- and minority-owned business are small.[292] In addition, financing for large businesses can be much more varied and complex than are the products used for small business lending The Bureau will continue to observe the market on this issue.

The Bureau also notes that the collection of data on applications for non-small women- or minority-owned businesses would not carry out either of section 1071's statutory purposes because the data would be of only limited usefulness for conducting the relevant analyses of non-small businesses. Such analyses would necessitate comparing data regarding non-small women-owned and minority-owned business applicants to data regarding non-small non-women-owned and non-minority-owned business applicants, in order to control for lending outcomes that result from differences in applicant size. But section 1071 does not require or otherwise address the collection of data for non-small business applicants that are not women- or minority-owned. Therefore, the resulting dataset will lack a control group, arguably the most meaningful comparator for any data on non-small women- or minority-owned businesses. It is unlikely that Congress intended, and the statute is reasonably read not to require, the collection of data that would be of limited utility.[293]

Finally, the Bureau notes that the title of section 1071 is "Small Business Data Collection," and section 1071 amends ECOA to add a new section titled "Small Business Loan Data Collection." In the presence of ambiguity, these titles provide some additional evidence that Congress did not intend the statute to authorize the collection of data on businesses that are not small.[294]

For these reasons, the Bureau interprets ECOA section 704B(b) to cover the collection only of data with respect to small businesses, including those that are women- and minority-owned. Likewise, as discussed immediately below in E.2 of this *Overview* to part V, the Bureau is clarifying that the 704B(b)(1) inquiry, when applicable, pertains to an applicant's minority-owned business status and women-owned business status, as well as an applicant's LGBTQI+-owned business status, along with the ethnicity, race, and sex of its principal owners. For the same reasons, the Bureau believes that not requiring the collection of data with respect to applications for non-small businesses would be necessary or appropriate to carry out the purposes of section 1071; in the alternative, the Bureau exercises its exception authority in 704B(g)(2) to effectuate this outcome. Finally, because

---

[290] Merriam-Webster defines "case" as meaning "a set of circumstances or conditions," "a situation requiring investigation or action (as by the police)," or "the object of investigation or consideration," *https://www.merriam-webster.com/dictionary/case* (last visited Mar. 20, 2023).

[291] As discussed in greater detail in the next section, the fact that the language of ECOA section 704B(b)(1) is designed to expressly permit inquiry into protected demographic information, which would otherwise be prohibited by existing § 1002.5(b), is also evidenced by the statute's three provisions creating special protections for responses to the inquiry: 704B(b)(2) requires that responses to inquiries about protected demographic information remain separate from the application and accompanying information; 704B(c) requires that applicants have a right to refuse to answer the inquiry about protected demographic information; and 704B(d) requires that certain underwriters or other employees involved in making determinations on an application not have access to the responses to inquiries about protected demographic information.

[292] In the U.S. Census Bureau's 2018 Annual Business Survey, 5.7 million firms (99.6 percent of all employer firms) are small, as defined within that survey as having fewer than 500 employees. That same definition covers one million minority-owned employer firms (99.9 percent of all minority-owned firms) and 1.1 million women-owned employer firms (99.9 percent of all women-owned firms). *See* U.S. Census Bureau, *2018 Annual Business Survey (ABS)—Company Summary* (2018), *https://www.census.gov/data/tables/2018/econ/abs/2018-abs-company-summary.html*.

[293] *See, e.g.,* Pub. Citizen v. *U.S. Dep't of Just.,* 491 U.S. 440, 454 (1989) ("Where the literal reading of a statutory term would 'compel an odd result,' *Green* v. *Bock Laundry Machine Co.,* 490 U.S. 504, 509 (1989), we must search for other evidence of congressional intent to lend the term its proper scope.").

[294] *Almendarez-Torres* v. *United States,* 523 U.S. 224, 234 (1998) (" '[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute.") (quoting *Bhd. of R.R. Trainmen* v. *Balt. & Ohio R.R.,* 331 U.S. 519, 529 (1947)).

AdminRecord-000039

the Bureau believes that the collection of data on non-small women- and minority-owned businesses would "yield a gain of trivial or no value," in the alternative the Bureau exercises its implied *de minimis* authority to create this exception.[295]

### 2. The Meaning of "Information Requested Pursuant to Subsection (b)"

Four different provisions of section 1071 refer to or rely on "information requested pursuant to subsection (b)" or similar language. First, ECOA section 704B(b)(2) provides that financial institutions must "maintain a record of the responses to such inquiry" and keep those records separate from the application and information that accompanies it. Second, 704B(c) states that applicants for credit "may refuse to provide any information requested pursuant to subsection (b)." Third, 704B(d) requires financial institutions to limit the access of certain employees to "information provided by the applicant pursuant to a request under subsection (b)," with certain exceptions. Fourth, 704B(e) instructs financial institutions that "information provided by any loan applicant pursuant to a request under subsection (b) . . . shall be itemized in order to clearly and conspicuously disclose" data including the loan type and purpose, amount of credit applied for and approved, and gross annual revenue.

In light of these four disparate provisions, the Bureau believes that section 1071 is ambiguous with respect to the meaning of "any information provided by the applicant pursuant to a request under subsection (b)."[296] On the one hand, ECOA section 704B(b)(1) directs financial institutions to inquire whether a business is "a women-owned, minority-owned, or small business," so the phrase could be interpreted as referring only to those three data points. Section 704B(e), however, indicates that the scope of 704B(b) could be much broader; it suggests that all of the information that financial institutions are required to compile and maintain— not simply an applicant's status as a women-owned, minority-owned, or small business—constitutes information provided by an applicant "pursuant to a request under subsection (b)." But as noted above, information deemed provided pursuant to subsection (b) is

subject to the notable protections of separate recordkeeping under 704B(b)(2), a right to refuse under 704B(c), and the firewall under 704B(d). Applying these special protections to many of the data points in 704B(e), such as gross annual revenue or amount applied for, would be extremely difficult to implement, because this information is critical to financial institutions' ordinary operations in making credit decisions. Additionally, 704B(e) describes as "provided by any loan applicant" under 704B(b) data points that plainly must come from the financial institution itself, such as application number and action taken, further suggesting that Congress viewed this term as encompassing more information than lies within the four corners of 704B(b)(1). Finally, as noted above, the circular structure of 704B(b) complicates the question of what constitutes information provided "pursuant to a request under subsection (b)." Read together, the introductory language in 704B(b) and (b)(1) direct financial institutions, "in the case of" a credit application "for [1] women-owned, [2] minority-owned, or [3] small business," to "inquire whether the business is a [1] women-owned, [2] minority-owned, or [3] small business." The Bureau believes that this circularity further demonstrates the ambiguity of the phrase "pursuant to a request under subsection (b)."

The Bureau believes that it is reasonable to resolve these ambiguities by giving different meanings to the phrase "any information provided by the applicant pursuant to a request under subsection (b)" (or similar) with respect to ECOA section 704B(e) as opposed to 704B(b)(2), (c), and (d).[297] With respect to 704B(e), the Bureau interprets the phrase to refer to all the data points now articulated in proposed § 1002.107(a). Section 704B(e) is the source of financial institutions' obligation to "compile and maintain" data that they must then submit to the Bureau, so it would be reasonable to interpret this paragraph as referring to

the complete data collection Congress devised in enacting section 1071.

But with respect to the three statutory provisions creating special protections for certain information—the firewall in ECOA section 704B(d), separate recordkeeping in 704B(b)(2), and the right to refuse in 704B(c)—the Bureau interprets the phrase to refer to the data points in § 1002.107(a)(18) (women-owned and minority-owned business statuses, along with the new LGBTQI+-owned business status), and (a)(19) (ethnicity, race, and sex of principal owners).[298] Each of these data points requests protected demographic information that has no bearing on the creditworthiness of the applicant, about which existing § 1002.5(b) would generally prohibit the financial institution from inquiring absent section 1071's mandate to collect and report that information, and with respect to which applicants are protected from discrimination. The Bureau accordingly believes that it is reasonable to apply section 1071's special-protection provisions only to this information, regardless of whether the statutory authority to collect it originates in 704B(b)(1) (women-owned and minority-owned business statuses), 704B(e)(2)(H) (LGBTQI+-owned business status), or 704B(e)(2)(G) (ethnicity, race, and sex of principal owners). The Bureau similarly believes that it would have been unreasonable for Congress to have intended that these special protections would apply to any of the other data points now proposed in § 1002.107(a), which the financial institution is permitted to request regardless of coverage under section 1071 which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting and other purposes.

The Bureau implements these interpretations of "information requested pursuant to subsection (b)," and any relevant comments received, in several different section-by-section analyses. With respect to ECOA section 704B(e), the Bureau discusses its interpretation of the phrase in the section-by-section analysis of § 1002.107(a). The Bureau's interpretation of 704B(d)'s firewall requirement is addressed at greater length in the section-by-section analysis of § 1002.108, and the Bureau's interpretation of the separate recordkeeping requirement in 704B(b)(2) is addressed in the section-

---

[295] *Waterkeeper All. v. EPA,* 853 F.3d 527, 530 (D.C. Cir. 2017) (quoting *Pub. Citizen v. FTC,* 869 F.2d 1541, 1556 (D.C. Cir. 1989)); *see Alabama Power Co. v. Costle,* 636 F.2d 323, 360–61 (D.C. Cir. 1979).

[296] The Bureau does not believe that the minor linguistic variations in these four provisions themselves have significance.

[297] While there is a presumption that a phrase appearing in multiple parts of a statute has the same meaning in each, "this is no more than a presumption. It can be rebutted by evidence that Congress intended the words to be interpreted differently in each section, or to leave a gap for the agency to fill." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,* 846 F.3d 492, 532 (2d Cir. 2017) (citing *Env't Def. v. Duke Energy Corp.,* 549 U.S. 561, 575 (2007)). Here, the Bureau believes Congress indicated such an intention by using the same phrase in the substantially different contexts of providing special protections for protected demographic information on the one hand and "itemiz[ing]" all collected data on the other.

[298] The Bureau's interpretations with respect to a separate data point for small business status are discussed in the next section.

AdminRecord-000040

by-section analysis of § 1002.111(b). The right to refuse in 704B(c) is discussed in the section-by-section analyses of the data points that the Bureau deems subject to the right to refuse: § 1002.107(a)(18) (women-owned, minority-owned, and LGBTQI+-owned business statuses) and (19) (ethnicity, race, and sex of principal owners).

3. No Collection of Small Business Status as a Data Point

The Bureau notes that neither of its interpretations of "information requested pursuant to subsection (b)" reference a specific data point for an applicant's status as a small business, nor did the Bureau otherwise include in proposed § 1002.107(a) that financial institutions collect, maintain, or submit a data point whose sole function is to state whether the applicant is or is not a small business.

The Bureau's definition of small business in final § 1002.106, which is based on an applicant's gross annual revenue, renders redundant any requirement that financial institutions collect a standalone data point whose sole purpose is to state whether an applicant is a small business. Indeed, under the definition of small business, when a financial institution asks an applicant its gross annual revenue, that question is functionally identical to asking, "are you a small business?" The Bureau believes that it is a reasonable interpretation of ECOA section 704B(b)'s query as to small business status for that question to take the form of, "what is your gross annual revenue?" [299] Furthermore, as discussed above with respect to the Bureau's approach to non-small women- and minority-owned businesses, the Bureau interprets financial institutions' data collection obligations as attaching only in the case of applications from small businesses; if a financial institution determines that an applicant is not a small business, none of the obligations under this rule would apply. As such, a standalone data point that serves only to designate whether a business qualifies as small for purposes of the rule would be redundant with the mere fact that the data collection occurs at all, as well as with the collection of gross annual revenue.

The Bureau sought comment on whether a standalone data point solely

dedicated to small business status might nonetheless be useful and, if so, how it might be implemented. The Bureau received no comments on this issue.

The Bureau acknowledges that the plain language of ECOA section 704B(b) could be read to require financial institutions to ask applicants subject to the data collection the precise question, "are you a small business?" Upon further analysis, however, the Bureau believes that Congress's intended treatment of small business status as a standalone data point is ambiguous. As described in more detail above with respect to the rulemaking's coverage of women- and minority-owned businesses that are not small, 704B(b)'s introductory language and 704B(b)(1) appear to require financial institutions to know the answer to whether an applicant is women-owned, minority-owned, or small before they make their inquiry; to resolve this ambiguity, the Bureau interprets 704B(b)'s introductory language and 704B(b)(1) to require that financial institutions first straightforwardly assess whether an applicant is a small business before proceeding to inquire into the applicant's protected demographic information that would otherwise be prohibited by existing § 1002.5(b).

Pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules as may be necessary to carry out, enforce, and compile data pursuant to section 1071, the Bureau interprets 704B(b) and (b)(1) to obviate the need for financial institutions to collect a standalone data point whose sole purpose is to note an applicant's small business status. For the same reasons, the Bureau believes that not requiring the collection of a separate data point on small business status would be necessary or appropriate to carry out the purposes of section 1071; therefore, in the alternative, the Bureau is exercising its exception authority in 704B(g)(2) to effectuate this outcome. Finally, because the Bureau believes that the collection of a standalone data point on small business status would "yield a gain of trivial or no value," in the alternative, the Bureau exercises its implied *de minimis* authority to create this exception.[300]

*F. Conforming Amendments to Existing Regulation B*

As discussed above, the Bureau is implementing section 1071 in a new subpart B of Regulation B. The content of existing Regulation B is becoming

subpart A of Regulation B. This change does not affect the current section numbering in Regulation B. The Bureau believes it is appropriate to make this rule a part of Regulation B, as section 1071 is a part of ECOA.

The Bureau sought comment on whether it should instead codify its rule to implement section 1071 as a free-standing regulation with its own CFR part and, if so, why. A bank commenter supported the location of this rule within a new subpart B to Regulation B, noting that lenders often overlook that Regulation B applies to business as well as consumer credit. The commenter also noted that the intent of section 1071, to provide all credit applicants fair and equitable treatment and credit, makes Regulation B the natural place for this rule, rather than a free-standing regulation, which would generate unnecessary confusion.

As noted above and as discussed in more detail below, the Bureau is amending existing § 1002.5(a)(4) and commentary for existing § 1002.5(a)(2) and (4) to expressly permit under certain circumstances voluntary collection of minority-owned, women-owned, and LGBTQI+-owned business status, and the ethnicity, race, and sex of applicants' principal owners in accordance with the requirements of subpart B.

In addition, the Bureau is revising certain references to the entire regulation (which use the terms "regulation" or "part") in existing Regulation B to instead refer specifically to subpart A. The Bureau is likewise adding additional specificity in certain provisions in existing Regulation B to avoid confusion. The Bureau does not intend to make any substantive changes with these revisions, but rather intends to maintain the status quo. The Bureau is making the following changes:

In § 1002.1(a), regarding authority and scope, the Bureau is changing two references to "part" to instead refer to "subpart," regarding the application of what is now subpart A to creditors.

In § 1002.2, regarding definitions, the introductory text states that definitions contained therein apply to Regulation B, unless the context indicates otherwise. The Bureau is adding "or as otherwise defined in subpart B" for clarity.

In § 1002.12(b)(1) introductory text, (b)(2) introductory text, (b)(3) through (5) and (7), regarding record retention, the Bureau is adding "or as otherwise provided in subpart B" to indicate that subpart B may provide different record retention requirements than what is set forth in those paragraphs for business credit. The Bureau is also changing a reference to "this rule" in comment

---

[299] The financial institution could ask, in order to make an initial determination as to whether the rule applies, whether the applicant's gross annual revenue in its last full fiscal year was $5 million or less. If it was, the financial institution would need to request the specific revenue amount to comply with final § 1002.107(a)(14), along with the other applicant-provided data points specified in final § 1002.107(a).

[300] *Waterkeeper All.,* 853 F.3d at 530 (quoting *Pub. Citizen,* 869 F.2d at 1556); *see Alabama Power,* 636 F.2d at 360–61.

12(b)(7)–1 to instead refer to existing § 1002.12(b)(7) regarding retention of prescreened credit solicitations, to avoid confusion with subpart B's treatment of solicitations.

Finally, § 1002.13 addresses information for monitoring purposes for credit secured by an applicant's dwelling. The Bureau is revising comment 13(b)–5, which addresses applications made through unaffiliated loan shopping services, to refer to subpart A of Regulation B instead of the entirety of Regulation B, for clarity. The existing comment also refers to applications received by creditors subject to HMDA and associated data collection requirements; the Bureau is also adding to the end of the comment an additional sentence noting that creditors that are covered financial institutions under subpart B of this regulation may also be required to collect, report, and maintain certain data, as set forth in subpart B of Regulation B.

*Subpart A—General*

*Section 1002.5  Rules Concerning Requests for Information*

5(a) General Rules

5(a)(4) Other Permissible Collection of Information

Background

ECOA prohibits creditors from discriminating against applicants, with respect to any aspect of a credit transaction, on the basis of—among other characteristics—race, color, religion, national origin, sex, marital status, or age.[301] It also states that making an inquiry under 15 U.S.C. 1691c–2 (that is, section 1071), in accordance with the requirements of that section, shall not constitute discrimination for purposes of ECOA.[302] Regulation B, in existing § 1002.5(b), generally prohibits a creditor from inquiring about certain protected demographic information in connection with a credit transaction. Existing § 1002.5(a)(2), however, expressly permits collection of such otherwise prohibited information if required by a regulation, order, or agreement to monitor or enforce compliance with Regulation B, ECOA, or other Federal or State law or regulation.

In 2017, the Bureau amended Regulation B, adding § 1002.5(a)(4) to expressly permit creditors to collect ethnicity, race, and sex from mortgage applicants in certain cases where the creditor is not required to report under

HMDA and Regulation C.[303] For example, existing § 1002.5(a)(4) expressly permits the collection of ethnicity, race, and sex information for certain transactions for which Regulation C permits optional reporting. However, nothing in existing Regulation B (or in ECOA) expressly permits collection and reporting of protected demographic data for financial institutions that are not required to report certain data under section 1071.

During the SBREFA process, some small entity representatives, primarily small CDFIs and mission-oriented community banks, stated that they would be inclined to collect and report small business lending data to the Bureau even if not required to do so, such as if they fell under loan-volume thresholds. These small entity representatives expressed an intent to report data even if not required to out of a belief in the importance and utility of these data.

Proposed Rule

The Bureau proposed to amend existing § 1002.5(a)(4) to add three provisions (in proposed § 1002.5(a)(4)(vii), (viii), and (ix)) that would permit certain creditors that are not covered financial institutions under the rule to collect small business applicants' protected demographic information under certain circumstances. The Bureau also proposed to add comment 5(a)(2)–4 and to revise existing comment 5(a)(4)–1 to provide guidance on these proposed exemptions.

Proposed § 1002.5(a)(4)(vii) would have permitted a previously covered financial institution to collect demographic information pursuant to subpart B for covered applications for up to five years after it fell below the loan-volume threshold of proposed § 1002.105(b), provided that it does so in accordance with the relevant requirements of proposed subpart B.

Proposed § 1002.5(a)(4)(viii) would have provided that a creditor in its first year of exceeding the covered financial institution loan-threshold in § 1002.105(b) may, in the second year collect demographic information pursuant to subpart B for covered applications, provided that it does so in accordance with the relevant requirements of proposed subpart B.

Proposed § 1002.5(a)(4)(ix) would have permitted a financial institution not covered by the rule that wishes to voluntarily report small business

lending data to collect applicants' protected demographic information without violating Regulation B. Unlike creditors subject to proposed § 1002.5(a)(4)(vii) or (viii), a creditor seeking to voluntarily collect applicant's protected demographic information under proposed § 1002.5(a)(4)(ix) would also be required to report it to the Bureau.

Existing comment 5(a)(4)–1 addresses recordkeeping requirements for ethnicity, race, and sex information that is voluntarily collected for HMDA under the existing provisions of § 1002.5(a)(4). The Bureau proposed revising this comment by adding to it a parallel reference to proposed subpart B, along with a statement that the information collected pursuant to proposed subpart B must be retained pursuant to the requirements set forth in proposed § 1002.111.

Proposed comment 5(a)(2)–4 would have explained that proposed subpart B of Regulation B generally requires creditors that are covered financial institutions as defined in proposed § 1002.105(a) to collect and report information about the ethnicity, race, and sex of the principal owners of applicants for certain small business credit, as well as whether the applicant is a minority-owned business or a women-owned business as defined in proposed § 1002.102(m) and (s), respectively. The Bureau proposed this comment for parity with existing comment 5(a)(2)–2, which addresses the requirement to collect and report information about the ethnicity, race, and sex of applicants under HMDA. Existing comment 5(a)(2)–3 explains that persons such as loan brokers and correspondents do not violate ECOA or Regulation B if they collect information that they are otherwise prohibited from collecting, where the purpose of collecting the information is to provide it to a creditor that is subject to HMDA or another Federal or State statute or regulation requiring data collection.

The Bureau sought comment on its three proposed provisions to be added to existing § 1002.5(a)(4), and associated commentary, including whether there were other specific situations to add to the list of provisions in § 1002.5(a)(4) to permit the collection of applicants' protected demographic information pursuant to section 1071, and whether any similar modifications to other provisions were necessary. In particular, the Bureau sought comment on whether it should add another provision to § 1002.5(a)(4) relating to proposed § 1002.114(c)(1), wherein the Bureau proposed to permit financial institutions to collect, but would not require them

---

[301] 15 U.S.C. 1691(a).
[302] 15 U.S.C. 1691(b)(5).

[303] *Equal Credit Opportunity Act (Regulation B) Ethnicity and Race Information Collection,* 82 FR 45680, 45684 (Oct. 2, 2017).

AdminRecord-000042

**35192**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

to report, applicants' protected demographic information prior to the compliance date.

Comments Received

The Bureau received comments on this provision from several industry commenters, a business advocacy group, and a community group. The community group supported the reasoning and approach of the proposed provisions. The commenter inquired whether the provisions would allow for voluntary reporting of only the protected demographic data, or all data points, noting that if the Bureau intended only to permit voluntary data collection of demographic information that it would not make sense to permit publication of these data points, and that the usefulness of such incomplete data would be limited. A business advocacy group applauded the Bureau for the proposed provisions and recommended that the Bureau add incentives for voluntary disclosure of data for those financial institutions, but asked that the incentives not distort the purposes of the regulation by encouraging lenders to report inaccurate or untrue data to reap the benefits of the incentive to report.[304]

A community group commented that the Bureau should permit voluntary collection not only by financial institutions not covered by the rule, but also should permit covered financial institutions to collect data on consumer credit used to fund small businesses.[304]

Two agricultural lenders requested that the Bureau exempt Farm Credit System (FCS) lenders entirely from coverage under the rule while also adding a provision to the proposed voluntary reporting provisions stating that FCS lenders may submit a supplemental voluntary collection of data that is not otherwise already being provided to the public.

Final Rule

For the reasons set forth herein, the Bureau is finalizing amendments to existing § 1002.5(a)(4) introductory text and three provisions (in final § 1002.5(a)(4)(vii), (viii), and (ix)) that permit certain creditors that are not covered financial institutions under the rule to collect small business applicants' protected demographic information under certain circumstances. The

Bureau is also adopting new § 1002.5(a)(4)(x) to similarly address information collected about multiple co-applicants. The Bureau is finalizing comment 5(a)(2)–4 along with its revision to existing comment 5(a)(4)–1 providing guidance on these new exemptions. The Bureau is additionally revising existing comment 5(a)(4)–3, as discussed below. These provisions contain updated cross-references to other sections in the final regulatory text and commentary, as well as addition of LGBTQI+-owned business status to accompany references to women- and minority-owned business statuses.

Final § 1002.5(a)(4)(vii) provides that creditor that was required to report small business lending data pursuant to final § 1002.109 for any of the preceding five calendar years but is not currently a covered financial institution under final § 1002.105(b) may collect protected demographic information pursuant to subpart B for covered applications from small businesses as defined in final §§ 1002.103 and 1002.106(b) if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to final §§ 1002.107(a)(18) and (19), 1002.108, 1002.111, and 1002.112 for those applications. Final § 1002.5(a)(4)(vii) also states that such a creditor is permitted, but not required, to report data to the Bureau collected pursuant to subpart B if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.109 and 1002.110.

The Bureau anticipates that some creditors that are no longer covered financial institutions and thus no longer required to report data in a given reporting year may prefer to continue to collect applicants' protected demographic information in the event they become a covered financial institution again, in order to maintain consistent compliance standards from year to year. As it did in a similar context for HMDA reporting, the Bureau believes that permitting such collection for five years provides an appropriate time frame under which a financial institution should be permitted to continue collecting the information without having to change its compliance processes. The Bureau believes that a five-year period is sufficient to help an institution discern whether it is likely to have to report small business lending data in the near future but not so long as to permit it to collect such information in a period too attenuated from previous reporting.

Final § 1002.5(a)(4)(viii) provides a creditor that exceeded the loan-volume

threshold in the first year of the two-year threshold period provided in final § 1002.105(b) may, in the second year, collect protected demographic information pursuant to subpart B for covered applications from small businesses as defined in final §§ 1002.103 and 1002.106(b) if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to final §§ 1002.107(a)(18) and (19), 1002.108, 1002.111, and 1002.112 for that application. Final § 1002.5(a)(4)(viii) also states that such a creditor is permitted, but not required, to report data to the Bureau collected pursuant to subpart B if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.109 and 1002.110. The Bureau believes that this provision will benefit creditors when the creditor has not previously reported small business lending data but expects to be covered in the following year and wishes to prepare for that future reporting obligation. For example, where a creditor surpasses the loan-volume threshold of final § 1002.105(b) for the first time in a given calendar year, it may wish to begin collecting applicants' protected demographic information for covered applications received in the next calendar year (second calendar year) so as to ensure its compliance systems are fully functional before it is required to collect and report information pursuant to subpart B in the following calendar year (third calendar year).

Final § 1002.5(a)(4)(ix) provides that a creditor that is not currently a covered financial institution under final § 1002.105(b), and is not otherwise a creditor to which final § 1002.5(a)(4)(vii) or (viii) applies, may collect protected demographic information pursuant to subpart B for covered applications from small businesses as defined in final §§ 1002.103 and 1002.106(b) for a transaction if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to final §§ 1002.107 through 1002.112 for that application. Voluntarily reported data pursuant to final § 1002.5(a)(4)(ix) may add some information that otherwise would not be collected and reported, and which would further both the statutory purposes of section 1071 without requiring reporting from very low-volume financial institutions that may find it difficult or costly to report data.

The Bureau is finalizing § 1002.5(a)(4)(ix) in response to feedback from some small entity

---

[304] The Bureau addresses comments regarding the reporting of non-covered products in the section-by-section analysis of § 1002.104(b), under the heading *Voluntary Reporting.* While the final rule does not permit the voluntary reporting of non-covered products, the Bureau has implemented a safe harbor in § 1002.112(c)(4) for financial institutions that collect data on applications for products that turn out not to be covered credit transactions.

representatives and other stakeholders at SBREFA, as well as several NPRM commenters, that indicated lenders might want to collect and report small business lending data even if they were not required to do so.

New § 1002.5(a)(4)(x) provides that a creditor that is collecting information pursuant to subpart B or as described in §§ 1002.5(a)(4)(vii) through (ix) for covered applications from small businesses as defined in §§ 1002.103 and 1002.106(b) regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners may also collect that same information for any co-applicants provided that it also complies with the relevant requirements of subpart B of this part or as described in paragraphs (a)(4)(vii) through (ix) of this section with respect to those co-applicants.

The Bureau is adding § 1002.5(a)(4)(x) to permit creditors to collect information pursuant to subpart B regarding co-applicants for a covered application for a small business. Existing § 1002.5(a)(4) does not explicitly address whether creditors have permission to collect demographic information for co-applicants for a covered application for a small business, and the Bureau implements new § 1002.5(a)(4)(x) to remove any doubt that creditors that are permitted to collection information pursuant to subpart B on an applicant for covered applications for a small business pursuant to §§ 1002.5(a)(4)(vii) through (ix) is also permitted to collect such information for co-applicants as well, even if the financial institution will only report information regarding a single designated applicant per new comment 103(a)–10. As described below, final comment 103(a)–10 provides that if a covered financial institution receives a covered application from multiple businesses that are not affiliates, it shall compile, maintain, and report data for only a single applicant that is a small business. The Bureau believes that it may be easier and more efficient for financial institutions to request the same information of all co-applicants—new § 1002.5(a)(4)(x) will enable financial institutions to collect small business lending data from unreported co-applicants without violating ECOA and Regulation B's general prohibition against collecting protected demographic information.

The Bureau believes that it is an appropriate use of its statutory authority

under sections 703(a) and 704B(g)(1) of ECOA to permit creditors to collect, and for § 1002.5(a)(4)(ix) report, protected demographic information in the manner set out in § 1002.5(a)(4)(vii) through (x). These provisions will effectuate the purposes of and facilitate compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071. Section 1002.5(a)(4)(vii) will permit creditors to collect information without interruption from year to year, thereby facilitating compliance with the rule's data collection requirements and improving the quality and reliability of the data collected. Section 1002.5(a)(4)(viii) improves the quality and reliability of the data collected by financial institutions that may be transitioning into being required to collect and report 1071 data, and will provide a creditor assurance of compliance with existing § 1002.5 regardless of whether it actually becomes subject to subpart B reporting at the end of the two-year threshold period. Section 1002.5(a)(4)(ix) will potentially increase the collection of additional information and amount of data available for analysis, thereby advancing the purposes of section 1071. Finally, § 1002.5(a)(4)(x) will permit collection of demographic information for co-applicants, thereby reducing operational complexity to allow creditors to focus on data quality and reliability. The Bureau also believes that these provisions are narrowly tailored and preserves and respects the general limitations in existing § 1002.5(b) through (d).

The Bureau is also revising existing comment 5(a)(2)–3, which explains that persons such as loan brokers and correspondents do not violate ECOA or Regulation B if they collect information that they are otherwise prohibited from collecting, where the purpose of collecting the information is to provide it to a creditor that is subject to HMDA or another Federal or State statute or regulation requiring data collection. The Bureau stated its belief in the NPRM that the reference to "another Federal statute or regulation" adequately encompassed section 1071 and subpart B, and thus did not propose to amend this existing comment. However, upon further reflection, the Bureau has determined to revise the provision specifically to reference subpart B for the sake of further clarity and the avoidance of doubt that loan brokers and other persons collecting applicants' protected demographic information on behalf of covered financial institutions pursuant to this final rule are not

violating ECOA or Regulation B by doing so. The Bureau believes that it is an appropriate use of its general authority under ECOA sections 703(a) and 704B(g)(1) to permit such persons to collect protected demographic information on behalf of covered financial institutions, as such collection will effectuate the purposes of and facilitate compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071.

The Bureau is finalizing comment 5(a)(2)–4, which defines the phrase "information required by subpart B," with revisions to add cross-references to LGBTQI+-owned businesses, as defined in § 1002.102(l). Final comment 5(a)(2)–4 addresses the requirement under this final rule that creditors that are covered financial institutions as defined in § 1002.105(a) collect and report information about the ethnicity, race, and sex of the principal owners of applicants for certain small business credit, as well as whether the applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, as defined in § 1002.102(m), (s), and (l), respectively. The Bureau is finalizing this comment for parity with existing comment 5(a)(2)–2, which addresses the requirement to collect and report information about the ethnicity, race, and sex of applicants under HMDA. The Bureau believes that it is an appropriate use of its general authority under ECOA sections 703(a) and 704B(g)(1) to specify the meaning of "information required by subpart B," by adding comment 5(a)(2)–4 and that the clarity and certainty this provision adds will effectuate the purposes of and facilitates compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071.

Finally, the Bureau is finalizing its revisions to existing comment 5(a)(4)–1 as proposed. The existing comment establishes recordkeeping requirements for ethnicity, race, and sex information that is voluntarily collected for HMDA under the existing provisions of § 1002.5(a)(4). The revisions to comment 5(a)(4)–1 likewise provide that protected demographic information that is not required to be collected pursuant to subpart B may nevertheless be collected under the circumstances set forth in § 1002.5(a)(4) without violating existing § 1002.5(b), and that the information collected pursuant to this final rule must be retained pursuant to the requirements set forth in final § 1002.111. The Bureau is revising this comment to provide for parity between this final rule and existing references to voluntary collection of data pursuant to HMDA. The Bureau believes that these

revisions are an appropriate use of its general authority under ECOA sections 703(a) and 704B(g)(1) as these revisions provide clarity and certainty to financial institutions in their voluntary collection of applicants' protected demographic information. Such clarity and certainty effectuate the purposes of and facilitates compliance with ECOA and these revisions are necessary to carry out, enforce, and compile data pursuant to section 1071.

Regarding a commenter's request to clarify whether these amendments permit voluntary reporting only as to data points concerning protected demographic data, the Bureau observes that nothing prohibits creditors from collecting any of the information set forth in final § 1002.107, other than the protected demographic information in § 1002.107(a)(18) and (19). Creditors that choose to collect protected demographic information pursuant to final § 1002.5(a)(4)(ix) must comply with § 1002.109 (along with other specified provisions), which means that they must collect and report all the required data specified in final § 1002.107.

The Bureau is not adding incentives for voluntary disclosure of data for creditors that are not covered financial institutions, as suggested by one commenter. It appears, based on SBREFA and NPRM comments, that some creditors already have an incentive to collect and report small business lending data pursuant to section 1071 even if they are not covered financial institutions under the rule; it is unclear what additional incentives the Bureau could offer to encourage other creditors to do the same. Regarding ensuring that reported data are not distorted, however, the Bureau notes that voluntary reporters must identify themselves as such pursuant to final § 1002.109(b)(10) and, a creditor voluntarily collecting and reporting data pursuant to final § 1002.5(a)(4)(ix) must do so in compliance with §§ 1002.107 through 1002.112 and 1002.114.

Regarding the comment that the visual observation and surname requirement would cause certain covered institutions to violate the prohibition in 12 CFR 202.5(b) from inquiring about the race, color, religion, national origin, or sex of an applicant or any other person in connection with a credit transaction, the Bureau notes that the concern is moot because the Bureau is not finalizing its proposed provisions for collecting principal owners' ethnicity and race via visual observation or surname in certain circumstances. (See the section-by-section analysis of

§ 1002.107(a)(19) for a detailed discussion of this change.) In any case, a creditor is permitted to make such inquiries under existing § 1002.5(a)(2), given that the provision permits the collection of demographic information when required to do so by another law or regulation (which includes this rule).

The Bureau addresses potential voluntary collection and reporting of data regarding non-covered products, including consumer-designated credit used for small business purposes, in the section-by-section analysis of § 1002.104(b) below. Based on its determination not to permit voluntary collection of data for such non-covered products, the Bureau is not adding an additional provision to § 1002.5(a)(4) to address such collection.

As discussed in the section-by-section analyses of §§ 1002.104(a) and 1002.105(b), the Bureau is not excluding agricultural lending or FCS lenders from coverage under this final rule. The commenter's request to permit supplemental voluntary collection and reporting of data by exempt FCS lenders if such data are not otherwise already being provided to the public is thus moot. Of course, any FCS lenders that are not covered financial institutions could nonetheless voluntarily collect and report data pursuant to final § 1002.5(a)(4)(ix).

### Subpart B—Small Business Lending Data Collection

### Section 1002.101   Authority, Purpose, and Scope

Proposed § 1002.101 would have set forth the authority, purpose, and scope for proposed subpart B. The Bureau sought comment on its proposed approach to this section, including whether any other information on the rule's authority, purpose, or scope should be addressed herein.

The Bureau did not receive any comments specifically regarding its recitation of the authority, purpose, and scope of subpart B. Comments addressing the authority, purpose, and scope of section 1071 and this final rule as a general matter are addressed in D.1 in the *Overview* to this part V above.

The Bureau is finalizing § 1002.101 as proposed. Final § 1002.101(a) provides that subpart B is issued by the Bureau pursuant to section 704B of ECOA (15 U.S.C. 1691c–2), and states that, except as otherwise provided therein, subpart B applies to covered financial institutions, as defined in § 1002.105(b), other than a person excluded from coverage of this part by section 1029 of the Dodd-Frank Act. Final § 1002.101(b) sets out section 1071's two statutory purposes of

facilitating fair lending enforcement and enabling the identification of business and community development needs and opportunities for women-owned, minority-owned, and small businesses.

### Section 1002.102   Definitions

The Bureau is finalizing a number of definitions for terms used in subpart B, in § 1002.102.[305] These definitions generally fall into several categories. First, some definitions in final § 1002.102 refer to terms defined elsewhere in subpart B—specifically, the terms business, covered application, covered credit transaction, covered financial institution, financial institution, and small business are defined in final §§ 1002.106(a), 1002.103, 1002.104, 1002.105(b), 1002.105(a), and 1002.106(b), respectively. These terms are of particular importance in subpart B, and the Bureau is defining them in separate sections, rather than in § 1002.102, for ease of reading.

Second, some terms in final § 1002.102 are defined by cross-referencing the definitions of terms defined in existing Regulation B—specifically, business credit, credit, and State are defined by reference to existing § 1002.2(g), (j), and (aa), respectively. Similarly, a portion of the small business and affiliate definitions refer to the SBA's regulation at 13 CFR 121.103. These terms are each used in subpart B, and the Bureau believes it is appropriate to incorporate them into the subpart B definitions in this manner.

Finally, the remaining terms are defined directly in final § 1002.102. These include applicant, closed-end credit transaction, LGBTQI+ individual, LGBTQI+-owned business, minority-owned business, open-end credit transaction, principal owner, small business lending application register, and women-owned business, as well as a portion of the definition of affiliate. Some of these definitions draw on definitions in existing Regulation B or elsewhere in Federal laws or regulations.

The Bureau believes that basing this rule's definitions on previously defined terms (whether in Regulation B or regulations promulgated by another agency), to the extent possible, will

---

[305] The Bureau notes that there are certain terms defined in subpart B outside of final § 1002.102. This occurs where a definition is relevant only to a particular section. For example, the firewall provisions in final § 1002.108 use the phrases "involved in making any determination concerning a covered application" and "should have access." Those phrases are defined in § 1002.108(a). Such definitions are discussed in detail in the section-by-section analyses of the provisions in which they appear.

AdminRecord-000045

minimize regulatory uncertainty and facilitate regulatory compliance, particularly where the other regulations are likely to apply to the same transactions. As discussed further below, in certain instances, the Bureau is deviating from the existing definitions for purposes of this rule.

These definitions are each discussed in detail below. The Bureau is finalizing these definitions pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. In addition, the Bureau is finalizing certain of these definitions to implement particular definitions in section 1071 including the statutory definitions set out in 704B(h). Any other authorities that the Bureau is relying on to finalize certain definitions are discussed in the section-by-section analyses of those specific definitions.

### 102(a) Affiliate

Proposed Rule

The Bureau proposed § 1002.102(a) to define "affiliate" based on whether the term is used to refer to a financial institution or to an applicant.

Proposed § 1002.102(a) would have defined "affiliate" with respect to a financial institution as any company that controls, is controlled by, or is under common control with, another company, as set forth in the Bank Holding Company Act of 1956.[306] Existing Regulation B does not define affiliate. This proposed definition would have provided a consistent approach with the Bureau's Regulation C, which applies the term to financial institutions, as defined in Regulation C, for certain reporting obligations.[307]

Proposed § 1002.102(a) would have defined "affiliate" with respect to a business or an applicant as having the same meaning as described in 13 CFR 121.103, which is an SBA regulation titled "How does SBA determine affiliation?" The proposed definition would have provided consistency with the Bureau's proposed approach to what constitutes a small business for purposes of section 1071 in proposed § 1002.106(b). Proposed § 1002.107(a)(14) would have permitted, but not required, a financial institution to report the gross annual revenue for the applicant in a manner that includes the revenue of affiliates as well. In proposed § 1002.107(a)(16), workers for affiliates of the applicant would be counted in certain circumstances for the number of workers data point.

The Bureau sought comment on its proposed approach to this definition.

Comments Received

Several industry commenters provided feedback on the Bureau's proposed definition of "affiliate." A joint letter from several trade associations asked the Bureau to provide clarification on how the definition of "affiliate" applies in the context of commercial real estate lending. Two other commenters objected to the Bureau's proposed reference to the SBA definition to determine affiliate of a small business because it can be changed by the SBA and the commenters recommended that the Bureau simplify the definition.

The Bureau did not receive comments on the proposed definition of "affiliate" with respect to a financial institution.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.102(a) as proposed. The Bureau believes it is appropriate to define "affiliate" with respect to financial institutions to be consistent with the approach in the Bureau's Regulation C, and received no comments suggesting it should do otherwise. The consistency with an existing regulatory definition may help provide clarity for financial institutions when determining their responsibilities under this final rule.

Regarding commenters' suggestions to simplify the definition of "affiliate," the Bureau does not believe it would be appropriate to deviate from the SBA's definition for determining who is an affiliate with respect to a business or an applicant. ECOA section 704B(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[308] Consistent with the statute, the Bureau's definitions of business and small business in final § 1002.106 refer to definitions in the SBA's regulations, of which the SBA's definition of affiliate in 13 CFR 121.103 is a part. The Bureau believes that defining "affiliate" in this manner is appropriate and necessary to maintain consistency with the SBA's definitions. In addition, the Bureau believes that using a commonly known existing regulatory definition will facilitate compliance with reporting obligations under this final rule. Finally, the Bureau believes the SBA's definition of affiliate is sufficiently broad to afford financial institutions flexibility in the small business size determination process, as

discussed below in the section-by-section analysis of § 1002.106(b).

The Bureau addresses the comment regarding how the definition of "affiliate" applies in the context of commercial real estate lending in the section-by-section analysis of § 1002.106(b)(1) below.

### 102(b) Applicant

Proposed § 1002.102(b) would have defined "applicant" to mean any person who requests or who has received an extension of business credit from a financial institution. The term "applicant" is undefined in section 1071. Proposed § 1002.102(b) was based on the definition of applicant in existing Regulation B, though for consistency with other parts of the proposed rule, it added a limitation that the credit be business credit and uses the term financial institution instead of creditor. It also omitted the references to other persons who are or may become contractually liable regarding an extension of credit such as guarantors, sureties, endorsers, and similar parties. The Bureau acknowledged that including other such persons could exceed the scope of the data collection anticipated by section 1071. Including them could also make the data collection more difficult as financial institutions might need to report data points (such as gross annual revenue, NAICS code, time in business, and others) regarding multiple persons in connection with a single application. The Bureau believed that collecting such information on guarantors, sureties, endorsers, and similar parties would likely not support section 1071's business and community development purpose.

The Bureau sought comment on its proposed approach to this definition and received one comment in response. The commenter requested that the Bureau clarify that loans jointly made to multiple borrowers, where one or more of the borrowers may qualify as a small business under the rule but are not the primary business(es) seeking the funding, are not subject to the reporting requirements.

For the reasons discussed herein, the Bureau is finalizing § 1002.102(b) as proposed. The Bureau believes it is appropriate to base the definition of applicant for purposes of new subpart B on the definition of applicant in existing Regulation B, with the limitation that the credit be business credit and using the term financial institution instead of creditor. The Bureau likewise believes that it is appropriate to limit the definition of applicant in subpart B to only those persons who request, or have

---

[306] 12 U.S.C. 1841 et seq.
[307] See Regulation C comment 4(a)(11)–3.

[308] 15 U.S.C. 632.

received, an extension of business credit from a financial institution. As such, the definition of applicant in final § 1002.102(b) does not include other persons who are or may become contractually liable regarding an extension of business credit such as guarantors, sureties, endorsers, and similar parties. As stated in final comment 102(b)–1, in no way are the limitations to the term applicant in § 1002.102(b) intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term applicant in existing § 1002.2(e) as applicable to existing Regulation B.

In response to the comment regarding loans jointly made to multiple borrowers, the Bureau does not believe that a modification to the definition of applicant is necessary. Rather, the Bureau is adding comment 103(a)–10 to address data collection and reporting if a covered financial institution receives a covered application from co-applicant businesses that are not affiliates, as defined in final § 1002.102(a). Final comment 103(a)–10 provides that if a covered financial institution receives a covered application from multiple businesses that are not affiliates, as defined by final § 1002.102(a), it shall compile, maintain, and report data pursuant to final §§ 1002.107 through 1002.109 for only a single applicant that is a small business, as defined in final § 1002.106(b). A covered financial institution shall establish consistent procedures for designating a single small business for purposes of collecting and reporting data under subpart B in situations where there is more than one small business co-applicant, such as reporting on the first small business listed on an application form. In addition, the Bureau notes that—if the applicants are affiliated entities—the rule already permits consideration of affiliates' revenues in determining whether a business qualifies as small. See the section-by-section analyses of §§ 1002.106(b) and 1002.107(a)(14) for additional discussion of affiliate revenue.

### 102(c) Business

Final § 1002.102(c) refers to § 1002.106(a) for a definition of the term "business." See the section-by-section analysis of § 1002.106(a) for a detailed discussion of that definition.

### 102(d) Business Credit

Proposed § 1002.102(d) would have referred to existing § 1002.2(g) for a definition of the term "business credit." The term "credit" is undefined in section 1071. Section 1071 does not use the term "business credit," though it

does define "small business loan" as a loan made to a small business. Existing § 1002.2(g) defines "business credit" as "refer[ring] to extensions of credit primarily for business or commercial (including agricultural) purposes, but excluding extensions of credit of the types described in § 1002.3(a)–(d)," *i.e.,* public utilities credit, securities credit, incidental credit, and government credit.

The Bureau received two comments specific to its proposed definition of business credit. These two commenters, both credit union trade associations, expressed support for the proposed definition, stating that it was familiar to credit unions and encompasses the most common business credit products aimed at small business borrowers. The Bureau also received numerous comments related to its proposed coverage of agricultural credit, parts of which also touched on the proposed definition of "business credit"; these comments are discussed below in the section-by-section analysis of § 1002.104(a).

The Bureau is finalizing § 1002.102(d) as proposed. Final § 1002.102(d) points to existing § 1002.2(g) in defining the term "business credit." The Bureau believes it is appropriate to define business credit by reference to the existing definition in Regulation B, which incorporates by reference the meaning of "credit," as defined in existing § 1002.2(j). For clarity and completeness, as discussed below, the Bureau is also adopting existing Regulation B's definition of credit. The Bureau's final rule uses the term business credit principally in defining a covered credit transaction in § 1002.104(a).

The Bureau notes that existing § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit (that is, extensions of credit made *to* governments or governmental subdivisions, agencies, or instrumentalities—not extensions of credit made *by* governments), as defined in existing § 1002.3(a) through (d), from certain aspects of existing Regulation B.[309] For the purpose of subpart B, the Bureau is both incorporating existing § 1002.2(g)—which already includes partial carveouts for public utilities credit, securities credit, and incidental credit—and also finalizing complete

exclusions for these types of credit from the definition of a covered credit transaction in § 1002.104(b). For clarity, the Bureau is separately defining these terms in § 1002.104(b) and explains the rationales for excluding each of them in the section-by-section analysis of § 1002.104(b) below. The Bureau is not adopting an exclusion for extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities, because governmental entities do not constitute small businesses under the final rule.[310]

### 102(e) Closed-End Credit Transaction

Proposed § 1002.102(e) would have stated that a closed-end credit transaction means an extension of credit that is not an open-end credit transaction under proposed § 1002.102(n). The term "closed-end credit transaction" is undefined in section 1071. The Bureau's proposal would have specified different requirements for collecting and reporting certain data points based on whether the application is for a closed-end credit transaction or an open-end credit transaction. The definition of open-end credit transaction was addressed in proposed § 1002.102(n).

The Bureau sought comment on its proposed approach to the definition of a closed-end credit transaction. The Bureau received no comments and is finalizing § 1002.102(e) with one revision for clarity. The Bureau is revising the definition of a closed-end credit transaction to mean an extension of business credit that is not an open-end credit transaction under § 1002.102(n). The Bureau believes this definition is reasonable as it aligns with the definition of "open-end credit transaction" in final § 1002.102(o), and that such alignment will minimize confusion and facilitate compliance.

### 102(f) Covered Application

Final § 1002.102(f) refers to § 1002.103 for a definition of the term "covered application." See the section-by-section analysis of § 1002.103 for a detailed discussion of that definition.

### 102(g) Covered Credit Transaction

Final § 1002.102(g) refers to § 1002.104 for a definition of the term "covered credit transaction." See the section-by-section analysis of § 1002.104 for a detailed discussion of that definition.

---

[309] As explained in existing comment 3–1, under § 1002.3, procedural requirements of Regulation B do not apply to certain types of credit. The comment further states that all classes of transactions remain subject to § 1002.4(a) (the general rule barring discrimination on a prohibited basis) and to any other provision not specifically excepted.

[310] Government entities are not "organized for profit" and thus are not a "business concern" under final § 1002.106(a).

AdminRecord-000047

102(h) Covered Financial Institution

Final § 1002.102(h) refers to § 1002.105(b) for a definition of the term "covered financial institution." See the section-by-section analysis of § 1002.105(b) for a detailed discussion of that definition.

102(i) Credit

Proposed § 1002.102(i) would have referred to existing § 1002.2(j) for a definition of the term "credit." The term "credit" is undefined in section 1071. Existing § 1002.2(j), which largely follows the definition of credit in ECOA,[311] defines "credit" to mean the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor. The Bureau sought comment on its proposed approach to this definition.

The Bureau received several comments regarding its proposed definition of "credit." A few community groups expressed general support for a broad definition of credit. To ensure adequate coverage for future products, one commenter suggested defining credit to also cover situations where money is transmitted to a recipient but the money still effectively belongs to the transmitter and is to be repaid according to certain terms. Another commenter advocated for a credit definition that included as many lenders (and financing companies that are not technically lenders) as possible within the scope of this rulemaking, even when such companies are providing financing in a format that, according to the commenter, is not technically credit (the commenter offered cash advance and factoring companies as examples).

For the reasons set forth herein, the Bureau is finalizing § 1002.102(i) as proposed. Section 1002.102(i) refers to existing § 1002.2(j) for a definition of the term "credit." The Bureau believes that aligning to the implemented definition of credit in ECOA[312] for purposes of subpart B will help to foster consistency with existing Regulation B. The term credit in subpart B is used in the context of what constitutes a covered credit transaction—that is, whether the application is reportable under this final rule. See the section-by-section analysis of § 1002.104 below for a detailed discussion of what does, and does not,

constitute a covered credit transaction for purposes of this final rule.

102(j) Financial Institution

Final § 1002.102(j) refers to § 1002.105(a) for a definition of the term "financial institution." See the section-by-section analysis of § 1002.105(a) for a detailed discussion of that definition.

102(k) LGBTQI+ Individual and 102(l) LGBTQI+-Owned Business

Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." In the NPRM, the Bureau sought comment on whether it should adopt a data point to collect an applicant's lesbian, gay, bisexual, transgender, or queer plus (LGBTQ+)-owned business status, similar to its proposal for collecting minority-owned business status and women-owned business status under proposed § 1002.107(a)(18) and (19). The Bureau also sought comment on whether including this question, along with others, would improve data collection or otherwise further section 1071's purposes, as well as whether it would pose any particular burdens or challenges for industry.[313]

This section-by-section analysis of § 1002.102(k) and (*l*) discusses the Bureau's definition of LGBTQI+ individual and the related definition of LGBTQI+-owned business, respectively. Collection of LGBTQI+-owned business status is addressed in the section-by-section analysis of § 1002.107(a)(18).

Comments Received

The Bureau received comments from several lenders, individual commenters, and community and advocacy groups as to whether the Bureau should adopt a data point to collect an applicant's "LGBTQ+-owned business" status.[314] As explained further in the section-by-section analysis of § 1002.107(a)(18), some of these commenters did not support including such a data point in the final rule (and thus did not make any suggestions for how an LGBTQ+-owned business should be defined). One commenter opposed collecting LGBTQ+ data without a corresponding proposal

to modify the definition of minority-owned business.

In contrast, other commenters supported requiring the collection and reporting of applicants' LGBTQ+-owned business status information. As discussed further in the section-by-section analysis of § 1002.107(a)(18), commenters generally explained that collecting such data would enhance fair lending enforcement and identify credit needs for these small businesses.

Most of these commenters generally echoed the Bureau's use of the term "LGBTQ+-owned business" status in expressing their support for the data point. Several recommended that the Bureau require financial institutions' inquiries about such status to include a definition of the status and give applicants response options specifically indicating that they are or are not such a business, similar to the Bureau's proposed approach for requesting information about applicants' minority-owned and women-owned business status.

One commenter suggested that the Bureau use the phrase "LGBTQI+-owned business" and include a definition in the final rule. The commenter recommended that the Bureau define the term as a business where (1) more than 50 percent of the ownership or control of which is held by one or more individuals self-identifying as lesbian, gay, bisexual, transgender, queer, or intersex and (2) more than 50 percent of the net profit or loss accrues to one or more individuals self-identifying as lesbian, gay, bisexual, transgender, queer, or intersex. The commenter stated that this definition is similar to the definitions of minority-owned and women-owned businesses and consistent with other Federal government and expert practice and recommendations as well as the definition of "LGBTQ-owned business" in Federal legislation that was pending at that time.[315]

Final Rule

As discussed further in part II above and the section-by-section analysis of § 1002.107(a)(18) below, the Bureau believes that the collection of an applicant's LGBTQI+-owned business status will aid in fulfilling the purposes of section 1071, by facilitating evaluations of potential discriminatory

---

[311] See 15 U.S.C. 1691a. Existing Regulation B uses the term "applicant" instead of "debtor."

[312] See id. Existing Regulation B closely aligns with the definition of credit in ECOA, with some technical revisions and use of the term "applicant" instead of "debtor."

[313] 86 FR 56356, 56482 (Oct. 8, 2021).

[314] The terms "LGBT," "LGBTQ," "LGBTQ+," and "LGBTQIA+" are used in this preamble to reflect the specific terms used by commenters, the conditions or titles of any cited research, or (particularly for "LGBTQ+") the Bureau's request for comment in the NPRM.

[315] The commenter cited the *LGBTQ Business Equal Credit Enforcement and Investment Act*, H.R. 1443, 117th Cong. (2021), *https://www.congress.gov/bill/117th-congress/house-bill/1443/text* (which would have amended ECOA section 704B to, among other things, require financial institutions to inquire whether a business is a "LGBTQ-owned" business).

AdminRecord-000048

lending practices on the basis of sex in violation of fair lending laws and helping communities, governmental entities, and creditors identify needs and opportunities of small businesses. Thus, the Bureau is adopting § 1002.102(k) and (*l*) pursuant to its authority under ECOA section 704B(e)(2)(H) to require financial institutions to compile and maintain any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071 and its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to the statute. The Bureau is not, as suggested by one commenter, including LGBTQI+ status in the definition of minority-owned business, but is, as requested by multiple commenters, adopting a definition of LGBTQI+ owned business that largely parallels the definition of a minority-owned business.

For the reasons set forth herein, the Bureau is defining "LGBTQI+ individual" in final § 1002.102(k) as including an individual who identifies as lesbian, gay, bisexual, transgender, queer, or intersex. The Bureau is defining the term "LGBTQI+-owned business" in final § 1002.102(*l*) as "a business for which one or more LGBTQI+ individuals hold more than 50 percent of its ownership or control, and for which more than 50 percent of the net profits or losses accrue to one or more such individuals." Both definitions are being included to facilitate the requirement in final § 1002.107(a)(18) that financial institutions collect an applicant's minority-owned, women-owned, and LGBTQI+-owned business statuses.

The Bureau agrees with a commenter's suggestion to use the term "LGBTQI+-owned business"—including an "I" to capture intersex individuals—instead of "LGBTQ+-owned business." [316] The Bureau believes that the term "LGBTQI+-owned business" better reflects the Bureau's intent to be broadly inclusive.

The Bureau notes that in user testing it conducted to assist its understanding

of small business applicants' potential experience using the sample data collection form in the summer and fall of 2022, a few users were confused by the term "LGBTQI+-owned business." [317] Therefore, and consistent with commenters' suggestions, final comments 102(*l*)–2 and 107(a)(18)–2 explain that a financial institution must provide the definition of LGBTQI+-owned business when inquiring as to the applicant's business ownership status pursuant to final § 1002.107(a)(18). A financial institution may use the definition as set forth on the sample data collection form at appendix E. Final comment 102(*l*)–2 also clarifies that a financial institution must provide the definition of LGBTQI+ individual under final § 1002.102(k) if asked by the applicant, but does not need to do so unless asked.

Final comment 102(*l*)–2 clarifies that the definition of LGBTQI+-owned business is used only when an applicant determines if it is such a business for purposes of final § 1002.107(a)(18). The financial institution is not permitted or required to make its own determination as to whether an applicant is a LGBTQI+-owned business.

In line with commenters' suggestions, the definition for LGBTQI+-owned business in final § 1002.102(*l*) parallels concepts in the Bureau's definitions for minority-owned business and women-owned business in final § 1002.102(m) and (s), respectively. The final rule's LGBTQI+-owned business definition incorporates the same two-prong approach as the other business status definitions, with more than 50 percent ownership or control as the first prong and more than 50 percent of net profits or losses as the second prong.

The commentary for final § 1002.102(*l*) generally mirrors the commentary for the minority-owned business and women-owned business definitions in the final rule. [318] Final comment 102(*l*)–1 explains that a business must satisfy both prongs of the definition to be a LGBTQI+-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more LGBTQI+ individuals, and (B) more than 50

percent of the net profits or losses accrue to one or more LGBTQI+ individuals. Final comment 102(*l*)–1 clarifies that the first prong of the definition can be met through either the control or ownership requirements (as do final comments 102(m)–1 and 102(s)–1).

Final comments 102(*l*)–3 through –6 mirror the corresponding commentary for the definitions of minority-owned business and women-owned business and provide clarifications of terms used and the concepts of ownership, control, and accrual of net profits or losses.

102(m) Minority-Owned Business

Proposed Rule

As discussed further herein, the final rule combines proposed § 1002.102(*l*) (minority individual) into final § 1002.102(m) to streamline the rule and facilitate compliance.

ECOA section 704B(b)(1) requires financial institutions to inquire whether applicants for credit are minority-owned businesses. For purposes of the financial institution's inquiry under 704B(b), 704B(h)(5) defines a business as a minority-owned business if (A) more than 50 percent of the ownership or control is held by one or more minority individuals, and (B) more than 50 percent of the net profit or loss accrues to one or more minority individuals. Section 1071 does not expressly define the related terms of "ownership" or "control," nor does it describe what it means for net profits or losses to accrue to an individual. Section 704B(h)(4) defines the term "minority" as having the same meaning as in section 1204(c)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). [319] That statute defines "minority" to mean any Black American, Native American, Hispanic American, or Asian American. [320] While section 1071 uses the term "minority individual" in 704B(h)(5), it does not define that term.

*Proposed § 1002.102(l)—definition of minority individual.* Proposed § 1002.102(*l*) would have clarified that the term "minority individual" means a natural person who is American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. As explained in the NPRM, the Bureau believed that these categories represent contemporary, more specific delineations of the categories described in section 1204(c)(3) of FIRREA. Proposed comment 102(*l*)–2

---

[316] Explicit inclusion of intersex individuals within the scope of the definitions for LGBTQI+ individual and LGBTQI+-owned business is consistent with the prohibitions against discrimination on the basis of "sex" under ECOA and Regulation B. Sex characteristics including intersex traits are "inextricably bound up with" sex," *Bostock* v. *Clayton Cty.*, 140 S. Ct. 1731, 1742 (2020), and "cannot be stated without referencing sex," *Grimm* v. *Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (quoting *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017)).

[317] CFPB, *User testing for sample data collection form for the small business lending final rule* at app. C, at 3, 8 (Mar. 2023), *https:// www.consumerfinance.gov/data-research/research-reports/user-testing-for-sample-data-collection-form-for-the-small-business-lending-final-rule/.*

[318] For discussion of comments as to the concepts of ownership and control in the LGBTQI+-owned business definition, the Bureau refers to discussion of the comments in the section-by-section analyses of § 1002.102(m) and (s) regarding the definitions for minority-owned business and women-owned business.

[319] Public Law 101–73, section 1204(c)(3), 103 Stat. 183, 521 (1989) (12 U.S.C. 1811 note).
[320] *Id.*

would have clarified that a multi-racial or multi-ethnic person is a minority individual. Proposed comment 102(*1*)–1 would have clarified that this definition would be used only when an applicant determines whether it is a minority-owned business pursuant to proposed §§ 1002.102(m) (definition of minority-owned business) and 1002.107(a)(18) (data point for minority-owned business status). Proposed comment 102(*1*)–3 would have clarified the relationship of the definition of minority individual to the disaggregated subcategories used to determine a principal owner's ethnicity and race.

The Bureau sought comment on its proposed approach to this definition, including its proposed clarification of the definition of minority individual, and requested comment on whether additional clarification was needed. The Bureau also sought comment on whether the definition of minority individual should include a natural person who is Middle Eastern or North African, and whether doing so should be dependent on whether Middle Eastern or North African is added as an aggregate category for purposes of proposed § 1002.107(a)(20).[321]

*Proposed § 1002.102(m)—definition of minority-owned business.* Proposed § 1002.102(m) would have defined a minority-owned business as a business for which more than 50 percent of its ownership or control is held by one or more minority individuals, and more than 50 percent of its net profits or losses accrue to one or more minority individuals. Proposed comment 102(m)–1 would have explained that a business must satisfy both prongs of the definition to be a minority-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more minority individuals, and (B) more than 50 percent of the net profits or losses accrue to one or more minority individuals.

Proposed comment 102(m)–2 would have clarified that the definition of minority-owned business is used only when an applicant determines if it is a minority-owned business for purposes of proposed § 1002.107(a)(18). A financial institution would provide the definition of minority-owned business when asking the applicant to provide minority-owned business status pursuant to proposed § 1002.107(a)(18), but a financial institution would not be permitted or required to make its own

determination regarding whether an applicant is a minority-owned business for this purpose.

Proposed comment 102(m)–3 would have further noted that a financial institution would be permitted to assist an applicant when determining whether it is a minority-owned business but would not be required to do so, and could provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in proposed comments 102(m)–4 through –6. Additionally, for purposes of reporting an applicant's minority-owned business status, a financial institution would rely on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

The Bureau proposed to clarify "ownership" and "control" using concepts from the beneficial ownership requirements in FinCEN's customer due diligence rule.[322] Proposed comment 102(m)–4 would have clarified that a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Proposed comment 102(m)–4 would have also provided examples of ownership and clarified that, where applicable, ownership would need to be traced or followed through corporate or other indirect ownership structures for purposes of proposed §§ 1002.102(m) and 1002.107(a)(18). Proposed comment 102(m)–5 would have clarified that a natural person controls a business if that natural person has significant responsibility to manage or direct the business, and would have provided examples of natural persons who control a business. Proposed comment 102(m)–6 would have clarified that a business's net profits and losses accrue to a natural person if that natural person receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally

entitled or required to recognize the net profits or losses for tax purposes.

The Bureau sought comment on the proposed definition of minority-owned business and possible alternatives that may clarify the term in order to help ensure that small business applicants can determine whether they are minority-owned businesses for purposes of data collection pursuant to section 1071.

Comments Received

*Proposed § 1002.102(l)—definition of minority individual.* The Bureau received comments regarding the definition of minority individual from several industry commenters and community groups.

One community group stated that the Bureau's proposal to mirror HMDA with respect to the definition of minority individual is desirable because HMDA's racial and ethnic categories are reasonably comprehensive, and using the same categories eases reporting requirements and creates consistency for applicants. A group of trade associations and a bank supported the Bureau's proposal to define a minority individual using only aggregate ethnicity and race categories, stating that doing so will help lessen confusion. Another bank requested clarification on who is considered multi-racial or multi-ethnic for purposes of the rule.

*Proposed § 1002.102(m)—definition of minority-owned business.* The Bureau received comments regarding the definition of minority-owned business from lenders, trade associations, and community groups.

One community group stated that the collection of data on minority-owned businesses, along with the collection of data on women-owned businesses, will help illustrate the experience of firms owned by women of color who likely face even higher barriers to accessing small business credit than those firms not owned by women of color. The commenter noted that these firms comprise a significant portion of small businesses and there are a greater proportion of women of color who own businesses than the share of white-owned businesses owned by women. Another requested that the Bureau add an "I don't know" response to the list of possible responses, as there may be applicants who cannot make a legal conclusion as to whether the small business is minority-owned. A trade association asserted that inquiring about the ethnicity (or gender) of business owners is contrary to the expectations of financial institutions and applicants alike.

---

[321] The Bureau received a number of comments regarding whether Middle Eastern or North African should be added as an aggregate category. Those comments are discussed in the section-by-section analysis of § 1002.107(a)(19).

[322] *See* 31 CFR 1010.230 (describing the beneficial ownership requirements for legal entity customers). The Department of the Treasury's Financial Crimes Enforcement Unit (FinCEN) recently issued a final rule to implement requirements regarding reporting of beneficial ownership information pursuant to the Corporate Transparency Act, 31 U.S.C. 5336. *See* 87 FR 59498 (Sept. 30, 2022). While FinCEN's final rule does not include changes to the current customer due diligence rule, FinCEN has indicated its intent to revise the customer due diligence rule in a future rulemaking. *See id.* at 59507. FinCEN's final rule includes definitions for beneficial owner that will be different from what currently exists in the customer due diligence rule, as to both control and ownership, when the rule goes into effect on January 1, 2024. *See id.* at 59544. However, the final rule does not change the 25 percent threshold for determining ownership. *See id.*

AdminRecord-000050

Regarding the proposed requirement that in order to be considered a minority-owned business, one or more minority individuals must hold more than 50 percent of the ownership or control of the business, the Bureau received comments from several community groups and lenders in support. Conversely, a trade association and a bank urged the Bureau to revise the requirement such that one or more minority individuals must hold "50 percent or more" of the ownership or control because the statutory definition may result in underreporting for equal partnerships with mixed race partners and this would, they said, slant the statistical picture.

Regarding the proposed requirement that in order to be considered a minority-owned business, more than 50 percent of the net profit or loss must accrue to one or more minority individuals, a community group stated that the definition is appropriate to prevent illusory "ownership" by a minority individual. Several other commenters also supported the definition.

Several industry commenters requested that the Bureau not include the requirement that more than 50 percent of the net profits or losses must accrue to one or more minority individuals. Some of these commenters stated that the initial prong of the definition requiring more than 50 percent of ownership or control by a minority individual is sufficient for determining ownership and would reduce complexity for borrowers. A CDFI lender stated that defining ownership based on a profit and loss calculation may not fully serve the objectives of the statute, and asked the Bureau to consider the CDFI Fund definition of minority-owned business.[323] Several commenters also argued that the net profits or losses prong complicates the definition, could result in inaccurate data collection, implicates the limited understanding of many small business owners regarding the meaning of net profits and losses as well as the sensitive nature of these

issues, and concluded that many small business owners will not understand the definition as provided and will, as a result, decline to answer the question.

A bank asked for clarification whether data (specifically demographic data) collected in prior years could be reused, and what to do if there are multiple collections. Specifically, the commenter gave an example of an applicant that provides demographic information for one application, and then chooses not to provide information for a subsequent application, and asking which collection should be reported.[324] A trade association stated that it is possible in certain states for a third party non-owner to act as trustee of a trust, and that the Bureau should change a comment example to clarify whether it is the Bureau's intent to presume that the trustee of a trust is the owner. Another bank also asserted that requiring banks to collect such information is costly to banks, customers, and communities. A group of trade associations asserted that the commentary should be revised to explicitly state that a financial institution must provide an applicant with the applicable definition.

Several industry commenters supported the proposal to rely solely on the data provided by the applicant and that financial institutions should not be required to verify any such information provided by the applicant. With respect to self-certification of minority-owned business status, two trade associations supported permitting credit applicants to self-certify that 50 percent or more of the net profit or loss accrues to one or more minority individuals, rather than lenders needing to verify this information. Another trade association asserted that the applicant should solely determine whether the individual owners are multi-ethnic or multi-racial individuals and the financial institution should not be required to otherwise verify or report any information other than that supplied by the applicant.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.102(m) with a number of revisions to the regulatory text and commentary to incorporate the definition of minority individual. The Bureau has made these changes to streamline the rule and facilitate compliance. The Bureau is otherwise finalizing the associated commentary with a minor adjustment for clarity.

Final § 1002.102(m) defines a minority-owned business as a business for which one or more American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individuals hold more than 50 percent of its ownership or control and for which more than 50 percent of the net profits or losses accrue to one or more such individuals. Final comment 102(m)–1 explains that a business must satisfy both prongs of the definition to be a minority-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more such individuals, and (B) more than 50 percent of the net profits or losses accrue to one or more such individuals. Final comment 102(m)–1 includes an additional sentence to clarify that a business that is controlled by an individual with the characteristics listed in the regulatory text satisfies this prong of the definition even if none of the individuals with ownership in the business satisfies those characteristics.

Final comment 102(m)–2 clarifies that the definition of minority-owned business is used only when an applicant determines if it is a minority-owned business for purposes of final § 1002.107(a)(18), and is finalized with an adjustment made for clarity. Final comment 102(m)–3 is finalized as proposed and notes that a financial institution is permitted to assist an applicant when determining whether it is a minority-owned business but is not required to do so, may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in final comments 102(m)–4 through –6, and that, for purposes of reporting an applicant's minority-owned business status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

Final comment 102(m)–4, finalized with minor edits for consistency and clarity, provides examples of ownership and clarifies that, where applicable, ownership needs to be traced through corporate or other indirect ownership structures. With regard to a commenter's assertion that, in certain states, a trustee could act as a third party non-owner trustee of a trust, the Bureau believes the trustee would be considered an owner for purposes of this definition. Final comment 102(m)–4 also clarifies (as it did in the Bureau's proposal) that a trustee is considered the owner of a trust.

Final comment 102(m)–5 clarifies that an individual controls a business if that individual has significant responsibility

---

[323] The community group cited to the September 2021 CDFI Transactional Level Report Data Point Guidance, which provides guidance on providing transactional level report data. Under "Minority Owned or Controlled," the guidance states to "[r]eport whether the investee/borrower is more than 50% owned or controlled by one or more minorities. If the business is a for-profit entity, report whether more than 50% of the owners are minorities. If the business is a nonprofit entity, report whether more than 50% of its Board of Directors are minorities." CDFI Fund, *CDFI Transactional Level Report Data Point Guidance*, at 33 (Sept. 2021), *https://www.cdfifund.gov/sites/cdfi/files/2021-08/CDFITLRGuidance_Final_Sept2021.pdf*.

[324] See the section-by-section analysis of § 1002.107(d) regarding the use of previously collected data.

AdminRecord-000051

to manage or direct the business, while final comment 102(m)–6 clarifies that a business's net profits and losses accrue to an individual if that individual receives the net profits, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes. Both comments are finalized with minor edits for consistency and clarity.

Final comments 102(m)–7 and –8 are adopted from the commentary to proposed § 1002.102(*l*) (respectively, proposed comments 102(*l*)–2 and –3). Final comment 102(m)–7 clarifies that an individual who is multi-racial or multi-ethnic constitutes an individual for which the definition of minority-owned business may apply, depending on whether the individual meets the other requirements of the definition. Final comment 102(m)–8 clarifies that the relationship of the ethnicity and race categories used in this section are aggregate ethnicity and race categories and are the same aggregate categories (along with Not Hispanic or Latino for ethnicity, and White for race) to collect an applicant's principal owners' ethnicity and race pursuant to final § 1002.107(a)(19). Final comment 102(m)–8 is revised from proposed comment 102(*l*)–3 to more clearly state the relationship of the ethnicity and race disaggregated subcategories in this comment to those used in final § 1002.107(a)(19). Proposed comment 102(*l*)–1 was not finalized because it was no longer relevant once the definition of minority individual was incorporated into the minority-owned business definition.

With respect to the categories of persons that constitute minorities for purposes of determining minority-owned business status, the Bureau believes it clarified terminology in final § 1002.102(m), which uses the aggregate ethnicity and race categories set forth in existing § 1002.13(a)(1)(i) and appendix B to Regulation C, will avoid the potentially confusing situation where an applicant is presented one set of aggregate ethnicity and race categories when answering questions about the principal owners' ethnicity and race pursuant to final § 1002.107(a)(19) (which also uses the same aggregate ethnicity and race categories)[325] but is

asked to use a different set of aggregate categories when indicating whether the business is a minority-owned business. It also avoids creating a situation where a financial institution is required to use different aggregate ethnicity and race categories when complying with different portions of Regulation B and, if applicable, Regulation C. This consistency across ethnicity and race data collection regimes will also allow for better coordination among data users when reviewing data.[326] Further, the Bureau believes that these categories represent contemporary, more specific delineations of the categories described in section 1204(c)(3) of FIRREA.[327]

The Bureau does not believe it would be appropriate to deviate from the statutory definition of a minority-owned business in the various ways some commenters suggested, and the Bureau's authority to deviate from the statutory language is limited. The Bureau also believes that many small business applicants already respond to questions about who owns and who controls a business entity when completing customer due diligence forms or otherwise responding to questions related to that rule and thus will be familiar with these concepts. Although the customer due diligence rule does not address the second prong of the definition regarding accrual of net profits or losses, final comment 102(m)–6 provides a comprehensive explanation of this prong of the definition.

With regard to comments urging the Bureau to remove the prong requiring that more than 50 percent of its net profits or losses accrue to one or more minority individuals in order to be considered a minority-owned business, aside from the Bureau's limited authority to deviate from the statutory language, the Bureau finds that this prong is necessary to prevent illusory "ownership" claims by "straw" owners.

Finally, with regard to commenters' requests for further clarification, in accordance with ECOA section 704B(g)(3), the Bureau may release material, as part of its regulatory implementation strategy, to assist both financial institutions with complying with the requirements of § 1002.102(m)

and small businesses in understanding this definition.

**102(n) Open-End Credit Transaction**

Proposed § 1002.102(n) would have stated that an open-end credit transaction means an open-end credit plan as defined in Regulation Z § 1026.2(a)(20), but without regard to whether the credit is consumer credit, as defined in § 1026.2(a)(12), is extended by a creditor, as defined in § 1026.2(a)(17), or is extended to a consumer, as defined in § 1026.2(a)(11). The term "open-end credit transaction" is undefined in section 1071. The Bureau's proposal would have specified different rules for collecting and reporting certain data points based on whether the application is for a closed-end credit transaction or an open-end credit transaction.

The Bureau sought comment on its proposed approach to this definition. The Bureau received no comments and is finalizing § 1002.102(n) as proposed. The Bureau believes this definition is reasonable because it aligns with the definition of "open-end credit transaction" in Regulation Z § 1026.2(a)(20), and that such alignment will minimize confusion and facilitate compliance.

**102(o) Principal Owner**

*Proposed Rule*

ECOA section 704B(e) requires financial institutions to compile and maintain the ethnicity, race, and sex of an applicant's principal owners. However, section 1071 does not expressly define who is a principal owner of a business. Proposed § 1002.102(o) would have defined principal owner in a manner that is, in part, consistent with the beneficial ownership requirements in FinCEN's customer due diligence rule.[328] Specifically, a natural person would be a principal owner if the natural person directly owns 25 percent or more of the equity interests of the business. Further, as noted in proposed comment 102(o)–1, a natural person would need to directly own an equity share of 25 percent or more in the business in order to be a principal owner. The Bureau also

---

[325] The Bureau notes that while the aggregate ethnicity and race categories are the same among final § 1002.107(a)(19), existing § 1002.13(a)(1)(i), and appendix B to Regulation C, the disaggregated race subcategories that an applicant may use to respond to a financial institution's inquiry as to its principal owners' race under final § 1002.107(a)(19) differ (*i.e.*, due to the addition of disaggregated Black or African American race subcategories) from

the disaggregated race subcategories in existing § 1002.13(a)(1)(i), and appendix B to Regulation C. See the section-by-section analysis of § 1002.107(a)(19).

[326] For example, OMB uses these same categories for the classification of Federal data on race and ethnicity. *See* Off. of Mgmt. & Budget, *Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity,* 62 FR 58785 (Oct. 30, 1996).

[327] *See, e.g.,* 80 FR 36356 (June 24, 2015) (NCUA interpretive ruling and policy statement implementing an identical FIRREA definition of minority using this same modern technology).

[328] *See* 31 CFR 1010.230 (describing the beneficial ownership requirements for legal entity customers). As noted above, FinCEN issued a final rule to implement requirements regarding reporting of beneficial ownership information pursuant to the Corporate Transparency Act. *See* 87 FR 59498 (Sept. 30, 2022). That final rule does not amend the current customer due diligence rule (although FinCEN has indicated that it will be revised at a later point). *See* 87 FR 59498, 59507. Notably, however, FinCEN's final rule did not change the 25 percent threshold for determining ownership. *See id.* at 59594.

proposed that entities not be considered principal owners and indirect ownership by individuals likewise not be considered when determining if someone is a principal owner for purposes of collecting and reporting principal owners' ethnicity, race, and sex or the number of principal owners. Thus, when determining who is a principal owner, ownership would not be traced through multiple corporate structures to determine if a natural person owns 25 percent or more of the applicant's equity interests. Additionally, because only a natural person would be a principal owner for purposes of the rule, entities such as trusts, partnerships, limited liability companies, and corporations, would not be principal owners.

Proposed comment 102(o)–2 would have clarified that a financial institution would provide an applicant with the definition of principal owner when asking the applicant to provide the number of its principal owners pursuant to proposed § 1002.107(a)(20) and the ethnicity, race, and sex of its principal owners pursuant to proposed § 1002.107(a)(19). Proposed comment 102(o)–2 would have also explained that if a financial institution meets in person with a natural person about a covered application, the financial institution may be required to determine if the natural person with whom it meets is a principal owner in order to collect and report the principal owner's ethnicity and race based on visual observation and/or surname. Additionally, proposed comment 102(o)–2 would have noted that if an applicant does not provide the number of its principal owners in response to the financial institution's request pursuant to proposed § 1002.107(a)(21), the financial institution may need to determine the number of the applicant's principal owners and report that information based on other documents or information.

The Bureau explained that aligning the proposed definition of principal owner with the 25 percent ownership definition in the customer due diligence rule would likely be familiar to most financial institutions and applicants. The customer due diligence rule is broadly in use and banks, credit unions, and certain other financial institutions must comply with that rule. Further, the Bureau believed that applicants, as a general matter, would be more likely to be familiar with customer due diligence requirements than SBA or CDFI Fund requirements because they have to complete customer due diligence forms before opening an initial account (*i.e.,* loan or deposit account) at a bank or at

certain other institutions. However, unlike the customer due diligence rule, due to potential complications with collecting ethnicity, race, and sex information for principal owners, the Bureau proposed that individuals that only indirectly own 25 percent or more of an applicant's equity interests, as well as entities and trusts, would not be considered principal owners for purposes of the rule. The Bureau sought comment on its proposed definition, including its proposal to not include individuals that only indirectly own 25 percent or more of an applicant's equity interests as principal owners.

Comments Received

The Bureau received comments on this aspect of the proposal from a number of banks, trade associations, community groups, and a business advocacy group. Some of the industry commenters and a community group supported the Bureau's proposed definition for principal owner. A group of trade associations agreed with the Bureau's proposal to align, in part, the definition with the customer due diligence rule, stating that financial institutions are already familiar with ownership concepts through that rule. Trade association commenters also supported the Bureau's proposal not to include entities and indirect ownership by natural persons, with one stating that the concepts of ownership by entities and indirect ownership would add unnecessary complexity to the Bureau's final rule and another noting that its members found them difficult concepts to explain and determine. The community group supporting the Bureau's proposed definition for principal owner stated that the proposed definition made intuitive sense, as 25 percent is a significant amount of ownership.

Several other industry commenters did not support the Bureau's proposed definition. Specifically, these commenters requested that the Bureau look to and align with all the concepts of the customer due diligence rule. The commenters stated that because financial institutions and customers are familiar with the customer due diligence rule and financial institutions already identify principal owners thereunder, consistency between the two regulatory regimes would reduce complexity and facilitate compliance. A business advocacy group stated that aligning the rules completely would allow financial institutions to leverage existing processes and training and focus on customer needs rather than regulatory interpretation. Another commenter argued that a new definition

for principal owner under the rule would add unnecessary complexity to the loan origination process. A lender specifically suggested that financial institutions be required to identify and verify the identity of each individual who owns 25 percent or more of the entity, and one individual who controls the entity, as is required under the customer due diligence rule. Another commenter similarly argued for replicating this requirement for the rule, arguing that financial institutions would not find it challenging to trace indirect ownership because they already do so under the customer due diligence rule, that the approach would be familiar to small business applicants structured as legal entities, and that small businesses that are not legal entities (*e.g.,* sole proprietorships) likely would not have complicated equity structures.

Two industry commenters that supported aligning principal owner definition in the Bureau's rule more closely with the customer due diligence rule than proposed by the Bureau also expressed concern that differences in the definition between the regulatory regimes would lead to customer confusion. One of these commenters argued that confusion would likely result for applicants who will be asked to provide information about principal owners under both rules at the same point of the origination process. The other asserted that confusion as a result of different definitions would increase the possibility that customers would refuse to provide information.

A bank commented that the Bureau's proposal did not provide enough guidance or procedures for how financial institutions should handle reporting for small business applicants whose principal owner(s) are a separate corporate entity or trust.

Another bank stated that financial institutions should not be required to determine the ownership of small businesses, which it said the proposed rule would require.

A trade association, which requested an exclusion for applications from trusts from coverage under the final rule, raised a question about who should be considered a principal owner of a trust for data collection purposes, such as whether they should be the settlors, beneficiaries, trustees, or some combination thereof.

Final Rule

For the reasons set forth herein, the Bureau is finalizing its definition of principal owner in § 1002.102(o) and associated commentary with certain adjustments. The Bureau believes it is appropriate to align, in part, its

definition of principal owner with the 25 percent ownership concept in FinCEN's customer due diligence rule given financial institutions' and applicants' likely familiarity with that rule's requirements.[329] The Bureau does not believe, however, that its definition must completely match the ownership and control requirements in the customer due diligence rule as urged by some commenters. While differences between similar concepts in different regulatory regimes may lead to some initial confusion, particularly as financial institutions (as well as small business applicants) already familiar with the customer due diligence rule implement this final rule's requirements, the Bureau believes that adding the concepts of indirect ownership by natural persons, as well as ownership by entities or trusts, to the definition of principal owner would add unnecessary complexity to this final rule.

Generally, FinCEN's customer due diligence rule defines a beneficial owner as not just any individual who directly owns 25 percent or more of a legal entity, but also includes individuals who indirectly have that amount of ownership in the entity, such as through multiple corporate structures.[330] If a trust directly or indirectly owns 25 percent or more of the entity, the trustee is considered to be a beneficial owner.[331] In addition to ownership, the customer due diligence rule also looks to control. A beneficial owner also includes the single individual with significant responsibility to control, manage, or direct the entity.[332]

The Bureau does not believe that it would be appropriate for the rule's definition of principal owner to incorporate indirect ownership and control, as suggested by some commenters. This final rule requires covered financial institutions to collect and report the ethnicity, race, and sex of small business applicants' principal owners and includes the definition of principal owner at § 1002.102(o) for the purpose of facilitating financial institutions' and applicants' ability to provide such information. The Bureau believes that a simpler definition for principal owner that aligns with the customer due diligence rule's general 25 percent or more ownership concept, but which only applies to individuals (not entities or trusts) with direct ownership, will encourage applicants to provide their principal owners' ethnicity, race, and sex and facilitate more accurate reporting. With the simpler definition for principal owner, applicants do not need to first make potentially difficult determinations about which individuals indirectly own or control the small business before providing such individuals' ethnicity, race, and sex information.

The Bureau does not believe differences between the customer due diligence beneficial owner definition and the principal owner definition in this rule will lead applicants to refuse to provide their principal owners' ethnicity, race, and/or sex information, as suggested by one commenter. In contrast, the Bureau believes that its principal owner definition is less complicated and easier to understand and is more likely to facilitate applicants' willingness to provide their principal owners' information.

With respect to a commenter's assertion that the NPRM did not provide enough guidance or procedures for how financial institutions should handle reporting for small business applicants whose principal owner(s) are a separate corporate entity or trust, under the final rule (as generally in the proposal), only individuals are considered principal owners. Thus, entities, such as trusts, partnerships, limited liability companies, and corporations, are not principal owners. Final comment 107(a)(19)–10 clarifies that if an applicant has fewer than four principal owners (*e.g.,* because only one individual owns 25 percent or more of the equity interests of the small business), the financial institution reports ethnicity, race, and sex information for the number of principal owners that the applicant has identified and reports that the ethnicity, race, and sex fields for additional principal owners are "not applicable." (In the NPRM, this clarification generally appeared in proposed appendix G, instruction 25.)

Relatedly, as discussed in the section-by-section analysis of § 1002.106(a), a trust may also be a small business applicant (as opposed to a trust that is an owner of small business applicant) under the final rule. In this case, as was noted by a trade association commenter, it is unclear who should be considered a principal owner for the purpose of principal owners' ethnicity, race, and sex information. The Bureau has added new comment 102(o)–2 clarifying that if a trust is an applicant for a covered credit transaction, a trustee is considered an owner of the trust, to align with commentary accompanying the definitions for LGBTQI+-owned business, minority-owned business, and women-owned business.

As to a commenter's concern that the rule would require financial institutions to determine the ownership of a business, it is unclear as to the specific aspect of the Bureau's proposal to which the commenter was referring. Under the Bureau's proposal (as in the final rule), a financial institution would collect and report the following information related to the ownership of an applicant: the applicant's status as a minority-owned and/or women-owned small business (as well as LGBTQI+-owned business status), the number of principal owners, and the ethnicity, race, and sex of those principal owners. A financial institution can rely (and, in fact, for the protected demographic information, must rely) upon an applicant's self-reported information. This aspect of those data points has been substantially finalized as proposed. Final comment 107(a)(18)–9, regarding the collection and reporting of women-owned, minority-owned, and LGBTQI+-owned business status information clarifies that a financial institution must only report an applicant's responses, even if it verifies or otherwise obtains such information. Final comment 107(a)(20)–2, regarding the collection and reporting of the number of an applicant's principal owners, also provides that a financial institution may rely upon an applicant's statements or information to report such information. It further provides that the financial institution is not required to verify the number of an applicant's principal owners, but if it does so, then it must report the verified information. Thus, a financial institution is not required to make its own determinations about the ownership of a business under the final rule.[333]

In light of the foregoing, the text of final § 1002.102(o) and final comment 102(o)–1 generally remain unchanged from the proposal, though upon further consideration the Bureau has changed the reference to "natural person" in the

---

[329] 86 FR 56356, 56395 (Oct. 8, 2021).

[330] 31 CFR 1010.230(d)(1). *See also* Fin. Crimes Enf't Network, U.S. Dep't of Treas., *FinCEN Guidance FIN–2018–G001: Frequently Asked Questions Regarding Customer Due Diligence Requirements for Financial Institutions* 3 (Apr. 3, 2018), *https://www.fincen.gov/sites/default/files/ 2018-04/FinCEN_Guidance_CDD_FAQ_FINAL_508_ 2.pdf.* Certain legal entities are exempted from the rule. 31 CFR 1010.230(e)(2).

[331] 31 CFR 1010.230(d)(3).

[332] 31 CFR 1010.230(d)(2).

[333] The Bureau notes, however, that as part of its proposal requiring financial institutions to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances, a financial institution would have needed to determine if a representative of the applicant with whom it was meeting in person was a principal owner. As discussed in the section-by-section analysis of § 1002.107(a)(19) below, the Bureau is not finalizing this requirement. Thus, to the extent the comment was referring to this aspect of the proposal, the commenter's concern has been rendered moot.

AdminRecord-000054

proposed definition and related comment to "individual" in the final rule. In user testing conducted on versions of the Bureau's proposed sample data collection form at appendix E, users expressed confusion about the term "natural person." [334] The Bureau does not believe that there is a meaningful difference between the terms "individual" and "natural person" and as a result has decided to use the term "individual" in the definition for comprehensibility.

The Bureau is finalizing proposed comment 102(o)–2, renumbered as final comment 102(o)–3, to explain the purpose of the definition of principal owner; the Bureau has revised this comment to reflect other changes in the rule.

### 102(p) Small Business

Final § 1002.102(p) refers to § 1002.106(b) for a definition of the term "small business." See the section-by-section analysis of § 1002.106(b) for a detailed discussion of that definition.

### 102(q) Small Business Lending Application Register

Proposed § 1002.102(q) would have defined the term "small business lending application register" or "register" as the data reported, or required to be reported, annually pursuant to proposed § 1002.109. This definition referred only to the data that is reported, or required to be reported, annually; it did not refer to the data required to be collected and maintained (prior to reporting).[335] The Bureau sought comment on its proposed definition of "small business lending application register" or "register" in proposed § 1002.102(q). The Bureau received no comments on this definition, and therefore is finalizing § 1002.102(q) as proposed.

### 102(r) State

Proposed § 1002.102(r) would have referred to existing § 1002.2(aa) for a definition of the term "State." Existing § 1002.2(aa) defines the term as any State, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States. The Bureau requested comment

[334] CFPB, User testing for sample data collection form for the small business lending final rule at app. B, at 12, 15 (Mar. 2023), https://www.consumerfinance.gov/data-research/research-reports/user-testing-for-sample-data-collection-form-for-the-small-business-lending-final-rule/.

[335] In contrast, the term "Loan/Application Register" in Regulation C § 1003.2(k) refers to both the record of information required to be collected pursuant to § 1003.4 as well as the record submitted annually or quarterly, as applicable, pursuant to § 1003.5(a).

on its proposed approach to this definition, but did not receive any feedback. The Bureau is finalizing § 1002.102(r) as proposed. The Bureau believes that, being consistent with existing Regulation B, this definition will be familiar to financial institutions.

### 102(s) Women-Owned Business

Proposed Rule

ECOA section 704B(b)(1) requires financial institutions to inquire whether applicants for credit are women-owned businesses. For purposes of the financial institution's inquiry under 704B(b), 704B(h)(6) defines a business as a women-owned business if (A) more than 50 percent of the ownership or control is held by one or more women, and (B) more than 50 percent of the net profit or loss accrues to one or more women. Section 1071 does not expressly define the related terms of "ownership" or "control," nor does it describe what it means for net profits or losses to accrue to an individual.

Proposed § 1002.102(s) would have defined a women-owned business as a business for which more than 50 percent of its ownership or control is held by one or more women, and more than 50 percent of its net profits or losses accrue to one or more women. Proposed comment 102(s)–1 would have explained that a business must satisfy both prongs of the definition to be a women-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more women, and (B) more than 50 percent of the net profits or losses accrue to one or more women.

Proposed comment 102(s)–2 would have clarified that the definition of women-owned business is used only when an applicant determines if it is a women-owned business for purposes of proposed § 1002.107(a)(19). A financial institution would have provided the definition of women-owned business when asking the applicant to provide women-owned business status pursuant to proposed § 1002.107(a)(19), but a financial institution would not have been permitted or required to make its own determination regarding whether an applicant is a women-owned business for this purpose.

Proposed comment 102(s)–3 would have further noted that a financial institution would be permitted to assist an applicant when determining whether it is a women-owned business but would not be required to do so, and could provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in proposed comments 102(s)–4 through

–6. Additionally, for purposes of reporting an applicant's women-owned business status, a financial institution would rely on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

The Bureau proposed to clarify "ownership" and "control" using concepts from FinCEN's customer due diligence rule. Proposed comment 102(s)–4 would have clarified that a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Proposed comment 102(s)–4 would have also provided examples of ownership and clarified that, where applicable, ownership would need to be traced or followed through corporate or other indirect ownership structures for purposes of proposed §§ 1002.102(s) and 1002.107(a)(19). Proposed comment 102(s)–5 would have clarified that a natural person controls a business if that natural person has significant responsibility to manage or direct the business and would provide examples of natural persons who control a business. Proposed comment 102(s)–6 would have clarified that a business's net profits and losses accrue to a natural person if that natural person receives the net profits, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

The Bureau sought comment on the proposed definition of women-owned business and possible alternatives that may clarify the term in order to help ensure that small business applicants can determine whether they are women-owned businesses for purposes of data collection pursuant to section 1071.

Comments Received

The Bureau received comments regarding the definition of a women-owned business from a number of banks, trade associations, and community groups.

One community group requested that the Bureau add an "I don't know" response to the list of possible responses, as there may be applicants who cannot make a legal conclusion as to whether the small business is women-owned.

Regarding the proposed requirement that to be considered a women-owned business, one or more women must hold "more than 50 percent" of the ownership or control, the Bureau received several comments from community groups and a CDFI lender

supporting this requirement. A trade association stated that the Bureau should revise the requirement to state that one or more women must hold "50 percent or more" of the ownership or control because the statutory definition may result in underreporting for equal partnerships with mixed gender partners.

Regarding the proposed requirement that to be considered a women-owned business, more than 50 percent of the net profit or loss must accrue to one or more women, one community group stated that the statutory definition is appropriate to prevent illusory "ownership" by one or more women. Another commenter supported the definition.

Some commenters stated that the Bureau should not include the statutory definition requirement that more than 50 percent of the net profit or loss must accrue to one or more women. A number of commenters stated that the initial prong of the definition requiring more than 50 percent of ownership or control by a woman is sufficient for determining ownership and would reduce complexity for borrowers. A CDFI lender stated that defining ownership on a profit and loss calculation may not fully serve the objectives of the statute, and asked the Bureau to consider the CDFI Fund definition of women-owned business.[336] Several industry commenters asserted that the net profits or losses prong complicates the definition, can result in inaccurate data collection (for example, in spousal relationships where each partner equally owns and controls a small business), implicates the limited understanding of many small business owners regarding the meaning of net profits and losses as well as the sensitive nature of these issues, and that many small business owners will not understand the definition as provided and will, as a result, decline to answer the question.

A bank asked for clarification whether data (specifically demographic data) collected in prior years could be reused, and what to do if there are multiple collections. Specifically, the commenter

gave an example of an applicant that provides demographic information for one application, and then chooses not to provide information for a subsequent application, and asking which collection should be reported.[337] A trade association stated that it is possible in certain States for a third party non-owner to act as trustee of a trust, and that the Bureau should change a comment example to clarify whether it is the Bureau's intent to presume that the trustee of a trust is the owner. Another bank also asserted that requiring banks to collect such information is costly to banks, customers, and communities. A group of trade associations asserted that the commentary should be revised to explicitly state that a financial institution must provide an applicant with the applicable definition.

### Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.102(s) with one addition and one minor adjustment for clarity, along with several non-substantive technical revisions to update citations to other provisions.

Final § 1002.102(s) defines a women-owned business as a business for which more than 50 percent of its ownership or control is held by one or more women, and more than 50 percent of its net profits or losses accrue to one or more women. Final comment 102(s)–1 explains that a business must satisfy both prongs of the definition to be a women-owned business and includes an additional sentence to clarify that a business that is controlled by a woman or by women satisfies this prong of the definition even if none of the individuals with ownership in the business are women.

Final comment 102(s)–2 clarifies that the definition of women-owned business is used only when an applicant determines if it is a women-owned business for purposes of final § 1002.107(a)(18), and is finalized as proposed with the exception of one small adjustment for clarity.

Final comment 102(s)–3 is finalized as proposed and notes that a financial institution is permitted to assist an applicant when determining whether it is a women-owned business but is not required to do so, may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in final comments 102(s)–4 through –6, and that, for purposes of reporting an

applicant's women-owned business status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

Final comment 102(s)–4 is finalized with an updated cross-reference and minor edits for consistency and clarity. It provides examples of ownership and clarifies that, where applicable, ownership needs to be traced or followed through corporate or other indirect ownership structures. With regard to a commenter's assertion that, in certain states, a trustee could act as a third party non-owner trustee of a trust, the Bureau believes that in such circumstances, the trustee would be considered an owner for purposes of this definition. Final comment 102(s)–4 also clarifies (as it did in the Bureau's proposal) that a trustee is considered the owner of a trust.

Final comment 102(s)–5 clarifies that an individual controls a business if that individual has significant responsibility to manage or direct the business, while final comment 102(s)–6 clarifies that a business's net profits and losses accrue to an individual if that individual receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes. Both comments are finalized with minor edits for consistency and clarity.

The Bureau does not believe that it would be appropriate to deviate from the statutory definition of women-owned business, as suggested by some commenters, and notes that the Bureau's authority to deviate from the statutory language is limited. The Bureau also believes that many small business applicants already respond to questions about who owns and who controls a business entity when completing customer due diligence forms or otherwise responding to questions related to that rule and thus will be familiar with the concepts therein. Although the customer due diligence rule does not address the second prong of the definition regarding accrual of net profits or losses, final comment 102(s)–6 provides a comprehensive explanation of this prong of the definition.

With regard to comments urging the Bureau to remove the prong requiring that more than 50 percent of its net profits or losses accrue to one or more women in order to be considered a women-owned business, the Bureau finds that this prong is necessary to prevent illusory "ownership" claims by "straw" owners.

Finally, in accordance with ECOA section 704B(g)(3), the Bureau may

---

[336] The community group cited to the September 2021 CDFI Transactional Level Report Data Point Guidance, which provides guidance on providing transactional level report data. Under "Women Owned or Controlled," the guidance states to "[r]eport whether the investee/borrower is more than 50% owned or controlled by one or more women. If the business is a for-profit entity, report whether more than 50% of the owners are women. If the business is a nonprofit entity, report whether more than 50% of its Board of Directors are women." CDFI Fund, *CDFI Transactional Level Report Data Point Guidance*, at 33 (Sept. 2021), *https://www.cdfifund.gov/sites/cdfi/files/2021-08/CDFITLRGuidance_Final_Sept2021.pdf*.

[337] See the section-by-section analysis of § 1002.107(d) for a discussion on the use of previously collected data.

AdminRecord-000056

release material, as part of its regulatory implementation strategy, to assist both financial institutions in complying with the requirements of § 1002.102(s) and small businesses in understanding this definition.

Proposed Definition of Dwelling

Proposed § 1002.102(j) would have referred to Regulation C § 1003.2(f) for a definition of the term "dwelling." That provision defines dwelling to mean a residential structure, whether or not attached to real property. The term includes but is not limited to a detached home, an individual condominium or cooperative unit, a manufactured home or other factory-built home, or a multifamily residential structure or community. Proposed comment 102(j)–1 would have provided that Bureau interpretations that appear in supplement I to part 1003 containing official commentary in connection with § 1003.2(f) are generally applicable to the definition of a dwelling in proposed § 1002.102(j). Proposed comment 102(j)–2 would have clarified that the definition of dwelling under existing § 1002.14(b)(2) applies to relevant provisions under existing Regulation B, and proposed § 1002.102(j) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing § 1002.14(b)(2). The Bureau did not receive any comments on this aspect of the proposal.

The Bureau is not finalizing its proposed definition of "dwelling." The need for the Bureau to adopt its own definition of "dwelling" in this rulemaking is obviated by the Bureau's decision in this final rule to not require reporting of transactions that would constitute "covered loans" under Regulation C. That decision is discussed in detail in the section-by-section analysis of § 1002.104 below. The Bureau understands that there may be limited instances where a dwelling is used as collateral for a covered credit transaction that does not fall under the definition of a Regulation C covered loan because it does not involve the purchase, improvement, or refinance of a dwelling—for example, where a small business seeks to use their primary dwelling as collateral to obtain working capital such as inventory. In this example, the transaction would only be reported under the final rule, not under Regulation C, with a credit purpose of working capital (includes inventory or floor planning) per final comment 107(a)(6)–1. Taking into account these limited circumstances, the Bureau

believes that adopting the Regulation C definition of dwelling is no longer necessary to minimize the compliance risks that would have arisen from having to report a transaction under both Regulation C and this final rule.

*Section 1002.103    Covered Applications*

ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered financial institutions, the definition of "application" will trigger data collection and reporting obligations with respect to covered credit transactions. However, section 1071 does not expressly define "application."

The Bureau is finalizing § 1002.103 and associated commentary with minor revisions for clarity and consistency, to define what is, and is not, a covered application for purposes of subpart B pursuant to its authority in ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Final § 1002.103(a) provides a general definition of the term "covered application," followed by a list of the circumstances that are not covered applications in final § 1002.103(b). For the reasons discussed below, the Bureau believes that its determinations as to what does and does not constitute a covered application for purposes of this rulemaking constitute reasonable interpretations of an "application" as used in section 1071.

103(a) Covered Application

Proposed Rule

The Bureau proposed to define a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. As noted above, the term "application" is undefined in section 1071. The Bureau believed its proposed definition of the term was reasonable, particularly as it would align with the similar definition of "application" in existing § 1002.2(f). The Bureau also proposed commentary to accompany this definition.

In considering the proposed definition of a "covered application," the Bureau believed that incomplete and withdrawn applications—which would have generally been captured under proposed § 1002.103(a)—would be essential to the purposes of section 1071 as a tool to identify potential

discrimination and to better understand the credit market. The definition of "covered application" in proposed § 1002.103(a), which was similar to the definition of "application" in existing § 1002.2(f), would have also been familiar to creditors and would have provided flexibility to accommodate different application processes.

The Bureau recognized that the proposed definition of "covered application" in § 1002.103(a), while flexible, would have meant that data collection and reporting may be triggered at different times for different financial institutions and different types of covered credit transactions. While the proposed definition of "covered application" would not have provided a bright-line rule, the Bureau believed the proposed definition would have been familiar to financial institutions and would have provided consistency with similar definitions found in existing Regulation B and Regulation C.

As discussed in the NPRM, the Bureau also considered proposing several other options for defining a "covered application." First, the Bureau considered triggering collection and reporting based on a "completed application," which is defined in existing § 1002.2(f) as an application in which the creditor has received "all the information that the creditor regularly obtains and considers" in evaluating similar products. As noted in the NPRM, the Bureau did not propose to use the definition of "completed application" in existing § 1002.2(f) for its definition of covered application in subpart B, as doing so would have excluded incomplete applications and many withdrawn applications that may reflect demand for credit or potential discrimination during the application process. The Bureau also considered proposing to define "covered application" as a set of specific data points that, if collected, would trigger a duty to collect and report small business lending data. As noted in the NPRM, the Bureau did not propose this approach for several reasons, including that it would have introduced a new regulatory definition of "application," would have led to operational changes and complexities for financial institutions, and could have led to increased evasion.

Proposed comments 103(a)–1 through –3 would have provided additional guidance on identifying what is a "covered application." Proposed comments 103(a)–4 through –6 would have addressed how a financial institution reports multiple covered credit transaction requests at one time or a request for a credit transaction that results in the origination of multiple

AdminRecord-000057

covered credit transactions. Proposed comment 103(a)–7 would have addressed how a financial institution would report applications where there is a change in whether the applicant is requesting a covered credit transaction.

The Bureau sought comment on its proposed definition of a covered application in § 1002.103(a) and associated commentary. The Bureau also sought comment on the advantages and disadvantages of collecting data on incomplete or withdrawn applications, as well as how collection would or would not further the purposes of section 1071. In addition, the Bureau sought comment on reporting of multiple lines of credit on a single credit account, including how financial institutions internally consider multiple lines of a credit on a single account and the Bureau's approach in proposed comment 103(a)–6.

Comments Received

The Bureau received comments on its proposed approach to defining a covered application from a wide range of lenders, trade associations, community groups, and a business advocacy group. The overwhelming majority of commenters to address the issue, including most industry commenters and some community groups, generally supported the Bureau's proposal to define a ''covered application'' largely consistent with the existing Regulation B definition. Several of these commenters stated that lenders are familiar with the existing Regulation B definition and so implementing it within this rule would minimize the need for additional training or new procedures. Commenters also stated that the proposed definition is a flexible one that can accommodate the variety of small business lenders, products, and processes that exist in the marketplace, and thus avoids a one-size-fits-all approach that would be unworkable in small business lending. Several lenders and trade associations urged the Bureau to finalize proposed comment 103(a)–1, which would have provided that a financial institution has latitude to establish its own application process or procedures, including designating the type and amount of information it will require from applicants. Some of these commenters also stated that the proposed comment is consistent with longstanding interpretation of existing Regulation B and that the flexibility is critical given the unique nature of commercial credit applications. A community bank stated that defining an application based on a set of specific data points would be inappropriate for commercial lending, which is less

standardized than consumer mortgage lending. The bank further noted that defining an application based on a standardized set of data points would be unnecessary so long as each data point has a ''not applicable'' or ''not received'' choice for incomplete applications, which the commenter emphasized would be important to capture.

Some community groups and community-oriented lenders expressed support for the Bureau's proposed definition because it would capture applicants that do not make it to a completed application, and therefore potentially help identify barriers to credit early in the application process. These commenters argued that the proposed definition would further the purposes of section 1071, including by identifying potential bias, discouragement, or other discrimination. Similarly, some community-oriented lenders stated that the proposed definition would strike the right balance of triggering data collection and reporting requirements only after there is an actual request for credit, but still early enough in the process to capture most incomplete, withdrawn, and denied applications.

One community group expressed concern about the lack of standardization under the proposed definition, but ultimately concluded that the proposed definition makes sense and any concerns could be allayed through monitoring. The commenter expressed understanding for the desire to follow current lender procedures for defining an application based on existing Regulation B, though noted that how a lender defines an application should have enough standardization to generate consistent data and be early enough in the process to capture incomplete and withdrawn applications, which are necessary to identify discouragement. The commenter also expressed support for the idea that peer comparisons may be a reasonable way to check a financial institution's method of defining an application; for example, by analyzing whether a financial institution has abnormally high rates of approval or low rates of incomplete applications.

A number of industry commenters, including community banks, credit unions, and trade associations, described the small business application process as informal and consultive. These commenters explained that the application process often does not involve a written application or a ''formal'' application, can be months-long, and often involves extensive back-and-forth communications between the lender and the small business, including

in-person meetings, phone calls, texts, and emails. One commenter noted that many loans are funded without any ''application,'' but rather based on the business's existing relationship with the institution and financial information on file. Some commenters described how the application process can start informally from a conversation, a general inquiry, or as an offshoot to deposit activity. Commenters explained that a business will bring in financial statements, tax returns, business plans, and other documents, which will be reviewed by the financial institution in order to analyze and generate the most appropriate package to fit the credit needs of the business. Several banks stated that business customers will often ''shop around'' with multiple financial institutions to get the best terms. Several commenters stated that small business lending often involves a lot of ''hand holding'' and lender involvement to reach a point where a formal application or a particular product and terms can be considered. Industry commenters also stated that commercial business customers are unique and each requires an individualized approach based on the characteristics of the business and the products of interest. Several commenters also noted that the small business lending process differs from mortgage lending, which is highly regimented and uniform.

A number of community banks and other industry commenters expressed concern that the Bureau's rule implementing section 1071 would standardize and formalize the small business application process (which, they asserted, would be to its detriment); they predicted that business customers would be unhappy with the more rigid lending structure, and may avoid seeking credit altogether. These commenters expressed concern that small business lending would become impersonal and ''form centric,'' and that it would change the fundamental relationship between lender and borrower, including the personalized attention and advice currently provided by lenders. Many of these commenters stated the view that the rule's data collection and reporting requirements would cause them to lose flexibility and adopt ''check-the-box'' criteria that is at odds with how community banks conduct business. Several commenters were concerned that at the start of an inquiry, a lender would need to implement a written application or other formalized method to collect the required data and that by doing so, conversations will turn into implied commitments. Commenters also stated

the belief that lenders would implement a more rigid application process in order to avoid triggering data collection and reporting requirements under the Bureau's rule. Several other commenters argued that data collection and reporting obligations would require lenders to rebuild their loan application process and incur additional training and other costs, would reduce the availability of credit, and would give large banks an unfair advantage because such entities will have an easier time implementing the requirements of the Bureau's rule for online applications.

Most of these commenters' concerns were directed at small business lending data collection and reporting generally, and not specifically at the proposed definition of a covered application. However, a few commenters urged the Bureau to finalize a more concrete definition of covered application due to the concern that a subjective definition would be difficult for financial institutions' employees to implement. One commenter was also concerned about how its practices would be reviewed by the subjective judgment of examiners. Another commenter cautioned against reporting of oral applications, noting that it could lead to inaccurate data if an answer is misheard or mistyped.

Some industry commenters, including trade associations for community banks, credit unions, and online lenders, requested the Bureau define a covered application consistent with existing Regulation B's "completed application" definition in existing § 1002.2(f), which would require reporting only when the lender has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (*i.e.*, enough information to make a credit decision). These commenters argued that triggering data collection and reporting off an "oral or written request" would be unrealistic, unworkable, and too open-ended. One commenter stated that a mere request is not something a lender can act or report on because there is insufficient information at that point to make the required reporting. Another commenter said that lenders need clear guidance on what events trigger data collection and the completed application definition would provide the most uniformity across products and financial institutions. Another commenter stated that using the completed application definition would avoid collecting data on incomplete applications, which often come from "unengaged" applicants. This commenter also noted that collecting 1071 data could lead to

applicant confusion as to why personal information is being collected, which could lead to more incomplete applications. The commenter further argued that completed applications are the most essential data to capture in small business lending, that there is no indication Congress intended section 1071 to mirror HMDA or existing Regulation B, and that discouragement can be investigated using other 1071 data and existing examination authorities. Similarly, two industry commenters opposed requiring reporting on incomplete or withdrawn applications, arguing that reporting such transactions would not serve the purposes of section 1071, would create additional operational and regulatory burden, and that the focus of the Bureau's rule should be on declined and originated applications. Another urged the Bureau to avoid triggering collection based on when a credit check is pulled, noting that financial institutions may often conduct a soft pull credit check outside the application process.

In contrast, some community group commenters argued that the proposed definition of covered application would be too narrow, and requested that a covered application include all communications where a business inquires about credit and seeks a credit decision. In support, the commenters pointed to research identifying discrimination in the pre-application stage. As noted above, other community group commenters supported the Bureau's proposed definition of a covered application, stressing the need to capture applications that do not make it to a completed application.

The Bureau received several comments on certain aspects of its proposed commentary to § 1002.103(a). A community bank and a community group supported proposed comment 103(a)–4, which would have provided that if an applicant makes a request for two or more covered credit transactions at one time, the financial institution reports each request for a covered credit transaction as a separate covered application. The bank stated that while the proposed approach would result in more work for the financial institution, it would lead to more accurate reporting (since each request would generate different reported data) and the approach would be similar to how data are reported under Regulation C. The community group commenter stated that it would be a reasonable approach and would accurately reflect the varied credit needs of applicants. A group of community group commenters supported the Bureau's proposed approach to require reporting of

separate applications where an applicant seeks two or more products at one time, but requested that where the applicant only seeks one product, but is not sure about the type of product, it should only be reported as a single covered application. These commenters also noted a concern that the language in proposed comment 107(a)(5)–2 requiring lenders to maintain reasonable procedures designed to collect data, including regarding the credit product requested, would require the lender to identify each product that would be acceptable to the applicant, and if multiple, report them as separate covered applications.

In response to the Bureau's request for comments as to how a financial institution should report applications where there is a change in whether the request for credit involves a covered credit transaction, which was addressed in proposed comment 103(a)–7, the Bureau received feedback from trade associations and a business advocacy group. These commenters opposed reporting on a transaction in which the product ultimately pursued is not a covered credit transaction. They argued that financial institutions should not be required to report on non-covered credit transactions, collecting partial data on a product that is not a covered transaction would affect data quality and be of low value, and doing so would not advance the purposes of section 1071. Two of the commenters sought clarification or a safe harbor providing that if a financial institution collects data on an application that the financial institution anticipates will be covered by the Bureau's rule implementing section 1071 at the time of collection, but ultimately is not covered, the initial collection does not violate existing Regulation B. Otherwise, the Bureau did not receive any additional comments directly discussing proposed comment 103(a)–7 and limited reporting of non-covered credit products, despite seeking comment on the advantages and disadvantages of requiring full or limited reporting where an applicant initially seeks a product that is a covered credit transaction, but ultimately is offered and accepts a product that is not reportable.

Although the Bureau did not seek comment on the issue, a couple commenters asked how to report on an application made jointly by multiple business co-applicants. An agricultural lender requested that, if an application is submitted by more than one business, the financial institution be permitted to treat all co-applicants as one applicant when determining whether a borrower is a "small business." The commenter

also asked the Bureau to clarify how to identify whether the application is from a minority-owned or women-owned business where one, but not all, co-applicants are minority- and women-owned businesses. Another commenter requested that the Bureau clarify that loans jointly made to multiple businesses, where one or more of the co-applicants may qualify as a small business under the rule, but are not the primary business seeking the funding, are not subject to data collection and reporting requirements.

Several commenters asked the Bureau to clarify certain scenarios related to a covered application, including clarifying that certain scenarios are not covered applications. Several industry commenters were concerned that language in the NPRM's preamble—noting that ECOA section 704B(b)(1) provides that an "application" triggering data collection and reporting obligations occurs without regard to whether such application is received in person, by mail, by telephone, by electronic mail or other form of electronic transmission, or by any other means—may be interpreted to *require* a financial institution to accept an application through all of these channels. One commenter asked for clarification whether a covered application includes an incomplete application where the information provided is insufficient to render a credit decision by the lender. A trade association representing online lenders asked the Bureau to expressly exclude from the definition of a covered application the circumstance where a business populates certain information on a web page, but does not follow through with submitting the form to the financial institution. The commenter argued that it would be very burdensome for the financial institution to capture such circumstances as reportable transactions and that attempting to do so would result in misleading, erroneous, and unhelpful data. A couple commenters requested certain additional exclusions from the definition of covered application, including for HMDA reporters, co-branded and private label credit cards, and purchased loans.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.103(a) as proposed to define a "covered application" as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. As described above, the

overwhelming majority of commenters, including industry and community group commenters, supported this definition. As noted by some commenters, the definition will be familiar to creditors, provides flexibility to accommodate different application procedures and lending models (including written and oral applications), and will capture incomplete and withdrawn applications, which are essential data for identifying potential barriers to credit, including potential discrimination. Final § 1002.103(a) will also align with the similar definition of "application" in existing § 1002.2(f), which is reasonable given the term "application" is otherwise undefined in ECOA and section 1071. Finally, the Bureau believes this approach strikes an appropriate balance by triggering data collection and reporting requirements only after there is a request for credit (using procedures defined by the financial institution), but still early enough in the process to capture most incomplete, withdrawn, and denied applications, which are essential data to the purposes of section 1071.

A number of industry commenters, particularly smaller institutions that engage in relationship lending, described the application process as informal, high-touch, and involving extensive back-and-forth. The Bureau believes the final definition of covered application can work well within the heterogeneous and sometimes iterative context of small business lending. Indeed, final § 1002.103(a) defines covered application in a manner that provides financial institutions flexibility to define an application based on its own unique business model. Thus, while a financial institution must have some type of trigger or tipping point within its process when an applicant has made a request for credit in accordance with its procedures, therefore triggering a "covered application," financial institutions have leeway on how precisely to define that tipping point, provided it occurs in the early stages of the process before a financial institution has begun meaningfully evaluating or underwriting the request.[338] Moreover,

as noted above, creditors complying with existing Regulation B should be familiar with this definition, and have already incorporated it in some manner into their processes.[339] In response to industry commenters' concern that data collection and reporting under this final rule will standardize and formalize small business lending, the Bureau notes that most of this feedback was not directed at the proposed definition of a "covered application," but rather at the overall data collection and reporting regime. Indeed, some of the commenters raising these concerns also expressly supported the proposed definition of a covered application. Moreover, in response to commenters' general concerns that data collection and reporting under this rule will standardize and formalize small business lending, the Bureau does not believe that collection of certain data points will necessitate that lenders to fundamentally alter how they conduct business. Moreover, section 1071 is a congressional mandate; the Bureau has sought to implement it in a manner that furthers the purposes of the statute while reducing unnecessary burden.

---

[338] The Bureau recognizes that the flexibility provided in final § 1002.103(a), which defines a covered application, may result in data collection and reporting obligations being triggered at different times for different financial institutions and different types of covered credit transactions. For example, for a financial institution that defines an application under its procedures as the submission of a standard form either online or in-person, a "covered application" will be triggered when an applicant submits the form. In contrast, another financial institution may not use a standard form

and instead define an application as a request for credit only when the applicant authorizes the creditor to pull a credit check on the business and principal owners to allow the creditor to determine whether the business, in particular, qualifies for a particular product. In that circumstance, a "covered application" will not be triggered until that process was satisfied. Using the same example, if the financial institution orally collects certain information from a prospective applicant (such as gross annual revenue and business location) and discusses with the prospective applicant potential credit product options offered by the financial institution, no "covered application" will be triggered until the prospective applicant indicates that it wants to proceed to apply for credit and authorizes the financial institution to pull a credit check. Similarly, if a prospective applicant merely expresses interest in knowing the types of products that the creditor offers—not yet focusing on any particular type of covered credit transaction and not yet interested in submitting a "covered application"—the interaction also will not be reportable under this example.

[339] The Bureau believes that business creditors should be familiar with operationalizing this definition based on their experience providing adverse action notices under existing Regulation B, which can be triggered in relation to an incomplete application. *See* § 1002.9(a)(1) and (c) (requiring notice within 30 days after taking adverse action on an incomplete application or 30 days after receiving an incomplete application). The Bureau believes that financial institutions may also be familiar with Regulation C's definition of "application," which generally aligns with existing § 1002.2(f)'s definition of the term. *See* § 1003.2(b) (generally defining an "application" as "an oral or written request for a covered loan that is made in accordance with procedures used by a financial institution for the type of credit requested"); *see also* Regulation C comment 2(b)–1 (noting that Bureau interpretations that appear in the official commentary to Regulation B are generally applicable to the definition of application under Regulation C).

Several commenters had specific suggestions or concerns regarding the definition of a covered application. Regarding several commenters' concern that the definition is too subjective, the Bureau notes that a bright-line definition would likely impose a more rigid process on financial institutions that would be difficult to implement given the heterogenous nature of small business lending. Moreover, as noted above, the definition used in final § 1002.103(a) should be familiar to financial institutions and will provide consistency with existing Regulation B and Regulation C. The Bureau is also not adopting existing Regulation B's definition of a "completed application," as urged by some commenters. Although the Bureau agrees that a "completed application" definition would provide greater uniformity, the definition would exclude incomplete applications and most withdrawn applications. The Bureau believes including such applications is essential to the purposes of section 1071, as it may reflect demand for credit and potential discrimination early in the application process. As to the commenters who took issue with the proposed covered application definition precisely because it includes incomplete and withdrawn applications, the Bureau believes collecting data on such applications is likewise essential for the purposes of section 1071 and may reveal important trends or information on why small businesses initially seek credit, but ultimately do not complete the application process.

On the other hand, the Bureau does not believe it would be appropriate to expand the definition of "covered application" to include all communications where a business inquires about credit and seeks a decision. Although discrimination may occur in the pre-application phase, the Bureau believes that it could be very difficult as an operational matter for financial institutions to collect 1071 data whenever a business expresses any interest in credit, no matter how preliminary or informal the request, and that could require reporting of transactions with missing, unavailable, or erroneous data. As discussed below in the section-by-section analysis of § 1002.103(b), the Bureau is excluding inquiries and prequalification requests from the definition of a covered application; many of the reasons for those exclusions are relevant here as well and thus the Bureau is not broadening the general definition of a covered application. In response to a commenter's concern about reporting of

oral applications, the Bureau notes that it is the responsibility of the financial institution to ensure that it accurately collects and reports required data pursuant to final § 1002.107, no matter the method of application. Commenter requests for certain additional exclusions from the definition of covered application, including for HMDA reporters, co-branded and private label credit cards, and purchased loans, are addressed in more detail in the section-by-section analysis of § 1002.104 below.

Several commenters asked the Bureau to clarify certain scenarios related to a covered application. First, in response to several industry commenters' concerns that the language in the NPRM's preamble discussing ECOA section 704B(b)(1) could be interpreted to *require* a financial institution to accept an application through all of these channels, the Bureau notes that this was not the intent and that it does not interpret ECOA section 704B(b)(1) in that manner. Rather, the Bureau interprets the statutory language to mean that data collection and reporting requirements apply regardless of a financial institution's method of accepting applications. Thus, whatever the means used by a financial institution to accept applications (*e.g.,* in person, by telephone, by electronic transmission, etc.), once a covered application is triggered, the financial institution has a duty to collect and report on the application.

Next, a commenter asked whether a covered application includes an incomplete application where the information provided is insufficient to render a credit decision by the lender. Assuming the business has requested a covered credit transaction in accordance with procedures used by a financial institution for the type of credit requested, the financial institution would be required to collect and report data, even if there is insufficient information to render a credit decision.[340] Indeed, as noted above, the

[340] Generally, a "covered application" may align with the information necessary to make a credit decision or it may be possible to have a "covered application" before having information necessary to make a credit decision—it depends on each financial institution's own procedures. For example, suppose a financial institution defines an application under its procedures as the point when an applicant, or someone on the applicant's behalf, requests credit by filling out certain key pieces of information on an application form. If nothing else is required to qualify for credit and the financial institution's process is to immediately transmit the application to underwriting for a decision once the form is submitted, under the proposed definition of "covered application," data collection and reporting obligations would likely be triggered at the same time there is sufficient information to

Bureau believes capturing incomplete or withdrawn applications is essential to the purposes of section 1071.

In response to a trade association's request to expressly exclude from the definition of a covered application the circumstance where a business populates certain information on a web page, but does not follow through with submitting the form to the financial institution, the Bureau notes that reporting of such circumstances depends on the procedures used by a financial institution for the type of credit requested. For example, if a financial institution's procedures require an applicant to submit a paper or digital form to the financial institution in order to be considered for the credit product requested, then there is no covered application that is reportable until the business submits the form to the financial institution. If, on the other hand, the financial institution regularly begins evaluating information about the applicant even if the form is not "officially" submitted to the financial institution, then there is likely a reportable covered application, even if the applicant has not "submitted" the form. In other words, if a financial institution offering online applications does not track or begin to evaluate applications until the business presses a "submit" button, the financial institution would not be required to begin tracking partial information inputted online for purposes of this final rule.

One commenter was concerned that the proposed definition lacked standardization, and emphasized the need for monitoring to ensure that financial institutions define an application under their own procedures in a manner that generates consistent data and is early enough in the process to capture incomplete and withdrawn applications. The Bureau agrees that review of data, including peer analysis, is important and may indicate whether a financial institution collects data in a manner that appropriately captures incomplete and withdrawn applications. For example, instances of unusually high approval rates or unusually low rates of incomplete and withdrawn applications can preliminarily indicate financial institutions that may be seeking to define an "application" in its written

make a credit decision. On the other hand, if the financial institution requires additional verification of information and the institution commonly makes follow-up requests after the applicant has requested credit and before submitting the loan file to underwriting, the financial institution would likely have a "covered application" before it has sufficient information to make a credit decision.

AdminRecord-000061

policies as occurring later in the process than actually occurs in practice; if a financial institution has a very high approval rate because all "applications" have been vetted earlier in the process, the financial institution's stated definition of an application likely does not reflect its actual practices. Similarly, where a financial institution has very few incomplete or withdrawn applications this may—depending on the financial institution's product offering and business model—be a sign that the financial institution is collecting data or defining an application as occurring after an applicant has requested credit. While a financial institution has flexibility to identify its own procedures for what constitutes a request for credit, thereby triggering data collection and reporting obligations under this final rule, the Bureau anticipates that in most cases a covered application will typically occur before the financial institution underwrites or evaluates the request for credit.

The Bureau is finalizing comment 103(a)–1 with minor revisions for clarity. Final comment 103(a)–1 underscores that a financial institution has latitude to establish its own application procedure and to decide the type and amount of information it will require from applicants. The Bureau removed the word "process" (from the phrase "process and procedures") in proposed comment 103(a)–1 to align with the term "procedures" in final § 1002.103(a) and in final comment 103(a)–2; the rewording is not intended to indicate a substantive change. The Bureau is also finalizing as proposed comments 103(a)–2 and –3. Final comment 103(a)–2 explains that the term "procedures" refers to the actual practices followed by a financial institution as well as its stated application procedures, and provides an example. Final comment 103(a)–3 provides that the commentary accompanying existing §§ 1002.2(f) and 1002.9 is generally applicable to the definition of "covered application," except as provided otherwise in final § 1002.103(b).

In response to certain commenter questions about the scope of a covered application, the Bureau is adding new comment 103(a)–4 to clarify that the term covered application does not include solicitations, firm offers of credit, and other evaluations or offers initiated by the financial institution because in these situations, the business has not made a request for credit, and provides illustrative examples. New comment 103(a)–4, including a summary of comments received relating

to the change, is discussed in the section-by-section analysis of § 1002.103(b).

The Bureau is finalizing comment 103(a)–5 (proposed as comment 103(a)–4) to provide that if an applicant makes a request for two or more covered credit transactions at one time, the financial institution reports each request as a separate covered application. The Bureau believes this approach furthers the purposes of section 1071 by better capturing demand for credit, including demand for different covered credit transactions at the same time. The Bureau also believes this method of reporting will lead to higher data accuracy, as argued by one commenter, due to the simplicity of the approach. Finally, the Bureau believes that concerns about duplicative information requests will be mitigated by permitting financial institutions to reuse certain previously collected data, as set forth in final § 1002.107(d). In response to a commenter request, the Bureau is revising final comment 103(a)–5 to clarify that if an applicant is only requesting a single covered credit transaction, but has not decided on which particular product, the financial institution reports the request as a single covered application. This clarification resolves a commenter's concern that a financial institution will need to report multiple covered applications if more than one credit product is acceptable to the applicant. Final comment 103(a)–5 also provides illustrative examples.

The Bureau is finalizing comments 103(a)–6 and –7 (proposed as comments 103(a)–5 and –6) with minor adjustments for clarity and consistency. Final comment 103(a)–6 addresses the circumstance where an initial request for a single covered credit transaction would result in the origination of multiple covered credit transactions. Similarly, final comment 103(a)–7 addresses requests for multiple lines of credit at one time, providing that such requests are reported based on the procedures used by the financial institution for the type of credit account.

The Bureau is adopting new comment 103(a)–8 to address reporting of duplicate covered applications. Under new comment 103(a)–8, a financial institution may treat two or more duplicate covered applications as a single covered application for purposes of subpart B, so long as for purposes of determining whether to extend credit, the financial institution would also treat one or more of the applications as a duplicate under its procedures. The Bureau is adding this comment to respond to commenters' general concerns about duplicative reporting

and because the Bureau does not believe reporting of true duplicates would further the purposes of section 1071. As set forth in new comment 103(a)–8, however, the provision only applies if the applications are duplicates that a financial institution would otherwise treat as such under its own procedures.

The Bureau is finalizing comment 103(a)–9 (proposed as comment 103(a)–7) with revisions for clarity. Final comment 103(a)–9 addresses how a financial institution reports applications where there is a change in whether the applicant is requesting a covered credit transaction. Final comment 103(a)–9 provides that if an applicant initially requests a product that is not a covered credit transaction, but prior to final action taken decides to seek instead a product that is a covered credit transaction, the application is a covered application and must be reported pursuant to final § 1002.109. However, if an applicant initially requests a product that is a covered credit transaction, but prior to final action taken decides instead to seek a product that is not a covered credit transaction, the application is not a covered application and thus is not reported. The Bureau agrees with commenters' concerns that requiring reporting on applications where the applicant ultimately does not seek a covered credit transaction could lead to data quality issues, for example, if only partial data are captured. Although the Bureau sought comment on whether to require full or limited reporting in order to address concerns about potential steering in these cases, the Bureau did not receive any specific comments advocating for either full or limited reporting. In response to commenter requests for clarification that a financial institution does not violate existing Regulation B if it collects otherwise prohibited information on a transaction that ultimately is not a covered application, the Bureau has revised final § 1002.112(c)(4) to provide a safe harbor for incorrect determination of a covered credit transaction if, at the time of collection, the financial institution had a reasonable basis for believing that the application was a covered application. The Bureau has also revised final comment 103(a)–9 to clarify that once a financial institution determines there is a covered application, it shall endeavor to compile, maintain, and report the data required under § 1002.107(a) in a manner that is reasonable under the circumstances. Final comment 103(a)–9 also discusses reporting if a financial institution makes a counteroffer for a product that is not a covered credit

**35212** **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

transaction. Finally, the Bureau revised the language "during the application process" to "prior to final action taken" in final comment 103(a)–9 to provide greater clarity on the applicable timeframe.

The Bureau is adding new comment 103(a)–10 to address reporting in situations where a covered financial institution receives a covered application from multiple businesses that are not affiliates, as defined in final § 1002.102(a). The Bureau is adding this commentary in response to commenters' questions about how to report certain data if there is more than one co-applicant. Final comment 103(a)–10 provides that if a covered financial institution receives a covered application from multiple businesses who are not affiliates, as defined by final § 1002.102(a), it shall compile, maintain, and report data pursuant to final §§ 1002.107 through 1002.109 for only a single applicant that is a small business, as defined in final § 1002.106(b). A covered financial institution shall establish consistent procedures for designating a single small business for purposes of collecting and reporting data under subpart B in situations where there is more than one small business co-applicant, such as reporting on the first small business listed on an application form.

The Bureau considered requiring reporting data of all co-applicant small businesses, but doing so could potentially add significant complexity and may result in data quality issues. For example, reporting co-applicants as separate applications would likely result in duplicative reporting or special rules to address how to modify the reported data to avoid duplication. Similarly, requiring additional fields to accommodate reporting of all co-applicants' information would result in a significant expansion of the total data fields reported, adding considerable complexity and potentially leading to data quality issues. Given that only two commenters raised the issue of co-applicants, the Bureau believes that financial institutions likely do not frequently encounter applications involving more than one small business applicant.

On the other hand, the Bureau is not requiring reporting of a small business co-applicant only if it is the primary business seeking funding, as suggested by one commenter. The Bureau believes it may not always be clear who is the "primary" applicant if there are multiple co-applicants; such a rule could be used to evade reporting altogether in these situations. The Bureau therefore believes that it is

reasonable to require data collection and reporting for a single small business if there are multiple co-applicants. Final comment 103(a)–10 provides several illustrative examples. In addition, new § 1002.5(a)(4)(x) permits a creditor to collect certain demographic information concerning a co-applicant without violating existing Regulation B. See also the section-by-section analysis of § 1002.106(b) for a discussion of calculating gross annual revenue for purposes of determining small business status under final § 1002.106(b) if there are multiple co-applicants.

Lastly, the Bureau is adding new comment 103(a)–11 to clarify that refinances and requests for additional credit amounts on an existing account are covered applications, as further discussed in the section-by-section analysis of § 1002.103(b).

### 103(b) Circumstances That Are Not Covered Applications

#### Proposed Rule

Proposed § 1002.103(b) would have identified certain circumstances that are not covered applications—even if they may otherwise be considered an application under existing § 1002.2(f). Specifically, the Bureau proposed that a covered application would not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; and (2) inquiries and prequalification requests. Solicitations and firm offers of credit would also not have been "covered applications" under the proposed definition. Proposed comments 103(b)–1 through –5 would have provided additional guidance and examples of circumstances that do and do not trigger data collection and reporting for covered applications.

The Bureau sought comment on proposed § 1002.103(b) and associated commentary concerning circumstances that would not be a covered application. Solicitations for comment on specific issues are noted throughout the discussion below.

*Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.* The Bureau proposed to exclude from the definition of a "covered application" requests by borrowers to modify the terms or duration of an existing extension of credit, other than requests for additional credit amounts. The Bureau believed that requests to modify the terms or duration of an existing extension of credit, which occur with high frequency in the small business lending space,

would have added complexity and burden for financial institutions, while potentially providing limited additional information relevant to the purposes of section 1071.

However, the Bureau proposed that reporting would have been required for requests for additional credit amounts (such as line increases or new money on existing facilities). The Bureau believed that capturing requests for additional credit amounts would further the purposes of section 1071, particularly the community development purpose, as it would have more accurately captured demand for credit.

*Inquiries and prequalification requests.* The Bureau proposed to exclude inquiries and prequalification requests from what constitutes a "covered application." The Bureau believed that requiring data collection for all inquiries and prequalification requests could create operational challenges and pose data accuracy issues, including raising the risk of missing, unavailable, erroneous, or duplicative data.

The Bureau also considered whether to only require reporting of inquiries and prequalification requests in situations that would otherwise be treated as an "application" under existing Regulation B—*i.e.,* when the financial institution evaluates information about the business, decides to decline the request, and communicates this to the business. Ultimately, the logistics of reporting an inquiry or prequalification request only in these circumstances (where an inquiry or prequalification request becomes an "application" under existing § 1002.2(f)) could be operationally challenging for financial institutions, could lead to data distortion as only denials would be captured, and could cause unintended market effects.

On the other hand, potential discrimination may occur in these early interactions with a financial institution. In particular, the Bureau was concerned about excluding data on inquiries and prequalification requests when the financial institution evaluates information about a business and declines the request, as such data may be useful for identifying potential discouragement of or discrimination against applicants or prospective applicants.

Ultimately, however, the Bureau believed it was appropriate to interpret "application" as used in section 1071 to exclude inquiries and prequalification requests given the considerations identified above, including the timing and often informal nature of such

AdminRecord-000063

interactions, the operational challenges of implementing such a definition, and related concerns about the reliability of the data.

The Bureau sought comment on a number of issues in connection with the reporting of inquiries and prequalification requests. For example, the Bureau sought comment on whether instead to define a "covered application," consistent with existing Regulation B, to include inquiries or prequalification requests where the financial institution evaluates information about the business, decides to decline the request, and communicates this to the business. Related to this alternative approach, the Bureau further sought comment on whether additional data fields would be necessary in order to distinguish prequalification requests and inquiries from other reported applications. In addition, if the Bureau were to require reporting of declined inquiries or prequalification requests, the Bureau sought comment on whether financial institutions would want the option to report all prequalification requests and inquiries, to allow for a comparison with denials.

*Solicitations, firm offers of credit, and other evaluations or offers initiated by the financial institution.* Proposed comment 103(b)–4 would have clarified that the term covered application does not include solicitations and firm offers of credit. The Bureau explained that like other reviews or evaluations initiated by the financial institution, these communications do not involve an *applicant* requesting credit, and so would not be "covered applications." Excluding solicitations and firm offers of credit would also be consistent with the language of ECOA section 704B(b)(1), which expressly contemplates that an application could arise in response to a solicitation by a financial institution, though the text is silent on solicitations without any applicant response. Thus, consistent with the statutory language, the Bureau proposed that a solicitation or firm offer of credit could become a "covered application" under the proposed definition if an applicant responds to the solicitation or offer by requesting a covered credit transaction.

Comments Received

The Bureau received comments on its proposal to identify certain circumstances that are not covered applications, even if they otherwise would have been considered an application under existing § 1002.2(f), from a wide range of lenders, trade associations, community groups, and a business advocacy group.

Some commenters, including several lenders and trade associations, expressly supported all the clarifications of circumstances that are not reportable in proposed § 1002.103(b). One noted that the proposed exclusions would avoid duplicative steps and keep the data collection focused on its core purposes. Other commenters stated that the proposed exclusions were appropriate because they would not provide useful data and that the proposal would help ease financial institutions' transition to data collection. Comments on particular aspects of proposed § 1002.103(b) are discussed below.

*Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.* Many industry commenters supported the Bureau's proposed exclusion of reevaluations, extensions, or renewal requests on an existing business credit account. However, industry commenters largely urged the Bureau to exclude requests for additional credit amounts on existing accounts. These commenters argued that reporting line increases would add unnecessary complexity and time to an otherwise streamlined process that occurs with high frequency, in response to rapid changes to business conditions, and is typically automated, which they said further lowers any risk of discrimination. These commenters argued that data collection for line increases would hurt small businesses by introducing hurdles in transactions where time is of the essence, and might discourage businesses from seeking line increases or creditors from offering them. Commenters also noted differences in how credit line increases are underwritten compared to other business credit: the process typically does not involve an application or other documentation, may involve limited underwriting, and any analysis performed is usually focused on the business's past performance and relationship with the financial institution. In addition, commenters expressed concern that including line increases would distort the data (for example, by "double reporting" accounts or because of the unique nature of credit line increases) or would provide data of limited value. A couple commenters emphasized the potential compliance difficulties for financial institutions, noting that excluding line increases would be simpler and avoid the need for financial institutions to determine who initiated a line increase. A trade association raised the additional

concern that reporting of credit line increases and other requests for additional credit amounts will inflate the number of originations counted for purposes of determining whether an institution is a covered financial institution. In support of excluding modifications more generally, one commenter stated that modifications are not explicitly covered by other consumer financial laws and regulations, such as HMDA, the Real Estate Settlement Procedures Act of 1974 (RESPA), and Regulation Z.

Although opposed to the reporting of line increases, several commenters urged that, to the extent such transactions are reportable, the Bureau should mitigate the burden on financial institutions by (1) exempting any existing account from data collection under the Bureau's rule; and (2) permitting lenders to rely on prior responses regardless of when provided, unless there is a reason to believe the data are inaccurate. In support of the first proposal, these commenters argued that existing accounts may need challenging technology build-outs to integrate the rule's data collection requirements and existing clients may not be used to the collection process.

Most community groups to comment on this issue generally requested that all such circumstances (reevaluations, extensions, renewals), as well as refinances, be treated as reportable applications. These commenters argued that there should be a reportable application whenever a business communicates an interest in obtaining credit and has requested lender action, or if the lender takes action on the request, such as pulling a credit report, the business's tax information, or obtaining other data that can be used for underwriting—particularly if the financial institution's actions might negatively affect the business (for example, by lowering their credit score). A few commenters specifically focused on renewals and extensions, urging the Bureau to require reporting of these transactions, and to separate such transactions in the data from new originations. These commenters argued that renewals and extensions are an important source of credit for businesses and not reporting such circumstances would create a disconnect with Community Reinvestment Act (CRA) reporting. One commenter urged the Bureau to collect verbal and written agricultural loan modification or restructuring requests made to the Farm Service Agency, arguing that such requests constitute applications under existing Regulation B, highlighting concerns about discrimination in loan

AdminRecord-000064

servicing and the detrimental effects on businesses when servicing applications are not granted, including default, acceleration, and foreclosures. Some commenters further argued that lender-initiated renewals should also be captured, given the detrimental effect they may have on a business that is "denied" credit or experiences a reduction in access to credit.

Several commenters requested clarification on aspects of the Bureau's proposed approach to reevaluation, extension, or renewal requests. A community bank was uncertain what dates to report under § 1002.107(a)(2) and (9) (application date and action taken date) for requests for additional credit on existing accounts, and was concerned that if the dates changed from the initial origination, it could be construed as a data misrepresentation. Several other commenters inquired whether a transaction is a reportable covered application if a new note is executed as part of a request to consolidate existing credit amounts under the same terms or as part of a periodic review extending the credit under the same terms. A sales-based financing company explained that its customers often request funding over time, and asserted that each new request for credit should be reportable.

*Inquiries and prequalification requests.* The industry commenters to weigh in on inquiries and prequalification requests, including several banks, a CDFI lender, trade associations, and a business advocacy group, overwhelmingly supported the Bureau's proposal to exclude inquiries and prequalification requests. Commenters argued that including inquiries and prequalification requests would be operationally difficult given the high volume of such requests and because the interactions typically occur before the financial institution has the infrastructure in place to track requests for credit. They also argued that including such interactions could be misleading and lead to data accuracy issues, given the informal nature of such requests and because many such inquiries are subsequently abandoned or otherwise left incomplete. A business advocacy group also noted concerns about duplicative reporting of inquiries and prequalification requests if the business ultimately submits a credit application. A group of trade associations for insurance premium finance lenders argued that including inquiries and prequalification requests would be unworkable for their lenders, who are often not aware of a prospective applicant's interest in credit until they receive an agreement from the

applicable insurance agent or broker; as a result, such financial institutions would be unaware of any inquiries or prequalification requests. Another commenter argued that reporting such transactions would effectively punish borrowers for inquiring about qualification requirements, products, and rates. Finally, one commenter stated that each financial institution should be permitted to define what constitutes an application, including any exclusions. Although industry commenters were generally in favor of the exclusion, a number of industry commenters stated that the line between inquiries or prequalification requests and covered applications should be sufficiently clear to avoid uncertainty during implementation, and asked the Bureau provide examples, in commentary to the rule, to differentiate these scenarios.

Conversely, a number of commenters, including a lender and community groups, urged the Bureau to require reporting on all or some inquiries and prequalification requests. Citing a study identifying the prevalence of discrimination in the pre-application phase,[341] commenters argued that the definition of covered application must be broad enough to capture pre-application phase discrimination. Several commenters requested that all communications where a business inquires about credit and seeks a credit decision should be reportable; another commenter urged reporting whenever the financial institution pulls a credit report or takes other action to begin underwriting. Several other commenters suggested that the Bureau align with existing Regulation B's treatment of prequalifications by treating denied inquiries and prequalifications as reportable applications.[342] One community group emphasized the importance of having online applications reported, including online prequalification requests in particular. The commenter argued that the absence of such data has been detrimental in the HMDA context, it creates an imbalance between online and traditional lenders, and the burden of reporting would be low as lenders are already required to capture such transactions for purposes of providing adverse action notices.

---

[341] Nat'l Cmty. Reinvestment Coal., *Disinvestment, Discouragement and Inequity in Small Business Lending* (Sept. 2019), *https://ncrc.org/wp-content/uploads/2019/09/NCRC-Small-Business-Research-FINAL.pdf.*

[342] Existing comment 2(f)–3 provides that a creditor treats an inquiry or a prequalification request as an application if it evaluates information about the consumer, decides to decline the request, and communicates this to the consumer.

Although the Bureau sought comment on whether, alternatively, to define a "covered application" consistent with Regulation C—which does not require a financial institution to report prequalification requests and does not address reporting of inquiries more generally—the Bureau did not receive any comments directly on this point. Similarly, the Bureau did not receive any comments directly responding to its request for comment on the frequency with which financial institutions accept prequalification requests and what data are collected in connection with such prequalification requests, as well as potential effects on the market if some or all prequalification requests were reportable under section 1071. In addition, the Bureau did not receive any comments in response to its request for feedback on whether assumptions[343] are used in the small business lending context and whether reporting of assumptions for small business lending would further the purposes of section 1071.

*Solicitations, firm offers of credit, and other evaluations or offers initiated by the financial institution.* A number of industry commenters urged the Bureau to exclude "preapprovals," which the commenters described as credit offered or originated by the financial institution without an initiating application from the business (including offers for a different product or offers to extend additional credit amounts). One of the commenters was particularly concerned about lender-initiated offers based on data collected or acquired by the financial institution about the small business; for example, a financial institution that uses deposit account data to evaluate a business for credit card offers. The commenter argued that in these circumstances, the business has not been "denied" credit because it never applied for credit; similarly, the commenter argued, accepted offers also should not be reported because there is no initiating application from the business. The commenter further argued that reporting of originated offers initiated by the financial institution would skew the data, as it would only reflect approvals. Reporting of "denied" offers, argued the commenter, would be infeasible, create confusion for the customer, and likely lead lenders to discontinue extending such offers altogether. Several other industry commenters similarly urged the Bureau to exclude "preapprovals," though they

---

[343] Regulation C requires the reporting of assumptions for HMDA. *See* Regulation C comment 2(j)–5 (discussing when assumptions should be reported as home purchase loans).

AdminRecord-000065

did not explain what precisely they meant by the term. One commenter argued that while preapprovals are clearly articulated in Regulation C, "preapprovals" do not exist in the small business lending space.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.103(b) as proposed to identify certain circumstances that are not covered applications, even if they otherwise would have been considered an application under existing § 1002.2(f). Specifically, final § 1002.103(b) provides that a covered application does not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; and (2) inquiries and prequalification requests. The Bureau is finalizing comments 103(b)–1 through –4 with minor revisions for clarity and consistency, to provide additional guidance and examples of circumstances that do and do not trigger data collection and reporting under the definition of a covered application. The Bureau is finalizing comment 103(b)–5, which discusses inquiries and prequalification requests, to provide additional discussion and examples distinguishing a covered application from an inquiry or prequalification request. As discussed in the section-by-section analysis of § 1002.103(a) above, the Bureau is also adding new comment 103(a)–4 to clarify that solicitations, firm offers of credit, or other evaluations initiated by the financial institution are not a covered application; however, if the business seeks to obtain the credit offered, the business's request constitutes a covered application.

*Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.* Pursuant to final § 1002.103(b)(1), the Bureau is excluding reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts, from the definition of a covered application. The Bureau believes that requests to modify the terms or duration of an existing extension of credit—such as extensions on the duration of a credit line or changes to a guarantor requirement—occur with high frequency in the small business lending space. If the Bureau were to require reporting of such circumstances, the Bureau believes it would add complexity for reporting financial institutions while, as some commenters have noted, potentially providing limited additional

information relevant to the purposes of section 1071. Moreover, the Bureau believes that broadly including requests to modify the terms or duration of existing extensions of credit might affect data quality absent additional flags to distinguish the transactions from new originations, as well as to identify the particular nature of the changes. The Bureau further notes that Regulation C takes a similar approach by excluding reporting of loan modifications.[344]

Although some commenters argued that such transactions should be reported because they would provide a better understanding on the availability of credit, the Bureau believes such benefits would be modest, particularly absent additional data concerning how the modified credit request differs from the original request, which would require the collection of a number of additional data points. Similarly, although one commenter urged the Bureau to collect verbal and written agricultural loan modification or restructuring requests made to the Farm Service Agency, as discussed directly above, the Bureau believes expanding data collection and reporting requirements to all modification requests (except requests for additional credit amounts) would add significant complexity for lenders, could be duplicative, and may provide limited benefits without knowing the precise terms changed in the modification request. Nor does the Bureau believe that the definition of covered application should be expanded to encompass any expression of interest from a business to obtain credit or action by the financial institution towards underwriting; as noted above in the section-by-section analysis of § 1002.103(a) above, triggering data collection and reporting obligations too early could add significant complexity and affect data quality.

The Bureau believes that requiring reporting of requests for additional credit amounts (such as line increases or new money on existing facilities) is appropriate. Capturing requests for additional credit amounts directly furthers the purposes of section 1071, particularly the business and community development purpose, as it will more accurately capture demand for credit. Although industry commenters opposed reporting on new credit amounts due to what they

described as the streamlined, fast-paced nature of such reviews, the Bureau believes those factors do not outweigh the benefits of having these data collected and reported. Moreover, the Bureau does not believe that collecting data on such transactions will be so time consuming or difficult that it will dissuade small businesses from seeking the additional credit they need, particularly in light of final § 1002.107(d), which permits financial institutions to reuse applicant-provided data in certain circumstances. Collecting data on requests for additional credit amounts will assist in fair lending testing and provide additional insight into small business credit trends and availability, furthering the purposes of section 1071, even if—as some commenters suggested—line increases are often underwritten differently than new requests for credit.

Regarding commenters' concerns about duplicative reporting, the Bureau notes that pursuant to final § 1002.107(a)(7) and (8), the financial institution only reports the additional credit amount sought (and approved or originated, as applicable)—not the entire credit amount extended—therefore avoiding duplicative reporting. Moreover, the fact that a request is for a line increase will be reflected in the reporting of credit purpose pursuant to final § 1002.107(a)(6). Thus, unlike renewals or modifications more generally, which may occur for a variety of reasons, requests for additional credit amounts and the amounts requested will be clearly identifiable in the data. The Bureau also believes that commenters' concerns about collecting data are further mitigated by final § 1002.107(d), which permits a financial institution to reuse certain data points under certain circumstances. In response to a commenter's concern that reporting of credit line increases and other requests for additional credit amounts will inflate the number of originations counted for purposes of determining whether an institution is a covered financial institution, the Bureau notes that new comment 105(b)–4 clarifies that requests of additional credit amounts on an existing account are not counted as originations for the purpose of determining whether a financial institution is a covered financial institution pursuant to § 1002.105(b).

The Bureau is also providing specialized rules for the reporting of line increases, as suggested by several commenters. One suggested strategy—exempting accounts that are in place before this final rule goes into effect—

---

[344] *See* Regulation C comment 2(d)–2. Although CRA regulations currently require the reporting of renewals, the recent proposed revisions to the CRA rule would instead use 1071 data once available to satisfy small business loan and small farm loan data collection and reporting requirements. 87 FR 33884, 33997–98 (June 3, 2022).

could significantly reduce reportable transactions, potentially for years into the future.[345] Moreover, under the tiered implementation period set forth in final § 1002.114(b), the Bureau believes that financial institutions (and their customers) will have adequate time to adjust to reporting. Similarly, in response to a different commenter's question about reporting requests for additional credit amounts, the Bureau notes that if there is an application for an additional credit amount on a covered credit transaction, a financial institution must collect data pursuant to this final rule even if the existing account was opened prior to the applicable compliance date.

The Bureau is also not adopting the commenters' second suggestion—to indefinitely allow financial institutions to rely on prior applicant responses—as the commenters provide no reason why reused data are more trustworthy in the context of requests for additional credit amounts, compared to other existing customers' requests for new credit. However, pursuant to final § 1002.107(d), financial institutions may reuse most applicant-provided data, so long as there is no reason to believe the data are inaccurate, for up to 36 months. Although not specific to requests for additional credit amounts, this provision may ease some of the commenters' concerns.

In response to comments, mainly from community groups, regarding the importance of having refinance transactions reported, the Bureau is revising comment 103(b)–2 to make clear that an applicant's request to refinance, which occurs when an existing obligation is satisfied and replaced by a new obligation undertaken by the same borrower, is reportable. The Bureau agrees with commenters that refinance transactions should be covered applications; they legally constitute a new credit obligation, and so are typically included within regulatory schemes governing originations.[346] Indeed, as one

commenter correctly noted, the Bureau's inclusion of refinancing categories for the credit purpose data point (in proposed comment 107(a)(6)–1) in the proposed rule shows that the Bureau intended for refinances to be reportable transactions.

Several other commenters also requested clarification on aspects of the Bureau's proposed approach to reevaluation, extension, or renewal requests. In response to a community bank's questions regarding what dates to report under § 1002.107(a)(2) and (9) (application date and action taken date) for requests for additional credit on existing accounts, the Bureau notes the dates should be based on the new request for credit. Because a request for additional credit amounts is considered a separate covered application pursuant to final § 1002.103(a), all data reported, including applicable dates, should be in reference to the new request for credit, and not the initial origination. Several other commenters inquired whether a transaction is a reportable covered application if a new note is executed as part of a request to consolidate existing credit amounts under the same terms or as part of a periodic review extending the credit under the same terms. If an existing obligation is satisfied by a new credit obligation, as determined by contract and State law, it would generally be reportable as a covered application (assuming the other conditions of a covered application are met). Although in certain circumstances this may require reporting of credit amounts previously outstanding under a different credit obligation with the same borrower and with similar or identical terms, the Bureau believes that seeking to exempt these fact-specific circumstances would add considerable complexity to the rule and could undermine data quality. The Bureau generally agrees with the assertion that each new request for credit that is separately evaluated should be reportable (excluding counteroffers, pursuant to final comment 107(a)(9)–2). If a financial institution evaluates each new request for credit, then each of those instances should be reported as separate covered applications for the amount advanced. For example, if a small business makes several requests for advances from a merchant cash advance provider, each of which is evaluated by the provider, each of those requests will typically constitute a separate covered application. In contrast, if a financial institution

extends a line of credit up to a specified amount, then any request drawn against the line within that established limit is authorized and would not be a separate covered application. See also existing § 1002.2(q), which defines the term to "extend credit" or "extension of credit."

*Inquiries and prequalification requests.* As the Bureau explained in the NPRM, existing Regulation B recognizes that before a consumer or business requests credit in accordance with the procedures used by a creditor for the type of credit requested, a creditor may provide a prospective applicant with information about credit terms. Generally, an inquiry occurs when a prospective applicant consumer or business requests information about credit terms offered by a creditor; a prequalification request generally refers to a request by a consumer or business for a preliminary determination on whether the prospective applicant would likely qualify for credit under a creditor's standards or for what amount.[347] Under existing Regulation B comments 2(f)–3 and 9–5, an inquiry or prequalification request may become an "application" if the creditor evaluates information about the consumer or business, decides to decline the request, and communicates this to the consumer or business; otherwise, such inquiries and prequalification requests are generally not considered applications under existing Regulation B. As explained in existing comment 2(f)–3, whether the inquiry or prequalification request becomes an application depends on how the creditor responds to the consumer or business, not on what the consumer or business says or asks. Finally, Regulation C excludes all prequalification requests from HMDA reporting, even if the prequalification request constitutes an application under existing Regulation B.[348]

Pursuant to final § 1002.103(b)(2), a "covered application" does not include inquiries and prequalification requests, even in circumstances where the inquiry or prequalification request may constitute an "application" under existing § 1002.2(f). The Bureau agrees with commenters who stated that reporting inquiries or prequalification requests would be extremely operationally difficult given the volume of such requests and because such requests typically occur very early in the process, making it difficult to obtain or track applicant-provided data. There could be data quality issues given the sometimes-informal nature of such

---

[345] Although information on average business credit card account age is not publicly available, credit card accounts typically have no expiration date and so may remain open indefinitely. Thus, exempting such accounts could create blind spots in the data for potentially years, or even decades, into the future.

[346] *See, e.g.,* Fed. Fin. Insts. Examination Council, *A guide to CRA Data Collection and Reporting,* at 12 (2015), *https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf* (stating that an institution should collect information about small business and small farm loans that it refinances or renews as loan originations). Regulation C § 1003.4(a)(3) (requiring reporting of whether the covered loan is a refinance); Regulation Z § 1026.20(a) ("A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced

by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer. . . .").

[347] *See* Regulation C comment 2(b)–2 (describing prequalification requests).

[348] *See id.*

requests, which could raise the risk of missing, unavailable, or erroneous data. As noted by one commenter, reporting inquiries and prequalification requests could also be duplicative if the applicant subsequently applies for credit in accordance with the procedures designated by the financial institution; the Bureau would potentially need to create a separate data field or flag to distinguish such requests. Requiring reporting of such interactions could also lead financial institutions to pull back on offering prequalification reviews or engaging with prospective applicants, which could inhibit prospective applicants from shopping around for the best terms. As discussed in the section-by-section analysis of § 1002.103(a) above, small depository institutions have expressed concern that this rule will overly formalize small business lending and inhibit relationship lending. Given these concerns, the Bureau is not expanding the definition of a covered application to include pre-application conduct, such as every time a business inquires about credit or if a financial institution pulls information about the business, as urged by some community groups.

The Bureau also is not requiring, as suggested by some commenters, reporting of inquiries and prequalification requests only in situations that would otherwise be treated as an "application" under existing Regulation B—*i.e.,* when the financial institution evaluates information about the business, decides to decline the request, and communicates this to the business. The logistics of reporting an inquiry or prequalification request only in these circumstances could be operationally challenging for financial institutions and could lead to data distortion in a manner inconsistent with the statutory purposes of section 1071, as only denials would be captured. In this case, a financial institution may prefer to report all inquiries and prequalification requests, which could lead to some of the challenges identified above. Moreover, a financial institution will not know ex ante whether a prequalification will result in the financial institution notifying the business it is unlikely to qualify, and so the financial institution would likely need to collect 1071 data at the beginning of the interaction regardless. Although the Bureau sought comment about its concerns related to the reporting of only denials, no commenters specifically addressed this issue.

As noted above, one commenter emphasized the importance of having online applications reported, including online prequalification requests in particular, arguing that the absence of reporting would lead to a lack of data and an imbalance among lenders. The Bureau notes, however, that the final rule does not exclude online applications (nor did the proposal). While prequalification requests are excluded for the reasons discussed above, that exclusion is not limited to a particular channel. However, to the extent an online questionnaire is truly a voluntary tool for businesses to shop around for potential terms, and not an application under the procedures established by the financial institution, the Bureau believes such inquiries should be excluded for the reasons described above.

Of course, requests for credit that meet the definition of "covered application" are reportable, even if the application was preceded by an inquiry or prequalification request. For example, if a business initially seeks information about potential credit offerings, the financial institution responds, and then the business submits an application for a covered credit transaction, the application is reportable. If, on the other hand, the business asks about potential credit offerings, but then chooses not to request credit, there is no covered application.

In response to commenters' request to provide further examples, in commentary to the rule, to differentiate inquiries or prequalification requests and covered applications, the Bureau has added to comment 103(b)–5 additional illustrative examples.

The Bureau has also made minor revisions to comment 103(b)–4 for clarity and consistency.

In sum, the Bureau believes it is appropriate to interpret "application" as used in section 1071 to exclude inquiries and prequalification requests given the considerations identified above, including the timing and often informal nature of such interactions, the operational challenges of implementing such a definition, and related concerns about the reliability of the data. However, the Bureau does share commenters' concerns about discrimination that may occur in the pre-application phase. As discussed above, the Bureau believes it is important for regulators and other enforcers to review data collected and reported pursuant to section 1071 to preliminarily identify where financial institutions might not be appropriately defining an application, and for

financial institutions to self-monitor for the same. For example, as discussed above, very high approval rates or very low rates of incomplete or withdrawn applications may be a preliminary indication that the financial institution is evading its obligations, for example, by collecting 1071 data late in the application process. Similarly, such rates may also suggest that the financial institution has a regular practice of decisioning requests for credit through "inquiries" or "prequalification requests"; if such reviews are regularly conducted and effectively function as a prescreening tool for the financial institution, they should be reported as a "covered application."[349]

The Bureau believes it is important for regulators and other enforcers to also carefully review the data for indicia of potential illegal discouragement in the pre-application stage, and for financial institutions to self-monitor for the same. For example, analyzing the rates of applications from small businesses within majority-minority neighborhoods, as compared to a financial institution's peers, may be useful to identify potential discrimination. Finally, the Bureau notes that inquiries and prequalification requests where the institution evaluates information about the consumer or business, declines the request, and communicates it to the business or consumer, are "applications" under existing Regulation B, and are thus subject to its requirements regarding "applications," including its adverse action notification requirements and nondiscrimination provisions. As stated in final comment 103(b)–1, in no way are the exclusions in final § 1002.103(b) intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term application in existing § 1002.2(f) as applicable to existing Regulation B.

*Solicitations, firm offers of credit, and other evaluations or offers initiated by the financial institution.* The Bureau is adding new comment 103(a)–4 to clarify that the term covered application does not include solicitations, firm offers of credit, and other evaluations or offers initiated by the financial institution because the business has not made a request for credit, and to provide illustrative examples. The Bureau is adding this comment in response to comments from industry urging the Bureau to exclude "preapprovals," which the commenters described as credit offered by the financial institution without an initiating application from the business. The

---

[349] *See also* final comment 103(b)–5.

Bureau agrees with commenters who urged that solicitations, reviews, or evaluations initiated by the financial institution should not, on their own, be considered "covered applications" because the communications do not involve an *applicant* requesting credit. Excluding solicitations and firm offers of credit is also consistent with the language of ECOA section 704B(b)(1), which expressly contemplates that an application in response to a solicitation by a financial institution could be an application under section 1071, but the text is silent on solicitations without any applicant response.

The Bureau does not agree, however, that such offers or evaluations should not be reported even where the applicant responds to such a request and seeks the credit offered, as suggested by one commenter. Once the applicant responds affirmatively to the solicitation indicating that it wishes to proceed, there is a request for credit from the applicant; there is no requirement in the final definition of a covered application that the applicant be the initiating entity, only that the applicant make an oral or written request for a covered credit transaction in accordance with procedures used by a financial institution for the type of credit requested. Capturing such requests would also implement the language of ECOA section 704B(b)(1), which provides that data collection and reporting is required "whether or not such application is in response to a solicitation by the financial institution." The commenter also argued that reporting on accepted solicitations or offers would skew the data as it would only include accepted offers. The Bureau understands that this may result in some data skew, but believes this outcome is preferable to having no data at all on applicant requests for credit in response to a solicitation. Thus, solicitations, firm offers of credit, or other evaluations or offers initiated by the financial institution for a covered credit transaction may become a "covered application" if an applicant responds to the solicitation or offer by requesting the offered credit. However, if a financial institution unilaterally— with no request from the business— increases a credit line or provides some other type of credit to the business, it would not be considered a covered application because, similar to a mere solicitation, the transaction does not involve a request for credit.

Several commenters also asked the Bureau to provide that "preapprovals" are not covered applications. As noted above, to the extent the commenters are referring to evaluations or offers initiated by the financial institution alone, such events are not covered applications unless the applicant affirmatively responds, wishing to proceed. However, a preapproval as described in existing comment 2(f)–5.i is an example of a covered application. Under that comment, a preapproval occurs when a creditor reviews a request under a program in which the creditor, after a comprehensive analysis of an applicant's creditworthiness, issues a written commitment valid for a designated period of time to extend a loan up to a specified amount. If a creditor's program does not provide for giving written commitments, requests for preapprovals are treated as prequalification requests.

### Section 1002.104   Covered Credit Transactions and Excluded Transactions

#### 104(a) Covered Credit Transaction

ECOA section 704B(b) requires financial institutions to collect and report information regarding any application for "credit" made by women-owned, minority-owned, or small businesses. Although the term "credit" is not specifically defined in section 1071, ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." [350] As noted above in the section-by-section analysis of § 1002.102(d), existing Regulation B further defines "business credit" as "extensions of credit primarily for business or commercial (including agricultural) purposes," with some exclusions.[351] As discussed in detail below, the Bureau is finalizing its proposal that covered financial institutions report data for all applications for transactions that meet the definition of business credit unless otherwise excluded.

Proposed § 1002.104(a) would have defined the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under proposed § 1002.104(b). Proposed comment 104(a)–1 would have reiterated that the term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and merchant cash advances) unless otherwise excluded under § 1002.104(b). The Bureau explained that such credit transactions for agricultural purposes and HMDA-reportable transactions

would have fallen within the scope of the proposed rule. The Bureau noted that this was not an exhaustive list of covered credit transactions; other types of business credit would have constituted covered credit transactions unless excluded by proposed § 1002.104(b). With respect to excluded transactions, proposed § 1002.104(b) would have stated that the requirements of subpart B do not apply to trade credit, public utilities credit, securities credit, and incidental credit. Proposed commentary would have made clear that the term "covered credit transaction" also did not cover factoring, leases, consumer-designated credit used for business purposes, or credit secured by certain investment properties.

The Bureau received comments on transaction coverage from many lenders, trade associations, business advocacy groups, nonbank online lenders, the offices of two State attorneys general, and community groups. The Bureau received a few comments from industry expressing general support for the proposed definition of covered credit transaction. Many community groups, as well as several community-oriented lenders and a cross-sector group of lenders, community groups, and small business advocates, requested expansive and broad product coverage; some commenters argued that such coverage was needed to prevent evasion, for comprehensive data analysis, and/or to fulfill section 1071's statutory purposes. Some commenters suggested the Bureau monitor the market to ensure that new products are covered by, and reported under, the rule. A business advocacy group and a joint letter from community groups, community-oriented lenders, and business advocacy groups urged the Bureau to subject "all forms of credit"— including merchant cash advances, factoring, and leases, in addition to term loans, credit cards, and other forms of credit—to fair lending and credit need analysis. They asserted that each of these products occupies a substantial portion of the "credit market" for small businesses and excluding any of them would allow potentially detrimental lending practices to proliferate.

For the reasons set forth herein, the Bureau is finalizing its definition of "covered credit transaction" in § 1002.104(a) as proposed. Final § 1002.104(a) defines the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under § 1002.104(b). Final comment 104(a)–1 reiterates that the term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and

---

[350] 15 U.S.C. 1691a(d); *see also* § 1002.2(j).
[351] 12 CFR 1002.2(g).

AdminRecord-000069

merchant cash advances) unless otherwise excluded under final § 1002.104(b). Loans, lines of credit, credit cards, merchant cash advances, and credit products used for agricultural purposes fall within the scope of this final rule, which covers the majority of products that small businesses use to obtain financing.[352] As discussed in greater detail below, the Bureau believes that covering these products in this rule is important to fulfilling the purposes of section 1071. The Bureau stresses that the products discussed herein do not constitute an exhaustive list of covered credit transactions; other types of business credit not specifically described in the rule and its associated commentary nevertheless constitute covered credit transactions unless excluded by final § 1002.104(b). In line with this approach, the Bureau thus is not expressly listing other products (such as credit extensions incident to factoring arrangements discussed below) as covered credit transactions.

Final § 1002.104(b), in turn, states that the requirements of subpart B do not apply to trade credit, HMDA-reportable transactions, insurance premium financing, public utilities credit, securities credit, and incidental credit. Associated commentary makes clear that the term "covered credit transaction" also does not cover factoring, leases, consumer-designated credit that is used for business or agricultural purposes, or credit transaction purchases, purchases of an interest in a pool of credit transactions, and purchases of a partial interest in a credit transaction. In response to comments received, the Bureau is now excluding HMDA-reportable transactions and insurance premium financing from the scope of this final rule. As a result, the Bureau believes that proposed commentary that would have made clear that the term "covered credit transaction" does not cover credit secured by certain investment properties is not necessary.

The Bureau agrees that broad product coverage is important to fulfill section 1071's statutory purposes, though the Bureau is not extending coverage to all forms of small business financing as requested by some commenters. The Bureau believes the exclusions from the definition of covered credit transaction that it proposed in § 1002.104(b) are appropriate and has added two additional exclusions (HMDA-reportable transactions and insurance premium financing) in response to comments received. For the reasons set forth herein, the Bureau is finalizing

§ 1002.104 pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071.

Comments received on specific types of transactions that are reportable or not reportable under this rule are discussed in turn below.

Loans, Lines of Credit, and Credit Cards

Proposed Rule

Proposed § 1002.104(a) would have defined the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under proposed § 1002.104(b). Proposed comment 104(a)–1 would have reiterated that the term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and merchant cash advances) unless otherwise excluded under § 1002.104(b). The Bureau did not propose definitions for loans, lines of credit, and credit cards because the Bureau believed these products are generally and adequately covered by the definition of "credit" in proposed § 1002.102(i), which, as noted above, references existing § 1002.2(j). The Bureau sought comment on its proposed approach to covered credit transactions and particularly on whether it should define loans, lines of credit, and credit cards, and, if so, how.

Comments Received

A few commenters expressed general support for the explicit coverage of loans, lines of credit, and credit cards. One bank commenter opined that the Bureau's rule does not need to define loans, lines of credit, and credit cards because those definitions would add unnecessary complexities. One community group expressed approval for the Bureau's proposed coverage of lines of credit, stating that such products meet important credit needs to help businesses weather fluctuations in revenues and their coverage will help inform stakeholders whether minority-and/or women-owned businesses are able to access this important credit type or whether they experience a disproportionate amount of denials.

The Bureau received mixed feedback regarding its proposed coverage of credit cards. A few community groups supported credit card coverage, with one noting that credit cards are widely used by small businesses, often with smaller principal balances and higher interest rates than term loans. This commenter stressed the importance of assessing whether Hispanic- and

African American-owned businesses are more likely to rely upon credit cards than other businesses and whether the smallest businesses, and women- and minority-owned businesses, have equitable access to term loans or are served disproportionately by credit card loans or other credit products.

By contrast, a few credit union trade associations urged the Bureau to exclude credit cards from the rule to reduce burden and reporting volumes. One commenter argued that every credit union that offers even a single small business credit card product will ultimately become a covered financial institution unless the Bureau either establishes a de minimis threshold or expressly excludes small business credit cards. Another urged the Bureau to exclude credit cards from the rule on the basis that these products are already covered by the Credit Card Accountability Responsibility and Disclosure (CARD) Act and the exclusion would reduce compliance burden without weakening the quality of resulting data and would relieve lenders of the responsibility to sort out and isolate business credit card data from consumer credit card data, which are often both run by the same platform independently of other commercial lending activities.

Final Rule

For the reasons set forth herein, the Bureau is finalizing its coverage of loan, lines of credit, and credit cards as proposed. These products are commonly offered to small business applicants (making up almost 60 percent of the aggregate dollar volume of various financial products used by small businesses).[353] According to a recent Federal Reserve Banks' survey of employer firms, loans and lines of credit were the most common forms of financing sought by applicants, with credit cards in second place.[354] The Bureau believes that covering these products is important for advancing both of section 1071's statutory purposes.

The Bureau does not believe that it would be appropriate to exclude credit cards from coverage, as requested by several commenters. The Federal Reserve Banks found that almost one third of employer firm applicants sought credit cards[355] and credit card usage among minority-owned small businesses is higher than among white-

---

[352] See White Paper at 21–22.

[353] See id. at 21 fig. 2.
[354] 2022 Report on Employer Firms at 25, https://www.fedsmallbusiness.org/survey/2022/report-on-employer-firms.
[355] Id.

owned small businesses.[356] The Bureau believes that excluding this popular source of small business financing, particularly among the smallest businesses and start-ups, would not be consistent with section 1071's statutory purposes. The Bureau has considered the concerns regarding reporting volumes among credit unions and notes that its higher originations threshold in final § 1002.105(b) for coverage under the rule should help alleviate these concerns. The Bureau does not believe that CARD Act reporting is a sufficient substitute for data collected under section 1071 because it does not cover business-purpose credit cards and does not include protected demographic information, both of which are central to section 1071's statutory purposes.

The Bureau is finalizing § 1002.104(a) and comment 104(a)–1 as proposed. The Bureau is not adopting definitions for loans, lines of credit, and credit cards because it believes these products are generally and adequately covered by the definition of "credit" in § 1002.102(i).[357]

Merchant Cash Advances

Background and Proposed Rule

As discussed above, proposed § 1002.104(a) would have defined the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under proposed § 1002.104(b), and proposed comment 104(a)–1 would have reiterated that the term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and merchant cash advances) unless otherwise excluded under § 1002.104(b). The Bureau sought comment on its proposed approach to covered credit transactions, and in particular, on whether it should define merchant cash advances and/or other sales-based financing transactions, and if so, how.

As the Bureau explained in the NPRM, merchant cash advances are a form of financing for small businesses that purport to be structured as a sale of potential future income. Merchant cash advances vary in form and substance, but under a typical merchant cash

advance, a merchant receives a cash advance and promises to repay it plus some additional amount or multiple of the amount advanced (*e.g.*, 1.2 or 1.5, the "payback" or "factor" "rate"). The merchant promises to repay by either pledging a percentage of its future revenue, such as its daily credit and debit card receipts (the "holdback percentage"), or agreeing to pay a fixed daily withdrawal amount to the merchant cash advance provider until the agreed upon payment amount is satisfied. Merchant cash advance contracts often provide for repayment directly through the merchant's card processor and/or via Automated Clearing House withdrawals from the merchant's bank account.[358] Merchant cash advances constitute the primary product under an umbrella term often referred to as "sales-based financing;" generally, transactions wherein a financial institution extends funds to a business and repayment is based on the business's anticipated sales, revenue, or invoices.[359]

The Bureau understands that the merchant cash advance market is generally dominated by nondepository institutions not subject to Federal safety and soundness supervision or reporting requirements. The Bureau also understands that merchant cash advance providers may not be required to obtain State lending licenses. As a result, information on merchant cash advance lending volume and practices is limited. The Bureau notes, however, that a few states have enacted laws that would impose disclosure requirements

upon certain commercial financing providers, including merchant cash advance providers.[360]

Although the Bureau's 2017 White Paper estimated the merchant cash advance market constituted less than 1 percent of the aggregate dollar volume of various financial products used by small businesses in the U.S. in 2014,[361] the Bureau notes that more recent evidence suggests the industry may now be much larger. For example, the 2021 Federal Reserve Banks' survey of firms with 1–499 employees ("employer firms") found that 8 percent of such businesses applied for and regularly used merchant cash advances.[362] Moreover, on August 18, 2019, the trade website deBanked reported that according to an investment bank's projections, "the [merchant cash advance] industry will have more than doubled its small business funding to $19.2 billion by year-end 2019, up from $8.6 billion in 2014."[363]

The Bureau understands that merchant cash advances are often used by merchants due to the speed and ease with which they can be obtained,[364]

[356] *See, e.g.,* Fed. Rsrv. Bank of N.Y. *et al., Latino-Owned Businesses: Shining a Light on National Trends* (Nov. 2018), *https://www.newyorkfed.org/medialibrary/media/smallbusiness/2017/Report-on-Latino-Owned-Small-Businesses.pdf* (finding that Latino business owners are more likely than non-Latino white business owners to use credit cards).

[357] As noted in the section-by-section analysis of § 1002.107(a)(5) below, the Bureau distinguishes between secured and unsecured loans and lines of credit when financial institutions report the type of credit product being applied for. The Bureau does not believe that this distinction has relevance to whether these products constitute "credit."

[358] This description is based on the Bureau's review of a sample of merchant cash advance contracts that the Bureau believes fairly represent typical merchant cash advance contracts in the market. The Bureau's review comports with observations made by industry and community groups regarding merchant cash advances.

[359] As stated below, the Bureau is not specifically defining sales-based financing in the rule because the Bureau believes these products are covered by the definition of "credit" in final § 1002.102(i). New York and California laws have recently sought to define sales-based financing. New York law, for example, defines "sales-based financing" as "a transaction that is repaid by the recipient to the provider, over time, as a percentage of sales or revenue, in which the payment amount may increase or decrease according to the volume of sales made or revenue received by the recipient." N.Y. Fin. Serv. 801(j). New York's definition of sales-based financing also encompasses a true-up mechanism where the financing is repaid as a fixed payment but provides for a reconciliation process that adjusts the payment to an amount that is a percentage of sales or revenue. *Id.* California law uses a similar definition. *See* 10 Cal. Code Reg. 2057(a)(22) (defining sales-based financing as "a commercial financing transaction that is repaid by a recipient to the financer as a percentage of sales or income, in which the payment amount increases and decreases according to the volume of sales made or income received by the recipient" and including "a true-up mechanism").

[360] *See, e.g.,* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (Dec. 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*. The California law does not go so far as to amend the California Financing Law to require factors or merchant cash advance providers to be licensed, but it does impose first-in-the-nation disclosure requirements in connection with these products similar to those imposed under TILA. The California law is implemented through regulations that took effect on December 9, 2022. *See* State of Cal. Dep't of Bus. Oversight, *PRO 01–18 Commercial Financing Disclosures SB 1235* (June 9, 2022), *https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/06/PRO-01-18-Commercial-Financing-Disclosure-Regulation-Final-Text.pdf*. The New York law is also implemented through regulations, which have not been finalized yet. *See* N.Y. Dep't of Fin. Servs., Revised Proposed New 23 NYCRR 600 (Sept. 14, 2022), *https://www.dfs.ny.gov/system/files/documents/2022/09/rp_23nycrr600_text_20220914.pdf*.

[361] *See* White Paper at 21 fig. 2, 22 fig. 3.

[362] Fed. Rsrv. Banks, *Small Business Credit Survey—2022 Report on Employer Firms,* at 19 (Feb. 22, 2022), *https://www.fedsmallbusiness.org/survey/2022/report-on-employer-firms* (2022 Small Business Credit Survey). Starting in 2017, the Federal Reserve Banks began to gather specific data on merchant cash advances for its annual reports on small business financing for employer firms—in the 2017 report, the survey found that 7 percent of such businesses applied for and regularly used merchant cash advances. Fed. Rsrv. Banks, *Small Business Credit Survey—2017 Report on Employer Firms,* at 9 (Apr. 11, 2017), *https://www.fedsmallbusiness.org/survey/2017/report-on-employer-firms* (2017 Small Business Credit Survey).

[363] Paul Sweeney, *Gold Rush: Merchant Cash Advances Are Still Hot,* deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*.

[364] *See* Fed. Rsrv. Banks, *Small Business Credit Survey—2021 Report on Employer Firms,* at 26 (Feb. 3, 2021), *https://www.fedsmallbusiness.org/*

particularly for merchants unable to obtain financing from more traditional sources.[365] According to the 2021 Federal Reserve Banks' report regarding firms owned by people of color (both small employer firms and non-employer firms), Black-owned firms, Hispanic-owned firms, and Asian-owned firms were more likely to have applied for merchant cash advances (14 percent, 10 percent, and 10 percent, respectively) than white-owned firms (7 percent).[366]

The Bureau believes that the higher frequency of merchant cash advance use among minority-owned businesses coupled with reports of problematic provider practices lends credence to claims that merchant cash advances may raise fair lending concerns. The Federal Trade Commission (FTC) released a Staff Perspective in February 2020 discussing its concerns with the merchant cash advance industry[367] and noting the industry's tendency to "cater to higher-risk businesses or owners with low credit scores—typically offering them higher-cost products." [368] The FTC has also filed enforcement actions against merchant cash advance providers and their principals, in one case alleging that they misrepresented the terms of merchant cash advances that they provided, and then used "unfair collection practices, including sometimes threatening physical violence, to compel consumers to pay." [369] In April 2021, the FTC obtained a settlement that required a merchant cash advance provider to pay more than $9.8 million to settle charges that it took money from businesses'

bank accounts without permission and deceived business owners about the amount of financing they would receive and about other features of its financing products.[370] More recently, the FTC obtained a court order that permanently bans a merchant cash advance company and its owner from the merchant cash advance industry for deceiving and threatening small businesses and their owners.[371]

Moreover, the Bureau understands that the delinquency/default rate amongst small businesses that use merchant cash advances is relatively high—6 to 20 percent according to one estimate[372] and 10 percent according to an SEC analysis of one merchant cash advance provider[373] (compared with a charge off rate between 0 to 3.59 percent on SBA loans[374] and just over 1 percent on certain commercial and industrial loans[375]). The Bureau believes this high default rate may be explained by the fact that the typical merchant cash advance holdback percentage—10 to 20 percent of gross receipts or revenues—may be onerous for already cash-strapped small businesses.[376] The Bureau also understands that it is not uncommon for

small businesses that use merchant cash advances to obtain new merchant cash advances from other merchant cash advance providers (more than a quarter of such businesses, by one account);[377] they also may use one merchant cash advance to pay off another. Firms that take on added debt loads in this way (a process known as "stacking") "may not fully recognize the costs involved, which could potentially jeopardize the financial health of their businesses." [378]

As small businesses struggled with the COVID–19 pandemic, reports of merchant cash advance providers employing aggressive collection practices continued, such as "pursuing legal claims against owners that freeze their bank accounts and . . . pressing their family members, neighbors, insurers, distributors—even their customers." [379] Given the fact that 84 percent of the credit applicants surveyed by the Federal Reserve Banks were approved for a merchant cash advance[380] and the fact that it appears to have been significantly more difficult to obtain credit as a "high credit risk" applicant during the COVID–19 pandemic,[381] the Bureau believes that many vulnerable small businesses sought merchant cash advances to support their pandemic recovery.

### Comments Received

The Bureau received comments on this aspect of the proposal from a wide range of lenders, trade associations, business advocacy groups, community groups, individuals, the offices of two State attorneys general, and others. The Bureau observes that, throughout the development of the rule to implement section 1071, merchant cash advances have been the focus of significant attention and a unique source of near-consensus among a diverse array of stakeholders—almost all of whom

survey/2021/report-on-employer-firms (2021 Small Business Credit Survey) (reporting that 84 percent of surveyed credit applicants were approved for a merchant cash advance, as compared to a 43 percent approval rate for personal loans).

[365] See 2022 Small Business Credit Survey (noting that only 8 percent of "high credit risk" applicants obtained all the financing sought).

[366] See Fed. Rsrv. Banks, Small Business Credit Survey—2021 Report on Firms Owned by People of Color, at 30 (Apr. 15, 2021), https://www.fedsmallbusiness.org/survey/2021/2021-report-on-firms-owned-by-people-of-color (Small Business Credit Survey of Firms Owned by People of Color).

[367] Fed. Trade Comm'n, 'Strictly Business' Forum, Staff Perspective, at 6–8 (Feb. 2020), https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-ftcs-strictly-business-forum/strictly_business_forum_staff_perspective.pdf.

[368] See id. at 2.

[369] Press Release, Fed. Trade Comm'n, New York-Based Finance Companies Deceived Small Businesses, Non-Profits and Seized Their Personal and Business Assets (June 10, 2020), https://www.ftc.gov/news-events/press-releases/2020/06/new-york-based-finance-companies-deceived-small-businesses. See also Press Release, Fed. Trade Comm'n, FTC Alleges Merchant Cash Advance Provider Overcharged Small Businesses Millions (Aug. 3, 2020), https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small.

[370] Press Release, Fed. Trade Comm'n, Cash Advance Firm to Pay $9.8M to Settle FTC Complaint It Overcharged Small Businesses (Apr. 22, 2021), https://www.ftc.gov/news-events/press-releases/2021/04/cash-advance-firm-pay-98m-settle-ftc-complaint-it-overcharged.

[371] Press Release, Fed. Trade Comm'n, FTC Action Results in Ban for Richmond Capital and Owner From Merchant Cash Advance and Debt Collection Industries and Return of More Than $2.7M to Consumers (June 6, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-action-results-ban-richmond-capital-owner-merchant-cash-advance-debt-collection-industries.

[372] See Bryant Park Capital, Merchant Cash Advance/Small Business Financing Industry Report, at 28 (Jan. 2016), https://bryantparkcapital.com/wp-content/uploads/2018/06/BPC-MCA-SMB-Financing-Industry-Report.pdf.

[373] SEC Complaint (Jan. 2020), https://www.sec.gov/litigation/complaints/2020/comp24860.pdf.

[374] Small Bus. Admin., Table 9—Charge Off Rates as a Percent of Unpaid Principal Balance (UPB) Amount by Program (Mar. 31, 2022), https://www.sba.gov/document/report-small-business-administration-loan-program-performance.

[375] Bd. of Governors of the Fed. Rsrv. Sys., Charge-Off and Delinquency Rates on Loans and Leases of Commercial Banks (Aug. 22, 2022), https://www.federalreserve.gov/releases/chargeoff/delallsa.htm.

[376] See Bd. of Governors of the Fed. Rsrv. Sys., Browsing to Borrow: "Mom & Pop" Small Business Perspectives on Online Lenders, at 9 (June 2018), https://www.federalreserve.gov/publications/files/2018-small-business-lending.pdf (Board Small Business Perspectives) (noting that when asked "about the toughest part of running their businesses, most participants cited the challenges of managing their cash flow"); id. at 5 (noting that "[s]ome observers have argued that the owner's loss of control over cash flow puts some small businesses at risk"). The Bureau also notes that many merchant cash advance providers believe that they are not subject to State usury laws.

[377] See Opportunity Fund, Unaffordable and Unsustainable: The New Business Lending, at 3 (May 2016), https://www.leg.state.nv.us/App/InterimCommittee/REL/Document/13129 (stating that "[m]ore than a quarter of the businesses in our dataset had loans outstanding with multiple alternative lenders").

[378] Board Small Business Perspectives at 6.

[379] Gretchen Morgenson, FTC official: Legal 'loan sharks' may be exploiting coronavirus to squeeze small businesses, NBC News (Apr. 3 2020), https://www.nbcnews.com/business/economy/ftc-official-legal-loan-sharks-may-be-exploiting-coronavirus-squeeze-n1173346.

[380] See 2021 Small Business Credit Survey at 26.

[381] Compare id. at 22 (noting that only 7 percent of "high credit risk" applicants obtained all the financing sought), with Fed. Rsrv. Banks, Small Business Credit Survey—2020 Report on Employer Firms, at 12 (Apr. 7, 2020), https://www.fedsmallbusiness.org/survey/2020/report-on-employer-firms (reporting that 23 percent of "high credit risk" applicants obtained all the financing sought) (2020 Small Business Credit Survey).

advocated for covering merchant cash advances in the rule.[382] Comments received in response to the NPRM were no different in that, with the exception of a sole credit union trade association, the only commenters that supported the exclusion of merchant cash advances from the rule were merchant cash advance providers or trade associations representing merchant cash advance providers (the Bureau is not aware of any credit unions that offer merchant cash advances as that term is used herein). Most of these commenters argued that merchant cash advances do not meet the definition of credit under ECOA or State law and should instead be treated like traditional factoring arrangements (described in detail below), which are generally understood not to be credit. A few of these commenters also asserted that covering merchant cash advances is contrary to public policy because doing so will negatively impact access to financing and because they benefit businesses. Two commenters asserted that the Bureau failed to engage adequately in cost/benefit analysis as required by section 1022(b)(2)(a) of the Dodd-Frank Act, claiming that some smaller funders would exit the market due to increased regulatory burdens and costs. One commenter explained that because the merchant cash advance industry has never had to track the demographic status of a small business owner, implementing the Bureau's rule would require costly programming upgrades, adjustments to merchant cash advance funder systems, and additional employees to handle the reporting and auditing of these functions. This commenter also argued the rule would result in a less competitive market dominated by larger players and would put merchant cash advances at an unfair disadvantage compared to factoring.

The Bureau received many comments, primarily from community groups and community-oriented lenders, expressing broad support for covering merchant cash advances. A few of these commenters pointed to the fact that State regulators have started cracking down on the merchant cash advance industry due to its lack of transparency and potentially predatory practices. A community group and a cross-sector group of lenders, community groups,

and small business advocates noted that merchant cash advances are an important and growing part of small business financing, with the community group relaying one merchant cash advance provider's announcement that the COVID–19 pandemic created new demand for its products, in part because the kinds of smaller firms that it primarily serves encountered greater-than-normal challenges to accessing capital through traditional bank financing during the pandemic. The cross-sector group and another community group stressed a need for transparency and noted that there is insufficient data on merchant cash advances. The community group acknowledged that reporting on merchant cash advances may be more complex due to their different terms but argued that these features make transparency into this lending channel critical. This commenter also opined that excluding merchant cash advances from scrutiny would encourage lenders to "double down" on their use rather than offer more consumer-friendly products.

Several supporters of merchant cash advance coverage, including the offices of two State attorneys general, maintained that merchant cash advances are clearly credit and they incur repayment liability. A joint letter from community and business advocacy groups explained that merchant cash advances are distinct from factoring in that a genuine factoring transaction creates a completed sale of receivables owed to the seller as a result of goods delivered or services provided by the seller to a third party. A few commenters asserted that coverage of merchant cash advances meets section 1071's statutory purposes. One online lender noted that merchant cash advances are not regulated. Many commenters expressed strong concerns about high costs and predatory practices often associated with merchant cash advances, with the majority of these commenters expressing particular concern about use of merchant cash advances among minority business owners. A CDFI lender explained that it had analyzed several merchant cash advance and balance sheet lender agreements provided by its clients and discovered that the average product carried an annual percentage rate of 94 percent, with one product reaching 358 percent. This commenter also found that, among the Hispanic borrowers in its sample, the average monthly payment was more than 400 percent of their take-home pay. An online lender characterized the lack of transparency in

pricing merchant cash advances as a significant market failure that harms small business owners. A community group expressed strong concerns about the increasingly common practice of using confessions of judgments (where a borrower must agree to allow the lender to obtain a legal judgment without going to court) within merchant cash advance lending, citing an investigation that found that the number of merchant cash advance cases ending with a confession in favor of a merchant cash advance provider in New York State rose from 14 cases in 2014 to over 3,500 cases in 2018.[383] The commenter noted that the study further found that these confession of judgment cases won the merchant cash advance industry an estimated $500 million in 2017.[384]

Potential coverage of merchant cash advances under the final rule has also drawn the attention of government entities seeking to regulate the industry. For example, in response to the SBREFA Outline, the California Department of Financial Protection and Innovation submitted a comment letter stating that "nearly all the data points would be just as easy for a merchant cash advance company to report as any other financial institution." In addition, FTC staff submitted a comment letter in response to the Bureau's Request for Information on the Equal Credit Opportunity Act and Regulation B [385] noting that the FTC has brought many actions protecting small businesses but that detecting illegal conduct in this space can be challenging, particularly with regard to merchant cash advances. The FTC comment letter urged the Bureau to remind small business lenders that whether a particular law applies depends on actual facts and circumstances and not solely on how one party chooses to characterize the transaction. FTC staff also recommended that the Bureau help small businesses through data collection, collecting complaints, and education.[386]

In response to the NPRM, the offices of two State attorneys general submitted a comment stating that merchant cash advance transactions fall within the definition of credit and that the

[382] For instance, of the substantive responses to the 2017 request for information, comments authored or co-authored by dozens of stakeholders (including community and business groups, industry, and trade associations) expressed explicit support for requiring the reporting of merchant cash advances (and additional letters expressed support for covering "fintech" or "alternative online" products more generally).

[383] Zachary R. Mider & Zeke Faux, *Sign Here to Lose Everything Part 1: "I Hereby Confess Judgment"* (Nov. 20, 2018), *https://www.bloomberg.com/graphics/2018-confessions-of-judgment*.

[384] Zachary R. Mider & Zeke Faux, *Sign Here to Lose Everything Part 2: The $1.7 Million Man* (Nov. 27, 2018), *https://www.bloomberg.com/graphics/2018-confessions-of-judgment-millionaire-marshal/*.

[385] Comment No. CFPB–2020–0026–0117 (Dec. 1, 2020), *https://www.regulations.gov/comment/CFPB-2020-0026-0117*.

[386] *Id.*

inclusion of merchant cash advance transactions is crucial given the rapid expansion of the merchant cash advance market in the past decade and limited publicly available data on market size or standard industry practices. Having brought enforcement actions against multiple merchant cash advance providers, they also asserted that the unregulated nature of the merchant cash advance market makes it ripe for the type of problematic practices that they have directly observed through their investigations into the industry. They expressed strong support for the inclusion of merchant cash advance transactions within the scope of the Bureau's rule, stating their belief that the rule will promote fairness, transparency, and enhanced data collection in the area of small business financing, including the rapidly growing merchant cash advance market that is targeting small businesses.

The Bureau also received a few comments about other aspects of its proposal to cover merchant cash advances. One commenter advised against defining merchant cash advances in the rule, arguing that such a definition could be inconsistent with some State laws and thus may create additional complexity in complying with the final rule. Another commenter urged the Bureau to clarify the application of the rule to merchant cash advances, including by clearly defining merchant cash advances and explaining how the rule will apply to the particular features of merchant cash advance products. Two commenters expressed more general support for coverage of sales-based financing.

Final Rule

For the reasons set forth herein, the Bureau is finalizing its definition of "covered credit transaction" as proposed. Final § 1002.104(a) defines the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under § 1002.104(b). Final comment 104(a)–1 reiterates that the term "covered credit transaction" includes merchant cash advances.

The Bureau believes that the statutory term "credit" in ECOA is intentionally broad so as to include a wide variety of products without specifically identifying any particular product by name. As noted above, ECOA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." As a result, the definition does not explicitly state that it applies to any

type of credit, whether it be installment loans, credit cards, or merchant cash advances. To the extent there is any ambiguity about whether a particular product constitutes "credit," Congress appears to have intended for the Bureau (or previously, the Board) to fill that gap, but neither the Bureau nor the Board have had occasion to provide further clarity with respect to coverage of sales-based financing products like merchant cash advances except to note in commentary that factoring, as "a purchase of accounts receivable," [387] is not covered by ECOA or Regulation B. However, based on its review of typical merchant cash advance arrangements and its expertise with respect to the nature of credit transactions, the Bureau believes the term "credit" encompasses merchant cash advances and other types of sales-based financing. As a result, the Bureau believes that merchant cash advances and other sales-based financing are covered by the definition of "credit" in final § 1002.102(i). The Bureau does not believe it is necessary to specifically define merchant cash advances or sales-based financing because the broad definition of "credit" in ECOA and Regulation B—includes credit products covered by the rule unless the Bureau specifically excludes them.

Nor does the Bureau believe that merchant cash advances should be excluded from the rule as a species of factoring because merchant cash advances do not constitute factoring within the meaning of the existing commentary to Regulation B or the definition in final comment 104(b)–1. In factoring transactions, entities receiving financing sell their legal right to payment from a third party for goods supplied or services rendered, and that right exists at the time of the transaction itself; the provider of funds seeks payment directly from the third party, and the transaction between the recipient and the provider of funds is complete at the time of the sale. In other words, the recipient of the financing has no remaining payment obligation, meaning that no payment is deferred. In contrast, at the time of the advance in a merchant cash advance, the recipient of the financing has no existing rights to payment that it can transfer. The transaction thus constitutes only a promise by the recipient to transfer funds to the provider once they materialize at a later date. The Bureau believes that the ECOA definition of credit, by referring to the right to "defer" payments, necessarily invokes this temporal consideration.

The Bureau does not agree with arguments raised by other commenters that merchant cash advances are not "credit" under ECOA. Specifically, the Bureau does not agree that the purchase of the right to a specific portion of a merchant's future proceeds, up to an agreed-upon limit, constitutes a substantially contemporaneous exchange of value between a merchant cash advance provider and a merchant. The Bureau notes that a merchant's proceeds from future sales of goods and services, by definition, do not exist in the present and thus there can be no contemporaneous exchange of value, substantial or otherwise, where there is no present right to payment. The Bureau believes merchant cash advances are clearly distinguishable from back-dated checks, service contracts with staggered payment schedules, and true leases (discussed below). Merchant cash advances are typically repaid over a period of three to 12 months and the merchant has no existing rights to payment that it can transfer to the merchant cash advance provider until they materialize at a later date, usually at least a month later. The Bureau also notes that under Regulation B, a transaction is "credit" if there is a right to defer payment of a debt—regardless of the number of installments required for repayment or whether the transaction is subject to a finance charge.[388]

Furthermore, the Bureau interprets ECOA's definition of credit as making dispositive whether one party has granted another the right to repay at some time subsequent to the initial transaction, without consideration of factors such as the absence of recourse or analysis of who bears the risk of loss. Merchant cash advance providers grant such a right: they advance funds to small businesses and grant them the right to defer repayment by allowing them to repay over time. Additionally, as a practical matter, the Bureau understands that merchant cash advances are underwritten and function like a typical loan (i.e., underwriting of the recipient of the funds; repayment that functionally comes from the recipient's own accounts rather than from a third party; repayment of the advance itself plus additional amounts akin to interest; and, at least for some subset of merchant cash advances, repayment in regular intervals over a predictable period of time).

Finally, the Bureau believes that the inclusion of merchant cash advances in the Bureau's rule is important to fulfilling both the fair lending and the

---

[387] Existing comment 9(a)(3)–3.

[388] Existing comment 2(j)–1.

business and community development purposes of section 1071.[389] Commenters have warned of high costs and predatory practices in this area, and the Bureau is particularly focused on their increasingly prevalent use among minority business owners.[390] The Bureau also believes that including merchant cash advances will create a more level playing field across financial institutions that provide cash flow financing to small businesses by shedding light on such credit transactions as well as create a dataset that better reflects demand for such financing by the smallest and most vulnerable businesses.

## Agricultural-Purpose Credit

### Background

As reported by the 2017 Census of Agriculture,[391] there are about 3.4 million farmers and ranchers ("producers") working on 2 million farming and ranching operations ("farms") in the United States. The U.S. Department of Agriculture (USDA) Economic Research Service found that family farms (where the majority of the business is owned by the operator and individuals related to the operator) of various types together accounted for nearly 98 percent of U.S. farms in 2020.[392] Small family farms (less than $350,000 in gross cash farm income) accounted for 90 percent of all U.S. farms and large-scale family farms ($1 million or more in gross cash farm income) make up about 3 percent of farms but 44 percent of the value of production.[393]

According to the 2020 Annual Report of the Farm Credit Administration, most agricultural lending (approximately 83 percent) is done by either commercial banks or the Farm Credit System (FCS), a network of government-sponsored enterprises regulated by the Farm Credit Administration, an independent

government agency.[394] The USDA's Farm Service Agency accounts for a small share (3 percent) of agricultural credit through direct loans and guarantees of loans made by private lenders.[395]

In a July 2019 report, the U.S. Government Accountability Office (GAO) discussed its finding that information on the amount and types of agricultural credit to socially disadvantaged farmers and ranchers is limited,[396] and suggested that this rulemaking may be a way to engage in "additional data collection and reporting for nonmortgage loans." [397] The GAO found that, using 2015–2017 USDA survey data, socially disadvantaged farmers and ranchers represented an estimated 17 percent of primary producers in the survey, but accounted for only an estimated 8 percent of total outstanding agricultural debt.[398] Loans to purchase agricultural real estate accounted for most of socially disadvantaged farmers and ranchers' outstanding debt (67 percent).[399] Farms with minority or women primary producers[400] are, on average, smaller and bring in less revenue than farms with a non-socially disadvantaged primary producer (i.e., a white male)— while socially disadvantaged farmers and ranchers represented 30 percent of all farms, they operated 21 percent of total farmland and accounted for 13 percent of the market value of agricultural products sold in 2017.[401]

The share of minority representation in farming, particularly that of Black farmers, has declined sharply over the last 100 years.[402] (The number of female

producers has increased significantly over the last 100 years but remains relatively small compared to male farm producers.[403] Based on the disposition of numerous lawsuits alleging discrimination against minority farmers,[404] the Bureau believes that credit discrimination may play a role in this decline. The GAO cites advocacy groups for socially disadvantaged farmers and ranchers, which have said some socially disadvantaged farmers and ranchers face actual or perceived unfair treatment in lending or may be dissuaded from applying for credit because of past instances of alleged discrimination.[405] In addition, the GAO cites advocacy groups, lending industry representatives, and Federal officials in stating that socially disadvantaged farmers and ranchers are more likely to operate smaller, lower-revenue farms, have weaker credit histories, or lack clear title to their agricultural land, which can make it difficult for them to qualify for loans.[406] The Bureau understands that determining the "creditworthiness" of a farmer is often a judgmental process in which lending decisions are de-centralized and involve weighing many discretionary factors, and believes that there are heightened fair lending risks in agricultural lending.

### Proposed Rule

In its proposal, the Bureau noted that credit used for agricultural purposes is generally covered by the broad definition of credit under ECOA and

---

[389] ECOA section 704B(a).

[390] See, e.g., Fed. Rsrv. Bank of N.Y. et al., Latino-Owned Businesses: Shining a Light on National Trends (Nov. 2018) (stating "Latino business owners are more likely than non-Latino White business owners to use credit cards, factoring, and merchant cash advances—products that require less collateral and are associated with higher average interest rates").

[391] The Census of Agriculture is conducted by the USDA every five years and provides a detailed picture of farms and the people who operate them. See generally U.S. Dep't of Agric., 2017 Census of Agriculture (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1_Chapter_1_US/usv1.pdf.

[392] Econ. Rsch. Serv., U.S. Dep't of Agric., Farming and Farm Income (updated Sept. 1, 2022), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/.

[393] Id.

[394] Farm Credit Admin., 2020 Annual Report of the Farm Credit Administration, at 20 (2020), https://www.fca.gov/template-fca/about/2020AnnualReport.pdf.

[395] Id.

[396] See Gov't Accountability Off., Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited (2019), https://www.gao.gov/assets/gao-19-539.pdf (GAO Report).

[397] Id. at 12.

[398] Id. at 16. "The primary producer is the individual on a farm who is responsible for the most decisions. Each farm has only one primary producer." Id. at 5.

[399] Id. at introductory highlights.

[400] "Producers" are individuals involved in farm decision-making. A single farm may have more than one producer.

[401] See GAO Report at 7.

[402] In 1910, approximately 893,370 Black farmers operated approximately 41.1 million acres of farmland, representing approximately 14 percent of farmers. U.S. Census Bureau, 1910 Census: Volume 5 (Agriculture), Statistics of Farms, Classified by Race, Nativity, and Sex of Farmers, at 298 (1910), https://www2.census.gov/library/publications/decennial/1920/volume-5/06229676v5ch04.pdf. In 2017, of the country's 3.4 million total producers, only 45,508 of them (1.3 percent) are Black and they farm on only 4.1 million acres (0.5 percent of total

farmland); by comparison, 95 percent of U.S. producers are white and own 94 percent of farmland. U.S. Dep't of Agric., 2017 Census of Agriculture, at 62, 72 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1_Chapter_1_US/usv1.pdf.

[403] In 1910, women farmers represented approximately 4 percent of farm workers. See U.S. Census Bureau, 1910 Census: Volume 5 (Agriculture), Statistics of Farms, Classified by Race, Nativity, and Sex of Farmers, at 340 (1910), https://www2.census.gov/library/publications/decennial/1920/volume-5/06229676v5ch04.pdf. As of 2017, women account for approximately 36 percent of farmers. See U.S. Dep't of Agric., 2017 Census of Agriculture, at 62 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1_Chapter_1_US/usv1.pdf.

[404] See, e.g., Order, In re Black Farmers Discrimination Litig., No. 08-mc-0511 (D.D.C. filed Aug. 8, 2008), https://blackfarmercase.com/Documents/2008.08.08%20-%20PLF%20Consolidation%20Order_0.pdf; Pigford v. Glickman, 206 F.3d 1212 (D.C. Cir. 2000). See also Garcia v. Vilsack, 563 F.3d 519 (D.C. Cir. 2009); Love v. Connor, 525 F. Supp. 2d 155 (D.D.C. 2007); Keepseagle v. Veneman, No. 99-CIV-03119, 2001 U.S. Dist. LEXIS 25220 (D.D.C. Dec. 12, 2001).

[405] GAO Report at introductory highlights. Additionally, the GAO cited these sources as noting that some socially disadvantaged farmers and ranchers may not be fully aware of credit options and lending requirements, especially if they are recent immigrants or new to agriculture. Id.

[406] Id.

agricultural businesses are included in section 1071's definition of small business. Taking into account the information above, the Bureau stated that covering agricultural credit in this rulemaking was important for advancing both of section 1071's statutory purposes and did not propose defining covered credit in a way that would exclude agricultural credit from coverage. The Bureau sought comment on the potential costs and complexities associated with covering such credit.

Comments Received

The Bureau received comments on this aspect of the proposal from many agricultural lenders, banks, trade associations, and community groups. Several community-oriented lenders and many community groups voiced support for the Bureau's proposed coverage of agricultural-purpose credit. A joint letter from community groups, community oriented lenders, and business advocacy groups asserted that covering agricultural credit will be helpful in advancing the goals of section 1071 because the vast majority of farms are small and family run, and farmers are an important part of the community development landscape, and because the litigation regarding discrimination against Black farmers shows the risk of discrimination and unequal access is significant in the agricultural context. A rural community group argued that the Bureau's legislative mandate is clear on this issue because agricultural lending falls under ECOA's definition of credit and farming operations are correctly included in the proposed rule's definition of small business. Several commenters asserted that covering agricultural credit serves section 1071's community development and fair lending statutory purposes. Another community group expressed its belief that 1071 data will allow for promotion of adaptive and sustainable agriculture among smaller farmers as opposed to relying on large agricultural businesses.

Some commenters discussed their belief that including agricultural credit within the scope of this rule was needed to address historical and/or continuing discrimination. A rural community group described the challenges relating to justifying claims in the discrimination settlements against USDA due specifically to the lack of any other form of data to quantify the results of disparities in treatment with access to loans. This commenter also relayed minority farmers' experiences of being more at risk of foreclosure due to not being told about or not being given fair access to many farm programs that benefit white farmers and due to

receiving unfavorable loans originated with the specific intent of pushing these farmers into acceleration and foreclosure to remove them from their land. This commenter also detailed how the rule would illuminate a host of factors leading to disparate treatment of minority farmers, citing conflicts of interest among staff of local Farm Service Agency offices, disclosure of loan terms, imposition of collateral requirements, and changes in valuations of assets in appraisals. This commenter described discouragement of minority farmers from making loan applications or requesting loss mitigation and asserted that data collection is a proven way to document and address such discouragement. The commenter alleged that agricultural lenders, notably Farm Credit System lenders, lack the data or any system to comply with ECOA.

One community group maintained that constrained access to capital has contributed to the staggering loss of Black-owned farmland in the Deep South, while another said that the Bureau's rule will highlight the racially disparate impact of facially neutral policies that disproportionately result in adverse outcomes for Black farmers, including underwriting decisions based on the types of farm, the business structure, and land appraisals. A CDFI lender relayed examples of issues faced by Black farmers, including: (1) lack of access to fair, affordable credit as a barrier for new farmers; (2) lenders and local USDA offices that seek to frustrate Black farmers by making things more complicated and causing lengthy delays that white farmers do not encounter; (3) lack of relationships with banks resulting in their being less willing to work with the farmers and provide assistance during the loan application process; (4) agricultural loan underwriting criteria that favor beef, cattle, and grain production, which are often the enterprises of large-scale white farmers; (5) alternative financing from a private lender not being an adequate substitute for having fair access to government lending programs with 1 percent interest and 40 year terms; and (6) Black farmers often being unable to secure financing and thus being left with no choice but to sell their land to white farmers.

Several commenters stressed the need for transparency due to lack of sufficient data on agricultural lending markets. One such commenter noted that the USDA has not made its limited data—which includes only numbers of loans applied for, made, and denied, at the county level—easily available to the public. This commenter also argued that comprehensive data are particularly

important to increase equity and uniformity in loan modifications and restructurings and to assist with decisions related to pandemic relief programs and the grant of specialized loan servicing. Another commenter suggested that 1071 data would help the USDA, the SBA, and other relevant government agencies better understand the needs of small agricultural businesses and noted that agricultural credit extends beyond acquisition of inventory farmland to include operational loans, agricultural machinery and building loans, and loans to develop local markets for selling agricultural products. A community group dismissed concerns that agricultural lending data would be too complex to collect and report, because it is already reported under CRA.

Some commenters suggested changes and clarifications related to applying the Bureau's rule to agricultural credit. One community group suggested the Bureau modify or clarify data collection to identify forms of disparate treatment unique in small-scale farm operations that may differ from other small businesses. This commenter also suggested that the Bureau clarify that the rule covers the Farm Service Agency, the Farm Credit System, all lenders making Farm Service Agency guaranteed loans, and the full range of other entities that provide credit to small farm businesses. A number of Farm Credit System lenders expressed support for a trade association letter that discussed how agricultural lending is fundamentally different from small commercial lending and requested a different small business definition to account for how they would be disproportionately covered by the rule. These comments are discussed in more detail in the section-by-section analysis of § 1002.106(b). One agricultural community group suggested that base acre payment transactions (transactions that take into account certain government payments, which are in turn based on a farm's historic crop yield) should be considered covered credit transactions because of concerns that base program acres may not benefit Native American farmers and because base acre payments are often used to prove or deny a farmer's request for loan origination or modification.

Some industry commenters requested an exclusion for agricultural credit from the Bureau's rule. One credit union association argued that agricultural lending should be exempted because many agricultural borrowers are serviced by small local community financial institutions, including credit

unions whose members are agriculturally based and whose members and borrowers are represented on the credit unions' board of directors. A few other commenters asserted that agricultural credit is not comparable to other types of small business lending and urged the Bureau to exempt it on those grounds; one stated that it does not make sense to compare a 200-acre farm with a gas station. A trade association pointed to different treatment under CRA and HMDA as evidence that it was unlikely that section 1071 was enacted to cover agricultural lending because their underwriting criteria are distinct and different from small business loans. A bank also suggested exempting agricultural lending, maintaining that its numbers would not be useful for fair lending purposes because unlike small business loans that are more on a one loan to one borrower or two-to-one basis, its agricultural portfolio included multiple loans to the same borrower. A few commenters argued that covering agricultural credit under the rule would have an outsized impact on farmers by increasing this cost of credit and reducing its availability. A trade association asserted that the burden of section 1071 compliance may force small lenders to reduce their lending below the exemption threshold, which in turn may limit the access to agricultural credit because large banks often do not engage in significant agricultural lending.

Final Rule

For the reasons set forth herein, the Bureau is not defining a "covered credit transaction" in final § 1002.104 in a way that would exclude agricultural credit from the final rule. Credit used for agricultural purposes is generally covered by the broad definition of credit under ECOA. First, ECOA's definition of "credit" is not limited to a particular use or purpose and Regulation B expressly covers agricultural-purpose credit. Further, ECOA does not provide an exception for agricultural credit, and it assigns enforcement authority to regulators of agricultural lending such as the Secretary of Agriculture and the Farm Credit Administration.[407] Moreover, agricultural businesses are included in section 1071's statutory definition of small business.[408] The

Bureau believes that covering agricultural credit in this rulemaking is important for advancing both of section 1071's statutory purposes and is not excluding agricultural credit from the final rule. The Bureau notes that most of the comments received on this aspect of the proposal were in favor of the rule covering agricultural lending. Even the many comments that the Bureau received from Farm Credit System lenders and related associations generally focused on urging the Bureau to adopt a separate small farm definition rather than a wholesale exclusion of agricultural credit.

As noted above, the products discussed in this rule do not constitute an exhaustive list of covered credit transactions; other types of business credit not specifically described in the rule and its associated commentary nevertheless constitute covered credit transactions unless excluded by final § 1002.104(b). In line with this approach, the Bureau thus is not delineating certain products (such as base acre payment transactions) as covered credit transactions.

The Bureau does not believe it would appropriate to exclude agricultural credit from the rule, as requested by some commenters. With regard to the concern that agricultural lending should be exempted because of the impact on small local community financial institutions, such as credit unions, the Bureau notes that it is increasing its institutional coverage threshold, as discussed in the section-by-section analysis of § 1002.105 below, to limit any risk of impact on smaller financial institutions or of market disruption in the small business lending sector. By declining to draw a potentially blurry line between business-purpose credit and agricultural-purpose credit, the Bureau also believes that its finalized inclusive approach will better enable it to ensure that financial institutions that are offering business credit are complying with the final rule.

With respect to comments asserting that agricultural credit is unique and not comparable to other types of small business lending, the Bureau acknowledges that every small business industry has its own unique characteristics. In order to fulfill section 1071's business and community development purpose and to address the particularities of certain lending models, the Bureau is providing clarification regarding how reporting

rules apply to certain covered credit transactions and is also not covering certain transactions. For the reasons described herein, however, the Bureau is not categorically exempting agricultural credit from the rule.

Moreover, the Bureau believes that data on agricultural credit will be useful for fair lending purposes. As discussed above, there is some evidence that minority-owned farms may obtain, or may be offered, higher interest rates and less favorable terms on agricultural credit. Data collected and reported under this final rule will allow the Bureau, other government agencies, and other data users to have insight into the existing market, observe the market for potentially troubling trends, and conduct fair lending analyses.

The Bureau has considered the comments arguing that covering agricultural credit under the rule would have an outsized impact on farmers by increasing this cost of credit and reducing its availability. The Bureau has also considered the claim that small lenders will reduce their lending below the exemption threshold, which in turn may limit the access to agricultural credit because large banks often do not engage in significant agricultural lending. The Bureau does not believe that there is a significant risk that lenders will reduce their agricultural lending as a result of this rule such that there will be a marked impact on the availability of agricultural credit. Moreover, as noted in the section-by-section analysis of § 1002.105 below, the Bureau is increasing its institutional coverage threshold for the final rule to reduce the impact on financial institutions with the lowest volume of small business lending, including agricultural lenders.

Based on its review of the GAO Report,[409] the decline of minority representation in farming over the last 100 years,[410] the disposition of numerous lawsuits alleging discrimination against minority

---

[407] See 15 U.S.C. 1691c; Regulation B § 1002.16(a).

[408] ECOA section 704B(h)(2) (defining a small business as having the same meaning as the term "small business concern" in section 3 of the Small Business Act (15 U.S.C. 632)). Section 704B(h)(2) defines small business by reference to the Small Business Act definition of a small business concern,

which includes independently owned and operated "enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries." 15 U.S.C. 632(a)(1).

[409] See, e.g., GAO Report at 16.

[410] In 1910, approximately 893,370 Black farmers operated approximately 41.1 million acres of farmland, representing approximately 14 percent of farmers. U.S. Census Bureau, *1910 Census: Volume 5 (Agriculture), Statistics of Farms, Classified by Race, Nativity, and Sex of Farmers*, at 298 (1910), *https://www2.census.gov/library/publications/decennial/1920/volume-5/06229676v5ch04.pdf*. In 2017, of the country's 3.4 million total producers, only 45,508 of them (1.3 percent) are Black and they farm on only 4.1 million acres (0.5 percent of total farmland); by comparison, 95 percent of U.S. producers are white and own 94 percent of farmland. U.S. Dep't of Agric., *2017 Census of Agriculture*, at 62, 72 (Apr. 2019), *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf*.

AdminRecord-000077

farmers,[411] and comments discussing how the inclusion of agricultural credit in the rule is needed to address historical and/or continuing discrimination, the Bureau finds that covering agricultural credit is crucial to serving section 1071's purpose of facilitating enforcement of fair lending laws.

The Bureau furthers finds that covering agricultural credit is vital to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of small businesses, including small farms. The Bureau agrees with commenters that stressed the need for transparency due to lack of sufficient data on agricultural lending markets. The Bureau believes that the transparency afforded by data collected and reported under this final rule will empower rural communities to better address the challenges they face, particularly with regard to equitable credit access. Representatives of these communities appear to agree—in a recent letter addressed to the House and Senate Agriculture and Financial Services and Banking committees characterizing the proposed rule as "pro-farmer," multiple community groups noted that "[s]mall farmers have consistently demanded more transparent and fair markets, and our members know that having an accurate and up-to-date picture of agricultural lending will help farmers and consumers, not hurt them."[412] Relatedly, in a recent report, the Bureau found that rural communities face unique challenges in accessing and using consumer financial products and that further research is required to better understand the needs of rural households and how the Bureau can best ensure that rural residents have equitable access to financial markets.[413]

The Bureau notes that many agricultural lenders have already been collecting and reporting some form of data by HMDA, the CRA, and/or the Farm Credit Administration and so should be able to adapt to the data collection requirements mandated by Congress. Additionally, to the extent that commenters were concerned about the impact on the smallest agricultural lenders, many of those concerns are addressed by the Bureau's decision, as discussed in the section-by-section analysis of § 1002.105(b) below, to require data collection and reporting only by financial institutions that meet a 100-loan threshold. In short, as further discussed in part IX below, the Bureau does not anticipate any material adverse effect on credit access in the long or short term to rural small businesses.

### 104(b) Excluded Transactions

Proposed § 1002.104(b) would have provided that the requirements of subpart B do not apply to trade credit, public utilities credit, securities credit, and incidental credit. Proposed comments 104(b)–1 and –2 would have made clear that the term covered credit transaction also does not cover factoring and leases. Proposed comments 104(b)–3 and –4 would have clarified that the term covered credit transaction does not include consumer-designated credit or credit secured by certain investment properties because such transactions are not business credit. In the NPRM, the Bureau also discussed its proposed treatment of extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities and certain purchases of covered credit transactions.

The Bureau received comments on its overall approach to § 1002.104(b) from several banks, trade associations, individuals, and members of Congress. Two industry commenters supported the exclusions as proposed, with another commenter expressing support but also suggesting expansion. Two commenters suggested listing all exclusions in the regulatory text with any clarifications of those exclusions set out in the commentary. A bank trade association urged the Bureau to extend section 1071 requirements to all nontraditional lenders and nontraditional products to avoid leaving open the opportunity for the abuse or dissatisfaction of small business borrowers to go undetected or disadvantaging highly regulated institutions such as community banks. A joint letter from several members of Congress asked the Bureau reconsider its proposed exclusions on the grounds that such exclusions would lead to a gap in understanding of the small business lending marketplace and whether entities are in compliance with fair lending laws. Comments received regarding specific exclusions, including additional exclusions sought by commenters, are discussed in greater detail below.

For the reasons set forth herein, the Bureau is finalizing § 1002.104(b) to provide that the requirements of subpart B do not apply to trade credit, HMDA-reportable transactions, insurance premium financing, public utilities credit, securities credit, and incidental credit. In response to comments received, the Bureau is excluding HMDA-reportable transactions from coverage under the final rule. As a result, the Bureau believes that proposed comment 104(b)–4 that would have made clear that the term "covered credit transaction" does not cover credit secured by certain investment properties is not necessary. Final comments 104(b)–1 and –2 make clear that the term covered credit transaction also does not cover factoring and leases. Final comment 104(b)–3 clarifies that the term covered credit transaction does not include consumer-designated credit because such transactions are not business credit. New comment 104(b)–4 provides clarification regarding certain purchases of covered credit transactions, including pooled loans, and partial interests. All of these provisions are discussed in detail below.

The Bureau has considered comments suggesting that all exclusions be listed in the regulatory text. The Bureau appreciates the need for clarity in articulating which products must be reported under this final rule but believes that it can provide sufficient clarity through its regulatory text and commentary. The Bureau's approach differentiates between products that meet the definition of both "credit" and "business credit" under Regulation B, and between those products that the Bureau is excluding (for reasons discussed below) pursuant to its exception authority under ECOA section 704B(g)(2). Products excepted under section 704B(g)(2) are enumerated in the regulatory text. Such specific exclusion is not necessary for products the Bureau considers not to be "business credit" in the first place; however, the Bureau believes that identifying and describing some such products in the commentary—which it has done—will provide clarity and facilitate compliance.

[411] *See, e.g.,* Order, *In re Black Farmers Discrimination Litig.,* No. 08–mc–0511 (D.D.C. filed Aug. 8, 2008), *https://blackfarmercase.com/Documents/2008.08.08%20–%20PLF%20Consolidation%20Order_0.pdf; Pigford v. Glickman,* 206 F.3d 1212 (D.C. Cir. 2000). *See also Garcia v. Vilsack,* 563 F.3d 519 (D.C. Cir. 2009); *Love v. Connor,* 525 F. Supp. 2d 155 (D.D.C. 2007); *Keepseagle v. Veneman,* No. 99–CIV–03119, 2001 U.S. Dist. LEXIS 25220 (D.D.C. Dec. 12, 2001).

[412] HEAL (Health, Environment, Agriculture, Labor) Food All., Rural Coal., Nat'l Young Farmers Coal., Ctr. for Responsible Lending *et al., RE: Support for Proposed Section 1071 rule and Opposition to H.R.7768—Farm Credit Administration Independent Authority Act* (R. Davis) (Sept. 14, 2022), *https://www.ushcc.com/advocacy-letters.html.*

[413] CFPB, *Data Spotlight: Challenges in Rural Banking Access* (Apr. 2022), *https://files.consumerfinance.gov/f/documents/cfpb_data-spotlight_challenges-in-rural-banking_2022-04.pdf.*

**35228**   **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

## 104(b)(1) Trade Credit

### Background

Under existing Regulation B, trade credit refers to a "financing arrangement that involves a buyer and a seller—such as a supplier who finances the sale of equipment, supplies, or inventory; it does not apply to an extension of credit by a bank or other financial institution for the financing of such items." [414] Thus, trade credit typically involves a transaction in which a seller allows a business to purchase its own goods or services without requiring immediate payment in full, and the seller is not otherwise involved in financial services and does not otherwise provide credit that could be used for purposes other than the purchase of its own goods or services. [415] Businesses offering trade credit generally do so as a means to facilitate the sale of their own goods and not as a stand-alone financing product or a more general credit product offered alongside the sale of their own goods or services.

Although ECOA and Regulation B generally may apply to trade credit, most of the specific notification requirements of existing Regulation B do not apply to trade credit transactions. [416] The Bureau's White Paper estimated that trade credit represents approximately 21 percent of the aggregate dollar volume of various financial products used by small businesses. [417] The Bureau understands that there are tens of thousands of merchants and wholesalers that extend credit to small businesses solely in connection with the sale of their goods and services.

### Proposed Rule

The Bureau proposed to not cover trade credit in the section 1071 final rule. Proposed § 1002.104(b)(1) would have defined trade credit as a financing arrangement wherein a business acquires goods or services from another business without making immediate payment to the business providing the goods or services. Proposed comment 104(b)(1)–1 would have provided that an example of trade credit is one that involves a supplier that finances the sale of equipment, supplies, or inventory. Proposed comment 104(b)(1)–1 would have provided that an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit. Proposed comment

104(b)(1)–2 would have clarified that the definition of trade credit under existing comment 9(a)(3)–2 applies to relevant provisions under existing Regulation B, and that proposed § 1002.104(b)(1) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing comment 9(a)(3)–2. The Bureau sought comment on its proposal to exclude trade credit from the rule and on its proposed definition of trade credit.

### Comments Received

The Bureau received comments on this aspect of the proposal from a range of commenters, including banks, trade associations, and a business advocacy group. Several industry commenters expressed general support for the proposal to exclude trade credit. However, some of these commenters advocated expanding the exclusion. For instance, one commenter suggested that all asset-based financing should be excluded as trade credit, arguing that if the rule should not apply to sellers to facilitate their sales of goods, the rule also should not apply to their "behind the scenes" non-recourse factors and asset-based lenders who facilitate those sales. Two commenters urged broadening the proposed exclusion to include captive finance companies when they are financing equipment manufactured by their parent companies because these companies exist solely to facilitate the acquisition of the original equipment manufacturers' products. A few comments more broadly asked that the Bureau not limit the exclusion to "in-house" trade credit, suggesting that trade credit offered by financial institutions allows more suppliers to offer trade credit programs, and as a result provides more opportunities for credit access to small businesses. These commenters additionally argued that such expansion is needed to prevent uneven regulatory treatment, to promote competition in the market for trade credit, to avoid pushing more business transactions into a less regulated environment, and to obtain more fulsome data collection and reporting on trade credit. A trade association asked the Bureau to clarify that the trade credit exclusion encompasses auctions where a buyer may pay for acquired property at a later date.

A few other industry commenters urged the Bureau to cover trade credit in the final rule. Two of these commenters argued that providers of trade credit, especially in the agricultural sector, are competitors to

traditional lenders, and should be covered. One commenter asked the Bureau to provide several specific transaction examples so that covered financial institutions can readily identify those transactions that they must report on, and those that are exempted. Another commenter asked the Bureau to clarify whether floor plan financing, which generally allows merchants to stock inventory available for sale without advance payment to the manufacturer or distributor, would fall within the proposed trade credit exclusion. This commenter noted that floor plan finance companies support merchants by allowing them to maintain some level of inventory with frequent adjustments to the financing and payment terms, and they may be affiliated with the manufacturer or distributor.

Several commenters urged the Bureau to expand its trade credit exclusion to private label or cobranded credit. These commenters primarily argued that such transactions need to be quickly completed, often at a point-of-sale, and that asking for protected demographic information and other required data may reduce the supply and demand for such credit. A few commenters suggested that if the Bureau were to include private label and co-branded transactions in the final rule, it should only require the collection and reporting of such transactions over $50,000 to mitigate the impact of their inclusion.

### Final Rule

For the reasons set forth herein, the Bureau is finalizing largely as proposed its exclusion for trade credit in this final rule. Final § 1002.104(b)(1) defines trade credit as a financing arrangement wherein a business acquires goods or services from another business without making immediate payment in full to the business providing the goods or services. The Bureau has added the words "in full" to the proposed definition to account for the fact that trade credit may include an immediate partial payment or down payment to the businesses providing the goods or services. Final comment 104(b)(1)–1 provides that an example of trade credit is one that involves a supplier that finances the sale of equipment, supplies, or inventory. Final comment 104(b)(1)–1 provides that an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit, and it also provides that credit extended by a business providing goods or services to another business is not trade credit for the purposes of subpart B where the supplying business intends

---

[414] Comment 9(a)(3)–2.

[415] *See* comment 9(a)(3)–2.

[416] *See* § 1002.9(a)(3)(ii).

[417] White Paper at 21 fig. 2.

to sell or transfer its rights as a creditor to a third party, such as a financial institution. Final comment 104(b)(1)–2 clarifies that the definition of trade credit under existing comment 9(a)(3)–2 applies to relevant provisions under existing Regulation B, and that § 1002.104(b)(1) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing comment 9(a)(3)–2.

The Bureau is adopting a definition of "covered credit transaction" that excludes trade credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071, as well as its authority under ECOA 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. While trade credit constitutes "credit" within the meaning of § 1002.102(i) and may constitute "business credit" within the meaning of § 1002.102(d), depending on its purpose, and therefore generally covered by ECOA, the Bureau believes that trade credit is different from products like loans, lines of credit, credit cards, and merchant cash advances and that there are several reasons to exclude it from coverage. The Bureau does not believe it would be appropriate to include trade credit in the scope of this final rule, despite some commenters' assertions that providers of trade credit in the agricultural sector would have a competitive advantage over other lenders.

Trade credit is not a general-use business lending product—that is, trade creditors generally extend credit as a means to facilitate the sale of their own goods or services, rather than offering credit as a stand-alone financial product or as more general credit product offered alongside the sale of their own goods or services. The Bureau believes that while trade creditors might meet the definition of a financial institution under § 1002.105(a), they are not primarily financial services providers, nor do they have the infrastructure needed to manage compliance with regulatory requirements associated with making extensions of credit. The Bureau understands that trade credit can be offered by entities that are themselves very small businesses; these entities, in

particular, may incur large costs relative to their size to collect and report small business lending data in an accurate and consistent manner.[418] Taken together, requiring trade credit to be reported under subpart B could lead to significant data quality issues. The Bureau also wants to avoid the risk that the fixed costs of coming into compliance with the rule could lead these businesses to limit offering trade credit to their small business customers, which may run contrary to the business and community development purpose of section 1071. These concerns are distinct from coverage generally under ECOA and Regulation B, which as noted above may still apply to trade credit.

The Bureau does not believe that the trade credit exclusion should be expanded to include all asset-based financing, captive finance companies, or trade credit offered by financial institutions that are not suppliers of goods or services, as requested by some commenters. The Bureau believes that, unlike trade creditors themselves, such providers offer stand-alone credit products in the same way as other financial institutions and are not retailers or merchants with limited regulatory compliance experience. As such, the Bureau does not have the same concerns about data quality or reduced small business lending by affiliates and facilitators that it does about trade creditors themselves. Thus, the Bureau is finalizing its definition of trade credit in § 1002.104(b)(1) to focus on the business providing the goods or services being financed. The trade credit exclusion does not extend to affiliates and facilitators of trade creditors that provide financing, even if only for the trade creditor's products and not for competing or unrelated products. Thus, provided that they otherwise meet the definition of a covered financial institution in § 1002.105(b), such affiliates and facilitators must collect and report data under the rule.

The Bureau also is not making further revisions to the regulatory text or commentary. With respect to the suggestion that the Bureau clarify that the trade credit exclusion encompasses auctions, the Bureau notes that because auction houses generally do not supply equipment, supplies, or inventory but rather facilitate sales for others, they do not offer trade credit under final

§ 1002.104(b)(1). However, other exclusions, such as the exclusion for incidental credit discussed below, may apply to such transactions. The Bureau is not adding further transaction examples, as only one comment requesting such additions and it otherwise appears that commenters understood that the proposed exclusion was intended to narrowly cover credit directly extended by the supplier of goods and services. Regarding floor plan financing, the Bureau notes that under final § 1002.104(b)(1), the trade credit exclusion applies where the manufacturer or distributor is financing its own inventory, but not where a financial institution is providing the financing and receiving payment.

The Bureau is also not expanding the trade credit exclusion to cover private label or cobranded credit transactions, which are credit transactions (typically, credit cards, but also revolving lines of credit and installment loans) that are originated at or facilitated by financial institutions through retailers either in-store or through a website. Moreover, as explained in the section-by-section analysis of § 1002.107(a)(5), the Bureau believes it is important to capture these products as a separate credit type. As that section explains, a private-label credit card account is a credit card account that can only be used to acquire goods or services provided by one business (for example, a specific merchant, retailer, independent dealer, or manufacturer) or a small group of related businesses. A co-branded or other card that can also be used for purchases at unrelated businesses is not a private-label credit card.

The Bureau believes that covering private label or cobranded credit transactions supports section 1071's statutory purposes. For instance, the Bureau believes that having robust data on this important source of financing will help to better understand small business needs. In researching the consumer credit card market, for example, the Bureau learned that while private label card account holding has declined relative to general purpose cards,[419] late fees comprised the

[418] See Leora Klapper et al., *Trade Credit Contracts*, 25 Review of Fin. Studies 838–67 (2012), *https://academic.oup.com/rfs/article/25/3/838/1616515*, and Justin Murfin & Ken Njoroge, *The Implicit Costs of Trade Credit Borrowing by Large Firms*, 28 Review of Fin. Studies 112–45 (2015), *https://academic.oup.com/rfs/article/28/1/112/1681329*.

[419] The Bureau estimates that around 90 million consumers hold at least one general purpose and at least one private label card. Some 79 million hold only general-purpose cards. Just under 9 million hold only private label cards. General purpose cards remain prevalent, while private label cardholding has become relatively less common. By year-end 2020, there were 485 million open general purpose card accounts and 214 million open private label accounts. General purpose cardholding is just as common today as it was prior to the Great Recession, though that share is down from 63 percent on the eve of the pandemic. In contrast, 36

Continued

overwhelming majority—91 percent—of all consumer fees and 25 percent of total interest and fees for private label cards (compared to 45 percent and 7 percent, respectively, for general purpose credit cards).[420] Additionally, since private label and cobranded credit accounts are typically offered and serviced by financial institutions, with applications typically submitted directly to the financial institution via a website, the Bureau does not have the same concerns related to data quality or regulatory compliance as it does with trade credit offered by a supplier of goods and services who is not in the business of providing financial services. The Bureau also is not placing a $50,000 minimum threshold on such transactions, as suggested by a few commenters, because doing so would exclude significant portions of small business lending. The Bureau does not believe that such an approach would further the purposes of section 1071.

### 104(b)(2) HMDA-Reportable Transactions

#### Proposed Rule

The potential for overlap exists between section 1071 and HMDA because HMDA reporting requirements apply to mortgages regardless of whether they are consumer-purpose or business-purpose, so long as they are secured by residential real property. Section 1071 applies to all small business credit, regardless of what the credit is to be used for. For example, a mortgage intended to finance the purchase of an investment property would be covered by HMDA, assuming relevant institutional thresholds and other coverage criteria were otherwise met. If the mortgage applicant is a natural person, their ethnicity, race, and sex would be captured and reported under HMDA. However, if the mortgage applicant were a non-natural person (*e.g.*, a limited liability company or a corporation), then the lender would not collect demographic data under HMDA. That is, the lender would still need to report the application under HMDA, but they would report ethnicity, race, and sex as "not applicable." But under the

Bureau's proposed rule, the lender would have captured the applicant's principal owners' ethnicity, race, and sex.

In its NPRM, the Bureau stated that by proposing to adopt Regulation C's definition of dwelling and its commentary regarding investment properties, the Bureau sought to ensure consistency and minimize compliance burdens for financial institutions that must also report credit transactions covered by HMDA (that is, HMDA-reportable transactions). Using the 2019 HMDA data, the Bureau had found that close to 2,000 lenders and around 530,000 applications indicated a "business or commercial purpose" and around 500,000 applications were used for an "investment" (as defined by the occupancy code) purpose. Of those applications, around 50,000 were for 5+ unit properties. The overall number of applications the Bureau expected to be reported annually under the proposed rule would have been around 26 million. Thus, the Bureau had anticipated a relatively small but not insignificant overlap regarding real estate investment loans between HMDA and section 1071.

Also in its proposal, the Bureau stated that it had considered excluding all transactions that were also reportable under HMDA but believed such an exclusion would have added complexity to data analysis. The Bureau understood that requiring lenders to find and delete from databases that supply their small business lending data submission only those transactions that also appear in HMDA may require a separate scrub of the data and create additional compliance burden, as well as compliance risk, if HMDA-reportable transactions are not deleted from a small business lending data submission. For example, if a small business wants to purchase a 5+ dwelling unit property (that is, HMDA reportable), the financial institution would have to make sure it is not collecting protected demographic information on principal owners, even though that information must be collected for every other type of loan that same business might apply for. The Bureau also believed that it may not be possible to identify loans in the HMDA data that, but for this exclusion, would be reported under the Bureau's rule implementing section 1071 because the financial institution would need to know which HMDA applications are for small businesses versus large businesses. Moreover, excluding HMDA-reportable applications could mean that a financial institution that is below the HMDA reporting threshold would not report these loans at all.

Further, in addition to not being able to distinguish which applications are from small and not large businesses, the Bureau noted in its proposal its concerns that excluding all transactions that were also reportable under HMDA may be at odds with the statutory purposes of section 1071. The Bureau explained that the following proposed data points would not be collected for applications only reported under HMDA: (1) the principal owner's ethnicity, race, and sex where the applicant is an entity not an individual; (2) minority-owned and women-owned business status; (3) gross annual revenue; and (4) other data points such as pricing, NAICS code, and number of workers.

For applications that, under the proposal, would have been reported under both HMDA and section 1071 (generally, business credit secured by dwellings, with the exception of credit secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy), the Bureau sought comment on whether it should require such applications to be flagged as such when reported under subpart B. The Bureau noted its belief that for data integrity and analysis purposes, it may be helpful to know if a loan is in both datasets and a dual reporting flag may help ensure any data analysis is not double-counting certain applications.

#### Comments Received

The Bureau received comments on this aspect of the proposal from a range of commenters, including lenders, trade associations, community groups, and a business advocacy group. Only one commenter, a community group, expressly supported dual reporting. The Bureau received a general suggestion to connect a loan to a HMDA record and then capture, under HMDA, demographic data on corporate entities, and expand its coverage to include more lenders, such as government entities and CDFIs. Two commenters suggested the Bureau provide a section 1071/HMDA sample form to aid dual reporting compliance. Some industry commenters generally stressed the need for consistency among reporting regimes and asked the Bureau to reconcile any differences.

Numerous comments, echoing those made by a trade association, urged the CFPB to avoid duplicative and inconsistent reporting of HMDA and CRA data in order to reduce compliance burden and the potential for inaccurate data reporting. An agricultural lender suggested the Bureau might be able to obtain 1071 data using the existing

---

percent of adults held at least one private label card in 2020, compared to 52 percent in 2005. Consumers in all credit score tiers have seen declines in private label card account holding. Most general purpose and private label cards are held by consumers with superprime scores. CFPB, *The Consumer Credit Card Market*, at 25–26 (Sept. 2021), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2021.pdf.*

[420] *See* CFPB, *Credit card late fees*, at 13 (Mar. 2022), *https://files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf.*

definitions and collection process currently in place for covered institutions under HMDA. A few credit union trade associations maintained that reporting of HMDA-reportable transactions should be voluntary. A bank recommended the Bureau remove and avoid data collection requirements that are duplicative and/or inconsistent, providing the example of misaligned action taken categories or alternatively, eliminate all business-purpose loans from the HMDA reporting requirement. A credit union argued that the benefit of dual reporting does not justify the increased burdens.

A few industry commenters stated that if dual reporting is required under the final rule, a dual reporting flag would be useful. Another commenter opposed adoption of a dual reporting flag, arguing that flagging entries will be a manual process that will increase the time it takes to file both reports and increase the possibility of making an error.

Almost all the comments on this aspect of the proposal argued against the proposal to report HMDA-reportable transactions under this rule. Some opponents to dual reporting urged the Bureau to exclude all HMDA-reportable transactions from this rule, while others recommended excluding transactions covered by this rule (such as business purpose loans) from Regulation C. A few other commenters did not express a preference and asked that the Bureau exempt HMDA-reportable applications from section 1071 reporting, or vice versa. Many commenters asserted burden and stated that reported data would be duplicative and/or inconsistent. Several commenters pointed to differences in census tract reporting requirements as a source of potential confusion and data errors. And as discussed in the section-by-section analysis of § 1002.107(a)(19), another urged the Bureau to consider difficulties caused by the differences in collection and reporting of the ethnicity, race, and sex fields and the variations in data specifications for such information.

One bank commenter suggested that avoiding dual reporting may also avoid materially misrepresenting a lender's total loan application activity. A few industry commenters argued that reporting under HMDA alone meets 1071 purposes, with two of these commenters pointing to the Bureau's website, which states that HMDA "data help show whether lenders are serving the housing needs of their communities; they give public officials information that helps them make decisions and policies; and they shed light on lending patterns that could be

discriminatory." [421] Two commenters that argued against dual reporting explained that mortgage lending is fundamentally different from small business lending. Responding to concerns about data gaps, two other commenters suggested that if the Bureau tailored the exception to applications that are reported under HMDA, not applications that could be reported under HMDA, institutions not subject to the HMDA reporting regime would still have to report HMDA-eligible applications under section 1071 because they would not actually report such applications under HMDA. A bank recommended separating HMDA and section 1071 reporting such that only after a transaction was assessed for HMDA-reportability would a financial institution determine whether the transaction needed to be reported under section 1071.

Final Rule

For the reasons set forth herein, the Bureau is adding new § 1002.104(b)(2) to exclude a covered loan as defined by Regulation C, 12 CFR 1003.2(e), pursuant to its authority under ECOA section 704B(g)(2) to adopt exceptions to any requirement of section 1071, as the Bureau deems necessary or appropriate to carry out section 1071's purposes. Under this approach, for all applications with potential HMDA and section 1071 overlap, the Bureau would not require reporting under section 1071 (transactions would only be reportable under HMDA, and the recordkeeping and demographic data collection obligations of HMDA will apply). In 2021, there were 61,789 "business or commercial purpose" applications (excluding purchased loans), reported under HMDA with the "investment" occupancy code, for 5+ unit properties. Of those, 54,436 were from "non-natural person" applicants so demographic data under HMDA was not collected (thus, such data would have been requested for only 7,353 of the 61,789 applications in 2021). The Bureau recognizes that there would continue to be no demographic data information collected and reported for the ~55,000 HMDA applications with non-natural person owners. The Bureau is finalizing this exclusion of HMDA-reportable transactions in order to alleviate concerns from a broad range of industry commenters about the difficulties associated with dual reporting, particularly in light of potential inconsistences related to demographic

data collection and recordkeeping. In addition, this approach resembles the effort by the CRA agencies to eliminate dual reporting under section 1071 and the eventual CRA rule.

While the Bureau agrees that dual reporting of such transactions could be useful, the Bureau is mindful of commenters' concerns regarding burden and that reported data would be somewhat duplicative and/or potentially inconsistent for data points such as census tract, and principal owners' ethnicity, race, and sex. The Bureau believes that excluding all HMDA-reportable transactions would further the purposes of section 1071 because such an exclusion would limit this potential inconsistency that could result in poor data quality. Further, the Bureau is excluding all HMDA-reportable transactions from this final rule because excluding section 1071 transactions from Regulation C of HMDA would require a separate rulemaking and would disrupt ongoing and planning HMDA data collection efforts that have been in place for years.

The Bureau also agrees that reporting under HMDA alone would meet section 1071's purposes. Regulation C, which implements HMDA, provides that its public loan data can be used: (i) to help determine whether financial institutions are serving the housing needs of their communities; (ii) to assist public officials in distributing public-sector investment so as to attract private investment to areas where it is needed; and (iii) to assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes.[422] These purposes are entirely consistent with section 1071's purposes to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[423] As the Bureau has previously stated, it believes that "HMDA's scope is broad enough to cover all dwelling-secured commercial-purpose transactions and that collecting information about all such transactions would serve HMDA's purposes." [424] The Bureau has also noted that collecting data about dwelling-secured commercial-purpose transactions serves HMDA's purposes by showing not only the availability and condition of multifamily housing units, but also the full extent of leverage on single-family homes, particularly in communities that

[421] CFPB, *Mortgage Data (HMDA), About HMDA,* *https://www.consumerfinance.gov/data-research/ hmda/* (last visited Mar. 20, 2023).

[422] Regulation C § 1003.1(b)(1).
[423] ECOA section 704(a).
[424] 80 FR 66127, 66171 (Oct. 28, 2015).

AdminRecord-000082

may rely heavily on dwelling-secured loans to finance small-business expenditures.[425]

The Bureau recognizes its finalized approach will result in some data gaps. Most notably, some section 1071 information will not be collected for applications reported under HMDA, including the principal owner's ethnicity, race, and sex where the applicant is not an individual but an entity (*i.e.,* not a natural person); minority-owned, women-owned, and LGBTQI+-owned business statuses; gross annual revenue; pricing; NAICS code; and number of workers. Moreover, at this time, the Bureau is not tailoring its exception to applications that are actually reported under HMDA, as opposed to those that could be reported under HMDA. New § 1002.104(b)(2) excludes all transactions meeting the definition of a Regulation C "covered loan," which means that institutions not subject to the HMDA reporting regime (because, for example, of institutional coverage thresholds) do not have to report HMDA-eligible applications under section 1071 even though they would not actually report such applications under HMDA. Additionally, the Bureau does not believe it would be feasible to connect, as suggested, an application reported under this final rule to a HMDA record and then capture, under HMDA, demographic data on corporate entities, and expand its coverage to include more lenders, such as government entities and CDFIs.

After considering the comments, the Bureau has concluded that trying to close all potential data gaps would defeat the purpose of trying to reduce complexity and alleviate concerns from commenters about having to implement and maintain two separate reporting systems. Given the fact that the Bureau expects around 25 million applications to be reported annually under the final rule, it believes that its exclusion of HMDA-reportable transactions will result in a relatively small loss of data and that these data might have been inconsistent with other 1071 data in ways that could impede analysis, frustrating the purposes of section 1071. The Bureau also notes that even in its proposal, and as discussed below, it did not seek to requiring reporting of all HMDA-reportable transactions under section 1071—only those "business or commercial purpose" applications (excluding purchased loans), reported under HMDA with the "investment" occupancy code, for 5+ unit properties would have also been reported under

1071. As a result, the Bureau notes that for 7,353 of the 61,789 such applications in 2021, there would continue to be no demographic data information collected and reported for only ~55,000 HMDA applications with non-natural person owners. The Bureau believes that this is an acceptable number given how small it is compared to the total number of reported transactions and given the strong concerns expressed about the difficulties with compliant dual reporting that could result in poor data quality and thereby undermine the section 1071 statutory purposes. As for the number of "covered loan" applications that are ultimately not reported under HMDA, the Bureau believes that these applications can be excluded for the same reasons explained below in the section-by-section analysis of § 1002.105(b); financial institutions with the lowest volume of small business lending might limit small business lending activity because of the fixed costs of coming into compliance with the reporting requirements, creating risk of market disruption which would run contrary to the business and community development purpose of section 1071. Additionally, as the Bureau explained in HMDA, the Bureau "sought to exclude financial institutions whose data are of limited value in the HMDA dataset, thus ensuring that the institutional coverage criteria do not impair HMDA's ability to achieve its purposes, while also minimizing the burden for financial institutions." [426] The Bureau similarly believes that these data would have limited value in the 1071 dataset—the Bureau will be able to fulfill section 1071's purposes without it, while reducing burden and complexity for financial institutions that are not HMDA reporters.

Finally, the Bureau notes that section 1071 will capture business credit transactions that are secured by real estate but are not presently captured under HMDA. For example, section 1071 will capture transactions secured by non-dwellings as well as business loans secured by an applicant's primary residence or residential investment property as collateral for inventory financing or working capital (such loans would not be captured under HMDA because they do not involve a home purchase, home improvement, or refinancing). The small business lending rule will also capture transactions that are secured by dwellings located on real property used primarily for agricultural purposes.

**Credit Secured by Certain Investment Properties**

Based on feedback received during the SBREFA process as well as its general knowledge regarding both consumer and commercial real estate lending, the Bureau understands that many financial institutions use their consumer mortgage lending channels to process credit applications secured by 1–4 individual dwelling units and used for investment purposes, while applications for credit secured by 5+ unit multifamily properties or rental portfolio loans secured by more than four 1–4 unit residential properties are generally processed through commercial mortgage lending channels. The Bureau also understands that loans made through consumer mortgage lending channels are often made pursuant to the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration, and the Department of Veterans Affairs, and are likely already reported under HMDA.

In line with the SBREFA Panel's recommendation, the Bureau proposed that the rule not cover credit secured by certain investment properties, because such credit may not always be primarily for business or commercial purposes. Specifically, proposed comment 104(b)–4 would have explained that a covered credit transaction does not include an extension of credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy. The Bureau did not propose to exclude credit secured by owner-occupied dwellings; for example, those secured by a dwelling occupied by a business's sole proprietor/principal owner. The Bureau proposed to exclude real estate investment loans only in certain limited circumstances (such as when credit is secured by non-owner occupied 1–4 dwelling units and not 5+ dwelling units). The Bureau proposed to define "dwelling" to have the same meaning as Regulation C § 1003.2(f). Similarly, proposed comment 104(b)–4, which would address what does and does not constitute an investment property, was modeled on Regulation C's comment 4(a)(6)–4.

In its proposal, the Bureau noted its belief that its exclusion of credit secured by certain investment properties will better capture lending to true small businesses (as opposed to consumers seeking to diversify their investments) and will also better align with financial institution lending practices. The Bureau stated that it understands that it may not always be easy for financial institutions to distinguish between

---

[425] *Id.*

[426] *Id.* at 66278.

business-purpose real estate investment loans and consumer-purpose real estate investment loans; however, covering all such loans would likely include some percentage of consumer-purpose loans, which could be contrary to section 1071's business and community development purpose.

The Bureau sought comment on its proposed approach for credit secured by certain investment properties, including whether it is appropriate to consider credit not to be business credit when it is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy; and, if not, whether a different number of dwelling units in the property securing the credit would be an appropriate way to make a distinction between business and consumer-purpose credit. The Bureau also sought comment on whether to permit financial institutions to voluntarily report real estate investment loan transactions that are secured by non-owner occupied 1–4 dwelling units.

The Bureau received comments on this aspect of the proposal from lenders, trade associations, and a community group. Several commenters supported the exclusion of credit secured by certain investment properties. A community group stated that the exclusion was appropriate because the purpose of such credit is investment and not operating a business of renting out units.

A few comments urged expansion of the proposed exclusion to other real estate secured lending. A joint letter from several trade associations representing the commercial real estate industry advocated for expanding the proposed exclusion to impose a clear boundary between small business lending and all investment property lending to ensure that the information gathered under section 1071 reflects true small business lending. In line with this suggestion, this commenter also recommended rule text revisions. Another trade association suggested expanding the exclusion to all non-owner occupied commercial and multifamily real estate lending, arguing that the credit is underwritten on the cash flow of the property and the value of the property itself, rather than the operating revenue of a business, like other investment properties. Another commenter suggested the Bureau specifically exempt commercial real estate loans secured by non-owner-occupied investment real estate to borrowing entities with NAICS codes 5311XX, the industry code for lessors of real estate.

Some comments reflected requests for clarifications and confusion regarding the proposal. A bank suggested removing occupancy status from covered credit transaction considerations because occupancy does not fairly or materially delineate small business lending from consumer lending and creates complexity in how financial institutions would need to design processes, systems, and training. Community groups suggested the Bureau require financial institutions to ask whether the credit will be used primarily for business purposes, such as to secure rental income. A bank suggested the Bureau focus on borrower type (natural person versus entity) instead of property type. A trade association urged the Bureau to remove the proposed exclusion for credit secured by certain investment properties and replace it with an exclusion of all credit subject to Regulation Z. Another bank commenter sought clarification of the proposed exclusion, noting situations where a borrower or a related party occupies a dwelling unit but still considers it to be an investment property and not a business. A trade association asked the Bureau how to determine owner occupancy for non-dwelling real estate, such as where a business owns an office building with multiple rental office spaces, and rents out all of these spaces except for one space occupied by the business itself. One bank appeared to believe that credit secured by 1–4 dwelling unit investment properties would be reportable for both HMDA and section 1071 with varying reporting requirements.

For the reasons stated herein and in the section above regarding HMDA-reportable transactions, the Bureau is adding new § 1002.104(b)(2) to exclude a covered loan as defined by Regulation C, 12 CFR 1003.2(e). This new exclusion renders moot the Bureau's consideration of proposed comment 104(b)–4 by encompassing virtually all credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy. The Bureau's decision also renders moot comments regarding requests for clarifications and confusion regarding the proposal.

A "covered loan" as defined by Regulation C, 12 CFR 1003.2(e), means a closed-end mortgage loan or an open-end line of credit that is not an excluded transaction under § 1003.3(c). A transaction is not a "covered loan" if it is excluded by purpose. For example, Regulation C excludes agricultural-purpose transactions and transactions that are secured by a dwelling, as

defined by § 1003.2(f), that is located on real property that is used primarily for agricultural purposes.[427] The regulation also excludes transactions otherwise made primarily for a business or commercial purpose [428] unless the transaction is also: a home improvement loan;[429] a home purchase loan;[430] or a refinancing (including cash-out refinancing).[431] Transactions are only covered under HMDA as covered loans if they are secured by a lien on dwelling. In addition to principal residences, a dwelling includes, but is not limited to, manufactured homes, multifamily apartment buildings, and properties for long-term housing and related services (such as assisted living for senior citizens or supportive housing for people with disabilities). Thus, a transaction may need to be reported under section 1071 if it is secured by a lien on a non-dwelling; for example, a recreational vehicle, houseboat, a hotel, dormitory, or properties for long-term housing and medical care if the primary use is not residential. For a full list of exclusions, please refer to Regulation C, section 1003.3. The Bureau notes that even if a transaction is excluded under Regulation C, that does not mean it is necessarily reportable under section 1071. For example, even though a transaction is a not a HMDA "covered loan" if it is a purchase of a partial interest in an otherwise covered loan, and thus not excluded by new § 1002.104(b)(2), it is also not reportable under this rule because, as explained below in the section regarding certain purchases of covered transactions, only the definition of "covered application" will trigger data collection and reporting obligations with respect to covered credit transactions and such purchases do not involve an application for credit.

While the Bureau anticipates that adoption of new § 1002.104(b)(2) results in the exclusion of most dwelling-secured lending, this Bureau is not expanding this exclusion to all investment (non-owner occupied) property lending, as recommended by a few commenters. Where a small business seeks credit to invest in commercial (non-dwelling) real estate, it is likely to apply to a financial institution's commercial lending division and there are unlikely to be any difficulties in determining that the transaction is a business-purpose real estate investment (and not a consumer-purpose real estate investment). It is

---

[427] 12 CFR 1003.3(c)(9).
[428] 12 CFR 1003.3(c)(10).
[429] 12 CFR 1003.2(i).
[430] 12 CFR 1003.2(j).
[431] 12 CFR 1003.2(p).

AdminRecord-000084

important for this rule to capture lending to true small businesses (as opposed to consumers seeking to diversify their investments) to meet section 1071's business and community development purpose. Moreover, because such lending is not covered by HMDA, the potential for poor data quality arising from inconsistent dual reporting does not occur in this situation. In other words, excluding such transactions from coverage would not advance section 1071's statutory purposes in the same way as does excluding HMDA-reportable transactions. Rather, covering these transactions will allow data users for the first time to better understand the rationale behind credit decisions, help identify potential fair lending concerns, and provide financial institutions with data to evaluate their business underwriting criteria and address potential gaps for commercial real estate lending and cash flow financing. In addition, robust data on such credit transactions across applicants, financial institutions, products, and communities could help target limited resources and assistance to applicants and communities, thus furthering section 1071's business and community development purpose. With respect to fair lending compliance, such data would help data users analyze potential discriminatory disparities.

104(b)(3) Insurance Premium Financing

To better manage cash flow and help pay for costly property and casualty insurance premiums, many businesses enter into insurance premium financing arrangements. Under a typical arrangement, an insurance premium financing company provides funds to pay for premiums that are remitted directly to the business's insurance provider, either directly or through an insurance agent or broker. The business then repays the premium amount advanced, plus some additional amount in the form of interest or a service charge, which is sometimes capped by State law.[432] If the business fails to repay the loan or otherwise defaults in its obligation, or if the insurance contract is cancelled, the insurance premium financing company is empowered under the financing agreement to demand the unearned premiums directly from the insurer. The Bureau understands that insurance premium financing companies have little to no contact with the businesses seeking credit and insurance premium financing arrangements are typically

underwritten based on the terms of the insurance policy, the financial strength of the insurer that issued the policy and holds the unearned premium, and the uncollateralized exposure of the financing company, if any.

Unlike with other forms of credit, borrowers in insurance premium financing transactions are not free to use advanced amounts for general purchases because those amounts are intended solely to cover the cost of property and casualty insurance premiums and the funds are often remitted directly to the business's insurer. Moreover, because insurance premium financing companies are contractually empowered in the event of default to cancel the insured's insurance coverage and obtain a refund of unearned premiums to repay the amount advanced, these transactions are not typically underwritten based on the insured's ability to repay but on the value of the unearned premium collateral and the financial strength of the insurance carrier holding that collateral. The Bureau also understands that, in some cases, certain contractual terms, including maximum interest rates, are regulated by State law.[433]

In the NPRM, the Bureau stated its belief that an organization offering insurance premium financing, where the organization provides short-term loans to businesses to pay for property and casualty insurance, would have been included within the definition of a financial institution in proposed § 1002.105(a), even though this specific business model was not described in proposed comment 105(a)–1. The Bureau did not specifically discuss insurance premium financing in its section-by-section analysis of proposed § 1002.104, noting that the Bureau was proposing to require that covered financial institutions report data for all applications for transactions that meet the definition of business credit unless otherwise excluded.

A group of insurance premium financing trade associations urged the Bureau to exclude insurance premium financing from the rule. This comment did not dispute that such financing is credit but argued that it should not be covered because it is unlike any other form of small business credit—insurance premium finance lenders do not interact with or exchange information with the applicant, credit terms (including interest rate and fees) are preestablished and do not vary, and

some State insurance codes provide requirements regarding interest rates, fees, disclosures, and other aspects of a premium finance transaction. This commenter also maintained that insurance premium financing presents minimal fair lending risk, most of the data proposed to be required is not currently collected and would not be useful for comparisons, and financing companies would incur significant costs to comply, potentially limiting access to this credit. The commenter noted that FinCEN exempted insurance premium financing companies from its final rule imposing customer due diligence (beneficial ownership) obligations under the Bank Secrecy Act. This trade association stated that, if the Bureau does not exclude insurance premium financing companies, the Bureau should clarify how the rule will apply to avoid curtailment of credit and conflict with State insurance laws, particularly those that prohibit, or at a minimum discourage, insurance agents and brokers from collecting applicant-provided demographic data from insureds.

The Bureau also received a letter from several members of Congress citing potential conflicts between proposed section 1071 requirements and State regulatory frameworks that they believed would improperly impair or interfere with State insurance law. They requested the Bureau reconsider subjecting these products to the final rule because they believed that doing so would not advance the policy underpinning section 1071 and would further negatively impact small businesses and their ability to purchase adequate insurance coverage.

For the reasons set forth herein, the Bureau is excluding insurance premium financing transactions from the final rule. New § 1002.104(b)(3) defines insurance premium financing as a financing arrangement wherein a business agrees to pay to a financial institution, in installments, the principal amount advanced by the financial institution to an insurer or insurance producer in payment of premium on the business's insurance contract or contracts, plus charges, and as security for repayment, the business assigns to the financial institution certain rights, obligations, and/or considerations (such as the unearned premiums, accrued dividends, or loss payments) in its insurance contract or contracts. New § 1002.104(b)(3) adds that this exclusion does not include the financing of insurance policy premiums obtained in connection with the financing of goods and services.

[432] *See, e.g.,* Fla. Stat. Ann. section 627.840(3)(b); 215 Ill. Comp. Stat. Ann. 5/513a10(c).

[433] *See, e.g.,* Fla. Stat. Ann. section 627.840 (providing, in part, that a premium finance company shall not impose a service charge of more than $12 per $100 per year); 215 Ill. Comp. Stat. Ann. 5/513a10 (stating that the maximum service charge is $10 per $100 per year).