# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>       *Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>       *Defendants*. | Case No: 7:23-cv-00144 |

# JOINT APPENDIX
# OF ADMINISTRATIVE RECORD DESIGNATIONS
# VOLUME II

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
|---|---|
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

The Bureau is adopting a definition of "covered credit transaction" that excludes insurance premium financing pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071, as well as its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. While insurance premium financing constitutes "credit" within the meaning of § 1002.102(i) and may constitute "business credit" within the meaning of § 1002.102(d) (depending on its purpose), the Bureau believes that it is categorically different from products like loans, lines of credit, credit cards, and merchant cash advances and that there are several reasons to believe that excluding it from coverage advances section 1071's statutory purposes. Insurance premium financing is not a general-use lending product, but instead, like trade credit, exists only to facilitate the sale of a specific nonfinancial product or service. Providers of insurance premium financing are not primarily financial services providers, nor do they currently manage compliance with regulatory requirements associated with making extensions of credit. Taken together, requiring insurance premium financing to be reported under subpart B may lead to significant data quality issues. In addition, the fixed costs of coming into compliance with this final rule could lead insurance premium financing companies to limit offering this credit to their small business customers, potentially undermining the business and community development purpose of section 1071.

The Bureau believes the new exclusion in final § 1002.104(b)(3) will carve out narrow financing arrangements where the amount financed is reasonably related to and intended to directly pay the cost of a business's insurance policy premiums. New § 1002.104(b)(3) also limits the exclusion to situations where the business assigns the financial institution certain rights, obligations, and/or considerations (such as the unearned premiums) in its insurance policy because the Bureau understands that such security interests ensure that the underwriting focus is on the insurer, and not the small business applicant.

New § 1002.104(b)(3) clarifies that the exclusion does not include the financing of insurance contract premiums purchased in connection with the financing of goods and services.

The Bureau notes that final § 1002.104(b)(3) does not cover situations where the insurance provider itself provides a business the right to defer payment of an insurance premium or fee owed by the business beyond the monthly period in which the premium or fee is due. However, such arrangements may be covered by the trade credit exclusion in final § 1002.104(b)(1).

### Factoring

#### Background

In traditional factoring arrangements, a business in need of financing sells all or a portion of its accounts receivable (existing but unpaid invoices) to another business, known as a "factor." The factor then receives payments on the accounts receivable from the business's debtors or customers directly, and not from the business that had entered into the factoring transaction. If the business has sold only a portion of its invoices, then once the account debtors pay their invoices to the factor, the factor remits the remainder of the balance to the business after deducting a fee (specifically, a discount applied to the sold accounts receivable usually stated on a percentage basis).

The Bureau understands that the factoring market is generally dominated by nondepository institutions not subject to Federal safety and soundness supervision or reporting requirements. The Bureau also understands that generally, factors may not be required to obtain State lending licenses. As a result, information on factoring volume and practices is limited. The Bureau notes, however, that the California and New York disclosure laws mentioned above cover factoring.[434]

The Bureau's 2017 White Paper estimated the factoring market as constituting around 8 percent of the number of accounts used by small businesses in the U.S. in 2014.[435] Based on more recent evidence, the Bureau believes the industry has not significantly grown. For example, the 2017 and 2020 Federal Reserve Banks' surveys of firms with 1–499 employees ("employer firms") found that 4 percent

of such businesses applied for and regularly used factoring.[436] In the 2020 Small Business Credit Survey of Employer Firms, this figure dropped to 3 percent of employer firms[437] and in the 2021 survey, this figure went back up to 4 percent.[438]

An existing comment in Regulation B (comment 9(a)(3)–3) provides that "[f]actoring refers to a purchase of accounts receivable, and thus is not subject to [ECOA or Regulation B]." Existing Regulation B does not offer a definition for "accounts receivable." However, if there is a "credit extension incident to the factoring arrangement," Regulation B's notification rules[439] apply, as do other relevant sections of ECOA and Regulation B.[440] The Bureau understands that the Board's treatment of credit extensions incident to factoring arrangements—as a type of credit but one entitled to exemptions from certain requirements—was motivated by its reading of congressional intent related to the Women's Business Ownership Act of 1988,[441] which amended ECOA to extend notification and record retention requirements to business credit. In its proposed rule on this issue, the Board explained that it was treating credit extensions incident to factoring arrangements differently from other forms of business credit based on "evidence of congressional intent that the amendments should not apply to . . . certain types of business credit (such as applications for trade credit and credit incident to factoring arrangements)."[442]

#### Proposed Rule

In the NPRM, the Bureau proposed to not cover factoring. Modeled on the definitions set forth in the New York and California commercial financing

---

[434] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https:// leginfo.legislature.ca.gov/faces/ billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https:// legislation.nysenate.gov/pdf/bills/2019/S5470B.*

[435] White Paper at 21 fig. 2, 22 fig. 3.

[436] 2020 Small Business Credit Survey; 2017 Small Business Credit Survey.

[437] *See* 2021 Small Business Credit Survey at 24.

[438] *See* 2022 Small Business Credit Survey at 25.

[439] *See* existing § 1002.9(a)(3)(ii) (requiring a creditor to notify an applicant, within a reasonable time (as opposed to within 30 days for credit sought by consumers and businesses with gross revenues of $1 million or less in preceding fiscal year), orally or in writing, of the action taken).

[440] Comment 9(a)(3)–3.

[441] Public Law 100–533, 102 Stat. 2689 (1988).

[442] 54 FR 29734, 29736 (July 14, 1989); *see also* 134 Cong. Rec. H9282–89 (daily ed. Oct. 3, 1988) (explaining that the committee recognizes that some forms of commercial loan transactions and extensions of credit may "require specialized rules," and that, for example, the committee believes that loans and credit extensions incidental to trade credit, factoring arrangements, and sophisticated asset-based loans should continue to be exempted from the record retention and automatic notification requirements).

AdminRecord-000086

disclosure laws,[443] proposed comment 104(b)–1 would have provided that factoring is an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment has not yet been made. Proposed comment 104(b)–1 would have also clarified that an extension of business credit incident to a factoring arrangement is a covered credit transaction and that a financial institution shall report such a transaction as an "Other sales-based financing transaction" under proposed § 1002.107(a)(5).

The Bureau sought comment on its proposed approach to factoring. The Bureau also sought comment on how the subset of purported factoring arrangements that may in fact be credit (*i.e.,* those that are revolving in nature or that cover anticipated receivables) should be reported under the rule. Specifically, the Bureau sought comment on whether such arrangements should be reported as credit extensions incident to factoring (and thus reported as "other sales-based financing") or as merchant cash advance.

Comments Received

The Bureau received comments on this aspect of the proposal from a range of commenters, including lenders, trade associations, and community groups. One commenter urged the Bureau to include the distinctions between merchant cash advances and factoring that were discussed in the NPRM preamble in the final rule's text or commentary to avoid future confusion over what products are ultimately covered by the final rule. This commenter also asked the Bureau to address the role of recourse and underwriting in its analysis of whether a particular financing transaction qualifies as credit. Another commenter encouraged the Bureau to consider differences between various factoring product structures and offered some explanations on how the term and costs of factoring arrangements could be reported. A community group asked the Bureau to explicitly include credit extensions incident to factoring arrangements in the list of covered transactions in the final rule, along with loans, lines of credit, credit cards, and merchant cash advances.

A wide range of commenters, including many community groups, community-oriented lenders, several members of Congress, individuals, and a nonbank online lender, urged the Bureau to cover factoring in the final rule. One community group suggested the Bureau use its discretionary authority to define credit broadly, regardless of comment 9(a)(3)–3 in Regulation B or other ECOA provisions, to avoid a conflict with congressional intent of shedding light on the distribution of financing to minority-owned, women-owned, and small businesses. Several commenters shared concerns about insufficient data on factoring and stressed the need for more transparency and for having a complete picture of the small business financing market. A few commenters argued that factoring constitutes a large part of the small business financing landscape and that section 1071's purposes would not be fulfilled without covering this product. Several commenters pointed to the fact that factoring arrangements are often used by minority-owned small businesses as evidence that they should be covered by the rule, with a few commenters specifically raising fair lending concerns related to factoring.

A few commenters questioned factoring's exclusion as non-credit, with the cross-sector group arguing that its inclusion would not create compliance concerns for other provisions of Regulation B because section 1071 is not broadly applicable to the entirety of Regulation B. That commenter also argued that a factoring arrangement is "credit" whenever its recipient is held liable for deferred payments conditional on the third party's ability to repay. This commenter noted that while recourse agreements (cited by the commenter as constituting 88 percent of the industry) enable the factor to pursue payment from the recipient if the third party fails to repay, non-recourse agreements also enable factors to seek payments from recipients under a variety of circumstances. Another community group argued a factoring arrangement is credit when a small business receives an amount less than the amount due from its client because the small business recipient in that case is effectively paying interest and/or fees. A joint letter from community groups suggested the Bureau make clear that factoring is excluded only where there is a bona fide sale of an accrued right to payment without creating any obligations—contingent or otherwise—on the seller.

Two commenters pointed to the fact that New York and California both include factoring in their respective commercial financing disclosure laws as

a reason why it should be covered by the rule. Some commenters expressed strong concerns that the exclusion of factoring would open a door to potential evasion by merchant cash advance providers and other actors. Many commenters urged the Bureau to include factoring within its rule implementing section 1071 in order to monitor these arrangements and prevent abuses.

Two commenters, both providers of factoring, suggested the Bureau clarify that non-recourse factoring is covered by the trade credit exclusion. These commenters noted that non-recourse factors would be subject to the rule as proposed because it would have provided that the extension of business credit by a financial institution (such as a factor) other than a supplier for the financing of the sale of inventory is not "trade credit." These commenters argued that compliance would be burdensome and disruptive to their operations, with one commenter stressing how important non-recourse factoring is in facilitating the sale of product by sellers to buyers.

Final Rule

For the reasons set forth herein, the Bureau is finalizing comment 104(b)–1 largely as proposed and is not covering factoring under the rule. The Bureau believes that, as discussed with respect to merchant cash advances above, a factoring agreement, as described in comment 104(b)–1, is not credit under ECOA because the provider of the funds does not grant the recipient the right to defer payment. Instead, the provider of funds seeks payment directly from a third party on a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment in full has not yet been made. The Bureau also believes that treating factoring as credit under the rule could create inconsistencies and compliance concerns related to existing Regulation B, which currently states that factoring (as a purchase of accounts receivable) is not subject to ECOA.

The Bureau is finalizing a detailed description of what constitutes factoring in comment 104(b)–1 because the existing Regulation B commentary regarding factoring may not provide sufficient clarity for purposes of collecting and reporting data under section 1071 as it does not define "accounts receivable." This finalized description, modeled on the definitions set forth in the New York and California commercial financing disclosure

[443] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https:// leginfo.legislature.ca.gov/faces/ billTextClient.xhtml?bill_id=201720180SB1235;* N.Y. S.B. S5470B (July 23, 2020), *https:// legislation.nysenate.gov/pdf/bills/2019/S5470B.*

laws,[444] provides that factoring is an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment in full has not yet been made. The Bureau has added the words "in full" to the proposed description to account for the fact that factoring may include an immediate partial payment or down payment to the businesses supplying the goods or services. Comment 104(b)–1 states that it is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing comment 9(a)(3)–3.

Based on the Bureau's work to date, comments received, and conversations with industry stakeholders, the Bureau understands that purported factoring arrangements may take various forms, including longer-term or revolving transactions that appear to have credit or credit-like features, and the Bureau believes that a subset of such arrangements may constitute credit incident to the factoring arrangement. Comment 104(b)–1 thus clarifies that an extension of business credit incident to a factoring arrangement is a covered credit transaction and that a financial institution shall report such a transaction as an "Other sales-based financing transaction" under § 1002.107(a)(5). By contrast, arrangements that do not involve goods or services that have already been supplied or rendered are not "factoring" under the Bureau's description. The Bureau makes clear in comment 104(b)–1 that, despite the fact that some providers may label such arrangements as factoring, the name used by the financial institution for a product is not determinative of whether or not it is a "covered credit transaction," and such arrangements are not factoring as described in the final rule and are covered.

The Bureau does not believe it would be appropriate to codify distinctions between merchant cash advances and factoring in the final rule's text or commentary, as suggested by a commenter. The Bureau believes that factoring involves the sale of existing and alienable assets, while merchant cash advances involve a promise of

future payments derived from anticipated receivables. Accordingly, providers of merchant cash advances—but not factoring that involves the sale of existing and alienable assets—grant the right to incur debt and defer its payment at a later date within the meaning of "credit" under § 1002.102(i).

For that reason, to the extent that a purported factoring arrangement involves multiple revolving transactions such that the transaction between the recipient and the provider of funds is not complete at the time of the sale, that transaction constitutes credit, and the Bureau would expect such a transaction to be reported as an "Other sales-based financing transaction" because it constitutes an extension of business credit that may or may not be incident to a factoring arrangement (depending on whether the first transaction involved the sale of existing and alienable assets). In terms of how to report the term and costs of extensions of credit incident to factoring arrangements, the Bureau notes that final § 1002.107(a)(12)(v) would require financial institutions to report, for a merchant cash advance or other sales-based financing transactions, the difference between the amount advanced and the amount to be repaid and that final § 1002.107(a)(5)(iii) requires reporting of estimated loan term for merchant cash advances and other sales-based financing in certain circumstances.

As noted above, the products discussed in this preamble do not constitute an exhaustive list of covered credit transactions; other types of business credit not specifically described nevertheless constitute covered credit transactions unless excluded by final § 1002.104(b). In line with this approach, the Bureau is not expressly delineating additional products (such as credit extensions incident to factoring arrangements) as covered credit transactions in the final rule's regulatory text or commentary. Nor is it reopening existing Regulation B at this time in order to interpret "credit" to include factoring. The Bureau acknowledges that factoring constitutes a large part of the small business financing landscape, particularly among minority-owned small businesses, and that it would be helpful to have more transparency into these arrangements. However, making such a change as part of this final rule could creating inconsistencies and compliance challenges with respect to existing Regulation B provisions.

The Bureau also does not believe that the question of whether a factoring arrangement is credit should be

determined based on whether the small business recipient is effectively paying finance charges. For the reasons discussed in the section-by-section analysis of § 1002.102(i), the Bureau is finalizing a definition of "credit" that largely follows the definition of credit in ECOA[445] and existing § 1002.2(j); meaning the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor. This longstanding definition does not turn on "the number of installments required for repayment, or whether the transaction is subject to a finance charge,"[446] nor on how underwriting is conducted. Rather, in order for factoring to be credit under ECOA, a factor must grant the right to defer payment of debt or to incur debts and defer its payment.

The Bureau also does not believe it would be appropriate, at this time, to distinguish between recourse and non-recourse factoring that involves the business-to-business sale of existing and alienable assets. The Bureau is aware that a significant proportion of the factoring market, as it is currently understood, may consist of recourse factoring, in which factors may pursue repayment from the recipient of funds if the third party fails to pay, and that even non-recourse agreements may enable factors to seek repayment from recipients under some circumstances, such as fraud. As a result, the Bureau understands that in much of what market participants understand to be "factoring" within the meaning of existing Regulation B, the transaction between the recipient and the provider of funds is not conclusively complete at the time of the sale. The Bureau agrees with commenters that these transactions are, at minimum, akin to credit. Nevertheless, the Bureau believes that requiring reporting for these transactions at this time would have the effect of upending market participants' settled expectations that "factoring" is not credit within the meaning of existing Regulation B. Therefore, data collection and reporting pursuant to subpart B is not required for an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment has not yet been made, regardless of whether the

---

[444] See Cal. S.B. 1235 (Sept. 30, 2018), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235; N.Y. S.B. S5470B (July 23, 2020), https://legislation.nysenate.gov/pdf/bills/2019/S5470B.

[445] See 15 U.S.C. 1691a. Existing Regulation B uses the term "applicant" instead of "debtor."
[446] Existing comment 2(j)–1.

AdminRecord-000088

agreement includes recourse or other nonpayment contingency provisions.

The Bureau appreciates the fact that New York and California both include factoring in their respective commercial financing disclosure laws and has in fact drawn from the States' helpful regulatory language for its own section 1071 commentary. However, coverage of factoring by these or other States[447] in their commercial financing disclosure regimes does not affect what constitutes "credit" under ECOA. The Bureau understands concerns that exclusion of factoring may open a door to potential evasion by merchant cash advance providers and other actors. However, the Bureau does not agree that it must include factoring in this final rule in order to monitor these arrangements and prevent abuses.

In the course of considering financial institutions' compliance with the rule, the Bureau intends to closely scrutinize secured finance transactions to ensure that companies are appropriately categorizing and reporting products as required by section 1071. The Bureau also intends to obtain more information about the use of recourse and other nonpayment provisions in the factoring market, including types of these provisions and the frequency with which factors invoke them. If it proves necessary to modify existing Regulation B or subpart B, the Bureau is prepared to exercise all of its available authorities, including its authority under section 703 of ECOA to make adjustments that are necessary to prevent circumvention or evasion.

With respect to comments asking the Bureau to clarify that non-recourse factoring is covered by the trade credit exclusion, the Bureau notes that while non-recourse factors may not be subject to the trade credit exclusion because they are not typically a supplier that finances the sale of equipment, supplies, or inventory, they are likely providing "factoring" as described in final comment 104(b)–1. For the reasons discussed in the section-by-section analysis of § 1002.104(b)(1), the Bureau is not expanding its exclusion of trade credit to include third-party financing companies.

## Leases

### Background

A leasing transaction generally refers to an agreement in which a lessor

transfers the right of possession and use of a good or asset to a lessee in return for consideration.[448] Under a "true" or "operating" lease, a lessee (the user) makes regular payments to a lessor (the owner) in exchange for the right to use an asset (such as equipment, buildings, motor vehicles, etc.).

Leases are not expressly addressed in ECOA or Regulation B. Until the issuance of the NPRM, the Bureau had never opined on whether ECOA and Regulation B apply to leases, and the Board made only one statement about the applicability of ECOA and Regulation B to leases, in the preamble to a final rule under ECOA. In that 1985 statement, the Board responded to the Ninth Circuit's opinion in *Brothers* v. *First Leasing*,[449] which concluded that consumer leasing falls under ECOA.[450] The Board stated that it believes that "Congress did not intend the ECOA, which on its face applies only to credit transactions, to cover lease transactions unless the transaction results in a 'credit sale' as defined in the Truth in Lending Act and Regulation Z."[451] The Board then noted that it will continue to monitor leasing transactions and take further action as appropriate.[452] The Bureau is unaware of any such further actions taken by the Board.

The Bureau understands that many financial institutions (such as equipment finance companies) offer both loans and leases to their small business customers and some financial institutions comply with Regulation B for their leases as well as their loans as a matter of course. Lessor stakeholders have told Bureau staff that from their perspective, as well as that of their customers, loans and leases are indistinguishable. The Bureau understands that this is particularly true of "financial" or "capital" leases, as defined under article 2A of the Uniform Commercial Code (UCC),[453] which closely resemble (and according to some stakeholders, in some cases are indistinguishable from) term loans. The Bureau understands that financial leases are treated like assets on buyers' balance

sheets, whereas operating leases are treated as expenses that remain off the balance sheet. The Bureau understands that the ownership characteristics of a financial lease also resemble those of a loan—the financial lease term is the substantial economic life of the asset (as evidenced by a low dollar purchase option at the end of the lease term and/or lack of residual financial obligations at the end of the lease term) and the lessee claims both interest and depreciation on their taxes. The Bureau understands that for some financial institutions, reporting loans but not leases may require added cost and effort to separate them in databases. The Bureau also understands that because depository institutions currently report both loan and lease activity to other regulators in their Call Reports, they may prefer to maintain a consistent approach for section 1071.

### Proposed Rule

In the NPRM, the Bureau proposed to not cover leases. Drawing from the UCC definition of "lease,"[454] which was incorporated into the New York and California commercial financing disclosure laws,[455] proposed comment 104(b)–2 would have provided that the term covered credit transaction does not cover leases, and that a lease, for purposes of proposed subpart B, is a transfer from one business to another of the right to possession and use of goods for a term, and for primarily business or commercial (including agricultural) purposes, in return for consideration. It would have further stated that a lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest. The Bureau sought comment on whether there are types of leases, or leases with certain characteristics, that should be excluded from proposed comment 104(b)–2 and thus treated as reportable under section 1071. Based on the practical difficulty cited by some stakeholders of distinguishing leases from loans, the Bureau also sought comment on whether financial institutions should be permitted to voluntarily report lease transactions.

---

[447] Other States, including Virginia and Utah, have passed similar commercial financing disclosure laws. *See, e.g.,* Virginia H. 1027 (enacted Apr. 11, 2022), *https://lis.virginia.gov/cgi-bin/legp604.exe?221+ful+CHAP0516*; Utah S.B. 183 (enacted Mar. 24, 2022), *https://le.utah.gov/~2022/bills/static/SB0183.html*.

[448] *See* UCC 2A–103(1)(j) (defining a "lease").

[449] 724 F.2d 789 (9th Cir. 1984).

[450] 50 FR 48018, 48020 (Nov. 20, 1985).

[451] *Id.*

[452] *Id.* Since then, courts have gone both ways on the issue. *Compare Ferguson* v. *Park City Mobile Homes,* No. 89–CIV–1909, 1989 WL 111916, at *5 (N.D. Ill. Sept. 18, 1989) (consumer leases are "credit" under ECOA), *with Laramore* v. *Ritchie Realty Mgmt. Co.,* 397 F.3d 544, 547 (7th Cir. 2005) (consumer leases are not "credit" under ECOA).

[453] The Bureau notes that the UCC separately defines a "consumer lease." *See* UCC 2A–103(1)(e). The Bureau's analysis regarding leases does not apply to leases primarily for a personal, family, or household purpose.

[454] UCC 2A–103(1)(j) (" 'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease.").

[455] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*.

## Comments Received

The Bureau received comments on this aspect of the proposal from several community groups and community oriented lenders, trade associations, an online lender, and several members of Congress. Many of these comments argued that leases should be covered under the Bureau's rule. A few commenters suggested that leases were much like loans and other credit, with one commenter asserting that where a small business may retain leased equipment, that is akin to lending in which debt is incurred, payment is deferred and payments are made over a significant time period for a substantial asset, that is, the equipment. This commenter noted that the Bureau could apply its proposed loan threshold to leases. A cross-sector group of lenders, community groups, and small business advocates maintained that any data collection on the leasing market would be valuable, even if limited to credit sale leases or "$1 leases" (where the lessee makes payments on the leased item and at the end of the lease term, purchases the item for $1), which the commenter viewed as a form of credit sale lease.

A few commenters urged the Bureau to cover this large and growing share of the small business financing market in order to avoid data gaps. Two commenters expressed fair lending and predatory practice concerns regarding leasing—one commenter pointed to a lawsuit filed by the California State Attorney General against two lease financing companies operating in 15 states that allegedly forced 193 Black churches to make lease payments on falsely advertised and faulty computer kiosks.[456] Another commenter noted that leases are often used by minority-owned businesses, in some cases more often than white-owned businesses. This commenter also noted that New York and California both include leasing in their respective commercial financing disclosure laws and that at the Federal level, bicameral commercial financing disclosure legislation has been introduced to cover leasing. Two commenters argued that not covering leases in the final rule would open the door to potential evasion, allowing merchant cash advance providers and other financing companies to structure transactions as leases instead of loans.

Several trade associations, including ones representing equipment and vehicle lease and finance companies, expressed support for the Bureau's

proposed approach to not cover leases. One commenter commended the Bureau for recognizing that leases are not treated as credit in the U.S. regulatory structure and for proposing use of the widely accepted UCC definition of a lease. Another commenter observed that the Bureau's proposed definition of "lease" would not cover instances where a lessee purchased or eventually owned the product being leased. This commenter advised against covering leases in the rule, arguing that doing so would result in incorrect reporting when applicants' employees submit lease applications but do not know the full scope of their employer's ownership makeup or financial holdings; it would also increase compliance costs, making short-term leases and rentals significantly more expensive.

## Final Rule

For the reasons set forth herein, the Bureau is finalizing comment 104(b)–2 largely as proposed and is not covering leases under the final rule. Drawing from the UCC definition of "lease,"[457] which was incorporated into the New York and California commercial financing disclosure laws,[458] comment 104(b)–2 provides that the term covered credit transaction does not cover leases, and that a lease, for purposes of subpart B, is a transfer from one business to another of the right to possession and use of goods for a term, and for primarily business or commercial (including agricultural) purposes, in return for consideration. It further states that a lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest. In addition, comment 104(b)–2 clarifies that the name used by the financial institution for a product is not determinative of whether or not it is a "covered credit transaction."

The Bureau considered several other approaches to covering leasing, including referring to Regulation Z's definition of "credit sale." Under that definition, a "credit sale" is "a sale in which the seller is a creditor," and it includes a lease—unless the consumer may terminate it at any time without penalty—where the consumer "[a]grees

to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved" and "[w]ill become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement."[459] The Bureau understands that financial institutions focused on offering leases and loans for business purposes are generally not familiar with the Regulation Z definition of "credit sale," given that Regulation Z applies only to consumer credit.[460] The Bureau thus believes that referring to the Regulation Z definition of "credit sale" could create confusion and would not align with current industry practices. The Bureau understands that such financial institutions offering leases primarily for business or commercial (including agricultural) purposes are more accustomed to applying the UCC definitions of "lease"[461] and "finance lease,"[462] and/or the generally accepted accounting principles (GAAP) rules issued by the Financial Accounting Standards Board governing "operating," "capital," and "finance" leases.[463] The Bureau believes that drawing from the UCC definition of lease will lead to more consistency with financial institutions' current practices. Nearly all U.S. jurisdictions have adopted Article 2A of the UCC,[464] and the Bureau

---

[456] See Complaint, *California v. Television Broadcasting Online, Ltd.,* 2011 WL 849066 (Cal. Super. Feb. 2011), *https://oag.ca.gov/system/files/attachments/press_releases/n2042_complaint.pdf.*

[457] UCC 2A–103(1)(j) (" 'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease.").

[458] See Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B.*

[459] 12 CFR 1026.2(a)(16).

[460] See Regulation Z §§ 1026.2(a)(12) (defining "consumer credit" as "credit offered or extended to a consumer primarily for personal, family, or household purposes") and 1026.3(a)(1) (excluding extensions of credit "primarily for a business, commercial or agricultural purpose").

[461] UCC 2A–103(1)(j).

[462] UCC 2A–103(1)(g).

[463] See Fin. Acct. Standards Bd., *Accounting Standards Update: Leases (Topic 842),* No. 2016–02 (Feb. 2016), *https://www.fasb.org/Page/ShowPdf?path=ASU+2016-02_Section+A.pdf&title=Update+2016-02%E2%80%94Leases+%28Topic+842%29+Section+A%E2%80%94Leases%3A+Amendments+to+the+FASB+Accounting+Standards+Codification%C2%AE&acceptedDisclaimer=true&Submit=.*

[464] See Ala. Code 7–2A–101 *et seq.;* Alaska Stat. 45.12.101 *et seq.;* Ariz. Rev. Stat. 47–2A101 *et seq.;* Ark. Code Ann. 4–2A–101 *et seq.;* Cal. Com. Code 10101 *et seq.;* Choctaw Tribal Code 26–2A–101 *et seq.;* Colo. Rev. Stat. 4–2.5–101 *et seq.;* Conn. Gen. Stat. 42a–2A–101 *et seq.;* D.C. Code 28:2A–101 *et seq.;* Del. Code Ann. tit. 6, 2A–101 *et seq.;* Fla. Stat. 680.1011 *et seq.;* Ga. Code Ann. 11–2A–101 *et seq.;* Haw. Rev. Stat. 490:2A–101 *et seq.;* Idaho Code 28–12–101 *et seq.;* 810 Ill. Comp. Stat. 5/2A–101 *et seq.;* Ind. Code 26–1–2.1–101 *et seq.;* Iowa Code 554.13101 *et seq.;* Kan. Stat. Ann. 84–2a–101 *et seq.;* Ky. Rev. Stat. Ann. 355.2A–101 *et seq.;* Mass. Gen. Laws ch. 106, 2A–101 *et seq.;* Md. Code Ann., Com. Law 2A–101 *et seq.;* Me. Stat. tit. 11, 2–1101 *et seq.;* Mich. Comp. Laws 440.2801 *et seq.;* Minn. Stat. 336.2A–101 *et seq.;* Miss. Code Ann. 75–2A–101 *et seq.;* Mo. Rev. Stat. 400.2A–101 *et seq.;* Mont. Code Ann. 30–2A–101 *et seq.;* N.C. Gen. Stat. 25–2A–101 *et seq.;* N.D. Cent. Code 41–02.1–01 *et seq.;*
Continued

understands that virtually every form of lease used by major leasing companies provides that it is governed by the laws of one of the jurisdictions that has adopted Article 2A.

Based on its review of business-purpose leases and its expertise with respect to the meaning of "credit," the Bureau believes that the term "credit" does not encompass such business leases. In the business-purpose context, the Bureau understands that in a true lease, the lessor retains title and will receive the property back after the conclusion of the lease term, without any expectation by either party that, for example, ownership of the property will be transferred or that payments made pursuant to the lease agreement constitute anything other than payments in exchange for the temporary use of the property. As a result, the Bureau does not believe that in the business-purpose context a true lease transaction involves the right to incur debt and defer its payment, defer payment of a debt, or defer payment for goods or services.

The Bureau is aware that there are other types of leases with characteristics that bear some resemblance to forms of credit like credit sales, such as a contemplated transfer of ownership at the end of the lease term. The Bureau does not parse whether different types of leases might constitute "credit" but notes that final comment 104(b)–2's definition of lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest. For further clarification, the Bureau notes that UCC section 1–203 provides helpful guidance on how to distinguish a lease from a security interest. For example, UCC section 1–203 provides, in part, that a lease transaction creates a security interest if the lessee's payment obligation continues for the term of the lease and is not subject to termination by the lessee and the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon

compliance with the lease agreement.[465] The UCC additionally provides that additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.[466] The UCC appropriately notes that whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.[467] The Bureau believes that drawing from an established definition of "lease" that small business lenders already use will minimize compliance risks and will offer sufficient consistency and clarity regarding interpretation of final comment 104(b)–2.

The Bureau is not covering leases under this final rule, as requested by some commenters. The Bureau agrees that some business leases are structured like loans and other credit but notes that a commenter's example of a small business being able to retain leased equipment is an example of the creation of a security interest, not a lease under final comment 104(b)–2. Similarly, so-called "$1 leases" create security interests because the lessee has an option to become the owner of the goods for nominal additional consideration. As noted by one commenter, final comment 104(b)–2's definition of lease does not include a transaction resulting in the retention or creation of a security interest.

The Bureau understands that bicameral commercial financing disclosure legislation was introduced in the last Congress to cover some leasing and other commercial finance products under the Federal Truth in Lending Act and that New York and California both include leases in their respective commercial financing disclosure laws. (The Bureau has in fact drawn from the states' helpful regulatory language for its own section 1071 commentary.) However, the Bureau does not believe that the coverage of leases in these particular legislative efforts has any bearing on what constitutes "credit" under ECOA. The Bureau appreciates commenters' concerns that not covering leases could open a door to potential evasion and lead to data gaps or fair lending problems. The Bureau believes that it can observe the small business financing market for such abuses and prevent them without including all leases in the rule. For example, in considering financial institutions' compliance with the rule, the Bureau intends to closely scrutinize

transactions to ensure that companies are appropriately categorizing and reporting products as required by section 1071.

Consumer-Designated Credit

The Bureau understands that some small business owners may use consumer-designated credit in order to finance their small businesses—such as taking out a home equity line of credit or charging business expenses on their personal credit cards.

The proposed rule would not have covered products designated by the creditor as consumer-purpose products (consumer-designated credit). Proposed comment 104(b)–3 would have made clear that the term covered credit transaction does not include consumer-designated credit used for business purposes, because such transactions are not business credit. Proposed comment 104(b)–3 would have provided that a transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes. The Bureau sought comment on this proposed interpretation, including how the Bureau has defined the scope of consumer-designated credit. The Bureau also sought comment on whether it should permit financial institutions to voluntarily report consumer-designated credit when they have reason to believe the credit might be used for business purposes.

The Bureau received comments on this aspect of the proposal from a range of banks, credit unions, trade associations, and community groups. One trade association generally agreed with the Bureau's approach to consumer-designated credit but asked the Bureau to clarify whether retail installment sales contracts are covered by the exclusion of consumer-designated credit. This commenter also asked the Bureau to confirm that, in determining whether credit is excluded as consumer-designated credit, existing comment 2(g)–1 interpreting the definition of "business credit" applies, which provides that "[a] creditor may rely on an applicant's statement of the purpose for the credit requested."

Some industry commenters supported the Bureau's proposed exclusion of consumer-designated credit. One of these commenters argued that the inclusion of consumer-designated credit within the rule would dramatically expand the size of the data collected beyond the purpose of section 1071, circumventing the congressional intent and increasing the rule's impact on the availability of credit for all consumers—

---

N.H. Rev. Stat. Ann. 382–A:2A–101 *et seq.;* N.J. Stat. Ann. 12A:2A–101 *et seq.;* N.M. Stat. Ann. 55–2A–101 *et seq.;* N.Y. UCC Law 2–A–101 *et seq.;* Neb. Rev. Stat. UCC 2A–101 *et seq.;* Nev. Rev. Stat. 104A.2101 *et seq.;* Ohio Rev. Code Ann. 1310.01 *et seq.;* Okla. Stat. tit. 12A, 2A–101 *et seq.;* Or. Rev. Stat. 72A.1001 *et seq.;* Pa. Cons. Stat. 2A101 *et seq.;* R.I. Gen. Laws 6A–2.1–101 *et seq.;* S.C. Code Ann. 36–2A–101 *et seq.;* S.D. Codified Laws 57A–2A–101 *et seq.;* Tenn. Code Ann. 47–2A–101 *et seq.;* Tex. Bus. & Com. Code Ann. 2A.101 *et seq.;* Utah Code Ann. 70A–2a–101 *et seq.;* V.I. Code Ann. tit. 11A, 2A–101 *et seq.;* Va. Code Ann. 8.2A–101 *et seq.;* Vt. Stat. Ann. tit. 9A, 2A–101 *et seq.;* W. Va. Code 46–2A–101 *et seq.;* Wash. Rev. Code 62A.2A–101 *et seq.;* Wisc. Stat. 411.101 *et seq.;* Wyo. Stat. Ann. 34.1–2.A–101 *et seq.*

[465] UCC 1–203(b).
[466] UCC 1–203(d).
[467] UCC 1–203(a).

not just business borrowers. Another commenter asked the Bureau to clarify that it will not challenge the designation of a transaction as consumer-designated credit, expressing concerns because financial institutions have no reliable method for validating a latent business purpose in an application for a consumer-designated credit transaction. Two banks recommended against requiring financial institutions to second guess consumers' intentions regarding use of funds by requiring them to report on loans suspected to be used for business purposes.

Several commenters urged the Bureau to cover consumer credit that will be used for business purposes. One community group suggested collecting 1071 data where personal credit card applicants responded that 50 percent or more of the loan would be used for small business purposes, asserting that this threshold would sufficiently weed out applications that would result in nominal amounts of funding for small business purposes but would still capture ones that are potentially important for meeting the community development purpose of section 1071. Two commenters expressed concerns that not covering consumer-designated credit would result in a push toward unregulated products, with one commenter asserting that a portion of the fintech sector is engaging in unscrupulous targeting of vulnerable customers (including racial and ethnic minorities). Two community groups asked the Bureau to reconsider its proposal, emphasizing how important consumer-designated credit is as a source of financing for small businesses, particularly for women-owned and minority-owned small businesses, sole proprietorships, and new businesses. Another community group recommended that the Bureau additionally include personal credit card loans that finance business expenses, asserting that these cards are a vital source of credit for very small and start-up businesses, as well as businesses owned by women and people of color.

A number of banks suggested the Bureau exclude all credit subject to Regulation Z. Some suggested that such an exemption would provide clarity to the definition of "covered credit transaction" and would ease compliance burden when identifying covered applications, implementing data collection, and ensuring data integrity in a manner that meets the statutory purpose. One trade association added that financial institutions are already familiar with determining loan purpose under the Regulation Z

definition in their everyday lending activities and that this approach would alleviate confusion with the proposed exclusion for credit secured by certain investment properties.

For the reasons set forth herein, the Bureau is finalizing comment 104(b)–3 almost entirely as proposed and is not covering consumer-designated credit under the final rule. Comment 104(b)–3 makes clear that the term covered credit transaction does not include consumer-designated credit used for business or agricultural purposes, because such transactions are not business credit. The Bureau is adding the reference to agricultural purposes for clarity. Comment 104(b)–3 provides that a transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes. For example, an open-end credit account used for both personal and business purposes is not business credit for the purpose of subpart B unless the financial institution designated or intended for the primary purpose of the account to be business-related.

The Bureau believes it is appropriate to interpret section 1071 as not applying to this type of credit. Most notably, ECOA section 704B(b) directs financial institutions to collect data in the case of an application "*for credit* for women-owned, minority-owned, or small *business*" (emphasis added). The statute thus applies only to applications for credit for a business; at the time of an application for consumer-designated credit, however, the application is not for a business. Several policy reasons also support this approach. First, financial institutions may not be able to consistently identify when consumer-designated credit is being used for business or agricultural purposes. Inconsistent reporting across financial institutions could lead to data quality concerns. Credit sought by consumers for both personal and business purposes could be particularly difficult to separate into reportable and non-reportable portions. The Bureau believes that excluding consumer-designated credit will simplify compliance by obviating the need for financial institutions to identify and distinguish business uses of consumer-purpose credit products. Second, not including consumer-designated credit that is used for business or agricultural purposes within the scope of this rulemaking makes it clear that the applications reported will all be seeking credit to use for business/agricultural purposes, which supports section 1071's directive to collect and report data in the case of

an application for credit for a *business*. Third, not covering consumer-designated credit that is used for business or agricultural purposes provides certainty to financial institutions that offer only consumer-designated credit that they are not subject to this final rule's data collection and reporting requirements.

With respect to the request to clarify whether retail installment sales contracts are covered by the exclusion of consumer-designated credit, the Bureau notes that this exclusion applies equally to all credit products. In other words, a retail installment sales contract qualifies as consumer-designated credit if the financial institution offers or extends it primarily for personal, family, or household purposes. The Bureau confirms, as requested, that because the Bureau is finalizing § 1002.102(d) to define business credit as having the same meaning as in existing § 1002.2(g), existing comment 2(g)–1 also applies to subpart B. Thus, in determining whether credit is excluded as consumer-designated credit, a financial institution "may rely on an applicant's statement of the purpose for the credit requested."[468]

The Bureau agrees with commenter concerns that the inclusion of consumer-designated credit within the rule would dramatically expand the size of the data collected beyond the purpose of section 1071, circumventing congressional intent and potentially increasing the rule's impact on the availability of credit for all consumers— not just small business borrowers. The Bureau also confirms that financial institutions may rely on an applicant's statement of purpose for the credit requested and need not report consumer-purpose loans suspected to be used for business purposes, recognizing that alternative approaches would likely result in inconsistent results across lenders as they tried to discern latent business purposes in an application for a consumer-designated credit transaction.

With respect to the suggestion that the Bureau require financial institutions to inquire on an application whether 50 percent or more of the borrowed funds would be used for small business purposes and require collection of 1071 data in those instances, the Bureau believes that this approach would raise many of the policy concerns discussed above. The Bureau appreciates the concerns about potential fair lending violations and evasion raised by commenters relating to consumer-designated credit. The Bureau believes that its finalized bright-line approach

---

[468] Existing comment 2(g)–1.

will better enable it to ensure that financial institutions that are offering business credit are complying with the final rule.

The Bureau is not excluding to exclude all credit subject to Regulation Z from this rule's definition of "business credit," as suggested by some commenters. The final rule does not cover consumer-designated credit, which includes Regulation Z credit as well as other consumer-designated credit that is not encompassed by Regulation Z. The Bureau notes that some of Regulation Z's provisions apply to business purpose credit cards [469] and that Regulation Z does not cover consumer credit over certain applicable threshold amounts.[470]

### Certain Purchases of Covered Credit Transactions, Including Pooled Loans and Partial Interests Proposed Rule

As discussed in the section-by-section analysis of § 1002.103 above, ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered financial institutions, the definition of "application" triggers data collection and reporting obligations with respect to covered credit transactions. In the NPRM, the Bureau noted that under proposed subpart B, purchasing a loan, purchasing an interest in a pool of loans, or purchasing a partial interest in a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. Rather, a reporting obligation arises on the basis of receiving a covered application for credit. (See the section-by-section analysis of § 1002.109(a)(3) for additional information.) The Bureau also noted the corollary point that selling an originated covered credit transaction would not, in itself, obviate an existing obligation of a covered financial institution to report small business lending data for that application, pursuant to proposed comment 107(a)–1.i.

In addition, the Bureau believed that requiring covered financial institutions to collect and maintain data related to the purchase of an interest in a pool of covered credit transactions would do little to further the purposes of section 1071. The Bureau generally believed that a pooled loan purchase would arise after credit decisions on the relevant loans had already been made (e.g., after the loans were originated) and therefore

the Bureau believed that the purchaser of an interest in a pool of loans would understand that there would be no section 1071 obligation. Information about the loans in this pool would already be captured, as the application for each originated loan in the pool would already be reported (assuming it was originated by a covered financial institution and otherwise satisfies the requirements of subpart B). For clarity, however, the Bureau stated in the NPRM preamble that no reporting obligations arise from purchasing an interest in a pool of covered credit transactions, including credit-backed securities or real estate investment conduits. The Bureau believed that this clarification, similar to Regulation C comment 3(c)(4)–1, would assist covered financial institutions in understanding the scope of their obligations.

Moreover, the Bureau stated that the purchase of a partial interest in a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. The Bureau believed that this approach, combined with proposed § 1002.109(a)(3), provided sufficient clarity for financial institutions that choose to take part in loan participations. For example, Financial Institution A receives an application from a small business for a covered credit transaction and approves the loan, and then Financial Institution A organizes a loan participation agreement where Financial Institutions B and C agree to purchase a partial interest. This is a reportable application for a covered credit transaction for Financial Institution A, but it is not a reportable application for Financial Institutions B and C. The Bureau noted that this approach differs from how loan participations are reported by banks and savings associations under the CRA. That is, under the CRA, if the loan originated by Financial Institution A met the definition of a small business loan, then for any (or all) of the financial institutions that were CRA reporters, the loans could be reported under the CRA.[471]

The Bureau believed that the statutory purposes of section 1071 encourage the broad collection of small business lending data by financial institutions. The Bureau was not aware of any reason why data with respect to covered credit transactions should not be collected because more than one financial

institution holds an interest in the originated loan. Conversely, the Bureau did not believe that requiring reporting by *each* financial institution with a partial interest in a covered credit transaction would further section 1071's purposes, and because having a single loan reported by multiple financial institutions could compromise the quality of the 1071 dataset. Read in conjunction with proposed § 1002.109(a)(3), however, the Bureau believed that the covered credit transactions at issue here would nonetheless generally be reported by one financial institution provided it met the threshold for originated loans pursuant to § 1002.105(b)—*i.e.,* the financial institution that sold portions of the loan to other participants.

The Bureau did not expressly exclude loan purchases, the purchase of an interest in a pool of covered credit transactions or the purchase of a partial interest in a covered credit transaction in the proposed rule's regulatory text or commentary, but sought comment on this approach. With respect to partial interests specifically, the Bureau solicited comment on how such an exclusion may differ from reporting obligations under the CRA and, if the Bureau adopted another approach, how overlapping reporters or data might be flagged to avoid double-counting certain information.

### Comments Received

The Bureau received several comments regarding loan purchases and loan participations. Commenters did not address pooled loans specifically. A trade association and two banks agreed that loan purchases should not be covered; one of these banks requested that the Bureau add commentary emphasizing this point.

In contrast, two other commenters argued that all loan purchases should be reported, citing consistency with treatment under CRA and HMDA. One commenter further stated that excluding loan purchases and participations from reporting requirements would ignore the role of financial institutions with a significant percentage of loan purchases, despite their importance in the small business lending market. The other commenter stated that 1071 data should replace CRA lending data, the CRA considers loan purchases, and thus so should the Bureau's rule for consistency.

Several farm credit lenders and a trade association said that participation interests and participation loans should be specifically excluded, noting that a participation interest is legally distinct from a loan, the purchaser of an interest

---

[469] *See* Regulation Z § 1026.12(a) and (b).
[470] *See id.* § 1026.3(b).

[471] *See, e.g.,* 12 CFR 228.21(f) (stating that when assessing the record of a nonminority-owned and nonwomen-owned bank, the Board considers loan participation as a factor).

AdminRecord-000093

is not considered a creditor, and there is risk of double counting the data. One commenter asked that the Bureau exclude loan participations from the definition of "covered credit transaction" because a customer never applies for any lender to participate in a covered credit transaction. In addition, some farm credit lenders noted that they frequently enter into loan participation agreements. They stated that a loan participation is significantly different from the purchase of a loan because under these agreements, the borrower's contractual relationship remains solely with the lead lender. These commenters further stated that requiring a participant to report would be akin to requiring a trust in a mortgage securitization to report HMDA data.

Final Rule

For the reasons set forth herein, the Bureau is revising the commentary to § 1002.104(b) to make clear that loan purchases, the purchase of an interest in a pool of loans, and the purchase of a partial interest in a credit transaction are not "covered credit transactions." Specifically, the Bureau is adding comment 104(b)–4 to clarify that for purposes of subpart B, the term "covered credit transaction" does not include the purchase of an originated credit transaction, the purchase of an interest in a pool of credit transactions, or the purchase of a partial interest in a credit transaction such as through a loan participation agreement. Such purchases do not, in themselves, constitute applications for business credit that the purchasing entity makes decisions on. Relatedly, in order to illustrate reporting obligations regarding pooled loans and partial interests, the Bureau is also adding examples to the commentary to § 1002.109(a)(3). The section-by-section analysis of § 1002.109(a)(3) addresses in detail situations where multiple financial institutions are involved in a covered credit transaction.

While the Bureau acknowledges the important role of loan purchases in the small business lending market, the Bureau notes that the definition of "covered application" triggers data collection and reporting obligations with respect to covered credit transactions. Under the final rule, purchasing an originated loan, purchasing an interest in a pool of loans, or purchasing a partial interest in a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data regarding the application underlying the purchased loan. The Bureau has made clear in final

§ 1002.109(a)(3) and associated commentary that only the action taken on the *application* is reportable.

In response to commenters who urged consistency with HMDA, as noted above, the statutory language in HMDA contemplates data collection for loan purchases. Similarly, as interpreted by the agencies administering CRA, the CRA statute permits banks to fulfill their obligation to meet local credit needs by lending in low-to-moderate income communities or by purchasing loans made by others.[472] Conversely, section 1071 does not contain such language; it is focused on applications as the trigger for data collection and reporting obligations. Thus, the Bureau concludes for this rule that it is appropriate for financial institutions to have reporting obligations on the basis of making credit decisions on applications, as explained further in the section-by-section analysis of § 1002.109(a)(3)—a subsequent purchase of a loan (or an interest in a pool of loans, or a partial interest in a loan) is not, in itself, reportable.

104(b)(4) Public Utilities Credit

As noted above, the existing definition of business credit in § 1002.2(g) partially excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through (d), from requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau proposed complete exclusions for public utilities credit from the definition of a covered credit transaction in proposed § 1002.104(b). The Bureau also proposed to define business credit in proposed § 1002.102(d) by reference to existing § 1002.2(g), which already excludes public utilities credit. The Bureau sought comment on its proposal to exclude public utilities credit but did not receive any comments in response.

For the reasons set forth herein, the Bureau is finalizing § 1002.104(b)(2) as proposed. Section 1002.104(b)(2) excludes public utilities credit, as defined in existing § 1002.3(a)(1). Existing § 1002.3(a)(1) states that the term public utilities credit refers to extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service, delayed payment, and any discount for prompt payment

are filed with or regulated by a government unit. Several existing Regulation B requirements do not apply to public utilities credit transactions.[473] Existing comment 3(a)–1 explains that the definition applies only to credit for the purchase of a utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—such as for financing the purchase of a gas dryer, telephone equipment, or other durable goods, or for insulation or other home improvements—is not excepted under § 1002.104(b)(2) but may be excepted if it constitutes trade credit under § 1002.104(b)(1), or in the example of financing for certain home improvements, if it does not constitute an extension of business credit under § 1002.104(a). Existing comment 3(a)–2 states in part that a utility company is a creditor when it supplies utility service and bills the user after the service has been provided.

The Bureau is adopting a definition of "covered credit transaction" that only covers business credit and that fully excludes public utilities credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071, as well as its authority under ECOA 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau believes that fully excluding public utilities credit from the rule is reasonable for the same reasons as the Board enumerated when it adopted exemptions from certain procedural requirements under subpart A. Specifically, covering public utilities credit under this rule could potentially result in "substantial changes in the forms and procedures of public utilities companies. Costs associated with such changes would, in all likelihood, be passed along to [small business owners]."[474] The Bureau notes that many of the policies and procedures of public utilities companies are separately regulated at the State and municipal levels by public service commissions, and at the Federal level by the Federal Energy Regulatory Commission. The Bureau also believes that public utilities credit is akin to trade credit and thus is

---

[472] See, e.g., 12 CFR 228.22(a)(2) (stating that the Board will consider both originations and purchases of loans under the lending test).

[473] See § 1002.3(a).

[474] 40 FR 49298, 49305 (Oct. 22, 1975).

AdminRecord-000094

**35244**   **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

excluding it from coverage under subpart B for the same reasons.

### 104(b)(5) Securities Credit

As noted above, the existing definition of business credit in § 1002.2(g) partially excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through (d), from requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau proposed complete exclusions for securities credit from the definition of a covered credit transaction in proposed § 1002.104(b). The Bureau sought comment on its proposal to exclude securities credit but did not receive any comments in response.

For the reasons set forth herein, the Bureau is finalizing § 1002.104(b)(3) as proposed. Section 1002.104(b)(3) excludes securities credit, as defined in existing § 1002.3(b)(1). Existing § 1002.3(b)(1) states that the term securities credit refers to extensions of credit subject to regulation under section 7 of the Securities Exchange Act of 1934 or extensions of credit by a broker or dealer subject to regulation as a broker or dealer under the Securities Exchange Act of 1934. Several existing Regulation B requirements do not apply to securities credit transactions.[475]

The Bureau is adopting a definition of "covered credit transaction" that only covers business credit and that fully excludes securities credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071, as well as its authority under ECOA 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau is excluding securities credit to foster consistency with existing Regulation B.

### 104(b)(6) Incidental Credit

As noted above, the existing definition of business credit in § 1002.2(g) partially excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through (d), from requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau

proposed complete exclusions for incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b).

As the Bureau explained in the NPRM, existing § 1002.3(c)(1) states that incidental credit refers to extensions of consumer credit other than public utilities and securities credit (i) that are not made pursuant to the terms of a credit card account; (ii) that are not subject to a finance charge (as defined in Regulation Z § 1026.4); and (iii) that are not payable by agreement in more than four installments. For example, existing comment 3(c)–1 explains that if a service provider (such as a hospital, doctor, lawyer, or merchant) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of Regulation B, even though there is no finance charge and no agreement for payment in installments—meaning that it would not be covered under Regulation Z. Such extensions of incidental credit are excepted from compliance with certain procedural requirements as specified in existing § 1002.3(c). The Board created these exceptions in response to commenters that urged it to minimize burdens on businesses that "permit their customers to defer payment of debt as a convenience and are not in the business of extending credit."[476]

The Bureau sought comment on its proposal to exclude incidental credit and it received one industry comment in support of the proposed exclusion.

For the reasons set forth herein, the Bureau is finalizing § 1002.104(b)(4) as proposed. The Bureau is adopting a definition of "covered credit transaction" that only covers business credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071, as well as its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau believes that the Board's reasoning with respect to incidental credit's limited exception under existing Regulation B is equally applicable and relevant here. Additionally, the Bureau believes that providers of incidental credit may not intend to extend credit and may not currently manage compliance with

regulatory requirements associated with making extensions of credit. The Bureau believes an exclusion is appropriate to further the business and community development purpose of section 1071 because of the likelihood that these entities may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner, which could result in entities limiting credit to their small business customers or in potential data quality issues.

### Government Credit

The existing definition of business credit in § 1002.2(g) partially excludes public utilities credit, securities credit, incidental credit, and government credit (that is, extensions of credit made *to* governments or governmental subdivisions, agencies, or instrumentalities—not extensions of credit made *by* governments), as defined in existing § 1002.3(a) through (d), from existing Regulation B.[477]

In its NPRM, the Bureau did not propose in § 1002.104(b) to separately exclude government credit, as defined in existing § 1002.3(d)(1) to mean "extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities." The Bureau sought comment on its approach to government credit but did not receive any comments on this aspect of the proposal. For the purpose of subpart B, the Bureau is finalizing complete exclusions for public utilities credit, securities credit, and incidental credit from the definition of a covered credit transaction in final § 1002.104(b), as described above, but is not adopting a similar exclusion for government credit. The Bureau is finalizing its approach because it believes that an express exclusion for extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities is not necessary because such governmental entities would not constitute small businesses under the final rule.[478]

### Additional Requested Exclusions

The Bureau received numerous comments requesting the Bureau exclude additional products from coverage under the rule. These

---

[475] *See* § 1002.3(b).

[476] 40 FR 49298, 49304 (Oct. 22, 1975).

[477] As explained in existing comment 3–1, under § 1002.3, procedural requirements of Regulation B do not apply to certain types of credit. The comment further states that all classes of transactions remain subject to § 1002.4(a) (the general rule barring discrimination on a prohibited basis) and to any other provision not specifically excepted.

[478] Government entities are not "organized for profit" and are thus not a "business concern" under proposed § 1002.106(a).

comments and the Bureau's response are discussed below.

*Point-of-sale transactions.* A trade association urged the Bureau to fully exempt point-of-sale transactions from the rule, arguing that data collected in connection with such transactions would be inaccurate. In the alternative, this commenter suggested an exception from the requirement to obtain principal owners' ethnicity, race, and sex information, for credit lines below $50,000. As discussed in the section-by-section analysis of § 1002.107(c), the Bureau does not believe it would be appropriate to categorically exempt point-of-sale transactions. The Bureau also is not adopting a minimum transaction amount threshold, as discussed below.

*Minimum transaction amount threshold.* Some industry commenters requested the Bureau exempt all credit transactions from section 1071 collection and reporting requirements if they fell below a certain minimum transaction threshold. One commenter asked the Bureau to adopt a de minimis loan amount exemption of at least $1 million to soften the rule's impact on small entities and borrowers. A credit union stated that the Bureau should implement a minimum loan amount of $10 million. Some banks urged an exemption for "small loans" under $25,000, asserting a need to help institutions, especially smaller institutions, keep compliance costs down and ensure these credit products remain available to the small and agricultural businesses who need them most.

Some industry commenters, including several credit union trade associations, requested an exemption for credit transactions under $50,000. A few commenters argued such an exemption was needed for consistency with National Credit Union Administration regulations, which impose a $50,000 threshold for reporting member business loans. Two credit union trade associations argued that failing to exempt such loans would reduce their availability and also reflects a substantial underestimation of the full impact of the proposed covered financial institution threshold. Several trade associations also recommended the Bureau permit voluntary reporting of loans below $50,000. A bank stated that a $50,000 threshold would result in a significant improvement that would still allow the Bureau to obtain meaningful data. Another bank maintained that this exclusion was needed to reduce compliance burdens related to small loans that are not profitable but that are important to

communities. On the other hand, another commenter stressed the importance of supporting access to microloans for financing start-up or growth and suggested separating microloans ($50,000 or less) into a separate category.

A few industry commenters suggested exempting loans under $100,000. These commenters generally argued that such an exemption was needed to keep the cost of loan origination lower for small dollar borrowers, thereby helping to make more borrowers eligible for credit. Several industry commenters urged the Bureau adopt a minimum transaction amount threshold, without specifying a dollar amount. One of these commenters noted that, due to price inflation, $100,000 would be too small of an amount for such a threshold and that if a threshold were established, it would need to be per loan and not cumulative.

For the reasons set forth herein, the Bureau is not adopting an exemption for credit transactions below a certain dollar threshold. At the time of the Federal Reserve Banks' 2021 survey of employer firms, 60 percent of employer firms had $100,000 or less in outstanding debt, with 48 percent of such firms holding $50,000 or less in outstanding debt.[479] According to SBA data, more than 87 percent of Paycheck Protection Program loans in 2021 were loans of $50,000 and below,[480] and approximately 20 percent of SBA 7(a) loans between 2010 and 2019 were in amounts less than $25,000. In terms of industry adoption of minimum loan amount thresholds, research by the FDIC shows that only a small share (14.8 percent) of small banks require a minimum loan amount for their top loan product to small businesses, compared with a majority (69.8 percent) of large banks.[481] Moreover, as discussed in the section-by-section analysis of § 1002.106(b)(1), the Bureau believes that loan size a poor proxy for small business size—in fact, FDIC staff found "at least $19.1 billion in gross understatement of small business lending (in which small businesses with less than $1 million in gross annual revenue received loans with amounts greater than $1 million)."[482] Based on this information, the Bureau does not

believe that adopting a minimum transaction amount threshold would further the purposes of section 1071 because it would exclude substantial portions of small business lending.

*Vehicle financing.* One bank urged the Bureau to specify that any motor vehicle financed in the first instance by retail motor vehicle dealers are deemed consumer loans and thus exempt. A vehicle leasing association also suggested that vehicle financing was so similar to consumer lending that it should be exempt from section 1071 reporting requirements.

The Bureau is not categorically exempting business-purpose vehicle financing, even though it may often be offered alongside consumer-purpose credit. Per existing comment 2(g)–1, the test for deciding whether a transaction qualifies as business credit is one of primary purpose. Where a small business applies for vehicle financing primarily for business or commercial (including agricultural) purposes from a covered financial institution, the transaction is reportable. For a broader discussion of vehicle financing with respect to reporting obligations where multiple financial institutions are involved in a covered credit transaction, see the section-by-section analysis of § 1002.109(a)(3).

*Letters of credit.* A bank asked the Bureau to clarify if letters of credit are covered credit transactions for purposes of section 1071, and if they are, this commenter also recommended that the Bureau exclude these types of transactions from reporting.

The Bureau understands that letters of credit products are primarily used in the international trade context. Generally, a letter of credit is an instrument issued by a bank that promises, upon the presentation of certain documents and/or satisfaction of certain conditions, to direct payment to a beneficiary of the instrument. Letters of credit are often presented by buyers of goods who seek to postpone payment until their goods have been received. Some letters of credit are secured by a promissory note and are converted if the customer fails to pay.

ECOA and Regulation B do not address letters of credit. Regulation Z excludes letters of credit under its comment 2(a)(14)–1.vi. In finalizing this exclusion, the Board stated that "[i]ssuance of letters of credit and execution of option contracts are not extensions of credit, although there may be an extension of credit when the letter of credit is presented for payment or the option is exercised, if there is a deferral of the payment of a debt at that

[479] 2022 Small Business Credit Survey at 13.

[480] Small Bus. Admin., *PPP Report: Approvals through 05/31/2021, https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf.*

[481] Small Business Lending Survey at 44, *https://www.fdic.gov/bank/historical/sbls/full-survey.pdf.*

[482] Fed. Deposit Ins. Corp., *Measurement of Small Business Lending Using Call Reports: Further Insights From the Small Business Lending Survey,* at 7 (July 2020), *https://www.fdic.gov/analysis/cfr/staff-studies/2020-04.pdf.*

**35246**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

time." [483] The Bureau agrees with the Board's assessment of these products and believes that a letter of credit is not credit under ECOA. Thus, the Bureau is not covering letters of credit under the final rule.

*Government programs.* Some industry commenters urged the Bureau to exempt government lending programs (such as the Paycheck Protection Program) and/or government sponsored/guaranteed loans (such as USDA loans), arguing that inclusion would discourage participation. One also argued that the fact that the fees and interest rates for Paycheck Protection Program loans were set by Congress, meant there was a reduced risk of discriminatory lending practices related to terms of the credit transaction. Another suggested that 1071 data collection and reporting was not required because many government programs already collected similar information. A few commenters specifically recommended exempting SBA lending programs, particularly section 504 loans.

The Bureau has considered these comments but is not categorically exempting credit transactions originated by, sponsored by, facilitated by, or guaranteed by government entities. According to one source, there are 65 government-sponsored, grants, loans, and programs that may benefit small businesses. [484] The Bureau understands that many small businesses rely on government programs for credit and believes that excluding such credit in this final rule would not further either of section 1071's statutory purposes.

*C–PACE loans.* A trade association of Commercial Property Assessed Clean Energy (C–PACE) loan providers requested an exemption due to purportedly unique features of C–PACE loans, such as prior approval by the local government, absence of acceleration, lack of control over the identity of the obligor, and absence of private remedies.

C–PACE programs generally allow commercial property owners, which could include small businesses, to receive financing to fund clean-energy, seismic strengthening, or water conservation improvements to their properties. The financial obligation arises from voluntary contract. Various private companies appear to play a significant role in financing, originating, and administering C–PACE transactions. Under State law, C–PACE is an

assessment that appears on businesses' property tax bills. Although the commercial property owner signs the financing agreement, it is typically not a personal liability of the commercial property owner, and the obligation will stay with the property until fully paid. C–PACE is secured by a super-priority lien on the property—if the property is sold through foreclosure, C–PACE (like a regular property tax lien) is first in line to receive any proceeds from the sale even if a mortgage was on the property first. The Bureau understands that typically, only the arrearage on the C–PACE lien gets paid off in foreclosure, and the rest of the C–PACE indebtedness remains with the property after foreclosure.

While publicly available data on C–PACE programs appear to be limited, the Bureau understands that these programs are growing in popularity; [485] excluding these loan products from the requirements of this rule would result in incomplete data about the relevant markets and would thus not advance section 1071's business and community development purpose.

The Bureau is not excluding C–PACE financing arrangements from reporting under section 1071, as requested by one commenter. Based on its understanding of typical C–PACE financing arrangements and its expertise with respect to the nature of credit transactions, the Bureau believes that the term "credit" under ECOA and final § 1002.102(i) encompasses these products. Under a C–PACE financing arrangement, there is (1) a "debt" in the form of an obligation to pay for the cost of property upgrades and (2) a right to defer payment on that obligation for a term. Similarly, there is (1) a "purchase[] [of] property or services" in the form of property upgrades, and (2) a right to defer payment on the property or services. The borrower enters into C–PACE financing through a voluntary transaction. That the parties agree that payment will be made through an assessment through the property tax system does not change the Bureau's analysis. ECOA (and Regulation B) do not specify a particular vehicle or form of payment for a transaction to constitute credit, nor do they limit the form of obligation. The Bureau is not specifically defining C–PACE financing arrangements in the rule because the Bureau believes these products are

covered by the definition of "credit" in final § 1002.102(i).

Finally, in the Bureau's judgment, an exclusion of C–PACE loans—whether by interpretation or by granting an exception—would not further the fair lending and the business and community development purposes of section 1071. [486] This is for three independent reasons. First, while the Bureau understands that C–PACE financing may present less fair lending risk compared to some other products because such financing is based on the value of the property, not the creditworthiness of the obligor (who can change along with ownership of the property), the Bureau does not believe that is a sufficient reason by itself to exclude C–PACE lending from coverage under this final rule. Section 1071 is not limited to those products with the highest fair lending risk. Second, the Bureau does not agree that data collection to provide additional insight into the product is unnecessary. Third, and most significantly, including C–PACE loans should create a more level playing field across financial institutions that provide construction financing to small businesses as well as create a dataset that better reflects demand for such financing by the smallest and most vulnerable businesses.

*Overdraft lines of credit.* In its NPRM, the Bureau did not address overdraft lines of credit other than asking whether they should be listed as a credit product separate from other lines of credit. The Bureau received one comment urging exclusion of overdraft lines of credit on the grounds that their inclusion would significantly expand the data collection requirements for small business deposit account applications since most such deposit accounts have an option to obtain an overdraft line of credit. This commenter also argued that collecting data on overdraft lines of credit would not further section 1071's purpose of preventing discrimination against small business credit applicants because banks conduct little, if any, underwriting when extending overdraft lines of credit on small business deposit accounts.

The Bureau is not categorically exempting overdraft lines of credit but notes that they are reportable only where there is an "application" under § 1002.103. Providing occasional overdraft services as part of a deposit account offering would not be reported for the purpose of subpart B pursuant to new comment 107(a)(6)–8.

[483] 46 FR 20848, 20851 (Apr. 7, 1981).

[484] U.S. Chamber of Com., *65 Grants, Loans and Programs to Benefit Your Small Business* (Nov. 17, 2022), *https://www.uschamber.com/co/run/business-financing/government-small-business-grant-programs.*

[485] *See, e.g.,* Greenworks Lending, *C–PACE Financing Sees Massive Growth Nationally: What you should know about this alternative development financing mechanism* (June 7, 2021), *https://commercialobserver.com/2021/06/c-pace-financing-sees-massive-growth-nationally/.*

[486] ECOA section 704B(a).

## Voluntary Reporting

Absent a specific requirement to collect protected demographic data (such as in section 1071), ECOA generally blocks collection of such demographic data in connection with an application for credit. The Bureau sought comment on whether financial institutions should be permitted to voluntarily collect and report applicants' protected demographic information for transactions such as leases (due to the practical difficulty cited by some stakeholders of distinguishing leases from loans), consumer-designated credit (when financial institutions have reason to believe the credit might be used for business purposes), and real estate investment loan transactions that are secured by non-owner occupied 1–4 dwelling unit properties pursuant to proposed § 1002.109.

The Bureau received comments from community groups and trade associations on this aspect of the proposal. A number of community groups stated that the Bureau should permit voluntary reporting on leases and factoring to have the most comprehensive data on the small business financing market as it relates to minority entrepreneurs. A community group purporting to address the proposed amendments to existing § 1002.5(a)(4) commented that the Bureau should permit voluntary collection not only by financial institutions not covered by the rule, but also should permit covered financial institutions to collect data on consumer credit used to fund small businesses.

The Bureau did not receive any industry comments expressing an interest in being able to voluntarily report non-covered products. In fact, a few trade associations and a business advocacy group expressly opposed such voluntary reporting. One trade association argued against voluntary reporting of non-covered transactions, citing concerns about the quality of data collected and the creation of an uneven playing field among financial institutions that would contribute to misinterpretations of the data by observers. Two other commenters also argued against the voluntary reporting of consumer-designated credit used for business purposes, asserting that such reporting would create confusion, introduce the possibility of error, and put financial institutions in a position to question their members' intentions.

For the reasons set forth herein, the Bureau is finalizing its approach to not permit voluntary reporting of non-covered products. The Bureau sought comment on voluntary reporting to address a potential pain point for industry but heard no industry interest in such a solution. The Bureau thus finds it unnecessary to change the proposed section 1071 collection system to receive data on such non-covered products. However, as discussed in the section-by-section analysis of § 1002.112(c)(3), the Bureau is adopting a catch-all safe harbor that will protect financial institutions who encounter the underlying situation that voluntary reporting was intended to address. Specifically, that safe harbor will address situations where a financial institution has a reasonable basis—at the time of collecting the protected demographic information required by this rule—to believe there is a covered application and that data collection is necessary, including situations in which it later determines that the transaction is not in fact reportable (because the ultimate transaction is not a covered product, the business is not small, or there is otherwise not a covered application).

### Section 1002.105   Covered Financial Institutions and Exempt Institutions

ECOA section 704B(h)(1) defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." The Bureau is finalizing a definition of financial institution in § 1002.105(a) consistent with that statutory language. The Bureau is defining a covered financial institution in § 1002.105(b) as a financial institution that originated at least 100 covered credit transactions from small businesses in each of the two preceding calendar years. Only those financial institutions that meet this loan-volume threshold in the definition of a covered financial institution would be required to collect and report small business lending data pursuant to proposed subpart B.

The Bureau's definitions reflect the broad nature of the data collection specified in section 1071, while recognizing the risks that financial institutions with the lowest volume of small business lending might limit their small business lending activity because of the fixed costs of coming into compliance with this rule.

The Bureau is finalizing § 1002.105 to implement ECOA section 704B(h)(1) and pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.

The Bureau is also finalizing § 1002.105(b) pursuant to its authority under 704B(g)(2) to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau is finalizing these provisions and using its exemption authority under 704B(g)(2) for the reasons set forth below.

#### 105(a) Financial Institution

*Proposed Rule*

ECOA section 704B(h)(1) defines the term "financial institution," for purposes of section 1071, as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." Existing Regulation B, which implements ECOA, has not otherwise defined this term.

Proposed § 1002.105(a) would have restated the statutory definition of a financial institution as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. The Bureau believed that this definition reflects the broad nature of small business lending data collection specified in section 1071. Under such a definition, the rule's data collection and reporting requirements would apply to a variety of entities that engage in small business lending, including depository institutions (*i.e.*, banks, savings associations, and credit unions),[487] online lenders, platform lenders, CDFIs, Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit, nondepository lenders.

The Bureau noted that the broad scope of what may be considered a "financial activity" in the proposed

---

[487] Throughout this document, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this rulemaking, unless otherwise specified.

AdminRecord-000098

**35248**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

definition of financial institution would not be the principal determinative factor as to whether small business lending data collection and reporting is required; the proposed definition of a covered financial institution, the proposed definition of a covered application, and the proposed definition of a covered credit transaction, among others, all would impose limits on what entities could be subject to the rule's data collection and reporting requirements.

Proposed comment 105(a)–1 would have provided a list of examples of entities that may fit within the definition of a financial institution. This proposed comment would have made clear that nonprofit and governmental entities, governmental subdivisions, or governmental agencies, among others, who conduct financial activity fit within the definition of a financial institution. Proposed comment 105(a)–2 would have referred to proposed § 1002.101(a) to reiterate the statutory exclusion for motor vehicle dealers.

The Bureau sought comment on this proposed definition of a financial institution, and generally requested comment on whether additional clarification is needed.

*Comments Received*

A broad range of commenters, including lenders, trade associations, community groups, and business advocacy groups, expressed support for the Bureau's proposed general definition of financial institution. A number of commenters stated that it is an appropriately broad definition that captures a wide variety of lenders, including online lenders, platform lenders, lenders involved in equipment and vehicle financing, and commercial finance companies. Commenters asserted that a broad definition will yield meaningful data. Several commenters noted that capturing a broad array of lenders is essential for achieving the objectives of section 1071 and that a broad definition is important for regulatory parity. Other commenters stated that there should be no exceptions permitted for certain types of lenders and a community group stated that missing any segment of lending risks encouraging abusive lending institutions to violate fair lending laws. One trade association expressed opposition to the proposed definition, however, arguing that it is too broad because it includes captive vehicle finance partners.

Several commenters agreed that the rule must apply to government lenders, with one commenter specifically requesting inclusion of the Farm Service Agency. An association urged the Bureau to include as examples in the rule the largest Federal, State, and municipal lending programs.

Another trade association stated that SBA certified development companies are certified and regulated by the SBA, and the SBA already collects application information that includes the data points that the Bureau proposes to collect. The commenter further asserted that reproducing these data will likely incur significant one time and ongoing compliance costs. In contrast, a bank stated that data shows that the performance levels of the SBA and the lenders participating in their programs has produced dismal results, permitting some lenders to enjoy "preferred" lender status while not delivering loans to disadvantaged communities. Moreover, two commenters urged the Bureau to work with other government agencies to ensure that existing reporting is leveraged where possible.

*Final Rule*

For the reasons set forth herein, the Bureau is finalizing § 1002.105(a) and its associated commentary as proposed. The Bureau emphasizes that the list of examples of entities in comment 105(a)–1 is not exhaustive and that other entities not specifically described may nonetheless fit within the definition of a financial institution under § 1002.105(a). The Bureau agrees with commenters that governmental lenders should be covered by the rule. As explained in the proposed rule, the Bureau interprets the statute to include government entities in the definition of financial institution. The definition of the term "financial institution" in ECOA section 704B(h)(1) includes the phrase "or other entity." That term readily encompasses governments and government entities. Even if the term "or other entity" were ambiguous, the Bureau believes—based on its expertise and experience—that interpreting it to encompass governments and government entities promotes the purposes of section 1071.

For example, the Bureau believes that it will be helpful to identify the business and community development needs and opportunities of small businesses, including those that are women-owned, minority-owned, and LGBTQI+-owned, by collecting lending data from both a county-run assistance program for establishing new businesses and financial institutions that operate nationwide, like online lenders. The Bureau also believes that the terms "companies" or "corporations" under the definition of "financial institution" in ECOA section 704B(h)(1), cover all companies and corporations, including government-owned or -companies and corporations. And even if those terms were ambiguous, the Bureau believes—based on its expertise and experience—that interpreting them to cover government-owned or -companies and corporations advances the purposes of section 1071, particularly the business and community development purpose, as it will more accurately capture demand for credit.

The Bureau is not, however, listing specific examples of covered governmental lenders/programs in the rule. The Bureau does not believe such a list is necessary, and inclusion of a specific list could cause confusion if the listed programs (or those lenders' loan volumes) were to change.

In response to commenters who raised potential overlap with other reporting regimes, see part V.D.3 for a detailed discussion of this issue.

Commenters' requests for specific exclusions, such as for captive vehicle finance partners, are discussed in the section-by-section analysis of § 1002.105(b) below.

*105(b) Covered Financial Institution*

*Background*

Throughout the rulemaking process, the Bureau has received requests to adopt a variety of exemptions from collection and reporting requirements under section 1071. Reasons cited have included discouraging market disruption, ensuring data quality, alleged lack of materiality of data from smaller lenders that rarely make small business loans, and lack of capacity by the lenders sufficient to justify small business lending as a line of business in light of the cost of complying with the rule.

As detailed below, the Bureau is adopting an activity-based exemption. The Bureau defines a covered financial institution in § 1002.105(b) as a financial institution that originated at least 100 covered credit transactions from small businesses in each of the two preceding calendar years. Only those financial institutions that meet this loan-volume threshold in the definition of a covered financial institution will be required to collect and report small business lending data under this rule. The final rule does not include categorical exemptions for particular types of institutions from coverage, but the Bureau notes that its Regulation B does not apply to motor vehicle dealers.[488]

---

[488] Regulation B does not apply to a person excluded from coverage by section 1029 of the Consumer Financial Protection Act of 2010, title X

Proposed Rule

*Activity-based exemption.* In the SBREFA Outline, the Bureau stated that it was considering whether only financial institutions that engage in a certain amount of small business lending activity should be required to collect and report 1071 data.[489] The Bureau explained that in light of section 1071's potentially broad application to financial institutions, an activity-based test to determine reporting responsibility might be appropriate. In particular, the Bureau expressed concern that financial institutions with the lowest volume of small business lending might limit their small business lending activity because of the fixed costs of coming into compliance with the rule. The Bureau stated that this result could be contrary to the community development purpose of section 1071.

In the NPRM, the Bureau stated that it believed that an activity-based threshold would provide a simple basis for financial institutions that infrequently lend to small businesses to determine whether they have conducted sufficient lending activity as to be required to collect and report data under proposed subpart B. The Bureau believed that furnishing a dual activity-based and asset-based threshold, under which infrequent lenders must ascertain both measurements to determine whether reporting may be required, would cut against the goal of simplifying the rule as lenders would then have to track two metrics, not one. The Bureau believed that a dual threshold would create more regulatory complexity as compared to only tracking total annual small business originations.

In particular, the Bureau believed that a primary advantage of an activity-based threshold—ease of compliance—would be undermined if the Bureau were to implement a complex, dual threshold eligibility test. The Bureau wished to ensure that infrequent lenders were not incurring significant undue compliance costs, particularly while not reporting data. In general, tracking two thresholds is more complex than tracking one. The Bureau believed it is also more likely that financial institutions are already tracking total originations. The Bureau believed that proposing an activity-based threshold that employs data already generally collected by financial institutions could mitigate the risk that

section 1071, when implemented, would result in reduced access to credit.

*Activity threshold level.* Proposed § 1002.105(b) would have defined a covered financial institution as a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. Only those financial institutions that meet this loan-volume threshold in the definition of a covered financial institution would be required to collect and report small business lending data pursuant to subpart B.

The Bureau believed this definition would facilitate compliance by describing which financial institutions are required to collect and report small business data. The Bureau also proposed commentary to accompany proposed § 1002.105(b). In general, the Bureau believed that fulfilling the purposes of section 1071 necessitates collecting small business lending data from all sizes and types of financial institutions (other than those with a low volume of lending activity), particularly given the variety of entities identified in ECOA section 704B(h)(1). The Bureau proposed to exempt certain financial institutions from its small business lending rule because it remained concerned that financial institutions with the lowest volume of small business lending might limit their small business lending activity due to the fixed costs of coming into compliance with the rule. That type of market disruption could run contrary to the business and community development purpose of section 1071. Section 1071 describes its community development purpose as "enabl[ing] communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." [490] In the Bureau's view, ensuring that business and community development opportunities could be met as well as identified supported the Bureau's use of its exemption authority under 704B(g)(2) here.

The Bureau proposed to set the activity-based threshold based on small business originations, rather than applications. The statutory language of section 1071 generally applies to applications; however, the Bureau believed that using small business originations for purposes of defining a covered financial institution is the better approach. The Bureau expected that financial institutions track their small business application volumes in

various ways, but whether an origination resulted was a clear and readily identifiable metric. Using an exemption metric based on applications would have imposed new obligations on financial institutions solely for purposes of determining whether or not they are subject to this rule. As discussed above, the Bureau believed that proposing an activity-based threshold that employed data already generally collected by financial institutions could mitigate the risk that section 1071, when implemented, would result in reduced access to credit. In addition, even those financial institutions that track total applications now may not do so in a way that fully aligns with how the Bureau proposed to define covered applications for purposes of proposed subpart B. Using the number of originations, as opposed to applications, for an activity-based threshold was also consistent with the Bureau's Regulation C.

The Bureau proposed to clarify in § 1002.105(b) that for purposes of defining a covered financial institution, if more than one financial institution was involved in the origination of a covered credit transaction, only the financial institution that made the final credit decision approving the application shall count the origination. The Bureau believed that providing this clarifying language would assist financial institutions in understanding which transactions count towards the loan-volume threshold. This approach was consistent with the Bureau's proposed § 1002.109(a)(3).

Proposed comments 105(b)–4 and –5 would have explained when a financial institution was a covered financial institution following a merger or acquisition. These proposed comments were largely consistent with the Bureau's approach to reporting obligations surrounding a merger under Regulation C,[491] with modifications to reflect the nature of the small business lending market and to provide additional clarifications.

Proposed comment 105(b)–6 would have clarified that Regulation B (including proposed subpart B) generally did not apply to lending activities that occur outside the United States.

Finally, proposed comment 105(b)–7 would have addressed financial institutions that do not qualify as covered financial institutions but may nonetheless wish to voluntarily collect and report small business lending data. This proposed comment would have reiterated that proposed

---

of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

[489] SBREFA Outline at 12–13.

[490] ECOA section 704B(a).

[491] *See* Regulation C comments 2(g)–3 and –4.

§ 1002.5(a)(4)(vii) through (ix) permitted a creditor that was not a covered financial institution under proposed § 1002.105(b) to voluntarily collect and report information regarding covered applications in certain circumstances. If a creditor is voluntarily collecting applicants' protected demographic information for covered applications, it shall do so in compliance with proposed §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 as though it were a covered financial institution. Proposed comment 105(b)–7 would have further stated that if a creditor was voluntarily reporting those covered applications to the Bureau, it shall do so in compliance with proposed §§ 1002.109 and 1002.110 as though it were a covered financial institution.

The Bureau sought comment on its proposed 25 originations threshold incorporated into the definition of a covered financial institution. The Bureau also solicited comment on whether this threshold should alternatively be set at 50 or 100 covered credit transactions. In addition, the Bureau sought comment on whether an activity-based threshold should be based on the total number of small business applications, rather than originations. The Bureau also requested comment on whether additional clarification was needed for this proposed definition.

*Two-year threshold measurement period.* The Bureau proposed to define a covered financial institution using a loan-volume threshold that must be achieved in each of the two preceding calendar years.

The Bureau acknowledged that a loan-volume threshold based on a two-year period could create some operational complexity for some financial institutions. To be sure that it was not a covered financial institution, a financial institution would need to maintain records sufficient to show total small business originations for both years of the threshold period. The Bureau believed that two years was not a prohibitively long time, although it is possible that infrequent lenders may have smaller staff or fewer resources to reliably track such information for section 1071's purposes. The Bureau believed that a two-year threshold period was advisable to eliminate uncertainty surrounding data collection responsibilities. Under this proposal, a financial institution that may not frequently lend to small businesses, but that experiences an unusual and unexpectedly high lending volume in a single year would not be a covered financial institution. As discussed in

part VIII below, in order to comply with the Bureau's rule, a financial institution may need to undertake substantial one-time costs that include operational changes, such as staff training, information technology changes, and develop policies and procedures. Therefore, the Bureau believed it appropriate to propose a two-year threshold period to provide more stability around reporting responsibilities. Regulations that implement HMDA and the Community Reinvestment Act provide similar periods to determine coverage.

The Bureau noted that employing a two-year approach would delay reporting for new, potentially active entrants. For example, under this proposal a large lender that enters the market and originates hundreds or even thousands of small business loans in its first two calendar years of lending would not report its covered applications. That is, under the Bureau's proposal, this financial institution would not be required to collect and report data on its covered applications for small businesses in those first two years, although the institution could choose to voluntarily collect and report data. The Bureau recognized, however, that triggering data collection and reporting requirements based on lenders' estimates of their projected future volume could be challenging to implement.

The proposed two-year threshold period could pose other challenges for financial institutions that conduct small business lending activity near the proposed 25 small business originations threshold. See the section-by-section analysis of § 1002.5(a)(4) above for a discussion of § 1002.5(a)(4)(viii), which would allow a financial institution to collect ethnicity, race, and sex information pursuant to proposed subpart B for a covered application under certain circumstances during the second year of the threshold period. See the section-by-section analysis of § 1002.114(c)(2) below for discussion of additional flexibility that the Bureau is finalizing regarding measuring lending activity prior to the rule's compliance date.

Proposed comment 105(b)–1 would have clarified the meaning of a preceding calendar year for purposes of the proposed activity-based threshold. See the section-by-section analysis of § 1002.114(c)(3) below for additional discussion regarding measuring lending activity prior to the rule's compliance date. Proposed comment 105(b)–2 would have emphasized that a financial institution qualifies as a covered financial institution based on total

covered credit transactions originated for small businesses, rather than covered applications received from small businesses. Proposed comment 105(b)–3 would have explained that whether a financial institution is a covered financial institution depends on its particular small business lending activity in the two preceding calendar years, and that the obligations of a covered financial institution is an annual consideration for each year that data may be compiled and maintained under proposed § 1002.107(a).

*Other requested exemptions.* The Bureau did not propose to adopt alternative exemptions or exceptions to the definition of covered financial institution, other than the loan-volume threshold as described above.

With respect to government lenders, in the proposal the Bureau stated that it has not identified, nor did small entity representatives or other stakeholders provide, policy or legal rationales for excluding government lenders from the rule. The Bureau believed that collecting information on small business lending by government entities furthered the purposes of section 1071. Moreover, the Bureau believed, as described above in the discussion of proposed comment 105(a)–1, that government entities were included within the phrase "other entity" in the ECOA section 704B(h)(1) definition of "financial institution." For example, the Bureau believed that it would be helpful to identify the business and community development needs of women-owned, minority-owned, and small businesses by collecting lending data from both an online lender and a county-run assistance program for establishing new businesses.

For the same reasons, the Bureau did not believe that exempting not-for-profit lenders from data collection was consistent with the purposes of section 1071. The Bureau believed that organizations exempt from taxation pursuant to 26 U.S.C. 501(c) play a crucial role in lending to small businesses, particularly those that are women- or minority-owned, in certain communities.

With respect to the concern that certain financial institutions may encounter difficulty absorbing compliance costs, the Bureau believed that directly considering a financial institution's activity is a more appropriate way to address this concern and not a categorical exemption. With respect to a financial institution's lending importance for a community or region (such as low income or rural) as a reason to include categorical exemptions, the Bureau believed that

such arguments emphasize the importance of collecting and analyzing such data to further the purposes of section 1071 rather than justify an exemption. Finally, with respect to the concern that certain business models or products are not conducive to data collection or reporting, the Bureau believed it would most appropriately address such concerns by providing clarification regarding how reporting rules apply to certain covered credit transactions and also not covering certain transactions. See the section-by-section analyses of §§ 1002.104(b) and 1002.109(a)(3). The Bureau proposed comment 105(a)–1, discussed above, consistent with the considerations discussed here.

Therefore, for the reasons described above, the Bureau did not propose to define a covered financial institution by providing alternative exemptions or exceptions. The Bureau sought comment on this approach, including data or information that might bear upon any such alternative exemptions in light of section 1071's purposes.

Comments Received

Commenters expressed a variety of perspectives with respect to the Bureau's proposal regarding potential exemptions. Feedback from most industry commenters generally was in support of exempting certain financial institutions from data collection and reporting obligations. Most feedback in support of pursuing exemptions focused on the potential burden of new regulatory requirements, with some commenters cautioning that collection and reporting obligations could lead to an increase in the cost of credit and could cause lenders to exit the market. A few commenters connected these potential costs with section 1071's purpose of identifying business and community development needs and opportunities (chiefly arguing that costs might lead to higher costs of lending or lower lending volume), or otherwise expressed a general belief that some exemptions were consistent with statutory purposes. In addition, many commenters, mostly community groups, urged caution with respect to the extent of any such exemptions, arguing that not capturing a significant amount of small business lending data would run contrary to the general purposes of section 1071.

*Activity-based exemption.* Many commenters supported the general concept of an activity-based threshold. A large bank asserted that an origination-based approach would ensure that collected data represents a comprehensive view of the small business lending landscape. A few commenters stated that a clear, bright line rule is helpful, and that an activity threshold is relatively simple for low-volume lenders to apply. Moreover, two commenters said that an activity threshold creates a level playing field, while a CDFI lender stated that such an approach will ensure that the Bureau captures data from lenders that are small in asset size but active in small business lending. Two commenters, however, noted that some lenders may not currently track applicant GAR and this may somewhat increase burden of counting originations to small businesses.

A community group urged the Bureau to guard against evasion of the activity-based threshold through the creation of subsidiaries, stating that the Bureau should include a rule that for the purposes of determining the loan threshold, loans are counted at the parent institution or holding company level.

A number of commenters opposed an activity-based threshold. Two banks stated that it was confusing because the threshold is only for originations, yet all applications are reported. One of the banks stated that a financial institution may not know whether it would meet the threshold until very close to the reporting period, while another bank stated it may be difficult to know which loans are covered for purposes of determining loan activity.

Several industry commenters asserted that an activity-based threshold is not a good metric for banks, with several banks suggesting that an asset-size coverage definition would be more straightforward and consistent. Commenters explained that lending varies each year, while assets are more predictable and forecastable. A few community banks stated that an activity-based threshold based solely on originations is misguided and results in a one-size-fits-all exemption that disregards the unique characteristics that exist in communities across the country, resulting in reduced access to credit. Several industry commenters stated that an activity-based threshold could encourage lenders to deny applications or reduce their lending to stay under the threshold. Additionally, several commenters noted that some lenders near the threshold may go back and forth between being covered or not.

*Counting originations.* Several lenders, trade associations, and a community group, expressed support for counting originations, not applications, for determining coverage. The community group asserted that this approach is consistent with CRA and HMDA.

A few commenters provided feedback on how originations should be counted for purposes of determining the threshold. A trade association asserted that all Paycheck Protection Program loans and similar future government programs should be exempt from the originations threshold. In addition, two commenters stated that additional credit amounts, such as line increases, should not count as a separate credit product for purposes of counting originations for the threshold. One noted that very small businesses may request multiple line increases in a year.

*Activity threshold level.* The Bureau received a large number of comments regarding the activity threshold level from a range of stakeholders, including lenders and community groups. Many community groups and some industry commenters, including community-oriented lenders and a few large banks, along with a minority business advocacy group and several members of Congress, supported the proposed 25 loan threshold, citing its broad coverage. Commenters stated that the proposed threshold allows for coverage of banks, nondepository lenders, "fintech" lenders, CDFIs, and other types of financial institutions. A community-oriented lender argued that gathering data from small business lenders or all types and sizes is critical, given that entrepreneurs of color are less likely to be approved for capital by banks, often turning to alternative lenders as a result. Another commenter stated that even a 25-origination lender will have substantial data with respect to adverse actions or declinations, up to four times as much.

Commenters asserted that this threshold was an appropriate approach to excluding *de minimis* lenders, was simple to apply, and would yield meaningful data collection. A few commenters argued that the activity threshold should not be increased above 25 loans, given the Bureau's estimated costs of compliance. Some commenters cited similarities to the 2015 HMDA rule, with one commenter further asserting that when the HMDA threshold was raised, certain lenders no longer reported data. Commenters asserted that gathering robust lending data will ensure that the rule implementing section 1071 is fulfilling the statutory purposes and community development organizations need sufficient data that cover enough of the market. In addition, one commenter urged a 10-loan threshold, asserting that is the minimum threshold that is necessary to change lending behavior

AdminRecord-000102

and improve access to capital for Black business borrowers. This commenter further asserted that all regulated financial institutions that maintain FDIC deposit insurance should report their small business lending results.

Many commenters, including community groups, community-oriented lenders, individual commenters, and a business advocacy group, emphasized that section 1071's statutory purposes could be frustrated if the threshold were increased. Commenters argued that it would be impossible to meet the statutory purposes of the rule unless most of the market is covered. A commenter further asserted that if the threshold were increased, the database would no longer be statistically representative of actual lending and would not be able to accurately reveal whether credit needs were being met in all communities. Commenters stated that increasing the threshold will disproportionately harm many small business owners, rural communities, banking deserts and redlined areas that may find that "small" lenders make up a significant portion of the local lending market. Commenters stated that accurately measuring access to credit, and pursuing fair lending enforcement when warranted, would be substantially diminished if too many lenders and loans are exempt from reporting, particularly in smaller cities and rural areas. Another commenter asserted that if the Bureau elected to use a higher threshold it would exclude gathering data from commercial lenders that are small, but still impact many people. Moreover, a commenter stated that the Bureau's estimates show decreased coverage of banks at higher thresholds.

Commenters stated that it is important to ensure coverage of rural areas, which may be in persistent poverty, and which are often served by small lenders. Moreover, a community group stated that the threshold must cover intermediate-sized banks, which are important to rural communities and small cities, and whose information has been missing from CRA data since 2003. Commenters stated that increasing the threshold could frustrate enforcement of the CRA, and risk the chance that the data are not representative of the actual small business lending landscape. A commenter further asserted that comprehensive data are needed to assist in fair lending actions at the local level.

In contrast, nearly all industry commenters opposed the proposed coverage threshold of 25 originations annually for two consecutive years. Commenters stated that the threshold was too low and would lead to increased costs and burden, particularly

for community banks and credit unions. Numerous banks and trade associations expressed concern that too many small banks would be subject to the rule with a 25-loan activity threshold. For example, two trade associations asserted that at least 780 banks under $100 million in assets would be subject to reporting, and these institutions average 13 employees at 1.6 branches. In addition, several members of Congress asserted that the proposed threshold levels for the rule were far too stringent, and would drastically impact the ability of small institutions to make loans to small businesses and decrease access to credit for minority-owned, women-owned, and small businesses. Several commenters argued that small lenders have little data to offer relative to the costs of acquiring the data. One also asserted that it was unreasonable to subject thousands of additional small depository institutions to a complex and costly rule to collect data on approximately four percent of the small business lending market. Many of commenters suggested higher thresholds, with requests ranging from 100 to 1,000 transactions annually, using the same two-year test. In particular, a large number of commenters requested thresholds at 100, 200, 500, or 1,000 loans annually.

A number of industry commenters supported a 100-loan threshold. Many of these commenters urged the Bureau to set institutional coverage similar to HMDA at that time, both for consistency and because lenders already reporting HMDA data would incur lower compliance costs because they already have data collection systems in place. Moreover, commenters asserted that a 100-loan threshold would still capture an estimated 95 percent of businesses loans in the country.

Conversely, a CDFI lender and two business advocacy groups opposed a 100-loan threshold, arguing that the Bureau's estimates show narrower coverage of small business lending at that threshold level. Another CDFI lender stated that nearly a half billion in lending would be obscured from reporting in its community with a 100-loan threshold.

A credit union trade association stated that a 100-loan threshold was too low. This commenter asserted that researchers draw statistically significant conclusions from HMDA data which covers approximately 90 percent of the mortgage market, and because a 100-loan threshold covers more than that percentage of the small business market, the rule would gather more data than is necessary.

In the context of discussing the rule's threshold, numerous commenters, including community banks, credit unions, and trade associations, along with a group of State bank regulators, cautioned the Bureau regarding the risk of small lenders exiting the market due to the rule's burden. Commenters argued that the rule will damage small institutions' ability to remain competitive and would favor large lenders with large compliance teams. Many commenters stated that small community banks and credit unions lack the staff or resources, including automation capabilities, to comply with the reporting requirements, with numerous institutions sharing the limited number of full-time staff that they had dedicated to business and agricultural lending.

Commenters further argued that Dodd-Frank Act mortgage rules resulted in many community banks leaving the mortgage lending business, and this proposal would produce similar results. For example, several commenters argued that HMDA and TILA–RESPA integrated disclosure rules led to market exodus, and they were concerned that there would be similar market exit of local lenders following the proposed rule implementing section 1071.[492] Commenters stated that communities could be left without a hometown bank and small businesses may seek credit from unregulated lenders. Moreover, two national trade associations stated that about 30 percent of surveyed franchised light-duty and commercial truck dealerships would discontinue small business credit extensions.

Several commenters also argued that the rule would exacerbate bank consolidation, particularly in rural and underserved areas, as the additional regulatory burden on community banks would lead to more mergers and acquisitions. Commenters further asserted that consolidation would reduce lending options for consumers and small businesses, and would discourage some smaller financial institutions from making small business loans. A few commenters stated that the rule would damage relationship banking and create an environment with less competition.

Numerous commenters also asserted that the rule is likely to reduce access to credit, as small banks and credit unions do not have the economies of scale to absorb the reporting costs, and thus compliance costs will be passed

[492] CFPB, *Integrated Mortgage Disclosure Rule Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z)*, 78 FR 80225 (Dec. 31, 2013).

AdminRecord-000103

along to small business customers. Several commenters stated that they would have to reconsider their product offerings. For example, one bank stated that they might need to also reconsider their consumer product offerings and prices, and a credit union stated they might consider reducing lending to avoid being covered by the rule. In addition, one bank stated that they may need to charge additional fees for agricultural borrowers, while another bank stated that they would either need to increase their origination fee or greatly increase the minimum loan amounts. Another bank stated that as operating costs increase, they will be forced to adjust their business model by either increasing interest rates on loans, decreasing interest rates on deposits, or implement other account fees. Moreover, several commenters stated that the 25-loan threshold would limit small business lending flexibility, which could stifle lending innovation and result in lenders choosing to set minimum loan amounts.

In addition, many commenters argued that the 25-loan threshold would have a negative effect on lending in small and rural communities. Commenters stated that small banks, which are vulnerable to increased compliance costs, are often located in rural areas where lending options are limited. Several commenters stated that the rule risks underserved areas being afforded fewer loan options. Commenters further asserted that the rule's regulatory burden would drive consolidation in rural and underserved areas, limiting access to credit in these communities.

Several commenters drew comparisons to HMDA. One bank stated that when it was subject to HMDA reporting, they struggled with compliance and eventually elected to reduce lending. In addition, several commenters asserted that the proposed 25-loan threshold was inconsistent with the reporting threshold of 100 closed-end mortgages in Regulation C at the time. Commenters argued that although their institution was exempt from HMDA reporting, and although their commercial lending unit is small, they would not qualify for the proposed 25-origination exemption from reporting under section 1071. State bankers association stated that half of their survey respondents are exempt from HMDA, while only six believed they would be exempt with a 25-loan threshold. The commenter further stated that these small financial institutions—83 percent under $250 million in assets—have no data collection infrastructure in place. Some other commenters similarly asserted that

many smaller institutions do not have data collection infrastructure in place and stated that they would incur significant costs.

In addition, some commenters asserted that the Bureau did not provide a sufficient rationale for a 25-loan threshold, arguing that the Bureau has not shown why this threshold is necessary and appropriate to carry out section 1071's purposes. Several commenters argued that the Bureau could obtain sufficient data at a higher threshold. Another commenter stated that the Bureau did not fully consider coverage, in particular how much data would be forgone at each threshold. A group of trade associations further asserted that the Bureau is obligated to provide coverage estimates for nondepository institutions and that RFA estimates are not sufficient.

While the Bureau did not propose an asset-based threshold in the proposed rule, numerous industry commenters requested an asset size threshold, ranging from $50 million to $10 billion. However, some industry commenters as well as community groups counseled against an asset-based exemption, arguing that exemptions should be based instead on lending activity, and that size-based exemptions risked under-reporting in important markets. For example, one commenter stated that an asset-based threshold could affect different regions of the country and risk "blind spots" in the data. Some commenters said that assets are not an applicable measurement for many lenders, such as nondepository institutions. A bank trade association stated that asset-based exemptions have been exploited by market disruptors partnering with exempted institutions to create an uneven regulatory playing field.

*Other requested exemptions.* A number of commenters opposed exemptions for specific categories of lenders (consistent with the Bureau's proposal), with several commenters noting that capturing a broad array of lenders is essential for achieving the objectives of section 1071. Some commenters asserted that the rule must apply to government and public sector lenders, merchant cash advance companies, nondepository lenders, non-profit lenders, online lenders, and/or commercial finance providers. A State bankers association stated that the Bureau should specifically name industrial loan companies to make clear that all nonbank entities making small business loans are covered by the rule. Community groups asserted that all lenders are obligated to comply with fair lending laws, and requiring data

disclosure will assist with ensuring compliance. Moreover, several industry commenters stated that a broad definition is important to ensure a level regulatory playing field and to ensure a comprehensive view of the entire small business lending market. A bank trade association urged the Bureau to pay close attention to nonbank lenders, which the commenter stated are roughly 30 percent of the current market and not currently subject to the Bureau's supervision.

In contrast, a large number of industry commenters urged the Bureau to exclude specific types of entities from coverage under the rule. Some requested that certain types of lenders such as credit unions or CDFIs be excluded from the rule entirely, while others requested certain indirect lending/multi-party business models be excluded, such as when applications are made via loan brokers, equipment dealers, or motor vehicle dealers. Numerous industry commenters noted the unique burdens they believed the rule would place on small banks and credit unions, while a subset of these commenters argued that the Bureau should exempt these smaller institutions from the rule altogether.

Several commenters requested an exemption for CDFIs, stating that they are mission-driven institutions and dedicating resources to new regulatory requirements would detract from their community focus. Moreover, some commenters argued that requiring CDFIs to report would be duplicative, as CDFIs already report lending data to the CDFI Fund that shows that they are providing financial products for small businesses in their communities. Commenters further cited the Treasury Department's certification process for CDFIs and stated that CDFIs are already held to a high standard. Several commenters cited that the Bureau decided to exempt CDFIs when implementing the Qualified Mortgage rule. Conversely, a number of community groups argued that the rule must apply to all financial institutions, including CDFIs.

A number of commenters urged the Bureau to exempt community banks from reporting requirements, stating that community banks already incur substantial regulatory burden and would be put at a competitive disadvantage under the rule. Several commenters emphasized the "high-contact and relationship-based business lending model" of community banks. A community bank asserted that community banks should be commended for advancing over 50 percent of the nation's small business loans and over 80 percent of the nation's agriculture loans despite holding less

AdminRecord-000104

than 20 percent of the nation's deposits. Another community bank stated that currently they are not subject to HMDA or CRA reporting requirements and thus this rulemaking poses the threat of significant new burdens on small community banks as well as on those community banks that are already subject to HMDA reporting.

In addition, some commenters stated that covering community banks will have the opposite effect of section 1071's purposes. Commenters asserted that community banks would incur substantial burden in gathering new data, which would make it more burdensome and expensive to offer small business loans, thus raising the cost of credit. A community bank stated that, if adopted as written, the rule's paperwork burden will harm community banks, waste critical resources, and further restrict lending. Another community bank stated that the rule as proposed may very well be the final straw of regulation that will drive small community banks out of business with devastating impact on the small communities they serve. Moreover, commenters argued that the Bureau was designed to regulate large, complex financial institutions, not community banks.

Several commenters also urged the Bureau to exempt credit unions from reporting requirements, stating that credit unions have not demonstrated a pattern of unfair lending, that they seek to help women-owned and minority-owned businesses, and that credit unions are member-owned and not-for-profit. A trade association asserted that credit unions would like to furnish more small business loans, but a reporting regime will increase costs. Some commenters stated that exempting credit unions would allow them to remain competitive lenders and would avoid imposing new burdens on members. In contrast, a number of commenters—including community groups, community-oriented lenders, a business advocacy group, and a bank trade association—opposed special treatment for credit unions, citing a 2020 Federal Reserve study that shows a higher percentage of Black and Hispanic-owned firms sought loans from credit unions and CDFIs. In addition, a commenter stated that 2018–2020 HMDA data show that 73 percent of credit union lending in Mississippi went to white borrowers and 15 percent to Black borrowers.

One farm credit lender stated that Farm Credit System institutions should be exempt from collection and reporting, while another asserted that FCA financial institutions should have

a qualified exemption that permits voluntary reporting. The latter commenter stated that these financial institutions are already reporting lending on Young, Beginning, and Small lending efforts and volume to the Farm Credit Administration. In addition, one commenter asserted that a lack of understanding of the Farm Credit System by the Bureau in this rulemaking will have unintended consequences for their customers. In contrast, a community group urged the Bureau to apply the rule implementing section 1071 to agricultural lenders, stating that historic discrimination against minority and disadvantaged groups has been well documented in agriculture, and including agricultural lenders will hold financial institutions accountable to equitably serving small farms and mid-sized farms, beginning farmers, and historically underserved farmers. Another community group asserted that Farm Service Agency activity should also be covered by the rule.

Several commenters requested an exemption for institutions outside of Metropolitan Statistical Areas, with many specifying that rural institutions should be exempt from the rule. Commenters stated that rural banks and credit unions often play a vital role in their communities and acquiring data from rural lending will result in fewer institutions willing to conduct rural lending. Several industry commenters asserted that the new burden to these institutions will increase the cost of credit, and will be a significant detriment for local small businesses seeking access to credit. A bank argued that many rural loans are small dollar loans to sole proprietors such as farmers and ranchers and without an exemption, the nation's most rural and remote borrowers will have a harder time obtaining credit for their businesses.

Two banks requested exemptions for CRA reporters, arguing that financial institutions subject to Board, FDIC, or OCC regulations under the CRA are already being assessed to ensure that they are identifying and meeting the credit needs of the small businesses in their communities. In addition, one of the banks stated that CRA-examined institutions with at least a satisfactory rating for its two previous exams should be exempt from reporting requirements. In contrast, another commenter opposed exempting CRA reporters, stating that big banks and "shadow lenders" have the most impact on small business lending and have thwarted the effective oversight and enforcement of the CRA.

The Federal Home Loan banks argued that they should be exempt from the

rule, explaining that the proposed definition of covered financial institution inadvertently would capture lending to their financial institution member/borrowers because those members are small businesses. They stated that applying the rule implementing section 1071 to them is unnecessary in light of the comprehensive FHFA regulatory regime that applies to credit extended by the Federal Home Loan banks to their small and diverse financial institution members.

A trade association urged the Bureau to exempt SBA certified development companies from the rule, stating that these financial institutions are certified and regulated by the SBA and have a mission to assist small businesses with access to capital, including businesses in underserved communities. In addition, two development companies stated that they do not have the budget to incur these new reporting costs.

A few commenters requested an exemption for minority depository institutions. A national trade association asserted that Congress has determined that such institutions play an important role in serving underserved communities and minority populations, the intent behind section 1071 is already met by minority depository institutions, and therefore, the rule should not redundantly be applied to this special class of financial institutions. One bank stated that minority depository institutions are mission-driven to support their communities, while another bank asserted that these institutions are certified by the Treasury Department for serving historically underserved communities and/or low-to-moderate income Americans.

A trade association stated that retailers by their very nature are not financial institutions and thus should not be covered by the rule. The commenter further argued that applying this rule to retailers will have a negative impact on retail employees and customers as offering credit at retail could be reduced or eliminated, affecting overall access to credit. Moreover, the commenter stated that the retail environment is different from a typical bank, in that employees are not trained in the specifics of financial products, and the environment may not be practical for obtaining more sensitive information.

Two trade associations requested an exemption for loan brokers. One argued that there could be duplicative or inaccurate reporting in cases where technology companies match an applicant with multiple third-party

lenders. The other argued that it is appropriate to have a similar approach to HMDA and data can be obtained from the lender instead of the broker.

Several commenters urged the Bureau to exempt indirect lending transactions where the applicant interacts only with a vendor partner, such as equipment dealers and manufacturers. Commenters argued that the financial institution does not directly interact with the applicant, only the dealer or manufacturer, and thus the fair lending purpose of section 1071 would not be furthered. A trade association asserted that such an exemption would be consistent with the Bureau's proposed approach to motor vehicle dealers. A business advocacy group stated that, alternatively, there should be flexibility with respect to the timing and collection of this information. They further argued that the equipment dealer or manufacturers' employees are not trained staff for the financial institution and the data may be less accurate.

Some commenters stated that indirect auto lenders should be exempt from the rule. One commenter stated that the Bureau should exclude motor vehicle dealers, and by extension, financial institutions when they are working with motor vehicle dealers. Two commenters stated that while indirect lenders may be involved in credit decisions, compliance with the rule would be difficult, as the financial institutions that evaluate and purchase the auto loan never meet the applicant. One also said that it was unclear what information indirect lenders would be required to gather.

In addition, two motor vehicle dealer trade associations urged the Bureau to exempt motor vehicle dealers. They argued that collecting new data will slow applications, raise compliance burden, and increase the risk of inaccurate data. They stated that motor vehicle dealers do not have the resources to comply with a rule in the manner that a financial institution would. Moreover, they stated that survey data indicates 30 percent of dealers might choose to leave the market rather than face these compliance costs. Two other trade associations pointed to Board regulations implementing ECOA and argued that the dealer would be prohibited under the law from asking the business owner for ethnicity, race, and sex demographic data. In addition, a bank expressed confusion over how a covered financial institution can require an exempt motor vehicle dealers to collect 1071 data. Another commenter noted that many dealers act as intermediaries between buyers and financial institutions, and requested that

the Bureau work with small motor vehicle dealers to make the direct and indirect impacts of the rulemaking the least burdensome possible.

One State bankers association asserted that much valuable small business lending data will not be captured given the Dodd-Frank Act exclusion for motor vehicle dealers and urged the Bureau to advocate in Congress as necessary to include them in the rule.

A trade association urged the Bureau to exempt captive vehicle partners from reporting, arguing that these institutions are inextricably tied to entities that are exempt. The trade association further argued that it would be confusing in terms of reporting responsibility, as there are many creditors involved in a single loan and its subsequent assignment, and the finance partner does not directly interact with the applicant. Furthermore, the commenter stated that a lack of regulatory relief could lead to market exit and that captive finance companies are crucial to the economy.

Commenters urged the Bureau to exempt a variety of other entities, including institutions outside of direct CFPB supervisory authority, mission-driven banks, and financial institutions that identify as small businesses. In addition, some commenters urged the Bureau to adopt exemptions similar to HMDA using exemption factors such as asset size, location test, federally related test, and loan activity. One merchant cash advance provider stated that merchant cash advance funders should not be considered covered financial institutions because they do not extend credit or provide loans.

In addition, several commenters cited the firewall requirement and said that certain financial institutions should be exempted from the entire rule due to the challenges associated with the statutory firewall provision. One commenter said that banks under $1 billion should be exempted on this basis, a few said community banks should be exempted on this basis, and one commenter said that all but the largest lenders or all depository lenders should be exempted.

*Two-year threshold measurement period.* Commenters who addressed the issue were in support of a two-year threshold measurement period, with one community group citing its consistency with CRA and HMDA.

Final Rule

For the reasons set forth herein, the Bureau is revising § 1002.105(b) to set the activity-based coverage threshold at 100 originations in each of the two preceding calendar years, rather than 25 originations as proposed. The Bureau is

also finalizing its proposal not to exempt particular types of institutions from the rule. The Bureau believes that a 100-loan activity threshold achieves section 1071's purposes while minimizing any risk that low volume small business lenders would reduce their lending activity. The Bureau is adding comments 105(b)–3 and -4, as explained below, as well as making other minor revisions to the commentary for additional clarity.

The Bureau is finalizing § 1002.105(b) pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071 and its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

*Activity-based exemption.* The activity-based threshold for coverage in the final rule will provide a simple basis for financial institutions that infrequently lend to small businesses to determine whether they have conducted sufficient lending activity as to be required to collect and report data under the final rule. Furthermore, in comparison to an asset-based exemption or a dollar-volume threshold, the Bureau believes that an activity-based exemption is a more compelling basis for exempting certain financial institutions from coverage in light of section 1071's business and community development purpose.

While several commenters expressed support for an asset-based threshold or a dual asset-based and activity-based threshold, the Bureau believes an activity-based threshold is considerably less complex. Moreover, small business lending activity is more directly related to a given financial institution's role in the small business lending market than a measurement of the financial institution's size as measured in total assets.

In addition, the Bureau believes that an activity-based exemption is a superior approach to a size-based exemption because an exemption based on asset size would apply only to depository institutions. The Bureau is unaware of a similar size metric for nondepository institutions, and commenters did not offer one. In addition, the Bureau agrees with commenters who stated that an asset-based exemption approach might create an uneven playing field and might risk

AdminRecord-000106

presenting a cost disadvantage for other small financial institutions.

Moreover, exempting proportionately more depository institutions than nondepository institutions may present a challenge to the comprehensiveness of the small business applicants' demographic data collected under section 1071 as well as to the lending by different types of lenders. A recent small business credit survey revealed racial disparities in applications under the SBA's Paycheck Protection Program: the data showed white-owned firms were most likely to apply for a loan through a small bank (defined as under $10 billion in assets), while Black-owned firms were three times as likely as white-owned firms to apply for a loan through an online lender.[493] Exempting depository institutions using an asset-based threshold and not similarly exempting nondepository institutions could run counter to the purposes of section 1071 and undermine the utility of the data, as well as the purposes of the Bureau, which are, in part, "to implement and, where applicable, enforce . . . consistently" Federal laws including ECOA.[494]

A few commenters asserted that an activity-based threshold could encourage lenders to deny applications or reduce their lending to stay under the threshold. These are speculative fears, but to the extent that institutions intend to take such action, the Bureau reminds financial institutions that inconsistencies in the way an institution applies its policies could give rise to a fair lending violation under ECOA. Denied applications must indicate the principal reason(s) for the adverse action, as required by § 1002.9(b)(2).

Regarding a commenter's concern about potential evasion of the activity-based threshold through the creation of subsidiaries, see the section-by-section analysis of § 1002.109(a)(2) which addresses reporting by subsidiaries.

*Counting originations.* The Bureau agrees with commenters who asserted that using a coverage threshold based on the number of originations rather than applications for purposes of defining a covered financial institution is the better approach. As one commenter pointed out, many financial institutions are already familiar with this approach due to its consistency with CRA and HMDA. Using originations provides a clear and readily identifiable metric for financial institutions. One commenter stated that the Paycheck Protection Program and similar future government

programs should be exempt from the threshold. As discussed above, the Bureau is not exempting specific government programs from the activity-based threshold. However, by the time this rule is effective and implemented, lending activity conducted pursuant to the Paycheck Protection Program will have long since ceased and such loans will not be included in origination counts, rendering such commenter concerns moot.

In addition, the Bureau agrees with commenters who stated that additional credit amounts, such as line increases, should not count as a separate origination for purposes of counting the activity-based threshold. Financial institutions may receive multiple requests for additional credit amounts on existing accounts in any given year and such activity may make it more difficult for institutions to determine coverage under the rule. In order to address this issue, the Bureau is adding comment 105(b)–5 which clarifies that for purposes of determining coverage under § 1002.105(b), requests for additional credit amounts on an existing account are not counted as originations.

Moreover, as discussed in § 1002.106(b)(2), every five years the gross annual revenue threshold used to define a small business in § 1002.106(b)(1) shall be adjusted, if necessary, to account for inflation. The first time such an update could occur is early 2030, with an effective date of January 2031. The Bureau is adding comment 105(b)–4 to clarify how financial institutions reporting data should count originations in this situation, explaining that a financial institution seeking to determine whether it is a covered financial institution applies the gross annual revenue threshold that is in effect for each year it is evaluating.

*Two-year threshold measurement period.* Consistent with commenters who addressed the issue, the Bureau believes that a two-year threshold period is advisable to minimize uncertainty surrounding data collection responsibilities.

*Activity threshold level.* Supporters of the 25-loan threshold and supporters of the 100-loan threshold each argued that the Bureau should set the threshold with reference to the HMDA threshold for closed-end loans. Given the differences in statutory authorities and between home mortgages and small business loans, the Bureau does not believe that the activity-based

thresholds implementing HMDA and section 1071 must be the same.[495]

Table 1 below provides the Bureau's estimated share of depository institutions, estimated share of small business loans from those institutions (measured in total number of loans), and estimated share of small business credit from those institutions (measured in dollars) that would be covered by a loan-volume threshold of 25, 50, or 100 small business loans. This information is based on FFIEC and NCUA Call Reports, as well as CRA submissions.[496] The Bureau estimates that a depository institution is covered for a particular loan-volume threshold as of 2019 if the estimated number of originations for that institution exceeded the threshold in both 2017 and 2018. Given the limitations of the existing source data (limitations acknowledged by the congressional mandate of section 1071), the Bureau cautions that these estimates cannot provide a complete sense of the possible consequences of adopting each particular threshold. These estimates apply only to depository institutions.[497]

---

[493] Small Business Credit Survey of Firms Owned by People of Color at 14.

[494] 12 U.S.C. 5511(a).

[495] The Bureau's 2015 HMDA Rule set the closed-end loan threshold at 25 originated loans for each of the two preceding calendar years. Then, in 2020, the Bureau increased the threshold to 100 closed-end loans, effective the same year. However, in September 2022, the United States District Court for the District of Columbia vacated the 2020 HMDA Rule's increased reporting threshold for closed-end mortgage loans as arbitrary and capricious under the Administrative Procedure Act. *Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau,* No. 20–cv–2074, 2022 WL 4447293 (D.D.C. Sept. 23, 2022).

Accordingly, the threshold for reporting data about closed-end mortgage loans is 25, which was the threshold set by the 2015 HMDA Rule. The court upheld the 2020 HMDA Rule's increase in the open-end credit threshold.

*See also* CFPB, Home Mortgage Disclosure (Regulation C); Judicial Vacatur of Coverage Threshold for Closed-End Mortgage Loans, Technical Amendment, 87 FR 77980 (Dec. 21, 2022), *https://files.consumerfinance.gov/f/ documents/cfpb_judicial-vacatur_technical-amendment_2022-12.pdf.*

[496] On the bank Call Report and in the Community Reinvestment Act data, for small bank and small farm loans, banks report on business loans with original amounts of $1 million or less and farm loans with original amounts of $500,000 or less. For lines of credit or loan commitments, banks report the size of the line of credit or commitment when it was most recently approved. Banks include loans guaranteed by the SBA and other government entities in their small loans to businesses. Banks do not report loans to nonprofit organizations in this category. Thus, these data collections would include loans made to purchase, for example, individual vehicles and pieces of equipment for the nation's largest businesses.

[497] Under these data collections, banks report small loans made to businesses and farms (regardless of the borrower's size). Credit unions report commercial loans over $50,000 made to members (also, regardless of the borrower's size). The methodologies and assumptions used to produce these estimates are further documented in the *Supplemental estimation methodology for institutional coverage and market-level cost*

AdminRecord-000107

TABLE 1—ESTIMATED DEPOSITORY INSTITUTION COVERAGE BY LOAN VOLUME (AS OF 2019)

| Coverage category | 25 Loans | 50 Loans | 100 Loans |
|---|---|---|---|
| Institutions Subject to Reporting .... | 38%–40% of all depository institutions [498]. | 27%–30% of all depository institutions. | 17%–19% of all depository institutions. |
| SBL Institutions Subject to Reporting [499]. | 63%–67% of SBL depository institutions. | 46%–50% of SBL depository institutions. | 29%–32% of SBL depository institutions. |
| Banks and Savings Associations (SAs) Subject to Reporting. | 70%–73% of all banks and SAs [500]. | 52%–56% of all banks and SAs ... | 33%–36% of all banks and SAs. |
| SBL Banks and SAs Subject to Reporting. | 71%–75% of SBL banks and SAs | 53%–57% of SBL banks and SAs | 33%–37% of SBL banks and SAs. |
| Credit Unions Subject to Reporting | 7% of all credit unions [501] .............. | 4% of all credit unions ................. | 2% of all credit unions. |
| SBL Credit Unions Subject to Reporting. | 31% of SBL credit unions ............. | 18% of SBL credit unions ............. | 8% of SBL credit unions. |
| Share of Total Small Business Credit by Depository Institutions (Number of Loans Originated Captured). | 98.3%–98.6%  ................................ | 96.7%–97.3%  ................................ | 94.2%–95.1%. |
| Share of Total Small Business Credit by Depository Institutions (Dollar Value of Loans Originated) Captured. | 95.3%–96.0%  ................................ | 89.4%–91.0%  ................................ | 81.0%–83.0%. |

Table 1 above shows that as the loan-volume threshold rises, the estimated share of depository institutions subject to section 1071 decreases substantially. Likewise, the estimated share of small business loans and small business credit captured by the rule would also decrease, although those decreases are less pronounced. The Bureau has no information for nondepository institutions (other than for Farm Credit System institutions based on their Call Report data [502]) such that the Bureau could provide similar estimates for comment. The Bureau requested in the NPRM such information and data that might bear on any activity-based exemption for nondepository institutions and did not receive any substantive information.

The Bureau notes that the above estimates represent small business lending data prior to the COVID–19 pandemic and ensuing policy responses. The Bureau is keenly aware that many financial institutions, including those that may not have historically participated actively in small business lending, served their communities by becoming participating lenders in the SBA's Paycheck Protection Program. This program ended on May 31, 2021. Because financial institutions' initial determinations of whether they are covered under this final rule, and if so into which compliance date tier they fall, will be based on 2022 and 2023 originations (see final § 1002.114(b)), institutions' Paycheck Protection Program lending activity will not factor into whether a given financial institution qualifies as a covered financial institution because such lending ceased in May 2021.

After considering the feedback from commenters, the Bureau seeks to minimize impact on the financial institutions with the lowest volume of small business lending due to the fixed costs of coming into compliance with this final rule. Numerous industry commenters cautioned the Bureau regarding the risk of market disruption due to the rule's burden and cost. Many argued that the relatively large fixed cost of complying with section 1071's data collection and reporting requirements would significantly increase the cost of small business credit. Commenters argued that the rule will damage small institutions' ability to remain competitive, would hasten consolidation, and would favor large lenders with large compliance teams. A number of lenders discussed the ways in which they may be forced to limit their lending, particularly in rural and underserved areas. Several lenders asserted that a 100-loan threshold was preferable, in part because HMDA reporters already have data collection infrastructure in place.

The Bureau stated in the NPRM that it was also considering a 50 or 100 origination threshold. After consideration of the comments, the Bureau believes that a 100-loan activity threshold is more appropriate. The Bureau believes that this adjustment will best address widespread industry concerns regarding compliance burdens for the smallest financial institutions and that it is consistent with the purposes of section 1071. A 100-loan threshold will ease compliance burdens for the smallest financial institutions and will still capture the overwhelming majority of the small business lending market, including the majority of agricultural lending. As demonstrated in Table 1, a 100-loan threshold captures nearly 95 percent of the share of small business loans originated by depository institutions. In short, while a 100-loan origination threshold decreases data coverage in comparison to a 25-loan origination threshold, a 100-loan origination threshold massively expands data availability relative to the status quo.[503]

*Other requested exemptions.* The Bureau agrees with commenters who

---

estimates in the small business lending rulemaking. This document is available at *https://https.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/*.

[498] There were 10,525 depository institutions as of December 31, 2019, including 112 credit unions that are not Federally insured.

[499] A depository institution is considered an "SBL institution" if it has any small business loans on its balance sheet.

[500] Based on FFIEC Call Report data, there were 5,177 banks and savings associations as of December 31, 2019.

[501] Based on the 2019 NCUA Call Report data, there were 5,348 credit unions as of December 31, 2019, including 112 credit unions that are not Federally insured.

[502] To estimate the number of Farm Credit System (FCS) members covered by the final rule, the Bureau considers the Young, Beginning, and Small Farmers Reports for all Farm Credit System lenders as of December 31, 2019. For the purposes of

estimating coverage, the Bureau assumes that all loans made by FCS members to farmers are covered loans. Thus, the Bureau estimates that the rule will cover almost all FCS small business loans.

[503] See part IX.H below for additional analysis on coverage of rural vs. non-rural depository institution branches. The Bureau notes that it has no data on the geography of lending for all depository institutions. Furthermore, commenters provided no additional data. As such, the Bureau is unable to estimate coverage of rural vs. non-rural small business loans.

AdminRecord-000108

**35258**    **Federal Register**/Vol. 88, No. 104/Wednesday, May 31, 2023/Rules and Regulations

urged broad coverage of financial institutions under the rule. The Bureau believes that, in light of the text and purposes of section 1071, the Bureau should generally adopt the posture that all manner of small business lenders should be subject to reporting. The Bureau is not categorically exempting any particular type of financial institution from coverage. The Bureau believes that exemptions for any category of financial institution—whether credit unions, community banks, CDFIs, minority depository institutions, government lenders, non-profit lenders, agricultural lenders, retailers, or merchant cash advance providers—would create significant gaps in the data and would create an uneven playing field between different types of institutions. Inclusion of data from not-for-profit lenders is likely to be particularly helpful in identifying further opportunities for business and community development, including by for-profit creditors. Moreover, the Bureau believes that most policy arguments made by industry for being exempt from this rule are better addressed by adjusting the activity-based threshold to 100 originated loans. The higher activity threshold will help minimize compliance costs for all types of smaller financial institutions with lower lending volumes but still result in a comprehensive dataset that furthers section 1071's statutory purposes.

Comment 105(a)–2 refers to § 1002.101(a) to reiterate the statutory exclusion for motor vehicle dealers. Given the statutory exclusion, motor vehicle dealers are not required to report small business lending data to the Bureau. See the section-by-section analysis of § 1002.109(a)(3) for further discussion on reporting obligations where multiple financial institutions are involved in a covered credit transaction, including indirect lending transactions.

With respect to addressing the particularities of certain lending models, the Bureau is not categorically exempting particular financial institutions from coverage. The Bureau is, however, providing clarification regarding how reporting rules apply to certain covered credit transactions and is also not covering certain transactions. See the section-by-section analyses of §§ 1002.104(b) and 1002.109(a)(3). Regarding the request by some commenters to be exempted from this rule due to the statutory firewall requirement, see the section-by-section analysis of § 1002.108.

## Section 1002.106   Business and Small Business

ECOA section 704B(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[504] The Bureau is defining a small business consistent with the statutory language. In particular, the Bureau is defining a small business to have the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented by 13 CFR 121.101 through 121.107. Notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of subpart B, the Bureau is providing that a business is a small business if its gross annual revenue for its preceding fiscal year is $5 million or less. The SBA Administrator has approved the Bureau's use of this alternate small business size standard pursuant to the Small Business Act.[505] The Bureau has also obtained approval for this gross annual revenue threshold to adjust, if need, for inflation or deflation every five years (after January 1, 2025) using the Consumer Price Index for All Urban Consumers (U.S. city average series for all items, not seasonally adjusted), rounded to the nearest multiple of $500,000.

Under the final rule, financial institutions will need to consider whether an applicant is a business under § 1002.106(a) and if the applicant is a business, whether it is small under § 1002.106(b). The Bureau believes that these definitions implement the statutory language of section 1071 while reflecting the need for a wide variety of financial institutions to apply a simple, broad definition of a small business that is practical across the many product types, application types, technology platforms, and applicants in the market.

For the reasons set forth below, the Bureau is adopting § 1002.106 to implement ECOA section 704B(h)(2) and pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071.

### 106(a) Business

#### Background

ECOA section 704B(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[506] The Small Business Act provides a general definition of a

"small business concern," authorizes the SBA to establish defined size standards for use by all agencies, and permits an agency to request SBA approval for a size standard specific to an agency's program. The SBA's regulations define a "business concern" as "a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor."[507]

#### Proposed Rule

Proposed § 1002.106(a) would have defined a business as having the same meaning as the term "business concern or concern" in 13 CFR 121.105. This proposed definition is consistent with ECOA section 704B(h)(2), which defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[508] The SBA issued 13 CFR 121.105, entitled "How does SBA define 'business concern or concern,'" pursuant to the Small Business Act. The Bureau referred to the entirety of that section for additional information. In particular, the Bureau noted that this definition would include elements such as being "a business entity organized for profit" that has "a place of business located in the United States" and "operates primarily within the United States or . . . makes a significant contribution to the U.S. economy."[509]

The Bureau sought comment on its proposed definition of a business, and generally sought comment on whether additional clarification is needed.

#### Comments Received

Comments received focused primarily on the Bureau's proposed business size standard, which are discussed in the section-by-section analysis of § 1002.106(b) below. The Bureau did receive some comments, however, on its proposed approach to the definition of business concern from a few banks, trade associations, a business advocacy group, and an online lender. These commenters requested that the Bureau consider certain modifications or adjustments to the definition of a business concern, such as clarifying that the term does not include non-profit entities, government agencies, certain trusts, foreign entities, and certain real estate holding companies.

---

[504] 15 U.S.C. 632.
[505] 15 U.S.C. 632(a)(2)(C).
[506] 15 U.S.C. 632.

[507] 13 CFR 121.105.
[508] 15 U.S.C. 632.
[509] 13 CFR 121.105(a)(1).

AdminRecord-000109

One bank generally supported the proposed definition but requested clarification that the definition of business concern excludes "passive businesses" and non-natural borrowing entities that are established by applicants solely for tax, anonymity, and other such purposes not intended to earn profit from business production, operations, or service delivery. This commenter noted that it is common for consumer borrowers to establish limited liability companies or trusts solely to acquire properties and conduct similar transactions, or for use in remaining anonymous to preserve their physical safety, and requested that these scenarios be explicitly excluded because these entities' obligations and contributions do not align with those of small businesses.

A few commenters recommended that applications from nonprofit organizations also be exempted. A few commenters specifically requested the Bureau exclude any not-for-profit organizations, which might include non-operating entities, holding companies, trusts, special purpose vehicles, pass-through entities, holding companies that are not organized for profit, and limited liability companies that are not formed for business purposes.

Two commenters asked the Bureau to confirm that public agencies and government institutions are excluded from the coverage of the final rule. One commenter asked the Bureau to exclude foreign-owned entities from the final rule. A bank asked for clarification on whether a "small business" can be taxed under the owner's Social Security number (as opposed to an employer identification number) or whether people that have a "hobby" business or farm that report income under Schedule C or F within their tax returns are considered a small business.

A trade association suggested the Bureau exclude applications from trusts (which could be a single purpose trust, such as a land trust that is established only to hold specific real estate, a traditional estate planning vehicle or, though more infrequently, a business trust) from coverage under the final rule. This commenter stated that including trusts could raise difficult issues regarding who should be considered for data collection purposes (the settlors, beneficiaries, trustees or some combination thereof), what is the "net profit or loss" of the trust, as well as who is entitled to that net profit or loss. The commenter argued that such burdens would not be justified by the minimal information that would be

generated with respect to reporting of lending to trusts.

One commenter argued for the inclusion of a test that would discern between independent contractors and what it called "actual" small businesses, as it believes that the credit needs and experiences of independent contractors and many small businesses can differ greatly. Another suggested the Bureau confirm that the proposed definition of "small business" excludes subsidiaries of large corporate entities.

A trade association for community banks recommended the Bureau exclude farms from the definition of "small business," arguing that the underwriting criteria for small farm loans differ from other small business loans and that this distinction is acknowledged in several Federal laws such as CRA and HMDA. This commenter argued that the proposed originations-based coverage threshold would likely lead to many small lenders reducing their agricultural lending below the threshold, thereby limiting the access to credit for small farms, and concluded that an exemption was needed to acknowledge the uniqueness of agricultural lending.

Final Rule

For the reasons discussed herein, the Bureau is finalizing § 1002.106(a) as proposed, to define the term business as having the same meaning as the term "business concern or concern" in 13 CFR 121.105.

As noted above, this definition includes elements such as being "a business entity organized for profit" that has "a place of business located in the United States" and "operates primarily within the United States or . . . makes a significant contribution to the U.S. economy." [510] This definition also provides that a business concern may take a number of different legal forms, including a trust, sole proprietorship, partnership, limited liability company, corporation, joint venture, or cooperative, except that where the form is a joint venture there can be no more than 49 percent participation by foreign business entities in the joint venture.[511] The Bureau is not providing interpretations of this SBA regulation in subpart B, as requested by some commenters, because the Bureau believes that existing SBA interpretations are responsive to commenters' request for clarification. For example, financial institutions are not required to collect and report data for not-for-profit applicants, because they are not "organized for profit" and

are thus not a "business concern." [512] Moreover, the Bureau expects that applications from foreign businesses will fall outside the scope of the rule's data collection and reporting requirements unless they have a place of business located in the United States and they either operate primarily within the United States or they make a significant contribution to the U.S. economy through payment of taxes or use of American products, materials, or labor.

The Bureau also does not believe it would be appropriate to deviate from the term "business concern or concern" in 13 CFR 121.105 by adopting additional exclusions such as one for passive businesses. As discussed above, section 1071 defines small business as referring to the definition of small business concern in section 3 of the Small Business Act. The Bureau thus must look to this definition, and the SBA's implementing regulations, in defining both a business and a small business for purposes of this final rule. (The SBA Administrator's approval for the Bureau's alternate size standard for this rulemaking is discussed in the section-by-section analysis of § 1002.106(b) below.)

In addition, the Bureau believes that covering applications from all types of businesses in its rule (including passive businesses [513] and non-operating entities) is important for advancing both of section 1071's statutory purposes. The Bureau is thus not adopting such exclusions requested by commenters. However, because the Bureau understands that passive businesses and non-operating entities are generally affiliated with other businesses (for example as subsidiaries of large corporate entities), and because financial institutions are permitted to consider affiliate revenue in determining whether a business is small for purposes of this rule, the Bureau anticipates that applications from most

---

[510] 13 CFR 121.105(a)(1).
[511] 13 CFR 121.105(b).

[512] *See id.,* which states that a business concern may be in the legal form of an individual proprietorship, partnership, limited liability company, corporation, joint venture, association, trust or cooperative, except that where the form is a joint venture there can be no more than 49 percent participation by foreign business entities in the joint venture.

[513] The SBA defines a business as passive if: (i) it is not engaged in a regular and continuous business operation (the mere receipt of payments such as dividends, rents, lease payments, or royalties is not considered a regular and continuous business operation); or (ii) its employees are not carrying on the majority of day to day operations, and the company does not provide effective control and supervision, on a day to day basis, over persons employed under contract; or (iii) it passes through substantially all of the proceeds of the financing to another entity. 13 CFR 107.720(b)(1).

AdminRecord-000110

of these kinds of businesses ultimately will not be reportable since many such businesses will not be "small" businesses under the rule implementing section 1071. (See the section-by-section analysis of § 1002.106(b) for additional related discussion.)

The Bureau does not agree that trusts must be excluded, as suggested by one commenter, on the grounds that covering applications from trusts could raise difficult issues regarding who should be considered the principal owner for data collection purposes. Treatment under the final rule differs, for certain data points, based on whether the applicant's owner is a trust or whether the applicant itself is a trust. When a financial institution seeks to extend credit to a small business applicant whose ownership interests or assets are owned by a trust, the trust or trustee often needs to be the applicant for the credit. In such situations, because only individuals who are direct owners are considered principal owners under final § 1002.102(o), entities such as trusts would not be principal owners and thus the financial institution would not need to collect or report principal owners' ethnicity, race, and sex or the number of principal owners. And as outlined in new comment 102(o)–2, if the applicant for a covered credit transaction is a trust, a trustee is considered the principal owner of the trust for reporting purposes. The Bureau also notes that only a trust organized for profit would meet the definition of a "business concern" and fall within the scope of the rule. The Bureau believes that these clarifications sufficiently address the commenter's concerns and that covering different types of business structures in its final rule is important for advancing both of section 1071's statutory purposes. Thus, the Bureau is not defining business in a way that would exclude trusts from the final rule.

In response to comments asking the Bureau to confirm that public agencies and government institutions are excluded from the coverage of the final rule, the Bureau notes that an express exclusion for extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities is not necessary because such governmental entities do not constitute businesses under the final rule. Specifically, government entities are not "organized for profit" and are thus not a "business concern" under final § 1002.106(a).

With respect to the suggestion that the Bureau develop a test to identify independent contractors (and presumably exclude them), the Bureau notes that it is not requiring financial institutions to collect or report an applicant's business structure. Independent contractor arrangements can take many forms; the Bureau does not believe it would be appropriate to exclude from coverage under section 1071, for example, a business that acts as an independent contractor to another business, simply by virtue of that arrangement. Finally, the Bureau notes that the SBA has routinely treated independent contractors as business concerns [514] and based on both of section 1071's statutory purposes, the Bureau is not convinced that it should define business in a way that would deviate from the SBA's approach and exclude independent contractors from the final rule.

In response to a commenter's request for clarification on whether a "small business" can be taxed under the owner's Social Security number (as opposed to an employer identification number) or whether people that have a "hobby" business or farm that report income under Schedule C or F within their tax returns are considered a small business, the Bureau notes that generally, tax documentation is not dispositive for the SBA's definition of a small business concern. In many instances (for example, with startup businesses), the business may not have any tax returns available or the business may be a sole proprietorship that is taxed with its owner's Social Security number. As long as the business is a "small business concern" in 15 U.S.C. 632(a) (as implemented in 13 CFR 121.101 through 121.107) and its gross annual revenue for its preceding fiscal year is $5 million or less, it is a small business under this final rule.

For reasons discussed in the section-by-section analysis of § 1002.104(a), the Bureau is not adopting a categorical exclusion for farms from the definition of "small business." Credit used for agricultural purposes is generally covered by the broad definition of "credit" under ECOA. ECOA's definition of credit is not limited to a particular use or purpose and Regulation B expressly covers agricultural-purpose credit; ECOA does not provide an exception for agricultural credit; and it assigns enforcement authority to regulators of agricultural lending such as the Secretary of Agriculture and the Farm Credit Administration.[515] Moreover, agricultural businesses are encompassed in section 1071's statutory definition of small business.[516] With respect to the concerns that the Bureau's proposed originations-based threshold would likely lead to many small lenders reducing their agricultural lending below the exemption threshold, the Bureau notes that it is increasing the exemption threshold as discussed in the section-by-section analysis of § 1002.105(b) above. Moreover, the Bureau believes that covering agricultural businesses in its rule is important for advancing both of section 1071's statutory purposes, particularly given historical and/or continuing discrimination against Black farmers and the need for transparency into agricultural lending both for fair lending enforcement and business and community development. The Bureau is thus not defining small business in a way that would exclude such businesses from the final rule.

106(b) Small Business Definition

106(b)(1) Small Business

Background

*Section 1071 data collection purposes, requirements, and potential impacts.* A key component of the Bureau's fair lending work under the Dodd-Frank Act is to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[517] Section 1071 of the Dodd-Frank Act, which amended ECOA, requires financial institutions to collect and report to the Bureau data regarding applications for credit for women-owned, minority-owned, and small businesses. ECOA section 704B(h)(2) states that "[t]he term 'small business' has the same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632)." Section 1071 was adopted for the dual statutory purposes of facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business needs and

---

[514] For example, in an interim final rule implementing changes related to loans made under the Paycheck Protection Program, the SBA stated "SBA has determined that changing the calculation for sole proprietors, *independent contractors,* and self-employed individuals will reduce barriers to accessing the [Paycheck Protection Program] and expand funding *among the smallest businesses.*" 86 FR 13149, 13150 (Mar. 8, 2021) (emphasis added).

[515] *See* 15 U.S.C. 1691c; Regulation B § 1002.16(a).

[516] ECOA section 704B(h)(2) (defining a small business as having the same meaning as the term "small business concern" in section 3 of the Small Business Act (15 U.S.C. 632)). Section 704B(h)(2) defines small business by reference to the Small Business Act definition of a small business concern, which includes independently owned and operated "enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries." 15 U.S.C. 632(a)(1).

[517] *See* 12 U.S.C. 5493(c)(2)(A).

opportunities of women-owned, minority-owned, and small businesses.[518]

As set forth in section 1071, the data that financial institutions are required to collect and report to the Bureau include, among other things, the gross annual revenue of the business in its preceding fiscal year, the type and purpose of the loan, the census tract for the applicant's principal place of business, and the ethnicity, race, and sex of the principal owners of the business.[519] ECOA section 704B(f)(2)(C) further provides that information compiled and maintained under the statute shall be "annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." The Bureau believes the collection and subsequent publication of robust and granular data pursuant to section 1071 regarding credit applications for small businesses will provide much-needed transparency to an otherwise opaque market and help ensure fair, equitable, and nondiscriminatory access to credit.

The Bureau understands that access to fair, equitable, and nondiscriminatory credit is crucial to the success of small businesses. Small businesses— including women-owned and minority-owned small businesses—need access to credit to smooth out business cash flows and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth. The market these businesses turn to for credit is vast, varied, and complex. Overall, small businesses have many options when it comes to financing, including a wide range of products and providers. Yet market-wide data on credit to small businesses remain very limited, particularly with respect to applicants' protected demographic information at the core of section 1071. The Bureau believes that its rulemaking implementing section 1071 of the Dodd-Frank Act will provide critical data for financial institutions, community groups, policy makers, and small businesses.

*SBA size standards.* The Small Business Act permits the SBA Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business, which may be based on the number of employees, dollar volume of business, net worth, net income, a combination of these, or other appropriate factors.[520]

As implemented by the SBA, these size standards generally hinge on average annual receipts or the average number of employees of the business concern and are customized industry-by-industry across 1,012 6-digit NAICS codes. Specifically, the SBA typically uses two primary measures of business size for size standards purposes: (i) average annual receipts [521] for businesses in services, retail trade, agricultural, and construction industries, and (ii) average number of employees for businesses in all manufacturing, most mining and utilities industries, and some transportation, information and research and development industries.[522] To measure business size, the SBA also uses financial assets for certain financial industries, and for the petroleum refining industry it uses refining capacity and employees. The SBA's size standards are used to establish eligibility for a variety of Federal small business assistance programs, including for Federal government contracting and business development programs designed to assist small businesses in obtaining Federal contracts and for the SBA's loan guarantee programs, which provide access to capital for small businesses that are unable to qualify for and receive conventional loans elsewhere.

Under the Small Business Jobs Act of 2010,[523] the SBA is required to review all size standards no less frequently than once every five years.[524] The SBA's lowest size standards based on average annual receipts are currently used for agricultural industries. At the time of the Bureau's NPRM, the SBA used a $1 million average annual receipts standard for 46 out of 64 agricultural industries.[525]

The SBA has since maintained or increased its size standards across all industries. Following the SBA's implementation of revised size standards in May and June 2022 [526] and

its inflation adjustment of monetary-based industry size standards in November 2022,[527] a $1 million standard is no longer used for any industry. The size standards for agricultural industries now range from $2.25 million to $34 million, and the size standards for non-agricultural industries now range from $8 million to $47 million. In April 2022, the SBA also proposed increasing 150 size standards for businesses in manufacturing and other sectors (excluding wholesale trade and retail trade) that are based on the number of employees.[528] The SBA also increased size standards for 57 industries in the wholesale trade and retail trade sectors.[529]

The Small Business Act further provides that no Federal agency may prescribe a size standard for categorizing a business concern as a small business concern absent approval by the SBA Administrator.[530] The SBA's rule governing its consideration of other agencies' requests for approval of alternate size standards requires that the agency seeking to adopt an alternate size standard consult in writing with the SBA's Division Chief for the Office of Size Standards in advance of issuing an NPRM containing the proposed alternate size standard.[531] The Bureau met this requirement and also provided a copy of the published NPRM to the Division Chief for the Office of Size Standards. The Bureau subsequently obtained approval from the SBA Administrator for its alternate small business size standard contained in this final rule.

*Market considerations.* A wide variety of financial institutions, with varying levels of sophistication and experience, extend credit to small businesses. This rulemaking applies to a broad range of financial institutions. Banks and credit unions that serve a breadth of customers

---

[518] ECOA section 704B(a).

[519] ECOA section 704B(e)(2).

[520] 15 U.S.C. 632(a)(2)(A) and (B).

[521] Effective January 6, 2020, the SBA changed its regulations on the calculation of average annual receipts for all its receipts-based size standards from a three-year averaging period to a five-year averaging period. 84 FR 66561 (Dec. 5, 2019).

[522] The SBA now uses a 24-month average to calculate a business concern's number of employees for eligibility purposes in all its programs. 87 FR 34094 (June 6, 2022).

[523] Public Law 111–240, 124 Stat. 2504 (2010).

[524] 15 U.S.C. 632 note.

[525] *See* Small Bus. Admin., *Table of size standards* (effective Oct 1, 2022), *https://www.sba.gov/document/support-table-size-standards.*

[526] Through a series of rules that became effective on May 2, 2022, the SBA implemented revised size standards for 229 industries (all using average annual receipts standards) to increase eligibility for its Federal contracting and loan programs. *See* 87 FR 18607 (Mar. 31, 2022); 87 FR 18627 (Mar. 31, 2022); 87 FR 18646 (Mar. 31, 2022); 87 FR 18665

(Mar. 31, 2022). The SBA did not reduce any size standards—it either maintained or increased the size standards for all 229 industries, in many cases with size standard increases of 50 percent or more. Effective July 14, 2022, the SBA also increased size standards for 22 wholesale trade industries and 35 retail trade industries. 87 FR 35869 (June 14, 2022).

[527] 87 FR 69118 (Nov. 17, 2022) (adjusting monetary-based industry size standards (*i.e.,* receipts- and assets-based) for inflation that occurred since 2014 by adding an additional 13.65 percent inflation increase to these size standards).

[528] 87 FR 24752 (Apr. 26, 2022) (establishing 250 employees and 1,500 employees, respectively, as the minimum and maximum size standard levels for Manufacturing and other industries (excluding Wholesale and Retail Trade), up from the current minimum of 100 employees and the current maximum of 1,500 employees in the SBA's existing size standards).

[529] 87 FR 35869 (June 14, 2022).

[530] 15 U.S.C. 632(a)(2)(C); *see also* 13 CFR 121.903(a)(5).

[531] 15 U.S.C. 632(a)(2).

AdminRecord-000112

**35262**  **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

typically organize their commercial lending operations into segments based on a combination of risk, underwriting, product offering, and customer management factors that are appropriate to each segment. The three most frequent organizational groupings are retail/small business, middle market, and large corporate banking. Commercial customers are generally assigned to an organizational grouping based on their revenue potential and aggregate credit exposure, with smaller accounts assigned to the retail/small business banking area. The overwhelming preponderance of small businesses are found in the retail/small business banking group, which may also conduct consumer banking.

Today, the distinguishing characteristic that many larger financial institutions (principally banks with $10 billion or more in assets) use to assign small businesses into the retail/small business banking group is gross annual revenue.[532] While cut-offs vary by financial institution, the Bureau understands that a common demarcation for small/retail customers are those with less than $5 million, or sometimes up to $10 million, in gross annual revenue. The maximum amount of a retail/small business banking term loan or credit line is typically $5 million or less.

Financial institutions that do not conduct SBA lending generally do not collect or consider the number of employees of a small business applying for credit, but they often capture gross annual revenue information, including for regulatory compliance purposes. Specifically, retail/small business lenders routinely collect applicants' gross annual revenue information because notification requirements under existing Regulation B vary for business credit applicants depending on whether they "had gross revenues of $1 million or less in [their] preceding fiscal year." [533] For a business applicant with gross annual revenues of $1 million or less, a creditor must provide a notification following an adverse action, such as a credit denial, that is generally similar to that provided to a consumer in both substance and timing.[534] As a

result, small business lenders often adopt compliance management systems similar to those found among consumer lenders.

The Bureau believes it is important for a financial institution to be able to quickly determine at the beginning of the application process whether an applicant is a "small business" for purposes of this final rule. Financial institutions generally cannot inquire about an applicant's protected demographic information (including the ethnicity, race, and sex of an applicant's principal owners) without being legally required to do so.[535] As discussed in the *Overview* of this part V, this final rule will only require (and thus only permit) such inquiries for small business applicants.[536] While the Bureau is allowing financial institutions flexibility in when they seek this protected demographic information, the Bureau believes that financial institutions generally have the best chance of obtaining it and supporting the purposes of section 1071, if they ask for it in the earlier stages of the application process. As a result, a financial institution may need to know, even before the application is initiated, which application path the applicant must follow—a 1071-governed or a non-1071-governed application path.

*Early feedback.* From very early on in its discussions with stakeholders regarding section 1071, the Bureau has received feedback focused primarily on how the Bureau might define a business size standard. For example, in response to the Bureau's 2017 request for information, many stakeholders expressed concern about the difficulties in determining the appropriate NAICS code for businesses and in applying the NAICS-based standards in determining whether a business loan applicant is a small business. Commenters who addressed the issue of a small business definition were universally in favor of the Bureau adopting something less complex than the SBA's size standards based on 6-digit NAICS codes. Commenters noted that the use of these standards is relatively complex and would introduce burdens for this rule with limited benefit.

Likewise, during the SBREFA process, small entity representatives generally preferred a simple small business definition and expressed concern regarding the complexity of the SBA's NAICS-based size standards. Some small entity representatives supported

an approach for defining a small business that would use an applicant's gross annual revenue for determining whether it was "small" (thresholds under consideration at SBREFA were $1 million and $5 million). For most small entity representatives, nearly all their small business customers had less than $5 million in gross annual revenue; most were under $1 million. Several small entity representatives remarked that a $1 million gross annual revenue threshold would be too low, noting that it would exclude many businesses defined by SBA regulations as "small"; some of these small entity representatives said that a $5 million gross annual revenue threshold would be acceptable. Some small entity representatives advocated for higher revenue thresholds, such as $8 million or $10 million. Some small entity representatives supported a more complex approach that would distinguish between applicants in manufacturing and wholesale industries (500 employees) and all other industries ($8 million in gross annual revenue). One small entity representative also supported another approach, which was closest to the SBA's existing size standards, stating that it reflects the SBA's substantially different definitions of a small business across different industries. Feedback from stakeholders other than small entity representatives also reflected broad support for the Bureau pursuing a simplified version of the SBA small business definition.

Proposed Rule

Proposed § 1002.106(b) would have defined a small business as having the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. Proposed § 1002.106(b) would have further stated that, notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of proposed subpart B, a business is a small business if its gross annual revenue, as defined in proposed § 1002.107(a)(14), for its preceding fiscal year is $5 million or less. The Bureau's proposal noted it was seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act.[537]

Proposed comments 106(b)–1 and 106(b)–2 would have clarified the obligations of covered financial institutions when new information changed the determination of whether an applicant is a small business, giving rise to requirements under proposed subpart B and/or prohibitions under

---

[532] *See* Fed. Deposit Ins. Corp., *Small Business Lending Survey,* at 11 (2018), *https://www.fdic.gov/bank/historical/sbls/full-survey.pdf* (FDIC Small Business Lending Survey) (finding that a substantial majority of large banks use gross annual revenue (61.8 percent) as a limit to define small businesses).

[533] 12 CFR 1002.9(a)(3)(i).

[534] *Id.* The notification requirements for applicants with gross annual revenues in excess of $1 million are generally more flexible in substance and also do not impose a firm deadline for provision of a Regulation B notification. 12 CFR 1002.9(a)(3)(ii).

[535] *See* 12 CFR 1002.5(a).

[536] Such inquiries are also permitted for co-applicants of small businesses pursuant to final § 1002.5(a)(4)(x).

[537] 15 U.S.C. 632(a)(2)(C).

AdminRecord-000113

existing Regulation B. The Bureau acknowledged that a financial institution's understanding of an applicant's gross annual revenue may change as the application proceeds through underwriting.

Proposed comment 106(b)–3 would have explained that a financial institution may rely on an applicant's representations regarding gross annual revenue (which may or may not include an affiliate's revenue) for purposes of determining small business status under proposed § 1002.106(b).

The Bureau sought comment on this proposed definition of a small business, including the $5 million gross annual revenue size standard, as well as whether additional clarification is needed for any aspect of this proposed definition. The Bureau also sought comment on whether another variation of the proposed size standard would better serve the purposes of section 1071, such as a lower revenue size standard or a higher one, potentially at the $8 million or $10 million level. The Bureau also sought comment on whether, in addition to the above-described gross annual revenue-based size standard, a small business definition that also included any business that was furnished a loan pursuant to an SBA program (regardless of the applicant's gross annual revenue) would further the purposes of section 1071.

Similarly, the Bureau sought comment on whether a threshold based on $8 million gross annual revenue or 500 employees (depending on the type of business) would align more closely with section 1071's purposes. Likewise, the Bureau sought comment on whether a variation of the proposed size standard, such as using an applicant's average gross annual revenue averaged over two or five years, would better serve the purposes of section 1071. In addition, the Bureau sought comment on defining a small business consistent with the entirety of existing SBA regulations, including any advantages or disadvantages that using such a definition might pose specifically in the context of this rulemaking. Specifically, the Bureau sought comment on how the proposed size standard would fit in with a financial institution's current lending or organization practices. The Bureau sought comment on whether the proposed size standard would introduce additional difficulties or challenges for SBA lenders.

Comments Received

The Bureau received many comments supporting the use of a simple gross annual revenue threshold from a range of lenders and trade associations, along with a community group, a technology service provider, a business advocacy group, several members of Congress, and others. Many commenters said that a gross annual revenue threshold was simple, objective, relatively easy to apply at the time of application, and/or will make compliance easier. One bank more generally emphasized the need for a simplified definition of small business that is easily determinable at the time of application. Another commenter noted that determining the appropriate NAICS codes and the number of employees is not easy early on in the application process. A bank stated that revenue thresholds provide a consistent and transparent line of delineation. Some commenters asserted that a gross annual revenue threshold was preferable to the SBA's more complex size standards that change over time. One commenter asserted that a gross annual revenue threshold was the only feasible way to implement section 1071 and that trying to apply SBA size standards would massively complicate the data collection process, lead to the introduction of errors that would undermine data accuracy and interfere with financial institutions' ability to extend credit to business applicants in a prompt and efficient manner. One agricultural lender argued that having to determine whether a business is small for the purposes of the rule could delay communicating a credit decision in violation of ECOA and the Farm Credit Act, while another commenter hypothesized that financial institutions may decline loan requests due to inadequate financial documentation for a small business determination. Another commenter expressed general support for a broad definition of small business.

Despite the broad support for a gross annual revenue threshold, commenters disagreed on where to set the threshold. Some commenters supported the proposed threshold of $5 million or less in gross annual revenue. A trade association stated that the proposed approach was sufficiently broad and could encompass as great a portion of the population of minority- and women-owned businesses as practical. One agricultural lender asked for additional context and insight for the $5 million threshold and an explanation regarding how a number larger than $1 million, which the Bureau had previously considered during the SBREFA process, meets the intent of Congress under section 1071. A bank advocated for a $250,000 gross annual revenue threshold, asserting that most businesses that surpass this threshold

have access to or already utilize an attorney or accountant, either one of which should be able to adequately advise on the presence of any discriminatory terms.

The Bureau received some comments expressing general disapproval of its proposed approach to the gross annual revenue threshold. A few banks argued that a $5 million threshold is too high, with one adding that this was particularly true in community bank areas and another suggesting that the Bureau did not adequately support its proposal with statistics. A few industry commenters asserted that an expansive small business definition would burden their organizations with significant costs and that the Bureau should instead reduce the number of businesses that are reportable under the regulation. A women's business advocacy group suggested the Bureau have "multiple levels" in its small business definition. Several commenters noted a preference for a gross annual revenue threshold lower than $5 million, without specifying an amount. A credit union suggested the Bureau ensure that both annual revenue and asset size [538] be taken into consideration.

Most commenters that suggested an alternative small business definition expressed preference for a $1 million gross annual revenue threshold. Some industry commenters asserted that a $1 million threshold would be less burdensome, less costly, and/or would simplify compliance as compared to the proposed $5 million threshold. One said that anything other than a $1 million threshold may be too complex for applicants and/or financial institutions, which could lead to less than expected levels of data integrity and misalignment with the 1071 statutory purposes. Several industry commenters and a business advocacy group argued that a gross annual revenue threshold of $1 million or less is more in line with congressional intent and purpose. A bank asserted that it would be more feasible to implement a firewall between underwriter and customer because a $1 million threshold would avoid a complete change in how the bank underwrites and processes small business loan applications.

Some commenters said that a $1 million threshold would better align with existing Regulation B adverse action notification requirements, with one adding that misalignment leads to compliance costs. A bank suggested the Bureau amend the existing Regulation B

---

[538] It is unclear whether the commenter was referring to the asset size of the small business or asset size of the financial institution.

requirements on adverse actions to ensure consistency with this rule and avoid confusion with loan officers and loan processers.

Many more commenters advocated for alignment with CRA regulations that use $1 million or less in annual revenue to define a small business, with some arguing that misalignment with the CRA would lead to increased compliance costs. Some industry commenters stressed the need for consistency between reporting regimes, asserting that the proposed threshold did not align with other regulatory requirements such as CRA. One commenter suggested that inconsistency with CRA would add another nuance to data validation. A State bankers association suggested that a $1 million threshold would also better align with Small Business Development Center and Small Business Investment Company program guidelines. A credit union trade association suggested that a $1 million gross annual revenue threshold would be consistent with the SBA's definitions for some types of small businesses, including most agricultural small businesses.

Some commenters said that a $1 million threshold would cover most (over 95 percent) of small businesses as defined by the SBA size standards in effect at the time of the NPRM. Similarly, many commenters argued that the proposed $5 million threshold would be overinclusive and a $1 million threshold would better exclude non-small businesses. One bank said this overinclusiveness would be particularly notable in middle/rural America, while another argued that the proposed definition would create inequity and inflated costs for banks serving small-to-midsize markets by picking up a disproportionate number of businesses as small businesses under the rule.

Two credit union trade associations argued that the proposed $5 million threshold would increase the size of the 1071 data collection, the risk to data privacy, and the costs associated with compliance for covered financial institutions. Two other commenters suggested that a $1 million threshold would accomplish the goals of section 1071 without unnecessary drawbacks.

In contrast, some commenters requested a more expansive size standard for defining small businesses under the rule. A number of community groups expressed a preference for a $7.5 million threshold, citing language from the SBA's website [539] indicating that

most non-manufacturing businesses with average annual receipts under $7.5 million will qualify as a small business. A few other commenters expressed a preference for a $8 million threshold. A CDFI lender maintained that a $8 million threshold was the most common SBA size standard threshold for average annual receipts, would cover more manufacturing and wholesale businesses, and received broad support from small entity representatives (though they recommended eliminating the 500 employees standard for manufacturing and wholesale that was part of that option under consideration at SBREFA). Another commenter opined that a threshold of $8 million (adjusted every five years according to the SBA's recalibrations) would better cover the small business market, account for differences in business types (such as manufacturing) and regional economic conditions, and would more closely align with what lenders already consider small businesses. Finally, a joint letter from community groups, community oriented lenders, and business advocacy groups asserted that a threshold lower than $8 million would lead to significantly less data against which to compare lending patterns and to identify lending trends and gaps.

*Existing SBA size standards.* Several commenters recommended the Bureau use the SBA's definition and size standards. One credit union trade association asserted that the SBA definition is already used by credit unions and all financial services providers as the industry standard and thus using an alternative definition would only create confusion and inconsistent Federal regulations, thereby harming credit unions' ability to serve their members. A bank argued that having different definitions and requirements across similar regulatory obligations would result in more burden and costs due to the unique review and maintenance of each obligation.

*Loan size.* Some industry commenters suggested defining a small business by the credit amount requested. Several said that small businesses should be defined by loans of $1 million or less. A bank asserted that this would be a much more reasonable definition of what a small business is and will encompass the majority of its commercial lending to small businesses. A few commenters argued that this would better align with CRA and call report requirements. Another commenter noted that loan size does not fluctuate over time like revenue and it is easy to identify at the beginning of the application process. Some credit union commenters suggested requiring

reporting for small business loans up to $10 million. A few other industry commenters suggested adopting a maximum amount applied for "exclusion" of $750,000 in order to exempt applications from non-small businesses. These commenters asserted that such an exclusion would harmonize this rule with the SBA's maximum direct loan amount. A few commenters expressed disapproval of a $1 million loan size threshold, noting many small businesses borrow amounts far more than $1 million while many large businesses borrow amounts far below that threshold.

*Small farm definition.* The Bureau received comments from many agricultural lenders suggesting that the $5 million gross annual revenue threshold would be overinclusive when applied to farms and that agricultural lending needs a different small business definition for purposes of section 1071 in order to capture only truly small farms. One commenter asserted that under the Small Business Act's implementing regulations, the Bureau must take into account differing industry characteristics. Specifically, many agricultural lenders suggested that the Bureau's definition of "small business" align with the Farm Credit Administration's (FCA) definition of "small farmer," which is a "farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products." [540] A few also urged the Bureau not to ignore the USDA small farm definitions. [541] One commenter noted that even a $1 million threshold would be too high because 96 percent of farms had less than $1 million in annual sales of agricultural products. Several commenters suggested that the FCA

[539] Small Bus. Admin., *Basic requirements*, https://www.sba.gov/federal-contracting/contracting-guide/basic-requirements (last visited Mar. 20, 2023).

[540] Farm Credit Admin., *Bookletter 040—Revised: Providing Sound and Constructive Credit to Young, Beginning, and Small Farmers, Ranchers, and Producers or Harvesters of Aquatic Products*, at 2 (Aug. 10, 2007), https://ww3.fca.gov/readingrm/Handbook/FCA%20Bookletters/BL-040%20REVISED.docx.

[541] The USDA Economic Research Service (USDA–ERS) measures farm size by annual gross cash farm income—a measure of the farm's revenue (before deducting expenses) that includes sales of crops and livestock, payments made under agricultural Federal programs, and other farm-related cash income including fees from production contracts. Econ. Rsch. Serv., U.S. Dep't of Agric., *Farm Structure and Contracting* (last updated Mar. 8, 2022), https://www.ers.usda.gov/topics/farm-economy/farm-structure-and-organization/farm-structure-and-contracting/. Within this classification system, small family farms have gross cash farm income less than $350,000, with subcategories of low-sales farms (gross cash farm income less than $150,000) and moderate-sales farms (gross cash farm income between $150,000 and $349,999). *Id.*

definition would facilitate compliance because staff and compliance professionals at Farm Credit lenders are already very familiar with that standard and because it would be confusing and burdensome for staff to manage two competing regulatory definitions of "small" customers.

Several commenters noted that approximately half of Farm Credit System loans outstanding were to "small farmers" and that this level of coverage would more than accomplish section 1071's statutory purposes. One agricultural lender noted that over 76 percent of its loan volume portfolio would fall within the proposed $5 million "small business" definition (approximately 3,770 loans) but 10.7 percent of the loan volume portfolio falls under the FCA definition (approximately 2,730 loans).

*Other suggested size standards.* A trade association representing online lenders recommended the Bureau adopt an easy-to-administer definition based on 4-digit NAICS codes. This commenter argued that while a singular revenue or number of employees standard to designate small businesses might be simpler for the Bureau, it would not be a true reflection of the small business market. The commenter asserted that employing the first 4 digits of the NAICS codes would provide measurements that differentiates broadly by industry, but provides a standard that gives lenders flexibility, allowing them to use data supplied by the borrower without having to undertake a costly and time-consuming verification process of the data provided.

Many community groups, community-oriented lenders, and a minority business advocacy group urged the Bureau to adopt the 500 employee/ $8 million test set forth in the SBREFA Outline. A few of these commenters said this was an easily implemented definition that covered the bulk of small businesses as defined by the SBA without the complexities of the SBA's NAICS-code based definitions, whereas the Bureau's proposal would exclude 270,000 businesses that the SBA classifies as small businesses, with many such businesses disproportionately located within retail trade and construction industries, where small businesses are more likely to be owned by people of color.

One comment letter suggested defining a small business as having a gross annual revenue of $1 million and including a threshold for the number of employees required for a business to be deemed small. They referenced the SBA's size standards, which use a 100-

employee threshold for some industries, but suggested the Bureau use a similar definition or alter its small business definition to include more minority-and women-owned small businesses.

*Other issues.* A few comments addressed the role of affiliate revenue in business size determinations. A bank suggested aligning treatment of affiliate revenue with current CRA requirements [542] to avoid reporting disparities from institution to institution for similarly situated applicants. Pointing to SBA rules and guidance, two other industry commenters asserted that subsidiaries of large companies should be excluded from the definition of "small business" if the aggregate revenues for all affiliates, as defined in 13 CFR 121.103, exceed the gross annual revenue threshold.

Two commenters asked for clarification related to business size determinations involving multiple applicants. One suggested the Bureau clarify that loans jointly made to multiple borrowers are not reportable where one or more of the borrowers may qualify as a small business under the rule but is not the primary business seeking the funding. Another commenter suggested the Bureau (i) allow lenders to treat all co-borrowers as one applicant such that the gross annual revenue of all co-borrowers would be aggregated for purposes of assessing whether the loan is a small business loan and (ii) clarify how to identify loans to a "minority-owned business" or a "women-owned business" when one, but not all, co-borrowers meet the definitions of these terms.

A group of insurance premium finance trade associations noted that their members do not obtain any financial information or information about for-profit status regarding any applicant and suggested the Bureau permit their members to ask the insured business if it is a small business (after furnishing the regulation's operative definition) when the signed premium finance agreement is submitted to the lender or immediately after the lender receives the signed premium finance agreement.

---

[542] The CRA requires an institution to rely on the revenues that it considered in making its credit decision when indicating whether a small-business or small-farm borrower had gross annual revenues of $1 million or less—in the case of affiliated businesses, the institution would aggregate the revenues of the business and the affiliate to determine whether the revenues are $1 million or less only if the institution considered the revenues of the entity's parent or a subsidiary corporation of the parent as well as that of the business. *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting,* at 13 (Jan. 2001), *https://www.ffiec.gov/cra/pdf/cra_guide.pdf.*

## Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.106(b)(1) (proposed as § 1002.106(b)) to define a small business as having the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. As discussed above, the Bureau believes that adopting existing statutory and regulatory small business definitions, which are widely understood and already the subject of notice and comment, is consistent with the purposes of section 1071 and will facilitate compliance. Final § 1002.106(b)(1) further states that, notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of subpart B, a business is a small business if its gross annual revenue, as defined in final § 1002.107(a)(14), for its preceding fiscal year is $5 million or less. The Bureau believes this definition implements the statutory language of section 1071 while reflecting a need for financial institutions to apply a simple, broad definition of a small business across industries. The Bureau has obtained SBA approval for this alternate small business size standard pursuant to the Small Business Act.[543]

The Bureau believes that adopting this gross annual revenue standard is consistent with the purposes of section 1071 and addresses the concerns that the Bureau has heard with respect to determining whether applicants are small businesses for purposes of complying with section 1071, particularly regarding determining the applicant's NAICS code, and the implications thereof. Due to concerns expressed by other stakeholders, which are described above, and upon its own further consideration as discussed in this section-by-section analysis under *Alternatives Considered* below, the Bureau is not adopting suggested alternative standards, including, but not limited to a $1 million gross annual revenue standard, a $7.5 or $8 million gross annual revenue standard, a threshold based on loan size, a different standard for agricultural lending, nor the existing SBA size standards.

The Bureau agrees with the many commenters who said that a definition of small business for purposes of section 1071 based on a gross annual revenue threshold was simple, objective, relatively easy to apply at the time of application, and/or will make compliance easier. The Bureau understands that a majority of large banks already use gross annual revenue

---

[543] 15 U.S.C. 632(a)(2)(C); 13 CFR 121.903.

thresholds to delineate small business lending within their own institutions.[544] The Bureau also agrees that a gross annual revenue threshold is the preferred way to implement section 1071 to avoid overly complicating the data collection process, leading to the introduction of errors that would undermine data accuracy, or interfering with financial institutions' ability to extend credit to business applicants in a prompt and efficient manner. The Bureau believes that a simplified definition of small business that does not require determining the appropriate NAICS codes and/or the number of employees will satisfy lenders' needs to easily determine small business status early in the application process and avoid delays in communicating a credit decision.

While the Bureau received broad support for a simple gross annual revenue threshold generally, it received narrower support for a threshold of $5 million or less in gross annual revenue. The Bureau believes that a $5 million threshold strikes the right balance in terms of broadly covering the small business financing market to fulfill section 1071's statutory purposes while meeting the SBA's criteria for an alternative size standard.[545] As described above, the SBA is generally increasing size standards across industries and no longer uses a $1 million annual receipts standard for any industry. As a result, the Bureau's $5 million standard is sufficiently inclusive relative to the SBA size standards. Moreover, while there is no clear consensus on a simplified size standard that uniformly covers all small business financing markets,[546] the Bureau understands that among the banks that already use a gross annual revenue threshold to delineate small business lending, the majority of banks of all sizes use a threshold above $1 million in firm gross annual revenue.[547] In fact, larger banks typically use even higher thresholds (for banks with less than $1 billion in assets, 25.1 percent use a threshold greater than $5 million in firm gross annual revenue, while 37.0 percent of banks with $1 billion to $10 billion in assets use a gross annual

revenue threshold of $5 million or more).[548]

The Bureau has considered the potential effect of applying a $5 million gross annual revenue threshold to both non-agricultural and agricultural industries and compared that standard to coverage under the SBA's existing size standards. Among non-agricultural industries, the Bureau estimates [549] that over 1.5 million (27 percent) small businesses would not be covered by an alternative $1 million gross annual revenue threshold and at a $2 million threshold, the rule would have been underinclusive by 12 percent. (This and other size standards suggested by commenters are discussed in detail under *Alternatives Considered* below.) At a $8 million threshold, the percentage of underinclusivity falls to approximately 4 percent, or approximately 235,000 non-agricultural businesses.

Applying an $8 million threshold to agricultural businesses, the Bureau's analysis [550] shows that over 20,000 such businesses that are *not* considered small under the SBA's size standards would have their applications reported to the Bureau.[551] With the finalized $5 million gross annual revenue threshold, relative to current SBA size standards, *all* small farms' applications will be reported to the Bureau, along with applications from 14,000 agricultural businesses that are not considered small under the SBA's size standards. Thus, the Bureau believes that its $5 million gross annual revenue threshold strikes an appropriate balance between covering the applications of most businesses that are considered small under the SBA's size standards, while minimizing the number of businesses above the SBA's size standards whose applications will be reported to the Bureau, and in a way

that satisfies the SBA's criteria for approving an alternative size standard under its regulations.

The Bureau also notes that in their proposal to amend their regulations implementing the CRA, the Board, FDIC, and OCC proposed to define the terms "small business" and "small farm" consistent with the Bureau's definitions in its NPRM.[552] Thus, per the CRA proposal, once 1071 data are available, the agencies would transition from the current CRA definitions of small business and small farm loans to definitions that cover loans to small businesses and small farms with gross annual revenues of $5 million or less.[553] Given the many comments that the Bureau received advocating for CRA alignment, the Bureau strongly supports the CRA agencies' efforts and believes that finalizing its proposed small business definition will streamline reporting and minimize compliance risks for financial institutions that are also reporting covered credit transactions under CRA and would simplify data analysis for CRA-reportable transactions. See part II.F.2.i above for further discussion of the CRA and its relationship to this rule.

With respect to a commenter's suggestion that the Bureau increase the existing Regulation B threshold for notification to business credit applicants for consistency with this rule, the Bureau does not believe such a change would be appropriate at this time. Given the fact that these notification requirements have been in place for close to 50 years and financial institutions have invested in compliance infrastructure around these requirements, the Bureau believes that the notification threshold in existing Regulation B should not be amended without additional research and input from stakeholders.

To address ECOA and existing Regulation B's general prohibition against inquiring about protected demographic information in connection with a credit transaction,[554] and to clarify the obligations of covered financial institutions under subpart B, the Bureau is adopting final comments 106(b)(1)–1 and 106(b)(1)–2 to address situations when new information may arise that could change the determination of whether an applicant is a small business. The Bureau acknowledges that a financial institution's understanding of an applicant's gross annual revenue may

---

[544] *See* FDIC Small Business Lending Survey at 11.

[545] *See* 15 U.S.C. 632(a)(2)(C); 13 CFR 121.903.

[546] *See, e.g.,* FDIC Staff Report at 10 (discussing various gross annual revenue thresholds ranging from $1 million to $10 million and resolving "[g]iven the lack of consensus on the correct definition of a small business, [to] present results using both thresholds wherever possible").

[547] *Id.* at 9.

[548] *Id.*

[549] The Bureau used the most recent Statistics of U.S. Businesses (SUSB) from Census (from 2017) to estimate the total number of businesses that would be under- or over-included for section 1071, relative to the SBA's size standards and based on various revenue-based size standard alternatives. We use SBA size standards as of May 2022 which reference 2017 NAICS codes; these NAICS codes are consistent with the SUSB data. The 2017 SUSB only contains information on employer businesses.

[550] The Bureau's analysis of agricultural industries used the 2017 Census of Agriculture from the USDA, relative to the SBA's size standards, based on various revenue-based size standard alternatives. The Bureau notes that because the Census of Agriculture does not have the granularity of the SUSB, it made some additional strong assumptions. The Census of Agriculture also does not have the same employer/non-employer distinction as the SUSB and therefore includes information on all farms.

[551] In the Census of Agriculture, there is just a $5+ million category so this number would not change for thresholds above $5 million.

[552] 87 FR 33884, 33890 (June 3, 2022).

[553] *Id.* at 33899.

[554] *See* existing § 1002.5(a)(2); 15 U.S.C. 1691(b)(5).

AdminRecord-000117

change as the institution proceeds through underwriting. The Bureau is finalizing comment 106(b)(1)–1 (proposed as 106(b)–1) with updated cross-references to other portions of the final rule. Final comment 106(b)(1)–1 explains that if a financial institution initially determines an applicant is a small business as defined in final § 1002.106(b) based on available information and obtains data required by final § 1002.107(a)(18) and (19), but the financial institution later concludes that the applicant is not a small business, the financial institution may process and retain the data without violating ECOA or Regulation B if it meets the requirements of final § 1002.112(c)(4). The Bureau is finalizing comment 106(b)(1)–2 (proposed as 106(b)–2) with certain revisions for additional clarity. Final comment 106(b)(1)–2 explains that if a financial institution initially determines that the applicant is not a small business as defined in final § 1002.106, but then later concludes the applicant is a small business prior to taking final action on the application, the financial institution must report the covered application pursuant to final § 1002.109. In this situation, the financial institution shall endeavor to compile, maintain, and report the data required under final § 1002.107(a) in a manner that is reasonable under the circumstances.

The Bureau is finalizing comment 106(b)(1)–3 (proposed as comment 106(b)–3) to explain that a financial institution is permitted to rely on an applicant's representations regarding gross annual revenue (which may or may not include an affiliate's revenue) for purposes of determining small business status under final § 1002.106(b)(1). The comment further clarifies that, if the applicant provides updated gross annual revenue information or the financial institution verifies such information, the financial institution must use the updated or verified information in determining small business status. The Bureau has changed the heading of this comment and has removed some of the introductory language to this comment for clarity as suggested by several commenters; this change is not intended to alter the meaning of this comment.

The Bureau has considered comments regarding the role of affiliate revenue in business size determinations. The Bureau agrees that subsidiaries of large companies should be excluded from the definition of ''small business'' provided that the aggregate revenues for all affiliates, as defined in 13 CFR 121.103, exceed the $5 million gross annual

revenue threshold—and, indeed, this is consistent with what the Bureau proposed. The Bureau is not, however, adopting the mandate in the SBA regulations, which provide that the average annual receipts size of a business concern with affiliates *must* be calculated by adding the average annual receipts of the business concern with the average annual receipts of each affiliate.[555] The Bureau understands that the SBA totals the average annual receipts of the applicant and all of its affiliates in determining size because in order to be eligible for certain Federal programs and certain Federal contracts and subcontracts, a firm must be a ''small business concern.'' [556] Because the size standard used for this rule is only to determine whether data collection is required pursuant to section 1071 and has no bearing on eligibility for Federal small business assistance, the Bureau does not believe it is necessary to mandate that financial institutions consider affiliate revenue in determining an applicant's small business status.

The Bureau believes that this approach to use of affiliate revenue in size determinations will address concerns related to treatment of passive businesses and non-operating entities, such as special purpose vehicles. The Bureau understands that passive businesses and non-operating entities are generally affiliated with other businesses (for example as subsidiaries of large corporate entities). The Bureau notes that final § 1002.102(a) adopts the SBA's expansive view of what constitutes affiliation,[557] and it is therefore unlikely that a special purpose entity or other large project financing investment entity would be formed without any affiliation with an established entity—rather, they are likely created as subsidiaries of an existing business or as joint ventures between existing businesses.[558] Thus,

financial institutions will be able to exclude businesses that are, in fact, middle- or large-sized applicants from data collection and reporting under this final rule by considering these businesses' affiliate revenues, which will likely exceed the $5 million gross annual revenue threshold for purposes of the definition of a small business. For example, if a financial institution receives an application for financing from a special purpose vehicle or shell company established for the purpose of acquiring significant commercial real estate (such as a hospital building), the financial institution could rely on information provided by the applicant regarding its, and its affiliates, gross annual revenue for purposes of determining small business status under § 1002.106(b). As discussed in greater detail below, the Bureau also believes that its approach to affiliate revenue further obviates the need to define a small business by the credit amount requested as suggested by some commenters.

The Bureau has considered the comments regarding business size determinations involving multiple unaffiliated applicants and does not agree with the suggested approach to allow financial institutions to treat all co-applicants as one applicant by aggregating their gross annual revenues for purposes of assessing business size. The Bureau does not believe that (in situations not involving affiliated entities) such an approach would be consistent with the SBA's definitions of business concern and small business concern. The Bureau is addressing commenters' requests for clarification on this issue by adding new comment 106(b)(1)–4, which provides that if a covered financial institution receives a covered application from multiple businesses who are not affiliates, as defined by final § 1002.102(a), where at least one business is a small business under final § 1002.106(b), the financial institution shall compile, maintain, and report data pursuant to final §§ 1002.107 through 1002.109 regarding the covered application for only a single applicant that is a small business. The comment clarifies that the financial institution shall not aggregate unaffiliated co-applicants' gross annual revenues for purposes of determining small business status under final § 1002.106(b) and provides a cross reference to final comment 103(a)–9 for additional details.

---

[555] 13 CFR 121.104(d)(1).

[556] Small Bus. Admin., *Small Business Compliance Guide*, at 4 (July 2020), *https://www.sba.gov/sites/default/files/2020-10/AFFILIATION%20GUIDE_Updated%20%28004%29-508.pdf*.

[557] 13 CFR 121.103; *see also* Small Bus. Admin., *Small Business Compliance Guide* (July 2020), *https://www.sba.gov/sites/default/files/2020-10/AFFILIATION%20GUIDE_Updated%20%28004%29-508.pdf* (affiliation can be based on (1) ''control (when one controls or has the power to control the other, or a third party or parties controls or has the power to control both)''; (2) ownership; (3) ''stock options, convertible securities, and agreements to merge''; (4) management; (5) identity of interest''; or (6) ''franchise and license agreements'').

[558] Similarly, where a substantial portion of its assets and/or liabilities of a special purpose entity is the same as a predecessor entity, the SBA's

definition of a business concern specifically dictates that the annual receipts and employees of the predecessor must be taken into account in determining size of the new business concern. 13 CFR 121.105(c).

AdminRecord-000118

In response to the group of insurance premium finance trade associations that highlighted their members' challenges with determining small business status, the Bureau notes that insurance premium financing arrangements are excluded under final § 1002.104(b)(4) for the reasons set forth in the corresponding section-by-section analysis.

Alternatives Considered

*Gross annual revenue of $1 million.* In the NPRM, the Bureau did not propose a $1 million gross annual revenue threshold, expressing concern that such a threshold likely would not satisfy the SBA's requirements for an alternative size standard across industries and would exclude too many businesses designated as small under the SBA's size standards. Nevertheless, as discussed above, many commenters requested the Bureau adopt a $1 million gross annual revenue threshold.

The SBA no longer uses a $1 million annual receipts standard for any industry and the Bureau does not believe that a gross annual revenue threshold of $1 million would be more in line with congressional intent and purpose. Congress did not specify a gross annual revenue threshold for defining a small business under section 1071 but instead pointed to the SBA's definition of small business concern.[559] However, Congress set forth a process to allow the Bureau to prescribe an alternative size standard, if approved by the SBA Administrator.[560] Given the fact that the SBA no longer uses a $1 million standard for any industry[561] and is thus unlikely to approve an alternative size standard at that threshold for all industries, the Bureau believes that its small business

definition is a more appropriate alternative size standard.

While it is true that a $1 million threshold would better align with existing Regulation B adverse action notification requirements, the Bureau believes that the flexibilities built into the final rule for small business size determinations will obviate the need for changes to adverse action operations, including compliance with existing Regulation B adverse action notification requirements. The Bureau also notes that the concerns raised by many commenters regarding alignment with CRA regulations would likely be resolved if the CRA proposal, which expressly seeks alignment with the Bureau's alternative small business definition, is finalized. With respect to suggested alignment with Small Business Development Center and Small Business Investment Company program guidelines, the Bureau points to the fact that credit transactions made under programs with lower thresholds are by default small business transactions for the purposes of the final rule and thus not inconsistent.

The Bureau has considered the comments arguing that a $5 million threshold would be overinclusive and a $1 million threshold would better exclude non-small businesses. Based on the Bureau's analysis, neither a $1 million threshold nor $5 million threshold would be overinclusive among non-agricultural industries relative to the SBA's current size standards. On the other hand, the Bureau estimates that, in terms of the number of SBA "small" firms whose applications would not be reported to the Bureau, a $1 million threshold would be 4.5 times more underinclusive than a $5 million threshold. Moreover, research conducted by FDIC staff found that among banks with $1 billion to $10 billion in assets, more than one-third of self-described small business lending would be excluded under the $1 million gross annual revenue definition and that among banks with more than $10 billion in assets, nearly two-thirds would be excluded.[562] Based on this study, FDIC staff concluded that "for the typical bank, a [gross annual revenue] threshold of $1 million is overly conservative and would exclude many firms that should properly be considered small businesses." The Bureau agrees with this conclusion, and likewise believes that a $1 million gross annual revenue threshold would not satisfy the SBA's requirements for an alternative size standard across industries and would

exclude too many businesses designated as small under the SBA's size standards.

*Gross annual revenue of $7.5 to $8 million.* The Bureau is not adopting a $7.5 million or $8 million gross annual revenue threshold, as suggested by a number of commenters. While the Bureau agrees that a threshold of $7.5 to 8 million would more expansively cover SBA small businesses (the Bureau estimates that under an $8 million threshold, applications from approximately 130,000 more SBA "small" firms would be reported to the Bureau as compared to a $5 million threshold), the Bureau does not believe that this definition more closely aligns with what lenders already consider small businesses based on comments received in support of a lower than $5 million threshold. Moreover, the Bureau notes that while an $8 million threshold would be less underinclusive among non-agricultural industries relative to SBA size standards, it would be more overinclusive among agricultural businesses.

*Loan size.* The Bureau does not believe that it would be appropriate to define a small business based on the size of the loan applied for (*i.e.,* by adopting a maximum "amount applied for" exclusion) such as one in the amount of $750,000 (for SBA alignment) or $1 million (for CRA alignment), as suggested by some commenters. The Bureau likewise is not defining a small business based on whether a loan is for an amount up to $10 million, as suggested by some commenters, or any other size.[563] As explained in the NPRM, the Bureau believes that such potential definitions do not bear a sufficient relationship to the size of the business or its operations. For instance, under a definition similar to existing CRA requirements, application data for businesses with low revenue that may be applying for large loans would be excluded. The Bureau does not believe that adopting such an approach would further the purposes of section 1071. The Bureau likewise agrees with commenters cautioning against using the CRA definition based on loan size, because many small businesses borrow amounts far more than $1 million while many large businesses borrow amounts far below that threshold.[564]

---

[559] In ECOA section 704B(h)(2), Congress provided that "[t]he term 'small business' has the same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632)."

[560] 15 U.S.C. 632(a)(2)(C).

[561] Through a series of rules that became effective on May 2, 2022, the SBA implemented revised size standards for 229 industries (all using average annual receipts standards) to increase eligibility for its Federal contracting and loan programs. *See* 87 FR 18607 (Mar. 31, 2022); 87 FR 18627 (Mar. 31, 2022); 87 FR 18646 (Mar. 31, 2022); 87 FR 18665 (Mar. 31, 2022). The SBA did not reduce any size standards—it either maintained or increased the size standards for all 229 industries, in many cases with size standard increases of 50 percent or more. Effective July 14, 2022, the SBA also increased size standards for 22 wholesale trade industries and 35 retail trade industries. 87 FR 35869 (June 14, 2022). Effective December 19, 2022, the SBA added an additional 13.65 percent inflation increase to the monetary small business size standards. 87 FR 69118 (Nov. 17, 2022).

[562] FDIC Staff Report at 10.

[563] It is possible that these commenters intended to advocate for a $10 million gross annual revenue threshold. For the reasons stated above, the Bureau does not believe a definition of small business using a $10 million gross annual revenue threshold would fulfill section 1071's statutory purposes.

[564] *See, e.g.,* FDIC Small Business Lending Survey at 17 (finding that at banks with assets of $1 billion to $10 billion, at least $19.1 billion in gross understatement of small business lending (in which

*Existing SBA size standards.* Despite some recommendations that the Bureau use the SBA's definition and size standards, the Bureau believes the SBA's size standards are not suitable for this data collection initiative and prefers to establish a small business definition specifically tailored to this rulemaking implementing section 1071.

A simple, easy-to-implement small business definition is necessary in light of the general prohibition in existing Regulation B against creditors' inquiring about protected demographic information in connection with a credit transaction unless otherwise required by Regulation B, ECOA, or other State or Federal law, regulation, order, or agreement.[565] ECOA section 704(b)(2)(G), as implemented by this rule, requires a financial institution to collect and report the ethnicity, race, and sex of the principal owners of the business. Thus, in order to avoid potential liability under ECOA and existing Regulation B, a financial institution must accurately determine that a business credit application is subject to section 1071 *before* inquiring about the applicant's protected demographic information. The Bureau does not believe the SBA's existing size standards allow for the quick and accurate determination of small business status for this 1071 data collection initiative. Specifically, the Bureau does not believe this determination can be quickly and accurately made if, as required under the SBA's existing size standards, the financial institution must determine the appropriate 6-digit NAICS code for the business and then apply the NAICS-based size standards to determine whether an applicant for business credit is a small business.

As discussed above, commenters expressed concern to the Bureau about the difficulties in determining the appropriate 6-digit NAICS code for businesses and in applying the SBA's NAICS-based size standards. They generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business—which bases classification on an applicant's 6-digit NAICS code—is relatively complex in this context. The Bureau believes that removing a NAICS code-based small business determination as a step in

determining small business status will both facilitate compliance and better achieve the purposes of section 1071. The Bureau understands that one reason that commenters expressed a strong desire for a simple approach to determining whether an applicant is small is that this initial determination may drive the application process. To comply with section 1071 requirements, financial institutions may use a different application process, or different or additional application materials, with small business credit applicants than they do with applicants that are not small businesses. Thus, quickly and accurately determining whether an applicant is a small business at the outset of the application process may be a crucial step, one that financial institutions would benefit from being able to seamlessly accomplish. Considering the requirements and prohibitions in ECOA with respect to protected demographic information, the Bureau understands the import that financial institutions have placed on both the speed and accuracy of this determination.

Notwithstanding its decision to not rely on NAICS codes in its small business definition, the Bureau believes that NAICS codes possess considerable value for section 1071's fair lending purpose as well as its business and community development purpose. As discussed in the section-by-section analysis of § 1002.107(a)(15) below, the Bureau is therefore requiring financial institutions to collect and report 3-digit NAICS sector codes for applications subject to this final rule. However, the Bureau believes that gathering NAICS code information at some point during the application process, while still the subject of some concern for financial institutions, differs in kind from requiring NAICS information as a necessary step to beginning an application (and correctly determining which type of application to initiate). In addition, the NAICS information now required by the final rule is a 3-digit NAICS code instead of a 6-digit code as proposed; this information will provide valuable data to analyze fair lending patterns and identify business subsectors with unmet credit needs, while limiting the burden this collection may impose on financial institutions and small business applicants.

The Bureau also believes that its simplified alternative size standard will provide reporting results that are largely consistent with what would be reported by adopting the full SBA size standards. The Bureau used data from the U.S. Census's 2012 Statistics of U.S. Businesses (SUSB) and the U.S.

Department of Agriculture's 2012 Census of Agriculture to analyze how various alternative approaches would change the number of businesses considered "small" under this rule relative to the SBA definition.[566] Among the 7.2 million small employer businesses and farms, the Bureau estimates that 365,000 businesses that would be small under the SBA's existing size standards will not be covered by the Bureau's $5 million gross revenue standard. The Bureau further estimates that the Bureau's rule will cover some 14,000 agricultural businesses that would not be small under the SBA's existing size standards. The Bureau believes that such variation with respect to the SBA's current size standards is an appropriate trade-off for the reasons described herein.

The Bureau notes, however, that some industries will have greater divergence between which businesses are small under the Bureau's $5 million gross annual revenue alternative size standard and which businesses are small under the SBA's existing size standards. That is, applications for businesses that are small under the SBA's existing size standards will be reported to the Bureau less from some industries than others. In general, there will be a larger proportion of businesses whose applications will not be reported in industries with a higher revenue-based size standard. The industries most affected by this are the retail trade and construction industries. Other industries disproportionately affected may include manufacturing, wholesale trade, health care and social assistance, and professional, scientific, and technical services. The Bureau received limited public feedback with respect to such concerns.

The Bureau also believes that a simplified size standard will be important for financial institutions that may not frequently engage in small business lending in determining whether they are covered under this final rule. As discussed in the section-by-section analysis of § 1002.105(b), small business lending data collection and reporting is required only for financial institutions that originated at least 100 covered credit transactions for small businesses in each of the two preceding calendar years. Financial institutions that do not frequently lend

---

small businesses with less than $1 million in gross annual revenue received loans with amounts greater than $1 million)).

[565] ECOA provides that it is not discrimination for a financial institution to inquire about women-owned or minority-owned business status, or the ethnicity, race, and sex of principal owners pursuant to section 1071. 15 U.S.C. 1691(b)(5).

[566] The 2012 SUSB is the most recent Census product to have categories of revenue and employees granular enough to conduct this analysis. The Bureau constructed the 2012 equivalents of the second and third alternatives due to the vintage of the SUSB data available and used the SBA's 2012 size standards for the analysis. The 2012 SUSB only covers employer firms or businesses with at least one employee.

to small businesses will seek to track precisely how many such transactions they have originated. The Bureau believes that it is important to empower financial institutions to quickly ascertain whether a covered credit transaction was originated for a small business, so that infrequent lenders can continue to monitor whether compliance with this final rule is required.

The Bureau believes that its $5 million gross annual revenue standard is a more efficient and appropriate measure of applicant size for purposes of determining whether small business lending data collection is required pursuant to section 1071. The Bureau understands that the SBA generally bases business concern size standards on average annual receipts or the average number of employees of the business concern, as customized industry-by-industry across 1,012 6-digit NAICS codes. The SBA typically uses two primary measures of business size for size standards purposes: (i) average annual receipts [567] for businesses in services, retail trade, agricultural, and construction industries, and (ii) average number of employees [568] for businesses in all manufacturing industries, most mining and utilities industries, and some transportation, information, and research and development industries.[569] The Bureau understands that the SBA's size standards are used to establish eligibility for a variety of Federal small business assistance programs, including for Federal government contracting and business development programs designed to assist small businesses in obtaining Federal contracts and for the SBA's loan guarantee programs, which provide access to capital for small businesses that are unable to qualify for and receive conventional loans elsewhere. The Bureau notes that its $5 million size standard will only be used to determine whether small business lending data collection is required pursuant to section 1071, and has no

bearing on eligibility for Federal small business assistance. Moreover, the Bureau believes it is far more likely that an applicant will be able to readily respond to a question regarding its gross annual revenue for the preceding fiscal year—something already contemplated by existing Regulation B for all business credit to determine whether adverse action notice requirements apply [570]—than offer the closest metric currently in use by SBA regulations, which is generally average annual receipts across the previous five fiscal years.[571]

The Bureau believes that requiring application of existing SBA size standards for this rule could result in many financial institutions having to undergo extensive operational and/or compliance management system changes. The Bureau believes that it will reduce burden for financial institutions, particularly those without sophisticated compliance management systems or familiarity with SBA lending, to comply with a gross annual revenue size standard for the section 1071 small business definition that better aligns with current lending practices.

If the Bureau were to adopt a small business definition using the existing SBA size standards that vary by industry based on 6-digit NAICS codes, financial institutions would only be able to request an applicant's protected demographic information further along in the application process, once they have obtained the multiple pieces of data that would be necessary to determine whether the applicant is small and, therefore, the 1071 process applies. This delay could make it more difficult for financial institutions to collect applicants' protected demographic information (particularly for applications that are withdrawn or closed for incompleteness early in the application process), which is important to both of section 1071's statutory purposes. These data collection considerations differ from those applicable to SBA lending programs, whereby a lender often cannot (and should not) make an accurate eligibility determination for an SBA loan until later in the application process, often after a loan has already been initially decisioned and after the lender has collected information related to size, time in business, and other data.

In order to allow financial institutions to expeditiously determine whether this rule applies, the Bureau is seeking to minimize complexity for financial institutions in determining whether a covered application is reportable

because the applicant business is a small business—a necessary determination for the collection of protected demographic information pursuant to section 1071. The Bureau believes, and most commenters agreed, that this rule will benefit from a universal, easy-to-apply reporting trigger that does not need to be supported by additional documentation or research. Such a reporting trigger must be easily understood by small business owners who may be completing an application online, or by the tens of thousands of customer-facing personnel who take small business applications in an industry with a recent turnover rate of over 20 percent.[572] The Bureau also believes that a gross annual revenue reporting trigger will facilitate better compliance with section 1071 requirements because it aligns with many larger financial institutions' current lending and organizational practices, which use gross annual revenue to assign small businesses into their retail/small business banking groups.[573]

Requiring financial institutions to rely on the SBA's existing size standards for purposes of 1071 data collection and reporting requirements could pose risks to the efficient operation of small business lending. Based on the overwhelmingly consistent feedback the Bureau has received from stakeholders on this issue, the Bureau believes that using the SBA's existing size standards for the purposes of section 1071— wherein the financial institution must quickly determine the appropriate 6-digit NAICS code for businesses and then apply a variety of standards, including potentially gathering information to determine five years of the applicant's average annual receipts or employee information—would not align with current lending and organizational practices. Application of the SBA's existing size standards, at the beginning of the application process, could slow down the application process, particularly at institutions that otherwise would often be able to render credit decisions in a matter of minutes; the Bureau believes that financial institutions may be compelled to raise the cost of credit or originate fewer covered credit transactions as a result.

---

[567] The Bureau understands that the SBA changed its regulations on the calculation of average annual receipts for all its receipts-based size standards, and for other agencies' proposed receipts-based size standards, from a three-year averaging period to a five-year averaging period, outside of the SBA Business Loan and Disaster Loan Programs. 84 FR 66561 (Dec. 5, 2019).

[568] Generally, the average number of employees of the business concern is used (including the employees of its domestic and foreign affiliates) based upon numbers of employees for each of the pay periods for the preceding completed 24 calendar months. *See* 13 CFR 121.106(b)(1).

[569] To measure business size, the SBA also uses financial assets for certain financial industries, and for the petroleum refining industry, it uses refining capacity and employees.

[570] *See* 12 CFR 1002.9(a)(3).

[571] 13 CFR 121.104(a) and (c).

[572] Jim Dobbs, *Employee churn surges at banks despite pay hikes,* Am. Banker (Sept. 9, 2022), *https://www.americanbanker.com/news/employee-churn-surges-at-banks-despite-pay-hikes.*

[573] *See* Fed. Deposit Ins. Corp., *Small Business Lending Survey,* at 12 (2018), *https://www.fdic.gov/resources/publications/small-business-lending-survey/2018-survey/section2.pdf* (finding that a substantial majority of large banks use gross annual revenue (61.8 percent) as a limit to define small businesses).

Such an outcome could needlessly affect access to credit for small businesses. The Bureau believes that eliminating credit opportunities or reducing access to credit for small businesses, including women-owned and minority-owned small businesses, in this way would frustrate the statutory purpose of section 1071 to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[574]

The Bureau expects that many financial institutions, for efficiency, will bifurcate their business credit application procedures based on an initial determination of whether the application will be subject to this rule. The Bureau therefore believes that many financial institutions will not proceed with taking applicant information until the financial institution is able to determine that the applicant is small (in which case, this rule requires it to collect and report the applicant's protected demographic information) or that the applicant is not small (where ECOA generally prohibits the financial institution from collecting protected demographic information). If this process necessitates determining the correct NAICS code for the applicant, and in many cases, requesting five years of average annual receipts or the 24-month average number of employees from the applicant pursuant to SBA's existing size standards, the Bureau believes that businesses seeking credit would encounter, at a minimum, otherwise avoidable delays in application processing.

Section 1071 is also unique in that Congress specified that the data collection regime include a particular form of revenue for the businesses at issue. As discussed in the section-by-section analysis of § 1002.107(a)(14) below, section 1071 requires a financial institution to collect "the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application."[575] The Bureau considered whether under section 1071 a financial institution should have to apply two different revenue-based rules (first, one for determining whether the business is small under the existing SBA size standards and therefore 1071 data must be collected and reported; and, second, if the business is small, another for reporting the business's gross annual

revenue in the last fiscal year), or whether applying only one revenue-based standard for implementing section 1071 could be sufficient. Requiring financial institutions to apply different standards could be unnecessarily confusing and burdensome, as well as also increase the potential for errors in data collection and reporting. Moreover, as discussed below, section 1071 amends ECOA, which already incorporates the concept of gross annual revenue as implemented under existing Regulation B's adverse action notice requirements.

*Small farm definition.* The Bureau is not adopting a different small business definition for farms. Many agricultural lenders suggested aligning with the Farm Credit Administration's (FCA) small farmer definition for agricultural financing transactions, primarily arguing that: (i) the proposed $5 million threshold is substantially overinclusive as applied to the farming community and would cover almost all the customers of FCS lenders; (ii) aligning with the FCA's "small farmer" definition would facilitate compliance and reduce burden because FCS lenders are very familiar with the standard; and (iii) this change would take into account the unique nature of the agricultural industry, which is disproportionately dominated by family farms.

The Farm Credit Act of 1971 authorizes the FCS to provide financing and services to farmers and ranchers through FCS banks and associations. The Act also provides the FCA, an independent Federal agency, authority to regulate and examine these institutions and it requires them to report annually to FCA about the operations and achievements of the associations' lending and service programs for young, beginning, and small farmers and ranchers. FCA's definition of "small farmer" is "a farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products."[576] The FCA has not updated this threshold since it was first adopted in 1998 although it has since considered whether to change it.[577]

The NPRM made clear the Bureau's intention to cover agricultural credit, and the Bureau did not propose a separate small farm definition or any other adjustments specifically for agricultural credit. Prior to the SBA increasing its size standards for small farms, the Bureau acknowledged in the NPRM that its proposed $5 million size standard could result in data reporting on applications from approximately 77,000 businesses that would not be considered small under the SBA size standards in effect at that time, the vast majority of which would be farms (for which, at that time, the SBA predominantly used a $1 million standard). Conversely, the Bureau estimated that 270,000 primarily non-agricultural businesses that would be small under the SBA's size standards in effect at the time of the NPRM would not be covered under the proposed $5 million gross annual revenue standard.

As noted above, the SBA's size standards for agricultural industries have increased since the NPRM and now range from $2.25 million to $34 million average annual receipts—which now means that the $5 million gross annual revenue standard the Bureau is finalizing is markedly more aligned with SBA's size standards for farms than it was at the time of the NPRM. The Bureau believes that these recent changes to the SBA size standards, which were based on extensive research and a notice and comment rulemaking, further suggest that a definition of small farms based on $250,000 in annual gross sales, preferred by certain commenters, would not sufficiently cover small agricultural businesses.

The Bureau does not believe that the Small Business Act requires the Bureau to adopt a separate definition for small farms, as implied by one commenter. The Small Business Act provides that the SBA Administrator must "ensure that the size standard varies from industry to industry to the extent necessary to reflect the differing characteristics of the various industries and consider other factors deemed to be relevant by the Administrator."[578] The Bureau believes, and explained to the SBA when obtaining its approval, that this rule will benefit from a universal, easy-to-apply reporting trigger that reflects the need for a wide variety of financial institutions to apply a simple, broad definition of a small business that is practical across the many product types, application types, technology platforms, and applicants in the market.

---

[574] ECOA section 704B(a).
[575] *Id.*

[576] Farm Credit Admin., *Bookletter 040—Revised: Providing Sound and Constructive Credit to Young, Beginning, and Small Farmers, Ranchers, and Producers or Harvesters of Aquatic Products,* at 2 (Aug. 10, 2007), *https://ww3.fca.gov/readingrm/Handbook/FCA%20Bookletters/BL-040%20REVISED.docx.*

[577] 84 FR 5389, 5390 (Feb. 21, 2019) ("Several agricultural and economic cycles have occurred since 1998, and we are considering whether the $250,000 gross sales amount continues to be appropriate or should be revised or indexed to reflect the changes, including the economic

conditions presently affecting agricultural producers.")

[578] 15 U.S.C. 632(a)(3).

AdminRecord-000122

In particular, the Bureau believes that the size standard finalized here is consistent with factors that the SBA has previously identified as relevant to the proper exercise of its discretion in this respect—the SBA considers (1) current economic conditions, (2) its mission and program objectives, (3) the SBA's current policies, (4) impacts on small businesses under current and proposed or revised size standards, (5) suggestions from industry groups and Federal agencies, and public comments on the proposed rule, and (6) whether a size standard based on industry and other relevant data successfully excludes businesses that are dominant in the industry.[579]

While the Bureau received widespread support for a simple gross annual revenue threshold, it also understands, as explained by some commenters, that many agricultural lenders generally do not collect gross annual revenue for underwriting or regulatory compliance purposes, which could complicate use of a gross annual revenue threshold to determine small business status. Nonetheless, ECOA section 704B(e)(2)(F) requires financial institutions to collect and report gross annual revenue under section 1071. As discussed in this section-by-section analysis of § 1002.107(a)(14), the Bureau is finalizing comment 107(a)(14)–2, which first clarifies that pursuant to final § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, including the gross annual revenue of the applicant. The final comment then states that if a financial institution is nonetheless unable to collect or determine the specific gross annual revenue of the applicant, the financial institution reports that the gross annual revenue is "not provided by applicant and otherwise undetermined." The Bureau believes that permitting this reporting flexibility for agricultural lenders and other financial institutions will reduce the complexity and difficulty of reporting gross annual revenue information, particularly when an application has been denied or withdrawn early in the process and the gross annual revenue could not be collected.

While the Bureau acknowledges arguments the FCA definition might facilitate compliance among FCS lender staff and other compliance professionals who are already familiar with that definition, the Bureau does not believe

it would be appropriate to deviate from its otherwise widely supported cross-industry approach. While the Bureau acknowledges that the market share of total farm business debt held by FCS lenders is significant (44.4 percent at the end of 2020[580]), the Bureau is mindful that many other types of non-FCS lenders participate in this important small business lending market. Such lenders would not be able to leverage familiarity with the existing FCA definition and may engage in other types of non-farm lending that would not be subject to this definition. As a result, these lenders may not equally benefit from applying the FCA definition to agricultural small businesses. Indeed, the Bureau understands that an association of community banks issued a letter to oppose efforts to obtain special treatment for FCS lenders, stating that "[i]t would be totally inappropriate to exempt FCS lenders from onerous regulatory burdens while subjecting smaller lenders, such as community banks, to those regulations even as both types of lenders are serving the same customer base in many instances."[581] The Bureau believes a consistent small business definition that applies to all financial institutions will result in consistency across the 1071 data, more robust fair lending analyses, and arguably an even playing field for compliance across all financial institutions.

The Bureau acknowledges that a $5 million gross annual revenue threshold will be somewhat overinclusive relative to SBA and Census of Agriculture standards. Some agricultural lenders lament that the threshold would cover almost all their lending and several commenters argued in favor of the FCA definition instead for section 1071 purposes because, they said, it would capture a substantial amount of data while mitigating some of the impact of the compliance cost. As discussed above, the Bureau believes that its $5 million gross annual revenue threshold strikes an appropriate balance between covering the applications of most businesses that are considered small under the SBA's size standards, while minimizing the number of businesses above the SBA's size standards whose

applications will be reported to the Bureau, and in a way that satisfies the SBA's criteria for approving an alternative size standard under its regulations. In striking this balance, the Bureau considered section 1071's statutory purposes, and it believes that a broader scope of coverage with regard to agricultural businesses is warranted, given the historical and/or continuing discrimination against Black farmers and the need for transparency into agricultural lending both for fair lending enforcement and business and community development.

*Other suggested size standards.* The Bureau is not adopting a small business definition based on 4-digit NAICS codes, as suggested by one commenter. As explained above in its discussion of existing SBA size standards, the Bureau believes needing to obtain even a 4-digit NAICS code at the beginning of the application process would often result in a financial institution not being able to determine whether an applicant for business credit is small (and thus subject to the data collection requirements of this final rule) until later in the application process. Similarly, the Bureau believes that a small business definition based on both number of employees and gross annual revenues (e.g., the 500 employee/$8 million standard set forth in the SBREFA Outline and suggested by commenters or one commenter's 100 employee/$1 million standard) would mean that a financial institution would only be able to request an applicant's protected demographic information further along in the application process, once they have obtained the multiple pieces of data that would be necessary to determine whether the applicant is small and, therefore, only at that later stage would it be able to determine that such data collection is required. This delay could interfere with financial institutions' ability to collect these data, particularly for applications that are withdrawn or closed for incompleteness early in the application process, which would limit the usefulness of the data for section 1071's statutory purpose of fair lending enforcement.

### 106(b)(2) Inflation Adjustment

Inflation is a general increase in the overall price level of the goods and services in the economy; deflation marks a general decrease in the same. A price index, of which there are several types, measures changes in the price of a group of goods and services. The Board's Federal Open Market Committee currently finds that an annual increase in inflation of 2 percent in the price index for personal

---

[579] See 85 FR 62372, 62373 (Oct. 2, 2020) (discussing the SBA's revised size standard methodology).

[580] Farm Credit Admin., *2021 Annual Report*, at 16 (2022), *https://www.fca.gov/template-fca/about/2021AnnualReport.pdf*.

[581] Letter from Indep. Cmty. Bankers of Am., to Senate Chairs Stabenow and Brown and Ranking Members Boozman and Toomey (June 23, 2022), *https://www.icba.org/docs/default-source/icba/advocacy-documents/letters-to-congress/senate-letter-opposing-fca-independent-authority-act.pdf?sfvrsn=8d2f1c17_0*.

AdminRecord-000123

consumption expenditures, produced by the Department of Commerce, is most consistent over the longer run with the Board's mandate for maximum employment and price stability.[582] The United States Bureau of Labor and Statistics, which publishes several price indices, found that from December 2020 to December 2021, "consumer prices for all items rose 7.0 percent, the largest December to December percent change since 1981."[583]

In order to keep pace with changes to the SBA's own size standards and the potential impact of future inflation or deflation, the Bureau stated in the NPRM that it was considering whether it might update its proposed $5 million gross annual revenue size standard over time (perhaps at the end of a calendar year in order to allow financial institutions to use the same threshold consistently throughout the year). The Bureau sought comment on how this should be done and the frequency at which it should occur.

Two community groups and a CDFI lender requested that the Bureau address adjustments of its gross annual revenue threshold for defining a small business under the rule. The community groups suggested annual adjustments for inflation, while the CDFI lender suggested an adjustment every five to ten years to account for future inflation and keep pace with changes to the SBA's own size standards. Conversely, a bank argued against incremental adjustments, stating that the Bureau should set its small business definition once in the final rule. Another bank suggested that the Bureau wait to determine if the threshold needs adjusting after it has sufficient data to analyze after several years of collection.

For the reasons set forth herein, the Bureau is finalizing new § 1002.106(b)(2) to provide that every five years after January 1, 2025, the gross annual revenue threshold set forth in § 1002.106(b)(1) shall adjust based changes to the Consumer Price Index for All Urban Consumers (U.S. city average series for all items, not seasonally

adjusted), as published by the United States Bureau of Labor Statistics (CPI– U). Any such adjustment will be rounded to the nearest multiple of $500,000. If an adjustment is to take effect, it will do so on January 1 of the following calendar year.

New comment 106(b)(2)–1 clarifies the Bureau's inflation adjustment methodology. The comment explains that the base for computing each adjustment (both increases and decreases) is the January 2025 CPI–U; this base value will be compared to the CPI–U value in January 2030 and every five years thereafter. The comment provides several examples illustrating this comparison. New comment 106(b)(2)–1 makes clear that if, as a result of rounding to the nearest multiple of $500,000, there is no change in the gross annual revenue threshold, there will be no adjustment.

New comment 106(b)(2)–2 provides that if publication of the CPI–U ceases, or if the CPI–U otherwise becomes unavailable or is altered in such a way as to be unusable, then the Bureau shall substitute another reliable cost of living indicator from the United States Government for the purpose of calculating adjustments pursuant to final § 1002.106(b)(2).

The Bureau agrees with several commenters that it should provide for a mechanism to update the rule's $5 million gross annual revenue size standard over time to account for the potential impact of inflation or deflation. In order to minimize operational disruptions, the Bureau is not adopting an annual adjustment for inflation; instead, a determination regarding the need to adjust the threshold will occur every five years, beginning in 2030, to account for future inflation or deflation on a schedule similar to the SBA's own size standards, which are required to be reviewed no less frequently than once every five years under the Small Business Act.[584] Recently, the SBA added a 13.65 percent inflation increase to its receipts- and assets-based size standards.[585] Moreover, in order to mitigate

commenters' concerns discussed in the section-by-section analysis of § 1002.107(a)(14) regarding complexity and difficulty of collecting gross annual revenue information, the Bureau will round any such adjustment to the nearest multiple of $500,000. The Bureau believes that this rounding, in combination with the approach in final comment 107(a)(14)–1—clarifying that a financial institution need not verify applicant-provided gross annual revenue information, and providing language that a financial institution may use to ask the applicant for such information—will make it easier for financial institutions to more quickly determine small business status for the purpose of rule applicability. The Bureau also believes that this approach is consistent with existing Bureau procedures for inflation adjustments (albeit in a more streamlined way), provides transparency for replication, and will result in less-frequent changes in the reporting requirements of financial institutions, thereby reducing the disruption that an annual inflation adjustment might cause in this situation.

The Bureau is providing commentary to ensure transparency regarding its inflation methodology, which will allow financial institutions to better anticipate and prepare for potential inflation or deflation adjustments. To further explain its methodology, the Bureau is providing the following illustration, which assumes that compliance with the rule was required beginning July 1, 2014, subject to the same five-year adjustment schedule described above. In this illustration, the base for computing each adjustment would be January 2015, which had a CPI–U value of 233.707. Here, the CPI–U value for January 2020 (257.971) would be used for the first five-year inflation update since January 2015 and would update the gross annual revenue threshold to reflect the change in the CPI between January 2015 and January 2020. As demonstrated with the formulas below, the percentage change between those two years' CPI–U values would be calculated (about 10.4 percent) and then would be applied to the $5 million gross annual revenue threshold to get a value of $5,519,112. This would be rounded to $5,500,000 and would become the new threshold effective in January 2021.

---

[582] Bd. of Governors of the Fed. Rsrv. Sys., *What is inflation and how does the Federal Reserve evaluate changes in the rate of inflation?* (last updated Sept. 2016), *https://www.federalreserve.gov/faqs/economy_14419.htm.*

[583] U.S. Bureau of Labor Stat., *Consumer Price Index: 2021 in review* (Jan. 2022), *https://www.bls.gov/opub/ted/2022/consumer-price-index-2021-in-review.htm.*

[584] Pub. L. 111–240, 124 Stat. 2504 (2010); *see also* 13 CFR 121.102(c) (requiring the SBA examine the impact of inflation on monetary size standards (*e.g.,* receipts, tangible net worth, net income, and assets) and make necessary adjustments at least once every five years).

[585] 87 FR 69118 (Nov. 17, 2022).

**35274**   **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

$$\text{GAR effective January 2021} = \$5 \, million \; x \left( \frac{\text{CPI-U January 2020}}{\text{CPI-U January 2015}} \right)$$

$$= \$5 \, million \; x \left( \frac{257.971}{233.707} \right)$$

$$= \$5 \, million \; x \; (1.1038)$$

$$= \$5,519,112$$

$$rounded \; to \; the \; nearest \; \$500,000$$

$$= \$5,500,000$$

All subsequent adjustments would be made in the same manner. For instance, using the above illustrative example, the following calculation would be performed in January 2025 (ten years after January 2015, five years after January 2020):

$$\text{GAR effective January 2026} = \$5 \, million \; x \left( \frac{\text{CPI-U January 2025}}{\text{CPI-U January 2015}} \right)$$

$$rounded \; to \; the \; nearest \; \$500,000$$

The CPI–U series [586] used for the Bureau's inflation adjustment methodology is public and can be used by anyone wishing to perform the calculation themselves. Additionally, the Bureau of Labor and Statistics provides an inflation calculator for this exact CPI–U series, which allows any entity to easily calculate an adjusted gross annual revenue threshold without the need for manual calculations.[587]

In addition to new comment 106(b)(2)–2, discussed above, which clarifies the timing of its inflation adjustments, the Bureau believes that the adjustment schedule set forth below will also be helpful to explain the inflation adjustment timing:

TABLE 2—INFLATION/DEFLATION ADJUSTMENT SCHEDULE

| Date | Inflation/deflation adjustment schedule |
|---|---|
| January 2025 | Base month/year for computing each adjustment. |
| January 2030 | Reference month/year for the first five-year inflation adjustment. |
| Spring–Summer 2030. | Calculation performed to determine changes in the CPI–U between January 2025 and January 2030. |
| January 2031 | If necessary, effective date for the adjusted gross annual revenue threshold amount. |
| January 2035 | Reference month/year for the second five-year inflation adjustment. |
| Spring–Summer 2035. | Calculation performed to determine changes in the CPI–U between January 2025 and January 2035. |
| January 2036 | If necessary, effective date for the adjusted gross annual revenue threshold amount. |

*Section 1002.107   Compilation of Reportable Data*

107(a) Data Format and Itemization

Background

ECOA section 704B(e) requires financial institutions to "compile and maintain" records of information provided by applicants "pursuant to a request under subsection (b)," and requires them to "itemiz[e]" such information to "clearly and conspicuously disclose" a number of data points enumerated in the statute in section 704B(b) and (e)(2).[588] In addition, section 704B(e)(2)(H) provides the Bureau with authority to require "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." Section 1071's statutory purposes are twofold: (1) to facilitate enforcement of fair lending laws; and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[589]

Proposed Rule

The Bureau proposed to adopt the data points enumerated in ECOA section 704B(b) and (e)(2)(A) through (G) largely consistent with its proposals under consideration at SBREFA, but with certain changes as discussed in the proposed rule. Consistent with its

---

[586] Specifically, the Bureau of Labor and Statistics series is CUUR0000SA0 and a chart with its values for all months and years is available at *https://data.bls.gov/timeseries/CUUR0000SA0*. The CPI–U is released on a month lag, so the value for January is available in February.

[587] This calculator is available at *https://www.bls.gov/data/inflation_calculator.htm* and uses the CUUR0000SA0 as the basis for its calculation. To use this calculator for the illustrative example above, enter 5,000,000 in the $ field, enter January 2015 as the starting date, and January 2020 in the subsequent date field. Click on calculate, and the result is $5,519,111.54, the same number as above, which would be rounded to the nearest $500,000, *i.e.*, $5,500,000.

[588] As discussed in greater detail above in E.2 of the *Overview* to this part V, the Bureau interprets the phrase "pursuant to a request under subsection (b)" in section 1071 as referring to all of the data points contemplated by ECOA section 704B(b), not merely whether the applicant is a minority-owned, women-owned, or small business.

[589] ECOA section 704B(a).

approach in the SBREFA Outline,[590] the Bureau proposed data points pursuant to its statutory authority set forth in section 704B(e)(2)(H) relating to pricing, time in business, NAICS code, and number of workers. In addition, based on feedback from small entity representatives and other stakeholders and in the course of developing the proposed rule, the Bureau identified several additional data points that it believed would be important to the quality and completeness of the data collected and would aid significantly in furthering the purposes of section 1071. The Bureau proposed to adopt additional data points regarding application method, application recipient, denial reasons, and number of principal owners. In addition, the Bureau relied on ECOA section 704B(e)(2)(H), as well as its authority under 704B(g)(1), to propose certain clarifications to the data points enumerated in section 704B(b) and (e)(2)(A) through (G).

In regard to the specific method by which a financial institution would collect the data points, the proposed rule would have required a covered financial institution to compile and maintain data regarding covered applications from small businesses, and required that the data be compiled in the manner prescribed for each data point and as explained in associated Official Interpretations (included in the proposed rule) and the Filing Instructions Guide that the Bureau anticipated later providing on a yearly basis. The proposed rule then explained that the data compiled would include the items described in proposed § 1002.107(a)(1) through (21). The Official Interpretations, sometimes referred to as official comments or official commentary, would provide important guidance on compliance with the regulation and were discussed in relation to each data point as well as other regulatory provisions. The Filing Instructions Guide would provide instructions on the operational methods for compiling and reporting data, including which codes to report for different required information. The Filing Instructions Guide would be updated yearly, as is the Filing Instructions Guide that is used with HMDA compilation and reporting.[591] Proposed comment 107(a)–1 would have provided general guidance on complying with § 1002.107(a).

The Bureau crafted the proposed rule in consideration of the concerns and input of the small entity representatives and other stakeholders. First, the proposed rule would generally not have required a financial institution to verify applicant-provided information and limited the data points proposed pursuant to ECOA section 704B(e)(2)(H) to those that the Bureau believed would be most useful for the purposes of section 1071. In addition, the Bureau considered the costs, including data quality scrubs, automation and training, that would be imposed by the collection and reporting of the proposed data points; these were discussed in the proposed rule and that discussion is now updated in part IX below. The Bureau attempted to craft the collection and reporting requirements to be as clear and operationally manageable as possible, and requested comment on potential methods for increasing clarity and manageability.

In regard to concerns from small entity representatives and other stakeholders about being required to collect applicants' protected demographic information for purposes of section 1071, the Bureau noted that several small entity representatives reported collecting this kind of information currently in certain situations (because they are CDFIs, or because they are participating in certain SBA or similar guarantee programs). In addition, the Bureau crafted the proposed rule to provide flexibility for financial institutions in the collection and reporting of this information. The Bureau also did not propose an exemption for small financial institutions from reporting data points adopted pursuant to ECOA section 704B(e)(2)(H), as suggested by some small entity representatives and commenters, though it did propose an exemption from the rule for certain institutions with limited small business credit originations.

The Bureau sought comment on its proposed approach to the collection and reporting of data points, including the specific requests for input above and in the section-by-section analysis of each of the proposed data points.

Comments Received

The Bureau received numerous comments discussing the general data point collection and reporting requirements from banks, trade associations, credit unions, farm credit institutions, community groups, lenders, research institutions, an association of State bank supervisors, and a Federal agency. This comment summary section will discuss the comments regarding the overall data points first, then focus on those that dealt specifically with the data points proposed pursuant to ECOA section 704B(e)(2)(H) (often making statements similar to those on the overall data points). Comments regarding individual data points are discussed below in the section-by-section analyses that follow.

*General data point comments.* Several community groups and a business advocacy group supported the overall data points requirements, stating that robust data are essential for understanding underwriting, gaps in lending, unmet community needs, and other issues that stand in the way of equitable, responsible lending. A business advocacy group stated that the recent enhancement of HMDA data proves the importance of robust data because of its strongly positive impact on lending to minorities. That commenter also stated that the rule should start out with the collection of granular data because discrimination often involves not only credit denials but also less favorable credit terms.

A joint comment letter from community groups, community oriented lenders, and business advocacy groups stated that CDFIs and mission-driven lenders, who will have to comply with the data point reporting requirements, view the costs as reasonable considering the benefits of the rule. Two community-oriented lenders made similar statements, saying that they already collect most of this information for underwriting and compliance with other requirements. One also stated that it does not plan to raise fees or restrict access to credit as a result of the rule. One rural community group stated that the data points will be important for understanding agricultural lending and for that reason supported the inclusion of agricultural lending under the rule.

Several industry commenters stated that the data points were too numerous and would be burdensome to collect and report. These commenters stated that setting up the compliance system would be particularly costly and that the cost would have to be passed on to customers, and one suggested that the Bureau should reconsider moving forward with the rule. These commenters also stated that financial institutions do not currently collect these data points. A trade association for online lenders stated that collecting these data points would interfere with online lenders' business model and the Bureau should obtain this information from other sources, such as the SBA, the Minority Business Development Agency, and the Treasury Department. A bank stated that 1071 data disclosure

[590] SBREFA Outline at 34–35.

[591] *See generally* Fed. Fin. Insts. Examination Council, *The Home Mortgage Disclosure Act, https://ffiec.cfpb.gov/* (last visited Mar. 20, 2023).

AdminRecord-000126

will help address significant racial and gender gaps but asked that the Bureau consider the depth and breadth of the data collected because community banks are faced with what it referred to as seemingly continuous data collection (for HMDA, Bank Secrecy Act, etc.) and regulatory exams. The bank also asked that the collection method be "SMART" (specific, measurable, attainable, realistic, and timely) in order to reduce burden.

Several banks suggested that HMDA data yield useful fair lending analyses in the residential mortgage market because those loans are underwritten similarly. In contrast, they stated, small business loans are more complex and unique and have to be manually underwritten to consider numerous variables in accordance with the individual institution's standards, rendering any fair lending analyses flawed and unreliable. One of these commenters suggested that if fair lending analysis is to be performed using only the data points proposed, lenders will be forced to revamp and substantially limit the inputs used in decision making, ultimately leading to a smaller number of product offerings and fewer approvals for small business loans overall.

Industry commenters also made several other suggestions and requests regarding the proposed data points. Two commenters asked that the Bureau eliminate or reduce the use of free-form text to report additional information, suggesting that the information gathered would be burdensome, hard to trend, open to different interpretations, and unreliable. Two commenters stated that it was important that applicants provide their information voluntarily. A trade association asked for reporting flexibility when information is not available, recommending the use of "declined to answer" if the applicant declined, and "not available" for all other circumstances in which the applicant did not provide the information notwithstanding the lender's inquiry.

One commenter asked for a rule provision stating that the collection and reporting requirements under the rule are not intended to limit the range of data that a financial institution may collect, use, and share for its own purposes. That commenter stated that technology companies currently use numerous data points when making credit decisions that enable them to extend credit to a wider range of applicants, and limiting their ability to do so could limit access to credit for small businesses.

*Issues regarding data points proposed pursuant to ECOA section 704B(e)(2)(H).*

The Bureau received numerous comments from lenders, community groups, and individual commenters supporting inclusion of the data points proposed pursuant to ECOA section 704B(e)(2)(H). Several of these commenters stated that such data points are important because the dataset must include key underwriting variables in order to fulfill section 1071's fair lending purpose. One commenter stated that these data points are necessary to ensure proper analysis and not allow lenders, as HMDA reporters have done, to hide behind data *not* collected as a reason for lending disparities. Two commenters stated that such data points are necessary because robust data are needed to illuminate who lenders are serving and who they are excluding.

Several commenters stated that the Bureau must require the collection and public dissemination of a database detailed enough to meaningfully achieve section 1071's fair lending and community development purposes. Others suggested that the data points proposed pursuant to ECOA section 704B(e)(2)(H) will allow comparisons of small businesses in general with very small businesses, which they view as the bedrock of communities. One commenter said that such data points will help CDFIs better understand the small business credit market, especially in low-income communities, and whether and how discrimination in small business lending is occurring. That commenter and another also stated that robust data will help policymakers and the public to better understand lending gaps and unmet community needs.

One lender stated that the proposed data points will provide insight on the quality of the capital accessed by different demographic groups of small business applicants, which will be useful in not only identifying potentially discriminatory lending practices, but also highlight capital gaps in the marketplace that lenders may be able to fill. It also said that the data will show how financial institutions compare across key metrics and help determine if an institution has equitable lending, providing an unprecedented snapshot of the lending landscape for small businesses.

The Bureau received a large number of comments, mainly from industry, objecting to the inclusion of data points proposed pursuant to ECOA section 704B(e)(2)(H). Commenters made many objections, but the most common was that such data points are not collected now and would add significantly to the burden imposed by the rule, raising costs for borrowers. Many commenters

also stated that several of these data points would be of little use and some suggested that they could result in inaccurate data. Many commenters suggested that the extra burden would reduce the availability of small business credit, and some stated that the extra burden of such data points would limit community banks' survivability and speed up consolidation and the closing of branches in rural and underserved communities. Other commenters also stated that these data points would be particularly difficult for institutions that do not have any reporting requirements under HMDA, credit unions, auto finance lenders, CDFIs, and/or smaller lenders in general. Several commenters stated that because farm credit associations are often customer owned, the increased costs would be imposed directly on the borrowers. One commenter stated that the data points proposed pursuant to ECOA section 704B(e)(2)(H) can fluctuate during loan processing, and would create tracking issues and reporting errors. Some commenters suggested that small business applicants would not want to provide so much information, which would slow down and interfere with the lending process.

Numerous commenters stated that small business lending is complex and nuanced and very different from residential lending, and the partial information provided by the data points would lead to inaccurate interpretations and potentially interfere with current credit approval methods. Several of these commenters stated that if statistical disparities are detected using the more straightforward data points adopted pursuant to ECOA section 704B(e)(2)(A) through (G), those disparities can be researched on an institution, transaction, or file basis, providing the same information that the Bureau has proposed to collect pursuant to 704B(e)(2)(H), but within context and without raising false positive flags. Those commenters and others stated that including too many unreliable and nuanced data point analyses will result in numerous false positives and inaccurate and unfair conclusions by community groups and their members, and potentially regulators. A State bankers association stated that these data could be used against banks as a competitive advantage for credit unions and other non-traditional lenders. Conversely, a credit union trade association stated that any rule to implement section 1071 will widen the competitive gulf between credit unions and big banks and "fintechs" that have the economies of scale and the

AdminRecord-000127

technological sophistication to automate complex functions, and the data points proposed pursuant to ECOA section 704B(e)(2)(H) would make this problem worse. Another commenter stated that it would be unfair to compare some such data points between regulated and non-regulated entities because regulated entities have additional costs.

Some commenters who objected to the inclusion of data points pursuant to ECOA section 704B(e)(2)(H) suggested that the Bureau should first require the data points enumerated in 704B(e)(2)(A) through (G), then add any other appropriate data points over time. They explained that this approach would allow the Bureau to assess the burden and potential restriction of small business credit imposed by the data points in 704B(e)(2)(A) through (G) before moving forward with further requirements only if appropriate and beneficial. Some commenters also pointed out that HMDA reporting evolved over many years and the "all at once" approach in the proposal is a mistake and will not allow lenders time to adjust.

Several small lenders and their trade associations stated that if the Bureau opts to require some or all of the data points proposed pursuant to ECOA section 704B(e)(2)(H), then it should consider partial collection of data for community banks and other small lenders. A trade association for community banks suggested that the cost of such data points would include expensive data quality scrubs to avoid negative exam findings, which would be disproportionately borne by smaller financial institutions. That commenter was also concerned that the rule could require the standardization and homogenization of small business lending, damaging the customized and relationship-based lending for which community banks are valued. The commenter went on to state that if community banks are forced to standardize, it will especially harm the vulnerable small businesses that most benefit from the high-touch, relationship-based lending that they offer.

Some commenters stated that the data points proposed pursuant to ECOA section 704B(e)(2)(H) would create serious privacy risks. Several commenters suggested that this was especially a concern in rural areas where the applicant might be identified through certain data points, such as the combination of the NAICS code and census tract, and this risk might lead some small businesses to not apply for credit. Some of these commenters also stated that it would be disadvantageous

for financial institutions to have access to pricing terms of their competitors. One of these commenters stated that collecting more data points would increase business borrower perception that this information is being used in the credit decision.

One commenter suggested that data collection mandates in excess of what the law requires may be found to be "arbitrary and capricious," if a court decides that the Bureau has "relied on factors which Congress has not intended it to consider" or "offered an explanation for its decision that runs counter to the evidence before the agency." The commenter did not explain whether or how the proposed data points might be viewed this way. Another commenter stated that the full scope of data that the rule would require financial institutions to report is inconsistent with the operation of business credit markets, and that Congress established a limited scope data collection regime in section 1071. That commenter further stated that if Congress intended to require all covered financial institutions to proactively deliver the same data required in fair lending enforcement actions, Congress would have written that into the law. Although not specifically mentioning the relevant legal standard for inclusion of such data, several industry commenters argued that some or all of the data points proposed pursuant to ECOA section 704B(e)(2)(H) would not fulfill the purposes of section 1071.

*Final Rule*

As discussed in the section-by-section analyses that follow, the Bureau has made changes to many of the proposed data points in order to carry out the purposes of section 1071 more effectively and to reduce any difficulties the rule might impose on small business lenders. In particular, the Bureau has sought to: (1) improve the usefulness of the data points for fair lending analysis and for business and community development purposes; and (2) facilitate compliance by, among other things, focusing on the reporting of information the financial institution already collects or possesses. The Bureau's NPRM approach, comments received, and final rule (including changes to specific data points) are discussed for each data point in turn. The Bureau notes that proposed § 1002.107(a)(19), "women-owned business status," has been combined with proposed § 1002.107(a)(18), "minority-owned business status," and the final § 1002.107(a)(18) data point now addresses "minority-owned, women-owned, and LGBTQI+-owned business statuses." As a result, the data

points in proposed § 1002.107(20) and (21) have been renumbered as final § 1002.107(19) and (20).

The Bureau is finalizing the introductory text to § 1002.107(a), regarding data format and itemization, to reflect the number of data points in the final rule. Final § 1002.107(a) provides that a covered financial institution shall compile and maintain data regarding covered applications from small businesses, and that the data shall be compiled in the manner prescribed in the individual data point provisions and the Filing Instructions Guide for subpart B for the appropriate year. Furthermore, the data compiled shall include the items described in final § 1002.107(a)(1) through (20). The Bureau believes that these methods will facilitate compliance and yield quality data, and did not receive comments on the specific text of § 1002.107(a) or associated commentary.

The Bureau is finalizing comment 107(a)–1 to provide general guidance on complying with § 1002.107(a). Comment 107(a)–1 explains that a covered financial institution (i) reports the data enumerated in § 1002.107(a) even if the credit originated pursuant to the reported application was subsequently sold by the institution; (ii) annually reports data for covered applications for which final action was taken in the previous calendar year; and (iii) annually reports data for a covered application on its small business lending application register for the calendar year during which final action was taken on the application, even if the institution received the application in a previous calendar year. The Bureau believes that these operational instructions will clarify a financial institution's collection and reporting requirements and so facilitate compliance. The Bureau also believes that these instructions will help to ensure the accuracy and consistency of the data collected and reported. The Bureau did not receive comments on comment 107(a)–1.

The final rule adds new comment 107(a)–2, which explains that a covered financial institution may use technology such as autocorrect and predictive text when requesting applicant-provided data under subpart B that the financial institution reports via free-form text fields, provided that such technology does not restrict the applicant's ability to write in its own response instead of using text suggested by the technology. The Bureau believes that the ability to use autocorrect and predictive text will facilitate the use of free-form text boxes. The Bureau considered commenters' objections to the use of free-form text

AdminRecord-000128

boxes for collecting and reporting data under this final rule. Although the Bureau is aware that data collected with predetermined lists is easier to report and work with, the Bureau believes that free-form text responses will provide useful information that would not otherwise be collected, as they have done for HMDA data, and the use of autocorrect and predictive text will facilitate use of free-form text boxes and reduce inadvertent errors or typos.

The Bureau is finalizing comment 107(a)–3 (which was numbered as comment 107(a)–2 in the proposal) as proposed, except that the final rule adds a web address instead of the placeholder in the proposed rule. Final comment 107(a)–3 explains that additional details and procedures for compiling data pursuant to § 1002.107 are included in the Filing Instructions Guide, which is available at *https:// www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/*. As explained above, the Bureau did not receive comments on the use of the Filing Instructions Guide.

The Bureau is also adding new comment 107(a)–4, to make clear that the Bureau may add additional response options to the lists of responses contained in certain of the individual data-point comments, via the Filing Instructions Guide, and instructs financial institutions to refer to the Filing Instructions Guide for any updates for each reporting year. For example, a credit purpose provided frequently in the free-form text box for that data point could be added to the response options via listing in the Filing Instructions Guide. The Bureau believes that such flexibility will enhance the quality and currency of the data collected. In addition, because financial institutions must refer to the Filing Instructions Guide when compiling, maintaining and reporting their data, the Bureau does not believe that this flexibility will add operational difficulty to the reporting of data under this final rule.

*General data point issues.* In regard to the comments suggesting that the overall data point collection regime is too burdensome, the Bureau notes that most of the data points are enumerated in the statute and the Bureau has implemented the data points in such a way as to reduce the burden of compilation and reporting as much as feasible while fulfilling the purposes of section 1071. The Bureau does not require verification of applicant-provided data, allows responses of "not applicable" and "not provided by applicant and otherwise undetermined" when appropriate, and provides several

safe harbors to facilitate compliance. In addition, the Bureau believes that it has set up the compilation and reporting system in a way that is specific, measurable, attainable, realistic and timely, as requested by a commenter. In addition, see the discussion below regarding other data points considered for further information on the question of the rule's burden and the issue of accuracy of fair lending analysis and small business credit data.

In regard to the suggestion that the Bureau use other sources to obtain information regarding small business credit instead of via this rulemaking, as explained above the Bureau does not believe that currently available sources are sufficient to carry out the purposes of section 1071, and Congress required the Bureau to promulgate a rule to collect the data. In addition, the Bureau notes that the data collected under this rule are not exclusive, and financial institutions may collect any other data allowable under current law to use in processing or underwriting small business credit. For this reason, the Bureau does not believe that this final rule will interfere with online lenders' business practices, which a commenter was concerned about, or the business practices of other entities that offer small business credit. In addition, the Bureau does not believe that compilation of data under this final rule will interfere with relationship banking by community banks, because they will continue to be able to relate to and serve customers as they have done previously, and may continue to make credit decisions in any legally appropriate fashion that they have done in the past.

As for the commenter's concern that applicant responses are voluntary, the Bureau notes that although financial institutions are required to have processes and procedures in place to collect these data, applicants are free to choose not to answer their requests. For the collection of demographic data, applicants may select an option of "I do not wish to respond" or similar. For many of the other data points, so long as a financial institution maintains procedures reasonably designed to collect applicant-provided data, a financial institution may report "not provided by applicant and otherwise undetermined." In regard to the commenter's request that the Bureau allow responses of "declined to answer" and "not available," the Bureau believes that the reporting options of "not provided by applicant and otherwise undetermined" and "not applicable" are more suited to this data collection, and notes that the commenter did not

explain why the suggested responses would be better.

*Issues regarding data points adopted pursuant to ECOA section 704B(e)(2)(H).* The Bureau is finalizing its proposed data points with certain changes as described in the respective section-by-section analyses of those data points below. The Bureau is relying on ECOA section 704B(e)(2)(H), as well as its authority under 704B(g)(1), to make clarifications to certain of the data points set forth in 704B(b) and (e)(2)(A) through (G), as described in the section-by-section analyses of those data points below.

Pursuant to its statutory authority set forth in ECOA section 704B(e)(2)(H), the Bureau is adopting data points for pricing, time in business, NAICS code, number of workers, application method, application recipient, denial reasons, and number of principal owners. The Bureau has determined that these data points will serve the purposes of section 1071, improve the utility of the data for stakeholders, and reduce the occurrence of misinterpretations or incorrect conclusions based on analysis of an otherwise more limited dataset. In finalizing these data points, the Bureau considered the additional operational complexity and potential reputational harm described by commenters that collecting and reporting these data points could impose on financial institutions. The Bureau seeks to respond to industry concerns by adopting a limited number of data points that will offer the highest value in light of section 1071's statutory purposes. For this reason, the Bureau is not adopting certain additional data points suggested by commenters such as credit score, applicant's disability status, or business structure (see the discussion below).

In addition, the Bureau did not choose to take an incremental approach to adding data points, as several commenters suggested, or permit collecting and reporting of certain data points to be phased in over time. The Bureau believes the information from the data points adopted pursuant to ECOA section 704B(e)(2)(H) will enhance the usefulness of the data points enumerated in 704B(e)(2)(A) through (G), and further section 1071's purposes for the reasons stated above and in the descriptions of those data points in the section-by-section analyses below, and so should be collected and reported as soon as possible. In addition, data from these data points will be an important part of the privacy risk assessment that the Bureau will conduct after the first full year of data are received. In response to the

AdminRecord-000129

commenters who expressed concern about privacy risks, the Bureau notes that when making modification and deletion decisions prior to publication of the data, it intends to consider re-identification risk and other cognizable privacy risks. See part VIII below for additional information.

As explained above, numerous industry commenters stated that data points adopted pursuant to ECOA section 704B(e)(2)(H) would make the rule more burdensome, result in greater costs for not only financial institutions but also their small business customers, and potentially lead to a reduction in credit availability. The Bureau does not believe that the effects on the small business credit market from the data points adopted pursuant to ECOA section 704B(e)(2)(H) will be so pronounced. Rather, such data points will add only incremental costs to the rule,[592] and the Bureau has carefully crafted all the data points in the final rule to provide flexibility by allowing reporting of information that is already present in the credit file or easily gathered from the applicant. In addition, the final rule does not require verification, allows for responses of "I do not wish to respond" or similar, "not applicable," and "not provided by applicant and otherwise undetermined" when appropriate, and provides several safe harbors to facilitate compliance and reduce costs in the compilation and reporting of the data points.

Numerous industry commenters also stated that the small business credit market is different from the residential housing market disclosed in HMDA data, and the varied and complex nature of the small business application, underwriting and approval processes will cause the data collected pursuant to ECOA section 704B(e)(2)(H) to suggest false positives for discrimination. Although the potential risk of misinterpretation exists with all public data, the Bureau notes that any fair lending analysis of the public dataset should be considered preliminary to meaningful further investigation, and inferences from the public data alone are not determinative of unlawful discrimination.[593] Furthermore, the

Bureau believes that the additional information from these data points is more likely to eliminate false positives than to create them. For example, knowing applicants' time in business will help to avoid comparing credit outcomes for established businesses with outcomes for riskier start-ups and expecting them to be similar. In this way, regulators engaged in fair lending analysis, and the financial institutions they are examining or researching, will be able to avoid unnecessary further investigation.

Many industry commenters also suggested that information from data points adopted pursuant to ECOA section 704B(e)(2)(H) will be unreliable and not useful for data users. However, the Bureau considers the information required to be reported to be very useful in fulfilling the fair lending and business and community development purposes of section 1071, as explained in the section-by-section analysis of each of these data points below. Although, as one commenter pointed out, some of these data may change in the course of credit processing, HMDA data and the data from the data points specified in ECOA section 704B(e)(2)(A) through (G) often do the same. The Bureau believes that financial institutions will use the appropriate information from the credit file and report accurately, as the overwhelming majority of HMDA reporters do now.

As explained above, some commenters stated that many applicants will not want to provide the requested information and some may be concerned that the information will be used in the credit decision if too much information is requested. The Bureau does not believe that these problems will be widespread, and to the extent that they do manifest, the financial institution can use the appropriate responses to indicate that the applicant did not wish to provide information. The Bureau also believes that applicants for small business credit expect to be asked for numerous pieces of information, and the applicant-provided data points adopted pursuant to ECOA section 704B(e)(2)(H) (NAICS code, number of workers, time in business, and number of business owners) do not appear likely to raise red flags.

Other commenters were concerned that different types of financial institutions would fare differently regarding the data points adopted

pursuant to ECOA section 704B(e)(2)(H), and this difference would create competitive distortions. The Bureau does not believe that the structure of a financial institution will have a large effect on the difficulty of reporting such data points. Because all covered financial institutions have the same responsibilities under this final rule, the Bureau believes that the effects on different financial institution types will be similar. Numerous commenters also stated that small financial institutions, such as community banks and small credit unions, would be disadvantaged because they lack the economies of scale to allow them to readily absorb the rule's costs. Several of these commenters requested an exemption for these institutions from any data points adopted pursuant to ECOA section 704B(e)(2)(H), but the Bureau has determined that such an additional exemption that focuses specifically on such data points is not appropriate. As explained in the section-by-section analysis of § 1002.105 above, the proposed exemption for certain institutions with limited small business credit originations is now finalized at a higher transaction level than proposed, exempting a larger number of small financial institutions from section 1071's data collection and reporting obligations. Furthermore, the usefulness of the data collected would be reduced if the dataset is incomplete for some financial institutions. In addition, the Bureau will provide assistance to small institutions and compliance vendors during the implementation period to help them transition to the new rule's requirements.

In regard to the commenters who discussed legal issues involved in this rulemaking, the Bureau notes that each of the data points adopted pursuant to ECOA section 704B(e)(2)(H) fulfills the purposes that Congress stated in section 1071, fair lending and business and community development, as explained in the section-by-section analyses that follow. In addition, the Bureau has carefully considered the evidence before it, including from the SBREFA process and public comments, and has based its decisions regarding these data points on that evidence in relation to the factors that Congress intended it to consider. Furthermore, as explained above, the Bureau does not consider that the full data collected, whether pursuant to ECOA section 704B(e)(2)(A) through (G) or pursuant to section 704B(e)(2)(H), should be used alone to determine whether a lender is complying with fair lending laws. When regulators conduct fair lending examinations, they will

---

[592] See part IX.F.5 below for a discussion of the economic impacts of an alternative that only includes the data points specified in ECOA section 704B(e)(2)(A) through (G).

[593] In regard to the HMDA dataset for 2020, the Bureau publicly stated that "HMDA data are generally not used alone to determine whether a lender is complying with fair lending laws. The data do not include some legitimate credit risk considerations for loan approval and loan pricing decisions. Therefore, when regulators conduct fair lending examinations, they analyze additional information before reaching a determination about

an institution's compliance with fair lending laws." See CFPB, FFIEC Announces Availability of 2020 Data on Mortgage Lending (June 17, 2021), https://www.consumerfinance.gov/about-us/newsroom/ffiec-announces-availability-of-2020-data-on-mortgage-lending/.

consider additional information before reaching a determination about an institution's compliance. The Bureau considers the scope of data reported to be well within the parameters of congressional intent apparent in section 1071.

Other Data Points Considered

As mentioned above, small entity representatives and other stakeholders suggested some additional data points for the Bureau's consideration, and the Bureau considered others in the development of the proposed rule. Because of the operational complexities likely to be posed by each of these potential data points, as well as the reasons explained below, the Bureau chose not to propose to include any of the following data points in the rule. Nonetheless, the Bureau sought comment on whether the following potential data points or any others would further the purposes of section 1071 and thus should be considered for inclusion in the final rule.

*Type of business/entity structure (sole proprietorship, C-corporation, limited liability company, partnership, etc.).* This information could be useful in providing context to the ethnicity, race, and sex data regarding applicants' principal owners. However, the Bureau believed that collecting the number of principal owners, as proposed in § 1002.107(a)(21), would better serve this purpose.

*Credit score.* Collecting credit score and other credit information could be particularly useful for the fair lending purpose of section 1071. However, because of the different types of scores and different situations in which a financial institution would or would not access scores, the Bureau believed that this data point could be quite complicated and involve complex sub-fields, which could pose operational difficulties for financial institutions in collecting and reporting this information. These complexities could also make it difficult for data users to understand and interpret credit score data.

*Credit reporting information, including whether credit information was accessed.* This data point could also be complicated and involve complex sub-fields, making it difficult for financial institutions to collect and report. As with credit score, these complexities could also make it difficult for data users to understand and interpret these data. In addition, it was not clear that this information would be useful without also collecting credit score.

*Percentage ownership of each principal owner and percentage ownership by women and by minorities.* This information could be useful in providing context to the ethnicity, race, and sex data regarding applicants' principal owners. However, the Bureau was concerned that requesting this type of percentage data could be confusing to applicants and could result in inconsistent responses across applicants and institutions. The Bureau believed that collecting the number of principal owners (those individuals who each directly own 25 percent or more of the equity interests of a business), as proposed in § 1002.107(a)(21), would better serve this same purpose.

*Whether the applicant has an existing relationship with the financial institution and the nature of that relationship.* This information could provide additional context for a financial institution's credit decision, and thus could be useful for both of section 1071's statutory purposes. However, the Bureau believed that the usefulness of the data collected might not justify the additional operational complexity of identifying and tracking such relationships for reporting.

*Customer number, and/or unique (but anonymous) identification number for applicants or associated persons for tracking of multiple applications.* This information could be useful to track multiple applications by a single small business within a particular financial institution, whether submitted at one time or over the course of the year. However, the Bureau believed that the potential difficulties posed by requiring the reporting of this information—particularly for applications that have been withdrawn or abandoned—would not be warranted in light of the utility of the data.

Comments Received

*Type of business/entity structure.* The Bureau received comments from some lenders, community groups, and others requesting the inclusion of a data point for type of business structure. The Bureau did not receive any comments specifically opposing the inclusion of type of business structure, though the Bureau understands the overwhelming industry opposition to all data points adopted pursuant to ECOA section 704B(e)(2)(H) likely implicates this one.

Commenters stated that collecting type of business structure would allow for better analysis of credit outcomes, because different structures may indicate varying levels of sophistication and can be viewed differently by creditors. One commenter pointed out that Black and Latino business owners

are more likely to have non-employer businesses, and type of business structure could help identify those businesses and track their access to credit. That commenter also stated that without the information about business structure, it will not be possible to identify gaps in capital access between sole proprietorships (often minority owned) and other forms, and so collecting business structure will help ensure that future capital programs, whether private or public, adequately include or target business structures. One commenter stated that business structure, along with credit score, would be important for rooting out patterns of discriminatory or exclusionary lending practices in the deep South. A CDFI lender stated that being able to differentiate between sole proprietors versus corporations is also key for philanthropic efforts that may aid the work of mission-based lenders working with specific underserved communities, and added that it already collects this information for the SBA 7(a) program, Paycheck Protection Program, and the CDFI Fund. Discussing the Bureau's suggestion that collecting the number of principal owners would provide the desired context, a commenter stated that under the proposal, only a natural person who directly owns at least 25 percent of a business is counted as a principal owner, and thus a partnership, corporation, and sole proprietorship could appear similarly situated despite presenting different credit needs.

*Credit score.* The Bureau received numerous comments from community groups, community-oriented lenders, business advocacy groups, and others requesting the inclusion of a data point for credit score. The Bureau did not receive any comments specifically opposing the inclusion of credit score, though the Bureau understands the overwhelming industry opposition to all data points adopted pursuant to ECOA section 704B(e)(2)(H) as likely implicating this one.

Commenters stated that including a data point for credit score, along with other key underwriting criteria, was important for effective fair lending analysis. A joint letter from community and business advocacy groups stated that the Federal Reserve Banks in their annual small business surveys have found large disparities in credit access even after controlling for credit scores, and other commenters agreed that this was the case. Many compared the situation to HMDA, where credit scores were only recently required, suggesting that the lack of credit scores allowed lenders to avoid accountability. A number of community groups stated

that, in addition to fair lending, credit scores allow users to understand the characteristics of applicants that are denied credit so as to identify areas of unmet need. A joint letter from community groups and community oriented lenders stated that more than half of Black individuals and 41 percent of Latinos have low or no credit scores, which impacts their ability to access financing. One community group stated that since the Bureau implemented the expanded HMDA data collection rules, they have determined that in their county Black mortgage applicants are more than 10 percent likelier than white applicants to be denied for credit history, and that having more robust information would allow them to better advocate to their financial partners for more equitable credit scoring models in small business lending. A CDFI lender stated that lenders rely heavily on credit scores to assess borrower risk and creditworthiness, and they are used in many cases to screen for pre-qualified and/or pre-approved applicants before moving further in the application process. Several rural community groups stated that credit score reporting would be important for analyzing potential discrimination in farm credit.

Numerous commenters suggested that requiring credit scores would not be as complicated or difficult as the Bureau stated in the proposed rule, pointing out that HMDA currently requires credit score reporting and this rule could use a similar method. Commenters said lenders that rely on an individual or composite credit score of business owners should be required to report that score and the scoring model used, as is currently required under HMDA. A CDFI lender stated that it would be straightforward for lenders to disclose borrower credit scores, type (personal or business), and scoring model and version in accordance with HMDA procedures, including the options to select not applicable and write in the name and credit scoring model if not listed. Once commenter suggested requiring only personal credit scores because business scores were not yet industry standard. A community group suggested that the Bureau use the Federal Reserve Bank of Atlanta's small business credit survey method, which they said accommodates a single score irrespective of how it was used by the lender. Another CDFI lender stated that it already collects credit score for the CDFI Fund. Several commenters stated that privacy would not be a problem, and some suggested that credit scores could be released in ranges or other

non-specific methods to avoid any issue.

*Disability status.* Although the Bureau did not propose or seek comment on the possibility of including the disability status of applicant owners as a data point, a number of commenters requested that the Bureau do so. An advocacy group for persons with disabilities stated that this population is twice as likely as people without disabilities to be living in poverty, twice as likely to use costly nonbank lending, and twice as likely to be unbanked. They stated further that people with disabilities that are part of the labor force are more likely to own small businesses than those without disabilities, and that for a growing number of adults with disabilities, establishing small businesses has become a viable path to improve their economic stability and security. Finally, they stated that the absence of disability data renders people with disabilities invisible and creates an obstacle to understanding and analyzing potential discriminatory lending practices and creates a challenge in advocating for and designing effective policies. Other commenters referred to and supported this organization's comment letter.

Some commenters stated that discrimination against people with disabilities is clearly present in society, and several suggested that including a disability data point would further enforcement and implementation of section 1071, the Americans with Disabilities Act, and various bank vendor procurement programs, amongst other laws and initiatives. One commenter stated that people with disabilities often face significant economic disparities such as lower net worth or thinner credit history that may create barriers to entrepreneurship. A CDFI lender stated that it already collects this information for the SBA 7(a) program.

*Additional agricultural data.* Although the Bureau did not propose or seek comment on the issue, two rural community groups requested that the final rule include additional data points regarding agricultural credit. One of these commenters stated that the Bureau should require reporting of farm marketing strategies, years of farmer experience, and certain kinds of farm production certifications (USDA Organic, animal welfare, labor standard certification, etc.) to help determine if all farm operations are treated equally in the lending process. The other requested that information regarding base acre payments (farm program benefit payments) be reported because information on program benefits

attached to base acres is valuable to minority farmers' farm credit loan making and servicing. That commenter also asked that the Bureau require reporting on collateral requirements, on differences in appraised value or loans or loan modifications rejected based on failure to appraise, on refinancings precipitated by required graduation from Farm Service Agency loans, and on all forms of loan modifications that have historically been a central factor in farm loss for farmers of color.

*Other requested data points.* The Bureau received requests for several other additional data points that were not proposed and on which it did not seek comment. Commenters suggested that the Bureau require reporting on veteran status, limited English proficiency status, and senior citizen status in order to monitor risks to these groups. A CDFI lender stated that it already collects veteran status for SBA 7(a) loans and other programs. They also stated that it collects information on low-income owned or controlled status for the CDFI Fund, though did not specifically ask the Bureau to require reporting of that information or veteran status.

Commenters also requested that the Bureau require reporting of the appraised value of collateral in relation to the loan amount, the origination date, community of residence (using ZIP code, school zone or other demographic data), the type of purchaser of the originated credit, and a legal entity identifier (LEI) for the small business applicant.

## Final Rule

The Bureau is adopting a limited number of data points pursuant to the authority set forth in ECOA section 704B(e)(2)(H) that it believes will offer the highest value in light of section 1071's statutory purposes. The Bureau believes that the potential additional data points that it sought comment on would pose operational complexities, as would the other data points suggested by commenters. For these reasons, and the reasons explained below, the Bureau is not including any of the following data points in this final rule.

*Type of business/entity structure.* The Bureau believes that collecting the number of principal owners will be more useful than type of business structure in providing additional useful context to the ethnicity, race, and sex data regarding applicants' principal owners. In addition, the Bureau believes that the number of workers and gross annual revenue data points will provide useful context regarding the size and sophistication of the applicant, which

AdminRecord-000132

appears to address the primary reason that commenters wanted type of business structure to be collected.

*Credit score.* Although the Bureau agrees with commenters that this data would be useful for fair lending analyses, it nonetheless could be quite complicated and involve complex sub-fields, which could pose operational difficulties for financial institutions, especially given the use of business credit scores as well as personal credit scores in small business lending.

*Disability status.* The Bureau did not propose or seek comment on including this data point, and so does not have the benefit of robust stakeholder input as to whether and how to implement it. More importantly, ECOA does not include disability as one of the enumerated bases on which discrimination is prohibited, and so it is not clear that the Bureau has the legal authority to include this data point.

*Additional agricultural data.* The Bureau did not propose or seek comment on including these data points, and so does not have the benefit of robust stakeholder input as to whether and how to implement them. In addition, the Bureau does not have sufficient other information to assess the importance or feasibility of requiring that these data points be reported.

*Other requested data points.* The Bureau did not propose or seek comment on including these data points regarding veteran, limited English proficiency, and senior citizen status, and so does not have the benefit of robust stakeholder input as to whether and how to implement them. In addition, the Bureau does not have sufficient other information to assess the importance or feasibility of requiring that these data points be reported.

*Credit reporting information, including whether credit information was accessed.* Commenters did not focus on this potential additional data point that the Bureau sought comment on, instead focusing their requests on the related potential credit score data point discussed above. For the reasons discussed above, the Bureau is not including this data point in the final rule.

*Percentage ownership of each principal owner* and *percentage ownership by women and by minorities.* The Bureau did not receive comments on this potential additional data point that the Bureau sought comment on. For the reasons discussed above, the Bureau is not including this data point in the final rule.

*Whether the applicant has an existing relationship with the financial institution and the nature of that relationship.* The Bureau did not receive comments on this potential additional data point that the Bureau sought comment on. For the reasons discussed above, the Bureau is not including this data point in the final rule.

*Customer number, and/or unique (but anonymous) identification number for applicants or associated persons for tracking of multiple applications.* The Bureau did not receive comments on this potential additional data point that the Bureau sought comment on. For the reasons discussed above, the Bureau is not including this data point in the final rule.

107(a)(1) Unique Identifier

Proposed Rule

ECOA section 704B(e)(2)(A) requires financial institutions to collect and report "the number of the application . . . ." Regulation C includes a similar reporting requirement for a universal loan identifier,[594] though some insured credit unions and depositories whose lending activity falls below applicable thresholds are partially exempt and only need to report a non-universal loan identifier.[595] Both the universal loan identifier and the non-universal loan identifier use only alphanumeric characters, and do not allow use of identifying information about the applicant or borrower in the identifier. The universal loan identifier is "unique" in the national HMDA reporting market because it uses a unique LEI for the reporting institution and then the identifier is required to be unique within that institution.[596] The universal loan identifier must be no more than 45 characters and the non-universal loan identifier must be no more than 22 characters.[597]

The Bureau proposed to require that financial institutions report an alphanumeric identifier starting with the LEI of the financial institution. This unique alphanumeric identifier would have been required to be unique within the financial institution to the specific covered application and to be usable to identify and retrieve the specific file corresponding to the application for or extension of credit. The Bureau also

proposed commentary with additional details, as discussed below.

For clarity, the Bureau included language in proposed comment 107(a)(1)–1 that would have explained that the identifier can be assigned at any time prior to reporting the application. Proposed comment 107(a)(1)–1 would also have provided the formatting requirements for the unique identifier. The Bureau proposed an identifier of 45 characters or fewer, as is currently required for HMDA. The Bureau made clear in the proposal that the unique identifier would not need to stay "uniform" throughout the application and subsequent processing. Proposed comment 107(a)(1)–1 would have also explained that refinancings or applications for refinancing must be assigned a different identifier than the transaction that is being refinanced.

Proposed comment 107(a)(1)–2 would have made clear that the unique identifier must not include any directly identifying information regarding the applicant or persons (natural or legal) associated with the applicant. The Bureau was aware that internal identification numbers assigned by the financial institution to the application or applicant could be considered directly or indirectly identifying information, and requested comment on this issue. The Bureau also noted that due to privacy risks the Bureau was proposing to not publish unique identifier in unmodified form; the Bureau sought comment on potential modifications to or deletion of this data point in the published application-level data. Proposed comment 107(a)(1)–2 would have also cross-referenced proposed § 1002.111(c) and related commentary, which would have prohibited any personally identifiable information concerning any individual who is, or is connected with, an applicant, in records retained under proposed § 1002.111.

As stated above, the Bureau proposed to require that the unique identifier begin with the financial institution's LEI. Pursuant to proposed § 1002.109(b)(1)(vi), any covered financial institution that did not currently use an LEI would have been required to obtain and maintain an LEI in order to identify itself when reporting the data. Although a "check digit"—a portion of an identifying number that can be used to check accuracy—is required for the HMDA universal loan identifier, the Bureau did not propose to require its use in the 1071 unique identifier.

The Bureau sought comment on its proposed approach to the unique identifier data point. In addition, the

---

[594] 12 CFR 1003.4(a)(1)(i).

[595] 12 CFR 1003.3(d)(5).

[596] 12 CFR 1003.4(a)(1)(i)(A), (B)(2). The non-universal loan identifier is only required to be unique within the annual loan/application register in which the covered loan or application is included. 12 CFR 1003.3(d)(5)(ii).

[597] The universal loan identifier length limit is included in the Bureau's yearly HMDA Filing Instructions Guide. *See* CFPB, *Filing instructions guide for HMDA Data collected in 2023* (2022), *https://ffiec.cfpb.gov/*. The length limit for the non-universal loan identifier is in Regulation C § 1003.3(d)(5).

AdminRecord-000133

Bureau requested comment on the use of the LEI in the unique identifier and the possible use of a check digit.

## Comments Received

The Bureau received comments on the unique identifier data point from several lenders and trade associations. Some commenters supported the data point as proposed; several stated that it was a reasonable and appropriate means of implementing the statutory requirement. Another lender noted that it already reports this type of data for Paycheck Protection Program and CDFI Fund lending. A trade association stated that community banks prefer not to be required to create this identifier too early in the credit origination process. A national auto finance trade association noted that its members generally assign application or loan numbers to new credit applications, but not necessarily to credit line increases, and suggested that financial institutions will have this data without needing the Federal Reserve to issue a parallel rule to implement section 1071 for motor vehicle dealers.[598]

A community bank stated that the cost of creating a customer identification numbering system that does not use the employer identification number, taxpayer identification number, or Social Security number (SSN) would be passed on to the borrower. That commenter requested that the Bureau allow use of the last four digits of the employer identification number, taxpayer identification number, or SSN for identification purposes. They also expressed confusion as to how an LEI (which it may not currently have) could be incorporated with the loan number in its system for reporting, and stated that the Bureau did not provide sufficient guidance on how to incorporate the unique identifiers into its current system.

## Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(1) with a minor edit for clarity. Financial institutions will report an alphanumeric identifier, starting with the LEI of the financial institution, that is unique within the financial institution to the specific covered application. The identifier must be usable to identify and retrieve the specific file or files

corresponding to the application for or extension of credit.

The Bureau is finalizing comment 107(a)(1)–1 with a minor change. As apparent from the instructions in comment 107(a)(1)–1, the Bureau chose to follow the well-known and workable HMDA format to avoid introducing new complications. With respect to the concerns raised by one commenter about the unique identifier data point, the Bureau notes that a *customer* identification number is not required. The unique identifier refers to the application or origination being reported, not the customer who applies for or borrows the funds. In addition, comment 107(a)(1)–1 makes clear that financial institutions may assign the unique identifier at any time prior to reporting the application, facilitating compliance. The Bureau believes that final § 1002.107(a)(1) will accommodate different institutions' numbering systems because the unique identifier can be created separately from those internal systems. In order to foster uniformity of format and avoid confusion as to what constitutes a "unique" identifier, comment 107(a)(1)–1 now requires that any alphabetical characters in the unique identifier be upper-case.

The Bureau is finalizing comment 107(a)(1)–2 with a minor change described below. Final comment 107(a)(1)–2 states that the unique identifier must not include any directly identifying information regarding the applicant or persons (natural or legal) associated with the applicant. In regard to the use of directly identifying information, such as an SSN or taxpayer identification number, the Bureau notes that section 1071 specifically forbids financial institutions from using personally identifiable information concerning any individual who is, or is connected with, an applicant in compiling and maintaining data for reporting.[599] Although the Bureau has preliminarily determined not to release unique identifier data reported to the Bureau in unmodified form in the public, application-level dataset, inclusion of a small business's employer identification number or a natural person's SSN or taxpayer identification number could present a risk of fraud or identity theft. Thus, for clarity, the Bureau is including in comment 107(a)(1)–2 that SSN and employer identification number, in whole or partial form, are examples of directly identifying information that must not be used.

The final rule requires that the unique identifier begin with the financial institution's LEI. Final § 1002.109(b)(1)(vi) requires any covered financial institution that does not currently use an LEI to obtain and maintain an LEI in order to identify itself when reporting data to the Bureau. The Bureau does not believe that including the financial institution's LEI in its unique identifiers will pose particular difficulties for reporting institutions; as noted above, the unique identifier can be assigned at any time prior to reporting an application. The Bureau also believes that including the LEI will increase the specificity and usefulness of the identifier and the record it identifies.

The Bureau did not receive comments discussing the possible inclusion of a "check digit," which is required for the HMDA universal loan identifier but was not proposed as part of the 1071 unique identifier. The Bureau believes that, based on its expectations for small business lending data submission platform, a check digit will be unnecessary, as well as potentially complicated for small financial institutions to implement, and thus it is not included in the final rule.

### 107(a)(2) Application Date

#### Proposed Rule

ECOA section 704B(e)(2)(A) requires financial institutions to collect and report the "date on which the application was received."

The Bureau proposed to require reporting of application date in § 1002.107(a)(2) as the date the covered application was received by the financial institution or the date on a paper or electronic application form. Proposed comments 107(a)(2)–1 and –2 would have clarified the need for a financial institution to take a consistent approach when reporting application date, and would have provided guidance on how to report application date for applications not submitted directly to the financial institution or its affiliate (indirect applications). The Bureau also proposed a safe harbor in § 1002.112(c)(4), which would have provided that a financial institution does not violate subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date pursuant to proposed § 1002.107(a)(2).

The Bureau sought comment on its approach to collecting application date in proposed § 1002.107(a)(2) and associated commentary. The Bureau also sought comment on how best to

---

[598] ECOA authority over motor vehicle dealers lies with the Board, not the Bureau, because Regulation B does not apply to a person excluded from coverage by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

[599] ECOA section 704B(e)(3).

define the "application date" data point in light of the Bureau's definition of "covered application" in proposed § 1002.103.

Comments Received

The Bureau received feedback on its proposal to require reporting of application date in § 1002.107(a)(2) from several lenders, trade associations, and a community group. Most commenters to address this data point supported proposed § 1002.107(a)(2). A trade association stated that application date is currently collected in its financial institutions' work flows. A trade association urged the Bureau to define application date in a manner that is consistent with existing Regulation B, so as to avoid inconsistency, though it did not identify any aspect of proposed § 1002.107(a)(2) that would be inconsistent with existing Regulation B. Similarly, a bank urged the Bureau to align application date with HMDA—to increase efficiency for the customer, facilitate compliance, and avoid duplicative collections—but did not identify whether or how proposed § 1002.107(a)(2) would differ from how financial institutions report application date under Regulation C. A community bank urged the Bureau to provide a concrete definition of application date, explaining that a subjective definition would discourage banks from small business lending, and that application date is often difficult to pinpoint as there frequently is no written application and the application process may occur over time, both in-person and by phone.[600]

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(2) to require reporting of application date as the date the covered application was received or the date on a paper or electronic application form. The Bureau believes the flexibility to report either the date the covered application was received or the date shown on a paper or electronic application form will accommodate institutions' varied practices. While several commenters urged the Bureau to align reporting of application date with existing Regulation B and Regulation C, the commenters did not identify how the proposed definition would differ from those regulatory provisions, and the Bureau believes they do not conflict. For example, a financial institution may

report application date based on the date a "covered application" was received, and final § 1002.103(a) defines a covered application largely based on Regulation B's definition of an application in existing § 1002.2(f). Similarly, Regulation C § 1003.4(a)(1)(ii) requires reporting of the date the application was received or the date shown on the application form. While a commenter urged the Bureau to provide a concrete definition of application date, the commenter never indicated whether or how the proposed definition was vague.[601]

Final § 1002.107(a)(2) states that application date may be the date "the covered application was received;" the Bureau has removed the phrase that followed in proposed § 1002.107(a)(2), which read "by the financial institution . . . " to reflect that not all covered applications will be received directly by the financial institution. The Bureau is also adopting new comment 107(a)(2)–2 to provide guidance on when an application is "received" for covered applications submitted directly to the financial institution or its affiliate.

Comment 107(a)(2)–1 is finalized with minor revisions for clarity and consistency, to provide guidance on maintaining a consistent approach to reporting application date. Final comment 107(a)(2)–3 (proposed as comment 107(a)(2)–2) provides guidance on how a financial institution reports application date where a covered application was not submitted directly to the financial institution or its affiliate. Lastly, final comment 107(a)(2)–4 is adopted to note the safe harbor in final § 1002.112(c)(1), which provides that a financial institution does not violate subpart B if it reports on its small business lending application register an application date that is within three business days of the actual application date pursuant to final § 1002.107(a)(2).

107(a)(3) Application Method

Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that application method data will aid in fulfilling the purposes of section 1071.

The Bureau did not address the method of application as a potential data point under consideration in the SBREFA Outline. However, during the SBREFA process, one CDFI small entity representative suggested collecting information regarding the way an application was taken (in person, by phone, or online) in order to monitor for possible discouragement of applicants.[602] Relatedly, several small entity representatives that took applications for credit primarily or entirely online asserted that such channels were less likely to result in discrimination and more likely to increase access to credit to women-owned and minority-owned small businesses.

In light of the feedback during the SBREFA process and further consideration by the Bureau of additional data that would aid in fulfilling the purposes of section 1071, the Bureau proposed to require financial institutions to collect and report application method. The Bureau proposed § 1002.107(a)(3) to define this data point as the means by which the applicant submitted the covered application directly or indirectly to the financial institution. The Bureau also proposed commentary to accompany proposed § 1002.107(a)(3).

The Bureau believed that data on application method would improve the market's understanding of how applicants apply for credit which, in turn, would facilitate fair lending enforcement and the business and community development purposes of section 1071. In addition, the Bureau believed that collecting data on application method would aid in analysis of multiple data points collected and reported by financial institutions, including the ethnicity, race, and sex of applicants' principal owners.

Finally, data on application method would assist in analyzing data reported under, and assessing compliance with, proposed § 1002.107(a)(20), which would have required financial institutions to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances. The Bureau explained that having application method reporting would allow the Bureau and other data users to determine, for example, which applications could be subject to data collection via visual observation or surname (because the financial institution met with the applicant in person) and, together with information reported under proposed

---

[600] Comments primarily directed at how to define an application under section 1071, rather than the date reported for that application, are discussed in connection with the section-by-section analysis of § 1002.103(a) above.

[601] As discussed in more detail in the section-by-section analysis of § 1002.103(b), if the covered application is requesting additional credit on an existing account, all data reported, including applicable dates, relate to the new request for credit rather than the initial origination.

[602] SBREFA Panel Report at 30–31.

AdminRecord-000135

§ 1002.107(a)(20), which of those applications did and did not have information collected that way.

The Bureau proposed comment 107(a)(3)–1 to clarify that a financial institution would comply with proposed § 1002.107(a)(3) by reporting the means by which the applicant submitted the application from one of the following options: in-person, telephone, online, or mail. Proposed comment 107(a)(3)–1 would have explained how financial institutions are to choose which application method to report, including via a "waterfall approach" when they have contact with an applicant in multiple ways. Proposed comments 107(a)(3)–1.i through .iv would have provided detailed descriptions and examples of each of the four proposed application methods.

The Bureau proposed comment 107(a)(3)–2 to provide guidance on what application method a financial institution would report for interactions with applicants both online and by mail. In short, a financial institution would have reported application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners pursuant to proposed § 1002.107(a)(20). Proposed comment 107(a)(3)–2 also would have provided separate examples of when the application method should be reported as "online" and "mail."

The Bureau sought comment on its proposed approach to this data point.

*Comments Received*

The Bureau received comments on its proposed application method data point from a number of banks, trade associations, and community groups. Several commenters supported the Bureau's proposal to require financial institutions to report data on application method; some noted that such data would facilitate fair lending enforcement and/or further the community development purpose of section 1071. A community group asserted that data on the application method would enable the comparison of application outcomes based on the application channel at specific institutions and could also help assess whether applicants are receiving comparable access to comparable credit across application channels. Another community group stated that data on application method would help shed light on the issue of whether newer, online lenders are more effective at reaching underserved populations and businesses. One commenter suggested the Bureau create more categories, particularly to distinguish email from web portal because an application received by email often reflects a more personal relationship than does an application submitted via web portal.

In contrast, several banks and trade associations opposed the proposed requirement to collect application method data and urged the Bureau to drop it from the final rule. A few commenters said that this data point was added "late" in the rulemaking process or without adequate public input.

Industry commenters explained that application method data are not currently collected nor recorded in the loan file. A bank stated that it would need to collect the data manually because it does not have a way to record or report the information and asserted that this data collection requirement would affect its ability to serve the credit needs of its community. Several other commenters noted that this data point is not a factor in the credit decision and argued that there is no information or insight that can be gleaned from it. Some commenters also questioned how the data point would provide value in fair lending analysis. One commenter suggested the data have limited value and that the Bureau's policy goals can be achieved by combining publicly available data with section 1071's statutory requirements; for example, collection of census tract data will indicate whether a loan was originated in a "credit desert," thereby eliminating the need for the application method data point.

Some commenters asserted that the proposed waterfall approach was problematic and would introduce complexity into reporting application method data. These commenters explained that there are multiple interactions between the lender and the applicant throughout the application process and suggested that reporting application method using the proposed waterfall approach would require the financial institution to document each interaction with an applicant. They further said that could lead to a cumbersome process in trying to determine exactly how an application was received and could result in unintentional errors. One industry commenter stated that an application may start out as an email request, followed up by a phone call, and then be completed in person. This commenter suggested that there would be difficulty collecting the data accurately because the proposal did not allow for multiple methods of application, particularly because the definition of application is at the financial institution's discretion. A bank suggested that the Bureau drop the waterfall approach and allow financial institutions to designate the best way to determine application method. A group of trade associations likewise requested that the Bureau drop the waterfall approach, and instead have financial institutions report the application method where the ethnicity, race, and sex of the applicant's principal owners was requested. A few commenters suggested that the application method should be based only on the initial contact. Two of these commenters indicated that basing the application method on initial contact would provide clear requirements in the event that the applicant provides information via two methods: for example, when an applicant applies online but later provides information by telephone.

A group of trade associations noted that while the data point is about the means by which the application was submitted, the proposed commentary discusses when a financial institution meets with the applicant or communicates with the applicant by telephone. This commenter stated that the proposed commentary was confusing and did not provide clear guidance on compliance.

*Final Rule*

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(3) with a number of revisions to the associated commentary. Pursuant to its authority under ECOA section 704B(e)(2)(H), the Bureau believes that collecting data on application method would aid in fulfilling the purposes of section 1071, as explained below.

Initially, the Bureau believes that data on application method will improve the market's understanding of how applicants apply for credit. In addition, data on application method will support 1071's statutory purposes by, *inter alia,* providing additional context for the business and community development needs of particular geographic regions. For instance, application method may help data users analyze the extent to which financial institutions may be providing access to credit online or by telephone in "credit deserts" where financial institutions do not have branch operations.

In addition, the Bureau believes that collecting data on application method will aid in analysis of multiple data points collected and reported by financial institutions, including the ethnicity, race, and sex of applicants' principal owners. For example, these data will assist the Bureau and other data users in identifying whether applicants are more or less likely to

AdminRecord-000136

**35286**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

provide this (and other) 1071 information in different application channels. This information may also assist in determining whether a financial institution has procedures to collect applicant-provided data at a time and in a manner that are reasonably designed to obtain a response, as required by § 1002.107(c).

The Bureau explained in the NPRM that having application method data would be useful in analyzing data reported under, and assessing compliance with, proposed § 1002.107(a)(20) related to collecting the ethnicity and race of principal owners via visual observation or surname in certain circumstances. However, as explained in the section-by-section analysis of § 1002.107(a)(19) below, the Bureau has removed the visual observation or surname requirement from this final rule. Consequently, the proposed waterfall approach is less relevant for assessing compliance with final § 1002.107(a)(19). In combination with the concerns expressed by commenters regarding compliance complexities, including the need to document multiple interactions between the financial institution and applicant, the Bureau has decided not to adopt the proposed waterfall approach for reporting application method.

The Bureau is thus adopting comments 107(a)(3)–1.i through .iv with revisions to reflect the removal of the waterfall. The Bureau believes these changes will also address a commenter's concern regarding potential confusion about the proposed commentary's treatment of meetings and other interactions with applicants. Relatedly, the Bureau is not finalizing proposed comment 107(a)(3)–2, which would have provided guidance on reporting for interactions with applicants both via mail and online under the waterfall approach.

In addition, the Bureau has added new guidance in comment 107(a)(3)–1 to clarify what a financial institution reports if it retains multiple versions of the application form. The Bureau has also made a few minor revisions in comments 107(a)(3)–1.i through .iv for clarity. Final comment 107(a)(3)–1 lists the options a financial institution reports for the means by which an applicant submitted the application. In final comment 107(a)(3)–1.i, the Bureau has clarified that the in-person application method applies, for example, to those applications submitted at a branch office, including applications hand delivered by an applicant. In final comment 107(a)(3)–1.ii, the Bureau has clarified that an application submitted via telephone call

is reported as "telephone." In final comment 107(a)(3)–1.iii, the Bureau has clarified that an application submitted via website, mobile application (commonly known as an app), fax transmission, or text-based electronic communication is also reported as "online." The Bureau does not believe it is appropriate to distinguish between applications submitted by email and applications submitted through a web portal, on the basis that an application that is emailed reflects a more personal relationship, as suggested by a commenter. The Bureau believes that both application methods are appropriately reportable as "online" because they reflect an electronic communication. The Bureau notes that various electronic communication methods provided in final comment 107(a)(3)–1.iii can reflect a personal relationship. For example, an applicant may have begun communications with the financial institution through email, followed by text messages, and then submitted the application through the financial institution's website. All of these methods can potentially reflect a personal relationship.

The Bureau removed the hand delivery at a teller window example in comment 107(a)(3)–1.iv because, under the final rule, an application hand delivered by an applicant at a branch is reported as "in-person" pursuant to final comment 107(a)(3)–1.i. Regarding a suggestion from commenters that the Bureau use the method by which ethnicity, race, and sex of the principal owners are collected for reporting this data point, the Bureau does not believe that such an approach is necessary given that it is not finalizing its proposed requirement to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances. In addition, the Bureau does not believe that application method should be based on initial contact, as suggested by a few commenters. As explained by commenters, there could be multiple interactions between the lender and applicant throughout the pre-application and application process. Thus, the initial interaction may not amount to an application submission because, for example, the initial contact was simply an inquiry.[603] In light of commenters' concerns regarding the potential difficulties in identifying application method, the Bureau believes that its approach to final § 1002.107(a)(3), which is tied to an

applicant submitting an application, is preferable to the suggestions made by commenters.

Regarding commenters' concerns about the utility of this data point, the Bureau believes that application method data will facilitate the fair lending and business and community development purposes of section 1071, as explained above. This information cannot be replicated by combining data points specifically enumerated in section 1071, such as census tract, with other publicly available data. Application method is not intended solely to identify "credit deserts," as the commenter appeared to suggest, and although census tract information might provide information as to where the proceeds will be applied (or the location of the applicant's headquarters/main office, or another location), that does not necessarily indicate where (or how) the financial institution interacted with the applicant. With respect to comments stating that application method is not currently collected nor is it considered as part of the credit decision, the Bureau believes that removal of the proposed waterfall approach will make collecting this data easier than contemplated in the proposed rule.

Finally, this data point was introduced with sufficient time for the public to provide feedback and offer alternatives. The data point was suggested by small entity representatives during the SBREFA process and was included in the SBREFA Panel Report. It was also included in the proposed rule and the Bureau specifically sought—and obtained—comment on it. As noted, the Bureau has made changes as a result of that feedback.

### 107(a)(4) Application Recipient

#### Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that information regarding how an application is received will enhance small business lending data and aid in fulfilling the purposes of section 1071.

The Bureau proposed § 1002.107(a)(4), which would have required financial institutions to collect and report the application recipient, meaning whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application

---

[603] Under § 1002.103(b)(2), a covered application does not include inquiries and prequalification requests.

indirectly to the financial institution via a third party. Proposed comment 107(a)(4)–1 would have clarified that if a financial institution is reporting actions taken by its agent consistent with proposed comment 109(a)(3)–3, then the agent is considered the financial institution for the purposes of proposed § 1002.107(a)(4).

The Bureau sought comment on its proposed approach to this data point.

Comments Received

The Bureau received comments on the proposed application recipient data point from industry and community groups. A community group expressed its support, noting that in combination with the application method data point under proposed § 1002.107(a)(3), it would help stakeholders determine whether traditional banking or online lending is most effective in reaching underserved small businesses or whether the effectiveness of the lending model depends on local context and conditions. A trade association also expressed its support, stating that the information can help data users understand the relationship between lender and applicant. This commenter further noted that recipient data would provide context for other collected and reported data and also improve transparency around when and whether an intermediary is considered a financial institution for the purposes of this data collection. In addition, a CDFI lender stated its general support of the Bureau's proposal to collect application recipient data.

In contrast, a number of banks and trade associations opposed the Bureau's proposal to collect application recipient data for various reasons. One trade association raised a concern that the application recipient data point was not included in the SBREFA Outline and, along with several other industry commenters, pointed out it is not one of the data points expressly enumerated in ECOA section 704B(e)(2). Several industry commenters stated that the data are not currently collected and a few of these commenters further stated that such data are not used or considered in the underwriting decision. Several industry commenters argued that the data point is burdensome and two banks stated they would need to collect the data manually because their systems are not equipped to collect the data. Other industry commenters questioned the value of the data point or how it fulfills the statutory purposes of section 1071. One industry commenter stated it is not dispositive of fair lending violations. Two banks urged the Bureau to drop the data point from

the final rule or provide an exemption for certain institutions. One of these banks urged the Bureau to drop the data point from the final rule because it does not have affiliates nor does it accept applications indirectly and thus would not provide any data. The other bank commented that community banks should be exempt if they do not use actual third parties, but instead use a third-party online application system within the bank's firewall, and suggested that the only reason this data point should apply is if a bank is truly working with a third party, not a vendor who helps manage online tools. A trade association urged the Bureau to eliminate the application recipient data point from the final rule until a later determination can be made regarding its necessity.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(4) and related commentary with a small modification for clarity. Final § 1002.107(a)(4) requires the financial institution to report whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party. Final comment 107(a)(4)–1 explains that if a financial institution is reporting actions taken by its agent consistent with comment 109(a)(3)–3, then the agent is considered the financial institution for the purposes of § 1002.107(a)(4). The comment also provides an example. The Bureau believes that data on application recipient will facilitate fair lending analysis and enable a better understanding of business and community development needs. Pursuant to ECOA section 704B(e)(2)(H), the Bureau believes that collecting data on application recipient will aid in fulfilling the purposes of section 1071.

Regarding commenters' concerns that application recipient data are not currently collected nor used in underwriting decisions, the Bureau anticipates that financial institutions know and track how they receive applications for small business loans. The Bureau does not believe it would be difficult to track this information, even if the financial institution does not currently collect the information.

With respect to the comments received that question how application recipient data fulfill the purposes of section 1071, the Bureau believes that collecting data on application recipient, in combination with application method, as discussed above, will

improve the market's understanding of how small businesses interact with financial institutions when applying for credit which, in turn, will facilitate fair lending analysis, including the identification of risks in small business lending. Regarding the comment that application recipient data are not dispositive of fair lending violations, the Bureau agrees that such data would not be dispositive of a violation on their own, but believes data on application recipient can be used in combination with other data points or information to provide a more robust analysis. With respect to promoting the business and community development purposes of section 1071, the Bureau believes that data on application recipient will improve the public's understanding of the structure of small business lending originations across the market, the methods by which credit is originated for particular groups or underserved markets, and trends over time (for example, to the extent applicant preferences shift from in-person to online interactions). In addition, application recipient data may assist with an understanding of the business and community development needs of an area or applicant. For example, such data may help data users understand whether financial institutions making credit decisions are directly interacting with the applicant and/or generally operate in the same community as the applicant. Moreover, data on application recipient will allow the Bureau and data users to better understand the relationship between the covered financial institution and the applicant in the context of certain other data collected and reported under this final rule.

The Bureau is not removing the application recipient data point from the final rule or providing an exemption, as suggested by some commenters, for financial institutions that do not have affiliates, do not accept applications indirectly, and/or do not use third parties. Some financial institutions employ a wide variety of lending models in extending credit to small businesses. They may receive applications for credit directly from the applicant and some financial institutions may receive applications routed to them through third parties, such as brokers or vehicle or equipment dealers. Some financial institutions issue credit cards branded for particular retailers, for which applications are taken in person at the retailer's store locations. Some brokers and dealers may send applications to a single financial institution, while others may

**35288**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

send them to multiple financial institutions at the same time. In these types of application scenarios involving third parties, the financial institution may not directly interact with the applicant at all during the application process. Information regarding whether the applicant submitted the application directly to the financial institution is necessary to further the purposes of section 1071, including by improving the market's understanding of how small businesses interact with financial institutions when applying for credit and whether the financial institution is operating in the same community as the small business. This is true even if a particular financial institution does not accept applications indirectly or does not use third parties, and reporting of this data point should be simple for financial institutions in that situation.

Finally, this data point was introduced with sufficient time for the public to provide feedback and offer alternatives. It was also included in the proposed rule and the Bureau specifically sought—and obtained—comment on it. Given the wide variety of lending models financial institutions currently use when extending credit to small businesses, the Bureau believes it is timely and appropriate to include this data point in this final rule.

### 107(a)(5) Credit Type

#### Proposed Rule

Section 1071 requires financial institutions to collect and report "the type and purpose of the loan or other credit being applied for."[604] (The credit purpose data point is discussed in the section-by-section analysis of § 1002.107(a)(6) immediately below.) For HMDA reporting, Regulation C requires numerous data points that indicate the type of credit applied for or originated: the type of guarantees used; lien order; loan term; the presence of nontraditional contract terms including balloon, interest only, and negative amortization payments; variable rate information; open-end status; and reverse mortgage status.[605] Section 1071 provides no additional information or details regarding what aspects of credit type should be collected and reported.

The Bureau proposed in § 1002.107(a)(5) to require that financial institutions collect and report the following information regarding the type of credit applied for or originated: (i) The credit product; (ii) The type or types of guarantees that were obtained for an extension of credit, or that would

have been obtained if the covered credit transaction were originated; and (iii) The length of the loan term, in months, if applicable. These aspects of credit type are discussed in turn below. This proposal was consistent with the approach presented in the SBREFA Outline, and would have required the financial institution to choose the credit product and guarantee(s) from a specified list. (These lists were provided in the commentary accompanying proposed § 1002.107(a)(5).) The lists included choices for "Other" and "Not provided by applicant and otherwise undetermined," as appropriate, to facilitate compliance.

The Bureau sought comment on its proposed approach to the credit type data point, including the lists of products and guarantees proposed and the other specific requests for input below.

*Credit product.* The first subcategory the Bureau proposed to include in the credit type data point was the *credit product* (*i.e.,* a commonly understood category of small business lending like term loans or lines of credit) which the Bureau considered to be an integral part of the statutory requirement to collect credit type.

Proposed comment 107(a)(5)–1 would have presented the instructions for collecting and reporting credit product and the proposed list of credit products from which financial institutions would select. Proposed comment 107(a)(5)–1 would have explained that a financial institution would comply with § 1002.107(a)(5)(i) by selecting the credit product requested from the list provided in the comment. It would also have explained that if an applicant requests more than one credit product, the financial institution reports each credit product requested as a separate application. Proposed comment 107(a)(5)–1 would have also explained that if the credit product for an application does not appear on the list of products provided, the financial institution would select "other" as the credit product and report the specific product via free-form text.

Proposed comment 107(a)(5)–2 would have explained that, pursuant to proposed § 1002.107(c)(1), a financial institution would be required to maintain procedures reasonably designed to collect applicant-provided data, which includes credit product. However, if a financial institution was nonetheless unable to collect or otherwise determine credit product information because the applicant did not indicate what credit product it sought and the application was denied, withdrawn, or closed for

incompleteness before a credit product was identified, the proposed comment would have explained that the financial institution would report that the credit product was "not provided by applicant and otherwise undetermined."

Proposed comment 107(a)(5)–3 would have explained how a financial institution would report a transaction that involves a counteroffer. The comment would have stated that if a financial institution presents a counteroffer for a different credit product than the product the applicant had initially requested, and the applicant does not agree to proceed with the counteroffer, a financial institution would report the application for the original credit product as denied pursuant to proposed § 1002.107(a)(9). If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution would report the disposition of the application based on the credit product that was offered, and would not report the original credit product applied for. In addition, proposed comment 107(a)(5)–6 would have explained when "other sales-based financing transaction" would be used for reporting.

The Bureau noted that, under its proposal, line increases would be reportable so that the small business lending market could be tracked accurately. See the section-by-section analysis of § 1002.103(a) above for additional details. However, the Bureau did not propose that line increases be included as a separate item in the credit product list.

The Bureau sought comment on its proposed approach to this subcategory, including the appropriateness and usefulness of the products included in the list, whether there were other products that should be added, and the proposed treatment of counteroffers. The Bureau also sought comment on how financial institutions currently handle increases in lines of credit and whether a line increase should be considered a credit product, and on whether an overdraft line of credit should be considered a product separate from a line of credit and thus added to the product list.

*Type of guarantee.* The second data field the Bureau proposed to include in the credit type data point was *guarantee.* Proposed comment 107(a)(5)–4 would have presented the instructions for collecting and reporting type of guarantee and the proposed list of guarantees from which financial institutions would select. Proposed comment 107(a)(5)–4 would also have explained that a financial institution

---

[604] ECOA section 704B(e)(2)(B).

[605] Regulation C § 1003.4(a)(2), (14), (25), (27), (28), (37), and (38).

AdminRecord-000139

complies with § 1002.107(a)(5)(ii) by selecting the type or types of guarantee(s) obtained for an originated covered credit transaction, or that would have been obtained if the covered credit transaction were originated, from the list provided in the comment.

Proposed comment 107(a)(5)–4 would have also explained that the financial institution may select, if applicable, up to a maximum of five guarantees for a single application or transaction. Small business credit may have more than one guarantee, such as an SBA guarantee and a personal guarantee, and the Bureau believed that more complete information could be collected by requiring as many as five to be reported.

Proposed comment 107(a)(5)–4 would have also explained that if the type of guarantee for an application or originated transaction does not appear on the list of guarantees provided, the financial institution selects "other guarantee," and reports the type of guarantee as free-form text. As with credit product, the Bureau believed that allowing financial institutions to choose "other" when a guarantee for the application does not appear on the provided list would facilitate compliance. In addition, collecting this information on "other" guarantee types would assist the Bureau in monitoring trends in usage of other types of guarantees and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the rule.

Finally, proposed comment 107(a)(5)–4 would have provided that if no guarantee is obtained or would have been obtained if the covered credit transaction were originated, the financial institution would select "no guarantee." Because a small business credit transaction does not always involve use of a guarantee, the Bureau did not propose to include "not provided by applicant and otherwise undetermined" as an option. If no guarantee was identified for an application, the financial institution would report "no guarantee."

The Bureau sought comment on its proposed approach to this subcategory, including the appropriateness and usefulness of the items listed, and whether there are other guarantees that should be added. The Bureau also sought comment on whether five is the appropriate upper limit for reporting guarantees.

*Loan term.* The third subcategory the Bureau proposed to include in the credit type data point was the *loan term.* Proposed comment 107(a)(5)–5 would have presented the instructions for collecting and reporting loan term.

Specifically, it would have explained that a financial institution complies with proposed § 1002.107(a)(5)(iii) by reporting the number of months in the loan term for the covered credit transaction, and that the loan term is the number of months after which the legal obligation will mature or terminate. The comment would have further explained how to measure the loan term and the possible use of rounding.

Proposed comment 107(a)(5)–5 would have also made clear that if a credit product, such as a credit card, does not have a loan term, the financial institution would report loan term as "not applicable." The financial institution would also report "not applicable" if the application is denied, withdrawn, or determined to be incomplete before a loan term has been identified.

The Bureau sought comment on its proposed approach to this subcategory.

Comments Received

The Bureau received comments on its proposed approach to the credit type data point from a number of banks, community-oriented lenders, trade associations, community groups, and others.

Several commenters, including community-oriented lenders, community groups, a trade association, and a business advocacy group, supported the credit type data point as proposed, though some suggested small changes to the three individual subcategories discussed below. One commenter stated that to avoid the pitfalls that limited the use of HMDA data for spotting predatory trends in mortgages, the Bureau must collect sufficiently granular data on applicants and credit terms, including credit type. That commenter further stated that this information is critical because discrimination is not just evidenced in loan denials, but also less favorable credit terms. A community group stated that the information collected for the credit type data point would allow for more effective analysis than the current CRA small business information. A trade association stated that despite the added complexity of requiring three "data points" for the one listed in the statute, the Bureau has accounted for and addressed some of the concerns that community banks have raised related to credit type. That commenter went on to state its approval of the simple reporting of counteroffers and the ability to mark fields as "not provided by applicant" in the case of incomplete applications. Finally, a lender stated that it already collects the credit type information for the CDFI Fund.

Only one commenter opposed the credit type data point as a whole, stating that credit type and other data points would be a waste of time and efficiency.

*Credit product.* Two community groups and an auto finance trade association expressed support for the product list the Bureau proposed. The community groups stated that the list was nuanced and would provide useful differentiation between products. One explained that being able to determine which products were accessed could help in understanding bias in the credit market more accurately than CRA data currently allows for. An auto finance trade association specifically expressed support for the inclusion of "other" and "unknown" to facilitate compliance.[606]

One commenter stressed the importance of providing detail in distinguishing credit products, and several commenters requested changes to the credit products list. A joint letter from community groups and business advocacy groups stated that there might be value in separating out mortgages, auto loans and equipment financing as discrete secured loan types but treating all other term loan applications together, rather than treating secured term loans as one category and unsecured term loans as another. A community group asked that refinances and renewals be added to the product list, stating that this information would help demonstrate community credit needs. That commenter went on to state that listing refinances in the credit purpose data point, as proposed, would be confusing, and that the Bureau should look at the ways refinances are reported under HMDA and CRA. Several minority business advocacy groups, along with a joint letter from community groups, community oriented lenders, and business advocacy groups, responded to the Bureau's request for comment by encouraging the Bureau to include "overdraft line of credit" in the list of credit products. These commenters stated that overdraft can contain hidden costs, so having a way to monitor lenders who provide it could be useful.. A trade association opposed the inclusion of overdraft line of credit in the credit products list, though it did not provide a reason. Several community groups commented that the Bureau should require reporting of collateral requirements and value, instead of simply requiring "secured" and "unsecured" for items in the credit product list. One of these commenters suggested that collateral info would

---

[606] The proposed rule used the terms "other" and "not provided by applicant and otherwise undetermined."

shed light on underwriting changes and approaches during various economic conditions, allow stakeholders to understand why pricing might be lower on some loans and the risk that some loans might pose to borrowers.

A joint letter from community and business advocacy groups objected to the requirement to report each credit product requested as a separate application, stating that this would seem to require the lender to report each credit type requested as a separate application even when the applicant is seeking only one transaction but is open to alternative structures, and even though there would be only one action taken and one set of terms.

*Type of guarantee.* Several community groups expressed support for including guarantees as part of the credit type data point. These commenters stated that data on government guarantee programs would allow for better analysis of their usage, including whether minority and women owned businesses are being steered to these loans. One of these commenters stated that requiring reporting on all types of guarantees would facilitate analysis of whether minority and women owned businesses were receiving more costly or onerous credit. That commenter also stated that personal guarantees can at times be abusive, and reporting of those would allow better monitoring of this issue. Although it did not specifically express support for requiring reporting of guarantees, a trade association for auto finance lenders stated that its members will have this information for reporting.

Two industry commenters objected to the collection of guarantees as part of the credit type data point on the grounds that the statute does not require reporting of guarantees and asking that the credit type data point be limited to credit product and loan term. Those commenters, and several others who did not object to the general guarantee reporting requirement, were concerned in particular about the requirement to report what guarantees *would have been obtained* if the transaction had been originated. Some commenters stated that such a requirement extends into mere speculation, and would undermine the accuracy, reliability, and consistency of the data. Another commenter stated that it would not be possible to report what guarantees would have been obtained, and joint letter from community groups and business advocacy groups stated that the requirement could be problematic in the case of a declined application because the lender would be speculating as to potential guarantees, such as personal

guarantees, from owners or non-owners. That comment went on to recommend that the Bureau either limit the reporting of this field to offers and counteroffers that are made (*i.e.,* allow financial institutions to report type of guarantee as "not applicable" for declined applications, as is permitted with respect to the loan term and loan pricing data fields) or, for declined applications, require reporting only if the requested guarantee were a government or programmatic guarantee (such as SBA, USDA or some other third-party guarantee program).

A community group and two CDFI lenders requested that the list of guarantees be changed in certain ways. The community group stated that the data should distinguish whether the guarantee is offered by the natural person(s) owning the business or the business itself, because it matters whether a creditor can seize assets of a person or the business. One of the CDFI lenders requested that the guarantee categories be broken down further to detail collateral coverage, which is often the deciding factor on approval or denial, and because people of color own homes (and amass wealth) at much lower rates than whites. That commenter went on to suggest that these details could shed light on the credit needs of minority small business owners and whether financial institutions are applying collateral requirements equitably. The other lender requested that State guarantee and local guarantee be separated on the list, rather than the combined "state or local guarantee" that was proposed. That commenter stated that differentiating between the performance of these two levels of government would be critical for understanding the focus of future reforms or capital flows through these entities. The commenter also provided statistics suggesting that conflating State and local guarantees would not be as informative as separating them.

*Loan term.* A community group and a community-oriented lender stated their support for the proposed loan term provision. The community group stated that loan term length influences pricing and other terms and conditions, and would help in explaining differences in these features. That commenter also suggested that loan term should be straightforward to report for lenders. In addition, a national auto finance trade association stated that its members would have this information to report.

A number of banks and a trade association objected to the proposal to have the loan term measured from the first payment period rather than the date

of origination. These commenters stated that they do not measure loan term in this way, and having to do so for reporting would cause unnecessary and significant compliance difficulties. They asked to be able to measure loan term from the date of origination of the credit. Another bank objected to the reporting of loan term for applications, stating that applicants seldom make an application that specifies the desired loan term.

Although the proposed rule did not discuss how or whether merchant cash advance providers would report loan term, the Bureau did seek comment on proposed § 1002.107(a)(12)(v) and its commentary, the pricing provision for merchant cash advances, including whether to require additional pricing information for merchant cash advances, and whether merchant cash advances could be structured in ways that evade the proposed reporting requirement. Two commenters urged the Bureau to make clear that merchant cash advance providers must report loan term, and must not use the proposed rule's provision stating that "not applicable" could be reported for a product that has no loan term. These commenters discussed the importance of loan term in comparing different credit pricing and stated that merchant cash advances are sometimes abusive and are used disproportionately by minority businesses. These commenters also stated that loan term can be readily ascertained for merchant cash advances and they described different methods for doing so. One method suggested was that when a merchant cash advance is paid off before reporting, the provider should report the actual length of time to repayment. In addition, they suggested that for a partially paid merchant cash advance the provider could project the amount of time to repayment based on the amount already paid. One of these commenters, a cross-sector group of lenders, community groups, and small business advocates, stated that merchant cash advance providers establish an estimated loan term when they underwrite an advance, and that most merchant cash advance contracts have an estimated payment amount.

Final Rule

The Bureau is finalizing § 1002.107(a)(5) certain changes to facilitate compliance and enhance the quality and usefulness of the data reported. Final § 1002.107(a)(5) requires that financial institutions collect and report the following information regarding the type of credit applied for or originated: (i) the credit product; (ii)

AdminRecord-000141

the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated; and (iii) the length of the loan term, in months, if applicable.

The Bureau believes that it is reasonable to interpret the statutory term "credit type" to comprise the three required subcategories, because they are critical to understanding the nature of small business credit applied for and provided, as explained below. For the reasons discussed herein, the Bureau believes that the subcategories of credit product (including collateral), guarantee type, and loan term will aid in fulfilling the purposes of section 1071. Financial institutions generally have all of the information required for this data point when they process applications (and the reporting regime is sufficiently flexible when they do not), so the Bureau does not believe there is anything in this approach that will impose particular operational difficulty. Additionally, the Bureau believes it is reasonable to interpret type of credit "applied for" to include the type of credit actually originated when an application results in an extension of credit.

The statutory term "type . . . of the loan" is ambiguous, and the Bureau reasonably interprets the term to include the credit product, any guarantee obtained, and the term of a loan because an accurate and useful record of the "type" of loan or credit would include those data fields. In the alternative, ECOA section 704B(e)(2)(H) authorizes the Bureau to require inclusion of "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]," and for the reasons discussed herein, the Bureau has also determined that the subcategories of credit product (including collateral), guarantee type, and loan term will aid in fulfilling those purposes.

*Credit product.* The Bureau is finalizing the credit product subcategory with certain changes to the associated commentary to facilitate compliance and enhance the quality and usefulness of the data reported. Final § 1002.107(a)(5)(i) requires financial institutions to compile and maintain data on the credit product applied for or originated. The Bureau continues to consider credit product to be an integral part of the statutory requirement to collect credit type. The Bureau believes information about the various products sought by applicants will further the purposes of section 1071 by demonstrating, for example, how small businesses of different sizes or in different sectors choose to pursue, or ultimately access, different forms of credit.

The Bureau distinguishes between secured and unsecured term loans and lines of credit in its list of credit products because it believes that whether a term loan or line of credit is collateralized can have such a significant effect on things like approval rates and pricing that secured and unsecured products fundamentally differ in kind. For this reason, the Bureau believes that including information on the use of collateral in the credit product subcategory will help data users to avoid inaccurate interpretations of data. The Bureau believes that whether a loan is secured or unsecured will be part of an application or loan file and, as a result, will not be operationally difficult to report once a financial institution's section 1071 compliance system is set up.

Final comment 107(a)(5)–1 presents the instructions for collecting and reporting credit product and the list of credit products from which financial institutions will select. Comment 107(a)(5)–1 explains that a financial institution complies with § 1002.107(a)(5)(i) by selecting the credit product applied for or originated from the list provided in the comment. The Bureau believes that the list of credit products provided in final comment 107(a)(5)–1 aligns with the most common types of credit products in small business lending. Final comment 107(a)(5)–1 also explains that if the credit product for an application does not appear on the list of products provided, the financial institution selects "other" as the credit product and reports the specific product via free-form text. The Bureau believes that allowing financial institutions to choose "other" when the credit product for the application does not appear on the provided list will facilitate compliance. In addition, collecting this information on "other" credit products will assist the Bureau in tracking product trends and key developments in the small business lending market, which the Bureau can use to inform any future iterations of the list.

Comment 107(a)(5)–1 also explains that if an applicant requests more than one credit product at the same time, the financial institution reports each credit product requested as a separate application. The issue of how to collect and report multiple products applied for at the same time affects several data points, but is most salient for credit type. The Bureau believes that requiring a separate application to be reported for each credit product requested will yield more complete and useful data, and that a financial institution will not experience operational difficulties in copying the relevant information, identical for most data points, to separate lines in the small business lending application register. However, the Bureau has changed the language regarding this requirement from the proposed rule, in order to clarify that when the applicant is seeking only one transaction but is open to alternative product types, the financial institution reports only one application. Comment 107(a)(5)–1 now includes instructions on how to report credit product when the applicant only requests a single covered credit transaction, but has not decided which particular product to request. The Bureau believes that this new language will facilitate compliance and lead to the collection of more accurate data. The issue of reporting requests for multiple covered credit transactions at one time is discussed more fully in the section-by-section analysis of § 1002.103(a) above.

As explained above, many commenters suggested changes to the list of products in comment 107(a)(5)–1. In regard to the requests to separate out mortgages, auto loans and equipment financing as discrete secured loan types, to include additional information about collateral, and to make "refinancing" a credit product rather than a credit purpose, the Bureau believes that its credit product taxonomy presents a clear, uncomplicated framework using the basic forms of credit extended to small businesses. Including types of collateral and different refinancings as part of credit products would complicate the taxonomy and introduce categorization difficulties, for example with partial refinancings. Under the final rule, these types of credit will be reported using the credit product applied for or originated, from the list in comment 107(a)(5)–1, and the extra information suggested may or may not be appropriately included in the credit purpose data point under § 1002.107(a)(6), depending on the situation. Similarly, the Bureau believes that the overdraft aspect of overdraft lines of credit will best be reported using the credit purpose "overdraft," and that the credit product will then be reported as a line of credit, secured or unsecured. The Bureau believes that this arrangement will help preserve the uncomplicated framework of the credit products list. See the section-by-section analysis of § 1002.107(a)(6) below for further discussion.

As a result of further analysis and consideration, the Bureau has made one change from the proposal to the final

**35292**     **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

credit products list in comment 107(a)(5)–1. The proposed "credit card account" product has now been separated into "credit card account, not private-label," and "private-label credit card account." The Bureau believes that private-label credit cards form a distinct and important market segment that operates differently from other credit cards, and this distinction will facilitate robust data analysis and better further the purposes of section 1071. The Bureau also believes that financial institutions will have the information needed for reporting these different types of accounts readily available, and so separating the two types will not cause operational difficulty. In addition to the change in the credit product list in comment 107(a)(5)–1, the Bureau has added new comments 107(a)(5)–2 and –3 to explain the difference between these card products and facilitate compliance. Final comment 107(a)(5)–2 provides a definition of credit card accounts that are not private-label and includes instructions on reporting these products. Final comment 107(a)(5)–3 provides a definition of private-label credit card accounts and includes instructions on reporting these products.

The Bureau is also finalizing comments 107(a)(5)–4, –5 (which were numbered as comments 107(a)(5)–2 and –3 in the proposal) and comment 107(a)(5)–6 as proposed. Final comment 107(a)(5)–4 describes the situation in which a financial institution reports that the credit product was "not provided by applicant and otherwise undetermined." The Bureau believes that permitting this response will facilitate compliance and enhance the quality of data collected. As discussed above, commenters supported the flexibility afforded by this kind of response.

Final comment 107(a)(5)–5 provides instructions on how a financial institution reports a transaction that involves a counteroffer. The comment states that if a financial institution presents a counteroffer for a different credit product than the product the applicant had initially requested, and the applicant does not agree to proceed with the counteroffer, a financial institution reports the application for the original credit product as denied pursuant to § 1002.107(a)(9). If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the disposition of the application based on the credit product that was offered, and does not report the original credit product applied for. The Bureau believes that, in the complex

circumstances created by counteroffers, the meaning of the type of credit "applied for" is ambiguous, and it is reasonable to interpret the credit product "applied for" to mean the credit product considered via the applicant's response to the counteroffer. For a discussion of the Bureau's treatment of counteroffers more generally, see the section-by-section analysis of § 1002.107(a)(9) below.

Final comment 107(a)(5)–6 explains that for an extension of business credit incident to a factoring arrangement that is otherwise a covered credit transaction, a financial institution selects "other sales-based financing transaction" as the credit product, and provides a cross reference to comment 104(b)–1. The Bureau believes that this explanation will facilitate reporting of applications involving this important market segment.

*Type of guarantee.* The Bureau is finalizing the requirement to report guarantees as a subcategory of the credit type data point with changes to enhance the quality of the data collected and facilitate compliance. The final rule requires a financial institution to report the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated.

The Bureau considers the guarantee obtained for an extension of credit to be part of the credit "type" because it is fundamental to the nature of the transaction in that it meaningfully impacts terms such as interest rates, such that guarantee information can help to explain potential disparities in outcomes and reduce inaccurate conclusions, aiding in fulfilling the fair lending purpose of section 1071. Indeed, in common parlance, small business credit transactions are often referred to using the name of the guarantee (*e.g.,* "a 7(a) loan," referring to the SBA 7(a) guarantee). Because various types of guarantees are available for different credit products, the Bureau believes that guarantee type should constitute a separate subcategory within the credit type data point, so that data users can conduct separate analyses with respect to credit product and guarantees, and to avoid excessive complexity in the credit product data field. The Bureau further believes that information on the distribution of government loan guarantees (such as those provided in SBA programs) across different geographic areas and applicant groups will allow a better understanding of how those programs function on the ground, aiding in fulfilling the business and community development purpose

of section 1071. As with collateral, information on guarantees is generally a part of an application or loan file and the Bureau does not believe it will be operationally difficult to report once a financial institution's 1071 compliance system is set up.

Final comment 107(a)(5)–7 (which was numbered as comment 107(a)(5)–4 in the proposal) presents the instructions for collecting and reporting type of guarantee and the list of guarantees from which financial institutions will select. The Bureau believes the list of guarantee types provided in comment 107(a)(5)–7 aligns with the most common types of guarantees used in small business lending. Final comment 107(a)(5)–7 also explains that a financial institution complies with § 1002.107(a)(5)(ii) by selecting the type or types of guarantee(s) obtained for an originated covered credit transaction, or that would have been obtained if the covered credit transaction were originated, from the list provided in the comment.

The Bureau agrees with the commenters who suggested that clarity was needed on how to report guarantee type when the covered credit transaction is not originated. Consequently, comment 107(a)(5)–7 now states that if an application is denied, withdrawn, or closed for incompleteness before any guarantee has been identified, the financial institution selects "no guarantee." The Bureau believes that this reporting option will facilitate compliance and result in the collection of more reliable data. The Bureau also agrees that separating State and local guarantees, so that they can be tracked individually, will enhance the quality of the data collected. Comment 107(a)(5)–7 now includes separate items for these guarantee types, and states that the financial institution chooses State government guarantee or local government guarantee, as applicable, based on the entity directly administering the program, not the source of funding. The Bureau believes that this instruction will facilitate compliance and enhance the quality of the data collected. The Bureau also believes that differentiating between State and local guarantees will not cause operational difficulty for reporters because the financial institution will have the information in the loan file.

The Bureau understands that there may be some value in collecting the additional information suggested by commenters on whether a natural person or business makes a guarantee and the nature of the collateral backing a guarantee. However, the Bureau

AdminRecord-000143

believes that these items will increase the complexity and operational difficulty of compliance in reporting the type of guarantee and has not included them in the final rule.

*Loan term.* The Bureau is finalizing the requirement to report loan term as part of the credit type data point with certain changes to the associated commentary to facilitate compliance and enhance the quality of the data collected. Final § 1002.107(a)(5)(iii) requires a financial institution to report the length of the loan term, in months, if applicable.

As with the consumer lending market, the pricing and sustainability of closed-end credit transactions for small businesses are associated with term length, and without awareness of the term of the loan, data users will have less of an understanding of the types of credit being made available to applicants. Credit with a one-month term may differ not just in degree but in kind from credit with a 60-month term. The Bureau thus believes that the length of the loan term is a fundamental attribute of the type of credit that applicants are seeking such that it should be treated as a separate subcategory within credit type. As with other elements of the credit type data point, loan term information will allow data users to reduce inaccurate conclusions or misinterpretations of the data, aiding in fulfilling both the fair lending and business and community development purposes of section 1071. Likewise, the loan term will be part of the application or loan file and should not be operationally difficult to report once a financial institution's 1071 compliance system is set up.

Final comment 107(a)(5)–8 (which was numbered as comment 107(a)(5)–5 in the proposal) presents the instructions for collecting and reporting loan term. Specifically, it explains that a financial institution complies with § 1002.107(a)(5)(iii) by reporting the number of months in the loan term for the covered credit transaction, and that the loan term is the number of months after which the legal obligation will mature or terminate. In the proposed rule, this comment included language that would have required financial institutions to measure the loan term in the way that loan terms are generally described in real property transactions. However, the Bureau agrees with those commenters who stated that such a provision would create compliance difficulties. Although the final comment continues to allow the loan term to be measured for real property transactions in the way the Bureau proposed, it makes clear that loan term for small

business credit is generally measured from the date of origination and should be reported that way.

Final comment 107(a)(5)–8 also makes clear that if a credit product, such as a credit card, does not have a loan term, the financial institution reports loan term as "not applicable." The Bureau believes that permitting the use of "not applicable" in these situations will facilitate compliance and aid in the collection of appropriate data. However, the Bureau does not consider products that have an estimated loan term, such as certain merchant cash advances and other sales-based financing transactions, as products that do not have a loan term. The Bureau agrees with those commenters who suggested that merchant cash advance providers should report loan term so that appropriate comparisons can be made with other products. Consequently, comment 107(a)(5)–8 now provides that for merchant cash advances and other sales-based financing transactions, the financial institution complies with § 1002.107(a)(5)(iii) by reporting the loan term, if any, that the financial institution estimated, specified, or disclosed in processing or underwriting the application or transaction. The Bureau notes that loan term for a merchant cash advance or other sales-based financing transaction can also be the estimated loan term disclosed in a State or locally required disclosure, if applicable. The comment also explains that if more than one loan term is estimated, specified, or disclosed, the financial institution reports the one it considers to be the most accurate, in its discretion. The Bureau believes that these instructions will enhance the quality of the data collected and facilitate compliance by providing clear guidance on these providers' reporting responsibilities. The Bureau chose not to use the other loan term measurements that commenters suggested because they would likely have introduced significant operational difficulty. The Bureau believes that merchant cash advance and other sales-based financing providers will not have operational difficulty reporting an estimate that they already possess. If a merchant cash advance or other sales-based financing provider does not estimate, specify, or disclose a loan term as part of the processing or underwriting of the application or transaction, the provider may report that the loan term is "not applicable."

The proposed rule's loan term comment would have also provided that the financial institution would report "not applicable" if the application is denied, withdrawn, or determined to be

incomplete before a loan term has been identified. However, in order to facilitate compliance, enhance the quality of information collected, and for consistency with the other data points in the final rule, final comment 107(a)(5)–8 now provides that for a credit product that generally has a loan term, the financial institution reports "not provided by applicant and otherwise undetermined" if the application is denied, withdrawn, or determined to be incomplete before a loan term has been identified. The Bureau believes that the availability of this response will facilitate the reporting of the loan term subcategory for applications in these situations.

107(a)(6) Credit Purpose

Proposed Rule

Section 1071 requires financial institutions to collect and report "the type and purpose of the loan or other credit being applied for."[607] (The credit type data point is discussed in the section-by-section analysis of § 1002.107(a)(5) immediately above.)

The Bureau proposed in § 1002.107(a)(6) to require that financial institutions collect and report the purpose or purposes of the credit applied for or originated. Proposed comment 107(a)(6)–1 would have presented instructions for collecting and reporting credit purpose and would have provided the proposed list of credit purposes from which financial institutions would select.

The proposed list of credit purposes was similar to the list in the SBREFA Outline, with certain adjustments. First, the items on the SBREFA list that described types of collateral, such as commercial real estate, were updated to more clearly reflect that the financial institution would be collecting and reporting the *purpose* of the loan, and not the form of collateral, though the form of collateral might be referred to in describing that purpose. In addition, the proposed listed purposes involving real property would have differentiated between dwelling and non-dwelling real property. The Bureau believed that this distinction would help in collecting more precise and useful data. To facilitate compliance the Bureau proposed to include "not applicable" in the purposes list for use when an application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card. Proposed comment 107(a)(6)–5 would have also explained

---

[607] ECOA section 704B(e)(2)(B).

AdminRecord-000144

the use of "not applicable" as a response.

Proposed comment 107(a)(6)–2 would have explained that if the applicant indicated or the financial institution was otherwise aware of more than one purpose for the credit applied for or originated, the financial institution would have reported those purposes, up to a maximum of three, using the list provided, in any order it chose.

Proposed comment 107(a)(6)–3 would have explained that if a purpose of the covered credit transaction did not appear on the list of purposes provided, the financial institution would report "other" as the credit purpose and report the purpose as free-form text. For efficiency and to facilitate compliance, proposed comment 107(a)(6)–3 would have also explained that if the application had more than one "other" purpose, the financial institution would choose the most significant "other" purpose, in its discretion, and would report that "other" purpose. The comment would have then explained that a financial institution would report a maximum of three credit purposes, including any "other" purpose reported.

Proposed comment 107(a)(6)–4 would have explained that, pursuant to proposed § 1002.107(c)(1), a financial institution would maintain procedures reasonably designed to collect applicant-provided information, which would include credit purpose. However, if a financial institution was nonetheless unable to collect or determine credit purpose information, the financial institution would have reported that the credit purpose was "not provided by applicant and otherwise undetermined."

In order to facilitate compliance, the Bureau also proposed comments 107(a)(6)–6 and –7. Proposed comment 107(a)(6)–6 would have clarified that, as explained in proposed comment 104(b)–4, subpart B did not apply to an extension of credit that was secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners did not, or would not, occupy. Proposed comment 107(a)(6)–7 would have clarified the collection and reporting obligations of financial institutions with respect to the credit purpose data point, explaining that the financial institution would be permitted, but not required, to present the list of credit purposes provided in comment 107(a)(6)–1 to the applicant. Proposed comment 107(a)(6)–7 would have further explained that the financial institution would also be permitted to ask about purposes not included on the list provided in proposed comment 107(a)(6)–1. Finally, proposed comment

107(a)(6)–7 would have clarified that if an applicant chose a purpose or purposes that were similar to purposes on the list provided, but used different language, the financial institution would report the purpose or purposes from the list provided.

The Bureau sought comment on its proposed approach to the credit purpose data point. In addition, the Bureau sought comment on whether there were any purposes that should be added to or modified on its proposed list. In particular, the Bureau sought comment on the potential usefulness of including "agricultural credit" and "overdraft line of credit" in the credit purposes list. Finally, the Bureau requested comment on whether further explanations or instructions with respect to this data point would facilitate compliance.

*Comments Received*

The Bureau received comments on its proposed approach to the credit purpose data point from a number of lenders, trade associations, and community groups, along with a minority business advocacy group. Several community groups expressed support for the credit purpose data point as proposed by the Bureau, and a CDFI lender explained that it already collects this information. A community group stated that the proposal accurately captured the wide variety of credit purposes and then expressed specific support for distinguishing dwellings from non-dwellings, allowing reporting of three credit purposes, and inclusion of the "other" category with a free-form text box. In addition, this commenter suggested that the proposed method for credit purpose collection could work well with the CRA.

A trade association representing community banks also supported the proposal for credit purpose, especially the flexibility provided by the "not applicable" and "not provided by applicant and otherwise undetermined" options, and the provision allowing a financial institution to report the credit purposes in any order it chooses, when the institution is aware of more than one purpose. That commenter said that these accommodations would facilitate compliance while still achieving the policy goals of the law. A trade association representing auto finance lenders also stated support for the flexibility provided by the "not applicable" and "not provided by applicant and otherwise undetermined" options. Two banks opposed the credit purpose proposal, explaining that it would require extensive changes and burdensome ongoing operations, and that the interplay with other regulatory

requirements was unclear. One of these commenters also questioned the usefulness of the data collected. However, neither commenter suggested alternative ways to implement the statutorily required credit purpose data point.

Several commenters asked that the Bureau clarify certain aspects of the credit purpose proposal. Two industry commenters requested clarification of the circumstances when institutions should use "not provided by applicant and otherwise undetermined" as opposed to "not applicable." Several industry commenters requested guidance on when to use "owner-occupied" versus "non-owner occupied" for non-dwelling real property. Another asked about how to report when the loan is mixed-use (business and consumer purpose). A joint letter from community groups and community oriented lenders requested that the Bureau clarify that the category "Working capital (includes inventory or floor planning)" also includes salaries, rents, and other daily expenses. A credit union trade association suggested that the Bureau clarify how transactions should be reported when made directly to a sole proprietor, not to the business directly, explaining that credit unions may find it confusing to report a loan purpose that implies that the business itself is the recipient.

Several commenters requested more substantial changes in the proposed credit purpose data point. Two joint comment letters, each representing multiple community groups and other entities, requested that the Bureau require more granular reporting in certain situations, especially with regard to real property loans. These comments suggested collecting real property loan data on rental purpose, whether buildings are mixed-use, the number and type of units in buildings, as well as a way to easily connect to a HMDA record for any loan that is reported under both regimes. One of these comments asked that the Bureau make it easier to determine if a capital expense loan is used to maintain a business or expand it. Another community group requested that the Bureau disaggregate the purchase-construction-repair purpose from refinancing for things like real estate, vehicles, and equipment, perhaps by adding a separate data point. Another requested that refinancings (along with renewals) should be listed as a credit product in the credit type data point, rather than as a credit purpose. That same commenter requested that financial institutions not be allowed to use their own list of purposes, as

AdminRecord-000145

proposed, and suggested that the Bureau consider providing a sample application form, which would include the rule's list of credit purposes, to facilitate data collection.

Several industry commenters responded to the Bureau's request for comment on including "agricultural credit" as a credit purpose. These commenters mostly requested that new purposes specifically geared to agricultural lending be included, though they did not offer any examples of such purposes. The commenters emphasized that agricultural lending is different from other business lending and suggested that choosing from the credit purposes listed would be difficult for this market. A community group stated that it might be confusing to list agricultural credit as a credit purpose as the credit product data point would collect that they are farm loans.[608]

Several community groups and a minority business advocacy group responded to the Bureau's request for comment on whether the final rule should include "Overdraft line of credit" as a credit purpose. These commenters supported inclusion of overdraft as a purpose, stating that it should be monitored for potential abuses, especially abuses in communities of color. No industry commenters discussed the possible inclusion of overdraft lines of credit as a credit purpose.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(6) and associated commentary with certain revisions for clarity, to improve the usefulness of the data collected, and to accommodate a new coverage exclusion for HMDA-reportable transactions. Final § 1002.107(a)(6) requires that financial institutions collect and report the purpose or purposes of the credit applied for or originated.

Final comment 107(a)(6)–1 provides instructions for collecting and reporting credit purpose and presents the list of credit purposes from which financial institutions will select. The final list of purposes is very similar to the proposed list but deletes two purposes that describe credit likely to be HMDA reportable, includes one additional purpose ("overdraft") and makes minor edits to accommodate those changes and for clarity. The Bureau believes that the list of credit purposes provided in comment 107(a)(6)–1 appropriately aligns with the purposes of credit

sought in the small business credit market.

Because the Bureau is adopting an exclusion for HMDA-reportable credit, the proposed purposes list's differentiation between dwelling and non-dwelling real property is no longer necessary. In addition, the purposes in the list that pertained to dwellings were very likely to be HMDA-reportable, and so have been removed in the final rule. See the section-by-section analysis of § 1002.104(b) above for further discussion of this exclusion.

The Bureau agrees with the commenter who suggested that "Working capital (includes inventory or floor planning)" will often also include salaries, rents, and other daily expenses. However, the final rule does not include these items in the credit purposes list description of working capital because the Bureau believes the term is already clear, and listing these items may cause confusion as to other working capital items that are not listed.

The Bureau has not added "Agricultural credit" or specific purposes associated with agricultural credit to the list of credit purposes in the final rule. First, although "farm loans" are not listed as a credit product in the credit type data point, the NAICS data point in final § 1002.107(a)(15) will make clear when the small business borrower is an agricultural business. In addition, other business types are not included in the credit purposes list and doing so with agriculture could cause confusion. As far as including specific agricultural purposes in the purposes list, the commenters who suggested this did not provide examples, and the Bureau did not propose such purposes. Going forward, the Bureau may learn of specific agricultural credit purposes from the "Other" free-form text box, and if appropriate, potentially add them to the rule later.

The Bureau agrees that overdraft should be separately identified as a credit purpose in the list in comment 107(a)(6)–1 in order to observe its use in the market. Rather than "Overdraft line of credit" as referenced in the proposal's preamble, the Bureau is using the term "Overdraft." In order to facilitate compliance regarding overdraft as a credit purpose, the Bureau is adding new comment 107(a)(6)–8 to the final rule, which makes clear that when overdraft is an aspect of the covered credit transaction applied for or originated, the financial institution reports "Overdraft" as a purpose of the credit. The new comment also explains that the financial institution reports credit type pursuant to § 1002.107(a)(5)(i) as appropriate for the

underlying covered credit transaction, such as "Line of credit—unsecured." The Bureau does not believe that reporting overdraft as a credit purpose will create operational difficulties for financial institutions because the information will be readily apparent as an aspect of the credit. Finally, new comment 107(a)(6)–8 makes clear that providing occasional overdraft services as part of a deposit account offering would not be reported for the purpose of subpart B.

The Bureau is finalizing comments 107(a)(6)–2 through –5 with minor edits to accommodate the removal of purposes related to the exclusion for HMDA-reportable transactions and for clarity. Final comment 107(a)(6)–2 explains that if the applicant indicates or the financial institution is otherwise aware of more than one purpose for the credit applied for or originated, the financial institution reports those purposes, up to a maximum of three, using the list provided, in any order it chooses. Since applicants may have more than one purpose for a credit transaction, the Bureau believes it is appropriate to require collection and reporting of more than one credit purpose for this data point in that situation. The Bureau believes that having financial institutions report up to three credit purposes will provide useful data. The Bureau also believes that allowing financial institutions discretion as to the order of the credit purposes reported will facilitate compliance.

Final comment 107(a)(6)–3 explains that if a purpose of an application does not appear on the list of purposes provided, the financial institution reports "other" as the credit purpose and reports the credit purpose as free-form text. The Bureau believes that allowing financial institutions to choose "other" when a credit purpose for the application did not appear on the provided list will facilitate compliance. In addition, the Bureau believes that collecting this information on "other" credit purposes will assist in monitoring trends in this area and key developments in the small business lending market, which the Bureau can use to inform any future changes to the list.

Final comment 107(a)(6)–4 makes clear that, pursuant to final § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes credit purpose. However, the comment further explains that if a financial institution is nonetheless unable to collect or determine credit purpose information,

---

[608] The Bureau notes that the proposed rule did not expressly list agricultural loans (or similar) on either the credit products list or credit purposes list.

AdminRecord-000146

the financial institution reports that the credit purpose is "not provided by applicant and otherwise undetermined." The Bureau agrees with the industry commenters who stated that this provision would provide flexibility and believes that permitting use of this response will facilitate compliance and enhance the quality of data reported.

In order to facilitate compliance, final comment 107(a)(6)–5 explains that if the application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card, the financial institution may report credit purpose as "not applicable." As with the "not provided by applicant and otherwise undetermined" purpose, the Bureau agrees with the industry commenters who felt that this provision would provide appropriate flexibility. The Bureau does not believe that there will be confusion about the situations for which "not provided by applicant and otherwise undetermined" (as explained in final comment 107(a)(6)–4) and "not applicable" (as explained in final comment 107(a)(6)–5) are appropriate to use. The commenters who suggested that such confusion might occur did not explain why the proposed language would not be sufficient.

Final comment 107(a)(6)–6 provides details on the collection of credit purposes by financial institutions. The comment states that, pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, including credit purpose. In addition, the financial institution is permitted, but not required, to present the list of credit purposes provided in comment 107(a)(6)–1 to the applicant. The financial institution is also permitted to ask about credit purposes not included on the list provided in comment 107(a)(6)–1. If the applicant chooses a purpose or purposes not included on the provided list, the financial institution follows the instructions in comment 107(a)(6)–3 regarding reporting of "other" as the credit purpose. If an applicant chooses a purpose or purposes that are similar to purposes on the list provided, but uses different language, the financial institution reports the purpose or purposes from the list provided. The Bureau believes that the explanations and instructions in the final commentary accompanying § 1002.107(a)(6) will reduce any confusion as to how a financial institution reports this data point when an application involves multiple credit purposes, and in other situations.

The Bureau believes that prohibiting financial institutions from using their own credit purpose lists, as one commenter suggested, would not be appropriate because the Bureau does not have sufficient information to create a definitively comprehensive credit purposes list and wishes to provide institutions the flexibility appropriate to their market segment. In regard to that commenter's suggestion that the Bureau provide a sample application form, this issue is discussed in the section-by-section analysis of appendix E below. In addition, the Bureau does not believe additional clarification regarding how to report credit purpose for business loans made to sole proprietors is necessary.

Because the Bureau is providing a complete exclusion for HMDA-reportable transactions in the final rule, the Bureau is not finalizing proposed comment 107(a)(6)–6, which would have provided a cross-reference to the partial exclusion for dwelling-secured credit in the proposed rule.

New comment 107(a)(6)–7 explains that real property is owner-occupied if any physical portion of the property is used by the owner for any activity, including storage. The Bureau adds this explanation in response to comments asking for clarity on this issue. The Bureau believes that the language provided clearly indicates the meaning of "owner-occupied" for reporting purposes and will facilitate compliance and help in the collection of uniform data.

In regard to the commenters that objected to the entire credit purpose data point as excessively burdensome and not providing useful information, the Bureau notes that this data point was specified by Congress in section 1071 as one that financial institutions must collect and report; these commenters did not suggest a different method of collection. The Bureau also believes, along with the national trade association representing small banks whose comment is described above, that the reporting accommodations included in the credit purpose provision will facilitate compliance while still achieving the policy goals of section 1071.

Although some additional useful information might be collected if the Bureau were to expand the credit purpose data point to include the more granular reporting requested by community groups, such changes would make the collection more difficult for financial institutions as well as potentially confusing for small business applicants; the Bureau does not believe that further granularity is necessary at this time, especially at the risk of

obtaining potentially less accurate or complete data overall. In regard to making "refinancing" a credit product rather than a credit purpose as proposed, the Bureau believes that its credit product taxonomy presents a clear, uncomplicated framework using the basic forms of credit extended. Making refinancing a product would complicate the taxonomy and introduce categorization difficulties, for example with partial refinancings. As for including renewals, the section-by-section analysis of § 1002.103(b) above discusses this issue.

### 107(a)(7) Amount Applied For

#### Proposed Rule

Section 1071 requires financial institutions to collect and report "the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved." [609] The Bureau stated in the SBREFA Outline that it was considering requiring financial institutions to report the amount applied for data point using the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the financial institution's evaluation of the credit request. [610]

The Bureau proposed § 1002.107(a)(7) to require a financial institution to collect and report "the initial amount of credit or the initial credit limit requested by the applicant." Proposed comment 107(a)(7)–1 would have explained that a financial institution is not required to report credit amounts or limits discussed before an application is made, but must capture the amount initially requested at the application stage or later. In addition, proposed comment 107(a)(7)–1 would have stated that if the applicant does not request a specific amount, but the financial institution underwrites the application for a specific amount, the financial institution reports the amount considered for underwriting as the amount applied for. Finally, proposed comment 107(a)(7)–1 would have instructed that if the applicant requests an amount as a range of numbers, the financial institution reports the midpoint of that range.

To address the situation where the financial institution requests an amount applied for but the applicant nonetheless does not provide one, proposed comment 107(a)(7)–2 would have explained that, in compliance with proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect

---

[609] ECOA section 704B(e)(2)(C).
[610] SBREFA Outline at 28.

applicant-provided information, which includes the credit amount initially requested by the applicant. However, if a financial institution is nonetheless unable to collect or otherwise determine the amount initially requested, the financial institution would have been required to report that the amount applied for is "not provided by applicant and otherwise undetermined."

Proposed comment 107(a)(7)–3 would have provided instructions for reporting the amount applied for in regard to firm offers. Proposed comment 107(a)(7)–3 would have explained that when an applicant responds to a "firm offer" that specifies an amount or limit, which may occur in conjunction with a pre-approved credit solicitation, the financial institution reports the amount applied for as the amount of the firm offer, unless the applicant requests a different amount. If the firm offer does not specify an amount or limit and the applicant does not request a specific amount, proposed comment 107(a)(7)–3 would have explained that the amount applied for is the amount underwritten by the financial institution.

Proposed comment 107(a)(7)–4 would have explained that when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution reports only the additional credit amount sought, and not any previous amounts sought or extended. The Bureau noted that a request to withdraw additional credit amounts at or below a previously approved credit limit amount on an existing open-end line of credit would not be a covered application, and so proposed comment 107(a)(7)–4 would not have applied to such a situation.

The Bureau sought comment on its proposed approach to the amount applied for data point. The Bureau also requested comment on how best to require reporting of amount applied for in situations involving multiple products or credit lines under a single credit limit. The Bureau also requested comment on potential methods for avoiding misinterpretations of disparities between the amount applied for and the amount approved or originated. Finally, the Bureau requested comment on its proposed approach to reporting when a range of numbers is requested.

Comments Received

The Bureau received comments from lenders, trade associations, community groups, and others regarding this proposed data point. Community groups and a CDFI lender supporting the Bureau's approach to the collection of

the amount applied for data point. One commenter said that it works with minority farmers whose loans are approved for far less than what they originally applied for and that the data would give them information regarding lending practices involving minority farm businesses. Several commenters stated that amount applied for and amount approved or originated are key data for fair lending purposes. One said that Black-, Latino-, and Asian-owned businesses have been substantially less likely to receive the full small business loan amount requested than white-owned small businesses. Another commenter requested that the Bureau scrutinize lenders when the application and approval amounts are conspicuously close, especially if there is a disproportionate impact on women and minority-owned businesses, because some lenders may dissuade applicants from making a specific request and steer them to the considered underwriting amount that is lower than the financing need of the small business.

A community group noted that amounts should not be reported in ranges since the statute requires reporting of amounts and furthermore, that ranges are not useful for assessing whether lenders are responding adequately to credit needs. This community group also commented that with respect to line increases, it makes sense for the lender to report the additional amount instead of the additional and original amount because it is more precise in terms of being able to assess whether credit needs are being met.

Several industry commenters and a group of State banking regulators expressed concerns about collecting the data in light of the lending process where the "amount applied for" can fluctuate throughout the application stage. One trade association commented that financial institutions should not be required to report amounts stated before an application is made because applicants state a loan amount early on but that loan amount usually changes throughout the process for various reasons. Another stated that many business credit applications include offers, counteroffers, and negotiations. One commenter stated that even though the initial amount requested appears useful it does not reflect the true dynamic of the small business lending process. The commenter reasoned that it is not uncommon during the application process to see the actual loan amount fluctuate as the entrepreneur further refines their capital needs, and that makes tracking this type of information

not particularly relevant or reflective of the process. A credit union trade association recommended that financial institutions have the discretion to report an "amount applied for" that is determined at a later stage, rather than at the first request of the applicant, because reporting the initial credit request could inaccurately represent the lending process. A group of state banking regulators commented that some applicants may not request an amount or may request a range, and some financial institutions will not require such information at the outset. They stated that mandating reporting of a requested loan amount would impose increased compliance burdens and has the potential to disrupt the relationship aspect of small business lending.

Two industry commenters requested the Bureau clarify how financial institutions should report the amount applied for when a firm offer of credit specifies a range of possible amounts, for example, amounts between $20,000 and $40,000. These commenters stated they believe such offers should be deemed not to specify an amount or limit and that institutions should be able to report the amount underwritten as the amount applied for. They reasoned that reporting the top of the range as the amount applied for in these circumstances could be misleading because many applicants likely will not qualify for amounts at the top of the range. A bank suggested that when an applicant indicates a range, each financial institution should be able to decide whether to report the low, midpoint, or high end of the range so long as it is consistent for the financial institution's entire small business lending application register.

Two business advocacy groups noted that uncertainty regarding key definitions could create compliance challenges and requested that the Bureau provide additional clarity as to the meaning of "applied for." A bank stated that its systems do not have a way to collect and record this data point and that it would need to collect it manually, which would affect its ability to serve its customers and community.

The Bureau did not receive comments on how best to require reporting for situations involving multiple products or credit lines under a single credit limit or potential methods for avoiding disparities between amount applied for and amount originated or approved.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(7) and associated commentary with revisions and an addition in the commentary for

AdminRecord-000148

clarity. The Bureau notes that for HMDA, Regulation C § 1003.4(a)(7) requires reporting of "the amount of the covered loan or the amount applied for, as applicable," which requires reporting of the amount applied for only when the credit is not originated. Because section 1071 uses the conjunction "and" rather than "or," the Bureau reads section 1071 to require collection and reporting of the amount applied for regardless of whether the application is ultimately approved or originated.[611] The Bureau believes its interpretation of "the amount of the credit or credit limit applied for" pursuant to ECOA section 704B(e)(2)(C) is reasonable and appropriate.

With respect to the commenter that indicated that some lenders may dissuade applicants from making a specific request and steer them to the considered underwriting amount, which may be lower than their financing needs, the Bureau believes that it is necessary to capture both the amount applied for and amount approved or originated to fulfill the statutory purposes of section 1071, including facilitating fair lending enforcement. The Bureau believes the amount applied for and the amount approved data points are necessary to identify potentially discriminatory practices, such as discouragement or steering, in the lending process. For example, greater differences between amount applied for and amount originated among protected groups could indicate a fair lending concern. The Bureau notes that if a financial institution were to seek to unduly influence or alter the amount requested by the applicant in order to avoid reporting it, such conduct would violate the requirement in final § 1002.107(c) to not discourage an applicant from responding to requests for applicant-provided data and to maintain procedures to collect such data at a time and in a manner that are reasonably designed to obtain a response.

Regarding commenters' concerns that the amount applied for can change throughout the lending process, the Bureau acknowledges that there could be complexity in pinpointing the specific initial amount requested by an applicant in the fluid process of a small business credit application. The Bureau acknowledges that this complexity could make this data point challenging for financial institutions to collect and report. Nonetheless, the statute requires that the amount applied for be reported,

and the information is important for both of section 1071's statutory purposes. The Bureau is finalizing comment 107(a)(7)–1 with minor edits for clarification. Final comment 107(a)(7)–1 provides that the financial institution reports the initial amount of credit or the credit limit initially requested by the applicant at the application stage and is not required to report credit amounts or limits discussed before an application is made. The Bureau believes that this guidance will provide a flexible compliance regime that will accommodate different business practices. A financial institution will not be required to report amounts discussed before the application is made, which will accommodate preliminary informal interactions. Regarding the recommendation that financial institutions have the discretion to report an amount determined at a later stage rather than the initial request of the applicant, the Bureau notes that the statute requires the amount applied for to be reported even though a small business credit application process can be fluid. Therefore, a financial institution should report the initial request of the applicant if the lending process has already reached the application stage. In regard to ranges of amounts requested, the Bureau does not believe that permitting financial institutions to decide whether to report the low, midpoint, or high end of the range, as requested by a commenter, would yield data that will be comparable to the other data collected for this data point because different financial institutions will be applying different rules for what to report. The Bureau believes that more uniform information will be more useful and should not create extra difficulty for financial institutions to collect. Therefore, to facilitate compliance, final comment 107(a)(7)–1 provides that for amounts that were requested as a range of numbers, the financial institution reports the midpoint of the range. In addition, for clarity, the Bureau moved guidance on what to report if an applicant does not request a specific amount to final comment 107(a)(7)–2, as explained below.

With respect to the comment that an amount may not be initially required or that some applicants may not request an amount or may request a range, the Bureau understands that a specific amount may not be provided by the applicant and that a specific amount is often not required by many financial institutions for products such as credit cards, as the financial institution assigns

the credit limit as part of the credit evaluation process. Final comment 107(a)(7)–2 provides that in situations where the applicant does not request a specific amount at the application stage, but the financial institution underwrites the application for a specific amount, the financial institution reports the amount that was considered in underwriting. Final comment 107(a)(7)–2 also provides that if a particular type of credit product does not involve a specific amount requested, then the financial institution reports "not applicable." The Bureau believes this method will aid compliance with section 1071 and yield appropriate data by avoiding the need to report a preliminary number when a financial institution's business practices do not result in there being such a number to report. For clarity, the Bureau moved guidance regarding amounts that are otherwise undetermined that was addressed in proposed comment 107(a)(7)–2 to final comment 107(a)(7)–5, as explained below.

Regarding the request that the Bureau clarify how institutions should report the amount applied for when a firm offer of credit specifies a range of possible amounts, the Bureau added guidance in final comment 107(a)(7)–3 that addresses this situation. "Firm offers" involve solicitations to small businesses when they have been pre-approved for a term loan, line of credit, or credit card.[612] The Bureau understands that financial institutions often provide an amount in such solicitations and the Bureau believes that when the applicant knows the amount of the pre-approval before responding, that figure could appropriately be considered as the amount applied for. However, if no amount appears in the pre-approved solicitation, the Bureau considers that an applicant responding to the firm offer has not requested a specific amount, and reporting of the amount underwritten would be appropriate. Final comment 107(a)(7)–3 provides that when an applicant responds to a firm offer, a financial institution reports the amount applied for as the amount of the firm offer, unless the applicant requested a different amount. If, on the other hand, the firm offer did not contain a specified amount and the applicant did not request one, then the financial institution reports the amount applied for as the amount that was underwritten. The Bureau did not propose guidance that addresses what financial institutions report when a firm

---

[611] The amount approved or originated data point is addressed in the section-by-section analysis of § 1002.107(a)(8).

[612] *See* 15 U.S.C. 1681a(*l*); *see also* Regulation B comment 12(b)(7)–1 (describing offers of credit).

AdminRecord-000149

offer specifies a range of possible amounts. The Bureau agrees with the commenters that such offers should be treated similarly to those situations where a firm offer did not specify an amount. To address this scenario, final comment 107(a)(7)–3 states that if the firm offer specifies an amount or limit as a range of numbers and the applicant does not request a specific amount, the amount applied for is the amount underwritten by the financial institution. The Bureau believes that this guidance will aid compliance and yield useful data.

The Bureau is finalizing comment 107(a)(7)–4 as proposed. The comment explains that when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution reports only the additional credit amount sought, and not any previous amounts extended.

The Bureau added final comment 107(a)(7)–5 to address situations where the initial amount applied for cannot be determined. Specifically, the comment provides that under § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the credit amount initially requested by the applicant (other than for products that do not involve a specific amount requested). However, the Bureau understands that there may be situations in which amount applied for was not collected and could not be otherwise determined. Thus, final comment 107(a)(7)–5 provides that if a financial institution is unable to collect or otherwise determine the amount initially requested, the financial institution reports that the amount applied for is "not provided by applicant and otherwise undetermined." The Bureau believes that providing this reporting flexibility will facilitate compliance by accommodating different business practices.

With respect to the commenter that indicated that its systems do not have a way to collect this data point, the Bureau believes that the data on the amount applied for will generally be available in the loan files and should not present particular difficulties in reporting. Regarding the request from commenters that the Bureau provide additional clarity as to the meaning of applied for, the commenters did not indicate specific issues in the amount applied for data point that require clarification. The Bureau believes it has addressed in this final rule the requests for clarity from other commenters as well as other clarifications the Bureau believes are appropriate.

### 107(a)(8) Amount Approved or Originated

#### Proposed Rule

Section 1071 requires financial institutions to collect and report "the amount of the credit transaction or the credit limit approved."[613]

Proposed § 1002.107(a)(8) would have required that the amount approved or originated data point be collected and reported as follows: (i) for an application for a closed-end credit transaction that is approved but not accepted, the financial institution collects and reports the amount approved by the financial institution; (ii) for a closed-end credit transaction that is originated, the financial institution collects and reports the amount of credit originated; and (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the financial institution collects and reports the amount of the credit limit approved.

Proposed comment 107(a)(8)–1 would have provided general instructions for the amount approved or originated data point, explaining that a financial institution reports the amount approved or originated for credit that is originated or approved but not accepted. For applications that the financial institution, pursuant to proposed § 1002.107(a)(9), would have reported as denied, withdrawn by the applicant, or incomplete, the financial institution would have reported that the amount approved or originated is "not applicable."

Proposed comment 107(a)(8)–2 would have explained that when a financial institution presents multiple approval amounts from which the applicant may choose, and the credit is approved but not accepted, the financial institution reports the highest amount approved. Proposed comments 107(a)(8)–3 and –4 would have provided specific instructions for identifying and reporting the amount approved or originated for closed-end transactions, including refinancings.

Proposed comment 107(a)(8)–5 would have provided instructions regarding counteroffers and the amount approved or originated data point, explaining that if an applicant agrees to proceed with consideration of a counteroffer for an amount or limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the financial institution reports the amount granted. Proposed comment 107(a)(8)–5 would have further explained that if an

applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the action taken on the application as denied and reports "not applicable" for the amount approved or originated. The proposed comment would have provided a reference to proposed comment 107(a)(9)–2, which discusses the action taken data point in relation to counteroffers.[614]

The Bureau sought comment on its proposed approach to the amount approved or originated data point. The Bureau also requested comment on potential methods for avoiding misinterpretations of disparities between the credit amount or limit applied for and the credit amount or limit originated or approved and on the possible use of ranges of numbers for reporting the amount applied for and amount approved or originated data points. In addition, the Bureau requested comment on whether it would be useful and appropriate to require reporting of the amount approved as well as the amount originated for closed-end credit transactions.

#### Comments Received

The Bureau received comments on the amount approved or originated data point from lenders, trade associations, and community groups. Almost all of the comments received supported the Bureau's proposal. A bank and a trade association commented that the Bureau's proposal is a reasonable and appropriate means of implementing the statutory requirement. A community group and a CDFI lender highlighted the usefulness of the data for fair lending purposes, including identifying potentially discriminatory lending practices. The CDFI lender suggested that the data can help show how financial institutions compare across key metrics and reveal capital gaps in the market that lenders may be able to fill. Two commenters supported the proposal's requirement that data collection on amount approved or originated be required for transactions that are approved but not accepted, not just those that are originated. A trade association commented that different standards are appropriate for closed-end and open-end products, while a community group noted that it is appropriate to report the credit limit in cases of open-end credit. Another trade association emphasized the Bureau's proposal regarding counteroffers and

---

[613] ECOA section 704B(e)(2)(C).

[614] See the section-by-section analysis of § 1002.107(a)(9) for a complete discussion of how the final rule treats reporting obligations for applications involving counteroffers.

that it appropriately allows for negotiations prevalent in small business lending. A community group requested that the Bureau not permit reporting of amounts in ranges, stating that the statute requires reporting of specific amounts and that ranges are not useful for assessing whether lenders are responding to credit needs adequately.

Two banks expressed concerns about the overall reporting requirement to collect data on amount approved or originated. One suggested that the data are meaningless because the majority of loan requests at a community bank are not submitted formally and in most cases the amount approved is what was requested. That bank also noted that it would be rare for the amount to change and it does not have a way to currently track the information, thus adding burden. Another bank recommended that financial institutions should not be generally required to report information on applications where no credit was extended, such as applications that were not completed by the applicant or where the applicant did not accept the terms. This bank reasoned that the amount approved data point is irrelevant because the loan was not originated and that it does not further the purposes of section 1071 because the information would not help the Bureau materially understand credit opportunities nor help ensure fair lending laws are enforced.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(8) and associated commentary as proposed. The Bureau is also adding new comment 107(a)(8)–6. The Bureau reads the statutory language "the amount of the credit transaction or the credit limit approved" to require the amount of the credit limit approved to be reported for open-end applications, and the amount of the credit transaction to be reported for closed-end applications. The Bureau believes the phrase "the amount of the credit transaction or the credit limit approved" to be ambiguous in regard to closed-end transactions because the most common meaning of the word "transaction" in the context for closed-end credit transactions would be an originated loan. Thus, the Bureau reasonably interprets the statute as requiring reporting of the amount originated for closed-end credit transactions. In the alternative, section 1071 authorizes the Bureau to include any "additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that it is appropriate to use its exception authority under ECOA section

704B(g)(2) to require the amount originated, rather than the amount approved, for originated closed-end credit transactions, because excluding the amount approved for originated closed-end transactions, and requiring collection of the amount originated instead, would enhance the utility and quality of the data being reported, thus further the fair lending and business and community development purposes of section 1071.

In response to the commenters' suggestion that data on applications should not be reported in situations where the application is withdrawn or incomplete as well as the commenter's suggestion that the data are meaningless, the Bureau believes there is value in the data to be reported, even if no amount is reported for the amount approved or originated data point. Other information to be reported for the application that was, pursuant to § 1002.107(a)(9), withdrawn by the applicant or incomplete, can help further the fair lending and community development purposes of section 1071. For example, data from applications that are withdrawn or incomplete can help identify potential discriminatory practices in the application process and also indicate demand for credit by small business applicants. This would not be possible if data on applications that are withdrawn or incomplete are not reported. Accordingly, final comment 107(a)(8)–1 explains that for applications a financial institution, pursuant to § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports that the amount originated or approved is "not applicable." The Bureau also believes that reporting "not applicable" for amount approved or originated in certain circumstances will facilitate compliance for this data point.

The Bureau does not believe, as suggested by one commenter, that data on applications where the applicant did not accept the terms would not further the statutory purposes of section 1071. The data will help facilitate fair lending enforcement by indicating the credit that had been offered to different types of applicants when the transaction does not close and there is no amount originated to report. Reporting data with respect to the amount approved will also aid in fulfilling the business and community development purpose of section 1071 by providing a more complete picture of the credit being offered to different businesses and communities.[615]

As stated above, the Bureau is finalizing the commentary to § 1002.107(a)(8) as proposed. Final comment 107(a)(8)–2 provides guidance on reporting the amount approved or originated data point when the transaction involves multiple approval amounts. The Bureau believes that reporting the highest amount approved when credit is approved but not accepted will most accurately reflect the amount of credit that was made available to the applicant in this situation. Final comments 107(a)(8)–3 and –4 provide guidance on reporting amount approved or originated for closed-end transactions and refinancings, respectively. Final comment 107(a)(8)–5 provides guidance on reporting amount approved or originated when the transaction involves counteroffers.

The Bureau is adding comment 107(a)(8)–6 to provide guidance on reporting amount approved or originated with respect to existing accounts. Comment 107(a)(8)–6 provides that the financial institution reports only the additional credit amount approved or originated for an existing account, and not any previous amounts that were extended. The Bureau believes this will help facilitate compliance for this data point.

The Bureau did not receive specific comments with respect to this data point on methods for avoiding misinterpretations of disparities between credit amount or limit applied for and credit amount or limit originated or approved and whether it would be useful and appropriate to require reporting of amount approved as well amount originated for originated closed-end credit transactions. The Bureau is therefore not requiring reporting of that additional data.

107(a)(9) Action Taken

Proposed Rule

ECOA section 704B(e)(2)(D) requires financial institutions to report the "type of action taken" on an application.

The Bureau proposed in § 1002.107(a)(9) to require reporting of the action taken by the financial institution on the covered application, reported as originated, approved but not

---

[615] The Bureau similarly believes that reporting the amount originated on closed-end credit

transactions that are originated also fulfills the purposes of section 1071. For these transactions, reporting of the amount originated would aid in fulfilling the enforcement of fair lending laws by indicating the credit that had been provided to different types of applicants in actual transactions. It would also aid in fulfilling the business and community development purpose of section 1071 by providing a more complete and accurate picture of the credit actually being provided to different businesses and in different communities.

AdminRecord-000151

accepted, denied, withdrawn by the applicant, or incomplete. In addition, the Bureau proposed to categorize all incomplete applications as a single category of "incomplete," rather than following the approach in Regulation C of separately reporting denials based on incompletes and notices of incompleteness. Although the Bureau considered expanding the action taken codes to those currently used in Regulation C (including preapprovals or purchased loans), the Bureau did not believe those additional fields would have been appropriate or necessary in the context of section 1071 given the diversity of processes and other complexities in the small business lending space and because section 1071, unlike HMDA, does not expressly reference loan purchases.

Proposed comment 107(a)(9)–1 would have provided additional clarity on when a financial institution should select each of the proposed action taken codes. The financial institution would have identified the applicable action taken code based on final action taken on the covered application.

Proposed comment 107(a)(9)–2 would have provided instructions for reporting action taken on covered applications that involve a counteroffer, along with examples. The Bureau's proposed treatment of counteroffers would have aligned with how counteroffers are treated under existing § 1002.9 notification procedures and how they are reported under Regulation C.[616] The Bureau also considered, but did not propose, adding an action taken category or flag for counteroffers. The Bureau believed the addition of a counteroffer flag or field would have provided limited useful information beyond what would have been captured under the proposal.

Proposed comment 107(a)(9)–3 would have discussed reporting action taken for rescinded transactions. Proposed comment 107(a)(9)–4 would have clarified that a financial institution reports covered applications on its small business lending application register for the year in which final action is taken. Finally, proposed comment 107(a)(9)–5 would have provided guidance for reporting action taken if a financial institution issues an approval that is subject to the applicant meeting certain conditions.

The Bureau sought comment on proposed § 1002.107(a)(9) and its associated commentary.

*Comments Received*

The Bureau received comment on its proposal in § 1002.107(a)(9) to require reporting of action taken from a wide range of lenders, trade associations, and community groups.

*Action taken categories in general.* A number of commenters, including community groups, lenders, and a trade association supported the action taken reporting categories in proposed § 1002.107(a)(9). Two industry commenters agreed that proposed § 1002.107(a)(9) was a reasonable and appropriate means of implementing section 1071. One community group stated that the action taken codes are an essential metric to enforce fair lending laws and that the proposed action taken categories are substantially similar to those used for HMDA reporting, and so will be familiar to lenders. A joint letter from community groups, community oriented lenders, and business advocacy groups similarly supported use of the action taken fields that are also used for HMDA reporting. A trade association noted that action taken information is not typically collected by motor vehicle dealers in indirect vehicle finance transactions, but may be included by the finance source as part of the credit application decision.

Some commenters focused on particular proposed action taken categories, urging the Bureau to retain a proposed action taken category and not combine categories. For example, a several lenders and community groups specifically supported collection on incomplete and withdrawn applications. They asserted that it is important to collect data on applications that do not go through the full lending process (*i.e.,* through loan decisioning) in order to identify potential discouragement. Several commenters further explained that capturing incomplete and withdrawn applications would be important for fair lending assessments, as it would identify potential disparities in treatment, discouragement, and steering. In response to the Bureau's request for comment on whether to combine the "withdrawn by applicant" and "incomplete" categories, a community group supported the Bureau's proposed approach to keep the categories separate. The commenter asserted that data analysis and fair lending assessments would be more accurate if the withdrawn and incomplete categories are kept separate, as they represent different actions by the applicant. Another community group commenter supported distinct action taken categories for approvals and

denials, noting, for example, research finding disparities in credit denials for Black, Latino, and Asian small businesses.[617] A lender, however, urged the Bureau to use caution in interpreting and analyzing data collected under section 1071, noting for example that a high denial rate for different types of businesses (*e.g.,* small or minority-owned businesses) could be reflective of a financial institution's high volume of applications from such small businesses and not of a pattern of discriminatory lending.

In response to the Bureau's request for comment on whether to retain the "approved but not accepted" category, two community groups urged the Bureau to include this category among the available action taken options. The commenters argued that the approved but not accepted category could be used to identify instances where an applicant was offered loan terms that did not meet the needs of the small business (such as high pricing or other unfavorable terms), and could be tracked to identify potential disparities among women-owned or minority-owned small businesses, or other vulnerable populations. Another commenter argued that data may be misconstrued if approved but not accepted loans are treated as "denials."

In contrast, several community banks urged the Bureau to remove certain proposed action taken categories. For example, a community bank argued against use of withdrawn by applicant or denied action taken codes, stating that there was no reason to report such applications and it would violate the applicant's trust. A different community bank urged the Bureau to remove the incomplete category, noting that financial institutions treat incompleteness as a denial under existing Regulation B (because it requires an adverse action notice or a notice of incompleteness), and that such events are better captured as denials or withdrawals.

In the NPRM, the Bureau also sought comment on whether the Bureau's proposal to categorize all incomplete applications as a single category of "incomplete" (closed or denied) should instead be reported consistent with the approach in Regulation C, which provides separate categories for denials (including on the basis of incompleteness) and files closed for incompleteness (if the financial institution sent a written notice of

---

[616] Regulation C comment 4(a)(8)(i)–9.

[617] *See* Fed. Rsrv. Bank of Atlanta, *Small Business Loan Turndowns, Personal Wealth and Discrimination* (July 2002), *https:// www.federalreserve.gov/pubs/feds/2002/200235/ 200235pap.pdf.*

incompleteness). A few industry and community group commenters specifically supported diverging from Regulation C and reporting denials based on incompleteness as "incomplete" applications, rather than "denied" applications. A CDFI lender and a community group stated that doing so would be in line with the intent of section 1071 and would lead to more accurate data by reserving the denied category exclusively for creditworthiness and underwriting factors. One trade association stated that such reporting would be easier to comply with and provide less opportunity for data errors, while another trade association noted that additional subcategories of incomplete would create confusion and add difficulty for financial institutions.

In contrast, several banks and a group of bank trade associations urged the Bureau to align reporting of incomplete applications with HMDA reporting. A bank commented that aligning with HMDA would increase efficiency for the customer, facilitate compliance, and ensure that financial institutions only need to collect data once. Similarly, several commenters argued that misalignment with HMDA would add substantial difficulty for financial institutions required to report under HMDA. However, some of those same commenters also stated that they were sympathetic to the Bureau's underlying reasons for wanting to report all incomplete applications in one category, and argued that this was further reason to exclude all HMDA transactions. A bank asked for clarification on how to report an application that results in adverse action based on incompleteness.

*Treatment of counteroffers.* The majority of commenters to address the issue, including several lenders, trade associations, and a community group, supported the Bureau's proposal as related to counteroffers. In response to the Bureau's request for comment on whether counteroffers that are not accepted should be reported as "approved but not accepted," rather than "denied," several commenters, including a community group and a CDFI lender, supported the Bureau's proposal that declined counteroffers would be recorded as denials and accepted counteroffers would be reported as originations. Several CDFI lenders further commented that this proposal would avoid lenders seeking to game the system and avoid reporting denials by giving unreasonable counteroffers likely to be denied by the applicant. In contrast, a trade association argued that counteroffers that are not accepted should be reported

as "approved but not accepted" as it would better reflect the availability of credit. A bank asked how to report an accepted counteroffer that does not ultimately lead to an origination, and urged consistency with HMDA.

In response to the Bureau's request for comment on whether to specifically capture data on counteroffers, several industry commenters supported the Bureau's proposal to not separately track counteroffers. One of these commenters urged the Bureau to not separately track counteroffer terms (such as the amount requested and approved) as it would create burden for financial institutions, and if the offer was ultimately accepted, would not provide meaningful data. Similarly, other industry commenters argued that determining what is a counteroffer would be difficult and it would be infeasible to capture all data points for each counteroffer. A bank said that small business lending involves many discussions between the lender and the applicant, and so capturing counteroffers would be extraordinarily complex and require additional training. The industry commenters also stated that capturing counteroffers could lead to confusion and data errors. One of the commenters further urged the Bureau to align with Regulation C, which it asserted does not require reporting of counteroffers.

On the other hand, a CDFI lender and a joint letter from community and business advocacy groups urged the Bureau to require reporting of any counteroffers and their terms. These commenters suggested the Bureau modify the action taken fields to add "counteroffer accepted" and "counteroffer rejected," and require reporting of pricing information on these options. The joint letter argued that separate reporting of counteroffers would provide visibility into pricing of credit offers made but not accepted or offers that otherwise do not result in an origination. The commenter further took issue with the aspect of the proposal that would require a lender to report it has denied an application, when it has in fact it had approved it on different terms. A CDFI lender similarly argued that the proposal provides a loophole for financial institutions, and urged the Bureau to require reporting of pricing on the initial request and any counteroffers to prevent exploitative lending. The commenter acknowledged, however, that the Bureau's proposal does not penalize entities seeking to provide assistance to businesses, which often entails multiple counteroffers to best meet the business's needs.

Finally, the joint letter from community and business advocacy groups asserted that the proposed definition of a counteroffer is problematic. Under the proposal, a counteroffer was described to occur when a financial institution offers to grant credit on terms other than those originally requested by the applicant. The commenter stated, however, that nothing requires a lender to initially solicit from applicants what terms they are seeking (other than amount applied for and credit type), and so it would not be clear when to treat an offer as a "counteroffer" for purposes of the rule.

*Final Rule*

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(9) with a minor revision for consistency, to require reporting of the action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. Most commenters to address this issue generally supported the Bureau's proposed action taken categories, noting that the approach was a reasonable one and would assist in fair lending enforcement.

Although the Bureau sought comment on whether to remove or combine certain of the action taken categories, the Bureau is finalizing the list of categories as proposed in § 1002.107(a)(9). The Bureau is not eliminating the "approved but not accepted category"; data collected under this category would reflect demand for credit, and as noted by some commenters, could potentially be used to identify offers made that do not meet the needs of small businesses. Moreover, no commenter expressly urged the Bureau to remove the "approved but not accepted" category. The Bureau is also retaining the "withdrawn by the applicant" and "incomplete" action taken categories. As noted by some commenters, capturing data on incomplete and withdrawn applications is important to identifying potential discrimination and discouragement during the application process, and thus consistent with the purposes of section 1071. Next, the Bureau is keeping "withdrawn by the applicant" and "incomplete" as separate action taken categories; the categories represent different actions by the applicant, and so keeping them distinct will lead to more accurate data analysis, including better fair lending analysis. Moreover, the Bureau believes a high incidence of incomplete applications could potentially indicate that there is an issue with the level of

assistance provided by a financial institution (for example, not providing reasonable support or assistance to ensure an applicant satisfies all credit conditions; or providing more support to some applicants than others). Although a couple of community banks urged the Bureau to remove the "denied," "withdrawn by applicant," or "incomplete" action taken categories as unnecessary or inconsistent with current lender practice, the Bureau believes retaining those categories further the purposes of section 1071, as described above.

The Bureau is also finalizing § 1002.107(a)(9) to require a financial institution to report all incomplete applications—whether the application is closed or denied based on incompleteness—as the "incomplete" action taken category. While this proposed approach is not consistent with Regulation C comments 4(a)(8)(i)–4 and –6, there could be potential errors in the data if financial institutions report incomplete denials separate from notices of incompleteness. As noted by commenters, grouping all incomplete applications together would lead to more useful data by reserving the denied category solely for creditworthiness and underwriting decisions. Moreover, as noted by several commenters, grouping all incomplete applications in one category would be easier for financial institutions to implement. Although several industry commenters urged the Bureau to align reporting of incomplete applications with Regulation C in order to increase efficiency and facilitate compliance, those concerns are mitigated by the Bureau's decision to exclude reporting of all HMDA-reportable transactions, as set forth in final § 1002.104(b)(2). Indeed, one of the commenters advocating for alignment with Regulation C also stated that they were sympathetic to the Bureau's reasons for wanting all incomplete applications reported under a single category. In response to a commenter's question regarding the reporting of applications where an adverse action notice is provided based on incompleteness, under final § 1002.107(a)(9), the financial institution would report such an application as "incomplete," rather than "denied." In response to another commenter's concern that data may be misconstrued if approved but not accepted loans are treated as "denials," the Bureau notes that there is a separate action taken category for "approved but not accepted" (see final § 1002.107(a)(9) and associated commentary for reporting of that action code).

The Bureau is also finalizing as proposed its treatment of counteroffers in final comment 107(a)(9)–2. The Bureau agrees with commenters that this approach (requiring that counteroffers that are not accepted to be reported as "denied," rather than "approved but not accepted") would prevent lenders from trying to improperly influence how their data are reported by extending unreasonable counteroffers that are likely to be denied. This approach is also consistent with existing § 1002.9 notification procedures and reporting of counteroffers under Regulation C,[618] and so will be familiar to financial institutions. In response to a commenter's concern that this approach would not capture the availability of credit (as rejected counteroffers would be reported as "denials"), the Bureau believes the considerations noted above—preventing gamesmanship and consistency with existing Regulation B and Regulation C—outweigh the potential benefit of alternate reporting. In response to a commenter's question about how a financial institution reports an accepted counteroffer that does not ultimately lead to an origination, the Bureau directs the commenter to final comment 103(a)(9)–2, which provides that if an applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the action taken as the disposition of the application based on the terms of the counteroffer.

The Bureau is also finalizing comment 107(a)(9)–2 to not separately track counteroffers as an additional action taken category or flag. As noted by some commenters, it would be potentially infeasible to capture all data points for every back-and-forth counteroffer with an applicant, and attempting to do so would likely lead to confusion, heightened complexity, and data errors. The Bureau also believes that even without a counteroffer flag or field, the data will capture many of the terms of an accepted counteroffers (such as pricing, guarantee, etc.), as well as the amount initially requested by the applicant. Therefore, the addition of a counteroffer flag or field would provide limited useful information beyond what will already be captured under section 1071. Moreover, while a counteroffer flag or field might be useful as a screening tool for potential discrimination (for example, if women-owned businesses or minority-owned businesses are provided higher rates of counteroffers or denials compared to male- or non-Hispanic white-owned businesses), a flag alone would lack any specificity that could be leveraged for further fair lending analysis.

While several commenters urged the Bureau to require reporting of accepted and rejected counteroffers, as well as their pricing terms, the Bureau does not believe the benefits of additional reporting would outweigh the added complexity, logistical challenges, and potential data accuracy issues involved in reporting counteroffers. For example, while some commenters suggested adding counteroffer rejected and counteroffer accepted action taken categories, and to require reporting of pricing, the commenter does not explain how a financial institution would report multiple back-and-forth counteroffers connected to a single covered application, which some commenters report is typical in small business lending. Moreover, focusing solely on the pricing term of a counteroffer would leave unknown other material terms of a counteroffer, such as the amount offered, duration, or a requirement to have a co-signer or guarantor. In response to commenters' concerns that not capturing counteroffers would mean a lack of visibility into counteroffers that are made but not accepted, the Bureau agrees that such information would not be captured, however, as described above, the Bureau believes that reporting of such data would add significant complexity, could undermine data quality, and would provide only limited additional benefits. Regarding some commenters' criticism that the definition of a counteroffer is flawed because it presumes a lender has solicited all requested terms from the applicant, the Bureau believes the description of a counteroffer in final comment 107(a)(9)–2 as an offer to grant credit or terms other than those originally requested by the applicant is a reasonable one: an applicant will likely specifically request the terms most important to the applicant, the definition is consistent with existing Regulation B and Regulation C and so will be familiar to financial institutions, and the commenters do not propose an alternative.

The Bureau is finalizing the commentary to § 1002.107(a)(9) with minor revisions for clarity and consistency. Final comment 107(a)(9)–1 provides additional clarity on when a financial institution should select each of the proposed action taken codes. The comment further clarifies that a financial institution identifies the applicable action taken code based on final action taken on the covered application.

---

[618] Regulation C comment 4(a)(8)(i)–9.

AdminRecord-000154

Final comment 107(a)(9)–2 provides instructions for reporting action taken on covered applications that involve a counteroffer, along with examples. As described above, final comment 107(a)(9)–2 provides that if a financial institution makes a counteroffer to grant credit on terms other than those originally requested by the applicant and the applicant declines to proceed with the counteroffer or fails to respond, the institution reports the action taken as a denial on the original terms requested by the applicant. If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the action taken as the disposition of the application based on the terms of the counteroffer.

Final comment 107(a)(9)–3 discusses reporting action taken for rescinded transactions. Final comment 107(a)(9)–4 clarifies that a financial institution reports covered applications on its small business lending application register for the year in which final action is taken. Finally, final comment 107(a)(9)–5 provides guidance for reporting action taken if a financial institution issues an approval that is subject to the applicant meeting certain conditions.

### 107(a)(10) Action Taken Date

*Proposed Rule*

In addition to requiring financial institutions to collect and report the type of action they take on an application, ECOA section 704B(e)(2)(D) requires financial institutions to collect and report the "date of such action."

The Bureau proposed § 1002.107(a)(10) to require action taken date to be reported as the date of the action taken by the financial institution. Proposed comments 107(a)(10)–1 through –5 would have provided additional details on how to report the action taken date for each of the action taken categories in proposed § 1002.107(a)(9). For example, proposed comment 107(a)(10)–1 would have explained that for denied applications, the financial institution reports either the date the application was denied or the date the denial notice was sent to the applicant.

Proposed comment 107(a)(10)–4 would have explained that for covered credit transactions that are originated, a financial institution generally reports the closing or account opening date. That proposed comment also stated that if the disbursement of funds takes place on a date later than the closing or account opening date, the institution may, alternatively, use the date of initial disbursement.

The Bureau sought comment on its proposed approach to the action taken date data point as well as whether it should adopt data points to capture application approval date and/or the date funds are disbursed or made available.

*Comments Received*

The Bureau received comments on the proposed action taken date data point from lenders, trade associations, and consumer groups. One commenter expressed its support for the data points regarding an application, including action taken date, noting that the data will provide insight regarding the quality of the capital accessed and that it will be useful in identifying potentially discriminatory lending practices, as well as highlight capital gaps in the marketplace that lenders may be able to fill. Furthermore, this commenter noted that the data will show how financial institutions compare across key metrics and help determine if the institution has equitable lending. Industry commenters expressed their support for the proposed data point as a reasonable and appropriate means of implementing the statutory requirement. A CDFI lender noted that defining "action taken date" as the one in which the financial institution acts is correct.

Several commenters provided feedback on whether the Bureau should adopt separate data points for application approval date and the date funds were disbursed or made available. A trade association opposed adoption of separate data points for the date the application was approved and the date the funds were disbursed or made available. This trade association reasoned that it would add degrees of complexity to the compliance process and the Bureau would be chasing de minimis data points that have diminishing value. A bank also opposed the separate data points explaining that the Bureau would already gather enough information from gathering the application date and the action taken date to find timing discrepancies and suggested the Bureau focus more on underwriting data to determine discriminatory and other fair lending issues. A CDFI lender explained that in many cases the gap between an approval and disbursal of funds can be affected by several factors outside a lender's control, such as an applicant's availability to sign closing documents.

On the other hand, three commenters urged the Bureau to adopt separate data points for application approval date and the date funds were disbursed or made available. A community group

commented that separate data fields would be important for fair lending and community development purposes because if any institutions are delaying the availability of funds for unreasonable periods of time after loan approval, they would not be serving community needs, and it could also possibly indicate fair lending problems if protected classes disproportionately experience delays. Another community group suggested that discrimination in the agricultural industry occurs when loan approvals are delayed or not approved in a timely manner. This community group noted that untimely disbursement of funds could drastically impact the opportunity for a small business to succeed. They further noted that farmers lose entire seasons of income when the operating loans which they timely applied for are not approved in a timely manner. A third community group stated that lenders have a history of delaying loan approvals for farmers of color compared to white farmers.

*Final Rule*

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(10) and its associated commentary with minor edits for clarity and consistency. The Bureau believes the action taken date data point is a reasonable interpretation of ECOA section 704B(e)(2)(D), which requires financial institutions to collect and report the "date of such action" taken on an application. The Bureau notes that its approach for this data point largely mirrors the Regulation C approach for action taken date in § 1003.4(a)(8)(ii) and related commentary, with modifications to align with the action taken categories in final § 1002.107(a)(9).

Final § 1002.107(a)(10) requires financial institutions to report the date of the action taken by the financial institution on the application. Final comments 107(a)(10)–1 through –5 provide guidance on how to report the action taken date for each of the action taken categories provided in final § 1002.107(a)(9). For applications that were denied, final comment 107(a)(10)–1 provides that a financial institution reports either the date the application was denied or the date the denial notice was sent to the applicant. For applications that were withdrawn by the applicant, final comment 107(a)(10)–2 provides that a financial institution reports either the date the express withdrawal was received or the date shown on the notification form in the case of a written withdrawal. For applications that were approved but not accepted by the applicant, final

comment 107(a)(10)–3 provides that a financial institution reports any reasonable date, such as the approval date, the deadline for accepting the offer, or the date the file was closed. The comment notes, however, that the financial institution should generally be consistent in its approach.

The Bureau is finalizing comments 107(a)(10)–4 and –5 with minor edits for clarity and consistency to facilitate compliance. Final comment 107(a)(10)–4 provides that for applications that result in an extension of credit, a financial institution generally reports the closing or account opening date. However, if the disbursement of funds takes place on a date later than the closing or account opening date, the institution may, alternatively, use the date of initial disbursement. The comment further provides that the financial institution should generally be consistent in its approach. Final comment 107(a)(10)–5 provides that for applications that are closed for incompleteness, a financial institution reports either the action taken date or the date the denial or incompleteness notice was sent to the applicant.

The Bureau is not adopting in this final rule a requirement that financial institutions report both the date the application was approved and the date the funds were disbursed. Two of the commenters who requested this change specifically focused on loan approval delays, which seems to indicate the issue is with delays in the loan approval process rather than the timing of the fund disbursements or credit availability. The application date and action taken date together will provide information about the length of time it takes for an application to reach the credit decision. In addition, the Bureau believes that the time between a loan's approval and the date of funds availability is dependent on many factors, some of which may not be within the control of the financial institution, as suggested by a commenter. Accordingly, the Bureau is not adopting a requirement that financial institutions report, in all cases, the date the funds were disbursed or made available.

### 107(a)(11) Denial Reasons

#### Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau proposed § 1002.107(a)(11) to require financial

institutions to collect and report the principal reason or reasons an application was denied.

Proposed § 1002.107(a)(11) would have required reporting of the principal reason or reasons the financial institution denied the covered application. Proposed comment 107(a)(11)–1 would have explained that a financial institution complies with proposed § 1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons, and the financial institution would report only the principal reason or reasons it denied the application, even if there are fewer than four reasons. The proposed comment provided an example to illustrate. The proposed comment would have also stated that the reason(s) reported must accurately describe the principal reason or reasons the financial institution denied the application. Finally, the proposed comment provided a list of denial reasons from which financial institutions would select the principal reason or reasons for denying a covered application.

Proposed comment 107(a)(11)–1 would also have explained that a financial institution would have reported the denial reason as "other" where none of the enumerated denial reasons adequately describe the principal reason or reasons it denied the application, and the institution would report the denial reason or reasons as free-form text. Proposed comment 107(a)(11)–2 would have clarified that a financial institution complies with proposed § 1002.107(a)(11) by reporting that the requirement is not applicable if the action taken on the application, pursuant to § 1002.107(a)(9), is not a denial.

The Bureau sought comment on its proposed approach to the denial reasons data point, including whether the denial reason categories listed in proposed comment 107(a)(11)–1 sufficiently cover the common credit denial reasons in the small business lending industry. The Bureau also sought comment on the potential utility of denial reason data as well as on the potential burdens to industry in reporting denial reasons, in light of the proposed denial reason categories and the data's ability to aid in fulfilling the purposes of section 1071.

#### Comments Received

The Bureau received comments on the denial reasons data point from lenders, trade associations, and community groups. A number of these commenters supported the Bureau's proposal to collect data on denial reasons, stating that it would aid in fair lending analysis

and further the community development purpose of section 1071. A community group said that an analysis of different types of lenders could determine whether industry-wide practices could be creating unnecessary barriers, and denial reason data could help to illuminate those practices. Some commenters noted that denial reasons can help policymakers and the public determine legitimate reasons that small businesses do not qualify for certain forms of credit and will, in turn, enable policymakers to work towards solutions. A trade association commented that the data has the potential to help identify ways to improve service in underserved communities and agreed this is an opportunity to provide financial institutions with data to evaluate their business underwriting criteria and address potential gaps as needed. Another community group stated that this data point is one of the single most important items the Bureau can collect in its aim to carry out section 1071 and illuminate the reasons behind disparate results in small business lending. A bank commented that reporting of denial reasons would help identify roadblocks to gaining access to credit.

Commenters generally agreed with the Bureau's approach to collecting reasons for denial. Community groups supported the range of the Bureau's proposed list of reasons for denial as well as the Bureau's proposal for a financial institution to select up to four reasons. A trade association commented that the proposed list of reasons for denial adequately cover the potential reasons and noted that the list largely aligns with the HMDA/Regulation C denial reasons. This commenter also noted the importance of the option for financial institutions to select "other" and report additional denial reason information as free-form text.

Several community groups suggested that personal credit score must be included as an option as it is often cited as the reason for denial. They asserted that if low credit scores or other reasons for denial correlate with a business owner's race or location, but do not correlate with loan performance, then it would be important for lenders to use alternative methods for assessing creditworthiness that do not have a disparate impact on business owners of color or certain communities. Another commenter suggested that the Bureau consider clarifying the government criteria option, recommending that the option should only be used if no other principal reason applies and should come after other reasons to ensure that it does not mask those other reasons. A trade association suggested that the

AdminRecord-000156

Bureau allow financial institutions the discretion to choose whether to report the data; however, that commenter also indicated that if the Bureau were to require the denial reasons data point then the proposed denial reasons did represent a full picture of the typical reasons for denial. Other commenters suggested the Bureau follow the flexible approach of financial institutions providing denial reasons in ECOA adverse action notices. Two banks asked the Bureau to compare the reporting requirement against other reporting regimes, such as HMDA and CRA, to avoid duplicative and inconsistent reporting.

Some industry commenters opposed the Bureau's proposal to collect denial reasons. A few commenters stated that these data are not tracked or maintained. A bank said stated they will need to build a new and independent tracking system if the data are mandated. A joint trade association letter noted that in indirect vehicle financing transactions, dealerships are not often provided and do not have access to reasons why a third-party financing source denied a credit application. A bank questioned what the Bureau intends to do with the data and stated that it is not necessary to meet the goals and requirements of section 1071. The bank further asserted that it would eventually result in additional regulatory requirements that continue to push small and mid-size lenders from the small business lending market. Another bank raised concerns about reporting denial reason data, asserting that there are multiple factors involved in the decisions and the use of raw data without any other means to evaluate the individual decisions made could lead to allegations of discrimination against banks based solely upon data that reflect disparate impact based on ethnicity, race, or gender. Another commenter expressed a similar concern that requiring denial reasons under certain categories could lead to damaging misinterpretations. A trade association urged the Bureau to drop the denial reasons data point from the final rule, stating that the requirement is drafted in a rigid manner that is unlikely to produce accurate or reliable data. That commenter also stated that the Bureau and other regulatory agencies already have access to these data because financial institutions are already providing denial reasons under the ECOA adverse action notice requirement. In addition, commenters further noted that the proposed denial reason data point is incompatible with the Bureau's flexible approach to

providing adverse action reasons in ECOA adverse action notices.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(11) and associated commentary with minor revisions. The final rule requires that financial institutions collect and report, for denied applications, the principal reason or reasons the financial institution denied the covered application. The Bureau believes data regarding denial reasons will further the fair lending and business and community development purposes of section 1071. Data on denial reasons will allow data users to better understand the rationale behind denial decisions, help identify potential fair lending concerns, and provide financial institutions with data to evaluate their business underwriting criteria and address potential gaps as needed. Robust data on application denial reasons across applicants, financial institutions, products, and communities should help limited resources and assistance to applicants and communities, thus furthering section 1071's business and community development purpose. Furthermore, data on denial reasons will help data users analyze potential denial disparities, and could facilitate more efficient and less burdensome fair lending examinations. Therefore, pursuant to ECOA section 704B(e)(2)(H), the Bureau determines that collecting data on denial reasons would aid in fulfilling the purposes of section 1071.

Final comment 107(a)(11)–1 explains that a financial institution reports the principal reason or reasons it denied the application, indicating up to four reasons and makes clear that the financial institution reports only the principal reason or reasons it denied the application. Final comment 107(a)(11)–1 also provides a list of denial reasons from which financial institutions select the principal reason or reasons for denying a covered application. In addition, final comment 107(a)(11)–1 explains that a financial institution reports the denial reason as "other" when none of the enumerated denial reasons adequately describes the principal reason or reasons it denied the application, and reports the denial reason or reasons as free-form text. The Bureau believes that including the option to select "other" will facilitate compliance and that collecting such information will enable the Bureau to observe trends and key developments in the small business lending market. In addition, the Bureau may use the

information to inform any future iterations of the list.

The Bureau is making a revision in comment 107(a)(11)–1.iii to change "use of loan proceeds" to "use of credit proceeds" to reflect commonly understood categories of small business lending like term loans or lines of credit. The Bureau is also making a clarification in comment 107(a)(11)–1.iii to broaden the scope of the "use of credit proceeds" denial reason. Final comment 107(a)(11)–1.iii explains that a financial institution reports the denial reason as "use of credit proceeds" if it denies an application because, as a matter of policy or practice, it places limits on lending to certain kinds of businesses, products, or activities it has identified as high risk. The Bureau is removing the example provided in the proposed rule because the Bureau does not believe an example is necessary and financial institutions know what they consider to be high risk to them. Moreover, financial institutions may have different policies on credit activities or products they consider high risk such that a high risk activity or product to one financial institution may not be considered high risk to another.

The Bureau is also making a minor revision in comment 107(a)(11)–1.v to clarify that a denial reason based on collateral refers to collateral that was insufficient or otherwise unacceptable to the financial institution. The Bureau also removed the example that appeared in proposed comment 107(a)(11)–1.vi.

The Bureau is making a minor change in comment 107(a)(11)–1.vii to clarify that a denial reason based on "government criteria" refers to government loan program criteria. Government loan program criteria for this purpose refers to those loan programs backed by government agencies that have specific eligibility requirements. Accordingly, final comment 107(a)(11)–1.vii lists "government loan program criteria" as a denial reason option.

The Bureau does not share the concerns raised by commenters that denial reason data may lead to unjustified conclusions that do not necessarily meet the goals and purposes of section 1071. Rather, as explained above, the Bureau believes data on denial reasons can help identify potential lending concerns and help data users analyze potential denial disparities. In fact, the Bureau believes that including denial reasons in 1071 data should reduce the risk of inaccurate accusations of fair lending violations, as it would allow financial institutions to point to potentially legitimate reasons for disparities.

AdminRecord-000157

**Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations　　**35307**

With respect to the comments that denial reasons are not currently tracked or maintained, the Bureau believes that most financial institutions already have information on denial reasons, or at least should be prepared to provide the information. The Bureau understands from commenters that there may be creditors that are not subject to the adverse action notice requirements under Regulation B and such institutions may face greater challenges in implementing the denial reason data reporting requirement than those institutions that are already subject to Regulation B requirements.[619] Nevertheless, the Bureau believes that data on denial reasons will further the fair lending and business and community development purposes of section 1071 by helping to identify potential fair lending concerns and providing financial institutions with data to evaluate their lending criteria and address potential gaps. Moreover, data on denial reasons not only help identify potential fair lending concerns, but are critical to understanding the rationale behind a financial institution's decision to deny credit, which can provide small business applicants the information they need to be able to access capital.

For transactions involving indirect vehicle financing where the dealership may not have the reasons why a third-party financing source denied a credit application, the Bureau believes that the entity that makes the final credit decision will be able to provide or obtain the reasons for denying a credit application. See section-by-section analysis of § 1002.109(a)(3) for a discussion of which institutions have a reporting obligation in transactions involving multiple financial institutions.

With respect to the suggestion from a commenter that the Bureau should allow financial institutions to report denial reason data voluntarily, the Bureau believes optional reporting is not the appropriate approach, given the need for consistent and meaningful data to further the purposes of section 1071.

Regarding the suggestion that the denial reason data point in the final rule should mirror the HMDA reporting requirements or other reporting regimes, the Bureau's approach to the final rule is to largely mirror the Regulation C reporting requirements but with modifications that better reflect the business or agricultural lending (rather

[619] Existing § 1002.9(a)(3) requires creditors to provide the specific reasons for adverse action taken or to notify business credit applicants of their right to request the reasons for denying an application or taking other adverse action.

than mortgage lending) context. The Bureau believes that aligning closely to a known regulatory scheme, such as Regulation C, will facilitate compliance. Regarding the suggestion that the Bureau provide more flexibility so that financial institutions can report the reasons that were provided in an adverse action notice, the Bureau believes, and as a commenter noted, the denial reasons proposed and finalized in this rule are a comprehensive list and represent a full picture of the common denial reasons for small business credit. In addition, the Bureau believes the inclusion of "other" as a reason for denial and the free-form text field, which will enable financial institutions to report a denial reason that is not otherwise listed, will provide flexibility, and will facilitate compliance.

### 107(a)(12) Pricing Information

#### Proposed Rule

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau proposed, in § 1002.107(a)(12), to require financial institutions to report certain pricing information for covered credit transactions. Specifically, proposed § 1002.107(a)(12)(i)(A) would have required financial institutions to report the interest rate that is or would be applicable to the covered credit transaction; proposed § 1002.107(a)(12)(ii) would have required financial institutions to report the total origination charges for a covered credit transaction; proposed § 1002.107(a)(12)(iii) would have required financial institutions to report the broker fees for a covered credit transaction; proposed § 1002.107(a)(12)(iv) would have required financial institutions to report the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction; proposed § 1002.107(a)(12)(v) would have required financial institutions to report, for merchant cash advances or other sales-based financing transactions, the difference between the amount advanced and the amount to be repaid; and proposed § 1002.107(a)(12)(vi) would have required financial institutions to report information about any prepayment penalties applicable to the covered credit transaction.

Proposed comment 107(a)(12)–1 would have clarified that, for applications that the financial

institution reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports pricing information as "not applicable." Proposed § 1002.107(a)(12) would have applied only to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

#### Comments Received

The Bureau sought comment on proposed § 1002.107(a)(12) and its commentary, including on additional information that could help reduce misinterpretations of disparities in pricing, such as more information about the nature of the collateral securing the credit. The Bureau also sought comment on ways to reduce burden on financial institutions with respect to overlaps or conflicts between State law disclosure requirements and the Bureau's proposal. Numerous commenters addressed the proposed pricing data point in their feedback. The Bureau addresses feedback on proposed § 1002.107(a)(12) generally in this section; feedback on specific aspects of proposed § 1002.107(a)(12)(i) through (vi) is addressed in the section-by-section analyses that follow.

Many commenters expressed views on whether the Bureau should require financial institutions to report any pricing data. Some commenters, including community groups, trade associations, a lender, and a technology service provider, supported the inclusion of pricing information. These commenters stated pricing information will help data users understand not simply whether credit is available to certain borrowers, but the terms of such credit. Several community groups said that pricing information would help with fair lending analysis, with one community group stating that academic research and mystery shopping tests suggested the presence of discrimination in the small business lending market. Other community groups said that pricing information would allow users to identify unmet business needs. A community group commented that lenders were already collecting much of the proposed pricing data for SBA and CDFI programs, while a trade association supported the proposal but noted that CDFIs would need more time to comply than larger financial institutions.

Industry commenters generally opposed including pricing information in the final rule. These commenters made several arguments in support of their position. First, they asserted that the final rule should include only data points specifically enumerated in the

**35308**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

statute. One commenter suggested that because pricing was not expressly enumerated in the statute, Congress therefore did not intend for the data collected and reported pursuant to section 1071 to include pricing information. Other commenters said that pricing data (along with other data points adopted pursuant to ECOA section 704B(e)(2)(H)) would increase the burden on financial institutions because, for example, pricing information can change throughout the application and underwriting process. And several industry commenters who generally objected to the inclusion of any data points pursuant to section 704B(e)(2)(H) claimed that lenders lack systems that can calculate or collect all the proposed pricing data.

Second, these commenters stated that commercial financing is less standardized than consumer financing, such that pricing is influenced by a wide variety of factors that they believed would not be adequately reflected in the 1071 data. Factors cited included the credit score of the applicant, the nature and value of collateral, the loan purpose and type, the presence of bundled services, the applicant's cash flow, the type of business, the size of any down payment, the strength of any guarantee, and debt service coverage ratio. Commenters elaborated on certain factors specific to certain financial institutions or transaction types. For example, a few commenters stated that community banks might make loans with higher interest rates than other lenders to comply with safety and soundness requirements. Some agricultural lenders and a trade association commented that farm credit borrowers periodically receive patronage dividends from lenders, which effectively lowers the cost of credit. And a group of trade associations representing the insurance premium financing industry stated that the pricing of insurance premium financing is determined almost entirely by the value of the unearned premiums, negating the benefit of pricing data for these transactions.

The absence of information about these other factors affecting the price of credit, commenters argued, would cause data users to draw inaccurate conclusions when analyzing pricing in the 1071 data. As a result, commenters claimed, financial institutions would suffer reputational harm from erroneous accusations of fair lending violations or other harmful pricing practices. However, a community group commented that advocates knew how to responsibly use pricing data and typically approach regulators or

industry before publicizing pricing discrepancies. Industry commenters also argued that misleading data would reduce financial institutions' willingness to consider individualized factors in the lending process, restricting the availability of credit to small business applicants.

Many industry commenters also opposed the disclosure of any pricing information because of competition and privacy concerns. These commenters claimed that disclosure would reveal confidential information that would put financial institutions at a disadvantage. For example, competitors could attract borrowers with loans that were cheaper but inferior in other respects. These commenters also asserted that disclosure of pricing information would harm the privacy interests of applicants, especially in small communities where users could re-identify borrowers.

Instead of including pricing information in the final rule, several industry commenters suggested that analysis of pricing data was more appropriate in the supervision and examination context. One trade association asserted that requiring pricing data in the rule would be redundant of, or usurp, the supervisory activities of the prudential regulators because those agencies also collect and use pricing information in their exams. Another group of trade associations said the Bureau could use information it gathers in the course of exercising its supervision authority to determine whether pricing data could further fair lending purposes before requiring such data in the rule.

In contrast to industry commenters, who generally objected to reporting any pricing information, community groups requested additional pricing information. Specifically, numerous community groups and a minority business advocacy group, as well as some lenders and a technology service provider, asked the Bureau to require financial institutions to report the annual percentage rate (APR) for a covered credit transaction. These commenters stated that APR was the only easily understandable, uniform, and comprehensive single pricing measure for comparing diverse transactions. These commenters generally did not argue that the proposed pricing data point lacked value, but that APR would provide additional information that was superior in certain respects. For example, a cross-sector group of lenders, community groups, and small business advocates asserted that the diversity of transactions in the small business lending market increased the value of

APR, because comparing loan pricing would be difficult without a single measure. This group further stated that unlike the proposed pricing data, which lacked a time period, APR standardizes the cost of a transaction over a year.

A few commenters believed that APR would make the pricing data easier for data users to understand. Some stated that although sophisticated data users might be able to estimate APR from the proposed data points, the 1071 data should allow anyone to gain information about small business loan pricing. Also, the cross-sector group's comment discussed above noted that many small business owners are familiar with APR from their consumer financing transactions.

Regarding burden, several of these commenters asserted that calculating APR was feasible in the small business lending market, with many noting that APR is a formula amenable to calculation through an automated process using generally available software. For non-traditional transactions such as merchant cash advances, commenters suggested estimating the term length from repayment data or from the term, if any, that the financial institution calculated during the underwriting process. Indeed, some of these commenters also believed that the market was evolving toward the use of APR for commercial finance transactions. They cited the New York and California commercial financing disclosure laws, as well as private disclosure initiatives that include the APR, such as the SMART Box and Small Business Borrower's Bill of Rights.[620] A CDFI lender predicted that financial institutions would eventually use a single disclosure to comply with all State disclosure laws, which would resolve any issues with differing APR methodologies among the states. A bank commented that if the Bureau required pricing information, it should adopt only APR because reporting APR was simpler than reporting multiple pieces of pricing information.

A few commenters suggested alternatives if the Bureau did not adopt APR, including requiring APR for a subset of transactions for which

---

[620] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*; Innovative Lending Platform Ass'n, *The SMART Box Model Disclosure—In Depth, https://innovativelending.org/smart-box-model-disclosure-depth/* (last visited Mar. 20, 2023); Responsible Bus. Lending Coal., *Small Business Borrower's Bill of Rights* (2021), *http://www.borrowersbillofrights.org/bill-of-rights.html.*

calculating APR was feasible or having the Bureau calculate and publish APR data itself.

Although industry commenters largely did not address APR, a few offered arguments against its inclusion in the final rule. A group of trade associations questioned the existence of a trend toward the use of APR in commercial financing, noting that only California and Virginia had adopted commercial financing disclosure laws at the time of the NPRM. This group also speculated that Congress believed APR may be inappropriate for the small business lending market because it did not extend TILA to commercial credit in the Dodd-Frank Act. Other commenters discussed the burden of reporting APR. Several banks stated that lenders would need to change their systems to calculate APR for small business loans. A State bankers association asserted that the terms of small business loans did not allow APR to be calculated. And a CDFI lender stated that APR calculations are infeasible for loans made under the SBA's 7(a) program.[621] Such loans, the commenter explained, have fees that may vary based on the type or purpose of the loan, which makes the APR difficult to determine accurately.

Finally, some commenters directed their feedback to the scope of the proposed pricing data point. Some community groups asked the Bureau to require pricing information for all counteroffers because, they asserted, such information would illuminate situations where lenders are prepared to extend credit on less desirable terms than those requested by the applicant. An industry commenter recommended limiting the pricing information to originated transactions because it believed pricing information for approved applications held no fair lending value. But some community groups commented that including approved applications in reported pricing data would further fair lending purposes, such as allowing data users to evaluate whether financial institutions are offering high-priced loans to minority applicants that the applicants do not accept. A trade association commented that the pricing information should include only interest rate and origination charges but offered no explanation for its position.

**Final Rule**

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12) and associated commentary with certain adjustments. Final § 1002.107(a)(12)(i) through (vi) require reporting of the following for covered credit transactions that are originated or approved by the financial institution but not accepted by the applicant: interest rate; total origination charges; broker fees; the total amount of all non-interest charges that are scheduled to be imposed over the first annual period; for a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid; and information about any applicable prepayment penalties. The details of final § 1002.107(a)(12)(i) through (vi) are discussed in turn in the section-by-section analyses that follow; the discussion here focuses on the Bureau's overall approach to the pricing data point.

The Bureau is finalizing comment 107(a)(12)–1 as proposed, which clarifies that, for applications that the financial institution reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports pricing information as "not applicable."

As discussed in the NPRM, the Bureau believes that pricing data will further both the fair lending purpose and the business and community development purpose of section 1071. The majority of small businesses are run by a single owner without extensive financial experience or expert staff to navigate the commercial credit marketplace, which lacks many of the Federal protections found in consumer lending.[622] Heightened risks to fair lending and small business development may arise from different pricing for the same products and the selective marketing of higher-priced or even predatory and unsustainable products. Because price-setting is integral to the functioning of any market, any analysis of the small business lending market—including to enforce fair lending laws or identify community and business development opportunities—would be less meaningful without this information.

Research conducted for the Department of Commerce has found that minority-owned businesses tend to pay higher interest rates on business loans than those that are not minority-owned,[623] and a report by the Federal Reserve Bank of Atlanta found that minority-owned firms more frequently applied for potentially higher-cost credit products, and were also more likely to report challenges in obtaining credit, such as being offered high interest rates.[624] In addition, research conducted for the SBA has found that Black- and Hispanic-owned businesses were less likely to have business bank loans and more likely to use more expensive credit card financing.[625] The 2020 Small Business Credit Survey by a collaboration of Federal Reserve Banks found that small business applicants to nonbank lenders, such as online lenders and finance companies, were more likely to report high interest rates or unfavorable terms than applicants to depository institutions.[626] To the extent that the recovery from the lingering economic disruptions following the COVID–19 pandemic is still ongoing when covered financial institutions begin collecting data under this final rule, and in regard to emergencies affecting small business access to credit that may occur in the future, tracking pricing in this segment of the market is particularly important.

The Bureau believes pricing data are important because they offer useful insight into underwriting disparities and are necessary for data users to examine predatory pricing or pricing disparities. For example, they might show that a particular market segment is expanding and apparently filling an important need, but the new credit offered might be predatory in nature. Pricing information will allow the Bureau and others to understand the situation more accurately. Data collection without pricing information

---

[621] *See* Cong. Rsch. Serv., *Small Business Administration 7(a) Loan Guaranty Program*, *https://fas.org/sgp/crs/misc/R41146.pdf* (updated June 30, 2022) (discussing the SBA's flagship 7(a) loan guarantee program).

[622] For example, TILA's standardized disclosure requirements for residential mortgage loans and limits on linking compensation to mortgage loan terms, including pricing, do not apply to business loans. *See, e.g.*, 15 U.S.C. 1639b, Regulation Z § 1026.36 (TILA's prohibition on basing mortgage loan originator compensation on loan terms).

[623] Minority Bus. Dev. Agency, U.S. Dep't of Com., *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs*, at 3, 5, 21, 36–37 (2010), *https://archive.mbda.gov/page/executive-summary-disparities-capital-access-between-minority-and-non-minority-businesses.html.*

[624] Fed. Rsrv. Bank of Atlanta, *Report on Minority Owned Firms: Small Business Credit Survey* (Dec. 2019), *https://www.fedsmallbusiness.org/-/media/project/smallbizcredittenant/fedsmallbusinesssite/fedsmallbusiness/files/2019/20191211-ced-minority-owned-firms-report.pdf.*

[625] Alicia Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms*, at 47 (2018) (prepared for Off. of Advocacy, Small Bus. Admin.), *https://advocacy.sba.gov/2018/02/01/financing-patterns-and-credit-market-experiences-a-comparison-by-race-and-ethnicity-for-u-s-employer-firms/.*

[626] However, the survey noted that online lenders tended to receive applications with lower credit scores so applicant risk could play a role in higher interest rates for nonbank lenders. *See* 2020 Small Business Credit Survey at 15.

could have the unintended consequence of incentivizing irresponsible lending, as providers seeking to increase representation of underserved groups could be encouraged to adopt high-cost models of lending.

Without information on pricing, data users would be unable to screen for fair lending pricing risks, and regulators would be less able to focus their enforcement and supervision resources appropriately on situations of greater possibility for questionable activities. In addition, if potential discriminatory conduct is monitored effectively in regard to credit approvals, but not in regard to pricing, industry compliance systems may focus solely on approvals and denials and ignore potential pricing disparities. Having pricing data available will also increase transparency and help demonstrate to lenders where business opportunities exist to offer sustainable credit to underserved markets. In addition, it could demonstrate to small businesses the availability of more affordable credit.

Pricing information that is separately enumerated as the interest rate and general categories of fees will allow data users to more precisely analyze the components of a credit transaction's price. For example, data users will be able to identify potentially discriminatory price disparities within upfront fees charged to borrowers at origination that may not be visible in a single pricing metric. Similarly, information about which components of a transaction's price may be relatively more expensive should allow data users to better identify business and community development initiatives because they will be able to target their initiative at the particular component, such as the interest rate, that may be most responsible for the relatively high price of the transaction. The Bureau's decision to not require reporting of APR, as requested by some commenters, is discussed in more detail below.

The Bureau disagrees with commenters who suggested the pricing data point lacks congressional authorization. ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." This provision reflects Congress's understanding that certain information not explicitly identified in section 1071 may advance the statutory purposes. As described herein, the pricing data point satisfies this standard.

The Bureau understands that the small business lending market is

flexible and tailored to the situations of small business applicants and borrowers. For this reason, pricing for small business credit is affected by numerous factors, some of which are not reflected in the 1071 data. For example, the final rule does not require financial institutions to report applicants' credit scores, which would provide useful information for explaining pricing differences between transactions. But the Bureau believes that commenters have understated the amount of information the final rule includes about factors relevant to pricing. For example, the final rule includes information about the existence and nature of collateral;[627] the credit purpose and type;[628] the applicant's industry,[629] size,[630] and history;[631] the type of guarantee;[632] and the type of the lender.[633] This information will provide important context for pricing data.

More broadly, the 1071 data need not reflect every determinant of credit pricing to provide value to users. The pricing data will further fair lending enforcement by allowing regulators to better understand fair lending risks and allocate their resources accordingly. As explained in the NPRM, HMDA data have long served a similar function. Some commenters questioned the analogy to HMDA data, citing greater standardization in the mortgage market. But the same basic utility—signaling fair lending risk—exists even if the nature of the signal differs. Indeed, with respect to entities it supervises, the Bureau similarly uses pricing data, when available in small business examinations, to help identify fair lending risk.

Regarding suggestions that the Bureau consult supervisory and examination data before adopting any pricing data requirements, the Bureau has relied on its experience in these areas while developing the final rule. The Bureau does not believe this rule is redundant

of the supervision and examination activities of any Federal agency. Moreover, confidential supervisory information available only to Federal regulators is no substitute for a publicly available dataset.

Furthermore, comments that focus narrowly on comparisons between applicants ignore the business and community development purpose of section 1071. Data users can examine pricing data at a more general level to further this purpose. For example, government entities could develop loan programs designed to increase the availability of credit to certain small businesses whose existing financing options carry high prices.

Regarding comments about the harmful consequences of potentially misleading data, the Bureau anticipates noting when disclosing the 1071 data that the data alone generally do not offer proof of compliance with fair lending laws.[634] And the Bureau expects community groups to use the data responsibly, with knowledge of these limitations, which such groups say they have. The Bureau does not believe, as suggested by commenters, that pricing data would reduce the availability of credit to small business applicants. Instead, by helping to reduce fair lending risk and identify business and community development opportunities, the pricing data will help expand access to credit. Privacy and confidentiality concerns about the pricing data are discussed in part VIII.B.6.x below.

The Bureau understands that many financial institutions will incur costs to collect and report pricing information. The Bureau has attempted to reduce the difficulty of collecting and reporting these data in several ways. For example, final § 1002.107(a)(12) is limited to approved applications and originated transactions. These are transactions for which financial institutions generally would have to determine the price to approve (or originate) the transaction. Other transactions—*i.e.,* those that are denied, withdrawn by the applicant, or incomplete—are likely to have pricing information that is subject to change or that has not yet been determined. In addition, final § 1002.107(a)(12) generally takes a broad, functional approach to the reportability of pricing information, rather than defining reportability according to complex factors such as how a fee is

---

[627] *See* final § 1002.107(a)(5) (indicating whether credit is secured or unsecured); final § 1002.107(a)(6) (suggesting, along with the credit type data point, whether a loan is secured by a dwelling).

[628] *See* final § 1002.107(a)(5) (credit type); final § 1002.107(a)(6) (credit purpose). The Bureau also notes that insurance premium finance transactions are not covered by the final rule (*see* final § 1002.104(b)(3)). Thus, the unique challenges of interpreting pricing information cited by commenters for those transactions will not affect data users.

[629] *See* final § 1002.107(a)(15) (NAICS code).

[630] The gross annual revenue and number of workers data points are related to the applicant's size. *See* final § 1002.107(a)(14) and (16).

[631] *See* final § 1002.107(a)(17) (time in business).

[632] *See* final § 1002.107(a)(5)(ii) (guarantees).

[633] *See* final § 1002.109(b) (financial institution identifying information).

[634] For example, the FFIEC cautions users of HMDA data that "HMDA data are generally not used alone to determine whether a lender is complying with fair lending laws." CFPB, *Summary of 2021 Data on Mortgage Lending* (2022), *https://www.consumerfinance.gov/data-research/hmda/summary-of-2021-data-on-mortgage-lending/.*

AdminRecord-000161

denominated or the nature of the collateral securing a transaction. The Bureau believes this will simplify the collection and reporting process. Despite any remaining burden for financial institutions, the Bureau believes that pricing data are important for achieving both of section 1071's purposes.

Further reducing the potential difficulty of reporting pricing data, the Bureau has decided against requiring financial institutions to report APR at this time. Calculating and reporting APR across the diverse types of commercial transactions covered by the final rule may require complex estimates to generate necessary variables for the APR formula. Many merchant cash advances, for example, lack a disclosed periodic payment amount. Thus, financial institutions would have to estimate this term, if they do not do so now, to calculate an APR. Although financial institutions may estimate some of the necessary information during underwriting, they may not estimate it according to the same formula, and may not maintain such information in a system designed for data reporting. The Bureau understands that many financial institutions will calculate APR to comply with State commercial financing disclosure laws.[635] But many financial institutions are not currently subject to such State laws, or are subject to State laws that do not require APR disclosure.[636] As noted in the NPRM, the Bureau will continue to monitor regulatory developments in the small business lending market. The Bureau considered requiring reporting of APR only for transactions where it is less complex to calculate, as some commenters suggested. But a limited-transaction APR reporting requirement would negate two important benefits that commenters cited for APR: using it to compare diverse types of transactions and to apply a single intuitive pricing measure for nontraditional types of financing.

The Bureau understands commenters' concerns over the accessibility and comparability of rate and fees versus APR. Final § 1002.107(a)(5)(iii) requires

[635] Cal. Dep't of Fin. Prot. & Innovation, *Commercial Financing Disclosures* (2022), *https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/06/PRO-01-18-Commercial-Financing-Disclosure-Regulation-Final-Text.pdf*; N.Y. Dep't of Fin. Servs., *Proposed Disclosure Requirements for Certain Providers of Commercial Financing Transactions* (2022), *https://www.dfs.ny.gov/system/files/documents/2022/09/rp_23nycrr600_text_20220914.pdf*.

[636] Utah Dep't of Fin. Insts., *Commercial Financing Registration and Disclosure Act* (2022), *https://le.utah.gov/xcode/Title7/Chapter27/C7-27_2022050420220504.pdf*.

financial institutions to report loan term; the Bureau has added to final comment 107(a)(6)–8 a requirement that financial institutions report, for merchant cash advances and other sales-based financing, the loan term, if any, that the financial institution estimated, specified, or disclosed in processing or underwriting the application or transaction. This information will provide important context for data users comparing the pricing of different transactions and help address the criticism over the lack of a time period for pricing data. Regarding accessibility, the Bureau believes the pricing data will be generally understandable by data users. Most of the pricing data are similar to information found on existing consumer and commercial credit disclosures, including the State commercial financing disclosures cited by commenters. Additionally, the Bureau anticipates that government agencies, researchers, press organizations, community groups, and others will publish research and reports using the small business lending data, just as they do now with HMDA data. These publications may render pricing information in a form more accessible to other users.

Finally, the Bureau is not adopting modifications to the scope of the pricing data point. As discussed above, limiting the pricing data to approved and originated transactions reduces the difficulty of reporting while providing important information about the pricing decisions of financial institutions. The Bureau does not believe, as suggested by a commenter, that approved but not accepted applications lack value for fair lending analysis. Rather, these applications are similarly valuable because they also reflect transactions for which the lender has made a credit decision and set the pricing for the transaction. Lastly, limiting final § 1002.107(a)(12) to interest rate and origination charges would deprive data users of the benefits of other pricing information. The importance of each aspect of the pricing data point is discussed in the section-by-section analyses that follow.

107(a)(12)(i) Interest Rate

Proposed Rule

Proposed § 1002.107(a)(12)(i)(A) would have required financial institutions to report the interest rate that is or would be applicable to the covered credit transaction. If the interest rate is adjustable, proposed § 1002.107(a)(12)(i)(B) would have required the submission of the margin, index value, and index name that is or

would be applicable to the covered credit transaction at origination.[637]

Proposed comment 107(a)(12)(i)–1 would have clarified that if a covered credit transaction includes an initial period with an introductory interest rate, after which the interest rate adjusts, a financial institution complies by reporting information about the interest rate applicable after the introductory period. Proposed comment 107(a)(12)(i)–2 would have explained that a financial institution reports the interest rate applicable to the amount of credit approved or originated reported in proposed § 1002.107(a)(8) if a covered credit transaction includes multiple interest rates applicable to different credit features. Lastly, proposed comment 107(a)(12)(i)–3 listed a number of indices to report and directed that if the index used does not appear on the list of indices provided, the financial institution reports "other" and provides the name of the index via free-form text field.

Proposed § 1002.107(a)(12)(i)(B) would have provided that, for adjustable interest rates based upon an index, a financial institution must report the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination. Proposed comment 107(a)(12)(i)–4 would have clarified that a financial institution complies with proposed § 1002.107(a)(12)(i)(B) by reporting the index value at the time the application is approved by the financial institution. The Bureau sought comment on whether the index value should be reported based on a different time period or whether the index value should be reported at the time of approval.

The Bureau sought comment on proposed § 1002.107(a)(12)(i) and its commentary, including whether a different measure of pricing would provide more accurate data, whether additional information about pricing (for example, amortization type or adjustment frequency) would provide beneficial data to help ascertain fair lending risk and further the business and community development purpose of section 1071, and whether there are additional indices that should be included in the list from which financial institutions choose to report the applicable index on adjustable rate transactions. Lastly, the Bureau sought

[637] It should be noted that not all covered credit transactions include an interest rate. Final § 1002.107(a)(12)(v) applies to certain covered credit transactions that do not include an interest rate. The discussion of final § 1002.107(a)(12)(iv) below also addresses other covered credit transactions that may not include an interest rate.

**35312**   **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

comment on whether there may be covered credit transactions where the interest rate may change after origination based on factors such as if the borrower maintains an account at the financial institution or if some other condition is met, and if so, whether additional commentary would be helpful to provide more guidance on which rate to report in that circumstance.[638]

## Comments Received

The Bureau received comments specifically regarding the collection of interest rate from banks and trade associations, among others. While some commenters supported the Bureau's proposal, several industry commenters had questions regarding how the provision would work. The community group stated that interest rate information is beneficial as long as data users have access to both the initial interest rate and the interest rate after a potential initial rate reset. An industry commenter agreed that interest rate information would be helpful in conducting fair lending analyses. In contrast, a bank commenter asserted that interest rate information is of limited value.

Regarding the details of the Bureau's proposal to collect interest rate, a bank commenter noted that commercial loans may have more than one interest rate. With respect to indices for variable rate transactions and the Bureau's solicitation of comment on whether the index value should be reported based on a different time period or if at approval is the most appropriate time to measure, a group of trade associations asserted in their comment that the index value is often not related to the timing of approval or origination, and will not provide useful data, while a bank commented that it would be less burdensome to report the index value used to establish the interest rate rather than the value at the time of approval. A State bankers association asserted that the index value at approval may not have any connection to the price of the loan, providing the example of agricultural lending where the rate and terms are set after the financial institution approves the loan. Two industry commenters noted that the index value could change between approval and origination. Another bank requested that Constant Maturity Treasury (CMT) rate be included in the list of indices. Two trade associations inquired as to how to report an internal index used to set the rate on a variable rate transaction, while a bank commenter stated that use of internal indices that are unique to a financial institution would make interest rate data difficult to interpret.

A bank requested clarification of the term ''introductory period.'' Another bank asserted that for a variable interest rate transaction with a five-year introductory period, the interest rate data reported at approval will be outdated and inaccurate when the period ends. Finally, a trade association inquired as to how a financial institution would report an interest rate that is unknown at origination, such as a line of credit whose interest rate changes based on the amount advanced.

## Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12)(i) with one addition, as well as with other adjustments and additions to the commentary to address comments received regarding introductory interest rate periods and adjustable interest rates. Final § 1002.107(a)(12)(i) requires financial institutions to report the interest rate that is or would be applicable to the covered credit transaction. If the interest rate is adjustable, final § 1002.107(a)(12)(i)(B) requires the submission of the margin, index value, introductory rate period expressed in months (if applicable), and the index name that is or would be applicable to the covered credit transaction. As with all aspects of pricing within § 1002.107(a)(12), this requirement applies to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

The Bureau believes that collection of the interest rate on the covered credit transaction furthers both the fair lending purpose and the business and community development purpose of section 1071 by allowing regulators, small business advocates, and industry to conduct fair lending reviews and monitor the market for emerging high-cost products. In addition, the availability of this pricing metric will provide pricing transparency and will encourage the development of successful lending models because policymakers, community organizations, investors, banks seeking partnerships, and others will have better visibility into which business models are successful at providing sustainable credit to minority-owned, women-owned, and other underserved small businesses.

Furthermore, research has found that minority-owned businesses tend to obtain, or be offered, higher interest rates on business credit than non-minority-owned businesses.[639] The collection of interest rate (along with fees) will allow the Bureau, other government agencies, and other data users to have insight into the existing market, monitor the market for potentially troubling trends, and conduct fair lending analyses that adequately take into account this important metric.

In general, interest rate information should be in or readily determinable from the credit file, and thus available for reporting. To the extent that it is not, the Bureau notes that certain State-level commercial lending disclosures, notably those of California and New York, require the disclosure of APR.[640] Because the interest rate must be known to calculate APR, the Bureau believes that final § 1002.107(a)(12)(i) imposes little burden on financial institutions that already include the interest rate on such disclosures required by State law, as well as on the contract between the financial institution and the applicant.

As noted above, final § 1002.107(a)(12)(i) remains largely the same as proposed § 1002.107(a)(12)(i). However, the Bureau has added to final § 1002.107(a)(12)(i)(B) a requirement that financial institutions report the initial rate period expressed in months (if applicable) (along with the margin, index value, and the index name that is or would be applicable to the covered credit transaction, as proposed). The Bureau agrees with commenters that for transactions with a variable interest rate where there is an initial rate and the interest rate resets after a certain period, at the time the financial institution approves the transaction and sets the interest rate, the financial institution will not know the future value of the index used to create the interest rate. By collecting the number of months of the initial period (if any), the rule will allow data users to determine the accurate interest rate applicable to the transaction because they will have the name of the index and the timing of the index value. For example, as written in final comment 107(a)(12)(i)–2, if a

[639] U.S. Dep't of Com., *Minority Business Development Agency, Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs*, at 3, 5, 21, 36–37 (2010), *https://archive.mbda.gov/page/executive-summary-disparities-capital-access-between-minority-and-non-minority-businesses.html*.

[640] *See* N.Y. S.898, section 803(c) (signed Jan. 6, 2021) (amending S.5470–B), *https://legislation .nysenate.gov/pdf/bills/2021/s898*; Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*.

[638] The Bureau did not receive any comments on this solicitation.

financial institution originates a covered credit transaction with a fixed initial interest rate of 0 percent for six months following origination, after which the interest rate will adjust according to a Prime index rate plus a 3 percent margin, the financial institution reports the 3 percent margin, the number "6" for the length of the initial rate period, Prime as the name of the index used to adjust the interest rate, and "not applicable" for the index value.

New comment 107(a)(12)(i)–1 clarifies that a financial institution complies with § 1002.107(a)(12)(i) by reporting the interest rate applicable to the amount of credit approved or originated as reported pursuant to final § 1002.107(a)(8). The Bureau is adopting this comment to address the issue raised by a commenter as to how a financial institution would report an interest rate that is unknown at origination or where the rate changes based on the amount advanced, such as with some lines of credit.

The Bureau is adopting comment 107(a)(12)(i)–2 (renumbered from 107(a)(12)(i)–1 in the proposal) with several alterations. Final comment 107(a)(12)(i)–2 clarifies that if a covered credit transaction includes an initial period with an introductory interest rate of 12 months or less, after which the interest rate adjusts upwards or shifts from a fixed to a variable rate, a financial institution complies with the provision by reporting information about the interest rate applicable after the introductory period. If a covered transaction includes an initial rate period of more than 12 months after which the interest rate resets, a financial institution complies with the provision by reporting information about the interest rate applicable prior to the reset period. Final comment 107(a)(12)(i)–2 also provides two examples to illustrate these scenarios. The Bureau's revisions to this comment address a commenter's request to clarify the term "introductory period" (which the Bureau has done by clarifying that an introductory period includes an initial period of 12 months or less after which the interest rate adjusts upward or shifts from a fixed to a variable rate), as well as another commenter's concern that in a transaction with a five-year introductory period, the interest rate reported at approval will be outdated and inaccurate when the period ends.

Final comment 107(a)(12)(i)–3 (renumbered from proposed comment 107(a)(12)(i)–2 with one non-substantive adjustment) clarifies that if a covered credit transaction includes multiple interest rates applicable to different credit features, a financial institution

complies with § 1002.107(a)(12)(i) by reporting the interest rate applicable to the amount of credit approved or originated reported pursuant to final § 1002.107(a)(8). The comment also provides an example.

Final comment 107(a)(12)(i)–4 (renumbered from proposed comment 107(a)(12)(i)–3) includes a list of indices for reporting the appropriate index for variable rate transactions, and also specifies that a financial institution reports "other" and reports the index name in free-form text if the applicable index is not listed. The Bureau has added CMT to the list of indices in the comment, as requested by a commenter. In response to requests from a number of commenters for clarification as to how a financial institution should report internal indices, the Bureau has also added "Internal Index" to the list of indices in the comment. The Bureau believes that allowing financial institutions to choose "other" when an index used does not appear on the provided list will facilitate compliance. In addition, collecting this information on "other" indices will assist the Bureau in monitoring trends in this area and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list.

Final comment 107(a)(12)(i)–5 (renumbered from proposed comment 107(a)(12)(i)–4) clarifies that a financial institution complies with § 1002.107(a)(12)(i) by reporting the index value used to set the rate that is or would be applicable to the covered transaction. Proposed comment 107(a)(12)(i)–4 would have required financial institutions to report, for covered transactions with an adjustable interest rate, the index value applicable at the time the application was approved by the financial institution. Some commenters stated that the index value at the time of approval may have no relationship to the index value used to set the interest rate and that it would be less burdensome to report the index value used to establish the interest rate rather than the value at the time of approval. To address these concerns, the Bureau has adjusted final comment 107(a)(12)(i)–5 to require reporting of the index value used to set the rate that is or would be applicable to the covered transaction. In most cases, this will be the index value at the time of approval, because the financial institution will set the pricing when the credit decision is made, but in cases where there might be a difference, this comment as revised will ensure that financial institutions are reporting the index value actually used to establish the interest rate, rather

than the value that otherwise exists at the time of approval.

107(a)(12)(ii) Total Origination Charges

*Proposed Rule*

Proposed § 1002.107(a)(12)(ii) would have required financial institutions to report the total origination charges for a covered credit transaction. Total origination charges are the total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars.

Proposed comment 107(a)(12)(ii)–1 would have clarified that charges imposed uniformly in cash and credit transactions are not reportable. Proposed comment 107(a)(12)(ii)–2 would have provided guidance on reporting charges imposed by third parties. Proposed comment 107(a)(12)(ii)–3 would have clarified that broker fees are included in the total origination charges.[641] Proposed comment 107(a)(12)(ii)–4 would have provided guidance on reporting charges for other products or services paid at or before origination. And proposed comment 107(a)(12)(ii)–5 would have listed examples of reportable charges.

The Bureau sought comment on proposed § 1002.107(a)(12)(ii) and its commentary, including whether concepts and guidance adapted from Regulation Z, such as proposed comment 107(a)(12)(ii)–1 on comparable cash transactions, were applicable in the small business lending context such that they should be incorporated as drafted. The Bureau also sought comment on whether to enumerate certain types of charges separately in the 1071 data, and whether to include or exclude certain types of charges in the total origination charges.

*Comments Received*

The Bureau received comments specifically regarding total origination charges from several banks and trade associations, along with a community group and a joint letter from a cross-sector group of lenders, community groups, and small business advocates.

A few industry commenters questioned the utility of information about total origination charges. For example, several commenters asserted that proposed § 1002.107(a)(12)(ii) would not provide useful data because the amount of origination charges may vary based on factors not captured by

---

[641] For more information on broker fees, see the section-by-section analysis of § 1002.107(a)(12)(iii) below.

the 1071 data, such as geographical differences in appraisal fees. A group of trade associations stated that including broker fees while itemizing them separately in another data field would inflate the amount of origination charges. And a bank preferred to report only origination points but believed that such data would provide only limited value. This commenter did not define origination points but the Bureau understands the term to refer to one way that financial institutions denote fees paid to the lender for originating the loan. However, the cross-sector group commented that total origination charges would be especially helpful for data users examining the cost of merchant cash advances because these transactions include upfront fees not otherwise captured in the pricing data.

A few commenters asserted that reporting total origination charges would be burdensome. For example, several industry commenters stated that calculating the finance charge under Regulation Z, which defines certain charges similar to the proposed total origination charges data field, is complex and not performed for commercial credit transactions. And a trade association suggested that the proposed treatment of certain charges, such as a borrower's premium for property insurance, was unclear.

Several commenters addressed specific aspects of total origination charges. For example, a community group stated that charges imposed uniformly in cash and credit transactions should be reportable because, they asserted, such charges are rare and the existence of such an exclusion may encourage fee shifting. Conversely, a trade association stated that any charge imposed uniformly on all applicants should be excluded because such a charge could not be the source of a pricing disparity. Several industry commenters stated that third-party charges should be excluded because the imposition of such fees is often outside a financial institution's control, while a group of trade associations found the treatment of such charges confusing. Finally, another trade association stated that aligning the definition of total origination charges to Regulation C's definition of origination charges used to report data under HMDA [642] would provide helpful clarity because the Regulation C definition is understood to include only charges retained by the financial institution.

[642] 12 CFR 1003.4(a)(18).

### Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12)(ii) with additional clarifying commentary. Final § 1002.107(a)(12)(ii) requires financial institutions to report the total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars. As with all aspects of pricing within § 1002.107(a)(12), this requirement applies to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

The Bureau is finalizing comments 107(a)(12)(ii)–1 through –5 as proposed. In addition, the Bureau is adopting final comment 107(a)(12)(ii)–6, which clarifies the reporting of a net lender credit provided by a financial institution to an applicant at origination.

As discussed in the NPRM, total origination charges provide information about an important component of pricing for small business credit: the upfront cost of originating and extending credit. This relatively specific information enables insight into credit pricing that would be obscured by more general information, such as the trade-offs between the interest rate and the upfront charges. Indeed, new comment 107(a)(12)(ii)–6 enhances users' ability to examine the relationship between components of credit pricing by clarifying how to report net lender credits provided to the applicant. For example, without information about net lender credits, transactions where a borrower accepted a lender credit at origination in exchange for a higher interest rate would appear to have inflated prices. Moreover, by generally covering all upfront fees and credits regardless of how they are structured and denominated, final § 1002.107(a)(12)(ii) limits financial institutions' opportunity to shift fees to excluded charges by giving similar fees different names. Thus, final § 1002.107(a)(12)(ii) will enable users to better understand pricing disparities and identify potential business and community development opportunities.

The Bureau disagrees with commenters who claimed that information about total origination charges would not have value. Although such charges are affected by factors not included in the 1071 data, final § 1002.107(a)(12)(ii) will still provide insight into pricing in the small

business lending market. General information about upfront charges will enable users to better understand fair lending disparities, even if they cannot conclusively determine the existence of unlawful disparities from the data alone. And users need not attempt to make precise comparisons among individual applicants to identify business and community development needs and opportunities. Regarding broker fees, the Bureau believes that such charges are an important component of the upfront cost of credit and notes that Regulation Z also includes them in the finance charge.[643] Also, broker fees are separately itemized in final § 1002.107(a)(12)(iii) so that users who are concerned about the impact of including broker fees can deduct them from the total origination charges.

Regarding commenters' concerns about burden, the Bureau understands that some financial institutions find calculation of the finance charge in Regulation Z § 1026.4—which is similar to final § 1002.107(a)(12)(ii)'s description of total origination charges—to be complex. But final § 1002.107(a)(12)(ii) is simpler in several important respects. First, final § 1002.107(a)(12)(ii) excludes all credit costs occurring after origination of a covered credit transaction, such as interest and time-price differential. And final § 1002.107(a)(12)(ii) adopts a more inclusive approach to upfront charges than Regulation Z's finance charge, which has numerous provisions addressing specific fees.[644] This simplified approach should make the total origination charges less burdensome to calculate than the finance charge. Regarding a commenter's question about the treatment of a borrower's premium for property insurance, this charge is handled using the general approach to charges for other products or services described in comment 107(a)(12)(ii)–4: such charges are included in the total origination charges only if the financial institution requires the purchase of such other product or service as a condition of or an incident to the extension of credit.

The Bureau is not making certain specific changes to the total origination charges data field suggested by commenters. First, final § 1002.107(a)(12)(ii) maintains the

[643] *Compare* final comment 107(a)(12)(ii)–3, *with* Regulation Z § 1026.4(a)(3).

[644] For example, the finance charge excludes application fees charged to all applicants for credit, and numerous fees in transactions secured by real property. *See* Regulation Z § 1026.4(c)(1) (application fees) and (7) (real estate-related fees).

exclusion for charges imposed uniformly in cash and credit transactions, similar to the exclusion in Regulation Z's finance charge, because the Bureau believes that pricing data better serves section 1071's statutory purposes when it focuses on the cost of credit that the lender is imposing rather than capturing all costs that may be associated with a particular transaction (whether financed or not). Furthermore, the Bureau is not excluding charges simply because a financial institution imposes them uniformly on all applicants for credit. Even if such charges—given their uniformity—were to hold no value for fair lending analysis, they would still be part of the upfront cost of credit that data users may wish to examine in identifying business and community development needs and opportunities. Final § 1002.107(a)(12)(ii) also adopts the proposal's treatment of third-party charges, with such charges being reportable only if a financial institution either requires the use of a third party as a condition of or an incident to the extension of credit, even if the applicant can choose the third party; or retains a portion of the third-party charge, to the extent of the portion retained.[645] This approach focuses final § 1002.107(a)(12)(ii) on those upfront third-party charges that are effectively set by the lender as a cost of credit. The Bureau believes this approach is consistent with that requested by commenters who did not want third-party charges to be reportable if they were outside of a financial institution's control. Regulation Z's finance charge definition uses a similar standard for third-party charges, and the Bureau is not aware of significant confusion over its applicability. Finally, Regulation C's definition of total origination charges, which is taken directly from the amount disclosed to borrowers of closed-end consumer credit transactions secured by real property,[646] is limited in ways that the Bureau believes would reduce the value of final § 1002.107(a)(12)(ii) in the small business lending context. For example, new comment 107(a)(12)(ii)–6 clarifies that financial institutions may report a negative amount to reflect a net credit provided by the lender, but such credits could not be included in Regulation C's total origination charges data point.

### 107(a)(12)(iii) Broker Fees

#### Proposed Rule

Proposed § 1002.107(a)(12)(iii) would have required financial institutions to report the broker fees for a covered credit transaction. Broker fees are the total amount of all charges included in the total reportable origination charges that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars. Proposed comment 107(a)(12)(iii)–1 would have provided an example of reporting different types of broker fees. Proposed comment 107(a)(12)(iii)–2 would have clarified that financial institutions would use a "best information readily available" standard regarding fees paid directly to a broker by an applicant.

The Bureau sought comment on proposed § 1002.107(a)(12)(iii) and its commentary, including on the knowledge that financial institutions might have about direct broker fees and the challenges of reporting such information.

#### Comments Received

The Bureau received comments specifically regarding broker fees from several lenders, trade associations, and community groups. A community group stated that information about broker fees would help data users monitor for abusive practices. Conversely, a group of trade associations asserted that the Bureau had not established that broker fees were inflating the cost of credit in the small business lending market. This commenter also speculated that Congress was unconcerned with broker fees in this market because it had not extended certain TILA protections to commercial transactions or explicitly identified broker fees in section 1071.

Several commenters addressed the reporting of broker fees paid directly to the broker. A trade association commented that the amount of such fees may be difficult for a financial institution to obtain, while a bank said that documenting efforts to verify direct broker fees would be burdensome. A community group said that the Bureau's proposed "best information readily available" standard was reasonable, while a joint letter from community groups and business advocacy groups asked the Bureau to separately itemize indirect broker fees in order to provide more information about charges that are imposed by the lender.

#### Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12)(iii) and associated commentary as proposed. As with all aspects of pricing within § 1002.107(a)(12), this requirement to report broker fees applies to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

As discussed in the NPRM, loan brokers play an important role in the small business lending market. The market has shifted to include more nonbank and nontraditional lenders offering different types of financial products, which creates opportunities for intermediaries, such as brokers, who might assist applicants in navigating among potential lenders or products.[647] These intermediaries offer benefits to applicants but also create risks for those applicants arising from misaligned incentives.[648] Indeed, the small business lending market lacks certain substantive protections against misconduct that are found in the consumer credit market, such as the prohibition on basing certain loan originator compensation on the terms of a transaction.[649]

Information about broker fees will help data users better understand the small business lending market in general and the impact broker fees have on credit pricing in particular. Although broker fees are included in final § 1002.107(a)(12)(iii)'s definition of total origination charges, separately enumerating the total broker fees will allow data users to better understand the role that brokers play in the price of

---

[647] *See, e.g.,* 2022 Small Business Credit Survey (reporting that 40 percent of respondents applied for credit at either an online lender or a finance company in 2021).

[648] *See* Fin. Stability Oversight Council, *2016 Annual Report,* at 126 (2016), *https://home.treasury.gov/system/files/261/FSOC-2016-Annual-Report.pdf* (discussing intermediaries in alternative lending arrangements and explaining that "[i]n other markets, business models in which intermediaries receive fees for arranging new loans but do not retain an interest in the loans they originate have, at times, led to incentives for intermediaries to evaluate and monitor loans less rigorously"). Because of the potential risks involved in multi-party business arrangements, the FFIEC's Interagency Fair Lending Examination Procedures emphasize the importance of understanding the role that brokers play in a financial institution's lending process. Fed. Fin. Insts. Examination Council, *Interagency Fair Lending Examination Procedures,* at 3 (2009), *https://www.ffiec.gov/PDF/fairlend.pdf* (instructing examiners to consider an institution's organization of its credit decision-making process, including identification of the delegation of separate lending authorities and the extent to which discretion in pricing or setting credit terms and conditions is delegated to various levels of managers, employees, or independent brokers or dealers and an institution's loan officer or broker compensation program).

[649] Regulation Z § 1026.36 (implementing TILA's prohibition on basing residential mortgage loan originator compensation on loan terms).

AdminRecord-000166

small business credit. For example, data users will be able to analyze whether broker fees specifically appear to be creating fair lending risk or higher-priced transactions for certain communities. Empowering data users to engage in this level of analysis will aid in fulfilling both the fair lending enforcement and business and community development purposes of the statute.

The Bureau acknowledges the lack of data regarding the extent to which broker fees may or may not be inflating the cost of credit. This insufficiency, however, is exactly what 1071 data are intended to help address. Moreover, final § 1002.107(a)(12)(iii) is valuable to data users even in the absence of any problematic pricing practices regarding brokers because it will help shed light on an important aspect of commercial financing arrangements. The final rule includes numerous data points, including much of the pricing data point, that do not capture information that about intrinsically or especially abusive conduct, but that will help data users identify fair lending concerns and identify business and community development needs and opportunities. Regarding Congress's intent, the Bureau notes that section 1071 expressly authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." [650] As discussed herein, final § 1002.107(a)(12)(iii) satisfies this requirement.

The Bureau understands that financial institutions often may not have complete access to information regarding the amount of broker fees that an applicant pays directly to a broker. Thus, final comment 107(a)(12)(iii)–2 clarifies that a financial institution may rely on the best information readily available to the financial institution at the time final action is taken. Information readily available can include, for example, information provided by an applicant or broker that the financial institution reasonably believes regarding the amount of fees paid by the applicant directly to the broker. The Bureau believes commenters may be overestimating the burden associated with this standard, which contemplates only consulting information "readily" available rather than performing a searching inquiry into the amount of direct broker fees. As noted in the NPRM, the same standard is used for reporting certain HMDA data under Regulation C, and it does not

[650] ECOA section 704B(e)(2)(H).

appear to be unduly burdensome in that context.[651] Additionally, many nonbank financial institutions will need to determine the amount of broker fees in certain circumstances to comply with State commercial financing disclosure laws.[652]

Finally, the Bureau is not requiring separate itemization of indirect broker fees at this time. Such fees could be imposed for a variety of reasons and in a variety of ways; the Bureau believes that additional information and stakeholder feedback would be beneficial before adopting such a requirement.

107(a)(12)(iv) Initial Annual Charges

Proposed Rule

Proposed § 1002.107(a)(12)(iv) would have required financial institutions to report the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars.

Proposed comment 107(a)(12)(iv)–1 would have provided an example of how to calculate the amount to report. Proposed comment 107(a)(12)(iv)–2 would have highlighted that a financial institution should exclude interest expenses from the initial annual charges reported. Proposed comment 107(a)(12)(iv)–3 would have noted that a financial institution should not include any charges for events that are avoidable by the applicant, including for example, charges for late payment, for exceeding a credit limit, for delinquency or default, or for paying items that overdraw an account. Proposed comment 107(a)(12)(iv)–4 would have provided examples of initial annual charges that may be scheduled to be imposed during the initial annual period, including monthly fees, annual fees, and other similar charges. Finally, proposed comment 107(a)(12)(iv)–5 would have clarified that a financial institution complies with the provision by reporting as the default the highest amount for a charge scheduled to be imposed, and provides an example of

[651] See Regulation C comments 4(a)(31)–4 and 4(a)(32)–5.

[652] For example, California's commercial financing disclosure law requires lenders to determine the finance charge, which includes "any charge that would be a finance charge under 12 CFR part 1026.4." Cal. Code Regs. tit. 10, section 943(a)(1), https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/06/PRO-01-18-Commercial-Financing-Disclosure-Regulation-Final-Text.pdf. In turn, Regulation Z § 1026.4(a)(3) generally includes fees charged by a mortgage broker, whether paid directly or indirectly. California law also requires separate disclosure of broker fees that are included in the amount financed by the borrower. Cal. Code Regs. tit. 10, section 956(a)(5).

how to calculate the amount reported when the scheduled fee to be imposed may be reduced based upon a specified occurrence.

The Bureau sought comment on proposed § 1002.17(a)(12)(iv) and its commentary, including whether to include or exclude certain types of charges as reportable under initial annual charges. The Bureau also sought comment on the likelihood that financial institutions would schedule charges in the second year of a covered credit transaction and beyond specifically in an effort to avoid reporting the charges for purposes of section 1071. Finally, the Bureau sought comment on how it should treat situations where the applicant has informed the financial institution that it expects to regularly incur "avoidable charges," and whether such charges should be reported as a scheduled charge.

Comments Received

The Bureau received comments specifically regarding the collection of initial annual charges from lenders, trade associations, and community groups.

A community group stated that the Bureau should finalize the provision as proposed, but that the Bureau should conduct research to determine if lenders are shifting fees beyond the first year. Several community groups and a lender requested that the Bureau require financial institutions to also report charges scheduled to be imposed after the first year to avoid encouraging lenders to impose charges disproportionately in the later years of the loan's term.

With respect to avoidable fees, a community group stated that the Bureau should include all fees that could be imposed at the lender's discretion in order to avoid evasion. A bank and a joint letter from bank trade associations argued that including avoidable fees that the applicant intends to incur would unfairly inflate the prices of some loans and create documentation problems for lenders. One commenter asserted that, for loans with terms shorter than one year, financial institutions should not be made to speculate as to what constitutes the initial period on short term loans and what could occur during the initial annual period regarding charges.

A State bankers association expressed concern that the terms "scheduled" and "initial period following origination" were not defined in the NPRM. That commenter and a bank asserted that many charges that may be incurred during the first year may be uncertain,

such as an inspection fee for a construction project where the timing of inspections is determined by events occurring after origination. The State bankers association also stated that some loans may have multiple transactions within a one-year period, such as a line of credit that was originated and then increased, and asserted that it is unclear whether associated charges would be reported twice or combined.

Final Rule

For the reasons set forth herein, the Bureau is adopting § 1002.107(a)(12)(iv) and associated commentary with additions and adjustments to commentary to address comments regarding speculative charges and transactions with terms of less than one year. Final § 1002.107(a)(12)(iv) provides that a financial institution reports only charges scheduled to be imposed over the first annual period of the covered credit transaction. The Bureau understands that there are a variety of ways that small business credit transactions may be structured. This includes, for example, whether there is an interest rate imposed on the transaction, whether there are finance charges, and whether there are a myriad of other fees that may be scheduled to be paid or are contingent upon some occurrence. In addition, the Bureau understands that scheduled fees may constitute a substantial part of the cost of a covered credit product, and without knowledge of those fees, the cost of the credit would be incomplete. The Bureau believes that final § 1002.107(a)(12)(iv) enables data users to have a more accurate understanding of the cost of the covered credit transaction than if the data lacked information about scheduled fees.

There may be small business credit transactions that do not include an interest rate, but do include a monthly finance charge. If the financial institution were only required to report the interest rate on these types of transactions, the true cost of credit would be obscured because the monthly finance charge would not be reported. In addition, small business credit, like consumer credit, may include a number of other fees, such as annual fees and other similar charges. The information collected and reported under final § 1002.107(a)(12)(iv) allows data users to have a more complete picture of the cost of the covered credit transaction and promotes market transparency, thus furthering the business and community development purpose of section 1071. In addition, this pricing data furthers the fair lending purpose of section 1071

as it enhances the ability to understand the cost of credit and any disparities that may exist.

The Bureau believes that by requiring only scheduled charges to be reported (rather than the submission of all potential charges, some of which could be speculative), the data reported will be more accurate than if a financial institution were to make an educated guess as to what unscheduled charges will be imposed over the first annual period. Final § 1002.107(a)(12)(iv) does not require a financial institution to itemize the charges reported thereunder. The Bureau also believes that requiring charges to be itemized would add a considerable amount of complexity for financial institutions in collecting and reporting the initial annual charges, given the range of fees that could be charged and the variations in how they might be imposed.

A financial institution complies with final § 1002.107(a)(12)(iv) by not including charges for events that are avoidable by the applicant; this restriction is explained more fully in final comment 107(a)(12)(iv)–3 (unchanged from the proposal), which provides examples of types of avoidable charges. As noted above, the Bureau believes that the accuracy of the data reported is enhanced by only including charges that are scheduled to be imposed and not including potential charges that are contingent upon an action (or inaction) by the borrower. The Bureau also believes that only requiring financial institutions to report such charges for the first year, and not the life of the loan, will reduce any burden associated with reporting the data. This information should be included in the contract and, at most, would require a simple calculation to arrive at the total charges for the initial annual period. An example of how to calculate the initial annual charges for the first annual period is found in final comment 107(a)(12)(iv)–1. Additionally, to address comments received regarding uncertain or speculative charges, the Bureau has revised final comment 107(a)(12)(iv)–1 to state explicitly that, in a transaction where there will be a charge in the initial annual period following origination but the amount of that charge is uncertain at the time of origination, a financial institution complies by not reporting that charge as scheduled to be imposed during the initial annual period following origination.

The Bureau is finalizing comments 107(a)(12)(iv)–2 (providing that a financial institution complies with the provision by excluding any interest expense from the initial annual charges

reported) and –4 (providing examples of charges scheduled to be imposed during the initial annual period) as proposed. The Bureau is also finalizing comment 107(a)(12)(iv)–5 as proposed. This comment provides additional explanation about what amount to report when the financial institution provides a discount on the charge if certain conditions are met. The Bureau understands that some financial institutions may provide a discount on specific charges when certain conditions are met. For example, a financial institution may provide a discount on a monthly charge if the borrower maintains a checking account at the financial institution. In such a circumstance, final § 1002.107(a)(12)(iv)–5 requires the financial institution to report the non-discounted amount to maintain consistency across the data that are reported by all financial institutions.

The Bureau is adopting new comment 107(a)(12)(iv)–6 to clarify that, for a transaction with a term less than one year, a financial institution complies with the provision by reporting all charges scheduled to be imposed during the term of the transaction. This comment was added to address requests for clarification regarding how to report the data for transactions with terms less than one year as well as what is meant by initial annual period.

107(a)(12)(v) Additional Cost for Merchant Cash Advances or Other Sales-Based Financing

Proposed Rule

Proposed § 1002.107(a)(12)(v) would have required financial institutions to report additional cost data for merchant cash advances or other sales-based financing transactions. Specifically, this cost is the difference between the amount advanced and the amount to be repaid, expressed in dollars. Proposed comment 107(a)(12)(v)–1 would have provided an example of the difference between the amount advanced and the amount to be repaid for a merchant cash advance.

The Bureau sought comment on proposed § 1002.107(a)(12)(v) and its commentary, including whether to require additional pricing information for merchant cash advances, and whether merchant cash advances could be structured in ways that evade the proposed reporting requirement, such as by omitting or making variable the amount to be repaid.

Comments Received

The Bureau received comments specifically regarding this aspect of the

proposal from several industry and community group commenters. Several joint letters from community groups, community oriented lenders, and business advocacy groups, as well as a trade association, asked the Bureau to require reporting the loan term for merchant cash advances or other sales-based financing transactions. These commenters stated that the loan term was necessary to compare the pricing of merchant cash advances, and offered potential methodologies for estimating unknown loan terms, including those from State commercial financing disclosure laws. A lender asked the Bureau to accommodate future transaction types by allowing financial institutions to report amounts under § 1002.107(a)(12)(v) even if the transaction is not a merchant cash advance or other sales-based financing transaction. Finally, a cross-sector group of lenders, community groups, and small business advocates agreed that § 1002.107(a)(12)(v), along with the other pricing data, would capture the cost of merchant cash advances.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.107(a)(12)(v) and comment 107(a)(12)(v)–1 as proposed. Final § 1002.107(a)(12)(v) requires financial institutions to report the difference between the amount advanced and the amount to be repaid, expressed in dollars, for merchant cash advances or other sales-based financing transactions. As with all aspects of pricing within final § 1002.107(a)(12), this requirement applies to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant.

As discussed in the NPRM, some types of commercial financing contain pricing terms that are difficult to reflect in data about interest rate and fees. For example, under a typical merchant cash advance, a merchant receives a cash advance and promises to repay it (plus some additional amount) to the merchant cash advance provider. Merchant cash advance providers generally do not provide an interest rate, and while they may charge fees at origination or during the first year, the majority of a merchant cash advance's cost to the merchant comes from the additional amount repaid by the merchant on top of the amount advanced. This additional amount may be expressed as a multiple of the amount advanced in the form of a factor rate or percentage, or it may be derived by comparing the total payback amount to the amount actually advanced. This

additional amount is typically not characterized as interest, so it would not be reported under final § 1002.107(a)(12)(i). Nor is this additional amount characterized as a fee charged at origination or scheduled to be imposed during the first year after the transaction, so it would not be reported under final § 1002.107(a)(12)(ii) or (iv). Without an additional pricing data field to capture this additional amount along with any other fees the merchant cash advance provider charges, data users attempting to analyze merchant cash advance pricing would miss most of the cost of credit associated with these transactions. Therefore, the inclusion of this data field aids in fulfilling both the fair lending enforcement and business and community development purposes of the statute.

The Bureau believes that collecting and reporting this data will impose relatively little burden on financial institutions, because they can determine the additional amount repaid by computing the difference between the amount of revenue purchased and the purchase price typically found in the merchant cash advance contract. Commenters generally did not make assertions to the contrary.

As discussed in the section-by-section analysis of § 1002.107(a)(5) above, the Bureau is requiring, for merchant cash advances and other sales-based financing transactions, that financial institutions report the loan term, if any, that the financial institution estimated, specified, or disclosed in processing or underwriting the application or transaction. This information will allow data users to better understand and use the information reported pursuant to final § 1002.107(a)(12)(v). However, the Bureau is not adopting one commenter's suggestion regarding future transaction types that may resemble merchant cash advances or other sales-based financing, as the Bureau believes such transactions should be adequately covered by the "other sales-based financing" label and thus this information would be reportable for such transactions.

107(a)(12)(vi) Prepayment Penalties

Proposed Rule

Proposed § 1002.107(a)(12)(vi)(A) would have required financial institutions to report whether the financial institution could have included a prepayment penalty under the policies and procedures applicable to the covered credit transaction. Proposed § 1002.107(a)(12)(vi)(B) would have required financial institutions to report whether the terms of the covered

credit transaction include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due. Proposed comment 107(a)(12)(vi)–1 would have provided additional information on how to determine whether the applicable policies and procedures allow a financial institution to include prepayment penalties in the loan agreement.

The Bureau sought comment on proposed § 1002.107(a)(12)(vi) and its commentary, including whether to enumerate other types of contingent charges separately in the 1071 data to more accurately reflect the cost of covered credit transactions. The Bureau also sought comment on whether there are alternative data that would provide similar insight into whether certain borrowers are being steered into covered credit transactions containing prepayment penalty terms or other similar contingent terms.

Comments Received

The Bureau received comments regarding the reporting of prepayment penalty information from lenders, trade associations, and community groups. A number of community groups supported the proposal to collect prepayment penalty information. One asserted that information on prepayment penalties is important for data users to determine whether such charges are targeting underserved borrowers. Another noted that research by the Federal Reserve Board shows that many small business borrowers do not expect the balloon finance charge that many merchant cash advances and other transactions impose for prepayment.[653] A joint letter from community and business advocacy groups requested that the Bureau ensure that financial institutions cannot evade the reporting requirement by changing how prepayment penalties are described.

A number of trade associations and banks questioned the necessity of prepayment penalty data and claimed that it would be misleading. A group of trade associations stated that the Bureau offered no evidence that these penalties impact community development or are used in a discriminatory fashion. The same commenter also asserted that nearly all merchant cash advance providers collect a charge for prepaying the amount advanced, but this charge would not be reflected in the proposed

---

[653] Barbara Lipman & Ann Marie Wiersch, Bd. of Governors of the Fed. Rsrv. Sys., *Browsing to Borrow: "Mom & Pop" Small Business Owners' Perspectives on Online Lenders and Products* (June 2018), *https://www.federalreserve.gov/publications/files/2018-small-business-lending.pdf.*

AdminRecord-000169

prepayment penalty data point, leading to the data appearing to inflate the apparent cost of non-merchant cash advance credit. A State bankers association asserted that nondiscriminatory reasons exist for certain loans to have prepayment penalties even if a lender's general policies and procedures do not provide for them, so the reported data could not be used to detect steering. A bank stated that the proposal would not detect steering because it does not clarify whether the prepayment penalty applies to the transaction requested or the transaction approved.

Two trade association comments asserted that lending policies are written in general terms and do not address prepayment penalties. Another trade association commented that it is possible that every loan "could" have a prepayment penalty.

A number of commenters requested that the Bureau change the scope of the data collection. A lender stated that the data collection should be limited to a binary flag and not require details on the potential penalties themselves. Two banks and a State bankers association stated that the data collection should be limited to whether a prepayment penalty was actually charged because a lender's policies might change during the reporting year and are dependent on external factors, such as the requirements of a third-party guarantor. A joint letter from community and business advocacy groups asserted that the Bureau should require reporting of the amount of any prepayment penalty and the term over which the penalty could be imposed. Finally, a cross-sector group of lenders, community groups, and small business advocates stated that the data collection should be modified to capture the balloon finance charge that nearly all merchant cash advances, and many other small business loans, charge on prepayment. This commenter stated that, because this charge is the finance charge that would be paid over the original term of the loan, it would not be considered a "penalty."

Final Rule

For the reasons set forth herein, the Bureau is adopting final § 1002.107(a)(12)(vi) with one technical correction, adopting comment 107(a)(12)(vi)–1 as proposed, and adding new comment 107(a)(12)(vi)–2 regarding charges that become due immediately on prepayment. Final § 1002.107(a)(12)(vi)(A) requires a financial institution to report whether it could have included a charge to be imposed for paying all or part of the transaction's principal before the date on which the principal is due under the policies and procedures applicable to the covered credit transaction (notwithstanding whether such a provision was in fact included in this specific credit transaction). Final § 1002.107(a)(12)(vi)(B) requires financial institutions to report whether the terms of the covered credit transaction do in fact include such a charge. These provisions allow data users to determine what percentage of covered credit transactions could contain a prepayment penalty term, what percentage of such transactions actually contain such a term, and, together with other data points, the demographic profile of borrowers whose contracts do and do not include the term. The two provisions work together to allow data users to better determine whether certain borrowers are being steered towards covered credit transactions containing prepayment penalty terms.

Final comment 107(a)(12)(vi)–1 elaborates on the requirement to report whether financial institutions could have included a prepayment penalty in the covered credit transaction to clarify that the applicable policies and procedures are those that the financial institution follows when evaluating applications for the specific credit type and credit purpose requested. The Bureau believes this provision will ensure that similar credit products are being analyzed together and reduces the possibility that potential fair lending risk is incorrectly identified. In response to commenters who said that financial institutions' policies may change during the reporting year, the Bureau notes that comment 107(a)(12)(vi)–1 explains that the relevant policies and procedures are those in effect at the time of the covered credit transaction. A financial institution would not report based on different policies and procedures that might be adopted later in the reporting period.

New comment 107(a)(12)(vi)–2 explains that a financial institution complies with final § 1002.107(a)(12)(vi) by reporting as a prepayment penalty any balloon finance charge that may be imposed for paying all or part of the transaction's principal before the date on which the principal is due and provides an example which illustrates a balloon finance charge that should be reported. As explained above, one commenter stated that most merchant cash advances and many other transactions have finance charges that would be paid over the entire term of the loan but that immediately become due on prepayment. The Bureau agrees that it was not sufficiently clear that these balloon finance charges would have been covered under the proposed description of a prepayment penalty. In addition, another commenter asked the Bureau to make clear that financial institutions cannot evade the reporting requirement by changing how prepayment penalties are described. New comment 107(a)(12)(vi)–2 was added to address both of these concerns.

In response to commenters asserting that prepayment penalty data are unnecessary or misleading, the Bureau notes that small business loan contracts may include prepayment penalties and the penalties can be sizable and structured as a percent of the remaining outstanding balance. The Bureau also understands that there may be concern among stakeholders, including community groups, that certain small business applicants may be steered toward loans containing prepayment penalty terms. The collection of data regarding which contracts contain a prepayment penalty and whether a prepayment penalty could have been imposed on specific contract types allows the data to be analyzed for fair lending purposes to see if certain groups are more frequently entering into contracts containing prepayment penalties. From a market competition standpoint, financial institutions may want to know how frequently their competitors are using prepayment penalties, and collection of these data could improve market transparency and new product development opportunities. The Bureau is not convinced by commenters' assertions that the data will not be valuable nor that it should require reporting of additional data related to prepayment penalties. The Bureau believes the type of data required to be reported pursuant to final § 1002.107(a)(12)(vi) strikes the right balance between collecting information helpful to analyze for the purposes mentioned above and not requiring financial institutions to provide information regarding prepayment penalties.

107(a)(13) Census Tract

Proposed Rule

Section 1071 requires financial institutions to collect and report "the census tract in which is located the principal place of business of the . . . applicant." [654] This provision is similar to Regulation C, which requires reporting of the census tract in certain circumstances if the property securing the loan (or proposed to secure the loan,

---

[654] ECOA section 704B(e)(2)(E).

AdminRecord-000170