# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

# JOINT APPENDIX
# OF ADMINISTRATIVE RECORD DESIGNATIONS
# VOLUME IV

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

required to report under various circumstances.

In addition, final comment 109(a)(3)–1.iii clarifies reporting obligations in circumstances where it is necessary for more than one financial institution to make a credit decision in order to approve a single covered credit transaction and where more than one financial institution denies the application or otherwise does not approve the application. In this circumstance, the reporting financial institution (the last financial institution with authority to set the material terms of the covered credit transaction) shall have a consistent procedure for determining how it reports inconsistent or differing data points for purposes of subpart B, such as reporting the denial reason(s) from the first financial institution that denied the covered application.

The Bureau believes that the revisions to § 1002.109(a)(3) and associated commentary will help ensure clarity and consistency from the outset regarding which entity has reporting responsibility in a variety of fact patterns involving multiple financial institutions. In addition, the Bureau believes that this approach advances section 1071's purposes by reducing logistical challenges and potential data accuracy issues resulting from reporting by multiple financial institutions on the same application.

In response to commenters who urged consistency with HMDA, the Bureau notes that it initially sought alignment with Regulation C given its understanding of how well the approach has worked in the residential mortgage context and the similarities that exist with various indirect lending scenarios in the small business lending context. While the Bureau's approach in final § 1002.109(a)(3) in many situations is consistent with Regulation C outcomes, it deviates in some ways because, unlike Regulation C, this final rule does not cover purchase transactions. In addition, the Bureau believes that commenters' concerns about alignment with HMDA are mitigated by the Bureau's decision to exclude reporting of all HMDA-reportable transactions, as set forth in final § 1002.104(b)(2).

Unlike section 1071, HMDA expressly contemplates data collection for loan purchases, and Regulation C thus requires financial institutions to report purchases of covered loans.[791]

Moreover, Regulation C commentary clarifies that if more than one institution approved an application prior to closing or account opening and one of those institutions purchased the loan after closing, the institution that purchased the loan after closing reports the loan as an origination.[792] The preamble to the 2015 final HMDA rule explained that requiring that only one institution report the origination of a covered loan eliminates duplicative data.[793] Identical language was included in proposed comment 109(a)(3)–1.i.

Upon further consideration, the Bureau believes that Regulation C's approach involving a purchasing institution is incongruous with section 1071 requirements and thus the final rule adopts a different approach. As described in the section-by-section analysis of § 1002.104(b) above, purchases of covered credit transactions are not, in themselves, covered by the rule. Thus, the Bureau is removing language from proposed comment 109(a)(3)–1.i that would have required reporting by a purchasing financial institution that also approved an application prior to closing or account opening, and is instead placing the reporting obligation on the last covered financial institution with authority to set the material terms of the covered credit transaction. The Bureau believes that this approach is more broadly applicable to the small business financing context (particularly since the Bureau is excluding HMDA-reportable transactions) where there are some salient differences to the mortgage lending context.

For example, while there may also be intermediaries in a mortgage loan transaction, an intermediary typically does not have the discretion and authority to materially deviate from the terms expected by a secondary-market purchaser. In some small business lending contexts, even where a subsequent bona fide purchaser and holder in due course of a covered credit transaction has been identified, an intermediary may have the authority to sort through different purchase offers, select one, and present it to the applicant. Such an intermediary may also have the authority to change material terms of the covered credit transaction prior to closing, such as modifying the pricing terms, loan amount, or repayment duration. As the only party to interact with the applicant

prior to closing, the intermediary can be the party with the most fair lending risk. The Bureau believes, given section 1071's statutory purposes, this last financial institution with the authority to set the terms of the small business's credit obligation should be the one to report on an application.

Indirect auto lending transactions are a common example of situations involving multiple financial institutions. It is common for motor vehicle dealers to assess specific credit information about the applicant, negotiate and set credit terms (such as the duration of the transaction), negotiate and charge for add-on products, and include loan pricing markups. Likewise, the dealer is typically the original creditor, executing and setting the terms of a retail installment sales contract with the customer, and then selling it to another financial institution. Even if the motor vehicle dealer interacts with several financial institutions to make a credit decision and originate a credit transaction, the dealer is typically the last entity with authority to set the material credit terms of the covered credit transaction. Final comments 109(a)(3)–2.vii and viii provide examples of such scenarios.

In some cases, a financial institution's purchase of the retail installment sales contract may not even occur until well after the contract has been signed and the vehicle has been driven off the lot. The fact that a contract may be conditioned on a financial institution's purchase of the contract at a later time does not alter the analysis. In these situations, often known as "spot delivery," the applicant has met the underwriting and creditworthiness conditions used by the motor vehicle dealer and has been approved. The fact that a motor vehicle dealer has imposed other conditions on the execution of the contract (*i.e.,* a financial institution purchasing the contract) that are outside of the applicant's control does not change the conclusion. Once the contract has been signed and the terms of credit set, there is no credit decision on a covered *application* by a subsequent purchaser.

The Bureau recognizes that its rules generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.[794] This provision is codified in final § 1002.101(a). The Dodd-Frank Act also specifies that in general, "nothing

[791] *See* 12 U.S.C. 2803(a)(1) (stating that institutions "shall compile and make available . . . the number and total dollar amount of mortgage loans which were (A) originated (or for which the institution received completed applications), or (B) purchased by that institution"); Regulation C

§ 1003.4(a) (stating that a financial institution "shall collect data regarding . . . covered loans that it purchases for each calendar year").

[792] Regulation C comment 4(a)–2.i.

[793] 80 FR 66128, 66173 (Oct. 28, 2015).

[794] 12 U.S.C. 5519.

AdminRecord-000256

in this title . . . shall be construed as modifying, limiting, or superseding the operation of any provision of Federal law, or otherwise affecting the authority of the Board of Governors . . . with respect to a [motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both]." [795] Thus, consistent with this provision, if the motor vehicle dealer is the last financial institution with authority to set the material credit terms of the covered credit transaction, that application will not be reported under subpart B.

Relatedly, several commenters asserted that motor vehicle dealers are prohibited by the Board's Regulation B from asking for protected demographic information in order to furnish it to another financial institution for reporting under the Bureau's rule. As noted above, the Bureau believes that dealers are often the last entity with authority to set the material credit terms of the covered credit transaction, and so are generally unlikely to be collecting 1071 data on behalf of other reporting financial institutions. But even in situations where the dealer is acting as a mere conduit, and thus may be collecting information on behalf of another financial institution, comment 5(a)(2)–3 to the Board's Regulation B states that persons such as loan brokers and correspondents do not violate ECOA or Regulation B if they collect information that they are otherwise prohibited from collecting, where the purpose of collecting the information is to provide it to a creditor that is subject to HMDA or another Federal or State statute or regulation requiring data collection.[796]

The Bureau appreciates the range of potential alternatives raised by commenters as to the entity that should be required to report data when a covered credit transaction involves multiple financial institutions, but is not implementing these alternative suggestions. For the reasons described above, the Bureau believes that the last financial institution with the authority to set the material terms of the covered credit transaction should be the one to report.

The Bureau believes that the final rule is also consistent with arrangements where an online lender partners with a bank and provides further clarity

regarding who reports when multiple financial institutions are involved.

Commenters' concerns regarding reporting of insurance premium financing transactions are rendered moot by the Bureau's exclusion of such transactions from coverage under the rule. See the section-by-section analysis of § 1002.104(b)(3) for additional details.

Regarding farm credit institutions' request that the Bureau clarify that the rule does not apply to credit decisions made after loan approval, the Bureau has made clear in final § 1002.109(a)(3) and associated commentary that only the action taken on the *application* is reportable.

Regarding partial purchase interests and participation loans, as explained in the section-by-section analysis of § 1002.104(b), the Bureau has added commentary to clarify that a partial purchase of a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. The Bureau believes that applications for covered credit transactions will generally be reported by one covered financial institution, *i.e.,* the financial institution that sold portions of the loan to other participants. The examples provided in final comments 109(a)(3)–2.ix and .x speak to such scenarios.

The Bureau further believes that the rule is consistent with loan syndication arrangements where multiple lenders come together to fund a large loan for a single borrower. Syndication is distinguishable from loan participations. In participations, the contractual relationship runs from the borrower to the lead bank and from the lead bank to the participants. In syndications, the borrower signs a loan agreement with multiple creditors, each of whom has a direct contractual relationship with the borrower. Usually, each creditor in a syndicated loan transaction receives its own promissory note from the borrower. In fact, the Farm Credit Administration legally distinguishes between the Farm Credit System's loan-making authority (which includes syndication transactions) and its participation authority.[797] The Bureau believes that syndication is typically used for large commercial projects and a limited number of reportable applications are likely to involve syndicated loans. The Bureau also understands that typical syndication arrangements have a syndicate agent/lead bank. If the lead bank has the last authority to set the material terms of the covered credit

transaction, it has the reporting obligation.

The Bureau also believes that the rule is consistent with lending through Certified Development Companies (CDCs) for SBA loans. CDCs are nonprofit organizations that are certified by, but independent of, the SBA. SBA 504 loans involve two applications— one to a CDC and one to another participating SBA lender. Generally, the transaction begins with the applicant submitting an application to the CDC to obtain approval for up to 40 percent of a project's costs. Once the application is approved by the CDC, the applicant works with another lender—typically a bank—to apply for the other portion of the financing. The other lender's loan typically covers 50 percent of a project's cost and is secured by a first lien, while the CDC's loan covers up to 40 percent of the project's cost and is secured by a second lien. The CDC loan is backed by a 100 percent SBA-guaranteed debenture. The bank earns interest from the debenture, which it receives semi-annually. The borrower contributes equity of at least 10 percent, sometimes up to 20 percent, of the project cost. The CDC and the other lender separately underwrite the loan, and the terms and conditions on the CDC and bank loans may differ. Because both the CDC and the other lender make their own credit decisions on separate covered applications, they are each responsible for reporting the application covering their portion of the financing.

### 109(b) Financial Institution Identifying Information

As explained in the NPRM, beginning in 1989, Regulation C required financial institutions reporting HMDA data to use a discrete transmittal sheet to provide information on themselves separate from the loan/application registers used to submit HMDA data.[798] The 2015 HMDA final rule incorporated information previously submitted on the transmittal sheet into the regulatory reporting requirements.[799] The FFIEC publishes information on financial institutions that report HMDA data in

---

[795] 12 U.S.C. 5519(c).

[796] This language aligns with comment 5(a)(2)–3 in the Bureau's Regulation B, to which the Bureau is adding a reference to subpart B for additional clarity.

[797] *See* 69 FR 8407 (Feb. 24, 2004).

[798] *See* 54 FR 51356, 51361 (Dec. 15, 1989) (requiring financial institutions to use the transmittal sheet and loan/application register in appendix A).

[799] 80 FR 66128, 66526 (Oct. 28, 2015) (deleting appendix A and relocating its substantive requirements to § 1003.5(a)(3)). The information now required by Regulation C includes: (i) the financial institution's name; (ii) the calendar year the data submission covers; (iii) the name and contact information of a person who may be contacted with questions about the institution's submission; (iv) its appropriate Federal agency; (v) the total number of entries contained in the submission; (vi) its Federal taxpayer identification number; and (vii) its Legal Entity Identifier (LEI).

the HMDA Reporter Panel, which includes the required submission information provided by financial institutions under § 1003.5(a)(3), as well as other data derived from this information.[800]

The Bureau proposed to collect similar information regarding financial institutions that report small business lending data. Specifically, proposed § 1002.109(b) would have required that a financial institution provide the following information about itself as part of its submission: (1) its name; (2) its headquarters address; (3) the name and business contact information of a person who may be contacted with questions about the financial institution's submission; (4) its Federal prudential regulator, if applicable; (5) its Federal taxpayer identification number; (6) its LEI; (7) its Research, Statistics, Supervision, and Discount identification (RSSD ID) number, if applicable; (8) its parent institution information, if applicable (including the name, LEI, and RSSD ID number of its immediate parent entity and top-holding parent entity, if applicable); (9) the type of financial institution, chosen from a list provided; and (10) whether the financial institution is voluntarily reporting data.

The Bureau sought comment on its approach to collecting information on financial institutions, including each of the items listed in proposed § 1002.109(b)(1) through (10) as well as whether the Bureau should require the reporting of any other information on financial institutions. The Bureau did not receive any comments on the requirement to provide financial institution identifying information generally, although comments received regarding each of the items listed in proposed § 1002.109(b)(1) through (10), are discussed in turn below. The Bureau also received comments discussing the benefits and privacy risks of financial institution identifying information, which are discussed in part VIII below.

For the reasons set forth herein, the Bureau is finalizing § 1002.109(b) with modifications to move examples regarding when to report changed financial institution identifying information to new comment 109(b)–1 to streamline and ensure uniformity in the guidance, with revisions to § 1002.109(b)(3) to clarify which contact person's information must be provided, and to adjust the list provided in

comment 109(b)(9)–1 based on comments received.

The Bureau believes it is appropriate to require each of these pieces of information regarding financial institutions reporting small business lending data. As a practical matter, the Bureau anticipates that this information will be provided by a financial institution when it initially sets up an account with the Bureau's small business lending data submission platform to allow it to file data as required by the rule. Thus, this information will exist in the Bureau's data submission system and will be updated by the financial institution as needed.

The Bureau believes that collecting a financial institution's name (as well as all the other identifying information in proposed § 1002.109(b)) is necessary to carry out, enforce, and compile data under section 1071, and will aid in fulfilling the purposes of section 1071. For both of section 1071's statutory purposes, the identity of the financial institution taking covered applications and originating covered credit transactions is critical as it will (1) make fair lending enforcement possible, and (2) make analyzing business and community development needs of small businesses more effective.

With the possible exception of the LEI (in final § 1002.109(b)(6) and (8)(ii) and (v)) in certain circumstances, the Bureau believes that financial institutions already have all the information that is required of them under final § 1002.109(b), and that being required to provide this information to the Bureau should not pose any particular difficulties or costs on financial institutions.

Paragraph 109(b)(1)

Proposed § 1002.109(b)(1) would have required a financial institution to provide its name. Regulation C (§ 1003.5(a)(3)(i)) requires financial institutions to provide their names when filing HMDA data, and the Bureau believed that a similar requirement would have been appropriate here.

The Bureau detailed several practical considerations for proposing to require a financial institution to provide its name, including identification for examination purposes and administration of the Bureau's website for data submissions. Additionally, the Bureau noted that it proposed in § 1002.110(c) that financial institutions' statutory obligation to make data available to any member of the public, upon request, pursuant to ECOA section 704B(f)(2)(B) would have been satisfied by the institutions' directing the public

to the Bureau's website for this information. Without the financial institution's name (and other relevant identifying information), proposed § 1002.110(c) would not have satisfied this statutory requirement.

The Bureau received two comments on this aspect of the proposal from community groups, both of which supported § 1002.109(b)(1) as proposed. For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(1) as proposed.

Paragraph 109(b)(2)

Proposed § 1002.109(b)(2) would have required a financial institution to provide the physical address of its headquarters location. The headquarters address of a financial institution would provide geographic information that would aid in fulfilling the statutory purposes of section 1071, including, for instance, analyses of the connection between a financial institution's location and the business and community development needs where it operated. It would also help identify and differentiate financial institutions, particularly nondepository financial institutions, that have similar names.

Having received no comments on this aspect of the proposal and for the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(2) as proposed.

Paragraph 109(b)(3)

Proposed § 1002.109(b)(3) would have required a financial institution to provide the name and business contact information of a person who may have been contacted with questions about the financial institution's data submission. The Bureau noted that Regulation C includes a similar requirement in § 1003.5(a)(3)(iii), and the Bureau believed it would have been appropriate to require such information here. In general, the Bureau found, from its experience with HMDA and Regulation C, that requiring the name and business contact information of a person who may have been contacted with questions generally facilitated communication in the event that follow-up on a submission is required.

Having received no comments on this aspect of the proposal and for the reasons set forth herein, the Bureau is generally finalizing § 1002.109(b)(3) as proposed. However, the Bureau is revising final § 1002.109(b)(3) to make clear that the contact reported is a person responsible for responding to Bureau or other regulator inquiries about the submission, rather than inquiries from the general public.

---

[800] *See, e.g.,* Fed. Fin. Insts. Examination Council, *HMDA Public Panel, https://ffiec.cfpb.gov/documentation/2017/panel-data-fields/* (last visited Mar. 20, 2023).

**Paragraph 109(b)(4)**

Proposed § 1002.109(b)(4) would have required a financial institution that is a depository institution to provide the name of its Federal prudential regulator, if applicable. Proposed comment 109(b)(4)–1 would have explained how to determine which Federal prudential regulator (i.e., the OCC, the FDIC, the Board, or the NCUA) a financial institution should report. Proposed comment 109(b)(4)–2 would have provided guidance on when a financial institution would be required to report a new Federal prudential regulator, for instance, in the event of a merger or a change of charter.

The Bureau noted that Regulation C includes a similar provision in § 1003.5(a)(3)(iv), requiring financial institutions to identify the appropriate Federal agency. In the Regulation C context, the purpose of this requirement is to identify the agency to which a financial institution must report its HMDA data—often the financial institution's Federal prudential regulator for depository institutions.[801] For small business lending data, the Bureau believed a requirement to report a financial institution's Federal prudential regulator would be appropriate for different reasons. The reporting of a financial institution's Federal prudential regulator would enable analysts to more easily identify other information about a financial institution that its Federal prudential regulator makes publicly available, such as Call Report data; further, such additional data may be used by regulators to perform analyses of the characteristics of financial institution's data. Nondepository institutions generally do not have Federal prudential regulators and would not have reported one under this requirement.[802]

Having received no comments on this aspect of the proposal and for the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(4) as proposed, but has moved the example in proposed comment 109(b)(4)–2 to new comment 109(b)–1.

**Paragraph 109(b)(5)**

Proposed § 1002.109(b)(5) would have required a financial institution to

provide its Federal taxpayer identification number (TIN). Proposed comment 109(b)(5)–1 would have explained when a financial institution should report a new Federal TIN in the event that it obtained a new Federal TIN (for instance, because the financial institution merged with another financial institution and adopted the Federal TIN of the other financial institution). The Bureau noted that Regulation C § 1003.5(a)(3)(vi) requires financial institutions to report Federal TIN with their HMDA submissions, and the Bureau believed such a requirement would be appropriate here as well. A financial institution's Federal TIN may be used to identify other publicly available information on a financial institution, and combined with a financial institution's small business lending application register to enhance the types of analysis that can be conducted to further the two statutory purposes of section 1071.

Having received no comments on this aspect of the proposal and for the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(2) as proposed, but has moved the example in proposed comment 109(b)(5)–1 to new comment 109(b)–1.

**Paragraph 109(b)(6)**

Proposed § 1002.109(b)(6) would have required a financial institution to provide its LEI. Proposed comment 109(b)(6)–1 would have explained what an LEI is and would have made clear that financial institutions that do not currently have an LEI must obtain one, and that financial institutions would have an ongoing obligation to maintain an LEI in order to satisfy proposed § 1002.109(b)(6).

The Bureau explained that an LEI is a unique, 20-digit identifier issued by an entity endorsed or otherwise governed by the Global LEI Foundation. Regulation C requires financial institutions to obtain and use an LEI, which facilitates the analysis of HMDA data and aids in the recognition of patterns by more precisely identifying financial institutions and affiliated companies.[803] The LEI also helps financial institutions that report HMDA data generate the universal loan identifier used to identify application or application-level records in Regulation C. Similarly, in the section 1071 context, a financial institution's LEI would also likely facilitate data

analyses,[804] by helping the Bureau and other stakeholders better understand a financial institution's corporate structure. Proposed § 1002.107(a)(1) would have also required that financial institutions use their LEIs in creating unique identifiers for covered applications. The Bureau believed this, in turn, would result in more sophisticated and useful analyses of the financial institution's data.

The Bureau received a few comments on this aspect of the proposal. These commenters were supportive of proposed § 1002.109(b)(6), agreeing with the Bureau's assertion that an LEI would help facilitate analyses. One commenter stated that the Bureau needed to ensure data users could identify parent and affiliate connections. The comments also supported requiring financial institutions to provide LEI information, stating that it would be consistent with HMDA, as discussed in the proposal.

For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(6) as proposed. Regarding the comment requesting the Bureau make identification of parent and affiliate connections easier, the Bureau notes that it is requiring LEI information in part for this reason, as discussed in the proposal. As explained in comment 109(b)(6)–1, financial institutions are required to report the current LEI number, and if the financial institution does not currently possess one, to obtain one. Financial institutions also have an ongoing obligation to maintain their LEI number. As part of maintaining an LEI number, a financial institution must make sure the LEI number and associated information are current, including any relationship data. The Bureau believes that publication of a financial institution's LEI, as well as any parent and top parent LEIs, as applicable, will allow data users to identify these relationship connections.

**Paragraph 109(b)(7)**

Proposed § 1002.109(b)(7) would have required a financial institution to report its RSSD ID number, if applicable. The Bureau explained that an RSSD ID is a unique identifying number assigned to institutions, including main offices and branches, by the Federal Reserve System. All depository institutions know and regularly report their RSSD ID numbers on FFIEC regulatory forms. The Bureau believed that an RSSD ID would help data users link the data for

---

[801] 12 U.S.C. 2803(h).

[802] Additionally, while some nondepository institutions have Federal regulators, those Federal regulators may not meet the definition of Federal prudential regulator provided in comment 109(b)(4)–1 and this data point still may not be applicable. For example, while Farm Credit System institutions are regulated and supervised by the Farm Credit Administration, the Farm Credit Administration is not a Federal prudential regulator as defined in comment 109(b)(4)–1.

[803] 80 FR 66128, 66248 (Oct. 28, 2015) (noting that, despite the cost, the Bureau believed that the benefit of all HMDA reporters using an LEI justified the associated costs by improving the ability to identify the financial institution reporting the data and link it to its corporate family).

[804] Id. ("By facilitating identification, this requirement will help data users achieve HMDA's objectives of identifying whether financial institutions are serving the housing needs of their communities, as well as identifying possible discriminatory lending patterns.").

AdminRecord-000259

a particular financial institution to other regulatory data, including the connections between a particular financial institution with other financial institutions. The Bureau believed that this additional information would result in more sophisticated and useful analyses of the financial institution's small business lending data.

Proposed comment 109(b)(7)–1 would have explained what an RSSD ID number is and how financial institutions that have one might find it. Financial institutions that do not have RSSD IDs, typically nondepository institutions, would not have been required to obtain them, and would report "not applicable" in that field.

The Bureau received one comment from a community group supporting this aspect of the proposal. For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(7) as proposed.

Paragraph 109(b)(8)

Proposed § 1002.109(b)(8) would have required a financial institution to provide certain information on its parent entities, if applicable. This information would have included the name, the LEI (if available), and the RSSD ID (if available) of the financial institution's immediate parent entity and the financial institution's top-holding parent entity.

Proposed comments 109(b)(8)–1 and –2 would have provided guidance on how to identify a financial institution's immediate parent entity and a financial institution's top-holding parent entity. Proposed comment 109(b)(8)–3 would have explained that a financial institution would have reported its parent entities' LEIs if they have them, but that no parent entity would be required to obtain an LEI if it did not already have one. Proposed comment 109(b)(8)–4 would likewise have explained that a financial institution would report its parent entities' RSSD ID numbers if they had them.

In the NPRM, the Bureau explained that it believed that the collection of information on a financial institution's structure would further both of the statutory purposes of section 1071. Data on a financial institution's organizational structure that is self-reported would be more accurate than would be the case if the Bureau attempted to generate such information from publicly available sources.[805]

[805] With respect to HMDA, the Bureau, on behalf of the FFIEC and HUD, does currently attempt to generate and publish information on filers, including parent company and top holder information obtained from the LEI provided. *See* Fed. Fin. Insts. Examination Council, *Public Panel—Data Fields with Values and Definitions,*

The Bureau further explained that better structural information would, for instance, improve the accuracy of peer analyses, which would facilitate fair lending enforcement. The Bureau stated that analyzing trends over time would be useful for identifying institutions that may give rise to fair lending risk. Given structural changes to institutions over time, information that enables the identification of institutions consistently and accurately over time is important to this trend analysis.

In addition, the Bureau believed that information on a financial institution's structure would advance the business and community development purpose of section 1071 by facilitating the analysis of whether and how corporate structure impacts how a financial institution provides access to credit to small businesses. In particular, this structural information could be used to understand how regulation in one part of a corporate structure impacts unregulated entities within the same corporate group.

Proposed § 1002.109(b)(8) would have resulted in more accurate and

*https://ffiec.cfpb.gov/documentation/2021/panel-data-fields/* (last visited Mar. 20, 2023). But the Bureau has encountered difficulties in using the LEI to obtain parent company and top holder information, and thus proposed for this rulemaking to require that it be provided directly by financial institutions.

From 1989 to 1998, Regulation C required financial institutions to report their parent entity information on transmittal sheets. 54 FR 51356, 51361, 51368 (Dec. 15, 1989) (adding the transmittal sheet requirement, including parent institution information, to appendix A to Regulation C); 63 FR 52140, 52141 (Sept. 30, 1998) (stating that the Board believed that the availability of information from the FFIEC website makes the continuation of the requirement for parent company information on the transmittal sheet unnecessary). In 2002, Regulation C again required financial institutions to report parent information on transmittal sheets on the grounds that data users asserted the importance of having the parent institution information associated with the HMDA data itself, rather than in a separate database provided by the National Information Center. 67 FR 7221, 7232 (Feb. 15, 2002).

In the 2014 HMDA NPRM, the Bureau proposed to continue requiring that financial institutions identify their parent companies. The Bureau stated that because information about parent companies was not yet available through the LEI, the Bureau believed it was necessary to maintain this requirement to ensure that financial institutions' submissions can be linked with those of their corporate parents. 79 FR 51731, 51861 (Aug. 29, 2014). However, required reporting of parent company information stopped under the 2015 HMDA final rule on the grounds that once the LEI is fully implemented, parent entity information was expected to become available. 80 FR 66128, 66248 (Oct. 28, 2015) (citing Fin. Stability Bd., LEI Implementation Grp., *Fourth Progress Notes on the Global LEI Initiative,* at 4 (Dec. 11, 2013), *http://www.financialstabilityboard.org/wp-content/uploads/r_121211.pdf?page_moved=1*) (noting that the LEI Implementation Group is developing proposals for additional reference data on the direct and ultimate parent(s) of legal entities and on relationship data more generally).

comprehensive corporate structure information by requiring financial institutions to provide not only the name of one parent entity, but the immediate parent entity of the financial institution as well as the top-holding parent of the financial institution (for some financial institutions, this would be a bank holding company). For the reasons set out above in the section-by-section analyses of § 1002.109(b)(6) and (7), the reporting of LEI and RSSD ID of parent entities would improve the ability of regulators and other stakeholders to map out more precisely and fully the often-complex networks of a financial institution's corporate structure. This more detailed and accurate structural data, in turn, might be used to perform more sophisticated and useful analyses of the financial institution's small business lending data. In addition, this information would have helped the Bureau confirm whether data were appropriately being reported by financial institutions on behalf of their subsidiaries pursuant to proposed § 1002.109(a)(2).

With respect to proposed § 1002.109(b)(8), the Bureau sought comment on whether it should require any other parent entity information to be provided by financial institutions reporting data.

The Bureau received comments on this aspect of the proposal from a community group and a trade association. These commenters were supportive of proposed § 1002.109(b)(8). One commenter supported identifying the parent and top holder parent entities under proposed § 1002.109(b)(8)(i) and (iv). Both commenters supported the inclusion of LEI information for both the parent and top holder parent entities under proposed § 1002.109(b)(8)(ii) and (v). For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(8) as proposed.

Paragraph 109(b)(9)

Proposed § 1002.109(b)(9) would have required a financial institution to report the type of financial institution it is, selecting the applicable type or types of institution from a list in proposed comment 109(b)(9)–1. The comment would also have explained that a financial institution would select all applicable types. The list provided in the proposed comment included: (i) bank or savings association, (ii) minority depository institution, (iii) credit union, (iv) nondepository institution, (v) CDFI, (vi) other nonprofit financial institution, (vii) Farm Credit System institution, (viii) government lender, (ix) commercial finance company, (x) equipment finance company, (xi)

industrial loan company, (xii) fintech, and (xiii) other. Proposed comment 109(b)(9)–2 would have explained that a financial institution reports the type of financial institution as "other" where none of the enumerated types of financial institution appropriately describe the applicable type of financial institution, and the institution reports the type of financial institution as free-form text.

The Bureau believed that information regarding the type of financial institution reporting small business lending data would greatly assist in the analysis conducted by the Bureau and other data users. Information providing further details on types of financial institutions would help advance the statutory purposes of section 1071; fair lending analysts might use this information on the financial institution type (for instance, depository institutions compared to nondepository institutions) as a control variable for their analyses. The inclusion of this information may also assist in an assessment of the business and community development needs of an area as it may provide analysts a means of determining what types of financial institutions serve certain geographic areas.

In addition, the Bureau believed that this information, combined with the parent entity information required by proposed § 1002.109(b)(8), would offer more accurate and granular data on nondepository institutions within the same corporate group as depository institutions. The Bureau noted that, at the time of the NPRM, the National Information Center database, which contains information on the structure of corporate groups that contain banks and other financial institutions, provided little information on nondepository institutions. In connection with proposed § 1002.109(b)(8), information on corporate structure that financial institutions self-report could fill in reporting gaps, including more specific information on financial institution types.

With respect to proposed § 1002.109(b)(9), the Bureau sought comment on whether it should consider removing, modifying, or adding any types of financial institutions to the list in proposed comment 109(b)(9)–1, including in order to manage unique privacy interests (such as, for example, whether a category for captive finance companies that lend to applicants that share the same branding should be included on the list). The Bureau also sought comment on whether it should consider defining any of the types of financial institutions in the proposed

list, in particular whether and how to define the term "fintech."

The Bureau received comments on this aspect of the proposal from several community groups and a software vendor. Generally, these commenters were supportive of proposed § 1002.109(b)(9), though some requested certain modifications. Two commenters stated that the use of "fintech" in the list of financial institution types in proposed comment 109(b)(9)–1 was not a clear descriptor, and that "online lender" would be a better term. One commenter also requested the Bureau make clear that selection of "other" as a type of financial institution does not qualify the financial institution for exemption from coverage of this rule. Additionally, the commenter requested the Bureau make clear that selection of multiple financial institution types from the list provided in proposed comment 109(b)(9)–1 is permitted. Finally, a commenter requested the Bureau require financial institutions to identify the types of products they offer, in addition to the type of financial institution.

For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(9) with a revision in comment 109(b)(9)–1 to replace the financial institution type "fintech" with "online lender" and to add commentary about how the Bureau may add additional financial institution types in the future. The Bureau agrees with commenters that using "online lender" as a financial institution type will help better identify the type of financial institution that is being described rather than "fintech." As commenters noted, "fintech" has a wide variety of uses over different industries. That variety may make it difficult to determine what "fintech" means as a financial institution type and under what circumstances a financial institution must report "fintech" as one of their types. Using "online lender" as the financial institution type helps make clear the financial institution's business model is to conduct business primarily online. For example, an online lender would include a platform or peer-to-peer lender that generally only receives applications and originates loans through a website and that does not have in-person encounters with small businesses, such as accepting applications or having meetings with loan officers, at a physical office. In such a case, the financial institution would select "online lender" as the type of financial institution (in addition to any other applicable financial institution types listed in final comment 109(b)(9)–1).

For similar reasons as those discussed in the section-by-section analysis of § 1002.107(a) regarding the addition of comment 107(a)–4, the Bureau is also adding a comment in § 1002.109(b)(9) to facilitate flexibility and account for the evolution of small business lending market, identifying how the Bureau may add additional financial institution types in the future. Comment 109(b)(9)–3 provides that the Bureau may add additional types of financial institutions via the Filing Instructions Guide and related materials. Comment 109(b)(9)–3 refers financial institutions to the Filing Instructions Guide for any updates for each reporting year.

Regarding commenters' requests for clarity regarding selection of multiple financial institution types, and that selecting "other" does not exempt an institution from coverage under the rule, final comment 109(b)(9)–1 states a financial institution shall select *all* applicable types, confirming that multiple financial institution types should be selected if more than one type applies to the financial institution. Additionally, the Bureau notes that final § 1002.105 addresses institutional coverage under this rule. Financial institution type is not a determinative factor for coverage; in fact, an exempt institution (unless voluntarily reporting data pursuant to §§ 1002.107 through 1002.109 as discussed in comment 105(b)–6) would not be submitting information pursuant to § 1002.109 in the first instance. Final comment 109(b)(9)–2 explains the circumstances for which a financial institution is required, or permitted, to report "other."

Finally, the Bureau does not believe it is necessary to add a requirement for financial institutions to provide their product types as part of the financial institution identifying information, as suggested by one commenter. Section 1002.107(a)(5), as finalized, requires a financial institution to identify the credit type for each application or origination reported. This information, together with the other financial institution identifying information required pursuant to § 1002.109(b), will allow data users to identify the product types offered by each financial institution in the dataset.

Paragraph 109(b)(10)

Proposed § 1002.109(b)(10) would have required a financial institution to indicate whether it was not a covered financial institution under proposed § 1002.105(a) and was thus voluntarily reporting covered applications.

The Bureau believed it was important to be able to specifically identify these

AdminRecord-000261

institutions' transactions in the dataset. If reporting were restricted to only financial institutions required to report, the data would accurately reflect the overall population of financial institutions subject to the final rule. However, institutions that do not meet the rule's loan-volume threshold in proposed § 1002.105(b) could choose to voluntarily report small business lending data pursuant to proposed § 1002.5(a)(4)(vii) through (ix). Those institutions that voluntarily reported data might not be representative of all potential voluntary reporters and might differ from required reporters. Without a specific designation, it might not be possible to distinguish an institution voluntarily reporting data after a single year of exceeding the loan-volume threshold from an institution reporting because it had already exceeded the loan-volume threshold in two consecutive years. The Bureau believed that data users would benefit from being able to use this information as a control variable, resulting in better fair lending as well as business and community development analyses, to account for certain differences that might exist as between required and voluntary reporters.

The Bureau received one comment on this aspect of the proposal from a community group. The commenter supported inclusion of § 1002.109(b)(10), agreeing with the Bureau's assertion that data users will need to identify voluntary reporters. For the reasons set forth herein, the Bureau is finalizing § 1002.109(b)(10) as proposed.

109(c) Procedures for the Submission of Data to the Bureau

Proposed Rule

Proposed § 1002.109(c) and comment 109(c)–1 would have directed financial institutions to a publicly available website containing the Bureau's Filing Instructions Guide, which would have set out technical instructions for the submission of data to the Bureau pursuant to proposed § 1002.109. Regulation C § 1003.5(a)(5) contains a comparable provision, which directs users to a Bureau website that sets out instructions for the submission of HMDA data, and the Bureau believed a similar approach would be appropriate here.

The Bureau sought comment on this aspect of the proposal, including the provision of technical instructions for data submission via a Bureau website and how best to implement the provisions of this section in a manner that minimizes cost and burden

particularly to small financial institutions while implementing all statutory obligations. The Bureau also sought comment on ways it could streamline reporting for small business institutions.

Comments Received

The Bureau received comments from two lenders, several trade associations, and a community group concerning the Bureau's publication of a Filing Instructions Guide to assist lenders in their submission of small business lending data to the Bureau. A CDFI lender and two trade associations supported the publication of technical instructions for data submission in the Filing Instructions Guide, stating that it would greatly aid in complying with the rule. One of these commenters requested that the Bureau dedicate staff to provide answers that can be relied on, such that community banks could not be criticized or penalized during subsequent examinations.

A bank and several trade associations expressed concern about the possible timing for the Bureau's publication of its Filing Instructions Guide, noting the importance of receiving such instructions well in advance such that lenders could comply with the rule and provide accurate and reliable data. Two of these commenters requested that the Bureau release the Filing Instructions Guide at least six months before any required data collection begins.

A trade association inquired whether the Filing Instructions Guide for this regulation would be similar to the one for HMDA and Regulation C, and whether the Bureau would make the Filing Instructions Guide available for comment. A joint letter from community and business advocacy groups suggested that certain data categories for race and ethnicity be contained in the Filing Instructions Guide, so they could be adjusted from time to time to align any changes in the OMB's Federal Data Standards on Race and Ethnicity, rather than being codified in the commentary to this regulation.

Final Rule

The Bureau is finalizing § 1002.109(c) as proposed. The Bureau is developing a system to receive, process, and publish the data collected pursuant to this final rule. In doing so, the Bureau has benefitted from what it learned in its multiyear effort in developing the HMDA Platform, through which entities file data as required under HMDA and Regulation C. As it did in developing the HMDA Platform, the Bureau's ongoing work in developing the small business lending data submission

system focuses on satisfying all legal requirements, promoting data accuracy, and reducing burden. The Bureau is publishing, concurrently with this final rule, a Filing Instructions Guide and related materials for financial institutions.[806] The Bureau does not believe proposed comment 109(c)–1 is necessary as it is duplicative of the regulatory text, and thus has removed it from the final rule.

ECOA section 704B(g)(1) authorizes the Bureau to prescribe rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Section 704B(g)(3) provides for the Bureau to issue guidance to facilitate compliance with the requirements of section 1071. Here, final § 1002.109(c) is justified under both ECOA provisions because the issuance of the means of submitting data to the Bureau are both necessary to compile data pursuant to section 1071 and to facilitate compliance with section 1071.

The Bureau agrees with commenters that the Filing Instructions Guide will significantly facilitate compliance with section 1071. Regarding the request that the Bureau provide staff to answer questions about complying with the rule before the rule's compliance date, Bureau staff will be available after the publication of this final rule to provide guidance to lenders in complying with the rule. The Bureau will make other compliance and technical resources available as well, as described at the end of part I above.

The Bureau notes, in response to the question of whether the Filing Instructions Guide would be similar to the one for HMDA, that many aspects of the Filing Instructions Guide for this regulation are based on the HMDA guide. The Bureau does not believe it is necessary to request public comment on the Filing Instructions Guide, as it is a technical document that reflects the regulatory requirements of § 1002.107 and § 1002.109(b) such that data can be submitted to the Bureau's small business lending data submission platform. However, as with HMDA, various iterations of the Filing Instructions Guide will be published over time with changes based in part on feedback from financial institutions and third-party providers. Regarding the comment that certain data categories for race and ethnicity contained in the Filing Instructions Guide be adjusted from time to time to align any changes in the OMB's Federal Data Standards on

---

[806] See https://www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/.

AdminRecord-000262

Race and Ethnicity, the Bureau recognizes that it may need to adjust some data categories over time, but that the statute may not permit exact alignment with all future developments by another agency that is not itself implementing section 1071.

Other Reporting Issues

With respect to HMDA data, Regulation C § 1003.5(a)(1)(i) provides that a financial institution shall submit its annual loan/application register in electronic format to the appropriate Federal agency. Regulation C does not provide for the submission of HMDA data by unaffiliated third parties directly on behalf of financial institutions in the way that a parent institution may submit HMDA data on behalf of its subsidiary under § 1003.5(a)(2) and comment 5(a)–3. The Bureau understands from financial institutions that report HMDA data to the Bureau that most institutions use third-party software vendors in some way to help them prepare or submit their loan/application registers to the Bureau. The Bureau sought comment on whether it should permit third parties (such as financial software vendors) to submit to the Bureau a small business lending application register on behalf of a financial institution, including whether financial institutions should be required to designate third parties authorized to submit registers on their behalf.

Commenters did not directly address the topic of third-party submissions of small business lending application registers on behalf of financial institutions. One trade association, in the context of proposed § 1002.109, noted that its members rely on third-party vendors for many important business processes, and the contributions of such vendors to support financial institution innovation is important. Industry commenters, including trade associations and lenders, widely noted their reliance on third-party vendors for many important business processes in commenting on other sections of the proposed rule, as is noted, for instance, in the section-by-section analysis of § 1002.114(b). The commenter asked that the Bureau encourage vendors to develop solutions to help financial institution clients comply with section 1071.

The Bureau is finalizing § 1002.109 as proposed. While there is no explicit provision addressing financial institution use of service providers in connection with submission of applicant registers, informed by its HMDA experience, the Bureau is open to such submission, so long as it

complies with all applicable provisions of the final rule, including the restrictions on disclosure of protected demographic data contained in final § 1002.110(e). In addition, the Bureau will continue to engage with vendors and industry to assess future demand for service provider use in this area. Regarding the comment asking the Bureau to encourage third-party solutions to help covered financial institutions comply with section 1071, the Bureau agrees and has engaged in outreach to third-party vendors, as discussed in part III above, since the issuance of the NPRM to facilitate their development of solutions to assist financial institutions in complying with this rule.

*Section 1002.110    Publication of Data*

Final § 1002.110 addresses several issues surrounding publication of small business lending data. First, final § 1002.110(a) addresses annual publication of application-level data on the Bureau's website, subject to modification and deletion decisions by the Bureau based on consideration of privacy interests. Second, final § 1002.110(b) states that the Bureau may compile and aggregate data submitted by financial institutions and may publish such compilations or aggregations as the Bureau deems appropriate. Third, final § 1002.110(c) requires a covered financial institution to publish on its website a statement that its small business lending data, as modified by the CFPB, are or will be available on the CFPB's website. Finally, final § 1002.110(d) provides when a covered financial institution shall make the notice required by final § 1002.110(c) available to the public and how long it shall maintain the notice on its website.

The Bureau is finalizing § 1002.110 to implement ECOA section 704B(f)(2)(B) and (C), which require the Bureau to adopt regulations addressing the form and manner that data are made available to the public, and pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. The Bureau is also finalizing § 1002.110(b) pursuant to 704B(f)(3), which permits the Bureau to compile and aggregate small business lending data, and to publish such aggregate data.

110(a) Publication of Small Business Lending Application Registers and Associated Financial Institution Information

ECOA section 704B(f)(2)(C) requires the Bureau to annually make the small

business lending data it receives from financial institutions available to the public in such form and in such manner as the Bureau determines by regulation.

Proposed Rule

Proposed § 1002.110(a) would have provided that the Bureau shall make available to the public generally the data reported to it by financial institutions pursuant to proposed § 1002.109, subject to deletions or modifications made by the Bureau if the Bureau determines that, based on the proposed balancing test, the deletion or modification of the data would advance a privacy interest.[807] The Bureau proposed to make such data available on an annual basis, by publishing it on the Bureau's website. The Bureau sought comment on its proposed approach to implementing ECOA section 704B(f)(2)(C).

Comments Received

In response to proposed § 1002.110(a), the Bureau received comments from a range of lenders, trade associations, community groups, individual commenters, and others. Many commenters supported the Bureau's proposal to make data available on an annual basis by publishing it on the Bureau's website. Some noted that publication of disaggregated data is critical to achieving the statutory purposes of section 1071. Some commenters indicated the Bureau should make clear that the Bureau *must* publish data annually, citing their concern that any discretion in data publication could allow for inconsistent data publication in the future. A commenter further supported publication on the Bureau's website, stating that it preferred the Bureau as the singular source for published data because it would ensure the data was uniform and consistent in data and publication formats, which would help to prevent obfuscation efforts by bad actors. The commenter noted that, based on their historical experience with HMDA data, without publication on the website, the public would need to request data from each financial institution individually and the data

---

[807] As discussed in part VIII below, the Bureau is not announcing how it will consider different factors when implementing its discretion to delete or modify application-level data before publication. The Bureau will continue to engage with stakeholders on publication and it intends to make final decisions only after that continued engagement and receipt of a full year of application data. Part VIII lays out the CFPB's preliminary views, in light of comments received on the balancing test articulated in the NPRM, on how to assess and protect privacy interests through modifications and deletion.

AdminRecord-000263

provided may not be in the same file format, may not be in an accessible file format, and the data may have variations in formatting, which could hide data anomalies or patterns of discrimination.

Some commenters opposed publication of disaggregated data entirely, citing various privacy risks, or otherwise preferred the Bureau publish small business lending data only in aggregate form.[808] Some commenters supported publication of disaggregated data publication, but also supported modifications in light of privacy risk.

Commenters also discussed timing of data publication. Some supported annual publication, as proposed. Others requested publication as soon as possible but did not suggest a specific schedule. Two requested quarterly data publication, and one suggested publication every six months. A few commenters requested the Bureau also establish a deadline by which it would annually publish data; some did not suggest a specific deadline while others requested a fall publication deadline, shortly after data are submitted to the Bureau, in order to maximize the data's currency and usefulness.

Many commenters requested the Bureau ensure that published data are accessible to the general public. These commenters noted that the data should be easily searchable or filterable so that anyone with an interest in fair lending can use and understand the data. Some of these commenters noted that data can sometimes be inaccessible if provided in a very technical manner, such that only those with expertise in data analysis can understand and use the data. One commenter suggested that this concern was of particular concern for ethnicity and race data. Additionally, a few commenters pointed to previous Bureau data releases as examples of publication that worked well, such as the consumer complaint database, and those that they would prefer the Bureau not follow, including the current data tool used to publish HMDA data.

Some commenters requested the Bureau add disclaimers or explanations to data fields when the data is published to aid in user understanding about the data, such as data limits, caveats, or exceptions. For example, several commenters requested the Bureau add a disclaimer to data submitted by Farm Credit System lenders identifying their unique statutory coverage limitations and dividend structures. Other commenters requested a disclaimer that identifies when ethnicity, race, and sex data was collected on the basis of visual

observation pursuant to proposed § 1002.107(a)(20). One commenter requested a publication disclaimer for amount of credit applied for and amount of credit approved or originated, that would explain that applicant-provided information can be arbitrary and may not match the amount of credit approved or originated. Another commenter requested that the Bureau include a disclaimer for private label credit because, they said, private label credit should not be compared to other small business credit products because it is based on the availability of the financial institution's retail partners and those partners' geographic locations. Conversely, one commenter requested the Bureau not add any disclaimers to pricing data points on the grounds that they would cause further misunderstanding of the data.

Two commenters suggested the CFPB establish an advisory group to offer advice or it should seek public feedback on ways to improve publication and enhance data accuracy. One commenter asked that it establish an authorization program to certify as "CFPB-approved" particular data products and programs created from 1071 data. Another commenter stated that when publishing the data, the Bureau should ensure that the data are organized by institution and credit product type as a default setting, rather than only by institution, to ensure proper comparison by data users.

*Final Rule*

For these reasons set forth herein, the Bureau is finalizing § 1002.110(a) largely as proposed. As finalized, subject to modification or deletion decisions made by the Bureau to advance privacy interests as discussed in part VIII below, the Bureau has committed itself in § 1002.110(a) to making application-level data available to the public via annual publication. Because publication is subject to any modification or deletion decisions made by the Bureau pursuant to its privacy analysis, the Bureau concludes that § 1002.110(a) itself adequately addresses commenter concerns about privacy risks. As discussed in part VIII, the CFPB is also of the view that application-level data have significant disclosure benefits that will facilitate the fair lending and business and community development purposes of section 1071. This determination strongly supports disclosure of the data in a disaggregated format to the extent consistent with the privacy interests. As a result, the Bureau does not intend to publish only aggregate data compilations pursuant to § 1002.110(b).

Publication of application-level data on an annual basis is appropriate. While a few commenters proposed shorter cycles, the Bureau would not have new data to publish more frequently because, as discussed in the section-by-section analysis of § 1002.109(a), the Bureau is requiring financial institutions to report annually. Further, the Bureau concludes that until it obtains a full year of reported data and performs a full privacy analysis, as discussed in part VIII below, it cannot know with certainty the amount of time it will take to analyze the privacy risks, and make modifications or deletions as needed, particularly for the first publication of application-level data. Accordingly, the final rule does not set a publication deadline.

Because the Bureau is still creating its data publication platform, it takes under advisement commenter concerns about accessibility and ease of use, and will make efforts to be responsive to those comments as the platform and user tools are built. The Bureau is also taking under advisement suggestions on how to organize and display data.

Similarly, the Bureau is taking under advisement requests to make data limitations, such as related to credit or financial institution type, clear to data users. But it does not intend to state that the amount of credit applied for and amount of credit approved or originated may have discrepancies because the applicant underestimated their credit limitations. As discussed in the section-by-section analyses of § 1002.107(a)(7) and (8) above and in the NPRM, there are several other reasons for discrepancy between the amount an applicant applies for and the amount for which they are approved. A disclaimer asserting the discrepancy may be attributable to applicant overconfidence would minimize the serious risk of fair lending concerns that these data points may otherwise identify. For similar reasons, the Bureau does not intend to add disclaimers to pricing data.

Finally, the Bureau notes that while it does not have an advisory group dedicated to small business lending data publication, there are several avenues through which it expects to receive feedback from the public on small business lending data in the future, including the Bureau's Advisory Committees, as well as any regulatory or technical assistance function created for data submitters. The Bureau also intends to pursue continued public engagement, including with respect to its intended privacy assessment and associated modification and deletion decisions, as discussed in part VIII below. Further, the Bureau will not

---

[808] *See also* part VIII below.

AdminRecord-000264

approve or endorse any particular entity's use of or republication of data, although entities may use and republish the data once it is made available in the public domain pursuant to this rule. Because the statutory purposes and noted benefits of data publication (as discussed herein) include providing information to the public to identify and address fair lending issues in the small business lending market, the Bureau encourages data users to analyze the data to address the statutory purposes. It also encourages technologists to develop tools to assist in this analysis.

110(b) Publication of Aggregate Data

ECOA section 704B(f)(3) provides that the Bureau may "compile and aggregate data collected under this section for its own use" and "make public such compilations of aggregate data."

Proposed § 1002.110(b) would have provided that the Bureau may compile and aggregate data submitted by financial institutions pursuant to proposed § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate. The proposal explained that publication of certain such compilations and aggregations would provide useful data to the public to supplement the Bureau's publication of application-level data. In particular, the Bureau noted the importance of providing aggregations for the application-level data fields that may be modified or deleted before publication to protect privacy interests.

The Bureau received comments on this aspect of the proposal from several community groups, business advocacy groups, and a software provider. These commenters were supportive of proposed § 1002.110(b), though some requested modifications. Several commenters requested the Bureau make specific aggregations available, based on their experience with HMDA or for specific user purposes. Additionally, two commenters requested that the Bureau commit to annual publication of aggregate data.

For the reasons set forth herein, the Bureau is finalizing § 1002.110(b) as proposed. It is unnecessary for the rule to commit to specific timing for publication of aggregate data or to identify the specific aggregations that it will make available. ECOA section 704B(f)(3) provides the Bureau discretion to compile and aggregate data collected, and to make those aggregations publicly available. Any aggregations compiled using the data collected will be dependent on multiple factors, including privacy considerations, the volume of data, and

the trends in the data received. For these reasons, the Bureau believes it is important to preserve flexibility as to both the content and timing of any aggregate data publications, although it anticipates publishing aggregate data before releasing application-level data.

110(c) Statement of Financial Institution's Small Business Lending Data Available on the Bureau's Website and 110(d) Availability of Statements

Proposed Rule

ECOA section 704B(f)(2)(B) requires that the data compiled and maintained by financial institutions shall be "made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau."

Proposed § 1002.110(c) would have required that a covered financial institution make available to the public on its website, or otherwise upon request, a statement that the covered financial institution's small business lending application register, as modified by the Bureau pursuant to proposed § 1002.110(a), is or will be available on the Bureau's website.

Proposed § 1002.110(c) would have also stated that a financial institution shall use language provided by the Bureau, or substantially similar language, to satisfy this requirement to provide a statement. Proposed comment 110(c)–1 would have provided model language that a financial institution could use to comply with proposed § 1002.110(c). Proposed comment 110(c)–2 would have provided guidance to financial institutions that do not have websites.

Proposed § 1002.110(d) would have provided that a covered financial institution shall make the notice required by proposed § 1002.110(c) available to the public on its website when submitting its small business lending application register to the Bureau pursuant to proposed § 1002.109(a)(1), and shall maintain the notice for as long as it has an obligation to retain its small business lending application registers pursuant to proposed § 1002.111(a).

The Bureau sought comment on its proposed approach to implementing ECOA section 704B(f)(3), including how best to implement proposed § 1002.110(c) and (d) in a manner that minimizes cost and burden particularly on small financial institutions while implementing all statutory obligations.

Comments Received

In response to proposed § 1002.110(c) and (d), the Bureau received comments

from a number of lenders, trade associations, and community groups, along with one individual commenter. A majority of those commenters supported the proposed approach to making financial institutions' data available to the general public on the Bureau's website, citing reasons including reduction of compliance burden, cost, and redundant data. However, a few commenters argued that covered financial institutions should be required to make their data available on their own websites. One such commenter asserted that financial institutions (particularly large banks) should be required to make their data available within 30 days of a request to do so, which they stated has worked well for HMDA.[809] This commenter also stated that if the Bureau were to adopt proposed § 1002.110(c), it should require quarterly public data reporting. An individual commenter suggested that without a requirement that financial institutions release their own data, the public would have no way to confirm the "legitimacy" of data released by the Bureau.

Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.110(c) with a minor modification and § 1002.110(d) as proposed, to implement ECOA section 704B(f)(2)(B). The Bureau's revision to § 1002.110(c) removes the specific URL at which the Bureau will publish 1071 data on its website. The Bureau has made several small revisions to the notice language set forth in comment 110(c)–1 for clarity. The Bureau is also adopting new comment 110(c)–3 to explain that the Bureau may modify the location specified in the notice language provided in comment 110(c)–1, at which small business lending data are available, via the Filing Instructions Guide and related materials.

The approach set forth in final § 1002.110(c) and (d) will reduce potential burdens on financial institutions associated with publishing modified data. It will also reduce privacy risks resulting from errors by individual financial institutions implementing any modifications or deletions required by the Bureau, and would be more efficient overall. Regulation C (§ 1003.5(c)(1)) implements a similar statutory requirement regarding the form of data reporting and requires financial institutions to direct any public requests

---

[809] The Bureau's approach to § 1002.110(c) aligns with Regulation C § 1003.5(c)(1). However, prior to the 2015 HMDA Amendments, covered financial institutions were required to make their HMDA data available upon request.

for HMDA data they receive to the Bureau. A similar provision is appropriate here to maintain continuity across reporting regimes, and because this centralized approach will help ensure consistent implementation of any modifications or deletions made to protect privacy interests. Commenters' concerns regarding the timing of financial institutions making their own data available are thus rendered moot.

The Bureau does not believe that financial institutions should be required to make their data available within 30 days of a request to do so. Such requests can be fulfilled as easily by accessing small business lending application registers on the Bureau's website, after modifications or deletions are made to protect privacy interests. Nor does the Bureau believe that quarterly public data reporting is appropriate, as discussed in the section-by-section analysis of § 1002.110(a) above. Further, the Bureau does not believe that a requirement that financial institutions release their own data is necessary to confirm the "legitimacy" of data released by the Bureau. The Bureau will conduct examinations of unredacted small business lending data, and will make application-level data (subject to privacy modifications and deletions) available for review and analysis by members of the public.

110(e) Further Disclosure Prohibited

ECOA section 704B(e) and (f) require financial institutions to compile and maintain records of information provided by applicants and to submit such data annually to the Bureau. However, the statute does not expressly address what a financial institution may do with data collected pursuant to section 1071 for purposes other than reporting such data to the Bureau, nor did the proposal specify restrictions on a financial institution's use or disclosure of data collected pursuant to this rulemaking for purposes other than collecting, maintaining, and reporting such data to the Bureau.

The Bureau received comments from individuals and industry that raised concerns about potential misuse of protected demographic data provided pursuant the small business lending rulemaking. For example, one commenter expressed concern that LGBTQ community members are at risk that their data may be used for unintended and harmful purposes outside of 1071 data collection. Commenters further noted that applicants may be hesitant to provide certain information if the data can be inappropriately used. The Bureau also received comments from industry

commenters urging that protected demographic data be reported directly to the Bureau, stating, in part, that such a regime would likely increase response rates because applicants would not be concerned that financial institutions would improperly use the data.

In order to safeguard protected demographic data against possible misuse and encourage applicant responses, and in response to comments, the Bureau is adding new § 1002.110(e) pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. New § 1002.110(e) prevents misuse of applicants' protected demographic information in two ways.

First, § 1002.110(e)(1) prohibits a financial institution from disclosing or providing to a third party the protected demographic information it collects under subpart B except in limited circumstances. First, a financial institution may disclose such information to a third party to further compliance with ECOA or Regulation B. This exception permits disclosure, for example, to a third-party service provider that is assisting the financial institution in auditing or submitting small business lending data to the Bureau. This exception also permits disclosure to a third party for uses consistent with how such protected demographic information may currently be used under ECOA and Regulation B, such as to conduct internal fair lending testing or to extend special purpose credit programs. Section 1002.110(e)(1) further states that a financial institution may disclose or provide protected demographic information collected pursuant to this rule as required by law.

Second, § 1002.110(e)(2) prohibits further redisclosure of protected demographic information by a third party that initially obtains such information for the purposes of furthering compliance with the ECOA and Regulation B. In such situations, the third party is prohibited from disclosing the protected demographic information except to further compliance with ECOA and Regulation B or as required by law.

*Section 1002.111    Recordkeeping*

Final § 1002.111 addresses several aspects of the recordkeeping requirements for small business lending data. First, final § 1002.111(a) requires a covered financial institution to retain evidence of its compliance with subpart B, which includes a copy of its small business lending application register, for at least three years after the register

is required to be submitted to the Bureau pursuant to final § 1002.109. Second, final § 1002.111(b) requires a financial institution to maintain, separately from the rest of the application and accompanying information, an applicant's responses to the financial institution's inquiries regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, and/or an LGBTQI+-owned business under final § 1002.107(18) and regarding the ethnicity, race, and sex of the applicant's principal owners under final § 1002.107(19). Finally, final § 1002.111(c) requires that, in compiling, maintaining, and reporting data pursuant to final § 1002.109 or § 1002.111(a) or (b), a financial institution shall not include personally identifiable information concerning any individual who is, or is connected with, an applicant.

The Bureau is finalizing § 1002.111 to implement ECOA section 704B(f)(2)(A), which requires financial institutions to compile and maintain data for at least three years; 704B(b)(2), which requires financial institutions to maintain a record of the responses to the inquiry required by 704B(b)(1), separate from the application and accompanying information; and 704B(e)(3), which provides that in compiling and maintaining data, a financial institution may not include personally identifiable information concerning an individual who is, or is connected with, an applicant. The Bureau is also finalizing § 1002.111 pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.

111(a) Record Retention

Proposed Rule

ECOA section 704B(f)(2)(A) requires that information compiled and maintained under section 1071 be retained for not less than three years after the date of preparation. Proposed § 1002.111(a) would have required that a financial institution retain a copy of its small business lending application register for three years after the register is submitted to the Bureau pursuant to proposed § 1002.109. By way of comparison, under Regulation C, financial institutions must retain the loan/application registers that they submit to the Bureau for three years.[810] This reflects the requirement in HMDA itself that a loan/application register be

---

[810] Regulation C § 1003.5(a)(1).

retained for three years after it is made available.[811]

Proposed comment 111(a)–1 would have provided examples of what evidence of compliance with the proposed provision is likely to include. Proposed comment 111(a)–2 would have required that a creditor that is voluntarily, under proposed § 1002.5(a)(4)(vii) and (viii), collecting information pursuant to subpart B but is not required to report that data to the Bureau, complies with proposed § 1002.111(a) by retaining evidence of compliance with subpart B for at least three years after June 1 of the year following the year that data was collected.

The Bureau sought comment on its proposed approach to implementing ECOA section 704B(f)(2)(A), including how best to implement proposed § 1002.111(a) in a manner that minimizes cost and burden particularly on small financial institutions while implementing all statutory obligations.

Comments Received

The Bureau received comments from several lenders, trade associations, and others on this aspect of its proposal. One trade association supported the proposed requirement that financial institutions retain their data for at least three years after submission to the Bureau, noting that this retention period is congruent with the five-year period that banks must maintain data under the Bank Secrecy Act. A CDFI lender agreed the proposal was reasonable and stated that it did not foresee issues with compiling and maintaining data for three years.

A trade association, a business advocacy group and a software vendor recommended that the Bureau instead align the recordkeeping requirement with ECOA's 25-month retention period rather than HMDA's three-year retention period. The software vendor asserted that the proposed provision appeared to be in conflict with ECOA's 12-month record retention period for commercial loans under $1 million. The trade association recommended avoiding requirements that would necessitate the acquisition of costly record retention systems. Another industry commenter said that the proposed provision would unnecessarily burden community banks.

A joint letter from two trade associations recommended that the Bureau expressly state that financial institutions without a reporting obligation under the rule, in particular motor vehicle dealers, are not required to comply with the other obligations in the rule, including the recordkeeping requirements of the rule.

Final Rule

The Bureau is finalizing § 1002.111(a) as proposed. The Bureau is also finalizing the associated commentary with an adjustment as discussed below. The Bureau is finalizing this provision to implement section 1071's recordkeeping requirement as set forth in ECOA section 704B(f)(2)(A).

Regarding commenters' requests that the Bureau should adopt either existing Regulation B's 25-month retention period for consumer credit or its 12-month retention period for business credit, rather than a three-year period, ECOA section 704B(f)(2)(A) mandates that the Bureau adopt a three-year recordkeeping requirement for applications for small business loans. In any case, the Bureau notes that, in contrast to these commenters, at least one lender suggested that § 1002.111(a) was congruent with other recordkeeping requirements applicable to certain extensions of credit.[812] The Bureau is finalizing comment 111(a)–1 (regarding evidence of compliance) with an additional sentence to reiterate that final § 1002.111(a)'s three-year record retention requirement applies to any records covered by § 1002.111(a), notwithstanding the more general 12-month retention period for records related to business credit specified in existing § 1002.12(b). The Bureau is finalizing comment 111(a)–2 (regarding record retention for creditors that voluntarily collect data under § 1002.5(a)(4)(vii) and (viii)) as proposed.

The Bureau acknowledges commenters' concerns that this provision would necessitate the acquisition of costly record retention systems or about its impact on community banks, but does not believe that further adjustments would be appropriate. While financial institutions may incur added expenses in complying with final § 1002.111(a), the provision does not itself require or mandate that lenders must acquire new record systems; the provision simply requires that financial institutions adjust their procedures if they do not already retain certain records for the period specified in § 1002.111(a). In any case, as noted above, final § 1002.111(a) implements the record retention period set forth in the statute.

Regarding the comment concerning the obligations of financial institutions that are not required to report data under the rule, the Bureau agrees that a

financial institution that is not covered by the rule is not subject to its provisions, including the recordkeeping provisions. However, a covered financial institution must keep records in accordance with § 1002.111(a). In order to satisfy its own recordkeeping obligations, a covered financial institution must ensure that it has obtained the necessary records from third parties through which it receives applications or ensure that those third parties keep adequate records on its behalf.

111(b) Certain Information Kept Separate From the Rest of the Application

Proposed Rule

ECOA section 704B(b)(2) requires financial institutions to maintain a record of the "responses to [the] inquiry" required by 704B(b)(1) separate from the application and accompanying information. Consistent with the approach the Bureau is finalizing as set forth in E.2 of the *Overview* to this part V, the Bureau proposed to interpret the term "responses to such inquiry" in 704B(b)(2) to be the applicant's responses to inquiries regarding protected demographic information—that is, whether the applicant was a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners.

Proposed § 1002.111(b) would have stated that a financial institution shall maintain, separately from the rest of the application and accompanying information, an applicant's responses to the financial institution's inquiries to collect data pursuant to proposed subpart B regarding whether an applicant for a covered credit transaction is a minority-owned business under proposed § 1002.107(a)(18) or a women-owned business under proposed § 1002.107(a)(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under proposed § 1002.107(a)(20).

Proposed comment 111(b)–1 would have explained that a financial institution may satisfy this requirement by keeping an applicant's responses to the financial institution's request pursuant to proposed § 1002.107(a)(18) through (20) in a file or document that is discrete or distinct from the application and its accompanying information. For example, such information could be collected on a piece of paper that is separate from the rest of the application form. In order to satisfy the requirement in proposed

---

[811] 12 U.S.C. 2803(j)(6).

[812] *See, e.g.,* 31 CFR 1010.410(a) and 1010.430(d).

AdminRecord-000267

§ 1002.111(b), proposed comment 111(b)–1 would have clarified that an applicant's responses to the financial institution's request pursuant to proposed § 1002.107(a)(18) through (20) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application. However, the financial institution may nonetheless need to keep this information in a different electronic or physical file in order to satisfy the requirements of proposed § 1002.108.

The Bureau sought comment on its proposed approach to implementing ECOA section 704B(b)(2), including how best to implement proposed § 1002.111(b) in a manner that minimizes cost and burden, particularly on small financial institutions, while implementing all statutory obligations. The Bureau also sought comment on whether, for financial institutions that determine that underwriters or other persons should have access to applicants' demographic information pursuant to proposed § 1002.108(b), it should likewise waive the requirement in proposed § 1002.111(b) to keep that information separate from the application and accompanying information.

Comments Received

A number of lenders and trade associations commented on the proposed requirement that protected demographic information be kept separate from application or loan files. A CDFI lender said the proposal was reasonable and did not foresee issues with maintaining demographic information separate from applications. A trade association, while claiming proposed § 1002.111(b) would be difficult to comply with, acknowledged that the provision was mandated by section 1071. Another trade association agreed with the Bureau that ECOA section 704B(b)(2) should be interpreted as referring to applicants' responses to the inquiries regarding minority-owned and women-owned business status in proposed § 1002.107(a)(18) and (19), as well as the ethnicity, race, and sex of applicant's principal owners in proposed § 1002.107(a)(20). A joint letter from two trade associations supported the limitation on accessing protected demographic information but expressed concern about the effort and cost it would take to segregate and limit this information and ensure the accuracy of reports and files that must be maintained. These trade associations suggested that all regulations and guidance related to record retention be consistent with the FTC's newly amended Gramm-Leach-Bliley Safeguards Rule and Privacy Rule.

A trade association and a business advocacy group requested clarifications to improve feasibility and reduce technical challenges, expressing concern that compliance with proposed § 1002.111(b) could require expensive technical solutions to separate protected demographic information from applications in different electronic or physical files. One sought clarity as to what proposed comment 111(b)–1 meant, stating that, to satisfy § 1002.108, some financial institutions may need to keep protected demographic information in a different electronic or physical file.

Some industry commenters opposed the proposal on the grounds of cost, complexity and practicality. A few of these commenters argued that proposed § 1002.111(b) would add unnecessary cost and complexity to compliance and would make audits of data more difficult. Others asserted the provision would be difficult to implement or unworkable. One commenter stated that this requirement would impact small lenders in particular and would increase ongoing costs.

Several industry commenters requested that the Bureau exercise exemption authority to exempt all lenders from having to comply with this provision on the grounds that it would make examinations and audits more cumbersome and costly because demographic information would need to be retrieved from separate files. Commenters also requested that, to remain consistent with proposed § 1002.108(b), the Bureau waive this requirement for financial institutions that determine that underwriters or other persons should have access to applicants' demographic information. They also stated that both provisions were operationally burdensome without any benefit, and that if a firewall was infeasible, so was the proposed recordkeeping provision.

Several industry commenters requested that the Bureau not prohibit the collection of demographic information on the same form as the rest of the application, explaining that such a prohibition would disrupt SBA's 7(a) loan process, and because section 1071 itself does not prohibit including demographic questions on an application form; rather, it requires "recording" the information separately. A bank also that such a prohibition would disrupt loan processes and data integrity audits. Another bank requested that the Bureau not specify that protected demographic information be kept in a separate file, which it said would be costly and burdensome for financial institutions, but rather that the Bureau leave to lenders how to comply with this provision.

A bank and a trade association asserted that proposed § 1002.111(b) was not feasible or necessary, and noted that Regulation C does not require lenders to keep demographic information separate from mortgage loan files. They also asserted that there was no evidence of violations of Regulation B because demographic information was not kept separate from loan files. Another bank requested that the Bureau align the requirements of HMDA and section 1071 by waiving § 1002.111(b) for applications reportable under both regimes.

Final Rule

The Bureau is finalizing § 1002.111(b) with adjustments to reflect updated cross-references to other portions of the final rule and to refer to LGBTQI+-owned businesses along with women- and minority-owned businesses, as per final § 1002.107(a)(18). The Bureau is also finalizing the comment 111(b)–1 with one adjustment as discussed below, and the Bureau is adding a new comment 111(b)–2.

As discussed in detail above in part V.E.2, the Bureau believes the best reading of the statutory provisions that mention the inquiry made under ECOA section 704B(b)(1)—in 704B(b)(2) as well as in 704B(c) regarding the right to refuse and 704B(d) regarding the firewall—is that they refer to applicants' responses to the inquiries regarding protected demographic information: minority-owned, women-owned, and LGBTQI+-owned business statuses in final § 1002.107(a)(18) and the ethnicity, race, and sex of applicants' principal owners in final § 1002.107(a)(19). Each of these data points require financial institutions to request demographic information that has no bearing on the creditworthiness of the applicant. Moreover, a financial institution generally could not inquire about this demographic information absent section 1071's mandate to collect and report the information, and ECOA prohibits a creditor from discriminating against an applicant on the basis of the information. The Bureau accordingly believes that the best effectuation of congressional intent is to apply section 1071's special-protection provisions to this demographic information, regardless of whether the statutory authority to collect it originates in 704B(b)(1) (women-owned business status and minority-owned business status), 704B(e)(2)(G) (race, sex, and ethnicity of principal owners), or

704B(e)(2)(H) (LGBTQI+-owned business status, which is additional data that the Bureau has determined would aid in fulfilling the purposes of section 1071). The Bureau similarly believes that Congress did not intend these special protections to apply to any of the other applicant-provided data points in final § 1002.107(a), which the financial institution is permitted to request whether or not it is covered under section 1071, which are not the subject of Federal antidiscrimination laws, and many of which financial institutions already collect and use for underwriting purposes.

The Bureau does not believe it would be appropriate to modify the statutory requirements implemented in final § 1002.111(b) (or elsewhere in § 1002.111), as requested by some commenters, for consistency with the FTC's newly amended Gramm-Leach-Bliley Safeguards Rule [813] and Privacy Rule.[814] Commenters did not identify any inconsistency between § 1002.111 and the requirements of the Gramm-Leach-Bliley Act.[815] The Bureau notes that the privacy and data security provisions of these rules apply to consumer information, and the Gramm-Leach-Bliley Act defines consumer to mean an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes. The Bureau is finalizing comment 111(b)–1 with updated cross-references to other portions of the final rule and additional text explaining that while § 1002.111(b) does not always require that a financial institution maintain certain information in separate physical or digital files, a financial institution may nonetheless as a practical matter need to keep this information in a different electronic or physical file in order to satisfy the requirements of § 1002.108(b) to establish and maintain a firewall. Final comment 111(b)–1, as revised, is intended to clarify, and facilitate compliance with, the statutory directive that financial institutions must keep certain information separate from the credit application. The Bureau is also adding comment 111(b)–2 to the final rule, which states that a financial institution is permitted to maintain information regarding the applicant's number of principal owners pursuant to final § 1002.107(a)(20) with an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) and (19). The Bureau believes that as a practical matter, the demographic information that financial institutions would have to maintain separately would inherently and necessarily include the applicant's number of principal owners. For example, if an applicant had three principal owners, the separately maintained demographic information would necessarily contain three sets of responses to questions about principal owners' race, sex and ethnicity, even if no part of the separately maintained information explicitly listed "3" as the information responsive to § 1002.107(a)(20).

Regarding comments seeking further clarification of § 1002.111(b) and comment 111(b)–1, the Bureau intended in these provisions to provide financial institutions with flexibility in complying with § 1002.111(b), which some industry commenters favored. The Bureau believes that some commenters overstate the complexity of § 1002.111(b); several appeared to interpret this provision as requiring financial institutions to create separate physical or digital files in all instances. This is contrary to proposed comment 111(b)–1, which explicitly states that the demographic information need not be maintained in a separate electronic system, nor removed from the physical files containing the application. The Bureau's intent was to acknowledge that different lenders may implement § 1002.111(b) in varying ways, depending on how they choose to comply with the firewall requirement. For instance, a lender that complies with § 1002.108(b) may determine that to keep demographic information from underwriters and other employees, it must maintain such information in a separate file from the application, rather than on a separate piece of paper in the same file as the application. However, for those financial institutions that, pursuant to § 1002.108(c), determine it is not feasible to limit access to an applicant's protected demographic information, the Bureau believes that compliance with ECOA section 704B(b)(2), as implemented in § 1002.111(b), does not necessitate maintaining such information in separate files.

Regarding several commenters' request that the Bureau use its exemption authority generally to exempt all lenders from having to comply with § 1002.111(b) and should, in any case, waive the requirement for lenders where the firewall under § 1002.108(b) is infeasible, the Bureau does not believe it would be appropriate to do so. The request for a general exemption appears to be based on the premise that proposed § 1002.111(b) would have required demographic information to be stored in separate files. As explained above, final § 1002.111(b) and final comment 111(b)–1 make clear that there is not a mandate for all financial institutions to maintain protected demographic information in separate files, and the commenters do not explain why financial institutions would choose to maintain separate files for protected demographic information when they have determined that one or more officers or employees should have access to that information.

Regarding the various comments opposing § 1002.111(b) on the grounds of cost, complexity, and feasibility of compliance, the Bureau acknowledges that the provision adds effort and expense to complying with this rule. However, the Bureau believes that comments overstate the magnitude of the costs, complexity, and purported infeasibility of complying with § 1002.111(b). Comment 111(b)–1 provides for flexibility in complying with § 1002.111(b) in retaining records containing demographic information required by section 1071. The commenters addressing the cost, complexity, and feasibility did not identify any less costly, complex, and more feasible methods of compliance, especially for those financial institutions that found it infeasible to maintain a firewall pursuant to § 1002.108(b). In any case, several other commenters, including a lender, agreed with the Bureau that compliance with § 1002.111(b) is feasible.

The Bureau does not believe that § 1002.111(b) would be counterproductive in the conduct of examinations or audits, as suggested by some commenters. As with the comments concerning cost, complexity and feasibility, these comments— assuming the necessity of separate electronic or physical files in all cases— overstate the complexity of § 1002.111(b). As final comment 111(b)– 1 establishes, in many instances, simpler means of separating protected demographic information from other information within an application file would suffice, and, the Bureau believes, would not impede audits or examinations. Further, the Bureau believes that for purposes of complying with ECOA and subpart A of Regulation B, many financial institutions already maintain certain documents in files separate from the application, such as copies of drivers' licenses, that may reveal protected demographic

---

[813] Fed. Trade Comm'n, *Standards for Safeguarding Customer Information*, Final Rule, 86 FR 70272 (Dec. 9, 2021).

[814] Fed. Trade Comm'n, *Privacy of Consumer Financial Information Rule Under the Gramm-Leach-Bliley Act*, 86 FR 70020 (Dec. 9, 2021).

[815] 15 U.S.C. 6801 through 6809.

AdminRecord-000269

information about business applicants' owners, such as race and sex.

The Bureau likewise disagrees with the assertion that § 1002.111(b) is not necessary; this provision implements a statutory requirement in ECOA section 704B(b)(2). In addition, in its interpretation of 704B(b)(2), the Bureau has endeavored to minimize cost and complexity by reading the provision narrowly. Regarding the comment that § 1002.111(b) would impact small lenders in particular and increase ongoing costs, the Bureau does not believe the cost and complexity of small lenders' compliance efforts will necessarily be greater than for other institutions, as discussed in part IX below.

Regarding comments that the Bureau should not prohibit the collection of demographic information on the same form as the rest of the application, the Bureau disagrees. The Bureau interprets ECOA section 704B(b)(2), which § 1002.111(b) implements, to suggest that collection of protected demographic information on separate forms may be a practical necessity. That is, it would be difficult, if not impossible, to determine whether a financial institution had complied with § 1002.111(b), or the firewall provision, if demographic information is collected with the information from which it must be kept separate. This is also illustrated in final comment 107(a)(18)–5.

The Bureau does not believe that § 1002.111(b) would disrupt the SBA's 7(a) loan process, as a commenter suggested—neither § 1002.111(b) nor § 1002.107(a)(18) and (19) affect how demographic information gathered for purposes other than compliance with this final rule are to be collected or retained.

Regarding the request that the final rule mirror HMDA's approach to the collection of demographic information, the Bureau notes that HMDA does not include a requirement comparable to the one in ECOA section 704B(b)(2) mandating the separation of certain information from the application; Regulation C thus permits demographic information required under HMDA to be retained as part of the application.[816] Regarding the claim that no evidence exists of fair lending violations from a failure to separate demographic information separate mortgage files, the Bureau reiterates that § 1002.111(b) implements a statutory requirement in ECOA. Regarding the request to exempt HMDA-reportable loans from complying with § 1002.111(b), the request is mooted by the Bureau's adoption of new

§ 1002.104(b)(2), which excludes HMDA-reportable transactions from the requirements of this final rule.

111(c) Limitation on Personally Identifiable Information Retained in Certain Records Under This Section

Proposed Rule

ECOA section 704B(e)(3) provides that in compiling and maintaining any record of information under section 1071, a financial institution may not include in such record the name, specific address (other than the census tract), telephone number, electronic mail address, or any other personally identifiable information (PII) concerning any individual who is, or is connected with, an applicant.

The Bureau proposed in § 1002.111(c) that in compiling and maintaining any records under proposed § 1002.107 or § 1002.111(b), or reporting data pursuant to proposed § 1002.109, a financial institution shall not include any name, specific address, telephone number, email address, or any PII concerning any individual who is, or is connected with, an applicant, other than as required pursuant to proposed § 1002.107 or § 1002.111(b). The prohibition on the inclusion of PII in ECOA section 704B(e)(3), which covers the ''compiling and maintaining [of] any record of information,'' implicates proposed §§ 1002.107, 1002.109, and 1002.111, which together would address the compilation, maintenance, and reporting of data by financial institutions.

Proposed comment 111(c)–1 would have clarified that the prohibition in proposed § 1002.111(c) applies to data compiled and maintained pursuant to § 1002.107, data in the small business lending application register submitted by the financial institution to the Bureau under proposed § 1002.109, the version of the register that the financial institution maintains under proposed § 1002.111(a), and the separate record of certain information created pursuant to proposed § 1002.111(b).

Proposed comment 111(c)–2 would have addressed the types of information (including PII) that a financial institution is prohibited from including in the data it compiles and maintains pursuant to § 1002.107, in its records under proposed § 1002.111(b), or in data reported to the Bureau under proposed § 1002.109.

Proposed comment 111(c)–3 would have clarified that the prohibition in proposed § 1002.111(c) does not extend to the application or any other records that the financial institution maintains. This comment was intended to address

the request by stakeholders in the SBREFA process that the Bureau clarify that this prohibition does not extend more broadly to a financial institution's application or loan-related files.

Proposed comment 111(c)–4 would have clarified that the prohibition in proposed § 1002.111(c) does not bar financial institutions from providing to the Bureau, pursuant to proposed § 1002.109(b)(3), the name and business contact information of the person who may be contacted with questions about the financial institution's submission.

The Bureau sought comment on its proposed approach to implementing ECOA section 704B(e)(3), including how best to implement this requirement in a manner that minimizes cost and burden, particularly on small financial institutions, while implementing all statutory obligations. Regarding comments by stakeholders in the SBREFA process that reporting small business lending data to the Bureau could give rise to a potential conflict with the data protection and privacy laws prohibiting the disclosure of nonpublic personal information to unaffiliated third parties, the Bureau noted that such laws typically provide an exemption for disclosures made pursuant to Federal and State law.[817]

The Bureau sought comment on whether the requirements in this proposed rule could conflict with other data privacy or data protection laws, and whether the Bureau might need to use its preemption authority under ECOA,[818] Regulation B,[819] and/or section 1041(a)(1) of the Dodd-Frank Act to ensure that financial institutions do not violate State law in reporting 1071 data to the Bureau. The Bureau also sought comment on whether it should include a provision to preempt any State data privacy or data protection laws that would prohibit the collection, maintenance, and reporting to the Bureau of 1071 data. In the SBREFA process before the publication of the proposed rule, some industry

---

[816] See 80 FR 66128, 66192–93 (Oct. 28, 2015).

[817] See, e.g., California Consumer Privacy Act, Cal. Civ. Code 1798.145(a)(1) (noting that the obligations imposed on businesses by CCPA ''shall not restrict a business' ability to . . . comply with federal, state, or local laws''). Some other laws on this topic may apply only to consumers acting primarily for personal, family, or household purposes, but they also provide an exemption for disclosures made pursuant to Federal and State law. See Gramm-Leach-Bliley Act section 502(e)(8), 15 U.S.C. 6802(e)(8), and Regulation P § 1016.15(a)(7)(i) (stating that the limitations on disclosing nonpublic personal information to unaffiliated third parties do not apply if the information is disclosed to comply with Federal, State, or local laws, rules and other applicable legal requirements).

[818] 15 U.S.C. 1691d(f).

[819] Existing § 1002.11.

stakeholders expressed concern regarding a different issue related to data privacy, specifically that reporting 1071 data to the Bureau may cause them to violate other data privacy laws, including State data privacy laws.

### Comments Received

The Bureau received comments on this aspect of the proposal from several lenders and trade associations. A CDFI lender said the proposed provision was reasonable and that it did not foresee an issue with ensuring that the enumerated PII is not connected to the applicant. A trade association stated the Bureau, in proposing this provision, identified a consistent and correct approach to protecting PII. Another trade association said that the Bureau should issue a provision clarifying when PII must be excluded in the compiling and maintaining of any record of information at the different stages in the process.

A bank opposed the proposal, observing that most small community banks correlate documents to a specific borrower and application using PII, and that if the rule prohibited the inclusion of such information on the collection form, there would be no way to tie demographic information to the specific application in order to aggregate and accurately report the data.

A credit union trade association stated that the proposed visual observation and surname data collection requirement for principal owners' ethnicity and race (pursuant to proposed § 1002.107(a)(20)) may expose covered financial institutions to compliance costs related to an evolving patchwork of State personal data privacy laws, including in California, which provides financial institutions only an information-level exemption from its data privacy law.[820]

### Final Rule

The Bureau is finalizing § 1002.111(c) and associated commentary with revisions for clarity. Final § 1002.111(c), and the associated commentary, is intended to implement ECOA section 704B(e)(3), which provides that in compiling and maintaining any record of information under section 1071, a financial institution may not include in such record the name, specific address (other than the census tract), telephone number, electronic mail address, or any other PII concerning any individual who is, or is connected with, an applicant. The Bureau further clarifies in final § 1002.111(c) that it does not interpret ECOA section 704B(e)(3) as prohibiting

a financial institution from including PII in its application or other files, but only the small business lending application register submitted by the financial institution to the Bureau, the copy of the submitted register that is retained for inspection, and the separately maintained record of protected demographic information kept pursuant to § 1002.111(b).

Final § 1002.111(c), along with corresponding passages in the commentary, now states that in reporting a small business lending application register pursuant to § 1002.109, maintaining the register pursuant to § 1002.111(a), and maintaining a separate record of information pursuant to § 1002.111(b), a financial institution shall not include any name, specific address, telephone number, email address, or any other PII concerning any individual who is, or is connected with, an applicant, other than as required pursuant to § 1002.107 or § 1002.111(b). Final § 1002.111(c) and final comment 111(c)–2 now refer to "any *other* personally identifiable information" for the sake of clarity and to better conform with ECOA section 704B(e)(3). Final § 1002.111(c) and associated commentary incorporate several revisions compared to the proposal. First, to address a potential misunderstanding regarding the first cross-reference to § 1002.107 in proposed § 1002.111(c)—as some comments reflected—as to whether a financial institution is prohibited from maintaining PII with not only the small business lending application register but also any other records related to the collection and maintenance of data points specified in § 1002.107, including an application for a covered credit transaction. The Bureau acknowledges the comment that, as drafted, the reference to "compiling and maintaining any records under § 1002.107" in proposed § 1002.111(c) made it unclear exactly what documents, beyond the small business lending application register and the separately maintained demographic information of applicants, are subject to the prohibition on the inclusion of PII.

The Bureau understands that the initial collection of records relevant to the data points specified in § 1002.107 will commence in the normal course of business for financial institutions when they receive a covered application from a small business. At that phase, and during the underwriting of the application, it would be impractical to expect that financial institutions could keep the PII of the individuals associated with an application separate from all of the other information in the

application from which the various data points in § 1002.107(a) could be derived. The Bureau acknowledges comments suggesting that a prohibition on including PII on forms—such as the applicant's name—to tie an application for credit to the separately kept demographic information would likely impede the accurate compiling and reporting of data.

As a result, the Bureau has revised § 1002.111(c) to clarify that financial institutions are prohibited from maintaining certain types of PII in reporting data pursuant to § 1002.109, the provision concerning the creation and maintenance of the small business lending application register. Likewise, final comments 111(c)–1 and 111(c)–2 now refer to the reporting of data pursuant to § 1002.109, rather than the compilation and maintenance of any records pursuant to § 1002.107, to focus on PII associated with the small business lending application register, rather than any records, even those loosely associated with, the data points under § 1002.107.

Second, the Bureau is finalizing § 1002.111(c) and comment 111(c)–2 to refer explicitly to § 1002.111(a) for clarity. Proposed comment 111(c)–1 referred to § 1002.111(a) in prohibiting PII in the copy of the small business lending application register maintained by the financial institution, but proposed § 1002.111(c) and proposed comment 111(c)–2 did not explicitly mention § 1002.111(a). Final § 1002.111(c) and final comment 111(c)–2 have been modified to remedy this omission. If financial institutions are prohibited from including PII not only in the small business lending application register they submit to the Bureau pursuant to § 1002.109, logically they must also be prohibited from including PII in the copy of the register they retain pursuant to § 1002.111(a). The Bureau clarifies in final § 1002.111(c) that it is the Bureau's interpretation that ECOA section 704B(e)(3) should be read as prohibiting lenders from including PII in the small business lending application register submitted to the Bureau pursuant to § 1002.109, and, logically, as requiring lenders to also exclude PII from the copy of this register that a financial institution is required to retain pursuant to § 1002.111(a).

Third, the Bureau is finalizing § 1002.111(c) and comment 111(c)–2 to refer explicitly to § 1002.111(b) earlier in both provisions. Section 1002.111(b) is mentioned towards the end of both proposed § 1002.111(c) and proposed comment 111(c)–2; however, in neither provision is it abundantly clear that the

---

[820] 4 Cal. Civ. Code 1798.145(c).

protected demographic information that lenders must maintain separately from the application pursuant to § 1002.111(b) must itself be free of PII. This lack of clarity is remedied in final § 1002.111(c) and final comment 111(c)–2.

Fourth, the Bureau is finalizing § 1002.111(c) and comment 111(c)–2 to clarify that financial institutions are prohibited from including in the enumerated records certain enumerated types of PII specified in the statute, as well as any other PII. The proposed § 1002.111(c) referred simply to "any" PII (rather than "any other"), which the Bureau believes could have been misinterpreted to suggest that the list of specific items preceding "any" (name, specific address, telephone number, email address) were not themselves forms of PII. As a result, to avoid any potential confusion, in both final § 1002.111(c) and final comment 111(c)–2, the Bureau refers to "any other" PII, which also better conforms with the text of ECOA section 704B(e)(3).

Finally, the Bureau is finalizing comment 111(c)–3 to specify that the prohibition in § 1002.111(c) does not extend to an application for credit, or any other records that the financial institution maintains that are not specifically enumerated in final § 1002.111(c). Proposed comment 111(c)–3 simply noted that § 1002.111(c) did not apply to an application for credit or any other records that the financial institution maintains. The addition of the phrase "that are not specifically enumerated in § 1002.111(c)" is intended to eliminate any uncertainty about the scope of application of § 1002.111(c).

Regarding the comment requesting clarification on whether the prohibition on PII includes different stages in the process of compiling and maintaining any record of information, the Bureau addresses these concerns in final § 1002.111(c), and comments 111(c)–1 and 111(c)–2, as revised, as well as comment 111(c)–3, which is finalized as proposed. Final comment 111(c)–1 specifies the categories of information that § 1002.111(c) applies to, and final comment 111(c)–3 makes clear that the prohibition on PII does not extend to the application or other records that the financial institution maintains beyond the small business lending application register.

Regarding the comment that a prohibition on the inclusion of PII on forms—such as the applicant's name—to tie an application for credit to the separately kept demographic information would impede the accurate aggregation and reporting of data, the Bureau believes that for this specific purpose, other identifiers not involving PII may be used. For instance, the unique identifier data point in § 1002.107(a)(1) is specific to a particular applicant and can be used to tie an application to the separately maintained demographic information for that applicant. By definition and according to comment 107(a)(1)–3, the unique loan identifier may not include PII prohibited by § 1002.111(c).

The concern that the visual observation and surname provision of the proposal would expose covered lenders to compliance costs related to State personal data privacy laws, such as California's, is rendered moot by the Bureau's decision not to finalize its proposal for financial institutions to use visual observation and surname analysis to determine principal owners' ethnicity and race in certain circumstances.

*Section 1002.112    Enforcement*

Final § 1002.112 addresses several issues related to the enforcement of violations of the requirements of proposed subpart B. First, § 1002.112(a) states that a violation of section 1071 or subpart B of Regulation B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA. Second, § 1002.112(b) provides that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. This provision also addresses the maintenance of procedures reasonably adapted to avoid such errors. Third, § 1002.112(c) identifies four safe harbors under which certain errors—namely, certain types of incorrect entries for the census tract, NAICS code, and application date data points, or incorrect determination of small business status, covered credit transaction, or covered application—do not constitute violations of ECOA or Regulation B.

The Bureau is finalizing § 1002.112 to implement sections 704 and 706 of ECOA, pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071 and pursuant to its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate

to carry out the purposes of section 1071.

112(a)    Administrative Enforcement and Civil Liability

Proposed Rule

A violation of section 1071 is subject to the enforcement provisions of ECOA, of which section 1071 is a part. ECOA contains administrative enforcement provisions in section 704,[821] and it provides for civil liability in section 706.[822] The enforcement provisions in existing Regulation B (§ 1002.16(a)(1) and (2)) cross-reference and paraphrase these administrative enforcement and civil liability provisions of ECOA. Proposed § 1002.112(a) would have provided that a violation of section 1071 or subpart B of Regulation B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA, where applicable. The Bureau sought comment on its proposed approach to administrative enforcement and civil liability.

Comments Received

Several lenders and several trade associations commented on the proposed administrative and civil enforcement provisions of the rule. A CDFI lender and two trade associations supported the proposed provision as appropriate and in line with other regulations. Several commenters observed that, with respect to Farm Credit lenders, the Farm Credit Administration examines and enforces compliance with fair lending laws, including compliance with any rule implementing section 1071. A trade association observed that for banks with $10 billion or less in assets, this regulation will be enforced under section 8 of the Federal Deposit Insurance Act by the appropriate Federal banking agency.

One community group asked that the final rule provide for the recording and enforcement of whistleblower complaints in the event that rural farm lenders retaliate against farmers for the good faith exercise of their rights under various Federal consumer protection laws, as protected by ECOA and subpart A of Regulation B. The community group had cited farm loan servicing in particular as an area where minority famers faced the most discriminatory terms and conditions.

One bank opposed the proposed administrative enforcement and civil liability provisions in general. A trade association requested that the Bureau prohibit private causes of action based

---

[821] 15 U.S.C. 1691c.
[822] 15 U.S.C. 1691e.

**35422** **Federal Register**/Vol. 88, No. 104/Wednesday, May 31, 2023/Rules and Regulations

on 1071 data, including discovery in private proceedings. The commenter claimed that the Bureau had overemphasized the use of these data by non-governmental entities such as researchers, economists, industry, and community groups, and that only governmental agencies should have the power to use such data for supervision and enforcement because only they were capable of providing appropriate governance to covered institutions. The same commenter opposed the Bureau's use of such data in its own enforcement and supervision actions because the right of applicants to refuse to provide demographic information would render the data incomplete, unreliable, and inherently inaccurate. The commenter also claimed that the Bureau had not explained how it would acquire data on the broader business credit market, without which accurate decisions on potential violations of fair lending or other laws could not be made.

One trade association requested that the Bureau, and any regulators responsible for implementing section 1071, train examiners well and assign senior staff to examine CDFI banks. The commenter further observed that the small business lending market is mostly unregulated, and requested that the Bureau develop examination capacity to cover currently unregulated lenders such that it should delay implementation until it has the capacity to enforce compliance with section 1071 across all covered lenders. A women's business advocacy group indicated support for auditing by the Bureau to ensure that financial institutions do not alter information to manipulate the data to their benefit. Another trade association asked what underwriting imbalance threshold would cause the Bureau to initiate investigation and enforcement, and how such a process would allow for the mitigation of data anomalies and errors. Finally, one trade association supported and deferred to the views of covered lenders, and other trade associations, and their opinions on the proposed administrative and civil enforcement provisions of the rule.

A trade association said that because small business loans vary widely in design and purpose, use of the same analytical techniques and examination approaches applicable to HMDA's enforcement may yield erroneous results, and that the Bureau must coordinate with other FFIEC agencies, including NCUA, to develop model examination procedures in advance of a final rule. A bank asked that the Bureau limit the use of data by regulators to conduct fair lending exams only, and not to subject financial institutions to

technical audit and compliance requirements, based on its experience with HMDA.

Final Rule

The Bureau is finalizing § 1002.112(a) as proposed. Final § 1002.112(a) is necessary to implement the administrative and civil enforcement provisions of ECOA. A violation of section 1071 is subject to the enforcement provisions of ECOA, of which section 1071 is a part. ECOA contains administrative enforcement provisions in section 704, and it provides for civil liability in section 706. The enforcement provisions in existing Regulation B (§ 1002.16(a)(1) and (2)) cross-reference and paraphrase these administrative enforcement and civil liability provisions of ECOA. The Bureau notes that several commenters, including trade associations to industry, agreed with the Bureau's proposed implementation of the administrative and civil enforcement provisions of ECOA. Regarding the comments noting the role of other statutory regimes in the enforcement of section 1071, the Bureau agrees and notes that the administrative enforcement provisions of ECOA cross-reference the enforcement authority of other Federal regulators, including the agencies mentioned by the commenters.

Regarding the request to record and enforce whistleblower complaints against farm lenders, the Bureau notes that this would be outside of the scope of this regulation, although the commenter correctly notes that retaliation for the good faith exercise of rights under various Federal consumer protection laws could violate ECOA and subpart A of Regulation B.

Regarding the comment opposing § 1002.112(a) in its entirety, the Bureau notes that § 1002.112(a) simply implements, by cross-reference, the existing administrative enforcement and civil liability provisions of ECOA. Regarding a commenter's request that the Bureau prohibit private causes of action, including discovery proceedings, the Bureau is not making such a change as § 1002.112(a) implements, by cross-reference, the existing administrative enforcement and civil liability provisions of ECOA, of which section 1071 is a part. Further, as specified in the preamble to the proposed rule, the Bureau expressed its belief in response to stakeholders' comments on the SBREFA Outline that the administrative enforcement mechanisms under ECOA would be appropriate to address most instances of non-compliance by financial institutions that report small business lending data to the Bureau, based on its experience with Regulation

C and HMDA.[823] Further, other provisions would serve to limit private liability, especially for unintentional errors, including the bona fide error provision of § 1002.112(b) and the various safe harbors in § 1002.112(c).

The same commenter claimed that the proposal overemphasized the use of data by non-governmental entities such as researchers, economists, industry, and community groups, and that only government agencies should have access to these data. However, ECOA section 704B(a) explicitly states that one of the purposes of the statute is to enable communities and creditors to identify business and community needs and opportunities; researchers and economists work at community groups and within industry to assist their analyses in identifying business and community needs. Moreover, the Bureau does not believe the statute's other purpose—facilitating enforcement of fair lending laws—was intended to be limited to enforcement by only governmental entities. Regarding the commenter's claim that only governmental agencies should have the power to use such data for supervision and enforcement because only they are capable of providing appropriate governance to covered institutions, the commenter undercuts this claim by, in the same comment letter, also opposing the Bureau's use of small business lending data in its own enforcement and supervision actions on the grounds that applicants' right to refuse to answer demographic information would render the data incomplete, unreliable, and inherently inaccurate. The Bureau recognizes that the applicant's right to refuse pursuant to 704B(c) may result in a less complete dataset, but compared to the status quo, this rule will result in a vastly expanded dataset on the market for small business credit.

Regarding the varied supervision-related requests for ensuring sufficient examiner training, assigning senior staff to CDFI banks, training for examiners to supervise currently unregulated lenders, and conducting audits to check for the manipulation of data, the Bureau notes that such requests are outside of the scope of this rulemaking; the Bureau establishes supervisory and examination procedures only after a regulation has been finalized, and such procedures will be consistent with the Bureau's existing policies regarding supervision and examinations. The Bureau does not believe it would be appropriate to state, at this time, what would cause the Bureau to initiate investigation and enforcement, and how it would allow

---

[823] 86 FR 56356, 56503 (Oct. 8, 2021).

AdminRecord-000273

for the mitigation of data errors. The Bureau notes, however, that § 1002.112(b) and appendix F establish thresholds for errors in the reporting of data.

Regarding the comment concerning how the Bureau should conduct examinations, the Bureau observes that such comments are outside of the scope of this regulation. In any case, the Bureau agrees that the analytical techniques and examination approaches for HMDA may differ somewhat from the small business credit context, in part because small business credit products differ widely in design and purpose, and the Bureau's supervision and enforcement will reflect this. However, because HMDA as implemented by Regulation C is a data collection regime that shares similar structures and goals as section 1071 and this regulation, including the manner in which HMDA data facilitates fair lending enforcement, the Bureau believes that its experience with HMDA/Regulation C is instructive for this rulemaking and will inform its enforcement and supervisory work. Regarding the comment that the Bureau must coordinate with other FFIEC agencies, including NCUA, to develop examination procedures in advance of a final rule, the Bureau notes that examination procedures normally follow after the publication of a new rule. Regarding the comment that the Bureau should only use the data it receives to conduct fair lending examinations, and not technical compliance examinations, the Bureau does not believe that such a limitation would be appropriate and notes that fair lending examinations are less effective if the underlying data are not accurate; technical compliance examinations help ensure the accuracy of data.

### 112(b) Bona Fide Errors

#### Background

During the SBREFA process, small entity representatives and other industry stakeholders expressed concern about private litigants suing them for non-compliance with the rule.[824] In addition, several small entity representatives requested that the Bureau not assess penalties for the first year of data collection and reporting, as it did following the 2015 HMDA final rule; prior to the compliance date for that rule, the Bureau issued a policy statement announcing it would not seek penalties for errors for the first calendar year (2018) of data collected under the

amended Regulation C.[825] Stakeholders asked the Bureau to emulate that approach for this rulemaking. Other stakeholders expressed concern about the potential consequences of committing what they viewed as technical or inadvertent errors in collecting or reporting data. One financial institution stakeholder suggested that the rule adopt or emulate the good faith error provisions set out in Regulation C, including § 1003.6(b)(1), which provides that an error in compiling or recording data for a covered loan or application is not a violation of HMDA or Regulation C if the error was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. Stakeholders also referred to the existing error-related exemptions in ECOA and Regulation B.[826] ECOA's civil liability provision states that creditors will not be liable for acts done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Bureau.[827]

#### Proposed Rule

Proposed § 1002.112(b) would have provided that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. A bona fide error is not a violation of ECOA or subpart B. A financial institution would be presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose in proposed appendix H. However, an error would not be a bona fide error if either there is a reasonable basis to believe the error was intentional or there is other evidence that the financial institution did not maintain procedures reasonably adapted to avoid such errors.

The Bureau believed that a similar approach to Regulation C, modified and combined with the approach taken by Federal agencies in HMDA examinations, would be appropriate

here. Regulation C § 1003.6(b)(1) provides that an error in compiling or recording data for a covered loan or application is not a violation of HMDA or Regulation C if the error was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. In an examination of a financial institution for compliance with Regulation C, a financial institution may make a certain number of unintentional errors in a testing sample of applications for a given data field in the institution's loan/application register, the HMDA analog to the small business lending application register, before it must resubmit its loan/application register. These tolerance thresholds are based on the number of loans or applications in a loan/application register as set out in the HMDA tolerances table in the FFIEC's Interagency HMDA examination procedures.[828]

The Bureau provided a table of thresholds in proposed appendix H and incorporated it in the bona fide error provision in proposed § 1002.112(b). Under this proposed provision and the table of thresholds in proposed appendix H, financial institutions that report a number of errors equal to or below the applicable thresholds would have been presumed to have in place procedures reasonably adapted to avoid errors; those that report a number of errors above the applicable thresholds would not be presumed to have in place procedures reasonably adapted to avoid errors.

Proposed comment 112(b)–1 would have explained that a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose. Proposed comment 112(b)–1 would also have explained that the Bureau's thresholds appear in column C of the table in proposed appendix H, and that the size of the random sample shall depend on the size of the financial institution's small business lending application register, as shown in column A of the table in appendix H.

Proposed comment 112(b)–2 would have provided that, for purposes of determining bona fide errors under § 1002.112(b), the term "data field"

[824] The small entity representative feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 34–36.

[825] CFPB, *CFPB Issues Public Statement On Home Mortgage Disclosure Act Compliance* (Dec. 21, 2017), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-public-statement-home-mortgage-disclosure-act-compliance/* (noting that the Bureau did not intend to require data resubmission unless data errors were material, or assess penalties with respect to errors for HMDA data collected in 2018 and reported in 2019).

[826] *See, e.g.,* § 1002.16(c).

[827] 15 U.S.C. 1691e(e).

[828] Fed. Fin. Insts. Examination Council, *Interagency Examination Procedures: HMDA* (Apr. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_hmda-exam-procedures_2019-04.pdf.*

generally refers to individual fields, but that, with respect to information on the ethnicity or race of an applicant or borrower, or co-applicant or co-borrower, a data field group may consist of more than one field. Proposed comment 112(b)–2 would have provided that if one or more of the fields within an ethnicity or race field group have errors, they count as one (and only one) error for that data field group.

Proposed comment 112(b)–3 would have provided that an error that meets the criteria for one of the four safe harbor provisions in proposed § 1002.112(c) would not be counted as an error for purposes of determining whether a financial institution has exceeded the error threshold for a given data field.

The Bureau sought comment on its proposed approach to bona fide errors, including whether the tolerance levels in proposed appendix H were appropriate.

Comments Received

The Bureau received comments on this aspect of the proposal from lenders, trade associations, a community group, a women's business advocacy group, and a third-party service provider. Several lenders and trade associations expressed support for the proposed provision on bona fide errors. One trade association also noted that the provision, with a table of thresholds, was broadly consistent with HMDA.

A women's business advocacy group and a community group expressed some concerns about the provision. The trade association understood that the proposal would hold financial institutions harmless for bona fide errors, and encouraged a limit to the number of safe harbors. The community group expressed the concern that the tolerances must not be overly generous because if the rule was too lax, data quality would suffer and the statutory purposes of the rule would be imperiled.

A community group asked the Bureau to clarify that certain types of errors might still prompt an examination or enforcement action even if the number of errors in a sample did not exceed the threshold, citing the example provided by the Bureau in proposed comment 112(b)–1 in which a lender coded withdrawn applications as denials to conceal a potential fair lending deficiency. The commenter asked that the Bureau further spell out these examples so as not to completely overrule the proposed table of tolerances, noting that perhaps extra scrutiny should apply mainly to the action taken categories, revenue size,

and ethnicity, race, and sex data points and fields.

A CDFI lender observed that, as a lender focused on women and minority-owned small businesses, it had noticed discrepancies in self-reporting ethnicity and race, where a minority self-reported as non-minority, and vice versa. The commenter said that this could have serious consequences for non-profit lenders focused on minorities, and that it used software and other relevant information to reconcile ethnicity and race information when possible. The commenter asked if the Bureau recognized this as an issue, and if the Bureau would have an issue with lenders correcting or overriding inaccurate self-reported ethnicity and racial data.

A group of trade associations asked that any errors associated with special lending programs, such as the SBA's Paycheck Protection Program, that would require financial institutions to quickly provide credit to their communities and that involved changing guidance, should not be counted toward the tolerances.

A service provider requested clarification of the "good faith" compliance provision of ECOA, especially what would fall outside of the definition of "good faith" under ECOA's civil liability provision, which provides that "creditors will not be liable for acts done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the CFPB." The commenter also suggested that clarity on this provision would reduce compliance friction, and lenders would feel secure in providing information to the Bureau if they had certainty that the data would not be used against them.

A community group suggested that an example identified in proposed comment 112(b)–2 should constitute two errors, not one, for purposes of the thresholds. The commenter stated that the example involved the Bureau examining a lender's data finding an error in the ethnicity and race fields of the applicant and co-applicant in the same data record, and counting the two errors in the applicant and co-applicant field as only one error.

Final Rule

The Bureau is finalizing § 1002.112(b), associated commentary, as well as appendix F (renumbered from appendix H in the proposal), with minor revisions. The Bureau has revised comment 112(b)–2 slightly by changing references from "data field groups" to "data fields," because the Bureau will not use data field groups as it does in

the HMDA data collection. The Bureau has also revised an example in comment 112(b)–2 to clarify that, regarding the example provided in the comment, one error rather than two would be reported for purposes of the tolerance thresholds.

The Bureau believes that a similar approach to Regulation C, modified and combined with the approach taken by Federal agencies in HMDA examinations, is appropriate here. These tolerance thresholds are based on the number of applications in a register, as set out in the HMDA tolerances table.[829] Accordingly, the Bureau believes that the approach set out in § 1002.112(b), including the accompanying comments and appendix F, is broadly consistent with the approach it has taken for HMDA.[830] The Bureau also believes that this approach addresses the concerns first expressed by stakeholders in the SBREFA process regarding liability for some data reporting errors, especially in the earlier years of reporting, as processes are first being implemented. Moreover, the Bureau believes that this provision will help to ensure the accuracy of the data submitted by requiring the maintenance of appropriate procedures; at the same time, this provision will prevent financial institutions from being subjected to liability for some difficult-to-avoid errors that could drive those institutions from the small-business lending market. Therefore, the Bureau believes this provision is necessary to carry out, enforce, and compile data pursuant to section 1071, as well as necessary or appropriate to carrying out section 1071's purposes.

The Bureau notes that while a handful of commenters expressed concern about this provision, the vast majority approved of the inclusion of the bona fide error provision, even if most criticized the tolerance thresholds, as further described in the section-by-section analysis of appendix F. The Bureau agrees with the comment that expressed its strong support on the grounds that the bona fide error approach was consistent with HMDA.

Regarding the concern that the bona fide error provision might make it harder to hold lenders accountable for data errors, the Bureau acknowledges the potential trade-offs between

---

[829] For HMDA, similar error tolerance thresholds are set forth in the FFIEC's Interagency HMDA examination procedures, rather than in Regulation C itself. Fed. Fin. Insts. Examination Council, *Interagency Examination Procedures: HMDA* (Apr. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_hmda-exam-procedures_201904.pdf.*

[830] *Home Mortgage Disclosure (Regulation C),* 80 FR 66128, 66269 (Oct. 28, 2015).

maximizing data quality and practicability of implementation for lenders, and believes that the tolerances in appendix F strike a reasonable balance between these factors based on the experience of the tolerance thresholds in HMDA. Regarding the request to clarify the types of errors that might prompt regulatory action even if the number of errors in a sample did not exceed the tolerance threshold, the Bureau notes that the example of denials coded as withdrawals in comment 112(b)–1 was merely illustrative; the bona fide error provision is a general standard. Regarding the concerns of erroneous self-reporting of ethnicity or race, the Bureau notes that for purposes of reporting data under this regulation, as specified in § 1002.112(b) and comment 107(a)(19)–1, a financial institution relies on an applicant's self-reporting of ethnicity and race.

The final rule does not include a provision that errors associated with applications and loans associated with emergency or special lending programs such as the Paycheck Protection Program not be counted towards the tolerances, as requested by some commenters. The Bureau appreciates the logistical difficulties that might have been encountered by financial institutions in compiling accurate data associated with the Paycheck Protection Program and the Economic Impact Disaster Loan Program, but believes it is more appropriate to consider guidance in the future tailored to emergency programs as they arise.

Regarding the request to clarify "good faith" in the ECOA provision absolving creditors of liability for "acts done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the CFPB," the Bureau notes that the provision speaks for itself and applies generally to any ECOA violation, not only violations of this regulation. The Bureau does not believe it would be appropriate to state that data collected under this rule would not be used in supervisory or enforcement actions against covered financial institutions, given that one of the statutory purposes of this regulation is the facilitation of fair lending enforcement.

Regarding the comment stating that the example in comment 112(b)–2 should have constituted two errors, not one, for purposes of the thresholds, the commenter referenced the ethnicity and race fields of the applicant and co-applicant in the same data record, but the example did not mention these. In any case, the example in comment 112(b)–2 expresses how the Bureau

intends to treat certain types of errors within data fields.

## 112(c) Safe Harbors

### Proposed Rule

Proposed § 1002.112(c) would have established four safe harbor provisions, providing that certain types of errors would not constitute violations of ECOA or Regulation B. Proposed § 1002.112(c)(1) would have provided a safe harbor for an incorrect entry for census tract obtained by correct use of a geocoding tool provided by the FFIEC or the Bureau. Proposed § 1002.112(c)(2) would have provided a safe harbor for an incorrect NAICS code determined by a financial institution under certain circumstances. Proposed § 1002.112(c)(3) would have provided a safe harbor for the collection of applicants' protected demographic information pursuant to proposed § 1002.107(a)(18) through (20) after an initially erroneous determination that an applicant is a small business. Proposed § 1002.112(c)(4) would have provided a safe harbor for the reporting of an application date that is within three calendar days of the actual application date.

### Comments Received

The Bureau received a number of comments from banks, trade associations, banks concerning the safe harbor provision generally or not addressing the specific safe harbors in (c)(1) to (c)(4). A women's business advocacy group encouraged the Bureau to generally limit the number of safe harbors. Two banks encouraged the general expansion of safe harbors.

Several banks and trade associations requested a general safe harbor from liability applying to data if the financial institution reports what the applicant submitted in the application process, even if that data are incorrect or inaccurate. One bank further asserted that it is burdensome for a financial institution to review each data point for accuracy, and the ability to rely on applicant provided data would limit the corrections needed. A trade association pointed out that under the proposal, lenders may rely on some but not all data provided by applicants, and recommended that the Bureau permit lenders to rely on all data, without verification, in all circumstances.

Two industry commenters suggested that the Bureau adopt a general safe harbor for any data that is reasonably documented, and the financial institution can demonstrate that it has policies and procedures in place to capture the data. Another commenter

recommended a safe harbor setting a reasonableness standard for data collection and/or relying on self-reporting, where lenders are not held liable for the accuracy of the applicant's responses because they are in jeopardy of violating other laws.

A number of commenters suggested more specific safe harbors. Two suggested that the Bureau provide an express safe harbor for applicant-provided data on the applicant's number of workers, § 1002.107(a)(16), and the applicant's time in business, § 1002.107(a)(17). Another suggested that the Bureau provide an express safe harbor for gross annual revenue, § 1002.107(a)(14), asserting that ensuring precision in the data is difficult, often requiring manual review, that the precision of the data does not affect interpretation of data. The bank stated that, for instance, an applicant might report an initial estimate (*e.g.,* $900,000), but that during underwriting, preliminary financials may show a different amount (*e.g.,* $915,000), and audited financials yet another (*e.g.,* $912,000), making it likely that the final number may not be the one reported to the Bureau. To penalize such errors, which the commenter described as immaterial, would, according to the commenter, burden lenders and regulators as well. The bank suggested that the Bureau should institute a 10 percent tolerance for errors made in reporting gross annual revenue. A trade association suggested a safe harbor for when an applicant misidentifies itself as a women- or minority-owned business, which would then cause the lender to ask questions about ethnicity, race, and sex that may be in violation of ECOA. Another trade association asked the Bureau to consider adding a safe harbor related to the feasibility of the firewall, allowing for variations in determining feasibility.

### Final Rule

As described in further detail below, the Bureau is finalizing four safe harbors established in final § 1002.112(c) with modifications. In addition, the Bureau has renumbered the four subsections to be more aligned with the order in the data points these safe harbors address.

The Bureau is finalizing these safe harbors pursuant to its authority under ECOA and as amended by section 1071. ECOA section 703 provides the Bureau the authority to prescribe regulations to carry out the purposes of ECOA, including such adjustments and exceptions for any class of transactions that in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent

AdminRecord-000276

circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. Section 704B(g)(1) provides that the Bureau shall prescribe such rules as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Section 704B(g)(2) authorizes the Bureau to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

The Bureau is not further modifying the safe harbor provisions in response to commenters' requests that the Bureau either generally limit or expand the number of safe harbors. Regarding the request for a safe harbor from liability when a financial institution submits applicant-provided data, the Bureau does not believe a safe harbor is necessary because pursuant to § 1002.107(b) and comment 107(b)–1, financial institutions are already permitted to rely upon applicant-provided data in accord with those provisions. Regarding the comment that it is burdensome for financial institutions to review each data point for accuracy, the Bureau again notes that financial institutions may rely upon applicant-provided data and need not verify such data, subject to the requirements of § 1002.107(b) and comment 107(b)–1. Regarding the comment that the Bureau should permit lenders to report and rely solely on applicant-provided data even when they have verified some of that data for their own business purposes, the Bureau believes that such a safe harbor would result in a reduction of data quality. The Bureau believes that final § 1002.107(b) and comment 107(b)–1 strikes a reasonable balance between data quality and cost and effort incurred by lenders.

Regarding the comment that the Bureau adopt a general safe harbor for any data that is reasonably documented by financial institutions with policies and procedures in place, the Bureau does not believe such a safe harbor would be consistent with the statutory purposes of section 1071. Such a safe harbor would appear to shield a lender from liability even if the data submitted to the Bureau were not accurate, *i.e.,* did not reflect the underlying documentation. Regarding the comment requesting that the Bureau adopt a safe harbor establishing a general reasonableness standard for errors in data reporting, the Bureau does not believe it consistent with the statutory purposes of section 1071 to adopt such an apparently open-ended safe harbor

without further consideration of what the limits to this provision would be. The Bureau believes the bona fide error provision in this final rule will serve the function requested by the commenter's suggested safe harbor in a manner consistent with the statutory purposes of section 1071, for the reasons set out in the section-by-section analysis of § 1002.112(b).

The Bureau does not believe any of the more specific safe harbors suggested by commenters are needed. The Bureau believes that a safe harbor for the number of workers data point is not necessary because final § 1002.107(a)(16) does not require the reporting of a precise numbers of workers, but rather permits the selection of ranges of numbers. Similarly, the Bureau believes that a safe harbor for the time in business data point is not necessary because final § 1002.107(a)(17) does not require the reporting of exact years in business for this data point unless the financial institution already obtains that information for its own purposes.

The Bureau also does not believe that a safe harbor for gross annual revenue is needed, as § 1002.107(a)(14), and comments 107(a)(14)–1 and –2, permit financial institutions to report gross annual revenue in the manner they collect it. The Bureau disagrees, however, with the comment that the precision of the data would not materially affect data analysis. The commenter offered a specific example of discrepancies between different estimates of gross annual revenue that were minor and might not be material; the commenter did not suggest that in practice that the differences between self-reported and verified measures of revenue would consistently be as small as in the example presented. In any case, the commenter did not address whether the time between when an application was submitted and when the financial institution would have to submit the data related to the application to the Bureau was insufficient to arrive at a final gross annual revenue number. Neither does the Bureau agree with the comment offering examples of errors in reporting gross annual revenue would not really impact the overall integrity of the data; based on its experience with other data reporting regimes such as HMDA, the 10 percent error range suggested by the commenter in the reporting of gross annual revenue could be material and impact the integrity of the data the Bureau received.

A safe harbor for when an applicant misidentifies itself as a women-owned or minority-owned business is likewise

not necessary, as financial institutions are required to report business statuses as provided by the applicant, without verification, pursuant to final § 1002.107(a)(18) and comment 107(a)(18)–8. Regarding the request to add a safe harbor related to the feasibility of the firewall, allowing for variations in determining feasibility, the Bureau notes that its implementation of the statutory firewall provision, in § 1002.108, provides financial institutions substantial leeway; as specified in comment 108(c)–1, a financial institution is not required to perform a separate analysis of the feasibility of maintaining a firewall beyond determining whether an employee or officer should have access to an applicant's protected demographic information.

*112(c)(1) Incorrect Entry for Application Date*

Final § 1002.107(a)(2) requires financial institutions to report application date. In the NPRM, the Bureau proposed § 1002.112(c)(4), which would have provided that a financial institution does not violate proposed subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date pursuant to proposed § 1002.107(a)(2). The Bureau sought comment on its proposed approach to this safe harbor.

The Bureau received comments on proposed application date safe harbor from a handful of lenders and trade associations. Most of these commenters generally supported the safe harbor, with one commenter stating that it would reduce the compliance burden of pinpointing an exact application date. A trade association supporting the safe harbor further stated that the application process is fluid and that it should be sufficient for the financial institution to reasonably document the data point and have policies and procedures in place to capture the data. Another trade association stated that the proposed safe harbor is appropriate, but questioned its utility. The commenter noted that it was unclear who or how the "actual" application date would be determined and the proposed definition of a covered application was already flexible and subjective.

Two banks urged the Bureau to change "calendar" days to "business" days in the safe harbor. These commenters stated that they often operate their business seven days a week or may approve requests for credit on non-business days. They argued that business days would allow for

AdminRecord-000277

consistent application of the safe harbor regardless of the date a business applied for credit, retaining only calendar days would mean financial institutions would lose the flexibility afforded by a safe harbor when it is most needed, and that failure to make the change could preempt the ability of financial institutions to provide "off-hour" services. Finally, a couple commenters urged the Bureau to provide additional clarifications, such as examples of how to calculate the safe harbor date range or illustrations in the commentary on how the safe harbor would operate.

The Bureau is finalizing § 1002.112(c)(1) (proposed as § 1002.112(c)(4)) with modifications to provide that a financial institution does not violate ECOA or subpart B if it reports on its small business lending application register an application date that is within three business days of the actual application date pursuant to final § 1002.107(a)(2). The Bureau believes this provision will both ensure the level of accuracy needed for the resulting data to be useful in carrying out section 1071's purposes and minimize the risk that financial institutions will be held liable for difficult-to-avoid errors, which might otherwise affect their participation in the small business lending market. The Bureau therefore believes final § 1002.112(c)(1) is necessary or appropriate to carry out section 1071's purposes pursuant to ECOA section 704(g)(1) and (2).

In response to commenters' concerns that "calendar" days would disadvantage a financial institution that receives applications on non-traditional business days, the Bureau is revising "calendar" days to "business" days. A business day means any day the financial institution is open for business.[831] The Bureau agrees with commenters that the safe harbor should apply equally regardless of which day of the week an application is received. In response to commenters' request for illustrations as to how the safe harbor would work, the Bureau believes the text of final § 1002.112(c)(1) provides sufficient guidance on how to calculate whether a reported date falls within the safe harbor. For example, in accordance with final § 1002.112(c)(1), if a covered application is received by a financial institution on Saturday, January 5, and the financial institution is closed for business on Sunday, January 6, the safe

harbor would apply so long as the financial institution reports an application date that falls between Wednesday, January 2 (three business days preceding the actual date of a covered application) and Wednesday, January 9 (three business days following the actual date of a covered application). Sunday, January 6 does not count as one of the three business days because it was not a business day for the financial institution.

### 112(c)(2) Incorrect Entry for Census Tract

#### Proposed Rule

Proposed § 1002.112(c)(1) would have provided that an incorrect entry for census tract is not a violation of ECOA or this subpart if the financial institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. Regulation C § 1003.6(b)(2) contains a similar provision, and the Bureau believed a similar approach would be appropriate here.

Proposed comment 112(c)(1)–1 would have explained that the safe harbor provision under proposed § 1002.112(c)(1) would not extend to a financial institution's failure to provide the correct census tract number for a covered application on its small business lending application register, as would have been required by proposed § 1002.107(a)(13), because the FFIEC or Bureau geocoding tool did not return a census tract for the address provided by the financial institution. In addition, proposed comment 112(c)(1)–1 would have explained that this safe harbor provision would not extend to a census tract error that results from a financial institution entering an inaccurate address into the FFIEC or Bureau geocoding tool.

The Bureau sought comment on its proposed approach to this safe harbor.

#### Comments Received

Several lenders and trade associations commented on the proposed safe harbor for incorrect census tract. Some commenters supported the safe harbor as proposed; several further requested that the safe harbor also protect the use of reasonable processes to identify and report census tract data where the FFIEC and Bureau tools did not return a census tract. Two commenters requested that the Bureau create an exclusion from census tract reporting when the applicant only provides a P.O. Box or other mailbox that is not connected to a physical address. Another requested, because the Bureau census tract tool is not yet available and because the FFIEC

tool does not permit batch geocoding, that the Bureau extend the safe harbor to include commercially available batch geocoders often found within HMDA and CRA reporting software. One commenter supported the safe harbor but asserted that the safe harbor's usefulness was limited because of the difficulty in proving that a geocoding tool was used correctly. Two commenters requested additional latitude if a census tract is reported for a business where the business has a physical location, even if it is not the business's main address or where loan funds are spent.

#### Final Rule

For the reasons set forth herein, the Bureau is finalizing § 1002.112(c)(2) (proposed as § 1002.112(c)(1)) and comment 112(c)(2)–1 (proposed as 112(c)(1)–1) as proposed. As noted above, Regulation C § 1003.6(b)(2) contains a similar provision, and the Bureau believes a similar approach is appropriate here. Given the number of years that financial institutions have been relying on the FFIEC geocoding tool in the HMDA context, the Bureau believes it is reasonable to similarly permit financial institutions to rely on information provided by a geocoding tool offered by the FFIEC or the Bureau, subject to the caveats in comment 112(c)(2)–1. Additionally, the Bureau believes that this safe harbor will ultimately improve the accuracy of the data submitted by encouraging the use of reliable FFIEC geocoding tools, and preventing financial institutions from being subject to liability for difficult-to-avoid errors that some commenters said could drive those institutions to eschew these useful tools. The Bureau thus believes this provision is necessary to carry out, enforce, or compile data pursuant to section 1071, and necessary or appropriate to carry out section 1071's purposes pursuant to ECOA section 704(g)(1) and (2).

Regarding commenters' request that the safe harbor be adjusted to protect the use of reasonable processes to identify and report census tract data where the FFIEC and Bureau geocoding tools did not return a census tract, or that the Bureau expand the safe harbor to include commercially available batch geocoding tools, the Bureau does not believe that such changes are warranted. Both Regulation C § 1003.6(b)(2) and final § 1002.112(c)(2) permit financial institutions to rely on the accuracy of tools provided by the Federal government when they are able to return a census tract. Where such tools return no census tract at all, financial institutions must rely on other tools,

---

[831] If a financial institution accepts covered applications online at any time, but under its procedures does not actually receive or review the application until the next business day, the mere willingness to accept applications online does not mean the financial institution is open for business seven days a week.

AdminRecord-000278

**35428**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

such as geocoding tools provided by third parties, or must use other means to determine census tract. The Federal government does not review, and therefore cannot verify or take responsibility for, the accuracy of commercially available geocoders.

Similarly, the Bureau is not adopting an exception for situations in which the applicant only provides a P.O. Box or other mailbox that is not connected to a physical address. The "waterfall" reporting method for the census tract data point implements the statutory term "principal place of business." Pursuant to final § 1002.107(c), a financial institution is required to maintain procedures reasonably designed to collect applicant-provided data, which includes an address or location for purposes of determining census tract. Because a P.O. or other mailbox address is generally unrelated to the location of the principal place of business or another location associated with the business, the Bureau expects that in most instances (for its own purposes or as needed to comply with other regulations) a financial institution will attempt to collect an address more suitable for determining the census tract. If the financial institution is unable to do so, it may use a P.O. or other mailbox address for reporting census tract.

Despite the assertion that this safe harbor is limited because of the difficulty in proving that a geocoding tool was used correctly, the Bureau does not believe that changes to the safe harbor would be appropriate. The safe harbor, which the Bureau notes is broader than the one in Regulation C (this safe harbor extends to the Bureau geocoding tool; the one in Regulation C does not), is intended to be narrowly applicable to government-provided geocoding tools. Financial institutions have relied for years on existing geocoding tools, including the FFIEC tool in the HMDA context. The use of the FFIEC tool, and the manner that the Bureau has dealt with any errors derived from the use of the tool, are well established. Thus, the Bureau does not anticipate difficulties identifying whether an error is caused by user error (which would not be protected by the safe harbor) or by the geocoding tool itself (which would be protected). The Bureau does not believe that, as requested by the same commenter, any further latitude is required in the reporting of census tract (*i.e.*, if the census tract is reported for a physical location, even if it is not the business's main address or where the proceeds of the credit applied for or originated will be or would have been principally

applied) for the reasons set out here and in the section-by-section analysis of § 1002.107(a)(13) above.

112(c)(3) Incorrect Entry for NAICS Code

*Proposed Rule*

The Bureau proposed to require financial institutions to collect and report an applicant's 6-digit NAICS code in proposed § 1002.107(a)(15). A financial institution would have been permitted to rely on statements of or information provided by the applicant in collecting and reporting the NAICS code as described in proposed comments 107(a)(15)–3 and –4. The Bureau also proposed a safe harbor, in § 1002.112(c)(2), to address situations where a financial institution does not rely on such information, but instead identifies the NAICS code for an applicant itself and the identified NAICS code is incorrect. Specifically, proposed § 1002.112(c)(2) would have provided that the incorrect entry for that institution-identified NAICS code is not a violation of ECOA or subpart B, provided that the first two digits of the NAICS code are correct and the financial institution maintains procedures reasonably adapted to correctly identify the subsequent four digits.

The Bureau sought comment on its proposed approach to this safe harbor. The Bureau also sought comment on whether requiring a 3-digit NAICS code with no safe harbor would be a better alternative.

*Comments Received*

The Bureau received a number of comments on its proposal to require collection and reporting of a 6-digit NAICS code, as discussed in the section-by-section analysis of § 1002.107(a)(15) above. The Bureau received comments from some lenders and trade associations specifically regarding the related safe harbor in proposed § 1002.112(c)(2). Several industry commenters reiterated their general opposition to the proposed NAICS code data point but asserted that they supported the safe harbor if the Bureau were to require financial institutions to collect and report NAICS code. A trade association stated that as long as the data point reported is reasonably documented and the financial institution can demonstrate it has policies and procedures in place to capture the data, the Bureau should recognize that it is sufficient. A bank and a trade association for online lenders stated that where an institution in good faith reports a NAICS code,

believed to be accurate based on the attestation and information provided by the applicant, but was provided with inaccurate information, a reporting financial institution should not be deemed to be in noncompliance with the regulation. A few commenters asserted that if the Bureau requires NAICS code to be collected, then the Bureau should permit lenders to rely upon applicant statements or codes obtained through the use of business information products as proposed in comments 107(a)(15)–3 and –4.

A few trade associations and a business advocacy group expressed the belief that the safe harbor was insufficient and should be broader. In particular, these commenters asserted that the safe harbor would not apply when the institution relied on the applicant's statement for the NAICS code. A group of trade associations concluded that financial institutions that want to use the safe harbor would be required to try to determine the NAICS code themselves and said that this process would be burdensome and fraught with the risk of inaccuracies.

*Final Rule*

For the reasons set forth herein, the Bureau is finalizing § 1002.112(c)(3) (proposed as § 1002.112(c)(2)) with certain adjustments. As discussed in the section-by-section analysis of § 1002.107(a)(15) above, the Bureau is requiring that financial institutions collect and report a 3-digit NAICS code for the applicant. The Bureau is revising the safe harbor to account for this modification for the required number of digits and to clarify what information the financial institution may rely on in reporting NAICS codes. In addition, while the bona fide error provision in final § 1002.112(b) continues to apply (provided its requirements are met), the Bureau is deleting that language from comment 112(c)–2 for consistency across the safe harbor provisions and because comment 112(b)–3 addresses the issue.

Specifically, final § 1002.112(c)(3) makes clear that an incorrect entry for a 3-digit NAICS code is not a violation of ECOA or subpart B, provided that the financial institution obtained the 3-digit NAICS code by: (i) Relying on an applicant's representations or on an appropriate third-party source, in accordance with § 1002.107(b), regarding the NAICS code; or (ii) identifying the NAICS code itself, provided that the financial institution maintains procedures reasonably adapted to correctly identify a 3-digit NAICS code.

AdminRecord-000279

As discussed above, some commenters believed that the proposed safe harbor would not apply when the institution relied on the applicant's statement for the NAICS code, and as a result financial institutions could be penalized for reporting erroneous NAICS codes provided by applicants and thus may have to re-check such NAICS codes themselves in order to qualify for the safe harbor. Given the provisions in proposed § 1002.107(a)(15) and (b) (finalized in § 1002.107(b) with additional detail) that expressly permitted a financial institution to rely on applicant-provided information in reporting NAICS code, the Bureau did not believe that such a safe harbor was necessary. However, to address commenters' concerns, the Bureau is expressly including NAICS codes provided by applicants or obtained from an appropriate third-party source, in accordance with § 1002.107(b), within the scope of final § 1002.112(c)(3).

The Bureau is adopting this safe harbor pursuant to its statutory authority under section 704B(g)(1) and (2). The Bureau believes that this safe harbor, as revised, is responsive to commenters' concerns about the difficulties in correctly classifying an applicant's NAICS code (whether because the business may change over time, codes may have overlapping definitions, small businesses may not know their NAICS code, or because classifications may otherwise be prone to human error). The Bureau also believes that the safe harbor will help to ensure the accuracy of the data submitted by requiring the maintenance of appropriate procedures when the financial institution is determining an applicant's NAICS code itself; at the same time, the safe harbor prevents financial institutions from being subjected to liability for some difficult-to-avoid errors. Therefore, the Bureau believes final § 1002.112(c)(3) is necessary or appropriate to carry out section 1071 purposes pursuant to ECOA section 704B(g)(1) and (2).

*112(c)(4) Incorrect Determination of Small Business Status, Covered Credit Transaction, or Covered Application*

Proposed Rule

Proposed § 1002.112(c)(3) would have provided that a financial institution that initially determines that an applicant for a covered credit transaction is a small business, as defined in proposed § 1002.106(b), but later concludes the applicant is not a small business, does not violate ECOA or Regulation B if it collected information pursuant to

subpart B regarding whether an applicant for a covered credit transaction is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners. Proposed § 1002.112(c)(3) would further have provided that a financial institution seeking to avail itself of this safe harbor would have to comply with the requirements of subpart B as otherwise required pursuant to proposed §§ 1002.107, 1002.108, and 1002.111 with respect to the collected information.

The Bureau proposed this safe harbor to address situations where a financial institution may otherwise be uncertain about whether it "may obtain information required by a regulation" under existing § 1002.5(a)(2), which could deter financial institutions from complying with the rule implementing section 1071. The Bureau believed that this safe harbor would facilitate compliance with ECOA by eliminating a situation in which a financial institution might be deterred from appropriately collecting applicants' protected demographic information due to the possibility that their understanding of an applicant's small business status might change during the course of the application process.

Proposed § 1002.112(c)(3) would have made it clear that a financial institution seeking to avail itself of this safe harbor must comply with the requirements of subpart B as otherwise required pursuant to proposed §§ 1002.107, 1002.108, and 1002.111 with respect to the collected information. Relatedly, proposed comment 106(b)–1 would have clarified that, in such a situation, the financial institution does not report the application on its small business lending application register pursuant to § 1002.109.

The Bureau sought comment on its proposed approach to this safe harbor.

Comments Received

As set out above in the section-by-section analysis of § 1002.112(c), the Bureau received comments generally supporting all four of the proposed safe harbors, including proposed § 1002.112(c)(3), as well as comments suggesting that the proposed safe harbors were too narrow. With respect to proposed § 1002.112(c)(3) specifically, a CDFI lender and two trade associations supported this safe harbor generally. The trade association further urged the Bureau to allow banks to rely on applicant-provided revenue data in determining whether to collect data pursuant to this regulation. Several other industry commenters, apparently

unaware of proposed § 1002.112(c)(3), requested that the Bureau adopt a safe harbor, in substance, identical to proposed § 1002.112(c)(3). A bank and a business advocacy group suggested that the Bureau adopt a new safe harbor applying to an application for a covered credit transaction where the applicant ultimately accepts a product that is not reportable; the trade association suggested that the collection of data for such applications would not advance the statutory purposes of section 1071.

Final Rule

For the reasons set forth herein, the Bureau is finalizing this safe harbor, renumbered as § 1002.112(c)(4), with revisions. The Bureau has expanded the safe harbor for the reasonable, yet erroneous, collection of demographic data beyond an initial determination that an applicant is a small business, to also cover an initial determination that the application is for a covered credit transaction and that there is a covered application.

Specifically, final § 1002.112(c)(4) provides that a financial institution that initially collects protected demographic data—regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, or a LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners pursuant to final § 1002.107(a)(18) and (19)—but later concludes that it should not have collected such data does not violate ECOA or Regulation B if the financial institution, at the time it collected these data, had a reasonable basis for believing that the application was a covered application from a small business for a covered credit transaction pursuant to §§ 1002.103, 1002.104 and 1002.106. Consistent with the proposal, final § 1002.112(c)(4) further states that a financial institution seeking to avail itself of this safe harbor shall comply with the requirements of subpart B as otherwise required pursuant to §§ 1002.107, 1002.108, and 1002.111 with respect to the collected data. The Bureau is also adopting new comment 112(c)–3 to provide an example of the kinds of errors covered by the safe harbor in final § 1002.112(c)(4).

The Bureau is adopting this safe harbor pursuant to its authority under ECOA sections 703(a), 704B(g)(1), and 704B(g)(2). The Bureau has determined it is appropriate to expand the safe harbor to address other situations which could pose the same challenges to financial institutions as the one addressed by proposed § 1002.112(c)(3). Specifically, the safe harbor as revised addresses several determinations a

financial institution must make as a threshold matter in order to collect applicants' protected demographic data pursuant to the rule: whether an application is reportable pursuant to § 1002.103, for a covered credit transaction under § 1002.104, and from a small business applicant pursuant to § 1002.106.

Comments the Bureau received on the safe harbor in proposed § 1002.112(c)(3), and on the underlying substantive provisions including proposed §§ 1002.103, 1002.104 and 1002.106, suggested that financial institutions need additional leeway in making threshold determinations, particularly when those determinations are based on applicant-provided data that may later change or otherwise turn out to be incorrect. Under existing § 1002.5(a)(2), a creditor may only obtain otherwise protected information if "required by a regulation," or some other express exception applies. Absent this expanded safe harbor, financial institutions may be deterred from appropriately collecting applicants' protected demographic information for fear of running afoul of existing § 1002.5(b) due to the possibility that their understanding of an application— whether the application is for a covered credit transaction, and is from a small business applicant—may change during the course of the application process and so collection of demographic data will no longer be "required by a regulation." The Bureau thus believes that the safe harbor in § 1002.112(c)(3), as revised from the proposal, will facilitate compliance with ECOA and the rule.

The Bureau agrees, as suggested by several commenters, that the safe harbor in proposed § 1002.112(c)(3) may have been too narrow, focused as it was on errors in determining the small business status of an applicant. For the reasons explained herein, the Bureau believes it is appropriate to extend the safe harbor to other threshold determinations: whether an application is reportable at all under § 1002.103 and whether the application in question is for a covered credit transaction under § 1002.104.

Regarding a commenter's request that banks should be allowed to rely on applicant-provided revenue information in deciding to collect demographic data, the Bureau notes that, pursuant to final § 1002.107(b), financial institutions may rely on unverified applicant-provided gross annual revenue (although if the financial institution verifies that information, it must use the verified information instead).

Regarding the same commenter's request to expand the safe harbor to

include any application for a covered credit transaction where the applicant accepts an offer for a financing product that is not reportable, the Bureau does not believe any further expansion of final § 1002.112(c)(4) is warranted. Final § 1002.112(c)(4) addresses the collection of demographic data from a small business that initially applies for a covered credit transaction but, before final action is taken, instead seeks a non-covered transaction, such as a lease.[832] The safe harbor suggested by the commenter, on the other hand, would be unnecessarily broad, reaching a covered application from a small business that accepted a non-covered product after final action has been taken on the covered application for a covered credit product. In such circumstances, the initial decision of the financial institution to collect demographic data on such applications for covered credit transactions was not erroneous and would not have violated ECOA or Regulation B, and thus a safe harbor is not necessary. Further, the commenter did not explain why a safe harbor covering the situations it described would be consistent with the statutory purposes of section 1071, which requires the collection of "*any* application to a financial institution for credit" (emphasis added).

*Section 1002.113   Severability*

Proposed § 1002.113 would have provided that the provisions of subpart B are separate and severable from one another, and that if any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

One trade association said that it had no comments on proposed § 1002.113.

The Bureau is finalizing § 1002.113 with revisions to clarify that applications of provisions are also severable. This is a standard severability clause of the kind that is included in many regulations to clearly express agency intent about the course that is preferred if such events were to occur.

*Section 1002.114   Effective Date, Compliance Date, and Special Transitional Rules*

Final § 1002.114 addresses when the final rule becomes effective and when financial institutions will be required to comply with the rule, as well as how financial institutions can choose to comply with the rule during this transitional period. Final § 1002.114(a) states that this small business lending

data collection rule will become effective 90 days after the final rule is published in the **Federal Register**. Final § 1002.114(b) provides a tiered approach to compliance dates. Specifically, the dates by which covered financial institutions are initially required to comply with the requirements of this rule are specified in four provisions based on the number of covered originations. Compliance with the rule beginning October 1, 2024 is required for financial institutions that originate the most covered credit transactions for small businesses. However, institutions with a moderate transaction volume have until April 1, 2025 to begin complying with the rule, and those with the lowest volume have until January 1, 2026.

Final § 1002.114(c)(1) permits covered financial institutions to begin collecting information pursuant to final § 1002.107(a)(18) through (19) beginning 12 months prior to the compliance date. Final § 1002.114(c)(2) permits a financial institutions that do not have ready access to sufficient information to determine their compliance tier (or whether they are covered by the rule at all) to use reasonable methods to estimate their volume of originations to small businesses for this purpose.

114(a) Effective Date and 114(b) Compliance Date

Background

Section 1071 does not specify an implementation period, though pursuant to ECOA section 704B(f)(1) financial institutions must report data to the Bureau on an annual basis. In the SBREFA Outline, the Bureau noted that it sought to ensure that financial institutions have sufficient time to implement the rule, and stated that it was considering proposing that financial institutions have approximately two calendar years for implementation.[833]

Small entity representative and stakeholder feedback regarding the two-year period for implementation under consideration during the SBREFA process was mixed.[834] Some found the two-year period to be adequate, some requested more time, and a few urged for less. Some provided related feedback about adopting a grace period for data errors in the first year(s) after the rule becomes effective. A fuller discussion of the feedback from small entity representatives and stakeholders on implementation period is included in

[832] See also comment 103(a)–9, which discusses reporting where there is a change in whether there is a covered credit transaction.

[833] SBREFA Outline at 42.

[834] The small entity representative feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 36–37.

AdminRecord-000281

the NPRM and in the SBREFA Panel Report.

Proposed Rule

The Bureau proposed in § 1002.114(a) that its small business lending data collection rule become effective 90 days after the final rule is published in the **Federal Register**. At that time, the rule would become part of the Code of Federal Regulations; this would permit financial institutions to avail themselves of the special transitional rule in proposed § 1002.114(c)(2), discussed below. However, pursuant to proposed § 1002.114(b), compliance with the final rule would not have been required until approximately 18 months after the final rule is published in the **Federal Register**.

The Bureau's proposed approach was a compromise between the two-year implementation period under consideration at SBREFA that a slight majority of stakeholders found acceptable and the shorter one-year implementation period requested by certain stakeholders. The Bureau believed that the statutory purposes of section 1071 are better served by an earlier compliance date that would, in turn, result in earlier publication of data by the Bureau. The Bureau acknowledged the preference of various small entity representatives and other stakeholders for a compliance period of two or more years to comply. The Bureau noted, however, that some small entity representatives and other industry stakeholders said that they could be ready in less than two years. The Bureau agreed with the stakeholders that asserted that a shorter implementation period is preferable given the length of time that has elapsed since the passage of section 1071 of the Dodd-Frank Act.

The Bureau believed that permitting or requiring a partial year collection in the initial year of compliance would further the purposes of section 1071 by expediting the collection and, potentially, the publication of data to be used to further the fair lending and community development purposes of the statute.

The Bureau sought comment on its proposed effective date of 90 days following publication of an eventual final rule and its proposed compliance date of approximately 18 months after the publication of its final rule to implement section 1071. In particular, the Bureau sought comment on which aspects of the Bureau's proposed rule might require more or less time to implement, and ways in which the Bureau could facilitate implementation for small financial institutions,

especially those that have had no experience with other Federal data reporting regimes. The Bureau further sought comment on two alternatives: (a) whether the Bureau should adopt a compliance date of two years after the publication of the final rule; and (b) whether the Bureau should adopt different compliance dates based on the size of a financial institution (*e.g.*, one year for large financial institutions, two years for smaller institutions).

Comments Received

The Bureau received several comments in response to proposed § 1002.114(a). A CDFI lender approved of the proposed effective date of 90 days after **Federal Register** publication of this rule. A joint letter from several trade associations did not object to the 90-day effective date. A business advocacy group requested a that there be no retroactive application of the rule prior to the effective date. They noted that the proposed rule would require numerous complex compliance burdens based on the collection of new data, the establishment of new internal processes, and the development of new systems, and urged the Bureau to clearly explain that the final rule does not apply retroactively, including as to draws made after the effective date on loans made before the effective date.

The Bureau received a large number of comments in response to proposed § 1002.114(b). Several comments supported an 18-month compliance period or requested a shorter period, but the vast majority of comments suggested a longer compliance period, for varied reasons.

*Support.* One community group preferred a 1-year implementation but was satisfied that the Bureau did not provide for a 2-year period as requested by lenders. A trade association offered appreciation that the proposed compliance period reflected consideration by the Bureau for the lenders but still requested a longer compliance period than proposed.

*Requests to publish data quickly and frequently.* A number of commenters urged the Bureau to finalize the rule quickly to collect and publish data as soon as possible. A range of commenters emphasized the urgency of the Bureau implementing this rule carefully and quickly. Two commenters stated that the ongoing failure to collect and publish data harms women-owned and minority-owned small businesses and communities because discriminatory practices are permitted to continue. One also said that the absence of 1071 data would compromise the goals of mission-driven lenders. A joint letter from

community groups and community oriented lenders said that swift implementation was critical for consumers, regulators, and advocates to assess markets given the limited data currently available.

A number of commenters asserted that the Bureau should move quickly to implement the rule, collect and publish data given that more than 10 years have passed since the Dodd-Frank Act required the promulgation of this rule. A minority business advocacy group requested that initial data findings be published as soon as possible, and every six months so that stakeholders can monitor progress and utilize data.

*Less than 18 months.* Several commenters asserted that an 18-month compliance period was too long. Some commenters, including a joint letter community groups, community oriented lenders, and business advocacy groups, requested that the compliance date for this rule be January 1, 2024. Another commenter argued that a one-year period better served the statutory purposes of the rule. Several CDFI lenders stated that mission-based lenders ready to report within 18 months should be permitted to opt-in to report data. A community group suggested that section 1071's statutory purposes are better served by shorter compliance period considering Congress enacted section 1071 in the Dodd-Frank Act in 2010.

*More than 18 months.* A large number of commenters, including lenders, trade associations, and a community group, opposed the proposed compliance date. Many of these commenters asked for a longer compliance period without specifying how much time lenders needed. One commenter stated that even if the final rule were shorter than the NPRM, lenders would need more than 18 months.

*Resources.* Two industry commenters asserted that lenders needed more resources for new data collection and reporting systems to comply. A bank noted that it already faced thin margins and already had to comply with the Financial Accounting Standards Board's Current Expected Credit Losses rule.[835]

---

[835] Off. of the Comptroller of the Currency, Treasury; Bd. of Governors of the Fed. Rsrv. Sys.; and Fed. Deposit Ins. Corp., *Regulatory Capital Rule: Revised Transition of the Current Expected Credit Losses Methodology for Allowances,* Final Rule, 85 FR 61577 (Sept. 30, 2020) (delaying for two years the requirement that banking organizations implement the estimated impact on regulatory capital stemming from the implementation of Accounting Standards Update No. 2016–13, Financial Instruments—Credit Losses, Topic 326, Measurement of Credit Losses on Financial Instruments).

AdminRecord-000282

*Scope and complexity.* Two trade associations claimed that lenders needed more time to understand the scope of the final rule and to apply new processes to various lines of business. One commenter noted that the much of the data to be collected would be novel for lenders.

*Previous experience.* Two lenders requested additional time because of their lack of experience with Federal data collections, such as HMDA or CRA.

*Policies and procedures.* A number of commenters requested more time to develop and/or update policies and procedures for application intake and data collection. Several small lenders asserted that they would have to implement new application processes and adopt new forms. One bank noted that it would have to create formal applications and associated procedures for agricultural or business loans.

*Technology.* A number of commenters identified the need to purchase or upgrade compliance software in support of extending the compliance period. Some banks said they needed time—for some, years—to rewrite core processors to add data points for this rule. Several banks said they needed to automate their small business lending processes, a difficult task with many systems to choose from, review, develop and implement. Several banks asked for more time to buy software from vendors, including time to conduct due diligence, allow vendors to develop systems, test integration with existing systems, and manage vendors. One lender stated that 10 percent of agricultural loans are made using a scoring system called AgScore, which must be re-engineered to support this rule, a costly and time-consuming task.

*Training.* A number of banks said they needed more time to hire new staff and/or train existing employees.

*Other regulations.* Commenters asserted that other comparably complex data collection regulations provided for longer compliance periods. A number of banks and two credit union trade associations noted that the 2015 HMDA rule had a two-year compliance period, and by contrast that this rule is a major regulation covering many different products, requiring even more time for vendors to adapt. Several commenters cited their experience with the TILA/RESPA integrated disclosure rule, which gave two years to comply with updated requirements, as proof that 18 months was not sufficient to comply with this new rule.

*Specific industries.* Different types of lenders requested longer compliance periods for their industries. One commenter stated that 18 months was

insufficient because most mission-based lenders were small, and that compliance would take time and resources. They also suggested that CDFIs unable to meet the 18-month deadline should get more time to comply. Two trade associations claimed that 18 months was insufficient even for larger credit unions, and that most credit unions had to wait for vendors to create compliance products. One commenter requested more time because equipment finance companies are not accustomed to Federal regulators. A commenter requested more time for community banks because they would have to rely on software and vendors, not internal staff.

*Other comments.* One bank claimed that a short deadline would cause unintended errors, leading to actions against the bank. Another bank claimed that compliance costs will increase cost of small business and agricultural lending, affecting customer profitability. A different bank claimed that it needed more time because many borrowers may not have or want to provide this data, and that small business owners require education to be willing to provide data for this rule. Another said rushed implementation would lead to unintended consequences.

*Two years.* Many banks, credit unions, and trade associations requested a two-year compliance period. A joint letter from several trade associations suggested a compliance period starting the January 1, two full years after the calendar year of the effective date. A bank asserted that an 18-month period would make the rule an undue regulatory burden, costly, and not commensurate to any reporting benefit.

*Scope and complexity.* Several industry commenters asserted that lenders needed two years to understand the full scope and complexity of the rule. One argued that two years was warranted because the scope of rule expanded after the SBREFA process, adding additional data points pursuant to ECOA section 704B(e)(2)(H) and a visual observation and surname requirement. The commenter also argued that car dealers face open scope and coverage issues, specifically the involvement of dealers exempt from Bureau rulemaking. One lender asked for more time because the rule is a new regulatory paradigm, applying to multiple credit products and loan systems even within one bank. Another lender justified two years because small businesses need more time to understand the requirements of the final rule.

*Policies and procedures.* Several industry commenters requested two

years to permit lenders to develop and test new policies and procedures.

*Technology.* Some industry commenters requested at least two years to comply to have enough time to deal with all of the steps related to purchasing or upgrading compliance software, including finding and onboarding vendors, conducting due diligence on vendors (some lenders said they were required to vet third parties), integrating compliance software with existing software, testing software, and reconfiguring platforms, all before the compliance deadline. Some noted that no vendors, at the time comments were submitted, offered compliance software for this rule. One bank asked for more time to ensure that their software differentiated between data reported under different overlapping regulations, including CRA, HMDA, and FinCEN's beneficial owner rule. Two industry commenters noted that lenders needed more time to accommodate core providers to adjust and update their software. One bank observed that, by way of example, its core provider only finished software six weeks before the end of the two-year compliance period for the beneficial owner rule.

*Staff and training.* Several lenders said they needed at least two years to adjust staffing and train staff. A number of banks stated that they would need to hire new staff. Some industry commenters stated that lenders would need to train staff on compliance policies as well as new software.

Two industry commenters argued that small financial institutions in particular needed more time. One trade association said that early stage online lenders would be burdened by the rule while seeking to expand access to credit for small businesses. A bank asserted that small banks needed two years because, unlike large banks, vendors and not internal staff would develop compliance systems.

*Other regulations.* Several industry commenters justified a two-year period based on the compliance periods for comparable data collection regulations, including HMDA. One bank said that this rule was no less complex than HMDA and that no less time should be given to comply. Another bank observed that the 2015 HMDA rule justified a two-year period in part on the new time-consuming and complex requirement to collect open-end mortgage data; the bank argued that this rule was also new and complex. Two commenters noted that lenders' experience with HMDA showed how much time was needed to implement new systems, policies, procedures, data privacy, data security, staff training and compliance programs.

AdminRecord-000283

One trade association noted that this rule would be harder for financial institutions with no experience with data reporting regimes such as HMDA.

*Other comments.* A trade association argued that the proposed 18-month period was inconsistent with the two-year period in the SBREFA Outline of proposals under consideration.

*30 months.* Some industry commenters requested at least 30 months to comply with the final rule, for several reasons.

*Scope and complexity.* Several banks asserted that the scope and complexity of the rule warranted a 30-month compliance period. One bank stated that each product had a unique application process and record system, and different personnel. Another bank stated that the rule would result in far-reaching, expensive changes across the bank's many branches, including front and back-end staff. Several banks requested more time because of the strain on dedicated resources. One bank said it needed more time to ensure compliance as to all its products.

*Processes.* Several industry commenters requested 30 months to comply to create or change processes and procedures in response to the rule, including new collection and reporting processes.

*Software.* Some industry commenters requested 30 months to have time to purchase or upgrade software. Several noted that software to comply with this rule does not yet exist. Commenters also noted that vendor management requires time, including conducting third-party due diligence, integrating compliance software with existing software, and training staff on new software. One bank said that 30 months would give vendors time to develop and test solutions, and banks time to evaluate these solutions. One software vendor asserted that vendors needed 30 to 36 months to work with business partners, such as form vendors, to coordinate, make changes, and distribute work to lenders. The commenter noted that it needed lead time to analyze, plan, design, develop, test, document and distribute software changes to its financial institution clients before the compliance date. A bank stated that the collection of new data points would require extensive changes to software for applications, loan processing, core processing, data collection and fair lending, and that each update required testing and training.

Commenters offered specific concerns regarding small lenders and software. One trade association noted that core providers that small banks rely on do not now offer tools to comply with this rule. One bank, not a HMDA filer, expressed that it was at the mercy of its core provider regarding timing and expense. Another bank said it needed more time because it did not have ready access to its vendors because it was small compared to other lenders.

Several industry commenters requested 30 months to have time to hire new staff and/or train existing staff to comply with this rule. One bank noted that such training would involve staff from different areas of the bank, including commercial lending, compliance, underwriting, applications support, and business systems support. A community bank said that it would not have a dedicated team for this rule, but rather existing staff, including a loan operations manager, loan audit clerk, and compliance officer, with competing concerns, would meet monthly to work slowly through the rule. One bank noted the particular importance of training its lending staff.

A trade association requested a 30-month period on the grounds that a shorter period would result in flawed data the first few years, which could negatively impact analysis. Another commenter noted that small business lending is varied, involves more negotiation than consumer lending, and is therefore more difficult to capture consistent data for.

Some commenters justified a 30-month period on compliance periods for other complex regulations. Several lenders cited their experience with HMDA to justify a 30-month period. One noted that many HMDA software kits barely met deadlines, and significant updates were still needed after the deadline. Another bank, based on its experience with the TILA/RESPA integrated disclosure rule, stated that it would take longer than 18 months to comply with this rule.

Several lenders commented that they needed 30 months to comply because they had no experience with other data collection regulations such as HMDA or CRA.

Two banks expressed a concern that an 18-month period would hamper their ability to serve customers. One also said it would be challenging to comply with the new rule while still serving customers and maintaining day-to-day bank operations. Another said that to ensure data consistency, the adoption of new processes may produce less access to credit.

Some commenters supported a 30-month period for specific small business lenders. Some stated that 18 months was not sufficient for small and community banks to review, develop and implement collection systems. A number of smaller lenders and a trade association stated that while large lenders have dedicated compliance staff, smaller banks need more time because they rely on vendors and software. One bank stated that regulations should target large and not small banks, that rules often apply to lenders regardless of size, and that the Bureau should set a longer period for all lenders for the sake of small ones. A bank emphasized that a 30-month period would give smaller community banks time to prepare processes that work for both the bank and its customers.

A number of mission-based lenders stated that small CDFIs had limited capacity and needed more time to develop compliance systems. Several commenters stated that mission-based lenders should be able to opt-in to comply in 18 months if they were ready to do so.

A trade association expressed concern that banks it represented would have difficulties with the proposed 18-month period, especially for rural lenders with no HMDA experience, which would have to create new processes.

A software provider identified a sequence of factors justifying a 30-month period. First, this rule would require new data collection fields to collect, store, and report data. Such changes could only begin when this rule is finalized. After software changes are distributed, lenders must test software, implement procedural changes, and train employees on system updates prior to compliance date. Further, some clients may operate on different releases of software so multiple versions will have to be supported, requiring changes for multiple versions. The commenter requested more time to address these steps in an orderly fashion.

Several other comments supported a 30-month period. One bank noted that the time is needed to resolve unanticipated implementation issues. Another bank supported a 30-month period to match compliance examination cycles. A third bank argued that a 30-month to three-year period was not much more time than the proposed 18-month period, given that the Bureau justified its proposal on the 10 years that elapsed since the passage of the Dodd-Frank Act.

*Three years.* A plurality of commenters requesting a longer compliance period than proposed suggested three years to comply, including a wide variety of trade associations, as well as midsized and smaller banks, credit unions, and agricultural lenders.

AdminRecord-000284

*General comments.* Several commenters stated that a three-year period would permit lenders to make changes to achieve the statutory purposes of section 1071. One lender suggested a compliance date of January 1, 2026. A trade association asserted that the compliance period should be three years and should start on January 1 on the grounds that a partial year of data would not provide meaningful benefits and would be ignored because data users would want to make year-over-year comparisons.

Several industry commenters favoring a three-year period argued that it was inappropriate for the Bureau to use its 10-year delay in issuing this rule pursuant to the Dodd-Frank Act as grounds to burden lenders with a short compliance period. Two bank trade associations asserted that it was arbitrary and unreasonable for the Bureau to propose an 18-month period to comply with the broader requirements of the NPRM compared to the SBREFA outline of proposals under consideration, which contemplated a two-year compliance period.

*Sequential changes.* Two trade associations noted that compliance steps in sequence, each step dependent on the completion of prior one—vendors create new data collection and reporting systems, lenders develop and test procedures for these systems, staff are trained on the systems and procedures, then further testing may identify issues that require revisions and iterating again before the deadline. One commenter stated that, ideally, at least six months before the compliance date, lenders would receive software that can be tested and validated.

*Scope and complexity.* Some industry commenters based a three-year period in part on the need for time to understand and interpret this rule. Several commenters noted that this new rule involves the collection of new data and would be a "sea change" for small business lenders, especially those with no experience with HMDA or data reporting. A trade association stated it did not know how much more time to request without knowing the content of the final rule. Another trade association stated that a three-year period would give the Bureau time to educate and support lenders as they implement this rule, based on the experience with the Paycheck Protection Program.

Many banks and several trade associations cited the scope and complexity of the rule to justify a three-year period, specifically, that the rule would cover many different products with different processes. Two commenters requested a three-year

period because compliance involves changes across many business units, systems, and small business lending channels. A group of trade associations asserted that the rule would require the collection of 21 data points, the separate maintenance of demographic information, and the firewall. Two trade associations stated that compliance with this rule would be significant and time-consuming. One bank noted that small business lending involved a wider variety of solutions than consumer lending. One bank noted that the rule as proposed would have required the reporting of 6,500 loans, 44 percent more than its 4,500 CRA-reportable small business loans.[836]

A number of industry commenters and a business advocacy group justified a three-year period to create, update, and test non-software processes and policies. Some commenters stated that lenders would need new procedures or workflows for applications and data collection. One bank stated that existing workflows would change to align with firewall. Several commenters stated that lenders would need to overhaul or obtain new forms and applications after the final rule. Other commenters claimed not to use written applications for small business and farm loans. One bank stated that it needed to develop a high-touch data collection system because of its variety of small business lending products. One trade association noted that lenders must wait for the final rule to change their policies and procedures, and that clarifications and questions regarding the rule would take months to address, especially new proposed provisions not discussed at SBREFA. One bank said it needed to establish controls and processes to train staff. A trade association stated lenders needed time to assign responsibility across departments, including

---

[836] This comment highlights the extent to which this final rule will greatly improve the comprehensiveness of application-level small business lending data available for analysis, compared to the data available under the status quo, such as current CRA regulations. The CFPB has worked closely with the OCC, FDIC, and Federal Reserve Board to harmonize this rule with those agencies' proposed CRA amendments; more comprehensive small business lending data from this final rule can lead to better analysis of business and community development needs in the context of the amended CRA regulations. *See, e.g.,* Bd. of Governors of the Fed. Rsrv. Sys.; Fed. Deposit Ins. Corp.; and Off. of the Comptroller of the Currency, *Treasury, Community Reinvestment Act, Joint Proposed Rule,* 87 FR 33884, 33941 (June 3, 2022) ("[T]he agencies propose using section 1071 data, once available, to develop market benchmarks."); *id.* at 33998 ("In the longer term, the CRA's data collection and reporting requirements for small business loans and small farm loans would be eliminated and replaced by the CFPB's section 1071 data collection and reporting requirements.").

compliance. Another bank observed that it would take time to receive direction from compliance vendors.

*Software.* Many comments supported a three-year compliance period based in part on technological issues. Some industry commenters justified a three-year period on the need to automate processes and update small business lending applications. One bank stated that it needed to build data collection procedures for its manual lending processes, and that small business lending is not automated to same extent as consumer lending. One bank stated that many lenders report HMDA and CRA data via a manual process, and this will need to be automated to collect the significantly expanded data under section 1071.

A number of industry commenters stated that lenders would need time to choose, onboard and integrate new software. Several banks said no existing software complies with this rule, and one bank stated that many providers were waiting for this rule to be finalized and would still take time to make a proven and accurate solution available. Some lenders and trade associations noted that many lenders need to find and vet vendors before buying a software system. Some industry commenters stated that lenders do not have technology in place to collect data for the rule. One bank offered a contrary view, reporting that its software vendor was already working on software to comply with this rule. A large bank stated that it would need additional time to build compliance software itself.

One bank said that it had no relationship with vendors and no data collection programs. A trade association stated that this rule would require significant infrastructure investments for credit unions. Another bank that it needed addition time to implement software before updating its processes. A trade association stated that lenders needed software before training staff. A group of trade associations stated that the integration of compliance systems would be an iterative process of testing, finding and fixing problems, and testing again, all across multiple lines of small business lending products. Another commenter identified a sequential process to purchasing software, including selection, installation, training and testing.

Several commenters offered other details on why their technology requirements justified three years to comply. One bank stated that it needed at least 24 months to implement new software, and 12 months more to have accurate reporting. Another bank stated that 18 months suffice for vendors to

AdminRecord-000285

develop and install a data collection and reporting system but would not suffice for lenders to implement the software and train staff. A different bank stated that it searched for 1071 software for over two years and would need 18 months to integrate the software with other systems. Another bank said it needed more than two years to develop, test, and implement systems of this scope. One bank stated that its vendor would take six months to upgrade software after the final rule is released. Yet another bank needed 18 months for software to become available, vetted and installed, and 18 months more to train staff. A trade association claimed that lenders needed more time because they decide what technology to build one to two years in advance, and more time was needed to take into account "blackout" periods, during which technology builds stop eight weeks before calendar year end, which the commenter believed could add up to four months to timeline to comply with this rule.

A number of industry commenters stated that lenders needed time to wait for vendors to prepare new software or update existing software, and time to test it. Several industry commenters and a business advocacy group also stated that lenders needed more time to onboard and test software.

A number of lenders, particularly small and mid-sized banks, requested more time to comply because they lacked control over the speed and preparation of third-party software vendors. A trade association for community banks stated that small banks depend more on vendors to develop new systems. Several commenters stated that core providers, particularly relied upon by community banks, need more time to adjust to collect new data points. That is, community banks must wait for core providers to update their systems, test updates and resolve problems, after which compliance vendors can develop systems to integrate with the core system. The same commenter stated that community banks that use a platform, not a core provider, to originate loans must ensure that, once their core provider has built the fields for all of the data points, each is mapped individually to the small business lending platform, requiring the creation of multiple APIs, which would result in more costs and delays.

Smaller lenders described complications they would face in obtaining software for this rule. One bank stated that lenders needed time to conduct due diligence on these vendors. Another bank stated that many financial institutions may make demands on the same vendors at the same time, slowing implementation. A third bank stated that covered financial institutions would compete for software implementation dates to comply with this rule, and that the smallest lenders will be at the greatest disadvantage for getting software in time to comply with this rule. Another commenter stated that community banks face higher costs to buy compliance software.

Two trade associations asserted that three years would suffice for credit unions to work with vendors to revise systems for this rule. Another trade association stated that credit unions required more time than 18 months because they are at the mercy of vendors and must train staff and update forms and processes.

A business advocacy group stated that the rule would result in significant, time-consuming changes to reprogram software because online lenders do not currently collect demographic information so as to avoid accessing data that would make intentional discrimination possible.

*Staffing.* A number of commenters, including a number of lenders and trade associations, justified a three-year compliance period on the time lenders needed to hire and/or train existing staff to collect, verify, and report data for this rule.

Some industry commenters stated that lenders would have to hire new staff for data collection, verification, and reporting. One bank stated that time would be needed to determine staffing needs. Two smaller banks stated that they would need an additional employee to collect and verify data for this rule. A State bankers association said that lenders needed more time because they and their small business customers were struggling with the lasting effects of the pandemic and labor market shortages.

Many commenters, including a number of lenders and trade associations, justified a three-year compliance period in part on the need to train staff, both new and existing employees, to comply with the rule. Several banks stated that they could not start to train staff until software and processes exists for compliance with this rule; one bank said that 18 months was not sufficient to do this well.

Several commenters said that lenders would need to train a variety of staff on compliance and software for this rule, including loan officers and customer-facing staff as well as compliance, risk, legal, and technology employees. Further, several banks and a business advocacy group observed that lenders needed to train staff on what to collect, including data points for this rule. A group of trade associations noted that some lenders are not accustomed to collecting data to the accuracy standards of the Bureau, and that staff familiar with HMDA and CRA would require more training not to be confused with overlaps with this rule.

Several industry commenters noted that the rule would require greater staffing resources. One bank said it would increase staff hours to collect and review data, which would impact operations. Another bank stated that the biggest hurdle to compliance would be allocating employee resources. Yet another bank noted that staff training is time consuming. One bank noted that it needed several months to train its 3,000 employees. A credit union trade association stated that a tight labor market, global pandemic, and economic crisis make updating services harder.

Some commenters stated that they needed three years to comply to communicate changes caused by the rule to consumer to minimize disruption. Several commenters noted the need to accustom small business applicants to the collection of ethnicity, race, and sex information. One bank stated that borrowers may resist this type of inquiry. Another bank said that customer education for this rule was important, that many customers already believe that lenders ask for too much information, and that customers may be driven from traditional banking to less safe products as a result.

*Access to credit.* Several commenters supported a longer compliance period on the grounds that financial institutions might need to pause or stop their small business lending until they were in compliance with this rule, hurting vulnerable small businesses that section 1071 was intended to benefit.

*Data accuracy.* A number of commenters stated that hasty implementation of the rule would result in data errors, bad data quality and bad analysis based on that data. A group of State banking regulators asked the Bureau to consider a longer compliance period so that financial institutions can better prepare to compile and accurately report data. Several banks and trade associations asserted that rushed implementation generally would make data in the first few years after the compliance date flawed, incomplete, or unusable, limiting the usefulness of the data for fair lending and business and community development purposes.

Some commenters asserted that more time to comply would make data more accurate, or otherwise justified a three-year compliance period on the grounds

of data accuracy. Several commenters stated that rushed compliance would result in errors which, in turn, would lead to Bureau actions against lenders as well as unnecessary public scrutiny, ultimately harming small businesses that section 1071 was intended to help. One bank stated that the implementation of policies and procedures, acquisition of software, and training of employees would take more than 18 months to implement, but that three years would suffice to ensure the collection of reliable data. Another bank stated that data will be error-laden in early years of collection until systems can be refined. A different bank stated that the proposed 18-month period will likely lead to flawed initial data reporting and flawed analyses. A trade association asserted that a three-year period more closely adhered to the expectation in the statute. Another trade association stated that a compliance period of fewer than three years would risk the viability of CDFI lending programs.

Many industry commenters requested a longer compliance period because many lenders lacked experience with data reporting regulations, such as HMDA or CRA. Specifically, a number of lenders and trade associations stated that lenders not subject to HMDA reporting needed three years to comply because they will start from scratch without existing vendors, processes or procedures to adapt to small business lending or train staff. A group of trade associations stated that banks that do not report HMDA/CRA data will meet vendors for first time and will not have experience with testing process. One bank stated that for lenders with limited staffing resources and no existing reporting mechanisms, 18 months to comply is unreasonable. Another bank stated that many lenders have not had to collect this amount of data.

*Other regulations.* A number of commenters compared the proposed compliance date with those of other regulations. One said that the proposed 18-month period was short compared to those of other complex rules. A bank said, based on past regulatory reporting rollouts, it would take three years to comply with this rule. Another commenter stated that historically, short implementation periods for complex rules are not feasible.

Some commenters compared the proposed 18-month period to comply with a new, complex rule with the more than two years that lenders had to comply with the 2015 HMDA rule, which only modified existing requirements. Commenters pointed out that, unlike the 2015 HMDA rule, this

rule requires the construction of new systems for a new data collection regime rather than building on systems already in place. One commenter encouraged the Bureau to consider a period of three years or longer, especially to ensure that smaller lenders would have time to comply. A large bank pointed out that, unlike HMDA, this rule covers numerous credit products offered by lenders to small businesses, including loans, lines of credit, and credit cards, each of which uses a unique application process and system of record, and different personnel.

Other lenders and trade associations expressed concern about the proposed compliance period based on their experience with HMDA, noting that vendors were not ready before the initial deadlines established by the Bureau, which then had to provide leniency related to data accuracy for HMDA data, as well as issue multiple corrections and clarifications to HMDA rule since 2015. Several commenters noted that the 2015 HMDA rule took several years and resulted in Congress amending HMDA in 2018. One bank noted that, as with HMDA, lenders will spend many hours reviewing data to avoid errors and resubmission.

Commenters also compared the proposed § 1002.114(b) with compliance periods of other Federal rulemakings. One bank said that, based on its experience with the CRA, this rule would require more than 18 months. Several commenters stated that the experience with the TILA/RESPA integrated disclosure rule shows that 18 months were insufficient for major changes. One commenter requested three years to comply based on its experience with that same rule, noting that vendors sought clarity on that rule to make and deploy solutions, and the Bureau answered questions until the effective date, making implementation challenging. A trade association observed that industry had two years to comply with the FinCEN's customer due diligence rule,[837] which it said was a simpler regulation.

Two industry commenters took the opposite view, noting that lender experiences with past regulations are irrelevant. A bank said that a successful rollout would take more than 18 months even if a lender was experienced with

---

[837] FinCEN's customer due diligence rule requires financial institutions to have procedures for each of its legal entity customer to identify each 25 percent natural person who owns more than 25 percent of the legal entity as well as one natural person executive of the legal entity. Fin. Crimes Enf't Network, *Customer Due Diligence Requirements for Financial Institutions,* Final Rules, 81 FR 29397 (May 11, 2016).

data collection regulations. A trade association stated that even current HMDA reporters would find compliance with this rule challenging because of the differences between small business and agricultural lending and mortgage lending, specifically because small business lending involves different loan platforms, small business lending units do not offer a "menu" of standardized credit products, and clear application procedures do not exist because small business customers are unique.

*Industry-specific rationales.* A number of industry commenters suggested rationales specific to their industries to justify a three-year compliance period. An agricultural lender stated that many FCS lenders, community banks, and small credit unions would incur great expense if required to obtain new technology and train new employees within 18 months. A trade association noted that a compliance period of less than three years would burden CDFIs.

Some commenters, including a trade association and a number of banks, stated that small and community banks needed three years to comply rather than 18 months. One commenter emphasized that stakeholders it consulted stated that an 18-month period was inadequate, and that small lenders may take three years to comply. A bank emphasized that while larger banks have more resources for compliance, small banks will struggle without more time to comply and will be disadvantaged. A trade association noted that smaller banks that are not HMDA reporters would find a new data collection regime challenging. A group of State banking regulators stated that small lenders would face particular challenges early on in implementation. A trade association and a bank noted that small banks depend on vendors to develop systems. A bank stated that small and mid-sized lenders are a lower priority for vendors, which would erode their participation in small business lending. Two banks noted that small and community banks would struggle because of shortfalls in staffing and technology.

A trade association stated that mid-sized banks were unlikely to stand up systems in 18 months despite best efforts, based on the experience of lenders with other data reporting regimes.

A business advocacy group stated that innovative start-ups, small banks, and credit unions would struggle to implement the rule given the resources at their disposal.

A group of State banking regulators requested a longer compliance period,

AdminRecord-000287

in part, so that the Bureau could "demonstrate" its ability to collect data from nondepository institutions subject to the rule.

A joint comment from two auto dealer trade associations requested a three-year period because they said the proposed 18-month period is untenable for dealerships in general and small dealerships in particular, which must coordinate compliance efforts with credit application system providers, vendors, and finance sources, after which systems must be updated and tested, and staff must be trained.

*More than three years.* One commenter said that the compliance period should be three to five years because the bank would have to make hard decisions on staffing and its lending capacity due to the additional reporting measures, and may exit the market. The commenter expressed concern that a short implementation period would force the bank to exit the small business lending market and hurt its current customers.

*Tiered compliance.* Some commenters supported some kind of phased or tiered compliance under which larger lenders would have earlier compliance dates and smaller lenders would have later compliance dates. Many industry commenters requested tiered compliance dates in addition to, or as an alternative to, a longer single compliance period for all lenders. Two commenters suggested tiered compliance starting not less than three years after the final rule is issued because the process of implementation would raise issues that require time and deliberate action to frame and solve.

Industry commenters justified tiered compliance on a number of grounds, including the scope and complexity of the rule, as well as the need for smaller lenders to implement and test automated collecting and reporting. One trade association observed that some lenders needed time to test systems to ensure accurate collection and reporting, and asserted that with an 18-month period, a bank would have just six months to collect data to do a trial run with one year of data before the compliance date.

Many commenters, including lenders and trade associations for State banks and credit unions, argued for tiered compliance because of the need to purchase or develop new software to comply with the rule. Industry commenters also pointed to other factors requiring a longer compliance period, include the time to find vendors, time to develop software, time for vendors to plan and execute network changes, and time to train and hire staff

to integrate systems with software for this rule.

Two industry commenters emphasized the dependence of smaller lenders on third-party vendors to justify tiered compliance—that small lenders would need time to evaluate lenders and complete due diligence, that vendors would need time to develop new compliance software, and that lenders would need time to integrate and test software with existing systems.

Several trade associations emphasized that many lenders needed the additional time that tiered compliance would provide to permit them to hire and/or train compliance staff, and train existing lending staff, to comply with the rule.

Two trade associations suggested that tiered compliance dates were necessary for credit unions to educate their members and allow for the development of member notifications.

A number of commenters justified tiered compliance based on industry experience with complying with other regulations. Several commenters noted lenders had more than two years to comply with the 2015 HMDA rule, which amended existing regulations, while this rule is new and complicated. Several trade associations pointed to industry experience with Financial Accounting Standards Board's Current Expected Credit Loss rule as an example of rushed implementation; after initially setting a single compliance date, regulators later staggered implementation, requiring smaller institutions to comply later, recognizing high one-time costs and advantages large institutions had in negotiating with vendors.

A bank justified tiered implementation on the grounds that hasty implementation would lead to inaccurate data in the first few years of the rule.

Two trade associations stated that phased compliance is important for lenders not experienced with data collection rules to give them time to build infrastructure. One commenter noted that lenders that are not federally insured depositories in particular need more time to start training programs from scratch, and that it would be hard for such lenders to find and hire enough staff with coding expertise without regulatory data systems in place. Another commenter said that banks that do not comply with HMDA would need more time to comply with this rule than money-center banks that have HMDA experience.

Smaller lenders and trade associations justified longer compliance dates for smaller lenders on various grounds. One bank stated that smaller lenders could

learn from the earlier compliance rollouts of large banks. Others said that tiered compliance would give smaller lenders more time to resolve unanticipated issues.

Several commenters suggested several compliance dates, tiered by lender type. A trade association suggested that smaller lenders should have a later compliance date to learn from largest banks, and to have time to resolve unanticipated issues. In particular, the commenter said that rural and underserved communities need more time than money-center banks.

Amongst commenters that supported tiered compliance dates, there was a variety of comments on how to determine which financial institutions should report later. Two commenters requested tiered or staggered compliance in any manner, whether by transaction type, lender type, or lender size. A community bank asked that the Bureau tier compliance dates based on asset-size or some other factor to provide a longer compliance period for community banks. One CDFI lender requested that the Bureau extend the compliance date to at least 30 months for mission-based lenders.

Two trade associations and a large credit union supported tiering based on loan volume. One of the trade associations asked for tiered compliance with the earliest date starting three years after the final rule is issued, on the grounds that credit unions often have little bargaining power with vendors and are often the last to receive system upgrades.

Several lenders suggested two compliance dates, with tiers set by asset size. One lender suggested two tiers, giving more time to lenders with less than $2 billion in assets because smaller institutions have smaller compliance and information technology staffs. The lender did not place much weight to the $2 billion threshold it proposed other than it would match "small lender" definitions in other areas of consumer financial law.

Several industry commenters suggested two compliance date tiers. One bank suggested giving smaller lenders 24 to 36 months more than large banks. Two banks suggested giving smaller lenders one year more than larger banks, which they argued could reduce competition for software installation, implementation help, and training, which in turn could reduce costs and resource issues for small lenders. These commenters believed that smaller lenders could learn best practices from larger banks. A trade association said that large lenders ($10 billion or more in assets), should have

AdminRecord-000288

two years to comply, while smaller lenders should have three years. The commenter stated this manner of tiering compliance dates would allow the Bureau to collect a large amount of data earlier, and would also give vendors more time to develop and integrate compliance products.

Several commenters suggested three compliance date tiers by asset size. A trade association suggested that the Bureau adopt three compliance tranches, giving large lenders one year to comply, medium-sized lenders two years, and small lenders three years. The commenter suggested the third tier should include the smallest lenders, community banks, and lenders to small businesses that the Bureau trusts and knows to be successful. Another bank proposed giving lenders with $5 billion or more in assets 18 months to comply, lenders with $1 billion or more 24 months to comply, and banks with $1 billion or less 30 months to comply. One bank suggested three tiers by size, without defining size, and proposing that the largest lenders comply in the first year, mid-sized lenders comply in second year, and small lenders comply in the third year. The commenter justified the earliest compliance date for large lenders because of the greater staff expertise, capacity and resources that these institutions had to comply with the rule.

Several commenters opposed tiered compliance dates. The industry commenters asserted that this rule represents a major change for small and large lenders alike, from a ban on collecting protected demographic information data to requiring collection of it for small business loans. These commenters claimed that no vendors have a compliance software ready for this rule, that all lenders need sufficient time to understand the content of this rule, change processes, build and test systems, train employees, and implement procedures and controls. These commenters warned that a failure to give financial institutions of all sizes adequate implementation time will limit access to small business credit, which negatively impact the economy. A community group opposed tiered compliance dates on the grounds that the proposed 18-month period was sufficient for all institutions, and that lenders had from the release of the NPRM in September 2021 to begin preliminary planning to comply with this rule.

Final Rule

The Bureau is finalizing § 1002.114(a) as proposed. The small business lending data collection rule will become

effective 90 days after it is published in the **Federal Register**. The Bureau confirms, as requested by a commenter, that this final rule does not apply retroactively, including for funds drawn after the effective date where the loan was originated before the effective date. See also final comment 114(c)–2, which makes clear that covered applications received prior to a financial institution's compliance date, but final action is taken on or after that date, are not required to be reported.

The Bureau is not finalizing § 1002.114(b) as proposed, which would have required compliance with the final rule approximately 18 months after publication of the final rule in the **Federal Register**. Instead, the Bureau is finalizing a tiered approach to compliance dates. Specifically, the dates by which covered financial institutions are initially required to comply with the requirements of this rule are specified in four provisions:

First, under § 1002.114(b)(1), a covered financial institution that originated at least 2,500 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning October 1, 2024. This compliance date is 18 months after the Bureau's issuance of this final rule.

Second, under § 1002.114(b)(2), a covered financial institution that is not subject to § 1002.114(b)(1) and that originated at least 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning April 1, 2025. This compliance date is 24 months after the Bureau's issuance of this final rule.

Third, under § 1002.114(b)(3), a covered financial institution that is not subject to § 1002.114(b)(1) or (2) and that originated at least 100 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning January 1, 2026. This compliance date is 33 months after the Bureau's issuance of this final rule.[838]

Finally, under § 1002.114(b)(4), a financial institution that did not originate at least 100 covered credit transactions for small businesses in each of calendar years 2022 and 2023 but

subsequently originates at least 100 such transactions in two consecutive calendar years shall comply with the requirements of this subpart in accordance with § 1002.105(b), but in any case no earlier than January 1, 2026. This compliance date is 33 months after the Bureau's issuance of this final rule.

In addition, the Bureau has added a number of provisions to the commentary accompanying § 1002.114. New comment 114(b)–1 explains that the applicable compliance date in § 1002.114(b) is the date by which a covered financial institution must begin to compile data as specified in § 1002.107, comply with the firewall requirement of § 1002.108, and begin to maintain records as specified in § 1002.111. In addition, the covered financial institution must comply with § 1002.110(c) and (d) no later than June 1 of the year after the applicable compliance date. New comment 114(b)–2 provides that when the compliance date of October 1, 2024 specified in § 1002.114(b)(1) applies to a covered financial institution, the financial institution is required to collect data for covered applications during the period from October 1 to December 31, 2024. The financial institution must compile data for this period pursuant to § 1002.107, comply with the firewall requirement of § 1002.108, and maintain records as specified in § 1002.111. In addition, for data collected during this period, the covered financial institution must comply with §§ 1002.109 and 1002.110(c) and (d) by June 1, 2025. New comment 114(b)–3 addresses informal names for compliance date provisions, providing for informal, simplified names to facilitate discussion of the compliance dates specified in § 1002.114(b)(1), (2), and (3). Under this new comment 114(b)–3, Tier 1 refers to the cohort of covered financial institutions that have a compliance date of October 1, 2024 pursuant to § 1002.114(b)(1), Tier 2 refers to the cohort with a compliance date of April 1, 2025 pursuant to § 1002.114(b)(2), and Tier 3 refers to the cohort with a compliance date of January 1, 2026 pursuant to § 1002.114(b)(3). New comments 114(b)–4(i) through (vii) provide examples of various scenarios that illustrate how to determine which compliance date specified in § 1002.114(b) applies to financial institutions.

The Bureau is adopting § 1002.114(b) pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.

---

[838] The Bureau considered giving Tier 3 financial institutions 36 months to comply with the rule, as requested by many commenters. This would have resulted in a Tier 3 compliance date of April 1, 2026. However, the Bureau believes that there is no material difference between the 3 years (36 months) requested by certain commenters and the 33 months provided to covered financial institutions subject to Tier 3.

AdminRecord-000289

The Bureau is adopting a tiered approach to compliance for a number of reasons. The Bureau believes, all else equal, that the statutory purposes of section 1071 are better served by an earlier compliance date because it will result in the earlier publication of data by the Bureau and use by the public.

Most industry commenters that addressed the issue of the compliance date opposed § 1002.114(b) as proposed, and requested more than 18 months to comply with the rule. Views varied widely on how much more time was necessary. While commenters suggested compliance periods of 24 months, 30 months, three years, and in one case 3.5 years or more, a plurality of industry commenters supported a single compliance date of three years for all lenders. A sizable number of commenters also supported tiered compliance dates based on the size of the lender, as an alternative to a single, compliance period longer than 18 months.

The Bureau gives credence to a set of three major factors commenters cited in requesting additional time, beyond 18 months, to comply with the rule (whether from 24 months to 3.5 years): the need to purchase or upgrade compliance software (including time to find and perform due diligence on vendors, purchase software, integrate compliance software with other systems, and test all of these); the need to create or adjust policies and procedures to comply with the rule; the need to train and, in some cases, hire staff to use the new software and implement the policies and procedures to collect data. Commenters did not clearly tie these factors to precise periods of time.

Many commenters identified the sequential and iterative nature of these major factors. Generally, a lender must purchase and integrate new software before developing new policies and procedures concerning the use of the software, and the lender must have new policies in place before hiring and training staff to implement the software and follow the new processes. These processes are also iterative in that, in testing software, procedures and staff training, lenders may identify errors in software, processes, or training, and need to make adjustments that may then require additional changes in other aspects of the overall compliance program or system.

The Bureau believes from comments received, and consistent with feedback received in SBREFA, that smaller financial institutions may face particular difficulties that justify providing them additional time to comply with the rule. Several industry commenters expressed their concern that they were at the mercy of their software vendors and other third-party providers and could not start compliance steps, such as establishing new policies and training employees, in the absence of such software. By contrast, one large bank requested more time to comply to develop in-house compliance software.

Other commenters noted that with a shorter compliance period, vendors may be overloaded with requests from a market of financial institutions attempting to comply at the same time with this rule. Several commenters cited their experience in attempting to obtain the services of third-party vendors to comply with other rules such as the TILA/RESPA integrated disclosure rule and the HMDA 2015 updates, and observed that vendors tended to service larger lenders first, leaving smaller lenders with little time to integrate software, update policies and procedures, train and hire employees, and test all of these systems.

Compounding these issues, many commenters—generally smaller lenders, some of which were rural or community financial institutions—stated that they did not have previous experience with data collection rules, such as HMDA or CRA. The Bureau is aware that this rule may be the first contact that many covered non-depository institutions have with a Federal data collection regime. Further, a substantial number of commenters noted that they used manual or analog systems and claimed that they would have to automate their operations to comply with the rule. The Bureau believes that the increased originations threshold under in final § 1002.105(b) may preclude many financial institutions that expressed concern that they would have to automate their processes from having to report data at all.

All of these factors suggest that smaller financial institutions would face particular difficulties in complying with this rule within 18 months. The comments suggested a variety of potential consequences stemming from insufficient time to comply. Some suggested that financial institutions would exit the market, that they would face greater costs to comply more quickly (for instance, a financial institution that might be able to use existing staff over the course of three years may need instead to hire additional staff to comply with the rule in 18 months), and/or that they may submit inaccurate or data of lesser quality to the Bureau than they would have if given more time to the comply.

The Bureau does not believe that financial institutions would exit the small business lending market because of the compliance date, but rather believes that many smaller institutions may simply find it challenging to comply within the 18-month compliance period. The Bureau gives some credence to the concern that a shorter compliance period may result in somewhat higher, though not significant, costs that in turn may be passed on to customers. The Bureau believes that smaller financial institutions, especially those unaccustomed to data collection rules, may stay in the market but may be unable to comply within 18 months for reasons at least partly out of their control. The Bureau believes, based on comments received, that generally smaller financial institutions are more likely to be at the mercy of vendors that may prioritize larger customers.

While a plurality of commenters requested a single, three-year compliance period for all lenders, the Bureau does not believe that such a change is justified. The Bureau received comparatively few comments from large banks regarding the sufficiency of an 18-month compliance period. One large bank stated that it would require additional time to develop its own compliance software. A trade association requested three years to comply with the rule on the grounds that larger lenders have more complex compliance systems to establish and operate because such lenders often had different divisions dedicated to different small business lending products. The Bureau does not believe, given the dearth of comments on this point, that the quality of data from large financial institutions is compromised by an 18-month compliance period. The Bureau thus believes that it would not be consistent with the statutory purposes of this rule to provide large financial institutions a longer compliance period.

As a result, the Bureau believes that tiered compliance dates balance several factors at once; that the statutory purposes of section 1071 are best advanced by, in aggregate collecting as much data as possible, as accurately as possible, as soon as possible; and that a system of tiered compliance dates accomplishes this better than a single 18-month compliance period.

In part, the Bureau believes that is accomplished by maintaining the existing 18-month compliance period for the largest-volume financial institutions that are likely to report the bulk of the application-level data, and are likely to do so accurately. These financial institutions are more likely

AdminRecord-000290

than smaller and even mid-sized institutions to have the resources and experience to, with relative celerity, upgrade or purchase compliance software, create pertinent policies and procedures, and train or hire existing staff. The Bureau believes that the experience that many of these larger-volume financial institutions have with other Federal data collection regimes, such as HMDA or CRA, gives them the ability to adapt to this rule within the time given to collect and submit data.

Further, by maintaining the 18-month compliance period for larger-volume financial institutions in Tier 1, collection and reporting of most small business lending data will begin quickly. That is, covered financial institutions will report to the Bureau the vast majority of small business lending applications—approximately 90 percent of the applications covered by this rule, as detailed in part IX.D.2 Table 4—on the timeline proposed in the NPRM.

The Bureau also believes that the statutory purposes of section 1071 are best advanced in aggregate by permitting small and mid-sized financial institutions, by volume of originations, to have more than 18 months to comply with this rule. As discussed above, the Bureau believes, based on the large volume of comments and the rationale provided by them, that an 18-month compliance period increases the likelihood that small and mid-sized financial institutions, for a variety for reasons that are unique to them, will have difficulty collecting and reporting data, and that the data reported would be more likely to be inaccurate or unreliable. Further, the Bureau believes based on the comments it has received, feedback received in SBREFA, and its own observations about the small business lending market that the smallest financial institutions, especially those that do not already report data to Federal agencies, have more manual processes and relatively few employees, which increases the likelihood that they submit unreliable and inaccurate data to the Bureau.

The Bureau believes that tiered compliance dates will improve the accuracy of data from smaller and mid-sized financial institutions. Later compliance dates for smaller and mid-sized financial institutions will mean they do not have to compete with larger financial institutions for the time and attention of software and compliance vendors. The Bureau understands that while the largest lenders are more likely to rely on in-house capacity to comply with the final rule, many other financial institutions with loan volumes likely to place them in Tier 1 may still rely on

software vendors and may compete with smaller-volume financial institutions for the time and attention of software vendors. With a longer timeframe to comply, smaller and mid-sized financial institutions might also be able to avoid expedited and more costly overtime and overflow work, and would have time to learn lessons from the compliance experience of larger institutions.

Regarding the criteria for tiering, most commenters who addressed the issue suggested asset size as the criteria to determine which financial institutions should comply later. The primary virtue of that approach is its simplicity—most depositories know their total assets. However, many financial institutions that will be covered by this rule are nondepository institutions that may originate a large volume of loans but may have relatively few assets compared to depository institutions. Conversely, some depositories with a large volume of assets may have a low volume of small business loans. A tiering approach based on assets may require early reporting by large depositories with little interest in small business lending and exclude large-volume small business lenders with comparatively few assets. The Bureau does not believe that this approach would be as consistent with the statutory purposes of section 1071 as a criterion for tiering directly tied to a financial institution's relative activity in the small business lending market. As a result, the Bureau believes that the number of annual originations of covered credit transactions for small businesses should be the basis for tiering compliance dates

On the number of tiers, commenters tended to favor two tiers rather than three. The Bureau believes that the statutory purposes of the rule are better served by three tiers. The Bureau determined from reviewing all of the comments that there were meaningful differences in the compliance challenges faced by smaller volume, middle-volume, and large-volume financial institutions. The Bureau believes that three compliance dates will help vendors better manage their capacity to serve their customers. The Bureau also believes that three compliance dates may also help the Bureau be more responsive to industry during the transition period. By extending the implementation period, the Bureau will be better able to provide more tailored attention to smaller and mid-sized financial institutions.

*General responses to comments received.* The Bureau observes that the vast majority of comments it received identified specific factors or concerns

regarding compliance with this rule that justified a longer compliance period. Nearly all of these comments also identified multiple factors or steps in the process of complying with this rule that justified a compliance period longer than the one proposed in the NPRM. As noted above, the Bureau observes that these comments, with very few exceptions, did not quantify specific amounts of additional time attributable to each specific factor or step in the compliance process that were identified. For instance, a frequent industry comment might have requested a three-year, rather than 18-month, compliance period, citing the need to purchase and implement software, create processes, and train staff, without attempting to attribute the additional 18 months to each of these three steps in the compliance process.

*Requests to publish data quickly and frequently.* Regarding requests to collect and publish small business lending data as soon as possible, the Bureau agrees that the absence of these data will continue to hinder vital capital flow to small businesses, as small business and community development needs cannot be effectively identified without this data. However, the Bureau must conduct its privacy analysis, so the publication of data will not immediately follow its collection. Regarding the request to publish data as soon as possible, and to publish data every six months so that stakeholders can monitor progress and utilize data, the Bureau is not adopting a 6-month reporting requirement because requiring financial institutions to provide multiple data submissions a year may be administratively challenging for both financial institutions to comply with and for the Bureau to process. However, the Bureau may consider publishing aggregate data more often than once a year in the future if administratively feasible.

*Less than 18 months.* The Bureau has considered comments asserting that 18 months is too long a compliance period. While some financial institutions could comply with this rule in less than 18 months, the Bureau believes that most financial institutions appear unable to, given the volume and intensity of comments requesting more time. The Bureau believes a one-year compliance period would be inconsistent with the statutory purposes of the rule because it appears that such a short period could be costly for financial institutions and result in inaccurate data. The Bureau agrees that mission-based lenders (or any other lenders) ready to report within 18 months should be permitted

to do so, and the rule permits them to do so.

*More than 18 months.* Regarding the comments requesting a compliance period of more than 18 months, the Bureau agrees in part. As discussed above, the Bureau believes that many lower-volume financial institutions, with either lower assets or a low volume of small business lending and thus potentially fewer resources dedicated to that line of business, may need additional time to comply with the rule for the reasons provided above.

Regarding comments concerning resources, the Bureau agrees in part. The Bureau does not believe that more time is justified solely because the rule may cause a financial institution to expend resources to comply with the rule. However, the Bureau agrees that smaller financial institutions may need more time to marshal the necessary resources, as discussed above.

The Bureau has considered comments stating that financial institutions needed more time to understand the final rule and its scope. While the application of this rule would be new to some lines of business, and while some data would be novel the Bureau believes that financial institutions have had enough time to understand the concepts in the rule, especially for those financial institutions that have had experience with other Federal data collection rules, such as HMDA, CRA, or CDFI Fund. The concepts in the rule implement 2010 statutory language, and the rule's implementation of those statutory concepts relies on well-known concepts from existing rules, particularly the HMDA and the CRA regulatory requirements. Nonetheless, the Bureau acknowledges that preparing for compliance may be somewhat more difficult for financial institutions, particularly smaller institutions, with no previous experience with Federal data collections. The Bureau believes that final § 1002.114(b) provides sufficient additional time for such financial institutions to come into compliance with the final rule.

Regarding comments that financial institutions need more time to establish policies and procedures, the Bureau does not believe this is necessary for larger-volume lenders. The Bureau's proposed 18-month compliance period was intended to accommodate the need of financial institutions to develop or update policies and procedures to comply with the rule. The Bureau believes, however, that more time may be warranted for smaller financial institutions that do not have existing written policies or procedures and do not currently use written applications

for small business or agricultural lending applications. The Bureau does not have reason to believe that there are larger-volume lenders that do not currently use forms or formal written applications.

Regarding comments requesting more time to comply because of technological issues, the Bureau acknowledges the various steps that may be involved in obtaining software needed to imply with this rule, including updating core processors, automating analog systems, conducting due diligence, choosing vendors, and testing and integrating systems.

The Bureau agrees with commenters that smaller-volume lenders may need more time than proposed to prepare software before the rule's compliance date. In particular, the Bureau understands that smaller financial institutions may need time to transition from informal applications to automated systems. Regarding the reengineering of agricultural credit scoring systems, the Bureau understood this issue to apply to smaller FCS lenders and believes that the additional time provided by the final compliance period provision would suffice for changes to be made to AgScore and for them to adjust accordingly.

Regarding the comments that banks needed more time to hire new staff and/or train existing employees, the Bureau notes that not enough detail was provided by commenters that explained why this factor on its own justified more than 18 months to comply with this rule.

Regarding the comments that the compliance periods for other similar regulations provided more time, the Bureau acknowledges that this rule, unlike HMDA and the TILA/RESPA integrated disclosure rule, covers a variety of different product types, that this rule is a new rulemaking rather than an amendment to existing regulations. The Bureau notes from its experience that smaller financial institutions in particular appeared to face challenges complying within the timeframe given for the 2015 HMDA rule amending Regulation C and the TILA/RESPA integrated disclosure rule. The Bureau agrees, from the experience of past rulemakings, that smaller financial institutions may wait longer than larger institutions for vendors to prioritize them.

Regarding various industry-specific rationales given for extending the compliance period, the Bureau observes that many of the comments advocated for types of financial institutions that tended to be smaller, such as CDFIs, credit unions, and community banks.

The Bureau believes that final § 1002.114(b) will provide most of the smaller volume lenders the additional time they need to comply.

Regarding comments that even larger credit unions would have to wait for vendors to create compliance products, the Bureau agrees only in part. The Bureau believes that vendors are more likely to focus on larger financial institutions—including larger credit unions—earlier, but that smaller financial institutions, including credit unions, are more likely to have to wait longer.

Regarding the comment that equipment finance companies may be less accustomed to Federal regulators, the Bureau agrees but does not believe that this justifies a longer compliance period specifically for this type of lender. The Bureau believes that equipment finance companies with larger volumes of originations are likely to have sufficient experience and resources to prepare to come into compliance more quickly.

Regarding the comment that a short compliance period would promote unintentional errors, the Bureau agrees in part. The Bureau believes that faced with limited time and resources, smaller financial institutions are more likely to submit inaccurate data, and that this is one of the rationales for providing lower-volume institutions additional time to comply with the rule. Regarding the concern that compliance costs will directly increase lending costs, the Bureau acknowledges in its impacts analysis in part IX below that this may take place, but that the per-loan impact of this rule will be relatively low.

Regarding the comments that many borrowers do not possess or are unwilling to provide data pursuant to this rule, the Bureau agrees that educating small business applicants would improve their responses to requests for data under this rule. Regarding the comment that rushed implementation would lead to unintended consequences, the Bureau observes that the notice and comment processes has identified potentially unintended consequences of an 18-month compliance period, and that the final tiered compliance provision is intended to address these concerns.

*Two years.* Regarding the comments favoring a two-year compliance period for financial institutions, the Bureau agrees in part. Based on a consideration of a variety of factors, including the comments it has received, the Bureau has determined that a two-year compliance period is appropriate for mid-sized financial institutions. The Bureau does not believe that two years

is an appropriate compliance period for all institutions. The Bureau believes that two years more time than is needed by the largest volume financial institutions, which have the ability to comply earlier, and too little time for the smallest volume financial institutions, which need closer to three years to comply with this rule.

The Bureau has considered the comment asserting that the proposed compliance period would make the rule an undue regulatory burden, costly, and not be commensurate to any potential reporting benefit. As set out above, the Bureau believes that a shorter compliance period would be challenging for many smaller and mid-sized financial institutions, and the Bureau believes that it is more likely to obtain more accurate data if it provides smaller volume financial institutions more time to comply with this rule.

*Scope and complexity.* The Bureau has considered comments stating that financial institutions needed a two-year compliance period to understand the full scope and complexity of the new rule. While the proposed rule included provisions not considered during SBREFA, such as additional data points pursuant to ECOA section 704B9(e)(2)(H), the Bureau does not believe that the increased complexity of the rule alone justifies additional time. Most of the new provisions in the NPRM are well-known outside of the context of this rule. In addition, the Bureau has in some ways limited the scope of this rule further by, for instance, not finalizing certain more complex provisions, such as the proposed visual observation and surname analysis requirement. Regarding scope and coverage issues faced by motor vehicle dealers, the Bureau does not believe that there are open issues requiring resolution as suggested by some commenters. The issues raised concerning the application of Bureau regulations to indirect motor vehicle lenders are well-established and not unique to this rulemaking. The Bureau likewise does not believe that this rule represents an entirely new regulatory paradigm; the many comments the Bureau received concerning the overlap between this rule and HMDA, CRA, and CDFI Fund data collections suggest that the concepts in this rule are already well understood by many financial institutions and not necessarily novel or paradigm-shifting. While the Bureau agrees that this rule is the first to attempt to collect application-level data comprehensively from the entire small business lending market, the Bureau does not believe that this alone is a

reason to extend the compliance period of the rule.

*Policies and procedures.* The Bureau has considered comments stating that financial institutions needed two years to develop and test new policies and procedures. However, the comments did not provide enough detail to support extending the compliance period based on this factor alone.

*Technology.* Regarding comments requesting two years to comply because of the need to purchase or upgrade compliance software, the Bureau agrees in part. The Bureau acknowledges the various steps related to implementing or updating compliance software, including finding and vetting vendors, integrating compliance software with other systems. The Bureau acknowledges the concerns of some commenters that vendors may not be ready with compliance software before the proposed compliance date. The Bureau, as noted in part II above, has worked proactively with vendors and technology departments of financial institutions since the release of the NPRM to help them speed their work The Bureau believes that the tiered compliance schedule will ensure that financial institutions in need of time to buy or upgrade software will have that time.

*Staff and training.* Regarding comments requesting a two-year compliance period in order to allow additional time to hire new staff and train existing staff, the Bureau took those factors into account when proposing an 18-month compliance date. However, the Bureau agrees that small financial institutions may require additional time to comply because they may not have the staff to develop compliance systems that larger financial institutions may have. The Bureau believes that smaller institutions may be particularly reliant upon vendors and third-party software and, as mentioned before, may not be prioritized by these providers.

*Other regulations.* Regarding the comments that a two-year period based was justified based on the compliance periods for other similar data collection regulations, the Bureau agrees in part for the reasons specified above. The Bureau acknowledges that industry's experience with the 2015 HMDA rule suggests that more time is required for smaller financial institutions in particular, and especially those with no past experience with a data collection regime like HMDA.

*Other comments.* Regarding concerns that the proposed compliance period was inconsistent with the two-year period that the Bureau previously

considered in the SBREFA process, the Bureau now believes that the two-year period is appropriate for financial institutions with a moderate volume of originations.

*30 months.* The Bureau has considered comments requesting a single 30-month compliance period but does not believe this approach would be appropriate, for the reasons provided below.

*Scope and complexity.* Regarding the comments that the scope and complexity of the rule warrants a 30-month compliance period, the Bureau acknowledges the breadth and complexity of this rule but does not believe that the time needed to understand the rule in itself justifies one additional year to comply with the rule.

*Processes.* The Bureau acknowledges that compliance with the rule may itself entail complex changes to the various processes pertaining to small business lending, including front and back-end operations, and operations across different branches. The Bureau notes that while industry commenters explained the complexity of changing processes and procedures with some clarity, the Bureau anticipated these types of changes in proposing an 18-month compliance period. In any case, these commenters identified various changes they would have to make in response to the rule without explaining why these changes justified extending the proposed compliance period by 12 months.

*Software.* Regarding the comments requesting 30 months to comply with the rule because of the need to purchase new software or upgrade existing software, the Bureau agrees in part. The Bureau acknowledges the various steps and complexities in the process to upgrade or purchase software that commenters have identified, but the Bureau does not believe that all financial institutions need more time to purchase or upgrade software. The Bureau also acknowledges concerns that compliance software for this rule did not exist when comments were submitted in response to the NPRM. The Bureau understands from its outreach that software providers have been developing compliance products since the release of the NPRM, and while such products cannot be finalized until after the final rule, the Bureau believes that such software will be available for timely implementation by financial institutions, especially because the Bureau is committed to providing assistance to technology departments from financial institutions and software providers to develop compliance solutions in time to meet the final tiered

AdminRecord-000293

compliance dates. Regarding the comment that software providers need 30 to 36 months to work with their business partners, the Bureau believes based on its outreach and comments received from some banks that this work had already begun with the release of the NPRM, and that the compliance dates provided in final § 1002.114(b) should be sufficient for software providers to work with their business partners and financial institutions.

The Bureau acknowledges commenters' concerns about small financial institutions and their ability to implement software before the proposed compliance date. The Bureau believes that lower volume lenders, especially those without previous experience with data collection rules, are likely to be at the mercy of compliance software providers and core providers, and are not as likely to have priority access to new software or provider assistance in implementing it. The Bureau does not, however, agree that these concerns justify a single 30-month compliance period. Instead, the Bureau believes that these concerns justify tiered compliance based on the financial institution's transaction volume.

*Staffing and training.* Regarding comments that a single, 30-month compliance period is needed to accommodate the hiring of new staff and/or training of existing staff, the Bureau agrees in part. The Bureau acknowledges that this rule may require the hiring or training of staff in variety of different areas and roles across financial institutions. The Bureau emphasizes, however, that the comment specific to smaller volume lenders that a community bank would not have a dedicated implementation team for this rule, but rather would assign responsibility for rule implementation to existing employees across the bank in addition to their existing tasks.

*Data accuracy.* The Bureau acknowledges the comments that the proposed compliance period may result in data inaccuracies, but does not believe that a single, 30-month compliance period would be the most appropriate way to address these concerns. The Bureau, for the reasons provided already, believes that smaller and even moderate volume lenders, if subject to an 18-month compliance period data, may be at particular greater risk of collecting and submitting inaccurate data to the Bureau. The Bureau acknowledges the comment that small business lending is varied, involves more negotiation than consumer lending, and therefore makes it more difficult to capture consistent data for, but the Bureau does not believe

that this factor alone justifies extending the compliance period. The Bureau observes that the existing regulations that collect data on small business and small farm lending already take into account the varied and more individually negotiated nature of such transactions.

*Other regulations.* The Bureau acknowledges the comments concerns that other comparably complex regulations identified by commenters, such as the 2015 HMDA rule amendments and the TILA/RESPA integrated disclosure rule, provided for compliance periods longer than the 18 months proposed by this rule. The Bureau acknowledges the comment observing that in response to the 2015 HMDA amendments, many software providers barely met the compliance date for that rule, and that significant updates were still required after the deadline. The Bureau agrees that smaller lenders may need more time to comply because of their lack of experience with data collection regulations such as those under HMDA or CRA. However, the Bureau does not believe that a uniform, 30-month compliance period would be the appropriate way to address all these concerns. The Bureau believes that the specific comments it received advocating for a 30-month compliance period for smaller volume lenders or for those inexperienced with data collection rules support the tiered compliance dates set forth in the final rule.

*Customer relationships.* Regarding the concerns that a short compliance period would hamper the ability of their ability to serve commercial lending customers, the Bureau agrees in part. The Bureau believes that smaller lenders and, to a lesser extent, moderate volume lenders may find it challenging to comply with the new rule while still serving customers and maintaining day-to-day bank operations. The Bureau acknowledges the concern that some commenters may adopt new processes to ensure data quality but provide less access to credit for applicants. The Bureau does not believe that a uniform, 30-month compliance period would be the appropriate way to address these concerns in a manner consistent with the statutory purposes of the rule. Rather, the Bureau believes that the customer relationships of smaller volume lenders are likelier to be affected by a shorter compliance period than the customer relationships of larger lenders.

*Sector specific.* Regarding the comments that 18 months was not sufficient for smaller lenders, the

Bureau agrees. The Bureau believes the differences between the compliance challenges faced by smaller and larger lenders suffice to justify a longer compliance period for smaller-volume lenders. The Bureau agrees with the multiple comments stating that smaller institutions, such as community banks, CDFIs, and rural lenders, are more limited in their capacity to expend the additional time and resources needed to comply with this rule within 18 months, and with comments that larger lenders do not have such limitations and often have staff dedicated to regulatory compliance. Regarding the comment that regulations should apply only to large banks, not smaller banks, the Bureau notes that while the Dodd-Frank Act contains provisions specific to larger institutions, it does not apply exclusively to larger lenders. The Bureau, however, agrees that the compliance date provision of this rule should not apply to all financial institutions regardless of size, given the differences in the relative capacity to comply quickly, as the final tiered compliance date provision recognizes.

Regarding the comments of a software provider concerning the various steps in the process to implementing compliance software, the Bureau appreciates the complexity of the process and the back-and-forth between software vendors and lenders. The Bureau, however, believes that the tiered compliance provision provides for more time for a majority of smaller and moderate volume lenders to work through the software implementation process. The Bureau is providing resources, such as the Filing Instructions Guide, concurrent with the release of this final rule to aid software vendors' and financial institutions' development of software expeditiously.

*Other comments.* Regarding the comment requesting for 30 months to address unanticipated implementation issues, the Bureau believes that the final compliance date provision provides enough time and leeway for lenders to address any such issues. Regarding the comment that a 30-month compliance period would match the normal compliance examination cycle, the Bureau disagrees as not every financial institution subject to this rule has examinations on this schedule. Regarding the comment that an 18-month compliance period is not justified by the length of time that has elapsed since the passage of the Dodd-Frank Act, the Bureau notes that in part, it agrees, providing an additional six to 18 months to most lenders.

*Three years.* The Bureau is not adopting a single compliance period of three years for all covered financial

institutions, for the reasons below. The Bureau acknowledges that much of the reasoning provided in support of a single, three-year compliance period justifies the compliance period for Tier 3 financial institutions. As noted above, the Bureau believes that there is no material difference between 33 months and three years for purposes of this rule and the compliance of Tier 3 institutions.

*General comments.* Regarding the comments that a single, three-year period would achieve the statutory purposes of the rule, the Bureau believes that having larger- and moderate-volume lenders begin collecting data in 18 or 24 months, respectively, rather than 33 months, while waiting to obtain more accurate data from smallest-volume financial institutions, is most likely to maximize the speed with which the Bureau receives the largest possible volume of accurate data. Because of this, the Bureau believes that the final tiered compliance provision better accomplishes the statutory purposes of the rule. Regarding the comment that such a three-year compliance period should start on January 1, the Bureau believes that earlier collection of data is consistent with the purposes of section 1071, even if it results in the collection of a partial year of data. While less useful in a year-over-year comparison, a partial year of data would not be ignored entirely. Given the new data points that would be collected under the final rule, a partial year of collection will give data users valuable information they could not access from other sources, for the purposes of facilitating fair lending enforcement and identifying business and community development needs.

The Bureau has considered comments asserting that by proposing an 18-month compliance period, the Bureau has shifted the burden of rapidly complying with the rule onto lenders. The proposed compliance date reflected an attempt to balance competing concerns, and the final compliance date reflects a reconsideration of how best to balance the need to collect data quickly, and the need to collect it accurately.

Regarding the comments that it was arbitrary and unreasonable for the Bureau to propose a broader rule with an 18-month compliance period in the NPRM, compared to a rule of lesser scope and a two-year compliance period in the SBREFA process, the Bureau is not finalizing a blanket 18-month compliance period in this final rule, as explained above. And even if the Bureau were finalizing an 18-month compliance period as proposed, the

Bureau would disagree with the commenters for a number of reasons.

First, the Bureau does not believe that the scope of data collection and reporting under the NPRM expanded greatly compared to the SBREFA outline of proposals under consideration. While several data points were proposed pursuant to ECOA section 704B9(e)(2)(H), most of these data points (such as pricing, application method, application recipient, reasons for denial) are data in possession of financial institutions, as items that are part of the underwriting or lending process. Some of the other items, such as time in business and NAICS Code, are captured by some lenders in any case. Similarly, the NPRM (but not the SBREFA Outline) included several provisions giving leeway to financial institutions attempting to comply in good faith, such as the bona fide error and safe harbor provisions.

Second, even assuming that the scope of data collection and reporting under the NPRM were greatly expanded as compared to the SBREFA Outline, the final rule includes a variety of provisions intended to streamline compliance as compared to the NPRM. For instance, the Bureau has simplified the approach to pricing, time in business, and NAICS code (requiring the collection of just 3 digits rather than 6), and the Bureau is no longer requiring the use of visual observation and surname analysis. The Bureau is also providing a grace period during which it does not intend to assess penalties, so long as financial institutions attempts to comply with this rule in good faith (see part VII below). The Bureau also believes that the materials it has prepared for concurrent release with the final rule, including the initial version of the Filing Instructions Guide, will have the effect of facilitating compliance with the rule.

Regarding the comment that the Bureau was shifting the burden of its delay in issuing the rule to industry, the Bureau disagrees. The Bureau's intention in proposing an 18-month compliance period was balancing two factors—providing sufficient time to comply while obtaining data as soon as possible. The Bureau believes that the final tiered compliance provision better strikes that balance by differentiating between lenders more likely to be able to comply earlier with accurate data, and lenders that are likely to need more time to report accurate data.

*Sequential changes.* The Bureau acknowledges the comments that the implementation of compliance systems involves numerous steps in a specific order. However, the Bureau does not

believe that this justifies a single, three-year compliance period for all financial institutions. The Bureau believes that it is generally correct that compliance must proceed in a specific order, and it also believes that larger lenders are more likely to have the capacity and resources to work on different steps of compliance implementation in parallel rather than purely sequentially, and thus comply in a shorter amount of time than smaller-volume lenders with less capacity and resources.

*Scope and complexity.* Regarding the comments that a three-year period is needed to carefully understand and interpret the new rule, the Bureau agrees that this rule will be entirely new to many lenders with no experience with other data collection rules. However, the Bureau believes that such lenders are likelier to be smaller, lower-volume lenders, and that the final tiered compliance regime give them the additional time they need to understand this rule. Regarding the comment that lenders could only understand the content of the regulations after the issuance of the final rule, the Bureau observes that it has endeavored to simplify this final rule compared to the content of the NPRM. Regarding comments that a single three-year period would give the Bureau time to educate and support lenders as they implemented this rule, the Bureau believes that the finalized system of tiered compliance dates provides sufficient time to educate and support smaller, lower-volume lenders more likely to need this help.

The Bureau acknowledges that this rule would cover many different financial products and services, often with different processes, involving many changes across business units and systems, but the Bureau does not believe that a single three-year compliance period for all financial institutions is warranted on these grounds. The Bureau acknowledges that this rule is more comprehensive than existing collections of small business lending data, both in terms of how many financial institutions will be required to report under the rule, and in terms of the scope of what is required of any given financial institutions. However, the Bureau observes that many larger volume lenders have already complied with similar data reporting requirements for small business lending, including CRA and the Paycheck Protection Program, which also involved many data points and, for larger volume lenders, compliance across different business units and systems. The scope of this rule is somewhat more expansive than past data collections, but, as many

AdminRecord-000295

other commenters have pointed out, the significant overlap between this rule and the data required by other rules means that the content of this rule is likely to be well understood by many financial institutions.

Regarding the comments that the rule requires the collection of 21 data points, the separation of demographic information, and consideration of the feasibility of a firewall, the Bureau notes that these comments summarized the provisions of the rule without explaining how compliance with these provisions would require three years rather than 18 months. Regarding the comment that the regulatory burden of the rule would be significant and time-consuming, the Bureau refers to the impacts analysis in part IX. In short, such comments do not explain how the Bureau's specific attempts to quantify costs were erroneous, and do not address specific amounts of time that tasks would take.

*Policies and processes.* Regarding comments that lenders need three years to create, update, and test non-software processes and policies, the Bureau acknowledges that some lenders do not currently use written applications for small business and farm loans, and would need to start using them. The Bureau believes that these lenders are more likely to be smaller lenders with lower volumes of originations. The Bureau also acknowledges that lenders would not be able to change procedures, forms, policies, and systems until the final rule is issued, and that clarifications and questions may take some time to address. The Bureau does not believe this justifies a single three-year compliance period for all lenders.

Further, while stating that 18 months was insufficient, commenters did not specify the additional amount of time needed to create new procedures or workflows for applications, change existing workflows to align with the firewall requirement, overhaul their forms and applications, or to obtain new ones. The Bureau believes that the proposed compliance date would have provided sufficient time for these processes. The Bureau believes, however, that smaller lenders with lower volumes of originations may need more time than other lenders to adjust their processes and procedures to comply with the rule for the reasons provided.

*Technology.* The Bureau acknowledges the many comments that it received requesting a longer compliance period to implement software solutions, and the various steps in that process, including identifying, vetting, and choosing vendors, and

integrating and testing software. The Bureau acknowledges that the implementation process for software can be iterative and sequential. The Bureau understands that many lenders, especially smaller and community banks, that will need to automate currently manual lending processes to collect data for this rule. In particular, primarily lower-volume lenders, such as community banks and rural institutions, will need additional time to automate their processes with software to accurately collect data, including some lenders that collect HMDA and CRA data by manual processes. The Bureau also understands that many lenders not experienced with data collection rules have no relationships with vendors.

While some lenders said that they could not begin to implement software until vendors create it, the Bureau notes that one commenter had identified a vendor already at work on compliance software for this rule as of early 2022. Regarding the comment from a larger lender stating that it would need additional time to build compliance software itself, the Bureau notes that it received relatively few comments from larger lenders.

The Bureau notes that of the comments citing software changes to justify a three-year compliance period, only several provided any estimates of the time needed to implement software. The few estimates there were ranged from as few as six months from the issuance of the final rule to upgrade software to 18 months to two years to implement software, and further time still to train staff and test software. The Bureau believes that these comments may overestimate the time vendors will take to prepare compliance software. Some estimates assumed that vendors would not start their work until after the release of the final rule, but the Bureau understands from comments and other feedback that some software vendors started work on compliance software for this rule not long after the release of the NPRM. The Bureau also believes, based on other comments received, that the longer periods suggested by commenters are most likely to apply to smaller and mid-sized lenders, for the reasons discussed before—that vendors are likely to prioritize larger lenders in implementing new or upgraded software.

Regarding the comment that lenders should have software six months before the compliance date for testing, the Bureau believes that the tiered compliance provision would provide most lenders this extra time. In any case, the Bureau believes that the grace period discussed in part VII may permit

lenders to continue testing after their compliance dates, if needed. Regarding the comment that lenders need more than 18 months to comply because they make build technology decisions one to two years in advance, the Bureau believes that the release of the NPRM gave lenders time to plan and budget for compliance technology well in advance of this final rule. Regarding the comment that some lenders adopt blackout periods of eight weeks at the end of the year, which could add four months to the time needed by lenders, the Bureau does not believe additional changes are needed to final § 1002.114(b). The commenter did not suggest how common such blackouts were amongst lenders, nor how an eight-week blackout period would necessitate a four-month compliance date delay.

The Bureau acknowledges commenters' concerns that small and mid-sized banks will likely need more time to comply because of their greater dependence on the timing of third-party software vendors because these comments were based on industry experience with software vendors in the context of past rulemakings. The Bureau believes comments that vendors may become time or resource-constrained and have difficulties serving many lenders at once, and, given a single compliance date, are less likely to prioritize smaller lenders. The Bureau gives credence to comments that small lenders struggled to implement compliance systems for the TILA/RESPA integrated disclosure and HMDA rulemakings before their respective compliance dates because small lenders competed with larger lenders for the limited time and attention of vendors in advance of regulatory deadlines.

*Staffing.* The Bureau acknowledges the many comments that lenders need more time to hire new staff and train existing staff to collect, verify, and report data for this rule; that training may apply to staff across different departments and business units within financial institutions; and that training can be time-consuming. The Bureau observes that comments requesting a three-year period based in part on staffing concerns did not estimate how much of the additional time requested was attributable to staffing issues. One exception was a comment from a lender that said it would need several months to train its staff of 3,000 employees; the Bureau believes that this comment tends to support an 18-month compliance period for larger lenders.

The Bureau understands that certain staff training—on compliance software for this rule—may occur only after software is implemented. However, the

AdminRecord-000296

Bureau believes that other training may be conducted in parallel with the development of software, such as the training on the content of this rule. The Bureau agrees that lender staff with no familiarity with data collection rules may need more time to be trained in complying with this rule. The Bureau notes that the concern that staff already familiar with the HMDA and CRA rules would need training to avoid confusion with this rule is mooted by the Bureau's decision to exclude HMDA-reportable loans from reporting under this rule, and the proposed amendments to the CRA rules that would eliminate the existing CRA reporting regime.

Regarding other comments, the Bureau agrees that part of the compliance process will involve communicating operational changes resulting from this rule to customers to minimize disruption and increase the likelihood that they will answer inquiries related to protected demographic information. The Bureau acknowledges that some customers may believe that lenders already request too much data but believes that it is speculative to say that customers may be driven to less safe financial products to avoid providing data for this rule.

*Access to credit.* Regarding comments requesting a longer compliance period because lenders might need to pause or stop their small business lending until they were in compliance with this rule, hurting the small businesses that section 1071 was intended to benefit, the Bureau does not believe that a reduction in access to credit is likely for the reasons set out in part IX.

*Data accuracy.* The Bureau, for the reasons stated above, agrees that smaller and mid-sized lenders are more likely to need more time to comply with this rule to ensure the accuracy of the data that they will submit. The Bureau agrees with the group of State banking regulators that the implementation timeframe should be increased for many financial institutions to better equip them to accurately report data.

The Bureau makes particular note of comments from smaller lenders and their representatives that lenders lacking experience with data reporting regulations, such as HMDA or CRA, require more time to report accurate data. Inexperienced lenders must create processes from scratch, develop vendor relationships, and become accustomed to new procedures, such as testing software and other systems, to ensure the accuracy of data. The Bureau also agrees that the proposed 18-month period is not sufficient for lenders with lower-volume small business lending operations that may face limited staffing resources and that have never before collected the amount of data required by this rule.

The Bureau agrees in principle that rushed implementation generally would make data in the first few years after the compliance date flawed, incomplete, or unusable, limiting the usefulness of the data for section 1071's fair lending and business and community development purposes. The Bureau believes that the tiered compliance date approach it is taking in this final rule will not result in rushed implementation. Rather, its final compliance provisions will provide sufficient time for especially smaller and mid-sized lenders to implement compliance systems and prepare to collect and report accurate data.

Regarding the comments that data will be error-laden in the first few years of collection until systems, policies, and procedures can be refined, the Bureau has accounted for this in its final rule, with its bona fide error provision and additional safe harbors for certain data points. As discussed in part VII, the Bureau is also providing a grace period for lenders during which it does not intend to assess penalties for errors, so long as lenders engaged in good faith compliance efforts.

Regarding the assertion that a three-year compliance period more closely adhered to the expectation in the statute, the Bureau notes that text of the statute does not identify a specific compliance period, much less one as specific as three years. The Bureau interprets section 1071 as requiring a compliance period that best advances the statutory purposes of the rule. For the reasons specified above, the Bureau believes that its tiered compliance provision does this. In any case, the Bureau believes that the majority of covered financial institutions will report data with Tier 3, and thus will have 33 months to comply with the rule from its issuance.

*Other regulations.* Regarding the comments that other comparably complex regulations—such as the 2015 HMDA rule, CRA, the TILA/RESPA integrated disclosure rule, and FinCEN's customer due diligence rule—provided for more time to comply that the proposed 18-month compliance period, the Bureau agrees that these other rules may be instructive as to how much time smaller and mid-sized lenders might need to prepare to comply with this rule. However, the Bureau does not believe that this necessitates a single compliance period of three years.

The Bureau acknowledges the comment that, unlike the 2015 HMDA rule, this rule does not involve building on an existing system but rather making a new data collection system, and that smaller-volume lenders in particular should therefore have closer to three years to comply. The Bureau also acknowledges that this rule, unlike HMDA, encompasses different credit products for small businesses which may use or require different processes, systems, and personnel.

The Bureau agrees that smaller-volume lenders should have more time because they are more likely to have to build new systems and face challenges. The Bureau believes that larger lenders are less likely to have to start from scratch in complying with this rule, that they are more likely to be familiar with concepts from this rule borrowed or analogous to provisions in other existing data collection regulations, such as HMDA and CRA. This remains true even if larger lenders are more likely than smaller lenders to offer different credit products for small businesses which use different processes, systems, and personnel.

The Bureau acknowledges commenters' concerns that based on industry experience with the 2015 HMDA rule, vendors were not likely to be ready in time for lenders to comply with this rule. The Bureau believes that the tiered compliance provision will give vendors time to work with covered financial institutions on a timely basis by spreading out software needs across three compliance dates. Vendors will be able to focus on smaller-volume lenders in Tiers 2 and 3, avoiding the hasty implementation or inattentive or delayed service commenters mentioned experiencing in complying with the 2015 HMDA rule and the TILA/RESPA integrated disclosure rule.

The Bureau acknowledges comments that the Bureau to provide leniency regarding data accuracy for initial submissions after the 2015 HMDA rule, and that lenders spent hours reviewing data to avoid errors and resubmissions under HMDA. The Bureau notes that the final rule contains provisions—including the bona fide error provision and the various safe harbors for several data points—that relieve lenders of the need to provide perfectly accurate data, especially in early submissions of data. As discussed in part VII below, the Bureau is also providing a grace period for lenders during which it does not intend to assess penalties for errors.

The Bureau appreciates the concerns that vendors may need time to make inquiries to obtain clarity on the provisions of this final rule after its release to deploy solutions, as they did with the TILA/RESPA integrated disclosure rule. The Bureau intends to

AdminRecord-000297

work with vendors to answer inquiries about this rule as early as possible. The Bureau is releasing certain compliance aids and guides concurrently with the final rule to assist vendors in advance of the compliance dates; with previous rules; in the past, such materials were only made available months after the release of final rules. The Bureau believes that the leeway the Bureau is providing, in the form of the grace periods for all three compliance tiers, also may give vendors more time to test, adjust and improve their systems.

Regarding the comments that experiences with past regulations are irrelevant, the Bureau disagrees that experience with past rules will not help lenders comply more quickly with this rule. The Bureau believes that experienced lenders, especially larger ones, have developed institutional knowledge and infrastructure in complying with regulations that will enable them to adapt to more quickly to new rules than lenders without such experience. The Bureau believes that the experience with data collection regulations, such as HMDA and CRA, is particularly relevant to compliance with this rule.

*Industry-specific rationales.* The Bureau finds compelling the comments arguing that smaller-volume lenders— including FCS lenders, community banks, small credit unions, CDFIs, and start-up lenders—would face greater challenges and costs in complying with the rule within the proposed 18-month period. The Bureau gives particular weight to concerns of other regulators that small financial institutions may need closer to three years to comply with the rule because they face particular challenges in implementation.

In short, the Bureau finds the specific explanations compelling and reasonable—larger banks, as commenters pointed out, have more resources for compliance efforts, while smaller and even midsized banks may have less resources to, for instance, pay for staff for overtime or other short-term capacity to comply within 18 months. The Bureau also believes that small and mid-sized financial institutions will be a lower priority for vendors, based on the Bureau's outreach and comments by smaller lenders that experienced this in complying with past Bureau rulemakings. All of this suggests that smaller and, to a lesser extent, mid-sized financial institutions may face a tradeoff between speedy compliance and expending resources that larger lenders do not face.

The Bureau acknowledges the comment that mid-sized banks may face challenges standing up systems in 18 months despite their best efforts. The Bureau believes, however, that relative to the lenders with the smallest volume of small business loans, middle-volume lenders tend to have more resources and are more capable of complying somewhat more quickly with this rule. The Bureau believes that while a 33-month compliance period may be appropriate for smaller-volume lenders, a two-year compliance period is appropriate for middle-volume lenders.

Regarding the comment that the Bureau should consider a longer compliance period based on its capacity to collect data from non-depository institutions subject to the rule, the Bureau believes the challenge may be ensuring compliance by non-depositories that have not previously been subject to Federal data collection regimes. Nonetheless, the Bureau believes that larger non-depository lenders are likelier to be able to prepare to comply with this rule more readily while smaller volume lenders have additional time to prepare to comply.

Regarding the comments that the Bureau should provide three years to comply because the proposed 18-month period is not tenable for motor vehicle dealers in general and small dealerships in particular, the Bureau observes that motor vehicle dealers are not covered financial institutions under this rule. Moreover, as described in the section-by-section analysis of § 1002.109(a)(3), the Bureau believes that motor vehicle dealers are often the last entity with authority to set the material credit terms of the covered credit transaction, and so are generally unlikely to be collecting small business lending data on behalf of other reporting financial institutions.

*More than three years.* Regarding the comment that the Bureau should adopt a compliance period of three to five years because community banks would have to make hard decisions on staffing and lending capacity, resulting in potential market exit, the Bureau does not believe that such a lengthy compliance period is necessary for all financial institutions. The Bureau is providing Tier 3 lenders—which the Bureau believes will include many smaller community banks—33 months, or nearly three years, to prepare to comply with the final rule. The commenter did not provide any details that would justify an even lengthier compliance period.

*Tiered compliance.* Regarding the large number of comments received from industry commenters that requested tiered compliance—often as an alternative to a single compliance date longer than 18 months—the Bureau agrees for the reasons set out above.

The Bureau appreciates industry comments in support of tiered compliance periods on the grounds that such a system would give smaller lenders would have more time to comply with the rule, including that the scope and complexity of the rule and the need to test systems to ensure accurate reporting would be particularly challenging to smaller lenders.

The Bureau observes that many commenters that requested tiered compliance periods on the grounds that smaller banks and credit unions, especially those serving rural and underserved communities, needed more time to comply to have time to implement new compliance software. The Bureau acknowledges the comments identifying discrete steps in the process of implementing software, including finding vendors, giving vendors time to develop software, planning and executing network changes, and training staff but notes that these steps are not unique to smaller or mid-sized lenders. The Bureau observes that smaller-volume lenders may find these steps more challenging for a number of reasons already articulated above. The Bureau acknowledges that smaller lenders may have little bargaining power with vendors and are often the last to receive system upgrades. The Bureau believes that tiered compliance dates are justified because hasty implementation by smaller banks facing difficulties implementing this rule may result in inaccurate data.

The Bureau acknowledges certain factors identified by commenters, such as the need for lenders to hire and/or train additional compliance staff, train existing lending staff, educate customers on the content of the rule, are not unique to smaller lenders. However, the Bureau believes that smaller-volume lenders, especially those without previous experience complying with data collection rules, may face more challenges with all of these factors than larger lenders.

The Bureau agrees with the comments that smaller financial institutions— including CDFIs, credit unions, and lenders servicing rural and underserved communities—should have a later compliance date to learn from money-center banks. The Bureau agrees that tiered compliance is important for lenders inexperienced with data collection rules to give them time to build compliance infrastructure. The Bureau agrees that such lenders may face more challenges than depository institutions in complying quickly with

AdminRecord-000298

this rule, needing to create compliance training programs from scratch, and that they may have a harder time obtaining expertise to implement compliance software and procedures. The Bureau agrees with the comment that banks with no HMDA compliance experience may need more time to comply with this rule than larger banks with such experience. The Bureau believes that the experience of larger banks with HMDA will enable them to more quickly comprehend this rule and implement compliance systems for this rule. This experience will also enable such banks to train their staffs more quickly. The Bureau further agrees that, under a tiered compliance system, smaller-volume lenders may learn from the earlier implementation of large banks, and that tiered compliance would give smaller lenders more time to resolve unanticipated issues.

The Bureau believes that industry experience with the staggered effective dates in the Financial Accounting Standards Board's Current Expected Credit Loss rule somewhat informs the final tiered compliance provision. The Bureau believes that the approach taken by the Financial Accounting Standards Board and other Federal regulators regarding the Current Expected Credit Loss rule support the Bureau's approach here.

Regarding the number of compliance date tiers, the Bureau believes that the three tiers included in this final rule are more appropriate than two as suggested by some commenters, for the reasons already articulated. However, commenters distinguished not just between smaller and larger lenders; comments also identified mid-volume lenders as facing unique issues in complying with the rule, occupying a space between large and small lenders. Mid-volume lenders face certain challenges complying with the rule compared to larger lenders, but have greater resources and, often, more experience with Federal regulations and data collections than small lenders.

Regarding the comments supporting the adoptions of three compliance tiers, the Bureau agrees. Regarding the comment that the Bureau should adopt three compliance tiers, giving the largest lenders one year to comply, medium-sized lenders two years, and small lenders three years, the Bureau agrees in part. The Bureau agrees that earlier compliance dates are justified for large lenders because they have greater staff expertise, as well as capacity and resources, to comply with data collection regulations. However, the Bureau believes that a one-year compliance period may be insufficient

for many larger financial institutions to comply with this rule.

Regarding the comment that the third compliance tier should include trusted small business lenders, the CFPB intends to propose, in a follow-on notice of proposed rulemaking, that lenders with strong records under the CRA or other relevant frameworks be permitted additional time to come into compliance with the rule. That approach is consistent with the statutory purposes of the rule.

Regarding the request for tiered compliance starting not less than three years after the final rule, the Bureau does not believe such an approach would be appropriate, for the reasons specified above concerning the request for a single three-year compliance period. The Bureau believes that a three-year period for the earliest tier is inconsistent with the statutory purposes of the rule because larger volume financial institutions are capable of adequate compliance with this rule within 18 months. Further delay for these lenders would result in a longer period during which data are unavailable to facilitate the enforcement of fair lending laws or to identify business and community development needs and opportunities.

Regarding the requests that the Bureau use asset size to determine compliance date tiers, the Bureau acknowledges that asset size can sometimes be a proxy for determining the resources and capacity a lender has to prepare to come into compliance with the rule. It is also a simple metric to implement, given that there are recognized standards for reporting assets. The Bureau agrees that institutions with less assets often have smaller compliance and information technology staffs.

However, the Bureau notes that this rule applies to non-depository institutions as well. Some such lenders may have high volumes of originations but relatively low assets. As a result, the Bureau observes that asset size may not be as reliable a proxy for the capacity and resources a non-depository institution has to comply quickly with the rule. The Bureau believes that volume of originations is, in the context of small business lending, a better proxy than asset size for determining the capacity of a lender to comply with this rule. The Bureau also believes that tiering based on volume of originations is proportional to the interest a lender would have in complying with this rule, regardless of asset size.

Regarding the comments opposing tiered compliance dates, the Bureau appreciates that this rule represents a

great change for small and large financial institutions that may proceed through similar steps to implement the rule, including understanding the rule, changing processes, building and testing systems, training staff, and adding procedures and controls. The Bureau does not believe, however, that the magnitude of challenges lenders face is the same regardless of the size or capacity of the institution. The Bureau believes that the largest volume lenders that will be in Tier 1 have the capacity to comply with this rule within 18 months, especially given the leeway provided by this rule—in the form of the bona fide error thresholds and safe harbors—and by the grace period to report data that is sufficiently accurate. The Bureau agrees with the comment that limiting access to small business credit could have a negative impact on the economy, but does not believe the final tiered compliance date provision would "inevitably" result in any diminishing of access to credit for small businesses, as discussed in more detail in part IX below.

Regarding the comment opposing tiered compliance dates on the grounds that 18 months was sufficient for all institutions, the Bureau disagrees for the reasons specified above. While many smaller-volume lenders may be able to comply within 18 months, the Bureau believes that many such lenders may find it challenging to comply with 18 months. Regarding the comment that financial institutions have had since the release of the NPRM in September 2021 to begin preliminary planning to comply with this rule, the Bureau agrees in part. While the final rule differs from the NPRM in several aspects, many provisions are based on statutory requirements—such as the mandatory data points, the firewall provision, the recordkeeping requirements, and the privacy analysis—and would have been finalized in some manner, permitting some planning for financial institutions concerned with preparing for implementation well in advance of the eventual compliance date. The Bureau does not believe, however, that the September 2021 release of the NPRM gives smaller volume lenders the ability to comply with this rule within 18 months of its issuance.

Regarding the comment that the proposed compliance period of 18 months would give banks just six months to collect data to do a trial run with one year of data before compliance date, the Bureau observes that smaller volume lenders in Tiers 2 or 3 would have more time to test their collection systems. The Bureau also notes that pursuant to final § 1002.114(c)(1), all

financial institutions may start collecting data one year before their respective compliance dates, giving especially smaller-volume lenders more time to test their systems.

### 114(c) Special Transitional Rules

The Bureau is adopting two transitional rules in § 1002.114(c) to facilitate the initial compliance of financial institutions with subpart B. Final § 1002.114(c)(1) permits, but does not require, financial institutions as described by § 1002.114(b)(1) through (3) to collect information regarding applicants' minority-owned business status, women-owned business status, LGBTQI+-owned business status, and the ethnicity, race, and sex of applicants' principal owners under final § 1002.107(a)(18) and (19) beginning 12 months prior to the financial institution's applicable compliance date as set forth in § 1002.114(b)(1) through (3). A financial institution collecting such information pursuant to § 1002.114(c)(1) must do so in accordance with the requirements set out in §§ 1002.107(a)(18) and (19), 1002.108, and 1002.111(b) and (c). In addition, comment 114(c)–2 clarifies that a financial institution that receives an application prior to its compliance date under § 1002.114(b), but takes final action on the application after the compliance date, is not required to collect data regarding that application under § 1002.107 and not required to report the application pursuant to § 1002.109.

Final § 1002.114(c)(2) permits a financial institution that is unable to determine the number of originations of covered credit transactions for small businesses for calendar years 2022 and 2023, because for some or all of this period it does not have readily accessible the information needed to determine whether its covered credit transactions were originated for small businesses as defined in § 1002.106(b), to use a reasonable method to estimate its originations to small businesses for either or both of the calendar years 2022 and 2023.

The Bureau believes that these transitional rules pursuant to its authority under ECOA section 704B(g)(1), are necessary to carry out, enforce, and compile data pursuant to section 1071.

### 114(c)(1) Collection of Certain Information Prior to a Financial Institution's Compliance Date

#### Proposed Rule

Proposed § 1002.114(c)(1) would have provided that a financial institution that

will be a covered financial institution as of the compliance date in proposed § 1002.114(b) is permitted, but not required, to collect information regarding whether an applicant for a covered credit transaction is a minority-owned business under proposed § 1002.107(a)(18), a women-owned business under proposed § 1002.107(a)(19), and the ethnicity, race, and sex of the applicant's principal owners under proposed § 1002.107(a)(20) beginning 12 months prior to the compliance date. A financial institution collecting such information pursuant to proposed § 1002.114(c)(1) would have been required to do so in accordance with the requirements set out in proposed §§ 1002.107(18) through (20) and 1002.108.

The Bureau sought comment on the approach in this proposal.

#### Comments Received

A joint letter from several trade associations supported the proposed provision permitting early collection of data. A community group agreed with the reasoning and approach to allowing voluntary reporting by financial institutions, inquired whether the Bureau was permitting voluntary reporting of date only for demographic information, and suggested that to permit the reporting of only demographic information would be of limited use. A business advocacy group commended the Bureau for encouraging the reporting of data before the start of the compliance period, and encouraged the Bureau to offer incentives to enable collection of data as early as possible to help enable the analysis of fair lending. Several CDFI lenders suggested that mission-oriented lenders ready to report data in 18 months should be able to opt in. Two banks recommended that the 12-month period of voluntary collection in advance of the compliance date should be extended further, noting that such a transitional period would be a critical period for lenders to implement, test, and if necessary, modify data collection and maintenance processes and systems before the compliance date. One trade association requested that the Bureau clarify that applications submitted before the compliance date, but approved after the compliance date, not be considered covered applications for purposes of determining coverage.

#### Final Rule

The Bureau is finalizing § 1002.114(c)(1), maintaining the provision in principle but making several changes. First, final § 1002.114(c)(1) permits, but does not require, a financial institution that will

be a covered financial institution by the compliance dates set out in § 1002.114(b)(1) through (3) to collect protected demographic information pursuant to § 1002.107(a)(18) and (19) beginning 12 months prior to the compliance date applicable to that financial institution. This regulatory text has been adjusted to account for the change from a single compliance date in proposed § 1002.114(b) to the three different compliance dates in final § 1002.114(b)(1) through (3). Second, final § 1002.114(c)(1) clarifies that any protected demographic information collected under this provision must comply with the requirements of § 1002.107(a)(18) and (19), and § 1002.108, as proposed, and adds a new requirement that any demographic information collected must comply with the requirements of § 1002.111(b) and (c). Third, final § 1002.114(c)(1) clarifies that a financial institution that receives an application prior to its compliance date specified in § 1002.114(b), but takes financial action on or after that compliance date, is not required to collect data regarding that application pursuant to § 1002.107 nor to report the application pursuant to § 1002.109.

The Bureau is also finalizing new comments 114(b)–1 through 4. Comment 114(b)–1 specifies the provisions of this rule that a covered financial institution must comply with by the compliance date that applies to it under § 1002.114(b). Comment 114(b)–2 specifies the provisions of this rule that covered financial institutions that must comply with the initial partial year collection pursuant to § 1002.114(b)(1), from October 1, 2024 through December 31, 2024. Comment 114(b)–3 establishes informal names for compliance date provisions (Tier 1, Tier 2 and Tier 3) to facilitate discussion of the compliance dates specified in § 1002.114(b)(1), (2), and (3). Comment 114(b)–4 illustrates the application of § 1002.114(b) to determine the compliance dates of a variety of financial institutions, based on a variety of volumes of originations of covered credit transactions to small businesses.

The Bureau believes that this provision will give financial institutions time to test their procedures and systems for compiling and maintaining this information in advance of actually being required to collect and subsequently report it to the Bureau. Under this provision, financial institutions will have time to adjust any procedures or systems that may result in the inaccurate compilation or maintenance of applicants' protected demographic information, the collection of which is required by section 1071 but

otherwise generally prohibited under ECOA and Regulation B. (Financial institutions could of course collect the other information that would be required by this proposed rule at any time, without needing express permission in Regulation B to do so.) The Bureau believes that this provision will facilitate compliance and improve the quality and accuracy of the data reported to the Bureau and therefore is necessary to carry out, enforce, and compile data pursuant to section 1071, and will carry out the purposes of ECOA, and is necessary or proper to effectuate the purposes of ECOA and facilitate or substantiate compliance therewith.

Regarding the question as to whether the proposed provision permits voluntary reporting only of protected demographic information, the Bureau observes that the provision actually only permits the collection, not reporting, of demographic information. The provision is necessary because, in its absence, ECOA and § 1002.5(b) of Regulation B would otherwise prohibit creditors from collecting such demographic information, while creditors are not prohibited by ECOA and Regulation B from collecting the other data points required by this rule. Regarding the comments encouraging the Bureau to offer incentives to collect data as early as possible to help enable the analysis of fair lending, the Bureau notes that the provision exists only to help financial institutions better prepare to comply with the rule. The Bureau is not adopting any additional incentives, as suggested by commenters, and indeed it is unclear what incentives it might offer to further encourage early reporting.

Regarding the comment that mission-oriented lenders ready to report data in 18 months should be able to opt in, the Bureau agrees. Regarding the request to extend the transitional period further such that financial institutions could collect protected demographic information without being required to report it for a period longer than 12 months, the Bureau acknowledges these concerns but does not believe such a change would be appropriate. The Bureau's decision to provide most smaller-volume financial institutions additional time by way of tiered compliance dates, as well as a grace period during which it does not intend to exercise its supervisory or enforcement authorities, all give financial institutions additional time and leeway to establish their compliance systems. Further, institutions seeking longer periods to collect demographic information would

not necessarily have even one year of information upon which to base a determination that they may have to begin preparing to comply with the rule, potentially resulting in the collection (but not reporting) of protected demographic data in a way that completely overrides the general prohibition in existing § 1002.5(b).

Regarding the request to clarify that applications submitted before the compliance date, but approved after, not be considered covered applications, the Bureau agrees that such clarity is useful and thus final § 1002.114(c)(1) addresses and implements this request.

### 114(c)(2) Determining Which Compliance Date Applies to a Financial Institution That Does Not Collect Information Sufficient To Determine Small Business Status

#### Proposed Rule

Proposed § 1002.114(c)(2) would have provided that for purposes of determining whether a financial institution is a covered financial institution under proposed § 1002.105(b) as of the compliance date specified in proposed § 1002.114(b), a financial institution would be permitted, but not required, to use its originations of covered credit transactions for small businesses in the second and third preceding calendar years (rather than its originations in the two immediately preceding calendar years).

The Bureau sought comment on the approach in this proposal.

#### Comments Received

A joint letter from trade associations representing the commercial real estate industry supported the proposed provision and suggested an edit to the regulatory text of proposed § 1002.114(c)(2) specifying that a financial institution is permitted, but not required, to use its originations in the first two full calendar years after the effective date of the rule, rather than its originations in the two immediately preceding calendar years.

A joint letter from trade associations, in commenting on the proposed compliance date, claimed that 18 months was not enough time to determine covered financial institution status pursuant to § 1002.105(b) because lenders would be required to collect gross annual revenue data to determine the small business status of their originations for purposes of originations thresholds, but they could not collect such data until after the publication of the final rule. The commenter noted that many lenders do not collect gross

annual revenue for their commercial loans (*e.g.*, investment property loans are underwritten based on net operating income), and that some lenders that collected gross revenue data did not have it readily accessible. The commenter requested a longer compliance period to give lenders time to understand the content of the final rule before the start of a calendar year to track originations for small businesses to avoid retroactive application of the final rule. The commenter suggested, instead, a two-calendar-year period to collect gross annual revenue data, followed by the compliance date starting the third calendar year for those financial institutions that determine they are covered. The commenter noted that its proposed schedule was a minimum, and was predicated on having a gap between publication of the final rule and the start of the first calendar year during which lenders would track the small business status of originations, and that the Bureau published technical specifications sufficiently in advance of the third calendar year. A trade association, also commenting on the compliance period, claimed that two years would allow for implementation by lenders, would provide time to track originations of covered transactions and, therefore, the small business status of applicants, and would allow lenders to make changes necessary to achieve the statutory purposes of the rule.

#### Final Rule

The Bureau is not finalizing § 1002.114(c)(2) as proposed. The Bureau is instead implementing a different provision stating that a financial institution that is unable to determine the number of covered credit transactions it originated for small businesses for calendar years 2022 and 2023 for purposes of determining its compliance date pursuant to § 1002.114(b), because for some or all of this period it does not have readily accessible the information needed to determine whether its covered credit transactions were originated for small businesses as defined in § 1002.106, is permitted to use any reasonable method to estimate its originations to small businesses for either or both of the calendar years 2022 and 2023. The Bureau is also implementing new comments 114(c)–3 through –6. Comment 114(c)–3 specifies circumstances under which a financial institution has readily accessible the information needed to determine the small business status of its covered credit transactions for purposes of determining its compliance date. Final

AdminRecord-000301

comment 114(c)–4 specifies certain circumstances under which a financial institution does not have readily accessible the information needed to determine small business status of its covered credit transactions for purposes of determining its compliance date. Final comment 114(c)–5 identifies three reasonable methods that may be used by financial institutions to estimate the number of covered credit transactions for small businesses for purposes of determining its compliance date. Final comment 114(c)–6 provides examples of financial institutions applying each of the three reasonable methods identified in comment 114(c)–5 by financial institutions, as well as financial institutions applying reasonable methods not specified in comment 114(c)–5, to estimate the number of covered credit transactions for purposes of determining its compliance date.

The Bureau believes that, in the context of the proposed single compliance date, proposed § 1002.114(c)(2) would have provided greater clarity and certainty to financial institutions as to whether or not they would be covered financial institutions. This may have been particularly important for those financial institutions that originated a volume of covered credit transactions close to the threshold under proposed § 1002.105(b) and a single compliance date. The Bureau believed this provision would have been necessary to carry out, enforce, and compile data pursuant to section 1071.

However, because of the changes to the compliance date provision in final § 1002.114(b), from a single compliance date to several tiers of compliance dates, the Bureau believes that § 1002.114(c)(2) as originally proposed may no longer effectively serve the purposes for which it was originally intended. The Bureau believes that because the final rule provides for several compliance dates, the optionality provided by proposed § 1002.114(c)(2) is no longer necessary and may even make compliance more confusing. The transition to several compliance dates in the final rule, from a single compliance date in the proposal, means that many lower-volume financial institutions will have one to two years in advance of their compliance date to determine whether they are covered financial institutions that must report data at all. For instance, an institution with a compliance date of January 1, 2026, based on its annual originations in 2022 and 2023, may not be a covered financial institution at all by its compliance date if it has less than 100 annual originations in 2024 or 2025.

The Bureau received one comment directly addressing proposed § 1002.114(c)(2). By contrast, the Bureau received multiple comments on the difficulty that some financial institutions may face in determining their coverage under this rule, and therefore their compliance date, because they do not collect information on the gross annual revenue of their applicants for business credit. Some industry commenters, as set out in the section-by-section analysis of § 1002.107(a)(14), noted either that they did not collect data on gross annual revenue of some small business applicants, or that there would be difficulties in collecting such data.

In response to these comments, the Bureau has revised § 1002.114(c)(2) to provide greater flexibility for those financial institutions that do not have ready access to data on gross annual revenue to determine what compliance date will apply to them for purposes of § 1002.114(b). Because of the changes to this rule after the proposal, the Bureau believes that this provision, as finalized, will provide greater clarity and certainty to those financial institutions that do not currently collect gross annual revenue data as to which compliance date will apply to them. This will be particularly important for those financial institutions that originated a volume of potentially covered credit transactions close to the threshold under § 1002.105(b), and those financial institutions that originated a volume of potentially covered credit transactions close to the thresholds in § 1002.114(b). The Bureau believes this provision is necessary to carry out, enforce, and compile data pursuant to section 1071.

*Appendix E to Part 1002—Sample Form for Collecting Certain Applicant-Provided Data Under Subpart B*

Proposed Rule

The Bureau proposed a sample data collection form that financial institutions could choose to use to collect minority-owned business status, women-owned business status, and principal owners' ethnicity, race, and sex. The proposed sample data collection form would have been similar to the HMDA data collection form and would have included a notice of the applicant's right to refuse to provide the information as well as an explanation of why the financial institution is requesting the information. The sample data collection form would have also included the definitions of minority individual, minority-owned business, principal owner, and women-owned business as they would have been

defined in proposed § 1002.102(*l*), (m), (o), and (s), respectively.

Additionally, to aid financial institutions with the collection of the information in proposed § 1002.107(a)(21), the sample data collection form would have included a question about the applicant's number of principal owners. The sample data collection form would have also included language that a financial institution would have been able to use to satisfy the notice requirement under ECOA section 704B(d)(2) if it determined that one or more employees or officers should have access to the applicant's protected demographic information pursuant to proposed § 1002.108(b)(2).

The Bureau requested comment on the proposed sample data collection form, including the proposed language for the notice under ECOA section 704B(d)(2). The Bureau also generally requested comment on whether to provide additional clarification regarding any aspect of the sample data collection form or the related notice provided pursuant to ECOA section 704B(d)(2). In addition, the Bureau sought comment on whether the sample data collection form should identify the Bureau to applicants as a potential resource in connection with their applicable legal rights or for additional information about the data collection, including concerns regarding non-compliance. It also sought comment on whether financial institutions need additional information on how to adapt this form for use in digital modes of data collection, and, if so, what specific information would be most useful. The Bureau further requested comment on whether a sample data collection form in Spanish or other languages would be useful to financial institutions.

Comments Received

Commenters were generally supportive of the Bureau's inclusion of a sample data collection form in the final rule, stating that the sample data collection form would help financial institutions meet the demographic data collection requirements.

Several commenters had suggestions for language to add to the proposed sample data collection form. One trade association suggested that the data collection form disclose, as the beginning, that the applicant is not required to respond to the questions, and second inquire as to whether the applicant is a small business based on its gross annual revenue and establish that the form is not required if the applicant is not a small business. One bank commented that the form should

include language, in bold, to the applicant stating that the information provided will not be used against them and is not derogatory.

A bank urged providing an option on the proposed form for an applicant to indicate if the applicant's principal owner was present when the form was completed or if the responses were provided by the principal owner, to lessen confusion and discomfort during the application process. The bank stated such an option would also improve data quality where a financial institution does not meet with a principal owner in person and thus cannot make ethnicity and race determinations on the basis of visual observation and/or surname analysis. A trade association suggested including options to indicate on the form if the applicant declined to answer and that the applicant was not available, which could be used if an applicant representative was uncertain of an absent principal owner's ethnicity, race, and/or sex or was unsure if the principal owner wished to provide such information.

A community group commenter recommended that the sample data collection form include a notice that the Americans with Disabilities Act prohibits discrimination in lending practices on the basis of an applicant's disability.

An individual commenter suggested that applications include an explanation of why the Bureau is collecting protected demographic information after a demographic information collection section, which would allow an applicant to make an informed decision in providing information and know who to contact in the event of discrimination.

A bank and a trade association stated that the proposed sample data collection form is misleading because it would have indicated that the demographic information is required and would not have stated that the borrower has the right to refuse to provide the requested information. In contrast, however, a CDFI lender supported the statement on the proposed form that applicants are not required to provide the information requested but are encouraged to do so. This commenter also supported the notice on the sample form that while provided information could not be used to discriminate against the applicant, some employees may have access to the information.

Some lenders and trade associations expressed concerns about the text on the proposed sample form that would have disclosed that, if an applicant does not provide ethnicity, race, or sex information for at least one principal

owner and the financial institution meets with a principal owner in person or via electronic media with an enabled video component, the financial institution is required by Federal law to report at least one principal owner's ethnicity and race based on visual observation and/or surname. Some of these commenters, who also opposed the proposed visual observation and surname data collection requirement this language would have referenced, stated that the proposed disclosure language may discourage an applicant from seeking an in-person meeting with the financial institution or pressure applicants to provide the information to avoid inaccurate guesses by bank employees or officers. Other commenters requested that the disclosure about the proposed visual observation and surname data collection requirement be removed from the form, because it would inform an applicant that the financial institution will be collecting information about their principal owners' ethnicity and race regardless of their choice to not provide the information. A joint letter from several trade associations representing the commercial real estate industry opposing the proposed visual observation and surname data collection requirement stated that the related disclosure language on the proposed form should be removed if the data collection requirement is not adopted for the final rule.

Some community groups, a CDFI lender, and a joint trade association letter recommended that the Bureau provide non-English translations of any sample forms, including in Spanish. Two community groups suggested that the data collection form be provided in English, Spanish, and Mandarin Chinese. They stated that providing the forms in multiple languages would help reduce confusion and help lenders. Other community groups and a lender suggested that the proposed form be provided in at least the top ten spoken languages in the United States, as determined by the Census, so applicants can understand the data being collected and its context. They stated that the translations are necessary to honor the statutory intent, and that immigrants are more likely to start businesses than non-immigrants, and research shows that many immigrants and immigrant entrepreneurs have limited English proficiency, which leads to difficulties in navigating the financial marketplace.

A trade association and a bank requested flexibility to solicit responses to the questions on the proposed sample collection form across different circumstances, and specifically asked

for clarification that financial institutions could list the response "I do not wish to provide this information," as the first response option and not the last, as it is listed for all the proposed questions on the form. The commenters also asked for flexibility, when using an electronic data collection form, to collapse subcategories of questions, so that they appear only when an applicant clicks on a question to facilitate readability. The commenters also asked for clarification for applications taken orally, as to whether all categories of responses must be read to the applicant, even if the applicant has responded to an earlier response option. These commenters also requested a safe harbor from liability for not using the language of the sample data collection form when taking a covered application orally, stating that some words on the form are long, complex, and may be difficult for employees to pronounce. These commenters also stated that the sample data collection form should disclose which data points will be published to allow applicants to make informed decisions, address privacy concerns, and improve data quality.

Some commenters had suggestions for additional forms or materials the Bureau should issue. A trade association stated that the Bureau should create a business-specific form to request information, which the commenter stated should be optional for financial institutions to use. Several commenters, including banks, community groups, and a minority business advocacy group, asked the Bureau to create a uniform or model data collection or application form. The commenters generally stated that such a form would facilitate accurate data collection. One bank asserted that the likelihood of a respondent providing information would be higher, citing Paycheck Protection Program data that the majority of applicants chose not to provide demographic information. The bank stated that absent a uniform CFPB-issued form, collection and the resulting data will be flawed. Two commenters cited the HMDA model application forms as an example of such a uniform application, which one said effectively explains to borrowers why data are being collected and encourages completion of the data while also giving the borrower some assurance that they will not be discriminated against for either furnishing (or not) the data. A trade association and a bank urged the Bureau to create a specific data collection form for loans covered by HMDA and by section 1071, if HMDA-reportable loans are included in the

final rule, to facilitate consistent reporting. A trade association and a business advocacy group encouraged the Bureau to evaluate the sample data collection form and instructions on an ongoing basis for any necessary changes.

Final Rule

Pursuant to its authority under ECOA section 704B(g)(1), the Bureau is finalizing appendix E to help financial institutions comply with requirements to collect applicants' protected demographic information and to keep an applicant's responses to inquiries for such information separately from the credit application and accompanying information. The introductory language in the sample form includes right to refuse, firewall, and non-discrimination notices. When lenders choose to use the form, this language serves to facilitate compliance with ECOA section 704B(c) and, when applicable, 704B(d)(2), as well as with comment 107(a)(19)–4, which requires that applicants be informed that Federal law requires it to ask for the principal owners' ethnicity, race, and sex/gender to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. Though the sample form reflects a number of legal requirements applicable to collection, the rule does not require use of the form itself. Rather, the sample form is intended as a compliance resource for lenders who choose to use it.

The Bureau agrees generally with commenters that the sample data collection form at final appendix E will help facilitate financial institutions' efforts to comply with the data collection requirements of the final rule, meet their statutory obligations, and that it will streamline the data collection process. To further these goals, the sample data collection form at final appendix E reflects edits made by the Bureau in response to comments received and further Bureau consideration. The final version of the form also considers feedback from user testing, conducted to learn about small business owners' likely experience in filling out the form and to explore design and language options to make the form effective.[839]

The Bureau received comments suggesting that the Bureau provide more guidance or specific text on the form about the purpose of the data collected through the form. The Bureau agrees with commenters that it is important to provide applicants with a general explanation of the rule and its purpose. As discussed in the section-by-section analysis of § 1002.107(a)(19), in response to similar comments and in consideration of feedback from the user testing, comments 107(a)(18)–4 and 107(a)(19)–4 provide that a financial institution must inform an applicant that Federal law requires it to ask for the applicant's principal owners' ethnicity, race, and sex to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. The Bureau has also included sample language for the statement on the sample form at appendix E. In the Bureau's user testing, participants also generally reflected a preference for upfront placement of language establishing that Federal law requires the collection of the requested information and emphasizing the purpose of collecting the information, to ensure that small business owners are treated fairly. As revised, the introduction on the first page of the final sample data collection form starts with this statement and also reiterates the purpose of the data collection in the last sentence. As discussed in the section-by-section analysis of § 1002.108, the Bureau has also revised the firewall notice in the introduction. The Bureau has moved its placement to the second paragraph of the introduction. In line with a suggestion by a commenter, the Bureau has also generally revised the language of the non-discrimination notice to emphasize that the financial institution may not discriminate against the applicant on the basis of its answers, by bolding and capitalizing the phrase, "Federal law prohibits discrimination" in that disclosure, along with other edits.[840]

To accommodate the changes described above, the right to refuse notice is now included later in the introduction. The Bureau received comments that the proposed sample data collection form does not state that applicants have the right to refuse to provide the information requested—which the Bureau notes is incorrect—and a suggestion that the form emphasize that right at the very beginning. In the user testing, some participants also recommended greater emphasis on the right to refuse.[841] After consideration of all the received feedback, the Bureau believes that the introduction of the sample data

collection form appropriately addresses an applicant's right to refuse to provide the information requested. In particular, the preceding introductory material in the sample data collection form, as described above, will inform applicants about what they are refusing when exercising that right.

The first page of the final sample form also includes a question about the applicant's business status under final § 1002.107(a)(18). Whereas the proposed sample form originally had separate inquiries for an applicant's minority-owned business status and women-owned business status, the final sample data collection form combines those questions, along with the inquiry about whether the applicant is an LGBTQI+-owned business, into one question to streamline the questions on the data collection form.[842] The Bureau also received feedback during its user testing of the forms that the term "business status" was confusing for applicants. In consideration of that feedback and comments received generally urging the Bureau to make the sample data collection form clearer for applicants, the Bureau has revised the sample question heading to read "Business ownership status."

As discussed in the section-by-section analysis of § 1002.102(m), the Bureau is not adopting its proposed definition for minority individual in the final rule, because it is incorporating the substance of the minority individual definition in the "minority-owned business" definition at final § 1002.102(m). To facilitate the readability of the combined business ownership status question on the final sample data collection form, the Bureau is including a separate explanation for what is meant by a minority individual, which is similar to the approach to the minority-owned business question on the proposed sample data collection form. A financial institution is permitted to use the language on the sample form to satisfy the rule's requirement to provide certain definitions when requesting an applicant's business status.

The first page of the final sample data collection form also includes a question about the number of the applicant's principal owners, as did the first page of the Bureau's proposed form. The Bureau has revised the question to include check boxes for potential responses instead of a write-in text field as proposed, to reduce the likelihood of

---

[839] CFPB, *User testing for sample data collection form for the small business lending final rule* (Mar. 2023), *https://www.consumerfinance.gov/data-research/research-reports/user-testing-for-sample-data-collection-form-for-the-small-business-lending-final-rule/*.

[840] *Id.* at app. A.

[841] *Id.*

[842] Two versions of a combined question were tested in the Bureau's user testing. The version in final appendix E is the version the Bureau believes is conceptually simpler for applicants to understand.

AdminRecord-000304

error by applicants in responding to the question.

Final comments 102(o)–3 and 107(a)(20)–1 clarify that a financial institution must provide the definition of principal owner set forth in § 1002.102(o) when requesting information about the number of an applicant's principal owners. As discussed further in the section-by-section analyses of §§ 1002.102(o) and 1002.107(a)(20), in consideration of overall feedback from commenters to improve applicant understanding of the data collection and positive feedback received in the course of the user testing, the Bureau has revised the number of principal owners inquiry on the final sample data collection form to use the term "individual" instead of the term "natural person" when providing the definition of a principal owner.

As explained in the section-by-section analysis of § 1002.107(a)(19), the Bureau has elected to not adopt the proposed requirement that a financial institution collect at least one principal owner's ethnicity and race information through visual observation and/or surname analysis under certain circumstances. As a result, the Bureau has removed the proposed disclosure regarding this requirement from the second page of the final sample data collection form, rendering commenters' objections to the disclosure moot.

In the Bureau's user testing, some participants expressed confusion about differences between the ethnicity and race questions on the sample data collection form. Some users also stated it was not obvious how many separate questions they had to answer. To ensure that the sample data collection form is clear and easily understood, on the second page of the form the Bureau has numbered the sample questions about a principal owner's ethnicity, sex (as "sex/gender"), and race (from one to three, in that order) to make more apparent that the questions are separate inquiries. The Bureau has also changed the inquiries on that page to appear as questions (e.g., for ethnicity, to ask "Are you Hispanic or Latino?") to make the substance of each inquiry clearer. The Bureau has also made edits to rearrange the questions and to the format of the ethnicity and race aggregate categories and disaggregated subcategories on the final form, to make clearer for the reader that the disaggregated subcategories are associated with the aggregate categories. The Bureau has further updated the instruction associated with each of the response options with a write-in text field to direct the applicant to "specify" a response and not "print" a response as proposed, to facilitate the use of the

instruction for paper, electronic, and oral applications.

The Bureau carefully considered the comment suggesting that the sample form first note applicants' right to refuse and, second, establish that if the applicant is not a small business it does not need to fill out the form, by including an inquiry about the applicant's gross annual revenue. However, in the Bureau's user testing, participants preferred having information explaining that the data collection was required under Federal law at the beginning of the form and emphasized the importance of explaining the purpose of the data collection.[843] And, for the reasons explained above, the Bureau believes the placement of the right to refuse in the introductory text is appropriate.

The Bureau also does not believe that it is necessary for the sample form to include an inquiry establishing the applicant's small business status. Financial institutions will be required to maintain reasonably designed procedures to collect applicant-provided data, pursuant to § 1002.107(c). The Bureau has also included a safe harbor under § 1002.112(c) for a financial institution that initially collects data under § 1002.107(a)(18) and (19) regarding whether an applicant for a covered credit transaction is a minority-owned, a women-owned, and/or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners, but later concludes that it should not have collected this data, if certain conditions are met. The Bureau believes these other regulatory provisions will mitigate the possibility that data will be incorrectly collected and protect financial institutions from inadvertent collection. As a result, the Bureau does not believe that it is necessary for the sample form to include a question to establish the applicant's small business status.

The Bureau considered the commenter's suggestion to include a disclosure about the American with Disabilities Act on the final sample data collection form. The sample form has been developed by the Bureau to address a financial institution's disclosure and data collection obligations under section 1071 and the Bureau believes it would be confusing for the sample form to include text as to the applicability of other laws.

---

[843] CFPB, *User testing for sample data collection form for the small business lending final rule* at app. A, at 6, 11–12, 14 (Mar. 2023), *https://www.consumerfinance.gov/data-research/research-reports/user-testing-for-sample-data-collection-form-for-the-small-business-lending-final-rule/*.

The Bureau is not adopting commenters' suggestions that the sample data collection form include options for indicating whether an applicant's principal owners or the applicant are not present or available, that the data was not provided by principal owner, or that the applicant declines to fill out the form. As discussed above, the proposed form would have included a notice about the applicant's right to refuse to provide the information requested. This right to refuse notice also appears, with some edits, on the final sample data collection form. The Bureau believes it is reasonable to assume that if the person filling out the data collection form on behalf of an applicant does not feel comfortable providing the information for any reason, including because they are not the principal owner at issue or do not believe they can provide accurate responses, that they will exercise the right to refuse to provide the requested information. Further, an applicant can also choose to not fill out the entirety of the form, to not provide responses to a specific question, or to select the "I do not wish to provide this information" or similar response option available for each of the demographic questions on the sample data collection form. As a result, the Bureau does not believe it is necessary to include the suggested options on the sample data collection form to address any discomfort by persons that may be completing the data collection form, who are not principal owners, as suggested by some commenters. Further, as explained in the section-by-section analysis of § 1002.107(a)(19), the Bureau is not finalizing its proposal to require a financial institution to collect at least one principal owner's ethnicity and race on the basis of visual observation and/or surname analysis under certain circumstances. All financial institutions will be required to report only applicant-provided responses to the demographic questions on the final sample data collection form. As a result, the Bureau does not believe the suggested options are necessary to address data quality concerns relating to the proposed visual observation and surname data collection requirement, as suggested by one commenter.

The Bureau has considered comments suggesting that the sample data collection form disclose what information will be published. As discussed in greater detail in part VIII below, after receiving a full year of reported data, the Bureau will assess privacy risks associated with the data and make modification and deletion

AdminRecord-000305

decisions to the public, application-level dataset. As a result, the Bureau does not have definitive information about the public, application-level dataset available to put on the sample data collection form. The Bureau takes the privacy of such information seriously and, as noted, will be making appropriate modifications and deletions to any data before making it public. However, the Bureau intends to continue engage with the public about how to mitigate privacy risk.

The Bureau also considered the suggestion to translate the sample data collection form into other languages. Generally, Bureau stakeholders have underscored the importance of language access as a way of ensuring fair and competitive access to financial services and products. Persons with limited English proficiency in the United States make up a significant portion of the population. According to a report, more than one in five immigrant entrepreneurs, or nearly 773,000 people, in the United States in 2018 had limited English proficiency.[844] More than 67 million people, or close to 22 percent of the U.S. population over the age of five, speak a language other than English at home.[845] In 2021, over five million households reported that all their members were of limited English speaking ability.[846]

The Bureau believes that competitive, transparent, and fair markets are supported by providing translations of key material in the customer's preferred language, along with the corresponding English-language material. Accordingly, the Bureau will make available translations of the sample data collection form, for financial

---

[844] New Am. Econ. Rsch. Fund, *Assessing Language Barriers for Immigrant Entrepreneurs* (Aug. 13, 2020), *https://research.newamerican economy.org/report/covid19-immigrant-entrepreneurs-languages/* (analyzing 2018 data from the Census Bureau's American Community Survey).

[845] U.S. Census Bureau, *American Community Survey, 2021 American Community Survey 1-Year Estimates, Table S1601: Language Spoken at Home, https://data.census.gov/cedsci/table?q=language %20spoken%20at%20home&tid= ACSST1Y2021.S1601* (last visited Mar. 20, 2023).

[846] U.S. Census Bureau, *American Community Survey, 2021 American Community Survey 1-Year Estimates, Table S1602: Limited English Speaking Households, https://data.census.gov/cedsci/ table?q=language%20spoken%20at%20home&tid= ACSST1Y2021.S1602* (last visited Mar. 20, 2023). The U.S. Census defines a "limited English speaking household" as one in which no member 14 years old and over (1) speaks only English or (2) speaks a non-English language and speaks English "very well." See U.S. Census Bureau, *Frequently Asked Questions (FAQs) About Language Use, https://www.census.gov/topics/population/ language-use/about/faqs.html#:~:text=What%20is %20a%20Limited%20English,least%20some%20 difficulty%20with%20English* (last visited Mar. 20, 2023).

institutions that wish to use them. Use of these translations, like use of the form itself, is not required under rule, but the Bureau is providing them as an implementation resource for lenders.

Some commenters asked for flexibility as to the presentation of the information, inquiries, and response options on the sample data collection form at final appendix E. Generally, the Bureau believes that applicants should have substantially similar experiences, regardless of a financial institution's method of collection, when being provided with required notices under the final rule (*e.g.,* the firewall notice, the non-discrimination notice, and the right to refuse notice) and when asked for protected demographic information. The Bureau has designed the sample data collection form at final appendix E to assist financial institutions with their compliance obligations and to maximize the likelihood that an applicant will provide demographic information, after review of the comments received, user testing feedback, and other considerations. However, the Bureau notes that the use of the sample data collection form at final appendix E to collect information required under the final rule is not mandatory, and financial institutions are thus not prohibited from modifying the form, so long as the resulting collection method complies with applicable rule requirements.

With regard to a couple of commenters' request for clarification as to whether a financial institution must read all of the categories of responses if collecting over the phone or orally even if an applicant has responded to an earlier response option, the Bureau is uncertain whether the commenters' request is referring to the collection of a principal owner's ethnicity and race information, which provides aggregate categories and disaggregated subcategories as response options. If so, the Bureau notes that it has revised the associated commentary for § 1002.107(a)(19) to provide financial institutions with certain flexibility when inquiring about a principal owner's ethnicity and race information. Generally, comment 107(a)(19)–16 provides that for applications taken orally through means other than by a paper or electronic form (*e.g.,* telephone applications), the financial institution will not be required to read aloud every disaggregated ethnicity and race subcategory, in the manner described in the comment. Further, because an applicant using a paper version of the sample data collection form will reference all available answer options to a question at once and may review the

answer options in any order, the Bureau does not believe that the answer options for a specified question need to be provided in a specific order for an application taken over the phone, as long as all the answer options are presented. However, for the requirement to collect ethnicity and race information specifically, comment 107(a)(19)–16 clarifies that the financial institution may not present the applicant with the option to decline to provide the information requested without also presenting specified aggregate categories and disaggregated subcategories for ethnicity and race. This would apply even if the applicant informs the financial institution, before the financial institution has asked for a principal owner's ethnicity and race information, that it does not wish to provide such information.

The Bureau is not including other sample, uniform, or model applications or data collection forms in the final rule, as suggested by some commenters. There are a variety of products that are covered transactions under the final rule, and the Bureau understands that covered financial institutions may need to ask for the information (except for the protected demographic information) they are required to report to the Bureau in different ways. The Bureau does not believe that a sample, uniform, or model application or data collection form would be able to account for such potential variations. Thus, any additional forms may have limited utility and could incorrectly suggest that financial institutions are limited in the manner in which they collect non-demographic data under this final rule. As a result, the Bureau is not providing such a form at this time. The Bureau may consider issuing other guidance, tools, and compliance aids if it later determines doing so is necessary.

The Bureau notes that there is no need for a specific data collection form for loans that are reportable under both HMDA and section 1071, as the Bureau has decided to exclude HMDA-reportable loans from the data requirements of the final rule as discussed in the section-by-section analysis of § 1002.104(b)(2).

Some commenters urged the Bureau to continue to review the sample data collection form and its instructions after these final rules are issued. The Bureau anticipates receiving and feedback as the final rules are implemented and, as with all the regulations it administers, will issue guidance as necessary and consider if changes to any aspect of the final rules are required, whether through rulemaking or otherwise.

AdminRecord-000306

*Appendix F to Part 1002—Tolerances for Bona Fide Errors in Data Reported Under Subpart B*

Proposed Rule

The Bureau proposed appendix H, which would have set out a Threshold Table, as referred to in proposed § 1002.112(b) and proposed comment 112(b)–1. As these provisions would have explained, a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of a financial institution's data submission for a given data field do not equal or exceed the threshold in column C of the Threshold Table.

Under the Threshold Table in proposed appendix H, column A listed the size of the financial institution's small business lending application register in ranges of application register counts (*e.g.,* 25 to 50, 51–100, 101–130, etc.). The applicable register count range would have then determined both the size of the random sample, under column B, and the applicable error threshold, under column C. The error threshold of column C, as proposed comment 112(b)–1 would have explained, identifies the maximum number of errors that a particular data field in a financial institution's small business lending application register may contain such that the financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field. Column D would have been illustrative, showing the error threshold as a percentage of the random sample size.

Proposed appendix H would also have included examples of how financial institutions would use the Threshold Table.

The Bureau sought comment on proposed appendix H. In particular, the Bureau sought comment on whether the register count ranges in column A, the random sample sizes in column B, and the error thresholds in column C were appropriate. The Bureau further sought comment on whether a covered financial institution should be required to correct and resubmit data for a particular data field, if the institution has met or exceeded the thresholds provided in appendix H.

Comments Received

A number of commenters, including banks, trade associations, and a community group addressed the proposed appendix H and its tolerance thresholds. The community group supported the structure of the tolerances as sensible, noting that larger lenders

should face more stringent tolerances, expressed as lower percentages, and that the proposed thresholds were time-tested, and balanced reasonableness and data integrity, because they were consistent with Regulation C (implementing HMDA).

Many banks and trade associations stated that the tolerances set out in proposed appendix H were too low and should be raised. One commenter said that limited error tolerances would create undue hardships for banks, and that it was imperative to work through processes to create valid data, and that invalid data are likely to raise false red flags that are burdensome for banks to defend. Another commenter stated that the tolerances were too low and needed to be raised because of the great amount of time needed to verify and re-verify data points. A trade association advocated for higher tolerance thresholds in recognition of the substantial implementation efforts which will need to occur, and to provide banks a more meaningful opportunity to effectively implement the rule.

A number of industry commenters noted that the thresholds in proposed appendix H were based on the tolerance thresholds for resubmitting data under Regulation C and HMDA, and asserted that these thresholds were too low for this rule, citing the number of data points required and the complexity of the data reporting requirements. Several of these commenters asked that the error threshold be increased to a "more reasonable level" without specifying exact threshold percentages. One commenter requesting higher tolerances noted that HMDA reporting requirements had been in place for decades and that HMDA reporters thus have had decades to fine tune their processes and procedures.

A bank said that the proposed thresholds left a margin of error that is statistically 0 percent, and claimed that by adopting error thresholds similar to the HMDA requirements, financial institutions would have to conduct a 100 percent audit to ensure accurate data collection/reporting, which they said would burden lenders. Another bank suggested that because data entry errors are inevitable the tolerance levels should be changed to a "reasonable" rate, and that a 95 percent confidence level would be sufficient. A trade association stated that the tolerance thresholds were unrealistically low, given that small business loan data collection is entirely unprecedented and would require new systems and processes. The commenter stated that 90 to 97.5 percent data accuracy was out of

reach for most of the trade association's lenders, particularly in the first year. The commenter also noted that stringent data accuracy requirements under HMDA were already costly.

A group of trade associations similarly requested that the tolerance thresholds be increased, in recognition of the substantial implementation efforts that financial institutions will undertake for a new data collection and reporting regime, requiring new processes and procedures, noting that despite all of these efforts that bona fide errors are likely to occur, especially given the substantial number of data points the Bureau is mandating.

A bank suggested that the tolerance thresholds did not appropriately scale, noting that while there were seven tiers there were only two threshold levels. The bank asked that the Bureau implement more threshold levels and increase the thresholds, especially for low and intermediate volume lenders. Another bank said that the Bureau should increases the tolerance thresholds for lenders that had between 191 to 500 applications, to at least 4 percent but preferably 5 percent. A third bank suggested expanding the threshold categories, to include different groupings, by number of applications: 501 to 1,000; 1,001 to 10,000; 10,001 to 100,000; and more than 100,000. The bank also suggested incremental increases in the threshold number of bona fide errors.

Final Rule

The Bureau is finalizing appendix H, renumbered as appendix F, with revisions that include the deletion of the first two rows of Table 1 to appendix F. These rows, covering small business lending application register counts of 25 to 50 applications and 51–100 applications, are omitted to correspond with the change in the originations threshold to determine if a financial institution is a covered financial institution under final § 1002.105(b), from 25 originations to 100 originations. While each provision looks to different metrics—originations for § 1002.105(b) and applications for appendix F—it is not possible for a lender to have originated more than 100 covered credit transactions for small businesses in a given year without also having received more than 100 applications for covered credit transactions. The Bureau believes that rows containing register counts of less than 100 are superfluous. Table 1 of appendix F is adjusted accordingly.

For the reasons set out in the section-by-section analysis of § 1002.112(b), the Bureau is finalizing appendix F pursuant to its authority under ECOA

section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

Regarding the various comments on the tolerance thresholds in proposed appendix H, the Bureau agrees with the comment that the structure of the tolerance thresholds was sensible, that larger lenders should face more stringent tolerances, and that the proposed thresholds were time-tested because of their use in examinations under Regulation C. The Bureau has considered the various comments asserting that the tolerances, based on the HMDA examination thresholds, are too low. The error thresholds were, as one commenter mentioned, tested in the HMDA context and reasonably balance the competing concerns of data quality and practicability of implementation. Further, commenters claiming that the thresholds were too low did not acknowledge one major difference with the HMDA thresholds; while the HMDA thresholds determine when lenders must resubmit their HMDA data to the Bureau, § 1002.112(b), with the thresholds in appendix F, serve to eliminate financial institution liability under ECOA and this rule for bona fide errors under the thresholds. The Bureau does not believe that limited tolerances will create undue hardships, given the need to validate and re-validate data, nor that they will raise false red flags that will be burdensome for banks to defend. The revised compliance date provision in § 1002.114(b) will provide the majority of covered financial institutions more time to validate their data in advance of the first submission to the Bureau under this rule. In addition, the Bureau is providing a grace period of one year, during which it does not intend to assess penalties for errors in data submitted by financial institutions that make good faith efforts to comply with rule (see part VII below).

Regarding the comment that higher tolerance thresholds are needed in recognition of the substantial implementation efforts which will need to occur, the Bureau observes that it is recognizing these efforts in other ways, including the added time to comply under revised § 1002.114(b), and the grace period offered to all institutions in their first 12 months of collecting data.

Regarding the comment that HMDA reporting requirements had been in place for decades, and that HMDA reporters had decades to fine tune their processes and procedures, and that the Bureau should increase the tolerances in proposed appendix H, the Bureau acknowledges that many HMDA reporters have had time to fine tune their processes, but also notes that the tolerances apply nonetheless to new HMDA reporters as well. In any case, the comment appears to support the point that the HMDA tolerances have been time-tested and are reasonable to implement.

Regarding the comments that the proposed thresholds leave a margin of error of 0 percent, that they would require lenders to conduct a 100 percent audit to ensure accurate data collection, and that a 95 percent confidence level would be sufficient, the Bureau refers the commenter to appendix F, which specifies the actual error thresholds based on the number of transactions, ranging from 10 percent for the reporters with the lowest volumes to 2.5 percent for those with the highest. Regarding the comment that 90 to 97.5 percent data accuracy would be out of reach for most of the trade association's lenders, particularly in the first year, the Bureau notes that in addition to the error thresholds, lenders will have the benefit of several other safe harbors, a grace period, and additional time to comply for most lenders as specified in § 1002.114(b).

Regarding the comment that the tolerance thresholds do not scale and that there were only two threshold levels, the Bureau notes that proposed appendix H, finalized as appendix F, specified more than two thresholds (five) and that final appendix F specifies four—6.4 percent, 5.4 percent, 5.1 percent, and 2.5 percent. The Bureau is not implementing more threshold levels or to increasing the thresholds, as requested by some commenters, as these thresholds are already relatively high for low and intermediate volume lenders. Regarding the comment requesting that the Bureau increases the tolerance thresholds for the lenders that had between 191 to 500 applications to at least 4 percent but preferably 5 percent, the Bureau notes that the error threshold for lenders in this range is already 5.1 percent. Regarding the suggested expansion of threshold categories, to include more groupings between 500 and 100,000, the Bureau notes that no explanation was given about what such additional ranges would accomplish, or what specific thresholds should be applied to these new ranges, other than that they should increase incrementally.

The Bureau is also not adopting incremental increases in the error thresholds. Appendix F reflects the experience of HMDA examinations, and financial institutions with more applications are expected to have a lower percentage of errors than those that receive fewer applications.

## VI. Effective Date and Compliance Dates

The Bureau is adopting an effective date of 90 days after the publication of this final rule in the **Federal Register** consistent with section 553(d) of the Administrative Procedure Act [847] and with section 801(a)(3) of the Congressional Review Act.[848]

This final rule includes the addition of a new subpart B to Regulation B comprised of final §§ 1002.101 through 1002.114 and related commentary, appendices E and F. This final rule also amends certain sections of existing Regulation B, renumbered as subpart A, specifically § 1002.5(a)(4) and commentary related to § 1002.5(a)(2) and (4). It also makes conforming changes in several other provisions in existing Regulation B.

Further, for the reasons specified in the section-by-section analysis of § 1002.114(b), the Bureau is finalizing three different compliance dates, based on the number of originations of covered credit transactions for small businesses, rather than the single compliance date in the NPRM, which proposed a compliance period of 18 months after the publication of the final rule in the **Federal Register**. As specified in § 1002.114(b)(1), covered financial institutions in Tier 1, which had at least 2,500 originations of covered credit transactions for small businesses in each of calendar years 2022 and 2023, will have a compliance date of October 1, 2024. As specified in § 1002.114(b)(2), covered financial institutions in Tier 2, which had at least 500 originations of covered credit transactions for small businesses in each of calendar years 2022 and 2023, will have a compliance date of April 1, 2025. As specified in § 1002.114(b)(3), covered financial institutions in Tier 3, which had at least 100 originations of covered credit transactions for small businesses in each of calendar years 2022 and 2023, will have a compliance date of January 1, 2026. As specified in § 1002.114(b)(4), covered financial institutions which did not have at least 100 originations of covered credit transactions for small businesses in each of calendar years 2022 and 2023, but subsequently

---

[847] 5 U.S.C. 553(d).
[848] 5 U.S.C. 801(a)(3).

originates at least 100 such transactions in two consecutive calendar years, will have a compliance date of no earlier than January 1, 2026.

## VII. Grace Period Policy Statement

During the SBREFA process and in response to the NPRM, the Bureau received numerous comments requesting a grace period in the early period after financial institutions are required to comply with the Bureau's final rule implementing section 1071. The Bureau agrees that it is appropriate to provide a grace period during which it does not intend to exercise its enforcement and supervisory authorities, assuming good faith compliance efforts by financial institutions; for instance, attempts to discourage applicants from providing data would not be in good faith. This Grace Period Policy Statement explains how the Bureau intends to implement such a grace period.

### Comments Received

In the context of responding to the proposal presented during SBREFA for a two-year implementation period, some small entity representatives and other stakeholders suggested that the Bureau adopt a grace period for data errors in the first year(s) after the rule goes into effect. These comments suggested that the Bureau adopt a grace period of some kind during which financial institutions would not be penalized for errors when trying to comply with the Bureau's rule implementing section 1071. This grace period would be akin to the first year in which the 2015 revisions to Regulation C were effective, when examinations were used to troubleshoot and perfect data reporting rather than penalize reporters.[849]

In response to both the proposed enforcement and the compliance date provisions in the NPRM, the Bureau received a number of comments requesting a grace period during which the Bureau would either not examine financial institutions for compliance with this rule, or would not assess penalties for violations of the rule. Several lenders supported a grace period without specifying how long the grace period should be. One of these commenters asked that the Bureau provide a grace period for at least one exam cycle.

Many industry commenters requested a grace period of one year or more from Bureau enforcement and examinations

for data errors. Commenters offered various reasons in support of this grace period. Many lenders and trade associations stated that a one-year grace period would be consistent with the Bureau's approach to the 2015 HMDA rule. Some commenters with HMDA experience observed that the one-year grace period in that context was helpful for compliance efforts. Several other industry commenters stated that the experience with the 2015 HMDA rule demonstrated that a grace period would improve data accuracy, as it would allow financial institutions time to identity errors and implement corrective action without penalty.

Several banks stated that a grace period would be critical to give lenders an opportunity to ensure systems are working properly. One said that a one-year grace period would foster cooperation and frank discussions between covered financial institutions and the Bureau, and that lenders would be more open and proactive in working with the Bureau to ensure their compliance. Other commenters requested a grace period on the grounds that compliance with the rule was a significant change involving the revamping of systems, and that the grace period would protect lenders from scrutiny for unintentional and bona fide errors. Several stated that a grace period was necessary to provide banks an opportunity to implement the rule effectively, perform testing, and ensure that loan operation systems, software, and other technologies are functioning correctly. A trade association requested that the Bureau work with other regulators to provide a grace period so that lenders are not penalized immediately for errors. A bank stated that the numerous data points and the various reportable sub-parts to those data points would inevitably lead to errors. Another industry commenter requested a one-year grace period to permit lenders to avoid penalties for data errors in spite of their best efforts. Two trade associations requested a one-year grace period as necessary protections given the need to implement substantial changes under the rule. A trade association and a bank asserted that a one-year grace period should be provided because honest errors are only discovered in the process of implementation, and a grace period would permit not only the lenders that committed these errors to learn from them, but also the industry as a whole. Similarly, a bank stated that the grace period would help ensure that all lenders were on the same page regarding all the different circumstances

presented by the rule. Another bank stated that compliance with the rule would be new to all financial institutions. A different bank stated that the grace period would ensure that the rule would not cause undue compliance hardships on banks and would help banks create valid data. A trade association urged that the Bureau use enforcement actions sparingly in the 12 months following the rule's compliance date.

A smaller number of industry commenters requested a two-year grace period. One bank justified a two-year period because of the burden of compiling, maintaining, and reporting data under the rule. Another bank cited the magnitude of the rule's requirements and the tremendous effort to implement software, create policies and procedures, and train staff appropriately, and noted that such a grace period would allow for data quality testing in a real-life environment and lead to improvements in data accuracy. Several industry commenters requested that the Bureau avoid enforcement actions related to technical deficiencies for two years. Commenters also stated, in support of a two-year grace period, that absent such a grace period small business credit may be limited and the economy may be hurt; that compliance with the rule is spread across different business units, systems, and channels for larger lenders, and that current compliance systems are built to *avoid* collecting key data required by the rule (such as demographic information).

Some industry commenters stated that the experience with the 2015 HMDA rule showed that the Bureau should provide a two-year grace period. Two of these commenters noted that the Bureau should follow its approach in the 2015 HMDA rule, in which the Bureau imposed no penalties for two years after the new HMDA data collections took effect.[850] These commenters also stated that with such a grace period, lenders could self-correct issues with data accuracy without threat of enforcement actions for the inevitable tech and other challenges that will arise initially.

### Policy Statement

The Bureau agrees that a grace period is appropriate. The following discussion explains how the Bureau intends to exercise its supervisory and enforcement discretion following a

---

[849] CPFB, *CFPB Issues Public Statement On Home Mortgage Disclosure Act Compliance* (Dec. 21, 2017), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-public-statement-home-mortgage-disclosure-act-compliance/*.

[850] CFPB, *Statement with respect to HMDA implementation* (Dec. 21, 2017), *https://files.consumerfinance.gov/f/documents/cfpb_statement-with-respect-to-hmda-implementation_122017.pdf*.

covered financial institution's initial compliance date.

With respect to institutions subject to the Bureau's supervisory or enforcement jurisdiction, the Bureau intends to provide a 12-month grace period for the initial data submission from covered financial institutions that have compliance dates specified in § 1002.114(b)(2), and (3) (*i.e.,* Tier 2 and Tier 3 institutions), covered financial institutions subject to § 1002.114(b)(4) that must start collecting data on January 1, 2026, and any financial institutions that make a voluntarily submission for the first time for data collected in 2025 or 2026.

With respect to covered financial institutions subject to the Bureau's supervisory or enforcement jurisdiction that make good faith efforts to the comply with the rule that have a compliance date specified in § 1002.114(b)(1) (*i.e.,* Tier 1 institution), as well as any financial institutions that make a voluntarily submission for the first time for data collected in 2024, the Bureau intends to provide a grace period covering the 3 months of data collected in 2024 (from October 1, 2024 through December 31, 2024) as well as the first 9 months of data collected in 2025 (from January 1, 2025 through September 30, 2025).

With respect to covered financial institutions subject to the Bureau's supervisory or enforcement jurisdiction that make good faith efforts to the comply with the rule that have a compliance date specified in § 1002.114(b)(2) (*i.e.,* Tier 2 institution), as well as any financial institutions that make a voluntarily submission for the first time for data collected in 2025, the Bureau intends to provide a 12-month grace period covering the 9 months of data collected in 2025 (from April 1, 2025 through December 31, 2025) as well as the data collected in the first three months of 2026 (from January 1, 2026 through March 31, 2026).

With respect to covered financial institutions subject to the Bureau's supervisory or enforcement jurisdiction that make good faith efforts to the comply with the rule that have a compliance date specified in § 1002.114(b)(3) (*i.e.,* Tier 3 institution), as well as any financial institutions that make a voluntarily submission for the first time for data collected in 2026, the Bureau intends to provide a grace period covering the 12 months of data collected in calendar year 2026 (from January 1, 2026 through December 31, 2026).

The Bureau believes that a 12-month grace period will give institutions further time to diagnose and address unintentional errors without the prospect of penalties for inadvertent compliance issues, and may ultimately assist other covered financial institutions, especially those in later compliance tiers, in identifying best practices. While the Bureau believes that financial institutions in each reporting tier are capable of fully preparing to comply with the rule by their respective compliance dates, the Bureau believes that the use of its discretion providing a grace period that covers 12 months for each tier may result in more deliberate and thoughtful compliance with the rule, while still providing important data regarding small business lending as soon as feasibly possible.

During the grace period, if the Bureau identifies errors in a financial institution's initial data submissions, the Bureau does not intend to require data resubmission unless data errors are material. Further, the Bureau does not intend to assess penalties with respect to errors in the initial data submissions. Any examinations of these initial data submissions will consider the good faith efforts of the financial institutions to comply with the data collection and reporting requirements. The examinations will be diagnostic and will help to identify compliance weaknesses. However, errors that are not the result of good faith compliance efforts by financial institutions, especially attempts to discourage the reporting of data, will remain subject to the Bureau's full supervisory and enforcement authority, including the assessment of penalties.

The Bureau believes that these initial data submissions will provide financial institutions an opportunity to identify any gaps in their implementation of this rule and make improvements in their compliance management systems for future years.

The Bureau agrees with commenters who said that a grace period will promote openness and frankness, and will permit the Bureau to help financial institutions identify errors and, thereby, self-correct to avoid such errors in the future. The Bureau can also use data collected during the grace period to alert financial institutions of common errors and potential best practices in data collection and submissions under this rule.

The Bureau believes that a grace period covering institutions' first 12 months of data submission is sufficient, especially given the other accommodations the Bureau is making to ensure that financial institutions are not unduly penalized for good faith errors, such as the bona fide error provision and the various safe harbors the Bureau has finalized in this rule, and the other provisions that the Bureau believes are likely to lead to more accurate data, such as the tiered compliance date structure, for the reasons specified in the section-by-section analysis of § 1002.114(b). The Bureau does not believe that a two-year grace period is necessary to avoid impacting small businesses' access to credit; as the impacts analysis in part X below suggests, the Bureau does not believe that this rule will materially impact the access small businesses have to credit.

Regarding the comment that the Bureau work with other regulators to provide a grace period so that lenders are not penalized immediately for errors, the Bureau notes that, unlike with HMDA, the Bureau is the sole agency that will be in a position to examine financial institutions' submissions for data errors in the first instance.

This is a general statement of policy under the Administrative Procedure Act.[851] It articulates considerations relevant to the Bureau's exercise of its authorities. It does not impose any legal requirements, nor does it confer rights of any kind. It also does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by the Office of Management and Budget under the Paperwork Reduction Act.[852]

## VIII. Public Disclosure of Data

### A. Background

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to collect and report to the Bureau data about applications for credit for women-owned, minority-owned, and small businesses, and for those data to be subsequently disclosed to the public.[853] Section 1071 further states that the Bureau may "at its discretion, delete or modify data collected under [section 1071] which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[854] Under the final rule, financial institutions may not compile, maintain, or submit any name, specific address, telephone number, email address or any personally identifiable information concerning any

---

[851] 5 U.S.C. 553(b).
[852] 44 U.S.C. 3501 through 3521.
[853] *See* ECOA section 704B(e)(1) and (f)(2).
[854] ECOA section 704B(e)(4).

AdminRecord-000310

**35460**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

individual who is, or is connected with, an applicant, other than as would be required pursuant to final § 1002.107. Nonetheless, as the statute recognizes, publication of the data fields set forth in § 1002.107(a) in an unedited, application-level format could potentially affect privacy interests—for example, through the re-identification of, and risk of harm to, small businesses and related natural persons.

The CFPB is not determining its final approach to protecting such interests via pre-publication deletion and modification because it lacks the reported data it needs to finalize its approach and it does not see comparable datasets to use for this purpose. In light of comments received on the NPRM's privacy analysis, this part VIII offers a preliminary assessment of how it might appropriately assess and advance privacy interests by means of selective deletion or modification. The CFPB is not at this point identifying the specific procedural vehicle for effecting its privacy assessment. With respect to both substance and process, it will continue to engage with external stakeholders; and it intends to invite further input on how it plans to appropriately protect privacy in connection with publishing application-level data.

*B. Preliminary Privacy Assessment*

1. Overview

Under ECOA section 704B(e)(4), Congress provided the CFPB with broad discretion to modify or delete data prior to public disclosure to advance privacy interests.[855] The NPRM proposed the use a balancing test for the exercise of this discretion. Specifically, it stated that it would modify or, as appropriate, delete data fields from collected application-level data where release of the unmodified data would pose risks to the privacy interests of applicants, related natural persons, or financial institutions that would not be justified by the benefits of such release to the public in light of the statutory purposes of section 1071. The Bureau explained that disclosure of an unmodified individual data field may create a risk to privacy interests if such disclosure either would substantially facilitate the re-identification of an applicant or related natural person, or would disclose information about applicants or related natural persons, or an identified financial institution, that is not otherwise public and that may be harmful or sensitive.

This balancing test would have required that the Bureau consider the benefits of disclosure in light of section 1071's purposes and, where these benefits did not justify the privacy risks the disclosure would create, modify the public application-level dataset to appropriately balance privacy risks and disclosure benefits. The Bureau would have deleted a data field prior to publishing the application-level dataset if other modifications would not appropriately balance the privacy risks and disclosure benefits. An individual data field would have been a candidate for modification or deletion under the balancing test if its disclosure in unmodified form would create a risk of re-identification or a risk of harm or sensitivity.

Section 1071 requires financial institutions to compile and maintain data and provides that such information be made available to the public upon request.[856] Accordingly, section 1071 contemplates that the public know what published application-level data are associated with particular financial institutions. As a result, the re-identification risk element of the balancing test analysis would not have applied to financial institutions, although the Bureau would have considered the risk to a financial institution that the release of 1071 data in unmodified form would inappropriately disclose commercially sensitive information.

The Bureau sought comment on the design of the balancing test. It also sought comment on whether the balancing test should apply to the privacy interests of natural persons generally or only of those related to applicants.

Comments Received

A wide range of commenters provided feedback on the proposed balancing test. Many community groups, as well as a several members of Congress, generally supported the NPRM approach. Others, including industry and several community groups, saw it as too subjective. These community groups stated that future Bureau leadership could choose to restrict publication by releasing truncated or aggregated data, but not application-level data. A lender and a trade association were concerned that the balancing test would not sufficiently protect privacy interests. Another commenter stated that the approach would be ineffective if a third party had personal knowledge of an applicant or related natural person because modifications to prevent re-

identification risk in this scenario would critically reduce data utility. A joint letter from community and business advocacy groups asked the Bureau to confirm that the balancing test would evolve. They asked the Bureau to assess market developments and how well the final rule achieved statutory purposes, and to use this information to modify its publication approach. Industry commenters asked the CFPB to limit or wholly abandon release of application-level data.[857] For example, one commenter said that the agency should use exception authority under ECOA section 704B(g)(2) to not publish application-level data to avoid risks and burdens to the commercial and reputational interests of financial institutions.

Several commenters provided feedback about what benefits and risks the balancing test should consider. A joint letter from community groups, community-oriented lenders, and business advocacy groups, along with a joint letter from several members of Congress, supported the Bureau's stated intent to consider the benefits of public disclosure and the statutory purposes of section 1071. In contrast, an industry commenter said that the balancing test should not consider fair lending enforcement as a relevant benefit. According to this commenter, using the data for fair lending enforcement would subject financial institutions to unjustified scrutiny by regulators and hinder the development of innovative underwriting techniques.

Several commenters specifically stressed the importance of the Bureau considering the personal privacy interests of small business owners. More generally, a number of industry commenters, as well as several members of Congress, supported the Bureau's considering the privacy interests of applicants, related natural persons, and financial institutions. Numerous commenters said that public application-level data could pose significant privacy risks to these entities. Some noted that publication carries risks of re-identification and the disclosure of sensitive commercial and financial information. Industry commenters also reported that small business customers express privacy concerns whenever the government mandates disclosure of their business information. Commenters cited negative reactions to Paycheck Protection Program reporting requirements.

---

[855] *Id.*

[856] *See* ECOA section 704B(e), (f)(2)(B).

[857] Commenters also provided feedback on potential modification and deletions for each of the Bureau's proposed data points; those comments are addressed in detail for each data point in part VIII.B.6 below.

AdminRecord-000311

Some community groups saw the privacy risks associated with publication as low. Several asserted that HMDA data, which contains similar data fields, has not resulted in an increase of fraud or identify theft against mortgage applicants. Some commenters also noted that the interval between reporting and publication would reduce the likelihood of misuse, as would the public availability of some of the date from existing sources. Several community groups and a CDFI lender urged the Bureau not to give weight to the privacy interests of financial institutions. According to these commenters, publication should not consider the commercial, proprietary, litigation, and reputational interests of financial institutions. A joint letter from community and business advocacy groups stated that because section 1071 contemplates the disclosure of financial institution identity, the Bureau should not consider any of their privacy interests. Conversely, some commenters raised concerns about financial institution privacy interests. A trade association said that failing to consider such interests would result in the disclosure of trade secrets and other confidential information.

Some commenters suggested that the balancing test include various presumptions for or against the publication of 1071 data. Community groups and a CDFI lender generally agreed that the balancing test should include a strong presumption in favor of disclosure. For example, some commenters stated that the Bureau should only modify or delete application-level data where its unmodified publication would pose privacy risks that meet a particular significance threshold—for example, where data fields would be "highly sensitive" or "clear" re-identification risk exists). Several industry commenters, on the other hand, suggested that the balancing test incorporate a presumption in favor of protecting privacy interests. For instance, a few commenters suggested that the Bureau give special consideration to the privacy interests of small financial institutions. These commenters warned that small business customers may gravitate to larger lenders because they believe it would be harder to identify individual applicants or related natural persons in data reported by large lenders.

Current Approach

In light of the comments received on the balancing test, the Bureau is now of the preliminary view that re-identification risk to small businesses

and their owners is the core risk from which the preponderance of cognizable privacy risks flow. In this respect, the Bureau is focused particularly on risks to personal privacy interests.[858] The Bureau's preliminary assessment is that it will consider modification and deletion techniques to reduce those risks, while also considering the non-personal commercial privacy risks of small businesses. Lender privacy interests would be considered only where publication would create a compelling risk to those interests.

Although some comments urged that it not publish any application-level data, the Bureau does not intend to withhold all such data from the public because that would critically undermine the stated purposes of section 1071 and run contrary to the express disclosure provisions in the statute. This drastic step is also unnecessary to adequately mitigate relevant privacy risks.

In response to comments positing harms that could arise from a third party having personal knowledge of an applicant or its owners, the Bureau agrees that this scenario heightens privacy risks. The Bureau will observe market developments to assess the likelihood and nature of this risk as it considers the appropriate approach to publication.

The Bureau does not intend to separately assess disclosure benefits when making modification and deletion decisions about individual data points. After considering commenters' feedback about the value of the data fields, the Bureau is preliminarily of the view that all of the data fields have significant disclosure benefits that will facilitate fair lending enforcement as well as business and community development.

Most comments on privacy risk generally supported the Bureau's intention to consider the privacy interests of small businesses, related individuals, and financial institutions. While the Bureau cannot conduct the statistical analysis necessary for a full re-identification analysis until it receives reported data from financial institutions, the Bureau's preliminary privacy assessment accepts that some such data likely could re-identify applicants and their owners, potentially disclosing sensitive information. The personal privacy interests of small business owners, in particular, implicate compelling risks of harms or sensitivities. As acknowledged in the

NPRM, some privacy risks are mitigated by the interval between collection and publication, and some 1071 data are already available from other sources. But publication of some data fields potentially poses significant risks of harm or sensitivities to both the personal privacy interests and non-personal commercial privacy interests of applicants and related individuals. While public HMDA data do not result in substantial privacy harms for mortgage applicants, that is in part because the Bureau makes modifications and deletions before publication, informed by a privacy risk assessment.[859]

The Bureau does not intend to ignore the privacy interests of financial institutions. As discussed further below, however, the privacy risks to financial institutions raised by commenters are less significant than those to small businesses and related individuals. Accordingly, while the Bureau does not intend to exclude consideration of financial institution privacy risks, it anticipates modifying or deleting data to protect a financial institution's privacy interests only when publication poses a compelling privacy risk. At this time, commenters have not identified compelling privacy risks to financial institutions.

In response to comments, the CFPB does not believe that a presumption or threshold would provide the Bureau with a more administrable standard. However, partly in response to comments on these issues, the Bureau's preliminary privacy assessment is more directly focused on the most significant privacy risks—particularly re-identification risk—than the balancing test described in the NPRM.

2. Implementation Process

Proposed Approach

The NPRM did not include a full application of the balancing test to most of the proposed data points. It stated that the Bureau would analyze the re-identification risk element, in part, using a statistical analysis. However, the absence of an existing dataset or an alternative set of sufficiently similar data significantly impeded the Bureau's ability to discern whether a proposed data field, individually or in combination with other data, would substantially facilitate re-identification of small businesses and related persons, and how specifically to modify data to reduce that risk. Underestimating the degree to which a 1071 data field, individually or in combination with

---

[858] The Bureau is considering whether the risks to sole proprietors, where the business and owner are indistinguishable for tax or legal purposes, may also qualify as personal risks. This may be the case where information reflects the sole proprietor's personal information, such as creditworthiness.

[859] See generally 82 FR 44586 (Sept. 25, 2017).

other data, facilitates re-identification risk could unnecessarily increase privacy risks to an applicant or a related individual, while overestimating re-identification risk could unnecessarily reduce data utility. Accordingly, the Bureau believed that a re-identification analysis of data other than actual reported 1071 data would not provide an accurate basis on which the Bureau could apply the balancing test to modify or delete data.

In light of these limitations, the Bureau considered deferring even initial analysis until after it had obtained a full year of reported 1071 data. Doing so, however, would have reduced opportunities for public feedback on privacy issues and their relationship to the proposed rule. The Bureau saw substantial value in setting forth its partial analysis under other aspects of the balancing test. Specifically, the Bureau set forth an initial analysis of the benefits and harms or sensitivities associated with the proposed data fields, the capacity and motives of third parties to match proposed 1071 data fields to other identifiable datasets, and potential modification techniques it might consider to address privacy risks. The Bureau responds to public feedback from commenters and updates this initial analysis below.

In the NPRM, the Bureau indicated that a policy statement, rather than a notice-and-comment rulemaking, would be an appropriate vehicle for announcing its intentions with respect to data modifications and deletions. The Bureau offered several reasons for this approach. Under section 1071, the Bureau may delete or modify data at its discretion, in contrast to other provisions in the statute that require legislative rulemaking.[860] Further, the Bureau's suggested approach with respect to modifications and deletions would not impose compliance obligations on financial institutions.[861] In addition, the Bureau stated that preserving the ability to exercise its discretion to modify or delete data through policy statements would allow the Bureau to manage the relationship between privacy risks and benefits of disclosure more actively. The Bureau believed this flexibility may be especially important in the event that the Bureau becomes aware of

developments that might contribute to privacy risks. The Bureau stated that potential uses of the application-level data in furtherance of the statute's purposes may also evolve, such that the benefits associated with the disclosure of certain data may increase to an extent that justifies providing more information to the public in less modified form.

As a result, the Bureau suggested that after the first full year of data are reported, but before it releases data to the public, it would publish a policy statement setting forth its intentions with respect to modifications and deletions to the public application-level data. Before publishing that policy statement, the Bureau intended to conduct a balancing test analysis based on feedback to the NPRM as well as a quantitative analysis of re-identification risk using reported 1071 data. The Bureau stated that in the interests of making data available in a timely manner, it did not intend to put its ultimate balancing test analysis out for public comment prior to issuing the policy statement. The Bureau sought comment on this approach.

**Comments Received**

A wide range of commenters provided feedback on the Bureau's general approach to implementing the balancing test. Several community group and industry commenters supported the Bureau's intention to defer modification and deletion decisions until it had obtained a full year of 1071 data. While not explicitly opposed, other community groups and a minority business advocacy group asked the Bureau to publish data as fast as possible to help realize the statute's purposes. Some noted that the data remain unavailable despite Congress amending ECOA on this point more than a decade ago. Commenters also provided feedback about when the Bureau should begin publishing application-level data. Several commenters stated that the Bureau should commit in the final rule to releasing data by a date certain; some suggested January 1, 2024 as a target.

Several industry commenters opposed deferring modification and deletion decisions until the Bureau received a full year of 1071 data. Some stated that if the Bureau published modification and deletion decisions before lenders started to collect data, small business applicants would better understand how to protect their privacy interests. Another said that publishing a full privacy analysis before the rule is effective is necessary for financial institutions to evaluate privacy risks.

Other commenters asserted that deferring re-identification analysis until after data are reported is unnecessary because it is already apparent that some proposed data fields, such as NAICS code and census tract, create a unique set of records that can be matched to public datasets. Several commenters offered alternative timing for modification and deletion decisions. Some suggested that the Bureau publish such decisions in this final rule. Another suggested that the Bureau publish interim decisions in this final rule, which could then be adjusted through notice-and-comment rulemaking after the Bureau receives the first full year of data. Others asked the Bureau to publish a full privacy analysis before the rule becomes effective. One lender suggested that data not be published for at least a year after the final rule is implemented to enable the Bureau to assess the effectiveness of its privacy analysis.

The Bureau received a significant amount of feedback about its intention of announcing modification and deletion decisions in a policy statement without seeking additional comment. One industry commenter supported this approach, but most industry commenters on this issue asked the Bureau to seek additional comment on its privacy analysis and on its modification and deletion decisions, regardless of whether the Bureau announced publication decisions in a policy statement or through a legislative rulemaking. Commenters stated that the opportunity to comment would promote public confidence in the data collection process and contribute to a more accurate dataset. A number of commenters argued that the opportunity to comment on the full balancing test and on modification and deletion decisions would be necessary for stakeholders to provide meaningful feedback on privacy risk. According to some commenters, this would be particularly important for smaller financial institutions that were unable to provide adequate comment on what they considered to be complex privacy issues raised in the NPRM. Two lenders urged the Bureau to hold public meetings or hearings in compliance with the Regulatory Flexibility Act to seek feedback from smaller financial institutions and small businesses to, among other things, specifically address the privacy risks associated with reporting and publishing application-level data. A few industry commenters stated that the opportunity to comment on the full privacy analysis would be consistent with the Bureau's approach

---

[860] *Compare* ECOA section 704B(e)(4), *with* ECOA section 704B(f)(2).

[861] Section 1071 requires financial institutions to compile and maintain data and provides that such data be publicly available upon request. *See* ECOA section 704B(e), (f)(2)(B). As discussed in the section-by-section analysis of § 1002.110, the Bureau is finalizing its proposal to publish data on behalf of financial institutions.

adopted in the 2015 HMDA final rule. One commenter stated that the Bureau's analysis of the first full year of reported data would likely generate additional privacy issues that would warrant public input. Two others suggested that the Bureau seek comment about how it would release unmodified data to outside parties for research or other purposes.

Several industry commenters, as well as a joint letter from several members of Congress, specifically requested that the Bureau implement its privacy assessment, and make associated modifications and deletions, via legislative rule. Some of these commenters asserted that this was required under administrative law. A group of trade associations contended that section 1071 does not permit the Bureau to use its discretion to make modification and deletion decisions outside an Administrative Procedure Act rulemaking process. According to this commenter, two provisions in section 1071 provide the Bureau "discretion": ECOA section 704B(e)(4) provides the Bureau discretion to delete or modify public application-level data and ECOA section 704B(f)(3) provides the Bureau discretion to compile and publish aggregate 1071 data. Noting that the Bureau proposed § 1002.110(b) to implement the latter provision in this rule, the commenter asserted that the Bureau did not adequately explain how it was appropriate to implement the former provision outside a rule. The commenter said that these provisions should be implemented in a formal rulemaking. In addition, some industry commenters stated that increasing transparency about forthcoming publication, including potentially through a notice-and-comment rulemaking, would protect the Bureau from litigation under FOIA. In this respect, commenters cited litigation involving the SBA's publication of Paycheck Protection Program data.[862]

Citing the benefits of transparency and to facilitate information about credit access and fair lending information, a joint letter from community groups, community-oriented lenders, and business advocacy groups stated that the Bureau should produce and release aggregate analyses of 1071 data in addition to releasing application-level data.

Current Approach

For reasons discussed below, the Bureau intends to conduct a full privacy analysis and issue modification and

deletion decisions with respect to the publication of application-level data after it obtains a full year of reported 1071 data. However, the Bureau is not committing at this time to issue modification and deletion decisions through a policy statement. Instead, the Bureau will continue to consider the specific timing and vehicle choice for issuing modification and deletion decisions, as it remains engaged with stakeholders on privacy and publication issues.

Publication of application-level data will substantially advance the fair lending enforcement and business and community development purposes of section 1071. The Bureau thus intends to conduct a full privacy analysis and issue modification and deletion decisions as soon as practicable. It will also continue to consider feedback obtained to date and to engage with the public on how best to mitigate re-identification risk and other risks to privacy interests. While the Bureau is not determining the vehicle with which it will announce modification and deletion decisions with respect to application-level data, or the precise timing of such decisions, it anticipates that those decisions will continue to be informed by public engagement.

The Bureau intends to announce modification and deletion decisions only after obtaining a full year of application-level data. The Bureau lacks the data needed to perform an accurate re-identification analysis and commenters were not able to identify an alternative dataset that could be used for this purpose. Without data for an accurate re-identification analysis, the Bureau cannot conduct a full privacy analysis to inform modification and deletion decisions.[863] As discussed further below, there are certain data fields that the Bureau anticipates may present comparatively high risk to privacy interests, including the combination of NAICS code and census tract. However, the Bureau lacks data to confirm whether these data fields in fact create unique records that can be matched to public datasets.

The Bureau is not committing to a specific timeline for publishing application-level data. However, a target date of January 1, 2024 for publication, as suggested by some commenters, is not feasible because covered financial institutions are not required to begin collecting data under this rule until October 1, 2024 at the earliest. The

Bureau intends to treat data under this rule as confidential in accordance with 12 CFR part 1070 until such time as it has completed its privacy analysis and published the data, and it will work expeditiously to those ends.

Robust feedback, including in response to the NPRM, SBREFA, and other outreach, about the risks and benefits of 1071 data publication, has informed the Bureau's thinking to date.[864] The Bureau intends to continue to seek further public engagement with respect to these issues. It does not believe, however, that such further engagement must be by formal comment either to ensure robust engagement or for the sake of procedural consistency with the Bureau's approach in HMDA.[865]

The Bureau is not establishing a separate program by which industry, community researchers, or academics will have access to unmodified data; the published data, subject to the modifications and deletions made by the Bureau, will be available to all users. However, it intends the Bureau plans to exercise its discretion to provide access to State or Federal regulators to the extent such disclosure is relevant to the exercise of the agency's authorities, and subject to appropriate restrictions. The Bureau plans to provide such access to Federal regulators that enforce ECOA.[866]

The Administrative Procedure Act and other laws do not require the Bureau to seek comment on the full privacy analysis or to issue modification and deletion decisions through a legislative rule with formal notice and comment. Section 1071 states that the Bureau may "at its discretion, delete or modify data collected under [section 1071] which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest." [867] Statutorily, this provides the Bureau with flexibility to decide how it will make modification and deletion decisions, including the flexibility to do so without a legislative rulemaking. Other provisions of section 1071 plainly require the Bureau to engage in formal rulemaking, indicating that Congress did not intend such a requirement

---

[862] See, e.g., WP Co. LLC v. U.S. Small Bus. Admin., 502 F. Supp. 3d 1 (D.D.C. Nov. 5, 2020).

[863] As discussed below, the Bureau is announcing more conclusive intentions with respect to modifications or deletions for individual contact information, unique identifier, and the use of free-form text in responses for certain data fields.

[864] See part III above for additional information.

[865] Unlike for HMDA, no data yet exists that the Bureau could use to conduct a full privacy analysis and make modification and deletion decisions.

[866] Other regulators with authority to enforce ECOA include the OCC, the Board, the FDIC, the NCUA, the Surface Transportation Board, the Civil Aeronautics Board, the Secretary of Agriculture, the Farm Credit Administration, the SEC, the SBA, the Secretary of Transportation, and the FTC. See 15 U.S.C. 1691c; Regulation B § 1002.16(a).

[867] ECOA section 704B(e)(4).

AdminRecord-000314

here.[868] The Bureau does not agree that it is implementing ECOA section 704B(e)(4) and (f)(3) inconsistently. It is codifying and implementing these provisions in final § 1002.110(a) and (b) to preserve its discretion to make publication decisions without legislative rulemaking. Further, the circumstances of this rulemaking are distinguishable from the relevant facts in the PPP litigation that commenters cited.

At the same time, the Bureau is also not committing at this time to issuing modification and deletion decisions through a policy statement. As the Bureau has not yet obtained a full year of reported data to use in completing its privacy risk assessment, it is prudent to continue considering specific timing and vehicle choice for issuing modification and deletion decisions. Following further public engagement, including further opportunities for input, the Bureau will announce these decisions at a later date. Finally, the Bureau agrees with commenters that it should produce and release aggregate analyses of 1071 data in addition to releasing application-level data. The Bureau anticipates releasing select aggregated data before it publishes application-level data.

### 3. Publication Benefits

#### Proposed Approach

In the NPRM, the Bureau sought comment on its understanding of the benefits of public disclosure of the 1071 dataset as a whole as well as the disclosure benefits for individual proposed data fields. The Bureau expected that users of the data would rely on this information to help achieve the statutory purposes of facilitating the enforcement of fair lending laws, and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[869]

#### Comments Received

The Bureau received robust feedback on the general benefits of public disclosure of application-level data from lenders, trade associations, community groups, several members of Congress, individual commenters, and others. It received comparatively few substantive comments on the potential disclosure benefits associated with particular individual data fields.

Many commenters supported the publication of application-level data

and agreed that the data will facilitate enforcement of fair lending laws. Some community groups stated that the transparency afforded by the publication of 1071 data generally would discourage predatory and discriminatory practices in the small business lending market. One of these commenters noted that action taken data, particularly categorical information such as denials, incompletes, or approved but not accepted by the applicant, were integral to promoting the fair lending purpose of section 1071. Other commenters said that transparency would protect responsible lenders from unfair scrutiny. Many community groups, along with some lenders, individual commenters, and others also stated that 1071 data would allow governmental entities and community groups to monitor individual lenders' lending practices, identify lending disparities on a granular level, and enforce ECOA to the benefit of women and minority business owners. Community groups, a business advocacy group, and a CDFI lender further stated that HMDA data reporting has demonstrated that loan-level data enables community organizations, economists, and governmental entities to identify disparities between populations, which facilitates enforcement of fair lending laws. Other commenters expressed particular support for the publication of agricultural lending data, noting that the inclusion of data from agricultural creditors would help address discrimination in farm credit lending. These commenters cited a long history of discrimination targeting socially disadvantaged farmers and producers, including women-owned and minority-owned farms, in the farm credit market. Other stated that the 1071 dataset would help reveal where responsible lenders are serving small businesses fairly, aiding in the remediation of deficiencies, or removing barriers to equitable lending. A joint letter from community groups, community-oriented lenders, and business advocacy groups stated that the data would reveal disparities in access to credit in immigrant communities. Other community group commenters, along with two minority business advocacy groups, stated that application-level data would improve the understanding of demographic disparities in small business lending and support efforts to identify, address, and eliminate practices that create lending gaps for women-owned and minority-owned small businesses.

Commenters also asserted that the publication of application-level data would promote the business and community development purpose of section 1071, stating that the data would provide greater understanding of small business credit trends, such as lending dynamics or credit request cycles for different industries, and would improve understanding of the small business lending market more broadly. Some commenters, including a minority business advocacy group, stated that disclosure would help facilitate development of targeted programs to help address inequities and foster efficiency in the small business credit marketplace. For example, commenters said disclosure would allow community groups and lenders to compare how lenders are meeting community credit needs, develop score cards on local lending, identify gaps in lending, and advocate for low-income and microbusinesses. A CDFI lender stated that pricing information data would allow stakeholders to assess loan affordability in underserved communities. Citing the benefits of increased transparency, a commenter noted that publishing small business credit transaction data would support price discovery by allowing the comparison of credit costs between institutions, credit types, and business types, which is critical for market efficiency. Commenters also said that disclosure would help community groups educate small businesses, facilitate the development of tools to effectively identify barriers small businesses face, and empower owners to access credit on fair terms.

In contrast, several industry commenters saw little benefit from publication because the data would not include all factors that lenders rely on to make credit decisions. Some said that every small business loan is unique and without contextual information the data would not meaningfully increase understanding about the small business lending market. Others asserted that the data would be insufficient to conduct fair lending analyses, suggesting that data collection and publication are less effective mechanisms for identifying discrimination than examinations and disparate impact analyses. According to these commenters, HMDA data do not effectively reveal discrimination in the mortgage industry. One of these commenters also stated that publication would be ineffective because, as proposed, the data would not enable identification of additional types of discrimination, such as discouragement of particular groups of applicants. Two

---

[868] See, e.g., ECOA section 704B(g).

[869] See ECOA section 704B(a).

AdminRecord-000315

lenders suggested that the dataset duplicate data already required under HMDA and the CRA. A trade association suggested that data from credit unions would not be comparable to data from other lenders because of community-based member restrictions. A joint trade association letter disagreed with the Bureau's proposed analysis of the disclosure benefits of application-level data, suggesting that the Bureau's analysis was vaguely defined and not clearly linked to the statutory purposes of section 1071.

Current Approach

The Bureau has considered the comments above, and also relied on the NPRM's discussion of—and requests for comment on—the potential benefits of disclosing particular data fields. Given the comparative lack of comments on such benefits, the Bureau concludes that the NPRM's initial assessments of the utility of individual data fields were generally correct.

As Congress recognized, market transparency through publication of application-level data will serve to realize their intended purposes in section 1071. Publishing such data will help to identify and discourage potential fair lending violations in small business lending, while protecting responsible lenders from unfair scrutiny. The Bureau agrees with commenters that published data will help address discrimination in agricultural lending. Publication of this data will also improve understanding of small business credit needs and will provide insights into the small business lending market, promoting the business and community development purposes of section 1071. Increased transparency can make it easier for small businesses to access credit efficiently, and easier for lenders and potential lenders to identify opportunities in the market, thereby increasing access to credit. Moreover, data users, such as community groups, researchers, and public officials, will be able to use the data to help determine whether certain types of credit are disproportionately available to different communities. Insights gained from publication will enable lenders, advocates, investors, and the public sector to better meet the needs of small businesses.

These benefits are material even as the dataset may not include all factors that lenders may rely on in making credit decisions. The Bureau notes the feedback of SBREFA commenters discussed in the NPRM and the numerous comments from lenders, trade associations, individual commenters, and community groups discussed above

who expressed general agreement that public data will facilitate the observation of small business lending practices in ways that are currently not possible. For example, data points such as pricing information and census tract will facilitate comparison of pricing data across discrete geographic locations allowing data users to efficiently compare credit costs offered by financial institutions. The relative lack of substantive comments disagreeing with the NPRM's initial assessment of the benefits of disclosing particular data fields also speaks to the utility of the data fields in relation to the stated statutory purposes.

Commenters did not offer substantive evidence to back claims that data collection and publication do not help facilitate fair lending enforcement. In addition, whether other approaches to fair lending enforcement are more or less effective misses the point that analysis of data collected under this rule—as is true for data collected under HMDA—will contribute to robust and effective fair lending analysis. Further, publication of application-level data collected under the final rule will not inappropriately duplicate efforts under HMDA or CRA. Final § 1002.104(b)(3) excludes HMDA-reportable transactions from coverage. Data collected under the final rule will cover more types of transactions from more institutions than existing CRA data, and it will include applications as well as originations. As discussed in part II.F.2.i and elsewhere, Federal prudential regulators have proposed to use data collected under the CFPB's final rule, once it becomes available, for purposes of CRA small business and small farm lending assessments, rather than drawing data from FFIEC Call Reports.[870]

The benefits from publishing application-level data are so substantial that the Bureau is now of the view that each data field warrants inclusion in public data, subject to completion of the Bureau's full privacy analysis. Accordingly, the Bureau intends to publish application-level data except to the extent that it modifies or deletes data consistent with its privacy analysis.

4. Privacy Risk

The NPRM considered the risks to privacy that might result from publication of application-level data reported to the Bureau. Based on its analysis at that time, the Bureau recognized that publication of the complete data set, without any form of modification, could pose risks to privacy interests. As discussed in more

detail below, this was because certain data fields could create re-identification risk and disclosure of some fields would create a risk of harm or sensitivity. Accordingly, the Bureau intended to consider whether pre-publication modifications or deletions would reduce these risks to privacy and appropriately balance them with the benefits of disclosure.

The Bureau sought comment on the range of privacy concerns discussed in the NPRM, including potential re-identification of small businesses and financial institutions, as well as the types of harms and sensitivities that unmodified release of data could have caused to financial institutions and small business applicants, which are described further below. As discussed above, informed by the comments on the NPRM, the Bureau's preliminary assessment is that it should adjust the balancing test articulated in the NPRM to assess, primarily, whether data, individually or in combination with other data, create significant re-identification risk for small businesses and their owners. Though this approach focuses primarily on re-identification risk, the privacy harms or sensitivities discussed below clarify the consequences of re-identification and underscore the importance of managing re-identification risk. Because re-identification is a prerequisite to any potential harms or sensitivities that may result from publishing data, the Bureau also concludes that actions taken to prevent re-identification will mitigate those harms or sensitivities for small business applications and their owners. In addition, the Bureau's preliminary view is that its privacy assessment should not consider financial institution privacy interests except where the Bureau identifies a compelling risk to such interests.

i. Re-Identification Risk

Proposed Approach

The NPRM explained that, while information that directly identifies natural persons, such as name, address, date of birth, or Social Security number would not be collected, publication of application-level data in an unmodified format potentially could be used to re-identify small business applicants and related natural persons and potentially harm their privacy interests. The Bureau identified two re-identification scenarios. First, a third party may use common data fields to match a data record to a record in another dataset that contains the identity of the applicant or related natural person. Second, a third party may rely on pre-existing personal

870 87 FR 33884, 33930 (June 3, 2022).

AdminRecord-000316

knowledge to recognize an applicant's record in the unmodified data. The Bureau used the term "adversary" to refer to either type of third party.[871]

*Re-identification based on matching.* Under the first scenario, the Bureau explained that it might be possible to match a data record to an identified dataset, either directly or through a combination of intermediate datasets.[872] However, successfully re-identifying a data record would require several steps and could present a significant challenge. An adversary generally would have to isolate a record that is unique or rare within the data. A record is unique or rare when the values of the data fields associated with it are shared by zero or few other records. The Bureau stated that it believed actual data would be needed to perform an accurate re-identification analysis. Thus, it did not intend to apply the balancing test until after it had analyzed re-identification risk with a full year of reported data.

The Bureau explained that a data record having unique combinations of values would not automatically result in re-identification; an adversary would also have to find a record corresponding to the applicant or related natural person in another dataset by matching similar combinations of data fields. Once a data record had been matched, an adversary would possess any additional fields found in the corresponding record but not found in the data record—including, potentially, the applicant's identity. However, even after accomplishing such a match, an adversary might not have accurately re-identified the true applicant to whom the data record relates. For example, if the corresponding record was not the only record in the other dataset to share certain data fields with the unique data record, an adversary would have to make a probabilistic determination as to which corresponding record belongs to the applicant.

The Bureau expected that census tract and NAICS code, if published as proposed and without modification, could significantly contribute to re-identification risk. Geographic and industry information are publicly available in a variety of sources and in a form that directly identifies businesses or in a way that could be derived with

reasonable accuracy. This information is also likely to produce unique instances in the data, both when used separately, but particularly when combined. Other proposed data fields could have resulted in unique combinations (particularly when combined with census tract), but the Bureau stated it would need actual data to analyze their contribution to uniqueness.

In this context, the Bureau indicated that particularly relevant sources of identified data for matching purposes were UCC filings, property records, and titles. Such filings could pose a serious re-identification risk because of the availability of information about the lender, the applicant, and the date of transaction. For example, an adversary might be able to use the date and financial institution listed in UCC filings to identify the applicants of originated loans in the public application-level data. UCC filings also typically have the address of the borrower. With this information, combinations of financial institution identity, action taken date, and census tract data might result in unique combinations that an adversary could connect to a publicly available source of information to re-identify the applicant.

With respect to covered loans secured by residential and commercial property, publicly available real estate transaction records and property tax records would be particularly relevant sources of identified data, as the Bureau described in its proposed policy guidance on the disclosure of loan-level HMDA data.[873] Because some of the data fields in such public records are also present in application-level data, publication without any modifications would have created a risk that these public records could be directly matched to a data record. UCC filings also frequently include the name of the lender, the name of the business, and the date that the filing was submitted. Though the availability differs by State, UCC filings are often searchable in State databases, and are frequently mined by data brokers. UCC statements are often filed against specific collateral and business assets generally. The NPRM accordingly indicated that such filings could pose a serious re-identification risk.

The NPRM also explained that public records in loan-level datasets for programs like the SBA's 7(a), 8(a), 504, and Paycheck Protection Program, as well as State-level registries of women-owned and minority-owned businesses for contracting purposes, could contribute to re-identification risk. These datasets include information such

as loan program guarantee information, industry information or NAICS code, demographic information about the business owners, time in business, and number of employees. As a result, the time in business and number of workers data fields might significantly contribute to reidentification risk, especially in combination with other data fields like census tract and NAICS code. Similarly, loan-level performance datasets made available by the Government-Sponsored Enterprises include information such as borrower demographic information, loan program guarantee information, pricing data, loan term, loan purpose, and the year of action taken. Asset-backed securities datasets for securitized mortgage and auto loans are made available by the Securities and Exchange Commission through the Electronic Data Gathering, Analysis, and Retrieval system. These datasets, which include information about the lender, the date of action taken, pricing data, loan term, loan amount applied for and approved, are available online with limited restrictions on access. But these datasets do not include the name of the borrower; as described above, this means that an adversary who is able to match a record in one of these datasets to a record in the data would need to make an additional match to an identified dataset to re-identify an applicant. And some of these datasets contain restrictions on use, such as a prohibition on attempting to re-identify borrowers. Finally, the Bureau noted the existence of private datasets that might be matched to the data. For example, data brokers collect information about small businesses from a wide range of sources and sell it for a variety of purposes, including marketing, identity verification, and fraud detection.[874] These datasets typically include data collected from commercial, government, and other publicly available sources and could contain data such as NAICS code, location, and estimates of gross annual income, number of workers, and information about related natural persons, including the ethnicity and race of principal owners.

In addition to considering the steps an adversary would need to take to re-identify applicants and the various data sources that may be required to accomplish re-identification, including

[871] The term does not mean that the adversary's motives are necessarily malicious or adverse to the interests of others. *See, e.g.,* Nat'l Inst. of Standards & Tech., *De-Identification of Personal Information* (2015), *http://nvlpubs.nist.gov/nistpubs/ir/2015/NIST.IR.8053.pdf* (using the term "adversary").

[872] For these purposes, an "identified" dataset is one that directly identifies a natural or non-natural person.

[873] *See* 82 FR 44586, 44593 (Sept. 25, 2017).

[874] *See generally* Fed. Trade Comm'n, *Data Brokers: A Call for Transparency and Accountability* (May 2014), *https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf* (describing the types of products offered and the data sources used by data brokers).

their limitations, the Bureau considered the capacity, incentives, and characteristics of potential adversaries, including those that might attempt re-identification for harm. In particular, a competitor or potential competitor might seek information about a business's expansion strategy or financial condition, including whether it was able to obtain credit approval. As the Bureau explained, some adversaries could possess the resources to use private datasets in addition to publicly available records. However, the Bureau noted the extent to which much of the commercial benefit to be obtained by re-identifying the data would be more readily available from private datasets to which these potential adversaries already have access without the need for recourse to the data. In many cases, information from other datasets could be timelier than that found in the data. Furthermore, some of these potential adversaries might refrain from re-identifying the small business applicant for reputational reasons or because they have agreed to restrictions on using data for these purposes.

Additionally, the Bureau stated that some academics, researchers, and journalists may be interested in re-identifying published data for research purposes. As noted above, however, some private datasets have contractual terms prohibiting their use for re-identification purposes and therefore these persons might be restricted from actually using the data to re-identify applicants. Further, some academics or journalists may be affiliated with organizations that have reputational or institutional interests adverse to re-identification efforts.

The Bureau considered whether parties intending to commit identity theft or financial fraud may have the incentive and capacity to re-identify applicants, but it assessed that the data would be of minimal use for these purposes. In addition, such adversaries are not law abiding and may have easier, albeit illegal, ways to secure data for these purposes than attempting to re-identify application-level data.

*Re-identification based on personal knowledge.* The NPRM also noted the potential for re-identification based on personal knowledge. Location, as well as demographic and industry information, might well be known to an adversary familiar with an applicant, meaning that they might be able to re-identify an applicant without matching a record to another dataset. The Bureau explained that the personal knowledge possessed by such an adversary would be limited to information about a subset of applicants and related natural persons. Thus, any such re-identification would impact a more limited number of applicants or natural persons than might be re-identified by adversaries possessing sophisticated matching techniques. The Bureau explained that uncertainty over the extent of relevant personal knowledge posed challenges for evaluating how much individual data fields contribute to this re-identification risk. For these reasons, the NPRM generally focused on matching-based risk. However, the Bureau sought comment on how to assess re-identification risk arising from personal knowledge.

*Applications that do not result in originations.* In its final policy analysis on the disclosure of loan-level HMDA data, the Bureau explained that the risk of re-identification to applicants is significantly lower for applications that do not result in originated loans.[875] A lack of public information about applications significantly reduces the likelihood that an adversary could match the record of a HMDA loan application that was not originated to an identified record in another dataset. In the NPRM, the Bureau stated that it had not identified any publicly available information about applications for business loans. However, unmodified data might still contain data fields that facilitate the re-identification of applicants. For example, census tract and NAICS code data could result in unique combinations that an adversary could use to match to an identified public record, such as a business directory.

*Overlap between HMDA and 1071 data generally.* The Bureau proposed that some covered applications would also be reported under HMDA.[876] The public loan-level HMDA dataset contains data fields in addition to, or that overlap with, the proposed data fields, and the proposed data would have included data fields not included in the public loan-level HMDA dataset. The Bureau recognized that, in cases of overlap, some data fields may have required additional analysis with respect to risks of harm or sensitivity and re-identification posed by such overlap. The Bureau sought comment on this issue and the implications of potential re-identification risk and potential risk of harm or sensitivity for applications reported under both section 1071 and HMDA.

---

[875] *See* 84 FR 649, 658 (Jan. 31, 2019); *see also* 82 FR 44586, 44593 n.55 (Sept. 25, 2017).

[876] See the section-by-section analysis of § 1002.104 for additional details.

Comments Received

The Bureau received comments from lenders, trade associations, community groups, a business advocacy group, a software vendor, and several individuals on re-identification risk posed by the publication of unmodified, application-level data. Nearly all of these commenters agreed that re-identification risk, either through matching or via personal knowledge, should be considered by the Bureau when determining whether to modify or delete data for publication.

Many industry commenters and a business advocacy group saw a high risk of data being used to re-identify applicants and related natural persons and that this would disclose harmful or sensitive private information. Some industry and individual commenters agreed that re-identification risk will be higher as a result of data point combinations; several pointed to the combination of NAICS and census tract. One commenter stated that because re-identification risk depends on the distinctness of the data being published and on the ability to match that data to other datasets, the Bureau should consider privacy risk for the overall dataset rather than for each data point. Another stated that unpredictable changes in re-identification technologies may make data that are currently impossible to re-identify susceptible to re-identification in the future. Commenters also stated that businesses in rural areas face particular re-identification risk because of the likelihood that those areas have low populations and a low number of small businesses. Several commenters also saw re-identification risk in rural areas as more relevant to certain products, such as agricultural lending, that are concentrated in such areas. A group of trade associations said that CRA data are not published at the application-level, in part because geography can contribute to the increased risk of re-identification.

In contrast, some commenters, primarily consisting of community groups, asserted that re-identification risk, either through matching or because of personal knowledge, is low. Two commenters stated that the risk is low because much of the information that would be included in the 1071 dataset is already publicly available, either in commercial data sources or as a result of data breaches. Some commenters also stated that there have been no reported incidents of HMDA data, which is similar to 1071 data, being used to re-identify individuals. One said that the effectiveness of modifications and

deletion techniques for HMDA data suggest that similar modifications and deletions will nullify the re-identification risk for 1071 data. The Bureau did not receive comments about its assumption that data on applications that do not result in originations pose lower re-identification risk than data on originated applications.

Current Approach

In the Bureau's preliminary assessment, re-identification risk of small business applicants and their owners is the core privacy risk associated with data publication. While the primary focus of the Bureau's intended privacy analysis is the impact of re-identification risk on personal privacy interests, controlling reidentification risk will naturally mitigate other privacy risks and harms, including commercial privacy risks for small businesses. The prevailing view of commenters was that unmodified application-level data poses re-identification risks that the Bureau should consider when making modification and deletion decisions. The Bureau also agrees with commenters that data point combinations, particularly the combination of NAICS and census tract, pose particular re-identification risks, and it intends to take this into account in making modifications and deletions.

The Bureau agrees that small businesses in small or rural areas may face heightened re-identification risk. However, overall re-identification risk depends on multiple factors. For example, while the overall transaction volume in a rural area may be lower than in an urban area, concentration of certain credit products in rural areas may change how much of an impact low transaction volume has on re-identification risk. Thus, the Bureau does not intend to rely on a categorical determination that geographical area types or particular census tracts will contribute to the risk of re-identification in every circumstance. The Bureau intends to determine whether targeted modification of individual data fields sufficiently mitigates privacy risks from geographical identifiers, rather than relying on wholesale deletion of data from rural areas.

The Bureau agrees that it is difficult to predict how technology will evolve in the future and impact re-identification risk. This is one reason it intends to track developments in the small business lending market, continue to engage with stakeholders, and reassess its privacy approach as necessary. The Bureau intends to preserve flexibility so

that its privacy analysis can evolve with changes to privacy risks.

The Bureau assesses that modification and deletion techniques can effectively limit re-identification risk and therefore concludes that completely withholding data—which would be contrary to section 1071's statutory purposes and express disclosure provisions—is not necessary to manage re-identification risk. As noted by commenters, modification and deletion techniques have effectively reduced re-identification risk from HMDA data, and the Bureau anticipates the same result with this data. The existence of some data that matches with existing data sets is not grounds to forego the full privacy analysis of collected data that will allow it to make targeted modification and deletion decisions to protect privacy interests.

For the reasons given above and as discussed in part VIII.B.4.ii below, the Bureau preliminarily views re-identification risk as the most significant privacy risk associated with publishing application-level data—and thus the most important privacy risk to consider in making modification and deletion decisions. Re-identification is a prerequisite to any potential harms or sensitivities that small business applicants or related natural persons may experience from publishing such data. As the risk of re-identification is reduced, the risk of harm caused by disclosing harmful or sensitive information also will be reduced. Further, as discussed below, because almost all the harms and sensitivities to financial institutions result from concerns about small business applicant or related natural person re-identification, preventing such re-identification will also prevent the most serious harms and sensitivities for financial institutions.

ii. Risk of Harm or Sensitivity

Proposed Approach

The NPRM considered whether a re-identified application-level record would disclose information about an applicant, related natural person, or financial institution that is not otherwise public and may be harmful or sensitive. Specifically, the Bureau evaluated whether such data could be used for harmful purposes such as fraud or identity theft or the targeted marketing of products and services that may pose other risks. The NPRM evaluated whether the data could cause competitive harm to small business applicants or to financial institutions. It also evaluated whether certain data fields might be viewed as sensitive if

associated with a particular applicant, related natural person, or financial institution. In evaluating the potential sensitivity of a data field, the Bureau considered whether disclosure of the data field could cause dignitary or reputational harm to small business applicants, related natural persons, and financial institutions.

The NPRM explained that some identifiable information about small business lending is already publicly available. Such information is both in public records and in private datasets with varying barriers to access and restrictions on use. The Bureau's analysis accordingly considered the degree to which disclosure would increase this risk relative to the risk that already exists. In general, where a data field was already publicly available, the NPRM saw a reduced risk of harm or sensitivity from its further disclosure.[877]

The Bureau considered whether the data could be used for harmful purposes such as fraud or identity theft or the targeted marketing of products and services that may pose other risks. The Bureau's initial view was that unmodified application-level data would be of minimal use for perpetrating identity theft or financial fraud against applicants or related natural persons. As proposed, application-level data would not include information typically required to open new accounts in the name of a small business's principal owner, such as Social Security number, date of birth, place of birth, passport number, or driver's license number. Additionally, the data would not include information useful to perpetrate existing account fraud, such as account numbers or passwords. The Bureau acknowledged, however, that almost any information relating to a small business could, in theory, be used for these purposes. For example, unmodified data could potentially be used in a phishing attack against an applicant, or for knowledge-based authentication. Some such data, however, may already be available from public and private sources. The Bureau also noted, on the basis of its expertise and analysis, that the publication of HMDA data—which contain many data fields that are similar to data fields that would be disclosed under the proposal—has not resulted in any measurable increase in fraud or identity theft against mortgage applicants.

---

[877] However, where a data field was already publicly available, disclosing that data field in the data may have enabled the matching of data to other datasets that may not have been controlled by the Bureau, which could have substantially facilitated re-identification or the disclosure of harmful or sensitive information.

AdminRecord-000319

The Bureau also considered potential impacts on targeted marketing of products and services. The Bureau explained that although the data could be used to market products and services that would have been beneficial for small businesses—perhaps increasing competition among creditors that could help small businesses receive better terms—they could also be used to target potentially vulnerable small businesses with marketing for products and services that may have posed risks that were not apparent. For example, users might perceive certain data to reveal negative information about an applicant's financial condition or vulnerability to scams relating to debt relief or credit repair. Information about a loan might also be used for a practice known as "stacking," in which creditors may obtain lead lists based on publicly available information and offer follow-on loans or advances that add to the debt burden carried by small businesses. Some creditors might also use the data for deceptive marketing practices. However, the Bureau noted that the utility of the data for predatory marketing practices may be limited by delay between action taken on a loan and data publication.

The Bureau considered whether unmodified data would result in competitive harm to small business applicants or related natural persons by disclosing general information about a small business's use of credit that was not currently available to the general public. The Bureau acknowledged that certain data points in unmodified form could reflect negatively on the financial condition of a business or its owners. The Bureau also considered the potential for competitive harm to financial institutions. As discussed below with respect to the financial institution identifying information that would be reported pursuant to proposed § 1002.109(b), the Bureau proposed to identify the financial institution in the public application-level data. Therefore, the data could reveal general information about a financial institution's lending practices that is not widely available to the general public. As the Bureau explained, data fields such as census tract, NAICS code, credit type, and pricing could disclose information about where a financial institution is doing business, what industries it is doing business with, what kinds of products it is offering, and what kinds of prices it is charging, respectively. Additionally, if a small business applicant were re-identified, a financial institution's competitors could identify the small businesses to which

the financial institution is offering or providing credit. A financial institution could then potentially offer credit to a particular small business at a lower price than they currently received. However, the Bureau did not assess that unmodified application-level data would include key inputs for, or be detailed enough, to substantially facilitate reverse-engineering of proprietary lending models. For example, it would not have included information about an applicant's credit history. The NPRM also noted stakeholder concern that data could harm financial institutions by increasing the amount of litigation against them. The Bureau sought comment on this risk.

With respect to feedback that disclosing information about applicants in rural areas could lead them to seek financing elsewhere, the Bureau noted that would not necessarily reduce the risk that someone in the small business's community may ultimately re-identify them because the data would be reported with respect to the location of the business, as discussed in the section-by-section analysis of § 1002.107(a)(13).

In addition to considering whether the disclosure of a data field could lead to financial or other more tangible harms, the Bureau also considered whether the data might be viewed as sensitive. In assessing whether a data field creates a risk of sensitivity, the Bureau evaluated whether its disclosure could lead to dignitary or reputational harm to small business applicants or related natural persons. For example, if re-identified, the data could reveal information that casts a negative light on a small business's financial condition, such as the fact that a loan was denied due to a business's credit characteristics or cashflow.

The Bureau also evaluated whether the disclosure of a data field could cause reputational harm to financial institutions. The Bureau discussed stakeholder concerns that the data could lead users to draw unfounded inferences about discrimination. The Bureau noted that several of the data fields, if disclosed in unmodified form, would help address this concern by serving as control variables. For example, many financial institutions consider a small business's revenue when assessing the risk of extending credit. As a result, disclosing gross annual revenue data would help ensure that data users who are evaluating potential disparities in underwriting or pricing can compare small businesses with similar revenues, thereby controlling for a factor that might

provide a reason for some disparities. The Bureau also noted that it does not expect that data alone could generally be used to determine whether a lender is complying with fair lending laws. The Bureau expected that, when regulators conduct fair lending examinations, they would analyze additional information before reaching compliance determinations.

The Bureau also considered general expectations with respect to what information is available to the general public. For example, the Bureau explained that disclosing gross annual revenue in unmodified form could disclose sensitive information because it could reflect the financial condition of a small business or, where a small business is a sole proprietorship, a particular individual. This type of information is typically not available to the general public. The Bureau also acknowledged concerns that some small businesses and their owners would consider seeking credit sensitive, or would consider the disclosure of a banking relationship sensitive because others may draw adverse inferences about the small business's financial condition. These are concerns about sensitivity that would result from the re-identification of the applicant, rather than from the disclosure of particular data fields. The Bureau sought to address these concerns by mitigating the risk of re-identification.

*Comments Received*

The Bureau received comments in this area from a range of commenters including lenders, trade associations, business advocacy groups, and community groups.

*Risk of identity theft or fraud.* Some industry and academic commenters stated that the data points may subject small business applicants and related natural persons to an increased risk of fraud or identity theft. Commenters also stated that publication may expose financial institution employees, such as the financial institution contact reported under § 1002.109(b)(3), to fraud or identity theft actions, such as phishing attacks. Another commenter stated that rural applicants will be easily identifiable in data and, as a result, at greater risk of fraud.

*Risk of targeted marketing harms.* A group of bank trade associations and a business advocacy group asserted that public data could be collected and sold to interested third parties, potentially for targeted marketing purposes. No commenters asserted financial institutions would experience such harms.

AdminRecord-000320

**35470**   **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

*Risk of competitive harms.* Several industry commenters and a business advocacy group expressed concern that the disclosure of application-level data would pose risks of competitive harm to small business applicants or related natural persons. Some commenters stated that if an applicant is re-identified, competitors will gain non-public insights into financial information directly bearing on that small business's long term financial health and competitive goals. Some commenters noted that larger competitors may be more likely to gain information about the financial health and long-term business goals of small businesses. For example, a lender asserted that larger companies may use the data to outbid smaller competitors. Other commenters stated that data may reveal non-public information about a small business's use of credit, such as financing terms, that competitors may use to their competitive advantage.

Some industry commenters and a business advocacy group stated that small business applicants may experience reduced availability or increased cost if other financial institutions learn of their small business loans or loan terms, which would reduce their ability to obtain liquidity or increase their operating costs as compared to their competitors. These commenters asserted that publication may impose increased compliance costs and litigation risks on financial institutions that are passed on to small business applicants or that cause financial institutions to limit credit to borrowers with higher risk profiles to prevent losses.

Many industry commenters stated that publication will present significant risk of competitive harms to financial institutions. Commenters asserted that application-level data may be used to identify or reverse-engineer proprietary lending information, such as underwriting requirements or pricing models. One commenter asserted that if the pricing information and action taken data points could be used to determine a lender's limits for other credit terms that are not collected under the rule, such as the APR limit, the lender's competitors would be able to undercut or otherwise compete with those terms, for example by offering lower rates. This commenter stated that while lower APRs are generally beneficial for consumers, this may come at the cost of lower quality service. A lender suggested that data points such as gross annual revenue and the time in business may be used to reverse-engineer a financial institution's proprietary lending strategy. Another commenter

asserted that data points for private label credit, such as the pricing information or census tracts, are particularly commercially sensitive to financial institutions and there is risk that disclosure of this information will cause competitive harm.

Other industry commenters indicated that competitive harm experienced by financial institutions may have broader impacts on the small business lending market. Some commenters suggested that if public data reveals proprietary commercial lender information, financial institutions may be compelled to engage in anti-competitive behavior, such as price-fixing, that restricts credit or offers less favorable terms, because it will effectively homogenize the market and limit their ability to compete with one another. One asserted that compliance concerns due to publication could result in reduced product availability by financial institutions, as they asserted was seen after publication of HMDA and CRA data.

Some industry and academic commenters stated that competitive harm may particularly impact smaller or rural financial institutions. They asserted that because these lenders have fewer small business customers than larger financial institutions, their customers are at a higher risk of re-identification. As such, it may be easier for the larger competitors of smaller or rural financial institutions to approach their small business applicants to underprice the loans and offer better terms. These commenters stated that smaller and rural financial institutions may have less flexibility to respond to resulting competitive harms because of their size and lower applicant volume.

*Risk of reputational harms.* An industry commenter and a business advocacy group stated that small business applicants and related natural persons will be subject to reputational risks as a result of publication. For example, one noted that if applicants are re-identified, small business owners may experience harm, discrimination, or stigmatization from disclosure of certain data points, such as race, sex, and ethnicity. Other industry commenters stated that financial institutions may also experience reputational harms. Many commenters stated that risks of reputational harm and frivolous litigation will result from incorrect conclusions about the data drawn by the public or regulators. These commenters asserted that incorrect data conclusions could result from the unique characteristics of small business lending generally, particular credit scenarios common within small business lending, and the fact that the

data will not reflect all factors that went into underwriting decisions. For example, some commenters asserted that there is particular risk of misunderstanding with Farm Credit System credit based on how dividends are provided and the legal limitations for such loans. These commenters explained that because statutory provisions for Farm Credit System credit have specific coverage criteria, data may disclose a justified, but disproportionately high, rate of application denial. Additionally, commenters explained that Farm Credit System institutions may appear to charge a higher interest rate to certain borrowers but that the interest rates are offset by dividends based on the borrower's patronage.

A few industry commenters cited potential discrepancies between data points and those that appear in other sources, which could increase the risk of reputational harm and litigation for financial institutions. These commenters said that because data requirements for these other sources are not the same as proposed requirements, but are labeled with the same identifier, the resulting variations could unfairly increase scrutiny or lead to inaccurate conclusions. These commenters were especially concerned about this risk for loans subject to HMDA or CRA. Additionally, some industry commenters stated that financial institutions' reputations for protecting applicants' privacy may be impacted by data publication. Commenters noted that applicants may have concerns about providing information and may feel that conversations with a financial institution are less confidential because certain information is being disclosed to the government. One commenter mentioned that if a financial institution or the Bureau experiences a data breach, the financial institution may not be viewed as trustworthy by applicants.

In contrast, other commenters stated that published data will decrease reputational and litigation risks for financial institutions. According to one commenter, the data will provide evidence of responsible lenders' fair lending practices, which will give them a competitive advantage over less scrupulous financial institutions. Additionally, a few commenters stated that reputational and litigation harm risks from publication can be mitigated by disclaimers, as well as by data modifications and deletions. For example, these commenters stated that any data publication should include a statement for agricultural lending credit types that Farm Credit System entities

AdminRecord-000321

can only lend to applicants that are eligible under the Farm Credit Act.

*Other harms or sensitivities.* Commenters identified three additional harms that were not discussed in the NPRM: physical harms, data security, and harm to applicants' relationship with, or trust in, financial institutions.

A software vendor and several individual commenters stated the Bureau should consider physical harm or personal security threats that could result from publication. For example, a few commenters stated that if an applicant's LGBTQI+ status was revealed, the applicant may face threats to their personal security due to discrimination.

One industry commenter stated small business applicants or related natural persons may be exposed to data breaches because financial institutions will store and transmit data online. Some industry and business advocacy group commenters asserted that a data breach could cause privacy risks for financial institutions, including reputational harm related to litigation. The commenters said this would be true even if the Bureau were the breached entity, and that the Bureau must take action to protect reported data from potential breaches. Some also requested that the Bureau detail the steps it will take to protect data from breach or to indemnify financial institutions impacted by data breaches arising from a breach to the Bureau. One commenter stated that the Bureau should seek comment on its data security safeguards.

Some commenters, mainly from industry, identified potential impacts that privacy risks may have on the relationships between small business applicants and financial institutions. Some commenters stated that the publication may create friction in the lending process due to negative public sentiment. These commenters asserted that, because small business applicants may view the data collection methods as invasive or because financial institutions may feel obligated to reduce tailored credit underwriting to prevent misconceptions about lending practices, financial institutions may not be able to provide customer service at the level currently obtained. Other commenters noted that applicants who are concerned about the privacy or security of this data may be hesitant to seek credit or they might seek credit from more expensive unregulated sources.

**Current Approach**

As discussed below, the Bureau's preliminary view is that the risk of harm or sensitivity to small businesses and related natural persons is significant

and should be considered in its privacy assessment. The Bureau's current intent is to address these risks primarily by controlling for re-identification risk. The Bureau is particularly focused on risks to personal privacy interests. Such interests may involve protected demographic information or information about personal finances that could have reputational impact if disclosed; for example, this might include the reputational impact of a credit denial arising from a personal credit score.[878] The Bureau also intends to consider certain commercial risks of harms and sensitivities to small businesses when modifying or deleting data. The Bureau does not currently intend to consider financial institution privacy interests in its analysis unless there is a compelling privacy risk.

*Risk of identity theft or fraud.* Based on comments received, the Bureau views any risk of identity theft or fraud for small business applicants or related natural persons resulting from the publication of data to be predicated on the small business applicant or related natural person being re-identified. As to comments that publication of financial institution contact information will subject financial institution employees to identity theft or fraud, such as phishing attempts, consistent with the NPRM, the Bureau plans to exclude from publication the name and business contact information of a person who may be contacted with questions about the financial institution's submission from the public application-level data.

*Risk of targeted marketing harms.* Targeted marketing harms likewise presuppose that a small business applicant or related natural person is re-identified.

*Risk of competitive harms.* Potential competitive harms, including information about a small business's long term financial health and competitive goals, are also predicated on re-identification. For example, commenters stating that an applicant's competitors may gain insights into its financial health, competitive strategy,

and goals all assumed that the small business applicant is first re-identified.

The Bureau does not view data publication as increasing a financial institution's compliance costs and litigation risks, such that increased costs and risks would result in increased fees, reduction in credit program availability, or reduce credit availability for applicants with weak credit profiles. Historical evidence from HMDA suggests that such impacts will be minimal. Notwithstanding similar contentions prior to the 2015 HMDA Final Rule, the Bureau recently reported that, based on 2021 HMDA data, trends in mortgage origination continued to increase since the HMDA rule became effective in 2018.[879] Based on this experience with HMDA, the Bureau does not anticipate that this final rule will significantly increase the cost of credit products, reduce credit product availability, or result in otherwise unnecessary tightening of underwriting criteria.[880]

The Bureau also disagrees that publication will reveal proprietary lending information, thereby resulting in competitive harm to financial institutions. Unmodified application-level data will not include key inputs for, or be detailed enough, to substantially facilitate the reverse-engineering of proprietary lending models. For example, it will not include applicants' credit score data. Other comments expressing concern that the data collected would provide only an incomplete picture of the financial institution's lending practices confirmed that other key information about underwriting will not be collected. These omissions should prevent competitors from reverse-engineering proprietary lending models and make it unlikely that financial institutions could use the data to engage in anti-competitive behavior like price-fixing.

By the same token, there is no basis for small or rural financial institutions

---

[878] For example, § 1002.107(a)(11) requires a covered financial institution to report the principal reason or reasons the financial institution denied a covered application. Comment 107(a)(11)–1.ii states that a covered financial institution reports the denial reason as "credit characteristics of the principal owner(s) or guarantor(s)" if it denies the application based on an assessment of the principal owner(s) or guarantor(s)'s ability to meet its current or future credit obligations. Examples include principal owner(s) or guarantor(s)'s credit score, history of charge offs, bankruptcy or delinquency, low net worth, limited or insufficient credit history, or history of excessive overdraft. Thus, data about a denial reason may provide personal information about a principal owner's personal financial health that may not otherwise be known to the public.

[879] The 2015 HMDA Final Rule noted that SBREFA SERs and NPRM commenters stated that compliance costs meant that financial institutions would increase price, reduce availability, or exit markets. *See* 80 FR 66127, 66296 (Oct. 28, 2015). But the Bureau's 2021 HMDA Data Point notes that mortgage origination trends have continued to increase since that rule became effective in 2018. Mortgage origination volume has increased from 4.14 million in 2018 to 5.13 million in 2021. Similar increases were seen in application volume. *See* CFPB, *Data Point: 2021 Mortgage Market Activity and Trends* (Sept. 19, 2022), *https://files.consumerfinance.gov/f/documents/cfpb_data-point-mortgage-market-activity-trends_report_2022-09.pdf.*

[880] See part IX.F.4's analysis of small business costs for more information about the magnitude of these effects.

**35472**    **Federal Register**/Vol. 88, No. 104/Wednesday, May 31, 2023/Rules and Regulations

to be at more significant risk of this type of harm. The Bureau acknowledges that the risk of re-identification of small business applicants and related natural persons may be greater in smaller or rural areas, but that does not increase the risk of proprietary lending models being disclosed.

*Risk of reputational harms.* Reputational harm to small business applicants and related natural persons is also predicated on re-identification.

The Bureau does not agree that publication will increase a responsible financial institution's reputational risk. While the Bureau recognizes that financial institutions may need to defend against some increased litigation about their small business lending practices, it agrees with commenters that publication will help responsible financial institutions defend against such litigation, accordingly making it less likely to occur in the first place. The Bureau similarly agrees with commenters that responsible financial institutions will be able to use the data as evidence of their fair lending compliance, as well as to prevent or counter erroneous claims that the institution is engaging in discriminatory practices. The Bureau has not seen any significant detrimental impact on mortgage applicants' trust in financial institutions, and HMDA-covered mortgage originations have increased since the Bureau's amendments to Regulation C went into effect in 2018.[881] As in the mortgage market, requesting and publishing data from applicants does not have enough reputational impact on financial institutions to impair origination activity.

With respect to reputational risk arising from overlapping databases, the Bureau is finalizing a coverage exception for transactions covered by the Bureau's HMDA rule.[882] In addition, many datasets contain data types that already overlap with HMDA and CRA data. There is accordingly no compelling reason to expect that publishing application-level data will significantly increase whatever risk already exists from HMDA coverage.

As to comments that assert that Farm Credit System products may be incomparable to other credit product types, thereby creating the risk of

reputational harm or frivolous litigation, the data will provide sufficient opportunity for Farm Credit System entities to prevent and refute any erroneous conclusions. The Bureau agrees with commenters that this harm can be averted by distinguishing Farm Credit System loans in the dataset. The Farm Credit System is one of the identified types of financial institutions for the data required under § 1002.109(b)(9).[883] As a result, users can filter the data accordingly. Farm Credit System financial institutions can also filter to defend against any conclusions they believe are inaccurate because of comparisons outside the Farm Credit System.

*Other harms or sensitivities.* The Bureau agrees that the privacy assessment should take account of risks of physical harm and personal security threats to applicants or related natural persons, as well as the potential for data, once available, to be used by third parties to single out or target certain applicants or related natural persons for discriminatory treatment. Re-identification in some circumstances could result in significant risks, including threats of physical or personal harm and discrimination. The risks raised by commenters are supported, for example, by Hate Crime Statistics reported by the Federal Bureau of Investigation (FBI) through its Uniform Crime Reporting Program,[884] and by Equal Employment Opportunity Commission data.[885] The Bureau believes that the risk to personal privacy interests arising from physical harm, personal security threats, and discrimination resulting from information about protected characteristics warrant significant consideration when the Bureau

considers modifications or deletions to data.

However, historical evidence indicates that data publication will have little long-term impact to relationships between applicants and financial institutions. The Bureau reported in 2021 that mortgage originations subject to HMDA continued to increase despite the HMDA rule becoming effective in 2018.[886] Based on this and earlier experience with HMDA, the Bureau does not agree that publication will drive small business applicants to seek alternative financing options to avoid disclosure. The HMDA evidence also suggests that any potential increase in costs after this rule becomes effective will not be prohibitive for applicants seeking financing from a regulated financial institution and that market volume will not be substantially impacted.

Finally, the Bureau takes strong measures to mitigate and address any risks to the security of sensitive data it receives, consistent with the guidance and standards set for Federal information security programs. The agency is accordingly committed to protecting the privacy and information security of the data it receives from financial institutions under this rule. In addition, the Bureau does not agree that a financial institution could be held legally liable for the exposure of data due to a breach at a government agency or for reporting data to the Bureau if the institution was legally required to provide the data and did so in accordance with other applicable law.

Based on the record to date, the Bureau intends to consider the risk of harms to small business applicants and related natural persons discussed above in its privacy risk assessment. However, the risks of harms or sensitivities to small businesses and related natural persons discussed by commenters logically assume re-identification already occurred. The harms and sensitivities recognized above clarify the consequences of re-identification and underscore the importance of managing re-identification risk. Additionally, the Bureau's preliminary view is that privacy risks to financial institutions are less significant compared to both personal privacy interests and non-personal commercial privacy risks to small business applicants and related natural persons. Many of the harms attributable to financial institutions

---

[881] Mortgage origination trends since the HMDA rule became effective in 2018 suggest that any distrust resulting from financial institutions seeking HMDA data has not deterred applicants from continuing to seek credit. *See* CFPB, *Data Point: 2021 Mortgage Market Activity and Trends* (Sept. 19, 2022), *https://files.consumerfinance.gov/f/documents/cfpb_data-point-mortgage-market-activity-trends_report_2022-09.pdf.*

[882] *See* § 1002.104(b)(2).

[883] *See* comment 109(b)(9)–1.vii.

[884] For 2019, the FBI's Uniform Crime Reporting Program reported that in single-bias incidents, 1,492 victims were targeted because of their sexual orientation and 227 victims because of their gender identity. *See* Fed. Bureau of Investigation, *2019 Hate Crimes Statistics, https://ucr.fbi.gov/hate-crime/2019/topic-pages/tables/table-1.xls* (last visited Mar. 20, 2023).

[885] The Equal Employment Opportunity Commission reports that from FY 2014 through FY 2021, approximately $43.5 million dollars of monetary benefits were paid on LGBTQ+-based sex discrimination charges. The amount has increased from $2.2 million to $9.2 million over this period. It also reports that it received 13,546 LGBTQ+-based sex discrimination charges in the same time period, with annual charges increasing from 1,100 in FY 2014 to 1,968 in FY 2021. *https://www.eeoc.gov/data/lgbtq-based-sex-discrimination-charges* (last visited Mar. 20, 2023). *See also* Off. of Mgmt. & Budget, Off. of the Chief Statistician of the U.S., *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys* 8–9.

[886] *Compare* 80 FR 66127, 66296 (Oct. 28, 2015), *with* CFPB, *Data Point: 2021 Mortgage Market Activity and Trends* (Sept. 19, 2022), *https://www.consumerfinance.gov/data-research/research-reports/data-point-2021-mortgage-market-activity-trends/.*

noted by commenters are only likely if small business applicants are re-identified, are not likely to occur based on the history of HMDA data publication, or exist independent of the data and therefore do not result from publication. As a result, measures that the Bureau takes to reduce re-identification risk will also reduce the risk of harms to financial institutions. Thus, the Bureau intends to consider modifying or deleting data to protect a financial institution privacy interest where data publication creates a compelling privacy risk.

### 5. Privacy-Informed Modification and Deletion

#### Proposed Approach

*Generally.* The NPRM stated that where disclosure of an individual data field, alone or in combination with other fields, would pose risks to privacy that were not justified by the benefits of disclosure to 1071's purposes, the Bureau would consider whether it could appropriately balance the privacy risks and disclosure benefits through modification techniques or whether the field should be deleted from the public dataset. The Bureau stated that it also would evaluate the risks and benefits of disclosing a data field in light of modifications or deletions considered for other data fields. Where the Bureau determines that modification of a data field is appropriate, the Bureau stated that its consideration of the available forms of modification for the 1071 data would also be informed by the operational challenges associated with various forms of modification and the need to make application-level data available to the public in a timely manner.

In general, the Bureau stated that deleting or modifying data because the data would disclose general information about a financial institution's lending practices—compared with information that could substantially facilitate, for example, the reverse-engineering of a financial institution's proprietary lending models—would be inconsistent with section 1071, which directly contemplates disclosure of financial institution identity in connection with the public application-level dataset.[887] Each of the data fields prescribed by the statute—with the exception of the application number—could provide some insight into a financial institution's lending practices. If the Bureau were to exclude data on this basis, therefore, it would exclude virtually all of the statutorily required

1071 data points from the public data, frustrating both of the statutory purposes of section 1071.[888] While the Bureau acknowledged financial institutions' concern about the litigation and reputational risks involving 1071 data, the Bureau did not believe that this concern would justify the exclusion of data from public disclosure. One of the statutory purposes of section 1071 is to facilitate enforcement of fair lending laws, which authorize enforcement by parties other than the Bureau.[889] Additionally, section 1071 contemplates that financial institutions would make their own application-level data available to the public, which necessarily entails their identification.[890]

In light of the statutory purposes, the Bureau intended to modify or delete data only as needed under the balancing test prior to public disclosure. The NPRM discussed associated modification techniques with respect to specific data points. Where no specific modification technique was described with respect to a particular data point, the Bureau stated that it had not identified an obvious modification technique other than swapping, suppression, or deletion.

While certain information that directly identifies applicants or related natural persons generally would not be collected under the proposed rule, the Bureau did not accept that this would eliminate privacy risks that would arise from publishing the data in unmodified form. The Bureau also rejected the idea that privacy risks could be adequately resolved through rule coverage. While some re-identification risk could be reduced by increasing the number of applications reported to the Bureau, the Bureau did not believe the effects of doing so are necessarily predictable because re-identification risk depends on the characteristics of the data. Further, the Bureau did not believe that increasing the number of applications would have addressed risks of harm or sensitivity to re-identified applicants or natural persons.

*Aggregate data.* In the NPRM, the Bureau stated that it did not intend to address privacy risks arising from application-level data by disclosing aggregated data in its place. As required by section 1071, the Bureau proposed in § 1002.110(a) to make available to the public the information submitted to it by financial institutions pursuant to proposed § 1002.109, subject to

deletions or modifications made by the Bureau. The Bureau stated that, as authorized by the statute, proposed § 1002.110(b) would have stated that the Bureau may, at its discretion, compile and aggregate information submitted by financial institutions pursuant to proposed § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate. The Bureau initially anticipated making the data collected under section 1071 available at the application level—with appropriate potential modifications and deletions—rather than providing aggregate data with counts and averages for each data field. The Bureau stated that it may consider releasing aggregated data in the future, after it determined whether narrower modifications or deletions could address privacy risks. The Bureau had received some suggestions to consider "differential privacy" techniques,[891] which are typically used in connection with aggregate statistics to reduce the identifiability of more granular data. The Bureau sought comment on whether differential privacy techniques might be appropriate for application-level data.

*Recoding.* The NPRM identified the Bureau's intention to consider various methods to "recode" the proposed data fields as necessary. The Bureau explained that recoding techniques decrease the number of distinct categories for a data field. In this context, recoding would involve providing the value of a data field in a higher-level category that increases the number of records within a given combination. Some data fields like census tract and NAICS code have structures that permit recoding without developing new 1071-specific recoding categories. For instance, if the Bureau were to determine that the re-identification risk presented by the census tract data field does not justify the benefits of unmodified disclosure, the Bureau could instead provide geography at the county level because census tracts are designed to be non-overlapping subdivisions of a county.

The Bureau also stated that it intended to consider recoding via bins or intervals of values for data fields that, in unmodified form, would have continuous values. The Bureau stated that unmodified continuous data fields can be highly identifying, but binning can significantly reduce this risk. It also

---

[887] *See* ECOA section 704B(f)(2)(B).

[888] *See* ECOA section 704B(a).

[889] *See, e.g.,* ECOA section 706 (providing for civil liability).

[890] *See* ECOA section 704B(f)(2).

[891] Differential privacy is a statistical method designed to protect individuals from reidentification risk. A dataset is said to be differentially private if, by looking at the dataset, one cannot tell whether any individual's data was included in the dataset.

**35474**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

noted the possibility of top- or bottom-coding a data field to prevent extreme—and potentially very re-identifiable—values from being released.

*Other techniques.* The Bureau stated that it might also consider "targeted suppression," which makes certain values of data points unavailable when a certain combination of values is held by too few records. The Bureau stated that it might consider treating certain values of data points as "not available" if the application is the only small business application from a particular census tract. The Bureau explained that targeted suppression can be applied in several ways. One way would be to remove the value of a field that makes the record identifiable. For example, if census tract and NAICS code identify a record, the microdata could delete the value of the NAICS code for any applications that are in cells deemed sensitive. A second approach could leave the census tract and NAICS code but suppress the values of other data points. This method would reduce the potential harm if the record were re-identified. A third approach could be to remove the record from the dataset entirely. The Bureau stated that, in general, suppression is a more common approach for aggregate data than for application-level data.

The Bureau noted that one drawback to targeted suppression is that it complicates data analysis for end users. A data user would be presented with millions of rows, but in certain rows and for certain data points, values would be missing.[892] Another identified drawback is that suppression would need to be done so that the remaining unmodified data do not provide a user with the ability to back out the modified field, sometimes involving complementary suppression or deleting values of other applications to ensure that the missing value cannot be reengineered. The Bureau sought comment on whether targeted suppression techniques could preserve the benefits of publishing application-level data, and, if so, what the Bureau should consider as the minimum cell size to implement targeted suppression.

The Bureau sought comment on other modification techniques, such as "data swapping" (sometimes called "switching"). Data swapping involves finding two records that are similar on several dimensions and swapping the values for other data fields between the two records. In effect, data swapping

would require that the Bureau preserve certain data fields while swapping others. The Bureau stated that another set of techniques for addressing privacy risks for continuous data would involve adding "random noise" to the reported values. For example, under "additive noise techniques," a random value is added to the existing value of the data field. Under "multiplicative noise techniques," the true value is multiplied by a random value. The Bureau sought comment on whether such techniques would preserve the benefits of publication. The Bureau explained that a drawback to these approaches is that data would be released with values that do not match the true values of the underlying data.[893] Data users would need to take such modifications into account when performing any analyses.

### Comments Received

*Generally.* With regard to how the Bureau stated its intention to assess privacy risks that would inform modification and deletion decisions, several community group commenters, a minority business advocacy group, and several members of Congress urged the Bureau to apply the NPRM's balancing test in favor of public disclosure and to make available a robust dataset. According to some commenters, the fair lending and business and community development purposes of section 1071 militate in favor of data transparency. A number of community and business advocacy group commenters stated that if published application level data are not robust, or if specific data points are not disclosed, the dataset will not adequately reveal whether these statutory purposes of section 1071 are being met. Several commenters asserted that society's interest in tackling discrimination and closing the racial wealth gap supported robust disclosure. A business advocacy group stated that robust 1071 data would promote financial stability in the economy, and cited insufficiently granular HMDA data as contributing to the 2008 subprime financial crisis.

Some community group commenters and a software vendor urged the Bureau not to delete or modify public application-level data because it would

undermine the statutory purposes of section 1071. The software vendor stated that modifications or deletions may reduce the utility of the data for no privacy benefit. Several commenters asserted that the Bureau should only modify public 1071 data to protect the privacy interests of small business applicants. A joint letter from community and business advocacy groups agreed with the Bureau's statement that litigation and reputational risks faced by financial institutions do not justify excluding data from public disclosure.

On the other hand, several industry commenters urged the Bureau to make modification and deletion decisions to protect the privacy of financial institutions, applicants, and related natural persons. They stated that protecting these privacy interests was consistent with the statutory purposes of section 1071 because limiting disclosure would increase credit access and lower credit costs to minority-owned and women-owned small businesses.

Several industry, community group, and academic commenters supported modification and deletion of application-level data, stating that it could adequately address privacy risks posed by publication. A trade association asserted that publishing certain data points in an unedited, application-level format would increase the risk of applicant re-identification. Another trade association supported the liberal use of modification and deletion techniques to protect privacy interests of lenders, small business applicants, and related natural persons. Some commenters stated that the lack of reported incidents in which an individual has been re-identified in HMDA data suggests that modifications or deletions can reduce re-identification risks here also.

Some commenters offered views about what data points would be modified or deleted. Several suggested that data modifications or deletions should be consistent with HMDA. According to these commenters, the Bureau should ensure that any data deleted in the HMDA dataset is also deleted in the 1071 dataset, including the unique identifier, the application date, and the action taken date. A software vendor stated that the Bureau should modify data points that reflect gender identity or sexual orientation information, which could result in persons being subject to physical harm. Several individual commenters likewise suggested that LGBTQI+ persons face particular privacy risks. A joint letter from community and business advocacy

---

[892] Data users would need to understand the method behind the modifications and plan analyses to account for the fact that the suppressed data would necessarily not reflect all small business loans in a given year.

[893] For example, with respect to the amount applied for data field, a recoding technique would release the values of the data field in broad categories, for instance "$100,000–$150,000." In such case, the broader category provides less information but reflects the true value of the underlying data. Noise addition, by contrast, would involve the Bureau manipulating (in a standardized and decoundented way) the actual values of loan amount. An application's loan amount may be released as $85,000 in the public dataset when the true value was $78,000.

groups stated that if the Bureau modifies 1071 data, it should do so on a loan-by-loan basis because the modification of a particular data field may not be necessary for all records in the dataset.

*Aggregate data.* The Bureau received no comments about how differential privacy techniques may be applied to application-level data. However, the Bureau did receive comments about aggregating 1071 data. Several industry commenters suggested that the Bureau publish aggregate data, instead of an application-level dataset, to mitigate privacy risks. One stated that aggregate data are sufficient to analyze the business needs and credit access of applicants, including minority-owned and women-owned small businesses. Another said that disclosing aggregate data, as opposed to application-level data, would be consistent with the practices of other agencies. Other industry commenters stated that, while some 1071 data could be disclosed at the application level, the Bureau should aggregate any data points that present re-identification risk.

*Recoding.* Several community group commenters stated that if the disclosure of 1071 data fields present significant privacy risks, the Bureau should consider binning data or disclosing intervals of values. For example, these commenters stated that when disclosing gross annual revenue data, the Bureau could consider publishing data in $10,000 increments. One stated that binning would be appropriate as long as the modified public 1071 dataset could satisfy the fair lending and business and community development statutory purposes of section 1071.

Other commenters stated that the use of binning should be limited. A community group and a software vendor stated that if the Bureau bins data, it should ensure that the public 1071 dataset remains sufficiently detailed to allow meaningful analysis. To demonstrate this point, the community group asserted that the current CRA system of combining all loans for businesses with revenue under $1 million does not allow for analysis of small businesses within that range. The software vendor cautioned that binning may not always be effective.

*Other techniques.* With respect to other modification techniques discussed in the NPRM, a community group stated that data swapping and targeted suppression would be appropriate as long as the modified public 1071 dataset could satisfy the fair lending and business and community development statutory purposes of section 1071. The Bureau received no comments about other potential modification techniques.

## Current Approach

The Bureau intends to consider modification and deletion techniques as necessary to reduce cognizable privacy risks. The Bureau agrees with comments that a robust public dataset will serve the statutory objectives of section 1071.[894] By extension, a public application-level dataset with less detailed data or that omits certain data points entirely would confer relatively less public benefit. These benefits notwithstanding, in some cases modification and deletion decisions may be appropriate to protect privacy interests. The statute empowers the Bureau to modify or delete data, and the Bureau believes that modifications or deletions may be appropriate in some circumstances to reduce the cognizable privacy risks set forth above.

Modifications or deletions will not necessarily undermine the utility of the published data or will not be futile because they will not mitigate risks. With respect to the effectiveness of modifications and deletion techniques, the Bureau points to the lack of reported incidents in which an individual has been re-identified in public HMDA data, which the Bureau modifies to reduce re-identification risk. The Bureau concludes that targeted modification and deletion decisions can adequately reduce privacy risks while preserving the utility of 1071 data, as is the case with HMDA data. Modifications and deletions may be necessary, for example, in cases where unmodified application-level data will likely lead to re-identification of small business applicants or related natural persons. The Bureau will also consider modifications and deletions to the public 1071 dataset when data fields, individually or in combination with other data, pose cognizable privacy risks, as discussed above.

After obtaining a full year of reported data and conducting a full privacy analysis, the Bureau intends to make modification and deletion decisions tailored for individual data points where appropriate. The Bureau will not delete or modify data solely to align with HMDA practice. Small business lending and mortgage lending are distinct markets which face their own unique privacy risks, and re-

identification risk depends on the characteristics of particular data. With respect to comments about modifying or deleting data that may convey the gender identity or sexual orientation of applicants' principal owners or other individuals that own or control applicants, the Bureau views this as sensitive information that implicates important personal privacy interests. While the Bureau is not making modification and deletion decisions about this information prior to conducting the full privacy analysis, it does intend to give significant consideration to personal privacy interests. However, it would not be feasible to make modification and deletion decisions on a loan-by-loan basis, as one comment suggested.

Regarding feedback on specific modification techniques, the Bureau does not intend to publish aggregate data instead of application-level data. Aggregate datasets do not permit the detailed, application-level analyses that best facilitate the fair lending enforcement and business and community development purposes of section 1071. In addition, the Bureau can adequately mitigate privacy risks through targeted modification and deletions of individual data fields—it is not necessary to avoid publication of all application-level data. While the Bureau does not intend to publish aggregate data in place of an application-level dataset, it anticipates releasing select aggregated data before it publishes application-level data.

The Bureau sees recoding, including binning data or disclosing intervals, as an appropriate modification technique to address privacy risks that may be posed by public release of unmodified data. While the Bureau is not making specific modification decisions at this time, it intends to consider recoding data in a targeted manner that preserves the utility of the public dataset. The Bureau also views other modification techniques, including data swapping and targeted suppression, as appropriate tools to address privacy risks. Finalizing the exact tool set, however, will depend on securing a full year of data and will be informed by continued engagement with stakeholders.

When exercising its discretion to modify or delete 1071 data, the Bureau anticipates publishing data in a manner that reduces privacy risks, in particular re-identification risk. If the Bureau determines that it is necessary to modify an individual data point to address a privacy risk, the Bureau intends to consider a range of modification techniques, including, but not limited to, recoding, data swapping, and

---

[894] The Bureau lacks evidence to assess the comment that published data would promote financial stability. If true, this result would align with the Bureau's authorizing statute whose purpose, in part, is to "promote the financial stability of the United States by improving accountability and transparency in the financial system." Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010).

targeted suppression. The Bureau intends to engage with stakeholders in the future about these issues, including providing opportunities for additional input as the Bureau considers its privacy analysis further.

6. Preliminary Privacy Assessment of Particular Data Fields

In the NPRM, the Bureau identified certain data fields that it believed would need modification or deletion to appropriately protect privacy interests, while taking account of disclosure benefits: individual contact information at reporting financial institutions; free-form text data, which occurs in a number of data fields; and the unique identifier for each application. Beyond these specific fields, the NPRM explained that the Bureau lacked data under section 1071 or comparable proxies that it could use for its privacy risk assessment. Accordingly, it did not suggest specific modifications and deletions with respect to any other data.

In order to benefit from stakeholder engagement, however, the Bureau did set forth some initial analysis on how it would apply the NPRM's balancing test to the proposed data fields. With respect to each such data field, whether individually or in combination with others, the Bureau sought comments on: (1) whether there are additional benefits of unmodified public disclosure in light of the purposes of the statute; (2) whether disclosure in unmodified form would reveal additional information that might be considered harmful or sensitive by an applicant, related natural person, or financial institution; and (3) whether disclosure in unmodified form would significantly contribute to the risk that an applicant or related natural person might be re-identified. The Bureau also sought comment on modification techniques it could use, and whether deletion would be appropriate. Where no specific technique was described with respect to particular data points, the Bureau did not identify any obvious technique besides potentially swapping, suppression, or deletion.

The Bureau received feedback on this initial analysis from a range of commenters, including industry and community group commenters. The Bureau has taken this feedback into consideration to refine its analysis of the qualitative risks associated with disclosing particular data fields in unmodified form, although, consistent with the above analysis, the Bureau's assessment remains preliminary.[895]

Overall, with the exceptions noted with respect to unique identifier, free-form text, and individual contact information, for all other finalized data points, the Bureau intends to further consider whether modification techniques may be appropriate when it analyzes reported data and conducts its full privacy analysis. In doing so, the Bureau intends to take into account existing feedback, as well as conducting ongoing engagement, about potential modifications as it examines what modifications or deletions may be appropriate for these fields. In addition, the Bureau is mindful of the statutory purposes of section 1071 and will only modify or delete data to advance a privacy interest.

i. Unique Identifier

Proposed § 1002.107(a)(1) would have required financial institutions to collect and report an alphanumeric identifier, starting with the legal entity identifier of the financial institution, unique within the financial institution to the specific covered application, and which can be used to identify and retrieve the specific file or files corresponding to the application for or extension of credit. As discussed in the section-by-section analysis of § 1002.107(a)(1), the Bureau is finalizing this data point substantially as proposed.

In the NPRM, the Bureau stated that disclosing the unique identifier in the 1071 data in unmodified form by itself would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. Section 1071 prohibits financial institutions from including in 1071 records certain personally identifiable information that directly identifies a natural person applicant or someone connected with the applicant.[896] In addition, the Bureau proposed to prohibit financial institutions from reporting information that would directly identify a small business. For these reasons, the Bureau did not expect that the unique identifier would be considered harmful or sensitive.

With respect to re-identification risk, the NPRM noted that although publicly available datasets do not presently include the unique identifier data field, financial institution legal entity identifiers are publicly available, and

the Bureau was aware of rare instances in which a loan number was included in UCC filings. In addition, the Bureau noted that many jurisdictions publicly disclose real estate transaction records in an identified form, and the Bureau stated that many financial institutions may include loan numbers on these publicly recorded documents.[897]

The Bureau stated that inclusion of the proposed unique identifier, rather than application or loan numbers, would limit the possibility of using an application or loan number to match 1071 data to those publicly recorded documents, thus reducing risk of re-identification. However, the Bureau acknowledged that there is a risk that, after financial institutions begin to report data under section 1071, they may replace the loan numbers currently assigned to small business loans with the unique identifier and, if they do, the unique identifier could be included on publicly recorded documents. Considering the uniqueness of the identifiers, the Bureau reasoned that this data field on a publicly recorded document could be used to match a 1071 record to an identified public record directly and reliably.

In light of these potential re-identification risks, the Bureau stated that it did not intend to publish the unique identifier data field in unmodified form. The Bureau sought comment on whether there are modifications to the unique identifier data field that would appropriately balance identified privacy risks and disclosure benefits. The Bureau stated that it was considering the feasibility of disclosing a separate unique identifier that the Bureau could create. The Bureau also considered deleting the data field from the public application-level data, but sought comment on whether such deletion would create challenges for users of the data and, if so, how the Bureau could address those challenges other than by creating a separate unique identifier. The Bureau sought comment on this analysis as well as its intent not to publish the unique identifier in unmodified form.

An academic research and policy organization agreed with the Bureau's initial analysis, noting that public HMDA data do not include a unique identifier. Several industry commenters stated that, because lenders are allowed to use their own internal account numbers and therefore the unique identifier may include a loan number or account number, the data point in combination with the financial

---

[895] The Bureau sought and received feedback about several data points that it did not propose. As

[896] ECOA section 704B(e)(3).

it is not adopting those data points, it does not address privacy risks or modification techniques associated with reporting them.

[897] See 82 FR 44586, 44599 (Sept. 25, 2017); see also 84 FR 649, 660 (Jan. 31, 2019).

institution's name provides substantial opportunity for fraud. Because of the privacy risks discussed above, most of these commenters supported the Bureau's suggestion not to publish the unmodified unique identifier field. A CDFI lender stated that the Bureau should consider publishing a modified identifier or a separate one created by the Bureau.

After considering these comments, the Bureau intends not to publish the unique identifier data field in an unmodified form. Although it has not yet conducted a full re-identification analysis for the 1071 data, the Bureau agrees with the re-identification risks raised by commenters. The universal loan identifier for HMDA data, which is similar to the unique identifier, is not published because of the re-identification risk that it poses.[898] While HMDA publication practices are not dispositive here, the Bureau draws upon its experience implementing HMDA and Regulation C where appropriate, and it does so here.

At this time, the Bureau has not decided whether to publish public application-level data without any unique identifier information, disclose instead a separate unique identifier created by the Bureau for this purpose, or employ some other modification. The Bureau will consider what modification or deletion techniques may be appropriate when it analyzes application-level data and conducts its full privacy analysis.

ii. Application Date

Proposed § 1002.107(a)(2) would have required financial institutions to collect and report the date the covered application was received by the financial institution or the date shown on a paper or electronic application form. As discussed in the section-by-section analysis of § 1002.107(a)(2), the Bureau is finalizing this data point with modifications such that financial institutions must collect and report the date the covered application was received or shown on a paper or electronic application form.

The NPRM stated that, by itself, disclosing application date in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The Bureau noted that an adversary such as a competitor may conceivably find it helpful to understand when a business is seeking

credit. In addition, marketers and creditors could use this information to target products to entities recently in the market for credit, either to deploy new funds or to refinance out of a current loan. However, the Bureau did not believe that disclosing the application date would otherwise disclose sensitive information about a small business or its owner. The Bureau also reasoned that any utility of this data field for such purposes would be curtailed by the time to publication.

The Bureau was not able to identify publicly available datasets that include data fields an adversary could directly match to the application date field. However, the Bureau acknowledged that an adversary may be able to infer a likely origination date based on typical time lags between application, credit decision, and origination, potentially enabling matching to other datasets that record these later dates. The Bureau stated that, if it determined that application date should be modified, it may consider disclosing the application date at a higher level; for example, disclosing the month and year but not the specific date. In light of the potential re-identification risk arising from this data field, the Bureau sought comment on whether there are other specific modifications it should consider, and whether it should consider deletion outright.

Several commenters provided feedback on the Bureau's analysis. In supporting disclosure of the application date field, a community group stated that it would promote understanding of small business lending. However, an academic research and policy organization asserted that disclosure of application date would pose re-identification risk to applicants and noted that HMDA does not disclose application date. This commenter, along with a group of trade associations, urged the Bureau not to publish the application date field to ensure consistency between 1071 and HMDA.

As discussed in part VIII.B.3 above, the Bureau views the disclosure of application date as having significant benefits. This preliminary assessment is consistent with feedback that publication of application date would promote understanding about small business lending. The Bureau's preliminary assessment is that the application date field does not pose re-identification risks such that the Bureau should modify or delete it before publication. Commenters supporting such modification or deletion did not provide additional evidence of re-identification risk that would alter the partial privacy analysis described above.

The Bureau also preliminarily assesses that this unmodified data field would present limited privacy risk if re-identification occurred.

iii. Application Method and Application Recipient

Proposed § 1002.107(a)(3) would have required financial institutions to collect and report the means by which the applicant submitted the covered application directly or indirectly to the financial institution. A financial institution would have reported whether the applicant submitted the application in person, by telephone, by mail, or online. Proposed § 1002.107(a)(4) would have required financial institutions to collect and report whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application directly or indirectly to the financial institution. As discussed in the section-by-section analyses of § 1002.107(a)(3) and (4), the Bureau is finalizing these data points as proposed, with certain modifications to related commentary.

In the NPRM, the Bureau stated that disclosing application method and whether the application was submitted directly or indirectly, in unmodified form, would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. The Bureau reasoned that the application method is likely to be of relatively limited utility to an adversary because it conveys little information about a natural person or a business's financial condition. While adversaries interested in targeted marketing could direct future marketing efforts to a business using the same application channel, the Bureau noted that marketing firms already possess strategic information about methods for establishing contact. Unmodified disclosure of application method and whether the application was submitted indirectly may reveal information that financial institutions regard as harmful or sensitive, but the Bureau did not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau was not able to identify publicly available datasets that include data fields an adversary could directly match to the application method or application recipient data fields. While the Bureau's HMDA data and the Government-Sponsored Enterprises loan-level datasets include acquisition channel information in loan-level data, the Bureau stated that these datasets do

---

[898] *See* 84 FR 649, 660 (Jan. 31, 2019).

AdminRecord-000328

not identify applicants or related natural persons. However, the Bureau sought comment on whether there are other identifiable application/loan-level datasets that include this information or whether HMDA data or the Government-Sponsored Enterprises loan-level datasets could be matched to other identifiable datasets.

The Bureau received two comments from trade associations on this analysis. These questioned whether publishing the application method and application recipient fields would provide disclosure benefits related to section 1071's statutory purposes. One stated that lenders' methods for receiving applications are strategic business decisions and disclosing this information will cause commercial harm.

As discussed above in part VIII.B.3, the Bureau views these data fields as having significant disclosure benefits. The Bureau does not see disclosure causing significant commercial harm to financial institutions. Disclosure of application method and application recipient data would not permit the reverse-engineering of proprietary lending models. Accordingly, the Bureau preliminarily assesses that disclosing these data fields in unmodified form would present limited privacy risk if re-identification occurred.

iv. Credit Type

Proposed § 1002.107(a)(5) would have required financial institutions to collect and report to the Bureau certain information about the type of credit applied for or originated. The proposal would have required financial institutions to report three categories of information that together constitute the type of credit. First, the proposal would have required financial institutions to report the type of credit product. Second, the proposal would have required financial institutions to report the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction had been originated. Third, the proposal would have required financial institutions to report the length of the loan term, in months, if applicable. As discussed in the section-by-section analysis of § 1002.107(a)(5), the Bureau is finalizing this data point as proposed, with revisions to the related commentary.

The NPRM stated that data on type of credit product, type of guarantee, and loan term could disclose information that may be harmful or sensitive to applicants or related natural persons. It also stated that a business's competitors

could use these data fields—in conjunction with the loan amount and pricing data fields—to draw inferences about the business's financial condition based on whether the business obtained credit on favorable or unfavorable terms. Type of guarantee data could indicate heightened credit risk for the applicant.[899] Credit type data could also be used for targeted marketing of products and services that may pose risks.

The Bureau further stated that disclosure of these data fields in unmodified form may reveal information that financial institutions regard as harmful or sensitive, such as the types of products they offer or the government programs in which they participate. However, the Bureau did not expect disclosure of these data fields to permit the reverse-engineering of proprietary lending models. Furthermore, the Bureau stated that general information about the types of credit a financial institution is offering is already widely available.

The Bureau was aware that certain identified datasets include application-level information on the type of credit product, type of guarantee, or loan term. Government lending programs, such as the SBA's 7(a) programs, publish loan-level data that indicate the term of the loan and whether the loan is a term loan or a line of credit. In some States, UCC filings may include some information related to the type of collateral. In the NPRM, the Bureau stated that the existing public availability of this information decreased the potential harm or sensitivity of disclosing information about the type of credit product, type of guarantee, and loan term in the 1071 data. By the same token, however, the Bureau recognized that an adversary could use these other datasets, combined with other fields, to match a section 1071 record to an identified publicly available record.

If it determined that modifications were ultimately needed, the Bureau identified a number of possible approaches. The Bureau could disclose "Federal guarantee" instead of disclosing the specific program. Similarly, the Bureau could recode loan term data into bins—for example, using intervals of two or five years.

The Bureau received feedback from two community group commenters. One stated that publication of credit type data would promote understanding of

small business lending. The other stated that combining loans from different Federal government guarantee programs into a single category for publication would not reduce the utility of 1071 data. The commenter also stated that if the Bureau recodes length of the loan term data into bins, the Bureau should test those bins to ensure that the recoded data are useful to users.

Based on its earlier analysis and from the comments received, the Bureau assesses that disclosing credit type data in unmodified form may present significant privacy risks if re-identification occurred. For example, the Bureau believes that these data could result in non-personal commercial privacy risks to small businesses, including revealing sensitive financial information or facilitating problematic targeted marketing. However, the Bureau does not identify any compelling privacy risks to financial institutions.

v. Credit Purpose

Proposed § 1002.107(a)(6) would have required financial institutions to collect and report the purpose or purposes of the credit applied for or originated. As discussed in the section-by-section analysis of § 1002.107(a)(6), the Bureau is finalizing this data point with modifications.

The NPRM stated that disclosing credit purpose in unmodified form by itself would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. It noted that information about credit purpose could be useful to adversaries such as a small business's competitors, potential acquirers, or new market entrants, since it contains information about a business's strategy and performance, such as whether a business is expanding. Even so, this information would generally not be detailed enough to cause competitive harm, and its competitive value would likely be mitigated by time to publication.

The Bureau did not identify publicly available datasets that include data fields an adversary could directly match to the credit purpose data fields in unmodified form in the public application-level data with respect to an applicant or related natural person. The Bureau stated that identified public datasets pertaining to small business loans generally do not contain information about the purpose of the credit. Therefore, the Bureau reasoned that an adversary would have difficulty

---

[899] For example, the "SBA guarantee—7(a) program" data field is intended for businesses that have been unsuccessfully applying for credit or have had some other difficulty in accessing credit.

using the credit purpose data fields to match a section 1071 record to an identified publicly available record accurately.

The Bureau stated that disclosure of credit purpose in unmodified form may also reveal information that financial institutions regard as harmful or sensitive, such as information that a financial institution offers credit that is used for certain purposes. However, the Bureau did not identify reasons that disclosure would permit reverse-engineering of proprietary lending models.

Several lenders and one trade association provided feedback. These commenters generally stated that credit purpose data created privacy risks for small business applicants. For example, one commenter stated that if re-identification occurred, credit purpose data could reveal confidential commercial information, such as plans for business acquisitions or expansions. As discussed in the NPRM, the Bureau acknowledges that credit purpose data contains information about a business's strategy and performance. However, the Bureau does not view this information as posing a significant risk of harm because of its relative lack of detail and the delay between the date of action taken on a loan and the publication of 1071 data. Commenters did not offer evidence to the contrary. Commenters also did not offer evidence that indicates that this data point presents significant re-identification risks.

Accordingly, the Bureau preliminarily assesses that disclosing credit purpose data in unmodified form would present limited privacy risk.

vi. Amount Applied For

Proposed § 1002.107(a)(7) would have required financial institutions to collect and report to the Bureau the initial amount of credit or the initial credit limit requested by the applicant. As discussed in the section-by-section analysis of § 1002.107(a)(7), the Bureau is finalizing the amount applied for data point as proposed.

The NPRM stated that disclosing this data field in unmodified form would likely disclose information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. Business owners might view details about the amount applied for as sensitive, particularly where they are concerned about the risk of being re-identified as an applicant for credit. The Bureau also noted that were re-identification to occur, the amount applied for could lead to targeted marketing of products or services that pose risks because it could

help lenders target small businesses that received less credit than they requested with offers for loans at higher rates or fees. The Bureau stated that the amount applied for is generally not included in other publicly available data, so it would likely not be useful to adversaries seeking to match 1071 data with other publicly available data. However, the Bureau believed that amount applied for would be useful to an adversary in other ways. For example, a significant shortfall between the amount applied for and the amount approved could be used either by an applicant's competitor or by a consumer to infer that the business has a relatively weak financial position. With information on whether or not a business is granted a loan, an adversary might gain insight into the scale of a business's objectives based on the amount applied for or approved. The Bureau also noted that the relative scarcity of this information at present would also increase its value to adversaries. As an additional consideration, the Bureau saw no reason that disclosure would permit the reverse-engineering of proprietary lending models.

The Bureau received comments from several industry commenters and a community group. A group of trade associations stated that if a small business applicant is re-identified, disclosing the amount applied for could reveal information about the financial status of that small business that could harm its prospects for credit. Several industry commenters expressed concern that data about the amount applied for would create privacy risks for small business applicants by revealing confidential information, such as plans for business acquisitions or expansions. Another commenter stated that disclosing the amount applied for can create privacy risks for financial institutions. This commenter noted that the amounts applicants apply for can be arbitrary and, therefore, comparing these amounts to any amounts approved could be misleading and not a reliable metric for whether credit demand is met.

The Bureau stated that if it determined that the amount applied for should be modified, it may consider recoding the data into bins. For example, the Bureau could recode the amount applied for into bins of $25,000. In response, a community group stated that the Bureau could recode the amount applied for into bins that use the mid-point of $10,000 intervals. As noted by the commenter, HMDA utilizes this technique, and, according to the commenter, it would be sufficient for

privacy purposes while producing more accurate data.

After reviewing these comments, the Bureau assesses that disclosing this data field may create some privacy risk where small business applicants and related natural persons face re-identification risk that could reveal non-public commercial information, such as an application for credit or business acquisition or expansion plans. Further, to the extent that this data point, combined with the amount approved or originated data point, indicates business difficulties, this could impact the reputational interests of small businesses and their owners. The Bureau also assesses that in some circumstances disclosing amount applied for could disclose personal information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. Comments asserting privacy risks for financial institutions, however, provided no compelling evidence of privacy risk to alter the NPRM analysis on point.

vii. Amount Approved or Originated

Proposed § 1002.107(a)(8) would have required financial institutions to collect and report to the Bureau: (i) for an application for a closed-end credit transaction that is approved but not accepted, the amount approved by the financial institution; or (ii) for a closed-end credit transaction that is originated, the amount of credit originated; or (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the amount of the credit limit approved. As discussed in the section-by-section analysis of § 1002.107(8), the Bureau is finalizing the amount approved or originated data point as proposed.

The NPRM stated that disclosing this data in unmodified form would likely disclose information about an applicant or related natural person that might be harmful or sensitive if such person were re-identified, or that might be harmful or sensitive to an identified financial institution. The Bureau stated that information about the amount approved or originated could be useful to potential adversaries. For example, these data fields would provide creditors some insight into competitors' lending practices, particularly when combined with other data points such as gross annual revenue, number of workers, time in business, and pricing. Likewise, these data might allow creditors to make general inferences about the relative risk appetites of their competitors. However, the Bureau did not see any reason that disclosure

would permit the reverse-engineering of proprietary lending models.

The Bureau stated that it had identified publicly available datasets that include data fields an adversary could directly match to the amount approved or originated data fields in unmodified form. Credit amount approved or originated is often widely available in public datasets, such as loan-level data for the SBA 7(a) and 504 programs, as well as property records and UCC filings. The Bureau accordingly stated that adversaries would be able to match the amount of credit approved or originated to an existing public record. The Bureau further stated that if it determined that the amount approved or originated should be modified, it may consider recoding.

The Bureau received comments from several industry and community group commenters. The community groups generally supported publishing these data fields. Several industry commenters disagreed. Two such commenters stated that if re-identification occurred, the amount approved or originated could harm small business applicants by disclosing information about business expansions or acquisitions. A community group stated that the Bureau could recode the amount applied for into bins that use the mid-point of $10,000 intervals. As the commenter noted, HMDA utilizes this technique and, according to the commenter, it would be sufficient for privacy purposes while producing more accurate data.

After reviewing these comments, the Bureau preliminarily assesses that disclosing amount approved or originated data in unmodified form may present significant privacy risk if re-identification occurred. In some circumstances disclosing amount approved or originated could disclose personal information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. For example, because amount approved or originated was found in publicly available datasets, in combination with information about the amount applied for, this data could facilitate targeted marketing of higher interest or predatory credit products. This combination of data could also have reputational impacts on small business applicants and related natural persons. The Bureau does not see any reason, however, that this data field will create compelling privacy risks for financial institutions.

### viii. Type of Action Taken and Denial Reasons

Proposed § 1002.107(a)(9) and (11) would have required financial institutions to collect and report to the Bureau the action taken by the financial institution on the covered application, and for denied applications, the principal reason or reasons the financial institution denied the covered application. As discussed in the section-by-section analysis of § 1002.107(a)(9) and (11), the Bureau is finalizing these data points as proposed.

The NPRM stated that reasons for denial data could be harmful or sensitive for applicants or related natural persons. However, the Bureau did not believe disclosing the fact that credit was sought, in and of itself, likely would be harmful or sensitive to small businesses because credit is so widely used by small businesses. Further, the harm or sensitivity of disclosing information that credit was originated is mitigated by the publication of originated loan details in other databases such as UCC filings. Additionally, the Bureau did not assess that disclosure of action taken would permit the reverse-engineering of proprietary lending models.

The Bureau had not identified publicly available datasets that include data fields an adversary could directly match to these data fields in unmodified form. At a category level, however, the Bureau noted that these data fields could tell adversaries which records it may be possible to match against databases that include originated loans. The Bureau stated that most of these data fields included in this data point are not found in publicly available records that contain the identity of an applicant; the only data field that would be consistently available would be for originated loans. Without such an identified publicly available record to match with, attempting to re-identify an applicant by matching a 1071 record using these data fields likely would be difficult. However, the Bureau stated that adversaries may be able to use other data fields, such as census tract, NAICS code, and identified public information, such as business directories, to determine the identity of an applicant or related natural person. Thus, if applicants and related natural persons could be re-identified, an adversary could learn information about application denials for these businesses and use this information for a variety of purposes.

The Bureau sought comment on this analysis, specifically in light of potential harm and sensitivity arising

from the disclosure of application denials and the reasons for denial, whether there are specific modification techniques that should be considered, and whether modifying these data fields by grouping or deleting these data fields would appropriately balance the privacy risks and benefits of disclosure, in light of the purposes of section 1071.

Community group commenters stated that the Bureau should publish data about action taken, including whether the loan was approved or denied or whether it was withdrawn or left incomplete. One stated their opposition to deleting action taken categories such as "denied," "incomplete," or "approved but not accepted," stating that such data are fundamental to the fair lending purpose of the statute. Several stated that publishing data on denial reasons would promote fair lending and business and community development objectives by helping lenders and policymakers assess whether creditors are denied credit for legitimate reasons. An industry commenter said that action taken data may also be misleading in the context of agricultural loans because not all creditworthy applicants are eligible for loans through the Farm Credit System.

Other trade associations and a lender commented that disclosure of action taken could cause commercial or competitive harms to applicants and related natural persons. These commenters specifically noted that data about the action taken could reveal information about a business's financial status, or acquisition or expansion plans. Other commenters stated that including denial reasons in 1071 data, without including contextual information surrounding individual credit decisions, would result in unjustified reputational or litigation harm to smaller financial institutions, which originate a lower loan volume—possibly resulting in more pronounced statistical aberrations that could be erroneously interpreted as discrimination.

In response to the Bureau's request for comment about whether these data should be modified or deleted from the public dataset, a community group stated that the Bureau should not modify or delete these fields because they are fundamental to the fair lending purposes of the statute. The commenter further noted that for decades, and without adverse consequences, HMDA has included information on whether an application for credit was originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. This commenter stated that if the Bureau found it necessary to

modify this data field, a higher level of disclosure that included reasons of denial by category of business and for groupings of census tracts could achieve important fair lending and community development objectives.

As discussed above in part VIII.B.3, the Bureau views these data fields as having significant disclosure benefits. Commenters did not offer compelling evidence that disclosure of action taken, in and of itself, would reveal information about a small business applicant's financial status or strategic plans also lacked evidentiary support.[900] If re-identification were to occur, however, information about an application for credit being denied could have detrimental impacts to applicants or related natural persons when personal credit qualifications are used in making credit decisions, including personal embarrassment. Likewise, re-identification could cause non-personal commercial harm to small businesses. Accordingly, the Bureau preliminarily assesses that disclosing these data fields in unmodified form may present significant privacy risk if re-identification occurred.

ix. Action Taken Date

Proposed § 1002.107(a)(10) would have required financial institutions to collect and report the date of the action taken by the financial institution. As discussed in the section-by-section analysis of § 1002.107(10), the Bureau is finalizing this data point as proposed.

The Bureau stated that disclosing action taken date in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The NPRM noted that publicly available datasets include data fields an adversary could directly match to the action taken date data field in unmodified form in the public application-level data with respect to an applicant or related natural person. Public availability of this data depends on the type of action taken. The approval date of originated loans is widely available in SBA 7(a), 504, and other program loan-level records that identify borrowers, and the date of executed agreements, which could be closely related to the action taken date,

is often available for property records and UCC filings. For originated loans, therefore, the action taken date would substantially facilitate matching with publicly available datasets that identify borrowers. The Bureau also stated that action taken date may be less useful in re-identifying applicants of loans that were not originated because the action taken date for such loans is rarely publicly available.

The Bureau stated that if it ultimately determined that the action taken date should be modified for publication, it may consider disclosing at a higher level, such as month instead of a specific date. The Bureau sought comment on this analysis, including about whether there are specific modifications it should consider, and whether deletion would better balance the risks and benefits of disclosure.

In response, a group of trade associations stated that the Bureau should not disclose the action taken date, noting that this information is not published in HMDA data. This commenter expressed a concern that publishing the action taken date when the same data point is deleted or modified in HMDA public data would constitute inconsistent treatment without adequate explanation. The Bureau disagrees that it should omit action taken date from the public 1071 data simply to ensure consistency between this final rule and HMDA. Commenters did not provide additional evidence related to re-identification risk.

Commenters did not provide additional evidence related to re-identification risk that would alter the initial assessment provided in the NPRM. In addition, the Bureau preliminarily assesses that the action taken date would present limited privacy risk if re-identification occurred. This data field presents minimal, if any, personal information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. The Bureau also does not believe publication of these data would result in non-personal commercial privacy risks to small businesses being disclosed. The Bureau also identifies no compelling privacy risks to financial institutions.

x. Pricing Information

Proposed § 1002.107(a)(12) would have required financial institutions to collect and report to the Bureau the following information, where applicable, regarding the pricing of a covered credit transaction that is originated, or approved but not

accepted: (i) the interest rate; (ii) total origination charges; (iii) broker fees; (iv) initial annual charges; (v) additional costs for merchant cash advances or other sales-based financing; and (vi) prepayment penalties. As discussed in the section-by-section analysis of § 1002.107(a)(12), the Bureau is finalizing the pricing information data point largely as proposed.

The NPRM stated that information about the interest rates and fees charged in connection with credit represents basic information about the features of a product generally and would present low risk of harm or sensitivity. It further noted that disclosure of pricing data in unmodified form may reveal information that some applicants or related natural persons may regard as harmful or sensitive, such as a reflection of their perceived credit risk. However, the Bureau also reported that it had received feedback during the SBREFA process that multiple factors contribute to pricing for small business credit. While the Bureau further stated that disclosure of pricing data in unmodified form may also reveal information that financial institutions regard as harmful or sensitive, the NPRM did not identify evidence that disclosure of pricing information would permit the reverse-engineering of proprietary lending models.

The NPRM also noted that publicly available datasets include data fields an adversary could directly match to the pricing data fields in unmodified form. Identified data about the interest rate and fees charged for a given loan are available from a limited number of publicly available datasets, such as data for the SBA 7(a) and 504 programs. The Bureau further stated that, if it were to determine that pricing data should be modified, it may consider recoding the pricing information data fields into bins, such as interest rates bins of 0.25 percentage points or origination fee bins of $500; and it also noted that it could consider top-coding pricing data.

The Bureau received feedback from a range of commenters. Community groups and some others generally agreed that publishing pricing information would serve the objectives of section 1071. These commenters saw pricing information as necessary to monitor loan affordability and assess lending in underserved communities. A software vendor stated that publishing pricing information will improve competition and pricing efficiency by allowing applicants to compare credit costs offered by financial institutions. However, industry commenters stated that pricing information would have limited benefits. Two lenders stated that

---

[900] When the Bureau previously assessed whether to include action taken and denial reasons in HMDA loan-level public data, it concluded that modification was unnecessary 84 FR 649, 658 (Jan. 31, 2019). The Bureau articulated its decision that "action taken and reasons for denial" would be disclosed without modification.

AdminRecord-000332

pricing information is not meaningful because it is based on a complex set of factors that is unique to each transaction. A trade association stated that pricing information in small business lending would have little benefit compared to loan pricing data in HMDA because, unlike consumer mortgage data reported in HMDA, commercial data that would be reported in the 1071 dataset is not standardized or uniform. Others said that pricing information has a high risk of being misinterpreted.

Several lenders also stated that small businesses would have privacy concerns if pricing information on their loans was made public. Two industry commenters stated that pricing information would create re-identification risk, particularly in smaller and rural areas. Another stated that farm loans present risks because such credit may be extended in small markets with few customers which could increase the possibility of re-identification of small business applicants or related natural persons. Several other industry commenters said that if re-identification were to occur, the publication of pricing data information would create competitive risks for small businesses. One said that this risk is particularly high in smaller communities where it is possible to use published information to reveal pricing information about individuals. Others stated that privacy risks are especially potent for sole proprietorships because those entities' pricing may be largely based on owners' individual credit performance and personal information. A group of trade associations commented that pricing information was the most sensitive data point and it could reveal sensitive competitive information that would place businesses at a substantial competitive disadvantage. Regarding non-personal commercial harms to small business applicants, some industry commenters aid that disclosing pricing information in 1071 data would cause some financial institutions to limit their lending to reduce reputational or litigation risk.

Other commenters addressed the risk of harm or sensitivity to financial institutions. Some industry commenters stated that publishing pricing data will create competitive risks for financial institutions by revealing pricing models for small business loans, potentially allowing competitors to undercut pricing. Two agricultural lenders commented that rural financial institutions in markets with few customers face unique risks and that they may lose customers to larger financial institutions or online lenders

that have larger customer bases and thus lower re-identification risk. Several other industry commenters stated that publishing pricing information would carry reputational and competitive risks for financial institutions. Some commenters were concerned that pricing information would not capture the full context of credit decisions, risking misconceptions about the underlying rationale for pricing and creating illusory disparities in credit terms. A bank trade association stated that comparing pricing information between different types of financial institutions can be misleading and may result in reputational harm because certain lenders like credit unions and farm credit system lenders receive tax or funding advantages to offer lower interest rates. Other commenters noted the risk of reputational harm from patronage dividends in agricultural lending not being accounted for in disclosed pricing. Other commenters asserted that disclosure of pricing information in 1071 data could create litigation risk for financial institutions. Several commenters said that if regulators utilize pricing information to analyze for fair lending without taking into account all variables that went into underwriting, incorrect analyses could result in unwarranted allegations of discrimination. A bank said that litigation risk based on these misconceptions may be particularly high for smaller banks that originate fewer loans because the lower volume could result in greater variation in pricing information.

The Bureau also sought comment on whether pricing information, if published, should be modified, and if so, what modification or deletion techniques would preserve the benefits of the public application-level data. A number of lenders and trade associations stated that pricing information should not be published at all because of privacy risks. Other commenters suggested modifications. A trade association stated that published pricing information should be limited to interest rates and origination fees. This commenter also supported disclosing pricing information in bins to protect privacy without harming data utility. In contrast, a community group opposed recoding interest rates or origination fees because that might mask lending disparities, thereby hindering fair lending enforcement.

As discussed in part VIII.B.3, the Bureau views pricing information as having significant disclosure benefits. In light of the re-identification risks discussed above, the Bureau appreciates commenters' concerns that if re-

identification were to occur, the disclosure of pricing information in the public application-level data could pose significant risk to sole proprietors for whom underwriting could be based on personal credit performance. The Bureau also recognizes that re-identification, if it occurred, could exacerbate privacy risks, including personal privacy risks, presented by other data fields in the dataset. Additionally, re-identification could create a risk of non-personal commercial harms for applicants, particularly in small or rural communities when combined with other data fields like census tract or NAICS code. The Bureau acknowledges commenters' concerns about potential risk of harm or sensitivity to financial institutions, including reputation and litigation risks resulting from possible misinterpretations of published pricing information. However, the Bureau does not view privacy risks to financial institutions as compelling enough to justify exclusion of the data field. As discussed in part VIII.B.4, by mitigating re-identification risk, other potential risks and harms, including those faced by financial institutions, will also be mitigated.

The Bureau preliminarily assesses that some modification techniques may be appropriate when publishing pricing information. Potential modifications that the Bureau could consider include binning data or top-coding pricing data fields. However, the Bureau is mindful that modifying pricing information too much could mask discriminatory pricing practices, thus hindering fair lending analyses. Similarly, such modifications could hinder identification of community development needs and opportunities.

xi. Census Tract

Proposed § 1002.107(a)(13) would have required financial institutions to collect and report the census tract containing the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or if this information is unknown, the tract containing the address or location of the main office or headquarters of the applicant; or if this information is also unknown, the tract containing another address or location associated with the applicant. In addition to reporting the census tract, the financial institution would have been required to indicate which one of these three types of addresses or locations the census tract is based on. As discussed above in the section-by-section analysis of

AdminRecord-000333

§ 1002.107(a)(13), the Bureau is finalizing this data point as proposed.

The NPRM observed that the census tract itself would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The Bureau acknowledged that for sole proprietors, the main office is often a home address, but it noted that the applicant's actual street address would not be reported to the Bureau. The Bureau also noted that small businesses commonly make their locations available in the normal course of business—for example, to reach prospective customers.

The Bureau stated that if the address reflects where the proceeds of the credit will be or would have been principally applied, disclosing the census tract may reveal some information about an applicant's business strategy, particularly if paired with the loan purpose data field. For example, the Bureau stated that the data could indicate that a small business is pursuing or was pursuing an expansion to a particular location. However, the Bureau believed the value of this information to a small business's competitors is likely mitigated by the time to publication. The Bureau stated that disclosure of the census tract in unmodified form may also reveal information that financial institutions regard as harmful or sensitive, such as a financial institution's trade area. However, the Bureau did not conclude that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau identified publicly available datasets that include data fields an adversary could directly match to the census tract data field in unmodified form in the public application-level data with respect to an applicant or related natural person. The Bureau expected that, in most cases, the census tract that financial institutions would report to the Bureau would be based on the address or location of the main office or headquarters of the applicant, either because that is where the proceeds of the credit will be applied, or because the financial institution does not know the location or address where the proceeds of the credit will be applied but does know the applicant's main office or headquarters address. The Bureau also observed that, for many small businesses, this address or location is likely to be publicly available from sources such as the business's website and review websites. Information about a business's location

is also likely available from loan-level data for public loan programs as well as from private datasets, such as from data brokers. Therefore, in many cases, the Bureau expected that an adversary could use the census tract data fields, combined with other fields, to match a section 1071 record to an identified publicly available record. The Bureau also sought comment on whether disclosing county, State, or some other geographic identifier—rather than the census tract—would affect the benefits of disclosure, the potential for harm or sensitivity, and the potential for re-identification of applicants or related natural persons.

A range of commenters provided feedback on the Bureau's analysis. Community group commenters saw the publication of this data as important to both the fair lending and business and community development purposes of section 1071. Some said that because there are currently no comprehensive data on the capital access problems faced by marginalized communities, census tract data would provide insight into small business credit challenges at the intersection of race, sex, ethnicity, and geography. Other community groups and a business advocacy group expressed support for publishing census tract data, stating that including demographic and geographic data could positively impact the reduction of economic inequality and generally would encourage lending to underserved markets via specific policy making.

A number of lenders, along with a trade association and a community group, expressed concern that publication of census tract data would pose significant re-identification risk for applicants, especially in smaller or rural communities with low levels of lending. Other industry commenters said that the unmodified publication of census tract data combined with other data points, in particular NAICS code data, would pose significant re-identification risk.

While some community groups expressly supported the unmodified disclosure of census tract data, others suggested specific modification techniques. One commenter suggested that the Bureau consider switching records for similarly situated applicants between nearby census tracts to protect the privacy of applicants in smaller geographic areas while preserving data utility. With respect to the Bureau's suggestion to consider disclosing a broader location category, at least one trade association expressed support for disclosing data at the State level. Meanwhile, a community group generally opposed disclosure limited to

the county- or State-level, arguing that it would frustrate the purposes of section 1071. But this commenter did suggest that the Bureau consider combining and aggregating adjacent census tracts in rural areas with low levels of lending.

As discussed above in part VIII.B.3, the Bureau views the disclosure of census tract as having significant benefits. Further, disclosing census tract data on its own would present limited privacy risk. Application-level census tract by itself would likely disclose minimal, if any, information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. In addition, the Bureau does not discern evidence of compelling privacy risks for financial institutions. However, the Bureau appreciates the potential re-identification risks to applicants or related natural persons posed by the combination of census tract data and other data fields, such as NAICS code. With respect to privacy risks raised by commenters, as discussed above, the Bureau has identified publicly available datasets that include data fields an adversary could directly match to certain census tract data. Accordingly, the Bureau assesses that census tract data, combined with other data fields such as NAICS code, could be used to match to an identified publicly available record, particularly in rural areas, thereby potentially re-identifying a small business applicant or its ownership. Re-identification could in turn exacerbate privacy risks, including harm or sensitivity risks, presented by other data fields in the dataset.

Considering this privacy risk, the Bureau's preliminary assessment is that some modification techniques may be appropriate. Application-level census tract would likely disclose minimal, if any, information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. In addition, the Bureau does not discern evidence of a compelling privacy risks for financial institutions. However, the Bureau appreciates the potential re-identification risks to applicants or related natural persons posed by the combination of census tract data and other data fields such as NAICS code, and recognizes that there may be significant geographic variation in the likelihood of re-identification risk from census tract alone. The Bureau is mindful that modifying census tract data, like disclosing a broader location category such as county or State, while reducing re-identification risk to applicants and related natural persons,

AdminRecord-000334

**35484**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

could also reduce the utility of the 1071 dataset.

### xii. Gross Annual Revenue

Proposed § 1002.107(a)(14) would have required financial institutions to collect and report to the Bureau the gross annual revenue of the applicant for the preceding full fiscal year prior to when the information is collected. As discussed in the section-by-section analysis of § 1002.107(a)(14), the Bureau is finalizing this data point substantively as proposed.

The NPRM stated that disclosing gross annual revenue in unmodified form would likely disclose information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. The data field could reflect the financial condition of a small business or its ownership. The Bureau stated that competitors of the small business, other commercial entities, creditors, researchers, or persons with criminal intent all may have an interest in using these data to monitor the size or performance of an applicant that may be a rival, partner, or target of inquiry, investigation, or illegal activity. With respect to the risk of harm or sensitivity to financial institutions, the NPRM acknowledged that other creditors might use gross annual revenue data to learn more about the types of small businesses with which their competitors do business. However, the Bureau did not identify evidence that disclosure would permit reverse-engineering of proprietary lending models.

The Bureau also noted that publicly available datasets include data fields an adversary could directly match to this data field in unmodified form. This availability is not widespread. Gross annual revenue data are available from private databases. They are also available for New York State's women- and minority-owned business certification program, but those data are recoded into bins. The Bureau stated that if it determined that gross annual revenue data should be modified, it may consider recoding this data into bins, for example in ranges of $25,000, or top-coding the data to mask particularly high values, thereby reducing the identifiability of application data from small businesses with especially high gross annual revenue.

Commenters did not provide additional evidence related to re-identification risk. However, community groups and trade associations commented on modifying this field prior to publication. Several community groups and a CDFI lender generally favored the Bureau publishing unmodified gross annual revenue data to maintain its utility. One such commenter opposed modification here, stating that aggregation of data by revenue size would limit the usefulness of the data to all stakeholders, including technical assistance providers who can help small businesses apply for loans, as well as parties seeking to identify and respond to discriminatory lending patterns. Other community groups and a trade association expressed support for publishing gross annual revenue data in bins to mitigate privacy risks for applicants. These community groups stated that modified data must still be detailed enough to permit meaningful analysis, and they criticized the current CRA system of identifying all loans to businesses with revenue under $1 million as not allowing for such analysis. One commenter suggested that if the Bureau decided to modify the gross annual revenue data field it should select the mid-point and recode the data in bins of $10,000 increments. They also expressed support for top-coding provided that it did not mask any significant differences in data for larger small businesses, and suggested that the Bureau conduct testing within the first year of data to assess whether the modification was appropriate.

As discussed above in part VIII.B.3, the Bureau views disclosure of gross annual revenue data as having significant disclosure benefits. After reviewing comments, the Bureau preliminarily assesses that if re-identification were to occur, disclosing gross annual revenue data in unmodified form may present significant privacy risk to small business applicants and related natural persons. The Bureau also preliminarily assesses that modifications to this field can be made while preserving the utility of the data for statutory purposes. The Bureau will continue to consider feedback about potential modification techniques, such as binning at smaller intervals and conducting testing before top-coding.

### xiii. NAICS Code

Proposed § 1002.107(a)(15) would have required financial institutions to collect and report to the Bureau a 6-digit NAICS code. As discussed above in the section-by-section analysis of § 1002.107(a)(15), the Bureau is modifying how NAICS code is reported. Under the final rule, financial institutions must collect and report a 3-digit NAICS subsector code. Using only 3-digit NAICS subsector codes will decrease the risk of re-identification to applicants and owners while adhering to the purposes of section 1071.

The NPRM stated that publishing 6-digit NAICS codes in unmodified form by itself would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. Information about a small business's industry is likely apparent to anyone interacting with it. The Bureau noted that disclosure of 6-digit codes in unmodified form may reveal information that financial institutions regard as harmful or sensitive, such as the industries with which the financial institution does business, but it did not discern that such disclosure would permit reverse-engineering of proprietary lending models.

The Bureau acknowledged that 6-digit codes were likely to produce unique instances in the data, especially if combined with unmodified census tract data. It noted the existence of 73,057 census tracts and 1,057 6-digit NAICS codes.[901] With over 77 million resulting combinations, there would likely be many instances of this data forming unique combinations. The NPRM stated that if the Bureau modified 6-digit codes for publication, it would consider disclosing 2-, 3-, or 4-digit codes to reduce re-identification risk while maintaining data utility.

Community group commenters supported disclosing 6-digit NAICS codes to support the fair lending purpose of the statute. Many industry commenters expressed concern that such codes, particularly in small or rural communities where only a limited number of businesses share certain NAICS codes, would create significant re-identification risks.

Several commenters expressed support for modifying the 6-digit NAICS code in the public application-level data. One commenter stated that the NAICS code should be truncated to general categories. Several industry commenters expressed specific support for disclosing a 2-digit NAICS code, and another supported a 4-digit modification, stating it would provide sufficient information while mitigating re-identification risk.

As discussed above in part VIII.B.3, the Bureau views disclosure of a NAICS code as having significant disclosure benefits. In addition, the Bureau's shift to requiring collection and reporting of a 3-digit code will significantly reduce re-identification risk while preserving

---

[901] *See* 2010 Census Tallies; Off. of Mgmt. & Budget, *North American Industry Classification System (NAICS) Updates for 2022,* 86 FR 35350, 35352 (July 2, 2021).

AdminRecord-000335

the utility of the dataset. This shift acknowledges privacy concerns raised by some commenters, reducing the risk of cognizable privacy harms.

Overall, the Bureau preliminarily assesses that published 3-digit codes by themselves present limited privacy risk. It is unlikely that publication of these data would disclose personal information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. The Bureau also does not see evidence of non-personal commercial privacy risks to small businesses, or of any compelling privacy risk to financial institutions. However, the Bureau appreciates that there is a heightened risk of re-identification when a NAICS code is combined with other data fields, such as census tract.

xiv. Number of Workers

Proposed § 1002.107(a)(16) would have required financial institutions to collect and report to the Bureau the number of non-owners working for the applicant. In the final rule, however, a financial institution complies with § 1002.107(a)(16) by reporting in ranges. The Bureau is adopting this change in response to concerns expressed by commenters about the complexity of providing an exact number.

The NPRM stated that disclosing number of workers in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified. Additionally, the Bureau did not see disclosure being harmful or sensitive to financial institutions. Financial institutions may use such data to learn more about the types of small businesses with which their competitors do business, but the Bureau did not see evidence that disclosure would permit reverse-engineering of proprietary lending models.

The Bureau noted that information about the number of workers is likely to be publicly available for many businesses. For example, State registries of businesses may include information about a business's number of workers, and private databases also commonly include this information. This decreases any potential sensitivity or harm of disclosing this data point in the application-level data, and also the direct utility of the data to potential adversaries. However, these data sources also mean that in some cases an adversary could use number of workers, combined with other fields, to match an identified publicly available record. Data on a business's number of workers could easily produce unique

combinations when combined with other data fields, particularly for businesses with higher numbers of workers. The NPRM further stated that the Bureau would consider modification options, including recoding and top-coding.

Several community group commenters and a group of State banking regulators supported unmodified disclosure of this data as important to the fair lending purposes of section 1071. However, an industry commenter stated that the data point was not useful for achieving any of the statutory purposes, particularly given the difficulties in counting seasonal and part-time employees. Several industry commenters stated that publishing the number of workers without modification could create privacy risks. These commenters generally asserted that the data point should not be published because the exact number of workers could be used to re-identify applicants and would reveal sensitive commercial information about the applicant's competitive strategy or business plan. Some of these commenters also expressed concern that these data are susceptible to misinterpretation and inaccuracy, particularly for seasonal or cyclical businesses that experience routine variations in employee volume over the course of a calendar year. Several commenters expressed support for modifying the public number of workers data field by recoding the data into bins. One commenter stated that the bins would need to be developed such that they do not obscure differences in smaller businesses.

As discussed above in part VIII.B.3, the Bureau views disclosure of the number of workers to have significant disclosure benefits. In addition, the Bureau's decision to have financial institutions report this data in ranges will reduce the risk of re-identification for applicants or related natural persons. In turn, that lowers the risk that applicants or related natural persons are subject to competitive harms, such as the disclosure of their proprietary business information. Further, although the Bureau has identified publicly available datasets that include number of workers, these data vary over time and are difficult to align across multiple datasets. Reporting in ranges will also help address concerns about data inaccuracy and variance.

The Bureau preliminarily assesses that disclosing unmodified application-level number of workers data in ranges would present limited privacy risk if re-identification occurred. It is unlikely that publication of this data would

disclose personal information about an applicant or related natural person that would be harmful or sensitive if such person were re-identified; it is also unlikely that publication would result in non-personal commercial privacy risks to small businesses or compelling privacy risks to financial institutions.

xv. Time in Business

Proposed § 1002.107(a)(17) would have required financial institutions to collect and report to the Bureau the time the applicant has been in business, described in whole years, as relied on or collected by the financial institution. As discussed in the section-by-section analysis of § 1002.107(a)(17), however, the final rule requires a financial institution to report this data in whole years only if it collects or otherwise obtains that information as part of its procedures for evaluating credit applications. Otherwise, the financial institution reports whether the applicant has been in existence for less or more than two years. This change responds to commenter concerns about complexity in collecting this data.

The NPRM explained that disclosing time in business in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The Bureau did not see evidence that disclosure would permit the reverse-engineering of proprietary lending models. In addition, information about time in business was likely to be publicly available for many businesses in public registration filings and other sources, decreasing any potential harm or sensitivity from publishing this data. The Bureau noted that these same data sources could enable an adversary to directly match the time in business data field in unmodified form, particularly when combined with other fields.

The Bureau stated that if it were to modify the time in business data field, it may consider recoding time in business into bins—for example, using two- or five-year intervals. It would also consider top-coding time in business at a value such as 25 years, given that larger values are more likely to be unique. The Bureau specifically sought comment on what intervals the Bureau should use if it were to recode time in business into bins and what value the Bureau should use if it were to top-code this data field.

Several community group commenters and a group of State banking regulators supported

unmodified disclosure of time in business in the dataset to facilitate the fair lending purpose of the statute. A few industry commenters expressed concern that publication of time in business data could create re-identification risks for small business applicants and reputational harm for financial institutions. In particular, one commenter agreed that time in business data could be combined with other data points to re-identify small business applicants. With respect to potential modification options, a trade association and a community group expressed support for either binning or top-coding. The community group noted, however, that a bin that ranged from two to five years may be too long. The commenter also stated that a top-code of 25 years may be reasonable but urged the Bureau to conduct further analysis after it received the first year's data.

As discussed in part VIII.B.3, the Bureau views disclosure of time in business as having significant benefits. The Bureau also preliminary assesses that the availability of this data in existing datasets decreases potential harm or sensitivity of disclosure if re-identification occurs, but also increases the risk of re-identification risk. The Bureau will consider whether binning, top-coding, or other modification techniques may be appropriate when it analyzes application-level data and conducts its full privacy analysis. Commenters did not explain how the disclosure of the applicant's time in business could lead to reputational harms to financial institutions.

xvi. Business Ownership Status

Proposed § 1002.107(a)(18) and (19) would have required financial institutions to collect and report to the Bureau whether the applicant is a minority-owned business or a women-owned business and whether minority-owned business status or women-owned business status is being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). As discussed in the section-by-section analysis of § 1002.107(a)(18), the Bureau is finalizing these data points with modifications. Specifically, it is finalizing proposed § 1002.107(a)(18) and (19) as final § 1002.107(a)(18). In addition to the minority-owned and women-owned business statuses, the final rule requires financial institutions to collect and report LGBTQI+-owned business status.

The NPRM stated that publishing demographic ownership status in unmodified form would have likely disclosed minimal, if any, information about an applicant or related natural

person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. While some applicants or related natural persons may regard this information as harmful or sensitive, the Bureau believed this information generally would present low risk of harm or sensitivity. The Bureau also believed that this information already may be available to the general public and would have relatively limited utility for adversaries if an applicant or related natural person were re-identified.

However, the Bureau noted that in many cases an adversary could have used women-owned or minority-owned business status, in combination with other data, to match a section 1071 record to an identified publicly available record. The Bureau identified several sources that could have been used for such matching. Women- and minority-ownership is likely to be publicly available for many businesses that publicly register or certify with the SBA or State or local authorities as women- or minority-owned. Businesses' websites may also provide this information, and private commercial databases also include or estimate this information.

The Bureau did not receive any comments on this aspect of its privacy analysis. This lack of engagement suggests that the NPRM generally correctly assessed the privacy impacts that disclosing women-owned and minority-owned business statuses in the data in unmodified form would have for an applicant or related natural person if such person were re-identified. It also suggests the Bureau generally correctly surmised there would be minimal, if any, harms or sensitivities to financial institutions.

However, the Bureau received comments from several industry and individual commenters on the Bureau's request for comment in proposed § 1002.107(a)(20) about whether the Bureau should require financial institutions to ask separate questions regarding the sex, sexual orientation, and gender identity, of principal owners. As discussed below in part VIII.B.6.xvii, a few commenters urged the Bureau to not collect or publish data on sexual orientation and gender identity of principal owners. The commenters noted the significant risk of harm to small business applicants and related natural persons, due to the particularly sensitive nature of this information if re-identification occurred.

The Bureau acknowledges that an individual's LGBTQI+ status likely is

sensitive personal information that could pose personal privacy risks as well as non-personal commercial privacy risks. If re-identification occurred, its disclosure could pose risks to privacy interests of small business owners. Accordingly, while the Bureau views disclosure of business ownership status as having significant disclosure benefits, the Bureau preliminarily assesses that disclosing this data may present significant privacy risks if re-identification occurred. That is particularly so as to LGBTQI+-owned business status; in contrast, women-owned and minority-owned business status information would present relatively limited privacy risk. The Bureau does not see evidence that LGBTQI+-owned status poses compelling privacy risks to financial institutions.

xvii. Number and Demographic Status of Principal Owners

Proposed § 1002.107(a)(20) would have required a financial institution to collect and report to the Bureau the ethnicity, race, and sex of the applicant's principal owners; whether ethnicity and race were being collected by the financial institution on the basis of visual observation and/or surname analysis; and whether ethnicity, race, or sex were being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). Proposed § 1002.107(a)(21) would have required that financial institutions collect and report to the Bureau the number of an applicant's principal owners. As discussed in the section-by-section analyses of § 1002.107(a)(19) and (20), the Bureau is finalizing the ethnicity, race, and sex of principal owners and number of principal owners data points with several modifications, including renumbering the sections, changing how financial institutions are required to inquire about the principal owners sex, and removing the requirement that a financial institution report whether the ethnicity and race of an applicant's principal owners was collected on the basis of visual observation and/or surname analysis.

The NPRM stated that, in general, disclosing the ethnicity, race, and sex of an applicant's principal owners in unmodified form would likely have disclosed minimal, if any, information about an applicant or related individual that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. As noted similarly above for the data fields on women-owned and minority-owned business statuses, while some applicants or

AdminRecord-000337

related natural persons may regard this information as harmful or sensitive, this information generally would present low risk of harm or sensitivity. The Bureau also noted that this information may be already available to the general public, and that this information would have relatively limited utility for adversaries if an applicant or related natural person were re-identified.

The Bureau identified publicly available datasets that include data fields an adversary could directly match to the ethnicity, race, and sex of the applicant's principal owner(s) data fields in unmodified form. For example, certain State business registries, including those required to access women-owned and minority-owned business programs, provide this information. Other public record databases, such as the SBA's 8(a) program and the Paycheck Protection Program, also include ethnicity, race, and sex data alongside the borrower's name. In many cases, therefore, the Bureau stated that an adversary could use the ethnicity, race, and sex of the applicant's principal owners, combined with other fields, to directly or indirectly match a section 1071 record to an identified publicly available record.

As discussed in the section-by-section analysis of § 1002.107(a)(19), the Bureau proposed that financial institutions would report sex as described in proposed comment 107(a)(20)–8, which would have permitted an applicant to self-describe a principal owner's sex by selecting the ''I prefer to self-describe'' response option on a paper or electronic form or by providing additional information for an oral application, with the financial institution reporting the response using free-form text. In the NPRM, the Bureau stated intention to exclude free-form text from public application-level data. However, the Bureau sought comment on whether there were additional specific modifications it should consider with regard to applicants who choose to self-describe their principal owners' sex. The Bureau also sought comment on whether, if finalized, disclosure of sex, sexual orientation, or gender identity could cause heightened sensitivity or risk of harm and any specific modifications the Bureau should consider if such data points were included in the final rule.

Many community group and minority business advocacy group commenters supported disaggregated disclosure of ethnicity, race, and sex of principal owners, and underscored its significance in achieving the fair lending purpose of section 1071. Some

of these commenters stated that publication of disaggregated data would facilitate development of policy solutions for issues of financial inequality as it relates to ethnicity, race, and sex. A few trade associations expressed concerns about publishing information collected on the basis of visual observation or surname.

Some industry commenters expressed concerns that ethnicity, race, and sex data would create significant privacy risks for small business applicants, particularly in smaller or rural communities. Other industry and individual commenters cautioned the Bureau against collecting and publishing the sexual orientation and gender identity of principal owners. Specifically, these commenters noted the significant risk of harm to small business applicants, due to the particularly sensitive personal nature of this information if re-identification occurred.

Some trade associations noted concerns that publishing ethnicity, race, and sex information, particularly where collected based on visual observation or surname, will present the risk of harm to financial institutions. Two such commenters asserted that financial institutions faced the potential for reputational or litigation risks if the ethnicity, race, or sex data are published because of potential conflicts with State or Federal privacy laws. One commenter stated that asking for this information without proper privacy precautions may expose the financial institution to legal risk under certain State privacy laws, such as the California Consumer Protection Act, that protect against disclosure of ethnicity and race information. Two others noted that State privacy laws may conflict with the requirement to obtain ethnicity and race data based on visual observation. These commenters also stated that the perceived intrusiveness from the acquisition of these data and the knowledge that it would become public could cause competitive and reputational harm to financial institutions as institutions that do not protect their customers' privacy. For example, one commenter asserted that visual observation collection may reduce trust in the financial institution and increase the applicant's apprehension regarding their privacy. As to whether the Bureau should publish the unmodified, applicant-level data on the number of principal owners, several industry commenters opposed the publication of these data, should it be finalized. The commenters stated that publication of the number of principal

owners could facilitate re-identification, particularly in small or rural areas.

As discussed above in part VIII.B.3, the Bureau views disclosure of these data to have significant benefits. Commenters did not provide additional evidence related to re-identification risk that would alter the NPRM's partial privacy analysis. The current availability of these data in existing databases likely limits the risk of harm or sensitivity, although it may amplify re-identification risk. Comments that the disclosure of ethnicity, race, and sex data present a risk of reputational or litigation harm to financial institutions because it may be based on visual observation or surname are moot because no visual observation requirement is in the final rule. Commenters did not explain with sufficient detail how the final rule will increase a financial institution's litigation risks due to conflicts with State or Federal privacy laws. To the extent that asking for an applicant's principal owners' ethnicity, race, or sex must be done with proper privacy protocols in place, it seems likely that a financial institution could comply with both this final rule and other privacy requirements.

Accordingly, the Bureau preliminarily assesses that disclosure in unmodified form may increase re-identification risk and presents significant risk of harm or sensitivity if re-identification occurred. The possibility of significant privacy risk primarily results from the fact that sex data will be reported as free-form text, which as discussed in part VIII.B.6.xix below, the Bureau preliminarily assesses it will include, in some form, in the public data. The disclosure of information about the ethnicity and race of principal owners generally will present lesser risk. The Bureau does not discern evidence of compelling privacy risks to financial institutions.

xviii. Financial Institution Identifying Information

Proposed § 1002.109(b) would have required a financial institution to provide the Bureau with certain information with its submission of its small business lending application register: (1) its name; (2) its headquarters address; (3) the name and business contact information of a person who may be contacted with questions about the financial institution's submission; (4) its Federal prudential regulator, if applicable; (5) its Federal Taxpayer Identification Number; (6) its LEI; (7) its RSSD ID, if applicable; (8) parent and top-parent entity information, if applicable; (9) the type of

AdminRecord-000338

financial institution that it is, indicated by selecting the appropriate type or types of institution from the list provided or entering free-form text; [902] and (10) whether the financial institution is voluntarily reporting covered applications for covered credit transactions. As discussed above in the section-by-section analysis of § 1002.109(b), the Bureau is generally finalizing this data point as proposed, with certain modifications.

Regulation C requires financial institutions to report similar information when submitting their loan-level HMDA data. Regulation C also requires financial institutions to report the calendar year of submission and the total number of entries in their loan-level HMDA data. Regulation C does not require financial institutions to submit their headquarters address, RSSD ID, or financial institution type or indicate whether they are reporting data voluntarily. With the exception of contact information for a person who can be reached about the financial institution's submission, the information financial institutions are required to submit with their HMDA submissions under § 1003.5(a)(3) is publicly available through the FFIEC website.

*Financial institution identifying information other than individual contact information.* In the NPRM, the Bureau stated its intention to disclose the financial institution identifying information data fields in unmodified form, other than the name and business contact information of a person who may be contacted with questions about the submission. The Bureau stated that disclosing financial institution identifying information in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. While some businesses might view their identification as an applicant as harmful or sensitive, revealing the name of the financial institution would not significantly increase such risks. In addition, the Bureau reasoned that this information is already largely available from other identified public records, such as UCC filings. For the same reason, revealing the name of the financial institution would not significantly increase risk of fraud or identity theft. The Bureau stated that disclosing financial institution identifying information in the data in unmodified form would not, by itself,

reveal information that is harmful or sensitive, given financial institutions' commercial interests. Additionally, other public records, such as public HMDA data, tax records, and commercial databases disclose Federal Taxpayer Identification number, RSSD ID, and LEI. [903] Disclosing financial institution identifying information in unmodified form may reveal information that financial institutions regard as harmful or sensitive, but the Bureau did not discern evidence that it would permit reverse-engineering of proprietary lending models. The Bureau acknowledged, however, that this information could, in some circumstances, lead to reputational risks and increased costs for financial institutions, which might be passed on to their customers in the form of increased costs or decreased access to credit.

The NPRM noted that the Bureau had received feedback that publishing financial institution identifying information could increase re-identification risk of applicants and related natural persons. This included feedback that customers of captive wholesale finance companies with applicant bases limited to franchises or licensees of a particular distributor or manufacturer would face unique re-identification risks because, in many instances, these applicants may be the financial institution's only customer in a particular State, or one of only a very small number of customers in the State, heightening the privacy concerns for publication of data tied to these financial institutions. The NPRM also noted that the Bureau had identified publicly available datasets that include data fields an adversary could directly match to financial institution identifying information data fields in unmodified form. Therefore, in many cases, the Bureau reasoned that an adversary could use identifying financial institution data fields, combined with other section 1071 data fields, to match a section 1071 record to an identified public record.

With respect to concerns about wholesale finance companies, the Bureau acknowledged that financial institution identifying information in unmodified form in the public application-level data could, in combination with other data fields like census tract, NAICS codes, and credit

type or purpose, facilitate re-identification of applicants that have a common name, without requiring that adversaries match 1071 records to other identified datasets. Under proposed § 1002.104(b), which the Bureau has finalized, trade credit and other transactions would be excluded from the scope of covered credit transactions. The Bureau indicated that this might eliminate some transactions involving such lenders. The Bureau sought comment on the circumstances under which a transaction involving a captive wholesale finance company would be covered by the proposal notwithstanding the exemption. To the extent there are such transactions, the Bureau also sought comment on the instances in which captive wholesale finance companies lend *exclusively* to businesses that are publicly branded in a way that can be easily matched to the identity of the financial institution. The Bureau sought comment on whether a final rule could include certain categories of financial institution types that would allow the Bureau to easily identify such financial institutions in the unmodified 1071 dataset without an application-level analysis. Finally, the Bureau sought comment on whether there are particular modification techniques that would reduce re-identification risks and risks of harm or sensitivity for applicants and related natural persons who might be re-identified in the public application-level data.

In the NPRM, the Bureau stated its intention to publish financial institution identifying information, other than individual contact information, as reported and without modification. The Bureau stated that risks to privacy interests from the disclosure of this data in unmodified form would be justified by the benefits of disclosure for section 1071's purposes. While the Bureau did not conduct a uniqueness analysis, it stated that disclosure of financial institution identifying information would very likely substantially facilitate the re-identification of applicants or related natural persons. If such persons were re-identified, the Bureau stated that disclosure of other data fields would likely create a risk of harm or sensitivity. In addition, the Bureau stated that the disclosure of other proposed data fields in combination with a financial institution name likely would reveal information that may be harmful or sensitive to financial institutions. The Bureau nonetheless stated that these risks to privacy would be justified by the benefits of disclosure in light of section 1071's purposes.

---

[902] Part VIII.B.6.xix further discusses the disclosure of free-form text field information.

[903] The FFIEC publishes transmittal sheet information, including LEI and Federal Taxpayer Identification number, on its website. Fed. Fin. Insts. Examination Council, *Public Transmittal Sheet—Schema, https://ffiec.cfpb.gov/documentation/2020/public-ts-schema/* (last visited Mar. 20, 2023).

AdminRecord-000339

The Bureau sought comment on this analysis and its stated intention to disclose these fields without modification in the public application-level data. The Bureau received feedback on this proposed analysis from trade association and community group commenters. Two community group commenters generally supported the Bureau's proposal to disclose unmodified financial institution identifying information, other than individual contact information. A trade association opposed the proposal. This commenter urged the Bureau to withhold all financial institution identifying information data fields because, whether or not it is available elsewhere, this information would create privacy risks for financial institutions, including risks involving identity theft and data security. With respect to the Bureau's request for comment about whether these proposed data fields would pose risks to captive wholesale companies and their customers, this commenter urged the Bureau to provide additional protections for this market segment to mitigate re-identification risk.

The Bureau acknowledges that publication of financial institution identifying information may reveal information that may be harmful or sensitive to financial institutions, leading to reputational risks and increased costs. However, feedback received by the Bureau does not explain how these data would pose previously unconsidered identity theft or data security risks. Separately, the Bureau acknowledges feedback that the proposed data fields may pose special risks to captive wholesale companies and their customers. It intends to consider what additional modifications or deletions may be appropriate to protect the privacy interests of these entities.

As explained in the NPRM, this data point could potentially increase re-identification risk and commenters did not provide additional evidence related to re-identification risk that would alter the partial privacy analysis described above. However, the Bureau preliminarily assesses that disclosing the financial institution identifying information data fields in unmodified form, other than data fields containing the information for the financial institution's point of contact, would present limited risk of harm or sensitivity if re-identification occurred. The Bureau believes that it is unlikely that publication of this data would disclose personal information about an applicant or related natural person that would be harmful or sensitive if such

person were re-identified. The Bureau does not believe this data will result in significant non-personal commercial risks to small businesses. The disclosure of this data field does not pose compelling privacy risks to financial institutions. The Bureau will continue to give consideration to the scenario involving captive wholesale companies and their customers as it conducts its full privacy analysis.

*Individual contact information.* Proposed § 1002.109(b)(1)(iii) would have required financial institutions to report the name and business contact information of a person who may be contacted with questions about the financial institution's submission. As discussed above in the section-by-section analysis of § 1002.109(b)(1)(iii), the Bureau is finalizing this data point largely as proposed, but with certain modifications. In contrast to the other financial institution identifying information described above, in the NPRM the Bureau stated its intention to delete this data field from the publicly available data.

The Bureau stated that disclosing individual contact information in the data in unmodified form would likely not disclose any information about an applicant or related natural person if such person were re-identified. However, the Bureau stated that disclosing the name and contact information of natural persons designated by the financial institution would disclose information that may be harmful or sensitive to the identified financial institutions and their employees. Financial institutions have a legitimate interest in protecting the identities of their employees from the public, consistent with their job functions, and persons identified for purposes of questions about the financial institution's submission to the Bureau might not necessarily be responsible for engaging with the general public.

The Bureau considered whether modification other than by excluding individual contact information would appropriately balance identified privacy risks and disclosure benefits. Because disclosure of this data field in unmodified form would not promote the purposes of section 1071 and would likely reveal information that would be harmful or sensitive to a financial institution and its employees, the Bureau did not identify any such alternative. Accordingly, the Bureau stated that deleting individual contact information would appropriately balance the privacy risks and disclosure benefits of this data field.

The Bureau received feedback from one trade association commenter, which supported the Bureau's analysis. The Bureau accordingly determines that the publication of the name and business contact information of a person who may be contacted by the Bureau or other regulators with questions about the financial institution's submission has minimal, if any, disclosure benefits. Moreover, the Bureau concludes that the publication of this information presents significant privacy risks because it may be harmful or sensitive to identified financial institutions and their employees. Accordingly, the Bureau is announcing its intention not to publish the name and business contact information of a person who may be contacted by the Bureau or other regulators with questions about the financial institution's submission.

xix. Free-Form Text

The Bureau proposed to require financial institutions to use free-form text to report certain data where they are reporting information that is not included in a list provided for the data fields. Under proposed § 1002.107(a)(5), (6), (11), (12), and (20), free-form text could be used in reporting credit type (product and guarantee information); credit purpose; denial reasons; pricing (the interest rate index used); and principal owners' ethnicity, race, and sex.[904] Financial institutions also would have had flexibility in describing certain identifying information provided under proposed § 1002.109(b). Free-form text used to report principal owners' ethnicity, race, and sex would have been completed based on information provided by applicants; all other free-form text would have been completed by the financial institution. As discussed above in the section-by-section analyses for particular data points within § 1002.107(a), the Bureau is finalizing these data points with certain modifications. The free-form text aspect of § 1002.109(b) is being finalized as proposed.

The Bureau explained that use of free-form text would allow the reporting of any information, including information that may be harmful or sensitive to applicants, related natural persons, and possibly the interests of financial institutions. The Bureau stated that such information might also create a significant risk of re-identification for applicants or related natural persons. Given the amount of data expected to be reported each year, the Bureau stated that it would not be feasible for it to

---

[904] Proposed § 1002.107(a)(20) is being finalized as § 1002.107(a)(19).

AdminRecord-000340