# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION; RIO BANK, MCALLEN, TEXAS; and AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

# JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
### VOLUME V

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
| --- | --- |
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

1

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| | |
|---|---|
| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

review free-form text before publishing the application-level data. Under the balancing test described in the NPRM, therefore, the Bureau initially assessed that deleting free-form text from the public application-level data (other than with respect to the financial institution identifying information described in part VIII.B.6.xviii above) would appropriately balance the benefits of disclosure with the risks to the privacy interests of applicants, related natural persons, and financial institutions.

Several industry commenters generally supported deleting free-form text from the public application-level data. A bank noted that public the HMDA data do not include free-form text fields. A group of trade associations stated that deleting this information would appropriately balance privacy risks and disclosure benefits. In contrast, a CDFI lender urged the Bureau to publish free-form text fields arguing that such fields would include important information. This commenter suggested that the Bureau could adequately mitigate the risk that the free-form text would contain sensitive or harmful information by including a disclaimer on the data collection form that free-form text may be published.

The Bureau reiterates that HMDA publication practices do not dictate decisions in this rule and that consistency between public section 1071 data and public HMDA data may not be appropriate in every instance. As an additional matter, the Bureau believes that a general disclaimer that free-form text may be published would not adequately mitigate those privacy risks. Among other considerations, because financial institutions will supply the content of most free-form text fields, applicants and related natural persons have no direct control over what information appears in those fields. Therefore, a disclaimer would provide applicants or related natural persons limited ability to mitigate their privacy risks.

The Bureau agrees that certain free-form text fields may contain information that has some disclosure benefits. In particular, free-form text for the ethnicity, race, and sex data may contain information that is important to the statutory purposes of section 1071. As discussed in the section-by-section analysis of § 1002.107(a)(19), the Bureau is finalizing a requirement whereby applicants will indicate principal owners' sex via a write-in option. While the Bureau cannot feasibly review for privacy risks all free-form text fields supplied by all financial institutions reporting data, the Bureau expects to review the free-form text provided by

applicants regarding principal owners' sex. The Bureau anticipates that this free-form text will permit identification of certain response categories appropriate for publication, based on the Bureau's assessment of privacy risks. Similarly, the Bureau may be able to review ethnicity and race free-form text, where it is provided, to discern response categories that may be appropriate for publication.

The Bureau recognizes, however, that free-form text fields may present significant privacy risks if re-identification occurred. Such privacy risks would not be mitigated in the absence of pre-publication review. Accordingly, the Bureau is announcing its intention to delete free-form text from the public application-level data, other than with respect to ethnicity, race, and sex of principal owners described in part VIII.B.6.xvii and the financial institution identifying information described in part VIII.B.6.xviii. The Bureau will continue to consider whether modification techniques may be appropriate for the data fields for ethnicity, race, and sex of principal owners and certain financial institution identifying information.

## IX. Dodd-Frank Act Section 1022(b)(2) Analysis

The Bureau has considered the potential benefits, costs, and impacts of the final rule. The Bureau requested comment on the preliminary discussion presented below, as well as submissions of additional data that could inform the Bureau's consideration of the benefits, costs, and impacts of the proposed rule. In developing the rule, the Bureau has consulted or offered to consult with the prudential regulators (the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of the Comptroller of the Currency), the Department of Agriculture, the Department of Housing and Urban Development, the Department of Justice, the Department of the Treasury, the Economic Development Administration, the Farm Credit Administration, the Federal Trade Commission, the Financial Crimes Enforcement Network, and the Small Business Administration regarding, among other things, consistency with any prudential, market, or systemic objectives administered by such agencies.

In the Dodd-Frank Act, which was enacted "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system," Congress directed the Bureau to adopt

regulations governing the collection of small business lending data. Under section 1071 of that Act, covered financial institutions must compile, maintain, and submit certain specified data points regarding applications for credit for women-owned, minority-owned, and small businesses, along with "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." Under the final rule, covered financial institutions are required to collect and report the following data points: (1) a unique identifier, (2) application date, (3) application method, (4) application recipient, (5) credit type, (6) credit purpose, (7) amount applied for, (8) amount approved or originated, (9) action taken, (10) action taken date, (11) denial reasons, (12) pricing information, (13) census tract, (14) gross annual revenue, (15) NAICS code, (16) number of workers, (17) time in business, (18) minority-owned business status, women-owned business status, and LGBTQI+-owned business status, (19) ethnicity, race, and sex of principal owners, and (20) the number of principal owners.

Under the final rule, financial institutions will be required to report data on small business credit applications under section 1071 if they originated at least 100 covered credit transactions in each of the two preceding calendar years. The Bureau is defining an application as an oral or written request for a covered credit transaction that is made in accordance with the procedures used by a financial institution for the type of credit requested, with some exceptions. Loans, lines of credit, credit cards, and merchant cash advances (including such credit transactions for agricultural purposes) all fall within the transactional scope of this final rule. The Bureau is excluding trade credit, transactions that are reportable under the Home Mortgage Disclosure Act of 1975 (HMDA),[905] insurance premium financing, public utilities credit, securities credit, and incidental credit. Factoring, leases, and consumer-designated credit that is used for business or agricultural purposes are also not covered credit transactions. In addition, the Bureau has made clear that purchases of originated covered credit transactions are not reportable. For purposes of the final rule, a business is a small business if its gross annual revenue for its preceding fiscal year is $5 million or less.

---

[905] 12 U.S.C. 2801 *et seq.*

## A. Statement of Need

Congress directed the Bureau to adopt regulations governing the collection of small business lending data. Specifically, section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses. Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau is issuing this final rule to implement the section 1071 mandate.

Small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities.[906] However, comprehensive data on loans to small businesses currently are limited. The largest sources of information on lending by depository institutions (*i.e.*, banks, savings associations, and credit unions) are the FFIEC and NCUA Call Reports and reporting under the CRA. Under the FFIEC Call Report and CRA reporting requirements, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' and savings associations' total outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000) by institution.[907] The CRA currently requires banks and savings associations with assets over a specified threshold ($1.384 billion as of 2022)[908] to report data on loans to businesses with origination amounts of $1 million or less; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[909] Under the

CRA, banks and savings associations currently report aggregate numbers and values of originations at an institution level and at various geographic levels. The NCUA Call Report captures credit unions' total originations, but not applications, on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[910] Some federally-funded loan programs, such as the SBA's 7(a) or 504 programs and the CDFI Fund require reporting of loan-level data, but only for loans that received support under those programs. Nondepository institutions do not report small business lending applications under any of these reporting regimes. There are no similar sources of information about lending to small businesses by nondepository institutions.

There are also a variety of non-governmental data sources, issued by both private and nonprofit entities, that cover small businesses and/or the small business financing market. These include datasets and surveys published by commercial data and analytics firms, credit reporting agencies, trade associations, community groups, and academic institutions. See part II.B for additional information on these sources. While these non-public sources of data on small businesses may provide a useful supplement to existing Federal sources of small business lending data, these private and nonprofit sources often do not have lending information, may rely on unverified research based on public internet sources, and/or narrowly limit use cases for parties accessing data. Further, commercial datasets are generally not free to public users and can be costly, raising equity issues for stakeholders who cannot afford access.

Under the final rule, covered financial institutions are required to compile, maintain, and submit data regarding the ethnicity, race, and sex of the principal owners of the business and whether the business is women-owned, minority-owned, or LGBTQI+-owned. No other source of data comprehensively collects this type of protected demographic information on small business loan applications.

Section 1071 requires financial institutions to report detailed application-level data to the Bureau, and for the Bureau to generally make it

available to the public on an annual basis (subject to any deletions or modifications that the Bureau determines would advance a privacy interest). Such information will constitute a public good that illuminates the lending activities of financial institutions and the small business lending market in general. In particular, the public provision of application-level data, subject to any deletions or modifications that the Bureau determines would appropriately protect privacy interests, will: (1) provide communities, governmental entities, and financial institutions additional information to help identify business and community development needs and opportunities of small businesses and (2) allow members of the public, public officials, and other stakeholders to better assess compliance with antidiscrimination statutes.

First, the data made public pursuant to the final rule and the Bureau's subsequent privacy analysis will provide information that could help to improve credit outcomes in the small business lending market, furthering the community development purpose of the rule. As discussed above, market-wide data on small business credit transactions are currently limited. Neither the public nor private sectors provide extensive data on credit products or terms. Small business owners have access to very little information on typical rates or products offered by different lenders. As a result of the data that will be made public pursuant to the final rule and subject to modification and deletion decisions by the Bureau, community development groups and commercial services will be able to provide better information to small businesses. For example, a commercial provider could provide small businesses with information on what products lenders typically offer and at what rates. These data will allow small business owners to more easily compare credit terms and evaluate credit alternatives; without these data, small business owners are limited in their ability to shop for the credit product that best suits their needs at the best price. By engaging in more informed shopping, small business owners may achieve better credit outcomes.

Furthermore, communities will use data to identify gaps in access to credit and capital for small businesses. Financial institutions can analyze data to understand small business lending market conditions and determine how best to provide credit to borrowers. Currently, financial institutions are not able to conduct very granular or

---

[906] *See generally* White Paper.

[907] *See* FFIEC Call Report at Schedule RC–C Part II.

[908] *See* Fed. Fin. Insts. Examination Council, *Explanation of the Community Reinvestment Act Asset-Size Threshold Change* (2022), *https://www.ffiec.gov/cra/pdf/2022_Asset_Size_Threshold.pdf.*

[909] *See* 2015 FFIEC CRA Guide at 11, 13. Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report (TFR) as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as

loans whose origination amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland."

[910] *See* Nat'l Credit Union Admin., *Call Report Form 5300* (June 2020), *https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.*

AdminRecord-000342

comprehensive analyses because the data on small business lending are limited. The data made public pursuant to the final rule and subsequent privacy analysis will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions. The data will help enable institutions to identify potentially profitable opportunities to extend credit. They will additionally allow governmental entities to better develop targeted lending programs, loan funds, small business incubators, and other community-driven initiatives. Small business owners, as a result, could benefit from increased credit availability.

Second, while data made public pursuant to the final rule and subsequent privacy analysis may not constitute conclusive evidence of credit discrimination on its own, the data will enable members of the public, regulators, and other stakeholders to better identify lending patterns consistent with noncompliance with antidiscrimination statutes. As described above, there are currently no application-level data comprehensive enough or that contain the demographic information required by the final rule to enable the public to conduct these kinds of analyses. The data made public pursuant to the final rule and subsequent privacy analysis will be comprehensive and contain the necessary data fields for such analysis. Users will be able to examine whether, for example, a lender denies applications from women-owned, minority-owned, or LGBTQI+-owned businesses at higher rates than those that are not or whether these businesses are charged higher prices. This kind of transparency can place appropriate pressure on covered financial institutions to ensure that their credit lending practices comply with relevant laws. Additionally, data collected under the final rule will contain the data fields that allow users to conduct more accurate fair lending analyses by comparing applications for credit products with similar characteristics.

*B. Baseline for the Consideration of Costs and Benefits*

In evaluating the benefits, costs, and impacts of the final rule, the Bureau takes as a baseline the current legal framework governing financial markets, *i.e.,* the current state of the world before the Bureau's rule implementing section 1071. Under this baseline, the Bureau assumes that institutions are complying with regulations that they are currently

subject to, including reporting data under HMDA, CRA, and any State commercial financing disclosure laws.[911] The Bureau believes that such a baseline will also provide the public with better information about the benefits and costs of this rule.

The Bureau received no comments regarding its choice of baseline for its section 1022(b)(2) analysis.

*C. Basic Approach of the Bureau's Consideration of Benefits and Costs and Data Limitations*

Pursuant to section 1022(b)(2)(A) of the Dodd-Frank Act,[912] in prescribing a rule under the Federal consumer financial laws (which include ECOA and title X of the Dodd-Frank Act), the Bureau is required to consider the potential benefits and costs to "consumers" and "covered persons," including the potential reduction of access by consumers to consumer financial products or services resulting from such rule, and the impact of final rules on covered persons as described under section 1026 of the Dodd-Frank Act[913] (*i.e.,* depository institutions and credit unions with $10 billion or less in total assets), and the impact on consumers in rural areas.

The Dodd-Frank Act defines the term "consumer" as an individual or someone acting on behalf of an individual, while a "covered person" is one who engages in offering or providing a "consumer financial product or service," which means a financial product or service that is provided to consumers primarily for "personal, family, or household purposes."[914] In the rulemaking implementing section 1071, however, the only parties directly affected by the rule are small businesses (rather than individual consumers) and the financial institutions from whom they seek credit (rather than covered persons). Accordingly, a section 1022(b)(2)(A) analysis that considers only the costs and benefits to individual consumers and to covered persons would not meaningfully capture the costs and benefits of the rule.

---

[911] *See, e.g.,* N.Y. S.898 (signed Jan. 6, 2021) (amending S.5470–B), *https:// legislation.nysenate.gov/pdf/bills/2021/s898*; Cal. S.B. 1235 (Sept. 30, 2018), *https:// leginfo.legislature.ca.gov/faces/ billTextClient.xhtml?bill_id=201720180SB1235*; Virginia H. 1027 (enacted Apr. 11, 2022), *https:// lis.virginia.gov/cgi-bin/ legp604.exe?221+ful+CHAP0516*; Utah S.B. 183 (enacted Mar. 24, 2022), *https://le.utah.gov/~2022/ bills/static/SB0183.html.*

[912] 12 U.S.C. 5512(b)(2)(A).

[913] 12 U.S.C. 5516.

[914] 12 U.S.C. 5481(4) through (6).

Below, the Bureau conducts the statutorily required analysis with respect to the rule's effects on consumers and covered persons. Additionally, the Bureau is electing to conduct this same analysis with respect to small businesses and the financial institutions required to compile, maintain, and submit data under the final rule. This discussion relies on data that the Bureau has obtained from industry, other regulatory agencies, and publicly available sources. However, as discussed further below, the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule.

1. Analysis With Respect to Consumers and Covered Persons

The final rule implements a data collection regime in which certain covered financial institutions must compile, maintain, and submit data with respect to applications for credit for small businesses. The rule will not directly impact consumers or consumers in rural areas, as those terms are defined by the Dodd-Frank Act. However, some consumers will be directly impacted in their separate capacity as sole owners of small businesses covered by the rule. Some covered persons, including some that are depository institutions or credit unions with $10 billion or less in total assets, will be directly affected by the rule not in their capacity as covered persons (*i.e.,* as offerors or providers of consumer financial products or services) but in their separate capacity as financial institutions that offer small business credit covered by the rule. The costs, benefits, and impact of the rule on those entities are discussed below.

2. Costs to Covered Financial Institutions

The final rule establishes which financial institutions, applicants, transactions, and data points are covered by its requirements. In order to precisely quantify the costs to covered financial institutions, the Bureau would need representative data on the operational costs that financial institutions would incur to gather and report 1071 data, one-time costs for financial institutions to update or create reporting infrastructure to implement the final rule, and information on the level of complexity of financial institutions' business models and compliance systems. Currently, the Bureau does not believe that data on section 1071 reporting costs with this level of granularity are systematically available from any source. The Bureau has made reasonable efforts to gather data on section 1071 reporting costs.

Through outreach efforts with industry, community groups, and other regulatory agencies, the Bureau has obtained some information about potential ongoing operational and one-time compliance costs, and the discussion below uses this information to quantify certain costs of the final rule. Throughout the section 1071 discussion in the NPRM, the Bureau also solicited feedback about data or methodologies that would enable it to more precisely estimate the benefits, costs, and impacts of the proposed rule. The Bureau has reviewed these comments and considered the information provided by the commenters. The Bureau believes that the discussion herein constitutes the most comprehensive assessment to date of the costs of section 1071 reporting by financial institutions, as well as the most accurate estimates of costs given available information. However, the Bureau recognizes that these estimations may not fully quantify the costs to each covered financial institution, especially given the wide variation of section 1071 reporting costs among financial institutions.

The Bureau categorizes costs required to comply with the final rule into "one-time" and "ongoing" costs. "One-time" costs refer to expenses that the financial institution will incur initially and only once to implement changes required in order to comply with the requirements of this rule. "Ongoing" costs are expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis. In considering the costs and impacts of the rule, the Bureau has engaged in a series of efforts to estimate the cost of compliance by covered entities. The Bureau conducted a One-Time Cost Survey, discussed in more detail in part IX.E.1 below, to learn about the one-time implementation costs associated with implementing section 1071 and adapted ongoing cost calculations from previous rulemaking efforts. The Bureau evaluated the one-time costs of implementing the procedures necessary and the ongoing costs of annually reporting under the rule in part IX.F.3 below. The discussion below provides details on the Bureau's approach in performing these institution-level analyses. The Bureau realizes that costs vary by institution due to many factors, such as size, operational structure, and product complexity, and that this variance exists on a continuum that is impossible to fully represent. In order to conduct a cost consideration that is both practical and meaningful in light of these challenges, the Bureau has chosen an approach that focuses on three

representative types of financial institutions. For each type, the Bureau has produced reasonable estimates of the costs of compliance given the limitations of the available data. Part IX.F.3 below provides additional details on this approach.

### 3. Costs to Small Businesses

The Bureau has elected to estimate the costs to small businesses in addition to those for covered financial institutions. The Bureau expects the direct costs of the final rule to small businesses will be negligible. Therefore, the Bureau focuses its analysis on whether and how the Bureau expects financial institutions to pass on the costs of compliance with the final rule to small businesses and any possible effects on the availability or terms of small business credit. The Bureau relies on economic theory to understand the potential for costs to financial institutions to be passed on to small businesses. Further, the Bureau describes feedback received through the One-Time Cost Survey process, the SBREFA process, and comments from the NPRM process on how creditors might react to increased compliance costs due to the final rule.

### 4. Benefits to Small Businesses and Covered Financial Institutions

Quantifying benefits to small businesses presents substantial challenges. As discussed above, Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau is unable to readily quantify any of these benefits with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits. The Bureau believes that its final rule appropriately implements the statutory mandate of section 1071 to effectuate the section's stated purposes. As discussed further below, as a data reporting rule, most provisions of the final rule will benefit small businesses in indirect ways, rather than directly. Nevertheless, the Bureau believes that the impact of enhanced transparency will substantially benefit small businesses. For example, the final rule will facilitate the detection (and thus remediation) of discrimination; promote public and private investment in certain underserved markets; and

promote competitive markets. Quantifying and monetizing these benefits would require identifying all possible uses of data collected under this rule, establishing causal links to the resulting public benefits, and then quantifying the magnitude of these benefits.

Similar issues arise in attempting to quantify the benefits to covered financial institutions. Certain benefits to covered financial institutions are difficult to quantify. For example, the Bureau believes that the data collected under this rule will reduce the compliance burden of fair lending reviews for lower risk financial institutions by reducing the "false positive" rates during fair lending prioritization by regulators. That is, by providing more comprehensive application-level data about a covered institution's lending to small businesses, regulators will be able to better identify fair lending risks and, as such, more efficiently prioritize their fair lending examinations and enforcement activities. The Bureau also believes that data made public pursuant to the final rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions and to identify potentially profitable opportunities to extend credit. The Bureau believes that such benefits to financial institutions could be substantial. However, quantifying them would require data that are currently unavailable.

In light of these data limitations, the discussion below generally provides a qualitative consideration of the benefits and impacts of the final rule. General economic principles, together with the limited data available, provide insight into these benefits and impacts. Where possible, the Bureau makes quantitative estimates based on these principles and the data that are available. Quantifying these benefits is difficult because the size of each effect cannot be known in advance. Given the number of small business credit transactions and the size of the small business credit market, however, small changes in behavior can have substantial aggregate effects.

### 5. General Comments on the Impact Analyses in the Proposed Rulemaking

Throughout the Dodd-Frank Act section 1022 discussion in the NPRM,[915] the Bureau solicited feedback that would enable it to estimate the benefits, costs, and impacts of the

---

[915] *See* 86 FR 56356, 56540–64 (Oct. 8, 2021).

proposed regulation more precisely. The Bureau, for example, solicited comments on its methodology for estimating one-time and ongoing costs, the estimates of the specific costs themselves, and any information that would help it better quantify the benefits and potential impacts on small businesses and covered financial institutions. Many commenters made general statements, while several provided comments specific to certain methodologies or estimates. In this section, the Bureau describes the comments more generally, while in subsequent sections, it discusses comments specific to those sections.

Commenters offered general remarks on the quality of the Bureau's one-time and ongoing cost estimates. Several community groups described the Bureau's estimates as "well-considered" or described the costs of the proposed rule as being outweighed by the benefits. In contrast, some industry commenters and an office of a Federal agency generally asserted that the Bureau's cost estimates were too low. The Bureau has reviewed its estimates and considered the information provided by the commenters. In the sections below, the Bureau describes specific comments related to each section of benefits, costs, and the potential impact on small entities. The methodology described in the sections below for the final rule is the same methodology that the Bureau used in the NPRM unless otherwise noted.

### D. Coverage of the Final Rule

#### 1. Coverage in General

The final rule provides that financial institutions (both depository and nondepository) that meet all the other criteria for a "financial institution" in § 1002.105(a) would only be required to collect and report section 1071 data if they originated at least 100 covered credit transactions in each of the two preceding calendar years. See final § 1002.105(b).

As discussed above, market-wide data on small business lending are currently limited. The Bureau is unaware of any comprehensive data available on small business originations for all financial institutions, which are needed in order to precisely identify all institutions covered by the rule. To estimate coverage of the final rule, the Bureau uses publicly available data for financial institutions divided into two groups: depository (i.e., banks, savings associations, and credit unions) and nondepository institutions.

To estimate coverage of depository institutions, the Bureau relies on NCUA

Call Reports to estimate coverage for credit unions, including for those that are not federally insured, and FFIEC Call Reports and the CRA data to estimate coverage for banks and savings associations. For the purposes of the analysis in this section of part IX, the Bureau estimates the number of depository institutions that would have been required to report small business lending data in 2019, based on the estimated number of originations of covered products for each institution in 2017 and 2018.[916] The Bureau accounts for mergers and acquisitions between 2017 and 2019 by assuming that any depository institutions that merged in those years report as one institution.

As discussed above, the NCUA Call Report captures the number and dollar value of originations on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size. For the purposes of estimating the impacts of the final rule, the Bureau uses the annual number of originated commercial loans to members reported by credit unions as a proxy for the annual number of originated covered credit transactions under the rule.[917] These are the best data available for estimating the number of credit unions that may be covered by the final rule. However, the Bureau acknowledges that the true number of covered credit unions may be different than what is presented here. For example, this proxy would overestimate the number of credit unions that will be covered if some commercial loans to members are not covered because the member is taking out a loan for a business considered large under the definition of a small business in the final rule. Alternatively, this proxy would underestimate the number of credit unions covered by the final rule if credit unions originate a substantial number of covered credit transactions with origination values under $50,000.

The FFIEC Call Report captures banks' and savings associations' outstanding number and amount of small loans to businesses (i.e., loans

originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000). The CRA requires banks and savings associations with assets over a specified threshold ($1.384 billion as of 2022)[918] to report loans to businesses in original amounts of $1 million or less. For the purposes of estimating the impacts of the final rule, the Bureau follows the convention of using small loans to businesses as a proxy for loans to small businesses and small loans to farms as a proxy for loans to small farms. These are the best data available for estimating the number of banks and savings associations that may be covered by the final rule. However, the Bureau acknowledges that the true number of covered banks and savings associations may be different than what is presented here. For example, this proxy would overestimate the number of banks and savings associations covered by the rule if a significant number of small loans to businesses and farms are to businesses or farms that are considered large under the definition of a small business in the final rule. Alternatively, this proxy would underestimate the number of banks and savings associations covered by the rule if a significant number of businesses and farms that are small under the final rule take out loans that are larger than $1 million for businesses or $500,000 for farms.

Although banks and savings associations reporting under the CRA are required to report the number of originations of small loans to businesses and farms, the Bureau is not aware of any comprehensive dataset that contains originations made by banks and savings associations below the CRA reporting threshold. To fill this gap, the Bureau simulated plausible values for the annual number and dollar value of originations for each bank and savings association that falls below the CRA reporting threshold for 2017, 2018, and 2019.[919] The Bureau generated simulated originations in order to account for the uncertainty around the exact number and value of originations

---

[916] The Bureau uses 2019 instead of 2020 or 2021 in order to estimate coverage during, or based on, a year unaffected by COVID–19 pandemic conditions.

[917] For this analysis, the Bureau includes all types of commercial loans to members except construction and development loans and loans secured by multifamily residential property. This includes loans secured by farmland; loans secured by owner-occupied, non-farm, non-residential property; loans secured by non-owner occupied, non-farm, non-residential property; loans to finance agricultural production and other loans to farmers; commercial and industrial loans; unsecured commercial loans; and unsecured revolving lines of credit for commercial purposes.

[918] See Fed. Fin. Insts. Examination Council, *Explanation of the Community Reinvestment Act Asset-Size Threshold Change* (2022), *https:// www.ffiec.gov/cra/pdf/2022_Asset_Size_ Threshold.pdf*.

[919] Based on FFIEC Call Report data as of December 2019, of the 5,177 banks and savings associations that existed in 2019, only about 11 percent were required to report under CRA. That is, only about 11 percent of banks and savings associations had assets below $1.384 billion, the CRA reporting threshold in 2019. *See* Fed. Fin. Insts. Examination Council, *2019 Reporting Criteria*, *https://www.ffiec.gov/cra/reporter19.htm* (last visited Mar. 20, 2023).

AdminRecord-000345

for these banks and savings associations. To simulate these values, the Bureau assumes that these banks have the same relationship between outstanding and originated small loans to businesses and farms as banks and savings associations above the CRA reporting threshold. First, the Bureau estimated the relationship between originated and outstanding numbers and balances of small loans to businesses and farms for CRA reporters. Then the Bureau used this estimate, together with the outstanding numbers and balances of small loans to businesses and farms of non-CRA reporters, to simulate these

plausible values of originations. The Bureau has documented this methodology in more detail in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rule* released concurrently with this final rule.[920]

Based on 2019 data from FFIEC and NCUA Call Reports and the CRA data, using the methodology described above, the Bureau estimates that the number of depository institutions that will be required to report under the final rule is between approximately 1,800 and 2,000, as shown in Table 3 below. The Bureau

estimates that between 1,700 and 1,900 banks and savings associations and about 100 credit unions will be required to report under the final rule. These ranges represent 95 percent confidence intervals over the number of credit unions, banks and savings associations that will be covered under the final rule. The Bureau presents this range to reflect the uncertainty associated with the estimates and notes that the uncertainty is driven by the lack of data on originations by banks and savings associations below the CRA reporting threshold.

TABLE 3—ESTIMATED DEPOSITORY INSTITUTION COVERAGE

[As of 2019]

| Coverage category | Estimated coverage |
|---|---|
| Institutions Subject to 1071 Reporting .............................................................. | 1,800–2,000 depository institutions (17%–19% of all depository institutions). |
| Banks and Savings Associations (SAs) Subject to Reporting ....................... | 1,700–1,900 banks and SAs (33%–36% of all banks and SAs). |
| Credit Unions Subject to Reporting .................................................................. | 100 credit unions (2% of all credit unions). |
| Share of Total Small Business Credit by Depository Institutions (Number of Loans Originated) Captured. | 94.2%–95.1%. |
| Share of Total Small Business Credit by Depository Institutions (Dollar Value of Loans Originated) Captured. | 81.0%–83.0%. |

For nondepositories, the Bureau estimates that about 620 nondepository institutions will be covered by the final rule: about 140 nondepository CDFIs; about 70 merchant cash advance providers; about 30 online lenders; about 240 commercial finance companies; about 70 governmental lending entities; and 71 Farm Credit System members.[921] See part II.D above for more detail on how the Bureau arrived at these estimates.

*Comments on the estimates of coverage of the proposed rule.* In the NPRM, the Bureau sought comment on whether there are additional data sources that could provide better estimates of coverage and on the methods used to estimate coverage. Two trade associations commented that the Bureau substantially underestimates the coverage of credit unions because it does not account for small business loans under $50,000. The Bureau acknowledges this limitation of the

estimation methodology, as discussed above, but did not receive any information on which to base better coverage estimates for credit unions for purposes of the final rule.

2. Coverage Based on Tiered Compliance Dates

The final rule provides that the initial compliance date for covered financial institutions will occur in three tiers; a covered financial institution will determine its compliance date tier based on the number of covered credit transactions that it originated in each of the calendar years 2022 and 2023.[922] In this section, the Bureau presents estimates of the share of covered financial institutions that will report in each tier.

The Bureau uses the estimates of originations of covered products by depository institutions in 2017 and 2018, discussed above, to estimate how many covered depository institutions

will report in each tier. A covered depository institution is expected to report in Tier 1 if it originated at least 2,500 covered credit transactions in each of 2017 and 2018. A covered depository institution is expected to report in Tier 2 if it originated at least 500 covered credit transactions in each of 2017 and 2018 and was not required to report in Tier 1. A covered depository institution is expected to report in Tier 3 if it originated at least 100 covered credit transactions in each of 2017 and 2018 and was not required to report in Tier 1 or Tier 2. The Bureau also estimates the percent of covered applications from 2019 that are received by depository institutions in each tier.

Table 4, below, presents estimates of percentages of covered banks and credit unions that will report in each tier. The Bureau estimates that most covered banks, savings associations, and credit unions will not be required to report until Tier 3, as seen in the first two rows

---

[920] This document is available at *https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/.*

[921] The Bureau provides estimates for the majority of nondepository institutions but knows an exact number of members of the Farm Credit System. To estimate the number of Farm Credit System members, the Bureau considers the Young, Beginning, and Small Farmers Reports for all Farm Credit System members as of December 31, 2019.

The reports can be found at *https://reports.fca.gov/CRS/* (last visited Mar. 20, 2023). A Farm Credit System is covered if it reported more than 100 total number of loans on its Young, Beginning, and Small Farmers Report in 2019.

[922] A covered financial institution is in Tier 1, as specified by final § 1002.114(b)(1), if it has at least 2,500 originations of covered credit transactions in each of 2022 and 2023, with a compliance date of October 1, 2024. A covered financial institution is in Tier 2, as specified by final § 1002.114(b)(2), if it has at least 500 originations in each of 2022 and

2023 (but isn't in Tier 1) with a compliance date of April 1, 2025. A covered financial institution is in Tier 3, as specified by final § 1002.114(b)(3) and (4), if it has at least 100 originations in each of 2022 and 2023 (but isn't in Tiers 1 or 2), with a compliance date of January 1, 2026. Financial institutions that do not fall into any of the compliance tiers based on 2022 and 2023 originations, but that originate 100 more covered credit transactions in subsequent years, would comply beginning January 1, 2026 at the earliest.

AdminRecord-000346

**35496** **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

of the table. However, the next two rows show that most applications to banks and savings associations (and overall) | for covered products in the first reporting year will be received by the 5 percent to 6 percent of covered banks | and savings associations that are expected to report in Tier 1.

### TABLE 4—ESTIMATED DEPOSITORY INSTITUTION COVERAGE BY COMPLIANCE TIER [923]

| Coverage category | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|
| Percent Covered Banks and SAs Reporting in Tier. | 5%–6% of covered banks and SAs. | 17%–19% of covered banks and SAs. | 75%–77% of covered banks and SAs. |
| Percent Covered Credit Unions Reporting in Tier. | 0% of covered credit unions .. | 13% of covered credit unions | 87% of covered credit unions. |
| Percent of Covered Small Business Credit Applications by Banks and SAs Captured in Tier. | 90%–92% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. | 4%–5% of covered bank and SA applications. |
| Percent of Covered Small Business Credit Applications by Credit Unions Captured in Tier. | 0% of covered credit union applications. | 55% of covered credit union applications. | 46% of covered credit union applications. |

As discussed above, the Bureau is unaware of any institution-level data of originations for nondepository institutions that would allow for precise estimates of when these institutions are expected to report. Consistent with assumptions made below to generate market-level estimates, the Bureau assumes that online lenders and merchant cash advance providers each originate 2,000 covered credit transactions per year and all other nondepository institutions originate 200 loans per year. These assumptions imply that all online lenders and merchant cash advance providers would be required to report in Tier 2 and all other nondepository institutions would be required to report in Tier 3.

*E. Methodology for Generating Cost Estimates*

The Bureau used its 2015 HMDA final rule estimates as the basis for its review of 1071 data collection and reporting tasks that would impose one-time and ongoing costs. In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA final rule, the Bureau used interviews with financial institutions to understand the processes of complying with a regulation that requires collecting and reporting credit application data and to generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data.[924] To analyze the potential impacts of this final rule, the Bureau adapted its methodology from its 2015 HMDA rulemaking activities to the small business lending market. The methodology described below to

estimate costs of the final rule is the same as the methodology used in the NPRM unless otherwise noted.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the final rule will be similar to those under the 2015 HMDA final rule. The similarities in data collection and reporting tasks allowed the Bureau to leverage its previous rulemaking experience in its analysis of the impacts of this final rule. Outreach to industry, as well as feedback during the SBREFA process and in NPRM comments, validated this approach in general. The Bureau received no comments objecting to its use of the 2015 HMDA final rule impacts estimates as the basis for its methodology for the final rule implementing section 1071.

However, there are significant differences between the home mortgage and small business lending markets. For example, small business lending is generally less automated, and has a wider variety of products, smaller volumes, and smaller credit amounts. The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences would change the tasks required for data collection, checking for accuracy, and reporting under the final rule.

During the 2015 HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) the reporting system used; (2) the degree of system integration; (3) the degree of system

automation; (4) the tools for geocoding; (5) the tools for performing completeness checks; (6) the tools for performing edits; and (7) the compliance program. The Bureau assumes that financial institutions will set up their section 1071 reporting in a manner similar to how HMDA reporting was implemented.[925] As discussed in more detail below, this approach was generally supported by the SBREFA process and NPRM commenters.

The Bureau found during the HMDA rulemaking process that, generally, the complexity of a financial institution's approach across key aspects or dimensions was consistent—that is, a financial institution generally would not use less complex approaches on some dimensions and more complex approaches on others.[926] This allowed the Bureau to classify financial institutions, including depository institutions and nondepository institutions, into three broad types according to the overall level of complexity of their compliance operations. Using very similar assumptions to those used in the 2015 HMDA rulemaking, the Bureau's estimation of the costs of this final rule also assumes that complexity across key aspects or dimensions of a financial institution's small business lending data collection and reporting system is consistent.

Table 5, below, summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of financial institutions based on level of complexity in compliance operations. Financial institutions that are Type A have the lowest level of complexity in

---

[923] To estimate applications, the Bureau assumes that depository institutions that originate 1,000 or more covered credit transactions per year receive 3 applications per origination and depository institutions that originate fewer than

1,000 covered credit transactions per year receive 2 applications per origination.

[924] *Home Mortgage Disclosure (Regulation C)*, 80 FR 66128, 66269 (Oct. 28, 2015).

[925] For example, the Bureau assumes that financial institutions will integrate their small

business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.

[926] 80 FR 66128, 66269 (Oct. 28, 2015).

AdminRecord-000347

compliance operations, while Type B and Type C have the middle and highest levels of complexity, respectively.

TABLE 5—TYPICAL APPROACH TO CERTAIN ASPECTS/DIMENSIONS OF COMPLIANCE COSTS BASED ON LEVEL OF COMPLEXITY FOR TYPES OF FINANCIAL INSTITUTIONS

| Aspect/dimension of compliance costs | Typical approach by low complexity financial institutions (Type A FIs) | Typical approach by medium complexity financial institutions (Type B FIs) | Typical approach by high complexity financial institutions (Type C FIs) |
|---|---|---|---|
| Data storage system used | Store data in Excel | Use LOS and SBL DMS | Use multiple LOS, FI's central SoR, SBL DMS. |
| Degree of system integration | (None) | Have forward integration (LOS to SBL DMS). | Have backward and forward integration. |
| Degree of system automation | Highly manual process for entering and checking data. | Use manual edit checks | Have high automation (only verifying edits manually). |
| Tools for geocoding | Use FFIEC tool (manual) | Use batch processing | Use batch processing with multiple sources. |
| Tools for completeness checks | Conduct manual checks and rely on CFPB quality/validity checks. | Use LOS, which includes completeness checks. | Use multiple stages of checks. |
| Tools for edits | Use CFPB edits only | Use CFPB and customized edits | Use CFPB and customized edits run multiple times. |
| Compliance program | Have a joint compliance and audit office. | Have basic internal and external accuracy audit. | Have in-depth accuracy and fair lending audit. |

**Note:** LOS is "Loan Origination System"; SoR is "System of Record"; SBL DMS is "Small Business Lending Data Management System." [927]

During the rulemaking process for the 2015 HMDA final rule, the Bureau found that the number of loan applications received was largely correlated with overall complexity of financial institutions' compliance operations.[928] The Bureau used this observation of financial institution practices under the previous HMDA rulemaking work, in addition to early outreach to financial institutions and data from Call Reports and publicly available data from the CDFI Fund, to generate assumptions about the annual number of small business lending applications for covered credit transactions processed by each type of financial institution. These assumptions adapt the volume assumptions from the mortgage lending context to address the fact that financial institutions typically process fewer small business credit applications than mortgage applications. The Bureau assumes that Type A FIs receive fewer than 300 applications per year, Type B FIs receive between 300 and 2,000 applications per year, and Type C FIs receive more than 2,000 applications per year. The Bureau assumes that, for Type A and B FIs, one out of two small business applications will result in an origination. Thus, the Bureau assumes that Type A FIs originate fewer than 150 covered credit transactions per year and Type B FIs originate between 150 and 999 covered credit transactions per year. The Bureau

assumes that Type C FIs originate one out of three small business applications and at least 1,000 covered credit transactions per year.[929] As described in the comment review below, these methodology assumptions were generally supported by the SBREFA process and comments on the NPRM.

The Bureau understands that costs vary by financial institution due to many factors, such as size, operational structure, and product complexity, and that this variance exists on a continuum that is impossible to fully represent. Due to data limitations, the Bureau is unable to capture many of the ways in which costs vary by institution, and therefore uses these representative financial institutions with the above assumptions for its analysis. In order to aggregate costs to a market level, the Bureau must map financial institutions onto its types using discrete volume categories.

For the hiring costs discussion in part IX.F.3.i and ongoing costs discussion in part IX.F.3.ii below, the Bureau discusses costs in the context of representative financial institutions for ease of exposition. The Bureau assumes that a representative Type A FI receives 100

small business credit applications per year, a representative Type B FI receives 400 small business credit applications per year, and a representative Type C FI receives 6,000 small business credit applications per year. The Bureau further assumes that a representative Type A FI originates 50 covered credit transactions per year,[930] a representative Type B FI originates 200 covered credit transactions per year, and a representative Type C FI originates 2,000 covered credit transactions per year.

1. Methodology for Estimating One-Time Costs of Implementation of the Final Rule

The one-time cost estimation methodology for the final rule described in this section is the same methodology that the Bureau used in the NPRM unless otherwise noted. The primary differences are the addition of hiring costs, in response to comments, and changes in the wages to reflect the most recent data.

The Bureau has identified the following nine categories of one-time costs that will likely be incurred by financial institutions to develop the infrastructure to collect and report data under the final rule:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications

---

[927] The Bureau expects the development of a market for small business data management systems, similar to HMDA management systems, that financial institutions will license or purchase from third parties.

[928] 80 FR 66128, 66270 (Oct. 28, 2015).

[929] The Bureau chose the 1:2 and 1:3 application to origination ratios based on two sources of information. First see Biz2Credit, *Small Business Loan Approval Rates Rebounded in May 2020: Biz2Credit Small Business Lending Index* (May 2020), *https://cdn.biz2credit.com/appfiles/ biz2credit/pdf/report-may-2020.pdf*, which shows that, in December of 2019, large banks approved small business loans at a rate of 27.5 percent, while small banks and credit unions had approval rates of 49.9 percent and 40.1 percent. Additionally, the Bureau's supervisory data supports a 33 percent approval rate as a conservative measure among these estimates for complex financial institutions (Type C FIs).

[930] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule.

AdminRecord-000348

5. Training staff and third parties (such as brokers)
6. Developing policies/procedures
7. Legal/compliance review
8. Post-implementation review of compliance policies and procedures
9. Hiring costs [931]

Pre-NPRM outreach with financial institutions has informed the Bureau's understanding of one-time costs. Financial institutions will likely have to spend time and resources understanding the final rule, developing the required policies and procedures for their employees to follow, and engaging a legal team to review their draft policies and procedures. Additionally, financial institutions may require new equipment, such as new computer systems that can store and check the required data points; new or revised application forms or related materials to collect any data required under the final rule that they do not currently collect, including minority-owned, women-owned, and LGBTQI+-owned business statuses and the ethnicity, race, and sex of applicants' principal owners, and to provide any related disclosures required by the rule. Some financial institutions mentioned that they may store, check, and report data using third-party providers such as Fiserv, Jack Henry, LaserPro, or Fidelity Information Systems, while others may use more manual methods of data storage, checking, and reporting using software applications such as Microsoft Excel. Financial institutions will also engage in a one-time training of all small business lending staff to ensure that employees understand the new policies and procedures. After all new policies and procedures have been implemented and systems/equipment deployed, financial institutions will likely undertake a final internal review to ensure that all the requirements of the final rule have been satisfied.

The Bureau presented one-time cost categories 1 through 8 in the SBREFA Outline and during the SBREFA process in 2020.[932] The small entity representatives generally confirmed that these eight categories listed above accurately capture the components of one-time costs. Small entity representatives did not mention hiring costs during the SBREFA process. The Bureau added the hiring costs category after receiving comments in response to the NPRM.

The Bureau also conducted a survey in 2020 regarding one-time implementation costs for section 1071 compliance targeted at financial institutions who extend small business credit.[933] The Bureau developed the survey instrument based on guidance from industry on the potential types of one-time costs institutions might incur if required to report under a rule implementing section 1071 and tested the survey instrument on a small set of financial institutions, incorporating their feedback prior to implementation. The Bureau worked with several major industry trade associations to recruit their members to respond to the survey. A total of 105 financial institutions responded to the survey.

Estimates from survey respondents form the basis of the Bureau's estimates for one-time costs in assessing the impact of this final rule. The survey was broadly designed to ask about the one-time costs of reporting data under a regime that only included mandatory data points, used a reporting structure similar to HMDA, used the Regulation B definition of an "application," and used the respondent's own internal small business definition. The survey was divided into three sections: Respondent Information, One-Time Costs, and the Cost of Credit to Small Entities.

In the Respondent Information section, the Bureau obtained basic information about the respondent, including information on the type of institution, its size, and its volume of small business lending. (The Bureau did not, however, obtain the actual name or other directly identifying information about respondents.) The One-Time Costs section of the survey measured the total hours, staff costs, and non-salary expenses associated with the different tasks comprising one-time costs. Using the reported costs of each task, the Bureau estimated the total one-time cost for each respondent. The Cost of Credit to Small Entities section dealt with the respondent's anticipated response to the increased compliance costs of being covered by a rule implementing section 1071 in order to understand the potential impacts of the rule on its small business lending activity, including any anticipated potential changes to underwriting standards, volume, prices, product mix, or market participation.

To estimate one-time costs, the Bureau needs information on a financial institution's one-time costs by category and number of originations. Of the 105 total respondents, 49 answered these questions. The Bureau refers to these respondents as the "cost estimation sample." Of these respondents, 42 (86 percent) self-reported that they were a depository institution (bank, saving association, or credit union). The remaining seven (14 percent) were nondepository institutions. Table 6 presents the self-reported asset size of the 42 depository institution respondents in the cost estimation sample.[934]

#### TABLE 6—ASSET SIZES OF DEPOSITORY INSTITUTIONS IN ONE-TIME COST ESTIMATION SAMPLE

| Asset category | Count | Percent of sample |
|---|---|---|
| Less than $250 million | 9 | 21.43 |
| $250 million to $500 million | 9 | 21.43 |
| $500 million to $1 billion | 7 | 16.67 |
| $1 billion to $10 billion | 8 | 19.05 |
| $10 billion to $500 billion | 9 | 21.43 |

For the purposes of estimating one-time costs, the Bureau distinguishes between depository institutions and nondepository institutions. The majority of nondepository institutions are not currently subject to any similar data reporting requirements, with the notable exception of nondepository CDFIs. The Bureau anticipates that covered financial institutions that are not currently subject to data reporting requirements will need to make more changes to their existing business operations in order to comply with the requirements of the final rule. This

---

[931] The Bureau added this category after the NPRM and did not ask about it in the survey.

[932] SBREFA Outline at 49–52.

[933] The One-Time Cost Survey was released on July 22, 2020; the response period closed on October 16, 2020. The OMB control number for this collection is 3170–0032.

[934] Nondepository institutions also reported assets. The Bureau separately reports asset category for depository institutions because asset sizes are not as comparable between depositories and nondepositories. The Bureau does not report asset sizes for nondepository respondents because there were too few respondents to report separately without risking re-identification of respondents.

expectation is confirmed by the higher estimated one-time costs for nondepository institutions relative to depository institutions from the survey and discussed in part IX.F.3.i.

The Bureau categorizes depository institution respondents in the cost estimation sample into four groups according to the respondents' self-reported total originations. The first group contains the two depository institutions that reported fewer than 25 originations; the Bureau assumes these institutions would not report under the final rule. The second group contains ten depository institutions that reported between 25 and 149 originations.[935] The Bureau categorizes these as Type A DIs (that is, a DI that is a Type A FI as defined above.) The third group contains the 19 depository institutions that reported between 150 and 999 originations. The Bureau categorizes these as Type B DIs. The final group contains the 11 depository institutions that reported 1,000 or more originations. The Bureau categorizes these as Type C DIs.

There are not enough nondepository institutions in the cost estimation sample to separate nondepository institutions into Types A, B, and C and obtain meaningful estimates. Instead, the Bureau is relying on the assumption that nondepository institutions (referred to as Non-DIs for purposes of this analysis) will incur the same one-time costs regardless of the complexity of existing business operations, CDFI status, or coverage by State commercial financing laws.

The Bureau estimated the one-time costs for each of the four categories of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the following methodology.

For each of the first eight categories of one-time costs, the Bureau asked financial institutions to estimate and report the total number of hours that junior, mid-level, and senior staff would spend on each task, along with any additional non-salary expenses. If a respondent did not provide estimates for any component (*i.e.*, staff hours or non-salary expenses) of any category, it is not counted as part of the cost estimation sample. If a respondent provided estimates for some components but did not provide an estimate for a particular component (*e.g.*, non-salary expenses for preparation/planning) then the Bureau

assumed that the respondent estimated zero for that component.

The Bureau asked survey respondents to report the average hourly wage for junior, mid-level, and senior/executive staff involved in the one-time cost categories. However, for the purposes of estimating one-time costs, the Bureau assumes a constant wage across financial institutions for each level of staff. The Bureau has updated the wages for the final rule from the wages used in the NPRM. For junior staff, the Bureau uses $15.64, the 10th percentile hourly wage estimate for "loan officers" according to the 2021 Occupational Employment Statistics compiled by the Bureau of Labor Statistics.[936] For mid-level staff, the Bureau uses $38.74, the estimated mean hourly wage estimate for "loan officers." For senior staff, the Bureau used $66.50, the 90th percentile hourly wage estimate for "loan officers." To account for non-monetary compensation, the Bureau also scaled these hourly wages up by 43 percent.[937] The Bureau assumes a total hourly compensation of $22.37 for junior staff, as compared to $28.76, the mean of the junior wages reported by respondents to the survey. The Bureau assumes a total hourly compensation of $55.40 for mid-level staff, as compared to $48.94, the mean of the mid-level wages reported by respondents. The Bureau assumes a total hourly compensation of $95.10, as compared to $90.19, the mean of the senior/executive wages reported by respondents.

For each respondent in the cost estimation sample, the Bureau calculates the cost of each one-time cost category as the sum of the junior wage multiplied by the reported junior hours, the mid-level wage multiplied by the reported mid-level hours, and the senior wage multiplied by the reported senior-level hours and the reported non-salary expenses. The total cost of the first eight categories that the Bureau calculates for each respondent is the sum of the costs across all eight categories.

After calculating the total costs of the first eight categories for each respondent, the Bureau identifies

outliers within the four groups of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the interquartile range method, a standard outlier identification method. For each group of financial institutions, an observation is considered an outlier if the estimated total cost is greater than $1.5*(P_{75} - P_{25}) + P_{75}$ or less than $P_{25} - 1.5*(P_{75} - P_{25})$ where $P_{75}$ and $P_{25}$ are the 75th and 25th percentiles, respectively, of total costs within that group. Using this method, the Bureau identified one outlier in each Type A DI, Type B DI, and Type C DI group and no outliers in the Non-DI group.

In addition to the total estimated one-time costs, the Bureau is interested in the hours, non-salary expenses, and total costs associated with each of the different one-time cost categories. For each group, the Bureau estimates each component of one-time costs by taking the mean of the estimated component within the group, after excluding outliers. For example, the estimated number of junior hours required by Type A DIs to update computer systems is the mean number of junior hours reported by the nine Type A DIs that were in the cost estimation sample, excluding one outlier. The Bureau estimated the cost associated with each category as the sum of the junior wage multiplied by the estimated junior hours, the mid-level wage multiplied by the estimated mid-level hours, and the senior-level wage multiplied by the estimated senior hours, and the estimated non-salary expenses.

The Bureau did not include one-time hiring costs in the estimates for the NPRM. In response to comments, the Bureau estimates hiring costs for the final rule estimates. To estimate hiring costs, the Bureau assumes that, prior to implementing the final rule, current staff at a covered financial institution will not have extra capacity to take on new tasks. This assumption implies that each institution will need to hire at least one new employee. The Bureau anticipates that institutions will rearrange tasks across new and existing employees so that the new employees alone will not conduct all work associated with the final rule.

The Bureau assumes that a covered financial institution will need to hire enough full-time equivalent workers (FTEs) to cover the estimated number of staff hours necessary to comply with the final rule on an annual, ongoing basis. In part IX.E.2 below, the Bureau describes how it estimates the ongoing costs to comply with the rule, including the number of hours of staff time an institution needs per application. The Bureau assumes that an FTE will work

---

[935] The Bureau acknowledges that it uses information collected from institutions that will not be covered by the final rule to estimate the costs of implementing the rule. The Bureau uses these observations to maintain a large enough sample size.

[936] *See* U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Employment and Wage Statistics* (May 2021), *https://www.bls.gov/oes/current/oes132072.htm.*

[937] The June 2022 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, about 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ($((100/70) - 1) * 100 = 43$ percent). *See* U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Employer Costs for Employee Compensation* (June 2022), *https://www.bls.gov/news.release/archives/eci_07292022.pdf.*

AdminRecord-000350

about 2,080 hours each year (40 hours per week × 52 weeks = 2,080). The Bureau calculates that the total number of FTEs that a covered financial institution will need to hire as the number of hours per application multiplied by the estimated number of applications received per year divided by 2,080, rounded up to the next full FTE. For example, if an institution receives 500 applications per year and spends one hour on each application, it will need to hire one FTE ((1 * 500)/2080 = 0.24, which is round up to the next full FTE, *i.e.,* 1). In part IX.F.3.i, the Bureau also confirms that the estimated additional staff can cover the estimated staff hours required for implementing other one-time changes.

The Bureau calculates the hiring costs using the estimated cost-per-hire of $4,425, estimated by the Society for Human Resource Management.[938] This estimated cost includes advertising fees, recruiter pay and benefits, and employee referrals, among other categories. For each covered financial institution, the estimated hiring cost is $4,425 multiplied by the estimated new FTEs. The estimated total one-time costs are the sum of the estimated hiring costs and the other one-time costs for that institution discussed above.

*Comments on the one-time cost methodology of the proposed rulemaking.* In the NPRM, the Bureau sought comment on the methods used for estimating one-time costs of implementation. Many industry commenters provided information on the categories of costs that they expect to incur to develop the infrastructure to collect and report data under the proposed rule. In general, the costs these commenters discussed fall in the original eight one-time cost categories listed. Many of these commenters responded to the NPRM that they would incur costs associated with hiring new staff. The Bureau's one-time and ongoing cost methodologies account for the costs associated with paying staff to implement the final rule. The Bureau agrees, however, that the one-time cost methodology outlined in the NPRM could have more fulsomely accounted for the initial cost of hiring new staff to perform these tasks. As described above, the Bureau added hiring costs to one-time cost estimates in response to these comments. Except for hiring costs, commenters did not provide any additional one-time cost categories.

Two trade associations asserted that the Bureau's estimates of one-time costs are too low because the estimates are based on insufficient data for nondepository lenders and, in particular, merchant cash advance providers. The Bureau acknowledges that the scarcity of data for nondepositories pose a challenge when estimating the costs, benefits, and impacts of the final rule. This is particularly true for nondepositories that are not currently subject to a data reporting regime. Through outreach efforts with nondepository institutions and trade associations, the SBREFA process, and the one-time cost survey, the Bureau obtained information about the costs for nondepositories of complying with the final rule. Throughout the section 1022 discussion in the proposed rule, the Bureau also solicited feedback about data and methodologies that would enable it to more precisely estimate the costs of the proposed. The Bureau has reviewed these comments, considered the information provided by the commenters, and adjusted the methodology as described above.

2. Methodology for Estimating Ongoing Costs of Implementation of the Final Rule

The Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs. Table 7 presents the full list of 15 activities. Activities 1 through 3 can broadly be described as data collection activities: these tasks are required to intake data and transfer it to the financial institution's small business data entry system. Activities 4 through 10 are related to reporting and resubmission: these tasks are required to collect required data, conduct internal checks, and report data consistent with the final rule. Activities 11 through 13 are related to compliance and internal audits: employee training, and internal and external auditing procedures required to ensure data consistency and reporting in compliance with the rule. Finally, activities 14 and 15 are related to small business lending examinations by regulators: these tasks will be undertaken to prepare for and assist during regulatory compliance examinations. For the sake of this analysis, the Bureau assumes that all covered financial institutions will be subject to regulatory compliance examinations and thus incur costs related to activities 14 and 15.

TABLE 7—1071 DATA COLLECTION AND REPORTING ACTIVITIES IMPOSING ONGOING COSTS

| Number | Activity |
|---|---|
| 1 | Transcribing data. |
| 2 | Resolving reportability questions. |
| 3 | Transferring to Data Entry System, Loan Origination System, or other data storage system. |
| 4 | Geocoding data. |
| 5 | Standard annual edit and internal checks. |
| 6 | Researching questions. |
| 7 | Resolving question responses. |
| 8 | Checking post-submission edits. |
| 9 | Filing post-submission documents. |
| 10 | Small business data reporting/geocoding software. |
| 11 | Training. |
| 12 | Internal audit. |
| 13 | External audit. |
| 14 | Exam preparation. |
| 15 | Exam assistance. |

Table 8 provides an example of how the Bureau calculates ongoing compliance costs associated with each compliance task. The table shows the calculation for each activity and notes whether the task would be a ''variable

---

[938] *See* Soc'y for Hum. Res. Mgmt., *SHRM Customized Talent Acquisition Benchmarking Report,* at 11 (2017), *https://www.shrm.org/ ResourcesAndTools/business-solutions/Documents/ Talent-Acquisition-Report-All-Industries-All-FTEs.pdf.*

cost," which would depend on the number of applications the institution receives, or a "fixed cost" that does not depend on the number of applications.

Table 8 shows these calculations for a Type A FI, or the institution with the least amount of complexity. Table 9 below summarizes the activities whose

calculation differs by institution complexity and shows the calculations for Type B FIs and Type C FIs (where they differ from those for a Type A FI).

TABLE 8—ONGOING COMPLIANCE COST CALCULATIONS FOR A TYPE A FI

| Number | Activity | Calculation | Type[939] |
|---|---|---|---|
| 1 | Transcribing data | Hourly compensation × hours per app. × applications | Variable. |
| 2 | Resolving reportability questions | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 3 | Transfer to Data Entry System | Hourly compensation × hours per app. × applications | Variable. |
| 4 | Complete geocoding data | Hourly compensation × hours per app. × applications | Variable. |
| 5 | Standard annual edit and internal checks | Hourly compensation × hours spent on edits and checks | Fixed. |
| 6 | Researching questions | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 7 | Resolving question responses | Hourly compensation × hours per app. with question × applications with questions | Variable. |
| 8 | Checking post-submission edits | Hourly compensation × hours checking post-submission edits per application | Variable. |
| 9 | Filing post-submission documents | Hourly compensation × hours filing post-submission docs | Fixed. |
| 10 | Small business data reporting/geocoding software. | Uses free geocoding software | Fixed. |
| 11 | Training | Hourly compensation × hours of training per year × number of loan officers | Fixed. |
| 12 | Internal audit | No internal audit conducted by financial institution staff | Fixed. |
| 13 | External audit | One external audit per year | Fixed. |
| 14 | Exam preparation | Hourly compensation × hours spent on examination preparation | Fixed. |
| 15 | Exam assistance | Hourly compensation × hours spent on examination assistance | Fixed. |

Many of the activities in Table 8 require time spent by loan officers and other financial institution employees. To account for time costs, the calculation uses the hourly compensation of a loan officer multiplied by the amount of time required for the activity. The Bureau uses a mean hourly wage of $38.74 for loan officers, based on data from the Bureau of Labor Statistics.[940] To account for non-monetary compensation, the Bureau scales this hourly wage by 43 percent to arrive at a total hourly compensation of $55.40 for use in these calculations.[941] The Bureau uses assumptions from its 2015 HMDA final rule analysis, updated to reflect differences between mortgage lending and small business lending, to estimate time spent on "ongoing tasks."[942] As an example of a time

calculation, the Bureau estimates that transcribing the required data points would require approximately 11 minutes per application for a Type A FI. The calculation multiplied the number of minutes by the number of applications and the hourly compensation to arrive at the total cost, on an annual basis, of transcribing data. As another example, the Bureau estimates that ongoing training for loan officers to comply with a financial institution's 1071 policies and procedures would take about two hours per loan officer per year. The cost calculation multiplies the number of hours by the number of loan officers and by the hourly compensation.

To arrive at the amount of time required per application for each of the 15 tasks covered financial institutions would conduct to collect, check, and report 1071 data, the Bureau begins with the assumptions made for each task for the 35 data points under the 2015 HMDA final rule and then adjusts these required times relative to the number of data points required under the final rule. The final rule requires covered financial institutions to collect 20 data points for each covered application. Several of these data points have multiple components. For example, the credit type data point has three subcomponents: the product type, the type of guarantee, and the term. The data points for pricing information and the ethnicity, race, and sex of principal owners also have multiple subcomponents.

Some activity costs in Table 8 depend on the number of applications. It is important to differentiate between these

variable costs and fixed costs because the type of cost impacts whether and to what extent covered institutions might be expected to pass on their costs to small business loan applicants in the form of higher interest rates or fees (discussed in more detail in part IX.F.4 below). Data collection, reporting, and submission activities such as geocoding data, standard annual edits and internal checks, researching questions, and resolving question responses are variable costs. All other activities are fixed cost because they do not depend on the overall number of applications being processed. An example of a fixed cost calculation is exam preparation, where the hourly compensation is multiplied by the number of total hours required by loan officers to prepare for 1071-related compliance examinations.

Table 9 shows where and how the Bureau assumes Type B FIs and Type C FIs differ from Type A FIs in its ongoing cost methodology. Type B FIs and Type C FIs use more automated procedures, which result in different cost calculations. For example, for Type B FIs and Type C FIs, transferring data to the data entry system and geocoding applications are done automatically by business application data management software licensed annually by the financial institution. The relevant address is submitted for geocoding via batch processing, rather than done manually for each application. The additional ongoing geocoding costs reflect the time spent by loan officers on "problem" applications—that is, a percentage of overall applications that the geocoding software misses—rather than time spent on all applications. However, Type B FIs and Type C FIs have the additional ongoing cost of a

---

[939] In this table, the term "variable" means the compliance cost depends on the number of applications. The term "fixed" means the compliance cost does not depend on the number of applications (even if there are other factors upon which it may vary).

[940] These data reflect the mean hourly wage for "loan officers" according to the 2021 Occupational Employment Statistics compiled by the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Employment and Wages* (May 2021), *https://www.bls.gov/oes/current/oes132072.htm.*

[941] The June 2022 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, about 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ((100/70) − 1) * 100 = 43 percent). U.S. Bureau of Labor Stat., U.S. Dep't of Labor, *Employer Costs for Employee Compensation* (June 2022), *https://www.bls.gov/news.release/archives/eci_07292022.pdf.*

[942] *Home Mortgage Disclosure (Regulation C),* 80 FR 66128 (Oct. 28, 2015). Some differences, for example, are reflected in the number of data points for applications, the number of data points per

application, and the number of loan officers for the representative institutions.

**35502**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

subscription to a geocoding software or service as well as a data management software that represents an annual fixed cost of reporting 1071 data. This is an additional ongoing cost that less complex Type A FIs (that are covered financial institutions) will not incur. The Bureau expects that Type A FIs will use free geocoding software available from the FFIEC or the Bureau, which may include a new batch function that could be developed by either the FFIEC or the Bureau.

Additionally, audit procedures differ between the three representative institution types. The Bureau expects a Type A FI would not conduct an internal audit but would pay for an annual external audit. A Type B FI would be expected to conduct a simple internal audit for data checks and also pay for an external audit on an annual basis. Type C FIs would have a sophisticated internal audit process in lieu of an external audit.

### TABLE 9—DIFFERENCES IN ONGOING COST CALCULATIONS FOR TYPE B FIS AND TYPE C FIS VERSUS TYPE A FIS

| Number | Activity | Difference for a Type B FI | Difference for a Type C FI |
|---|---|---|---|
| 3 ............ | Transfer to Data Entry System .......... | No employee time cost. Automatically transferred by data management software purchased/licensed. | No employee time cost. Automatically transferred by data management software purchased/licensed. |
| 4 ............ | Complete geocoding data ................. | Cost of time per application unable to be geocoded by software. | Few applications that require manual attention. Completed by third-party software vendor. |
| 10 .......... | Small business data reporting/ geocoding software. | Uses geocoding software and/or data management software that requires annual subscription. | Uses geocoding software and/or data management software that requires annual subscription. |
| 12 .......... | Internal Audit ..................................... | Hourly compensation × hours spent in internal audit ..... | Hourly compensation × hours spent on internal audit. |
| 13 .......... | External Audit ..................................... | Yearly fixed expense on external audit .......................... | Only an extensive internal audit and no expenses on external audits. |

Table 10 below shows major assumptions that the Bureau makes for each activity for each type of financial institution. Table 10 provides the total number of hours the Bureau assumes are required for each task that requires labor.[943] For example, the Bureau assumes that transcribing data for 100 applications will require 19 hours of labor. The table also shows the assumed fixed cost of software and audits, as well as areas where the Bureau assumes there will be cost savings due to technology. In several cases, the activity does not apply to financial institutions of a certain type, and are therefore not displayed.

### TABLE 10—MAJOR ASSUMPTIONS FOR THE REPRESENTATIVE TYPE A FIS, TYPE B FIS, AND TYPE C FIS [944]

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 1 ............ | Transcribing data ................................. | 19 hours total ................................. | 38 hours total ................................. | 571 hours total. |
| 2 ............ | Resolving reportability questions ...... | 11 hours total ................................. | 23 hours total ................................. | 34 hours total. |
| 3 ............ | Transfer to 1071 data management software. | 19 hours total ................................. | N/A ................................................. | N/A. |
| 4 ............ | Complete geocoding data ................. | 7 hours total; reduction in time cost relative to HMDA for software with batch processing. | 10 hours total (0.5 hours per "problem" loan × 5% of loans that are "problem"). | N/A. |
| 5 ............ | Standard annual edit and internal checks. | 18 hours total; reduction for online submission platform. | 357 hours total; reduction for online submission platform. | 741 hours total; reduction for online submission platform. |
| 6 ............ | Researching questions ....................... | 6 hours total ................................... | 11 hours total ................................. | 17 hours total. |
| 7 ............ | Resolving question responses .......... | 1 hour total ..................................... | 1 hour total ..................................... | 1 hour total. |
| 8 ............ | Checking post-submission edits ....... | 1 hour total ..................................... | 5 hours total ................................... | 18 hours total. |
| 9 ............ | Filing post-submission documents ... | <1 hour total ................................... | <1 hour total ................................... | <1 hour total. |
| 10 .......... | 1071 data management system/ geocoding software. | N/A ................................................. | $8,000 .......................................... | $13,271. |
| 11 .......... | Training .............................................. | 24 hours total ................................. | 120 hours total ............................... | 800 hours total. |
| 12 .......... | Internal audit ..................................... | N/A ................................................. | 8 hours total ................................... | 2,304 hours total. |
| 13 .......... | External audit .................................... | $3,500 ............................................ | $5,000 ............................................ | N/A. |
| 14 .......... | Exam preparation .............................. | <1 hour total ................................... | 80 hours total ................................. | 480 hours total. |
| 15 .......... | Exam assistance ............................... | 2 hours total ................................... | 12 hours total ................................. | 80 hours total. |

*Comments on the ongoing cost methodology of the proposed rulemaking.* In the NPRM, the Bureau sought comment on the Bureau's proposed methods to estimate the ongoing costs of the small business lending rule. Many industry commenters described categories of ongoing costs that fell within the categories of ongoing cost activities set forth in the NPRM. Commenters, for example, described needing to transcribe data from the application, train employees, conduct external audits, or prepare for exams. Given the volume of comments affirming these existing categories, the Bureau has retained those existing categories of ongoing cost activities.

Some commenters suggested other categories of ongoing costs not considered by the Bureau in the NPRM. A credit union and a trade association suggested that more time was needed per application to explain to customers the new collection requirements; a bank said more time was needed to explain the requirements to collect ethnicity, race, and sex information. The Bureau believes that its one-time costs categories of "developing forms and applications" and "developing policies and procedures" already account for these types of costs and any remaining ongoing cost of explaining collection requirements will be minimal. The commenters also did not provide specific estimates for these categories of ongoing costs.

A joint trade association letter described how the rule has the potential to create a new ongoing cost of retaining

---

[943] Compared to the assumptions in the Bureau's proposal, this table includes additional time assumptions due to the collection of the business's LGBTQI+-owned status.

[944] The representative Type A, Type B, and Type C FIs are assumed to receive, respectively, 100, 400 and 6,000 applications.

AdminRecord-000353

the records. These comments focused on the information technology infrastructure associated with the retention of records. The Bureau believes that these costs are best described as one-time costs and are captured in the "updating computer systems" category of its one-time costs estimation. The Bureau thus has not included these as additional categories of ongoing costs.

*Comments on one-time and ongoing cost estimates based on levels of financial institution complexity.* The Bureau received several comments related to its approach to defining complexity and using complexity categories in its one-time and ongoing cost estimation. Several smaller banks and credit unions explained that many of their processes related to collecting, checking, and reporting data to the Bureau under the proposed rule would largely be manual. The Bureau believes that its Type A institution category already takes into account the various manual processes described by these commenters and decided against adding additional categories of complexity.

3. Methodology for Generating Market-Level Estimates of One-Time and Ongoing Costs

To generate market-level cost estimates, the Bureau relies on the estimates of the volume of small business lending originations described in part IX.D above. As with institutional coverage, the Bureau separates market-level cost estimates into estimates for depository institutions and for nondepository institutions. The methodology described below for the final rule is the same methodology that the Bureau used in the NPRM.

For depository institutions, the Bureau estimates which institutions of those that existed at the end of 2019 would likely be covered or not covered by the final rule. For this analysis, the Bureau uses 2019 to represent the first year of coverage. An institution would be required to report data on applications received in 2019 if it originated at least 100 covered originations in each of the preceding two years (*i.e.,* 2017 and 2018). If two depository institutions merged between the end of 2017 and the end of 2019, the Bureau assumes that those institutions would report as one entity. The Bureau then categorizes each institution as a Type A DI, Type B DI, or Type C DI based on its originations in 2019. Depository institutions with 0 to 149 covered originations in 2019 are categorized as Type A. Depository institutions with 150 to 999 covered originations are categorized as Type B.

Depository institutions with 1,000 or more covered originations are categorized as Type C. For each depository institution, the Bureau assigns the appropriate estimated one-time cost (including hiring cost as a function of estimated applications), ongoing fixed cost, ongoing variable cost per application, and applications per origination estimates associated with its institution type. The estimated number of annual applications for each institution is the estimated number of originations multiplied by the assumed number of applications per origination for that institution type. The annual ongoing cost for each institution is the ongoing fixed cost plus the ongoing variable cost per application multiplied by the estimated number of applications. The one-time hiring cost for each institution is the estimated number of applications multiplied by the annual staff hours per application divided by 2,080, rounded up to the next full FTE, multiplied by the cost-per-hire.

To generate market-level estimates, the Bureau first calculates the estimated one-time costs, including hiring costs, and annual ongoing costs for each depository institution covered by the rule based on the estimated number of originations for that institution in 2019. The Bureau then sums these costs over the covered depository institutions to find market-level statistics of total costs. As with coverage estimates, the Bureau presents a range for market-level estimates. The range reflects the uncertainty associated with the estimate of costs for banks and savings associations below the CRA reporting threshold. The Bureau has documented how it calculates these ranges in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rulemaking.*[945]

The Bureau is unaware of institution-level data on originations by nondepository institutions that are comprehensive enough to estimate costs using the same method as that for depository institutions. Therefore, to generate market-level estimates for nondepository institutions, the Bureau relies on the estimates discussed above and several key assumptions. The Bureau assumes that online lenders and merchant cash advance providers are Type C FIs because they generally have more automated systems and originate more loans. The Bureau assumes that

[945] *See https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodology-institutional-coverage-market-level-cost-estimates-small-business-lending-rulemaking/.*

the remaining nondepository institutions are Type B FIs. The Bureau assumes that each nondepository receives the same number of applications as the representative institution for each type, as described above. Hence, the Bureau assumes that online lenders and merchant cash advance providers each receive 6,000 applications per year and all other nondepository institutions receive 400 applications per year. As explained above, the Bureau also assumes that all nondepository institutions have the same one-time costs.

*F. Potential Benefits and Costs to Covered Financial Institutions and Small Businesses*

The benefits of the final rule to covered financial institutions and small businesses described in this section are largely the same as the benefits discussed in the NPRM. The discussions have been updated to reflect policy differences between the NPRM and final rule.

1. Benefits to Small Businesses

The final rule will benefit small businesses by collecting data that further the two statutory purposes of section 1071. Those purposes are to facilitate the enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. Some of the benefits to small businesses discussed below stem from the public release of the data collected under the rule. As discussed in more detail in part VIII.B.1, the Bureau intends to exercise its discretion under ECOA section 704B(e)(4) to delete or modify data collected under section 1071 which are or will be available to the public where it determines that such deletion or modification appropriately protects privacy interests. The discussion below considers the benefits of releasing unmodified data, but the Bureau acknowledges that the benefits derived from public disclosure may be lower if modifications or deletions are made.

Data collected and reported under the final rule will be the largest and most comprehensive dataset in the United States on credit availability for small businesses. These data will provide important insight into lending patterns in the small business lending market. Visibility into those patterns should provide important benefits for facilitating fair lending enforcement and enabling identification of community development needs and opportunities.

The data could lead to a more efficient use of government resources in enforcing fair lending laws through more efficient prioritization of fair lending examinations and investigations. The public nature of the dataset will allow for members of the public to review the dataset (subject to modification and deletion decisions by the Bureau) for possible violations of antidiscrimination statutes. The increased transparency will benefit women-owned, minority-owned, and LGBTQI+-owned small businesses directly, in the form of remediation in the event that lenders ultimately are found to have violated fair lending laws, and indirectly, with increased access to credit resulting from the increased transparency as to the lending practices of financial institutions.

Important to the fair lending benefit of the small business lending dataset is the action taken data point. Existing datasets that collect transaction-level data only contain data on originated small business loans. Application-level data, including the action taken data point, will allow users to construct approval or denial rates, for example, for particular financial institutions. Such analyses could indicate whether, for example, women-owned, minority-owned, or LGBTQI+-owned small businesses are being discouraged or denied credit at higher rates than other small businesses, which would warrant further exploration.

Also important are several data fields on the pricing of covered credit transactions that are originated or approved but not accepted. Data users will be able to examine, for example, whether women-owned, minority-owned, or LGBTQI+-owned small businesses are charged higher interest rates, or face higher origination charges or initial annual charges than similarly situated businesses that are not women-owned, minority-owned, or LGBTQI+-owned. The final rule also requires information on prepayment penalties, which can be an important aspect of the total costs of credit for small business owners.[946] Users will be able to examine whether women-owned, minority-owned, or LGBTQI+-owned small businesses are more likely to face prepayment penalties on extended credit.

Several data points included in the final rule will contribute to more accurate fair lending analyses by allowing users to compare credit products with similar characteristics. For example, differences in the risk of extending credit likely lead to differences in approval rates and prices for covered credit transactions based on credit amount applied for and approved, all three aspects of credit type (type of credit product, types of guarantees, and loan term), and credit purpose. Many creditors also consider characteristics about the small business, such as industry, gross annual revenue, or time in business, during their underwriting or pricing processes. Supply and demand for small business credit also varies over time and by location, so the inclusion of census tract, application date, and action taken date could lead to more accurate analyses. More accurate screening for fair lending risk will, for example, reduce the false positive rate observed during fair lending prioritization and increase the efficiency of fair lending reviews.

Communities may use these data to identify gaps in access to credit for small businesses. Identifying those gaps can fuel community development, in partnership with creditors and governmental entities through the development of targeted lending programs, loan funds, small business incubators, and other community-driven initiatives to support small businesses.

Creditors will likely use the data to understand small business lending market conditions more effectively and at a more granular level than is possible with existing data sources, such as Call Reports, data from public lending programs, or privately purchased data. Data collected under the final rule, combined with the institution's existing information on the small business lending market, can help creditors identify potentially profitable opportunities to extend credit. For example, creditors will be able to use census tract information to find areas of high credit demand into which they could consider expanding and other business opportunities for the creditor.

Governmental entities will likely use the data to develop solutions that achieve policy objectives. For example, loan guarantees provided by the SBA's 7(a) and 504 programs are designed to increase the availability of business credit for businesses that otherwise have difficulty accessing credit. Governmental entities will be able to use the comprehensive data on applications for covered credit transactions collected under the final rule to identify additional opportunities to create new—or tailor existing—programs to advance their small business lending policy objectives.

Additionally, the data could help facilitate emergency governmental interventions such as disaster relief.

The data collected under the final rule will be the most extensive data on credit access for women-owned, minority-owned, and LGBTQI+-owned small businesses, and such information will help various data users in understanding the needs and opportunities of such businesses. For example, governmental entities often create programs, such as those that reserve government contracts or those that provide grants, that specifically target women-owned and minority-owned businesses. Governmental entities could use data collected under the final rule to alter existing programs or create new ones to meet the needs of these business owners. Private lenders could also use the data to find untapped markets of credit demand from women-owned, minority-owned, and LGBTQI+-owned small businesses.

As one of the premier data sources on the small business credit market, data collected under the final rule will also facilitate rigorous research by academics and advocates. HMDA data, which are similar in many ways to the data that will be collected under the final rule, have been analyzed in many scholarly publications. The data collected under section 1071 will provide public- and private-sector academics and other researchers a clearer window into potential discrimination in the small business credit market, as well as a better understanding of small business credit market trends and dynamics. As in the case of HMDA, data collected under the final rule will be more broadly used to understand how business owners make borrowing decisions, respond to higher prices, and respond to risk.[947]

---

[946] California, for example, to include prepayment policies as a required component of pricing disclosures in commercial financing (see Cal. S.B. 1235 (Sept. 30, 2018), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235).

[947] For examples of how HMDA data has facilitated research on the mortgage market, see, e.g., CFPB, Data Point: Asian American and Pacific Islanders in the Mortgage Market (July 2021), https://files.consumerfinance.gov/f/documents/cfpb_aapi-mortgage-market_report_2021-07.pdf; CFPB, Manufactured Housing Finance: New Insights from the Home Mortgage Disclosure Act Data (May 2021), https://files.consumerfinance.gov/f/documents/cfpb_manufactured-housing-finance-new-insights-hmda_report_2021-05.pdf; Neil Bhutta & Benjamin J. Keys, Moral Hazard during the Housing Boom: Evidence from Private Mortgage Insurance, 35(2) Review of Fin. Studies (2021), https://academic.oup.com/rfs/advance-article/doi/10.1093/rfs/hhab060/6279755; Sumit Agarwal et al., The Effectiveness of Mandatory Mortgage Counseling: Can One Dissuade Borrowers from Choosing Risky Mortgages? (Nat'l Bureau of Econ. Research, Working Paper No. 19920, 2014), https://www.nber.org/system/files/working_papers/w19920/w19920.pdf; Alexei Alexandrov & Sergei Koulayev, No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information (CFPB, Off. of Research Working Paper

The final rule's data points will provide the above benefits in several ways. For example, the action taken and pricing information data points will allow various entities to monitor the tightness of the small business credit market and identify areas where there are high denial rates for small business credit or where it is provided only at high cost, especially to women-owned, minority-owned, or LGBTQI+-owned small businesses. Conversely, the data may also be used to identify areas of business opportunity for creditors or help assess the characteristics of successful business lending. Data on census tract, NAICS code, gross annual revenue, and number of workers will provide insight into the availability of small business credit by geography, industry, and business size. Credit type and credit purpose will provide more information on how women-owned, minority-owned, and LGBTQI+-owned small businesses use credit and whether their use differs from that of other small businesses. Time in business information will allow data users to understand the credit needs of young small businesses, and specifically young women-owned, minority-owned, and LGBTQI+-owned small businesses. Recent research has shown that women-owned and minority-owned businesses face different financing challenges early in the business lifecycle than other firms, primarily driven by less access to external financing.[948]

As creditors, communities, and governmental entities use these data to identify business opportunities, gaps in existing supports and capital access for small businesses, and more targeted policy interventions to support small businesses, small businesses will benefit from increased access to credit. Small businesses will also benefit from credit offerings more closely tailored to their needs as the data are used by creditors and others to develop more targeted credit products.

As described above, the Bureau believes that setting a threshold for coverage at 100 originated loans in each of the preceding two calendar years provides substantial coverage of the small business credit market. While the Bureau could theoretically have collected even more data pursuant to the final rule if it retained the 25-loan threshold proposed in the NPRM, the Bureau is not adopting this threshold in

order to ensure that financial institutions with the lowest volume of small business lending experience no pressure to reduce their small business lending activity in order to avoid the fixed costs of coming into compliance with this final rule. While some commenters expressed concern that institutions with a low volume of small business lending might reduce their lending in order to stay under the threshold, the Bureau cannot quantify this risk, particularly given the paucity of data on small business lending.

*Comments on the Bureau's estimation of the benefits to small businesses.* The Bureau sought comment on its analysis of potential benefits to small businesses as set forth in the NPRM. Many community groups and several business owners agreed that the rule would support fair lending. A small business, a CDFI lender, and some community groups said collecting data will improve visibility and understanding of small businesses, particularly those that are minority- and women-owned. The CDFI lender and a joint letter from community groups, community oriented lenders, and business advocacy groups stated that the data from this rule could be used to identify which products and business models best meet the needs of underserved entrepreneurs. One commenter pointed to agricultural products as a particular sector that would benefit from increased transparency afforded by the rule, particularly regarding the status of minority- and women-owned small businesses. Two community groups and a business advocacy group pointed to how data collected on ethnicity and race under HMDA preceded an increase in lending to minority borrowers, suggesting that a similar pattern may emerge in the small business lending market after the data goes into effect. Similarly, a few commenters pointed to how data from the Paycheck Protection Program and studies and surveys surrounding the program allowed researchers, regulators, financial institutions, and others to identify disparate lending patterns on the basis of ethnicity and race.

An individual commenter said collecting the data will help improve the collective understanding of small business lending and its interaction with regulations, and noted that other countries, such as Norway, already collect small business lending data on a Federal level. An individual commenter and two community groups suggested that the data could reveal patterns of disparities that are already well-known through lived experiences within their respective communities, particularly

Black communities and farming and agricultural communities. A joint letter from community and business advocacy groups pointed to how disaggregation of those identified as Asian has revealed wide variances in income and lending patterns within these diverse communities in the mortgage lending market, suggesting similar disaggregation of race data in the final rule would improve the understanding of these diverse communities in the small business lending market.

A few commenters noted potential positive spillover effects of the rule. One community group noted positive interaction effects between fair lending to small businesses and fair housing, as more people might purchase housing close to where local businesses flourish. An individual and a joint letter from community and business advocacy groups noted that investing in small businesses, particularly in historically underfunded neighborhoods, could provide pathways to economic opportunities for members of marginalized groups and even alleviate wealth gaps based on ethnicity and race. Another commenter similarly noted that the growth of small businesses could reduce unemployment, housing insecurity, and poverty in the surrounding community.

Finally, a few minority small business owners predicted that they would benefit if the rule improved fair lending. These commenters identified the disadvantages minority-owned small businesses face when fair lending is not enforced, including business closure. One of these commenters, along with some community groups, pointed to studies that suggested fair access to credit, such as loan modifications, during the pandemic could have prevented the closure of minority-owned firms, added millions in revenue to the U.S. economy, and created millions of jobs.

A number of commenters described ways in which the final rule would provide benefits consistent with the statutory purposes of section 1071, including the establishment of a comprehensive dataset of small business lending, and the collection of detailed data points that will allow for more accurate analyses of underwriting and pricing patterns. These data, in turn, will permit for better understanding of the supply and demand of credit, and financial institutions' treatment of small business applicants and borrowers, including those that are owned by women and minorities. Commenters corroborated other benefits identified by the Bureau, such as positive spillover effects to fair housing and the local

No. 2017–01, 2018), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2948491.*

[948] *See, e.g.,* JPMorgan Chase & Co. Inst., *Small business ownership and liquid wealth* (Mar. 2021), *https://www.jpmorganchase.com/institute/research/small-business/small-business-ownership-and-liquid-wealth-report.*

economy surrounding small businesses. Data from the final rule will help researchers (including, but not limited to, those in the government, private sector, and academia) observe and quantify these benefits, just as researchers have used data from HMDA and the Paycheck Protection Program to identify areas of potential fair lending risk.

On the other hand, many financial institutions and trade associations disagreed with the Bureau's assessment of potential benefits to small businesses. First, several commenters asserted there would be minimal or even no benefit. One bank said there would be no benefit at all. Two banks said there will be "minimal" benefit to their clients, to their communities, and to themselves.

Second, other commenters asserted the Bureau overestimated benefits. One bank said the usefulness of standardized data is undercut by the fact that small business lending by small lenders is highly specialized. Two trade associations specified this could be problematic because standardized data "could result in small business borrowers appearing to be similarly situated, when, in fact, the unique attributes of each borrower would result in different loan pricing by the bank."

Third, several commenters asserted any benefits would be outweighed by costs, *i.e.,* that there would be little benefit relative to costs. Other comments asserted the Bureau failed to adequately consider the potential benefits and costs to "consumers" and "covered persons" as required by section 1022(b)(2)(A) of the Dodd-Frank Act. While some of these arguments are discussed in detail in following sections regarding costs, we present some of the arguments here as well. Two community banks and a trade association said costs would outweigh benefits for community banks and small lenders in particular. Another trade association stated data points adopted pursuant to ECOA section 704B(e)(2)(H) in particular will only provide "minimal" benefits compared to the cost of collecting the data. Along a similar line of reasoning, three trade associations said the rule would harm the institutions that the rule is designed to benefit. Of these, two asserted that the small, women-owned, and minority-owned businesses the rule is designed to benefit in particular would be harmed.

As detailed above, the Bureau believes that the final rule will have benefits consistent with its two statutory purposes. The data collected under the final rule will be the most extensive data on credit access for women-owned,

minority-owned, and LGBTQI+-owned small businesses, and such information will facilitate the enforcement of fair lending laws and help identify business and community development needs.

With respect to comments that asserted the Bureau overestimated the benefits of the rule, the Bureau acknowledges in part IX.C the difficulty of precisely estimating the benefits of the data collection but also details how it estimates the benefits to small businesses using the best information available. With respect to commenters who described how data collected under the final rule would not have all relevant information about a credit application, the Bureau acknowledges this limitation in part IX.X above, but also describes, in part IX.F, how the data will provide significant benefits consistent with the statutory purposes of the rule despite these limitations.

With respect to comments that the costs would outweigh any benefits or that the Bureau did not adequately fulfill the requirements of section 1022(b)(2)(A) of the Dodd-Frank Act, in part IX.E, the Bureau details its methodology for estimating benefits and costs and, in part IX.F, details its estimates of benefits and costs, incorporating feedback from comments on the proposed rule. In doing so the Bureau fulfills its requirement to consider the potential benefits and costs to "consumers" and "covered persons" as required by section 1022(b)(2)(A) of the Dodd-Frank Act.

### 2. Benefits to Covered Financial Institutions

The final rule will provide some benefits to some covered financial institutions—*i.e.,* the financial institutions that will be required to collect and report 1071 data on small business applications for credit. The first is some reduction of the compliance burden of fair lending reviews for lower risk financial institutions, by reducing the "false positive" rates during fair lending review prioritization by regulators. Currently, financial institutions are subject to fair lending reviews by regulators to ensure that they are complying with ECOA in their small business lending. Data reported under the rule will allow regulators to prioritize fair lending reviews of financial institutions with higher risk of fair lending violations, which reduces the burden on institutions with lower fair lending risk. Covered financial institutions will also be able to use the data to monitor, identify, and address their own fair lending risks and thereby reduce the potential liability from

enforcement actions and adverse exam findings requiring remedial action.

The rule's data collection will also provide an unprecedented window into the small business lending market, and such transparency may benefit financial institutions. Comprehensive information on small business credit applications and originations are currently unavailable. The data made public pursuant to this rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions.

*Comments on the Bureau's estimation of the benefits to covered financial institutions.* The Bureau sought comment on its analysis of potential benefits to covered financial institutions as set forth in the NPRM. A broad range of commenters, including lenders, community groups, small business owners, business advocacy groups, and others, asserted that the final rule will provide an unprecedented window into the small business lending market and thereby facilitate fair lending enforcement.

However, several industry commenters suggested that the Bureau overstated the benefits of the data collection to financial institutions. To reiterate some of the comments in the previous section, a trade association stated that they do not believe the Bureau's rule to implement section 1071 would provide "any significant benefit" to financial institutions. Two banks said there will be "minimal" benefit to their clients, to their communities, and to themselves. Another trade association noted that lenders are likely already highly aware of the market in which they lend, especially considering that small business loans often require a relatively high degree of customization. Several industry commenters said the usefulness of standardized data is undercut by the fact that small business lending by small lenders is highly specialized to accommodate the highly individualized nature of each business.

The Bureau describes in detail above the potential benefits to financial institutions. The Bureau acknowledges that many lenders may have a high awareness of the local markets in which they lend but believes that the data will still shed light on additional information about areas where lenders do not currently operate and may also shed light on currently underserved markets within the areas lenders currently operate. Comprehensive, application-level data on small business lending will provide financial

AdminRecord-000357

institutions better understand their local markets as well as information about markets which they do not currently serve.

3. Costs to Covered Financial Institutions

i. One-Time Costs to Covered Financial Institutions

Using the methodology described in part IX.E.1 above, Table 11 shows the estimated total expected one-time costs of the final rule for the first eight cost categories for financial institutions covered by the final rule as well as a breakdown by the eight component categories that comprise the one-time costs for Type A DIs, Type B DIs, Type C DIs, and Non-DIs.[949] The final cost category, hiring costs, is discussed later in this section. The Bureau notes that the estimated costs presented in Table 11 differ slightly from the estimated costs presented in the NPRM. This difference comes only from the update in wages between the two calculations due to a release of new data.

Table 12 shows the estimated number of junior, mid-level, and senior staff hours and non-salary expenses for each component activity for Type A DIs. Tables 13 through 15 show the same estimates for Type B DIs, Type C DIs and Non-DIs respectively. As discussed above, the Bureau estimates all one-time costs to covered financial institutions using the One-Time Cost Survey results.

TABLE 11—ESTIMATED ONE-TIME COSTS BY COST CATEGORY AND FI TYPE

| Category | Type A DI | Type B DI | Type C DI | Non-DI |
|---|---|---|---|---|
| Preparation/planning | $6,500 | $7,400 | $20,500 | $13,900 |
| Updating computer systems | 17,000 | 17,400 | 6,900 | 57,300 |
| Testing/validating systems | 11,100 | 3,200 | 11,400 | 7,600 |
| Developing forms/applications | 4,300 | 3,200 | 4,600 | 4,400 |
| Training staff and third parties | 3,500 | 3,900 | 5,300 | 3,100 |
| Developing policies/procedures | 4,200 | 2,500 | 3,600 | 4,300 |
| Legal/compliance review | 7,700 | 3,000 | 7,300 | 3,900 |
| Post-implementation review | 5,000 | 4,300 | 18,000 | 1,700 |
| Total | 59,400 | 44,800 | 77,800 | 96,400 |

TABLE 12—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE A DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 43 | 21 | 0 |
| Updating computer systems | 34 | 52 | 41 | $10,000 |
| Testing/validating systems | 18 | 52 | 41 | 5,600 |
| Developing forms/applications | 14 | 34 | 51 | 0 |
| Training staff and third parties | 18 | 26 | 16 | 0 |
| Developing policies/procedures | 24 | 30 | 11 | 0 |
| Legal/compliance review | 28 | 26 | 15 | 3,300 |
| Post-implementation review | 26 | 38 | 19 | 0 |
| Total | 200 | 301 | 215 | 18,900 |

TABLE 13—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE B DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 50 | 35 | 21 | $200 |
| Updating computer systems | 25 | 20 | 12 | 13,600 |
| Testing/validating systems | 18 | 19 | 12 | 100 |
| Developing forms/applications | 21 | 14 | 7 | 200 |
| Training staff and third parties | 23 | 29 | 20 | 400 |
| Developing policies/procedures | 16 | 13 | 7 | 100 |
| Legal/compliance review | 14 | 16 | 5 | 700 |
| Post-implementation review | 15 | 22 | 27 | 1,100 |
| Total | 182 | 168 | 111 | 16,400 |

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 92 | 190 | 37 | $500 |
| Updating computer systems | 6 | 46 | 35 | 3,000 |

---

[949] The estimated one-time costs by cost category for each FI type is the sum of the wages multiplied by the estimated staff hours plus the non-salary expenses. For example, the Bureau expects that for preparation and planning for the final rule, on average, a Type A DI will pay senior staff $95.10 × 38 hours (= $3,613.80), mid-level staff $55.40 × 43 hours (= $2,382.20), and junior staff $22.37 × 21 hours (= $469.77). The total estimated cost is $6,465.77, rounded to $6,500, because Type A DI is not expected to pay non-salary expenses for preparation and planning.

TABLE 14—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR TYPE C DIS—Continued

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Testing/validating systems | 34 | 110 | 50 | 1,000 |
| Developing forms/applications | 13 | 46 | 34 | 100 |
| Training staff and third parties | 11 | 61 | 36 | 100 |
| Developing policies/procedures | 14 | 30 | 14 | 300 |
| Legal/compliance review | 9 | 56 | 44 | 2,300 |
| Post-implementation review | 3 | 246 | 103 | 1,800 |
| Total | 182 | 785 | 353 | 9,100 |

TABLE 15—ESTIMATED STAFF HOURS AND NON-SALARY EXPENSES BY COST CATEGORY FOR NON-DIS

| Category | Senior hours | Mid-level hours | Junior hours | Non-salary expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 47 | 29 | $7,100 |
| Updating computer systems | 27 | 147 | 39 | 45,700 |
| Testing/validating systems | 26 | 24 | 39 | 2,900 |
| Developing forms/applications | 30 | 15 | 19 | 300 |
| Training staff and third parties | 14 | 18 | 17 | 400 |
| Developing policies/procedures | 32 | 15 | 14 | 200 |
| Legal/compliance review | 26 | 18 | 11 | 200 |
| Post-implementation review | 16 | 2 | 1 | 100 |
| Total | 209 | 286 | 169 | 56,900 |

The Bureau estimates that updating computer systems will be the biggest driver of one-time costs for Type A DIs, Type B DIs, and Non-DIs. Type A DIs and Type B DIs are expected to spend similar amounts on updating computer systems, but Type A DIs would rely somewhat more on staff.

The Bureau expects that Non-DIs will have the highest one-time costs and the highest costs to update computer systems. To update computer systems, Non-DIs will rely on mid-level staff and third-party vendors. Non-DIs will also spend relatively more on preparation and planning than Type A DIs or Type B DIs. These estimates are consistent with the expectation that Non-DIs will incur higher costs because they are less likely to already report data to regulators.

The Bureau estimates that the biggest drivers of one-time costs for Type C DIs will be preparation and planning and post-implementation review. These depository institutions will generally rely on mid-level staff to implement the required one-time changes and, in particular, will rely on mid-level staff for these two key activities. The Bureau estimates that Type C DIs will spend the most of all financial institution types on staff hours to implement one-time changes and the least on non-salary expenses.

The Bureau estimates that one-time costs will be higher for Type A DIs than for Type B DIs. These two types of depository institutions have similar estimated costs for most activities, but Type A DIs are expected to spend more on testing/validating systems and legal/compliance review.

In addition to these one-time costs, the Bureau estimates the one-time hiring costs for the additional FTEs a financial institution expects to hire based on the number of applications the institution expects to receive each year. In the ongoing cost discussion in part IX.F.3.ii below, the Bureau explains how it estimates the number of staff hours per application required to comply with the final rule on an ongoing basis. The Bureau estimates that a Type A FI requires 1.1 hours per application, a Type B FI requires 1.6 hours per application, and a Type C FI requires 0.83 hours per application.

For the purposes of exposition, the Bureau presents the estimated number of FTEs for representative financial institutions. For the market-level estimates, the Bureau estimates the number of staff hours required based on the estimated number of applications each depository institution receives.

The representative Type A FI receives 100 applications annually, requiring 110 hours to comply with the final rule.[950] Under the assumptions described in part IX.E.1 above, the representative

Type A FI will need to hire one additional FTE at a one-time cost of $4,425 to cover the expected annual staff hours required to comply with the rule on an ongoing basis. This additional staff will also be able to cover the staff hours required to implement one-time changes because, on average, a Type A DI will require 716 staff hours for one-time changes (see Table 12). The Bureau estimates that the representative Type A DI will incur total one-time costs of $63,825 to implement the final rule.

The representative Type B FI receives 400 applications annually, requiring 654 hours to comply with the final rule. This FI will need to hire one additional FTE at a one-time cost of $4,425. This additional staff will also be able to cover the 461 staff hours, on average, required to implement one-time changes for a Type B DI. The Bureau estimates that the representative Type B DI will incur total one-time costs of $49,225 to implement the final rule.

The representative Type C FI receives 6,000 applications annually, requiring 5,009 hours to comply with the final rule. This FI will need to hire 3 additional FTE at a one-time cost of $13,275. This additional staff will also be able to cover the 1,320 staff hours, on average, required to implement one-time changes for a Type C DI. The Bureau estimates that the representative Type C DI will incur total one-time costs of $91,075 to implement the final rule.

---

[950] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule.

The Bureau assumes that most nondepository institutions are primarily Type B and Type C FIs, so the estimated staff hours to cover ongoing tasks discussed above apply here. For one-time tasks, the Bureau estimates that a nondepository institution will require about 664 staff hours, on average, to implement one-time changes. One additional FTE would be sufficient to cover these hours if the institution reallocates some tasks across staff. The Bureau estimates that the representative Non-DI will incur total one-time costs of $100,825 to implement the final rule.

As mentioned above, the Bureau realizes that one-time costs vary by institution due to many factors, and that this variance exists on a continuum that is impossible to fully represent. The Bureau focuses on representative types of financial institutions in order to generate practical and meaningful estimates of costs. As a result, the Bureau expects that individual financial institutions will have slightly different one-time costs than the average estimates presented here.

The One-Time Cost Survey instructed respondents to assume that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of ECOA for the 13 statutorily mandated data points one time per year, and be responsible for validating the accuracy of all data. Respondents were further instructed to use their own institution's internal definition of small business, assume the Regulation B definition of an application, and assume a reporting structure similar to that under HMDA. Finally, respondents were instructed to not include any costs associated with creating a firewall (that is, shielding applicants' protected demographic information from certain employees). As such, respondents estimated one-time costs assuming that the final rule would be different in some ways from what the Bureau described as the requirements in the survey. One small entity representative provided feedback during the SBREFA Panel that it was hard to estimate one-time costs in the survey without knowing all the details of the rule. The Bureau sought comment on the one-time costs associated with the additional data points it proposed but did not receive any information on which to base estimates. The Bureau expects that accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting

1071 data to being required to report such data.

The Bureau estimates that the overall market impact of one-time costs for depository institutions will be between $147,000,000 and $159,000,000.[951] These estimates include between $47,700,000 and $49,700,000 that depository institutions are estimated to spend on hiring additional staff.[952] Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for depository institutions will be $35,700,000 to $38,600,000. The Bureau estimates that the overall market impact of one-time costs for nondepository institutions will be $59,800,000. This estimate includes the $3,630,000 that nondepository institutions are estimated to spend on hiring additional staff. Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for nondepository institutions will be $15,500,000. As a frame of reference for these market-level one-time cost estimates, the estimated total non-interest expenses from the FFIEC and NCUA Call Reports for depository institutions that the Bureau estimates would be covered under the proposed rule was between $407 billion and $410 billion in 2019.[953] The upper bound estimate of total one-time costs is approximately 0.04 percent of the total annual non-interest expenses.

The Bureau estimated that the overall market impact of one-time costs from the NPRM would have been between $218,000,000 and $229,000,000 for depository institutions and $94,400,000 for nondepository institutions. The estimated market impacts for the final rule are lower than the estimated impacts from the NPRM because, based on changes made to the thresholds for the coverage of financial institutions in the final rule, the Bureau estimates that fewer financial institutions will be covered by the final rule. The estimates

are also different because in the estimates for the final rule, the Bureau updated wages and included hiring costs.

*Comments on the one-time cost estimates of the proposed rulemaking.* In the NPRM, the Bureau sought comment on its analysis of one-time costs. A few industry commenters expressed the difficulty in estimating these costs. Several other industry commenters provided an overall estimate of what they believed the overall one-time costs would be for their institution. These estimates ranged from slightly less than to considerably higher than the Bureau's estimates from the NPRM. For example, a bank with about 300 small business originations per year (a Type B DI in the Bureau's framework) estimated that the one-time implementation costs would be about $36,000. Another bank commenter estimated that it would cost well over $100,000 to implement changes.

A few industry commenters provided estimates of the costs associated with the individual cost categories used by the Bureau to estimate one-time costs. A few commenters provided estimates of the costs associated with updating computer systems in terms of staff hours or software (non-salary) expenses. For example, a State bankers association conveyed an estimate by a member of $5,000 for 1071 data submission software. A credit union commented that it anticipates initial costs of up to $100,000 to reconfigure or replace current reporting systems. A few other commenters provided estimates for other categories. For example, one credit union that originates about 150 small business loans per year estimated that staff would require 200 hours of training to prepare for the rule. A bank commented that it would require 30 to 80 hours to develop policies and procedures.

The Bureau has reviewed these estimates and considered the information reported by the commenters, together with the existing evidence provided in the one-time cost survey. The Bureau reiterates that the costs of implementing the rule are all institution-specific. As discussed above, the one-time cost estimates should be considered the average expected costs for an institution based on the complexity of the institution's operations. In addition, the Bureau expects that financial institutions will use a variety of methods to prepare for the rule. Some institutions will update systems using staff, while other institutions will purchase updates from third-party vendors. For example, one institution might use 50 staff hours to

---

[951] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

[952] The Bureau notes that the estimated hiring costs for the largest depository institutions may be an upper bound on the eventual realized costs and may be inflating the total hiring costs for depository institutions. The Bureau's methodology for estimating hiring costs implies that financial institutions with the most applications will need to hire several hundred employees to comply with the final rule. However, the Bureau anticipates that the largest institutions will likely save on these costs by automating some processes instead of hiring staff.

[953] The Bureau estimates this number by summing non-interest expenses over DIs that it estimates will be covered by the final rule.

**35510**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

update computer systems and another institution might pay $10,000 for an updated system. In this case, the Bureau would estimate that, on average, an institution would use 25 staff hours and $5,000 to update computer systems. For another example, a group of trade associations estimated, based on a survey of their members, that it would cost about $40,000 on average for small institutions to update commercial loan software. However, they also estimate that only a third of small institutions would need to update the software. This implies that the average cost associated with updating computer systems, including financial institutions that spend $0, is about $13,000, much closer to the Bureau's non-salary costs of updating computer systems for Type A DIs of $10,000. Overall, the trade association presented estimates only moderately higher than the Bureau's, after accounting for DIs that do not need to update computer systems. The Bureau considers most estimates provided by commenters as broadly consistent with the Bureau's one-time cost estimates.

A few industry commenters asserted that the firewall would be very costly to implement. However, the Bureau believes that, based on comments made on the firewall provision, it would not be feasible for many financial institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them that employees and officers involved in making determinations regarding their applications may have access to protected demographic information. As a result, the Bureau has not changed its one-time cost estimates based on the cost of implementing the firewall.

Many industry commenters specifically stated that the Bureau underestimated one-time costs. Most of these commenters considered the training costs as too low and a few others thought that the technology costs were too low. Some commenters stated that staff would require multiple follow up training sessions to prepare for

implementing the rule. However, none of the commenters provided specific information on how much training or technology would cost. The Bureau has not changed the training or technology cost estimates, preferring to rely on the evidence provided through the One-Time Cost Survey.

Many industry commenters expressed concern about being unable to implement the necessary one-time changes in the proposed 18-month implementation time. Several commenters noted the trial and error nature of implementing a new regulation and that this process could take a long time. Several other industry commenters said that third-party software providers would require significant time to develop new technology to comply with the proposed rule and financial institutions would still need to test the technology, conduct due diligence, and develop policies and procedures. A few others commented that small financial institutions, and particularly those unfamiliar with Federal reporting regimes like HMDA, would find it more difficult to implement one-time changes in time to comply with the proposed 18-month timeline. On the one-time costs survey, the Bureau did not ask about the time to make changes to prepare to comply with the eventual rule, nor did it specify an assumed time-frame. The Bureau interprets the survey responses as realistic estimates conditional on having enough time to implement changes. The comments received suggest that most financial institutions, particularly those that receive relatively fewer small business credit applications, would not have had enough time to implement changes in the proposed 18 months. The Bureau expects that the adoption of tiered compliance dates in the final rule, giving most lenders 24 or 33 months to comply with the rule, will give most financial institutions enough time to implement one-time changes in a manner consistent with the Bureau's estimates.

Several industry commenters asserted that the cost of complying with the proposed rule for small entities would be relatively higher than for larger entities. For example, a trade

association commented that smaller banks will not be able to exploit the economies of scale necessary to mitigate costs. The Bureau has tried to account for some of these differences by estimating the costs for the different representative types of institutions. The Bureau in its final rule increased the reporting activity threshold from the proposed 25 covered originations in each of the two preceding calendar years to 100 covered originations in each of the two preceding calendar years. The Bureau estimates that many small financial institutions will no longer be required to report 1071 data because of this change in the coverage of financial institutions in the final rule.

ii. Ongoing Costs to Covered Financial Institutions

Using the methodology described in part IX.E.2 above, Table 16 shows the total expected annual ongoing costs of the final rule as well as a breakdown by the component 15 activities that comprise the ongoing costs for Type A FIs, Type B FIs, and Type C FIs. The bottom of the table shows the total estimated annual section 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. To produce the estimates in Table 16, the Bureau used the calculations described in Tables 8 and 9 above and the assumptions for each activity in Table 10. In the following analysis, the Bureau provides examples of these cost calculations for the largest drivers of ongoing costs.

Compared to the NPRM, these estimated ongoing costs account for several changes. The first is a change in the assumed compensation for an hour of employee time, which was discussed in IX.E.2. The second is the inclusion of an additional data point, the LGBTQI+-owned indicator. Lastly, the new estimates account for an increased estimate of ongoing training costs in response to comments received, which is discussed in more detail in the comment review below. Besides these changes, the methodology for estimating ongoing costs remains the same as with respect to the proposed rule, unless explicitly stated otherwise.

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 1 ...................... | Transcribing data ........................................................................ | 1,108 | 2,110 | 31,657 |
| 2 ...................... | Resolving reportability questions ................................................ | 222 | 443 | 665 |
| 3 ...................... | Transfer to 1071 data management software ............................. | 1,108 | 0 | 0 |
| 4 ...................... | Complete geocoding data ........................................................... | 139 | 554 | 300 |
| 5 ...................... | Standard annual edit and internal checks ................................. | 510 | 11,126 | 27,972 |
| 6 ...................... | Researching questions ............................................................... | 275 | 551 | 826 |

AdminRecord-000361

TABLE 16—ESTIMATED ONGOING COSTS PER COMPLIANCE TASK AND FI TYPE—Continued

| Number | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 7 ...................... | Resolving question responses ............................................................... | 0 | 0 | 0 |
| 8 ...................... | Checking post-submission edits ............................................................ | 7 | 26 | 105 |
| 9 ...................... | Filing post-submission documents ....................................................... | 14 | 14 | 14 |
| 10 .................... | 1071 data management software/geocoding software ......................... | 0 | 8,000 | 13,650 |
| 11 .................... | Training ................................................................................................ | 1,336 | 6,681 | 44,542 |
| 12 .................... | Internal audit ....................................................................................... | 0 | 443 | 127,642 |
| 13 .................... | External audit ...................................................................................... | 3,500 | 5,000 | 0 |
| 14 .................... | Exam preparation ................................................................................ | 14 | 4,432 | 26,592 |
| 15 .................... | Exam assistance .................................................................................. | 116 | 698 | 4,654 |
| | Total ................................................................................................... | $8,349 | $40,079 | $278,618 |
| | Per application ..................................................................................... | $83 | $100 | $46 |

The Bureau estimates that a representative low complexity institution (*i.e.*, a Type A FI) would incur around $8,349 in total annual ongoing costs, or about $83 in total cost per application processed (assuming a representative 100 applications per year). For financial institutions of this type, the largest driver of ongoing costs is the fixed cost of the external audit, $3,500. Besides the audit cost, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau expects training (activity number 11) to cost approximately $1,336 annually for six representative loan officers and an equivalent number of other staff to engage in two hours of training. The Bureau expects other time-dependent activities to cost around $1,000 each. For example, the Bureau assumes that Type A FIs will spend around 19 hours transferring data to 1071 data management software (activity number 3) based on estimates of the required time to transfer data to HMDA data management software. At the assumed hourly compensation, our estimate is around $1,108 for the Type A FI institutions to transfer data. An assumption of around 18 total hours to conduct standard annual editing checks (activity number 5) with some savings assumed due to an online submission platform that automatically checks for errors, results in an estimated annual ongoing cost of $510.

The Bureau estimates that a representative middle complexity institution (*i.e.*, a Type B FI), which is somewhat automated, would incur approximately $40,079 in additional ongoing costs per year, or around $100 per application (assuming a representative 400 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (activity number 10) in the form of an annual software subscription fee, and the external audit of the data (activity number 13). Using interviews of financial institutions conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be comparable in the small business lending context and thus applies that estimate here. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and small business lending-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($11,126), training ($6,681), and prepping for examinations ($4,432) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination (activity number 14) resulting in a cost of $4,432, and have employees spend around 12 hours assisting with an examination (activity number 15) costing $698 annually.

The Bureau estimates a representative high complexity institution (*i.e.*, a Type C FI), would incur $278,618 of annual ongoing costs, or $46 per application (assuming a representative 6,000 applications per year). The largest driver of costs for a Type C FI is the employee time required to conduct an internal audit. The assumed 2,304 hours of employee time results in nearly

$127,642 of ongoing costs annually. Exam preparation, training, and standard annual and internal checks would be expected to cost $26,592, $44,542, and $26,592 each year, respectively. The Bureau also assumes that a Type C institution would need a subscription to a small business data management software near the upper bound of the range found in interviews with financial institutions during the 2015 HMDA rulemaking, of $13,650.

The Bureau estimates that the total annual ongoing costs for depository institutions will be between about $297,000,000 and $313,000,000 per year, about $190,000,000 to $199,000,000 of which will be annual variable costs. The Bureau estimates that the total annual ongoing costs for nondepository institutions would be about $48,700,000, about $9,900,000 of which would be annual variable costs.

The Bureau estimated that the total annual ongoing costs from the NPRM would have been between $310,000,000 and $330,000,000 for depository institutions and $62,300,000 for nondepository institutions. The estimated total ongoing costs decreased between the proposal and the final rule because the Bureau raised the financial institution coverage threshold from 25 to 100 covered originations in each of the two preceding calendar years. However, the cost estimates per institution increased because the Bureau, taking into account comments received on the proposed rule, raised the ongoing costs per application by changing training costs. These changes almost offset each other because, while the final rule covers about 2,200 fewer institutions relative to the proposal due to the change in the financial institution coverage threshold, these institutions that are no longer covered had the fewest number of applications, and ongoing costs are commensurate with the number of applications.

To understand the impacts of these cost estimates on the profits of

depository institutions, the Bureau estimates the average total net income across all products per small business origination for all DIs by type.[954] There is no comprehensive published source of data on profits earned on small business credit transactions. The Bureau presents estimates of total net income per origination as an indication of a financial institution's ability to cover the additional expenses associated with the final rule. The Bureau relies on its estimates of originations for each depository institution, described in part IX.D. and its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending rulemaking.* The Bureau estimates that banks and savings associations of Type A that will be covered by the final rule have an average net income per origination between $134,000 and $167,000. Credit unions of Type A that will be covered by the final rule have an average net income per origination of $144,000. Assuming two applications per origination, a covered bank or savings association of Type A has a net income per application of approximately $67,000 to $83,000 and a covered credit union of the same type has a net income per application of about $72,000. The Bureau estimates that covered banks and savings associations of Type B have an average net income per origination between $65,000 and $75,000 or a net income per application between $33,000 and $38,000. The Bureau estimates that covered credit unions of Type B have an average net income per origination of $229,000 or an average net income per application of $115,000. The Bureau estimates that covered banks and savings associations of Type C have a net income per origination between $252,000 and $278,000, or, assuming three applications per origination, a net income per application between $84,000 and $93,000. The Bureau estimates that covered credit unions of Type C have an average net income per origination of $8,000, and average net income per application of about $4,000. The Bureau notes that these estimates are slightly higher than reported in the proposal due

to the higher financial institution coverage threshold in the final rule.

With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose. Several commenters to the Bureau's 2017 request for information expressed concerns, however, about costs related to these analyses.[955] During the SBREFA process, some small entity representatives were concerned that published 1071 data could be used against financial institutions in class action litigation or to harm their public reputations.[956] Depending on the extent of publicly disclosed data, the Bureau expects that some financial institutions could incur ongoing costs responding to reports of disparities in their small business lending practices. Some financial institutions could also experience reputational risks associated with high profile reports of existing disparities where more complete analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis. In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some financial institutions may choose to change their product offerings available to small businesses, underwriting or pricing practices, or overall participation in the small business lending market. Several commenters expressed similar concerns that fair lending analyses on incomplete data could lead to false positives (*i.e.,* determinations of fair lending violations where none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. These costs associated with reputational risks are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

The Bureau also received feedback that financial institutions could face potential costs with the publication of a public dataset under the final rule either because potential clients would be concerned about their data being

collected or because of the additional competitive pressure brought by a publicly available dataset. The costs associated with customer privacy, reputational risk to financial institutions, and additional competitive pressure for financial institutions are difficult to quantify, and commenters on the proposed rule did not provide any specific estimates of these costs.

*Comments on the ongoing cost estimates of the proposed rulemaking.* Several industry commenters provided estimates of what they believed the overall ongoing costs would be for their institution. These estimates ranged from estimates that were quite similar to the Bureau's estimate for institutions of similar small business credit volume to estimates that were considerably higher than the Bureau's estimates. For example, a group of trade associations estimated that institutions under $500 million in assets, that on average originate 276 small business loans annually, would incur $145 per origination in ongoing cost. The Bureau's estimate in the proposal, for institutions of a similar size was $178 per origination ($89 per application). At the high end, a lender suggested over $1,000 per origination. The Bureau has reviewed these estimates and considered the information provided by the commenters.

The most voluminous category of comments was with respect to future staffing needs in response to the proposed rule. While not specific to any individual category of ongoing cost activity, a number of banks, credit unions, and Farm Credit System lenders, and several trade associations, described the need to hire additional staff to perform several of the ongoing cost activities that require staff time. Many provided estimates of the additional FTEs that the institution would have to hire to comply with the proposed rule. These estimates ranged from one additional FTE to up to 10 additional FTEs. A survey of community banks by a national trade association found that 88 percent of respondents would need to hire an additional FTE and, on average, institutions would have to hire 2–3 FTEs. Several commenters asserted that the hiring of additional staff alone showed that the Bureau's ongoing cost estimates in the proposal were inadequate.

In the ongoing cost estimates of the Bureau's proposal, the Bureau calculated the number of hours required to be spent on section 1071-related tasks, without distinguishing between existing or newly-hired staff. The Bureau assumes that the time spent on

---

[954] There are no broadly available data on profit per application for nondepository institutions. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2019, accessed on June 25, 2021. The Bureau uses the same internal estimates of small business loan originations as discussed in part VI.B above and total net income across all products. For estimates of net income per origination and per application, the Bureau uses only net income per origination for depository institutions with over 25 originations in 2019.

[955] 82 FR 22318 (May 15, 2017).

[956] For example, one small entity representative was concerned that published 1071 data could lead to increased litigation and thus a higher cost of credit for small businesses. Another expressed concern that pricing information could be misinterpreted by users of 1071 data (for example, according to the small entity representative, higher pricing for one race might be used to infer discrimination when the pricing was in fact unrelated to the race of the applicant). Such a misinterpretation may cause reputational damage and consequently decrease applications.

AdminRecord-000363

section 1071-related tasks necessarily takes time away from otherwise profitable activity to which the hours would be put in the rule's absence. Since the Bureau is accounting for time spent in this way, the Bureau believes that its estimates account for the additional staff activity required to be spent to collect, check, and report data under the final rule. For this reason, the Bureau did not change any staffing time estimates, with the below exceptions.

However, hiring additional FTEs would lead some institutions to incur one-time costs of hiring, including search and administrative burden, that they would not have incurred in the absence of the final rule. The Bureau categorizes this type of cost as a one-time cost, where the institution staffs up to be able to comply with the final rule. The Bureau is therefore incorporating the fixed cost of hiring new staff in the manner described in part IX.E.1.

Several commenters also suggested that the specific ongoing costs for training staff were too low in the proposal. As described in the proposal, the Bureau received similar comments during the SBREFA process, but wished to learn additional information through comments on the proposed rule to better estimate the cost of training. Several institutions provided specific annual costs of training employees or estimates of the overall employee time. Others more generally described the need to train more staff than just loan officers, but also administrative and other staff.

The Bureau's ongoing costs estimates only reflected the assumed training time required to train loan officers that directly handle the underwriting process. Based on the comments, the estimates in this final rule reflect a doubling of the number of assumed training hours required on an annual basis in order to account for the additional staff that would have to be trained on an annual basis besides simply the loan officers.

Lastly, the Bureau received several comments specifically about the ongoing cost of 1071 data management software. In addition to confirming this as an appropriate category of ongoing cost activity, several commenters provided specific estimates of the ongoing costs. One commenter's estimate was similar to the estimates the Bureau provided in its proposal, while others provided significantly larger estimates. A survey by a national trade organization found ongoing software cost estimates that were quite similar to the estimates the Bureau provided in its proposal for institutions of Types B and C. As an example, the survey average for institutions similar to Type B

institutions in the Bureau's proposal was around $7,000 per year, while the Bureau's estimate in the proposal was $8,000. Taking this information into account, the Bureau has not adjusted its ongoing cost estimates of the annual cost of 1071 data management or geocoding software.

4. Costs to Small Businesses

The Bureau expects that any direct costs of the final rule on small businesses will stem from additional fields that the applicant may have to complete on credit applications due to the final rule compared to a financial institution's existing application process. This could include information such as the race, ethnicity, and sex of the principal owners or number of workers were not previously required on business credit applications. However, the Bureau expects the cost of completing the new section 1071 fields on applications to be negligible. Therefore, the Bureau focuses the rest of the discussion on the costs of small businesses to whether and how the Bureau expects financial institutions to pass on the costs of compliance with the final rule to small businesses and any possible effects on the availability of small business credit.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the revenue from granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the added profit from extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs will be passed on in full to small business credit applicants in the form of higher prices or fees and does not expect there to be a significant reduction in small businesses' ability to access credit.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to continue supplying small business credit at their current levels. The Bureau believes that a financial institution would find it worthwhile to incur the one-time costs associated with complying with the

final rule if it expects to generate enough profit over multiple years to cover those costs. Each year, a financial institution would find it worthwhile to continue extending credit if the total expected revenue from its chosen quantity of loans is greater than the sum of its ongoing fixed and variable costs. As such, the Bureau believes a financial institution would find it worthwhile to reduce their supply of small business credit, even if it had already incurred the one-time costs, if the total expected revenue from that year were less than the total expected ongoing costs.[957] As discussed in detail below, the Bureau believes that a significant disruption in small business credit supply is unlikely.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071. Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses, where "1" was the most likely.

In order to analyze these responses, the Bureau pooled data only from respondents that answered both the ranking question and the number of originations question. The Bureau implemented these restrictions to the pool to eliminate responses from institutions that would not be required to report under the final rule. Of the 105 total respondents to the One-Time Cost Survey, 44 ranked every option and reported more than 25 originations in the last year.[958] The Bureau will henceforth refer to these respondents as the "impacts of implementation" sample.

Table 17 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents in the impacts of implementation sample. The responses

---

[957] SBREFA Outline at 50–52. The small entity representative feedback discussed herein can be found in the SBREFA Panel Report at 40.

[958] The Bureau discusses a representative Type A FI that will not be covered by the final rule to make the final estimates easier to compare with those in the NPRM and to highlight what the costs of the rule would have been for a financial institution that is not covered by the final rule. The Bureau includes survey respondents with originations below the origination threshold to ensure a large enough sample size for analysis.

are listed in order of most to least likely on average, where a lower average ranking number means that respondents ranked that response shed light on potential

disruptions to small business credit supply as a result of the final rule's implementation. Notably, respondents were least likely to report that they would reduce their small business

lending activity, with respondents on average indicating that they would be more likely to accept lower profits than to reduce their small business lending activity.

TABLE 17—ONE-TIME COST SURVEY RESPONSES TO IMPACTS OF IMPLEMENTATION

| Response | Average ranking |
|---|---|
| Raise rates or fees on small business products | 1.77 |
| Raise rates/fees on other credit products | 2.93 |
| Tighten underwriting standards | 3.73 |
| Accept lower profits | 3.82 |
| Offer fewer or less complex products | 4.59 |
| Exit some geographic markets | 5.75 |
| No longer offer small business credit products | 6.57 |

Consistent with economic theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. The Bureau expects that the variable ongoing costs would be passed on in full to small business credit applicants in the form of higher prices or fees. Per application, the variable costs are approximately $32, $26, and $7.5 for Type A FIs, Type B FIs, and Type C FIs, respectively. Even if the variable costs were passed on in full to small business applicants in the form of higher interest rates or fees associated with a loan or line of credit, the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business applicant. Therefore, the Bureau expects this increase in cost to have limited impact on the availability or affordability of small business credit. The Bureau estimates that the total market impact of these costs for small businesses will be between $200,000,000 and $208,000,000.

The relative ranking of other survey response options provides additional insight into the potential for small business credit supply disruptions. In Table 17, financial institutions ranked "tighten[ing] credit standards," on average, in the middle of their potential responses. The lowest three responses were "offer fewer or less complex products," "exit some geographic markets," and "no longer offer small business credit products." For these reasons, the Bureau believes the survey responses indicate limited likelihood of significant small business credit supply disruptions.

The Bureau's total estimated one-time and ongoing costs are non-negligible and could potentially affect the supply of small business credit by financial institutions that do not regularly originate many covered credit transactions. The Bureau's final institutional coverage threshold of 100

covered credit transactions in two consecutive years could prevent some low-volume financial institutions from reducing small business lending activity in response to the compliance costs of the final rule. For example, the Bureau estimates that a Type A DI would incur one-time costs of $63,825 and fixed ongoing costs of $5,195. A depository institution that originates very few covered transactions every year may reduce its small business lending activity if it does not expect that profits, even over several years, would cover that one-time cost or if it does not expect annual revenues to exceed the annual ongoing costs. However, based on the net income per application estimates discussed above, and the responses to the One-Time Cost Survey, the Bureau believes that institutions that are covered under the final rule are unlikely to find either the one-time costs of implementation or the ongoing costs of compliance a meaningful influence in their business decision regarding small business lending activity. It is possible that some lenders just above the coverage threshold might reduce their small business lending to below the threshold to avoid reporting but, even if this does occur, the Bureau does not anticipate that this will significantly decrease aggregate credit supply. Furthermore, the Bureau's findings from the respondents to the One-Time Cost Survey (discussed above) additionally support the Bureau's conclusion that the increase in compliance costs will likely be passed through to customers in the form of higher prices or fees, rather than a significant reduction in financial institutions' willingness to supply small business credit.[959]

If the Bureau were to release the data in unmodified form, the Bureau acknowledges there would be an ongoing risk of re-identification, which may bring with it reputational risk for covered financial institutions and more significant privacy risks for small business applicants and related natural persons. Examples of such scenarios and their potential risks are detailed in part VIII.B.4.ii. See part VIII generally for more about how the Bureau's modification and deletion decisions will mitigate these risks.

*Comments on the Bureau's estimation of the costs to small businesses.* The Bureau sought comment on other potential costs to small businesses not discussed above, and on its analysis of costs to small businesses as described herein. Several trade associations conducted their own surveys, which largely provided support for the Bureau's estimations, specifically that price increases would be the most likely response, and showed limited support for significant market exit.

A number of commenters, mainly lenders and trade associations, described how they expected costs would be passed on to borrowers, namely through higher interest rates or fees, though one lender said they would not raise fees or restrict access to credit. Two trade associations asserted the price of motor vehicles could increase because of the rule's effect on automobile financing. Several industry commenters who cited potential price increases also noted they might have to reduce their overall volume of small business lending. Others who cited potential price increases noted they might reduce the number of product offerings, such as small dollar lending products or insurance premium financing transactions.

Consistent with results from the Bureau's One-Time Cost Survey, comments also provided little evidence to indicate that lenders would exit the

---

[959] As stated in the SBREFA Panel Report at 40, "[g]enerally, [small entity representatives] did not suggest that they would leave the small business lending market in response to increased costs under the eventual 1071 rule."

small business credit market. While some lenders and trade associations cited business exit as a potential consequence, only one lender stated they themselves might consider exiting. A group of trade associations noted that in the survey it administered to its own members, there seemed to be little evidence that any of its own members would exit. A few lenders and trade associations asserted that some smaller lenders could exit the market due to increased regulatory burdens and costs. A group of trade associations asserted lenders could even close altogether or merge with other institutions.

One bank estimated how much of its portfolio would be affected by compliance costs; if it were to stop offering loans of less than $50,000 because it decided they were no longer profitable, it would lose up to 59 percent of its agricultural and commercial customers, or 13 percent of its total lending volume. If the bank were to stop offering loans of less than $10,000, it would lose 20 percent of its agricultural and commercial loans, or 1 percent of its total lending volume. The bank observed that because the percentage of customers affected would be greater than the percentage of lending volume affected, these estimates show that borrowers of small loan amounts would be negatively impacted by the rule.

A few lenders noted that, other than price increases, decreased competition from market exit could impact small businesses, namely a lower degree of customization in loan processing and underwriting. Several industry commenters claimed that processing times will increase because of the collection of data fields required by the rule but not otherwise collected in the normal course of business.

The Bureau believes that the comments generally supported the Bureau's expectation that the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial institutions' ongoing variable costs to small business credit applicants. While the Bureau acknowledges the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions, the Bureau does not expect these effects to be large enough to significantly impact the availability of small business credit. Additionally, the Bureau expects that its increased coverage threshold of one hundred loans for each of the two preceding years should reduce the likelihood of

reduced small business credit supply by financial institutions who originate few loans per year.

5. Alternatives Considered

This section discusses two categories of alternatives considered: other methods for defining a covered financial institution and limiting the data points to those mandated by section 1071. The Bureau uses the methodologies discussed in parts IX.D and IX.E to estimate the impacts of these alternatives.

First, the Bureau considered multiple reporting thresholds for purposes of defining a covered financial institution. In particular, the Bureau considered whether to exempt financial institutions with fewer than 25, 50, 200, or 500 originations in each of the two preceding calendar years instead of 100 originations, as finalized in the rule. The Bureau also considered whether to exempt depository institutions with assets under $100 million or $200 million from section 1071's data collection and reporting requirements.

Under a 25-origination threshold, which was proposed in the NPRM, the Bureau estimates that about 4,000 to 4,200 depository institutions would report, which is approximately 2,200 more depository institutions relative to the final threshold of 100 originations. The Bureau estimates that about 3,600 to 3,800 banks and savings associations and about 400 credit unions would be covered under a 25-origination threshold. The Bureau estimates that about 98 percent of small business loans originated by depository institutions would be covered under a 25-origination threshold, an increase of about 4 percentage points relative to the final rule. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would report under this alternative threshold. The Bureau estimates that the total one-time costs across all financial institutions associated with a 25-origination threshold would be about $338,000,000 to $350,000,000, an increase of about $132,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with the 25-origination threshold would be about $392,000,000 to $413,000,000, an increase of between $47,000,000 and $52,000,000 per year relative to the 100-origination threshold.

Under a 50-origination threshold, the Bureau estimates that about 2,900 to 3,100 depository institutions would report, which is approximately 1,100 more depository institutions relative to the final threshold of 100 originations.

The Bureau estimates that about 2,700 to 2,900 banks and savings associations and about 200 credit unions would be covered under a 50-origination threshold. The Bureau estimates that about 97 percent of small business loans originated by depository institutions would be covered under a 50-origination threshold, an increase of about 3 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 50-origination threshold would be about $272,000,000 to $285,000,000, an increase of about $66,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $373,000,000 to $393,000,000, an increase of about $28,000,000 to $32,000,000 per year relative to the 100-origination threshold. Again, the Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

Under a 200-origination threshold, the Bureau estimates that about 1,000 to 1,100 depository institutions would report, which is approximately 800 fewer depository institutions relative to the final threshold of 100 originations. The Bureau estimates that about 900 to 1,100 banks and savings associations and fewer than 100 credit unions would be covered under a 200-origination threshold. The Bureau estimates that about 91 percent of small business loans originated by depository institutions would be covered under a 200-origination threshold, a decrease of about 3 to 4 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 200-origination threshold would be about $159,000,000 to $167,000,000, a decrease of about $47,000,000 to $51,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $314,000,000 to $328,000,000, a decrease of about $31,000,000 to $33,000,000 per year relative to the 100-origination threshold. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

Under a 500-origination threshold, the Bureau estimates that about 400 to 500 depository institutions would report, which is approximately 1,500 fewer depository institutions relative to the final threshold of 100 originations. The

Bureau estimates that about 400 to 500 banks and savings associations and fewer than 20 credit unions would be covered under a 500-origination threshold. The Bureau estimates that about 88 percent of small business loans originated by depository institutions would be covered under a 500-origination threshold, a decrease of about 3 to 6 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with a 500-origination threshold would be about $128,000,000 to $131,000,000, a decrease of about $78,000,000 to $87,000,000 relative to the 100-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $281,000,000 to $290,000,000, a decrease of about $64,000,000 to $71,000,000 per year relative to the 100-origination threshold. The Bureau does not have sufficient information to precisely estimate how many more nondepository institutions would be required to report under this alternative.

The Bureau's NPRM discussed the possibility of exempting depository institutions with assets under $100 million or $200 million assets from the final rule. For the purposes of considering these alternatives, the Bureau estimates how institutional coverage and costs would be different if the Bureau required a 25-origination threshold in addition to an asset-based threshold for depository institutions. The Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more than 25 originations in 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018, exceeded the asset-based threshold.

Under a $100 million asset-based and 25-origination threshold, the Bureau estimates that between 3,500 and 3,600 depository institutions would report, approximately 1,600 to 1,700 more depository institutions relative to a 100-origination threshold with no asset-based threshold. The Bureau estimates that about 3,100 to 3,300 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $100 million asset-based threshold. The Bureau estimates that about 98 percent of small business

loans originated by depository institutions would be covered under a 25-origination and $100 million asset-based threshold, an increase of about 4 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $100 million asset-based threshold would be about $307,000,000 to $314,000,000, an increase of between $101,000,000 and $104,000,000 relative to the final rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $383,000,000 to $403,000,000, an increase of about $38,000,000 to $42,000,000 per year relative to the 100-origination threshold with no asset-based threshold.

Under a $200 million asset-based and 25-origination threshold, the Bureau estimates that about 2,700 depository institutions would report, approximately between 700 and 900 fewer depository institutions relative to a 100-origination threshold with no asset-based threshold. The Bureau estimates that about 2,400 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $200 million asset-based threshold. The Bureau estimates that about 96 percent of small business loans originated by depository institutions would be covered under a 25-origination and $100 million asset-based threshold, an increase of about 2 percentage points relative to the final rule. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $200 million asset-based threshold would be about $259,000,000 to $264,000,000, an increase of between $46,000,000 and $53,000,000 relative to the final rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $364,000,000 to $380,000,000, an increase of about $19,000,000 per year relative to the 100-origination threshold with no asset-based threshold.

Second, the Bureau considered the costs and benefits for limiting its data collection to the data points specifically enumerated in ECOA section 704B(e)(2)(A) through (G). In addition to those data points, the statute also requires financial institutions to collect and report any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071. The final rule includes several additional data points that rely solely on that latter authority in section 704B(e)(2)(H). Specifically, the final rule requires that financial institutions collect and report data on application

method, application recipient, denial reasons (for denied applications only), pricing information (for applications that are originated or approved but not accepted), NAICS code, number of workers, time in business, and number of principal owners, all of which are adopted based on the Bureau's authority pursuant to section 704B(e)(2)(H). The Bureau has considered the impact of instead finalizing only the collection of those data points enumerated in section 704B(e)(2)(A) through (G).

Requiring the collection and reporting of only the data points enumerated in ECOA section 704B(e)(2)(A) through (G) would result in a reduction in the fair lending benefit of the data compared to the final rule. For example, not collecting pricing information would obscure possible fair lending risk by covered financial institutions. Potential discriminatory behavior is not limited to the action taken on an application, but rather includes the terms and conditions under which applicants can access credit. If the Bureau did not collect pricing information, it would not be able to evaluate potential discriminatory lending practices. As mentioned in part IX.F.1 above, several of the data points the Bureau is finalizing under its ECOA section 704B(e)(2)(H) authority are critical to conducting more accurate and complete fair lending analyses. A reduction in the rule's ability to facilitate the enforcement of fair lending laws would negatively impact small businesses and small business owners and thus run counter to that statutory purpose of section 1071.

Limiting the rule's data collection to only the data points required under the statute would also reduce the ability of the rule to support the business and community development needs and opportunities of small businesses, which is the other statutory purpose of section 1071. For example, not including pricing information would significantly reduce the ability of communities, governmental entities, and creditors to understand credit conditions available to small businesses. Not including NAICS code or time in business would also reduce the ability of governmental entities to tailor programs that can specifically benefit young businesses or businesses in certain industries.

Only requiring the collection and reporting of the data points enumerated in ECOA section 704B(e)(2)(A) through (G) would have reduced the annual ongoing cost of complying with the final rule. Under this alternative, the estimated total annual ongoing costs for Type A FIs, Type B FIs, and Type C FIs would be $7,644; $38,296 and $265,809,

respectively. Per application, the estimated ongoing cost would be $76, $96, and $44 for Type A FIs, Type B FIs, and Type C FIs, respectively. Under this alternative, the estimated total ongoing costs for Type A FIs would be $705 less per year and $8 per application than the final rule; the estimated total ongoing costs for Type B FIs would be $1,783 less per year and $4 less per application than the final rule; and the estimated total ongoing costs for Type C FIs would be $12,809 per year and $2 per application than the final rule. The estimated total annual market-level ongoing cost of reporting would be between $326,000,000 and $340,000,000, or between about $19,000,000 to $21,000,000 per year less than under the final rule. As discussed above, respondents to the One-Time Cost Survey were instructed to assume that they would only report the statutorily mandated data fields. Hence, the Bureau can only estimate how ongoing costs would be different under this alternative.

### G. Potential Impact on Depository Institutions and Credit Unions With $10 Billion or Less in Total Assets

As discussed above, the final rule will exclude financial institutions with fewer than 100 originated covered credit transactions in both of the two preceding calendar years. The Bureau believes that the benefits of the final rule to banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the benefits to covered financial institutions as a whole, discussed above. Regarding costs, other than as noted here, the Bureau also believes that the impact of the final rule on banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the impact for covered financial institutions as a whole. The primary difference in the impact on these institutions is likely to come from differences in the level of complexity of operations, compliance systems, and software, as well as number of product offerings and volume of originations of these institutions, all of which the Bureau has incorporated into the cost estimates using the three representative financial institution types.

Based on FFIEC and NCUA Call Report data for December 2019, 10,375 of 10,525 banks, savings associations, and credit unions had $10 billion or less in total assets. The Bureau estimates that between 1,700 and 1,900 of such institutions would be subject to the final rule. The Bureau estimates that the market-level impact of the final rule on annual ongoing costs for banks, savings associations, and credit unions with $10 billion or less in assets would be between $124,000,000 and $140,000,000. Regarding one-time costs, the Bureau estimates that the market-level impact of the final rule for banks, savings associations, and credit unions with $10 billion or less in assets would be between $102,000,000 and $114,000,000. Using a 7 percent discount rate and a five-year amortization window, the estimated annualized one-time costs would be between $25,000,000 and $28,000,000.

### H. Potential Impact on Small Businesses in Rural Areas

The Bureau expects that small businesses in rural areas will directly experience many of the benefits of the rule described above in IX.F.1. Small businesses in rural areas will directly benefit from facilitating the enforcement of fair lending laws and the enabling of communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. As with all small businesses, small businesses in rural areas may bear some indirect costs of the rule. This would occur if financial institutions serving rural areas are covered by the final rule and if those institutions pass on some or all of their cost of complying with the final rule to small businesses.

The source data from CRA submissions that the Bureau uses to estimate institutional coverage and market estimates provide information on the county in which small business borrowers are located. However, approximately 89 percent of all banks did not report CRA data in 2019, and as a result the Bureau does not believe the reported data are robust enough to estimate the locations of the small business borrowers for the banks that do not report CRA data. The NCUA Call Report data do not provide any information on the location of credit union borrowers. Nonetheless, the Bureau is able to provide some geographical estimates of institutional coverage based on depository institution branch locations.

The Bureau used the FDIC's Summary of Deposits to identify the location of all brick and mortar bank and savings association branches and the NCUA Credit Union Branch Information to identify the location of all credit union branch and corporate offices.[960] A bank, savings association, or credit union branch was defined as rural if it is in a rural county, as specified by the USDA's Urban Influence Codes.[961] A branch is considered covered by the final rule if it belongs to a bank, savings association, or credit union that the Bureau estimated would be included if they exceed 100 originations in 2017 and 2018. Using the estimation methodology discussed in part IX.D above, the Bureau estimates that about 65 to 70 percent of rural bank and savings association branches and about 95 percent of non-rural bank and savings association branches would be covered under the final rule. The Bureau estimates that about 14 percent of rural credit union branches and about 11 percent of non-rural credit union branches would be covered under the final rule.[962]

In a competitive framework in which financial institutions are profit maximizers, financial institutions would pass on variable costs to future small business applicants, but absorb one-time costs and increased fixed costs in the short run.[963] Based on previous HMDA rulemaking efforts, the following seven operational steps affect variable costs: transcribing data, resolving reportability questions, transferring data to a data entry system, geocoding, researching questions, resolving question responses, and checking post-submission edits. Overall, the Bureau estimates that the impact of the final rule on variable costs per application is $32 for Type A FIs, $26 for Type B FIs, and $7.50 for Type C FIs. The Bureau believes that the covered financial institutions that serve rural areas will attempt to pass these variable costs on to future small business applicants.

---

[960] *See* Fed. Deposit Ins. Corp., *Summary of Deposits (SOD)—Annual Survey of Branch Office Deposits* (last updated June 1, 2022), *https://www.fdic.gov/regulations/resources/call/sod.html.*

The NCUA provides data on credit union branches in the quarterly Call Report Data files. *See* Nat'l Credit Union Admin., *Call Report Quarterly Data, https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last visited Mar. 20, 2023).

[961] This is a similar methodology as used in the Bureau's rural counties list. *See* CFPB, *Rural and underserved counties list, https://www.consumerfinance.gov/compliance/compliance-resources/mortgage-resources/rural-and-underserved-counties-list/* (last visited Mar. 20, 2023).

[962] The Bureau notes that most credit union branches do not belong to covered credit unions because most credit unions did not report any small business loans in the NCUA Call Report data. Of the 5,437 credit unions that existed in December 2019, 4,359 (or 81.5 percent) reported no small business originations in 2017 or 2018.

[963] If markets are not perfectly competitive or financial institutions are not profit maximizers, then what financial institutions pass on may differ. For example, they may attempt to pass on one-time costs and increases in fixed costs, or they may not be able to pass on variable costs. Furthermore, some financial institutions may exit the market in the long run. However, other financial institutions may also enter the market in the long run.

AdminRecord-000368

Amortized over the life of the loan, this expense would represent a negligible increase in the overall cost of a covered credit transaction.

The One-Time Cost Survey can shed light on how financial institutions that serve rural communities will respond to the final rule. The Bureau asked respondents to the survey to report whether their institution primarily served rural or urban communities or an even mix. All respondents in the impacts of implementation sample answered this question. Of the 44 respondents in the impacts of implementation sample, 13 primarily serve rural communities, 15 primarily serve urban communities, and 16 serve an even mix. Table 18 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents that serve rural communities, urban communities, an even mix, and all of the respondents in the impacts of implementation sample. The responses are listed in order of most to least likely on average across all respondents, where a lower average ranking number means that respondents ranked that response most likely. Respondents that primarily serve rural communities or an even mix rank raising rates or fees on small business or other credit products as the most likely response. These institutions also rank exiting some geographic markets and no longer offering small business credit products as the least likely response to a rule implementing section 1071.

TABLE 18—ONE-TIME COST SURVEY RESPONSES TO IMPACTS OF IMPLEMENTATION BY TYPE OF COMMUNITY SERVED

| Response | Rural (n = 13) | Urban (n = 15) | Even mix (n = 16) | All (n = 44) |
|---|---|---|---|---|
| Raise rates or fees on small business products | 1.62 | 1.6 | 2.06 | 1.77 |
| Raise rates/fees on other credit products | 2.54 | 2.73 | 3.44 | 2.93 |
| Tighten underwriting standards | 3.46 | 4.27 | 3.44 | 3.73 |
| Accept lower profits | 3.77 | 4.2 | 3.5 | 3.82 |
| Offer fewer or less complex products | 4.62 | 4.07 | 5.06 | 4.59 |
| Exit some geographic markets | 5.69 | 5.13 | 6.38 | 5.75 |
| No longer offer small business credit products | 6.62 | 6.13 | 6.94 | 6.57 |

The Bureau thus does not anticipate any material adverse effect on credit access in the long or short term to rural small businesses.

## X. Regulatory Flexibility Act Analysis

The Regulatory Flexibility Act (RFA) [964] generally requires an agency to conduct an initial regulatory flexibility analysis (IRFA) and a final regulatory flexibility analysis (FRFA) of any rule subject to notice-and-comment rulemaking requirements. These analyses must "describe the impact of the proposed rule on small entities." [965] An IRFA or FRFA is not required if the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. [966] The Bureau also is subject to certain additional procedures under the RFA involving the convening of a panel to consult with small business representatives prior to proposing a rule for which an IRFA is required. [967]

In the proposal, the Bureau did not certify that the proposed rule would not have a significant economic impact on a substantial number of small entities within the meaning of the RFA. Accordingly, the Bureau convened and chaired a Small Business Review Panel under SBREFA to consider the impact of the proposals under consideration on small entities that would be subject to the rule implementing section 1071 and to obtain feedback from representatives of such small entities. The proposal preamble included detailed information on the Small Business Review Panel. The Panel's advice and recommendations are found in the Small Business Review Panel Final Report [968] and were discussed in the section-by-section analysis of the proposed rule. [969] The proposal also contained an IRFA pursuant to section 603 of the RFA. In this IRFA, the Bureau solicited comment on any costs, recordkeeping requirements, compliance requirements, or changes in operating procedures arising from the application of the proposed rule to small businesses; comment regarding any Federal rules that would duplicate, overlap or conflict with the proposed rule; and comment on alternative means of compliance for small entities. Comments addressing individual provisions of the proposed rule are addressed in the section-by-section analysis above. Comments addressing the impact on small entities are discussed below. Many of these comments implicated individual provisions of the final rule or the Bureau's Dodd-Frank Act section 1022 discussion and are also addressed in those parts.

Based on the comments received, and for the reasons stated below, the Bureau believes the final rule will have a significant economic impact on a substantial number of small entities. Accordingly, the Bureau has prepared the following final regulatory flexibility analysis pursuant to section 604 of the RFA.

### Final Regulatory Flexibility Analysis

Under RFA section 604(a), when promulgating a final rule under 5 U.S.C. 553, after publishing a notice of proposed rulemaking, the Bureau must prepare a FRFA. Section 603(a) of the RFA also sets forth the required elements of the FRFA. Section 604(a)(1) requires the FRFA to contain a statement of the need for, and objectives of, the rule. Section 604(a)(2) requires the FRFA to contain a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments. Section 604(a)(3) requires the Bureau to respond to any comments filed by the

---

[964] 5 U.S.C. 601 *et seq.*

[965] 5 U.S.C. 603(a). For purposes of assessing the impacts of the proposed rule on small entities, "small entities" is defined in the RFA to include small businesses, small not-for-profit organizations, and small government jurisdictions. 5 U.S.C. 601(6). A "small business" is determined by application of SBA regulations and reference to the NAICS classifications and size standards. 5 U.S.C. 601(3). A "small organization" is any "not-for-profit enterprise which is independently owned and operated and is not dominant in its field." 5 U.S.C. 601(4). A "small governmental jurisdiction" is the government of a city, county, town, township, village, school district, or special district with a population of less than 50,000. 5 U.S.C. 601(5).

[966] 5 U.S.C. 605(b).

[967] 5 U.S.C. 609.

[968] CFPB, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf.*

[969] 86 FR 56356, 56378–510 (Oct. 8, 2021).

Chief Counsel for Advocacy of the SBA in response to the proposed rule and provide a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

The FRFA further must contain a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.[970] Section 603(b)(5) requires a description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for the preparation of the report or record. In addition, the Bureau must describe any steps it has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected. Finally, as amended by the Dodd-Frank Act, RFA section 604(a)(6) requires that the FRFA include a description of the steps the agency has taken to minimize any additional cost of credit for small entities.

## A. Statement of the Need for, and Objectives of, the Rule

As discussed in part I above, section 1071 of the Dodd-Frank Act amended ECOA to require that financial institutions collect and report to the Bureau certain data regarding applications for credit for women-owned, minority-owned, and small businesses.[971] Section 1071's statutory purposes are (1) to facilitate enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the Bureau to require any additional data that the Bureau determines would aid in fulfilling 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to

certain data, publication of data, and the Bureau's discretion to modify or delete data prior to publication in order to advance a privacy interest.

As discussed throughout this document, Congress amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. Section 1071 directs the Bureau to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

In addition, as discussed in part II above, currently available data on small business lending are fragmented, incomplete, and not standardized, making it difficult to make meaningful comparisons across products, financial institutions, and over time. This hinders attempts by policymakers and other stakeholders to understand the size, composition, and dynamics of the small business lending marketplace, including the interaction of supply and demand, as well as potentially problematic lending practices, gaps, or trends in funding that may be holding back some communities.[972]

Data collected under the final rule will constitute the largest and most comprehensive data in the United States on credit availability for small businesses. The data collection will also provide an unprecedented window into the small business lending market, and such transparency will benefit financial institutions covered by the rule. The public data published under the final rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other lenders. Lenders will likely use the data to understand small business lending market conditions more effectively and at a more granular level than is possible with existing data sources, such as Call Reports, data from public lending programs, or privately purchased data. Data collected under the final rule will enable lenders to identify promising opportunities to extend credit to small businesses.

The final rule will also provide some reduction of the compliance burden of fair lending reviews for lower risk financial institutions by reducing the "false positive" rates during fair lending review prioritization by regulators. Currently, financial institutions are subject to fair lending reviews by regulators to ensure that they are complying with ECOA in their small business lending. Data reported under the final rule will allow regulators to prioritize fair lending reviews of lenders with higher risk of potential fair lending violations, which reduces the burden on institutions with lower fair lending risk.

The final rule effectuates Congress's specific mandate to the Bureau to adopt rules to implement section 1071. For a further description of the reasons why agency action is being considered, see the background discussion for the final rule in part II above.

This rulemaking has multiple objectives. The final rule is intended to advance the two statutory purposes of section 1071, which are (1) facilitating enforcement of fair lending laws and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. To achieve these objectives, the rule will require covered financial institutions to collect and report certain data on applications for covered credit transactions for small businesses, including minority-owned, women-owned, and LGBTQI+-owned small businesses. The data to be collected and reported will include a number of statutorily required data fields regarding small business applications, as well as several additional data fields that the Bureau determined will help fulfill the purposes of section 1071. The Bureau will make available to the public, annually on the Bureau's website, the data submitted to it by financial institutions, subject to deletions or modifications made by the Bureau if the Bureau determines that such deletions or modifications would advance a privacy interest.

## B. Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of Such Comments

In accordance with section 603(a) of the RFA, the Bureau prepared an IRFA. In the IRFA, the Bureau estimated the possible compliance cost for small entities with respect to a pre-statute

---

[970] 5 U.S.C. 603(a)(4).

[971] ECOA section 704B.

[972] While Call Report and CRA data provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess, including with respect to local markets or protected classes.

AdminRecord-000370

baseline. Additionally, the IRFA discussed possible impacts on small entities, such as small businesses to whom lenders provide credit.

Very few commenters specifically address the IRFA included in the proposal. Comments made by the SBA Office of Advocacy related to the estimates included in the IRFA are addressed below in part X.B.3. A comprehensive discussion of comments that relate to parts of the regulatory flexibility analysis can be found throughout part IX above. This section addresses specific significant comments that affects the FRFA analysis.

Commenters provided feedback on the overall magnitudes of the one-time and ongoing cost estimates, which form a core part of the IRFA analysis. Some industry commenters provided their own estimates of either their institution's specific one-time or ongoing costs. With respect to one-time costs, the Bureau has reviewed estimates and considered the information provided by the commenters, together with the existing evidence provided in the One-Time Cost Survey. The Bureau considers most estimates provided by commenters as broadly consistent with the Bureau's one-time cost estimates. With respect to ongoing costs, industry commenters' estimates ranged from estimates that were quite similar to the Bureau's estimate for institutions of similar small business credit volume to estimates that were considerably higher than the Bureau's estimates. The Bureau has reviewed these estimates and considered the information provided by the commenters.

Many industry commenters claimed a need to hire additional staff, both with respect to the one-time cost of implementing the rule and the ongoing cost of reporting 1071 data annually. Many provided estimates of the additional FTEs that the institution would have to hire to comply with the proposed rule. These estimates ranged from one additional FTE to up to 10 additional FTEs. A survey of community banks by a national trade association found that 88 percent of respondents would need to hire an additional FTE and, on average, institutions would need to hire 2–3 FTEs. Several commenters asserted that the hiring of additional staff alone showed that the Bureau's one-time and ongoing cost estimates in the proposal were inadequate. In the ongoing costs estimates of the Bureau's proposal, the Bureau calculated the number of hours required to be spent on 1071-related tasks, without distinguishing between existing or newly-hired staff. The

Bureau assumes that the time spent on 1071-related tasks necessarily takes time away from otherwise profitable activity to which the hours would be put in the rule's absence. Since the Bureau is accounting for time spent in this way, the Bureau believes that its estimates account for the additional staff activity required to be spent to collect, check, and report data under the final rule. For this reason, the Bureau did not change any staffing time estimates, with exceptions mentioned below.

However, hiring additional FTEs would lead some institutions to incur fixed one-time costs of hiring, including search, administrative burden, and additional training, that they would not have incurred in the absence of the final rule. The Bureau categorizes this type of cost as a one-time cost, where the institution staffs up to be able to comply with the rule. So, while the Bureau has not changed ongoing costs estimates with respect to staff hours, it is incorporating the fixed cost of hiring new staff in its estimation of one-time costs.

Several commenters also suggested that the specific ongoing costs for training staff were too low in the proposal. As described in the proposal, the Bureau received similar comments during the SBREFA process, but wished to learn additional information through comments on the proposed rule to better estimate the cost of training. Several institutions provided specific annual costs of training employees or estimates of the overall employee time expected to be required to comply with the final rule. Others more generally described the need to train more staff than just loan officers, but also administrative and other staff.

The Bureau's ongoing cost estimates only reflected the assumed training time required to train loan officers that directly handle the underwriting process. The Bureau decided, based on the comments to the proposed rule, to double the amount of assumed training hours required on an annual basis to account for the additional staff that would have to be trained on an annual basis besides simply the loan officers. The estimates in this final rule reflect the doubling of annual training hours.

## C. Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

SBA Office of Advocacy provided a formal comment letter to the Bureau in

response to the proposed rule. This letter expressed concerns that the Bureau underestimated the costs of the proposed rule, that the Bureau did not adequately consider the scope of coverage, and that the Bureau additionally underestimated the effect of the proposed rule on the cost of credit to small entities. Additionally, SBA Office of Advocacy provided specific feedback related to certain provisions of the proposed rule, which are addressed below.

*Comments related to the Bureau's cost estimates.* SBA Office of Advocacy asserted that the Bureau's estimated costs of compliance in the proposal were too low, arguing, specifically, that training costs were too low and stated that the Bureau had acknowledged that small entity representatives, during the SBREFA process, had noted that the Bureau's training costs might be low because they did not account for enough staff being trained. Regarding these training costs, the Bureau notes that, as SBA Office of Advocacy observed, the proposal identified the feedback from small entity representatives that the training costs might be underestimated. In part VIII.F.3 of the proposal the Bureau sought comments on the training and other estimates to inform the ongoing cost estimation. As noted in part IX.F above, the Bureau has increased its estimates of training costs in response to SBA Office of Advocacy and other comments to account for additional staff that would need to be trained on an ongoing basis.

SBA Office of Advocacy expressed concerns that the Bureau has underestimated the one-time costs, specifically with regard to training costs. As noted in the above methods (part IX.E) and estimations (part IX.F) discussions, the Bureau estimated one-time costs from the Bureau's One-Time Cost Survey, which was conducted of industry participants potentially subject to the Bureau's rule implementing section 1071. The Bureau's Tables 14 through 16 provide averages of survey responses. To obtain final estimates, the Bureau combined this information with relevant information from comments on the proposal. The Bureau reviewed and considered comments on the cost estimates included in its proposal.

SBA Office of Advocacy also asserted that the Bureau underestimated the pass through of compliance costs to small businesses in the form of rates and fees. SBA Office of Advocacy also asserted that, because institutions could charge an application fee, the fee may be a disincentive for small businesses to shop for a better priced loan, and

therefore the overall cost of credit may be higher than indicated.

Regarding these comments on the pass through of costs, the Bureau notes in part IX.F.4 above that it expects the variable portion of ongoing costs to be passed on to small business credit borrowers in the form of higher interest rates and fees. It made this determination from the results to its One-Time Cost Survey, economic theory, and comments on the proposed rule. Additionally, lenders presently have the ability to charge applicants application fees, something that the potential increase in fees from compliance costs associated with this final rule does not change.

*Comments related to other aspects of the proposed rule.* In the section-by-section analysis of the final rule in part V above, the Bureau has responded to the SBA Office of Advocacy's comments concerning a number of topics in the proposed rule, including the definition of financial institution, the small business definition, the coverage of automobile dealers, the data points generally, the proposed visual observation and surname requirement related to applicants' demographic information, data points adopted pursuant to ECOA section 704B(e)(2)(H), and the compliance date of the rule. SBA Office of Advocacy's comments and the Bureau's responses on these topics are summarized below.

*Scope of coverage/definition of financial institution.* Initially, SBA Office of Advocacy expressed concern about the scope of coverage, particularly as related to who would be a covered financial institution required to collect and report 1071 data. SBA Office of Advocacy argued that the proposed 25-origination threshold may be too low, and that the Bureau has not analyzed the data fully to determine whether a higher threshold would garner an appropriate amount of information to fulfill the purposes of section 1071. SBA Office of Advocacy further urged the Bureau to consider additional alternative thresholds, and supplement its analysis, including 50-, 100-, 200- and 500-origination threshold alternatives. In the final rule, the Bureau has increased the institutional coverage threshold from 25 to 100 originations annually to address industry concerns regarding the impact on the smallest financial institutions. Smaller lenders play an integral role in lending to parts of the small business sector and the Bureau does not want to risk disruption to this sector, which would run contrary to the business and community development purpose of section 1071. The Bureau also considered higher

thresholds, but believes that raising the threshold further would undermine the purposes of section 1071.

*Definition of small business.* Next, SBA Office of Advocacy commended the Bureau for proposing an alternative size standard to SBA's approach to defining a small business, noting prior feedback concerning the need for a simpler definition that is easy for small business applicants to understand and financial institutions to implement. However, SBA Office of Advocacy noted concern from stakeholders that the $5 million gross annual revenue threshold may be too high for small financial institutions to implement and may cause some of those entities to forgo making business loans. SBA Office of Advocacy urged the Bureau to analyze other possible thresholds at a lower amount that would garner sufficient data, without the risk of smaller banks discontinuing business loans. Although the Bureau considered different threshold amounts and different size standards, it believes that a $5 million gross annual revenue threshold strikes the right balance in terms of broadly covering the small business credit market to fulfill section 1071's statutory purposes while meeting the SBA's criteria for an alternative size standard. The final rule also anticipates updates to this threshold every five years to account for inflation.

*Data points—collection of ethnicity and race via visual observation or surname, and data points adopted pursuant to ECOA section 704B(e)(2)(H).* SBA Office of Advocacy raised two concerns related to data points required to be collected under section 1071. First, SBA Office of Advocacy argued that the requirement in the proposed rule to collect ethnicity and race information based on visual observation or surname should be removed. SBA Office of Advocacy reiterated concerns expressed during the SBREFA panel about a visual observation requirement. SBA Office of Advocacy further argued that data collected through visual observation or surname could be corrupted by bias or other forms of discrimination, and would therefore be in opposition to the intent of section 1071. They further stated that even well trained and well-motivated financial institutions could make wrong assumptions and taint the quality of the data. After considering the issue further as explained in the section-by-section analysis of § 1002.107(a)(19) above, the final rule does not include a requirement to collect applicant demographic information based on visual observation or surname.

Second, SBA Office of Advocacy urged the Bureau to remove from the

rule all data points proposed pursuant to its statutory authority set forth in ECOA section 704B(e)(2)(H), arguing that such data points are not required by section 1071, are costly, and potentially raise privacy concerns. SBA Office of Advocacy noted that these data points could be reverse engineered to determine what businesses were denied credit, particularly in small communities. They focused particularly on pricing data, asserting that these data would be costly and could damage the reputation of the institution by creating unjustified inferences that pricing disparities are due to fair lending violations. The Bureau believes that pricing and the other data points provide valuable information that furthers the dual purposes of section 1071. The Bureau believes that any risks to privacy interests can be addressed through modifications or deletions to public, application-level data, as appropriate.

Next, SBA Office of Advocacy urged the Bureau to work with small automobile dealers to make the direct and indirect impacts of the rulemaking as least burdensome as possible. SBA Office of Advocacy stated that dealers may either directly issue credit or, as noted by a trade association, in many cases, act as intermediaries between buyers and financial institutions, and in those roles may be asked to support financial institutions' compliance with the rule. The Bureau's rule does not apply to motor vehicle dealers.[973] The Bureau has also made revisions to the rule's provisions addressing reporting obligations when multiple financial institutions are involved in originating a single covered credit transaction, which the Bureau believes will provide greater clarity to motor vehicle dealers and the covered financial institutions that work with them, as well as to other covered financial institutions that originate covered credit transactions for small businesses through third parties. In addition, the Bureau has sought to reduce burden on small covered financial institutions through many provisions in the final rule, including, for example, by issuing a sample data collection form that institutions can use to collect protected demographic data from applicants. Finally, SBA Office of Advocacy encouraged the Bureau to consider an implementation period of three years or longer for the rule, rather

---

[973] The Bureau's rules, including this final rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

AdminRecord-000372

than 18 months as proposed. SBA Office of Advocacy reiterated feedback from a roundtable session it held that an 18-month compliance period would not be sufficient, and it may take up to three years for small financial institutions to comply. They noted that unlike HMDA, financial institutions are not building off a system already in place, and instead need to develop new systems. SBA Office of Advocacy also reiterated feedback during the SBREFA process that supported a two- to three-year implementation period. The Bureau is adopting a tiered compliance date schedule because it believes that smaller and mid-sized lenders would have particular difficulties complying within the single 18-month compliance period proposed in the NPRM. Compliance with the rule beginning October 1, 2024 is required for financial institutions that originate the most covered credit transactions for small businesses. However, institutions with a moderate transaction volume have until April 1, 2025 to begin complying with the rule, and those with the lowest volume have until January 1, 2026.[974] The Bureau believes that approximately 90 percent of all covered financial institutions that are themselves "small" under the SBA's size standards will fall under the latest compliance date, giving them nearly three years to prepare for compliance with the Bureau's final rule.

D. Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply

For the purposes of assessing the impacts of the final rule on small entities, "small entities" is defined in the RFA to include small businesses, small nonprofit organizations, and small government jurisdictions.[975] A "small business" is determined by application of SBA regulations in reference to the North American Industry Classification System (NAICS) classification and size standards.[976] Under such standards, the Bureau identified several categories of small entities that may be subject to the proposed provisions: depository institutions; online lenders and merchant cash advance providers; commercial finance companies; nondepository CDFIs; Farm Credit System members; and governmental lending entities. The NAICS codes covered by these categories are described below.

The following table provides the Bureau's estimate of the number and types of entities that may be affected by the proposed rule:

TABLE 19—ESTIMATED NUMBER OF AFFECTED ENTITIES AND SMALL ENTITIES BY CATEGORY

| Category | NAICS | Small entity threshold | Est. total covered financial institutions | Est. number of small financial institutions |
|---|---|---|---|---|
| Depository Institutions | 522110, 522180, 522130, 522210 .. | $850 million in assets | 1,900 | 1,000 |
| Online Lenders and Merchant Cash Advance Providers. | 522299, 522291, 522320, 518210 .. | $40 million (NAICS 518210); $47 million (NAICS 522299, 522291, 522320). | 100 | 90 |
| Commercial Finance Companies | 513210, 532411, 532490, 522220, 522291. | $47 million (NAICS 513210, 522220, 522291); $40 million (NAICS 532490); $45.5 million (NAICS 532411). | 240 | 216 |
| Nondepository CDFIs | 522390, 523910, 813410, 522210 .. | $9.5 million (NAICS 813410); $15 million (NAICS 522310); $47 million (NAICS 523910, 522390). | 139 | 132 |
| Farm Credit System members | 522299 | $47 million | 71 | 31 |
| Governmental Lending Entities | NA | Population below 50,000 | 70 | 0 |

The following paragraphs describe the categories of entities that the Bureau expects would be affected by the final rule.

*Depository institutions (banks and credit unions):* The Bureau estimates that there are about 1,900 banks, savings associations, and credit unions engaged in small business lending that originate enough covered transactions to be covered by the final rule.[977] These companies potentially fall into four different industry categories, including "Commercial Banking" (NAICS 522110), "Savings Institutions" (NAICS 522120), "Credit Unions" (NAICS 522130), and "Credit Card Issuing" (NAICS 522210). All of these industries have a size standard threshold of $850 million in assets. The Bureau estimates that about 1,000 of these institutions are small entities according to this threshold. See part IX.D above for more detail on how the Bureau arrived at these estimates.

*Online lenders and merchant cash advance providers:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 100 fintech lenders and merchant cash advance providers engaged in small business lending that originate enough covered transactions to be covered by the final rule. These companies span multiple industries, including "All Other Nondepository Credit Intermediation" (NAICS 522298), "Consumer Lending" (NAICS 522291), "Financial Transactions, Processing, Reserve, and Clearinghouse Activities" (NAICS 522320), and "Data Processing, Housing and Related Services" (NAICS 518210). All of these industries have a size standard threshold of $40 million in sales (NAICS 518210) or $47 million in sales (all other NAICS). The Bureau assumes that about 90 percent, or 90, of these entities are small according to these size standards.

*Commercial finance companies:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 240 commercial finance companies, including captive and independent financing, engaged in small business lending that originate enough covered credit transactions to be covered by the final rule. These companies span multiple industries, including "Software Publishers" (NAICS 513210), "Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing" (NAICS 532411), "Other Commercial and Industrial Machinery and Equipment Rental and Leasing" (NAICS 532490), "Sales financing" (NAICS 522220) and "Consumer Lending" (NAICS 522291). These industries have size standard thresholds of $47 million in sales (NAICS 513210, 522220, 522291), $45.5

---

[974] The Bureau estimates that most small depository institutions will fall into Tier 3 and will be required to begin complying with the final rule in 2026.

[975] 5 U.S.C. 601(6).

[976] The current SBA size standards are found on the SBA's website, Small Bus. Admin., *Table of size standards* (Mar. 17, 2023), *https://www.sba.gov/document/support-table-size-standards.*

[977] The Bureau notes that the category of depository institutions also includes CDFIs that are also depository institutions.

AdminRecord-000373

million in sales (NAICS 532411), or $40 million in sales (NAICS 532490). Special Bureau assumes that about 90 percent, or 216, commercial finance companies are small according to these size standards.

*Nondepository CDFIs:* As discussed in more detail in part II.D above, the Bureau estimates that there are 139 nondepository CDFIs engaged in small business lending that originate enough covered credit transactions to be covered by the final rule. CDFIs generally fall into "Activities Related to Credit Intermediation (Including Loan Brokers)" (NAICS 522390), "Miscellaneous Intermediation" (NAICS 523910), "Civic and Social Organizations" (NAICS 813410), and "Mortgage and Nonmortgage Loan Brokers" (NAICS 522310). These industries have size standard thresholds of $9.5 million in sales (NAICS 813410), $15 million in sales (NAICS 522310), and $47 million in sales (NAICS 522390, 523910). The Bureau assumes that about 95 percent, or 132, nondepository CDFIs are small entities.

*Farm Credit System members:* The Bureau estimates that there are 71 members of the Farm Credit System (banks and associations) that are engaged in small business lending and that originate enough covered credit transactions to be covered by the final rule.[978] These institutions are in the "International, Secondary Market, and All Other Credit Intermediation" (NAICS 522299) industry. The size standard for this industry is $47 million in sales. The Bureau estimates that 18 members of the Farm Credit System are small entities.

*Governmental lending entities:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 70 governmental lending entities engaged in small business lending that originate enough covered credit transactions to be covered by the final rule. "Small governmental jurisdictions" are the governments of

---

[978] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System,* at 7 (Feb. 28, 2020), *https://www.farmcreditfunding.com/ffcb_live/serve/public/pressre/finin/report.pdf?assetId=395570.* The Bureau notes that Farm Credit System banks do not report FFIEC Call Reports and are thus not counted in the number of banks and savings associations discussed above. To estimate the number of small Farm Credit System members, the Bureau considered FCA Call Reports and Young, Beginning, and Small Farmers Reports for all Farm Credit System members as of December 31, 2019. The reports can be found at *https://reports.fca.gov/CRS/.* A Farm Credit System is covered if it reported more than 100 total number of loans on its Young, Beginning, and Small Farmers Report in 2019. A Farm Credit System member is considered small if its net interest income plus total non-interest income is less than $41.5 million.

cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand. The Bureau assumes that none of the governmental lending entities covered by the final rule are considered small.

E. Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Final Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for the Preparation of the Report or Record

*Reporting requirements.* ECOA section 704B(f)(1) provides that "[t]he data required to be compiled and maintained under [section 1071] by any financial institution shall be submitted annually to the Bureau." Section 1071 requires financial institutions to collect and report information regarding any application for "credit" made by women-owned, minority-owned, and small businesses. In its rule to implement section 1071, the Bureau is not covering the following transactions: leases, factoring, consumer-designated credit used for business purposes, HMDA-reportable transactions, insurance premium financing, trade credit, public utilities credit, securities credit, and incidental credit.

Under the final rule, financial institutions would be required to report data on small business credit applications if they originated at least 100 covered transactions in each of the previous two calendar years. The Bureau is requiring that data collection occur on a calendar-year basis and submitted to the Bureau by the following June 1. Under the final rule, covered financial institutions are required to collect and report the following data points: (1) a unique identifier, (2) application date, (3) application method, (4) application recipient, (5) credit type, (6) credit purpose, (7) amount applied for, (8) amount approved or originated, (9) action taken, (10) action taken date, (11) denial reasons, (12) pricing information, (13) census tract, (14) gross annual revenue, (15) NAICS code, (16) number of workers, (17) time in business, (18) minority-owned business status, women-owned business status, and LGBTQI+-owned business status, (19) ethnicity, race, and sex of principal owners, and (20) the number of principal owners. The section-by-section analyses in part V above discuss the required data points and the scope of the final rule in greater detail.

*Recordkeeping requirements.* ECOA section 704B(f)(2)(A) requires that

information compiled and maintained under section 1071 be "retained for not less than 3 years after the date of preparation." The Bureau is requiring that financial institutions retain 1071 data for at least three years after it is submitted to the Bureau. In accordance with 704B(e)(3), the Bureau is also instituting a prohibition on including certain personally identifiable information about any individuals associated with small business applicants in the data that a financial institution is required to compile, maintain, and report to the Bureau, other than information specifically required to be collected and reported (such as the ethnicity, race, and sex of principal owners and whether the business is women-owned, minority-owned, or LGBTQI+-owned). Financial institutions must, unless subject to an exception, limit the access of certain officers and employees to applicants' responses to the inquiries regarding women-owned, minority-owned, and LGBTQI+-owned business status, as well as the ethnicity, race, and sex of principal owners. In addition, applicants' responses to the inquiries regarding women-owned, minority-owned, and LGBTQI+-owned business status, as well as the ethnicity, race, and sex of principal owners, must be maintained separately from the application and accompanying information.

*Costs to small entities.* The Bureau expects that the proposed rule may impose one-time and ongoing costs on small-entity providers of credit to small businesses. The Bureau has identified eight categories of one-time costs that make up the components necessary for a financial institution to develop the infrastructure to collect and report data required by the rule. Those categories are preparation/planning; updating computer systems; testing/validating systems; developing forms/applications; training staff and third parties (such as dealers and brokers); developing policies/procedures; legal/compliance review; and post-implementation review of compliance policies and procedures. The Bureau conducted a survey regarding potential one-time implementation costs for section 1071 compliance targeted at financial institutions who extend small business credit. The Bureau used the results of this survey to estimate the one-time costs for financial institutions covered by the proposed rule using the methodology described in part VIII.E.1 above. The Bureau estimates that depository institutions with the lowest level of complexity in compliance

AdminRecord-000374

operations (*i.e.,* Type A DIs) would incur one-time costs of $63,825, including expected hiring costs. The Bureau estimates that depository institutions with a middle level of complexity in compliance operations (*i.e.,* Type B DIs) would incur one-time costs of $49,225, including expected hiring costs. The Bureau estimates that depository institutions with the highest level of complexity in compliance operations (*i.e.,* Type C DIs) would incur one-time costs of $91,075, including expected hiring costs. Finally, the Bureau estimates that Non-DIs would incur one-time costs of $105,250, including the costs of hiring two additional staff.

The Bureau estimates that the overall market impact of one-time costs for small depository institutions will be between $56,000,000 and $67,000,000.[979] The Bureau estimates that the overall market impact of one-time costs for Non-DIs will be about $45,000,000.

Adapting ongoing cost methodology from previous HMDA rulemaking efforts, the Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs to financial institutions covered by the rule.[980] The Bureau estimates that representative financial institutions with the lowest level of complexity in compliance operations (*i.e.,* Type A FIs) would incur around $8,349 in total annual ongoing costs, or about $83 in total cost per application processed (assuming a representative 100 applications per year). For financial institutions of this type, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau estimates that financial institutions with a middle level of complexity in compliance operations (*i.e.,* Type B FIs), which are somewhat automated, would incur approximately $40,079 in additional ongoing costs per year, or around $100 per application (assuming a representative 400 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (in the form of an annual software subscription fee) and the external audit of the data. The Bureau estimates that financial institutions with the highest level of complexity in compliance operations (*i.e.,* Type C FIs), which are significantly automated, would incur approximately $278,618 in additional ongoing costs per year, or around $46 per application (assuming a representative 6,000 applications per year). The largest components of this ongoing cost are the cost of an internal audit, transcribing data, and annual edits and internal checks.

The Bureau estimates that the overall market impact of ongoing costs for small entities will be between $83,000,000 and $96,000,000 per year.

*Estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for the preparation of the report or record.* Section 603(b)(4) of the RFA also requires an estimate of the type of professional skills necessary for the preparation of the reports or records. The recordkeeping and compliance requirements of the final rule that would affect small entities are summarized above. Based on outreach with financial institutions, vendors, and governmental agency representatives, the Bureau classified the operational activities that financial institutions would likely use for section 1071 data collection and reporting into 15 operational "tasks" which can be further grouped into four "primary tasks." These are:

1. *Data collection:* Transcribing data, resolving reportability questions, and transferring data to a 1071 data management system.

2. *Reporting and resubmission:* Geocoding, standard annual edit and internal checks, researching questions, resolving question responses, checking post-submission edits, filing post-submission documents, and using vendor data management software.

3. *Compliance and internal audits:* Training, internal audits, and external audits.

4. *Section 1071-related exams:* Exam preparation and exam assistance.

All these tasks are related to the preparation of reports or records and most of them are performed by compliance personnel in the compliance department of financial institutions. For some financial institutions, however, the data intake and transcribing stage could involve loan officers or processors whose primary function is to evaluate or process loan applications. For example, at some financial institutions the loan officers would take in information from the applicant to complete the application and input that information into the reporting system. However, the Bureau believes that such roles generally do not require any additional professional skills related to the recordkeeping or other compliance requirements of this final rule that are not otherwise required during the ordinary course of business for small entities. The Bureau also notes that small nondepository institutions might not be subject to fair lending exams and might, therefore, have reduced costs.

The type of professional skills required for compliance varies depending on the particular task involved. For example, data transcribing requires data entry skills. Transferring data to a data entry system and using vendor data management software requires knowledge of computer systems and the ability to use them. Researching and resolving reportability questions requires a more complex understanding of the regulatory requirements and the details of the relevant line of business. Geocoding requires skills in using the geocoding software, web systems, or, in cases where geocoding is difficult, knowledge of the local area in which the property is located. Standard manual editing, internal checks, and post-submission editing require knowledge of the relevant data systems, data formats, and section 1071 regulatory requirements in addition to skills in quality control and assurance. Filing post-submission documents requires skills in information creation, dissemination, and communication. Training, internal audits, and external audits require communications skills, educational skills, and regulatory knowledge. Section 1071-related exam preparation and exam assistance involve knowledge of regulatory requirements, the relevant line of business, and the relevant data systems.

The Standard Occupational Classification code has compliance officers listed under code 13–1041. The Bureau believes that most of the skills required for preparation of the reports or records related to this rule are the skills required for job functions performed in this occupation. However, the Bureau recognizes that under this general occupational code there is a high level of heterogeneity in the type of skills required as well as the corresponding labor costs incurred by the financial institutions performing these functions. During the SBREFA process, some small entity representatives noted that, for instance, high-level corporate officers

---

[979] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

[980] The Bureau applied the same methodology for the ongoing costs for small entities as that found in part IX.E.2 above.

such as CEOs and senior vice presidents could be directly involved in some regulatory tasks. The Bureau acknowledges the possibility that certain aspects of the final rule may require some small entities to hire additional compliance staff. The Bureau received many comments on its proposal that asserted that industry participants would have to hire additional employees to comply with the rule. The Bureau made changes to its estimates of one-time costs to reflect the additional one-time cost of hiring new staff. Compliance with the final rule may emphasize certain skills. For example, new data points may increase demand for skills involved in researching questions, standard annual editing, and post-submission editing. Nevertheless, the Bureau believes that compliance would still involve the general set of skills identified above. The recordkeeping and reporting requirements associated with the final rule would also involve skills for information technology system development, integration, and maintenance. Financial institutions required to report data under HMDA often use data management systems called HMDA Management Systems for existing regulatory purposes. A similar software for reporting the data required under the final rule could be developed by the institution internally or purchased from a third-party vendor. It

is possible that other systems used by financial institutions, such as loan origination systems, might also need to be upgraded to capture new data fields required to be collected and reported under the final rule. The professional skills required for this one-time upgrade would be related to software development, testing, system engineering, information technology project management, budgeting and operation.

F. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected; and for a Covered Agency, as Defined in Section 609(d)(2), a Description of the Steps the Agency Has Taken To Minimize Any Additional Cost of Credit for Small Entities

In drafting this final rule, the Bureau considered multiple financial institution reporting thresholds. In particular, the Bureau considered whether to exempt financial institutions with fewer than 25, 50, 200, or 500 originations of covered credit transactions for small businesses in each

of the two preceding calendar years, instead of 100 originations as finalized. The Bureau also considered whether to exempt depository institutions with assets under $100 million or $200 million from section 1071's data collection and reporting requirements. The Bureau expects that some burden reduction will result from the higher threshold of 100 loans.

The following table shows the estimated impact that different reporting thresholds the Bureau considered would have had on financial institution coverage. For the purposes of considering the asset-based threshold alternatives, the Bureau estimates how institutional coverage and costs would be different if the Bureau required a 25-origination threshold in addition to an asset-based threshold for depository institutions. For the asset-based threshold alternatives, the Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more than 25 originations in both 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018 exceeded the asset-based threshold.

TABLE 20—ESTIMATED IMPACT OF DIFFERENT REPORTING THRESHOLDS ON THE NUMBER AND PERCENTAGE OF SMALL DEPOSITORY INSTITUTIONS COVERED

| Threshold considered | Number of small depository institutions covered | % of small depository institutions covered |
| --- | --- | --- |
| 25 originations | 2,900–3,000 | 32–33 |
| 50 originations | 1,900–2,100 | 21–23 |
| 100 originations | 1,000–1,100 | 11–12 |
| 200 originations | 400–500 | 4–6 |
| 500 originations | 50–100 | 0.6–1 |
| 25 originations AND $100 million in assets | 2,400–2,500 | 26–28 |
| 25 originations AND $200 million in assets | 1,600–1,700 | 18–19 |

Further, the Bureau is finalizing several data points pursuant to its authority under ECOA section 704B(e)(2)(H) that is has concluded would help the data collection fulfill the purposes of section 1071: application method, application recipient, pricing, number of principal owners, NAICS code, number of workers, and time in business.

During the SBREFA process, small entity representatives provided detailed feedback on the data points that the Bureau was considering proposing pursuant to ECOA section

704B(e)(2)(H).[981] One small entity representative stated that the cost of collecting and reporting such data points under consideration would be significant, and another stated that the Bureau should include as few data points as possible to avoid unnecessary costs. Another small entity representative stated that the Bureau should finalize a rule with just the data points enumerated in 704B(e)(2)(A)

---

[981] The small entity representative feedback discussed herein can be found in the SBREFA Panel Report at 30–32.

through (G) and avoid adding any additional data points. Other small entity representatives favored or opposed the inclusion of some or all of the individual data points under consideration during the SBREFA process. Many industry commenters and SBA Office of Advocacy opposed the collection of any data points pursuant to section 704B(e)(2)(H). These commenters stated that such data points would be burdensome to collect and report, while some, particularly the

AdminRecord-000376

pricing data point, could be subject to misinterpretation by data users.

The Bureau understands that certain data points may introduce additional burden to small entities. However, the Bureau has determined that these data points would aid in fulfilling the statutory purposes of section 1071—facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the value of granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the profitability of extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs to comply with the proposed rule will be passed on in full to small business credit applicants in the form of higher prices or fees to small businesses.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071.[982] Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses. Respondents also had the opportunity to write in their own responses. Consistent with economic theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. On average, respondents reported that they would be least likely to exit some geographic

markets or cease offering small business credit products. Accordingly, the Bureau expects the likely impact of the rule on the cost of credit to small entities to be higher rates and fees because financial institutions pass on the variable ongoing costs of the required data collection. The Bureau estimates that $32, $26, and $7.50 in variable costs would be passed through per application to Type A, B, and C FIs, respectively. To put these values in context, the Bureau estimates that the per application net income is in a range of $66,000–$83,000; $33,000–$38,000; and $83,000–$92,000 for covered banks and savings associations of Types A, B, and C, respectively.

The Bureau also carefully considered the rule's potential impact on small entities in its decision related to transactional scope. For example, the Bureau is not covering trade credit in its 1071 final rule because it believes that trade credit is categorically different from products like loans, lines of credit, credit cards, and merchant cash advances and that there are several reasons to exclude it from coverage. As discussed in the section-by-section analysis of § 1002.104(b)(1), one such reason is that the Bureau understands that trade credit can be offered by entities that are themselves very small businesses; these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[983] The Bureau is also adding new § 1002.104(b)(5) to exclude all HMDA reportable transactions (i.e., covered loans as defined by Regulation C, 12 CFR 1003.2(e)). The Bureau is finalizing this exclusion of HMDA-reportable transactions in order to alleviate concerns from a broad range of industry commenters, including small entities, about the difficulties associated with dual reporting, particularly in light of potential inconsistencies related to demographic data collection and recordkeeping. Moreover, the final rule makes clear that the term covered credit transaction does not include consumer-designated credit used for business or agricultural purposes, because such transactions are not business credit. The Bureau believes that this interpretation will reduce burden for financial institutions (including smaller ones)

that offer only consumer-designated credit.

In response to the suggestion to exempt agricultural lending because of the impact on small local community financial institutions, such as credit unions, the Bureau is not defining a "covered credit transaction" in a way that would exclude agricultural credit from the final rule. As detailed in the section-by-section analysis of § 1002.104(a), the Bureau believes that covering agricultural credit in this rulemaking is important for both of section 1071's statutory purposes. The Bureau does note, however, that it is increasing its institutional coverage threshold, as discussed above, to minimize compliance costs for smaller financial institutions with lower lending volumes.

The Bureau believes that its adoption of a simplified small business definition better meets the needs of small businesses. The final rule provides that a business is a small business if its gross annual revenue for its preceding fiscal year is $5 million or less. As discussed in the section-by-section analysis of § 1002.106(b)(1), the Bureau believes that this approach addresses the concerns that the Bureau has heard (during the SBREFA process and in response to the NPRM) with respect to determining whether applicants are small businesses for purposes of complying with section 1071, particularly with respect to the concerns regarding determining the applicant's NAICS code.

## XI. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA),[984] Federal agencies are generally required to seek approval from the Office of Management and Budget (OMB) for information collection requirements prior to implementation. Under the PRA, the Bureau may not conduct nor sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.

As part of its continuing effort to reduce paperwork and respondent burden, the Bureau conducted a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on the information collection requirements in accordance with the PRA. This helps ensure that the public understands the Bureau's requirements or instructions, respondents can provide the requested data in the desired format,

---

[982] See One-Time Cost Survey at 11.

[983] See Leora Klapper et al., Trade Credit Contracts, 25(3) Review of Fin. Studies 838–67 (2012), https://academic.oup.com/rfs/article/25/3/838/1616515, and Justin Murfin & Ken Njoroge, The Implicit Costs of Trade Credit Borrowing by Large Firms, 28(1) Review of Fin. Studies 112–45 (2015) https://academic.oup.com/rfs/article/28/1/112/1681329.

[984] 44 U.S.C. 3501 et seq.

AdminRecord-000377

reporting burden (time and financial resources) is minimized, information collection instruments are clearly understood, and the Bureau can properly assess the impact of information collection requirements on respondents. The Bureau conducted several rounds of message, form, and user testing that were approved under OMB control number 3170–0022 after appropriate public notice and a 30-day comment period.

The final rule amends 12 CFR part 1002 (Regulation B), which implements ECOA. The Bureau's OMB control number for Regulation B is 3170–0013. This final rule will revise the information collection requirements contained in Regulation B that OMB has approved under that OMB control number.

Under the rule, the Bureau adds four information collection requirements to Regulation B:

1. Compilation of reportable data (§ 1002.107), including a notice requirement (in § 1002.107(a)(18) and (19)).

2. Reporting data to the Bureau (§ 1002.109).

3. Firewall notice requirement (§ 1002.108(d)).

4. Recordkeeping (§ 1002.111).

The information collection requirements in this final rule are mandatory. Certain data fields will be modified or deleted by the Bureau, in its discretion, to advance a privacy interest before the 1071 data are made available to the public (as permitted by section 1071 and the Bureau's final rule). The data that are not modified or deleted will be made available to the public. The rest of the data will be considered confidential if the information:

• Identifies any applicants or natural persons who might not be applicants (*e.g.,* owners of a business where a legal entity is the applicant); or

• Implicates the relevant privacy interests of applicants, related natural persons, or financial institutions.

The collections of information contained in this rule, and identified as such, have been submitted to OMB for review under section 3507(d) of the PRA. A complete description of the information collection requirements (including the burden estimate methods) is provided in the information collection request that the Bureau has submitted to OMB under the requirements of the PRA. The information collection request submitted to OMB requesting approval under the PRA for the information collection requirements contained herein is available at *www.regulations.gov* as well as on

OMB's public-facing docket at *www.reginfo.gov.*

*Title of Collection:* Regulation B: Equal Credit Opportunity Act.

*OMB Control Number:* 3170–0013.

*Type of Review:* Revision of a currently approved collection.

*Affected Public:* Private Sector; Federal and State Governments.

*Estimated Number of Respondents:* 2,470 (subpart B only).

*Estimated Total Annual Burden Hours:* 8,302,000 (subpart B only).

The Bureau will publish a separate **Federal Register** notice once OMB concludes its review announcing OMB approval of the information collections contained in this final rule.

In the NPRM, the Bureau invited comments on: (a) Whether the collection of information is necessary for the proper performance of the functions of the Bureau, including whether the information will have practical utility; (b) the accuracy of the Bureau's estimate of the burden of the collection of information, including the validity of the methods and the assumptions used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

No comments pertaining specifically to this section were received. The other comments on the rule generally are summarized above.

## XII. Congressional Review Act

Pursuant to the Congressional Review Act,[985] the Bureau will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States at least 60 days prior to the rule's published effective date. The Office of Information and Regulatory Affairs has designated this rule as a ''major rule'' as defined by 5 U.S.C. 804(2).

## List of Subjects in 12 CFR Part 1002

Banks, banking, Civil rights, Consumer protection, Credit, Credit unions, Marital status discrimination, National banks, Penalties.

## Authority and Issuance

For the reasons set forth in the preamble, the Bureau amends Regulation B, 12 CFR part 1002, as set forth below:

[985] 5 U.S.C. 801 *et seq.*

## PART 1002—EQUAL CREDIT OPPORTUNITY ACT (REGULATION B)

■ 1. The authority citation for part 1002 is revised to read as follows:

**Authority:** 12 U.S.C. 5512, 5581; 15 U.S.C. 1691b. Subpart B is also issued under 15 U.S.C. 1691c–2.

■ 2. Designate §§ 1002.1 through 1002.16 as subpart A under the following heading:

## Subpart A—General

### § 1002.1   [Amended

■ 3. In § 1002.1 amend the second sentence of paragraph (a) by removing the phrase ''this part applies'' and adding in its place ''this subpart applies''.

■ 4. Section 1002.2 is amended by revising the introductory text to read as follows:

### § 1002.2   Definitions.

For the purposes of this part, unless the context indicates otherwise or as otherwise defined in subpart B, the following definitions apply:

\*     \*     \*     \*     \*

■ 5. Section 1002.5 is amended by revising the introductory text of paragraph (a)(4) and adding paragraphs (a)(4)(vii) through (x) to read as follows:

### § 1002.5   Rules concerning requests for information.

(a) \* \* \*

(4) *Other permissible collection of information.* Notwithstanding paragraph (b) of this section, a creditor may collect information under the following circumstances provided that the creditor collects the information in compliance with § 1002.107(a)(18) and (19) and accompanying commentary, or appendix B to 12 CFR part 1003, as applicable:

\*     \*     \*     \*     \*

(vii) A creditor that was required to report small business lending data pursuant to § 1002.109 for any of the preceding five calendar years but is not currently a covered financial institution under § 1002.105(b) may collect information pursuant to subpart B of this part for covered applications from small businesses as defined in §§ 1002.103 and 1002.106(b) regarding whether an applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements for covered financial institutions pursuant to §§ 1002.107(a)(18) and (19), 1002.108, 1002.111, and 1002.112 for that

AdminRecord-000378

application. Such a creditor is permitted, but not required, to report data to the Bureau collected pursuant to subpart B of this part if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.109 and 1002.110.

(viii) A creditor that exceeded the loan-volume threshold in the first year of the two-year threshold period provided in § 1002.105(b) may, in the second year, collect information pursuant to subpart B of this part for covered applications from small businesses as defined in §§ 1002.103 and 1002.106(b) regarding whether an applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements for covered financial institutions pursuant to §§ 1002.107(a)(18) and (19), 1002.108, 1002.111, and 1002.112 for that application. Such a creditor is permitted, but not required, to report data to the Bureau collected pursuant to subpart B of this part if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.109 and 1002.110.

(ix) A creditor that is not currently a covered financial institution under § 1002.105(b), and is not otherwise a creditor to which § 1002.5(a)(4)(vii) or (viii) applies, may collect information pursuant to subpart B of this part for covered applications from small businesses as defined in §§ 1002.103 and 1002.106(b) regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners for a transaction if it complies with the requirements for covered financial institutions pursuant to §§ 1002.107 through 1002.112 for that application.

(x) A creditor that is collecting information pursuant to subpart B of this part or as described in paragraphs (a)(4)(vii) through (ix) of this section for covered applications from small businesses as defined in §§ 1002.103 and 1002.106(b) regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners may also collect that same information for any co-applicants provided that it also complies with the relevant requirements

of subpart B of this part or as described in paragraphs (a)(4)(vii) through (ix) of this section with respect to those co-applicants.

\*     \*     \*     \*     \*

■ 6. Section 1002.12 is amended by revising paragraphs (b)(1) introductory text, (b)(2) introductory text, (b)(3), (4), and (5), and paragraph (b)(7) introductory text to read as follows:

### § 1002.12   Record retention.

\*     \*     \*     \*     \*

(b) \* \* \* (1) *Applications.* For 25 months (12 months for business credit, except as provided in paragraph (b)(5) of this section or otherwise provided for in subpart B of this part) after the date that a creditor notifies an applicant of action taken on an application or of incompleteness, the creditor shall retain in original form or a copy thereof:

\*     \*     \*     \*     \*

(2) *Existing accounts.* For 25 months (12 months for business credit, except as provided in paragraph (b)(5) of this section or otherwise provided for in subpart B of this part) after the date that a creditor notifies an applicant of adverse action regarding an existing account, the creditor shall retain as to that account, in original form or a copy thereof:

\*     \*     \*     \*     \*

(3) *Other applications.* For 25 months (12 months for business credit, except as provided in paragraph (b)(5) of this section or otherwise provided for in subpart B of this part) after the date that a creditor receives an application for which the creditor is not required to comply with the notification requirements of § 1002.9, the creditor shall retain all written or recorded information in its possession concerning the applicant, including any notation of action taken.

(4) *Enforcement proceedings and investigations.* A creditor shall retain the information beyond 25 months (12 months for business credit, except as provided in paragraph (b)(5) of this section or otherwise provided for in subpart B) if the creditor has actual notice that it is under investigation or is subject to an enforcement proceeding for an alleged violation of the Act or this part, by the Attorney General of the United States or by an enforcement agency charged with monitoring that creditor's compliance with the Act and this part, or if it has been served with notice of an action filed pursuant to section 706 of the Act and § 1002.16 of this part. The creditor shall retain the information until final disposition of the matter, unless an earlier time is allowed by order of the agency or court.

(5) *Special rule for certain business credit applications.* With regard to a business that had gross revenues in excess of $1 million in its preceding fiscal year, or an extension of trade credit, credit incident to a factoring agreement, or other similar types of business credit, the creditor shall retain records for at least 60 days, except as otherwise provided for in subpart B, after notifying the applicant of the action taken. If within that time period the applicant requests in writing the reasons for adverse action or that records be retained, the creditor shall retain records for 12 months.

\*     \*     \*     \*     \*

(7) *Prescreened solicitations.* For 25 months after the date on which an offer of credit is made to potential customers (12 months for business credit, except as provided in paragraph (b)(5) of this section or otherwise provided for in subpart B), the creditor shall retain in original form or a copy thereof:

\*     \*     \*     \*     \*

■ 7. Subpart B is added to read as follows:

### Subpart B—Small Business Lending Data Collection

Sec.
§ 1002.101   Authority, purpose, and scope.
§ 1002.102   Definitions.
§ 1002.103   Covered applications.
§ 1002.104   Covered credit transactions and excluded transactions.
§ 1002.105   Covered financial institutions and exempt institutions.
§ 1002.106   Business and small business.
§ 1002.107   Compilation of reportable data.
§ 1002.108   Firewall.
§ 1002.109   Reporting of data to the Bureau.
§ 1002.110   Publication of data and other disclosures.
§ 1002.111   Recordkeeping.
§ 1002.112   Enforcement.
§ 1002.113   Severability.
§ 1002.114   Effective date, compliance date, and special transitional rules.

### Subpart B—Small Business Lending Data Collection

#### § 1002.101   Authority, purpose, and scope.

(a) *Authority and scope.* This subpart to Regulation B is issued by the Bureau pursuant to section 704B of the Equal Credit Opportunity Act (15 U.S.C. 1691c–2). Except as otherwise provided herein, this subpart applies to covered financial institutions, as defined in § 1002.105(b), other than a person excluded from coverage of this part by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

(b) *Purpose.* This subpart implements section 704B of the Equal Credit

AdminRecord-000379

Opportunity Act, which Congress intended:

(1) To facilitate enforcement of fair lending laws; and

(2) To enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

### § 1002.102    Definitions.

In this subpart:

(a) *Affiliate* means, with respect to a financial institution, any company that controls, is controlled by, or is under common control with, another company, as set forth in the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*). With respect to a business or an applicant, *affiliate* shall have the same meaning as in 13 CFR 121.103.

(b) *Applicant* means any person who requests or who has received an extension of business credit from a financial institution.

(c) *Business* is defined in § 1002.106(a).

(d) *Business credit* shall have the same meaning as in § 1002.2(g).

(e) *Closed-end credit transaction* means an extension of business credit that is not an open-end credit transaction under paragraph (n) of this section.

(f) *Covered application* is defined in § 1002.103.

(g) *Covered credit transaction* is defined in § 1002.104.

(h) *Covered financial institution* is defined in § 1002.105(b).

(i) *Credit* shall have the same meaning as in § 1002.2(j).

(j) *Financial institution* is defined in § 1002.105(a).

(k) *LGBTQI+ individual* includes an individual who identifies as lesbian, gay, bisexual, transgender, queer, or intersex.

(l) *LGBTQI+-owned business* means a business for which one or more LGBTQI+ individuals hold more than 50 percent of its ownership or control, and for which more than 50 percent of the net profits or losses accrue to one or more such individuals.

(m) *Minority-owned business* means a business for which one or more American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individuals hold more than 50 percent of its ownership or control, and for which more than 50 percent of the net profits or losses accrue to one or more such individuals.

(n) *Open-end credit transaction* means an open-end credit plan as

defined in Regulation Z, 12 CFR 1026.2(a)(20), but without regard to whether the credit is consumer credit, as defined in § 1026.2(a)(12), is extended by a creditor, as defined in § 1026.2(a)(17), or is extended to a consumer, as defined in § 1026.2(a)(11).

(o) *Principal owner* means an individual who directly owns 25 percent or more of the equity interests of a business.

(p) *Small business* is defined in § 1002.106(b).

(q) *Small business lending application register* or *register* means the data reported, or required to be reported, annually pursuant to § 1002.109.

(r) *State* shall have the same meaning as in § 1002.2(aa).

(s) *Women-owned business* means a business for which more than 50 percent of its ownership or control is held by one or more women, and more than 50 percent of its net profits or losses accrue to one or more women.

### § 1002.103    Covered applications.

(a) *Covered application.* Except as provided in paragraph (b) of this section, covered application means an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested.

(b) *Circumstances that are not covered applications.* A covered application does not include:

(1) Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.

(2) Inquiries and prequalification requests.

### § 1002.104    Covered credit transactions and excluded transactions.

(a) *Covered credit transaction* means an extension of business credit that is not an excluded transaction under paragraph (b) of this section.

(b) *Excluded transactions.* The requirements of this subpart do not apply to:

(1) *Trade credit.* A financing arrangement wherein a business acquires goods or services from another business without making immediate payment in full to the business providing the goods or services.

(2) *Home Mortgage* Disclosure *Act (HMDA)-reportable transactions.* A covered loan, or application therefor, as defined by Regulation C, 12 CFR 1003.2(e).

(3) *Insurance premium financing.* A financing arrangement wherein a business agrees to pay to a financial institution, in installments, the

principal amount advanced by the financial institution to an insurer or insurance producer in payment of premium on the business's insurance contract or contracts, plus charges, and, as security for repayment, the business assigns to the financial institution certain rights, obligations, and/or considerations (such as the unearned premiums, accrued dividends, or loss payments) in its insurance contract or contracts. Insurance premium financing does not include the financing of insurance policy premiums obtained in connection with the financing of goods and services.

(4) *Public utilities credit.* Public utilities credit as defined in § 1002.3(a)(1).

(5) *Securities credit.* Securities credit as defined in § 1002.3(b)(1).

(6) *Incidental credit.* Incidental credit as defined in § 1002.3(c)(1), but without regard to whether the credit is consumer credit, as defined in § 1002.2(h).

### § 1002.105    Covered financial institutions and exempt institutions.

(a) *Financial institution* means any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity.

(b) *Covered financial institution* means a financial institution that originated at least 100 covered credit transactions for small businesses in each of the two preceding calendar years.

### § 1002.106    Business and small business.

(a) *Business* has the same meaning as the term "business concern or concern" in 13 CFR 121.105.

(b) *Small business definition*—(1) *Small business* has the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. Notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of this subpart, a business is a small business if its gross annual revenue, as defined in § 1002.107(a)(14), for its preceding fiscal year is $5 million or less.

(2) *Inflation adjustment.* Every 5 years after January 1, 2025, the gross annual revenue threshold set forth in paragraph (b)(1) of this section shall adjust based on changes to the Consumer Price Index for All Urban Consumers (U.S. city average series for all items, not seasonally adjusted), as published by the United States Bureau of Labor Statistics. Any adjustment that takes effect under this paragraph shall be rounded to the nearest multiple of $500,000. If an adjustment is to take

AdminRecord-000380

effect, it will do so on January 1 of the following calendar year.

### § 1002.107 Compilation of reportable data.

(a) *Data format and itemization.* A covered financial institution shall compile and maintain data regarding covered applications from small businesses. The data shall be compiled in the manner prescribed herein and the Filing Instructions Guide for this subpart for the appropriate year. The data compiled shall include the items described in paragraphs (a)(1) through (20) of this section.

(1) *Unique identifier.* An alphanumeric identifier, starting with the legal entity identifier of the financial institution, unique within the financial institution to the specific covered application, and which can be used to identify and retrieve the specific file or files corresponding to the application for or extension of credit.

(2) *Application date.* The date the covered application was received or the date shown on a paper or electronic application form.

(3) *Application method.* The means by which the applicant submitted the covered application directly or indirectly to the financial institution.

(4) *Application recipient.* Whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party.

(5) *Credit type.* The following information regarding the type of credit applied for or originated:

(i) *Credit product.* The credit product.

(ii) *Guarantees.* The type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated.

(iii) *Loan term.* The length of the loan term, in months, if applicable.

(6) *Credit purpose.* The purpose or purposes of the credit applied for or originated.

(7) *Amount applied for.* The initial amount of credit or the initial credit limit requested by the applicant.

(8) *Amount approved or originated.* (i) For an application for a closed-end credit transaction that is approved but not accepted, the amount approved by the financial institution; or

(ii) For a closed-end credit transaction that is originated, the amount of credit originated; or

(iii) For an application for an open-end credit transaction that is originated or approved but not accepted, the amount of the credit limit approved.

(9) *Action taken.* The action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete.

(10) *Action taken date.* The date of the action taken by the financial institution.

(11) *Denial reasons.* For denied applications, the principal reason or reasons the financial institution denied the covered application.

(12) *Pricing information.* The following information regarding the pricing of a covered credit transaction that is originated or approved but not accepted, as applicable:

(i) *Interest rate.* (A) If the interest rate is fixed, the interest rate that is or would be applicable to the covered credit transaction; or

(B) If the interest rate is adjustable, the margin, index value, initial rate period expressed in months (if applicable), and index name that is or would be applicable to the covered credit transaction;

(ii) *Total origination charges.* The total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars;

(iii) *Broker fees.* The total amount of all charges included in paragraph (a)(12)(ii) of this section that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars;

(iv) *Initial annual charges.* The total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars;

(v) *Additional cost for merchant cash advances or other sales-based financing.* For a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid, expressed in dollars; and

(vi) *Prepayment penalties.* (A) Notwithstanding whether such a provision was in fact included, whether the financial institution could have included a charge to be imposed for paying all or part of the transaction's principal before the date on which the principal is due under the policies and procedures applicable to the covered credit transaction; and

(B) Notwithstanding the response to paragraph (a)(12)(vi)(A) of this section, whether the terms of the covered credit transaction do in fact include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

(13) *Census tract.* The census tract in which is located:

(i) The address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or

(ii) If the information in paragraph (a)(13)(i) of this section is unknown, the address or location of the main office or headquarters of the applicant; or

(iii) If the information in both paragraphs (a)(13)(i) and (ii) of this section is unknown, another address or location associated with the applicant.

(iv) The financial institution shall also indicate which one of the three types of addresses or locations listed in paragraphs (a)(13)(i), (ii), or (iii) of this section the census tract is based on.

(14) *Gross annual revenue.* The applicant's gross annual revenue for its preceding fiscal year.

(15) *NAICS code.* A 3-digit North American Industry Classification System (NAICS) code for the applicant.

(16) *Number of workers.* The number of non-owners working for the applicant.

(17) *Time in business.* The time the applicant has been in business.

(18) *Minority-owned, women-owned, and LGBTQI+-owned business statuses.* Whether the applicant is a minority-owned, women-owned, and/or LGBTQI+-owned business. When requesting minority-owned, women-owned, and LGBTQI+-owned business statuses from an applicant, the financial institution shall inform the applicant that the financial institution cannot discriminate on the basis of minority-owned, women-owned, or LGBTQI+-owned business statuses, or on whether the applicant provides this information.

(19) *Ethnicity, race, and sex of principal owners.* The ethnicity, race, and sex of the applicant's principal owners. When requesting ethnicity, race, and sex information from an applicant, the financial institution shall inform the applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex, or on whether the applicant provides this information.

(20) *Number of principal owners.* The number of the applicant's principal owners.

(b) *Reliance on and verification of applicant-provided data.* Unless otherwise provided in this subpart, the financial institution may rely on information from the applicant, or appropriate third-party sources, when compiling data. If the financial institution verifies applicant-provided data, however, it shall report the verified data.

(c) *Time and manner of collection—*
(1) *In general.* A covered financial institution shall not discourage an applicant from responding to requests for applicant-provided data under paragraph (a) of this section and shall otherwise maintain procedures to collect such data at a time and in a manner that are reasonably designed to obtain a response.

(2) *Applicant-provided data collected directly from the applicant.* For data collected directly from the applicant, procedures that are reasonably designed to obtain a response shall include provisions for the following:

(i) The initial request for applicant-provided data occurs prior to notifying an applicant of final action taken on a covered application;

(ii) The request for applicant-provided data is prominently displayed or presented;

(iii) The collection does not have the effect of discouraging an applicant from responding to a request for applicant-provided data; and

(iv) Applicants can easily respond to a request for applicant-provided data.

(3) *Procedures to monitor compliance.* A covered financial institution shall maintain procedures to identify and respond to indicia of potential discouragement, including low response rates for applicant-provided data.

(4) *Low response rates.* A low response rate for applicant-provided data may indicate discouragement or other failure by a covered financial institution to maintain procedures to collect applicant-provided data that are reasonably designed to obtain a response.

(d) *Previously collected data.* A covered financial institution is permitted, but not required, to reuse previously collected data to satisfy paragraphs (a)(13) through (20) of this section if:

(1) To satisfy paragraphs (a)(13) and (a)(15) through (20) of this section, the data were collected within the 36 months preceding the current covered application, or to satisfy paragraph (a)(14) of this section, the data were collected within the same calendar year as the current covered application; and

(2) The financial institution has no reason to believe the data are inaccurate.

**§ 1002.108  Firewall.**

(a) *Definitions.* For purposes of this section, the following terms shall have the following meanings:

(1) *Involved in making any determination concerning a covered application from a small business* means participating in a decision regarding the evaluation of a covered application from a small business or the creditworthiness of a small business applicant for a covered credit transaction.

(2) *Should have access* means that an employee or officer may need to collect, see, consider, refer to, or otherwise use the information to perform that employee's or officer's assigned job duties.

(b) *Prohibition on access to certain information.* Unless the exception under paragraph (c) of this section applies, an employee or officer of a covered financial institution or a covered financial institution's affiliate shall not have access to an applicant's responses to inquiries that the financial institution makes pursuant to this subpart regarding whether the applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business under § 1002.107(a)(18), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(19), if that employee or officer is involved in making any determination concerning that applicant's covered application.

(c) *Exception to the prohibition on access to certain information.* The prohibition in paragraph (b) of this section shall not apply to an employee or officer if the financial institution determines that it is not feasible to limit that employee's or officer's access to an applicant's responses to the financial institution's inquiries under § 1002.107(a)(18) or (19) and the financial institution provides the notice required under paragraph (d) of this section to the applicant. It is not feasible to limit access as required pursuant to paragraph (b) of this section if the financial institution determines that an employee or officer involved in making any determination concerning a covered application from a small business should have access to one or more applicants' responses to the financial institution's inquiries under § 1002.107(a)(18) or (19).

(d) *Notice.* In order to satisfy the exception set forth in paragraph (c) of this section, a financial institution shall provide a notice to each applicant whose responses will be accessed, informing the applicant that one or more employees or officers involved in making determinations concerning the covered application may have access to the applicant's responses to the financial institution's inquiries regarding whether the applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and regarding the ethnicity, race, and sex of the applicant's principal owners. The financial institution shall

provide the notice required by this paragraph (d) when making the inquiries required under § 1002.107(a)(18) and (19) and together with the notices required pursuant to § 1002.107(a)(18) and (19).

**§ 1002.109  Reporting of data to the Bureau.**

(a) *Reporting to the Bureau—*(1) *Annual reporting.* (i) On or before June 1 following the calendar year for which data are compiled and maintained as required by § 1002.107, a covered financial institution shall submit its small business lending application register in the format prescribed by the Bureau.

(ii) An authorized representative of the covered financial institution with knowledge of the data shall certify to the accuracy and completeness of the data reported pursuant to this paragraph (a).

(iii) When the last day for submission of data prescribed under paragraph (a)(1) of this section falls on a Saturday or Sunday, a submission shall be considered timely if it is submitted on the next succeeding Monday.

(2) *Reporting by subsidiaries.* A covered financial institution that is a subsidiary of another covered financial institution shall complete a separate small business lending application register. The subsidiary shall submit its small business lending application register, directly or through its parent, to the Bureau.

(3) *Reporting obligations where multiple financial institutions are involved in a covered credit transaction.* Where it is necessary for more than one financial institution to make a credit decision in order to approve a single covered credit transaction, only the last covered financial institution with authority to set the material terms of the covered credit transaction is required to report the application. Financial institutions report the actions of their agents.

(b) *Financial institution identifying information.* A financial institution shall provide each of the following with its submission:

(1) Its name.

(2) Its headquarters address.

(3) The name and business contact information of a person that the Bureau or other regulators may contact about the financial institution's submission.

(4) Its Federal prudential regulator, if applicable.

(5) Its Federal Taxpayer Identification Number (TIN).

(6) Its Legal Entity Identifier (LEI).

(7) Its Research, Statistics, Supervision, and Discount

identification (RSSD ID) number, if applicable.

(8) Parent entity information, if applicable, including:

(i) The name of the immediate parent entity;

(ii) The LEI of the immediate parent entity, if available;

(iii) The RSSD ID number of the immediate parent entity, if available;

(iv) The name of the top-holding parent entity;

(v) The LEI of the top-holding parent entity, if available; and

(vi) The RSSD ID number of the top-holding parent entity, if available.

(9) The type of financial institution that it is, indicated by selecting the appropriate type or types of institution from the list provided.

(10) Whether the financial institution is voluntarily reporting covered applications from small businesses.

(c) *Procedures for the submission of data to the Bureau.* The Bureau shall make available a Filing Instructions Guide, containing technical instructions for the submission of data to the Bureau pursuant to this section, as well as any related materials, at *https:// www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/.*

### § 1002.110  Publication of data and other disclosures.

(a) *Publication of small business lending application registers and associated financial institution information.* The Bureau shall make available to the public generally the data reported to it by financial institutions pursuant to § 1002.109, subject to deletions or modifications made by the Bureau if the Bureau determines that the deletion or modification of the data would advance a privacy interest. The Bureau shall make such data available on an annual basis.

(b) *Publication of aggregate data.* The Bureau may compile and aggregate data submitted by financial institutions pursuant to § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate.

(c) *Statement of financial institution's small business lending data available on the Bureau's website.* A covered financial institution shall make available to the public on its website, or otherwise upon request, a statement that the covered financial institution's small business lending application register, as modified by the Bureau pursuant to § 1002.110(a), is or will be available from the Bureau. A financial institution shall use language provided by the Bureau, or substantially similar

language, to satisfy the requirement to provide a statement pursuant to this paragraph (c).

(d) *Availability of statements.* A covered financial institution shall make the notice required by paragraph (c) of this section available to the public on its website when it submits a small business lending application register to the Bureau pursuant to § 1002.109(a)(1), and shall maintain the notice for as long as it has an obligation to retain its small business lending application registers pursuant to § 1002.111(a).

(e) *Further disclosure prohibited*—(1) *Disclosure by a financial institution.* A financial institution shall not disclose or provide to a third party the information it collects pursuant to § 1002.107(a)(18) and (19) except to further compliance with the Act or this part or as required by law.

(2) *Disclosure by a third party.* A third party that obtains information collected pursuant to § 1002.107(a)(18) and (19) for the purpose of furthering compliance with the Act or this part is prohibited from any further disclosure of such information except to further compliance with the Act or this part or as required by law.

### § 1002.111  Recordkeeping.

(a) *Record retention.* A covered financial institution shall retain evidence of compliance with this subpart, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the Bureau pursuant to § 1002.109.

(b) *Certain information kept separate from the rest of the application.* A financial institution shall maintain, separately from the rest of the application and accompanying information, an applicant's responses to the financial institution's inquiries pursuant to this subpart regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, and/or an LGBTQI+-owned business under § 1002.107(a)(18), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(19).

(c) *Limitation on personally identifiable information in certain records retained under this section.* In reporting a small business lending application register pursuant to § 1002.109, maintaining the register pursuant to paragraph (a) of this section, and maintaining a separate record of information pursuant to paragraph (b) of this section, a financial institution shall not include any name, specific address, telephone number, email address, or

any other personally identifiable information concerning any individual who is, or is connected with, an applicant, other than as required pursuant to § 1002.107 or paragraph (b) of this section.

### § 1002.112  Enforcement.

(a) *Administrative enforcement and civil liability.* A violation of section 704B of the Act or this subpart is subject to administrative sanctions and civil liability as provided in sections 704 (15 U.S.C. 1691c) and 706 (15 U.S.C. 1691e) of the Act, where applicable.

(b) *Bona fide errors.* A bona fide error in compiling, maintaining, or reporting data with respect to a covered application is one that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. A bona fide error is not a violation of the Act or this subpart. A financial institution is presumed to maintain procedures reasonably adapted to avoid such errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose in appendix F to this part. However, an error is not a bona fide error if either there is a reasonable basis to believe the error was intentional or there is evidence that the financial institution does not or has not maintained procedures reasonably adapted to avoid such errors.

(c) *Safe harbors*—(1) *Incorrect entry for application date.* A financial institution does not violate the Act or this subpart if it reports on its small business lending application register an application date that is within three business days of the actual application date pursuant to § 1002.107(a)(2).

(2) *Incorrect entry for census tract.* An incorrect entry for census tract is not a violation of the Act or this subpart if the financial institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau.

(3) *Incorrect entry for NAICS code.* An incorrect entry for a 3-digit NAICS code is not a violation of the Act or this subpart, provided that the financial institution obtained the 3-digit NAICS code by:

(i) Relying on an applicant's representations or on an appropriate third-party source, in accordance with § 1002.107(b), regarding the NAICS code; or

(ii) Identifying the NAICS code itself, provided that the financial institution maintains procedures reasonably adapted to correctly identify a 3-digit NAICS code.

AdminRecord-000383

(4) *Incorrect determination of small business status, covered credit transaction, or covered application.* A financial institution that initially collects data regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners pursuant to § 1002.107(a)(18) and (19) but later concludes that it should not have collected such data does not violate the Act or this regulation if the financial institution, at the time it collected this data, had a reasonable basis for believing that the application was a covered application for a covered credit transaction from a small business pursuant to §§ 1002.103, 1002.104, and 1002.106, respectively. A financial institution seeking to avail itself of this safe harbor shall comply with the requirements of this subpart as otherwise required pursuant to §§ 1002.107, 1002.108, and 1002.111 with respect to the collected data.

### § 1002.113  Severability.

If any provision of this subpart, or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect.

### § 1002.114  Effective date, compliance date, and special transitional rules.

(a) *Effective date.* The effective date for this subpart is August 29, 2023.

(b) *Compliance date.* The dates by which covered financial institutions are initially required to comply with the requirements of this subpart are as follows:

(1) A covered financial institution that originated at least 2,500 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning October 1, 2024.

(2) A covered financial institution that is not subject to paragraph (b)(1) of this section and that originated at least 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning April 1, 2025.

(3) A covered financial institution that is not subject to paragraphs (b)(1) or (2) of this section and that originated at least 100 covered credit transactions for small businesses in each of calendar years 2022 and 2023 shall comply with the requirements of this subpart beginning January 1, 2026.

(4) A financial institution that did not originate at least 100 covered credit transactions for small businesses in each of calendar years 2022 and 2023 but subsequently originates at least 100 such transactions in two consecutive calendar years shall comply with the requirements of this subpart in accordance with § 1002.105(b), but in any case no earlier than January 1, 2026.

(c) *Special transitional rules—*(1) *Collection of certain information prior to a financial institution's compliance date.* A financial institution as described in paragraphs (b)(1), (2), or (3) of this section is permitted, but not required, to collect information regarding whether an applicant for a covered credit transaction is a minority-owned business, a women-owned business, and/or an LGBTQI+-owned business under § 1002.107(a)(18), and the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(19) beginning 12 months prior to its applicable compliance date as set forth in paragraphs (b)(1), (2), or (3) of this section. A financial institution collecting such information pursuant to this paragraph (c)(1) must do so in accordance with the requirements set out in §§ 1002.107(a)(18) and (19), 1002.108, and 1002.111(b) and (c).

(2) *Determining which compliance date applies to a financial institution that does not collect information sufficient to determine small business status.* A financial institution that is unable to determine the number of covered credit transactions it originated for small businesses in each of calendar years 2022 and 2023 for purposes of determining its compliance date pursuant to paragraph (b) of this section, because for some or all of this period it does not have readily accessible the information needed to determine whether its covered credit transactions were originated for small businesses as defined in § 1002.106(b), is permitted to use any reasonable method to estimate its originations to small businesses for either or both of the calendar years 2022 and 2023.

AdminRecord-000384

■ 7. Appendices E and F are added to read as follows:

**Appendix E to Part 1002—Sample Form for Collecting Certain Applicant-Provided Data Under Subpart B**

BILLING CODE 4810–AM–P

# Sample data collection form

Federal law requires that we request the following information to help ensure that all small businesses applying for loans and other kinds of credit are treated fairly and that communities' small business credit needs are met.

One or more employees or officers involved in making a determination concerning your application may have access to the information provided on this form. However, **FEDERAL LAW PROHIBITS DISCRIMINATION** on the basis of your answers on this form. Additionally, we cannot discriminate on the basis of whether you provide this information.

While you are not required to provide this information, we encourage you to do so. Importantly, our staff are not permitted to discourage you in any way from responding to these questions. **Filling out this form will help to ensure that ALL small business owners are treated fairly.**

## Business ownership status

Please indicate the business ownership status of your small business. For the purposes of this form, your business is a minority-owned, women-owned, or LGBTQI+-owned business if one or more minorities,* women, or LGBTQI+ individuals (i) directly or indirectly own or control more than 50 percent of the business AND (ii) receive more than 50 percent of the net profits/losses of the business.

### What is your business ownership status?
*(Check one or more of the options below)*

☐ **Minority-owned business**
☐ **Women-owned business**
☐ **LGBTQI+-owned business**
  — or —
☐ **None of these apply**
  — or —
☐ **I do not wish to provide this information**

*Minority means Hispanic or Latino, American Indian or Alaska Native, Asian, Black or African American, or Native Hawaiian or Other Pacific Islander. A multi-racial or multi-ethnic individual is a minority for this purpose.

## Number of principal owners

For purposes of this form, a principal owner is any individual who owns 25 percent or more of the equity interest of a business. A business might not have any principal owners if, for example, it is not directly owned by any individuals (i.e., if it is owned by another entity or entities) or if no individual directly owns at least 25 percent of the business.

### How many principal owners does your business have? *(Check one)*

☐ 0
☐ 1
☐ 2
☐ 3
☐ 4

## Demographic information about principal owners

As a reminder, applicants are not required to provide this information but are encouraged to do so. We cannot discriminate on the basis of any person's ethnicity, race, or sex/gender. Additionally, we cannot discriminate on the basis of whether you provide this information.

**Please fill out one sheet for each principal owner.**

**❶ Are you Hispanic or Latino?**
*i.e., What's your ethnicity? (Check one or more)*

☐ **Hispanic or Latino**
- ☐ Cuban
- ☐ Mexican
- ☐ Puerto Rican
- ☐ Other Hispanic or Latino *(Please specify your origin, for example, Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on):*

☐ **Not Hispanic or Latino**
 — or —
☐ **I do not wish to provide my ethnicity**

**❷ What is your sex/gender?**
*(Please specify):*

— or —
☐ **I do not wish to provide my sex/gender**

**❸ What is your race?**
*(Check one or more)*

☐ **American Indian or Alaska Native** *(Please specify the name of your enrolled or principal tribe):*

☐ **Asian**
- ☐ Asian Indian
- ☐ Chinese
- ☐ Filipino
- ☐ Japanese
- ☐ Korean
- ☐ Vietnamese
- ☐ Other Asian *(Please specify your race, for example, Cambodian, Hmong, Laotian, Pakistani, Thai, and so on):*

☐ **Black or African American**
- ☐ African American
- ☐ Ethiopian
- ☐ Haitian
- ☐ Jamaican
- ☐ Nigerian
- ☐ Somali
- ☐ Other Black or African American *(Please specify your race, for example, Barbadian, Ghanaian, South African, and so on):*

☐ **Native Hawaiian or Other Pacific Islander**
- ☐ Guamanian or Chamorro
- ☐ Native Hawaiian
- ☐ Samoan
- ☐ Other Pacific Islander *(Please specify your race, for example, Fijian, Tongan, and so on):*

☐ **White**
 — or —
☐ **I do not wish to provide my race**

BILLING CODE 4810–AM–C

**Appendix F to Part 1002—Tolerances for Bona Fide Errors in Data Reported Under Subpart B**

As set out in § 1002.112(b) and in comment 112(b)–1, a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of a financial institution's data submission for a given data field do not equal or exceed the threshold in column C of the following table (Table 1, Tolerance Thresholds for Bona Fide Errors):

AdminRecord-000386

TABLE 1 TO APPENDIX F—TOLERANCE THRESHOLDS FOR BONA FIDE ERRORS

| Small business lending application register count | Random sample size[986] | Threshold (#) | Threshold (%) |
|---|---|---|---|
| (A) | (B) | (C) | (D) |
| 100–130 | 47 | 3 | 6.4 |
| 131–190 | 56 | 3 | 5.4 |
| 191–500 | 59 | 3 | 5.1 |
| 501–100,000 | 79 | 4 | 5.1 |
| 100,001+ | 159 | 4 | 2.5 |

The size of the random sample, under column B, shall depend on the size of the financial institution's small business lending application register, as shown in column A of the Threshold Table.

The thresholds in column C of the Threshold Table reflect the number of unintentional errors a financial institution may make within a particular data field (e.g., the credit product data field within the credit type data point or the ethnicity data field for a particular principal owner within the ethnicity, race, and sex of principal owners data point) in a small business lending application register that would be deemed bona fide errors for purposes of § 1002.112(b).

For instance, a financial institution that submitted a small business lending application register containing 105 applications would be subject to a threshold of three errors per data field. If the financial institution had made two errors in reporting loan amount and two errors reporting gross annual income, all of these errors would be covered by the bona fide error provision of § 1002.112(b) and would not constitute a violation of the Act or this part. If the same financial institution had made four errors in reporting loan amount and two errors reporting gross annual income, the bona fide error provision of § 1002.112(b) would not apply to the four loan amount errors but would still apply to the two gross annual income errors.

Even when the number of errors in a particular data field do not equal or exceed the threshold in column C, if either there is a reasonable basis to believe that errors in that field were intentional or there is evidence that the financial institution did not maintain procedures reasonably adapted to avoid such errors, then the errors are not bona fide errors under § 1002.112(b).

For purposes of determining bona fide errors under § 1002.112(b), the term "data field" generally refers to individual fields. Some data fields may allow for more than one response. For example, with respect to information on the ethnicity or race of an applicant's principal owners, a data field may identify more than one race or more than one ethnicity for a given person. If one

986 For a financial institution with fewer than 30 entries in its small business lending application register, the full sample size is the financial institution's total number of entries. The threshold number for such financial institutions remains three. Accordingly, the threshold percentage will be higher for financial institutions with fewer than 30 entries in their registers

or more of the ethnicities or races identified in a data field are erroneous, they count as one (and only one) error for that data field.

■ 8. In Supplement I to part 1002:
■ a. Under *Section 1002.5—Rules Concerning Requests for Information,* revise *Paragraph 5(a)(2)* and *Paragraph 5(a)(4);*
■ b. Under *Section 1002.12—Record Retention,* revise *12(b)(7) Preapplication marketing information;*
■ c. Under *Section 1002.13— Information for Monitoring Purposes,* revise *13(b) Obtaining of information;* and
■ d. Add: *Section 1002.102— Definitions; Section 1002.103—Covered Applications; Section 1002.104— Covered Credit Transactions and Excluded Transactions; Section 1002.105—Covered Financial Institutions and Exempt Institutions; Section 1002.106—Business and Small Business; Section 1002.107— Compilation of Reportable Data; Section 1002.108—Firewall; Section 1002.109— Reporting of Data to the Bureau; Section 1002.110—Publication of Data and Other Disclosures; Section 1002.111— Recordkeeping; Section 1002.112— Enforcement;* and *Section 1002.114— Effective Date, Compliance Date, and Special Transition Rules.*

The revisions and additions read as follows:

**Supplement I to Part 1002—Official Interpretations**

\*    \*    \*    \*    \*

*Section 1002.5—Rules Concerning Requests for Information*

5(a)(2) Required Collection of Information

1. *Local laws.* Information that a creditor is allowed to collect pursuant to a "state" statute or regulation includes information required by a local statute, regulation, or ordinance.

2. *Information required by Regulation C.* Regulation C, 12 CFR part 1003, generally requires creditors covered by the Home Mortgage Disclosure Act

(HMDA) to collect and report information about the race, ethnicity, and sex of applicants for certain dwelling-secured loans, including some types of loans not covered by § 1002.13.

3. *Collecting information on behalf of creditors.* Persons such as loan brokers and correspondents do not violate the ECOA or Regulation B if they collect information that they are otherwise prohibited from collecting, where the purpose of collecting the information is to provide it to a creditor that is subject to subpart B of this part, the Home Mortgage Disclosure Act, or another Federal or State statute or regulation requiring data collection.

4. *Information required by subpart B.* Subpart B of this part generally requires creditors that are covered financial institutions as defined in § 1002.105(b) to collect and report information about the ethnicity, race, and sex of the principal owners of applicants for certain small business credit, as well as whether the applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business, as defined in § 1002.102(m), (s), and (*l*), respectively.

5(a)(4) Other Permissible Collection of Information

1. *Other permissible collection of information.* Information regarding ethnicity, race, and sex that is not required to be collected pursuant to Regulation C, 12 CFR part 1003, or subpart B of this part, may nevertheless be collected under the circumstances set forth in § 1002.5(a)(4) without violating § 1002.5(b). The information collected pursuant to 12 CFR part 1003 must be retained pursuant to the requirements of § 1002.12. The information collected pursuant to subpart B of this part must be retained pursuant to the requirements set forth in § 1002.111.

\*    \*    \*    \*    \*

*Section 1002.12—Record Retention*

\*    \*    \*    \*    \*

12(b) Preservation of Records

\*    \*    \*    \*    \*

## 12(b)(7) Preapplication Marketing Information

1. *Prescreened credit solicitations.* The rule requires creditors to retain copies of prescreened credit solicitations. For purposes of this part, a prescreened solicitation is an "offer of credit" as described in 15 U.S.C. 1681a(1) of the Fair Credit Reporting Act. A creditor complies with § 1002.12(b)(7) if it retains a copy of each solicitation mailing that contains different terms, such as the amount of credit offered, annual percentage rate, or annual fee.

2. *List of criteria.* A creditor must retain the list of criteria used to select potential recipients. This includes the criteria used by the creditor both to determine the potential recipients of the particular solicitation and to determine who will actually be offered credit.

3. *Correspondence.* A creditor may retain correspondence relating to consumers' complaints about prescreened solicitations in any manner that is reasonably accessible and is understandable to examiners. There is no requirement to establish a separate database or set of files for such correspondence, or to match consumer complaints with specific solicitation programs.

\*　　\*　　\*　　\*　　\*

## Section 1002.13—Information for Monitoring Purposes

\*　　\*　　\*　　\*　　\*

## 13(b) Obtaining of Information

1. *Forms for collecting data.* A creditor may collect the information specified in § 1002.13(a) either on an application form or on a separate form referring to the application. Appendix B to this part provides for two alternative data collection model forms for use in complying with the requirements of § 1002.13(a)(1)(i) and (ii) to collect information concerning an applicant's ethnicity, race, and sex. When a creditor collects ethnicity and race information pursuant to § 1002.13(a)(1)(i)(A), the applicant must be offered the option to select more than one racial designation. When a creditor collects ethnicity and race information pursuant to § 1002.13(a)(1)(i)(B), the applicant must be offered the option to select more than one ethnicity designation and more than one racial designation.

2. *Written applications.* The regulation requires written applications for the types of credit covered by § 1002.13. A creditor can satisfy this requirement by recording on paper or by means of computer the information that the applicant provides orally and that

the creditor normally considers in a credit decision.

3. *Telephone, mail applications.* i. A creditor that accepts an application by telephone or mail must request the monitoring information.

ii. A creditor that accepts an application by mail need not make a special request for the monitoring information if the applicant has failed to provide it on the application form returned to the creditor.

iii. If it is not evident on the face of an application that it was received by mail, telephone, or via an electronic medium, the creditor should indicate on the form or other application record how the application was received.

4. *Video and other electronic-application processes.* i. If a creditor takes an application through an electronic medium that allows the creditor to see the applicant, the creditor must treat the application as taken in person. The creditor must note the monitoring information on the basis of visual observation or surname, if the applicant chooses not to provide the information.

ii. If an applicant applies through an electronic medium without video capability, the creditor treats the application as if it were received by mail.

5. *Applications through loan-shopping services.* When a creditor receives an application through an unaffiliated loan-shopping service, it does not have to request the monitoring information for purposes of the ECOA or subpart A of this Regulation B. Creditors subject to the Home Mortgage Disclosure Act should be aware, however, that data collection may be called for under Regulation C (12 CFR part 1003), which generally requires creditors to report, among other things, the sex and race of an applicant on brokered applications or applications received through a correspondent. Similarly, creditors that are covered financial institutions under subpart B of this Regulation may also be required to collect, report, and maintain certain data, as set forth in subpart B of this Regulation.

6. *Inadvertent notation.* If a creditor inadvertently obtains the monitoring information in a dwelling-related transaction not covered by § 1002.13, the creditor may process and retain the application without violating the regulation.

\*　　\*　　\*　　\*　　\*

## Section 1002.102—Definitions

## 102(b) Applicant

1. *General.* In no way are the limitations to the term applicant in § 1002.102(b) of subpart B intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term applicant in § 1002.2(e) as applicable to subpart A.

## 102(l) LGBTQI+-Owned Business

1. *General.* In order to be an LGBTQI+-owned business for purposes of subpart B of this part, a business must satisfy both prongs of the definition of LGBTQI+-owned business. First, one or more LGBTQI+ individuals must own or control more than 50 percent of the business. However, it is not necessary that one or more LGBTQI+ individuals both own and control more than 50 percent of the business. For example, a business that is owned entirely by one or more LGBTQI+ individuals but is not controlled by any one or more such individuals satisfies the first prong of the definition. Similarly, a business that is controlled by an LGBTQI+ individual satisfies this first prong of the definition, even if none of the individuals with ownership in the business are LGBTQI+ individuals. If a business does not satisfy this first prong of the definition, it is not an LGBTQI+-owned business. Second, 50 percent or more of the net profits or losses must accrue to one or more LGBTQI+ individuals. If a business does not satisfy this second prong of the definition, it is not an LGBTQI+-owned business, regardless of whether it satisfies the first prong of the definition.

2. *Purpose of definition.* The definition of LGBTQI+-owned business is used only when an applicant determines if it is an LGBTQI+-owned business for purposes of § 1002.107(a)(18). A financial institution shall provide an applicant with the definition of LGBTQI+-owned business when asking the applicant to provide its LGBTQI+-owned business status pursuant to § 1002.107(a)(18). A financial institution satisfies this requirement if it provides the definition as set forth in the sample data collection form in appendix E. The financial institution must provide additional clarification by referencing the definition of LGBTQI+ individual as set forth in § 1002.102(k) if asked by the applicant. The financial institution is neither permitted nor required to make its own determination regarding the applicant's LGBTQI+-owned business status.

3. *Further clarifications of terms used in the definition of LGBTQI+-owned*

*business.* In order to assist an applicant when determining whether it is an LGBTQI+-owned business, a financial institution may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses and related concepts set forth in comments 102(*l*)–4 through –6. A financial institution may assist an applicant when the applicant is determining its LGBTQI+-owned business status but is not required to do so. For purposes of reporting an applicant's status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

4. *Ownership.* For purposes of determining if a business is an LGBTQI+-owned business, an individual owns a business if that individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Examples of ownership include being the sole proprietor of a sole proprietorship, directly or indirectly owning or holding the stock of a corporation or company, directly or indirectly having a partnership interest in a business, or directly or indirectly having a membership interest in a limited liability company. Indirect as well as direct ownership are used when determining ownership for purposes of §§ 1002.102(*l*) and 1002.107(a)(18). Thus, where applicable, ownership must be traced through corporate or other indirect ownership structures. For example, assume that the applicant is company A. If company B owns 60 percent of applicant company A and an individual owns 100 percent of company B, the individual owns 60 percent of applicant company A. Similarly, if an individual directly owns 20 percent of applicant company A and is an equal partner in partnership B that owns the remaining 80 percent of applicant company A, the individual owns 60 percent of applicant company A (*i.e.*, 20 percent due through direct ownership and 40 percent indirectly through partnership B). A trustee is considered the owner of the trust. Thus, if a trust owns a business and the trust has two co-trustees, each co-trustee owns 50 percent of the business.

5. *Control.* An individual controls a business if that individual has significant responsibility to manage or direct the business. An individual controls a business if the individual is an executive officer or senior manager (*e.g.*, a chief executive officer, chief financial officer, chief operating officer, managing member, general partner, president, vice president, or treasurer)

or regularly performs similar functions. Additionally, a business may be controlled by two or more LGBTQI+ individuals if those individuals collectively control the business, such as constituting a majority of the board of directors or a majority of the partners of a partnership.

6. *Accrual of net profits or losses.* A business's net profits and losses accrue to an individual if that individual receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

102(m) Minority-Owned Business

1. *General.* In order to be a minority-owned business for purposes of subpart B of this part, a business must satisfy both prongs of the definition of minority-owned business. First, one or more American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individuals must own or control more than 50 percent of the business. However, it is not necessary that one or more American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individuals both own and control more than 50 percent of the business. For example, a business that is owned entirely, but is not controlled by, individuals belonging to one of these groups satisfies the first prong of the definition. Similarly, a business that is controlled by an American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individual satisfies this first prong of the definition, even if none of the individuals with ownership in the business are American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino. If a business does not satisfy this first prong of the definition, it is not a minority-owned business. Second, 50 percent or more of the net profits or losses must accrue to one or more individuals belonging to these groups. If a business does not satisfy this second prong of the definition, it is not a minority-owned business, regardless of whether it satisfies the first prong of the definition.

2. *Purpose of definition.* The definition of minority-owned business is used only when an applicant determines if it is a minority-owned business for purposes of § 1002.107(a)(18). A financial institution

shall provide an applicant with the definition of minority-owned business when asking the applicant to provide its minority-owned business status pursuant to § 1002.107(a)(18), but the financial institution is neither permitted nor required to make its own determination regarding the applicant's minority-owned business status.

3. *Further clarifications of terms used in the definition of minority-owned business.* In order to assist an applicant when determining whether it is a minority-owned business, a financial institution may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses and related concepts set forth in comments 102(m)–4 through –6. A financial institution may assist an applicant when the applicant is determining its minority-owned business status but is not required to do so. For purposes of reporting an applicant's status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

4. *Ownership.* For purposes of determining if a business is a minority-owned business, an individual owns a business if that individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Examples of ownership include being the sole proprietor of a sole proprietorship, directly or indirectly owning or holding the stock of a corporation or company, directly or indirectly having a partnership interest in a business, or directly or indirectly having a membership interest in a limited liability company. Indirect as well as direct ownership are used when determining ownership for purposes of §§ 1002.102(m) and 1002.107(a)(18). Thus, where applicable, ownership must be traced through corporate or other indirect ownership structures. For example, assume that the applicant is company A. If company B owns 60 percent of applicant company A and an individual owns 100 percent of company B, the individual owns 60 percent of applicant company A. Similarly, if an individual directly owns 20 percent of applicant company A and is an equal partner in partnership B that owns the remaining 80 percent of applicant company A, the individual owns 60 percent of applicant company A (*i.e.*, 20 percent due through direct ownership and 40 percent indirectly through partnership B). A trustee is considered the owner of the trust. Thus, if a trust owns a business and the trust

has two co-trustees, each co-trustee owns 50 percent of the business.

5. *Control.* An individual controls a business if that individual has significant responsibility to manage or direct the business. An individual controls a business if the individual is an executive officer or senior manager (*e.g.,* a chief executive officer, chief financial officer, chief operating officer, managing member, general partner, president, vice president, or treasurer) or regularly performs similar functions. Additionally, a business may be controlled by two or more American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or Hispanic or Latino individuals if those individuals collectively control the business, such as constituting a majority of the board of directors or a majority of the partners of a partnership.

6. *Accrual of net profits or losses.* A business's net profits and losses accrue to an individual if that individual receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

7. *Multi-racial and multi-ethnic individuals.* For purposes of subpart B of this part, an individual who is multi-racial or multi-ethnic constitutes an individual for whom the definition of minority-owned business may apply, depending on whether the individual meets the other requirements of the definition. For example, an individual who is both Asian and White is an individual for whom the definition of minority-owned business shall apply if the individual meets the other requirements of the definition related to ownership or control and accrual of profits or losses.

8. *Relationship to disaggregated subcategories used to determine ethnicity and race of principal owners.* The ethnicity and race categories used in this section are aggregate ethnicity (Hispanic or Latino) and race (American Indian or Alaska Native, Asian, Black or African American, and Native Hawaiian or Other Pacific Islander) categories. Those ethnicity and race categories are the same aggregate categories used (along with Not Hispanic or Latino for ethnicity, and White for race) to collect an applicant's principal owners' ethnicity and race pursuant to § 1002.107(a)(19).

102(o) Principal Owner

1. *Individual.* Only an individual can be a principal owner of a business for purposes of subpart B of this part. Entities, such as trusts, partnerships,

limited liability companies, and corporations, are not principal owners for this purpose. Additionally, an individual must directly own an equity share of 25 percent or more in the business in order to be a principal owner. Unlike the determination of ownership for purposes of collecting and reporting minority-owned business status, women-owned business status, and LGBTQI+-owned business status, indirect ownership is not considered when determining if someone is a principal owner for purposes of collecting and reporting principal owners' ethnicity, race, and sex or the number of principal owners. Thus, when determining who is a principal owner, ownership is not traced through multiple corporate structures to determine if an individual owns 25 percent or more of the equity interests. For example, if individual A directly owns 20 percent of a business, individual B directly owns 20 percent, and partnership C owns 60 percent, the business does not have any owners who satisfy the definition of principal owner set forth in § 1002.102(o), even if individual A and individual B are the only partners in the partnership C. Similarly, if individual A directly owns 30 percent of a business, individual B directly owns 20 percent, and trust D owns 50 percent, individual A is the only principal owner as defined in § 1002.102(o), even if individual B is the sole trustee of trust D.

2. *Trustee.* Although a trust is not considered a principal owner of a business for the purposes of subpart B, if the applicant for a covered credit transaction is a trust, a trustee is considered the owner of the trust. Thus, if a trust is an applicant for a covered credit transaction and the trust has two co-trustees, each co-trustee is considered to own 50 percent of the business and would each be a principal owner as defined in § 1002.102(o). In contrast, if the trust has five co-trustees, each co-trustee is considered to own 20 percent of the business and would not meet the definition of principal owner under § 1002.102(o).

3. *Purpose of definition.* A financial institution shall provide an applicant with the definition of principal owner when asking the applicant to provide the number of its principal owners pursuant to § 1002.107(a)(20) and the ethnicity, race, and sex of its principal owners pursuant to § 1002.107(a)(19). See comments 107(a)(19)–2 and 107(a)(20)–1.

102(s) Women-Owned Business

1. *General.* In order to be a women-owned business for purposes of subpart

B of this part, a business must satisfy both prongs of the definition of women-owned business. First, one or more women must own or control more than 50 percent of the business. However, it is not necessary that one or more women both own and control more than 50 percent of the business. For example, a business that is owned entirely by women but is not controlled by any women satisfies the first prong of the definition. Similarly, a business that is controlled by a woman satisfies this first prong of the definition, even if none of the individuals with ownership in the business are women. If a business does not satisfy this first prong of the definition, it is not a women-owned business. Second, 50 percent or more of the net profits or losses must accrue to one or more women. If a business does not satisfy this second prong of the definition, it is not a women-owned business, regardless of whether it satisfies the first prong of the definition.

2. *Purpose of definition.* The definition of women-owned business is used only when an applicant determines if it is a women-owned business pursuant to § 1002.107(a)(18). A financial institution shall provide an applicant with the definition of women-owned business when asking the applicant to provide its women-owned business status pursuant to § 1002.107(a)(18), but the financial institution is neither permitted nor required to make its own determination regarding the applicant's women-owned business status.

3. *Further clarifications of terms used in the definition of women-owned business.* In order to assist an applicant when determining whether it is a women-owned business, a financial institution may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses and related concepts set forth in comments 102(s)–4 through –6. A financial institution may assist an applicant when the applicant is determining its women-owned business status but is not required to do so. For purposes of reporting an applicant's status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

4. *Ownership.* For purposes of determining if a business is a women-owned business, an individual owns a business if that individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Examples of ownership include being the sole proprietor of a sole proprietorship,

AdminRecord-000390

**35540**    **Federal Register** / Vol. 88, No. 104 / Wednesday, May 31, 2023 / Rules and Regulations

directly or indirectly owning or holding the stock of a corporation or company, directly or indirectly having a partnership interest in a business, or directly or indirectly having a membership interest in a limited liability company. Indirect as well as direct ownership are used when determining ownership for purposes of §§ 1002.102(s) and 1002.107(a)(18). Thus, where applicable, ownership must be traced through corporate or other indirect ownership structures. For example, assume that the applicant is company A. If company B owns 60 percent of the applicant company A and an individual owns 100 percent of company B, the individual owns 60 percent of the applicant company A. Similarly, if an individual directly owns 20 percent of the applicant company A and is an equal partner in a partnership B that owns the remaining 80 percent of the applicant company A, the individual owns 60 percent of applicant company A (*i.e.*, 20 percent due through direct ownership and 40 percent indirectly through partnership B). A trustee is considered the owner of the trust. Thus, if a trust owns a business and the trust has two co-trustees, each co-trustee owns 50 percent of the business.

5. *Control.* An individual controls a business if that individual has significant responsibility to manage or direct the business. An individual controls a business if the individual is an executive officer or senior manager (*e.g.*, a chief executive officer, chief financial officer, chief operating officer, managing member, general partner, president, vice president, or treasurer) or regularly performs similar functions. Additionally, a business may be controlled by two or more women if those women collectively control the business, such as constituting a majority of the board of directors or a majority of the partners of a partnership.

6. *Accrual of net profits or losses.* A business's net profits and losses accrue to an individual if that individual receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

*Section 1002.103—Covered Applications*

103(a) Covered Application

1. *General.* Subject to the requirements of subpart B of this part, a financial institution has latitude to establish its own application procedures, including designating the

type and amount of information it will require from applicants.

2. *Procedures used.* The term "procedures" refers to the actual practices followed by a financial institution as well as its stated application procedures. For example, if a financial institution's stated policy is to require all applications to be in writing on the financial institution's application form, but the financial institution also makes credit decisions based on oral requests, the financial institution's procedures are to accept both oral and written applications.

3. *Consistency with subpart A.* Bureau interpretations that appear in this supplement I in connection with §§ 1002.2(f) and 1002.9 are generally applicable to the definition of a covered application in § 1002.103. However, the definition of a covered application in § 1002.103 does not include inquiries and prequalification requests. The definition of a covered application also does not include reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts. See § 1002.103(b).

4. *Solicitations and firm offers of credit.* For purposes of subpart B of this part, the term covered application does not include solicitations, firm offers of credit, or other evaluations initiated by the financial institution because in these situations the business has not made a request for credit. For example, if a financial institution sends a firm offer of credit to a business for a $10,000 line of credit, and the business does not respond, it is not a covered application because the business never made a request for credit. However, using the same example, if the business seeks to obtain the credit offered, assuming the requirements of a covered application are otherwise met, the business's request constitutes a covered application for purposes of subpart B of this part. See also comment 103(b)–4.

5. *Requests for multiple covered credit transactions at one time.* Assuming the requirements of a covered application are met, if an applicant makes a request for two or more covered credit transactions at the same time, the financial institution reports each request as a separate covered application. For example, if an applicant is seeking both a term loan and a line of credit and requests them both on the same application form, the financial institution reports the requests as two separate covered applications, one for a term loan and another for a line of credit. See § 1002.107(d) for the requirements for reusing data so that a financial institution need only ask once

for certain data required under § 1002.107(a). If, on the other hand, the applicant is only requesting a single covered credit transaction, but has not decided on which particular product, the financial institution reports the request as a single covered application. For example, if the applicant indicates interest in either a term loan or a line of credit, but not both, the financial institution reports the request as a single covered application. See comment 107(a)(5)–1 for instructions on reporting credit product in this situation.

6. *Initial request for a single covered credit transaction that would result in the origination of multiple covered credit transactions.* Assuming the requirements of a covered application are met, if an applicant initially makes a request for one covered credit transaction, but over the course of the application process requests multiple covered credit transactions, each covered credit transaction must be reported as a separate covered application. See § 1002.107(d) for the requirements for reusing data so that a financial institution need only ask once for certain data required under § 1002.107(a).

7. *Requests for multiple lines of credit at one time.* Assuming the requirements of a covered application are met, if an applicant requests multiple lines of credit on a single credit account, it is reported as one or more covered applications based on the procedures used by the financial institution for the type of credit account. For example, if a financial institution treats a request for multiple lines of credit at one time as sub-components of a single account, the financial institution reports the request as a single covered application. If, on the other hand, the financial institution treats each line of credit as a separate account, then the financial institution reports each request for a line of credit as a separate covered application, as set forth in comment 103(a)–5.

8. *Duplicate applications.* If a financial institution receives two or more duplicate covered applications (*i.e.*, from the same applicant, for the same credit product, for the same amount, at or around the same time), the financial institution may treat the request as a single covered application for purposes of subpart B, so long as for purposes of determining whether to extend credit, it would also treat one or more of the applications as a duplicate under its procedures.

9. *Changes in whether there is a covered credit transaction.* In certain circumstances, an applicant may change the type of product requested during the course of the application process.

Assuming other requirements of a covered application are met, if an applicant initially requests a product that is not a covered credit transaction, but prior to final action taken decides to seek instead a product that is a covered credit transaction, the application is a covered application and must be reported pursuant to § 1002.109. In this circumstance, the financial institution shall endeavor to compile, maintain, and report the data required under § 1002.107(a) in a manner that is reasonable under the circumstances. If, on the other hand, an applicant initially requests a product that is a covered credit transaction, but prior to final action taken decides instead to seek a product that is not a covered credit transaction, the application is not a covered application and thus is not reported. See also § 1002.112(c)(4), which provides a safe harbor for incorrect collection of certain data if, at the time of collection, the financial institution had a reasonable basis for believing that the application was a covered application. Assuming other requirements of a covered application are met, if an applicant initially requests a product that is a covered credit transaction, the financial institution counteroffers with a product that is not a covered credit transaction, and the applicant declines to proceed or fails to respond, the application is reported as a covered application. For example, if an applicant initially applies for a term loan, but then, after consultation with the financial institution, decides that a lease would better meet its needs and decides to proceed with that product, the application is not a covered application and thus is not reported. However, if an applicant initially applies for a term loan, the financial institution offers to consider the applicant only for a lease, and the applicant refuses, the transaction is a covered application that must be reported.

10. *Multiple unaffiliated co-applicants.* If a covered financial institution receives a covered application from multiple businesses that are not affiliates, as defined by § 1002.102(a), it shall compile, maintain, and report data pursuant to §§ 1002.107 through 1002.109 for only a single applicant that is a small business, as defined in § 1002.106(b). A covered financial institution shall establish consistent procedures for designating a single small business for purposes of collecting and reporting data under subpart B in situations where there is more than one small business co-applicant, such as reporting on the first

small business listed on an application form. For example, if three businesses jointly apply as co-applicants for a term loan to purchase a piece of equipment, but only one of the businesses is a small business, as defined in § 1002.106(b), the financial institution reports on the single small business. If, however, two of the businesses are small businesses, as defined in § 1002.106(b), the financial institution must have a procedure for designating which small business among multiple small business co-applicants it will report information on, such as consistently reporting on the first small business listed on an application form. See also § 1002.5(a)(4)(x), which permits a creditor to collect certain protected information about co-applicants under certain circumstances.

11. *Refinancings and evaluation, extension, or renewal requests that request additional credit amounts.* As discussed in comments 103(b)–2 and –3, assuming other requirements of a covered application are met, an applicant's request to refinance and an applicant's request for additional credit amounts on an existing account both constitute covered applications.

103(b) Circumstances That Are Not Covered Applications

1. *In general.* The circumstances set forth in § 1002.103(b) are not covered applications for purposes of subpart B of this part, even if considered applications under subpart A of this part. However, in no way are the exclusions in § 1002.103(b) intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term application in § 1002.2(f) as applicable to subpart A.

2. *Reevaluation, extension, or renewal requests that do not request additional credit amounts.* An applicant's request to change one or more terms of an existing account does not constitute a covered application, unless the applicant is requesting additional credit amounts on the account. For example, an applicant's request to extend the duration on a line of credit or to remove a guarantor would not be a covered application. However, assuming other requirements of a covered application are met, an applicant's request to refinance would be reportable. A refinancing occurs when an existing obligation is satisfied and replaced by a new obligation undertaken by the same borrower.

3. *Reevaluation, extension, or renewal requests that request additional credit amounts.* A Assuming other requirements of a covered application are met, an applicant's request for

additional credit amounts on an existing account constitutes a covered application. For example, an applicant's request for a line increase on an existing line of credit, made in accordance with a financial institution's procedures for the type of credit requested, would be a covered application. As discussed in comment 107(a)(7)–4, when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution need only report the additional credit amount sought, and not the entire credit amount. For example, if an applicant currently has a line of credit account for $100,000, and seeks to increase the line to $150,000, the financial institution reports the amount applied for as $50,000.

4. *Reviews or evaluations initiated by the financial institution.* For purposes of subpart B of this part, the term covered application does not include evaluations or reviews of existing accounts initiated by the financial institution because the business has not made a request for credit. For example, if a financial institution conducts periodic reviews of its existing lines of credit and decides to increase the business's line by $10,000, it is not a covered application because the business never made a request for the additional credit amounts. However, if such an evaluation or review of an existing account by a financial institution results in the financial institution inviting the business to apply for additional credit amounts on an existing account and the business does so, the business's request constitutes a covered application for purposes of subpart B of this part, assuming other requirements of a covered application are met. Similarly, as noted in comment 103(a)–4, the term covered application also does not include solicitations and firm offers of credit.

5. *Inquiries and prequalification requests.* An inquiry is a request by a prospective applicant for information about credit terms offered by the financial institution. A prequalification request is a request by a prospective applicant for a preliminary determination on whether the prospective applicant would likely qualify for credit under a financial institution's standards or for a determination on the amount of credit for which the prospective applicant would likely qualify. Inquiries and prequalification requests are not covered applications under subpart B of this part, even though in certain circumstances inquiries and prequalification requests may constitute

applications under subpart A. For example, while an inquiry or prequalification request may become an "application" under subpart A if the creditor evaluates information about the business, decides to decline the request, and communicates this to the business, such inquiries or prequalifications would not be "covered applications" under subpart B of this part. Whether a particular request is a covered application, or whether instead it is an inquiry or prequalification request that is not reportable under subpart B, may turn, for instance, on how a financial institution structures and processes such requests: does the financial institution require or encourage a preliminary review in order for a business to be considered for a covered credit transaction, or does the business voluntarily seek preliminary feedback as a tool to explore its options before it decides whether to apply for credit with the financial institution? The name used by the financial institution for such a request is not determinative. For example, under subpart B, a review is a reportable covered application if the financial institution requires the business, before it may apply for credit, to pass through a mandatory screening process that considers particular information about the business and denies or turns away the business if it is ineligible or unlikely to qualify for credit. In contrast, a business that requests a financial institution to identify credit products for which the business might qualify based on limited or self-described characteristics, and without any commitment from the financial institution to extend credit, may not have submitted a covered application for purposes of subpart B.

*Section 1002.104—Covered Credit Transactions and Excluded Transactions*

104(a) Covered Credit Transaction

1. *General.* The term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and merchant cash advances) unless otherwise excluded under § 1002.104(b).

104(b) Excluded Transactions

1. *Factoring.* The term "covered credit transaction" does not cover factoring as described herein. For the purpose of this subpart, factoring is an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered

but for which payment in full has not yet been made. The name used by the financial institution for a product is not determinative of whether or not it is a "covered credit transaction." This description of factoring is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to comment 9(a)(3)–3. A financial institution shall report an extension of business credit incident to a factoring arrangement that is otherwise a covered credit transaction as "Other sales-based financing transaction" under § 1002.107(a)(5).

2. *Leases.* The term "covered credit transaction" does not cover leases as described herein. A lease, for the purpose of this subpart, is a transfer from one business to another of the right to possession and use of goods for a term, and for primarily business or commercial (including agricultural) purposes, in return for consideration. A lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest. The name used by the financial institution for a product is not determinative of whether or not it is a "covered credit transaction."

3. *Consumer-designated credit.* The term "covered credit transaction" does not include consumer-designated credit that is used for business or agricultural purposes. A transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes. For example, an open-end credit account used for both personal and business/agricultural purposes is not business credit for the purpose of subpart B of this part unless the financial institution designated or intended for the primary purpose of the account to be business/agricultural-related.

4. *Credit transaction purchases, purchases of an interest in a pool of credit transactions, and purchases of a partial interest in a credit transaction.* The term "covered credit transaction" does not cover the purchase of an originated credit transaction, the purchase of an interest in a pool of credit transactions, or the purchase of a partial interest in a credit transaction such as through a loan participation agreement. Such purchases do not, in themselves, constitute an application for credit. See also comment 109(a)(3)–2.i.

104(b)(1) Trade Credit

1. *General.* Trade credit, as defined in § 1002.104(b)(1), is excluded from the

definition of a covered credit transaction. An example of trade credit involves a supplier that finances the sale of equipment, supplies, or inventory. However, an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit. Also, credit extended by a business providing goods or services to another business is not trade credit for the purposes of this subpart where the supplying business intends to sell or transfer its rights as a creditor to a third party.

2. *Trade credit under subpart A.* The definition of trade credit under comment 9(a)(3)–2 applies to relevant provisions under subpart A, and § 1002.104(b)(1) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to comment 9(a)(3)–2.

*Section 1002.105—Covered Financial Institutions and Exempt Institutions*

105(a) Financial Institution

1. *Examples.* Section 1002.105(a) defines a financial institution as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. This definition includes, but is not limited to, banks, savings associations, credit unions, online lenders, platform lenders, community development financial institutions, Farm Credit System lenders, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, organizations exempt from taxation pursuant to 26 U.S.C. 501(c), and governments or governmental subdivisions or agencies.

2. *Motor vehicle dealers.* Pursuant to § 1002.101(a), subpart B of this part excludes from coverage persons defined by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

105(b) Covered Financial Institution

1. *Preceding calendar year.* The definition of covered financial institution refers to preceding calendar years. For example, in 2029, the two preceding calendar years are 2027 and 2028. Accordingly, in 2029, Financial Institution A does not meet the loan-

volume threshold in § 1002.105(b) if did not originate at least 100 covered credit transactions for small businesses both during 2027 and during 2028.

2. *Origination threshold.* A financial institution qualifies as a covered financial institution based on total covered credit transactions originated for small businesses, rather than covered applications received from small businesses. For example, if in both 2024 and 2025, Financial Institution B received 105 covered applications from small businesses and originated 95 covered credit transactions for small businesses, then for 2026, Financial Institution B is not a covered financial institution.

3. *Counting originations when multiple financial institutions are involved in originating a covered credit transaction.* For the purpose of counting originations to determine whether a financial institution is a covered financial institution under § 1002.105(b), in a situation where multiple financial institutions are involved in originating a single covered credit transaction, only the last financial institution with authority to set the material terms of the covered credit transaction is required to count the origination.

4. *Counting originations after adjustments to the gross annual revenue threshold due to inflation.* Pursuant to § 1002.106(b)(2), every five years, the gross annual revenue threshold used to define a small business in § 1002.106(b)(1) shall be adjusted, if necessary, to account for inflation. The first time such an adjustment could occur is in 2030, with an effective date of January 1, 2031. A financial institution seeking to determine whether it is a covered financial institution applies the gross annual revenue threshold that is in effect for each year it is evaluating. For example, a financial institution seeking to determine whether it is a covered financial institution in 2032 counts its originations of covered credit transactions for small businesses in calendar years 2030 and 2031. The financial institution applies the initial $5 million threshold to evaluate whether its originations were to small businesses in 2030. In this example, if the small business threshold were increased to $5.5 million effective January 1, 2031, the financial institution applies the $5.5 million threshold to count its originations for small businesses in 2031.

5. *Reevaluation, extension, or renewal requests, as well as credit line increases and other requests for additional credit amounts.* While requests for additional credit amounts on an existing account can constitute a "covered application" pursuant to § 1002.103(b)(1), such requests are not counted as originations for the purpose of determining whether a financial institution is a covered financial institution pursuant to § 1002.105(b). In addition, transactions that extend, renew, or otherwise amend a transaction are not counted as originations. For example, if a financial institution originates 50 term loans and 30 lines of credit for small businesses in each of the preceding two calendar years, along with 25 line increases for small businesses in each of those years, the financial institution is not a covered financial institution because it has not originated at least 100 covered credit transactions in each of the two preceding calendar years.

6. *Annual consideration.* Whether a financial institution is a covered financial institution for a particular year depends on its small business lending activity in the preceding two calendar years. Therefore, whether a financial institution is a covered financial institution is an annual consideration for each year that data may be compiled and maintained for purposes of subpart B of this part. A financial institution may be a covered financial institution for a given year of data collection (and the obligations arising from qualifying as a covered financial institution shall continue into subsequent years, pursuant to §§ 1002.110 and 1002.111), but the same financial institution may not be a covered financial institution for the following year of data collection. For example, Financial Institution C originated 105 covered transactions for small businesses in both 2024 and 2025. In 2026, Financial Institution C is a covered financial institution and therefore is obligated to compile and maintain applicable 2026 small business lending data under § 1002.107(a). During 2026, Financial Institution C originates 95 covered transactions for small businesses. In 2027, Financial Institution C is not a covered financial institution with respect to 2027 small business lending data, and is not obligated to compile and maintain 2027 data under § 1002.107(a) (although Financial Institution C may voluntarily collect and maintain 2027 data pursuant to § 1002.5(a)(4)(vii) and as explained in comment 105(b)–10). Pursuant to § 1002.109(a), Financial Institution C shall submit its small business lending application register for 2026 data in the format prescribed by the Bureau by June 1, 2027 because Financial Institution C is a covered financial institution with respect to 2026 data, and the data

submission deadline of June 1, 2027 applies to 2026 data.

7. *Merger or acquisition—coverage of surviving or newly formed institution.* After a merger or acquisition, the surviving or newly formed financial institution is a covered financial institution under § 1002.105(b) if it, considering the combined lending activity of the surviving or newly formed financial institution and the merged or acquired financial institutions (or acquired branches or locations), satisfies the criteria included in § 1002.105(b). For example, Financial Institutions A and B merge. The surviving or newly formed financial institution meets the threshold in § 1002.105(b) if the combined previous components of the surviving or newly formed financial institution (A plus B) would have originated at least 100 covered credit transactions for small businesses for each of the two preceding calendar years. Similarly, if the combined previous components and the surviving or newly formed financial institution would have reported at least 100 covered transactions for small businesses for the year previous to the merger as well as 100 covered transactions for small businesses for the year of the merger, the threshold described in § 1002.105(b) would be met and the surviving or newly formed financial institution would be a covered institution under § 1002.105(b) for the year following the merger. Comment 105(b)–8 discusses a financial institution's responsibilities with respect to compiling and maintaining (and subsequently reporting) data during the calendar year of a merger.

8. *Merger or acquisition—coverage specific to the calendar year of the merger or acquisition.* The scenarios described below illustrate a financial institution's responsibilities specifically for data from the calendar year of a merger or acquisition. For purposes of these illustrations, an "institution that is not covered" means either an institution that is not a financial institution, as defined in § 1002.105(a), or a financial institution that is not a covered financial institution, as defined in § 1002.105(b).

i. Two institutions that are not covered financial institutions merge. The surviving or newly formed institution meets all of the requirements necessary to be a covered financial institution. No data are required to be compiled, maintained, or reported for the calendar year of the merger (even though the merger creates an institution that meets all of the requirements necessary to be a covered financial institution).

ii. A covered financial institution and an institution that is not covered merge. The covered financial institution is the surviving institution, or a new covered financial institution is formed. For the calendar year of the merger, data are required to be compiled, maintained, and reported for covered applications from the covered financial institution and is optional for covered applications from the financial institution that was previously not covered.

iii. A covered financial institution and an institution that is not covered merge. The institution that is not covered is the surviving institution and remains not covered after the merger, or a new institution that is not covered is formed. For the calendar year of the merger, data are required to be compiled and maintained (and subsequently reported) for covered applications from the previously covered financial institution that took place prior to the merger. After the merger date, compiling, maintaining, and reporting data is optional for applications from the institution that was previously covered for the remainder of the calendar year of the merger.

iv. Two covered financial institutions merge. The surviving or newly formed financial institution is a covered financial institution. Data are required to be compiled and maintained (and subsequently reported) for the entire calendar year of the merger. The surviving or newly formed financial institution files either a consolidated submission or separate submissions for that calendar year.

9. *Foreign applicability.* As discussed in comment 1(a)–2, Regulation B (including subpart B) generally does not apply to lending activities that occur outside the United States.

10. *Voluntary collection and reporting.* Section 1002.5(a)(4)(vii) through (x) permits a creditor that is not a covered financial institution under § 1002.105(b) to voluntarily collect and report information regarding covered applications from small businesses in certain circumstances. If a creditor is voluntarily collecting information for covered applications regarding whether the applicant is a minority-owned business, a women-owned business, and/or an LGBTQI+-owned business under § 1002.107(a)(18), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(19), it shall do so in compliance with §§ 1002.107, 1002.108, 1002.111, 1002.112 as though it were a covered financial institution. If a creditor is reporting those covered applications from small businesses to the Bureau, it shall do so in compliance

with §§ 1002.109 and 1002.110 as though it were a covered financial institution.

*Section 1002.106—Business and Small Business*

106(b) Small Business Definition

106(b)(1) Small Business

1. *Change in determination of small business status—business is ultimately not a small business.* If a financial institution initially determines an applicant is a small business as defined in § 1002.106 based on available information and collects data required by § 1002.107(a)(18) and (19) but later concludes that the applicant is not a small business, the financial institution does not violate the Act or this regulation if it meets the requirements of § 1002.112(c)(4). The financial institution shall not report the application on its small business lending application register pursuant to § 1002.109.

2. *Change in determination of small business status—business is ultimately a small business.* Consistent with comment 107(a)(14)–1, a financial institution need not independently verify gross annual revenue. If a financial institution initially determines that the applicant is not a small business as defined in § 1002.106(b), but later concludes the applicant is a small business prior to taking final action on the application, the financial institution must report the covered application pursuant to § 1002.109. In this situation, the financial institution shall endeavor to compile, maintain, and report the data required under § 1002.107(a) in a manner that is reasonable under the circumstances. For example, if the applicant initially provides a gross annual revenue of $5.5 million (that is, above the threshold for a small business as initially defined in § 1002.106(b)(1)), but during the course of underwriting the financial institution discovers the applicant's gross annual revenue was in fact $4.75 million (meaning that the applicant is within the definition of a small business under § 1002.106(b)), the financial institution is required to report the covered application pursuant to § 1002.109. In this situation, the financial institution shall take reasonable steps upon discovery to compile, maintain, and report the data necessary under § 1002.107(a) to comply with subpart B of this part for that covered application. Thus, in this example, even if the financial institution's procedure is typically to request applicant-provided data together with the application form, in this circumstance, the financial institution

shall seek to collect the data during the application process necessary to comply with subpart B in a manner that is reasonable under the circumstances.

3. *Applicant's representations regarding gross annual revenue; inclusion of affiliate revenue; updated or verified information.* A financial institution is permitted to rely on an applicant's representations regarding gross annual revenue (which may or may not include any affiliate's revenue) for purposes of determining small business status under § 1002.106(b). However, if the applicant provides updated gross annual revenue information or the financial institution verifies the gross annual revenue information (see comment 107(b)–1), the financial institution must use the updated or verified information in determining small business status.

4. *Multiple unaffiliated co-applicants—size determination.* The financial institution shall not aggregate unaffiliated co-applicants' gross annual revenues for purposes of determining small business status under § 1002.106(b). If a covered financial institution receives a covered application from multiple businesses who are not affiliates, as defined by § 1002.102(a), where at least one business is a small business under § 1002.106(b), the financial institution shall compile, maintain, and report data pursuant to §§ 1002.107 through 1002.109 regarding the covered application for only a single applicant that is a small business. See comment 103(a)–10 for additional details.

106(b)(2) Inflation Adjustment

1. *Inflation adjustment methodology.* The small business gross annual revenue threshold set forth in § 1002.106(b)(1) will be adjusted upward or downward to reflect changes, if any, in the Consumer Price Index for All Urban Consumers (U.S. city average series for all items, not seasonally adjusted), as published by the United States Bureau of Labor Statistics ("CPI–U"). The base for computing each adjustment is the January 2025 CPI–U; this base value shall be compared to the CPI–U value in January 2030 and every five years thereafter. For example, after the January 2030 CPI–U is made available, the adjustment is calculated by determining the percentage change in the CPI–U between January 2025 and January 2030, applying this change to the $5 million gross annual revenue threshold, and rounding to the nearest $500,000. If, as a result of this rounding, there is no change in the gross annual revenue threshold, there will be no adjustment. For example, if in January

2030 the adjusted value were $4.9 million (reflecting a $100,000 decrease from January 2025 CPI–U), then the threshold would not adjust because $4.9 million would be rounded up to $5 million. If on the other hand, the adjusted value were $5.7 million, then the threshold would adjust to $5.5 million. Where the adjusted value is a multiple of $250,000 (*e.g.*, $5,250,000), then the threshold adjusts upward (in this example, to $5,500,000).

2. *Substitute for CPI–U.* If publication of the CPI–U ceases, or if the CPI–U otherwise becomes unavailable or is altered in such a way as to be unusable, then the Bureau shall substitute another reliable cost of living indicator from the United States Government for the purpose of calculating adjustments pursuant to § 1002.106(b)(2).

*Section 1002.107—Compilation of Reportable Data*

107(a) Data Format and Itemization

1. *General.* Section 1002.107(a) describes a covered financial institution's obligation to compile and maintain data regarding the covered applications it receives from small businesses.

i. A covered financial institution reports these data even if the credit originated pursuant to the reported application was subsequently sold by the institution.

ii. A covered financial institution annually reports data for covered applications for which final action was taken in the previous calendar year.

iii. A covered financial institution reports data for a covered application on its small business lending application register for the calendar year during which final action was taken on the application, even if the institution received the application in a previous calendar year.

2. *Free-form text fields.* A covered financial institution may use technology such as autocorrect and predictive text when requesting applicant-provided data under subpart B of this part that the financial institution reports via free-form text fields, provided that such technology does not restrict the applicant's ability to write in its own response instead of using text suggested by the technology.

3. *Filing Instructions Guide.* Additional details and procedures for compiling data pursuant to § 1002.107 are included in the Filing Instructions Guide, which is available at *https://www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/.*

4. *Additional data point response options.* The Bureau may add additional

response options to the lists of responses contained in the commentary that follows for certain of the data points set forth in § 1002.107(a), via the Filing Instructions Guide. Refer to the Filing Instructions Guide for any updates for each reporting year.

107(a)(1) Unique Identifier

1. *Unique within the financial institution.* A financial institution complies with § 1002.107(a)(1) by compiling and reporting an alphanumeric application or loan identifier unique within the financial institution to the specific application. The identifier must not exceed 45 characters, and must begin with the financial institution's Legal Entity Identifier (LEI), as defined in comment 109(b)(6)–1. Separate applications for the same applicant must have separate identifiers. The identifier may only include standard numerical and/or upper-case alphabetical characters and cannot include dashes, other special characters, or characters with diacritics. The financial institution may assign the unique identifier at any time prior to reporting the application. Refinancings or applications for refinancing must be assigned a different identifier than the transaction that is being refinanced. A financial institution with multiple branches must ensure that its branches do not use the same identifiers to refer to multiple applications.

2. *Does not include directly identifying information.* The unique identifier must not include any directly identifying information, such as a whole or partial Social Security number or employer identification number, about the applicant or persons (natural or legal) associated with the applicant. See also § 1002.111(c) and related commentary.

107(a)(2) Application Date

1. *Consistency.* Section 1002.107(a)(2) requires that, in reporting the date of covered application, a financial institution shall report the date the covered application was received or the date shown on a paper or electronic application form. Although a financial institution need not choose the same approach for its entire small business lending application register, it should generally be consistent in its approach by, for example, establishing procedures for how to report this date within particular scenarios, products, or divisions. If the financial institution chooses to report the date shown on an application form and the institution retains multiple versions of the application form, the institution reports the date shown on the first application

form satisfying the definition of covered application pursuant to § 1002.103.

2. *Application received.* For an application submitted directly to the financial institution or its affiliate (as described in § 1002.107(a)(4)), the financial institution shall report the date it received the covered application, as defined under § 1002.103, or the date shown on a paper or electronic application form. For an application initially submitted to a third party, see comment 107(a)(2)–3.

3. *Indirect applications.* For an application that was not submitted directly to the financial institution or its affiliate (as described in § 1002.107(a)(4)), the financial institution shall report the date the application was received by the party that initially received the application, the date the application was received by the financial institution, or the date shown on the application form. Although a financial institution need not choose the same approach for its entire small business lending application register, it should generally be consistent in its approach by, for example, establishing procedures for how to report this date within particular scenarios, products, or divisions.

4. *Safe harbor.* Pursuant to § 1002.112(c)(1), a financial institution that reports on its small business lending application register an application date that is within three business days of the actual application date pursuant to § 1002.107(a)(2) does not violate the Act or subpart B of this part. For purposes of this paragraph, a business day means any day the financial institution is open for business.

107(a)(3) Application Method

1. *General.* A financial institution complies with § 1002.107(a)(3) by reporting the means by which the applicant submitted the application from one of the following options: in-person, telephone, online, or mail. If the financial institution retains multiple versions of the application form, the institution reports the means by which the first application form satisfying the definition of covered application pursuant to § 1002.103 was submitted.

i. *In-person.* A financial institution reports the application method as "in-person" if the applicant submitted the application to the financial institution, or to another party acting on the financial institution's behalf, in person. The in-person application method applies, for example, to applications submitted at a branch office (including applications hand delivered by the applicant), at the applicant's place of

AdminRecord-000396

**35546**    **Federal Register**/Vol. 88, No. 104/Wednesday, May 31, 2023/Rules and Regulations

business, or via electronic media with a video component).

ii. *Telephone.* A financial institution reports the application method as "telephone" if the applicant submitted the application to the financial institution, or another party acting on the financial institution's behalf, by telephone call or via audio-based electronic media without a video component.

iii. *Online.* A financial institution reports the application method as "online" if the applicant submitted the application to the financial institution, or another party acting on the financial institution's behalf, through a website, mobile application (app), fax transmission, electronic mail, text message, or some other form of text-based electronic communication.

iv. *Mail.* A financial institution reports the application method as "mail" if the applicant submitted the application to the financial institution, or another party acting on the financial institution's behalf, via United States mail, courier or overnight service, or an overnight drop box.

107(a)(4) Application Recipient

1. *Agents.* When a financial institution is reporting actions taken by its agent consistent with comment 109(a)(3)–3, the agent is considered the financial institution for the purposes of § 1002.107(a)(4). For example, assume that an applicant submitted an application to Financial Institution B, and Financial Institution B made the credit decision acting as Financial Institution A's agent under State law. Financial Institution A reports the application and indicates that the application was submitted directly to Financial Institution A.

107(a)(5) Credit Type

1. *Reporting credit product—in general.* A financial institution complies with § 1002.107(a)(5)(i) by selecting the credit product applied for or originated, from the list below. If the credit product applied for or originated is not included on this list, the financial institution selects "other," and reports the credit product via free-form text field. If an applicant requested more than one credit product at the same time, the financial institution reports each credit product requested as a separate application. However, if the applicant only requested a single covered credit transaction, but had not decided on which particular product, the financial institution complies with § 1002.107(a)(5)(i) by reporting the credit product originated (if originated), or the credit product denied (if denied),

or the credit product of greater interest to the applicant, if readily determinable. If the credit product of greater interest to the applicant is not readily determinable, the financial institution complies with § 1002.107(a)(5)(i) by reporting one of the credit products requested as part of the request for a single covered credit transaction, in its discretion. See comment 103(a)–5 for instructions on reporting requests for multiple covered credit transactions at one time.

i. Term loan—unsecured.
ii. Term loan—secured.
iii. Line of credit—unsecured.
iv. Line of credit—secured.
v. Credit card account, not private-label.
vi. Private-label credit card account.
vii. Merchant cash advance.
viii. Other sales-based financing transaction.
ix. Other.
x. Not provided by applicant and otherwise undetermined.

2. *Credit card account, not private-label.* A financial institution complies with § 1002.107(a)(5)(i) by reporting the credit product as a "credit card account, not private-label" when the product is a business-purpose open-end credit account that is not private label and that may be accessed from time to time by a card, plate, or other single credit device to obtain credit, except that accounts or lines of credit secured by real property and overdraft lines of credit accessed by debit cards are not credit card accounts. The term credit card account does not include debit card accounts or closed-end credit that may be accessed by a card, plate, or single credit device. The term credit card account does include charge card accounts that are generally paid in full each billing period, as well as hybrid prepaid-credit cards. A financial institution reports multiple credit card account, not private-label applications requested at one time using the guidance in comment 103(a)–7.

3. *Private-label credit card account.* A financial institution complies with § 1002.107(a)(5)(i) by reporting the credit product as a "private-label credit card account" when the product is a business-purpose open-end private-label credit account that otherwise meets the description of a credit card account in comment 107(a)(5)–2. A private-label credit card account is a credit card account that can only be used to acquire goods or services provided by one business (for example, a specific merchant, retailer, independent dealer, or manufacturer) or a small group of related businesses. A co-branded or other card that can also be used for

purchases at unrelated businesses is not a private-label credit card. A financial institution reports multiple private-label credit card account applications requested at one time in the same manner as credit card account, not private-label applications, using the guidance in comment 103(a)–7.

4. *Credit product not provided by the applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution is required to maintain procedures reasonably designed to collect applicant-provided data, which includes credit product. However, if a financial institution is nonetheless unable to collect or otherwise determine credit product information because the applicant does not indicate what credit product it seeks and the application is denied, withdrawn, or closed for incompleteness before a credit product is identified, the financial institution reports that the credit product is "not provided by applicant and otherwise undetermined."

5. *Reporting credit product involving counteroffers.* If a financial institution presents a counteroffer for a different credit product than the product the applicant had initially requested, and the applicant does not agree to proceed with the counteroffer, the financial institution reports the application for the original credit product as denied pursuant to § 1002.107(a)(9). If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the disposition of the application based on the credit product that was offered and does not report the original credit product applied for. See comment 107(a)(9)–2.

6. *Other sales-based financing transaction.* For an extension of business credit incident to a factoring arrangement that is otherwise a covered credit transaction, a financial institution selects "other sales-based financing transaction" as the credit product. See comment 104(b)–1.

7. *Guarantees.* A financial institution complies with § 1002.107(a)(5)(ii) by selecting the type or types of guarantees that were obtained for an originated covered credit transaction, or that would have been obtained if the covered credit transaction was originated, from the list below. The financial institution selects, if applicable, up to a maximum of five guarantees for a single application. If the type of guarantee does not appear on the list, the financial institution selects "other" and reports the type of guarantee via free-form text field. If no guarantee is obtained or would have been obtained if the covered credit transaction was originated, the

financial institution selects "no guarantee." If an application is denied, withdrawn, or closed for incompleteness before any guarantee has been identified, the financial institution selects "no guarantee." The financial institution chooses State government guarantee or local government guarantee, as applicable, based on the entity directly administering the program, not the source of funding.

i. Personal guarantee—owner(s).
ii. Personal guarantee—non-owner(s).
iii. SBA guarantee—7(a) program.
iv. SBA guarantee—504 program.
v. SBA guarantee—other.
vi. USDA guarantee.
vii. FHA insurance.
viii. Bureau of Indian Affairs guarantee.
ix. Other Federal guarantee.
x. State government guarantee.
xi. Local government guarantee.
xii. Other.
xiii. No guarantee.

8. *Loan term.* A financial institution complies with § 1002.107(a)(5)(iii) by reporting the number of months in the loan term for the covered credit transaction. The loan term is the number of months after which the legal obligation will mature or terminate, measured from the date of origination. For transactions involving real property, the financial institution may instead measure the loan term from the date of the first payment period and disregard the time that elapses, if any, between the settlement of the transaction and the first payment period. For example, if a loan closes on April 12, but the first payment is not due until June 1 and includes the interest accrued in May (but not April), the financial institution may choose not to include the month of April in the loan term. In addition, the financial institution may round the loan term to the nearest full month or may count only full months and ignore partial months, as it so chooses. If a credit product, such as a credit card, does not have a loan term, the financial institution reports that the loan term is "not applicable." The financial institution also reports that the loan term is "not applicable" if the credit product is reported as "not provided by applicant and otherwise undetermined." For a credit product that generally has a loan term, the financial institution reports "not provided by applicant and otherwise undetermined" if the application is denied, withdrawn, or determined to be incomplete before a loan term has been identified. For merchant cash advances and other sales-based financing transactions, the financial institution

complies with § 1002.107(a)(5)(iii) by reporting the loan term, if any, that the financial institution estimated or specified in processing, underwriting or providing disclosures for the application or transaction. If more than one such loan term is estimated or specified, the financial institution reports the one it considers to be most accurate, in its discretion. For merchant cash advances and other sales-based financing transactions that do not have a loan term, the financial institution reports "not provided by applicant and otherwise undetermined."

107(a)(6) Credit Purpose

1. *General.* A financial institution complies with § 1002.107(a)(6) by selecting the purpose or purposes of the covered credit transaction applied for or originated from the list below.
i. Purchase, construction/ improvement, or refinance of non-owner-occupied real property.
ii. Purchase, construction/ improvement, or refinance of owner-occupied real property.
iii. Purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks).
iv. Purchase, refinance, or rehabilitation/repair of equipment.
v. Working capital (includes inventory or floor planning).
vi. Business start-up.
vii. Business expansion.
viii. Business acquisition.
ix. Refinance existing debt (other than refinancings listed above).
x. Line increase.
xi. Overdraft.
xii. Other.
xiii. Not provided by applicant and otherwise undetermined.
xiv. Not applicable.

2. *More than one purpose.* If the applicant indicates or the financial institution is otherwise aware of more than one purpose for the credit applied for or originated, the financial institution reports those purposes, up to a maximum of three, using the list provided, in any order it chooses. For example, if an applicant refinances a commercial building it owns and uses the funds to purchase a motor vehicle and expand the business it runs in a part of that building, the financial institution reports that the three purposes of the credit are purchase, construction/improvement, or refinance of owner-occupied real property; purchase, refinance, or rehabilitation/ repair of motor vehicle(s) (including light and heavy trucks); and business expansion. If an application has more than three purposes, the financial institution reports any three of those

purposes. In the example above, if the funds were also used to purchase equipment, the financial institution would select only three of the relevant purposes to report.

3. "*Other*" *credit purpose.* If a purpose of an application does not appear on the list of purposes provided, the financial institution reports "other" as the credit purpose and reports the credit purpose via free-form text field. If the application has more than one "other" purpose, the financial institution chooses the most significant "other" purpose, in its discretion, and reports that "other" purpose. The financial institution reports a maximum of three credit purposes, including any "other" purpose.

4. *Credit purpose not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes credit purpose. However, if a financial institution is nonetheless unable to collect or determine credit purpose information, the financial institution reports that the credit purpose is "not provided by applicant and otherwise undetermined."

5. *Not applicable.* If the application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card, the financial institution may report credit purpose as "not applicable."

6. *Collecting credit purpose.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, including credit purpose. The financial institution is permitted, but not required, to present the list of credit purposes provided in comment 107(a)(6)–1 to the applicant. The financial institution is also permitted to ask about purposes not included on the list provided in comment 107(a)(6)–1. If the applicant chooses a purpose or purposes not included on the provided list, the financial institution follows the instructions in comment 107(a)(6)–3 regarding reporting of "other" as the credit purpose. If an applicant chooses a purpose or purposes that are similar to purposes on the list provided, but uses different language, the financial institution reports the purpose or purposes from the list provided.

7. *Owner-occupied real property.* Real property is owner-occupied if any physical portion of the property is used by the owner for any activity, including storage.

8. *Overdraft.* When overdraft is provided as an aspect of the covered credit transaction applied for or

originated, the financial institution reports "Overdraft" as a purpose of the credit. The financial institution reports credit type pursuant to § 1002.107(a)(5)(i) as appropriate for the underlying covered credit transaction, such as "Line of credit—unsecured." Providing occasional overdraft services as part of a deposit account offering would not be reported for the purpose of subpart B.

107(a)(7) Amount Applied For

1. *Initial amount requested.* A financial institution complies with § 1002.107(a)(7) by reporting the initial amount of credit or the initial credit limit requested by the applicant. The financial institution is not required to report credit amounts or limits discussed before an application is made, but must capture the initial amount requested at the application stage. If the applicant requests an amount as a range of numbers, the financial institution reports the midpoint of that range.

2. *No amount requested.* If the applicant does not request a specific amount at the application stage, but the financial institution underwrites the application for a specific amount, the financial institution complies with § 1002.107(a)(7) by reporting the amount considered for underwriting as the amount applied for. If the particular type of credit product applied for does not involve a specific amount requested, the financial institution reports that the requirement is "not applicable."

3. *Firm offers.* When an applicant responds to a "firm offer" that specifies an amount or limit, which may occur in conjunction with a pre-approved credit solicitation, the financial institution reports the amount of the firm offer as the amount applied for, unless the applicant requests a different amount. If the firm offer does not specify an amount or limit and the applicant does not request a specific amount, the amount applied for is the amount underwritten by the financial institution. If the firm offer specifies an amount or limit as a range and the applicant does not request a specific amount, the amount applied for is the amount underwritten by the financial institution.

4. *Additional amounts on an existing account.* When reporting a covered application that seeks additional credit amounts on an existing account, the financial institution reports only the additional credit amount sought, and not any previous amounts extended. See comment 103(b)–3.

5. *Initial amount otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution

shall maintain procedures reasonably designed to collect applicant-provided data, which includes the credit amount initially requested by the applicant (other than for products that do not involve a specific amount requested). However, if a financial institution is nonetheless unable to collect or otherwise determine the amount initially requested, the financial institution reports that the amount applied for is "not provided by applicant and otherwise undetermined." But see comment 107(a)(7)–2 for how to report the credit amount initially requested by the applicant for particular types of credit products that do not involve a specific amount requested.

107(a)(8) Amount Approved or Originated

1. *General.* A financial institution complies with § 1002.107(a)(8) by reporting the amount approved or originated for credit that is originated or approved but not accepted. For applications that the financial institution, pursuant to § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports that the amount approved or originated is "not applicable."

2. *Multiple approval amounts.* A financial institution may sometimes approve an applicant for more than one credit amount, allowing the applicant to choose which amount the applicant prefers for the extension or line of credit. When multiple approval amounts are offered for a closed-end credit transaction for which the action taken is approved but not accepted, and the applicant does not accept the approved offer of credit in any amount, the financial institution reports the highest amount approved. If the applicant accepts the offer of closed-end credit, the financial institution reports the amount originated. When multiple approval amounts are offered for an open-end credit transaction for which the action taken is approved but not accepted, and the applicant does not accept the approved offer of credit in any amount, the financial institution reports the highest amount approved. If the applicant accepts the offer of open-end credit, the financial institution reports the actual credit limit established.

3. *Amount approved or originated— closed-end credit transaction.* For an originated closed-end credit transaction, the financial institution reports the principal amount to be repaid. This amount will generally be disclosed on the legal obligation.

4. *Amount approved or originated— refinancing.* For a refinancing, the financial institution reports the amount of credit approved or originated under the terms of the new debt obligation.

5. *Amount approved or originated— counteroffer.* If an applicant agrees to proceed with consideration of a counteroffer for an amount or limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the financial institution reports the amount granted. If an applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the application as denied and reports "not applicable" for the amount approved or originated. See comment 107(a)(9)–2.

6. *Amount approved or originated— existing accounts.* For additional credit amounts that were approved for or originated on an existing account, the financial institution reports only the additional credit amount approved or originated, and not any previous amounts extended.

107(a)(9) Action Taken

1. *General.* A financial institution complies with § 1002.107(a)(9) by selecting the action taken by the financial institution on the application from the following list: originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. A financial institution identifies the applicable action taken code based on final action taken on the covered application.

i. *Originated.* A financial institution reports that the application was originated if the financial institution made a credit decision approving the application and that credit decision resulted in an extension of credit.

ii. *Approved but not accepted.* A financial institution reports that the application was approved but not accepted if the financial institution made a credit decision approving the application, but the applicant or the party that initially received the application failed to respond to the financial institution's approval within the specified time, or the covered credit transaction was not otherwise consummated or the account was not otherwise opened.

iii. *Denied.* A financial institution reports that the application was denied if it made a credit decision denying the application before an applicant withdrew the application, before the application was closed for incompleteness, or before the application was denied on the basis of incompleteness.

iv. *Withdrawn by the applicant*. A financial institution reports that the application was withdrawn if the application was expressly withdrawn by the applicant before the financial institution made a credit decision approving or denying the application, before the application was closed for incompleteness, or before the application was denied on the basis of incompleteness.

v. *Incomplete*. A financial institution reports that the application was incomplete if the financial institution took adverse action on the basis of incompleteness under § 1002.9(a)(1)(ii) and (c)(1)(i) or provided a written notice of incompleteness under § 1002.9(c)(1)(ii) and (2), and the applicant did not respond to the request for additional information within the period of time specified in the notice.

2. *Treatment of counteroffers*. If a financial institution makes a counteroffer to grant credit on terms other than those originally requested by the applicant (for example, for a shorter loan maturity, with a different interest rate, or in a different amount) and the applicant declines the counteroffer or fails to respond, the institution reports the action taken as a denial on the original terms requested by the applicant. If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the action taken as the disposition of the application based on the terms of the counteroffer. For example, assume an applicant applies for a term loan and the financial institution makes a counteroffer to proceed with consideration of a line of credit. If the applicant declines to be considered for a line of credit, the financial institution reports the application as a denied request for a term loan. If, on the other hand, the applicant agrees to be considered for a line of credit, then the financial institution reports the action taken as the disposition of the application for the line of credit. For instance, using the same example, if the financial institution makes a credit decision approving the line of credit, but the applicant fails to respond to the financial institution's approval within the specified time by accepting the credit offer, the financial institution reports the application on the line of credit as approved but not accepted.

3. *Treatment of rescinded transactions*. If a borrower successfully rescinds a transaction after closing but before a financial institution is required to submit its small business lending application register containing the information for the application under

§ 1002.109, the institution reports the application as approved but not accepted.

4. *Treatment of pending applications*. A financial institution does not report any application still pending at the end of the calendar year; it reports such applications on its small business lending application register for the year in which final action is taken.

5. *Treatment of conditional approvals*. If a financial institution issues an approval that is subject to the applicant meeting certain conditions prior to closing, the financial institution reports the action taken as provided below dependent on whether the conditions are solely customary commitment or closing conditions or if the conditions include any underwriting or creditworthiness conditions. Customary commitment or closing conditions may include, for example, a clear-title requirement, proof of insurance policies, or a subordination agreement from another lienholder. Underwriting or creditworthiness conditions may include, for example, conditions that constitute a counteroffer (such as a demand for a higher down-payment), satisfactory loan-to-value ratios, or verification or confirmation, in whatever form the institution requires, that the applicant meets underwriting conditions concerning applicant creditworthiness, including documentation or verification of revenue, income or assets.

i. *Conditional approval—denial*. If the approval is conditioned on satisfying underwriting or creditworthiness conditions, those conditions are not met, and the financial institution takes adverse action on some basis other than incompleteness, the financial institution reports the action taken as denied.

ii. *Conditional approval—incompleteness*. If the approval is conditioned on satisfying underwriting or creditworthiness conditions that the financial institution needs to make the credit decision, and the financial institution takes adverse action on the basis of incompleteness under § 1002.9(a)(1)(ii) and (c)(1)(i), or has sent a written notice of incompleteness under § 1002.9(c)(1)(ii) and (2), and the applicant did not respond within the period of time specified in the notice, the financial institution reports the action taken as incomplete.

iii. *Conditional approval—approved but not accepted*. If the approval is conditioned on satisfying conditions that are solely customary commitment or closing conditions and the conditions are not met, the financial institution reports the action taken as approved but not accepted. If all the conditions

(underwriting, creditworthiness, or customary commitment or closing conditions) are satisfied and the financial institution agrees to extend credit but the covered credit transaction is not originated (for example, because the applicant withdraws), the financial institution reports the action taken as approved but not accepted.

iv. *Conditional approval—withdrawn by the applicant*. If the applicant expressly withdraws before satisfying all underwriting or creditworthiness conditions and before the institution denies the application or before the institution closes the file for incompleteness, the financial institution reports the action taken as withdrawn.

107(a)(10) Action Taken Date

1. *Reporting action taken date for denied applications*. For applications that are denied, a financial institution reports either the date the application was denied or the date the denial notice was sent to the applicant.

2. *Reporting action taken date for applications withdrawn by applicant*. For applications that are withdrawn by the applicant, the financial institution reports the date the express withdrawal was received, or the date shown on the notification form in the case of a written withdrawal.

3. *Reporting action taken date for applications that are approved but not accepted*. For applications approved by a financial institution but not accepted by the applicant, the financial institution reports any reasonable date, such as the approval date, the deadline for accepting the offer, or the date the file was closed. A financial institution should generally be consistent in its approach to reporting by, for example, establishing procedures for how to report this date for particular scenarios, products, or divisions.

4. *Reporting action taken date for originated applications*. For applications that result in an extension of credit, a financial institution generally reports the closing or account opening date. If the disbursement of funds takes place on a date later than the closing or account opening date, the institution may, alternatively, use the date of initial disbursement. A financial institution should generally be consistent in its approach to reporting by, for example, establishing procedures for how to report this date for particular scenarios, products, or divisions.

5. *Reporting action taken date for incomplete applications*. For applications closed for incompleteness or denied for incompleteness, the financial institution reports either the date the action was taken or the date the

denial or incompleteness notice was sent to the applicant.

107(a)(11) Denial Reasons

1. *Reason for denial—in general.* A financial institution complies with § 1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons. The financial institution reports only the principal reason or reasons it denied the application. For example, if a financial institution denies an application due to insufficient cashflow, unacceptable collateral, and unverifiable business information, the financial institution is required to report these three reasons. The reasons reported must accurately describe the principal reason or reasons the financial institution denied the application. A financial institution reports denial reasons by selecting its principal reason or reasons for denying the application from the following list:

i. *Credit characteristics of the business.* A financial institution reports the denial reason as "credit characteristics of the business" if it denies the application based on an assessment of the business's ability to meet its current or future credit obligations. Examples include business credit score, history of business bankruptcy or delinquency, and/or a high number of recent business credit inquiries.

ii. *Credit characteristics of the principal owner(s) or guarantor(s).* A financial institution reports the denial reason as "credit characteristics of the principal owner(s) or guarantor(s)" if it denies the application based on an assessment of the principal owner(s) or guarantor(s)'s ability to meet its current or future credit obligations. Examples include principal owner(s) or guarantor(s)'s credit score, history of charge offs, bankruptcy or delinquency, low net worth, limited or insufficient credit history, or history of excessive overdraft.

iii. *Use of credit proceeds.* A financial institution reports the denial reason as "use of credit proceeds" if it denies an application because, as a matter of policy or practice, it places limits on lending to certain kinds of businesses, products, or activities it has identified as high risk.

iv. *Cashflow.* A financial institution reports the denial reason as "cashflow" when it denies an application due to insufficient or inconsistent cashflow.

v. *Collateral.* A financial institution reports the denial reason as "collateral" when it denies an application due to collateral that it deems insufficient or otherwise unacceptable.

vi. *Time in business.* A financial institution reports the denial reason as "time in business" when it denies an application due to insufficient time or experience in a line of business.

vii. *Government loan program criteria.* Certain loan programs are backed by government agencies that have specific eligibility requirements. When those requirements are not met by an applicant, and the financial institution denies the application, the financial institution reports the denial reason as "government loan program criteria." For example, if an applicant cannot meet a government-guaranteed loan program's requirement to provide a guarantor or proof of insurance, the financial institution reports the reason for the denial as "government loan program criteria."

viii. *Aggregate exposure.* Aggregate exposure is a measure of the total exposure or level of indebtedness of the business and its principal owner(s) associated with an application. A financial institution reports the denial reason as "aggregate exposure" where the total debt associated with the application is deemed high or exceeds certain debt thresholds set by the financial institution. For example, if an application for unsecured credit exceeds the maximum amount a financial institution is permitted to approve per applicant, as stated in its credit guidelines, and the financial institution denies the application for this reason, the financial institution reports the reason for denial as "aggregate exposure."

ix. *Unverifiable information.* A financial institution reports the denial reason as "unverifiable information" when it is unable to verify information provided as part of the application, and denies the application for that reason. The unverifiable information must be necessary for the financial institution to make a credit decision based on its procedures for the type of credit requested. Examples include unverifiable assets or collateral, unavailable business credit report, and unverifiable business ownership composition.

x. *Other.* A financial institution reports the denial reason as "other" where none of the enumerated denial reasons adequately describe the principal reason or reasons it denied the application, and the institution reports the denial reason or reasons via free-form text field.

2. *Reason for denial—not applicable.* A financial institution complies with § 1002.107(a)(11) by reporting that the requirement is not applicable if the action taken on the application,

pursuant to § 1002.107(a)(9), is not a denial. For example, if the application resulted in an originated covered credit transaction, or the application was approved but not accepted, the financial institution complies with § 1002.107(a)(11) by reporting not applicable.

107(a)(12) Pricing Information

1. *General.* For applications that a financial institution, pursuant to § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports that pricing information is "not applicable."

107(a)(12)(i) Interest Rate

1. *General.* A financial institution complies with § 1002.107(a)(12)(i) by reporting the interest rate applicable to the amount of credit approved or originated as reported pursuant to § 1002.107(a)(8).

2. *Interest rate—initial period.* If a covered credit transaction includes an initial period with an introductory interest rate of 12 months or less, after which the interest rate adjusts upwards or shifts from a fixed to variable rate, a financial institution complies with § 1002.107(a)(12)(i) by reporting information about the interest rate applicable after the initial period. If a covered transaction includes an initial period with an interest rate of more than 12 months after which the interest rate resets, a financial institution complies with § 1002.107(a)(12)(i) by reporting information about the interest rate applicable prior to the reset period. For example, if a financial institution originates a covered credit transaction with a fixed, initial interest rate of 0 percent for six months following origination, after which the interest rate will adjust according to a Prime index rate plus a 3 percent margin, the financial institution reports the 3 percent margin, Prime as the name of the index used to adjust the interest rate, the number 6 for the length of the initial period, and "not applicable" for the index value. As another example, in a 10/1 adjustable-rate mortgage transaction, where the first 10 years of the repayment period has a fixed rate of 3 percent and after year 10 the interest rate will adjust according to a Prime index rate plus a 3 percent margin, a financial institution complies with § 1002.107(a)(12)(i) by reporting the fixed rate of 3 percent, the number 120 for the initial period, and "not applicable" in the fields for the index, margin, and index value.

3. *Multiple interest rates.* If a covered credit transaction includes multiple

AdminRecord-000401

interest rates applicable to different credit features, a financial institution complies with § 1002.107(a)(12)(i) by reporting the interest rate applicable to the amount of credit approved or originated reported pursuant to § 1002.107(a)(8). For example, if a financial institution originates a credit card with different interest rates for purchases, balance transfers, cash advances, and overdraft advances, the financial institution reports the interest rate applicable for purchases.

4. *Index names.* A financial institution complies with § 1002.107(a)(12)(i) by selecting the index used from the following list: Wall Street Journal Prime, 6-month CD rate, 1-year T-Bill, 3-year T-Bill, 5-year T-Note, 12-month average of 10-year T-Bill, Cost of Funds Index (COFI)-National, Cost of Funds Index (COFI)-11th District, Constant Maturity Treasury (CMT). If the index used is internal to the financial institution, the financial institution reports "internal index" via the list of indices provided. If the index used does not appear on the list of indices provided (and is not internal to the financial institution), the financial institution reports "other" and reports the name of the index via free-form text field.

5. *Index value.* For covered transactions with an adjustable interest rate, a financial institution complies with § 1002.107(a)(12)(i)(B) by reporting the index value used to set the rate that is or would be applicable to the covered transaction.

107(a)(12)(ii) Total Origination Charges

1. *Charges in comparable cash transactions.* Charges imposed uniformly in cash and credit transactions are not reportable under § 1002.107(a)(12)(ii). In determining whether an item is part of the total origination charges, a financial institution should compare the covered credit transaction in question with a similar cash transaction. A financial institution financing the sale of property or services may compare charges with those payable in a similar cash transaction by the seller of the property or service.

2. *Charges by third parties.* A financial institution includes fees and amounts charged by someone other than the financial institution in the total charges reported if the financial institution:

i. Requires the use of a third party as a condition of or an incident to the extension of credit, even if the applicant can choose the third party; or

ii. Retains a portion of the third-party charge, to the extent of the portion retained.

3. *Special rule; broker fees.* A financial institution complies with § 1002.107(a)(12)(ii) by including fees charged by a broker (including fees paid by the applicant directly to the broker or to the financial institution for delivery to the broker) in the total origination charges reported even if the financial institution does not require the applicant to use a broker and even if the financial institution does not retain any portion of the charge. For more information on broker fees, see commentary for § 1002.107(a)(12)(iii).

4. *Bundled services.* Total origination charges include all charges imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit. Accordingly, a financial institution complies with § 1002.107(a)(12)(ii) by including charges for other products or services paid at or before origination in the total origination charges reported if the financial institution requires the purchase of such other product or service as a condition of or an incident to the extension of credit.

5. *Origination charges—examples.* Examples of origination charges may include application fees, credit report fees, points, appraisal fees, and other similar charges.

6. *Net lender credit.* If a financial institution provides a credit to an applicant that is greater than the total origination charges the applicant would have paid, the financial institution complies with § 1002.107(a)(12)(ii) by reporting the net lender credit as a negative amount. For example, if a covered transaction has $500 provided to the applicant at origination to offset closing costs, and the financial institution does not charge any origination charges, the financial institution complies with § 1002.107(a)(12)(ii) by reporting negative $500 as the total origination charges.

107(a)(12)(iii) Broker Fees

1. *Amount.* A financial institution complies with § 1002.107(a)(12)(iii) by including the fees reported in § 1002.107(a)(12)(ii) that are fees paid by the applicant directly to the broker or to the financial institution for delivery to the broker. For example, a covered transaction has $3,000 of total origination charges. Of that $3,000, $250 are fees paid by the applicant directly to a broker and an additional $300 are fees paid to the financial institution for delivery to the broker. The financial

institution complies with § 1002.107(a)(12)(iii) by reporting $550 in the broker fees reported.

2. *Fees paid directly to a broker by an applicant.* A financial institution complies with § 1002.107(a)(12)(iii) by relying on the best information readily available to the financial institution at the time final action is taken. Information readily available could include, for example, information provided by an applicant or broker that the financial institution reasonably believes regarding the amount of fees paid by the applicant directly to the broker.

107(a)(12)(iv) Initial Annual Charges

1. *Charges during the initial annual period.* The total initial annual charges include all charges scheduled to be imposed during the initial annual period following origination. For example, if a financial institution originates a covered credit transaction with a $50 monthly fee and a $100 annual fee, the financial institution complies with § 1002.107(a)(12)(iv) by reporting $700 in the initial annual charges reported. If there will be a charge in the initial annual period following origination but the amount of that charge is uncertain at the time of origination, a financial institution complies with § 1002.107(a)(12)(iv) by not reporting that charge as scheduled to be imposed during the initial annual period following origination.

2. *Interest excluded.* A financial institution complies with § 1002.107(a)(12)(iv) by excluding any interest expense from the initial annual charges reported.

3. *Avoidable charges.* A financial institution complies with § 1002.107(a)(12)(iv) by only including scheduled charges and excluding any charges for events that are avoidable by the applicant from the initial annual charges reported. Examples of avoidable charges include charges for late payment, for exceeding a credit limit, for delinquency or default, or for paying items that overdraw an account.

4. *Initial annual charges—examples.* Examples of charges scheduled to be imposed during the initial annual period may include monthly fees, annual fees, and other similar charges.

5. *Scheduled charges with variable amounts.* A financial institution complies with § 1002.107(a)(12)(iv) by reporting as the default the highest amount for a charge scheduled to be imposed. For example, if a covered credit transaction has a $75 monthly fee, but the fee is reduced to $0 if the applicant maintains an account at the financial institution originating the

AdminRecord-000402

covered credit transaction, the financial institution complies with § 1002.107(a)(12)(iv) by reporting $900 ($75 × 12) in the initial annual charges reported.

6. *Transactions with a term of less than one year.* For a transaction with a term of less than one year, a financial institution complies with § 1002.107(a)(12)(iv) by reporting all charges scheduled to be imposed during the term of the transaction.

**107(a)(12)(v) Additional Cost for Merchant Cash Advances or Other Sales-Based Financing**

1. *Merchant cash advances.* Section 1002.107(a)(12)(v) requires a financial institution to report the difference between the amount advanced and the amount to be repaid for a merchant cash advance or other sales-based financing transaction. Thus, in a merchant cash advance, a financial institution reports the difference between the amount advanced and the amount to be repaid, using the amounts (expressed in dollars) provided in the contract between the financial institution and the applicant.

**107(a)(12)(vi) Prepayment Penalties**

1. *Policies and procedures applicable to the covered credit transaction.* The policies and procedures applicable to the covered credit transaction include the practices that the financial institution follows when evaluating applications for the specific credit type and credit purpose requested. For example, assume that a financial institution's written procedures permit it to include prepayment penalties in the loan agreement for its term loans secured by non-owner occupied commercial real estate. For such transactions, the financial institution includes prepayment penalties in some loan agreements but not others. For an application for, or origination of, a term loan secured by non-owner occupied commercial real estate, the financial institution reports under § 1002.107(a)(12)(vi)(A) that a prepayment penalty could have been included under the policies and procedures applicable to the transaction, regardless of whether the term loan secured by non-owner occupied commercial real estate actually includes a prepayment penalty.

2. *Balloon finance charges.* A financial institution complies with § 1002.107(a)(12)(vi) by reporting as a prepayment penalty any balloon finance charge that may be imposed for paying all or part of the transaction's principal before the date on which the principal is due. For example, under the terms of a transaction, the amount of funds

advanced is $12,000, the amount to be repaid is $24,000 (which includes $12,000 in principal and $12,000 in interest and fees), the length of the transaction is 12 months, and the applicant must repay $2,000 per month. The terms of the transaction state that if the applicant prepays the principal before the 12-month period is over, the applicant is responsible for paying the difference between $24,000 and the amount the applicant has already repaid prior to initiating prepayment. The difference between the $24,000 to be repaid and what the applicant has already repaid prior to initiating prepayment is a balloon finance charge and should be reported as a prepayment penalty.

**107(a)(13) Census Tract**

1. *General.* A financial institution complies with § 1002.107(a)(13) by reporting a census tract as defined by the U.S. Census Bureau, which includes State and county numerical codes. A financial institution complies with § 1002.107(a)(13) if it uses the boundaries and codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting. The financial institution reports census tract based on the following:

i. *Proceeds address.* A financial institution complies with § 1002.107(a)(13) by reporting a census tract based on the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied, if known. For example, a financial institution would report a census tract based on the address or location of the site where the proceeds of a construction loan will be applied.

ii. *Main office or headquarters address.* If the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied is unknown, a financial institution complies with § 1002.107(a)(13) by reporting a census tract number based on the address or location of the main office or headquarters of the applicant, if known. For example, the address or location of the main office or headquarters of the applicant may be the home address of a sole proprietor or the office address of a sole proprietor or other applicant.

iii. *Another address or location.* If neither the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied nor the address or location of the main office or headquarters of the applicant are known, a financial institution complies

with § 1002.107(a)(13) by reporting a census tract number based on another address or location associated with the applicant.

iv. *Type of address used.* In addition to reporting the census tract, pursuant to § 1002.107(a)(13)(iv) a financial institution must report which one of the three types of addresses or locations listed in § 1002.107(a)(13)(i) through (iii) and described in comments 107(a)(13)–1.i through iii that the census tract is determined from.

2. *Financial institution discretion.* A financial institution complies with § 1002.107(a)(13) by identifying the appropriate address or location and the type of that address or location in good faith, using appropriate information from the applicant's credit file or otherwise known by the financial institution. A financial institution is not required to make inquiries beyond its standard procedures as to the nature of the addresses or locations it collects.

3. *Address or location not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes at least one address or location for an applicant for census tract reporting. However, if a financial institution is nonetheless unable to collect or otherwise determine any address or location for an application, the financial institution reports that the census tract information is "not provided by applicant and otherwise undetermined."

4. *Safe harbor.* As described in § 1002.112(c)(2) and comment 112(c)–1, a financial institution that obtains an incorrect census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau does not violate the Act or subpart B of this part.

**107(a)(14) Gross Annual Revenue**

1. *Collecting gross annual revenue.* A financial institution reports the applicant's gross annual revenue, expressed in dollars, for its fiscal year preceding when the information was collected. A financial institution may rely on the applicant's statements or on information provided by the applicant in collecting and reporting gross annual revenue, even if the applicant's statement or information is based on estimation or extrapolation. However, pursuant to § 1002.107(b), if the financial institution verifies the gross annual revenue provided by the applicant, it must report the verified information. Also, pursuant to comment 107(c)(1)–5, a financial institution reports updated gross annual revenue

AdminRecord-000403

data if it obtains more current data from the applicant during the application process. If a financial institution has already verified gross annual revenue data and then the applicant updates it, the financial institution reports the information it believes to be more accurate, in its discretion. The financial institution may use the following language to ask about gross annual revenue and may rely on the applicant's answer (unless subsequently verified or updated):

*What was the gross annual revenue of the business applying for credit in its last full fiscal year? Gross annual revenue is the amount of money the business earned before subtracting taxes and other expenses. You may provide gross annual revenue calculated using any reasonable method.*

2. *Gross annual revenue not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the gross annual revenue of the applicant. However, if a financial institution is nonetheless unable to collect or determine the gross annual revenue of the applicant, the financial institution reports that the gross annual revenue is "not provided by applicant and otherwise undetermined."

3. *Affiliate revenue.* A financial institution is permitted, but not required, to report the gross annual revenue for the applicant that includes the revenue of affiliates as well. Likewise, as explained in comment 106(b)(1)–3, in determining whether the applicant is a small business under § 1002.106(b), a financial institution may rely on an applicant's representations regarding gross annual revenue, which may or may not include affiliates' revenue.

4. *Gross annual revenue for a startup business.* In a typical startup business situation where the applicant has no gross annual revenue for its fiscal year preceding when the information is collected, the financial institution reports that the applicant's gross annual revenue in the preceding fiscal year is "zero." The financial institution shall not report pro forma projected revenue figures because these figures do not reflect actual gross revenue.

107(a)(15) NAICS Code

1. *General.* NAICS stands for North American Industry Classification System. The Office of Management and Budget has charged the Economic Classification Policy Committee with the maintenance and review of NAICS.

A financial institution complies with § 1002.107(a)(15) if it uses the 3-digit NAICS subsector codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting.

2. *NAICS not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes NAICS code. However, if a financial institution is nonetheless unable to collect or otherwise determine a NAICS code for the applicant, the financial institution reports that the NAICS code is "not provided by applicant and otherwise undetermined."

3. *Safe harbor.* As described in § 1002.112(c)(3) and comment 112(c)–2, a financial institution that obtains an incorrect NAICS code does not violate the Act or subpart B of this part if it either relies on an applicant's representations or on an appropriate third-party source, in accordance with § 1002.107(b), regarding the NAICS code, or identifies the NAICS code itself, provided that the financial institution maintains procedures reasonably adapted to correctly identify a 3-digit NAICS code.

107(a)(16) Number of Workers

1. *General.* A financial institution complies with § 1002.107(a)(16) by reporting the number of people who work for the applicant, using the ranges prescribed in the Filing Instructions Guide.

2. *Collecting number of workers.* A financial institution may collect number of workers from an applicant using the ranges for reporting as specified by the Bureau (see comment 107(a)(16)–1) or as a numerical value. When asking for the number of workers from an applicant, a financial institution shall explain that full-time, part-time and seasonal employees, as well as contractors who work primarily for the applicant, would be counted as workers, but principal owners of the applicant would not. If asked, the financial institution shall explain that volunteers are not counted as workers, and workers for affiliates of the applicant are counted if the financial institution were also collecting the affiliates' gross annual revenue. The financial institution may use the following language to ask about the number of workers and may rely on the applicant's answer (unless subsequently verified or updated):

*Counting full-time, part-time and seasonal workers, as well as contractors who work primarily for the business applying for credit, but not counting*

*principal owners of the business, how many people work for the business applying for credit?*

3. *Number of workers not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the number of workers of the applicant. However, if a financial institution is nonetheless unable to collect or determine the number of workers of the applicant, the financial institution reports that the number of workers is "not provided by applicant and otherwise undetermined."

107(a)(17) Time in Business

1. *Collecting time in business.* A financial institution complies with § 1002.107(a)(17) by reporting the time the applicant has been in business.

i. If a financial institution collects or otherwise obtains the number of years an applicant has been in business as part of its procedures for evaluating an application for credit, it reports the time in business in whole years, rounded down to the nearest whole year.

ii. If a financial institution does not collect time in business as described in comment 107(a)(17)–1.i, but as part of its procedures determines whether or not the applicant's time in business is less than two years, it reports the applicant's time in business as either less than two years or two or more years in business.

iii. If a financial institution does not collect time in business as part of its procedures for evaluating an application for credit as described in comments 107(a)(17)–1.i or .ii, the financial institution complies with § 1002.107(a)(17) by asking the applicant whether it has been in existence for less than two years or two or more years and reporting the information provided by the applicant accordingly.

2. *Time in business collected as part of the financial institution's procedures for evaluating an application for credit.* A financial institution that collects or obtains an applicant's time in business as part of its procedures for evaluating an application for credit is not required to collect or obtain time in business pursuant to any particular definition of time in business for this purpose. For example, if the financial institution collects the number of years the applicant has existed (such as by asking the applicant when its business was started, or by obtaining the applicant's date of incorporation from a Secretary of State or other State or Federal agency that registers or licenses businesses) as

the time in business, the financial institution reports that information accordingly pursuant to comment 107(a)(17)–1.i. Similarly, if the financial institution collects the number of years of experience the applicant's owners have in the current line of business, the financial institution reports that information accordingly pursuant to comment 107(a)(17)–1.i. If, however, the financial institution collects both the number of years the applicant has existed as well as some other measure of time in business (such as the number of years of experience the applicant's owners have in the current line of business), the financial institution reports the number of years the applicant has existed as the time in business pursuant to comment 107(a)(17)–1.i.

3. *Time in business not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the applicant's time in business. However, if a financial institution is nonetheless unable to collect or determine the applicant's time in business, the financial institution reports that the time in business is "not provided by applicant and otherwise undetermined."

**107(a)(18) Minority-Owned, Women-Owned, and LGBTQI+-Owned Business Statuses**

1. *General.* A financial institution must ask an applicant whether it is a minority-owned, women-owned, and/or LGBTQI+-owned business. The financial institution must permit an applicant to refuse (*i.e.,* decline) to answer the financial institution's inquiry regarding business status and must inform the applicant that the applicant is not required to provide the information. See the sample data collection form in appendix E to this part for sample language for providing this notice to applicants. The financial institution must report the applicant's substantive response regarding each business status, that the applicant declined to answer the inquiry (that is, selected an answer option of "I do not wish to provide this information" or similar), or its failure to respond to the inquiry (that is, "not provided by applicant"), as applicable.

2. *Definitions.* When inquiring about minority-owned, women-owned, and LGBTQI+-owned business statuses (regardless of whether the request is made on a paper form, electronically, or orally), the financial institution also must provide the applicant with definitions of the terms "minority-owned business," "women-owned business," and "LGBTQI+-owned business" as set forth in § 1002.102 (m), (s) and (*l*), respectively. The financial institution satisfies this requirement if it provides the definitions as set forth in the sample data collection form in appendix E.

3. *Combining questions.* A financial institution may combine on the same paper or electronic data collection form the questions regarding minority-owned, women-owned, and LGBTQI+-owned business status pursuant to § 1002.107(a)(18) with principal owners' ethnicity, race, and sex pursuant to § 1002.107(a)(19) and the applicant's number of principal owners pursuant to § 1002.107(a)(20). See the sample data collection form in appendix E.

4. *Notices.* When requesting minority-owned, women-owned, and LGBTQI+-owned business statuses from an applicant, a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of the applicant's minority-owned, women-owned, or LGBTQI+-owned business statuses, or on whether the applicant provides its minority-owned, women-owned, or LGBTQI+-owned business statuses. A financial institution must also inform the applicant that Federal law requires it to ask for an applicant's minority-owned, women-owned, and LGBTQI+-owned business statuses to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. A financial institution may combine these notices regarding minority-owned, women-owned, and LGBTQI+-owned business statuses with the notices that a financial institution is required to provide when requesting principal owners' ethnicity, race, and sex if a financial institution requests information pursuant to § 1002.107(a)(18) and (19) in the same data collection form or at the same time. See the sample data collection form in appendix E for sample language that a financial institution may use for these notices.

5. *Maintaining the record of an applicant's response regarding minority-owned, women-owned, and LGBTQI+-owned business statuses separate from the application.* A financial institution must maintain the record of an applicant's responses to the financial institution's inquiry pursuant to § 1002.107(a)(18) separate from the application and accompanying information. See § 1002.111(b) and comment 111(b)–1. If the financial institution provides a paper or electronic data collection form, the data collection form must not be part of the application form or any other document that the financial institution uses to provide or collect any information other than minority-owned business status, women-owned business status, LGBTQI+-owned business status, principal owners' ethnicity, race, and sex, and the number of the applicant's principal owners. See the sample data collection form in appendix E. For example, if the financial institution sends the data collection form via email, the data collection form should be a separate attachment to the email or accessed through a separate link in the email. If the financial institution uses a web-based data collection form, the form should be on its own page.

6. *Minority-owned, women-owned, and/or LGBTQI+-owned business statuses not provided by applicant.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the applicant's minority-owned, women-owned, and LGBTQI+-owned business statuses. However, if a financial institution does not receive a response to the financial institution's inquiry pursuant to § 1002.107(a)(18), the financial institution reports that the applicant's business statuses were "not provided by applicant."

7. *Applicant declines to provide information about minority-owned, women-owned, and/or LGBTQI+-owned business statuses.* A financial institution reports that the applicant responded that it did not wish to provide the information about an applicant's minority-owned, women-owned, and LGBTQI+-owned business statuses, if the applicant declines to provide the information by selecting such a response option on a paper or electronic form (*e.g.,* by selecting an answer option of "I do not wish to provide this information" or similar). The financial institution also reports an applicant's refusal to provide such information in this way, if the applicant orally declines to provide such information for a covered application taken by telephone or another medium that does not involve providing any paper or electronic documents.

8. *Conflicting responses provided by applicants.* If the applicant both provides a substantive response to the financial institution's inquiry regarding business status (that is, indicates that it is a minority-owned, women-owned, and/or LGBTQI+-owned business, or checks "none apply" or similar) and also checks the box indicating "I do not wish to provide this information" or

similar, the financial institution reports the substantive response(s) provided by the applicant (rather than reporting that the applicant declined to provide the information).

9. *No provision of business statuses.* Notwithstanding § 1002.107(b), a financial institution must report the applicant's substantive response(s), that the applicant declined to answer the inquiry (that is, selected an answer option of "I do not wish to provide this information" or similar), or the applicant's failure to respond to the inquiry (that is, that the information was "not provided by applicant") pursuant to § 1002.107(a)(18), even if the financial institution verifies or otherwise obtains an applicant's minority-owned, women-owned, and/or LGBTQI+-owned business statuses for other purposes. For example, if a financial institution uses a paper data collection form to ask an applicant if it is a minority-owned business, a women-owned business, and/or an LGBTQI+-owned business and the applicant does not indicate that it is a minority-owned business, the financial institution must not report that the applicant is a minority-owned business, even if the applicant indicates that it is a minority-owned business for other purposes, such as for a special purpose credit program or a Small Business Administration program.

**107(a)(19) Ethnicity, Race, and Sex of Principal Owners**

1. *General.* A financial institution must ask an applicant to provide its principal owners' ethnicity, race, and sex. The financial institution must permit an applicant to refuse (*i.e.,* decline) to answer the financial institution's inquiry and must inform the applicant that it is not required to provide the information. See the sample data collection form in appendix E to this part for sample language for providing this notice to applicants. The financial institution must report the applicant's substantive responses regarding principal owners' ethnicity, race, and sex, that the applicant declined to answer an inquiry (that is, selected an answer option of "I do not wish to provide this information" or similar), or its failure to respond to an inquiry (that is, "not provided by applicant"), as applicable. The financial institution must report an applicant's responses about its principal owners' ethnicity, race, and sex, regardless of whether an applicant declines or fails to answer an inquiry about the number of its principal owners under § 1002.107(a)(20). If an applicant provides some, but not all, of the

requested information about the ethnicity, race, and sex of a principal owner, the financial institution reports the information that was provided by the applicant and reports that the applicant declined to provide or did not provide (as applicable) the remainder of the information. See comments 107(a)(19)–6 and –7.

2. *Definition of principal owner.* When requesting a principal owner's ethnicity, race, and sex, the financial institution must also provide the applicant with the definition of the term "principal owner" as set forth in § 1002.102(o). The financial institution satisfies this requirement if it provides the definition of principal owner as set forth in the sample data collection form in appendix E.

3. *Combining questions.* A financial institution may combine on the same paper or electronic data collection form the questions regarding the principal owners' ethnicity, race, and sex pursuant to § 1002.107(a)(19) with the applicant's number of principal owners pursuant to § 1002.107(a)(20) and the applicant's minority-owned, women-owned, and LGBTQI+-owned business statuses pursuant to § 1002.107(a)(18). See the sample data collection form in appendix E.

4. *Notices.* When requesting a principal owner's ethnicity, race, and sex from an applicant, a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex/gender, or on whether the applicant provides the information. A financial institution must also inform the applicant that Federal law requires it to ask for the principal owners' ethnicity, race, and sex/gender to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. A financial institution may combine these notices with the similar notices that a financial institution is required to provide when requesting minority-owned business status, women-owned business status, and LGBTQI+-owned business status, if a financial institution requests information pursuant to § 1002.107(a)(18) and (19) in the same data collection form or at the same time. See the sample data collection form in appendix E for sample language that a financial institution may use for these notices.

5. *Maintaining the record of an applicant's responses regarding principal owners' ethnicity, race, and sex separate from the application.* A financial institution must maintain the record of an applicant's response to the

financial institution's inquiries pursuant to § 1002.107(a)(19) separate from the application and accompanying information. *See* § 1002.111(b) and comment 111(b)–1. If the financial institution provides a paper or electronic data collection form, the data collection form must not be part of the application form or any other document that the financial institution uses to provide or collect any information other than minority-owned business status, women-owned business status, LGBTQI+-owned business status, principal owners' ethnicity, race, and sex, and the number of the applicant's principal owners. See the sample data collection form in appendix E for sample language. For example, if the financial institution sends the data collection form via email, the data collection form should be a separate attachment to the email or accessed through a separate link in the email. If the financial institution uses a web-based data collection form, the form should be on its own page.

6. *Ethnicity, race, or sex of principal owners not provided by applicant.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the ethnicity, race, and sex of an applicant's principal owners. However, if an applicant does not provide the information, such as in response to a request for a principal owner's ethnicity, race, or sex on a paper or electronic data collection form, the financial institution reports the ethnicity, race, or sex (as applicable) as "not provided by applicant" for that principal owner. For example, if the financial institution provides a paper data collection form to an applicant with two principal owners, and asks the applicant to complete and return the form but the applicant does not do so, the financial institution reports that the two principal owners' ethnicity, race, and sex were "not provided by applicant." Similarly, if the financial institution provides an electronic data collection form, the applicant indicates that it has two principal owners, the applicant provides ethnicity, race, and sex for the first principal owner, and the applicant does not make any selections for the second principal owner's ethnicity, race, and sex, the financial institution reports the ethnicity, race, and sex that the applicant provided for the first principal owner and reports that each of the ethnicity, race, and sex for the second principal owner was "not provided by applicant." Additionally, if the financial institution provides an

electronic or paper data collection form, the applicant indicates that it has one principal owner, provides the principal owner's ethnicity and sex information, but does not provide information about the principal owner's race and also does not select a response of "I do not wish to provide this information" with regard to race, the financial institution reports the ethnicity and sex provided by the applicant and reports that the race of the principal owner was "not provided by applicant."

7. *Applicant declines to provide information about a principal owner's ethnicity, race, or sex.* A financial institution reports that the applicant responded that it did not wish to provide the information about a principal owner's ethnicity, race, or sex (as applicable), if the applicant declines to provide the information by selecting such a response option on a paper or electronic form (*e.g.,* by selecting an answer option of "I do not wish to provide this information" or similar). The financial institution also reports an applicant's refusal to provide such information in this way, if the applicant orally declines to provide such information for a covered application taken by telephone or another medium that does not involve providing any paper or electronic documents.

8. *Conflicting responses provided by applicant.* If the applicant both provides a substantive response to a request for a principal owner's ethnicity, race, or sex (that is, identifies a principal owner's race, ethnicity, or sex) and also checks the box indicating "I do not wish to provide this information" or similar, the financial institution reports the information on ethnicity, race, or sex that was provided by the applicant (rather than reporting that the applicant declined provide the information). For example, if an applicant is completing a paper data collection form and writes in a response that a principal owner's sex is female and also indicates on the form that the applicant does not wish to provide information regarding that principal owner's sex, the financial institution reports the principal owner's sex as female.

9. *No verification of ethnicity, race, and sex of principal owners.* Notwithstanding § 1002.107(b), a financial institution must report the applicant's substantive responses as to its principal owners' ethnicity, race, and sex (that is, the applicant's identification of its principal owners' race, ethnicity, and sex), that the applicant declined to answer the inquiry (that is, selected an answer option of "I do not wish to provide this information" or similar), or the

applicant's failure to respond to the inquiry (that is, the information was "not provided by applicant") pursuant to § 1002.107(a)(19), even if the financial institution verifies or otherwise obtains the ethnicity, race, or sex of the applicant's principal owners for other purposes.

10. *Reporting for fewer than four principal owners.* If an applicant has fewer than four principal owners, the financial institution reports ethnicity, race, and sex information for the number of principal owners that the applicant has and reports the ethnicity, race, and sex fields for additional principal owners as "not applicable." For example, if an applicant has only one principal owner, the financial institution reports ethnicity, race, and sex information for the first principal owner and reports as "not applicable" the ethnicity, race, and sex data fields for principal owners two through four.

11. *Previously collected ethnicity, race, and sex information.* If a financial institution reports one or more principal owners' ethnicity, race, or sex information based on previously collected data under § 1002.107(d), the financial institution does not need to collect any additional ethnicity, race, or sex information for other principal owners (if any). See also comment 107(d)–9.

12. *Guarantors.* A financial institution does not collect or report a guarantor's ethnicity, race, and sex unless the guarantor is also a principal owner of the applicant, as defined in § 1002.102(o).

13. *Ethnicity.* i. *Aggregate categories.* A financial institution must permit an applicant to provide each principal owner's ethnicity for purposes of § 1002.107(a)(19) using one or more of the following aggregate categories:

A. Hispanic or Latino.
B. Not Hispanic or Latino.
ii. *Disaggregated subcategories.* A financial institution must permit an applicant to provide each principal owner's ethnicity for purposes of § 1002.107(a)(19) using one or more of the following disaggregated subcategories, regardless of whether the applicant has indicated that the relevant principal owner is Hispanic or Latino and regardless of whether the applicant selects any aggregate categories: Cuban; Mexican; Puerto Rican; or Other Hispanic or Latino. If an applicant indicates that a principal owner is Other Hispanic or Latino, the financial institution must permit the applicant to provide additional information regarding the principal owner's ethnicity, by using free-form text on a paper or electronic data collection form

or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone. The financial institution must permit the applicant to provide additional information indicating, for example, that the principal owner is Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, or Spaniard. See the sample data collection form in appendix E for sample language. If an applicant chooses to provide additional information regarding a principal owner's ethnicity, such as by indicating that a principal owner is Argentinean orally or in writing on a paper or electronic form, a financial institution must report that additional information via free-form text. If the applicant provides such additional information but does not also indicate that the principal owner is Other Hispanic or Latino (*e.g.,* by selecting Other Hispanic or Latino on a paper or electronic form), a financial institution is permitted, but not required, to report Other Hispanic or Latino as well.

iii. *Selecting multiple categories.* The financial institution must permit the applicant to select one, both, or none of the aggregate categories and as many disaggregated subcategories as the applicant chooses. A financial institution must permit an applicant to select a disaggregated subcategory even if the applicant does not select the corresponding aggregate category. For example, an applicant must be permitted to select the Mexican disaggregated subcategory for a principal owner without being required to select the Hispanic or Latino aggregate category. If an applicant provides ethnicity information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant. For example, if an applicant selects both aggregate categories and four disaggregated subcategories for a principal owner, the financial institution reports the two aggregate categories that the applicant selected and all four of the disaggregated subcategories that the applicant selected. Additionally, if an applicant selects only the Mexican disaggregated subcategory for a principal owner and no aggregate categories, the financial institution reports Mexican for the ethnicity of the applicant's principal owner but does not also report Hispanic or Latino. Further, if the applicant selects an aggregate category (*e.g.,* Not Hispanic or Latino) and a disaggregated

subcategory that does not correspond to the aggregate category (*e.g.,* Puerto Rican), the financial institution reports the information as provided by the applicant (*e.g.,* Not Hispanic or Latino, and Puerto Rican).

14. *Race.* i. *Aggregate categories.* A financial institution must permit an applicant to provide each principal owner's race for purposes of § 1002.107(a)(19) using one or more of the following aggregate categories:

A. American Indian or Alaska Native.
B. Asian.
C. Black or African American.
D. Native Hawaiian or Other Pacific Islander.
E. White.

ii. *Disaggregated subcategories.* The financial institution must permit an applicant to provide a principal owner's race for purposes of § 1002.107(a)(19) using one or more of the disaggregated subcategories as listed in this comment 107(a)(19)–14.ii, regardless of whether the applicant has selected the corresponding aggregate category.

A. The Asian aggregate category includes the following disaggregated subcategories: Asian Indian; Chinese; Filipino; Japanese; Korean; Vietnamese; and Other Asian. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the applicant indicates that the principal owner is Asian and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Asian, the financial institution must permit the applicant to provide additional information about the principal owner's race, by using free-form text on a paper or electronic data collection form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone. The financial institution must permit the applicant to provide additional information indicating, for example, that the principal owner is Cambodian, Hmong, Laotian, Pakistani, or Thai. See the sample data collection form in appendix E for sample language.

B. The Black or African American aggregate category includes the following disaggregated subcategories: African American; Ethiopian; Haitian; Jamaican; Nigerian; Somali; or Other Black or African American. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the

applicant indicates that the principal owner is Black or African American and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Black or African American, the financial institution must permit the applicant to provide additional information about the principal owner's race, by using free-form text on a paper or electronic data collection form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone. The financial institution must permit the applicant to provide additional information indicating, for example, that the principal owner is Barbadian, Ghanaian, or South African. See the sample data collection form in appendix E for sample language.

C. The Native Hawaiian or Other Pacific Islander aggregate category includes the following disaggregated subcategories: Guamanian or Chamorro; Native Hawaiian; Samoan; and Other Pacific Islander. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the applicant indicates that the principal owner is Native Hawaiian or Other Pacific Islander and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Pacific Islander, the financial institution must permit the applicant to provide additional information about the principal owner's race, by using free-form text on a paper or electronic data collection form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone. The financial institution must permit the applicant to provide additional information indicating, for example, that the principal owner is Fijian or Tongan. See the sample data collection form in appendix E for sample language.

D. If an applicant chooses to provide additional information regarding a principal owner's race, such as indicating that a principal owner is Cambodian, Barbadian, or Fijian orally or in writing on a paper or electronic form, a financial institution must report that additional information via free-form text in the appropriate data reporting field. If the applicant provides such additional information but does not also indicate that the principal owner is

Other Asian, Other Black or African American, or Other Pacific Islander, as applicable (*e.g.,* by selecting Other Asian on a paper or electronic form), a financial institution is permitted, but not required, to report the corresponding "Other" race disaggregated subcategory (*i.e.,* Other Asian, Other Black or African American, or Other Pacific Islander).

E. In addition to permitting an applicant to indicate that a principal owner is American Indian or Alaska Native, a financial institution must permit an applicant to provide the name of an enrolled or principal tribe, by using free-form text on a paper or electronic data collection form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone. If an applicant chooses to provide the name of an enrolled or principal tribe, a financial institution must report that information via free-form text in the appropriate data reporting field. If the applicant provides the name of an enrolled or principal tribe but does not also indicate that the principal owner is American Indian or Alaska Native (*e.g.,* by selecting American Indian or Alaska Native on a paper or electronic form), a financial institution is permitted, but not required, to report American Indian or Alaska Native as well.

iii. *Selecting multiple categories.* The financial institution must permit the applicant to select as many aggregate categories and disaggregated subcategories as the applicant chooses. A financial institution must permit an applicant to select one or more disaggregated subcategories even if the applicant does not select an aggregate category. For example, an applicant must be permitted to select the Chinese disaggregated subcategory for a principal owner without being required to select the Asian aggregate category. If an applicant provides race information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant. For example, if an applicant selects two aggregate categories and five disaggregated subcategories for a principal owner, the financial institution reports the two aggregate categories that the applicant selected and the five disaggregated subcategories that the applicant selected. Additionally, if an applicant selects only the Chinese disaggregated subcategory for a principal owner, the financial institution reports Chinese for the race of the principal owner but does

not also report that the principal owner is Asian. Similarly, if the applicant selects an aggregate category (*e.g.,* Asian) and a disaggregated subcategory that does not correspond to the aggregate category (*e.g.,* Native Hawaiian), the financial institution reports the information as provided by the applicant (*e.g.,* Asian and Native Hawaiian).

15. *Sex.* Generally, a financial institution must permit an applicant to provide each principal owner's sex for purposes of § 1002.107(a)(19). When requesting information about a principal owner's sex, a financial institution shall use the term "sex/gender." If the financial institution uses a paper or electronic data collection form to collect the information, the financial institution must allow the applicant to provide each principal owner's sex/gender using free-form text. When a financial institution collects the information orally, such as by telephone, the financial institution must inform the applicant of the opportunity to provide each principal owner's sex/gender and record the applicant's response. A financial institution reports the substantive information provided by the applicant (reported via free-form text in the appropriate data reporting field), or reports that the applicant declined to provide the information.

16. *Ethnicity and race information requested orally.* As described in comments 107(a)(19)–13 and –14, when collecting principal owners' ethnicity and race pursuant to § 1002.107(a)(19), a financial institution must present the applicant with the specified aggregate categories and disaggregated subcategories. When collecting ethnicity and race information orally, such as by telephone, a financial institution may not present the applicant with the option to decline to provide the information without also presenting the applicant with the specified aggregate categories and disaggregated subcategories.

i. *Ethnicity and race categories.* Notwithstanding comments 107(a)(19)–13 and –14, a financial institution is not required to read aloud every disaggregated subcategory when collecting ethnicity and race information orally, such as by telephone. Rather, the financial institution must orally present the lists of aggregate ethnicity and race categories, followed by the disaggregated subcategories (if any) associated with the aggregate categories selected by the applicant or which the applicant requests to be presented. After the applicant makes any disaggregated category selections associated with the

aggregate ethnicity or race category, the financial institution must also ask if the applicant wishes to hear the lists of disaggregated subcategories for any aggregate categories not selected by the applicant. The financial institution must record any aggregate categories selected by the applicant, as well as any disaggregated subcategories regardless of whether such subcategories were selected based on the disaggregated subcategories read by the financial institution or were otherwise provided by the applicant.

ii. *More than one principal owner.* If an applicant has more than one principal owner, the financial institution is permitted to ask about ethnicity and race in a manner that reduces repetition when collecting ethnicity and race information orally, such as by telephone. For example, if an applicant has two principal owners, the financial institution may ask for both principal owners' ethnicity at the same time, rather than asking about ethnicity, race, and sex for the first principal owner followed by ethnicity, race, and sex for the second principal owner.

107(a)(20) Number of Principal Owners

1. *General.* If the financial institution asks the applicant to provide the number of its principal owners pursuant to § 1002.107(a)(20), a financial institution must provide the definition of principal owner set forth in § 1002.102(o). The financial institution satisfies this requirement if it provides the definition of principal owner as set forth in the sample data collection form in appendix E.

2. *Number of principal owners provided by applicant; verification of number of principal owners.* The financial institution may rely on statements or information provided by the applicant in collecting and reporting the number of the applicant's principal owners. However, pursuant to § 1002.107(b), if the financial institution verifies the number of principal owners provided by the applicant, it must report the verified information.

3. *Number of principal owners not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c), a financial institution shall maintain procedures reasonably designed to collect applicant-provided data, which includes the number of principal owners of the applicant. However, if a financial institution is nonetheless unable to collect or otherwise determine the applicant's number of principal owners, the financial institution reports that the number of principal owners is "not

provided by applicant and otherwise undetermined."

107(b) Reliance on and Verification of Applicant-Provided Data

1. *Reliance on information provided by an applicant or appropriate third-party sources.* A financial institution may rely on statements made by an applicant (whether made in writing or orally) or information provided by an applicant when compiling and reporting data pursuant to subpart B of this part for applicant-provided data; the financial institution is not required to verify those statements or that information. However, if the financial institution does verify applicant statements or information for its own business purposes, such as statements relating to gross annual revenue or time in business, the financial institution reports the verified information. Depending on the circumstances and the financial institution's procedures, certain applicant-provided data can be collected from appropriate third-party sources without a specific request from the applicant, and such information may also be relied on. For example, gross annual revenue or NAICS code may be collected from tax return documents; a financial institution may also collect an applicant's NAICS code using third-party sources such as business information products. Applicant-provided data are the data that are or could be provided by the applicant, including § 1002.107(a)(5) through (7) and (13) through (20). See comment 107(c)(1)–3. In regard to restrictions on verification of minority-owned, women-owned, and LGBTQI+-owned business statuses, and principal owners' ethnicity, race, and sex, see comments 107(a)(18)–9 and 107(a)(19)–9.

107(c) Time and Manner of Collection

107(c)(1) In General

1. *Procedures.* The term "procedures" refers to the actual practices followed by a financial institution as well as its stated procedures. For example, if a financial institution's stated procedure is to collect applicant-provided data on or with a paper application form, but employees encourage applicants to skip the page that asks whether the applicant is a minority-owned business, a women-owned business, or an LGBTQI+-owned business under § 1002.107(a)(18), the financial institution's procedures are not reasonably designed to obtain a response.

2. *Latitude to design procedures.* A financial institution has flexibility to establish procedures concerning the

AdminRecord-000409

timing and manner in which it collects applicant-provided data that work best for its particular lending model and product offerings, provided those procedures are reasonably designed to collect the applicant-provided data in § 1002.107(a), as required pursuant to § 1002.107(c)(1), and where applicable comply with the minimum requirements set forth in § 1002.107(c)(2).

3. *Applicant-provided data.* Applicant-provided data are the data that are or could be provided by the applicant, including § 1002.107(a)(5) (credit type), § 1002.107(a)(6) (credit purpose), § 1002.107(a)(7) (amount applied for), § 1002.107(a)(13) (address or location for purposes of determining census tract), § 1002.107(a)(14) (gross annual revenue), § 1002.107(a)(15) (NAICS code, or information about the business such that the financial institution can determine the applicant's NAICS code), § 1002.107(a)(16) (number of workers), § 1002.107(a)(17) (time in business), § 1002.107(a)(18) (minority-owned business status, women-owned business status, and LGBTQI+-owned business status), § 1002.107(a)(19) (ethnicity, race, and sex of the applicant's principal owners), and § 1002.107(a)(20) (number of principal owners). Applicant-provided data do not include data that are generated or supplied only by the financial institution, including § 1002.107(a)(1) (unique identifier), § 1002.107(a)(2) (application date), § 1002.107(a)(3) (application method), § 1002.107(a)(4) (application recipient), § 1002.107(a)(8) (amount approved or originated), § 1002.107(a)(9) (action taken), § 1002.107(a)(10) (action taken date), § 1002.107(a)(11) (denial reasons), § 1002.107(a)(12) (pricing information), and § 1002.107(a)(13) (census tract, based on address or location provided by the applicant).

4. *Collecting applicant-provided data without a direct request to the applicant.* Depending on the circumstances and the financial institution's procedures, certain applicant-provided data can be collected without a direct request to the applicant. For example, credit type may be collected based on the type of product chosen by the applicant. Similarly, a financial institution may rely on appropriate third-party sources to collect certain applicant-provided data. See § 1002.107(b) concerning the use of third-party sources.

5. *Data updated by the applicant.* A financial institution reports updated data if it obtains more current data from the applicant during the application process. For example, if an applicant

states its gross annual revenue for the preceding fiscal year was $3 million, but then the applicant notifies the financial institution that its revenue in the preceding fiscal year was actually $3.2 million, the financial institution reports gross annual revenue of $3.2 million. For reporting verified applicant-provided data, see § 1002.107(b) and comment 107(b)–1. If a financial institution has already verified data and then the applicant updates it, the financial institution reports the information it believes to be more accurate, in its discretion. If a financial institution receives updates from the applicant after the application process has closed (for example, after closing or account opening), the financial institution may, at its discretion, update the data at any time prior to reporting the covered application to the Bureau.

107(c)(2) Applicant-Provided Data Collected Directly From the Applicant

1. *In general.* Whether a financial institution's procedures are reasonably designed to collect applicant-provided data is a fact-based determination and may depend on the financial institution's particular lending model, product offerings, and other circumstances; procedures that are reasonably designed to obtain a response may therefore require additional provisions beyond the minimum criteria set forth in § 1002.107(c)(2). In general, reasonably designed procedures will seek to maximize collection of applicant-provided data and minimize missing or erroneous data. While the requirements of § 1002.107(c)(2) do not apply to applicant-provided data that a financial institution obtains without a direct request to the applicant, as explained in comment 107(c)(1)–4, in such instances, a covered financial institution must still comply with § 1002.107(c)(1).

2. *Specific components.* i. *Timing of initial collection attempt.* While a financial institution has some flexibility concerning when applicant-provided data is are collected, under no circumstances may the initial request for applicant-provided data occur simultaneous with or after notifying an applicant of final action taken on a covered application. Generally, the earlier in the application process the financial institution initially seeks to collect applicant-provided data, the more likely the timing of collection is reasonably designed to obtain a response.

ii. *The request for applicant-provided data is prominently displayed or presented.* Pursuant to § 1002.107(c)(2)(ii), a financial

institution must ensure an applicant actually sees, hears, or is otherwise presented with the request for applicant-provided data. If an applicant is likely to overlook or miss a request for applicant-provided data, the financial institution does not have reasonably designed procedures. Similarly, a financial institution also does not have reasonably designed procedures if it obscures, prevents, or inhibits an applicant from accessing or reviewing a request for applicant-provided data.

iii. *The collection does not have the effect of discouraging an applicant from responding to a request for applicant-provided data.* A. A covered financial institution avoids discouraging a response by, for example, communicating to the applicant that the collection of applicant-provided data is worthy of the applicant's attention or is as important as information collected in connection with the financial institution's creditworthiness determination. In contrast, a covered financial institution that collects applicant-provided data in a time or manner that directly or indirectly discourages or obstructs an applicant from responding or providing a particular response violates § 1002.107(c)(2)(iii). For example, a financial institution may not discourage a response to inquiries regarding the demographic data pursuant to § 1002.107(a)(18) and (19) by communicating to the applicant that the request is unimportant, encouraging the applicant to bypass the form altogether, or attempting to influence or alter the applicant's preferred response.

B. A covered financial institution also avoids discouraging a response by requiring an applicant to provide a response to one or more requests for applicant-provided data in order to proceed with a covered application, including, as applicable, a response of "I do not wish to provide this information" or similar. (As described in comments 107(a)(18)–1 and 107(a)(19)–1, a financial institution must permit an applicant to decline to provide the demographic data required by § 1002.107(a)(18) and (19), which can be satisfied by providing a response option of "I do not wish to provide this information" or similar.) For example, in an electronic application, a financial institution may require the applicant to either make a substantive selection about a principal owner's ethnicity, race, or sex, select an option of "I do not wish to provide this information" or similar, or indicate there are no principal owners before allowing the applicant to proceed to the next page of requested information.

iv. *The applicant can easily provide a response.* Pursuant to § 1002.107(c)(2)(iv), a financial institution must structure the request for information in a manner that makes it easy for the applicant to provide a response. For example, a financial institution requests applicant-provided data in the same format as other information required for the covered application, provides applicants multiple methods to provide or return applicant-provided data (for example, on a written form, through a web portal, or through other means), or provides the applicant some other type of straightforward and seamless method to provide a response. Conversely, a financial institution must avoid imposing unnecessary burden on an applicant to provide the information requested or requiring the applicant to take steps that are inconsistent with the rest of its application process. For example, a financial institution does not have reasonably designed procedures if it collects application information related to its own creditworthiness determination in electronic form, but mails a paper form to the applicant initially seeking the data required under § 1002.107(a) that the financial institution does not otherwise need for its creditworthiness determination and requiring the applicant to mail it back. On the other hand, a financial institution complies with § 1002.107(c)(2)(iv) if, at its discretion, it requests the applicant to respond to inquiries made pursuant to § 1002.107(a)(18) and (19) through a reasonable method intended to keep the applicant's responses discrete and protected from view.

v. *Multiple requests for applicant-provided data.* A financial institution is permitted, but not required, to make more than one attempt to obtain applicant-provided data if the applicant does not respond to an initial request. For example, if an applicant initially does not respond when asked early in the application process (before notifying the applicant of final action taken on the application, pursuant to § 1002.107(c)(2)(i)) to inquiries made pursuant to § 1002.107(a)(18) and (19), a financial institution may request this information again, for example, during a subsequent in-person meeting with the applicant or after notifying the applicant of final action on the covered application.

107(c)(3) Procedures To Monitor Compliance

1. *Procedures to identify and respond to indicia of potential discouragement, including low response rates.* Section

1002.107(c)(3) requires a covered financial institution to maintain procedures designed to identify and respond to indicia of potential discouragement, including low response rates for applicant-provided data. In general, these include monitoring for low response rates (*i.e.,* the percentage of covered applications for which the financial institution has obtained some type of response to requests for applicant-provided data, including, as applicable, an applicant response of "I do not wish to provide this information" or similar); monitoring for significant irregularities in any particular response that may indicate steering, improper interference, or other potential discouragement or obstruction of applicants' preferred responses; monitoring response rates and responses by division, location, loan officer, or other factors to ensure that no discouragement or improper conduct is occurring in some parts of a financial institution, even if the financial institution maintains adequate response rates and responses overall; providing adequate training to loan officers and other persons involved in collecting applicant-provided data; promptly investigating any indicia of potential discouragement; and taking prompt remedial action if discouragement or other improper conduct is identified.

107(c)(4) Low Response Rates

1. *In general.* A low response rate for applicant-provided data may indicate that the financial institution has engaged in discouragement or otherwise failed to maintain reasonably designed procedures. Response rate generally refers to whether the financial institution has obtained some type of response to requests for applicant-provided data (including, as applicable, an applicant response of "I do not wish to provide this information" or similar). A response rate may be measured, as appropriate, as compared to financial institutions of a similar size, type, and/ or geographic reach, or other factors, as appropriate. Similarly, significant irregularities in a particular response (for example, very high rates of an applicant response of "I do not wish to provide this information" or similar) may also indicate that a financial institution does not have reasonably designed procedures, for example, because of steering, improper interference, or other potential discouragement or obstruction of applicants' preferred responses. Response rates may be relevant across all applicant-provided data, though are particularly relevant for the collection of the demographic data pursuant to

§ 1002.107(a)(18) and (19) given the heightened sensitivity of these inquiries and the importance of those data to the purposes of subpart B.

107(d) Previously Collected Data

1. *In general.* A financial institution may, for the purpose of reporting such data pursuant to § 1002.109, reuse certain previously collected data if the requirements of § 1002.107(d) are met. In that circumstance, a financial institution need not seek to collect the data anew in connection with a subsequent covered application to satisfy the requirements of this subpart. For example, if an applicant applies for and is granted a term loan, and then subsequently applies for a credit card in the same calendar year, the financial institution need not request again the data specified in § 1002.107(d). Similarly, if an applicant applies for more than one covered credit transaction at one time, a financial institution need only ask once for the data specified in § 1002.107(d).

2. *Data that can be reused.* Subject to the requirements of § 1002.107(d), a financial institution may reuse the following data: § 1002.107(a)(13) (address or location for purposes of determining census tract), § 1002.107(a)(14) (gross annual revenue) (subject to comment 107(d)–7), § 1002.107(a)(15) (NAICS code), § 1002.107(a)(16) (number of workers), § 1002.107(a)(17) (time in business) (subject to comment 107(d)–8), § 1002.107(a)(18) (minority-owned business status, women-owned business status, and LGBTQI+-owned business status) (subject to comment 107(d)–9), § 1002.107(a)(19) (ethnicity, race, and sex of applicant's principal owners) (subject to comment 107(d)–9), and § 1002.107(a)(20) (number of principal owners). A financial institution is not, however, permitted to reuse other data, such as § 1002.107(a)(6) (credit purpose).

3. *Previously reported data without a substantive response.* Data have not been "previously collected" within the meaning of § 1002.107(d) if the applicant did not provide a substantive response to the financial institution's request for that data and the financial institution was not otherwise able to obtain the requested data (for example, from the applicant's credit report, or tax returns).

4. *Updated data.* If, after the application process has closed on a prior covered application, a financial institution obtains updated information relevant to the data required to be collected and reported pursuant to § 1002.107(a)(13) through (20), and the

applicant subsequently submits a new covered application, the financial institution must use the updated information in connection with the new covered application (if the requirements of § 1002.107(d) are otherwise met) or seek to collect the data again. For example, if a business notifies a financial institution of a change of address of its sole business location, and subsequently submits a covered application within the time period specified in § 1002.107(d)(1) for reusing previously collected data, the financial institution must report census tract based on the updated information. In that circumstance, the financial institution may still reuse other previously collected data to satisfy § 1002.107(a)(14) through (20) if the requirements of § 1002.107(d) are met.

5. *Collection within the preceding 36 months.* Pursuant to § 1002.107(d)(1), data can be reused to satisfy § 1002.107(a)(13) and (15) through (20) if they are collected within the preceding 36 months. A financial institution may measure the 36-month period from the date of final action taken (§ 1002.107(a)(9)) on a prior application to the application date (§ 1002.107(a)(2)) on a subsequent application. For example, if a financial institution takes final action on an application on February 1, 2025, it may reuse certain previously collected data pursuant to § 1002.107(d)(1) for subsequent covered applications dated or received by the financial institution through January 31, 2028.

6. *Reason to believe data are inaccurate.* Whether a financial institution has reason to believe data are inaccurate pursuant to § 1002.107(d)(2) depends on the particular facts and circumstances. For example, a financial institution may have reason to believe data on the applicant's minority-owned business status, women-owned business status, and LGBTQI+-owned business status may be inaccurate if it knows that the applicant has had a change in ownership or a change in an owner's percentage of ownership.

7. *Collection of gross annual revenue in the same calendar year.* Pursuant to § 1002.107(d)(1), gross annual revenue information can be reused to satisfy § 1002.107(a)(14) provided it is collected in the same calendar year as the current covered application, as measured from the application date. For example, if an application is received and gross annual revenue is collected in connection with a covered application in one calendar year, but then final action was taken on the application in the following calendar year, the data may only be reused for the calendar year

in which it was collected and not the calendar year in which final action was taken on the application. However, if an application is received and gross annual revenue is collected in connection with a covered application in one calendar year, a financial institution may reuse that data pursuant to § 1002.107(d) in a subsequent application initiated in the same calendar year, even if final action was taken on the subsequent application in the following calendar year.

8. *Time in business.* A financial institution that decides to reuse previously collected data to satisfy § 1002.107(a)(17) (time in business) must update the data to reflect the passage of time since the data were collected. If a financial institution only knows that the applicant had been in business less than two years at the time the data was initially collected, as described in comment 107(a)(17)–1.ii or iii, it updates the data based on the assumption that the applicant had been in business for 12 months at the time of the prior collection. For example:

i. If a financial institution previously collected data on a prior covered application that the applicant has been in business for four years, and then seeks to reuse that data for a subsequent covered application submitted one year later, it must update the data to reflect that the applicant has been in business for five years.

ii. If a financial institution previously collected data on a prior covered application that the applicant had been in business less than two years (and was not aware of the business's actual length of time in business at the time), and then seeks to reuse that data for a subsequent covered application submitted 18 months later, the financial institution reports time in business on the subsequent covered application as over two years in business.

9. *Minority-owned business status, women-owned business status, LGBTQI+-owned business status, and principal owners' ethnicity, race, and sex.* A financial institution may not reuse data to satisfy § 1002.107(a)(18) and (19) unless the data were collected in connection with a prior covered application pursuant to this subpart B. If the financial institution previously asked the applicant to provide its minority-owned business status, women-owned business status, and LGBTQI+-owned business status, and principal owners' ethnicity, race, and sex for purposes of § 1002.107(a)(18) and (19), and the applicant declined to provide the information (such as by selecting "I do not wish to provide this information" or similar on a data collection form or by telling the

financial institution that it did not wish to provide the information), the financial institution may use that response when reporting data for a subsequent application pursuant to § 1002.107(d). However, if the applicant failed to respond (such as by leaving the response to the question blank or by failing to return a data collection form), the financial institution must inquire about the applicant's minority-owned business status, women-owned business status, LGBTQI+-owned business status, and principal owners' ethnicity, race, or sex, as applicable, in connection with a subsequent application because the data were not previously obtained. See also comment 107(a)(19)–11 concerning previously collected ethnicity, race, and sex information.

*Section 1002.108—Firewall*

108(a) Definitions

1. *Involved in making any determination concerning a covered application from a small business.* i. *General.* An employee or officer is involved in making a determination concerning a covered application from a small business for purposes of § 1002.108 if the employee or officer makes, or otherwise participates in, a decision regarding the evaluation of a covered application from a small business or the creditworthiness of a small business applicant for a covered credit transaction. This includes, but is not limited to, employees and officers serving as underwriters. The decision that an employee or officer makes or participates in must be about a specific covered application or about the creditworthiness of a specific applicant. An employee or officer is not involved in making a determination concerning a covered application if the employee or officer is only involved in making a decision that affects covered applications generally, or if the employee or officer only interacts with small businesses prior to them becoming applicants or submitting an application. An employee or officer may be participating in a determination concerning a covered application even if the employee or officer is not the ultimate decision maker or the sole decision maker. For example, an employee participates in a determination concerning a covered application if the employee recommends that another employee or officer approve or deny the application. Similarly, an employee or officer participates in a determination concerning a covered application if the employee or officer is part of a larger group, such as a committee, that makes

AdminRecord-000412

a determination concerning a covered application. For example, an employee participates in a decision if the employee is a member of a committee that approves the terms offered to an applicant for a covered application. This is true even if the employee does not support the committee's ultimate decision regarding the terms offered. Conversely, an employee or officer does not participate in a determination concerning a covered application if the employee or officer only performs ministerial functions for the committee, such as recording the minutes, or if the committee does not make a determination concerning a specific covered application.

ii. *Examples of activities that do not constitute being involved in making a determination concerning a covered application from a small business.* The following are examples of activities that do not constitute being involved in making a determination concerning a covered application:

A. Developing policies and procedures, designing or programming computer or other systems, or conducting marketing.

B. Discussing credit products, loan terms, or loan requirements with a small business before it submits a covered application.

C. Making or participating in a decision after the financial institution has taken final action on the covered application, such as a decision about servicing or collecting a covered credit transaction.

D. Using a check box form to confirm whether an applicant has submitted all necessary documents or handling a minor or clerical matter during the application process, such as suggesting or selecting a time for an appointment with an applicant.

E. Gathering information (including information collected pursuant to § 1002.107(a)(18) or (19)) and forwarding the information or a covered application to other individuals or entities.

F. Reviewing previously collected data to determine if it can be reused for a later covered application pursuant to § 1002.107(d).

iii. *Examples of activities that constitute being involved in making a determination concerning a covered application from a small business.* The following are examples of activities (done individually or as part of a group) that constitute being involved in making a determination concerning a covered application:

A. Making or participating in a decision to approve or deny a specific covered application. This includes, but

is not limited to, making or participating in a decision that an applicant does not satisfy one or more of the requirements for the covered credit transaction for which it has applied.

B. Making or participating in a decision regarding the reason(s) for denial of a covered application.

C. Making or participating in a decision that a guarantor or collateral is required in order to approve a specific covered application.

D. Making or participating in a decision regarding the credit amount or credit limit that will be approved for a specific covered application.

E. Making or participating in a decision to set one or more of the other terms that will be offered for a specific covered credit transaction. This includes, but is not limited to, making or participating in a decision regarding the interest rate, the loan term, or the payment schedule that will be offered for a specific covered credit transaction.

F. Making or participating in a decision regarding a counteroffer made to a specific applicant, including a decision regarding the terms of such a counteroffer.

G. Recommending that another decision maker approve or deny a specific covered application, provide a specific reason for denying a covered application, require a guarantor or collateral in order to approve a covered application, approve a credit amount or credit limit for a covered credit transaction, set one or more other terms for a covered credit transaction, make a counteroffer regarding a covered application, or set a specific term for such a counteroffer.

2. *Should have access.* i. *General.* A financial institution may determine that an employee or officer who is involved in making a determination concerning a covered application from a small business should have access to information otherwise subject to the prohibition in § 1002.108(b) if that employee or officer is assigned one or more job duties that may require the employee or officer to collect, see, consider, refer to, or otherwise use information subject to the prohibition in § 1002.108(b). If the employee or officer might need to collect, see, consider, refer to, or use such information to perform the employee's or officer's assigned job duties, the financial institution may determine that the employee or officer should have access. For example, if a loan officer is involved in making a determination concerning a covered application and that loan officer's job description or the financial institution's policies and procedures state that the loan officer may need to

collect information pursuant to § 1002.107(a)(18) or (19), the financial institution may determine that the loan officer should have access.

ii. *When a group of employees or officers should have access.* A financial institution may determine that all employees or officers with the same job description or assigned duties should have access for purposes of § 1002.108. For example, if a job description, a policy, a procedure, or another document states that a loan officer may have to collect or explain any part of a data collection form that includes the inquiries described in § 1002.107(a)(18) and (19), the financial institution may determine that all employees and officers who have been assigned the position of loan officer should have access for purposes of § 1002.108.

iii. *Making a determination regarding who should have access.* A financial institution is permitted to choose what lawful factors it will consider when determining whether an employee or officer should have access. A financial institution's determination that an employee or officer should have access may take into account relevant operational factors and lawful business practices. For example, a financial institution may consider its size, the number of employees and officers within the relevant line of business or at a particular branch or office location, and/or the number of covered applications the financial institution has received or expects to receive. Additionally, a financial institution may consider its current or its reasonably anticipated staffing levels, operations, systems, processes, policies, and procedures. A financial institution is not required to hire additional staff, upgrade its systems, change its lending or operational processes, or revise its policies or procedures for the sole purpose of limiting who should have access.

108(b) Prohibition on Access to Certain Information

1. *Scope of persons subject to the prohibition.* The prohibition in § 1002.108(b) applies to an employee or officer of a covered financial institution or its affiliate if the employee or officer is involved in making any determination concerning a covered application from a small business. For example, if a financial institution is affiliated with company B and an employee of company B is involved in making a determination concerning a covered application on behalf of the financial institution, then the financial institution must comply with § 1002.108 with regard to company B's employee.

AdminRecord-000413

Section 1002.108 does not require a financial institution to limit the access of employees and officers of third parties who are not affiliates of the financial institution.

2. *Scope of information that cannot be accessed when the prohibition applies to an employee or officer.* i. *Information that cannot be accessed when the prohibition applies.* If a particular employee or officer is involved in making a determination concerning a covered application from a small business, the prohibition in § 1002.108(b) only limits that employee's or officer's access to that small business applicant's responses to the inquiries that the covered financial institution makes to satisfy § 1002.107(a)(18) and (19). For example, if a financial institution uses a paper data collection form to request information pursuant to § 1002.107(a)(18) and (19), an employee or officer that is subject to the prohibition is not permitted access to the paper data collection form that contains the applicant's responses to the inquiries made pursuant to pursuant to § 1002.107(a)(18) and (19), or to any other record that identifies how the particular applicant responded to those inquires. Similarly, if a financial institution makes the inquiries required pursuant to § 1002.107(a)(18) and (19) during a telephone call, the prohibition applies to the applicant's responses to those inquiries provided during that telephone call and to any record that identifies how the particular applicant responded to those inquiries.

ii. *Information that can be accessed when the prohibition applies.* If a particular employee or officer is involved in making a determination concerning a covered application, the prohibition in § 1002.108(b) does not limit that employee's or officer's access to an applicant's responses to inquiries regarding whether the applicant is a minority-owned, women-owned, or LGBTQI+-owned business, or principal owners' ethnicity, race, or sex, made for purposes other than compliance with § 1002.107(a)(18) or (19). Thus, for example, an employee or officer who is subject to the prohibition in § 1002.108(b) may have access to information regarding whether an applicant is eligible for a Small Business Administration program for women-owned businesses without regard to whether the exception in § 1002.108(c) is satisfied. Additionally, an employee or officer who knows that an applicant is a minority-owned business, women-owned business, or LGBTQI+-owned business, or who knows the ethnicity, race, or sex of any of the applicant's

principal owners due to activities unrelated to the inquiries made to satisfy the financial institution's obligations under § 1002.107(a)(18) and (19) is not prohibited from making a determination concerning the applicant's covered application. Thus, an employee or officer who knows, for example, that an applicant is a minority-owned business due to a social relationship or another professional relationship with the applicant or any of its principal owners may make determinations concerning the applicant's covered application. Furthermore, an employee or officer that is involved in making a determination concerning a covered application may see, consider, refer to, or use data collected to satisfy aspects of § 1002.107 other than § 1002.107(a)(18) or (19), such as gross annual revenue, number of workers, and time in business.

108(c) Exception to the Prohibition on Access to Certain Information

1. *General.* A financial institution is not required to limit the access of an employee or officer who is involved in making determinations concerning a covered application from a small business if the financial institution determines that the particular employee or officer should have access to the information collected pursuant to § 1002.107(a)(18) or (19), and the financial institution provides the notice required by § 1002.108(d). A financial institution is not required to perform a separate analysis of the feasibility of maintaining a firewall. A determination that an employee or officer should have access means that it is not feasible to maintain a firewall as to that particular employee or officer, and the exception applies to that employee or officer if the financial institution provides the notice required by § 1002.108(d). However, the fact that a financial institution has made a determination that an employee or officer should have access does not mean that the financial institution can permit other employees and officers who are involved in making determinations concerning a covered application to have access to the information collected pursuant to § 1002.107(a)(18) and (19). A financial institution may only permit an employee or officer who is involved in making a determination concerning a covered application to have access to information collected pursuant to § 1002.107(a)(18) and (19) if it has determined that employee or officer or a group of which the employee or officer is a member should have access to the information.

2. *Applying the exception to a specific employee or officer or group of similarly situated employees or officers.* The exception applies to an employee or officer if the financial institution determines that the employee or officer should have access to the information collected pursuant to § 1002.107(a)(18) or (19), and the financial institution provides the notice required by § 1002.108(d). A financial institution can also determine that several employees and officers should have access, that all of a group of similarly situated employees or officers should have access, and that multiple groups of similarly situated employees or officers should have access to information collected pursuant to § 1002.107(a)(18) or (19). See also comment 108(a)–2. For example, a financial institution could determine that all its small business loan officers, small business loan processors, compliance officers, and legal officers should have access. If the financial institution provides the notice required in § 1002.108(d), the financial institution may permit all of its small business loan officers, small business loan processors, compliance officers, and legal officers to have access. However, the financial institution cannot permit other employees and officers to have access simply because it has determined that the small business loan officers, loan processors, compliance officers, and legal officers should have access. For example, in this case, the financial institution may not permit its underwriters or chief executive officer to have access to the information collected from the applicant pursuant to § 1002.107(a)(18) or (19) if they are involved in making any determination concerning a covered application, unless the financial institution also determines that they should have access. This would be true even if the chief executive officer or underwriter had some of the same assigned duties as a loan officer, such as being a member of a credit committee, but has not been assigned the task(s) that may require access to one or more applicants' responses to the financial institution's inquiries under § 1002.107(a)(18) or (19). If the financial institution separately determines that underwriters and the chief executive officer should have access, then the underwriters and chief executive officer may also have access.

108(d) Notice

1. *General.* If a financial institution determines that one or more employees or officers should have access pursuant to § 1002.108(c), the financial institution must provide the required notice to, at

a minimum, the applicant or applicants whose responses will be accessed by an employee or officer involved in making determinations concerning the applicant's or applicants' covered applications. Alternatively, a financial institution may also provide the required notice to applicants whose responses will not or might not be accessed. For example, a financial institution could provide the notice to all applicants for covered credit transactions or all applicants for a specific type of product.

2. *Content of the required notice.* The notice must inform the applicant that one or more employees and officers involved in making determinations concerning the applicant's covered application may have access to the applicant's responses regarding the applicant's minority-owned business status, women-owned business status, LGBTQI+-owned business status, and its principal owners' ethnicity, race, and sex. See the sample data collection form in appendix E to this part for sample language for providing this notice to applicants. If a financial institution establishes and maintains a firewall and chooses to use the sample data collection form, the financial institution can delete this sample language from the form.

3. *Timing for providing the notice.* If the financial institution is providing the notice orally, it must provide the notice required by § 1002.108(d) prior to asking the applicant if it is a minority-owned business, women-owned business, or LGBTQI+-owned business and prior to asking for a principal owner's ethnicity, race, or sex. If the notice is provided on the same paper or electronic data collection form as the inquiries about minority-owned business status, women-owned business status, LGBTQI+-owned business status and the principal owners' ethnicity, race, or sex, the notice must appear before the inquiries. If the notice is provided in an electronic or paper document that is separate from the data collection form, the notice must be provided at the same time as the data collection form or prior to providing the data collection form. Additionally, the notice must be provided with the non-discrimination notices required pursuant to § 1002.107(a)(18) and (19). See appendix E for sample language.

*Section 1002.109—Reporting of Data to the Bureau*

109(a) Reporting to the Bureau

109(a)(2) Reporting by Subsidiaries

1. *Subsidiaries.* A covered financial institution is considered a subsidiary of

another covered financial institution for purposes of reporting data pursuant to § 1002.109 if more than 50 percent of the ownership or control of the first covered financial institution is held by the second covered financial institution.

109(a)(3) Reporting Obligations Where Multiple Financial Institutions Are Involved in a Covered Credit Transaction

1. *General.* The following clarifies how to report applications involving more than one financial institution. The discussion below assumes that all parties involved with the covered credit transaction are covered financial institutions. However, the same principles apply if any party is not a covered financial institution.

i. A financial institution shall report the action that it takes on a covered application, whether or not the covered credit transaction closed in the financial institution's name and even if the financial institution used underwriting criteria supplied by another financial institution. However, where it is necessary for more than one financial institution to make a credit decision in order to approve a single covered credit transaction, only the last financial institution with authority to set the material terms of the covered credit transaction is required to report. Setting the material terms of the covered credit transaction include, for example, selecting among competing offers, or modifying pricing information, amount approved or originated, or repayment duration. In this situation, the determinative factor is not which financial institution actually made the last credit decision prior to closing, but rather which financial institution last had the authority for setting the material terms of the covered credit transaction prior to closing. Whether a financial institution has taken action for purposes of § 1002.109(a)(3) and comment 109(a)(3)–1 is not relevant to, and is not intended to repeal, abrogate, annul, impair, or interfere with, section 701(d) (15 U.S.C. 1691(d)) of the Act, § 1002.9, or any other provision within subpart A of this Regulation.

ii. A financial institution takes action on a covered application for purposes of § 1002.109(a)(3) if it denies the application, originates the application, approves the application but the applicant did not accept the transaction, or closes the file or denies for incompleteness. The financial institution must also report the application if it was withdrawn. For reporting purposes, it is not relevant whether the financial institution receives the application directly from

the applicant or indirectly through another party, such as a broker, or (except as otherwise provided in comment 109(a)(3)–1.i) whether another financial institution also reviews and reports an action taken on a covered application involving the same credit transaction.

iii. Where it is necessary for more than one financial institution to make a credit decision in order to approve a single covered credit transaction and where more than one financial institution denies the application or otherwise does not approve the application, the reporting financial institution (the last financial institution with authority to set the material terms of the covered credit transaction) shall have a consistent procedure for determining how it reports inconsistent or differing data points for purposes of subpart B. For example, Financial Institution A is the reporting entity because it has the last authority to set the material credit terms. Financial Institution A sends the application to Financial Institution B and Financial Institution C for review, but both Financial Institution B and Financial Institution C deny the application, with different denial reasons. Based on these denials, Financial Institution A follows suit and denies the application. Financial Institution A must have a consistent procedure for what denial reason(s) to report, such as reporting the denial reason(s) from the first financial institution that denied the covered application.

2. *Examples.* The following scenarios illustrate how a financial institution reports a particular covered application. The illustrations assume that all parties involved with the covered credit transaction are covered financial institutions. However, the same principles apply if any party is not a covered financial institution. Examples i through iv involve a single financial institution with responsibility for making a credit decision without the involvement of an intermediary. Example v describes a financial institution intermediary with only passive involvement in the covered credit transaction. Example vi describes a transaction where multiple financial institutions independently decision and take action on a covered application. Examples vii and viii describe situations where more than one financial institution must make a credit decision in order to approve the covered credit transaction. Examples ix and x describe situations involving pooled and participation interests.

i. Financial Institution A received a covered application from an applicant

and approved the application before closing the covered credit transaction in its name. Financial Institution A was not acting as Financial Institution B's agent. Financial Institution B later purchased the covered credit transaction from Financial Institution A. Financial Institution A was not acting as Financial Institution B's agent. Financial Institution A reports the application. Financial Institution B has no reporting obligation for this transaction.

ii. Financial Institution A received a covered application from an applicant. If approved, the covered credit transaction would have closed in Financial Institution B's name. Financial Institution A denied the application without sending it to Financial Institution B for approval. Financial Institution A was not acting as Financial Institution B's agent. Since Financial Institution A took action on the application, Financial Institution A reports the application as denied. Financial Institution B does not report the application.

iii. Financial Institution A reviewed a covered application and made a credit decision to approve it using the underwriting criteria provided by a Financial Institution B. Financial Institution B did not review the application and did not make a credit decision prior to closing. Financial Institution A was not acting as Financial Institution B's agent. Financial Institution A reports the application. Financial Institution B has no reporting obligation for this application.

iv. Financial Institution A reviewed and made the credit decision on a covered application based on the criteria of a third-party insurer or guarantor (for example, a government or private insurer or guarantor). Financial Institution A reports the action taken on the application.

v. Financial Institution A received a covered application from an applicant and forwarded that application to Financial Institution B. Financial Institution B reviewed the application and made a credit decision approving the application prior to closing. The covered credit transaction closed in Financial Institution A's name. Financial Institution B purchased the covered credit transaction from Financial Institution A after closing. Financial Institution B was not acting as Financial Institution A's agent. Since Financial Institution B made the credit decision prior to closing, and Financial Institution A's approval was not necessary for the credit transaction, Financial Institution B reports the origination. Financial Institution A does

not report the application. Assume the same facts, except that Financial Institution B reviewed the application before the covered credit transaction would have closed, but Financial Institution B denied the application. Financial Institution B reports the application as denied. Financial Institution A does not report the application because it did not take an action on the application. If, under the same facts, the application was withdrawn before Financial Institution B made a credit decision, Financial Institution B would report the application as withdrawn and Financial Institution A would not report the application for the same reason.

vi. Financial Institution A received a covered application and forwarded it to Financial Institutions B and C. Financial Institution A made a credit decision, acting as Financial Institution D's agent, and approved the application. Financial Institutions B and C are not working together with Financial Institutions A or D, or with each other, and are solely responsible for setting the terms of their own credit transactions. Financial Institution B made a credit decision approving the application, and Financial Institution C made a credit decision denying the application. The applicant did not accept the covered credit transaction from Financial Institution D. Financial Institution D reports the application as approved but not accepted. Financial Institution A does not report the application, because it was acting as Financial Institution D's agent. The applicant accepted the offer of credit from Financial Institution B, and credit was extended. Financial Institution B reports the application as originated. Financial Institution C reports the application as denied.

vii. Financial Institution A received a covered application and made a credit decision to approve it using the underwriting criteria provided by Financial Institution B. Financial Institution A was not acting as Financial Institution B's agent. Financial Institution A forwarded the application to Financial Institution B. Financial Institution B reviewed the application and made a credit decision approving the application prior to closing. Financial Institution A makes a credit decision on the application and modifies the credit terms (the interest rate and repayment term) offered by Financial Institution B. The covered credit transaction reflecting the modified terms closes in Financial Institution A's name. Financial Institution B purchases the covered credit transaction from Financial Institution A after closing. As the last

financial institution with the authority for setting the material terms of the covered credit transaction, Financial Institution A reports the application as originated. Financial Institution B does not report the origination because it was not the last financial institution with the authority to set the material terms on the application. If, under the same facts, Financial Institution A did not modify the credit terms offered by Financial Institution B, Financial Institution A still reports the application as originated because it was still the last financial institution with the authority for setting the material terms, even if it chose not to so do in a particular instance. Financial Institution B does not report the origination.

viii. Financial Institution A received a covered application and forwarded it to Financial Institutions B, C, and D. Financial Institution A was not acting as anyone's agent. Financial Institution B and C reviewed the application and made a credit decision approving the application and Financial Institution D reviewed the application and made a credit decision denying the application. Prior to closing, Financial Institution A makes a credit decision on the application by deciding to offer to the applicant the credit terms offered by Financial Institution B and does not convey to the applicant the credit terms offered by Financial Institution C. The applicant does not accept the covered credit transaction. As the last financial institution with the authority for setting the material terms of the covered credit transaction, Financial Institution A reports the application as approved but not accepted. Financial Institutions B, C, and D do not report the application because they were not the last financial institution with the authority for setting the material terms of the covered credit transaction. Assume the same facts, except the applicant accepts the terms of the covered credit transaction from Financial Institution B as offered by Financial Institution A. The covered credit transaction closes in Financial Institution A's name. Financial Institution B purchases the transaction after closing. Here, Financial Institution A reports the application as originated. Financial Institutions B, C, and D do not report the application because they were not the last financial institution responsible for setting the material terms of the covered credit transaction.

ix. Financial Institution A receives a covered application and approves it, and then Financial Institution A elects to organize a loan participation agreement where Financial Institutions B and C agree to purchase a partial interest in the covered credit

AdminRecord-000416

transaction. Financial Institution A reports the application. Financial Institutions B and C have no reporting obligation for this application.

x. Financial Institution A purchases an interest in a pool of covered credit transactions, such as credit-backed securities or real estate investment conduits. Financial Institution A does not report this purchase.

3. *Agents.* If a covered financial institution takes action on a covered application through its agent, the financial institution reports the application. For example, acting as Financial Institution A's agent, Financial Institution B approved an application prior to closing and a covered credit transaction was originated. Financial Institution A reports the covered credit transaction as an origination. State law determines whether one party is the agent of another.

### 109(b) Financial Institution Identifying Information

1. *Changes to financial institution identifying information.* If a financial institution's information required pursuant to § 1002.109(b) changes, the financial institution shall provide the new information with the data submission for the collection year of the change. For example, assume two financial institutions that previously reported data under subpart B of this part merge and the surviving institution retained its Legal Entity Identifier but obtained a new TIN in February 2026. The surviving institution must report the new TIN with its data submission for its 2026 data (which is due by June 1, 2027) pursuant to § 1002.109(b)(5). Likewise, if that financial institution's Federal prudential regulator changes in February 2026 as a result of the merger, it must identify its new Federal prudential regulator in its annual submission for its 2026 data.

### Paragraph 109(b)(4)

1. *Federal prudential regulator.* For purposes of § 1002.109(b)(4), *Federal prudential regulator* means, if applicable, the Federal prudential regulator for a financial institution that is a depository institution as determined pursuant to section 3q of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), including the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, or the Board of Governors of the Federal Reserve System; or the National Credit Union Administration Board for financial institutions that are Federal credit unions.

### Paragraph 109(b)(6)

1. *Legal Entity Identifier (LEI).* A Legal Entity Identifier is a utility endorsed by the LEI Regulatory oversight committee, or a utility endorsed or otherwise governed by the Global LEI Foundation (GLEIF) (or any successor of the GLEIF) after the GLEIF assumes operational governance of the global LEI system. A financial institution complies with § 1002.109(b)(6) by reporting its current LEI number. A financial institution that does not currently possess an LEI number must obtain an LEI number, and has an ongoing obligation to maintain the LEI number. The GLEIF website provides a list of LEI issuing organizations. A financial institution may obtain an LEI, for purposes of complying with § 1002.109(b)(6), from any one of the issuing organizations listed on the GLEIF website.

### Paragraph 109(b)(7)

1. *RSSD ID number.* The RSSD ID is a unique identifying number assigned to institutions, including main offices and branches, by the Board of Governors of the Federal Reserve System. A financial institution's RSSD ID may be found on the website of the National Information Center, which provides comprehensive financial and structure information on banks and other institutions for which the Federal Reserve Board has a supervisory, regulatory, or research interest including both domestic and foreign banking organizations that operate in the United States. If a financial institution does not have an RSSD ID, it reports that this information is not applicable.

### Paragraph 109(b)(8)

1. *Immediate parent entity.* An entity is the immediate parent of a financial institution for purposes of § 1002.109(b)(8)(i) through (iii) if it is a separate entity that directly owns more than 50 percent of the financial institution.

2. *Top-holding parent entity.* An entity is the top-holding parent of a financial institution for purposes of § 1002.109(b)(8)(iv) through (vi) if it ultimately owns more than 50 percent of the financial institution, and the entity itself is not controlled by any other entity. If the immediate parent entity and the top-holding parent entity are the same, the financial institution reports that § 1002.109(b)(8)(iv) through (vi) are not applicable.

3. *LEI.* For purposes of § 1002.109(b)(8)(ii) and (v), a financial institution shall report the LEI of a parent entity if the parent entity has an LEI number. If a financial institution's

parent entity does not have an LEI, the financial institution reports that this information is not applicable.

4. *RSSD ID numbers.* For purposes of § 1002.109(b)(8)(iii) and § 1002.109(b)(8)(vi), a financial institution shall report the RSSD ID number of a parent entity if the entity has an RSSD ID number. If a financial institution's parent entity does not have an RSSD ID, the financial institution reports that this information is not applicable.

### Paragraph 109(b)(9)

1. *Type of financial institution.* A financial institution complies with § 1002.109(b)(9) by selecting the applicable type or types of financial institution from the list below. A financial institution shall select all applicable types.

i. Bank or savings association.
ii. Minority depository institution.
iii. Credit union.
iv. Nondepository institution.
v. Community development financial institution (CDFI).
vi. Other nonprofit financial institution.
vii. Farm Credit System institution.
viii. Government lender.
ix. Commercial finance company.
x. Equipment finance company.
xi. Industrial loan company.
xii. Online lender.
xiii. Other.

2. *Use of "other" for type of financial institution.* A financial institution reports type of financial institution as "other" where none of the enumerated types of financial institution appropriately describe the applicable type of financial institution, and the institution reports the type of financial institution via free-form text field. A financial institution that selects at least one type from the list is permitted, but not required, to also report "other" (with appropriate free-form text) if there is an additional aspect of its business that is not one of the enumerated types set out in comment 109(b)(9)–1.

3. *Additional types of financial institution.* The Bureau may add additional types of financial institutions via the Filing Instructions Guide and related materials. Refer to the Filing Instructions Guide for any updates for each reporting year.

### Paragraph 109(b)(10)

1. *Financial institutions that voluntarily report covered applications under subpart B of this part.* A financial institution that is not a covered financial institution pursuant to § 1002.105(b) but that elects to voluntarily compile, maintain, and

report data under §§ 1002.107 through 1002.109 (see comment 105(b)–10) complies with § 1002.109(b)(10) by selecting "voluntary reporter."

*Section 1002.110—Publication of Data and Other Disclosures*

110(c) Statement of Financial Institution's Small Business Lending Data Available on the Bureau's Website

1. *Statement.* A financial institution shall provide the statement required by § 1002.110(c) using the following, or substantially similar, language:

Small Business Lending Data Notice

*Data about our small business lending are available online for review at the Consumer Financial Protection Bureau's (CFPB's) website at https://www.consumerfinance.gov/data-research/small-business-lending/. The data show the geographic distribution of our small business lending applications; information about our loan approvals and denials; and demographic information about the principal owners of our small business applicants. The CFPB may delete or modify portions of our data prior to posting it if doing so would advance a privacy interest. Small business lending data for many other financial institutions are also available at this website.*

2. *Website.* A financial institution without a website complies with § 1002.110(c) by making a written statement using the language in comment 110(c)–1, or substantially similar language, available upon request.

3. *Revised location for publicly available data.* The Bureau may modify the location specified in comment 110(c)–1 at which small business lending data are available via the Filing Instructions Guide and related materials. Refer to the Filing Instructions Guide for any updates for each reporting year.

*Section 1002.111—Recordkeeping*

111(a) Record Retention

1. *Evidence of compliance.* Section 1002.111(a) requires a financial institution to retain evidence of compliance with subpart B of this part for at least three years after its small business lending application register is required to be submitted to the Bureau pursuant to § 1002.109. In addition to the financial institution's small business lending application register, such evidence of compliance is likely to include, but is not limited to, the applications for credit from which information in the register is drawn, as well as the files or documents that,

under § 1002.111(b), are kept separate from the applications for credit. This three-year record retention requirement applies to any records covered by § 1002.111(a), notwithstanding the more general 12-month retention period for records related to business credit specified in § 1002.12(b).

2. *Record retention for creditors under § 1002.5(a)(4)(vii) and (viii).* A creditor that is voluntarily, under § 1002.5(a)(4)(vii) and (viii), collecting information pursuant to subpart B of this part complies with § 1002.111(a) by retaining evidence of compliance with subpart B for at least three years after June 1 of the year following the year that data was collected.

111(b) Certain Information Kept Separate From the Rest of the Application

1. *Separate from the application.* A financial institution may satisfy the requirement in § 1002.111(b) by keeping an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) and (19) in a file or document that is discrete or distinct from the application and its accompanying information. For example, such information could be collected on a piece of paper that is separate from the rest of the application form. In order to satisfy the requirement in § 1002.111(b), an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) and (19) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application so long as there is some separation between the demographic information and the rest of the application and its accompanying information. However, the financial institution may nonetheless need to keep this information in a different electronic or physical file in order to satisfy the prohibition in § 1002.108(b).

2. *Number of principal owners.* A financial institution is permitted to maintain information regarding the applicant's number of principal owners pursuant to § 1002.107(a)(20) with an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) and (19).

111(c) Limitation on Personally Identifiable Information in Certain Records Retained Under This Section

1. *Small business lending application register.* The prohibition in § 1002.111(c) applies to data in the small business lending application register submitted by the financial institution to the Bureau under § 1002.109, the version of the register

that the financial institution maintains under § 1002.111(a), and the separate record of certain information created pursuant to § 1002.111(b).

2. *Examples.* Section 1002.111(c) prohibits a financial institution from including any name, specific address (other than the census tract required under § 1002.107(a)(13)), telephone number, or email address of any individual who is, or is connected with, an applicant in the small business lending application register it reports pursuant to § 1002.109, in the copy of the register the financial institution retains under § 1002.111(a), and in the records of certain information it must retain separately from the application pursuant to § 1002.111(b). It likewise prohibits a financial institution from including any other personally identifiable information concerning any individual who is, or is connected with, an applicant, except as required pursuant to § 1002.107 or § 1002.111(b). Examples of such personally identifiable information that a financial institution may not include in its small business lending application register include, but are not limited to, the following: date of birth, Social Security number, official government-issued driver's license or identification number, alien registration number, government passport number, or employer or taxpayer identification number.

3. *Other records.* The prohibition in § 1002.111(c) does not extend to an application for credit, or any other records that the financial institution maintains that are not specifically enumerated in § 1002.111(c).

4. *Name and business contact information for submission.* The prohibition in § 1002.111(c) does not bar financial institutions from providing to the Bureau, pursuant to § 1002.109(b)(3), the name and business contact information of the person who may be contacted by the Bureau or other regulators with questions about the financial institution's submission under § 1002.109.

*Section 1002.112—Enforcement*

112(b) Bona Fide Errors

1. *Tolerances for bona fide errors.* Section 1002.112(b) provides that a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's data submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose. The Bureau's thresholds

appear in column C of the table in appendix F. The size of the random sample, set out in column B, shall depend on the size of the financial institution's small business lending application register, as shown in column A of the table in appendix F. A financial institution has not maintained procedures reasonably adapted to avoid errors if either there is a reasonable basis to believe the error was intentional or there is evidence that the financial institution has not maintained procedures reasonably adapted to avoid errors.

2. *Tolerances and data fields.* For purposes of determining whether an error is bona fide under § 1002.112(b), the term "data field" generally refers to individual fields. All required data fields, and valid response options for those fields, are set forth in the Bureau's Filing Instructions Guide, available at *https://www.consumerfinance.gov/data-research/small-business-lending/filing-instructions-guide/*. Some data fields may allow for more than one response. For example, with respect to information on the ethnicity and race of an applicant's principal owner, a data field may identify more than one race or ethnicity. If there are one or more errors within an ethnicity data field, or within a race data field, for a particular principal owner, they would count as one (and only one) error for that data field. For instance, in the ethnicity data field, if an applicant indicates that one of its principal owners is Cuban, but the financial institution reports that the principal owner is Mexican and Puerto Rican, the financial institution has made one error in the ethnicity data field for that principal owner. For purposes of the error threshold table in appendix F, the financial institution is deemed to have made one error, not two.

3. *Tolerances and safe harbors.* An error that meets the criteria for one of the four safe harbor provisions in § 1002.112(c) is not counted as an error for purposes of determining whether a financial institution has exceeded the relevant error threshold in appendix F for a given data field.

112(c) Safe Harbors

1. *Information from a Federal agency—census tract.* Section 1002.112(c)(2) provides that an incorrect entry for census tract is not a violation of the Act or subpart B of this part, if the financial institution obtained the census tract using a geocoding tool provided by the FFIEC or the Bureau. However, this safe harbor provision does not extend to a financial institution's failure to provide the correct census tract number for a covered application on its small business lending application register, as required by § 1002.107(a)(13), because the FFIEC or Bureau geocoding tool did not return a census tract for the address provided by the financial institution. In addition, this safe harbor provision does not extend to a census tract error that results from a financial institution entering an inaccurate address into the FFIEC or Bureau geocoding tool.

2. *Applicability of NAICS code safe harbor.* The safe harbor in § 1002.112(c)(3) applies to an incorrect entry for the 3-digit NAICS code that financial institutions must collect and report pursuant to § 1002.107(a)(15), provided certain conditions are met. For purposes of § 1002.112(c)(3)(i), a financial institution is permitted to rely on statements made by the applicant, information provided by the applicant, or on other information obtained through its use of appropriate third-party sources, including business information products. See also comments 107(a)(15)–4 and 107(b)–1.

3. *Incorrect determination of small business status, covered credit transaction, or covered application—examples.* Section 1002.112(c)(4) provides a safe harbor from violations of the Act or this regulation for a financial institution that initially collects data under § 1002.107(a)(18) and (19) regarding whether an applicant for a covered credit transaction is a minority-owned, a women-owned, or LGBTQI+-owned business, and the ethnicity, race, and sex of the applicant's principal owners, but later concludes that it should not have collected this data, if certain conditions are met. Specifically, to qualify for this safe harbor, § 1002.112(c)(4) requires that the financial institution have had a reasonable basis at the time it collected data under § 1002.107(a)(18) and (19) for believing that the application was a covered application for a covered credit transaction from a small business pursuant to §§ 1002.103, 1002.104, and 1002.106, respectively. For example, Financial Institution A collected data under § 1002.107(a)(18) and (19) from an applicant for a covered credit transaction that had self-reported its gross annual revenue as $4.8 million. Sometime after Financial Institution A had collected this data from the applicant, the financial institution reviewed the applicant's tax returns, which indicated the applicant's gross annual revenue was in fact $5.2 million. Financial Institution A is permitted to rely on representations made by the applicant regarding gross annual revenue in determining whether an applicant is a small business (see § 1002.107(b) and comments 106(b)(1)–3 and 107(a)(14)–1). Thus, Financial Institution A may have had a reasonable basis to believe, at the time it collected data under § 1002.107(a)(18) and (19), that the applicant was a small business pursuant to § 1002.106, in which case Financial Institution A's collection of such data would not violate the Act or this regulation.

*Section 1002.114—Effective Date, Compliance Date, and Special Transition Rules*

114(b) Compliance Date

1. *Application of compliance date.* The applicable compliance date in § 1002.114(b) is the date by which the covered financial institution must begin to compile data as specified in § 1002.107, comply with the firewall requirements of § 1002.108, and begin to maintain records as specified in § 1002.111. In addition, the covered financial institution must comply with § 1002.110(c) and (d) no later than June 1 of the year after the applicable compliance date. For instance, if § 1002.114(b)(2) applies to a financial institution, it must comply with §§ 1002.107 and 1002.108, and portions of § 1002.111, beginning April 1, 2025, and it must comply with § 1002.110(c) and (d), and portions of § 1002.111, no later than June 1, 2026.

2. *Initial partial year collections pursuant to § 1002.114(b).* i. When the compliance date of October 1, 2024 specified in § 1002.114(b)(1) applies to a covered financial institution, the financial institution is required to collect data for covered applications during the period from October 1, 2024 to December 31, 2024. The financial institution must compile data for this period pursuant to § 1002.107, comply with the firewall requirements of § 1002.108, and maintain records as specified in § 1002.111. In addition, for data collected during this period, the covered financial institution must comply with §§ 1002.109 and 1002.110(c) and (d) by June 1, 2025.

ii. When the compliance date of April 1, 2025 specified in § 1002.114(b)(2) applies to a covered financial institution, the financial institution is required to collect data for covered applications during the period from April 1, 2025 to December 31, 2025. The financial institution must compile data for this period pursuant to § 1002.107, comply with the firewall requirements of § 1002.108, and maintain records as specified in § 1002.111. In addition, for data collected during this period, the covered financial institution must

comply with §§ 1002.109 and 1002.110(c) and (d) by June 1, 2026.

3. *Informal names for compliance date provisions.* To facilitate discussion of the compliance dates specified in § 1002.114(b)(1), (2), and (3), in the official commentary and any other documents referring to these compliance dates, the Bureau adopts the following informal simplified names. Tier 1 refers to the cohort of covered financial institutions that have a compliance date of October 1, 2024 pursuant to § 1002.114(b)(1). Tier 2 refers to the cohort of covered financial institutions that have a compliance date of April 1, 2025 pursuant to § 1002.114(b)(2). Tier 3 refers to the cohort of covered financial institutions that have a compliance date of January 1, 2026 pursuant to § 1002.114(b)(3).

4. *Examples.* The following scenarios illustrate how to determine whether a financial institution is a covered financial institution and which compliance date specified in § 1002.114(b) applies.

i. Financial Institution A originated 3,000 covered credit transactions for small businesses in calendar year 2022, and 3,000 in calendar year 2023. Financial Institution A is in Tier 1 and has a compliance date of October 1, 2024.

ii. Financial Institution B originated 2,000 covered credit transactions for small businesses in calendar year 2022, and 3,000 in calendar year 2023. Because Financial Institution B did not originate at least 2,500 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1. Because Financial Institution B did originate at least 500 covered credit transactions for small businesses in each of 2022 and 2023, it is in Tier 2 and has a compliance date of April 1, 2025.

iii. Financial Institution C originated 400 covered credit transactions to small businesses in calendar year 2022, and 1,000 in calendar year 2023. Because Financial Institution C did not originate at least 2,500 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1, and because it did not originate at least 500 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 2. Because Financial Institution C did originate at least 100 covered credit transactions for small businesses in each of 2022 and 2023, it is in Tier 3 and has a compliance date of January 1, 2026.

iv. Financial Institution D originated 90 covered credit transactions to small businesses in calendar year 2022, 120 in calendar year 2023, and 90 in both of the calendar years 2024 and 2025. Because Financial Institution D did not originate at least 100 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1, Tier 2, or Tier 3. Because Financial Institution D did not originate at least 100 covered credit transactions for small businesses in subsequent consecutive calendar years, it is not a covered financial institution under § 1002.105(b) and is not required to comply with the rule in 2024, 2025, or 2026.

v. Financial Institution E originated 120 covered credit transactions for small businesses in each of calendar years 2022, 2023, and 2024, and 90 in 2025. Because Financial Institution E did not originate at least 2,500 or 500 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1 or Tier 2. Because Financial Institution E originated at least 100 covered credit transactions for small businesses in each of 2022 and 2023, it is in Tier 3 and has a compliance date of January 1, 2026. However, because Financial Institution E did not originate at least 100 covered credit transactions for small businesses in each of 2024 and 2025, it no longer satisfies the definition of a covered financial institution in § 1002.105(b) at the time of the compliance date for Tier 3 institutions and thus is not required to comply with the rule in 2026.

vi. Financial Institution F originated 90 covered credit transactions for small businesses in calendar year 2022, and 120 in 2023, 2024, and 2025. Because Financial Institution F did not originate at least 100 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1, Tier 2, or Tier 3. Because Financial Institution F originated at least 100 covered credit transactions for small businesses in subsequent calendar years, § 1002.114(b)(4), which cross-references § 1002.105(b), applies to Financial Institution F. Because Financial Institution F originated at least 100 covered credit transactions for small businesses in each of 2024 and 2025, it is a covered financial institution under § 1002.105(b) and is required to comply with the rule beginning January 1, 2026.

vii. Financial Institution G originated 90 covered credit transactions for small businesses in each of calendar years 2022, 2023, 2024, and 2025, and 120 in each of 2026 and 2027. Because Financial Institution F did not originate at least 100 covered credit transactions for small businesses in each of 2022 and 2023, it is not in Tier 1, Tier 2, or Tier 3. Because Financial Institution G originated at least 100 covered credit transactions for small businesses in subsequent calendar years, § 1002.114(b)(4), which cross-references § 1002.105(b), applies to Financial Institution G. Because Financial Institution G originated at least 100 covered credit transactions for small businesses in each of 2026 and 2027, it is a covered financial institution under § 1002.105(b) and is required to comply with the rule beginning January 1, 2028.

114(c) Special Transition Rules

1. *Collection of certain information prior to a financial institution's compliance date.* Notwithstanding § 1002.5(a)(4)(ix), a financial institution that chooses to collect information on covered applications as permitted by § 1002.114(c)(1) in the 12 months prior to its initial compliance date as specified in § 1002.114(b)(1), (2) or (3) need comply only with the requirements set out in §§ 1002.107(a)(18) and (19), 1002.108, and 1002.111(b) and (c) with respect to the information collected. During this 12-month period, a covered financial institution need not comply with the provisions of § 1002.107 (other than §§ 1002.107(a)(18) and (19)), 1002.109, 1002.110, 1002.111(a), or 1002.114.

2. *Transition rule for applications received prior to a compliance date but final action is taken after a compliance date.* If a covered financial institution receives a covered application from a small business prior to its initial compliance date specified in § 1002.114(b), but takes final action on or after that date, the financial institution is not required to collect data regarding that application pursuant to § 1002.107 nor to report the application pursuant to § 1002.109. For example, if a financial institution is subject to a compliance date of October 1, 2024, and it receives an application on September 15, 2024 but does not take final action on the application until October 5, 2024, the financial institution is not required to collect data pursuant to § 1002.107 nor to report data to the Bureau pursuant to § 1002.109 regarding that application.

3. *Has readily accessible the information needed to determine small business status.* A financial institution has readily accessible the information needed to determine whether its originations of covered credit transactions were for small businesses as defined in § 1002.106 if, for instance, it in the ordinary course of business collects data on the precise gross annual revenue of the businesses for which it originates loans, it obtains information sufficient to determine whether an applicant for business credit had gross annual revenues of $5 million or less, or if it collects and reports similar data to

Federal or State government agencies pursuant to other laws or regulations.

4. *Does not have readily accessible the information needed to determine small business status.* A financial institution does not have readily accessible the information needed to determine whether its originations of covered credit transactions were for small businesses as defined in § 1002.106 if it did not in the ordinary course of business collect either precise or approximate information on whether the businesses to which it originated covered credit had gross annual revenue of $5 million or less. In addition, even if precise or approximate information on gross annual revenue was initially collected, a financial institution does not have readily accessible this information if, to retrieve this information, for example, it must review paper loan files, recall such information from either archived paper records or scanned records in digital archives, or obtain such information from third parties that initially obtained this information but did not transmit such information to the financial institution.

5. *Reasonable method to estimate the number of originations.* The reasonable methods that financial institutions may use to estimate originations for 2022 and 2023 include, but are not limited to, the following:

i. A financial institution may comply with § 1002.114(c)(2) by determining the small business status of covered credit transactions by asking every applicant, prior to the closing of approved transactions, to self-report whether it had gross annual revenue for its preceding fiscal year of $5 million or less, during the period October 1 through December 31, 2023. The financial institution may annualize the number of covered credit transactions it originates to small businesses from October 1 through December 31, 2023 by quadrupling the originations for this period, and apply the annualized number of originations to both calendar years 2022 and 2023.

ii. A financial institution may comply with § 1002.114(c)(2) by assuming that every covered credit transaction it originates for business customers in calendar years 2022 and 2023 is to a small business.

iii. A financial institution may comply with § 1002.114(c)(2) by using another methodology provided that such methodology is reasonable and documented in writing.

6. *Examples.* The following scenarios illustrate the potential application of § 1002.114(c)(2) to a financial institution's compliance date under § 1002.114(b).

i. Prior to October 1, 2023, Financial Institution A did not collect gross annual revenue or other information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions in calendar years 2022 and 2023. Financial Institution A chose to use the methodology set out in comment 114(c)–5.i and as of October 1, 2023 began to collect information on gross annual revenue as defined in § 1002.107(a)(14) for its covered credit transactions originated for businesses. Using this information, Financial Institution A determined that it had originated 750 covered credit transactions for businesses that were small as defined in § 1002.106. On an annualized basis, Financial Institution A originated 3,000 covered credit transactions for small businesses (750 originations * 4 = 3,000 originations per year). Applying this annualized figure of 3,000 originations to both calendar years 2022 and 2023, Financial Institution A is in Tier 1 and has a compliance date of October 1, 2024.

ii. Prior to July 1, 2023, Financial Institution B collected gross annual revenue information for some applicants for business credit, but such information was only noted in its paper loan files. Financial Institution B thus does not have reasonable access to information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions for calendar years 2022 and 2023. Financial Institution B chose to use the methodology set out in comment 114(c)–5.i, and as of October 1, 2023, Financial Institution B began to ask all businesses for whom it was closing covered credit transactions if they had gross annual revenues in the preceding fiscal year of $5 million or less. Using this information, Financial Institution B determined that it had originated 350 covered credit transactions for businesses that were small as defined in § 1002.106. On an annualized basis, Financial Institution B originated 1,400 covered credit transactions for small businesses (350 originations * 4 = 1,400 originations per year). Applying this estimated figure of 1,400 originations to both calendar years 2022 and 2023, Financial Institution B is in Tier 2 and has a compliance date of April 1, 2025.

iii. Prior to April 1, 2023, Financial Institution C did not collect gross annual revenue or other information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions in calendar years 2022 and 2023. Financial Institution C chose its own methodology pursuant to comment

114(c)–5.iii, basing it in part on the methodology specified in comment 114(c)–5.i. Starting on April 1, 2023, Financial Institution C began to ask all business applicants for covered credit transactions if they had gross annual revenue in their preceding fiscal year of $5 million or less. Using this information, Financial Institution C determined that it had originated 100 covered credit transactions for businesses that were small as defined in § 1002.106. On an annualized basis, Financial Institution C originated approximately 133 covered credit transactions for small businesses ((100 originations * 365 days)/275 days = 132.73 originations per year). Applying this estimate of 133 originations to both calendar years 2022 and 2023, Financial Institution C is in Tier 3 and has a compliance date of January 1, 2026.

iv. Financial Institution D did not collect gross annual revenue or other information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions in calendar years 2022 and 2023. Financial Institution D determined that it had originated 3,000 total covered credit transactions for businesses in each of 2022 and 2023. Applying the methodology specified in comment 114(c)–5.ii, Financial Institution D assumed that all 3,000 covered credit transactions originated in each of 2022 and 2023 were to small businesses. On that basis, Financial Institution D is in Tier 1 and has a compliance date of October 1, 2024.

v. Financial Institution E did not collect gross annual revenue or other information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions in calendar years 2022 and 2023. Financial Institution E determined that it had originated 700 total covered credit transactions for businesses in each of 2022 and 2023. Applying the methodology specified in comment 114(c)–5.ii, Financial Institution E assumed that all such transactions in each of 2022 and 2023 were originated for small businesses. On that basis, Financial Institution E is in Tier 2 and has a compliance date of April 1, 2025.

vi. Financial Institution F did does not have readily accessible gross annual revenue or other information that would allow it to determine the small business status of the businesses for whom it originated covered credit transactions in calendar years 2022 and 2023. Financial Institution F determined that it had originated 80 total covered credit transactions for businesses in 2022 and

150 total covered credit transactions for businesses in 2023. Applying the methodology set out in comment 114(c)–5.ii, Financial Institution F assumed that all such transactions originated in 2022 and 2023 were

originated for small businesses. On that basis, Financial Institution E is not in Tier 1, Tier 2 or Tier 3, and is subject

to the compliance date provision specified in § 1002.114(b)(4).

\*      \*      \*      \*      \*

**Rohit Chopra,**
*Director, Consumer Financial Protection Bureau.*

[FR Doc. 2023–07230 Filed 5–30–23; 8:45 am]

**BILLING CODE 4810–AM–P**

AdminRecord-000422