**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**JOINT APPENDIX**
**OF ADMINISTRATIVE RECORD DESIGNATIONS**
**VOLUME VI**

# TBA v. CFPB – Joint Appendix Designations

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| | |
|---|---|
| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| | |
|---|---|
| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

56356 Federal Register / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Part 1002**

**[Docket No. CFPB–2021–0015]**

**RIN 3170–AA09**

## Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Proposed rule; request for public comment.

**SUMMARY:** The Bureau of Consumer Financial Protection (Bureau) is publishing for public comment a proposed rule amending Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). Consistent with section 1071, the Bureau is proposing to require covered financial institutions to collect and report to the Bureau data on applications for credit for small businesses, including those that are owned by women or minorities. The Bureau's proposal also addresses its approach to privacy interests and the publication of section 1071 data; shielding certain demographic data from underwriters and other persons; recordkeeping requirements; enforcement provisions; and the proposed rule's effective and compliance dates.

**DATES:** Comments must be received on or before January 6, 2022.

**ADDRESSES:** You may submit comments, identified by Docket No. CFPB–2021–0015 or RIN 3170–AA09, by any of the following methods:

- *Federal eRulemaking Portal: https://www.regulations.gov*. Follow the instructions for submitting comments.
- *Email: 2021-NPRM-1071@cfpb.gov*. Include Docket No. CFPB–2021–0015 or RIN 3170–AA09 in the subject line of the message.
- *Mail/Hand Delivery/Courier:* Comment Intake—Section 1071 Small Business Lending Data Collection, Bureau of Consumer Financial Protection, 1700 G Street NW, Washington, DC 20552.

*Instructions:* The Bureau encourages the early submission of comments. All submissions should include the agency name and docket number or Regulatory Information Number (RIN) for this rulemaking. Because paper mail in the Washington, DC area and at the Bureau is subject to delay, and in light of difficulties associated with mail and hand deliveries during the COVID–19 pandemic, commenters are encouraged to submit comments electronically. In general, all comments received will be posted without change to *https://www.regulations.gov*. In addition, once the Bureau's headquarters reopens, comments will be available for public inspection and copying at 1700 G Street NW, Washington, DC 20552, on official business days between the hours of 10 a.m. and 5 p.m. Eastern Time. At that time, you can make an appointment to inspect the documents by telephoning 202–435–7275.

All comments, including attachments and other supporting materials, will become part of the public record and subject to public disclosure. Proprietary information or sensitive personal information, such as account numbers or Social Security numbers, or names of other individuals, should not be included. Comments will not be edited to remove any identifying or contact information.

**FOR FURTHER INFORMATION CONTACT:** Camille Gray, Paralegal Specialist; Tola Adenuga, Regulatory Implementation and Guidance Specialist; Tarrian Ellis, Honors Attorney; Jaydee DiGiovanni, Counsel; Kristine M. Andreassen, Pavitra Bacon, Benjamin Cady, Joseph Devlin, Amy Durant, Gregory Evans, David Jacobs, Kathryn Lazarev, Lawrence Lee, Kristen Phinnessee, or Michael Scherzer, Senior Counsels, Office of Regulations, at 202-435-7700 or *https://reginquiries.consumerfinance.gov/*. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Summary of the Proposed Rule

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act amended ECOA[1] to require that financial institutions collect and report to the Bureau certain data regarding applications for credit for women-owned, minority-owned, and small businesses.[2] Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the Bureau to require any additional data that the Bureau determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain 1071 data; recordkeeping; publication of 1071 data; and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the Bureau to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau is proposing to add a new subpart B to Regulation B to implement the requirements of section 1071.[3] Key aspects of the Bureau's proposal are summarized below.

If finalized, the Bureau's proposed rule would create the first comprehensive database of small business credit applications in the United States. This would include critical information about women-owned and minority-owned small businesses to help regulators and the public identify and address fair lending concerns. The database would also enable a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. Just as the Bureau works in other ways to help foster fairness and opportunity in consumer financial services markets for all consumers, the proposed 1071 rule is structured to realize these same goals for the small business market—for *all* small businesses within the scope of the rule, including those that are owned by women and minorities. Research indicates that minority-owned small businesses face particular obstacles, as do those that are women-owned, but the current lack of comprehensive, quantitative data has made it difficult to understand the extent of these obstacles and address them with responsive

[1] 15 U.S.C. 1691 *et seq.*

[2] Public Law 111–203, tit. X, section 1071, 124 Stat. 1376, 2056 (2010), codified at ECOA section 704B, 15 U.S.C. 1691c–2.

[3] The Bureau interpreted section 1071 to mean that obligations for financial institutions to collect, maintain, and submit data "do not arise until the Bureau issues implementing regulations and those regulations take effect." *See* Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), *https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf*.

policy. By shining a light on lending practices in this area, the Bureau believes that the 1071 data would not only foster a culture of compliance but bring particular attention to the underserved parts of the small business market that have traditionally faced the greatest obstacles to success. In this way, the proposed rule is intended to help small businesses drive inclusive and equitable growth.

*Scope.* The Bureau is proposing to require financial institutions to collect and report 1071 data regarding applications for credit for small businesses, including those that are owned by women and minorities. The Bureau is not proposing to require that financial institutions collect and report data regarding applications for women-owned and minority-owned businesses that are *not* small. Because most existing businesses are small businesses, covering small businesses necessarily means nearly all women-owned and minority-owned businesses will also be covered. The Bureau believes that this scope is consistent with the statute and will allow the rule to carry out section 1071's purposes without requiring collection of data that would be of limited utility.

*Covered financial institutions.* Consistent with language from section 1071, the Bureau is proposing to define a ''financial institution'' to include any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. Under the proposed definition, the Bureau's 1071 rule would apply to a variety of entities that engage in small business lending, including depository institutions (*i.e.,* banks, savings associations, and credit unions),[4] online lenders, platform lenders, community development financial institutions (both depository and nondepository institutions), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders.[5]

The Bureau's proposal uses the term ''covered financial institution'' to refer to those financial institutions that would be required to comply with section 1071's data collection and reporting requirements. The Bureau is proposing that a covered financial institution would be a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. The Bureau is not proposing an asset-based exemption threshold for depository institutions, or any other general exemptions for particular categories of financial institutions.

The Bureau is also proposing to permit creditors that are not covered financial institutions to voluntarily collect and report data under section 1071 in certain circumstances.

*Covered credit transactions.* The Bureau is proposing to require that covered financial institutions collect and report data regarding covered applications from small businesses for covered credit transactions. The Bureau is proposing to define a ''covered credit transaction'' as one that meets the definition of business credit under existing Regulation B, with certain exceptions. Loans, lines of credit, credit cards, and merchant cash advances (including such credit transactions for agricultural purposes and those that are also covered by the Home Mortgage Disclosure Act of 1975 (HMDA)[6]) would all be covered credit transactions within the scope of this proposed rule. The Bureau is proposing to exclude trade credit, public utilities credit, securities credit, and incidental credit. Factoring, leases, consumer-designated credit used for business purposes, and credit secured by certain investment properties would also not be covered credit transactions.

*Covered applications.* The Bureau is proposing to define a ''covered application''—which would trigger data collection and reporting and related requirements—as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. This proposed definition of covered application is largely consistent with the existing Regulation B definition of that term. However, the Bureau is also proposing that certain circumstances would not be covered applications, even if they are considered applications under existing Regulation B. Specifically, the Bureau is proposing that a covered application does not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; or (2) inquiries and prequalification requests.

*Small business definition.* The Bureau is proposing to define a ''small business,'' about whose applications for credit data must be collected and reported, by reference to the definitions of ''business concern'' and ''small business concern'' as set out in the Small Business Act[7] and Small Business Administration (SBA) regulations. However, in lieu of using the SBA's size standards for defining a small business concern, the Bureau's proposed definition would look to whether the business had $5 million or less in gross annual revenue for its preceding fiscal year. The Bureau is seeking SBA approval for its alternate small business size standard pursuant to the Small Business Act.[8]

*Data to be collected and reported.* The Bureau's proposal addresses the data points that must be collected and reported by covered financial institutions for covered applications from small businesses. Many of the proposed data points are specifically enumerated in section 1071; for the others, the Bureau is proposing to use the authority granted by section 1071 to require financial institutions to collect and report any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071. Certain of these data points are or could be collected from the applicant (or otherwise determined based on information provided or authorized by the applicant); other data points are based on information solely within the financial institution's control. The Bureau is proposing that covered financial institutions maintain procedures to collect applicant-provided data at a time and in a manner that is reasonably designed to obtain a response. The Bureau's proposal also addresses what financial institutions should do if, despite having such procedures in place, they are unable to obtain certain data from an applicant. A financial institution would be permitted to rely on statements made by an

[4] For purposes of this notice of proposed rulemaking, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, 12 U.S.C. 1751 *et seq.,* as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1811 *et seq.;* there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this notice, unless otherwise specified.

[5] The Bureau's rules, including this proposed rule to implement section 1071, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

[6] 12 U.S.C. 2801 *et seq.*

[7] 15 U.S.C. 631 *et seq.*

[8] *See* 15 U.S.C. 632(a)(2)(C).

applicant (whether in writing or orally) or information provided by an applicant when collecting and reporting 1071 data, although for most data points if the financial institution verifies the information provided it must report the verified information. The Bureau's proposal would also permit financial institutions to reuse certain previously collected data in certain circumstances.

As noted above, the Bureau's proposal includes certain data points that are, or could be, provided by the applicant. Some data points specifically relate to the credit being applied for: The credit type (which includes information on the credit product, types of guarantees, and loan term); The credit purpose; and the amount applied for. There are also data points that relate to the applicant's business: A census tract based on an address or location provided by the applicant; gross annual revenue for the applicant's preceding full fiscal year; the 6-digit North American Industry Classification System (NAICS) code appropriate for the applicant; the number of workers that the applicant has (*i.e.,* non-owners working for the applicant); the applicant's time in business; and the number of principal owners of the applicant.

There are also data points that would be provided by the applicant addressing the demographics of the applicant's ownership: Whether the applicant is a minority-owned business; whether the applicant is a women-owned business; and the ethnicity, race, and sex of the applicant's principal owners. The Bureau refers to these data points collectively as an applicant's ''protected demographic information.'' The Bureau is proposing that principal owners' ethnicity and race be collected from applicants using aggregate categories as well as disaggregated subcategories. The Bureau is proposing to permit principal owners to self-describe their sex (instead of or in addition to choosing male and/or female), and is seeking comment on whether and, if so, how its collection of principal owners' sex should incorporate sexual orientation and gender identity in light of the recent Supreme Court decision in *Bostock* v. *Clayton County*[9] and the Bureau's subsequent ECOA interpretive rule.[10] If an applicant does not provide any ethnicity, race, or sex information for any principal owners, the Bureau is proposing that the financial institution must collect at least one principal owner's race and ethnicity (but not sex) via visual observation or surname, but only if the financial institution meets with any principal owners in person or via electronic media with an enabled video component. The Bureau is proposing detailed instructions to assist financial institutions in collecting and reporting applicants' protected demographic information pursuant to section 1071. The Bureau is also proposing a sample data collection form, which would include a required notice to applicants that the financial institution cannot discriminate on the basis of an applicant's minority- or women-owned business status or any principal owner's ethnicity, race, or sex.

In addition, the Bureau's proposal includes data points that would be generated or supplied solely by the financial institution. These data points include, for all applications: A unique identifier for each application for or extension of credit; the application date; the application method (*i.e.,* the means by which the applicant submitted its application); the application recipient (that is, whether the financial institution or its affiliate received the application directly, or whether it was received by the financial institution via a third party); the action taken by the financial institution on the application; and the action taken date. For denied applications, there is also a data point for denial reasons. For applications that are originated or approved but not accepted, there is a data point for the amount originated or approved, and a data point for pricing information (which would include, as applicable, interest rate, total origination charges, broker fees, initial annual charges, additional cost for merchant cash advances or other sales-based financing, and prepayment penalties).

*Firewall.* The Bureau's proposal includes a section to implement the requirement in section 1071 that certain data collected be shielded from underwriters and certain other persons; the Bureau refers to this as the ''firewall.'' An employee or officer of a financial institution or a financial institution's affiliate that is involved in making any determination concerning the application would be prohibited from accessing an applicant's responses to inquiries that the financial institution makes pursuant to section 1071 regarding whether the applicant is a minority-owned or women-owned business, and the ethnicity, race, and sex of the applicant's principal owners.

This prohibition would not apply to an employee or officer, however, if the financial institution determines that it is not feasible to limit that employee's or officer's access to an applicant's responses to the financial institution's inquiries regarding the applicant's protected demographic information, and the financial institution provides a notice to the applicant regarding that access. It would not be feasible to limit access if the financial institution determines that an employee or officer involved in making any determination concerning a covered application should have access to one or more applicants' responses to inquiries regarding protected demographic information. The notice must be provided to each applicant whose information will be accessed or, alternatively, the financial institution could provide the notice to all applicants whose information could be accessed. The Bureau is proposing sample language that a financial institution could use in providing this notice.

*Reporting data to the Bureau; publication of data by the Bureau; and privacy considerations.* The Bureau is proposing to require that 1071 data be collected on a calendar year basis and reported to the Bureau on or before June 1 of the following year. Financial institutions reporting data to the Bureau would be required to provide certain identifying information about themselves as part of their submission. The Bureau is proposing to provide technical instructions for the submission of 1071 data in a *Filing Instructions Guide* and related materials.

The Bureau is proposing to make available to the public, on an annual basis and on the Bureau's website, the data submitted to it by financial institutions, subject to modifications or deletions made by the Bureau, at its discretion, to protect privacy interests. To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a ''balancing test'' that would assess the risks and benefits of public disclosure. After the Bureau receives at least one full year of 1071 data following the compliance date of the final rule, the Bureau plans to issue a policy statement in which it would set forth its intended modifications and deletions. The Bureau is also proposing that the Bureau's publication of the data would satisfy financial institutions' statutory obligation to make data available to the public upon request.

*Recordkeeping, enforcement, severability, and effective and compliance dates.* The Bureau's proposal addresses issues related to recordkeeping and to severability of the rule. It also addresses enforcement of violations of the rule, along with provisions regarding bona fide errors

[9] 140 S. Ct. 1731 (2020).

[10] 86 FR 14363 (Mar. 16, 2021).

under the rule as well as several safe harbors.

Finally, the Bureau is proposing that its final rule to implement section 1071 would become effective 90 days after publication in the **Federal Register**, though compliance with the rule would not be required until approximately 18 months after publication in the **Federal Register**. The Bureau is also proposing several related transitional provisions that would permit covered financial institutions to begin collecting applicants' protected demographic information prior to the compliance date and would permit financial institutions to use a different time period to determine whether they will be covered by the rule as of the compliance date.

## II. Background

As discussed above, in 2010, Congress enacted the Dodd-Frank Act. Section 1071 of the Dodd-Frank Act, which amended ECOA, requires financial institutions to collect and report to the Bureau data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071 was adopted for the dual purposes of facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses. Section 1071 complements other Federal efforts to ensure fair lending and to promote community development for small businesses, including through ECOA, the Community Reinvestment Act of 1977 (CRA),[11] and the Community Development Financial Institutions (CDFI) Fund.[12]

The collection and subsequent publication of more robust and granular data regarding credit applications for small businesses, including those that are women- and minority-owned, will provide much-needed transparency to the small business lending market. The current COVID–19 pandemic has shown that transparency is essential, particularly at a time of crisis, when small businesses, especially those owned by women and minorities, may be in urgent need of credit in order to recover from economic shocks.

Furthermore, in the years and decades to come, the collection and publication of these data will be helpful in identifying potential fair lending violations and in facilitating the enforcement of anti-discrimination laws. It will also help governments, community groups, financial institutions, and other stakeholders to identify opportunities and gaps in the market, thereby enhancing business and community development and boosting broad-based economic activity and growth.

*Overview*

Small businesses are a cornerstone of the U.S. economy. There were over 30 million small businesses in the U.S. in 2017, employing almost half of all private sector employees.[13] Small businesses, particularly start-ups, also generated 65 percent of new jobs since 2000.[14] Small businesses were hit hard by two major shocks in the last two decades. First, the Great Recession, which began in 2007, disproportionately affected small businesses.[15] Between 2007 and 2009, employment at businesses with under 50 employees fell by 10.4 percent, compared with 7.5 percent at larger firms,[16] while between 2008 and 2011 lending to small firms fell by 18 percent, compared with 9 percent at larger firms.[17] Small businesses suffered again because of the COVID–19 pandemic. Around 40 percent of small businesses were temporarily closed in late March and early April 2020, due primarily to demand shocks and employee health concerns.[18] Across the first year of the pandemic, "excess" business establishment exits from the market, in comparison to exits over the same period from prior years, numbered up to 200,000.[19] As of mid-2021, loan approvals (other than for government emergency programs) still remained low, and some 845,000 non-farm private sector jobs had not yet been recovered.[20]

During the last two decades, the small business lending landscape has also transformed. Traditional providers—namely banks—consolidated, leading to branch closures. The number of banks in the U.S. has declined from over 18,000 in 1986 to under 5,200 today and the number of branches declined by 14 percent from 2009 to 2020.[21] Meanwhile, new providers and products, such as fintechs and merchant cash advances (MCAs), have become increasingly prevalent in the small business lending market. Financing by MCA providers is estimated to have increased from $8.6 billion in volume during 2014 to $15.3 billion in 2017.[22] From 2017 to 2019, the volume may

[11] 12 U.S.C. 2901 *et seq.*

[12] The Riegle Community Development Banking and Financial Institutions Act of 1994, 12 U.S.C. 4701 *et seq.*, authorized the Community Development Financial Institution Fund (CDFI Fund). The CDFI Fund is discussed in more detail in part II.F.2.ii below.

[13] Off. of Advocacy, Small Bus. Admin., *2020 Small Business Profile* (May 2020), *https://cdn.advocacy.sba.gov/content/uploads/2020/06/04144214/2020-Small-Business-Economic-Profile-States-Territories.pdf* (estimating 31.7 million small businesses in the United States).

[14] Off. of Advocacy, Small Bus. Admin., *Frequently Asked Questions About Small Business*, at 1 (Oct. 2020), *https://cdn.advocacy.sba.gov/wp-content/uploads/2020/11/05122043/Small-Business-FAQ-2020.pdf* (SBA OA 2020 FAQs) (small businesses accounted for 65.1 percent of new jobs since 2000). *See generally* Congressional Research Serv., *Small Business Administration and Job Creation* (updated June 23, 2021), *https://fas.org/sgp/crs/misc/R41523.pdf (discussing small business job creation); Jon Haltiwanger et al., Who Creates Jobs? Small Versus Large Versus Young, 95 Rev. Econ. Stat. 347, 347–48 (May 2013), https://direct.mit.edu/rest/article/95/2/347/58100/Who-Creates-Jobs-Small-versus-Large-versus-Young (finding that young firms, which are generally small, contribute disproportionately to both gross and net job creation).*

[15] Jason Dietrich *et al.*, Bureau of Consumer Fin. Prot., *Data Point: Small Business Lending and the Great Recession*, at 9 (Jan. 23, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_data-point_small-business-lending-great-recession.pdf* (finding that small business lending fell sharply during the Great Recession and recovered slowly, still not reaching pre-Recession levels by 2017).

[16] Ayşegül Şahin *et al.*, Fed. Reserve Bank of N.Y., Current Issues in Economics & Finance, *Why Small Businesses Were Hit Harder by the Recent Recession*, at 1 (Vol. 17, No. 4, 2011), *https://www.newyorkfed.org////_issues/ci17-4.pdf*.

[17] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin, *How Did the Financial Crisis Affect Small Business Lending in the United States?*, at 2 (Nov. 2012), *https://www.microbiz.org/content/ploads//04/SmallBizLending-and-FiscalCrisis.pdf*.

[18] Alexander W. Bartik *et al., The Impact of COVID–19 on Small Business Outcomes and Expectations*, 117 Proc. Nat'l Acad. Sci. 17656, 17656 (July 2020), *https://www.pnas.org/content/pnas/117/30/17656.full.pdf*.

[19] Leland D. Crane *et al.*, Bd. of Governors of the Fed. Reserve Sys., Finance and Economics Discussion Series, 2020–089, *Business Exit During the COVID–19 Pandemic: Non-Traditional Measures in Historical Context*, at 4 (2020), *https://www.federalreserve.gov/econres/feds/files/2020089r1pap.pdf* (estimating excess establishment exits and analyzing other estimates of small business exits during the pandemic). The paper defines "exit" as permanent shutdown and calculates "excess" exits by comparing the number of exits during the 12-month period from March 2020 to February 2021 with previous years. *Id.* at 2–4.

[20] ADP Research Inst., *ADP National Employment Report* (May 2021), *https://adpemploymentreport.com////May-2021.aspx* (non-farm private sector jobs as of June 2021 as compared to Feb. 2020); Biz2Credit, *Biz2Credit Small Business Lending Index Finds April 2021 Non-PPP Loan Approval Rates Move Little for All Types of Lenders* (Apr. 2021), *https://www.biz2credit.com/business-lending-index/april-2021* (approvals as of May 2021).

[21] Congressional Research Serv., *Small Business Credit Markets and Selected Policy Issues*, at 6 (Aug. 20, 2019), *https://fas.org/sgp//misc/R45878.pdf* (decline since 1986); Bruce C. Mitchell *et al.*, Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations*, *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (last visited Aug. 24, 2021) (branch closures).

[22] PYMNTS, *How Long Can MCAs Avoid the 'Loan' Label?* (Jan. 20, 2016), *https://www.pymnts.com/in-depth/2016/how-long-can-mcas-avoid-the-loan-label/*.

have increased further to $19 billion.[23] Meanwhile, financing by fintechs [24] is estimated to have increased from $1.4 billion [25] in outstanding balances in 2013 to approximately $25 billion [26] in 2019.

Both recent economic shocks and changes in patterns of small business financing have had fair lending and community development implications. In terms of the effect of economic shocks, data suggest that women-owned and minority-owned small businesses were impacted disproportionately by the economic crises of the last two decades.[27] Data further suggest that women-owned and minority-owned small businesses, compared to other small businesses, had fewer cash reserves and faced steeper hurdles in accessing credit that would have allowed them to better weather these crises.[28]

Regarding trends in the small business financing landscape, the shift away from traditional providers of small business credit toward newer types of providers gives rise to both potential harm and opportunity. In terms of potential harms, bank closures may have made it more difficult for small businesses, particularly women-owned and minority-owned small businesses, to access credit and remain open—particularly in low- and moderate-income areas and rural communities. Newer providers, often offering newer products, have less experience complying with both Federal and State lending laws and regulations. Additionally, they may use algorithms and artificial intelligence (AI), which may create or heighten "risks of unlawful discrimination, unfair, deceptive, or abusive acts or practices . . . or privacy concerns." [29] In addition, opaque product terms and high interest rates could trap business owners in cycles of debt.

In terms of opportunity, innovative products and lending models, including the use of AI, may yield benefits of more accurate, lower-cost, and faster underwriting, as well as expanded credit access for small businesses that may not have obtained credit under traditional credit underwriting approaches.[30] Specifically, newer providers and approaches may permit those with low or nonexistent personal or business credit scores—including women and minorities who own or seek to start small businesses but on average have relatively lower personal credit scores than male and white business owners [31]—to more easily access credit.[32] Non-traditional credit providers may help offset decreases in lending associated with the closure of bank branches. For instance, fintechs may help provide financing to small businesses in rural communities that lack bank branches.

The precise impacts of these broader trends are not well understood at present because there are no comprehensive, comparable, and application-level data across the fragmented and complex small business lending market. Some small business lending data exist, provided mostly by Federal regulators, but available data are incomplete in certain ways. Some do not include lending by certain categories of institutions, such as smaller depository institutions. And none include lending by nondepository institutions, which comprises almost half of all small business financing.[33]

The datasets that do exist both over- and underestimate small business lending in certain respects by including small dollar loans to non-small businesses and by excluding larger loans to small businesses.[34] Further, these datasets all concern originated loans; they do not include information on applications that do not result in originated loans. Nor do they generally include borrower demographics. Other public, private, and nonprofit datasets offer only partial snapshots of particular areas of the market. Finally, much of the publicly available data are aggregated, which does not permit more granular, loan- or application-level analysis that

---

[23] Paul Sweeney, *Gold Rush: Merchant Cash Advances are Still Hot*, deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*. Although the article does not specify one way or the other, estimates by the underlying source, Bryant Park Capital, appear to reference origination volumes rather than outstanding balances. *See* Nimayi Dixit, S&P Global Market Intelligence, *Payment Fintechs Leave Their Mark On Small Business Lending* (Aug. 28, 2018), *https://www.spglobal.com/marketintelligence/en/news-insights/research/payment-fintechs-leave-their-mark-on-small-business-lending*. Depending on credit multiplier effects, the value of annual origination volumes could be smaller or greater than outstanding balances. Without information on outstanding balances and for the purposes of calculating a market size for small business financing in 2019, the Bureau assumes in this paper a 1:1 ratio between annual origination volumes and outstanding balances for MCA products. See part II.D below for discussion of credit multiplier effects and for market size calculations for MCA and other small business financing products in 2019.

[24] Fintechs are defined as "technology companies providing alternatives to traditional banking services, most often exclusively in an online environment," and may overlap in part with other categories of financial institution, such as commercial finance companies and/or providers of specialized products, including factoring and MCAs. Brett Barkley & Mark Schweitzer, *The Rise of Fintech Lending to Small Businesses: Businesses' Perspectives on Borrowing,* 17 Int'l J. Cent. Banking 35, 35–36 (Mar. 2021), *https://www.ijcb.org/journal/ijcb21q1a2.pdf*.

[25] *Id. (citing* Katie Darden *et al.*, S&P Global Market Intelligence, *2018 US Fintech Market Report,* at 5, *https://www.spglobal.com/marketintelligence/en/documents/2018-us-fintech-market-report.pdf (2018 US Fintech Market Report)). This figure annualizes $121 million in estimated 2013 quarterly originations to $484 million in annual originations and scales up to estimated outstanding balances using the ratio between the FFIEC Call Report and the CRA data discussed in part II.D below.*

[26] 2018 US Fintech Market Report at 6. This figure scales up $9.3 billion in estimated 2019 credit originations for small to medium sized enterprise (SME) borrowers to outstanding balances *using the ratio methodology discussed in part II.D below.*

[27] *See* part II.E below.

[28] *Id.*

[29] 86 FR 16837, 16839 (Mar. 31, 2021).

[30] *Id. See also* Patrice Ficklin *et al.*, Bureau of Consumer Fin. Prot., *Innovation Spotlight: Providing Adverse Action Notices When Using AI/ML Models* (July 7, 2020), *https://www.consumerfinance.gov/about-us/blog/innovation-spotlight-providing-adverse-action-notices-when-using-ai-ml-models/* (discussing potential benefits and risks from financial institutions using AI in credit underwriting and other areas).

[31] Geng Li, Bd. of Governors of the Fed. Reserve Sys., *FEDS Notes: Gender-Related Differences in Credit Use and Credit Scores* (June 22, 2018), *https://www.federalreserve.gov/econres/notes/feds-notes/gender-related-differences-in-credit-use-and-credit-scores-20180622.htm* (finding that single women on average have lower credit scores than single men); Alicia Robb, Off. of Advocacy, Small Bus. Admin., *Minority-Owned Employer Businesses and their Credit Market Experiences in 2017,* at 4 (July 22, 2020), *https://cdn.advocacy.sba.gov/wp-content/uploads/2020/07/22172533/Minority-Owned-Employer-Businesses-and-their-Credit-Market-Experiences-in-2017.pdf* (finding that Black and Hispanic small business borrowers are disproportionately denied credit or discouraged from applying for credit on the basis of their credit score).

[32] *See* Jessica Battisto *et al., Who Benefited from PPP Loans by Fintech Lenders?,* Liberty Street Economics (May 27, 2021), *https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders.html (showing that fintech lenders were an important source of credit for Black owners during the COVID–19 pandemic).*

[33] The Bureau estimates that nondepository private business financing totaled approximately $550 billion out of around $1.2 trillion in total private outstanding balances in 2019 (47 percent). This $550 billion figure includes estimated financing by fintechs (around $25 billion), commercial finance companies (around $160 billion), nondepository CDFIs (around $1.5 billion), MCA providers (around $19 billion), factors (around $100 billion), equipment leasing providers (around $160 billion), nondepository mortgage lenders originating loans for 5+ unit residential developments (around $30 billion), and non-financial trade creditors (around $50 billion). There may additionally be lending by equipment and vehicle dealers originating loans in their own name that is not captured here. Public lenders include the Small Business Association (SBA), the Federal Housing Association (FHA), Fannie Mae and Freddie Mac, and the Farm Credit System (FCS), with public lending totaling around $210 billion in traditional lending programs plus $1 trillion in emergency COVID–19 SBA lending programs. See part II.D below for methodology and sources regarding market size estimates for each lending category.

[34] *See* part II.B below.

would facilitate fair lending or business and community development analysis by stakeholders other than those that collected the data. See part II.B below for a detailed discussion on existing data on small business financing.

The remainder of this part II focuses on several broad topics that explain, in more detail, the need for the small business lending data that the proposed rule to implement section 1071 would provide: (A) The role of small businesses in the U.S. economy; (B) existing data on small business financing; (C) the landscape of small business financing; (D) estimating the size of the small business financing market despite limited data; (E) the particular challenges faced by women-owned and minority-owned small businesses; and (F) the purposes and impact of section 1071.

*A. Small Businesses in the United States*

Small businesses are an important, dynamic, and widely diverse part of the U.S. economy. They are critical to employment, innovation, and economic growth and stability, both overall and specifically for minority and women entrepreneurs.

The Small Business Act, as implemented by the SBA, defines a small business using size standards that generally hinge on the average number of employees or average annual receipts of the business concern and are customized industry by industry across 1,057 6-digit North American Industry Classification System (NAICS) codes.[35] Size standards based on average number of employees are used in all industries in the manufacturing and wholesale trade sectors, as well as in certain industries across a variety of other sectors as well. Employee-based size standards range from 100 (used almost entirely in certain industries within the wholesale trade sector) to 1,000 (used in industries across a variety of sectors including, for example, petroleum refineries, automobile manufacturing, and greeting card publishers).[36] Size standards based on average annual receipts are used in nearly all other industries, and range from $1 million (used in most industries in the crop production and animal production and aquaculture subsectors) to $41.5 million (used in industries across a variety of sectors including, for example, passenger car leasing, television broadcasting, and general medical and surgical hospitals).[37]

Simpler definitions of what constitutes a small business are used in certain contexts. For example, in certain annual research releases the SBA's Office of Advocacy defines a small business as one that has fewer than 500 employees.[38] According to the Office of Advocacy, and based on this definition of a small business, there are 31.7 million such businesses in the U.S. that represent 99.9 percent of all U.S. firms and employ over 60 million Americans.[39] Six million of these small businesses have paid employees, while 25.7 million are non-employer businesses (*i.e.,* the owner(s) are the only people involved in the business).[40] From 2000 to 2019, small businesses, particularly young businesses and start-ups, created 10.5 million net new jobs in the U.S., while large businesses created 5.6 million.[41]

Nearly one third of all businesses are minority-owned and more than one third are women-owned, though minorities and women own a smaller share of employer firms. As of 2018, minorities owned over one million employer firms in the U.S. (amounting to 18.3 percent of all employer firms)[42] and, as of 2017, approximately 8.2 million non-employer firms.[43] Likewise, as of 2018, women owned about 1.1 million employer firms (19.9 percent of all employer firms)[44] and, as of 2017, approximately 10.6 million non-employer firms.[45]

Businesses are legally structured in several ways. In 2017, 87 percent of non-employer businesses were sole proprietorships, which means that the business is not distinguishable from the owner for tax and legal purposes; the owner receives profits directly but is also legally responsible for the business's obligations.[46] Seven percent of non-employer businesses were partnerships, which can be structured to limit the personal liability of some or all owners; limited partners may exchange control for limited liability, while general partners that run the business may remain personally liable.[47] Six percent of non-employer businesses were structured as corporations—4.6 percent are S-corporations and 1.5 percent are C-corporations—which are independent legal entities owned by shareholders who are not personally liable for the corporation's obligations.[48] In 2017, most small employer businesses were corporations, with 50.5 percent choosing to be S-corporations and 16.8 percent preferring C-corporation status, although sole proprietorship and partnership structures remained relatively popular at 12.9 percent and 11.8 percent respectively. By contrast, 74.2 percent of large employer businesses chose to be C-corporations, with 9.3 percent preferring a partnership structure and 8.1 percent S-corporation status.[49]

Small businesses are particularly important in specific sectors of the economy. In 2016, in the services sector, small businesses supplied 45 percent of 19.7 million healthcare and social services jobs, over 60 percent of 13.7 million accommodation and food services jobs, and over 80 percent of 6.3 million construction jobs.[50] In the same year, in manufacturing, small businesses made up 44 percent out of 11.6 million

[35] *See* Small Bus. Admin., *Table of Small Business Size Standards Matched to North American Industry Classification System Codes* (effective Aug. 19, 2019), *https://www.sba.gov/sites/default/files/2019-08/SBA%20%20%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.*

[36] *See id.*

[37] A small number of industries use a size standard based on a metric other than average annual receipts or average number of employees. For example, the commercial banking industry (NAICS 522110) is subject to an asset-based size standard. *See id.*

[38] *See* SBA OA 2020 FAQs at 1.

[39] *See id.*

[40] *See id.*

[41] *See id.; see also Haltiwanger et al., 95 Rev. Econ. Stat. at 347–48 (finding that young firms, which are generally small, contribute disproportionately to both gross and net job creation).*

[42] *See* Press Release, U.S. Census Bureau, *Annual Business Survey Release Provides Data on Minority-Owned, Veteran-Owned and Women-Owned Businesses* (Jan. 28, 2021), *https://www.census.gov/newsroom/press-releases//business-survey.html.*

[43] Minority Bus. Dev. Agency, U.S. Dep't of Com., *The Number of Minority Nonemployer Firms Grew by Nearly 17% between 2014 and 2017* (Dec. 18, 2020), *https://www.mbda.gov/news/press-releases/2020/12/the-number-of-minority-nonemployer* (stating that the nearly 8.2 million minority non-employer firms in the U.S. generated $279.3 billion in revenues in 2017, and grew in number at four times the rate of non-minority non-employer firms between 2014 and 2017). *See also* SBA OA 2020 FAQs at 3 (showing over 7.6 million minority-owned non-employer firms as of 2016).

[44] *See* Press Release, U.S. Census Bureau, *Annual Business Survey Release Provides Data on Minority-Owned, Veteran-Owned and Women-Owned Businesses* (Jan. 28, 2021), *https://www.census.gov/newsroom/press-releases//business-survey.html.*

[45] *See* Press Release, Nat'l Women's Bus. Council, *NWBC Shares 2017 Nonemployer Statistics by Demographics Estimates for Women-Owned Businesses* (Dec. 17, 2020), *https://www.nwbc.gov/2020/12/17/nwbc-shares-2017-nonemployer-statistics-by-demographics-estimates-for-women-owned-businesses/* (also stating that these 10.6 million non-employer firms generate $286.1 billion in revenue, and that nearly half of all women-owned non-employer firms generate less than $10,000 in annual receipts, while only 0.05 percent generate $1 million or more in revenue).

[46] *See* SBA OA 2020 FAQs at 3.

[47] *Id.* at 4.

[48] *Id.*

[49] *Id.*

[50] *See* Off. of Advocacy, Small Bus. Admin., *2019 Small Business Profile* (Apr. 2019), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/04/23142719/2019-Small-Business-Profiles-US.pdf* (2019 Small Business Profile).

jobs.[51] Finally, in 2016, small family farms totaled 96 percent out of 2.2 million farms,[52] and small businesses provided over 80 percent of agriculture, forestry, and fishing and hunting jobs out of 161,000.[53] As such, the financial health of small businesses is essential to the U.S. economy, especially to the supply of critical and basic goods and services—from producing food to serving it at restaurants, and from home building to healthcare.

Small businesses have been especially hard-hit by the COVID–19 pandemic. At a low point in the pandemic in April 2020, 20 percent of self-employed workers had temporarily exited the labor market.[54] Industries in which small businesses played a large role have been particularly impacted. For example, comparing April 2020 with April 2019, employment declined by almost 50 percent in the leisure and hospitality industries (also declining by 50 percent among food services and drinking establishments within the leisure and hospitality industry), in which small businesses employ 60 percent of workers.[55]

*B. Existing Data on Small Business Lending*

While small businesses are a critical part of the U.S. economy and require financial support, it is still true, as it was in 2017 when the Bureau published its White Paper on small business lending, that it is not possible with current data to confidently answer basic questions regarding the state of small business lending. This limitation is especially the case with regard to the race, sex, and ethnicity of small business owners, applications as opposed to originations, and for small business financing products that are not currently reported in Call Report data.[56]

Data on small business lending are fragmented, incomplete, and not standardized, making it difficult to conduct meaningful comparisons across products and over time. This hinders attempts by policymakers and other stakeholders to understand the size, shape, and dynamics of the small business lending marketplace, including the interaction of supply and demand, as well as potentially problematic lending practices, gaps in the market, or trends in funding that may be holding back some communities.[57] For example, absent better data, it is hard to determine if relatively lower levels of bank loans to small businesses in the decade before the pandemic began were reflective of a net relative decline in lending to small businesses as compared to large businesses or rather a shift within small business lending from banks to alternative lenders.[58] To the extent there may have been a relative decline, it is difficult to assess if that decline affected certain types of small businesses more than others, including women-owned and minority-owned small businesses.[59]

The primary sources of information on lending by depository institutions are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports), as well as reporting under the CRA. Under the FFIEC and CRA reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000).[60] The CRA requires banks and savings associations with assets over a specified threshold to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[61] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[62] There are no similar sources of information about lending to small businesses by nondepository institutions. The SBA also releases data concerning its loan programs, but these typically do not include demographic information, and this covers only a small portion of the overall small business financing market.

These public data sources provide some of the most extensive information currently available on small business lending. However, they suffer from four material limitations, namely that the data capture only parts of the market, are published at a high level of aggregation, do not permit detailed analysis across the markets, and lack standardization across different agencies.

First, these datasets exclude entire categories of lenders. For example, banks under $1.322 billion in assets do not have to report under the CRA.[63] The FFIEC and NCUA Call Reports and CRA data do not include lending by nondepository financial institutions, which the Bureau estimates to represent 40 percent of the small business financing market and is rapidly growing.[64]

---

[51] *Id.* at 3.

[52] Nat'l Inst. of Food & Agric., U.S. Dep't of Agric., *Family Farms, https://nifa.usda.gov/family-farms (last visited July 26, 2021)* (classifying family farms as any farm organized as a sole proprietorship, partnership, or family corporation. Family farms exclude farms organized as non-family corporations or cooperatives, as well as farms with hired managers.).

[53] 2019 Small Business Profile at 3.

[54] Daniel Wilmoth, Off. of Advocacy, Small Bus. Admin., *The Effects of the COVID–19 Pandemic on Small Businesses* (Issue Brief No. 16) (Mar. 2021), *https://cdn.advocacy.sba.gov/wp-content/uploads/2021/03/02112318/COVID-19-Impact-On-Small-Business.pdf.*

[55] *Id. By August 2021, many of these jobs had since returned as mandatory closure orders ended and the economy began to recover.*

[56] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape,* at 39–40 (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf* (White Paper).

[57] While Call Report and CRA data provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess, including with respect to local markets or protected classes.

[58] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?,* at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008 to 2015 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. Fed. Deposit Ins. Corp., *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited July 22, 2021).

[59] White Paper at 40.

[60] *See* Fed. Fin. Insts. Examination Council, *Reporting Forms 31, 41, and 51* (last modified Mar. 16, 2021), *https://www.ffiec.gov/ffiec_report_forms.htm* (FFIEC Call Report).

[61] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting,* at 11, 13 (2015), *https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf* (2015 FFIEC CRA Guide). Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11. Beginning in 2023, national banks supervised by the OCC with assets greater than $2.5 billion will be required to report loans of $1.6 million or less and indicate whether the borrower's gross annual review is $1.6 million or less. *See* 85 FR 34734 (June 5, 2020).

[62] *See* Nat'l Credit Union Admin., *Call Report Form 5300* (June 2020), *https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.*

[63] Fed. Fin. Insts. Examination Council, *Community Reinvestment Act 2021 Reporting Criteria, https://www.ffiec.gov/cra/reporter21.htm* (last visited Aug. 5, 2021).

[64] Nondepository lending is estimated to total approximately $550 billion out of $1.4 trillion in total lending, excluding $1 trillion in COVID–19 emergency program lending. *See* part II.D below

Second, Federal agencies publish summary data at a high level in a manner that does not facilitate independent analysis by other agencies or stakeholders. The FFIEC and NCUA Call Reports and the CRA data are all available at a higher level of aggregation than loan-level, limiting fair lending and detailed geographic analyses since race, sex, and ethnicity as well as business location data are rarely disclosed.

Third, the detailed data collected by these Federal sources have significant limitations as well, preventing any analysis into certain issues or types of borrowers, even by the regulators possessing these data. Neither Call Report nor CRA data include applications, which limits insights into any potential discrimination or discouragement in application processes as well as into the interaction between credit supply and demand. The Call Report and CRA data separately identify loans of under $1 million in value, and CRA data also identify loans to businesses with annual revenues of $1 million or less.[65] However, the Call Report definition of small business loans as those with a loan size of $1 million or less at origination is both overinclusive, as it counts small loans to businesses of all sizes, and underinclusive, as it excludes loans over $1 million made to small businesses. Credit unions report any loans under $50,000 as consumer loans and not as commercial loans,[66] potentially excluding from measurement an important source of funding for many small businesses, particularly the smallest and often most underserved.

Finally, the Federal sources of small business lending data are not standardized across agencies and cannot be easily compared. For example, the FFIEC Call Report collects small loans to businesses as a proxy for small business lending, whereas the NCUA Call Report collects loans to members for commercial purposes above $50,000 but with no upper limit. The loan-level data for the Paycheck Protection Program (PPP) offer an unprecedented level of insight into small business lending, but this dataset is a one-off snapshot into the market for a specific lending program at an acute moment of crisis and is also limited in utility by relatively low response levels to demographic questions concerning borrowers.[67]

The Federal government also conducts and releases a variety of statistics, surveys, and research reports on small business lending through the member banks for the Federal Reserve System, the FDIC, CDFI Fund, and the U.S. Census Bureau. These data sources offer insights into broad trends and specific small business lending issues but are less useful for detailed fair lending analyses or identification of specific areas, industries, or demographic groups being underserved. Periodic changes in survey methodology and questions can also limit comparability and the ability to track developments over time.

There are also a variety of non-governmental data sources, issued by both private and nonprofit entities, that cover small businesses and/or the small business financing market. These include datasets and surveys published by commercial data and analytics firms, credit reporting agencies, trade associations, community groups, and academic institutions. Certain of these data sources are publicly available and track specific topics, such as small business optimism,[68] small business employment,[69] rates of small business credit application approvals,[70] small business lending and delinquency levels,[71] and rates of small business closure.[72] Other databases have more granularity and provide detailed information on individual businesses, including revenue, credit utilization, industry, and location.[73]

While these non-public sources of data on small businesses may provide a useful supplement to existing Federal sources of small business lending data, these private and nonprofit sources often do not have lending information, may rely in places on unverified research based on public internet sources, and/or narrowly limit use cases for parties accessing data. Further, commercial datasets are generally not free to public users and can be costly, raising equity issues for stakeholders who cannot afford access.

### *C. The Landscape of Small Business Finance*

Notwithstanding the lack of data on the market, it is clear that financing plays an important role in enabling small businesses to grow and contribute to the economy. When it is available, financing not only provides resources for small businesses to smooth cash flows for current operations, but also affords business owners the opportunity to invest in business growth. An analysis by the National Small Business Association, which examined data from 1993 through 2016, found a correlation between small business owners' ability to access credit and their ability to hire.[74] This same study found that, while not the sole cause, the inability to secure financing may have led 16 percent of small businesses to reduce their number of employees and approximately 10 percent of small businesses to reduce employee benefits. Lack of access to financing also contributed to a further 10 percent of small businesses being unable to increase store inventory in order to meet existing demand.[75]

To support their growth or to make it through harder times, small businesses look to a variety of funding sources. Especially when starting out, entrepreneurs often rely on their own

(providing a detailed breakdown and methodology of estimates across lending products).

[65] Fed. Fin. Insts. Examination Council, *Schedule RC–C, Part II Loans to Small Businesses and Farms,* at 1, *https://www.fdic.gov/regulations/resources/call/crinst-031-041/2017/2017-03-rc-c2.pdf* (detailing the Call Report loan size threshold of $1 million at origination for loans to small businesses); 2015 FFIEC CRA Guide at 11 (detailing the CRA size thresholds of $1 million both for loan amount at origination and for revenue of small business borrowers).

[66] Nat'l Credit Union Admin., *Call Report Form 5300 Instructions,* at 26 (effective Mar. 31, 2021), *https://www.ncua.gov/files/publications/regulations/call-report-instructions-march-2021.pdf.*

[67] Zachary Warmbrodt, *Tracking the Money: Bid to Make Business Rescue More Inclusive Undercut by Lack of Data,* Politico (Mar. 2, 2021), *https://www.politico.com/news/2021/03/02/businesses-inclusive-coronavirus-relief-money-data-472539* (reporting that 75 percent of PPP recipients did not report their ethnicity and 58 percent did not reveal their gender).

[68] Nat'l Fed'n of Indep. Bus., *Small Business Optimism Index* (June 2021), *https://www.nfib.com/surveys/small-business-economic-trends/.*

[69] ADP, *Employment Reports, https://adpemploymentreport.com/* (last visited July 22, 2021).

[70] Biz2Credit, *Biz2Credit Small Business Lending Index, https://www.biz2credit.com/small-business-lending-index* (last visited July 27, 2021).

[71] PayNet, *Small Business Lending Index, https://sbinsights.paynetonline.com/lending-activity/* (last visited July 27, 2021).

[72] Opportunity Insights Economic Tracker, *https://trackthe recovery.org/* (last visited July 27, 2021). The Opportunity Insights Economic Tracker and similar data sources may materially overestimate the number of business closures by not controlling for attrition in the small business client base of data providers. *See* Leland D. Crane *et al.,* Bd. of Governors of the Fed. Reserve Sys., Finance and Economics Discussion Series, 2020–089, *Business Exit During the COVID–19 Pandemic: Non-Traditional Measures in Historical Context,* at 21–22 (2020), *https://www.federalreserve.gov/econres/feds/files2020089r1pap.pdf.*

[73] *See, e.g.,* Dun & Bradstreet, *https://www.dnb.com/* (data provider and credit reporter); Data Axle, *https://www.data-axle.com/* (data provider); Equifax, *https://www.equifax.com/business/business-credit-reports/* (credit reporter); Experian, *https://www.experian.com/small-business/business-credit-reports* (credit reporter).

[74] Nat'l Small Bus. Ass'n, *2016 Year-End Economic Report* (July 2017), *https://www.nsba.biz/wp-content/uploads/2017/02/Year-End-Economic-Report-2016.pdf.*

[75] *Id.*

savings and help from family and friends. If a business generates a profit, its owners may decide to reinvest retained earnings to fund further growth. However, for many aspiring business owners—and their personal networks—savings and retained earnings may not be sufficient to fund a new venture or grow it, leading owners to seek other sources of funding. This is particularly true for minority- and women-led households, which on average have less wealth than their white- and men-led counterparts.[76]

One such source of funding comes from others besides family and friends, whether high net worth individuals or ''angel investors,'' venture capital funds, or, in a more recent development usually facilitated by online platforms, via crowdsourcing from retail investors. Often, these early investments take the form of equity funding, which business owners are not obligated to repay to investors. However, equity funding requires giving up some ownership and control to investors, which certain entrepreneurs may not wish to do. For small businesses, equity funding also tends to be somewhat more expensive than debt financing in the longer run. This is for a number of reasons, including that loan interest payments, unlike capital gains, are tax-deductible.[77] Finally, equity investments from others besides family and friends are available to only a minority of small businesses.

Many small businesses instead seek debt financing from a wide range of providers. These providers include depository institutions, such as banks, savings associations, and credit unions,[78] as well as fintechs and commercial finance companies, specialized providers of specific financing products, and a range of government and government-sponsored enterprises, among others.

In the past, small businesses principally sought credit from banks; however, as banks have merged and consolidated, particularly in the wake of the Great Recession, they have provided less financing to small businesses.[79] As noted earlier, the number of banks has declined significantly since a post-Great Depression peak in 1986 of over 18,000 institutions to around 5,200 institutions today,[80] while 13,500 branches closed from 2009 to mid-2020, representing a 14 percent decrease.[81] Although nearly half of counties either gained bank branches or retained the same number between 2012 and 2017, the majority lost branches over this period.[82] Out of 44 counties that were deeply affected by branch closures, defined as having 10 or fewer branches in 2012 and seeing five or more of those close by 2017, 39 were rural counties.[83] Of rural counties, just over 40 percent lost bank branches in that period; the rural counties that experienced substantial declines in bank branches tend to be lower-income and with a higher proportion of African-American residents relative to other rural counties,[84] raising concerns about equal access to credit.

As banks and branches have merged and/or closed, the share of banking assets has also become increasingly concentrated in the largest institutions, with banks of over $10 billion in assets representing 84 percent of all industry assets in 2018,[85] totaling $15.1 out of $17.9 trillion.[86] Nevertheless, banks of under $10 billion in assets continue to hold approximately half of all small business loans (using the FFIEC Call Report definition of loans of under $1 million), highlighting the importance of smaller banks to the small business lending market.[87] Since smaller bank credit approvals have traditionally been close to 50 percent, while large banks approve only 25–30 percent of applications, bank consolidation may have implications for small business credit access.[88] Since institutions under $1.322 billion in assets are not required to report on lending under the CRA,[89] it is difficult to precisely assess the

[76] Emily Moss *et al., The Black-White Wealth Gap Left Black Households More Vulnerable,* Brookings Inst. (Dec. 8, 2020), *https://www.brookings.edu/blog/up-front/2020/12/08/the-black-white-wealth-gap-left-black-households-more-vulnerable/* (detailing wealth gaps in 2019 by race and sex that show white male households with more wealth than white female or Black male or female households at all age brackets). *See also* Erin Ruel & Robert Hauser, *Explaining the Gender Wealth Gap,* 50 Demography 1155, 1165 (Dec. 2012), *https://read.dukeupress.edu/demography/article/50/4/1155/169553/Explaining-the-Gender-Wealth-Gap* (finding a gender wealth gap of over $100,000 in a longitudinal study over 50 years of a single age cohort in Wisconsin); Neil Bhutta *et al.,* Bd. of Governors of the Fed. Reserve Sys., *Disparities in Wealth by Race and Ethnicity in the 2019 Survey of Consumer Finances* (Sept. 28, 2020), *https://www.federalreserve.gov/econres/notes/feds-notes/disparities-in-wealth-by-race-and-ethnicity-in-the-2019-survey-of-consumer-finances-20200928.htm* (finding median white family wealth in 2019 of $188,200 compared with $24,100 for Black families and $36,100 for Hispanic families).

[77] Jim Woodruff, *The Advantages and Disadvantages of Debt and Equity Financing,* CHRON (updated Mar. 4, 2019), *https://smallbusiness.chron.com/advantages-disadvantages-debt-equity-financing-55504.html.*

[78] For purposes of this notice of proposed rulemaking, the Bureau is using the term depository institution to mean any bank or savings association defined by section 3(c)(1) of the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). The Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this notice, unless otherwise specified, to facilitate analysis and discussion.

[79] Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?,* at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008 to 2015 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. Fed. Deposit Ins. Corp., *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited July 22, 2021).

[80] Congressional Research Serv., *Small Business Credit Markets and Selected Policy Issues,* at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45878.pdf.*

[81] Bruce C. Mitchell *et al.,* Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations,* at 6 (2020), *https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (stating that in 2009 there were 95,596 brick and mortar full-service branches or retail locations but, as of June 30, 2020, that number had fallen to 82,086).

[82] Bd. of Governors of the Fed. Reserve Sys., *Perspectives from Main Street: Bank Branch Access in Rural Communities,* at 1, 3–4, 19 (Nov. 2019), *https://www.federalreserve.gov/publications/files/bank-branch-access-in-rural-communities.pdf.*

[83] *Id.*

[84] *Id.*

[85] Congressional Research Serv., *Small Business Credit Markets and Selected Policy Issues,* at 6 (Aug. 20, 2019), *https://fas.org/sgp/crs/misc/R45878.pdf.*

[86] Fed. Deposit Ins. Corp., *Bank Data and Statistics, https://www.fdic.gov/bank/statistical/* (last visited Aug. 22, 2021).

[87] Speech by Board Governor Lael Brainard: *Community Banks, Small Business Credit, and Online Lending* (Sept. 30, 2015), *https://www.federalreserve.gov/newsevents/speech/brainard20150930a.htm.* Banks with under $10 billion in assets are often referred to as ''community banks.'' Congressional Research Serv., *Over the Line: Asset Thresholds in Bank Regulation,* at 2–3 (May 3, 2021), *https://fas.org/sgp/crs/misc/R46779.pdf* (noting that the Board of Governors of the Federal Reserve System (Board) and the Office of the Comptroller of the Currency (OCC) define community banks as having under $10 billion in assets, although there may be other criteria, with the FDIC considering also geographic footprint and a relative emphasis on making loans and taking deposits as opposed to engaging in securities and derivatives trading). Community banks are also more likely to engage in relationship-based lending. *See id.* at 3.

[88] Biz2Credit, *Biz2Credit Small Business Lending Index, https://www.biz2credit.com/small-business-lending-index* (last visited July 22, 2021). These historical approval rates are reflected in pre-pandemic Small Business Lending Index releases by Biz2Credit. *See, e.g.,* Biz2Credit, *Small Business Loan Approval Rates at Big Banks Remain at Record High in February 2020: Biz2Credit Small Business Lending Index, https://www.biz2credit.com/small-business-lending-index/february-2020* (last visited July 29, 2021) (showing large bank approvals of 28.3 percent in February 2020 and of 27.2 percent in February 2019 and smaller bank approvals of 50.3 percent in February 2020 and of 48.6 percent in February 2019).

[89] *See* part II.B above.

impact of bank consolidation and shuttered branches on small business lending and access to credit in local areas.[90] By contrast, credit unions increased their small business lending from $30 billion in 2008 to at least $55 billion in 2019.[91] Like banks, credit unions typically receive high satisfaction scores among small business borrowers, reflecting more high-contact, relationship-based lending models.[92]

Certain banks and credit unions choose to be mission-based lenders, as CDFIs or Minority Depository Institutions (MDIs).[93] Mission-based lenders focus on providing credit to traditionally underserved and low-income communities and individuals to promote community development and expand economic opportunity, making them a relatively smaller by dollar value but essential part of the small business lending market. There were over 1,200 CDFIs (around half of which are depository institutions) as of May 2021 and over 140 MDIs as of March 2021.[94]

During a period in which that depository institutions have been providing relatively less funding to small businesses,[95] small businesses have increasingly relied on other nondepository institutions for financing. Since nondepositories typically do not report their small business financing activities to regulators, however, there are no authoritative sources for either the number of such entities or the dollar value of financing they provide to small businesses.[96] However, what data are available make clear that fintech firms are rapidly increasing their share of the small business financing market.[97]

Whether depository or nondepository, each provider of small business financing assesses a variety of different criteria to determine whether and on what terms to grant an extension of credit or other financing product, including business and financial performance, the credit history of the business and its owner(s), the time in business, and the industry, among other factors. Protections such as guarantees, collateral, and insurance can mitigate perceived risks, potentially enabling a lender to offer better terms or facilitating an extension of credit that would otherwise not meet lending limit or underwriting criteria. Often, government agencies, including the SBA, FHA, and USDA, guarantee or insure loans themselves to encourage lenders to provide credit to borrowers that may not otherwise be able to obtain credit, either on affordable terms and conditions or at all.[98] Different lenders also employ diverse methods for assessing risk, with smaller banks generally relying more on traditional underwriting methods and typically managing multi-product relationships. Fintechs increasingly use algorithms, automation, and even AI and machine learning to assess risk and make underwriting decisions, with originations typically being less relationship-based in nature.

As well as diversity in underwriting methodology and criteria, there are also considerable differences across small business financing products and providers with respect to pricing methods and repayment structures. As a result, it can be challenging to compare the competitiveness of product pricing and terms. The Bureau understands that term loans, lines of credit, and credit cards typically disclose annualized interest rates; leases often take into account depreciation; factoring products discount an invoice's value and add a fee; and MCAs apply a multiple to the value of the up-front payment.[99] Moreover, providers may add additional fees that are not standardized within industries, much less across them. The Bureau believes that this complexity may confuse business owners and render them unable to secure more favorable rates due to opacity in offers presented—which in some cases may even be deliberate[100]—and a corresponding inability to effectively compare across different financing options.[101] This may impair applicants' ability to make informed choices.

*D. Estimating the Size and Scope of the Small Business Financing Market*

In light of the lack of data and the heterogeneity of products and providers within the small business financing market, it can be difficult to get a clear sense of the size and scope of the market. In this section, the Bureau describes its estimates of the total outstanding balances of credit in the market, the number of institutions that are active in the small business

---

90 Bruce C. Mitchell *et al.,* Nat'l Cmty. Reinvestment Coal., *Relationships Matter: Small Business and Bank Branch Locations, https://ncrc.org/relationships-matter-small-business-and-bank-branch-locations/* (last visited July 27, 2021).

91 Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?,* at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf.*

92 Fed. Reserve Banks, *Small Business Credit Survey, 2021 Report On Employer Firms* (2021), *https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/2021-sbcs-employer-firms-report.*

93 According to the FDIC, FDIC-insured MDIs and CDFI banks are banks, savings banks, and savings associations (collectively, banks) that serve minority, low- or moderate-income (LMI), and rural communities at higher rates than mainstream banks. MDIs serve minority communities including African American, Asian American, Hispanic American, and Native American. CDFI banks are certified through the U.S. Department of the Treasury by demonstrating they serve LMI communities. *See, e.g.,* Fed. Deposit Ins. Corp. Minority Depository Institutions Program website, *https://www.fdic.gov/regulations/resources/minority/mission-driven/index.html* (last visited July 11, 2021).

94 Cmty. Dev. Fin. Inst., *CDFI Certification, https://www.cdfifund.gov/programs-training/certification/cdfi* (last visited July 21, 2021); Fed. Deposit Ins. Corp., *Minority Depository Institutions Program* (last updated June 9, 2021), *https://www.fdic.gov/regulations/resources/minority/mdi.html.*

95 *See* Rebel A. Cole, Off. of Advocacy, Small Bus. Admin., *How Did Bank Lending to Small Business in the United States Fare After the Financial Crisis?,* at 26 (Jan. 2018), *https://cdn.advocacy.sba.gov/wp-content/uploads/2019/05/09134658/439-How-Did-Bank-Lending-to-Small-Business-Fare.pdf* (showing a decline in bank loans to small businesses from 2008–15 from $710 billion to $600 billion). The level of bank lending to small businesses has recovered somewhat since a trough in 2012–13 that represented the lowest amount of lending since 2005. *See also* Fed. Deposit Ins. Corp., *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited July 21, 2021) (tabulating outstanding balances for credit extended to small- and non-small business lending by banks and thrifts over time).

96 *See* part II.B above.

97 *See* part II.D below.

98 Congressional Research Serv., *Small Business Administration 7(a) Loan Guaranty Program* (updated June 21, 2021), *https://fas.org/sgp/crs/misc/R41146.pdf* (discussing the SBA's flagship 7(a) loan guarantee program); U.S. Dep't of Hous. & Urban Dev., *Descriptions Of Multifamily Programs, https://www.hud.gov/program_offices/housing/mfh/progdesc* (last visited July 27, 2021) (listing FHA mortgage insurance programs for 5+ unit residential developments); Farm Serv. Agency, U.S. Dep't of Agric., *Guaranteed Loan Program Fact Sheet* (Mar. 2020), *https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/guaranteed_loan_program-factsheet.pdf* (discussing the USDA's Farm Service Agency guaranteed loan program).

99 See part II.D below for definitions of the different product categories.

100 Press Release, Fed. Trade Comm'n, *Cash Advance Firm to Pay $9.8M to Settle FTC Complaint It Overcharged Small Businesses* (Apr. 22, 2021), *https://www.ftc.gov/news-events/press-releases/2021/04/cash-advance-firm-pay-98m-settle-ftc-complaint-it-overcharged* (settling a lawsuit between the Federal Trade Commission (FTC) and an MCA provider for $9.8 million where the complaint alleged that the provider "deceived" and "misle[d]" business borrowers about the amount and terms of financing); Bd. of Governors of the Fed. Reserve Sys., *Record of Meeting: Community Advisory Council and the Board of Governors,* at 7 (Oct. 5, 2018), *https://www.federalreserve.gov/aboutthefed/files/cac-20181005.pdf* (noting a growing trend of small business owners facing difficulty with expensive loan products such as MCAs where the pricing and structure of the loans is often deliberately obscured).

101 Fed. Trade Comm'n, *'Strictly Business' Forum, Staff Perspective,* at 5 (Feb. 2020), *https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-ftcs-strictly-business-forum/strictly_business_forum_staff_perspective.pdf* (discussing the difficulty in comparing across financing products with widely differing methods for calculating and describing key features).

financing market, and how the Bureau arrived at these estimates. Where possible, the Bureau tries to estimate the state of the small business financing market at the end of 2019 in order to estimate the state of the market during a year unaffected by the COVID–19 pandemic.

One challenge is that some of the data report the dollar value of originations and some report outstanding balances. For the purposes of this exercise and for most, but not all, products, the Bureau assumes that for every $1 originated in the market in a given year, there is approximately a corresponding $3 of outstanding balances. This assumption is based on the ratio of the 2019 FFIEC Call Report data, which totaled $721 billion in outstanding balances on bank loans to small businesses and small farms, and the 2019 CRA data, which recorded $264 billion in bank loan originations to small businesses and small farms.[102] This assumption is limited by the extent to which other small business financing products differ from loans and lines of credit, which make up the majority of financing products captured by the FFIEC Call Report data and the CRA data.[103]

As detailed in this section, the Bureau estimates that the market for small business financing products totaled $1.4 trillion in outstanding balances in 2019. The Bureau estimates that small business financing by depository institutions makes up just over half of small business financing by private institutions. In 2020 and 2021, COVID–19 emergency lending programs added a further $1 trillion to this value, bringing the overall size of the small business financing market up to $2.4 trillion. Below, the Bureau estimates the market share for different small business financing products.

Since the available data regarding depository institutions' small loans to businesses address term loans, lines of credit, and credit cards together, the respective share of different products in the overall small business financing market is difficult to assess. As detailed in this section, the Bureau estimates that together, private term loans and lines of credit constitute the largest small business credit product by value, totaling approximately $770 billion in outstanding balances in 2019, although PPP and EIDL Program loans have since added $1 trillion to this figure.

Lending by banks, saving associations, and credit unions comprises the largest part of this total amount for private term loans and lines of credit. Using FFIEC Call Report data for December 2019, the Bureau estimates that banks and savings associations account for a total of about $721 billion in outstanding credit to small businesses and small farms as of December 2019.[104] Using NCUA Call Report data for December 2019, the Bureau estimates that credit unions account for a total of about $55 billion in outstanding credit to members for commercial purposes.[105] From this value, the Bureau subtracts $62 billion in credit card lending to arrive at $713 billion in outstanding balances for term loans and lines of credit. From this value, the Bureau further subtracts $134 billion in SBA guaranteed loans to arrive at $580 billion in outstanding balances for private term loans and lines of credit extended by depository institutions (*i.e.,* banks, savings associations, and credit unions) as of December 2019.

The remaining $190 billion in outstanding balances for private term loans and lines of credit was extended by various nondepository institutions, namely commercial finance companies, fintechs, and nondepository CDFIs.[106]

Commercial finance companies specialize in financing equipment and vehicle purchases. The Bureau estimates that the value of outstanding balances on credit extended by commercial finance companies totaled approximately $160 billion. Using data from the Federal Reserve Board's Finance Company Business Receivables data on owned assets as of December 2019, the Bureau estimates commercial finance companies outstanding credit for commercial purposes as the value of retail motor vehicle loans plus equipment loans and other business receivables, which totaled about $215 billion.[107] The Bureau further assumes that about 75 percent of this value, or $162 billion, can be attributed to loans to small businesses.[108]

Typical fintech providers are characterized primarily by providing banking services exclusively in an online environment.[109] The Bureau estimates that total outstanding loan balances for fintech providers reached around $25 billion in 2019. In a 2018 report, S&P Global projected that online

[102] FFIEC Call Report data records outstanding balances on loans with origination amounts less than $1 million across Commercial & Industrial, Nonfarm Nonresidential, Agricultural, and Secured by Farmland lending categories. *See* FDIC Quarterly Banking Profile Time Series, *https://www.fdic.gov/analysis/quarterly-banking-profile/qbp/timeseries/small-business-farm-loans.xlsx* (last visited August 29, 2021).

[103] FFIEC Call Report data and CRA data on small business credit products also include business credit card products, but loans and lines of credit made up $713 billion out of $775 billion in outstanding balances on bank, savings association, and credit union loans to small businesses in 2019. One important caveat to this assumption is that products with materially shorter average term lengths, for example credit cards, factoring products, and MCAs, may have an inverse ratio of originations to outstanding balances. For example, top issuers of general purpose credit cards recorded purchase volumes of two to seven times their outstanding balances in 2020. Nilson Report, Issue 1192, at 6 (Feb. 2021), *https://nilsonreport.com/publication_newsletter_archive_issue.php?issue=1192*. If business-purpose credit cards, factoring products, and MCAs behaved similarly with respect to the ratio of originations to outstanding balances, then for every $1 originated in the market in a given year, there could be a corresponding $0.14–0.50 in outstanding balances for such products ($1 divided by two to seven).

[104] Calculated from FFIEC Call Report data accessed on June 8, 2021. The Bureau notes that, as discussed in part II.B above, these estimates rely on small loans to businesses as a proxy for loans to small businesses. As such, the Bureau acknowledges that the true outstanding value of credit extended to small businesses by such institutions may be different than what is presented here. For example, the small loans to businesses proxy would overestimate the value of outstanding credit if a significant number of small loans to businesses and farms are to businesses or farms that are actually large. Alternatively, the proxy would underestimate the value of outstanding credit to small businesses if a significant number of businesses and farms that are small under the proposed rule take out loans that are larger than $1 million or $500,000, for businesses and farms, respectively.

[105] Nat'l Credit Union Admin., *2019 Call Report Quarterly Data, https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last visited Aug. 24, 2021) (2019 NCUA Call Report). The Bureau notes that, as discussed in part II.B above, credit unions only report credit transactions made to members for commercial purposes with values over $50,000. The Bureau uses this value as a proxy for small business credit. The Bureau acknowledges that the true value of small business credit extended by credit unions may be different than what is presented here. For example, this proxy may overestimate the value of outstanding small business credit because some members are taking out loans for large businesses. Alternatively, this proxy may underestimate the value of outstanding small business credit if credit unions originate a substantial number of small business loans with origination values of under $50,000. For this analysis, the Bureau includes all types of commercial loans to members except construction and development loans and multifamily residential property. This includes loans secured by farmland; loans secured by owner-occupied, non-farm, non-residential property; loans secured by non-owner occupied, non-farm, non-residential property; loans to finance agricultural production and other loans to farmers; commercial and industrial loans; unsecured commercial loans; and unsecured revolving lines of credit for commercial purposes. The Bureau does include multifamily in part VII below.

[106] There may additionally be lending by equipment and vehicle dealers originating loans in their own name that is not captured here.

[107] Bd. of Governors of the Fed. Reserve Sys., *Finance Companies—G.20* (updated July 15, 2021), *https://www.federalreserve.gov/releases/g20/hist/fc_hist_b_levels.html*. The Bureau does not include leases, since they are already counted within the product category of equipment and vehicle leasing, or wholesale loans, which it assumes are typically made to non-small businesses.

[108] This methodology is consistent with the approach taken by Gopal and Schnabl (2020).

[109] Barkley & Schweitzer, 17 Int'l J. Cent. Banking at 35–36.

platform lenders would originate about $9.3 billion in credit to small and medium enterprises in 2019.[110] Using this estimate, the Bureau scales up the value of originations to $25 billion in estimated outstanding balances, under the assumptions discussed above.[111] At the beginning of the COVID–19 pandemic and financial crisis, fintechs originated around $22 billion in PPP loans to small businesses from March to August 2020[112] and likely continued to originate billions more during the third wave of PPP loans in 2021, which represents an almost 90 percent increase or more in outstanding balances since 2019.[113] This follows already rapid growth from $1.4 billion in estimated outstanding balances in 2013.[114]

The Bureau estimates the value of outstanding balances on credit extended by nondepository CDFIs to small business borrowers to be around $1.5 billion. Using reporting by the CDFI Fund for 2019, the Bureau scales down the outstanding balances for loan funds of $13.8 billion and for venture capital funds of $0.3 billion by the proportion of all CDFI lending attributable to business borrowers, which totaled $15.4 billion out of $141.2 billion.[115]

Categorized here separately so as to distinguish residential from non-residential loans, the Bureau estimates outstanding balances for loans on 5+ unit residential dwellings to total over $30 billion.[116] Using data from the Mortgage Bankers Association, the Bureau scales up $11 billion in 2019 annual originations on loans of under $1 million in value at origination for 5+ unit residential dwellings to $30 billion in estimated outstanding balances, using the ratio between the FFIEC Call Report and the CRA data discussed above.[117]

Also categorized separately from depository institution totals so as to distinguish private from government and government-sponsored loans, the Bureau estimates that outstanding balances for loans extended by the Small Business Administration and the Farm Credit System totaled around $200 billion in 2019.[118]

The SBA, through its traditional 7(a), 504, and microloan programs as well as the Economic Impact Disaster Loan (EIDL) program and funding for Small Business Investment Companies (SBICs), is the largest governmental lender by value, with $143.5 billion in outstanding balances at the end of fiscal 2019.[119] However, since the outbreak of the COVID–19 pandemic, SBA lending has increased in size by over $1 trillion due to the PPP, which totaled $800 billion, and the EIDL Program, which totaled $210 billion.[120]

The Farm Credit System is another important government-related part of the small business credit landscape. The Bureau estimates that Farm Credit System members had around $55 billion in outstanding balances of credit extended to small farms in 2019. Using the same small loan to farms proxy as is used in the FFIEC Call Report, the Bureau estimates credit to farms with an origination value of less than $500,000. Based on the Farm Credit System's 2019 Annual Information Statement of the Farm Credit System, the Bureau estimates that outstanding balances of such small credit to farms totaled $55 billion at the end of 2019.[121] The Bureau notes that, as with the FFIEC Call Report proxy, this number may include credit to non-small farms and may exclude larger credit transactions extended to small farms.

Mostly extended by depository institutions, the Bureau estimates that the market for small business credit cards totaled over $60 billion in outstanding balances for 2020.[122] Using data from Y–14 Form submissions to the Federal Reserve Board, the Bureau estimates the value of outstanding balances for small business credit card accounts where the loan is underwritten

[110] 2018 US Fintech Market Report at 6.

[111] The Bureau notes that this figure may underestimate the total value of fintech lending because it focuses on platform lenders and may overestimate the value of lending to small businesses because it also includes credit to medium businesses. Additionally, the Bureau notes that fintechs often offer products besides loans and lines of credit, and that there is no clear demarcation between fintech, commercial finance company, and MCA provider, limiting the precision of market size estimates. Finally, fintechs often sell loans once originated to other entities, securitize their originations, or purchase loans that banks have originated, which may further present challenges to the precision of market size estimates for this market segment.

[112] Jessica Battisto *et al., Who Benefited from PPP Loans by Fintech Lenders?,* Liberty Street Economics (May 27, 2021), *https://libertystreeteconomics.newyorkfed.org/2021/05/who-received-ppp-loans-by-fintech-lenders.html;* Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through 12 p.m. EST Apr. 16, 2020), *https://www.sba.gov/sites/default/files/2020-06/PPP%20Deck%20copy-508.pdf;* Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through Aug. 8, 2020), *https://www.sba.gov/sites/default/files/2020-08/PPP_Report%20-%202020-08-10-508.pdf.*

[113] Per the program's intent, many PPP loans have been forgiven since the program began, which may mean that outstanding balances on PPP loans extended by fintech providers have since declined.

[114] Barkley & Schweitzer, 17 Int'l J. Cent. Banking at 35–36 (citing 2018 US Fintech Market Report at 5). This figure annualizes $121 million in estimated 2013 quarterly originations to $484 million in annual originations and scales up to estimated outstanding balances using the ratio between the FFIEC Call Report and the CRA data discussed above.

[115] CDFI Fund, *CDFI Annual Certification and Data Collection Report (ACR): A Snapshot for Fiscal Year 2019,* at 17, 22 (Oct. 2020), *https://www.cdfifund.gov/sites/cdfi/files/2021-01/ACR-Public-Report-Final-10292020-508Compliant.pdf.* To the extent that CDFI loan funds and venture capital funds extend credit to business customers at different rates than CDFI banks and credit unions, this calculation may over- or underestimate the value of lending to small businesses by nondepository CDFIs. This figure also assumes that all CDFI lending is for small businesses.

[116] Depository institutions, discussed above, extend a sizeable proportion of loans for 5+ unit residential dwellings; both nondepository and depository institutions are included in the total for 5+ unit outstanding balances.

[117] *See* Mortg. Bankers Ass'n, *Annual Report on Multi-Family Lending—2019,* at 5 (2020), *https://www.mba.org/store/products/research/general/report/2019-annual-report-on-multifamily-lending.* This includes both private loans, estimated at around $18 billion, and loans extended by Fannie Mae, Freddie Mac, and the FHA, estimated at around $13 billion. The share of 5+ unit residential dwelling loans of all sizes extended by governmental or government-sponsored entities was 41 percent. The Bureau assumes for the purposes of this exercise that the same share is reflected in loans of under $1 million in value at origination, although arguably this share would be higher if government and government-sponsored entities are extended disproportionately smaller dollar value loans on average.

[118] The grand total for lending by government and government-sponsored entities would be approximately $210 billion, including 5+ unit residential dwelling loans extended by Fannie Mae, Freddie Mac, and the FHA, which are separately recorded within the 5+ unit residential dwelling loan product category.

[119] Small Bus. Admin., *Small Business Administration Loan Program Performance* (effective Mar. 31, 2021), *https://www.sba.gov/document/report-small-business-administration-loan-program-performance.* SBA guaranteed loans comprised $134 billion out of this total, which amount has been deducted from the totals for depository institutions to avoid double counting.

[120] Small Bus. Admin., *Paycheck Protection Program (PPP) Report* (approvals through May 31, 2021), *https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf;* Small Bus. Admin., *Disaster Assistance Update—Nationwide COVID EIDL, Targeted EIDL Advances, Supplemental Targeted Advances* (June 3, 2021), *https://www.sba.gov/sites/default/files/2021-06/COVID-19%20EIDL%20TA%20STA_6.3.2021_Public-508.pdf;* Small Bus. Admin., *Disaster Assistance Update—Nationwide EIDL Loans* (Nov. 23, 2020), *https://www.sba.gov/sites/default/files/2021-02/EIDL%20COVID-19%20Loan%2011.23.20-508_0.pdf.*

[121] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System,* at 54, *https://www.farmcreditfunding.com/ffcb_live/investorResources/informationStatements.html* (last visited Aug. 13, 2021).

[122] *See* Bd. of Governors of the Fed. Reserve Sys., Report Forms FR Y–14M, *https://www.federalreserve.gov/apps/reportforms/reportdetail.aspx?sOoYJ+5BzDYnbIw+U9pka3sMtCMopzoV* (last visited July 12, 2021). The Board's data are received from bank holding companies over $50 billion in assets, which represent 70 percent of outstanding balances for consumer credit cards; the corresponding percent of balances captured for small business cards is not known, so the total small business-purpose credit card market could be substantially higher or lower. *See* Bureau of Consumer Fin. Prot., *The Consumer Credit Card Market,* at 18 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2019.pdf.*

with the sole proprietor or primary business owner as an applicant.[123]

Equipment and vehicle leasing, whereby businesses secure the right to possess and use a piece of equipment or vehicle for a term in return for consideration, is another important product category that is estimated to value roughly $160 billion in outstanding balances in 2019. Using data from the Equipment Leasing and Financing Foundation for 2019, the Bureau estimates the total size of the equipment and vehicle leasing market for all sized businesses in 2019 to be approximately $900 billion.[124] The Bureau further assumes that small businesses comprise around 18 percent of the total equipment and vehicle leasing market.[125]

Factoring is a similarly significant product type, estimated at around $100 billion in market size for 2019.[126] In a factoring transaction, factors purchase, at a discount, a legally enforceable claim for payment (*i.e.,* accounts receivables or invoices) for goods already supplied or services already rendered by a business for which payment has not yet been made; hence, a factor's risk related to repayment often lies with the business's customer and not the business itself. In most cases, specific companies, called factors, provide factoring products.

The market for MCAs is developing rapidly and data are even more scarce than for other segments of the small business lending market. This limits the reliability of estimates as to the MCA market's size. Based on market research conducted by Bryant Park Capital (BPC) and reported on by *deBanked.com*, the Bureau estimates the 2019 market size to be around $20 billion.[127] The MCA market is also of particular significance for smaller and traditionally underserved businesses that may not qualify for other types of credit.[128] MCAs are typically structured to provide a lump sum payment up front (a cash advance) in exchange for a share of future revenue until the advance, plus an additional amount, is repaid. Unlike the majority of other small business financing products, MCAs typically purport to be for short durations.[129] The Bureau understands that MCAs also tend to be relatively high-cost products.[130] Two States, New York and California, will soon implement laws that will require providers of ''sales-based financing,'' such as MCAs, to provide disclosures (including estimated APR) similar to those required under the Truth in Lending Act (TILA),[131] which generally only applies to consumer credit.[132]

Finally, trade credit is another significant market, which the Bureau estimates to total $51 billion in outstanding balances in 2019. Using a report by Fundbox/PYMNTS, the Bureau estimates the trade credit market size by adding the total accounts payable for businesses under $1 million in annual revenue.[133] Considering the total value of accounts payable for businesses between $1 million and $5 million would increase the market size by $88 billion.[134] Trade credit is an often informal, business-to-business transaction, usually between non-financial firms whereby suppliers allow their customers to acquire goods and/or

[123] Off. of Mgmt. & Budget, *Instructions for the Capital Assessments and Stress Testing Information Collection (Reporting Form FR–Y14M),* OMB No. 7100–0341, at 148 (Mar. 2020), *https://omb.report/icr/202101-7100-006/doc/108187801.*

[124] *See* Equip. Leasing & Fin. Found., *Horizon Report, https://www.leasefoundation.org/industry-resources/horizon-report/* (last updated Apr. 22, 2021).

[125] *See* Karen Mills, Harvard Bus. Sch., *State of Small Business Lending,* at 29 (July 2014), *https://www.hbs.edu/ris/Supplemental%20Files/15-004%20HBS%20Working%20Paper%20Chart%20Deck_47695.pdf* (estimating equipment leasing outstanding balances for small business borrowers at approximately $160 billion at Dec. 31, 2013); Monitor Daily, *SEFI Report Finds Strong Performance Despite Challenges, https://www.monitordaily.com/news-posts/sefi-report-finds-strong-performance-despite-challenges/* (last visited July 27, 2021) ($903 billion market in 2014, commensurate with an 18 percent market share for small business borrowers at the time of the Karen Mills report).

[126] *See* Secured Fin. Found., *2019 Secured Finance: Market Sizing & Impact Study Extract Report,* at 7 (June 2019), *https://www.sfnet.com/docs/default-source/data-files-and-research-documents/sfnet_market_sizing___impact_study_extract_f.pdf?sfvrsn=72eb7333_2.* This study estimated the total volume of the U.S. factoring market to be $101 billion. To the extent that factoring volumes differ from outstanding balances, the value of outstanding balances may be higher or lower than this estimate. Also, this estimate captures factoring for business borrowers of all sizes, not just small business borrowers. The Bureau assumes that most factoring is provided to small business customers.

[127] Paul Sweeney, *Gold Rush: Merchant Cash Advances are Still Hot,* deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/.* BPC estimates appear to reference origination volumes rather than outstanding balances. *See* Nimayi Dixit, S&P Global Market Intelligence, *Payment Fintechs Leave Their Mark On Small Business Lending* (Aug. 28, 2018), *https://www.spglobal.com/marketintelligence/en/news-insights/research/payment-fintechs-leave-their-mark-on-small-business-lending.* Depending on credit multiplier effects, the value of annual origination volumes could be smaller or greater than outstanding balances. Without information on outstanding balances and for the purposes of calculating a market size for small business financing in 2019, the Bureau assumes in this paper a 1:1 ratio between annual origination volumes and outstanding balances for MCA products. See above for discussion of credit multiplier effects.

[128] *Cf.* Barbara Lipman & Ann Marie Wiersch, Bd. of Governors of the Fed. Reserve Sys., *Uncertain Terms: What Small Business Borrowers Find When Browsing Online Lender websites,* at 3 (Dec. 2019), *https://www.federalreserve.gov/publications/files/what-small-business-borrowers-find-when-browsing-online-lender-websites.pdf* (observing that online lenders, including providers of MCA products, position themselves as offering financing to borrowers underserved by traditional lenders).

[129] *See id.* (stating that MCAs are generally repaid in three to 18 months).

[130] *Id.* (stating that annual percentage rates on MCA products can exceed 80 percent or rise to triple digits). *See also* Fed. Trade Comm'n, *'Strictly Business' Forum, Staff Perspective,* at 5 (Feb. 2020), *https://www.ftc.gov/system/files/documents/report/staff-perspective-paper-ftcs-strictly-business-forum/strickly_business__forum_staff_perspective.pdf* (observing stakeholder concern about the high-cost of MCAs that can reach triple digit annual percentage rates).

[131] 15 U.S.C. 1601 *et seq.*

[132] New York State law will require, as of January 1, 2022, that providers of ''sales-based financing'' provide disclosures to borrowers which would include calculations of an estimated annual percentage rate in accordance with the Bureau's Regulation Z, 12 CFR part 1026. *See* New York S.898, section 803(c) (signed Jan. 6, 2021) (amending S.5470–B), *https://legislation.nysenate.gov/pdf/bills/2021/s898.* Similarly, California's Department of Financial Protection and Innovation is in the process of issuing a rule to implement a California law requiring disclosures by commercial financing companies, including those providing sales-based financing. *See* 10 Cal. Code Reg. 2057(a)(22) (defining sales-based financing as ''a commercial financing transaction that is repaid by a recipient to the financer as a percentage of sales or income, in which the payment amount increases and decreases according to the volume of sales made or income received by the recipient'' and including ''a true-up mechanism''); 10 Cal. Code Reg. 2065(a)(3) and 3001 (requiring sales-based financing providers disclosure estimated annual percentage rate according to Regulation Z, 12 CFR part 1026). Under these laws, providers of commercial financing generally will be required to disclose: (1) The total amount financed, and the amount disbursed if it is different from the total amount financed; (2) the finance charge; (3) the APR (or the estimated APR for sales-based financing and factoring transactions), calculated in accordance with TILA and Regulation Z; (4) the total repayment amount; (5) the term (or the estimated term for sales-based financing) of the financing; (6) periodic payment amounts; (7) prepayment charges; (8) all other fees and charges not otherwise disclosed; and (9) any collateral requirements or security interests. *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235;* N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B.*

[133] *See Fundbox/PYMNTS.com, The Trade Credit Dilemma,* at 11 (May 2019), *https://www.pymnts.com/wp-content/uploads/2019/05/Trade-Credit-Dilemma-Report.pdf* (estimating accounts payable for businesses with revenue of under $250,000 at $6.7 billion and for businesses with revenue of $250,000 to $999,000 at $44.6 billion).

[134] *Id.* The trade credit market is estimated to total $1.6 trillion across all business sizes in the United States. In the overall $1.4 trillion market size total for all small business financing products, the Bureau has included only the trade credit market for businesses of up to $1 million in revenue for consistency with its White Paper.

services without requiring immediate payment.

The Bureau estimates that there were approximately 8,100 financial institutions extending small business financing in 2019, almost 80 percent of which were depository institutions.

Based on FFIEC Call Report data for December 2019, the Bureau estimates that about 5,100 banks and savings associations are active in the small business lending market, out of a total of about 5,200 banks and savings associations.[135] The Bureau assumes that a bank or savings association is ''active'' in the market if it reports a positive outstanding balance of small loans, lines of credit, and credit cards to businesses.

Based on the NCUA Call Report data for December 2019, the Bureau estimates that about 1,200 out of 5,300 total credit unions were active in the small business lending market.[136] The Bureau defines a credit union as ''active'' in the market if it reported a positive number of originations of loans, lines of credit, and credit cards to members for commercial purposes in 2019.

The Bureau estimates that there are about 1,800 nondepository institutions active in the small business financing market,[137] accounting for around $550 billion in outstanding credit to small businesses.

The Bureau estimates that about 300 commercial finance companies are engaged in small business lending. By searching UCC filings, Manasa Gopal and Philipp Schnabl identified almost 300 commercial finance companies, including both independent and captive finance companies, with at least 1,500 small business loans between 2006 and 2016.[138] The Bureau also estimates there to be about 30 or more fintechs currently active in the small business lending market, not including MCA providers. Using the same methodology as for commercial finance companies, Gopal and Schnabl identified 19 fintech companies.[139] The Bureau conservatively increases this estimate to 30 to account for rapid growth in the industry from 2016 to 2019.

The Bureau estimates that 340 nondepository CDFIs are engaged in small business lending. Both depository and nondepository institutions can be CDFIs. Depository CDFIs are counted in the numbers of banks, savings associations, and credit unions engaged in small business lending. According to the CDFI fund, 487 nondepository funds (*i.e.,* loan funds and venture capital funds) reported as CDFIs in 2019.[140] Of these, 340 institutions reported that business finance or commercial real estate finance were a primary or secondary line of business in 2019.[141]

The Bureau estimates that about 270 nondepository mortgage lenders participated in the credit market for 5+ unit residential dwellings in 2019 and that about 50 of these institutions extended 25 or more of these loans to small businesses. In its ''2019 Multifamily Lending Report,'' the Mortgage Bankers Association lists annual multifamily lending volumes by institution, including a distinction for loans of under $1 million in value at origination.[142] Using the same small loan to business proxy as is used in the FFIEC Call Report, the Bureau estimates the number of nondepository mortgage lenders by counting the number of institutions that appear on this list that are not depository institutions and that extended at least 50 loans in 2019. The Bureau counts institutions extending at least 50 loans of any size in order to estimate institutions extending at least 25 small loans, based on the assumption that some 50 percent of these loans may have been for values greater than $1 million.

Based on data from UCC filings collected by deBanked.com, the Bureau estimates that about 100 institutions were active in the market for providing MCA products to small businesses in 2021.[143]

The Bureau estimates the number of factors to be between 700–900 and assumes that most factors are providing financing to small business.[144]

Finally, many government agencies and government-sponsored enterprises provide or facilitate a significant proportion of small business credit. As the flagship government lender, the Small Business Administration managed in 2019 a portfolio of over $140 billion in loans to small businesses, to which it added over $1 trillion in loans extended as part of the COVID–19 emergency lending programs. Across Federal, State, and municipal governments, the Bureau estimates that there are likely over 100 government small business lending programs.[145] Additionally, the Farm Credit System reports that, as of December 2019, the Farm Credit System contains a total of 72 banks and associations.[146] The Bureau assumes that all of these Farm Credit System institutions are engaged in lending to small farms.

[135] Calculated from FFIEC Call Report data accessed on June 8, 2021.

[136] 2019 NCUA Call Report. (One hundred twelve credit unions were not federally insured as of December 2019 but are included here as depository institutions. Calculated from NCUA Call Report data accessed on June 8, 2021.)

[137] There may also be cooperative or nonprofit lenders as well as equipment and vehicle finance dealers originating in their own name that are not captured by the Bureau in these figures. For example, by searching Uniform Commercial Code (UCC) filings, Manasa Gopal and Philipp Schnabl identified 19 cooperative lenders that originated at least 1,500 loans over the period from 2006 to 2016. Manasa Gopal & Philipp Schnabl, *The Rise of Finance Companies and FinTech Lenders in Small Business Lending,* N.Y.U. Stern Sch. of Bus., at 18 (May 13, 2020), *https://ssrn.com/abstract=3600068.* Additionally, these figures do not include trade creditors, which are non-financial companies that extend credit by allowing customers a period of time in which to pay and which are much greater in number since the practice is widespread across the economy.

[138] *Id. This figure combines* 192 independent finance companies with 95 captive finance companies. Since this estimate captures only those commercial finance companies averaging at least 150 loans per year over the 2006 to 2016 period, it may exclude smaller volume lenders and should be considered conservative.

[139] *Id.* Since this estimate captures only those fintechs averaging at least 150 loans per year over the 2006 to 2016 period, it may exclude smaller volume lenders and should be considered conservative. On the other hand, since 2019, the COVID–19 economic shock may have led to some fintechs scaling back or exiting the small business financing market. *See, e.g.,* Ingrid Lunden, *Amex Acquires SoftBank-backed Kabbage After Tough 2020 for the SMB Lender,* TechCrunch (Aug. 17, 2020), *https://techcrunch.com/2020/08/17/amex-acquires-softbank-backed-kabbage-after-tough-2020-for-the-smb-lender/* (noting that Kabbage temporarily shut down credit lines to small businesses during April 2020 and then spun off its small business loan portfolio when it was subsequently acquired by American Express).

[140] CDFI Fund, *CDFI Annual Certification and Data Collection Report (ACR): A Snapshot for Fiscal Year 2019,* at 8 (Oct. 2020), *https://www.cdfifund.gov/sites/cdfi/files/2021-01/ACR-Public-Report-Final-10292020-508Compliant.pdf.*

[141] *Id.* at 15–16.

[142] *See* Mortg. Bankers Ass'n, *Annual Report on Multi-Family Lending—2019,* at 9–66 (2020), *https://www.mba.org/store/products/research/general/report/2019-annual-report-on-multifamily-lending.*

[143] deBanked, *UCC–1 and UCC–3 Filings by Merchant Cash Advance Companies & Alternative Business Lenders, https://debanked.com/merchant-cash-advance-resource/merchant-cash-advance-ucc/* (last visited July 11, 2021).

[144] *See* Secured Fin. Found., *2019 Secured Finance: Market Sizing & Impact Study Extract Report,* at 15 (June 2019), *https://www.sfnet.com/docs/default-source/data-files-and-research-documents/sfnet_market_sizing___impact_study_extract_f.pdf?sfvrsn=72eb7333_2* (estimating the number of factors at between 700 and 900).

[145] In addition to several Federal small business lending programs, States and major municipalities also often have one or more programs of their own. One State and one municipal program in each State would already total 100 government lending programs across Federal, State, and municipal governments.

[146] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System,* at 7 (Feb. 28, 2020), *https://www.farmcreditfunding.com/ffcb_live/serve/public/pressre/finin/.pdf?assetId=395570.* The Bureau notes that Farm Credit System banks do not report FFIEC Call Reports and are thus not counted in the number of banks and savings associations discussed above.

*E. Challenges for Women-Owned and Minority-Owned Small Businesses*

Within the context of small business financing, women-owned and minority-owned businesses often face relatively more challenges than their counterparts. Specifically, women-owned and minority-owned small businesses can be even more susceptible to the impact of economic shocks and have a harder time accessing credit to survive and thrive in better times.

Although women-owned and minority-owned businesses are found in many industry sectors, women-owned businesses are concentrated in the health care and social assistance sector, while minority-owned businesses are primarily concentrated in the service sector, the healthcare and social assistance sector, and the administrative support, waste management and remediation sectors.[147] During economic downturns, such as the Great Recession and the financial crisis resulting from the COVID–19 pandemic, women-owned and minority-owned small businesses tend to fare worse than other small businesses. Women and minority business owners have been disproportionately hurt by the COVID–19 pandemic, with rates of business ownership dropping from February to April 2020 by 41 percent, 32 percent, and 26 percent for African American, Latinx, and Asian individuals, respectively, compared with 17 percent for white individuals.[148] Female business ownership declined by 25 percent, compared with 20 percent for male ownership.[149]

Women-owned and minority-owned small businesses often have smaller cash reserves on average, leaving them less able to weather downturns and credit crunches. For example, in February 2021, 39 percent of women-owned businesses had one month or less in cash reserves, compared with 29 percent of men-owned firms.[150] And in around 90 percent of majority Black and Hispanic communities, most businesses have fewer than 14 days of cash buffer, while this is true of only 35 percent of majority white communities.[151] As a result, many small businesses, especially those owned by women and minorities, may have had a greater need for financing just as small business lenders began to approve fewer loans in response to economic uncertainty. Loan approvals at smaller banks dropped from 50 percent pre-pandemic to 12 percent in April 2020 and have settled between 18 and 19 percent since June 2020; the trend is similar for large banks, credit unions, and fintechs.[152]

The PPP—part of the Federal government's response to the pandemic—helped to keep many small businesses afloat, but a number of factors prevented minority-owned small businesses from accessing PPP loans as easily as other firms. For example, established banking relationships between applicants and lending providers were often critical to approvals in early PPP underwriting;[153] many minority-owned businesses did not have such relationships.[154] Further, many minority-owned firms are sole proprietorships and independent contractors, both of which received delayed access to PPP loans.[155] Unprofitable non-employer firms were also initially barred from receiving loans.[156] Although Black-owned firms are more likely to use fintech providers, these lenders were only belatedly allowed to disburse PPP funds.[157] However, once fintech providers were allowed to disburse PPP loans, Black borrowers in particular benefited from this access, highlighting the ability of fintech firms to reach minority-owned business borrowers.[158]

Finally, applicants whose owners belong to protected categories may have received different credit outcomes when applying for PPP loans, although limitations in demographic information for PPP loans have hindered fair lending analyses.[159]

Given the severity of the COVID–19 pandemic for small businesses generally and its potentially disproportionate impact on women-owned and minority-owned small businesses, it is essential to better understand the small business financing landscape to maintain support for this key part of the U.S. economy both during and after the pandemic.

---

[147] White Paper at 12, 15.

[148] Robert Fairlie, Stanford Inst. for Economic Policy Research, Working Paper No. 20–022, *The Impact of COVID–19 on Small Business Owners: Evidence of Early Stage Losses from the April 2020 Current Population Survey,* at 5 (May 2020), *https://siepr.stanford.edu/sites/default/files/publications/20-022.pdf.* The authors define the rate of business ownership as the percentage of the labor force that owns and is actively employed in a business as their main job in the survey month. *Id.* at 3. As such, the decline in business ownership could reflect owners not only exiting the labor market but also switching to a different (wage and salary) job. In many cases, these exit or switching trends were temporary reactions to public health lockdowns and have since partially reversed.

[149] *Id.* at 6, 8.

[150] Eric Groves, *Cash Strapped SMBs, While 75% Of PPP Is Still Available,* Alignable (Feb. 9, 2021), *https://www.alignable.com/forum/alignable-road-to-recovery-report-february-2021?utm_campaign=February&utm_medium=Press&utm_source=Press.*

[151] JPMorgan Chase Inst., *Place Matters: Small Business Financial Health in Urban Communities,* at 5 (Sept. 2019), *https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-place-matters.pdf.*

[152] Biz2Credit, *Small Business Lending Index, https://www.biz2credit.com/small-business-lending-index* (last visited July 27, 2021).

[153] Sara Savat, *Who you know matters, even when applying for PPP loans,* The Source, Newsroom, Wash. Univ. in St. Louis (Feb. 15, 2021), *https://source.wustl.edu/2021/02/who-you-know-matters-even-when-applying-for-ppp-loans/* (previous lender relationship increased likelihood of obtaining a PPP loan by 57 percent). *See generally* 86 FR 7271, 7280 (Jan. 27, 2021) (noting that many banks restricted access to PPP loans to existing customers, which may run a risk of violating the ECOA and Regulation B).

[154] Claire Kramer Mills, Fed. Reserve Bank of N.Y., *Double Jeopardy: COVID–19's Concentrated Health and Wealth Effects in Black Communities,* at 6 (Aug. 2020), *https://www.newyorkfed.org/medialibrary/media/smallbusiness/DoubleJeopardy_COVID19andBlackOwnedBusinesses* (arguing that a lack of strong banking relationships among Black-owned firms may have led to relatively lower rates of access to PPP loans for such firms); Fed. Reserve Banks, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color,* at ii (Apr. 15, 2021), *https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color* (Small Business Credit Survey of Firms Owned by People of Color) (finding that "firms owned by people of color tend to have weaker banking relationships").

[155] Greg Iacurci, *Coronavirus loan program delayed for independent contractors and self-employed workers,* CNBC (Apr. 3, 2020), *https://www.cnbc.com/2020/04/03/delays-in-sba-loans-for-independent-contractors-self-employed-workers.html.*

[156] Stacy Cowley, *'It Was a Joke': Some Small Businesses Got $1 Relief Loans,* N.Y. Times (Jan. 11, 2021), *https://www.nytimes.com/2021/01/11/business/small-businesses-ppp-covid.html* (observing that sole proprietorships were initially eligible for PPP loans only if they were profitable); *see also* Stacy Cowley, *Minority Entrepreneurs Struggled to Get Small-Business Relief Loans,* N.Y. Times (Apr. 4, 2021), *https://www.nytimes.com/2021/04/04/business/ppp-loans-minority-businesses.html* (noting that sole proprietorships and independent contractor business structures are particularly prevalent among minority-owned businesses, which led to minority-owned businesses being disproportionately restricted from accessing PPP loans during initial roll-out of the program).

[157] Claire Kramer Mills, Fed. Reserve Bank of N.Y., *Double Jeopardy: COVID–19's Concentrated Health and Wealth Effects in Black Communities,* at 5–7 (Aug. 2020), *https://www.newyorkfed.org/medialibrary/media/smallbusiness/DoubleJeopardy_COVID19andBlackOwnedBusinesses.*

[158] Jessica Battisto *et al.,* Liberty Street Economics, Fed. Reserve Bank of N.Y., *Who Benefited from PPP Loans by Fintech Lenders?* (May 27, 2021), *https://libertystreeteconomics.newyorkfed.org/2021/05/who-benefited-from-ppp-loans-by-fintech-lenders.html.*

[159] Rocio Sanchez-Moyano, Fed. Reserve Bank of S.F., *Paycheck Protection Program Lending in the Twelfth Federal Reserve District* (Mar. 3, 2021), *https://www.frbsf.org/community-development/publications/community-development-research-briefs/2021/february/ppp-lending-12th-district/* (citing matched-pair audit studies that found discouragement and provision of incomplete information for minority business owners seeking PPP loans); 86 FR 7271, 7280 (Jan. 27, 2021) (noting that facially neutral PPP policies such as limiting loans to businesses with pre-existing relationships may run a risk of violating the ECOA and Regulation B due to a disproportionate impact on a prohibited basis).

*F. The Purposes and Impact of Section 1071*

The Dodd-Frank Act sets forth the Bureau's purposes and mission. It provides that a key component of the Bureau's fair lending work is to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[160] And in passing section 1071, Congress articulated two purposes for requiring the Bureau to collect data on small business credit applications and loans—to "facilitate enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[161] Although the Dodd-Frank Act does not further explain or clarify these dual statutory purposes, other Federal laws shed light on both purposes. That is, a set of existing Federal laws form the backdrop for the use of 1071 data to facilitate the enforcement of fair lending laws, and to identify business and community development needs of small businesses across the United States.

1. Facilitating Enforcement of Fair Lending Laws

Congress intended for section 1071 to "facilitate enforcement of fair lending laws,"[162] which include ECOA, the Home Mortgage Disclosure Act of 1975 (HMDA),[163] the Fair Housing Act (FHAct),[164] and other Federal and State anti-discrimination laws.

i. Equal Credit Opportunity Act (ECOA)

ECOA, which is implemented by Regulation B, applies to all creditors. Congress first enacted ECOA in 1974 to require financial institutions and other firms engaged in the extension of credit to "make credit equally available to all creditworthy customers without regard to sex or marital status."[165] Two years later, Congress expanded ECOA's scope to include age, race, color, religion, national origin, receipt of public assistance benefits, and exercise of rights under the Federal Consumer Credit Protection Act.[166]

ECOA makes it unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction (1) on the basis of race, color, religion, national origin, sex (including sexual orientation and gender identity),[167] marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.[168] In keeping with the broad reach of the statute's prohibition, Regulation B covers creditor activities before, during, and after the extension of credit.[169] Regulation B also bars creditors from making any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage, on a prohibited basis, a reasonable person from making or pursuing an application.[170] Regulation B also generally prohibits creditors from making inquiries about whether an applicant is a member of certain protected categories.[171]

The Bureau has recognized the following methods of proving lending discrimination under ECOA and Regulation B: Overt evidence of discrimination, evidence of disparate treatment, and evidence of disparate impact.[172] Overt evidence of discrimination exists when a creditor blatantly discriminates on a prohibited basis.[173] Disparate treatment occurs when a creditor treats an applicant differently based on a prohibited basis such as race or national origin.[174] Disparate impact occurs when a creditor employs facially neutral policies or practices that have an adverse effect or impact on a member of a protected class unless the facially neutral policies or practices meet a legitimate business need that cannot reasonably be achieved by means that are less disparate in their impact.[175]

Multiple Federal regulators can enforce violations of ECOA and Regulation B and apply various penalties. Enforcement and penalties for those who violate ECOA and Regulation B are set forth in 15 U.S.C. 1691e(b) and 12 CFR 1002.16. Violations may also result in civil money penalties, which are governed by 12 U.S.C. 5565(c)(3). The Bureau and multiple other Federal regulators have the statutory authority to bring actions to enforce the requirements of ECOA.[176] These regulators have the authority to engage in research, conduct investigations, file administrative complaints, hold hearings, and adjudicate claims through the administrative enforcement process regarding ECOA. Regulators also have independent litigation authority and can file cases in Federal court alleging violations of fair lending laws under their jurisdiction. Like other Federal regulators who are assigned enforcement authority under section 704 of ECOA, the Bureau is required to refer matters to the Department of Justice (DOJ) when it has reason to

[160] *See* 12 U.S.C. 5493(c)(2)(A) (directing the Office of Fair Lending and Equal Opportunity to provide "oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau," including ECOA and the Home Mortgage Disclosure Act).

[161] ECOA section 704B(a).

[162] *Id.*

[163] 12 U.S.C. 2801 *et seq.*

[164] 42 U.S.C. 3601 through 3619.

[165] Public Law 93–495, tit. V, section 502, 88 Stat. 1500, 1521 (1974).

[166] *See* Equal Credit Opportunity Act Amendments of 1976, Public Law 94–239, section 701(a), 90 Stat. 251, 251 (1976).

[167] In March 2021, the Bureau issued an interpretive rule clarifying that the scope of ECOA's and Regulation B's prohibition on credit discrimination on the basis of sex encompasses discrimination based on sexual orientation and gender identity, including discrimination based on actual or perceived nonconformity with sex-based or gender-based stereotypes and discrimination based on an applicant's associations. 86 FR 14363 (Mar. 16, 2021). *See also* Press Release, Bureau of Consumer Fin. Prot., *CFPB Clarifies That Discrimination by Lenders on the Basis of Sexual Orientation and Gender Identity Is Illegal* (Mar. 9, 2021), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-clarifies-discrimination-by-lenders-on-basis-of-sexual-orientation-and-gender-identity-is-illegal/*. The interpretive rule states that an example of discriminatory sex-based or gender-based stereotyping occurs if a small business lender discourages a small business owner appearing at its office from applying for a business loan and tells the prospective applicant to go home and change because, in the view of the creditor, the small business customer's attire does not accord with the customer's gender. 86 FR at 14365.

[168] 15 U.S.C. 1601 *et seq.*

[169] *See* Regulation B § 1002.4(a) and (b).

[170] *Id.* § 1002.4(b).

[171] *Id.* § 1002.5(b) through (d).

[172] *See* Bureau of Consumer Fin. Prot., *CFPB Bulletin 2012–04 (Fair Lending), Lending Discrimination* (Apr. 18, 2012), *https://files.consumerfinance.gov/f/201404_cfpb_bulletin_lending_discrimination.pdf* (Interagency Policy Statement on Discrimination in Lending) (concurring with Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending,* 59 FR 18266 (Apr. 15, 1994)).

[173] *See* Interagency Policy Statement on Discrimination in Lending at 18268.

[174] *See* Regulation B comment 4(a)–1 (stating that "[d]isparate treatment on a prohibited basis is illegal whether or not it results from a conscious intent to discriminate"); Bureau of Consumer Fin. Prot., *Equal Credit Opportunity Act (ECOA) Examination Procedures,* at 1 (Oct. 30, 2015), *https://files.consumerfinance.gov/f/documents/201510_cfpb_ecoa-narrative-and-procedures.pdf* (ECOA Examination Procedures); *see also* Interagency Policy Statement on Discrimination in Lending at 18268.

[175] *See* Regulation B comment 6(a)–2; ECOA Examination Procedures at 1; *see also* Interagency Policy Statement on Discrimination in Lending at 18269.

[176] These regulators include the OCC, the Board, the FDIC, the NCUA, the Surface Transportation Board, the Civil Aeronautics Board, the Secretary of Agriculture, the Farm Credit Administration, the Securities and Exchange Commission, the SBA, the Secretary of Transportation, the Bureau, and the FTC. *See* 15 U.S.C. 1691c; Regulation B § 1002.16(a).

believe that a creditor has engaged in a pattern or practice of lending discrimination.[177] Private parties may also bring claims under the civil enforcement provisions of ECOA, including individual and class action claims against creditors for actual and punitive damages for any violation of ECOA.[178]

ii. Home Mortgage Disclosure Act (HMDA)

HMDA, implemented by the Bureau's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to report detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. These reported data are a valuable resource for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There may be some overlap between what is required to be reported under HMDA and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses.

A violation of HMDA and Regulation C is subject to administrative sanctions, including civil money penalties. Compliance can be enforced by the Bureau, the U.S. Department of Housing and Urban Development (HUD), the FDIC, the Board, the National Credit Union Administration (NCUA), or the Office of the Comptroller of Currency (OCC). These regulators have the statutory authority to bring actions to enforce the requirements of HMDA and to engage in research, conduct investigations, file administrative complaints, hold hearings, and adjudicate claims through the administrative enforcement process regarding HMDA.

iii. Fair Housing Act (FHAct)

Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act, or FHAct), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion, sex (including sexual orientation and gender identity),[179] disability,[180] familial status, or national origin.[181] The Fair Housing Act[182] and its implementing regulations specifically prohibit discrimination in the making of loans,[183] the purchasing of loans,[184] and in setting the terms and conditions for making loans available,[185] without reference to consumers, legal entities, or the purpose of the loan being made, although these prohibitions relate exclusively to dwellings.[186] As with ECOA, the courts have recognized three methods of proof of lending discrimination under the FHAct: (1) Overt evidence of discrimination; (2) evidence of disparate treatment; and (3) evidence of disparate impact.[187]

The DOJ and HUD are jointly responsible for enforcing the Fair Housing Act. The Fair Housing Act authorizes the HUD Secretary to issue a Charge of Discrimination on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.[188] The DOJ may bring lawsuits where there is reason to believe that a person or entity is engaged in a "pattern or practice" of discrimination or where a denial of rights to a group of persons raises an issue of general public importance,[189] or where a housing discrimination complaint has been investigated by HUD, HUD has issued a Charge of Discrimination, and one of the parties to the case has "elected" to go to Federal court.[190] In FHAct cases, HUD and the DOJ can obtain injunctive relief, including affirmative requirements for training and policy changes, monetary damages and, in pattern or practice cases, civil penalties.[191]

Upon receipt of a complaint alleging facts that may constitute a violation of the FHAct or upon receipt of information from a consumer compliance examination or other information suggesting a violation of the FHAct, Federal executive agencies forward such facts or information to HUD and, where such facts or information indicate a possible pattern or practice of discrimination in violation of the FHAct, to the DOJ.[192] Private parties may also bring claims under the civil enforcement provisions of FHAct.[193]

iv. Other Fair Lending Laws

Several other Federal statutes seek to promote fair lending. The CRA seeks affirmatively to encourage institutions to help to meet the credit needs of the entire community served by each institution covered by the statute, and CRA ratings take into account lending discrimination by those institutions.[194] The Americans with Disabilities Act of 1990 prohibits discrimination against persons with disabilities in the provision of goods and services, including credit services.[195] Sections 1981[196] and 1982[197] of the Federal Civil Rights Acts are broad anti-discrimination laws that have been applied to many aspects of credit transactions.[198]

---

[177] *See* 15 U.S.C. 1691e(h).

[178] 15 U.S.C. 1691e(a); Regulation B §1002.16(b)(1).

[179] *See* U.S. Dep't of Hous. & Urban Dev., *Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act* (Feb. 11, 2021), *https://www.hud.gov/sites/dfiles/PA/documents/HUD_Memo_EO13988.pdf*.

[180] The Bureau uses the term "disability" to refer to what the FHA and its implementing regulations term a "handicap" because that is the preferred term. *See, e.g., Hunt* v. *Aimco Props., L.P.,* 814 F.3d 1213, 1218 n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[181] 42 U.S.C. 3601 through 3619, 3631.

[182] 42 U.S.C. 3605(b) (noting that for purposes of 3605(a), a "residential real estate-related transaction" includes the making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling, or transactions secured by residential real estate).

[183] 24 CFR 100.120.

[184] 24 CFR 100.125.

[185] 24 CFR 100.130.

[186] A "dwelling," as defined by the Fair Housing Act, is any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof. 42 U.S.C. 3602(b).

[187] *See* Interagency Policy Statement on Discrimination in Lending at 18268. *See also* 78 FR 11459, 11459 (Feb. 15, 2013) (stating that HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, "has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate").

[188] 42 U.S.C. 3610(g)(1) and (2).

[189] *See* 42 U.S.C. 3614(a).

[190] 42 U.S.C. 3612(o)(1).

[191] *See* 42 U.S.C. 3612, 3614.

[192] 59 FR 2939, 2939 (Jan. 17, 1994).

[193] *See* 42 U.S.C. 3613.

[194] *See* 12 U.S.C. 2901 *et seq.*

[195] *See* 42 U.S.C. 12101 *et seq.*

[196] 42 U.S.C. 1981(a).

[197] 42 U.S.C. 1982.

[198] *See, e.g., Jackson* v. *Novastar Mortg., Inc.,* 645 F. Supp. 2d 636 (W.D. Tenn. 2007) (motion to dismiss claim that defendants violated sections 1981 and 1982 by racial targeting and by offering credit on less favorable terms on the basis of race denied); *Johnson* v. *Equicredit Corp.,* No. 01–CIV–5197, 2002 U.S. Dist. LEXIS 4817 (N.D. Ill. Mar. 22, 2002) (predatory lending/reverse redlining case brought pursuant to section 1981); *Hargraves* v. *Cap. City Mortg. Corp.,* 140 F. Supp. 2d 7 (D.D.C. 2000) (predatory lending/reverse redlining case brought under both sections 1981 and 1982), *reconsideration granted in part, denied in part,* 147 F. Supp. 2d 1 (D.D.C. 2001) (section 1981 claim dismissed for lack of standing, but not section 1982 claim); *Doane* v. *Nat'l Westminster Bank USA,* 938

Many States and municipalities have also enacted fair lending, fair housing, and/or civil rights laws (often modeled on their Federal counterparts) that seek to broadly prohibit credit discrimination, including protections for business credit.[199] Some of these laws expressly enumerate protections beyond those expressly enumerated in the Federal statutes.[200]

v. Facilitating Enforcement

In order for the 1071 rule to facilitate enforcement of the fair lending laws discussed above, the Bureau believes that it must collect and make available sufficient data to help the public and regulators identify potentially discriminatory lending patterns that could constitute violations of fair lending laws. Financial regulators and enforcement agencies need a consistent and comprehensive dataset for all financial institutions subject to 1071 reporting in order to also use 1071 data in their initial prioritization, peer analysis, redlining reviews, and screening processes to select institutions for monitoring, examination, or investigation. Section 1071 data would facilitate more efficient fair lending examinations. For example, regulators could use pricing and other data to prioritize fair lending examinations—without such data, some financial institutions would face unnecessary examination burden while others whose practices warrant closer review would not receive sufficient scrutiny.

Moreover, as discussed in part V below, the Bureau believes specific aspects of its proposal offer particular benefits for the enforcement of fair lending laws. For example, the Bureau's proposal regarding transactional and institutional coverage would allow community groups and government agencies to include most of the small business financing market in fair lending analyses. The proposed inclusion of pricing data fields such as interest rate and fees would provide information on disparities in pricing outcomes, and data fields such as gross annual revenue, denial reasons, and time in business would allow for a more refined analysis and understanding of disparities in both underwriting and pricing outcomes. While 1071 data alone generally will not offer proof of compliance with fair lending laws, regulators, community groups, researchers, and financial institutions will be able to use 1071 data to identify potential disparities in small business lending based on disaggregated categories of race and ethnicity. Overall, the data collection under 1071 rule will allow, for the first time, for comprehensive and market-wide fair lending risk analysis.

2. Identifying Business and Community Development Needs

The second purpose of section 1071 is to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[201]

Section 1071 does not expressly define the phrase "business and community development needs." However, other Federal statutes and regulations, including the CRA and the Riegle Community Development and Regulatory Improvement Act of 1994,[202] reference or define the phrases "business development" and "community development" and can help explain what it means to enable communities, governmental entities, and creditors to "identify business and community development needs and opportunities."

The Bureau believes, based on its consideration of these other Federal statutes and regulations, that the proposed 1071 rule would provide more data to the public—including communities, governmental entities, and creditors—for analyzing whether financial institutions are serving the credit needs of their small business customers. In addition, with 1071 data, the public would be better able to understand access to and sources of credit in particular communities or industries, such as a higher concentration of risky loan products in a given community, and to identify the emergence of new loan products, participants, or underwriting practices. The data would not only assist in identifying potentially discriminatory practices, but would also contribute to a better understanding of the experiences that members within certain communities may share in the small business financing market.

i. Community Reinvestment Act (CRA)

The CRA, a part of the Housing and Community Development Act, was passed by Congress in 1977, which found that "regulated financial institutions have continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered." [203] As such, one of the statutory purposes of the CRA is to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions.[204]

The legislative history for the CRA suggests that the concerns motivating the Act's passage included certain practices by banks including redlining (*i.e.,* declining to extend credit in neighborhoods populated by ethnic or racial minorities) [205] and community

F. Supp. 149 (E.D.N.Y. 1996) (mortgage redlining case brought under sections 1981 and 1982); *Fairman* v. *Schaumberg Toyota, Inc.,* No. 94–CIV–5745, 1996 U.S. Dist. LEXIS 9669 (N.D. Ill. July 10, 1996) (section 1981 suit over allegedly predatory credit scheme targeting African Americans and Hispanics); *Steptoe* v. *Sav. of Am.,* 800 F. Supp. 1542 (N.D. Ohio 1992) (mortgage redlining case brought under sections 1981 and 1982 and the Fair Housing Act); *Evans* v. *First Fed. Sav. Bank of Ind.,* 669 F. Supp. 915 (N.D. Ind. 1987) (section 1982 can be used in mortgage lending discrimination case); *Assocs. Home Equity Servs.* v. *Troup,* 778 A.2d 529 (N.J. 2001) (predatory lending/reverse redlining case brought pursuant to section 1981).

[199] *See, e.g.,* Cal. Civ. Code 51 and 51.5 and Cal. Gov't Code 12955; Colo. Rev. Stat. 24–34–501(3) and 5–3–210; Conn. Gen. Stat. 46a-81e, 46a-81f, and 46a-98; Del. Code Ann. tit. 6, 4604; D.C. Code 2–1402.21; Haw. Rev. Stat. 515–3 and 515–5; 775 Ill. Comp. Stat. 5/1–102, 5/1–103, 5/4–102, 5/3–102, and 5/4–103; Iowa Code 216.8A and 216.10; Me. Rev. Stat. tit. 5, 4553(5–C) and (9–C), 4595 to 4598, and 4581 to 4583; Md. Code Ann. State Gov't 20–705, 20–707, and 20–1103; Mass. Gen. Laws ch. 151B, 4(3B), (14); Minn. Stat. 363A.03 (Subd. 44), 363A.09(3), 363A.16 (Subds. 1 and 3), and 363A.17; N.H. Rev. Stat. Ann. 354–A:10; N.J. Stat. Ann. 10:5–12(i); N.M. Stat. Ann. 28–1–7; N.Y. Civ. Rights Law 40-c(2); N.Y. Exec. Law 296–A; Or. Rev. Stat. 174.100(7) and 659A.421; R.I. Gen. Laws 34–37–4(a) through (c), 34–37–4.3, and 34–37–5.4; Va. Code Ann. 6.2–501(B)(1), 15.2–853, and 15.2–965; Vt. Stat. Ann. tit. 8, 10403 and tit. 9, 2362, 2410, and 4503(a)(6); Wash. Rev. Code 49.60.030, 49.60.040 (14), (26), and (27), 49.60.175, and 49.60.222; Wis. Stat. 106.50 and 224.77. There are also a number of municipalities that have enacted credit discrimination ordinances. *See, e.g.,* Austin City Code 5–1–1 *et seq.;* N.Y.C. Admin. Code 8–101 and 8–107 *et seq.;* S.F. Police Code 3304(a) *et seq.*

[200] *See, e.g.,* Mass. Gen. Laws ch. 151B, 4(3B) (prohibiting discrimination based on genetic information); N.J. Stat. Ann. 10:5–1 to 10:5–42 (same); D.C. Code 2–1401.02 and 2–1402.21 (extending protections from discrimination to domestic violence victims); Wis. Stat. 224.77 (same); N.Y. Exec. Law 296-a (prohibiting discrimination on the basis of military status) (credit transactions); N.Y. Exec. Law 296(5)(a) through (c) (same) (housing transactions); Wash. Rev. Code 49.60.176 (protecting veterans and honorably discharged service members); 775 Ill. Comp. Stat. 5/3–101 and 5/4–101 (prohibiting discrimination based on an applicant's unfavorable discharge from the military); 815 Ill. Comp. Stat. 140/1a (same). Several other State statutes also prohibit discrimination based on the geographic area of residence. *See, e.g.,* 815 Ill. Comp. Stat. 120/1 to 120/6; Iowa Code 535A.1 to 535A.9; Md. Code Ann., Com. Law 12–603 (West); Mich. Comp. Laws 445.1601 to 445.1614; Minn. Stat. 363A.09(3)(c); N.Y. Banking Law 9–f; Wash. Rev. Code 30.04.500 to 30.04.515.

[201] ECOA section 704B(a).

[202] Public Law 103–325, tit. I, section 102, 108 Stat. 2160, 2163 (1994) (12 U.S.C. 4701 through 4719).

[203] 12 U.S.C. 2901(a)(3).

[204] 12 U.S.C. 2901(b).

[205] *See* H.R. Rep. No. 561, 94th Cong., 1st Sess. 4 (1975) ("[The practice of redlining] increasingly

Continued

disinvestment (*i.e.,* taking deposits from lower-income areas, often populated by ethnic or racial minorities, without extending credit or banking services to residents of those areas).[206] The CRA requires the "appropriate Federal financial supervisory agency" of a given depository institution to "prepare a written evaluation of the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods." [207] These requirements were first implemented by a 1978 rulemaking,[208] and were amended in 1995 [209] and 2005.[210] These rulemakings, adopted by each of the agencies responsible for ensuring compliance with the CRA, established specific performance measures,[211] requiring banks to disclose information about small business, small farm and community development lending.[212]

The agencies tasked with ensuring compliance—including the OCC,[213] the Board,[214] and the FDIC [215]—evaluate each insured depository institution's record in helping meet the credit needs of its entire community.[216] Overall, the CRA and its regulations generate data that help agencies and the public at large identify instances of redlining, community disinvestment, and geographical areas that are "banking deserts." [217] The CRA regulations of the Board and the FDIC currently have the same definitions of "community development" that include banking and credit services that support the following: (1) Affordable housing for low- and moderate-income (LMI) individuals; [218] (2) community services for LMI individuals; [219] (3) activities that promote economic development by financing small business and small farms; [220] and (4) activities that revitalize or stabilize LMI geographies, disaster areas, and certain distressed or underserved middle-income areas based on other factors.[221]

In September 2020, the Board announced an advance notice of proposed rulemaking to update its CRA regulations, specifically to more effectively meet the needs of LMI communities and address inequities in credit access." [222] As part of this exercise, the Board requested feedback on potential revisions to its data collection and reporting requirements.[223] The Board suggested that more granular reporting of community development loan and investment data may be needed to aid community development and improve compliance with the CRA, noting that the lack of such data "means that there is no aggregate community development data at a local level available to create the local benchmarks for the community development financing metric." [224] As such, the publication of 1071 data would also be a useful resource for supporting community development efforts under the CRA.

In June 2020, the OCC promulgated a final rule that adopted a broader definition of "community development" than the one used by the Board and the FDIC.[225] However, in July 2021, the OCC announced that it was reconsidering the June 2020 revisions to its CRA regulations,[226] and that it may join the Board's consideration of proposed revisions to strengthen bank compliance with CRA regulations.[227]

ii. Community Development Financial Institution Fund (CDFI Fund)

The Riegle Community Development and Regulatory Improvement Act of 1994 authorized the CDFI Fund.[228] In passing that statute, Congress found that many of the Nation's urban, rural, and Native American communities face "critical social and economic problems arising in part from the lack of economic growth, people living in poverty, and the lack of employment and other opportunities." [229]

To address these problems, Congress created the CDFI Fund to "promote economic revitalization and community development" through investment in and assistance to CDFIs, including enhancing the liquidity of CDFIs.[230]

The concept of community development is central to the operation of the CDFI Fund. While CDFI Fund regulations do not directly define that term, any entity applying for CDFI certification must have "promoting community development" as its "primary mission." [231] In making this determination, the CDFI Fund considers whether the activities of the entity are purposefully directed toward improving the social and/or economic conditions of underserved people, which may include low-income persons or persons

---

has served to polarize elements of our society . . . . As polarization intensifies, neighborhood decline accelerates."), *reprinted in* 1975 U.S.C.C.A.N. 2303, 2305–06.

[206] Robert C. Art, *Social Responsibility in Bank Credit Decisions: The Community Reinvestment Act One Decade Later,* 18 Pac. L.J. 1071, 1076–77 & n.23 (1987) (citing 123 Cong. Rec. S8958 (daily ed. June 6, 1977), which stated that Sen. Proxmire, the congressional sponsor of the Act described redlining as "the fact that banks and savings and loans will take their deposits from a community and instead of reinvesting them in that community, they will invest them elsewhere, and they will actually or figuratively draw a red line on a map around the areas of their city," further noting that those lines are drawn "sometimes in the inner city, sometimes in the older neighborhoods, sometimes ethnic and sometimes black . . . .").

[207] 12 U.S.C. 2906(a)(1).

[208] 43 FR 47144 (Oct. 12, 1978).

[209] 60 FR 22156 (May 4, 1995).

[210] 70 FR 44256 (Aug. 2, 2005).

[211] 12 CFR 228.11.

[212] *See, e.g.,* 12 CFR 25.42, 228.11.

[213] 12 CFR part 25.

[214] 12 CFR part 228.

[215] 12 CFR parts 345, 195.

[216] Most specifically, that record is taken into account in considering an institution's application for deposit facilities, including mergers and acquisitions with other financial institutions and the opening of bank branches.

[217] OCC regulations define "CRA desert" as an area that has "significant unmet community development or retail lending needs" and where: (1) Few banks have branches or non-branch deposit-taking facilities, (2) There is "less retail or community development lending than would be expected based on demographic or other factors," or (3) The area "lacks community development organizations or infrastructure." 12 CFR 25.03.

[218] 12 CFR 228.12(g)(1), 345.12(g)(1).

[219] 12 CFR 228.12(g)(2), 345.12(g)(2).

[220] 12 CFR 228.12(g)(3), 345.12(g)(3).

[221] 12 CFR 228.12(g)(4), 345.12(g)(4).

[222] 85 FR 66410 (Oct. 19, 2020).

[223] *Id.* at 66459–63.

[224] *Id.* at 66462.

[225] The FDIC initially joined the OCC in issuing its early 2020 proposed rule to expand the definition of "community development" for purposes of CRA compliance, but it did not join the OCC in its issuance of a rule finalizing that proposal. *Compare* 85 FR 1204 (Jan. 9, 2020) (joint FDIC–OCC proposal to amend the agencies' respective CRA regulations), *with* 85 FR 34734 (June 5, 2020) (OCC final rule amending CRA regulations). The rule added to the range of activities that comprise "community development" for purposes of the OCC's revisions to the CRA regulations. Specifically, the OCC expanded the qualifying activities criteria to capture activities the OCC stated were consistent with the statutory purpose of the CRA but that generally did not receive credit under CRA regulations prior to the OCC's revisions, including certain activities in identified "areas of need beyond LMI areas (*i.e.,* underserved areas, distressed areas, disaster areas, Indian country and other tribal and native lands)" as well as those activities that "benefit a whole community, while maintaining an appropriate focus on LMI neighborhoods." 85 FR 34734, 34735 (June 5, 2020); *see also* 12 CFR 25.04(a)(1) (stating that a retail loan, a community development loan, a community development investment, or a community development service "that helps to meet the credit needs of a bank's entire community, including low- and moderate-income communities, is a qualifying activity if it meets the criteria in this section at the time the activity is originated, made, or conducted"); 12 CFR 25.04(b)(3) (listing 12 sets of activities that qualify as community development loans, investments and services).

[226] Off. of the Comptroller of the Currency, *OCC Statement on Rescinding its 2020 Community Reinvestment Act Rule* (News Release 2021–76) (July 20, 2021), *https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-76.html* (stating that the OCC will propose rescinding its June 2020 CRA final rule).

[227] *Id.* (noting the crucial nature of strengthening the CRA jointly with the Board and FDIC and signaling intention to issue a joint notice of proposed rulemaking building on the ANPR proposed by the Board in September 2020).

[228] 12 U.S.C. 4701(b).

[229] 12 U.S.C. 4701(a)(1).

[230] 12 U.S.C. 4701(b).

[231] 12 CFR 1805.201(b)(1).

who lack adequate access to capital and financial services and residents of economically distressed communities.[232]

The CDFI Fund collects data from the recipients of its financial and technical assistance, shedding some light on the extent of community development in the areas where CDFIs operate.[233] The CDFI Fund also publishes the data it receives with appropriate redactions to protect privacy interests.[234] However, given that CDFIs comprise a relatively small share of the overall small business lending market, section 1071 would materially enhance understanding of the broader extent of community development outside of areas where CDFIs already operate. The data from a 1071 rulemaking would also likely augment the data the CDFI Fund already receives.

3. Potential Impact of Section 1071 Data

A section 1071 rule would provide on an annual basis application-level data on small business credit, including certain protected demographic information about applicants and their principal owners. This would include information on applications for credit that are originated, as well as those that are denied, withdrawn, incomplete, or approved by the financial institution but not accepted by the applicant. This information would enable stakeholders of all kinds in the small business lending market to gain unprecedented insight into trends in small business lending, specifically with respect to women-owned and minority-owned small businesses. It would also provide insight into the interaction of supply and demand over time.

In terms of facilitating fair lending enforcement, interested government agencies and other stakeholders would be able to use 1071 data to analyze potential instances of practices resulting in the disparate treatment of or disparate impact on women- and minority-owned small businesses, using statistical methods to identify possible fair lending risks.

Regarding the identification of business and community development needs, the data that would be made available by the Bureau under this rulemaking, if finalized as proposed, would help government entities and public and private lenders identify and target sub-segments of the market that remain underserved, facilitating entrepreneurship and business development in those communities.

The advancement of both statutory purposes of section 1071—facilitating fair lending enforcement and identifying business and community development needs—in turn will support small businesses across all sectors of the economy, which are fundamental to the economic health of the U.S. and which have been hard hit by recent economic and financial crises. The use of data that would be provided pursuant to regulations under section 1071 can both support the underlying purposes of section 1071 and help the economy as a whole. For example, according to one estimate, fair and equitable lending to Black entrepreneurs could have added $13 trillion in business revenue over the last 20 years and created 6 million jobs.[235] As the economy recovers from the effects of the COVID–19 pandemic, data collected and published pursuant to regulations implementing section 1071 would help to support equitable and sustainable growth and prosperity in all communities in the U.S.

4. Bureau Priorities

On June 2, 2021, the Bureau announced as priorities action to address issues of pervasive racial injustice and the long-term economic impacts of the COVID–19 pandemic on consumers.[236] The Acting Director explained that the Bureau will use all of its tools and authority—including rulemaking—to protect and fight for fairness for all consumers in financial markets.[237] The Bureau believes that implementing the section 1071 data collection, maintenance, and reporting obligations established in the Dodd-Frank Act would advance those priorities.

Congress enacted section 1071 for the purposes of facilitating enforcement of fair lending laws, and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. The Bureau believes that 1071 data will come to play an important role as HMDA data have done for the mortgage market. HMDA data have provided lenders, community groups, and others the tools to identify and address fair lending risks and strengthen fair lending oversight and enforcement. In a similar way, section 1071 data will allow diverse stakeholders to analyze lending patterns that are potentially discriminatory. By identifying and addressing discriminatory small business lending practices, the Bureau will help to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.

HMDA data have also proven effective in creating transparency in the mortgage market that improves the understanding of credit needs, where they may remain unmet, and the relationship between mortgage lending and community development. The Bureau believes that the 1071 data will provide the Bureau and other stakeholders with critical insights into the small business lending market. The current COVID–19 pandemic has shown that transparency is essential at a time of crisis, when small businesses, especially those owned by women and minorities, may be in urgent need of credit in order to recover from the economic shocks. As at least one SER suggested, a 1071 rule would help lenders across the country better connect underserved entrepreneurs to working capital and resources in order to build a more inclusive economy.

## III. Outreach

In the years leading up to the release of this proposed rule, the Bureau held over 100 outreach meetings with financial institutions, trade associations, community groups, researchers, governmental entities, and other stakeholders regarding the 1071 rulemaking. The Bureau also took a number of other steps, beyond individual stakeholder meetings, to solicit feedback more broadly from the public on a 1071 rule.

*Request for information, field hearing, and White Paper on small business lending.* On May 10, 2017, the Bureau published a request for information (RFI) regarding the small business lending market[238] in which it sought public comment to understand more about the products that are offered to small businesses, the financial institutions that offer such credit, the small business lending data that currently are used and may be maintained by financial institutions, the potential complexity and cost of small business data collection and reporting,

---

[232] *Id.*

[233] 12 CFR 1805.803(e) (requiring recipients of technical and financial assistance to provide to the CDFI Fund certain information and documentation).

[234] 12 CFR 1805.803(e)(4).

[235] Citigroup, Citi GPS: Global Perspectives & Solutions, *Closing the Racial Inequality Gaps: The Economic Cost of Black Inequality in the U.S.,* at 4 (Sept. 2020), *https://ir.citi.com/NvIUklHPilz14Hwd3oxqZBLMn1_XPqo5FrxsZD0x6hhil84ZxaxEuJUWmak51UHvYk75VKeHCMI%3D.*

[236] Blog post, Dave Uejio, Acting Director, Bureau of Consumer Fin. Prot., *Addressing racial inequities in consumer finance markets* (June 2, 2021), *https://www.consumerfinance.gov/about-us/blog/addressing-racial-inequities-consumer-finance-markets/.*

[237] *See* Bureau of Consumer Fin. Prot., *https://www.consumerfinance.gov/about-us/racial-equity/.*

[238] 82 FR 22318 (May 15, 2017).

and privacy concerns related to the disclosure purposes of section 1071.[239] On the same date, the Bureau held a field hearing regarding section 1071 at which the RFI was announced and then-Director Richard Cordray noted the importance of a section 1071 rulemaking given the absence of systematic data on how small businesses are faring and whether or how much they are being held back by financing constraints.[240] Finally, at the same time, the Bureau also published its White Paper on small business lending,[241] which reflected the initial findings of the Bureau's research providing a preliminary understanding of the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses.

*1071 Symposium.* In November 2019, the Bureau held a symposium on section 1071 to assist the Bureau in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and government experts in the small business lending arena.[242] The symposium had two panels. The first panel focused on the evolution in the small business lending marketplace. The second panel included a discussion surrounding the implementation of section 1071, including issues raised in response to the Bureau's RFI.

*Small Business Advisory Review Panel.* Under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[243] which amended the Regulatory Flexibility Act (RFA), the Bureau must convene and chair a Small Business Advisory Review Panel (Panel) if it is considering a proposed rule that could have a significant economic impact on a substantial number of small entities.[244] The Panel considers the impact of the proposals under consideration by the Bureau and obtains feedback from representatives of the small entities that would likely be subject to the rule. The Panel is comprised of a representative from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration (SBA), and a representative from the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB). Representatives from 20 small businesses were selected as small entity representatives (SERs) for this SBREFA process. These SERs were representatives of small businesses that are financial institutions that would likely be directly affected by a 1071 rule. These SERs did *not* represent the small business applicants for credit about whom information would be collected and reported under a 1071 rule.

On September 15, 2020, the Bureau issued its Outline of Proposals under Consideration and Alternatives Considered (Outline or SBREFA Outline) for the section 1071 rulemaking, a detailed document that discusses (1) the relevant law, (2) the regulatory process, (3) the rule proposals the Bureau was considering, and (4) an economic analysis of the potential impacts of those proposals on directly affected small entities.[245]

The Bureau convened the Panel for this proposed rule on October 15, 2020 and held a total of four meetings with SERs during October 19–22, 2020, conducted online via video conference (Panel Outreach Meetings). In preparation for the Panel Outreach Meetings and to facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the SERs were included throughout the Bureau's Outline.[246]

In advance of the Panel Outreach Meetings, the Bureau, SBA's Office of Advocacy, and OIRA held a series of video conferences with the SERs to describe the Small Business Review Process, obtain important background information about each SER's current business practices, and begin discussions on selected portions of the proposals under consideration.

All 20 SERs participated in the Panel Outreach Meetings. Representatives from the Bureau, SBA's Office of Advocacy, and OIRA provided introductory remarks. The meetings were then organized around discussions led by the Bureau about each aspect of the proposals under consideration and the potential impact on small businesses. The Bureau also invited SERs to submit written feedback by November 9, 2020; most SERs did so.

On December 15, 2020, the Bureau released the Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking.[247] This report includes a summary of the feedback received from SERs during the panel process (including oral feedback received during the pre-Panel video conferences and Panel Outreach Meetings, as well as timely submitted written feedback) and findings and recommendations made by the Panel.[248] As required by the RFA, the Bureau considers the Panel's findings in its initial regulatory flexibility analysis, as set out in part VIII below.

The Bureau also invited other stakeholders to submit feedback on the SBREFA Outline by December 14, 2020. The Bureau received approximately 60 submissions from a variety of other stakeholders, including financial institutions, trade associations,

[239] In response to the RFI, the Bureau received over 2,000 comments in total, and over 100 unique comments offering detailed substantive responses on the topics raised in the RFI. These comments from the public helped to inform the Bureau's approach in its SBREFA Outline. *See* Bureau of Consumer Fin. Prot., *Request for Information Regarding the Small Business Lending Market,* Docket ID CFPB–2017–0011, *https://www.regulations.gov/docket/CFPB-2017-0011.*

[240] *See* Bureau of Consumer Fin. Prot., *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017), *https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.*

[241] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), *https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.*

[242] Bureau of Consumer Fin. Prot., *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), *https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.*

[243] Public Law 104–121, 110 Stat. 857 (1996).

[244] 5 U.S.C. 609(b).

[245] Bureau of Consumer Fin. Prot., *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf* (SBREFA Outline). *See also* Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Releases Outline of Proposals Under Consideration to Implement Small Business Lending Data Collection Requirements* (Sept. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-releases-outline-proposals-implement-small-business-lending-data-collection-requirements/.*

[246] These questions also appeared in a shorter Discussion Guide for Small Entity Representatives. *See* Bureau of Consumer Fin. Prot., *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Discussion Guide for Small Entity Representatives* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_discussion-guide_2020-09.pdf.*

[247] Bureau of Consumer Fin. Prot., *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (Dec. 14, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf* (SBREFA Panel Report). *See also* Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Releases Report on Implementing the Dodd-Frank Act's Small Business Lending Data Collection Requirement* (Dec. 15, 2020), *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-report-on-implementing-the-dodd-frank-acts-small-business-lending-data-collection-requirement/.* The Bureau's SBREFA Outline and related materials, as well as the Bureau's presentation slides framing the discussion during the Panel Outreach Meetings, are appended to the SBREFA Panel Report. *See* SBREFA Panel Report at app. C through F.

[248] The written feedback from SERs is appended to the Panel Report. *See id.* at app. A.

community groups, a think tank, and a government agency.[249] Feedback from these other stakeholders was not considered by the Panel and is not reflected in the Panel Report.

The Bureau has considered the feedback it received from SERs, the findings and recommendations of the Panel, and the feedback from other stakeholders in preparing this proposed rule. The feedback, findings, and recommendations are summarized throughout this notice where relevant.

*One-Time Cost Survey.* On July 22, 2020, the Bureau released a voluntary survey to measure the one-time costs of compliance with an eventual small business lending data collection rule.[250] The objective of the survey was to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. The survey did not cover potential on-going costs from actually collecting and reporting 1071 data, and assumed that reporting was required only for the 13 statutorily required data points and that compliance with the statutory firewall requirement was not required.[251] The deadline for responses was October 16, 2020. The Bureau received responses from 105 financial institutions.[252] The results of the survey inform the Bureau's analyses of the potential impacts of the proposed rule as set out in parts VII and VIII below.

*ECOA request for information.* On July 28, 2020, the Bureau issued a request for information to seek public input on ECOA and Regulation B.[253] In the RFI, the Bureau sought public comment on a number of topics, including small business lending and the ways that the Bureau, in light of its authority under ECOA and Regulation B, might support efforts to meet the credit needs of small businesses, particularly those that are minority-owned and women-owned.[254]

*Ongoing market monitoring.* The Bureau conducts outreach to industry and other stakeholders to understand their experiences with the small business finance market, economic conditions, and the collection and reporting of data regarding that market. A particular near-term priority in the Bureau's recent market monitoring has been the impacts of the pandemic and the effectiveness of the Federal government response. Findings from market monitoring activities inform the Bureau on matters affecting the small business sector.

*Technical outreach.* In the months before the publication of this proposed rule, the Bureau began conducting technical outreach with third party software providers that serve financial institutions and software and technology staff from financial institutions that are likely to have to report 1071 data to the Bureau. With these software vendors and technical staffs, the Bureau has held and, after publication of this proposed rule, will continue to hold discussions concerning the technical systems and procedures the Bureau will provide to collect 1071 data. The Bureau intends to understand the technology solutions currently provided by vendors to support the small business lending activities of financial institutions. The Bureau believes this information will be helpful in informing the Bureau in its design and implementation of a platform for intake and processing of 1071 data to help the platform integrate, to the degree possible, with existing systems and data collection procedures. These meetings also serve to raise awareness of technology providers as to their potential future role in supporting the 1071 rule as well as the lead time that may be necessary for some or all affected financial institutions to come into compliance with the requirements of a final section 1071 rule. The feedback that the Bureau is gathering is purely technical in nature. This outreach process is ongoing and will continue throughout the rulemaking.

## IV. Legal Authorities

The Bureau is issuing this proposed rule pursuant to its authority under section 1071. Some aspects of this rule are also proposed under the Bureau's more general rulemaking authorities in ECOA. Congress enacted ECOA to prohibit discrimination against any applicant, regarding any aspect of a credit transaction, on the basis of, amongst other things, race, color, national origin, and sex.[255] The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.

ECOA is implemented in Regulation B.[256] Among other things, Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including if it is required by law.[257]

As discussed above, in the Dodd-Frank Act Congress amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. Specifically, section 1071 requires financial institutions to collect and report to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[258] Congress enacted section 1071 for the purpose of (1) facilitating enforcement of fair lending laws and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[259] The Bureau often refers to these as section 1071's fair lending purpose and its business and community development purpose, respectively.

To advance these statutory purposes, section 1071 grants the Bureau general rulemaking authority for section 1071, providing that the Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.[260] ECOA section 704B(g)(2) also permits the Bureau to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau principally relies on its 704B(g)(1) authority in this proposed rule and relies on 704B(g)(2) when proposing specific exceptions or exemptions to section 1071's requirements. Section 704B(g)(3) directs the Bureau to issue guidance designed to facilitate compliance with the requirements of section 1071.

In addition, section 703(a) of ECOA gives the Bureau broad authority to prescribe regulations to carry out the purposes of ECOA, including provisions

[249] Feedback received from these stakeholders on the SBREFA Outline will be placed on the public docket for this notice.

[250] Bureau of Consumer Fin. Prot., *Survey: Small Business Compliance Cost Survey* (July 22, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-survey_2020-10.pdf.*

[251] *Id.* at 1.

[252] See part VI below for additional details regarding this survey.

[253] Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Requests Information on Ways to Prevent Credit Discrimination and Build a More Inclusive Financial System* (July 28, 2020), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-rfi-prevent-credit-discrimination-build-more-inclusive-financial-system/.*

[254] 85 FR 46600, 46602 (Aug. 3, 2020).

[255] 15 U.S.C. 1691(a)(1).

[256] 12 CFR part 1002.

[257] Regulation B § 1002.5(a)(2).

[258] ECOA section 704B.

[259] ECOA section 704B(a).

[260] ECOA section 704B(g)(1).

that in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. That section also states that the Bureau may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

Section 1071 establishes requirements or obligations for financial institutions that the Bureau would implement in this proposed rule. These provisions include the requirement in ECOA section 704B(b) that a financial institution shall inquire whether an applicant for credit is a women-owned, minority-owned, or small business; that a financial institution must maintain a record of responses to such inquiry, separate from the application; that an applicant may refuse to provide any information requested regarding the inquiry under 704B(b); that a financial institution must limit access of loan underwriters, or other officers or employees of the financial institution or any affiliate, to applicant responses to inquiries under 704B(b); and that if a financial institution determines that a loan underwriter or other officer or employee should have access to any information provided by the applicant pursuant to a request under 704B(b) that the financial institution shall provide notice to the applicant of the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information.[261]

ECOA section 704B(e)(1) directs financial institutions to compile and maintain, in accordance with regulations of the Bureau, records of the information provided by applicants for credit pursuant to a request under 704B(b). Section 704B(e)(2) requires that the information compiled and maintained under 704B(e)(1) be itemized in order to clearly and conspicuously disclose an enumerated list of data points. Section 704B(e)(2)(H) requires financial institutions to compile and maintain any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071.

Several provisions of section 1071 expressly refer to regulations that the Bureau shall promulgate to implement certain requirements, including in ECOA section 704B(e)(1) regarding how financial institutions must compile and maintain data pursuant to section 1071, and in 704B(f)(2)(B) and (C) regarding the form of information made available by financial institutions to the public and the form and manner in which the Bureau itself should make 1071 data available to the public generally.

Two provisions expressly give the Bureau discretion with respect to public availability of 1071 data. Specifically, ECOA section 704B(e)(4) states that the Bureau may, at its discretion, delete or modify 1071 data before making it available to the public if the Bureau determines that the deletion or modification of the data would advance a privacy interest. Section 704B(f)(3) gives the Bureau the discretion to compile and aggregate 1071 data for its own use, as well as to make public such compilations of aggregate data.

## V. Section-by-Section Analysis

*Overview*

In this *Overview* of part V, the Bureau first provides an overview of section 1071 and then a brief summary of the proposed rule. Each provision, along with its rationale and relevant feedback received through the SBREFA process, is discussed in detail in the section-by-section analyses that follow. The Bureau's proposed rule is largely consistent with, though more detailed than, its proposals under consideration in the SBREFA Outline. However, the Bureau has altered or refined its approach since SBREFA in certain respects, which are noted in the summary of the proposed rule below and discussed in detail in the section-by-section analyses that follow.

Next, the Bureau discusses the high-level and general comments regarding this rulemaking that it received from SERs and other stakeholders on its SBREFA Outline. Finally, the Bureau addresses several issues for which there is no proposed regulatory text or commentary.

The Bureau seeks comment on its proposed approach to implementing section 1071. Requests for comment on each provision and on particular issues are included throughout the section-by-section analyses in this part V.

*A. Overview of Section 1071*

As discussed above, section 1071 of the Dodd-Frank Act requires that financial institutions collect and report to the Bureau certain data regarding applications for credit for women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the Bureau to require any additional data that the Bureau determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain 1071 data and publication of 1071 data. In addition, section 1071 permits the Bureau, at its discretion, to modify or delete data prior to publication if it determines that such a deletion or modification would advance a privacy interest.

Section 1071 directs the Bureau to prescribe such rules, and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. It also permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. Section 1071 also directs the Bureau to issue guidance designed to facilitate compliance with the requirements of section 1071. As discussed in part IV above and throughout the section-by-section analyses in this part V, most of the Bureau's proposal is dedicated to implementing these statutory provisions.

*B. Section 1071 in the Context of HMDA*

The Bureau's proposal for implementing section 1071 necessarily exists against the backdrop of HMDA[262] (as discussed in part II.F.1.ii above). With the passage of the Dodd-Frank Act in 2010, Congress enacted section 1071 at the same time that it amended HMDA and transferred HMDA rulemaking authority and other functions to the Bureau. HMDA is a data collection and reporting statute that requires certain depository institutions and for-profit nondepository institutions to collect, report, and disclose data about originations and purchases of mortgage loans, as well as mortgage loan applications that do not result in originations (for example, applications that are denied or withdrawn). The Bureau's Regulation C, 12 CFR part

[261] ECOA section 704B(b)(1), (b)(2), (c), (d)(1) and (2).

[262] 12 U.S.C. 2801 *et seq.*

1003, implements HMDA. In light of the similarities between 1071 and HMDA, the Bureau's section-by-section analyses in this part V often discusses how similar provisions are addressed in the context of HMDA.

HMDA's purposes are: (1) To help determine whether financial institutions are serving their communities' housing needs; (2) to assist public officials in distributing public investment to attract private investment; and (3) to assist in identifying potential discriminatory lending patterns and enforcing antidiscrimination statutes.

A covered institution for purposes of HMDA reporting is a depository or nondepository institution that meets the relevant coverage criteria set forth in the regulation. A depository institution is required to comply with Regulation C if it meets the asset-size threshold, location test, loan activity test, federally related test, and the loan-volume threshold for either closed-end loans or open-end lines of credit set forth in the regulation. A nondepository institution is required to comply with Regulation C if it meets the location test and the loan-volume threshold for either closed-end loans or open-end lines of credit set forth in the regulation.

A covered transaction under HMDA is generally a loan or line of credit secured (or, for applications, proposed to be secured) by a lien on a dwelling, that is not specifically excluded under Regulation C § 1003.3(c). The data points generally required to be reported about each covered transaction can be grouped into four broad categories: [263]

- Information about the applicants, borrowers, and underwriting process, such as ethnicity, race, and sex of the applicant,[264] the applicant's gross income and debt-to-income ratio, the application channel, action taken, and, if applicable, reason(s) for denial.
- Information about the property securing the loan or proposed to secure the loan, such as census tract and other property location information, construction method, property value, and additional information about manufactured and multifamily housing.
- Information about the features of the loan, such as the loan type, pricing information (including interest rate and origination charges), loan term, introductory rate period, and non-amortizing features.
- Certain unique identifiers, such as a universal loan identifier, loan originator identifier, and a legal entity identifier for the financial institution.

Covered institutions are required to submit their HMDA data by March 1 following the calendar year for which data are collected. Covered institutions with larger volumes of covered loans and applications are required to submit their HMDA data for each of the first three quarters of the year in addition to their annual submission.

Following the calendar year in which HMDA data are collected, a covered institution's disclosure statement [265] and modified loan/application register (LAR) become publicly available on the FFIEC's HMDA Platform.[266] In addition, aggregate reports for each Metropolitan Statistical Area and Metropolitan Division that show lending patterns by property location, age of housing stock, and income level, sex, ethnicity, and race become publicly available.

HMDA data are the primary source of information for regulators, researchers, economists, industry, and advocates analyzing the mortgage market both for HMDA's purposes and for general market monitoring. HMDA data are used by the Federal supervisory agencies to support a variety of activities. For example, Federal supervisory agencies use HMDA data as part of their fair lending [267] examination process, and also use HMDA data in conducting Community Reinvestment Act [268] performance evaluations. HMDA disclosures provide the public with information on the home mortgage lending activities of particular reporting entities and on activity in their communities. These disclosures are used by local, State, and Federal officials to evaluate housing trends and issues and by community organizations to monitor financial institution lending patterns.

*C. Summary of the Proposed Rule*

The Bureau is proposing to add a new subpart B to Regulation B to implement the requirements of section 1071 and to make conforming amendments to existing Regulation B. The Bureau's proposal is summarized below, in the order of the section-by-section analyses in this part V that follow.

1. General Provisions (§§ 1002.5(a)(4), 1002.101, and 1002.102)

*Changes to existing Regulation B (§ 1002.5(a)(4)).* The Bureau is proposing to amend existing § 1002.5(a)(4) to expressly permit voluntary collection and reporting of information regarding the ethnicity, race, and sex of applicants' principal owners, or whether the applicant is a minority-owned business or a women-owned business, in certain circumstances.

*Scope, purpose, and authority (§ 1002.101).* The Bureau is proposing in § 1002.101 to set forth the authority, purpose, and scope for proposed subpart B. Among other things, this proposed section would set forth section 1071's two statutory purposes of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

*Definitions (§ 1002.102).* The Bureau is proposing in § 1002.102 a number of definitions for terms used in proposed subpart B, which generally fall into several categories. First, some proposed definitions refer to terms defined elsewhere in proposed subpart B—specifically, terms of particular importance including business, covered application, covered credit transaction, covered financial institution, financial institution, and small business. Second, some proposed definitions refer to terms defined elsewhere in existing Regulation B (*i.e.,* business credit, credit, and State) or other regulations (*i.e.,* the definition of dwelling and a portion of the definition of affiliate reference Regulation C and an SBA regulation, respectively). Finally, the remaining terms are defined in proposed § 1002.102, including

[263] Under the Economic Growth, Regulatory Relief, and Consumer Protection Act, Public Law 115–174, 132 Stat. 1296 (2018), as implemented in Regulation C § 1003.3(d), certain HMDA-covered institutions may be eligible for partial exemptions from some of the HMDA reporting requirements and only certain covered loans and applications are covered under partial exemptions. If a covered loan or application is covered under a partial exemption, the covered institution is not required to collect, record, and report certain data points.

[264] As with section 1071, collection of an applicant's ethnicity, race, and sex under HMDA is an exception to the general prohibition on inquiring into protected demographic information in existing § 1002.5(b).

[265] A disclosure statement contains aggregated data derived from loan-level data.

[266] A HMDA LAR contains the record of information required to be collected and the record submitted annually or quarterly, as applicable. A modified LAR is a covered institution's LAR modified by the Bureau, on its website, to protect applicant and borrower privacy. The Bureau interprets HMDA, as amended by the Dodd-Frank Act, to call for the use of a balancing test to determine whether and how HMDA data should be modified prior to its disclosure to the public in order to protect applicant and borrower privacy while also fulfilling HMDA's public disclosure purposes. *See* 80 FR 66127, 66133–34 (Oct. 28, 2015). In December 2018, the Bureau issued final policy guidance describing the modifications the Bureau intends to apply to the loan-level HMDA data that covered institutions report before the data are disclosed publicly. *See* 84 FR 649 (Jan. 31, 2019).

[267] *See* ECOA (15 U.S.C. 1691 through 1691f), Regulation B, 12 CFR part 1002, and FHA, 42 U.S.C. 3605, 24 CFR part 100.

[268] 12 U.S.C. 2901 through 2908, and 12 CFR parts 25, 195, 228, and 345.

applicant, closed-end credit transaction, minority individual, minority-owned business, open-end credit transaction, principal owner, small business lending application register, women-owned business, and a portion of the definition of affiliate.

2. Coverage (§§ 1002.103 Through 1002.106)

*Covered applications (§ 1002.103).* The Bureau is proposing § 1002.103 to define what is, and is not, a covered application under proposed subpart B; this definition would trigger the data collection and reporting requirements under subpart B for covered financial institutions. The Bureau is proposing to define a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. The Bureau is also proposing that a covered application does not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; and (2) inquiries and prequalification requests.

*Covered credit transactions (§ 1002.104).* The Bureau is proposing to require that covered financial institutions collect and report data for all covered applications from small businesses for transactions that meet the definition of business credit under existing Regulation B, with certain exceptions. The Bureau is proposing § 1002.104(a) to define the term covered credit transaction as an extension of business credit that is not an excluded transaction under proposed § 1002.104(b). Loans, lines of credit, credit cards, and MCAs (including such credit transactions for agricultural purposes and those that are also covered by HMDA'' [269] (that is, HMDA-reportable transactions)) would all fall within the scope of this proposed rule. The Bureau is proposing in § 1002.104(b) to exclude from the requirements of proposed subpart B trade credit, public utilities credit, securities credit, and incidental credit. Factoring, leases, consumer-designated credit used for business purposes, and credit secured by certain investment properties would also not be covered credit transactions.

*Covered financial institutions (§ 1002.105).* The Bureau is proposing to define in § 1002.105(a) the term financial institution, consistent with the definition in section 1071, as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. Under this proposed definition, proposed subpart B's requirements would apply to a variety of entities that engage in small business lending, including depository institutions (*i.e.,* banks, savings associations, and credit unions), online lenders, platform lenders, CDFIs, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit nondepository lenders. The Bureau is not proposing to cover motor vehicle dealers.[270] The Bureau is proposing in § 1002.105(b) to define the term covered financial institution as a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. Only financial institutions that meet this loan-volume threshold would be required to collect and report small business lending data under proposed subpart B.

*Small business definition (§ 1002.106).* The Bureau is proposing in § 1002.106 to adopt the SBA's definitions of ''business'' and ''small business'' as set out in the Small Business Act and SBA regulations. The Bureau is also proposing that, notwithstanding the small business size standards established by SBA regulations, for purposes of proposed subpart B, a business is a small business if and only if its gross annual revenue is $5 million or less for its preceding fiscal year. The Bureau is seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act.

3. Compiling, Maintaining, and Reporting 1071 Data (§§ 1002.107 Through 1002.111)

*Compilation of reportable data (§ 1002.107).* The Bureau is proposing in § 1002.107 to address several aspects of collecting data on covered applications from small businesses. The Bureau is proposing in § 1002.107(a) to require financial institutions to compile and maintain the data points enumerated in § 1002.107(a)(1) through (21) regarding covered applications from small businesses. These data points would be collected and reported in accordance with the proposed official commentary and the *Filing Instructions Guide* that the Bureau anticipates later providing for the appropriate year. Certain of these data points are or could be collected from the applicant (or otherwise determined based on information provided or authorized by the applicant); other data points are based on information solely within the financial institution's control. Proposed appendix E would provide a sample data collection form for requesting from applicants their minority- and women-owned business status and the race, sex, and ethnicity of their principal owners. Proposed appendices F and G provide additional details and guidance regarding collecting those data points.

The Bureau is proposing in § 1002.107(c)(1) that covered financial institutions maintain procedures to collect applicant-provided data at a time and in a manner that is reasonably designed to obtain a response. The Bureau's proposal also addresses what financial institutions should do if, despite having such procedures in place, they are unable to obtain certain data from an applicant. Pursuant to proposed § 1002.107(b), financial institutions would be permitted to rely on statements made by an applicant (whether in writing or orally) or information provided by an applicant when collecting and reporting 1071 data, although for most data points if the financial institution verifies the information provided it must report the verified information. Proposed § 1002.107(c)(2) would also permit financial institutions to reuse certain previously collected data in certain circumstances.

*Firewall (§ 1002.108).* The Bureau is proposing § 1002.108 to implement the requirement in section 1071 that certain data collected be shielded from underwriters and certain other persons; the Bureau refers to this as the ''firewall.'' Pursuant to proposed § 1002.108(b), an employee or officer of a financial institution or a financial institution's affiliate that is involved in making any determination concerning the application would be prohibited from accessing an applicant's responses to inquiries that the financial institution makes pursuant to section 1071 regarding whether the applicant is a minority-owned or women-owned business, and the ethnicity, race, and sex of the applicant's principal owners.

However, pursuant to proposed § 1002.108(c), this prohibition would not apply to an employee or officer if the financial institution determines that it is not feasible to limit that employee's or officer's access to an applicant's

[269] 12 U.S.C. 2801 *et seq.*

[270] The Bureau is proposing that subpart B does not apply to a person excluded from coverage by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

responses to the financial institution's inquiries regarding the applicant's protected demographic information, and the financial institution provides a notice to the applicant regarding that access. It would not be feasible to limit access if the financial institution determines that an employee or officer involved in making any determination concerning a covered application should have access to one or more applicants' responses to inquiries regarding the applicant's protected demographic information. The notice must be provided to each applicant whose information will be accessed or, alternatively, the financial institution could provide the notice to all applicants whose information could be accessed. The Bureau is proposing sample language that a financial institution could use in providing this notice.

*Reporting data to the Bureau (§ 1002.109).* The Bureau is proposing § 1002.109 to address several aspects of financial institutions' obligations to report section 1071 data to the Bureau. First, the Bureau is proposing in § 1002.109(a) that 1071 data be collected on a calendar year basis and reported to the Bureau on or before June 1 of the following year. The Bureau also addresses collection and reporting requirements of subsidiaries of financial institutions and collection and reporting requirements of financial institutions where multiple financial institutions are involved in a transaction in proposed § 1002.109(a). Second, the Bureau lists in proposed § 1002.109(b) the information that financial institutions would be required to provide about themselves when reporting 1071 data to the Bureau, including the financial institution's name, headquarters address, contact person, Federal prudential regulator, institutional identifiers, and parent entity information. Finally, the Bureau is proposing § 1002.109(c) to address technical instructions for the submission of data to the Bureau, including information about the *Filing Instructions Guide,* which the Bureau anticipates later providing for the appropriate year.

*Publication of 1071 data by the Bureau (§ 1002.110).* The Bureau is proposing in § 1002.110 to address several issues regarding the publication of 1071 data. The Bureau is proposing in § 1002.110(a) that it shall make available to the public, on an annual basis and on the Bureau's website, the data submitted to it by financial institutions. The Bureau is proposing to make these data available subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that such deletions or modifications would advance a privacy interest. To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a "balancing test" that assesses the risks and benefits of public disclosure. The Bureau's proposed approach to the balancing test is discussed in detail in part VI below. Proposed § 1002.110(b) would state that the Bureau may, at its discretion, compile and aggregate data submitted by financial institutions and may publish such compilations or aggregations.

Proposed § 1002.110(c) would require a covered financial institution to publish on its website a statement that its 1071 data, as modified by the Bureau, are or will be available on the Bureau's website. Proposed § 1002.110(d) would set forth when a covered financial institution shall make this statement available and how long the financial institution shall maintain the statement on its website. These requirements would satisfy financial institutions' statutory obligation to make data available to the public upon request.

*Recordkeeping (§ 1002.111).* The Bureau is proposing § 1002.111 to address several aspects of the recordkeeping requirements for 1071 data. First, the Bureau is proposing § 1002.111(a) to require a covered financial institution to retain evidence of compliance with proposed subpart B, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the Bureau pursuant to proposed § 1002.109. Second, the Bureau is proposing § 1002.111(b) to require a financial institution to maintain, separately from the rest of an application for credit and accompanying information, an applicant's responses to a financial institution's inquiries regarding the applicant's protected demographic information. Finally, the Bureau is proposing § 1002.111(c) to require that, in compiling and maintaining its small business lending application register, a financial institution not include any personally identifiable information concerning any individual who is, or is connected with, an applicant.

4. Other Provisions (§§ 1002.112 Through 1002.114)

*Enforcement (§ 1002.112).* The Bureau is proposing § 1002.112 to address several issues related to the enforcement of proposed subpart B. First, the Bureau is proposing § 1002.112(a) to state that a violation of section 1071 or proposed subpart B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA. Second, the Bureau is proposing in § 1002.112(b) to provide that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error, and that such an error is presumed not to be a violation of ECOA or proposed subpart B if the number of such errors does not exceed the thresholds set forth in proposed appendix H. Third, the Bureau is proposing in § 1002.112(c) to identify four safe harbors under which certain errors—specifically those regarding census tract, NAICS code, small business status, and application date—would not constitute violations of ECOA or Regulation B.

*Severability (§ 1002.113).* The Bureau is proposing in § 1002.113 to provide that the provisions of proposed subpart B are separate and severable from one another, and that if any provision is stayed or determined to be invalid, it is the Bureau's intent that the remaining provisions shall continue in effect.

*Effective date, compliance date, and special transitional rules (§ 1002.114).* The Bureau is proposing § 1002.114 to address several issues related to the Bureau's eventual final rule to implement section 1071. First, the Bureau is proposing in § 1002.114(a) that its final rule to implement section 1071 would become effective 90 days after publication in the **Federal Register**, but pursuant to proposed § 1002.114(b) compliance with the final rule would not be required until approximately 18 months after publication in the **Federal Register**. Second, the Bureau is proposing in § 1002.114(c) certain transitional provisions that would permit covered financial institutions to begin collecting protected applicants' demographic information beginning 12 months prior to the compliance date and would permit financial institutions to use a different time period to determine whether they will be covered by the rule as of the compliance date.

*D. High-Level and General Comments on the SBREFA Outline*

During the SBREFA process, SERs provided feedback on nearly all aspects of the Bureau's proposals under consideration as set forth in the SBREFA Outline. Other stakeholders did likewise in their written feedback on the SBREFA Outline. That feedback

is discussed in the section-by-section analyses of the proposed rule below. SERs and other stakeholders also provided feedback of a more general nature on the Bureau's section 1071 rulemaking. That feedback is summarized here; the SBREFA Panel Report provides a more complete summary of the SBREFA process and comments provided by SERs.[271]

Most SERs and stakeholders were generally supportive of the statutory purposes of section 1071.[272] Several SERs as well as a range of other stakeholders—including community groups, CDFIs, several community banks, and a State consumer financial protection agency—were supportive of the Bureau's statutory mandate to promulgate a section 1071 rule. Many stakeholders, including community groups, several CDFI banks, and a small community bank, expressly supported broad coverage of both financial institutions and products in the 1071 rulemaking. One community bank stakeholder stated that larger financial institutions should not be excluded; another community bank asserted that a 1071 rule should cover credit unions, governmental entities, commercial finance firms, and alternative online lenders.

Several trade association stakeholders supported a more limited approach to implementation of a 1071 rulemaking. A number of trade associations requested exemptions for the specific types of financial institutions they represented, including credit unions, vendor finance and dealer-related institutions, and community banks. One trade association argued that Federal credit union laws limited the extent to which credit unions could seek to expand their small business lending operations. Two trade association stakeholders suggested that the Bureau adopt a phased or staged approach to implementation, starting only with certain products and institutions. One trade association suggested that the Bureau adopt a high size-based exemption for institutions.

A number of SERs and stakeholders, including several CDFIs, a number of community groups and a community bank, expressed the view that data transparency in the small business lending market is critical to advance the goals of fair lending enforcement and access to credit for small businesses, especially those that are minority-owned and women-owned. One SER and several stakeholders, including two community groups and one small business trade association, stated that the limited data currently available show that the lending practices of many financial institutions exclude women-owned and minority-owned businesses, exacerbating a racial wealth gap, and that section 1071 has the opportunity to address such lending disparities, which are costly to businesses, lenders, and the economy as a whole. The SER also said that data transparency and fairness should be an advantage to smaller, local financial institutions, allowing them to better distinguish their value proposition compared to larger financial institutions or predatory lenders.[273] A CDFI stakeholder and a community group stakeholder emphasized that 1071 data would be an important supplement to CRA and HMDA data to determine community development needs. Another community group stakeholder and a small business trade association emphasized the importance of supporting access to credit for women-owned and minority-owned small businesses. One community group argued that the availability of 1071 data would spur innovation in the small business lending market.

Several SERs and several community groups and CDFI stakeholders stated that the completion of a 1071 rulemaking was welcome, given the many years stakeholders have been waiting for these data. Several SERs and other stakeholders, including community groups and CDFIs, supported a 1071 rulemaking as necessary to better understand the small business lending market, as the COVID–19 pandemic highlighted how the most vulnerable small businesses can be disproportionately impacted by economic shocks. Several community groups and a small business trade association stakeholders argued that the response to the COVID–19 pandemic, including the PPP program, exacerbated existing gender and racial disparities, and did not provide access to credit to excluded lower- and middle-income communities and women-owned or minority-owned small businesses. Two community bank trade associations noted the outsized importance of community banks and CDFIs in providing PPP loans to their local communities, including to minority-owned small businesses, and warned that an unintended consequence of a 1071 rulemaking may be to impair this existing lending. One trade association suggested that the Bureau delay issuing any proposal until the economic forces driven by the COVID–19 pandemic have subsided and recovery is evident.

Other stakeholders expressed concerns about the uses of data coming from a 1071 rulemaking. One trade association suggested that the collection of data on race and gender would create the perception among customers that these factors played a role in credit decisions. One community bank stakeholder asserted that 1071 data should not be used in regulatory oversight or examinations of financial institutions, but rather to better understand the small lending market and help regulators support lending. Several trade associations expressed concerns that misleading conclusions could be drawn from data from a 1071 rulemaking, and that small business lending was complex and varied.

SERs nearly uniformly suggested that the Bureau aim to draft simple regulations, and choose simpler options if possible, noting that more complex rules tend to make compliance more difficult and drive up compliance costs, which could potentially increase prices or reduce small businesses' access to credit. A number of stakeholders—including community banks, community groups, a small business trade association, and bank and credit union trade associations—similarly supported simple and clear regulations and requested that the Bureau avoid complex or ambiguous rules, which they asserted would make compliance more costly. One CDFI bank stakeholder asserted that existing ambiguities and conflicts in the law have caused financial institutions to avoid collecting the very data they would need to identify lending discrimination, and that mandating data collection and clarifying rules would be critical to addressing these concerns.

Many SERs and a community bank stakeholder requested clear written guidance and implementation support materials from the Bureau, such as small entity compliance guides, a ''help desk'' for questions, and sample disclosure language (translated into languages other than English for individuals with limited English proficiency). Several SERs also discussed the need for applicant-facing materials explaining what the section 1071 regulation is and why the financial institution must collect data. Relatedly, one SER requested that the Bureau educate and train currently unregulated financial institutions to help them implement the rule.

A number of SERs (representing financial institutions that operate primarily online as well as financial institutions that interact with small business applicants in-person) indicated their belief that financial institutions

[271] *See generally* SBREFA Panel Report.

[272] The SER feedback discussed herein can be found in the SBREFA Panel Report at 17–18.

[273] *Id.*

with extensive online lending operations would be able to comply with an eventual 1071 rule more easily, more quickly, and at lower cost due to their greater degree of automation than financial institutions with primarily in-person and/or paper-based operations. SERs and several stakeholders (including a community bank trade association, a community group, and a community bank) urged the Bureau to align with other Federal data reporting regimes—such as HMDA, CRA, CDFI Fund, or SBA—if possible, and thought that financial institutions with experience complying with these other Federal data reporting regimes would have an easier time complying with an eventual 1071 rule than would financial institutions, including some SERs, with no such experience. One trade association suggested that any comparisons with HMDA were misplaced, as the small business lending market is more varied and complex than the market for residential mortgage lending.

Several SERs stated that a 1071 rule should take into account the different types of financial institutions operating in the small business lending market. One SER suggested that the Bureau had not focused enough attention on the impact of a 1071 rule on nondepository institutions, which they said play a vital role in providing essential credit to small businesses in the United States, many of which are women-owned and minority-owned. Another SER and two trade associations asserted that the data collected from credit unions, which are bound by their charters (pursuant to Federal and State laws and regulations) to serve a specific field of membership, would likely be incomparable with data from other financial institutions that are permitted to serve any kind of customer.

Many SERs supported broad coverage of both financial institutions and products, as reflected in section 1071's language covering any application to a financial institution for credit for a women-owned, minority-owned, or small business.

The SBREFA Panel recommended that the Bureau issue implementation and guidance materials (including a small entity compliance guide as required by the RFA, as well as other materials), specifically to assist small financial institutions in complying with the eventual 1071 rule.[274] The Panel also recommended that the Bureau consider providing sample disclosure language related to the collection of ethnicity, race, and sex of applicants.[275]

[274] *Id.* at 43.

[275] *Id.*

The Bureau agrees with the general comments made in favor of keeping the scope of the proposed rule broad. In general, the Bureau believes that broad coverage of institutions and products as requested by a number of SERs and stakeholders would result in the collection of more data and would be consistent with the statutory purposes of section 1071. The Bureau does not believe that the request made by several trade association stakeholders to take a more limited approach to scope—including the various limitations on the coverage of certain types of financial institutions and products—would be consistent with the statutory purposes of section 1071. The Bureau addresses these issues directly in the section-by-section analyses of proposed §§ 1002.104 and 1002.105 below.

The Bureau agrees with the SERs and stakeholders that expressed the view that data transparency in the small business lending market is critical to advancing the statutory purposes of section 1071. The Bureau believes that the limited data that do exist, cited by one SER and several stakeholders, appear to support the existence of disparities in the small business lending markets, as identified in part II above. The Bureau agrees—as do other Federal regulators that the Bureau has consulted in developing this proposed rule—that 1071 data would be an important supplementation to CRA and HMDA data in helping a variety of parties determine and address business and community development needs. The Bureau agrees with the SERs and stakeholders that identified specific ways that the publication of 1071 data would advance this statutory purpose in helping the public identify business needs, including, as one SER suggested, creating data that would be useful to help smaller, local financial institutions distinguish their value proposition compared to other lenders, and could be used to spur innovation in the small business lending market.

Regarding the support of certain SERs and other stakeholders welcoming the completion of a 1071 rulemaking, the Bureau's views on this are best expressed in the section-by-section analyses of proposed §§ 1002.113 and 1002.114 concerning effective date and compliance date. Regarding the data cited by SERs and other stakeholders concerning lending disparities in the PPP program during the COVID–19 pandemic, the Bureau believes that the availability of data on PPP lending further supports the importance of collecting and publishing 1071 data; it was only the existence of PPP lending data, despite its limitations, that enabled these stakeholders to make arguments regarding the state of fair lending and business and community development under PPP.

The Bureau appreciates the concerns expressed by some stakeholders concerning the uses of 1071 data. The Bureau believes that the firewall provision of proposed § 1002.108, including the proposed notice provision, are intended to address the concern by one trade association stakeholder that the collection of ethnicity, race, and sex data may create the perception among customers that these factors play a role in credit decisions. The Bureau disagrees with the stakeholder that asserted that 1071 data should not be used in regulatory oversight or examinations. Such use is contemplated by ECOA section 704B(a)(2), which provides that the data are intended to facilitate the enforcement of fair lending laws. The Bureau does agree with the same stakeholder, however, that 1071 data should be used to help regulators better understand the small business lending markets and better support such lending. The Bureau does not disagree in the abstract with the assertions made by several trade associations that misleading conclusions could be drawn from 1071 data; the Bureau notes that these stakeholders did not cite any examples and that any source of data may be misinterpreted absent robust procedures and methodologies. The Bureau believes, given its experience with HMDA data, that such concerns are misplaced—overall, HMDA data have helped shed light on previously hidden issues and proven highly effective in accomplishing its congressionally mandated purposes.

The Bureau has attempted as much as possible to propose rules that are both simple and clear, as SERs and other stakeholders suggested. For instance, the Bureau is proposing a simple definition of small business in proposed § 1002.106 below. While the Bureau has endeavored to avoid unnecessary ambiguity and complexity in its proposed rule, complexity in the proposed rule reflects the inherent complexity of the subject, including the variations and diversity in the small business lending market as well as the complications of collecting data to conduct fair lending analyses and identify business and community development needs.

Regarding the request for clear written guidance and implementation support materials, the Bureau intends to develop various compliance materials, as it does with most major rules. These materials will include a small entity compliance

guide that will provide regulatory implementation guidance, and a *Filing Instructions Guide* that will provide technical instructions for the submission of 1071 data to the Bureau. With regard to the comment that the Bureau should provide applicant-facing materials, the Bureau proposes in appendix E a sample data collection form that can be used to collect from applicants their minority-owned business status, women-owned business status, and the ethnicity, race, and sex of their principal owners, along with the related required disclosures.

The Bureau generally agrees with the observation of a number SERs that financial institutions with extensive online lending operations would likely find compliance with a section 1071 rule easier than those with primarily in-person operations. The Bureau sets out its preliminary assessment of the costs of the rule on financial institutions in parts VII and VIII below.

The Bureau has attempted, whenever possible, to align or conform its proposed rule with other Federal data reporting regimes, as several SERs and other stakeholders requested. The Bureau references and, where possible, aligns the proposed rule with specific Federal data reporting regimes, as explained in the section-by-section analyses below. The Bureau appreciates the comments made by some SERs and other stakeholders that there are different types of financial institutions in the small business lending market and that the differences between institutional types may complicate data analysis. The Bureau notes, however, that simply excluding certain types of institutions from 1071 reporting requirements would be inconsistent with the statutory purposes of section 1071, and that it would be more congruent with section 1071 instead to collect information on financial institution type as set out in proposed § 1002.109(b)(9), for the reasons set out below.

*E. Cross-Cutting Interpretive Issues*

1. The Bureau's Approach to Non-Small Women-Owned and Minority-Owned Businesses in This Rulemaking

The Bureau is proposing to require financial institutions to collect and report data regarding applications for credit for small businesses; the Bureau is not, however, proposing to require financial institutions to collect and report data with respect to applicants that are *not* small businesses. ECOA section 704B(b) states that "in the case of any application to a financial institution for credit for [a] women-owned, minority-owned, or small business," the financial institution must "inquire whether the business is a women-owned, minority-owned or small business . . . ." For the reasons set forth below, the Bureau is proposing this approach as an interpretation of the statute pursuant to its authority under 704B(g)(1), and, in the alternative, pursuant to its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071 and its implied *de minimis* authority.

The Bureau explained in the SBREFA Outline that in light of the comprehensive coverage of women-owned and minority-owned businesses within the scope of small businesses (discussed in more detail below), it was considering proposing that the data collection and reporting requirements of its eventual 1071 rule would apply to any application to a financial institution for credit only for small businesses as defined under the eventual 1071 rule.[276] The Bureau explained that it was concerned that a requirement to collect and report 1071 data on applications for women-owned and minority-owned businesses that are not small businesses could affect all aspects of financial institutions' commercial lending operations while resulting in limited information beyond what would already be collected and reported about women-owned and minority-owned small businesses. In addition, financing for large businesses can be much more varied and complex than are the products used for small business lending. Thus, under the approach the Bureau was considering proposing, financial institutions would collect and report lending data for all applicants that satisfy the Bureau's definition of a small business, including identifying women-owned and minority-owned businesses within that pool, but financial institutions would not be required to collect and report 1071 data for women-owned and minority-owned businesses that are not "small."

In the SBREFA Outline, the Bureau noted that most existing businesses, including almost all women-owned and minority-owned businesses, are "small business concerns" as that term is currently defined by the SBA.[277] Therefore, the Bureau posited that coverage of small businesses by this rule would necessarily include nearly all women-owned and minority-owned businesses. Based on the 2018 Annual Business Survey by the U.S. Census, the Bureau estimated that 5.72 million employer firms—99.6 percent of all employer firms—are small (defined for the purposes of the survey as having fewer than 500 employees). That same definition covers one million minority-owned employer firms (99.9 percent of all minority-owned firms) and 1.1 million women-owned employer firms (99.9 percent of all women-owned firms).[278] The Bureau estimated that, among non-small businesses, which are only 0.4 percent of all firms nationally, 10 percent of this small fraction are minority-owned firms and 13 percent are women-owned.[279]

A number of SERs expressed a belief that covering just small business applications would supply adequate or nearly complete lending data for purposes of section 1071.[280] However, other SERs stated that the Bureau's regulation should collect data regarding applications for credit for non-small minority-owned and women-owned businesses as well. One SER relayed first-hand observations in their community that larger minority-owned and women-owned businesses were excluded from full access to credit, and expressed an interest in the Bureau capturing and reporting that information. One SER observed that smaller financial institutions, or those that generally focus on small business lending, might find that collecting and reporting data for all business loan applications would be simpler than determining which applications would be within the scope of the eventual 1071 rule.

The SBREFA Panel recommended that the Bureau continue to explore whether the data collection and reporting requirements in its 1071 rule should be limited to any application to a financial institution for credit only for small businesses (as defined by the Bureau's regulation) or whether it should also extend to applications for women-owned and minority-owned businesses that are not small.[281] The Panel also recommended that the Bureau seek comment on the costs to small financial institutions of collecting and reporting 1071 data regarding applications for credit for women-owned and minority-owned businesses

[276] SBREFA Outline at 9.

[277] See the section-by-section analysis of proposed § 1002.106 below for additional discussion regarding the definition of "small business" for purposes of this rulemaking.

[278] SBREFA Outline at 9.

[279] *Id.*

[280] The SER feedback discussed in herein can be found in the SBREFA Panel Report at 18.

[281] *Id.* at 43.

that are not small (as defined by the Bureau's regulation).[282]

Feedback from other stakeholders generally supported the Bureau's approach to limiting 1071 data collection to small businesses, including identifying women- and minority-owned businesses within that pool. A number of commenters expressed support for the Bureau's approach under consideration, arguing that requiring data collection for non-small women- and minority-owned businesses would increase compliance burden without significantly contributing to 1071's purposes. Some responses also stated that this approach was consistent with legislative intent, positing that Congress did not intend for financial institutions to collect 1071 data on large companies. A community group noted that its support for the Bureau's approach was conditional on the Bureau adopting a broad definition of small business, thus limiting the likelihood of missing significant women- and minority-owned business application data. A joint comment from a number of community groups urged the Bureau to monitor the market and to reevaluate this approach if later publications of the Annual Business Survey show that the number of non-small women- and minority-owned businesses exceed current estimates. Another joint comment from community groups did not support the Bureau's approach under consideration, urging the Bureau to consider instead covering non-small women- and minority-owned businesses in the data collection and arguing that it might be easier for financial institutions to collect data for all applicants, as opposed to developing systems for screening out applicants that are not covered. Two banks suggested that 1071 data collection should extend to all businesses; one was concerned about fair lending disparities, while the other remarked that large business applicants should not be relieved of the burden of having their data collected under 1071.

The Bureau believes that section 1071 is ambiguous with respect to its coverage of applications for credit for non-small women- or minority-owned businesses, and the Bureau therefore proposes to interpret this ambiguity pursuant to ECOA section 704B(g)(1). The Bureau acknowledges that the plain language of 704B(b) could be read to require financial institutions to collect information from all women-owned and minority-owned businesses, including those that are not small businesses. But based on a close consideration of the text, structure, and purpose of the statute, and the interactions between section 1071 and other provisions of ECOA and Regulation B, the Bureau believes that the statute's coverage of, and Congress's intent with respect to, data regarding non-small businesses is ambiguous.

The Bureau interprets ECOA section 704B(b) and (b)(1) to require that financial institutions first determine whether an applicant is a small business within the scope of the rule's data collection before making the required inquiries that would otherwise be prohibited by existing Regulation B. There is a general prohibition in existing Regulation B (in § 1002.5(b)) which states that a "creditor shall not *inquire* about the race, color, religion, national origin, or sex of an applicant or any other person in connection with a credit transaction, except" if expressly permitted to do so by law or regulation.

In the introductory language to ECOA section 704B(b), Congress instructed that the 1071 data collection regime applies only "*in the case of* any application to a financial institution for credit for women-owned, minority-owned, or small business" (emphasis added). The Bureau believes that "in the case of" indicates Congress's intent to limit application of section 1071 to these types of businesses, rather than requiring financial institutions to make 1071-related inquiries of all business applicants for credit.[283] The next paragraph (704B(b)(1)) does not use the conditional phrase "in the case of" used in 704B(b); rather, it instructs a financial institution to "inquire." The Bureau believes that the instruction to "inquire" in 704B(b)(1) is intended to provide the necessary exception to Regulation B's general prohibition against "inquir[ing]" as to protected demographic information in connection with a credit transaction.[284] Indeed, absent section 1071's lifting of the prohibition, generally, a financial institution could not determine, or even ask about, an applicant's women- or minority-owned status, because doing so would necessarily constitute "inquir[ing] about the race, color, religion, national origin, or sex of an applicant" in violation of existing § 1002.5(b). The Bureau believes that Congress likely intended to ensure that financial institutions could determine whether an applicant is covered by the 1071 data collection without risking a violation of other provisions of ECOA and Regulation B.

However, unlike with women- and minority-owned business status, there is no legal impediment to a financial institution's determining whether an applicant is a small business, and financial institutions can make that determination as a threshold matter without risking running afoul of ECOA and Regulation B. Therefore, the Bureau believes that the scope of the introductory "in the case of" language in ECOA section 704(b) is ambiguous as to coverage of non-small women- and minority-owned businesses. To resolve this ambiguity, the Bureau has applied its expertise to interpreting the language and structure of 1071 within the context of the general prohibition on inquiring into protected demographic information in existing § 1002.5(b), and concludes that ECOA section 704B(b)(1) is best read as only referring to questions about applicants' protected demographic information (*i.e.,* women- and minority-owned business status as well as the race, sex, and ethnicity of the principal owners of the business). The Bureau believes 704B(b)'s more general "in the case of" language should be understood to indicate the conditions under which 1071 data collection should take place, and requires financial institutions to make a threshold determination that an applicant is a small business before proceeding with an inquiry into the applicant's protected demographic information.

The Bureau also notes that the collection of data on applications for non-small women- or minority-owned businesses would not carry out either of section 1071's stated purposes because the data would be of only limited usefulness for conducting the relevant analyses of non-small businesses. Such analyses would necessitate comparing data regarding non-small women-owned and minority-owned business applicants to data regarding non-small non-women-owned and non-minority-owned business applicants, in order to control for lending outcomes that result from differences in applicant size. But section 1071 does not require or otherwise address the collection of data for non-small business applicants that

[282] *Id.*

[283] Merriam-Webster defines "case" as meaning "a set of circumstances or conditions," "a situation requiring investigation or action (as by the police)," or "the object of investigation or consideration."

[284] As discussed in greater detail in the next section, the fact that the language of ECOA section 704B(b)(1) is designed to expressly permit inquiry into protected demographic information, which would otherwise be prohibited by existing § 1002.5(b), is also evidenced by the statute's three provisions creating special protections for responses to the inquiry: 704B(b)(2) requires that responses to protected inquiries remain separate from the application and accompanying information; 704B(c) requires that applicants have a right to refuse to answer the protected inquiry; and 704B(d) requires that certain underwriters or other employees involved in making determinations on an application not have access to the responses to protected inquiries.

are not women- or minority-owned. Therefore, the resulting data set will lack a control group, arguably the most meaningful comparator for any data on non-small women- or minority-owned businesses. It is unlikely that Congress intended, and the statute is reasonably read not to require, the collection of data that would be of limited utility.[285]

Finally, the Bureau notes that the title of section 1071 is ''Small Business Data Collection,'' and 1071 amends ECOA to add a new section titled ''Small Business Loan Data Collection.'' In the presence of ambiguity, these titles provide some additional evidence that Congress did not intend the statute to authorize the collection of data on businesses that are not small.[286]

For these reasons, the Bureau proposes to interpret ECOA section 704B(b) to cover the collection only of data with respect to small businesses, including those that are women- and minority-owned. Likewise, as discussed immediately below in E.2 of this *Overview* to part V, the Bureau is proposing to clarify that the 704B(b)(1) inquiry, when applicable, pertains to an applicant's minority-owned business status and women-owned business status as well as the race, sex, and ethnicity of its principal owners. For the same reasons, the Bureau believes that not requiring the collection of data with respect to applications for non-small businesses would be necessary or appropriate to carry out the purposes of section 1071; therefore, in the alternative, the Bureau proposes to exercise its exception authority in 704B(g)(2) to effect this outcome. Finally, because the Bureau believes that the collection of data on non-small women- and minority-owned businesses would ''yield a gain of trivial or no value,'' the Bureau proposes, in the alternative, to exercise its implied *de minimis* authority to create this exception.[287]

The Bureau seeks comment on its proposed approach to limiting the scope of data collection pursuant to subpart B to covered applications for small businesses, but not women- or minority-owned businesses that are not small. As recommended by the SBREFA Panel, the Bureau also seeks comment on the costs to small financial institutions of collecting and reporting 1071 data regarding applications for credit for women-owned and minority-owned businesses that are not small businesses as defined in proposed § 1002.106(b). See the section-by-section analysis of proposed § 1002.106(b) below, where the Bureau is seeking comment on the proposed definition of a small business.

2. The Meaning of ''information requested pursuant to subsection (b)''

Four different provisions of section 1071 refer to or rely on ''information requested pursuant to subsection (b)'' or similar language. First, ECOA section 704B(b)(2) provides that financial institutions must ''maintain a record of the responses to such inquiry'' and keep those records separate from the application and information that accompanies it. Second, 704B(c) states that applicants for credit ''may refuse to provide any information requested pursuant to subsection (b).'' Third, 704B(d) requires financial institutions to limit the access of certain employees to ''information provided by the applicant pursuant to a request under subsection (b),'' with certain exceptions. Fourth, 704B(e) instructs financial institutions that ''information provided by any loan applicant pursuant to a request under subsection (b) . . . shall be itemized in order to clearly and conspicuously disclose'' data including the loan type and purpose, amount of credit applied for and approved, and gross annual revenue.

In light of these four disparate provisions, the Bureau believes that section 1071 is ambiguous with respect to the meaning of ''any information provided by the applicant pursuant to a request under subsection (b).''[288] On the one hand, ECOA section 704B(b)(1) directs financial institutions to inquire whether a business is ''a women-owned, minority-owned, or small business,'' so the phrase could be interpreted as referring only to those three data points. Section 704B(e), however, indicates that the scope of 704B(b) could be much broader; it suggests that all of the information that financial institutions are required to compile and maintain—not simply an applicant's status as a women-owned, minority-owned, or small business—constitutes information provided by an applicant ''pursuant to a request under subsection (b).'' But as noted above, information deemed provided pursuant to subsection (b) is subject to the notable protections of separate recordkeeping under 704B(b)(2), a right to refuse under 704B(c), and the firewall under 704B(d). Applying these special protections to many of the data points in 704B(e), such as gross annual revenue or amount applied for, would be extremely difficult to implement, because this information is critical to financial institutions' ordinary operations in making credit decisions. Additionally, 704B(e) describes as ''provided by any loan applicant'' under 704B(b) data points that plainly must come from the financial institution itself, such as application number and action taken, further suggesting that Congress viewed this term as encompassing more information than lies within the four corners of 704B(b)(1). Finally, as noted above, the circular structure of 704B(b) complicates the question of what constitutes information provided ''pursuant to a request under subsection (b).'' Read together, the introductory language in 704B(b) and (b)(1) direct financial institutions, ''in the case of'' a credit application ''for [1] women-owned, [2] minority-owned, or [3] small business,'' to ''inquire whether the business is a [1] women-owned, [2] minority-owned, or [3] small business.'' The Bureau believes that this circularity further demonstrates the ambiguity of the phrase ''pursuant to a request under subsection (b).''

The Bureau believes that it is reasonable to resolve these ambiguities by giving different meanings to the phrase ''any information provided by the applicant pursuant to a request under subsection (b)'' (or similar) with respect to ECOA section 704B(e) as opposed to 704B(b)(2), (c), and (d).[289] With respect to 704B(e), the Bureau interprets the phrase to refer to all the data points now articulated in proposed § 1002.107(a). Section 704B(e) is the source of financial institutions' obligation to ''compile and maintain'' data that they must then submit to the

[285] *See, e.g., Pub. Citizen* v. *U.S. Dep't of Just.,* 491 U.S. 440, 454 (1989) (''Where the literal reading of a statutory term would 'compel an odd result,' *Green* v. *Bock Laundry Machine Co.,* 490 U.S. 504, 509 (1989), we must search for other evidence of congressional intent to lend the term its proper scope.'').

[286] *Almendarez-Torres* v. *United States,* 523 U.S. 224, 234 (1998) (''[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute.'') (quoting *Bhd. of R.R. Trainmen* v. *Balt. & Ohio R.R.,* 331 U.S. 519, 529 (1947)).

[287] *Waterkeeper All.* v. *EPA,* 853 F.3d 527, 530 (D.C. Cir. 2017) (quoting *Pub. Citizen* v. *FTC,* 869 F.2d 1541, 1556 (D.C. Cir. 1989)); *see Alabama Power Co.* v. *Costle,* 636 F.2d 323, 360–61 (D.C. Cir. 1979).

[288] The Bureau does not believe that the minor linguistic variations in these four provisions themselves have significance.

[289] While there is a presumption that a phrase appearing in multiple parts of a statute has the same meaning in each, ''this is no more than a presumption. It can be rebutted by evidence that Congress intended the words to be interpreted differently in each section, or to leave a gap for the agency to fill.'' *Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *EPA,* 846 F.3d 492, 532 (2d Cir. 2017) (citing *Env't Def.* v. *Duke Energy Corp.,* 549 U.S. 561, 575 (2007)). Here, the Bureau believes Congress indicated such an intention by using the same phrase in the substantially different contexts of providing special protections for sensitive demographic information on the one hand and ''itemiz[ing]'' all collected data on the other.

Bureau, so it would be reasonable to interpret this paragraph as referring to the complete data collection Congress devised in enacting section 1071.

But with respect to the three statutory provisions creating special protections for certain information—the firewall in ECOA section 704B(d), separate recordkeeping in 704B(b)(2), and the right to refuse in 704B(c)—the Bureau interprets the phrase to refer to the data points in proposed § 1002.107(a)(18) (women-owned business status), (a)(19) (minority-owned business status), and (a)(20) (ethnicity, race, and sex of principal owners).[290] Each of these data points requests sensitive demographic information that has no bearing on the creditworthiness of the applicant, about which existing § 1002.5(b) would generally prohibit the financial institution from inquiring absent section 1071's mandate to collect and report that information, and with respect to which applicants are protected from discrimination. The Bureau accordingly believes that it would be reasonable to apply section 1071's special-protection provisions to apply to this information, regardless of whether the statutory authority to collect it originates in 704B(b)(1) (women-owned and minority-owned business status) or 704B(e)(2)(G) (race, sex, and ethnicity of principal owners). The Bureau similarly believes that it would have been unreasonable for Congress to have intended that these special protections would apply to any of the other data points now proposed in § 1002.107(a), which the financial institution is permitted to request regardless of coverage under section 1071 which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting purposes.

The Bureau implements these interpretations of "information requested pursuant to subsection (b)" in several different section-by-section discussions. With respect to ECOA section 704B(e), the Bureau discusses its interpretation of the phrase in the section-by-section analysis of proposed § 1002.107(a). The Bureau's interpretation of 704B(d)'s firewall requirement is addressed at greater length in the section-by-section analysis of proposed § 1002.108, and the Bureau's interpretation of the separate recordkeeping requirement in 704B(b)(2) is addressed in the section-by-section analysis of proposed § 1002.111(b). The right to refuse in 704B(c) is discussed in the section-by-section analyses of the data points that the Bureau proposes to be subject to the right to refuse: Proposed § 1002.107(a)(18) (women-owned business status), (19) (minority-owned business status), and (20) (ethnicity, race, and sex of principal owners).

3. No Collection of Small Business Status as a Data Point

The Bureau notes that neither of its interpretations of "information requested pursuant to subsection (b)" reference a specific data point for an applicant's status as a small business, nor is the Bureau otherwise including in proposed § 1002.107(a) that financial institutions collect, maintain, or submit a data point whose sole function is to state whether the applicant is or is not a small business.

At SBREFA, the Bureau conveyed that it was considering proposing small business status as a separate data point. The Bureau also stated that it was considering not proposing to extend the right to refuse or firewall to a financial institution's specific inquiry regarding small business status;[291] the Bureau did not address in the SBREFA Outline whether small business status would be subject to the separate recordkeeping requirement. In lieu of further details about the potential data point on small business status, the Bureau noted that it was considering proposing that collection and reporting of whether an applicant for credit is a small business be based on applicant-reported information, but that the precise nature of the data point would depend on the ultimate definition of small business.

As discussed below in the section-by-section analysis of proposed § 1002.106(b), the Bureau is now proposing a definition of small business that largely adopts the SBREFA Outline's First Alternative Approach with a threshold of $5 million. After considering the implications of this approach, the Bureau now believes that it would render redundant any requirement that financial institutions also collect a standalone data point whose sole purpose is to state whether an applicant is a small business, because the gross annual revenue data point wholly encompasses whether an applicant is a small business. Indeed, under the proposed definition of small business, when a financial institution asks an applicant its gross annual revenue, that question is functionally identical to asking, "are you a small business?" The Bureau believes that it would be a reasonable interpretation of ECOA section 704B(b)'s query as to small business status for that question to take the form of, "what is your gross annual revenue?" Furthermore, as discussed above with respect to the Bureau's approach to non-small women- and minority-owned businesses, the Bureau is interpreting financial institutions' data collection obligations as attaching only in the case of applications from small businesses; if a financial institution determines that an applicant is not a small business, none of the obligations under this rule would apply. As such, a standalone data point that serves only to designate whether a business qualifies as small for purposes of the rule would be redundant with the mere fact that the 1071 data collection occurs at all, as well as with the collection of gross annual revenue.

The Bureau acknowledges that the plain language of ECOA section 704B(b) could be read to require financial institutions to ask applicants subject to the data collection the precise question, "are you a small business?" Upon further analysis, however, the Bureau believes that Congress's intended treatment of small business status as a standalone data point is ambiguous. As described in more detail above with respect to the rulemaking's coverage of women- and minority-owned businesses that are not small, 704B(b)'s introductory language and 704B(b)(1) appear to require financial institutions to know the answer to whether an applicant is women-owned, minority-owned, or small before they make their inquiry; to resolve this ambiguity, the Bureau interprets 704B(b)'s introductory language and 704B(b)(1) to require that financial institutions first straightforwardly assess whether an applicant is a small business before proceeding to inquire into the applicant's protected demographic information that would otherwise be prohibited by existing § 1002.5(b).

In sum, pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules as may be necessary to carry out, enforce, and compile data pursuant to section 1071, the Bureau interprets 704B(b) and (b)(1) to obviate the need for financial institutions to collect a standalone data point whose sole purpose is to note an applicant's small business status. For the same reasons, the Bureau believes that not requiring the collection of a separate data point on small business status would be necessary or appropriate to carry out the purposes of section 1071; therefore, in the alternative, the Bureau proposes to exercise its exception authority in 704B(g)(2) to effect this outcome.

[290] The Bureau's interpretations with respect to a separate data point for small business status are discussed in the next section.

[291] SBREFA Outline at 25.

Finally, because the Bureau believes that the collection of a standalone data point on small business status would "yield a gain of trivial or no value," the Bureau proposes, in the alternative, to exercise its implied *de minimis* authority to create this exception.[292]

In light of the above, the Bureau seeks comment on whether a standalone data point solely dedicated to small business status might nonetheless be useful and, if so, how it might be implemented.

*F. Conforming Amendments to Existing Regulation B*

As discussed above, the Bureau is proposing to implement its section 1071 rule in a new subpart B of Regulation B. The content of existing Regulation B would become subpart A of Regulation B. This change would not affect the current section numbering in Regulation B. The Bureau believes it is appropriate to make this rule a part of Regulation B, as section 1071 is a part of ECOA. Nonetheless, the Bureau seeks comment on whether it should instead codify its section 1071 rule as a free-standing regulation with its own CFR part and, if so, why.

As noted above and as discussed in more detail below, the Bureau is proposing amendments to amend existing § 1002.5(a)(4) and associated commentary to expressly permit voluntary collection of minority-owned business status, women-owned business status, and the race, sex, and ethnicity of applicants' principal owners in accordance with the requirements of subpart B. In addition, the Bureau anticipates revising certain references to the entire regulation (which use the terms "regulation" or "part") in existing Regulation B to instead refer specifically to subpart A. The Bureau does not intend to make any substantive changes with these revisions, but rather intends to maintain the status quo.

Subpart A—General

Section 1002.5 Rules Concerning Requests for Information

5(a) General Rules

5(a)(4) Other Permissible Collection of Information

Background

ECOA prohibits creditors from discriminating against applicants, with respect to any aspect of a credit transaction, on the basis of—among other things—race, color, religion, national origin, sex or marital status, or age.[293] It also states that making an inquiry under 15 U.S.C. 1691c–2 (that is, section 1071), in accordance with the requirements of that section, shall not constitute discrimination for purposes of ECOA.[294] Regulation B, in existing § 1002.5(b), generally prohibits a creditor from inquiring about protected demographic information in connection with a credit transaction unless otherwise required by Regulation B, ECOA, or other Federal law or regulation.[295]

In 2017, the Bureau amended Regulation B, adding § 1002.5(a)(4) to allow creditors to collect ethnicity, race, and sex from mortgage applicants in certain cases where the creditor is not required to report under HMDA and Regulation C.[296] As part of this rulemaking, the Bureau added § 1002.5(a)(4) to expressly permit the collection of ethnicity, race, and sex information from mortgage applicants in certain cases where the creditor is not required to report under HMDA and Regulation C. For example, existing § 1002.5(a)(4) expressly permits the collection of ethnicity, race, and sex information for certain transactions for which Regulation C permits optional reporting. However, nothing in existing Regulation B (or in ECOA) expressly permits voluntary collection and reporting of information regarding the ethnicity, race, and sex of applicants' principal owners, or whether the applicant is a minority-owned business or women-owned business, under section 1071.

SBREFA Proposal Under Consideration and Feedback Received

During the SBREFA process, some SERs, primarily small CDFIs and mission-oriented community banks, stated that they would be inclined to collect and report 1071 data to the Bureau even if not required to do so, such as if they fell under loan-volume thresholds. These SERs expressed an intent to report data even if not required to out of a belief in the importance and utility of 1071 data.

Proposed Rule

The Bureau is proposing to amend existing § 1002.5(a)(4) to add three exemptions (in proposed § 1002.5(a)(4)(vii), (viii), and (ix)) that would permit certain creditors that are not covered financial institutions under the rule to collect small business applicants' protected demographic information under certain circumstances. The Bureau is also proposing to add comment 5(a)(2)–4 and to revise existing comment 5(a)(4)–1 to provide guidance on these proposed exemptions.

Proposed § 1002.5(a)(4)(vii) would provide that a creditor that was required to report small business lending data pursuant to proposed § 1002.109 for any of the preceding five calendar years but is not currently a covered financial institution under proposed § 1002.105(b) may collect information pursuant to proposed subpart B for a covered application as defined in proposed § 1002.103 regarding whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements of proposed subpart B as otherwise required for covered financial institutions pursuant to proposed §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 for that application. In short, proposed § 1002.5(a)(4)(vii) would permit a previously covered financial institution to collect such information for covered applications for up to five years after it fell below the loan-volume threshold of proposed § 1002.105(b), provided that it does so in accordance with the relevant requirements of proposed subpart B.

The Bureau expects that some creditors that are no longer covered financial institutions and thus no longer required to report 1071 data in a given reporting year may prefer to continue to collect applicants' protected demographic information in the event they become a covered financial institution again, in order to maintain consistent compliance standards from year to year. As it did in a similar context for HMDA reporting,[297] the Bureau believes that permitting such collection for five years provides an appropriate time frame under which a financial institution should be permitted to continue collecting the information without having to change its compliance processes. The Bureau believes that a five-year period is sufficient to help an institution discern whether it is likely to have to report 1071 data in the near future but not so long as to permit it to collect such information in a period too attenuated from previous 1071 reporting.

Therefore, the Bureau believes that it is an appropriate use of its statutory authority under sections 703(a)[298] and

[292] *Waterkeeper All.*, 853 F.3d at 530 (quoting *Pub. Citizen*, 869 F.2d at 1556); *see Alabama Power*, 636 F.2d at 360–61.

[293] 15 U.S.C. 1691(a).

[294] 15 U.S.C. 1691(b)(5).

[295] Existing § 1002.5(a)(2).

[296] *Equal Credit Opportunity Act (Regulation B) Ethnicity and Race Information Collection*, 82 FR 45680, 45684 (Oct. 2, 2017).

[297] Existing § 1002.5(a)(4)(iii).

[298] 15 U.S.C. 1691b(a).

704B(g)(1) of ECOA to permit creditors to collect the 1071 demographic information in the manner set out in proposed § 1002.5(a)(4)(vii). The proposal would effectuate the purposes of and facilitate compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071 because it would permit creditors to collect information without interruption from year to year, thereby facilitating compliance with the 1071 rule's data collection requirements and improving the quality and reliability of the data collected. The Bureau also believes that this provision is narrowly tailored and would preserve and respect the general limitations in existing § 1002.5(b) through (d).

Proposed § 1002.5(a)(4)(viii) would provide that a creditor that exceeded the loan-volume threshold in the first year of the two-year threshold period provided in proposed § 1002.105(b) may, in the second year, collect information pursuant to proposed subpart B for a covered application as defined in proposed § 1002.103 regarding whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to proposed §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 for that application.

The Bureau believes that its proposal would benefit creditors in certain situations in which the creditor has not previously reported 1071 data but expects to be covered in the following year and wishes to prepare for that future reporting obligation. For example, where a creditor surpasses the loan-volume threshold of proposed § 1002.105(b) for the first time in a given calendar year, it may wish to begin collecting applicants' protected demographic information for covered applications received in the next calendar year (second calendar year) so as to ensure its compliance systems are fully functional before it is required to collect and report information pursuant to proposed subpart B in the following calendar year (third calendar year).

The Bureau believes that it is an appropriate use of its statutory authority under sections 703(a) and 704B(g)(1) of ECOA to permit creditors to collect information under proposed § 1002.5(a)(4)(viii). A creditor likely would benefit from being able to collect applicants' protected demographic information with assurance of compliance with existing § 1002.5 regardless of whether it actually becomes subject to proposed subpart B reporting at the end of the two-year threshold period. The proposal would effectuate the purposes of and facilitate compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071 because it would facilitate compliance with the 1071 rule's data collection requirements and improve the quality and reliability of the data collected by financial institutions that may be transitioning into being required to collect and report 1071 data.

Proposed § 1002.5(a)(4)(ix) would state that a creditor that is not currently a covered financial institution under proposed § 1002.105(b), and is not otherwise a creditor to which proposed § 1002.5(a)(4)(vii) or (viii) applies, may collect information pursuant to proposed subpart B for a covered application as defined in proposed § 1002.103 regarding whether an applicant for a covered credit transaction is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners if the creditor complies with the requirements of proposed subpart B as otherwise required for covered financial institutions pursuant to proposed §§ 1002.107 through 1002.112 and 1002.114 for that application. The proposal would permit a financial institution that wishes to voluntarily report 1071 data to collect applicants' protected demographic information without running afoul of Regulation B. Unlike creditors subject to proposed § 1002.5(a)(4)(vii) or (viii), a creditor seeking to voluntarily collect applicant's protected demographic information under proposed § 1002.5(a)(4)(ix) would be required to report it to the Bureau.

The Bureau believes that permitting creditors to collect 1071 demographic information pursuant to proposed § 1002.5(a)(4)(vii) or (viii) would facilitate compliance and promote data quality in the event that creditors subject to those provisions later become covered financial institutions. For those creditors that wish to voluntarily report 1071 data, as well as others covered by proposed § 1002.5(a)(4)(ix) (where reporting is required when applicants' protected demographic information is collected), the reported data would be additional information that would further the intended purposes of the statute. An analysis of business and community development needs would benefit from the inclusion of voluntarily reported data from financial institutions below the reporting threshold. Such institutions more often serve sparsely populated rural, underserved communities or are member-owned organizations (such as credit unions). As some SERs suggested, the voluntary collection and reporting of 1071 data by such financial institutions may stem from a community development orientation and commitment to fair lending. Further, the reporting of such data would provide a more complete picture of total lending activity—and therefore enable a more complete analysis of fair lending risks as well as business and community development needs—especially given that larger financial institutions may be less likely to operate in sparsely populated, rural, and underserved communities, for the reasons set out in part II above. The Bureau is proposing § 1002.5(a)(4)(ix) in response to feedback from some stakeholders that indicated they might want to collect and report 1071 data even if they were not required to do so. The Bureau believes, for the reasons set out above, that it is an appropriate use of its general authority under sections 703(a) and 704B(g)(1) of ECOA to permit creditors to collect information under proposed § 1002.5(a)(4)(ix), as such collection would effectuate the purposes of and facilitate compliance with ECOA and is necessary to carry out, enforce, and compile data pursuant to section 1071. Further, the Bureau believes that permitting creditors to collect applicants' protected demographic information would result in the collection of additional information that could carry out section 1071's business and community development purpose.

Existing comment 5(a)(4)–1 currently addresses recordkeeping requirements for ethnicity, race, and sex information that is voluntarily collected for HMDA under the existing provisions of § 1002.5(a)(4). The Bureau is proposing to revise this comment by adding to it a parallel reference to proposed subpart B, along with a statement that the information collected pursuant to proposed subpart B must be retained pursuant to the requirements set forth in proposed § 1002.111.

Proposed comment 5(a)(2)–4 would state that proposed subpart B of Regulation B generally requires creditors that are covered financial institutions as defined in proposed § 1002.105(a) to collect and report information about the ethnicity, race, and sex of the principal owners of applicants for certain small business credit, as well as whether the applicant is minority-owned or women-owned as defined in proposed § 1002.102(m) and (s), respectively. The Bureau is proposing this comment for parity with existing comment 5(a)(2)–2, which

addresses the requirement to collect and report information about the race, ethnicity, and sex of applicants under HMDA. Existing comment 5(a)(2)–3 explains that persons such as loan brokers and correspondents do not violate ECOA or Regulation B if they collect information that they are otherwise prohibited from collecting, where the purpose of collecting the information is to provide it to a creditor that is subject to HMDA or another Federal or State statute or regulation requiring data collection. The Bureau believes that the reference to another Federal statute or regulation adequately encompasses section 1071 and proposed subpart B, and thus it does not propose to amend this existing comment in order to make clear that loan brokers and other persons collecting applicants' protected demographic information on behalf of covered financial institutions are not violating ECOA or Regulation B by doing so.

The Bureau seeks comment on these three proposed exemptions to be added to existing § 1002.5(a)(4), and associated commentary, including whether there are other specific situations that should be added to the list of exemptions in § 1002.5(a)(4) to permit the collection of applicants' protected demographic information, and whether any similar modifications to other provisions are necessary. In particular, the Bureau seeks comment on whether it should add another exemption to § 1002.5(a)(4) relating to proposed § 1002.114(c)(1), wherein the Bureau is proposing to permit financial institutions to collect, but would not require them to report, applicants' protected demographic information prior to the compliance date.

The Bureau also notes that, as discussed in the section-by-section analysis of proposed § 1002.104(a) below, it seeks comment on whether it should permit financial institutions to voluntarily collect and report 1071 data on applications for products that the Bureau is not proposing to cover. If the Bureau were to permit such voluntary collection and reporting, the Bureau expects to add a provision similar to proposed § 1002.5(a)(4)(ix) to address it.

## Subpart B—Small Business Lending Data Collection

### Section 1002.101 Authority, Purpose, and Scope

Proposed § 1002.101 would set forth the authority, purpose, and scope for proposed subpart B. Specifically, it would provide that proposed subpart B is issued by the Bureau pursuant to section 704B of ECOA (15 U.S.C. 1691c–2). It would further state that, except as otherwise provided therein, proposed subpart B applies to covered financial institutions, as defined in proposed § 1002.105(b), other than a person excluded from coverage of this part by section 1029 of the Dodd-Frank Act. It also would set out section 1071's two statutory purposes of facilitating fair lending enforcement and enabling the identification of business and community development needs and opportunities for women-owned, minority-owned, and small businesses.

The Bureau seeks comment on its proposed approach to this section, including whether any other information on the 1071 rule's authority, purpose, or scope should be addressed herein.

### Section 1002.102 Definitions

The Bureau is proposing a number of definitions for terms used in subpart B, in § 1002.102.[299] These definitions generally fall into several categories. First, some definitions in proposed § 1002.102 refer to terms defined elsewhere in proposed subpart B—specifically, the terms business, covered application, covered credit transaction, covered financial institution, financial institution, and small business are defined in proposed §§ 1002.106(a), 1002.103, 1002.104, 1002.105(b), 1002.105(a), and 1002.106(b), respectively. These terms are of particular importance in proposed subpart B, and the Bureau is proposing to define them in separate sections, rather than in proposed § 1002.102, for ease of reading.

Second, some terms in proposed § 1002.102 are defined by cross-referencing the definitions of terms defined in existing Regulation B—specifically, business credit, credit, and State are defined by reference to existing § 1002.2(g), (j), and (aa), respectively. Similarly, several definitions refer to terms defined in other regulations—specifically, a portion of the affiliate definition refers to the SBA's regulation at 13 CFR 121.103, and dwelling refers to the definition in Regulation C § 1003.2(f). These terms are each used in proposed subpart B, and the Bureau believes it is appropriate to incorporate them into the subpart B definitions in this manner.

Finally, the remaining terms are defined directly in proposed § 1002.102. These include applicant, closed-end credit transaction, minority individual, minority-owned business, open-end credit transaction, principal owner, small business lending application register, and women-owned business, as well as a portion of the definition of affiliate. Some of these definitions draw on definitions in existing Regulation B or elsewhere in Federal laws or regulations.

The Bureau believes that basing this proposal's definitions on previously defined terms (whether in Regulation B, Regulation C, or regulations promulgated by another agency), to the extent possible, would minimize regulatory uncertainty and facilitate compliance, particularly where the other regulations are likely to apply, in their own right, to the same transactions. However, as discussed further below, the Bureau is in certain instances proposing to deviate from the existing definitions for purposes of this proposal.

These definitions are each discussed in detail below. The Bureau is proposing these definitions pursuant to its authority under section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. In addition, the Bureau is proposing certain of these definitions to implement particular definitions in section 1071 including the statutory definitions set out in 704B(h). Any other authorities that the Bureau is relying on to propose certain definitions are discussed in the section-by-section analysis of those specific definitions.

The Bureau seeks comment on its proposed approach to each of these definitions, as well as whether there are any other terms that the Bureau should define for purposes of proposed subpart B.

#### 102(a) Affiliate

Proposed § 1002.102(a) would define "affiliate" based on whether the term is used to refer to a financial institution or to an applicant.

Proposed § 1002.102(a) would define "affiliate" with respect to a financial institution as any company that controls, is controlled by, or is under common control with, another company, as set forth in the Bank Holding Company Act of 1956.[300] Existing Regulation B does not define affiliate. This proposed definition

[299] The Bureau notes that there are certain terms defined in proposed subpart B outside of proposed § 1002.102. This occurs where a definition is relevant only to a particular section. For example, the firewall provisions in proposed § 1002.108 use the phrases "involved in making any determination concerning a covered application" and "should have access." Those phrases are defined in § 1002.108(a). Those definitions are discussed in detail in the section-by-section analysis of the provisions in which they appear.

[300] 12 U.S.C. 1841 *et seq.*

would provide a consistent approach with the Bureau's Regulation C, which applies the term to financial institutions, as defined in Regulation C, for certain reporting obligations.[301] The Bureau believes that this definition would be appropriate to define an affiliate of a financial institution, and that it should provide sufficient clarity for financial institutions when determining responsibilities under proposed subpart B.

Proposed § 1002.102(a) would define "affiliate" with respect to a business or an applicant as having the same meaning as described in 13 CFR 121.103, which is an SBA regulation titled "How does SBA determine affiliation?" This proposed definition would provide consistency with the Bureau's proposed approach to what constitutes a small business for purposes of section 1071, as discussed in the section-by-section analysis of proposed § 1002.106(b) below. As discussed in the section-by-section analysis of proposed § 1002.106(b) below, the Bureau is proposing to define a small business by reference to the SBA's regulations (with the exception of an alternate size standard, as set forth in proposed § 1002.106(b)). As discussed in the section-by-section analysis of proposed § 1002.107(a)(14), the Bureau is proposing to permit, but not require, a financial institution to report the gross annual revenue for the applicant in a manner that includes the revenue of affiliates as well. As discussed in the section-by-section analysis of proposed § 1002.107(a)(16), the Bureau is proposing that a financial institution, if asked, shall explain to the applicant that workers for affiliates of the applicant would only be counted if the financial institution were also collecting the affiliates' gross annual revenue. The Bureau is therefore proposing to define affiliate in subpart B for purposes of a business or an applicant by referring to the SBA's definition of affiliate.

The Bureau seeks comment on its proposed approach to this definition.

102(b) Applicant

Proposed § 1002.102(b) would define "applicant" to mean any person who requests or who has received an extension of business credit from a financial institution. The term "applicant" is undefined in section 1071. Proposed § 1002.102(b) is based on the definition of applicant in existing Regulation B, though for consistency with other parts of this proposed rule, it adds a limitation that the credit be business credit and uses the term financial institution instead of creditor. It also omits the references to other persons who are or may become contractually liable regarding an extension of credit such as guarantors, sureties, endorsers, and similar parties. The Bureau is concerned that including other such persons could exceed the scope of the data collection anticipated by section 1071. Including them could also make the data collection more difficult as financial institutions might need to report data points (such as gross annual revenue, NAICS code, time in business, and others) regarding multiple persons in connection with a single application. Collecting such information on guarantors, sureties, endorsers, and similar parties would likely not support 1071's business and community development purpose. Thus, the Bureau believes it is appropriate to limit the definition of applicant in proposed subpart B to only those persons who request, or have received, an extension of business credit from a financial institution.

The Bureau seeks comment on its proposed approach to this definition.

102(c) Business

Proposed § 1002.102(c) would refer to proposed § 1002.106(a) for a definition of the term "business." See the section-by-section analysis of proposed § 1002.106(a) for a detailed discussion of that definition.

102(d) Business Credit

Proposed § 1002.102(d) would refer to existing § 1002.2(g) for a definition of the term "business credit." The term "credit" is undefined in section 1071. Section 1071 does not use the term "business credit," though it does define "small business loan" as a loan made to a small business. Existing § 1002.2(g) defines "business credit" as "referring to extensions of credit primarily for business or commercial (including agricultural) purposes, but excluding extensions of credit of the types described in § 1002.3(a) through (d)." The Bureau believes it is appropriate to define business credit by reference to the existing definition in Regulation B. The Bureau's proposal uses the term business credit principally in defining a covered credit transaction in proposed § 1002.104(a).

As described in the section-by-section analysis of proposed § 1002.104(a) below, loans, lines of credit, credit cards, and MCAs (including such credit transactions for agricultural purposes and those that are also covered by HMDA) would all fall under the proposed definition for business credit.

The Bureau notes existing § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit (that is, extensions of credit made *to* governments or governmental subdivisions, agencies, or instrumentalities—not extensions of credit made *by* governments), as defined in existing § 1002.3(a) through (d), from certain aspects of existing Regulation B.[302] As described in the section-by-section analysis of proposed § 1002.104(b) below, for the purpose of subpart B, the Bureau is proposing complete exclusions for public utilities credit, securities credit, and incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b). The Bureau is not proposing an exclusion for extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities, because governmental entities would not constitute small businesses under the proposed rule.[303] Moreover, as described in the section-by-section analysis of proposed § 1002.104(b) below, the Bureau believes it is appropriate to interpret section 1071 as not applying to factoring, leases, consumer-designated credit used for business purposes, or credit secured by certain investment properties.

The Bureau seeks comment on its proposed approach to this definition.

102(e) Closed-End Credit Transaction

Proposed § 1002.102(e) states that a closed-end credit transaction means an extension of credit that is not an open-end credit transaction under proposed § 1002.102(n). The Bureau's proposal specifies different requirements for collecting and reporting certain data points based on whether the application is for a closed-end credit transaction or an open-end credit transaction. See the section-by-section analysis of proposed § 1002.102(n) for a discussion of what constitutes an open-end credit transaction.

The Bureau seeks comment on its proposed approach to this definition.

102(f) Covered Application

Proposed § 1002.102(f) would refer to proposed § 1002.103 for a definition of the term "covered application." See the

[301] *See* Regulation C comment 4(a)(11)–3.

[302] As explained in existing comment 3–1, under § 1002.3, procedural requirements of Regulation B do not apply to certain types of credit. The comment further states that all classes of transactions remain subject to § 1002.4(a) (the general rule barring discrimination on a prohibited basis) and to any other provision not specifically excepted.

[303] Government entities are not "organized for profit" and thus would not be a "business concern" under proposed § 1002.106(a).

section-by-section analysis of proposed § 1002.103 for a detailed discussion of that definition.

102(g) Covered Credit Transaction

Proposed § 1002.102(g) would refer to proposed § 1002.104 for a definition of the term ''covered credit transaction.'' See the section-by-section analysis of proposed § 1002.104 for a detailed discussion of that definition.

102(h) Covered Financial Institution

Proposed § 1002.102(h) would refer to proposed § 1002.105(b) for a definition of the term ''covered financial institution.'' See the section-by-section analysis of proposed § 1002.105(b) for a detailed discussion of that definition.

102(i) Credit

Proposed § 1002.102(i) would refer to existing § 1002.2(j) for a definition of the term ''credit.'' The term ''credit'' is undefined in section 1071. Existing § 1002.2(j), which largely follows the definition of credit in ECOA,[304] defines ''credit'' to mean the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor. The Bureau believes that referring to this existing definition of credit for purposes of subpart B would help to foster consistency with existing Regulation B. The term credit in proposed subpart B is used in the context of what constitutes a covered credit transaction—that is, whether the application is reportable under the section 1071 rule. See the section-by-section analysis of proposed § 1002.104 below for more details.

The Bureau seeks comment on its proposed approach to this definition.

102(j) Dwelling

Proposed § 1002.102(j) would refer to Regulation C § 1003.2(f) for a definition of the term ''dwelling.'' That provision defines dwelling to mean a residential structure, whether or not attached to real property. The term includes but is not limited to a detached home, an individual condominium or cooperative unit, a manufactured home or other factory-built home, or a multifamily residential structure or community. Proposed comment 102(j)–1 would provide that Bureau interpretations that appear in supplement I to part 1003 containing official commentary in connection with § 1003.2(f) are generally applicable to the definition of a dwelling in proposed § 1002.102(j). Proposed comment 102(j)–2 would clarify that the definition of dwelling under existing § 1002.14(b)(2) applies to relevant provisions under existing Regulation B, and proposed § 1002.102(j) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing § 1002.14(b)(2).

The Bureau believes that adopting the Regulation C definition of dwelling would streamline reporting and minimize compliance risks for financial institutions that are also reporting covered credit transactions under HMDA and would simplify data analysis for HMDA-reportable transactions. As an alternative, the Bureau considered adopting the existing Regulation B definition of dwelling, which is similar to the Regulation C definition. The Bureau understands that the existing Regulation B definition of dwelling is primarily applied in the context of the ECOA Valuations Rule[305] and would thus not streamline reporting and minimize compliance risks in the same way as would adopting the Regulation C definition, which is already being applied to data collection and reporting requirements. The existing Regulation B definition of dwelling is also not supported by the same level of clarifying commentary as the definition under Regulation C. The Bureau believes that proposed comment 102(j)–1 will address most if not all questions related to the definition of dwelling by incorporating the Bureau's official commentary related to § 1003.2(f). Proposed comment 102(j)–2 also seeks to avoid potential confusion by clarifying that proposed § 1002.102(j) does not affect the status of existing § 1002.14(b)(2), which defines the term ''dwelling'' for purposes of existing Regulation B.

The Bureau seeks comment on its proposed approach to this definition.

102(k) Financial Institution

Proposed § 1002.102(*l*) would refer to proposed § 1002.105(a) for a definition of the term ''financial institution.'' See the section-by-section analysis of proposed § 1002.105(a) for a detailed discussion of that definition.

102(l) Minority Individual

Background

ECOA section 704B(b)(1) requires a financial institution to ask whether an applicant is a minority-owned business. Additionally, 704B(h)(5) uses the term ''minority individual'' when defining the term minority-owned business. Although 704B(h)(5) defines the term ''minority,'' section 1071 does not define the term ''minority individual.'' Section 704B(h)(4) defines the term ''minority'' as having the same meaning as in section 1204(c)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).[306] That statute defines ''minority'' to mean any Black American, Native American, Hispanic American, or Asian American.[307]

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing guidance that would clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino [308] (*i.e.,* would mirror the aggregate race and ethnicity categories in Regulation C).thnsp;[309] The Bureau also stated it was considering proposing guidance clarifying that a multi-racial person would be considered a minority individual.

Several SERs supported clarifying the meaning of minority individual using the aggregate categories for race and ethnicity in Regulation C.[310] However, one SER suggested using the disaggregated categories in Regulation C, instead of the aggregate categories, for this purpose. Other stakeholders providing feedback on the SBREFA Outline generally supported using the aggregate categories when determining who is a minority individual for purposes of reporting whether a business is a minority-owned business.

The SBREFA Panel recommended clarifying that, consistent with the aggregate categories for race and ethnicity in Regulation C, a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino.[311]

Proposed Rule

Consistent with the approach that the Bureau took during the SBREFA process, proposed § 1002.102(1) would clarify that the term ''minority

[304] *See* 15 U.S.C. 1691a. Existing Regulation B uses the term ''applicant'' instead of ''debtor.''

[305] *See* 12 CFR 1002.14.

[306] Public Law 101–73, section 1204(c)(3), 103 Stat. 183, 521 (1989) (12 U.S.C. 1811 note).

[307] *Id.*

[308] SBREFA Outline at 18–19.

[309] Appendix B to 12 CFR part 1003.

[310] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 22.

[311] *Id.* at 44.

individual'' means a natural person who is American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. The Bureau believes that these categories represent contemporary, more specific delineations of the categories described in section 1204(c)(3) of FIRREA.[312] Proposed comment 102(1)–2 would clarify that a multi-racial or multi-ethnic person would be a minority individual. Proposed comment 102(1)–1 would clarify that this definition would be used only when an applicant determines whether it is a minority-owned business pursuant to proposed §§ 1002.102(m) and 1002.107(a)(18). Proposed comment 102(1)–3 would clarify the relationship of the definition of minority individual to the disaggregated subcategories used to determine a principal owner's ethnicity and race. The Bureau's proposed approach is consistent with the SBREFA Panel's recommendation discussed above.

The Bureau believes this clarified terminology, which uses the aggregate ethnicity and race categories set forth in existing Regulation B [313] and Regulation C,[314] would avoid the potentially confusing situation where an applicant is using one set of aggregate race and ethnicity categories when answering questions about the principal owners' race and ethnicity but is asked to use a different set of aggregate categories when indicating whether a business is a minority-owned business. It also avoids creating a situation where a financial institution is required to use different race and ethnicity categories when complying with different portions of Regulation B and, if applicable, Regulation C. Consistency among race and ethnicity data collection regimes may also allow for better coordination among data users when reviewing data across multiple data collection regimes.[315]

The Bureau seeks comment on its proposed approach to this definition, including its proposed clarification of the definition of minority individual, and requests comment on whether additional clarification is needed. Additionally, in section-by-section analysis of proposed § 1002.107(a)(20), the Bureau is requesting comment regarding whether an additional category for Middle Eastern or North African should be added for purposes of responding to a financial institution's inquiry regarding a principal owner's ethnicity or race and, if so, how this category should be included and defined. The Bureau also seeks comment on whether the definition of minority individual should include a natural person who is Middle Eastern or North African, as well as whether the inclusion of a natural person who is Middle Eastern or North African in the definition of minority individual for purposes of proposed § 1002.102(*l*) should be dependent on whether Middle Eastern or North African is added as an aggregate category for purposes of proposed § 1002.107(a)(20).

102(m) Minority-Owned Business

Background

ECOA section 704B(b)(1) requires financial institutions to inquire whether applicants for credit are minority-owned businesses. For purposes of the financial institution's inquiry under 704B(b), 704B(h)(5) defines a business as a minority-owned business if (A) more than 50 percent of the ownership or control is held by one or more minority individuals, and (B) more than 50 percent of the net profit or loss accrues to one or more minority individuals. Section 1071 does not expressly define the related terms of ''ownership'' or ''control,'' nor does it describe what it means for net profits or losses to accrue to an individual.

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing use of the statutory definition of ''minority-owned business'' (as set forth above) with further clarification of the terms ''ownership'' and ''control.'' [316] The Bureau considered proposing use of concepts set forth in the Financial Crimes Enforcement Network's (FinCEN) Customer Due Diligence (CDD) rule [317] to clarify these terms.

Some SERs expressed concerns with certain aspects of the statutory definition of minority-owned business, asserting that the definition could cause confusion or pose particular complexities.[318] Several SERs and some other stakeholders providing feedback on the SBREFA Outline asked that the definition of minority-owned business be revised to align with the definition used by other agencies, such as the SBA and the CDFI Fund. These SERs and other commenters recommended that the Bureau use a ''50 percent or more'' threshold for ownership or control, instead of the ''more than 50 percent'' standard in the statutory definition. Conversely, two SERs and several other commenters supported using the statutory definition of minority-owned business, including the ''more than 50 percent'' portion of the definition.

A number of SERs recommended that the Bureau simplify the definition to ensure it is understandable to small business applicants and to thereby facilitate consistent data collection. SERs' suggestions included eliminating the portion of the definition that refers to accrual of net profits and losses, eliminating the portion of the definition that refers to control, and providing a simplified and standardized definition.

Several SERs supported using the concepts of ownership and control in FinCEN's CDD rule when defining minority-owned business; one SER said that doing so would be logical and efficient, while another said it would create regulatory consistency and ease compliance burden. One SER said that most credit unions are familiar with the CDD rule. Generally, other commenters supported use of the CDD concepts to clarify the terms ''ownership'' and ''control.'' They stated that small business applicants are familiar with the concepts in the CDD rule or that they appreciated the consistency with existing regulatory requirements. However, one trade association commenter requested that the Bureau provide simplified applicant-facing materials without clarifying the definition, and two other stakeholders suggested that applicants might not be familiar with the CDD rule or may not understand the CDD rule.

The SBREFA Panel recommended seeking comment on potential interpretations of the definition of minority-owned business to clarify the term and to ensure that small business applicants would be able to understand questions asking if they are minority-owned businesses.[319]

Proposed Rule

Proposed § 1002.102(m) would define a minority-owned business as a business for which more than 50 percent of its ownership or control is held by one or more minority individuals, and more than 50 percent of its net profits or

[312] *See, e.g.,* 80 FR 36356 (June 24, 2015) (NCUA interpretive ruling and policy statement implementing an identical FIRREA definition of minority using this same modern terminology).

[313] 12 CFR 1002.13(a)(1)(i).

[314] Appendix B to 12 CFR part 1003.

[315] For example, the OMB uses these same categories for the classification of Federal data on race and ethnicity. *See* Off. of Mgmt. & Budget, *Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity,* 62 FR 58785 (Oct. 30, 1996).

[316] SBREFA Outline at 18–19.

[317] *See* 31 CFR 1010.230.

[318] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 22.

[319] *Id.* at 44.

losses accrue to one or more minority individuals. This definition is consistent with ECOA section 704B(h)(5) and the Bureau's proposal under consideration in the SBREFA Outline.

Proposed comment 102(m)–1 would explain that a business must satisfy both prongs of the definition to be a minority-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more minority individuals, and (B) more than 50 percent of the net profits or losses accrue to one or more minority individuals.

Proposed comment 102(m)–2 would clarify that the definition of minority-owned business is used only when an applicant determines if it is a minority-owned business for purposes of proposed § 1002.107(a)(18). A financial institution would provide the definition of minority-owned business when asking the applicant to provide minority-owned business status pursuant to proposed § 1002.107(a)(18), but a financial institution would not be permitted or required to make its own determination regarding whether an applicant is a minority-owned business for this purpose.

Proposed comment 102(m)–3 would further note that a financial institution would be permitted to assist an applicant when determining whether it is a minority-owned business but would not be required to do so, and could provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in proposed comments 102(m)–4 through –6. Additionally, for purposes of reporting an applicant's minority-owned business status, a financial institution would rely on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

Consistent with the approach described during the SBREFA process, the Bureau is proposing to clarify ''ownership'' and ''control'' using concepts from the CDD rule. Proposed comment 102(m)–4 would clarify that a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Proposed comment 102(m)–4 would also provide examples of ownership and clarify that, where applicable, ownership would need to be traced or followed through corporate or other indirect ownership structures for purposes of proposed §§ 1002.102(m) and 1002.107(a)(18). Proposed comment 102(m)–5 would clarify that a natural person controls a business if that natural person has significant responsibility to manage or direct the business, and would provide examples of natural persons who control a business. Proposed comment 102(m)–6 would clarify that a business's net profits and losses accrue to a natural person if that natural person receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

The Bureau believes many small business applicants already respond to questions about who owns and who controls a business entity when completing CDD forms or otherwise responding to questions related to the CDD rule and thus should be familiar with the concepts in the CDD rule. Because the CDD rule does not address the second prong of the definition in ECOA section 704B(h)(5) (regarding accrual of net profit or loss), the Bureau is proposing in § 1002.102(m) that this prong of the definition be defined to mean that one or more minority individuals must receive or be legally entitled to receive the net profits or losses or that one or more minority individuals must be legally required to recognize the net profits and losses. However, the Bureau shares some SERs' concerns that the statutory definition of minority-owned business might, in some cases, be difficult for applicants to understand, which could in turn jeopardize the accuracy of reported data. Thus, consistent with the SBREFA Panel's recommendation, the Bureau seeks comment on the proposed definition of minority-owned business and possible alternatives that may clarify the term in order to help ensure that small business applicants can determine whether they are minority-owned businesses for purposes of section 1071 data collection.

### 102(n) Open-End Credit Transaction

Proposed § 1002.102(n) would state that open-end credit transaction means an open-end credit plan as defined in Regulation Z § 1026.2(a)(20), but without regard to whether the credit is consumer credit, as defined in § 1026.2(a)(12), is extended by a creditor, as defined in § 1026.2(a)(17), or is extended to a consumer, as defined in § 1026.2(a)(11). The term ''open-end credit transaction'' is undefined in section 1071. The Bureau's proposal specifies different rules for collecting and reporting certain data points based on whether the application is for a closed-end credit transaction or an open-end credit transaction. The Bureau believes its proposed definition is reasonable because it aligns with the definition of ''open-end credit transaction'' in Regulation Z § 1026.2(a)(20). The Bureau further believes that such alignment will minimize confusion and facilitate compliance.

The Bureau seeks comment on its proposed approach to this definition.

### 102(o) Principal Owner

#### Background

ECOA section 704B(e) requires financial institutions to compile and maintain the ethnicity, race, and sex of an applicant's principal owners. However, section 1071 does not expressly define who is a principal owner of a business.

#### SBREFA Proposal Under Consideration and Feedback

In the SBREFA Outline, the Bureau stated that it was considering proposing to define the term ''principal owner'' in a manner consistent with the CDD rule.[320] Under a definition consistent with the CDD rule, an individual would be a principal owner if the individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the business.

Several SERs and other stakeholders providing feedback on the SBREFA Outline expressed familiarity with the CDD rule, and supported aligning with that rule's 25 percent ownership standard for defining a principal owner for the section 1071 rule.[321] One SER said that aligning definitions with the CDD rule would be logical and efficient. Another SER supported use of the CDD rule's concepts in determining who was a principal owner. Other SERs and stakeholders said they currently collect this information for beneficial owners at or above 20 percent in order to comply with SBA or other requirements and suggested aligning with that standard instead.

The SBREFA Panel recommended that the Bureau propose aligning the definition of principal owner with concepts of ownership and control that exist in other Federal regulations with which financial institutions are already complying, to the extent possible.[322]

#### Proposed Rule

Proposed § 1002.102(o) would define principal owner in a manner that is, in

[320] SBREFA Outline at 32.

[321] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 30.

[322] *Id.* at 46.

part, consistent with the CDD rule. Specifically, a natural person would be a principal owner if the natural person directly owns 25 percent or more of the equity interests of the business. However, as proposed comment 102(o)–1 would note, a natural person would need to directly own an equity share of 25 percent or more in the business in order to be a principal owner. Due to the potential complications with collecting a principal owner's ethnicity, race, and sex information when a trust or entity is an owner, the Bureau is proposing that entities not be considered principal owners and indirect ownership by individuals likewise not be considered when determining if someone is a principal owner for purposes of collecting and reporting principal owners' ethnicity, race, and sex or the number of principal owners. Thus, when determining who is a principal owner, ownership would not be traced through multiple corporate structures to determine if a natural person owns 25 percent or more of the applicant's equity interests. Additionally, because only a natural person would be a principal owner for the 1071 rule, entities such trusts, partnerships, limited liability companies, and corporations, would not be principal owners.

Proposed comment 102(o)–2 would clarify that a financial institution would provide an applicant with the definition of principal owner when asking the applicant to provide the number of its principal owners pursuant to proposed § 1002.107(a)(21) and the ethnicity, race, and sex of its principal owners pursuant to proposed § 1002.107(a)(20). If a financial institution meets in person with a natural person about a covered application, the financial institution may be required to determine if the natural person with whom it meets is a principal owner in order to collect and report the principal owner's ethnicity and race based on visual observation and/or surname. (See proposed comments 107(a)(20)–5 and –9.) Additionally, proposed comment 102(o)–2 would note that if an applicant does not provide the number of its principal owners in response to the financial institution's request pursuant to proposed § 1002.107(a)(21), the financial institution may need to determine the number of the applicant's principal owners and report that information based on other documents or information. (See proposed comments 107(a)(21)–1 through –3.)

Consistent with its approach in the SBREFA Outline and with the SBREFA Panel's recommendation, the Bureau is proposing that the definition of principal owner align with the 25 percent ownership definition in the CDD rule. The Bureau believes that this standard, which aligns with another Federal regulation, is already broadly in use and is likely to be familiar to most financial institutions and applicants. Banks, credit unions, and certain other financial institutions must comply with the CDD rule. The Bureau believes applicants, as a general matter, are more likely to be familiar with CDD requirements than SBA or CDFI Fund requirements because they have to complete CDD forms before opening an initial account (*i.e.,* loan or deposit account) at a bank or at certain other institutions. However, due to potential complications with collecting ethnicity, race, and sex information for principal owners, the Bureau is proposing that individuals that only indirectly own 25 percent or more of an applicant's equity interests, as well as entities and trusts, are not principal owners.

The Bureau notes that it is possible under its proposed approach that an applicant might not identify any principal owners as being women or minorities but nonetheless could be a women- and/or minority-owned business. This could occur, for example, if a white male owned 40 percent of a business while three Asian women each owned 20 percent. Only the white male would be designated as a principal owner, but the business would be nonetheless both women-owned and minority-owned. While the Bureau acknowledges that some applicants could find this approach confusing, it is consistent with the statutory language in section 1071. To help mitigate against potential confusion, the Bureau has proposed that the questions regarding minority-owned business status and women-owned business status appear in the proposed sample data collection form before questions about the race, sex, and ethnicity of principal owners.

The Bureau seeks comment on this proposed definition of a principal owner, including the proposal not to include individuals that only indirectly own 25 percent or more of an applicant's equity interests as principal owners. The Bureau requests comment on whether additional clarification on any aspect of the proposed definition is needed.

102(p) Small Business

Proposed § 1002.102(p) would refer to proposed § 1002.106(b) for a definition of the term ''small business.'' See the section-by-section analysis of proposed § 1002.106(b) for a detailed discussion of that definition.

102(q) Small Business Lending Application Register

Proposed § 1002.102(q) would define the term ''small business lending application register'' or ''register'' as the data reported, or required to be reported, annually pursuant to proposed § 1002.109. The Bureau did not include a definition of small business lending application register in the SBREFA Outline, though it did address proposals under consideration for compiling, maintaining, and reporting 1071 data to the Bureau.[323] See the section-by-section analysis of proposed § 1002.109 for a detailed discussion of the proposed rule's provisions addressing reporting data to the Bureau, including feedback received from SERs and other stakeholders on that subject. The Bureau's proposed definition refers only to the data that is reported, or required to be reported, annually; it does not refer to the data required to be collected and maintained (prior to reporting).[324]

The Bureau seeks comment on its proposed definition of ''small business lending application register'' or ''register'' in proposed § 1002.102(q).

102(r) State

Proposed § 1002.102(r) would refer to existing § 1002.2(aa) for a definition of the term ''State.'' Existing § 1002.2(aa) defines the term as any State, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States. The Bureau did not include a definition of State in the SBREFA Outline nor did it receive any feedback on the term from SERs. This proposed definition of State would be consistent with existing Regulation B and familiar to financial institutions.

The Bureau seeks comment on its proposed approach to this definition.

102(s) Women-Owned Business

Background

ECOA section 704B(b)(1) requires financial institutions to inquire whether applicants for credit are women-owned businesses. For purposes of the financial institution's inquiry under 704B(b), 704B(h)(5) defines a business as a women-owned business if (A) more than 50 percent of the ownership or control is held by one or more women, and (B) more than 50 percent of the net profit or loss accrues to one or more women.

[323] SBREFA Outline at 39.

[324] In contrast, the term ''Loan/Application Register'' in Regulation C § 1003.2(k) refers to both the record of information required to be collected pursuant to § 1003.4 as well as the record submitted annually or quarterly, as applicable, pursuant to § 1003.5(a).

Section 1071 does not expressly define the related terms of "ownership" or "control," nor does it describe what it means for net profits or losses to accrue to an individual.

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing use of the statutory definition of a "women-owned business" (as set forth above) with further clarification of the terms "ownership" and "control" using concepts set forth in the CDD rule.[325]

Some SERs expressed concerns with certain aspects of the statutory definition of women-owned business, asserting that the definition could cause confusion or pose particular complexities.[326] Several SERs and some other stakeholders providing feedback on the SBREFA Outline asked that the definition of women-owned business be revised to align with the definition used by other agencies, such as the SBA and the CDFI Fund. Some SERs as well as some other commenters expressed concern that a business that is owned equally by a woman and a man would not be a "women-owned business" under the statutory definition of women-owned business because the woman would not own "more than 50 percent" of the business and the woman might not control more than 50 percent of the business. These SERs and other commenters recommended that the Bureau instead use a "50 percent or more" threshold for ownership or control as the standard. Conversely, two SERs and several other stakeholders supported using the statutory definition of women-owned business, including the "more than 50 percent" portion of the definition.

A number of SERs recommended that the Bureau simplify the definition to ensure it is understandable to small business applicants and to thereby facilitate consistent data collection. SERs' suggestions included eliminating the portion of the definition that refers to accrual of net profit and loss, eliminating the portion of the definition that refers to control, and providing a simplified and standardized definition.

Several SERs supported using the concepts of ownership and control in the CDD rule when defining women-owned business; one SER said that doing so would be logical and efficient, while another said it would create regulatory consistency and ease compliance burden. One SER said that most credit unions are familiar with the CDD rule. Generally, other commenters supported use of the CDD concepts to clarify the terms "ownership" and "control." They stated that small business applicants are familiar with the concepts in the CDD rule or that they appreciated the consistency with existing regulatory requirements. However, one trade association commenter thought the Bureau should provide simplified applicant-facing materials without clarifying the definition, and two other stakeholders suggested that applicants might not be familiar with the CDD rule or may not understand the CDD rule.

The SBREFA Panel recommended seeking comment on potential interpretations of the definition of women-owned business to clarify the term and to ensure that small business applicants would be able to understand questions asking if they are a women-owned business.[327]

Proposed Rule

Proposed § 1002.102(s) would define a women-owned business as a business for which more than 50 percent of its ownership or control is held by one or more women, and more than 50 percent of its net profits or losses accrue to one or more women. This definition is consistent with ECOA section 704B(h)(6) and the Bureau's proposal under consideration in the SBREFA Outline.

Proposed comment 102(s)–1 would explain that a business must satisfy both prongs of the definition to be a women-owned business—that is, (A) more than 50 percent of the ownership or control is held by one or more women, and (B) more than 50 percent of the net profits or losses accrue to one or more women.

Proposed comment 102(s)–2 would clarify that the definition of women-owned business is used only when an applicant determines if it is a women-owned business for purposes of proposed § 1002.107(a)(19). A financial institution would provide the definition of women-owned business when asking the applicant to provide women-owned business status pursuant to proposed § 1002.107(a)(19), but a financial institution would not be permitted or required to make its own determination regarding whether an applicant is a women-owned business for this purpose.

Proposed comment 102(s)–3 would further note that a financial institution would be permitted to assist an applicant when determining whether it is a women-owned business but would not be required to do so, and could provide the applicant with the definitions of ownership, control, and accrual of net profits or losses set forth in proposed comments 102(s)–4 through –6. Additionally, for purposes of reporting an applicant's women-owned business status, a financial institution would rely on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

Consistent with the approach during the SBREFA process, the Bureau is proposing to clarify "ownership" and "control" using concepts from the CDD rule. Proposed comment 102(s)–4 would clarify that a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Proposed comment 102(s)–4 would also provide examples of ownership and clarify that, where applicable, ownership would need to be traced or followed through corporate or other indirect ownership structures for purposes of proposed §§ 1002.102(s) and 1002.107(a)(19). Proposed comment 102(s)–5 would clarify that a natural person controls a business if that natural person has significant responsibility to manage or direct the business and would provide examples of natural persons who control a business. Proposed comment 102(s)–6 would clarify that a business's net profits and losses accrue to a natural person if that natural person receives the net profits, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

The Bureau believes many small business applicants already respond to questions about who owns and who controls a business entity when completing CDD forms or otherwise responding to questions related to the CDD rule and would be familiar with the concepts in the CDD rule. Because the CDD rule does not address the second prong of the definition in ECOA section 704B(h)(6) (regarding accrual of net profit or loss), the Bureau is proposing in comment 102(s)–4 that this prong of the definition be defined to mean that one or more women must receive or be legally entitled to receive the net profits or losses or that one or more women must be legally required to recognize the net profits or losses. However, the Bureau shares some SERs' concerns that the statutory definition of women-owned business might, in some cases, be difficult for applicants to

[325] SBREFA Outline at 18–19.

[326] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 22.

[327] *Id.* at 44.

understand, which could in turn jeopardize the accuracy of reported data. Thus, consistent with the SBREFA Panel's recommendation, the Bureau seeks comment on the proposed definition of women-owned business and possible alternatives that may clarify the term in order to help ensure that small business applicants can determine whether they are a women-owned business for purposes of section 1071 data collection.

Section 1002.103 Covered Applications

ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding ''any application to a financial institution for credit.'' For covered financial institutions, the definition of ''application'' will trigger data collection and reporting obligations with respect to covered credit transactions. However, section 1071 does not expressly define ''application.''

The Bureau is proposing § 1002.103 to define what is, and is not, a covered application for purposes of subpart B pursuant to its authority in ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Proposed § 1002.103(a) would provide a general definition of the term ''covered application,'' followed by a list of the circumstances that are not covered applications in proposed § 1002.103(b).

103(a) Covered Application

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering defining an ''application'' largely consistent with the definition of that term in existing § 1002.2(f)—*i.e.,* ''an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested.''[328] The Bureau considered possible alternative definitions of ''application,'' including defining the term by using the definition of the term ''completed application'' in existing § 1002.2(f) (when ''a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested . . . ''). The Bureau also considered defining ''application'' as particular documents or specific data points that, if collected, would trigger a duty to collect and report data.

SERs discussed their varied methods of defining what constitutes an ''application'' within their institutions.[329] Many SERs define an application as the point when there is enough information to make a credit decision. Several SERs define an application as meeting the requirements of a checklist, stating that obtaining all the information and satisfying due diligence can take a long time. Other SERs define an application as the submission of specific data or documents, or obtaining sufficient information about the borrower to pull a credit report. One SER explained that their in-person application process is iterative, not readily definable, and unique for each applicant. The SER also explained that a single underwriting process could be used at their financial institution for multiple loans requested throughout the year.

Several SERs supported using the definition of ''application'' in existing § 1002.2(f). One of these SERs emphasized the importance of capturing data that may indicate potential discouragement of minority-owned businesses, including discouragement that could occur in advance of an application being submitted for underwriting. Another SER stated that using the definition in existing § 1002.2(f) would be helpful for training purposes, rather than creating a wholly new definition for purposes of implementing section 1071. Many SERs urged the Bureau in an eventual 1071 rule to define an application as a completed application, that is, at the point when there is sufficient information to render a credit decision. One SER opposed using the definition of ''completed application,'' explaining that it would be too restrictive and less aligned with the purposes of section 1071. Another SER opposed use of the definition of application in existing § 1002.2(f), explaining that in a ''relationship lending'' model, each small business application is unique.

SERs expressed varying views on whether withdrawn and incomplete applications should be captured in the 1071 data. Some SERs felt incomplete applications should be captured in the 1071 data as a potential indicator of discouragement. One SER stated that small and unsophisticated businesses are more likely to leave an application incomplete. Another SER recommended not capturing incomplete applications, asserting that such data would not be informative or useful. Another SER expressed concern about whether incomplete or withdrawn applications would include sufficient data for reporting.

Other stakeholders also provided feedback on the definition of ''application.'' The overwhelming majority of commenters, including both community groups and industry representatives, supported use of the definition of an ''application'' in existing § 1002.2(f). Community groups, CDFIs, and a SER noted that use of the definition would further the purposes of 1071 by capturing applicants dissuaded from completing an application, potentially due to unlawful discouragement or other discrimination. Commenters highlighted research that minority-owned and women-owned businesses are disproportionately discouraged from applying for credit and the frequency of discrimination during the pre-application stage. One commenter stated that the definition could better identify barriers to credit, consistent with the community development purpose of section 1071. Other commenters, including many industry commenters, stated that financial institutions are familiar with the definition in existing § 1002.2(f), and so use of this definition would reduce burden by minimizing the need for additional training or different procedures. Several commenters also stated that using the definition in existing § 1002.2(f) is appropriate given that section 1071 amends ECOA, which is implemented by existing Regulation B. One industry commenter also highlighted the flexibility provided by the definition in existing § 1002.2(f).

Although supportive of using the definition in existing § 1002.2(f) for the 1071 rule, several industry commenters sought further clarification or illustrations of the definition given considerable variations in practices among financial institutions. One commenter suggested a safe harbor that allows a financial institution to define what constitutes an ''application.'' One industry trade representative expressed that many of its members have no formal ''application'' and so attempts to leverage existing definitions or stages to define an application would be unfamiliar to their members and could create an inflexible process.

Several industry commenters supported triggering section 1071 data collection and reporting based on the ''completed application'' definition in existing § 1002.2(f) and stated that the Bureau should not require data collection on withdrawn and incomplete applications. These commenters stated that using a

[328] SBREFA Outline at 22–23.

[329] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 24.

"completed application" definition would provide more complete and meaningful data, more uniformity across products and lenders, and conserve resources that would otherwise be required to gather missing data points on incomplete or withdrawn applications. One commenter stated that collection of data on incomplete applications would not further section 1071's purposes or reflect potential discrimination, but rather would merely represent borrower confusion in the application process. One commenter suggested using a defined set of criteria to define an "application."

Several SERs and other stakeholders also provided comments on applicant requests for more than one product at the same time. For example, in connection with the application/loan number data point (referred to in this proposal as the unique identifier data point), one SER stated that if an applicant requests more than one type of credit product, a separate application/loan number is assigned to each product request. In contrast, other SERs indicated they use a single application number even if multiple products are requested. Among other stakeholders, some commenters supported reporting separate applications in instances where the applicant requests multiple covered credit transactions at the same time, while others supported requiring reporting of only one application. One commenter suggested that the Bureau should accommodate both approaches. Another commenter remarked that if a business is applying for multiple products, the basic information is going to be the same, the only difference being that only one product is funded. This same commenter suggested that if these requests are reported as multiple applications, that will overinflate the data.

Relatedly, two SERs discussed the issue of multiple extensions of credit resulting from a single application. One of these SERs explained that such multiple extensions of credit are assigned separate application/loan numbers at their financial institution. The other SER suggested that reporting in this situation will be complex, and that combining the separate loans that could result into a single reporting line would be extremely difficult.

The SBREFA Panel recommended that, if the Bureau proposes using the Regulation B definition of the term "application"[330] for 1071 data collection, the Bureau consider clarifying when a completed application—*i.e.,* an application sufficient to make a credit decision—falls within the proposed definition of the term "application." [331] The SBREFA Panel further recommended the Bureau seek comment on the benefits and costs of collecting 1071 data on incomplete or withdrawn applications.[332] Finally, with respect to lines of credit, the SBREFA Panel recommended (in the context of the loan/credit type and loan/credit purpose data points) that the Bureau seek comment on how financial institutions currently handle increases in lines of credit and how best to require reporting of multiple lines of credit within the same account.[333]

Proposed Rule

The Bureau is proposing to define a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. This proposed definition of "covered application" is consistent with the definition of "application" that the Bureau said it was considering proposing in the SBREFA Outline.[334] As noted above, the term "application" is undefined in section 1071. The Bureau believes its proposed definition of the term is reasonable, particularly as it aligns with the definition of "application" in existing § 1002.2(f). The Bureau is also proposing commentary to accompany this definition. Circumstances that are not covered applications are addressed in the section-by-section analysis of proposed § 1002.103(b) below. Pursuant to ECOA section 704B(b)(1), an "application" triggering data collection and reporting obligations occurs without regard to whether such application is received in person, by mail, by telephone, by electronic mail or other form of electronic transmission, or by any other means.

Several SERs and a majority of other commenters supported use of this definition, noting that it best aligns with the purposes of section 1071 and is familiar to creditors. The Bureau agrees with certain SERs and other commenters that incomplete and withdrawn applications—which would generally be captured under proposed § 1002.103(a)—are essential to the purposes of section 1071 as a tool to identify potential discrimination (including through discouragement) and to better understand the credit market.

The definition of "covered application" in proposed § 1002.103(a), which is similar to the definition of "application" in existing § 1002.2(f), is also familiar to creditors and provides flexibility to accommodate different application processes described by the SERs (including written and oral applications; online and relationship lending models; and use of standard forms, checklists, and other minimum requirements).[335] Finally, the Bureau believes this approach strikes an appropriate balance by triggering 1071 collection and reporting requirements only after there is a request for credit (using procedures defined by the financial institution), but still early enough in the process to capture most incomplete, withdrawn, and denied applications.

The Bureau recognizes that the proposed definition of "covered application" in § 1002.103(a), while flexible, would mean that 1071 data collection and reporting may be triggered at different times for different financial institutions and different types of covered credit transactions. For example, for a financial institution that defines an application under its procedures as the submission of a standard form either online or in-person, a "covered application" would be triggered when an applicant submits the form. In contrast, another financial institution may not use a standard form and instead define an application as a request for credit and authorization to pull a credit check on the business and principal owners. In that circumstance, a "covered application" under proposed § 1002.103(a) would not be triggered until that process is satisfied. Using the same example, if the financial institution orally collects certain information from a prospective applicant (such as gross annual revenue and business location) and discusses with the prospective applicant potential credit product options offered by the

[330] 12 CFR 1002.2(f).

[331] SBREFA Panel Report at 45.

[332] *Id.*

[333] *Id.*

[334] SBREFA Outline at 22–23.

[335] Business creditors should be familiar with operationalizing this definition based on their experience providing adverse action notices under existing Regulation B, which can be triggered in relation to an incomplete application. *See* § 1002.9(a)(1) and (c) (requiring notice within 30 days after taking adverse action on an incomplete application or 30 days after receiving an incomplete application). Financial institutions may also be familiar with Regulation C's definition of "application," which aligns with existing § 1002.2(f)'s definition of the term. *See* § 1003.2(b) (generally defining an "application" as "an oral or written request for a covered loan that is made in accordance with procedures used by a financial institution for the type of credit requested"); *see also* Regulation C comment 2(b)–1 (noting that Bureau interpretations that appear in the official commentary to Regulation B are generally applicable to the definition of application under Regulation C).

financial institution, no ''covered application'' would be triggered until the prospective applicant indicates that it wants to proceed to apply for credit and authorizes the financial institution to pull a credit check. Similarly, if a prospective applicant merely expresses interest in obtaining credit—not yet focusing on any particular type of covered credit transaction and not submitting a ''covered application''—the interaction also would not be reportable. While the proposed definition of ''covered application'' does not provide a bright-line rule, the Bureau believes the proposed definition would be familiar to financial institutions and provide consistency with existing Regulation B and Regulation C.

During SBREFA, SERs asked the Bureau to clarify when an application sufficient to make a credit decision would align with an ''application'' triggering 1071 collection and reporting requirements. Accordingly, the Bureau notes that a ''covered application'' may align with the information necessary to make a credit decision or it may be possible to have a ''covered application'' before having information necessary to make a credit decision—it depends on each financial institution's own procedures. For example, suppose a financial institution defines an application under its procedures as the point when an applicant, or someone on the applicant's behalf, fills out certain key pieces of information on an application form. If the financial institution's process is to immediately transmit the application to underwriting for a decision once the form is submitted, 1071 collection and reporting would likely be triggered at the same time there is sufficient information to make a credit decision. On the other hand, if the financial institution requires additional verification of documents and follow-up requests before submitting the loan file to underwriting, the financial institution would likely have a ''covered application'' before it has sufficient information to make a credit decision.

Proposed comment 103(a)–1 would underscore that a financial institution has latitude to establish its own application process or procedure and to decide the type and amount of information it will require from applicants. Proposed comment 103(a)–2 would explain that the term ''procedures'' refers to the actual practices followed by a financial institution as well as its stated application procedures, and provides an example. Because the definition of ''covered application'' is based on a financial institution's actual practices, a financial institution should have little incentive to attempt to artificially define an ''application'' in its written procedures as occurring later in the process; for example, if a financial institution has near a 100 percent approval rate because all ''applications'' have already been vetted earlier in the process, the financial institution's stated definition of an application likely does not reflect its actual practices. Proposed comment 103(a)–3 would provide that the commentary accompanying existing §§ 1002.2(f) and 1002.9 is generally applicable to the proposed definition of ''covered application,'' except as provided otherwise in proposed § 1002.103(b).

Proposed comments 103(a)–4 through –6 would address how a financial institution reports multiple covered credit transaction requests at one time or a request for a credit transaction that results in the origination of multiple covered credit transactions. Proposed comment 103(a)–4 would provide that if an applicant makes a request for two or more covered credit transactions at one time, the financial institution reports each request for a covered credit transaction as a separate covered application. The Bureau believes the proposed approach would further the purposes of section 1071 by better capturing demand for credit, including demand for different covered credit transactions at the same time. The Bureau also believes that the simplicity of this approach would reduce data reporting errors compared to potential alternatives, for example, alternatives in which the financial institution may sometimes report such requests as a single covered application or, in other circumstances, as multiple covered applications. Finally, the Bureau believes that concerns about duplicative information requests would be mitigated by permitting financial institutions to reuse certain previously collected data, as set forth in proposed § 1002.107(c)(2). In response to SERs' feedback, proposed comment 103(a)–5 would address the circumstance where an initial request for a single covered credit transaction results in the origination of multiple covered credit transactions. Similarly, in response to the SBREFA Panel's recommendations, proposed comment 103(a)–6 would address requests for multiple lines of credit at one time, proposing that such requests would be reported based on the procedures used by the financial institution for the type of credit account.

Proposed comment 103(a)–7 would address how a financial institution would report applications where there is a change in whether the applicant is requesting a covered credit transaction. If the applicant initially requests a covered credit transaction, but during the application process is offered and accepts instead a product that is not reportable, the Bureau is proposing to designate this circumstance as not a covered application, due in part to concerns that reporting in this scenario could affect data quality. For example, reporting on product types that are not covered credit transactions (for example, leases) could raise data quality questions if there are not appropriate fields to capture the terms of those transactions. Despite these concerns, the Bureau is also considering whether capturing such transactions in the 1071 data could be useful to identifying potential steering or other forms of discrimination, therefore furthering the purposes of section 1071. As noted below, the Bureau seeks comment on whether to require full or limited reporting in these circumstances. If an applicant initially requests a product that is not a covered credit transaction, but during the application process decides to seek instead a product that is a covered credit transaction, the application is a covered application and must be reported.

The Bureau seeks comment on its proposed definition of a covered application in § 1002.103(a) and associated commentary. The Bureau also seeks comment on the advantages and disadvantages of collecting data on incomplete or withdrawn applications, as well as how collection would or would not further the purposes of section 1071. In addition, the Bureau seeks comment on reporting of multiple lines of credit on a single credit account, including how financial institutions internally consider multiple lines of a credit on a single account and the Bureau's proposed approach in comment 103(a)–6.

As noted above, the Bureau also seeks comment on how a financial institution should report applications where there is a change in whether the request for credit involves a covered credit transaction. Specifically, the Bureau seeks comment on the advantages and disadvantages of requiring full or limited reporting where an applicant initially seeks a product that is a covered credit transaction, but ultimately is offered and accepts a product that is not reportable. For example, whether in those circumstances the financial institution should report limited data points related to the transaction (such as whether the applicant is a small business; whether the applicant is a women-owned business or a minority-owned business;

the principal owners' race, sex, and ethnicity; number of principal owners; gross annual revenue; and loan type reported as ''Non-reportable credit product'' or something similar). The Bureau is particularly interested in receiving comments on the utility of such data to identify potential steering or other forms of discrimination, the effect on data quality, and other factors related to the purposes of section 1071.

Alternatives Considered

The Bureau considered several other options for defining ''application.'' First, the Bureau considered triggering 1071 collection and reporting based on a ''completed application,'' which is defined in existing § 1002.2(f) as an application in which the creditor has received ''all the information that the creditor regularly obtains and considers'' in evaluating similar products. The Bureau is not proposing to use the definition of ''completed application'' in existing § 1002.2(f) for its definition of covered application in subpart B, as doing so would exclude incomplete applications and many withdrawn applications that may reflect demand for credit and potential discrimination during the application process. While some commenters noted that use of this definition would provide uniformity in the data across financial institutions and product types, the Bureau is concerned about the loss of data on incomplete and withdrawn applications. Although some commenters suggested that the ''completed application'' definition could result in more accurate and complete data because it is collected later in the application process, the Bureau believes that this benefit can largely be obtained under the current proposal by requiring financial institutions to report, where available, verified applicant-provided information, as set forth in proposed § 1002.107(b). Although some SERs and other stakeholders urged the Bureau to define an application based on when there is sufficient information to render a credit decision, as pointed out by another SER, such a definition may not be as effective in furthering the purposes of 1071. For example, it would capture few to no incomplete applications and a smaller share of withdrawn applications. Moreover, as discussed above, in certain situations—depending on a financial institution's application procedures—the definition of a covered application in proposed § 1002.103(a) may align with the point where there is enough information to render a credit decision.

The Bureau also considered defining ''covered application'' as a set of specific data points that, if collected, would trigger a duty to collect and report 1071 data. The Bureau is not proposing this approach for a few reasons. First, this approach would introduce another regulatory definition of ''application,'' [336] which could cause confusion and hinder compliance. Second, this approach could require financial institutions to alter their existing practices, resulting in burden. Third, this approach could lead some financial institutions to intentionally delay the gathering of one or more data points until after a credit decision was made in order to avoid triggering 1071 obligations. Last, this approach may be difficult to execute given that financial institutions use different data points in underwriting based on product type, lending model, exposure, and other factors.

103(b) Circumstances That Are Not Covered Applications

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering clarifying circumstances that would not be reportable under section 1071, even if certain of those circumstances would otherwise be considered an ''application'' under existing § 1002.2(f). Specifically, those circumstances were: (1) Inquiries/prequalifications; (2) reevaluation, extension, and renewal requests, except requests for additional credit amounts; and (3) solicitations and firm offers of credit.[337]

*Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.* Several SERs supported the Bureau's proposal under consideration to exclude renewals unless additional credit is requested; one SER also supported excluding solicitations.[338] Several SERs urged the Bureau to exclude line increases as a distinct type of application, explaining that financial institutions may not require a new application for such requests and that underwriting a line increase request is substantively distinct from underwriting a request for new credit because a line increase extensively relies on past performance data and prior relationships. Due to these differences, one SER suggested that including line increases may skew 1071 data, causing misinterpretations. The SBREFA Panel recommended the Bureau seek comment on whether to include line increases as a separate reportable application.[339] The SBREFA Panel also recommended that the Bureau seek comment on how financial institutions currently handle increases in lines of credit.[340]

A number of other industry stakeholders also supported the Bureau's proposal under consideration to exclude reevaluations, extensions, and renewal requests (except requests for additional credit amounts). The commenters stated that such collection would be duplicative since financial institutions would also be reporting data on the original application (perhaps in the same reporting year). The commenters also noted that extension requests are often short term and granted without a full application process, that requiring reporting could lead to fewer financial institutions offering extensions due to the added collection and reporting burden (particularly for open-ended credit), and that providing an exemption would be consistent with HMDA reporting. One commenter sought exclusion of rate adjustments. Community group commenters opposed exclusion of reevaluations, renewals, and extensions.

Several industry commenters opposed 1071 collection and reporting on reevaluations, extensions, or renewals that seek additional credit amounts. These commenters stated that 1071 collection and reporting should focus on data collected at the time of origination, that collecting data repeatedly from the same borrowers would add burden, and that collecting data for line increases would make it difficult for financial institutions to provide timely approvals. One commenter suggested only reporting on additional credit amounts if the original note is replaced. Other industry commenters—while not explicitly opposing such collection—suggested the Bureau further consider whether increases or renewals with additional credit amounts should be an ''application'' for purposes of the rule. The commenters noted that such increases/renewals are typically more streamlined than a standard application given the financial institution already has the applicant's information in its possession, and that the Bureau should carefully balance burden (which could

[336] Although certain regulations define an ''application'' as a set of specific data points (*e.g.*, name, income, property address, estimated property value, etc.), many of the data points in those regulations are specific to the mortgage context and would not be applicable to small business lending. These regulations also do not relate to data collection. *See, e.g.*, Regulation X § 1024.2(b) and Regulation Z § 1026.2(a)(3).

[337] SBREFA Outline at 22–24.

[338] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 24–25.

[339] *Id.* at 45–46.

[340] *Id.*

affect how such requests could be processed) with benefit (obtaining additional data on the same applicant). One industry representative supported collection on requests that include additional credit amounts. Another commenter sought clarification on what would be reported in such circumstances: The newly advanced funds or the entire outstanding amount.

*Inquiries and prequalification requests.* Several SERs urged the Bureau not to require reporting on prequalifications or inquiries. These SERs explained that they encounter a high number of inquiries from rate shoppers asking about qualification requirements and potential rates, many of which are abandoned or otherwise do not progress to a completed application.[341] A significant number of other industry commenters also supported the Bureau's proposal under consideration to exclude inquiries and prequalifications. These commenters noted that such inquiries could include countless informal interactions that would be difficult to collect in a consistent manner and that may lead to misleading or erroneous data. The commenters also stated that collection would be duplicative and impose significant burden without countervailing benefits. Community group commenters expressed support for collecting data on inquiries and prequalifications to identify discrimination that occurs before an application is submitted.

*Solicitations and firm offers of credit.* A number of industry commenters supported exclusion of solicitations and firm offers of credit. One commenter noted that excluding such data would avoid duplicative steps and be consistent with the purposes of section 1071.

Proposed Rule

Proposed § 1002.103(b) would identify certain circumstances that are not covered applications—even if they otherwise would be considered an application under existing § 1002.2(f). Specifically, the Bureau is proposing that a covered application does not include (1) reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts; and (2) inquiries and prequalification requests. As discussed below, solicitations and firm offers of credit would also not be "covered applications" under the proposed definition. The Bureau is also proposing comments 103(b)–1 through –5 to provide additional guidance and examples of circumstances that do and do not trigger 1071 collection and reporting as a covered application. For example, proposed comment 103(b)–4 clarifies that the term "covered application" does not include evaluations or reviews of existing accounts initiated by the financial institution.

*Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.* The Bureau is proposing to exclude from the definition of a "covered application" requests by borrowers to modify the terms or duration of an existing extension of credit, other than (as explained below) requests for additional credit amounts. The Bureau believes that requests to modify the terms or duration of an existing extension of credit, which occur with high frequency in the small business lending space, may add complexity and burden for financial institutions, while potentially providing limited additional information relevant to the purposes of section 1071. Moreover, broadly including requests to modify the terms or duration of existing extensions of credit might affect the quality of the data absent additional flags to distinguish the transactions from new originations. The Bureau is also concerned about the impact of adding 1071 collection and reporting requirements to what are otherwise streamlined evaluations, particularly given the limited additional data that would be gained from such reporting. The Bureau also notes that Regulation C takes a similar approach by excluding reporting of loan modifications.[342]

In contrast, the Bureau is not proposing to exclude requests for additional credit amounts (such as line increases or new money on existing facilities). That is, reporting would be required for requests for additional credit amounts. The Bureau believes that capturing requests for additional credit amounts will further the purposes of section 1071, particularly the community development purpose, as it would more accurately capture demand for credit. Although several SERs and other commenters opposed reporting on new credit amounts—due to the potentially streamlined nature of such reviews (which may differ from underwriting of new applications) and concerns about duplicative reporting—the Bureau believes these factors do not outweigh the potential community development benefits of reporting and collection. Moreover, the Bureau believes that concerns about duplicative reporting would be mitigated by proposed § 1002.107(c)(2), which would permit a financial institution to reuse certain data points under certain circumstances. In addition, under proposed § 1002.107(a)(7) and (8), when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution would only report the additional credit amount sought (and approved or originated, as applicable), and not the entire credit amount extended. A request to withdraw additional credit amounts at or below a previously approved credit limit amount on an existing open-end line of credit would not be a covered application as the request falls within the terms of a previously approved covered credit agreement.

*Inquiries and prequalification requests.* Existing Regulation B recognizes that before a consumer or business requests credit in accordance with the procedures used by a creditor for the type of credit requested, a creditor may provide a prospective applicant with information about credit terms. Existing Regulation B comments 2(f)–3 and 9–5 refer to these situations as inquiries and prequalification requests. Generally, an inquiry occurs when a consumer or business requests information about credit terms offered by a creditor; a prequalification request generally refers to a request by a consumer or business for a preliminary determination on whether the prospective applicant would likely qualify for credit under a creditor's standards or for what amount.[343] Under existing Regulation B comments 2(f)–3 and 9–5, an inquiry or prequalification request may become an "application" that triggers adverse action notification requirements if the creditor evaluates information about the consumer or business, decides to decline the request, and communicates this to the consumer or business; otherwise, such inquiries and prequalification requests are generally not considered applications under existing Regulation B. As explained in existing comment 2(f)–3,

[341] *Id.* at 24–25.

[342] *See* Regulation C comment 2(d)–2.

[343] *See also* Regulation C comment 2(b)–2 (describing prequalification requests). In addition, a preapproval as described in existing comment 2(f)–5.i of Regulation B is an example of an application under existing Regulation B. Under that comment, a preapproval occurs when a creditor reviews a request under a program in which the creditor, after a comprehensive analysis of an applicant's creditworthiness, issues a written commitment valid for a designated period of time to extend a loan up to a specified amount. If a creditor's program does not provide for giving written commitments, requests for preapprovals are treated as prequalification requests.

whether the inquiry or prequalification request becomes an application depends on how the creditor responds to the consumer or business, not on what the consumer or business says or asks.

Regulation C excludes all prequalification requests from HMDA reporting, even if the prequalification request becomes an application under existing Regulation B.[344] Regulation C does not address reporting of inquiries more generally.

The Bureau is proposing to exclude inquiries and prequalification requests as a "covered application," even if the inquiry or prequalification request may become an "application" under existing § 1002.2(f) that may trigger notification requirements. The Bureau agrees with SERs and other commenters that requiring data collection for all inquiries and prequalifications could create operational challenges given that such interactions may be voluminous and typically occur before a financial institution has the relevant data or processes in place for tracking requests for credit. The Bureau is likewise concerned that requiring the collection of 1071 data for these requests could pose data accuracy issues, given the often informal nature of these interactions, which may raise the risk of missing, unavailable, or erroneous data. In addition, reporting of inquiries and prequalifications could be duplicative if the applicant subsequently applies for credit in accordance with the procedures designated by the financial institution.

The Bureau also has concerns about requiring reporting of inquiries and prequalification requests only in situations that would otherwise be treated as an "application" under existing Regulation B—*i.e.,* when the financial institution evaluates information about the consumer or business, decides to decline the request, and communicates this to the consumer or business. The Bureau is concerned that the logistics of reporting an inquiry or prequalification only in certain circumstances—if the institution evaluates the information, declines the request, and communicates it to the business—would be operationally challenging for financial institutions and could lead to data distortion as only denials would be captured. In these circumstances, a financial institution may prefer reporting all inquiries and prequalifications, which could lead to some of the challenges identified above. The Bureau is also considering the market effects of requiring reporting only for certain inquiries and prequalification requests, including whether it would cause financial institutions to restrict such interactions or services.

The Bureau, however, remains concerned about potential discrimination that may occur in these early interactions with a financial institution. In particular, the Bureau is concerned about excluding data on inquiries and prequalification requests when the financial institution evaluates information about a business and declines the request, which may be useful for identifying potential prohibited discouragement of or discrimination against applicants or prospective applicants.

On balance, the Bureau believes it is appropriate to interpret "application" as used in section 1071 to exclude inquiries and prequalification requests given the considerations identified above, including the timing and often informal nature of such interactions, the operational challenges of implementing such a definition, and related concerns about the reliability of the data.

Although the Bureau is proposing to exclude inquiries and prequalification requests from the definition of "covered application," the Bureau notes that the relevant analysis of whether an inquiry or prequalification request is reportable focuses on how the financial institution structures, processes, and responds to such requests, not what they are called. For example, if a financial institution has a formalized process to screen businesses requesting credit and deny those it considers ineligible, a request for credit that goes through that process may be a "covered application," even if the financial institution labels the review a "prequalification" request or an "inquiry."

The Bureau further notes that requests for credit that meet the proposed definition of "covered application" would be reportable, even if the application was preceded by an inquiry or prequalification request. For example, if a business initially seeks information about potential credit offerings, the financial institution responds, and then the business submits an application for a covered credit transaction following the financial institution's procedures, the application would be reportable. If, on the other hand, the business asks about potential credit offerings, but then chooses not to submit an application, there is no covered application.

Finally, the Bureau notes that inquiries and prequalification requests where the institution evaluates the information, declines the request, and communicates it to the business or consumer, are "applications" under existing Regulation B, and are thus subject to its requirements regarding "applications," including its adverse action notification requirements and nondiscrimination provisions. In no way are the exclusions in proposed § 1002.103(b) intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term application in existing § 1002.2(f) as applicable to existing Regulation B.

*Solicitations and firm offers of credit.* Proposed comment 103(b)–4 would clarify that the term covered application does not include solicitations and firm offers of credit; like other reviews or evaluations initiated by the financial institution, these communications do not involve an *applicant* requesting credit, and so are not "covered applications." Excluding solicitations and firm offers of credit is also consistent with the language of ECOA section 704B(b)(1), which provides that an application in response to a solicitation by a financial institution could be an application under section 1071, but the text is silent on solicitations without any applicant response. Thus, consistent with the statutory language, a solicitation or firm offer of credit may become a "covered application" under the proposed definition if an applicant responds to the solicitation or offer by requesting a covered credit transaction.

In conclusion and for the reasons identified above, the Bureau believes its proposed exclusion of inquiries and prequalification requests is reasonable. Similarly, the Bureau believes its proposed exclusion of reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts, is a reasonable interpretation of an "application" as used in section 1071 for the reasons described above, including that the original extension of credit would be collected and reported and further reporting would yield limited additional data. The Bureau also believes its proposed treatment of solicitations and firm offers of credit is a reasonable interpretation of an "application" as used in section 1071, as discussed above.

The Bureau seeks comment on its proposed definition of a covered application in § 1002.103(b) and associated commentary. The Bureau also seeks comment on whether instead to define a "covered application," consistent with existing Regulation B, to include inquiries or prequalification requests where the financial institution evaluates information about the business, decides to decline the request,

[344] *See* Regulation C comment 2(b)–2.

and communicates this to the business. Related to this alternative approach, the Bureau further seeks comment on whether additional data fields may be necessary in order to distinguish prequalification requests and inquiries from other reported applications. In addition, if the Bureau were to require reporting of declined inquiries or prequalification requests (as described above), the Bureau seeks comment on whether financial institutions would want the option to report all prequalification requests and inquiries, to allow for a comparison with denials.

In addition, the Bureau seeks comment on whether, alternatively, to define a ''covered application'' consistent with Regulation C, which (as discussed above) does not require a financial institution to report prequalification requests, even if those requests may constitute applications under existing Regulation B for purposes of adverse action notices, but does not address reporting of inquiries more generally. Related to this alternative approach, the Bureau also seeks comment on whether greater clarity could be achieved by defining, for purposes of proposed subpart B only, inquiries as requests for information about loan terms that do not become applications under existing Regulation B, and prequalification requests as requests that may become applications under existing Regulation B. In addition, the Bureau also seeks comment on the frequency with which financial institutions accept prequalification requests (as described in Regulation C comment 2(b)–2, but with respect to prospective business applicants) and what data are collected in connection with such prequalification requests, as well as potential effects on the market if some or all prequalification requests were reportable under section 1071.

Consistent with the SBREFA Panel's recommendation, the Bureau also seeks comment on whether to include line increase requests as a ''covered application'' and information on how financial institutions currently process requests for a line of credit increase. In addition to line increases, the Bureau also seeks comment on financial institution practices related to other types of requests for additional credit amounts, and whether such requests should be captured in 1071 data.

Lastly, the Bureau notes that Regulation C requires the reporting of assumptions for HMDA,[345] but the Bureau does not have information on whether assumptions are similarly used in the small business lending context. The Bureau seeks comment on this issue, including how an assumption in small business lending might be structured (for example, whether it is typically a modification of an existing extension of credit or a new extension of credit), the frequency of assumptions in the small business lending context, and whether reporting of assumptions for small business lending would further the purposes of section 1071.

Section 1002.104 Covered Credit Transactions and Excluded Transactions

104(a) Covered Credit Transaction

ECOA section 704B(b) requires financial institutions to collect and report information regarding any application for ''credit'' made by women-owned, minority-owned, or small businesses. Although the term ''credit'' is not specifically defined in section 1071, ECOA defines ''credit'' as ''the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor.'' [346] As noted above in the section-by-section analysis of § 1002.102(d), existing Regulation B further defines ''business credit'' as ''extensions of credit primarily for business or commercial (including agricultural) purposes,'' with some exclusions.[347] As discussed in detail below, the Bureau is proposing to require that covered financial institutions report data for all applications for transactions that meet the definition of business credit unless otherwise excluded. Proposed § 1002.104(a) would define the term ''covered credit transaction'' as an extension of business credit that is not an excluded transaction under proposed § 1002.104(b). Loans, lines of credit, credit cards, and MCAs (including such credit transactions for agricultural purposes and HMDA-reportable transactions) would all fall within the scope of this proposed rule, which would cover the majority of products that small businesses use to obtain financing.[348] As such, the Bureau believes that the inclusion of these products in the Bureau's 1071 rule is important to fulfilling the purposes of section 1071. Pursuant to this approach, the Bureau notes that the products discussed below do not constitute an exhaustive list of covered credit transactions; other types of business credit not specifically described below would nevertheless constitute covered credit transactions unless excluded by proposed § 1002.104(b).

Proposed § 1002.104(b), in turn, would state that the requirements of subpart B do not apply to trade credit, public utilities credit, securities credit, and incidental credit. Associated commentary would make clear that the term ''covered credit transaction'' also does not cover factoring, leases, consumer-designated credit used for business purposes, or credit secured by certain investment properties.

For the reasons set forth below, the Bureau is proposing § 1002.104 pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071.

In the SBREFA Outline, the Bureau stated that it was considering proposing that a covered product under section 1071 is one that meets the definition of ''credit'' under ECOA and is not otherwise excluded from collection and reporting requirements.[349] Specifically, the Bureau stated that it was considering proposing that covered products under section 1071 would include term loans, lines of credit, and credit cards. The Bureau stated that term loans, lines of credit, and credit cards meet the definition of ''credit'' under ECOA and these products collectively make up the majority of business financing products used by small businesses and are an essential source of financing for such businesses.[350] The Bureau also proffered in the SBREFA Outline that the inclusion of these products in the Bureau's 1071 rule is important to fulfilling the purposes of section 1071.[351] The Bureau also stated in SBREFA Outline that it was considering proposing that the following products *not* be covered by the 1071 rule: consumer credit used for business purposes; leases; trade credit; factoring; and MCAs.[352]

SERs and other stakeholders providing feedback on the SBREFA Outline generally supported the Bureau's proposal under consideration to include term loans, lines of credit, and credit cards as covered products under section 1071.[353] Many stakeholders (including roughly half the SERs) urged the Bureau to pursue

[345] *See* Regulation C comment 2(j)–5 (discussing when assumptions should be reported as home purchase loans).

[346] 15 U.S.C. 1691a(d); *see also* § 1002.2(j).

[347] 12 CFR 1002.2(g).

[348] *See* White Paper at 21–22.

[349] SBREFA Outline at 19–20.

[350] *Id.* at 20.

[351] *Id.*

[352] *Id.*

[353] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 22–23.

expansive product coverage in order to adequately capture small businesses' experiences with obtaining financing, especially for women-owned and minority-owned small businesses. Many SERs and other stakeholders advocated for including MCAs within the scope of the eventual 1071 rule; some SERs and stakeholders also advocated for including factoring, and in some cases leases as well, in order to capture the full landscape of small business financing. Multiple stakeholders expressed concern that the exclusions under consideration for certain products (*e.g.,* MCAs) would disproportionately burden traditional lenders who do not offer such products.

As discussed below, the Bureau proposes that the 1071 rule cover loans, lines of credit, credit cards, and MCAs. The Bureau also explains below that "covered credit transaction" would encompass agricultural-purpose credit and HMDA-reportable transactions.

*Loans, lines of credit, and credit cards.* As noted above, stakeholders generally presume and support the coverage of loans, lines of credit, and credit cards. These products are commonly offered to small business applicants (making up almost 60 percent of the aggregate dollar volume of various financial products used by small businesses).[354] The Bureau is not proposing definitions for loans, lines of credit, and credit cards because the Bureau believes these products are generally and adequately covered by the proposed definition of "credit" in proposed § 1002.102(i).[355]

The Bureau seeks comment on its proposed approach to covered credit transactions and particularly on whether it should define loans, lines of credit, and credit cards, and, if so, how.

*Merchant cash advances.* MCAs are a form of financing for small businesses that purport to be structured as a sale of potential future income. MCAs vary in form and substance, but under a typical MCA, a merchant receives a cash advance and promises to repay it plus some additional amount or multiple of the amount advanced (*e.g.,* 1.2 or 1.5, the "payback" or "factor" "rate"). The merchant promises to repay by either pledging a percentage of its future revenue, such as its daily credit and debit card receipts (the "holdback percentage"), or agreeing to pay a fixed daily withdrawal amount to the MCA provider until the agreed upon payment amount is satisfied. MCA contracts often provide for repayment directly through the merchant's card processor and/or via ACH withdrawals from the merchant's bank account.[356] MCAs constitute the primary product under an umbrella that the Bureau refers to as "sales-based financing"; generally, transactions wherein a financial institution extends funds to a business and repayment is based on the business's anticipated sales, revenue, or invoices.[357]

The Bureau understands that the MCA market is generally dominated by nondepository lenders not subject to Federal safety and soundness supervision or reporting requirements. The Bureau also understands that MCA providers may not be required to obtain State lending licenses. As a result, information on MCA lending volume and practices is limited. The Bureau notes, however, that California recently enacted a law that brings providers of commercial financing options, including factoring and MCAs, into the California Financing Law (CFL), which will impose disclosure requirements.[358] New York also enacted a law that would impose similar disclosure requirements upon certain New York commercial financing providers, including MCA providers.[359]

Although the Bureau's 2017 White Paper estimated the MCA market constituted less than 1 percent of the aggregate dollar volume of various financial products used by small businesses in the U.S. in 2014,[360] the Bureau finds that more recent evidence suggests the industry may now be much larger. For example, the 2020 Federal Reserve Banks' survey of firms with 1–499 employees ("employer firms") found that 8 percent of such businesses applied for and regularly used MCAs.[361] Moreover, on August 18, 2019, the trade website deBanked reported that according to an investment bank's projections, "the MCA industry will have more than doubled its small business funding to $19.2 billion by year-end 2019, up from $8.6 billion in 2014."[362]

Based on stakeholder feedback and available data, the Bureau understands that MCAs are often used by merchants due to the speed and ease with which they can be obtained,[363] particularly for merchants unable to obtain financing from more traditional sources.[364] According to the 2020 Federal Reserve Banks' report regarding firms owned by people of color (both small employer firms and non-employer firms), Black-owned firms, Hispanic-owned firms, and Asian-owned firms were more likely to have applied for MCAs (14 percent, 10 percent, and 10 percent

[354] *See id.* at 21 fig. 2.

[355] As noted in the section-by-section analysis of proposed § 1002.107(a)(5) below, the Bureau distinguishes between secured and unsecured loans and lines of credit when financial institutions report the type of credit product being applied for. The Bureau does not believe that this distinction has relevance to whether these products constitute "credit."

[356] This description is based on the Bureau's review of a sample of MCA contracts that the Bureau believes fairly represent typical MCA contracts in the market. The Bureau's review comports with observations made by industry and community groups regarding MCAs.

[357] As stated below, the Bureau is not proposing to specifically define sales-based financing in the 1071 rule because the Bureau believes these products are covered by the proposed definition of "credit" in proposed § 1002.102(i). New York and California laws have recently sought to define sales-based financing. New York law, for example, defines "sales-based financing" as "a transaction that is repaid by the recipient to the provider, over time, as a percentage of sales or revenue, in which the payment amount may increase or decrease according to the volume of sales made or revenue received by the recipient." N.Y. Fin. Serv. 801(j). New York's definition of sales-based financing also encompasses a true-up mechanism where the financing is repaid as a fixed payment but provides for a reconciliation process that adjusts the payment to an amount that is a percentage of sales or revenue. *Id.* California law uses a similar definition. *See* 10 Cal. Code Reg. 2057(a)(22) (defining sales-based financing as "a commercial financing transaction that is repaid by a recipient to the financer as a percentage of sales or income, in which the payment amount increases and decreases according to the volume of sales made or income received by the recipient" and including "a true-up mechanism").

[358] The new law does not go so far as to amend the CFL to require factors or MCA providers to be licensed, but it does impose first-in-the-nation disclosure requirements in connection with these products similar to those imposed under TILA. *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*. The law will be implemented through regulations, which have not been finalized yet. *See* State of Cal. Dep't of Bus. Oversight (DBO), *Draft Regulations* (July 26, 2019), *https://dbo.ca.gov/wp-content/uploads/sites/296/2019/07/SB-1235-Draft-Regulations-7-26-19.pdf*.

[359] N.Y. S.B. S5470B (Dec. 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*.

[360] *See* White Paper at 21 fig. 2, 22 fig. 3.

[361] Fed. Reserve Banks, *Small Business Credit Survey—2021 Report on Employer Firms,* at 24 (Feb. 3, 2021), *https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/2021-sbcs-employer-firms-report* (2021 Small Business Credit Survey). Starting in 2017, the Federal Reserve Banks began to gather specific data on MCAs for its annual reports on small business financing for employer firms—in the 2017 report, the survey found that 7 percent of such businesses applied for and regularly used MCAs. Fed. Reserve Banks, *Small Business Credit Survey—2017 Report on Employer Firms,* at 9 (Apr. 11, 2017), *https://www.fedsmallbusiness.org/medialibrary/fedsmallbusiness/files/2018/sbcs-employer-firms-report.pdf* (2017 Small Business Credit Survey).

[362] Paul Sweeney, *Gold Rush: Merchant Cash Advances Are Still Hot,* deBanked (Aug. 18, 2019), *https://debanked.com/2019/08/gold-rush-merchant-cash-advances-are-still-hot/*.

[363] *See* 2021 Small Business Credit Survey at 26 (reporting that 84 percent of surveyed credit applicants were approved for an MCA, as compared to a 43 percent approval rate for personal loans).

[364] *See id.* at 22 (noting that only 7 percent of "high credit risk" applicants obtained all the financing sought).

respectively) than white-owned firms (7 percent).[365] The Bureau believes that this report supports stakeholders' assertions that minority-owned businesses are more likely to use MCAs.

The Bureau believes that the higher frequency of MCA use among minority-owned businesses coupled with reports of problematic provider practices lends credence to many stakeholders' claims that MCAs may raise fair lending concerns. The FTC released a Staff Perspective in February 2020 discussing its concerns with the MCA industry [366] and noting the industry's tendency to "cater to higher-risk businesses or owners with low credit scores—typically offering them higher-cost products." [367] The FTC has also filed enforcement actions against MCA providers and their principals, in one case alleging that they misrepresented the terms of MCAs that they provided, and then used "unfair collection practices, including sometimes threatening physical violence, to compel consumers to pay." [368] The FTC recently obtained a settlement that requires an MCA provider to pay more than $9.8 million to settle charges that it took money from businesses' bank accounts without permission and deceived them about the amount of financing business owners would receive and other features of its financing products.[369] Moreover, the Bureau understands that the default rate amongst small businesses that use MCAs is relatively high—5 to 15 percent according to one estimate (compared with a 2 percent default rate on SBA loans).[370] The Bureau believes this high default rate may be explained by the fact that the typical MCA holdback percentage—10 to 20 percent of gross receipts or revenues—may be onerous for already cash-strapped small businesses.[371] The Bureau also understands that it is not uncommon for small businesses that use MCAs to obtain new MCAs from other MCA providers (more than a quarter of such businesses, by one account); [372] they also may use one MCA to pay off another. Firms that take on added debt loads in this way (a process known as "stacking") "may not fully recognize the costs involved, which could potentially jeopardize the financial health of their businesses." [373]

As small businesses struggle with the COVID–19 pandemic, the Bureau is seeing more reports of MCA providers employing aggressive collection practices, such as "pursuing legal claims against owners that freeze their bank accounts and . . . pressing their family members, neighbors, insurers, distributors—even their customers." [374] Given the fact that 84 percent of the credit applicants surveyed by the Federal Reserve Banks were approved for an MCA [375] and the fact that it appears significantly more difficult to obtain credit as a "high credit risk" applicant during the COVID–19 pandemic,[376] the Bureau believes that vulnerable small businesses are increasingly seeking MCAs to support their pandemic recovery.

In its SBREFA Outline, the Bureau stated that it was considering proposing that MCAs not be a covered product under section 1071 since including them may add additional complexity or reporting burden given the unique structure of the transactions.[377]

During and following the SBREFA Panel meetings, many SERs advocated for including MCAs within the scope of the 1071 rule due, in part, to their widespread use by small businesses in the same way as traditional loans. In response to the SBREFA Outline, many other stakeholders, including community groups and industry representatives, urged the inclusion of MCAs for one or more of the following reasons:

- MCAs are widely used by small businesses and have a rapidly growing market share.
- MCAs are often advertised as loans even though MCA providers have been strongly opposed to labeling their products as loans.
- The complexity of MCAs is not a good reason to exclude them from coverage.
- Minority-owned small businesses disproportionately use MCAs.
- Excluding the largely unregulated MCA industry would create unequal regulatory burdens for entities that may compete for the same small business clients.
- MCAs should be considered "credit" for the purposes of section 1071.
- Small businesses do not distinguish these products from other forms of financing.
- Some MCA providers engage in harmful practices and should be subject to oversight.

The Bureau observes that, throughout the development of the 1071 rule, MCAs have been the focus of significant attention and a unique source of near-consensus among a diverse array of stakeholders—almost all of whom advocated for covering MCAs in the 1071 rule.[378] The only commenters that have supported the exclusion of MCAs from the 1071 rule were MCA providers or trade associations representing MCA providers. These stakeholders argue that MCAs do not meet the definition of

---

[365] Small Business Credit Survey of Firms Owned by People of Color at 30.

[366] Fed. Trade Comm'n, *'Strictly Business' Forum, Staff Perspective,* at 6–8 (Feb. 2020), *https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-ftcs-strictly-business-forum/strictly_business_forum_staff_perspective.pdf.*

[367] *See id.* at 2.

[368] Press Release, Fed. Trade Comm'n, *New York-Based Finance Companies Deceived Small Businesses, Non-Profits and Seized Their Personal and Business Assets* (June 10, 2020), *https://www.ftc.gov/news-events/press-releases/2020/06/new-york-based-finance-companies-deceived-small-businesses. See also* Press Release, Fed. Trade Comm'n, *FTC Alleges Merchant Cash Advance Provider Overcharged Small Businesses Millions* (Aug. 3, 2020), *https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small.*

[369] Press Release, Fed. Trade Comm'n, *Cash Advance Firm to Pay $9.8M to Settle FTC Complaint It Overcharged Small Businesses* (Apr. 22, 2021), *https://www.ftc.gov/news-events/press-releases/2021/04/cash-advance-firm-pay-98m-settle-ftc-complaint-it-overcharged.*

[370] Kevin Voigt, *It's the Wild West Out There: NerdWallet Special Report,* NerdWallet (Oct. 13, 2016), *https://www.nerdwallet.com/blog/small-business-special-report-mca/.*

[371] *See* Bd. of Governors of the Fed. Reserve Sys., *Browsing to Borrow: "Mom & Pop" Small Business Perspectives on Online Lenders,* at 9 (June 2018), *https://www.federalreserve.gov/publications/files/2018-small-business-lending.pdf* (Board Small Business Perspectives) (noting that when asked "about the toughest part of running their businesses, most participants cited the challenges of managing their cash flow"); *id.* at 5 (noting that "[s]ome observers have argued that the owner's loss of control over cash flow puts some small businesses at risk"). The Bureau also notes that many MCA providers believe that they are not subject to State usury laws.

[372] *See* Opportunity Fund, *Unaffordable and Unsustainable: The New Business Lending,* at 3 (May 2016), *https://www.leg.state.nv.us/App/InterimCommittee/REL/Document/13129* (stating that "[m]ore than a quarter of the businesses in our dataset had loans outstanding with multiple alternative lenders").

[373] Board Small Business Perspectives at 6.

[374] Gretchen Morgenson, *FTC official: Legal 'loan sharks' may be exploiting coronavirus to squeeze small businesses,* NBC News (Apr. 3 2020), *https://www.nbcnews.com/business/economy/ftc-official-legal-loan-sharks-may-be-exploiting-coronavirus-squeeze-n1173346.*

[375] *See* 2021 Small Business Credit Survey at 26.

[376] *Compare id.* at 22 (noting that only 7 percent of "high credit risk" applicants obtained all the financing sought), *with* Fed. Reserve Banks, *Small Business Credit Survey—2020 Report on Employer Firms,* at 12 (Apr. 7, 2020), *https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2020/2020-sbcs-employer-firms-report* (reporting that 23 percent of "high credit risk" applicants obtained all the financing sought) (2020 Small Business Credit Survey).

[377] SBREFA Outline at 22.

[378] For instance, of the substantive responses to the 2017 RFI, comments authored or co-authored by dozens of stakeholders (including community and business groups, industry, and trade associations) expressed explicit support for requiring the reporting of MCAs (and additional letters expressed support for covering "fintech" or "alternative online" products more generally).

credit under ECOA or State law and are instead much like traditional factoring arrangements, which are generally understood not to be credit.

Potential coverage of MCAs under the 1071 rule has also drawn the attention of government entities seeking to regulate the industry. For example, in response to the SBREFA Outline, the California Department of Financial Protection and Innovation submitted a comment letter stating that "nearly all the data points would be just as easy for an MCA company to report as any other financial institution." In addition, FTC staff submitted a comment letter in response to the Bureau's Request for Information on the Equal Credit Opportunity Act and Regulation B [379] noting that the FTC has brought many actions protecting small businesses but that detecting illegal conduct in this space can be challenging, particularly with regard to MCAs. The FTC comment letter urges the Bureau to remind small business lenders that whether a particular law applies depends on actual facts and circumstances and not solely on how one party chooses to characterize the transaction. FTC staff also recommends the Bureau help small businesses through data collection, collecting complaints, and education.

Upon further consideration and in light of stakeholder feedback provided during the SBREFA process, the Bureau is proposing to cover MCAs as reportable under 1071. The Bureau believes that the statutory term "credit" in ECOA is ambiguous as to whether it covers sales-based financing products like MCAs, and existing Regulation B offers no further clarity except to note in commentary that factoring, as "a purchase of accounts receivable," is not covered by ECOA or Regulation B.[380] Based on its review of typical MCA arrangements and its expertise with respect to the nature of credit transactions, the Bureau believes that the better reading of the term "credit" is that it encompasses MCAs and other types of sales-based financing. As noted above, ECOA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." The Bureau is thus not proposing to specifically define MCAs or other sales-based financing in the 1071 rule because the Bureau believes these products are covered by the proposed definition of "credit" in § 1002.102(i). Nor does the Bureau believe that MCAs should be excluded from the rule as a species of factoring (as defined in proposed comment 104(a)–2), because MCAs are not based on accounts receivable from "goods that the recipient has supplied or services that the recipient has rendered."

As an initial matter, the Bureau believes that MCAs do not constitute factoring within the meaning of the existing commentary to Regulation B or the definition in proposed comment 104(b)–1, discussed in greater detail below. In factoring transactions, entities receiving financing sell their legal right to payment from a third party for goods supplied or services rendered, and that right exists at the time of the transaction itself; the provider of funds seeks payment directly from the third party, and the transaction between the recipient and the provider of funds is complete at the time of the sale. In other words, the recipient of the financing has no remaining payment obligation, meaning that no payment is deferred. In contrast, at the time of the advance in an MCA, the recipient of the financing has no existing rights to payment that it can transfer. The transaction thus constitutes only a promise by the "seller" to transfer funds to the "buyer" once they materialize at a later date. The Bureau believes that the ECOA definition of credit, by referring to the right to "defer" payments, necessarily invokes this temporal consideration.

Furthermore, the Bureau interprets ECOA's definition of credit as making dispositive whether one party has granted another the right to repay at some time subsequent to the initial transaction, without consideration of factors such as the existence of recourse or analysis of who bears the risk of loss. MCA providers grant such a right: They advance funds to small businesses and grant them the right to defer repayment by allowing them to repay over time. Additionally, as a practical matter, the Bureau understands that MCAs are underwritten and function like a typical loan (*i.e.,* underwriting of the recipient of the funds; repayment that functionally comes from the recipient's own accounts rather than from a third party; repayment of the advance itself plus additional amounts akin to interest; and, at least for some subset of MCAs, repayment in regular intervals over a predictable period of time).

Finally, the Bureau believes that the inclusion of MCAs in the Bureau's 1071 rule is important to fulfilling both the fair lending and the business and community development purposes of section 1071.[381] The Bureau also believes that including MCAs would create a more level playing field across financial institutions that provide cash flow financing to small businesses as well as create a data set that better reflects demand for such financing by the smallest and most vulnerable businesses.

The Bureau seeks comment on its proposed approach to covered credit transactions, and in particular, on whether it should define MCAs and/or other sales-based financing transactions, and if so, how.

*Agricultural-purpose credit.* In the SBREFA Outline, the Bureau did not expressly address credit used for agricultural purposes, although such credit is generally covered by the broad definition of credit under ECOA and agricultural businesses are included in section 1071's definition of small business.[382] Based on questions from SERs about the Bureau's intended approach, however, the SBREFA Panel recommended that the Bureau address in the proposed rule whether it intends to cover agricultural loans in the eventual 1071 rule.[383] Moreover, in a July 2019 report, the U.S. Government Accountability Office (GAO) discussed its finding that information on the amount and types of agricultural credit to socially disadvantaged farmers and ranchers (SDFRs) [384] is limited, and suggested that the 1071 rulemaking may be a way to engage in "additional data collection and reporting for nonmortgage loans." [385]

[379] 85 FR 46600 (Aug. 3, 2020).

[380] Existing comment 9(a)(3)–3.

[381] ECOA section 704B(a).

[382] ECOA section 704B(h)(2) (defining a small business as having the same meaning as the term "small business concern" in section 3 of the Small Business Act (15 U.S.C. 632)"). Section 704B(h)(2) defines small business by reference to the Small Business Act definition of a small business concern, which includes independently owned and operated "enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries." 15 U.S.C. 632(a)(1).

[383] SBREFA Panel Report at 44.

[384] The U.S. Department of Agriculture (USDA) defines SDFRs as members of certain racial and ethnic minority groups and women. According to the GAO, USDA regulations further define SDFRs as belonging to the following groups: American Indians or Alaskan Natives, Asians, Blacks or African Americans, Native Hawaiians or other Pacific Islanders, Hispanics, and women. *See* Gov't Accountability Off., *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers is Limited,* at 2 (2019), *https://www.gao.gov/assets/710/700218.pdf* (GAO Report). The Bureau notes that those five categories align with the Bureau's proposed categories used in the definition of "minority individual" in proposed § 1002.102(*l*).

[385] GAO Report at 16.

According to the 2017 Census of Agriculture,[386] there are about 3.4 million farmers and ranchers (''producers'') working on 2 million farming and ranching operations (''farms'') in the United States. The U.S. Department of Agriculture (USDA) Economic Research Service found that family farms (where the majority of the business is owned by the operator and individuals related to the operator) of various types together accounted for nearly 98 percent of U.S. farms in 2019.[387] Small family farms (less than $350,000 in gross cash farm income (GCFI)) accounted for 90 percent of all U.S. farms and large-scale family farms ($1 million or more in GCFI) make up about 3 percent of farms but 44 percent of the value of production.[388]

According to the 2019 Annual Report of the Farm Credit Administration, most agricultural lending (approximately 83 percent) is done by either commercial banks or the Farm Credit System (FCS), a network of government-sponsored entities (GSEs) regulated by the Farm Credit Administration, an independent government agency.[389] The USDA's Farm Service Agency accounts for a small share (3 percent) of agricultural credit through direct loans and guarantees of loans made by private lenders.[390]

The GAO found that, using 2015–2017 USDA survey data, SDFRs represented an estimated 17 percent of primary producers in the survey, but accounted for only an estimated 8 percent of total outstanding agricultural debt.[391] Loans to purchase agricultural real estate accounted for most of SDFRs' outstanding debt (67 percent).[392] Farms with minority or women primary producers [393] are, on average, smaller and bring in less revenue than farms with a non-SDFR primary producer (*i.e.,* a white male)—while SDFRs represented 30 percent of all farms, they operated 21 percent of total farm land and accounted for 13 percent of the market value of agricultural products sold in 2017.[394]

The share of minority representation in farming, particularly that of Black farmers, has declined sharply over the last 100 years.[395] The number of female producers has increased significantly over the last 100 years but remains relatively small compared to male farm producers.[396] Based on the disposition of numerous lawsuits alleging discrimination against minority farmers,[397] the Bureau believes that credit discrimination may play a role in this decline. The GAO cites SDFR advocacy groups, which have said some SDFRs face actual or perceived unfair treatment in lending or may be dissuaded from applying for credit because of past instances of alleged discrimination.[398] In addition, the GAO cites SDFR advocacy groups, lending industry representatives, and Federal officials in stating that SDFRs are more likely to operate smaller, lower-revenue farms, have weaker credit histories, or lack clear title to their agricultural land, which can make it difficult for them to qualify for loans.[399] The Bureau understands that determining the ''creditworthiness'' of a farmer is often a judgmental process in which lending decisions are de-centralized and involve weighing many discretionary factors, the Bureau believes that there are heightened fair lending risks in agricultural lending.

In light of the above, the Bureau believes that covering agricultural credit in its 1071 rule is important for both of section 1071's statutory purposes, and is not proposing to define covered credit in a way that would exclude agricultural credit from the rule. The Bureau seeks comment on the potential costs and complexities associated with covering such credit.

*HMDA-reportable transactions.* By adopting Regulation C's definition of dwelling and its commentary regarding investment properties, the Bureau seeks to ensure consistency and minimize compliance burdens for financial institutions that must also report credit transactions covered by HMDA (that is, HMDA-reportable transactions). Based on Bureau calculations using the 2019 HMDA data, the Bureau found that close to 2,000 lenders and around 530,000 applications indicated a ''business or commercial purpose'' and around 500,000 applications were used for an ''investment'' (as defined by the occupancy code) purpose. Of those applications, around 50,000 were for 5+ unit properties. The overall number of applications the Bureau expects to be reported annually under the proposed rule is around 26 million. Thus, the Bureau anticipates a relatively small but not insignificant overlap regarding real estate investment loans between HMDA and 1071.

The Bureau has considered excluding all transactions that were also reportable under HMDA, but believes such an exclusion would add complexity to data analysis. The Bureau understands that requiring lenders to find and delete from databases that supply their 1071 submission only those transactions that also appear in HMDA may require a separate scrub of the data and create additional compliance burden, as well as compliance risk if HMDA-reportable transactions are not deleted from a 1071 submission. For example, if the Bureau were to exclude HMDA reportable transactions from 1071 and a small business wants to purchase a 5+ dwelling unit property (that the financial institution would need to know is HMDA reportable), the

[386] The Census of Agriculture is conducted by the USDA every five years and provides a detailed picture of farms and the people who operate them. *See generally* U.S. Dep't of Agric., *2017 Census of Agriculture* (Apr. 2019), *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf.*

[387] Econ. Research Serv., U.S. Dep't of Agric., *Farming and Farm Income* (updated May 10, 2021), *https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/.*

[388] *Id.*

[389] Farm Credit Admin., *2019 Annual Report of the Farm Credit Administration,* at 18 (2019), *https://www.fca.gov/template-fca/about/2019AnnualReport.pdf.*

[390] *Id.*

[391] GAO Report at 16. ''The primary producer is the individual on a farm who is responsible for the most decisions. Each farm has only one primary producer.'' *Id.* at 5.

[392] *Id.* at 2.

[393] ''Producers'' are individuals involved in farm decision-making. A single farm may have more than one producer.

[394] *See* GAO Report at 7.

[395] In 1910, approximately 893,370 Black farmers operated approximately 41.1 million acres of farmland, representing approximately 14 percent of farmers. U.S. Census Bureau, *1910 Census: Volume 5 (Agriculture), Statistics of Farms, Classified by Race, Nativity, and Sex of Farmers,* at 298 (1910), *https://www2.census.gov/library/publications/decennial/1920/volume-5/06229676v5ch04.pdf.* In 2017, of the country's 3.4 million total producers, only 45,508 of them (1.3 percent) are Black and they farm on only 4.1 million acres (0.5 percent of total farmland); by comparison, 95 percent of U.S. producers are white and own 94 percent of farmland. U.S. Dep't of Agric., *2017 Census of Agriculture,* at 62, 72 (Apr. 2019), *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf.*

[396] In 1910, women farmers represented approximately 4 percent of farm workers. *See* U.S. Census Bureau, *1910 Census: Volume 5 (Agriculture), Statistics of Farms, Classified by Race, Nativity, and Sex of Farmers,* at 340 (1910), *https://www2.census.gov/library/publications/decennial/1920/volume-5/06229676v5ch04.pdf.* As of 2017, women account for approximately 36 percent of farmers. *See* U.S. Dep't of Agric., *2017 Census of Agriculture,* at 62 (Apr. 2019), *https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf.*

[397] *See, e.g.,* Order, *In re Black Farmers Discrimination Litig.,* No. 08–mc–0511 (D.D.C. filed Aug. 8, 2008), *https://blackfarmercase.com/Documents/2008.08.08%20-%20PLF%20Consolidation%20Order_0.pdf*; *Pigford* v. *Glickman,* 206 F.3d 1212 (D.C. Cir. 2000). *See also Garcia* v. *Vilsack,* 563 F.3d 519 (D.C. Cir. 2009); *Love* v. *Connor,* 525 F. Supp. 2d 155 (D.D.C. 2007); *Keepseagle* v. *Veneman,* No. 99–CIV–03119, 2001 U.S. Dist. LEXIS 25220 (D.D.C. Dec. 12, 2001).

[398] GAO Report at introductory highlights. Additionally, the GAO cited these sources as noting that some SDFRs may not be fully aware of credit options and lending requirements, especially if they are recent immigrants or new to agriculture. *Id.*

[399] *Id.*

financial institution would have to make sure it is not collecting protected demographic information on principal owners, even though that information must be collected for every other type of loan that same business might apply for. The Bureau also believes that it may not be possible to identify loans in the HMDA data that, but for this exclusion, would be reported under 1071 because the financial institution would need to know which HMDA applications are for small businesses versus large businesses. Moreover, excluding HMDA-reportable applications could mean that a financial institution that is below the HMDA reporting threshold would not report these loans at all.

Further, in addition to not being able to distinguish which applications are from small and not large businesses, the Bureau believes that excluding all transactions that were also reportable under HMDA may be at odds with the statutory purposes of section 1071. The following information will not be collected for applications only reported under HMDA: (1) The principal owner's race, sex, or ethnicity where the applicant is not a natural person; (2) minority-owned and women-owned business status; (3) gross annual revenue; and (4) other 1071 data points such as pricing, NAICS code, and number of workers. The Bureau is concerned that not collecting this information would run contrary to section 1071's fair lending and business and community development purposes.

For applications that would be reported under both HMDA and 1071 (generally, business credit secured by dwellings, with the exception of credit secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy), the Bureau seeks comment on whether it should require such applications to be flagged as such when reported under subpart B. The Bureau believes that for data integrity and analysis purposes, it may be helpful to know if a loan is in both datasets and a dual reporting flag may help ensure any data analysis is not double-counting certain applications.

104(b) Excluded Transactions

Proposed § 1002.104(b) would provide that the requirements of subpart B do not apply to trade credit, public utilities credit, securities credit, and incidental credit. Proposed comments 104(b)–1 and –2 would make clear that the term covered credit transaction also does not cover factoring and leases. The proposed treatment of each of these types of transactions is discussed in detail below. Proposed comments 104(b)–3 and –4 would clarify that the term covered credit transaction does not include consumer-designated credit or credit secured by certain investment properties because, as discussed in detail below, such transactions are not business credit. The Bureau also discusses its proposed treatment of extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities and certain purchases of covered credit transactions. Finally, the Bureau discusses its proposed exclusions for trade credit, public utilities credit, securities credit, and incidental credit.

The Bureau seeks comment on whether it should permit financial institutions to voluntarily collect applicants' protected demographic information (that is, the applicant's minority-owned business status and women-owned business status, and the ethnicity, race, and sex of the applicant's principal owners) for applications for some or all of the types of transactions that the Bureau is proposing not to cover, and to report those applications to the Bureau pursuant to proposed § 1002.109.

*Factoring.* In traditional factoring arrangements, a business in need of financing sells all or a portion of its accounts receivable (existing but unpaid invoices) to another business, known as a "factor." The factor then receives payments on the accounts receivable from the business's debtors or customers directly, and not from the business that had entered into the factoring transaction. If the business has sold only a portion of its invoices, then once the account debtors pay their invoices to the factor, the factor remits the remainder of the balance to the business after deducting a fee (specifically, a discount applied to the sold accounts receivable usually stated on a percentage basis).

The Bureau understands that like the market for MCAs, the factoring market is generally dominated by nondepository lenders not subject to Federal safety and soundness supervision or reporting requirements. The Bureau also understands that generally, factors may not be required to obtain State lending licenses. As a result, information on factoring volume and practices is limited. The Bureau notes, however, that the California and New York disclosure laws mentioned above cover factoring.[400]

The Bureau's 2017 White Paper estimated the factoring market as constituting around 8 percent of the number of accounts used by small businesses in the U.S. in 2014.[401] Based on more recent evidence, the Bureau believes the industry has not significantly grown. For example, the 2017 and 2020 Federal Reserve Banks' surveys of firms with 1–499 employees ("employer firms") found that 4 percent of such businesses applied for and regularly used factoring.[402] In the 2020 Small Business Credit Survey of Employer Firms, this figure dropped to 3 percent of employer firms.[403]

In the SBREFA Outline, the Bureau stated that it was considering excluding factoring from coverage under the 1071 rule.[404] As a general matter, the Bureau received fewer comments from stakeholders regarding factoring compared to some other products, though some SERs did advocate for including factoring. Moreover, several stakeholders (representing both community group and industry perspectives) argued that factoring should be covered under section 1071: First, factoring is widely used by small businesses, particularly very small businesses, who are more likely to face heightened challenges accessing business credit; second, both New York and California have passed disclosure laws covering factoring and exclusion would potentially lead to a regulatory advantage for lenders offering higher-cost, less-transparent credit products.

A community group commenter stated that the Bureau should require the reporting of these agreements regardless of whether there is a credit agreement incident to the factoring agreement under Regulation B (this concept is discussed in more detail below). A few commenters that supported the proposed exclusion under consideration of factoring did so on the basis that factoring is not "credit" under ECOA. Commenters did not raise fair lending concerns or concerns about predatory practices related to factoring.

An existing comment in Regulation B (comment 9(a)(3)–3) provides that "[f]actoring refers to a purchase of accounts receivable, and thus is not subject to [ECOA or Regulation B]." Existing Regulation B does not offer a definition for "accounts receivable." However, if there is a "credit extension incident to the factoring arrangement,"

[400] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*.

[401] White Paper at 21 fig. 2, 22 fig. 3.

[402] 2020 Small Business Credit Survey; 2017 Small Business Credit Survey.

[403] *See* 2021 Small Business Credit Survey at 24.

[404] SBREFA Outline at 22.

Regulation B's notification rules[405] apply, as do other relevant sections of ECOA and Regulation B.[406] The Bureau understands that the Board's treatment of credit extensions incident to factoring arrangements—as a type of credit but one entitled to exemptions from certain requirements—was motivated by its reading of congressional intent related to the Women's Business Ownership Act of 1988,[407] which amended ECOA to extend notification and record retention requirements to business credit. In its proposed rule on this issue, the Board explained that it was treating credit extensions incident to factoring arrangements differently from other forms of business credit based on "evidence of congressional intent that the amendments should not apply to . . . certain types of business credit (such as applications for trade credit and credit incident to factoring arrangements)." [408] Based on the Bureau's work to date and conversations with industry stakeholders, the Bureau understands that purported factoring arrangements may take various forms, including longer-term or revolving transactions that appear to have credit or credit-like features, and the Bureau believes that a subset of such arrangements may constitute credit incident to the factoring arrangement, particularly if they involve goods or services that have not been supplied or rendered.

The Bureau is proposing to not cover factoring under the 1071 rule. Modeled on the definitions set forth in the New York and California commercial financing disclosure laws,[409] proposed comment 104(b)–1 would provide that factoring is an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment has not yet been made. Proposed comment 104(b)–1 would also clarify that an extension of business credit incident to a factoring arrangement is a covered credit transaction and that a financial institution shall report such a transaction as an "Other sales-based financing transaction" under proposed § 1002.107(a)(5).

The Bureau believes that, as discussed with respect to MCAs above, a traditional factoring agreement, as described in proposed comment 104(b)–1, is not credit under ECOA because the provider of the funds does not grant the recipient the right to defer payment. Instead, the provider of funds seeks payment directly from a third party, and the transaction between the recipient and the provider of funds is complete at the time of the sale. The Bureau also believes that treating factoring as credit under the 1071 rule could create inconsistencies and compliance concerns related to existing Regulation B, which currently states that factoring (as a purchase of accounts receivable) is not subject to ECOA. Moreover, while a few commenters did suggest covering factoring as part of a broader effort to adequately capture small businesses' experiences with obtaining financing, the Bureau notes that commenters did not raise particular fair lending concerns related to factoring. The Bureau is proposing a more detailed description of what constitutes factoring in proposed comment 104(b)–1 because it is concerned that the existing Regulation B commentary regarding factoring may not provide sufficient clarity for purposes of collecting and reporting data under section 1071 as it does not offer a definition for "accounts receivable." Proposed comment 104(b)–1 would state that it is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing comment 9(a)(3)–3.

The Bureau seeks comment on its proposed approach to factoring. The Bureau also seeks comment on how the subset of purported factoring arrangements that may in fact be credit (*i.e.,* those that are revolving in nature or that cover anticipated receivables) should be reported under the 1071 rule. Specifically, the Bureau seeks comment on whether such arrangements should be reported as credit extensions incident to factoring (and thus reported "other sales-based financing") or as MCAs.

*Leases.* A leasing transaction generally refers to an agreement in which a lessor transfers the right of possession and use of a good or asset to a lessee in return for consideration.[410] Under a "true" or "operating" lease, a lessee (the user) makes regular payments to a lessor (the owner) in exchange for the right to use an asset (such as equipment, buildings, motor vehicles, etc.).

Leases are not expressly addressed in ECOA or Regulation B. The Bureau has never opined on whether ECOA and Regulation B apply to leases, and the Board made only one statement about the applicability of ECOA and Regulation B to leases, in the preamble to a final rule under ECOA. In that 1985 statement, the Board responded to the Ninth Circuit's opinion in *Brothers* v. *First Leasing,*[411] which concluded that consumer leasing falls under ECOA.[412] The Board stated that it believes that "Congress did not intend the ECOA, which on its face applies only to credit transactions, to cover lease transactions unless the transaction results in a 'credit sale' as defined in the Truth in Lending Act and Regulation Z." [413] The Board then noted that it would continue to monitor leasing transactions and take further action as appropriate.[414] The Bureau is unaware of any such further actions taken by the Board.

The Bureau understands that many financial institutions (such as equipment finance companies) offer both loans and leases to their small business customers and some financial institutions comply with Regulation B for their leases as well as their loans as a matter of course. Lessor stakeholders have told Bureau staff that from their perspective, as well as that of their customers, loans and leases are indistinguishable. The Bureau understands that this is particularly true of "financial" or "capital" leases, as defined under article 2A of the UCC,[415] which closely resemble (and according to some stakeholders, in some cases are indistinguishable from) term loans. The Bureau understands that financial leases

[405] *See* existing § 1002.9(a)(3)(ii) (requiring a creditor to notify an applicant, within a reasonable time (as opposed to within 30 days for credit sought by consumers and businesses with gross revenues of $1 million or less in preceding fiscal year), orally or in writing, of the action taken).

[406] Comment 9(a)(3)–3.

[407] Public Law 100–533, 102 Stat. 2689 (1988).

[408] 54 FR 29734, 29736 (July 14, 1989); *see also* 134 Cong. Rec. H9282–89 (daily ed. Oct 3, 1988) (explaining that the committee recognizes that some forms of commercial loan transactions and extensions of credit may "require specialized rules," and that, for example, the committee believes that loans and credit extensions incidental to trade credit, factoring arrangements, and sophisticated asset-based loans should continue to be exempted from the record retention and automatic notification requirements).

[409] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*.

[410] *See* UCC Art. 2A–103(1)(j) (defining a "lease").

[411] 724 F.2d 789 (9th Cir. 1984).

[412] 50 FR 48018, 48020 (Nov. 20, 1985).

[413] *Id.*

[414] *Id.* Since then, courts have gone both ways on the issue. *Compare Ferguson* v. *Park City Mobile Homes,* No. 89–CIV–1909, 1989 WL 111916, at *5 (N.D. Ill. Sept. 18, 1989) (leases are "credit" under ECOA), *with Laramore* v. *Ritchie Realty Mgmt. Co.,* 397 F.3d 544, 547 (7th Cir. 2005) (leases are not "credit" under ECOA).

[415] The Bureau notes that the UCC separately defines a "consumer lease." *See* UCC 2A–103(1)(e). The Bureau's analysis regarding leases does not apply to leases primarily for a personal, family, or household purpose.

are treated like assets on buyers' balance sheets, whereas operating leases are treated as expenses that remain off the balance sheet. The Bureau understands that the ownership characteristics of a financial lease also resemble those of a loan—the financial lease term is the substantial economic life of the asset (as evidenced by a one dollar purchase option at the end of the lease term and/or lack of residual financial obligations at the end of the lease term) and the lessee claims both interest and depreciation on their taxes. The Bureau understands that for some financial institutions, reporting loans but not leases may require added cost and effort to separate them in databases. The Bureau also understands that because depository institutions currently report both loan and lease activity to other regulators in their Call Reports, they may prefer to maintain a consistent approach for section 1071.

In its SBREFA Outline, the Bureau stated that it was considering proposing that leases not be a covered product under section 1071 unless the product is a credit sale.[416] The Bureau stated that for purposes of section 1071, it was considering proposing a definition of ''credit sale'' similar to the Regulation Z definition of that term as a transaction in which the lessor is a creditor and the lessee (i) agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and (ii) will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.[417]

In response to the SBREFA Outline, several stakeholders argued that leases should be covered in an eventual 1071 rule, one noting that leasing products make up 13 percent of the small business financing market share in dollar terms. A few other stakeholders stated that leases should not be covered. For example, a trade association stated that (1) given the unique structure of the transactions, including leases would add unnecessary, additional complexity and reporting burdens, and that (2) unlike credit, in a lease, the lessee does not have an ownership interest in the leased property and that this difference could lead to data integrity issues.

The Bureau is proposing to not cover leases under the 1071 rule. Drawing from the UCC definition of ''lease,''[418] which was adopted by the New York and California commercial financing disclosure laws,[419] proposed comment 104(b)–2 would provide that the term covered credit transaction does not cover leases, and that a lease, for purposes of proposed subpart B, is a transfer from one business to another of the right to possession and use of goods for a term, and for primarily business or commercial (including agricultural) purposes, in return for consideration. It would further state that a lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest.

The Bureau considered several other approaches to covering leasing, including referring to Regulation Z's definition of ''credit sale.'' The Bureau understands that financial institutions focused on offering leases and loans for business purposes are generally not familiar with the Regulation Z definition of ''credit sale,'' given that Regulation Z applies only to consumer credit.[420] The Bureau thus believes that referring to the Regulation Z definition of ''credit sale'' could create confusion and would not align with current industry practices. The Bureau understands that such financial institutions offering leases primarily for business or commercial (including agricultural) purposes are more accustomed to applying the UCC definitions of ''lease''[421] and ''finance lease,''[422] and/or the generally accepted accounting principles (GAAP) rules issued by the Financial Accounting Standards Board (FASB) governing ''operating,'' ''capital,'' and ''finance'' leases.[423] The Bureau believes that drawing from the UCC definition of lease will lead to more consistency with financial institutions' current practices. Nearly all U.S. jurisdictions have adopted Article 2A of the UCC,[424] and the Bureau understands that virtually every form of lease used by major leasing companies provides that it is governed by the laws of one of the jurisdictions that has adopted Article 2A.

Based on its review of business-purpose leases and its expertise with respect to the meaning of ''credit,'' the Bureau believes that the better reading of the term ''credit'' is that it does not encompass such leases. In the business-purpose context, the Bureau understands that in a true lease, the lessor retains title and will receive the property back after the conclusion of the lease term, without any expectation by either party that, for example, ownership of the property will be transferred or that payments made pursuant to the lease agreement constitute anything other than payments in exchange for the temporary use of the property. As a result, the Bureau does not believe that in the business-purpose context a true lease transaction involves the right to incur debt and defer its payment, defer payment of a debt, or defer payment for goods or services.

The Bureau is aware that there are other types of leases with characteristics that bear some resemblance to forms of credit like credit sales, such as a contemplated transfer of ownership at the end of the lease term. The Bureau is not proposing at this time to parse whether different types of leases might

---

[416] SBREFA Outline at 21.

[417] *See* Regulation Z § 1026.2(16).

[418] UCC 2A–103(1)(j) ('' 'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. Unless the context clearly indicates otherwise, the term includes a sublease.'').

[419] *See* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*; N.Y. S.B. S5470B (July 23, 2020), *https://legislation.nysenate.gov/pdf/bills/2019/S5470B*.

[420] *See* Regulation Z § 1026.2(a)(12) (defining ''consumer credit'' as ''credit offered or extended to a consumer primarily for personal, family, or household purposes'') and 1026.3(a)(1) (excluding extensions of credit ''primarily for a business, commercial or agricultural purpose'').

[421] *Id.*

[422] UCC 2A–103(1)(g).

[423] *See* Fin. Acct. Standards Bd., *Accounting Standards Update: Leases (Topic 842),* No. 2016–02 (Feb. 2016), *https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176167901010&acceptedDisclaimer=true*.

[424] *See* Ala. Code 7–2A–101 *et seq.;* Alaska Stat. 45.12.101 *et seq.;* Ariz. Rev. Stat. 47–2A101 *et seq.;* Ark. Code Ann. 4–2A–101 *et seq.;* Cal. Com. Code 10101 *et seq.;* Choctaw Tribal Code 26–2A–101 *et seq.;* Colo. Rev. Stat. 4–2.5–101 *et seq.;* Conn. Gen. Stat. 42a–2A–101 *et seq.;* DC Code 28:2A–101 *et seq.;* Del. Code Ann. tit. 6, 2A–101 *et seq.;* Fla. Stat. 680.1011 *et seq.;* Ga. Code Ann. 11–2A–101 *et seq.;* Haw. Rev. Stat. 490:2A–101 *et seq.;* Idaho Code 28–12–101 *et seq.;* 810 Ill. Comp. Stat. 5/2A–101 *et seq.;* Ind. Code 26–1–2.1–101 *et seq.;* Iowa Code 554.13101 *et seq.;* Kan. Stat. Ann. 84–2a–101 *et seq.;* Ky. Rev. Stat. Ann. 355.2A–101 *et seq.;* Mass. Gen. Laws ch. 106, 2A–101 *et seq.;* Md. Code Ann., Com. Law 2A–101 *et seq.;* Me. Stat. tit. 11, 2–1101 *et seq.;* Mich. Comp. Laws 440.2801 *et seq.;* Minn. Stat. 336.2A–101 *et seq.;* Miss. Code Ann. 75–2A–101 *et seq.;* Mo. Rev. Stat. 400.2A–101 *et seq.;* Mont. Code Ann. 30–2A–101 *et seq.;* N.C. Gen. Stat. 25–2A–101 *et seq.;* N.D. Cent. Code 41–02.1–01 *et seq.;* N.H. Rev. Stat. Ann. 382–A:2A–101 *et seq.;* N.J. Stat. Ann. 12A:2A–101 *et seq.;* N.M. Stat. Ann. 55–2A–101 *et seq.;* N.Y. UCC Law 2–A–101 *et seq.;* Neb. Rev. Stat. UCC 2A–101 *et seq.;* Nev. Rev. Stat. 104A.2101 *et seq.;* Ohio Rev. Code Ann. 1310.01 *et seq.;* Okla. Stat. tit. 12A, 2A–101 *et seq.;* Or. Rev. Stat. 72A.1010 *et seq.;* Pa. Cons. Stat. 2A101 *et seq.;* R.I. Gen. Laws 6A–2.1–101 *et seq.;* S.C. Code Ann. 36–2A–101 *et seq.;* S.D. Codified Laws 57A–2A–101 *et seq.;* Tenn. Code Ann. 47–2A–101 *et seq.;* Tex. Bus. & Com. Code Ann. 2A.101 *et seq.;* Utah Code Ann. 70A–2a–101 *et seq.;* V.I. Code Ann. tit. 11A, 2A–101 *et seq.;* Va. Code Ann. 8.2A–101 *et seq.;* Vt. Stat. Ann. tit. 9A, 2A–101 *et seq.;* W. Va. Code 46–2A–101 *et seq.;* Wash. Rev. Code 62A.2A–101 *et seq.;* Wisc. Stat. 411.101 *et seq.;* Wyo. Stat. Ann. 34.1–2.A–101 *et seq.*

constitute "credit" but notes that proposed comment 104(b)–2's definition of lease would not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest. The Bureau seeks comment on whether there are types of leases, or leases with certain characteristics, that should be excluded from proposed comment 104(b)–2 and thus treated as reportable under 1071. Based on the practical difficulty cited by some stakeholders of distinguishing leases from loans, the Bureau also seeks comment on whether financial institutions should be permitted to voluntarily report lease transactions.

*Consumer-designated credit.* In the SBREFA Outline, the Bureau stated that it was considering proposing that the 1071 rule not cover products designated by the creditor as consumer purpose products.[425] In response, several SERs asserted that consumer-designated credit is often an important source of financing for small businesses (particularly for women-owned and minority-owned small businesses, and sole proprietorships), and ideally should be included within the scope of the eventual 1071 rule. One SER stated that consumer-designated credit used for business purposes should be included in an eventual 1071 rule if trends show increasing usage. However, these SERs acknowledged the potential complexity and burden of trying to identify the intended use of consumer-designated credit, such as whether a consumer's home equity line of credit will be used for a business purpose.

Several SERs supported excluding consumer-designated credit. One SER asserted that including consumer credit would not support the purposes of section 1071. Another SER stated that including consumer-designated credit used for business purposes would double their cost of complying with an eventual 1071 rule. The SBREFA Panel recommended that the Bureau continue to explore the potential costs to financial institutions associated with reporting consumer-designated credit used for business purposes in the 1071 rule as well as the implications of including such credit in a small business lending data set.[426] The Panel also recommended that the Bureau seek comment in the proposed rule on how best to define consumer-designated credit in the event the Bureau determines that an exclusion for such products is appropriate.[427]

Many non-SER stakeholders supported the proposed exclusion under consideration of consumer-designated credit from section 1071 for one or more of the following reasons: First, that financial institutions should be able to rely on the applicant's stated purpose for the use of funds and institutions would not know, nor should they be expected to know, if a borrower instead starts or invests in a business using the proceeds of a personal loan. Second, that this approach would greatly simplify the regulatory effort necessary to define and identify business uses of consumer products. Third, that inclusion of consumer credit could vastly expand the scope of the data collected beyond usefulness and also greatly increase the costs of compliance.

One credit union trade association stakeholder stated that the Bureau should adopt a clearer definition of consumer-designated credit and that it should clarify that it will not challenge a credit union's judgment when designating a consumer or business purpose for credit.

The Bureau is proposing that the 1071 rule not cover products designated by the creditor as consumer purpose products (consumer-designated credit). Proposed comment 104(b)–3 would make clear that the term covered credit transaction does not include consumer-designated credit used for business purposes, because such transactions are not business credit. Proposed comment 104(b)–3 would provide that a transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes. For example, an open-end credit account used for both personal and business purposes is not business credit for the purpose of proposed subpart B unless the financial institution designated or intended for the primary purpose of the account to be business-related.

The Bureau understands that some small business owners may use consumer-designated credit in order to finance their small businesses—such as taking out a home equity line of credit or charging business expenses on their personal credit cards. Nonetheless, the Bureau believes it is appropriate to interpret section 1071 as not applying to this type of credit. Most notably, ECOA section 704B(b) directs financial institutions to collect data in the case of an application "*for credit* for women-owned, minority-owned, or small *business*" (emphasis added). The statute thus applies only to applications for credit for a business; at the time of an application for consumer-designated credit, however, the application is not for a business. Several policy reasons also support this approach. First, the Bureau is concerned about financial institutions' ability to consistently identify when consumer-designated credit is being used for business purposes. Inconsistent reporting across financial institutions could lead to data quality concerns. Credit sought by consumers for both personal and business purposes could be particularly difficult to separate into reportable and non-reportable portions. The Bureau believes the proposal to define business credit to exclude consumer-designated credit will simplify compliance by obviating the need for financial institutions to identify and distinguish business uses of consumer-purpose credit products. Second, not including consumer-designated credit used for business purposes within the scope of this rulemaking would make it clear that the applications reported will all be seeking credit to use for business purposes, which supports 1071's directive to collect and report data in the case of an application for credit for a *business.* Third, not covering consumer-designated credit used for business purposes would provide certainty to financial institutions that offer only consumer-designated credit that they would not be subject to this proposal's data collection and reporting requirements.

As recommended by the SBREFA Panel, the Bureau seeks comment on this proposed interpretation, including how the Bureau has defined the scope of consumer-designated credit. The Bureau also seeks comment on whether it should permit financial institutions to voluntarily report consumer-designated credit when they have reason to believe the credit might be used for business purposes.

*Credit secured by certain investment properties.* In the SBREFA Outline, the Bureau did not expressly discuss treatment of real estate-secured loans used for investment purposes. Based on questions from SERs about the Bureau's intended approach, however, the SBREFA Panel recommended that the Bureau address in the proposed rule whether it intends to cover real estate-secured investment loans in the 1071 rule.[428] One SER had asked that the Bureau clarify whether loans covering 1–4 family properties used for investment purposes are business loans under section 1071, and several SERs recommended that the Bureau cover real estate investment loans (for both non-owner occupied residential property

[425] SBREFA Outline at 20–21.

[426] SBREFA Panel Report at 44.

[427] *Id.* at 45.

[428] *Id.* at 44–45.

and commercial property) under section 1071. Several other SERs sought to distinguish certain types of real estate investment loans; one SER remarked, for example, that owning a single non-owner occupied residential property as an investment may be more of a ''hobby'' but owning multiple properties could be considered a business.

A number of other stakeholders suggested that the Bureau should exclude at least some real estate investment loans under section 1071. A few stakeholders stated that the Bureau should consider an exemption for loans that are reported under another regulatory framework, such as HMDA and/or CRA because the effort of collecting and reporting information regarding such real estate loans would not be worth the added burden given the availability of alternative data sources. A few stakeholders argued that Congress did not intend to include real estate investment loans within the scope of section 1071. One such stakeholder stated that this intention is evident because many of the proposed loan purpose categories reflect a desire to collect data regarding credit offered to businesses which offer a product or service. One stakeholder seeking exclusion of certain real estate loans explained that most commercial real estate loans are made to borrowers as investments and not for operating their business. A few stakeholders suggested that the Bureau should only treat as reportable loans secured by owner-occupied commercial real estate where the primary source of repayment is the cash flow from the ongoing business operations. One stakeholder noted that because commercial real estate loans made to investors are typically made to business entities with complex ownership structures, their inclusion under 1071 would create additional hurdles for lenders seeking to determine the principal owners.

Based on this feedback as well as its general knowledge regarding both consumer and commercial real estate lending, the Bureau understands that many financial institutions use their consumer mortgage lending channels to process credit applications secured by 1–4 family residential property and used for investment purposes, while applications for credit secured by 5+ unit multifamily properties or rental portfolio loans secured by more than four 1–4 unit residential properties are generally processed through commercial mortgage lending channels. The Bureau also understands that loans made through consumer mortgage lending channels are often made pursuant to the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), and the Department of Veterans Affairs (VA), and are likely already reported under HMDA.

In light of the feedback received and the Panel's recommendation, the Bureau is proposing that the 1071 rule not cover credit secured by certain investment properties, because such credit may not always be primarily for business or commercial purposes. Specifically, proposed comment 104(b)–4 would explain that a covered credit transaction does not include an extension of credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy. The Bureau is not proposing to exclude credit secured by owner-occupied dwellings; for example, those secured by a dwelling occupied by a business's sole proprietor/principal owner. The Bureau is thus proposing to exclude real estate investment loans only in certain limited circumstances (such as when credit is secured by non-owner occupied 1–4 dwelling units and not 5+ dwelling units). As discussed above in the section-by-section analysis of proposed § 1002.102(j), the Bureau is proposing to define ''dwelling'' to have the same meaning as Regulation C § 1003.2(f). Similarly, proposed comment 104(b)–4, which would address what does and does not constitute an investment property, is modeled on Regulation C's comment 4(a)(6)–4.

The Bureau is proposing a definition of ''covered credit transaction'' that does not cover certain real estate investment loans in the scope of a ''covered credit transaction'' pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071. The Bureau believes that its exclusion of credit secured by certain investment properties will better capture lending to true small businesses (as opposed to consumers seeking to diversify their investments) and will also better align with financial institution lending practices. The Bureau understands that it may not always be easy for financial institutions to distinguish between business-purpose real estate investment loans and consumer-purpose real estate investment loans; however, covering all such loans would likely include some percentage of consumer-purpose loans in the 1071 rule, which could be contrary to section 1071's business and community development purpose.

The Bureau seeks comment on its proposed approach for credit secured by certain investment properties, including whether it is appropriate to consider credit not to be business credit when it is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy; and, if not, whether a different number of dwelling units in the property securing the credit would be an appropriate way to make a distinction between business and consumer-designated credit. The Bureau also solicits comment on whether to permit financial institutions to voluntarily report real estate investment loan transactions that are secured by non-owner occupied 1–4 dwelling units.

*Government credit.* The existing definition of business credit in § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit (that is, extensions of credit made *to* governments or governmental subdivisions, agencies, or instrumentalities—not extensions of credit made *by* governments), as defined in existing § 1002.3(a) through (d), from certain aspects of existing Regulation B.[429] For the purpose of proposed subpart B, the Bureau is proposing complete exclusions for public utilities credit, securities credit, and incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b), as discussed below.

However, the Bureau is not proposing to exclude government credit, as defined in existing § 1002.3(d)(1) to mean ''extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities.'' The Bureau believes that an express exclusion for extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities is not necessary because such governmental entities would not constitute small businesses under the proposed rule.[430] The Bureau seeks comment on its approach to government credit.

*Certain purchases of covered credit transactions.* In the SBREFA Outline, the Bureau did not expressly discuss treatment of loan purchases, but the Bureau sought feedback on any products that should or should not be covered by

[429] As explained in existing comment 3–1, under § 1002.3, procedural requirements of Regulation B do not apply to certain types of credit. The comment further states that all classes of transactions remain subject to § 1002.4(a) (the general rule barring discrimination on a prohibited basis) and to any other provision not specifically excepted.

[430] Government entities are not ''organized for profit'' and are thus not a ''business concern'' under proposed § 1002.106(a).

the Bureau's eventual 1071 rule.[431] Several SERs voiced support for generally aligning small business lending reporting requirements for financial institutions with the approach taken for HMDA reporting in the Bureau's Regulation C. One SER stressed that imposing section 1071 requirements for loan buyers, who play an important role in assisting CDFIs but do not make credit decisions, might risk their continued participation. Feedback from other stakeholders was limited, although a few stakeholders suggested that the Bureau should generally exclude purchased loans. The Panel did not provide a specific recommendation on this topic.

The Bureau believes that this feedback may be based in part on the requirements that apply to HMDA, where Regulation C requires financial institutions to report purchases of covered loans under HMDA.[432] This requirement is based on statutory language that contemplates data collection for loan purchases.[433] As discussed in the section-by-section analysis of proposed § 1002.103, ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered financial institutions, the definition of "application" will trigger data collection and reporting obligations with respect to covered credit transactions. Under proposed subpart B, purchasing a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. Rather, a reporting obligation may arise on the basis of making a final credit decision on an application. (See the section-by-section analysis of proposed § 1002.109(a)(3) for additional information.) The Bureau also notes the corollary point that selling a covered loan would not, in itself, obviate an existing obligation of a covered financial institution to report small business lending data for that application, pursuant to proposed comment 107(a)–1.i.

Because under this proposal purchasing a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data regarding the underlying application, the Bureau is not proposing a specific exclusion for these purchases.

The Bureau seeks comment on its proposal not to expressly exclude the purchase of covered credit transactions in the proposed rule's regulatory text or commentary.

*Certain purchases of covered credit transactions—pooled loans.* In the SBREFA Outline, the Bureau did not expressly discuss treatment of pooled loan purchases, but the Bureau sought feedback on any products that should or should not be covered by the Bureau's eventual 1071 rule.[434] A CDFI SER that occasionally participates in pooled loan purchases recommended that the Bureau ensure that reporting obligations for such pooled loans are clear.

The Panel did not provide a specific recommendation on this topic. The Bureau believes that this feedback may be based in part on the requirements that apply to HMDA, where Regulation C requires financial institutions to report purchases of covered loans under HMDA.[435] This requirement is based on statutory language that contemplates data collection for loan purchases.[436] However, Regulation C exempts from these general reporting requirements "[t]he purchase of an interest in a pool of closed-end mortgage loans or open-end lines of credit" [437] As discussed in the section-by-section analysis of proposed § 1002.103 above, ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered financial institutions, the definition of "application" (or, as used in this proposed rule, "covered application") will trigger data collection and reporting obligations with respect to covered credit transactions. Under this proposed subpart, the purchase of an interest in a pool of loans does not, in itself, generate an obligation for a covered financial institution to report small business lending data. There is thus no need to propose a similar exclusion in this proposed subpart.

The Bureau believes that requiring covered financial institutions to collect and maintain data related to the purchase of an interest in a pool of covered credit transactions would do little to further the purposes of section 1071. The Bureau generally believes that a pooled loan purchase would arise after a final credit decision on the relevant loans has already been made (*e.g.,* after the loans were originated) and therefore the Bureau believes that the purchaser of an interest in a pool of loans would understand that there would be no section 1071 obligation. Section 1071 would already capture the lending information of the loans in this pool, as the application for each origination in the pool would already be reported (assuming it was originated by a covered financial institution and otherwise satisfies the requirements of proposed subpart B). For clarity, however, the Bureau is stating here that no reporting obligations arise from purchasing an interest in a pool of covered credit transactions, including credit-backed securities or real estate investment conduits. The Bureau believes that this clarification, similar to Regulation C comment 3(c)(4)–1, will assist covered financial institutions in understanding the scope of their obligations.

The Bureau seeks comment on its proposal not to expressly exclude the purchase of an interest in a pool of covered credit transactions in the proposed rule's regulatory text or commentary.

*Certain purchases of covered credit transactions—partial interests in a covered credit transaction.* In the SBREFA Outline, the Bureau did not specifically solicit feedback on a financial institution's obligation to report the purchase of a partial interest in a covered credit transaction (such as through participation loans, where multiple financial institutions fund a single origination); however, the Bureau did receive some feedback on this issue. One SER noted that there was some uncertainty with respect to how the Bureau intended to treat loan participations. This SER urged the Bureau not to discourage smaller credit unions in rural markets, who the SER stated may be likely to take part in loan participations, from helping their communities. The Panel did not provide a specific recommendation on this topic. Several other stakeholders also requested that the Bureau exempt participation loans.

The Bureau believes that this feedback may be based in part on the requirements that apply to HMDA, where Regulation C requires financial institutions to report purchases of

[431] SBREFA Outline at 19–20.

[432] *See* Regulation C § 1003.4(a) (stating that a financial institution "shall collect data regarding . . . covered loans that it purchases for each calendar year").

[433] *See* 12 U.S.C. 2803(a)(1) (stating that institutions "shall compile and make available . . . the number and total dollar amount of mortgage loans which were (A) originated (or for which the institution received completed applications), or (B) purchased by that institution").

[434] SBREFA Outline at 19–20.

[435] *See* Regulation C § 1003.4(a) (stating that a financial institution "shall collect data regarding . . . covered loans that it purchases for each calendar year").

[436] *See* 12 U.S.C. 2803(a)(1) (stating that depository institutions "shall compile and make available . . . the number and total dollar amount of mortgage loans which were (A) originated (or for which the institution received completed applications), or (B) purchased by that institution").

[437] 12 CFR 1003.3(c)(4).

covered loans under HMDA.[438] This requirement is based on statutory language that contemplates data collection for loan purchases.[439] However, Regulation C exempts from these general reporting requirements "[t]he purchase of a partial interest in a closed-end mortgage loan or open-end line of credit" [440] As discussed in the section-by-section analysis of proposed § 1002.103 above, ECOA section 704B(b) requires that financial institutions collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered financial institutions, the definition of "application" (or, as used in this proposed rule, "covered application") will trigger data collection and reporting obligations with respect to covered credit transactions. Under this subpart, a partial purchase of a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. There is thus no need to propose a similar exclusion in this subpart.

The Bureau believes that this approach, combined with proposed § 1002.109(a)(3), provides sufficient clarity for financial institutions that choose to take part in loan participations. For example, Financial Institution A receives an application for a covered credit transaction and approves the loan, and then Financial Institution A elects to organize a loan participation agreement where Financial Institutions B and C agree to purchase a partial interest. This is a covered credit transaction for Financial Institution A, but it is not a covered credit transaction for Financial Institutions B and C. The Bureau believes that this approach differs from how loan participations are reported by banks and savings associations under the CRA. That is, under the CRA, if the loan originated by Financial Institution A met the definition of a small business loan, then if any (or all) of the financial institutions were CRA loan reporters the loans may be reported under the CRA.[441]

The Bureau believes that the purposes of section 1071 counsel towards the broad collection of small business lending by financial institutions. The Bureau is further unaware of any reason why data with respect to such lending should not be collected because more than one financial institution holds an interest in a covered product. Conversely, the Bureau does not believe that requiring reporting by *each* financial institution with a partial interest in a covered credit transaction would further section 1071's purposes, and is concerned that having a single loan reported by multiple financial institutions could compromise the quality of the section 1071 dataset. Read in conjunction with proposed § 1002.109(a)(3), however, the Bureau believes that the covered credit transactions at issue here will nonetheless generally be reported by one covered financial institution, the financial institution that sold portions of the loan to other participants.

The Bureau seeks comment on its proposal not to expressly exclude the purchase of a partial interest in a covered credit transaction in the proposed rule's regulatory text or commentary. In particular, the Bureau solicits comment on how this proposed exclusion may differ from reporting obligations under the CRA, and if the Bureau adopted another approach, how overlapping reporters or data might be flagged to avoid double-counting certain information.

*Trade credit.* Under existing Regulation B, trade credit refers to a "financing arrangement that involves a buyer and a seller—such as a supplier who finances the sale of equipment, supplies, or inventory; it does not apply to an extension of credit by a bank or other financial institution for the financing of such items." [442] Thus, trade credit typically involves a transaction in which a seller allows a business to purchase its own goods without requiring immediate payment, and the seller is not otherwise in the financial services business. Businesses offering trade credit generally do so as a means to facilitate the sale of their own goods and not as a stand-alone financing product.

Most of the notification requirements of existing Regulation B do not apply to trade credit transactions.[443] In a typical trade credit transaction, the seller is not otherwise in the financial services business.[444] The Bureau's White Paper estimated that trade credit represents approximately 21 percent of the aggregate dollar volume of various financial products used by small businesses.[445] The Bureau understands that there are tens of thousands of merchants and wholesalers that extend credit to small businesses solely in connection with sale of goods and services by these trade creditors.

In its SBREFA Outline, the Bureau stated that it was considering proposing that trade credit not be a covered product under section 1071.[446] The Bureau stated that trade credit can be offered by entities that are themselves very small businesses and that the Bureau was concerned that these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[447]

The Bureau only received a few comments regarding its proposal under consideration to exclude trade credit. A few stakeholders suggested that trade credit should be covered. One commenter noted that trade credit is used for a significant number of agricultural finance transactions (equipment financing and input financing for row crop farmers) and suggested that the Bureau should monitor this sector of the agricultural finance industry. A trade association stated that the exclusion of trade credit should apply not only to the seller of inventory and businesses facilitating the sale of inventory, but also its affiliates and facilitators because these entities generally provide financing only for the seller's products and not for competing or unrelated products. The trade association cautioned that the collection and publication of data, if applied to such an affiliate, could significantly impact the seller's ability to maintain trade secrets, as these data would provide competitors a comprehensive insight into the seller's distribution and wholesale strategies, and it would also create a substantial risk to the applicants themselves due to privacy concerns.

The Bureau is proposing to not cover trade credit in its 1071 rule. Proposed § 1002.104(b)(1) would define trade credit as a financing arrangement wherein a business acquires goods or services from another business without making immediate payment to the business providing the goods or services. Proposed comment 104(b)(1)–1 would provide that an example of trade credit is one that involves a supplier that finances the sale of equipment,

[438] *See* Regulation B § 1003.4(a) (stating that a financial institution "shall collect data regarding . . . covered loans that it purchases for each calendar year").

[439] *See* 12 U.S.C. 2803(a)(1) (stating that depository institutions "shall compile and make available . . . the number and total dollar amount of mortgage loans which were (A) originated (or for which the institution received completed applications), or (B) purchased by that institution").

[440] 12 CFR 1003.3(c)(8).

[441] *See, e.g.,* 12 CFR 228.21(f) (stating that when assessing the record of a nonminority-owned and nonwomen-owned bank, the Board considers loan participation as a factor).

[442] Comment 9(a)(3)–2.

[443] *See* § 1002.9(a)(3)(ii).

[444] *See* comment 9(a)(3)–2.

[445] White Paper at 21 fig. 2.

[446] SBREFA Outline at 21.

[447] *See id.*

supplies, or inventory. Proposed comment 104(b)(1)–1 would provide that an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit. Proposed comment 104(b)(1)–2 would clarify that the definition of trade credit under existing comment 9(a)(3)–2 applies to relevant provisions under existing Regulation B, and that proposed § 1002.104(b)(1) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to existing comment 9(a)(3)–2.

The Bureau is proposing a definition of ''covered credit transaction'' that excludes trade credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071. While trade credit constitutes ''credit'' within the meaning of proposed § 1002.102(k), the Bureau believes that trade credit is categorically different from products like loans, lines of credit, credit cards, and MCAs and that there are several reasons to exclude it from coverage. Trade credit is not a general-use business lending product—that is, trade creditors generally extend credit as a means to facilitate the sale of their own goods, rather than offering it as a stand-alone financial product. The Bureau believes that while trade creditors might meet the definition in section 1071 of a financial institution, they are not financial services providers that manage compliance with regulatory requirements associated with making extensions of credit. The Bureau understands that trade credit can be offered by entities that are themselves very small businesses; the Bureau continues to be concerned that these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[448] Taken together, the Bureau is concerned that requiring trade credit to be reported under proposed subpart B may lead to significant data quality issues. The Bureau is also concerned that the fixed costs of coming into compliance with its 1071 rule could lead these businesses to reduce or cease offering trade credit to their small business customers, which would run contrary to the community development purpose of section 1071.

The Bureau notes that its proposed definition of trade credit in § 1002.104(b)(1) is focused on the business providing the goods or services being financed. It thus does not extend to affiliates and facilitators of trade creditors that provide financing, even if only for the trade creditor's products and not for competing or unrelated products. Provided that they otherwise meet the definition of a covered financial institution in proposed § 1002.105(b), such affiliates and facilitators must collect and report data under the 1071 rule. The Bureau believes that, unlike trade creditors themselves, such affiliates and facilitators offer stand-alone credit products in the same way as other financial institutions. As such, the Bureau does not have the same concerns about data quality or market exit by affiliates and facilitators that it does about trade creditors themselves.

The Bureau seeks comment on its proposal to exclude trade credit from the 1071 rule and on its proposed definition of trade credit.

*Public utilities credit.* As noted above, the existing definition of business credit in § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through (d), from certain procedural requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau is proposing complete exclusions for public utilities credit from the definition of a covered credit transaction in proposed § 1002.104(b).

In the SBREFA Outline, the Bureau did not expressly discuss treatment of public utilities credit transactions. However, the Bureau sought feedback on any products that should or should not be covered by the Bureau's eventual 1071 rule, and did not receive any feedback specific to public utilities credit.

Proposed § 1002.104(b)(2) would exclude public utilities credit, as defined in existing § 1002.3(a)(1). Existing § 1002.3(a)(1) states that the term public utilities credit refers to extensions of credit that involve public utility services provided through pipe, wire, or other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service, delayed payment, and any discount for prompt payment are filed with or regulated by a government unit. Several existing Regulation B requirements do not apply to public utilities credit transactions.[449] Existing comment 3(a)–1 explains that the definition applies only to credit for the purchase of a utility service, such as electricity, gas, or telephone service. Credit provided or offered by a public utility for some other purpose—such as for financing the purchase of a gas dryer, telephone equipment, or other durable goods, or for insultation or other home improvements—would not be excepted under proposed § 1002.104(b)(2) but may be excepted if it constitutes trade credit under proposed § 1002.104(b)(1), or in the case of financing for certain home improvements, for example, if it does not constitute an extension of business credit under proposed § 1002.104(a). Existing comment 3(a)–2 states in part that a utility company is a creditor when it supplies utility service and bills the user after the service has been provided.

The Bureau is proposing a definition of ''covered credit transaction'' that excludes public utilities credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071. The Bureau believes that excluding public utilities credit from the 1071 rule is reasonable for the same reasons as the Board enumerated when it adopted exemptions from certain procedural requirements under subpart A. Specifically, the Bureau is concerned that covering public utilities credit under 1071 could require ''substantial changes in the forms and procedures of public utilities companies. Costs associated with such changes would, in all likelihood, be passed along to [small business owners].'' [450] The Bureau notes that many of the policies and procedures of public utilities companies are separately regulated at the State and Municipal levels by public service commissions, and at the Federal level by the Federal Energy Regulatory Commission. The Bureau also believes that public utilities credit is akin to trade credit and thus is proposing to exclude it from coverage under subpart B for the same reasons.

The Bureau seeks comment on its proposal to exclude public utilities credit.

*Securities credit.* As noted above, the existing definition of business credit in § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through

[448] *See* Leora Klapper *et al.,* The Review of Financial Studies, *Trade Credit Contracts,* at 838–67 (vol. 25, issue 3, 2012), *https://academic.oup.com/rfs/article/25/3/838/1616515,* and Justin Murfin & Ken Njoroge, The Review of Financial Studies, *The Implicit Costs of Trade Credit Borrowing by Large Firms,* at 112–45 (vol. 28, issue 1, 2015), *https://academic.oup.com/rfs/article/28/1/112/1681329.*

[449] *See* § 1002.3(a).

[450] 40 FR 49298, 49305 (Oct. 22, 1975).

(d), from certain procedural requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau is proposing complete exclusions for securities credit from the definition of a covered credit transaction in proposed § 1002.104(b).

In the SBREFA Outline, the Bureau did not expressly discuss treatment of securities credit transactions, but the Bureau sought feedback on any products that should or should not be covered by the Bureau's eventual 1071 rule. The Bureau did not receive any feedback specific to securities credit.

Proposed § 1002.104(b)(3) would exclude securities credit, as defined in existing § 1002.3(b)(1). Existing § 1002.3(b)(1) states that the term securities credit refers to extensions of credit subject to regulation under section 7 of the Securities Exchange Act of 1934 or extensions of credit by a broker or dealer subject to regulation as a broker or dealer under the Securities Exchange Act of 1934. Several existing Regulation B requirements do not apply to securities credit transactions.[451]

The Bureau is proposing a definition of "covered credit transaction" that excludes securities credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071. The Bureau is proposing to exclude securities credit to foster consistency with existing Regulation B.

The Bureau seeks comment on its proposal to exclude securities credit.

*Incidental credit.* As noted above, the existing definition of business credit in § 1002.2(g) excludes public utilities credit, securities credit, incidental credit, and government credit, as defined in existing § 1002.3(a) through (d), from certain procedural requirements of existing Regulation B. For the purpose of proposed subpart B, the Bureau is proposing complete exclusions for incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b).

In the SBREFA Outline, the Bureau did not expressly discuss treatment of incidental credit transactions, but the Bureau sought feedback on any products that should or should not be covered by the Bureau's eventual 1071 rule. The Bureau did not receive any feedback specific to incidental credit.

Proposed § 1002.104(b)(4) would exclude incidental credit, as defined in existing § 1002.3(c)(1), but without regard to whether the credit is consumer credit, as defined in existing § 1002.2(h). Existing § 1002.3(c)(1) states that incidental credit refers to extensions of consumer credit other than the types described in § 1002(a) and (b): (i) That are not made pursuant to the terms of a credit card account; (ii) that are not subject to a finance charge (as defined in Regulation Z § 1026.4); and (iii) that are not payable by agreement in more than four installments. A number of existing Regulation B requirements do not apply to "incidental credit" (referring to extensions of consumer credit).[452] Existing comment 3(c)–1 explains that if a service provider (such as a hospital, doctor, lawyer, or merchant) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by existing § 1002.3, however, these particular credit extensions are excepted from compliance with certain procedural requirements as specified in § 1002.3(c).

The Bureau is proposing a definition of "covered credit transaction" that excludes incidental credit pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071. The Bureau believes that the Board's reasoning with respect to incidental credit's limited exception under existing Regulation B is equally applicable and relevant here. The Board sought to minimize burdens on businesses that "permit their customers to defer payment of debt as a convenience and are not in the business of extending credit." [453] The Board cited the example of doctors and dentists that permit their patients to defer payment of fees and who are extending credit as incidental to their principal activity of health care.[454] The Board also noted that "[s]mall neighborhood businesses such as drugstores and grocery stores frequently permit their customers to postpone payment on an informal basis not associated with a formal credit plan." [455] The Bureau believes that incidental credit, as described above, is akin to trade credit and thus is proposing to exclude it from coverage under subpart B for the same reasons.

The Bureau seeks comment on its proposal to exclude incidental credit.

Section 1002.105 Covered Financial Institutions and Exempt Institutions

ECOA section 704B(h)(1) defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." The Bureau is proposing to define a financial institution in § 1002.105(a) consistent with that statutory language. The Bureau is proposing to define a covered financial institution in § 1002.105(b) as a financial institution that originated at least 25 covered credit transactions from small businesses in each of the two preceding calendar years. Only those financial institutions that meet this loan-volume threshold in the definition of a covered financial institution would be required to collect and report small business lending data pursuant to proposed subpart B.

The Bureau's proposed definitions reflect the broad nature of the data collection specified in section 1071, while recognizing the risks that financial institutions with the lowest volume of small business lending might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with this rule.

The Bureau is proposing § 1002.105 to implement ECOA section 704B(h)(1) and pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. The Bureau is also proposing § 1002.105(b) pursuant to its authority under 704B(g)(2) to conditionally or unconditionally exempt any financial institution or class of financial institutions from the statute's requirements, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. The Bureau is proposing these provisions and proposing to use its exemption authority under 704B(g)(2) for the reasons set forth below.

105(a) Financial Institution

Background

ECOA section 704B(h)(1) defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity."

[451] *See* § 1002.3(b).

[452] *See* § 1002.3(c).

[453] 40 FR 49298, 49304 (Oct. 22, 1975).

[454] *Id.*

[455] *Id.*

SBREFA Proposals Under Consideration and Feedback Received

At SBREFA, the Bureau stated it was considering proposing a general definition of ''financial institution'' consistent with the section 1071 definition.[456] The Bureau noted that Regulation B, which implements ECOA, has not otherwise defined this term.

SERs generally did not express concern regarding the general definition of a ''financial institution'' under consideration, although one SER expressed concern at the broad reach of what might be considered a financial activity.[457] The SBREFA Panel did not provide any recommendations on the definition of a financial institution. Feedback on the definition of ''financial institution'' from other stakeholders was likewise nearly universally positive, with most opining that a definition that encompasses all small business lenders would be appropriate.

Proposed Rule

Proposed § 1002.105(a) would define a financial institution as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. This proposed definition restates the statute and is the same definition that the Bureau stated it was considering proposing in the SBREFA Outline.[458] The Bureau believes that this definition reflects the broad nature of small business lending data collection specified in section 1071. Under such a definition, the rule's data collection and reporting requirements would apply to a variety of entities that engage in small business lending, including depository institutions (*i.e.,* banks, savings associations, and credit unions),[459] online lenders, platform lenders, CDFIs, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and nonprofit, nondepository lenders.

As noted above, one SER expressed concern at the broad reach of this definition. But the broad scope of what may be considered a ''financial activity'' in the proposed definition of financial institution is not the principal determinative factor as to whether small business lending data collection and reporting is required; the proposed definition of a covered financial institution, the proposed definition of a covered application, and the proposed definition of a covered credit transaction, among others, all would impose limits on what entities could be subject to this proposed rule's data collection and reporting requirements.

Proposed comment 105(a)–1 would provide a non-exhaustive list of examples of entities that may fit within the definition of a financial institution. This proposed comment would make clear that nonprofit and governmental entities, governmental subdivisions, or governmental agencies, among others, who conduct financial activity fit within the definition of a financial institution. The definition of the term ''financial institution'' in ECOA section 704B(h)(1) includes the phrase ''or other entity.'' That term readily encompasses governments and government entities. Even if the term were ambiguous, the Bureau believes—based on its expertise and experience—that interpreting it to encompass governments and government entities would promote the purposes of section 1071. For example, the Bureau believes that it will be helpful to identify the business and community development needs of women-owned, minority-owned, and small businesses by collecting lending data from both a county-run assistance program for establishing new businesses and financial institutions that operate nationwide, like online lenders. The Bureau also believes that the terms ''companies'' or ''corporations'' under the definition of ''person,'' on their face, cover all companies and corporations, including government-owned or -affiliated companies and corporations. And even if those terms were ambiguous, the Bureau believes—based on its expertise and experience—that interpreting them to cover government-owned or -companies and corporations would promote the purposes of section 1071. The Bureau emphasizes that the list of examples of entities in proposed comment 105(a)–1 is not exhaustive and that other entities not specifically described would nonetheless fit within the definition of a financial institution under proposed § 1002.105(a). For example, the Bureau believes that an organization offering insurance premium financing, where the organization provides short-term loans to businesses to pay for property and casualty insurance, is included within the definition of proposed § 1002.105(a), even though this specific business model is not described in proposed comment 105(a)–1.

Proposed comment 105(a)–2 would refer to proposed § 1002.101(a) to reiterate the statutory exclusion for motor vehicle dealers.

The Bureau seeks comment on this proposed definition of a financial institution, and generally requests comment on whether additional clarification is needed.

105(b) Covered Financial Institution

Background

The Bureau has received requests to adopt exemptions from section 1071 collection and reporting requirements for financial institutions that do not frequently engage in small business lending. Reasons cited have included encouraging market entry, ensuring data quality, alleged lack of materiality of data from smaller lenders that rarely make small business loans, and lack of capacity by the lenders sufficient to justify small business lending as a line of business in light of the cost of complying with an eventual 1071 rule.

SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering, in light of section 1071's statutory purposes, proposing to exempt financial institutions from any collection and reporting requirements based on either or both a size-based and/or activity-based threshold. In the SBREFA Outline, the Bureau set forth several alternative thresholds under consideration for such an exemption.[460]

There was a diversity of perspectives with respect to the Bureau's approaches under consideration regarding potential exemptions.[461] While some SERs stressed the need for expansive lender coverage to fulfill section 1071's purposes, others suggested that such purposes could be fulfilled by the Bureau collecting and reporting data from only the largest lenders. SERs also offered varying opinions regarding the exemption metrics and thresholds under

[456] SBREFA Outline at 10.

[457] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 18–20.

[458] SBREFA Outline at 10.

[459] For purposes of this notice of proposed rulemaking, the Bureau is using the term depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2. The Bureau notes that the Dodd-Frank Act defines a depository institution to mean any bank or savings association defined by the Federal Deposit Insurance Act; there, that term does not encompass credit unions. 12 U.S.C. 5301(18)(A), 1813(c)(1). To facilitate analysis and discussion, the Bureau is referring to banks and savings associations together with credit unions as depository institutions throughout this notice, unless otherwise specified.

[460] SBREFA Outline at 11–13.

[461] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 18–20.

consideration, with some SERs favoring activity-based exemptions and others preferring an asset-based approach. SERs uniformly supported clear, predictable collection and reporting exemption thresholds.

The SBREFA Panel recommended that the Bureau continue to explore whether either or both a size-based or activity-based test might be appropriate to determine whether a financial institution must collect and report 1071 data or should be exempt, given section 1071's statutory purposes.[462] The SBREFA Panel also recommended that the Bureau continue to explore whether the fixed costs of coming into compliance with an eventual 1071 rule might cause certain financial institutions to reduce or cease lending to small businesses, as it considers the possible exemptions for financial institutions based on size and/or activity, along with any alternative approaches.[463]

Feedback from other stakeholders generally was in support of exempting certain financial institutions from 1071 collection and reporting obligations. Most feedback in support of pursuing exemptions focused on the potential burden of a new regulatory regime, with some stakeholders cautioning that collection and reporting obligations could lead to an increase in the cost of credit. A few stakeholders connected these potential costs with section 1071's purpose to identify community development needs and opportunities (chiefly arguing that costs might lead to higher costs of lending or lower lending volume), or otherwise expressed a general belief that some exemptions were consistent with statutory purposes. Several stakeholders, mostly community groups, urged caution with respect to the extent of any such exemptions, arguing that significant data limitations would run contrary to the general purposes of section 1071.

*Activity-based exemption.* In the SBREFA Outline, the Bureau stated that it was considering whether only financial institutions that engage in a certain amount of small business lending activity should be required to collect and report 1071 data.[464] The Bureau explained that in light of 1071's potentially broad application to financial institutions, an activity-based test to determine reporting responsibility might be appropriate. In particular, the Bureau expressed concern that financial institutions with the lowest volume of small business lending might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with an eventual 1071 rule. The Bureau stated that this result could be contrary to the community development purpose of section 1071.

The Bureau specifically mentioned three possible activity-based threshold levels, each defined by a financial institution's annual number of small business loans originated or the financial institution's annual total dollar value of small business loans originated. (That is, if either measurement is exceeded, then the financial institution must collect and report 1071 data.) Those three possible activity-based threshold levels were: Originations of at least 25 loans or $2.5 million (Option 1 Exemption Threshold); originations of at least 50 loans or $5 million (Option 2 Exemption Threshold); and originations of at least 100 loans or $10 million (Option 3 Exemption Threshold). These possible activity-based thresholds could be based on the financial institution's lending as of the end of the last calendar year, or the end of each of the last two calendar years. An activity-based exemption could apply to depository and nondepository institutions alike.

Some SERs advocated for an activity-based exemption. Several of these SERs preferred an annual 25-loan threshold (with at least one expressing support specifically for the Option 1 Exemption Threshold). One SER preferred the Option 2 Exemption Threshold, while another preferred the Bureau's Option 3 Exemption Threshold. Another SER recommended setting a threshold of more than 100 small business applications (rather than originations) for two consecutive years. These SERs emphasized a general need for thorough data reporting from a wide variety of lenders, and cautioned that in many smaller and rural markets, larger exemptions might result in little or no data collection given that many lenders in those markets make very few small business loans annually.

One SER suggested setting an activity-based threshold based on loan portfolio size rather than annual originations. Another SER suggested that the Bureau consider exempting certain financial institutions using a location test similar or identical to what is used for HMDA, which does not apply to institutions that do not have a home or branch office in a Metropolitan Statistical Area.

There was no uniformity in the feedback from other stakeholders with respect to an activity-based exemption and its potential level. Many commenters, including lenders, trade associations, and community groups, expressed support for the Option 1 Exemption Threshold, although most explicitly supported only the 25-loan threshold. On the other hand, a few comments advocated for versions of the Option 3 Exemption Threshold and many comments urged the Bureau to adopt a threshold higher than the Option 3 Exemption Threshold. Commenters who advocated for higher thresholds consisted of lenders and trade associations.

*Size-based exemption.* In the SBREFA Outline, the Bureau stated that it was concerned that the smallest financial institutions might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with an eventual 1071 rule, which could be contrary to the community development purpose of section 1071.[465] Specifically, the Bureau considered whether depository institutions with assets under a given threshold should be exempt from collecting and reporting small business lending data.

The Bureau stated that it was considering proposing to exempt depository institutions with assets under a given threshold from section 1071's data collection and reporting requirements. The Bureau postulated that this size-based approach could provide a straightforward exemption for very small depository institutions and avoid the need for those entities to measure or monitor their small business lending activity in order to determine whether they would be exempt from the Bureau's 1071 rule. In particular, the Bureau considered possible asset-based exemption threshold levels of $100 million (Option A Exemption Level) and $200 million (Option B Exemption Level). For purposes of this exemption, the Bureau considered proposing that a depository institution measure assets as of the end of the last calendar year, or the end of both of the last two calendar years. The Bureau asked SERs whether there were alternative approaches to a size-based exemption that the Bureau should consider.

SERs did not suggest size-based exemptions other than an asset-based metric that would apply to depository institutions. A few SERs advocated that the Bureau should consider initially exempting lenders other than "large" financial institutions (which, one SER suggested, might be defined for depository institutions as those having more than $1 billion in assets). These SERs stated that this approach would capture the vast majority of small business loans while avoiding imposing

[462] *Id.* at 43.

[463] *Id.*

[464] SBREFA Outline at 12–13.

[465] *Id.* at 11–12.

undue regulatory burden on smaller lenders, who might be less capable of absorbing such costs. They suggested that the Bureau might later consider whether to expand section 1071 data collection and reporting requirements to smaller financial institutions after first analyzing the available data. Several SERs cautioned that some financial institutions, particularly small nondepository lenders, might cease lending to small businesses if the eventual 1071 rule's one-time costs are too high.

One SER stated that a $200 million asset-based exemption would be helpful to small depository lenders, and others suggested that a threshold of $600 million was appropriate. Another SER countered, however, that they were unaware of data to support an asset-based exemption larger than $100 million. Some SERs expressly opposed an asset-based exemption; one SER cautioned that an exemption based solely on asset size would be inadvisable because many lenders do not hold their loans on their balance sheet. Another SER stated that adopting an asset-based exemption would risk excluding the collection of nearly all small business lending data in certain regions.

Input from other stakeholders was split. Many stakeholders supported a size-based exemption (typically an asset-based exemption), contending that small depository institutions faced substantial compliance costs and presented a lower likelihood of fair lending violations. Small depository institutions were also particularly concerned about data security issues. However, a number of other stakeholders counseled against a size-based exemption, arguing that exemptions should be based instead on lending activity, and that size-based exemptions risked under-reporting in important markets. In addition, some stakeholders noted that because there was no ready equivalent size-based measurement for nondepository institutions, including an asset-based exemption in the 1071 rule would put other small financial institutions at a cost disadvantage.

*Combined exemption.* The Bureau stated that it was exploring whether to combine the size- and activity-based approaches.[466] Under a combined approach, a financial institution would be required to collect and report 1071 data if it exceeds either: (1) A given annual number of small business loans originated; or (2) annual total small business lending, measured in dollars. However, depository institutions with assets under a given asset threshold would be exempt from reporting, regardless of the number or dollar value of small business loans they originated during the relevant time period.

At least one SER supported a combined size-based and activity-based exemption. Some SERs also suggested other possible bases for setting exemption thresholds. For example, several SERs suggested that the Bureau focus on the number of small business loans that would be covered or excluded, rather than the number of financial institutions, in setting an exemption threshold. One SER suggested setting a threshold based on loan portfolio size rather than annual originations. As discussed above, another SER suggested that the Bureau consider exempting certain financial institutions using a location test similar or identical to what is used for HMDA, which does not apply to institutions that do not have a home or branch office in a Metropolitan Statistical Area.

*Alternative exemptions.* The Bureau did not express that it was considering other collection and reporting exemptions. However, the Bureau did request feedback on alternative approaches. In particular, the Bureau asked whether there were certain types of financial institutions, such as governmental lending entities or nonprofit nondepository lenders, that the Bureau should consider not including within 1071's data collection and reporting requirements.

One credit union SER requested that the Bureau exempt all credit unions from section 1071 data collection and reporting requirements, asserting that credit unions had not displayed what they characterized as a ''pattern of unfair lending.'' In contrast, another SER cautioned against providing exemptions for particular types of financial institutions, noting the risk of missing important lending data. A few SERs, particularly CDFIs, strongly preferred that all lenders, including nonprofit and government lenders, be subject to section 1071 data collection and reporting requirements. One SER asserted that disparities exist in many forms of small business lending, including the SBA's 7(a) Loan Program, State lending programs, and funds distributed through the recent Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[467] Another SER stated that in certain parts of the country, such as the Midwest, Farm Credit System loans are available to small businesses, and thus Farm Credit institutions are in competition with other lenders and should be covered entities. One SER stated that the Bureau should consider exempting nondepository, nonprofit Native CDFIs because section 1071 data collection and reporting requirements might impose significant compliance costs and privacy concerns.[468] The SBREFA Panel recommendations did not directly address this topic, although the Panel did recommend that the Bureau continue to consider alternative approaches to exemptions.[469]

Feedback from other stakeholders included a variety of suggestions for other types of financial institutions that the Bureau should consider exempting. These suggestions were made by financial institutions (or their trade associations) to describe either themselves or portions of their membership. The Bureau received this feedback pertaining to CDFIs, credit unions, minority depository institutions, financial institutions in rural areas or low- and moderate-income areas, financial institutions that would themselves be small businesses under the rule, and motor vehicle dealers. Conversely, some stakeholders encouraged the Bureau not to provide any such categorical exemptions. One stakeholder also urged the Bureau not to exempt government or nonprofit lenders, arguing that they were an important element of achieving broad coverage in 1071 data.

Proposed Rule—Activity-Based Exemption

Proposed § 1002.105(b) would define a covered financial institution as a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. This proposed definition adopts the portion of the Option 1 Exemption Threshold based on number of originations discussed at SBREFA, using the two consecutive year approach that was also described at SBREFA. The Bureau believes this definition will facilitate compliance by describing which financial institutions are required to collect and report small business data. The Bureau is also proposing commentary to accompany proposed § 1002.105(b). The Bureau's

[466] *Id.* at 13.

[467] Public Law 116–136, 134 Stat. 281 (2020).

[468] Native CDFIs are organizations certified as community development financial institutions that primarily serve a Native Community and are therefore eligible for Financial Assistance and Technical Assistance awards provided by the Native American CDFI Assistance Program. CDFI Fund, *Fostering Economic Self-Determination for Your Native Community, https://www.cdfifund.gov/sites/cdfi/files/documents/cdfi7205_fs_ni_updatedfeb20.pdf* (last visited Aug. 12, 2021).

[469] SBREFA Panel Report at 43.

rationale for proposing this exemption, and for not proposing any others, is discussed in detail below.

In general, the Bureau believes that fulfilling the purposes of section 1071 necessitates collecting small business lending data from all sizes and types of financial institutions (other than those with a low volume of lending activity), particularly given the variety of entities identified in ECOA section 704B(h)(1). The Bureau is proposing to exempt certain financial institutions from its small business lending data collection rule because it remains concerned that financial institutions with the lowest volume of small business lending might reduce or cease their small business lending activity due to the fixed costs of coming into compliance with the 1071 rule. A reduction in access to credit would run contrary to the community development purpose of section 1071. Section 1071 describes its community development purpose as ''enabl[ing] communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.''[470] In the Bureau's view, such business and community development opportunities cannot be appropriately identified if the 1071 rule unduly eliminates those opportunities by reducing access to credit, which, as explained below, supports the Bureau's use of its exemption authority under 704B(g)(2) here. Feedback from SBREFA showed that a broad array of financial institutions, trade associations, community groups, and others share the Bureau's concern about the risk of reducing access to small business credit, particularly with respect to financial institutions that infrequently lend to small businesses.

The Bureau is proposing § 1002.105(b) pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071 and its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

The Bureau believes that an activity-based threshold would provide a simple basis for financial institutions that infrequently lend to small businesses to determine whether they have conducted sufficient lending activity as to be required to collect and report data under proposed subpart B. With respect to setting an activity-based threshold, feedback favored using only originations. SERs uniformly supported clear, predictable collection and reporting exemption thresholds. With respect to feedback from other stakeholders, nearly all of the comments that expressed support for the Option 1 Exemption Threshold provided support only for the 25-loan metric, and not the total lending metric (and several comments explicitly urged the Bureau not to adopt the $2.5 million lending threshold). The Bureau believes that furnishing a dual activity-based threshold, under which infrequent lenders must ascertain both measurements to determine whether reporting may be required, would cut against the goal of simplifying the rule as lenders would then have to track two metrics, not one. The Bureau believes that a dual threshold would create more regulatory complexity as, among other things, the resulting rule would have to address issues such as how lines of credit and credit cards are meant to be counted towards the dollar volume threshold. (For example, should the rule use the maximum amount that could be extended or something else, like an average of the amount actually outstanding? If the former, how should changes in the limit be treated?) In contrast, tracking total annual small business originations does not entail such complexity.

In particular, the Bureau believes that a primary advantage of an activity-based threshold—ease of compliance—would be undermined if the Bureau were to implement a complex, dual threshold eligibility test. The Bureau wishes to ensure that infrequent lenders are not incurring significant undue compliance costs, particularly while not reporting data. In general, tracking two thresholds is more complex than tracking one. And of these two thresholds, the Bureau believes that tracking total originations is simpler than tracking total lending. The Bureau believes it is also more likely that financial institutions are already tracking total originations. The Bureau believes that proposing an activity-based threshold that employs data already generally collected by financial institutions could mitigate the risk that section 1071, when implemented, would result in reduced access to credit.

The Bureau is thus proposing to set the loan-volume threshold at 25 covered credit transactions from small businesses in each of the past two years. This proposal is based, in part, on feedback received at SBREFA. As mentioned above, several SERs recommended an annual 25-loan threshold and many comments, including those from lenders, trade associations, and community groups, expressed support for the Option 1 Exemption Threshold, with most explicitly supporting just the 25-loan threshold and not total lending.

The Bureau continues to consider whether this loan-volume threshold should be set at a different level, such as 50 or 100 originations, as described in the SBREFA Outline.[471] The Bureau notes that there was also substantial support for a much higher loan-volume threshold than 25 originations. In addition to the SER feedback discussed above, several stakeholders advocated for 100 loans and many others advocated for an even higher threshold. However, at least to this point, the Bureau is not convinced, based on the feedback from SERs and other stakeholders, that higher thresholds would be more necessary or appropriate to carry out the purposes of section 1071. Rather, such advocacy focused either on concerns that lower thresholds would not exempt a particular financial institution or type of financial institution, such as community banks, or that higher thresholds would not substantially diminish overall data collection.

Supporters of the 25-loan threshold and supporters of the 100-loan threshold each argued that such a threshold would be similar to that used in HMDA. The Bureau's 2015 HMDA Rule set the closed-end loan threshold

[470] ECOA section 704B(a).

[471] SBREFA Outline at 12.

Case 7:23-cv-00144 Document 105-6 Filed on 08/01/24 in TXSD Page 70 of 89



at 25 originated loans for each of the two preceding calendar years.[472] However, in 2020, the Bureau increased the threshold to 100 closed-end loans, effective the same year.[473] The Bureau set the HMDA threshold pursuant to its authority to provide adjustments or exceptions that it judges as necessary and proper to effectuate the purposes of HMDA or to facilitate compliance with HMDA. In the present case, with respect to institutional coverage thresholds, the Bureau does not believe a direct comparison with HMDA is instructive because of differences in the relevant statutory authorities and between home mortgages and small business loans.

The Bureau also considered how its proposed threshold of 25 covered credit transactions for small businesses (and the other thresholds under consideration at SBREFA) might affect overall collection and reporting of 1071 data from banks and credit unions, based on data as of 2019. Table 1 below provides the Bureau's estimated share of depository institutions, estimated share of small business loans from those institutions (measured in total number of loans), and estimated share of small business credit from those institutions (measured in dollars) that would be covered by a loan-volume threshold of 25, 50, or 100 small business loans. The Bureau estimates that a depository institution is covered for a particular loan-volume threshold as of 2019 if the estimated number of originations for that institution exceeded the threshold in both 2017 and 2018. Given the limitations of the source data, the Bureau cautions that these estimates are not intended to provide a complete sense of the possible consequences of adopting each particular threshold. Nonetheless, the Bureau is providing estimates based on these data because it is the best information currently available to the Bureau. Moreover, the Bureau emphasizes that these estimates apply only to depository institutions. This information is based on FFIEC and Credit Union Call Reports, as well as Community Reinvestment Act submissions.[474] Under these data collections, banks report small loans made to businesses and farms (regardless of the borrower's size). Credit unions report commercial loans over $50,000 made to members (also, regardless of the borrower's size). The Bureau is unable to determine the degree to which these data provide an adequate proxy for the applications from small businesses that would be subject to 1071 reporting. The methodologies and assumptions used to produce these estimates are further documented in part VII.D below and in more detail in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending data collection notice of proposed rulemaking* released concurrently with this proposal.[475]

**Table 1: Estimated depository institution coverage by loan volume (as of 2019)**

| | 25 Loans | 50 Loans | 100 Loans |
|---|---|---|---|
| Institutions Subject to Reporting | 38% – 40% of all depository institutions[476] | 27% – 30% of all depository institutions | 17% – 19% of all depository institutions |
| Banks and Savings Associations (SAs) Subject to Reporting | 70% – 73% of all banks and SAs[477] | 52% – 56% of all banks and SAs | 33% – 36% of all banks and SAs |
| Credit Unions Subject to Reporting | 7% of all credit unions[478] | 4% of all credit unions | 2% of all credit unions |
| Share of Total Small Business Loans by Depository Institutions (Number of Loans Originated) Captured | 98.3% – 98.6% | 96.7% – 97.3% | 94.2% – 95.1% |
| Share of Total Small Business Credit by Depository Institutions (Dollar Value of Loans Originated) Captured | 97.9% – 98.6% | 95.3% – 96.3% | 90.0% – 92.0% |

[472] *See* 80 FR 66127 (Oct. 28, 2015). The Bureau also provided a higher threshold of 100 for open-end lines of credit. *Id.*

[473] *See* 85 FR 28364 (May 12, 2020).

[474] On the bank Call Report and in the Community Reinvestment Act data, for small bank and small farm loans, banks report on business loans with original amounts of $1 million or less and farm loans with original amounts of $500,000 or less. For lines of credit or loan commitments, banks report the size of the line of credit or commitment when it was most recently approved. Banks include loans guaranteed by the SBA and other government entities in their small loans to businesses. Banks do not report loans to nonprofit organizations in this category. Thus, these data collections would include loans made to purchase, for example, individual vehicles and pieces of equipment for the nation's largest businesses.

[475] This document is available at *https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodologies-small-business-lending-data-collection-nprm/*.

Table 1 above shows that as the loan-volume threshold rises, the estimated share of depository institutions subject to section 1071 decreases substantially. Likewise, the estimated share of small business loans and small business credit captured by the rule would also decrease, although those decreases are less pronounced. The Bureau has no information for nondepository institutions such that the Bureau could provide similar estimates for comment. The Bureau requests in response to this proposal such information and data that might bear on any activity-based exemption for nondepository institutions.[476 477 478]

The Bureau notes that the above estimates represent small business lending data prior to the COVID–19 pandemic and ensuing policy responses. The Bureau is keenly aware that many financial institutions, including those that may not have historically participated actively in small business lending, served their communities by becoming participating lenders in the SBA's Paycheck Protection Program. This program ended on May 31, 2021. The Bureau expects that by the time its 1071 rule is finalized and implemented, lending activity conducted pursuant to the SBA's Paycheck Protection Program will not be determinative of whether a given financial institution qualifies as a covered financial institution under the 1071 rule. The Bureau will continue to monitor the market and consider what other adjustments, if any, may be needed to ensure that, to the best of the Bureau's ability, the 1071 rulemaking is informed by up-to-date and accurate information about the small business lending market.

The Bureau seeks comment on its proposed 25 originations threshold incorporated into the definition of a covered financial institution. The Bureau also solicits comment on whether this threshold should alternatively be set at 50 or 100 covered credit transactions.

The Bureau is proposing to define a covered financial institution using a loan-volume threshold that must be achieved in each of the two preceding calendar years. SERs provided relatively little feedback directly on the measurement period, but broadly expressed a desire for clear, predictable collection and reporting thresholds. The Bureau received substantial feedback advocating for a two-year approach, but little feedback asking for a one-year threshold period. A few stakeholders also expressed interest in a measurement period longer than two years.

The Bureau acknowledges that a loan-volume threshold based on a two-year period could create some operational complexity for some financial institutions. To be sure that it was not a covered financial institution, a financial institution would need to maintain records sufficient to show total small business originations for both years of the threshold period. The Bureau believes that two years is not a prohibitively long time, although it is possible that infrequent lenders may have smaller staff or fewer resources to reliably track such information for 1071 purposes. The Bureau believes that a two-year threshold period is advisable to eliminate uncertainty surrounding data collection responsibilities. Under this proposal, a financial institution that may not frequently lend to small businesses, but that experiences an unusual and unexpectedly high lending volume in a single year would not be a covered financial institution. As discussed in part VII below, in order to comply with the Bureau's proposed 1071 rule, a financial institution may need to undertake substantial one-time costs that include operational changes, such as staff training, information technology changes, and develop policies and procedures. Therefore, the Bureau believes that it is appropriate to propose a two-year threshold period to provide more stability around reporting responsibilities. Regulations that implement HMDA and the Community Reinvestment Act provide similar periods to determine coverage.

The Bureau notes that employing a two-year approach would delay reporting for new, potentially active entrants. For example, under this proposal a large lender that enters the market and originates hundreds or even thousands of small business loans in its first two calendar years of lending would not report its covered applications. That is, under the Bureau's proposal, this financial institution would not be required to collect and report 1071 data on its covered applications for small businesses in those first two years, although the institution could choose to voluntarily collect and report data. The Bureau has concerns, however, about triggering data collection and reporting requirement based on lenders' estimates of their projected future volume.

The proposed two-year threshold period may pose other considerations for financial institutions that conduct small business lending activity near the proposed 25 small business originations threshold. See the section-by-section analysis of proposed § 1002.5(a)(4) above for a discussion of proposed § 1002.5(a)(4)(viii), which would allow a financial institution to collect ethnicity, race, and sex information pursuant to proposed subpart B for a covered application under certain circumstances during the second year of the threshold period. See the section-by-section analysis of proposed § 1002.114(c) below for discussion of additional flexibility that the Bureau is proposing regarding measuring lending activity prior to the rule's compliance date.

The Bureau is proposing to set the activity-based threshold based on small business originations, rather than applications. The statutory language of 1071 generally applies to applications; however, the Bureau believes that using small business originations for purposes of defining a covered financial institution is the better approach. The Bureau expects that financial institutions track their small business application volumes in various ways, but whether an origination resulted is a clear and readily identifiable metric. The Bureau is concerned that attempting to use an exemption metric based on applications would impose new obligations on financial institutions solely for purposes of determining whether or not they are subject to this rule. As discussed above, the Bureau believes that proposing an activity-based threshold that employs data already generally collected by financial institutions could mitigate the risk that section 1071, when implemented, would result in reduced access to credit. In addition, even those financial institutions that track total applications now may not do so in a way that fully aligns with how the Bureau is proposing to define covered applications for purposes of proposed subpart B. Using originations is also consistent with the Bureau's Regulation C. In addition, the Bureau received limited feedback advocating for the use of applications to set the activity-based threshold.

Proposed comment 105(b)–1 would clarify the meaning of a preceding calendar year for purposes of the proposed activity-based exemption. See the section-by-section analysis of proposed § 1002.114(c)(2) below for additional discussion regarding measuring lending activity prior to the rule's compliance date. Proposed

[476] There were 10,525 depository institutions as of December 31, 2019, including 112 credit unions that are not federally insured.

[477] Based on FFIEC Call Report data, there were 5,177 banks and savings associations as of December 31, 2019.

[478] Based on the 2019 NCUA Call Report data, there were 5,348 credit unions as of December 31, 2019, including 112 credit unions that are not federally insured.

comment 105(b)–2 would emphasize that a financial institution qualifies as a covered financial institution based on total covered credit transactions originated for small businesses, rather than covered applications received from small businesses. Proposed comment 105(b)–3 would explain that whether a financial institution is a covered financial institution depends on its particular small business lending activity in the two preceding calendar years, and that the obligations of a covered financial institution is an annual consideration for each year that data may be compiled and maintained under proposed § 1002.107(a).

The Bureau is proposing to clarify in § 1002.105(b) that for purposes of defining a covered financial institution, if more than one financial institution was involved in the origination of a covered credit transaction, only the financial institution that made the final credit decision approving the application shall count the origination. The Bureau believes that providing this clarifying language would assist financial institutions in understanding which transactions count towards the loan-volume threshold. This approach is consistent with the Bureau's proposed § 1002.109(a)(3).

Proposed comments 105(b)–4 and –5 would explain when a financial institution is a covered financial institution following a merger or acquisition. These proposed comments are largely consistent with the Bureau's approach to reporting obligations surrounding a merger under Regulation C,[479] with modifications to reflect the nature of the small business lending market and to provide additional clarifications.

Proposed comment 105(b)–6 would clarify that Regulation B (including proposed subpart B) generally does not apply to lending activities that occur outside the United States.

Finally, proposed comment 105(b)–7 would address financial institutions that do not qualify as covered financial institutions but may nonetheless wish to voluntarily collect and report small business lending data. This proposed comment would reiterate that proposed § 1002.5(a)(4)(vii) through (ix) permits a creditor that is not a covered financial institution under proposed § 1002.105(b) to voluntarily collect and report information regarding covered applications in certain circumstances. If a creditor is voluntarily collecting applicants' protected demographic information for covered applications, it shall do so in compliance with proposed §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 as though it were a covered financial institution. Proposed comment 105(b)–7 would further state that if a creditor is voluntarily reporting those covered applications to the Bureau, it shall do so in compliance with proposed §§ 1002.109 and 1002.110 as though it were a covered financial institution.

The Bureau seeks comment on its proposed definition of a covered financial institution, which uses a loan-volume threshold of 25 covered credit transactions from small businesses. The Bureau continues to consider whether this loan-volume threshold should be changed to a different threshold, such as 50 or 100 originations from small businesses, and seeks feedback and data related to any of these three potential thresholds. In addition, the Bureau seeks comment on whether an activity-based threshold should be based on the total number of small business applications, rather than originations. The Bureau also requests comment on whether additional clarification is needed for this proposed definition.

Alternatives Considered—Size-Based Exemption and Combined Exemptions

The Bureau is not proposing to define a covered financial institution on the basis of the size of the financial institution, as measured by total assets for depository institutions or some other metric. Likewise, the Bureau is not proposing to define a covered financial institution with reference to the financial institution's size in combination with its small business lending activity.

For the reasons discussed above, the Bureau believes that proposing an exemption based on a financial institution's recent small business lending activity would be appropriate to carry out the purposes of section 1071. The Bureau believes that in comparison to a size-based exemption, an activity-based exemption is a more compelling basis for exempting certain financial institutions from coverage in light of section 1071's community development purpose. As previously stated, the Bureau is concerned that certain financial institutions might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with this rule, and that a reduction in access to credit would run contrary to the community development purpose of section 1071. However, the Bureau is persuaded that small business lending activity holds a more direct relationship to a given financial institution's role in the small business lending market than a more general measurement of the financial institution's size as measured in total assets. Using a size-based metric would present a much rougher proxy for the risk that a financial institution may reduce or eliminate its small business lending activities as a result of the one-time costs of coming into compliance with this rule.

The Bureau also believes that proposing an activity-based exemption is a superior approach to proposing a size-based exemption because an exemption based on asset size would apply only to depository institutions. The Bureau is unaware of a similar size metric for nondepository institutions, and SERs and other stakeholders who provided feedback on the SBREFA Outline were not able to offer one. A size-based exemption approach might therefore risk distorting the collected data and create an uneven playing field. As noted above, other stakeholders explained that because there was no readily available equivalent size-based measurement for nondepository institutions, including an asset-based exemption might risk presenting a cost disadvantage for other small financial institutions. Moreover, exempting proportionately more depository institutions than nondepository institutions may present demographic data collection concerns. A recent small business credit survey revealed racial disparities in applications under the SBA's Paycheck Protection Program: the data showed white-owned firms were most likely to apply for a loan through a small bank (defined as under $10 billion in assets), while Black-owned firms were three times as likely as white-owned firms to apply for a loan through an online lender.[480] The Bureau is concerned that collecting data under different standards for depository institutions versus nondepository institutions would run contrary to the purposes of section 1071 and undermine the utility of the data, as well as the purposes of the Bureau, which are, in part, "to implement and, where applicable, enforce . . . consistently" Federal laws including ECOA.[481]

The Bureau also considered whether proposing a size-based exemption, on the basis of total assets for depository institutions, would be appropriate in combination with the above-discussed activity-based exemption. The Bureau is not persuaded that proposing such an additional exemption would be necessary or appropriate to carry out the

[479] *See* Regulation C comments 2(g)–3 and –4.

[480] Small Business Credit Survey of Firms Owned by People of Color at 14.

[481] 12 U.S.C. 5511(a).

purposes of section 1071. In particular, the Bureau considered two types of depository institutions that might be exempt by virtue of a size-based exemption:

- An Active Small Depository Institution (ASDI), meaning any depository institution smaller than a particular asset size that lends at or above a given activity-based threshold, and
- An Inactive Small Depository Institution (ISDI), meaning any depository institution smaller than a particular asset size that lends below a given activity-based threshold.

In examining the case for ASDIs and ISDIs, the Bureau believes that an additional, asset-based exemption may provide a slightly less costly means of ascertaining exemption status for a small number of ISDIs, but such an exemption would eliminate small business lending data from a moderate share of ASDIs that would otherwise provide valuable data in fulfilling both of section 1071's purposes.

Using the same data that were compiled for the activity-based exemption analysis, the Bureau estimates that under its proposed 25 originations threshold approximately 6,300 to 6,500 depository institutions would not be covered financial institutions, and therefore would be exempt from collection and reporting. The Bureau further estimates that proposing an asset-based exemption of $200 million would result in approximately 1,300 to 1,500 additional depository institutions not reporting (all of which, by definition, are ASDIs), while 5,200 to 5,400 depository institutions would already have been exempt, but have a somewhat lower-cost method of ascertaining this information (*e.g.,* ISDIs).[482]

Table 2 below indicates the estimated number of ASDIs that would report under various loan-volume thresholds, by asset size. As shown in Table 2, if the Bureau proposed an asset-based exemption of $100 million in addition to the proposed activity-based exemption of 25 originated covered credit transactions for small businesses, 500 to 592 more depository institutions would not be covered financial institutions, although these institutions originated more than 25 covered credit transactions for small businesses in each of the previous two years. Likewise, if the Bureau proposed an asset-based exemption of $200 million in addition to the proposed 25-originations activity-based exemption, 1,299 to 1,466 more depository institutions would not be covered financial institutions, although these institutions originated more than 25 covered credit transactions for small businesses in each of the previous two years.

**Table 2: Estimated active small depository institutions (ASDIs) by loan-volume threshold and asset category (as of 2019)**

| Thresholds | ASDIs with assets between 0 and $100 million | ASDIs with assets between $100 million and $200 million |
|---|---|---|
| 25 Originations | 500 – 592 | 799 – 874 |
| 50 Originations | 220 – 295 | 493 – 583 |
| 100 Originations | 64 – 103 | 216 – 285 |

Of the estimated 5,200 to 5,400 ISDIs, as defined by a 25 originations threshold and $200 million asset threshold, about 4,200 are credit unions and about 1,000 or 1,200 are banks. Furthermore, the vast majority of these ISDI credit unions (88 percent) had either no small business originations in 2017 and 2018 or fewer than 10 small business originations in 2017 and 2018 (97 percent).[483] The Bureau believes that it is likely that these institutions would be able to determine that they do not meet a loan-volume threshold almost as easily as they can determine that they do not meet an asset-based threshold. Only 34 credit unions with assets below $200 million had between 10 and 25 small business originations in both 2017 and 2018. The Bureau estimates that as many as 1,200 banks and 34 credit unions would benefit from a simpler method of determining exemption status. However, as stated above, the Bureau believes that such cost savings likely would still be minimal.

The Bureau therefore believes that providing an additional, asset-based exemption might provide a somewhat less costly means of ascertaining exemption status for some ISDIs, although this number may be relatively modest. However, the tradeoff of providing a simpler exemption for some depository institutions is that a $200 million asset-based exemption would increase the overall percent of exempt depository institutions by some 13 percentage points by also extending to ASDIs. The Bureau estimates that these ASDIs accounted for between 171,000 and 226,000 originations in 2019, or about 2 percent of total covered originations under the 25 originations threshold. Exempting additional depository institutions by adding an asset-based exemption would curtail

[482] For the purposes of this analysis, the Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more originations than the loan-volume threshold in 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018 exceeded the asset-based threshold. Of the 10,525 depository institutions that existed at the end of 2019, 6,687 either didn't exist at the end of 2018 or had merger adjusted assets below $200 million.

[483] However, it is possible that these credit unions have originated loans to small businesses with values below $50,000. Credit unions report commercial loans over $50,000 made to members (regardless of the borrower's size).

both the volume of and possible variety of data, and the Bureau is concerned that exempting ASDIs would detract from the utility of 1071 data in carrying out the purposes of section 1071 by removing important data from disclosure and review.

The Bureau also considered feedback from SERs and other stakeholders who suggested that the Bureau exempt lenders other than ''large'' financial institutions, such as depository institutions with more than $1 billion in assets, and then potentially extend the rule to smaller lenders at a later time. These SERs and stakeholders argued that this approach would capture the vast majority of small business loans while avoiding imposing undue regulatory burden on smaller lenders, who might be less capable of absorbing such costs. However, the Bureau is not currently persuaded that capturing lending data only from large financial institutions would be necessary or appropriate to carry out section 1071's statutory purposes.

Supporters of collecting data only from large depository institutions argue that such depository institutions may be more capable of absorbing compliance costs. However, the Bureau is concerned that data collection from only large depository institutions may not provide adequate data for community development purposes, as there may be demographic disparities among applications by the type (and size) of financial institution. Likewise, data collection from only large depository institutions would not allow the Bureau to conduct fair lending analyses for other types of financial institutions. In general, the Bureau believes that appropriately carrying out the purposes of section 1071 necessitates collecting small business lending data from all sizes and types of financial institutions (other than those with the lowest volume of lending activity), particularly given the variety of entities identified in section 704B(h)(1), discussed above. See the section-by-section analysis of proposed § 1002.114 below, however, for further discussion of a possible tiered compliance date based on the size of the financial institution.

Therefore, for the reasons described above, Bureau is not proposing an asset-based exemption to the definition of a covered financial institution.

Alternative Considered—Other Exemptions

The Bureau is not proposing to adopt alternative exemptions or exceptions to the definition of covered financial institution, other than the loan-volume threshold as described above.

As discussed above, the Bureau believes that, in light of the text and purposes of section 1071, the Bureau should generally adopt the posture that all manner of small business lenders should be subject to reporting. Feedback from SERs and others generally did not provide compelling policy reasons or legal arguments for exempting entire classes of financial institutions. Moreover, the Bureau believes that most policy arguments that were raised in this context are better addressed through potential activity-based considerations.

With respect to government lenders, the Bureau has not identified, nor did SERs or other stakeholders provide, policy or legal rationales for excluding government lenders from data collection. To the contrary, a few SERs, particularly CDFIs, strongly preferred that all lenders, including government entities, be subject to section 1071 data collection and reporting requirements; one stakeholder likewise urged the Bureau not to exempt government lenders. The Bureau believes that collecting information on small business lending by government entities furthers the purposes of section 1071. Moreover, the Bureau believes, as described above in the discussion of proposed comment 105(a)–1, that government entities are included within the phrase ''other entity'' in the ECOA section 704B(h)(1) definition of ''financial institution.'' For example, the Bureau believes that it will be helpful to identify the business and community development needs of women-owned, minority-owned, and small businesses by collecting lending data from both an online lender and a county-run assistance program for establishing new businesses.

For the same reasons, the Bureau does not believe that exempting not-for-profit lenders from data collection is consistent with the purposes of section 1071. The Bureau believes that organizations exempt from taxation pursuant to 26 U.S.C. 501(c) play a crucial role in lending to small businesses, particularly those that are women- or minority-owned, in certain communities.

Those providing feedback generally argued for categorical exemptions because, they said, certain financial institutions (1) would encounter difficulty absorbing compliance costs; (2) are integral to a community's lending needs; and/or (3) employ business methods or offer products not conducive to data collection and reporting. With respect to compliance costs, the Bureau believes that directly considering a financial institution's activity is a more appropriate way to address this concern. With respect to a financial institution's lending importance for a community or region (such as low income or rural), the Bureau believes that such arguments emphasize the importance of collecting and analyzing such data to further the purposes of section 1071 rather than justify an exemption. Finally, with respect to considering the particularities of certain business models, the Bureau is persuaded that it can most appropriately address such concerns by considering potentially modified reporting rules for particular business models and specific products. See the section-by-section analyses of proposed §§ 1002.104(b) and 1002.109(a)(3). The Bureau is proposing comment 105(a)–1, discussed above, consistent with the considerations discussed here.

Therefore, for the reasons described above, the Bureau is not proposing to define a covered financial institution by providing alternative exemptions or exceptions. The Bureau seeks comment on this approach, including data or information that might bear upon any such alternative exemptions in light of section 1071's purposes.

Section 1002.106 Business and Small Business

ECOA section 704B(h)(2) defines the term ''small business'' as having the same meaning as ''small business concern'' in section 3 of the Small Business Act.[484] The Bureau is proposing to define a small business consistent with the statutory language. In particular, the Bureau is proposing to define a small business concern to have the same meaning as the term ''small business concern'' in 15 U.S.C. 632(a), as implemented by 13 CFR 121.101 through 121.107. Notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of proposed subpart B, the Bureau is proposing that a business is a small business if and only if its gross annual revenue for its preceding fiscal year is $5 million or less. The Bureau is seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act.[485]

The Bureau believes it may be instructive for financial institutions to first consider whether an applicant may be a business under proposed § 1002.106(a), and then to consider, if the applicant is a business, whether the business is small under § 1002.106(b). Furthermore, the Bureau believes that these proposed definitions implement the statutory language of section 1071

[484] 15 U.S.C. 632.

[485] 15 U.S.C. 632(a)(2)(C).

while reflecting the need for a wide variety of financial institutions to apply a simple, broad definition of a small business that would be practical across the many product types, application types, technology platforms, and applicants in the market.

For the reasons set forth below, the Bureau is proposing § 1002.106 to implement ECOA section 704B(h)(2) and pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data under section 1071.

106(a) Business

Background

ECOA section 704B(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[486] The Small Business Act provides a general definition of a "small business concern," authorizes SBA to establish detailed size standards for use by all agencies, and permits an agency to request SBA approval for a size standard specific to an agency's program. The SBA's regulations define a "business concern" as "a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor."[487]

SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing to define "small business" by cross-referencing the SBA's general definition of "small business concern" but adopting a simplified size standard for purposes of its section 1071 rule.[488] Thus, the Bureau explained that it was considering a proposal under which financial institutions would not be required to collect and report 1071 data for not-for-profit applicants, because they are not "organized for profit" and are thus not a "business concern." The Bureau explained that a business concern may take a number of different legal forms, including a sole proprietorship, partnership, LLC, corporation, joint venture, trust, or cooperative.[489] The Bureau explained that, because the definition is limited to American businesses, if the Bureau adopted this definition for purposes of 1071, loans to foreign companies would be outside the scope of 1071 data collection and reporting requirements.

Feedback from stakeholders regarding the proposal under consideration focused primarily on how the Bureau might define a business size standard, addressed below.[490] The Bureau did receive limited feedback, however, suggesting that the Bureau consider certain modifications or adjustments to the definition of a business concern, such as clarifying that the term does not include foreign-owned entities, certain trusts, and certain real estate holding companies.

Proposed Rule

Proposed § 1002.106(a) would define a business as having the same meaning as the term "business concern or concern" in 13 CFR 121.105. This proposed definition is consistent with ECOA section 704B(h)(2), which defines the term "small business" as having the same meaning as "small business concern" in section 3 of the Small Business Act.[491] The SBA has issued 13 CFR 121.105, "How does SBA define 'business concern or concern,'" pursuant to the Small Business Act. The Bureau refers to the entirety of that section for additional information. In particular, the Bureau notes that this definition includes elements such as being "a business entity organized for profit" that has "a place of business located in the United States" and "operates primarily within the United States or . . . makes a significant contribution to the U.S. economy."[492]

The Bureau is not providing interpretations of this SBA regulation in proposed subpart B because the Bureau believes that existing SBA interpretations are responsive to the general questions posed at SBREFA.[493]

The Bureau seeks comment on this proposed definition of a business, and generally seeks comment on whether additional clarification is needed.

106(b) Small Business

Background

*Section 1071 data collection purposes, requirements, and potential impacts.* A key component of the Bureau's fair lending work under the Dodd-Frank Act is to ensure fair, equitable, and nondiscriminatory access to credit for both individuals and their communities.[494] Section 1071 of the Dodd-Frank Act, which amended ECOA, requires financial institutions to collect and report to the Bureau data regarding applications for credit for women-owned, minority-owned, and small businesses. ECOA section 704B(h)(2) states that "[t]he term 'small business' has the same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632)." Section 1071 was adopted for the dual statutory purposes of facilitating fair lending enforcement and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[495]

As set forth in section 1071, the data that financial institutions would be required to collect and report to the Bureau include, among other things, the gross annual revenue of the business in the preceding fiscal year, the type and purpose of the loan, the census tract for the applicant's principal place of business, and the race, sex, and ethnicity of the principal owners of the business.[496] ECOA section 704B(f)(2)(C) further provides that information compiled and maintained under the statute shall be "annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation." The Bureau believes that the collection and subsequent publication of robust and granular data pursuant to section 1071 regarding credit applications for small businesses, including those that are women- and minority-owned, will provide much-needed transparency to an otherwise opaque market and better ensure fair, equitable, and nondiscriminatory access to credit.

The Bureau understands that access to fair, equitable, and nondiscriminatory credit is crucial to the success of small businesses. Small businesses—including women-owned and minority-owned small businesses—need access to credit to smooth out business cash flows

[486] 15 U.S.C. 632.

[487] 13 CFR 121.105.

[488] SBREFA Outline at 14–18.

[489] 13 CFR 121.105(b).

[490] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 20–22.

[491] 15 U.S.C. 632.

[492] 13 CFR 121.105(a)(1).

[493] *See, e.g.,* 13 CFR 121.105(b), which states that a business concern may be in the legal form of an individual proprietorship, partnership, limited liability company, corporation, joint venture, association, trust or cooperative, except that where the form is a joint venture there can be no more than 49 percent participation by foreign business entities in the joint venture. Thus, for example, financial institutions would not be required to collect and report data under proposed subpart B for not-for-profit applicants, because they are not "organized for profit" and are thus not a "business concern."

[494] *See* 12 U.S.C. 5493(c)(2)(A).

[495] ECOA section 704B(a).

[496] ECOA section 704B(e)(2).

and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth. The market these businesses turn to for credit is vast, varied, and complex. Overall, small businesses have many options when it comes to financing, including a wide range of products and providers. Yet market-wide data on credit to small businesses remains very limited, particularly with respect to applicants' protected demographic information at the core of section 1071. The Bureau believes that a section 1071 rulemaking would provide data that could serve as a significant resource for financial institutions, community groups, policy makers, and small businesses.

*SBA size standards.* The Small Business Act permits the Small Business Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business, which may be based on the number of employees, dollar volume of business, net worth, net income, a combination of these, or other appropriate factors.[497]

As implemented by the SBA, these size standards generally hinge on average annual receipts or the average number of employees of the business concern and are customized industry-by-industry across 1,057 6-digit NAICS codes. Specifically, the SBA typically uses two primary measures of business size for size standards purposes: (i) Average annual gross receipts[498] for businesses in services, retail trade, agricultural, and construction industries, and (ii) average number of employees for businesses in all manufacturing, most mining and utilities industries, and some transportation, information and research and development industries. To measure business size, the SBA also uses financial assets for certain financial industries, and for the petroleum refining industry, it uses refining capacity and employees. The SBA's size standards are used to establish eligibility for a variety of Federal small business assistance programs, including for Federal government contracting and business development programs designed to assist small businesses in obtaining Federal contracts and for SBA's loan guarantee programs, which provide access to capital for small businesses that are unable to qualify for and receive conventional loans elsewhere. Under the Small Business Jobs Act of 2010 (Small Business Act),[499] the SBA is required to review all size standards no less frequently than once every five years.[500] The Small Business Act further provides that no Federal agency may prescribe a size standard for categorizing a business concern as a small business concern unless certain conditions are met, including approval by the SBA's Administrator.[501]

The SBA's rule governing its consideration of other agencies' requests for approval of alternate size standards requires that the agency seeking to adopt an alternate size standard consult in writing with the SBA's Division Chief for the Office of Size Standards in advance of issuing an NPRM containing the proposed alternate size standard.[502] The Bureau has met this requirement. After issuing an NPRM, the agency must provide a copy of the published NPRM to the Division Chief for the Office of Size Standards, and the agency cannot adopt a final rule including its alternate size standard until the size standard has been approved by the SBA's Administrator.[503]

*Market considerations.* A wide variety of financial institutions, with varying levels of sophistication and experience, extend credit to small businesses. As proposed, section 1071 applies to abroad range of financial institutions. Banks and credit unions that serve a breadth of customers typically organize their commercial lending operations into segments based on a combination of risk, underwriting, product offering, and customer management factors that are appropriate to each segment. The three most frequent organizational groupings are retail/small business, middle market, and large corporate banking. Commercial customers are generally assigned based on their revenue potential and aggregate credit exposure, with smaller accounts assigned to the retail/small business banking area. The overwhelming preponderance of small businesses are generally found in the retail/small business banking group, which may also conduct consumer banking.

Today, the distinguishing characteristic that many larger financial institutions (principally banks with $10 billion or more in assets) use to assign small businesses into the retail/small business banking group is gross annual revenue. While cut-offs vary by financial institution, the most common demarcations categorize small/retail customers as those below $5 million, or up to $10 million, in gross annual revenue. The maximum amount of a retail/small business banking term loan or credit line is typically $5 million or less.

Financial institutions that do not conduct SBA lending generally do not collect or consider the number of employees of a small business applying for credit, but they often capture gross annual revenue information, including for regulatory compliance purposes. Specifically, retail/small business lenders routinely collect applicants' gross annual revenue information because notification requirements under existing Regulation B vary for business credit applicants depending on whether or not they ''had gross revenues of $1 million or less in [their] preceding fiscal year.''[504] For a business applicant with gross annual revenues of $1 million or less, a creditor must provide a notification following an adverse action, such as a credit denial, that is generally similar to that provided to a consumer in both substance and timing.[505] As a result, small business lenders often adopt compliance management systems similar to those found among consumer lenders.

The Bureau believes it is important for a financial institution to be able to quickly determine at the beginning of the application process whether an applicant is a ''small business'' for purposes of the 1071 rule. Financial institutions generally cannot inquire about an applicant's protected demographic information (including the race, sex, and ethnicity of an applicant's principal owners) without being legally required to do so.[506] As discussed in the *Overview* of this part V, this proposal will only require (and thus only permit) such inquiries for small businesses. While the Bureau is proposing to allow financial institutions flexibility in when they seek this protected demographic information, the Bureau believes that financial institutions generally have the best chance of obtaining it, and supporting the purposes of section 1071, if they ask for it in the earlier stages of the application process. As a result, a

[497] 15 U.S.C. 632(a)(2)(A) and (B).

[498] The SBA recently changed its regulations on the calculation of average annual receipts for all of SBA's receipts-based size standards, and for other agencies' proposed receipts-based size standards, from a three-year averaging period to a five-year averaging period, outside of the SBA Business Loan and Disaster Loan Programs. 84 FR 66561 (Dec. 5, 2019).

[499] Public Law 111–240, 124 Stat. 2504 (2010).

[500] 15 U.S.C. 632 note.

[501] 15 U.S.C. 632(a)(2)(C).

[502] 13 CFR 121.903(a)(2).

[503] 13 CFR 121.903(a)(5).

[504] 12 CFR 1002.9(a)(3)(i).

[505] *Id.* The notification requirements for applicants with gross annual revenues in excess of $1 million are generally more flexible in substance and also do not impose a firm deadline for provision of a Regulation B notification. 12 CFR 1002.9(a)(3)(ii).

[506] *See* 12 CFR 1002.5(a).

financial institution may need to know, even before the application is initiated, which application path the applicant must follow—a 1071-governed or a non-1071-governed application path.

*Early feedback.* From very early on in its discussions with stakeholders regarding section 1071, the Bureau has received feedback focused primarily on how the Bureau might define a business size standard. For example, in response to the Bureau's 2017 RFI, many stakeholders expressed concern about the difficulties in determining the appropriate NAICS code for businesses and in applying the NAICS-based standards in determining whether a business loan applicant is a small business. Commenters who addressed the issue of a small business definition were universally in favor of the Bureau adopting something less complex than the SBA's size standards based on 6-digit NAICS codes. Commenters noted that the use of these standards is relatively complex and would introduce burdens for the 1071 rule with limited benefit. There was broad support in this particular context for a simpler definition of small business, particularly echoing the 2017 RFI's mention of gross annual revenue as a threshold delineation defining a small business. In addition to revenue, number of employees, loan amount, total exposure of the business, or some combination of those factors were also mentioned as possible bases for alternate size standards. While community groups supported a simpler definition, some cautioned that whatever definition the Bureau chooses must cover most small businesses in order to comport with congressional intent.

SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it believed that using a simpler, more straightforward approach to the size standard aspect of the "small business" definition was a better approach for purposes of its 1071 rule.[507] The Bureau further stated that such an approach would assist both financial institutions and applicants seeking to quickly understand whether a business is "small" and to employ a workable size standard for small business data collection without navigating the potential complexities of determining the appropriate 6-digit NAICS code, and then the relevant size standard based on that NAICS code, for each applicant.

The Bureau stated in the SBREFA Outline that it was considering three alternative approaches to determining whether an applicant business is small.[508] These three approaches, described in more detail below, would have used: (1) Only gross annual revenue ("SBREFA First Alternative Approach"); (2) either the number of employees or average annual receipts/gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services ("SBREFA Second Alternative Approach"); or (3) size standards across 13 industry groups that correspond to 2-digit NAICS code industry groupings ("SBREFA Third Alternative Approach").

Under the SBREFA First Alternative Approach, the Bureau considered proposing a size standard using the gross annual revenue of the applicant business in the prior year, with a potential "small" threshold of $1 million or $5 million.

Under the SBREFA Second Alternative Approach, the Bureau considered proposing a size standard of a maximum of 500 employees for manufacturing and wholesale industries and a maximum of $8 million in gross annual revenue for all other industries. The Bureau selected 500 employees as a potential threshold for manufacturing and wholesale industries because that figure is the most common of the SBA's employee-based size standards. The Bureau selected $8 million for all other industries because that figure is the most common size standard threshold for average annual receipts. The Bureau stated that it was considering using gross annual revenue, rather than the SBA's average annual receipts, for consistency with the 1071 statutorily required gross annual revenue data point.

Under the SBREFA Third Alternative Approach, the Bureau considered proposing a size standard using gross annual revenue or the number of employees based on a size standard in each of 13 2-digit NAICS code categories that applies to the largest number of firms within each 2-digit NAICS code category.[509] Applying the SBA's 2019 size standards, the third alternative would result in eight different size standards across the 13 categories.

The Bureau stated it was not planning to propose requiring that financial institutions verify information provided by applicants necessary for determining whether an applicant is small, regardless of the Bureau's approach to a small business size standard. Rather, the Bureau was considering proposing that a financial institution would generally report the information as provided by the applicant. However, if the financial institution verifies such information for its own purposes, it would report the verified information to the Bureau.

SERs generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business—which bases classification on an applicant's 6-digit NAICS code—is relatively complex. The Bureau discusses the concerns with respect to the potential complexity of gathering NAICS codes in the section-by-section analysis of proposed § 1002.107(a)(15) below, and the Bureau discusses the concerns with respect to the potential complexity using NAICS codes to determine small business status below.

Nearly all SERs expressed some familiarity with the SBA's small business definition. More than half the SERs currently gather an applicant's NAICS code as a routine part of the application process, because NAICS codes are used for SBA loans and for CDFI Fund reporting. One SER also uses this information for tracking the concentration of its loans across certain industries. Some SERs gather NAICS codes from applicants' tax documents or business credit reports and others rely on information provided directly by the applicants; these SERs emphasized the importance of permitting reliance on applicant self-reported data.

One SER remarked that it would be critical for the purposes of section 1071 to have sectoral industry information about applicants in some form, such as NAICS codes, in order to ensure meaningful data. The Bureau discusses the independent value of NAICS codes, and related comments from SERs regarding certain difficulties and challenges surrounding collecting NAICS codes from applicants, in the section-by-section analysis of proposed § 1002.107(a)(15) below. Another SER expressly opposed using NAICS codes to determine whether an applicant is a small business for purposes of section 1071. A few SERs stated that they did not think it would be particularly costly to collect NAICS codes for all of their small business loans, and one SER described the SBA's classification

[507] SBREFA Outline at 16.

[508] *Id.*

[509] Specifically, under this approach, the Bureau first considered the total number of employer firms in each NAICS 6-digit industry, based on U.S. Census Bureau data. U.S. Census Bureau, *2017 Statistics of U.S. Businesses* (2017), *https://www.census.gov/data/datasets/2017/econ/susb/2017-susb.html.* Next, within each NAICS 2-digit industry, the Bureau determined how many unique size standards are applied within that 2-digit industry and the total number of employer firms to which each unique standard is applied. The simplified standard for each NAICS 2-digit industry is the one that applies to the largest number of firms within that industry.

approach as precise and not very burdensome.

Some SERs supported the SBREFA First Alternative Approach for defining a small business, which would use an applicant's gross annual revenue with a potential ''small'' threshold of $1 million or $5 million. Several SERs were supportive of this simple approach but thought the potential threshold should be higher. For most SERs, nearly all their small business customers had less than $5 million in gross annual revenue; most are under $1 million. Several SERs remarked that a $1 million gross annual revenue threshold would be too low, noting that it would exclude many businesses defined by SBA regulations as ''small''; some of these SERs said that a $5 million gross annual revenue threshold would be acceptable. Some SERs advocated for higher revenue thresholds, such as $8 million or $10 million. One SER cautioned that a small business definition based only on gross annual revenue would not account for regional variations in business size. One SER specifically suggested that the Bureau align its small business definition with the $1 million standard used by certain supervisory agencies for CRA reporting (which requires the reporting of loans in original amounts of $1 million or less to businesses and, if known, identification of whether the business's gross annual revenue is $1 million or less). However, this SER also supported other versions of the SBREFA First Alternative Approach and SBREFA Second Alternative Approach if the Bureau did not adopt the CRA approach. Relatedly, there were some concerns about capturing revenue information from small businesses. Some SERs do not collect these data now, or do not do so across all lending products. SERs also expressed a concern that some applicants likely would not know their gross annual revenue as a precise dollar amount. See the section-by-section analysis of proposed § 1002.107(a)(14) below for a discussion of the gross annual revenue data point.

Some SERs supported the Bureau's SBREFA Second Alternative Approach, which would distinguish between applicants in manufacturing and wholesale industries (500 employees) and all other industries ($8 million in gross annual revenue). These SERs stated that while this approach was still relatively simple, it would nonetheless capture most relevant data. One SER noted a discrepancy between the thresholds, stating that a manufacturer with 500 employees would be much larger than a business with $8 million in gross annual revenue. Some SERs expressed concerns about how to collect data on the number of employees, particularly regarding how part-time and seasonal employees, and contractors, would be counted. One SER suggested that a small business be defined as having less than $10 million in annual revenue and 50 or fewer employees. Another SER emphasized the importance of including collection and reporting requirements for applicants with very few or no employees on payroll, stating that most minority-owned and women-owned small businesses have no employees. One SER opposed the SBREFA Second Alternative Approach, stating that it would be too complex and potentially confusing.

One SER also supported the SBREFA Third Alternative Approach as closest to the SBA approach, stating that it reflects the SBA's substantially different definitions of a small business across different industries. This SER stated that the SBREFA First and Second Alternative Approaches would exclude many SBA-qualified small businesses. Other SERs also stated that this 2-digit NAICS code alternative was significantly less complex and prone to less human error than the SBA definition using 6-digit NAICS codes. On the other hand, one SER stated that the SBREFA Third Alternative Approach would be the most costly and difficult to implement compared to the other two alternatives under consideration.

The SBREFA Panel recommended that the Bureau seek to adopt a definition of ''small business'' that is easy for small business applicants to understand and straightforward for financial institutions to implement, while still collecting comprehensive data regarding lending to small businesses.[510] The SBREFA Panel also recommended that the Bureau continue to explore how information that small financial institutions may or may not currently collect from small business applicants (specifically, gross annual revenue, number of employees, and NAICS code) might inform the potential selection of an alternative for a ''small business'' size standard.[511] The SBREFA Panel also recommended that the Bureau continue to explore ways to minimize burden on both the small financial institutions collecting NAICS code information as well as the small business applicants who need to provide it, for example the possibility of collecting the 2-digit NAICS code rather than the 6-digit code.[512]

Feedback on the SBREFA materials from stakeholders other than SERs showed broad support for the Bureau pursuing a simplified version of the SBA small business definition, focusing chiefly on the size standard. A diverse array of stakeholders requested that the Bureau provide a simplified small business definition, including a wide variety of lenders, trade associations, and community groups. However, at least one commenter explicitly urged the Bureau to adopt the SBA definition. Reasons for supporting a simpler definition included that it might lower compliance costs (and therefore, the commenters noted, the cost of credit), it would obviate the need for financial institutions to understand or track the SBA size standards, and a more complex definition might impact data consistency or quality (either because financial institutions might incorrectly report data, or because the data itself might not lend itself to analysis). Several stakeholders voiced concern with respect to the SBA's detailed approach to categorizing the applicant's business, arguing that NAICS codes were developed for procurement, contained too many categories, and were not familiar to many financial institutions and applicants.

Stakeholders offered varying levels of support for the Bureau's proffered size standard alternatives, although in general there was more support for a standard using only gross annual revenue. Many stakeholders, including a variety of trade associations, supported the SBREFA First Alternative Approach; a few explicitly opposed it. Those voicing support generally preferred the simplicity of the approach; some stakeholders noted that a definition using gross annual revenue aligned with how lenders typically consider an applicant's size for other purposes. Stakeholders suggested that the Bureau select a specific revenue limit for small businesses including $500,000, $1 million, $5 million, and $8 million. Some stakeholders expressing support for a $8 million revenue limit noted that it would better capture small businesses in wholesale and manufacturing, while allowing the Bureau to adopt a single, uniform standard. Stakeholders opposing the SBREFA First Alternative Approach generally expressed concern with using gross annual revenue, either citing concerns about its accuracy or because they said a uniform gross annual revenue standard would not account for regional variation among

510 SBREFA Panel Report at 44.

511 *Id.*

512 *Id.*

businesses or reflect the SBA's general approach to distinguishing businesses by industry. One stakeholder generally expressed concern that the SBREFA First Alternative Approach might exclude too many small business applicants from the 1071 rule.

Several stakeholders, mostly community groups, supported the SBREFA Second Alternative Approach; several comments from industry opposed the approach. Those in support of the SBREFA Second Alternative Approach characterized it as providing a balance between simplicity and providing results more closely aligned with the more comprehensive SBA approach, which distinguishes businesses by industry. Some stakeholders expressed concern with respect to distinguishing the nature of the applicant's business (*e.g.,* whether it was engaged in manufacturing or wholesale), and others thought that there may be difficulties accurately measuring the number of employees.

A few stakeholders supported the SBREFA Third Alternative Approach, while several explicitly opposed it. Supporters of the SBREFA Third Alternative Approach praised how closely the alternative aligned with the SBA's definition, while those in opposition criticized it as overly complex. In particular, those opposing this approach were concerned that it would still require financial institutions to have a close working knowledge of NAICS codes.

A few stakeholders advocated that the Bureau consider adopting a small business definition that incorporated loan size. Some of these stakeholders suggested that the Bureau consider aligning this definition with standards in the CRA. One stakeholder suggested that the Bureau define a small business as one with gross annual revenue of $1 million where the business has requested a loan of $1 million or less.

Proposed Rule

Proposed § 1002.106(b) would define a small business as having the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. The Bureau believes that adopting existing statutory and regulatory small business definitions, which are widely understood and already the subject of notice and comment, is consistent with the purposes of section 1071 and will facilitate compliance. Proposed § 1002.106(b) would further state that, notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of proposed subpart B, a business is a small business if and only if its gross annual revenue, as defined in proposed § 1002.107(a)(14), for its preceding fiscal year is $5 million or less. This proposed definition largely adopts the SBREFA First Alternative Approach with a threshold of $5 million. The Bureau believes this proposed definition implements the statutory language of section 1071 while reflecting a need for financial institutions to apply a simple, broad definition of a small business. The Bureau is seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act.[513]

Proposed comments 106(b)–1 and 106(b)–2 would clarify the obligations of covered financial institutions when new information may arise that could change the determination of whether an applicant is a small business, which in turn gives rise to requirements under proposed subpart B and/or prohibitions under existing Regulation B. The Bureau acknowledges that a financial institution's understanding of an applicant's gross annual revenue may change as the institution proceeds through underwriting. Proposed comment 106(b)–1 would explain that if a financial institution initially determines an applicant is a small business as defined in proposed § 1002.106 based on available information and obtains data required by proposed § 1002.107(a)(18) through (20), but the financial institution later concludes that the applicant is not a small business, the financial institution may process and retain the data without violating ECOA or this regulation if it meets the requirements of proposed § 1002.112(c)(3). Proposed comment 106(b)–2 would explain that if a financial institution initially determines that the applicant is not a small business as defined in proposed § 1002.106, but then later concludes the applicant is a small business, the financial institution shall endeavor to compile, maintain, and report the data required under proposed § 1002.107(a) in a manner that is reasonable under the circumstances.

Proposed comment 106(b)–3 would explain that a financial institution may rely on an applicant's representations regarding gross annual revenue (which may or may not include an affiliate's revenue) for purposes of determining small business status under § 1002.106(b).

For the reasons discussed above in the section-by-section analysis of proposed § 1002.106(a), the Bureau is proposing to define a small business as having the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. However, for reasons discussed in detail below, the Bureau is proposing that notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of subpart B, a business is a small business if and only if its gross annual revenue, as defined in proposed § 1002.107(a)(14), for its preceding fiscal year is $5 million or less. Generally, the Bureau believes that adopting this gross annual revenue standard from the SBREFA First Alternative Approach is consistent with the purposes of section 1071 and addresses the concerns that the Bureau has heard with respect to determining whether applicants are small businesses for purposes of complying with section 1071, particularly with respect to the concerns regarding determining the applicant's NAICS code, and the implications thereof. Due to concerns expressed by other stakeholders, which are described above, and upon its own further consideration as discussed in this section-by-section analysis under *Alternatives Considered* below, the Bureau is not proposing the $1 million gross annual revenue standard from the SBREFA First Alternative Approach.

The Bureau seeks comment on this proposed definition of a small business, including the $5 million gross annual revenue size standard, as well as whether additional clarification is needed for any aspect of this proposed definition. The Bureau also seeks comment on whether another variation of the proposed size standard would better serve the purposes of section 1071, such as a lower revenue size standard or a higher one, potentially at the $8 million or $10 million level. The Bureau also seeks comment on whether, in addition to the above-described gross annual revenue-based size standard, a small business definition that also included any business that was furnished a loan pursuant to an SBA program (regardless of the applicant's gross annual revenue) would further the purposes of 1071.

Similarly, the Bureau seeks comment on whether the SBREFA Second Alternative Approach at $8 million gross annual revenue or 500 employees (depending on the type of business) would align more closely with section 1071's purposes. Likewise, the Bureau seeks comment on whether a variation of the proposed size standard, such as using an applicant's average gross annual revenue averaged over two or five years, would better serve the purposes of section 1071. In addition, the Bureau seeks comment on defining

[513] 15 U.S.C. 632(a)(2)(C).

a small business consistent with the entirety of existing SBA regulations, including any advantages or disadvantages that using such a definition might pose specifically in the context of this rulemaking. Specifically, the Bureau seeks comment on how the proposed size standard would fit in with a financial institution's current lending or organization practices. If the financial institution is an SBA lender, the Bureau seeks comment on whether the proposed size standard would introduce additional difficulties or challenges.

In order to keep pace with changes to the SBA's own size standards and the potential impact of future inflation, the Bureau is considering whether it might update its proposed $5 million gross annual revenue size standard over time (perhaps at the end of a calendar year in order to allow financial institutions to use the same threshold consistently throughout the year). The Bureau seeks comment on how this should be done and the frequency at which it should occur.

Alternatives Considered

*Gross annual revenue of $1 million.* Under the SBREFA First Alternative Approach, the Bureau considered proposing a size standard using the gross annual revenue of the applicant business in the prior year, with a potential "small" threshold of $1 million or $5 million.[514] However, upon further consideration, the Bureau is concerned that the $1 million threshold considered under the SBREFA First Alternative Approach likely would not satisfy the SBA's requirements for an alternative size standard across industries and would exclude too many businesses designated as small under the SBA's size standards.

*Loan size.* The Bureau considered defining a small business based at least in part on loan size. For example, one SER suggested that the Bureau align its small business definition with the $1 million standard for revenue and loan size used by certain supervisory agencies for CRA reporting. The Bureau also considered that under the FFIEC Call Report collections, banks report small loans made to businesses and farms. Through the Credit Union Call Report, credit unions report commercial loans over $50,000 made to members.

The Bureau believes that such potential definitions do not bear a sufficient relationship to the size of the business or its operations. The above-mentioned Call Report data, for example, is reported regardless of the size of the business. Thus, such Call Reports would capture lending information regarding small loans furnished to businesses that may be dominant in their field. Likewise, under a definition similar to the CRA, application data for businesses with low revenue that may be applying for large loans would be excluded. The Bureau does not believe that adopting such an approach would further the purposes of section 1071. The Bureau also received some stakeholder feedback cautioning against using the CRA definition based on loan size, because such a definition would exclude substantial portions of small business lending.

*Existing SBA size standards.* As discussed above, the Bureau is seeking approval from the SBA to use a $5 million gross annual revenue alternative size standard in defining a "small business" for purposes of this rulemaking, as the Bureau does not believe the SBA's size standards are suitable for this data collection initiative and prefers to establish a more appropriate small business definition limited to the section 1071 rulemaking.

The Bureau believes that requiring application of existing SBA size standards for the section 1071 rule could result in many financial institutions having to undergo operational and/or compliance management system changes. The Bureau believes that it will reduce burden for financial institutions, particularly those without sophisticated compliance management systems or familiarity with SBA lending, to comply with a gross annual revenue size standard for the section 1071 small business definition that better aligns with current lending practices.

If the Bureau were to adopt a small business definition using the existing SBA size standards that vary by industry based on 6-digit NAICS codes, financial institutions would only be able to request an applicant's protected demographic information further along in the application process, once they have obtained the multiple pieces of data that would be necessary to determine whether the applicant is small and, therefore, the 1071 process applies. The Bureau is concerned that this delay would make it more difficult for financial institutions to collect applicants' protected demographic information that is important to both of section 1071's statutory purposes. The Bureau is particularly concerned about financial institutions' ability to collect these data for applications that are withdrawn or closed for incompleteness early in the application process. These data collection considerations differ from those applicable to SBA lending programs, whereby a lender often cannot (and should not) make an accurate eligibility determination for an SBA loan until later in the application process, often after a loan has already been initially decisioned and after the lender has collected information related to size, time in business, and other data.

In order to allow financial institutions to quickly determine whether the section 1071 rule applies, the Bureau is seeking to minimize complexity for financial institutions in determining whether a covered application is reportable because the applicant business is a small business—a necessary determination for the 1071-based collection of any other information. The Bureau believes that the section 1071 rule would benefit from a universal, easy-to-apply reporting trigger that does not need to be supported by additional documentation or research. Such a reporting trigger must be easily understood by small business owners who may be completing an application online, or by the tens of thousands of customer-facing personnel who take small business applications in an industry with a typical annual turnover rate of 10 to 20 percent. The Bureau believes that a gross annual revenue reporting trigger will facilitate better compliance with 1071 requirements because it aligns with current lending and organizational practices.

The Bureau is concerned that requiring financial institutions to rely on the SBA's existing size standards for purposes of the section 1071 data collection and reporting requirements would pose risks to the efficient operation of small business lending. Based on the overwhelmingly consistent feedback the Bureau has received from stakeholders on this issue, the Bureau believes that using the SBA's existing size standards for the purposes of section 1071—wherein the financial institution must quickly determine the appropriate 6-digit NAICS code for businesses and then apply a variety of standards, including potentially gathering information to determine five years of the applicant's average annual receipts or employee information—would not align with current lending and organizational practices. Application of the existing size standards, at the beginning of the application process, could slow down the application process, particularly at institutions that are often able to render credit decisions in a matter of minutes; the Bureau is concerned that financial institutions may be compelled to raise the cost of credit or originate fewer

[514] SBREFA Outline at 16.

covered credit transactions as a result. Such an outcome could needlessly affect access to credit for small businesses. Eliminating credit opportunities or reducing access to credit to small businesses, including women-owned and minority-owned small businesses, in this way would conflict with the statutory purpose of section 1071 to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[515]

The Bureau expects that many financial institutions, for efficiency, will bifurcate their business credit application procedures based on an initial determination of whether the application will be subject to section 1071. The Bureau therefore believes that many financial institutions will not proceed with taking applicant information until the financial institution is able to determine that the applicant is small (in which case, section 1071 will require the financial institution to collect and report the applicant's protected demographic information) or that the applicant is not small (where ECOA generally prohibits the financial institution from collecting protected demographic information). If this process requires determining the correct NAICS code for the applicant, and in many cases, requesting five years of average annual receipts or employee information from the applicant, the Bureau believes that businesses seeking access to credit will encounter, at a minimum, otherwise avoidable delays in processing applications.

The Bureau believes that the $5 million gross annual revenue standard it is proposing is a more efficient and appropriate measure of applicant size for purposes of determining whether small business lending data collection is required pursuant to section 1071. The Bureau understands that the SBA generally bases business concern size standards on average annual receipts or the average number of employees of the business concern, as customized industry-by-industry across 1,057 6-digit NAICS codes. The SBA typically uses two primary measures of business size for size standards purposes: (i) Average annual gross receipts[516] for businesses in services, retail trade, agricultural, and construction industries, and (ii) average number of employees[517] for businesses in all manufacturing industries, most mining and utilities industries, and some transportation, information, and research and development industries.[518] The Bureau understands that SBA's size standards are used to establish eligibility for a variety of Federal small business assistance programs, including for Federal government contracting and business development programs designed to assist small businesses in obtaining Federal contracts and for SBA's loan guarantee programs, which provide access to capital for small businesses that are unable to qualify for and receive conventional loans elsewhere. The Bureau notes that the size standard used under section 1071 would only be used to determine whether small business lending data collection is required pursuant to section 1071, and would have no bearing on eligibility for Federal small business assistance. Moreover, the Bureau believes it is far more likely that an applicant will be able to readily respond to a question regarding its gross annual revenue for the preceding fiscal year—something already contemplated by existing Regulation B for all business credit to determine whether notice requirements apply[519]—than offer the closest metric currently in use by SBA regulations, which is generally average annual receipts for the previous five fiscal years.[520] Furthermore, use of this gross annual revenue standard would be efficient, as a financial institution is statutorily required to collect and report gross annual revenue by ECOA section 704B(e)(2)(F).

The Bureau believes that section 1071 differs from other programs that may have been contemplated pursuant to the Small Business Act's provisions pertaining to the establishment of size standards. First and most notably, the rulemaking contemplated by section 1071 is not a "program" in the traditional sense of a procurement or other Federal assistance program; the rule would not confer a direct benefit or advantage to the small business applicant or financial institution in terms of contract, procurement, loan guaranty, or government backed debenture. Rather, financial institutions will be contributing information about credit applications for businesses identified as small under section 1071—information that will be valuable to the Bureau, financial institutions, policymakers, and other stakeholders, including small businesses. Second, unlike other such alternative size standard requests, the Bureau notes that a size standard under section 1071 would apply to businesses across all sectors applying for financing, rather than a particular industry or sector. And third, the Bureau believes that arriving at a simplified size standard is an essential element to this "program," as more complex approaches may limit opportunities for small businesses by reducing access to credit.

Section 1071 is also unique in that Congress specified that the data collection regime include a particular form of revenue for the businesses at issue. As discussed in the section-by-section analysis of proposed § 1002.107(a)(14) below, section 1071 requires a financial institution to collect "the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application."[521] The Bureau considered whether under section 1071 a financial institution should have to apply two different revenue-based rules (first, one for determining whether the business is small under the existing SBA size standards and therefore section 1071 data must be collected and reported; and, second, if the business is small, another for reporting the business's gross annual revenue in the last fiscal year), or whether applying only one revenue-based rule for section 1071 could be sufficient. The Bureau believes that requiring financial institutions to apply both would be unnecessarily confusing and burdensome, and would also increase potential for errors in data collection. The Bureau does not believe it is appropriate to use only average annual receipts, given the language of section 1071. Moreover, as discussed below, section 1071 amends ECOA, which already incorporates gross annual revenue as implemented under existing Regulation B.

ECOA section 704B(e)(2)(G) requires a financial institution to collect and report the race, sex, and ethnicity of the principal owners of the business. Existing Regulation B generally prohibits a creditor from inquiring about

[515] ECOA section 704B(a).

[516] The Bureau understands that the SBA recently changed its regulations on the calculation of average annual receipts for all of SBA's receipts-based size standards, and for other agencies' proposed receipts-based size standards, from a three-year averaging period to a five-year averaging period, outside of the SBA Business Loan and Disaster Loan Programs. 84 FR 66561 (Dec. 5, 2019).

[517] Generally, the average number of employees of the business concern is used (including the employees of its domestic and foreign affiliates) based upon numbers of employees for each of the pay periods for the preceding completed 12 calendar months. *See* 13 CFR 121.106(b)(1).

[518] To measure business size, the SBA also uses financial assets for certain financial industries, and for the petroleum refining industry, it uses refining capacity and employees.

[519] *See* 12 CFR 1002.9(a)(3).

[520] 13 CFR 121.104(a) and (c).

[521] *Id.*

such protected demographic information in connection with a credit transaction unless otherwise required by Regulation B, ECOA, or other State or Federal law, regulation, order, or agreement.[522] Thus, in order to avoid potential liability under ECOA and existing Regulation B, a financial institution must accurately determine that a business credit application is subject to section 1071 before inquiring about the applicant's protected demographic information. The Bureau does not believe the SBA's existing size standards allow for the quick and accurate determination of small business status required for this 1071 data collection initiative. Specifically, the Bureau does not believe this determination can be quickly and accurately made if, as required under the SBA's existing size standards, the financial institution must determine the appropriate NAICS code for the business and then apply the NAICS-based size standards to determine whether a business loan applicant is a small business.

As discussed above, SERs and other stakeholders have expressed concern to the Bureau about the difficulties in determining the appropriate NAICS code for businesses and in applying the NAICS-based size standards. They generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business—which bases classification on an applicant's 6-digit NAICS code—is relatively complex in this context. The Bureau believes that removing a NAICS-based small business determination as a step in determining small business status will both facilitate compliance and better achieve the purposes of section 1071. The Bureau understands that one reason that SERs and others expressed a strong desire for a simple approach to determining whether an applicant is small is that this initial determination may drive the application process. To comply with section 1071 requirements, financial institutions may use a different application process, or different or additional application materials, with applicants for business credit that are small businesses than they do with applicants that are not small businesses. Thus, quickly and accurately determining whether an applicant is a small business at the outset of the application process may be a crucial step, one that financial institutions would benefit from being able to seamlessly accomplish. Considering the requirements and prohibitions in ECOA with respect to protected demographic information, the Bureau understands the import that financial institutions have placed on both the speed and accuracy of this determination.

As discussed in the section-by-section analysis of proposed § 1002.107(a)(15) below, the Bureau believes that NAICS codes possess considerable value for section 1071's fair lending purpose as well as its business and community development purpose beyond being necessary for determining whether an applicant is a small business under the SBA's size standards. The Bureau is therefore proposing that financial institutions be required to collect and report NAICS codes as one of the data fields for applications subject to section 1071. However, the Bureau believes that gathering NAICS code information at some point during the application process, while still the subject of some concern for financial institutions, is a different consideration from requiring NAICS information as a necessary step to beginning an application (and correctly determining which type of application to initiate).

The Bureau also believes that this simplified alternative size standard will provide largely consistent reporting results, as compared to adopting the full SBA size standards. The Bureau used data from the U.S. Census's 2012 Statistics of U.S. Businesses (SUSB) and the U.S. Department of Agriculture's 2012 Census of Agriculture to analyze how each of the Bureau's contemplated alternative approaches would change the number of businesses defined as "small" relative to the SBA definition.[523] If all NAICS classifications and size assessments could be done correctly, applying the SBA's full 6-digit NAICS code-based size standards would result in complete coverage of small businesses as defined by the SBA—all applications by small businesses would be reported (other than those made to financial institutions that qualify for an exemption) and no applications made by non-small businesses would be reported. The Bureau estimates that 270,000 businesses that would be small under the SBA's existing size standards (out of 7.2 million small employer businesses and farms) would not be covered by the Bureau's proposed $5 million gross revenue standard. The Bureau further estimates that the Bureau's proposed rule would cover some 77,000 businesses that would not be small under the SBA size standards. The Bureau believes that such variation with respect to the SBA's current size standards is an appropriate trade-off for the reasons described herein.

The Bureau notes, however, that a $5 million gross annual revenue alternative size standard would affect some industries more than others. That is, applications for small businesses would be reported to the Bureau less from some industries than others. In general, there will be a larger proportion of businesses whose applications would not be reported in industries with a higher revenue-based size standard. The industries most affected by this are the retail trade and construction industries. Other industries that would be disproportionately affected may include manufacturing, wholesale trade, health care and social assistance, and professional, scientific, and technical services. The Bureau received little public feedback with respect to such concerns, although the Bureau seeks comment with respect to any potential effects on particular subsets of applicants that may be disproportionately included or excluded on the basis of a gross annual revenue standard (such as those subject to employee-based size standards), particularly in light of section 1071's purposes.

The Bureau also believes that a simplified size standard will be important for financial institutions that may not frequently engage in small business lending in determining whether they are covered under the 1071 rule. As discussed in the section-by-section analysis of proposed § 1002.105(b), the Bureau is proposing to mandate section 1071 small business lending data collection only from those financial institutions that originated at least 25 covered credit transactions from small businesses in each of the two preceding calendar years. Those financial institutions that do not frequently lend to small businesses will be seeking to track precisely how many covered credit transactions for small businesses they have originated. The Bureau believes that it is important to empower financial institutions to quickly ascertain whether a covered credit transaction was furnished to a small business, such that infrequent lenders can continue to monitor

[522] Existing § 1002.5(a)(2). ECOA states that it is not discrimination for a financial institution to inquire about women-owned or minority-owned business status, or the race, sex, and ethnicity of principal owners pursuant to section 1071. 15 U.S.C. 1691(b)(5).

[523] The 2012 SUSB is the most recent Census product to have categories of revenue and employees granular enough to conduct this analysis. The Bureau constructed the 2012 equivalents of the second and third alternatives due to the vintage of the SUSB data available and used the SBA's 2012 size standards for the analysis. The 2012 SUSB only covers employer firms or businesses with at least one employee.

whether section 1071 compliance is required.

*Average gross annual revenue.* The Bureau considered proposing an approach that would use an *average* gross annual revenue calculated over an averaging or ''lookback'' period instead of using the gross annual revenue for the *preceding fiscal year.* This alternative approach would be similar to the SBA approach of using a five-year annual receipts average. The Bureau understands that the SBA expects the five-year average to: (i) Enable some mid-size businesses currently categorized above their corresponding size standards to gain or regain small business status and thereby qualify for participation in Federal assistance intended for small businesses, and (ii) allow some advanced and larger small businesses close to their size thresholds to lengthen their small business status for a longer period and thereby continue their participation in Federal small business programs.[524] However, because the 1071 rule is not connected to eligibility for participation in any Federal programs for small business loans, grants, procurement, or otherwise, the Bureau believes that allowing financial institutions to consider applicants' gross annual revenue for the preceding fiscal year is sufficient for 1071 purposes. The Bureau also notes that using gross annual revenue for the preceding fiscal year is consistent with the notification requirements of existing Regulation B and the Bureau's approach in proposed § 1002.107(a)(14) regarding the gross annual revenue data point. The Bureau believes that using this measure instead of an average will better align with current lending practices and will simplify determinations regarding 1071 reporting status.

## Section 1002.107 Compilation of Reportable Data

### 107(a) Data Format and Itemization

#### Background

ECOA section 704B(e) requires financial institutions to ''compile and maintain'' records of information provided by applicants ''pursuant to a request under subsection (b),'' and requires them to ''itemiz[e]'' such information to ''clearly and conspicuously disclose'' a number of data points;[525] the Bureau refers to these as statutory data points. Section 704B(e)(2)(H) provides the Bureau with authority to require ''any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]''; the Bureau refers to data points adopted under this authority as discretionary data points. The stated statutory purposes of 1071 are twofold: (1) To facilitate enforcement of fair lending laws; and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[526] The Bureau notes that ''discretionary'' in this context means discretionary for the Bureau to adopt, not discretionary for financial institutions to comply with.

The 1071 data collected and reported by financial institutions would generally be made available to the public unless the Bureau decides to delete or modify certain data to advance a privacy interest.[527] As discussed below in part VI, the Bureau is proposing to use a balancing test to determine what data should be deleted or modified, but does not intend to apply the balancing test until financial institutions have reported at least a full year of 1071 data to the Bureau. The Bureau notes that the utility of 1071 data to particular groups of data users will depend on the specific data collected and the form, manner, and extent to which the Bureau makes such data available to the public.

The users of data from the Bureau's proposed 1071 rule could include the Bureau itself; other Federal agencies including the prudential banking regulators; Congress; State and local governments; community, consumer, and civil rights groups; researchers and academics; financial institutions; small businesses; and small business trade organizations. The comprehensive data that would be collected under the Bureau's rule is not available elsewhere, though some aggregate information for some loans to businesses—but not applications—exists in other sources. For example, there are several datasets on loans to businesses by depository institutions. The FFIEC Call Report data provide information on banks' and savings associations' total outstanding number and amount of loans to businesses for loans under $1 million and farms for loans under $500,000. The CRA requires banks and savings associations with assets over a specified threshold ($1.322 billion as of 2021) to report data on loans to businesses with origination amounts of $1 million or less and loans to farms with origination amounts of $500,000 or less. NCUA Call Reports include information on credit unions' outstanding and originated commercial loans to members over $50,000. Though the Bureau and other agencies with supervisory jurisdiction can currently approximate some 1071 data through requests during examinations of individual institutions, the agencies would only have access to data from a relatively small number of such institutions at any one time and the data obtained would not be uniform among institutions. The availability of uniform 1071 data across different types of financial institutions should significantly improve agencies' ability to focus limited supervisory resources on institutions with higher fair lending risk. Section 1071 data may also provide insight into how well the market is meeting the credit needs of small businesses in general, as well as women- and minority-owned small businesses in particular, and could potentially be used to identify market opportunities.

The Bureau has received feedback relevant to the 1071 rulemaking from a variety of sources, including through the SBREFA process as well as the Bureau's 1071 Symposium and the 2017 RFI on small business lending. This feedback addressed, among other things, the potential inclusion of discretionary data points in the 1071 rulemaking, which is discussed further below. By discussing these potential discretionary data points under consideration in the SBREFA Outline, the Bureau obtained helpful feedback on costs and benefits from the SERs and other stakeholders to inform the Bureau's decision-making for purposes of this NPRM.

#### SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau explained its understanding of the data points enumerated in section 1071.[528] The Outline noted that ECOA section 704B(b) requires financial institutions to inquire whether an applicant for credit is a women-owned, minority-owned, or small business. In addition, the statute states that the information compiled and maintained by a financial institution under section 704B(e)(1) shall be itemized in order to clearly and conspicuously disclose a number of particular items that are enumerated in the statute. In the Outline, the Bureau

[524] *See* 84 FR 66561, 66562 (Dec. 5, 2019).

[525] As discussed in greater detail above in E.2 of the *Overview* to this part V, the Bureau interprets the phrase ''pursuant to a request under subsection (b)'' in section 1071 as referring to all of the data points contemplated by ECOA section 704B(e), not merely whether the applicant is a minority-owned, women-owned, or small business.

[526] ECOA section 704B(a).

[527] ECOA section 704B(e)(4), (f).

[528] SBREFA Outline at 24.

stated that it was considering proposing to require all of these data points.[529]

The Bureau also discussed in the SBREFA Outline its proposals under consideration regarding data points adopted pursuant to its discretionary data points authority under ECOA section 704B(e)(2)(H).[530] The Bureau explained that it was considering proposing to require that financial institutions report discretionary data points regarding pricing, time in business, NAICS code, and number of employees.

SERs provided feedback on nearly all aspects of the data points under consideration, including certain feedback applicable to all data points.[531] Regarding data points generally, most SERs requested that the Bureau make the collection and reporting of data points as simple as possible. Two SERs stated that collecting and reporting the statutory data points would not pose any issues because they collect them now. A number of SERs urged the Bureau to require collection and reporting of a number of data points based only on information as provided by the applicant. One SER stated that the Bureau should be aware that, as with HMDA reporting, the cost of collecting and reporting the data points will include expensive data quality scrubs in order to avoid negative examination findings. Another SER stated that it will be challenging to standardize the data so reporting can be automated, and that this will likely require significant training and a tremendous amount of human intervention.

Furthermore, some SERs expressed concern about asking applicants to provide certain information (in particular the race, sex, and ethnicity of principal owners), as they believed that applicants would feel uncomfortable providing, or even being asked about, that information, and that if applicants are denied credit they might feel it was because of the protected demographic information they provided. One SER stated that the collection of 1071 data could seem like an intrusion of privacy by the financial institution, particularly to minority borrowers. The SER stated that prospective applicants may decide to seek financing elsewhere. Another SER stated that some prospective applicants' distrust of the Federal government (and concern over how 1071 data might be used) might adversely impact their ability to lend to the communities they serve. Other SERs that currently collect this information (for example, because they are CDFIs or SBA lenders) indicated that they generally do not have difficulty collecting demographic information from borrowers.

Several SERs suggested that the Bureau develop a system to assist in the collection of applicants' protected demographic information, and possibly other applicant-provided 1071 data, that would avoid the need for financial institutions to request and store sensitive information about applicants. One SER suggested that this system could also permit applicants to input their addresses for geocoding.

SERs also provided detailed feedback on the discretionary data points that the Bureau was considering. One SER stated that the cost of collecting and reporting the discretionary data points under consideration would be significant, and another SER stated that the Bureau should include as few data points as possible to avoid unnecessary costs. Another SER stated that the Bureau should finalize a rule with just the statutorily required data points and avoid adding any discretionary data points. That SER suggested that if the Bureau does include discretionary data points, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters, similar to the partial data point exemption approach taken under HMDA.[532]

Other SERs favored the inclusion of some or all of the discretionary data points. Two SERs stated their support for the inclusion of all four discretionary data points under consideration. One of these SERs suggested that the Bureau also collect information regarding the way the application was taken (in person, by phone, or online) in order to monitor possible discouragement of applicants. The other SER suggested that the Bureau also collect credit score information.

Stakeholders commenting on the statutory data points and data points in general largely echoed the SERs' concerns. Industry commenters suggested that the method of collection be as clear and simple as possible, that the cost burden be taken into account, and that the Bureau not require verification of applicant-provided information. Community groups largely supported the Bureau's proposals under consideration for the statutory data points, and emphasized the importance of the new 1071 data collection regime.

A large majority of industry stakeholders commenting on the SBREFA Outline opposed the collection of any discretionary data points, stating that including them would be overly burdensome and unnecessary. Industry commenters argued that the 1071 rule would be very burdensome in any case, requiring new software and onerously different business processes, and adding data points would only increase that burden. Some commenters stated that collecting and reporting the discretionary data points would increase compliance obligations and costs, and likely impact credit costs and availability for small business customers. Some commenters were concerned about the discretionary data points being made public without contextual information, potentially leading to damaging misinterpretations. One stakeholder stated that unnecessary discretionary data points would add to the already significant privacy concerns of financial institutions and borrowers. Several commenters suggested that the Bureau consider an incremental approach to expanding the data collection in the future should the statutory fields not be sufficient to accomplish the original intent of 1071. Several other stakeholders suggested that if the Bureau includes discretionary data points, it should provide an exemption from reporting them for smaller financial institutions.

Community groups and several community development lenders supported mandatory reporting of the discretionary data points under consideration, saying that they would help achieve section 1071's purposes. One stakeholder stated that the discretionary data points under consideration relate to underwriting decisions and must be accounted for so credit providers cannot—as they said HMDA reporters have done for years—hide behind data not collected as justification for their lending disparities. A community development lender supported the collection of the discretionary data points, but suggested that the Bureau not collect number of employees. Some stakeholders suggested additional discretionary data points.

Regarding data points in general, the SBREFA Panel recommended that the Bureau consider proposing in the NPRM that applicant-provided data points be self-reported by the applicant only, without an obligation for the financial institution to verify the information

[529] *Id.* at 24–36.

[530] *Id.* at 33.

[531] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 25–30.

[532] *See* Regulation C § 1003.3(d).

provided by the applicant.[533] Regarding the discretionary data points, the SBREFA Panel recommended that if time in business, number of employees, and NAICS code become part of the proposal, the Bureau continue to explore ways to minimize the burden to small financial institutions of collecting and reporting such data; and with respect to NAICS code specifically, the burden on small business applicants who need to provide the information.[534] As to pricing, the Panel recommended that if this data point becomes part of the proposal, the Bureau seek comment on potential methods for avoiding misinterpretations of disparities.[535]

Proposed Rule

The Bureau is proposing to adopt the statutory data points largely consistent with its proposals under consideration at SBREFA, but with certain changes as discussed in the section-by-section analyses of the individual data points below. Consistent with its approach under consideration in the SBREFA Outline,[536] the Bureau is proposing discretionary data points relating to pricing, time in business, NAICS code, and number of workers. In addition, based on feedback from SERs and other stakeholders and in the course of developing the proposed rule, the Bureau identified several additional data points that it believes would be important to the quality and completeness of the 1071 data collected and would aid significantly in furthering the purposes of section 1071. The proposed rule would adopt additional discretionary data points regarding application method, application recipient, denial reasons, and number of principal owners. In addition, the Bureau is relying on ECOA section 704B(e)(2)(H), as well as its authority under 704B(g)(1), to make certain clarifications to the statutory data points. These data points are all discussed in detail in the section-by-section analyses of proposed § 1002.107(a)(1) through (21) below.

The Bureau continues to believe that discretionary data points for pricing, time in business, NAICS code, and number of workers would serve the purposes of 1071, improve the utility of the data for stakeholders, and potentially reduce the occurrence of misinterpretations or incorrect conclusions based on analysis of an otherwise more limited data set. The Bureau also believes that discretionary data points for application method, application recipient, denial reasons, and number of principal owners would help to achieve these goals more effectively.

In proposing these discretionary data points, the Bureau considered the additional operational complexity and potential reputational harm that collecting and reporting discretionary data points could impose on financial institutions. The Bureau has sought to respond to industry concerns regarding discretionary data points by proposing a limited number of discretionary data points that would offer the highest value in light of 1071's statutory purposes. For this reason, the Bureau is not proposing certain additional discretionary data points suggested by SERs and other stakeholders such as credit score or applicant's business structure (see the discussion below). In addition, the Bureau has not chosen to take an incremental approach to adding data points, as one stakeholder suggested, or permitting collecting and reporting of discretionary data points to be phased in over time. The Bureau believes the information from the proposed discretionary data points would further section 1071's purposes for the reasons stated above, and should be collected and reported as soon as possible. In addition, data from these discretionary data points would be an important part of the privacy balancing test analysis that would be conducted after the first year of 1071 data is received.[537] The Bureau will consider industry concerns about potential reputational harm that collecting and reporting discretionary data points could impose on financial institutions when it conducts the privacy balancing test analysis.

In regard to the specific method by which a financial institution would collect the 1071 data points, the proposed rule would require a covered financial institution to compile and maintain data regarding covered applications from small businesses, and require that the data be compiled in the manner prescribed for each data point and as explained in associated Official Interpretations (included in this proposed rule) and the *Filing Instructions Guide* (FIG) that the Bureau anticipates later providing on a yearly basis. The proposed rule would then explain that the data compiled shall include the items described in proposed § 1002.107(a)(1) through (21). The Official Interpretations, sometimes referred to as official comments or official commentary, provide important guidance on compliance with the regulation and are discussed in this preamble in relation to each data point as well as other regulatory provisions. The FIG would provide instructions on the operational methods for compiling and reporting data, including which codes to report for different required information. The FIG would be updated yearly, as is the FIG that is used with HMDA compilation and reporting.[538]

The Bureau notes that some of the details contained in the proposed regulatory text and commentary may also be appropriate for inclusion in the FIG, and it anticipates that it may choose to relocate some such details to the FIG when issuing the final rule. For example, proposed § 1002.107(a)(1) addresses the unique identifier data point. A portion of proposed comment 107(a)(1)–1 would explain that the unique identifier must not exceed 45 characters, and may only include standard numerical and/or alphabetical characters and cannot include dashes, other special characters, or characters with diacritics. At the final rule stage, the Bureau might consider removing those details from the commentary and addressing them instead in the FIG, in order to preserve flexibility in how the submission platform is ultimately designed and implemented.

Proposed comment 107(a)–1 would provide general guidance on complying with § 1002.107(a), and would explain that: (i) A covered financial institution reports the data even if the credit originated pursuant to the reported application was subsequently sold by the institution; (ii) a covered financial institution annually reports data for covered applications for which final action was taken in the previous calendar year; and (iii) a financial institution reports data for a covered application on its small business lending application register for the calendar year during which final action was taken on the application, even if the institution received the application in a previous calendar year. The Bureau believes that these operational instructions would clarify a financial institution's collection and reporting requirements and so facilitate compliance. The Bureau also believes that these instructions would help to ensure the accuracy and consistency of the data collected and reported.

The Bureau crafted the proposed rule in consideration of the concerns and input of the SERs and other stakeholders. First, the proposed rule would generally not require a financial

[533] SBREFA Panel Report at 46.

[534] *Id.*

[535] *Id.*

[536] SBREFA Outline at 34–35.

[537] *See* part VI below.

[538] *See generally* Fed. Fin. Insts. Examination Council, *The Home Mortgage Disclosure Act, https://ffiec.cfpb.gov/* (last visited July 28, 2021).

institution to verify applicant-provided information, as discussed more fully in the section-by-section analysis of proposed § 1002.107(b) below, and has limited the discretionary data points to those that the Bureau believes would be most useful for the purposes of section 1071. In addition, the Bureau has considered the costs, including data quality scrubs, automation and training, that would be imposed by the collection and reporting of the statutory and discretionary data points; these are discussed in detail in part VII below. The Bureau has attempted to craft the collection and reporting requirements to be as clear and operationally manageable as possible, and requests comment on potential methods for increasing clarity and manageability.

In regard to concerns from SERs and other stakeholders about being required to collect applicants' protected demographic information for purposes of section 1071, the Bureau notes that several SERs reported collecting this kind of information currently (because they are CDFIs, or because they are participating in certain SBA or similar loan guarantee programs). In addition, the Bureau crafted the proposed rule to provide flexibility for financial institutions in the collection and reporting of this information. The Bureau is also not proposing an exemption for small financial institutions from reporting the discretionary data points, as suggested by some SERs and commenters. As explained in the section-by-section analysis of proposed § 1002.105(b) above, certain institutions with limited small business loan originations would be exempt from 1071 collection and reporting obligations. Furthermore, the Bureau is concerned that the usefulness of the data collected would be reduced if the data set is incomplete for some financial institutions. Finally, the Bureau is not proposing at this time to establish a Federal collection system for protected demographic or other information for use with 1071 reporting that would avoid the need for financial institutions to request and store this information about applicants, as suggested by several SERs.

The Bureau seeks comment on its proposed approach to the collection and reporting of the 1071 data points, including the specific requests for input above and in the section-by-section analysis of each of the proposed data points below.

Proposed Rule—Other Discretionary Data Points Considered But Not Proposed

As mentioned above, SERs and other stakeholders suggested some additional data points for the Bureau's consideration, and the Bureau considered others in the development of this proposed rule. Because of the operational complexities likely to be posed by each of these potential data points, as well as the reasons explained below, the Bureau has chosen not to propose to include any of the following data points in the 1071 rule. Nonetheless, the Bureau seeks comment on whether the following potential data points or any others would further the purposes of section 1071 and thus should be considered for inclusion in the final rule.

- *Type of business/entity structure (sole proprietorship, C-corp, LLC, partnership, etc.).* This information could be useful in providing context to the race, sex, and ethnicity data regarding applicants' principal owners. However, the Bureau believes that collecting the number of principal owners, as proposed in § 1002.107(a)(21), would better serve this purpose.
- *Credit score.* Collecting credit score and other credit information could be particularly useful for the fair lending purpose of section 1071. However, because of the different types of scores and different situations in which a financial institution would or would not access scores, the Bureau believes that this data point could be quite complicated and involve complex sub-fields, which could pose operational difficulties for financial institutions in collecting and reporting this information. These complexities could also make it difficult for data users to understand and interpret credit score data.
- *Credit reporting information, including whether credit information was accessed.* This data point could also be complicated and involve complex sub-fields, making it difficult for financial institutions to collect and report. As with credit score, these complexities could also make it difficult for data users to understand and interpret these data. In addition, it is not clear that this information would be useful without also collecting credit score.
- *Percentage ownership of each principal owner* and *percentage ownership by women and by minorities.* This information could be useful in providing context to the ethnicity, race, and sex data regarding applicants' principal owners. However, the Bureau is concerned that requesting this type of percentage data could be confusing to applicants and could result in inconsistent responses across applicants and institutions. The Bureau believes that collecting the number of principal owners, as proposed in § 1002.107(a)(21), would better serve this same purpose.
- *Whether the applicant has an existing relationship with the financial institution and the nature of that relationship.* This information could provide additional context for a financial institution's credit decision, and thus could be useful for both of section 1071's statutory purposes. However, the Bureau believes that the usefulness of the data collected may not justify the additional operational complexity of identifying and tracking such relationships for reporting.
- *Customer number, and/or unique (but anonymous) identification number for applicants or associated persons for tracking of multiple applications.* This information could be useful to track multiple applications by a single small business within a particular financial institution, whether submitted at one time or over the course of the year. However, the Bureau believes that the potential difficulties posed by requiring the reporting of this information—particularly for applications that have been withdrawn or abandoned—would not be warranted in light of the utility of the data.

107(a)(1) Unique Identifier

Background

ECOA section 704B(e)(2)(A) requires financial institutions to collect and report "the number of the application . . . ." Regulation C includes a similar reporting requirement for a universal loan identifier (ULI),[539] though some insured credit unions and depositories whose lending activity falls below applicable thresholds are partially exempt and only need to report a non-universal loan identifier (NULI).[540] Both the ULI and the NULI use only alphanumeric characters, and do not allow use of identifying information about the applicant or borrower in the identifier. The ULI is "unique" in the national HMDA reporting market because it uses a unique legal entity identifier (LEI) for the reporting institution and then the identifier is required to be unique within that

[539] 12 CFR 1003.4(a)(1)(i).

[540] 12 CFR 1003.3(d)(5).

institution.[541] The ULI must be no more than 45 characters and the NULI must be no more than 22 characters.[542]

SBREFA Proposals Under Consideration and Feedback Received

The Bureau stated in the SBREFA Outline that it was considering proposing that financial institutions report an alphanumeric application or loan number of no more than 45 characters that is unique, within the financial institution, to the referenced extension (or requested extension) of credit and that remains uniform through the application and origination stages of the process.[543] The financial institution would assign this number to an application, and the number would be reported as the application number if the credit applied for was not originated. The same number would be reported as the loan number if the credit applied for was originated. The application/loan number would not include any identifying information about the applicant. The Bureau stated that it was considering proposing a structure for the method of assigning and reporting the application/loan number under section 1071 to follow HMDA/Regulation C formatting and other requirements, which might reduce initial software development costs.

SERs reported varied practices with respect to assigning application and loan numbers.[544] Some SERs stated they do not assign application numbers; some of those SERs indicated, however, that they do assign loan numbers at or before origination. Two SERs reported tracking applications and loans using an identification number assigned to the customer. One SER expressed concern about reporting actual loan numbers to the Bureau due to potential identity theft, and requested that the Bureau permit financial institutions to generate a new application/loan number specifically for 1071 reporting purposes. One SER stated that if an applicant requests more than one type of credit product, a separate application/loan number is assigned to each product request, while other SERs indicated they use a single application number even if multiple products are requested.

The SBREFA Panel recommended that in the NPRM the Bureau consider proposing to permit financial institutions to report ''dummy'' application/loan numbers assigned specifically for 1071 reporting purposes, rather than the numbers they use internally.[545]

Feedback from other stakeholders echoed many of the SERs' concerns, making clear that many lenders do not assign numbers at the application stage and others assign them at various points in the process. One commenter explained that being required to assign an application number early would disrupt its procedures. Another commenter stated that the Bureau should provide flexibility in this data point to account for the wide range of practices.

Proposed Rule

The Bureau is proposing to require that financial institutions report an alphanumeric identifier starting with the LEI of the financial institution. This unique alphanumeric identifier would be required to be unique within the financial institution to the specific covered application, and would be required to be usable to identify and retrieve the specific file corresponding to the application for or extension of credit. The Bureau is also proposing commentary with additional details, as discussed below.

This proposed unique identifier requirement closely follows the SBREFA Outline approach for this data point, with certain adjustments and clarifications. First, the Bureau has chosen to propose the more precise term of ''unique identifier,'' instead of ''application/loan number,'' which was the term used in the SBREFA Outline. In addition, the Bureau had stated that its approach in the SBREFA Outline would follow Regulation C formatting and other requirements, but did not explicitly discuss the use of ''dummy'' numbers, as is done with HMDA.[546] For clarity, the Bureau is including language in proposed comment 107(a)(1)–1 that would explain that the identifier does not have to be the number that the financial institution uses for the application internally. Proposed comment 107(a)(1)–1 would also provide the formatting requirements for the unique identifier. The Bureau is proposing an identifier of 45 characters or fewer, as is currently required for HMDA.

The Bureau notes that the SBREFA Outline language could be read to suggest that the financial institution must assign a number to an application and then keep that number uniform throughout its subsequent processing of the application; this is not what was intended. The Bureau is making clear in the proposal that the unique identifier would not need to stay ''uniform'' throughout the application and subsequent processing. Proposed comment 107(a)(1)–1 would explain that the financial institution may assign the unique identifier at any time prior to reporting the application. Proposed comment 107(a)(1)–1 would also explain that refinancings or applications for refinancing must be assigned a different identifier than the transaction that is being refinanced.

Proposed comment 107(a)(1)–2 would make clear that the unique identifier must not include any directly identifying information regarding the applicant or persons (natural or legal) associated with the applicant. The Bureau is aware that internal identification numbers assigned by the financial institution to the application or applicant could be considered directly or indirectly identifying information, and requests comment on this issue. The Bureau also notes that, as discussed in part VI.C.6.i, due to privacy risks the Bureau is proposing to not publish the unique identifier data field in unmodified form; the Bureau is seeking comment on potential modifications to or deletion of this data field in the published application-level 1071 data.

Proposed comment 107(a)(1)–2 would also cross-reference proposed § 1002.111(c) and related commentary, which prohibit any personally identifiable information concerning any individual who is, or is connected with, an applicant, in records retained under proposed § 1002.111.

As stated above, the Bureau is proposing to require that the unique identifier begin with the financial institution's LEI; this requirement was not stated in the SBREFA Outline. Pursuant to proposed § 1002.109(b)(1)(vi), any covered financial institution that does not currently use an LEI would be required to obtain and maintain an LEI in order to identify itself when reporting the 1071 data. Including the financial institution's LEI in the unique identifiers that it assigns to its applications should not cause extra operational difficulty once the programming to do so has been

[541] 12 CFR 1003.4(a)(1)(i)(A), (B)(2). The NULI is only required to be unique within the annual loan/application register in which the covered loan or application is included. 12 CFR 1003.3(d)(5)(ii).

[542] The ULI length limit is included in the Bureau's yearly Filing Instructions Guide. *See* Bureau of Consumer Fin. Prot., *Filing instructions guide for HMDA Data collected in 2021* (2021), *https://s3.amazonaws.com/cfpb-hmda-public/prod/help/2021-hmda-fig.pdf.* The limit for the NULI is in Regulation C § 1003.3(d)(5).

[543] SBREFA Outline at 26.

[544] SBREFA Panel Report at 26–27.

[545] *Id.* at 45.

[546] SBREFA Outline at 26.

implemented. The Bureau believes that including the LEI will increase the specificity and usefulness of the identifier and the record it identifies. Although a ''check digit'' is required for the HMDA ULI, the Bureau is not proposing to require its use in the 1071 unique identifier. The Bureau believes that, based on its current expectations for a 1071 reporting platform, a check digit would be unnecessary.

The Bureau's proposal is intended to avoid the potential problems identified by SERs during the SBREFA process. The method proposed would accommodate different institutions' numbering systems because the unique identifier can be created separately from that internal system. The Bureau's proposed approach would also alleviate the identity theft concerns raised with respect to reporting actual loan numbers, though the Bureau is unlikely to release the unique identifier data reported to the Bureau publicly in any case. In regard to the issue of requests by the same applicant for more than one credit product at the same time, the Bureau proposes to treat those as separate applications. See the section-by-section analysis of proposed § 1002.103 above.

The Bureau seeks comment on its proposed approach to the unique identifier data point. In addition, the Bureau requests comment on the use of the LEI in the unique identifier and the possible use of a check digit.

107(a)(2) Application Date

Background

ECOA section 704B(e)(2)(A) requires financial institutions to collect and report the ''date on which the application was received.''

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing that financial institutions report the application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an ''application.'' [547] The Bureau considered proposing that application date be reported with a day, month, and year. The Bureau also considered proposing that financial institutions have a grace period of several days on either side of the date reported to reduce the compliance burden of pinpointing an exact date on which an application was received.

Most SERs stated that application date would not be difficult to report, though some suggested different triggers for the reporting of application date.[548] This feedback overlapped with feedback on the definition of an application. Several SERs suggested the date an application is completed and submitted for underwriting review should be the triggering date. Several other SERs expressed support for reporting the date based on when a credit memorandum is generated. One SER suggested that each financial institution be permitted to develop its own process for reporting application date, so long as it is done consistently. Another SER expressed concern with reporting application date as a general matter, explaining that a date is not currently recorded in their system as a matter of practice. Instead of application date, that SER suggested that financial institutions report the date they make a decision on the loan. Several SERs were strongly in favor of the Bureau providing a grace period of several days on either side of the date reported to reduce compliance burden.

Other stakeholders to comment on this data point were generally in favor of the proposal under consideration, and particularly the grace period, which they expressed would reduce the compliance burden of pinpointing an exact date. One stakeholder suggested a 7-day grace period. One financial institution suggested that application date be assigned up through and including at closing in order to accommodate financing requests outside normal business hours.

The SBREFA Panel recommended that the Bureau seek comment on how best to define ''application date'' in light of how it decides to propose defining an ''application.'' [549]

Proposed Rule

The Bureau is proposing to require reporting of application date in § 1002.107(a)(2) as the date the covered application was received by the financial institution or the date on a paper or electronic application form. Proposed § 1002.107(a)(2) is consistent with the Bureau's proposal under consideration in the SBREFA Outline, with revised language for clarity. Proposed comments 107(a)(2)–1 and –2 would clarify the need for a financial institution to take a consistent approach when reporting application date, and provide guidance on how to report application date for indirect applications. In light of SER and other stakeholder feedback [550] supportive of permitting a grace period for reporting the date of application, the Bureau is proposing a safe harbor in § 1002.112(c)(4), which would provide that a financial institution does not violate proposed subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date pursuant to proposed § 1002.107(a)(2).

The Bureau seeks comment on its proposed approach to collecting application date in § 1002.107(a)(2) and associated commentary. As recommended by the SBREFA Panel, the Bureau also seeks comment on how best to define this data point in light of the Bureau's proposed definition of ''covered application'' in § 1002.103.

107(a)(3) Application Method

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain ''any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071].'' The Bureau believes that application method data will aid in fulfilling the purposes of section 1071, as explained below.

The Bureau did not address the method of application as a potential data point under consideration in the SBREFA Outline. However, during the SBREFA process, one CDFI SER suggested collecting information regarding the way an application was taken (in person, by phone, or online) in order to monitor for possible discouragement of applicants.[551] Relatedly, several SERs that took applications for credit primarily or entirely online asserted that such channels were less likely to result in discrimination and more likely to increase access to credit to women-owned and minority-owned small businesses.

In light of this feedback during the SBREFA process, pursuant to its authority under ECOA section 704B(e)(2)(H), and for the reasons set forth below, the Bureau is proposing to require financial institutions to collect and report application method. Proposed § 1002.107(a)(3) would define this data point as the means by which the applicant submitted the covered application directly or indirectly to the financial institution. The Bureau is also proposing commentary to accompany proposed § 1002.107(a)(3).

[547] *Id.*

[548] SBREFA Panel Report at 27.

[549] *Id.* at 45.

[550] SER feedback primarily directed at how to define an application under section 1071, rather than the date reported for that application, are discussed in connection with the section-by-section analysis of proposed § 1002.103(a) above.

[551] SBREFA Panel Report at 30.

The Bureau believes that data on application method would improve the market's understanding of how applicants apply for credit which, in turn, would facilitate fair lending enforcement, including helping determine whether certain application methods are more or less likely to be associated with violations of fair lending laws. This proposed data field would also permit comparisons across financial institutions for a given application method. In addition, data on application method supports 1071's statutory purposes by assisting with an understanding of the business and community development needs of a particular geographic region. For instance, application method may help users of 1071 data analyze the extent to which financial institutions may be providing access to credit online or by telephone in "credit deserts" where financial institutions do not have branch operations.

The Bureau also believes that collecting data on application method will aid in analysis of multiple 1071 data points collected and reported by financial institutions, including the ethnicity, race, and sex of applicants' principal owners. First, these data will assist the Bureau and other data users in identifying whether applicants are more or less likely to provide this (and other) 1071 information in different application channels. This information may also assist in determining whether a financial institution has procedures to collect applicant-provided data at a time and in a manner that is reasonably designed to obtain a response, as would be required by proposed § 1002.107(c)(1).

Finally, data on application method would assist in analyzing data reported under, and assessing compliance with, proposed § 1002.107(a)(20), which requires financial institutions to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances. Having application method reporting will allow the Bureau and other data users to determine, for example, which applications could be subject to data collection via visual observation or surname (because the financial institution met with the applicant in person) and, together with information reported under proposed § 1002.107(a)(20), which of those applications did and did not have information collected that way.

Proposed comment 107(a)(3)–1 would clarify that a financial institution complies with proposed § 1002.107(a)(3) by reporting the means by which the applicant submitted the application from one of the following options: in-person, telephone, online, or mail. Proposed comment 107(a)(3)–1 would explain how financial institutions are to choose which application method to report, including via a "waterfall approach" when they have contact with an applicant in multiple ways.

Proposed comment 107(a)(3)–1.i would provide that an financial institution reports the application method as "in-person" if the financial institution, or another party acting on the financial institution's behalf, meets with the applicant in person (for example, in a branch office, at the applicant's place of business, or via electronic media with a video component). Proposed comment 107(a)(3)–1.ii would provide that a financial institution reports the application method as "telephone" if the financial institution, or another party acting on the financial institution's behalf, did not meet with the applicant in person as described in proposed comment 1002.107(a)(3)–1.i but communicated with the applicant by telephone or via electronic media without a video component.

Proposed comment 107(a)(3)–1.iii would provide that a financial institution reports the application method as "online" if it, or another party acting on the financial institution's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone as described in proposed comments 1002.107(a)(3)–1.i and ii but communicated with the applicant through an online application, electronic mail, text message, and/or some other form of online communication. Proposed comment 107(a)(3)–1.iv would provide that a financial institution reports the application method as "mail" if the financial institution, or another party acting on the financial institution's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone, as described in proposed comments 1002.107(a)(3)–1.i and ii, but communicated with the applicant in writing via United States mail, courier or overnight service, or hand-delivery (including hand-delivery of documents via an overnight drop box or at a teller window).

Proposed comment 107(a)(3)–2 would provide guidance on what application method a financial institution would report for interactions with applicants both online and by mail. In short, a financial institution would report application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners pursuant to proposed § 1002.107(a)(20). Proposed comment 107(a)(3)–2 also would provide separate examples of when the application method should be reported as "online" and "mail."

The Bureau seeks comment on its proposed approach to this data point.

107(a)(4) Application Recipient

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." Although the Bureau did not address application recipient as a potential data point under consideration in the SBREFA Outline, the Bureau believes that application recipient data would aid in fulfilling the purposes of section 1071, as explained below.

Financial institutions employ a wide variety of lending models in extending credit to small businesses. During the SBREFA process, the Bureau explored section 1071's requirement to collect and report certain data for any "application to a financial institution for credit," which could be read as applying to more than one financial institution when an intermediary provides the application to another financial institution that takes final action on the application.[552] See the section-by-section analysis of proposed § 1002.109(a)(3) below for a discussion of proposed reporting obligations where multiple financial institutions are involved in a covered credit transaction. Financial institutions, of course, may receive applications for credit directly from small businesses—depending on the institution, applications may be submitted online, by telephone, by mail, or in person at a branch location, the applicant's place of business, or some other place. In addition, some financial institutions may receive applications routed to them through third parties, such as brokers or vehicle or equipment dealers. Some financial institutions issue credit cards branded for particular retailers, for which applications are taken in person at the retailer's store locations. Some brokers and dealers may send applications to a single financial institution, while others may send them to multiple financial institutions at the same time. In these types of application scenarios involving third parties, the financial institution may not directly interact with the

[552] ECOA section 704B(b).