# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

## JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
## VOLUME VII

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
| --- | --- |
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

applicant at all during the application process.

In the SBREFA Outline, the Bureau noted the wide array of small business lending models operating today. The Bureau noted that certain section 1071 requirements might apply to intermediaries in the application chain.[553] As discussed in the section-by-section analysis of proposed § 1002.109(a)(3) below, several SERs voiced support for aligning reporting requirements for financial institutions that are not the lender of record with the approach taken for HMDA reporting in the Bureau's Regulation C. The Bureau did not receive feedback from SERs on whether data concerning the existence of intermediaries should be collected. Other stakeholders did urge the Bureau, however, to provide clear rules for lenders that work with partners, including when lenders should, and need not, collect 1071 data. Stakeholders also urged the Bureau to provide clear rules that would work for a broad array of business models, including lenders working with partners and agents.

The Bureau believes that information regarding how an application is received would enhance small business lending data and further the purposes of section 1071. Pursuant to its authority under ECOA section 704B(e)(2)H), the Bureau is thus proposing § 1002.107(a)(4), which would require financial institutions to collect and report the application recipient, meaning whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party. Proposed comment 107(a)(4)–1 would clarify that if a financial institution is reporting actions taken by its agent consistent with proposed comment 109(a)(3)–3, then the agent is considered the financial institution for the purposes of proposed § 1002.107(a)(4).

The Bureau believes that collecting data on application recipient, in combination with application method, as discussed above, would improve the market's understanding of how small businesses interact with financial institutions when applying for credit which, in turn, would facilitate fair lending analysis, including identifying risks in small business lending. Information about application method and whether the application was submitted directly or indirectly also would promote the community and

business development purposes of the statute by improving the public's understanding of the structure of small business lending originations across the market, the methods by which credit is originated for particular groups or underserved markets, and trends over time (for example, to the extent applicant preferences shift from in-person to online interactions). It will also be helpful for the Bureau and data users to know the relationship between the covered financial institution and the applicant in the context of certain other collected and reported data.

The Bureau also believes that collecting and reporting information on the application recipient may facilitate fair lending analysis because particular business models may provide more or less reliable information with respect to the ethnicity, race, and sex of the principal owners of the applicant. In addition, the Bureau believes that collecting and reporting information on the application recipient may assist with an understanding of the business and community development needs of an area or applicant. For instance, the proposed collection of application recipient may help users of 1071 data understand whether financial institutions making credit decisions are directly interacting with the applicant and/or generally operate in the same community as the applicant. Finally, the Bureau expects that financial institutions know and track how they receive applications for credit from small businesses and thus does not believe that this data point should be difficult for financial institutions to collect and report.

The Bureau seeks comment on its proposed approach to this data point.

## 107(a)(5) Credit Type

### Background

Section 1071 requires financial institutions to collect and report "the type and purpose of the loan or other credit being applied for."[554] (The credit purpose data point is addressed in proposed § 1002.107(a)(6).) For HMDA reporting, Regulation C requires numerous data points that indicate the type of credit applied for or originated: the type of guarantees used; lien order; loan term; the presence of nontraditional contract terms including balloon, interest only, and negative amortization payments; variable rate information; open-end status; and reverse mortgage status.[555] Section 1071 provides no additional information or

details regarding what aspects of credit type should be collected and reported.

### SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing that financial institutions report the loan/credit type data point via three sub-components: (1) Type of Loan Product (chosen from a specified list); (2) Type of Guarantee (chosen from a specified list); and (3) Loan Term (in months, or using "Not Applicable" for products that do not have a loan term and for applications that did not specify a loan term). The SBREFA Outline included lists of types of loan product and types of guarantees.[556]

The Bureau explained in the SBREFA Outline that a separate category for the presence of a guarantee was included in recognition of the fact that a guaranteed loan is often made as a counteroffer for either a requested loan by the applicant or because the applicant does not qualify for a conventional loan.[557] Having guarantee status captured as a feature of loan type therefore would provide useful information. The Bureau also noted that some borrowers specifically request a government guaranteed loan program and/or receive a loan from a financial institution that only participates in such a program.[558]

For reporting when an application requests more than one type of loan product, the Bureau stated in the SBREFA Outline that it was considering whether to propose that (1) financial institutions choose up to three items from the subcomponent lists for the Loan Type data point if there is only one application and multiple products/guarantees/terms were asked for; or (2) financial institutions report separate applications/originations for each loan type requested or originated. The Bureau explained that financial institutions would be able to choose more than one guarantee for originated or approved but not accepted credit. For loan product and loan term, however, financial institutions would report only one of each subcomponent on originated credit or credit approved but not accepted.[559]

A number of SERs requested certain products be added to the "product type" list; this feedback generally aligned with feedback regarding product coverage (see the section-by-section analysis of proposed § 1002.104 above). Two SERs suggested that line increases should be

---

[553] SBREFA Outline at 13.

[554] ECOA section 704B(e)(2)(B).
[555] Regulation C § 1003.4(a)(2), (14), (25), (27), (28), (37), and (38).

[556] SBREFA Outline at 26–27.
[557] Id.
[558] Id.
[559] Id. at 27.

AdminRecord-000508

excluded. Some SERs requested that the Bureau permit multiple types of guarantees to be selected for a single application, and one SER suggested that FHA guarantees be added to the guarantee list. One SER explained that government guarantees and personal guarantees are different—the government guarantee being a credit enhancement and a personal guarantee being a form of collateral.

The SBREFA Panel recommended that the Bureau consider modifying the product type and guarantee lists in accordance with the various suggestions made by SERs. The Panel also recommended that the Bureau seek comment on how financial institutions currently handle increases in lines of credit and how best to require reporting of this data point for multiple lines of credit within the same account.[560]

The Bureau also received feedback from other stakeholders regarding this data point. A community group commenter stated that the three data fields making up this data point are appropriate choices because each is necessary separately and in combination to help determine whether lenders are responding to the needs for credit by offering affordable and sustainable products to traditionally underserved small businesses. Commenters requesting that additional products be covered by the rule, such as MCAs, likewise said those products would need to be added to the loan product list. Another commenter stated that the Bureau should also expand the number of guarantees that a financial institution can select because creditors will sometimes stack four or five guarantees on a single loan product.

One commenter stated that the "type and purpose of the financing" are fluid in the application process, and the Bureau should make it clear that high-level, general, or categorical information is sufficient for these data points. Other commenters appreciated the inclusion of "other," "unknown," and "other/unknown" in the field lists to facilitate compliance. One commenter asked that the Bureau provide clear guidance on how this data point should be reported, and another stated that reporting this data point should not be costly if it is defined simply and left unchanged.

*Treatment of multiple products requested at the same time.* Regarding how a single request for multiple loan/credit products should be reported, some commenters supported reporting separate applications while others supported requiring reporting as a single application. One commenter suggested

that the Bureau should accommodate both approaches. Another commenter remarked that if a business is applying for multiple products, the basic information is going to be the same, the only difference would be which product is funded. This same commenter suggested that if multiple applications are reported, that will overinflate the data points as the business does not have three separate applications, but only one application for different products. This commenter further pointed out that there are instances where a business is only applying for a loan but ends up liking the terms of a line of credit, and asked whether that change in decision would become a new application.

*Proposed Rule*

The Bureau is proposing in § 1002.107(a)(5) to require that financial institutions collect and report the following information regarding the type of credit applied for or originated: (i) The credit product; (ii) The type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated; and (iii) The length of the loan term, in months, if applicable. These aspects of credit type are discussed in turn below. This proposal is consistent with the approach presented in the SBREFA Outline, and would require the financial institution to choose the credit product and guarantee(s) from a specified list. (These lists are provided in the commentary accompanying proposed § 1002.107(a)(5).) The lists include choices for "Other" and "Not provided by applicant and otherwise undetermined," as appropriate, to facilitate compliance. Based on the feedback from SERs and other stakeholders, and consistent with the SBREFA Panel's recommendation to consider modifying the product type and guarantee lists in accordance with the suggestions made by SERs, the Bureau has updated the lists to reflect additional credit products and types of guarantees. The Bureau is also proposing to use the term "credit type" for this data point, rather than the SBREFA Outline term "loan/credit type," for clarity and consistency with terminology used elsewhere in the proposal.

The Bureau believes that it is reasonable to interpret the statutory term "credit type" to comprise the proposed three data fields, because they are critical to understanding the nature of small business credit applied for and provided, as explained below. For the reasons discussed herein, the Bureau

believes that the subcategories of credit product (including collateral), guarantee type, and loan term would aid in fulfilling the purposes of section 1071. Financial institutions generally have all of the information required for this data point when they process applications (and the reporting regime would be sufficiently flexible when they do not), so the Bureau does not believe there is anything in this approach that would impose particular operational difficulty. Additionally, the Bureau believes it is reasonable to interpret type of credit "applied for" to include the type of credit actually originated when an application results in an extension of credit.

The Bureau seeks comment on its proposed approach to the credit type data point, including the lists of products and guarantees proposed and the other specific requests for input below.

*Credit product.* The first data field the Bureau is proposing to include in the credit type data point is the *credit product* (*i.e.,* a commonly understood category of small business lending like term loans or lines of credit) which the Bureau considers to be an integral part of the statutory requirement to collect credit type. The Bureau believes information about the various products sought by applicants would further the purposes of section 1071 by demonstrating, for example, how small businesses of different sizes or in different sectors choose to pursue, or ultimately access, different forms of credit.

The Bureau distinguishes between secured and unsecured term loans and lines of credit in its list of credit products because it believes that whether a term loan or line of credit is collateralized can have such a significant effect on things like approval rates and pricing that secured and unsecured products fundamentally differ in kind. For this reason, the Bureau believes that including information on the use of collateral in the credit product data field will help data users to avoid inaccurate interpretations of 1071 data. The Bureau believes that whether a loan is secured or unsecured will be part of an application or loan file and, as a result, should not be operationally difficult to report once a financial institution's 1071 compliance system is set up.

Proposed comment 107(a)(5)–1 would present the instructions for collecting and reporting credit product and the proposed list of credit products from which financial institutions would select. Proposed comment 107(a)(5)–1 would explain that a financial

---

[560] SBREFA Panel Report at 45.

AdminRecord-000509

institution complies with § 1002.107(a)(5)(i) by selecting the credit product requested from the list provided in the comment. It would also explain that if an applicant requests more than one credit product, the financial institution reports each credit product requested as a separate application.

The issue of how to collect and report multiple products applied for at the same time affects several data points, but is most salient for credit type. The Bureau believes that requiring a separate application to be reported for each credit product requested would yield more complete and useful data, and that a financial institution should not experience operational difficulties in copying the relevant information, identical for most data points, to separate lines in the small business lending application register. This issue is discussed more fully in the section-by-section analysis of proposed § 1002.103(a), which also addresses the Bureau's proposed approach to multiple lines of credit within the same account.

The Bureau intends the list of credit products provided in proposed comment 107(a)(5)–1 to align with the most common types of credit products in small business lending. As explained above, the list for credit product included in the SBREFA Outline has been amended based on SER and stakeholder input, as well as other considerations. Specifically, "Merchant cash advance" and "Other sales-based financing transaction" have been added to the list to correspond with their inclusion as covered credit transactions under proposed § 1002.104. See the section-by-section analysis of proposed § 1002.104 above for a more complete discussion of products covered by and excluded from the Bureau's proposal. Proposed comment 107(a)(5)–6 would explain when "other sales-based financing transaction" is used for reporting.

Proposed comment 107(a)(5)–1 would also explain that if the credit product for an application does not appear on the list of products provided, the financial institution selects "other" as the credit product and reports the specific product via free-form text. The Bureau believes that allowing financial institutions to choose "other" when the credit product for the application does not appear on the provided list would facilitate compliance. In addition, collecting this information on "other" credit products would assist the Bureau in monitoring product trends and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list.

Proposed comment 107(a)(5)–2 would explain that, pursuant to proposed § 1002.107(c)(1), a financial institution is required to maintain procedures reasonably designed to collect applicant-provided data, which includes credit product. However, if a financial institution is nonetheless unable to collect or otherwise determine credit product information because the applicant does not indicate what credit product it seeks and the application is denied, withdrawn, or closed for incompleteness before a credit product is identified, the proposed comment would explain that the financial institution reports that the credit product is "not provided by applicant and otherwise undetermined." This option is similar to the "unknown" response under consideration during SBREFA, but has been revised to more accurately reflect the situations in which the response would be appropriate. The Bureau believes that permitting use of this response would facilitate compliance and enhance the quality of data collected. As discussed above, commenting stakeholders supported the flexibility afforded by this kind of response.

Proposed comment 107(a)(5)–3 would explain how a financial institution reports a transaction that involves a counteroffer. The comment would state that if a financial institution presents a counteroffer for a different credit product than the product the applicant had initially requested, and the applicant does not agree to proceed with the counteroffer, a financial institution reports the application for the original credit product as denied pursuant to proposed § 1002.107(a)(9). If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the disposition of the application based on the credit product that was offered, and does not report the original credit product applied for. The Bureau believes that, in the complex circumstances created by counteroffers, the meaning of the type of credit "applied for" is ambiguous, and it is reasonable to interpret the credit product "applied for" to mean the credit product considered via the applicant's response to the counteroffer. For a discussion of the Bureau's proposed treatment of counteroffers more generally, see the section-by-section analysis of proposed § 1002.107(a)(9) below.

The Bureau notes that, under its proposal, line increases would be reportable so that the small business lending market can be tracked accurately. See the section-by-section

analysis of proposed § 1002.103(a) above for additional details. However, the Bureau is not proposing that line increases be included as a separate item in the credit product list.

The Bureau seeks comment on its proposed approach to this data field, including the appropriateness and usefulness of the products included in the list, whether there are other products that should be added, and the proposed treatment of counteroffers. The Bureau also seeks comment on how financial institutions currently handle increases in lines of credit and whether a line increase should be considered a credit product, and on whether an overdraft line of credit should be considered a product separate from a line of credit and thus added to the product list.

*Type of guarantee.* The second data field the Bureau is proposing to include in the credit type data point is *guarantee.* The Bureau considers the guarantee obtained for an extension of credit to be part of the credit "type" because it is fundamental to the nature of the transaction in that it meaningfully impacts terms such as interest rates, such that guarantee information could help to explain potential disparities in outcomes and reduce inaccurate conclusions, aiding in fulfilling the fair lending purpose of section 1071. Indeed, in common parlance, small business credit transactions are often referred to using the name of the guarantee (*e.g.,* "a 7(a) loan," referring to the SBA 7(a) guarantee). Because various types of guarantees are available for different credit products, the Bureau believes that guarantee type should constitute a separate data field within the credit type data point, so that data users can conduct separate analyses with respect to credit product and guarantees, and to avoid excessive complexity in the credit product data field. Information on the distribution of government loan guarantees (such as those provided in SBA programs) across different geographic areas and applicant groups should allow a better understanding of how those programs function on the ground, aiding in fulfilling the business and community development purpose of section 1071. As with collateral, information on guarantees is generally a part of an application or loan file and should not be operationally difficult to report once a financial institution's 1071 compliance system is set up.

Proposed comment 107(a)(5)–4 would present the instructions for collecting and reporting type of guarantee and the proposed list of guarantees from which financial institutions would select.

Proposed comment 107(a)(5)–4 would explain that a financial institution complies with § 1002.107(a)(5)(ii) by selecting the type or types of guarantee(s) obtained for an originated covered credit transaction, or that would have been obtained if the covered credit transaction were originated, from the list provided in the comment.

The Bureau intends the list of guarantee types provided in proposed comment 107(a)(5)–4 to align with the most common types of guarantees used in small business lending. As explained above, the list for guarantee type included in the SBREFA Outline has been amended based on SER and stakeholder input. Specifically, "FHA insurance" and "Bureau of Indian Affairs guarantee," which the Bureau believes are often used with small business credit, have been added.

Proposed comment 107(a)(5)–4 would also explain that the financial institution may select, if applicable, up to a maximum of five guarantees for a single application or transaction. In the SBREFA Outline, the Bureau stated that it was considering allowing financial institutions to report more than one guarantee for an application or originated credit.[561] The Bureau understands that small business credit may have more than one guarantee, such as an SBA guarantee and a personal guarantee, and believes that more complete information can be collected by requiring as many as five to be reported.

Proposed comment 107(a)(5)–4 would also explain that if the type of guarantee for an application or originated transaction does not appear on the list of guarantees provided, the financial institution selects "other guarantee," and reports the type of guarantee as free-form text. As with credit product, the Bureau believes that allowing financial institutions to choose "other" when a guarantee for the application does not appear on the provided list will facilitate compliance. In addition, collecting this information on "other" guarantee types would assist the Bureau in monitoring trends in usage of other types of guarantees and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list.

Finally, proposed comment 107(a)(5)–4 would provide that if no guarantee is obtained or would have been obtained if the covered credit transaction were originated, the financial institution selects "no guarantee." Because a small business credit transaction does not

always involve use of a guarantee, the Bureau is not proposing to include "not provided by applicant and otherwise undetermined" as an option. If no guarantee is identified for an application, the financial institution would report "no guarantee."

In regard to the distinction one SER made between government and personal guarantees, the Bureau notes that the proposed rule would identify them as separate options within the data field, thereby allowing data users to analyze them independently.

The Bureau seeks comment on its proposed approach to this data field, including the appropriateness and usefulness of the items listed, and whether there are other guarantees that should be added. The Bureau also seeks comment on whether five is the appropriate upper limit for reporting guarantees.

*Loan term.* The third data field the Bureau is proposing to include in the credit type data point is the *loan term.* As with the consumer lending market, the pricing and sustainability of closed-end credit transactions for small businesses are associated with term length, and without awareness of the term of the loan, data users will have less of an understanding of the types of credit being made available to applicants. Credit with a one-month term may differ not just in degree but in kind from credit with a 60-month term. The Bureau thus believes that the length of the loan term is a fundamental attribute of the type of credit that applicants are seeking such that it should be treated as a separate data field within credit type. As with other elements of the credit type data point, loan term information would allow data users to reduce inaccurate conclusions or misinterpretations of the 1071 data, aiding in fulfilling both the fair lending and business and community development purposes of section 1071. Likewise, the loan term will be part of the application or loan file and should not be operationally difficult to report once a financial institution's 1071 compliance system is set up.

Proposed comment 107(a)(5)–5 would present the instructions for collecting and reporting loan term. Specifically, it would explain that a financial institution complies with proposed § 1002.107(a)(5)(iii) by reporting the number of months in the loan term for the covered credit transaction, and that the loan term is the number of months after which the legal obligation will mature or terminate. The comment would further explain how to measure the loan term and the possible use of rounding.

Proposed comment 107(a)(5)–5 would also make clear that if a credit product, such as a credit card, does not have a loan term, the financial institution reports loan term as "not applicable." The financial institution also reports "not applicable" if the application is denied, withdrawn, or determined to be incomplete before a loan term has been identified. The Bureau believes that permitting the use of "not applicable" in these situations would facilitate compliance and aid in the collection of appropriate data. The Bureau believes that the proposed regulatory text and commentary described above would alleviate many of the concerns of the SERs and other commenting stakeholders regarding the credit type data point. The credit product and guarantee type lists have been updated using their input and continued Bureau consideration. Multiple types of guarantees would be permitted by the proposal, and FHA guarantees have been added to the list.

The Bureau believes the statutory term "type . . . of the loan" to be ambiguous, and reasonably interprets the term to include the credit product, any guarantee obtained, and the term of a closed-end loan because an accurate and useful record of the "type" of loan or credit would include those data fields. In the alternative, ECOA section 704B(e)(2)(H) authorizes the Bureau to require inclusion of "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]," and for the reasons discussed above, the Bureau has also determined that the subcategories of credit product (including collateral), guarantee type, and loan term would aid in fulfilling those purposes.

The Bureau seeks comment on its proposed approach to this data field.

### 107(a)(6) Credit Purpose

#### Background

Section 1071 requires financial institutions to collect and report "the type and purpose of the loan or other credit being applied for." [562] (The credit type data point is addressed in proposed § 1002.107(a)(5).)

#### SBREFA Proposals Under Consideration and Feedback Received

The Bureau stated in the SBREFA Outline that it was considering proposing that financial institutions report the loan/credit purpose data point by choosing one or more purposes from a specified list. In addition to several specific business purposes, the list included choices for "Other" or

---

[561] SBREFA Outline at 27.

[562] ECOA section 704B(e)(2)(B).

AdminRecord-000511

"Unknown" to facilitate compliance. The Bureau also explained that it was considering proposing that financial institutions is allowed to choose up to three purposes when the applicant indicates more than one purpose.[563]

Some SERs stated that they collect information on loan/credit purpose, although the information they collect may be different from that in the loan/credit purpose list in the SBREFA Outline.[564] One SER did, however, suggest that the Bureau's purposes list was similar to their list. Some SERs made suggestions of additional loan/credit purposes to add to the list, including for inventory loans, agricultural loans, and contract financing. One SER requested that the Bureau clarify whether this data point is intended to capture the purpose of the loan or the type of collateral. Another SER recommended combining the categories of motor vehicle finance and equipment finance, explaining that certain financing can span both categories (such as for a truck and a trailer as a combined purchase). One of the SERs expressed concern about possible confusion regarding credit with multiple purposes, and another SER suggested that the Bureau provide clear instructions on this data point. Another SER suggested that the Bureau explain how a line of credit should be reported if there can be multiple lines for different purposes all within the same account.

The SBREFA Panel recommended that the Bureau consider modifying the loan/credit purpose lists in accordance with the various suggestions made by SERs.[565]

Like the SERs, the other stakeholders who provided feedback on the SBREFA Outline stated that they often collect loan purpose information from applicants, but that the specific loan purposes they use differ somewhat from those listed in the SBREFA Outline. Stakeholders supported the inclusion of "other" and "unknown" in the list of purposes, and one suggested that the Bureau add "Not Applicable" for products, such as credit cards, that do not have a specific purpose. As with the SERs, these stakeholders requested clarifications and several changes to the loan purposes list. One commenter stated that financial institutions should not have to present the entire list to applicants where a loan product's terms do not allow the loan to be used for one or more of the specified purposes. That same commenter suggested that

financial institutions should be allowed to include additional purposes not on the list, and in the instance an applicant selects an additional purpose, the financial institution would include it as "other" unless the selected purpose squarely fits within, or is a subset of, a purpose specified on the Bureau's list.

Proposed Rule

The Bureau is proposing in § 1002.107(a)(6) to require that financial institutions collect and report the purpose or purposes of the credit applied for or originated. The Bureau's proposed approach aligns with the SBREFA Outline approach, with certain adjustments. First, the Bureau is proposing to use the term "credit purpose" for this data point, rather than "loan/credit purpose," for clarity and consistency with terminology used elsewhere in the proposal. In addition, the proposal would provide a more complete description of the purposes listed, which would clarify the relation between the purpose of the credit and the form of collateral used. The proposal also reflects other changes to the list of purposes presented in the SBREFA Outline, as explained below.

Proposed comment 107(a)(6)–1 would present instructions for collecting and reporting credit purpose and would provide the proposed list of credit purposes from which financial institutions would select.

The proposed list is similar to the list in the SBREFA Outline although, consistent with the SBREFA Panel's recommendation, the Bureau has made adjustments based on SERs' suggestions, as well as those of other stakeholders and its own further consideration. First, the items on the SBREFA list that described types of collateral, such as commercial real estate, have been updated to more clearly reflect that the financial institution is collecting and reporting the *purpose* of the loan, and not the form of collateral, though the form of collateral may be referred to in describing that purpose. In addition, the listed purposes involving real estate now differentiate between dwelling and non-dwelling real estate. The Bureau believes that this distinction would help in collecting more precise and useful data. To facilitate compliance the Bureau is also proposing to add "not applicable" to the purposes list for use when an application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card. Proposed comment 107(a)(6)–5 would also explain the use of "not applicable" as a response. In addition to the changes described above, the proposed list of

purposes also reflects small nonsubstantive edits for clarity.

Proposed comment 107(a)(6)–2 would explain that if the applicant indicates or the financial institution is otherwise aware of more than one purpose for the credit applied for or originated, the financial institution would report those purposes, up to a maximum of three, using the list provided, in any order it chooses. Since an applicant may have more than one purpose for a credit transaction, the Bureau believes it is appropriate to require collection and reporting of more than one credit purpose for this data point in that situation. The Bureau believes that having financial institutions report up to three purposes would provide useful and substantive data. The Bureau also believes that allowing financial institutions discretion as to the order of the purposes would facilitate compliance.

Proposed comment 107(a)(6)–3 would explain that if a purpose of the covered credit transaction does not appear on the list of purposes provided, the financial institution reports "other" as the credit purpose and reports the purpose as free-form text. The Bureau believes that allowing financial institutions to choose "other" when a credit purpose for the application does not appear on the provided list would facilitate compliance. In addition, collecting this information on "other" credit purposes would assist the Bureau in monitoring trends in this area and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list. For efficiency and to facilitate compliance, proposed comment 107(a)(6)–3 would also explain that if the application has more than one "other" purpose, the financial institution chooses the most significant "other" purpose, in its discretion, and reports that "other" purpose. The comment would then explain that a financial institution reports a maximum of three credit purposes, including any "other" purpose reported.

Proposed comment 107(a)(6)–4 would explain that, pursuant to proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes credit purpose. However, if a financial institution is nonetheless unable to collect or determine credit purpose information, the financial institution would report that the credit purpose is "not provided by applicant and otherwise undetermined." The Bureau believes that permitting use of this response would facilitate compliance

---

[563] SBREFA Outline at 28.
[564] SBREFA Panel Report at 27.
[565] *Id.* at 45.

AdminRecord-000512

and enhance the quality of data collected.

In order to facilitate compliance, the Bureau is also proposing comments 107(a)(6)–6 and –7. Proposed comment 107(a)(6)–6 would clarify that, as explained in proposed comment 104(b)–4, subpart B does not apply to an extension of credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy. Proposed comment 107(a)(6)–7 would clarify the collection and reporting obligations of financial institutions with respect to the credit purpose data point, explaining that the financial institution would be permitted, but not required, to present the list of credit purposes provided in comment 107(a)(6)–1 to the applicant. Proposed comment 107(a)(6)–7 would further explain that the financial institution would also be permitted to ask about purposes not included on the list provided in proposed comment 107(a)(6)–1. Finally, proposed comment 107(a)(6)–7 would clarify that if an applicant chooses a purpose or purposes that are similar to purposes on the list provided, but uses different language, the financial institution would report the purpose or purposes from the list provided. The Bureau believes that minimizing use of free-form text here would improve the usefulness of the data collected and facilitate compliance.

The Bureau believes that, with the modifications discussed above, the list of credit purposes provided in proposed comment 107(a)(6)–1 appropriately aligns with the purposes of credit sought in the small business credit market. As explained above, the Bureau has clarified the distinction between the purpose of the credit and the collateral involved, as one SER suggested. In addition, the Bureau believes that the explanations and instructions in the proposed commentary accompanying § 1002.107(a)(6) should reduce any confusion as to how a financial institution would comply when an application involves multiple purposes, and in other situations. In regard to the SER comment about multiple lines of credit for different purposes within the same account, see the discussion of "covered application" in the section-by-section analysis of proposed § 1002.103(a) above.

The Bureau seeks comment on its proposed approach to the credit purpose data point. In addition, the Bureau seeks comment on whether there are any purposes that should be added to or modified on its proposed list including, in particular, on the potential usefulness of including "agricultural credit" and

"overdraft line of credit" in the credit purposes list. Finally, the Bureau requests comment on whether further explanations or instructions with respect to this data point would facilitate compliance.

### 107(a)(7) Amount Applied For

#### Background

Section 1071 requires financial institutions to collect and report "the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved." [566]

The Bureau notes that for HMDA, Regulation C § 1003.4(a)(7) requires reporting of "the amount of the covered loan or the amount applied for, as applicable," which requires reporting of the amount applied for only when the credit is not originated. Because section 1071 uses the conjunction "and" rather than "or," the Bureau reads section 1071 to require collection and reporting of the amount applied for regardless of whether the application is ultimately approved or originated. (The amount approved or originated data point is addressed in proposed § 1002.107(a)(8).)

#### SBREFA Proposals Under Consideration and Feedback Received

The Bureau stated in the SBREFA Outline that it was considering requiring financial institutions to report the amount applied for data point using the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the financial institution's evaluation of the credit request.[567] The Bureau further explained in the SBREFA Outline that this method would not require reporting of amounts discussed before an application is made to a financial institution, but would capture the initial amount requested at the application stage or later, and would reflect the amount of the request that was evaluated by the financial institution in making a credit decision. In addition, if the applicant did not request a particular amount, but the financial institution underwrote the application as being for a specific amount, the financial institution would report the amount considered for underwriting. If the particular product applied for would not involve a specific amount requested or underwritten, the financial institution would report "Not Applicable" for this data point. Finally, the Bureau suggested in the SBREFA Outline [568] that when an applicant

responds to a "firm offer" that specifies an amount, which may occur in conjunction with a pre-approved credit solicitation, the amount applied for would generally be the amount of the firm offer.

Because of the relationship between the amount applied for and the amount approved or originated data points, the following summary of SER feedback includes input on both.[569] One SER articulated the importance of capturing data on both the amount applied for and the amount approved, stating that both data points were necessary to identify potentially discriminatory practices, such as discouragement, in the lending process. Another SER explained that the amount applied for could change during the iterative application process, particularly with a business that may not have previously had a banking relationship with the financial institution, but that the amount generally stayed consistent through underwriting. Other SERs asserted that differences between the amounts requested and approved were frequent, for a variety of reasons. One SER stated that they notify applicants of a preliminary offered amount, which often changes after documentation and underwriting. One example offered was that disparities between the amount applicants applied for and the amount the lenders approved may be attributable to collateral being assessed at a different value than the amount the applicants initially requested. Some SERs also remarked that differences in these amounts were often attributable to financial institutions acting as counselors or advisors to small businesses, including start-ups, and going back and forth until arriving at an amount that is appropriate given the customer's needs.

One SER (who supported reporting the amount initially applied for and the amount approved) strongly opposed reporting counteroffers, stating that negotiation is quite prevalent in small business lending. Another SER suggested that the Bureau use ranges for reporting the amount applied for, rather than specific numbers, and that the Bureau allow a financial institution to report "not applicable" if an applicant does not specify an amount requested. A SER also suggested there could be other potential complexities in capturing data on credit amount/limit the applicant applied for and credit amount/limit the lender approved, such as simultaneous or grouped financings involving multiple products, different sub-limits for each product or loan, and

---

[566] ECOA section 704B(e)(2)(C).
[567] SBREFA Outline at 28–29.
[568] Id.

[569] See SBREFA Panel Report at 27–28.

a general credit limit for an entire facility. SERs asked that these data points be captured in a manner that took these complexities into account.

The SBREFA Panel recommended that the Bureau seek comment on potential methods for avoiding misinterpretations of disparities between the credit amount/limit applied for and the credit amount/limit approved.[570]

The Bureau also received feedback from other stakeholders regarding this data point. Industry stakeholders providing feedback on the SBREFA Outline emphasized that arriving at an applied for amount is a complex, iterative process and that the reporting requirement should be flexible. One stakeholder suggested that the Bureau propose to require reporting of the amount of the request that was evaluated by the financial institution in making the credit decision. That stakeholder echoed the comments of others when it explained that the amount of credit requested can change a great deal in formulating an application. The stakeholder further explained that some borrowers request a specific amount immediately, others may not arrive at a number until after two or three sessions, and still others may float multiple numbers during several conversations, trying to gauge a loan officer's reaction. Another stakeholder commented that an applicant's stated credit desires can be arbitrary and that comparing the initial amount requested against the amount approved could be misleading and is not a reliable measure of the health or efficacy of small business lending. Other stakeholders stated that an applicant will often or usually state a specific amount early on, but that the amount will usually change during the process for various appropriate reasons. One stakeholder explained that small business loans generally are not a quick affair and require substantial review by and interaction between the lender and borrower, and business credit that it is uncommon for a small business applicant's requested credit amount to stay the same from application to underwriting. One trade association stated that many small businesses will request a much higher loan amount than what is ultimately approved after evaluation of collateral, particularly in transactions involving real estate or equipment, and that for start-ups and sole proprietorships a lack of sophistication can also lead to initial requests being unrealistic. That trade association further explained that in these cases, the financial institution will work with the applicant to arrive at a more reasonable amount, which could take place over a period of weeks or months. The trade association then recommended that the Bureau allow reporting of an amount that is determined at a later stage than the first request. Finally, another industry stakeholder requested that the Bureau propose to allow reporting of the applied for amount using ranges of numbers, stating that applicants often request credit this way.

A community group stakeholder stated that the Bureau should require financial institutions to report the initial amount requested at the time of application, explaining that the amount of credit requested is important for the purposes of section 1071, which it described as including enforcing fair lending laws and assessing whether credit needs are met.

Two stakeholders supported the use of "not applicable" when the credit product does not have a specific amount or limit, and another stakeholder said that no "applied for" credit limit should be required for open-end products. Two other stakeholders requested that the Bureau allow the use of "not applicable" whenever an applicant does not request a specific amount.

### Proposed Rule

The Bureau is proposing in § 1002.107(a)(7) to require that a financial institution collect and report "the initial amount of credit or the initial credit limit requested by the applicant." Proposed comment 107(a)(7)–1 would explain that a financial institution is not required to report credit amounts or limits discussed before an application is made, but must capture the amount initially requested at the application stage or later. In addition, proposed comment 107(a)(7)–1 would state that if the applicant does not request a specific amount, but the financial institution underwrites the application for a specific amount, the financial institution reports the amount considered for underwriting as the amount applied for. Finally, proposed comment 107(a)(7)–1 would instruct that if the applicant requests an amount as a range of numbers, the financial institution reports the midpoint of that range.

The Bureau is aware that there could be complexity in pinpointing the specific initial amount requested by an applicant in the fluid process of a small business credit application, which the Bureau acknowledges could make this data point difficult for financial institutions to collect and report. Nonetheless, the statute requires that the amount applied for be reported, and that information could be important for both of section 1071's statutory purposes. The Bureau believes that its proposed regulatory text and commentary, described above, would provide a flexible compliance regime for this data point that would accommodate different business practices. A financial institution would not be required to report amounts discussed before the application is made, which would accommodate preliminary informal interactions. In addition, the proposed comment's instruction on how to report this data point when the applicant requests a range of numbers would facilitate compliance in that situation and yield data that would be comparable to the other data collected for this data point (i.e., specific numbers and not ranges of numbers). The Bureau believes that more precise information will be more useful and should not create extra difficulty for financial institutions to collect.

Furthermore, proposed comment 107(a)(7)–1 would address the method for reporting when no initial amount is requested by the applicant—that is, the financial institution reports the amount considered for underwriting as the amount applied for. The Bureau believes that this method would aid compliance and yield appropriate data by avoiding the need to report a preliminary number when a financial institution's business practices do not result in there being such a number to report. The Bureau understands that a specific amount is often not required by many financial institutions for products such as credit cards, as the financial institution assigns the credit limit as part of the credit evaluation process.

The SER and stakeholder feedback from SBREFA suggest that mandating reporting of an amount applied for in all cases could impose undue compliance burden and complicate Regulation B compliance for entities that do not, for certain products, currently require that the borrower request a specific credit amount or credit limit as part of the financial institution's application process. In light of the complexities and concerns described by the SERs and other stakeholders, and the Bureau's understanding that sometimes there is no amount underwritten to, the Bureau believes that the amount applied for data point should avoid interfering with this arrangement by allowing use of "not applicable" in certain instances. Thus, proposed comment 107(a)(7)–2 would explain that if the particular product applied for does not involve a

---

[570] Id.

specific amount requested or underwritten, the financial institution reports that the requirement is "not applicable."

In addition to situations in which no amount applied for is requested by the financial institution or underwritten to and the amount applied for would be "not applicable," as described above, the Bureau understands that there may be situations where the financial institution requests an amount applied for but the applicant nonetheless does not provide one. To address this situation, proposed comment 107(a)(7)–2 would explain that, in compliance with proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the credit amount initially requested by the applicant. However, if a financial institution is nonetheless unable to collect or otherwise determine the amount initially requested, the financial institution reports that the amount applied for is "not provided by applicant and otherwise undetermined." The Bureau believes that providing the reporting flexibilities in proposed comment 107(a)(7)–2, along with the proposed reporting of the amount presented for underwriting when appropriate, would facilitate compliance by accommodating different business practices and would also allow for collection of useful data.

Proposed comment 107(a)(7)–3 would provide instructions for reporting the amount applied for in regard to firm offers. "Firm offers" involve solicitations to small businesses when they have been pre-approved for a term loan, line of credit, or credit card.[571] Proposed comment 107(a)(7)–3 would explain that when an applicant responds to a "firm offer" that specifies an amount or limit, which may occur in conjunction with a pre-approved credit solicitation, the financial institution reports the amount applied for as the amount of the firm offer, unless the applicant requests a different amount. If the firm offer does not specify an amount or limit and the applicant does not request a specific amount, the amount applied for is the amount underwritten by the financial institution. The Bureau believes that when the applicant knows the amount of the pre-approval before responding, that figure could appropriately be considered as the amount applied for. The Bureau understands that financial institutions often provide an amount in such solicitations. But if no amount appears in the pre-approved solicitation, the Bureau considers that an applicant responding to the firm offer has not requested a specific amount, and reporting of the amount underwritten would be appropriate. The Bureau's proposal follows the SBREFA Outline's approach under consideration for handling firm offers, and the SERs and other stakeholders did not object to this method. The Bureau seeks comment, however, on whether it should handle reporting of the amount applied for in connection with firm offers in a different manner than as set forth in this proposed comment, such as by requiring reporting of "not applicable" in situations where the firm offer does not specify an amount or limit and the applicant does not request one.

Proposed comment 107(a)(7)–4 would explain that when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution reports only the additional credit amount sought, and not any previous amounts sought or extended. The Bureau believes that this comment would facilitate compliance by providing clear guidance on reporting in this situation, and that avoiding double reporting of previous amounts would result in more appropriate and useful data. The Bureau notes that a request to withdraw additional credit amounts at or below a previously approved credit limit amount on an existing open-end line of credit would not be a covered application, and so proposed comment 107(a)(7)–4 would not apply to such a situation.

The Bureau believes that the proposed regulatory text and commentary described above would alleviate many of the concerns of the SERs and other stakeholders providing feedback on the SBREFA Outline. The Bureau notes that the proposal would accommodate different business practices and the often fluid nature of amounts applied for in small business lending. In regard to concerns about disparities between the amount applied for and the amount approved or originated, section 1071 requires the collection and reporting of the amount applied for, which is important for both of section 1071's statutory purposes.

The Bureau seeks comment on its proposed approach to the amount applied for data point. The Bureau also requests comment on how best to require reporting of amount applied for in situations involving multiple products or credit lines under a single credit limit. The Bureau also requests comment on potential methods for avoiding misinterpretations of disparities between the amount applied for and the amount approved or originated. Finally, the Bureau requests comment on its proposed approach to reporting when a range of numbers is requested.

107(a)(8) Amount Approved or Originated

Background

Section 1071 requires financial institutions to collect and report "the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved."[572] (The amount applied for data point is addressed in proposed § 1002.107(a)(7).) As explained in the section-by-section analysis of proposed § 1002.107(a)(7) above, the Bureau reads section 1071 to require collection and reporting of the amount or limit applied for as well as the amount of the credit transaction or credit limit approved.

SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau explained that it was considering proposing that financial institutions report (1) the *amount of the originated loan* for a closed-end origination; (2) the *amount approved* for a closed-end loan application that is approved but not accepted; and (3) the *amount of the credit limit approved* for open-end products (regardless of whether the open-end product is originated or approved but not accepted).[573] In light of the potential meaning of the statutory language, the Bureau explained that it was considering proposing different standards for closed-end and open-end products. In addition, the financial institution would report "Not Applicable" for this data point for applications that are denied, closed for incompleteness, or withdrawn by the applicant before a final decision is made.

The relevant SBREFA Panel Report section summarized feedback on both the amount applied for and the amount approved data points. For ease of reading, the Bureau has included the discussion of both above in the section-by-section analysis of proposed § 1002.107(a)(7). The following summary focuses more on the amount approved or originated data point. One SER articulated the importance of capturing data on both the amount applied for and the amount approved, stating that both data points were necessary to identify practices, such as

---

[571] *See* 15 U.S.C. 1681a(*l*); *see also* Regulation B comment 12(b)(7)–1 (describing offers of credit).

[572] ECOA section 704B(e)(2)(C).
[573] SBREFA Outline at 23.

AdminRecord-000515

discouragement, in the lending process. Other SERs asserted that differences between the amounts requested and approved were frequent, for a variety of reasons. One SER stated that they notify applicants of a preliminary offered amount, which often changes after documentation and underwriting. One example offered was that disparities between the amount applicants applied for and the amount the lenders approved may be attributable to collateral being assessed at a different value than the amount the applicants initially requested.

One SER (who supported reporting the amount initially applied for and the amount approved) strongly opposed reporting counteroffers, stating that negotiation is quite prevalent in small business lending.[574] Another SER also suggested there could be other potential complexities in capturing data on credit amount/limit the applicant applied for and credit amount/limit the lender approved, such as simultaneous or grouped financings involving multiple products, different sub-limits for each product or loan, and a general credit limit for an entire facility. SERs asked that these data points be captured in a manner that took these complexities into account.

As noted in the feedback summary above, the SBREFA Panel recommendation addressed both the amount applied for and the amount approved data points. The Panel recommended that the Bureau seek comment on potential methods for avoiding misinterpretations of disparities between the credit amount/limit applied for and the credit amount/limit approved.[575]

Few of the stakeholders who provided written feedback on the SBREFA Outline objected to the reporting method under consideration for amount approved/originated. One commenter asked that this data point be reported using ranges of numbers rather than specific amounts, in order for it to be uniform with the method it suggested for the amount applied for data point. Other commenters pointed out possible confusion as to the definitions of closed-end and open-end credit. In addition, commenters stated that sometimes applicants are provided more than one approval amount, and one commenter suggested that in such cases the Bureau should require reporting of the highest approval amount when the credit is approved but not accepted.

**Proposed Rule**

The Bureau is proposing in § 1002.107(a)(8) that the amount approved or originated data point be collected and reported as follows: (i) For an application for a closed-end credit transaction that is approved but not accepted, the financial institution collects and reports the amount approved by the financial institution; (ii) for a closed-end credit transaction that is originated, the financial institution collects and reports the amount of credit originated; and (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the financial institution collects and reports the amount of the credit limit approved.

The Bureau's proposal follows the SBREFA Outline approach for this data point, with certain adjustments and clarifications. First, for clarity the proposed rule refers to this data point as "amount approved or originated." In addition, the Bureau is proposing comment 107(a)(8)–2 to explain that when a financial institution presents multiple approval amounts from which the applicant may choose, and the credit is approved but not accepted, the financial institution reports the highest amount approved. The Bureau believes that reporting the highest amount approved when credit is approved but not accepted, as addressed in this proposed comment, would most accurately reflect the amount of credit that was made available to the applicant in this situation.

Proposed comment 107(a)(8)–1 would provide general instructions for the amount approved or originated data point, explaining that a financial institution would comply with proposed § 1002.107(a)(8) by reporting the amount approved or originated for credit that is originated or approved but not accepted. For applications that the financial institution, pursuant to proposed § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution would report that the amount approved or originated is "not applicable." The Bureau believes that these instructions and providing for reporting of "not applicable" in certain circumstances will facilitate compliance for this data point and elicit accurate and appropriate data.

Proposed comments 107(a)(8)–3 and –4 would provide specific instructions for identifying and reporting the amount approved or originated for closed-end transactions, including refinancings. The Bureau believes that the instructions provided would facilitate compliance and elicit accurate and useful data.

Proposed comment 107(a)(8)–5 would provide instructions regarding counteroffers and the amount approved or originated data point, explaining that if an applicant agrees to proceed with consideration of a counteroffer for an amount or limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the financial institution reports the amount granted. Proposed comment 107(a)(8)–5 would further explain that if an applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the action taken on the application as denied and reports "not applicable" for the amount approved or originated. The proposed comment would then provide a reference to proposed comment 107(a)(9)–2, which discusses the action taken data point in relation to counteroffers. For a more complete discussion of how the proposed rule would treat reporting obligations for applications involving counteroffers, see the section-by-section analysis of proposed § 1002.107(a)(9) below (action taken).

Most of the SER feedback on the amount approved or originated data point focused on its relation to the amount applied for data point. That issue is discussed in the section-by-section analysis of proposed § 1002.107(a)(7) above (amount applied for). One SER also expressed concern about reporting counteroffers in relation to the amount approved or originated data point. The Bureau believes that, as explained above, proposed comment 107(a)(8)–5 provides an appropriate and manageable method for reporting amount approved or originated in counteroffer situations. Other stakeholders asked that the Bureau take into account the complexity of multiple product or account situations. The Bureau has done so in relation to its treatment of covered applications, discussed in the section-by-section analysis of proposed § 1002.103(a) above. In regard to the comment concerning confusion between closed-end and open-end credit, the Bureau is proposing to define these terms clearly in the regulatory text at proposed § 1002.102(e) and (n). As for the suggestion that the amount approved or originated data point be reported using ranges of numbers (for consistency with its request to report the amount applied for data point using ranges), the Bureau is not proposing to have financial institutions report the amount applied for using ranges of numbers, though it

---

[574] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 27–28.

[575] *Id.* at 46.

**56450**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

does seek comment on this possibility in the section-by-section analysis of proposed § 1002.107(a)(7) above.

The Bureau reads the statutory language "the amount of the credit transaction or the credit limit approved" to require the amount of the credit limit approved to be reported for open-end applications, and the amount of the credit transaction to be reported for closed-end applications. The Bureau believes the phrase "the amount of the credit transaction or the credit limit approved" to be ambiguous in regard to closed-end transactions because the most common meaning of the word "transaction" in the context for closed-end credit transactions would be an originated loan. Thus, the Bureau reasonably interprets the statute as requiring reporting of the amount originated for closed-end credit transactions. In the alternative, section 1071 authorizes the Bureau to include any "additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau has determined that for closed-end credit transactions that are originated, reporting of the amount originated would aid in fulfilling the enforcement of fair lending laws, by indicating the credit that had been provided to different types of applicants in actual transactions. The Bureau has also determined that reporting of the amount originated for closed-end credit transactions would aid in fulfilling the business and community development purpose of section 1071 by providing a more complete and accurate picture of the credit actually being provided to different businesses and communities. In addition, in the alternative, the Bureau believes that it is appropriate to use its exception authority under ECOA section 704B(g)(2) to require the amount originated, rather than the amount approved, for originated closed-end credit transactions, because collecting data on the amount approved instead of the amount originated for a closed-end transaction would compromise the utility and quality of the data being reported, thus inhibiting the fair lending and business and community development purposes of section 1071.

Similarly, the Bureau has determined that for closed-end credit that is approved but not accepted, the amount approved would aid in fulfilling the purposes of section 1071. Primarily, reporting of the amount approved for closed-end credit would aid in fulfilling the enforcement of fair lending laws, by indicating the credit that had been offered to different types of applicants when the transaction does not close and there is no amount originated to report.

Reporting of the amount approved for closed-end credit would also aid in fulfilling the business and community development purpose of section 1071 by providing a more complete picture of the credit being offered to different businesses and communities.

The Bureau seeks comment on its proposed approach to the amount approved or originated data point, including on the specific requests for input above. As recommended by the SBREFA Panel and explained in the section-by-section analysis of proposed § 1002.107(a)(7) above, the Bureau requests comment on potential methods for avoiding misinterpretations of disparities between the credit amount or limit applied for and the credit amount or limit originated or approved and on the possible use of ranges of numbers for reporting the amount applied for and amount approved or originated data points. In addition, the Bureau requests comment on whether it would be useful and appropriate to require reporting of the amount approved as well as the amount originated for originated closed-end credit transactions.

### 107(a)(9) Action Taken

#### Background

ECOA section 704B(e)(2)(D) requires financial institutions to report the "type of action taken" on an application.

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing five categories for reporting "action taken": Loan originated, application approved but not accepted, application denied, incomplete application (closed or denied), and application withdrawn by the applicant.[576]

*Action taken categories in general.* Most SERs were supportive of the action taken categories under consideration.[577] Several SERs stated that the categories align with information they currently collect. One SER explained that a single application could pass through all of these stages and expressed concern that identifying the right category to report may be subjective and questioned by examiners or auditors after the fact. Another SER asked for additional clarity on the difference between denied applications and incomplete applications. This SER also suggested adding a category for lenders to indicate if an applicant is rate shopping. The SBREFA Panel recommended that the

Bureau further clarify the circumstances in which each of the action taken categories should be used.[578]

Of the other stakeholders that provided feedback on this issue, several supported the action taken codes set forth in the SBREFA Outline. One industry commenter stated that the data point would generally not be difficult or expensive to report and two commenters reported currently tracking some similar (though not identical) fields. One community group commenter underscored the importance of collecting action taken codes (including approvals and denials) in order to track demand for credit and identify potential discrimination. The commenter also noted current available data (Community Reinvestment Act data and surveys) on small business lending provides limited information on supply and demand. The commenter stated that capturing incomplete and withdrawn applications was important as it may reflect discouragement or discriminatory treatment, and that the approved but not accepted category could reflect less favorable pricing or loan terms. Two industry commenters suggested the Bureau further simplify the action taken categories by eliminating the approved but not accepted and incomplete categories, and including only originated, abandoned, and denied categories. One stakeholder suggested adding a field for other circumstances, such as rate shopping. Several community group commenters suggested the action taken categories be expanded to include all the HMDA action taken categories.

*Treatment of counteroffers.* In response to a question in the SBREFA Outline about whether counteroffers should be separately identified in the 1071 data set, several SERs discussed the frequency of counteroffers in small business lending and the potential utility of capturing counteroffers in 1071 data. One SER expressed concern with reporting each adjustment in the application process because, they said, not all counteroffers are memorialized in writing. In the context of discussions on the amount approved data point, a SER strongly opposed reporting counteroffers, stating that negotiation is quite prevalent in small business lending. The SBREFA Panel recommended the Bureau seek comment on whether to capture counteroffers in 1071 data, and if so, the best method for doing so.[579]

Other stakeholders also commented on counteroffers. Several industry

---

[576] SBREFA Outline at 29–30.

[577] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 28–29.

[578] *Id.* at 46.

[579] *Id.*

commenters stated that counteroffers should not be reported. The commenters noted that there are often multiple rounds of back-and-forth communications in small business lending, that capturing counteroffers is unnecessary as the information is practically captured in the loan decision and other 1071 data (such as loan amount approved), and that counteroffers are not necessary to show the availability of credit. If reported, several industry commenters suggested use of a data flag to simplify reporting, avoid reporting of potentially numerous counteroffers in a single application, and avoid the additional costs for financial institutions to conduct edits and validity checks on each separate counteroffer. Another industry representative also urged that if counteroffers are reported, they should be considered a single application. No community groups commented on this topic.

Proposed Rule

The Bureau is proposing in § 1002.107(a)(9) to require reporting of the action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. As discussed above, most SERs and other stakeholders were generally supportive of these categories. In addition, the Bureau is proposing to categorize all incomplete applications as a single category of "incomplete"; while this proposed approach is not consistent with Regulation C comments 4(a)(8)(i)–4 and –6, the Bureau is concerned about potential errors in the data if financial institutions report incomplete denials separate from notices of incompleteness. There may also be some benefit for fair lending analysis to reserve the denied category solely for credit-related denials, rather than denials that are based on incompleteness. As noted below, the Bureau seeks comment on reporting the "incomplete" action taken category.

In response to commenter suggestions, the Bureau considered removing or combining several action taken categories. For example, the Bureau considered eliminating the approved but not accepted category; however, because the Bureau believes data collected under this category would reflect demand for credit, the Bureau is retaining this category in its proposal. The Bureau also considered removing the category of incomplete applications. However, because the Bureau believes capturing data on incomplete applications is essential to

identifying potential discrimination and discouragement during the application process, the Bureau is retaining this action taken category as well. Finally, the Bureau considered combining the incomplete and withdrawn categories, since both actions reflect an applicant's inability or affirmative decision not to proceed with the request for credit. However, the Bureau is retaining incomplete and withdrawn as separate categories, as a high incidence of incomplete applications could signal an issue with the level of assistance provided by the financial institution (for example, not providing reasonable support or assistance to ensure an applicant satisfies all credit conditions; or providing more support to some applicants than others). As noted below, the Bureau seeks comment on this issue.

The Bureau is not proposing additional action taken categories beyond what was considered in the SBREFA Outline. Although some commenters suggested the Bureau expand the action taken codes to those currently used in Regulation C (including preapprovals or purchased loans), the Bureau does not believe those additional fields would be appropriate or necessary in the context of section 1071 given the diversity of processes and other complexities in the small business lending space and because section 1071, unlike HMDA, does not expressly reference loan purchases.

The Bureau also considered, but is not proposing, adding an action taken category or flag for counteroffers. As noted by certain SERs and other commenters, it would be potentially infeasible to capture all of the proposed 1071 data fields for every back-and-forth counteroffer with an applicant, and attempting to do so would likely lead to confusion and data errors. The Bureau also agrees with commenter feedback that, even without a counteroffer flag or field, the proposed section 1071 data fields would capture many of the terms of accepted counteroffers (such as pricing, guarantee, etc.), as well as the amount initially requested by the applicant. Thus, the Bureau believes the addition of a counteroffer flag or field would provide limited useful information beyond what would be captured under the current proposal. Moreover, while a counteroffer flag or field might be useful as a screening tool for potential discrimination (for example, if women-owned businesses or minority-owned businesses are provided counteroffers or denied at a higher rate than male- or non-Hispanic white-owned businesses), a flag alone

would lack any specificity to provide further fair lending analysis.

Following the SBREFA Panel's recommendation and feedback from other stakeholders, proposed comment 107(a)(9)–1 would provide additional clarity on when a financial institution should select each of the proposed action taken codes. The financial institution identifies the applicable action taken code based on final action taken on the covered application.

Proposed comment 107(a)(9)–2 would provide instructions for reporting action taken on covered applications that involve a counteroffer, along with examples. The Bureau's proposed treatment of counteroffers aligns with how counteroffers are treated under existing § 1002.9 notification procedures. Specifically, proposed comment 107(a)(9)–2 would state that if a financial institution makes a counteroffer to grant credit on terms other than those originally requested by the applicant and the applicant declines to proceed with the counteroffer or fails to respond, the institution reports the action taken as a denial on the original terms requested by the applicant. If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the action taken as the disposition of the application based on the terms of the counteroffer. This proposed approach to reporting counteroffers also aligns with how they are reported under Regulation C.[580]

Proposed comment 107(a)(9)–3 would discuss reporting action taken for rescinded transactions. Proposed comment 107(a)(9)–4 would clarify that a financial institution reports covered applications on its small business lending application register for the year in which final action is taken. Finally, proposed comment 107(a)(9)–5 would provide guidance for reporting action taken if a financial institution issues an approval that is subject to the applicant meeting certain conditions.

The Bureau seeks comment on proposed § 1002.107(a)(9) that would require reporting of action taken and the associated commentary. The Bureau also specifically seeks comment on whether the "withdrawn by applicant" category should be merged with the "incomplete" category for purposes of reporting action taken. The Bureau seeks comment as well on whether the Bureau's proposal to categorize all incomplete applications as a single category of "incomplete" (closed or denied) should instead be reported consistent with the approach in

---

[580] Regulation C comment 4(a)(8)(i)–9.

Regulation C, which provides separate categories for denials (including on the basis of incompleteness) and files closed for incompleteness (if the financial institution sent a written notice of incompleteness). In addition, the Bureau seeks comment on whether counteroffers that are not accepted, such as a credit offer for a lower credit amount than requested, should be reported as "approved but not accepted" rather than "denied," in order to reflect the availability of credit. As recommended by the SBREFA Panel, the Bureau also seeks comment on whether to specifically capture counteroffers in section 1071 data, and if so, whether to use a counteroffer flag in the data or some other method.

### 107(a)(10) Action Taken Date

In addition to requiring financial institutions to collect and report the type of action they take on an application, as discussed in the section-by-section analysis of proposed § 1002.107(a)(9) above, ECOA section 704B(e)(2)(D) requires financial institutions to collect and report the "date of such action."

In the SBREFA Outline, the Bureau indicated that it was considering proposing that the action taken date be reported with a day, month, and year, and requested feedback on potential challenges financial institutions may have in identifying such date for each of the action taken categories.[581] The Bureau received limited comments on this data point during the SBREFA process.[582] One SER suggested that the Bureau provide a grace period of several days before and after the action taken date. Another SER recommended that the date assigned as the action taken date be to the best of the financial institution's knowledge or belief given the uncertainty in assigning a particular date. The Bureau received similar feedback from other stakeholders. Two industry stakeholders suggested that a grace period or tolerance be provided to ease compliance burden, similar to the tolerance under consideration for the "application date" data point. One stakeholder recommended that the action taken date for approved and denied loans be the exact date such actions occurred.

Proposed § 1002.107(a)(10) would require action taken date to be reported as the date of the action taken by the financial institution. Proposed comments 107(a)(10)–1 through –5 would provide additional details on how to report the action taken date for each of the action taken categories in proposed § 1002.107(a)(9). For example, proposed comment 107(a)(10)–1 would explain that for denied applications, the financial institution reports either the date the application was denied or the date the denial notice was sent to the applicant.

The Bureau notes that its proposed approach for this data point largely mirrors the Regulation C approach for action taken date in § 1003.4(a)(8)(ii) and related commentary, with modifications to align with the action taken categories in proposed § 1002.107(a)(9). Regarding the request from a SER and other stakeholders to adopt a grace period for the action taken date data point, the Bureau believes that a grace period or tolerance to report the action taken date would not be necessary, in light of the flexibility already provided in proposed comments 107(a)(10)–1 through –5. Further, the Bureau believes that financial institutions generally already have policies and procedures in place to capture the date an action is taken in the normal course of their business operations.

Proposed comment 107(a)(10)–4 would explain that for covered credit transactions that are originated, a financial institution generally reports the closing or account opening date. That proposed comment also states that if the disbursement of funds takes place on a date later than the closing or account opening date, the institution may, alternatively, use the date of initial disbursement.

The Bureau seeks comment on its proposed approach to the action taken date data point.

In addition, for originated transactions, the Bureau is considering whether the date the application was approved should be captured in addition to, or instead of, the date of closing or account opening. The Bureau is also considering whether the date of closing or account opening should be reported separately from the date of disbursement of funds (for term loans) or funds availability (for lines of credit). Having these dates reported separately would permit the Bureau and other data users to determine the length of time elapsed between when an application is approved, when the closing occurred or the account was opened, and when the applicant actually received the loan funds or access to funds. Specifically, the Bureau is concerned that a lengthy gap between the loan approval date and the date the funds are made available to applicants could have adverse effects particularly on certain types of small businesses. For example, in agricultural lending where planting and harvesting seasons fall within certain time frames, if loan proceeds are not provided within a certain period of time after the financial institution receives and approves an application, the loan proceeds may no longer be of maximum value to the applicant. The Bureau seeks comment on whether it should adopt data points to capture application approval date and/or the date funds are disbursed or made available.

### 107(a)(11) Denial Reasons

#### Background

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." In addition to requiring financial institutions to collect and report the action taken date for denied applications, as discussed in the section-by-section analysis of proposed § 1002.107(a)(10) above, the Bureau is proposing to require financial institutions to collect and report the principal reason or reasons an application was denied. The Bureau believes that collection of denial reason information would aid in fulfilling the purposes of section 1071, as explained below.

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, as part of its discussion regarding the action taken data point, the Bureau requested feedback on whether financial institutions would prefer to report denial reasons to help explain the decision on an application, and if so, whether reporting denial reasons should be mandatory or optional.[583]

When asked whether they would prefer reporting denial reasons to help explain the decision on an application, some SERs expressed concern about reporting denial reasons.[584] These SERs asserted that requiring lenders to report reasons for denial could add more burden than benefit, may not be useful given the number of possible reasons for a denial, might not shed light on the actual reasons for a denial, may be difficult to standardize for uniform reporting, would require additional processes to ensure accurate reporting, and may present heightened privacy concerns. One SER expressed a preference to report denial reasons.

Feedback received from other stakeholders was mixed. Stakeholders

---

[581] SBREFA Outline at 30.
[582] SBEFA Panel Report at 28–29.

[583] SBREFA Outline at 29–30.
[584] SBREFA Panel Report at 28–29.

AdminRecord-000519

opposing reporting denial reasons expressed concerns about the privacy of applicants' information if such data were released to the public. For example, they asserted that if denial reasons were released to the public, such information would make it easy to identify applicants from small communities and expose an applicant's sensitive business information like insufficient cashflow. One stakeholder mentioned that denial reasons may encompass multiple reasons and would therefore be burdensome to collect and store.

Stakeholders in favor of optional (rather than mandatory) reporting of denial reasons asserted that reporting this information would be unnecessary and burdensome and may further push small and mid-size financial institutions out of small business lending, and suggested that, if included in the rule, reporting not be made mandatory (that is, financial institutions would be permitted but not required to report such information, at the financial institution's discretion). One stakeholder suggested that rural community banks under $1 billion be exempted from reporting denial reasons due to data privacy concerns.

Finally, stakeholders in favor of mandatory reporting of denial reasons asserted that such data provide regulators and the public with important—and currently unavailable—data necessary to uncover fair lending issues and identify underwriting factors that need to be addressed. They stressed that the collection of denial data (via the action taken data point) accompanied by robust denial reasons will provide small business applicants with useful and actionable information. In addition, commenters noted that these data will help identify barriers to credit for small businesses and provide deeper insight into the reasons why credit is denied. The SBREFA Panel did not make any recommendations related to denial reasons.

### Proposed Rule

Proposed § 1002.107(a)(11) would require reporting of the principal reason or reasons the financial institution denied the covered application. Proposed comment 107(a)(11)–1 would explain that a financial institution complies with proposed § 1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons. The financial institution reports only the principal reason or reasons it denied the application, even if there are fewer than four reasons. The proposed comment provides an example

to illustrate. The proposed comment would also state that reasons reported must accurately describe the principal reason or reasons the financial institution denied the application. Finally, the proposed comment provides a list of denial reasons from which financial institutions would select the principal reason or reasons for denying a covered application.

Proposed comment 107(a)(11)–1 also explains that a financial institution reports the denial reason as "other" where none of the enumerated denial reasons adequately describe the principal reason or reasons it denied the application, and the institution reports the denial reason or reasons as free-form text. The Bureau believes that allowing financial institutions to choose "other" in this situation would facilitate compliance. In addition, collecting information on "other" denials would assist the Bureau in monitoring trends in this area and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list.

Proposed comment 107(a)(11)–2 would clarify that a financial institution complies with proposed § 1002.107(a)(11) by reporting that the requirement is not applicable if the action taken on the application, pursuant to proposed § 1002.107(a)(9), is not a denial, and provides an example.

The Bureau notes that its proposed approach for this data point largely mirrors the Regulation C approach for denial reasons in § 1003.4(a)(16) and related commentary, with modifications to align with the reasons applications are denied in the small business lending (rather than residential mortgage lending) context.

Pursuant to its authority under ECOA section 704(e)(2)(H), the Bureau believes that data regarding denial reasons would further the purposes of section 1071 by allowing data users to better understand the rationale behind denial decisions, help identify potential fair lending concerns, and provide financial institutions with data to evaluate their business underwriting criteria and address potential gaps as needed. In addition, robust data on application denial reasons across applicants, financial institutions, products, and communities could help target limited resources and assistance to applicants and communities, thus furthering section 1071's community development purpose. With respect to fair lending compliance, denial reasons data would help data users analyze potential denial disparities.

With regard to the potential additional compliance burdens SERs and other commenters referenced, the Bureau believes that, as a practical matter, most financial institutions are already documenting the principal reason or reasons for the denial in an adverse action notice, or should be prepared to do so if requested.[585] However, the Bureau recognizes that if a financial institution is not currently covered by existing adverse action notice requirements under Regulation B, it may face greater challenges in reporting this information than financial institutions that currently provide adverse action notifications. The concerns raised by SERs and other stakeholders regarding the privacy implications of denial reasons are addressed in part VI.C.viii below.

The Bureau also believes that exempting certain financial institutions from the requirement to report denial reasons, or permitting financial institutions to report denial reasons voluntarily, would not be appropriate given the need for consistent and meaningful data to further the purposes of section 1071. In addition, the Bureau considered gaps in the existing small business lending data and notes that available survey data are often not representative across the industry, does not provide timely information, and does not cover all entities involved in small business lending.[586] The Bureau notes that the 2015 HMDA Final Rule added mandatory reporting of denial reasons to Regulation C because the Bureau recognized that the collection of denial reason data could facilitate more efficient and less burdensome fair lending examinations.[587]

Finally, the Bureau is aware that certain stakeholders are concerned that reporting denial reason data may result in fair lending actions against financial institutions for potential discriminatory

---

[585] Existing § 1002.9(a)(3) requires creditors to provide the specific reasons for action taken or to notify business credit applicants of their right to request the reasons for denying an application or taking other adverse action.

[586] See 2020 Small Business Credit Survey. The survey provides baseline data on the financing and credit positions of small firms in 2020. It delivers information on small business financing needs, decisions, and outcomes to policymakers, lenders, and service providers. However, the survey is not representative because it surveys only employer firms (with less than 500 employees) and is subject to the firms' self-reporting. Also, only aggregate denial reasons are provided, and further breakdowns are unavailable. In addition, the survey provides a very limited list of denial reasons to survey respondents that may not correspond to denial reasons from financial institutions. See also Fed. Deposit Ins. Corp., *Small Business Lending Survey* (2018), https://www.fdic.gov/bank/historical/sbls/section5.pdf.

[587] See 80 FR 66127, 66204–05 (Oct. 28, 2015).

disparities. The Bureau, however, believes that including denial reasons in 1071 data might actually reduce this risk, as it would allow financial institutions to point to potentially legitimate reasons for disparities.

The Bureau seeks comment on its proposed approach to this data point, including regarding whether the denial reason categories listed and explained in proposed comment 107(a)(11)–1 sufficiently cover the common credit denial reasons in the small business lending industry. If not, the Bureau seeks input on other denial reason categories to consider including in the proposed list of denial reasons. The Bureau also requests further comment on the potential utility of denial reason data as well as on the potential burdens to industry in reporting denial reasons, in light of the denial reason categories it is proposing and the data's ability to aid in fulfilling the purposes of section 1071.

### 107(a)(12) Pricing Information

#### Background

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that pricing data would serve to further both the fair lending purpose and the business and community development purpose of 1071. The majority of small businesses are run by a single owner without extensive financial experience or expert staff to navigate the commercial credit marketplace, which lacks many of the Federal protections found in consumer lending.[588] Heightened risks to fair lending and small business development may arise from different pricing for the same products and the selective marketing of higher-priced or even predatory and unsustainable products. Because price-setting is integral to the functioning of any market, any analysis of the small business lending market—including to enforce fair lending laws or identify community and business development opportunities—would be less meaningful without this information.

Research conducted for the Department of Commerce has found that minority-owned businesses tend to pay higher interest rates on business loans than those that are not minority-owned,[589] and a recent report by the Federal Reserve Bank of Atlanta found that minority-owned firms more frequently applied for potentially higher-cost credit products, and were also more likely to report challenges in applying for credit such as being offered high interest rates.[590] In addition, research conducted for the SBA has found that Black- and Hispanic-owned businesses were less likely to have business bank loans and more likely to use more expensive credit card financing.[591] The 2020 Small Business Credit Survey by a collaboration of Federal Reserve Banks found that small business applicants to nonbank lenders, such as online lenders and finance companies, were more likely to report high interest rates or unfavorable terms than applicants to depository institutions.[592] To the extent that the recovery from the COVID–19 pandemic and resulting economic crisis is still ongoing when the Bureau's final 1071 rule becomes effective, and in regard to economic emergencies affecting small business access to credit that may occur in the future, tracking pricing in this segment of the market is particularly important.

The Bureau believes pricing data are important because the statutory data points alone offer (1) limited insight into underwriting disparities and (2) no insight into predatory prices or pricing disparities. For example, they might show that a particular market segment is expanding and apparently filling an important need, but this could actually be an area with predatory conduct. Pricing information would allow the Bureau and others to understand the situation more accurately. Data collection without pricing information

could have the unintended consequence of incentivizing irresponsible lending, as providers seeking to increase representation of underserved groups could be encouraged to adopt high-cost models of lending.

Without information on pricing, data users would be unable to screen for fair lending pricing risks, and regulators would be less able to focus their enforcement and supervision resources appropriately on situations of greater possibility for questionable activities. In addition, if potential discriminatory conduct is monitored effectively in regard to loan approvals, but not in regard to pricing, industry compliance systems may focus solely on approvals and denials and ignore potential pricing disparities. Having pricing data available under 1071 would also increase transparency and help demonstrate to lenders where business opportunities exist to offer credit to underserved markets. In addition, it could demonstrate to small businesses the availability of more affordable credit.

#### SBREFA Proposal Under Consideration and Feedback Received

At SBREFA, the Bureau stated that it was considering proposing to include pricing of originated credit and credit that is approved but not accepted as a discretionary data point because it could further the fair lending purpose of section 1071 by enhancing the ability to effectively and efficiently enforce fair lending laws. In addition, the Bureau stated that pricing data could add value in promoting market transparency and new product development opportunities, thus furthering the business and community development purpose of section 1071. The Bureau also stated that a pricing data point could be reported on the basis of annual percentage rate (APR), total cost of credit (TCC), interest rate and total fees, or some other pricing metric. The SBREFA Panel recommended that, if pricing were to be part of this proposal, the Bureau seek comment on potential methods for avoiding misinterpretations of disparities in pricing data.[593]

During the SBREFA process, SERs provided various comments on the inclusion of pricing data in the rule.[594] Feedback relevant to a specific pricing data point is discussed in the section-by-section analysis of proposed § 1002.107(a)(12)(i) through (vi) below. Immediately below, the Bureau

---

[588] For example, TILA's standardized disclosure requirements and limits on linking compensation to loan terms, including pricing, do not apply to business loans. *See, e.g.,* 15 U.S.C. 1639b, Regulation Z § 1026.36 (TILA's prohibition on basing loan originator compensation on loan terms).

[589] U.S. Dep't of Com., *Minority Business Development Agency, Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs,* at 3, 5, 21, 36–37 (2010), *https://archive.mbda.gov/page/executive-summary-disparities-capital-access-between-minority-and-non-minority-businesses.html.*

[590] Fed. Reserve Bank of Atlanta, *Report on Minority Owned Firms: Small Business Credit Survey* (Dec. 2019), *https://www.fedsmall business.org/medialibrary/fedsmallbusiness/files/2019/20191211-ced-minority-owned-firms-report.pdf.*

[591] Alicia Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms,* at 47 (2018) (prepared for Off. of Advocacy, Small Bus. Admin.), *https://www.sba.gov/sites/default/files/Financing_Patterns_and_Credit_Market_Experiences_report.pdf.*

[592] However, the survey noted that online lenders tended to receive applications with lower credit scores so applicant risk could play a role in higher interest rates for nonbank lenders. *See* 2020 Small Business Credit Survey at 15.

[593] SBREFA Panel Report at 47.
[594] *Id.* at 31–32.

addresses feedback relevant to reporting pricing information in general.

Some SERs urged the Bureau to require submission of a pricing metric, stating, for example, that pricing data are essential to understanding the operation of the market and the nature of credit extended. Some SERs supported use of APR as a pricing metric, including several who stated that they currently calculate APR. One SER (a CDFI) stated that they disclose APR to applicants now, and that if they are able to easily collect and report this data point without additional cost and burden, other FIs should be able to do the same. Several SERs supported the use of APR to enable comparisons of pricing across various small business lending products, and suggested the Bureau look to State-mandated and Truth in Lending Act APR disclosures for guidance on methodologies. One SER supported the use of APR as the metric if lenders and not the Bureau did the calculation. Another SER suggested the Bureau collect detailed pricing information, including APR, but ''hold harmless'' the reporting financial institutions to ensure the accuracy of the data. Conversely, at least two SERs opposed using APR as a pricing metric; one cited the burden associated with making that calculation and the other said pricing information based on APR would be confusing to small business owners. Several SERs supported reporting pricing information as interest rate and fees. Two SERs preferred using TCC. One SER suggested that the Bureau consider allowing financial institutions to choose which pricing metric they prefer to report.

A large majority of industry stakeholders opposed inclusion of any discretionary data points, and they were particularly concerned about a pricing data point. Several stakeholders stated that a pricing data point would be complex and costly to implement across various product types. One stakeholder was concerned about contracts that bundle services with credit, stating that pricing data would not capture the true economics of the transaction. Several stakeholders were worried about reputational risk because pricing could be publicly reported without contextual information such as the nature of the collateral, credit scores, size of down payment, compensating deposit balances, bundled services, etc., that would explain the pricing variations. One commenter opposed including pricing data, but said that if the Bureau chose to do so it should also allow voluntary submission of some of this contextual information. One stakeholder stated that pricing of commercial loans

is often complex and cannot be adequately analyzed with the limited factors proposed, which may lead to erroneous conclusions and have severe negative impacts on the financial industry from regulatory and reputational risk standpoints. A community bank stakeholder commented that community banks price risk on a case-by-case basis and asserted that if this ability to price risk appropriately is restricted by uninformed fair lending guidelines, the Bureau risks removing a large number of community banks from existence. The bank went on to opine that this could further reduce the ability of thousands of small businesses to access credit. Another bank stated that pricing data alone would provide an incomplete picture that could be easily distorted to suit the political agenda of the user. That bank was also concerned about disparate impact analysis or similar tools being used because this could be unfair to the bank or its borrowers considering the small data set that the reported data of this small bank represents. Another stakeholder summed up these industry concerns, stating that pricing is simply too varied across the spectrum of the industry to include in the 1071 process without sowing confusion among lenders, borrowers, and the general public, stifling lending activity, and introducing numerous unintended consequences.

Several SERs, along with industry stakeholders, were concerned about the Bureau potentially making public pricing data and felt that this choice could be costly and challenging to carry out. They further asserted that bad outcomes could result from unjustified fair lending concerns, such as distortions to the market through interference with risk-based pricing. Many SERs, along with other industry stakeholders, noted that pricing is complex, often unique to the applicant's situation, and may involve extra services bundled with the loan. Without adequate context, therefore, pricing data could lead to inaccurate interpretations of the collected data and unfair reputational damage. One SER stated that the market for small business credit is price competitive and accordingly pricing information is unnecessary for section 1071. Another SER said that pricing for some products may reflect more than just the cost of the loan and may be high relative to other credit products if the covered financial institution is a supportive lender working with less established or higher credit risk applicants over a period of time. Similarly, the SBREFA Panel

Report recommended that the Bureau seek comment in the proposed rule on potential methods for avoiding misinterpretations of disparities in pricing.[595]

Community groups, as well as some community development lenders, strongly favored inclusion of discretionary data points in general, and were particularly interested in having pricing data reported to help achieve 1071's purposes. One stakeholder stated that pricing information is a critical fair lending tool and would allow regulators, advocates, and industry to conduct fair lending reviews and monitor the market for emerging high-cost products. That commenter also stated that the eventual inclusion of pricing data in HMDA has been critical in identifying disparate pricing among protected classes. Another stakeholder suggested that a data collection regime designed to further fair lending enforcement cannot ignore information about whether high-cost lenders are targeting business owners of color or women-owned businesses, or if lenders are charging more to their female borrowers or customers of color. One community group stated that without pricing data lenders flooding neighborhoods of color with high-cost loans would be seen as adequately serving otherwise underserved markets. Another commenter stated that MCAs have extremely high effective APRs, and added that if section 1071 data collection indicates that access to capital is improving but is blind to whether that capital is provided at 30 percent APR or 300 percent APR, Congress's intent will not be accomplished.

Regarding 1071's business and community development purpose specifically, one stakeholder stated that merely by providing price transparency the Bureau could encourage the development of successful lending models because policymakers, community organizations, investors, banks seeking partnerships, and others would be able to see, for the first time, which business models are successful at reaching minority-owned, women-owned, and other underserved small businesses. That commenter went on to state that transparency would also attract investment capital and partnerships into models that work, and could lead to a market-based model and a pro-innovation approach to regulation.

One community development lender that supported inclusion of a pricing data point encouraged the Bureau to identify one consistent pricing metric

---

[595] *Id.* at 47.

that financial institutions must report on and added that because this could create reporting challenges, especially for smaller institutions, the Bureau should ensure there is clear guidance and consistency on the pricing data point. Of the pricing metrics asked about in the SBREFA Outline, a majority of the community groups and community development lenders who supported inclusion of a pricing data point preferred use of APR, though some suggested the Bureau also require reporting of rate and fees with the APR, as well as rate spread as reported under HMDA. One community development lender stated that APR is the only established metric that enables informed comparisons of the cost of capital over time and between products of different dollar amounts and term lengths. That lender went on to state that APR is the metric that people know and expect, because it is the legally required standard for mortgages, auto loans, credit cards, student loans and personal loans, including short-term loans. The lender further explained that small businesses seeking financing from CDFIs or mission-based lenders are informed about their true cost of capital through an APR disclosure, and if it can easily collect and report this data point without additional burdens and costs, other small business lenders should be able to. Some commenters who favored APR suggested that the Bureau start with the recent disclosure methods adopted in California and New York, and that the Bureau use those methods for pricing of MCAs and factoring specifically.

Industry stakeholders stated that APR would be complicated and costly to implement, and that if it is used the Bureau should provide clear guidance, with one stakeholder suggesting the Bureau follow the Regulation Z method, which sets out instructions for calculating APR. Another stakeholder stated that for some products, such as inventory financing, APR would be meaningless. Some industry stakeholders suggested the Bureau use other metrics—one requested TCC, another requested rate and fees, and a third asked that the Bureau allow reporting of a single fixed fee as an option.

Finally, some SERs and industry stakeholders also expressed privacy-related concerns regarding public disclosure of pricing information. The Bureau addresses these comments in part VI below regarding privacy considerations involving publication of the 1071 data.

**Proposed Rule**

The Bureau is proposing, in § 1002.107(a)(12), to require financial institutions to report certain pricing information for covered credit transactions. Specifically, proposed § 1002.107(a)(12)(i)(A) would require financial institutions to report the interest rate that is or would be applicable to the covered credit transaction; proposed § 1002.107(a)(12)(ii) would require financial institutions to report the total origination charges for a covered credit transaction; proposed § 1002.107(a)(12)(iii) would require financial institutions to report the broker fees for a covered credit transaction; proposed § 1002.107(a)(12)(iv) would require financial institutions to report the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction; proposed § 1002.107(a)(12)(v) would require financial institutions to report, for an MCA or other sales-based financing transactions, the difference between the amount advanced and the amount to be repaid; and proposed § 1002.107(a)(12)(vi) would require financial institutions to report information about any prepayment penalties applicable to the covered credit transaction.

Proposed comment 107(a)(12)–1 would clarify that, for applications that the financial institution reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports pricing information as "not applicable." Proposed § 1002.107(a)(12) would apply only to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant. The Bureau believes that pricing information is generally available for these transactions because the financial institution would generally have to determine the price to approve (or originate) the transaction. But other applications—like those that are denied, withdrawn by the applicant, or incomplete—would likely have terminated too early in the application process for pricing information to be generally available.

The Bureau is proposing to require financial institutions to report pricing data generally as interest rate and fees rather than APR, TCC, or another single pricing metric that attempts to combine multiple aspects of the cost of credit. The Bureau believes that interest rate and fees provide greater utility to data users than the formula-based pricing

metrics described above, which will aid in fulfilling the purposes of section 1071. Separately enumerating the interest rate and certain general categories of fees will allow 1071 data users to more precisely analyze the components of a credit transaction's price. For example, 1071 data users could identify potentially discriminatory price disparities within upfront fees charged to borrowers at origination that may not be visible in a single pricing metric. Similarly, information about which components of a transaction's price may be relatively more expensive would allow users to better identify business and community development initiatives because they would be able to target their initiative at the particular component, such as the interest rate, that appears to be most responsible for the relatively high price of the transaction.

The diversity of products in the commercial lending space may also undermine the utility of APR or other single pricing metrics. Many MCAs, for example, lack either a defined term or a periodic payment amount. Thus, financial institutions would have to estimate these terms to calculate an APR.

The Bureau also believes that the interest rate and fees may be less burdensome for financial institutions to report than other single pricing metrics. These alternative pricing metrics involve complex calculations that may be difficult for financial institutions to perform accurately. And, as noted above, certain types of commercial financing would require financial institutions to assume or estimate parts of the pricing formula, further increasing complexity. The interest rate and fees, in contrast, are typically listed in the credit contract for a particular transaction.

The Bureau acknowledges that some financial institutions currently calculate APR for commercial financing transactions, or will do so in the future, either as a best practice or to comply with State disclosure laws. In developing the pricing data points in proposed § 1002.107(a)(12), the Bureau has reviewed definitions and concepts found in Regulation Z, such as the definition of "finance charge" in § 1026.4. Regulation Z also forms the basis for many parts of State commercial financing disclosure laws. The Bureau does not intend to achieve a wholesale incorporation of § 1026.4 into proposed § 1002.107(a)(12), with interpretations of one regulation necessarily controlling the meaning of the other regulation. In fact, as discussed below, in many places perfect alignment between proposed

AdminRecord-000523

§ 1002.107(a)(12) and Regulation Z would not be feasible or desirable. But proposed § 1002.107(a)(12) adopts many concepts from Regulation Z. The Bureau believes that this similarity may limit burden for financial institutions that are calculating APR for other purposes.

Regarding State commercial financing disclosures, the Bureau understands that the disclosures under development in New York and California [596] rely upon Regulation Z definitions, such as the finance charge. These States have not fully implemented their disclosures at the time of this notice and may change their standards in the future. In addition, other States might adopt new commercial financing disclosures with different definitions and methodologies. The Bureau will continue to monitor regulatory developments in the small business lending market, and seeks comment on ways to reduce burden on financial institutions with respect to overlaps or conflicts between State law disclosure requirements and the Bureau's proposal.

As a general matter, the Bureau believes that 1071 data can provide value to users without reflecting every factor that influences pricing. For comparison, HMDA data have a long history of utility for fair lending purposes even though they alone generally do not offer proof of compliance with fair lending laws.[597] This proposed rule includes several important factors that influence pricing, such as the credit product, the type of guarantee, and the credit purpose. These data points will help users avoid improper comparisons when examining the 1071 data. The Bureau seeks comment on its proposed approach to this data point, as well as regarding

additional information that could help reduce misinterpretations of disparities in pricing, including modifications to the pricing information in proposed § 1002.107(a)(12). For example, the Bureau seeks comment on whether more information about the nature of the collateral securing the loan is necessary to understanding pricing data, such as total origination charges, applicable to a particular transaction.

*Proposed Rule—107(a)(12)(i) Interest Rate*

Proposed § 1002.107(a)(12)(i)(A) would require financial institutions to report the interest rate that is or would be applicable to the covered credit transaction. If the interest rate is adjustable, proposed § 1002.107(a)(12)(i)(B) would require the submission of the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination.[598]

Proposed comment 107(a)(12)(i)–1 would clarify that if a covered credit transaction includes an initial period with an introductory interest rate, after which the interest rate adjusts, a financial institution complies by reporting information about the interest rate applicable after the introductory period. Proposed comment 107(a)(12)(i)–2 would explain that a financial institution reports the interest rate applicable to the amount of credit approved or originated reported in proposed § 1002.107(a)(8) if a covered credit transaction includes multiple interest rates applicable to different credit features. Lastly, proposed comment 107(a)(12)(i)–3 lists a number of indices to report and directs that if the index used does not appear on the list of indices provided, the financial institution reports "other" and provides the name of the index via free-form text. The Bureau believes that allowing financial institutions to choose "other" when an index that does not appear on the provided list is used would facilitate compliance. In addition, collecting this information on "other" indices would assist the Bureau in monitoring trends in this area and key developments in the small business lending market, which the Bureau could use to inform any future iterations of the list.

The Bureau is proposing to collect the interest rate on the covered credit

transaction because this information furthers both the fair lending purpose and the business and community development purpose of section 1071 by allowing regulators, advocates, and industry to conduct fair lending reviews and monitor the market for emerging high-cost products. In addition, the availability of this pricing metric would provide pricing transparency and could encourage the development of successful lending models because policymakers, community organizations, investors, banks seeking partnerships, and others would be able to see which business models are successful at reaching minority-owned, women-owned, and other underserved small businesses.

As discussed above, research has found that minority-owned businesses tend to obtain, or be offered, higher interest rates on business credit. The collection of interest rate (along with fees) will allow the Bureau, other government agencies, and other data users to have insight into the existing market, monitor the market for potentially troubling trends, and conduct fair lending analyses that adequately take into account this important metric.

As discussed above, during the SBREFA process, several SERs supported the use of APR as a pricing metric. The Bureau notes that certain State level commercial lending disclosures, notably California and New York, require the disclosure of APR.[599] Because the interest rate must be known to calculate APR, the Bureau believes that proposed § 1002.107(a)(12)(i) may impose little burden on financial institutions that already include the interest rate on such disclosures required by State law, as well as on the contract between the financial institution and the applicant.

Proposed § 1002.107(a)(12)(i)(B) would provide that, for adjustable interest rates based upon an index, a financial institution must report the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination. Just as the disclosure of the interest rate for fixed rate transactions will allow data users to ascertain the interest rate applicable to the covered credit transaction throughout its cycle, the Bureau believes that these three elements will allow data users to do the same for adjustable rate transactions based upon an index and improve the

---

[596] Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo. legislature.ca.gov/faces/billTextClient.xhtml?bill_ id=201720180SB1235;* 2020 N.Y. Sess. Laws ch. 369. The New York and California commercial financing disclosure laws are discussed in more detail below in relevant provisions.

[597] For example, the FFIEC cautions users of HMDA data that "HMDA data are generally not used alone to determine whether a lender is complying with fair lending laws." Bureau of Consumer Fin. Prot., *FFIEC Announces Availability of 2020 Data on Mortgage Lending* (2021), *https:// www.consumerfinance.gov/about-us/newsroom/ ffiec-announces-availability-of-2020-data-on- mortgage-lending/; see also* Bureau of Consumer Fin, Prot., *Data Point: 2019 Mortgage Market Activity and Trends,* at 36 (2020), *https:// files.consumerfinance.gov/f/documents/cfpb_2019- mortgage-market-activity-trends_report.pdf* (explaining that when examiners for the Federal banking agencies evaluate an institution's fair lending risk, they analyze HMDA price data, loan application outcomes, and explanatory factors, in conjunction with other information and risk factors, which can be drawn directly from loan files or electronic records maintained by lenders, in accordance with the Interagency Fair Lending Examination Procedures).

[598] It should be noted that not all covered credit transactions include an interest rate. Proposed § 1002.107(a)(12)(v) would apply to certain covered credit transactions that do not include an interest rate. The discussion of proposed § 1002.107(a)(12)(iv) below also addresses other covered credit transactions that may not include an interest rate.

[599] Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo. legislature.ca.gov/billTextClient.xhtml?bill_ id=201720180SB1235;* 2020 N.Y. Sess. Laws ch. 369.

utility of such data. Proposed comment 107(a)(12)(i)–4 would clarify that a financial institution complies with proposed § 1002.107(a)(12)(i)(B) by reporting the index value at the time the application is approved by the financial institution. The Bureau seeks comment on whether the index value should be reported based on a different time period or if at the time of approval is the most appropriate measure.

The Bureau seeks comment on proposed § 1002.107(a)(12)(i) and its commentary, including whether a different measure of pricing would provide more accurate data, whether additional information about pricing (for example, amortization type or adjustment frequency) would provide beneficial data to help ascertain fair lending risk and further the business and community development purpose of section 1071, and whether there are additional indices that should be included in the list from which financial institutions choose to report the applicable index on adjustable rate transactions.

The Bureau also seeks comment on whether there may be covered credit transactions where the interest rate may change after origination based on factors such as if the borrower maintains an account at the financial institution or if some other condition is met, and if so, whether additional commentary would be helpful to provide more guidance on which rate to report in that circumstance.

### Proposed Rule—107(a)(12)(ii) Total Origination Charges

Proposed § 1002.107(a)(12)(ii) would require financial institutions to report the total origination charges for a covered credit transaction. Total origination charges are the total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars.

Proposed comment 107(a)(12)(ii)–1 would clarify that charges imposed uniformly in cash and credit transactions are not reportable. Proposed comment 107(a)(12)(ii)–2 would provide guidance on reporting charges imposed by third parties. Proposed comment 107(a)(12)(ii)–3 would clarify that broker fees are included in the total origination charges.[600] Proposed comment 107(a)(12)(ii)–4 would provide guidance

on reporting charges for other products or services paid at or before origination. And proposed comment 107(a)(12)(ii)–5 would list examples of reportable charges.

The Bureau understands that financial institutions charge a variety of fees when originating credit for small business applicants. For example, financial institutions may charge fees for processing an application, for underwriting, for filing a UCC–1 statement, for obtaining an appraisal, for obtaining a guarantee through a Federal agency program, and for other activities related to origination. Depending on the financial institution and the credit product, similar fees may take different names. One financial institution may describe a charge as an origination fee, while another describes a similar charge as an underwriting or documentation fee. Proposed § 1002.107(a)(12)(ii) would provide information about the total amount of all upfront fees charged for originating and extending credit, regardless of how such fees are denominated.

Information about the total origination charges would benefit 1071 data users by giving them relatively granular pricing data. Much of the research on access to credit in the small business lending environment has lacked information about upfront fees,[601] or has used less granular pricing metrics.[602] Proposed § 1002.107(a)(12)(ii) would enable users to examine the contribution upfront costs make to the price of credit in the small business lending market. For example, users could analyze pricing disparities specifically in upfront charges to borrowers or borrowers in certain communities. Users could also look at total origination charges to better understand the relationship between the elements of credit pricing such as by examining the trade-offs between the interest rate and the upfront charges. Empowering users to engage in this level of analysis would aid in fulfilling the fair lending and business and

community development purposes of the statute.

In developing the total origination charges data point, the Bureau considered definitions and concepts in existing regulations. In particular, Regulation Z § 1026.4 contains a measure of the cost of credit: The finance charge. Regulation Z § 1026.4 defines the finance charge as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." The finance charge appears in numerous regulatory provisions governing consumer financial services, such as disclosures to borrowers in certain mortgage transactions,[603] and calculation of the APR.[604]

Proposed § 1002.107(a)(12)(ii)'s description of total origination charges is similar to Regulation Z's definition of the finance charge. As with the finance charge, proposed § 1002.107(a)(12)(ii) would exclude charges imposed uniformly in cash and credit transactions.[605] Proposed § 1002.107(a)(12)(ii) would use a similar test for including fees and amounts charged by someone other than the financial institution.[606] And proposed § 1002.107(a)(12)(ii) adopts the same approach toward including broker fees in the total origination charges that Regulation Z takes toward including mortgage broker fees in the finance charge.[607] With respect to charges for other products or services that the applicant pays at or before origination, proposed comment 107(a)(12)(ii)–4 would explain that such charges are included in the total origination charges only if the financial institution requires the purchase of such other product or service. Regulation Z does not adopt a uniform approach to services bundled with the credit transaction. But charges or premiums for credit insurance or debt cancellation coverage are included in the finance charge if the creditor requires the purchase of such additional services.[608]

Proposed § 1002.107(a)(12)(ii), however, differs in important ways from Regulation Z's definition of the finance charge. First, proposed § 1002.107(a)(12)(ii) is narrower than the finance charge. The finance charge includes certain credit costs that are

---

[600] For more information on broker fees, see the section-by-section analysis of proposed § 1002.107(a)(12)(iii) below.

[601] See, e.g., Minority Bus. Dev. Agency, U.S. Dep't of Com., *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs,* at 3, 5, 21, 36–37 (2010), *https://archive.mbda.gov/page/executive-summary-disparities-capital-access-between-minority-and-non-minority-businesses.html.*

[602] See, e.g., Opportunity Fund, *Unaffordable and Unsustainable: The New Business Lending on Main Street* (2016), *https://aofund.org/news/unaffordable-and-unsustainable-new-business-lending/* (analyzing 150 alternative loans (*i.e.,* from nondepository lenders or marketplaces, generally obtained online) to small businesses and finding an average APR of 94 percent).

[603] See Regulation Z § 1026.38(o)(2).

[604] See appendix J to Regulation Z.

[605] Compare proposed comment 107(a)(12)(ii)–1, *with* Regulation Z comment 4(a)–1.

[606] Compare proposed comment 107(a)(12)(ii)–2, *with* Regulation Z § 1026.4(a)(1).

[607] Compare proposed comment 107(a)(12)(ii)–3, *with* Regulation Z § 1026.4(a)(3).

[608] Regulation Z § 1026.4(d)(1) and (3).

AdminRecord-000525

imposed after a financial institution originates a transaction, such as interest and time-price differential.[609] Proposed § 1002.107(a)(12)(ii), on the other hand, is limited to charges at or before origination, because other proposed pricing data points, such as the interest rate and initial annual charges, capture information about the cost of credit over the life of the transaction. Second, within its scope, proposed § 1002.107(a)(12)(ii) is more comprehensive than the finance charge. The finance charge excludes many upfront costs of obtaining credit. For example, the finance charge excludes application fees charged to all applicants for credit, and numerous fees in transactions secured by real property.[610] Proposed § 1002.107(a)(12)(ii) contains no similar exclusions. The Bureau believes that many of the upfront fees omitted from the finance charge, such as application fees, are typical of small business credit transactions, and therefore including such charges helps data users to understand pricing in the small business lending market. Additionally, a measure of origination charges with numerous exclusions may encourage financial institutions to shift costs to the excluded fees, where they would be hidden from users of the 1071 data. Finally, proposed § 1002.107(a)(12)(ii) is simpler than the Regulation Z definition of finance charge, which the Bureau believes may improve the likelihood that the information is accurately reported.

As discussed above, during the SBREFA process, some SERs supported use of APR as a pricing metric, including several who stated that they currently calculate APR. Several SERs supported the use of APR to enable comparisons of pricing across various small business lending products, and suggested the Bureau look to State-mandated and Truth in Lending Act APR disclosures for guidance on methodologies. Of the pricing metrics asked about in the SBREFA Outline, a majority of the community groups and community development lenders who supported inclusion of a pricing data point preferred use of APR, though some suggested the Bureau also require submission of a rate spread with the APR, as well as rate spread as reported under HMDA. Some commenters who favored APR suggested that the Bureau start with the recent disclosure methods adopted in California and New York, and that the Bureau use those methods

for pricing of MCAs and factoring specifically. As discussed above, the Bureau is proposing to require financial institutions generally to report interest rate and fees, rather than APR. But in developing proposed § 1002.107(a)(12)(ii)'s definition of total origination charges, the Bureau has adapted certain language and concepts from Regulation Z's definition of the finance charge. Because the finance charge must be known to calculate APR, including the APR that would be disclosed under California and New York law,[611] the Bureau believes that proposed § 1002.107(a)(12)(ii) may impose less burden on financial institutions and improve the likelihood that the information is accurately reported as compared to a measure of total origination charges that had no similarity to the finance charge.

For the reasons given above, proposed § 1002.107(a)(12)(ii) would require financial institutions to report the total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars. Proposed § 1002.107(a)(12)(ii) would apply to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant. The Bureau seeks comment on proposed § 1002.107(a)(12)(ii) and its commentary. For example, the Bureau seeks comment on whether concepts and guidance adapted from Regulation Z, such as proposed comment 107(a)(12)(ii)–1 on comparable cash transactions, are applicable in the small business lending context such that they should be incorporated as drafted. The Bureau also seeks comment on whether to enumerate certain types of charges separately in the 1071 data, and whether to include or exclude certain types of charges in the total origination charges.

Proposed Rule—107(a)(12)(iii) Broker Fees

Proposed § 1002.107(a)(12)(iii) would require financial institutions to report the broker fees for a covered credit transaction. Broker fees are the total amount of all charges included in the

total reportable origination charges that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars.

Proposed comment 107(a)(12)(iii)–1 would provide an example of reporting different types of broker fees. Proposed comment 107(a)(12)(iii)–2 would clarify that financial institutions would use a "best information readily available" standard regarding fees paid directly to a broker by an applicant.

The Bureau believes that small business loan brokers are an important part of the small business lending market, and may feature more prominently in certain financing arrangements, such as MCAs. The existence of brokers creates opportunities for potential practices that inflate the cost of small business credit. For example, compensation that is tied to the terms of a loan may encourage brokers to steer applicants to financial institutions offering less favorable terms. Because of the potential risks involved in multi-party business arrangements, the FFIEC's Interagency Fair Lending Examination Procedures emphasize the importance of understanding the role that brokers play in a financial institution's lending process.[612] These risks may be heightened in the small business lending market because applicants lack the substantive protections afforded to consumer credit applicants, such as the prohibition on basing loan originator compensation on the terms of a transaction.[613]

Accordingly, proposed § 1002.107(a)(12)(iii) would provide information about the broker fees associated with a transaction. Although broker fees are included in proposed § 1002.107(a)(12)(iii)'s definition of total origination charges, separately enumerating the total broker fees would allow users to better understand the role that brokers play in the price of small business credit. For example, users could analyze whether broker fees specifically appear to be creating fair lending risk or higher prices for certain

---

[609] *Id.* § 1026.4(b)(1).
[610] *Id.* § 1026.4(c)(1) (application fees) and (7) (real-estate related fees).

---

[611] The New York and California disclosure laws currently add various costs to the Regulation Z finance charge depending on the credit product. *See* Cal. Dep't of Fin. Prot. & Innovation, Proposed Commercial Financing Disclosures (S.B. 1235) (Apr. 7, 2021), *https://dfpi.ca.gov/wp-content/uploads/sites/337/2021/04/2021-04-07-SB-1235-With-Redlines-FINAL-for-Publication.pdf*; 2020 N.Y. Sess. Laws ch. 369, 801(e).

---

[612] Fed. Fin. Insts. Examination Council, *Interagency Fair Lending Examination Procedures,* at 3 (2009), *https://www.ffiec.gov/PDF/fairland.pdf* (instructing examiners to consider an institution's organization of its credit decision-making process, including identification of the delegation of separate lending authorities and the extent to which discretion in pricing or setting credit terms and conditions is delegated to various levels of managers, employees, or independent brokers or dealers and an institution's loan officer or broker compensation program).
[613] Regulation Z § 1026.36 (implementing TILA's prohibition on basing loan originator compensation on loan terms).

communities. Empowering users to engage in this level of analysis would aid in fulfilling the fair lending and business and community development purposes of the statute.

The Bureau believes, however, that financial institutions may have difficulty reporting broker fees that an applicant pays directly to a broker. Proposed comment 107(a)(12)(iii)–2 would clarify that a financial institution would rely on the best information readily available to the financial institution at the time final action is taken. Information readily available could include, for example, information provided by an applicant or broker that the financial institution reasonably believes regarding the amount of fees paid by the applicant directly to the broker. The "best information readily available" standard is used in reporting certain HMDA data under Regulation C,[614] and the Bureau believes it may also be appropriate for reporting fees paid directly to a broker by an applicant.

For the reasons given above, proposed § 1002.107(a)(12)(iii) would require financial institutions to report the total amount of all charges included in proposed § 1002.107(a)(12)(ii) that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars. Proposed § 1002.107(a)(12)(iii) would apply to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant. The Bureau seeks comment on proposed § 1002.107(a)(12)(iii) and its commentary, including on the knowledge that financial institutions might have about direct broker fees and the challenges of reporting such information.

Proposed Rule—107(a)(12)(iv) Initial Annual Charges

Proposed § 1002.107(a)(12)(iv) would require financial institutions to report the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars.

Proposed comment 107(a)(12)(iv)–1 would provide an example of how to calculate the amount to report. Proposed comment 107(a)(12)(iv)–2 would highlight that a financial institution should exclude interest expenses from the initial annual charges reported. Proposed comment 107(a)(12)(iv)–3 would note that a financial institution

should not include any charges for events that are avoidable by the applicant, including for example, charges for late payment, for exceeding a credit limit, for delinquency or default, or for paying items that overdraw an account. Proposed comment 107(a)(12)(iv)–4 would provide examples of initial annual charges that may be scheduled to be imposed during the initial annual period, including monthly fees, annual fees, and other similar charges. Finally, proposed comment 107(a)(12)(iv)–5 would clarify that a financial institution complies with the provision by reporting as the default the highest amount for a charge scheduled to be imposed, and provides an example of how to calculate the amount reported when the scheduled fee to be imposed may be reduced based upon a specified occurrence.

The Bureau understands that there are a variety of ways that small business loans may be structured. This could include whether there is an interest rate imposed on the transaction, whether there are finance charges, and whether there are a myriad of other fees that may be scheduled to be paid or are contingent upon some occurrence. In addition, the Bureau understands from its market monitoring activity that covered credit transactions may include scheduled fees that encompass a substantial part of the cost of the covered credit product, and without knowledge of those fees, the cost of the credit would be misleading. The Bureau believes that proposed § 1002.107(a)(12)(iv) would enable data users to have a more accurate understanding of the cost of the covered credit transaction than if the data lacked information about scheduled fees.

As noted above, the Bureau believes that there may be small business loans that do not include an interest rate, but do include a monthly finance charge that is imposed on the covered credit transaction.[615] If the financial institution were only required to report the interest rate on these types of transactions, the true cost of credit would be wholly inaccurate because the monthly finance charge would not be reported. In addition, small business loans, like consumer loans, may include a number of other fees, such as annual fees and other similar charges. The information collected and reported under proposed § 1002.107(a)(12)(iv) would allow data users to have a more

complete picture of the cost of the covered credit transaction and promote market transparency, thus furthering the business and community development purpose of section 1071. In addition, this pricing data could further the fair lending purpose of section 1071 as it could enhance the ability to effectively and efficiently enforce fair lending laws.

Proposed § 1002.107(a)(12)(iv) would provide that a financial institution only report charges scheduled to be imposed over the first annual period of the covered credit transaction. The Bureau believes that by only requiring scheduled charges to be reported (rather than the submission of all potential charges, some of which could be speculative), the data reported will be more accurate than if a financial institution had to make an educated guess as to what charges will be imposed over the first annual period. Proposed § 1002.107(a)(12)(iv) would not require a financial institution to itemize the charges reported thereunder. The Bureau believes that requiring charges to be itemized could add a considerable amount of complexity for financial institutions in collecting and reporting the initial annual charges, given the range of fees that could be charged and the variations in how they might be imposed. The Bureau seeks comment on the likelihood that FIs would schedule charges in the second year of a covered credit transaction and beyond specifically in an effort to avoid reporting the charges for purposes of 1071.

A financial institution complies with proposed § 1002.107(a)(12)(iv) by not including charges for events that are avoidable by the applicant; this restriction is explained more fully in proposed comment 107(a)(12)(iv)–3, which would provide examples of types of avoidable charges. As noted above, the Bureau believes that the accuracy of the data reported is enhanced by only including charges that are scheduled to be imposed and not including potential charges that are contingent upon an action (or inaction) by the borrower. The Bureau also believes that only requiring financial institutions to report such charges for the first year, and not the life of the loan, will minimize any burden associated with reporting the data. This information should be included in the contract and, at most, would require a simple calculation to arrive at the total charges for the initial annual period. An example of how to calculate the initial annual charges for the first annual period is found in proposed comment 107(a)(12)(iv)–1. The Bureau also seeks comment on how it should treat situations where the applicant has

---

[614] *See* Regulation C comments 4(a)(31)–4 and 4(a)(32)–5.

[615] Proposed comment 107(a)(12)(iv)–2 would clarify that financial institutions should not report the interest scheduled to be imposed in the first year under proposed § 1002.107(a)(12)(iv).

AdminRecord-000527

informed the financial institution that it expects to regularly incur "avoidable charges," for example where an applicant intends to pay late each month, such that a late fee, which would otherwise be an avoidable charge and not reportable under this provision, is in effect no longer contingent. Specifically, the Bureau seeks comment on whether such charges should be reported as a scheduled charge.

Proposed comment 107(a)(12)(iv)–5 would provide additional explanation about what amount to report when the financial institution provides a discount on the charge if certain conditions are met. The Bureau understands that some financial institutions may provide a discount on specific charges when certain conditions are met. For example, a financial institution may provide a discount on a monthly charge if the borrower maintains a checking account at the financial institution. In such a circumstance, proposed § 1002.107(a)(12)(iv) would require the financial institution to report the non-discounted amount to maintain consistency across the data that is reported by all financial institutions.

The collection of initial annual charges was not discussed during the SBREFA process. However, during that process several SERs remarked that pricing is complex and often unique to the applicant's situation, and may involve extra services bundled with the loan, and without adequate context pricing data could lead to inaccurate interpretations and reputational damage to financial institutions. The Bureau believes that the submission of initial annual charge data will help to decrease the likelihood of inaccurate interpretations and provide additional context by giving a more complete picture of the pricing of each covered credit transaction.

For the reasons given above, proposed § 1002.107(a)(12)(iv) would require submission of the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars. The Bureau seeks comment on proposed § 1002.17(a)(12)(iv) and its commentary, including whether to include or exclude certain types of charges as reportable under initial annual charges.

Proposed Rule—107(a)(12)(v) Additional Cost for Merchant Cash Advances or Other Sales-Based Financing

Proposed § 1002.107(a)(12)(v) would require financial institutions to report additional cost data for MCAs or other sales-based financing transactions.

Specifically, this cost is the difference between the amount advanced and the amount to be repaid, expressed in dollars. Proposed comment 107(a)(12)(v)–1 would provide an example of the difference between the amount advanced and the amount to be repaid for an MCA.

As discussed above, the Bureau is proposing several data points to provide information on pricing in the small business lending market. These pricing data points would provide information about the interest rate and fees applicable to a covered credit transaction. Some types of commercial financing, however, contain pricing terms that are difficult to reflect in data points about a transaction's interest rate and fees. For example, under a typical MCA, a merchant receives a cash advance and promises to repay it (plus some additional amount) to the MCA provider. MCA providers generally do not provide an interest rate, and while they may charge fees at origination or during the first year, the majority of an MCA's cost comes from the additional amount repaid by the merchant on top of the cash advance. This additional amount may be expressed as a multiple of the amount advanced in the form of a factor rate or percentage, or it may be derived by comparing the total payback amount to the amount actually advanced. This additional amount is typically not characterized as interest, so it would not be reported under proposed § 1002.107(a)(12)(i). Nor is this additional amount characterized as a fee charged at origination or scheduled to be imposed during the first year after the transaction, so it would not be reported under proposed § 1002.107(a)(12)(ii) or (iv). Without an additional pricing data point to capture this additional amount due, users attempting to analyze MCA pricing for fair lending or business and community development purposes would miss most of the cost of credit associated with these transactions. Therefore, the inclusion of this data point would aid in fulfilling the fair lending and business and community development purposes of the statute.

At the same time, the Bureau believes that information about the additional amount repaid by the merchant would impose relatively low burden on financial institutions. A typical MCA contract lists the amount of future revenue purchased and the purchase price. A financial institution could determine the additional amount repaid by computing the difference between these two numbers.

For the reasons discussed above, proposed § 1002.107(a)(12)(v) would

require financial institutions to report, for an MCA or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid, expressed in dollars. Proposed § 1002.107(a)(12)(v) would apply to credit transactions that either have been originated or have been approved by the financial institution but not accepted by the applicant. The Bureau seeks comment on proposed § 1002.107(a)(12)(v) and proposed comment 107(a)(12)(v)–1, including whether to require additional pricing information for MCAs, and whether MCAs could be structured in ways that evade the proposed reporting requirement, such as by omitting or making variable the amount to be repaid.

Proposed Rule—107(a)(12)(vi) Prepayment Penalties

Proposed § 1002.107(a)(12)(vi)(A) would require financial institutions to report whether the financial institution could have included a prepayment penalty under the policies and procedures applicable to the covered credit transaction. Proposed § 1002.107(a)(12)(vi)(B) would require financial institutions to report whether the terms of the covered credit transaction include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due. Proposed comment 107(a)(12)(vi)–1 would provide additional information on how to determine whether the applicable policies and procedures allow a financial institution to include prepayment penalties in the loan agreement.

The Bureau understands, through its market monitoring function, that small business loan contracts may include prepayment penalties and the penalties can be sizable and structured as a percent of the remaining outstanding balance. The Bureau also understands that there may be concern among stakeholders, including community groups, that certain small business applicants may be steered toward loans containing prepayment penalty terms. The collection of data regarding which contracts contain a prepayment penalty and whether a prepayment penalty could have been imposed on specific contract types allows the data to be analyzed for fair lending purposes to see if certain groups may be steered into contracts containing prepayment penalties. Assuming that prepayment penalty data would be part of the publicly available data, from a market competition standpoint, financial institutions may want to know how

frequently their competitors are utilizing prepayment penalties. Thus, these data could help further the business and community development purpose of section 1071 by promoting market transparency and new product development opportunities.

Proposed § 1002.107(a)(12)(vi)(A) would require financial institutions to report whether the financial institution could have included a prepayment penalty under the policies and procedures applicable to the covered credit transaction, while proposed § 1002.107(a)(12)(vi)(B) would require financial institutions to report whether the terms of the covered credit transaction actually include a prepayment penalty term. The provisions would allow data users to determine what percentage of covered credit transactions could contain a prepayment penalty term, what percentage of such transactions actually contain the term, and, together with other data points, the demographic profile of borrowers whose contracts do and do not include the term. The Bureau believes the two provisions work together to allow data users to better determine whether certain borrowers are being steered towards covered credit transactions containing prepayment penalty terms.

Proposed comment 107(a)(12)(vi)–1 would elaborate on the requirement to report whether financial institutions could have included a prepayment penalty in the covered credit transaction to clarify that the applicable policies and procedures are those that the financial institution follows when evaluating applications for the specific credit type and credit purpose requested. The Bureau believes this provision will ensure that similar credit products are being analyzed together and minimize the possibility that potential fair lending risk is incorrectly identified.

For the reasons given above, proposed § 1002.107(a)(12)(vi)(A) would require financial institutions to report whether the financial institution could have included a prepayment penalty under the policies and procedures applicable to the covered credit transaction. Proposed § 1002.107(a)(12)(vi)(B) would require financial institutions to report whether the terms of the covered credit transaction include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

The Bureau seeks comment on proposed § 1002.107(a)(12)(vi) and its commentary, including whether to enumerate other types of contingent charges separately in the 1071 data to

more accurately reflect the cost of covered credit transactions. The Bureau also seeks comment on whether there are alternative data that would provide similar insight into whether certain borrowers are being steered into covered credit transactions containing prepayment penalty terms or other similar contingent terms.

### 107(a)(13) Census Tract

#### Background

Section 1071 requires financial institutions to collect and report "the census tract in which is located the principal place of business of the . . . applicant." [616] This provision is similar to Regulation C, which requires reporting of the census tract in certain circumstances if the property securing the loan (or proposed to secure the loan, if the transaction was not originated) is in a county with a population of more than 30,000.[617] Under Regulation C, the financial institution generally finds the census tract by geocoding using the address of the property. Geocoding is the process of using a particular property address to locate its geographical coordinates and the corresponding census tract.

CRA reporting of business loans by depository institutions also requires reporting of census tract. The Bureau understands that CRA allows reporting of a census tract based on the address or location where the proceeds of the credit will be principally applied.[618]

#### SBREFA Proposals Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau explained that it was considering proposing that financial institutions report a census tract based on an address collected in the application, or during review or origination of the loan.[619] The financial institution would use the address where the loan proceeds will principally be applied, if that address is known to the financial institution, which the Bureau believes would be more useful to carry out the community development and fair lending purposes of section 1071. For example, if a financial institution makes a loan to a small business to buy or improve commercial real estate, the location of the real estate is more relevant to section 1071's statutory purposes than the location of the main office. If the financial institution does

not possess that information, the financial institution would use the location of the small business borrower's main office or headquarters. If that, too, is unknown, the financial institution could use another business address associated with the application. The financial institution would also report which of these address types it is using, unless that information is unknown: (1) The address where the loan proceeds will principally be applied; or (2) the location of the small business borrower's main office or headquarters; or (3) some other business address, including those for which the financial institution is unsure about the nature of the address.

In response to the SBREFA Outline, SERs explained that they generally capture the main office address of small business applicants, which for sole proprietors is frequently a home address; the address where the loan proceeds will be used is typically captured for commercial real estate transactions.[620] Some of the SERs stated that they do not know the proceeds address, and one suggested that for simplicity the Bureau should use the business address only.

A number of SERs explained that they have experience geocoding addresses to obtain census tract information—such as for CDFI Fund reporting, voluntary CRA reporting, or for reporting mortgage loans under HMDA—though some did not. Some SERs suggested that a requirement to report a geocoded census tract for financial institutions that do not do so now would impose costs on the financial institution and possibly the borrower. One SER stated that few nondepository institutions collect or are even familiar with census tract data. One SER recommended following the format used for CRA reporting of census tract information, rather than the slightly different format used under HMDA. Another SER suggested that the Bureau provide simple instructions for reporting census tract and employ less burdensome geocoding requirements than exist for HMDA. Several SERs explained that they use a free service available through the FFIEC to convert addresses they receive from applicants to census tract data. A few SERs suggested that the Bureau should provide or support a Federal government-sponsored system for the secure batch processing of address data to convert to census tract information that could be used to satisfy geocoding requirements across multiple reporting regimes including 1071.

---

[616] ECOA section 704B(e)(2)(E).

[617] Regulation C § 1003.4(a)(9)(ii)(C). Regulation C also requires reporting of the property address for all applications.

[618] See 2015 FFIEC CRA Guide at 16.

[619] SBREFA Outline at 30–31.

---

[620] SBREFA Panel Report at 29.

AdminRecord-000529

The SBREFA Panel recommended that the Bureau seek comment on the feasibility and ease of using existing Federal services to geocode addresses in order to determine census tract for 1071 reporting purposes (such as what is offered by the FFIEC for use in reporting HMDA data).[621]

Stakeholders commenting on the SBREFA Outline explained that financial institutions do not currently collect census tract information unless they need to report it as a CDFI, or for CRA or HMDA. Some commenters stated that they use the free FFIEC tool for geocoding, though one commenter pointed out that this service does not allow batch processing. One commenter requested that financial institutions be given a safe harbor if the tool used provides an incorrect coding. The comments, like the SER feedback, did not suggest a problem with the waterfall approach in the SBREFA Outline. There were concerns about proceeds locations not having addresses, and proceeds addresses being unknown to the financial institution, but the waterfall would allow them to simply use another address. One commenter stated that not requiring a specific type of address would help avoid burdening financial institutions. Another commenter stated that it had no reason to ask applicants about the proceeds address, and one requested that the Bureau make clear that a financial institution has no obligation to ask about the proceeds or headquarters address if it does not do so now. Several commenters stated that allowing use of the proceeds address was helpful, and would further section 1071's purposes and reduce burden by allowing use of the same data as reported under CRA. Two commenters stated that the Bureau should align this data point with the CRA, and one of these, a community development organization, stated that the CRA method for reporting census tract was easier than the HMDA method. This commenter provided statistical evidence suggesting that the CRA method also yielded more complete data than the HMDA method.

Proposed Rule

The Bureau is proposing § 1002.107(a)(13) to require financial institutions to collect and report the census tract data point using a "waterfall" approach, which closely aligns with the Bureau's proposal under consideration in the SBREFA Outline. The proposed rule would require a financial institution to collect and report the census tract in which is

located: (i) The address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or (ii) If the information in (i) is unknown, the address or location of the main office or headquarters of the applicant; or (iii) If the information in both (i) and (ii) is unknown, another address or location associated with the applicant. In addition, the proposed rule would require that the financial institution also indicate which one of the three types of addresses or locations listed in (i), (ii), or (iii) the census tract is based on. Although the proposed rule does not specifically require it, the Bureau assumes that financial institutions or their vendors would generally use a geocoding tool to convert the appropriate address to a census tract number.

The Bureau believes that its proposed reporting method for the census tract data point leverages existing industry information collection practices and would result in useful information to further section 1071's purposes while avoiding imposing much additional burden on financial institutions. The waterfall method in the proposed regulation would achieve these goals by allowing a financial institution to report an address it already has, with no further investigation; allowing a financial institution to avoid further investigation when it is unsure about the nature of the address reported; and allowing CRA reporters to report the same address for 1071 as they do for CRA;[622] while also increasing the likelihood of the proceeds address being reported. The Bureau considers the census tract of the proceeds address to be particularly useful for both the fair lending and business and community development purposes of 1071.

First, the proposed approach would require a financial institution to report the census tract of the proceeds address if it is available, but would not require a financial institution to ask about it specifically. Financial institutions would be able to apply the waterfall approach to the addresses they are currently collecting; they would not be required to specifically ask for the proceeds or headquarters addresses. In addition, the proposed method would allow a financial institution to report that it is unsure about the nature of the

address if it has no information as to the nature or function of the business address it possesses. This provision should address potential concerns about reporters spending time on complex, fact-specific questions and unintentionally misreporting this data point when financial institution staff have to determine what kind of address they are reporting based on insufficient information. The Bureau believes that this option would be particularly helpful if the application were denied or withdrawn early in the application process before the nature of any address provided by the applicant is clear.

Proposed comment 107(a)(13)–1 would provide general instructions on using the waterfall reporting method, with examples for guidance. The Bureau believes that this comment would facilitate compliance and seeks comment on whether any additional instructions or examples would be useful.

Proposed comment 107(a)(13)–2 would explain that a financial institution complies with proposed § 1002.107(a)(13) by identifying the appropriate address or location and the type of that address or location in good faith, using appropriate information from the applicant's credit file or otherwise known by the financial institution. The comment would also make clear that a financial institution is not required to investigate beyond its standard procedures as to the nature of the addresses or locations it collects. The Bureau believes that this guidance strikes the right balance by allowing flexibility in reporting, and also requiring appropriate good faith compliance in exercising that flexibility, thereby yielding quality data.

Proposed comment 107(a)(13)–3 would explain that pursuant to proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes at least one address or location for an applicant for census tract reporting. However, the comment would further explain that if a financial institution is nonetheless unable to collect or otherwise determine any address or location for an application, the financial institution reports that the census tract information is "not provided by applicant and otherwise undetermined." Based on the Bureau's understanding of how financial institutions currently define an application under their internal procedures, the Bureau believes it is highly unlikely that a financial institution would not obtain some type of address for the applicant.

---

[621] Id. at 46.

[622] As explained above, the Bureau understands that CRA allows reporting of a census tract based on the address or location where the proceeds of the credit will be principally applied. The Bureau also believes that CRA reporting on this data point is reasonably flexible, and a financial institution would be able to coordinate the two compliance regimes to report the same census tract.

Nonetheless, the Bureau is proposing to permit financial institutions to report this data point using the "not provided by applicant and otherwise undetermined" response in order to facilitate compliance in those rare instances when the financial institution does not have the data requested. The reference in the comment to proposed § 1002.107(c)(1) would make clear, however, that a financial institution must maintain procedures reasonably designed to collect at least one address. As with the previous comment, the Bureau believes that this comment would strike the right balance by facilitating compliance and also emphasizing the requirement to collect appropriate data.

The Bureau is proposing a safe harbor in § 1002.112(c)(1), which would state that an incorrect entry for census tract is not a violation of ECOA or subpart B if the financial institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. Proposed comment 107(a)(13)–4 would cross-reference that provision.[623] See the section-by-section analysis of proposed § 1002.112(c)(1) below for additional discussion of this safe harbor.

The Bureau notes that section 1071's description of the census tract data point refers to the census tract for the applicant's "principal place of business."[624] The Bureau considers the waterfall approach in proposed § 1002.107(a)(13) to be a reasonable interpretation of the undefined statutory term "principal place of business," which the Bureau understands not to have a standard definition, and thus believes to be ambiguous. First, the Bureau believes that the address or location of the main office or headquarters of the applicant fits easily into one of the common meanings of "principal place of business." In addition, the Bureau expects that, generally, the address where the loan proceeds will be applied will also be the main office or headquarters address.[625]

The primary exception to this principle would be in the case of credit intended for purchase, construction/, or refinancing of real estate; under these circumstances, the Bureau reasonably interprets the term "principal place of business" to mean, in essence, the principal location for business activities relating to the extension of credit at issue. Although "another address or location associated with the applicant" may not always be the principal place of business of the applicant, the Bureau considers this information to be the financial institution's best option for reporting data on the principal place of business when the nature of a location is unknown.

In the alternative, section 1071 authorizes the Bureau to include any "additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau has determined that requiring reporting of the proceeds address would aid in fulfilling both the fair lending and business and community development purposes of section 1071 by providing more useful information on the location of the credit activity for fair lending analysis and understanding where the business and community development is occurring. Requiring reporting of another address or location associated with the applicant when both the proceeds address and the main office or headquarters address are not available would provide location data when otherwise none would be present, thus also aiding in fulfilling both the fair lending and business and community development purposes of section 1071 by providing more useful information on the location of the lending for fair lending analysis and understanding where the business and community development is likely occurring. In addition, requiring data on the nature of the address reported would aid in

fulfilling both the fair lending and business and community development purposes of section 1071 by facilitating accurate analyses of the data reported. Also, in the alternative, the Bureau believes it would be appropriate to use its exception authority under 704B(g)(2) to provide that financial institutions would not report the "main office or headquarters address" in certain situations because the Bureau believes that the proceeds address and "another address or location associated with the applicant" would carry out the purposes of section 1071 more appropriately than requiring the main office or headquarters address in every situation.

As discussed above, some SERs explained that they generally collect the main office address of the small business, which for sole proprietorships will often be a home address, and are generally not aware of the proceeds address. The Bureau's proposed waterfall approach accommodates this situation by allowing financial institutions to report census tract using the address that they have. In regard to SERs' concerns about the potential burden of geocoding addresses to obtain census tract, the Bureau notes that there does not appear to be a viable alternative to collecting and reporting the statutorily required census tract data without geocoding. While several SERs are already geocoding applicants' addresses, some SERs were concerned about the burden associated with geocoding for HMDA and one expressed a preference for the CRA method of geocoding, as did several other stakeholders. Accordingly, the Bureau seeks comment on the difference between geocoding for HMDA and for CRA, and any specific advantages or disadvantages associated with geocoding under either method. In regard to a Federal government tool capable of batch processing for geocoding of addresses, the Bureau is considering the utility of such a tool. The Bureau notes that the proposed rule would provide a safe harbor for use of such a Bureau tool, if created, as well as for the currently existing FFIEC tool. As the SBREFA Panel recommended, the Bureau seeks comment on the feasibility and ease of using existing Federal services to geocode addresses in order to determine census tract for 1071 reporting purposes (such as what is offered by the FFIEC for use in reporting HMDA data).

The Bureau seeks comment on its proposed approach to the census tract data point. In addition to the specific requests for input above, the Bureau notes that the waterfall method is intended to allow CRA reporters to

---

[623] Proposed comment 112(c)(1)–1 would explain that "this safe harbor provision does not extend to a financial institution's failure to provide the correct census tract number for a covered application on its small business lending application register, as required by § 1002.107(a)(13), because the FFIEC or Bureau geocoding tool did not return a census tract for the address provided by the financial institution. In addition, this safe harbor provision does not extend to a census tract error that results from a financial institution entering an inaccurate address into the FFIEC or Bureau geocoding tool."

[624] ECOA section 704B(e)(2)(E).

[625] According to U.S. Census 2017 SUSB data, there are 5,976,761 firms with fewer than 500 employees (which will be used, for this purpose, as a rough proxy for a "small business"); those firms

collectively have 6,512,802 establishments (i.e., locations). This means that, at most, approximately 9 percent of firms with fewer than 500 employees could have more than one location. See U.S. Census Bureau, *2017 SUSB Annual Datasets by Establishment Industry, https://www.census.gov/programs-surveys/susb/data/tables.html* (last visited Aug. 27, 2021). According to the U.S. Census Bureau's Non-employer Statistics, there are 25,701,671 non-employer firms (regardless of revenue size). Non-employer firms account for fewer than 4 percent of all sales, though, and the vast majority are sole proprietorships. While not impossible, the Bureau believes it is very unlikely that non-employer firms would have more than one location. See U.S. Census Bureau, *All Sectors: Nonemployer Statistics by Legal Form of Organization and Receipts Size Class for the U.S., States, and Selected Geographies: 2017* (2017), *https://data.census.gov/cedsci/table?q=NONEMP2017.NS1700NONEMP&tid=NONEMP2017.NS1700NONEMP&hidePreview=true.*

provide the same data for both reporting regimes, but requests comment on whether the proposed method would achieve this goal and, if not, whether and how this data point should be further coordinated with CRA.

### 107(a)(14) Gross Annual Revenue

#### Background

Section 1071 requires financial institutions to collect and report "the gross annual revenue of the business in the last fiscal year of the . . . applicant preceding the date of the application." [626]

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions report the gross annual revenue of the applicant during its last fiscal year. [627] The Bureau stated that if a financial institution verifies gross annual revenue and bases its credit decision on that amount, the financial institution would report the verified amount. If the financial institution does not verify gross annual revenue, it would report the amount provided by the applicant.

Many SERs indicated that they collect gross annual revenue information, although they differed in how much they seek to verify this information. [628] Several SERs requested clarification regarding how gross annual revenue would be reported for startups and other young businesses. A few SERs stated that they do not capture gross annual revenue at all or collect it only in limited circumstances. One of these SERs stated that collecting gross annual revenue would be challenging; others suggested they could likely estimate gross annual revenue based on information they do collect.

Several SERs explained that they collect gross annual revenue using different methods and forms of verification for different types of credit. SERs advocated for allowing gross annual revenue to be reported as provided by the applicant, without an obligation for the financial institution to verify that information. A few SERs suggested that applicants often cannot provide accurate gross annual revenue information, although one SER suggested that in its experience applicants are generally able to provide reasonable estimates of gross annual revenue. Several SERs preferred reporting ranges rather than precise values. Several SERs also remarked that

most businesses take advantage of tax filing extensions and thus typically do not have complete financial information for the prior year until many months later, and asked how that situation should be addressed when requesting applicants' gross annual revenue for the prior fiscal year.

The SBREFA Panel recommended that, in light of SER feedback supporting the Bureau's proposal under consideration to not require financial institutions to verify gross annual revenue information, the Bureau proceed with that approach in the proposal. The SBREFA Panel also recommended that the Bureau explore the timing of tax and revenue reporting and seek comment in the proposal on how that timing can best be coordinated with the collection and reporting of this data point. [629]

The Bureau also received feedback from other stakeholders. Although one stakeholder commented that gross annual revenue is a consistent measure, simple to define, and easily computed, other stakeholders were concerned about the complexity and difficulty of reporting a specifically defined revenue number. One stakeholder stated that gross annual revenue was difficult to precisely define given differences in accounting and tax practices both across and within business subsectors. Two commenters suggested that reporting this data point would be complicated by the question of whether a business uses cash flow or accrual accounting. Other stakeholders requested the reporting of revenue ranges rather than specific values, and one of these commenters suggested that reporting a specific number may discourage some borrowers from applying. Another stakeholder explained that sometimes an application is denied or withdrawn before the revenue information is collected. One stakeholder stated that allowing flexibility in the collection and reporting of this data point would be very important.

With regard to whether the revenue of affiliates is included in the gross annual revenue they collect and whether that information is used for underwriting purposes, stakeholders reported that some collect this information and some do not, depending on the application and specific product. One commenter stated that it does not collect such information unless the affiliate will be liable on the loan. Two stakeholders stated that the Bureau must require inclusion of affiliate revenue to make sure that a given business truly is small.

Many stakeholders stated that they generally verify the income information using profit and loss statements, taxes, bank statements, and "third-party technology solutions." Some stated that they do not verify revenue information for specific products, such as credit cards, and that sometimes it is difficult to verify the revenue of a particular applicant, as tax information can be complex or dated. Stakeholders overwhelmingly supported the Bureau's proposal under consideration not to require verification of revenue, and one stakeholder objected to requiring the reporting of verified information even when the lender has verified the revenue.

Stakeholders also expressed concern about collecting gross annual revenue for start-ups and very small businesses that might not have useable or clear information. One stakeholder explained that its members may obtain and rely on applicant bank statements for a specified time period, and so should be permitted to extrapolate annual revenue based on partially reported revenue.

#### Proposed Rule

Proposed § 1002.107(a)(14) would require reporting of the gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected. The Bureau is proposing to require reporting of a specific value for gross annual revenue—rather than a range, for which some SERs and stakeholders expressed a preference—to simplify the reporting of gross annual revenue information for financial institutions and because it believes that a precise value would be more useful for 1071 data users, including the Bureau.

Consistent with the SBREFA Panel's recommendation and feedback from SERs and other stakeholders, proposed comment 107(a)(14)–1 would clarify that a financial institution need not verify gross annual revenue information provided by the applicant to comply with proposed § 1002.107(a)(14). The proposed comment would explain that the financial institution may rely on statements of or information provided by the applicant in collecting and reporting gross annual revenue. The proposed comment would also state, however, that if the financial institution verifies the gross annual revenue provided by the applicant it must report the verified information. The Bureau believes that a requirement to verify gross annual revenue could be operationally difficult for many financial institutions, particularly in situations in which the financial institution does not collect gross annual

---

[626] ECOA section 704B(e)(2)(F).

[627] SBREFA Outline at 31.

[628] SBREFA Panel Report at 29.

[629] *Id.* at 46.

revenue currently. The Bureau also does not believe, at this time, that such a requirement is necessary in fulfilling either of section 1071's statutory purposes. However, the Bureau does believe that reporting verified revenue when the financial institution already possesses that information would not be operationally difficult, and would enhance the accuracy of the information collected.

Proposed comment 107(a)(14)–1 would also provide specific language that a financial institution could use to ask about an applicant's gross annual revenue and would explain that a financial institution could rely on the applicant's answer. The Bureau believes this language would facilitate compliance for financial institutions that currently do not collect gross annual revenue, collect it only in limited circumstances, or would otherwise find its collection challenging, as some SERs and other stakeholders suggested.

Overall, the Bureau believes that this approach in proposed comment 107(a)(14)–1—clarifying that a financial institution need not verify applicant-provided gross annual revenue information, and providing language that a financial institution may use to ask for such information—should reduce the complexity and difficulty of collecting gross annual revenue information that some SERs and stakeholders expressed concern about.

The Bureau believes that situations could arise in which the financial institution has identified that an applicant is a small business for the purposes of proposed § 1002.106(b) through, for example, an initial screening question asking whether the applicant's gross annual revenue is below $5 million, but then the specific gross annual revenue amount could not be collected. Therefore, the Bureau is proposing comment 107(a)(14)–2, which would first clarify that pursuant to proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, including the gross annual revenue of the applicant. The proposed comment would then state that if a financial institution is nonetheless unable to collect or determine the specific gross annual revenue of the applicant, the financial institution reports that the gross annual revenue is "not provided by applicant and otherwise undetermined." The Bureau believes that permitting this reporting flexibility would reduce the complexity and difficulty of reporting gross annual revenue information, particularly when

an application has been denied or withdrawn early in the process and the gross annual revenue could not be collected.

Proposed comment 107(a)(14)–3 would clarify that a financial institution is permitted, but not required, to report the gross annual revenue for the applicant that includes the revenue of affiliates as well. The proposed comment would state that, for example, if the financial institution does not normally collect information on affiliate revenue, the financial institution reports only the applicant's revenue and does not include the revenue of any affiliates when it has not collected that information. The Bureau believes that permitting, but not requiring, a financial institution to include the revenue of affiliates will carry out the purposes of section 1071 while reducing undue burden on financial institutions in collecting gross annual revenue information. Proposed comment 107(a)(14)–3 would conclude by explaining that in determining whether the applicant is a small business under proposed § 1002.106(b), a financial institution may rely on an applicant's representations regarding gross annual revenue, which may or may not include affiliates' revenue. The Bureau notes that proposed comment 106(b)–3 would follow the same approach to affiliate revenue for purposes of determining whether an applicant is a small business under proposed § 1002.106(b). The Bureau believes that this operational equivalence between proposed § 1002.107(a)(14) and proposed § 1002.106(b) would facilitate compliance and enhance the consistency of 1071 data.

As mentioned above, some SERs suggested they might be able to estimate gross annual revenue using information that they now collect, and one stakeholder suggested that it could extrapolate annual revenue based on partially reported revenue. The Bureau does not currently believe that estimation or extrapolation would be likely to result in sufficiently accurate data for reporting under proposed § 1002.107(a)(14). For example, a seasonal business's bank statements for its busy season would likely yield an inflated gross annual revenue when extrapolated to a full year. In addition, the Bureau believes that the language presented in proposed comment 107(a)(14)–1 would provide a manageable method for collecting full gross annual revenue when a financial institution does not do so now. Nonetheless, the Bureau seeks comment on whether financial institutions should be permitted to estimate or extrapolate

gross annual revenue from partially reported revenue or other information, and how such estimation or extrapolation would be carried out. The Bureau also notes that estimation or extrapolation of gross annual revenue is sufficient for the purposes of determining small business status under proposed § 1002.106(b), subject to the requirement under proposed comment 107(a)(14)–1 that a financial institution must report verified gross annual revenue information if available.

The Bureau seeks comment on its proposed approach to the gross annual revenue data point, as well as the specific requests for comment above. As the SBREFA Panel recommended, the Bureau also seeks comment on how the timing of tax and revenue reporting can best be coordinated with the collection and reporting of gross annual revenue. In addition, the Bureau seeks comment on the effect of cash flow versus accrual accounting on reporting of gross annual revenue.

### 107(a)(15) NAICS Code

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau is proposing in § 1002.107(a)(15) to require that financial institutions collect and report an applicant's 6-digit NAICS code. The Bureau believes that 6-digit NAICS code data would aid in fulfilling the purposes of section 1071, as explained below.

As described above, the SBA customizes its size standards on an industry-by-industry basis using 1,057 6-digit NAICS codes. The first two digits of a NAICS code broadly capture the industry sector of a business. The third digit captures the industry's subsector, the fourth captures the industry group, the fifth captures the industry code, and the sixth captures the national industry. The NAICS code thus becomes more specific as digits increase and the 6-digit code is the most specific. In its SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions collect and report NAICS code as an important metric for fair lending analysis (allowing separation of dissimilar types of businesses to limit misinterpretations of the data) and assessing community development impacts (allowing better measurement of community development impact).[630]

As described in detail in the section-by-section analysis of proposed § 1002.106(b) above, SERs and other

---

[630] SBREFA Outline at 35.

stakeholders expressed concern about the difficulties in determining the appropriate NAICS code for businesses and in applying the NAICS-based standards in determining whether a business loan applicant is a small business.[631] In addition, several SERs stated that correctly classifying an applicant's NAICS code can be difficult, as the business may change over time, codes may have overlapping definitions, small businesses often do not know their NAICS code or may operate in multiple NAICS sectors, and classifications may be prone to human error. Another SER noted that NAICS codes classifications could be subject to change based on SBA rulemaking, and thus financial institutions would need to track such developments. Other SERs stated that the 2-digit NAICS code is significantly less complex and prone to less human error than the SBA definition using 6-digit NAICS codes.

The SBREFA Panel recommended that the Bureau continue to explore ways to minimize burden on both the small financial institutions collecting NAICS code information as well as the small business applicants who need to provide it, for example the possibility of collecting the 2–NAICS code rather than the 6-digit code.[632]

Proposed § 1002.107(a)(15) would require financial institutions to collect and report a 6-digit NAICS code appropriate for the applicant's business. Proposed comment 107(a)(15)–1 would provide general background on NAICS codes and would state that a financial institution complies with proposed § 1002.107(a)(15) if it uses the NAICS codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting. Proposed comment 107(a)(15)–2 would clarify that, when a financial institution is unable to collect or determine the applicant's NAICS code, it reports that the NAICS code is ''not provided by applicant and otherwise undetermined.''

The Bureau is also proposing that financial institutions be permitted to rely on NAICS codes obtained from the applicant or certain other sources, without having to verify that information itself. Specifically, proposed comment 107(a)(15)–3 would clarify that, consistent with proposed § 1002.107(b), a financial institution may rely on applicable applicant information or statements when compiling and reporting the NAICS code and would provide an example of an applicant providing a financial

institution with the applicant's tax return that includes the applicant's reported NAICS code. Proposed comment 107(a)(15)–4 would provide that a financial institution may rely on a NAICS code obtained through the financial institution's use of business information products, such as company profiles or business credit reports, which provide the applicant's NAICS code.

The Bureau believes that NAICS codes would considerably aid in fulfilling both section 1071's fair lending purpose and its business and community development purpose, even if having NAICS code is not necessary for determining whether an applicant is a small business under the Bureau's proposed alternative size standard. The Bureau believes that capturing 6-digit NAICS codes in the 1071 data would facilitate enforcement of fair lending laws. For example, financial institutions often designate certain industries as high-risk, such as industries that have high rates of businesses leaving the market or that deal primarily in cash transactions. The 6-digit NAICS codes would help ensure that users are comparing applicants with similar profiles, thereby controlling for factors that might provide non-discriminatory explanations for disparities in credit and pricing decisions. Moreover, NAICS codes would be useful for identifying business and community development needs and opportunities of small businesses, which may differ widely based on industry, even controlling for other factors. For example, 6-digit NAICS codes would help data users identify industries where small businesses face challenges accessing credit and understand how small businesses in different industries use credit. Furthermore, disclosing NAICS codes would provide for consistency and compatibility with other public datasets related to small business lending activity, which generally use NAICS codes. This ability to synthesize 1071 data with other datasets would help the public use the data in ways that advance both the business and community development and fair lending purposes of section 1071.

The Bureau believes that collecting the full 6-digit NAICS code (as opposed to the 2-digit sector code) would better enable the Bureau and other stakeholders to drill down and identify whether disparities arise at a sector level or more specifically at a U.S. National Industry level and would also enable the collection of better information on the specific types of businesses that are accessing, or struggling to access, credit. For example,

a wide variety of businesses, including those providing car washes, footwear and leather goods repair, and nail salons, all fall under the 2-digit sector code 81: Other Services (except Public Administration). Without 6-digit NAICS codes, all of these business types would be combined into one analysis, potentially masking different characteristics and different outcomes across these business types.

The Bureau recognizes that, under its proposal, all financial institutions subject to reporting would need to gain familiarity with the NAICS code system, refer to NAICS classifications for all relevant applications, and report NAICS codes to the Bureau. To address commenter concerns related to the complexity of determining a correct NAICS code, the Bureau is proposing (1) a safe harbor to indicate that an incorrect NAICS code entry is not a violation of subpart B if the first two digits of the NAICS code are correct and the financial institution maintains procedures reasonably adapted to correctly identify the subsequent four digits (see proposed § 1002.112(c)(2)); (2) permitting a financial institution to rely on applicable applicant information or statements when compiling and reporting the NAICS code (see proposed comment 107(a)(15)–3); and (3) permitting a financial institution to rely on a NAICS code obtained through the financial institution's use of business information products, such as company profiles, business credit reports, or NAICS identification tools (see proposed comment 107(a)(15)–4). The proposed NAICS-specific safe harbor would be available to financial institutions in addition to the general bona fide error exemption under proposed § 1002.112(b). See the section-by-section analysis of proposed § 1002.112(c)(2) below for a detailed discussion of the proposed safe harbor.

The Bureau seeks comment on its proposal to collect 6-digit NAICS codes together with the safe harbor described in proposed § 1002.112(c)(2). The Bureau also seeks comment on whether requiring a 3-digit NAICS code with no safe harbor would be a better alternative.

### 107(a)(16) Number of Workers

#### Background

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain ''any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071].'' The Bureau believes that data providing the number of persons

---

[631] SBREFA Panel Report at 31.
[632] *Id.* at 46.

working for a small business applicant would aid in fulfilling the business and community development purpose of section 1071. These data would allow users to better understand the job maintenance and creation that small business credit is associated with and help track that aspect of business and community development.

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions collect and report the number of employees of the applicant. The Bureau stated that it was considering proposing that if the financial institution verifies the number of employees provided by the applicant, the financial institution would report the verified number. On the other hand, if the financial institution does not verify the number of employees, it would report the number provided by the applicant.

Many SERs indicated that they do not collect number of employees.[633] One of these SERs stated that they do not support the inclusion of this data point in an eventual 1071 rule, although they could collect this information. Several SERs suggested that there could be particular complexities in accurately capturing this information, particularly regarding how part-time and seasonal employees and contractors should be counted. Some SERs stated that they collect number of employees but do not verify that information.

The SBREFA Panel recommended (with respect to both the time in business and number of employees data points), that if these data points become part of the proposal, the Bureau continue to explore ways to minimize the burden to small financial institutions of collecting and reporting these data points.[634]

A large majority of industry stakeholders commenting on the SBREFA Outline opposed the inclusion of any of the discretionary data points, including number of employees. One trade association stated that this data point would frustrate small business applicants, particularly if they have to apply full-time employee calculation formulas. Several stakeholders discussed the difficulty of defining a number of employees data point, suggesting that complex rules would be necessary for how to count part-time and seasonal employees, as well as contractors. Another commenter suggested that verifying this information

would be extremely difficult. Industry commenters also explained that most financial institutions do not collect this information now, and several pointed out that these data are not useful for evaluating credit risk. Another stated that number of employees is not a meaningful figure across industries, given the use of contractors and part-time employees. One commenter pointed out that the many sole proprietorships and non-employee firms mean that this number will often be zero. One financial institution stated that it does collect this information now, but does not verify it.

Community groups were strongly in favor of including a number of employees data point. One group stated that the number of employees data would help provide a greater understanding of microbusinesses, typically defined in terms ranging from less than five to ten employees, one or more of whom is the owner. Another suggested that the Bureau collect the total number of employees and number of owners separately, which it said would avoid the problem found in PPP data where owners mistakenly reported themselves as employees. This same commenter stated that user testing and guidance would be necessary to ensure that the number of employees is reported accurately and consistently. However, one community development fund that supported the collection of the other discretionary data points opposed collection of the number of employees. This stakeholder stated that there is little research support for direct job creation/retention as the primary impact of small business assistance, and that the scholarly consensus suggests the economic impacts of small firms are related to their capacity to improve local entrepreneurial networks and create ecosystems that are desired and sought out by bigger firms. The commenter then stated that by having covered financial institutions report on job counts, the Bureau would be implicitly reinforcing the inaccurate notion that employment is a key dimension of small business assistance.

Proposed Rule

Proposed § 1002.107(a)(16) would require financial institutions to report the number of non-owners working for the applicant. Although some SERs and other stakeholders questioned the usefulness of employment data for 1071's purposes, the Bureau continues to believe that this information would be particularly helpful in fulfilling the business and community development purpose of section 1071. Information on the number of workers should help data

users assess community development impacts by allowing better understanding of the number of jobs affected. In addition, in order to avoid mistaken over-reporting of workers, the proposed regulation would make clear that only non-owners would be reported as workers.

Proposed comment 107(a)(16)–1 would discuss the collection of the number of workers. As discussed above, several SERs and other stakeholders suggested that there could be particular complexities in accurately capturing this information, particularly regarding how part-time and seasonal workers and contractors should be counted. To help alleviate these concerns, the proposed comment would state that in collecting the number of workers from an applicant, the financial institution would explain that full-time, part-time, and seasonal workers, as well as contractors who work primarily for the applicant, would be counted as workers, but principal owners of the business would not. If asked, the financial institution would explain that volunteers would not be counted as workers. This treatment of part-time, seasonal, contract, and volunteer workers would follow the SBA's method for counting employees,[635] with minor simplifications. The Bureau believes that this guidance would allow financial institutions that originate SBA-guaranteed loans to use the same number of workers data for both the loan guarantee program and 1071 reporting. The Bureau seeks comment on whether further modifications to the number of workers data point are needed to facilitate this operational simplification.

Proposed comment 107(a)(16)–1 would also explain that workers for affiliates of the applicant would only be counted if the financial institution were also collecting the affiliates' gross annual revenue. The Bureau believes that this coordination between these two data points would facilitate compliance and yield more consistent data.

The proposed comment would further explain that the financial institution may rely on statements of or information provided by the applicant in collecting and reporting number of workers, but if the financial institution verifies the number of workers provided by the applicant, it must report the verified information. This guidance would address the concerns raised about the difficulty of verification. The Bureau believes that allowing financial institutions to rely on applicant-

---

[633] *Id.* at 31.
[634] *Id.* at 46.

[635] *See* 13 CFR 121.106(a).

AdminRecord-000535

provided information will sufficiently safeguard accuracy such that the resulting data will aid in fulfilling the purposes of 1071. However, the Bureau also believes that reporting the verified number of workers when the financial institution already possesses that information would not be operationally difficult, and would enhance the accuracy of the information collected.

Finally, proposed comment 107(a)(16)-1 would also provide sample language that a financial institution could use to ask about the number of workers, if it does not collect the number of workers by another method. The Bureau understands that, as discussed above, financial institutions engaged in SBA lending are already collecting employee information to apply the SBA's size standards. However, SBA lending represents only a small percentage of the small business credit market. Given the difficulty for financial institutions in potentially requesting this information of all applicants, the Bureau provides the sample language in the proposed comment, which implements the simplified version of the SBA definition presented earlier in the proposed comment. The Bureau believes that permitting use of the model question would facilitate compliance. The Bureau seeks comment on this method of collection, and on the specific language proposed.

Proposed comment 107(a)(16)–2 would first clarify that a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, including the number of workers of the applicant. The proposed comment would then state that if a financial institution is nonetheless unable to collect or determine the number of workers of the applicant, the financial institution reports that the number of workers is "not provided by applicant and otherwise undetermined." The Bureau believes that this approach would reduce the burden on financial institutions that are unable to collect or determine the number of workers of the applicant, particularly when an application is denied or withdrawn early in the application process.

The Bureau seeks comment on its proposed approach to the number of workers data point, as well as on the specific requests for comment above. The Bureau also seeks comment on whether financial institutions collect information about the number of workers from applicants using definitions other than the SBA's, and how the collection of this data point

could best be integrated with those collections of information.

### 107(a)(17) Time in Business

#### Background

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that data providing the time in business of a small business applicant would aid in fulfilling both the business and community development and fair lending purposes of section 1071, as explained below.

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing to include as a discretionary data point time in business of the applicant (as of the date of application), expressed in years, or months if less than one year.[636] The Bureau stated that time-in-business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the section 1071 dataset by distinguishing potentially riskier new businesses from less risky established businesses. Time-in-business information could also provide a better measurement of community development effects, in terms of number of start-ups or other relatively new businesses seeking and obtaining financing. The Bureau stated that a financial institution may choose to verify the time in business provided by an applicant as part of its normal course of business. If the financial institution does not verify the time in business provided by the applicant, the financial institution would report the time in business provided by the applicant. If the financial institution does verify the time in business provided by the applicant, it would report the verified information.

Many SERs currently collect time-in-business information, explaining that time-in-business information is valuable for measuring risk in underwriting.[637] However, some SERs collect this information on their application forms or keep it as part of a general narrative in a credit memorandum about the application, but do not retain it as a specific data field in their systems. Some SERs capture time-in-business information by recording the year, or month/day/year, of incorporation;

others capture it as the number of years the applicant has been in business. One SER stated that they do not support the inclusion of time in business as a data point in the NPRM, although they could collect this information.

Several SERs stated that they use State incorporation filings to determine or verify time in business. Some SERs explained that they view a business as a start-up if it has been in business either less than two or less than three years. For one SER, time in business is relevant for the specific line of business for which financing is sought, rather than the length of time the applicant has been in some business generally. Another SER suggested that the Bureau use ranges for time-in-business reporting, similar to a suggested method for collecting and reporting gross annual revenue.

The SBREFA Panel recommended (with respect to both the time in business and number of employees data points), that if these data points become part of the proposal, the Bureau continue to explore ways to minimize the burden to small financial institutions of collecting and reporting these data points.[638]

Community group stakeholders supported the inclusion of the time-in-business data point, stating that start-ups and younger businesses often face challenges accessing credit, and having time-in-business data would be especially critical to exploring gender and racial disparities and fostering equitable access to affordable loan capital. Two industry stakeholders supported inclusion, stating that time in business is a key underwriting factor and could explain credit disparities. One community group stakeholder agreed, stating that time in business and other discretionary data points must be accounted for so credit providers cannot, as they said HMDA reporters have done for years, hide behind data not collected as justification for their lending disparities.

A large majority of industry stakeholders opposed all discretionary data points, including time in business. One industry stakeholder focused specifically on the time-in-business data point, stating that there are too many variables in the data point to be easily and clearly defined for collection. That stakeholder provided examples of complications in collection of the data point, such as (1) the time the entity has existed or existed under the current ownership, (2) how much experience the owners have had in this business or closely related fields, (3) if the

---

[636] SBREFA Outline at 34–35.
[637] SBREFA Panel Report at 31.

[638] *Id.* at 46.

experience is in closely related fields how close must they be, (4) whether the entity has history but is being purchased using loan funds by ownership with little experience, and (5) whether industry should report how long the existing management structure has been in place. It then requested that the Bureau drop this data point or make the options very simple.

Industry stakeholders reported different ways that they currently collect and use time-in-business information. Stakeholders report that the information is not universally collected and may be collected using different formats, even within a single institution. A trade association suggested that reporting time in business should be optional. One stakeholder said that it verifies the data using Secretary of State or other third-party information, and that an applicant that does not meet the time-in-business requirement for a product may be automatically rejected. Two other stakeholders stated that they focus on the overall experience of the ownership or management, rather than the age of the business.

Proposed Rule

Proposed § 1002.107(a)(17) would require a financial institution to collect and report the time the applicant has been in business, described in whole years, as relied on or collected by the financial institution. Proposed § 1002.107(a)(17) would require the data be reported in whole years, rather than ranges of time, as suggested by a SER and a stakeholder, because a financial institution would have a definite number of years if it collects this information, and the Bureau believes that would make the data more granular and useful.

The Bureau continues to believe that time in business would likely advance both statutory purposes of 1071. Research illustrates, and commenters have emphasized, the role that start-ups and new businesses play in the business ecosystem and in promoting important community development aims, such as creating new jobs.[639] Financial institutions often have special credit policies regarding start-ups and other young businesses, including whether the institution will extend credit to start-ups at all, the type(s) of credit products start-ups and new businesses can apply for, and the amount of credit for which they can be approved. Studies generally show that start-ups experience greater difficulty in accessing credit,[640] and one community group stakeholder made the same point. In addition, one study suggested that Black- and Hispanic-owned firms are under-represented in terms of firms that have external financing, have lower levels of liquidity in their early years, and have higher rates of exiting the market within the first three years.[641] In regard to the facilitation of fair lending analyses, time-in-business data would provide a useful control in fair lending analyses to identify similarly situated applicants and eliminate some false positives, while also allowing monitoring of potential disparate treatment of minority- and women-owned start-ups and relatively new businesses. In addition, many SERs reported that time-in-business information is valuable for measuring risk in underwriting, and they did not limit this observation to start-ups and new businesses. The Bureau also believes that collecting time-in-business information generally, rather than in the first few years, would provide useful data for understanding the relative maturity of small businesses in different communities.

The Bureau believes that time-in-business data would benefit data users, including financial institutions, policymakers, and communities. Such data would allow data users to better identify the proportion of small businesses seeking credit that are start-ups or relatively new businesses, the type(s) of credit that is offered and provided to start-ups and newer businesses, the geographic makeup of those businesses, the types of financial institutions that are reaching such businesses, and where communities might focus business development efforts. The data may also aid policymakers in addressing issues impacting the growth of small start-ups. The data, particularly as to unmet demand, could help interested financial institutions identify lending opportunities to reach more start-ups and new businesses, promoting both business and community development.

In addition, as some of the stakeholders suggested, the Bureau believes that the inclusion of time-in-business data could help mitigate the concerns of data misrepresentation. For example, data indicating that a small business applicant is a start-up with little experience or financial history could provide a legitimate business explanation for why the financial institution denied the application or approved it for less credit than was applied for. Therefore, time-in-business data may help to explain the credit decision made by a financial institution, which may address any concerns of data misrepresentation.

The Bureau is not proposing to make this data field optional, as suggested by a trade association. The Bureau is concerned that, if it were to do so, very little data would be reported.

As explained above, the SBREFA Panel recommended that the Bureau explore ways to minimize the burden on small financial institutions of collecting and reporting the time-in-business data point. SERs and industry stakeholders reported different ways that they currently collect and use time-in-business information, reporting that the information is not universally collected and may be collected using different formats, even within a single institution. The Bureau believes that by allowing financial institutions to report the time in business that they *relied on* in making their credit decisions, the burden on the financial institution (of any size) could be reduced, while the resulting information would still aid in fulfilling the purposes of section 1071. Although industry commenters overwhelmingly expressed concern about the burden associated with any discretionary data points as a general matter, the Bureau believes that time-in-business information can be made relatively easy for financial institutions to collect if the Bureau leverages the methods currently in use by individual financial institutions. As the SERs and stakeholders explained, many or possibly most financial institutions already collect time-in-business information for underwriting purposes or to determine general eligibility, though the format and specific information collected vary by institution[642] and may relate to owner

[639] *See, e.g.,* Small Bus. Admin., *2018 Small Business Profiles,* at 1–2 (2018), *https:// www.sba.gov/advocacy/2018-small-business-profiles-states-and-territories?utm_ medium=email&utm_source=govdelivery;* John Haltiwanger *et al., Who Creates Jobs? Small versus Large versus Young,* The Review of Economics and Statistics, 95(2), at 347–61 (2013), *https:// direct.mit.edu/rest/article/95/2/347/58100/Who-Creates-Jobs-Small-versus-Large-versus-Young.*

[640] For example, a Federal Reserve Bank of New York report, based on data from the 2016 Small Business Credit Surveys that included information from 12 Federal Reserve Banks, provides statistics on how start-ups are less likely to receive credit as compared to mature businesses, even with comparable credit scores. *See* Fed. Reserve Bank of N.Y., *Small Business Credit Survey: Report on Start-up Firms,* at iv (2017), *https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-StartupFirms-2016.pdf.*

[641] J.P. Morgan Chase, *Small Business Owner Race, Liquidity and Survival* (July 2020), *https:// www.jpmorganchase.com/content/dam/jpmc/ jpmorgan-chase-and-co/institute/pdf/institute-small-business-owner-race-report.pdf.*

[642] Of a limited sample of application forms the Bureau reviewed from a variety of types of financial institutions, a majority of forms contained some type of time-in-business field. When the Bureau

AdminRecord-000537

or management experience rather than business longevity. Therefore, the Bureau is proposing that financial institutions that collect time-in-business information be required to report the time in business that they relied on (or would have relied on, for applications that were withdrawn prior to a credit decision) in making the credit decision. If the financial institution collects time-in-business information that reflects owner or management experience rather than business longevity, the financial institution would report time in business using the number it collects and relies on reflecting owner or management experience. If the financial institution relies on verified information, it reports the verified information. If it does not verify the information, it reports the unverified information. Requiring reporting of time in business "relied on" should avoid requiring financial institutions that collect some version of this information to change their practices or add extra procedures to collect the Bureau's version of time in business. In addition, the Bureau believes that collecting the actual information used by the financial institution to evaluate the application would aid fair lending analysis. Furthermore, the Bureau does not believe that the variations among the data collected by individual institutions would interfere with the business and community development purpose of 1071, because the information would still be useful in identifying new ownership, management, and businesses that may face credit challenges.

In addition to providing some financial institutions with the ability to avoid duplicative information gathering by simply reporting the time in business relied on, the proposed data point would also facilitate compliance for financial institutions that do not currently collect or rely on time-in-business information by allowing them to use the specific question provided in proposed comment 107(a)(17)–4, as explained below. The Bureau believes that permitting these two proposed methods for collection and reporting should accommodate different institutional practices and reduce operational difficulty for financial institutions in reporting this data point.

---

looked at lenders that have undergone a small business fair lending exam from the Bureau, a few (but not the majority) maintained data on time in business in their existing systems. Examples of time-in-business reference points include time of formation or registration, time under current ownership, and history of financial records, recorded as either month and year or just year.

In order to clarify the potential use of the two methods (relied on or collected) of reporting for the time-in-business data point, proposed comment 107(a)(17)–1 would provide guidance on how to report using either method. The proposed comment would explain that, regardless of which method is used, the financial institution must report the time in business in whole years, or indicate if a business has not begun operating yet, or has been in operation for less than a year. The Bureau believes that this reporting format would inform data users of the maturity of the applicant businesses and signal which are start-ups.

Proposed comment 107(a)(17)–1 would further explain that when the financial institution relies on an applicant's time in business as part of a credit decision, it reports the time in business relied on in making the credit decision. However, the comment would further explain that proposed § 1002.107(a)(17) would not require the financial institution to rely on an applicant's time in business in making a credit decision. The Bureau believes that this guidance would make clear that the requirement to collect and report applicants' time in business would not change the financial institution's internal business practices. A financial institution would only be required to report the time in business relied on in making the credit decision if the financial institution actually does rely on an applicant's time in business in making its credit decision.

Proposed comment 107(a)(17)–1 would also explain that the financial institution may rely on statements or information provided by the applicant in collecting and reporting time in business; however, pursuant to proposed § 1002.107(b), if the financial institution verifies the time in business provided by the applicant, it must report the verified information. This guidance would apply whether the financial institution relies on the time in business in making its credit decision or not, although the Bureau believes that verification would be very uncommon when the financial institution is not relying on the information. The Bureau believes that allowing financial institutions to rely on applicant-provided information will sufficiently safeguard accuracy such that the resulting data will aid in fulfilling the purposes of 1071. However, the Bureau also believes that reporting the verified time in business when the financial institution already possesses that information would not be operationally difficult, and would enhance the accuracy of the information collected

and ensure that it was the information that the financial institution relied on in making the credit decision.

Proposed comment 107(a)(17)–2 would provide instructions on how to report the time in business relied on in making the credit decision. The proposed comment would state that when a financial institution evaluates an applicant's time in business as part of a credit decision, it reports the time in business relied on in making the credit decision. For example, the proposed comment would further explain, if the financial institution relies on the number of years of experience the applicant's owners have in the current line of business, the financial institution reports that number of years as the time in business. Similarly, if the financial institution relies on the number of years that the applicant has existed, the financial institution reports the number of years that the applicant has existed as the time in business. Proposed comment 107(a)(17)–2 would then conclude by stating that a financial institution reports the length of business existence or experience duration that it relies on in making its credit decision, and is not required to adopt any particular definition of time in business. The Bureau believes that this proposed comment would provide useful guidance on how a financial institution complies with § 1002.107(a)(17) when it relies on time in business and would help such financial institutions avoid unnecessary compliance difficulties by reporting information that they already possess.

Proposed comment 107(a)(17)–3 would state that a financial institution relies on an applicant's time in business in making a credit decision if the time in business was a factor in the credit decision, even if it was not a dispositive factor. The comment would provide the example that if the time in business is one of multiple factors in the financial institution's credit decision, the financial institution has relied on the time in business even if the financial institution denies the application because one or more underwriting requirements other than the time in business are not satisfied. The Bureau believes that this guidance would help financial institutions to understand how to comply correctly with proposed § 1002.107(a)(17).

Proposed comment 107(a)(17)–4 would clarify that if the financial institution does not rely on time in business in considering an application, pursuant to proposed § 1002.107(c)(1) it shall still maintain procedures reasonably designed to collect applicant-provided information, which

**56472**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

includes the applicant's time in business. The proposed comment would explain that in collecting time in business from an applicant, the financial institution complies with proposed § 1002.107(a)(17) by asking for the number of years that the applicant has been operating the business it operates now. The proposed comment would further explain that when the applicant has multiple owners with different numbers of years operating that business, the financial institution collects and reports the greatest number of years of any owner. As discussed above, the Bureau believes that providing this clear instruction on how to collect the time in business when a financial institution does not do so now would avoid the potential complications and difficulties described by the SERs and industry stakeholders in collecting this data point. In addition, the Bureau notes that, as would be made clear in proposed comment 107(a)(17)–1, a financial institution would not need to verify an applicant's response to the inquiry. Proposed comment 107(a)(17)–4 would then conclude by making clear that the financial institution does not need to comply with the instruction if it collects and relies on the time in business by another method in making the credit decision.

Proposed comment 107(a)(17)–5 would explain that pursuant to proposed § 1002.107(c)(1) a financial institution shall maintain reasonable procedures to collect information provided by the applicant, which includes the time in business of the applicant, but if the financial institution is unable to collect or determine the time in business of the applicant, the financial institution reports that the time in business is "not provided by applicant and otherwise undetermined." The Bureau believes that permitting use of this response would facilitate compliance, particularly in situations in which the application is denied or withdrawn early in the application process.

The Bureau seeks comment on its proposed approach to this data point. The Bureau also seeks comment on whether time-in-business information may be less relevant or collectable for certain products or situations (such as retailer-branded credit cards acquired at point of sale) and whether reporting "not applicable" should be allowed in those instances. In addition, the Bureau seeks comment on whether there should be an upper limit on time in business—for example, to allow reporting of "over 20 years" for any applicant of that duration, rather than requiring reporting of a specific number of years.

### 107(a)(18) Minority-Owned Business Status

#### Background

ECOA section 704B(b) requires financial institutions to inquire whether applicants for credit are minority-owned businesses and to maintain a record of the responses to that inquiry separate from the applications and accompanying information. Section 704B(c) provides that applicants for credit may refuse to provide information requested pursuant to 704B(b). The Bureau is proposing § 1002.107(a)(18) to address how a financial institution would collect and report an applicant's minority-owned business status.

#### SBREFA Proposal Under Consideration and Feedback

In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions be permitted to collect and report minority-owned business status based on applicant self-reporting and that the Bureau was not considering requiring reporting based on visual observation and/or surname.[643] The Bureau also stated that it was considering proposing that the right to refuse under ECOA section 704B(c) apply to the financial institution's specific inquiries regarding minority-owned business status as well as women-owned business status and the principal owners' race, sex, and ethnicity

Several SERs supported this approach and urged the Bureau to require collection and reporting of minority-owned business status based only on the information the applicant provides (*i.e.,* self-reporting).[644] SERs also expressed concerns about the difficulties and costs that may be associated with collecting minority-owned business status on some basis other than applicant self-reporting. For example, although many SERs indicated that they review some ownership information about applicants in order to obtain guarantees or for other reasons, most of those SERs said that they do not review the accrual of net profits and losses and some said that they do not review information related to who controls an applicant. One SER said that determining ownership is relatively straightforward, but the issue of control can be subjective. One SER said that it would not be able to determine who controlled an applicant and that an applicant would need to self-report that information. Another SER noted that some small business applicants do not have simple

ownership structures. A different SER stated that some financial institutions do not meet in person with all of the owners of small business applicants.

Other industry stakeholders providing feedback on the SBREFA Outline also supported collection and reporting of minority-owned business status based only on applicant self-reporting and noted several challenges with reporting this data point based on visual observation and/or surname. Some industry commenters stated that it would not be possible to report minority-owned business status based on visual observation and/or surname in at least some circumstances. Others expressed concerns about the cost and time required to do so. One industry commenter noted that the tracking of ownership and other information needed to report based on visual observation and/or surname would be laborious. Another commenter noted that some financial institutions do not obtain the information necessary to make the determinations that would underlie a visual observation requirement (*i.e.,* information about ownership, control, etc.). One commenter specifically noted that the statute only requires financial institutions to "inquire" about minority-owned business status. Conversely, a community group opposed reporting based only on applicant self-reporting.

Some commenters stated that financial institutions should not be required to collect or report this information at all, or that they should not be required to collect or report it in certain situations, such as when a trust or other entity owns or controls an applicant.

Some SERs and a few other commenters said that the Bureau should create a tool or otherwise arrange for applicants to self-report, at least, demographic information (namely, minority-owned business status and women-owned business status as well as the ethnicity, race, and sex of principal owners) directly to the Bureau or to a third-party that maintains a database of such information.

Some SERs were concerned that, if notified of their right to refuse, applicants may not provide protected demographic information, thus limiting the usefulness of 1071 data. One SER and several other commenters similarly agreed with the Bureau's proposal under consideration to limit the right to refuse to applicants' protected demographic information only. However, three commenters opined that the Bureau's approach was too limited and that the right to refuse should apply to small business status as well as other data

---

[643] SBREFA Outline at 25–26.
[644] SBREFA Panel Report at 26.

AdminRecord-000539

Federal Register / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

56473

points. Several SERs requested that the Bureau provide sample language for use in any disclosure and collection forms in which an applicant's right to refuse is stated, so that applicants understand why lenders are requesting protected demographic information and how the information will be used. Two SERs asked that the Bureau provide sample language in English as well as in other languages, such as Spanish.

The SBREFA Panel recommended that the Bureau consider creating sample data collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of this data point. The SBREFA Panel recommended that the Bureau consider developing sample disclosure language that financial institutions may use to provide some context as to why applicants are being asked to provide protected demographic information, in order to encourage applicants to respond. It also said that the Bureau should additionally consider providing these sample data collection forms in other languages, such as Spanish.[645]

Proposed Rule

Consistent with its approach during the SBREFA process, proposed § 1002.107(a)(18) would require financial institutions to collect and report whether an applicant is a minority-owned business. Proposed § 1002.107(a)(18) would also require financial institutions to collect and report whether minority-owned business status is being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). It would also require that when the financial institution requests minority-owned business status from an applicant, the financial institution inform the applicant that the financial institution cannot discriminate on the basis of the applicant's minority-owned business status, or on whether the applicant provides this information. Finally, proposed § 1002.107(a)(18) would refer to proposed appendix F for additional details regarding how financial institutions are required to collect and report minority-owned business status. Proposed appendix F would include a requirement that a financial institution inform an applicant that the applicant is not required to respond to the financial institution's questions regarding the applicant's minority-owned business status and women-owned business status, and a prohibition on financial institutions requiring applicants to

provide this information.[646] Consistent with the SBREFA Panel's recommendation, proposed appendix E, which is a sample data collection form, would include a question about minority-owned business status and related information to assist applicants with responding to the question.[647]

Proposed comment 107(a)(18)–1 would clarify that a financial institution would be required to ask an applicant if it is a minority-owned business for each covered application unless the financial institution is permitted to report minority-owned business status based on previously collected data. Additionally, the financial institution would be required to permit an applicant to refuse to answer the financial institution's inquiry and to inform the applicant that it is not required to provide the information. The financial institution would report the applicant's response, its refusal to answer the inquiry (such as when the applicant indicates that it does not wish to provide the requested information), or its failure to respond (such as when the applicant fails to submit a data collection form) to the inquiry. See proposed appendix F for additional instructions on how the Bureau proposes that financial institutions collect and report minority-owned business status.

Proposed comment 107(a)(18)–2 would explain that a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of an applicant's minority-owned business status or on whether the applicant provides the information. It would also clarify that a financial institution may combine this non-discrimination notice regarding minority-owned business status with the similar non-discrimination notices that a financial institution is required to provide when requesting women-owned business status and a principal owner's ethnicity, race, and sex if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

Proposed comment 107(a)(18)–3 would explain how, pursuant to

proposed § 1002.111(b), financial institutions must record an applicant's response regarding minority-owned business status pursuant to proposed § 1002.107(a)(18) separate from the application and accompanying information. This proposed comment would also provide examples of how responses could be recorded separately from the application and accompanying information.

Proposed comment 107(a)(18)–4 would state that pursuant to proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's minority-owned business status. However, if a financial institution does not receive a response to its inquiry, the financial institution would report that the applicant's minority-owned business status is "not provided by applicant."

Proposed comment 107(a)(18)–5 would state that notwithstanding proposed § 1002.107(b) (regarding verification of applicant-provided information), a financial institution would report the applicant's response, its refusal to answer the inquiry, or its failure to respond to the inquiry pursuant to proposed § 1002.107(a)(18), even if the financial institution verifies or otherwise obtains an applicant's minority-owned business status for other purposes. Moreover, as proposed in the instructions in appendix F, a financial institution would not be required or permitted to verify the applicant's response to the financial institution's inquiry pursuant to proposed § 1002.107(a)(18) regarding minority-owned business status.

Proposed comment 107(a)(18)–6 would clarify that a financial institution does not report minority-owned business status based on visual observation, surname, or any basis other than the applicant's response to the inquiry that the financial institution makes to satisfy § 1002.107(a)(18) or, if the financial institution is permitted to report based on previously collected data, on the basis of the applicant's response to the inquiry that the financial institution previously made to satisfy § 1002.107(a)(18).

Proposed comment 107(a)(18)–7 would clarify that a financial institution may report minority-owned business status based on previously collected data if the financial institution is permitted to do so pursuant to proposed § 1002.107(c)(2) and its commentary.

Consistent with its approach during the SBREFA process, the Bureau is not proposing that financial institutions collect or report minority-owned

---

[645] Id. at 45.

[646] Proposed appendix G would include a similar requirement to notify applicants that they are not required to provide information regarding principal owners' ethnicity, race, and sex and a similar prohibition on financial institutions requiring that applicants provide such information.

[647] The Bureau seeks additional comment regarding foreign language forms and notices in the section-by-section analysis of proposed appendix E below.

AdminRecord-000540

business status based on visual observation, surname, or any method other than an applicant-provided response to a specific inquiry asked for purposes of proposed § 1002.107(a)(18). Similarly, the Bureau is not proposing that financial institutions be permitted or required to verify an applicant's response. Although the Bureau is proposing that financial institutions collect and report a principal owner's ethnicity and race based on visual observation and/or surname in certain circumstances, the Bureau believes that there would be additional complexities and difficulties with attempting to collect and report minority-owned business status based on visual observation and/or surname. Some of these additional difficulties arise because the financial institution may need to determine who controls the applicant as well as who owns the applicant and who realizes the net profits and losses. Other difficulties arise from the fact that the financial institution would need to know how each natural person it meets with in person fits into the ownership structure of the applicant as well as its control and profit structures. For example, it would not be sufficient to know whether a natural person is an owner. The financial institution also would need to know what percentage of the ownership interest and control the natural person held and, if that ownership was not more than 50 percent, the institution would need to know who owned and controlled the remainder of the applicant. An additional complication, specific to this data point, arises when the financial institution is not able to visually observe absent owners. In these cases, the financial institution may not be able to determine if the business is a minority-owned business. Thus, even if a financial institution has an in-person meeting with one or more natural persons associated with an applicant, it may be difficult or impossible for the financial institution to determine if an applicant is a minority-owned business.

The Bureau seeks comment on its proposed approach to this data point, including the proposed methods of collecting and reporting the data. The Bureau also requests comment on whether additional clarification regarding any aspect of this data point is needed. In particular, the Bureau seeks comment on whether applicants are likely to have difficulty understanding and determining the information they are being asked to provide and, if so, how the Bureau may mitigate such difficulties.

## 107(a)(19) Women-Owned Business Status

### Background

ECOA section 704B(b) requires financial institutions to inquire whether applicants for credit are women-owned businesses and to maintain a record of the responses to that inquiry separate from the applications and accompanying information. Section 704B(c) provides that applicants for credit may refuse to provide information requested pursuant to 704B(b). The Bureau is proposing § 1002.107(a)(19) to address how a financial institution would collect and report an applicant's women-owned business status.

### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions be permitted to collect and report women-owned business status solely based on applicant self-reporting and that the Bureau was not considering requiring reporting based on visual observation and/or surname.[648] The Bureau also stated that it was considering proposing that the right to refuse under ECOA section 704B(c) apply to the financial institution's specific inquiries regarding minority-owned business status as well as women-owned status and the principal owners' race, sex, and ethnicity.

As with collecting and reporting minority-owned business status, several SERs supported this approach and urged the Bureau to require collection and reporting of women-owned business status based only on the information the applicant provides (i.e., self-reporting).[649] SERs also expressed concerns about the difficulties and costs that may be associated with collecting women-owned business status on some basis other than applicant self-reporting. For example, although many SERs indicated that they review some ownership information about applicants in order to obtain guarantees or for other reasons, most of those SERs said that they do not review the accrual of net profits and losses and some said that they do not review information related to who controls an applicant. One SER said that determining ownership is relatively straightforward, but the issue of control can be subjective. One SER said that it would not be able to determine who controlled an applicant and that an applicant would need to self-report that information. Another

SER noted that some small business applicants do not have simple ownership structures. A different SER stated that some financial institutions do not meet in person with all of the owners of small business applicants.

As with collecting and reporting minority-owned business status, other industry stakeholders providing feedback on the SBREFA Outline also supported collection and reporting of women-owned business status based only on applicant self-reporting and noted several challenges with reporting this data point based on visual observation and/or surname. Some industry commenters stated that it would not be possible to report women-owned business status based on visual observation and/or surname in, at least, some circumstances. Others expressed concerns about the cost and time required to do so. One industry commenter noted that the tracking of ownership and other information needed to report based on visual observation and/or surname would be laborious. Another commenter noted that some financial institutions do not obtain the information necessary to make the determinations that would underlie a visual observation requirement (i.e., information about ownership, control, etc.). One commenter specifically noted that the statute only requires financial institutions to "inquire" about women-owned business status. Conversely, a community group opposed reporting based only on applicant self-reporting.

Some commenters stated that financial institutions should not be required to collect or report this information at all, or that they should not be required to collect or report it in certain situations, such as when a trust or other entity owns or controls an applicant.

Some SERs and a few other commenters said that the Bureau should create a tool or otherwise arrange for applicants to self-report, at least, demographic information (namely women-owned business status and minority-owned business status as well as the ethnicity, race, and sex of principal owners) directly to the Bureau or to a third-party that maintains a database of such information.

Some SERs were concerned that, if notified of their right to refuse, applicants may not provide protected demographic information, thus limiting the usefulness of 1071 data. One SER and several other commenters similarly agreed with the Bureau's proposal under consideration to limit the right to refuse to applicants' protected demographic information only. However, three

---

[648] SBREFA Outline at 25–26.
[649] SBREFA Panel Report at 26.

commenters opined that the Bureau's approach was too limited and that the right to refuse should apply to small business status as well as other data points. Several SERs requested that the Bureau provide sample language for use in any disclosure and collection forms in which an applicant's right to refuse is stated, so that applicants understand why lenders are requesting protected demographic information and how the information will be used. Two SERs asked that the Bureau provide sample language in English as well as in other languages, such as Spanish.

The SBREFA Panel recommended that the Bureau consider creating sample data collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of this data point.[650] The SBREFA Panel recommended that the Bureau consider developing sample disclosure language that financial institutions may use to provide some context as to why applicants are being asked to provide protected demographic information, in order to encourage applicants to respond.[651] It also recommended that the Bureau should consider providing these sample data collection forms in other languages, such as Spanish.[652]

Proposed Rule

Consistent with its approach during the SBREFA process, proposed § 1002.107(a)(19) would require financial institutions to collect and report whether an applicant is a women-owned business. Proposed § 1002.107(a)(19) would also require financial institutions to collect and report whether women-owned business status is being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). It would also require that when the financial institution requests women-owned business status from an applicant, the financial institution inform the applicant that the financial institution cannot discriminate on the basis of the applicant's women-owned business status, or on whether the applicant provides this information. Finally, proposed § 1002.107(a)(19) would refer to proposed appendix F for additional details regarding how financial institutions are required to collect and report women-owned business status. Proposed appendix F would include a requirement that a financial institution inform an applicant that the applicant is not required to respond to the financial

institution's questions regarding the applicant's women-owned business status and minority-owned business status, and a prohibition on financial institutions requiring applicants to provide this information. Consistent with the SBREFA Panel's recommendation, proposed appendix E, which is a sample data collection form, would include a question about women-owned business status and related information to assist applicants with responding to the question.

Proposed comment 107(a)(19)–1 would clarify that a financial institution would be required to ask an applicant if it is a women-owned business for each covered application unless the financial institution is permitted to report women-owned business status based on previously collected data. Additionally, the financial institution would be required to permit an applicant to refuse to answer the financial institution's inquiry and to inform the applicant that it is not required to provide the information. The financial institution would report the applicant's response, its refusal to answer the inquiry (such as when the applicant indicates that it does not wish to provide the requested information), or its failure to respond (such as when the applicant fails to submit a data collection form) to the inquiry. See proposed appendix F for additional instructions on how the Bureau proposes that financial institutions collect and report women-owned business status.

Proposed comment 107(a)(19)–2 would explain that a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of an applicant's women-owned business status or on whether the applicant provides the information. It would also clarify that a financial institution may combine this non-discrimination notice regarding women-owned business status with the similar non-discrimination notices that a financial institution is required to provide when requesting minority-owned business status and a principal owner's ethnicity, race, and sex if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

Proposed comment 107(a)(19)–3 would explain how, pursuant to proposed § 1002.111(b), financial institutions must record an applicant's response regarding women-owned business status pursuant to proposed § 1002.107(a)(19) separate from the

application and accompanying information. This proposed comment would also provide examples of how responses could be recorded separately from the application and accompanying information.

Proposed comment 107(a)(19)–4 would state that pursuant to proposed § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's women-owned business status. However, if a financial institution does not receive a response, the financial institution would report that the applicant's women-owned business status is "not provided by applicant."

Proposed comment 107(a)(19)–5 would state that notwithstanding proposed § 1002.107(b) (regarding verification of applicant-provided information), a financial institution would report the applicant's response, its refusal to answer the inquiry, or its failure to respond to the inquiry pursuant to proposed § 1002.107(a)(19), even if the financial institution verifies or otherwise obtains an applicant's women-owned business status for other purposes. Moreover, as proposed in the instructions in appendix F, a financial institution would not be required or permitted to verify the applicant's response to the financial institution's inquiry pursuant to proposed § 1002.107(a)(19) regarding women-owned business status. Thus, for example, under the principle articulated in proposed comment 107(a)(19)–5, a financial institution could not second guess an applicant's decision to determine whether it is a women-owned business for purposes of proposed § 1002.107(a)(19) based on the gender identity of the principal owners. The Bureau seeks comment on whether it would be useful to expressly codify this application of the principle in the commentary.

Proposed comment 107(a)(19)–6 would clarify that a financial institution does not report women-owned business status based on visual observation, surname, or any basis other than the applicant's response to the inquiry that the financial institution makes to satisfy proposed § 1002.107(a)(19) or, if the financial institution is permitted to report based on previously collected data, on the basis of the applicant's response to the inquiry that the financial institution previously made to satisfy proposed § 1002.107(a)(19).

Proposed comment 107(a)(19)–7 would clarify that a financial institution may report women-owned business status based on previously collected

---

[650] Id. at 45.
[651] Id.
[652] Id.

**56476**    **Federal Register**/Vol. 86, No. 193/Friday, October 8, 2021/Proposed Rules

data if the financial institution is permitted to do so pursuant to proposed § 1002.107(c)(2) and its commentary.

Consistent with its approach during the SBREFA process, the Bureau is not proposing that financial institutions collect or report women-owned business status based on visual observation, surname, or any method other than an applicant-provided response to a specific inquiry asked for purposes of proposed § 1002.107(a)(19). Similarly, the Bureau is not proposing that financial institutions be permitted or required to verify an applicant's response. Although the Bureau is proposing that financial institutions collect and report a principal owner's ethnicity and race based on visual observation and/or surname in certain circumstances, the Bureau believes that there would be additional complexities and difficulties with attempting to collect and report women-owned business status based on visual observation and/or surname. Some of these additional difficulties arise because the financial institution may need to determine who controls the applicant as well as who owns the applicant and who realizes the net profits and losses. Other difficulties arise from the fact that the financial institution would need to know how each natural person it meets with in person fits into the ownership structure of the applicant as well as its control and profit structures. For example, it would not be sufficient to know whether a natural person is an owner. The financial institution also would need to know what percentage of the ownership interest and control the natural person held and, if that ownership was not more than 50 percent, the institution would need to know who owned and controlled the remainder of the applicant. An additional complication, specific to this data point, arises when the financial institution is not able to visually observe absent owners. In these cases, the financial institution may not be able to determine if the business is a women-owned business. Thus, even if a financial institution has an in-person meeting with one or more natural persons associated with an applicant, it may be difficult or impossible for the financial institution to determine if an applicant is a women-owned business.

The Bureau seeks comment on its proposed approach to this data point, including the proposed methods of collecting and reporting the data. The Bureau also requests comment on whether additional clarification regarding any aspect of this data point is needed. In particular, the Bureau

seeks comment on whether applicants are likely to have difficulty understanding and determining the information they are being asked to provide and, if so, how the Bureau may mitigate such difficulties.

## 107(a)(20) Ethnicity, Race, and Sex of Principal Owners

### Background

ECOA section 704B(e)(2)(G) requires financial institutions to compile and maintain certain information, including the race, sex, and ethnicity of an applicant's principal owners. However, section 1071 does not set out what categories should be used when collecting and reporting this information. The Bureau is proposing § 1002.107(a)(20) to address how a financial institution would collect and report the ethnicity, race, and sex of an applicant's principal owners. See the section-by-section analysis of proposed § 1002.102(o) above for a discussion of the definition of a principal owner.

### SBREFA Proposal Under Consideration and Feedback

In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions use the aggregate race, sex, and ethnicity categories from Regulation C when requesting that applicants provide race, sex, and ethnicity information of principal owners.[653]

SERs were generally supportive of aligning the race, sex, and ethnicity categories used for reporting demographic information about principal owners in 1071 with the aggregate categories used in Regulation C for HMDA.[654] However, one SER stated that the Bureau should consider revisiting the use of male and female as categories for sex because gender is not binary. Additionally, some other stakeholders, including community groups and a trade association, were opposed to using the HMDA aggregate categories for reporting race and ethnicity. Generally, these commenters opposed the use of the aggregate categories because, they said, those categories could mask discrimination and do not provide sufficient detail or context. These commenters generally supported use of the HMDA disaggregated subcategories for reporting a principal owner's race and ethnicity.

Additionally, in the SBREFA Outline, the Bureau stated that it was considering proposing that the collection and reporting of a principal

owner's race, sex, and ethnicity be based solely on applicant self-reporting. The Bureau stated in the SBREFA Outline that it anticipated that requiring reporting based on visual observation and/or surname could create unwarranted compliance burdens in the context of small business lending, although the Bureau sought feedback on the potential challenges, costs, and benefits of implementing such a requirement. The Bureau also stated in the SBREFA Outline that it was considering developing a sample data collection form to assist industry in collecting this information and to communicate an applicant's right to refuse to provide such information.[655]

SERs generally supported applicants' self-reporting of principal owners' race, sex, and ethnicity and strongly preferred that financial institutions not be required to report based on visual observation and/or surname. Some SERs said financial institutions should not be required to "guess" the race, sex, and ethnicity of principal owners, remarking, among other things, that doing so is both extremely difficult and ineffective, and that collecting demographic information based on visual observation makes staff uncomfortable. Another SER said that reporting demographic information based on visual observation and/or surname is likely to introduce both error and bias to the process. One SER stated that financial institutions do not always meet with all principal owners of a business in person and that financial institutions occasionally meet with a manager or officer who might not be a principal owner. Conversely, another SER stated that when relying on applicants to self-report demographic information, there are higher rates of non-FEFF responses in the business lending context compared to consumer residential lending. This SER suggested that the Bureau will need to account for this disparity.

Other industry and trade association stakeholders that commented on the SBREFA Outline also generally supported applicants' self-reporting of principal owners' race, sex, and ethnicity and strongly preferred that financial institutions not be required to report this information based on visual observation and/or surname. Some of these commenters noted that some financial institutions might not know who a business's principal owners are, might not collect the information necessary to determine who they are, or might not meet in person with principal owners. Others asserted that reporting

---

[653] SBREFA Outline at 32.
[654] SBREFA Panel Report at 29–30.

[655] SBREFA Outline at 32.

AdminRecord-000543

based on visual observation and/or surname increases the cost and time to process a small business loan, may result in inaccurate data, and may create awkward situations or customer disputes. One trade association argued that the statute only requires financial institutions to "inquire" about a principal owner's race, sex, and ethnicity. However, two community groups stated that financial institutions should be permitted or required to report based on visual observation and/or surname when an applicant does not provide the information, and a CDFI stated that financial institutions should be required to report race, sex, and ethnicity based on visual observation and/or surname only when an applicant does not provide the information and does not refuse to provide the information.

Two industry commenters suggested that the Bureau create a tool or otherwise arrange for applicants to self-report, at least, demographic information (namely minority-owned business status and women-owned business status as well as the race, sex, and ethnicity of principal owners) directly to the Bureau or to a third-party that maintains a database of such information.

Some SERs were concerned that, if notified of their right to refuse, applicants may not provide protected demographic information, thus limiting the usefulness of 1071 data. One SER and several other commenters similarly agreed with the Bureau's proposal under consideration to limit the right to refuse to applicants' protected demographic information only. However, three commenters opined that the Bureau's approach was too limited and that the right to refuse should apply to small business status as well as other data points. Several SERs requested that the Bureau provide sample language for use in any disclosure and collection forms in which an applicant's right to refuse is stated, so that applicants understand why lenders are requesting protected demographic information and how the information will be used. Two SERs asked that the Bureau provide sample language in English as well as in other languages, such as Spanish.

One trade association requested that reporting of a principal owner's race, sex, and ethnicity not be required in certain situations, such as when a principal owner is a trust or another entity.

Some SERs and other commenters requested that the Bureau develop a form to assist financial institutions with collecting the race, sex, and ethnicity of principal owners. One SER suggested

developing a sample data collection form similar to the one used for HMDA data collection and including the same disclosures. One commenter noted that the use of a model form may increase the uniformity and consistency of reporting such demographic information. Another commenter suggested that any model form should include an explanation of why the financial institution is requesting the information and a statement of the applicant's right to refuse to provide the information.[656]

The SBREFA Panel recommended that, in order to assist both small financial institutions and small business applicants, the Bureau consider creating sample data collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of this data point. The Panel also recommended that the Bureau additionally consider providing such sample data collection forms in other languages, such as Spanish.[657]

*Proposed Rule*

Proposed § 1002.107(a)(20) would require financial institutions to collect and report the ethnicity, race, and sex[658] of the applicant's principal owners as well as whether this information is being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). It would also require financial institutions to report whether the ethnicity and race are being reported by the financial institution on the basis of visual observation or surname. Proposed § 1002.107(a)(20) would require financial institutions to collect and report ethnicity, race, and sex data as prescribed in proposed appendix G. Proposed appendix G would include a requirement that a financial institution inform an applicant that the applicant is not required to respond to the financial institution's questions regarding its principal owners' ethnicity, race or sex and would also include a prohibition on financial institutions requiring applicants to provide this information. Proposed § 1002.107(a)(20) would also require that when the financial institution requests ethnicity, race, and sex information from an applicant, the financial institution inform the

applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex, or on whether the applicant provides this information. Consistent with the SBREFA Panel's recommendation, the Bureau is proposing a sample data collection form that financial institutions could use to collect ethnicity, race, and sex information. See proposed appendix E.

*Proposed Rule—Collecting Ethnicity, Race, and Sex, In General*

Proposed comment 107(a)(20)–1 would clarify how a financial institution collects ethnicity, race, and sex information. It would state that unless a financial institution is permitted to report ethnicity, race, and sex information based on previously collected data pursuant to proposed § 1002.107(c)(2), a financial institution must ask an applicant to report its principal owners' ethnicity, race, and sex for each covered application and that the financial institution must permit an applicant to refuse to answer the financial institution's inquiry. It would require financial institutions to inform the applicant that it is not required to provide the information. Proposed comment 107(a)(20)–1 would further clarify that the financial institution must report the applicant's responses, its refusal to answer the inquiries, or its failure to respond to the inquiries, and explain that in certain situations, discussed in proposed comments 107(a)(20)–7 and –8 and in appendix G, a financial institution may also be required to report one or more principal owners' ethnicity and race (but not sex) based on visual observation and/or surname. Proposed comment 107(a)(20)–1 would cross-reference proposed appendix G for additional instructions.

Proposed comment 107(a)(20)–2 would explain that a financial institution must inform the applicant that the financial institution shall not discriminate on the basis of a principal owner's ethnicity, race, or sex or on whether the applicant provides that information. It would also clarify that a financial institution may combine this non-discrimination notice with the similar non-discrimination notices that a financial institution would be required to provide when requesting minority-owned business status and women-owned business status if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

---

[656] For additional information related to SBREFA feedback on the right to refuse, see the section-by-section analyses of proposed § 1002.107(a)(18) and (19) above.

[657] SBREFA Panel Report at 46.

[658] While ECOA section 704B(e)(2)(G) uses "race, sex, and ethnicity," the Bureau has reordered them to "ethnicity, race, and sex" for purposes of this proposal, so that they appear alphabetically and for consistency with how they appear in Regulation C.

AdminRecord-000544

Proposed comment 107(a)(20)–3 would explain how, pursuant to proposed § 1002.111(b), financial institutions must record applicants' responses regarding a principal owner's ethnicity, race, and sex pursuant to § 1002.107(a)(20) separate from the application and accompanying information. This proposed comment would also provide examples of how responses could be recorded separately from the application and accompanying information.

Proposed comment 107(a)(20)–4 would clarify that a financial institution would be required to maintain procedures reasonably designed to collect applicant-provided information, including the ethnicity, race, and sex of an applicant's principal owners pursuant to proposed § 1002.107(c)(1). However, if a financial institution is nonetheless unable to collect the principal owners' ethnicity, race, or sex from the applicant and if the financial institution is not required to report the principal owners' ethnicity and race based on visual observation and/or surname, the financial institution would report that the principal owner's ethnicity, race, or sex (as applicable) is "not provided by applicant."

Proposed comment 107(a)(20)–12 would clarify that a financial institution would neither be required nor permitted to verify the ethnicity, race, or sex information that the applicant provides for purposes of proposed § 1002.107(a)(20), even if the financial institution verifies or otherwise obtains the ethnicity, race, or sex of the applicant's principal owners for other purposes. Thus, for example, under the principle articulated in proposed comment 107(a)(20)–12, a financial institution could not second guess an applicant's decision to provide sex information for the applicant's principal owners for purposes of § 1002.107(a)(20) based on the gender identity of the principal owners. The Bureau solicits comment on whether it would be useful to expressly codify this application of the principle in the commentary.

Additionally, the proposed comment would explain that, if an applicant refuses to respond to the inquiry pursuant to proposed § 1002.107(a)(20) or fails to respond to this inquiry, the financial institution would report that the applicant declined to provide the information or did not respond to the inquiry (as applicable), unless the financial institution is required to report ethnicity and race based on visual observation and/or surname. Finally, the proposed comment would explain that the financial institution does not report ethnicity, race, or sex pursuant to

proposed § 1002.107(a)(20) based on information that the financial institution collects for other purposes.

Proposed comment 107(a)(20)–5 would explain that generally an applicant determines its principal owners and decides whether to provide information about principal owners. It would further state that, nonetheless, a financial institution may be required to report ethnicity and race information based on visual observation and/or surname and may need to determine if a natural person with whom the financial institution meets in person is a principal owner. It would explain how a financial institution determines who is a principal owner in the event that the financial institution may be required to report ethnicity and race information based on visual observation and/or surname. It would also provide examples of how the financial institution can make that determination and note that the financial institution is not required to verify any responses regarding whether a natural person is a principal owner.

The Bureau seeks comment on these general aspects of collecting and reporting principal owners' ethnicity, race, and sex, including comments on the challenges that financial institutions may have implementing them.

Proposed Rule—Collecting Ethnicity and Race Using Aggregate Categories and Disaggregated Subcategories

The Bureau is proposing that financial institutions request principal owners' ethnicity and race using both aggregate categories as well as disaggregated subcategories.

With respect to ethnicity data collection, the Bureau is proposing to use the same aggregate categories (*i.e.,* Hispanic or Latino and Not Hispanic or Latino) and disaggregated subcategories as are used in Regulation C. With respect to race data collection, the Bureau is proposing to use the same aggregate categories as are used in Regulation C: American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander; and White. Regulation C also has disaggregated subcategories for the Asian race category and the Native Hawaiian or Other Pacific Islander race category. In addition, with respect to the American Indian or Alaska Native race category, Regulation C invites an applicant to provide the name of a principal or enrolled tribe. Similar to HMDA, the Bureau is proposing to invite an applicant to provide the name of a principal or enrolled tribe for each principal owner with respect to the Indian or Alaska

Native race category and to adopt the disaggregated subcategories used in HMDA for the Asian race category and the Native Hawaiian and Other Pacific Islander race category. In addition, the Bureau is proposing to add disaggregated subcategories for the Black or African American race category, which are not used when collecting data pursuant to Regulation C.

OMB has issued standards for the classification of Federal data on ethnicity and race.[659] OMB's government-wide standards provide a minimum standard for maintaining, collecting, and presenting data on race and ethnicity for all Federal reporting purposes. These standards have been developed to provide "a common language for uniformity and comparability in the collection and use of data on race and ethnicity by Federal agencies." [660] The OMB standards provide the following minimum categories for data on ethnicity and race: Two minimum ethnicity categories (Hispanic or Latino; Not Hispanic or Latino) and five minimum race categories (American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander; and White). The aggregate categories for ethnicity and race in Regulation C, which the Bureau is proposing to use in subpart B, conform to the OMB standards.

In addition to the minimum data categories for ethnicity and race, the OMB Federal Data Standards on Race and Ethnicity provide additional key principles. First, self-identification is the preferred means of obtaining information about an individual's ethnicity and race, except in instances where observer identification is more practical.[661] Second, the collection of greater detail is encouraged as long as any collection that uses more detail is organized in such a way that the additional detail can be aggregated into the minimum aggregate categories for data on ethnicity and race. More detailed reporting, which can be aggregated to the minimum categories, may be used at the agencies' discretion. Lastly, Federal agencies must produce as much detailed information on ethnicity and race as possible; however, Federal agencies shall not present data on detailed categories if doing so would

---

[659] Off. of Mgmt. & Budget, *Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity,* 62 FR 58782, 58782–90 (Oct. 30, 1997) (OMB Federal Data Standards on Race and Ethnicity).
[660] *See id.*
[661] *See id.*

compromise data quality or confidentiality standards.[662]

Although OMB received comments requesting the creation of a separate Arab or Middle Eastern ethnicity category prior to the adoption of the OMB Federal Data Standards on Race and Ethnicity in 1997, OMB accepted the Interagency Committee's recommendation not to include one in the 1997 minimum standards for reporting of Federal data on race and ethnicity. OMB noted that while it was adopting the Interagency Committee's recommendation, it believed additional research was needed to determine the best way to improve data on this population group.[663]

In 2017, OMB requested comment on the Federal Interagency Working Group for Research on Race and Ethnicity's (Working Group's) proposals to update the OMB Federal Data Standards on Race and Ethnicity.[664] The Working Group proposed adding a Middle Eastern or North African classification to the Federal Data Standards on Race and Ethnicity and to issue specific guidelines for the collection of detailed data for American Indian or Alaska Native, Asian, Black or African American, Hispanic or Latino, Native Hawaiian or Other Pacific Islander, and White groups.[665] The Working Group also considered whether race and ethnicity should be collected using separate questions versus a combined question.

In considering what to propose that financial institutions collect and report with respect to the ethnicity and race of the applicant's principal owners, the Bureau believes it is also important to consider the data standards that the U.S. Census Bureau (Census Bureau) uses in the Decennial Census. The definition of Hispanic or Latino origin used in the 2010 and 2020 Census questionnaire refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.[666] The 2010 and 2020 Census disaggregated the Hispanic or Latino ethnicity into four categories (Mexican, Mexican American,

or Chicano; Puerto Rican; Cuban; and Another Hispanic, Latino or Spanish origin) and included an area where respondents could provide (i.e., write in) a specific Hispanic, Latino, or Spanish origin group as additional information.[667]

The 2010 and 2020 Census questionnaires listed three of OMB's five aggregate race categories (American Indian or Alaska Native; Black or African American; and White). Although the questionnaires do not list the aggregate race categories for Asian or for Native Hawaiian or Other Pacific Islander, they do list the related disaggregated subcategories for the Asian race category (i.e., Asian Indian, Chinese, Filipino, Japanese, Korean, Vietnamese, Other Asian), and for the Native Hawaiian and Other Pacific Islander race category (i.e., Native Hawaiian, Chamorro,[668] Samoan, Other Pacific Islander). These questionnaires also included three areas where respondents could write in a specific race: A specific Other Asian race, a specific Other Pacific Islander race, or the name of an enrolled or principal tribe in the American Indian or Alaska Native category.[669] Additionally, the 2020 Census allowed respondents to write in a specific origin for the White category and for the Black or African American category. For respondents who did not identify with any of the five minimum OMB race categories, the Census Bureau included a sixth race category—Some Other Race—on the 2010 and 2020 Census questionnaires. Respondents could also select one or more race categories and write-in options.[670]

On February 28, 2017, the Census Bureau released its 2015 National Content Test: Race and Ethnicity Analysis Report. The National Content Test (NCT) provided the U.S. Census Bureau with empirical research to contribute to the planning for the content of the 2020 Census' race/ethnicity questions. The report presented findings to the Census Bureau Director and executive staff on research conducted to assess optimal design elements that could be used in question(s) on race and ethnicity. It noted that Americans view "race" and "ethnicity" differently than in decades past and that a growing number of

people find the current race and ethnicity categories confusing, or they wish to see their own specific group reflected on the Census questionnaire. The NCT's research found that there have been a growing number of people who do not identify with any of the official OMB race categories, and that an increasing number of respondents have been racially classified as "Some Other Race." This was primarily because of reporting by Hispanics who did not identify with any of the OMB race categories, but it also noted that segments of other populations, such as Afro-Caribbean and Middle Eastern or North African populations, did not identify with any of the OMB race categories.[671] The 2015 National Content Test: Race and Ethnicity Analysis Report concluded that optimal design elements that may increase reporting, decrease item non-response, and improve data accuracy and reliability include: (1) A combined race and ethnicity question with detailed checkbox options; (2) a separate "Middle Eastern or North African" response category; and (3) instructions to "Mark all that apply" or "Select all that apply" (instead of "Mark [X] one or more boxes").[672]

As discussed above, the Census Bureau did not ultimately incorporate these design elements into the questionnaire for the 2020 Decennial Census. Instead, the questionnaire continued to ask about ethnicity and race in two separate questions. While the questionnaire did not provide detailed check box options for the White race category or for the Black or African American race category, the questionnaire did add write-in options and noted examples. For White, it noted examples of German, Irish, English, Italian, Lebanese, and Egyptian. For Black or African American, it noted examples of African American, Jamaican, Haitian, Nigerian, Ethiopian, and Somali.[673] Nonetheless, as discussed below, the Bureau is requesting comment on whether the approach and design elements set forth in the 2015 National Content Test: Race and Ethnicity Report Analysis (whether in whole or in part) would improve data collection that otherwise furthers section 1071's purposes, improve self-identification of race and ethnicity by applicants and response rates, or impose

---

[662] See id.

[663] 62 FR 58782 (Oct. 30, 1997).

[664] 82 FR 12242 (Mar. 1, 2017).

[665] See OMB Federal Data Standards on Race and Ethnicity.

[666] See U.S. Census Bureau, 2010 Official Questionnaire, https://www.census.gov/history/pdf/2010questionnaire.pdf (2010 Census Official Questionnaire), and U.S. Census Bureau, 2020 Official Questionnaire, https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/questionnaires-and-instructions/questionnaires/2020-informational-questionnaire.pdf (2020 Census Official Questionnaire).

[667] See 2010 Census Official Questionnaire and 2020 Census Official Questionnaire.

[668] The questionnaire for the 2010 Census included "Guamanian or Chamorro," but the questionnaire for the 2020 Census included only "Chamorro."

[669] See 2010 Census Official Questionnaire and 2020 Census Official Questionnaire.

[670] See id.

[671] U.S. Census Bureau, 2015 National Content Test: Race and Ethnicity Analysis Report, Executive Summary, at ix (Feb. 28, 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/final-analysis-reports/2015nct-race-ethnicity-analysis.pdf.

[672] Id. at 83–85.

[673] See 2020 Census Official Questionnaire.

AdminRecord-000546

burdens on financial institutions collecting and reporting this information.

Consistent with its approach during the SBREFA process, the Bureau is proposing that financial institutions must permit applicants to provide a principal owner's ethnicity and race using the aggregate categories used for HMDA data collection. The Bureau also believes that aligning the aggregate ethnicity and race categories for 1071 data collection with the HMDA data collection will promote consistency and may reduce potential confusion for applicants, financial institutions, and other users of the data. As noted above, the feedback received on the SBREFA Outline generally showed that SERs and commenters favored such consistency.

However, the Bureau is also proposing that applicants must be permitted to provide a principal owner's ethnicity and race using the disaggregated subcategories used in HMDA data collection. With respect to ethnicity data collection, the Bureau is proposing that applicants must be permitted to provide a principal owner's ethnicity using the disaggregated subcategories used in HMDA data collection. For race data collection, the Bureau is proposing that applicants must be permitted to provide a principal owner's race using the disaggregated subcategories for the Asian race category and the Native Hawaiian or Other Pacific Islander race category. Unlike HMDA, the Bureau is also proposing that applicants must be permitted to provide a principal owner's race using disaggregated subcategories for the Black or African American race category. Lastly, similar to HMDA, the Bureau is proposing to invite an applicant to provide the name of a principal or enrolled tribe for each principal owner with respect to the American Indian or Alaska Native race category.

This portion of proposed § 1002.107(a)(20) differs from the Bureau's SBREFA approach. The Bureau is proposing use of disaggregated subcategories for 1071 data collection, in part, for consistency with existing HMDA reporting requirements. Moreover, based on feedback received during the SBREFA process from SERs and other stakeholders, the Bureau believes that collection and reporting using disaggregated subcategories could be beneficial when attempting to identify potential discrimination or business and community development needs in particular communities. While the Bureau recognizes that disaggregated data may not be useful in analyzing potential discrimination where financial institutions do not have a sufficient number of applicants or borrowers within particular subgroups to permit reliable assessments of whether unlawful discrimination may have occurred, disaggregated data on ethnicity and race may help identify potentially discriminatory lending patterns in situations in which the numbers are sufficient to permit such fair lending assessments. Additionally, as suggested in the 2015 National Content Test: Race and Ethnicity Report Analysis, the use of disaggregated subcategories may increase response rates.

Nonetheless, the Bureau acknowledges the concerns that some SERs and other stakeholders raised regarding the collection and reporting of disaggregated data. In particular, the Bureau understands that including the disaggregated subcategories for four principal owners may make data collection more difficult in certain situations, such as for applications taken solely by telephone or for paper applications taken at retail locations. Given these concerns, the Bureau seeks comment on whether an accommodation should be made for certain application scenarios, for example by permitting financial institutions to collect ethnicity and race information using only the aggregate categories or to permit financial institutions to collect ethnicity, race, and sex information on only one principal owner in those scenarios. Additionally, the Bureau notes that FinCEN's CDD rule excludes from certain of its requirements point-of-sale transactions for the purchase of retail goods or services up to a limit of $50,000.[674] For the reasons discussed in more detail in the section-by-section analysis of proposed § 1002.107(c)(1) below, the Bureau is not proposing to take this approach for the 1071 rule given the different purposes and requirements of the CDD rule (as well as FinCEN's related customer identification program (CIP) rule)[675]

and section 1071. Nonetheless, the Bureau seeks comment on whether covered applications taken at retail locations, such as credit cards and lines of credit with a credit limit under a specified amount (such as $50,000), should be excepted from some or all of the requirement to obtain principal owners' ethnicity, race, and sex information. For example, should financial institutions only be required to ask about principal owners' sex along with aggregate race and ethnicity categories (but not disaggregated subcategories), or to ask about only one principal owner's ethnicity, race, and sex for such applications?

The Bureau seeks comment on its proposed use of the HMDA aggregate categories, the HMDA disaggregated subcategories (including the ability to provide additional information if an applicant indicates that a principal owner is Other Hispanic or Latino, Other Asian, or Other Pacific Islander), and the addition of disaggregated subcategories for the Black or African American category. Additionally, the Bureau seeks comment regarding whether it would be helpful or appropriate to provide additional clarification or to pursue a different approach regarding the ability of a principal owner to identify as Other Hispanic or Latino, Other Asian, or Other Pacific Islander or to provide additional information if a principal owner is Other Hispanic or Latino, Other Asian, or Other Pacific Islander. The Bureau also seeks comment on whether any additional or different categories or subcategories should be used for 1071 data collection, and whether the collection and reporting of race and ethnicity should be combined into a single question for purposes of 1071 data collection and reporting. The Bureau further seeks comment on whether an additional category for Middle Eastern or North African should be added and, if so, how this category should be included and defined. In addition, the Bureau seeks comment on whether disaggregated subcategories should be added for the aggregate White category, and if so, what disaggregated subcategories should be added and whether the applicant should be permitted to write in or otherwise provide other disaggregated subcategories or additional information. The Bureau seeks comment on whether the approach and design elements set forth in the 2015 National Content Test: Race and Ethnicity Report Analysis

---

[674] 31 CFR 1010.230(h)(1)(i). The CDD exclusion for certain POS transactions is based on the "very low risk posed by opening such accounts at [a] brick and mortar store." Fin. Crimes Enf't Network, U.S. Dep't of Treasury, *Guidance: Frequently Asked Questions Regarding Customer Due Diligence Requirements for Financial Institutions,* at Q 29 (Apr. 3, 2018), *https://www.fincen.gov/sites/default/files/2018-04/FinCEN_Guidance_CDD_FAQ_FINAL_508_2.pdf.*

[675] FinCEN's CIP rule does not include a point of sale exclusion. While the rule permits *verification* of customer identity information within a reasonable time after an account is opened, the *collection* of required customer information must occur prior to account opening. *See* 31 CFR 1020.220(a)(2)(i)(A) and (ii). For credit card accounts, a bank may obtain identifying

information about a customer from a third-party source prior to extending credit to the customer. 31 CFR 1020.220(a)(2)(i)(C).

AdminRecord-000547

would improve data collection or otherwise further section 1071's purposes, as well as whether it would pose any particular burdens or challenges for financial institutions collecting and reporting this information. Finally, the Bureau seeks comment on whether, similar to data collection pursuant to Regulation C, financial institutions should be limited to reporting a specified number of aggregate categories and disaggregated subcategories and, if so, whether such a limitation should be described in the sample data collection form.

Proposed comment 107(a)(20)–6 would explain that applicants must be permitted to provide a principal owner's ethnicity using aggregate categories and disaggregated subcategories and would also list the aggregate categories and disaggregated subcategories that applicants must be permitted to use. Proposed comment 107(a)(20)–6 would also explain that applicants must be permitted to select one, both, or as many disaggregated subcategories as the applicant chooses, even if the applicant does not select the corresponding aggregate category. Proposed comment 107(a)(20)–6 would state that, if an applicant provides ethnicity information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant, and it would provide an example. The proposed comment would state that a financial institution must also permit the applicant to refuse to provide ethnicity information for one or more principal owners and explain how a financial institution reports ethnicity information if an applicant declines to provide the information or fails to respond. Finally, the proposed comment would explain how a financial institution reports ethnicity information if an applicant has fewer than four principal owners, and it would provide an example.

Proposed comment 107(a)(20)–7 would explain that applicants must be permitted to provide a principal owner's race using aggregate categories and disaggregated subcategories and would also list the aggregate categories and disaggregated subcategories that applicants must be permitted to use. Proposed comment 107(a)(20)–7 would also explain that applicants must be permitted to select one, more than one, or none of the aggregate categories and as many disaggregated subcategories as the applicant chooses, even if the applicant does not select the corresponding aggregate category. Proposed comment 107(a)(20)–7 would

explain that, if an applicant provides race information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant, and it would provide an example. The proposed comment would state that a financial institution must also permit the applicant to refuse to provide race information for one or more principal owners and explains how a financial institution reports race information if an applicant declines to provide the information or fails to respond. Finally, the proposed comment would explain how a financial institution reports race information if an applicant has fewer than four principal owners, and it would provide an example.

Proposed Rule—Collecting Sex

Federal, State, and local government agencies have been moving to providing options for designating sex beyond the binary options of male or female. At the Federal level, for example, the Department of State has announced that it is planning to offer the option of a new gender marker for non-binary, intersex, and gender non-conforming persons. It will be available for passports and Consular Reports of Birth Abroad as an alternative to male or female.[676] The Food and Drug Administration includes the gender options female, male, intersex, transgender, and "prefer not to disclose" on certain patient forms.[677] A number of States and the District of Columbia, as well as some local governments, offer an alternative sex or gender designation to male and female (*e.g.,* "X") on government-issued documents and forms such as drivers' licenses and identification cards, and in some cases birth certificates.[678]

The Supreme Court's opinion last year in *Bostock* v. *Clayton County* concluded that sex discrimination encompasses sexual orientation discrimination and gender identity discrimination, and that these forms of discrimination necessarily involve consideration of sex.[679] It reached this conclusion in the context of Title VII of the Civil Rights Act of 1964, as amended,[680] which prohibits sex discrimination in employment.[681] Following the issuance of the Supreme Court's opinion and building on a 2016 letter the Bureau sent to an advocacy organization,[682] the Bureau issued an interpretive rule clarifying that ECOA's and Regulation B's prohibition on discrimination based on sex protects against discrimination based on sexual orientation, gender identity, actual or perceived nonconformity with sex based or gender-based stereotypes, and the sex of people associated with the applicant.[683] Other Federal agencies have similarly clarified that other statutes that protect against

Connecticut Dep't of Motor Vehicles, *Gender Designation on a License or Identification Card, https://portal.ct.gov/-/media/DMV/20/29/B-385.pdf*; District of Columbia Dep't of Motor Vehicles, *Procedure For Establishing or Changing Gender Designation on a Driver License or Identification Card* (June 13, 2017), *https://dmv.dc.gov/sites/default/files/dc/sites/dmv/publication/attachments/DC%20DMV%20Form%20Gender%20Self-Designation%20English.pdf*, *DC Driver License or Identification Card Application* (Jan. 2019), *https://dmv.dc.gov/sites/default/files/dc/sites/dmv/publication/attachments/DMV%20BOE%20Application_2-15-19.pdf*; Maine Bureau of Motor Vehicles, *Gender Designation Form* (Nov. 4, 2019), *https://www1.maine.gov/sos/bmv/forms/GENDER%20DESIGNATION%20FORM.pdf*; State of Nevada Dep't of Motor Vehicles, *Name Changes, https://dmvnv.com/namechange.htm*; State of New Jersey Dep't of Health, Off. of Vital Statistics and Registry, *Request Form and Attestation (REG–L2) to Amend Sex Designation to Reflect Gender Identity on a Birth Certificate—Adult* (Feb. 2019), *https://www.nj.gov/health/forms/reg-l2_1.pdf*; 2019 N.J. Sess. Law Serv. ch. 271; New Mexico Motor Vehicle Div., *Request for Sex Designation Change, http://realfile.tax.newmexico.gov/mvd10237.pdf*; New Mexico Dep't of Health, *Request to Change Gender Designation on a Birth Certificate* (Oct. 2019), *https://www.nmhealth.org/publication/view/form/5429/*; Virginia Dep't of Motor Vehicles, *Driver's License and Identification Card Application* (July 1, 2021), *https://www.dmv.virginia.gov/webdoc/pdf/dl1p.pdf*; Washington State Dep't of Licensing, *Change of Gender Designation* (Nov. 2019), *https://www.dol.wa.gov/forms/520043.pdf*; New York City Dep't of Homeless Services, Off. of Policy, Procedures and Training. *Transgender, Non-binary, and Intersex Clients* (July 15, 2019), *https://www1.nyc.gov/assets/dhs/downloads/pdf/dhs_policy_on_serving_transgender_non_binary_and_intersex_clients.pdf*.

679 *See Bostock,* 140 S. Ct. 1731.

680 42 U.S.C. 2000e *et seq.*

681 *Bostock,* 140 S. Ct. 1731.

682 *See* Letter from Bureau of Consumer Fin. Prot., to Serv. & Advocacy for GLBT Elders (SAGE) (Aug. 30, 2016), *https://files.consumerfinance.gov/f/documents/cfpb_sage-response-letter_2021-02.pdf*.

683 86 FR 14363 (Mar. 16, 2021).

676 *See* U.S. Dep't of State, *Proposing Changes to the Department's Policies on Gender on U.S. Passports and Consular Reports of Birth Abroad* (June 30, 2021), *https://www.state.gov/proposing-changes-to-the-departments-policies-on-gender-on-u-s-passports-and-consular-reports-of-birth-abroad/*.

677 *See* Food & Drug Admin., *MedWatch forms FDA 3500 and 3500A* (Sept. 12, 2018) (approved under OMB No. 0910–0291), *https://www.fda.gov/media/76299/download* and *https://www.fda.gov/media/69876/download*.

678 *See, e.g.,* Cal. S.B. 179, *Gender identity: female, male or nonbinary* (Oct. 16, 2017), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB179*; State of California Dep't of Motor Vehicles, *Driver's License or ID Card Updates, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/updating-information-on-your-driver-license-or-identification-dl-id-card/* (last visited July 23, 2021); Colo. Dep't of Revenue, *Change of Sex Designation, https://drive.google.com/file/d/1PeYZd7U43ar6Flg8lFAT1Etg1EPdLVUy/view*; State of

discrimination based on sex protect against discrimination based on sexual orientation and gender identity.[684]

Some other Federal agencies have also begun to re-consider how they collect information on sex by including questions about sexual orientation and gender identity as part of questions about sex. For example, the Census Bureau released the Household Pulse Survey,[685] which asked questions about sex assigned at birth, current gender identity, and sexual orientation. Specifically, the Household Pulse Survey includes the following three questions:

1. What sex were you assigned at birth, on your original birth certificate? (A respondent could provide a response of male or female.)

2. Do you currently describe yourself as male, female or transgender? (A respondent also could provide a response of "none of these.")

3. Which of the following best represents how you think of yourself?

In response to the third question, a respondent would select from the following responses: (1) Gay or lesbian; (2) Straight, that is not gay or lesbian; (3) Bisexual; (4) Something else; or (5) I don't know.

Other Federal agencies and initiatives have encouraged sexual orientation and gender identity data collection in health care settings.[686]

In light of the Bureau's recent ECOA interpretive rule, the continued evolution of categories used for sex data collection purposes at the Federal, State, and local government levels, and feedback on the SBREFA Outline, the Bureau is proposing to collect information about sex for purposes of section 1071 more expansively than was under consideration in the SBREFA Outline. Specifically, the Bureau is proposing adding an option for "I prefer to self-describe" (with the ability of the applicant to write in or otherwise provide additional information) for the principal owner's sex to accompany the existing "male," "female," and "I do not wish to provide this information" options currently used on the HMDA sample data collection form.

Proposed comment 107(a)(20)–8 would explain that an applicant must be permitted to provide a principal owner's sex using one or more of the following categories: Male, Female, and/or that the principal owner prefers to self-describe their sex. It would further explain that, if an applicant indicates that a principal owner prefers to self-describe their sex, the financial institution would be required to permit the applicant to provide additional information about the principal owner's sex. The financial institution would report to the Bureau the additional information provided by the applicant as free-form text.

Proposed comment 107(a)(20)–8 would state that a financial institution must permit an applicant to select as many categories as the applicant chooses and that the financial institution reports the category or categories selected by the applicant, including any additional information provided by the applicant, or reports that the applicant refused to provide the information or failed to respond. It would clarify that a financial institution is not permitted to report sex based on visual observation, surname, or any basis other than the applicant-provided information. Finally, proposed comment 107(a)(20)–8 would explain how a financial institution would report sex if an applicant has fewer than four principal owners, provide an example, and direct financial institutions to proposed appendix G for additional information on collecting and reporting a principal owner's sex.

The Bureau seeks comment on its proposed approach to requesting information about a principal owner's sex, including the opportunity for self-identification (by allowing the applicant to write in or otherwise provide additional information). The Bureau also seeks comment on whether the sample data collection form should list examples from which the applicant could choose when a principal owner self-identifies and an applicant writes in or otherwise provides additional information about the principal owner's sex, such as "intersex," "non-binary," or "transgender." The Bureau also seeks comment on whether, alternatively, sex should be collected solely via the "I prefer to self-describe" option (with the ability to write in or otherwise provide additional information)—that is, without male and female being listed as options. The Bureau also seeks comment on whether applicants should be restricted from designating more than one category for a principal owner's sex (e.g., from selecting both "Female" and "I prefer to self-describe").

The Bureau also seeks comment on whether financial institutions should be required to ask separate questions regarding sex, sexual orientation, and gender identity and, if so, what categories should be offered for use in responding to each question. For example, the Bureau requests comment on whether the sample data collection form should include the three questions and related responses (described above) from the Pulse Household Survey questionnaire, or a check box for "Principal owner identifies as LGBTQ+" with an accompanying space for providing additional information. The Bureau also seeks comment on whether it should adopt a data point to collect an applicant's lesbian, gay, bisexual, transgender, or queer plus (LGBTQ+)-owned business status, similar to the way it is proposing to collect minority-owned business status and women-owned business status as discussed in the section-by-section analysis of proposed § 1002.107(a)(18) and (19) above. The Bureau also seeks comment on whether including such questions would improve data collection or otherwise further section 1071's purposes, as well as whether it would pose any particular burdens or challenges for industry.

In addition, to ensure that a financial institution's representation of nondiscrimination on the basis of sex information provided by the applicant is consistent with the protections afforded under ECOA and Regulation B, the Bureau seeks comment on whether ambiguity exists for any responses that

---

[684] See, e.g., 86 FR 32637 (June 22, 2021) (Department of Education interpreting Title IX of the Education Amendments of 1972); 86 FR 27984 (May 25, 2021) (Department of Health and Human Services interpreting section 1557 of the Affordable Care Act); Memorandum from Jeanine M. Worden, Acting Assistant Secretary for Fair Housing and Equal Opportunity, Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act (Feb. 11, 2021), https://www.hud.gov/sites/dfiles/PA/documents/HUD_Memo_EO13988.pdf (Department of Housing and Urban Development interpreting the Fair Housing Act).

[685] U.S. Census Bureau, Phase 3.2 Household Pulse Survey (undated), http://www2.census.gov/programs-surveys/demo/technical-documentation/hhp/Phase_3.2_Household_Pulse_Survey_FINAL_ENGLISH.pdf.

[686] See, e.g., Off. of Disease Prevention & Health Promotion, Healthy People (2020), https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health; Off. of the Nat'l Coordinator of Health Info. Tech., 2021 Interoperability Standards Advisory (2021), https://www.healthit.gov/isa/sites/isa/files/inline-files/2021-ISA-Reference-Edition.pdf; Ctrs. for Disease Control & Prevention, Collecting Sexual Orientation and Gender Identity Information (Apr. 1, 2020), https://www.cdc.gov/hiv/clinicians/transforming-health/health-care-providers/collecting-sexual-orientation.html.

Additionally, on April 1, 2021, the Department of Health and Human Services' Administration for Community Living (ACL) published a notice of its submission of a revised National Survey of Older Americans Act Participants for OMB review and clearance. ACL proposed to revise the existing survey to add a new rotating module on COVID–19. In response to an earlier notice related to the survey, ACL received a comment asking it to include survey response options that include "transgender" or "other" with a write-in option. In

response to comments it received on an earlier notice, ACL indicated that it was supporting an ad hoc panel that would be reviewing measures and methodological issues related to measuring sex as a non-binary construct, gender identity, and sexual orientation. ACL indicated that it expected the panel to produce a consensus report in December 2021, and that ACL anticipated using the report as a basis for testing new survey questions. 86 FR 17153 (Apr. 1, 2021).

AdminRecord-000549

an applicant might reasonably use to self-describe a principal owner's sex for purposes of section 1071 (for example, intersex status) and if clarification may be needed.

Finally, the Bureau also requests information on Federal, State, and local government initiatives, as well as private sector initiatives, involving the use of sex categories other than male and female and the inclusion of questions regarding sexual orientation and gender identity in demographic information.

Proposed Rule—Collecting Ethnicity and Race via Visual Observation or Surname in Certain Circumstances

The Bureau is proposing that financial institutions are required to collect and report at least one principal owner's ethnicity and race based on visual observation and/or surname in certain circumstances. Specifically, a financial institution would be required to report at least one principal owner's ethnicity and race based on visual observation and/or surname if the financial institution meets in person with one or more of the applicant's principal owners and the applicant does not provide ethnicity, race, or sex information for at least one principal owner in response to the financial institution's inquiry pursuant to proposed § 1002.107(a)(20).

Although the Bureau indicated in the SBREFA Outline that it was not considering proposing that financial institutions report a principal owner's race, sex, and ethnicity based on visual observation and/or surname, the Bureau asked SERs to provide feedback about the potential challenges, costs, and benefits of implementing such a requirement for applicants who do not self-report the information. The Bureau also asked SERs to provide feedback about how those potential challenges and costs would change if reporting based on visual observation and/or surname was required only if the applicant is a sole proprietor but not if the applicant is an entity. Although many SERs and commenters opposed reporting ethnicity, race, or sex on the basis of visual observation and/or surname, some other commenters said that financial institutions should be required to report based on visual observation and/or surname in certain circumstances. Additionally, one SER specifically noted that the Bureau would need to account for lower self-reporting rates than are achieved for HMDA reporting. Consistent with this feedback, the Bureau notes that demographic response rates in the SBA's Paycheck Protection Program (PPP) data are much lower when

compared to ethnicity, race, and sex response rates in HMDA data.[687] For instance, roughly 71 percent of respondents in the PPP data did not provide a response for race, compared to only 14.7 percent in the HMDA data. Roughly 66 percent of respondents in the PPP data did not provide a response for ethnicity, compared to only 14.3 percent in the HMDA data.[688]

Without a visual observation and/or surname collection requirement, the Bureau believes that meaningful analysis of the 1071 principal owner race and ethnicity data could be difficult, significantly undermining section 1071's fair lending purpose. Comprehensive and accurate collection and reporting of data is also vital to section 1071's business and community development purpose. Historically, one challenge under HMDA has been the reluctance of some applicants to voluntarily provide requested demographic information, such as race and ethnicity. The requirement in Regulation C to collect race, sex, and ethnicity on the basis of visual observation or surname is an important tool to address that challenge, and the Bureau believes that requirement has resulted in more robust response rates in the HMDA data. The Bureau has considered the feedback in response to the SBREFA Outline and this related information and has determined that not proposing a requirement to report based on visual observation and/or surname could diminish the utility of the 1071 data.

Accordingly, the Bureau has determined that the appropriate approach to further section 1071's purposes is to propose to require that financial institutions collect at least one principal owner's race and ethnicity (but not sex) on the basis of visual observation and/or surname when the applicant does not provide ethnicity, race or sex information for at least one principal owner and the financial institution meets in person with one or more principal owners. In other words, a financial institution would not be required to collect race and ethnicity via visual observation and/or surname if the applicant provides *any* demographic information regarding any principal owner. The Bureau is concerned that,

for applicants with multiple principal owners, the financial institution may not be able to determine whether the applicant has provided the demographic information, for example the sex, of the principal owner who meets in person with the financial institution or for another principal owner. The Bureau seeks comment on this proposed approach. The Bureau also seeks comment on whether a financial institution should be required to collect a principal owner's ethnicity and/or race via visual observation and/or surname if the applicant has only one principal owner, the applicant does not provide the principal owner's information, and the financial institution meets in person with the principal owner. In this situation, the financial institution would be able to "match" any demographic information that the applicant provides with the correct the principal owner because there is only one principal owner.

Proposed comment 107(a)(20)–9 would explain that a financial institution is required to report ethnicity and race (but not sex) based on visual observation and/or surname in certain circumstances. The proposed comment would explain that if a financial institution meets in person with one or more of an applicant's principal owners and the applicant does not provide ethnicity, race, or sex information for at least one principal owner, the financial institution must report at least one principal owner's ethnicity and race (but not sex) based on visual observation, surname, or a combination of both visual observation and surname. It would further explain that a financial institution is not required to report based on visual observation and/or surname if the principal owner only meets in person with a third party through whom the applicant is submitting an application to the financial institution and would provide an example.

Proposed comment 107(a)(20)–10 would clarify that a financial institution meets with a principal owner in person if an employee or officer of the financial institution or one of its affiliates has a meeting or discussion with the applicant's principal owner about an application and can visually observe the principal owner. The proposed comment would also provide examples of situations where the financial institution meets in person with a principal owner and where it does not. The Bureau requests comment on this approach and whether additional or different examples are necessary.

Proposed comment 107(a)(20)–11 would clarify that a financial institution

---

[687] Small Bus. Admin., *Paycheck Protection Program Weekly Reports 2021, Version 11,* at 9 (effective Apr. 5, 2021), *https://www.sba.gov/sites/default/files/2021-04/PPP_Report_Public_210404-508.pdf.* PPP data was taken from 2021 loans for which the collection form for principal owner demographics was included on the PPP application itself and, for most of that time, was featured on the first page of the application.

[688] *Id.*

uses only aggregate categories when reporting ethnicity and race based on visual observation and/or surname and would direct financial institutions to proposed appendix G for additional information on collecting and reporting ethnicity and race based on visual observation and/or surname. However, the Bureau requests comment on whether financial institutions should be permitted, but not required, to use the disaggregated subcategories (in addition to the required aggregate categories) when reporting race and ethnicity based on visual observation and/or surname.

In addition to the specific matters identified above, the Bureau seeks comment on its proposed approach to this data point, the proposed methods of collecting and reporting the data, and requests comment on whether additional clarification regarding any aspect of this data point is needed.

### 107(a)(21) Number of Principal Owners

ECOA section 704B(e)(2)(H) authorizes the Bureau to require financial institutions to compile and maintain "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Bureau believes that collection of the number of principal owners of an applicant would aid in fulfilling the purposes of section 1071, as explained below.

The Bureau did not address the number of principal owners as a potential data point under consideration in the SBREFA Outline, although it did seek feedback on several questions related to the number of applicants' principal owners.[689] To facilitate collection of the ethnicity, race, and sex of applicants' principal owners pursuant to proposed § 1002.107(a)(20), the Bureau is proposing that financial institutions collect and report the number of an applicant's principal owners.

Section 1071 uses the term "principal owner" but does not define it. Proposed § 1002.102(o) would define a principal owner as a natural person who directly owns 25 percent or more of the equity interests of a business. Thus, under this proposed definition, it is possible that an applicant would have no principal owners or between one and four principal owners.

As explained in proposed comment 107(a)(21)–1, a financial institution would be able to collect an applicant's number of principal owners by requesting the number of principal owners from the applicant or by determining the number of principal

owners from information provided by the applicant or that the financial institution otherwise obtains. If the financial institution asks the applicant to provide the number of its principal owners pursuant to proposed § 1002.107(a)(21), the financial institution must provide the definition of principal owner set forth in proposed § 1002.102(o). If permitted pursuant to proposed § 1002.107(c)(2), a financial institution could report an applicant's number of principal owners based on previously collected data.

The Bureau believes that an applicant is likely to know how many principal owners it has and should not have significant difficulties or objections to providing this basic piece of information. Moreover, the Bureau understands that financial institutions are already obtaining information about principal owners. Further, this additional information would aid in fulfilling the purposes of section 1071 as it may provide necessary context for other data points. For example, if an applicant reports the ethnicity, race, and sex for one principal owner, having the total number of principal owners would permit the Bureau and other data users to know whether that owner's demographics represents the demographics of the entirety of the applicant's principal ownership or merely one quarter of it. This information would help data users in fulfilling both the fair lending and business and community development purposes of section 1071.

Proposed comment 107(a)(21)–2 would clarify the relationship between the proposed requirement to collect and report the number of principal owners in proposed § 1002.107(a)(21) with the proposed requirement to report verified information in proposed § 1002.107(b). The proposed comment would state that the financial institution may rely on an applicant's statements in collecting and reporting the number of the applicant's principal owners. The financial institution would not be required to verify the number of principal owners provided by the applicant, but if the financial institution verifies the number of principal owners, then the financial institution would be required to report the verified number of principal owners.

Proposed comment 107(a)(21)–3 would state that pursuant to proposed § 1002.107(c)(1), a financial institution is required to maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's number of principal owners. However, if a financial institution is nonetheless unable to collect or determine the

number of principal owners of the applicant, the financial institution would report that the number of principal owners is "not provided by applicant and otherwise undetermined."

The Bureau seeks comment on its proposed approach to this data point. The Bureau also seeks comment on whether the Bureau should instead, or additionally, require collection and reporting of similar information about owners (rather than principal owners). For example, should the Bureau require that financial institutions collect and report the number of owners that an applicant has that are not natural persons, in order to obtain a more complete picture of the applicant's ownership structure?

### 107(b) Verification of Applicant-Provided Information

ECOA section 704B(e)(1) provides that "[e]ach financial institution shall compile and maintain, in accordance with regulations of the Bureau, a record of the information provided by any loan applicant pursuant to a request under [section 704B(b)]."[690] Section 1071 does not impose any requirement for a financial institution to verify the information provided by an applicant.

In the SBREFA Outline, the Bureau did not include a general statement about the issue of verification of applicant-provided data points. For certain data points such as time in business, however, the Outline did explain that the Bureau was considering proposing that if the financial institution did not verify the information provided by the applicant, the financial institution would report the information provided by the applicant. If the financial institution did verify the information provided by the applicant, the Outline explained that the financial institution would report the verified information. The Outline did not state that the Bureau was considering proposing that a financial institution would be required to verify any of the applicant-provided data points.

As explained in the section-by-section analysis of proposed § 1002.107(a) above, a number of SERs urged the Bureau to require collection and reporting of a number of data points based only on information as provided by the applicant.[691] No SERs stated that they thought verification should be generally required. The industry stakeholders who commented on this issue asked that the Bureau not require

---

[689] SBREFA Outline at 32–33.

[690] ECOA section 704B(e)(1).
[691] SBREFA Panel Report at 26.

verification of applicant-provided information. The Bureau did not receive any comments on this issue from community group stakeholders.

The Bureau is proposing in § 1002.107(b) that unless otherwise provided in subpart B, the financial institution would be able to rely on statements of the applicant when compiling data unless it verifies the information provided, in which case it would be required to collect and report the verified information. Proposed comment 107(b)–1 would explain that a financial institution may rely on statements made by an applicant (whether made in writing or orally) or information provided by an applicant when compiling and reporting data pursuant to the 1071 rule for applicant-provided data; the financial institution would not be required to verify those statements. Proposed comment 107(b)–1 would further explain, however, that if the financial institution does verify applicant statements for its own business purposes, such as statements relating to gross annual revenue or time in business, the financial institution would report the verified information. The comment would go on to explain that, depending on the circumstances and the financial institution's procedures, certain applicant-provided data could be collected without a specific request from the applicant. For example, gross annual revenue could be collected from tax return documents. In addition, the proposed comment would make clear that applicant-provided data are the data that are or could be provided by the applicant, including those in proposed § 1002.107(a)(5) through (7), and (13) through (21). Finally, proposed comment 107(b)–1 would provide a cross reference to proposed comment 107(c)(2)–3, which would discuss the possible reuse of certain previously collected data.

The Bureau believes that requiring verification of applicant-provided data points would greatly increase the operational burden of the 1071 rule, and that relying on applicant-provided data would ensure sufficient accuracy to carry out the purposes of section 1071. As discussed above, section 1071 does not speak to verification; rather it refers only to compiling and maintaining a record of certain information provided by an applicant. However, the Bureau believes that requiring financial institutions to collect and report (for the 1071 rule) information that they have already verified would not add operational difficulty, and would enhance the accuracy and usefulness of the data, thereby furthering the purposes of section 1071. The Bureau is

implementing this requirement pursuant to its authority under ECOA section 704B(g)(1) to prescribe rules in order to carry out, enforce, and compile data pursuant to section 1071, and as an interpretation of the statutory phrase "compile and maintain" in ECOA section 704B(e)(1). In the Bureau's view, the verification that the financial institution chooses to carry out is part of compiling and maintaining the information provided by the applicant, and this requirement will improve the quality and usefulness of the resulting 1071 data set.

As discussed above, many SERs and other stakeholders opposed the inclusion of a verification requirement, and the Bureau has taken their input into account when crafting this proposed provision.

The Bureau seeks comment on its proposed approach to verification of the 1071 data points, including the specific guidance that would be presented in comment 107(b)–1. The Bureau also seeks comment on whether financial institutions should be required to indicate whether particular data points being reported have been verified or not.

107(c) Time and Manner of Collection

107(c)(1) In General

Background

Although the definition of "application" triggers a financial institution's *duty* to collect 1071 data, the application definition does not necessarily govern *when* that data must be collected. The language and structure of section 1071—which applies to "applications" from "applicants"— indicates that the data must be collected sometime during the application process, but does not provide further detail.[692]

Financial institutions have expressed concern about when applicant-provided data must be collected, and particularly the timing of collecting applicants' protected demographic information (that is, whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners, pursuant to proposed § 1002.107(a)(18) through (20)). Collecting this protected demographic information from applicants for purposes of section 1071 has been a particular concern for financial institutions, as financial institutions currently are generally prohibited from

collecting such information except in narrow circumstances.[693] As such, its required collection under section 1071 will be a departure from current practice for most financial institutions.

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was not currently considering specifying a particular time period in which financial institutions must seek to collect 1071 data from applicants.[694] It also conveyed that it was seeking to provide financial institutions discretion and flexibility to time their 1071 data collection at a point during the application process that works best for their processes and relationships with applicants and to avoid unnecessary costs, while still fulfilling section 1071's purposes. The Bureau also noted that it had considered possible alternatives of requiring financial institutions to collect 1071 data within or by a specified time period, such as simultaneous with the triggering of an "application," before obtaining a "completed application," or before notifying the applicant of action taken.

Most SERs that addressed the issue of timing for data collection indicated that they plan to collect 1071 data, and particularly applicants' protected demographic information (as would be required under proposed § 1002.107(a)(18) through (20)), early in the application process and likely at the time an application is initially being submitted.[695] These SERs felt that the longer they wait to request 1071 data, the more difficult or infeasible it will be to gather the information from applicants. Another SER urged the Bureau to give financial institutions flexibility to explore optimal timing for collection of 1071-required protected demographic information in order to maximize the response rate without discouraging applicants from pursuing the application. This SER suggested that protected demographic information should be collected during the application process, but before the application is considered complete. The SBREFA Panel recommended that the Bureau seek comment on whether it is necessary to specify a time period specifically for the collection of 1071-required protected demographic information, and if so, what would be the best period to designate.[696]

---

[692] *See, e.g.,* ECOA section 704B(b) ("[I]n the case of any *application* to a financial institution . . . .") and 704B(c) ("Any *applicant* . . . may refuse to provide any information requested . . . .") (emphases added)).

[693] *See* § 1002.5(b).
[694] SBREFA Outline at 35–36.
[695] SBREFA Panel Report at 32.
[696] *Id.* at 47.

AdminRecord-000552

Nearly all industry stakeholders to comment on this issue supported the Bureau not specifying a time period, and instead giving financial institutions discretion to set their own optimal timing for the collection of applicant-provided 1071 data. The commenters noted that given the variety of products, financial institutions, and business models in small business lending, a one-size-fits-all approach would be unworkable and could disrupt financial institutions' processes. Some commenters also highlighted the complexity of small business lending applications and stated that flexible collection would provide greater simplicity, reduce burden, and allow for more accurate reporting, particularly where not all the data points are available at the time of collection. A few commenters sought flexibility due to concerns that if protected demographic information is collected early on in the process, an applicant would believe that information would be used to discriminate against them. One commenter suggested looking at FinCEN's customer due diligence rule, which allows for information collection at the time of closing. Although industry commenters generally favored flexibility, several stated they would likely collect 1071 data as early as possible in order to ensure data quality and collection. One stakeholder stated that applicant-provided data would be impossible to get if an application is withdrawn, incomplete, or denied before the required data are requested. Another industry commenter suggested the Bureau allow flexibility, but provide a safe harbor for financial institutions that collect applicant-provided data points on or with the application.

Many of the commenters seeking flexibility stated that point-of-sale (POS) applications would be particularly problematic with a rigid timing requirement. POS applications include those private label credit cards or other products offered through retailers in which the financial institution itself does not interact with the applicant at the time of application. POS applications are taken in a variety of different settings and locations, such as at the checkout line, online, or at customer service desks. Commenters urged that they would need additional flexibility for a POS application to request 1071 data, such as at some point reasonably following application submission. Commenters cited concerns about the accuracy and completeness of data collected in a POS application: Interactions are with retailer's employees who may not be able to

answer questions about the data collection, interactions often take place in a public place (which may lead to erroneous answers or refusals to answer), and the person submitting a POS application may not have relevant knowledge to respond to the 1071-required questions, leading to delayed or abandoned applications. Commenters also expressed concern that reporting of POS applications would reflect the retailer's lending footprint, not the financial institution's, and so lead to incorrect assumptions about the financial institution's lending.

A number of stakeholders, including community groups and several financial institutions, urged the Bureau to specify a time period for the collection of 1071 data, stating that failure to do so would undermine the accuracy of the data. The commenters stated that complete flexibility would result in inconsistent and unreliable data since financial institutions would be collecting the data at different stages of the application process. The commenters stated that financial institutions that wait to collect the data would have difficulty obtaining applicant-provided information if the application was withdrawn, incomplete, or denied. The commenters also noted that discrimination is likely to occur in the early stages of the application process, and would not be captured if financial institutions are permitted to delay data collection. One commenter stated that requiring collection at the time of application could also promote non-discriminatory treatment as it would impress upon lenders and applicants the need for fair treatment. An industry commenter stated that not specifying a time period may lead to financial institution regulatory paralysis or confusion about when to collect 1071 data from applicants.

Among commenters that recommended a specific time period for collection, many suggested collecting applicant-provided data at the time of an application or otherwise "upfront." One commenter noted that 1071-required data could be built into the application itself. On the other hand, several commenters suggested 1071 data should be collected any time before an application is considered complete or, one commenter suggested, when financial institutions know that 1071 collection will be required. The commenters stated that this would be the time period during which applicants are most likely to voluntarily provide the data, would ensure comparable data across lenders, and would still provide financial institutions flexibility to account for various application processes. One commenter suggested

testing and focus groups to determine optimal timing. Otherwise, the commenter suggested 1071 data be collected before a financial institution disburses funds to the applicant.

*Proposed Rule*

The Bureau is proposing § 1002.107(c)(1), which would require a covered financial institution to maintain procedures to collect applicant-provided data under proposed § 1002.107(a) at a time and in a manner that is reasonably designed to obtain a response. The Bureau agrees with SERs and other stakeholders about the benefits of providing a flexible approach concerning when applicant-provided data must be collected during the application process. As noted by some commenters, given the variety of application processes in the small business lending space, requiring 1071 data collection to occur within a narrow window may affect data quality and disrupt financial institution practices. On the other hand, the Bureau believes that safeguards are necessary to ensure that financial institutions are not evading or delaying their obligation to collect 1071 data in a manner that detrimentally affects response rates. In light of these considerations, the Bureau is proposing an approach that would maintain flexibility, but require a financial institution to maintain procedures to collect applicant-provided data at a time and in a manner that is reasonably designed to obtain a response. This proposal thus implements the flexible approach under consideration in the SBREFA Outline, though with additional safeguards.

Proposed comments 107(c)(1)–1 and –2 would clarify the meaning of financial institution "procedures" and reiterate a financial institution's latitude to establish procedures concerning the timing and manner that it collects applicant-provided data, provided that those procedures are reasonably designed to collect the applicant-provided data in proposed § 1002.107(a).

Proposed comment 107(c)(1)–3 would clarify what constitutes "applicant-provided data" in proposed § 1002.107(c)(1). The proposed comment would also clarify that applicant-provided data does not include data that is generated or supplied only by the financial institution. The Bureau believes this clarification would address commenter concerns that certain data points collected early in the process may not be as accurate (or available) as data available at a later time—for example,

information on action taken is only available late in the application process.

Proposed comment 107(c)(1)–4 would provide additional guidance on financial institutions' procedures that are reasonably designed to obtain a response. As noted in proposed comment 107(c)(1)–4, a financial institution would assess on a periodic basis whether its procedures are reasonably designed. One way a financial institution may be able to assess whether its procedures are reasonably designed would be, once 1071 data are made publicly available, to compare its response rate with similarly situated financial institutions (for example, those that offer similar products, use a similar lending model, or are of a similar size).[697] The Bureau also anticipates that the response rate will differ depending on the data point: Some applicant-provided data points (for example, time in business) may have a higher response rate than other applicant-provided data points (such as a principal owner's race, sex, and ethnicity). The key is for a financial institution to assess on a periodic basis whether its procedures are reasonably designed to obtain a response.

Proposed comments 107(c)(1)–5 and –6 would provide examples of procedures that generally are and are not reasonably designed to obtain a response. Although the inquiry requires a fact-based determination, the Bureau believes providing examples and further guidance of practices that likely are and are not reasonably designed to obtain a response would facilitate compliance and promote best practices. For example, the Bureau believes that, as a general matter, once there is a "covered application," the earlier a financial institution seeks to collect applicant-provided information, the greater the likelihood of obtaining an applicant response (particularly for covered applications that are later withdrawn or left incomplete). Thus, the Bureau believes that, as a general matter, a procedure reasonably designed to obtain a response is one in which a financial institution requests applicant-provided data at the time of a covered application. For example, it could request these data in connection with a

written application form, provided any collection form requesting applicants' protected demographic information pursuant to proposed § 1002.107(a)(18) through (20) is separate from the application form and other documents used to collect other information related to the application, as would be required by proposed § 1002.111(b). Collecting applicant-provided data after a covered application is submitted—for example, while the application is being completed through the submission of additional documents and verifications—may be reasonably designed to obtain a response depending on the particular financial institution's procedures, with earlier collections more likely to be reasonably designed. The Bureau believes providing such compliance examples would incentivize early collection and be consistent with the practice many SERs and other industry commenters indicated they planned to follow in any event. While some commenters stated that an applicant may be reluctant to respond to early collection due to concerns that the information may be used to discriminate against them, the Bureau believes those concerns can be addressed through the use of a data collection form (such as the sample collection form in proposed appendix E) that would explain to applicants the reason the information is being collected. Moreover, the Bureau notes that financial institutions regularly collect data required by HMDA and Regulation C at the time of application without significant issue and that the sample data collection form in Regulation C similarly provides an explanation to applicants as to the reason protected demographic information is being collected.

Conversely, the Bureau believes that, as a general matter, it is unlikely that small business applicants will respond to data requests that occur simultaneous with or after notifying an applicant of action taken on the covered application. Depending on the particular facts, however, these procedures may be reasonably designed to obtain a response; for example, if the financial institution has evidence or a reason to believe that under its procedures the response rate would be similar to or better than other alternatives. Although a fact-based determination, proposed comment 107(c)(1)–6 would clarify that such procedures would generally not be considered "reasonably designed."

Proposed comment 107(c)(1)–7 would explain that a financial institution reports updated applicant-provided data if it obtains more current data during the application process. Proposed

comment 107(c)(1)–8 would provide guidance in the event a financial institution changes its determination regarding an applicant's status as a small business.

Many industry commenters discussed the need for additional flexibility specifically for POS applications. The Bureau understands that many (though not all) POS applications, particularly those for smaller credit amounts or to purchase particular goods in a store, are often submitted on-site at POS and decisioned in real time. Under proposed § 1002.107(c)(1) and associated commentary, the Bureau anticipates that most financial institutions would generally collect applicant-provided 1071 data at POS, and not at some later time after the credit request has been decisioned and the applicant has left the store, as suggested by some commenters. Despite the comments on this issue, the Bureau is not proposing a different approach for collecting applicant-provided data specifically for POS applications. Commenters raised concerns about retail employees seeking to collect 1071 required data in a public setting. However, the Bureau believes that financial institutions can develop procedures to accommodate collection in this setting, including (as discussed above) by using the sample collection form developed by the Bureau. The Bureau also does not believe that any specialized knowledge is necessary to collect 1071 data, and so believes that retail employees can collect the information. Although it is possible that the accuracy of the data collected in POS applications may be more prone to errors, as some commenters allege, the Bureau believes that having such data, even with decreased accuracy, would be preferable to not having any applicant-provided data for such applications.[698]

Several industry commenters suggested the Bureau look to FinCEN's customer due diligence (CDD) rule, which excludes from certain of its requirements POS transactions to provide credit products solely for the purchase of retail goods/services up to a limit of $50,000.[699] The Bureau is not proposing to take this approach given the different purposes and requirements of the CDD rule and section 1071. The purpose of the CDD rule is to improve financial transparency and prevent criminals and terrorists from misusing companies to disguise their illicit activities and launder their ill-gotten

---

[697] As discussed in greater detail in part VI below, the Bureau is proposing not to determine what data to include in the public application-level 1071 data until after it receives at least one full year of 1071 data reported by financial institutions. Following the compliance date of the final rule, the Bureau proposes to issue a policy statement setting forth its intended modifications and deletions to the public application-level 1071 data. Of course, the Bureau acknowledges that the availability and robustness of a peer analysis would also depend on the extent to which 1071 data are made publicly available.

[698] In order to help identify such transactions, the Bureau is proposing to collect information about the application recipient. *See* proposed § 1002.107(a)(4).

[699] 31 CFR 1010.230(h)(1)(i).

AdminRecord-000554

gains.[700] Under the CDD rule, covered financial institutions must identify and verify the identity of natural persons (known as beneficial owners) of legal entity customers who own, control, and profit from companies when those companies open accounts.[701] The CDD exclusion for certain POS transactions is based on the "very low risk posed by opening such accounts at [a] brick and mortar store." [702] While the CDD rule (and the customer identification program (CIP) rule [703]) focus on accounts (including certain originated loans), obtaining data on denials is essential to 1071's purposes. Moreover, unlike the CDD and CIP rules, which require covered financial institutions to collect certain essential information, section 1071 only requires that financial institutions seek to collect applicants' protected demographic information, and permits applicants to refuse to provide that information. Given these key differences, the Bureau is not proposing to follow the CIP and CDD rules concerning timing of collection or the exclusion of certain POS applications.

The Bureau seeks comment on proposed § 1002.107(c)(1) and associated commentary. As recommended by the SBREFA Panel, the Bureau seeks comment on whether it is necessary to specify a time period specifically for the collection of protected 1071 demographic information, and if so, what time period the Bureau should designate. The Bureau also seeks comment on the examples set forth in proposed comments 107(c)(1)–5 and –6, and whether it would be useful to provide additional examples of procedures that are and that are not reasonably designed to obtain a response. In addition, the Bureau seeks comment on its proposed approach for POS applications, including its proposal that would not make any particular exceptions for the timing and manner of 1071 data collection for POS applications.

### 107(c)(2) Previously Collected Data

In the SBREFA Outline, the Bureau emphasized that it was seeking to

provide financial institutions with discretion and flexibility in the timing of 1071 data collection, in light of considerations including their relationships with applicants and the need to avoid unnecessary costs.[704] The Bureau did not specifically discuss whether a financial institution could meet its 1071 obligations on a covered application by reusing certain data it had previously collected from the same applicant. In response to the Bureau's proposal under consideration concerning timing of collection of certain 1071 data, however, a commenter suggested financial institutions provide annual certification of 1071 data where there is an ongoing customer relationship. The commenter noted that the data are unlikely to change within a year, there may be multiple transactions during that time, and it would avoid financial institutions and applicants having to provide the information during the application process, saving time and expense.

The Bureau is proposing § 1002.107(c)(2), which would permit, but not require, a financial institution to reuse previously collected data to satisfy proposed § 1002.107(a)(13) through (21) if the data were collected within the same calendar year as the current covered application and the financial institution has no reason to believe the data are inaccurate. The Bureau believes that, absent a reason to suspect otherwise, recently collected 1071 data are likely to be reliable. Additionally, the Bureau believes that a flexible approach giving financial institutions discretion to reuse these data is consistent with the approach the Bureau proposed at SBREFA. Although proposed § 1002.107(c)(2) would apply to certain data collected within the same calendar year, nothing prevents a financial institution from confirming with the applicant whether information collected more than a year ago from the applicant remains accurate.

Proposed comment 107(c)(2)–1 would provide an example of how certain previously collected data can be reused by a financial institution. Proposed comment 107(c)(2)–2 would identify the particular data that can be reused. The comment would also clarify that other data required by proposed § 1002.107(a) could not be reused, as those data points are specific and unique to each covered application. Proposed comment 107(c)(2)–3 would clarify instances where data have not been "previously collected" and so cannot be reused under proposed § 1002.107(c)(2).

Proposed comment 107(c)(2)–4 would provide guidance on when information is considered collected in the same calendar year, and so may be reused by a financial institution in certain circumstances. In particular, the proposed comment discusses applications that span more than one calendar year.

Proposed comment 107(c)(2)–5 would provide clarity and an example of when a financial institution has reason to believe data may be inaccurate, and so cannot be reused for a subsequent covered application. Finally, proposed comments 107(c)(2)–6 and –7 would provide guidance on when data regarding minority-owned business status, women-owned business status, and data on the principal owners' ethnicity, race, and sex may be reused by a financial institution in a subsequent covered application.

The Bureau seeks comment on § 1002.107(c)(2) and associated commentary. The Bureau also seeks comment on whether a period of one calendar year to reuse certain previously collected data is appropriate or whether it should be extended to a longer period (such as two or three years). In addition, the Bureau seeks comment on whether financial institutions should be required to notify applicants that information they provide (including, in particular, minority-owned business status, women-owned business status, and the principal owners' ethnicity, race, and sex) could be reused for subsequent applications.

### Section 1002.108    Firewall

Background

ECOA section 704B(d) generally restricts the access of certain individuals at a financial institution or its affiliates to certain information provided by an applicant pursuant to section 1071. The Bureau calls this requirement in 704B(d) a "firewall." More specifically, 704B(d)(1) states that "[w]here feasible," underwriters and other officers and employees of a financial institution or its affiliates "involved in making any determination concerning an application for credit" cannot have access to any information provided by the applicant pursuant to a request under 704B(b). That is, the statute limits access not only by underwriters and persons making an underwriting decision but also by anyone else involved in making any determination concerning an application. However, it does not expressly define the term "feasible" or provide clarification regarding what it means to be involved in making any

---

[700] See FinCEN, *Information on Complying with the Customer Due Diligence (CDD) Final Rule*, *https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule* (last visited Aug. 6, 2021).

[701] *Id.*

[702] FinCEN, *Guidance*, at Q 29 (Apr. 3, 2018), *https://www.fincen.gov/sites/default/files/2018-04/FinCEN_Guidance_CDD_FAQ_FINAL_508_2.pdf.*

[703] FinCEN's CIP rule does not include a point of sale exclusion. While the rule permits *verification* of the identity of the customer within a reasonable time after the account is opened, the *collection* of required customer information must occur prior to account opening. *See* 31 CFR 1020.220(a)(2)(i)(A) and (ii).

[704] SBREFA Outline at 35–36.

determination concerning an application for credit.

Additionally, under ECOA section 704B(d)(2), if the financial institution determines that an underwriter, employee, or officer involved in making a determination "should have access" to any information provided by the applicant pursuant to a request under 704B(b), the financial institution must provide a notice to the applicant of the underwriter's access to such information, along with notice that the financial institution may not discriminate on the basis of such information. Section 704B(d)(2) does not expressly define or describe when an underwriter, employee, or officer "should have access," nor does it explain the relationship, if any, between when a financial institution determines that an individual "should have access" under 704B(d)(2) and whether it is "feasible" to implement and maintain a firewall under 704B(d)(1).

The Bureau believes that ECOA section 704B(d) contains significant ambiguities with respect to how financial institutions, in practical terms, should determine how to implement a firewall to limit underwriters', employees', and officers' access to the information provided by applicants pursuant to section 704B(b). Indeed, based on feedback from SERs and other commenters, the Bureau believes that in many instances financial institutions that find it not "feasible" to implement and maintain a firewall will be the same institutions determining that relevant individuals "should have access" to the information provided by an applicant pursuant to 704B(b). The Bureau further believes that reading these two provisions in isolation from each other would result in significant confusion and challenges, particularly for smaller financial institutions.

Accordingly, the Bureau believes that section 1071's firewall requirement is best implemented by reading the "should have access" language in ECOA section 704B(d)(2) in conjunction with the "feasibility" language in 704B(d)(1). In 704B(d)(1), if it is feasible to implement and maintain a firewall, then underwriters, other employees, and officers shall not have access to the information subject to the firewall; but it is not feasible to implement and maintain a firewall if an underwriter, other employee, or officer subject to the firewall should have access to that information. If it is not feasible to implement and maintain a firewall, then that underwriter, other employee, or officer who should have access is permitted to have access so long as the

financial institution provides a notice to the applicant.

As discussed in greater detail above in E.2 of the *Overview* to this part V, the Bureau also believes that section 1071 is ambiguous with respect to the meaning of "any information provided by the applicant pursuant to a request under subsection (b)." On the one hand, ECOA section 704B(b)(1) directs financial institutions to inquire whether a business is "a women-owned, minority-owned, or small business," so the phrase could be interpreted as referring only to those three data points. Section 704B(e), however, indicates that the scope of 704B(b) is much broader. It instructs financial institutions that "information provided by any loan applicant pursuant to a request under subsection (b) . . . shall be itemized in order to clearly and conspicuously disclose" data including the loan type and purpose, the amount of credit applied for and approved, and gross annual revenue, among others. In other words, 704B(e) designates all of the information that financial institutions are required to compile and maintain— not simply an applicant's status as a women-owned, minority-owned, or small business—as information provided by an applicant "pursuant to a request under subsection (b)." But information deemed provided pursuant to 704B(b) is subject not only to the firewall under 704B(d) but also to a right to refuse under 704B(c) and separate recordkeeping requirements under 704B(b)(2). Applying these special protections to many of the data points in 704B(e), such as an applicant's gross annual revenue or the amount applied for, would be extremely difficult to implement because this information is critical to financial institutions' ordinary operations in making credit decisions.

In order to resolve these ambiguities, the Bureau believes that the best reading of the statute is to give different meanings to the phrase "any information provided by the applicant pursuant to a request under subsection (b)" with respect to ECOA section 704B(e) as opposed to 704B(b)(2), (c), and (d). As relevant here, with respect to the firewall in ECOA section 704B(d), the Bureau interprets the phrase to refer to the data points in proposed § 1002.107(a)(18) (minority-owned business status) and proposed § 1002.107(a)(19) (women-owned business status), as well as proposed § 1002.107(a)(20) (ethnicity, race, and sex of principal owners). Each of these data points require financial institutions to request demographic information that has no bearing on the creditworthiness

of the applicant. Moreover, a financial institution could not inquire about this demographic information absent section 1071's mandate to collect and report the information, and ECOA prohibits a financial institution from discriminating against an applicant on the basis of the information. The Bureau accordingly believes that the best effectuation of congressional intent is to apply section 1071's special-protection provisions to apply to this demographic information, regardless of whether the statutory authority to collect it originates in 704B(b)(1) (women-owned business status and minority-owned business status) or 704B(e)(2)(G) (race, sex, and ethnicity of principal owners). The Bureau similarly believes that Congress did not intend these special protections to apply to any of the other data points proposed in § 1002.107(a), which the financial institution is permitted to request regardless of coverage under section 1071, which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting purposes.[705]

The Bureau is proposing § 1002.108 to implement ECOA section 704B(d) and, pursuant to its authority in 704B(g)(1), to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.

SBREFA Proposal Under Consideration and Feedback

*Information subject to the firewall.* In the SBREFA Outline, the Bureau stated that it was considering proposing that financial institutions need only limit access under ECOA section 704B(d) to an applicant's responses to the financial institution's specific inquiries regarding women-owned and minority-owned business status and the ethnicity, race, and sex of principal owners, but not to an applicant's small business status.[706] As discussed below, many SERs and other commenters suggested that restricting access to protected demographic information obtained to comply with section 1071 (*i.e.,* minority-owned business status, women-owned business status, and the principal owners' ethnicity, race, and sex) would be difficult for their institutions. Although these SERs and other commenters generally did not comment on the scope of information that the Bureau considered proposing be subject to the firewall (other than to say

---

[705] As explained in the *Overview* to this part V, the Bureau is not proposing to require financial institutions to maintain and report a data point on small business status.

[706] SBREFA Outline at 36–37.

**56490**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

that liming access would be difficult), one commenter said that small business status should not be subject to the firewall and another commenter said that it should.

The SBREFA Panel recommended that the Bureau propose clear guidance on what information is subject to the firewall requirement.[707]

*Feasibility of maintaining a firewall.* In the SBREFA Outline, the Bureau also stated that it was considering how it might apply the feasibility standard in ECOA section 704B(d)(1) and asked several questions related to this standard.[708] Several SERs that take in-person or paper applications or that have very limited commercial lending staff stated that it would be costly or impossible for them to restrict access to applicants' protected demographic information by underwriters and other persons involved in making determinations concerning applications from small businesses.[709] In contrast, several SERs that operate entirely online said that it would be relatively easy for them to restrict access to applicants' protected demographic information. Another SER said that it could restrict access to protected demographic information for applications received online (though not for paper applications), but that it would necessitate an overhaul of its online system.

Many other stakeholders providing feedback on the SBREFA Outline said that it would not be possible to limit access to applicants' protected demographic information or that attempting to do so would be costly and time consuming. Some other commenters suggested that implementing and maintaining a firewall would be impossible for all financial institutions or certain categories of financial institutions (*i.e.,* smaller financial institutions, community banks, credit unions). Generally, these commenters requested exemptions from the firewall requirement for either all financial institutions or specific categories of financial institutions. Generally, commenters were concerned about the costs associated with hiring additional staff, outsourcing additional functions, or making system changes to implement and maintain the firewall. However, some commenters indicated that financial institutions should not be required to change their existing

application or other processes to maintain a firewall and noted that underwriters and officers who gather information from small business applicants also make determinations regarding such applications. Commenters noted that implementing a firewall would necessitate more points of contact between employees of the financial institution and an applicant and would require financial institutions to reassign job duties and retrain existing employees.

Importantly, many comments from SERs and others seemed to reflect confusion about the intended scope of the firewall. For example, some SERs and other commenters seemed to think that the firewall would prohibit employees who were generally aware of an applicant's business status or of a principal owner's ethnicity, race, and sex, such as due to participation in outside organizations or activities, from making any determinations regarding applications. One commenter remarked that it would be impossible to comply with the firewall requirement if a financial institution required a principal owner to provide a driver's license. Additionally, some SERs and other commenters requested guidance on the scope and applicability of the firewall, indicating that the SBREFA Outline was not sufficiently clear regarding the firewall's scope.

The SBREFA Panel recommended that the Bureau propose a clear feasibility standard that takes into account the costs of establishing and maintaining a firewall to limit access by underwriters and other persons.[710]

*Providing a notice in lieu of the firewall.* In the SBREFA Outline, the Bureau also stated that it was considering proposing to interpret ECOA section 704B(d)(2) to permit financial institutions to give underwriters, employees, and officers access to applicants' responses regarding women-owned business status, minority-owned business status and the principal owners' race, sex, and ethnicity when the financial institution determines that such access is needed for the underwriter, employee, or officer to perform usual and regularly assigned job duties.[711] In such circumstances, the financial institution would need to comply with the statutory requirement to provide a notice in lieu of limiting access. The Bureau also stated in the SBREFA Outline that the financial institution could provide the notice to all small business applicants or the specific applicant or applicants whose

information will or may be accessed. The Bureau also stated that it was considering developing sample disclosure language that financial institutions could use when providing the notice under 704B(d)(2) and that the notice under 704B(d)(2) need not include language regarding small business status.

SERs and other stakeholders generally were supportive of providing a notice to applicants in lieu of restricting access to applicants' protected demographic information obtained for purposes of the 1071 rule. Several stated that it should be permissible to provide a disclosure or notice to meet the firewall requirement, and others stated that a financial institution should be permitted to provide a notice to meet the firewall requirement if the financial institution itself determines that establishing and maintaining a firewall was not feasible. However, one industry commenter stated that financial institutions should not be required to provide a notice to comply with the firewall requirement, and one SER said that use of the notice should be optional. This SER suggested that requiring the use of a notice may cause confusion for the applicant and have the unintended consequence of causing unfounded claims of discrimination if the application is denied. One SER cautioned that many people do not read notices and disclosures, and another SER suggested that financial institutions would not want to provide a notice because the loan process already involves too much paperwork.

Several SERs and several other stakeholders indicated a preference for providing a notice to all applicants, not just those specific applicants whose protected demographic information was likely to be accessed by underwriters and others making decisions regarding applications.

Several stakeholders supported a model notice. One SER as well as two other commenters asked that, if the Bureau provided sample language or a model notice, that the Bureau provide it in English as well as in other languages, such as Spanish. SERs and other stakeholders suggested a variety of statements that they thought should or should not be included in sample language or a model notice. They also provided a variety of suggestions on combining the notice with other documents, such as the application, sample data collection form, or with other required notices and disclosures.

One SER requested that the Bureau clarify when a financial institution would be permitted to provide a notice in lieu of restricting access to

---

[707] SBREFA Panel Report at 47.

[708] SBREFA Outline at 36–37.

[709] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 33–34.

[710] *Id.* at 47.

[711] SBREFA Outline at 36–37.

applicants' protected demographic information. Some stakeholders requested additional guidance on the timing and methods for providing a notice.

The SBREFA Panel recommended that the Bureau propose to permit financial institutions to provide a notice to applicants instead of restricting access to applicants' protected demographic information if it is not feasible for the financial institution to restrict such access.[712]

Proposed Rule

The Bureau is proposing § 1002.108 to implement the firewall provisions in ECOA section 704B(d). Proposed § 1002.108(a) would provide certain relevant definitions, proposed § 1002.108(b) would state the general prohibition on access to applicants' protected demographic information by certain persons, proposed § 1002.108(c) would explain the exception to that prohibition, and proposed § 1002.108(d) would provide language for the notice necessary in order to qualify for the exception. The Bureau is also proposing commentary. The Bureau's proposed approach to § 1002.108 is consistent with its approach under consideration during the SBREFA process. The Bureau's general rationale for how it reads the firewall provisions are set forth in this section-by-section analysis of proposed § 1002.108 above, under *Background*.

Proposed § 1002.108(b) would state that, unless the exception under proposed § 1002.108(c) applies, an employee or officer of a covered financial institution or a covered financial institution's affiliate shall not have access to an applicant's responses to inquiries that the financial institution makes pursuant to this subpart regarding whether the applicant is a minority-owned business under proposed § 1002.107(a)(18) or a women-owned business under proposed § 1002.107(a)(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under proposed § 1002.107(20), if that employee or officer is involved in making any determination concerning that applicant's covered application.

Consistent with the SBREFA Panel's recommendation, proposed comment 108(b)–1 would clarify the information that is subject to the prohibition on access (*i.e.,* the firewall) and provide examples. First, proposed comment 108(b)–1 would clarify that the prohibition in proposed § 1002.108(b) would apply only to an applicant's

responses to the inquiries that the covered financial institution makes to satisfy § 1002.107(a)(18) through (20) and provide examples. Second, proposed comment 108(b)–1 would clarify that the prohibition in proposed § 1002.108(b) does not apply to ethnicity or race information about principal owners that the financial institution collects via visual observation or surname, or to an applicant's responses to inquiries regarding minority-owned or women-owned business status, or principal owners' ethnicity, race, or sex, made for other purposes and provide an example. It would also clarify that the prohibition does not apply if an employee or officer generally knows that an applicant is a minority-owned business or women-owned business, or knows the ethnicity, race, or sex of any of the applicant's principal owners due to activities unrelated to the inquiries made to satisfy the financial institution's obligations under subpart B, as well as provide an example.

In response to SBREFA feedback requesting additional clarification and guidance on who would be subject to the firewall, proposed comment 108(b)–2 would clarify the scope of persons subject to the prohibition and provide examples.

Additionally, the Bureau is proposing to define the phrase "involved in making any determination concerning a covered application." Proposed § 1002.108(a)(1) would define this phrase to mean participating in a decision regarding the evaluation of a covered application, including the creditworthiness of an applicant for a covered credit transaction. Thus, an employee or officer who participates in such decision would be subject to the prohibition in proposed § 1002.108(b), and thus could not have access to an applicant's responses to the covered financial institution's inquiries under proposed § 1002.107(a)(18) through (20) with regard to that covered application, unless the exception in proposed § 1002.108(c) applies.

Proposed comment 108(a)–1 would provide additional clarification regarding when an employee or officer is "involved in making any determination concerning a covered application." In particular, it would clarify that an employee or officer is involved in making a determination concerning a covered application if the employee or officer makes, or otherwise participates in, a decision regarding the evaluation of a covered application or the creditworthiness of an applicant for a covered credit transaction. Proposed comment 108(a)–1 would note that this

group of employees and officers includes, but is not limited to, employees and officers who serve as underwriters.[713] Additionally, it would explain that the decision that the employee or officer makes or participates in must be about a specific covered application. An employee or officer would not be involved in making a determination concerning a covered application if the employee or officer is involved in making a decision that affects covered applications generally, the employee or officer interacts with small businesses prior to them becoming applicants or submitting a covered application, or the employee or officer makes or participates in a decision after the financial institution has taken final action on the application, such as decisions about servicing or collecting a covered credit transaction.

Consistent with the SBREFA Panel's recommendation, proposed § 1002.108(c) would state that the prohibition in proposed § 1002.108(b) shall not apply to an employee or officer if a financial institution determines that it is not feasible to limit that employee's or officer's access to one or more of an applicant's responses to the financial institution's inquiries under § 1002.107(a)(18) through (20) and the financial institution provides the notice required under proposed § 1002.108(d) to the applicant. Proposed § 1002.108(c) would further state that it is not feasible to limit access as required pursuant to proposed § 1002.108(b) if the financial institution determines that an employee or officer involved in making any determination concerning a covered application should have access to one or more applicants' responses to the financial institution's inquiries under proposed § 1002.107(a)(18) through (20).

Proposed comment 108(c)–1 would clarify that a financial institution is not required to limit the access of a particular employee or officer who is involved in making determinations concerning covered applications if the financial institution determines that the particular employee or officer should have access to the information collected

[713] While ECOA section 704B(d) refers to underwriters and other officers and employees of a financial institution, or any affiliate of such institution, who are involved in making any determination concerning an application, the Bureau has clarified that underwriters are one classification or category of employees and officers who are involved in making a determination concerning an application. The Bureau has not separately listed underwriters as subject to the firewall because doing so is unnecessary given their inclusion in the larger group of employees and officers who are involved in making any determination concerning an application.

AdminRecord-000558

pursuant to proposed § 1002.107(a)(18) through (20) and the financial institution provides the notice required by proposed § 1002.108(d). It would explain that a financial institution can determine that several employees and officers should have access or that all of a group of similarly situated employees or officers should have access, but that a financial institution cannot permit all employees and officers to have access simply because it has determined that one or more employees or officers should have access. It would also provide an example.

Proposed § 1002.108(a)(2) would define the phrase "should have access" to mean that an employee or officer may need to collect, see, consider, refer to, or otherwise use the information to perform that employee's or officer's assigned job duties. Proposed comment 108(a)–2 would explain that a financial institution may determine that an employee or officer should have access for purposes of proposed § 1002.108 if that employee or officer is assigned one or more job duties that may require the employee or officer to collect (based on visual observation, surname, or otherwise), see, consider, refer to, or use information otherwise subject to the prohibition in proposed § 1002.108(b). The employee or officer would not have to be required to collect, see, consider, refer to or use such information or to actually collect, see, consider, refer to or use such information. It would be sufficient if the employee or officer might need to do so to perform the employee's or officer's assigned job duties. This approach is similar to the approach under consideration during the SBREFA process, though in response to feedback received, the proposed definition would not require that the assigned job duties be usually or regularly assigned. Thus, an employee or officer would not be subject to the prohibition if the financial institution determines that the employee or officer might need to see, consider, refer to, or otherwise use the information an applicant provided pursuant to proposed § 1002.17(a)(18) through (20) to perform the employee's or officer's assigned job duties, and the financial institution provides the required notice to the applicant. Proposed comment 108(a)–2 would include an example of when a financial institution would be able to determine that an officer should have access and would state that, if a financial institution determines that an employee or officer who is involved in making any determination concerning a covered application should have access for

purposes of § 1002.108, the financial institution is responsible for ensuring that the employee or officer only accesses and uses the protected information for lawful purposes. Additionally, proposed comment 108(a)–2 would explain that a financial institution may determine that all employees or officers with the same job description or assigned duties should have access for purposes of § 1002.108 and provide an example.

Proposed § 1002.108(d) would describe the notice that a financial institution is required to provide to satisfy the exception in proposed § 1002.108(c). Proposed § 1002.108(d) would state that, in order to satisfy the exception set forth in proposed § 1002.108(c), a financial institution shall provide a notice to each applicant whose responses will be accessed, informing the applicant that one or more employees or officers involved in making determinations concerning the covered application may have access to the applicant's responses to the financial institution's inquiries regarding whether the applicant is a minority-owned business or a women-owned business, and regarding the ethnicity, race, and sex of the applicant's principal owners. Proposed § 1002.108(d) would also state that the financial institution shall provide this notice when making the inquiries required under § 1002.107(a)(18) through (20) and together with the notices required pursuant to § 1002.107(a)(18) through (20).

Proposed comment 108(d)–1 would explain that if a financial institution determines that one or more employees or officers should have access pursuant to proposed § 1002.108(c), then the financial institution must provide the required notice to, at a minimum, the applicant or applicants whose responses will be accessed by an employee or officer involved in making determinations regarding the applicant's or applicants' covered applications. It would also clarify that, as an alternative, the financial institution could provide the required notice to a larger group of applicants, including all applicants, if it determines that one or more officers or employees should have access.

Proposed comment 108(d)–2 would describe the content of the required notice. It would state that the notice must inform the applicant that one or more employees and officers involved in making determinations regarding the applicant's covered application may have access to the applicant's responses regarding the applicant's minority-owned business status, its women-owned business status, and its principal

owners' ethnicity, race, and sex. Proposed comment 108(d)–2 would note that the financial institution may, but is not required to, provide the notice on its data collection form. Additionally, proposed comment 108(d)–2 would include language for the required notice. A financial institution would be required to use the language set forth in proposed comment 108(d)–2 or substantially similar language when providing the notice.

Comment 108(d)–3 would explain that if a financial institution is providing the notice required by proposed § 1002.108(d) orally, it must provide the notice prior to asking the applicant if it is a minority-owned business or women-owned business and prior to asking for a principal owner's ethnicity, race, or sex. It would further explain that, if the notice required by proposed § 1002.108(d) is provided on the same paper or electronic data collection form as the inquiries about minority-owned business status, women-owned business status, and the principal owners' ethnicity, race, or sex, the financial institution would be required to provide the notice at the top of the form. If the notice required by proposed § 1002.108(d) is provided in an electronic or paper document that is separate from the data collection form, the financial institution would be required to provide the notice at the same time as the data collection form or prior to providing the data collection form. Additionally, proposed comment 108(d)–3 would clarify that the notice required pursuant to proposed § 1002.108(d) must be provided with the non-discrimination notices required pursuant to proposed § 1002.107(a)(18) through (20) and would reference proposed appendix E for an example.

The Bureau believes that its proposed approach reflects the feedback from most SERs and commenters who preferred to be able to give a notice and did not want to hire additional staff or change processes. While some commenters did not want to provide a notice, section 1071 requires that a financial institution provide a specific notice to an applicant if the financial institution determines that an employee or officer should have access to information otherwise subject to the firewall requirement. As an alternative to providing a notice, a financial institution could take the steps necessary to establish and maintain a firewall.

The Bureau seeks comment on its proposed approach to the firewall requirement and whether a different approach might result in a better policy outcome. The Bureau also seeks

AdminRecord-000559

comment on the scope of the proposed firewall and the exception. The Bureau specifically seeks comment on whether the firewall should apply to information about principal owners' ethnicity and race that is obtained via visual observation and/or surname. Finally, the Bureau generally requests comment on whether additional clarification is needed regarding the firewall requirement.

Section 1002.109    Reporting of Data to the Bureau

Proposed § 1002.109 would address several aspects of financial institutions' obligations to report 1071 data to the Bureau. First, proposed § 1002.109(a) would require 1071 data to be collected on a calendar year basis and reported to the Bureau by June 1 of the following year, and would address several related issues. Second, proposed § 1002.109(b) would detail the information that financial institutions must provide about themselves when reporting 1071 data to the Bureau. Finally, proposed § 1002.109(c) would address technical instructions for submitting data to the Bureau.

The Bureau is proposing § 1002.109 to implement ECOA section 704B(f)(1) and pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. The Bureau is also proposing § 1002.109(b) pursuant to 704B(e)(2)(H), which requires financial institutions to compile and maintain as part of their 1071 data any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071.

109(a) Reporting to the Bureau

109(a)(1) Annual Reporting

Background

ECOA section 704B(f)(1) provides that "[t]he data required to be compiled and maintained under [section 1071] by any financial institution shall be submitted annually to the Bureau."

SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing that financial institutions collect 1071 data on a calendar year basis, and that financial institutions report 1071 data to the Bureau by a specified time after the end of each calendar year.[714]

SERs and other stakeholders responded to various aspects of the Bureau's proposals under consideration

in the SBREFA Outline on reporting 1071 data to the Bureau, including reporting frequency, reporting period, and submission date.[715]

Regarding reporting frequency, stakeholder comments were split. One SER suggested that data reporting be done on a calendar year basis, to avoid half-year measurements. Some other stakeholders—including several industry and trade association stakeholders, and a community group—also supported reporting no more or less frequently than once a year. Other stakeholders supported reporting on a more frequent basis than annually. In that latter group, another SER requested ongoing data reporting, arguing that more frequent reporting is less burdensome by permitting financial institutions to submit data as applications are received or loans are made. Three stakeholders (a community group, a think tank, and a community development lender trade association) also supported reporting more frequently than annually, especially for larger financial institutions, arguing that technology enables near real-time reporting.

Regarding the reporting period and submission date, several trade associations supported collecting data on a calendar year basis. A community group suggested an alternative to calendar-year reporting, specifically a one-year collection period starting on July 1 and ending on June 30 the next year. The group argued that this alternative schedule would help financial institutions avoid overlapping obligations with the calendar year data collection schedule for HMDA. A SER cautioned against aligning the annual reporting dates for section 1071 with the reporting dates for HMDA, noting that reporting for both regimes at the same time could strain resources; other stakeholders echoed this view. Other stakeholders requested that the Bureau coordinate reporting dates with other Federal agencies, including those responsible for collecting data from CDFI Fund participants and banks subject to CRA reporting.

Regarding reporting 1071 data to the Bureau, several SERs noted that they already report much of the data that a 1071 rule would seem likely to require to the Treasury Department's CDFI Fund. One SER requested that the Bureau coordinate with the CDFI Fund on consistency of definitions, types of data collection, and timing of reporting, and that the agencies should consider

streamlining reporting requirements through data sharing.

The SBREFA Panel recommended, regarding this issue as well as other recordkeeping and reporting issues addressed in the SBREFA Outline, that the Bureau seek comment on these aspects of a 1071 rule, and how best to implement them in a manner that minimizes cost and burden to small financial institutions.[716]

Proposed Rule

The Bureau is proposing, in § 1002.109(a)(1)(i), to require that by June 1 following the calendar year for which data are collected and maintained as required by proposed § 1002.107, a covered financial institution shall submit its small business lending application register in the format prescribed by the Bureau. This approach to reporting frequency and reporting period is consistent with both the annual submission schedule specified in the statute as well as with the approach under consideration at SBREFA.

Regarding reporting frequency, while several stakeholders and one SER advocated for more frequent reporting (especially via application programming interface (API)), annual reporting is consistent with what ECOA section 704B(f)(1) provides and with HMDA for most filers.[717] The Bureau is concerned that requiring more frequent reporting for 1071 data could be unduly onerous for financial institutions, especially small financial institutions and those with lower application volumes.

Further, the Bureau is not proposing that financial institutions (small or otherwise) be permitted to submit their 1071 data on a real-time basis. The Bureau believes that this would add complexity to the Bureau reporting system. The Bureau is concerned that this approach could result in financial institutions treating the Bureau as their official recordkeeping system for their 1071 data. Financial institutions that were required to update or correct their data as a result of an audit, examination, or compliance review would need to make such changes within the Bureau's system, requiring the Bureau to develop an infrastructure that not only accepts real-time submissions, but also real-time corrections to prior real-time submissions. Nonetheless, the Bureau is continuing to explore ways it might facilitate or streamline reporting, particularly for small financial

[714] SBREFA Outline at 39–40.

[715] The SER feedback in this section-by-section analysis can be found in the SBREFA Panel Report at 34.

[716] Id. at 47.

[717] Some financial institutions with over 60,000 covered loans and applications must file HMDA data on a quarterly basis. 12 CFR 1003.5(a)(ii).

**56494**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

institutions. See the section-by-section analysis of proposed § 1002.109(c) below for additional information.

Regarding the reporting period, the Bureau believes there are advantages to having data collected and reported on a calendar year basis. Calendar year reporting may facilitate other aspects of the rule that depend on data that is typically recorded on a calendar year basis. For instance, other parts of the rule look to annual data, such as proposed § 1002.105(b), which would use a financial institution's loan volumes over the prior two calendar years to determine coverage. Further, the Bureau understands that financial institutions would generally prefer to have such data collections occur on a calendar year basis because such an approach would be generally consistent with their operations. The Bureau is concerned that requiring an annual reporting period other than the calendar year—such as July 1 to June 30—could result in additional challenges for financial institutions in complying with the rule, which could in turn make errors in collecting and reporting data to the Bureau more likely.

As discussed in more detail below in the section-by-section analysis of proposed § 1002.114(b) below, the Bureau is considering whether to require or permit the initial collection of data under the eventual 1071 rule to begin, following an appropriate implementation period, at some point during the year rather than on January 1. For example, if the compliance date were on July 1, 2024, the Bureau would permit or require all financial institutions to collect and report data pursuant to proposed § 1002.109(a) for the period July 1 to December 31, 2024. After this initial partial collection year, financial institutions would collect data on a calendar year basis.

Regarding the proposed submission date, several stakeholders (including community groups) requested a March 1 submission deadline on the grounds that financial institutions comply with a March 1 deadline for HMDA despite its relative complexity compared to 1071. The Bureau is proposing a June 1 submission deadline to give additional time for the compliance staff of financial institutions to dedicate time and resources focused on preparing a small business lending application register, after meeting other reporting obligations with earlier deadlines, such as under HMDA or CRA. This may be especially important for smaller financial institutions that will rely on the same staff to comply with other data reporting regimes and this 1071 rule.

Proposed § 1002.109(a)(1)(ii) would require that an authorized representative of the covered financial institution with knowledge of the data submitted certify to the accuracy and completeness of data submitted pursuant to proposed § 1005.109(a). A similar provision exists in Regulation C (§ 1003.5(a)(i)), and the Bureau believes it would be appropriate to adopt it here as well. Based on the Bureau's experience with HMDA and Regulation C, the Bureau believes that having a specific person responsible for certifying to the accuracy and completeness of data is likely to lead to financial institutions providing better quality data.

Proposed § 1002.109(a)(1)(iii) would clarify that when the last day for submission of data prescribed under proposed § 1002.109(a)(1) falls on a date that is not a business day, a submission is considered timely if it is submitted no later than the next business day.

The Bureau seeks comment on its proposed approach to the aspects of reporting addressed in proposed § 1002.109(a), including that the reporting frequency be annual, that the reporting period be the calendar year, and that the submission date be June 1 of the next calendar year. In particular, the Bureau seeks comment with respect to proposed § 1002.109(a)(1)(i) on whether requiring the submission of small business lending application registers by June 1 might give rise to complications for any persons or entities relying on data from the registers for other purposes, such as Federal regulators scheduling examinations.

### 109(a)(2) Reporting by Subsidiaries

ECOA section 704B(f)(1) states that "any" financial institution obligated to report 1071 data to the Bureau must do so annually; the statute does not expressly address financial institutions that are themselves subsidiaries of other financial institutions. In the SBREFA Outline, the Bureau did not address this issue for section 1071 reporting.

Proposed § 1002.109(a)(2) would state that a covered financial institution that is a subsidiary of another covered financial institution shall complete a separate small business lending application register. The subsidiary shall submit its small business lending application register, directly or through its parent, to the Bureau. Proposed comment 109(a)(2)–1 would explain that a covered financial institution is considered a subsidiary of another covered financial institution for purposes of reporting data pursuant to proposed § 1002.109 if more than 50

percent of the ownership or control of the first covered financial institution is held by the second covered financial institution. This proposed provision mirrors one that exists for HMDA reporting under Regulation C in § 1003.5(a)(2). The Bureau believes that this proposed provision would help facilitate compliance with the 1071 rule by permitting parent financial institutions to coordinate the reporting of all their subsidiaries' small business lending data together.

The Bureau seeks comment on this aspect of its proposal. Additionally, the Bureau seeks comment on proposed § 1002.109(a)(2) in light of proposed § 1002.105(b), which would define a covered financial institution as a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. The Bureau seeks comment on whether this provision may risk creating ambiguity with respect to compliance and whether additional safeguards may be required to dissuade financial institutions from creating subsidiaries for the sole purpose of avoiding the collection and reporting or section 1071 data. The Bureau also seeks comment on all other aspects of this proposal.

### 109(a)(3) Reporting Obligations Where Multiple Financial Institutions Are Involved in a Covered Credit Transaction

Section 1071's requirement to collect and report data for any "application to a financial institution for credit" could be read as applying to more than one financial institution when an intermediary provides the application to another institution that takes final action on the application. It might also apply in cases where one application is simultaneously sent to multiple financial institutions. This broad reading may serve a useful function, such as comprehensive reporting by all financial institutions involved in a small business lending transaction, but could also generate duplicative compliance costs for financial institutions and potentially detract from the quality of reported 1071 data, increasing the risk that certain applications are reported multiple times.

At SBREFA, in considering ECOA section 704B(f)(1), the Bureau stated that it was considering proposing that in the situation where more than one party is involved on the lender side of a single small business loan or application, section 1071's data collection and reporting requirements would be limited in the same manner as in

AdminRecord-000561

Regulation C. For HMDA, Regulation C provides (in § 1003.4(a) and comment 4(a)–3) that if more than one financial institution was involved in the origination of a covered loan, the financial institution that made the final credit decision approving the application before closing or account opening shall report the covered loan as an origination. If there was an origination, then the financial institution making the final credit decision approving the application would be responsible for reporting (even if the financial institution used credit standards set by another party). If more than one financial institution approved a loan, and the loan was purchased after closing by one of the financial institutions approving the loan, the purchaser (such as an assignee) would report the loan. If there was no origination and multiple financial institutions received the same application, then any financial institution that made a credit decision would be responsible for reporting (even if other financial institution also reported on the same potential non-originated application).

Several SERs voiced support for aligning reporting requirements for financial institutions that are not the lender of record with the approach taken for HMDA reporting in the Bureau's Regulation C. One SER stressed that imposing section 1071 requirements for loan buyers, who play an important role in assisting CDFIs but do not make credit decisions, might risk their continued participation. Another CDFI SER explained that the institution occasionally participates in pooled loan purchases and recommended that the Bureau ensure that reporting obligations for such pooled loans are clear.[718] Other SERs expressed concern in adopting the Bureau's approach in Regulation C, noting the differences between small business and residential loan products, and advocated for simpler approaches. The SBREFA Panel did not provide a relevant recommendation.

Comments from other stakeholders included several voicing support for a HMDA-like approach, praising the Bureau's consistent approach and interest in limiting duplicative information. However, several comments advocated against the HMDA approach, generally by proffering other ideas rather than criticizing the rules or outcomes of the HMDA approach. Alternative suggestions varied, but included suggesting that data collection

and reporting should be required only for the company most closely interacting with the loan applicant; if a financial institution receives a covered application, then the application should be subject to reporting, regardless of outcome; the financial institution that funded (or would have funded) the loan should be required to collect and report; and the financial institution that conducts the underwriting and determines whether the small business credit applicant qualifies for credit using its underwriting criteria should be required to report and collect.

Proposed § 1002.109(a)(3) would provide that only one covered financial institution shall report each covered credit transaction as an origination, and that if more than one financial institution was involved in an origination, the financial institution that made the final credit decision approving the application shall report the loan as an origination, if the financial institution is a covered financial institution.

Proposed § 1002.109(a)(3) would further provide that if there was no origination, then any covered financial institution that made a credit decision shall report the application. The Bureau is aware that under certain lending models as they operate today, financial institutions may not always be aware of whether another financial institution originated a covered transaction. The Bureau believes that information on whether there was an origination should generally be available, or that lending models can be adjusted to provide this information at low cost. For example, if an applicant applies to Financial Institutions A and B, and then withdraws an application with Financial Institution A, then Financial Institution A should be able to ascertain whether the applicant obtained credit from Financial Institution B.

Proposed comment 109(a)(3)–1 would provide general guidance on how to report originations and applications involving more than one institution. In short, if more than one financial institution was involved in the origination of a covered credit transaction, the financial institution that made the final credit decision approving the application shall report the covered credit transaction as an origination. Proposed comment 109(a)(3)–2 would offer examples illustrating how a financial institution should report a particular application or originated covered credit transaction. Proposed comment 109(a)(3)–3 would explain that if a covered financial institution made a credit decision on a covered application through the actions of an

agent, the financial institution reports the application, and provides an example. State law determines whether one party is the agent of another. While these proposed comments assume that all of the parties are covered financial institutions, the same principles and examples would apply if any of the parties is not a covered financial institution.

The Bureau seeks comment on this aspect of its proposal. In particular, the Bureau seeks comment with respect to proposed § 1002.109(a)(3) on whether, particularly in the case of applications that a financial institution is treating as withdrawn or denied, the financial institution can ascertain if a covered credit transaction was originated by another financial institution without logistical difficulty or significant compliance cost.

## 109(b) Financial Institution Identifying Information

Beginning in 1989, Regulation C required financial institutions reporting HMDA data to use a discrete transmittal sheet to provide information on themselves separate from the loan/application registers used to submit HMDA data.[719] The 2015 HMDA final rule replaced the transmittal sheet requirement with Regulation C § 1003.5(a)(3), which requires that a financial institution reporting HMDA data to provide with its submission (i) its name; (ii) the calendar year the data submission covers; (iii) the name and contact information of a person who may be contacted with questions about the institution's submission; (iv) its appropriate Federal agency; (v) the total number of entries contained in the submission; (vi) its Federal Taxpayer Identification Number; and (vii) its Legal Entity Identifier (LEI).[720] The Bureau and FFIEC publish information on financial institutions that report HMDA data in the HMDA Reporter Panel, which includes the required submission information, provided by financial institutions under § 1003.5(a)(3), as well as other data derived from this information.[721]

The Bureau is proposing to collect information regarding financial institutions that report 1071 data, similar to the information required

---

[718] See the section-by-section analysis of proposed § 1002.104(a) above for further discussion of the proposed treatment of pooled loans.

[719] See 54 FR 51356, 51361 (Dec. 15, 1989) (requiring financial institutions to use the transmittal sheet and loan/application register in appendix A).

[720] 80 FR 66128, 66526 (Oct. 28, 2015) (deleting appendix A and relocating its substantive requirements to § 1003.5(a)(3)).

[721] See Fed. Fin. Insts. Examination Council, *HMDA Reporter Panel, https://www.ffiec.gov/hmdarawdata/FORMATS/HMDAReporterPanel.pdf* (last visited July 27, 2021).

AdminRecord-000562

under Regulation C. Specifically, proposed § 1002.109(b) would require that a financial institution provide the following information about itself as part of its submission: (1) Its name; (2) its headquarters address; (3) the name and business contact information of a person who may be contacted with questions about the financial institution's submission; (4) its Federal prudential regulator, if applicable; (5) its Federal Taxpayer Identification Number; (6) its LEI; (7) its Research, Statistics, Supervision, and Discount identification (RSSD ID) number, if applicable; (8) its parent institution information, if applicable (including the name, LEI, and RSSD ID number of its immediate parent entity and top-holding parent entity, if applicable); (9) the type of financial institution, chosen from a list provided; and (10) whether the financial institution is voluntarily reporting 1071 data.

As discussed below, the Bureau believes it would be appropriate to require each of these pieces of information regarding financial institutions reporting 1071 data. As a practical matter, the Bureau expects that this information might be provided by a financial institution when it initially sets up an account with the Bureau's 1071 data submission platform to allow it to file 1071 data as required by the rule. Thus, this information might exist in the Bureau's 1071 data submission system and be updated by the financial institution as needed.

As described in detail below, the Bureau believes that detailed information on the financial institutions reporting 1071 data is necessary to carry out, enforce, and compile data under section 1071, pursuant to ECOA section 704B(f)(1) and (g)(1), and would aid in fulfilling the purposes of section 1071, pursuant to 704B(e)(2)(H). To analyze 1071 data, the Bureau and other potential users of the data would need information on the financial institutions that are taking covered applications and making covered credit transactions. Fair lending analysis is based on a review of the decisions financial institutions make on applications. Similarly, an analysis of the business and community development needs of a given community is based on understanding the volume and geography of the lending activities of specific financial institutions.

With the possible exception of the LEI (in proposed § 1002.109(b)(6) and (8)(ii) and (v)) in certain circumstances, the Bureau believes that financial institutions already have all the information that would be required of them under proposed § 1002.109(b), and

that being required to provide this information to the Bureau should not pose any particular difficulties or costs on financial institutions.

The Bureau seeks comment on its approach to collecting information on financial institutions, including each of the items listed in proposed § 1002.109(b)(1) through (10) as well as whether the Bureau should require the reporting of any other information on financial institutions. Additional requests for comment specific to certain pieces of information are included below.

### Paragraph 109(b)(1)

During the SBREFA process, in the context of discussing privacy, some stakeholders expressed an aversion to the collection and publication of information on financial institutions. Some stakeholders, including SERs and some larger entities, commented that the Bureau should not publish the names of financial institutions reporting 1071 data, asserting that those financial institutions would face reputational risks. Some stakeholders even appeared to suggest that the Bureau not collect the names of financial institutions at all.

Proposed § 1002.109(b)(1) would require a financial institution to provide its name. Regulation C (§ 1003.5(a)(2)(i)) requires financial institutions to provide their names on their transmittal sheets when filing HMDA data, and the Bureau believes that a similar requirement would be appropriate here.

The Bureau believes that collecting a financial institution's name (as well as all the other identifying information in proposed § 1002.109(b)) is necessary to carry out, enforce, and compile data under section 1071, and would aid in fulfilling the purposes of section 1071. For both of section 1071's statutory purposes, the identity of the financial institution taking covered applications and originating covered credit transactions is critical. Without knowing the financial institution's name, fair lending enforcement would not be possible. Analyzing business and community development needs is much improved when it is possible to identify which financial institutions are operating in specific geographic areas.

There are additional practical considerations. Examinations for compliance with section 1071 would be difficult, if not impossible, without the name of the financial institution associated with a specific small business lending application register. Further, it would be difficult for the Bureau to administer a website for 1071 data submissions without creating logins assigned to specific financial

institutions. Finally, the Bureau is proposing in § 1002.110(c) that financial institutions' statutory obligation to make 1071 data available to any member of the public, upon request, pursuant to ECOA section 704B(f)(2)(B) would be satisfied by the institutions' directing the public to the Bureau's website for this information. Without the financial institution's name (and other relevant identifying information), proposed § 1002.110(c) would not satisfy this statutory requirement.

### Paragraph 109(b)(2)

Proposed § 1002.109(b)(2) would require a financial institution to provide the physical address of its headquarters location. The headquarters address of a financial institution would provide geographic information that would aid in fulfilling the statutory purposes of section 1071, including, for instance, analyses of the connection between a financial institution's location and the business and community development needs where it operates. It will also help identify and differentiate financial institutions, particularly nondepository financial institutions, that have similar names.

### Paragraph 109(b)(3)

Proposed § 1002.109(b)(3) would require a financial institution to provide the name and business contact information of a person who may be contacted with questions about the financial institution's 1071 data submission. Regulation C includes a similar requirement in § 1003.5(a)(3)(iii), and the Bureau believes it would be appropriate to require such information here. In general, the Bureau has found, from its experience with HMDA and Regulation C, that requiring the name and business contact information of a person who may be contacted with questions generally facilitates communication in the event that follow-up on a submission is required.

### Paragraph 109(b)(4)

Proposed § 1002.109(b)(4) would require a financial institution that is a depository institution to provide the name of its Federal prudential regulator, if applicable. Proposed comment 109(b)(4)–1 would explain how to determine which Federal prudential regulator (*i.e.,* the OCC, the FDIC, the Board, or the NCUA) a financial institution should report. Proposed comment 109(b)(4)-2 would provide guidance on when a financial institution must report a new Federal prudential regulator, for instance, in the event of a merger or a change of charter.

AdminRecord-000563

Regulation C includes a similar provision in § 1003.5(a)(3)(iv), requiring financial institutions to identify the appropriate Federal agency. In the Regulation C context, the purpose of this requirement is to identify the agency to which a financial institution must report its HMDA data—often the financial institution's Federal prudential regulator for depository institutions, and other agencies for nondepository institutions.[722] Here, the Bureau believes a requirement to report a financial institution's Federal prudential regulator would be appropriate for different reasons. The reporting of a financial institution's Federal prudential regulator may enable analysts to more easily identify other information about a financial institution that its Federal prudential regulator may make publicly available, such as Call Report data; further, such additional data may be used to perform analyses of the characteristics of financial institution's 1071 data by regulator. Nondepository institutions generally do not have Federal prudential regulators and would not report one under this proposed requirement.

Paragraph 109(b)(5)

Proposed § 1002.109(b)(5) would require a financial institution to provide its Federal Taxpayer Identification Number (TIN). Proposed comment 109(b)(5)–1 would explain when a financial institution should report a new Federal TIN in the event that it obtains a new Federal TIN (for instance, because the financial institution merges with another financial institution and adopts the Federal TIN of the other financial institution).

Regulation C § 1003.5(a)(3)(iv) requires financial institutions to report Federal TIN with their HMDA submissions, and the Bureau believes such a requirement would be appropriate here as well. A financial institution's Federal TIN may be used to identify other publicly available information on a financial institution, and combine that data with a financial institution's 1071 register to enhance the types of analysis that can be conducted to further the two statutory purposes of section 1071.

Paragraph 109(b)(6)

Proposed § 1002.109(b)(6) would require a financial institution to provide its LEI. Proposed comment 109(b)(6)–1 would explain what an LEI is and would make clear that financial institutions that do not currently have an LEI must obtain one, and that

financial institutions have an ongoing obligation to maintain an LEI in order to satisfy proposed § 1002.109(b)(6).

An LEI is a unique, 20-digit identifier issued by an entity endorsed or otherwise governed by the Global LEI Foundation. Regulation C requires financial institutions to obtain and use an LEI, which facilitates the analysis of HMDA data and aids in the recognition of patterns by more precisely identifying financial institutions and affiliated companies.[723] The LEI also helps financial institutions that report HMDA data generate the universal loan identifier used to identify application or application-level records in Regulation C. Similarly, in the 1071 context, a financial institution's LEI would also likely facilitate analyses of 1071 data,[724] by helping the Bureau and other stakeholders better understand a financial institution's corporate structure. The Bureau would also require, in proposed § 1002.107(a)(1), financial institutions to use their LEIs to create unique identifiers for covered applications. The Bureau believes this, in turn, would result in more sophisticated and useful analyses of the financial institution's 1071 data.

Paragraph 109(b)(7)

Proposed § 1002.109(b)(7) would require a financial institution to report its RSSD ID number, if applicable. An RSSD ID is a unique identifying number assigned to institutions, including main offices and branches, by the Federal Reserve System. All depository institutions know and regularly report their RSSD ID numbers on FFIEC regulatory forms. RSSD ID would help users of the 1071 data to link the data for a particular financial institution to other regulatory data, including the connections between a particular financial institution with others. The Bureau believes that this additional information would result in more sophisticated and useful analyses of the financial institution's 1071 data.

Proposed comment 109(b)(7)–1 would explain what a RSSD ID number is and how financial institutions that have one might find it. Financial institutions that do not have RSSD IDs, typically nondepository institutions, would not

be required to obtain them, and would report "not applicable" in that field.

Paragraph 109(b)(8)

Proposed § 1002.109(b)(8) would require a financial institution to provide certain information on its parent entities, if applicable. This information would include the name, the LEI (if available), and the RSSD ID (if available) of the financial institution's immediate parent entity and the financial institution's top-holding parent entity.

Proposed comments 109(b)(8)–1 and –2 would provide guidance on how to identify a financial institution's immediate parent entity and a financial institution's top-holding parent entity. Proposed comment 109(b)(8)–3 would explain that a financial institution would report its parent entities' LEIs if they have them, but that no parent entity would be required to obtain an LEI if it did not already have one. Proposed comment 109(b)(8)–4 would likewise explain that a financial institution would report its parent entities' RSSD ID numbers if they had them.

The Bureau believes that the collection of information on a financial institution's structure would further both of the statutory purposes of section 1071. Data on a financial institution's organizational structure that is self-reported would be more accurate than generating such information from publicly available sources.[725]

---

[722] 12 U.S.C. 2803(h).

[723] 80 FR 66128, 66248 (Oct. 28, 2015) (noting that, despite the cost, the Bureau believed that the benefit of all HMDA reporters using an LEI justified the associated costs by improving the ability to identify financial institution reporting the data and link it to its corporate family).

[724] Id. ("By facilitating identification, this requirement will help data users achieve HMDA's objectives of identifying whether financial institutions are serving the housing needs of their communities, as well as identifying possible discriminatory lending patterns.").

[725] Currently, the Bureau, on behalf of the FFIEC and HUD, generates and publishes information on filers including parent company and top holder information. *See* Fed. Fin. Insts. Examination Council, *Public Panel—Data Fields with Values and Definitions, https://ffiec.cfpb.gov/documentation/2021/panel-data-fields/* (last visited July 27, 2021).

From 1989 to 1998, Regulation C required financial institutions to report their parent entity information on transmittal sheets. 54 FR 51356, 51361, 51368 (Dec. 15, 1989) (adding the transmittal sheet requirement, including parent institution information, to appendix A to Regulation C); 63 FR 52140, 52141 (Sept. 30, 1998) (stating that the Board believed that the availability of information from the FFIEC website makes the continuation of the requirement for parent company information on the transmittal sheet unnecessary). In 2002, Regulation C again required financial institutions to report parent information on transmittal sheets on the grounds that data users asserted the importance of having the parent institution information associated with the HMDA data itself, rather than in a separate database provided by the National Information Center. 67 FR 7221, 7232 (Feb. 15, 2002).

In the 2014 HMDA NPRM, the Bureau proposed to continue requiring that financial institutions identify their parent companies. The Bureau stated that because information about parent companies was not yet available through the LEI, the Bureau believed it was necessary to maintain this requirement to ensure that financial institutions' submissions can be linked with those of their corporate parents. 79 FR 51731, 51861 (Aug. 29, 2014). However, required reporting of parent company information stopped under the 2015

Continued

AdminRecord-000564

Better structural information would, for instance, improve the accuracy of peer analyses, which would facilitate fair lending enforcement. Further analyzing trends over time would be useful for identifying institutions that may give rise to fair lending risk. Given structural changes to institutions over time, information that enables the identification of institutions consistently and accurately over time is important to this trend analysis.

In addition, the Bureau believes that information on a financial institution's structure would advance the business and community development purpose of section 1071 by facilitating the analysis of whether and how corporate structure impacts how a financial institution provides access to credit to small businesses. In particular, this structural information could be used to understand how regulation in one part of a corporate structure impacts unregulated entities within the same corporate group.

Proposed § 1002.109(b)(8) would result in more accurate and comprehensive corporate structure information by requiring financial institutions to provide not only the name of one parent entity, but the immediate parent entity of the financial institution as well as the top-holding parent of the financial institution (for some financial institutions, this would be a bank holding company). For the reasons set out in the section-by-section analyses of proposed § 1002.109(b)(6) and (7), the reporting of LEI and RSSD ID of parent entities would improve the ability of regulators and other stakeholders to map out more precisely and fully the often complex networks of a financial institution's corporate structure. This more detailed and accurate structural data, in turn, may be used to perform more sophisticated and useful analyses of the financial institution's 1071 data. In addition, this information will help the Bureau confirm whether data are appropriately being reported by financial institutions on behalf of their subsidiaries pursuant to proposed § 1002.109(a)(2).

HMDA final rule on the grounds that once the LEI is fully implemented, parent entity information was expected to become available. 80 FR 66128, 66248 (Oct. 28, 2015) (citing Fin. Stability Bd., LEI Implementation Grp., *Fourth Progress Notes on the Global LEI Initiative*, at 4 (Dec. 11, 2012), *http://www.financialstabilityboard.org/wp-content/uploads/r_121211.pdf?page_moved=1*)(noting that the LEI Implementation Group is developing proposals for additional reference data on the direct and ultimate parent(s) of legal entities and on relationship data more generally). However, the Bureau has subsequently encountered difficulties using LEI to obtain parent company information, and thus is proposing here to require that it be provided directly by financial institutions.

With respect to proposed § 1002.109(b)(8), the Bureau seeks comment on whether it should require any other parent entity information to be provided by financial institutions reporting 1071 data.

Paragraph 109(b)(9)

Proposed § 1002.109(b)(9) would require a financial institution to report the type of financial institution it is, selecting the applicable type or types of institution from a list in proposed comment 109(b)(9)–1. The comment would also explain that a financial institution shall select all applicable types. The list provided in the proposed comment includes: (i) Bank or savings association, (ii) minority depository institution, (iii) credit union, (iv) nondepository institution, (v) CDFI, (vi) other nonprofit financial institution, (vii) Farm Credit System institution, (viii) government lender, (ix) commercial finance company, (x) equipment finance company, (xi) industrial loan company, (xii) fintech, and (xiii) other. Proposed comment 109(b)(9)–2 would explain that a financial institution reports the type of financial institution as "other" where none of the enumerated types of financial institution appropriately describe the applicable type of financial institution, and the institution reports the type of financial institution as free-form text.

The Bureau believes that information regarding the type of financial institution reporting 1071 data would greatly assist in the analysis conducted by the Bureau and other users of 1071 data. Information providing further details on types of financial institutions would help advance the statutory purposes of section 1071; fair lending analysts might use this information on the financial institution type (for instance, depository institution compared to nondepository institutions) as a control variable for their analyses. The inclusion of this information may also assist in an assessment of the business and community development needs of an area as it may provide analysts a means of determining what types of financial institutions serve certain geographic areas.

In addition, the Bureau believes that this information, combined with the parent entity information required by proposed § 1002.109(b)(8), would offer more accurate and granular data on nondepository institutions within the same corporate group as depository institutions. Currently, the National Information Center database, which contains information on the structure of corporate groups that contain banks and other financial institutions, provides little information on nondepository institutions. As set out in the section-by-section analysis of proposed § 1002.109(b)(8) above, information on corporate structure that financial institutions self-report could fill in reporting gaps, including more specific information on financial institution types.

With respect to proposed § 1002.109(b)(9), the Bureau seeks comment on whether it should consider removing, modifying, or adding any types of financial institutions to the list in proposed comment 109(b)(9)–1, including in order to manage unique privacy interests (such as, for example, whether a category for captive finance companies that lend to applicants that share the same branding should be included on the list). The Bureau further seeks comment on whether it should consider defining any of the types of financial institutions in the proposed list, in particular whether and how to define the term "fintech."

Paragraph 109(b)(10)

Proposed § 1002.109(b)(10) would require a financial institution to indicate whether it is not a covered financial institution under proposed § 1002.105(a) and is thus voluntarily reporting covered applications.

The Bureau believes it is important to be able to specifically identify these institutions' transactions in the data set. If reporting were restricted to only financial institutions required to report, the 1071 data would accurately reflect the overall population of financial institutions subject to 1071. However, institutions that do not meet the rule's loan-volume thresholds in proposed § 1002.105(b) may choose to voluntarily report 1071 data pursuant to proposed § 1002.5(a)(4)(vii) through (ix). Those institutions that voluntarily report data may not be representative of all potential voluntary reporters and may differ from required reporters. Without a specific designation, it may not be possible to distinguish an institution voluntarily reporting data after a single year of exceeding the loan-volume threshold from an institution reporting because it has already exceeded the loan-volume threshold in two consecutive years. The Bureau believes that users of 1071 data would benefit from being able to use this information as a control variable, resulting in better fair lending as well as business and community development analyses, to account for certain differences that may exist as between required and voluntary reporters.

AdminRecord-000565

**109(c) Procedures for the Submission of Data to the Bureau**

ECOA section 704B(g)(1) authorizes the Bureau to prescribe rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Section 704B(g)(3) provides for the Bureau to issue guidance to facilitate compliance with the requirements of section 1071.

The SBREFA Panel recommended that the Bureau seek comment on the recordkeeping and reporting issues addressed in the SBREFA Outline,[726] including how best to implement them in a manner that minimizes cost and burden to small financial institutions. The Panel also recommended that the Bureau explore ways to streamline reporting for small financial institutions.

Proposed § 1002.109(c) would direct financial institutions to a publicly available website containing the Bureau's *Filing Instructions Guide,* which would set out technical instructions for the submission of data to the Bureau pursuant to proposed § 1002.109. Regulation C § 1003.5(a)(5) contains a comparable provision, which directs users to a Bureau website that sets out instructions for the submission of HMDA data, and the Bureau believes a similar approach would be appropriate here.

The Bureau intends to develop a system to receive, process, and publish the data collected pursuant to section 1071 and proposed subpart B. In doing so, the Bureau will benefit from what it learned in its multiyear effort in developing the HMDA Platform, through which entities file data as required under HMDA and Regulation C. The HMDA Platform satisfies regulatory requirements with an entirely web-based, open source system,[727] using a container-based microservices approach[728] and modern cloud architectures. It was designed to be continuously improved to incorporate evolving technologies and better serve HMDA data users.[729] Publication of the HMDA data is designed to meet user needs and includes, for example, a Data Browser to filter and download datasets

and explore the data using an interactive map. As it did in developing the HMDA Platform, the Bureau's work in developing the section 1071 data submission system will focus on satisfying all legal requirements, promoting data accuracy, and reducing burden. Also as with HMDA, the Bureau anticipates providing a *Filing Instructions Guide* and related materials for financial institutions.

The Bureau seeks comment on this aspect of the proposal, including the provision of technical instructions for data submission via a Bureau website and how best to implement the provisions of this section in a manner that minimizes cost and burden particularly to small financial institutions while implementing all statutory obligations. The Bureau also seeks comment on ways it could streamline reporting for small financial institutions.

Other Reporting Issues

Regulation C § 1003.5(a)(1)(i) provides that a financial institution shall submit its annual loan/application register in electronic format to the appropriate Federal agency. Regulation C does not provide for the submission of HMDA data by unaffiliated third parties directly on behalf of financial institutions in the way that a parent institution may submit HMDA data on behalf of its subsidiary under § 1003.5(a)(2) and comment 5(a)-3. The Bureau understands from financial institutions that report HMDA data to the Bureau that most institutions use third party software vendors in some way to help them prepare or submit their loan/application registers to the Bureau.

The Bureau seeks comment on whether it should permit third parties (such as financial software vendors) to submit to the Bureau a small business lending application register on behalf of a financial institution, including whether financial institutions should be required to designate third parties authorized to submit registers on their behalf.

Section 1002.110    Publication of Data

Proposed § 1002.110 would address several issues surrounding publication of section 1071 data. First, proposed § 1002.110(a) would address annual publication of application-level data on the Bureau's website, subject to deletions or modifications based on the Bureau's consideration of privacy interests. Second, proposed § 1002.110(b) would state that the Bureau may, at its discretion, compile and aggregate data submitted by

financial institutions and may publish such compilations or aggregations as the Bureau deems appropriate. Third, proposed § 1002.110(c) would require a covered financial institution to publish on its website a statement that its 1071 data, as modified by the Bureau, are or will be available on the Bureau's website. Finally, proposed § 1002.110(d) would provide when a covered financial institution shall make the notice required by proposed § 1002.110(c) available to the public and how long it shall maintain the notice on its website.

The Bureau is proposing § 1002.110 to implement ECOA section 704B(f)(2)(B) and (C), which require the Bureau to adopt regulations addressing the form and manner that 1071 data are made available to the public, and pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. The Bureau is also proposing § 1002.110(b) pursuant to 704B(f)(3), which permits the Bureau, at its discretion, to compile and aggregate 1071 data, and to publish such aggregate data.

**110(a) Publication of Small Business Lending Application Registers and Associated Financial Institution Information**

ECOA section 704B(f)(2)(C) requires that the Bureau annually make the 1071 data it receives from financial institutions available to the public in a such form and in such manner as the Bureau determines by regulation. The Bureau addressed this issue in the SBREFA Outline as part of its discussion regarding privacy considerations;[730] SER and other stakeholder comments regarding privacy issues are addressed in part VI below. Proposed § 1002.110(a) would state that the Bureau shall make available to the public generally the data reported to it by financial institutions pursuant to proposed § 1002.109, subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest. (The Bureau is proposing to make such determinations using a balancing test, as discussed in detail in part VI below.) The Bureau shall make such data available on an annual basis, by publishing it on the Bureau's website.

The Bureau seeks comment on its proposed approach to implementing ECOA section 704B(f)(2)(C).

---

[726] SBREFA Panel Report at 47.

[727] *See* GitHub, *CFPB/HMDA Platform, https://github.com/cfpb/hmda-platform* (last visited July 22, 2021).

[728] *See* DockerHub, *HMDA, https://hub.docker.com/u/hmda* (last visited July 22, 2021).

[729] On March 22–26, 2021, the Bureau hosted a HMDA Virtual Tech Sprint to explore other potential innovations related to HMDA data submission and publication. *See https://www.consumerfinance.gov/rules-policy/innovation/cfpb-tech-sprints/home-mortgage-disclosure-act-tech-sprint/.*

[730] SBREFA Outline at 40–41.

110(b) Publication of Aggregate Data

ECOA section 704B(f)(3) provides that the Bureau may, at its discretion "compile and aggregate data collected under this section for its own use" and "make public such compilations of aggregate data." The Bureau did not address this issue at SBREFA.

Proposed § 1002.110(b) would state that the Bureau may, at its discretion, compile and aggregate data submitted by financial institutions pursuant to proposed § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate. The Bureau believes that publication of certain such compilations and aggregations may provide useful data to the public to supplement the Bureau's publication of application-level data pursuant to proposed § 1002.110(a). This is especially true of application-level data fields that the Bureau may choose, using its proposed balancing test (described in parts VI.C.1 and .2 below) to modify or delete before publication pursuant to proposed § 1002.110(a).

The Bureau seeks comment on this aspect of its proposal.

110(c) Statement of Financial Institution's Small Business Lending Data Available on the Bureau's Website and 110(d) Availability of Statements

Background

ECOA section 704B(f)(2)(B) requires that the data compiled and maintained by financial institutions shall be "made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau."

SBREFA Proposal Under Consideration and Feedback Received

The Bureau stated in the SBREFA Outline that it was considering proposing an approach in which financial institutions could satisfy this requirement by referring the public to the Bureau's website where 1071 data would be available.[731] Under this approach, the 1071 data would be available with any modifications or deletions required based on the Bureau's application of the balancing test described in part VI below. The Bureau also stated that it considered requiring financial institutions to make their own data available to the public directly, upon request. However, the Bureau was concerned that this approach could involve greater burden for financial institutions, lead to privacy risks resulting from errors by individual

financial institutions implementing any modifications or deletions required by the Bureau, and be less efficient overall.

One SER and several industry stakeholders expressed strong support for the Bureau's proposal under consideration that the public be directed to access 1071 data via the Bureau's website, rather than requiring financial institutions to provide the data themselves upon request.[732] These stakeholders expressed concern that a requirement that financial institutions themselves provide 1071 data to the public upon request would be burdensome, adding complexity to the process, making errors more likely, and giving rise to data privacy risks. One community group asserted that the Bureau should require financial institutions to provide 1071 data within 30 days of a request from the public and, absent this, that the Bureau should make application-level 1071 data available to the public quarterly rather than annually.

The SBREFA Panel recommended, regarding this issue as well as other recordkeeping and reporting issues addressed in the SBREFA Outline, that the Bureau seek comment on these aspects of a 1071 rule, and how best to implement them in a manner that minimizes cost and burden to small financial institutions.[733]

Proposed Rule

Proposed § 1002.110(c) would require that a covered financial institution make available to the public on its website, or otherwise upon request, a statement that the covered financial institution's small business lending application register, as modified by the Bureau pursuant to proposed § 1002.110(a), is or will be available on the Bureau's website. The Bureau is proposing this approach, which is consistent with its approach under consideration at SBREFA, for the reasons discussed above, including that this approach would reduce potential burdens on financial institutions associated with publishing modified data, would reduce privacy risks resulting from errors by individual financial institutions implementing any modifications or deletions required by the Bureau, and would be more efficient overall. Regulation C (§ 1003.5(c)(1)) implements a similar statutory requirement regarding the form of data reporting and requires financial institutions to direct any public requests for HMDA data they receive to the Bureau;[734] the Bureau believes that a

similar provision would be appropriate here to maintain continuity across reporting regimes, and because the Bureau believes that this provision would help ensure consistent implementation of any modification or deletion decisions that the Bureau determines would advance a privacy interest.

Proposed § 1002.110(c) would also state that a financial institution shall use language provided by the Bureau, or substantially similar language, to satisfy this requirement to provide a statement. Proposed comment 110(c)–1 would provide model language that financial institutions can use to comply with proposed § 1002.110(c). Proposed comment 110(c)–2 would provide guidance to financial institutions that do not have websites.

Proposed § 1002.110(d) would provide that a covered financial institution shall make the notice required by proposed § 1002.110(c) available to the public on its website when it submits a small business lending application register to the Bureau pursuant to proposed § 1002.110(a), and shall maintain the notice for as long as it has an obligation to retain its small business lending application registers pursuant to proposed § 1002.111(a).

The Bureau seeks comment on its proposed approach to implementing ECOA section 704B(f)(3), including how best to implement proposed § 1002.110(c) and (d) in a manner that minimizes cost and burden particularly on small financial institutions while implementing all statutory obligations.

Section 1002.111   Recordkeeping

Proposed § 1002.111 would address several aspects of the recordkeeping requirements for 1071 data. First, proposed § 1002.111(a) would require a covered financial institution to retain evidence of its compliance with this section, which includes a copy of its small business lending application register, for at least three years after submitting the register pursuant to proposed § 1002.109. Second, proposed § 1002.111(b) would require a financial institution to maintain, separately from the rest of the application and accompanying information, an applicant's responses to a financial institution's inquiries required by ECOA section 704B(b)(1) (*i.e.*, whether the applicant is a minority-owned business or a women-owned business, and regarding the ethnicity, race, and sex of the applicant's principal owners). Finally, proposed § 1002.111(c) would require that, in compiling and maintaining any records under

---

[731] *Id.* at 41–42.

[732] SBREFA Panel Report at 34.
[733] *Id.* at 47.
[734] 12 U.S.C. 2803(j)(1).

proposed §§ 1002.107 and 1002.111(b), or reporting data pursuant to proposed § 1002.109, a financial institution shall not include personally identifiable information concerning any individual who is, or is connected with, an applicant.

The Bureau is proposing § 1002.111 to implement ECOA section 704B(f)(2)(A), which requires financial institutions to compile and maintain 1071 data for at least three years; 704B(b)(2), which requires financial institutions to maintain a record of the responses to the inquiry required by 704B(b)(1), separate from the application and accompanying information; and 704B(e)(3), which provides that in compiling and maintaining 1071 data, a financial institution may not include personally identifiable information concerning an individual who is, or is connected with, an applicant. The Bureau is also proposing § 1002.111 pursuant to its authority under 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071.

### 111(a) Record Retention

ECOA section 704B(f)(2)(A) requires that information compiled and maintained under section 1071 be retained for not less than three years after the date of preparation. In the SBREFA Outline, the Bureau stated that it was considering proposing that a financial institution retain its 1071 data for at least three years after they are submitted to the Bureau.[735] The Bureau received little feedback on this issue; a few stakeholders opined that the three-year retention period was acceptable.

The SBREFA Panel recommended, regarding this issue as well as other recordkeeping and reporting issues addressed in the SBREFA Outline, that the Bureau seek comment on these aspects of a 1071 rule, and how best to implement them in a manner that minimizes cost and burden to small financial institutions.[736]

Proposed § 1002.111(a) would require that a financial institution retain a copy of its small business lending application register for three years after the register is submitted to the Bureau pursuant to proposed § 1002.109. This proposed approach is consistent with the approach that the Bureau considered proposing at SBREFA. By way of comparison, under Regulation C, financial institutions must retain the loan/application registers that they

submit to the Bureau for three years.[737] This reflects the requirement in HMDA itself that a LAR be retained for three years after it is made available.[738]

Proposed comment 111(a)–1 would provide examples of what evidence of compliance with the proposed provision is likely to include. Proposed comment 111(a)–2 would require that a creditor that is voluntarily, under § 1002.5(a)(4)(vii) and (viii), collecting information pursuant to subpart B but is not required to report that data to the Bureau, complies with proposed § 1002.111(a) by retaining evidence of compliance with subpart B for at least three years after June 1 of the year following the year that data was collected.

The Bureau seeks comment on its proposed approach to implementing ECOA section 704B(f)(2)(A), including how best to implement proposed § 1002.111(a) in a manner that minimizes cost and burden particularly on small financial institutions while implementing all statutory obligations.

### 111(b) Certain Information Kept Separate From the Rest of the Application

ECOA section 704B(b)(2) requires financial institutions to maintain a record of the "responses to [the] inquiry" required by 704B(b)(1) separate from the application and accompanying information. As discussed below and consistent with the approach set forth in E.2 of the *Overview* to this part V, the Bureau proposes to interpret the term "responses to such inquiry" in 704B(b)(2) to be the applicant's responses to inquiries regarding protected demographic information— that is, whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners.

In the SBREFA Outline, the Bureau discussed this statutory provision but did not present a proposal under consideration to address it. Some SERs quoted this statutory language in written feedback, but none provided feedback on the particular issue of keeping certain information separate from the rest of the application. One trade association stakeholder noted that, under HMDA and Regulation C, banks are permitted to inquire about and collect required data points (which include information such as the ethnicity, race, and sex of applicants' principal owners) on and with the application. This stakeholder urged the

Bureau to permit the same for 1071, and further requested a safe harbor for a bank that inquires and collects required data points on or with an application.

The SBREFA Panel recommended, regarding this issue as well as other recordkeeping and reporting issues addressed in the SBREFA Outline, that the Bureau seek comment on this aspect of a 1071 rule, and how best to implement it in a manner that minimizes cost and burden to small financial institutions.[739]

Proposed § 1002.111(b) would state that a financial institution shall maintain, separately from the rest of the application and accompanying information, an applicant's responses to the financial institution's inquiries to collect data pursuant to proposed subpart B regarding whether an applicant for a covered credit transaction is a minority-owned business under proposed § 1002.107(a)(18) or a women-owned business under proposed § 1002.107(a)(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under proposed § 1002.107(a)(20).

Proposed comment 111(b)–1 would explain that a financial institution may satisfy this requirement by keeping an applicant's responses to the financial institution's request pursuant to proposed § 1002.107(a)(18) through (20) in a file or document that is discrete or distinct from the application and its accompanying information. For example, such information could be collected on a piece of paper that is separate from the rest of the application form. In order to satisfy the requirement in proposed § 1002.111(b), an applicant's responses to the financial institution's request pursuant to proposed § 1002.107(a)(18) through (20) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application. However, the financial institution may nonetheless need to keep this information in a different electronic or physical file in order to satisfy the requirements of proposed § 1002.108.

As discussed in detail above in E.2 in the *Overview* of this part V, the Bureau believes the best reading of the statutory provisions that mention the inquiry made under ECOA section 704B(b)(1)— in 704B(b)(2) as well as in 704B(c) regarding the right to refuse and 704B(d) regarding the firewall—is that they refer to applicants' responses to the inquiries regarding minority-owned and women-owned business status in proposed

---

[735] SBREFA Outline at 39.
[736] SBREFA Panel Report at 47.

[737] Regulation C § 1003.5(a)(1).
[738] 12 U.S.C. 2803(j)(6).

[739] SBREFA Panel Report at 47–48.

AdminRecord-000568

§ 1002.107(a)(18) and (19), and regarding the ethnicity, race, and sex of applicants' principal owners in proposed § 1002.107(a)(20). Each of these three data points require financial institutions to request demographic information that has no bearing on the creditworthiness of the applicant. Moreover, a financial institution could not inquire about this demographic information absent section 1071's mandate to collect and report the information, and ECOA prohibits a financial institution from discriminating against an applicant on the basis of the information. The Bureau accordingly believes that the best effectuation of congressional intent is to apply section 1071's special-protection provisions to apply to this demographic information, regardless of whether the statutory authority to collect it originates in 704B(b)(1) (women-owned business status and minority-owned business status) or 704B(e)(2)(G) (race, sex, and ethnicity of principal owners). The Bureau similarly believes that Congress did not intend these special protections to apply to any of the other applicant-provided data points proposed in § 1002.107(a), which the financial institution is permitted to request regardless of coverage under section 1071, which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting purposes.

With respect to the stakeholder's request that the section 1071 rule mirror HMDA's approach to collection of ethnicity, race, and sex data, the Bureau notes that there is no requirement in HMDA that is comparable to ECOA section 704B(b)(2)'s requirement that certain information be kept separate from the application and accompanying information; Regulation C thus anticipates that the demographic information required under HMDA can be collected as part of the application.[740] The Bureau recognizes from stakeholder comments identified in the section-by-section analysis of proposed § 1002.107(c)(1) above that there may be potential difficulties in satisfying the proposed requirements regarding the time and manner of collecting applicant-provided data while not being able to ask for that information on the application itself. Proposed comment 111(b)–1 is intended to clarify, and facilitate compliance with, the statutory directive that financial institutions must keep certain information separate from the credit application.

The Bureau seeks comment on its proposed approach to implementing ECOA section 704B(b)(2), including how best to implement proposed § 1002.111(b) in a manner that minimizes cost and burden, particularly on small financial institutions, while implementing all statutory obligations. The Bureau also seeks comment on whether, for financial institutions that determine that underwriters or other persons should have access to applicants' demographic information pursuant to proposed § 1002.108(b), it should likewise waive the requirement in proposed § 1002.111(b) to keep that information separate from the application and accompanying information.

### 111(c) Limitation on Personally Identifiable Information Retained Under This Section

#### Background

ECOA section 704B(e)(3) provides that in compiling and maintaining any record of information under section 1071, a financial institution may not include in such record the name, specific address (other than the census tract), telephone number, electronic mail address, or any other personally identifiable information (PII) concerning any individual who is, or is connected with, an applicant.

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated it was considering proposing a prohibition on including certain PII about any individuals associated with small business applicants in the small business lending application register a financial institution is required to compile, maintain, and report to the Bureau (other than the information specifically required to be collected and reported pursuant to section 1071, such as the ethnicity, race, and sex of principal owners). The Bureau also stated that this prohibition would not apply to PII collected by financial institutions outside of their specific 1071 data records.[741]

SERs and other stakeholders offered limited feedback on this issue.[742] One SER requested clarification on this statutory provision, specifically asking whether financial institutions were permitted to keep PII in their own loan-level records. A trade association supported a ban on including PII in the 1071 data. Another stated that the Bureau should issue a clarifying provision for excluding PII in compiling

and maintaining any record of information from the different stages in the process (e.g., bank systems, regulatory submission file). Two community group stakeholders supported a prohibition on including personally identifiable information in 1071 data to reduce potential privacy concerns surrounding release of 1071 data.

Some stakeholders expressed concern regarding a different issue related to data privacy. Federal and State laws protect the financial and data privacy of individuals, typically by imposing obligations on financial institutions to provide their customers notice and an opportunity to opt out in advance of the disclosure of their nonpublic personal information to unaffiliated third parties.[743] Several industry stakeholders expressed concern that reporting 1071 data to the Bureau may cause them to violate other data privacy laws, including State data privacy laws.

The SBREFA Panel recommended, regarding this issue as well as other recordkeeping and reporting issues addressed in the Outline, that the Bureau seek comment on these aspects of a 1071 rule, and how best to implement them in a manner that minimizes cost and burden to small financial institutions.[744]

#### Proposed Rule

The Bureau is proposing in § 1002.111(c) that in compiling and maintaining any records under proposed § 1002.107 or § 1002.111(b), or reporting data pursuant to proposed § 1002.109, a financial institution shall not include any name, specific address, telephone number, email address, or any PII concerning any individual who is, or is connected with, an applicant, other than as required pursuant to proposed § 1002.107 or § 1002.111(b). The prohibition on the inclusion of PII in ECOA section 704B(e)(3), which covers the "compiling and maintaining any record of information," implicates proposed §§ 1002.107, 1002.109, and 1002.111, which together would address the compilation, maintenance, and reporting of 1071 data by financial institutions.

Proposed comment 111(c)–1 would clarify that the prohibition in proposed § 1002.111(c) applies to data compiled and maintained pursuant to § 1002.107, data in the small business lending application register submitted by the financial institution to the Bureau under proposed § 1002.109, the version of the

---

[740] See 80 FR 66128, 66192–93 (Oct. 28, 2015).

[741] SBREFA Outline at 39.
[742] SBREFA Panel Report at 34.

[743] See, e.g., Gramm-Leach-Bliley Act, 15 U.S.C. 6801 et seq.; Regulation P, 12 CFR part 1016.
[744] SBREFA Panel Report at 47.

AdminRecord-000569

register that the financial institution maintains under proposed § 1002.111(a), and the separate record of certain information created pursuant to proposed § 1002.111(b).

Proposed comment 111(c)–2 would address the types of information (including PII) that a financial institution is prohibited from including in the data it compiles and maintains pursuant to proposed § 1002.107, in its records under proposed § 1002.111(b), or in data reported to the Bureau under proposed § 1002.109. The examples of types of PII identified in proposed comment 111(c)–2 are illustrative and not exhaustive.

Proposed comment 111(c)–3 would clarify that the prohibition in proposed § 1002.111(c) does not extend to the application or any other records that the financial institution maintains. This comment is intended to address the request by a SER and another stakeholder that the Bureau clarify that this prohibition does not extend more broadly to a financial institution's application or loan-related files.

Proposed comment 111(c)–4 would clarify that the prohibition in proposed § 1002.111(c) does not bar financial institutions from providing to the Bureau, pursuant to proposed § 1002.109(b)(3), the name and business contact information of the person who may be contacted with questions about the financial institution's submission.

The Bureau seeks comment on its proposed approach to implementing ECOA section 704B(e)(3), including how best to implement this requirement in a manner that minimizes cost and burden, particularly on small financial institutions, while implementing all statutory obligations. Regarding comments by stakeholders that reporting 1071 data to the Bureau could give rise to a potential conflict with the data protection and privacy laws prohibiting the disclosure of nonpublic personal information to unaffiliated third parties, the Bureau notes that such laws typically provide an exemption for disclosures made pursuant to Federal and State law.[745] The Bureau seeks comment on whether the requirements in this proposed rule could conflict with other data privacy or data protection

laws, and whether the Bureau might need to use its preemption authority under ECOA,[746] Regulation B,[747] and/or section 1041(a)(1) of the Dodd-Frank Act to ensure that financial institutions do not violate State law in reporting 1071 data to the Bureau. The Bureau also seeks comment on whether it should include a provision to preempt any State data privacy or data protection laws that would prohibit the collection, maintenance, and reporting to the Bureau of 1071 data.

### Section 1002.112   Enforcement

Proposed § 1002.112 would address several issues related to the enforcement of violations of the requirements of proposed subpart B. First, proposed § 1002.112(a) would state that a violation of section 1071 or subpart B of Regulation B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA. Second, proposed § 1002.112(b) would provide that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. This proposed provision also addresses the maintenance of procedures reasonably adapted to avoid such errors. Third, proposed § 1002.112(c) would identify four safe harbors under which certain errors—namely, certain types of incorrect entries for census tract, NAICS code, small business status, and application date—would not constitute violations of ECOA or Regulation B.

The Bureau is proposing § 1002.112 to implement sections 704 and 706 of ECOA, pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071 and pursuant to its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

### 112(a) Administrative Enforcement and Civil Liability

A violation of section 1071 is subject to the enforcement provisions of ECOA, of which section 1071 is a part. ECOA contains administrative enforcement

provisions in section 704,[748] and it provides for civil liability in section 706.[749] The enforcement provisions in existing Regulation B (§ 1002.16(a)(1) and (2)) cross-reference and paraphrase these administrative enforcement and civil liability provisions of ECOA.

Proposed § 1002.112(a) would provide that a violation of section 1071 or subpart B of Regulation B is subject to administrative sanctions and civil liability as provided in sections 704 and 706 of ECOA, where applicable. Regarding stakeholder concerns about private litigants bringing actions for non-compliance, the Bureau believes that its administrative enforcement mechanisms would be appropriate and adequate to address most instances of non-compliance by financial institutions that report 1071 data to the Bureau, based on its experience with Regulation C and HMDA. The Bureau believes that proposed § 1002.112(b) addresses the concerns raised by stakeholders that requested that penalties for non-compliance not be assessed in the first year that 1071 data is collected, given the likelihood of unintentional errors as covered financial institutions learn how to implement this rule.

The Bureau seeks comment on its proposed approach to administrative enforcement and civil liability.

### 112(b) Bona Fide Errors

#### SBREFA Proposal Under Consideration and Feedback Received

During the SBREFA process, SERs and other industry stakeholders expressed concern about private litigants suing them for non-compliance with the 1071 rule.[750] In addition, several SERs requested that the Bureau not assess penalties for the first year of 1071 data collection and reporting, as it did following the 2015 HMDA final rule; prior to the compliance date for that rule, the Bureau issued a policy statement announcing it would not seek penalties for errors for the first calendar year (2018) of data collected under the amended Regulation C.[751] Stakeholders

---

[745] *See, e.g.,* Gramm-Leach-Bliley Act section 502(e)(8), 15 U.S.C. 6802(e)(8), and Regulation P § 1016.15(a)(7)(i) (stating that the limitations on disclosing nonpublic personal information to unaffiliated third parties do not apply if the information is disclosed to comply with Federal, State, or local laws, rules and other applicable legal requirements); California Consumer Privacy Act, Cal. Civ. Code 1798.145(a)(1) (noting that the obligations imposed on businesses by CCPA "shall not restrict a business' ability to . . . comply with federal, state, or local laws").

[746] 15 U.S.C. 1691d(f).

[747] Existing § 1002.11.

[748] 15 U.S.C. 1691c.

[749] 15 U.S.C. 1691e.

[750] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 34–36.

[751] Bureau of Consumer Fin. Prot., *CFPB Issues Public Statement On Home Mortgage Disclosure Act Compliance* (Dec. 21, 2017), *https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-public-statement-home-mortgage-disclosure-act-compliance/* (noting that the Bureau did not intend to require data resubmission unless data errors were material, or assess penalties with respect to errors for HMDA data collected in 2018 and reported in 2019).

AdminRecord-000570

asked the Bureau to emulate that approach for 1071. Other stakeholders expressed concern about the potential consequences of committing what they viewed as technical or inadvertent errors in collecting or reporting 1071 data. One financial institution stakeholder suggested that the 1071 rule adopt or emulate the good faith error provisions set out in Regulation C, including § 1003.6(b)(1), which provides that an error in compiling or recording data for a covered loan or application is not a violation of HMDA or Regulation C if the error was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. Stakeholders also referred to the existing error-related exemptions in ECOA and Regulation B.[752] ECOA's civil liability provision states that creditors will not be liable for acts done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Bureau.[753]

Proposed Rule

Proposed § 1002.112(b) would provide that a bona fide error in compiling, maintaining, or reporting data with respect to a covered application is an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. A bona fide error is not a violation of ECOA or subpart B. A financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose in proposed appendix H. However, an error is not a bona fide error if either there is a reasonable basis to believe the error was intentional or there is other evidence that the financial institution did not maintain procedures reasonably adapted to avoid such errors.

The Bureau believes that a similar approach to Regulation C, modified and combined with the approach taken by Federal agencies in HMDA examinations, would be appropriate here. Regulation C § 1003.6(b)(1) provides that an error in compiling or recording data for a covered loan or application is not a violation of HMDA or Regulation C if the error was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. In an examination of a financial institution for

compliance with Regulation C, a financial institution may make a certain number of unintentional errors in a testing sample of applications for a given data field in the institution's loan/application register (LAR), the HMDA analog to the small business lending application register, before it must resubmit its LAR. These tolerance thresholds are based on the number of loans or applications in a LAR as set out in the HMDA tolerances table in the FFIEC's Interagency HMDA examination procedures.[754]

For instance, as described in the HMDA tolerances table, a bank that submitted 45 applications is subject to a threshold of three inadvertent errors per data field based on the review of a random sample of 30 applications in the bank's LAR; a bank that submitted 45,000 applications would be subject to a threshold of four inadvertent errors per data field based on a sample of 79 applications. The tolerances thresholds, as a percentage of the random sample of applications reviewed, become more stringent as the number of total applications rises.

The Bureau would provide a similar table of thresholds in proposed appendix H and incorporate it in the bona fide error provision as set out in proposed § 1002.112(b). Under this proposed provision and the table of thresholds in proposed appendix H, financial institutions that report a number of errors equal to or below the applicable thresholds are presumed to have in place procedures reasonably adapted to avoid errors; those that report a number of errors above the applicable thresholds are not presumed to have in place procedures reasonably adapted to avoid errors. The Bureau believes that this approach would be broadly consistent with the approach it has taken for HMDA.[755] The Bureau also believes that this approach would address the concerns expressed by stakeholders regarding liability for some data reporting errors, especially in the earlier years of reporting, as processes are first being implemented. Moreover, the Bureau believes that this provision will help to ensure the accuracy of the data submitted by requiring the maintenance of appropriate procedures; at the same time, this provision will prevent financial institutions from being subjected to liability for some difficult-to-avoid errors that could drive those

institutions from the small-business lending market. Therefore, the Bureau believes this provision is necessary to carry out, enforce, and compile data pursuant to section 1071, as well as necessary or appropriate to carrying out section 1071's purposes.

Proposed comment 112(b)–1 would explain that a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose. Proposed comment 112(b)–1 would also explain that the Bureau's thresholds appear in column C of the table in proposed appendix H, and that the size of the random sample shall depend on the size of the financial institution's small business lending application register, as shown in column A of the table in appendix H.

Proposed comment 112(b)–2 would provide that, for purposes of determining bona fide errors under § 1002.112(b), the term "data field" generally refers to individual fields, but that, with respect to information on the ethnicity or race of an applicant or borrower, or co-applicant or co-borrower, a data field group may consist of more than one field. If one or more of the fields within an ethnicity or race field group have errors, they count as one (and only one) error for that data field group.

Proposed comment 112(b)–3 would provide that an error that meets the criteria for one of the four safe harbor provisions in proposed § 1002.112(c) would not be counted as an error for purposes of determining whether a financial institution has exceeded the error threshold for a given data field.

The Bureau seeks comment on its proposed approach to bona fide errors, including whether the tolerance levels in proposed appendix H are appropriate.

112(c) Safe Harbors

Proposed § 1002.112(c) would establish four safe harbor provisions, providing that certain types of errors would not constitute violations of ECOA or Regulation B. Proposed § 1002.112(c)(1) would provide a safe harbor for an incorrect entry for census tract obtained by correct use of a geocoding tool provided by the FFIEC or the Bureau. Proposed § 1002.112(c)(2) would provide a safe harbor for an incorrect NAICS code determined by a financial institution under certain circumstances. Proposed

[752] See, e.g., § 1002.16(c).
[753] 15 U.S.C. 1691e(e).

[754] Fed. Fin. Insts. Examination Council, *Interagency Examination Procedures: HMDA* (Apr. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_hmda-exam-procedures_2019-04.pdf.*
[755] *Home Mortgage Disclosure (Regulation C),* 80 FR 66128, 66269 (Oct. 28, 2015).

§ 1002.112(c)(3) would provide a safe harbor for the collection of applicants' protected demographic information pursuant to proposed § 1002.107(a)(18) through (20) after an initially erroneous determination that an applicant is a small business. Proposed § 1002.112(c)(4) would provide a safe harbor for the reporting of an application date that is within three calendar days of the actual application date.

As described in further detail below, the Bureau is proposing the four safe harbors established in proposed § 1002.112(c) pursuant to its authority under ECOA and as amended by section 1071. Section 703 of ECOA provides the Bureau the authority to prescribe regulations to carry out the purposes of ECOA, including such adjustments and exceptions for any class of transactions that in the judgment of the Bureau are necessary or proper to effectuate the purposes of ECOA, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. Section 704B(g)(1) provides that the Bureau shall prescribe such rules as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Section 704B(g)(2) authorizes the Bureau to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

112(c)(1) Incorrect Entry for Census Tract

The Bureau received feedback on the SBREFA Outline,[756] concerning a provision in Regulation C providing for a good faith error exemption in inadvertently selecting the wrong census tract for a property. In response, the Bureau is proposing § 1002.112(c)(1), which would provide that an incorrect entry for census tract is not a violation of ECOA or this subpart if the financial institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. Regulation C § 1003.6(b)(2) contains a similar provision, and the Bureau believes a similar approach would be appropriate here. Especially in light of the years that financial institutions have already been relying on the FFIEC geocoding tool in the HMDA context, the Bureau believes financial institutions would be justified in expecting not to be held liable for reporting erroneous information

provided by the FFIEC or Bureau. Additionally, the Bureau believes that this proposed safe harbor will ultimately improve the accuracy of the data submitted by encouraging the use of reliable FFIEC geocoding tools, and preventing financial institutions from being subjected to liability for some difficult-to-avoid errors that could drive those institutions either to eschew these useful tools or exit the small business lending market. Therefore, the Bureau believes this provision is necessary to carry out, enforce, or compile data pursuant to section 1071, and necessary or appropriate to carry out section 1071's purposes.

Proposed comment 112(c)(1)–1 would explain that the safe harbor provision under proposed § 1002.112(c)(1) would not extend to a financial institution's failure to provide the correct census tract number for a covered application on its small business lending application register, as required by proposed § 1002.107(a)(13), because the FFIEC or Bureau geocoding tool did not return a census tract for the address provided by the financial institution. In addition, proposed comment 112(c)(1)–1 would explain that this safe harbor provision would not extend to a census tract error that results from a financial institution entering an inaccurate address into the FFIEC or Bureau geocoding tool.

The Bureau seeks comment on its proposed approach to this safe harbor.

112(c)(2) Incorrect Entry for NAICS Code

As discussed in the section-by-section analysis of proposed § 1002.107(a)(15) above, the Bureau is proposing to require financial institutions to collect an applicant's 6-digit NAICS code. A financial institution would be permitted to rely on an applicant's representations or on other information regarding its NAICS code as described in proposed comments 107(a)(15)–3 and –4. Proposed § 1002.112(c)(2) would apply when a financial institution does not rely on such information, but instead the financial institution identifies the NAICS code for an applicant and the identified NAICS code is incorrect. Specifically, proposed § 1002.112(c)(2) would provide that the incorrect entry for that institution-identified NAICS code is not a violation of subpart B, provided that the first two digits of the NAICS code are correct and the financial institution maintains procedures reasonably adapted to correctly identify the subsequent four digits.

The Bureau is proposing this safe harbor pursuant to its statutory

authority under section 704B(g)(1) and (2). This safe harbor would address comments from several stakeholders who stated that correctly classifying an applicant's NAICS code can be difficult, as the business may change over time, codes may have overlapping definitions, small businesses often do not know their NAICS code, and classifications may be prone to human error. The Bureau believes that this proposed safe harbor would also alleviate concerns about NAICS codes classifications being subject to change based on SBA rulemaking (in situations where the SBA does not change the 2-digit sector code). The Bureau believes that this proposed safe harbor will help to ensure the accuracy of the data submitted by requiring the maintenance of appropriate procedures and requiring that the most crucial first two digits be correct in every instance; at the same time, the proposed safe harbor will prevent financial institutions from being subjected to liability for some difficult-to-avoid errors. Therefore, the Bureau believes this provision is necessary and appropriate to carry out section 1071 and its purposes.

The Bureau seeks comment on its proposed approach to this safe harbor. As discussed in the section-by-section analysis of proposed § 1002.107(a)(15) above, the Bureau seeks comment on its proposal to collect 6-digit NAICS codes with the safe harbor described in proposed § 1002.112(c)(2). The Bureau also seeks comment on whether requiring a 3-digit NAICS code with no safe harbor would be a better alternative.

112(c)(3) Incorrect Determination of Small Business Status

Proposed § 1002.112(c)(3) would provide that a financial institution that initially determines that an applicant is a small business, as defined in proposed § 1002.106(b), but then later concludes the applicant is not a small business, does not violate ECOA or Regulation B if it collected information pursuant to subpart B regarding whether an applicant for a covered credit transaction is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners. Proposed § 1002.112(c)(3) would further provide that a financial institution seeking to avail itself of this safe harbor shall comply with the requirements of subpart B as otherwise required pursuant to proposed § 1002.107, 1002.108, and 1002.111 with respect to the collected information.

The Bureau is proposing this safe harbor pursuant to its authority under

[756] SBREFA Outline at 41–42.

AdminRecord-000572

section 703(a) of ECOA, which allows the Bureau to provide for certain exceptions to Regulation B "as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [ECOA], to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." The Bureau believes the proposed safe harbor is needed to address situations where the financial institution initially determines that an applicant is a small business and believes it is required under the 1071 rule to collect protected demographic information, but later concludes that the applicant is not a small business when it, for example, obtains updated gross annual revenue information. In such situations, the financial institution may be uncertain about whether it "may obtain information required by a regulation" under existing § 1002.5(a)(2), which could deter financial institutions from complying with the 1071 rule. The Bureau believes that this safe harbor would facilitate compliance with ECOA by eliminating a situation in which financial institutions might be deterred from appropriately collecting applicants' protected demographic information due to the possibility that their understanding of an applicant's small business status might change during the course of the application process.

Proposed § 1002.112(c)(3) would make it clear that a financial institution does not violate the existing Regulation B general prohibition against inquiring about the race, national origin, or sex of an applicant as long as the financial institution complies with the requirements of the subpart B, including the requirements set forth in proposed §§ 1002.107, 1002.108, and 1002.111 with respect to the collected information. Proposed comment 106(b)–1 would clarify that the financial institution does not report the application on its small business lending application register pursuant to § 1002.109.

The Bureau seeks comment on its proposed approach to this safe harbor.

### 112(c)(4) Incorrect Application Date

Proposed § 1002.107(a)(2) would require financial institutions to report application date. In the SBREFA Outline, the Bureau stated that it was considering proposing providing financial institutions a grace period of several days on either side of the date reported to reduce the compliance burden of pinpointing an exact date on which an application was received.[757]

As discussed in the section-by-section analysis of proposed § 1002.107(a)(2) above, several SERs and other stakeholders were strongly in favor of the Bureau providing such a grace period to reduce compliance burden.

In light of SER and other stakeholder feedback, proposed § 1002.112(c)(4) would provide that a financial institution does not violate proposed subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date pursuant to proposed § 1002.107(a)(2). The Bureau believes that this proposed provision will ensure the level of accuracy needed for the resulting data to be useful in carrying out section 1071's purposes and minimize the risk that financial institutions will be held liable for difficult-to-avoid errors, which might otherwise affect their participation in the small business lending market. Therefore, the Bureau believes this provision is necessary and appropriate to carry out section 1071 and its purposes. The Bureau seeks comment on its proposed approach to this safe harbor.

### Section 1002.113   Severability

Proposed § 1002.113 would provide that the provisions of subpart B are separate and severable from one another, and that if any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

This is a standard severability clause of the kind that is included in many regulations to clearly express agency intent about the course that is preferred if such events were to occur.

### Section 1002.114   Effective Date, Compliance Date, and Special Transitional Rules

Proposed § 1002.114 would address when the proposed rule would be effective and when financial institutions would be required to comply with the rule, as well as how financial institutions could choose to comply with the rule during this transitional period. Proposed § 1002.114(a) would state that this small business lending data collection rule would become effective 90 days after the final rule is published in the **Federal Register**. Proposed § 1002.114(b) would provide that compliance with the rule would not be required until approximately 18 months after the final rule is published in the **Federal Register**. Proposed § 1002.114(c)(1) would permit covered financial institutions to begin collecting information pursuant to proposed

§ 1002.107(a)(18) through (20) beginning 12 months prior to the compliance date. Proposed § 1002.114(c)(2) would permit a financial institution to use a different time period to determine whether it is a covered financial institution under proposed § 1002.105(b) as of the compliance date.

The Bureau is proposing § 1002.114 pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. The Bureau is also proposing § 1002.114(c) pursuant to its authority under section 703(a) of ECOA to prescribe regulations to carry out the purposes of ECOA and provide exceptions as in the judgment of the Bureau are necessary or proper to effectuate the purposes of or facilitate or substantiate compliance with ECOA.

### 114(a) Effective Date and 114(b) Compliance Date

#### Background

Section 1071 does not specify an implementation period, though pursuant to ECOA section 704B(f)(1), financial institutions must report 1071 data to the Bureau on an annual basis. In the SBREFA Outline, the Bureau noted that it sought to ensure that financial institutions have sufficient time to implement the 1071 rule, and stated that it was considering proposing that financial institutions have approximately two calendar years for implementation.[758]

#### SBREFA Proposal Under Consideration and Feedback Received

SER and stakeholder feedback regarding the two-year period for implementation under consideration was mixed.[759] Some found the two-year period to be adequate, some requested more time, and a few urged for less. Some provided related feedback about adopting a grace period for data errors in the first year(s) after the 1071 rule becomes effective.

A number of stakeholders agreed that two years was sufficient time to implement a 1071 rule. SERs generally supported a two-year implementation period. Several SERs with completely online operations felt that two years was sufficient time to implement the eventual 1071 rule; some estimated that they could do it in less time. A large number of industry stakeholders (including national and regional trade

---

[757] *Id.* at 26.

[758] *Id.* at 42.

[759] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 36–37.

AdminRecord-000573

associations, community banks, fintech lenders, and others) accepted a two-year implementation period as adequate or said that two years was the minimum amount of time needed to implement 1071 (though some of these stakeholders also requested more time, as discussed below). A few qualified their statements, however, as dependent on the Bureau not adopting additional data points beyond those discussed in the SBREFA Outline or not making further changes to the rule once it is finalized.

A number of other stakeholders argued that two years was inadequate time to implement a 1071 rule. Some other SERs that do not have primarily online operations and do not have experience with other Federal data reporting regimes such as HMDA said it would be hard to project how long implementation would take, but that it could potentially take three years or more. One SER said that two years would not be enough as currently there are no data collection vendors for 1071 compliance. Another SER said clear and concise definitions were important and expressed frustration that definitive answers to compliance-related questions (whether from the Bureau or third-party vendors) can be hard to come by, which could stymie implementation efforts. One SER suggested that it was overly optimistic for other SERs (mostly CDFIs) to say they would be able to implement 1071 quickly.

Some of the industry stakeholders mentioned above requested more time, up to three years, and suggested that two years was the bare minimum they required to implement a 1071 rule, given the need to create new systems, policies and procedures, to change their products as needed, and to train personnel in compliance. One large bank trade association stakeholder requested three years coupled with a two-year grace period.

Several trade associations representing community banks and credit unions asserted that two years was inadequate for smaller financial institutions that had no experience with HMDA or similar reporting regimes. These commenters suggested tiered implementation, with larger financial institutions (or HMDA reporters) reporting earlier and smaller financial institutions later. Similarly, two smaller trade associations asserted that smaller and mission-based lenders should have up to three years to implement 1071.

A number of stakeholders argued that two years was too much time to implement a 1071 rule. Several community group stakeholders opposed a two-year implementation period as too long and instead supported a one-year

period. These groups opposed a longer implementation period on the grounds that ten years have elapsed since Dodd-Frank Act was passed and the need for data to analyze disparities in small business lending is urgent. A State-level trade association suggested a one-year period for larger financial institutions and a longer period for smaller financial institutions.

Some stakeholders requested a grace period associated with the first year of implementation. A few SERs suggested that the Bureau adopt a grace period of some kind during which financial institutions would not be penalized for erring in trying to comply with a 1071 regulation. This grace period would be akin to the first year in which the 2015 revisions to Regulation C were effective, when examinations were used to troubleshoot and perfect data reporting rather than penalize reporters. Two other industry stakeholders similarly requested a safe harbor for any data collection errors for the first one or two years following the rule's effective date.

The SBREFA Panel recommended that the Bureau seek comment on the sufficiency of a two-year implementation period, and in particular what aspects of a 1071 rule might require more or less time to implement.[760] The Panel further recommended that the Bureau seek comment on ways to facilitate implementation for small financial institutions, particularly those that have had no experience with any kind of Federal data reporting regime.

Proposed Rule

The Bureau is proposing in § 1002.114(a) that its small business lending data collection rule become effective 90 days after the final rule is published in the **Federal Register**. At that time, the rule would become part of the Code of Federal Regulations; this would permit financial institutions to avail themselves of the special transitional rule in proposed § 1002.114(c)(2), discussed below. However, pursuant to proposed § 1002.114(b), compliance with the final rule would not be required until approximately 18 months after the final rule is published in the **Federal Register**.

The Bureau's proposed approach is a compromise between the two-year implementation period under consideration at SBREFA that a slight majority of stakeholders found acceptable and the shorter one-year implementation period requested by certain stakeholders. The Bureau

believes that the statutory purposes of section 1071 are better served by an earlier compliance date that would, in turn, result in earlier publication of data by the Bureau. The Bureau acknowledges the preference of various SERs and other stakeholders for a compliance period of two or more years to comply. The Bureau notes, however, that some SERs and other industry stakeholders said that they could be ready in less than two years. The Bureau agrees with the stakeholders that asserted that a shorter implementation period is preferable given the length of time that has elapsed since the passage of section 1071 of the Dodd-Frank Act.

The Bureau notes that it does not anticipate setting the compliance date at exactly 18 months following publication of the final rule in the **Federal Register**. Rather, the Bureau expects to specify a date certain for a compliance date, which it anticipates will be approximately 18 months after the final rule is published. Thus, for example, if the Bureau published the final rule in June 2023, the Bureau would set the compliance date at January 1, 2025.

If the final rule were published early or late in the year, because proposed § 1002.114(b) would require compliance approximately 18 months after publication of the final rule, the compliance date would be set in mid-year. For instance, if the final rule were published in the **Federal Register** in March 2023, the compliance date would be in September 2024. Based on this possibility, the Bureau is considering whether to permit or require financial institutions to collect data on a partial year basis in the remainder of the first year following the compliance date, as the section-by-section analysis of proposed § 1002.109(a)(1) addresses. For example, if the compliance date were July 1, 2024, the Bureau would permit or require all financial institutions to collect and report data pursuant to proposed § 1002.109(a) for the period July 1 to December 31, 2024, and financial institutions would report that data by June 1, 2025 (pursuant to proposed § 1002.109(a)(1)(i)). After 2024, financial institutions would comply with proposed § 1002.109(a), which requires the collection of 1071 data on a calendar year basis.

The Bureau believes that permitting or requiring a partial year collection in the initial year of compliance would further the purposes of section 1071 by expediting the collection and, potentially, the publication of data to be used to further the fair lending and community development purposes of the statute.

---

[760] *Id.* at 48.

The Bureau seeks comment on its proposed effective date of 90 days following publication of an eventual final rule and its proposed compliance date of approximately 18 months after the publication of its final rule to implement section 1071. In particular, the Bureau seeks comment on which aspects of the Bureau's proposed rule might require more or less time to implement, and ways in which the Bureau could facilitate implementation for small financial institutions, especially those that have had no experience with other Federal data reporting regimes. The Bureau further seeks comment on two alternatives: (a) Whether the Bureau should adopt a compliance date of two years after the publication of the final rule; and (b) whether the Bureau should adopt different compliance dates based on the size of a financial institution (*e.g.,* one year for large financial institutions, two years for smaller institutions).

### 114(c) Special Transitional Rules

The Bureau is proposing two transitional rules in § 1002.114(c) to facilitate the compliance of financial institutions with subpart B. Proposed § 1002.114(c)(1) would permit covered financial institutions to collect information regarding applicants' minority-owned business status, women-owned business status, and the race, sex, and ethnicity of applicants' principal owners under proposed § 1002.107(a)(18) through (20) beginning 12 months prior to the compliance date. Proposed § 1002.114(c)(2) would provide that to determine if it is a covered financial institution as of the compliance date, a financial institution is permitted to use its originations of covered credit transactions for small businesses in the second and third preceding calendar years (rather than its originations in the two immediately preceding calendar years).

The Bureau believes that these transitional rules are necessary to carry out, enforce, and compile data pursuant to section 1071, will carry out the purposes of ECOA, and are necessary or proper to effectuate the purposes of ECOA and facilitate or substantiate compliance therewith.

### 114(c)(1) Collection of Information Prior to the Compliance Date

Proposed § 1002.114(c)(1) would provide that a financial institution that will be a covered financial institution as of the compliance date in proposed § 1002.114(b) is permitted, but not required, to collect information regarding whether an applicant for a covered credit transaction is a minority-

owned business under proposed § 1002.107(a)(18), a women-owned business under proposed § 1002.107(a)(19), and the ethnicity, race, and sex of the applicant's principal owners under proposed § 1002.107(a)(20) beginning 12 months prior to the compliance date. A financial institution collecting such information pursuant to proposed § 1002.114(c)(1) must do so in accordance with the requirements set out in proposed §§ 1002.107(18) through (20) and 1002.108. The Bureau believes that this provision would give financial institutions time to test their procedures and systems for compiling and maintaining this information in advance of actually being required to collect and subsequently report it to the Bureau. Under this proposed provision, financial institutions would have time to adjust any procedures or systems that may result in the inaccurate compilation or maintenance of applicants' protected demographic information, the collection of which is required by section 1071 but otherwise generally prohibited under ECOA and Regulation B. (Financial institutions could of course collect the other information that would be required by this proposed rule at any time, without needing express permission in Regulation B to do so.) The Bureau believes that this provision would facilitate compliance and improve the quality and accuracy of the 1071 data reported to the Bureau and therefore is necessary to carry out, enforce, and compile data pursuant to section 1071, and will carry out the purposes of ECOA, and is necessary or proper to effectuate the purposes of ECOA and facilitate or substantiate compliance therewith.

The Bureau seeks comment on the approach in this proposal.

### 114(c)(2) Determining Whether a Financial Institution is a Covered Financial Institution for Purposes of This Subpart

Proposed § 1002.114(c)(2) would provide that for purposes of determining whether a financial institution is a covered financial institution under proposed § 1002.105(b) as of the compliance date specified in proposed § 1002.114(b), a financial institution would be permitted, but not required, to use its originations of covered credit transactions for small businesses in the second and third preceding calendar years (rather than its originations in the two immediately preceding calendar years). The Bureau believes that this proposed provision would provide greater clarity and certainty to financial institutions as to whether or not they

would be covered financial institutions as of the compliance date. This may be particularly important for those financial institutions that originate a volume of covered credit transactions close to the threshold under proposed § 1002.105(b). The Bureau believes this provision is necessary to carry out, enforce, and compile data pursuant to section 1071.

The Bureau seeks comment on the approach in this proposal.

### Appendix E to Part 1002—Sample Form for Collecting Certain Applicant-Provided Data Under Subpart B

#### Background

ECOA section 704B(b) requires financial institutions to inquire whether applicants are women-owned businesses, minority-owned businesses, or small businesses, and to maintain a record of the responses to that inquiry separate from the applications and accompanying information.

Additionally, ECOA section 704B(e) requires financial institutions to compile, maintain, and report certain information, including the ethnicity, race, and sex of an applicant's principal owners. Section 1071 does not set out what categories should be used when collecting and reporting this information.

ECOA section 704B(c) provides that applicants for credit may refuse to provide information requested pursuant to 704B(b), including minority-owned and women-owned business status.

Under ECOA section 704B(d)(2), if a financial institution determines that an underwriter, employee, or officer involved in making a determination "should have access" to any information provided by the applicant pursuant to a request under section 704B(b), the financial institution must provide a notice of "the access of the underwriter to such information," along with notice that the financial institution may not discriminate on the basis of such information.

#### SBREFA Proposal Under Consideration and Feedback Received

In the SBREFA Outline, the Bureau stated that it was considering developing a sample data collection form to assist industry in collecting the principal owners' ethnicity, race, and sex and to communicate an applicant's right to refuse to provide such information. The Bureau stated in the SBREFA Outline that this sample data collection form would also include the definition of principal owner and clarify that it is possible, depending on the factual circumstances, that no one will

AdminRecord-000575

be identified as a principal owner.[761] It also stated that the Bureau was considering proposing simplified applicant-facing materials to aid industry in collecting minority-owned business status and women-owned business status. Specifically, for these applicant-facing materials and industry clarifications, the Bureau stated in the SBREFA Outline that it was considering proposing the following definitions: (1) "Ownership" to mean directly or indirectly having an equity interest in a business (*i.e.,* directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, owning an equity interest in the business); (2) "control" of a business to mirror the CDD rule, where it means having significant responsibility to control, manage, or direct a business; and (3) the "accrual of net profit or loss" with reference to generally accepted accounting practices and any applicable Internal Revenue Service standards.[762] Finally, the Bureau stated in the SBREFA Outline that it was considering developing model disclosures that financial institutions could use when providing the notice under ECOA section 704B(d)(2).[763]

Some SERs requested that the Bureau develop a uniform collection form to assist financial institutions with the collection of reporting of minority-owned business status, women-owned business status, and the race, sex, and ethnicity of principal owners. One SER suggested developing a sample data collection form similar to the one used for HMDA data collection and including the same disclosures. One commenter noted that the use of a model form may increase the uniformity and consistency of reporting demographic information. Another commenter suggested that any model form should include an explanation of why the financial institution is requesting the information and a statement of the applicant's right to refuse to provide the information.

One SER asked that, if the Bureau provided sample language for the notice to be provided pursuant to ECOA section 704B(d)(2), that the Bureau provide it in English as well as in other languages, such as Spanish. One SER stated that sample language for a notice should include a statement that underwriter access to demographic information is not detrimental and that such access is necessary due to the small size of the lender.

The SBREFA Panel recommended that the Bureau consider creating

sample data collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of the minority-owned business data point, the women-owned business data point, and the principal owners' ethnicity, race, and sex data point. It also said that the Bureau should additionally consider providing these sample data collection forms in other languages, such as Spanish.[764] The Panel also recommended that the Bureau consider developing sample disclosure language that financial institutions could use to provide some context as to why applicants are being asked to provide demographic information, in order to encourage applicants to respond.[765]

*Proposed Rule*

Consistent with the SBREFA Panel's recommendation, the Bureau is proposing a sample data collection form that financial institutions could use to collect minority-owned business status, women-owned business status, and principal owners' ethnicity, race, and sex. As suggested in the feedback from SERs, the proposed sample data collection form would be similar to the HMDA data collection form and would include a notice of the applicant's right to refuse to provide the information as well as an explanation of why the financial institution is requesting the information. The sample data collection form would also include the definitions of minority individual, minority-owned business, principal owner, and women-owned business as they would be defined in proposed § 1002.102(*l*), (m), (o), and (s), respectively. Although the Bureau is not currently proposing a sample data collection form in Spanish or any language other than English, the Bureau requests comment on whether a sample data collection form in Spanish or in another language other than English would be useful to financial institutions in the context of their 1071 obligations.

Additionally, to aid financial institutions with the collection of the information in proposed § 1002.107(a)(21), the sample data collection form would include a question about the applicant's number of principal owners.

Finally, consistent with the SBREFA Panel's recommendation, the Bureau is proposing that the sample data collection form would include language that a financial institution could use to satisfy the notice requirement under ECOA section 704B(d)(2) if it

determines that one or more employees or officers should have access to the applicant's protected demographic information pursuant to proposed § 1002.108(b)(2).

The Bureau is proposing appendix E pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, in order to facilitate compliance with the statutory requirements to collect minority-owned and women-owned business status, and the ethnicity, race, and sex of principal owners pursuant to 704B(b)(1) and (e)(2)(G). Further, the Bureau is proposing appendix E pursuant to its obligation in 704B(g)(3) to issue guidance to facilitate compliance with the requirements of section 1071, including assisting financial institutions in working with applicants to determine whether the applicants are women-owned or minority-owned businesses.

The Bureau seeks comment on the proposed sample data collection form, including the proposed language for the notice under ECOA section 704B(d)(2). The Bureau generally requests comment on whether additional clarification regarding any aspect of the sample data collection form or the related notice provided pursuant to 704B(d)(2) is needed. The Bureau also seeks comment on whether the sample data collection form should identify the Bureau to applicants as a potential resource in connection with their applicable legal rights or for additional information about the data collection, including concerns regarding non-compliance. In addition, the Bureau seeks comment on whether financial institutions need additional information on how to adapt this form for use in digital modes of data collection, and, if so, what specific information would be most useful.

Appendix F to Part 1002—Instructions for Collecting and Reporting Small Business Applicants' Minority-Owned and Women-Owned Business Status Under Subpart B

ECOA section 704B(b) requires financial institutions to inquire whether applicants for credit are women-owned businesses, minority-owned businesses, or small businesses and to maintain a record of the responses to that inquiry separate from the applications and accompanying information. However, section 1071 does not include specific instructions on how a financial institution should collect or report such information.

The Bureau is proposing appendix F to provide instructions to aid financial

---

[761] SBREFA Outline at 32.
[762] *Id.* at 19.
[763] *Id.* at 38.

[764] SBREFA Panel Report at 45–46.
[765] *Id.* at 43, 47.

institutions when collecting minority-owned business status pursuant to proposed § 1002.107(a)(18) and women-owned business status pursuant to proposed § 1002.107(a)(19).

The Bureau is proposing appendix F pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, in order to facilitate compliance with the statutory requirements to collect minority-owned and women-owned business status pursuant to 704B(b)(1). Further, the Bureau is proposing appendix F pursuant to its obligation in 704B(g)(3) to issue guidance to facilitate compliance with the requirements of section 1071, including assisting financial institutions in working with applicants to determine whether the applicants are women-owned or minority-owned businesses.

The Bureau seeks comment on the proposed instructions, and generally requests comment on whether additional clarification regarding any aspect of the proposed instructions is needed. The Bureau further requests comment on whether additional or different instructions are needed for financial institutions that choose not to use a paper data collection form to collect minority-owned business status or women-owned business status, such as collecting such information using a web-based or other electronic data collection form, or over the telephone. The Bureau also seeks comment regarding the challenges faced by both applicants and financial institutions by the data collection instructions prescribed in appendix F and specifically requests comment on ways to improve the data collection of minority-owned business status and women-owned business status.

Appendix G to Part 1002—Instructions for Collecting and Reporting Ethnicity, Race, and Sex of Small Business Applicants' Principal Owners Under Subpart B

ECOA section 704B(e) requires financial institutions to compile, maintain, and report certain information, including the ethnicity, race, and sex of an applicant's principal owners, but does not provide specific instructions on how a financial institution should do so.

The Bureau is proposing appendix G to provide instructions to aid financial institutions when collecting principal owners' ethnicity, race, and sex pursuant to proposed § 1002.107(a)(20). The Bureau is proposing appendix G pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, to facilitate compliance with the statutory requirements to collect the ethnicity, race, and sex of principal owners pursuant to 704B(e)(2)(G), and pursuant to 704B(g)(3), which directs the Bureau to issue guidance designed to facilitate compliance with the requirements of section 1071.

The Bureau seeks comment on the proposed instructions, and generally requests comment on whether additional clarification regarding any aspect of the proposed instructions is needed. The Bureau further requests comment on whether additional or different instructions are needed for financial institutions that chose not to use a paper data collection form to collect, principal owners' ethnicity, race, and sex, such as collecting such information using a web-based or other electronic data collection form or over the telephone. The Bureau also seeks comment regarding the challenges faced by both applicants and financial institutions by the data collection instructions prescribed in appendix G and specifically requests comment on ways to improve the data collection of principal owners' ethnicity, race, and sex.

Appendix H to Part 1002—Tolerances for Bona Fide Errors in Data Reported Under Subpart B

The Bureau is proposing appendix H, which would set out a Threshold Table, as referred to in proposed § 1002.112(b) and proposed comment 112(b)–1. As these provisions would explain, a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of a financial institution's data submission for a given data field do not equal or exceed the threshold in column C of the Threshold Table.

Under the Threshold Table in proposed appendix H, column A would list the size of the financial institution's small business lending application register in ranges of application register counts (*e.g.*, 25 to 50, 51–100, 101–130, etc.). The applicable register count range would then determine both the size of the random sample, under column B, and the applicable error threshold, under column C. The error threshold of column C, as proposed comment 112(b)–1 would explain, identifies the maximum number of errors that a particular data field in a financial institution's small business lending application register may contain such that the financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field. Column D would be illustrative, showing the error threshold as a percentage of the random sample size.

Proposed appendix H would also include examples of how financial institutions would use the Threshold Table.

For the reasons set out in the section-by-section analysis of proposed § 1002.112(b), the Bureau is proposing appendix H pursuant to its authority under ECOA section 704B(g)(1) to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and its authority under 704B(g)(2) to adopt exceptions to any requirement of section 1071 and to exempt any financial institution or class of financial institutions from the requirements section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

The Bureau seeks comment on this proposed appendix H. In particular, the Bureau seeks comment on whether the register count ranges in column A, the random sample sizes in column B, and the error thresholds in column C are appropriate. The Bureau further seeks comment on whether a covered financial institution should be required to correct and resubmit data for a particular data field, if the institution has met or exceeded the thresholds provided in appendix H.

# VI. Public Disclosure of 1071 Data

## A. Introduction

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to collect and report to the Bureau data about applications for credit for women-owned, minority-owned, and small businesses, and for those data to be subsequently disclosed to the public.[766]

---

[766] *See* ECOA section 704B(e)(1), (f)(2) (detailing requirements for compilation, maintenance, and publication of information).

AdminRecord-000577

The Bureau is proposing that financial institutions not compile, maintain, or submit any name, specific address, telephone number, email address or any personally identifiable information concerning any individual who is, or is connected with, an applicant, other than as would be required pursuant to proposed § 1002.107. Nonetheless, publication of the data fields proposed in § 1002.107(a) in an unedited, application-level format could potentially affect the privacy interests and lead to the re-identification of, and risk of harm to, small businesses, related natural persons, and financial institutions.

Section 1071 states that the Bureau may, "at its discretion, delete or modify data collected under [section 1071] which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[767] For the reasons discussed below, the Bureau is proposing to adopt a balancing test as the method by which it would implement its "discretion" to delete or modify data before making the data available to the public.

However, the Bureau does not yet have any data under section 1071 and the Bureau does not believe that there are any comparable datasets that it could use as an adequate proxy for 1071 data to which it could apply the balancing test at this time. The Bureau is thus setting forth herein a partial analysis under the balancing test, for public comment. With several exceptions, discussed in part VI.C.6 below, the Bureau is not at this time proposing specific modifications or deletions for the public application-level 1071 data. After the Bureau receives at least one full year of 1071 data from financial institutions following the compliance date of the final rule, the Bureau intends to issue a policy statement (informed by comments received on the partial analysis in this proposal), in which the Bureau would set forth its intended modifications and deletions.

### B. Background

#### 1. SBREFA Outline

In the SBREFA Outline, the Bureau stated it was considering proposing to use a balancing test for purposes of deciding how to exercise its discretion to modify or delete data prior to publication.[768] The Bureau explained that data would be modified or deleted if disclosure of the data in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071. If the risks of disclosing unmodified data are not justified by the benefits under the balancing test, the Bureau explained it would determine whether modifications could appropriately diminish the risks. The Bureau further explained that it was considering proposing to apply this balancing test to the privacy interests of non-natural persons (e.g., small business applicants or financial institutions), with respect to protecting sensitive commercial information, as well as the privacy interests of natural persons (e.g., principal owners), with respect to protecting personal information.

As an alternative to a balancing test, the Bureau had considered an approach in which it would modify data prior to publication if an identified privacy risk crosses some significance threshold, without assessing that risk against the benefit of disclosure. The Bureau explained that such an approach, however, could be inconsistent with the express disclosure purposes of the statute.

#### 2. SBREFA Feedback

The Bureau received feedback on its privacy proposals under consideration from SERs and other commenters;[769] the SBREFA Panel also made recommendations regarding privacy. Comments related to the design and implementation of the balancing test itself are described immediately below. Comments addressing general issues related to benefits, privacy risks, and potential modifications of data fields are described further below in part VI.C. Comments addressing the benefits of specific data fields the Bureau considered as part of the SBREFA process are discussed in the section-by-section analysis of proposed § 1002.107(a), in part V above. Comments addressing the privacy risks and potential modifications of specific data fields are discussed below in part VI.C.

With respect to the balancing test itself, several SERs expressed the view that it would be difficult to balance transparency and fairness in the marketplace with privacy interests. A SER and another industry commenter suggested that the balancing test described in the SBREFA Outline would not adequately protect privacy interests because it appeared to be subjective,

dependent on the limitations of agency expertise, and subject to change. A community group commenter maintained that financial institution privacy did not appear to have been a concern for Congress in section 1071.

One industry commenter recommended that the Bureau consider the alternative approach of not balancing privacy risks against the benefits of disclosure because of the heightened privacy risks in the small business market (relative to consumer privacy risks), particularly in geographies where re-identification risk is higher. Another industry commenter expressed the view that excluding community banks from collection and reporting would provide a more straightforward approach to protecting privacy. On the other hand, a community group maintained that the benefits of public disclosure would always justify any alleged privacy risks.

Commenters also addressed information security concerns and potential conflicts with other privacy laws. Two SERs raised concerns that the transmission of 1071 data to the Bureau could give rise to the risk of a data security breach involving personally identifiable information or information that would directly identify a small business. One SER requested that financial institutions be held harmless if there were a data security breach for which the Bureau was responsible. Another industry commenter expressed the concern that some applicants would be hesitant to provide information in light of data security concerns. Another requested that the Bureau describe and seek comment on its data security safeguards.

Commenters also addressed procedural issues surrounding the implementation of the Bureau's privacy analysis. Several industry commenters requested that the Bureau not bifurcate the analysis of privacy issues into a separate notice-and-comment rulemaking, which was the approach the Bureau took with respect to data fields reported under the 2015 HMDA Final Rule. One commenter stated that a full explanation of the balancing test design and its application would help financial institutions consider potential reputational risks associated with data disclosure. One industry stakeholder stated that the Bureau should take what the stakeholder described as a transparent approach to decisions about public disclosure. Another stakeholder stated that if privacy issues are raised after implementation of a rulemaking, the Bureau should, as the stakeholder described, promptly limit publication of data that might be released to the

---

[767] ECOA section 704B(e)(4).

[768] See SBREFA Outline at 40–41.

[769] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 34–36.

AdminRecord-000578

public. Other industry commenters maintained that decisions about modifications or deletions to protect privacy should be published following notice-and-comment rulemaking, rather than by policy statement.

The SBREFA Panel recommended that the Bureau offer more detail in the proposal on the balancing test and its application to the 1071 data fields.[770] The Panel also recommended that the Bureau seek comment on how it should design and implement the balancing test. In addition, the Panel recommended that the Bureau seek comment on the range of privacy concerns articulated by SERs, including potential re-identification of small businesses and financial institutions, as well as the types of harms and sensitivities the unmodified release of 1071 data could cause to financial institutions and small business applicants.[771] Finally, the Panel recommended that the Bureau seek comment on the potential benefits of publishing unmodified 1071 data.[772]

*C. Design, Implementation, and Application of Balancing Test*

In light of the feedback from SERs and other stakeholders, and for the reasons below, the Bureau is proposing to adopt a balancing test, consistent with the test described in the SBREFA Outline. As recommended by the SBREFA Panel, the Bureau is providing additional detail on the balancing test and how it would be applied to the proposed 1071 data points; this analysis is in *Preliminary Application of the Balancing Test* in part VI.C.6 below. As discussed under *Implementation of the Balancing Test* in part VI.C.2 below, however, the Bureau is not proposing specific modifications or deletions for most of the proposed data fields because data required for a statistical analysis of re-identification risk are not yet available.

1. Balancing Test Design

Under ECOA section 704B(e)(4), the Bureau "may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest." [773] Congress thus provided the Bureau with broad discretion to modify or delete data prior to public disclosure to advance privacy interests. The Bureau continues to believe that a balancing test

is a reasonable approach for exercising this discretion and would effectuate the purposes of section 1071 better than the alternative approaches discussed in the SBREFA Outline and recommended by some commenters. As recognized by commenters, exercising this discretion inherently requires that the Bureau reconcile competing policy interests. A balancing test approach would help the Bureau consider the privacy risks and benefits of disclosing data fields, tailor modifications or deletions of data narrowly to appropriately balance privacy risks and benefits in the published data, and establish a decision framework that is responsive to a broad set of stakeholder concerns that might evolve over time. The Bureau intends to engage with stakeholders, including through this proposal, to supplement its own expertise in evaluating privacy interests for these purposes.

Alternative approaches recommended by stakeholders are summarized in part VI.B.2 above. The Bureau is not proposing approaches that do not consider the benefits of public disclosure because it is concerned they would result in outcomes inconsistent with the statutory purposes. For example, deleting all application-level data from public release and instead publishing aggregate data would advance privacy interests but would substantially undermine the public disclosure purposes of the statute.

The Bureau also considered the suggestion that it exercise its discretion to modify or delete application-level data prior to publication by exempting classes of financial institutions from public disclosure. While this would address the privacy interests of those financial institutions and their customers that might arise in certain markets, this approach would be too narrow because privacy concerns that arise for these persons may also arise for others, such as small businesses and natural persons in other markets. The Bureau is not proposing an approach that assumes the benefits of public disclosure will always justify risks to privacy interests. The commenter recommending this approach did not provide a basis for such a conclusion with respect to individual data fields, or the dataset as a whole.

With respect to the comment that the Bureau not consider the privacy interests of financial institutions, section 1071 generally provides that the Bureau may delete or modify data if it determines that doing so "would advance a privacy interest." [774] The

statute does not define the term "privacy interest," however, and the Bureau believes it can reasonably be interpreted broadly, for purposes of section 1071, to include interests of non-natural persons with respect to certain commercial information.

Whether a non-natural person has cognizable "privacy interests" under the Constitution or common law is not a settled legal question across all areas of the law. Common law recognizes that businesses have an interest in protecting sensitive commercial information, similar to the privacy interests enjoyed by natural persons.[775] Although the courts have typically described these interests as property interests, cases sometimes describe these types of interests as privacy interests.[776] Some circuits have held that non-natural persons have constitutionally protected privacy interests,[777] while other circuits have rejected this notion.[778] The Supreme Court has held that corporations do not have privacy rights on par with natural persons,[779] and that corporations do not have "personal" privacy interests;[780] however, it has not directly addressed the issue of whether a non-natural person has a cognizable "privacy interest." The Bureau also understands that the interests of many small businesses may be closely tied to the privacy interests of natural persons.[781]

---

[770] *See* SBREFA Panel Report at 47–48.

[771] *See id.*

[772] *See id.*

[773] ECOA section 704B(e)(4).

[774] *See* ECOA section 704B(a) (statutory purposes), (e)(4) (deletion or modification

authority), (f)(1) (reporting requirement), (f)(2)(C) (publication requirement).

[775] *See, e.g.,* Carpenter v. *United States,* 484 U.S. 19, 26 (1987) ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit . . . .") (citation omitted).

[776] *See, e.g.,* Kewanee Oil Co. v. *Bicron Corp.,* 416 U.S. 470, 487 (1974) ("A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable."); *E.I. duPont deNemours & Co.* v. *Christopher,* 431 F.2d 1012, 1016 (5th Cir. 1970) ("Commercial privacy must be protected from espionage which could not have been reasonably anticipated or prevented.").

[777] *See, e.g., Tavoulareas* v. *Wash. Post Co.,* 724 F.2d 1010, 1023 (D.C. Cir. 1984), *vacated on other grounds,* 737 F.2d 1170 (D.C. Cir. 1984).

[778] *See, e.g., Fleck & Assocs., Inc.* v. *City of Phoenix,* 471 F.3d 1100, 1105 (9th Cir. 2006).

[779] *United States* v. *Morton Salt Co.,* 338 U.S. 632, 652 (1950) ("[C]orporations can claim no equality with individuals in the enjoyment of a right to privacy.").

[780] *FCC* v. *AT&T, Inc.,* 562 U.S. 397, 402–407 (2011). In *FCC,* the Court held that corporations lack "personal privacy" interests under FOIA Exemption 6, which uses the term "personal privacy." The Court's opinion was based on the word "personal" and limited to the notion of "personal privacy." The Court stated that it was not addressing the scope of a non-natural person's "privacy interests" generally under constitutional or common law. *Id.* at 407 ("[T]his case does not call upon us to pass on the scope of a corporation's 'privacy' interests as a matter of constitutional or common law.").

[781] *See, e.g., Providence J. Co.* v. *FBI,* 460 F. Supp. 778, 785 (D.R.I. 1978) ("While corporations have no

The Bureau believes it is appropriate to consider the privacy interests of non-natural persons under the 1071 balancing test. The proposed 1071 data points would reveal information about non-natural persons—including small businesses and financial institutions—and Congress did not expressly limit the privacy interests the Bureau may consider to those of natural persons. Nor did Congress expressly limit the privacy interests the Bureau may consider to those of applicants or borrowers, as it did in HMDA.[782] Further, courts have recognized that non-natural persons have privacy interests in certain contexts. The Bureau seeks comment on its interpretation of "privacy interests" under section 1071 and its proposal to consider the privacy interests of both financial institutions and non-natural person applicants.

Several commenters raised concerns about the information security implications of reporting data to the Bureau. While the Bureau's information security procedures are outside the scope of this rulemaking, the Bureau takes strong measures to mitigate and address any risks to the security of sensitive data it receives, consistent with the guidance and standards set for Federal information security programs, and is committed to protecting the privacy and information security of the 1071 data it receives from financial institutions. In addition, the Bureau does not believe a financial institution could be held legally liable for the exposure of data due to a breach at a government agency or for reporting data to a government agency if the institution was legally required to provide the data to the agency and did so in accordance with other applicable law.

The Bureau acknowledges the concern raised by some SERs and other stakeholders that some applicants might be hesitant to provide information in light of data security concerns. However, the Bureau does not believe that such concerns will broadly discourage applicants from seeking credit from financial institutions that are responsible for reporting data to the Bureau.

For the reasons described above, the Bureau proposes to use a balancing test

to exercise its discretion under ECOA section 704B(e)(4) to delete or modify data collected under section 1071 which is or would be available to the public where the Bureau determines that the deletion or modification of the data would advance a privacy interest. Specifically, the Bureau proposes to modify or, as appropriate, delete data fields from the public application-level 1071 data where the release of the unmodified data would create risks to the privacy interests of applicants, related natural persons, or financial institutions that would not be justified by the benefits of such release to the public in light of the statutory purposes of section 1071. In such circumstances, the need to protect the privacy interests of applicants, related natural persons, or financial institutions would require that individual data fields be modified or, as appropriate, deleted. Considering the public disclosure of 1071 data as a whole, the privacy interests of applicants, related natural persons, or financial institutions would arise under the balancing test only where the disclosure of 1071 data may both substantially facilitate the re-identification of an applicant or related natural person, in the data and disclose information about such persons, or the identified financial institution, that is not otherwise public and may be harmful or sensitive. Thus, disclosure of an unmodified individual data field may create a risk to privacy interests if such disclosure either would substantially facilitate the re-identification of an applicant or related natural person; or would disclose information about applicants or related natural persons, or an identified financial institution, that is not otherwise public and that may be harmful or sensitive.[783] This interpretation implements ECOA section 704(e)(4).

Where the publication of unmodified application-level 1071 data may create risks to privacy, the proposed balancing test would require that the Bureau consider the benefits of disclosure in light of section 1071's purposes and, where these benefits do not justify the privacy risks the disclosure would create, modify the public application-level dataset to appropriately balance the privacy risks and disclosure

benefits. The Bureau would delete the data field prior to publishing the application-level dataset if other modifications would not appropriately balance the privacy risks and disclosure benefits. An individual data field would be a candidate for modification or deletion under the proposed balancing test if its disclosure in unmodified form would create a risk of re-identification or a risk of harm or sensitivity.

The Bureau's proposed balancing test generally resembles the balancing test adopted in the 2015 HMDA Final Rule,[784] with certain adjustments for the 1071 context. In particular, the Bureau's proposed 1071 balancing test would consider the privacy interests of not just applicants, but also related natural persons who might not be applicants (such as principal owners of a business, where a legal entity is the applicant), as well as the privacy interests of financial institutions reporting 1071 data.

The Bureau's proposed 1071 balancing test would not specifically consider the risks that a financial institution could be identified in the public application-level 1071 data. Section 1071 requires financial institutions to compile and maintain data and provides that such information be made available to the public upon request.[785] Accordingly, section 1071 contemplates that the public would know what application data are associated with particular financial institutions. Because the statute directly contemplates disclosure of a financial institution's identity in connection with the public application-level dataset, the Bureau proposes to disclose financial institution identity; the re-identification risk element of the analysis would not apply to financial institutions. However, the Bureau would consider the risk to a financial institution that the release of 1071 data in unmodified form would disclose information that may be harmful or sensitive to a financial institution.

As recommended by the SBREFA Panel, the Bureau seeks comment on the design of its proposed balancing test. The Bureau also seeks comment on whether the balancing test should apply to the privacy interests of natural persons generally, rather than just those of natural persons related to applicants.

### 2. Implementation of the Balancing Test

As noted above, the SBREFA Panel and other commenters recommended that the Bureau offer more detail in the proposal on how the Bureau intends to implement and apply its balancing test

---

privacy, personal financial information is protected, including information about small businesses when the individual and corporation are identical."), *rev'd on other grounds,* 602 F.2d 1010 (1st Cir. 1979).

[782] For context, the privacy interests that may be considered under HMDA are limited to the interests of "applicants and mortgagors" specifically. *See* 12 U.S.C. 2803(h)(1)(E), (h)(3)(B), (j)(2)(B). In contrast, section 1071 simply uses the term "privacy interest," without qualification. *See* ECOA section 704B(e)(4).

[783] The Bureau is aware that "re-identification" risk often is used in reference to risks applicable to natural persons and that identification of a small business in the public application-level 1071 data could be characterized as a "harm" or "sensitivity." However, for the ease of understandability, the proposed balancing test analyzes risks to both natural persons and small businesses as re-identification risks.

[784] *See* 80 FR 66127, 66133–34 (Oct. 28, 2015).
[785] *See* ECOA section 704B(e), (f)(2)(B).

AdminRecord-000580

to the 1071 data fields it is proposing.[786] Several industry commenters requested that the Bureau apply the balancing test directly in the Bureau's 1071 rulemaking, rather than after the Bureau issues a final rule. Because of data limitations discussed below, the Bureau is not proposing a full application of the balancing test to most of the proposed data points. Instead, the Bureau is setting forth and seeking comment on its analysis of the benefits and harms or sensitivities that could arise with respect to individual data fields and the dataset as a whole. The Bureau is not conducting a full analysis of the risks of re-identification; the Bureau is proposing to determine the extent of re-identification risk after it has obtained a full year of reported 1071 data. Accordingly, the Bureau is not proposing specific modifications or deletions for most of the proposed data points, but is instead seeking comment throughout part VI.C.5 and .6 on the types of techniques it is considering.

The Bureau is not applying the proposed balancing test fully to the proposed data fields because the lack of an existing 1071 dataset, or a sufficiently similar dataset, materially limits its ability to analyze re-identification risks. Unlike the balancing test elements of benefits, harms, and sensitivities, the Bureau would analyze the re-identification risk element, in part, using a statistical analysis. Specifically, the Bureau would determine whether a particular combination of data fields in a dataset generates a unique set of records that can be accurately matched to records in another publicly available dataset identifying an applicant or a related natural person.[787] Where certain data fields significantly contribute to re-identification risk, the Bureau can use this type of analysis to determine what modifications can be made to the data fields to reduce re-identification risk— that is, by reducing the number of unique combinations produced by data fields—while maintaining as much data utility as possible.

However, the absence of an existing 1071 dataset or sufficiently similar data significantly impedes the Bureau's ability to preliminarily determine whether a proposed 1071 data field, individually or in combination with others, would substantially facilitate re-identification, or how specifically to modify data to reduce that risk. Because

there does not exist a dataset sufficiently similar to what would be published under section 1071, a re-identification analysis of data other than actual reported 1071 data would not provide an accurate basis on which the Bureau could apply the balancing test and modify or delete the data, as appropriate.[788] Underestimating the degree to which a 1071 data field, individually or in combination with others, facilitates re-identification risk could unnecessarily increase privacy risks to an applicant or a related natural person, while overestimating re-identification risk could unnecessarily reduce data utility.

In light of these limitations, the Bureau considered deferring all analysis under the proposed balancing test until after the 1071 rule is finalized. However, the Bureau is concerned that doing so would reduce opportunities for public feedback on privacy issues and their relationship to the general 1071 proposal. Although the Bureau lacks data that would allow it to perform a complete re-identification analysis at this time, it believes there is substantial value in setting forth its preliminary analysis under other aspects of the balancing test. Specifically, the Bureau has preliminarily analyzed the benefits and harms or sensitivities associated with the proposed data fields, the capacity and motives of third parties to match proposed 1071 data fields to other identifiable datasets, and potential modification techniques it may consider to address privacy risks. The Bureau's preliminary analysis of these aspects of the balancing test is set forth below. The Bureau acknowledges that the public will not have an opportunity to comment on the Bureau's intentions with respect to specific modifications or deletions for each proposed data field before a 1071 rule is finalized. However, the Bureau believes this limitation outweighs the risks of basing modifications or deletions on a potentially inaccurate re-identification analysis. And while a number of community groups that provided feedback on the Bureau's SBREFA Outline asserted that privacy risks

would be low, they nonetheless recognized the role played by modification techniques. The Bureau agrees that modification techniques could play an important role in reducing privacy risks. The Bureau's ability to design effective modifications, however, requires application-level data that are not currently available.

As noted above, several industry commenters asserted that privacy decisions should be finalized by notice-and-comment rulemaking, rather than by policy statement. The Bureau believes, however, that a policy statement would be an appropriate vehicle for announcing its intentions with respect to modifications and deletions of 1071 data. First, under section 1071, the Bureau may delete or modify data at its discretion, in contrast to other provisions in the statute that require legislative rulemaking.[789] Second, the Bureau's proposed approach with respect to modifications and deletions would not impose compliance obligations on financial institutions; as discussed in the section-by-section analysis of proposed § 1002.110 above, the Bureau is proposing to publish application-level data on its website on behalf of financial institutions.[790]

Nonetheless, in the interest of obtaining public feedback on the qualitative aspects of its balancing test analysis, the Bureau is including a preliminary detailed analysis for each of the proposed data points, described under *Preliminary Application of the Balancing Test* in part VI.C.6 below. After the first year of 1071 data is reported to the Bureau, but before the Bureau releases the first year of 1071 data to the public, it would publish a policy statement setting forth its intentions with respect to modifications and deletions to the public application-level 1071 data. Before publishing that policy statement, the Bureau would conduct a balancing test analysis based on feedback to this proposal as well as a quantitative analysis of re-identification risk using reported 1071 data. At this time, the Bureau does not intend to re-propose its balancing test analysis for public comment prior to issuing the policy statement, in the interest of making data publicly available in a timely manner.

While the Bureau is seeking public feedback on its analysis below, preserving the ability to exercise its

---

[786] *See* SBREFA Panel Report at 47.

[787] For purposes of this discussion of the proposed balancing test analysis, the term "unique" can refer to a combination of values for a particular record or a combination of values shared by a few records.

[788] The Bureau considered whether it could analyze re-identification risk using data released under the SBA's Paycheck Protection Program (PPP) and U.S. Census data. However, estimating re-identification risk—and making modification and deletion decisions designed to reduce re-identification risk—based on existing public data sources would be substantively limited. First, the more limited scope of the PPP and Census data makes it difficult to accurately estimate the re-identification risk associated with all of the data points in the eventual 1071 data. Second, a re-identification analysis using existing PPP and Census datasets would not cover the same sets of small businesses that will appear in the 1071 data.

[789] *Compare* ECOA section 704B(e)(4), *with* ECOA section 704B(f)(2).

[790] Section 1071 requires financial institutions to compile and maintain data and provides that such information be made available to the public upon request. *See* ECOA section 704B(e), (f)(2)(B).

discretion to modify or delete data through policy statements allows the Bureau to manage the relationship between privacy risks and benefits of disclosure more actively. The Bureau believes this flexibility may be especially important in the event the Bureau becomes aware of developments that might contribute to privacy risks. The privacy landscape is constantly evolving, and risks to applicant privacy created by the publication of the application-level 1071 data may change as the result of technological advances and other external developments. For example, a new source of publicly available records may become accessible, increasing or decreasing privacy risks under the balancing test, or the Bureau may discover evidence suggesting that third parties are using the 1071 data in unforeseen, potentially harmful ways. Potential uses of the application-level 1071 data in furtherance of the statute's purposes may also evolve, such that the benefits associated with the disclosure of certain data may increase to an extent that justifies providing more information to the public in less modified form. As recommended by the SBREFA Panel, the Bureau seeks comment on its approach described above for implementing the balancing test.[791]

3. Disclosure Benefits

In the SBREFA Outline, the Bureau explained that, under the balancing test it was considering, data would be modified or deleted if disclosure in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071.[792] The Bureau sought feedback on the data points generally, as well as the benefits of public disclosure to financial institutions for each of the data points under consideration.[793] Feedback on the benefits of public disclosure of the data points under consideration during the SBREFA process is described in the applicable section-by-section analysis of proposed § 1002.107(a)(1) through (21) in part V above. Feedback on the benefits of public disclosure of the 1071 dataset as a whole is described below.

Under the proposed balancing test, the Bureau would consider the benefits of disclosure of the application-level 1071 data to the public in light of the statutory purposes of section 1071. As described above, the 1071 data would be the most comprehensive dataset available to analyze trends within the

U.S. small business lending industry. The Bureau expects that users of 1071 data would rely on this information to help achieve the statutory purposes of section 1071: (1) Facilitating the enforcement of fair lending laws; and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[794] This would make 1071 data the foremost data source that governmental entities, researchers, economists, industry, and community groups rely on to achieve 1071's purposes and to analyze the small business lending market. The Bureau received feedback provided by SERs, other commenters, and the SBREFA Panel on the potential benefits of disclosure. Comments related to the overall benefits of data disclosure, the fair lending benefits, and business and community development benefits are described below.

Some SERs and industry stakeholders generally supported the public disclosure of 1071 data to promote the monitoring of equal access to credit for small businesses, and narrowing the information gap between lenders and borrowers, community groups, and public officials. A number of SERs expressed the view that data transparency in the small business lending market is critical to advance the goals of fair lending enforcement and access to credit for small businesses, especially those that are minority-owned and women-owned. One SER stated that the data currently available are limited, and that section 1071 has the opportunity to address lending disparities. The SER also explained that data transparency and fairness could address lending practices that tend to exclude women-owned and minority-owned businesses, exacerbating a racial wealth gap. An industry stakeholder supported the public disclosure of 1071 data to promote the monitoring of equal access to credit for women- and minority-owned businesses.

Several SERs also underscored the importance of public disclosure of 1071 data in furthering the 1071 rule's business and community development purpose. One SER stated that the 1071 rule could be a model for the marketplace and pro-innovation if implemented with checks and balances. Another SER said that more transparency would help governments and creditors understand what strategies are successful in reaching women-owned and minority-owned small

businesses and shed light on the marketplace and pricing overall.[795] Other SERs emphasized the importance of publishing pricing information (specifically captured as APR), together with product type for understanding the cost and availability of financing products to small businesses, the importance of NAICS codes or other industry information for determining which industries are getting funding generally, and the importance of census tract or other geographic information for understanding the extent of lending to small businesses in low-to-moderate income neighborhoods.[796]

However, several industry commenters expressed the belief that there were no, or few, benefits to publishing 1071 data in general, in addition to raising general concerns about privacy risks, discussed under *Risks to Privacy Interests* in part VI.C.4 below. Several commenters maintained that the benefits of public disclosure would be limited due to concerns about the data points the Bureau was considering and the absence of other data points that could, in the view of these commenters, reduce the risk of misinterpretation of the data. SERs and industry commenters also questioned the benefits associated with individual data points, as described in the applicable section-by-section analysis of proposed § 1002.107(a)(1) through (21) in part V above.

Community group commenters supported public disclosure of 1071 data. One commenter expressed the view that robust data collection would allow the public to gain a much greater understanding of gaps in lending to borrowers in the marketplace, and easily identify unmet borrowing needs. The commenter explained that the 1071 dataset would cover more types of loans from more institutions than existing CRA data (which had been used for similar kinds of analyses in the past), potentially giving the Bureau a comprehensive view of the small business lending market. The commenter also explained that data collection under the proposal would build an understanding of the credit needs and financing outcomes of small businesses in the lending marketplace through information from data fields such as amount applied for, action taken, and amount approved or originated. Additionally, several community group commenters asserted that transparency through public disclosure would benefit responsible financial institutions by allowing them

---

[791] *See* SBREFA Panel Report at 24, 33, 48.
[792] *See* SBREFA Outline at 40–41.
[793] *See id.*

[794] *See* ECOA section 704B(a).

[795] *See* SBREFA Panel Report at 36.
[796] *See id.*

AdminRecord-000582

to distinguish themselves from others and providing a means for discovering and addressing problematic practices earlier.

The Bureau has considered these comments and the ways in which public disclosure of the proposed 1071 data fields would facilitate the enforcement of fair lending laws. Market transparency through publication of the application-level 1071 data would help to identify potential fair lending violations and address discrimination in small business lending. For example, the ability to compare pricing is a central outcome in many fair lending analyses, which often aim to determine if similarly situated applicants face higher prices due to a prohibited basis under ECOA, such as ethnicity, race, and sex. In supporting the inclusion of pricing as a discretionary data point, one community group explained that collecting data on price would facilitate enforcement of fair lending laws by identifying discrimination in lending through information on whether an application was approved and at what price. The 1071 data would also be used by public officials, researchers, and community groups to identify potentially discriminatory lending patterns and to enforce anti-discrimination statutes. For example, data on action taken would be used in fair lending analyses to identify potential disparities in denial rates among similarly situated applicants. Additionally, public disclosure of the 1071 data fields would enable data users to advocate that financial institutions maintain robust fair lending policies and practices and could also increase the prospect of self-correction when financial institutions conduct their own analyses to assess potential fair lending risks. At the same time, greater transparency could provide explanatory context for lending decisions, which may help protect responsible lenders from inaccurate assumptions based on more limited public data.

Moreover, data users, such as community groups, researchers, and public officials, would be able to use 1071 data to help determine whether certain types of credit are disproportionately available to different groups. For example, one community group commenter explained that because credit cards and other types of high-interest credit are widely used by small businesses, information on the types of credit applied for or originated could reveal the extent to which women-owned or minority-owned small businesses can access term loans or are served disproportionately by credit cards or other small business credit

products that generally carry higher interest rates. The same commenter also explained that data users may be able to use the 1071 data to investigate whether certain products or businesses are disproportionately supported by government guarantee programs in business and community development and possibly help to develop more targeted programs.

The Bureau has also considered the ways in which publication of the application-level 1071 data would promote the business and community development purpose of 1071. The Bureau believes that the public application-level 1071 data would provide useful and robust data, allowing data users to appropriately and efficiently focus resources on particular areas of need. For example, reporting of information about rates of denial, and the associated reasons for denial of a business credit application, combined with data fields commonly used to help make underwriting decisions, such as gross annual revenue and time in business, would improve the public's ability to generally understand financial institutions' decision-making and to identify underserved areas of the market. The Bureau also believes that the public application-level 1071 data could yield information helpful in understanding the economic health of communities. NAICS codes, for example, could provide information about rates at which particular types of businesses are applying for and receiving credit in general, and which types of lending products are being requested, when combined with credit type. This information would also allow data users to identify trends in the small business market that could provide evidence as to the health of the overall economy. Understanding these potential indicators would also help public officials focus efforts to help creditors serve the lending needs of communities and give government officials information to efficiently distribute resources to vulnerable small business applicants. Finally, pricing information, such as total origination charges for different types of credit, would also allow data users to better understand pricing decisions and the cost of credit to small businesses. Information about credit purpose would allow data users to better understand why small businesses are using credit, thus helping communities determine whether creditors are serving the small business lending needs of their communities and also helping public officials to target public investment to better attract private investment and innovation. As

recommended by the SBREFA Panel, the Bureau seeks comment on its understanding of the benefits of public disclosure of the 1071 data described above.[797]

4. Risks to Privacy Interests

The Bureau has considered the risks to privacy that may be created by the public disclosure of the 1071 data that would be reported to the Bureau under the proposal. Based on its analysis to date, the Bureau believes that public disclosure of the unmodified application-level dataset, as a whole, might create risks to privacy interests under the 1071 balancing test. As described in more detail below, this is due to the presence of unique data fields in the dataset that the Bureau believes could create re-identification risk and the presence of individual data fields that the Bureau believes would create a risk of harm or sensitivity. Accordingly, the Bureau intends to consider whether modifications or deletions to the public application-level 1071 data would reduce these risks to privacy and appropriately balance them with the benefits of disclosure for section 1071's purposes.

As recommended by the SBREFA Panel, the Bureau seeks comment on the range of privacy concerns articulated by SERs, including potential re-identification of small businesses and financial institutions, as well as the types of harms and sensitivities the unmodified release of 1071 data could cause to financial institutions and small business applicants, which are described further below.[798]

i. Re-Identification Risk

In the Bureau's SBREFA Outline, the Bureau explained that, while information that directly identifies natural persons, such as name, address, date of birth, or Social Security number would not be collected pursuant to section 1071 requirements, publication of 1071 data under consideration in an unmodified, application-level format potentially could be used to re-identify small business applicants and related natural persons or potentially harm their privacy interests.[799] One SER stated that there has not been a single demonstrated incident of re-identification using HMDA data, and that privacy concerns could be addressed through modification techniques. However, many SERs and several industry stakeholders explained that 1071 data would facilitate the re-

[797] See id. at 48.

[798] See id. at 47.

[799] See SBREFA Outline at 40.

AdminRecord-000583

identification of natural persons and businesses, particularly in low-density geographies, like rural areas. Some stakeholders stated that it would be difficult to predict whether re-identification could arise, particularly as technology evolves.

The Bureau is concerned about two re-identification scenarios. First, a third party may use common data fields to match a 1071 record to a record in another dataset that contains the identity of the applicant or related natural person. The Bureau uses the term "adversary" when referring to such third parties.[800] Second, an adversary may rely on pre-existing personal knowledge to recognize an applicant's record in the unmodified 1071 data.

*Re-identification based on matching.* Under the first scenario, it may be possible to match a 1071 record to an identified dataset, either directly or through a combination of intermediate datasets.[801] The 1071 data that would be reported under the proposal, like the data reported under HMDA and Regulation C, may contain data fields that create re-identification risk.[802] However, successfully re-identifying a 1071 record would require several steps and may present a significant challenge.

First, an adversary generally would have to isolate a record that is unique within the 1071 data. A 1071 record is unique when the values of the data fields associated with it are shared by zero or few other 1071 records. As discussed above, the Bureau believes actual 1071 data are needed to perform an accurate re-identification analysis. Thus, the Bureau does not intend to apply the balancing test until after it has analyzed re-identification risk with at least a full year of reported 1071 data.

A 1071 record having unique combinations of values would not automatically result in its re-identification; an adversary would also have to find a record corresponding to the applicant or related natural person in another dataset by matching similar combinations of data fields. Once a 1071 record has been matched to a

corresponding record, an adversary would possess any additional fields found in the corresponding record but not found in the 1071 record, such as, possibly, the identity of the applicant. However, even after accomplishing such a match, an adversary might not have accurately re-identified the true applicant to whom the 1071 record relates. For example, if the corresponding record is not the only record in the other dataset that shares certain data fields with the unique 1071 record, an adversary would have to make a probabilistic determination as to which corresponding record belongs to the applicant.

As described below and addressed with respect to individual data fields in part VI.C.6 further below, the Bureau expects that the census tract and NAICS code data fields may significantly contribute to re-identification risk. Geographic and industry information are publicly available in a variety of sources and in a form that directly identifies businesses or in a way that could be derived with reasonable accuracy. This information is also likely to produce unique instances in the data, both when used separately and also, especially, when combined. Other data fields may result in unique combinations (particularly when combined with census tract), but the Bureau would need actual 1071 data to analyze their contribution to uniqueness.

In the 1071 context, the Bureau believes that particularly relevant sources of identified data for matching purposes are UCC filings, property records, and titles. The Bureau believes that such filings could pose a serious re-identification risk because of the availability of information about the lender, the applicant, and the date of transaction. The proposed 1071 data fields in unmodified form would identify the financial institution as well as the action taken date or application date. If the action taken date is on or near the UCC filing date, for example, an adversary might be able to use the date and financial institution on the UCC filings to identify the applicants of originated loans in the public application-level 1071 data. The UCC filing also typically will have the address of the borrower. Combinations of lender, action taken date, and census tract might result in unique combinations of data fields that an adversary could connect to a publicly available source of information to re-identify the applicant. Therefore, the Bureau believes identity of the financial institution and the action taken date (and application date, which could be a

proxy for action taken date) may significantly contribute to re-identification risk. UCC filings may also, although to a lesser extent, contain detailed information on the type of loan and the amount approved.

With respect to 1071 loans secured by residential and commercial property, publicly available real estate transaction records and property tax records would be particularly relevant sources of identified data, as the Bureau described in its proposed policy guidance on the disclosure of loan-level HMDA data.[803] Because some of the data fields in such public records are also present in the 1071 data, the Bureau believes that the publication of application-level 1071 data without any modifications would create a risk that these public records could be directly matched to a 1071 record to re-identify an applicant. In addition, a business's own website, public directories, or websites that review businesses typically include the business's location, time in business, and information that could be used to derive information about the business's owners.

UCC filings also frequently include the name of the lender, the name of the business, and the date that the filing was submitted. Though the availability differs by State, UCC filings are often searchable in State databases, and are a source of data frequently mined by data brokers. UCC statements are often filed against specific collateral and business assets generally, especially for products like general lines of credit. These types of filings would be available more broadly than just for loans with very specific collateral (like equipment or vehicles). Such filings could pose a serious re-identification risk because of the availability of information about the lender, the applicant, and the date of transaction.

Identified public data records in loan-level datasets for programs like the SBA's 7(a), 8(a), 504, and PPP programs, as well as State-level registries of women-owned and minority-owned businesses for contracting purposes, may also contribute to re-identification risk. These datasets include information such as loan program guarantee information, industry or NAICS code, demographic information about the business owners, time in business, and

---

[800] The term is not intended to indicate that the adversary's motives are necessarily malicious or adverse to the interests of others. *See, e.g.,* Nat'l Inst. of Standards & Tech., *De-Identification of Personal Information* (2015), *http://nvlpubs.nist.gov/nistpubs/ir/2015/NIST.IR.8053.pdf* (using the term "adversary").

[801] For purposes of this discussion, an identified dataset is one that directly identifies a natural or non-natural person.

[802] HMDA data have a large number of records with unique combinations of data fields. *See* 84 FR 649, 654 n.33 (Jan. 31, 2019) (citing a 2005 Board study finding that more than 90 percent of the loan records in a given year's HMDA data are unique—that is, an individual lender reported only one loan in a given census tract for a specific loan amount).

[803] *See* 82 FR 44586, 44593 (Sept. 25, 2017). The Bureau explained that, although there is a variance by jurisdiction, such records are often available electronically and typically identify a borrower through documents such as the mortgage or deed of trust. These documents typically include the loan amount, the financial institution, the borrower's name, and the property address, and may include other information.

number of workers. Time in business and number of workers could also likely significantly contribute to re-identification risk, especially in combination with other data fields like census tract and NAICS code.

Other publicly available sources of data similar to those included in the proposed 1071 data, but only for certain types of credit, include loan-level performance datasets made available by the Government-Sponsored Enterprises (GSEs). The GSE datasets include information such as borrower demographic information, loan program guarantee information, pricing data, loan term, loan purpose, and the year of action taken. Asset-backed securities datasets for securitized mortgage and auto loans are made available by the Securities and Exchange Commission through the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system. These datasets include information about the lender, the date of action taken, pricing data, loan term, loan amount applied for and approved. These datasets are available online with limited restrictions on access. But these datasets do not include the name of the borrower; as described above, this means that an adversary who is able to match a record in one of these datasets to a record in the 1071 data would need to make an additional match to an identified dataset to re-identify an applicant. And some of these datasets contain restrictions on use, such as a prohibition on attempting to re-identify borrowers.

Private datasets, which could be made available in identified or de-identified form, that could be matched to the 1071 data are also available. For example, data brokers collect information about small businesses from a wide range of sources and sell it for a variety of purposes, including marketing, identity verification, and fraud detection.[904] These datasets typically include data collected from commercial, government, and other publicly available sources and may contain data about the business, including industry code, information about geography, and estimates of gross annual income, number of workers, and information about related natural persons, including the race and ethnicity of business owners. Some of these datasets contain restrictions on use, such as requiring a legitimate

business purpose, and some may prohibit attempts to re-identify borrowers.

In addition to considering the steps an adversary would need to complete to re-identify the 1071 data and the various data sources that may be required to accomplish re-identification, including their limitations, the Bureau also has considered the capacity, incentives, and characteristics of potential adversaries, including those that may attempt re-identification for harmful purposes. In particular, a potential competitor of a small business or a firm with other commercial interests may seek information about a business's expansion strategy or financial condition, including whether it was able to obtain credit approval. This could be part of routine market monitoring or to gain a specific commercial advantage.

These potential adversaries could possess the resources to use private datasets in addition to publicly available records to re-identify the 1071 data. However, the Bureau has considered the extent to which much of the commercial benefit to be obtained by re-identifying the 1071 data may be more readily available from private datasets to which these potential adversaries already have access without the need for recourse to the 1071 data. In many cases, information from other datasets may be timelier than that found in the 1071 data.[805] Furthermore, some of these potential adversaries may refrain from re-identifying the 1071 data for reputational reasons or because they have agreed to restrictions on using data from the additional datasets described above for re-identification purposes.

Additionally, while some academics, researchers, and journalists might use de-identified 1071 data, some may be interested in re-identifying the 1071 data for research purposes. These persons may differ in their capacity to re-identify an applicant in the 1071 data. However, as mentioned above, some private datasets may have contractual terms prohibiting their use for re-identification purposes and therefore these persons may be restricted from actually using the 1071 data to re-identify applicants. Further, those academics or journalists with significant resources may be affiliated with organizations that have reputational or institutional interests that would not be served by re-identifying the 1071 data. These factors

may reduce the risk of re-identification by such persons.

The Bureau has considered whether parties intending to commit identity theft or financial fraud may have the incentive and capacity to re-identify the 1071 data. As discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii below, the Bureau believes that the 1071 data would be of minimal use for these purposes. Further, these potential adversaries are not law abiding and may have easier, albeit illegal, ways to secure data for these purposes than attempting to re-identify application-level 1071 data.

*Re-identification based on personal knowledge.* In addition to the possibility of re-identifying applicants through matching 1071 data to other datasets, some potential adversaries may be able to re-identify a particular applicant or related natural person in the 1071 data by relying on personal knowledge about the applicant or natural person. The unmodified 1071 data would include location and demographic information, such as the race, sex, and ethnicity of principal owners, and industry information. These types of information may be likely to be known to a potential adversary who is familiar with a specific applicant or related natural person. Therefore, such a potential adversary may be able to re-identify a known applicant or related natural person without attempting to match a 1071 record to another data source. This potential adversary could include a customer, competitor, or person with other commercial ties to the applicant, or a neighbor or acquaintance of a related natural person, and the interest in re-identification may range from mere curiosity to the desire to embarrass or otherwise harm the applicant. These potential adversaries may possess a high level of specific knowledge about the characteristics of a particular applicant or related natural person. Adversaries who can re-identify an applicant or natural person based on personal knowledge would be able to complement their existing knowledge with the full 1071 application-level data, and therefore could contribute to risks of harm or sensitivity.

Pre-existing personal knowledge possessed by such a potential adversary would be limited to information about a subset of applicants and related natural persons. Thus, any re-identification attempt by such an adversary would likely target or impact a more limited number of applicants or natural persons, compared to the large numbers of applicants or natural persons who could be re-identified by

---

[904] *See generally* Fed. Trade Comm'n, *Data Brokers: A Call for Transparency and Accountability* (May 2014), *https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf* (describing the types of products offered and the data sources used by data brokers).

[805] *Cf.* 82 FR 44586, 44594 (Sept. 25, 2017) (explaining that the delay between action taken and publication of reported HMDA data ranges from three to 15 months).

adversaries possessing sophisticated matching techniques.[806]

Although the Bureau believes that location, protected demographic information, and industry information may be more likely to be known than other information in the 1071 data, it is impossible to predict the exact content of any pre-existing personal knowledge that such a potential adversary may possess. This uncertainty creates challenges for evaluating the degree to which individual data fields contribute to the risk of re-identification by such a potential adversary. For these reasons, the discussions of re-identification risk in the Bureau's analysis of data points below generally focus on the risk of re-identification based on matching, not on personal knowledge. The Bureau seeks comment on how the Bureau could assess re-identification risk arising from adversaries with personal knowledge.

*Applications that do not result in originations.* In its final policy guidance on the disclosure of loan-level HMDA data, the Bureau explained that the risk of re-identification to applicants is significantly lower for applications that do not result in originated loans.[807] The Bureau explained that the lack of public information about applications significantly reduces the likelihood that an adversary could match the record of a HMDA loan application that was not originated to an identified record in another dataset. The Bureau has not identified any publicly available information about applications for business loans. As discussed under *Implementation of the Balancing Test* in part VI.C.2 above, the Bureau lacks data necessary to perform a complete re-identification analysis at this time. However, the unmodified 1071 data might contain data fields that facilitate the re-identification of applicants. For example, the census tract and NAICS code data fields could result in unique combinations that an adversary could use to match to an identified public record, such as a business directory.[808]

*Overlap between HMDA and 1071 data generally.* As noted above in the section-by-section analysis of proposed § 1002.104(a), the Bureau anticipates that some applications would be reported under both HMDA and 1071.[809] The public loan-level HMDA dataset contains data fields in addition to, or that overlap with, the proposed 1071 data fields, and the proposed 1071 data includes data fields that are not included in the public loan-level HMDA dataset. The Bureau recognizes that, in cases of overlap, some 1071 data fields may require additional analysis with respect to risks of harm or sensitivity and re-identification posed by such overlap. When the Bureau performs a full re-identification analysis, it intends to consider the potential for applications reported under 1071 to be matched to loans reported under HMDA. The Bureau seeks comment on this issue and the implications of potential re-identification risk and potential risk of harm or sensitivity for applications reported under both section 1071 and HMDA.

**ii. Risk of Harm or Sensitivity**

In the SBREFA process, the Bureau sought feedback on the nature and scope of privacy interests of non-natural persons (*e.g.,* small business applicants and financial institutions) and natural persons (*e.g.,* principal owners of small businesses) that the Bureau should consider under its potential balancing test, including the types of sensitive commercial information that could be exposed by publishing the data points (individually or in combination) under consideration.[810]

A number of SERs and other stakeholders addressed the risk of harm or sensitivity from the disclosure of 1071 data in unmodified form.[811] Several SERs and other stakeholders stated that the disclosure of 1071 data could create a risk of harm or sensitivity for small businesses and related natural persons. Several SERs stated that public knowledge of borrowing activity (even without any other potential harms) would be very concerning to some small

businesses as some small business owners consider that information sensitive or deeply personal. Some stakeholders stated that the disclosure of a banking relationship could raise harm or sensitivity concerns because it might lead to adverse inferences about the business's financial condition. One SER stated that small business owners valued their privacy just as much as consumers. Several industry commenters stated that 1071 data might reveal information about a small business's strategy or financial condition, as well as information about the personal characteristics or financial conditions of related natural persons, which the commenters stated could contribute to identity theft.

Several community group stakeholders stated, in contrast, that the risk of harm or sensitivity from publishing 1071 data would be minimal because some of the data are already publicly available. These stakeholders also stated that financial institutions likely exaggerate privacy concerns of small businesses or natural persons. With respect to concerns that publication of data could facilitate targeted marketing of predatory lending products, a community group stated that rather than fostering predatory practices, public disclosure would deter them by enabling the public to identify problematic pricing or loan terms and conditions and prevent them from becoming more widespread.

In addition to addressing the risks of harm and sensitivity to small businesses, several SERs and other stakeholders addressed potential risks of harm and sensitivity to financial institutions from the disclosure of 1071 data. Several SERs stated that 1071 data could be used to generate marketing lists and that this would result in creditors taking other financial institutions' customers away. One SER stated that, because of this, financial institutions may stop lending to small businesses in certain markets. In contrast, two SERs stated that it was relatively easy to obtain information on other financial institutions' small business lending activity. Two SERs stated that they were more concerned about the privacy of small business applicants or borrowers than the privacy of financial institutions, but that both mattered. In addition, one industry stakeholder expressed concern that disclosing the type or purpose of financing and the amount applied for and approved could facilitate re-identification of borrowers, particularly in rural areas or small towns. The commenter also expressed concern that disclosing this information could harm

---

[806] There may be more potential adversaries with personal knowledge than those with the ability to do any kind of sophisticated matching to other datasets, but it is not possible to predict.

[807] *See* 84 FR 649, 658 (Jan. 31, 2019); *see also* 82 FR 44586, 44593 n.55 (Sept. 25, 2017).

[808] In addition, as the Bureau believed in the HMDA context, some of the information contained in the unmodified 1071 data for applicants may permit an adversary to re-identify an applicant despite the lack of publicly available records. For example, if an applicant withdraws an application and obtains a loan secured by the same property from another institution, it may be possible to link the 1071 data for the withdrawn application with the data for the origination, as much of the property and applicant information would be identical. *See* 84 FR 649, 658 (Jan. 31, 2019); *see also* 82 FR 44586, 44593 n.55 (Sept. 25, 2017).

[809] Applications involving certain investment properties would be excluded from 1071 reporting. As discussed in the section-by-section analysis of proposed § 1002.104(b) above, proposed comment 104(b)–4 would exclude an extension of credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy.

[810] *See* SBREFA Outline at 40–41.

[811] In this section, we summarize comments about harm and sensitivity that relate to the 1071 data generally. In the individual data field sections below, we summarize comments about risks of harm and sensitivity that relate to particular data fields.

**56520**     **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

community banks located in such areas. The commenter stated that this could happen because small businesses in such areas are likely to perceive that this information could cause them to be re-identified, and that they would respond by seeking financing with a large creditor in another town or online, rather than their community bank.

A few industry commenters expressed concern that the 1071 data could reveal information such as a financial institution's client lists, terms and conditions, insights about the financial institution's strategy in particular geographic areas, or, for certain financial institutions, sensitive supply management data. A community group commenter stated that public disclosure of 1071 data would not have significant negative effects on competition and could provide lenders with insights that could allow them to become more competitive.

Some SERs expressed concern that 1071 data could be used against financial institutions in litigation by class action attorneys or to harm their public reputations. One SER expressed concern that public disclosure of 1071 data could cause financial institutions to face more litigation, which, in the SER's view, would increase the cost of credit for small businesses. Another SER expressed concern that data users could misinterpret pricing information. For example, according to the SER, data users might infer discrimination based on higher pricing for an applicant, when the pricing was in fact unrelated to the applicant's race. The SER stated that the purpose of section 1071 was to help small businesses and asserted that releasing full 1071 data would present an opportunity for third parties to sue or criticize financial institutions.

Several industry commenters stated that data about loan terms would be sensitive because they would invite criticism of or litigation over disparities without accounting for various legitimate business reasons for disparities and increase compliance costs. Other industry commenters stated that publication of 1071 data would lead financial institutions to artificially lower prices, standardize underwriting, or reduce access to credit to limit exposure to fair lending litigation or reputational risk. One community group stated that it did not believe the purposes of section 1071 required the Bureau to take into account such financial institution concerns about litigation or reputational risk, compliance costs, or impacts on underwriting. One industry stakeholder stated that the Bureau could address these risks by providing clear guidance

about how it would use 1071 data in its fair lending supervisory program.

The Bureau has considered whether, if an application-level record in the public 1071 data were to be re-identified, 1071 data reported to the Bureau would disclose information about an applicant, related natural person, or financial institution that is not otherwise public and may be harmful or sensitive.[812] Specifically, the Bureau has evaluated whether the 1071 data could be used for harmful purposes such as fraud or identity theft or the targeted marketing of products and services that may pose risks that are not apparent. The Bureau has also evaluated whether the 1071 data could cause competitive harm to small business applicants or to financial institutions. Furthermore, even where the disclosure of the data field is unlikely to lead to financial or other tangible harms, the Bureau has evaluated whether certain 1071 data fields may be viewed as sensitive if associated with a particular applicant, related natural person, or financial institution. In evaluating the potential sensitivity of a data field, the Bureau has considered whether disclosure of the data field could cause dignitary or reputational harm to small business applicants and related natural persons. The Bureau has also evaluated whether disclosure of the data field could cause reputational harm to financial institutions.

As discussed above and as noted by several community group stakeholders, some identifiable information about small business lending is currently available to the general public. Such information is available both in public records and in private datasets with varying barriers to access and restrictions on use. In evaluating the risk of harm or sensitivity created by the publication of the application-level 1071 data, the Bureau's analysis has considered the degree to which such disclosure would increase this risk relative to the risk that already exists, absent the public availability of 1071 data. Accordingly, the Bureau has considered whether the data that would be reported to the Bureau are typically publicly available in an identifiable form. The Bureau has also considered whether there are any barriers to accessing such data or restrictions on its use. In general, the Bureau believes that, where a data field is already publicly available, the risk of harm or sensitivity

from the disclosure of that data field in the 1071 data is reduced.[813]

In evaluating the risk of harm or sensitivity created by the publication of the application-level 1071 data, the Bureau also has considered the likelihood that the application-level 1071 data would be re-identified. As discussed under *Re-Identification Risk* in part VI.C.4.i above, the Bureau generally believes that successful re-identification of application-level 1071 data would require several steps and may present a significant challenge. To the extent that the risk that re-identification would be accomplished is low, the risk of disclosing harmful or sensitive information would be reduced.

The Bureau agrees with commenters who stated that the disclosure of 1071 data could potentially create a risk of harm or sensitivity not only to natural persons, such as the owner of a small business that is a sole proprietorship, but also to non-natural persons. As discussed under *Balancing Test Design* in part VI.C.1 above, when considering the risk of harm or sensitivity, the Bureau's proposed balancing test would consider the risks to non-natural persons, including financial institutions.

The Bureau has considered whether the 1071 data could be used for harmful purposes such as fraud or identity theft or the targeted marketing of products and services that may pose risks that are not apparent. As noted above, several SERs and other stakeholders stated that the 1071 data could potentially be used for these purposes. The Bureau's preliminary view is that the unmodified application-level 1071 data would be of minimal use for purposes of perpetrating identity theft or financial fraud against applicants or related natural persons. The 1071 data would not include information typically required to open new accounts in the name of a small business's principal owner, such as Social Security number, date of birth, place of birth, passport number, or driver's license number. Additionally, the 1071 data would not include information useful to perpetrate existing account fraud, such as account numbers or passwords.[814]

---

[812] To the extent a section 1071 record could be associated with an identified applicant or related natural person, and successfully matched to another de-identified dataset to re-identify such a dataset, harmful or sensitive information in that dataset that is not otherwise public may also be disclosed.

[813] However, where a data field is already publicly available, disclosing that data field in the 1071 data may enable the matching of 1071 data to other datasets that may not be controlled by the Bureau, which could substantially facilitate re-identification or the disclosure of harmful or sensitive information.

[814] As noted above, however, to the extent a section 1071 record could be associated with an identified applicant or related natural person and could also successfully be matched to a de-identified dataset to re-identify such a dataset,

AdminRecord-000587

However, while the Bureau believes that the unmodified 1071 data would be of minimal use for perpetrating fraud or identity theft, the Bureau acknowledges that almost any information relating to a small business could, theoretically, be used for these purposes. As a result, the unmodified 1071 data could provide at least some additional data that could be used for these purposes. For example, the 1071 data could potentially be used in a phishing attack against an applicant by a perpetrator purporting to be the financial institution, or for knowledge-based authentication purposes.[815] While much information that may be useful for phishing or knowledge-based authentication—such as the name of the financial institution and the date of action taken—may already be available from UCC filings, the 1071 data may contain additional information that may be useful for such purposes, such as information about the type of loan and loan terms. However, some of this information may also be available from private data sources. The Bureau also notes that, based on the Bureau's expertise and analysis, the publication of HMDA data—which contains many data fields that are similar to data fields that would be disclosed under section 1071—has not resulted in any measurable increase in fraud or identity theft against mortgage applicants.

As several of the SERs and other stakeholders suggested, the Bureau has also considered whether the unmodified application-level 1071 data would provide information that is not already public and could be used for the targeted marketing of products and services that may pose risks that are not apparent. Although the 1071 data could be used to market products and services that would be beneficial for small businesses—perhaps increasing competition among creditors that could help small businesses receive better terms—they could also be used to target potentially vulnerable small businesses with marketing for products and services that may pose risks that are not apparent. While, as a community group stakeholder stated, the 1071 dataset may generally be useful for identifying predatory lending practices in the small business lending market, the Bureau believes that the targeted marketing of products that may pose risks that are not

apparent is a harmful purpose for which 1071 data could potentially be used.

For example, data users might perceive certain 1071 data to reveal negative information about an applicant's financial condition or vulnerability to scams relating to debt relief or credit repair. Information about a loan might also be used for a practice known as "stacking," in which some creditors have been alleged to obtain lead lists based on publicly available information and offer follow-on loans or advances that add to the debt burden carried by small businesses. Some creditors might also use the data for deceptive marketing practices. However, the utility of the 1071 data for predatory marketing practices may be limited by the delay between action taken on a loan and publication of the application-level 1071 data.

As several of the SERs and other stakeholders suggested, the Bureau has also considered whether the unmodified 1071 data would result in competitive harm to small business applicants or related natural persons. The 1071 data, if re-identified, may disclose some general information about a small business's use of credit that is not currently available to the general public. As discussed in the individual data field sections below, the Bureau acknowledges that certain 1071 data points in unmodified form could reflect negatively on the financial condition of a business or its owners.

As several of the SERs and other stakeholders recommended, the Bureau has also considered whether the unmodified 1071 data would result in competitive harm to financial institutions. As discussed below with respect to the financial institution identifying information that would be reported pursuant to proposed § 1002.109(b), the Bureau is proposing to identify the financial institution in the public application-level 1071 data. Therefore, the 1071 data could reveal general information about a financial institution's lending practices that is not widely available to the general public. Data fields such as census tract, NAICS code, credit type, and pricing could disclose information about where a financial institution is doing business, what industries it is doing business with, what kinds of products it is offering, and what kinds of prices it is charging, respectively. Additionally, as several SERs stated, if a small business applicant were to be re-identified, a financial institution's competitors could identify the small businesses to which the financial institution is offering or providing credit.

The Bureau acknowledges that the increased transparency into small business lending provided by 1071 data could reveal general information about a financial institution's lending practices that is not widely available to the general public, and that this information could be useful to others, including other financial institutions. For example, if the 1071 data were re-identified, a financial institution could potentially offer credit to a particular small business at a lower price than they received from another financial institution. However, the Bureau does not believe the unmodified application-level 1071 data would include key inputs for or be detailed enough to substantially facilitate the reverse-engineering of a financial institution's proprietary lending models. (For example, it would not include information about an applicant's credit history.) Financial institution concerns with disclosure of information about general lending practices are discussed in greater detail under *Balancing Risks and Benefits* in part VI.C.5 below.

As noted above, an industry commenter expressed concern that disclosing information about applicants in rural areas could lead them to seek financing elsewhere. However, from the perspective of a small business, seeking financing with a lender in another community would not necessarily reduce the risk that someone in the small business's community may ultimately re-identify them in the 1071 data because the 1071 data would be reported with respect to the location of the business, as discussed in the section-by-section analysis of proposed § 1002.107(a)(13) above (census tract). As discussed above, with respect to the concern about re-identification risk to applicants and related natural persons, the Bureau would determine the extent of re-identification risk when it has obtained a full year of reported 1071 data and would state its intentions, at that time, about whether certain 1071 data fields should be modified or deleted prior to public disclosure.

Some SERs expressed the concern, further detailed above, that 1071 data could harm financial institutions by increasing the amount of litigation against financial institutions. The Bureau acknowledges this risk, which is discussed in greater detail under *Balancing Risks and Benefits* in part VI.C.5 below, and in part VI.C.6.xviii with respect to the application of the proposed balancing test to financial institution identifying information.

In addition to considering whether the disclosure of a data field could lead to financial or other tangible harms,

harmful or sensitive information in that dataset that is not otherwise public may also be disclosed.

[815] Knowledge-based authentication (KBA) is a method of authentication which seeks to prove the identity of someone accessing a service, such as an account at a financial institution. KBA requires the knowledge of information about someone to prove that a person attempting to access a service is that person.

such as those described above, the Bureau has also considered whether the 1071 data fields might be viewed as sensitive. As noted above, several SERs and other stakeholders stated that disclosure of the unmodified 1071 data would divulge data that may be sensitive to applicants, related natural persons, or financial institutions. In assessing whether a data field creates a risk of sensitivity, the Bureau has evaluated whether its disclosure could lead to dignitary or reputational harm to small business applicants or related natural persons. For example, as several industry commenters stated, if the 1071 data were re-identified, the data could reveal information that casts a negative light on a small business's financial condition, such as the fact that a loan was denied due to a business's credit characteristics or cashflow. This information could be embarrassing to the small business and its owners.

The Bureau has also evaluated whether the disclosure of a data field could cause reputational harm to financial institutions. As noted above, some SERs expressed concern that 1071 data could harm a financial institution's reputation by leading data users to draw unfounded inferences about discrimination. The Bureau notes that several of the 1071 data fields, if disclosed in unmodified form, would help address this concern by serving as control variables. For example, many financial institutions consider a small business's revenue when assessing the risk of extending credit. As a result, disclosing gross annual revenue data would help ensure that data users who are evaluating potential disparities in underwriting or pricing can compare small businesses with similar revenues, thereby controlling for a factor that might provide a legitimate explanation for some disparities. The Bureau also notes that it does not expect that 1071 data alone could generally be used to determine whether a lender is complying with fair lending laws. The Bureau expects that, when regulators conduct fair lending examinations, they would analyze additional information before reaching a determination about an institution's compliance with fair lending laws.

In assessing the risk of sensitivity, the Bureau has also considered general societal and cultural expectations with respect to what information is available to the general public. For example, disclosing gross annual revenue in unmodified form could disclose sensitive information because it could reflect the financial condition of a small business or, where a small business is a sole proprietorship, a natural person.

This type of information about a business's or natural person's financial condition is typically not available to the general public.

The Bureau also acknowledges the comments stating that some small businesses and their owners would consider the very fact that they sought credit sensitive, or would consider the disclosure of a banking relationship sensitive because others may draw adverse inferences about the small business's financial condition. These are concerns about sensitivity that would result merely from the re-identification of the applicant, rather than from the disclosure of particular data fields. The Bureau seeks to address these concerns by mitigating the risk of re-identification, as described under *Re-Identification Risk* in part VI.C.4.i above.

The Bureau seeks comment on its approach to assessing the risks of harm and sensitivity presented by the disclosure of unmodified 1071 data.

### 5. Balancing Risks and Benefits

Under the approach described in the SBREFA Outline, the Bureau would delete or modify 1071 data if disclosure of the data in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071.[816] If the risks of disclosing unmodified data are not justified by the benefits under the balancing test, the Bureau would determine whether modifications or deletions could appropriately balance the risks and benefits. In the SBREFA Outline, the Bureau explained that it was considering various approaches that would appropriately advance privacy interests while still providing users with data useful to fulfilling the purposes of section 1071. The Bureau explained that these approaches could include various statistical disclosure limitation techniques when justified under the balancing test, such as those that mask the precise value of data points to prevent the disclosure of certain data elements. The Bureau also sought feedback generally on how it could mitigate concerns arising from re-identification risk.[817]

Several community group commenters stated that the Bureau should make as much data publicly available as possible to maximize data utility. One commenter stated that privacy concerns could be addressed through the prohibition on collecting personally identifiable information and

increasing coverage of 1071 reporters and products. But this commenter, several SERs, and many other industry commenters expressed support for modifying or deleting the data from the public application-level 1071 data to balance privacy risks with the benefits of public disclosure. Commenters provided a wide variety of feedback on what kind of techniques would be appropriate, including publishing data in ranges, aggregating data, differential privacy, and data-swapping.[818] In addition, several industry commenters recommended that the Bureau reduce rule coverage to limit harms, such as by using asset thresholds and exclusions for types of financial institutions. By contrast, a community group commenter recommended that the Bureau expand the rule's coverage to increase the number of observations and reduce re-identification risk. One SER recommended a process by which covered financial institutions could identify certain application records that might present heightened re-identification risk and trigger further analysis by the Bureau before full application-level data are published.[819] Another SER suggested that the Bureau set a minimum sample size before publishing application-level data for some rural markets to avoid harm.[820]

*Balancing risks and benefits generally.* As noted previously, the Bureau intends to apply the proposed balancing test after it receives the first year of data reported pursuant to an eventual 1071 rule. For data fields the public disclosure of which the Bureau believes would create risks to privacy interests of applicants, related natural persons, or financial institutions, either because a field increases re-identification risk or poses a risk of harm or sensitivity, the Bureau intends to assess these risks against the benefits of disclosure. Where the Bureau determines that the disclosure of an individual data field, alone or in combination with other fields, would create risks to privacy that are not justified by the benefits of disclosure to 1071's purposes, the Bureau would consider whether it could appropriately balance the privacy risks and disclosure benefits through modification techniques or whether the field should be deleted from the public dataset. The Bureau also would evaluate the risks and benefits of disclosing a data field in light of modifications or deletions considered for other data fields.

---

[816] *See* SBREFA Outline at 41.
[817] *Id.* at 40–41.

[818] *See* SBREFA Panel Report at 35–36.
[819] *See id.* at 35.
[820] *See id.*

AdminRecord-000589

The Bureau is mindful of the connection between the risk of re-identification and the risk of harm or sensitivity. To the extent that the risk of re-identification created by disclosure of the 1071 data is reduced, the risk of disclosing harmful or sensitive information also would be reduced. Conversely, to the extent that the public application-level 1071 data would not disclose information that is harmful or sensitive, the consequences of re-identification would be reduced. Where the Bureau determines that modification of a data field is appropriate, the Bureau's consideration of the available forms of modification for the 1071 data would also be informed by the operational challenges associated with various forms of modification and the need to make application-level data available to the public in a timely manner.

The Bureau is also aware of concerns raised by SERs and other stakeholders, described under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, that disclosing the proposed 1071 data in unmodified form could increase risks of litigation or reputational harm to financial institutions, and reveal information that could cause competitive harm to financial institutions. However, in applying the balancing test, the Bureau generally intends to give significant weight to the benefits of disclosure relative to these risks.

In general, the Bureau believes that deleting or modifying data because the data would disclose general information about a financial institution's lending practices—compared with information that could substantially facilitate, for example, the reverse-engineering of a financial institution's proprietary lending models—would be inconsistent with section 1071. As noted above, the statute directly contemplates disclosure of financial institution identity in connection with the public application-level 1071 dataset.[821] Each of the data fields prescribed by the statute—with the exception of the application number—could provide some insight into a financial institution's lending practices. If the Bureau were to exclude data on this basis, it would exclude virtually all of the statutorily required 1071 data points from the public data. This would significantly frustrate both of the statutory purposes of section 1071 because it would prevent the public from using the data to identify potential fair lending violations, and it would prevent communities and creditors from using the 1071 data to identify business

and community development needs and opportunities of small businesses.[822] For example, this information could benefit more competitive creditors, as well as small businesses in obtaining credit at a lower cost.

While the Bureau acknowledges financial institutions' concern about the litigation and reputational risks involving section 1071 data, the Bureau does not believe that this concern justifies the exclusion of data from public disclosure. One of the statutory purposes of section 1071 is to facilitate enforcement of fair lending laws, which authorize enforcement by parties other than the Bureau.[823] Additionally, section 1071 contemplates that financial institutions would make their own application-level data available to the public, which necessarily entails their identification.[824]

*Modification techniques generally.* In light of the purposes of section 1071, the Bureau intends to modify or delete the 1071 data only as needed under the balancing test prior to public disclosure. The Bureau recognizes, as explained by community groups, that modifications, to varying degrees, may negatively impact the utility of the data for the fair lending and business and community development purposes of the statute. However, the proposed balancing test is designed to ensure that decisions to modify or delete the public application-level 1071 data take these benefits into account. Below, the Bureau addresses general issues related to modification techniques in the context of this proposal. These techniques are discussed in greater detail within below with respect to specific data points further below. Where no specific modification technique is described with respect to particular data points, the Bureau has not identified an obvious modification technique other than potentially swapping, suppression, or deletion, which are discussed below under *Other techniques.*

While certain information that directly identifies applicants or related natural persons generally would not be collected under the proposal, the Bureau does not believe this feature of the proposal would be sufficient to eliminate privacy risks that would arise from publishing the data in unmodified form, as discussed in greater detail under *Risks to Privacy Interests* in part VI.C.4 above. The Bureau also does not believe that privacy risks can be adequately resolved through rule

coverage (*e.g.,* using asset thresholds and exclusions for types of financial institutions). While some re-identification risk could be reduced by increasing the number of loans reported to the Bureau, the Bureau does not believe the effects of doing so are necessarily predictable because re-identification risk depends on the characteristics of the data. Further, increasing the number of loans would not address risks of harm or sensitivity to re-identified applicants or natural persons. Suggestions for addressing privacy risks through exemptions are discussed under *Balancing Test Design* in part VI.C.1 above.

*Aggregate data.* The Bureau does not intend to address privacy risks for application-level 1071 data through aggregate disclosures at this time. As discussed in the section-by-section analysis of proposed § 1002.110(a) above, and as required by section 1071, the Bureau is proposing to make available to the public the information submitted to it by financial institutions pursuant to proposed § 1002.109, subject to deletions or modifications made by the Bureau. As discussed in the section-by-section analysis of proposed § 1002.110(b) above, and as authorized by the statute, the Bureau may, at its discretion, compile and aggregate information submitted by financial institutions pursuant to proposed § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate. The Bureau initially anticipates making the data collected under section 1071 available at the application level—with appropriate potential modifications and deletions—rather than providing aggregate data with counts and averages for each data field. The Bureau may consider releasing aggregated data in the future, after it determines whether narrower modifications or deletions could address privacy risks. The Bureau received some suggestions to consider "differential privacy" techniques.[825] Such techniques are typically used in connection with aggregate statistics to reduce the identifiability of more granular data. The Bureau seeks comment on whether differential privacy techniques might be appropriate for application-level data.

*Recoding.* The Bureau intends to consider various methods to "recode" the proposed data fields as necessary

---

[821] *See* ECOA section 704B(f)(2)(B).

[822] *See* ECOA section 704B(a).

[823] *See, e.g.,* ECOA section 706 (providing for civil liability).

[824] *See* ECOA section 704B(f)(2).

[825] Differential privacy provides a way to measure the contribution of any one record to the aggregate statistics disclosed in a way that makes re-identification risk easily quantifiable and allows those involved in the data production to keep re-identification risk under a certain risk tolerance.

AdminRecord-000590

**56524**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

under the balancing test. Recoding techniques decrease the number of distinct categories for a data field. In the context of the 1071 data fields, recoding would involve providing the value of a data field in a higher-level category that increases the number of records within a given combination. Some data fields like census tract and NAICS code have structures that permit recoding without developing new 1071-specific recoding categories. For example, if the Bureau were to determine that the re-identification risk presented by the census tract data field does not justify the benefits of unmodified disclosure, the Bureau could instead provide geography at the county level, for example, since census tracts are designed to be non-overlapping subdivisions of a county.

The Bureau also intends to consider recoding through the use of bins or intervals of values for data fields that, in unmodified form, would have continuous values (such as data fields for amount applied for, amount approved, gross annual revenue, or number of workers). Unmodified continuous data fields can be highly identifying, depending on the data field, but binning these values can reduce the risk of re-identification substantially. An additional approach for continuous data fields would be to top- or bottom-code the data field to prevent extreme values from being released that may be particularly identifiable. This approach could be performed alone or in conjunction with recoding the data into intervals.

*Other techniques.* The Bureau might also consider "targeted suppression" techniques. Targeted suppression makes certain values of data points unavailable for records when a certain combination of values is held by too few records. The Bureau might consider, for example, treating certain values of data points as "not available" if the application is the only small business application from a particular census tract. Targeted suppression can be applied in several ways. One way would be to remove the value of a field that makes the record identifiable. For example, if census tract and NAICS code identify a record, the microdata could delete the value of the NAICS code for any applications that are in cells deemed sensitive. A second approach could leave the census tract and NAICS code but suppress the values of other data points. This method would reduce the potential harm if the record were re-identified. A third approach could be to remove the record from the dataset entirely. In general, suppression is a more common approach for

aggregate data than for application-level data.

One drawback to targeted suppression is that it complicates data analysis for any end user. For example, with respect to the public application-level 1071 data, a data user would be presented with millions of rows, but in certain rows and for certain data points, values would be missing.[826] Another drawback is that suppression would need to be done in a way such that the remaining unmodified data do not provide a user with the ability to back out the modified field, sometimes involving complementary suppression or deleting values of other applications to ensure that the missing value cannot be reengineered. The Bureau seeks comment on whether targeted suppression techniques could preserve the benefits of the public application-level 1071 data, and, if so, what the Bureau should consider as the minimum cell size to implement targeted suppression.

The Bureau seeks comment on other modification techniques, such as "data swapping" (sometimes called "switching"). Data swapping involves finding two records that are similar on several dimensions and swapping the values for other data fields between the two records. In effect, data swapping would require that the Bureau preserve certain data fields while swapping others. Another set of techniques for addressing privacy risks for continuous data would involve adding "random noise" to the reported values. For example, under "additive noise techniques," a random value is added to the existing value of the data field. Under "multiplicative noise techniques," the true value is multiplied by a random value. The Bureau seeks comment on whether such techniques would preserve the benefits of the public application-level 1071 data. A drawback to these approaches is that data would be released with values that do not match the true values of the underlying data.[827] Data users would need to take such modifications into

account when performing any analyses.[828]

The Bureau has considered the SER recommendation for allowing financial institutions to identify records that might present heightened re-identification risk. The Bureau appreciates this suggestion but is not proposing it because privacy risks are likely common to many types of applicants, related natural persons, and financial institutions and such risks should be addressed in a broader context, such as through this proposal. The Bureau's proposed process for obtaining public input on the balancing test is discussed under *Implementation of the Balancing Test* in part VI.C.2 above.

6. Preliminary Application of the Balancing Test to Public Application-Level 1071 Data

As explained above, the Bureau does not yet have data under section 1071 and does not believe that there are comparable datasets that it could use as an adequate proxy for 1071 data to which it could apply the balancing test at this time. However, as recommended by the SBREFA Panel, the Bureau is providing additional detail on how it would apply the balancing test to the 1071 data fields as set forth in the proposal.[829]

In accordance with the proposed balancing test described above, privacy risks may not be justified by the benefits of disclosure if disclosing the data field in unmodified form would substantially facilitate the re-identification of applicants and related natural persons, or disclose information about an applicant, related natural persons, or a financial institution that is not otherwise public and may be harmful or sensitive. The Bureau has proposed modifications or deletions for the proposed financial institution identifying information (other than contact information for natural persons), and the proposed use of free-form text for certain data. The Bureau is also proposing not to disclose the proposed unique identifier in unmodified form. However, because the Bureau is not conducting a full re-identification analysis at this time, it has not determined whether the privacy risks of disclosing the other proposed data fields

---

[826] Data users would need to carefully understand the method behind the modifications and plan analyses to account for the fact that the suppressed data would necessarily not reflect all small business loans in a given year.

[827] For example, with respect to the amount applied for data field, a recoding technique would release the values of the data field in broad categories, for instance "$100,000–$150,000." In such case, the broader category provides less information but reflects the true value of the underlying data. Noise addition, by contrast, would involve the Bureau manipulating (in a standardized and documented way) the actual values of loan amount. An application's loan amount may be released as $85,000 in the public dataset when the true value was $78,000.

[828] Even if, for instance with additive random noise, the data maintain the underlying average value, users would need to take into account the change in the variance associated with the modification. While the Bureau can provide all the required information to make these adjustments, they would require a level of data analysis sophistication that may not be possessed by all potential users of the eventual 1071 data.

[829] *See* SBREFA Panel Report at 48.

in unmodified form in the public application-level 1071 data would be justified by the benefits of disclosure. Accordingly, the Bureau has not yet determined whether data fields—other than those for the proposed unique identifier data point, the proposed financial institution identifying information, and the proposed free-form text that would be used to report some of the data—should be deleted, modified, or published in unmodified form.

The Bureau is setting forth its preliminary analysis below to provide transparency and obtain public feedback. The Bureau seeks comment on its analysis of the public disclosure benefits and privacy risks for each data field. Specifically, the Bureau seeks comment on the following issues with respect to each data field, individually or in combination with others: (1) Whether there are additional benefits of unmodified public disclosure in light of the purposes of the statute; (2) whether disclosure in unmodified form would reveal additional information that might be considered harmful or sensitive by an applicant, related natural person, or financial institution; and (3) whether disclosure in unmodified form would significantly contribute to the risk that an applicant or related natural person might be re-identified. The Bureau seeks comment on other modification techniques it could use, and whether deletion would appropriately balance the benefits of disclosure with privacy risks.

i. Unique Identifier

Proposed § 1002.107(a)(1) would require financial institutions to collect and report an alphanumeric identifier, starting with the legal entity identifier of the financial institution, unique within the financial institution to the specific covered application, and which can be used to identify and retrieve the specific file or files corresponding to the application for or extension of credit.

Disclosing the unique identifier in the public application-level 1071 data in unmodified form would help data users conducting fair lending analysis or seeking to identify business and community development needs or opportunities. This data field would allow data users to run analyses that quickly compare specific records to detect trends or disparities. The unique identifier would also provide data users a way to identify, distinguish, and organize credit and application data, which is invaluable for data processing.

Disclosing the unique identifier in the 1071 data in unmodified form by itself would likely disclose minimal, if any,

information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. As noted above, section 1071 prohibits financial institutions from including in 1071 records certain personally identifiable information that directly identifies a natural person applicant or someone connected with the applicant.[830] In addition the Bureau is proposing to prohibit financial institutions from reporting information that would directly identify a small business. For these reasons, the Bureau does not expect that the unique identifier would be considered harmful or sensitive.

A few industry stakeholders expressed concern that small businesses could be identified if application or loan numbers were added to UCC filings. Although publicly available datasets do not presently include the unique identifier data field, financial institution legal entity identifiers are publicly available, and the Bureau is aware of rare instances in which a loan number is included in UCC filings. In addition, as the Bureau noted in its policy guidance on the disclosure of loan-level HMDA data, many jurisdictions publicly disclose real estate transaction records in an identified form, and the Bureau believes many financial institutions include loan numbers on these publicly recorded documents.[831]

The Bureau believes inclusion of the proposed unique identifier, rather than application or loan numbers, would limit the possibility of using application or loan number to match 1071 data to those publicly recorded documents, thus reducing risk of re-identification. However, there is a risk that, after financial institutions begin to report data under section 1071, they may replace the loan numbers currently assigned to small business loans with the unique identifier and, if they do, the unique identifier could be included on publicly recorded documents. Especially considering the uniqueness of the identifiers, this data field on a publicly recorded document could be used to match a 1071 record to an identified public record directly and reliably.

In light of these potential re-identification risks, the Bureau proposes not to publish the proposed unique identifier data field in unmodified form. The Bureau seeks comment on whether there are modifications that would

appropriately balance identified privacy risks and disclosure benefits. The Bureau is considering the feasibility of disclosing a separate unique identifier that the Bureau could create. The Bureau is also considering deleting the data field from the public application-level 1071 data, but seeks comment on whether the proposed deletion would create challenges for users of the data and, if so, how the Bureau could address those challenges other than by creating a separate unique identifier. The Bureau notes that some of the benefits of the unique identifier in analyzing the data could be achieved through the Bureau's proposed disclosure of LEI, as discussed in part VI.C.6.xviii below. The Bureau also notes that the universal loan identifier reported to the Bureau under HMDA, which is similar in function to the proposed unique identifier, is currently excluded from the public loan-level HMDA data.[832]

The Bureau seeks comment on this analysis as well as its proposal not to publish the unique identifier in unmodified form.

ii. Application Date

Proposed § 1002.107(a)(2) would require financial institutions to collect and report the date the covered application was received by the financial institution or the date shown on a paper or electronic application form.

Disclosing application date in the public application-level 1071 data in unmodified form would allow data users to monitor trends over time in small business lending. Application date also would provide a disaggregated piece of temporal data that can be used to identify seasonality in small business lending (for example, when combined with the pricing data fields to show interest rates charged to applicants over a specific date range). In fair lending analyses, application date would provide data users with the means to compare level of service (from application date to action taken date) and identify potential disparities on a prohibited basis between applications. Application date could also act as a control for factors that may provide a legitimate explanation for some disparities, such as interest rates during different time periods or differences in general economic conditions or institutional practices over time.

By itself, disclosing application date in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or

---

[830] ECOA section 704B(e)(3).

[831] See 82 FR 44586, 44599 (Sept. 25, 2017); see also 84 FR 649, 660 (Jan. 31, 2019).

[832] See 84 FR 649, 660 (Jan. 31, 2019).