# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

                                    *Plaintiffs*,

v.                                                    Case No: 7:23-cv-00144

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

                                    *Defendants*.

## JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
## VOLUME VIII

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| | |
|---|---|
| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
|---|---|
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. It is conceivable that an adversary such as a competitor or other market participant may find it helpful to understand when a business is seeking credit; for example, to better understand the business's strategy and cash flow needs. In addition, marketers and creditors could use this information to target products to entities recently in the market for credit, either to deploy new funds or to refinance out of a current loan. However, the Bureau does not believe that disclosing the application date would otherwise disclose sensitive information about a small business or its owner, or any information that would be used for harmful purposes. Any utility of this data field for such purposes would be curtailed by the time lag in public release of the 1071 data.

The Bureau has not identified publicly available datasets that include data fields an adversary could directly match to the application date field. However, an adversary may be able to infer a likely origination date based on typical time lags between application, credit decision, and origination, potentially enabling matching to other datasets that record these later dates.

If the Bureau determines that application date should be modified, the Bureau may consider disclosing the application date at a higher level; for example, disclosing the month and year but not the specific date. In light of the potential re-identification risk arising from this data field, the Bureau seeks comment on whether there are other specific modifications it should consider, and whether deletion would balance the risks and benefits of disclosure.

The Bureau seeks comment on this analysis.

iii. Application Method and Application Recipient

Proposed § 1002.107(a)(3) would require financial institutions to collect and report the means by which the applicant submitted application directly or indirectly to the financial institution. A financial institution would report whether the applicant submitted the application in person, by telephone, by mail, or online. Proposed § 1002.107(a)(4) would require financial institutions to collect and report whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party.

Disclosing application method and whether the application was submitted indirectly in the public application-level 1071 data would further the fair lending enforcement purpose of the statute. Application method information would allow the public to better understand the role of the financial institution as a creditor and would facilitate pricing analyses by helping the public identify potential factors in pricing outcomes. In addition, proposed § 1002.107(a)(20) would require the collection of race or ethnicity information for the applicant's principal owner(s) using visual observation or surname in certain circumstances. If the Bureau finalizes this proposal, application method information would provide context for the information collected.

Information about application method and whether the application was submitted directly or indirectly also would promote the community and business development purposes of the statute. This information would improve the public's understanding of the structure of small business lending originations across the market, the methods by which credit is originated for particular groups or underserved markets, and trends over time (for example, the extent to which applicant preferences shift from in-person to online interactions).

Disclosing application method and whether the application was submitted directly or indirectly, in unmodified form, would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. If applicants or related natural persons were re-identified, application method is likely to be of relatively limited utility to an adversary because it conveys little information about a natural person's characteristics or a business's financial condition. While adversaries interested in targeted marketing could direct future marketing efforts to a business using the same application channel, it is likely that marketing firms already possess strategic information about the best methods for establishing contact. Unmodified disclosure of application method and whether the application was submitted indirectly may reveal information that financial institutions regard as harmful or sensitive, but, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has not identified publicly available datasets that include data fields an adversary could directly match to the application method or application recipient data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. While the Bureau's HMDA data and the GSE loan-level datasets include acquisition channel information in loan-level data, these datasets do not identify applicants or related natural persons. Therefore, an adversary would face challenges in using application method or application recipient information to match a section 1071 record to an identified publicly available record. However, the Bureau seeks comment on whether there are other identifiable application/loan-level datasets that include this information or whether HMDA data or the GSE loan-level datasets could be matched to other identifiable datasets.

The Bureau seeks comment on this analysis.

iv. Credit Type

Proposed § 1002.107(a)(5) would require financial institutions to collect and report to the Bureau certain information about the type of credit applied for or originated. The proposal would require financial institutions to report three categories of information that together constitute the type of credit. First, the proposal would require financial institutions to report the type of credit product.[833] Second, the proposal would require financial institutions to report the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction had been originated.[834] Third, the proposal would require financial institutions to report the

---

[833] A financial institution would be required to select the credit product requested from the following list: Term loan—unsecured, term loan—secured, line of credit—unsecured, line of credit—secured, credit card, merchant cash advance, other sales-based financing transaction, other, or not provided by applicant and otherwise undetermined. A financial institution reporting "other" would be required to enter the type of credit product as free-form text. The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

[834] A financial institution would be required to select the type of guarantee from the following list: Personal guarantee—owner(s), personal guarantee—non-owner(s), SBA guarantee—7(a) program, SBA guarantee—504 program, SBA guarantee—other, USDA guarantee, FHA insurance, Bureau of Indian Affairs guarantee, other Federal guarantee, State or local government guarantee, other guarantee, or no guarantee. A financial institution reporting "other guarantee" would be required to enter the type of guarantee as free-form text. The Bureau analyzes the free-form text under the balancing test in a separate subsection below.

length of the loan term, in months, if applicable.

Disclosing data about the type of credit product, type of guarantee, and loan term in the public application-level 1071 data in unmodified form would facilitate enforcement of fair lending laws by allowing data users to determine whether any disparities in underwriting or pricing may be due to differences in these features of a loan.

Disclosing these data would also be useful for identifying business and community development needs. These data would enable the public to understand whether certain types of credit are disproportionately available to certain groups. For example, information about the presence or lack of collateral would provide more information about lending patterns in different geographic areas and for different groups of applicants. Furthermore, each of the credit type data fields would help the public avoid misinterpretations of the 1071 data. In addition, information on the distribution of government loan guarantees (such as those provided in SBA programs) across different geographic areas and groups of applicants could provide information about how those programs function on the ground, aiding in fulfilling the business and community development purpose of section 1071. Information about the type of guarantee would also allow communities, governmental entities, and creditors to monitor the use of personal guarantees, which carry additional risk to the guarantors and businesses. Finally, information about loan term would provide insights into the pricing and sustainability of closed-end credit transactions.

The Bureau believes that data about the type of credit product, type of guarantee, and loan term could disclose information that may be harmful or sensitive to applicants or related natural persons. A business's competitors could use these data fields—in conjunction with the loan amount and pricing data fields—to draw inferences about the business's financial condition based on whether the business obtained credit on favorable or unfavorable terms. The type of guarantee data fields could indicate heightened credit risk for the applicant.[835] Credit type data also could be used for targeted marketing of products and services that may pose

risks that are not apparent to the business or related natural persons.

Disclosure of the type of credit product, type of guarantee, and loan term in unmodified form may reveal information that financial institutions regard as harmful or sensitive, such as the types of products they offer or the government programs in which they participate. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure of these data fields would permit the reverse-engineering of a financial institution's proprietary lending models. Furthermore, general information about the types of credit a financial institution is offering is widely available on creditor websites and in marketing materials.

The Bureau is aware that certain identified datasets include application-level information on the type of credit product, type of guarantee, or loan term. Government lending programs, such as the SBA's 7(a) and 504 programs, publish loan-level data that indicate the term of the loan and whether the loan is a term loan or a line of credit. In some States, UCC filings may include some information related to the type of collateral. In the Bureau's view, the existing public availability of this information decreases the potential harm or sensitivity of disclosing information about the type of credit product, type of guarantee, and loan term in the 1071 data.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the credit type data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. As noted above, information about the type of credit product, loan term, and type of collateral is found in many publicly available datasets, including data from government lending programs and, in some States, UCC filings. Therefore, in many cases, an adversary could use this information, combined with other fields, to match a section 1071 record to an identified publicly available record.

If the Bureau determines that the type of guarantee should be modified, the Bureau may consider disclosing values that are more general than the values reported to the Bureau. For example, the Bureau could disclose "Federal guarantee" instead of disclosing the specific program. If the Bureau determines that the loan term should be modified, the Bureau may consider recoding loan term data into bins—for example, using intervals of two or five

years—to reduce the potential for re-identification risk.

The Bureau seeks comment on this analysis.

### v. Credit Purpose

Proposed § 1002.107(a)(6) would require financial institutions to collect and report to the Bureau the purpose or purposes of the credit applied for or originated.[836]

Disclosing the purpose of the credit in the public application-level 1071 data in unmodified form would facilitate enforcement of fair lending laws. Because financial institutions may generally consider credit used for certain purposes to be riskier than credit used for other purposes, data about the purpose of the credit would help ensure that users can compare applicants with similar profiles, thereby controlling for factors that might provide non-discriminatory explanations for some disparities in credit and pricing decisions. Disclosing data about the purpose of the credit would also be useful for identifying business and community development needs and opportunities of small businesses. Information about the purpose of the credit would help the public understand whether small businesses face barriers accessing credit that they would be seeking to use for a particular purpose. In conjunction with NAICS code and census tract, information about the purpose of the credit could help the public understand whether small businesses in certain industries or in certain communities face unique challenges accessing credit to, for example, purchase equipment or expand their businesses.

Disclosing the purpose of the credit in the 1071 data in unmodified form by itself would likely disclose minimal, if any, information about an applicant or

---

[835] For example, the "SBA guarantee—7(a) program" data field could indicate heightened credit risk because this program is intended for businesses that have been unsuccessfully applying for credit or have had some other difficulty in accessing credit.

[836] A financial institution would be required to report the credit purpose or purposes by selecting the purpose or purposes of the covered credit transaction applied for or originated from the following list: Purchase, construction/improvement, or refinance of owner-occupied dwelling(s); purchase, construction/improvement, or refinance of non-owner-occupied dwelling(s); purchase, construction/improvement, or refinance of non-dwelling real estate; purchase, construction/improvement, or refinance of owner-occupied, non-dwelling real estate; purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks); purchase, refinance, or rehabilitation/repair of equipment; working capital (includes inventory or floor planning); business start-up; business expansion; business acquisition; refinance existing debt (other than refinancings listed above); line increase; other; not provided by applicant and otherwise undetermined; or not applicable. A financial institution reporting "other" would be required to enter the purpose or purposes as free-form text. The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

AdminRecord-000594

related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. However, information about the purpose of the credit could be useful to adversaries such as a small business's competitors, potential acquirers, or new market entrants, since it contains information about a business's strategy and performance, such as whether a business is expanding or conducting an acquisition. Nonetheless, this information would generally not be detailed enough to cause small businesses competitive harm. The value of this information to a small business's competitors is also likely to be mitigated by the delay between the date of action taken on a loan and the publication of the application-level 1071 data.

Disclosure of credit purpose in unmodified form may also reveal information that financial institutions regard as harmful or sensitive, such as information that a financial institution offers credit that is used for certain purposes. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has not identified publicly available datasets that include data fields an adversary could directly match to the credit purpose data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Identified public datasets pertaining to small business loans generally do not contain information about the purpose of the credit. Therefore, an adversary would have difficulty using the credit purpose data fields to match a section 1071 record to an identified publicly available record accurately.

The Bureau seeks comment on this analysis.

vi. Amount Applied for

Proposed § 1002.107(a)(7) would require financial institutions to collect and report to the Bureau the initial amount of credit or the initial credit limit requested by the applicant.

Disclosing amount applied for in the public application-level 1071 data in unmodified form would help facilitate enforcement of fair lending laws by allowing data users to control for other variables in the data. Several industry representatives expressed concern that these data could lead to misinterpretations based on perceived disparate treatment as opposed to the complex nature of commercial lending.

For example, financial institutions may consider different or additional underwriting criteria, depending on the amount applied for. Applications for large lines of credit might require an in-depth cash-flow analysis, while a smaller line of credit may be underwritten, in part, based on a business's (or business owner's) credit scores. In conjunction with amount approved or originated, this data field would allow data users to determine the difference between the amount an applicant requested, and the amount approved or originated. This information would also help data users identify potentially discriminatory lending patterns and distinguish them from legitimate business factors when combined with other data. This type of information is important to consider in fair lending analyses since the amount applied for may affect the likelihood of denial or the price of an approved loan.

Amount applied for would also help data users understand lending disparities. For example, data users would be able to identify potential fair lending violations where certain small businesses disproportionately receive less credit than applied for on a prohibited basis. Finally, the amount applied for would help communities, governmental entities, and creditors monitor the demand for credit. Specifically, when combined with NAICS code and census tract, the amount applied for could help data users assess the demand for credit in particular industries and communities and enable data users to devise strategies for narrowing or eliminating potential inequalities.

Disclosing amount applied for in the 1071 data in unmodified form would likely disclose information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. Business owners might view details about the amount applied for as sensitive, particularly where they are concerned about the risk of being re-identified as an applicant for credit. In addition, the amount applied for could also lead to targeted marketing of products or services that pose risks that are not apparent, because it could help lenders target small businesses that received less credit than they requested with offers for loans at higher rates or fees. The amount applied for is generally not included in other publicly available data, so it would likely not be useful to adversaries seeking to match 1071 data with other publicly available data. However, the Bureau believes amount applied for would be useful to an adversary. For example, a significant

shortfall between the amount applied for and the amount approved could be used either by an applicant's competitor or by a consumer, to infer that the business has a relatively weak financial position. With information on whether or not a business is granted a loan, an adversary might gain insight into the scale of a business's objectives based on the amount applied for and/or approved. The relative scarcity of this information at present would also increase the value to adversaries of re-identification. In addition, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has not identified publicly available datasets that include data fields an adversary could directly match to the amount applied for data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person.

If the Bureau determines that the amount applied for should be modified, the Bureau may consider recoding the data into bins. For example, the Bureau could recode the amount applied for into bins of $25,000.

The Bureau seeks comment on this analysis.

vii. Amount Approved or Originated

Proposed § 1002.107(a)(8) would require financial institutions to collect and report to the Bureau: (i) For an application for a closed-end credit transaction that is approved but not accepted, the amount approved by the financial institution; or (ii) for a closed-end credit transaction that is originated, the amount of credit originated; or (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the amount of the credit limit approved.

Disclosing amount approved or originated in the public application-level 1071 data in unmodified form would allow users to identify potentially discriminatory lending patterns in which small business applicants might be receiving less credit due to a prohibited basis. These data would also enable data users to devise strategies for narrowing or eliminating these inequalities. Additionally, in conjunction with amount applied for, disclosure of these data fields would allow data users to determine if there is a difference between the amount requested and the amount approved or originated. This information would help data users identify any potentially discriminatory lending patterns in

AdminRecord-000595

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules    **56529**

which small businesses might disproportionately receive less credit than what they applied for on a prohibited basis. As described above, when combined with the amount applied for, these data also could provide significant value as a control in fair lending analysis. Additionally, due to the sometimes complex nature of underwriting in commercial lending, when combined with credit purpose these data would allow users to identify potential discrimination when comparing loan applications for similar purposes.

The amount approved or originated would also be useful for business and community development purposes. Disparities with respect to the provision of credit can significantly impede the growth of women-owned and minority-owned businesses. When combined with census tract, these data could help users understand whether women-owned and minority-owned businesses are experiencing issues accessing credit in their communities (separate from the question of whether potential fair lending violations are occurring). When combined with NAICS codes, these data could help users understand whether women-owned and minority-owned businesses in particular industries are struggling to access credit. In addition, these data would allow data users to approximate the size of the small business lending market.

Like the amount applied for data field, disclosing amount approved or originated in the 1071 data in unmodified form would likely disclose information about an applicant or related natural person that might be harmful or sensitive if such person were re-identified, or that might be harmful or sensitive to an identified financial institution. The Bureau believes that information about the amount approved or originated could be useful to potential adversaries. For example, for creditors, these data fields would provide some insight into competitors' lending practices, particularly when combined with other data points such as gross annual revenue, number of workers, time in business, and pricing. These data might allow creditors to make general inferences about the relative risk appetites of their competitors. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the amount approved or originated

data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Credit amount approved or originated is often widely available in public datasets, such as loan-level data for the SBA 7(a) and 504 programs, as well as property records and UCC filings. Therefore, in unmodified form, adversaries would be able to match the amount of credit approved or originated to an existing public record.

If the Bureau determines that the amount approved or originated should be modified, the Bureau may consider recoding the data into bins. For example, the Bureau could recode the data into bins of $25,000.

The Bureau seeks comment on this analysis.

### viii. Action Taken (Type) and Denial Reasons

Proposed § 1002.107(a)(9) and (11) would require financial institutions to collect and report to the Bureau the action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete; and if applicable, for denied applications, the principal reason or reasons the financial institution denied the covered application.[837]

Disclosing action taken and denial reasons in the public application-level 1071 data in unmodified form would provide important data on credit outcomes for small businesses, including women-owned and minority-owned small businesses, that apply for credit. Data provided by these data fields would allow data users to examine the rates of originations, approvals, denials, and incomplete and withdrawn applications, and whether they differ among groups protected under ECOA. Of the stakeholders that provided feedback on this issue, several supported the collection of action taken and denial reason data in order to track demand for credit and identify potential discrimination. Information that credit was originated or was approved, but not accepted, would help data users

determine whether there are potential disparities in the terms and conditions received by women-owned and minority-owned small businesses. Information that an application was incomplete or withdrawn would highlight potential issues of discouragement, level of assistance disparities, or other discriminatory treatment that could cause women-owned or minority-owned small businesses to walk away from the lending process or otherwise fail to complete the application. One commenter stated that capturing incomplete and withdrawn applications was important as it may reflect discouragement or discriminatory treatment, and that the approved but not accepted category could reflect less favorable pricing or loan terms. For example, when combined with amount approved or originated, data users could also identify issues of possible discouragement where lenders have potentially under-funded loan applications from women-owned and minority-owned businesses.

Denial reasons would help data users examine reasons for credit denials particularly for women-owned and minority-owned businesses. For example, when combined with action taken date, denial reasons could help identify potential denial reasons disproportionately affecting protected classes, which may be useful to identify discrimination and enable data users to potentially develop strategies for narrowing or eliminating inequalities. These data would also be useful as a way to compare similarly situated applicants, which could be useful to both identify and explain potential disparities. Disclosing action taken and denial reasons would also be useful for business and community development purposes. The type of action taken would provide insights into the supply of credit. Data users would be able to monitor rates of credit denial, which can provide information on the willingness of creditors to lend, when combined with other data. Granular denial reason codes would also provide useful actionable information to small business applicants generally. For example, where small businesses are denied loans because of insufficient collateral, or time in business, data users could help direct programs and investment targeted specifically to these businesses in a particular community. When combined with census tract, analysis of denial reasons by geographical area could help identify whether small businesses in certain areas are experiencing higher rates of

---

[837] As discussed in the section-by-section analysis of proposed § 1002.107(a)(12) above, the list of denial reasons would include the following: Business credit characteristics, personal credit characteristics (of business owner(s) or guarantor(s)), use of loan proceeds (*i.e.*, a non-permissible purpose), cash flow, collateral (insufficient or inappropriate or unacceptable), time in business, government criteria, aggregate exposure of business and its principal owner(s), unverifiable information, other, or not applicable. A financial institution reporting "other" would be required to enter the denial reason or reasons as free-form text. The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

AdminRecord-000596

denial and the specific reasons for denial.

During the SBREFA process, stakeholders commented that disclosure of denial reasons would be embarrassing for applicants and might discourage them from applying for credit.[838] Several industry commenters believed that reporting reasons for denial would reveal information that would be very harmful or sensitive for businesses or natural persons. The Bureau agrees that this information could be harmful or sensitive for applicants or related natural persons.

Commenters also described sensitivities associated with originated loans, such as concerns that some small business owners could be reluctant to be perceived as needing credit in the first place. One industry stakeholder believed that disclosure of action taken would allow competitors to reverse engineer a financial institution's credit scoring model. The Bureau does not believe disclosing the fact that credit was sought, in and of itself, likely would be harmful or sensitive to small businesses because credit is widely used by small businesses. Furthermore, the harm or sensitivity of disclosing information that credit was originated is mitigated by the publication of originated loan details in UCC filings, for instance. Additionally, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure of action taken would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has not identified publicly available datasets that include data fields an adversary could directly match to data fields for denied applications (and reasons for denial) in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. However, at a category level, these data fields could tell adversaries which records it may be possible to match against other databases that include originated loans, as opposed to unoriginated loan records that cannot be matched in this way. Credit denials or credit offered but not originated are generally not disclosed to the public. Specifically, most of these data fields included in this data point are not found in publicly available sources of records that contain the identity of an applicant; the only data field that would be consistently available would be for originated loans. Without such an identified publicly available record to match with, there would likely be

difficulty in attempting to re-identify an applicant by matching a 1071 record using these data fields.

However, as discussed under *Re-Identification Risk* in part VI.C.4.i above, adversaries may be able to use other data fields, such as census tract, NAICS code, and identified public information, such as business directories, to determine the identity of an applicant or related natural person. Thus, if applicants and related natural persons could be re-identified, an adversary could learn information about application denials for these businesses and use this information for a variety of purposes.

The Bureau seeks comment on this analysis. In light of the potential harm or sensitivity arising from the disclosure of application denials and the reasons for denial, the Bureau seeks comment on whether there are specific modifications it should consider, and whether modifying these data fields by grouping them, or deleting these data fields, would appropriately balance the privacy risks and benefits of disclosure, in light of the purposes of section 1071.

ix. Action Taken Date

Proposed § 1002.107(a)(10) would require financial institutions to collect and report the date of the action taken by the financial institution.

Disclosing action taken date in the public application-level 1071 data in unmodified form would allow data users to monitor trends over time in small business lending more precisely than they could if only the year were disclosed.[839] When combined with application date, information about the date of action taken would enable data users to determine the length of time, for different groups, between when businesses applied for credit and when they received the credit decision. This information would have benefits for fair lending analysis, allowing data users to determine whether certain groups experience different processing times (for example, longer processing for women-owned business, or faster denials for minority-owned businesses). The action taken date also would help ensure that users evaluating potential disparities in pricing or other terms and conditions can compare applicants that obtained loans on similar dates, thereby controlling for factors that might provide a legitimate explanation for some disparities, such as different market interest rates or different

institutional practices over different time periods.

Disclosing action taken date in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the action taken date data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Public availability of the action taken date depends on the type of action taken. For example, the approval date of originated loans is widely publicly available in SBA 7(a), 504, and other program loan-level records that identify borrowers, and the date of executed agreements is often available for property records and UCC filings, which could be closely related to action taken date. For originated loans, action taken date would substantially facilitate matching with publicly available datasets that identify borrowers. Additionally, the 1071 data could identify the lender as well as the application date and action taken date. Where action taken date is on or near the UCC filing date, for example, an adversary might be able to use the date and lender on the UCC filings to identify the borrowers of originated loans in the eventual 1071 data. Action taken date may be less useful in re-identifying applicants of loans that were not originated because the action taken date for such loans is rarely publicly available.

If the Bureau determined that action taken date should be modified, the Bureau may consider disclosing the date at a higher level; for example, disclosing the month in which action was taken, but not the specific date. This could reduce the re-identification risk from sources such as UCC filings that may include the specific date of action taken. In light of the potential re-identification risk arising from this data field, the Bureau seeks comment on whether there are other specific modifications it should consider and whether deletion would balance the risks and benefits of disclosure.

The Bureau seeks comment on this analysis.

x. Pricing Information

Proposed § 1002.107(a)(12) would require financial institutions to collect and report to the Bureau the following

---

[838] *See* SBREFA Panel Report at 34–35.

[839] Whether or not the Bureau discloses the date of action taken, the application-level data will indicate the year in which action was taken, because the 1071 data would be disclosed annually based on the date of action taken.

information regarding the pricing of a covered credit transaction that is originated or approved but not accepted, as applicable: (i) The interest rate;[840] (ii) total origination charges, defined as the total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit; (iii) broker fees, defined as the total amount of all origination charges that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker; (iv) initial annual charges, defined as the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction; (v) additional costs for merchant cash advances or other sales-based financing, defined as, for a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid; and (vi) prepayment penalties.[841]

The Bureau believes that these pricing data fields would serve to further both the fair lending purpose and the business and community development purpose of section 1071. The statutory data points alone offer limited insight into underwriting disparities and no insight into predatory prices or pricing disparities. For example, the statutory data points alone might show that a particular market segment is expanding and apparently filling an important need, but this could actually be an area with predatory conduct. Pricing information would allow the Bureau and others to understand the situation more accurately. Data collection without

pricing information could have the unintended consequence of incentivizing irresponsible lending, as providers seeking to increase representation of underserved groups could be encouraged to adopt high-cost models of lending.

Without information on pricing, data users would be unable to screen for fair lending pricing risks and prioritize fair lending enforcement resources. In addition, if potential discriminatory conduct is monitored effectively with regard to loan approvals, but not with regard to pricing, industry compliance systems may focus solely on approvals and denials and ignore potential pricing disparities. Having pricing data available in the public application-level 1071 data would also increase transparency and demonstrate to responsible lenders where business opportunities exist to offer credit to underserved markets. Pricing data could also help small businesses identify where credit may be available on better terms. The Bureau provides additional analysis of the benefits of the pricing data fields in the section-by-section analysis of proposed § 1002.107(a)(12) above, including proposed § 1002.107(a)(12)(i) through (vi).

During the SBREFA process, several industry commenters expressed concern that pricing data could lead financial institutions to artificially flatten prices or create misperceptions about disparities among applicants, in light of the complexity of underwriting decisions. One industry commenter stated that pricing data could present "privacy risk" to applicants in rural communities, without specifying the nature of the risk. Several SERs stated that pricing data may be sensitive to financial institutions. One of these SERs suggested that even aggregate pricing information would be commercially sensitive data for a financial institution. While acknowledging other SERs' concerns, a few SERs stated that information on competitors' pricing is relatively easy to obtain now.

The Bureau believes that information about the interest rates and fees charged in connection with credit represents basic information about the features of a product generally would present low risk of harm or sensitivity. Disclosure of pricing data in unmodified form may reveal information that some applicants or related natural persons may regard as harmful or sensitive, such as a reflection of their perceived credit risk. However, the Bureau received feedback during the SBREFA process that multiple factors contribute to pricing for small business credit. Disclosure of pricing data in unmodified form may also reveal

information that financial institutions regard as harmful or sensitive, such as the prices a financial institution charges for certain types of credit. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure of pricing information would permit the reverse-engineering of a financial institution's proprietary lending models.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the pricing data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Identified data about the interest rate and fees charged for a given loan are available from a limited number of publicly available datasets, such as data for the SBA 7(a) and 504 programs. Additionally, the PPP loan program has a uniform 1 percent interest rate.

During the SBREFA process, one industry stakeholder stated that, if pricing data are collected, the Bureau should publish them along with demographic information only in aggregate form, such as at an industry or multi-firm level, rather than the application level. The commenter stated that publication of pricing information along with demographic information risks creating the perception of potential fair lending violations that are not based on adequate analysis. The Bureau notes that 1071 data alone (including pricing data) generally could not be used to determine whether a lender is complying with fair lending laws. For example, HMDA data have a long history of utility for fair lending purposes even though they alone generally do not offer proof of compliance with fair lending laws. Additionally, in the section-by-section analysis of proposed § 1002.107(a)(12) above, the Bureau seeks comment on additional information that could help reduce misinterpretations of disparities in pricing, including modifications to the pricing information under proposed § 1002.107(a)(12).

If the Bureau determines that pricing data should be modified, the Bureau may consider recoding the pricing information data fields into bins. For example, the Bureau may consider recoding interest rates into bins of 0.25 percentage points or origination fees into bins of $500. The Bureau may also consider top-coding pricing data fields, which would mask particularly high values.

The Bureau seeks comment on this analysis.

---

[840] If the interest rate is fixed, the proposal would require the financial institution to report the interest rate that is or would be applicable to the covered credit transaction. If the interest rate is adjustable, the proposal would require the financial institution to report the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination. The proposal would also require the financial institution to report the index used by selecting the index used from a specified list. If the index used does not appear on the list of indices provided, the financial institution would report "other" and provide the name of the index as free-form text. The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

[841] The proposal would require the financial institution to report whether the financial institution could have included a charge to be imposed for paying all or part of the transaction's principal before the date on which the principal is due under the policies and procedures applicable to the covered credit transaction. The proposal would also would require the financial institution to report whether the terms of the covered credit transaction include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

### xi. Census Tract

Proposed § 1002.107(a)(13) would require financial institutions to collect and report the census tract in which is located: (1) The address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or, (2) if this information is unknown, the address or location of the main office or headquarters of the applicant; or, (3) if this information is also unknown, another address or location associated with the applicant. In addition to reporting the census tract, the financial institution would be required to indicate which one of these three types of addresses or locations the census tract is based on.

Disclosing census tract data in the public application-level 1071 data in unmodified form would aid in fulfilling both the fair lending and business and community development purposes of section 1071 by providing more useful information on the location of the credit activity for fair lending analysis and understanding where the business and community development is occurring. With respect to fair lending enforcement, a measure of geography at the neighborhood or community level is necessary to identify redlining—the illegal practice in which those in a certain area or neighborhood are denied access to credit, are charged higher prices, or are otherwise not given the same access to credit as those in other areas, on the basis of race or for some other prohibited reason. Additionally, because differences in the level of competition in the local credit market may contribute to differences in interest rates or approval rates for otherwise similarly situated small businesses, census tract data would help ensure that users can compare applicants with similar profiles, thereby controlling for factors that might provide non-discriminatory explanations for some disparities in credit and pricing decisions.

The inclusion of a geographic indicator, such as census tract, that identifies the appropriate community—not merely the appropriate county or State—would further the statute's community and business development purposes. Census tract data would enable data users to monitor credit conditions in particular communities and identify communities that are underserved by the small business credit market. In addition, requiring data on the nature of the address reported would aid in fulfilling both the fair lending and business and community development purposes of section 1071 by facilitating accurate analyses of the data reported.

Disclosing the census tract in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The Bureau is aware that, for sole proprietors, the main office address of small business applicants is frequently a home address. However, the actual street address would not be reported or disclosed. In addition, small businesses commonly make their locations available in the normal course of their business by disclosing their addresses.

If the address reflects where the proceeds of the credit will be or would have been principally applied, disclosing the census tract may reveal some information about an applicant's business strategy, particularly if paired with the loan purpose data field. For example, the data could indicate that a small business is pursuing or was pursuing an expansion to a particular address. However, the value of this information to a small business's competitors is likely to be mitigated by the delay between the date of action taken on a loan and the publication of the application-level 1071 data. Disclosure of the census tract in unmodified form may also reveal information that financial institutions regard as harmful or sensitive, such as a financial institution's trade area. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

During the SBREFA process, several industry stakeholders stated that geographic identifiers such as census tract would have a high potential to contribute to the re-identification of businesses or natural persons, especially in small towns or rural areas, where only one or two businesses may be located in a census tract. Several industry commenters expressed concern about re-identification risks arising from the combination of the census tract data fields with other data fields, noting that it might be difficult to predict which data fields could contribute to re-identification. One commenter stated that tax assessor and UCC records could be used to re-identify businesses in rural areas, and that adversaries with personal knowledge of businesses in rural areas could learn about a business's or natural person's sensitive financial characteristics. Some SERs stated that the combination of geographic identifiers and information about a small business's industry could make it easy to re-identify businesses in remote or rural areas.[842] Two industry stakeholders stated that census tract and data about the type and purpose of financing would contribute to the re-identification of businesses or natural persons. One of these commenters also stated that combining geographic identifiers with data on the amount applied for or approved could contribute to re-identification. One industry commenter stated that census tract, combined with gross annual revenue and NAICS code, could facilitate re-identification of applicants in areas with low populations. A community group stakeholder stated that increasing the universe of financial institutions reporting 1071 data would mitigate privacy concerns about disclosing census tract.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the census tract data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. The Bureau expects that, in most cases, the census tract that financial institutions would report to the Bureau would be based on the address or location of the main office or headquarters of the applicant, either because that is where the proceeds of the credit will be applied or because the financial institution does not know the location or address where the proceeds of the credit will be applied, but does know the main office or headquarters address. The Bureau believes that, for many small businesses, this address or location is likely to be publicly available on the internet from sources such as the business's website and review websites. Information about a business's location is also likely available from loan-level data for public loan programs as well as from private datasets, such as from data brokers. Therefore, in many cases, the Bureau believes an adversary could use the census tract data fields, combined with other fields, to match a section 1071 record to an identified publicly available record.

Disclosing the census tract is likely to produce unique instances in the data—particularly when combined with the 6-digit NAICS code, if the 6-digit NAICS code is disclosed in unmodified form. There are currently 73,057 census tracts and 1,057 6-digit NAICS codes,[843]

[842] *See* SBREFA Panel Report at 34–35.
[843] *See* U.S. Census Bureau, *2010 Census Tallies*, *https://www.census.gov/geographies/reference-*

AdminRecord-000599

which produce over 77 million combinations. With so many possible combinations, there would likely be many instances in the 1071 data where the census tract and 6-digit NAICS code form a unique combination. Regarding the comment that increasing the universe of financial institutions reporting 1071 data would mitigate privacy concerns about disclosing census tract, the Bureau's proposals regarding the coverage of the 1071 rule are addressed elsewhere in this proposed rule.

During the SBREFA process, several commenters suggested ways the Bureau might modify census tract data to reduce privacy risk. Several industry commenters recommended that the Bureau disclose geographical data on the county or State level to reduce re-identification risk. One SER recommended the reporting of geographic data only at the State level or higher. The SER stated that even county-level data in some areas could potentially lead to re-identification of applicants or borrowers.

A joint comment from a number of community groups recommended that the Bureau consider modifying data with a low number of observations in a census tract to be reported at the zip code or county level. One SER recommended that the Bureau establish a minimum sample size before publishing application-level data for some rural markets to avoid privacy risks. A community group stakeholder recommended masking techniques such as moving data from a census tract with few observations to a contiguous or nearby census tract. This commenter also recommended that the Bureau consider switching records for similarly situated applicants between nearby census tracts to make it impossible to reconnect individual applicants while preserving the benefits of the data.

If the Bureau were to modify census tract, it might consider disclosing a broader location category, such as county or State. Census tracts are defined by the U.S. Census Bureau, and the next-largest geographic identifier in the Census Bureau's hierarchy of geographic identifiers is county. The next-largest geographic identifier after county is State. While reducing re-identification risk substantially, disclosing the county or State instead of the census tract would also reduce the utility of the 1071 data. There are 73,057

census tracts, as noted above, but only 3,143 counties,[844] suggesting a significant loss of geographic detail in modifying census tract. The Bureau could potentially use a geographic designation larger than census tract but smaller than county. However, since the use of Census Bureau-defined geographies is widespread, using modifications that already reflect standard Census Bureau-defined geographies significantly improves the utility of the data to data users.

The Bureau seeks comment on this analysis. The Bureau seeks comment on how disclosing the county, State, or some other geographic identifier—rather than the census tract—would affect the benefits of disclosure, the potential for harm or sensitivity, and the potential for re-identification of applicants or related natural persons.

xii. Gross Annual Revenue

Proposed § 1002.107(a)(14) would require financial institutions to collect and report to the Bureau the gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected.

Disclosing gross annual revenue in the public application-level 1071 data in unmodified form would facilitate enforcement of fair lending laws. Many creditors use gross annual revenue to help define whether a business is a small business and set revenue thresholds for assigning risk. Information about gross annual revenue would help ensure that users who are evaluating potential disparities in underwriting or pricing can compare small businesses with similar revenues, thereby controlling for a factor that might provide a legitimate explanation for some disparities. Disclosing gross annual revenue would also be useful for identifying business and community development needs and opportunities of small businesses. And because gross annual revenue is often used as a proxy for the size of a small business, these data could allow users to determine the availability of credit for small businesses of various sizes—including the very smallest businesses, which may face unique challenges accessing credit.

Disclosing gross annual revenue in the 1071 data in unmodified form would likely disclose information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. One SER stated during the SBREFA process that, in the case of sole proprietorships, gross annual revenue can serve as a proxy for the small business owner's personal

income. The Bureau believes that disclosing gross annual revenue in unmodified form would likely disclose sensitive information because it could reflect the financial condition of a small business or, where a small business is a sole proprietorship, a natural person. With respect to the risk of harm or sensitivity to financial institutions, other creditors might use gross annual revenue data to learn more about the types of small businesses with which their competitors do business. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

Gross annual revenue data are likely to be of interest to potential adversaries. As described below, gross annual revenue data are not available on a widespread basis from identified public databases. Competitors of the small business, other commercial entities, creditors, researchers, or persons with criminal intent may have an interest in using these data to monitor the size or performance of an applicant that may be a rival, partner, or target of inquiry, investigation, or illegal activity.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the gross annual revenue data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Gross annual revenue data are available from private databases. Gross annual revenue data are also available from data for New York State's women- and minority-owned business certification program, in which it is recoded into bins. However, these data are not available from identified public databases on a widespread basis.

During the SBREFA process, a community group stakeholder recommended that the Bureau consider reporting gross annual revenue in categories rather than specific amounts. An industry commenter recommended that the Bureau delete gross annual revenue from the public application-level 1071 data to protect the privacy of an applicant or related natural person. If the Bureau determines that gross annual revenue should be modified, the Bureau may consider recoding gross annual revenue data into bins by, for example, disclosing the data in ranges of $25,000. The Bureau may also consider top-coding annual revenue, which would mask particularly high values, thereby reducing the identifiability of application data from businesses with especially high gross annual revenue.

---

files/time-series/geo/tallies.html (last visited Aug. 23, 2021) (2010 Census Tallies) (number of census tracts); Off. of Mgmt. & Budget, *North American Industry Classification System (NAICS) Updates for 2022*, 86 FR 35350, 35352 (July 2, 2021) (number of 6-digit NAICS codes).

[844] *See* 2010 Census Tallies.

AdminRecord-000600

The Bureau seeks comment on this analysis.

### xiii. NAICS Code

Proposed § 1002.107(a)(15) would require financial institutions to collect and report to the Bureau a 6-digit North American Industry Classification System (NAICS) code appropriate for the applicant.[845]

Disclosing 6-digit NAICS codes in the public application-level 1071 data in unmodified form would be useful for identifying business and community development needs and opportunities of small businesses. Such business and community development needs and opportunities may differ widely based on industry, even controlling for other factors. For example, 6-digit NAICS codes would help data users understand how small businesses in different industries use credit as well as identify industries in which small businesses face challenges accessing credit. Furthermore, disclosing NAICS codes would provide for consistency and compatibility with other public datasets related to small business lending activity, which generally use NAICS codes. This ability to synthesize 1071 data with other datasets would help the public use the data in ways that would advance both the fair lending and business and community development purposes of section 1071.

Disclosing 6-digit NAICS codes in the 1071 data in unmodified form would also facilitate enforcement of fair lending laws in other ways. Financial institutions often designate certain industries as high-risk, such as industries that have high rates of businesses leaving the market or that deal primarily in cash transactions. The 6-digit NAICS codes would help ensure that users can compare applicants with similar profiles, thereby controlling for factors that might provide non-discriminatory explanations for some disparities in credit and pricing decisions. The Bureau also believes that

using the SBA's 6-digit NAICS codes (as opposed to the 2-digit code) would enable the public to identify whether disparities arise at a sector level and would provide more specific information on the types of businesses that are accessing or struggling to access credit.[846]

Including 6-digit NAICS codes in the public application-level 1071 data in unmodified form by itself would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. The 6-digit NAICS codes are unlikely to be harmful or sensitive to a small business because information about a small business's industry is likely to be apparent to anyone interacting with it. Disclosure of the 6-digit NAICS codes in unmodified form may reveal information that financial institutions regard as harmful or sensitive, such as the industries with which the financial institution does business. However, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

During the SBREFA process, several industry commenters stated that NAICS codes would increase re-identification risk for small businesses, particularly in combination with geographic identifiers, such as census tract. The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the NAICS code data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. A business's NAICS code is likely to be publicly available in loan-level data for public loan programs such as the 7(a), 8(a), or PPP programs and in private datasets. In addition, even where the specific NAICS code may not be publicly available, it could be derived with reasonable accuracy from other public information that is available for most businesses, such as business directories, a business's website, or from personal observation by members of the community where a business is located. Therefore, in many cases, an adversary could use 6-digit NAICS codes, combined with other fields, to match a

section 1071 record to an identified publicly available record.

The 6-digit NAICS code data field is likely to produce unique instances in the data, especially when combined with census tract, if census tract is disclosed in unmodified form. There are currently 73,057 census tracts and 1,057 6-digit NAICS codes,[847] which produce over 77 million combinations. With so many possible combinations, there would likely be many instances in the 1071 data where the census tract and 6-digit NAICS code form a unique combination.

If the Bureau determines that the 6-digit NAICS code should be modified, the Bureau may consider disclosing NAICS codes at a higher level by disclosing the 2-digit, 3-digit, or 4-digit NAICS code instead of the 6-digit code. Disclosing NAICS codes at a higher level would reduce re-identification risk but would also reduce the utility of the data. There are 1,057 6-digit NAICS codes, as noted above, but there are only 99 3-digit subsectors and 20 broad 2-digit sectors.[848] As a result, disclosing NAICS code at a higher level would reduce the specificity of the information in the 1071 data about the small business's industry.

The Bureau seeks comment on this analysis. The Bureau specifically seeks comment on how disclosing the 2-, 3-, or 4-digit NAICS code—rather than the 6-digit NAICS code—would affect the benefits of disclosure, the potential harm and sensitivity, and potential for re-identification for this data field.

### xiv. Number of Workers

Proposed § 1002.107(a)(16) would require financial institutions to collect and report to the Bureau the number of non-owners working for the applicant.

Disclosing number of workers in the public application-level 1071 data in unmodified form would be useful for identifying business and community development needs and opportunities of small businesses. This information would give the public a greater understanding of how the business and community development needs and opportunities of small businesses may differ based on the number of workers. The number of workers would help the public understand, for example, the extent to which "non-employer" businesses, which do not have

---

[845] As discussed above in the section-by-section analysis of proposed § 1002.107(a)(15), the SBA customizes its size standards on an industry-by-industry basis using 1,057 6-digit NAICS codes. The first two digits of a NAICS code broadly capture the industry sector of a business. The third digit captures the industry's subsector, the fourth captures the industry group, and the fifth captures the industry code. The NAICS code thus becomes more specific as digits increase and the 6-digit long code is the most specific. For example, NAICS code 453910 describes a pet supply store, for which the 2-digit industry sector is the 44–45 "Retail Trade" sector. *See* Small Bus. Admin., *Table of Small Business Size Standards Matched to North American Industry Classification System Codes, https://www.sba.gov/sites/default/files/2019-08/SBA%20Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.*

[846] For example, a wide variety of businesses, including those providing car washes, footwear and leather goods repair, and nail salons all fall under the 2-digit sector code 81: Other Services (except Public Administration).

[847] *See* 2010 Census Tallies (number of census tracts); Off. of Mgmt. & Budget, *North American Industry Classification System (NAICS) Updates for 2022,* 86 FR 35350, 35352 (July 2, 2021) (number of 6-digit NAICS codes).

[848] Off. of Mgmt. & Budget, *North American Industry Classification System (NAICS) Updates for 2022,* 86 FR 35350, 35352 (July 2, 2021).

AdminRecord-000601

employees besides the owner, and "microbusinesses," which are typically defined as having fewer than 10 employees, may face unique challenges accessing credit or may use credit in different ways. Identifying the number of workers would also allow data users to understand the number of jobs supported by loans to a business. Disclosing the number of workers would also advance the fair lending purpose of section 1071. This information would help ensure that users of the 1071 data who are evaluating potential disparities in underwriting or pricing can compare small businesses with a similar number of workers, thereby controlling for a factor that might provide a legitimate explanation for some disparities.

Disclosing the number of workers in the application-level 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. Financial institutions may use data about the number of workers to learn more about the types of small businesses with which their competitors do business. However, as discussed above under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models.

Furthermore, information about the number of workers is also likely to be publicly available for many businesses. State registries of businesses may include information about a business's number of workers. Private databases also commonly include this information, which is often verified by the business. Further, loan-level records from SBA loan programs include a field for the number of jobs supported by a loan, which in some instances may reflect the business's number of workers. In the Bureau's view, the public availability of this information decreases any potential sensitivity or harm of disclosing number of workers in the application-level 1071 data. At the same time, the Bureau believes that the utility of number of workers data in the public application-level 1071 data to potential adversaries would be low due to the widespread public availability of this information.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the number of workers data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural

person. As noted above, information about a business's number of workers is found in many publicly available datasets in which the business's name is identified, including State business registries, commercial databases, and loan-level records from SBA loan programs. Therefore, in many cases, an adversary could use number of workers, combined with other fields, to match a section 1071 record to an identified publicly available record. Data on a business's number of workers may easily produce unique combinations, particularly when combined with other data fields in the public application-level 1071 data and particularly for businesses with higher numbers of workers, which are more likely to be unique in the dataset.

If the Bureau determines that the number of workers data field should be modified, the Bureau may consider recoding the data into bins. The Bureau could also top-code number of workers, given that larger values in the 1071 data are more likely to be unique.

The Bureau seeks comment on this analysis.

xv. Time in Business

Proposed § 1002.107(a)(17) would require financial institutions to collect and report to the Bureau the time the applicant has been in business, described in whole years, as relied on or collected by the financial institution.

Disclosing time in business in the public application-level 1071 data in unmodified form would advance both the fair lending and business and community development purposes of section 1071. As discussed in greater detail above in the section-by-section analysis of proposed § 1002.107(a)(17), start-ups and new businesses play an important role in the business ecosystem, particularly with respect to job creation. Time in business data would allow data users to better identify the proportion of small businesses seeking credit that are start-ups or relatively new businesses, the types of credit that are offered and provided to start-ups and newer businesses, the geographic makeup of those businesses, the types of financial institutions that are reaching such businesses, and where communities might focus business development efforts. The data may also aid policymakers in addressing issues impacting the growth of small start-ups. The data, particularly as to unmet demand, could help interested financial institutions identify lending opportunities to reach more start-ups and new businesses, promoting both business and community development.

Disclosing time in business would also facilitate the enforcement of fair lending laws. Because lenders generally perceive younger businesses as having higher credit risk, time in business data would help ensure that users can compare applicants with similar profiles, thereby controlling for factors that might provide non-discriminatory explanations for some disparities in credit and pricing decisions.

Disclosing time in business in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. During the SBREFA process, one industry commenter recommended that the Bureau delete time in business from the public application-level 1071 data, citing general concerns that the data field could facilitate re-identification and disclose previously non-public information to competitors.[849] However, while financial institutions may use time in business data to learn more about the types of small businesses with which their competitors do business, the Bureau does not believe that disclosure would permit the reverse-engineering of a financial institution's proprietary lending models, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above. Information about time in business is also likely to be publicly available for many businesses. Businesses typically disclose their date of establishment in public registration filings. Many commercial databases also include this information. In the Bureau's view, the existing public availability of this information decreases any potential harm or sensitivity of disclosing time in business in the public application-level 1071 data.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the time in business data field in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. As noted above, information about time in business is found in many publicly available datasets, including State business registries and commercial databases. Therefore, in many cases, an adversary could use time in business, combined with other fields, to match a section 1071 record to an identified

---

[849] The commenter did not make clear whether it was referring to competitors of a small business or competitors of a financial institution.

publicly available record. Time in business data may easily produce unique combinations, particularly when combined with other data fields in the public application-level 1071 data, and particularly for larger time in business values, which are more likely to be unique in the dataset.

If the Bureau determines that the time in business data field should be modified, it may consider recoding time in business into bins—for example, using two- or five-year intervals—to reduce the identifiability of a specific length of time in business. The Bureau could also top-code time in business at a value such as 25 years, given that larger values are more likely to be unique. With regard to the industry commenter's recommendation that the Bureau delete time in business from the public application-level 1071 data based on re-identification concerns, the Bureau's determination about whether this field should be modified or deleted will be based on the re-identification analysis that it will conduct once it receives at least a full year of actual data reported by financial institutions.

The Bureau seeks comment on this analysis. The Bureau specifically seeks comment on what intervals the Bureau should use if it were to recode time in business into bins and what value the Bureau should use if it were to top-code this data field.

### xvi. Minority-Owned Business Status and Women-Owned Business Status

Proposed § 1002.107(a)(18) and (19) would require financial institutions to collect and report to the Bureau whether the applicant is a minority-owned business or a women-owned business and whether minority-owned business status or women-owned business status is being reported based on previously collected data pursuant to proposed § 1002.107(c)(2).[850]

Disclosing women-owned and minority-owned business status in the public application-level 1071 data in unmodified form is central to furthering the fair lending purpose of section 1071 and would promote the business and community development purpose of the statute by identifying opportunities for further development of women-owned and minority-owned small businesses. In fair lending analyses, knowing whether a business is women-owned or minority-owned would help data users identify potential discriminatory lending patterns. Publishing

information on women-owned or minority-owned business status in the public application-level 1071 data would help data users examine and identify potential disparities in small business lending. For example, when combined with action taken, data users would be able to identify if women-owned and minority-owned small businesses are denied for credit at disproportionate rates. In addition, when combined with pricing information, data users would be able to identify if women-owned and minority-owned businesses are receiving credit at higher prices. Additionally, these data would allow communities, governmental entities, and creditors to determine areas where women-owned and minority-owned small businesses are underserved relative to other small businesses and to focus resources to identify business and community development opportunities for women-owned and minority-owned small businesses. Disclosing women-owned and minority-owned business status could also help communities, governmental entities, and creditors determine whether or not initiatives to increase access to credit for women-owned and minority-owned businesses are succeeding.

Disclosing women-owned and minority-owned business status in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. While some applicants or related natural persons may regard this information as harmful or sensitive, the Bureau believes this information generally would present low risk of harm or sensitivity. The Bureau also believes that this information already may be available to the general public, as discussed in the paragraph below, and that this information would have relatively limited utility for adversaries if an applicant or related natural person were re-identified.

However, in many cases, an adversary could use women-owned or minority-owned business status, in combination with other 1071 data, to match a section 1071 record to an identified publicly available record. The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the minority- or women-owned status data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Women-owned business status

and minority-owned business status is likely to be publicly available for many businesses. Many businesses also publicly register or certify with the SBA or State or local authorities as a women-owned or minority-owned business to access government programs. For example, businesses are identified as woman or minority-owned in the public loan-level SBA 7(a) and PPP data, and demographic status indicators are available in loan-level 8(a) records. Additionally, businesses' websites may have information about their owners that could be used to derive women-owned and minority-owned business status information. Private commercial databases also often contain this information, either imported from public records or estimated using software based on owner names (or both).

The Bureau invites comment on this analysis.

### xvii. Ethnicity, Race, and Sex of Principal Owners and Number of Principal Owners

Proposed § 1002.107(a)(20) would require financial institutions to collect and report to the Bureau the ethnicity, race, and sex of the applicant's principal owner(s);[851] whether ethnicity and race are being collected by the financial institution on the basis of visual observation or surname;[852] and whether ethnicity, race, or sex are being reported based on previously collected data pursuant to proposed § 1002.107(c)(2). Unless a financial institution is permitted to report ethnicity, race, and sex information based on previously collected data pursuant to proposed § 1002.107(c)(2), a financial institution must ask an applicant about its principal owners' ethnicity, race, and sex for each application. A financial institution must permit an applicant to

---

[850] The collection and reporting of women-owned and minority-owned business status is proposed to be based on applicants' self-reporting and would rely on the meanings of "ownership" and "control" defined in the CDD rule.

[851] Financial institutions would report ethnicity and race using the aggregate categories and disaggregated subcategories listed in proposed comments 107(a)(20)–5 and –6, respectively. Financial institutions would report sex as described in proposed comment 107(a)(20)–7, which prescribes that financial institutions shall report sex using the following categories: "Male," "Female," "I prefer to self-describe" (with accompanying free-form text), and "I do not wish to provide this information." The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

[852] Unless a financial institution is permitted to report ethnicity, race, and sex information based on previously provided data pursuant to proposed § 1002.107(c)(2), a financial institution would be required to ask an applicant to report its principal owners' ethnicity, race, and sex for each application. In certain situations, discussed in proposed comments 107(a)(20)–7 and –8 and in proposed appendix G, a financial institution may also be required to report the ethnicity and race of one or more principal owner(s) based on visual observation and/or surname.

AdminRecord-000603

refuse to answer the financial institution's inquiry and report its refusal to answer the inquiry, or its failure to respond to the inquiry.

Disclosing the ethnicity, race, and sex of an applicant's principal owner(s) in the public application-level 1071 data in unmodified form would be central to furthering the fair lending purpose of section 1071 and would promote the business and community development purpose of the statute by identifying opportunities for further development of women-owned and minority-owned small businesses. In fair lending analyses, data on the ethnicity, race, and sex of an applicant's principal owner(s) would be used to identify potential risk of discrimination under fair lending laws. These data would be essential for this purpose when analyzed in conjunction with data fields such as action taken, credit amount approved or originated, and pricing. For example, when combined with the type of action taken, ethnicity, race, and sex data of an applicant's principal owner(s) would help data users identify whether women-owned and minority-owned applicants are denied at higher rates on a prohibited basis. In addition, as discussed above with women-owned and minority-owned business status, when combined with pricing information, data on ethnicity, race, and sex of an applicant's principal owner(s) would help data users identify if women-owned and minority-owned businesses are receiving credit at higher prices. In addition, because the Bureau is proposing to require that financial institutions report ethnicity and race using the aggregate categories and disaggregated subcategories listed in proposed comments 107(a)(20)–5 and –6, respectively, such data would enable data users to identify potential discrimination or challenges accessing credit by particular ethnic and racial minorities.

Data on ethnicity, race, and sex of the applicant's principal owner(s) would also be essential for the business and community development purpose of section 1071. These data would allow communities, governmental entities, and creditors to determine areas where women-owned and minority-owned small businesses are underserved relative to other small businesses. In addition, such demographic information about small business applicants would allow communities, governmental entities, and creditors to focus resources to identify business and community development opportunities for women-owned and minority-owned small businesses. For example, in conjunction with NAICS codes, these data would

help data users identify challenges facing women-owned businesses and businesses owned by individuals from different ethnic and racial groups in particular industries. This information could also help communities and lenders focus investment and resources in traditionally underserved demographic groups.

In general, disclosing the ethnicity, race, and sex of the applicant's principal owner(s) in the 1071 data in unmodified form would likely disclose minimal, if any information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified, or that may be harmful or sensitive to an identified financial institution. As noted similarly above for the data fields on women-owned and minority-owned business status, while some applicants or related natural persons may regard this information as harmful or sensitive, the Bureau believes this information generally would present low risk of harm or sensitivity. The Bureau also notes that this information may be already available to the general public, and that this information would have relatively limited utility for adversaries if an applicant or related natural person were re-identified.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match to the ethnicity, race, and sex of the applicant's principal owner(s) data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Information about the ethnicity, race, and sex of the applicant's principal owner(s) is available to the general public in some datasets.[853] For example, certain State business registries, including those required to access women-owned and minority-owned business programs, provide this information. Other public record databases such as for SBA 8(a) and PPP loan programs also include ethnicity, race, and sex data alongside the borrower's name. Private databases often include information about the owners of businesses, which can be used to estimate ethnicity, race, and sex based on owner name. Therefore, in many cases, an adversary could use the

ethnicity, race, and sex of the applicant's principal owner(s), combined with other fields, to directly or indirectly match a section 1071 record to an identified publicly available record.

As discussed in the section-by-section analysis of proposed § 1002.107(a)(20) in part V above, the Bureau is proposing that financial institutions would report sex as described in proposed comment 107(a)(20)–7, which prescribes that financial institutions shall report sex using the following categories: "Male," "Female," "I prefer to self-describe" (with accompanying free-form text), and "I do not wish to provide this information." As such, if finalized, the Bureau would permit an applicant to self-describe their sex by selecting "I prefer to self-describe" with using free-from text. As discussed in part VI.C.6.xix below, the Bureau is proposing to delete free-form text from the public application-level 1071 data. However, the Bureau seeks comment on whether there are additional specific modifications it should consider with regard to applicants who choose to self-describe their sex.

As discussed in the section-by-section analysis of proposed § 1002.107(a)(20) in part V above, the Bureau is seeking comment in this proposal about the reporting of sexual orientation and gender identity of principal owners—specifically, whether separate questions regarding sex, sexual orientation, and gender identity should be asked and, if so, what categories should be offered on the sample data collection form for use by applicants in responding to each question. The Bureau seeks comment on whether disclosing that one or more principal owners of an applicant has answered any of these questions, and how, could cause heightened sensitivity or risk of harm and whether there are specific modifications the Bureau should consider if such data points are included in the final rule.

The Bureau seeks comment on this analysis.

xviii. Financial Institution Identifying Information

Proposed § 1002.109(b) would require a financial institution to provide the Bureau with certain information with its submission of its small business lending application register: (1) Its name; (2) its headquarters address; (3) the name and business contact information of a person who may be contacted with questions about the financial institution's submission; (4) its Federal prudential regulator, if applicable; (5) its Federal Taxpayer Identification Number; (6) its LEI; (7) its RSSD ID, if applicable; (8)

---

[853] Regulation B generally prohibits a creditor from inquiring about such protected demographic information in connection with a credit transaction unless otherwise required by Regulation B, ECOA, or other State or Federal law, regulation, order, or agreement. *See* § 1002.5(a)(2). Relatedly, ECOA states that it is not discrimination for a financial institution to inquire about women-owned or minority-owned business status, or the race, sex, and ethnicity of principal owners pursuant to section 1071. 15 U.S.C. 1691(b).

parent entity information,[854] if applicable; (9) the type of financial institution that it is, indicated by selecting the appropriate type or types of institution from the list provided or entering free-form text;[855] and (10) whether the financial institution is voluntarily reporting covered applications for covered credit transactions.

Regulation C requires financial institutions to report similar information when submitting their loan-level HMDA data. Regulation C also requires financial institutions to report the calendar year of submission and the total number of entries in their loan-level HMDA data. Regulation C does not require financial institutions to submit their headquarters address, RSSD ID, or financial institution type or indicate whether they are reporting data voluntarily. With the exception of contact information for a person who can be reached about the financial institution's submission, the information financial institutions are required to submit with their HMDA submissions under § 1003.5(a)(3) is publicly available through the FFIEC website.

*Financial institution identifying information other than individual contact information.* For the reasons described below, the Bureau preliminarily determines that the privacy risks of disclosing the financial institution identifying information data fields in unmodified form, other than data fields containing the information for the financial institution's point of contact for its 1071 data submission (*i.e.*, the name and business contact information of a person who may be contacted with questions about the submission), would be justified by the benefits of disclosure for section 1071's purposes. As such, the Bureau proposes to disclose such information to the public as reported, without modification. The Bureau seeks comment on this determination.

Disclosing the financial institution identifying information, other than individual contact information, in the public application-level 1071 data in unmodified form would facilitate the enforcement of fair lending laws. The purposes of section 1071 in large part concern evaluating the practices of individual financial institutions and disclosing their identifying information allows the public to evaluate their lending practices. Identifying their Federal regulator would also facilitate fair lending enforcement by enabling the public to communicate with the regulator in connection with administrative enforcement of fair lending laws. Disclosing RSSD ID and parent institution information would enable the public to map corporate relationships for financial institutions, which is also important for fair lending enforcement.

Disclosing financial institution identifying information, including financial institution type, would enable the public to evaluate which financial institutions are reaching underserved areas of the market and the extent to which different types of financing is available from different types of institutions. And as described more fully in the section-by-section analysis of proposed § 1002.109(b) above, financial institution identifying information would promote the fair lending and community and business development purposes of the statute by allowing users to identify financial institutions precisely and draw appropriate conclusions from the data.

Several SERs and industry commenters expressed concern that disclosing financial institution identifying information would lead to frivolous litigation and unfounded reputational risks, and would increase the cost of credit or limit credit availability for small businesses.[856]

Disclosing financial institution identifying information in the 1071 data in unmodified form would likely disclose minimal, if any, information about an applicant or related natural person that may be harmful or sensitive if such person were re-identified. While some businesses might view their identification as an applicant as harmful or sensitive, the Bureau does not believe revealing the name of the financial institution would significantly increase such risks. In addition, this information is already largely available from other

identified public records, such as UCC filings. For the same reason, the Bureau does not believe revealing the name of the financial institution would significantly increase risk of fraud or identity theft to businesses or related natural persons caused by adversaries impersonating the financial institution.

Disclosing financial institution identifying information in the 1071 data in unmodified form would not, by itself, reveal information that is harmful or sensitive, given financial institutions' commercial interests. Additionally, other public records, such as public HMDA data, tax records, and commercial databases disclose Federal Taxpayer Identification number, RSSD ID, and LEI.[857] Disclosing financial institution identifying information in unmodified form may reveal information that financial institutions regard as harmful or sensitive, but, as discussed under *Risk of Harm or Sensitivity* in part VI.C.4.ii above, the Bureau does not believe that disclosure of the information in the public application-level 1071 data would permit the reverse-engineering of a financial institution's proprietary lending models. The Bureau acknowledges, however, that this information could, in some circumstances, lead to reputational risks and increased costs for financial institutions, which might be passed on to their customers in the form of increased costs or decreased access to credit.

Several SERs were concerned that publishing financial institution identifying information could increase re-identification risk of applicants and related natural persons.[858] One industry stakeholder provided feedback that customers of captive wholesale finance companies with applicant bases limited to franchises or licensees of a particular distributor or manufacturer would face unique re-identification risks. The commenter explained that, in many instances, these applicants may be the financial institution's only customer in a particular State, or one of only a very small number of customers in the State, heightening the privacy concerns for publication of data tied to these financial institutions.

The Bureau has identified publicly available datasets that include data fields an adversary could directly match

---

[854] Parent entity information would include the name of the immediate parent entity, the LEI of the immediate parent entity, if available, the RSSD ID number of the immediate parent entity, if available, the name of the top-holding parent entity, the LEI of the top-holding parent entity, if available, and the RSSD ID number of the top-holding parent entity, if available.

[855] The list would include the following types: Bank or savings association, minority depository institution, credit union, nondepository institution, community development financial institution (CDFI), other nonprofit financial institution, Farm Credit System institution, government lender, commercial finance company, equipment finance company, industrial loan company, fintech, and "other" (reported as free-form text). The Bureau analyzes free-form text under the proposed balancing test in part VI.C.6.xix below.

[856] One industry commenter stated that financial institutions might respond to perceived reputational risks by eliminating certain product offerings or modifying underwriting practices in a way that reduces the overall diversity of small business products.

[857] The FFIEC publishes transmittal sheet information, including LEI and Federal Taxpayer Identification number, on its website. Fed. Fin. Insts. Examination Council, *Public Transmittal Sheet—Schema, https://ffiec.cfpb.gov/documentation/2020/public-ts-schema/* (last visited July 23, 2021).

[858] *See* SBREFA Panel Report at 34.

AdminRecord-000605

to financial institution identifying information data fields in unmodified form in the public application-level 1071 data with respect to an applicant or related natural person. Other identified public records, such as UCC filings, disclose financial institution name. Therefore, in many cases, an adversary could use identifying financial institution data fields, combined with other 1071 data fields, to match a section 1071 record to an identified public record. Because the Bureau does not intend to perform a re-identification analysis of the 1071 data fields until 1071 data are reported, it has not determined the extent to which financial institution identifying information or other data fields could contribute to record uniqueness.[859]

With respect to concerns raised regarding captive wholesale finance companies, the Bureau acknowledges that financial institution identifying information in unmodified form in the public application-level 1071 data could, in combination with other data fields like census tract, NAICS codes, and credit type or purpose, facilitate re-identification of applicants that have a common name, without requiring that adversaries match 1071 records to other identified datasets. As discussed in the section-by-section analysis of proposed § 1002.104(b) above, the Bureau proposes to exclude trade credit and other transactions from the scope of covered credit transactions. This might eliminate some transactions involving such lenders. The Bureau seeks comment on the circumstances under which a transaction involving a captive wholesale finance company would be covered by the proposal notwithstanding the exemption.

To the extent there are such transactions, the Bureau seeks comment on the instances in which captive wholesale finance companies lend *exclusively* to businesses that are publicly branded in a way that can be easily matched to the identity of the financial institution. As discussed in the section-by-section analysis of proposed § 1002.109(b) above, the Bureau also seeks comment on whether a final rule could include certain categories of financial institution types that would allow the Bureau to easily identify such financial institutions in the unmodified 1071 dataset without an application-level analysis. Finally, the Bureau seeks

comment on whether there are particular modification techniques that would reduce re-identification risks and risks of harm or sensitivity for applicants and related natural persons who might be re-identified in the public application-level 1071 data.

The Bureau has considered whether a modification of the 1071 data available to the public short of deleting financial institution identifying information (other than individual contact information) would appropriately balance identified privacy risks and disclosure benefits of this data field. Several SERs stated that a solution to their concerns about financial institution privacy would be for the Bureau not to release the names of financial institutions when publishing 1071 data.[860]

The Bureau proposes to disclose financial institution identifying information, other than individual contact information, to the public as reported, without modification. The Bureau preliminarily determines that risks to privacy interests from the disclosure of this data field in unmodified form would be justified by the benefits of disclosure for section 1071's purposes. As described above, while the Bureau has not conducted a uniqueness analysis, it is very likely that disclosure of financial institution identifying information would substantially facilitate the re-identification of applicants or related natural persons. If such persons were re-identified, disclosure of other 1071 data fields would likely create a risk of harm or sensitivity. In addition, the disclosure of other proposed 1071 data fields in combination with identifying financial institution name likely would reveal information that may be harmful or sensitive to financial institutions. The Bureau nonetheless determines that these risks to privacy would be justified by the benefits of disclosure in light of section 1071's purposes.

The Bureau also seeks comment on this analysis and its proposal to disclose these fields without modification in the public application-level 1071 data.

*Individual contact information.* Proposed § 1002.109(b)(1)(iii) would require financial institutions to report the name and business contact information of a person who may be contacted with questions about the financial institution's submission. In contrast to the other financial institution identifying information described above, the Bureau preliminarily determines that the privacy risks of disclosure in unmodified form of this

data field would not be justified by the benefits of disclosure for section 1071's purposes. As such, the Bureau proposes to delete such information from the publicly available data. The Bureau seeks comment on this determination.

Disclosing individual contact information in the public application-level 1071 data in unmodified form would enable the public to contact natural persons at financial institutions about the technical aspects of a financial institution's submission of application-level data. However, the Bureau does not believe this would promote the fair lending or community or business development purposes of section 1071 because the Bureau, not the general public, will coordinate with this person to ensure proper submission of data. Moreover, the person designated by the financial institution to respond to questions about the submission might not necessarily be designated for engaging with the general public.

Disclosing individual contact information in the 1071 data in unmodified form would likely not disclose any information about an applicant or related natural person if such person were re-identified. However, disclosing the name and contact information of natural persons designated by the financial institution would disclose information that may be harmful or sensitive to identified financial institutions and its employees. Financial institutions have a legitimate interest in protecting the identities of their employees from the public, consistent with their job functions, and persons identified for purposes of questions about the financial institution's submission to the Bureau might not necessarily be responsible for engaging with the general public.

The Bureau has considered whether a modification of the 1071 data available to the public other than exclusion of individual contact information would appropriately balance identified privacy risks and disclosure benefits of this data field. Because disclosure of this data field in unmodified form would not promote the purposes of section 1071 and would likely reveal information that would be harmful or sensitive to a financial institution and its employees, the Bureau does not believe there is a modification that would appropriately balance the privacy risks and disclosure benefits for this data field. Accordingly, the Bureau preliminarily determines that deleting individual contact information would appropriately balance the privacy risks and disclosure benefits of this data field.

---

[859] As discussed under *Balancing Test Design* in part VI.C.1 above, while the proposed balancing test would consider the risk of harm or sensitivity to financial institutions, it would not consider re-identification risk with respect to financial institutions because the statute contemplates the disclosure of their identity.

[860] *See* SBREFA Panel Report at 36.

The Bureau seeks comment on this analysis as well as its proposed deletion.

### xix. Free-Form Text

Proposed § 1002.107(a) would require financial institutions to use free-form text to report certain data fields where a financial institution reports information that is not included in a list of data fields provided. Under proposed § 1002.107(a)(5), (6), (11), (12), and (20), free-form text could be used to report credit type (product and guarantee information); credit purpose; denial reasons; pricing (the interest rate index used); and ethnicity, race, and sex.[861] Financial institutions also would have flexibility in describing identifying information that would be provided under proposed § 1002.109(b). Free-form text used to report ethnicity, race, and sex would be completed based on information provided by applicants; all other free-form text would be completed based on information provided by the financial institution.

Free-form text would allow the reporting of any information, including information that may be harmful or sensitive to applicants, related natural persons, and possibly the interests of financial institutions. Such information might also create a significant risk of re-identification for applicants or related natural persons. Given the expected amount of 1071 data reported each year, it will not be feasible for the Bureau to review the free-form text submitted before publishing the application-level 1071 data. The Bureau believes at this time that, under the balancing test, deleting free-form text from the public application-level 1071 data, other than with respect to the financial institution identifying information described in part VI.C.6.xviii above, would appropriately balance the benefits of disclosure with the risks to the privacy interests of applicants, related natural persons, and financial institutions.

The Bureau seeks comment on this analysis as well as its proposed deletion.

## VII. Dodd-Frank Act Section 1022(b)(2) Analysis

The Bureau is considering the potential benefits, costs, and impacts of the proposed rule. The Bureau requests comment on the preliminary discussion presented below, as well as submissions of additional data that could inform the

Bureau's consideration of the benefits, costs, and impacts of the proposed rule. In developing the proposed rule, the Bureau has consulted with or offered to consult with the prudential regulators (the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of the Comptroller of the Currency), the Department of Agriculture, the Department of Housing and Urban Development, the Department of Justice, the Department of the Treasury, the Economic Development Administration, the Farm Credit Administration, the Federal Trade Commission, the Financial Crimes Enforcement Network, the Minority Business Development Agency, and the Small Business Administration regarding, among other things, consistency with any prudential, market, or systemic objectives administered by such agencies.

In the Dodd-Frank Act, which was enacted "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system," Congress directed the Bureau to adopt regulations governing the collection of small business lending data. Under section 1071, covered financial institutions must compile, maintain, and submit certain specified data points regarding applications for credit for women-owned, minority-owned, and small businesses, along with "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." Under the proposed rule, covered financial institutions would be required to collect and report the following data points: (1) A unique identifier, (2) application date, (3) application method, (4) application recipient, (5) credit type, (6) credit purpose, (7) amount applied for, (8) amount approved or originated, (9) action taken, (10) action taken date, (11) denial reasons, (12) pricing information, (13) census tract, (14) gross annual revenue, (15) NAICS code, (16) number of workers, (17) time in business, (18) minority-owned business status, (19) women-owned business status, (20) ethnicity, race, and sex of principal owners, and (21) the number of principal owners.

Under the proposed rule, financial institutions would be required to report data on small business credit applications under section 1071 if they originated at least 25 covered credit transactions in each of the two preceding calendar years. The Bureau is proposing to define an application as an oral or written request for a covered

credit transaction that is made in accordance with the procedures used by a financial institution for the type of credit requested, with some exceptions. The Bureau is proposing to define the term covered credit transaction as an extension of business credit that is not an excluded transaction. Loans, lines of credit, credit cards, and merchant cash advances (including such credit transactions for agricultural purposes and those that are also covered by HMDA [862] (that is, HMDA-reportable transactions)) would all fall within the transactional scope of this proposed rule. The Bureau is broadly proposing to not cover the following types of transactions: Factoring, leases, consumer-designated credit used for business purposes, credit secured by certain investment properties, trade credit, public utilities credit, securities credit, and incidental credit. Additionally, the Bureau is proposing that a business is a small business if and only if its gross annual revenue for its preceding fiscal year is $5 million or less.

### A. Statement of Need

Congress directed the Bureau to adopt regulations governing the collection of small business lending data. Specifically, section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses. Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau is issuing this proposed rule to implement the section 1071 mandate.

Small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities.[863] However, comprehensive data on loans to small businesses currently are limited. The largest sources of information on lending by depository institutions are the FFIEC and NCUA Call Reports and reporting under the CRA. Under the FFIEC Call Report and CRA reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks'

---

[861] For example, the proposal would require financial institutions to report credit purpose by choosing one or more purposes from a specified list. Financial institutions selecting "other" would be required to report that other purpose as free-form text.

[862] 12 U.S.C. 2801 *et seq.*

[863] *See generally* White Paper.

and savings associations' total outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000) by institution.[864] The CRA requires banks and savings associations with assets over a specified threshold (currently $1.305 billion) to report data on loans to businesses with origination amounts of $1 million or less; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[865] Under the CRA, banks and savings associations report aggregate numbers and values of originations at an institution level and at various geographic levels. The NCUA Call Report captures credit unions' total originations, but not applications, on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[866] Some federally funded loan programs, such as the SBA's 7(a) or 504 programs and the CDFI Fund require reporting of loan-level data, but only for loans that received support under those programs. Nondepository institutions do not report small business lending applications under any of these reporting regimes. There are no similar sources of information about lending to small businesses by nondepository institutions.

There are also a variety of non-governmental data sources, issued by both private and nonprofit entities, that cover small businesses and/or the small business financing market. These include datasets and surveys published by commercial data and analytics firms, credit reporting agencies, trade associations, community groups, and academic institutions. See part II.B for additional information on these sources. While these non-public sources of data on small businesses may provide a useful supplement to existing Federal sources of small business lending data, these private and nonprofit sources often do not have lending information,

may rely on unverified research based on public internet sources, and/or narrowly limit use cases for parties accessing data. Further, commercial datasets are generally not free to public users and can be costly, raising equity issues for stakeholders who cannot afford access.

Under the proposed rule, covered financial institutions would be required to compile, maintain, and submit data regarding the race, sex, and ethnicity of the principal owners of the business and whether a small business is women-owned or minority-owned. No other source of data comprehensively collects this type of demographic information on small business loan applications.

Section 1071 requires financial institutions to report detailed application-level data to the Bureau, and to make it available to the public upon request. Such information will constitute a public good that illuminates the lending activities of financial institutions and the small business lending market in general. In particular, the public provision of application-level data will: (1) Provide small businesses and financial institutions with additional information to improve credit market outcomes and (2) allow members of the public, public officials, and other stakeholders to better assess compliance with antidiscrimination statutes.

First, the data made public pursuant to the proposed rule will provide information that could help to improve credit outcomes in the small business lending market. As discussed above, market-wide data on small business credit transactions is currently limited. Neither the public nor private sectors provide extensive data on credit products or terms. Small business owners have access to very little information on typical rates or products offered by different lenders. As a result, small business owners are limited in their ability to shop for the credit product that best suits their needs at the best price. The information made public pursuant to the proposed rule will provide extensive data on product types and credit terms that community development groups or commercial services could use to provide better information to small businesses. For example, a commercial provider could provide small businesses with information on what products lenders typically offer and at what rates. These data will allow small business owners to more easily compare credit terms and evaluate credit alternatives. By engaging in more informed shopping, small business owners may achieve better credit outcomes.

Furthermore, financial institutions can analyze data to understand small business lending market conditions and determine how best to provide credit to borrowers. However, financial institutions are not able to conduct very granular or comprehensive analyses because the data on small business lending are limited. The data made public pursuant to the proposed rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions. The data will help enable institutions to identify potentially profitable opportunities to extend credit. Small business owners, as a result, could benefit from increased credit availability.

Second, while data made public pursuant to the proposed rule may not constitute conclusive evidence of credit discrimination on its own, the data will enable members of the public, regulators, and other stakeholders to better assess compliance with antidiscrimination statutes. Application-level data that include information on business owners' race, sex, and ethnicity, as well as whether the business is women- or minority-owned, are necessary for the public to evaluate a lender's practices for potential risks of violating antidiscrimination statutes. However, as described above, there are currently no application-level data comprehensive enough or that contain the required demographic information to enable the public to conduct these kinds of analyses. The data made public pursuant to the proposed rule will be comprehensive and contain the necessary data fields for such analysis. Users will be able to examine whether, for example, a lender denies applications from women- or minority-owned businesses at higher rates than those that are not or whether these businesses are charged higher prices. This kind of transparency can place appropriate pressure on lenders to ensure that there is equity in their credit provision. Additionally, data collected under the proposed rule will contain the data fields that allow users to conduct more accurate fair lending analyses by comparing applications for credit products with similar characteristics.

*B. Baseline for the Consideration of Costs and Benefits*

The Bureau has discretion in any rulemaking to choose an appropriate scope of consideration with respect to potential benefits and costs and an appropriate baseline. The Bureau

[864] See FFIEC Call Report at Schedule RC–C Part II.

[865] See 2015 FFIEC CRA Guide at 11, 13. Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report (TFR) as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as loans whose origination amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland."

[866] See Nat'l Credit Union Admin., Call Report Form 5300 (June 2020), https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.

AdminRecord-000608

interpreted section 1071 to mean that obligations for financial institutions to collect, maintain, and submit data "do not arise until the Bureau issues implementing regulations and those regulations take effect." [867] Accordingly, this analysis considers the benefits, costs, and impacts of the major provisions of the proposed rule against a pre-section 1071 rule baseline, *i.e.,* the current state of the world before the Bureau's section 1071 rule is implemented. Under this baseline, the Bureau assumes that institutions are complying with regulations that they are currently subject to, including reporting data under HMDA and CRA. The Bureau believes that such a baseline will also provide the public with better information about the benefits and costs of this rule.

*C. Basic Approach of the Bureau's Consideration of Benefits and Costs and Data Limitations*

Pursuant to section 1022(b)(2)(A) of the Dodd-Frank Act,[868] in prescribing a rule under the Federal consumer financial laws (which include ECOA and title X of the Dodd-Frank Act), the Bureau is required to consider the potential benefits and costs to "consumers" and "covered persons," including the potential reduction of access by consumers to consumer financial products or services resulting from such rule, and the impact of proposed rules on covered persons as described under section 1026 of the Dodd-Frank Act [869] (*i.e.,* depository institutions and credit unions with $10 billion or less in total assets), and the impact on consumers in rural areas.

As mentioned above, section 1022(b)(2)(A) refers to "consumers" and "covered persons"; the Dodd-Frank Act defines the term "consumer" as an individual or someone acting on behalf of an individual, while a "covered person" is one who engages in offering or providing a "consumer financial product or service," which means a financial product or service that is provided to consumers primarily for "personal, family, or household purposes." [870] In the 1071 rulemaking, however, the only parties directly affected by the rule are small businesses (rather than individual consumers) and the financial institutions from whom

[867] *See* Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), *https://files.consumerfinance.gov/f/2011/04/GC-letter-re-1071.pdf.*
[868] 12 U.S.C. 5512(b)(2)(A).
[869] 12 U.S.C. 5516.
[870] 12 U.S.C. 5481(4) through (6).

they seek credit (rather than covered persons). Accordingly, a section 1022(b)(2)(A) analysis that considers only the costs and benefits to individual consumers and to covered persons would not meaningfully capture the costs and benefits of the rule.

Below, the Bureau conducts the statutorily required analysis with respect to the rule's effects on consumers and covered persons. Additionally, the Bureau is electing to conduct this same analysis with respect to small businesses and the financial institutions required to compile, maintain, and submit data fields under the proposed rule. This discussion relies on data that the Bureau has obtained from industry, other regulatory agencies, and publicly available sources. However, as discussed further below, the data limit the Bureau's ability to quantify the potential costs, benefits, and impacts of the proposed rule.

1. Analysis With Respect to Consumers and Covered Persons

The proposed rule implements a data collection regime in which certain covered financial institutions must compile, maintain, and submit data with respect to applicants for credit for small businesses. The rule does not directly impact consumers or consumers in rural areas, as those terms are defined by the Dodd-Frank Act. Some covered persons, including some that are depository institutions or credit unions with $10 billion or less in total assets, will be directly affected by the rule not in their capacity as covered persons (*i.e.,* as offerors or providers of consumer financial products or services) but in their separate capacity as covered financial institutions that offer commercial credit. The costs, benefits, and impact of the rule on those entities are discussed below.

2. Costs to Covered Financial Institutions

Regarding the costs to covered financial institutions, the proposed rule generally establishes which financial institutions, transactions, and data points must be covered under section 1071. In order to precisely quantify the costs to covered financial institutions, the Bureau would need representative data on the operational costs that financial institutions would incur to gather and report 1071 data, one-time costs for financial institutions to update or create reporting infrastructure in response to the proposed rule, and information on the level of complexity of financial institutions' business models and compliance systems. Currently, the Bureau does not believe

that data on section 1071 reporting costs with this level of granularity are systematically available from any source. The Bureau has made reasonable efforts to gather data on section 1071 reporting costs. Through outreach efforts with industry, community groups, and other regulatory agencies, the Bureau has obtained some information about potential ongoing operational and one-time compliance costs, and the discussion below uses this information to quantify certain costs of the proposed rule. The Bureau believes that the discussion constitutes the most comprehensive assessment to date of the potential costs of section 1071 reporting by financial institutions. However, the Bureau recognizes that these estimations may not fully quantify the costs to covered financial institutions, especially given the wide variation of section 1071 reporting costs among financial institutions. The Bureau continues to seek data from available sources in order to better quantify the costs to covered financial institutions.

The Bureau categorizes costs required to comply with the proposed rule into "one-time" and "ongoing" costs. "One-time" costs refer to expenses that the financial institution would incur initially and only once to implement changes required in order to comply with the requirements of the new rule. "Ongoing" costs are expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis. In considering the costs and impacts of the proposed rule, the Bureau has engaged in a series of efforts to estimate the cost of compliance by covered entities. The Bureau conducted a One-Time Cost Survey, discussed in more detail in part VII.E.1 below, to learn about the one-time implementation costs associated with implementing section 1071 and adapted ongoing cost calculations from previous rulemaking efforts. The Bureau evaluated the potential one-time costs of implementing the procedures necessary and the potential ongoing costs of annually reporting under the proposed rule in part VII.F.3 below. The discussion below provides details on the Bureau's approach in performing these institution-level analyses. The Bureau realizes that costs vary by institution due to many factors, such as size, operational structure, and product complexity, and that this variance exists on a continuum that is impossible to fully represent. In order to conduct a cost consideration that is both practical and meaningful, the Bureau has chosen an approach that focuses on three

AdminRecord-000609

representative types of financial institutions. For each type, the Bureau has produced reasonable estimates of the costs of compliance given the limitations of the available data. Part VII.F.3 below provides additional details on this approach. More elaboration is available in the SBREFA Outline and the SBREFA Panel Report.

3. Costs to Small Businesses

The Bureau has estimated the costs to small businesses in addition to those for covered financial institutions. The Bureau expects the direct costs of the proposed rule to small businesses will be negligible, especially compared to the overall cost of credit. Therefore, the Bureau focuses its analysis on whether and how the Bureau expects financial institutions to pass on the costs of compliance with the proposed rule to small businesses and any possible effects on the availability of small business credit. According to economic theory, in a competitive framework where financial institutions are profit maximizers, the affected financial institutions would pass on to small business applicants the marginal (*i.e.*, variable) cost per application or origination, and either absorb the one-time and increased fixed costs of complying with the rule or exit the market if the one-time and fixed costs are sufficiently high. As discussed below, the Bureau estimates that these costs would be relatively low. Further, the Bureau received feedback through the One-Time Cost Survey process on how creditors might react to increased compliance costs due to the proposed rule. The results generally suggest that covered financial institutions will generally pass the increased cost of compliance on to small businesses and would not exit the market. The Bureau received similar feedback during the SBREFA process.

4. Benefits to Small Businesses and Covered Financial Institutions

Quantifying benefits to small businesses presents substantial challenges. As discussed above, Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau is unable to readily quantify any of these benefits with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the

implementation of section 1071 will be in achieving those benefits. The Bureau believes that its proposals appropriately implement the statutory mandate of section 1071 to effectuate the section's stated purposes. As discussed further below, as a data reporting rule, most provisions of the proposal would benefit small businesses in indirect ways. Nevertheless, the Bureau believes that the impact of enhanced transparency would substantially benefit small businesses. For example, the proposed rule would facilitate the detection (and thus remediation) of discrimination; promote public and private investment in certain under-served markets; and promote competitive markets. Quantifying and monetizing these benefits would require identifying all possible uses of section 1071 data, establishing causal links to the resulting public benefits, and then quantifying the magnitude of these benefits. The Bureau seeks comment on whether there are additional data sources available regarding the benefits to small businesses of the proposed rule. The Bureau is particularly interested in the quantifiable impact of increased transparency on financial institution behavior, and the need for public and private investment. The Bureau is unaware of data that would enable reliable quantitative estimates of all of these effects.

Similar issues arise in attempting to quantify the benefits to covered financial institutions. Certain benefits to covered financial institutions are difficult to quantify. For example, the Bureau believes that the section 1071 data will reduce the compliance burden of fair lending reviews for lower risk financial institutions by reducing the "false positive" rates during fair lending prioritization by regulators. The Bureau also believes that data made public pursuant to the proposed rule will allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions. The Bureau believes that such benefits to financial institutions could be substantial. Nevertheless, quantifying them would require data that are currently unavailable.

In light of these data limitations, the discussion below generally provides a qualitative consideration of the benefits and impacts of the proposed rule. General economic principles, together with the limited data available, provide insight into these benefits and impacts. Where possible, the Bureau makes quantitative estimates based on these principles and the data that are

available. The Bureau seeks comment on the appropriateness of the approach described above, including additional data relevant to the benefits to small businesses and covered financial institutions.

*D. Coverage of the Proposed Rule*

The proposed rule provides that financial institutions (both depository and nondepository) that meet all the other criteria for a "financial institution" in proposed § 1002.105(a) would only be required to collect and report section 1071 data if they originated at least 25 covered credit transactions in each of the two preceding calendar years. See proposed § 1002.105(b).

As discussed above, market-wide data on small business lending are currently limited. The Bureau is unaware of any comprehensive data available on originations for all financial institutions, which would be needed in order to precisely identify all institutions covered by the rule. To estimate coverage of the proposed rule, the Bureau uses publicly available data for two groups of financial institutions: Depository and nondepository institutions.

To estimate coverage of depository institutions, the Bureau relies on NCUA Call Reports to estimate coverage for credit unions, including for those that are not federally insured, and FFIEC Call Reports and the CRA data to estimate coverage for banks and savings associations. For the purposes of the analysis in this part VII, the Bureau estimates the number of depository institutions that would have been required to report in 2019, based on the estimated number of originations of covered products for each institution in 2017 and 2018.[871] The Bureau accounts for mergers and acquisitions between 2017 and 2019 by assuming that any depository institutions that merged in those years report as one institution.

As discussed above, the NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size and including number and dollar value of originations. For the purposes of estimating the impacts of the proposed rule, the Bureau uses the annual number of originated commercial loans to members reported by credit unions as a proxy for the annual number of originated covered credit transactions under the

---

[871] The Bureau uses 2019 instead of 2020 to estimate coverage during a year unaffected by pandemic conditions.

**56544**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

proposed rule.[872] These are the best data available for estimating the number of credit unions that may be covered by the proposed rule. However, the Bureau acknowledges that the true number of covered credit unions may be different than what is presented here. For example, this proxy may overestimate the number of credit unions that would be covered if some commercial loans to members are not covered because the member is taking out a loan for a large business. Alternatively, this proxy may underestimate the number of credit unions that would be covered by the proposed rule if credit unions originate a substantial number of covered credit transactions with origination values under $50,000.

As discussed above, the FFIEC Call Report captures banks' and savings associations' outstanding number and amount of small loans to businesses (i.e., loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000). The CRA requires banks and savings associations with assets over a specified threshold ($1.322 billion as of 2021)[873] to report loans to businesses in original amounts of $1 million or less. For the purposes of estimating the impacts of the proposed rule, the Bureau follows the convention of using small loans to business as a proxy for loans to small businesses and small loans to farms as a proxy for loans to small farms.[874] These are the best data available for estimating the number of banks and savings associations that may

be covered by the proposed rule. However, the Bureau acknowledges that the true number of covered banks and savings associations may be different than what is presented here. For example, this proxy would overestimate the number of banks and savings associations covered by the rule if a significant number of small loans to businesses and farms are to businesses or farms that are considered large under the definition of a small business in the proposed rule. Alternatively, this proxy would underestimate the number of banks and savings associations covered by the rule if a significant number of businesses and farms that are small under the proposed rule take out loans that are larger than $1 million or $500,000, for businesses and farms, respectively.

Although banks and savings associations reporting under the CRA are required to report the number of originations of small loans to businesses and farms, the Bureau is not aware of any comprehensive dataset that contains originations made by banks and savings associations below the CRA reporting threshold. To fill this gap, the Bureau simulated plausible values for the annual number and dollar value of originations for each bank and savings association that falls below the CRA reporting threshold for 2017, 2018, and 2019.[875] The Bureau generated simulated originations in order to account for the uncertainty around the exact number and value of originations for these banks and saving associations. To simulate these values, the Bureau assumes that these banks have the same relationship between outstanding and originated small loans to businesses and farms as banks and savings associations above the CRA reporting threshold. First, the Bureau estimated the relationship between originated and outstanding numbers and balances of small loans to businesses and farms for CRA reporters. Then the Bureau used this estimate, together with the outstanding numbers and balances of small loans to businesses and farms of non-CRA reporters, to simulate these plausible values of originations. The Bureau has documented this methodology in more detail in its *Supplemental estimation methodology*

*for institutional coverage and market-level cost estimates in the small business lending data collection notice of proposed rulemaking* released concurrently with this proposal.[876]

Below, the Bureau reports a range of values for the estimated number of depository institutions covered under the proposed rule. The range represents a 95 percent confidence interval over the number of credit unions, banks and savings associations that would be covered under the proposed rule. The Bureau presents this range to reflect the uncertainty associated with the estimate and notes that the uncertainty is driven by the lack of data on originations by banks and savings associations below the CRA reporting threshold.

The Bureau estimates that about 992 nondepository institutions will be covered by the proposed rule: About 340 nondepository CDFIs; about 100 MCA providers; about 30 fintech companies; about 300 commercial finance companies; about 100 governmental lending entities; about 50 nondepository mortgage providers; and 72 Farm Credit System members.[877] See part II.D above for more detail on how the Bureau arrived at these estimates.

Based on 2019 data from FFIEC and NCUA Call Reports and the CRA data, using the methodology described above, the Bureau estimates that the number of depository institutions that would be required to report under the proposed rule would be between approximately 4,000 and 4,200. The Bureau estimates that between 3,600 and 3,800 banks and savings associations and about 400 credit unions would be required to report under the proposed rule.

The Bureau has attempted to use the best available data and methods to estimate the number of financial institutions that would be covered by the proposed rule. The Bureau seeks comment on whether there are additional data sources that could provide better estimates of coverage. The Bureau also seeks comment on its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending data collection notice of proposed rulemaking* describing the methods used to estimate coverage.

---

[872] For this analysis, the Bureau includes all types of commercial loans to members except construction and development loans. This includes loans secured by multifamily residential property; loans secured by farmland; loans secured by owner-occupied, non-farm, non-residential property; loans secured by non-owner occupied, non-farm, non-residential property; loans to finance agricultural production and other loans to farmers; commercial and industrial loans; unsecured commercial loans; and unsecured revolving lines of credit for commercial purposes.

[873] See Fed. Fin. Insts. Examination Council, *Community Reinvestment Act, 2021 Reporting Criteria* (Dec. 16, 2020), *https://www.ffiec.gov/cra/reporter21.htm*.

[874] The FFIEC Call Reports do not collect information on small loans to businesses made for the purposes of funding multifamily property. In order to account for these loans in the coverage estimates, for each bank or savings association, the Bureau adds the number of multifamily loans originated for business purposes with origination amounts under $1 million reported in the HMDA data to the estimated number of small business lending originations. While multifamily loans for business purposes have been reportable in HMDA data for some time, these loans have only been identifiable with data fields available since 2018. For simplicity, the Bureau assumes that a bank or savings association made the same number of multifamily loans for business purposes with origination amounts under $1 million in 2017 as it did in 2018.

[875] Based on FFIEC Call Report data as of December 2019, of the 5,177 banks and savings associations that existed in 2019, only about 11 percent were required to report under CRA. That is, only about 11 percent of banks and savings associations had assets below $1.284 billion, the CRA reporting threshold in 2019. See Fed. Fin. Insts. Examination Council, *2019 Reporting Criteria*, *https://www.ffiec.gov/cra/reporter19.htm* (last visited Aug. 5, 2021).

[876] This document is available at *https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodologies-small-business-lending-data-collection-nprm/*.

[877] The Bureau provides estimates for the majority of nondepository institutions but knows an exact number of members of the Farm Credit System.

*E. Methodology for Generating Cost Estimates*

The Bureau used previous HMDA rulemaking estimates as the basis for its review of 1071 data collection and reporting tasks that would impose one-time and ongoing costs. In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA final rule, the Bureau used interviews with financial institutions to understand the processes of complying with a regulation that requires collecting and reporting credit application data and to generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data.[878] To analyze the potential impacts of this proposed rule, the Bureau adapted its methodology from its HMDA rulemaking activities to the small business lending market.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the proposed rule would be similar to those under HMDA. The similarities in data collection and reporting tasks allowed the Bureau to leverage its previous rulemaking experience in its analysis of the potential impacts of this proposed rule.

However, there are significant differences between the home mortgage

and small business lending market. For example, small business lending is generally less automated, and has a wider variety of products, smaller volumes, and smaller credit amounts. The Bureau used the SBREFA process, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences would change the tasks required for data collection, checking for accuracy, and reporting.

During the HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) The reporting system used; (2) the degree of system integration; (3) the degree of system automation; (4) the tools for geocoding; (5) the tools for performing completeness checks; (6) the tools for performing edits; and (7) the compliance program. The Bureau assumes that financial institutions will set up their 1071 reporting in a manner similar to how HMDA reporting was implemented.[879] The Bureau presented this list of key aspects or dimensions of compliance costs in its SBREFA Outline, but did not receive specific

feedback or suggestions about these areas of compliance costs.

The Bureau found during the HMDA rulemaking process that, generally, the complexity of a financial institution's approach across dimensions was consistent—that is, a financial institution generally would not use less complex approaches on some dimensions and more complex approaches on others.[880] This allowed the Bureau to classify financial institutions, including depository institutions and nondepository institutions, into three broad tiers according to the overall level of complexity of their compliance operations. Using very similar assumptions to HMDA, the Bureau's estimation of the costs of this proposed rule also assumed that complexity across dimensions of a financial institution's small business lending data collection and reporting system is consistent.

Table 3 below summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of financial institutions based on level of complexity in compliance operations. Financial institutions that are Type A have the lowest level of complexity in compliance operations, while Type B and Type C have the middle and highest levels of complexity, respectively.

---

[878] *Home Mortgage Disclosure (Regulation C)*, 80 FR 66128, 66269 (Oct. 28, 2015).

[879] For example, the Bureau assumes that financial institutions will integrate their small business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.

[880] 80 FR 66128, 66269 (Oct. 28, 2015).

AdminRecord-000612

**Table 3: Typical approach to certain aspects/dimensions of compliance costs based on level of complexity for types of 1071 reporters**

| Aspect/dimension of compliance costs | Typical approach by low complexity financial institutions (Type A FIs) | Typical approach by medium complexity financial institutions (Type B FIs) | Typical approach by high complexity financial institutions (Type C FIs) |
|---|---|---|---|
| Data storage system used | Store data in Excel | Use LOS and SBL DMS | Use multiple LOS, FI's central SoR, SBL DMS |
| Degree of system integration | (None) | Have forward integration (LOS to SBL DMS) | Have backward and forward integration |
| Degree of system automation | Highly manual process for entering and checking data | Use manual edit checks | Have high automation (only verifying edits manually) |
| Tools for geocoding | Use FFIEC tool (manual) | Use batch processing | Use batch processing with multiple sources |
| Tools for completeness checks | Conduct manual checks and rely on CFPB quality/validity checks | Use LOS, which includes completeness checks | Use multiple stages of checks |
| Tools for edits | Use CFPB edits only | Use CFPB and customized edits | Use CFPB and customized edits run multiple times |
| Compliance program | Have a joint compliance and audit office | Have basic internal and external accuracy audit | Have in-depth accuracy and fair lending audit |

Note: LOS is "Loan Origination System"; SoR is "System of Record"; SBL DMS is "Small Business Lending Data Management System."[881]

In previous HMDA rulemakings, the Bureau found that the number of loan applications received was largely correlated with overall complexity of financial institutions' compliance operations.[882] The Bureau used this observation from HMDA, in addition to early outreach to financial institutions and data from Call Reports and publicly available data from the CDFI Fund, to generate assumptions about the number of annual small business lending applications processed by each FI type. The Bureau assumes that Type A FIs receive fewer than 300 applications per year, Type B FIs receive between 300

and 2,000 applications per year, and Type C FIs receive more than 2,000 applications per year. The Bureau assumes that, for types A and B, one out of two small business applications will result in an origination. Thus, the Bureau assumes that Type A FIs originate fewer than 150 products per year and Type B FIs originate between 150 and 1,000 products per year. The Bureau assumes that Type C FIs originate one out of three applications and more than 1,000 per year.[883]

The Bureau understands that costs vary by financial institution due to many factors, such as size, operational structure, and product complexity. Due to data limitations, the Bureau is unable to capture many of the ways in which costs vary by institution, and therefore uses these representative financial institutions with the above assumptions for its analysis. In order to aggregate costs to a market level, the Bureau must map financial institutions onto its types using discrete volume categories.

For the ongoing costs discussion in part VII.F.3.ii below, the Bureau discusses costs in the context of representative institutions for ease of

[881] The Bureau expects the development of a market for small business data management systems similar to HMDA management systems that financial institutions will license or purchase from third parties.

[882] 80 FR 66128, 66270 (Oct. 28, 2015).

[883] The Bureau chose the 1:2 and 1:3 application to origination ratios based on two sources of information. First see Biz2Credit, *Small Business Loan Approval Rates Rebounded in May 2020: Biz2Credit Small Business Lending Index* (May 2020), *https://cdn.biz2credit.com/appfiles/biz2credit/pdf/report-may-2020.pdf*, which shows that, in December of 2019, large banks approved small business loans at a rate of 27.5 percent, while small banks and credit unions had approval rates

of 49.9 percent and 40.1 percent. Additionally, and supported by the Bureau's data from supervisory exams, the Bureau chose a 33 percent approval rate as a conservative measure among these estimates for complex financial institutions (Type C FIs).

AdminRecord-000613

exposition. The Bureau assumes that a representative Type A FI receives 100 small business credit applications per year, a representative Type B FI receives 400 applications per year, and a representative Type C FI receives 6,000 applications per year. The Bureau further assumes that a representative Type A FI originates 50 covered credit transactions per year, a representative Type B FI originates 200 covered credit transactions per year, and a representative Type C FI originates 3,000 covered credit transactions per year.

The Bureau presented an earlier version of this cost calculation methodology in the SBREFA Outline and during the SBREFA process.[884] In general, SERs provided minimal feedback on the overall structure of the categorization of financial institutions and activities required to collect, check, and report data under the proposed rule.[885] The Bureau has made two changes to its methodology in response to SER feedback. One SER stated that the methodology would benefit from an additional category of complexity between Types B and C. To address this issue, while the Bureau did not add an additional category of complexity, it has increased the number of applications assumed for Type A FIs and Type B FIs so that these institutions cover more of the small business credit market. The Bureau has adjusted the categories of applications for Type A FIs and Type B FIs to 100 and 400 (from 75 and 300, respectively). Several SERs also suggested that the ratio of applications per originated loans used in the SBREFA Outline was too high. The Bureau has accordingly updated its assumptions to assume two applications per origination (instead of its original three-to-one ratio) for Type A FIs and Type B FIs.

The Bureau seeks comment on its methodologies, as described in this part VII.E (including parts VII.E.1, VII.E.2, and VII.E.3 below), for estimating one-time costs of implementation, estimating ongoing costs of implementation, and generating market-level estimates of one-time and ongoing costs.

1. Methodology for Estimating One-Time Costs of Implementation of the Proposed Rule

The Bureau has identified the following eight categories of one-time costs that would likely be incurred by

financial institutions to develop the infrastructure to collect and report data under the proposed rule:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications
5. Training staff and third parties (such as dealers and brokers)
6. Developing policies/procedures
7. Legal/compliance review
8. Post-implementation review of compliance policies and procedures

Conversations with financial institutions have informed the Bureau's understanding of one-time costs. Financial institutions will likely have to spend time and resources understanding the regulation, developing the required policies and procedures for their employees to follow, and engaging a legal team to review their draft policies and procedures. Additionally, financial institutions may require new equipment, such as new computer systems that can store and check the required data points; new or revised application forms or related materials to collect any data that would be required under the proposed rule that they do not currently collect, including minority-owned and women-owned business status and the ethnicity, race, and sex of applicants' principal owners, and to provide any related disclosures required by the rule. Some financial institutions mentioned that they may store, check, and report data using third-party providers such as Fiserv, Jack Henry, LaserPro, or Fidelity Information Systems (FIS), while others may use more manual methods of data storage, checking, and reporting using software applications such as Microsoft Excel. Financial institutions would also engage in a one-time training of all small business lending staff to ensure that employees understand the new policies and procedures. After all new policies and procedures have been implemented and systems/equipment deployed, financial institutions will likely undertake a final internal review to ensure that all the requirements of the section 1071 regulation have been satisfied.

The Bureau presented the one-time cost categories in the SBREFA Outline and during the SBREFA process.[886] The SERs generally confirmed that the eight categories listed above accurately capture the components of one-time costs.

The Bureau conducted a survey regarding one-time implementation costs for section 1071 compliance targeted at FIs who extend small

business credit.[887] The Bureau developed the survey instrument based on guidance from industry on the potential types of one-time costs institutions might incur if required to report under a 1071 rule and tested the survey instrument on a small set of FIs, incorporating their feedback prior to implementation. Estimates from survey respondents form the basis of the Bureau's estimates for one-time costs in assessing the potential impact of this proposed rule. The survey was broadly designed to ask about the one-time costs of reporting data under a regime that only includes mandatory data points, uses a reporting structure similar to HMDA, uses the Regulation B definition of an "application," and uses the respondent's own internal small business definition. The survey was divided into three sections: Respondent Information, One-Time Costs, and the Cost of Credit to Small Entities.

In the Respondent Information section, the Bureau obtained basic information about the respondent, including information on the type of institution, its size, and its volume of small business lending. (The Bureau did not, however, obtain the actual name or other directly identifying information about respondents.) The One-Time Costs section of the survey measured the total hours, staff costs, and non-salary expenses associated with the different tasks comprising one-time costs. Using the reported costs of each task, the Bureau estimated the total one-time cost for each respondent. The Cost of Credit to Small Entities section dealt with the respondent's anticipated response to the increased compliance costs of being covered by the rule in order to understand the impacts of the regulation on its small business lending activity, including any anticipated potential changes to underwriting standards, volume, prices, product mix, or market participation.

The Bureau worked with several major industry trade associations to recruit their members to respond to the survey. A total of 105 financial institutions responded to the survey.

To estimate one-time costs, the Bureau needed information on a financial institution's one-time costs by category and number of originations. Of the 105 total respondents, 49 answered these questions. The Bureau will henceforth refer to these respondents as the "cost estimation sample." Of these respondents, 42 (86 percent) self-

---

[884] SBREFA Outline at 52–56.
[885] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 37–38.

[886] SBREFA Outline at 49–52.

[887] The One-Time Cost Survey was released on July 22, 2020; the response period closed on October 16, 2020. The OMB control number for this collection is 3170–0032.

**56548**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

reported that they were a depository institution (bank or credit union). The remaining seven (14 percent) were

nondepository institutions. Table 4 presents the self-reported asset size of the 42 depository institution

respondents in the cost estimation sample.[888]

### Table 4: Asset sizes of depository institutions in one-time cost estimation sample

| Asset Category | Count | Frequency |
|---|---|---|
| Less than $250 million | 9 | 21.43 |
| $250 million to $500 million | 9 | 21.43 |
| $500 million to $1 billion | 7 | 16.67 |
| $1 billion to $10 billion | 8 | 19.05 |
| $10 billion to $500 billion | 9 | 21.43 |

For the purposes of estimating one-time costs, the Bureau distinguishes between depository institutions and nondepository institutions. The majority of nondepository institutions are not currently subject to any data reporting requirements, with the notable exception of nondepository CDFIs. The Bureau anticipates that covered financial institutions that are not currently subject to data reporting requirements will need to make more changes to their existing business operations in order to comply with the requirements of the new rule. This expectation is confirmed by the higher estimated one-time costs for nondepository institutions relative to depository institutions discussed in part VII.F.3.i.

The Bureau categorizes depository institution respondents in the cost estimation sample into four groups according to the respondents' self-reported total originations. The first group contains the two depository institutions that reported fewer than 25 originations; the Bureau assumes these institutions would not report under the proposed rule. The second group contains ten depository institutions that reported between 25 and 149 originations. The Bureau categorizes these as Type A DIs (that is, a DI that

is Type A as defined above.) The third group contains the 19 depository institutions that reported between 150 and 999 originations. The Bureau categorizes these as Type B DIs. The final group contains the 11 depository institutions that reported 1,000 or more originations. The Bureau categorizes these as Type C DIs.

There are not enough nondepository institutions in the cost estimation sample to separate nondepository institutions into Types A, B, and C and obtain meaningful estimates. Instead, the Bureau is relying on the assumption that nondepository institutions (referred to as Non-DIs for purposes of this analysis) will incur the same one-time costs regardless of complexity.

The Bureau estimated the one-time costs for each of the four categories of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the following methodology.

For each of the eight categories of one-time costs, the Bureau asked financial institutions to estimate and report the total number of hours that junior, mid-level, and senior staff would spend on each task, along with any additional non-salary expenses. If a respondent did not provide estimates for any component (*i.e.*, staff hours or non-salary expenses) of any category, it is

not counted as part of the cost estimation sample. If a respondent provided estimates for some components but did not provide an estimate for a particular component (*e.g.*, non-salary expenses for preparation/planning) then the Bureau assumed that the respondent estimated zero for that component.

The Bureau asked survey respondents to report the average hourly wage for junior, mid-level, and senior/executive staff involved in the one-time cost categories. However, for the purposes of estimating one-time costs, the Bureau assumed a constant wage across financial institutions for each level of staff. For junior staff, the Bureau used $16.18, the 10th percentile hourly wage estimate for "loan officers" according to the 2020 Occupational Employment Statistics compiled by the Bureau of Labor Statistics.[889] For mid-level staff, the Bureau used $36.99, the mean hourly wage estimate for "loan officers." For senior staff, the Bureau used $64.35, the 90th percentile hourly wage estimate for "loan officers." To account for non-monetary compensation, the Bureau also scaled these hourly wages up by 43 percent.[890] The Bureau assumed a total hourly compensation of $23.14 for junior staff, as compared to $28.76, the mean of the junior wages

---

[888] Nondepository institutions also reported assets. The Bureau separately reports asset category for depository institutions because asset sizes are not as comparable between depositories and nondepositories. The Bureau does not report asset sizes for nondepository respondents because there were too few respondents to report separately without risking re-identification of respondents.

[889] *See* Bureau of Labor Statistics, U.S. Dep't of Labor, *Occupational Employment and Wage Statistics* (May 2020), *https://www.bls.gov/oes/current/oes132072.htm*.

[890] The March 2020 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, 70 percent of employee compensation for private

industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ([100/70] − 1) * 100 = 43 percent). *See* Bureau of Labor Statistics, U.S. Dep't of Labor, *Employer Costs for Employee Compensation* (Mar. 2020), *https://www.bls.gov/news.release/archives/ecec_06182020.pdf*.

AdminRecord-000615

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules     **56549**

reported by respondents. The Bureau assumed a total hourly compensation of $52.90 for mid-level staff, as compared to $48.94, the mean of the mid-level wages reported by respondents. The Bureau assumed a total hourly compensation of $92.02, as compared to $90.19, the mean of the senior/executive wages reported by respondents.

For each respondent in the cost estimation sample, the Bureau calculated the cost of each one-time cost category as the sum of the junior wage multiplied by the reported junior hours, the mid-level wage multiplied by the reported mid-level hours, and the senior wage multiplied by the reported senior hours and the reported non-salary expenses. The total cost for the respondent was the sum of the costs across all eight categories.

After calculating the total costs for each respondent, the Bureau identified outliers within the four groups of financial institutions (Type A DI, Type B DI, Type C DI, and Non-DI) using the interquartile range method, a standard outlier identification method. For each group of financial institutions, an observation is considered an outlier if the estimated total cost is greater than $1.5*(P_{75} - P_{25}) + P_{75}$ or less than

$P_{25} - 1.5*(P_{75} - P_{25})$ where $P_{75}$ and $P_{25}$ are the 75th and 25th percentiles, respectively, of total costs within that group. Using this method, the Bureau identified one outlier in each Type A DI, Type B DI, and Type C DI group and no outliers in the Non-DI group.

In addition to the total estimated one-time costs, the Bureau is interested in the hours, non-salary expenses, and total costs associated with each of the different one-time cost categories. For each group, the Bureau estimated each component of one-time costs by taking the mean of the estimated component within the group, after excluding outliers. For example, the estimated number of junior hours required by DIs of Type A to update computer systems is the mean number of junior hours reported by the nine DIs of Type A that were in the cost estimation sample, excluding one outlier. The Bureau estimated the cost associated with each category as the sum of the junior wage multiplied by the estimated junior hours, the mid-level wage multiplied by the estimated mid-level hours, and the senior wage multiplied by the estimated senior hours, and the estimated non-salary expenses.

2. Methodology for Estimating Ongoing Costs of Implementation of the Proposed Rule

The Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs. Table 5 presents the full list of 15 activities. Activities 1 through 3 can broadly be described as data collection activities: These tasks are required to intake data and transfer it to the financial institution's small business data entry system. Activities 4 through 10 are related to reporting and resubmission: These tasks are required to collect required data, conduct internal checks, and report data consistent with the proposed rule. Activities 11 through 13 are related to compliance and internal audits: Employee training, and internal and external auditing procedures required to ensure data consistency and reporting in compliance with the rule. Finally, activities 14 and 15 are related to 1071 examinations by regulators: These tasks will be undertaken to prepare for and assist during regulatory compliance examinations.

BILLING CODE 4810-25-P

**Table 5: 1071 data collection and reporting activities imposing ongoing costs**

| No. | Activity |
|---|---|
| 1 | Transcribing data |
| 2 | Resolving reportability questions |
| 3 | Transferring to Data Entry System, Loan Origination System, or other data storage system |
| 4 | Geocoding data |
| 5 | Standard annual edit and internal checks |
| 6 | Researching questions |
| 7 | Resolving question responses |
| 8 | Checking post-submission edits |
| 9 | Filing post-submission documents |
| 10 | Small business data reporting/geocoding software |
| 11 | Training |
| 12 | Internal audit |
| 13 | External audit |
| 14 | Exam preparation |
| 15 | Exam assistance |

AdminRecord-000616

**56550**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

Table 6 provides an example of how the Bureau calculated ongoing compliance costs associated with each compliance task. The table shows the calculation for each activity and notes whether the task would be a "variable cost," which would depend on the number of applications the institution receives, or a "fixed cost" that does not depend on the number of applications. Table 6 shows these calculations for a Type A FI, or the institution with the least amount of complexity. Table 7 below summarizes the activities whose calculation differs by institution complexity and shows the calculations for Type B FIs and Type C FIs (where they differ from those for a Type A FI).[891]

### Table 6: Ongoing compliance cost calculations for a Type A FI

| No. | Activity | Calculation | Type[891] |
|---|---|---|---|
| 1 | Transcribing data | Hourly compensation x hours per app. x applications | Variable |
| 2 | Resolving reportability questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 3 | Transfer to Data Entry System | Hourly compensation x hours per app. x applications | Variable |
| 4 | Complete geocoding data | Hourly compensation x hours per app. x applications | Variable |
| 5 | Standard annual edit and internal checks | Hourly compensation x hours spent on edits and checks | Fixed |
| 6 | Researching questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 7 | Resolving question responses | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 8 | Checking post-submission edits | Hourly compensation x hours checking post-submission edits per application | Variable |
| 9 | Filing post-submission documents | Hourly compensation x hours filing post-submission docs | Fixed |
| 10 | Small business data reporting/geocoding software | Uses free geocoding software | Fixed |
| 11 | Training | Hourly compensation x hours of training per year x number of loan officers | Fixed |
| 12 | Internal audit | No internal audit conducted by financial institution staff | Fixed |
| 13 | External audit | One external audit per year | Fixed |
| 14 | Exam preparation | Hourly compensation x hours spent on examination preparation | Fixed |
| 15 | Exam assistance | Hourly compensation x hours spent on examination assistance | Fixed |

BILLING CODE 4810–25–C

[891] In this table, the term "variable" means the compliance cost depends on the number of applications. The term "fixed" means the compliance cost does not depend on the number of applications (even if there are other factors upon which it may vary).

AdminRecord-000617

Many of the activities in Table 6 require time spent by loan officers and other financial institution employees. To account for time costs, the calculation used the hourly compensation of a loan officer multiplied by the amount of time required for the activity. The Bureau used a mean hourly wage of $36.99 for loan officers, based on data from the Bureau of Labor Statistics.[892] To account for non-monetary compensation, the Bureau scaled this hourly wage by 43 percent to arrive at a total hourly compensation of $52.90 for use in these calculations.[893] The Bureau used assumptions from its 2015 HMDA final rule analysis, updated to reflect differences between mortgage lending and small business lending, to estimate time spent on "ongoing tasks." [894] As an example of a time calculation, the Bureau estimated that transcribing the required data points would require approximately 11 minutes per application for a Type A FI. The calculation multiplied the number of minutes by the number of applications and the hourly compensation to arrive at the total cost, on an annual basis, of transcribing data. As another example, the Bureau

estimated that ongoing training for loan officers to comply with a financial institution's 1071 policies and procedures would take about two hours per loan officer per year. The cost calculation multiplies the number of hours by the number of loan officers and by the hourly compensation.

To arrive at the amount of time required per application for each of the 15 tasks covered financial institutions would conduct to collect, check, and report 1071 data, the Bureau began with the assumptions made for each task for the 35 data points under the 2015 HMDA final rule and then adjusted these required times relative to the number of data points required under the proposed 1071 rule. The proposed rule would require covered financial institutions to collect 21 data points for each covered application. Several of these data points have multiple components. For example, the credit type data point has three subcomponents of product type, the type of guarantee, and the term. The data points for pricing information and the ethnicity, race, and sex of principal owners also have multiple subcomponents.

Some activity costs in Table 6 depend on the number of applications. It is important to differentiate between these variable costs and fixed costs because the type of cost impacts whether and to what extent covered institutions might be expected to pass on their costs to small business loan applicants in the form of higher interest rates or fees (discussed in more detail in part VII.F.4 below). Data collection, reporting, and submission activities such as geocoding data, standard annual edits and internal checks, researching questions, and resolving question responses are variable costs. All other activities are fixed cost because they do not depend on the overall number of applications being processed. An example of a fixed cost calculation is exam preparation, where the hourly compensation is

multiplied by the number of total hours required by loan officers to prepare for 1071-related compliance examinations.

Table 7 shows where and how the Bureau assumed Type B FIs and Type C FIs differ from Type A FIs in its ongoing cost methodology. Type B FIs and Type C FIs use more automated procedures, which result in different cost calculations. For example, for Type B FIs and Type C FIs, transferring data to the data entry system and geocoding applications are done automatically by business application data management software licensed annually by the financial institution. The relevant address is submitted for geocoding via batch processing, rather than done manually for each application. The additional ongoing geocoding costs reflect the time spent by loan officers on "problem" applications—that is, a percentage of overall applications that the geocoding software misses—rather than time spent on all applications. However, Type B FIs and Type C FIs have the additional ongoing cost of a subscription to a geocoding software or service as well as a data management software that represents an annual fixed cost of reporting 1071 application data. This is an additional ongoing cost that less complex Type A FIs will not incur. The Bureau expects that Type A FIs will use free geocoding software available from the FFIEC or the Bureau, which may include a new batch function that could be developed by either the FFIEC or the Bureau.

Additionally, audit procedures differ between the three representative institution types. The Bureau expects a Type A FI would not conduct an internal audit but would pay for an annual external audit. A Type B FI would be expected to conduct a simple internal audit for data checks and also pay for an external audit on an annual basis. Type C FIs would have a sophisticated internal audit process in lieu of an external audit.

**BILLING CODE 4810–25–P**

---

[892] These data reflect the mean hourly wage for "loan officers" according to the 2020 Occupational Employment Statistics compiled by the Bureau of Labor Statistics. *See* Bureau of Labor Statistics, U.S. Dep't of Labor, *Occupational Employment and Wages* (May 2020), *https://www.bls.gov/oes/current/oes132072.htm.*

[893] The March 2020 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation ((100/70) − 1) * 100 = 43 percent). Bureau of Labor Statistics, U.S. Dep't of Labor, *Employer Costs for Employee Compensation* (Mar. 2020), *https://www.bls.gov/news.release/archives/ecec_06182020.pdf.*

[894] *Home Mortgage Disclosure Act (Regulation C),* 80 FR 66128 (Oct. 28, 2015).

Some differences, for example, are reflected in the number of applications, the number of data points per application, and the number of loan officers for the representative institutions.

AdminRecord-000618

**Table 7: Differences in ongoing cost calculations for Type B FIs and Type C**

**FIs versus Type A FIs**

| No. | Activity | Difference for a Type B FI | Difference for a Type C FI |
|-----|----------|----------------------------|----------------------------|
| 3 | Transfer to Data Entry System | No employee time cost. Automatically transferred by data management software purchased/licensed | No employee time cost. Automatically transferred by data management software purchased/licensed |
| 4 | Complete geocoding data | Cost of time per application unable to be geocoded by software | Few applications that require manual attention. Completed by third party software vendor. |
| 10 | Small business data reporting/geocoding software | Uses geocoding software and/or data management software that requires annual subscription | Uses geocoding software and/or data management software that requires annual subscription |
| 12 | Internal Audit | Hourly compensation x hours spent on internal audit | Hourly compensation x hours spent on internal audit |
| 13 | External Audit | Yearly fixed expense on external audit | Only an extensive internal audit and no expenses on external audits |

Table 8 below shows major assumptions that the Bureau made for each activity for each type of financial institution. Table 8 provides the total number of hours the Bureau assumes are required for each task that requires labor. For example, the Bureau assumes that transcribing data for 100 applications will require 18 hours of labor. The table also shows the assumed fixed cost of software and audits, as well as areas where the Bureau assumes there will be cost savings due to technology. In several cases, the activity does not apply to financial institutions of a certain type, and are therefore not displayed.

AdminRecord-000619

Federal Register / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules    56553

### Table 8: Major assumptions for the representative Type A FIs, Type B FIs, and Type C FIs

| No. | Activity | Type A FI | Type B FI | Type C FI |
|-----|----------|-----------|-----------|-----------|
| 1 | Transcribing data | 18 hours total | 36 hours total | 543 hours total |
| 2 | Resolving reportability questions | 11 hours total | 22 hours total | 33 hours total |
| 3 | Transfer to 1071 Data Management Software | 18 hours total | N/A | N/A |
| 4 | Complete geocoding data | 7 hours total; reduction in time cost relative to HMDA for software with batch processing | 10 hours total (0.5 hours per "problem" loan times 5% of loans that are "problem") | N/A |
| 5 | Standard annual edit and internal checks | 17 hours total; reduction for online submission platform | 214 hours total; reduction for online submission platform | 704 hours total; reduction for online submission platform |
| 6 | Researching questions | 5 hours total | 11 hours total | 16 hours total |
| 7 | Resolving question responses | 1 hour total | 1 hour total | 1 hour total |
| 8 | Checking post-submission edits | 1 hour total | 4 hours total | 17 hours total |
| 9 | Filing post-submission documents | <1 hour total | <1 hour total | < 1 hour total |
| 10 | 1071 Data Management System / geocoding software | N/A | $8,000 | $13,271 |
| 11 | Training | 12 hours total | 60 hours total | 400 hours total |
| 12 | Internal audit | N/A | 8 hours total | 2,304 hours total |
| 13 | External audit | $3,500 | $5,000 | N/A |
| 14 | Exam preparation | <1 hour total | 80 hours total | 480 hours total |
| 15 | Exam assistance | 2 hours total | 12 hours total | 80 hours total |

BILLING CODE 4810–25–C

3. Methodology for Generating Market-Level Estimates of One-Time and Ongoing Costs

To generate market-level cost estimates, the Bureau relied on the estimates of the volume of small business lending originations described in part VII.D above. As with institutional coverage, the Bureau separates market-level cost estimates into estimates for depository institutions and for nondepository institutions.

For depository institutions, the Bureau estimated which institutions of those that existed at the end of 2019 would likely be covered or not covered by the proposed rule. An institution

would be required to report data on applications received in 2019 if it originated at least 25 covered originations in each of the preceding two years (*i.e.*, 2017 and 2018). If two depository institutions merged between the end of 2017 and the end of 2019, the Bureau assumes that those institutions would report as one entity. The Bureau then categorized each institution as a Type A DI, Type B DI, or Type C DI based on its originations in 2019. Depository institutions with 0 to 149 covered originations in 2019 are categorized as Type A. Depository institutions with 150 to 999 covered originations are categorized as Type B. Depository institutions with 1,000 or more covered originations are categorized as Type C. For each depository institution, the Bureau assigns the appropriate estimated one-time cost, ongoing fixed cost, ongoing variable cost per application, and applications per origination estimates associated with its institution type. The estimated number of annual applications for each institution is the estimated number of originations multiplied by the number of applications per origination for that institution type. The annual ongoing cost for each institution is the ongoing fixed cost plus the ongoing variable cost per application multiplied by the estimated number of applications.

To generate market-level estimates, the Bureau first calculates the estimated one-time and annual ongoing costs for each depository institution covered by the proposed rule based on the estimated number of originations for that institution in 2019. The Bureau then sums over the covered depository institutions to find market-level statistics of total costs. As with coverage estimates, the Bureau presents a range of estimates for market-level statistics. The range reflects the uncertainty associated with the estimate of costs for banks and savings associations below the CRA reporting threshold. The Bureau has documented how it calculated these ranges in its *Supplemental estimation methodology for institutional coverage and market-level cost estimates in the small business lending data collection notice of proposed rulemaking*.[895]

The Bureau is unaware of institution-level data on originations by nondepository institutions that are comprehensive enough to estimate costs using the same method as that for depository institutions. Therefore, to

generate market-level estimates for nondepository institutions, the Bureau relies on the estimates discussed above and several key assumptions. The Bureau assumes that fintech lenders and MCAs are Type C FIs because they generally have more automated systems and originate more products. The Bureau assumes that the remaining nondepository institutions are Type B FIs. The Bureau assumes that each nondepository receives the same number of applications as the representative institution for each type, as described above. Hence, the Bureau assumes that fintech lenders and MCAs each receive 6,000 applications per year and all other nondepository institutions receive 400 applications per year. As explained above, the Bureau also assumes that all nondepository institutions have the same one-time costs.

*F. Potential Benefits and Costs to Covered Financial Institutions and Small Businesses*

1. Benefits to Small Businesses

The proposed rule could benefit small businesses by collecting data that further the two statutory purposes of section 1071. Those purposes are to facilitate the enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. Some of the benefits to small businesses discussed below stem from the public release of the data collected under the proposed rule. As discussed in more detail in part VI, the Bureau is proposing to exercise its discretion under ECOA section 704B(e)(4) to delete or modify data collected under section 1071 which are or will be available to the public where the Bureau determines that the deletion or modification of the data would advance a privacy interest. The below discussion considers the benefits of unmodified data released for public consumption, but the Bureau acknowledges that the benefits derived from public disclosure may be lower if modifications are made that reduce the utility of the public dataset.

Data collected under the proposed rule would constitute the largest and most comprehensive data in the United States on credit availability for small businesses. These data would provide important insight into possible discriminatory lending patterns in the small business lending market. Regulators could use the data to gauge fair lending risks and prioritize

examinations of lenders that have a higher likelihood of violating antidiscrimination statutes. This would lead to a more efficient use of government resources in enforcing fair lending provisions. Furthermore, the public nature of the dataset would allow for members of the public to review the public dataset for possible violations of antidiscrimination statutes. The increased ability to perform fair lending analyses would benefit women-owned and minority-owned small businesses both directly, in the form of remediation when lenders ultimately are found to have violated fair lending laws, and indirectly, with increased access resulting from the scrutiny placed on financial institutions.

Central to the fair lending benefit of the dataset is the proposed collection of the action taken data point. Existing datasets that collect transaction-level data only contain data on originated small business loans. Application-level data, combined with the collection of action taken data, could allow users to construct approval or denial rates, for example, for particular lenders. Such analyses could indicate whether, for example, women-owned or minority-owned small businesses are being denied credit at higher rates than other small businesses.

The proposed rule would also include several data points on the pricing of covered credit transactions that are originated or approved but not accepted. Data users could examine, for example, whether women-owned or minority-owned small businesses are charged higher interest rates, origination charges, or initial annual charges than similarly situated businesses that are not women- or minority-owned. The proposed rule would also require information on prepayment penalties, which is an area of increasing concern due to the potential for predatory lending practices.[896] Users could examine whether women-owned or minority-owned small firms are more likely to have prepayment penalties on extended credit.

Several data points included in the proposed rule would contribute to more accurate fair lending analyses by allowing users to compare credit products with similar characteristics. For example, there are likely differences in approval rates and prices for covered credit transactions based on credit amount applied for and approved, all

---

[895] *See https://www.consumerfinance.gov/data-research/research-reports/supplemental-estimation-methodologies-small-business-lending-data-collection-nprm/.*

[896] Such concerns have led California, for example, to include prepayment policies as a required component of pricing disclosures in commercial financing (*see* Cal. S.B. 1235 (Sept. 30, 2018), *https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1235*).

AdminRecord-000621

three aspects of credit type (type of credit product, types of guarantees, and loan term), and credit purpose, since these factors influence the risk of extending credit. Many creditors also consider characteristics about the small business, such as industry, gross annual revenue, or time in business during their underwriting or pricing processes. Supply and demand for small business credit also varies over time and by location, so the inclusion of census tract, application date, and action taken date could lead to more accurate analyses. More accurate screening for fair lending risk would, for example, reduce the false positive rate observed during fair lending prioritization and increase the efficiency of fair lending reviews.

Creditors would also likely use the data to understand small business lending market conditions more effectively and at a more granular level than is possible with existing data sources, such as Call Reports, data from public lending programs, or privately purchased data. Data collected under the proposed rule, combined with the institution's existing information on the small business lending market, could help creditors to identify potentially profitable opportunities to extend credit. For example, creditors could use the census tract information to find areas of high credit demand into which they could consider expanding. Small business owners would benefit from increased credit availability.

Governmental entities will likely use the data to develop solutions that achieve policy objectives. For example, loan guarantees provided by the SBA's 7(a) and 504 programs are designed to increase the availability of business credit for businesses that otherwise have difficulty accessing credit. Governmental entities could use the comprehensive data on applications for covered credit transactions collected under the proposed rule to identify additional opportunities to create new— or tailor existing—programs to advance their small business lending policy objectives.

The data collected under the proposed rule would be the most extensive data on credit access for women-owned and minority-owned small businesses, and such information will help various data users in understanding the needs and opportunities of women-owned and minority-owned small businesses. For example, governmental entities often create programs that specifically target women-owned and minority-owned businesses, such as those that reserve government contracts, those that

provide grants, or those specifically targeted at women-owned and minority-owned small firms. Governmental entities could use data collected under the proposed rule to alter existing programs or create new ones to meet the needs of these business owners. Private lenders could also use the data to find untapped markets of credit demand from women-owned and minority-owned small businesses.

As one of the premier data sources on the small business credit market, data collected under the proposed rule would also facilitate rigorous academic research. HMDA data, which are similar in many ways to the data that will be collected under the proposed rule, have been analyzed in many scholarly publications. The data collected under section 1071 will provide academics and other researchers a clearer window into potential discrimination in the small business credit market, as well as a better understanding of small business credit market trends and dynamics. Like in the case of HMDA, data collected under the proposed rule will be more broadly used to understand how business owners make borrowing decisions, respond to higher prices, and respond to risk.[897]

The proposed data points would provide the above benefits in several ways. The action taken and pricing information data points would allow various entities to monitor the tightness of the small business credit market and identify areas where there are high denial rates for small business credit or where it is provided only at high cost, especially to women-owned or minority-owned small businesses. Data on census tract, NAICS code, gross

annual revenue, and number of workers will provide insight into the availability of small business credit by geography, industry, and business size. Credit type and credit purpose would provide more information on how small women-owned and minority-owned businesses use credit and whether their use differs from that of other small businesses. Time in business information would allow data users to understand the credit needs of young small businesses, and specifically young women-owned and minority-owned small businesses. Recent research has shown that women-owned and minority-owned businesses face different financing challenges early in the business lifecycle than other firms, primarily driven by less access to external financing.[898]

The Bureau seeks comment on its analysis of potential benefits to small businesses as described herein.

2. Benefits to Covered Financial Institutions

The proposed rule would provide some benefits to some covered financial institutions—*i.e.*, the financial institutions that would be required to collect and report 1071 data on small business applications for credit. The first is some reduction of the compliance burden of fair lending reviews for lower risk financial institutions, by reducing the "false positive" rates during fair lending review prioritization by regulators. Currently, financial institutions are subject to fair lending reviews by regulators to ensure that they are complying with the ECOA in their small business lending processes. Data reported under the proposed rule would allow regulators to prioritize fair lending reviews of financial institutions with higher risk of fair lending violations, which reduces the burden on institutions with lower fair lending risk. Covered financial institutions would also be able to use the data to monitor, identify, and address their own fair lending risks and thereby avoid liability from enforcement actions and adverse exam findings requiring remedial action.

The proposed data collection could also provide an unprecedented window into the small business lending market, and such transparency may benefit financial institutions covered by the rule. Comprehensive information on small business credit applications and originations are currently unavailable.

---

[897] For examples of how HMDA data has facilitated research on the mortgage market, *see, e.g.,* Bureau of Consumer Fin. Prot., *Data Point: Asian American and Pacific Islanders in the Mortgage Market* (July 2021), *https://files.consumerfinance.gov/f/documents/cfpb_aapi-mortgage-market_report_2021-07.pdf;* Bureau of Consumer Fin. Prot., *Manufactured Housing Finance: New Insights from the Home Mortgage Disclosure Act Data* (May 2021), *https://files.consumerfinance.gov/f/documents/cfpb_manufactured-housing-finance-new-insights-hmda_report_2021-05.pdf;* Neil Bhutta & Benjamin J. Keys, *Moral Hazard during the Housing Boom: Evidence from Private Mortgage Insurance,* The Review of Fin. Studies (2021), *https://academic.oup.com/rfs/advance-article/doi/10.1093/rfs/hhab060/6279755;* Sumit Agarwal et al., *The Effectiveness of Mandatory Mortgage Counseling: Can One Dissuade Borrowers from Choosing Risky Mortgages?* (Nat'l Bureau of Econ. Research, Working Paper No. 19920, 2014), *https://www.nber.org/system/files/working_papers/w19920/w19920.pdf;* Alexei Alexandrov & Sergei Koulayev, *No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information* (Bureau of Consumer Fin. Prot., Off. of Research Working Paper No. 2017–01, 2018), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2948491.*

[898] *See, e.g.,* JPMorgan Chase & Co. Inst., *Small business ownership and liquid wealth* (Mar. 2021), *https://www.jpmorganchase.com/institute/research/small-business/small-business-ownership-and-liquid-wealth-report.*

AdminRecord-000622

**56556**        **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

The data made public pursuant to the proposed rule could allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other covered financial institutions.

The Bureau seeks comment on its analysis of potential benefits to covered persons as described herein.

3. Costs to Covered Financial Institutions

i. One-Time Costs to Covered Financial Institutions

Using the methodology described in part VII.E.1 above, Table 9 shows the estimated total expected one-time costs for financial institutions covered by the proposed rule as well as a breakdown by the eight component categories that comprise the one-time costs for Type A

DIs, Type B DIs, and Type C DIs, and Non-DIs.

Table 10 shows the estimated number of junior, mid-level, and senior staff hours and non-salary expenses for each component activity for Type A DIs. Tables 11 through 13 show the same estimates for Type B DIs, Type C DIs and Non-DIs respectively. As discussed above, the Bureau estimates all one-time costs to covered financial institutions using the One-Time Cost Survey results.
BILLING CODE 4810-25-P

**Table 9: Estimated one-time costs by cost category and FI Type**

| Category | Type A DI | Type B DI | Type C DI | Non-DI |
|---|---|---|---|---|
| Preparation/planning | $6,300 | $7,100 | $20,000 | $13,800 |
| Updating computer systems | $16,900 | $17,200 | $6,800 | $56,900 |
| Testing/validating systems | $10,900 | $3,000 | $11,100 | $7,400 |
| Developing forms/applications | $4,300 | $3,000 | $4,500 | $4,300 |
| Training staff and third parties | $3,400 | $4,500 | $5,200 | $2,900 |
| Developing policies/procedures | $4,100 | $2,500 | $3,500 | $4,300 |
| Legal/compliance review | $7,600 | $3,000 | $7,100 | $3,900 |
| Post-implementation review | $4,900 | $4,200 | $17,500 | $1,700 |
| Total | $58,400 | $44,500 | $75,700 | $95,200 |

**Table 10: Estimated staff hours and non-salary expenses by cost category for**

**Type A DIs**

| Category | Senior Hours | Mid-Level Hours | Junior Hours | Non-Salary Expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 43 | 21 | 0 |
| Updating computer systems | 34 | 52 | 41 | $10,000 |
| Testing/validating systems | 18 | 52 | 41 | $5,600 |
| Developing forms/applications | 14 | 34 | 51 | 0 |
| Training staff and third parties | 18 | 26 | 16 | 0 |
| Developing policies/procedures | 24 | 30 | 11 | 0 |
| Legal/compliance review | 28 | 26 | 15 | $3,300 |
| Post-implementation review | 26 | 38 | 19 | 0 |
| Total | 200 | 301 | 215 | $18,900 |

AdminRecord-000623

Federal Register / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules     56557

**Table 11: Estimated staff hours and non-salary expenses by cost category for**

## Type B DIs

| Category | Senior Hours | Mid-Level Hours | Junior Hours | Non-Salary Expenses |
|---|---|---|---|---|
| Preparation/planning | 50 | 35 | 21 | $200 |
| Updating computer systems | 25 | 20 | 12 | $13,600 |
| Testing/validating systems | 18 | 19 | 12 | $100 |
| Developing forms/applications | 21 | 14 | 7 | $200 |
| Training staff and third parties | 23 | 29 | 20 | $400 |
| Developing policies/procedures | 16 | 13 | 7 | $100 |
| Legal/compliance review | 14 | 16 | 5 | $700 |
| Post-implementation review | 15 | 22 | 27 | $1,100 |
| Total | 182 | 168 | 111 | $16,400 |

**Table 12: Estimated staff hours and non-salary expenses by cost category for**

## Type C DIs

| Category | Senior Hours | Mid-Level Hours | Junior Hours | Non-Salary Expenses |
|---|---|---|---|---|
| Preparation/planning | 92 | 190 | 37 | $500 |
| Updating computer systems | 6 | 46 | 35 | $3,000 |
| Testing/validating systems | 34 | 110 | 50 | $1,000 |
| Developing forms/applications | 13 | 46 | 34 | $100 |
| Training staff and third parties | 11 | 61 | 36 | $100 |
| Developing policies/procedures | 14 | 30 | 14 | $300 |
| Legal/compliance review | 9 | 56 | 44 | $2,300 |
| Post-implementation review | 3 | 246 | 103 | $1,800 |
| Total | 182 | 785 | 353 | $9,100 |

AdminRecord-000624

**56558**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

**Table 13: Estimated staff hours and non-salary expenses by cost category for**

**Non-DIs**

| Category | Senior Hours | Mid-Level Hours | Junior Hours | Non-Salary Expenses |
|---|---|---|---|---|
| Preparation/planning | 38 | 47 | 29 | $7,100 |
| Updating computer systems | 27 | 147 | 39 | $45,700 |
| Testing/validating systems | 26 | 24 | 39 | $2,900 |
| Developing forms/applications | 30 | 15 | 19 | $300 |
| Training staff and third parties | 14 | 18 | 17 | $400 |
| Developing policies/procedures | 32 | 15 | 14 | $200 |
| Legal/compliance review | 26 | 18 | 11 | $200 |
| Post-implementation review | 16 | 2 | 1 | $100 |
| Total | 209 | 286 | 169 | $56,900 |

BILLING CODE 4810–25–C

The Bureau estimates that updating computer systems would be the biggest driver of one-time costs for Type A DIs, and Type B DIs and Non-DIs. Type A DIs and Type B DIs would be expected to spend similar amounts on updating computer systems, but Type A DIs would rely somewhat more on staff.

The Bureau expects that Non-DIs would have the highest one-time costs and the highest costs to update computer systems. To update computer systems, Non-DIs would rely on mid-level staff hours and third-party vendors. Non-DIs would also spend relatively more on preparation and planning than Type A DIs or Type B DIs. These estimates are consistent with the expectation that Non-DIs will incur higher costs because they are less likely to already report data to regulators.

The Bureau estimates that the biggest drivers of one-time costs for Type C DIs would be preparation and planning and post-implementation review. These depository institutions would generally rely on mid-level staff hours to implement the required one-time changes and, in particular, would rely on mid-level staff hours for these two key activities. The Bureau estimates that Type C DIs will spend the most of all financial institution types on staff hours to implement one-time changes and the least on non-salary expenses.

The Bureau estimates that one-time costs would be higher for Type A DIs than for Type B DIs. These two types of depository institutions have similar estimated costs for most activities, but Type A DIs are expected to spend more on testing/validating systems and legal/compliance review.

These estimates are generally consistent with feedback from SERs during the SBREFA process. Several SERs stated that changes to their computer systems would contribute to their one-time costs.[899] However, some SERs estimated larger one-time costs than the Bureau and others estimated smaller one-time costs. One SER (a commercial finance company) said that many financial institutions in their industry have no experience reporting data such as will be required under the 1071 rule and that their current developer estimates that the costs just to develop, test, and integrate their system could be up to $200,000. Another SER (a fintech) stated that they do not anticipate any one-time costs. Two SERs estimated that one-time costs would be between $15,000 and $25,000 without a detailed breakdown of those costs. One SER provided a detailed breakdown of costs and estimated that total one-time costs would be $27,000.

As mentioned above, the Bureau realizes that one-time costs vary by institution due to many factors, and that this variance exists on a continuum that is impossible to fully represent. The Bureau focuses on representative types of financial institutions in order to generate practical and meaningful estimates of costs. As a result, the Bureau expects that individual financial institutions would have slightly different one-time costs than the average estimates presented here.

The One-Time Cost Survey instructed respondents to assume that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of ECOA for the 13 statutorily mandated data points one time per year, and be responsible for validating the accuracy of all data. Respondents were further instructed to use their own institution's internal definition of small business, assume the Regulation B definition of an application, and assume a reporting structure similar to that under HMDA. Finally, respondents were instructed to not include any costs associated with creating a firewall. As such, respondents estimated one-time costs assuming that the proposed rule would be different in some ways from what the Bureau has ultimately proposed here. One SER provided feedback during the SBREFA Panel that it was hard to estimate one-time costs in the survey without knowing all the details of the proposed rule.

The Bureau estimates that the overall market impact of one-time costs for depository institutions would be between $218,000,000 and $229,000,000.[900] Using a 7 percent discount rate and a five-year amortization window, the annualized

---

[899] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 38–39.

[900] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

one-time costs for depository institutions would be $53,200,000 to $55,800,000. The Bureau estimates that the overall market impact of one-time costs for nondepository institutions would be $94,400,000. Using a 7 percent discount rate and a five-year amortization window, the annualized one-time costs for nondepository institutions would be $23,000,000. As a frame of reference for these market-level one-time cost estimates, the estimated total non-interest expenses from the FFIEC and NCUA Call Reports for depository institutions that the Bureau estimates would be covered under the proposed rule was about $439 billion in 2019. The upper bound estimate of total

one-time costs is approximately 0.05 percent of the total annual non-interest expenses.

The Bureau seeks comment on its analysis of one-time costs to covered financial institutions as described herein. In particular, the Bureau seeks comment on how to adjust the estimates of one-time costs to account for differences between what respondents to the survey were asked to assume and the proposed rule.

ii. Ongoing Costs to Covered Financial Institutions

Using the methodology described in part VII.E.2, Table 14 shows the total expected annual ongoing costs of the

proposed rule as well as a breakdown by the component 15 activities that comprise the ongoing costs for Type A FIs, Type B FIs, and Type C FIs. The bottom of the table shows the total estimated annual 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. To produce the estimates in Table 14, the Bureau used the calculations described in Tables 6 and 7 above and the assumptions for each activity in Table 8. In the following analysis, the Bureau provides examples of these cost calculations for the largest drivers of ongoing costs.

### Table 14: Estimated ongoing costs per compliance task

| No. | Activity | Type A FI | Type B FI | Type C FI |
|-----|----------|-----------|-----------|-----------|
| 1 | Transcribing data | 1,013 | 1,912 | 28,686 |
| 2 | Resolving reportability questions | 201 | 402 | 602 |
| 3 | Transfer to 1071 Data Management Software | 1,013 | 0 | 0 |
| 4 | Complete geocoding data | 132 | 528 | 300 |
| 5 | Standard annual edit and internal checks | 490 | 10,576 | 26,181 |
| 6 | Researching questions | 254 | 509 | 763 |
| 7 | Resolving question responses | 0 | 0 | 0 |
| 8 | Checking post-submission edits | 6 | 24 | 96 |
| 9 | Filing post-submission documents | 13 | 13 | 13 |
| 10 | 1071 Data Management System / geocoding software | 0 | 8,000 | 13,770 |
| 11 | Training | 638 | 3,189 | 21,262 |
| 12 | Internal audit | 0 | 423 | 121,750 |
| 13 | External audit | 3,500 | 5,000 | 0 |
| 14 | Exam preparation | 13 | 4,227 | 25,365 |
| 15 | Exam assistance | 112 | 672 | 4,478 |
| | **Total** | $7,386 | $35,476 | $243,266 |
| | Per application | $74 | $89 | $41 |

The Bureau estimates that a representative low complexity institution (*i.e.,* a Type A FI) would incur around $7,386 in total annual ongoing costs, or about $74 in total cost per application processed (assuming a representative 100 applications per year). For financial institutions of this

type, the largest driver of ongoing costs is the fixed cost of the external audit, $3,500. Besides the audit cost, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits

and internal checks, and training all require loan officer time. The Bureau expects training (activity number 11) to annually require approximately $638 for 6 representative loan officers to engage in two hours of training. The Bureau expects other time-dependent activities to cost around $1,000 each. For

AdminRecord-000626

example, the Bureau assumes that Type A FIs will spend around 18 hours transferring data to 1071 data management software (activity number 3) based on estimates of the required time to transfer data to HMDA data management software. At the assumed hourly compensation, our estimate is around $1,013 for the Type A FI institutions to transfer data. An assumption of around 17 total hours to conduct standard annual editing checks (activity number 5) with some savings assumed due to an online submission platform that automatically checks for errors, results in an estimated annual ongoing cost of $490.

The Bureau estimates that a representative middle complexity institution (*i.e.,* a Type B FI), which is somewhat automated, would incur approximately $35,476 in additional ongoing costs per year, or around $89 per application (assuming a representative 400 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (activity 10) in the form of an annual software subscription fee, and the external audit of the data (activity number 13). Using interviews of financial institutions conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be comparable in the small business lending context and thus applies that estimate here. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and small business lending-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($10,576), training ($3,189), and prepping for examinations ($4,227) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination (activity number 14) resulting in a cost of $4,227, and have employees spend around 12 hours assisting with an examination (activity number 15) costing $672 annually.

The Bureau estimates a representative high complexity institution (*i.e.,* a Type

C FI), would incur $243,266 of annual ongoing costs, or $41 per application (assuming a representative 6,000 application per year). The largest driver of costs for a Type C FI is the employee time required to conduct an internal audit. The assumed 2,304 hours of employee time results in nearly $122,000 of ongoing costs annually. Exam preparation, training, and standard annual and internal checks would be expected to cost $25,365, $26,262, and $26,181 each year, respectively. The Bureau also assumes that a Type C institution would need a subscription to a small business data management software near the upper bound of the range found in interviews with financial institutions, of $13,271.

The Bureau estimates that the total annual ongoing costs for depository institutions would be between about $310,000,000 and $330,000,000 per year, about $192,000,00 to $201,000,000 of which would be annual variable costs. The Bureau estimates that the total annual ongoing costs for nondepository institutions would be about $62,300,000, about $13,700,000 of which would be annual variable costs.

To understand the impacts of these cost estimates on the profits of depository institutions, the Bureau estimates the average total net income across all products per small business origination for all DIs by type.[901] There is no comprehensive published source of data on profits earned on small business credit transactions. The Bureau presents estimates of total net income per origination as an indication of a financial institution's ability to cover the additional expenses associated with the proposed rule. The Bureau estimates that banks and savings associations of Type A have an average net income per origination between $105,000 and $119,000. Credit Unions of Type A have an average net income per origination of $272,000. Assuming two applications per origination, a bank or savings association of Type A has a net income per application of approximately $53,000 to $60,000 and a credit union of the same type has a net income per application of about $136,000. The Bureau estimates that banks and savings associations of Type B have an average

net income per origination between $50,000 and $57,000 or a net income per application between $25,000 and $29,000. The Bureau estimates that credit unions of Type B have an average net income per origination of $218,000 or an average net income per application of $109,000. The Bureau estimates that banks and savings associations of Type C have a net income per origination between $237,000 and $267,000, or, assuming three applications per origination, a net income per application between $79,000 and $89,000. The Bureau estimates that credit unions of Type C have an average net income per origination of $8,000, and average net income per application of about $3,000.

The Bureau presented early versions of these ongoing cost estimates in the SBREFA Outline and to SERs during the SBREFA process. Since then, the Bureau has adjusted its estimates to match the total number of data points in the proposed rule relative to the SBREFA Outline. The Bureau also adjusted its estimates in response to SER feedback.[902] Several SERs provided feedback that audit costs in the SBREFA Outline were likely too low for the lowest complexity (*i.e.,* Type A) institution. The Bureau adjusted the Type A FI external audit costs to match estimates provided to the Bureau from a SER of $3,500, an increase from the original $500–$1,000 expected. The Bureau continues to assume the representative low complexity institution employs only an external audit but acknowledges feedback from SERs that this is not necessarily true for all Type A institutions.

The Bureau also seeks additional comment on the cost estimates above. During the Small Business Panel Review Process, several SERs indicated other areas where costs estimates should be adjusted. A number of SERs remarked that the annual training costs estimates were likely too low. One SER estimated that training costs should be around 20 percent higher and several suggested that the number of employees the Bureau is assuming for training costs on an annual basis is too low. One SER, for example, stated that everyone who interacts with customers will need to be trained and several indicated that the scope of employees who will require training includes administrative and management staff, as well as those directly involved in the credit process. One SER stated that the hourly compensation the Bureau was using for

---

[901] There are no broadly available data on profit per application for nondepository institutions. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2019, accessed on June 25, 2021. The Bureau uses the same internal estimates of small business loan originations as discussed in part VI.B above and total net income across all products. For estimates of net income per origination and per application, the Bureau uses only net income per origination for depository institutions with over 25 originations in 2019.

[902] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 39.

AdminRecord-000627

cost calculations is assuming employees are too junior given the complexity of the process and should be around $25 higher. Another suggested that the transcribing data costs estimate is too low. One SER remarked that researching questions and the annual subscription cost of 1071 data management or geocoding software is too low. While the Bureau has not made specific changes in response to these suggestions, the Bureau seeks comment on its estimation methodology and cost estimates. In accordance with the balancing test discussed in part VI above, the Bureau expects to publicly release data collected under the rule, potentially with certain data modified or deleted. A more fulsome discussion of potential risks and harms from the publication of a public 1071 data can be found in part VI.C above, but in this section the Bureau acknowledges several potential costs to covered entities that stem from the publication of a public dataset under the proposed rule.

With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose. Several commenters to the Bureau's 2017 RFI expressed concerns, however, about costs related to these analyses.[903] During the SBREFA process, some SERs were concerned that published 1071 data could be used against financial institutions in litigation by class action attorneys or to harm their public reputations.[904] Depending on the extent of publicly disclosed data, the Bureau expects that some financial institutions could incur ongoing costs related to responding to reports of disparities in their small business lending practices. Some financial institutions could also experience reputational risks associated with high profile reports of existing disparities where more fulsome analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis. In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some financial institutions may choose to change their product offerings available to small businesses,

underwriting or pricing practices, or overall participation in the small business lending market. These costs are difficult to quantify, but the Bureau seeks comment on the extent of the possible costs posed by litigation or reputational harm as a result of the proposed rule.

The Bureau also received feedback that financial institutions could face potential costs with the publication of a public dataset under the proposed rule either because potential clients would be concerned about their data being collected or because of the additional competitive pressure brought by a publicly available dataset. During the SBREFA process, a number of SERs were concerned that full disclosure of all 1071 data would result in the re-identification of small business applicants and potentially harm their privacy interests. Several SERs asserted that public knowledge of borrowing activity (even without any other potential harms) would be very concerning to some small businesses as some small business owners consider that information sensitive or deeply personal. Relatedly, one SER said that the collection of 1071 data, including personal or demographic information, could seem like an invasion of privacy by the financial institution, particularly to minorities, and thus prospective applicants may decide to seek financing elsewhere. A number of these SERs stated that 1071 data could be used to generate marketing lists, resulting in a financial institution's competitors stealing small business customers. Several SERs were concerned about the Bureau potentially making public pricing data. Several SERs were particularly focused on information regarding pricing and pricing structure being commercially sensitive to financial institutions. The Bureau seeks comment on this class of potential costs to covered financial institutions.

The Bureau seeks comment on its analysis of ongoing costs to covered financial institutions as described herein.

## 4. Costs to Small Businesses

The Bureau expects that any direct costs of the proposed rule on small businesses would stem from additional fields that the applicant may have to complete on credit applications due to the proposed rule compared to the baseline application process. This could include information such as the race, ethnicity, and sex of business owners or number of workers that are not typically required on business credit applications. However, the Bureau expects that the cost of completing these

fields on applications to be negligible, especially compared to the overall cost of credit. Therefore, the Bureau focuses the rest of the discussion on the costs of small businesses to whether and how the Bureau expects financial institutions to pass on the costs of compliance with the proposed rule to small businesses and any possible effects on the availability of small business credit.

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the revenue from granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the added profit from extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs will be passed on in full to small business credit applicants in the form of higher prices or fees and does not expect there to be a significant reduction in small businesses' ability to access credit.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to remain in the small business credit market or the market for specific small business credit products. A financial institution would find it worthwhile to incur the one-time costs associated with complying with the proposed rule if it expects to generate enough profit over multiple years to cover those costs. Each year, a financial institution would find it worthwhile to continue extending credit if the total expected revenue from its chosen quantity of loans is greater than the sum of its ongoing fixed and variable costs. A financial institution would find it worthwhile to exit the market, even if it had already incurred the one-time costs, if the total expected revenue from that year were less than the total expected ongoing costs. During the SBREFA process, the Bureau asked panelists how they would respond to the cost of complying with the proposed rule.[905] One nondepository institution participant did indicate that smaller firms in their industry may stop participating if one-time costs are too

---

[903] 82 FR 22318 (May 15, 2017).

[904] For example, one SER was concerned that published 1071 data could lead to increased litigation and thus a higher cost of credit for small businesses. Another SER expressed concern that pricing information could be misinterpreted by users of 1071 data (for example, according to the SER, higher pricing for one race might be used to infer discrimination when the pricing was in fact unrelated to the race of the applicant). Such a misinterpretation may cause reputational damage and consequently decrease applications.

[905] SBREFA Outline at 50–52.

high, particularly if small business lending is a secondary aspect of their business model.[906] Another nondepository institution participant indicated that significantly increasing the time between application and decision could occur due to the proposed requirements, which they said would threaten their ability to compete with other lenders.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071. Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting

standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses, where "1" was the most likely.

In order to analyze these responses, the Bureau pooled data only from respondents that answered both the ranking question and the number of originations question. The Bureau implemented these restrictions to the pool to eliminate responses from institutions that would not be required to report under the proposed rule. Of the 105 total respondents to the One-Time Cost Survey, 44 ranked every option and reported more than 25 originations in the last year. The Bureau

will henceforth refer to these respondents as the "impacts of implementation" sample.

Table 15 presents the potential responses to implementing section 1071 and the average ranking assigned by respondents in the impacts of implementation sample. The responses are listed in order of most to least likely on average, where a lower average ranking number means that respondents ranked that response most likely. Consistent with economic theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. On average, respondents reported that they would be least likely to exit some geographic markets or cease offering small business credit products.

**Table 15: One-Time Cost Survey responses to impacts of implementation**

| Response | Average Ranking |
|----------|-----------------|
| Raise rates or fees on small business products | 1.77 |
| Raise rates/fees on other credit products | 2.93 |
| Tighten underwriting standards | 3.73 |
| Accept lower profits | 3.82 |
| Offer fewer or less complex products | 4.59 |
| Exit some geographic markets | 5.75 |
| No longer offer small business credit products | 6.57 |

The Bureau expects that the variable ongoing costs would be passed on in full to small business credit applicants in the form of higher prices or fees. This expectation is consistent with both standard microeconomic theory and feedback from SERs during the SBREFA process and respondents to the One-Time Cost Survey. Per application, the variable costs are approximately $28, $24, and $7 for Type A FIs, Type B FIs, and Type C FIs, respectively. Even if the variable costs were passed on in full to small business applicants in the form of higher interest rates or fees associated with a loan or line of credit (or even applicants in the form of application fees), the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business applicant.

As discussed above, the Bureau believes financial institutions would

decide to remain in or exit the small business credit market based on the revenue generated from small business credit relative to the sum of one-time costs, fixed ongoing costs, and variable ongoing costs. The Bureau's total estimated one-time and ongoing costs are non-negligible and could potentially result in exit from the market by financial institutions that do not regularly originate many covered credit transactions. The Bureau's proposed coverage threshold of 25 covered credit transactions in two consecutive years could prevent some low-volume financial institutions from leaving the small business credit market in response to the compliance costs of the proposed rule. For example, the Bureau estimates that a Type A DI would incur one-time costs of $58,400 and fixed ongoing costs of $4,536. A depository institution that originates very few covered transactions

every year may exit the market if it does not expect that profits, even over several years, would cover that one-time cost or if it does not expect annual revenues to exceed the annual ongoing costs. However, based on the net income per application estimates discussed above, the Bureau believes that institutions that are covered under the proposed rule (*i.e.*, above the proposed coverage threshold) will earn enough revenue to exceed these costs. Furthermore, the Bureau's findings during the SBREFA process and the respondents to the One-Time Cost Survey (discussed above) additionally support the Bureau's conclusion that the increase in compliance costs will likely be passed through to customers in the form of increased fees, rather than result in financial institutions leaving the small business credit market.[907]

---

[906] The SER feedback discussed herein can be found in the SBREFA Panel Report at 40.

[907] As stated in the SBREFA Panel Report at 40, "[g]enerally, SERs did not suggest that they would

leave the small business lending market in response to increased costs under the eventual 1071 rule."

AdminRecord-000629

The Bureau seeks comment on other potential costs to small businesses not discussed here. The Bureau seeks comment on its analysis of costs to small businesses as described herein.

5. Alternatives Considered

This section discusses two categories of alternatives considered: Other methods for defining a covered financial institution and limiting the data points to those mandated by section 1071. The Bureau uses the methodologies discussed in parts VII.D and VII.E to estimate the impacts of these alternatives.

First, the Bureau considered multiple reporting thresholds for purposes of defining a covered financial institution. In particular, the Bureau considered whether to exempt financial institutions with fewer than 50 or 100 originations in each of the two preceding calendar years instead of 25 originations, as proposed. The Bureau also considered whether to exempt depository institutions with assets under $100 million or $200 million from section 1071's data collection and reporting requirements.

Under a 50-origination threshold, the Bureau estimates that about 2,900 to 3,100 depository institutions would report, which is approximately 1,100 fewer depository institutions relative to the proposed threshold of 25 originations. The Bureau estimates that about 2,700 to 2,900 banks and savings associations and about 200 credit unions would be covered under a 50-origination threshold. The Bureau does not have sufficient information to estimate how many fewer nondepository institutions would report under this alternative threshold. The Bureau estimates that the total one-time costs across all financial institutions associated with a 50-origination threshold would be about $252,000,000 to $264,000,000, a decrease of about $60,000,000 relative to the 25-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $357,000,000 to $374,000,000, a decrease of about $17,000,000 per year relative to the 25-origination threshold.

Under a 100-origination threshold, the Bureau estimates that about 1,800 to 2,000 depository institutions would report, which is approximately 2,200 fewer depository institutions relative to the proposed threshold of 25 originations. The Bureau estimates that about 1,700 to 1,900 banks and savings associations and about 100 credit unions would be covered under a 100-origination threshold The Bureau

estimates that the total one-time costs across all financial institutions associated with a 100-origination threshold would be about $192,000,000 to $203,000,000, a decrease of $120,000,000 relative to the 25-origination threshold. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $332,000,000 to $347,000,000, a decrease of about $40,000,000 to $45,000,000 per year relative to the 25-origination threshold. Again, the Bureau does not have sufficient information to estimate how many fewer nondepository institutions would be required to report under this alternative.

The Bureau also considered $100 million and $200 million asset-based thresholds for depository institutions. For the purposes of considering these alternatives, the Bureau estimates how institutional coverage and costs would be different if the Bureau required a 25-origination threshold in addition to an asset-based threshold for depository institutions. The Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more than 25 originations in 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018 exceeded the asset-based threshold.

Under a $100 million asset-based threshold, the Bureau estimates that between 3,500 and 3,600 depository institutions would report, approximately 500 to 600 fewer depository institutions relative to a 25-origination threshold with no asset-based threshold. The Bureau estimates that about 3,100 to 3,300 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $100 million asset-based threshold. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $100 million asset threshold would be about $284,000,000 to $291,000,000, a decrease of between $28,000,000 and $32,000,000 relative to the proposed rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $366,000,000 to $384,000,000, a decrease of about $7,000,000 to $9,000,000 per year relative to the 25-origination threshold with no asset-based threshold.

Under a $200 million asset-based threshold, the Bureau estimates that between 2,600 and 2,700 depository institutions would report, approximately 1,400 to 1,500 fewer depository institutions relative to a 25-origination threshold with no asset-based threshold. The Bureau estimates that about 2,300 to 2,400 banks and savings associations and about 300 credit unions would be covered under a 25-origination and $200 million asset-based threshold. The Bureau estimates that the total one-time costs across all financial institutions associated with the addition of a $200 million asset threshold would be about $240,000,000 to $244,000,000, a decrease of between $73,000,000 and $80,000,000 relative to the proposed rule. The Bureau estimates that the total annual ongoing costs associated with this threshold would be about $348,000,000 to $363,000,000, a decrease of about $25,000,000 to $29,000,000 per year relative to the 25-origination threshold with no asset-based threshold.

Second, the Bureau considered the costs and benefits for limiting its data collection to the data points required by the section 1071. In addition to the statutorily required data points enumerated in section 1071, the statute also requires financial institutions to collect and report any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071. The Bureau is proposing several additional data points that rely solely on this authority. Specifically, the Bureau is proposing to require that financial institutions collect and report data on application channel, application recipient, denial reasons (for denied applications only), pricing information (for applications that are originated or approved but not accepted), NAICS code, number of workers, time in business, and number of principal owners. The Bureau has considered the impact of instead proposing only the collection of those data points required by statute.

Requiring the collection and reporting of only the statutory data points would result in a reduction in the fair lending benefit of the data compared to the proposed rule. For example, not collecting pricing information would obscure possible fair lending risk by covered financial institutions. Potential discriminatory behavior is not limited to the action taken on an application, but rather includes the terms and conditions under which applicants can access credit. If the Bureau did not collect pricing information, it would not be able to evaluate potential discriminatory behaviors on the basis of price. As

AdminRecord-000630

**56564**    **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

mentioned in part VII.F.1 above, several of the data points the Bureau is proposing under its ECOA section 704(e)(2)(H) authority are useful in creating more accurate fair lending analyses. A reduction in the rule's ability to facilitate the enforcement of fair lending laws would negatively impact small businesses and small business owners relative to the proposed rule.

Limiting the rule's data collection to only the data points required under the statute would also reduce the ability of the rule to support the business and community development purpose of the section 1071. Not including pricing information would significantly reduce the ability of communities, governmental entities, and creditors to understand credit conditions available to small businesses. Not including NAICS code or time in business would reduce the ability of governmental entities to tailor programs that can specifically benefit young businesses or businesses in certain industries. This reduction in benefits might be disproportionately borne by women-owned and minority-owned small businesses.

Only requiring the collection and reporting of the statutory data points would have reduced the annual ongoing cost of complying with the proposed rule. Under this alternative, the estimated total annual ongoing costs for Type A FIs, Type B FIs, and Type C FIs would be $6,833; $34,004 and $233,209, respectively. Per application, the estimated ongoing cost would be $68, $85, and $39 for Type A FIs, Type B FIs, and Type C FIs, respectively. The estimated total annual market-level ongoing cost of reporting would be between $363,000,000 and $382,000,000 or about $10,000,000 per year less than under the proposed rule. As discussed above, respondents to the One-Time Cost Survey were instructed to assume that they would report the mandatory data fields. Hence, the Bureau can only estimate how ongoing costs would be different under this alternative.

## G. Potential Impact on Depository Institutions and Credit Unions With $10 Billion or Less in Total Assets

As discussed above, the proposed rule would exclude financial institutions with fewer than 25 originated covered credit transactions in both of the two preceding calendar years. The Bureau believes that the benefits of the proposed rule to banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the benefits to covered

financial institutions as a whole, discussed above. Regarding costs, other than as noted here, the Bureau also believes that the impact of the proposed rule on banks, savings associations, and credit unions with $10 billion or less in total assets will be similar to the impact for covered financial institutions as a whole. The primary difference in the impact on these institutions is likely to come from differences in the level of complexity of operations, compliance systems, and software, as well as number of product offerings and volume of originations of these institutions.

Based on FFIEC and NCUA Call Report data for December 2019, 10,375 of 10,525 banks, savings associations, and credit unions had $10 billion or less in total assets. The Bureau estimates that between 3,900 and 4,000 of such institutions would be subject to the proposed rule. The Bureau estimates that the market-level impact of the proposed rule on annual ongoing costs for banks, savings associations, and credit unions with $10 billion or less in assets would be between $151,000,000 and $171,000,000. Regarding one-time costs, the Bureau estimates that the market-level impact of the proposed rule for banks, savings associations, and credit unions with $10 billion or less in assets would be between $209,000,000 and $220,000,000. Using a 7 percent discount rate and a five-year amortization window, the estimated annualized one-time costs would be between $51,000,000 and $54,000,000. The Bureau seeks comment on its analysis of the potential impact on depository institutions and credit unions with $10 billion or less in total assets as described herein.

## H. Potential Impact on Small Businesses in Rural Areas

The proposed rule would not directly impact small businesses in rural areas. However, as with all small businesses, small businesses in rural areas may bear some indirect costs of the proposal. This would occur if financial institutions serving rural areas are covered by the proposed rule and if those institutions pass on some or all of their cost of complying with the proposed rule to small businesses.

The source data from CRA submissions that the Bureau uses to estimate institutional coverage and market estimates provide information on the county in which small business borrowers are located. However, approximately 89 percent of banks did not report CRA data in 2019, and as a result the Bureau does not believe the reported data are robust enough to estimate the locations of the small

business borrowers for the banks that do not report CRA data. The Credit Union Call Report data do not provide any information on the location of credit union borrowers. Nonetheless, the Bureau is able to provide some geographical estimates of institutional coverage based on depository institution branch locations.

The Bureau used the FDIC's Summary of Deposits to identify the location of all brick and mortar bank and savings association branches and the NCUA Credit Union Branch Information to identify the location of all credit union branch and corporate offices.[908] A bank, savings association, or credit union branch was defined as rural if it is in a rural county, as specified by the USDA's Urban Influence Codes.[909] A branch is considered covered by the proposed rule if it belongs to a bank, savings association, or credit union that the Bureau estimated would be included under the proposed threshold of 25 originations in 2017 and 2018. Using the estimation methodology discussed in part VII.D above, the Bureau estimates that about 90 to 92 percent of rural bank and savings association branches and about 95 percent of non-rural bank and savings association branches would be covered under the proposed rule. The Bureau estimates that about 27 percent of rural credit union branches and about 29 percent of non-rural credit union branches would be covered under the proposed rule.[910]

In a competitive framework in which financial institutions are profit maximizers, financial institutions would pass on variable costs to future small business applicants, but absorb one-time costs and increased fixed costs in the short run.[911] Based on previous

[908] See Fed. Deposit Ins. Corp., *Summary of Deposits (SOD)—Annual Survey of Branch Office Deposits* (last updated June 1, 2021), *https:// www.fdic.gov/regulations/resources/call/sod.html.* The NCUA provides data on credit union branches in the quarterly Call Report Data files. *See* Nat'l Credit Union Admin., Call Report Quarterly Data, *https://www.ncua.gov/analysis/credit-union-corporate-call-report-data/quarterly-data* (last visited Aug. 5, 2021).

[909] This is the same methodology as used in the Bureau's rural counties list. *See* Bureau of Consumer Fin. Prot., *Rural and underserved counties list, https://www.consumerfinance.gov/ compliance/compliance-resources/mortgage-resources/rural-and-underserved-counties-list/* (last visited July 28, 2020).

[910] The Bureau notes that most credit union branches do not belong covered credit unions because most credit unions did not report any small business loans in the NCUA Call Report data. Of the 5,437 credit unions that existed in December 2019, 4,359 (or 81.5 percent) reported no small business originations in 2017 or 2018.

[911] If markets are not perfectly competitive or financial institutions are not profit maximizers, then what financial institutions pass on may differ. For example, they may attempt to pass on one-time

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules          **56565**

HMDA rulemaking efforts and feedback through the SBREFA process, the following seven operational steps affect variable costs: Transcribing data, resolving reportability questions, transferring data to a data entry system, geocoding, researching questions, resolving question responses, and checking post-submission edits. Overall, the Bureau estimates that the impact of the proposed rule on variable costs per application is $28 for a Type A FI, $24 for type B FIs, and $7 for Type C FIs. The covered financial institutions that serve rural areas will attempt to pass these variable costs on to future small business applicants. Amortized over the life of the loan, this expense would represent a negligible increase in the cost of a covered credit transaction.

The One-Time Cost Survey can shed light on how financial institutions that serve rural communities will respond to the proposed rule. The Bureau asked respondents to the survey to report whether their institution primarily served rural or urban communities or an even mix. All respondents in the impacts of implementation sample answered this question. Of the 44 respondents in the impacts of implementation sample, 13 primarily serve rural communities, 15 primarily serve urban communities, and 16 serve an even mix. Table 16 presents the potential responses to implementing section 1071 and the average ranking

assigned by respondents that serve rural communities, urban communities, an even mix, and all of the respondents in the impacts of implementation sample. The responses are listed in order of most to least likely on average across all respondents, where a lower average ranking number means that respondents ranked that response most likely. Respondents that primarily serve rural communities or an even mix rank raising rates or fees on small business or other credit products as the most likely response. These institutions also rank exiting some geographic markets and no longer offering small business credit products as the least likely response to the proposed rule.

### Table 16: One-Time Cost Survey responses to impacts of implementation by type of community served

| Response | Rural (n = 13) | Urban (n = 15) | Even Mix (n = 16) | All (n = 44) |
|---|---|---|---|---|
| Raise rates or fees on small business products | 1.62 | 1.6 | 2.06 | 1.77 |
| Raise rates/fees on other credit products | 2.54 | 2.73 | 3.44 | 2.93 |
| Tighten underwriting standards | 3.46 | 4.27 | 3.44 | 3.73 |
| Accept lower profits | 3.77 | 4.2 | 3.5 | 3.82 |
| Offer fewer or less complex products | 4.62 | 4.07 | 5.06 | 4.59 |
| Exit some geographic markets | 5.69 | 5.13 | 6.38 | 5.75 |
| No longer offer small business credit products | 6.62 | 6.13 | 6.94 | 6.57 |

The Bureau thus does not anticipate any material adverse effect on credit access in the long or short term to rural small businesses.

The Bureau seeks comment on its analysis of potential impacts on small businesses in rural areas as described herein.

### VIII. Regulatory Flexibility Act Analysis

The Regulatory Flexibility Act (RFA) [912] generally requires an agency to conduct an initial regulatory flexibility analysis (IRFA) and a final regulatory flexibility analysis (FRFA) of any rule

subject to notice-and-comment rulemaking requirements. These analyses must "describe the impact of the proposed rule on small entities." [913] An IRFA or FRFA is not required if the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. [914] The Bureau also is subject to certain additional procedures under the RFA involving the convening of a panel to consult with small business representatives prior to proposing a rule for which an IRFA is required. [915] The Bureau has not certified that the proposed rule would not have a

significant economic impact on a substantial number of small entities within the meaning of the RFA. Accordingly, the Bureau convened and chaired a Small Business Review Panel under SBREFA to consider the impact of the proposed rule on small entities that would be subject to that rule and to obtain feedback from representatives of such small entities. The Small Business Review Panel for this rulemaking is discussed below in part VIII.A. The Bureau is also publishing an IRFA. Among other things, the IRFA estimates the number of small entities that will be subject to the proposed rule and

---

costs and increases in fixed costs, or they may not be able to pass on variable costs. Furthermore, some financial institutions may exit the market in the long run. However, other financial institutions may also enter the market in the long run.

[912] 5 U.S.C. 601 *et seq.*

[913] 5 U.S.C. 603(a). For purposes of assessing the impacts of the proposed rule on small entities,

"small entities" is defined in the RFA to include small businesses, small not-for-profit organizations, and small government jurisdictions. 5 U.S.C. 601(6). A "small business" is determined by application of SBA regulations and reference to the NAICS classifications and size standards. 5 U.S.C. 601(3). A "small organization" is any "not-for-profit enterprise which is independently owned and

operated and is not dominant in its field." 5 U.S.C. 601(4). A "small government jurisdiction" is the government of a city, county, town, township, village, school district, or special district with a population of less than 50,000. 5 U.S.C. 601(5).

[914] 5 U.S.C. 605(b).

[915] 5 U.S.C. 609.

AdminRecord-000632

describes the impact of that rule on those entities. The IRFA for this rulemaking is set forth below in part VIII.B.

*A. Small Business Review Panel*

Under section 609(b) of the RFA, as amended by SBREFA and the Dodd-Frank Act,[916] the Bureau must seek, prior to conducting the IRFA, information from representatives of small entities that may potentially be affected by its proposed rules to assess the potential impacts of that rule on such small entities.[917] Section 609(b) sets forth a series of procedural steps with regard to obtaining this information. The Bureau first notifies the Chief Counsel for Advocacy of the SBA (Chief Counsel) and provides the Chief Counsel with information on the potential impacts of the proposed rule on small entities and the types of small entities that might be affected.[918] Not later than 15 days after receipt of the formal notification and other information described in section 609(b)(1) of the RFA, the Chief Counsel then identifies the small entity representatives, the individuals representative of affected small entities for the purpose of obtaining advice and recommendations from those individuals about the potential impacts of the proposed rule.[919] The Bureau convenes a Small Business Review Panel for such rule consisting wholly of full-time Federal employees of the office within the Bureau responsible for carrying out the proposed rule, OIRA within the OMB, and the Chief Counsel.[920] The Small Business Review Panel reviews any material the Bureau has prepared in connection with the SBREFA process and collects the advice and recommendations of each individual small entity representative identified by the Bureau after consultation with the Chief Counsel on issues related to sections 603(b)(3) through (b)(5) and 603(c) of the RFA.[921]

No later than 60 days after the date the Bureau convenes the Small Business Review Panel, the panel reports on the comments of the small entity representatives (SERs) and its findings as to the issues on which the Small Business Review Panel consulted with the SERs, and the report is made public as part of the rulemaking record.[922] Where appropriate, the Bureau modifies the proposed rule or the IRFA in light of the foregoing process.[923]

On August 10, 2020, the Bureau provided the Chief Counsel (as well as OIRA) with the formal notification and other information required under section 609(b)(1) of the RFA. To obtain feedback from small entities to inform the Small Business Review Panel pursuant to section 609(b)(2) and (4) of the RFA, the Bureau, in consultation with the Chief Counsel, identified several categories of small entities that may be subject to the proposed rule for purposes of the IRFA: Depository institutions; fintech lenders and MCA providers; commercial finance companies; nondepository CDFIs; nondepository lenders of other 5+ unit mortgages; Farm Credit System members; and governmental lending entities. Section 3 of the IRFA, in part VIII.B.3 below, describes in greater detail the Bureau's analysis of the number and types of entities that may be affected by the proposed rule. Having identified the categories of small entities that may be subject to the proposed rule for purposes of an IRFA, the Bureau then, in consultation with the Chief Counsel and OIRA, selected 20 SERs to participate in the SBREFA process. As discussed in section 7 of the SBREFA Panel Report,[924] described below, the SERs included representatives from each of the categories identified by the Bureau and comprised a diverse group of individuals with regard to geography and type of locality (*i.e.,* rural, urban, suburban, or metropolitan areas).

On October 15, 2020, the Bureau formally convened the Small Business Review Panel pursuant to section 609(b)(3) of the RFA. Afterwards, to collect the advice and recommendations of the SERs under section 609(b)(4) of the RFA, the Small Business Review Panel held a total of four Panel Outreach Meetings with the SERs during October 19–22, 2020, conducted online via video conference. To help SERs and to

facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the SERs were included throughout the Bureau's SBREFA Outline.[925] In advance of the Panel Outreach Meetings, the Bureau, SBA's Office of Advocacy, and OIRA held a series of video conferences with the SERs to describe the Small Business Review Process, obtain important background information about each SER's current business practices, and begin discussions on selected portions of the proposals under consideration. All 20 SERs participated in the Panel Outreach Meetings. The Panel also invited SERs to submit written feedback by November 9, 2020; the Bureau received written feedback from 15 of the SERs.[926]

The Bureau also invited other stakeholders to submit feedback on the SBREFA Outline, which was due by December 14, 2020. *See generally* SBREFA Outline. Feedback from these other stakeholders was not considered by the Panel and is not reflected in the Panel Report. See part III above for additional information.

On December 15, 2020, the Bureau publicly released the written SBREFA Panel Report.[927] The SBREFA Panel Report includes the following:

Background information on the proposals under consideration at the time; information on the types of small entities that would be subject to those proposals and on the SERs who were selected to advise the Panel; a summary of the Panel's outreach to obtain the advice and recommendations of those small entity representatives; a discussion of the comments and recommendations of the small entity representatives; and a discussion of the Panel's findings, focusing on the statutory elements required under section 603 of the RFA.[928]

In preparing this proposed rule and the IRFA, the Bureau has considered the

---

[916] 5 U.S.C. 609(b).

[917] *Id.*

[918] 5 U.S.C. 609(b)(1).

[919] 5 U.S.C. 609(b)(2).

[920] 5 U.S.C. 609(b)(3).

[921] 5 U.S.C. 609(b)(4). As described in part VIII.B below, sections 603(b)(3) through (5) and 603(c) of the RFA, respectively, require a description of and, where feasible, provision of an estimate of the number of small entities to which the proposed rule will apply; a description of the projected reporting, record keeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap, or conflict with the proposed rule; and a description of any significant alternatives to the

proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. 5 U.S.C. 603(b)(3) through (5), (c).

[922] 5 U.S.C. 609(b)(5).

[923] 5 U.S.C. 609(b)(6).

[924] *See* SBREFA Panel Report at 15.

[925] These questions also appeared in a shorter Discussion Guide for Small Entity Representatives. Bureau of Consumer Fin. Prot., *Small Business Advisory Review Panel, Consumer Financial Protection Bureau, Small Business Lending Data Collection Rulemaking, Discussion Guide for Small Entity Representatives* (Sept. 15, 2020), *https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_discussion-guide_2020-09.pdf.*

[926] This written feedback is attached as appendix A to the SBREFA Panel Report.

[927] Bureau of Consumer Fin. Prot., *Consumer Financial Protection Bureau Releases Report on Implementing the Dodd-Frank Act's Small Business Lending Data Collection Requirement* (Dec. 15, 2021), *https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-releases-report-on-implementing-the-dodd-frank-acts-small-business-lending-data-collection-requirement/.*

[928] 5 U.S.C. 609(b)(5).

feedback from SERs through the SBREFA process and the findings and recommendations in the SBREFA Panel Report. The section-by-section analysis of the proposed rule in part V above and the IRFA discuss this feedback and the specific findings and recommendations of the Panel, as applicable. The SBREFA process provided the Panel and the Bureau with an opportunity to identify and explore opportunities to minimize the burden of the proposed rule on small entities while achieving the rule's purposes. It is important to note, however, that the Panel prepared the SBREFA Panel Report at a preliminary stage of the proposal's development and that the SBREFA Panel Report—in particular, the Panel's findings and recommendations—should be considered in that light. Also, any options identified in the SBREFA Panel Report for reducing the proposed rule's regulatory impact on small entities were expressly subject to further consideration, analysis, and data collection by the Bureau to ensure that the options identified were practicable, enforceable, and consistent with section 1071 of the Dodd-Frank Act and its statutory purposes. The proposed rule and the IRFA reflect further consideration, analysis, and data collection by the Bureau.

*B. Initial Regulatory Flexibility Analysis*

Under RFA section 603(a), an IRFA "shall describe the impact of the proposed rule on small entities." [929] Section 603(b) of the RFA sets forth the required elements of the IRFA. Section 603(b)(1) requires the IRFA to contain a description of the reasons why action by the agency is being considered. [930] Section 603(b)(2) requires a succinct statement of the objectives of, and the legal basis for, the proposed rule. [931] The IRFA further must contain a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply. [932] Section 603(b)(4) requires a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, including an estimate of the classes of small entities that will be subject to the requirement and the types of professional skills necessary for the preparation of the report or record. [933] In addition, the Bureau must identify, to the extent practicable, all relevant Federal rules which may duplicate, overlap, or conflict with the proposed

rule. [934] Furthermore, the Bureau must describe any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. [935] Finally, as amended by the Dodd-Frank Act, RFA section 603(d) requires that the IRFA include a description of any projected increase in the cost of credit for small entities, a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities (if such an increase in the cost of credit is projected), and a description of the advice and recommendations of representatives of small entities relating to the cost of credit issues. [936]

1. Description of the Reasons Why Agency Action Is Being Considered

As discussed in part I above, section 1071 of the Dodd-Frank Act amended ECOA to require that financial institutions collect and report to the Bureau certain data regarding applications for credit for women-owned, minority-owned, and small businesses. [937] Section 1071's statutory purposes are (1) to facilitate enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

Section 1071 specifies a number of data points that financial institutions are required to collect and report, and also provides authority for the Bureau to require any additional data that the Bureau determines would aid in fulfilling its statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain 1071 data, publication of 1071 data, and the Bureau's discretion to modify or delete data prior to publication in order to advance a privacy interest.

As discussed throughout this notice, Congress amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. Section 1071

directs the Bureau to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.

In addition, as discussed in part II above, currently available data on small business lending are fragmented, incomplete, and not standardized, making it difficult to make meaningful comparisons across products, financial institutions, and over time. This hinders attempts by policymakers and other stakeholders to understand the size, shape, and dynamics of the small business lending marketplace, including the interaction of supply and demand, as well as potentially problematic lending practices, gaps, or trends in funding that may be holding back some communities. [938]

Data collected under the proposed rule would constitute the largest and most comprehensive data in the United States on credit availability for small businesses. The proposed data collection would also provide an unprecedented window into the small business lending market, and such transparency will benefit financial institutions covered by the rule. The public data published under the proposed rule would allow financial institutions to better understand the demand for small business credit products and the conditions under which they are being supplied by other lenders. Lenders would likely use the data to understand small business lending market conditions more effectively and at a more granular level than is possible with existing data sources, such as Call Reports, data from public lending programs, or privately purchased data. Data collected under the proposed rule could enable lenders to identify promising opportunities to extend credit.

The proposed rule will also provide some reduction of the compliance burden of fair lending reviews for lower risk financial institutions by reducing the "false positive" rates during fair lending review prioritization by regulators. Currently, financial institutions are subject to fair lending reviews by regulators to ensure that they

[929] 5 U.S.C. 603(a).
[930] 5 U.S.C. 603(b)(1).
[931] 5 U.S.C. 603(b)(2).
[932] 5 U.S.C. 603(b)(3).
[933] 5 U.S.C. 603(b)(4).

[934] 5 U.S.C. 603(b)(5).
[935] 5 U.S.C. 603(c).
[936] 5 U.S.C. 603(d)(1); Dodd-Frank Act section 1100G(d)(1), 124 Stat. 2112.
[937] ECOA section 704B.

[938] While Call Report and CRA data provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess, including with respect to local markets or protected classes.

are complying with the ECOA in their small business lending processes. Data reported under the proposed rule will allow regulators to prioritize fair lending reviews of lenders with higher risk of potential fair lending violations, which reduces the burden on institutions with lower fair lending risk.

The proposed rule effectuates Congress's specific mandate to the Bureau to adopt rules to implement section 1071. For a further description of the reasons why agency action is being considered, see the background discussion for the proposed rule in part II above.

### 2. Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

This rulemaking has multiple objectives. The proposed rule is intended to advance the two statutory purposes of section 1071, which are (1) facilitating enforcement of fair lending laws and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. To achieve these objectives, the proposed rule would require covered financial institutions to collect and report certain data on applications for covered credit transactions for small businesses, including minority-owned and women-owned small businesses. The data to be collected and reported would include a number of statutorily required data fields regarding small business applications, as well as several additional data fields that the Bureau preliminarily determines would help fulfill the purposes of section 1071. The Bureau would make available to the public, annually on the Bureau's website, the data submitted to it by financial institutions, subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that such deletions or

modifications would advance a privacy interest.

As described above, the Dodd-Frank Act amended ECOA by adding section 1071, which directs the Bureau to adopt regulations governing the collection and reporting of small business lending data. ECOA section 704B(g)(1) grants the Bureau general rulemaking authority, providing that the Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071. Section 704B(g)(2) also permits the Bureau to adopt exceptions to any requirement of section 1071 and to conditionally or unconditionally exempt any financial institution or class of financial institutions from the requirements of section 1071, as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. In addition, section 703(a) of ECOA authorizes the Bureau to prescribe regulations to carry out the purposes of ECOA.

Much of section 1071 establishes requirements or obligations for financial institutions that the Bureau would implement in this proposed rule. ECOA section 704B(e)(2) requires that the information compiled and maintained be itemized in order to clearly and conspicuously disclose an enumerated list of data points. Section 704B(e)(2)(H) requires financial institutions to collect and report any additional data that the Bureau determines would aid in fulfilling the purposes of section 1071. Other parts of section 1071 require the Bureau to adopt regulations to implement certain requirements, including how financial institutions must compile and maintain data pursuant to section 1071, and the form of information made available by financial institutions to the public and the form and manner that the Bureau itself should make 1071 data available to the public generally. Additional section 1071 provisions give the Bureau the discretionary authority to delete or

modify 1071 data before making it available to the public if the Bureau determines that the deletion or modification of the data would advance a privacy interest, and to compile and aggregate 1071 data for its own use, as well as to make public such compilations of aggregate data. The legal basis for the proposed rule is discussed in detail in the legal authority analysis in part IV and in the section-by-section analyses in part V above.

### 3. Description of and, Where Feasible, Provision of an Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply

As discussed in the SBREFA Panel Report,[939] for the purposes of assessing the impacts of the proposed rule on small entities, "small entities" is defined in the RFA to include small businesses, small nonprofit organizations, and small government jurisdictions.[940] A "small business" is determined by application of SBA regulations in reference to the North American Industry Classification System (NAICS) classification and size standards.[941] Under such standards, the Bureau identified several categories of small entities that may be subject to the proposed provisions: Depository institutions; fintech lenders and MCA providers; commercial finance companies; nondepository CDFIs; nondepository lenders of other 5+ unit mortgages; Farm Credit System members; and governmental lending entities. The NAICS codes covered by these categories are described below.

The following table provides the Bureau's estimate of the number and types of entities that may be affected by the proposed rule:

---

[939] *See* SBREFA Panel Report at 41–42.
[940] 5 U.S.C. 601(6).
[941] The current SBA size standards are found on SBA's website, Small Bus. Admin., *Table of size standards* (Aug. 19, 2019), *http://www.sba.gov/content/table-small-businesssize-standards.*

AdminRecord-000635

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules    **56569**

### Table 17: Estimated number of affected entities and small entities by category

| Category | NAICS | Small Entity Threshold | Est. Total Covered Financial Institutions | Est. Number of Small Financial Institutions |
|---|---|---|---|---|
| Depository Institutions | 522110, 522120, 522130, 522210 | $600 million in assets | 4,100 | 2,700 |
| Fintech Lenders and MCAs | 522298, 522291, 522320, 518210 | $35 million (NAICS 518210); $41.5 million (NAICS 522298, 522291, 522320) | 130 | 117 |
| Commercial Finance Companies | 511210, 532411, 532490, 522220, 522291 | $41.5 million (NAICS 511210 and 522220); $35 million (NAICS 532411, 532490, and 522291) | 300 | 270 |
| Nondepository CDFIs | 522390, 523910, 813410, 522310 | $8 million (NAICS 522310, 813410); $22 million (NAICS 522390); $41.5 million (NAICS 523910) | 240 | 228 |
| Nondepository Lenders of Other 5+ Unit Mortgages | 522292, 522310 | $41.5 million | 50 | 45 |
| Farm Credit System members | 522298 | $41.5 million | 72 | 18 |
| Governmental Lending Entities | NA | Population below 50,000 | 100 | 0 |

The following paragraphs describe the categories of entities that the Bureau expects to be affected by the proposed rule.

*Depository institutions (banks and credit unions):* The Bureau estimates that there are about 4,100 banks, savings associations, and credit unions engaged in small business lending that originate enough covered transactions to be covered by the proposed rule.[942] These companies potentially fall into four different industry categories, including "Commercial Banking" (NAICS 522110), "Savings Institutions" (NAICS 522120), "Credit Unions" (NAICS 522130), and "Credit Card Issuing" (NAICS 522210). All of these industries have a size standard threshold of $600 million in assets. The Bureau estimates that about 2,700 of these institutions are small entities according to this threshold. See part VII.D above for more detail on how the Bureau arrived at these estimates.

*Fintech lenders and MCA providers:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 130 fintech lenders and MCA providers engaged in small business lending that originate enough covered transactions to be covered by the proposed rule. These companies span multiple industries, including "All Other Nondepository Credit Intermediation" (NAICS 522298), "Consumer Lending" (NAICS 522291), "Financial Transactions, Processing, Reserve, and Clearinghouse Activities" (NAICS 522320), and "Data Processing, Housing and Related Services" (NAICS 518210). All of these industries have a size standard threshold of $35 million in sales (NAICS 518210) or $41.5 million in sales (all other NAICS). The

---

[942] The Bureau notes that the category of depository institutions also includes CDFIs that are also depository institutions.

AdminRecord-000636

Bureau assumes that about 90 percent, or 117, of these entities are small according to these size standards.

*Commercial finance companies:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 300 commercial finance companies, including captive and independent financing, engaged in small business lending that originate enough covered credit transactions to be covered by the proposed rule. These companies span multiple industries, including "Software Publishers" (NAICS 511210), "Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing" (NAICS 532411), "Other Commercial and Industrial Machinery and Equipment Rental and Leasing" (NAICS 532490), "Sales financing" (NAICS 522220) and "Consumer Lending" (NAICS 522291). These industries have size standard thresholds of $41.5 million in sales (NAICS 511210 and 522220) or $35 million in sales (NAICS 532411, 532490, and 522291). The Bureau assumes that about 90 percent, or 270, commercial finance companies are small according to these size standards.

*Nondepository CDFIs:* As discussed in more detail in part II.D above, the Bureau estimates that there are 240 nondepository CDFIs engaged in small business lending that originate enough covered credit transactions to be covered by the proposed rule. CDFIs generally fall into "Activities Related to Credit Intermediation (Including Loan Brokers)" (NAICS 522390), "Miscellaneous Intermediation" (NAICS 523910), "Civic and Social Organizations" (NAICS 813410), and "Mortgage and Nonmortgage Loan Brokers" (NAICS 522310). These industries have size standard thresholds of $8 million in sales (NAICS 522310, 813410), $22 million in sales (NAICS 522390), and $41.5 million in sales (NAICS 523910). The Bureau assumes that about 95 percent, or 228, nondepository CDFIs are small entities.

*Nondepository lenders of other 5+ unit mortgages:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 50 nondepository mortgage lenders engaged in small business lending that originate enough covered credit transactions to be covered by the proposed rule. These institutions are in either "Real estate credit" (NAICS 522292) or "Mortgage and Nonmortgage Loan Brokers" (NAICS 522310). These industries both have a size standard threshold of $41.5 million. The Bureau estimates that about 90 percent, or 45, nondepository mortgage lenders are small entities.

*Farm Credit System members:* The Bureau estimates that there are 72 members of the Farm Credit System (banks and associations) that are engaged in small business lending and that originate enough covered credit transactions to be covered by the proposed rule.[943] These institutions are in the "All Other Nondepository Credit Intermediation" (NAICS 522298) industry. The size standard for this industry is $41.5 million in sales. The Bureau estimates that 18 members of the Farm Credit System are small entities.

*Governmental lending entities:* As discussed in more detail in part II.D above, the Bureau estimates that there are about 100 governmental lending entities engaged in small business lending that originate enough covered credit transactions to be covered by the proposed rule. "Small governmental jurisdictions" are the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand. The Bureau assumes that none of the governmental lending entities covered by the proposed rule are considered small.

4. Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for the Preparation of the Report

*Reporting requirements.* ECOA section 704B(f)(1) provides that "[t]he data required to be compiled and maintained under [section 1071] by any financial institution shall be submitted annually to the Bureau." Section 1071 requires financial institutions to collect and report information regarding any application for "credit" made by women-owned, minority-owned, and small businesses. The Bureau is also proposing that the following transactions are not covered by the rule: leases, factoring, consumer-designated credit, credit secured by certain properties, trade credit, public utilities credit, securities credit, and incidental credit.

Under the proposed rule, financial institutions would be required to report data on small business credit

---

[943] Fed. Farm Credit Banks Funding Corp., *Farm Credit 2019 Annual Information Statement of the Farm Credit System*, at 7 (Feb. 28, 2020), *https://www.farmcreditfunding.com/ffcb_live/serve/public/pressre/finin/report.pdf?assetId=395570*. The Bureau notes that Farm Credit System banks do not report FFIEC Call Reports and are thus not counted in the number of banks and savings associations discussed above.

applications if they originated at least 25 covered transactions in each of the previous two calendar years. The Bureau is proposing that 1071 data collection be done on a calendar-year basis and submitted to the Bureau by a specified time after the end of each calendar year. The section-by-section analyses of the proposed rule in part V above discuss the required data points and the scope of the proposed rule in greater detail. More information is also available in section 3 of the SBREFA Panel Report.

*Recordkeeping requirements.* ECOA section 704B(f)(2)(A) requires that information compiled and maintained under section 1071 be "retained for not less than 3 years after the date of preparation." The Bureau is proposing that financial institutions retain 1071 data for at least three years after it is submitted to the Bureau. Further, 704B(f)(2) generally requires that the information compiled and maintained by financial institutions, and submitted annually to the Bureau, be made available to the public. Publication of these data would fill existing gaps in the public's general understanding of the small business lending environment and help identify potential fair lending concerns regarding small businesses as well as the needs and opportunities for both business and community development. In accordance with 704B(e)(3), the Bureau is also proposing a prohibition on including certain personally identifiable information about any individuals associated with small business applicants in the data that a financial institution is required to compile, maintain, and report to the Bureau, other than information specifically required to be collected and reported (such as the race, sex, and ethnicity of principal owners). Financial institutions must, unless subject to an exception, limit the access of a certain officers and employees to applicants' responses to the inquiries regarding women-owned and minority-owned business status, as well as the race, sex, and ethnicity of principal owners. In addition, applicants' responses to the inquiries regarding women-owned and minority-owned business status, as well as the race, sex, and ethnicity of principal owners, must be maintained separately from the application and accompanying information.

*Costs to small entities.* The Bureau expects that the proposed rule may impose one-time and ongoing costs on small-entity providers of credit to small businesses. The Bureau has preliminarily identified eight categories of one-time costs that make up the components necessary for a financial

institution to develop the infrastructure to collect and report data required by the eventual 1071 rule. Those categories are preparation/planning; updating computer systems; testing/validating systems; developing forms/applications; training staff and third parties (such as dealers and brokers); developing policies/procedures; legal/compliance review; and post-implementation review of compliance policies and procedures. The Bureau conducted a survey regarding potential one-time implementation costs for section 1071 compliance targeted at financial institutions who extend small business credit. The Bureau used the results of this survey to estimate the one-time costs for financial institutions covered by the proposed rule using the methodology described in part VII.E.1 above. The Bureau estimates that depository institutions with the lowest level of complexity in compliance operations (*i.e.,* Type A DIs) would incur one-time costs of $58,400. The Bureau estimates that depository institutions with a middle level of complexity in compliance operations (*i.e.,* Type B DIs) would incur one-time costs of $44,500. The Bureau estimates that depository institutions with the highest level of complexity in compliance operations (*i.e.,* Type C DIs) would incur one-time costs of $75,700. Finally, the Bureau estimates that Non-DIs would incur one-time costs of $95,200.

The Bureau estimates that the overall market impact of one-time costs for small depository institutions will be between $143,000,000 and $153,000,000.[944] The Bureau estimates that the overall market impact of one-time costs for Non-DIs will be $63,000,000.

Adapting ongoing cost methodology from previous HMDA rulemaking efforts, the Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs to financial institutions covered by the rule.[945] The Bureau estimated that financial institutions with the lowest level of complexity in compliance operations (*i.e.* Type A FIs) would incur around $7,386 in total annual ongoing costs, or about $74 in total cost per application processed (assuming a

representative 100 applications per year). For financial institutions of this type, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau estimates that financial institutions with a middle level of complexity in compliance operations (*i.e.* Type B FIs), which is somewhat automated, would incur approximately $35,476 in additional ongoing costs per year, or around $89 per application (assuming a representative 400 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (in the form of an annual software subscription fee) and the external audit of the data. The Bureau estimates that financial institutions with the highest level of complexity in compliance operations (*i.e.* Type C FIs), which is significantly automated, would incur approximately $243,266 in additional ongoing costs per year, or around $41 per application (assuming a representative 6,000 applications per year). The largest components of this ongoing cost are the cost of an internal audit, transcribing data, and annual edits and internal checks.

The Bureau estimates that the overall market impact of ongoing costs for small entities will be between $112,000,000 and $126,000,000 per year.

Estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for the preparation of the report or record. Section 603(b)(4) of the RFA also requires an estimate of the type of professional skills necessary for the preparation of the reports or records. The recordkeeping and compliance requirements of the proposed rule that would affect small entities are summarized above. Based on outreach with financial institutions, vendors, and governmental agency representatives, the Bureau classified the operational activities that financial institutions would likely use for Section 1071 data collection and reporting into 15 operational "tasks" which can be further grouped into four "primary tasks." These are:

1. Data collection: Transcribing data, resolving reportability questions, and transferring data to a 1071 data management system.

2. Reporting and resubmission: Geocoding, standard annual edit and internal checks, researching questions,

resolving question responses, checking post-submission edits, filing post-submission documents, and using vendor data management software.

3. Compliance and internal audits: Training, internal audits, and external audits.

4. Section 1071-related exams: Exam preparation and exam assistance.

All these tasks are related to the preparation of reports or records and most of them are performed by compliance personnel in the compliance department of financial institutions. For some financial institutions, however, the data intake and transcribing stage could involve loan officers or processors whose primary function is to evaluate or process loan applications. For example, at some financial institutions the loan officers would take in information from the applicant to complete the application and input that information into the reporting system. However, the Bureau believes that such roles generally do not require any additional professional skills related to recordkeeping or other compliance requirements of this proposed rule that are not otherwise required during the ordinary course of business for small entities.

The type of professional skills required for compliance varies depending on the particular task involved. For example, data transcribing requires data entry skills. Transferring data to a data entry system and using vendor data management software requires knowledge of computer systems and the ability to use them. Researching and resolving reportability questions requires a more complex understanding of the regulatory requirements and the details of the relevant line of business. Geocoding requires skills in using the geocoding software, web systems, or, in cases where geocoding is difficult, knowledge of the local area in which the property is located. Standard annual editing, internal checks, and post-submission editing require knowledge of the relevant data systems, data formats, and section 1071 regulatory requirements in addition to skills in quality control and assurance. Filing post-submission documents requires skills in information creation, dissemination, and communication. Training, internal audits, and external audits require communications skills, educational skills, and regulatory knowledge. Section 1071-related exam preparation and exam assistance involve knowledge of regulatory requirements, the relevant line of business, and the relevant data systems.

[944] The Bureau notes that the variation in this range comes primarily from the uncertainty in the number of originations made by small banks and savings associations. The range does not fully account for the uncertainty associated with estimates of the one-time costs for each type of institution.

[945] The Bureau applied the same methodology for the ongoing costs for small entities as that found in part VII.E.2 above.

The Standard Occupational Classification (SOC) code has compliance officers listed under code 13–1041. The Bureau believes that most of the skills required for preparation of the reports or records related to this proposal are the skills required for job functions performed in this occupation. However, the Bureau recognizes that under this general occupational code there is a high level of heterogeneity in the type of skills required as well as the corresponding labor costs incurred by the financial institutions performing these functions. During the SBREFA process, some SERs noted that, for instance, high-level corporate officers such as CEOs and senior vice presidents could be directly involved in some regulatory tasks. As such, the Bureau seeks comment regarding the skills required for the preparation of the records related to this proposed rule.

The Bureau acknowledges the possibility that certain aspects of the proposed rule may require some small entities to hire additional compliance staff. The Bureau has no evidence that such additional staff will possess a qualitatively different set of professional skills than small entity staff employed currently for compliance purposes. It is possible, however, that compliance with the proposed rule may emphasize certain skills. For example, new data points may increase demand for skills involved in researching questions, standard annual editing, and post-submission editing. Nevertheless, the Bureau believes that compliance would still involve the general set of skills identified above. The recordkeeping and reporting requirements associated with this proposal would also involve skills for information technology system development, integration, and maintenance. Financial institutions required to report data under HMDA often use data management systems called HMDA Management Systems (HMS) for existing regulatory purposes. A similar software for reporting the data required under the proposed rule could be developed by the institution internally or purchased from a third-party vendor. It is possible that other systems used by financial institutions, such as loan origination systems, might also need to be upgraded to capture new data fields required to be collected and reported under the proposed rule. The professional skills required for this one-time upgrade would be related to software development, testing, system engineering, information technology project management, budgeting and operation.

5. Identification, to the Extent Practicable, of All Relevant Federal Rules Which May Duplicate, Overlap, or Conflict With the Proposed Rule

The proposed rule contains requirements related to the collection and reporting of small business lending information by certain financial institutions and publication by the Bureau. In its SBREFA Outline, the Bureau identified certain other Federal statutes and regulations that relate in some fashion to these areas and has considered the extent to which they may duplicate, overlap, or conflict with this proposal.[946] The SBREFA Panel Report included an updated list of these Federal statutes and regulations, as informed by SER feedback.[947] Each of the statutes and regulations identified in the SBREFA Panel Report is discussed below.

ECOA, implemented by the Bureau's Regulation B (12 CFR part 1002), prohibits creditors from discriminating in any aspect of a credit transaction, including a business-purpose transaction, on the basis of race, color, religion, national origin, sex (including sexual orientation and gender identity), marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act. The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.

Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex (including sexual orientation and gender identity), with limited exceptions, including if it is required by law. Regulation B requires creditors to request information about the race, ethnicity, sex, marital status, and age of applicants for certain dwelling-secured loans and to retain that information for certain periods. Regulation B requires this data collection for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, and requires the data to be maintained by the creditor for 25 months for purposes of

monitoring and enforcing compliance with ECOA/Regulation B and other laws. Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to compile, maintain, and submit to the Bureau certain data on credit applications by women-owned, minority-owned, and small businesses.

The Small Business Act,[948] administered through the SBA, defines a small business concern as a business that is "independently owned and operated and which is not dominant in its field of operation" and empowers the Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business. The SBA has adopted more than one thousand industry-specific size standards, classified by 6-digit NAICS codes, to determine whether a business concern is "small." In addition, the Small Business Act authorizes loans for qualified small business concerns for purposes of plant acquisition, construction, conversion, or expansion, including the acquisition of land, material, supplies, equipment, and working capital. The SBA sets the guidelines that govern the "7(a) loan program," determining which businesses financial institutions may lend to through the program and the type of loans they can provide. The Bureau's proposed rule would include reporting on SBA lending and guarantee programs.

The CRA, implemented through regulations issued by the OCC, the Board, and the FDIC, requires some institutions to collect, maintain, and report certain data about small business, farm, and consumer lending to ensure they are serving their communities. The purpose of the CRA is to encourage institutions to help meet the credit needs of the local communities in which they do business, including low- and moderate-income neighborhoods. The Bureau has been working with the CRA regulatory agencies to ensure that a 1071 rule and the CRA do not conflict and that 1071 data can be used as part of the CRA compliance process.

The Riegle Community Development and Regulatory Improvement Act of 1994[949] authorized the Community Development Financial Institution Fund (CDFI Fund). The Department of the Treasury administers the regulations that govern the CDFI Fund. A certified CDFI is a specialized financial institution that works in markets that are underserved by traditional financial institutions, including regulated institutions such as community

---

[946] Rules are duplicative or overlapping if they are based on the same or similar reasons for the regulation, the same or similar regulatory goals, and if they regulate the same classes of industry. Rules are conflicting when they impose two conflicting regulatory requirements on the same classes of industry.

[947] *See* SBREFA Panel Report at app. C.

[948] 15 U.S.C. 631 *et seq.*

[949] 12 U.S.C. 4701 *et seq.*

AdminRecord-000639

development banks and credit unions, and non-regulated institutions such as loan and venture capital funds. The CDFI program includes an annual mandatory Certification and Data Collection Report. The Bureau is proposing to require that financial institutions reporting 1071 data identify if they are CDFIs.

HMDA, implemented by the Bureau's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to collect, report, and disclose detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. The HMDA data are a valuable source for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There may be some overlap between what is required to be reported under HMDA and what is proposed to be covered by section 1071 for certain credit applications secured by dwellings.

The Currency and Foreign Transactions Reporting Act,[950] as amended by the USA PATRIOT Act,[951] and commonly referred to as the Bank Secrecy Act, authorized the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury, to combat money laundering and promote financial security. FinCEN regulations require covered financial institutions to establish and maintain written procedures that are reasonably designed to identify and verify beneficial owners of legal entity customers, which is sometimes called the customer due diligence (CDD) rule.

The Federal Credit Union Act, implemented by the NCUA (12 CFR part 1756), requires Federal credit unions to make financial reports as specified by the agency. The NCUA requires quarterly reports of the total number of outstanding loans, total outstanding loan balance, total number of loans granted or purchased year-to-date, total amount granted or purchased year-to-date for commercial loans to members, not including loans with original amounts less than $50,000. The NCUA also requires quarterly reports of the total number and total outstanding balance (including the guaranteed portion) of loans originated under an SBA loan program.

The Federal Deposit Insurance Act,[952] implemented by the FDIC (12 CFR part 304), requires insured banks and savings associations to file Call Reports in accordance with applicable instructions. These instructions require quarterly reports of loans to small businesses, defined as loans for commercial and industrial purposes to sole proprietorships, partnerships, corporations, and other business enterprises and loans secured by non-farm non-residential properties with original amounts of $1 million or less. In accordance with amendments by the Federal Deposit Insurance Corporation Improvement Act of 1991,[953] the instructions require quarterly reports of loans to small farms, defined as loans to finance agricultural production, other loans to farmers, and loans secured by farmland (including farm residential and other improvements) with original amounts of $500,000 or less. The Bureau intends to work with the FDIC to ensure that a 1071 rule and the Federal Deposit Insurance Act do not conflict.

The Bureau requests comment to identify any additional such Federal statutes or regulations that impose duplicative, overlapping, or conflicting requirements on financial institutions and potential changes to the proposed rules in light of duplicative, overlapping, or conflicting requirements.

## 6. Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities

In drafting this proposed rule, the Bureau considered multiple financial institution reporting thresholds. In particular, the Bureau considered whether to exempt financial institutions with fewer than 50 or 100 originations of covered credit transactions for small businesses in each of the two preceding calendar years, instead of 25 originations as proposed. The Bureau also considered whether to exempt depository institutions with assets under $100 million or $200 million from section 1071's data collection and reporting requirements. The Bureau understands that some burden reduction may result from a threshold higher than 25 loans. However, the Bureau is concerned that a higher threshold would result in the elimination of data that are important in fulfilling the purposes of section 1071. Therefore, the Bureau is proposing an originations threshold of at least 25 covered transactions in each of the previous two calendar years.

The following table shows the estimated impact that different reporting thresholds the Bureau considered would have had on financial institution coverage. For the purposes of considering the asset-based threshold alternatives, the Bureau estimates how institutional coverage and costs would be different if the Bureau required a 25-origination threshold in addition to an asset-based threshold for depository institutions. For the asset-based threshold alternatives, the Bureau assumes that the alternative proposal would have been that a depository institution would be required to report its small business lending activity for 2019 if it had more than 25 originations in both 2017 and 2018 and had assets over the asset-based threshold on December 31, 2018. The Bureau further assumes that if two institutions merged in 2019 then the resulting institution would be required to report if the sum of the separate institutions' assets on December 31, 2018 exceeded the asset-based threshold.

---

[950] Public Law 91–508, tit. II, 84 Stat. 1118 (1970).
[951] Public Law 107–56, 115 Stat. 272 (2001).

[952] 12 U.S.C. 1811 *et seq.*
[953] Public Law 102–242, 105 Stat. 2236 (1991).

AdminRecord-000640

**Table 18: Estimated impact of different reporting thresholds on the number and percentage of small depository institutions covered**

| Threshold considered | # of small depository institutions covered | % of small depository institutions covered |
|---|---|---|
| 25 originations | 4,000 – 4,200 | 38% – 40% |
| 50 originations | 2,900 – 3,100 | 28% – 29% |
| 100 originations | 1,800 – 2,000 | 17% – 19% |
| 25 originations AND $100 million in assets | 3,500 – 3,600 | 33% – 34% |
| 25 originations AND $200 million in assets | 2,600 – 2,700 | 25% – 25% |

Further, the Bureau is proposing a number of discretionary data points (*i.e.,* data points that are not expressly listed in section 1071 but that the Bureau is proposing to add pursuant to its authority under ECOA section 704B(e)(2)(H)) in this rule. The Bureau concluded that seven discretionary data points (application channel, application recipient, pricing, number of principal owners, NAICS code, number of workers, and time in business) would help the data collection fulfill the purposes of section 1071.

During the SBREFA process, SERs provided detailed feedback on the discretionary data points that the Bureau is considering.[954] One SER stated that the cost of collecting and reporting the discretionary data points under consideration would be significant, and another SER stated that the Bureau should include as few data points as possible to avoid unnecessary costs. Another SER stated that the Bureau should finalize a rule with just the statutorily required data points and avoid adding any discretionary data points. Other SERs favored or opposed the inclusion of some or all of the individual discretionary data points under consideration during the SBREFA process.

The Bureau understands that discretionary data points may introduce additional burden to small entities. However, the Bureau has preliminarily determined that these data points would aid in fulfilling the statutory purposes of section 1071—facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and

community development needs and opportunities of women-owned, minority-owned, and small businesses. The Bureau seeks comment on the likely impact of the proposed rule on the compliance cost to small entities.

7. Discussion of Impact on Cost of Credit for Small Entities

Three types of costs (one-time, fixed ongoing, and variable ongoing) have the potential to influence the price and availability of credit to small businesses. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the value of granting an additional loan is equal to the additional cost associated with the financial institution providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the profitability of extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will influence the number of loans a lender provides. Based on the Bureau's available evidence, it expects that the variable ongoing costs to comply with the proposed rule will be passed on in full to small business credit applicants in the form of higher prices or fees to small businesses.

During the SBREFA process, the Bureau asked SERs how they would respond to the cost of complying with the proposals under consideration.[955] One nondepository SER did indicate that smaller firms in their industry may stop participating if one-time costs are too high, particularly if small business lending is a secondary aspect of their

business model.[956] Another nondepository SER indicated that significantly increasing the time between application and decision could occur due to the proposed requirements, which they said would threaten their ability to compete with other lenders. When asked if they expected the costs of the eventual 1071 rule to be passed on in the form of higher rates and fees, a number of SERs (from banks, credit unions, and nondepositories) indicated that they expected to do so at their institutions. However, a number of other SERs indicated that they did not believe an eventual 1071 rule would result in higher rates or fees. Several depository institution SERs said that they would be able to absorb the costs in their operating budgets as they have with previous regulations.

In the One-Time Cost Survey, the Bureau asked respondents to rank a list of potential actions they may take in response to the compliance costs of implementing section 1071.[957] Respondents ranked the following list: "Raise rates or fees on small business products"; "Raise rates/fees on other credit products"; "Accept lower profits"; "Exit some geographic markets"; "Tighten underwriting standards"; "Offer fewer or less complex products"; "No longer offer small business credit products"; or "Other" with two write-in options. Respondents ranked these options from "1" to "9" indicating their most to least likely responses. Respondents also had the opportunity to write in their own responses. Consistent with economic

---

[954] The SER feedback discussed herein can be found in the SBREFA Panel Report at 30–32.

[955] SBREFA Outline at 50.

[956] The SER feedback discussed in this section-by-section analysis can be found in the SBREFA Panel Report at 40.

[957] *See* One-Time Cost Survey at 11.

AdminRecord-000641

theory, respondents reported that they would be most likely to raise rates or fees on small business products and other credit products. On average, respondents reported that they would be least likely to exit some geographic markets or cease offering small business credit products. Accordingly, the Bureau expects the likely impact of an eventual 1071 rule on the cost of credit to small entities to be higher rates and fees because financial institutions pass on the variable ongoing costs of the required data collection. The Bureau estimates that $28, $24, and $7 in variable costs would be passed through per application to Type A, B, and C FIs, respectively. To put these values in context, the Bureau estimates that the per application net income is in a range of $53,000–$60,500; $25,000–$28,500; and $79,000–$89,000 for banks and savings associations of Types A, B, and C, respectively.

## IX. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA),[958] Federal agencies are generally required to seek approval from the Office of Management and Budget (OMB) for information collection requirements prior to implementation. Under the PRA, the Bureau may not conduct nor sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.

As part of its continuing effort to reduce paperwork and respondent burden, the Bureau conducts a preclearance consultation program to provide the general public and Federal agencies with an opportunity to comment on the information collection requirements in accordance with the PRA. This helps ensure that the public understands the Bureau's requirements or instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, information collection instruments are clearly understood, and the Bureau can properly assess the impact of information collection requirements on respondents.

The proposed rule would amend 12 CFR part 1002 (Regulation B), which implements the ECOA. The Bureau's OMB control number for Regulation B is 3170–0013. This proposed rule would revise the information collection requirements contained in Regulation B that OMB has approved under that OMB control number.

---

[958] 44 U.S.C. 3501 *et seq.*

Under the proposal, the Bureau would add four information collection requirements to Regulation B:

1. Compilation of reportable data (proposed § 1002.107), including a notice requirement (in proposed § 1002.107(a)(18) through (20)).
2. Reporting data to the Bureau (proposed § 1002.109).
3. Firewall notice requirement (proposed § 1002.108(d)).
4. Recordkeeping (proposed § 1002.111).

The information collection requirements in this proposed rule would be mandatory. Certain data fields would be modified or deleted by the Bureau, in its discretion, to advance a privacy interest before the 1071 data are made available to the public (as permitted by section 1071 and the Bureau's proposed rule). The data that are not modified or deleted would be made available to the public and are not considered confidential. The rest of the data would be considered confidential if the information:

• Identifies any natural persons who might not be applicants (*e.g.*, owners of a business where a legal entity is the applicant); or
• Implicates the privacy interests of financial institutions.

The collections of information contained in this proposed rule, and identified as such, have been submitted to OMB for review under section 3507(d) of the PRA. A complete description of the information collection requirements (including the burden estimate methods) is provided in the information collection request (ICR) that the Bureau has submitted to OMB under the requirements of the PRA. Please send your comments to the Office of Information and Regulatory Affairs, OMB, Attention: Desk Officer for the Bureau of Consumer Financial Protection. Send these comments by email to *oira_submission@omb.eop.gov* or by fax to 202–395–6974. If you wish to share your comments with the Bureau, please send a copy of these comments as described in the **ADDRESSES** section above. The ICR submitted to OMB requesting approval under the PRA for the information collection requirements contained herein is available at *www.regulations.gov* as well as on OMB's public-facing docket at *www.reginfo.gov*.

*Title of Collection:* Regulation B: Equal Credit Opportunity Act.
*OMB Control Number:* 3170–0013.
*Type of Review:* Revision of a currently approved collection.
*Affected Public:* Private Sector; Federal and State Governments.

*Estimated Number of Respondents:* 188,800.
*Estimated Total Annual Burden Hours:* 5,688,000.

Comments are invited on: (a) Whether the collection of information is necessary for the proper performance of the functions of the Bureau, including whether the information will have practical utility; (b) the accuracy of the Bureau's estimate of the burden of the collection of information, including the validity of the methods and the assumptions used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Comments submitted in response to this proposal will be summarized and/or included in the request for OMB approval. All comments will become a matter of public record.

If applicable, the notice of final rule will display the control number assigned by OMB to any information collection requirements proposed herein and adopted in the final rule.

## List of Subjects in 12 CFR Part 1002

Banks, Banking, Civil rights, Consumer protection, Credit, Credit unions, Marital status discrimination, National banks, Penalties.

## Authority and Issuance

For the reasons set forth in the preamble, the Bureau proposes to amend Regulation B, 12 CFR part 1002, as set forth below:

## PART 1002—EQUAL CREDIT OPPORTUNITY ACT (REGULATION B)

■ 1. The authority citation for part 1002 is revised to read as follows:

**Authority:** 12 U.S.C. 5512, 5581; 15 U.S.C. 1691b. Subpart B is also issued under 15 U.S.C. 1691c–2.

## Subpart A—General

■ 2. Sections 1002.1 through 1002.16 are designated as subpart A under the heading set forth above.
■ 3. Section 1002.5 is amended by revising paragraph (a)(4) introductory text and adding paragraphs (a)(4)(vii) through (ix) to read as follows:

### § 1002.5 Rules concerning requests for information.

(a) *General rules*—
\*    \*    \*    \*    \*
(4) *Other permissible collection of information.* Notwithstanding paragraph (b) of this section, a creditor may collect

AdminRecord-000642

information under the following circumstances provided that the creditor collects the information in compliance with appendices F and G to this part, or appendix B to 12 CFR part 1003, as applicable:

\*    \*    \*    \*    \*

(vii) A creditor that was required to report small business lending data pursuant to § 1002.109 for any of the preceding five calendar years but is not currently a covered financial institution under § 1002.105(b) may collect information pursuant to subpart B of this part for a covered application as defined in § 1002.103 regarding whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 for that application.

(viii) A creditor that exceeded the loan-volume threshold in the first year of the two-year threshold period provided in § 1002.105(b) may, in the second year, collect information pursuant to subpart B of this part for a covered application as defined in § 1002.103 regarding whether the applicant is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 for that application.

(ix) A creditor that is not currently a covered financial institution under § 1002.105(b), and is not otherwise a creditor to which § 1002.5(a)(4)(vii) or (viii) applies, may collect information pursuant to subpart B of this part for a covered application as defined in § 1002.103 regarding whether an applicant for a covered credit transaction is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners for a transaction if it complies with the requirements of subpart B as otherwise required for covered financial institutions pursuant to §§ 1002.107 through 1002.112 and 1002.114 for that application.

\*    \*    \*    \*    \*

■ 4. Subpart B is added to read as follows:

## Subpart B—Small Business Lending Data Collection

§ 1002.101    Authority, purpose, and scope.
§ 1002.102    Definitions.
§ 1002.103    Covered applications.
§ 1002.104    Covered credit transactions and excluded transactions.
§ 1002.105    Covered financial institutions and exempt institutions.
§ 1002.106    Business and small business.
§ 1002.107    Compilation of reportable data.
§ 1002.108    Firewall.
§ 1002.109    Reporting of data to the Bureau.
§ 1002.110    Publication of data.
§ 1002.111    Recordkeeping.
§ 1002.112    Enforcement.
§ 1002.113    Severability.
§ 1002.114    Effective date, compliance date, and special transitional rules.

### § 1002.101    Authority, purpose, and scope.

(a) *Authority and scope.* This subpart to Regulation B is issued by the Bureau pursuant to section 704B of the Equal Credit Opportunity Act (15 U.S.C. 1691c–2). Except as otherwise provided herein, this subpart Applies to covered financial institutions, as defined in § 1002.105(b), other than a person excluded from coverage of this part by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

(b) *Purpose.* This subpart implements section 704B of the Equal Credit Opportunity Act, which is intended:

(i) To facilitate enforcement of fair lending laws; and

(ii) To enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

### § 1002.102    Definitions.

In this subpart:

(a) *Affiliate* means, with respect to a financial institution, any company that controls, is controlled by, or is under common control with, another company, as set forth in the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*). With respect to a business or an applicant, *affiliate* shall have the same meaning as in 13 CFR 121.103.

(b) *Applicant* means any person who requests or who has received an extension of business credit from a financial institution.

(c) *Business* is defined in § 1002.106(a).

(d) *Business credit* shall have the same meaning as in § 1002.2(g).

(e) *Closed-end credit transaction* means an extension of credit that is not an open-end credit transaction under paragraph (n) of this section.

(f) *Covered application* is defined in § 1002.103.

(g) *Covered credit transaction* is defined in § 1002.104.

(h) *Covered financial institution* is defined in § 1002.105(b).

(i) *Credit* shall have the same meaning as in § 1002.2(j).

(j) *Dwelling* shall have the same meaning as in Regulation C, 12 CFR 1003.2(f).

(k) *Financial institution* is defined in § 1002.105(a).

(*l*) *Minority individual* means a natural person who is American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino.

(m) *Minority-owned business* means a business for which more than 50 percent of its ownership or control is held by one or more minority individuals, and more than 50 percent of its net profits or losses accrue to one or more minority individuals.

(n) *Open-end credit transaction* means an open-end credit plan as defined in Regulation Z, 12 CFR 1026.2(a)(20), but without regard to whether the credit is consumer credit, as defined in § 1026.2(a)(12), is extended by a creditor, as defined in § 1026.2(a)(17), or is extended to a consumer, as defined in § 1026.2(a)(11).

(o) *Principal owner* means a natural person who directly owns 25 percent or more of the equity interests of a business.

(p) *Small business* is defined in § 1002.106(b).

(q) *Small business lending application register* or *register* means the data reported, or required to be reported, annually pursuant to § 1002.109.

(r) *State* shall have the same meaning as in § 1002.2(aa).

(s) *Women-owned business* means a business for which more than 50 percent of its ownership or control is held by one or more women, and more than 50 percent of its net profits or losses accrue to one or more women.

### § 1002.103    Covered applications.

(a) *Covered application.* Except as provided in paragraph (b) of this section, covered application means an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested.

(b) *Circumstances that are not covered applications.* A covered application does not include:

(1) Reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts.

AdminRecord-000643

(2) Inquiries and prequalification requests.

### § 1002.104  Covered credit transactions and excluded transactions.

(a) *Covered credit transaction* means an extension of business credit that is not an excluded transaction under paragraph (b) of this section.

(b) *Excluded transactions.* The requirements of this subpart do not apply to:

(1) *Trade credit.* A financing arrangement wherein a business acquires goods or services from another business without making immediate payment to the business providing the goods or services.

(2) *Public utilities credit.* Public utilities credit as defined in § 1002.3(a)(1).

(3) *Securities credit.* Securities credit as defined in § 1002.3(b)(1).

(4) *Incidental credit.* Incidental credit as defined in § 1002.3(c)(1), but without regard to whether the credit is consumer credit, as defined in § 1002.2(h).

### § 1002.105  Covered financial institutions and exempt institutions.

(a) *Financial institution* means any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity.

(b) *Covered financial institution* means a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years. For purposes of this definition, if more than one financial institution was involved in the origination of a covered credit transaction, only the financial institution that made the credit decision approving the application shall count the origination for purposes of this paragraph (b).

### § 1002.106  Business and small business.

(a) *Business* has the same meaning as the term "business concern or concern" in 13 CFR 121.105.

(b) *Small business* has the same meaning as the term "small business concern" in 15 U.S.C. 632(a), as implemented in 13 CFR 121.101 through 121.107. Notwithstanding the size standards set forth in 13 CFR 121.201, for purposes of this subpart, a business is a small business if and only if its gross annual revenue, as defined in § 1002.107(a)(14), for its preceding fiscal year is $5 million or less.

### § 1002.107  Compilation of reportable data.

(a) *Data format and itemization.* A covered financial institution shall compile and maintain data regarding covered applications from small businesses. The data shall be compiled in the manner prescribed below and as explained in associated Official Interpretations and the Filing Instructions Guide for this subpart for the appropriate year. The data compiled shall include the items described in paragraphs (a)(1) through (21) of this section.

(1) *Unique identifier.* An alphanumeric identifier, starting with the legal entity identifier of the financial institution, unique within the financial institution to the specific covered application, and which can be used to identify and retrieve the specific file or files corresponding to the application for or extension of credit.

(2) *Application date.* The date the covered application was received by the financial institution or the date shown on a paper or electronic application form.

(3) *Application method.* The means by which the applicant submitted the covered application directly or indirectly to the financial institution.

(4) *Application recipient.* Whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party.

(5) *Credit type.* The following information regarding the type of credit applied for or originated:

(i) *Credit product.* The credit product.

(ii) *Guarantees.* The type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated.

(iii) *Loan term.* The length of the loan term, in months, if applicable.

(6) *Credit purpose.* The purpose or purposes of the credit applied for or originated.

(7) *Amount applied for.* The initial amount of credit or the initial credit limit requested by the applicant.

(8) *Amount approved or originated.* (i) For an application for a closed-end credit transaction that is approved but not accepted, the amount approved by the financial institution; or

(ii) For a closed-end credit transaction that is originated, the amount of credit originated; or

(iii) For an application for an open-end credit transaction that is originated or approved but not accepted, the amount of the credit limit approved.

(9) *Action taken.* The action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete.

(10) *Action taken date.* The date of the action taken by the financial institution.

(11) *Denial reasons.* For denied applications, the principal reason or reasons the financial institution denied the covered application.

(12) *Pricing information.* The following information regarding the pricing of a covered credit transaction that is originated or approved but not accepted, as applicable:

(i) *Interest rate.* (A) If the interest rate is fixed, the interest rate that is or would be applicable to the covered credit transaction; or

(B) If the interest rate is adjustable, the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination;

(ii) *Total origination charges.* The total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars;

(iii) *Broker fees.* The total amount of all charges included in paragraph (a)(12)(ii) of this section that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars;

(iv) *Initial annual charges.* The total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars;

(v) *Additional cost for merchant cash advances or other sales-based financing.* For a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid, expressed in dollars; and

(vi) *Prepayment penalties.* (A) Notwithstanding whether such a provision was in fact included, whether the financial institution would have included a charge to be imposed for paying all or part of the transaction's principal before the date on which the principal is due under the policies and procedures applicable to the covered credit transaction; and

(B) Notwithstanding the response to paragraph (a)(20)(iv)(A) of this section, whether the terms of the covered credit transaction do in fact include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due.

(13) *Census tract.* The census tract in which is located:

(i) The address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or

(ii) If the information in paragraph (a)(13)(i) of this section is unknown, the address or location of the main office or headquarters of the applicant; or

(iii) If the information in both paragraphs (a)(13)(i) and (ii) of this section is unknown, another address or location associated with the applicant.

(iv) The financial institution shall also indicate which one of the three types of addresses or locations listed in paragraphs (a)(13)(i), (ii), or (iii) of this section the census tract is based on.

(14) *Gross annual revenue.* The gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected.

(15) *NAICS code.* A 6-digit North American Industry Classification System (NAICS) code appropriate for the applicant.

(16) *Number of workers.* The number of non-owners working for the applicant.

(17) *Time in business.* The time the applicant has been in business, described in whole years, as relied on or collected by the financial institution.

(18) *Minority-owned business status.* Whether the applicant is a minority-owned business and whether minority-owned business status is being reported based on previously collected data pursuant to § 1002.107(c)(2). The financial institution shall collect and report minority-owned business status as prescribed in appendix F to this part. When requesting minority-owned business status from an applicant, the financial institution shall inform the applicant that the financial institution cannot discriminate on the basis of minority-owned business status, or on whether the applicant provides this information.

(19) *Women-owned business status.* Whether the applicant is a women-owned business and whether women-owned business status is being reported based on previously collected data pursuant to § 1002.107(c)(2). The financial institution shall collect and report women-owned business status as prescribed in appendix F to this part. When requesting women-owned business status from an applicant, the financial institution shall inform the applicant that the financial institution cannot discriminate on the basis of women-owned business status, or on whether the applicant provides this information.

(20) *Ethnicity, race, and sex of principal owners.* The ethnicity, race, and sex of the applicant's principal

owners and whether ethnicity, race, and sex are being reported based on previously collected data pursuant to § 1002.107(c)(2). The data compiled for purposes of this paragraph (a)(20) shall also include whether ethnicity and race are being reported based on visual observation or surname. The financial institution shall collect and report principal owners' ethnicity, race, and sex information as prescribed in appendix G to this part. When requesting ethnicity, race, and sex information from an applicant, the financial institution shall inform the applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex, or on whether the applicant provides this information.

(21) *Number of principal owners.* The number of the applicant's principal owners.

(b) *Verification of applicant-provided information.* Unless otherwise provided in this subpart, the financial institution may rely on statements of the applicant when compiling data unless it verifies the information provided, in which case it shall use the verified information.

(c) *Time and manner of collection—*
(1) *In general.* A covered financial institution shall maintain procedures to collect applicant-provided data under paragraph (a) of this section at a time and in a manner that is reasonably designed to obtain a response.

(2) *Previously collected data.* A covered financial institution is permitted, but not required, to reuse previously collected data to satisfy paragraphs (a)(13) through (21) of this section if:

(i) The data were collected within the same calendar year as the current covered application; and

(ii) The financial institution has no reason to believe the data are inaccurate.

### § 1002.108  Firewall.

(a) *Definitions.* For purposes of this section, the following terms shall have the following meanings:

(1) *Involved in making any determination concerning a covered application* means participating in a decision regarding the evaluation of a covered application, including the creditworthiness of an applicant for a covered credit transaction.

(2) *Should have access* means that an employee or officer may need to collect, see, consider, refer to, or otherwise use the information to perform that employee's or officer's assigned job duties.

(b) *Prohibition on access to certain information.* Unless the exception under paragraph (c) of this section applies, an

employee or officer of a covered financial institution or a covered financial institution's affiliate shall not have access to an applicant's responses to inquiries that the financial institution makes pursuant to this subpart regarding whether the applicant is a minority-owned business under § 1002.107(a)(18) or a women-owned business under § 1002.107(a)(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(20), if that employee or officer is involved in making any determination concerning that applicant's covered application.

(c) *Exception to the prohibition on access to certain information.* The prohibition in paragraph (b) of this section shall not apply to an employee or officer if the financial institution determines that it is not feasible to limit that employee's or officer's access to an applicant's responses to the financial institution's inquiries under § 1002.107(a)(18) through (20) and the financial institution provides the notice required under paragraph (d) of this section to the applicant. It is not feasible to limit access as required pursuant to paragraph (b) of this section if the financial institution determines that an employee or officer involved in making any determination concerning a covered application should have access to one or more applicants' responses to the financial institution's inquiries under § 1002.107(a)(18) through (20).

(d) *Notice.* In order to satisfy the exception set forth in paragraph (c) of this section, a financial institution shall provide a notice to each applicant whose responses will be accessed, informing the applicant that one or more employees or officers involved in making determinations concerning the covered application may have access to the applicant's responses to the financial institution's inquiries regarding whether the applicant is a minority-owned business or a women-owned business, and regarding the ethnicity, race, and sex of the applicant's principal owners. The financial institution shall provide the notice required by this paragraph (d) when making the inquiries required under § 1002.107(a)(18) through (20) and together with the notices required pursuant to § 1002.107(a)(18) through (20).

### § 1002.109  Reporting of data to the Bureau.

(a) *Reporting to the Bureau—*(1) *Annual reporting.* (i) On or before June 1 following the calendar year for which data are compiled and maintained as required by § 1002.107, a covered

AdminRecord-000645

financial institution shall submit its small business lending application register in the format prescribed by the Bureau.

(ii) An authorized representative of the covered financial institution with knowledge of the data shall certify to the accuracy and completeness of the data reported pursuant to this paragraph (a).

(iii) When the last day for submission of data prescribed under paragraph (a)(1) falls on a date that is not a business day, a submission shall be considered timely if it is submitted no later than the next business day.

(2) *Reporting by subsidiaries.* A covered financial institution that is a subsidiary of another covered financial institution shall complete a separate small business lending application register. The subsidiary shall submit its small business lending application register, directly or through its parent, to the Bureau.

(3) *Reporting obligations where multiple financial institutions are involved in a covered credit transaction.* If a covered application results in an origination, only one covered financial institution shall report the covered credit transaction. If more than one financial institution is involved in the origination of a covered credit transaction, the financial institution that makes the final credit decision approving the application shall report the loan as an origination (if that financial institution is a covered financial institution). If there was no origination, then any covered financial institution that made a credit decision shall report the application.

(b) *Financial institution identifying information.* A financial institution shall provide each of the following with its submission:

(1) Its name.

(2) Its headquarters address.

(3) The name and business contact information of a person who may be contacted with questions about the financial institution's submission.

(4) Its Federal prudential regulator, if applicable.

(5) Its Federal Taxpayer Identification Number (TIN).

(6) Its Legal Entity Identifier (LEI).

(7) Its Research, Statistics, Supervision, and Discount identification (RSSD ID) number, if applicable.

(8) Parent entity information, if applicable, including:

(i) The name of the immediate parent entity;

(ii) The LEI of the immediate parent entity, if available;

(iii) The RSSD ID number of the immediate parent entity, if available;

(iv) The name of the top-holding parent entity;

(v) The LEI of the top-holding parent entity, if available; and

(vi) The RSSD ID number of the top-holding parent entity, if available.

(9) The type of financial institution that it is, indicated by selecting the appropriate type or types of institution from the list provided.

(10) Whether the financial institution is voluntarily reporting covered applications for covered credit transactions.

(c) *Procedures for the submission of data to the Bureau.* The Bureau shall make available a *Filing Instructions Guide,* containing technical instructions for the submission of data to the Bureau pursuant to this section, as well as any related materials, available at [a designated Bureau website].

### § 1002.110   Publication of data.

(a) *Publication of small business lending application registers and associated financial institution information.* The Bureau shall make available to the public generally the data reported to it by financial institutions pursuant to § 1002.109, subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest. The Bureau shall make such data available on an annual basis, by publishing it on the Bureau's website at [a designated Bureau website].

(b) *Publication of aggregate data.* The Bureau may, at its discretion, compile and aggregate data submitted by financial institutions pursuant to § 1002.109, and make any compilations or aggregations of such data publicly available as the Bureau deems appropriate.

(c) *Statement of financial institution's small business lending data available on the Bureau's website.* A covered financial institution shall make available to the public on its website, or otherwise upon request, a statement that the covered financial institution's small business lending application register, as modified by the Bureau pursuant to § 1002.110(a), is or will be available on the Bureau's website at [a designated Bureau website]. A financial institution shall use language provided by the Bureau, or substantially similar language, to satisfy the requirement to provide a statement pursuant to this paragraph (c).

(d) *Availability of statements.* A covered financial institution shall make the notice required by paragraph (c) of this section available to the public on its

website when it submits a small business lending application register to the Bureau pursuant to § 1002.109(a)(1), and shall maintain the notice for as long as it has an obligation to retain its small business lending application registers pursuant to § 1002.111(a).

### § 1002.111   Recordkeeping.

(a) *Record retention.* A covered financial institution shall retain evidence of compliance with this subpart, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the Bureau pursuant to § 1002.109.

(b) *Certain information kept separate from the rest of the application.* A financial institution shall maintain, separately from the rest of the application and accompanying information, an applicant's responses to the financial institution's inquiries pursuant to this subpart regarding whether an applicant for a covered credit transaction is a minority-owned business under § 1002.107(18) or a women-owned business under § 1002.107(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(20).

(c) *Limitation on personally identifiable information in records retained under this section.* In compiling and maintaining any records under § 1002.107 or paragraph (b) of this section, or reporting data pursuant to § 1002.109, a financial institution shall not include any name, specific address, telephone number, email address, or any personally identifiable information concerning any individual who is, or is connected with, an applicant, other than as required pursuant to § 1002.107 or paragraph (b) of this section.

### § 1002.112   Enforcement.

(a) *Administrative enforcement and civil liability.* A violation of section 704B of the Act or this subpart is subject to administrative sanctions and civil liability as provided in sections 704 (15 U.S.C. 1691c) and 706 (15 U.S.C. 1691e) of the Act, where applicable.

(b) *Bona fide errors.* A bona fide error in compiling, maintaining, or reporting data with respect to a covered application is one that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. A bona fide error is not a violation of the Act or this subpart. A financial institution is presumed to maintain procedures reasonably adapted to avoid such errors with respect to a given data field if the number of errors found in a random

sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose in appendix H to this part. However, an error is not a bona fide error if either there is a reasonable basis to believe the error was intentional or there is other evidence that the financial institution does not or has not maintained procedures reasonably adapted to avoid such errors.

(c) *Safe harbors.* (1) *Incorrect entry for census tract.* An incorrect entry for census tract is not a violation of the Act or this subpart if the financial institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau.

(2) *Incorrect entry for NAICS code.* If a financial institution identifies the NAICS code for an applicant itself, without the applicant or another source providing the NAICS code, and the identified NAICS code is incorrect, the incorrect entry for the NAICS code is not a violation of the Act or this subpart provided that the first two digits of the NAICS code are correct and the financial institution maintains procedures reasonably adapted to correctly identify the subsequent four digits.

(3) *Incorrect determination of small business status.* A financial institution that initially determines that an applicant for a covered credit transaction is a small business, as defined in § 1002.106(b), but later concludes the applicant is not a small business, does not violate the Act or this regulation if the financial institution collected information pursuant to this

subpart regarding whether an applicant for a covered business transaction is a minority-owned business or a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners. A financial institution seeking to avail itself of this safe harbor shall comply with the requirements of this subpart As otherwise required pursuant to §§ 1002.107, 1002.108, and 1002.111 with respect to the collected information.

(4) *Incorrect application date.* A financial institution does not violate the Act or this subpart if it reports on its small business lending application register an application date that is within three calendar days of the actual application date pursuant to § 1002.107(a)(2).

### § 1002.113   Severability.

The provisions of this subpart are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

### § 1002.114   Effective date, compliance date, and special transitional rules.

(a) *Effective date.* The effective date for this subpart is [90 days after the date of publication of the final rule in the **Federal Register**].

(b) *Compliance date.* The compliance date for this subpart is [approximately 18 months after the date of publication of the final rule in the **Federal Register**].

(c) *Special transitional rules*—(1) *Collection of information prior to the compliance date.* A financial institution that will be a covered financial

institution as of the compliance date in paragraph (b) of this section is permitted, but not required, to collect information regarding whether an applicant for a covered credit transaction is a minority-owned business under § 1002.107(a)(18), a women-owned business under § 1002.107(a)(19), and the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(a)(20) beginning [12 months prior to the compliance date]. A financial institution collecting such information pursuant to this paragraph (c)(1) must do so in accordance with the requirements set out in §§ 1002.107(18) through (20) and 1002.108.

(2) *Determining whether a financial institution is a covered financial institution for purposes of this subpart.* For purposes of determining whether a financial institution is a covered financial institution under § 1002.105(b) as of the compliance date specified in paragraph (b) of this section, a financial institution is permitted, but not required, to use its to use its originations of covered credit transactions for small businesses in the second and third preceding calendar years (rather than its originations in the two immediately preceding calendar years).

■ 5. Appendices E through H are added to read as follows:

**Appendix E to Part 1002—Sample Form for Collecting Certain Applicant-Provided Data under Subpart B**

BILLING CODE 4810–25–P

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules   **56581**

# Sample data collection form

Federal law requires that we ask if a small business applicant is a minority-owned business or a women-owned business. Federal law also requires us to ask small business applicants for their principal owners' ethnicity, race, and sex.

Applicants are not required to provide this information, but are encouraged to do so. We collect this information to help ensure that all small business applicants are treated fairly and that communities' small business credit needs are being fulfilled.

Employees and officers making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form. However, we cannot discriminate on the basis of minority-owned business status, women-owned business status, or a principal owner's ethnicity, race, or sex. Additionally, we cannot discriminate on the basis of whether an applicant provides this information.

## Minority-owned business status

For purposes of this form, an applicant is a minority-owned business if one or more minority individuals (i) directly or indirectly own or control more than 50 percent of the business and (ii) receive more than 50 percent of the net profits of the business.

A minority individual is a natural person who is Hispanic or Latino, American Indian or Alaska Native, Asian, Black or African American, or Native Hawaiian or Other Pacific Islander. A multi-racial or multi-ethnic individual is a minority individual for this purpose.

### Is the applicant a minority-owned business?

☐ Yes

☐ No

☐ I do not wish to provide this information

## Women-owned business status

For purposes of this form, an applicant is a women-owned business if one or more women (i) directly or indirectly own or control more than 50 percent of the business and (ii) receive more than 50 percent of the net profits of the business.

### Is the applicant a women-owned business?

☐ Yes

☐ No

☐ I do not wish to provide this information

## Number of principal owners

For purposes of this form, a principal owner is any natural person who owns 25 percent or more of the equity interest of a business. An applicant might not have any principal owners if, for example, it is not directly owned by any natural persons (i.e., if it is owned by another entity or entities) or if no natural person directly owns at least 25 percent of the business.

**How many principal owners does the applicant have?** _____

AdminRecord-000648

## Demographic information about principal owners

Applicants are not required to provide this information but are encouraged to do so. We cannot discriminate on the basis of a principal owner's ethnicity, race, or sex. Additionally, we cannot discriminate on the basis of whether an applicant provides this information.

If a small business applicant does not provide ethnicity, race, or sex information for at least one of its principal owners and we meet with a principal owner in person or via electronic media with an enabled video component, Federal law requires us to report at least one principal owner's ethnicity and race based on visual observation and/or surname.

**Please fill out one sheet for each principal owner.**

_____     _____

**Ethnicity** *(Check one or more)*

☐ **Hispanic or Latino**

    ☐ Cuban

    ☐ Mexican

    ☐ Puerto Rican

    ☐ Other Hispanic or Latino *(Print origin, for example, Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on)*:

☐ **Not Hispanic or Latino**

☐ I do not wish to provide this information

**Sex** *(Check one or more)*

☐ **Female**

☐ **Male**

☐ **I prefer to self-identify as:**

☐ I do not wish to provide this information

**Race** *(Check one or more)*

☐ **American Indian or Alaska Native** *(Print name of enrolled or principal tribe)*:

☐ **Asian**

    ☐ Asian Indian

    ☐ Chinese

    ☐ Filipino

    ☐ Japanese

    ☐ Korean

    ☐ Vietnamese

    ☐ Other Asian *(Print race, for example, Cambodian, Hmong, Laotian, Pakistani, Thai, and so on)*:

☐ **Black or African American**

    ☐ African American

    ☐ Ethiopian

☐ Haitian

☐ Jamaican

☐ Nigerian

☐ Somali

☐ Other Black or African American *(Print race, for example, Barbadian, Ghanaian, South African, and so on)*:

☐ **Native Hawaiian or Other Pacific Islander**

    ☐ Guamanian or Chamorro

    ☐ Native Hawaiian

    ☐ Samoan

    ☐ Other Pacific Islander *(Print race, for example, Fijian, Tongan, and so on)*:

☐ **White**

☐ I do not wish to provide this information

BILLING CODE 4825–25–C

## Appendix F to Part 1002—Instructions for Collecting and Reporting Small Business Applicants' Minority-Owned Business Status and Women-Owned Business Status Under Subpart B

Covered financial institutions are required by subpart B of this part to collect certain information from small business applicants about covered applications, including whether the applicant is a minority-owned business or a women-owned business. This appendix provides instructions for collecting that information.

1. Unless a financial institution is reporting based on previously collected data as discussed in Instruction 11, the financial institution must ask the applicant about its minority-owned business status and women-owned business status for each of the applicant's covered applications. However, the financial institution cannot require an applicant to provide this information.

2. Generally, a financial institution must ask the applicant whether it is a minority-owned business and whether it is a women-owned business on a paper or electronic data collection form that is separate from the application form and other documents used to collect other information related to the application. See the sample data collection form in appendix E for sample language. For a covered application taken solely by telephone or another medium that does not involve providing any paper or electronic documents, the financial institution must ask the applicant about its minority-owned business status and women-owned business status orally if the financial institution is not reporting based on previously collected data. The financial institution may combine these business status questions with questions regarding principal owners' ethnicity, race, and sex pursuant to § 1002.107(a)(20) and a question about the applicant's number of principal owners pursuant to § 1002.107(a)(21). See the sample data collection form in appendix E.

3. When asking the questions regarding minority-owned business status and women-owned business status (regardless of whether they are asked on a paper form, electronically, or orally), the financial institution also must provide the applicant with definitions of the terms "minority individual," "minority-owned business," and "women-owned business" as set forth in § 1002.102(l), (m), and (s). The financial institution satisfies this requirement if it provides the definitions of minority individual, minority-owned business, and women-owned business set forth in the sample data collection form in appendix E.

4. A financial institution may inform the applicant that Federal law requires it to ask for an applicant's minority-owned business status and women-owned business status to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. The financial institution must inform the applicant that it is not required to respond to the financial institution's questions regarding the applicant's minority-owned business status and women-owned

business status. The financial institution also must inform the applicant that the financial institution cannot discriminate on the basis of minority-owned business status or women-owned business status, or on the basis of whether the applicant provides this information.

5. A financial institution must report the answers to the minority-owned business status and women-owned business status questions that the applicant provided on the paper or electronic data collection form the financial institution uses to satisfy the requirements of § 1002.107(a)(18) and (19) without regard to any answers provided for other purposes. If the financial institution asks the minority-owned business status and women-owned business status questions orally, the financial institution must report the answers the applicant provided in response to the inquiries the financial institution makes to satisfy the requirements of § 1002.107(a)(18) and (19) without regard to any answers provided for other purposes. For example, if a financial institution uses a paper data collection form to ask an applicant if it is a minority-owned business or women-owned business for purposes of § 1002.107(a)(18) and (19) and the applicant responds that it is not a minority-owned business or a women-owned business, the financial institution must report that the applicant is not a minority-owned business or a women-owned business, even if the applicant indicates that it is a minority-owned business for other purposes, such as for a special purpose credit program or a Small Business Administration program.

6. A financial institution is neither required nor permitted to verify the minority-owned business status or women-owned business status that the applicant provides.

7. If the applicant declines to provide information on the applicant's minority-owned business status or women-owned business status (such as by checking only the "I do not wish to provide this information" box on a paper or electronic data collection form or stating orally that it does not wish to provide this information), the financial institution must report that the applicant declined to provide information on the applicant's minority-owned business status or women-owned business status, as applicable.

8. If the applicant does not respond to the financial institution's inquiry regarding its minority-owned business status (such as by leaving the response blank or failing to submit a data collection form), the financial institution must report that the information was not provided by the applicant. Similarly, if the applicant does not respond to the financial institution's inquiry regarding its women-owned business status, the financial institution must report that the information was not provided by the applicant.

9. If the applicant both provides a substantive response to a question requesting business status (that is, checks either "yes" or "no") and also checks the "I do not wish to provide this information" box for that question, the financial institution reports the minority-owned business status or women-owned business status provided by the applicant (rather than reporting that the

applicant declined to provide the information).

10. A financial institution does not report minority-owned business status or women-owned business status based on visual observation, surname, or any basis other than the applicant's responses to the inquiries that the financial institution makes to satisfy § 1002.107(a)(18) and (19) or, as discussed in Instruction 11, on the basis of the applicant's responses to the inquiries that the financial institution previously made to satisfy § 1002.107(a)(18) and (19).

11. Section 1002.107(c)(2) and its commentary set forth when a financial institution is permitted to report information based on previously collected data. If the financial institution is permitted to report minority-owned business status or women-owned business status based on previously collected data, the financial institution may but is not required to do so.

12. If a financial institution reports minority-owned business status or women-owned business status based on previously collected data, the financial institution must also report that it is providing that information based on previously collected data.

## Appendix G to Part 1002—Instructions for Collecting and Reporting Ethnicity, Race, and Sex of Small Business Applicants' Principal Owners Under Subpart B

Covered financial institutions are required by subpart B of this part to collect certain information from small business applicants about covered applications, including the ethnicity, race, and sex of the applicant's principal owners. This appendix provides instructions for collecting that information.

### General Instructions

1. Unless a financial institution is reporting based on previously collected data as discussed in Instructions 26 through 29, the financial institution must ask the applicant for the ethnicity, race, and sex of its principal owners for each of the applicant's covered applications. However, a financial institution cannot require an applicant or any principal owner to provide this information.

2. Generally, a financial institution must ask the applicant about the ethnicity, race, and sex of the applicant's principal owners on a paper or electronic data collection form that is separate from the application form and other documents used to collect other information related to the application. See the sample data collection form in appendix E for sample language. For a covered application taken solely by telephone or another medium that does not involve providing any paper or electronic documents, the financial institution must ask the applicant for the principal owners' ethnicity, race, and sex orally if the financial institution is not reporting based on previously collected data. A financial institution may combine the questions regarding the principal owners' ethnicity, race, and sex with a question regarding the applicant's number of principal owners pursuant to § 1002.107(a)(21) and questions regarding the applicant's minority-owned business status and women-owned

business status pursuant to § 1002.107(a)(18) and (19). See the sample data collection form in appendix E.

3. When asking about principal owners' ethnicity, race, and sex, the financial institution must also provide the applicant with the definition of the term "principal owner" as set forth in § 1002.102(o). The financial institution satisfies this requirement if it provides the definition of principal owner set forth in the sample data collection form in appendix E.

4. A financial institution may inform the applicant that Federal law requires it to ask for the principal owners' ethnicity, race, and sex to help ensure that all small business applicants for credit are treated fairly and that communities' small business credit needs are being fulfilled. The financial institution must inform the applicant that the applicant is not required to respond to the financial institution's questions regarding the principal owner's ethnicity, race, and sex. The financial institution also must inform the applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex, or on whether the applicant provides this information.

5. If it is possible that a financial institution will meet in person with one or more of the applicant's principal owners and the financial institution is not reporting based on previously collected data, the financial institution must inform the applicant that if the applicant does not provide any ethnicity, race, or sex information for at least one principal owner, the financial institution is required to report ethnicity and race on the basis of visual observation and/or surname for at least one of the principal owners that the financial institution has met in person. If a financial institution collects ethnicity, race, and sex information using a paper or electronic data collection form, the financial institution may satisfy this requirement by providing a statement on that form. See the sample data collection form in appendix E. If a financial institution meets in person with a natural person representing an applicant but does not know if the natural person is a principal owner, the financial institution must ask or otherwise determine if that person is a principal owner. See comment 107(a)(20)–10 for examples of when a financial institution has and has not met in person with one or more principal owners. As described in Instruction 23, financial institutions do not report a principal owner's sex based on visual observation or surname.

**Instructions Regarding Ethnicity, Race, and Sex Categories**

6. When asking for a principal owner's sex, a financial institution must allow the applicant to respond using the sex categories set forth in the sample data collection form in appendix E and discussed in comment 107(a)(20)–8. These categories must include the option to self-identify using free-form text on a paper or electronic form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone.

7. When asking for a principal owner's ethnicity and race, a financial institution must allow the applicant to respond using the aggregate and disaggregated ethnicity and race categories and subcategories as set forth in the sample data collection form in appendix E and discussed in comments 107(a)(20)–6 and –7. The disaggregated subcategories must include the "other" disaggregated subcategories that provide the option to self-identify using free-form text on a paper or electronic data collection form or using language that informs the applicant of the opportunity to self-identify when taking the application by means other than a paper or electronic data collection form, such as by telephone.

8. A financial institution must permit an applicant to identify its principal owners as being of a particular Hispanic or Latino disaggregated subcategory (Cuban, Mexican, Puerto Rican, Other Hispanic or Latino) or of a particular Asian disaggregated subcategory (Asian Indian, Chinese, Filipino, Japanese, Korean, Vietnamese, Other Asian) or of a particular Native Hawaiian or Other Pacific Islander disaggregated subcategory (Guamanian or Chamorro, Native Hawaiian, Samoan, Other Pacific Islander) or of a particular Black or African American disaggregated subcategory (African American, Ethiopian, Haitian, Jamaican, Nigerian, Somali, or Other Black or African American) or of a particular American Indian or Alaska Native enrolled or principal tribe. An applicant must be permitted to select a disaggregated ethnicity or race subcategory even if the applicant does not also select the corresponding aggregate ethnicity or aggregate race category. For example, if an applicant selects only the "Mexican" disaggregated subcategory, the financial institution reports "Mexican" for the ethnicity of the applicant but does not also report "Hispanic or Latino."

9. A financial institution must offer the applicant the option of selecting more than one ethnicity, race, and sex for each principal owner. If an applicant selects more than one ethnicity, race, or sex for a principal owner, the financial institution must report each selected designation. The financial institution must also report any additional information that the applicant has provided as free-form text in the appropriate data reporting field. For example, if the applicant chooses to self-identify a principal owner's sex and provides additional information, the financial institution must report that information as free-form text in the appropriate data reporting field. Similarly, if an applicant indicates that a principal owner is Other Asian and provides additional information, such as writing in Cambodian, the financial institution must report that information as free-form text in the appropriate data reporting field.

10. If an applicant provides ethnicity, race, or sex information for one or more principal owners, the financial institution must report the ethnicity, race, and sex as provided by the applicant. For example, if an applicant selects "Asian" for a principal owner's race, the financial institution reports "Asian" for the race of that principal owner. Similarly, if the applicant selects "Asian" and "Native

Hawaiian" for a particular principal owner, the financial institution reports that principal owner's race as "Asian" and "Native Hawaiian," even though "Native Hawaiian" is not a disaggregated subcategory for the aggregate "Asian" category.

11. A financial institution is neither required nor permitted to verify the ethnicity, race, or sex information that the applicant provides.

**Instructions for Reporting if the Applicant Fails To Provide or Declines To Provide Responses to a Financial Institution's Inquiries**

12. Except as noted in Instruction 17, if the applicant declines to provide a principal owner's ethnicity, race, or sex (such as by answering these questions by checking only the "I do not wish to provide this information" box on a paper or electronic data collection form or stating orally that it does not wish to provide this information), the financial institution must report that the applicant declined to provide this information. The financial institution only reports that the applicant declined to provide information if the applicant specifically declines to provide that information. See Instruction 13 for reporting if the applicant does not respond rather than specifically declines to provide information.

13. Except as noted in Instruction 17, if the applicant does not respond to a request about a principal owner's ethnicity, race, or sex, the financial institution must report that the information was not provided by the applicant. For example, if the financial institution provides the applicant with a paper data collection form and asks the applicant to complete and return the form but the applicant does not return it, the financial institution reports that the principal owner's ethnicity, race, and sex was not provided by the applicant. Similarly, if the financial institution provides an electronic data collection form, the applicant indicates that it has two principal owners, the applicant provides ethnicity, race, and sex for the first principal owner, and the applicant does not check any of the boxes (including the "I do not wish to provide this information" boxes) for the second principal owner's ethnicity, race, and sex, the financial institution reports the ethnicity, race, and sex that the applicant provided for the first principal owner and reports that ethnicity, race, and sex for the second principal owner were not provided by the applicant.

14. If an applicant provides some but not all of the requested ethnicity, race, and sex information, the financial institution reports the information that was provided by the applicant and reports that the applicant declined to provide or did not provide (as applicable) the remainder of the information. For example, assume an applicant indicates that it has two principal owners and provides ethnicity, race, and sex information for the first principal owner and provides only ethnicity for the second principal owner. Further assume that the applicant does not indicate that it does not wish to provide race or sex information for the second principal owner. In this case, the financial institution reports the ethnicity, race, and sex

**56585**

information provided for the first principal owner. The financial institution also reports the ethnicity provided for the second principal owner, and reports that the applicant did not provide race and sex information for the second principal owner.

15. If an applicant provides any ethnicity, race, or sex information for any principal owner, the financial institution does not report any additional information based on visual observation and/or surname. For example, if an applicant indicates that it has four principal owners and provides sex information for one principal owner and no other ethnicity, race, or sex information, the financial institution reports the sex information provided for one principal owner. It reports either that the applicant did not provide or declined to provide (as applicable) the ethnicity and race information for one principal owner and the ethnicity, race, and sex information for the other principal owners. The financial institution does not report any ethnicity or race information based on visual observation or surname, even if it is has met in person with one or more principal owners.

16. If an applicant provides information in response to the question requesting a given principal owner's ethnicity, race, or sex and also checks the "I do not wish to provide this information" box for that question or otherwise indicates that the applicant does not wish to provide the information, the financial institution reports the information on ethnicity, race, or sex that was provided by the applicant (rather than reporting that the applicant declined to provide the information). For example, if an applicant is completing a paper data collection form and provides information that a principal owner is female and also checks a box to indicate that the applicant does not wish to provide information regarding that principal owner's sex, the financial institution reports the principal owner's sex as female.

**Instructions for Collecting Ethnicity and Race Information via Visual Observation and/or Surname if the Applicant Declines To Provide Information or Does Not Respond**

17. If an applicant does not provide any ethnicity, race, or sex information for any of its principal owners or declines to provide all of the requested ethnicity, race, or sex information, and during the application process the financial institution meets in person with at least one principal owner of that applicant, the financial institution must collect the ethnicity and race of the principal owner(s) with whom it meets on the basis of visual observation and/or surname. For example, assume a financial institution provides electronic data collection forms to applicants, and an applicant fails to complete and submit the data collection form. Assume that the financial institution is not permitted to report based on previously collected data. Also, assume that the financial institution meets in person with two of the applicant's four principal owners at the same time during the application process. The financial institution reports the ethnicity and race information for the two principal owners it met with in person based on visual observation and/or surname. Additionally, as noted in Instruction 21, the financial institution reports that it is reporting this information based on visual observation and/or surname. The financial institution reports that the applicant did not provide sex information for these two principal owners. It also reports that the applicant did not provide ethnicity, race, and sex information for the other two principal owners. For additional information on when a financial institution has or has not met in person with a principal owner, see comment 107(a)(20)–10.

18. For purposes of determining whether reporting based on visual observation and/or surname is required, a financial institution is considered to have met in person with a principal owner if the financial institution has a meeting via an electronic medium with the principal owner and can visually observe the principal owner using a video component. For additional information on when a financial institution has or has not met in person with a principal owner, see comment 107(a)(20)–10. For additional information on when reporting based on visual observation and/or surname is required, see comment 107(a)(20)–9.

19. A financial institution is not required to report ethnicity and race information based on visual observation and/or surname if the financial institution only meets in person with one or more principal owners after the application process is complete, for example, at loan closing or account opening. In those circumstances, the financial institution may report that the information was not provided by the applicant or that the applicant declined to provide the information, as applicable.

20. A financial institution is required to collect race and ethnicity information based on visual observation and/or surname at only one meeting with one or more principal owners. If the financial institution meets in person with another principal owner at a different meeting, the financial institution is permitted, but not required, to also collect the other principal owner's race and ethnicity information via visual observation and/or surname. For example, assume that a financial institution meets in person with one of an applicant's principal owners on June 1 and records that principal owner's ethnicity and race. Also, assume that the financial institution meets in person with all four of the applicant's principal owners on June 10. The financial institution is permitted, but not required, to record the other principal owners' ethnicity and race information based on the meeting that occurs on June 10, because it already recorded one principal owner's ethnicity and race based on the meeting that occurred on June 1.

21. If a financial institution reports ethnicity and race based on visual observation and/or surname and is not relying on previously collected data, the financial institution also must report that the information was collected on the basis of visual observation and/or surname. If a financial institution is relying on previously collected data that the financial institution collected via visual observation and/or surname, the financial institution reports that it is reporting the information based on previously collected data, and that it is providing the information based on visual observation and/or surname.

22. When a financial institution reports ethnicity and race on the basis of visual observation and/or surname, the financial institution must select only from the following aggregate categories: Ethnicity (Hispanic or Latino; not Hispanic or Latino); race (American Indian or Alaska Native; Asian; Black or African American; Native Hawaiian or Other Pacific Islander; White).

23. A financial institution never reports sex based on visual observation or surname. If an applicant declines or otherwise does not provide a principal owner's sex, the financial institution reports that the applicant declined to provide that information or that the information was not provided by the applicant, as applicable.

**Instructions Regarding Persons who Are Not Principal Owners and When an Applicant Has Fewer Than Four Principal Owners**

24. A financial institution does not report a guarantor's ethnicity, race, and sex unless the guarantor is also a principal owner of the applicant.

25. Because there are data reporting fields for four principal owners, when submitting data to the Bureau, a financial institution will need to report that the requirement to report ethnicity, race, and sex is not applicable for some principal owners if the applicant has fewer than four principal owners. For example, if an applicant has only one principal owner (i.e., only one natural person directly owns 25 percent or more of the applicant's equity interests), the financial institution reports that the requirement to report ethnicity, race, and sex is not applicable in the data fields for principal owners two through four.

**Instructions for Reporting Based on Previously Collected Data**

26. Section 1002.107(c)(2) and its commentary set forth when a financial institution is permitted to report information based on previously collected data. If the financial institution is permitted to report ethnicity, race, or sex information based on previously collected data, the financial institution may but is not required to do so.

27. If a financial institution reports ethnicity, race, or sex information based on previously collected data, the financial institution must also report that it is providing that information based on previously collected data.

28. If a financial institution reports one or more principal owner's ethnicity, race, or sex information based on previously collected data, the financial institution does not need to collect any additional ethnicity, race, or sex information. However, the financial institution may need to report that the applicant did not provide or declined to provide information when the financial institution previously collected the data, as applicable.

29. If a financial institution is reporting a principal owner's ethnicity and/or race based on data that the financial institution previously collected via visual observation and/or surname, the financial institution

reports that it is reporting ethnicity and race based on previously collected data and based on visual observation and/or surname. Additionally, the financial institution reports that the applicant declined to provide information about the principal owner's sex or that the applicant did not provide the principal owner's sex, as applicable, and reports that the financial institution is reporting sex based on previously collected data.

### Appendix H to Part 1002—Tolerances for Bona Fide Errors in Data Reported Under Subpart B

As set out in § 1002.112(b) and in comment 112(b)–1, a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of a financial institution's data submission for a given data field do not equal or exceed the threshold in column C of the following table (Table 1, Tolerance Thresholds for Bona Fide Errors):

### Table 1 to Appendix H—Tolerance Thresholds for Bona Fide Errors

| Small Business Lending Application Register Count (A) | Random Sample Size[959] (B) | Threshold (#) (C) | Threshold (%) (D) |
|---|---|---|---|
| 25 – 50 | 30 | 3 | 10.0 |
| 51 – 100 | 30 | 3 | 10.0 |
| 101 – 130 | 47 | 3 | 6.4 |
| 131 – 190 | 56 | 3 | 5.4 |
| 191 – 500 | 59 | 3 | 5.1 |
| 501 – 100,000 | 79 | 4 | 5.1 |
| 100,001+ | 159 | 4 | 2.5 |

The size of the random sample, under column B, shall depend on the size of the financial institution's small business lending application register, as shown in column A of the Threshold Table.[959]

The thresholds in column C of the Threshold Table reflect the number of unintentional errors a financial institution may make within a particular data field (e.g., loan amount or gross annual revenue) in a small business lending application register that would be deemed bona fide errors for purposes of § 1002.112(b).

For instance, a financial institution that submitted a small business lending application register containing 45 applications would be subject to a threshold of three errors per data field. If the financial institution had made two errors in reporting loan amount and two errors reporting gross annual income, all of these errors would be covered by the bona fide error provision of § 1002.112(b) and would not constitute a violation of the Act or this part. If the same financial institution had made four errors in reporting loan amount and two errors reporting gross annual income, the bona fide error provision of § 1002.112(b) would not

apply to the four loan amount errors but would still apply to the two gross annual income errors.

Even when the number of errors in a particular data field do not equal or exceed the threshold in column C, if either there is a reasonable basis to believe that errors in that field were intentional or there is other evidence that the financial institution did not maintain procedures reasonably adapted to avoid such errors, then the errors are not bona fide errors under § 1002.112(b). To illustrate, assume that a financial institution has incorrectly coded withdrawn applications as denials to such an extent that it likely prevents reliable fair lending analysis of underwriting disparities. If so, the errors would not be deemed bona fide errors under § 1002.112(b) and would violate the Act and this part.

For purposes of determining bona fide errors under § 1002.112(b), the term ''data field'' generally refers to individual fields. However, with respect to information on the ethnicity or race of an applicant or borrower, or co-applicant or co-borrower, a data field group may consist of more than one field. If one or more of the fields within an ethnicity or race field group have errors, they count as one (and only one) error for that data field group.

■ 6. In Supplement I to part 1002:
■ a. Under *Section 1005.5—Rules Concerning Requests for Information,* revise *Paragraph 5(a)(2)* by revising the heading and adding comment –4, and

revise *Paragraph 5(a)(4)* including the heading.
■ b. Add *Section 1002.102—Definitions; Section 1002.103—Covered Applications; Section 1002.104—Covered Credit Transactions and Excluded Transactions; Section 1002.105—Covered Financial Institutions and Exempt Institutions; Section 1002.106—Business and Small Business; Section 1002.107—Compilation of Reportable Data; Section 1002.108—Firewall; Section 1002.109—Reporting of Data to the Bureau; Section 1002.110—Publication of Data; Section 1002.111—Recordkeeping;* and *Section 1002.112—Enforcement.*

The revisions and additions read as follows:

### Supplement I to Part 1002—Official Interpretations

*Section 1002.5—Rules Concerning Requests for Information*

5(a) General rules.

\*       \*       \*       \*       \*

5(a)(2) Required collection of information.

\*       \*       \*       \*       \*

4. *Information required by subpart B.* Subpart B of this part generally requires creditors that are covered financial institutions as defined in § 1002.105(a) to collect and report information about the

---

[959] For a financial institution with fewer than 30 entries in its small business lending application register, the full sample size is the financial insitution's total number of entries. The threshold number for such financial institution's remains three. Accordingly, the threshold percentage will be higher for financial instiions with fewer than 30 in their registers.

AdminRecord-000653

ethnicity, race, and sex of the principal owners of applicants for certain small business credit, as well as whether the applicant is minority-owned or women-owned as defined in § 1002.102(m) and (s), respectively.

*5(a)(4) Other permissible collection of information.*

1. *Other permissible collection of information.* Information regarding ethnicity, race, and sex that is not required to be collected pursuant to Regulation C, 12 CFR part 1003, or subpart B of this part, may nevertheless be collected under the circumstances set forth in § 1002.5(a)(4) without violating § 1002.5(b). The information collected pursuant to 12 CFR part 1003 must be retained pursuant to the requirements of § 1002.12. The information collected pursuant to subpart B of this part must be retained pursuant to the requirements set forth in § 1002.111.

\* \* \* \* \*

### Section 1002.102—Definitions

*102(j) Dwelling.*

1. *Consistency with Regulation C.* Bureau interpretations that appear in supplement I to part 1003 containing official commentary in connection with § 1003.2(f) are applicable to the definition of a dwelling in § 1002.102(j).

2. *Dwelling under subpart A.* The definition of dwelling under § 1002.14(b)(2) applies to relevant provisions under subpart A, and § 1002.102(j) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to § 1002.14(b)(2).

*102(l) Minority individual.*

1. *Purpose of definition.* The definition of minority individual is used only when an applicant determines if it is a minority-owned business pursuant to §§ 1002.102(m) and 1002.107(a)(18). A financial institution provides an applicant with the definition of minority individual when asking the applicant to determine if its business is a minority-owned business, as defined in § 1002.102(m). An applicant determines if the natural persons who own and control and to whom the business's profits or losses accrue are minority individuals when the applicant provides its minority-owned business status pursuant to § 1002.107(a)(18). Separately, pursuant to § 1002.107(a)(20) and related commentary, a financial institution may be required to report a principal owner's ethnicity and race based on visual observation and/or surname. However, the definition of minority individual in § 1002.102(l) is not used when determining the race or ethnicity of a principal owner.

2. *Multi-racial and multi-ethnic individuals.* For purposes of subpart B of this part, a natural person who is multi-racial or multi-ethnic is a minority individual. For example, a natural person who is both Asian and White is a minority individual.

3. *Relationship to disaggregated subcategories used to determine ethnicity and race of principal owners.* The term "minority individual" is defined in § 1002.102(l) using aggregate ethnicity (Hispanic or Latino) and race (American Indian or Alaska Native, Asian, Black or

African American, and Native Hawaiian or Other Pacific Islander) categories. Separately an applicant may provide a principal owner's ethnicity and race using aggregate categories and/or disaggregated subcategories for purposes of § 1002.107(a)(20). However, as discussed in comment 107(a)(20)–11, a financial institution may only use aggregate ethnicity and race categories when required to report a principal owner's ethnicity and race based on visual observation and/or surname.

*102(m) Minority-owned business.*

1. *In general.* In order to be a minority-owned business for purposes of subpart B of this part, a business must satisfy both prongs of the definition of minority-owned business. First, one or more minority individuals must own or control more than 50 percent of the business. However, it is not necessary that one or more minority individuals both own and control more than 50 percent of the business. For example, a business that is owned entirely by minority individuals, but is not controlled by any minority individuals satisfies the first prong of the definition. If a business does not satisfy this first prong of the definition, it is not a minority-owned business. Second, 50 percent or more of the net profits or losses must accrue to one or more minority individuals. If a business does not satisfy this second prong of the definition, it is not a minority-owned business, regardless of whether it satisfies the first prong of the definition.

2. *Purpose of definition.* The definition of minority-owned business is used only when an applicant determines if it is a minority-owned business for purposes of § 1002.107(a)(18). A financial institution provides an applicant with the definition of minority-owned business when asking the applicant to provide its minority-owned business status pursuant to § 1002.107(a)(18), but the financial institution is neither permitted nor required to make its own determination regarding the applicant's minority-owned business status.

3. *Further clarifications of terms used in the definition of minority-owned business.* In order to assist an applicant when determining whether it is a minority-owned business, a financial institution may provide the applicant with the definitions of ownership, control, and accrual of net profits or losses and related concepts set forth in comments 102(m)–4 through –6. A financial institution may assist an applicant when the applicant is determining its minority-owned business status but is not required to do so. For purposes of reporting an applicant's status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

4. *Ownership.* For purposes of determining if a business is a minority-owned business, a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Examples of ownership include being the sole proprietor of a sole proprietorship, directly or indirectly owning or holding the stock of a corporation or company, directly or indirectly having a partnership interest in a business, or directly

or indirectly having a membership interest in a limited liability company. Indirect as well as direct ownership are used when determining ownership for purposes of §§ 1002.102(m) and 1002.107(a)(18). Thus, where applicable, ownership must be traced through corporate or other indirect ownership structures. For example, assume that the applicant is company A. If company B owns 60 percent of applicant company A and a natural person owns 100 percent of company B, the natural person owns 60 percent of applicant company A. Similarly, if a natural person directly owns 20 percent of applicant company A and is an equal partner in partnership B that owns the remaining 80 percent of applicant company A, the natural person owns 60 percent of applicant company A (*i.e.,* 20 percent due through direct ownership and 40 percent indirectly through partnership B). A trustee is considered the owner of the trust. Thus, if a trust owns a business and the trust has two co-trustees, each co-trustee owns 50 percent of the business.

5. *Control.* A natural person controls a business if that natural person has significant responsibility to manage or direct the business. A natural person controls a business if the natural person is an executive officer or senior manager (*e.g.,* a chief executive officer, chief financial officer, chief operating officer, managing member, general partner, president, vice president, or treasurer) or regularly performs similar functions. Additionally, a business may be controlled by two or more minority individuals if those individuals collectively control the business, such as constituting a majority of the board of directors or a majority of the partners of a partnership.

6. *Accrual of net profits or losses.* A business's net profits and losses accrue to a natural person if that natural person receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

*102(o) Principal owner.*

1. *Natural person.* Only a natural person can be a principal owner of a business for purposes of subpart B of this part. Entities, such as trusts, partnerships, limited liability companies, and corporations, are not principal owners for this purpose. Additionally, a natural person must directly own an equity share of 25 percent or more in the business in order to be a principal owner. Unlike the determination of ownership for purposes of collecting and reporting minority-owned business status and women-owned business status, indirect ownership is not considered when determining if someone is a principal owner for purposes of collecting and reporting principal owners' ethnicity, race, and sex or the number of principal owners. Thus, when determining who is a principal owner, ownership is not traced through multiple corporate structures to determine if a natural person owns 25 percent or more of the equity interests. For example, if natural person A directly owns 20 percent of a business, natural person B directly owns 20 percent, and partnership C owns 60 percent, the business does not have any owners who

AdminRecord-000654

satisfy the definition of principal owner set forth in § 1002.102(o), even if natural person A and natural person B are the only partners in the partnership C. Similarly, if natural person A directly owns 30 percent of a business, natural person B directly owns 20 percent, and trust D owns 50 percent, natural person A is the only principal owner as defined in § 1002.102(o), even if natural person B is the sole trustee of trust D.

2. *Purpose of definition.* A financial institution shall provide an applicant with the definition of principal owner when asking the applicant to provide the number of its principal owners pursuant to § 1002.107(a)(21) and the ethnicity, race, and sex of its principal owners pursuant to § 1002.107(a)(20). If a financial institution meets in person with a natural person about a covered application, the financial institution may be required to determine if a natural person with whom it meets is a principal owner in order to collect and report the principal owner's ethnicity and race based on visual observation and/or surname. (See comments 107(a)(20)–5 and –9.) Additionally, if an applicant does not provide the number of its principal owners in response to the financial institution's request pursuant to § 1002.107(a)(21), the financial institution may need to determine and report the number of the applicant's principal owners based on other documents or information. (See comments 107(a)(21)–1 through –3.)

*102(s) Women-owned business.*

1. *In general.* In order to be a women-owned business for purposes of subpart B of this part, a business must satisfy both prongs of the definition of women-owned business. First, one or more women must own or control more than 50 percent of the business. However, it is not necessary that one or more women both own and control more than 50 percent of the business. For example, a business that is owned entirely by women, but is not controlled by any women satisfies the first prong of the definition. If a business does not satisfy this first prong of the definition, it is not a women-owned business. Second, 50 percent or more of the net profits or losses must accrue to one or more women. If a business does not satisfy this second prong of the definition, it is not a women-owned business, regardless of whether it satisfies the first prong of the definition.

2. *Purpose of definition.* The definition of women-owned business is used only when an applicant determines if it is a women-owned business pursuant to § 1002.107(a)(19). A financial institution provides an applicant with the definition of women-owned business when asking the applicant to provide its women-owned business status pursuant to § 1002.107(a)(19), but the financial institution is neither permitted nor required to make its own determination regarding the applicant's women-owned business status.

3. *Further clarifications of terms used in the definition of women-owned business.* In order to assist an applicant when determining whether it is a women-owned business, a financial institution may provide the applicant with the definitions of ownership, control, and accrual of net profits

or losses and related concepts set forth in comments 102(s)–4 through –6. A financial institution may assist an applicant when the applicant is determining its women-owned business status but is not required to do so. For purposes of reporting an applicant's status, a financial institution relies on the applicant's determinations of its ownership, control, and accrual of net profits and losses.

4. *Ownership.* For purposes of determining if a business is a women-owned business, a natural person owns a business if that natural person directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has an equity interest in the business. Examples of ownership include being the sole proprietor of a sole proprietorship, directly or indirectly owning or holding the stock of a corporation or company, directly or indirectly having a partnership interest in a business, or directly or indirectly having a membership interest in a limited liability company. Indirect as well as direct ownership are used when determining ownership for purposes of §§ 1002.102(s) and 1002.107(a)(19). Thus, where applicable, ownership must be traced through corporate or other indirect ownership structures. For example, assume that the applicant is company A. If company B owns 60 percent of the applicant company A and a natural person owns 100 percent of company B, the natural person owns 60 percent of the applicant company A. Similarly, if a natural person directly owns 20 percent of the applicant company A and is an equal partner in a partnership B that owns the remaining 80 percent of the applicant company A, the natural person owns 60 percent of applicant company A (*i.e.,* 20 percent due through direct ownership and 40 percent indirectly through partnership B). A trustee is considered the owner of the trust. Thus, if a trust owns a business and the trust has two co-trustees, each co-trustee owns 50 percent of the business.

5. *Control.* A natural person controls a business if that natural person has significant responsibility to manage or direct the business. A natural person controls a business if the natural person is an executive officer or senior manager (*e.g.,* a chief executive officer, chief financial officer, chief operating officer, managing member, general partner, president, vice president, or treasurer) or regularly performs similar functions. Additionally, a business may be controlled by two more women if those women collectively control the business, such as constituting a majority of the board of directors or a majority of the partners of a partnership.

6. *Accrual of net profits or losses.* A business's net profits and losses accrue to a natural person if that natural person receives the net profits or losses, is legally entitled or required to receive the net profits or losses, or is legally entitled or required to recognize the net profits or losses for tax purposes.

*Section 1002.103—Covered Applications*

*103(a) In general.*

1. *In general.* Subject to the requirements of subpart B of this part, a financial institution has latitude to establish its own

application process or procedures, including designating the type and amount of information it will require from applicants.

2. *Procedures used.* The term ''procedures'' refers to the actual practices followed by a financial institution as well as its stated application procedures. For example, if a financial institution's stated policy is to require all applications to be in writing on the financial institution's application form, but the financial institution also makes credit decisions based on oral requests, the financial institution's procedures are to accept both oral and written applications.

3. *Consistency with subpart A.* Bureau interpretations that appear in this supplement I in connection with §§ 1002.2(f) and 1002.9 are generally applicable to the definition of a covered application in § 1002.103. However, the definition of a covered application in § 1002.103 does not include inquiries and prequalification requests. The definition of a covered application also does not include reevaluation, extension, or renewal requests on an existing business credit account, unless the request seeks additional credit amounts. See § 1002.103(b).

4. *Requests for multiple covered credit transactions at one time.* Assuming the requirements of a covered application are met, if an applicant makes a request for two or more covered credit transactions at the same time, the financial institution reports each request for a covered credit transaction as a separate covered application. For example, if an applicant requests both a term loan and a line of credit on an application form, the financial institution reports each request for a covered credit transaction as a separate covered application. Section 1002.107(c)(2) sets forth the requirements for reusing certain data required under § 1002.107(a) across multiple applications.

5. *Initial request for a single covered credit transaction that results in the origination of multiple covered credit transactions.* Assuming the requirements of a covered application are met, if an applicant initially makes a request for one covered credit transaction, but over the course of the application process requests and obtains multiple covered credit transactions, each covered credit transaction must be reported as a separate covered application.

6. *Requests for multiple lines of credit at one time.* Assuming the requirements of a covered application are met, if an applicant requests multiple lines of credit on a single credit account, it is reported as one or more covered applications based on the procedures used by the financial institution for the type of credit account. For example, if a financial institution treats a request for multiple lines of credit at one time as sub-components of a single account, the financial institution reports the request as a single covered application. If, on the other hand, the financial institution treats each line of credit as a separate account, then the financial institution reports each request for a line of credit as a separate covered application, as set forth in comment 103(a)–4.

7. *Changes in whether there is a covered credit transaction.* In certain circumstances, an applicant may change the type of product

AdminRecord-000655

requested during the course of the application process. Assuming other requirements of a covered application are met, if an applicant initially requests a product that is not a covered credit transaction, but during the application process decides to seek instead a product that is a covered credit transaction, the application is a covered application and must be reported. If, on the other hand, an applicant initially requests a product that is a covered credit transaction, but then during the application process decides instead to seek a product that is not a covered credit transaction, the application is not a covered application and thus is not reported. If an applicant initially requests a product that is a covered credit transaction, the financial institution counteroffers with a product that is not a covered credit transaction, and the applicant declines to proceed or fails to respond, the application is reported as a covered application. For example, if an applicant initially applies for a term loan, but then, after consultation with the financial institution, decides that a lease would better meet its needs and decides to proceed with that product, the application is not a covered application and thus is not reported. However, if an applicant initially applies for a term loan, the financial institution offers to consider the applicant only for a lease, and the applicant refuses, the transaction is a covered application that must be reported.

*103(b) Circumstances that are not covered applications.*

1. *In general.* The circumstances set forth in § 1002.103(b) are not covered applications for purposes of subpart B of this part, even if considered applications under subpart A of this part. However, in no way are the exclusions in § 1002.103(b) intended to repeal, abrogate, annul, impair, change, or interfere with the scope of the term application in § 1002.2(f) as applicable to subpart A.

2. *Reevaluation, extension, or renewal requests that do not request additional credit amounts.* An applicant's request to change one or more terms of an existing account does not constitute a covered application, unless the applicant is requesting additional credit amounts on the account. For example, an applicant's request to extend the duration on a line of credit or to remove a guarantor would not be a covered application.

3. *Reevaluation, extension, or renewal requests that request additional credit amounts.* An applicant's request for additional credit amounts on an existing account that is a covered credit transaction constitutes a covered application. For example, an applicant's request for a line increase on an existing line of credit, made in accordance with a financial institution's procedures for the type of credit requested, would be a covered application. As discussed in comment 107(a)(7)–4, when reporting a covered application that seeks additional credit amounts on an existing account, the financial institution need only report the additional credit amount sought, and not the entire credit amount. For example, if an applicant currently has a line of credit account for $100,000, and seeks to increase the line to $150,000, the financial institution reports the amount applied for as $50,000.

4. *Reviews or evaluations initiated by the financial institution.* For purposes of subpart B of this part, the term covered application does not include evaluations or reviews of existing accounts initiated by the financial institution because the applicant has not made the request. For example, if a creditor conducts periodic reviews of its existing lines of credit and decides to increase the applicant's line by $10,000, it is not a covered application because the applicant never made a request for the additional credit amounts. However, if such an evaluation or review of an existing account by a financial institution results in the financial institution inviting the applicant to apply for additional credit amounts on an existing account that is a covered credit transaction, and the applicant does so, the applicant's request constitutes a covered application for purposes of subpart B of this part. Similarly, the term covered application also does not include solicitations and firm offers of credit.

5. *Inquiries and prequalification requests.* An inquiry is a request by a prospective applicant for information about credit terms offered by the financial institution. A prequalification request is a request by a prospective applicant for a preliminary determination on whether the prospective applicant would likely qualify for credit under a financial institution's standards or for a determination on the amount of credit for which the prospective applicant would likely qualify. Inquiry and prequalification requests are not covered applications under subpart B of this part, even though in certain circumstances inquiries and prequalification requests may constitute applications under subpart A.

*Section 1002.104—Covered Credit Transactions and Excluded Credit Transactions*

*104(a) Covered credit transaction.*

1. *General.* The term "covered credit transaction" includes all business credit (including loans, lines of credit, credit cards, and merchant cash advances) unless otherwise excluded in § 1002.104(b).

*104(b) Excluded transactions.*

1. *Factoring.* The term "covered credit transaction" does not cover factoring as described herein. For the purpose of this subpart, factoring is an accounts receivable purchase transaction between businesses that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment for goods that the recipient has supplied or services that the recipient has rendered but for which payment has not yet been made. This description of factoring is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to comment 9(a)(3)–3. A financial institution shall report an extension of business credit incident to a factoring arrangement that is otherwise a covered credit transaction as a "Other sales-based financing transaction" under § 1002.107(a)(5).

2. *Leases.* The term "covered credit transaction" does not cover leases as described herein. A lease, for the purpose of this subpart, is a transfer from one business

to another of the right to possession and use of goods for a term, and for primarily business or commercial (including agricultural) purposes, in return for consideration. A lease does not include a sale, including a sale on approval or a sale or return, or a transaction resulting in the retention or creation of a security interest.

3. *Consumer-designated credit.* The term "covered credit transaction" does not include consumer-designated credit used for business purposes. A transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes. For example, an open-end credit account used for both personal and business purposes is not business credit for the purpose of subpart B of this part unless the financial institution designated or intended for the primary purpose of the account to be business-related.

4. *Credit secured by certain investment properties.* The term "covered credit transaction" does not include an extension of credit that is secured by 1–4 individual dwelling units that the applicant (or one or more of the applicant's principal owners) does not, or will not, occupy. A financial institution should determine whether the property to which the covered credit transaction or application relates is or will be used as an investment property. For purposes of this comment, a property is an investment property if the applicant or one or more of the applicant's principal owners does not or will not occupy the property. For example, if an applicant purchases a property, does not occupy the property, and generates income by renting the property, the property is an investment property for purposes of this comment. Similarly, if an applicant purchases a property, does not occupy the property, and does not generate income by renting the property, but intends to generate income by selling the property, the property is an investment property. A property is an investment property if the applicant does not or will not occupy the property, even if the applicant does not consider the property as owned for investment purposes. For example, if a corporation purchases a property that is a dwelling under § 1002.102(j), that it does not occupy, but that is for the long-term residential use of its employees, the property is an investment, even if the corporation considers the property as owned for business purposes rather than investment purposes, does not generate income by renting the property, and does not intend to generate income by selling the property at some point in time. If the property is for transitory use by employees, the property would not be considered a dwelling under § 1002.102(j).

*104(b)(1) Trade credit.*

1. *General.* Trade credit, as defined in § 1002.104(b)(1), is excluded from the definition of a covered credit transaction. An example of trade credit involves a supplier that finances the sale of equipment, supplies, or inventory. However, an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit.

2. *Trade credit under subpart A.* The definition of trade credit under comment

9(a)(3)–2 applies to relevant provisions under subpart A, and § 1002.104(b)(1) is not intended to repeal, abrogate, annul, impair, or interfere with any existing interpretations, orders, agreements, ordinances, rules, or regulations adopted or issued pursuant to comment 9(a)(3)–2.

*Section 1002.105—Covered Financial Institutions and Exempt Institutions*

*105(a) Financial institution.*

1. *Examples.* Section 1002.105(a) defines a financial institution as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. This definition includes, but is not limited to, banks, savings associations, credit unions, online lenders, platform lenders, community development financial institutions, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, organizations exempt from taxation pursuant to 26 U.S.C. 501(c), and governments or governmental subdivisions or agencies.

2. *Motor vehicle dealers.* Pursuant to § 1002.101(a), subpart B of this part excludes from coverage persons defined by section 1029 of the Consumer Financial Protection Act of 2010, title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376, 2004 (2010).

*105(b) Covered financial institution.*

1. *Preceding calendar year.* The definition of covered financial institution refers to preceding calendar years. For example, in 2026, the two preceding calendar years are 2024 and 2025. Accordingly, in 2026, Financial Institution A does not meet the loan-volume threshold in § 1002.105(b) if did not originate at least 25 covered credit transactions for small businesses both during 2024 and during 2025.

2. *Origination threshold.* A financial institution qualifies as a covered financial institution based on total covered credit transactions originated for small businesses, rather than covered applications received from small businesses. For example, if in both 2024 and 2025, Financial Institution B received 30 covered applications from small businesses and originated 20 covered credit transactions for small businesses, then for 2026, Financial Institution B is not a covered financial institution.

3. *Annual consideration.* Whether a financial institution is a covered financial institution in a particular year depends on its small business lending activity in the preceding two calendar years. Therefore, whether a financial institution is a covered financial institution is an annual consideration for each year that data may be compiled and maintained for purposes of subpart B of this part. A financial institution may be a covered financial institution for a given year of data collection (and the obligations arising from qualifying as a covered financial institution shall continue into subsequent years, pursuant to §§ 1002.110 and 1002.111), but the same financial institution may not be a covered

financial institution for the following year of data collection. For example, Financial Institution C originated 30 covered transactions for small businesses in both 2024 and 2025. In 2026, Financial Institution C is a covered financial institution and therefore is obligated to compile and maintain applicable 2026 small business lending data under § 1002.107(a). During 2026, Financial Institution C originates 10 covered transactions for small businesses. In 2027, Financial Institution C is not a covered financial institution with respect to 2027 small business lending data, and is not obligated to compile and maintain 2027 data under § 1002.107(a) (although Financial Institution C may volunteer to collect and maintain 2027 data pursuant to § 1002.5(a)(4)(vii) and as explained in comment 105(b)–7). Pursuant to § 1002.109(a), Financial Institution C shall submit its small business lending application register for 2026 data in the format prescribed by the Bureau by June 1, 2027 because Financial Institution C is a covered financial institution with respect to 2026 data, and the data submission deadline of June 1, 2027 applies to 2026 data.

4. *Merger or acquisition—coverage of surviving or newly formed institution.* After a merger or acquisition, the surviving or newly formed financial institution is a covered financial institution under § 1002.105(b) if it, considering the combined lending activity of the surviving or newly formed institution and the merged or acquired financial institutions (or acquired branches or locations), satisfies the criteria included in § 1002.105(b). For example, Financial Institutions A and B merge. The surviving or newly formed financial institution meets the threshold in § 1002.105(b) if the combined previous components of the surviving or newly formed financial institution (A plus B) would have reported at least 25 covered credit transactions for small businesses for each of the two preceding calendar years. Similarly, if the combined previous components and the surviving or newly formed financial institution would have reported at least 25 covered transactions for small businesses for the year previous to the merger as well as 25 covered transactions for small businesses for the year of the merger, the threshold described in § 1002.105(b) would be met and the surviving or newly formed financial institution would be a covered institution under § 1002.105(b) for the year following the merger. Comment 105(b)–5 discusses a financial institution's responsibilities with respect to compiling and maintaining (and subsequently reporting) data during the calendar year of a merger.

5. *Merger or acquisition—coverage specific to the calendar year of the merger or acquisition.* The scenarios described below illustrate a financial institution's responsibilities specifically for data from the calendar year of a merger or acquisition. For purposes of these illustrations, an "institution that is not covered" means either an institution that is not a financial institution, as defined in § 1002.105(a), or a financial institution that is not a covered financial institution, as defined in § 1002.105(b).

i. Two institutions that are not covered financial institutions merge. The surviving or newly formed institution meets all of the requirements necessary to be a covered financial institution. No data are required to be compiled, maintained, or reported for the calendar year of the merger (even though the merger creates an institution that meets all of the requirements necessary to be a covered financial institution).

ii. A covered financial institution and an institution that is not covered merge. The covered financial institution is the surviving institution, or a new covered financial institution is formed. For the calendar year of the merger, data are required to be compiled, maintained, and reported for covered applications from the covered financial institution and is optional for covered applications from the financial institution that was previously not covered.

iii. A covered financial institution and an institution that is not covered merge. The institution that is not covered is the surviving institution and remains not covered after the merger, or a new institution that is not covered is formed. For the calendar year of the merger, data are required to be compiled and maintained (and subsequently reported) for covered applications from the previously covered financial institution that took place prior to the merger. After the merger date, compiling, maintaining, and reporting data is optional for applications from the institution that was previously covered.

iv. Two covered financial institutions merge. The surviving or newly formed financial institution is a covered financial institution. Data are required to be compiled and maintained (and subsequently reported) for the entire calendar year of the merger. The surviving or newly formed financial institution files either a consolidated submission or separate submissions for that calendar year.

6. *Foreign applicability.* As discussed in comment 1(a)–2, Regulation B (including subpart B) generally does not apply to lending activities that occur outside the United States.

7. *Voluntary collection and reporting.* Section 1002.5(a)(4)(vii) through (ix) permits a creditor that is not a covered financial institution under § 1002.105(b) to voluntarily collect and report information regarding covered applications in certain circumstances. If a creditor is voluntarily collecting information for covered applications regarding whether the applicant is a minority-owned business under § 1002.107(a)(18) or a women-owned business under § 1002.107(a)(19), and regarding the ethnicity, race, and sex of the applicant's principal owners under § 1002.107(20), it shall do so in compliance with §§ 1002.107, 1002.108, 1002.111, 1002.112, and 1002.114 as though it were a covered financial institution. See also comment 5(a)(4)–1. If a creditor is voluntarily reporting those covered applications to the Bureau, it shall do so in compliance with §§ 1002.109 and 1002.110 as though it were a covered financial institution.

*Section 1002.106—Business and Small Business*

*106(b) Small business.*

AdminRecord-000657

1. *Change in determination of small business status—business is ultimately not a small business.* If a financial institution initially determines an applicant is a small business as defined in § 1002.106 based on available information and collects data required by § 1002.107(a)(18) through (20) but later concludes that the applicant is not a small business, the financial institution may process and retain the data without violating the Act or this regulation if it meets the requirements of § 1002.112(c)(3). The financial institution shall not report the application on its small business lending application register pursuant to § 1002.109.

2. *Change in determination of small business status—business is ultimately a small business.* Consistent with § 1002.107(a)(14), a financial institution need not independently verify gross annual revenue. If a financial institution initially determines that the applicant is not a small business as defined in § 1002.106, but later concludes the applicant is a small business, the financial institution shall endeavor to compile, maintain, and report the data required under § 1002.107(a) in a manner that is reasonable under the circumstances. For example, if the applicant initially provides a gross annual revenue of $5.5 million (that is, above the threshold for a small business as defined in § 1002.106(b)), but during the course of underwriting the financial institution discovers the applicant's gross annual revenue was in fact $4.75 million (meaning that the applicant is within the definition of a small business under § 1002.106(b)), the financial institution is required to report the covered application pursuant to § 1002.109. In this situation, the financial institution shall take reasonable steps upon discovery to compile, maintain, and report the data necessary under § 1002.107(a) to comply with subpart B of this part for that covered application. Thus, in this example, even if the financial institution's procedure is typically to request applicant-provided data together with the application form, in this circumstance, the financial institution shall seek to collect the data during the application process necessary to comply with subpart B in a manner that is reasonable under the circumstances. The financial institution remains subject to § 1002.107(c)(1) related to the time and manner of collecting applicant-provided data.

3. *Affiliate revenue.* As explained in comment 107(a)(14)–3, a financial institution is permitted, but not required, to report the gross annual revenue for the applicant that includes the revenue of affiliates as well. As explained in comment 107(a)(14)–1, pursuant to § 1002.107(b), if the financial institution verifies the gross annual revenue provided by the applicant, it must report the verified information. Likewise, a financial institution is permitted to rely on an applicant's representations regarding gross annual revenue (which may or may not include the affiliate's revenue) for purposes of determining small business status under § 1002.106(b). However, if the applicant provides updated gross annual revenue information (see comment 107(c)(1)–7), or the financial institution verifies the gross

annual revenue information, the financial institution must use the updated or verified information in determining small business status.

*Section 1002.107—Compilation of Reportable Data*

*107(a) Data format and itemization.*
1. *General.* Section 1002.107(a) describes a covered financial institution's obligation to compile and maintain data regarding the covered applications it receives from small businesses.

i. A covered financial institution reports these data even if the credit originated pursuant to the reported application was subsequently sold by the institution.

ii. A covered financial institution annually reports data for covered applications for which final action was taken in the previous calendar year.

iii. A financial institution reports data for a covered application on its small business lending application register for the calendar year during which final action was taken on the application, even if the institution received the application in a previous calendar year.

2. *Filing Instructions Guide.* Additional details and procedures for compiling data pursuant to § 1002.107 are included in the *Filing Instructions Guide,* which is available at [a designated Bureau website].

*107(a)(1) Unique identifier.*
1. *Unique within the financial institution.* A financial institution complies with § 1002.107(a)(1) by compiling and reporting an alphanumeric application or loan identifier unique within the financial institution to the specific application. The identifier must not exceed 45 characters, and must begin with the financial institution's Legal Entity Identifier (LEI), as defined in comment 109(b)(6)–1. Separate identifiers for the same applicant must have separate identifiers. The identifier may only include standard numerical and/or alphabetical characters and cannot include dashes, other special characters, or characters with diacritics. The financial institution may assign the unique identifier at any time prior to reporting the application. Refinancings or applications for refinancing must be assigned a different identifier than the transaction that is being refinanced. A financial institution with multiple branches must ensure that its branches do not use the same identifiers to refer to multiple applications.

2. *Does not include directly identifying information.* The unique identifier must not include any directly identifying information about the applicant or persons (natural or legal) associated with the applicant. See also § 1002.111(c) and related commentary.

*107(a)(2) Application date.*
1. *Consistency.* Section 1002.107(a)(2) requires that, in reporting the date of covered application, a financial institution shall report the date it received the covered application, as defined under § 1002.103, or the date shown on a paper or electronic application form. Although a financial institution need not choose the same approach for its entire small business lending application register, it should generally be consistent in its approach by, for example,

establishing procedures for how to report this date within particular scenarios, products, or divisions. If the financial institution chooses to report the date shown on an application form and the institution retains multiple versions of the application form, the institution reports the date shown on the first application form satisfying the application definition provided under § 1002.103.

2. *Indirect applications.* For an application that was not submitted directly to the financial institution or its affiliate (as described in § 1002.107(a)(4)), the institution may report the date the application was received by the party that initially received the application, the date the application was received by the financial institution, or the date shown on the application form. Although a financial institution need not choose the same approach for its entire small business lending application register, it should generally be consistent in its approach by, for example, establishing procedures for how to report this date within particular scenarios, products, or divisions.

*107(a)(3) Application method.*
1. *General.* A financial institution complies with § 1002.107(a)(3) by reporting the means by which the applicant submitted the application from one of the following options: In-person, telephone, online, or mail.

i. *In-person.* A financial institution reports the application method as "in-person" if the financial institution, or another party acting on the financial institution's behalf, meets with the applicant in person (for example, in a branch office, at the applicant's place of business, or via electronic media with a video component).

ii. *Telephone.* A financial institution reports the application method as "telephone" if the financial institution, or another party acting on the financial institution's behalf, did not meet with the applicant in person as described in comment 1002.107(a)(3)–1.i but communicated with the applicant by telephone or via audio-based electronic media without a video component.

iii. *Online.* A financial institution reports the application method as "online" if the financial institution, or another party acting on the financial institution's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone as described in comments 1002.107(a)(3)–1.i and ii, but communicated with the applicant through an online application, electronic mail, text message, and/or some other form of online communication.

iv. *Mail.* A financial institution reports the application method as "mail" if the financial institution, or another party acting on the financial institution's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone, as described in comments 1002.107(a)(3)–1.i and ii, but communicated with the applicant in writing via United States mail, courier or overnight service, or hand-delivery (including hand-delivery of documents via an overnight drop box or at a teller window).

2. *Reporting for interactions with applicants involving both mail and online.* If

a financial institution, or another party acting on the financial institution's behalf, communicated with the applicant both online as described in comment 1002.107(a)(3)–1.iii and by mail as described in 1002.107(a)(3)–1.iv, the financial institution reports the application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners pursuant to § 1002.107(a)(20). For example, if a financial institution requests the ethnicity, race, and sex information through an online form, it reports the application method as "online." If the financial institution requests the ethnicity, race, and sex information via a paper form sent to the applicant by mail, it reports the application method as "mail." If the financial institution requests the ethnicity, race, and sex information electronically online or via an electronic document that is emailed to the applicant, that the applicant then prints and returns to the financial institution by mail, the financial institution reports the application method as "online" (because that is the method by which the financial institution requested the ethnicity, race, and sex information).

*107(a)(4) Application recipient.*

1. *Agents.* If a financial institution is reporting actions taken by its agent consistent with comment 109(a)(3)–3, the agent is considered the financial institution for the purposes of § 1002.107(a)(4). For example, assume that an applicant submitted an application to Financial Institution A, and Financial Institution A made the credit decision acting as Financial Institution B's agent under State law. Financial Institution B reports the origination and indicates that the application was submitted directly to Financial Institution B.

*107(a)(5) Credit type.*

1. *Reporting credit product—in general.* A financial institution complies with § 1002.107(a)(5)(i) by selecting the credit product requested from the list below. If an applicant requests more than one credit product, the financial institution reports each credit product requested as a separate application. If the credit product requested or originated is not included on this list, the financial institution selects "other," and reports the credit specific product as free-form text.

i. Term loan—unsecured.
ii. Term loan—secured.
iii. Line of credit—unsecured.
iv. Line of credit—secured.
v. Credit card.
vi. Merchant cash advance.
vii. Other sales-based financing transaction.
viii. Other.
ix. Not provided by applicant and otherwise undetermined.

2. *Credit product not provided by the applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution is required to maintain procedures reasonably designed to collect applicant-provided data, which includes credit product. However, if a financial institution is nonetheless unable to collect or otherwise determine credit product information

because the applicant does not indicate what credit product it seeks and the application is denied, withdrawn, or closed for incompleteness before a credit product is identified, the financial institution reports that the credit product is "not provided by applicant and otherwise undetermined."

3. *Reporting credit product involving counteroffers.* If a financial institution presents a counteroffer for a different credit product than the product the applicant had initially requested, and the applicant does not agree to proceed with the counteroffer, the financial institution reports the application for the original credit product as denied pursuant to § 1002.107(a)(9). If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the disposition of the application based on the credit product that was offered and does not report the original credit product applied for. See comment 107(a)(9)–2.

4. *Guarantees.* A financial institution complies with § 1002.107(a)(5)(iii) by selecting the type or types of guarantees that were obtained for an originated covered credit transaction, or that would have been obtained if the covered credit transaction was originated, from the list below. The financial institution selects, if applicable, up to a maximum of five guarantees for a single application or transaction. If the type of guarantee does not appear on the list, the financial institution selects "other guarantee" and reports the type of guarantee as free-form text. If no guarantee is obtained or would have been obtained if the covered credit transaction was originated, the financial institution selects "no guarantee."

i. Personal guarantee—owner(s).
ii. Personal guarantee—non-owner(s).
iii. SBA guarantee—7(a) program.
iv. SBA guarantee—504 program.
v. SBA guarantee—other.
vi. USDA guarantee.
vii. FHA insurance.
viii. Bureau of Indian Affairs guarantee
ix. Other Federal guarantee.
x. State or local government guarantee.
xi. Other guarantee.
xii. No guarantee.

5. *Loan term.* A financial institution complies with § 1002.107(a)(5)(iii) by reporting the number of months in the loan term for the covered credit transaction. The loan term is the number of months after which the legal obligation will mature or terminate. The financial institution does not include in the loan term the time that elapses, if any, between the settlement of the transaction and the first payment period. For example, if a loan closes on April 12, but the first payment is not due until June 1 and includes the interest accrued in May (but not April), the financial institution does not include the month of April in the loan term. The financial institution may round the loan term to the nearest full month or may count only full months and ignore partial months, as it so chooses. If a credit product, such as a credit card, does not have a loan term, the financial institution reports that the loan term is "not applicable." The financial institution also reports "not applicable" if the application is denied, withdrawn, or

determined to be incomplete before a loan term has been identified.

6. *Other sales-based financing transaction.* For an extension of business credit incident to a factoring arrangement that is otherwise a covered credit transaction, a financial institution selects "other sales-based financing transaction" as the credit product. See comment 104(b)–1.

*107(a)(6) Credit purpose.*

1. *General.* A financial institution complies with § 1002.107(a)(6) by selecting the purpose or purposes of the covered credit transaction applied for or originated from the list below.

i. Purchase, construction/improvement, or refinance of owner-occupied dwelling(s).
ii. Purchase, construction/improvement, or refinance of non-owner-occupied dwelling(s).
iii. Purchase, construction/improvement, or refinance of non-owner-occupied, non-dwelling real estate.
iv. Purchase, construction/improvement, or refinance of owner-occupied, non-dwelling real estate.
v. Purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks).
vi. Purchase, refinance, or rehabilitation/repair of equipment.
vii. Working capital (includes inventory or floor planning).
viii. Business start-up.
ix. Business expansion.
x. Business acquisition.
xi. Refinance existing debt (other than refinancings listed above).
xii. Line increase.
xiii. Other.
xiv. Not provided by applicant and otherwise undetermined.
xv. Not applicable.

2. *More than one purpose.* If the applicant indicates or the financial institution is otherwise aware of more than one purpose for the credit applied for or originated, the financial institution reports those purposes, up to a maximum of three, using the list provided, in any order it chooses. For example, if an applicant refinances a non-dwelling commercial building it owns and uses the funds to purchase a motor vehicle and expand the business it runs in a part of that building, the financial institution reports that the three purposes of the credit are purchase, construction/improvement, or refinance of owner-occupied, non-dwelling real estate; purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks); and business expansion. If an application has more than three purposes, the financial institution reports any three of those purposes. In the example above, if the funds were also used to purchase equipment, the financial institution would select only three of the relevant purposes to report.

3. *"Other" credit purpose.* If a purpose of an application does not appear on the list of purposes provided, the financial institution reports "other" as the credit purpose and reports the credit purpose as free-form text. If the application has more than one "other" purpose, the financial institution chooses the most significant "other" purpose, in its discretion, and reports that "other" purpose.

AdminRecord-000659

The financial institution reports a maximum of three credit purposes, including any "other" purpose reported.

4. *Credit purpose not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes credit purpose. However, if a financial institution is nonetheless unable to collect or determine credit purpose information, the financial institution reports that the credit purpose is "not provided by applicant and otherwise undetermined."

5. *Not applicable.* If the application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card, the financial institution may report credit purpose as "not applicable."

6. *Excluded dwellings.* As explained in comment 104(b)–4, subpart B of this part does not apply to an extension of credit that is secured by 1–4 individual dwelling units that the applicant or one or more of the applicant's principal owners does not, or will not, occupy.

7. *Collecting credit purpose.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, including credit purpose. The financial institution is permitted, but not required, to present the list of credit purposes provided in comment 107(a)(6)–1 to the applicant. The financial institution is also permitted to ask about purposes not included on the list provided in comment 107(a)(6)–1. If the applicant chooses a purpose or purposes not included on the provided list, the financial institution follows the instructions in comment 107(a)(6)–3 regarding reporting of "other" as the credit purpose. If an applicant chooses a purpose or purposes that are similar to purposes on the list provided, but uses different language, the financial institution reports the purpose or purposes from the list provided.

*107(a)(7) Amount applied for.*

1. *Initial amount requested.* A financial institution complies with § 1002.107(a)(7) by reporting the initial amount of credit or the credit limit initially requested by the applicant. The financial institution is not required to report credit amounts or limits discussed before an application is made, but must capture the amount initially requested at the application stage or later. If the applicant does not request a specific amount, but the financial institution underwrites the application for a specific amount, the financial institution reports the amount considered for underwriting as the amount applied for. If the applicant requests an amount as a range of numbers, the financial institution reports the midpoint of that range.

2. *No amount requested.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the credit amount initially requested by the applicant. However, if a financial institution is nonetheless unable to collect or otherwise determine the amount initially requested, the financial institution

reports that the amount applied for is "not provided by applicant and otherwise undetermined." If the particular product applied for does not involve a specific amount requested or underwritten, the financial institution reports that the requirement is "not applicable."

3. *Firm offers.* When an applicant responds to a "firm offer" that specifies an amount or limit, which may occur in conjunction with a pre-approved credit solicitation, the financial institution reports the amount applied for as the amount of the firm offer, unless the applicant requests a different amount. If the firm offer does not specify an amount or limit and the applicant does not request a specific amount, the amount applied for is the amount underwritten by the financial institution.

4. *Additional amounts on an existing account.* When reporting a covered application that seeks additional credit amounts on an existing account, the financial institution reports only the additional credit amount sought, and not any previous amounts extended. See comment 103(b)–3.

*107(a)(8) Amount approved or originated.*

1. *General.* A financial institution complies with § 1002.107(a)(8) by reporting the amount approved or originated for credit that is originated or approved but not accepted. For applications that the financial institution, pursuant to § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports that the amount approved or originated is "not applicable."

2. *Multiple approval amounts.* A financial institution may sometimes approve an applicant for more than one credit amount, allowing the applicant to choose which amount the applicant prefers for the extension or line of credit. When multiple approval amounts are offered for a closed-end credit transaction for which the action taken is approved but not accepted, and the applicant does not accept the approved offer of credit in any amount, the financial institution reports the highest amount approved. If the applicant accepts the offer of closed-end credit, the financial institution reports the amount originated. When multiple approval amounts are offered for an open-end credit transaction for which the action taken is approved but not accepted, and the applicant does not accept the approved offer of credit in any amount, the financial institution reports the highest amount approved. If the applicant accepts the offer of open-end credit, the financial institution reports the actual credit limit established.

3. *Amount approved or originated—closed-end credit transaction.* For an originated closed-end credit transaction, the financial institution reports the principal amount to be repaid. This amount will generally be disclosed on the legal obligation.

4. *Amount approved or originated—refinancing.* For a refinancing, the financial institution reports the amount of credit approved or originated under the terms of the new debt obligation.

5. *Amount approved or originated—counteroffer.* If an applicant agrees to proceed with consideration of a counteroffer

for an amount or limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the financial institution reports the amount granted. If an applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the application as denied and reports "not applicable" for the amount approved or originated. See comment 107(a)(9)–2.

*107(a)(9) Action taken.*

1. *General.* A financial institution complies with § 1002.107(a)(9) by selecting the action taken by the financial institution on the application from the following list: originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. A financial institution identifies the applicable action taken code based on final action taken on the covered application.

i. *Originated.* A financial institution reports that the covered credit transaction was originated if the financial institution made a credit decision approving the application and that credit decision results in an extension of credit.

ii. *Approved but not accepted.* A financial institution reports an application as approved but not accepted if the financial institution made a credit decision approving the application, but the applicant or the party that initially received the application fails to respond to the financial institution's approval within the specified time, or the covered credit transaction was not otherwise consummated or the account was not otherwise opened.

iii. *Denied.* A financial institution reports that the application was denied if it made a credit decision denying the application before an applicant withdraws the application, before the file is closed for incompleteness, or before the application is denied for incompleteness.

iv. *Withdrawn by the applicant.* A financial institution reports that the application was withdrawn if the application is expressly withdrawn by the applicant before the financial institution makes a credit decision approving or denying the application, before the file is closed for incompleteness, or before the application is denied for incompleteness.

v. *Incomplete.* A financial institution reports incomplete if the financial institution took adverse action on the basis of incompleteness under § 1002.9(c)(1)(i) or provided a written notice of incompleteness under § 1002.9(c)(2), and the applicant did not respond to the request for additional information within the period of time specified in the notice.

2. *Treatment of counteroffers.* If a financial institution makes a counteroffer to grant credit on terms other than those originally requested by the applicant (for example, for a shorter loan maturity, with a different interest rate, or in a different amount) and the applicant declines the counteroffer or fails to respond, the institution reports the action taken as a denial on the original terms requested by the applicant. If the applicant agrees to proceed with consideration of the financial institution's counteroffer, the financial institution reports the action taken

as the disposition of the application based on the terms of the counteroffer. For example, assume an applicant applies for a term loan and the financial institution makes a counteroffer to proceed with consideration of a line of credit. If the applicant declines to be considered for a line of credit, the financial institution reports the application as a denied request for a term loan. If, on the other hand, the applicant agrees to be considered for a line of credit, then the financial institution reports the action taken as the disposition of the application for the line of credit. For instance, using the same example, if the financial institution makes a credit decision approving the line of credit, but the applicant fails to respond to the financial institution's approval within the specified time by accepting the credit offer, the financial institution reports the application on the line of credit as approved but not accepted.

3. *Treatment of rescinded transactions.* If a borrower successfully rescinds a transaction after closing but before a financial institution is required to submit its small business lending application register containing the information for the application under § 1002.109, the institution reports the application as approved but not accepted.

4. *Treatment of pending applications.* A financial institution does not report any application still pending at the end of the calendar year; it reports such applications on its small business lending application register for the year in which final action is taken.

5. *Treatment of conditional approvals.* If a financial institution issues an approval that is subject to the applicant meeting certain conditions, the financial institution reports the action taken as provided below dependent on whether the conditions are solely customary commitment or closing conditions or if the conditions include any underwriting or creditworthiness conditions. Customary commitment or closing conditions include, for example, a clear-title requirement, proof of insurance policies, a subordination agreement from another lienholder, or property titling of associated accounts. Underwriting or creditworthiness conditions include, for example, conditions that constitute a counteroffer (such as a demand for a higher down-payment), satisfactory loan-to-value ratios, or verification or confirmation, in whatever form the institution requires, that the applicant meets underwriting conditions concerning applicant creditworthiness, including documentation or verification of revenue, income or assets.

i. *Conditional approval—denial.* If the approval is conditioned on satisfying underwriting or creditworthiness conditions, those conditions are not met, and the financial institution takes adverse action on some basis other than incompleteness, the financial institution reports the action taken as denied.

ii. *Conditional approval—incompleteness.* If the approval is conditioned on satisfying underwriting or creditworthiness conditions that the financial institution needs to make the credit decision, and the financial

institution takes adverse action on the basis of incompleteness under § 1002.9(c)(1)(i), or has sent a written notice of incompleteness under § 1002.9(c)(2) and the applicant did not respond within the period of time specified in the notice, the financial institution reports the action taken as incomplete.

iii. *Conditional approval—approved but not accepted.* If the approval is conditioned on satisfying conditions that are solely customary commitment or closing conditions and the conditions are not met, the financial institution reports the action taken as approved but not accepted. If all the conditions (underwriting, creditworthiness, or customary commitment or closing conditions) are satisfied and the financial institution agrees to extend credit but the covered credit transaction is not originated (for example, because the applicant withdraws), the financial institution reports the action taken as approved but not accepted.

iv. *Conditional approval—withdrawn by the applicant.* If the applicant expressly withdraws before satisfying all underwriting or creditworthiness conditions and before the institution denies the application or before the institution closes the file for incompleteness, the financial institution reports the action taken as withdrawn.

*107(a)(10) Action taken date.*

1. *Reporting action taken date for denied applications.* For applications that are denied, a financial institution reports either the date the application was denied or the date the denial notice was sent to the applicant.

2. *Reporting action taken date for applications withdrawn by applicant.* For applications that are withdrawn by the applicant, the financial institution reports the date the express withdrawal was received, or the date shown on the notification form in the case of a written withdrawal.

3. *Reporting action taken date for applications that are approved but not accepted.* For applications approved by a financial institution but not accepted by the applicant, the financial institution reports any reasonable date, such as the approval date, the deadline for accepting the offer, or the date the file was closed. A financial institution should generally be consistent in its approach to reporting by, for example, establishing procedures for how to report this date for particular scenarios, products, or divisions.

4. *Reporting action taken date for originated covered credit transactions.* For covered credit transactions that are originated, a financial institution generally reports the closing or account opening date. If the disbursement of funds takes place on a date later than the closing or account opening date, the institution may, alternatively, use the date of initial disbursement. A financial institution should generally be consistent in its approach to reporting by, for example, establishing procedures for how to report this date in different scenarios, products, or divisions.

5. *Reporting action taken date for incomplete applications.* For files closed for incompleteness or denied for

incompleteness, the financial institution reports either the date the action was taken or the date the denial or incompleteness notice was sent to the applicant.

*107(a)(11) Denial reasons.*

1. *Reason for denial—in general.* A financial institution complies with § 1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons. The financial institution reports only the principal reason or reasons it denied the application, even if there are fewer than four reasons. For example, if a financial institution denies an application due to insufficient cashflow, unacceptable collateral, and unverifiable business information, the financial institution is required to report these three reasons. The reasons reported must accurately describe the principal reason or reasons the financial institution denied the application. A financial institution reports denial reasons by selecting its principal reason or reasons for denying the application from the following list:

i. *Credit characteristics of the business.* A financial institution reports the denial reason as "credit characteristics of the business" if it denies the application based on an assessment of the business's ability to meet its current or future credit obligations. Examples include business credit score, history of business bankruptcy or delinquency, and/or a high number of recent business credit inquiries.

ii. *Credit characteristics of the principal owner(s) or guarantor(s).* A financial institution reports the denial reason as "credit characteristics of the principal owner(s) or guarantor(s)" if it denies the application based on an assessment of the principal owner(s) or guarantor(s)'s ability to meet its current or future credit obligations. Examples include principal owner(s) or guarantor(s)'s credit score, history of charge offs, bankruptcy or delinquency, low net worth, limited or insufficient credit history, or history of excessive overdraft.

iii. *Use of loan proceeds.* A financial institution reports the denial reason as "use of loan proceeds" if it denies an application because, as a matter of policy or practice, it limits lending to certain kinds of businesses, particular product lines within a business class, or certain industries it has identified as high risk. For example, if an application for credit to establish a cannabis dispensary is denied by a financial institution because it has classified all cannabis-related business as "high risk," the financial institution reports the reason for denial as "use of loan proceeds."

iv. *Cashflow.* A financial institution reports the denial reason as "cashflow" when it denies an application due to insufficient or inconsistent cashflow.

v. *Collateral.* A financial institution reports the denial reason as "collateral" when it denies an application due to insufficient, inappropriate, or unacceptable collateral.

vi. *Time in business.* A financial institution reports the denial reason as "time in business" when it denies an application due to insufficient time or experience in a line of business. For example, a credit applicant establishes a business and applies for credit

AdminRecord-000661

five months later. The financial institution may determine that the applicant has insufficient experience in the business under the institution's underwriting standards and deny the application.

vii. *Government criteria.* Certain loan programs are backed by government agencies that have specific eligibility requirements. When those requirements are not met by an applicant, and the financial institution denies the application, the financial institution reports the denial reason as "government criteria." For example, if an applicant cannot meet a government-guaranteed loan program's requirement to provide a guarantor or proof of insurance, the financial institution reports the reason for the denial as "government criteria."

viii. *Aggregate exposure.* Aggregate exposure is a measure of the total exposure or level of indebtedness of the business and its principal owner(s) associated with an application. A financial institution reports the denial reason as "aggregate exposure" where the total debt associated with the application is deemed high or exceeds certain debt thresholds set by the financial institution. For example, if an application for unsecured credit exceeds the maximum amount a financial institution is permitted to approve per applicant, as stated in its credit guidelines, and the financial institution denies the application for this reason, the financial institution reports the reason for denial as "aggregate exposure."

ix. *Unverifiable information.* A financial institution reports the denial reason as "unverifiable information" when it is unable to verify information on an application, and denies the application for that reason. The unverifiable information must be necessary for the financial institution to make a credit decision based on its procedures for the type of credit requested. Examples include unverifiable assets or collateral, unavailable business credit report, and unverifiable business ownership composition.

x. *Other.* A financial institution reports the denial reason as "other" where none of the enumerated denial reasons adequately describe the principal reason or reasons it denied the application, and the institution reports the denial reason or reasons as free-form text.

2. *Reason for denial—not applicable.* A financial institution complies with § 1002.107(a)(11) by reporting that the requirement is not applicable if the action taken on the application, pursuant to § 1002.107(a)(9), is not a denial. For example, if the application resulted in an originated covered credit transaction, or the application was approved but not accepted, the financial institution complies with § 1002.107(a)(11) by reporting not applicable.

*107(a)(12) Pricing information.*

1. *General.* For applications that a financial institution, pursuant to § 1002.107(a)(9), reports as denied, withdrawn by the applicant, or incomplete, the financial institution reports that pricing information is "not applicable."

*107(a)(12)(i) Interest rate.*

1. *Interest rate—introductory period.* If a covered credit transaction includes an initial period with an introductory interest rate, after which the interest rate adjusts upwards or shifts from a fixed to variable rate, a financial institution complies with § 1002.107(a)(12)(i) by reporting information about the interest rate applicable after the introductory period. For example, if a financial institution originates a covered credit transaction with a fixed, initial interest rate of 0 percent for six months following origination, after which the interest rate will adjust according to a Prime index rate plus a 3 percent margin, the financial institution reports the 3 percent margin, Prime's value, and Prime as the name of the index used to adjust the interest rate.

2. *Multiple interest rates.* If a covered credit transaction includes multiple interest rates applicable to different credit features, a financial institution complies with § 1002.107(a)(12)(i) by reporting the interest rate applicable to the amount of credit approved or originated reported in § 1002.107(a)(8). For example, if a financial institution originates a credit card with different interest rates for purchases, balance transfers, cash advances, and overdraft advances, the financial institution reports the interest rate applicable for purchases.

3. *Index names.* A financial institution complies with § 1002.107(a)(12)(i) by selecting the index used from the following list: Wall Street Journal Prime, 6-month CD rate, 1-year T-Bill, 3-year T-Bill, 5-year T-Note, 12-month average of 10-year T-Bill, Cost of Funds Index (COFI)-National, Cost of Funds Index (COFI)-11th District. If the index used does not appear on the list of indices provided, the financial institution reports "other" and provides the name of the index via free-form text.

4. *Index value.* For covered transactions with an adjustable interest rate, a financial institution complies with § 1002.107(a)(12)(i)(B) by reporting the index value that is applicable at the time the application was approved by the financial institution. For covered credit transactions that include an initial period with an introductory interest rate, after which the interest rate adjusts upwards or shifts from a fixed to variable rate, a financial institution complies with § 1002.107(a)(12)(i)(B) by reporting the index value applicable at the time the application was approved by the financial institution of the rate in effect after the introductory interest rate is complete.

*107(a)(12)(ii) Total origination charges.*

1. *Charges in comparable cash transactions.* Charges imposed uniformly in cash and credit transactions are not reportable under § 1002.107(a)(12)(ii). In determining whether an item is part of the total origination charges, a financial institution should compare the covered credit transaction in question with a similar cash transaction. A financial institution financing the sale of property or services may compare charges with those payable in a similar cash transaction by the seller of the property or service.

2. *Charges by third parties.* A financial institution includes fees and amounts charged by someone other than the financial institution in the total charges reported if the financial institution:

i. Requires the use of a third party as a condition of or an incident to the extension of credit, even if the applicant can choose the third party; or

ii. Retains a portion of the third-party charge, to the extent of the portion retained.

3. *Special rule; broker fees.* A financial institution complies with § 1002.107(a)(12)(ii) by including fees charged by a broker (including fees paid by the applicant directly to the broker or to the financial institution for delivery to the broker) in the total origination charges reported even if the financial institution does not require the applicant to use a broker and even if the financial institution does not retain any portion of the charge. For more information on broker fees, see commentary for § 1002.107(a)(12)(iii).

4. *Bundled services.* Total origination charges include all charges imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit. Accordingly, a financial institution complies with § 1002.107(a)(12)(ii) by including charges for other products or services paid at or before origination in the total origination charges reported if the financial institution requires the purchase of such other product or service as a condition of or an incident to the extension of credit.

5. *Origination charges—examples.* Examples of origination charges may include application fees, credit report fees, points, appraisal fees, and other similar charges.

*107(a)(12)(iii) Broker fees.*

1. *Amount.* A financial institution complies with § 1002.107(a)(12)(iii) by including the fees reported in § 1002.107(a)(12)(iii) that are fees paid by the applicant directly to the broker or to the financial institution for delivery to the broker. For example, a covered transaction has $3000 of total origination charges. Of that $3000, $250 are fees paid by the applicant directly to a broker and an additional $300 are fees paid to the financial institution for delivery to the broker. The financial institution complies with § 1002.107(a)(12)(iii) by reporting $550 in the broker fees reported.

2. *Fees paid directly to a broker by an applicant.* A financial institution complies with § 1002.107(a)(12)(iii) by relying on the best information readily available to the financial institution at the time final action is taken. Information readily available could include, for example, information provided by an applicant or broker that the financial institution reasonably believes regarding the amount of fees paid by the applicant directly to the broker.

*107(a)(12)(iv) Initial annual charges.*

1. *Charges during the initial annual period.* The total initial annual charges include all charges scheduled to be imposed during the initial annual period following origination. For example, if a financial institution originates a covered credit transaction with a $50 monthly fee and a $100 annual fee, the financial institution complies with § 1002.107(a)(12)(iv) by reporting $700 in the initial annual charges reported.

2. *Interest excluded.* A financial institution complies with § 1002.107(a)(12)(iv) by excluding any interest expense from the initial annual charges reported.

AdminRecord-000662

3. *Avoidable charges.* A financial institution complies with § 1002.107(a)(12)(iv) by only including scheduled charges and excluding any charges for events that are avoidable by the applicant from the initial annual charges reported. Examples of avoidable charges include charges for late payment, for exceeding a credit limit, for delinquency or default, or for paying items that overdraw an account.

4. *Initial annual charges—examples.* Examples of charges scheduled to be imposed during the initial annual period may include monthly fees, annual fees, and other similar charges.

5. *Scheduled charges with variable amounts.* A financial institution complies with § 1002.107(a)(12)(iv) by reporting as the default the highest amount for a charge scheduled to be imposed. For example, if a covered credit transaction has a $75 monthly fee, but the fee is reduced to $0 if the applicant maintains an account at the financial institution originating the covered credit transaction, the financial institution complies with § 1002.107(a)(12)(iv) by reporting $900 ($75×12) in the initial annual charges reported.

*107(a)(12)(v) Additional cost for merchant cash advances or other sales-based financing.*

1. *Merchant cash advances.* Section 1002.107(a)(12)(v) requires a financial institution to report the difference between the amount advanced and the amount to be repaid for a merchant cash advance or other sales-based financing transaction. For example, in a merchant cash advance, a financial institution reports the difference between the purchase price and the amount to be repaid, using the amounts provided in the contract between the financial institution and the applicant.

*107(a)(12)(vi) Prepayment penalties.*

1. *Policies and procedures applicable to the covered credit transaction.* The policies and procedures applicable to the covered credit transaction include the practices that the financial institution follows when evaluating applications for the specific credit type and credit purpose requested. For example, assume that a financial institution's written procedures permit it to include prepayment penalties in the loan agreement for its term loans secured by non-owner occupied commercial real estate. For such transactions, the financial institution includes prepayment penalties in some loan agreements but not others. For an application for, or origination of, a term loan secured by non-owner occupied commercial real estate, the financial institution reports under § 1002.107(12)(vi)(A) that a prepayment penalty could have been included under the policies and procedures applicable to the transaction, regardless of whether the term loan secured by non-owner occupied commercial real estate actually includes a prepayment penalty.

*107(a)(13) Census tract.*

1. *General.* A financial institution complies with § 1002.107(a)(13) by reporting a census tract number as defined by the U.S. Census Bureau, which includes State and county numerical codes. A financial institution complies with § 1002.107(a)(13) if it uses the boundaries and codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting. The financial institution reports census tract based on the following:

i. *Proceeds address.* A financial institution complies with § 1002.107(a)(13) by reporting a census tract based on the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied, if known. For example, a financial institution would report a census tract based on the address or location of the site where the proceeds of a construction loan will be applied.

ii. *Main office or headquarters address.* If the address or location where the proceeds of the credit applied for or originated is unknown, a financial institution complies with § 1002.107(a)(13) by reporting a census tract number based on the address or location of the main office or headquarters of the applicant, if known. For example, the address or location of the main office or headquarters of the applicant may be the home address of a sole proprietor or the office address of a sole proprietor or other applicant.

iii. *Another address or location.* If neither the address or location where the proceeds of the credit applied for or originated will be or would have been principally applied nor the address or location of the main office or headquarters of the applicant are known, a financial institution complies with § 1002.107(a)(13) by reporting a census tract number based on another address or location associated with the applicant.

iv. *Type of address used.* In addition to reporting the census tract, pursuant to § 1002.107(a)(13)(iv) a financial institution must report which one of the three types of addresses or locations listed in § 1002.107(a)(13)(i) through (iii) and described in comments 107(a)(13)–1.i through iii that the census tract is determined from.

2. *Financial institution discretion.* A financial institution complies with § 1002.107(a)(13) by identifying the appropriate address or location and the type of that address or location in good faith, using appropriate information from the applicant's credit file or otherwise known by the financial institution. A financial institution is not required to make inquiries beyond its standard procedures as to the nature of the addresses or locations it collects.

3. *Address or location not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes at least one address or location for an applicant for census tract reporting. However, if a financial institution is nonetheless unable to collect or otherwise determine any address or location for an application, the financial institution reports that the census tract information is "not provided by applicant and otherwise undetermined."

4. *Safe harbor.* As described in § 1002.112(c)(1) and comment 112(c)(1)–1, a financial institution that obtains an incorrect census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau does not violate the Act or subpart B of this part.

*107(a)(14) Gross annual revenue.*

1. *Collecting gross annual revenue.* A financial institution may rely on statements of or information provided by the applicant in collecting and reporting gross annual revenue. However, pursuant to § 1002.107(b), if the financial institution verifies the gross annual revenue provided by the applicant, it must report the verified information. The financial institution may use the following language to ask about gross annual revenue, if it does not collect gross annual revenue by another method, and may rely on the applicant's answer:

*What was the gross annual revenue of the business applying for credit in its last full fiscal year? Gross annual revenue is the amount of money the business earned before subtracting taxes and other expenses. You may provide gross annual revenue calculated using any reasonable method.*

2. *Gross annual revenue not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the gross annual revenue of the applicant. However, if a financial institution is nonetheless unable to collect or determine the gross annual revenue of the applicant, the financial institution reports that the gross annual revenue is ''not provided by applicant and otherwise undetermined."

3. *Affiliate revenue.* A financial institution is permitted, but not required, to report the gross annual revenue for the applicant that includes the revenue of affiliates as well. For example, if the financial institution does not normally collect information on affiliate revenue, the financial institution reports only the applicant's revenue and does not include the revenue of any affiliates when it has not collected that information. Similarly, in determining whether the applicant is a small business under § 1002.106(b), a financial institution may rely on an applicant's representations regarding gross annual revenue, which may or may not include the affiliate's revenue.

*107(a)(15) NAICS code.*

1. *General.* NAICS stands for North American Industry Classification System. The Office of Management and Budget has charged the Economic Classification Policy Committee with the maintenance and review of NAICS. A financial institution complies with § 1002.107(a)(15) if it uses the NAICS codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting.

2. *NAICS not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes NAICS code. However, if a financial institution is nonetheless unable to collect or otherwise determine the applicant's NAICS code, the financial institution reports that the NAICS code is ''not provided by applicant and otherwise undetermined."

AdminRecord-000663

3. *Reliance on statements by applicant.* Consistent with § 1002.107(b), a financial institution may rely on statements of or information provided by the applicant in collecting and reporting the NAICS code. For example, a financial institution may rely on the NAICS code on an applicant's tax return that the applicant has otherwise provided to the financial institution.

4. *Reliance on other information.* A financial institution may rely on a NAICS code obtained through the financial institution's use of business information products, such as company profiles or business credit reports, which provide the applicant's NAICS code.

5. *Safe harbor.* A financial institution that identifies an incorrect NAICS code does not violate the Act or subpart B of this part under the circumstances described in § 1002.112(c)(2).

*107(a)(16) Number of workers.*

1. *Collecting number of workers.* In collecting the number of workers from an applicant, a financial institution shall explain that full-time, part-time and seasonal employees, as well as contractors who work primarily for the applicant, would be counted as workers, but principal owners of the business would not. If asked, the financial institution shall explain that volunteers would not be counted as workers, and workers for affiliates of the applicant would only be counted if the financial institution were also collecting the affiliates' gross annual revenue. The financial institution may rely on statements of or information provided by the applicant in collecting and reporting number of workers. However, pursuant to § 1002.107(b), if the financial institution verifies the number of workers provided by the applicant, it must report the verified information. The financial institution may use the following language to ask about the number of workers, if it does not collect the number of workers by another method, and may rely on the applicant's answer:

*Counting full-time, part-time and seasonal workers, as well as contractors who work primarily for the business applying for credit, but not counting principal owners of the business, how many people work for the business applying for credit?*

2. *Number of workers not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the number of workers of the applicant. However, if a financial institution is nonetheless unable to collect or determine the number of workers of the applicant, the financial institution reports that the number of workers is "not provided by applicant and otherwise undetermined."

*107(a)(17) Time in business.*

1. *As relied on or collected.* A financial institution complies with § 1002.107(a)(17) by reporting the time the applicant has been in business as relied on in making the credit decision or collected by the financial institution. The financial institution must report the time in business in whole years and indicate if a business has not begun operating yet or has been in operation for less than a year. When the financial institution relies on an applicant's time in business as part of a credit decision, it reports the time in business relied on in making the credit decision. (See comments 107(a)(17)–2 and –3 below regarding reporting of the time in business relied on.) However, § 1002.107(a)(17) does not require the financial institution to rely on an applicant's time in business in making a credit decision. The financial institution may rely on statements of or information provided by the applicant in collecting and reporting time in business. However, pursuant to § 1002.107(b), if the financial institution verifies the time in business provided by the applicant, it must report the verified information.

2. *Time in business relied on.* When a financial institution evaluates an applicant's time in business as part of a credit decision, it reports the time in business relied on in making the credit decision. For example, if the financial institution relies on the number of years of experience the applicant's owners have in the current line of business, the financial institution reports that number of years as the time in business. Similarly, if the financial institution relies on the number of years that the applicant has existed, the financial institution reports the number of years that the applicant has existed as the time in business. The financial institution reports the length of business existence or experience duration that it relies on in making its credit decision, and is not required to adopt any particular definition of time in business.

3. *Multiple factors considered.* A financial institution relies on an applicant's time in business in making a credit decision if the time in business was a factor in the credit decision, even if it was not a dispositive factor. For example, if the time in business is one of multiple factors in the financial institution's credit decision, the financial institution has relied on the time in business even if the financial institution denies the application because one or more underwriting requirements other than the time in business are not satisfied.

4. *Collecting time in business.* If the financial institution does not rely on time in business in considering an application, pursuant to § 1002.107(c)(1) it shall still maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's time in business. In collecting time in business from an applicant, the financial institution complies with § 1002.107(a)(17) by asking for the number of years that the applicant has been operating the business it operates now. When the applicant has multiple owners with different numbers of years operating that business, the financial institution collects and reports the greatest number of years of any owner. (However, the financial institution does not need to comply with this instruction if it collects and relies on the time in business by another method in making the credit decision.)

5. *Time in business not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the time in business of the applicant. However, if a financial institution is nonetheless unable to collect or determine the time in business of the applicant, the financial institution reports that the time in business is "not provided by applicant and otherwise undetermined."

*107(a)(18) Minority-owned business status.*

1. *General.* Unless a financial institution is permitted to report minority-owned business status based on previously collected data pursuant to § 1002.107(c)(2), a financial institution must ask an applicant whether it is a minority-owned business for each covered application. The financial institution must permit an applicant to refuse to answer the financial institution's inquiry and must inform the applicant that the applicant is not required to provide the information. The financial institution must report the applicant's response, its refusal to answer the inquiry (such as when the applicant indicates that it does not wish to provide the requested information), or its failure to respond to the inquiry (such as when the applicant fails to submit a data collection form). See appendix F for additional instructions on collecting and reporting minority-owned business status.

2. *Notice of non-discrimination.* When requesting minority-owned business status from an applicant, a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of the applicant's minority-owned business status, or on whether the applicant provides its minority-owned business status. A financial institution may combine this non-discrimination notice regarding minority-owned business status with the similar non-discrimination notices that a financial institution is required to provide when requesting women-owned business status and a principal owner's ethnicity, race, and sex if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

3. *Recording an applicant's response regarding minority-owned business status separate from the application.* A financial institution must record an applicant's response to the financial institution's inquiry pursuant to § 1002.107(a)(18) separate from the application and accompanying information. See comment 111(b)–1. If the financial institution provides a paper or electronic data collection form, the data collection form must not be part of the application form or any other document that the financial institution uses to provide or collect any information other than women-owned business status, minority-owned business status, principal owners' ethnicity, race, and sex, and the number of the applicant's principal owners. See the sample data collection form in appendix E. For example, if the financial institution sends the data collection form via email, the data collection form should be a separate attachment to the email or accessed through a separate link in the email. If the financial

AdminRecord-000664

**56598**   **Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules

institution uses a web-based data collection form, the form should be on its own page.

4. *Minority-owned business status not provided by applicant.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's minority-owned business status. However, if a financial institution does not receive a response to the financial institution's inquiry for purposes of § 1002.107(a)(18), the financial institution reports that the applicant's minority-owned business status is ''not provided by applicant.''

5. *No verification.* Notwithstanding § 1002.107(b), a financial institution must report the applicant's response, the applicant's refusal to answer the inquiry, or the applicant's failure to respond to the inquiry pursuant to § 1002.107(a)(18), even if the financial institution verifies or otherwise obtains an applicant's minority-owned business status for other purposes.

6. *No reporting based on visual observation or surname.* A financial institution does not report minority-owned business status based on visual observation, surname, or any basis other than the applicant's response to the inquiry that the financial institution makes to satisfy § 1002.107(a)(18) or, if the financial institution is permitted to report based on previously collected data, on the basis of the applicant's response to the inquiry that the financial institution previously made to satisfy § 1002.107(a)(18).

7. *Previously collected data.* A financial institution may report minority-owned business status based on previously collected data if the financial institution is permitted to do so pursuant to § 1002.107(c)(2) and its commentary.

*107(a)(19) Women-owned business status.*

1. *General.* Unless a financial institution is permitted to report women-owned business status based on previously collected data pursuant to § 1002.107(c)(2), a financial institution must ask an applicant whether it is a women-owned business for each covered application. The financial institution must permit an applicant to refuse to answer the financial institution's inquiry and must inform the applicant that the applicant is not required to provide the information. The financial institution must report the applicant's response, its refusal to answer the inquiry (such as when the applicant indicates that it does not wish to provide the requested information), or its failure to respond to the inquiry (such as when the applicant fails to submit a data collection form). See appendix F for additional instructions on collecting and reporting women-owned business status.

2. *Notice of non-discrimination.* When requesting women-owned business status from an applicant, a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of the applicant's women-owned business status, or on whether the applicant provides its women-owned business status. A financial institution may combine this non-discrimination notice regarding women-owned business status with the similar non-discrimination notices that a financial institution is required to provide when

requesting minority-owned business status and a principal owner's ethnicity, race, and sex if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

3. *Recording an applicant's response regarding women-owned business status separate from the application.* A financial institution must record an applicant's response to the financial institution's inquiry pursuant to § 1002.107(a)(19) separate from the application and accompanying information. See comment 111(b)–1. If the financial institution provides a paper or electronic data collection form, the data collection form must not be part of the application form or any other document that the financial institution uses to provide or collect any information other than women-owned business status, minority-owned business status, principal owners' ethnicity, race, and sex, and the number of the applicant's principal owners. See the sample data collection form in appendix E. For example, if the financial institution sends the data collection form via email, the data collection form should be a separate attachment to the email or accessed through a separate link in the email. If the financial institution uses a web-based data collection form, the form should be on its own page.

4. *Women-owned business status not provided by applicant.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the applicant's women-owned business status. However, if a financial institution does not receive a response to the financial institution's inquiry for purposes of § 1002.107(a)(19), the financial institution reports that the applicant's women-owned business status is ''not provided by applicant.''

5. *No verification.* Notwithstanding § 1002.107(b), a financial institution must report the applicant's response, the applicant's refusal to answer the inquiry, or the applicant's failure to respond to the inquiry pursuant to § 1002.107(a)(19), even if the financial institution verifies or otherwise obtains an applicant's women-owned business status for other purposes.

6. *No reporting based on visual observation or surname.* A financial institution does not report women-owned business status based on visual observation, surname, any basis other than the applicant's response to the inquiry that the financial institution makes to satisfy § 1002.107(a)(19) or, if the financial institution is permitted to report based on previously collected data, on the basis of the applicant's response to the inquiry that the financial institution previously made to satisfy § 1002.107(a)(19).

7. *Previously collected data.* A financial institution may report women-owned business status based on previously collected data if the financial institution is permitted to do so pursuant to § 1002.107(c)(2) and its commentary.

*107(a)(20) Ethnicity, race, and sex of principal owners.*

1. *General.* Unless a financial institution is permitted to report ethnicity, race, and sex

information based on previously collected data pursuant to § 1002.107(c)(2), a financial institution must ask an applicant to report its principal owners' ethnicity, race, and sex for each covered application. The financial institution must permit an applicant to refuse to answer the financial institution's inquiries and must inform the applicant that it is not required to provide the information. The financial institution must report the applicant's responses, its refusal to answer the inquiries, or its failure to respond to the inquiries. In certain situations, discussed in comments 107(a)(20)–9 and –10 and in appendix G, a financial institution may also be required to report one or more principal owners' ethnicity and race based on visual observation and/or surname. However, a financial institution shall not report a principal owner's sex based on visual observation, surname, or any basis other than the applicant-provided information (including previously collected data if permitted pursuant to § 1002.107(c)(2)). See appendix G for additional instructions on collecting and reporting the ethnicity, race, and sex of principal owners.

2. *Notice of non-discrimination.* When requesting a principal owner's ethnicity, race, and sex from an applicant, a financial institution must inform the applicant that the financial institution cannot discriminate on the basis of a principal owner's ethnicity, race, or sex, or on whether the applicant provides the information. A financial institution may combine this non-discrimination notice with the similar non-discrimination notices that a financial institution is required to provide when requesting minority-owned business status and women-owned business status if a financial institution requests minority-owned business status, women-owned business status, and/or a principal owner's ethnicity, race, and sex in the same data collection form or at the same time.

3. *Recording an applicant's responses regarding principal owners' ethnicity, race, and sex separate from the application.* A financial institution must record an applicant's response to the financial institution's inquiries pursuant to § 1002.107(a)(20) separate from the application and accompanying information. See comment 111(b)–1. If the financial institution provides a paper or electronic data collection form, the data collection form must not be part of the application form or any other document that the financial institution uses to provide or collect any information other than women-owned business status, minority-owned business status, principal owners' ethnicity, race, and sex, and the number of the applicant's principal owners. See the sample data collection form in appendix E. For example, if the financial institution sends the data collection form via email, the data collection form should be a separate attachment to the email or accessed through a separate link in the email. If the financial institution uses a web-based data collection form, the form should be on its own page.

4. *Ethnicity, race, or sex of principal owners not provided by applicant.* Pursuant to § 1002.107(c)(1), a financial institution

**Federal Register** / Vol. 86, No. 193 / Friday, October 8, 2021 / Proposed Rules   **56599**

shall maintain procedures reasonably designed to collect applicant-provided information, which includes the ethnicity, race, and sex of an applicant's principal owners. However, if a financial institution is nonetheless unable to collect the principal owners' ethnicity, race, or sex from the applicant, and if the financial institution is not required to report based on visual observation or surname, the financial institution reports that the principal owner's ethnicity, race, or sex (as applicable) is "not provided by applicant."

5. *Determining who is a principal owner.* Generally, an applicant determines its principal owners and decides whether to provide information about those principal owners. However, as discussed in comments 107(a)(20)–9 and –10 and appendix G, a financial institution may be required to report ethnicity and race information based on visual observation and/or surname if the applicant does not provide ethnicity, race, or sex information for at least one principal owner and the financial institution meets in person with one or more principal owners. Thus, a financial institution may need to determine if a natural person that it meets with in person is a principal owner. In that case, the financial institution may either ask the natural person who is acting on behalf of an applicant whether that natural person is a principal owner, or it may independently determine if the natural person is a principal owner. For example, if a financial institution has collected information regarding an applicant's ownership structure and obtained the name or identity of the natural person for other purposes, it may use this information to independently determine whether the natural person who meets in person with the financial institution is a principal owner. If a financial institution asks if a natural person is a principal owner, the financial institution can rely on an applicant's or natural person's response, unless the financial institution has knowledge to the contrary. The financial institution is not required to verify any responses regarding whether a natural person is a principal owner.

6. *Ethnicity.* i. *Aggregate categories.* A financial institution must permit an applicant to provide a principal owner's ethnicity for purposes § 1002.107(a)(20) using one or more of the following aggregate categories:

A. Hispanic or Latino.
B. Not Hispanic or Latino.
ii. *Disaggregated subcategories.* A financial institution must permit an applicant to provide a principal owner's ethnicity for purposes of § 1002.107(a)(20) using one or more the following disaggregated subcategories, regardless of whether the applicant has indicated that the relevant principal owner is Hispanic or Latino and regardless of whether the applicant selects any aggregate categories: Cuban; Mexican; Puerto Rican; or Other Hispanic or Latino. If an applicant indicates that a principal owner is Other Hispanic or Latino, the financial institution must permit the applicant to provide additional information regarding the principal owner's ethnicity, such as indicating, for example, that the principal owner is Argentinean, Colombian,

Dominican, Nicaraguan, Salvadoran, or Spaniard. If an applicant chooses to provide additional information regarding a principal owner's ethnicity, such as indicating that a principal owner is Argentinean, a financial institution must report that additional information as free-form text in the appropriate data reporting field.

iii. *Selecting multiple categories.* The financial institution must permit the applicant to select one, both, or none of the aggregate categories and as many disaggregated subcategories as the applicant chooses. A financial institution must permit an applicant to select a disaggregated subcategory even if the applicant does not select the corresponding aggregate category. A financial institution must also permit the applicant to refuse to provide ethnicity information for one or more principal owners. If an applicant provides ethnicity information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant. For example, if an applicant selects both aggregate categories and four disaggregated subcategories for a principal owner, the financial institution reports the two aggregate categories that the applicant selected and all four of the disaggregated subcategories that the applicant selected.

iv. *Information not provided by applicant.* Unless a financial institution is required to report based on visual observation and/or surname (see comments 107(a)(20)–9 and –10 and appendix G), if an applicant refuses or fails to provide ethnicity information for a principal owner, the financial institution reports that the applicant declined to provide the information or failed to respond, as applicable. Because there are data reporting fields for four principal owners, when submitting data to the Bureau, a financial institution will need to report that the requirement to report ethnicity is not applicable for some principal owners if the applicant has fewer than four principal owners. For example, if an applicant has only one principal owner, the financial institution reports that the requirement to report ethnicity is not applicable in the data fields for principal owners two through four.

7. *Race.* i. *Aggregate categories.* A financial institution must permit an applicant to provide a principal owner's race for purposes of § 1002.107(a)(20) using one or more of the following aggregate categories:

A. American Indian or Alaska Native.
B. Asian.
C. Black or African American.
D. Native Hawaiian or Other Pacific Islander.
E. White.
ii. *Disaggregated subcategories.* The financial institution must permit an applicant to provide a principal owner's race for purposes of § 1002.107(a)(20) using one or more of the disaggregated subcategories as listed in this comment 107(a)(20)–7.ii and set forth in the sample data collection form in appendix E, regardless of whether the applicant has selected the corresponding aggregate category.

A. The Asian aggregate category includes the following disaggregated subcategories:

Asian Indian; Chinese; Filipino; Japanese; Korean; Vietnamese; and Other Asian. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the applicant indicates that the principal owner is Asian and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Asian, the financial institution must permit the applicant to provide additional information about the principal owner's race, such as providing information, for example, that the principal owner is Cambodian, Hmong, Laotian, Pakistani, or Thai.

B. The Black or African American category includes the following disaggregated subcategories: African American; Ethiopian; Haitian; Jamaican; Nigerian; Somali; or Other Black or African American. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the applicant indicates that the principal owner is Black or African American and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Black or African American, the financial institution must permit the applicant to provide additional information about the principal owner's race, such as providing information, for example, that the principal owner is Barbadian, Ghanaian, or South African.

C. The Native Hawaiian or Other Pacific Islander includes the following disaggregated subcategories: Guamanian or Chamorro; Native Hawaiian; Samoan; and Other Pacific Islander. An applicant must also be permitted to provide the principal owner's race using one or more of these disaggregated subcategories regardless of whether the applicant indicates that the principal owner is Native Hawaiian or Other Pacific Islander and regardless of whether the applicant selects any aggregate categories. Additionally, if an applicant indicates that a principal owner is Other Pacific Islander, the financial institution must permit the applicant to provide additional information about the principal owner's race, such as providing information, for example, that the principal owner is Fijian or Tongan.

D. If an applicant chooses to provide additional information regarding a principal owner's race, such as indicating that a principal owner is Cambodian, Barbadian, or Fijian, a financial institution must report that additional information as free-form text in the appropriate data reporting field.

E. In addition to permitting an applicant to indicate that a principal owner is American Indian or Alaska Native, a financial institution must permit an applicant to provide the name of an enrolled or principal tribe. An applicant must be permitted to provide the name of an enrolled or principal tribe regardless of whether the applicant indicates that the principal owner is American Indian or Alaska Native. If an applicant chooses to provide the name of an enrolled or principal tribe, a financial institution must report that information as free-form text in the appropriate data reporting field.

AdminRecord-000666

iii. *Selecting multiple categories.* The financial institution must permit the applicant to select as many aggregate categories and disaggregated subcategories as the applicant chooses. A financial institution must permit an applicant to select one or more disaggregated subcategories even if the applicant does not select an aggregate category. A financial institution must also permit the applicant to refuse to provide this information for one or more principal owners. If an applicant provides race information for a principal owner, the financial institution reports all of the aggregate categories and disaggregated subcategories provided by the applicant. For example, if an applicant selects two aggregate categories and five disaggregated subcategories for a principal owner, the financial institution reports the two aggregate categories that the applicant selected and the five disaggregated subcategories that the applicant selected.

iv. *Information not provided by applicant.* Unless the financial institution is required to report based on visual observation and/or surname (see comments 107(a)(20)–9 and –10 and appendix G), if an applicant refuses or fails to provide race information for a principal owner, the financial institution reports that the applicant declined to provide the information or failed to respond, as applicable. Because there are data reporting fields for four principal owners, when submitting data to the Bureau, a financial institution must report that the requirement to report race is not applicable for some principal owners if the applicant has fewer than four principal owners. For example, if an applicant has only one principal owner (*i.e.,* only one natural person directly owns 25 percent or more of the applicant's equity interests), the financial institution reports that the requirement to report race is not applicable in the data reporting fields for principal owners two through four.

8. *Sex.* A financial institution must permit an applicant to provide a principal owner's sex for purposes of § 1002.107(a)(20) using one or more of the following categories: Male, Female, and/or that the principal owner prefers to self-describe their sex. Additionally, if an applicant indicates that a principal owner prefers to self-describe their sex, the financial institution must permit the applicant to provide additional information about the principal owner's sex. A financial institution must permit an applicant to select as many categories as the applicant chooses. A financial institution reports the category or categories selected by the applicant, any additional information provided by the applicant (reported as free-form text in the appropriate data reporting field), or reports that the applicant refused to provide the information or failed to respond. A financial institution is not permitted to report sex based on visual observation, surname, or any basis other than the applicant-provided information. Because there are data reporting fields for four principal owners, when submitting data to the Bureau a financial institution must report that the requirement to report sex is not applicable for some principal owners if the applicant has fewer than four principal owners. For example, if

an applicant has only one principal owner, the financial institution reports that the requirement to report sex is not applicable in the data fields for principal owners two through four. See appendix G for additional information on collecting and reporting a principal owner's sex.

9. *Reporting based on visual observation and/or surname.* If a financial institution meets in person with one or more of an applicant's principal owners and the applicant does not provide ethnicity, race, or sex information for at least one principal owner, the financial institution must report at least one principal owner's ethnicity and race (but not sex) based on visual observation, surname, or a combination of both visual observation and surname. (See comment 107(a)(20)-10 for additional information regarding what constitutes an in-person meeting with an applicant's principal owners.) However, a financial institution is not required to report based on visual observation and/or surname if the principal owner only meets in person with a third party through whom it is submitting an application to the financial institution. For example, a financial institution is not required to report based on visual observation and/or surname when an employee or officer of an equipment dealer or retailer that is not an affiliate of the financial institution meets in person with a principal owner.

10. *Meeting in person with a principal owner.* i. *In-person meetings.* A financial institution meets in person with a principal owner if an employee or officer of the financial institution or one of its affiliates has a meeting or discussion with the applicant's principal owner about an application and can visually observe the principal owner. The following provides a non-exhaustive list of examples to illustrate when a financial institution meets in person with a principal owner for purposes of the requirement to collect principal owners' race and ethnicity information based on visual observation and/or surname if not provided by the applicant:

A. A principal owner comes to a financial institution's branch or office and meets with the financial institution's loan officer to discuss the status of a pending application.

B. A principal owner comes to a financial institution's branch or office and meets in person with one or more employees or officers of a financial institution in order to complete an application and related paperwork.

C. A principal owner contacts a financial institution's loan officer using an electronic communication method with a video component and, using the video component, meets with the loan officer to discuss outstanding documentation needed for a pending application.

ii. *Not in-person meetings.* The following provides a non-exhaustive list of examples to illustrate when a financial institution does not meet in person with a principal owner for purposes of the requirement to collect principal owners' race and ethnicity information via visual observation and/or surname if not provided by the applicant:

A. A principal owner drops off documents at a financial institution's branch or office or

provides the applicant's name and drops off documents without engaging in any discussion regarding a covered application.

B. A principal owner meets in person with an employee or officer of the financial institution to discuss something other than a covered application, such as another financial product.

C. The financial institution meets with a principal owner after the application process is complete, such as at account opening or loan closing.

D. A financial institution meets with a principal owner before the applicant submits an application.

11. *Use of aggregate categories when reporting based on visual observation or surname.* When reporting ethnicity and race based on visual observation and/or surname, the financial institution uses only the aggregate ethnicity and race categories. See appendix G for additional information on collecting and reporting based on visual observation and/or surname.

12. *No verification of ethnicity, race, and sex of principal owner.* Notwithstanding § 1002.107(b), a financial institution is neither required nor permitted to verify the ethnicity, race, or sex information that the applicant provides for purposes of § 1002.107(a)(20), even if the financial institution verifies or otherwise obtains the ethnicity, race, or sex of the applicant's principal owners for other purposes. Additionally, if an applicant refuses to respond to the inquiry pursuant to § 1002.107(a)(20) or fails to respond to this inquiry, the financial institution reports that the applicant declined to provide the information or did not respond to the request to provide the information (as applicable), unless the financial institution is required to report ethnicity and race based on visual observation and/or surname. The financial institution does not report ethnicity, race, or sex based on information that the financial institution collects for other purposes.

*107(a)(21) Number of principal owners.*

1. *General.* A financial institution may request an applicant's number of principal owners from the applicant or may determine the number of principal owners from information provided by the applicant or that the financial institution otherwise obtains. If the financial institution asks the applicant to provide the number of its principal owners pursuant to § 1002.107(a)(21), a financial institution must provide the definition of principal owner set forth in § 1002.107(c)(2). If permitted pursuant to § 1002.107(c)(2), a financial institution may also report an applicant's number of principal owners based on previously collected data.

2. *Number of principal owners provided by applicant; verification of number of principal owners.* The financial institution may rely on statements or information provided by the applicant in collecting and reporting the number of the applicant's principal owners. However, pursuant to § 1002.107(b), if the financial institution verifies the number of principal owners provided by the applicant, it must report the verified information. The financial institution is not required to verify the number of principal owners, but if the financial institution verifies the number of

principal owners in making the credit decision, then the financial institution reports the verified number of principal owners.

3. *Number of principal owners not provided by applicant and otherwise undetermined.* Pursuant to § 1002.107(c)(1), a financial institution shall maintain procedures reasonably designed to collect applicant-provided information, which includes the number of principal owners of the applicant. However, if a financial institution is nonetheless unable to collect or otherwise determine the applicant's number of principal owners, the financial institution reports that the number of principal owners is "not provided by applicant and otherwise undetermined."

*107(b) Verification of applicant-provided information.*

1. *Reliance on statements or information provided by an applicant.* A financial institution may rely on statements made by an applicant (whether made in writing or orally) or information provided by an applicant when compiling and reporting data pursuant to subpart B of this part for applicant-provided data; the financial institution is not required to verify those statements. However, if the financial institution does verify applicant statements for its own business purposes, such as statements relating to gross annual revenue or time in business, the financial institution reports the verified information. Depending on the circumstances and the financial institution's procedures, certain applicant-provided data can be collected without a specific request from the applicant. For example, gross annual revenue may be collected from tax return documents. Applicant-provided data are the data required that are or could be provided by the applicant, including § 1002.107(a)(5) through (7) and (13) through (21). See comment 107(c)(2)–3.

*107(c) Time and manner of collection.*
*107(c)(1) In general.*
1. *Procedures.* The term "procedures" refers to the actual practices followed by a financial institution as well as its stated policies or procedures. For example, if a financial institution's stated policy is to collect applicant-provided data on or with a paper application form, but the financial institution's employees encourage applicants to skip the page that asks whether the applicant is a minority-owned business or a women-owned business under § 1002.107(a)(18) and (19), the financial institution's procedures are not reasonably designed to obtain a response.

2. *Latitude to design procedures.* A financial institution has flexibility to establish procedures concerning the timing and manner that it collects applicant-provided data that work best for its particular lending model and product offerings, provided that those procedures are reasonably designed to collect the applicant-provided data in § 1002.107(a).

3. *Applicant-provided data.* Applicant-provided data are the data required that are or could be provided by the applicant, including § 1002.107(a)(5) (credit type), § 1002.107(a)(6) (credit purpose),

§ 1002.107(a)(7) (amount applied for), § 1002.107(a)(13) (address or location for purposes of determining census tract), § 1002.107(a)(14) (gross annual revenue), § 1002.107(a)(15) (NAICS code, or information about the business such that the financial institution can determine the applicant's NAICS code), § 1002.107(a)(16) (number of workers), § 1002.107(a)(17) (time in business), § 1002.107(a)(18) (minority-owned business status), § 1002.107(a)(19) (women-owned business status), § 1002.107(a)(20) (ethnicity, race, and sex of the applicant's principal owners), and § 1002.107(a)(21) (number of principal owners). Applicant-provided data does not include data that are generated or supplied only by the financial institution, including § 1002.107(a)(1) (unique identifier), § 1002.107(a)(2) (application date), § 1002.107(a)(3) (application method), § 1002.107(a)(4) (application recipient), § 1002.107(a)(8) (amount approved or originated), § 1002.107(a)(9) (action taken), § 1002.107(a)(10) (action taken date), § 1002.107(a)(11) (denial reasons), § 1002.107(a)(12) (pricing data), and § 1002.107(a)(13) (census tract, based on address or location provided by the applicant). Depending on the circumstances and the financial institution's procedures, certain applicant-provided data can be collected without a specific request from the applicant. For example, credit type may be collected based on the type of product chosen by the applicant or NAICS code may be collected from an applicant's tax return that the applicant has otherwise provided to the financial institution.

4. *Reasonably designed—generally.* Whether a financial institution's procedures are reasonably designed to collect applicant-provided data depends on the financial institution's particular lending model and product offerings. A financial institution shall reassess on a periodic basis, based on available data, whether its procedures are reasonably designed to obtain a response. For example, a financial institution may be able to assess whether its procedures are reasonably designed by comparing its response rate with similarly situated financial institutions (for instance, those that offer similar products, use a similar lending model, or are of a similar size). A financial institution is permitted, but not required, to develop different procedures for different applicant-provided data, so long as the procedures used are reasonably designed to obtain a response. A financial institution is permitted, but not required, to make more than one attempt to obtain applicant-provided data if the applicant does not respond to an initial request.

5. *Examples of procedures that are generally reasonably designed to obtain a response.* Although a fact-based determination, the following procedures reflect practices concerning the time or manner of collection that are generally reasonably designed to obtain a response:

i. *Timing of collection.* A financial institution requests applicant-provided data early in the application process; for example, at the time of a covered application, as defined in § 1002.103. The earlier in the

application process, the more likely the timing of collection is reasonably designed to obtain a response.

ii. *Manner of collection.* A financial institution requests applicant-provided data on the same form or in connection with other required information. For example, a financial institution requests applicant-provided data as part of a written application form or on a separate data collection form provided with the written application form. See also comments 107(a)(18)–3, 107(a)(19)–3, and 107(a)(20)–3, which discuss the use of a separate data collection form for collecting minority-owned business status, women-owned business status, and the ethnicity, race, and sex of an applicant's principal owners.

6. *Examples of procedures that are generally not reasonably designed to obtain a response.* The following procedures reflect practices concerning the time or manner of collection that are generally not reasonably designed to obtain a response. Depending on the particular facts, however, these procedures may be reasonably designed to obtain a response; for example, if the financial institution has evidence or a reason to believe that under its procedures the response rate would be similar to or better than other alternatives.

i. *Timing of collection.* A financial institution requests applicant-provided data simultaneous with or after notifying an applicant of its action taken on a covered application.

ii. *Manner of collection.* A financial institution requests applicant-provided data in a manner that imposes unnecessary applicant burden or is inconsistent with the rest of its application process. For example, collecting application information related to the creditworthiness determination in electronic form, but mailing a paper form to the applicant seeking the data required under § 1002.107(a) that the financial institution does not otherwise need for its creditworthiness determination and requiring the applicant to mail it back.

7. *Updated applicant-provided data.* A financial institution reports updated applicant-provided data if it obtains more current data during the application process. For example, if an applicant states it has 100 non-owners working for the business, but then the applicant notifies the financial institution that the number is actually 75, the financial institution reports 75 non-owners working for the business. For reporting of verified applicant-provided information, see § 1002.107(b) and comment 107(b)–1.

8. *Change in determination of small business status.* If a financial institution changes its determination regarding an applicant's status as a small business under § 1002.106(b), it must follow the procedures described in comments 106(b)–1 and –2.

*107(c)(2) Previously collected data.*
1. *In general.* A financial institution may reuse certain previously collected data if the requirements of § 1002.107(c)(2) are met. In that circumstance, a financial institution need not seek to collect the data anew in connection with a subsequent covered application. For example, if an applicant applies for and is granted a term loan, and

then subsequently applies for a credit card in the same calendar year, the financial institution need not request again the data set forth in § 1002.107(c)(2). Similarly, if an applicant applies for more than one covered credit transaction at one time, a financial institution need only ask once for the data set forth in § 1002.107(c)(2).

2. *Data that can be reused.* Subject to the requirements of § 1002.107(c)(2) and comment 107(c)(2)–3, a financial institution may reuse the following data:
§ 1002.107(a)(13) (census tract),
§ 1002.107(a)(14) (gross annual revenue),
§ 1002.107(a)(15) (NAICS code),
§ 1002.107(a)(16) (number of workers),
§ 1002.107(a)(17) (time in business),
§ 1002.107(a)(18) (minority-owned business status), § 1002.107(a)(19) (women-owned business status), § 1002.107(a)(20) (ethnicity, race, and sex of principal owners), and § 1002.107(a)(21) (number of principal owners). A financial institution is not, however, permitted to reuse other data, such as § 1002.107(a)(6) (credit purpose).

3. *Previously reported data without a substantive response.* Section 1002.107(c)(2) permits a financial institution to reuse certain previously collected data to satisfy § 1002.107(a)(13) through (21), if certain conditions are met. Data have not been "previously collected" within the meaning of this provision if the applicant did not provide a substantive response to the financial institution's request for that data and the financial institution was not otherwise able to obtain the requested data (for example, from the applicant's credit report, tax returns, or through visual observation or surname collection for race and ethnicity information).

4. *Collection in the same calendar year.* Pursuant to § 1002.107(c)(2)(i), data can be reused if they are collected in the same calendar year. For applications that span more than one calendar year, the following applies:

i. If the data are collected in connection with a covered application in one calendar year, but then final action was taken on the application in the following calendar year, the financial institution may consider the data as collected in the year that final action was taken on the application.

ii. If data are collected in connection with a covered application in one calendar year, a financial institution may reuse that data pursuant to § 1002.107(c)(2) in a subsequent application initiated in the same calendar year, even if final action was taken on the subsequent application in the following calendar year.

5. *Reason to believe data are inaccurate.* Whether a financial institution has reason to believe data are inaccurate pursuant to § 1002.107(c)(2)(ii) depends on the particular facts and circumstances. For example, a financial institution may have reason to believe data on the applicant's women-owned business status, minority-owned business status, and ethnicity, race, and sex of principal owners may be inaccurate if it knows that the applicant has had a change in ownership.

6. *Minority-owned business status and women-owned business status.* If the financial institution asked the applicant to provide its minority-owned business status or women-owned business status for purposes of § 1002.107(a)(18) and (19) and the applicant refused to provide the information (such as by selecting "I do not wish to provide this information" on a data collection form or by telling the financial institution that it did not wish to provide the information), the financial institution may use that response when reporting data for a subsequent application pursuant to § 1002.107(c)(2). However, if the applicant failed to respond (such as by leaving the response to the question blank or by failing to return a data collection form), the financial institution must inquire about the applicant's minority-owned business status or women-owned business status, as applicable, because the data were not previously obtained.

7. *Principal owners' ethnicity, race, and sex.* If the financial institution asked the applicant to provide its principal owners' ethnicity, race, or sex for purposes § 1002.107(a)(20) and the applicant refused to provide the information (such as by selecting "I do not wish to provide this information" on a data collection form or by telling the financial institution that it did not wish to provide the information) or if the financial institution reported ethnicity and race based on visual observation and/or surname, the financial institution may use these data when reporting information for a subsequent application under § 1002.107(c)(2). However, if the applicant failed to respond (such as by leaving the response to the question blank or by failing to return a data collection form) and the financial institution did not report ethnicity and race based on visual observation and/or surname, the financial institution must inquire about the ethnicity, race, and sex of the applicant's principal owners, as applicable, because the data were not previously obtained.

*Section 1002.108—Firewall*

*108(a) Definitions.*

1. *Involved in making any determination concerning a covered application.* An employee or officer is involved in making a determination concerning a covered application if the employee or officer makes, or otherwise participates in, a decision regarding the evaluation of a covered application or the creditworthiness of an applicant for a covered credit transaction. This includes, but is not limited to, employees and officers serving as underwriters. The decision that an employee or officer makes or participates in must be about a specific covered application. An employee or officer is not involved in making a determination concerning a covered application if the employee or officer is involved in making a decision that affects covered applications generally, or interacts with small businesses prior to them becoming applicants or submitting a covered application. This group might include officers and employees who develop policies and procedures, program systems, or conduct marketing. Additionally, an employee or officer is not involved in making a determination concerning a covered application if the employee or officer makes or participates in a decision after the financial institution has taken final action on the application, such as a decision about servicing or collecting a covered credit transaction. Furthermore, an officer or employee is not involved in making a determination concerning a covered application for purposes of § 1002.108 if the officer or employee simply uses a check box form to confirm whether an applicant has submitted all necessary documents or handles a minor or clerical matter during the application process, such as suggesting or selecting a time for an appointment with an applicant.

2. *Should have access.* i. *General.* A financial institution may determine that an employee or officer should have access for purposes of § 1002.108 if that employee or officer is assigned one or more job duties that may require the employee or officer to collect (based on visual observation, surname, or otherwise), see, consider, refer to, or use information otherwise subject to the prohibition in § 1002.108(b). The employee or officer does not have to be required to collect, see, consider, refer to or use such information or to actually collect, see, consider, refer to or use such information. It is sufficient if the employee or officer might need to do so to perform the employee's or officer's assigned job duties. For example, if a loan officer's job description states that the loan officer may need to collect ethnicity and race information based on visual observation and/or surname or if the loan officer is assigned the task of assisting applicants with the completion of data collection forms, the financial institution may determine that the loan officer should have access. If a financial institution determines that an employee or officer who is involved in making any determination concerning a covered application should have access for purposes of § 1002.108, the financial institution is responsible for ensuring that the employee or officer only accesses and uses the protected information for lawful purposes.

ii. *When a group of employees or officers should have access.* A financial institution may determine that all employees or officers with the same job description or assigned duties should have access for purposes of § 1002.108. If a job description assigns one or more tasks that may require access to one or more applicants' responses to the financial institution's inquiries under § 1002.107(a)(18) through (20), the financial institution may determine that all employees and officers who share that job description should have access for purposes of § 1002.108. For example, if the job description for the position of loan officer states that a loan officer may have to distribute, collect, and help applicants complete a data collection form that asks about the applicant's minority-owned business status, women-owned business status, and its principal owners' ethnicity, race, and sex, the financial institution may determine that all employees and officers who have been assigned the position of loan officer should have access for purposes of § 1002.108.

*108(b) Prohibition on access to certain information.*

AdminRecord-000669

1. *Scope of information subject to the prohibition.* i. *When the prohibition applies.* The prohibition in § 1002.108(b) applies only to an applicant's responses to the inquiries that the covered financial institution has to satisfy § 1002.107(a)(18) through (20). For example, if a financial institution satisfies § 1002.107(a)(18) through (20) by using a paper data collection form to ask an applicant if it is a minority-owned business, if it is a women-owned business, and for the ethnicity, race, and sex of its principal owners, the prohibition applies to the responses that the applicant provides on the paper data collection form and any other paper or electronic records that the financial institution creates based on the applicant's responses provided on the paper data collection form. Similarly, if a financial institution satisfies § 1002.107(a)(18) through (20) by asking an applicant about its minority-owned business status, its women-owned business status, and the ethnicity, race, and sex of its principal owners during a telephone call, the prohibition applies to the responses to those inquiries provided during that telephone call and to any records created on the basis of those responses.

ii. *When the prohibition does not apply.* Because the prohibition in § 1002.108(b) only applies to the applicant's responses to the inquiries that the financial institution makes to satisfy § 1002.107(a)(18) through (20), the prohibition does not apply to ethnicity or race information about principal owners that the financial institution collects via visual observation or surname. Additionally, the prohibition in § 1002.108(b) does not apply to an applicant's responses to inquiries regarding minority-owned or women-owned business status, or principal owners' ethnicity, race, or sex, made for other purposes. Thus, an employee or officer who obtains information to determine if an applicant is eligible for a Small Business Administration program for women-owned businesses may make determinations concerning the applicant's covered application without regard to whether the exception in § 1002.108(c) is satisfied. Additionally, § 1002.108(b) does not prohibit an employee or officer from making a determination regarding a covered application if the employee or officer generally knows that an applicant is a minority-owned business or women-owned business or knows the ethnicity, race, or sex of any of the applicant's principal owners due to activities unrelated to the inquiries made to satisfy the financial institution's obligations under subpart B of this part. Thus, an employee or officer who knows, for example, that an applicant is a minority-owned business due to social relationships or other professional relationships with the applicant or any of its principal owners may make determinations concerning the applicant's covered application.

2. *Scope of persons subject to the prohibition.* The prohibition in § 1002.108(b) applies to an employee or officer of a covered financial institution or its affiliate if the employee or officer is involved in making any determination concerning a covered application. For example, if a financial institution is affiliated with company B and

an employee of company B is involved in making a determination regarding a covered application on behalf of the financial institution, then the financial institution must comply with § 1002.108 with regard to company B's employee. Section 1002.108 does not require a financial institution to limit the access of employees and officers of third parties who are not affiliates of the financial institution. Section 1002.108 does not require a financial institution to limit the access of third parties (who are not employees or officers of the financial institution or its affiliates) through whom the financial institution receives covered applications.

*108(c) Exception to the prohibition on access to certain information.*

1. *General.* A financial institution is not required to limit the access of a particular employee or officer who is involved in making determinations concerning covered applications if the financial institution determines that the particular employee or officer should have access to the information collected pursuant to § 1002.107(a)(18) through (20) and the financial institution provides the notice required by § 1002.108(d). A financial institution can also determine that several employees and officers should have access or that all of a group of similarly situated employees or officers should have access. See comment 108(a)–2. However, the financial institution cannot permit all employees and officers to have access simply because it has determined that one or more employees or officers should have access. For example, a financial institution may determine that a single compliance officer or all of its compliance officers should have access and then permit one or all of its compliance officers, respectively, to have access. However, the financial institution cannot permit other employees or officers to have access unless it independently determines that they should have access.

*108(d) Notice.*

1. *General.* If a financial institution determines that one or more employees or officers should have access pursuant to § 1002.108(c), the financial institution must provide the required notice to, at a minimum, the applicant or applicants whose responses will be accessed by an employee or officer involved in making determinations regarding the applicant's or applicants' covered applications. Alternatively, the financial institution may also provide the required notice to larger group of applicants, including all applicants, if it determines that one or more officers or employees should have access.

2. *Content of the required notice.* The notice must inform the applicant that one or more employees and officers involved in making determinations regarding the applicant's covered application may have access to the applicant's responses regarding the applicant's minority-owned business status, women-owned business status, and its principal owners' ethnicity, race, and sex. The financial institution may, but is not required to, provide the notice on its data collection form. If the financial institution provides the notice on an electronic or paper

data collection form, the notice must use language substantially similar to the following: "Employees and officers making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form." If the financial institution provides the notice orally, it must use language substantially similar to the following: "Employees and officers making determinations concerning your application, such as loan officers and underwriters, may have access to your responses regarding your minority-owned business status, your women-owned business status, and your principal owners' ethnicity, race, or sex."

3. *Timing for providing the notice.* If the financial institution is providing the notice orally, it must provide the notice required by § 1002.108(d) prior to asking the applicant if it is a minority-owned business or women-owned business and prior to asking for a principal owner's ethnicity, race, or sex. If the notice is provided on the same paper or electronic data collection form as the inquiries about minority-owned business status, women-owned business status, and the principal owners' ethnicity, race, or sex, the notice must appear at the top of the form. If the notice is provided in an electronic or paper document that is separate from the data collection form, the notice must be provided at the same time as the data collection form or prior to providing data collection form. Additionally, the notice must be provided with the non-discrimination notices required pursuant to § 1002.107(a)(18) through (20). See appendix E.

*Section 1002.109—Reporting of Data to the Bureau*

109(a) Reporting to the Bureau.
109(a)(2) Reporting by subsidiaries.

1. *Subsidiaries. A covered financial institution is considered a subsidiary of another covered financial institution for purposes of reporting data pursuant to § 1002.109 if more than 50 percent of the ownership or control of the first covered financial institution is held by the second covered financial institution.*

*109(a)(3) Reporting obligations where multiple financial institutions are involved in a covered credit transaction.*

1. *General.* The following provides guidance on how to report originations and applications involving more than one institution. The discussion below assumes that all of the parties are covered financial institutions. However, the same principles apply if any of the parties is not a covered financial institution. See also comment 109(a)(3)–2 (providing examples of transactions involving more than one financial institution) and comment 109(a)(3)–3 (discussing how to report actions taken by agents).

i. Only one financial institution reports each originated covered credit transaction as an origination. If more than one financial institution was involved in the origination of a covered credit transaction, the financial institution that made the final credit decision approving the application reports the covered

credit transaction as an origination. It is not relevant whether the covered credit transaction closed or, in the case of an application, would have closed in the financial institution's name. If more than one financial institution approved an application prior to closing or account opening and one of those financial institutions purchased the covered credit transaction after closing, the financial institution that purchased the covered credit transaction after closing reports the covered credit transaction as an origination. If a financial institution reports a transaction as an origination, it reports all of the information required for originations, even if the covered credit transaction was not initially payable to the financial institution that is reporting the covered credit transaction as an origination.

ii. In the case of an application for a covered credit transaction that did not result in an origination, a financial institution reports the action it took on that application if it made a credit decision on the application or was reviewing the application when the application was withdrawn or closed for incompleteness. It is not relevant whether the financial institution received the application directly from the applicant or indirectly through another party, such as a broker, or whether another financial institution also reviewed and reported an action taken on the same application.

2. *Examples.* The following scenarios illustrate how a financial institution reports a particular application or originated covered credit transaction. The illustrations assume that all of the parties are covered financial institutions. However, the same principles apply if any of the parties is not a covered financial institution.

i. Financial Institution A received a covered application from an applicant and forwarded that application to Financial Institution B. Financial Institution B reviewed the application and approved the covered credit transaction prior to closing. The covered credit transaction closed in Financial Institution A's name. Financial Institution B purchased the covered credit transaction from Financial Institution A after closing. Financial Institution B was not acting as Financial Institution A's agent. Since Financial Institution B made the final credit decision prior to closing, Financial Institution B reports the application as an origination. Financial Institution A does not report the application.

ii. Financial Institution A received a covered application from an applicant and forwarded that application to Financial Institution B. Financial Institution B reviewed the application before the covered credit transaction would have closed, but the application did not result in an origination because Financial Institution B denied the application. Financial Institution B was not acting as Financial Institution A's agent. Since Financial Institution B made the credit decision, Financial Institution B reports the application as a denial. Financial Institution A does not report the application. If, under the same facts, the application was withdrawn before Financial Institution B made a credit decision, Financial Institution B would report the application as withdrawn

and Financial Institution A would not report the application.

iii. Financial Institution A received a covered application from an applicant and approved the application before closing the loan in its name. Financial Institution A was not acting as Financial Institution B's agent. Financial Institution B later purchased the covered credit transaction from Financial Institution A. Financial Institution B did not review the application before closing. Financial Institution A reports the application as an origination. Financial Institution B has no reporting obligation for this transaction.

iv. Financial Institution A received a covered application from an applicant. If approved, the covered credit transaction would have closed in Financial Institution B's name. Financial Institution A denied the application without sending it to Financial Institution B for approval. Financial Institution A was not acting as Financial Institution B's agent. Since Financial Institution A made the credit decision before the loan would have closed, Financial Institution A reports the application. Financial Institution B does not report the application.

v. Financial Institution A reviewed a covered application and made the credit decision to approve a covered credit transaction using the underwriting criteria provided by a third party (*e.g.,* another financial institution or party). The third party did not review the application and did not make a credit decision prior to closing. Financial Institution A was not acting as the third party's agent. Financial Institution A reports the application. The third party has no reporting obligation for this application. Assume the same facts, except that Financial Institution A made a credit decision to approve the application, and the applicant chose not to accept the covered credit transaction from Financial Institution A. Financial Institution A reports the application as approved but not accepted and the third party does not report the application.

vi. Financial Institution A reviewed and made the credit decision on a covered application based on the criteria of a third-party insurer or guarantor (for example, a government or private insurer or guarantor). Financial Institution A reports the action taken on the application.

vii. Financial Institution A received a covered application and forwarded it to Financial Institutions B and C. Financial Institution A made a credit decision, acting as Financial Institution D's agent, and approved the application. Financial Institution B made a credit decision approving the application, and Financial Institution C made a credit decision denying the application. The applicant did not accept the covered credit transaction from Financial Institution D. Financial Institution D reports the application as approved but not accepted. Financial Institution A does not report the application. The applicant accepted the offer of credit from Financial Institution B, and credit was extended. Financial Institution B reports the origination. Financial Institution C reports the application as denied.

3. *Agents.* If a covered financial institution made a credit decision on a covered application through the actions of an agent, the financial institution reports the application. For example, acting as Financial Institution A's agent, Financial Institution B approved an application prior to closing and a covered credit product was originated. Financial Institution A reports the covered credit product as an origination. State law determines whether one party is the agent of another.

*109(b) Financial institution identifying information.*

*Paragraph 109(b)(4).*

1. *Federal prudential regulator.* For purposes of § 1002.109(b)(4), *Federal prudential regulator* means, if applicable, the Federal prudential regulator for a financial institution that is a depository institution as determined pursuant to section 3q of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), including the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, or the Board of Governors of the Federal Reserve System; or the National Credit Union Administration Board for financial institutions that are Federal credit unions.

2. *Change in Federal prudential regulator.* If the Federal prudential regulator for a financial institution changes (as a consequence of a merger or a change in the institution's charter, for example), the institution must identify its new Federal prudential regulator in its data submission under § 1002.109 for the calendar year of the change. For example, if a financial institution's Federal prudential regulator changes in February 2026, it must identify its new Federal prudential regulator in the annual submission for its 2026 data (which is due by June 1, 2027) pursuant to § 1002.109(b)(4).

*Paragraph 109(b)(5).*

1. *Federal Taxpayer Identification Number.* If a financial institution obtains a new Federal Taxpayer Identification Number (TIN), it should provide the new number in its subsequent data submission. For example, if two financial institutions that previously reported data under subpart B of this part merge and the surviving institution retained its Legal Entity Identifier but obtained a new TIN, then the surviving institution should report the new TIN with its data submission. For example, if a financial institution's TIN changes in February 2026, it must identify its new TIN in the annual submission for its 2026 data (which is due by June 1, 2027) pursuant to § 1002.109(b)(5).

*Paragraph 109(b)(6).*

1. *Legal Entity Identifier (LEI).* A Legal Entity Identifier is a utility endorsed by the LEI Regulatory oversight committee, or a utility endorsed or otherwise governed by the Global LEI Foundation (GLEIF) (or any successor of the GLEIF) after the GLEIF assumes operational governance of the global LEI system. A financial institution complies with § 1002.109(b)(6) by reporting its current LEI number. A financial institution that does not currently possess an LEI number must obtain an LEI number, and has an ongoing obligation to maintain the LEI number. The GLEIF website provides a list of LEI issuing

AdminRecord-000671

organizations. A financial institution may obtain an LEI, for purposes of complying with § 1002.109(b)(6), from any one of the issuing organizations listed on the GLEIF website.

*Paragraph 109(b)(7).*

1. *RSSD ID number.* The RSSD ID is a unique identifying number assigned to institutions, including main offices and branches, by the Board of Governors of the Federal Reserve System. A financial institution's RSSD ID may be found on the website of the National Information Center, which provides comprehensive financial and structure information on banks and other institutions for which the Federal Reserve Board has a supervisory, regulatory, or research interest including both domestic and foreign banking organizations that operate in the United States. If a financial institution does not have an RSSD ID, it reports that this information is not applicable.

*Paragraph 109(b)(8).*

1. *Immediate parent entity.* An entity is the immediate parent of a financial institution for purposes of § 1002.109(b)(8)(i) through (iii) if it is a separate entity that directly owns more than 50 percent of the financial institution.

2. *Top-holding parent entity.* An entity is the top-holding parent of a financial institution for purposes of § 1002.109(b)(8)(iv) through (vi) if it ultimately owns more than 50 percent of the financial institution, and the entity itself is not controlled by any other entity. If the immediate parent entity and the top-holding parent entity are the same, the financial institution reports that § 1002.109(b)(8)(iv) through (vi) are not applicable.

3. *LEI.* For purposes of § 1002.109(b)(8)(ii) and (v), a financial institution shall report the LEI of a parent entity if the parent entity has an LEI number. If a financial institution's parent entity does not have an LEI, the financial institution reports that this information is not applicable.

4. *RSSD ID numbers.* For purposes of § 1002.109(b)(8)(iii) and § 1002.109(b)(8)(vi), a financial institution shall report the RSSD ID number of a parent entity if the entity has an RSSD ID number. If a financial institution's parent entity does not have an RSSD ID, the financial institution reports that this information is not applicable.

*Paragraph 109(b)(9).*

1. *Type of financial institution.* A financial institution complies with § 1002.109(b)(9) by selecting the applicable type or types of financial institution from the list below. A financial institution shall select all applicable types.

i. Bank or savings association.
ii. Minority depository institution.
iii. Credit union.
iv. Nondepository institution.
v. Community development financial institution (CDFI).
vi. Other nonprofit financial institution.
vii. Farm Credit System institution.
viii. Government lender.
ix. Commercial finance company.
x. Equipment finance company.
xi. Industrial loan company.
xii. Fintech.

xiii. Other.

2. *Use of "other" for type of financial institution.* A financial institution reports type of financial institution as "other" where none of the enumerated types of financial institution appropriately describe the applicable type of financial institution, and the institution reports the type of financial institution as free-form text. A financial institution that selects at least one type from the list is permitted, but not required, to also report "other" (with appropriate free-form text) if there is an additional aspect of its business that is not one of the enumerated types set out in comment 109(b)(9)–1.

*Paragraph 109(b)(10).*

1. *Financial institutions that voluntarily report covered applications under subpart B of this part.* A financial institution that is not a covered financial institution pursuant to § 1002.105(b) but that elects to voluntarily compile, maintain, and report data under §§ 1002.107 through 1002.109 (see comment 1002.105(b)–6) complies with § 1002.109(b)(10) by selecting "voluntary reporter."

*109(c) Procedures for the submission of data to the Bureau.*

1. *Filing Instructions Guide.* The Bureau includes in the *Filing Instructions Guide* additional details and procedures for the submission of data to the Bureau pursuant to § 1002.109, as well as any related materials, which are available at [a designated Bureau website].

*Section 1002.110—Publication of Data*

*110(c) Statement of financial institution's small business lending data available on the Bureau's website.*

1. *Statement.* A financial institution shall provide the statement required by § 1002.110(c) using the following, or substantially similar, language:

Small Business Lending Data Notice

*Data about our small business lending are available online for review at the Consumer Financial Protection Bureau's website at [a designated Bureau website]. The data show the geographic distribution of our small business lending applications; information about our loan approvals and denials; and demographic information about the principal owners of our small business applicants. The Bureau may delete or modify portions of our data prior to posting it if the Bureau determines that doing so would advance a privacy interest. Small business lending data for many other financial institutions are also available at this website.*

2. *website.* A financial institution without a website complies with § 1002.110(c) by making a written statement using the language in comment 110(c)–1, or substantially similar language, available upon request.

*Section 1002.111—Recordkeeping*

*111(a) Record retention.*

1. *Evidence of compliance.* Section 1002.111(a) requires a financial institution to retain evidence of compliance with subpart B of this part for at least three years after its small business lending application register is required to be submitted to the Bureau pursuant to § 1002.109. In addition to the

financial institution's small business lending application register, such evidence of compliance is likely to include, but is not limited to, the applications for credit from which information in the register is drawn, as well as the files or documents that, under § 1002.111(b), are kept separate from the applications for credit.

2. *Record retention for creditors under § 1002.5(a)(4)(vii) and (viii).* A creditor that is voluntarily, under § 1002.5(a)(4)(vii) and (viii), collecting information pursuant to subpart B of this part complies with § 1002.111(a) by retaining evidence of compliance with subpart B for at least three years after June 1 of the year following the year that data was collected.

*111(b) Certain information kept separate from the rest of the application.*

1. *Separate from the application.* A financial institution may satisfy the requirement in § 1002.111(b) by keeping an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) through (20) in a file or document that is discrete or distinct from the application and its accompanying information. For example, such information could be collected on a piece of paper that is separate from the rest of the application form. In order to satisfy the requirement in § 1002.111(b), an applicant's responses to the financial institution's request pursuant to § 1002.107(a)(18) through (20) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application. However, the financial institution may nonetheless need to keep this information in a different electronic or physical file in order to satisfy the requirements of § 1002.108.

*111(c) Limitation on personally identifiable information in records retained under this section.*

1. *Small business lending application register.* The prohibition in § 1002.111(c) applies to data compiled and maintained pursuant to § 1002.107, data in the small business lending application register submitted by the financial institution to the Bureau under § 1002.109, the version of the register that the financial institution maintains under § 1002.111(a), and the separate record of certain information created pursuant to § 1002.111(b).

2. *Examples.* Section 1002.111(c) prohibits a financial institution from including any name, specific address (other than the census tract required under § 1002.107(a)(13)), telephone number, or email address in the data it compiles and maintains pursuant to § 1002.107, in its records under § 1002.111(b), or in data reported to the Bureau under § 1002.109. It likewise prohibits a financial institution from including any personally identifiable information concerning any individual who is, or is connected with, an applicant, except as required pursuant to § 1002.107 or § 1002.111(b). Examples of such personally identifiable information that a financial institution may not include in its small business lending application register include, but are not limited to, the following: Date of birth, Social Security number, official government-issued driver's license or

identification number, alien registration number, government passport number, or employer or taxpayer identification number.

3. *Other records.* The prohibition in § 1002.111(c) does not extend to the application or any other records that the financial institution maintains.

4. *Name and business contact information for submission.* The prohibition in § 1002.111(c) does not bar financial institutions from providing to the Bureau, pursuant to § 1002.109(b)(3), the name and business contact information of the person who may be contacted with questions about the financial institution's submission under § 1002.109.

*Section 1002.112—Enforcement*

*112(b) Bona fide errors.*

1. *Tolerances for bona fide errors.* Section 1002.112(b) provides that a financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's data submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose. The Bureau's thresholds appear in column C of the table in appendix H. The size of the random sample, set out in column B, shall depend on the size of the financial institution's small business lending application register, as shown in column A of the table in appendix H. A financial institution has not maintained procedures reasonably adapted to avoid errors if either there is a reasonable basis to believe the error was intentional or there is other evidence that the financial institution has not maintained procedures reasonably adapted to avoid errors. To illustrate, assume that a financial institution has incorrectly coded

withdrawn applications as denials to such an extent that it likely prevents reliable fair lending analysis of underwriting disparities. If so, the errors would not be deemed bona fide errors under § 1002.112(b) and would violate the Act and this Regulation.

2. *Tolerances and data fields.* For purposes of determining whether an error is bona fide under § 1002.112(b), the term "data field" generally refers to individual fields. However, with respect to information on the ethnicity and race of an applicant's principal owner, a data field group consists of more than one field. If one or more of the fields within an ethnicity or race field group have errors, they count as one (and only one) error for that data field group. For instance, in the ethnicity data field group, if an applicant indicates that one of its principal owners is Cuban, but the financial institution reports that the principal owner is Mexican and Puerto Rican, the financial institution has made errors in two fields within the ethnicity data field group for that principal owner. For purposes of the error threshold table in appendix H, the financial institution is deemed to have made one error. However, a financial institution that makes, for example, one error in the race data field group and one error in the ethnicity field group regarding a particular principal owner has made two errors for purposes of the error threshold table in appendix H.

3. *Tolerances and safe harbors.* An error that meets the criteria for one of the four safe harbor provisions in § 1002.112(c) is not counted as an error for purposes of determining whether a financial institution has exceeded the relevant error threshold in appendix H for a given data field.

*112(c) Safe harbors.*

1. *Information from a Federal agency—census tract.* Section 1002.112(c)(1) provides

that an incorrect entry for census tract is not a violation of the Act or subpart B of this part, if the financial institution obtained the census tract using a geocoding tool provided by the FFIEC or the Bureau. However, this safe harbor provision does not extend to a financial institution's failure to provide the correct census tract number for a covered application on its small business lending application register, as required by § 1002.107(a)(13), because the FFIEC or Bureau geocoding tool did not return a census tract for the address provided by the financial institution. In addition, this safe harbor provision does not extend to a census tract error that results from a financial institution entering an inaccurate address into the FFIEC or Bureau geocoding tool.

2. *Applicability of NAICS code safe harbor.* A financial institution is permitted to rely on an applicant's representations or on other information regarding the NAICS code as described in comments 107(a)(15)–3 and –4. The safe harbor in § 1002.112(c)(2) applies when a financial institution does not rely on such information, but instead the financial institution identifies the NAICS code for an applicant and the NAICS code is incorrect. Where the incorrect NAICS code entry is due to an unintentional error, the safe harbor in § 1002.112(c)(2) may apply in addition to the bona fide error provision in § 1002.112(b), provided its requirements are met.

\*    \*    \*    \*    \*

Dated: August 31, 2021.

**David Uejio,**

*Acting Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2021–19274 Filed 9–30–21; 4:15 pm]

**BILLING CODE 4810–25–P**

AdminRecord-000673