# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

# JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
## VOLUME IX

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| | |
|---|---|
| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| | |
|---|---|
| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

# Proposed data points for small business lending data collection

On September 1, 2021, the Consumer Financial Protection Bureau (Bureau) issued a notice of proposed rulemaking (NPRM) to implement the small business lending data collection requirements set forth in section 1071 of the Dodd-Frank Act. This chart summarizes the data points that covered financial institutions (FIs) would be required to collect and report with respect to small business applications for covered credit transactions pursuant to proposed § 1002.107 in the NPRM. For more information on the NPRM, visit https://www.consumerfinance.gov/1071-rule.

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| Unique identifier | 107(a)(1) | FI would report an alphanumeric application or loan identifier unique within the FI to the specific application. | Unique alphanumeric application or loan number not to exceed 45 characters. Must begin with the FI's Legal Entity Identifier (LEI). | FIs would be permitted to use numbers generated solely for 1071 data reporting or other purposes as unique identifiers. |
| Application date | 107(a)(2) | FI would report application date using either: (i) the date the application was received by the FI; or (ii) the date shown on a paper or electronic application form. | A complete calendar date (i.e., month, day, and year). | For an application that was not submitted directly to the FI or its affiliate, the FI would be permitted to report the application date as the date the application was received by the party that initially received the application, the date the application was received by the FI, or the date shown on the application form. The NPRM includes a proposed safe harbor so that an FI would not violate 1071 if it reports an application date that is within |

AdminRecord-001055

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | three calendar days of the actual application date. |
| **Application method** | 107(a)(3) | FI would report the means by which the applicant submitted the application from the specified list. | One of the following: (1) In-person; (2) Telephone; (3) Mail; or (4) Online. | The proposed commentary provides additional information on how the FI would select the application method if the applicant communicated or provided information via multiple methods or channels. |
| **Application recipient** | 107(a)(4) | FI would report whether the applicant submitted the application directly to the FI or its affiliate, or whether the applicant submitted the application indirectly to the FI via a third party. | One of the following: (1) the applicant submitted the application directly to the FI or its affiliate; or (2) the applicant submitted the application indirectly to the FI via a third party. | |
| **Credit type** | 107(a)(5) | FI would report credit type in three parts: (1) credit product (from specified list); (2) guarantee(s) (from specified list); (3) loan term. | One of the **credit products** from the following list: (1) Term loan— unsecured; (2) Term loan—secured; (3) Line of credit—unsecured; (4) Line of credit—secured; (5) Credit card; (6) Merchant cash advance; (7) Other sales-based financing transaction; (8) Other (with additional information provided via free form text); (9) Not provided by | |

AdminRecord-001056

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant and otherwise undetermined. | |
| | | | One or more **types of guarantees** from the following list: (1) Personal guarantee—owner(s); (2) Personal guarantee—non-owner(s); (3) SBA guarantee—7(a) program; (4) SBA guarantee—504 program; (5) SBA guarantee—other; (6) USDA guarantee; (7) FHA guarantee; (8) Bureau of Indian Affairs guarantee; (9) Other Federal guarantee; (10) State or local government guarantee; (11) Other guarantee (with additional information provided via free-form text); (12) No guarantee. | |
| | | | The number of months in the **loan term** for products that have a loan term or "not applicable" for products that do not have a loan term and for applications that did not specify a loan term. | |
| **Credit purpose** | 107(a)(6) | FI would report credit purpose(s) from a specified list. | Up to three credit purposes from the following list: (1) Purchase, construction/improvement, or refinance of owner-occupied dwelling(s); (2) Purchase, | |

AdminRecord-001057

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | construction/improvement, or refinance of non-owner-occupied dwelling(s); (3) Purchase, construction/improvement, or refinance of non-owner occupied, non-dwelling real estate; (4) Purchase, construction/ improvement, or refinance of owner-occupied, non-dwelling real estate; (5) Purchase, refinance, or rehabilitation/repair of motor vehicle(s) (including light and heavy trucks); (6) Purchase, refinance, or rehabilitation/repair of equipment; (7) Working capital (includes inventory or floor planning); (8) Business start-up; (9) Business expansion; (10) Business acquisition; (11) Refinance existing debt (other than refinancings listed above); (12) Line increase; (13) Other (with additional information provided via free-form text); (14) Not provided by applicant and otherwise undetermined; (15) Not applicable. | |
| Amount applied for | 107(a)(7) | FI would report the initial amount of credit or the credit limit initially requested by the applicant at the application stage or later. | One of the following: (1) Dollar amount for initial amount of credit/credit limit requested by applicant; (2) Dollar amount of a | FI would not be required to report amounts discussed before an application is made but would be required to report |

AdminRecord-001058

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | "firm offer," if application is in response to a firm offer that specifies an amount; (3) Dollar amount underwritten (if applicant does not request a particular amount but FI underwrites for a specific amount); (4) Not provided by applicant and otherwise undetermined; (5) Not applicable (if the product applied for does not involve a specific amount). | the initial amount requested at the application stage or later. |
| **Amount approved or originated** | 107(a)(8) | FI would report the credit amount or credit limit approved or originated, using: (1) the amount of the originated loan for a closed-end origination; (2) the amount approved for a closed-end loan application that is approved but not accepted; or (3) the amount of the credit limit approved for open-end credit. | Only report amounts for originated credit or applications that are approved but not accepted.<br><br>For applications that are denied, closed for incompleteness, or withdrawn by the applicant, the FI would report "not applicable." | |
| **Action taken** | 107(a)(9) | FI would report one of five specified actions taken on the application. | One of the following: (1) Originated; (2) Approved but not accepted; (3) Denied; (4) Withdrawn by applicant; (5) Incomplete. | Incomplete applications would include (1) instances where an FI took adverse action on the basis of incompleteness, and (2) instances where the FI provided a written notice of incompleteness and the |

AdminRecord-001059

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | applicant did not respond in the time specified in the notice.<br><br>If an FI makes a counteroffer and the applicant declines the counteroffer or fails to respond, the FI would report the action taken as a denial.  If the applicant agrees to proceed with the counteroffer, the FI would report the action taken based on the eventual disposition of the counteroffer considered. |
| **Action taken date** | 107(a)(10) | FI would report the date the action was taken. | A complete calendar date (i.e., month, day, and year). | |
| **Denial reasons** | 107(a)(11) | For denied applications only, FI would report the principal reason(s) the application was denied from a specified list. | Up to four principal denial reasons from the following list (as applicable): (1) Credit characteristics of the business; (2) Credit characteristics of the principal owner(s) or guarantor(s); (3) Use of loan proceeds; (4) Cashflow; (5) Collateral; (6) Time in business; (7) Government criteria; (8) Aggregate exposure; (9) Unverifiable information; (10) Other (with additional | |

AdminRecord-001060

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | information provided via free form text). | |
| **Pricing information** | 107(a)(12) | FI would report pricing information for originated credit and credit that is approved but not accepted. | **If a fixed rate transaction**: the interest rate.<br><br>**If a variable-rate transaction**: the margin, index value, and index name. Index name is reported using one of the following: (1) Wall Street Journal Prime; (2) 6-month CD rate; (3) 1-year T-Bill; (4) 3-year T-Bill; (5) 5-year T-Note; (6) 12-month average of 10-year T-Bill; (7) Cost of Funds Index-National; (8) Cost of Funds Index-11th District; (9) Other (with additional information provided via free-form text).<br><br>**For a merchant cash advance or other sales-based financing transaction**: the difference between the amount advanced and the amount to be repaid.<br><br>The amount of the total origination charges.<br><br>The amount of the total broker fees and whether the applicant paid the | |

AdminRecord-001061

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | broker fees directly to broker or to FI for delivery to broker. The amount of the total non-interest charges scheduled to be imposed over the first annual period. Whether the FI could have included a prepayment penalty under its policies and procedures, and whether the terms of the transaction actually include a prepayment penalty. | |
| **Census tract (principal place of business)** | 107(a)(13) | FI would report a census tract based on an address collected in the application, or during review or origination of the credit. FI also reports the type of address used to determine the census tract. | Census tract based on one of the following: (1) Address where the loan proceeds will principally be applied, if known; (2) If (1) is not known, location of borrower's main office or headquarters; (3) If neither (1) or (2) are known, another address or location associated with the applicant. FI also reports which of the three address types was used to determine the census tract. If no address or location is known, FI would report "not provided by | The NPRM includes a proposed safe harbor for errors when using an FFIEC or Bureau geocoding tool correctly. |

AdminRecord-001062

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant and otherwise undetermined." | |
| **Gross annual revenue (GAR)** | 107(a)(14) | FI would report the GAR of the applicant during the last fiscal year. | The dollar amount of the applicant's GAR during its last fiscal year prior to when the information is collected.<br><br>If specific GAR cannot be collected from an applicant, FI would report "not provided by applicant and otherwise undetermined." | If the FI verifies the GAR, it would report the dollar amount of verified GAR. If the FI does not verify the GAR, it would report the dollar amount of GAR as reported by applicant or the GAR dollar amount that the FI otherwise obtained.<br><br>The proposed commentary provides a model question that an FI could use to obtain the GAR from the applicant.<br><br>Affiliate revenue may or may not be collected, depending on FI practice. |
| **North American Industry Classification System (NAICS) code** | 107(a)(15) | FI would report the NAICS code appropriate for the applicant. | Six-digit NAICS code.<br><br>If the NAICS code cannot be collected, FI would report "not provided by applicant and otherwise undetermined." | FI would use NAICS codes in effect as of Jan. 1 of the collection year.<br><br>FI would be permitted to rely on statements of or information provided by the applicant in collecting and reporting the NAICS code (such as using the |

AdminRecord-001063

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | | NAICS code on an applicant's tax return), or on a code obtained through the FI's use of business information products (such as company profiles or business credit reports that provide a NAICS code). |
| | | | | If the FI does not rely on such information, but instead identifies the NAICS code for an applicant itself, the NPRM includes a proposed safe harbor for an incorrect NAICS code entry, so long as the first two digits are correct and the FI maintains procedures reasonably adapted to correctly identify the subsequent four digits. |
| **Number of workers** | 107(a)(16) | FI would report the number of workers of the applicant. | Number of workers. Includes full-time, part-time, and seasonal workers as well as contractors working primarily for the applicant, but does not include principal owners.<br><br>If number of workers cannot be collected, FI would report "not | If the FI verifies the number of workers, it would report the verified number.  If the FI does not verify the number of workers, it would report the number reported by applicant or that the FI otherwise obtained.<br><br>The proposed commentary provides a model question that |

AdminRecord-001064

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | provided by applicant and otherwise undetermined." | an FI could use to obtain the number of workers from the applicant. |
| **Time in business (TIB)** | 107(a)(17) | FI would report the applicant's time in business, expressed in years. | Number of years that the applicant has been in business.<br><br>If the FI relied on the applicant's TIB in making the credit decision, the FI would report the TIB it relied on in making the credit decision. If the FI did not rely on the applicant's TIB in making the credit decision, the FI would collect and report TIB. FI would be required to indicate (1) if applicant hasn't started its business yet or (2) if applicant has been in business less than a year. | If the FI verifies TIB, it would report the verified TIB. If the FI does not verify TIB, it would report the TIB provided by applicant or that the FI otherwise obtained. |
| **Minority-owned business status** | 107(a)(18) | FI would report applicant's response to the FI's § 1002.107(a)(18) inquiry regarding whether the applicant is a minority-owned business. | FI would report applicant's response (yes, no, or "I do not wish to provide this information") or that the applicant did not respond.<br><br>FI would also report whether it is reporting this information based on previously collected data. | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |

AdminRecord-001065

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Women-owned business status** | 107(a)(19) | FI would report applicant's response to the FI's § 1002.107(a)(19) inquiry regarding whether the applicant is a women-owned business. | FI would report applicant's response (yes, no, or "I do not wish to provide this information") or that the applicant did not respond.<br><br>FI would also report whether it is reporting this information based on previously collected data. | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |
| **Ethnicity of principal owner(s)** | 107(a)(20) | Generally, FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the ethnicity of the applicant's principal owner(s). However, in some circumstances, the FI would report the ethnicity of one or more principal owners based on visual observation and/or surname. | **If the FI is reporting applicant-provided information**: For each principal owner, the FI would report the aggregate categories and disaggregated subcategories selected by the applicant, that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>**If the FI is reporting based on visual observation and/or surname**: For at least one principal owner, the FI would report using the aggregate categories only. For other principal owners, the FI would report that the applicant did not wish to provide the information or that the | FI would be required to inform applicant that it is not required to provide this information.<br><br>The proposed commentary and proposed sample data collection form include the aggregate categories and disaggregated subcategories that would be used when collecting and reporting ethnicity. |

AdminRecord-001066

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | applicant did not respond (as applicable).<br><br>**If the applicant has fewer than four principal owners**: As appropriate, the FI would report that this requirement is not applicable.<br><br>FI would also report whether or not the FI is reporting the principal owner's ethnicity based on visual observation and/or surname and whether the FI is reporting based on previously collected data. | |
| **Race of principal owner(s)** | 107(a)(20) | Generally, FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the race of the applicant's principal owner(s). However, in some circumstances, the FI would report the race of one or more principal owners based on visual observation and/or surname. | **If the FI is reporting applicant-provided information**: For each principal owner, the FI would report the aggregate categories and disaggregated subcategories selected by the applicant, that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>**If the FI is reporting based on visual observation and/or surname**: For at least one principal owner, the FI would report using the aggregate categories only. For other principal owners, the FI would | FI would be required to inform applicant that it is not required to provide this information.<br><br>The proposed commentary and proposed sample data collection form include the aggregate categories and disaggregated subcategories that would be used when collecting and reporting race. |

AdminRecord-001067

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | report that the applicant did not wish to provide the information or that the applicant did not respond (as applicable).<br><br>**If the applicant has fewer than four principal owners**: As appropriate, the FI would report that this requirement is not applicable.<br><br>FI would also report whether or not the FI is reporting the principal owner's race based on visual observation and/or surname and whether the FI is reporting based on previously collected data. | |
| **Sex of principal owner(s)** | 107(a)(20) | FI would report applicant's response to the FI's § 1002.107(a)(20) inquiry regarding the sex of applicant's principal owner(s). | For each principal owner, the FI would report the category or categories selected by the applicant (male, female, and/or that the principal owner prefers to self-describe with additional information provided via free form text), that the applicant did not wish to provide the information, or that the applicant did not respond (as applicable).<br><br>If the applicant has fewer than four principal owners, as appropriate, the | FI would report solely based on applicant-provided information; no verification or visual observation and/or surname analysis would be required or permitted.<br><br>FI would be required to inform applicant that it is not required to provide this information. |

AdminRecord-001068

| Data point | NPRM section | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | FI would report that this requirement is not applicable. | |
| **Number of principal owners** | 107(a)(21) | FI would report the number of the applicant's principal owners. | Number of principal owners (i.e., a number from zero to four).<br><br>If number of principal owners cannot be collected, FI would report "not provided by applicant and otherwise undetermined." | Generally, the FI would report the information provided by the applicant. However, if the FI verifies the number of principal owners, the FI would report the verified information. |

AdminRecord-001069

Final Report of the Small Business Review Panel on the
CFPB's Proposals Under Consideration for the
Small Business Lending Data Collection Rulemaking

December 14, 2020

AdminRecord-001147

**Table of contents**

1. Introduction ..................................................................................................1

2. Background ...................................................................................................2
   2.1    Market background ................................................................... 2
   2.2    Statutory authority .................................................................. 4
   2.3    Closely-related Federal laws and regulations ........................... 4

3. Overview of proposals and alternatives under consideration ...........................6
   3.1    Scope of the rulemaking ........................................................... 7
   3.2    Definition of "financial institution" (lender coverage) ............... 7
   3.3    Definition of "small business" applicants ................................. 7
   3.4    Definitions of "women-owned business," "minority-owned business," and "minority individual" ................................................................. 8
   3.5    Product coverage ...................................................................... 8
   3.6    Definition of an "application" .................................................... 8
   3.7    Mandatory data points .............................................................. 9
   3.8    Discretionary data points ......................................................... 9
   3.9    Timing of data collection ......................................................... 9
   3.10   Shielding data from underwriters and other persons (firewall) ........... 9
   3.11   Applicants' right to refuse to provide certain information ............10
   3.12   Compiling, maintaining, and reporting 1071 data to the Bureau..........10
   3.13   Privacy considerations involving Bureau publication of 1071 data.....10
   3.14   Implementation period .............................................................10
   3.15   Potential impacts on small entities ...........................................11

4. Applicable small entity definitions ................................................................ 12

5. Small entities that may be subject to the proposals under consideration ........... 13

6. Summary of small entity outreach.................................................................. 14
   6.1    Summary of the Panel's outreach meetings with small entity representatives .......14
   6.2    Other outreach efforts, including to small entities...............................15

7. List of small entity representatives ............................................................... 15

8. Summary of feedback from small entity representatives.................................... 16
   8.1    General feedback from SERs ......................................................17
   8.2    SER feedback related to the scope of the rulemaking.............................18
   8.3    SER feedback related to the definition of "financial institution" (lender coverage) 18
   8.4    SER feedback related to the definition of "small business" applicants .................20
   8.5    SER feedback related to the definitions of "women-owned business," and "minority-owned business," and "minority individual" ................................................22
   8.6    SER feedback related to product coverage.........................................22
   8.7    SER feedback related to the definition of an "application" .........................24
   8.8    SER feedback related to mandatory data points.......................................25
   8.9    SER feedback related to discretionary data points ..................................30
   8.10   SER feedback related to the timing of data collection ..........................32
   8.11   SER feedback related to shielding data from underwriters and other persons (firewall).................................................................................33
   8.12   SER feedback related to applicants' right to refuse to provide certain information33

FINAL REPORT OF THE SMALL BUSINESS REVIEW PANEL ON THE CFPB'S PROPOSALS UNDER CONSIDERATION FOR THE SMALL BUSINESS LENDING DATA COLLECTION RULEMAKING

AdminRecord-001148

8.13  SER feedback related to compiling, maintaining, and reporting 1071 data to the Bureau..................................................................................................34
8.14  SER feedback related to privacy considerations involving Bureau publication of 1071 data ............................................................................................34
8.15  SER feedback related to the implementation period............................................36
8.16  SER feedback related to potential impacts on small entities................................37
  8.16.1  SER feedback related to the Bureau's impact methodology ......................37
  8.16.2  SER feedback related to one-time costs....................................................38
  8.16.3  SER feedback related to ongoing costs......................................................39
  8.16.4  SER feedback related to additional potential impacts of the eventual 1071 rule 40
  8.16.5  SER feedback related to the cost and availability of credit to small entities ..40

**9. Panel findings and recommendations .....................................................................41**
9.1  Findings regarding number and types of small entities affected ............................41
9.2  Findings and recommendations regarding related Federal laws and regulations....42
9.3  Compliance burden and potential alternative approaches .....................................43
  9.3.1  General recommendations.........................................................................43
  9.3.2  Recommendations regarding scope of the rulemaking.................................43
  9.3.3  Recommendations regarding definition of "financial institution" (lender coverage) ................................................................................................43
  9.3.4  Recommendations regarding definition of "small business" applicants ........44
  9.3.5  Recommendations regarding definitions of "women-owned business," "minority-owned business," and "minority individual" ...............................44
  9.3.6  Recommendations regarding product coverage ..........................................44
  9.3.7  Recommendations regarding definition of an "application" .........................45
  9.3.8  Recommendations regarding mandatory data points ..................................45
  9.3.9  Recommendations regarding discretionary data points...............................46
  9.3.10  Recommendations regarding the timing of data collection...........................47
  9.3.11  Recommendations regarding shielding data from underwriters and other persons (firewall) .....................................................................................47
  9.3.12  Recommendations regarding applicants' right to refuse to provide certain information...............................................................................................47
  9.3.13  Recommendations regarding compiling, maintaining, and reporting 1071 data to the Bureau ...........................................................................................47
  9.3.14  Recommendations regarding privacy considerations involving Bureau publication of 1071 data...........................................................................47
  9.3.15  Recommendations regarding implementation period...................................48
  9.3.16  Recommendations regarding potential impacts on small entities ................48

**Appendix A:  Written Feedback Submitted by Small Entity Representatives......................49**

**Appendix B:  List of Materials Provided to Small Entity Representatives........................137**

**Appendix C:  Outline of Proposals Under Consideration and Alternatives Considered ......................................................................................138**

**Appendix D:  High-Level Summary of Proposals Under Consideration ............................218**

**Appendix E:  Discussion Guide for Small Entity Representatives .......................................225**

**Appendix F:  Panel Outreach Meetings Presentation Materials........................................261**

AdminRecord-001149

# 1. Introduction

Under the Small Business Regulatory Enforcement Fairness Act (SBREFA), which amended the Regulatory Flexibility Act (RFA), the Consumer Financial Protection Bureau (Bureau or CFPB) must convene and chair a Small Business Review Panel (Panel) if it is considering a proposed rule that could have a significant economic impact on a substantial number of small entities.[1] The Panel considers the impact of the proposals under consideration by the Bureau and obtains feedback from representatives of the small entities that would likely be subject to the rule. The Panel is comprised of a representative from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration (SBA), and a representative from the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget (OMB).

This Panel Report addresses the Bureau's small business lending data collection rulemaking. The Bureau is in the process of writing proposed regulations to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).[2] Section 1071 of the law amended the Equal Credit Opportunity Act (ECOA) to require financial institutions (FIs) to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses. On September 15, 2020, the Bureau issued its Outline of Proposals under Consideration and Alternatives Considered (Outline) for this rulemaking.[3]

In accordance with the RFA, the Panel conducts its review at a preliminary stage of the Bureau's rulemaking process. The Panel's findings and discussion here are based on information available at the time the Panel Report was prepared and therefore may not reflect the final findings of the Bureau in the process of producing a notice of proposed rulemaking (NPRM). As the Bureau proceeds in the rulemaking process, including taking actions responsive to the feedback received from small entity representatives (SERs) and the findings of this Panel, the agency may conduct additional analyses and obtain additional information. This Panel Report reflects feedback provided by the SERs and identifies potential ways for the Bureau to shape the proposals under consideration to minimize the burden of an eventual 1071 rule on small entities while achieving the purposes of the rulemaking. Options identified by the Panel for reducing the regulatory impact on small entities of the present rulemaking may require further consideration, information collection, and analysis by the Bureau to ensure that the options are practicable, enforceable, and consistent with the Dodd-Frank Act. Pursuant to the RFA, the Bureau will consider the Panel's findings when preparing the initial regulatory flexibility analysis in the eventual NPRM. This

---

[1] 5 U.S.C. 609(b).

[2] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376, 2056 (2010) (section 704B of ECOA was added by section 1071 of the Dodd-Frank Act) (codified at 15 U.S.C. 1691c-2). For ease of reading, this document refers to the provisions of 704B in a shorthand expressed in terms of section 1071. For example, when this document refers to "section 1071(b)," it is employing this shorthand to refer to section 704B(b) of ECOA, which is codified at 15 U.S.C. 1691c-2(b).

[3] Bureau of Consumer Fin. Prot., *Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking—Outline of Proposals Under Consideration and Alternatives Considered* (Sept. 15, 2020), https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf.

---

FINAL REPORT OF THE SMALL BUSINESS REVIEW PANEL ON THE CFPB'S PROPOSALS UNDER CONSIDERATION FOR THE SMALL BUSINESS LENDING DATA COLLECTION RULEMAKING

AdminRecord-001150

Panel Report will be included in the public record for the Bureau's small business lending data collection rulemaking.

This Panel Report includes the following:

- A description of the proposals that are being considered by the Bureau and that were reviewed by the Panel;

- Background information on small entities that would likely be subject to those proposals and on the particular SERs selected to advise the Panel;

- A discussion of the feedback from and recommendations made by the SERs; and

- A discussion of the findings and recommendations of the Panel.

In particular, the Panel's findings and recommendations address the following:

- A description of and, where feasible, an estimate of the number and type of small entities likely impacted by the proposals under consideration;

- A description of projected compliance requirements of all aspects of the proposals under consideration;

- A description of alternatives to the proposals under consideration that may accomplish the stated objectives of the Bureau's rulemaking and that may minimize the economic impact on small entities of the proposals under consideration; and

- An identification, to the extent practicable, of relevant Federal laws or regulations that may duplicate, overlap, or conflict with the proposals under consideration.

## 2. Background

## 2.1 Market background

Small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities.[4]  In 2017, small businesses in the United States employed 60 million people, or about 47 percent of the private workforce.[5]  Women-owned and minority-owned small businesses play an important role in supporting their local communities.[6]  According to the Census Bureau, there are more than 27.6 million small

---

[4] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[5] U.S. Census Bureau 2017 Statistics of U.S. Businesses.  *See generally* https://www.census.gov/programs-surveys/susb.html.

[6] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

AdminRecord-001151

businesses in the United States. More than 7.9 million of these businesses are minority-owned and over 9.8 million are women-owned.[7]

Access to financing is a crucial component to the success of small businesses. Small businesses—including women-owned and minority-owned small businesses—need access to credit to smooth out business cash flows and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth. The market these businesses turn to for credit is vast and complex. Small businesses have many options when it comes to financing, including products and providers. Using publicly available data and informed by conversations with market participants, the Bureau estimated in 2017 that the small business financing market at that time was roughly $1.4 trillion.[8]

However, market-wide data on loans to small businesses currently is very limited. The largest sources of information on lending by depository institutions (DIs) are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports) and reporting under the Community Reinvestment Act of 1977 (CRA). Under each of these reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000).[9] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[10] The CRA requires banks and savings associations with assets over a specified threshold (currently $1.305 billion) to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[11] There are no similar sources of information about lending to small businesses by non-DIs.

---

[7] *See* U.S. Census Bureau Survey of Business Owners (2012). The Survey of Business Owners provides statistics on non-employer and employer firms. The Census Bureau's 2018 American Business Survey (ABS) provides more recent statistics only on employer firms. According to the ABS, there are 5.7 million employer businesses in the United States. More than one million of these businesses are minority-owned and more than 1.1 million are women-owned.

[8] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[9] *See* Fed. Fin. Insts. Examination Council, *Reporting Forms 31, 41, and 51*, https://www.ffiec.gov/ffiec_report_forms.htm (last visited Dec. 9, 2020).

[10] *See* Nat'l Credit Union Admin., *Call Report Form 5300* (June 2020), https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.

[11] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11, 13 (2015), https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf. Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11. Beginning in 2023, national banks supervised by the Office of the Comptroller of the Currency with assets greater than $2.5 billion will be required to report loans of $1.6 million or less, and indicate whether the borrower's gross annual review is $1.6 million or less. *See* 85 FR 34734 (June 5, 2020), https://www.govinfo.gov/content/pkg/FR-2020-06-05.pdf/2020-11220.pdf.

AdminRecord-001152

## 2.2   Statutory authority

In the Dodd-Frank Act, which was enacted "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system," Congress directed the Bureau to adopt regulations governing the collection of small business lending data. Specifically, section 1071 of the Dodd-Frank Act amended ECOA to require, subject to rules prescribed by the Bureau, that FIs compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[12]  Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. Under section 1071, the data that FIs are required to compile, maintain, and submit include the type and purpose of the loan, the census tract for the applicant's principal place of business, and the race, sex, and ethnicity of the principal owners of the business, along with a number of other data points.  By issuing the Outline, convening the Panel, and completing this Panel Report, the Bureau is fulfilling its obligations under SBREFA to assess the impact of its proposals under consideration on directly affected small entities prior to issuing an NPRM regarding section 1071.

## 2.3   Closely-related Federal laws and regulations

In the Outline, the Bureau identified other Federal statutes and regulations related to small business lending that have potentially duplicative, overlapping, or conflicting requirements with section 1071.  SERs also provided suggestions of other potential closely-related Federal statutes and regulations.  Those statutes and regulations are described below.

The CRA, implemented through regulations issued by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation (FDIC), requires some institutions to collect, maintain, and report certain data about small business, farm, and consumer lending to ensure they are serving their communities.  The purpose of the CRA is to encourage institutions to help meet the credit needs of the local communities in which they do business, including low- and moderate-income neighborhoods.

The Currency and Financial Transactions Reporting Act of 1970, as amended by the USA Patriot Act of 2001, and commonly referred to as the Bank Secrecy Act, authorized the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury, to combat money laundering and promote financial security.  FinCEN regulations require covered FIs to establish and maintain written procedures that are reasonably designed to identify and verify beneficial owners of legal entity customers, which is sometimes called the customer due diligence (CDD) rule.[13]

---

[12] 15 U.S.C. 1691c-2.

[13] See 31 CFR 1020.210 for the CDD rule as applicable to FIs regulated only by a Federal functional regulator, including banks, savings associations, and credit union.

AdminRecord-001153

ECOA, implemented by the Bureau's Regulation B (12 CFR part 1002), prohibits creditors from discriminating in any aspect of a credit transaction, including a business-purpose transaction, on the basis of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act.[14]  The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.[15]

Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including if it is required by law.[16]  Regulation B requires creditors to request information about the race, ethnicity, sex, marital status, and age of applicants for certain dwelling-secured loans and to retain that information for certain periods.[17]  Regulation B requires this data collection for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, and requires the data to be maintained by the creditor for 25 months for purposes of monitoring and enforcing compliance with ECOA/Regulation B and other laws.[18]  Section 1071 of the Dodd-Frank Act amended ECOA to require FIs to compile, maintain, and submit to the Bureau certain data on credit applications by women-owned, minority-owned, and small businesses.

The Federal Credit Union Act, implemented by the NCUA (12 CFR part 1756), requires Federal credit unions to make financial reports as specified by the agency.  The NCUA requires quarterly reports of the total number of outstanding loans, total outstanding loan balance, total number of loans granted or purchased year-to-date, total amount granted or purchased year-to-date for commercial loans to members, not including loans with original amounts less than $50,000.  The NCUA also requires quarterly reports of the total number and total outstanding balance (including the guaranteed portion) of loans originated under an SBA loan program.

The Federal Deposit Insurance Act, implemented by the FDIC (12 CFR part 304), requires insured DIs to file Call Reports in accordance with applicable instructions.  These instructions require quarterly reports of loans to small businesses, defined as loans for commercial and industrial purposes to sole proprietorships, partnerships, corporations, and other business enterprises and loans secured by nonfarm nonresidential properties with original amounts of $1 million or less.  In accordance with amendments by the Federal Deposit Insurance Corporation Improvement Act of 1991, the instructions require quarterly reports of loans to small farms, defined as loans to finance agricultural production, other loans to farmers, and loans secured by

---

[14] 15 U.S.C. 1691(a)(1).

[15] *See* 15 U.S.C. 1691c.  The Bureau's rules, including any eventual 1071 rule, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.  12 U.S.C. 5519.  The authority to issue rules—including rules to implement section 1071—for certain motor vehicle dealers rests with the Board of Governors of the Federal Reserve System. *See, e.g.*, 12 CFR 202.17.

[16] 12 CFR 1002.5(a), (b), and comment 5(a)-2.

[17] 12 CFR 1002.5(a)(2), 1002.12(b)(1)(i), 1002.13(a).

[18] 12 CFR 1002.12(b)(1)(i), 1002.13(a)(1).

AdminRecord-001154

farmland (including farm residential and other improvements) with original amounts of $500,000 or less.

The Home Mortgage Disclosure Act (HMDA), implemented by the Bureau's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to report detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. This reported data is a valuable source for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There may be some overlap between what is required to be reported under HMDA and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses.

The Riegle Community Development Banking and Financial Institutions Act of 1994 authorized the Community Development Financial Institution Fund (CDFI Fund). The Department of the Treasury administers the regulations that govern the CDFI Fund. A certified CDFI is a specialized FI that works in markets that are underserved by traditional FIs, including regulated institutions such as community development banks and credit unions, and non-regulated institutions such as loan and venture capital funds. The CDFI program includes an annual mandatory Certification and Data Collection Report, which may contain information similar to the data points discussed in sections 3.7 and 3.8 below. The CDFI Fund is considering public comment concerning potential changes to this report.[19]

The Small Business Act (SB Act), administered through the SBA, defines a small business concern as a business that is "independently owned and operated and which is not dominant in its field of operation" and empowers the Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business. The SBA has adopted more than one thousand industry-specific size standards, classified by six-digit North American Industry Classification System (NAICS) codes, to determine whether a business concern is "small." In addition, the SB Act authorizes loans for qualified small business concerns for purposes of plant acquisition, construction, conversion, or expansion, including the acquisition of land, material, supplies, equipment, and working capital. The SBA sets the guidelines that govern the "7(a) loan program," determining which businesses FIs may lend to through the program and the type of loans they can provide.

# 3. Overview of proposals and alternatives under consideration

This section summarizes the Bureau's proposals under consideration as set forth in the Outline. The Outline is attached to this Panel Report as Appendix C.

---

[19] *See* 85 FR 27274 (May 7, 2020), https://www.cdfifund.gov/Documents/2020-09746-Certification%20Report.pdf.

AdminRecord-001155

## 3.1   Scope of the rulemaking

Section 1071(b) states that "in the case of any application to a financial institution for credit for [a] women-owned, minority-owned, or small business, the financial institution shall—(1) inquire whether the business is a women-owned, minority-owned or small business." That is, the text of section 1071 may be read to include data collection for all small businesses as well as women-owned and minority-owned businesses that are not small. Most existing businesses are "small business concerns," as that term is currently defined by the SB Act and the SBA's implementing regulations. It is therefore likely that if the eventual 1071 rule included all small businesses, the rule would cover nearly all women-owned and minority-owned businesses. In light of this, the Bureau is considering proposing that the data collection and reporting requirements of its eventual 1071 rule would apply to any application to an FI for credit by a small business, and that FIs would not be required to collect and report 1071 data for women- and minority-owned businesses that are not "small."

## 3.2   Definition of "financial institution" (lender coverage)

The Bureau is considering proposing to adopt a general definition of "financial institution" in a manner consistent with section 1071(h)(1), which defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." Under such a definition, the rule's data collection and reporting requirements may apply to a variety of entities that engage in small business lending, including DIs (*i.e.*, banks, savings associations, and credit unions), online lenders/platform lenders, CDFIs (both DIs and non-DIs), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit, non-DI lenders. The Bureau is also considering proposals, in light of section 1071's statutory purposes, to exempt FIs from any collection and reporting requirements based on either or both a size-based and/or activity-based threshold. In the Outline, the Bureau set forth several alternative thresholds under consideration for size-based and activity-based thresholds.

## 3.3   Definition of "small business" applicants

Section 1071 defines the term "small business" by reference to the SB Act's definition of "small business concern" in 15 U.S.C. 632. That Act provides a general definition of a "small business concern," authorizes the SBA to establish detailed size standards for use by all agencies, and permits an agency to request SBA approval for a size standard specific to an agency's program. The Bureau is considering adopting a simplified size standard for purposes of its eventual 1071 rule. In the Outline, the Bureau set forth three alternatives under consideration for a simplified size standard, which would use (1) only gross annual revenue; (2) either the number of employees or gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services; or (3) size standards across 13 industry groups that correspond to two-digit NAICS code industry groupings. Consistent with the statutory requirements, the Bureau will seek SBA approval for a simplified size standard if it ultimately decides to take this approach. The Bureau understands that implementing this approach will necessitate close coordination with, and approval from, the SBA.

AdminRecord-001156

## 3.4  Definitions of "women-owned business," "minority-owned business," and "minority individual"

The Bureau is considering clarifying the terms "women-owned business" and "minority-owned business" in line with the definitions of those terms provided in section 1071(h)(5) and (6), and to clarify the categories of "minority individual" (used in the definition of "minority-owned business") to mirror the aggregate categories used under the Home Mortgage Disclosure Act.

## 3.5  Product coverage

Section 1071 requires FIs to collect and report information regarding any application for "credit" made by women-owned, minority-owned, and small businesses. ECOA and Regulation B define "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." [20] Products that meet the definition of "credit" under ECOA and are not otherwise excluded from collection and reporting requirements will be covered products under section 1071. Specifically, the Bureau is considering proposing that covered products under section 1071 include term loans, lines of credit, and business credit cards. The Bureau is also considering proposing that the eventual 1071 rule not cover the following products: consumer-designated credit, leases, factoring, trade credit, and merchant cash advances (MCAs).

## 3.6  Definition of an "application"

Section 1071(b) requires that FIs collect, maintain, and report to the Bureau certain information regarding "any application to a financial institution for credit." For covered FIs with respect to covered products, the definition of "application" will trigger data collection and reporting under section 1071. The Bureau is considering defining an "application" largely consistent with the Regulation B definition of that term—*i.e.*, "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." [21]

The Bureau is considering clarifying circumstances that would not be reportable under section 1071, even if certain of these circumstances are considered an "application" under Regulation B, including (1) inquiries/prequalifications; (2) reevaluation, extension, and renewal requests, except requests for additional credit amounts; and (3) solicitations and firm offers of credit.

The Bureau considered possible alternative definitions of "application," including defining the term by using Regulation B's definition of the term "completed application." [22] The Bureau also considered defining "application" as particular documents or specific data points that, if collected, would trigger a duty to collect and report 1071 data.

---

[20] 15 U.S.C. 1691a(d); 12 CFR 1002.2(j).

[21] 12 CFR 1002.2(f).

[22] That is, as an application in which the creditor has received "all the information that the creditor regularly obtains and considers" in evaluating similar products. 12 CFR 1002.2(f).

AdminRecord-001157

## 3.7   Mandatory data points

Section 1071(e)(1) requires each FI to compile and maintain a record of certain information
provided by any credit applicant pursuant to a request under section 1071(b), and report that
information to the Bureau.  The Bureau refers to this information, along with the applicant's
responses to the inquiries under 1071(b)(1), as "mandatory data points," which include:
(1) whether the applicant is a women-owned, minority-owned, and/or small business,
(2) application/loan number, (3) application date, (4) loan/credit type, (5) loan/credit purpose,
(6) credit amount/limit applied for, (7) credit amount/limit approved, (8) type of action taken,
(9) action taken date, (10) census tract (principal place of business), (11) gross annual revenue,
and (12) race, sex, and ethnicity of the applicant's principal owners.

## 3.8   Discretionary data points

Section 1071(e)(2)(H) requires FIs to collect and report "any additional data that the Bureau
determines would aid in fulfilling the purposes of [section 1071]."  The Bureau is considering
requiring the reporting of the following "discretionary data points":  pricing, time in business,
NAICS code, and number of employees.

## 3.9   Timing of data collection

Although the definition of "application" triggers a covered FI's duty to collect 1071 data, the
statute does not provide further direction on when during the application process information
should be collected.  The Bureau is considering not specifying a particular time period during the
application process when FIs must collect 1071 data from applicants.  The Bureau also
considered possible alternatives of requiring FIs to seek to collect 1071 data within or by a
specified time period, such as simultaneous with the triggering of an "application," before
obtaining a "completed application," or before notifying an applicant of action taken on an
application.

## 3.10 Shielding data from underwriters and other persons (firewall)

Under section 1071(d)(1), where feasible, underwriters or others at an FI or affiliate involved in
making any determination concerning an application for credit cannot access "any information
provided by the applicant pursuant to a request under subsection (b)."  Under section 1071(d)(2),
if an FI finds that an underwriter or others involved in making a determination regarding an
application "should have access" to such information, the FI must provide the applicant a notice
of "the access of the underwriter to such information, along with notice that the financial
institution may not discriminate on the basis of such information."

The Bureau is considering proposing that FIs must limit the access of a loan underwriter or other
person to an applicant's responses to only the inquiries regarding women-owned and minority-
owned business status under section 1071(b), as well as the race, sex, and ethnicity of principal
owners.  The Bureau is further considering proposing that an applicant's response regarding
small business status need not be firewalled off pursuant to section 1071(d)(1).

AdminRecord-001158

The Bureau is considering developing sample disclosure language that FIs could use when providing the notice under section 1071(d)(2), which requires FIs to notify applicants of an underwriter's access to women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners. The Bureau is also considering proposing that the notice under section 1071(d)(2) need not include language regarding small business status.

## 3.11 Applicants' right to refuse to provide certain information

The Bureau is considering proposing that the right of an applicant under section 1071(c) to refuse to provide certain information applies to the FI's specific inquiries regarding women-owned and minority-owned business status in 1071(b), as well as the race, sex, and ethnicity of principal owners, but not to the FI's specific inquiry regarding small business status in 1071(b).

## 3.12 Compiling, maintaining, and reporting 1071 data to the Bureau

The Bureau is considering proposing that 1071 data collection be done on a calendar-year basis, and submitted to the Bureau by a specified time after the end of each calendar year. In accordance with section 1071(e)(3), the Bureau is also considering proposing a prohibition on including certain personally-identifiable information about any individuals associated with small business applicants or borrowers in the data that an FI is required to compile, maintain, and report to the Bureau, other than information specifically required to be collected and reported (such as the race, sex, and ethnicity of principal owners). Further, the Bureau is considering proposing that FIs retain 1071 data for at least three years after it is submitted to the Bureau.

## 3.13 Privacy considerations involving Bureau publication of 1071 data

The Bureau is examining the privacy implications of FIs' collection, reporting, and disclosure of information pursuant to section 1071 and the Bureau's public release of the data. For purposes of determining whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is considering using a "balancing test" that weighs the risks and benefits of public disclosure. Under this approach, data would be modified or deleted if its disclosure in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071. If the risks of disclosing unmodified data outweigh the benefits under the balancing test, the Bureau would determine whether modifications could bring them into balance. As an alternative to a balancing test, the Bureau considered an approach in which it would modify data if an identified privacy risk crosses some significance threshold, without weighing that risk against the benefit of disclosure.[23]

## 3.14 Implementation period

Section 1071 does not specify an implementation period, though pursuant to section 1071(f)(1) FIs must submit 1071 data to the Bureau on an annual basis. The Bureau is considering

---

[23] The Bureau noted in the Outline, however, that such an approach could be inconsistent with the express disclosure purposes of section 1071.

AdminRecord-001159

proposing that FIs have approximately two calendar years for implementation following the Bureau's issuance of its eventual 1071 rule.

## 3.15 Potential impacts on small entities

The Bureau expects that the proposals under consideration may impose one-time and ongoing costs on small-entity providers of credit to small businesses.

*One-time costs*. The Bureau has preliminarily identified eight categories of one-time costs that make up the components necessary for an FI to develop the infrastructure to collect and report data required by the eventual 1071 rule. Those categories are preparation/planning; updating computer systems; testing/validating systems; developing forms/applications; training staff and third parties (such as dealers and brokers); developing policies/procedures; legal/compliance review; and post-implementation review of compliance policies and procedures.

However, because section 1071 would result in costs for some FIs associated with developing entirely new systems and processes to implement a new data collection and reporting regime, the Bureau does not have detailed information about potential one-time costs for small entities to implement the eventual 1071 rule. The Bureau recently conducted a survey regarding one-time implementation costs for section 1071 compliance targeted at FIs who extend small business credit.[24] Estimates from survey respondents of the one-time costs of complying with an eventual 1071 rule are likely to form much of the basis of the Bureau's estimates for one-time costs in its impact analysis for the eventual NPRM.

*Ongoing costs*. Adapting ongoing cost methodology from previous HMDA rulemaking efforts, the Bureau identified 15 specific data collection and reporting activities that would impose ongoing costs. In the Outline, the Bureau estimated that FIs with the lowest level of complexity in compliance operations would incur around $2,500 in total annual ongoing costs, or about $34 in total cost per application processed (assuming an average of 75 applications per year). For FIs of this type, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time.

The Bureau estimates that FIs with a middle level of complexity in compliance operations, which is somewhat automated, would incur approximately $29,550 in additional ongoing costs per year, or around $99 per application (assuming an average of 300 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (in the form of an annual software subscription fee) and the external audit of the data.

*Additional potential impacts of the eventual 1071 rule*. The Bureau also identified two additional areas of potential impact of the eventual 1071 rule. First, the Bureau acknowledged the potential for standardization or homogenization of business credit products, which could increase compliance costs and provide an incentive for FIs to move away from products that

---

[24] This survey was released on July 22, 2020; the response period closed on October 16, 2020. The Bureau granted the SERs an additional two weeks after the deadline to provide survey responses directly to the Bureau via email.

AdminRecord-001160

require significant employee time to underwrite towards more standardized products that require less time and lower labor costs. Second, depending on the extent to which the Bureau publicly discloses the data it receives under the eventual 1071 rule, the Bureau expects that some FIs could incur ongoing costs related to responding to reports of disparities in their small business lending practices. Some FIs could also experience reputational risks associated with reports of existing disparities if more fulsome analysis of their business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis.

***Impacts on the cost and availability of credit to small entities***. The Bureau anticipates using the results of its one-time cost survey to refine its estimates of the impact of compliance with an eventual 1071 rule on the costs and availability of credit for small entities. The Bureau's one-time cost survey includes questions about the expected impact of 1071 compliance costs on business operations. The survey asks questions about whether lenders expect to raise interest rates or fees, change how they underwrite loans, or change the amount or areas of small business lending in response to the eventual 1071 rule.

Three types of costs (one-time, fixed ongoing, and variable ongoing) will determine the effect of the eventual 1071 rule compliance on price and availability of credit to small entities. One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to remain in the small business lending market or the market for specific small business lending products. The Bureau hopes to learn through the one-time cost survey the extent to which any lenders consider the potential additional one-time compliance costs to be so high that they predict they would exit the market or reduce the number of small business loans provided and thus reduce the availability of small business credit to small entities.

The Bureau expects that much of the variable cost component of ongoing costs would be passed on to small business borrowers in the form of higher interest rates or fees. Even if the variable cost were passed on in full to small business borrowers in the form of higher interest rates or fees associated with a loan or line of credit (or even applicants in the form of application fees), the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business borrower.

## 4. Applicable small entity definitions

A "small entity" may be a small business, small nonprofit organization, or small government jurisdiction. The NAICS classifies business types and the SBA establishes size standards for a "small business." To assess the impacts of the proposals under consideration, the Panel met with small entities that may be impacted by those proposals. Any small entity that falls within the statute's definition of "financial institution" and offers covered credit could potentially be affected. In this instance, the Bureau sought feedback from banks and credit unions (including several CDFIs), commercial finance companies, online lenders (fintechs), and non-DI CDFIs.

AdminRecord-001161

# 5. Small entities that may be subject to the proposals under consideration

The Panel is required to collect advice and recommendations from SERs that are likely to be subject to the regulation that the Bureau is considering proposing. For this purpose, the RFA defines "small entities" as small businesses, small organizations, and small governmental jurisdictions. The term "small business" has the same meaning as "small business concern" under section 3 of the SB Act; thus, to determine whether a business is a small entity the Bureau considers the SBA's size standards.[25] The term "small organization" is defined as any not-for-profit enterprise which is independently owned and operated and is not dominant in its field. The term "small governmental jurisdiction" is defined as the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than 50,000.[26]

There are two broad categories of entities that may be subject to an eventual 1071 rule: DIs and non-DIs. DIs are principally banks and credit unions. Types of non-DIs that may be covered under the eventual 1071 rule include lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, online lenders/platform lenders, non-DI CDFIs, governmental lending entities, and non-profit lenders.

The Panel has identified 10 categories of small businesses that are likely to represent most small entities that may be subject to an eventual 1071 rule, together with the maximum asset size or average annual receipts to be considered a small business under each NAICS code.

**Table 1: Categories of small entities likely to be subject to the proposals under consideration, by NAICS industry**

| NAICS industry | NAICS code | Maximum size to be considered "small" |
|---|---|---|
| Commercial banking | 522110 | $600 million in assets |
| Savings institutions | 522120 | $600 million in assets |
| Credit unions | 522130 | $600 million in assets |
| Sales financing | 522220 | $41.5 million in average annual receipts |
| Consumer lending | 522291 | $41.5 million in average annual receipts |
| Real estate credit | 522292 | $41.5 million in average annual receipts |

---

[25] U.S. Small Bus. Admin., *Table of Small Business Standards Matched to North American Industry Classification System Codes* (effective Aug. 19, 2019), https://www.sba.gov/sites/default/files/2019-08/SBA%20Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.

[26] *See* 5 U.S.C. 601(3) through (6).

AdminRecord-001162

| NAICS industry | NAICS code | Maximum size to be considered "small" |
|---|---|---|
| Mortgage and nonmortgage loan brokers | 522310 | $8 million in average annual receipts |
| Financial transactions processing, reserve, and clearinghouse activities | 522320 | $41.5 million in average annual receipts |
| Commercial air, rail, and water transportation equipment rental and leasing | 532411 | $35.0 million in average annual receipts |
| Civic and social organizations | 813410 | $8.0 million in average annual receipts |

In addition, as discussed above, a "small organization" is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, and "small governmental jurisdictions" are the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

# 6. Summary of small entity outreach

## 6.1 Summary of the Panel's outreach meetings with small entity representatives

The Bureau convened the Panel on October 15, 2020, and held a total of four Panel Outreach Meetings during October 19–22, 2020, conducted online via WebEx video conference.

In preparation for the Panel Outreach Meetings and to facilitate an informed and detailed discussion of the proposals under consideration, discussion questions for the SERs were included throughout the Bureau's Outline; these questions also appeared in a shorter Discussion Guide for Small Entity Representatives (see Appendix E).

In advance of the Panel Outreach Meetings, the Bureau, SBA's Office of Advocacy, and OIRA held a series of WebEx video conferences with the SERs (pre-Panel video conferences) to describe the Small Business Review Process, obtain important background information about each SER's current business practices, and begin discussions on selected portions of the proposals under consideration.

Representatives from 20 small businesses were selected as SERs for this SBREFA process and participated in the Panel Outreach Meetings.  Representatives from the Bureau, SBA's Office of Advocacy, and OIRA provided introductory remarks.  The meetings were then organized around discussions led by the Bureau's Office of Regulations, Office of Small Business Lending Markets, and Office of Research about each aspect of the proposals under consideration and the potential impact on small businesses.  The presentation slides framing this discussion are attached at Appendix F.  The Bureau also provided the SERs with an opportunity to submit written feedback by November 9, 2020.  Fifteen of the 20 SERs provided written feedback, copies of which are attached at Appendix A.

AdminRecord-001163

## 6.2  Other outreach efforts, including to small entities

In addition to the SBREFA process, the Bureau has conducted extensive outreach efforts to stakeholders, including consumer and community-based groups, industry and trade groups, and other Federal agencies.

The Bureau held a field hearing on May 10, 2017[27] and published a request for information regarding the small business lending market.[28]  Prior to that and in the years since, the Bureau held over 100 meetings with groups of financial institutions, community advocates, researchers, and governmental entities regarding the 1071 rulemaking.

In November 2019, the Bureau held a symposium on section 1071 to stimulate a dialogue to assist the Bureau in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and government experts in the small business lending arena.[29]  On July 22, 2020, the Bureau issued a survey to collect information about potential one-time costs to FIs to prepare to collect and report data on small business lending.[30]

# 7.  List of small entity representatives

The following 20 SERs were selected to participate in the Panel's Small Business Review process.

**Table 2: List of small entity representatives**

| Name & Title | Business Name, City, and State | Business Type |
|---|---|---|
| Chris Enbom<br>CEO | AP Equipment Financing<br>Bend, OR | Commercial Finance |
| Joel Schiller<br>SVP & CRO: Compliance & CRA Officer | Artisans' Bank<br>Wilmington, DE | Bank |
| Ryan M. Warner<br>Chairman & CEO | Bippus State Bank<br>Huntington, IN | Bank |

---

[27] *See* Bureau of Consumer Fin. Prot., *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.

[28] Bureau of Consumer Fin. Prot., *Request for Information Regarding the Small Business Lending Market*, 82 FR 22318 (May 15, 2017), https://www.consumerfinance.gov/policy-compliance/notice-opportunities-comment/archive-closed/request-information-regarding-small-business-lending-market/.

[29] Bureau of Consumer Fin. Prot., *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.

[30] The survey period closed October 16, 2020.  The Bureau granted the SERs an additional two weeks after the deadline to provide survey responses directly to the Bureau via email.

AdminRecord-001164

| Name & Title | Business Name, City, and State | Business Type |
|---|---|---|
| Kurt Chilcott<br>CEO & President | CDC Small Business Finance<br>San Diego, CA | CDFI (non-DI) |
| Cynthia Newell<br>Director, Impact & Strategy | City First Bank<br>Washington, DC | Bank and CDFI |
| Landon Capdeville<br>Vice President | Floorplan Xpress, LLC<br>Moore, OK | Commercial Finance |
| Barry Feierstein<br>COO | Fundation Group LLC<br>New York, NY | Online Lender (Fintech) |
| Ryan Metcalf<br>Head of Public Policy, Regulatory Affairs & Social Impact | Funding Circle<br>San Francisco, CA | Online Lender (Fintech) |
| Jordan Fein<br>CEO | Greenbox Capital<br>Miami, FL | Commercial Finance |
| William J. Bynum<br>CEO | Hope Credit Union<br>Jackson, MS | Credit Union and CDFI |
| Brooke Van Vleet<br>President & CEO | InRoads Credit Union<br>St. Helens, OR | Credit Union |
| Kwesi Rogers<br>President & CEO | Kore Capital Corporation<br>Bethesda, MD | Commercial Finance |
| Tawney Brunsch<br>Executive Director | Lakota Funds<br>Kyle, SD | CDFI (non-DI) |
| Robin Romano<br>CEO | MariSol Federal Credit Union<br>Phoenix, AZ | Credit Union and CDFI |
| Luz Urrutia<br>CEO | Opportunity Fund<br>San Jose, CA | CDFI (non-DI) |
| Julieann Thurlow<br>President & CEO | Reading Co-Operative Bank<br>Reading, MA | Bank |
| Jeff Ivey<br>President & CEO | River City Federal Credit Union<br>San Antonio, TX | Credit Union and CDFI |
| Sarah Getzlaff<br>CEO | Security First Bank of North Dakota<br>New Salem, ND | Bank |
| Debbie Jones<br>President & CEO | UT Federal Credit Union<br>Knoxville, TN | Credit Union |
| Jane Henderson<br>President & CEO | Virginia Community Capital<br>Richmond, VA | CDFI (non-DI) |

# 8. Summary of feedback from small entity representatives

Through the SBREFA process, the Panel solicits feedback from small businesses early in a rulemaking proceeding and prior to the Bureau's development of an NPRM. To obtain specific information about the costs of complying with a potential rulemaking, the Bureau provided SERs with a list of questions to consider about the impacts of the proposals under consideration and to assist the Bureau in refining the proposals under consideration. These discussion questions, which were part of the Outline (Appendix C), formed the basis of the Panel Outreach Meetings

AdminRecord-001165

and the subsequent written feedback. These discussion questions also appear in the Discussion Guide for Small Entity Representatives (Appendix E).

During the Panel Outreach Meetings, as well as during the pre-Panel video conferences and in written feedback submitted by SERs following the Panel Outreach Meetings, the SERs provided feedback on all aspects of the proposals under consideration. The SERs provided information to the Panel about their business operations and how the Bureau's proposals under consideration could impact their businesses. The Panel appreciates the meaningful feedback and data that SERs provided and for the time they spent assisting the Panel. This section summarizes SER feedback on the various parts of the Outline. Written feedback provided by SERs is included in Appendix A.

## 8.1   General feedback from SERs

SERs were generally supportive of the Bureau's statutory mission to promulgate a section 1071 rule, and many expressly supported broad coverage of both financial institutions and products in the 1071 rulemaking. A number of SERs expressed the view that data transparency in the small business lending market is critical to advance the goals of fair lending enforcement and access to credit for small businesses, especially those that are minority-owned and women-owned. One SER stated that the limited data currently available shows that the lending practices of many FIs exclude women-owned and minority-owned businesses, exacerbating a racial wealth gap, and that section 1071 has the opportunity to address such lending disparities, which are costly to businesses, lenders, and the economy as a whole. The SER also said that data transparency and fairness should be an advantage to smaller, local FIs, allowing them to better distinguish their value proposition compared to larger FIs or predatory lenders.

Several SERs stated that the completion of a 1071 rulemaking was both welcome, given the many years stakeholders have been waiting for this data, and necessary to better understand the small business lending market, as the COVID-19 pandemic highlighted how the most vulnerable small businesses can be disproportionately impacted by economic shocks.

SERs nearly uniformly suggested that the Bureau aim to draft simple regulations, and choose simpler options if possible, noting that more complex rules tend to make compliance more difficult and drive up compliance costs, which could potentially increase prices or reduce small businesses' access to credit. Many SERs also requested clear written guidance and implementation support materials from the Bureau, such as small entity compliance guides, a "help desk" for questions, and sample disclosure language (translated into languages other than English for individuals with Limited English Proficiency). Several SERs also discussed the need for applicant-facing materials explaining what the section 1071 regulation is and why the FI must collect data. Relatedly, one SER requested that the Bureau educate and train currently unregulated FIs to help them implement the rule.

A number of SERs (representing FIs that operate primarily online as well as FIs that interact with small business applicants in-person) indicated their belief that FIs with extensive online lending operations would be able to comply with an eventual 1071 rule more easily, quickly, and at less cost due to their greater degree of automation than FIs with primarily in-person and/or paper-based operations. SERs urged the Bureau to align with other Federal data reporting regimes—

AdminRecord-001166

such as HMDA, CRA, CDFI Fund, or SBA—if possible, and thought that FIs with experience complying with these other Federal data reporting regimes would have an easier time complying with an eventual 1071 rule than would FIs, including some SERs, with no such experience.

Many SERs expressed the concern that a 1071 rule, while required by statute, would cause smaller FIs to incur disproportionate compliance costs compared to larger FIs, and may either push FIs to reduce the availability of credit for certain small businesses or cause FIs to pass on the added costs and increase the cost of credit for small businesses.  Several SERs also cautioned that new regulations may have unintended consequences.  A few SERs disagreed, asserting that it would not be overly or materially costly for any FI to comply with an eventual 1071 rule. Several SERs also stated that the statutory purposes of section 1071 were important enough that the likely costs of complying with the future rule were worth incurring.  One SER suggested limiting use of 1071 data by regulators to conducting fair lending audits, and not subjecting FIs to technical audit and compliance requirements.

Several SERs stated that a 1071 rule should take into account the different types of FIs operating in the small business lending market.  One SER suggested that the Bureau had not focused enough attention on the impact of a 1071 rule on non-DI lenders, which they said play a vital role in providing essential credit to small businesses in the United States, many of which are women-owned and minority-owned.  Another SER asserted that the data collected from credit unions, which are bound by their charters (pursuant to Federal and State laws and regulations) to serve a specific field of membership, would likely be incomparable with data from other FIs that are permitted serve any kind of customer.

## 8.2   SER feedback related to the scope of the rulemaking

As noted above, many SERs supported broad coverage of both financial institutions and products, as reflected in section 1071(b)'s language covering "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business."  A number of SERs expressed a belief that covering just small business applications (however that is eventually defined by the Bureau) would supply adequate or nearly complete lending data for purposes of section 1071.  However, other SERs stated that the Bureau's regulation should collect data regarding applications for credit for non-small minority-owned and women-owned businesses as well.  One SER relayed first-hand observations in their community that larger minority-owned and women-owned businesses were excluded from full access to credit, and expressed an interest in the Bureau capturing and reporting that information.  Another SER observed that smaller FIs, or those that generally focus on small business lending, might find that collecting and reporting data for all business loan applications might be a simpler approach than undertaking a process of determining which applications might be within the scope of the eventual 1071 rule.

## 8.3   SER feedback related to the definition of "financial institution" (lender coverage)

SERs generally did not express concern regarding the general definition of a "financial institution" under consideration, although one SER expressed concern at the broad reach of what

AdminRecord-001167

might be considered a financial activity. There was a diversity of perspectives with respect to the Bureau's approaches under consideration regarding potential exemptions. While some SERs stressed the need for expansive lender coverage to fulfill section 1071's purposes, others suggested that such purposes could be fulfilled by the Bureau collecting and reporting data from only the largest lenders. SERs also offered varying opinions regarding the exemption metrics and thresholds under consideration, with some SERs favoring activity-based exemptions and others preferring an asset-based approach.

Some SERs advocated for an activity-based exemption. Several of these SERs preferred an annual 25-loan threshold (with at least one expressing support specifically for the "option 1" exemption threshold as described in the Outline, which was for annual originations of at least 25 small business loans or $2.5 million). One SER preferred the Bureau's "option 2" exemption threshold for annual originations of 50 small business loans or $5 million, while another preferred the Bureau's "option 3" exemption threshold for annual originations of at least 100 small business loans or $10 million. Another SER recommended setting a threshold of more than 100 small business applications for two consecutive years. These SERs emphasized a general need for thorough data reporting from a wide variety of lenders, and cautioned that in many smaller and rural markets, larger exemptions might result in little or no data collection given that many lenders in those markets were themselves small DIs and/or do not make many small business loans annually.

In contrast, a few SERs advocated that the Bureau should consider initially exempting lenders other than "large" FIs (which, one suggested, might be defined for DIs as those having more than $1 billion in assets). These SERs stated that this approach would capture the vast majority of small business loans while avoiding imposing undue regulatory burden on smaller lenders, who might be less capable of absorbing such costs. They suggested that the Bureau might later consider whether to expand section 1071 data collection and reporting requirements to smaller FIs after first analyzing the available data. Several SERs cautioned that some FIs, particularly small non-DI lenders, might cease lending to small businesses if the eventual 1071 rule's one-time costs are too high.

One SER stated that a $200 million asset-based exemption would be helpful to small DI lenders, and others suggested that a threshold of $600 million was appropriate. Another SER countered, however, that they were unaware of data that might support an asset-based exemption larger than $100 million. Some SERs expressly opposed an asset-based exemption; one SER cautioned that an exemption based solely on asset size would be inadvisable, because many lenders do not hold their loans on their balance sheet. Another SER stated that adopting an asset-based exemption would risk excluding the collection of nearly all small business lending data in certain regions. At least one SER supported a combined size-based and activity-based exemption. Some SERs also suggested other possible bases for setting exemption thresholds. For example, several SERs suggested that the Bureau focus on the number of small business loans that would be covered or excluded, rather than the number of financial institutions, in setting an exemption threshold. One SER suggested setting a threshold based on loan portfolio size rather than annual originations. Another SER suggested that the Bureau consider exempting certain FIs using a location test similar or identical to what is used for HMDA, which does not apply to institutions that do not have a home or branch office in a Metropolitan Statistical Area.

AdminRecord-001168

SERs uniformly supported clear, predictable collection and reporting exemption thresholds. One SER questioned how long a grace period an FI that exceeded an activity-based threshold would be afforded before collection and reporting requirements would commence. Another SER expressed concern regarding the potential burden for smaller lenders to keep track of exemption levels that might be subject to revision. A SER recounted that their institution incurred compliance burden when preparing to report HMDA data, but that the Bureau later adopted exemptions that excluded the institution from reporting requirements only after the institution had already spent the resources to prepare for compliance.

Several SERs voiced support for aligning reporting requirements for FIs that are not the lender of record with the approach taken for HMDA reporting in the Bureau's Regulation C. One SER stressed that imposing section 1071 requirements for loan buyers, who play an important role in assisting CDFIs but do not make credit decisions, might risk their continued participation. Another CDFI SER explained that the institution occasionally participates in pooled loan purchases and recommended that the Bureau ensure that reporting obligations for such pooled loans are clear. Other SERs expressed concern in adopting the Bureau's approach in Regulation C, noting the differences between small business and residential loan products, and advocated for simpler approaches.

One credit union SER requested that the Bureau exempt all credit unions from section 1071 data collection and reporting requirements, asserting that credit unions had not displayed what they characterized as a "pattern of unfair lending." In contrast, another SER cautioned against providing exemptions for particular types of FIs, noting the risk of missing important lending data. A few SERs, particularly CDFIs, strongly preferred that all lenders, including non-profit and government lenders, should be subject to section 1071 data collection and reporting requirements. One SER asserted that disparities exist in many forms of small business lending, including the SBA's 7(a) Loan Program, state lending programs, and funds distributed through the recent CARES Act. Another SER stated that in certain parts of the country, such as the Midwest, Farm Credit System (FCS) loans are available to small businesses, and thus Farm Credit institutions are in competition with other lenders and should be covered entities. One SER stated that the Bureau should consider exempting non-depository, nonprofit Native CDFIs because section 1071 data collection and reporting requirements might impose significant compliance costs and privacy concerns.

## 8.4   SER feedback related to the definition of "small business" applicants

SERs generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business—which bases classification on an applicant's 6-digit NAICS code—is relatively complex. Nearly all SERs expressed some familiarity with the SBA's small business definition. More than half the SERs currently gather an applicant's NAICS code as a routine part of the application process, because NAICS codes are used for SBA loans and for CDFI Fund reporting. One SER also uses this information for tracking the concentration of their loans across certain industries. Some SERs gather NAICS code from an applicant's tax documents or a business credit report and others rely on information provided directly by the applicant; these SERs emphasized the importance of permitting reliance on applicant self-reported data.

AdminRecord-001169

One SER remarked that it would be critical for the purposes of section 1071 to have industry information about applicants in some form, such as NAICS codes, in order to ensure meaningful data. Another SER expressly opposed using the NAICS code to determine whether an applicant is a small business for purposes of section 1071. A few SERs stated that they did not think it would be particularly costly to collect NAICS codes for all of their small business loans, and one SER described the SBA's classification approach as precise and not very burdensome. On the other hand, several SERs stated that correctly classifying an applicant's NAICS code can be difficult, as the business may change over time, codes may have overlapping definitions, small businesses often do not know their NAICS code, and classifications may be prone to human error. Another SER noted that NAICS codes classifications could be subject to change based on SBA rulemaking, and thus FIs would need to track such developments.

Some SERs supported the Bureau's first alternative approach for defining a small business, which would use an applicant's gross annual revenue with a potential "small" threshold of $1 million or $5 million. Several SERs were supportive of this simple approach, but thought the potential threshold should be higher. For most SERs, nearly all their small business customers had less than $5 million in gross annual revenue; most are under $1 million. Several SERs remarked that a $1 million gross annual revenue threshold would be too low, noting that it would exclude many businesses defined by SBA regulations as "small"; some of these SERs said that a $5 million gross annual revenue threshold would be acceptable. Some SERs advocated for higher revenue thresholds, such as $8 million or $10 million. One SER cautioned that a small business definition based only on gross annual revenue would not account for regional variations in business size. One SER specifically suggested that the Bureau align its small business definition with the $1 million standard used by certain supervisory agencies for CRA reporting. However, this SER also supported other versions of the Bureau's first and second alternatives if the Bureau did not adopt the CRA approach. Relatedly, there were some concerns about capturing revenue information from small businesses. Some SERs do not collect this data now, or do not do so across all lending products. SERs also expressed a concern that some applicants likely would not know their gross annual revenue as a precise dollar amount.

Some SERs supported the Bureau's second alternative, which would distinguish between applicants in manufacturing and wholesale industries (500 employees) and all other industries ($8 million in gross annual revenue). These SERs stated that while this approach was still relatively simple, it would nonetheless capture most relevant data. One SER noted a discrepancy between the thresholds, stating that a manufacturer with 500 employees would be much larger than a business with $8 million in gross annual revenue. Some SERs expressed concerns about how to collect data on the number of employees, particularly regarding how part-time and seasonal employees, and contractors, would be counted. One SER suggested that a small business be defined as having less than $10 million in annual revenue and 50 or fewer employees. Another SER emphasized the importance of including collection and reporting requirements for applicants with very few or no employees on payroll, stating that most minority-owned and woman-owned small businesses have no employees. One SER opposed the second alternative, stating that it would be too complex and potentially confusing.

One SER also supported the third alternative as closest to the SBA approach, stating that it reflects the SBA's substantially different definitions of a small business across different industries. This SER stated that the Bureau's first and second alternatives would exclude many

AdminRecord-001170

SBA-qualified small businesses. Other SERs also stated that this two-digit NAICS code alternative was significantly less complex and prone to less human error than the SBA definition using 6-digit NAICS codes. On the other hand, one SER stated that the third alternative would be the most costly and difficult to implement compared to the other two alternatives under consideration.

## 8.5  SER feedback related to the definitions of "women-owned business," "minority-owned business," and "minority individual"

SERs expressed concerns with certain aspects of the statutory definitions of "women-owned business" and "minority-owned business," asserting that the definitions could cause confusion or pose particular complexities. A number of SERs recommended that the Bureau simplify these definitions in the eventual 1071 rule to ensure the definitions are understandable to small business applicants and thereby facilitate consistent data collection across FIs. SERs' suggestions included eliminating the portion of the definitions that refers to accrual of net profit and loss, eliminating the portion of the definitions that refer to control and thus focusing only on ownership, and providing simplified and standardized definitions. Several SERs supported using the concepts of ownership and control in FinCEN's CDD rule when defining women-owned business and minority-owned business; one SER said that doing so would be logical and efficient, while another said it would create regulatory consistency and ease compliance burden. One SER said that most credit unions are familiar with the CDD rule.

Several SERs asked that the definitions of "women-owned business" and "minority-owned business" be revised to align with the definitions used by other agencies, such as the SBA and the CDFI Fund. Several SERs expressed concern that a business that is owned equally by a woman and a man (such as often occurs with heterosexual married couples who own a business together) would not be a "woman-owned business" under the definition of women-owned business that the Bureau is considering (because the woman would not own "more than 50 percent" of the business). These SERs recommended that the Bureau instead use "50 percent or more" of ownership or control as the standard instead. Two SERs supported using "more than 50 percent" of ownership for the definition.

Several SERs supported aligning the definition of "minority individual" with the aggregate categories for race and ethnicity in HMDA, stating that the Bureau should clarify that a "minority individual" is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. However, one SER suggested using the disaggregate categories in HMDA, instead of the aggregate categories.

## 8.6  SER feedback related to product coverage

*Covered products*. Approximately half the SERs urged the Bureau to pursue expansive product coverage in order to adequately capture small businesses' experiences with obtaining financing, especially for women-owned and minority-owned small businesses. Several additional SERs specifically expressed support for the Bureau's proposal under consideration to include term loans, lines of credit, and business credit cards as covered products under section 1071.

AdminRecord-001171

Two SERs asked the Bureau to clarify whether agricultural loans would be covered under section 1071, noting that they are distinct and separate from business loans and that there would be additional costs to gather data for farm-related credit. One SER also explained that in rural areas, FCS loans secured by residential real estate are used to support small businesses, as well as for agricultural purposes. Another SER asked whether sufficient data on these loans could be collected through FCS and the Farm Service Agency.

One SER asked that the Bureau clarify whether loans covering 1-to-4 family properties used for investment purposes are business loans under section 1071, and several SERs recommended that the Bureau cover real estate investment loans (for both non-owner occupied residential property and commercial property) under section 1071. Several other SERs sought to distinguish certain types of real estate loans; one SER remarked, for example, that owning a single non-owner occupied residential property as an investment may be more of a "hobby" but owning multiple properties could be considered a business.

***Products not covered***. As noted above, a number of SERs urged the Bureau to pursue expansive product coverage in an eventual 1071 rule. Many SERs advocated for including MCAs within the scope of the eventual 1071 rule; some SERs also advocated for including factoring, and in some cases leases as well. A few SERs asserted that these products are all very common forms of financing used by small businesses, especially women-owned and minority-owned small businesses, and that, without the inclusion of such products, the Bureau would not capture the full landscape of small business financing. One SER specifically stated that excluding these products could, in particular, leave minority-owned businesses vulnerable to exploitation. Relatedly, SERs urged inclusion of MCAs due to their widespread use by small businesses in the same way as loans and because they said that MCAs are marketed as loans and use underwriting practices that factor in merchants' credit ratings and bank balances, instead of their receivables. One SER stated that smaller start-up small businesses rely on MCAs, and thus excluding them provides an incomplete picture of the credit landscape. Another SER expressed concern about practices used by MCA providers (which the SER characterized as "predatory") and about how excluding MCAs could further enable such practices. A few SERs asserted that the complexity associated with MCAs and other products was not a good reason to exclude them from coverage under the eventual 1071 rule. Several SERs also noted that both New York and California have passed laws covering MCAs, as well as factoring, in their commercial financing disclosures laws; California's law also covers leasing.

In addition, several SERs expressed concern that the exclusion under consideration for certain products would disproportionately burden traditional lenders with reporting requirements, while another SER argued the need for a level playing field and recommended that all products be covered under section 1071. On the other hand, one SER argued that factoring is not "credit" under the plain language of section 1071 and ECOA, that it would thus be improper to include this product, and that its inclusion would corrupt the data set. Another SER said that factoring and asset-backed financing should be treated the same way—that is, either both should be covered, or both should be excluded.

Regarding consumer credit used for business purposes, several SERs asserted that consumer credit is often an important source of financing for small businesses (particularly for women-owned and minority-owned small businesses, and sole proprietorships), and ideally should be

AdminRecord-001172

included within the scope of the eventual 1071 rule. One SER stated that consumer credit used for business purposes should be included in an eventual 1071 rule if trends show increasing usage. However, these SERs acknowledged the potential complexity and burden of trying to identify the intended use of consumer-designated credit, for example, whether a consumer's home equity line of credit will be used for a business purpose.

Several SERs expressly supported excluding consumer-designated credit. One SER asserted that including consumer credit would not support the purposes of section 1071. Another SER stated that including consumer-designated credit used for business purposes would double their cost of complying with an eventual 1071 rule. Another SER asked the Bureau to adopt a clear definition of consumer-designated credit, noting that the Call Report for credit unions treats all loans under $50,000 as consumer credit. This SER advocated for a consistent reporting exemption for credit union business loans under $50,000. Two SERs countered that business loans under $50,000 should be reported by credit unions under an eventual 1071 rule, and one SER stated that if they are excluded from reporting, then the exclusion should apply to all FIs. Relatedly, one SER remarked that smaller loans are often made to women-owned and minority-owned businesses and in rural areas.

## 8.7  SER feedback related to the definition of an "application"

SERs discussed their varied methods of defining what constitutes an "application" within their institutions. Many SERs define an application as the point when there is enough information to make a credit decision. Several SERs define an application as meeting the requirements of a checklist, stating that obtaining all the information and satisfying due diligence can take a long time. Other SERs define an application as the submission of specific data or documents, or obtaining sufficient information about the borrower to pull a credit report. One SER explained that their in-person application process is iterative, not readily definable, and unique for each applicant. The SER also explained that a single underwriting process could be used at their FI for multiple loans requested throughout the year.

Several SERs supported using the Regulation B definition of "application." One of these SERs emphasized the importance of capturing data that may indicate potential discouragement of minority-owned businesses, including discouragement that could occur in advance of an application being submitted for underwriting. Another SER stated that the Regulation B definition would be helpful for training purposes, rather than creating a wholly new definition for purposes of implementing section 1071. Many SERs urged the Bureau to define in an eventual 1071 rule an application as a completed application, that is, at the point when there is sufficient information to render a credit decision. One SER opposed using the definition of "completed application," explaining that it would be too restrictive and less aligned with the purposes of section 1071. Another SER opposed use of the Regulation B definition of application, explaining that in a "relationship lending" model, each small business application is unique.

SERs expressed varying views on whether withdrawn and incomplete applications should be captured. Some SERs felt incomplete applications should be captured in the 1071 data as a potential indicator of discouragement. One SER stated that small and unsophisticated businesses are more likely to leave an application incomplete. Another SER recommended not capturing incomplete applications, asserting that such data would not be informative or useful. Another

AdminRecord-001173

SER expressed concern about whether incomplete or withdrawn applications would include sufficient data for 1071 reporting.

Several SERs urged the Bureau not to require reporting on prequalifications or inquiries. These SERs explained that they encounter a high number of inquiries from rate shoppers asking about qualification requirements and potential rates, many of which are abandoned or otherwise do not progress to a completed application. Several SERs urged the Bureau to exclude line increases as a distinct type of application, explaining that FIs may not require a new application for such requests and that underwriting a line increase request is substantively distinct from underwriting a request for new credit because a line increase extensively relies on past performance data and prior relationships. Due to these differences, one SER suggested that including line increases may skew 1071 data, causing misinterpretations. Several SERs supported the Bureau's proposal under consideration to exclude renewals unless additional credit is requested; one SER also supported excluding solicitations.

Two SERs discussed the issue of multiple extensions of credit resulting from a single application. One of these SERs explained that such multiple extensions of credit are assigned separate application/loan numbers at their FI. The other SER suggested that reporting in this situation will be complex, and that combining the separate loans that could result into a single reporting line would be extremely difficult.

## 8.8   SER feedback related to mandatory data points

SERs provided feedback on nearly all aspects of the data points under consideration, including certain feedback applicable to all data points. Regarding data points generally, most SERs requested that the Bureau make the collection and reporting of data points as simple as possible. Two SERs stated that collecting and reporting the mandatory data points would not pose any issues because they collect them now. A number of SERs urged the Bureau to require collection and reporting of a number of data points based only on information as provided by the applicant. One SER stated that the Bureau should be aware that, as with HMDA reporting, the cost of collecting and reporting the data points will include expensive data quality scrubs in order to avoid negative examination findings. Another SER stated that it will be challenging to standardize the data so reporting can be automated, and that this will likely require significant training and a tremendous amount of human intervention.

Furthermore, some SERs expressed concern about asking applicants to provide certain information (in particular the race, sex and ethnicity of principal owners), as they believed that applicants would feel uncomfortable providing, or even being asked about, that information, and that if applicants are denied credit they might feel it was because of the demographic information they provided. Other SERs that currently collect this information (for example, because they are CDFIs or SBA lenders) indicated that they generally do not have difficulty collecting demographic information from borrowers.

Several SERs suggested that the Bureau develop a system to assist in the collection of demographic information, and possibly other applicant-provided 1071 data, that would avoid the need for FIs to request and store sensitive information about applicants. One SER suggested that this system could also permit applicants to input their addresses for geocoding.

AdminRecord-001174

SERs' feedback on each of the mandatory data points is addressed in turn below.

***Whether the applicant is a women-owned business, a minority-owned business, and/or a small business***. Some SERs currently obtain information regarding whether small business applicants are women-owned and/or minority-owned, such as for SBA loan programs and pursuant to their obligations with the CDFI Fund, but many SERs do not. Several SERs discussed potential difficulties that they foresaw related to collecting and reporting women-owned business status and minority-owned business status. For example, several SERs expressed concerns that small business applicants might feel uncomfortable providing, or even being asked about, women-owned or minority-owned business status, and that discomfort could push them to alternative financing mechanisms, such as consumer purpose credit cards. Conversely, a few other SERs remarked that they did not have particular difficulty collecting minority-owned and women-owned status regarding their small business applicants.

Several SERs urged the Bureau to require collection and reporting of women-owned and minority-owned business status based only on the information the applicant provides. SERs also expressed concerns about the difficulties and costs that may be associated with collecting women-owned and minority-owned business status on some basis other than applicant self-reporting. Concerns raised by SERs regarding the collection of minority-owned business and women-owned business status overlapped with concerns expressed regarding the definitions of "women-owned business" and "minority-owned business" (see section 8.5 above). For example, although many SERs indicated that they review some ownership information about applicants in order to obtain guarantees or for other reasons, most of those SERs said that they do not review the accrual of net profits and loss and some said that they do not review information related to who controls an applicant. One SER said that determining ownership is relatively straightforward, but the issue of control can be subjective. One SER said that it would not be able to determine who controlled an applicant and that an applicant would need to self-report that information. Another SER noted that some small business applicants do not have simple ownership structures. A different SER stated that some FIs do not meet in person with all of the owners of small business applicants.

One SER asked that FIs not be required to collect women-owned and minority-owned business status for subsequent applications within a year (assuming there were no changes in the applicant's ownership structure). Another SER requested that reporting be based on data FIs already report, such as to the CDFI Fund. Some SERs requested that the Bureau develop a uniform collection form to assist FIs with the collection of reporting of minority-owned business status, women-owned business status, and the race, sex, and ethnicity of principal owners.

SERs did not provide feedback specifically on the reporting of small business status. Feedback provided by SERs regarding how small business status would be determined is addressed elsewhere in this report (see section 8.4 above regarding the definition of "small business" applicants, later in this section 8.8 regarding the gross annual revenue data point, and in section 8.9 below regarding discretionary data points for number of employees and NAICS code).

***Application/loan number***. SERs reported varied practices with respect to assigning application and loan numbers. Some SERs stated they do not assign application numbers; some of those SERs indicated, however, that they do assign loan numbers at or before origination. Two SERs

AdminRecord-001175

reported tracking applications and loans using an identification number assigned to the customer. One SER expressed concern about reporting actual loan numbers to the Bureau due to potential identity theft, and requested that the Bureau permit FIs to generate a new application/loan number specifically for 1071 reporting purposes. One SER stated that if an applicant requests more than one type of credit product, a separate application/loan number is assigned to each product request, while other SERs indicated they use a single application number even if multiple products are requested.

*Application date*. Most SERs stated that application date would not be difficult to report, though some suggested different triggers for the reporting of application date. This feedback overlapped somewhat with feedback on the definition of an "application" (see section 8.7 above). Several SERs suggested the date an application is completed and submitted for underwriting review should be the triggering date. Several other SERs expressed support for reporting the date based on when a credit memorandum is generated. One SER suggested that each FI be permitted to develop its own process for reporting application date, so long as it is done consistently. Another SER expressed concern with reporting application date as a general matter, explaining that a date is not currently recorded in their system as a matter of practice. Instead of application date, that SER suggested that FIs report the date the creditor makes a decision on the loan. Several SERs were strongly in favor of the Bureau providing a grace period of several days on either side of the date reported to reduce compliance burden.

*Loan/credit type*. A number of SERs requested certain products be added to the "product type" list; this feedback generally aligned with feedback regarding product coverage (see section 8.6 above). Two SERs suggested that line increases should be excluded (see section 8.7 above regarding the definition of an "application"). Some SERs requested that the Bureau permit multiple types of guarantees to be selected for a single application, and one SER suggested that FHA guarantees be added to the guarantee list. One SER explained that government guarantees and personal guarantees are different—the government guarantee being a credit enhancement and a personal guarantee being a form of collateral.

*Loan/credit purpose*. Some SERs stated that they collect information on loan purpose, although the information they collect may be different from the loan purpose information the Bureau is considering requiring. One SER did, however, suggest that the Bureau's purposes list was similar to their list. Some SERs made suggestions of additional loan/credit purposes to add to the list, including for inventory loans, agricultural loans, and contract financing. One SER requested that the Bureau clarify whether this data point is intended to capture the purpose of the loan or the type of collateral. Another SER recommended combining the categories of motor vehicle finance and equipment finance, explaining that certain financing can span both categories (such as for a truck and a trailer as a combined purchase). One of the SERs expressed concern about possible confusion regarding credit with multiple purposes, and another SER suggested that the Bureau provide clear instructions on this data point. Another SER suggested that the Bureau explain how a line of credit should be reported if there can be multiple lines for different purposes all within the same account.

*Credit amount/limit applied for and credit amount/limit approved.* One SER articulated the importance of capturing data on both the amount applied for and the amount approved, stating that both data points were necessary to identify practices, such as discouragement, in the lending

AdminRecord-001176

process.  Another SER explained that the amount applied for could change during the iterative application process, particularly with a business that may not have had a banking relationship before, but that the amount generally stayed consistent through underwriting.  Other SERs asserted that differences between the amounts requested and approved were frequent, for a variety of reasons.  One SER stated that they notify applicants of a preliminary offered amount, which often changes after documentation and underwriting.  One example offered was that disparities between the amount applicants applied for and the amount the lenders approved may be attributable to collateral being assessed at a different value than the amount the applicants initially requested.  Some SERs also remarked that differences in these amounts were often attributable to FIs acting as counselors or advisors to small businesses, including start-ups, and going back and forth until arriving at an amount that is appropriate given the customer's needs.

One SER (who supported reporting the amount initially applied for and the amount approved) strongly opposed reporting counteroffers, stating that negotiation is quite prevalent in small business lending.  Another SER suggested that the Bureau use ranges for reporting the amount applied for, rather than specific numbers, and that the Bureau allow an FI to report "Not Applicable" if an applicant does not specify an amount requested.  A SER also suggested there could be other potential complexities in capturing data on credit amount/limit the applicant applied for and credit amount/limit the lender approved, such as simultaneous or grouped financings involving multiple products, different sub-limits for each product or loan, and a general credit limit for an entire facility.  SERs asked that these data points be captured in a manner that took these complexities into account.

***Type of action taken and action taken date***.  Most SERs were supportive of the action taken categories under consideration.  Several SERs stated that the categories align with information they currently collect.  One SER explained that a single application could pass through all of these stages and expressed concern that identifying the right category to report may be subjective and questioned by examiners or auditors after the fact.  Another SER asked for additional clarity on the difference between denied applications and incomplete applications.  This SER also suggested adding a category for lenders to indicate if an applicant is rate shopping.

Several SERs discussed the frequency of counteroffers in small business lending and the potential utility of capturing counteroffers in 1071 data.  One SER expressed concern with reporting each adjustment in the application process because, they said, not all counteroffers are memorialized in writing.

When asked whether they would prefer reporting denial reasons to help explain the decision on an application, some SERs expressed concern about reporting denial reasons, asserting that requiring lenders to report reasons for denial could add more burden than benefit, may not be useful given the number of possible reasons for a denial, might not shed light on the actual reasons for a denial, may be difficult to standardize for uniform reporting, would require additional processes to ensure accurate reporting, and may present heightened privacy concerns.  One SER expressed a preference to report denial reasons.

On the action taken date, one SER supported the Bureau's proposal under consideration that the Bureau provide a grace period of several days before and after the action taken date.  Another

AdminRecord-001177

SER recommended that the date assigned be to the best of the FI's knowledge or belief given the uncertainty in assigning a particular date.

***Census tract (principal place of business).***  SERs explained that they generally capture the main office address of small business applicants, which for sole proprietors is frequently a home address; the address where the loan proceeds will be used is typically captured for commercial real estate transactions.  Some of the SERs stated that they do not know the proceeds address, and one suggested that for simplicity the Bureau should use the business address only.

A number of SERs have experience geocoding addresses to obtain census tract information— such as for CDFI Fund reporting, voluntary CRA reporting, or for reporting mortgage loans under HMDA—though some do not.  Some SERs suggested that a requirement to report a geocoded census tract for FIs that do not do so now, would impose costs on the FI and possibly the borrower.  One SER stated that few non-DIs collect or are even familiar with census tract data.  One SER recommended following the format used for CRA reporting of census tract information, rather than the slightly different format used under HMDA.  Another SER suggested that the Bureau provide simple instructions for reporting census tract and employ less burdensome geocoding requirements than exist for HMDA.  Several SERs explained that they use a free service available through the FFIEC to convert addresses they receive from applicants to census tract data.  A few SERs suggested that the Bureau should provide or support a Federal government-sponsored system for the secure batch processing of address data to convert to census tract information that could be used to satisfy geocoding requirements across multiple reporting regimes including 1071.

***Gross annual revenue.***  Many SERs indicated that they collect gross annual revenue information, although they differed in how much they seek to verify this data.  Several SERs requested clarification regarding how gross annual revenue would be reported for startups and other young businesses.  A few SERs stated that they do not capture gross annual revenue at all or collect it only in limited circumstances.  One of these SERs stated that collecting gross annual revenue would be challenging; others suggested they could likely estimate gross annual revenue based on information they do collect.

Several SERs explained that they collect gross annual revenue using different methods and forms of verification for different types of credit.  SERs advocated for allowing gross annual revenue to be reported as provided by the applicant, without an obligation for the FI to verify that information.  A few SERs suggested that applicants often cannot provide accurate gross annual revenue information, although one SER suggested that in their experience applicants are generally able to provide reasonable estimates of gross annual revenue.  Several SERs expressed a preference for reporting ranges for gross annual revenue rather than precise values.  Several SERs also remarked that most businesses take advantage of tax filing extensions and thus typically do not have complete financial information for the prior year until many months later, and asked how that situation should be addressed when requesting applicants' gross annual revenue for the prior fiscal year.

***Race, sex, and ethnicity of principal owners.***  SERs were generally supportive of aligning the race, sex, and ethnicity categories used for reporting demographic information about principal owners in 1071 with the aggregate categories used in HMDA.  However, one SER stated that the

AdminRecord-001178

Bureau should consider revisiting the use of male and female as categories for sex because gender is not binary.

Similar to the data point addressing women-owned and minority-owned business status discussed above, SERs also generally supported applicants' self-reporting of principal owners' race, sex, and ethnicity and strongly preferred that FIs not be required to report based on visual observation or surname analysis. Some SERs said FIs should not be required to guess the race, sex, and ethnicity of principal owners, remarking, among other things, that doing so is both extremely difficult and ineffective, and that collecting demographic information based on visual observation makes staff uncomfortable. Another SER said that reporting demographic information based on visual observation or surname analysis is likely to introduce both error and bias to the process. One SER stated that FIs do not always meet with all principal owners of a business in person and that FIs occasionally meet with a manager or officer who might not be a principal owner. Conversely, another SER stated that—when relying on applicants to self-report demographic information, there are higher rates of non-responses in the business lending context compared to consumer residential lending. This SER suggested that the Bureau's eventual 1071 rule will need to account for this disparity.

Some SERs requested that the Bureau develop a form to assist FIs with the collection and reporting of the race, sex, and ethnicity of principal owners. One SER suggested developing a sample collection form similar to the one used for HMDA data collection, and including the same opt-out disclosures.

Several SERs expressed familiarity with FinCEN's CDD rule, and supported aligning with that rule's 25 percent ownership standard for defining a "principal owner" for 1071 purposes. One SER said that aligning definitions with the CDD rule would be logical and efficient. Another SER supported use of the CDD rule's concepts in determining who was a principal owner. Other SERs said they currently collect this information for beneficial owners at or above 20 percent in order to comply with SBA or other requirements and suggested aligning with that standard instead.

## 8.9   SER feedback related to discretionary data points

SERs provided detailed feedback on the discretionary data points that the Bureau is considering. One SER stated that the cost of collecting and reporting the discretionary data points under consideration would be significant, and another SER stated that the Bureau should include as few data points as possible to avoid unnecessary costs. Another SER stated that the Bureau should finalize a rule with just the statutorily required data points and avoid adding any discretionary data points. That SER suggested that if the Bureau does include discretionary data points, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters, similar to the partial data point exemption approach taken under HMDA.

Other SERs favored or opposed the inclusion of some or all of the individual discretionary data points, as discussed below. Two SERs stated their support for the inclusion of all four discretionary data points under consideration. One of these SERs suggested that the Bureau also collect information regarding the way the application was taken (in person, by phone, or on-line)

AdminRecord-001179

in order to monitor possible discouragement of applicants.  The other SER suggested that the Bureau also collect credit score information.

***Time in business***.  Many SERs currently collect time in business information, explaining that time in business information is valuable for measuring risk in underwriting.  However, some SERs collect this information on their application forms or keep it as part of a general narrative in a credit memorandum about the application, but do not retain it as a specific data field in their systems.  Some SERs capture time-in-business information by recording the year, or month/day/year, of incorporation; others capture it as the number of years the applicant has been in business.  One SER stated that they do not support the inclusion of time in business as a data point in the NPRM, although they could collect this information.

Several SERs stated that they use State incorporation filings to determine or verify time in business.  Some SERs explained that they view a business as a start-up if it has been in business either less than two or less than three years.  For one SER, time in business is relevant for the specific line of business for which financing is sought, rather than the length of time the applicant has been in some business generally.  Another SER suggested that the Bureau use ranges for time in business reporting, similar to a suggested method for collecting and reporting gross annual revenue.

***Number of employees***.  Many SERs indicated that they do not collect number of employees; one of these SERs stated that they do not support the inclusion of this data point in an eventual 1071 rule, although they could collect this information.  Several SERs suggested that there could be particular complexities in accurately capturing this data, particularly regarding how part-time and seasonal employees and contractors should be counted.  Some SERs stated that they collect number of employees but do not verify that information.

***NAICS code.***  A number of SERs stated that they collect NAICS codes from small business applicants for a number of reasons, such as understanding their concentration of credit in certain industries or to comply with SBA, CRA, or CDFI Fund requirements.  Two SERs stated that collecting NAICS codes for 1071 would be useful for FIs to improve their understanding of small business lending markets.  Of the SERs that currently collect NAICS codes, the majority said they capture the more precise 6-digit code; the remainder collect industry information based on the broader 2-digit code.  One SER that currently collects NAICS codes stated that reporting the 2-digit version would be less burdensome than reporting 6-digit NAICS codes.  A few SERs do not collect NAICS codes from their applicants.  Some SERs that collect NAICS codes from applicants stated that they do not verify the information, while some collect it from or verify it against other documents, such as tax returns.  (See section 8.4 above for feedback received regarding the use of NAICS codes as part of the definition of "small business" applicants.)

***Pricing***.  Some SERs urged the Bureau to require reporting of a pricing metric, stating, for example, that pricing data is essential to understanding the operation of the market and the nature of credit extended.  Some SERs supported use of annual percentage rate (APR) as a pricing metric, including several who stated that they currently calculate APR.  One SER (a CDFI) stated that they disclose APR to their applicants now, and that if they are able to easily collect and report this data point without additional cost and burden, other FIs should be able to do the same.  Several SERs supported the use of APR to enable comparisons of pricing across various

AdminRecord-001180

small business lending products, and suggested the Bureau look to state-mandated and Truth in Lending Act APR disclosures for guidance on methodologies. One SER supported the use of APR as the metric if lenders and not the Bureau did the calculation. Another SER suggested the Bureau collect detailed pricing information, including APR, but "hold harmless" the reporting FIs to ensure the accuracy of the data. Conversely, at least two SERs opposed using APR as a pricing metric; one cited the burden associated with making that calculation and the other said pricing information based on APR would be confusing to small business owners.

Several SERs supported reporting pricing information as interest rate and fees. Two SERs preferred using total cost of credit (TCC). One SER suggested that the Bureau consider allowing FIs to choose which pricing metric they prefer to report.

Several SERs were concerned about the Bureau potentially making public pricing data and felt that this choice could be costly and challenging to carry out, and that bad outcomes could result from possible unjustified fair lending concerns, such as distortions to the market through interference with risk-based pricing. Many SERs remarked that pricing is complex and often unique to the applicant's situation, and may involve extra services bundled with the loan, and without adequate context pricing data could lead to inaccurate interpretations and reputational damage to financial institutions. One SER stated that the market for small business credit is competitive on price and that this data is not necessary for section 1071. Another SER said that pricing for some products may reflect more than just the cost of the loan and may be high relative to other credit products if the covered FI is a supportive lender working with less established or higher credit risk applicants over a period of time. Some SERs also expressed privacy-related concerns regarding public disclosure of pricing information (this feedback is discussed in section 8.14 below).

## 8.10 SER feedback related to the timing of data collection

Most SERs that addressed the issue of timing for data collection indicated that they plan to collect 1071 data, and particularly race, sex, and ethnicity data, early in the application process and at the time an application is initially being completed. These SERs felt that the longer they wait to request 1071 data, the more difficult or infeasible it will be to gather the information from applicants. One SER that is currently required to collect race, sex, and ethnicity information for certain government programs remarked that they have had success in gathering this type of data early in the application process. Another SER urged the Bureau to give FIs flexibility to explore optimal timing for collection of 1071-required demographic information so to maximize the response rate and without discouraging applicants from pursing the application. This SER suggested that race, sex, and ethnicity data should be collected during the application process, but before the application is considered complete. Another SER stated that race, sex, and ethnicity data may be difficult to obtain, especially early in the application process, if obtaining credit is delegated to an officer, employee, or other third party who may lack relevant knowledge concerning the applicant's principal owners. One SER asserted that FIs currently collect few, if any, of the 1071 data points at the time of an application.

AdminRecord-001181

## 8.11 SER feedback related to shielding data from underwriters and other persons (firewall)

Many SERs suggested that restricting access to demographic information obtained for purposes of the 1071 rule (*i.e.*, minority-owned business status, woman-owned business status, and the principal owners' race, sex, and ethnicity) would be difficult for their institutions. Additionally, several SERs that take in-person or paper applications or that have very limited commercial lending staff stated that it would be costly or impossible for them to restrict access to such demographic information by underwriters and other persons involved in making determinations concerning applications from small businesses. One SER indicated that, if the Bureau does not allow a notice to applicants pursuant to section 1071(d)(2) in situations where restricting access to demographic information is not feasible, they might leave the small business lending market entirely due to the significant costs they would incur hiring additional staff or a third party in order to appropriately restrict access to demographic information. In contrast, several SERs that operate entirely online said that it would be relatively easy for them to restrict access to demographic information. Another SER said that they could restrict access to demographic information for applications they receive online (though not for paper applications), but that it would necessitate an overhaul of their online system.

SERs were supportive of providing a notice to applicants in lieu of restricting access to demographic information obtained for purposes of the 1071 rule. Several SERs indicated a preference for providing this notice to all applicants, not just those specific applicants whose demographic information was likely to be accessed by underwriters and others making decisions regarding applications. One SER requested that the Bureau clarify when an FI would be permitted to provide a notice in lieu of restricting access to demographic information. Another SER said that use of the notice should be optional. This SER suggested that requiring the use of a notice may cause confusion for the applicant and have unintended consequences of causing unfounded claims of discrimination if the application is denied. Another SER asked that, if the Bureau provided sample language for the notice, that the Bureau provide it in English as well as in other languages, such as Spanish. However, one SER cautioned that many people do not read notices and disclosures, and another SER suggested that FIs would not want to provide a notice because the loan process already involves too much paperwork. One SER stated that sample language for a notice should include a statement that underwriter access to demographic information is not detrimental and that such access is necessary due to the small size of the lender.

## 8.12 SER feedback related to applicants' right to refuse to provide certain information

Some SERs were concerned that, if notified of their right to refuse, applicants may not provide demographic information, thus limiting the usefulness of 1071 data. One SER agreed with the Bureau's proposal under consideration to limit the right to refuse to demographic data only. Several SERs requested that the Bureau provide sample language for use in any disclosure and collection forms in which an applicant's right to refuse is stated, so that applicants understand why lenders are requesting demographic information and how the information will be used. Two

AdminRecord-001182

SERs asked that that Bureau provide sample language in English as well as in other languages, such as Spanish.

## 8.13 SER feedback related to compiling, maintaining, and reporting 1071 data to the Bureau

SERs offered limited feedback on these aspects of the proposals under consideration. One SER requested clarification on the statutory provision barring submission of personally identifiable information (PII) to the Bureau, and specifically asked whether FIs were permitted to keep such information in their own loan-level records.

With respect to reporting 1071 data to the Bureau, several SERs noted that they already report much of the data that a 1071 rule would seem likely to require to the Treasury Department's CDFI Fund. One SER requested that the Bureau coordinate with the CDFI Fund on consistency of definitions, types of data collection, and timing of reporting, and that the agencies should consider streamlining reporting requirements through data sharing. One SER suggested that data reporting be done on a calendar year basis, to avoid half-year measurements. Another SER requested that the Bureau permit FIs to report 1071 data on an ongoing basis rather than once a year, which would make reporting less burdensome by completing it along the way as applications are received or loans are made. One SER cautioned against aligning the annual reporting dates for section 1071 with the reporting dates for HMDA, noting that reporting for both regimes at the same time could strain resources.

One SER expressed strong support for the Bureau's proposal under consideration that the public be directed to access 1071 data via the Bureau's website, rather than requiring FIs to provide the data themselves upon request.

## 8.14 SER feedback related to privacy considerations involving Bureau publication of 1071 data

This aspect of the proposals under consideration generated considerable discussion among the SERs. Many SERs were concerned about the possibility of the Bureau publishing data identifying individual FIs or in other ways that could make the information traceable to specific applicants, a concern that was strongest in the feedback of SERs operating in rural areas.

Specifically, a number of SERs were concerned that full disclosure of all 1071 data would result in the re-identification of small business applicants or borrowers and potentially harm their privacy interests. Some SERs stated that it would be easy to reidentify small businesses in remote or rural areas (for instance, the only gas station serving a particular county). Several SERs asserted that public knowledge of borrowing activity (even without any other potential harms) would be very concerning to some small businesses as some small business owners consider that information sensitive or deeply personal. One SER stated that small business owners valued their privacy just as much as consumers. Another SER stated that publishing gross annual revenue information for sole proprietorships could be akin to disclosing the personal income of consumers. A SER also stated that disclosure of denial reasons (if the

AdminRecord-001183

Bureau were to require it) would be humiliating for applicants and might discourage them from applying for loans.

Relatedly, one SER said that the collection of 1071 data, including personal or demographic information, could seem like an intrusion of privacy by the FI, particularly to minorities, and thus prospective applicants may decide to seek financing elsewhere. Another SER raised concerns that some prospective applicants' distrust of the Federal government (and concern over how 1071 data will actually be used) might adversely impact their ability to lend to the communities they serve.

In response to these concerns, SERs offered a variety of suggestions. Regarding the risk of potential reidentification based on geography, one SER suggested that covered FIs be able to flag certain application records that the FI felt were at risk for being easily reidentified, triggering further analysis by the Bureau before full loan-level data was published. Another SER suggested the reporting of geographic data only at the State level or higher, because even county-level data in some areas could potentially lead to reidentification of applicants or borrowers. One SER suggested that the Bureau set a minimum sample size before publicly disclosing loan-level data for some rural markets to avoid harm.

One SER offered a contrary view on privacy, asserting that there has not been a single demonstrated incident of re-identification using HMDA data. The SER stated that 1071 data can be robustly disclosed without raising privacy concerns if appropriate safeguards are put in place, such as using tools for making data less precise (the SER suggested, for example, bucketing, ranges, and intervals). Two other SERs supported aggregating and banding data to reduce the risk of re-identification, stating that such measures were particularly important to protect privacy in "banking deserts" where there are few FIs making loans to small businesses.

Some SERs expressed concern about privacy for an FI's own information under a 1071 data release. A number of these SERs stated that 1071 data could be used to generate marketing lists, resulting in an FI's competitors stealing small business customers. Two SERs suggested, by contrast, that it was relatively easy to obtain information on other FIs' small business lending activity. One SER said that a consequence of this could be that FIs choose to cease lending to small businesses in certain markets. Two SERs stated that they were more concerned about the privacy of small business applicants or borrowers than the privacy of FIs, but that both mattered.

Several SERs were particularly focused on information regarding pricing and pricing structure being commercially sensitive to FIs. One of these SERs suggested that even aggregate pricing information was commercially sensitive data for an FI. While acknowledging other SERs' concerns, a few SERs stated that information on competitors' pricing is relatively easy to obtain now.

Some SERs were concerned that published 1071 data could be used against FIs in litigation by class action attorneys or to harm their public reputations. One SER was concerned that published 1071 data could lead to increased litigation and thus a higher cost of credit for small businesses. Another SER expressed concern that pricing information could be misinterpreted by users of 1071 data (for example, according to the SER, higher pricing for one race might be used to infer discrimination when the pricing was in fact unrelated to the race of the applicant). The

AdminRecord-001184

SER noted that the purpose of section 1071 was to help small businesses, and asserted that releasing full 1071 data would present an opportunity for third parties to sue or criticize FIs. Several SERs suggested that a solution to their concerns about FI privacy would be for the Bureau not to release the names of FIs when publishing 1071 data.

In comparison to the number of SERs expressing general privacy concerns, fewer SERs offered feedback on the balancing test itself. Several SERs said they appreciated the difficulty the Bureau faced in trying to balance transparency and fairness in the marketplace with privacy interests. One SER said the balancing test appeared to be subjective, indeterminate, and dependent on the limitations of agency staff who may not understand the challenges FIs face in building and maintaining their businesses.

Several SERs suggested that, to address the privacy risks posed to both small businesses and FIs, the Bureau should not publish loan-level or applicant-level data at all, but instead just aggregate data or provide general statistics. Other SERs emphasized the importance of public disclosure of 1071 data. One SER said that the 1071 rule could be a model for the marketplace and pro-innovation if implemented with checks and balances. The SER also said that more transparency would help governments and FIs understand what strategies are successful in reaching women-owned and minority-owned small businesses and shed light on the marketplace and pricing overall. Other SERs identified specific data points they believed were particularly important to publish. Those SERs emphasized the importance of publishing pricing information (specifically captured as APR) together with product type for understanding the cost and availability of financing products to small businesses, the importance of NAICS code or other industry information for determining which industries are getting funding generally, and the importance of census tract or other geographic information for understanding the extent of lending to low-to-moderate income small businesses.

Two SERs raised concerns that the transmission of 1071 data to the Bureau could give rise to the risk of a data security breach involving PII. One SER requested that FIs be held harmless if there were a data security breach for which the Bureau was responsible.

## 8.15 SER feedback related to the implementation period

SERs generally supported a two-year implementation period. Several SERs with completely online operations felt that two years was sufficient time to implement the eventual 1071 rule; some estimated that they could do it in less time. Some other SERs that do not have primarily online operations and do not have experience with other Federal data reporting regimes such as HMDA said it would be hard to project how long implementation would take, but that it could potentially take three years or more. One SER said that two years would not be enough as currently there are no data collection vendors for 1071 compliance. Another SER said clear and concise definitions were important and expressed frustration that definitive answers to compliance-related questions (whether from the Bureau or third-party vendors) can be hard to come by, which could stymie implementation efforts. One SER suggested that it was overly optimistic for other SERs (mostly CDFIs) to say they would be able to implement 1071 quickly.

A SER requested that the Bureau regularly check in with vendors and FIs to ensure compliance preparations are progressing as expected and consider extensions if issues arise. A few SERs

AdminRecord-001185

suggested that the Bureau adopt a grace period of some kind during which FIs would not be penalized for erring in trying to comply with a 1071 regulation. This grace period would be akin to the first year revisions finalized in 2015 to Regulation C (implementing HMDA) were effective, when examinations were used to troubleshoot and perfect data reporting rather than penalize reporters.

## 8.16 SER feedback related to potential impacts on small entities

### 8.16.1 SER feedback related to the Bureau's impact methodology

As discussed in section 3.15 above, for the purposes of estimating costs for the eventual 1071 rulemaking, the Bureau adapted the cost methodology from previous HMDA rulemaking to the small business lending framework. To capture the relationship between complexity and cost, the Bureau developed three representative FI types, reflecting low, medium, and high levels of complexity. The Bureau defined complexity based on seven dimensions: systems, integration, automation, geocoding, completeness checks, edits, and compliance program. For the impact analysis, the Bureau then developed a unique set of assumptions and cost estimates for each FI type.

Most of the SERs confirmed that to estimate costs FIs can be categorized based on the complexity of their compliance operations. One SER stated that there is a large difference between the medium complexity and high complexity representative institutions and the methodology would benefit from a fourth category between those two levels. A few SERs noted that their FIs have a higher acceptance rate on applications than the Bureau assumed for each representative FI type. Several SERs suggested that the Bureau should include business model or FI type as an additional dimension of complexity. Several SERs remarked that, while their FIs have very automated processes in place, they frequently still have to manually collect information. Five SERs identified themselves as Type A FIs (least complex), two SERs identified as type B (moderately complex), one SER identified as type C (most complex), one SER identified as between types A and B, one SER identified as between types B and C, and the remaining SERs did not identify a type.[31]

In general, SERs did not provide much feedback on the structure of the 15 activities the Bureau used to form its estimates of ongoing costs. Two SERs remarked that the activities that comprise the Bureau's ongoing costs estimates did not include the time to collect the information itself. The Bureau assumed for purposes of the Outline that SERs will develop application forms to collect the data points that would be self-reported by applicants; one SER explained that it would take staff time to verbally gather some of the data points from applicants. Another SER suggested that the process may not be linear, requiring the FI to go back and change data points if they receive updated information, particularly for those data points for which the Bureau is considering requiring verified data if verification is performed.

---

[31] The Bureau's classification of FIs into three broad tiers according to the overall level of complexity of their compliance operations (*i.e.*, Type A, Type B, and Type C FIs), and the resulting typical approach to certain aspects/dimensions of compliance costs based on level of complexity, is discussed in detail in part IV.D of the Outline.

AdminRecord-001186

Two SERs who identified as Type A complexity stated that the Bureau's assumption that low volume or Type A institutions use exclusively external auditing was not accurate for their institutions. One SER indicated that they perform internal audits despite being a small institution and the other remarked that while they do not have an internal auditor, per se, they do have employees that perform that function.

### 8.16.2 SER feedback related to one-time costs

The Bureau conducted a survey regarding one-time implementation costs for section 1071 compliance targeted at all FIs who extend small business credit. The survey was open for responses between July 22, 2020 and October 16, 2020. The Bureau granted the SERs an additional two weeks after the deadline to provide survey responses directly to the Bureau via email. The Bureau plans to use responses from the survey and feedback provided by the SERs to estimate one-time costs for the NPRM.

The SERs confirmed that the eight categories that the Bureau uses to capture the components of one-time costs are accurate. The SERs had a variety of feedback on their anticipated one-time costs. SERs primarily differed based on how much data their FI is currently required to report. Several SERs that are CDFIs explained that they already report many of these data points for existing reporting requirements and, as a result, they anticipate very small one-time costs to prepare for 1071 reporting. One SER (a community bank) stated that they had difficulty estimating the one-time costs because they do not currently report anything similar to what is under consideration for section 1071, as they do not report under HMDA or CRA and do not report to the CDFI Fund. A few SERs remarked that it was difficult to estimate one-time costs without knowing all of the details of the rule. One SER (a fintech company) stated that they do not anticipate any one-time costs. Two SERs estimated that one-time costs would be between $15,000 and $25,000 without a detailed breakdown of those costs. One SER provided a detailed breakdown of costs and estimated that total one-time costs would be $27,000.

Several SERs stated that changes to their computer systems would contribute to their one-time costs. A few SERs remarked that they might modify their systems in order to create new fields. One SER (a commercial finance company) said that many FIs in their industry have no experience reporting data such as will be required under an eventual 1071 rule and that their current developer estimates that the costs just to develop, test, and integrate their system could be up to $200,000. Another SER (a bank) estimated that it would cost approximately $5,000 to upgrade their system. One SER mentioned that they may decide to update their entire system sooner than expected in response to the eventual 1071 rule, which would cost an estimated $125,000. (However, not all of that cost would be attributable to changes needed to comply with the eventual 1071 rule.)

Several SERs suggested that they would rely on third parties to develop the capability to collect and report data under the eventual 1071 rule. Many SERs use third-party software to track their loans. Two SERs mentioned that they would wait to see what software services third parties offer before deciding how to comply with the eventual 1071 rule. One SER mentioned hiring a third party to train their staff on how to comply. One SER stated that they will rely on third parties to develop policies and procedures. Another SER said they will have to hire a third party to conduct a legal compliance review.

AdminRecord-001187

Several SERs had suggestions for how the Bureau could defray small FIs' one-time costs. Two SERs stated that the cost of developing policies and procedures will depend on how clearly the Bureau provides guidance. One SER suggested that the Bureau could work with trade associations to develop best practices. Several SERs agreed that the Bureau could reduce the costs associated with upgrading software by building a system that would permit applicants to provide their information directly to the Bureau.

### 8.16.3 SER feedback related to ongoing costs

The SERs had a variety of feedback on the Bureau's estimates of ongoing costs. Two SERs, one bank and one credit union, who offered specific dollar amounts during the discussion indicated that they expected annual ongoing costs to be around $9,000 and $2,500-$3,000, respectively. Two SERs that are CDFIs stated that the increased ongoing costs will be minimal and one SER who is a digital lender stated that the ongoing costs will be negligible. Several SERs indicated that there is currently too much uncertainty to fully provide costs estimates at this point.

In addition to overall estimates, several SERs provided feedback on where the ongoing costs estimates from the Bureau are likely too low. A number of SERs remarked that the annual training costs estimates were likely too low. One SER estimated that training costs should be around 20 percent higher and several suggested that the number of employees the Bureau is assuming for training costs on an annual basis is too low. One SER, for example, stated that everyone who interacts with customers will need to be trained and several indicated that the scope of employees who will require training includes administrative and management staff, as well as those directly involved in the credit process.

Several SERs asserted that the audit costs, particularly for Type A institutions, are too low. One SER offered that, instead of the Bureau's assumed $500-$1,000 for an external audit, the cost would likely be closer to $3,500. Two SERs asserted that audit costs would not depend on number of loans as much as the Bureau's estimates suggest, but that the audit estimate for Type B would likely also apply to Type A institutions. One SER indicated that the Bureau's assumption that Type A institutions do not conduct internal audits is incorrect. Two SERs also suggested that, based on their experience with HMDA examinations, the Bureau's estimates of examination preparation and assistance are too low. Additionally, two SERs said that checking the data will be a significant ongoing cost, with one SER estimating that doing so will cost around $2,000 in employee time for their institution to perform this activity and the other asserting that their institution will need to contract for a third party to check the data. One of these SERs explained that the potential for negative examination results due to poor data quality increases the amount of time and expense to clean and check the data.

SERs also made several other specific comments about the ongoing cost estimates. One SER stated that the hourly compensation the Bureau was using for cost calculations is assuming employees are too junior given the complexity of the process and should be around $25 higher. Another suggested that the transcribing data costs estimate is too low. One SER remarked that researching questions and the annual subscription cost of 1071 data management or geocoding software is too low. Lastly, several SERs suggested that the Bureau consider the opportunity cost of the institution's time being used for small business data collection purposes instead of assisting customers.

AdminRecord-001188

### 8.16.4 SER feedback related to additional potential impacts of the eventual 1071 rule

Two SERs expressed concern about the possible standardization or homogenization of business credit products in response to the eventual 1071 rule. One SER stated that they would not predict standardization in the credit process as they expected to continue creating individualized products according to customers' needs. A number of SERs indicated concern about the potential effects on public perception of their FIs and the possibility of having to defend themselves from unjustified accusations and possibly even lawsuits. Some of those SERs indicated that the data collected under the eventual 1071 rule would not be sufficient to explain legitimate differences in rates of denial or interest rates. Several SERs suggested that small business applicants' distrust of both the government and FIs could result in data collection under the eventual 1071 rule turning away customers who may feel that their information would be misused if supplied.

### 8.16.5 SER feedback related to the cost and availability of credit to small entities

When asked if they expected the costs of the eventual 1071 rule to be passed on in the form of higher rates and fees, a number of SERs (from banks, credit unions, and non-DIs) indicated that they expected to do so at their institutions. However, a number of other SERs indicated that they did not believe an eventual 1071 rule would result in higher rates or fees. Several DI SERs said that they would be able to absorb the costs in their operating budgets as they have with previous regulations.

SERs generally indicated that they did not expect the costs of the eventual 1071 rule to affect the small business loan product mix that they offer. One SER did state that they have business loans that look very similar to consumer loans and that could be recategorized as consumer loans to avoid the reporting costs under the eventual 1071 rule.

Several non-DI SERs indicated that sizeable cost increases could lead to a tightening of their underwriting standards or other changes, such as altering their product mix or an increase in their minimum loan amount. Additionally, one SER suggested that with high enough fixed costs of compliance, state usury limits could affect the provision of credit to higher risk borrowers. Two SERs stated that they would not change any underwriting standards as a result of increased costs.

Generally, SERs did not suggest that they would leave the small business lending market in response to increased costs under the eventual 1071 rule. One non-DI SER did indicate that smaller firms in their industry may stop participating if one-time costs are too high, particularly if small business lending is a secondary aspect of their business model. Another non-DI SER indicated that significantly increasing the time between application and decision could occur due to the eventual 1071 rule requirements, which they said would threaten their ability to compete with other lenders.

AdminRecord-001189

# 9. Panel findings and recommendations

## 9.1  Findings regarding number and types of small entities affected

For the purposes of assessing the impacts of the proposals under consideration on small entities, "small entities" are defined in the RFA to include small businesses, small nonprofit organizations, and small government jurisdictions. A "small business" is defined by the SBA's Office of Size Standards for all industries in the NAICS. The Bureau has identified several categories of small entities that may be subject to the proposals under consideration: DIs (such as commercial banks, savings associations, and credit unions), online lenders/platform lenders, non-DI CDFIs, lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, cooperatives, and non-profit lenders. According to the SBA's Office of Size Standards, DIs are small businesses if they have $600 million or less in assets. The maximum size standard for any of these non-DIs to be considered small is $41.5 million in average annual receipts, though several have lower thresholds (see table 3 below).

Table 3 provides information from the 2019 Call Report (Commercial Banks, Savings Institutions, and Credit Unions) and the Census Bureau's Statistics of U.S. Businesses for 2012 (all other categories) on the total number of entities and the total number of small entities within each NAICS industry that may be subject to the proposals under consideration. The NAICS categories are likely to include firms that do not extend credit that would be covered by the proposals under consideration. In a few NAICS categories, only a very small number of firms are engaged in small business lending and would therefore be covered by the eventual 1071 rule. For example, category 813410 includes entities such as social clubs and scouting organizations as well as other entities, most of which will not be engaged in lending covered by the proposals under consideration.

**Table 3: Total number of entities and total number of small entities that may be covered under an eventual 1071 rule, by NAICS industry**

| NAICS industry | NAICS code | Small entity threshold | Estimated number of total entities | Estimated number of small entities |
|---|---|---|---|---|
| Commercial banks and savings institutions | 522110; 522120 | $600 million | 5,177 | 3,929 |
| Credit unions | 522130 | $600 million | 5,348 | 4,837 |
| Sales financing | 522220 | $41.5 million | 2,347 | 2,097 |
| Consumer lending | 522291 | $41.5 million | 3,260 | 3,135 |
| Real estate credit | 522292 | $41.5 million | 3,233 | 2,854 |
| Mortgage and nonmortgage loan brokers | 522310 | $8 million | 7,007 | 6,843 |
| Financial transactions processing, reserve, and clearinghouse activities | 522320 | $41.5 million | 2,465 | 2,325 |

AdminRecord-001190

| NAICS industry | NAICS code | Small entity threshold | Estimated number of total entities | Estimated number of small entities |
|---|---|---|---|---|
| Commercial air, rail, and water transportation equipment rental and leasing | 532411 | $35 million | 613 | 566 |
| Civic and social organizations | 813410 | $8 million | 24,687 | 24,334 |

Table 4 provides the number of small DIs that the Bureau estimates may be covered by the eventual 1071 rule based on the coverage metrics and thresholds under consideration, based on small loans to businesses of all sizes by banks and commercial loans by credit unions in 2018.[32]

**Table 4: Small entity DIs covered under potential exemption metrics and thresholds under consideration[33]**

| Threshold considered for coverage (FIs below threshold would be exempt) | # of small credit unions covered under each threshold | # of small banks/savings institutions covered under each threshold |
|---|---|---|
| Originations of 25 loans or $2.5 million or more | 293 | 3,554 - 3,690 |
| Originations of 50 loans or $5 million or more | 189 | 3,026 - 3,221 |
| Originations of 100 loans or $10 million or more | 93 | 2,199 - 2,447 |
| $100 million in assets or more | 1,129 | 2,888 |
| $200 million in assets or more | 572 | 1,675 |

## 9.2    Findings and recommendations regarding related Federal laws and regulations

As discussed in section 2.3 above, the Bureau in its Outline identified other Federal statutes and regulations related to small business lending that have potentially duplicative, overlapping or conflicting requirements with section 1071. SERs also provided suggestions of other potentially related Federal statutes and regulations. The statutes and regulations identified by the Bureau and by SERs include HMDA, CRA, the SB Act, and the Community Development Banking and

---

[32] The Bureau uses 2018 as a base year for these estimates because that is the most recent year for which the necessary data are available. In particular, the Bureau relies on CRA data for estimates of DI coverage.

[33] Table 4 presents a range of estimates for the number of banks/savings institutions covered by the activity-based thresholds based on internal Bureau calculations because not all banks and savings institutions report originations of small loans to businesses. The table reports the exact numbers of credit unions covered by the activity-based thresholds based on the number of originations that credit unions report on their call reports. However, credit unions only report loans made to businesses with origination amounts greater than $50,000. The Bureau did not estimate the number of loans to small businesses that credit unions make with origination amounts less than $50,000. As a result, the Bureau expects that more credit unions that will be required to report under each threshold than what is reported in this table. The table reports exact numbers of DIs covered by the asset-based thresholds because all DIs report total assets on the call reports.

AdminRecord-001191

Financial Institutions Act of 1994 which established the CDFI Fund. Some SERs also identified other statutes they believed had some potential intersections with section 1071, including the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act, and the Gramm-Leach-Bliley Act, which is implemented in part by Regulation P.

The Panel recommends that the Bureau continue to evaluate the extent to which these and other Federal laws and regulations have potentially duplicative, overlapping, or conflicting requirements with section 1071, and that the Bureau continue to coordinate with the other Federal agencies responsible for relevant laws and rules.

## 9.3   Compliance burden and potential alternative approaches

Based on the oral and written feedback from SERs on the Bureau's proposals under consideration, as summarized in section 8 above, the Panel has the following recommendations.

### 9.3.1   General recommendations

The Panel recommends that the Bureau issue implementation and guidance materials (including a small entity compliance guide as required by the RFA, as well as other materials), specifically to assist small FIs in complying with the eventual 1071 rule. The Panel also recommends that the Bureau consider providing sample disclosure language related to the collection of race, sex, and ethnicity information for principal owners as well as women-owned and minority-owned business status.

### 9.3.2   Recommendations regarding scope of the rulemaking

The Panel recommends that the Bureau continue to explore whether the data collection and reporting requirements in its 1071 rule should be limited to any application to an FI for credit only for small businesses (as defined by the Bureau's regulation) or whether it should also extend to applications for women-owned and minority-owned businesses that are not small. The Panel also recommends that the Bureau seek comment in the NPRM on the costs to small FIs of collecting and reporting 1071 data regarding applications for credit for women-owned and minority-owned businesses that are not small (as defined by the Bureau's regulation).

### 9.3.3   Recommendations regarding definition of "financial institution" (lender coverage)

The Panel recommends that the Bureau continue to explore whether either or both a size-based or activity-based test might be appropriate to determine whether an FI must collect and report 1071 data or should be exempt, given section 1071's statutory purposes. The Panel also recommends that the Bureau continue to explore whether the fixed costs of coming into compliance with an eventual 1071 rule might cause certain FIs to reduce or cease lending to small businesses, as it considers the possible exemptions for FIs based on size and/or activity, along with any alternative approaches.

AdminRecord-001192

### 9.3.4    Recommendations regarding definition of "small business" applicants

The Panel recommends that the Bureau seek to adopt a definition of "small business" that is easy for small business applicants to understand and straightforward for FIs to implement, while still collecting comprehensive data regarding lending to small businesses.  As the Bureau noted in the Outline, adopting a simplified approach will necessitate close coordination with, and approval from, the SBA.  The Panel also recommends that the Bureau consult with the SBA Administrator and the SBA's Division Chief for the Office of Size Standards in advance of issuing an NPRM to implement section 1071 in order to determine whether any of the three alternatives for a "small business" size standard set forth in the Bureau's Outline, or another alternative that would be easy for small business applicants to understand and implement, should be included in an NPRM put out for public comment.

Further, the Panel recommends that the Bureau continue to explore how information that small FIs may or may not currently collect from small business applicants (specifically, gross annual revenue, number of employees, and NAICS code) might inform the potential selection of an alternative for a "small business" size standard.

### 9.3.5    Recommendations regarding definitions of "women-owned business," "minority-owned business," and "minority individual"

In light of SERs' concerns regarding certain aspects of the statutory definitions of "women-owned business" and "minority-owned business," the Panel recommends that the Bureau seek comment in the NPRM on potential interpretations of the definitions of those terms that would clarify them for purposes of the eventual 1071 rule, to ensure that small business applicants are able to understand questions based on these definitions (for the data point regarding women-owned and minority-owned business status).

The Panel also recommends that the Bureau consider clarifying that, consistent with the aggregate categories for race and ethnicity in HMDA, a "minority individual" is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino.  In addition, the Panel recommends that, similar to HMDA, the Bureau considers permitting applicants to select multiple race and ethnicity categories.

### 9.3.6    Recommendations regarding product coverage

The Panel recommends that the Bureau continue to explore the extent to which covering MCAs or other products, such as factoring, would further the statutory purposes of section 1071, along with the benefits and costs of covering such products.

The Panel recommends that the Bureau address in the NPRM whether it intends to cover agricultural and real estate-secured loans in the eventual 1071 rule.

The Panel recommends that the Bureau continue to explore the potential costs to FIs associated with reporting consumer-designated credit used for business purposes in the eventual 1071 rule as well as the implications of including such credit in a small business lending data set.  In

AdminRecord-001193

addition, the Panel recommends that the Bureau seek comment in the NPRM on how best to define consumer-designated credit used for business purposes in the event the Bureau determines that an exclusion for such products is appropriate.

### 9.3.7    Recommendations regarding definition of an "application"

If the Bureau proposes using the Regulation B definition of the term "application" for 1071 data collection, the Panel recommends that the Bureau consider clarifying when a completed application—*i.e.*, an application sufficient to make a credit decision—falls within the Regulation B definition of the term "application." The Panel further recommends the Bureau seek comment in the NPRM on the benefits and costs of collecting 1071 data on incomplete or withdrawn applications. In addition, the Panel recommends the Bureau seek comment in the NPRM on whether to include line increases as a separate reportable application.

### 9.3.8    Recommendations regarding mandatory data points

Regarding data points in general, the Panel recommends that the Bureau consider proposing in the NPRM that applicant-provided data points be self-reported by the applicant only, without an obligation for the FI to verify the information provided by the applicant.

The Panel's recommendations regarding each of the mandatory data points are addressed in turn below.

***Whether the applicant is a women-owned business, a minority-owned business, and/or a small business***. In order to assist both small FIs and small business applicants, the Panel recommends that the Bureau consider creating sample collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of this data point. The Bureau should additionally consider providing these sample collection forms in other languages, such as Spanish. (Other Panel recommendations relevant to this data point are addressed in section 9.3.5 above regarding the definitions of "women-owned business," "minority-owned business," and "minority individual.")

***Application/loan number***. The Panel recommends that in the NPRM the Bureau consider proposing to permit FIs to report "dummy" application/loan numbers assigned specifically for 1071 reporting purposes, rather than the numbers they use internally.

***Application date***. The Panel recommends that the Bureau seek comment in the NPRM on how best to define "application date" for the eventual 1071 rule in light of how it decides to propose defining an "application."[34]

***Loan/credit type and loan/credit purpose***. The Panel recommends that the Bureau consider modifying the product type, guarantee, and loan/credit purposes lists in accordance with the various suggestions made by SERs.

---

[34] The Panel's recommendations regarding the definition of an "application" are addressed in section 9.3.7 above.

AdminRecord-001194

The Panel recommends that the Bureau seek comment in the NPRM on how FIs currently handle increases in lines of credit and how best to require reporting of this data point for multiple lines of credit within the same account.

***Credit amount/limit applied for and credit amount/limit approved.*** The Panel recommends that the Bureau seek comment in the NPRM on potential methods for avoiding misinterpretations of disparities between the credit amount/limit applied for and the credit amount/limit approved.

***Type of action taken and action taken date***. The Panel recommends that the Bureau further clarify the circumstances in which each of the action taken categories should be used. The Panel also recommends the Bureau seek comment in the NPRM on whether to capture counteroffers in 1071 data, and if so, the best method for doing so.

***Census tract (principal place of business)***. The Panel recommends that the Bureau seek comment in the NPRM on the feasibility and ease of using existing Federal services to geocode addresses in order to determine census tract for 1071 reporting purposes (such as what is offered by the FFIEC for use in reporting HMDA data).

***Gross annual revenue***. In light of SER feedback supporting the Bureau's proposal under consideration to not require FIs to verify gross annual revenue information, the Panel recommends that the Bureau proceed with that approach in the NPRM. The Panel also recommends that the Bureau explore the timing of tax and revenue reporting, and seek comment in the NPRM on how that timing can best be coordinated with the collection and reporting of this data point.

***Race, sex, and ethnicity of principal owners***. In order to assist both small FIs and small business applicants, the Panel recommends that the Bureau consider creating sample collection forms that, to the extent possible, simply and clearly explain the information being requested for purposes of this data point. The Panel also recommends that the Bureau additionally consider providing such sample collection forms in other languages, such as Spanish. In addition, the Panel recommends that in the NPRM the Bureau propose to align its rule with concepts of ownership and control that exist in other Federal regulations with which FIs are already complying, to the extent possible.

### 9.3.9   Recommendations regarding discretionary data points

***Time in business and number of employees***. If these data points become part of the proposal, the Panel recommends that the Bureau continue to explore ways to minimize the burden to small FIs of collecting and reporting these data points.

***NAICS code***. If this data point becomes part of the proposal, the Panel recommends that the Bureau continue to explore ways to minimize burden on both the small FIs collecting this information as well as the small business applicants who need to provide it, for example the possibility of collecting the 2-digit NAICS code rather than the 6-digit code.

AdminRecord-001195

*Pricing*.  If this data point becomes part of the proposal, the Panel recommends that the Bureau seek comment in the NPRM on potential methods for avoiding misinterpretations of disparities in pricing.

### 9.3.10  Recommendations regarding the timing of data collection

The Panel recommends that the Bureau seek comment in the NPRM on whether it is necessary to specify a time period specifically for the collection of 1071-required demographic data, and if so, what would be the best period to designate.

### 9.3.11  Recommendations regarding shielding data from underwriters and other persons (firewall)

The Panel recommends that in the NPRM the Bureau propose to permit FIs to provide a notice to applicants instead of restricting access to demographic information if it is not feasible for the FI to restrict such access.  The Panel also recommends that in the NPRM the Bureau propose a clear feasibility standard that takes into account the costs of establishing and maintaining a "firewall" to limit access by underwriters and other persons, as well as clear guidance on what information is subject to the firewall requirement.

### 9.3.12  Recommendations regarding applicants' right to refuse to provide certain information

The Panel recommends that the Bureau consider developing sample disclosure language that FIs may use to provide some context as to why applicants are being asked to provide demographic information, in order to encourage applicants to respond.

### 9.3.13  Recommendations regarding compiling, maintaining, and reporting 1071 data to the Bureau

The Panel recommends that the Bureau seek comment in the NPRM on these aspects of a 1071 rule, and how best to implement them in a manner that minimizes cost and burden to small FIs. The Panel also recommends that the Bureau explore ways to streamline reporting for small FIs.

### 9.3.14  Recommendations regarding privacy considerations involving Bureau publication of 1071 data

The Panel recommends that the Bureau seek comment in the NPRM on the range of privacy concerns articulated by SERs, including potential reidentification of small businesses and FIs, as well as the types of privacy harms and sensitivities the unmodified release of 1071 data could cause to FIs and small business applicants.

The Panel also recommends that the Bureau seek comment in the NPRM on the potential benefits of publishing unmodified 1071 data, especially given section 1071's statutory purposes of facilitating fair lending enforcement and business and community development.

AdminRecord-001196

The Panel further recommends that the Bureau offer more detail in the NPRM on the balancing test it is considering and how it is proposing to apply the balancing test to the 1071 data fields that the Bureau decides to propose. The Panel also recommends that the Bureau seek comment in the NPRM on how it should design and implement the balancing test.

### 9.3.15 Recommendations regarding implementation period

The Panel recommends that the Bureau seek comment in the NPRM on the sufficiency of a two-year implementation period, and in particular what aspects of a 1071 rule might require more or less time to implement. The Panel further recommends that the Bureau seek comment in the NPRM on ways to facilitate implementation for small FIs, particularly those that have had no experience with any kind of Federal data reporting regime.

### 9.3.16 Recommendations regarding potential impacts on small entities

The Panel recommends that the Bureau incorporate feedback from SERs and analysis from the Bureau's one-time cost survey in its estimation of one-time costs for purposes of its consideration of costs and benefits in the NPRM, and to seek comment in the NPRM on its revised estimation of one-time costs of implementing the eventual 1071 rule.

The Panel recommends that the Bureau consider incorporating ongoing costs suggestions from SERs into the Bureau's estimation methodology for purposes of its consideration of costs and benefits in the NPRM, and to seek comment in the NPRM on its estimation of ongoing costs of implementing the eventual 1071 rule.

The Panel recommends that the Bureau continue to explore with small FIs the extent to which they believe compliance costs will pass through to small businesses or affect the composition of the small business credit market.

AdminRecord-001197

# APPENDIX A:  WRITTEN FEEDBACK SUBMITTED BY SMALL ENTITY REPRESENTATIVES

Written feedback submitted by the following SERs is attached:

- Chris Enbom, AP Equipment Financing
- Joel Schiller, Artisan's Bank
- Ryan M. Warner, Bippus State Bank
- Landon Capdeville, Floorplan Xpress
- Barry Feierstein, Fundation Group LLC
- Ryan Metcalf, Funding Circle
- William J. Bynum (letter from Diane Standaert), Hope Credit Union
- Brooke Van Vleet, InRoads Credit Union
- Kwesi Rogers, Kore Capital Corporation
- Tawney Brunsch, Lakota Funds
- Robin Romano, MariSol Federal Credit Union
- Luz Urrutia, Opportunity Fund
- Julieann Thurlow, Reading Cooperative Bank
- Sarah Getzlaff, Security First Bank of North Dakota
- Debbie Jones, UT Federal Credit Union

AdminRecord-001198

November 9, 2020

Consumer Financial Protection Bureau
SBREFA Panel Staff for Section 1071 Proposal

To whom it may concern:

The following submission is in coordination with my participation in the CFPB's SBREFA panel held during October of 2020, and the underlying proposal upon which the SBREFA panel was asked to review.

Once significant concern that I have with the proposal is that I believe that asking for pricing data without asking for credit data is dangerous and can lead to misinterpretations. In order to gain a fair and complete picture regarding the lending environment to small businesses, a complete profile of the lender must be taken by the CFPB if pricing data is collected. Pricing data in a vacuum only tells a small part of a lender's story, and the data is likely to be ammunition for other lenders and lawyers with nefarious aims.

As an example, AP Equipment Financing provides a myriad of services to our customers as part of our financing to our last mile delivery customers. Our company maintains a pool of new specialized vehicles for our customers that we order in conjunction with large commercial fleet dealers. We have a transportation department that handles delivery of the trucks. All of our services are bundled with financing. In addition, we generally require no down payment and other banks require a down payment.

In addition, we finance the whole credit spectrum.

Bank Leasing Company "A" may get business from brokers who know exactly what the credit window is, so their approval rates may look better. In addition, bank "A" only approves Tier 1 credits and only sees Tier 1 credits from the brokers.

AP finances all types of FedEx contractors from start-ups to Tier 1 credits. Contractors know they pay slightly more for our services because they are bundled. So if we just put out pricing, our approved transactions may look something like:

| Company | Term | Rate | |
|---|---|---|---|
| Company A | 72 Months | 5.9% | 50,000 |
| Company B | 60 Months | 9.5% | 50,000 |
| Company C | 48 Months | 14% | 50,000 |
| Company D | 60 Months | 5.9% | 50,000 |
| | | | |
| | | | |
| AVERAGE | | 8.825% | |

What you do not know, is that company B has a tax lien and poor credit, and company C has no operational history. Both would be declined by Bank Leasing Company.

The Bank Leasing company may look like the following:

| Company | Term | Rate | |
|---|---|---|---|

50

| Company A | 60 Months | 4.9% | 50,000 |
|---|---|---|---|
| Company B | 60 Months | 4.9% | 50,000 |
| Company C | 48 Months | 5.9% | 50,000 |
| Company D | 60 Months | 4.9% | 50,000 |
| | | | |
| | | | |
| AVERAGE | | 5.15% | |

Again, in a vacuum this data makes our company look like a bad actor, even though we have provided credit to customers who would normally not be eligible for credit, and we are providing bundled services.

For the borrower, with enough data it is also possible to triangulate to find data regarding individuals or groups of borrowers that is not data those borrowers want released into the public domain. We had the example of the one plumber in the Warm Springs Indian Reservation in Central Oregon – a very small community with very few providers of any services. It may be possible to triangulate data back to the borrower, who may already be distrustful of government to begin with. This may force certain borrowers to decline to provide the data.

AP believes strongly you should stick to the original intent of the law. What small businesses are applying for credit and which companies are being denied. What is the size of those businesses and ethnic and gender status of the ownership of the companies.

Expanding the scope of data collection and reporting could have consequences to lenders and borrowers you did not intend.

Making the data public, especially when mixed with pricing and other data (without underlying credit data) that could paint a deceiving picture of a lender, will only be used by competitors and bad-acting class action lawyers for personal gain, with the end result being less competition for lenders to riskier businesses.

Keep the data within the CFPB and use it as a starting point to determine internally if institutions might be discriminating. Don't allow data, especially data that paints an incomplete picture, to be released to the public to be used as a witch hunt. You may find a couple witches, but you will likely harm many other valid companies providing great lending services to minorities along the way.

Additionally, we strongly suggest that the CFPB exempt smaller lending institutions at a size much larger than is being considered. The overwhelming majority of lending is done by very large banks and other financial players. In our market, institutions like Ford Motor Credit, Daimler Financial, Wells Fargo Commercial Credit, Key Bank and other large institutions dominate the lending landscape. Companies like ours are small sliver of overall loan volume, and we generally have higher cost of funds and higher operating costs per transaction. At the same time, we provide valuable lending to many businesses, a large percentage of which are minority owned businesses. Increased regulation and reporting will continue to push smaller lenders out of the market.

Lastly, we urge the CFPB to have a portal which will allow data regarding ethnic and gender status to be collected directly from our potential customer, eliminating any potential compliance issues within our

AdminRecord-001200

small company.  This is the concept originally proposed by the Equipment Leasing and Finance Association, of which we are a member.  We believe technology should allow the CFPB to collect the data and upon completion of a form instantaneously notify finance companies.

I appreciated the opportunity to serve on the SBREFA panel.  I appreciate the fact you are listening to smaller stakeholders.

Best Regards,

*Chris Enbom*

Chris Enbom

52

AdminRecord-001201



November 05, 2020

Consumer Federal Protection Bureau
c/o **2020-SBREFA-1071@cfpb.gov**
Small Entity Representative Response Letter

### Artisans' Bank Overview

Artisans' is a Mutually Owned Community Bank in Wilmington Delaware owned by our depositors since 1861. We have 12 branches all within Delaware. Our CRA Assessment area includes all three counties in Delaware but does not include any census tracts that exist in the contiguous counties within these metropolitan areas. As a market footprint, however, we do include the contiguous counties in PA, MD, and NJ.

At December 31, 2019, Artisans' maintained a Balance Sheet of $541 million, with total loans of $390 million. Commercial Real Estate represented $192 million; Commercial and Industrial loans $35 million; Construction loans of $46 million; and Residential Real Estate of $117 million.

Within the C&I category, Artisans' offers commercial loans and lines for working capital, asset acquisitions, and equipment financing, a streamlined small business product for our smallest customers, and a variety of commercial real estate loans. Our Commercial Real Estate portfolio includes Owner Occupied and Non-Owner Occupied commercial and retail space, hotels, and office buildings as well as loans to finance the construction or acquisition of non-owner occupied residential (1-4) and multi-family properties. Our loan size is typically <= $1 million, (average of $275,000) although we also make larger loans up to our legal lending limit.

Our Small Business Lending product is a streamlined credit product for our smallest commercial borrowers. The underwriting requirements for this product are less detailed and the loans can be approved and funded quickly. The product is typically capped at $150M and is focused on C&I opportunities. Small business real estate lending, given their more extensive documentation requirements, is traditionally underwritten as a commercial real estate loan.

As an Intermediate Small Bank, we continue to optionally report CRA Small Business Data annually. We do so because we continue to maintain our internal data collection processes and the formal reporting of the data, does not represent a burden to our institution.

1

AdminRecord-001202

Our 2019 CRA Small Business Register contained 107 Small Business loans for $29 million; no small CRA Farm loans, and 1 Community Development loan for $148,000, that wasn't otherwise reported in our HMDA or CRA filings. We also identified four other commercial transactions for $4.2 million that have strong CRA Community Development attributes which we retain for CRA Examiner review – so we are looking forward to being able to submit potential community development transactions for advanced regulatory consideration under the DFA 1071 proposals.

Our Bank's detailed feedback on the DFA 1071 proposals follow. We hope you find this information useful when crafting the proposed regulations.

### Detailed DFA 1071 Feedback

**Exemptions** – As a mutually owned community bank, originally established to serve the Artisans (or working people) of Wilmington Delaware, Artisans' Bank supports the spirit, as well as, the technical requirements of the Community Reinvestment Act. As such, Artisans' supports the proposals which include as many lenders as possible in the 1071 data collection and reporting process. In our view, this is why the CRA law was passed and why we remain an optional reporter of the current CRA small business data. To us, the collection of data provides important fair lending information which outweighs the costs of establishing and maintaining these data collection and reporting processes.

**Definition** – Artisans' supports the proposals to simplify the definition of what is a small business loan. As a non-SBA lender, in our opinion, this should ideally be the same over under $1Million GAR Call Report definition that we use for CRA data collection and reporting. If this method is not permissible under the proposals, we would support option 1, then option 2. We prefer an over under or range approach to income and not a precise GAR amount. We do collect and utilize the global cash follows of not just our borrowing entity but their affiliated entities. We currently do not collect the number of employees or time in business but could add these to our data collection process. We are supportive of reporting the NAICS code with each transaction (as we already determine this information) and are supportive of using a simplified two-digit NAICS code. Option 3 is way too complicated in our opinion.

**Self-Identification** – Artisans' strongly supports the proposals which rely on the applicant's own statement of whether a business is minority and/or women owned – with no obligation to verify the information. Similar to HMDA GMI and BSA Beneficial Ownership, there must be a uniform format for the collection of this attestation, and we support collecting this data at the time of application. There will be compliance costs to not only collecting the information (several minutes per loan) but we are more concerned about the anticipated zero-tolerance audit and compliance cost impacts, which based on our experience based on the HMDA GMI and BSA Beneficial Ownership data collection rules, are significant.

**Exclusions** – Artisans' supports proposals which exclude consumer designated credit. Artisans' does not deal with Leases, Trade Credit, Factoring, or Merchant Cash Advances. While Artisans' would support proposals to include the reporting of commercial credit granted for the purpose of acquiring, improving, or refinancing non-owner occupied residential real estate, there needs to be an exclusion for borrowers who own less than three such properties. We do a lot of commercial lending in this business segment, which in our opinion, is not small business lending, but private entity lending to high-worth individuals.

2

AdminRecord-001203

**Application** – Artisans' does not use a written application for its business lending, although we do have an internal mechanism to determine the application date and an application number. Artisans' supports the grace period concept and suggests that each data reporter be allowed to define their application date; as long as they report the date consistently. Artisans' also supports the proposals to exclude line of credit renewals, unless additional funds are advanced; as most our business line of credit renewals are administrative with only a one or two-year duration.

**Amount** – Artisans' support proposals to report the original amount requested versus the amount approved, so that the data is meaningful. We would strongly oppose reporting all counteroffers, however, as negotiation is quite prevalent with small business lending. Also, collateral based lending is highly LTV dependent on the determined value of the collateral.

**Discretionary Elements** – Artisans' supports the proposals to report a simplified NAICS code. We do not support proposals to report number of employees or the time in business, however, we could collect this information. We strongly oppose the proposals to report APR. APR would be a burden as we do not calculate an APR for our business lending and our systems would require modification to accommodate APR. Moreover, some small business loans are very complex and calculating an APR, that would provide meaningful information about the loan, would be extraordinarily challenging. We also do not support reporting specific denial reasons, which we do collect on business loans but would need to establish internal processes to ensure the reasons reported are accurate.

**Pricing Info** – As we mentioned, Artisans' is strongly opposed to reporting APR. We would be willing to be willing to report the Interest Rate and the specific fees (origination/prepayment) that we collect on business loans and the term of the loan.

**Firewall** – Artisans' has concerns around the firewall concept. As a community bank, typically only our lenders (and maybe their administrative assistants) have direct contact with our borrowers. These lenders already provide the HMDA GMI disclosure to our commercial applicants and are already involved in the loan approval process. It would be an added expense to insert another party into this process. Also, due to our community bank mission and our support of CRA, we want to make loans to underserved groups and therefore we want our lenders to be involved in the customer contact process.

**Reporting** – As an alternative to the Bureau's proposals for reporting the data, Artisans recommends combining the reporting of the 1071 data with the current CRA small business reporting requirements. In our opinion, maintaining a separate 1071 register would be an added expense to maintain, scrub, and report.  Artisans' does not support proposals for the public release of data, unless it is redacted to prevent identification of the borrower or the bank.  If the consumer agencies wishes to access the 1071 data, they should interact directly with the Bureau and not involve the data reporters.

**Costs** – We have completed and submitted a 1071 Cost Survey and have estimated our one-time costs as approaching $27,000 and our ongoing annual expenses as approaching $7,500.  We consider ourselves a Type A institution and we voluntarily reported 107, 97, and 87 small business loans on our last three CRA Small Business Registers.

Our cost information support is as follows:

**1071 Cost Survey**

R1.    Bank

R2.    Urban

R3.    Facilitated PPP loans through a third-party platform (Lendio)

3

AdminRecord-001204

R4.    CRA Definition.  (Loan Amount; GAI; we collect NAIC

R5.    Between $250M-$600M (slightly over $600M as of Sept 30, 2020)

R6.    Equally Split between business lines and loans and CRE.  No Ag.  No optional.

R7.    Info not readily available

R8.    51% - 75%

R9.    Minimally Automated

R10.    We collect all the mandatory data points

R11.    HMDA.  Optional CRA

R12.    $7,000 in HR Expense (Plus External Costs See Below)

R13.    Inhouse

R14    N/A

R15.    Both.  Initially by Compliance – External Before Next Exam

R16    No

R17.    One Time Costs $20,000 (See next page)

R18.    $9,000 in Ongoing Costs (See next page); $20,000 in External Costs

R19.    Accept Lower Profits

R20.    None

|  | $82 hr. | $55 hr. | $27 hr. |  |
|---|---|---|---|---|
| General Preparation | 35 hours | 5 hours | 5 hours |  |
| Updating Comp Systems | 5 hours | 1 hour | 1 hours | $5,000 est. |
| System Testing & Validation | 5 hours |  |  | $5,000 est. |
| Forms and Applications | 10 hours |  |  | $5,000 est. |
| Training | 5 hours | 1 hour x 10 | 1 hour x 10 |  |
| Policy Procedure | 5 hours | 5 hours |  |  |
| Post Implementation |  |  |  | $5,000 est. |
| **Totals** | **$5,000** | **$1,000** | **$1,000** | **$20,000** |

4

AdminRecord-001205

| Training | 6 hrs. = $500 | 1 hr. = $500 | 1 hr. = $500 |
| --- | --- | --- | --- |
| Compliance Audits | | | $3,500 est. |

### Conclusion

As a mutually owned community bank, originally established to serve the Artisans' (or working people) of Wilmington Delaware, Artisans' Bank supports the spirit and the technical requirements of the Community Reinvestment Act and Section 1071 of the Dodd-Frank Act. As such, Artisans' supports those proposals which include as many lenders as possible in the 1071 data collection and reporting process. And while we would love to be excluded from a cost perspective; in our view, inclusion is why the CRA law was originally passed and why we remain an optional reporter of the current CRA data.

That being said, simplification should be everyone's overriding objective. Simplification in determining who is excluded, what products are excluded, defining a small business loan; data reporting processes, and clarity around the mandatory and discretionary data points are all important issues to us. Also important to us, would be limiting the 1071 data to fair lending audits and not subjecting it to the wide berth of technical audit and compliance requirements. We support keeping the 1071 data reporters out of the public disclosure arena: include a disclosure on how the public can access the data at the bureau, eliminate the need for the data reporters to maintain any type of "Public File", and provide the means for the public/consumer advocacy agencies to interact directly with the bureau.

Thank you again for allowing me to participate in the SBREFA process.

Respectfully

JOEL SCHILLER

Joel Schiller
SVP & CRO: Compliance & CRA Officer
Artisans' Bank
2961 Centerville Road
Wilmington, DE 19808

Cc:
Jennifer A. Smith, U.S. Small Business Administration, Office of Advocacy
Lindsay M. Abate, U.S. Office of Management and Budget, Office of Information and Regulatory Affairs

5

57

| From: | Ryan Warner |
|---|---|
| To: | 2020-SBREFA-1071 |
| Subject: | SBREFA Panel Feedback. |
| Date: | Friday, October 30, 2020 10:52:28 AM |

CAUTION: This email originated from a non-government domain. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact Cybersecurity Incident Response Team (CSIRT) at 202-435-7200 or report a suspicious email.

This email is to provide feedback from the two days of SBREFA Section 1071 panel discussions. Not sure of the proper format for this feedback, so I will just list item by item;

I will begin by stating that when I use the term "small business", I am also referring to women owned and minority owned businesses as well. I am just trying to shorten my narrative.

**Exemption of Ag loans –**
Ag loans are a specialized type of loan with specific underwriting characteristics. There is no such thing as a "start up" ag loan. Farming requires considerable capital investment for someone to "decide" to start farming. The closest thing to a start up farmer is a relative of a current farmer that has an opportunity to farm a small piece of farm land or has the chance to purchase some farm ground. This person is already working on the family farm, has knowledge of farming and has access to farm equipment that he does not have to rent or own. We utilize the Beginning Farmer Guarantee Program which is through the USDA/FSA (Farm Service Agency). To qualify you must be in a certain age range and/or limited experience and is unable to obtain credit elsewhere.

There is another program that is run through the USDA. This program is for Minority and Socially Disadvantaged Farmers Assistance. This provides help to those qualifying farmers and ranchers so that they are aware and can navigate through the myriad or farm programs, guarantee assistance and risk management help the USDA offers.

Because Ag loans are distinct and separate from "business loans." not likely considered or designed to be covered by 1071. I believe that Ag loans should not be included as a covered product under a 1071 rulemaking.

Should Ag loans not be exempted, then Farm Credit Services **MUST** be required to report their loans as well. They are the single largest Ag lender in the country. There would be no reason to require other lenders to report Ag loans and Farm Credit be allowed to be excluded.

**Location Test and Exempting Rural Lenders**

The CFPB should create a 1071 location test that should follow very closely or mirror the rule that HMDA follows for lender exemption. Under HMDA, a bank that does not have a home or branch office in a MSA is not subject to regulation C (regulation implementing HMDA).

**Capturing 80 Percent of Data while Burdening only 20 Percent of Industry**.

The small number of total loans that each rural lender makes will not affect the validity of the info

58

AdminRecord-001207

that is received from the larger lenders. The 80/20 rule certainly applies where 80% of all loans will be captured by 20% of the lenders. The other 80% of lenders, primarily small rural lenders not in an MSA and serving small communities, will provide the other 20% of the small business loans. Those 20% of banks however will spend 80% of the total cost because of the complete start from ground zero on this type of data capturing process. The large banks already have data capture software and processes in place for HMDA. I do not see the necessity of burdening these small banks with this cost to provide data that is only going to compliment and not add unique perspective to the data provided by large banks. I would state a cost vs benefit analysis would show that very little additional useful information is being obtained for the huge costs all the banks would have to spend to provide this information.

I surveyed 6 other community banks across northern and central Indiana and asked them what percentage of business loan applications or requests are approved. I received a consistent 80 t0 90 percent of requested small business, women owned and minority owned applications are approved. This number is equally consistent with my bank.

**CFPB Portal**

I brought up the possibility of a portal, managed by the CFPB that would allow small lenders to access a portal and  submit the info on a loan by loan basis. This process could be implemented as part of the closing document preparation. If small rural lenders are required to report, this would allow those lenders to avoid some sort of costly data maintaining and subsequent reporting of small business loan data software. Addresses would be part of the data provided and could automatically be geo-coded immediately through this portal. This data checklist could be maintained with the loan file for any examiner to review or could be scanned into a separate file. I am not in favor of that, as it adds an additional step in the closing process and can be missed through simple human error. Leaving the data sheet in the loan file for future need would be the easiest. Obviously if banks wanted to scan into a central file, they could.

**Application Date**

When a small business is interested in obtaining a loan or wants to discuss the possibility of asking for a loan, this process is never the same between any two borrowers. Some small businesses come in prepared with more information than you need while others will be bring in one piece of information at a time. A business tax return can be completed months before the personal return is completed. We would need both to properly underwrite the loan. We would also need info on the collateral being used, a personal financial statement since the borrower will be asked to guarantee the loan personally in virtually every case. Once the needed info is received, the underwriting can be completed. This underwriting could be used for multiple loan requests throughout the year. My suggestion for "Application Date" would be the date the loan is approved or denied after underwriting is finished.

**Loan Amount**

The NCUA does not consider loans below $50k as commercial loans purely from a safety and

59

AdminRecord-001208

soundness perspective in the NCUA's call report.  These loans are still recognized as "commercial loans" by NCUA but are not necessarily required to be underwritten as such.  I propose that these loans need to be reported by each credit union.  If they are allowed to be excluded, then all lenders should be provided that same $50k and under reporting exclusion.

**Privacy**

Any reporting structure that is created should not allow any data being obtained and reported be able to be traced back to a particular small business.  The public data should be in some sort of aggregate that would require small business anonymity.  In large urban areas where there are many small businesses this would not be a problem.   In a small community where there is one tool and die shop, or one Mexican restaurant, or one auto repair shop or whatever the business, the public data cannot be so granular as to be able to identity a particular business in a community.

I again want to thank the CFPB for allowing me to participate in this process.  I look forward to continuing to participate in this process in any way that I can provide value.  The industry of community banking is to important to small and rural communities across our county and I am happy to be a champion of this cause.

Thanks again.


**Ryan M. Warner**
*Chairman & CEO*



*Bippus State Bank*
*150 Hauenstein Road, PO Box 1148*
*Huntington, IN  46750*

*T: 260.356.8900  F: 260.356.8787*
*www.BippusBank.com*

60

AdminRecord-001209

Statement Submitted to the Consumer Financial Protection Bureau
SBREFA Session for Section 1071 of the Dodd-Frank Act
October 21-22, 2020

Statement Submitted by Landon Capdeville, Vice President, Floorplan Xpress, LLC

61

AdminRecord-001210

Thank you for the opportunity to participate as a Small Business Representative (SER) for the SBREFA Panel convened October 21-22, 2020.  I appreciate the opportunity to provide a written statement regarding the implementation of section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1071.

My comments refer mainly to small business loans made by small non-bank financial institutions and those lenders which serve as an ancillary to another business to drive sales. However my recommendations, where appropriate, apply to larger traditional financial institutions as well.

There has been significant discussion and research concerning section the impact of section 1071.  Common concerns focus on redundancies and burdens potentially placed banks which currently report data under the Community Reinvestment Act (CRA), Equal Credit Opportunity Act (ECOA) Home Mortgage Disclosure Act (HMDA), along with other reporting requirements of regulated financial institutions.

There has been limited discussion and focus as to the impact on non-bank lenders which primarily serve small business, many of which are women and minority owned.  These small lenders are an underrepresented class of lender which, while not in the spotlight, play a vital role in providing essential credit to small business in the United States.

The stated purpose of section 1071 is to "facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."15 U.S.C.1691c-2(a).

The intended purpose of provision 1071 is commendable. However, an unfortunate reality of well-intended regulation is the unintended consequences.  Too often additional regulations result in unforeseen burdens. The potential burdens of section 1071 could make it difficult for small lenders to feasibly meet the requirements which could negatively impact their ability to continue to extend credit to small businesses.

AdminRecord-001211

1071 will bring with it, new regulations requiring many lenders to report data, many of these lenders have never been required to report information.

Small lenders are often able to serve the needs of small businesses more effectively than large institutions, as small lenders have the flexibility and latitude to make loans based on factors outside those typically relied on by larger institutions.

If section 1071 is implemented in a manner which adversely affects small business lenders, especially those for which lending is not their primary business, many of those companies may withdraw from lending to small businesses.

As small lenders leave the market due to increased reporting and compliance costs, the overall credit available to minority-owned, and small businesses in general will be reduced, negatively impacting the women-owned, minority-owned, and small businesses section 1071 was intended to protect.

It is imperative that any regulation be crafted carefully to avoid unintended consequences which would impair the ability of small lenders to continue to provide financing and credit for small business.

**Define small business**

The CFPB should set a clear definition of small business. This definition should not require lenders use the North American Industry classification system (NAICS) codes to determine if the company is a small business.

Adapting a simple gross income revenue benchmark, to identify if a business is a small business would significantly reduce the burden of reporting particularly for those lenders who do not use or have any knowledge of the North American industry classification system (NAICS.)

In finalizing the definition of small business, it should be clear that a person who obtains consumer credit is outside the scope of 1071. The stated purpose of section 1071 is to help facilitate and monitor small business lending to women owned and minority owned small business. It should be made clear that the provision relates only to small businesses.

**Data collection and disclosure**

Section 1071 requires lenders identify women-owned, minority-owned, and small businesses. Additional data collection includes but is not limited to: race, sex, and ethnicity of the business owners, the type and purpose of the loan, amount of credit applied for, credit approved, the business's gross annual revenue, and "any additional data that the [CFPB] determines would aid in fulfilling the purposes of this section."

63                                                    3

AdminRecord-001212

This overly broad catch-all language implies the CFPB has extensive latitude in determining the volume and breadth of data points required under Section 1071. This language, if implemented could lead to the addition of multiple data fields increasing the complexity and cost of reporting data by financial institutions.

The CFPB needs to establish a clear and concise list of the fewest number of data points possible. Lenders must be able to easily report collected data in order to minimize the burden and related costs.

All collected information should be limited to an aggregate level data set with limited public disclosure.  Steps must be taken to eliminate the possibility that sensitive information can be traced back to an individual, their business or any specific financial institution.

Publicly accessible information should not contain specific transaction information, identifiable products, narrowed geographical information or lender information. Disclosure of such information could allow competitors access to customer data and proprietary information. 1071 is not intended to serve as a source for customer data mining and marketing. Any and all necessary steps should be taken to prevent the misuse of data.

The CFPB has under consideration allowing the collection and reporting of information be based solely on applicant self-reporting.  The CFPB could adopt the small business registration process advocated by the American Financial Services Association (AFSA) and the Equipment Finance and Leasing Association (EFLA). Businesses would register with CFP and submit data on whether they are a women or minority owned business, race, sex, ethnicity, census tract, and gross annual income. The existing standard penalties for false reporting to a federal agency would apply, to improve the accuracy of reporting.

Women owned and minority owned businesses could use the CFPB website to submit all required information. If they qualify as a small business a CFPB small business number would be issued.  Lenders would only be required to report that number along with the application results (e.g. loan approved or denied, counteroffer, etc.). Only the CFPB would know which small businesses with a CFPB small business number are women or minority owned businesses.

Utilizing a self-reporting system would benefit small lenders by relieving them of the burdens related to the collection and reporting of data.

Financial institutions should be able to rely on self-reported information submitted by the applicant when applying for credit. It should not require lenders independently /3rd party verify data. Much of the self-reported data it is not readily verifiable and a requirement to do so would result in additional time and expense to the lender.

Annual renewals of credit lines, or line increases should not be reported as applications. In certain industries credit lines and loans limits may fluctuate from season to season.  A small

64

4

business may receive an increased credit line during a certain time of year but will not have filled out an application.  If renewals and line increases are considered applications and must be reported the lender will be unable to comply without significantly changing how they do business. Intermingling loan renewals and credit line changes may skew the data causing misinterpretation.

**Defining Financial Institution**

Under section 1071(h)(1) a "financial institution" is defined as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." [1]

The Bureau has under consideration a proposal to create a general definition for "financial institution" consistent with the definition of financial institution in section 1071.[2]   This overly broad definition contains the ambiguous term "financial activity" which itself does not have a standardized definition and could be applied to a myriad of entities. It can only be assumed the broad definition is not intended to include all business entities who are engaged in any financial transaction.
It is not appropriate nor viable to attempt to interpret the intent of such a broad definition. The definition of financial institution must be clear and specific. Financial institutions must be identified as only those lenders involved in lending to small business as it pertains to the implementation of section 1071.

**Unintended consequences**

1071 reporting requirements will impact traditional banks, credit unions, and depository lenders along with small non-bank lenders.  Many of the small non-bank lenders who loan to small businesses have never considered themselves to be "institutions" of any type.  Under 1071 these small lenders would be considered financial institutions and subject to reporting requirements.

Non-bank financial institutions neither collect nor report data on small business financing. Many small non-bank financial institutions have very few employees, each who wear several hats throughout the day.  Many of these small lenders focus on relationship lending rather than statistical reports to determine loan eligibility. Often these small lenders have customers for many years who have revolving lines of credit, agricultural loans, inventory financing to name a few.

It is not feasible for these small lenders to create a firewall so the underwriter is not aware of the race, ethnicity or sex of the applicant. In small financial institutions the employee who

---

[1]  15 U.S. Code § 1691 c-2(h)1.
[2] Small Business Advisory Review Panel for CFPB Small Business Lending Data Collections Rulemaking, Discussion Guide for Small Entity Representatives, 2020

AdminRecord-001214

gathers the information for the application is often involved in the underwriting and loan approval process.

Non-bank financial institutions collect very few, if any, of the data points at the time of an application as required by Section 1071[3] in the ordinary course of business. Often there is no data gathered during a credit line extension or credit line increase.  These small non-bank financial institutions rely on relationships and past payment history of the borrower to determine credit eligibility.

Among the proposed data points is census tract data, it is safe to say that small financial institutions do not collect information on the census tract. The applicant's address is gathered during the credit application process, however few non-bank financial institutions collect the census tract data, most don't know what census tract data is. Requiring such information would require additional training, system modification, programming and increased costs of compliance.

Many of these non-bank financial institutions do not understand the myriad of acronyms used in the daily communications of regulated financial institutions and government agencies like the CFPB.  While this may seem laughable at first it is an example of momentous challenge in implementing 1071. CFPB must be prepared to allocate adequate resources for education and training.

Examples of financial institutions, which generally are not well known, but almost exclusively serve small business include equipment, vehicle, and revolving lines inventory financing companies.   Also included would be those businesses for which lending their focus but rather an ancillary designed to enhance their core business. (See the Appendix for an example of inventory financing as an ancillary to an auto auction)

The cost of data collection, complying with data security requirements and burden of reporting a large detailed amount of information is a serious concern. The combination will likely be enough for many of these small lenders discontinue lending. If this occurs less credit will be available to the small businesses.

Under 1071 the CFPB has the authority to exempt financial institutions from its data

---

[3] The data points identified for reporting under section 1071 include:
- Application number;
- application date;
- type and purpose of the financing;
- amount applied for;
- amount approved;
- type of action taken and action taken date;
- census tract of the principal place of business;
- gross annual revenue in the last fiscal year of the applicant preceding the date of the application; and
- information about the race, sex, and ethnicity of the business principal owners.

6

AdminRecord-001215

collection requirements: "the Bureau . . . may conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."[4]

The CFPB should consider an exemption for financial institutions which meet certain criteria. The American Financial Services Association (AFSA) set forth a simple list of criteria[5] if met would exempt certain classes of financial institutions which meet the following:
(1) Originate fewer than 100 loans to small businesses,
(2) finance fewer than 100 small business customers or
(3) are a small business themselves (defined either as a business with fewer than 100 employees or a business that meets the SBA's definition of a small business - $35.5 million in annual receipts for non-depository institutions)

Concerns over data being misinterpreted is a concern of financial institutions. Data must be collected in a way which does not allow for ambiguity. Many factors may cause incorrect conclusions being drawn by regulators.

Data may also be misinterpreted by simply showing approval and denial rates without consideration of applicant credit quality, collateral quality, existing obligations or the myriad of other factors which can be determining factors in a credit decision.

Inaccurate conclusions may also be drawn based on data from certain industries. For example, the data for automotive inventory finance companies will likely show a high percentage of inventory financing made to automobile dealerships owned by men. The fact that most inventory financing is made to white men is not an issue of discriminating against women. It is simply accredited to the fact most automobile dealerships in the United States are owned and run by men. According to General Motors in 2016 about 11% of the combined automakers dealerships were owned by women and minorities.[6]

In order for 1071 to achieve its intended purpose the CFPB must craft a regulation which is clear, not unduly burdensome to follow, and provide quantifiable data which is for which value can be derived.

---

[4] 15 U.S. Code § 1691 c-2(g)2.
[5] Himpler, Bill, American Financial Services Association. Letter to: Ms. Monica Jackson, Office of the Executive Secretary, Consumer Financial Protection Bureau, Request for Information Regarding the Small Business Lending Market (Docket No.: CFPB-2017-0011)

[6] Sawyers, Arlena. *GM plans for more dealerships to be owned by minorities, women*, 2016, https://www.autonews.com/article/20160411/RETAIL06/304119994/gm-plans-for-more-dealerships-to-be-owned-by-minorities-women

AdminRecord-001216

CFPB must put a system in place to take as much burden off the reporting lender as possible.  In addition, there must be clear guidance with a great deal of specificity in the descriptions, instructions and templates.  Many lenders who will be required to report under 1071 have never reported anything before this – the CFPB must keep this in mind.

68                                    8

AdminRecord-001217