# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

Case No: 7:23-cv-00144

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

## JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
## VOLUME X

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
|---|---|
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

APPENDIX

Automotive dealers often utilized "dealer only" auto auctions to acquire inventory which will then be resold at the dealership's retail lot.  Dealers purchase their inventory at auctions in different ways. Some dealers will pay cash or write a check, others will finance their inventory utilizing a floorplan.

Floorplan financing is a revolving line of credit which allows an automobile dealership to obtain financing to purchase an inventory of vehicles for resale. When a vehicle is sold by the automobile dealership, the advance against that particular vehicle is repaid.

In order to increase sales many auctions offer a floorplan either directly through the auction or through and associated floorplan company owned by the auction.  When dealers have more capital to spend on inventory, they tend to purchase more vehicles at the auction which increases auction sales.

Auction owned floorplans are designed to assist a dealer in acquiring more inventory through financing terms which are generally somewhere in the neighborhood of 30 to 90 days, often with options for extending the term.  The auctions floorplans are designed to turn a profit, however their main purpose is to drive business to the parent auction.

These auctions related financial institutions are required to comply with state usury laws, lending discloser laws and are required to be licensed in certain jurisdictions. They not required to report any data om loans to the federal government.

Many of these auctions and related finance companies are very small and cater to very small dealerships which are often minority owned.  Many of these very small minority owned dealerships are not able to acquire inventory financing through a traditional large financial institution, most often because of the requirements for financial documentation assets and time in business.   Many of these small dealerships are not sophisticated and do not have required financials.  The requested loan amount is often under $100,000 many large financial institutions do not offer floorplan lending to independent dealers or those dealers who are not associated with a franchise such as Ford, General Motors, Chevrolet, Toyota, etc.

AdminRecord-001218

FUNDATION®

October 28, 2020

Mr. Grady Hedgespeth
Assistant Director
Office of Small Business Lending Markets
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**SENT VIA ELECTRONIC MAIL TO** 2020-SBREFA-1071@cfpb.gov

**Re: Submission of Written Feedback by Small Entity Representative Following Section 1071 Small Business Regulatory Enforcement Fairness Act Panel**

Dear Mr. Hedgespeth:

Fundation Group LLC ("Fundation") was pleased to have the opportunity to participate as a Small Entity Representative ("SER") in the Consumer Financial Protection Bureau's ("CFPB" or "the Bureau") Small Business Regulatory Enforcement Fairness Act ("SBREFA") panel, which was convened to provide perspective regarding the implications for small businesses of the Bureau's forthcoming final rule implementing Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Dodd-Frank Act"). As I shared throughout my participation in the SBREFA process, Fundation fundamentally believes that expanding access to safe and affordable credit products – with transparent and comparable terms and conditions – to minority and women-owned small businesses is essential to bolster historically underserved communities, the small business marketplace, and the U.S. economy as a whole. I appreciate this opportunity to submit a written summary of the views I provided on Fundation's behalf during the SBREFA process.

**About Fundation**

As an integrated, private-label service provider to four of the largest 50 banks in the United States and a leading non-bank provider of affordable credit for the small business community, Fundation is a market-leading digital lending platform. We serve the small business market through private-labeled loan origination solutions for regional and super-regional banks ("Platform Solutions") and as a direct originator of credit ("Credit Solutions"). Fundation deploys our balance sheet through a differentiated origination strategy focused exclusively on originating loans and lines of credit through our clients, including integrated bank "second look" programs, bank referrals, point of sale and purchase finance, institutional partnerships, referral programs and online marketplaces.

70

AdminRecord-001219

FUND ATION®

Fundation empowers banks to serve small businesses by enabling them with a digital private label or co-branded loan origination solution specifically designed for small businesses. We also act as a lender ourselves, using our balance sheet to lend where a bank either does not want to or cannot due to credit criteria or concentration or risk limits. The result is that more small businesses are able to obtain credit at affordable and transparent terms than otherwise would. In addition to providing obvious benefit to the borrower, the bank also wins by being able to facilitate a responsible credit product for the customer even when not willing or able to lend directly.

Fundation has originated more than $1 billion of term loans, lines of credit and business credit card accounts across our Platform Solution clients as well as on our own balance sheet. Additionally, earlier this year Fundation had significant involvement in the Paycheck Protection Program ("PPP") to facilitate the survival of America's small business community during the recession caused by the COVID-19 pandemic. Fundation was both an approved fintech lender through the program and, in partnership with two large financial institutions, enabled billions of dollars in PPP loans. The average size of PPP loans facilitated by Fundation was well below $100,000, underscoring our experience as a provider of critical credit access to the smallest of small businesses in the United States.

In our Credit Solutions business, Fundation has focused on building a resilient loan portfolio rather than emphasizing portfolio growth. Throughout our history, we have always been a disciplined underwriter, which has resulted in exceptional relative portfolio performance compared to our peer group during these difficult economic conditions. We are proud to be among the most responsible lenders in the non-bank lending community. Our credit products attract prime and "mid-prime" borrowers, with effective yields that on average, have rates in the mid/high-teens, inclusive of interest and fees. Our loans and lines of credit have no prepayment penalties, no annual fees, no hidden fees, feature standard interest rate coupons (not factor rates), monthly or twice-monthly payments, and straight-line amortization schedules, similar to a traditional car loan or mortgage.

Importantly, Fundation caps interest rates below all state usury limits rather than opting to invoke choice of law as is the practice of other market participants, with some non-bank small business lenders offering products well above state-imposed usury caps for consumer loans. Fundation employs a highly data-driven and automated lending process using multiple Fair Credit Reporting Act-compliant data sources. We also incorporate a cash flow analysis to ensure that the small business has the capacity to make the payments on the money they borrow. The result is that Fundation is able to help expand access to credit for many small businesses while at the same time offering transparent lending products with affordable and fair interest rates.

While Fundation is not a Federal Deposit Insurance Corporation-supervised bank, we operate in many ways like a regulated financial institution. As an integrated service provider to the banking industry, we undergo a minimum of eight comprehensive bank vendor due diligence exercises annually, provide access to affordable credit for small businesses in 49 states (soon to be 50), and are subject, indirectly, to third-party partner risk management guidance overseen by the prudential regulatory agencies.

2

71

AdminRecord-001220

FUNDATION®

**Perspectives Regarding Minority-owned and Women-owned Small Business Data**

As I shared during the SBREFA panel process, Fundation is a strong advocate of as expansive a rule implementing the requirements of Section 1071 of the Dodd-Frank Act as is practicable to ultimately provide for improved access to safe, transparent and affordable credit for minority-owned and women-owned small businesses. To achieve this outcome, however, the Bureau – and the marketplace – collectively must be able to understand the status quo. In the small business lending marketplace, this is no easy feat as demographic information regarding small business loan applicants in not widely available. We believe that implementation of a rule under Section 1071 of the Dodd-Frank, which ultimately will require small business lenders to supply data to the CFPB regarding the small business credit applications they receive and the loans they offer, is the necessary first step towards a fairer and more inclusive lending environment. Said differently: to be successful, the Bureau's final rule implementing Section 1071 must afford the Bureau with the ability to see how minority-owned and women-owned small businesses are – and aren't – accessing credit today. Further, in order to place that data in context, we believe that a baseline of all small business borrowing activity should be established. Only by taking this approach can a full, <u>comparative analysis</u> of these issues be developed.

From Fundation's point of view, to be effective, any final rule implementing Section 1071 must take the following considerations into account to balance the very real benefits of data collection pertaining to lending for minority-owned and women-owned small businesses and the facilitation of a regime in which lenders are able to comply.

**Scope of Data Collection**

Collection of data related to the experiences that minority-owned and women-owned small businesses encounter when applying for credit is not, in and of itself, as useful an exercise as it would be if that data was compared to the experiences of the rest of the small business market. While statutory restrictions embedded in Section 1071 of the Dodd-Frank Act limit the Bureau's ability to mandate data collection for small business loan applicants that are not minority-owned or women-owned, the CFPB should strongly consider implementation of a parallel process outside of its forthcoming Section 1071 rulemaking through which small business lenders would be required to submit materially the same data pertaining to all other small business loan applications not included in the scope of the 1071 rule. This construct would enable the Bureau to make an apples-to-apples comparison of the experiences (i.e., approval rates, terms, pricing, etc.) that minority-owned and women-owned small businesses encounter when attempting to access credit as compared to the rest of the market.

Beyond a clear policy imperative to collect data in addition to the requirements provided by Congress under Section 1071 of the Dodd-Frank Act, the SBREFA panel discussed, at length, the appropriate definition of "small business" for the purposes of the Bureau's forthcoming rulemaking. As I articulated throughout the SBREFA process, Fundation's perspective on this question is driven entirely by an interest in seeing an appropriate calibration such that the data

3

AdminRecord-001221

FUND*ATION*®

ultimately collected by the CFPB is truly representative of the experience of applicable small businesses and does not include larger enterprises. We therefore believe that the most appropriate calibration to achieve this balance is a combination of a small businesses' total annual revenue and the firm's total number of employees. Based on our own data, Fundation suggests that any commercial credit applicant with less than $10 million in annual revenue and 50 or fewer employees should be considered a "small business" for the purpose of the Bureau's rule implementing Section 1071 of the Dodd-Frank Act. This definition would capture more than 95% of all small businesses across the country. To the extent the Bureau desires more actionable data, we would also be supportive of capturing this information in ranges to avoid potentially forcing false precision.

**Cost of Credit and Covered Products**

Understanding the cost of credit is as important as understanding access to credit. Therefore, any effective CFPB rulemaking implementing Section 1071 of the Dodd-Frank Act must include data fields related to the cost of credit to be useful to the Bureau and to the market more broadly. It simply is insufficient to understand only how many minority-owned and women-owned small businesses are applying for and receiving credit; the CFPB must also understand what lenders are charging them for it as compared to the cost of credit for other small businesses. The Bureau should require that lenders submit the coupon rate, total cost of capital and annual percentage rate ("APR") of their small business loans to obtain as detailed an understanding as possible of the cost minority-owned and women-owned small businesses pay for access to credit. To ensure the data provided by lenders is accurate, we also would suggest the CFPB commit in its final rule to holding harmless individual lenders from any adverse action as a result of reporting this data. Finally, we recognize that APR as a measure has its challenges, especially on short duration loans with upfront fees. While we are explicitly not making any value judgments on what APR businesses should be willing to pay for credit, we do believe that it is necessary to, at a minimum, have a uniform measure that can provide a comparison among different products and lenders. To ensure data fidelity, it is equally critical is that this information, once gathered, be aggregated in a manner that no individual borrower or financial institution can be identified. This is particularly important when considering how to treat data from low business population density census tracts when overlaying 6-digit NAICS codes.

The Bureau's final rule implementing Section 1071 of the Dodd-Frank Act should also account for the reality that small businesses – especially the smallest of small businesses – access credit differently than do larger businesses in the U.S. To provide a realistic and accurate depiction of minority-owned and women-owned small business access to credit across the country, the CFPB's rule should therefore take an expansive view with regard to the defining the types of credit products that are within the scope of the rule. To achieve this, the litmus test for the definition of "covered products" under the rule should be straightforward. A minority-owned or women-owned applicant that is a business, rather than an individual consumer and an indication from that applicant that the credit is being used for commercial purposes should trigger a requirement under the Bureau's forthcoming rule for data pertaining to the application and, if applicable, subsequent loan, to be in-scope. Critically, merchant cash advances ("MCAs"), equipment leases and accounts receivable factoring, which the Bureau proposes to exclude from

4

AdminRecord-001222

FUNDATION®

its rule, should be considered a "covered product" under a Section 1071 rulemaking, as these products represent an important means of accessing credit for small businesses.

**Scope of Small Business Lender Inclusion**

To provide a real overview of the current state of play for small business lending, as many lenders to small businesses as practicable should be considered within the scope of the Bureau's forthcoming rulemaking implementing Section 1071 of the Dodd-Frank Act. At the same time, the Bureau should seek to achieve a balance that ensures that requirements for data collection under the rule take into account the ability of a small business lender to provide the data in a timely fashion. While the largest lenders in the U.S. may have enterprise technology and sufficient resources to provide this data to the Bureau quickly, the smallest lenders in the U.S. do not. The CFPB's forthcoming rule therefore must take into consideration the compliance burden it places on a particular lender to ensure that compliance costs of the rule do not inadvertently constrict credit access to the small business community at a critical time for the market's economic wellbeing. Further, these smaller lenders are often "paper based" and interact with their small business customers face-to-face. For these lenders, firewalling off critical data elements will be extremely difficult. Accordingly, the Bureau should provide in its forthcoming rulemaking some guarantee of protection from potential fair lending claims arising from the data collection required under Section 1071 of the Dodd-Frank Act.

Based on Fundation's own significant experience as a lender to the small business marketplace, we suggest that the Bureau consider including in its final rule a threshold that would see any small business lender that originates at least 50 loans in aggregate across any of the credit products listed previously for a total of at least $5 million annually required to submit data under a final rulemaking implementing Section 1071 of the Dodd-Frank Act. We believe this threshold strikes the appropriate balance of including the vast majority of small business lenders active across the U.S. while also ensuring that the very smallest of lenders, who may provide critical access to small business credit in underserved markets, are not disincentivized to continue lending to small businesses as a result of compliance costs required to fulfill the data collection requirements promulgated by the Bureau's forthcoming rulemaking.

**Applicant and Borrower Privacy is Critical**

Congress' clear intent when drafting Section 1071 of the Dodd-Frank Act was to provide a steppingstone towards increased access to and lower costs of credit to minority-owned and women-owned small businesses. In implementing this worthy objective, the CFPB must not unintentionally harm the very small businesses the statute seeks to assist. The privacy of individual small business credit applicants and borrowers, as well as the participating financial institutions, must be protected as a foundational element of the Bureau's forthcoming rulemaking. The transmission of sensitive data fields from lender-held systems to the CFPB increases the potential risk of a privacy breach that could include personally identifiable information. The Bureau should ensure that any data collection effort built atop a Section 1071 rulemaking puts data privacy at the center of its technical design to mitigate the risk of applicant

5

74

FUNDATION®

or borrower harm, and should commit to withholding any lender-specific information from disclosure to additional parties as a means of protecting small business owners' data. Further, in the unfortunate event of a data breach for which the CFPB is responsible, the Bureau should indemnify and hold harmless the impacted lenders.

**Conclusion**

Once again, thank you for the opportunity to participate in the CFPB's SBREFA panel to inform the Bureau's perspectives regarding implementation of Section 1071 of the Dodd-Frank Act. On behalf of Fundation, and also personally, I commend the CFPB for moving forward with a rule that will ultimately serve to increase access to credit for minority-owned and women-owned small businesses. To accomplish this critical task, however, I believe it is imperative that the Bureau take an expansive view of the mandate provided to it by Congress under the statute. To the extent that I or Fundation can provide any additional information or perspective as you and your colleagues finalize the rule, I hope you will not hesitate to contact me.

Thank you once again for the invitation to join this important SBREFA panel.

Sincerely,

Barry Feierstein
Chief Operating Officer
barry.feiestein@fundation.com

6

Fundation Group LLC    11501 Sunset Hills Road    Reston, VA  20190

AdminRecord-001224



Building a better financial world.

Tiffany Tran                                                    November 5, 2020
Director's Financial Analyst
Research, Markets, and Regulations
Consumer Financial Protection Bureau

Dear Ms. Tran,

Funding Circle appreciates the opportunity to submit comments as a Small Entity Representative (SER) as authorized by the Small Business Regulatory Enforcement Fairness Act (SBREFA) and appointed by the Consumer Financial Protection Bureau (CFPB), Office of Management and Budget (OMB), and the Small Business Administration (SBA) in response to the CFPB Outline of Proposals Under Consideration to Implement Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) .

Funding Circle is the world's leading online marketplace for small business financing that operates in the U.S., U.K., Netherlands and Germany and is a founding member of the Responsible Business Lending Coalition (RBLC) and member of the Innovative Lending Platform Association (ILPA). As such, Funding Circle is committed to inclusive access to credit and transparent pricing for which we believe Section 1071 of the Dodd-Frank Act will help facilitate.

Section 1071 of the Dodd-Frank Act amended the Equal Credit Opportunity Act (ECOA), Regulation B, to require financial institutions (FI) to compile, maintain, and submit certain data on applications for credit for women-owned, minority-owned, and small businesses. The outline represents the first step in the rulemaking process to implement the statutory directive. Generally, Funding Circle encourages the Bureau to adhere to the Congress' intent which is to:

- facilitate enforcement of fair lending laws
- enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses

AdminRecord-001225

**Funding Circle**

**Scope of the Rulemaking**

Generally, the Bureau should require financial institutions (FI) to collect and report applicant data for as many small businesses, minority owned businesses, and women owned businesses as is reasonably possible. We believe the Bureau's proposal to only include minority and women owned businesses that are "small" is a reasonable approach considering this would include 99.9% of all minority and women owned businesses. However, the Bureau should monitor the U.S. Census Bureau's Annual Business Survey and re-evaluate this approach if minority or women owned businesses that are not considered "small" exceed 1%.

**Lender Coverage**

The small business financing industry comprises varying kinds of lenders and products offered by both depository and non-depository providers. In order to get a full and accurate picture of the market, the Bureau should include any financial institution that extends financing to small businesses. We understand that the Bureau is considering exempting certain financial institutions which we think would create an uneven burden of costs in the market and for that reason alone we do not think exemptions are appropriate. Additionally, the Bureau's proposal to exempt FI based on assets would be an inadvisable calculation considering many lenders, Funding Circle included, do not hold most of its loans on its balance sheet which makes some non-depository smb lenders particularly asset light vs others.

**Financial institutions that are not the lender of record**

We support the Bureau's proposal that in the situation where more than one party is involved on the lender side of a single small business loan or application, section 1071's data collection and reporting requirements should be limited in the same manner as in Regulation C.

**Definition of "small business" applicants**

Generally, the definition of small business should be inclusive of as many small businesses in every industry as possible and should be able to be efficiently implemented by lenders. Funding Circle does collect NAICS codes and gross revenue as part of our underwriting model, however our experience with NAICS codes present some unique challenges that do not make it the most efficient and accurate method for determining a small business. First, NAICS codes are self-reported on the business tax return and only

77

AdminRecord-001226



40% of applications received by Funding Circle have a 2 or 4 digit NAICS code. Oftentimes, the NAICS code is blank and we have to manually determine the appropriate code and sometimes it is unclear which code is appropriate or a business could be more than one code. NAICS code calculations change through SBA rule making which creates an additional requirement for lenders to track and implement. With that said, we do not think using the NAICS code system is the most efficient mechanism for determining a small business.

We do think the Bureau's proposal to create a size standard using the gross annual revenue of the applicant business in the prior year, with a potential "small" threshold is the right approach. However, to be as inclusive of as many small businesses as possible in every industry, we recommend that threshold be $8 million instead of $1 million or $5 million as proposed. $8 million is the most common size standard threshold for average annual receipts and would ensure we capture all small businesses in all industries without needing to determine employee count which makes it the most efficient definition to implement.

**Definitions of "women-owned business," "minority-owned business," and "minority individual"**

Section 1071(h)(5) and (6) that defines a women or minority owned business is problematic for a few reasons which the Bureau should consider addressing:

- "more than 50 percent of the ownership or control" excludes equal partnerships with opposite sex partners. This is particularly an issue with married couples that own a business together. We recommend "50 percent or more of ownership or control" to resolve this issue. Not doing so may underreport women owned businesses.
- Applicants should be able to self certify that "(B) more than 50 percent of the net profit or loss accrues to one or more minority individuals" but lenders should not be required to verify this information. Funding Circle currently collects information on 80% ownership and anyone that is at least a 20% owner. While we do collect personal financials on owners of 20% or more which indicates accrual of net profit or loss, we do not currently explicitly track or notate this calculation. Any requirement for us to make that determination or verify would present an overly burdensome operational requirement.

We recommend the Bureau propose guidance that would clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or

78

AdminRecord-001227



Other Pacific Islander, and/or Hispanic or Latino which would mirror the terminology of HMDA's aggregate categories and would also clarify that a multi- racial person could be considered a minority individual.

**Covered Products**

The Bureau should adopt a broad standard or definition of credit that includes all financing products offered to small businesses. Small businesses depend on a variety of financing products for different business use cases and exempting any one product or financial institution ignores the legislative intent of Section 1071 by 1) only facilitating the enforcement of fair lending laws for some products and FI and not others 2) prevents the full ability to identify business and community development needs and 3) creates an uneven playing field of compliance requirements among providers.

The Bureau is proposing to exempt Merchant Cash Advance (MCA) because "including them may add additional complexity or reporting burden given the unique structure of the transactions". However, complex or unique structures of transactions by their very nature alone should not be reason enough for exemption. Especially since the Federal Reserve in its annual Small Business Credit Survey[1] found that "Hispanic-owned firm applicants sought merchant cash advance products more frequently than did White-owned businesses". Cash advances are often marketed as loans, use underwriting practices that factor in merchants' credit ratings and bank balances (instead of their receivables), and don't reconcile the merchants' repayment of the advances. Both New York and California have passed laws covering MCA in their respective commercial financing disclosure laws as defined: "The term 'sales-based financing' – "(A) means a transaction where there is an extension of financing to a recipient that is repaid by the recipient, over time, as a percent-age of sales or revenue, in which the payment amount may increase or decrease according to the volume of sales made or revenue received by the recipient; and (B) includes transactions with a 'true-up mechanism'.

The Bureau is also considering exempting Factoring products because "factoring arrangements are generally not considered subject to ECOA or Regulation B". Similar to MCA, factoring products represent a significant source of capital for small businesses and should be covered. The Federal Reserve found that "Black-owned business applicants applied for factoring more frequently compared to White-owned firm applicants". Both New York and California have passed laws covering MCA in their respective commercial

---

[1] 2019 Federal Reserve Report on Minority Owned Firms: Small Business Credit Survey
https://www.fedsmallbusiness.org/medialibrary/fedsmallbusiness/files/2019/20191211-ced-minority-owned-firms-report.pdf

AdminRecord-001228



financing disclosure laws as defined: "The term 'factoring' means a transaction that includes an agreement to purchase, transfer, or sell a legally enforceable claim for payment held by a recipient for goods the recipient has supplied or services the recipient has rendered that have been ordered but for which payment has not yet been made."

**Definition of an "application"**

We agree with the Bureau's proposal to define an "application" for purposes of 1071 by using Regulation B's definition of the term "application" and that inquiries, prequalifications, and similar should be explicitly clarified as not reportable.

**Race, sex, and ethnicity of principal owner(s)**

The Bureau is considering proposing to define the term "principal owner" in a manner that is consistent with the CDD rule (25%). Funding Circle believes that the Bureau should be consistent with industry practice and the SBA definition of principal owner which is 20% or alternatively consider defining a principal owner as at least 20% which would accommodate FI that currently define above 20%.

**Pricing**

Funding Circle encourages the Bureau to collect the Annual Percentage Rate (APR) for all covered products because pricing data would further the fair lending purpose of section 1071 as it may enhance the ability to effectively and efficiently enforce fair lending laws. APR is the best metric to collect because that allows for the comparison of pricing and term or estimated term. It also includes all additional fees such as origination fee to account for the true price. APR is the only price metric that enables an apples-to-apples comparison between financing products of different types, amounts, and term lengths. It is familiar to borrowers and financiers, vetted by over 50+ years of the Truth in Lending Act. APR is straightforward to calculate, including for merchant cash advances. In fact, many commercial financing providers already calculate and disclose APR. And all who operate in CA or NY will soon be required to disclose APR under new state laws. The CFPB can make APR data collection simple by collecting whatever APR is required to be disclosed under the relevant state laws or, where no state law is in place, adopting a similar approach to what is required by these laws. Those laws establishing that APRs for small business financing should be calculated according to the Truth in Lending Act 12 CFR part 1026.4. This APR formula can flexibly accommodate any combination of payment amounts and frequencies. For

80

AdminRecord-001229



products like merchant cash advances, providers must use a projection of the borrower's sales volumes to establish the payment amounts and dates that plug in to the APR formula. These financing companies already have those sales projections, and used them to underwrite the financing. For calculating the APR to report to the CFPB under 1071, financing providers should use whatever sales projections they used in underwriting. In the unlikely case providers don't have a sales projection, they should establish a sales projection based on the average historical sales of the borrower, as described in the CA rules "historical method." The provider chooses a period of 2-12 months they will use in all of their sales projection calculations, and establishes the sales projection as the average sales over the most recent period of this # of months. To further ensure accuracy in the data, providers of products like merchant cash advances should include the actual retrospective APR of recently paid off financing in their annual 1071 reporting. This way the CFPB would have a record of APR as anticipated at origination, and then later the actual retrospective APR (This is essentially the flexible "underwriting method" from the CA 1235 rules, called the "opt-in method" in the NY bill).

**Timing considerations for collection of certain 1071 data**

It is important that the timing for collecting certain data maximizes participation, reduces friction in the application process as much as possible and is flexible enough that it takes into account varying application processes of lenders. We believe the best way to do this is to require that demographic information be collected during the application process and before the application is considered complete.

**Notification regarding access to information by underwriters and other persons**

We support the development of a model disclosure by the Bureau but believe it should remain optional for lenders to use. While we do not anticipate having to use such a disclosure, we do think there is a real possibility that requiring the use of it may cause confusion for the applicant and have the unintended consequence of causing unfounded claims of discrimination in the case of ultimate application denials.

**Applicants' right to refuse to provide certain information**

We agree with the Bureau's proposal that the scope of the right to refuse and the scope of limited access by underwriters and the related notice should be limited to demographic data only as additional data such as NAICS codes are used by some FI in the underwriting process.

81

AdminRecord-001230

**Funding Circle**

**Privacy interests considered under the balancing test**

With respect to public requests of information from financial institutions and the CFPB under 15 U.S.C. section 1691-c-2(f)(2)(B) & (C), we caution the CFPB to limit disclosure to aggregate-level data. Disclosure of information on a transaction-by-transaction basis tied to a particular lender would deliver to competitors granular insights into the strategies, credit products and dollar amounts, geographical focus, and target customers of other companies and is anti-competitive on its face. Disclosing only aggregate-level data would lessen the risk that the public will be able to tie sensitive information back to a specific institution and a specific individual.  We urge the CFPB not to publicly disclose loan-level data, which would compromise the confidentiality of proprietary lending information and could be used for anticompetitive purposes. Publicly disclosing only aggregate-level data, and omitting application numbers, would remove the risk that the public will be able to tie sensitive information back to a specific institution and a specific individual, and would reduce the anticompetitive concerns raised by Section 1071's detailed reporting obligations.

Funding Circle appreciates the Bureau's engagement with the small business financing industry during the SBREFA process and for the opportunity to provide official comment as a SER for the SBREFA Panel Report. We believe the implementation of 1071 to be an important part of making the industry more transparent and inclusive which will benefit all small businesses and the industry.

Sincerely,

Ryan Metcalf
Head of Public Policy, Regulatory Affairs & Social Impact
Funding Circle US

82



**Hope Credit Union**
**Hope Enterprise Corporation**
4 Old River Place | Jackson, Mississippi 39202
601-944-1100 | www.hopecu.org

Mr. Grady Hedgespeth
Assistant Director, Office of Small Business Lending Markets
Consumer Financial Protection Bureau

Jennifer A. Smith
Assistant Chief Counsel for Economic Regulation & Banking
Office of Advocacy U.S. Small Business Administration

Lindsay M. Abate
Policy Analyst Office of Information and Regulatory Affairs
Office of Management and Budget

Submitted via email 2020-SBREFA-1071@cfpb.gov

November 19, 2020

Please find below the comments of the Hope Enterprise Corporation / Hope Credit Union / Hope Policy Institute (HOPE) in response to the Consumer Financial Protection Bureau's outline of proposals under consideration to implement small business lending data collection requirements. HOPE appreciates the opportunity to have participated as a Small Entity Representative for the Small Business Advocacy Review Panel.

HOPE is a community development financial institution, credit union, loan fund and policy institute that provides affordable financial services; leverages private, public and philanthropic resources; and engages in policy analysis to fulfill its mission of strengthening communities, building assets, and improving lives in economically distressed areas throughout Alabama, Arkansas, Louisiana, Mississippi and Tennessee. HOPE exists to mitigate the extent to which factors such as race, gender, birthplace and wealth limit one's ability to prosper. Since 1994, HOPE has generated more than $2.5 billion in financing that has benefitted more than 1.5 million people in the Deep South.

Providing access to small business loans for historically underserved people and communities is a critical part of HOPE's activities. Between 2017 and 2019, 72% of HOPE's commercial loans were under $1 million. In 2019, over 60% of our commercial loans were to minority and women-owned businesses. In March 2020, HOPE launched a new small business loan product up to $100,000 to meet the demands and needs in our region. HOPE is both a certified Community Advantage Lender, and a participant in the SBA Paycheck Protection Program (PPP). Prior to PPP, HOPE originated about 50 business loans in a typical year, the majority of which go to businesses owned or led by women or people of color.

In response to the health and economic consequences of COVID-19, HOPE, like many CDFIs, stepped up to meet the challenges facing small businesses and to support the deployment of PPP funds.[1] As of September 15, 2020, HOPE funded 2,587 loans totaling $81 million, supporting

AdminRecord-001232

more than 10,200 jobs in the Deep South. The majority of HOPE's PPP borrowers are businesses owned or led by people of color and women, and the majority are located in communities of color.

As the Bureau proceeds with the rulemaking, HOPE urges the following:

1. Expansive coverage, of both lenders and credit, with few exceptions, with robust information gathered to ensure minority-owned businesses are receiving fair access to capital.
2. HOPE's experience demonstrates such data collection is possible, not cost-prohibitive, and to the extent there is a cost, it is outweighed by the benefits.
3. Robust data collection is beneficial for individual lenders and borrowers, and creates a level playing field for a more robust marketplace.

Each of these recommendations is explained below in more detail. They are rooted not only in HOPE's lending practices, but also in the existing disparities in small business lending for people of color and women-owned businesses.

**Existing Disparities**

The current reality is that Black-owned businesses are less likely to have an existing relationship with a financial institution, just as, or more, likely to seek credit, and yet, are more likely to be denied or discouraged than white owned businesses. Fewer than 25% of Black-owned employer firms have a recent borrowing relationship with a bank.[2] This number drops to 10% among Black non-employer firms, compared with 25% white-owned non-employers.[3] These gaps in financial relationships exist even among healthy firms. According to the Federal Reserve Bank of New York's August 2020 report, *Double Jeopardy*, 73% of healthy or stable white employers have an existing banking relationship, compared to 42% of healthy or stable Black employers.[4]

Lack of access to capital is not due to Black businesses not applying for it. In fact, Black-owned firms—both employer and non-employer—apply for financing at equal or higher rates than white-owned firms but are denied at higher rates.[5] Black business owners are also more likely than white owners to report being discouraged, or not applying for financing because they believe they will be turned down. Among Black employer firms, 37.9% reported being discouraged, compared to 12.7% of white-owned firms.[6]

These disparities and experiences were present prior to COVID-19, but the Paycheck Protection Program put them on full display. This was clear from HOPE's vantage point in serving smaller businesses and businesses of color. Many of the businesses that reached out to HOPE had been underserved or unserved by traditional lenders during the PPP process. A Black dentist was not funded by a large bank, and the bank never called to check on the application. The dentist applied with HOPE, and we approved her $12,000 loan request. HOPE approved a woman-owned staffing company in Memphis, coming to us after having received no response from her regional banks. HOPE approved a $7,200 loan for a Black-owned, 27-year old barbershop in New Orleans after the owner received no help from the bank he had asked to assist him. These stories were a constant narrative in our PPP lending process, an extension of a banking system

2

AdminRecord-001233

that has historically failed to serve communities of color and low-income communities with the same attention as others.

The outcomes of PPP and the impact of COVID-19 on small businesses of color, should also be top of mind when implementing 1071 to ensure that minority-owned and women-owned businesses will have access to capital and be included in the country's economic recovery. Due to a range of structural barriers within PPP, businesses owned by people of color faced greater barriers in accessing these relief funds. As just one of many examples, non-employer firms were unable to apply for PPP funds for the program's first seven days, until April 10, and the first round of $350 billion was fully depleted just six days later on April 16. This exclusion of non-employer firms at the start of this program was especially significant, as over 90% of Black and Latino owned businesses are non-employer firms.[7] As of August 8, still, only 5.4% of the deployed $525 billion in PPP loans went to businesses reporting one or fewer employees.[8]

Unfortunately, there is limited data on the race of PPP loan recipients. According to the U.S. Government Accountability Office "information was not reported for business owners' race for 90 percent of approved [PPP] loans, gender for 79 percent of approved loans."[9]  As such, the remaining available proxy is looking at whether PPP loans reached communities where a significant number of Black-owned businesses are located. The Federal Reserve Bank of New York found that PPP loans "reached only 20% of eligible firms in states with the highest densities of Black-owned firms, and in counties with the densest Black-owned business activity, coverage rates were typically lower than 20%."[10] The PPP's shortcomings unfolded against backdrop in which from February through the end of April, the number of Black-owned business owners declined by 41% and Latino business owners declined by 32%, compared to a decline of 17% of white business owners.[11] The disparities in access to PPP funds and COVID-induced business closures will reverberate for years in the growth and health of businesses owned by people of color. Fair access to capital in the years ahead is critical to closing the gaps it caused and perpetuated.

Section 1071 must be implemented with the recognition of the current realities faced by Black-owned businesses and other businesses owned by people of color and women. The Bureau must account for, not ignore, these disparities in order to craft a final rule best positioned to help alleviate them.

Towards this end, HOPE's specific recommendations are provided below.

1. **Expansive coverage, of both lenders and credit, with few exceptions, with robust information gathered to ensure minority-owned businesses are receiving fair access to capital.**

These realities underscore the importance of broad, expansive coverage, both in type of lenders and type of credit covered, as well as the definitions of small business, minority-and women-owned business, and application.

3

AdminRecord-001234

*What financial institutions are covered*

HOPE agrees with the proposal that all financial institutions should be covered, with only a limited exemption for those institutions that make less than 25 loans a year. The Bureau's own data provide that, under this option, based on call reports, roughly half of all Depository Institutions would be excluded, but it would capture 99% of small business loan originations by depositories.[12] Although the Bureau states that it considered thresholds based on higher activity levels, it does not provide information about how many depositories or small business loans would be exempt from such thresholds.

The Bureau should not make exemptions based on asset size. An exemption limit based on the number of loans is preferable to an exemption based on asset size for two reasons: (1) a sizeable number of small business loans are made by smaller financial institutions,[13] and (2) there is no data or comparable measure for asset size of non-depository institutions. The Bureau's data does not provide the number of small business loans that will be excluded due to exemptions based on asset sizes larger than $100 million.

Finally, in a region like the Deep South, with a dearth of large bank branches, communities are more likely to be served by smaller banks. Excluding small banks based on asset size may have an outsized effect of excluding a significant number of small business loans in those areas. For example, in Alabama, excluding lenders with asset size less than $100 million would exclude over 4,800 small business loans made by banks totaling over $329 million in capital. By comparison, an exemption based on less than 25 small business loans in a calendar year, only 19 small business loans totaling about $623,000 would be excluded.[14]

*What types of credit are covered*

The current proposal is too narrow and leaves out many products that small business lenders are accessing. The Bureau should include all that they are proposing to include, and include some that they are proposing to exclude. Specifically, HOPE supports the inclusion of merchant cash advances, factoring, and leases as part of this small business data reporting.

Merchant cash advances and factoring are generally provided online, and therefore may have disproportionate impact on borrowers of color. Data from the Federal Reserve show that minority-owned firms with 1 to 499 employees are more likely to use financing from online lenders than white firms, due in part to the perception they will be denied or discouraged by banks. See Table 1.

Table 1: Lender type used for firms with 1 to 499 employees, by race

|          | Bank | Online | Credit Union |
|----------|------|--------|--------------|
| Black    | 23%  | 27%    | 8%           |
| Hispanic | 32%  | 22%    | 4%           |
| White    | 46%  | 19%    | 6%           |

Source: Federal Reserve Banks, 2020 Report on Employer Firms Small Business Credit Survey, https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2020/2020-sbcs-employer-firms-report.pdf

4

AdminRecord-001235

Failing to gather data for these products will risk creating a two-tiered reporting system, leaving out a significant amount of activity by small business owners of color seeking access to capital. Given the range of predatory practices and high-pricing within merchant cash advances and factoring, gathering data on the terms of these products, such as pricing, of this type of credit is as important as their inclusion in 1071 reporting.

In terms of consumer loans for a business purpose, the CFPB should monitor to assess the trends in this area, and if it grows, consider including it for the purposes of 1071 reporting.

*What is considered a small business*

The Bureau should provide an expansive definition to ensure robust and accurate data collection about the marketplace. Specifically, the Bureau should use the Small Business Administration (SBA) definition of businesses less than 500 employees and under $8 million in revenue. The Bureau's data provides that defining small businesses as those with less than $1 million in revenue, would leave out 23% - nearly one in four - of small businesses with employees.[15] By comparison, the SBA definition of businesses with less than 500 employees covers all but 63,000 minority and women-owned businesses. Even though, under this scenario, the Bureau is considering different revenue thresholds for different industry sectors other than wholesale trade and manufacturing, HOPE supports the single bright line standard of either employee size (less than 500) or $8 million in revenue, regardless of industry type.

*What is considered a minority- or women- owned business*

HOPE concurs with the Bureau's proposal of a definition based on more than 50% of ownership. This definition is consistent with how the CDFI Fund defines minority- and women-owned ownership. HOPE is also in agreement, and familiar with, the definitions of ownership and control that are set forth in the Financial Crimes Enforcement Network's customer due diligence (CDD) rule.

As is the case with HMDA, the data should be collected and reported on a disaggregated basis, to identify differences among different racial and ethnic groups. SBA(7)(a) lending reports already do this, and provide an informative example as to their importance. For example, between 2015 and 2020, 28% of approved 7(a) loans went to minority-owned businesses.[16] However, when looking at Black businesses alone just 2.5% of approved SBA 7(a) loan capital went to Black borrowers ($3.7 billion out of $144 billion). Having this data available for specific racial and ethnic groups is critical to understanding how their unique capital needs are, or are not being met, specifically in light of a long-history of discriminatory and exclusionary lending practices.

*What is considered an application*

CFPB should err on the side of inclusiveness – an oral or written request for extension of credit. This is consistent with the definition in Regulation B, which implements the Equal Credit Opportunity Act. CFPB should not use the restrictive definition of waiting until all the information is received for a completed application. HOPE commercial lending staff finds it beneficial to be able to document and remain in touch with potential small business borrowers who are in contact with us even as they are at various stages of the inquiry process.

5

AdminRecord-001236

A broad definition of applicant is not only beneficial for business purposes, but is critical to carry out the purposes of section 1071. A broad, inclusive definition is necessary to for capturing businesses who may be turned away by other lenders early in the process, which are most likely to be businesses owned by people of color. A broad definition of application will help illuminate how often business owners of color, who are less likely to have an existing financial relationship and therefore need to make inquiries to financial institutions less familiar with them or their needs, are being turned away before they even get in the door.

**2. HOPE's experience demonstrates such data collection is possible, not cost-prohibitive, and to the extent there is a cost it is outweighed by its benefits.**

For loans that HOPE originates, we already gather essentially all of the fields that the CFPB is proposing to collect: minority/women ownership, gross annual revenue, number of employees, loan type/purpose/pricing, length of time in business, NAICS code, race/sex/ethnicity of owner, census tract, application date, unique id, and credit amount applied for. The Bureau should also include a mechanism to gather information on credit scores. On this point, HOPE concurs with the National Community Reinvestment Corporation that creditworthiness data can be reported by buckets or percentiles.

HOPE strongly urges the collection of pricing information, including all interest and fees. It is necessary for understanding whether different quality credit is being offered to different groups. Access to credit is not helpful if it is predatory, unaffordable credit. Without pricing information, it will not be possible to carry out the purpose of Section 1071, as it would not be possible to know if borrowers of color or women-owned businesses are being offered credit on less favorable terms than their white counterparts.

HOPE offers this story as just one example of the importance of gathering pricing information:

> HOPE recently closed a loan with a minority-owned, janitorial and landscaping company in Mississippi. Owned by a father and son team, it has expanded and secured contracts in five states and operates as a second-chance employer, providing job opportunities to people who were formerly incarcerated. The company reached out to HOPE seeking help to get out of a predatory lending cycle by refinancing its highest interest predatory loan – an online small business loan carrying 55% APR. Beyond the pricing, other terms of the loans were troubling, such as requiring weekly ACH withdrawals of about $1,200, a 19-month repayment term, and in the case of default, allowing the lender to collect the loan balance in full without notice. HOPE was able to help the borrower escape the 55% APR loan and replace it with a small business loan with 8% annual interest. HOPE's help will save the business $3,900 a month in loan payments, money that is now free to invest in the growth of the business.

Given that HOPE largely collects most of this data for the CDFI Fund Transaction Level Report (TLR), it shows that such data collection is possible, even for smaller lenders. As such, in terms of one-time costs, HOPE does not anticipate significant costs, as systems are already in place to

6

AdminRecord-001237

gather much of this data required.  It will primarily entail updating software, training compliance, and updating materials.

In terms of ongoing costs, HOPE anticipates that adjusting to the new requirements will be a fairly minimal burden, and also greatly beneficial. Much like HMDA is now, the gathering and reporting of this data will be considered simply as part of our necessary and normal costs of doing business and built into our cost and pricing structure. HOPE does not plan on raising fees or restricting access to credit due to this effort.

To maximize efficiencies in data collection, the Bureau should coordinate with the CDFI Fund to streamline 1071 reporting requirements with CDFI Fund Certification, Annual Reporting, and Transaction Level Reports. The CDFI Fund is currently undertaking a review and improvement to its current annual reporting process for all CDFIs.[17] Areas of coordination could include consistency of definitions, the types of data collection, and the timing of required reporting. The Bureau and the Fund should explore options to streamline annual reporting requirements such as through data sharing.

3.    **Robust data collection is beneficial for individual lenders, beneficial for borrowers, and creates a level playing field for a more robust market place.**

Gathering this data is not cost-prohibitive, but to the extent there is a cost, it is outweighed by the benefits. It also underscores the importance of having broad coverage in terms of covered lenders and covered credit in order to having a level playing field across all lenders. The benefits include identifying capital gaps in the market we serve, as well as being able to share HOPE's practices as a mission-based lender.

Importantly, and at the heart of 1071, this data is necessary to close the capital gap for businesses owned by people of color. Black entrepreneurs have difficulty accessing credit, often receiving less credit than white-owned businesses. In 2016, approximately 60% of Black entrepreneurs reported difficulty accessing credit and securing funds for expansion, twice the rates for white entrepreneurs.[18]  Prior to COVID-19, **the credit gap in the Black business community stood between $7 and $8.5 billion**, the highest in the nation on a population-adjusted basis, in terms of unmet needs.[19]

Closing the capital gap will fuel economic growth, beneficial to lenders and the communities we serve. Prior to COVID-19, there were 2.6 million Black-owned businesses in the U.S., supporting 3.56 million jobs.[20] These jobs created by Black businesses comprise a fifth of the employed Black workforce. This number could be much higher if Black businesses had access to the necessary capital to grow. According to the Association for Economic Opportunity, if Black-owned businesses could reach employment parity with all firms, they would create nearly 600,000 new jobs.[21] And, assuming these businesses hired mostly Black employees, these new jobs could significantly reduce the rate of unemployment in the Black community.

Growing and supporting Black entrepreneurs is key to building wealth in Black communities. While white adults have 13 times the wealth that Black adults do, the gap closes to three to one when comparing the median wealth of white business owners to Black business owners. The

7

AdminRecord-001238

median net worth for Black business owners is 12 times higher than Black non-business owners.[22]

Ultimately, **closing the racial wealth gap has the potential increase the national Gross Domestic Product (GDP) between $1 and $1.5 trillion by 2028.**[23] Closing the gap in access to small business capital for businesses owned by people of color is a critical pathway to closing the racial wealth gap. Lenders and businesses alike will benefit from the resulting economic activity from a fairer, more robust marketplace.

**Conclusion**

Collecting and using data is essential to the success of small lending entities. Data transparency and fairness should be an advantage to smaller lenders, allowing smaller entities to better distinguish our value proposition compared to larger lenders who are not in, or as familiar with the people and places we serve; or predatory lenders who prey on those most vulnerable.

Many CDFIs and smaller lenders are already collecting much of the data proposed in the CFPB outline. To the extent any additional data is required, the additions are incremental, the related costs are marginal, and are far outweighed by the benefits of this data.

There is already too high of a cost for not having these data reporting requirements in place. This is evident in continued disparities and inequities in the business credit marketplace. The limited data currently available, primarily through after-the-fact surveys of business owners about their experiences, clearly shows that there are lenders who continue to exclude businesses owned by people of color and women-owned businesses. These exclusionary lending practices, which Section 1071 has the opportunity to address, is costly to businesses, lenders, and our economy as a whole.

What we need are clear rules of the road and a level playing field, not only for lenders, but more importantly for all borrowers, regardless of their race, gender or geography. The Bureau has the opportunity to accomplish this through its Section 1071 rulemaking.

Thank you for your consideration of this information. HOPE appreciates the opportunity to participate and provide feedback.


Sincerely,

Diane M. Standaert
Senior Vice President, Policy and Advocacy
diane.standaert@hope-ec.org

AdminRecord-001239

---

[1] See e.g., Kiyadh Burt, Hope Policy Institute, "CDFIs Provide Relief to Women and Minority-Owned Businesses," April 22, 20202, http://hopepolicy.org/blog/cdfis-provide-relief-for-minority-and-women-owned-businesses/

[2] Claire Kramer Mills and Jessica Battisto, Federal Reserve Bank of New York, "Double Jeopardy: Covid-19's Concentrated Health And Wealth Effects In Black Communities," Aug. 2020, at 6 https://www.newyorkfed.org/medialibrary/media/smallbusiness/DoubleJeopardy_COVID19andBlackOwnedBusinesses (Double Jeopardy)

[3] Id.

[4] Id.

[5] Id. (finding "Among Black-owned firms, 28% of nonemployers and 54% of employers applied for financing in the last 12 months, compared to 45% of white employer firms and 25% of white nonemployers).

[6] Id.

[7] Ashley Harrington, Center for Responsible Lending, Testimony Before the United States House Committee on Small Business, "Paycheck Protection Program: Loan Forgiveness and Other Challenges," June 17, 2020

[8] U.S. Government Accountability Office, "COVID-19: Federal Efforts Could Be Strengthened by Timely and Concerted Action," Sept. 2020, at 59, https://www.gao.gov/assets/710/709492.pdf

[9] Id. at 62, https://www.gao.gov/assets/710/709492.pdf

[10] Double Jeopardy, at 2.

[11] Robert W. Fairlie, National Bureau of Economic Research, "The Impact Of Covid-19 On Small Business Owners: Evidence Of Early-Stage Losses From The April 2020 Current Population Survey," June 2020, https://www.nber.org/system/files/working_papers/w27309/w27309.pdf

[12] CFPB, Small Business Advisory Review Panel for Consumer Financial Protection Bureau, Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered, Sept. 15, 2020, at 12, https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf

[13] See e.g., Federal Reserve Banks, 2020 Report on Small Employer Firms: Small Business Credit Survey (finding that 36% of all firms with 1 to 499 employees applied to small banks, including 32% of small firms with medium to high credit risk).

[14] Hope Policy Institute, Analysis of SBA Office of Advocacy, "Small Business Bank Lending by State,2019: Outstanding Small Business Loans by Banks Headquartered in Alabama, June2019," (reporting bank lending of small business loans under $1 million) https://cdn.advocacy.sba.gov/wp-content/uploads/2020/09/10092934/State-Tables-SBL-Report.pdf

[15] CFPB, Small Business Advisory Review Panel for Consumer Financial Protection Bureau, Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered, Sept. 15, 2020, at 61, https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf

[16] SBA, "Weekly Approvals Report with data as of 09/30 for each FY," https://www.sba.gov/sites/default/files/2020-10/WebsiteReport_asof_20200930-508.pdf

[17] See generally CDFI Fund, "CDFI Certification Revisions For Public Comment," https://www.cdfifund.gov/programs-training/certification/cdfi/Pages/CertificationPRA.aspx

[18] Federal Reserve Bank of Cleveland, 2016 Small Business Credit Survey: Report on Minority-owned Firms, https://www.fedsmallbusiness.org/survey/2017/report-on-minority-owned-firms

[19] Association for Enterprise Opportunity. Tapestry of Black Business Ownership in America: Untapped Opportunities for Success. Feb. 2017, https://www.aeoworks.org/images/uploads/fact_sheets/AEO_Black_Owned_Business_Report_02_16_17_FOR_WEB.pdf

[20] Id.

[21] Id.

[22] Id.

[23] McKinsey and Company, "The economic impact of closing the racial wealth gap," Aug. 13, 2019, https://www.mckinsey.com/industries/public-and-social-sector/our-insights/the-economic-impact-of-closing-the-racial-wealth-gap

9

AdminRecord-001240



November 9, 2020

Consumer Financial Protection Bureau
*Sent via email to: 2020-SBREFA-1071@cfpb.gov*
1700 G Street, NW
Washington, DC 20552

Re: Small Business Advisory Review Panel for CFPB Small Business Lending Data Collection
Rulemaking

I am writing on behalf of InRoads Credit Union (InRoads CU), a federally-chartered and insured credit
union, to provide supplemental written comments to assist the Small Business Advisory Review Panel
for the Consumer Financial Protection Bureau (CFPB) Small Business Lending Data Collection
Rulemaking. The following feedback is in response to the CFPB's "Outline of Proposals under
Consideration and Alternatives Considered" (the Outline) released in September 2020.

## General Comment

InRoads CU and all credit unions are unique in the financial services industry as not-for-profit financial
cooperatives with a statutory mission to promote thrift and provide access to credit for provident
purposes. The member-owned structure of credit unions ensures we provide products and services to
our members in a manner that is fundamentally different than for-profit financial service providers. In
fact, in many cases, the credit union may have been formed to meet the specific financial needs of
their geographic community, select employer group, or other field of membership. As a result, credit
unions have a vested interest in helping the members and small business they serve succeed by
meeting their credit needs and providing low cost financial services.

Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) is
intended to facilitate enforcement of fair lending laws and enable communities, governmental entities,
and creditors to identify business and community development needs and opportunities for women-
owned, minority-owned, and small businesses. InRoads CU supports the goals of section 1071 and
seeks to provide all members with fair and equitable financial opportunities. That said, we are
concerned about the potential for unintended consequences and substantial costs of compliance
associated with the creation of a broad data collection where one does not currently exist. In addition,
as entities bound to serve a specific field of membership, the data collected from credit unions would
likely be incomparable to other lenders that are legally permitted serve anyone walking through its
door or accessing its website.

As a small community-based financial institution, the 1071 data collection will likely create some
burden on our compliance resources. It is going to be important for the Bureau to keep its rule as
simple as possible in order to avoid creating unintended barriers for small business borrowers seeking
credit as well as ensuring community lenders are able to maintain the privacy of their members data.

## Special Commercial Lending Considerations for Credit Unions

Credit unions have different requirements and rules for business lending than for-profit financial
institutions. In 1998, Congress passed the Credit Union Membership Access Act, which capped credit
unions' ability to offer member business loans (MBLs). While credit unions operate in every U.S. state
and provide an array of financial services, not all credit unions provide business loans and the choice
to do so is based on the regulatory environment and the individual credit unions' membership. While
the National Credit Union Administration (NCUA) and relevant state regulators have made positive
changes to business lending rules over the years, credit unions' business loans are nevertheless subject
to hurdles and limitations that other lenders are not.

AdminRecord-001241

Consumer Financial Protection Bureau
2020-SBREFA-1071@cfpb.gov
Page 2

Despite these limitations, NCUA has noted credit unions' "long history of meeting [the] business lending needs of their members," and such commitment proved essential in the period from 2007 to 2010.[1] This trend continues to this day as credit unions have stepped up to serve struggling businesses during the COVID-19 pandemic. We urge the CFPB to consider and recognize the role credit unions' play in meeting the commercial lending needs of consumers during times of crisis, and to avoid adopting a broad rule that could hinder the ability of credit unions to continue offering low-cost commercial loans.

## Scope of Proposed Rule
Based on the CFPB's Outline, lenders would collect and report lending data for all applicants that satisfy the rule's definition of a small business, including identifying women-owned and minority-owned businesses within that pool, but would not be required to collect and report section 1071 data for women-owned and minority-owned businesses that are not "small." We agree a business' status as a "small business" is the most germane factor when considering the intent and purpose of section 1071 and we support the CFPB's proposed scope. In addition, given the highly complex nature of lending to businesses that are not "small," we believe the Bureau's rulemaking is better suited focusing exclusively on the small business lending market.

## Definition of "Financial Institution" (Lender Coverage)
The Bureau is considering defining "financial institution" in a manner that would extend the rule's data collection and reporting requirements to a variety of entities engaged in small business lending, including, banks, savings associations, credit unions, online lenders/platform lenders, Community development financial institutions (CDFIs), lenders involved in equipment and vehicle financing, commercial finance companies, governmental lending entities, and non-profit non-depository institution lenders. As a starting point, we support the CFPB's proposed definition of "financial institution." The Bureau's rulemaking should ensure all types of entities offering commercial loans are initially covered so as not to favor one business model or charter type over another, which would create an uneven playing field and affect the lending market.

### Exemptions
As the CFPB moves forward, we believe it should ensure credit unions remain well-positioned to provide access to safe and affordable loans to small businesses. When rules make it expensive or difficult to access safe and affordable products and services from credit unions, consumers pay the price. We would recommend the CFPB consider using its exemption authority in meaningful way and exempt all credit unions from collecting and reporting 1071 data. Credit unions have no pattern of unfair lending and alternatively, are seeking ways to provide more business loans to consumers, not fewer.

That said, to mitigate its broad approach to lender coverage, the Bureau is considering whether to include a size-based or activity-based exemption for determining when a lender must collect and report 1071 data. The Bureau is – rightfully – concerned that the rule's potentially high cost of compliance may result in a decrease in credit availability for small businesses as smaller lenders pull out of or minimize their presence in the business lending market.

We support the addition of exemptions for smaller lenders. The best path forward for the Bureau, based on the options offered, would be to adopt both Option B (i.e. $200 million in assets) for the size-based exemption and Option 3 (i.e. originations of at least 100 loans or $10 million) for the activity-based exemption. While adopting either of these options would be helpful to small lenders, we believe taking the hybrid approach would safeguard continued credit availability for the small businesses served by community-based lenders. For example, a community-based lender may be over $200 million in assets but, due to a small volume, the cost of compliance on a per loan basis could mean an

---

[1] 81 Fed. Reg. at 13,532 (stating, "while lending at banks contracted during the recent recession, credit unions continued to lend").

Consumer Financial Protection Bureau
2020-SBREFA-1071@cfpb.gov
Page 3

asset-based exemption alone is insufficient and causes the lender to reduce its offerings. The same can be true for an activity-based only exemption, which may not properly account for a small size lender that focuses its services on small business lending.

In regard to entities that are not the lender of record, the Bureau is considering where more than one party is involved on the lender side of a single small business loan or application, the 1071 requirements would be limited in the same manner as in Regulation C, which implements the Home Mortgage Disclosure Act (HMDA). We caution against the use of HMDA as guide *in this context* because, although familiar to most mortgage lenders, mortgage lending and small businesses lending are completely different product lines with different structures and complexities. In the credit union context, which includes the authority to conduct loan participations, we believe the 1071 requirements should fall on the originating lender which would be in the best position to have relevant information on the borrower. In fact, participating lenders would be hard pressed to comply with 1071 given their distance from the borrower and the data they provide would likely be duplicative of the originating lender.

**Definition of "Small Business" Applicants**
The Bureau is considering three alternative approaches for a simpler size standard to determine the meaning of a "small business." These potential approaches to determining whether an applicant is small, include: (1) only gross annual revenue; (2) either the number of employees or average annual receipts/gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services; or (3) size standards across 13 industry groups that correspond to two-digit NAICS code industry groupings. Of the three options currently being considered, Option 3 is preferred. However, if the Bureau chooses to adopt Option 3, then it should be sure to provide substantial compliance guidance for determining a business' industry classification and how to classify businesses that may fall into more than one category.

We would be concerned Option 1, gross annual revenue, would not properly account for regional differences in business size. In addition, Option 2 and its use of number of employees or annual receipts/gross revenue – depending on the business type – would be overly complex and potentially confusing.

**Definitions of "Women-Owned Business," "Minority-Owned Business," and "Minority Individual"**
The Bureau is considering proposing 1071 guidance that would mirror the Home Mortgage Disclosure Act (HMDA) aggregate categories and clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. We support the use of HMDA as a guide for developing the 1071 definition of minority individual and encourage the Bureau to create regulatory consistency where appropriate.

Regarding control, the Bureau also is considering clarifying the definition of "women-owned business" and "minority-owned business" by using simple language that mirrors the concepts of ownership and control that are set forth in the Financial Crimes Enforcement Network's (FinCEN) customer due diligence (CDD) rule. As most credit unions are familiar with the CDD rule, we support the use of these concepts to determine ownership and control to create regulatory consistency and ease compliance.

**Product Coverage**
The Bureau is considering proposing that a covered product under section 1071 is one that meets the definition of "credit" under ECOA, including term loans, lines of credit, and business credit cards. We support the proposed product coverage as they represent the most common business financing products used by small businesses and their inclusion would assist in fulfilling the purposes of section 1071.

503.397.2376 | PO Box 537, St. Helens, OR 97051 | inroadscu.org    Be In**dividual**

AdminRecord-001243

Consumer Financial Protection Bureau
2020-SBREFA-1071@cfpb.gov
Page 4

The proposal also contemplates the express exclusion of consumer credit used for business purposes, leases, trade credit, factoring, and merchant cash advances (MCAs). We agree with the exclusion of these products, especially consumer credit used for business purposes. While some of the smallest businesses may blur the line between personal credit and business credit, the inclusion of consumer credit within the scope of section 1071 could vastly expand the scope of the data collected beyond usefulness and also greatly increase the costs of compliance.

**Definition of an "Application"**
Section 1071(b) requires that FIs collect and report to the Bureau certain information regarding any application to a financial institution for credit. As a result, the Bureau is considering proposing to define an "application" largely consistent with the Regulation B definition of that term. That is, as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."[2] We support adopting a definition that is consistent with Regulation B, which would be helpful for training purposes, rather than creating a wholly new definition specific to the 1071 rulemaking.

**Data Points**
Section 1071(b) requires lenders to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. If the answer is yes, then the statute requires lenders to clearly and conspicuously collect several items enumerated in the statute. The Bureau refers to these items as "mandatory data points."

As a general principle, we believe the Bureau should finalize a rule that sticks to the statutorily required data points and avoid adding discretionary data points that may not further the purposes of section 1071 in a material way.

InRoads CU has several comments and suggestions for the proposed mandatory data points:

i.    *Whether the applicant is a women-owned business, a minority-owned business, and/or a small business*

Yes, InRoads CU determines ownership and percentage of ownership. This determination usually occurs during application process and gathering of supporting materials.

ii.   *Application/Loan Number*

InRoads CU uses application numbers that are system generated. These loan numbers are assigned at loan booking and we would have both numbers for completed and booked loans.

iii.  *Application Date*

The Bureau is considering proposing that lenders report the application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application." We support this proposal and recommend the Bureau adopt a "grace period" of several days on either side of the date to ease compliance.

iv.   *Loan/Credit Type*

No comment on this mandatory data point.

v.    *Loan/Credit Purpose*

---

[2] 12 CFR 1002.2(f).

503.397.2376 | PO Box 537, St. Helens, OR 97051 | inroadscu.org        Be Individual

AdminRecord-001244

Consumer Financial Protection Bureau
2020-SBREFA-1071@cfpb.gov
Page 5

The loan/credit purpose is generally gathered during application process and referenced in the credit memo. We would potentially need to modify systems to create custom fields to capture for purposes of section 1071 reporting.

*vi.   Credit Amount/Limit Applied For*

Credit applicants may request a range or "up to" and the final approved amount may depend on appraisals or other factors. We suggest the Bureau consider adopting several options based on credit ranges as opposed to requiring a specific credit amount to be reported. This data points should also include an option of "not applicable" for instances where a small business borrower does not specify an amount of credit or limit applied for. In addition, we are concerned the credit amount/limit applied data point could be misconstrued as a denial of original amount when considered against the approved credit amount/limit.

*vii.   Credit Amount/ Limit Approved*

The Bureau is considering proposing that lenders report: (1) the amount of the originated loan for a closed-end origination; (2) the amount approved for a closed-end loan application that is approved but not accepted; and (3) the amount of the credit limit approved for open-end products (regardless of whether the open-end product is originated or approved but not accepted). For consistency with the "Credit Amount/Limit Applied For" data point, we suggest the Bureau consider adopting several options based on ranges as opposed to requiring a specific credit amount/limits to be reported.

*viii.  Type of Action Taken*

The Bureau is considering proposing five categories for reporting "action taken": 1) loan originated; 2) Application approved but not accepted; 3) application denied; 4) incomplete application (closed or denied); and 5) application withdrawn by applicant. We believe the Bureau should further explain the difference between Category 3 and 4, which both cover "denied applications. In addition, the categories should account for other common circumstances, such as when an applicant is merely rate shopping with multiple lenders. We would not support additional reporting of denial reasons as such information could lead to substantial consumer privacy concerns. For example, the borrower could lack sufficient cash flow to support a loan request.

*ix.   Action Taken Date*

The Bureau should permit a "grace period" of several days for reporting the specific Action Taken Date, similar to the "Application Date" data point, to ease compliance burden.

*x.   Census Tract (Principal Place of Business)*

InRoads CU does not currently capture or track census tract separately, but does receive this information on certain loans during the appraisal process or be able to identify using free software. However, requiring the reporting of a census tract will add a step to our process and need a field created to capture and save this information.  We typically collect a borrower's address of record but in some cases the funds may be used at a different location, The Bureau would need to clarify which location information needs to be captured and reported.

*xi.   Gross Annual Revenue*

The Bureau is considering proposing that lenders report the gross annual revenue of the applicant during its last fiscal year. In some cases, small businesses serviced by community-based lenders are quite unsophisticated and may not know their specific gross annual revenue for 1071 reporting purposes. In our loan process, the borrower reports gross revenue and the reported figure is usually verified with tax returns or audited financial statements. We recommend the Bureau consider permitting lenders to report revenue based on ranges as opposed to requiring a specific gross annual

revenue amount for the borrower to be reported.

*xii.   Race, Sex, and Ethnicity of Principal Owner(s)*

Section 1071(e)(2)(G) requires FIs to collect and report "the race, sex, and ethnicity of the principal owners of the business." As stated above, for regulatory consistency and ease of compliance, we support the use of the HMDA aggregate race, sex, and ethnicity categories to define "minority individual" and the FinCEN CDD rule ownership and control requirements to determine "principle owner." In addition, we strongly support this data point being based solely on the applicant's self-reporting, as opposed to visual observation, surname or another less reliable criteria.

## Discretionary Data Points
The proposed discretionary data points are of questionable use to the Bureau and would be needlessly burdensome. The Bureau can look as far as recent history, with the 2015 HMDA Rule, to find a situation where the addition of unnecessary discretionary data points created substantial costs of compliance. Those discretionary data points are now under review for possible reduction. In developing an entirely new data collection, as a starting point, the Bureau should limit its data set to data points that are statutorily required, and not add discretionary data points merely for the sake of collecting more data. In doing so, the Bureau could revisit its data set in the future and, if the collection of additional data proves to be justified, build out additional data points from there. In the alternative, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters – like the partial data point exemption approach taken in the HMDA context.

## Shielding Data from Underwriters and other Persons (Firewall)
Section 1071(d) includes two provisions that require a lender to limit internal access to certain information collected under section 1071. As a result, the Bureau is considering proposing that lenders would need to limit access to an applicant's responses to specific inquiries regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners. The Bureau is also considering proposing that an applicant's response to the 1071(b) inquiry regarding small business status need not be firewalled off from underwriters and others pursuant to 1071(d)(1). Additionally, the Bureau is considering proposing to permit lenders to give underwriters, employees, and officers access to the responses when the lender determines that such access is needed for the underwriter, employee, or officer to perform his or her usual and regularly assigned job duties.

We understand the intent behind firewalling certain section 1071 data collection information from any staff considering and making credit decisions. However, credit unions and other community-based lenders may find it difficult to comply with arbitrary firewall requirements given their small staff size. For example, according to CUNA research, nearly half of all credit unions have five or fewer full-time employees. We caution the Bureau against adopting a rulemaking that requires a firewalling of information without also establish some additional reasonable accommodations for lenders with a small number of employees. Not doing so would require lenders to either hire additional staff, outsource additional duties to vendors, or limit their business lending offerings.

## Compiling, Maintaining and Reporting 1071 Data to the Bureau
The Bureau is considering proposing that 1071 data collection be done on a calendar year basis, and submitted to the Bureau by a specified date following the end of each calendar year. We generally support calendar year collecting and reporting. However, we caution the Bureau against aligning the annual reporting dates for section 1071 with the reporting dates for HMDA – for many small reporters, complying with two large complex data collection and reporting regimes at the same time could ultimately strain finite resources.

## Privacy Considerations involving Bureau Publication of 1071 Data
InRoads CU has concerns about broad collection of financial data about consumers that could be used in ways not intended by the Dodd-Frank Act. For example, since not all credit unions participate in a

Be INdividual

AdminRecord-001246

Consumer Financial Protection Bureau
2020-SBREFA-1071@cfpb.gov
Page 7

commercial lending, any localized data made available to the public may be traceable to consumers in certain areas. A consumer seeking a small business loan to create a startup, or for another reason, may have concerns about their information becoming public. For example, this could be a concern if the consumer is employed elsewhere while building their business. To mitigate these concerns, the Bureau should only publicly release lending data at the state-wide level and in aggregated form.

Furthermore, requiring the encrypting of this data could present liability and costs concerns to credit unions that could harm their participation in this market. Data breaches and protecting members privacy are a top priority of credit unions, and new regulations making this issue more complex could negatively impact credit unions and their members.

## Implementation Period
The Bureau is considering proposing that FIs have approximately two calendar years for implementation following the Bureau's issuance of its eventual 1071 rule. Depending on the complexity of the final rule, we believe two years – and no less than two years – should be a sufficient period of time for vendors to adjust their products and services, and for covered entities to update or revise their systems and processes, and make additional changes necessary to meet the new 1071 rule. However, during the period prior to implementation, the Bureau should regularly check in with vendors and covered entities to ensure compliance preparations are progressing as expected and consider extensions if issues that could affect industry preparedness arise.

## Conclusion
On behalf of InRoads CU, thank you for the opportunity to serve as a Small Entity Representative on the Small Business Review Panel and for considering my feedback as you work to develop this important rulemaking. If you have questions or require additional information related to our feedback, please do not hesitate to contact me at (503) 397-2376 or brooke.vanvleet@inroadscu.org.

Sincerely,

*Brooke Van Vleet*

Brooke Van Vleet
President/CEO

AdminRecord-001247

**From:** Kwesi Rogers
**To:** 2020-SBREFA-1071
**Subject:** SBREFA comment
**Date:** Friday, October 30, 2020 6:01:43 PM
**Attachments:** image001.png
image002.png
image003.png

**CAUTION:** This email originated from a non-government domain. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact Cybersecurity Incident Response Team (CSIRT) at 202-435-7200 or report a suspicious email.

Good afternoon.

I would like to thank the CFPB for the honor of being named a SBREFA panelist on the Bureau's Section 1071 Outline. As I mentioned during my closing remarks I was impressed at how well organized and thought out the sessions were. The materials were perfectly organized and presented in in understandable format.

Second, I would like to speak to several comments made during the two days of discussion.

On a few occasions some of my SBREFA colleagues suggested that factoring should be a covered activity. There are several reasons I disagree with this suggestion. I am not a lawyer, but the language of both Section 1071 and the Equal Credit Opportunity Act make it clear that the transactions have to be related to the extension of credit. Factoring is not the extension of credit as factors purchase a company's assets (accounts receivable) at a discount in exchange for a cash advance. Factors generally rely on the credit worthiness of the account debtor, and not the seller (small business) of those receivables.

It is not only the plain language of Section 1071 and Equal Credit Opportunity Act that would make coverage of Factoring improper. Section 1071 states, "The purpose of this section is to facilitate the enforcement of fair lending laws" and address community needs. In an effort to accomplish the aforementioned goal, this section is intended to collect data on the extension of credit to women-owned businesses, minority-owned businesses and small businesses. Since factors purchase existing receivables, conflating factoring with the product that lenders offer would corrupt the very data the Section is designed to collect. The CFPB has appropriately recognized the need to preserve accurate data. This requires the ability to compare apples to apples.

In light of the foregoing, it is my hope that the CFPB will adhere to the outline's indication that factoring would not be required by the impending regulations to collect data on its activities on the basis that they do not extend credit.

Again, thank you for permitting me to participate in the process.

Respectfully Submitted,

Kwesi

99

Kwesi Rogers
President and CEO
301.307.5091
6701 Democracy Blvd #300
Bethesda, MD 20817

 



100

AdminRecord-001249



## Lakota Funds
### *Investing in the Oyate*

*Lakota Funds mission is to promote economic sustainability on the Pine Ridge Reservation and geographic service area, through business loans, technical assistance, and wealth building education for families and businesses.*

November 6, 2020

Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552
Dodd-Frank 1071

To Whom It May Concern:

Thank you for the opportunity to join the discussion regarding the update to the Dodd-Frank Wall Street Reform and Consumer Protection Act, with respect to small business lending reporting requirements under Section 1071 of the Act. I am encouraged the Consumer Financial Protection Bureau (CFPB) is interested in hearing from Native community development financial institutions (NCDFIS) prior to implementation of any updated rule.

To follow up on the discussion, here are additional comments regarding Native CDFIs' concerns around implementing new small business lending reporting requirements. After reviewing the matter, I have two broad concerns. First, there are new, additional reporting requirements that will be a burden for nonprofit Native CDFIs. Second, nonprofit and rural Native CDFIs will have serious privacy concerns about reporting requirements. These privacy concerns could drive consumers from using Native CDFIs. These major concerns could harm Native CDFI operations and could prevent these nonprofits from making loans to target communities. Therefore, given these two concerns, ***we strongly recommend that non-depository, nonprofit Native community development financial institutions be exempt from these reporting requirements.*** Fortunately, the law permits the CFPB to exempt a class of financial institutions, under 15 U.S.C. SEC. 704B (g)(2)(Pub.L. 111-203, 124 Stat. 2058). We strongly urge the CFPB to exercise this exemption.

BIA 2, Lakota Trade Center, Suite 201,
PO Box 340                          www.lakotafunds.org
Kyle, SD 57752

Office: 605.455.2500
FAX: 605.455.2585

101

AdminRecord-001250

**Background.**

1. **Burdensome & Duplicative Reporting.** As a nonprofit Native CDFI, our organization has serious concerns about the added burden of reporting on top of two existing federal reporting requirements and independent audits. First, nonprofit Native CDFIs must report much of the same information to the Treasury Department's CDFI Fund in order to receive CDFI certification. Second, nonprofit Native CDFIs (both independent 501(c)3 and tribally-sponsored IRC-7871 nonprofits) must file documentation annually. Much of the information already supplied to the Treasury and IRS would be duplicative of the information requested by the Dodd-Frank reporting requirements. In addition to these annual federal reporting demands, Native CDFIs also complete independent audits.

2. **Privacy Concerns Could Impede Business.** As a rural nonprofit Native CDFI, our organization also has serious concerns about data privacy when reporting ethnicity demographics for Native Americans. Native Americans make up 1.5% of the US population, so any reporting in a small or rural community could easily identify a loan applicant. This concern is further amplified if potential clients are concerned their information could become public if they apply for a loan with a smaller, local lender as opposed to a large national lender. If clients choose to work with national lenders as opposed to Native CDFIs, this could dramatically harm Native CDFIs.

Given these two concerns, we strongly recommend that non-depository, nonprofit community development financial institutions, which have already proved their mission, exempt from additional disclosure and reporting requirements. The Dodd-Frank Wall Street Reform and Consumer Protection Act will allow for an exemption for Native CDFIs. Below is the section which allows for this exemption.

- 15 USC 1691o–2. 'SEC. 704B (g)(2) EXCEPTIONS.—The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, ***exempt any financial institution or class of financial institutions from the requirements of this section***, as the Bureau deems necessary or appropriate to carry out the purposes of this section.

While our organization understands and respects the purpose of the Dodd-Frank reforms, duplicative reporting and privacy concerns with respect to Section 1071 of the act could severely harm Native CDFIs. We strongly urge the CFPB to exempt Native CDFIs as a class of financial institutions from these new and potentially harmful reporting requirements.

Please feel free to contact me or other Native CDFIs to follow up on this recommendation.

Sincerely,

Tawney Brunsch
Executive Director
Lakota Funds

AdminRecord-001251



November 9, 2020

Grady Hedgespeth
Assistant Director
Office of Small Business Lending Markets
CFPB

Via 2020-SBREFA-1071@cfpb.gov

Grady,

It was an honor to serve as a panelist for the SBREFA. I appreciate that the CFPB allowed an institution of MariSol's size under $50 million in assets to participate. We also appreciate the effort taken to hear the voices of CDFI's as MariSol is a CDFI.

Here is my written input to 1071:

## Data Collection:

I agree that eventually, all FI's will have to obtain information for any small business, so establishing a form and the right to collect the data needed from all small business is wise. There is no objection and would impact MariSol as all our business lending would meet current definitions of small. We do not process our loan differently for the business type.

I agree that providing guidance on a minority individual is wise; the proposed guidance of Black, Asian, American Indian, Alaska Native, Native Hawaiian or other Pacific Islander, or Hispanic or Latino is reasonable. It is what MariSol currently provides for reporting to the Community Development Fund in annual reporting. It is a guideline that most consumers and lenders understand.

Mirroring the concepts of ownership and control set for in the Financial Crimes Enforcement Network CDD rules is logical. It would be efficient for a Financial Institution since an account will have to be opened and this information is obtained.

Currently, 95% of MariSol's business accounts are sole proprietorship or 100% owner owned LLC's.

---

AdminRecord-001252



**Mandatory Data Points:**

There is no objection to the mandatory data points as most of this information is collected on a current business application.

MariSol does not currently collect race, ethnicity, women-owned status, or minority-owned status of principal owners and strongly encourages to CFPB create a standard form similar to information collected for HMDA with the same opt-out disclosures for the consumer.

MariSol does not routinely calculate the annual revenue for a business as net income for the individual borrower is used for underwriting, and would be an additional step for MariSol and the consumer.  Many applicants do not file tax returns timely and often do not have a profit and loss statement for their business.  MariSol will find it challenging to calculate gross annual revenue.  Most of MariSol's applicants are a sole proprietorship. Accounting/book-keeping for most small businesses is poor. MariSol has developed alternative ways to show income thru analysis of bank statements as well as invoices. This mandatory data point will be a challenge.

The majority (955) of our business have one owner, the remaining two owners.

MariSol does not report yet for HMDA but does collect the information.  There is no system in place to "leverage."  MariSol would have to create a system and likely manually process data collected.

MariSol does not support visual observation or surname reporting from the FI.  MariSol is an Arizona based FI, and surname is an ineffective means of determining ethnicity. Years of experience in the Hispanic market are not equivalent to expertise in determining ethnicity by sight.  Visual observation is problematic with HMDA and makes staff uncomfortable.

MariSol is a 17 person FI.  Our Loan Officers are the application takers, underwriters, and closers.  There is no feasible way for MariSol to separate duties at our size and level of lending.  Section 1071(d) is a material problem for a lender of our size and imposes a material hardship.  MariSol would have to hire an outside third party or hire internally to meet the separation guidelines.  That would mean a significant increase in costs to the credit union.  There is a distinct possibility that if there is no proposal to permit FI's to circumvent this rule with the proper disclosure, MariSol would consider leaving all small

AdminRecord-001253



business lending. Being a CDFI, this would harm our members and our community. MariSol would welcome the disclosure option and have no issue having the applicant sign the disclosure at the time of application.

MariSol is a CDFI since 2010; we currently track census tracts for all our accounts and have no issue with the collection of this data point. However, not all CU's are CDFI's, and the collection of this data will be new with a steep learning curve. Most credit union core processors do not have a field for census tracks in loan products other than mortgages. MariSol had to pay its core processor for an upgrade to track all our membership.

**Application Definition:**

MariSol does not have an objection to the Regulation "B" definition of an application. We agree that inquiries/pre-qualification, Re-evaluations (renewals), and solicitations should not be reported.

The possible proposal for using a completed application is wise. While it may exclude incomplete applications and withdrawn applications, it will also be more effective as incomplete and withdrawn applications often do not have sufficient information for complete reporting. As cited earlier, gross revenue will be a challenge for a completed application, so very near impossible for an incomplete application. Acquiring data on ownership, ethnicity, or race will be difficult if the applicant does not complete, and there is no CDD for BSA since an account is not opened, and borrowers do not like completing these data points

MariSol considers a complete application when there is:
- Name of borrower and name of the business.
- Purpose of the loan
- Amount of the loan
- Written loan application which the borrower states income amount
- Address for the applicant and the business if different.
- Social Security or ITIN.

MariSol will endeavor to collect the majority of mandatory data points at the time of application. A standard form that goes with the application for the race, sex, ethnicity, etc. would go a long way in collecting this data.

MariSol would prefer reporting denial reasons to explain decisions. MariSol recommends that at least two reasons are allowed to be chosen but that only one reason is required.

MariSol
Federal Credit Union
*Solutions*

**Costs:**

MariSol does not have a strong idea of the one-time costs. MariSol is currently looking at software for HMDA from $5,000 to $10,000 in one-time costs.

A review of Type A borrowers' costs where MariSol would land shows that the CFPB does not understand that a small institution does not typically get large breaks in products' costs. MariSol experience is that vendors charge more per borrower since the number of borrowers is smaller. The idea that a Type A would pay $0.00 for an internal audit is ridiculous. Type B FI costs seem to be more in line with what MariSol anticipates for the future.

**Definitions of Small Business Applicants:**

MariSol believes that using gross annual revenue under $5 million is the easiest method to use. MariSol does not routinely collect # of employees. MariSol collected the six-digit NAICS codes when doing the SBA PPP loan program this year. MariSol discovered that 99% of the applicants had never heard of the code and did know their code. MariSol looked up 99% of the codes for the PPP loans using www.naics.com. This data collection will be another steep learning curve for all CU's that have not used this site.

**Publication of data from 1071**

MariSol agrees with other panelists from the more rural areas about the unintentional issues with releasing data for specific areas. MariSol agrees that a business will be able to identify themselves and competitors that would create unintended harm. The CDFP is considering a balanced approach to the release of data, which seems wise. The main purpose of 1071 is to collect data for analysis; while data has to be disclosed, the CFPB does not have to release it.

The CFPB asked how long it will take to comply; it will take us at least two years after approval to comply due to our size. There are no current vendors with the capability of data collection at this time, unlike with the HMDA rule, where vendors were available.

---

AdminRecord-001255



**Definition of Financial Institution:**

As a small institution, MariSol would want to have a size sized exemption. However, MariSol agrees on the intent of the 1071 rule for data gathering and will agree with the panelists' consensus in using activity-based exemptions, which means MariSol would have to comply.

The lender of record should be the lender that complies with the rule.

**Product Coverage:**

MariSol agrees that the credit definition under the credit is adequate and supports the proposal not to have consumer business purpose loans included. MariSol believes there need to be clear definitions of what is a business purpose consumer loans. As a credit union, the CFPB needs to recognize that credit unions consider business loans under $50,000 as consumer loans per NCUA Rules and Regulations, but under 1071 may be considered business loans. That will create a conflict as well as issues with collecting the reporting data. These loans are normally treated as consumer loans through the application process, underwriting, and closing documentation. This area is problematic for all credit unions. Clear definitions, as well as specifically addressing this regulatory conflict, is needed.

Thank you for the opportunity to respond. I can be reached at 602-252-6831 ext 120 or a robinr@marisolcu.org

Sincerely,

Robin L. Romano
CEO

AdminRecord-001256



November 9, 2020

Mr. Grady Hedgespeth
Assistant Director
Office of Small Business Lending Markets
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**SUBMITTED VIA ELECTRONIC MAIL TO** 2020-SBREFA-1071@cfpb.gov

**Re: Written Feedback by SER Luz Urrutia following the Section 1071 SBREFA Panel**

Dear Mr. Hedgespeth:

Opportunity Fund is grateful for the opportunity to participate as a Small Entity Representative ("SER") in the Consumer Financial Protection Bureau's ("CFPB" or "the Bureau") Small Business Regulatory Enforcement Fairness Act ("SBREFA") panel, which was convened in October 2020 to provide perspective regarding the small business implications of the Bureau's forthcoming Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Dodd-Frank Act") final ruling.

Small business ownership drives economic mobility, creates jobs, and sustains families and communities. Yet entrepreneurs of color, low income individuals, immigrants, and women are disproportionately denied vital capital and support. After ten long years, we are looking forward to the Bureau's implementation of Section 1071 to better understand the small business lending landscape and assess the needs of small businesses who are seeking affordable and responsible financing. We believe that a rule that is broad and expansive with minimal exemptions, covers a broad range of products and collects pricing data in the form of APR will help the small business lending ecosystem better serve small businesses. Implementing Section 1071 will help lenders across the country, including Opportunity Fund, better connect underserved entrepreneurs to working capital and resources in order to build a more inclusive economy for everyone.

As mentioned in this letter and via my verbal remarks during the SBREFA meetings, we need a rule that is broad and expansive and includes all financial institutions and products (including MCAs, factoring and leasing) that are sought out by small businesses. Additionally, a pricing data point in the form of APR is needed to understand what products are offered to whom and at what cost.

AdminRecord-001257

**About Opportunity Fund**

Opportunity Fund is the leading non-profit financial institution founded in 1994 that drives economic mobility by delivering affordable capital and responsible financial solutions to determined entrepreneurs and communities. A nationally recognized leader among Community Development Financial Institutions (CDFIs), Opportunity Fund is the largest nonprofit microlender in the U.S. by portfolio size. We achieve our mission by providing micro and small business loans from $2,600-$250,000, with a particular focus on low and moderate-income entrepreneurs, minority, and women-owned businesses across 45 states. In addition, we offer business advising and technical assistance to our clients and any small business who may need this support.

Approximately 62% of Opportunity Fund's clients are low- to-moderate income; 74% are ethnic minorities, and 37% are women. These clients have an average credit score of 679, with approximately 7% having little to no credit history. Our loans provide disadvantaged entrepreneurs access to affordable credit to grow a business; support themselves and their families; create and retain jobs; and generate economic activity in their neighborhoods.

2020 has been a very difficult year for small businesses across the country, <u>especially for minority and women-owned businesses</u>. Opportunity Fund is working in overdrive to ensure that small businesses have the support to weather this pandemic, because even relatively small amounts of capital can make a huge difference for these entrepreneurs and their communities. In FY20 we invested $111,456,308 in small businesses and their communities. We provided $65 million in small business loans, $35 million in New Markets Tax Credits financing to high-impact community real estate projects, and $14 million in Paycheck Protection Program (PPP) loans. While the industry average PPP loan size was $101,000, our average PPP loan size was $14,829, going to some of the smallest and most vulnerable businesses in our country.

**Implementing Section 1071 is Urgent Now More than Ever**

There is currently no single comprehensive data set available to analyze trends within the U.S. small business lending industry. Section 1071 mandates that the CFPB collect data on small business credit, including data on race and gender. This data collection and reporting is critical to understanding the credit needs and financing outcomes of small business owners in today's lending marketplace—particularly for minority and women entrepreneurs.

The following Section 1071 recommendations, when implemented, will provide critical data points regarding the financing needs of small business owners and the outcomes of their applications. These insights are necessary to enable lenders, advocates, investors and the public sector to better meet the needs of *all* small business owners. We believe that the marginal added costs for lenders to collect and report this data is entirely offset by the increased  benefits to disadvantaged entrepreneurs and their access to responsible capital.

AdminRecord-001258

The time to act is now. The legislative intent of Section 1071 of the Dodd-Frank Act is to gain a full picture of minority-owned and women-owned small businesses and their obstacles in accessing credit. Given the catastrophic economic impact of COVID-19 on small businesses across the country, Section 1071 is now more urgent than ever. Minority-owned businesses, in particular, have been hit the hardest. Therefore, the scope of any proposed rule should ensure that the vast majority of minority and women-owned businesses are covered in the rulemaking.

This means that the scope of the definition of small business should be monitored regularly and adjusted as necessary.

**What Financial Institutions Should be Included**
Opportunity Fund supports the Bureau's proposal to define "financial institution" broadly so that it includes most types of institutions that serve the small business lending market. Today, minority-owned, women-owned, and small businesses are increasingly being served by a large variety of lenders, particularly non-depository institutions. Thus, it is important to define financial institutions broadly so the Bureau can capture the diversity of lenders serving small businesses, thereby providing more comprehensive data on the credit landscape.

To gain a full view of the credit access made available to minority and women-owned small businesses, the Bureau should not provide any blanket exemptions to Section 1071 reporting by financial institution type—regardless of whether they are private, public, or nonprofit. As a nonprofit, non-depository institution lender, we do not seek an exemption for our institution type. CDFIs like us must already report this data to the CDFI Fund in the U.S. Department of the Treasury.

As it relates to other exemptions, we support an activity-based exemption of 25 loans or $2.5 million in originated loans. The Bureau estimates that this would cover more than 99% of small business originations from depository institutions, which is admirable coverage in dollar terms. The Bureau also indicated that it does not have data that would allow it to estimate the number of applications that would be covered, or the number or value of loans, or applications, from non-DIs. This information is critical to understanding the size of loans made and the size of businesses receiving financing. Because the activity-based threshold is triggered by either a number of loans or by a total dollar value of originations, this will also ensure reporting from any non-depository institution providing a meaningful amount of small business credit in either originations or dollar terms but not holding it on their balance sheets.

We believe the Bureau should similarly be aiming for coverage of at least 90% in terms of number of all transactions, particularly for minority and women-owned businesses. According to a 2019 and 2020 Federal Reserve's Small Business Credit Survey, 76% of small business owners in America who seek financing are searching for loans of $250,000 or less; this rises to 80% for Hispanic-owned businesses and 91% for Black-owned businesses. Because minority and women-owned businesses are even more likely to seek smaller dollar amounts, it is imperative

AdminRecord-001259

that the majority of these transactions are covered. In summary, an activity threshold should be the only exemption granted to a financial institution (no additional asset-based, financial institution type, or product exemption) since it is a clearer indication of whether a lender is substantially engaged in the business of small business finance or whether a nominal number of loans indicates that small business lending is incidental to its lending activity. It is not the same to make $2.5 million in loans with an average size of $25,000 vs.$2.5 milion with an average size of $500,000.

This is consistent with HMDA rules historically, until 2020 when the threshold was raised to 100 loans.

**Defining Small Business: What is a Woman-owned Business? Minority-owned Business?**
Opportunity Fund supports the Bureau's efforts to achieve a simple definition of a small business and supports the proposed second alternative definition of a small business as one with gross annual revenues of $8M or less. Based on the CFPB's analysis, this would cover 99.6% of all employer firms, as well as 99.9% of both women-owned and minority-owned employer firms.

However, it remains critical that the definition of small business include both employer and nonemployer firms in order to capture comprehensive data on the small business credit market, particularly given that most minority-owned and woman-owned small businesses are non-employer firms. For 46% of Black-owned businesses, the owner is the only employee in their own firm.

*Minority and Women-Owned Small Businesses*
Opportunity Fund generally supports the Bureau's approach regarding the definition of women-owned and minority-owned business whereby a business is considered as such when more than 50% of the ownership is held by one or more women or minority individuals. However, this definition should in no way suggest that race and gender data be collected only on applicants that identify as women and/or minority individuals.

We recommend simplifying the definition as it relates to ownership or control to exclude the language regarding "percent of net profit or loss" that accrues to a specific individual. The initial definition is sufficient for determining ownership and focusing solely on ownership would reduce complexity for lenders and borrowers alike. In addition, defining ownership on a profit/loss calculation may not fully serve the objectives of 1071, in the sense that it may exclude business owners with different types of profit/loss or incentive structures. Like we mentioned earlier, the scope of any proposed rule should ensure that the vast majority of minority and women-owned businesses are covered. This means that the scope of the definition of small business should be monitored regularly and adjusted as necessary to meet the intent of Section 1071.

AdminRecord-001260

We support the definition of a minority individual to be consistent with the definition provided under HMDA.

**Financial Products Covered Must Include MCAs, Factoring and Equipment Leasing**
Opportunity Fund believes the Bureau's proposed list of covered products under Section 1071 is too narrow and excludes common financing and capital products that many small businesses use to fund their enterprises. Specifically, we urge that Merchant Cash Advances (MCAs), factoring, and equipment leasing be included in the list of covered products.

The justification that MCAs, factoring, and equipment leasing be excluded, because their inclusion may add additional complexity or reporting burdens, is unacceptable. Complexity is not a valid reason to exclude these products. By removing 'complex' product types, the compliance burden is disproportionately placed on providers and products that already meet stringent regulatory requirements, rather than actually leveling the playing field. This further incentivizes a two-tier financial system in which some providers exclude communities of color and others exploit them.

According to a white paper, Key dimensions of the small business lending landscape, published by the Bureau in 2017, the estimated number of accounts for factoring products was estimated to be at eight million, MCAs with one million, and equipment financing at nearly nine million. These three products accounted for over 18 million accounts, 2.5 times the estimated 7 million term loan accounts. While the dollar amount of factoring and MCA products is smaller than term loans, quantifying factoring and MCAs by number of accounts illustrates that these types of credit are widespread. Additionally, leasing products make up 13% of the small business financing market share in dollar terms, further indicating that those products should also be included.

Excluding MCAs, factoring, and equipment leasing as covered products will greatly inhibit gathering insight behind the most vulnerable small businesses who use these products, which Section 1071 intended to cover under this rule. We do not anticipate any significant reporting burdens for financial institutions who provide these products. On the contrary, we expect that more products covered under the rule will allow the Bureau to collect robust data that is needed to fully understand how products are being offered and to whom. Not only should these products be included under the rulemaking, but they should have the same activity-based exemptions as other product types.

The Federal Reserve Bank of Atlanta's Report on Minority-Owned Firms, December 2019 describes MCAs as "credit" and shows that MCAs disproportionately impact minority-owned businesses. According to the report, minority-owned firms more frequently applied for potentially higher-cost and less-transparent credit products (like MCAs and factoring.) Hispanic-owned firms sought MCA products more frequently than White-owned businesses, 15% compared with 8%, respectively. Black-owned businesses applied for factoring more

AdminRecord-001261

frequently compared to White-owned firms, 7% and 3%, respectively. Hispanic-owned firms applied for leases more frequently than White-owned firms, 11% and 8%, respectively."

Additionally, MCAs are often marketed as loans and use underwriting practices that factor in a merchants' credit ratings and bank balances, instead of their receivables. Truth in Lending legislation passed in several states (California and New York) and proposed at the federal level, define small business finance as including factoring, MCAs and leasing.

**Mandatory Data Points Must Include Pricing Terms**
Opportunity Fund supports the collection of the proposed mandatory data points: whether the applicant is a women-owned business, a minority-owned business, and/or a small business; application/loan number; application date; loan/credit type; loan/credit purpose; credit/limit applied for; credit amount/limit approved; type of action taken; action taken date; census tract; gross annual revenue; race, sex, and ethnicity.

*Discretionary Data Points Should Become Mandatory*
We support the mandatory collection of the Bureau's proposed discretionary data points: pricing, time in business, NAICS code, and number of employees.

Collecting the necessary pricing information to compare pricing across products and providers should be mandatory. APR is the only established metric that enables informed comparisons of the cost of capital over time and between products of different dollar amounts and term lengths. APR is the time-tested rate that people know and expect, because it is the legally required standard for mortgages, auto loans, credit cards, student loans and personal loans, including short-term loans. In fact, the Bureau's website supports the use of APR by stating that, "APR, or annual percentage rate, is the standard way to compare how much loans cost. It lets you compare the cost of loan products on an "apples-to-apples" basis."

Small businesses seeking financing from CDFIs like Opportunity Fund are informed about their true cost of capital through an APR disclosure. If we can easily collect and report this data point without additional burdens and costs, other small business lenders should be able to do the same. California and New York have both passed Truth in Lending laws to require that small business lenders (including MCAs and factoring) inform small business owners by disclosing an APR. Both state laws have developed the necessary methodologies to calculate an estimated APR for a range of product offerings. These methodologies should be considered by the Bureau as starting points for calculating comparable pricing terms for a range of small business credit products.

If implemented properly and as intended, Section 1071 could help the market address both the lack of access to affordable capital and the threat of irresponsible lending. Merely by providing price transparency, the Bureau can encourage the development of successful lending models. Policymakers, community organizations, investors, banks seeking partnerships, and others

AdminRecord-001262

would be able to see, for the first time, which business models are successful at reaching minority-owned, women-owned and other underserved small businesses. Transparency would also attract investment capital and partnerships into models that work. It could be a market-based model and a pro-innovation approach to regulation.

In order to encourage this level of market dynamism, Section 1071 must include APR. Without this one pricing metric, data collection would not be useful in fostering transparency or distinguishing between whether high market penetration is due to innovation or because lenders are charging unaffordable rates to businesses which may ultimately default. The Responsible Business Lending Coalition, which Opportunity Fund is a founding member, will be submitting a more detailed letter to the Bureau on the importance of and proposed methods for collecting a pricing data point in the form of APR.

Opportunity Fund does not anticipate any (significant) costs to collecting, checking, and reporting each data point as we, and many financial institutions, already partake in this data collection in some way for internal or external purposes.

Opportunity Fund believes that any benefits associated with collecting and reporting pricing for all products, in the form of APR, outweigh any cost burdens that financial institutions may experience. At the end of the day, the intent of Section 1071 is to have a full picture of credit access for small businesses and minority-owned and women-owned businesses, and collecting data on pricing will do just that. Therefore, the scope of the rule should not only cover the types of products offered to small businesses but also the pricing associated with them. This will provide insights as to what products businesses are consuming and at what cost.

Irresponsible small business lending has grown since the passage of the Dodd-Frank Act, therefore it is important to understand not only whether financing is being provided, but also at what terms and costs. Opportunity Fund conducted a study, Unaffordable and Unsustainable: The New Business Lending, that offers a first-of-its-kind analysis of the loans and cash advances being offered to small businesses by short-term, high-cost alternative lenders. Using the information provided to us by borrowers who refinanced their high-cost products with us, we found that the average APR on products provided by alternative lenders (MCAs, factoring, etc.) was 94%, and ranged as high as 358%, without those APRs ever having been disclosed to the borrowers. If Section 1071 data collection indicates that access to capital is improving, but is blind to whether that capital provided is at 30% APR or 300% APR, Congress' intent will not be accomplished. Understanding the type of products that small businesses utilize is important but as important is data on which businesses are accessing which types and costs of capital.

Lastly, nearly every financing provider has an annualized return that they expect to earn from a financing transaction, whether or not they are disclosing an estimated annualized cost of capital to the borrower; therefore, there is no excuse to not collect and report to the Bureau.

AdminRecord-001263

We also propose that the Bureau collect an additional point regarding the manner in which an application was collected. Proposed response options would be 1) in-person, 2) by phone, or 3) online. The collection of this data point would enable stakeholders to better understand the manner in which an applicant interacted with a financial institution. This would be a critical data point for assessing whether a personal interaction with staff of a financial institution may contribute to discouragement in submitting an application.

**Conclusion**
Opportunity Fund strongly supports the Section 1071 small business finance data collection effort. It's been 10 years since the passage of the Dodd-Frank Act and we still lack a full understanding of the small business landscape.

As mentioned in this letter and via my verbal remarks during the SBREFA meetings, we need a rule that is broad and expansive and includes all financial institutions and products (including MCAs, factoring and leasing) that are sought out by small businesses. Additionally, a pricing data point in the form of APR is needed to understand what products are offered to whom and at what cost. The cost of implementing a watered down rule with a broad range of exemptions is that it will only be harder to fulfill the intent of Section 1071. A strong rule will help better connect underserved entrepreneurs to working capital and resources in order to build a more inclusive economy for everyone.

Opportunity Fund is grateful to represent underserved small businesses as a Small Entity Representative on the SBREFA Panel and looks forward to working with the Bureau on implementing a strong rule that will truly help small businesses. The rule should be proposed and implemented as soon as possible to yield significant insights for small business lenders, policy makers, advocates, and most importantly, for small business owners, the backbone of our national economy at a time when they are rebuilding and regenerating Main Street from the impact of COVID and beyond.

Luz L Urrutia

Luz Urrutia
Chief Executive Officer
Opportunity Fund

AdminRecord-001264

November 9, 2020

By electronic delivery to:
2020-SBREFA-1071@cfpb.gov

Grady Hedgespeth
Assistant Director
Office of Small Business Lending Markets
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

Dear Mr. Hedgespeth:

Thank you for the opportunity to participate in the SBREFA process as a Small Entity
Representative (SER) assembled to provide input on the Small Business Lending Data
Collection Process and Costs to implement Section 1071 of the Dodd-Frank Wall Street Reform
and Consumer Protection Act.  I want to acknowledge the hard work that went into creating the
highly effective and entirely virtual SBREFA Panels; it was I am sure, no small undertaking.  I
offer the following written responses that either expand, clarify or answer any of the SBREFA
questions posed during the panel discussion.

I am the President & CEO of Reading Cooperative Bank (RCB), located in Reading, MA.  RCB
is a 135-year-old mutual bank with 8 offices and 86 employees.  We write about $60-100MM in
commercial real estate loans annually and anywhere from $2MM-$10MM in operating business
loans depending on the year.   We were recently approved to open a branch in a majority
minority community that is predominantly Spanish speaking.  This Gateway city has a large
small business community.  After writing PPP this past Spring, I cannot underscore the
importance that any data gathering form or disclosure resulting from this rule making be
provided in Spanish as well as other languages by the Bureau.

Observationally, the SBREFA panels included a large number of non-bank small business
lenders, Credit Unions and CDFIs.  There were only two banks that had experience with existing
HMDA reporting rules and the effects of Bank regulatory examinations on the inordinate cost of
the regulation for community bank.  CDFI participants also expressed that it was not a problem
to report data, as they already collect for grants and other funders.  It is important to recognize
that the CDFI data is generally not subject to data integrity reviews and Banks do not receive
grants and other funds in return for data collection.  The direct and indirect opportunity costs of
this regulation will impair the profit of the entire community bank industry.

Following the Bureau's outline, I am providing additional responses to the questions posed
about the CFPB's 1071 proposals under consideration.   I provided my responses to the
questions sequentially in the order provided in your outline for ease of reference, removing any
questions that did not require any further comment or clarification beginning below:

1

AdminRecord-001265

**Q1.** Are there any relevant Federal laws or rules which may duplicate, overlap, or conflict with the Bureau's proposals under consideration beyond those discussed in Appendix C? How might the Bureau's proposals under consideration for implementing section 1071 impact other aspects of ECOA/Regulation B compliance?

**HMDA data is collected on all Commercial Loans secured by Commercial Real Estate where any of the units financed are for residential occupancy. These loans will also be required to be reported as small businesses loans under this proposal. This reporting a) is redundant, and b) is in conflict with the data gathering as proposed which will create confusion for the individual gathering and reporting the data. (i.e. HMDA requires that the lender make an educated guess as to race and sex, whereas it is proposed that the borrower declare) As the majority of financial institutions operate separate residential and commercial divisions, a more streamlined approach would be to exempt business loans from HMDA reporting if data is gathered and reported for SBREFA purposes. If that is not possible then loans secured by residential housing should be excluded from reporting under 1071.**

**Lastly, the current fluidity around the definition of sex underscores the benefit of the Bureaus proposed borrower declaration in lieu of lender observation.**

**Q3.** How often does your FI make loans to businesses that are not "small"? Would you anticipate any specific complexities or costs in identifying women-owned and/or minority-owned applicants that are not small businesses, and collecting 1071 data about their applications for credit?

**As mentioned in person, rarely would our bank write loans to businesses that are not defined as small under every definition proposed. It seems far simpler to collect data from all applicants at time of application than to perform an evaluation post application and then chase the data so the scope of collection is much larger than previously considered.**

**Q5.** Please provide feedback and information on the approach the Bureau is considering regarding the general definition of "financial institution," along with any alternative approaches the Bureau should consider.

**All entities providing small business financing should be required to collect and report the data to ensure there is a level playing field for all market participants, and ensure that the Bureau and other researchers have a complete view of the market. It is further recommended that the Bureau provide varied mechanisms to report directly on a loan by loan basis. For smaller lenders, a loan by loan submission could accomplish the goal while larger more sophisticated organizations could batch and transmit the data in aggregate.**

AdminRecord-001266

**Q6.** Please provide feedback and information on the approach the Bureau is considering regarding the possible exemptions for FIs based on size and/or activity, along with any alternative approaches the Bureau should consider.

**If a simple mechanism for reporting could not be developed as referenced in Q5, then I would recommend a breakpoint based on the number of applications such as > 100; the reporting trigger should be 2 consecutive years greater than the target to require collection for the following calendar year. The basis for this recommendation is our experience with PPP small business loans in 2020.**

**Q7.** How does your FI currently track applications and/or originations (by number of loans and/or dollars)? Does this differ between DIs and non-DIs? What do you anticipate the potential costs would be to track whether your FI qualifies under an activity-based exemption metric?

**We do not currently track applications vs. originations, but expect the cost would be minimal.**

**Q12.** Please provide feedback and information on the approach the Bureau is considering regarding a combined size- and activity-based exemption, along with any alternative approaches the Bureau should consider. For example, would different asset sizes or number and/or volume of loans be more appropriate for a combined size- and activity-based exemption and, if so, why?

**Considering the responses to Q1 and Q6, if an institution is writing CRE loans secured by residential and multifamily housing but is not a 'true' C&I small business lender, they should be excluded from reporting.  In that case, maybe a lower target of 25 or 50 small business loans would be a trigger.**

**Q14.** Please provide feedback and information on the approach the Bureau is considering regarding the definition of "small business," along with any alternative approaches the Bureau should consider. For example, should the Bureau include or exclude applications from particular types of borrowers from the scope of its eventual 1071 rule in addition to or differently than as described herein?

**See Q1 above – either exclude multifamily investment properties or commercial loans secured by residential properties from HMDA or SBREFA, one or the other as collection and reporting is duplicative and asks for differing information**

**Q15.** What would the costs be to implement a small business definition based on each of the three alternatives above? (If these potential costs are difficult to quantify, you are invited to describe these costs qualitatively, such as small, medium, or large.) Are there any particular complexities you anticipate under any of the alternatives presented?

3

AdminRecord-001267

**The least costly is loan amount which is a small cost, second would be sales and number of employees with the final NAICS metric being the most costly and difficult to achieve and less accurate.**

**Q16.** Are you familiar with the SBA's six-digit NAICS code-based size standards, and does your FI currently use them for any purpose? What would the cost be to implement a small business definition based on the SBA's size standards?

**If much like race and sex, it is a borrower declared number, then it would lessen the cost; as experience with HMDA has taught us, once a reporting regimen is established, the costs to comply and validate data driven by audit and examination teams drive annual costs through the roof for internal reviews and external data quality testing.**

**Q17.** Please provide feedback and information on the approach the Bureau is considering regarding the definitions of "women-owned business," "minority-owned business," and "minority individual," along with any alternative approaches the Bureau should consider.

**Recognizing the sensitivity around race, sex, and national origin, we would strongly recommend that the agency prepare a simplified disclosure directed to consumers for their completion when applying for any manner of small business loan. The values attributed by the applicant as to ownership should be submitted and considered accurate, even if the ultimate verified ownership interest is different. The rationale for this recommendation is that informal ownership arrangements sometimes exist in minority and immigrant communities. The borrowers declaration may diverge from the values established at the time of corporate filing due to varying reasons such as immigrant status or criminal record etc; Borrower stated values would better reflect the business status at the time of application in the minds of the owner-operator(s).**

**This response is informed by my bank's experiences in the PPP application process when the beneficial interest disclosures were significantly different than those on the PPP application.**

**Q18.** What are the legal or ownership structures of the businesses that typically apply for small business loans from your FI (*i.e.*, sole proprietorship, partnership, limited liability company, "S" corporation, etc.)? Do those businesses typically have an indirect ownership structure (*i.e.*, ownership interests are held by other entities)?
What persons or group of persons are typically responsible for the operations of such business (*i.e.*, whether a managing member, two or more partners, a CEO, or some other person or group of persons)?

4

AdminRecord-001268

**Most real estate secured loans are in the name of an LLC, while small business applications vary amongst corporate form; with the preponderance of owner operators being one or two persons.**

**Q19.** Do you foresee any difficulties in using the CDD standards for purposes of 1071 data collection? Do your FI and/or your small business applicants routinely apply the concepts of "ownership" or "control" in a manner that does not align with the CDD rule? If so, what concepts do they use?

**In a majority of the husband and wife owned businesses, there may be one reported owners, but in actuality and by law, the business is a marital asset owned by both parties.**

**Q20.** Please provide feedback and information on the approach the Bureau is considering regarding covered products and use of the ECOA definition of "credit" for purposes of defining covered products under section 1071, along with any alternative approaches the Bureau should consider. Are there any products that should or should not be covered by the Bureau's eventual 1071 rule, and if so why?

**All products should be covered – including merchant cash advance products as they often serve as a primary source of liquidity for very small businesses. This should include Uber or Square advances auto loans for drivers.**

**Q25.** Please provide feedback and information on the approach the Bureau is considering for each mandatory data point, along with any alternative approaches the Bureau should consider.
**Loan product is incomplete and should include merchant cash advance, letters of credit and factoring**
**Guarantee list needs to allow for multiple guaranty options and does not reflect the value of a guarantee**
**Loan purpose would also be for multiple categories (i.e. startup and equipment)**
**Gross annual revenue is not readily available for many small and micro businesses applications as their financials are tax return dependent and the information would not be available until after April 15th, or the extension deadline in September.   It would be preferable that the number would be borrower declared and not require validation.**

**Q26.** What would the costs be for collecting, checking, and reporting each data point? Do these costs differ by data point and if so, what data points would impose higher costs and why?

**In comparing to HMDA, there is a significant ongoing cost element that has not been considered - the cost for data integrity scrubs at the end of every quarter and annually prior to loan data submission.  Error rates have historically been an abusive area during examination where the numerator is the number of errors and the denominator is the number of loans (not the number of loans x**

5

AdminRecord-001269

the number of fields). The faulty math has been used to torment financial institutions into spending exorbitant sums to external firms to perform data quality scrubs in an attempt to avoid an MRA or MRIA on a repeat finding.

**Q27.** For each data point, how should the Bureau address reporting multiple products applied for via a single application? Should such requests be considered one "application" or multiple "applications"? If the Bureau required reporting of each product separately, how would that affect your FI's costs to collect and report 1071 data?

**Commercial lending transactions evolve throughout the origination process as information is obtained. It will be challenging to standardize the data so reporting can be reported in an automated fashion. This will likely require significant training and a tremendous amount of human intervention.**

**As an example: A borrower asks for a loan to purchase a business. Once the purchase agreement and valuations are complete, the bank may counter with a term loan for working capital needs, an equipment loan for the business equipment being acquired and a third loan to purchase the owner-occupied real estate. Although ultimately 3 loans at closing, it started as one application. Consolidating note data could not be automated into one report line and would require calculating weighted rate and term and multiple collateral sources. Core data systems just do not have this capability.**

**Q28.** In the normal course of processing an application for small business credit, does your FI determine who owns and controls the entity applying for the financing (including the percentage of ownership and degree of control)? If so, at what point in the application process and for what purposes? Does your FI determine to whom an entity's profit and loss accrues or do they rely on ownership percentage? Does an employee of your FI routinely meet with all of the individuals who own and control a small business applying for credit?

**There is no allocation of profits to individual owners as the borrower is the business. We will of course measure on a global basis whether all owners' personal obligations can be satisfied by the surplus global cashflow after debt service.**

**Q31.** When in the application process for small business credit do applicants usually indicate the specific amount that they are applying for? How often does the amount applied for change between the initial application stage and when the application is considered for underwriting?

**The loan amount for a business loan can be fluid and based on negotiation both with the bank, and other parties to the transaction. Collateral, costs and cashflow capacity will drive any adjustments in the loan amount approved.**

6

AdminRecord-001270

**Q34.** How does your FI currently document the actions taken on applications from small businesses?

**Notes to a loan file would generally support the actions taken and rationale for the action.**

**Q36.** Might the availability of credit be underreported if counteroffers are not separately identified in the 1071 data set? If counteroffers are separately identified, what would be the most cost-effective way to do so (*e.g.*, reported as a separate action taken category or as a counteroffer data flag)? Should multiple counteroffers on a single application be reported? How should the ultimate action taken on a counteroffer be identified (counteroffer accepted, counteroffer rejected, etc.)?

**As noted in answer to Q27, there can be multiple counter offers to a loan request as the lender negotiates with the applicant.  The only numbers that are usually memorialized in writing are the original request and the final terms.  It would be most difficult to report on every adjustment made in the negotiation process.**

**Q37.** Do you foresee any potential challenges in identifying the action taken date for any of the "action taken" categories? Do you have suggestions on how to mitigate or resolve those challenges?

**The commercial loan process differs significantly from bank to bank and even more from equipment finance to online lenders.  The type and complexity of the loan or business will impact response time and approvals can be conditional. As a HMDA reporter, we know that the accuracy of the application and other action dates which are subject to interpretation have been used as data errors by overly enthusiastic auditors and examiners.  For both of these reasons it is recommended that the rules be written such that the date assigned is the date assigned is to the best of the institutions' knowledge or belief.**

**Q38.** Does your FI currently geocode addresses for a reporting requirement, such as HMDA, and what geocoder do you use? Would that geocoder be viable for purposes of 1071 data reporting? What are the costs to geocode addresses?

**We do not geocode addresses for small business loans.   The Geocode for HMDA is obtained along with our flood certification at a cost to the bank. Either we will use a free service and incur the cost of an employee's time or pay a service to generate on our behalf.  And additional costs would be charged to the borrower at closing.**

**Q39.** How often and in what circumstances does your FI know the address where the borrower's loan proceeds will be used? For example, does your FI have a loan proceeds address for loans other than those related to commercial real estate? How frequently are loan proceeds used at a location other than the applicant's main

7

AdminRecord-001271

office? What would the costs be to obtain the loan proceeds address from the applicant, in addition to or instead of other addresses?

**As a majority of our commercial loans that would be subject to reporting are for the acquisition or development of real estate for rental or sale, we would know the address for the investment, but it would not be the borrower's main office.**

Q41. How does your FI collect and verify gross annual revenue from applicants? Is the revenue of affiliates included in the gross annual revenue collected, and is that information used for underwriting purposes? Does your FI ever underwrite based on only part of an applicant's revenue, or based on the revenue (or income) of an entity or individual affiliated with the applicant?

**We do not necessarily collect data for gross annual revenue nor do we verify; we focus on net income and EBITDA to determine a borrowers capacity to repay the loan.  While we generally do not collect the gross annual number, it could be found on the borrowers tax return which we require for every loan application.**

Q45. To what extent could your FI leverage existing programs, systems, or personnel (including those used for HMDA) when collecting and reporting the race, sex, and ethnicity information of principal owners?

**HMDA is reported from the residential lending division, not the business lending division, so there are not resources to leverage for this reporting regime, it will be an additional requirement which will require additional resources.**

Q47. Although the Bureau is not considering proposing that FIs report a principal owner's race, sex, or ethnicity based on visual observation or surname, what would be the potential challenges, costs, and benefits of implementing such a requirement for applicants who do not self-report the information? How would those potential challenges and costs change if reporting based on visual observation or surname was required only if the applicant is a sole proprietor but not if the applicant is an entity?

**Sexual orientation is fluid right now – I would not want to be reporting based on a name or visual observation; further I would recommend that the agency consider amendments to the visual observation rules for HMDA. Furthermore, race is not always observable, therefore borrower reporting would be the only mechanism for collection that should be supported.**

Q49. What would the potential challenges and costs be for collecting, checking, and reporting each discretionary data point?

8

AdminRecord-001272

**Using HMDA experience, the cost for collecting, checking and reporting each discretionary point is significant and does not account for the additional cost for audit and review of the data.**

**Q50.** How does your FI calculate pricing for different credit products (*e.g.*, term loans, lines of credit, business credit cards)? If an eventual 1071 rule were to require reporting of pricing information, what pricing metric or metrics would be easiest to report given your FI's pricing methods?

**Pricing for commercial loans is based on a myriad of risk factors; type of inventory, quality or concentration of accounts receivables, industry risk or the net worth of the guarantor, and loan to value are just a few of the variables considered when pricing a commercial loan. No one commercial loan is exactly like another. Without having all of the elements reported, improper conclusions around price could be harmful to an institutions reputation. For example, there is a distinct difference between real estate and cattle as collateral. However, collecting all of the elements needed to provide context would be cost-prohibitive.**

**Q51.** What are the potential costs and benefits associated with collecting and reporting pricing using each of these metrics (*i.e.*, APR, TCC, interest rate and total fees)? Could the costs and benefits vary depending on the type of small business credit product about which pricing is being reported? Is there another metric that would be preferable in order to lower reporting burden?

**APR is calculated based on assumptions around term, costs, and time. Those assumptions are not standardized and depend on loan structure. If I had to choose, total costs would be the most transparent, but all of the choices do not account for the elements mentioned in Q50.**

**Q52.** Would a requirement to report pricing data impose costs on your FI or on your FI's borrowers besides reporting costs? Would you expect a pricing data point to affect how examiners examine FIs for fair lending compliance? How? Would a pricing data point affect the reputation of your FI? If so, how? How would your FI respond?

**See responses to Q50 and Q51; further, as it relates to examinations and reputational risk, the public data of pricing presents significant risk and cost to defend pricing that is based on business underwriting criteria not identified in the report and based on non-public personal information.**

**Q54.** Does your FI currently collect NAICS code information from any small business applicants? Do you collect six-digit NAICS codes, or two-, three- or four-digit codes instead? Does your FI determine what NAICS code is appropriate for a particular applicant or obtain it from an alternative source such as a credit report, or does your FI ask applicants to provide their NAICS codes? What do you anticipate the potential costs

9

AdminRecord-001273

and burdens would be if your FI was required to collect NAICS codes for small business applicants?

**The NAICS is located on the tax return and is typically assigned to the small business by their accountant when they first open their business. In many cases, the NAICS codes are not an accurate reflection of the business they are operating.**

**Q55.** Does your FI currently collect number of employees from any small business applicants? Does your FI take any steps to verify this information? What do you anticipate the potential costs and burdens would be if your FI was required to collect number of employees from small business applicants?

**We only collect number of employees for SBA loan applications and do not take any steps to verify the number of employees. This will be a new data set that is not currently required or a field in our core processing system so a new collection and retention process would be required.**

**Q56.** Please provide feedback and information on the approach the Bureau is considering with respect to the timing for collection of data points provided by applicants, along with any alternative approaches the Bureau should consider.

**As mentioned during the SBREFA panel and based on our experience with HMDA collection and reporting, this data in aggregate becomes unwieldy and requires quarterly scrubs of the data and a whole audit and examination regime. If the Agency would consider creating a portal for the bank to input the data upon receipt, it might be easier than each individual financial institution hiring a company to create a repository for the data for annual transmission and standardize the process for the industry. Small volume institutions could input loan by loan, while larger institutions could batch and deliver in bulk.**

**Q57.** How do you anticipate your FI seeking applicant-provided data (particularly race, sex, and ethnicity information about principal owners) required by section 1071, including the manner (*i.e.*, how information is requested) and timing of the request? How would you anticipate seeking such applicant-provided data if the application is withdrawn, incomplete, or denied before the data is requested?

**For the reason of withdrawn and declined applications, it will be necessary to collect for every commercial loan upon receipt of the loan application to ensure we have all of the required data elements for loans not closed. As with the requirement for annual financial statements from borrowers, it is difficult to obtain if they are not asking something of the bank.**

**Q59.** Please provide feedback and information on the approach the Bureau is considering regarding the firewall under section 1071(d)(1), along with any alternative approaches the Bureau should consider.

10

AdminRecord-001274

**All loan files are now electronic and consolidated.  There does not exist a method to block certain individuals from access to only certain data points in a file (whether paper or electronic)   Any separation of the customer record from the 1071 data, would increase the cost and accessibility for audit purposes.**

Q60. Could your FI create and maintain a firewall for an applicant's response to questions regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners? If not, why not? If so, how would your FI create such a firewall? What would the potential costs and challenges be to create and maintain such a firewall?  What circumstances might make creating and maintaining such a firewall more costly or more difficult?

**A mechanism does not exist for this 'firewall of partial data' nor does staffing allow for the walling off of data, as our commercial lending department has only two staff members.  In the event one is on vacation or on leave, they cover for each other and would need access.  Finally, the commercial lenders have loan authority.  The same person takes the application data from the small  business customer and recommends its approval or decline based on the credit characteristics.**

Q63. What types of employees and officers are involved in making determinations regarding small business credit applications (as noted above, the statutory firewall applies to certain people involved in making any determination regarding an application for credit)? Are these employees and officers likely to be involved in the collection or reporting of information pursuant to section 1071

**See Q 60 above**

Q65. Please provide feedback and information on the approach the Bureau is considering regarding the notice requirement under section 1071(d)(2), along with any alternative approaches the Bureau should consider.

**I think the disclosure needs to clarify that the access is not detrimental, but is due to the size of the organization.  I would not want a borrower to think that the access is a negative reflection on the financial institution.**

Q66. What are the potential challenges and costs associated with providing the notice pursuant to section 1071(d)(2) to particular applicants if your FI determines that an underwriter or other person involved in making any determination concerning an application for credit should have access to information regarding the applicant's 1071(b) responses?

**I would imagine a model disclosure that is a part of the form for submission of 1071 data by the client.**

11

AdminRecord-001275

**Q67.** Would your FI prefer to provide the 1071(d)(2) notice regarding anti-discrimination to all applicants, even if not required to do so?

**Yes – I imagine we would provide and collect data from all commercial loan applicants at the onset of the application to ensure we have the data in hand prior to any loan decision.**

**Q73.** Are there data points, individually or in combination, that could create significant risk of re-identification of individuals or small business entities if publicly disclosed by linking them to third-party data sources, such as public records, and/or expose particularly sensitive personal or commercial information?  Are there ways to mitigate these concerns?

**Many of our communities have a very small number of businesses, so providing a location combined with a business identification code alone may unintentionally identify the borrowing activity of a business and its income to the public.**

**Q75.** Please provide feedback and information on the potential costs and benefits of FIs referring the public to the Bureau's website to access 1071 data.

**We strongly support that public access to 1071 data be directly directly from the bureau rather than from the FI's CRA public file.**

**Q76.** Please provide feedback and information on the approach the Bureau is considering regarding an implementation period, along with any alternative approaches the Bureau should consider.

**As mentioned during the panel discussion, we would strongly recommend that data collection commence effective January 1 in the year prior to the first submission.  Further, we would recommend a minimum of 24 months implementation for date of publishing to allow for education, software development and implementation.  Further, as with the most recent HMDA overhaul, the agencies provided a grace period for errors in reporting for the first examination post implementation which allowed for corrective action without penalties.**

**Certain SER's noted that implementation would be easy as they currently collect much of the data.  It is important to note that CDFI's are not for profits that collect the data to support grant funding; banks and credit unions do not have the benefit of grants to support activities and will need to divert resources from profitable operations post pandemic to comply with the 1071 and a significant cost to the organization with no return on this activity.   In addition, the data CDFIs collect and report to the CDFI fund is not subject to stringent data integrity exams, so those entities are presumably not factoring in the significant costs of data scrubs.**

12

AdminRecord-001276

**Q78.** The Bureau's  overall methodological approach to measuring one-time and ongoing costs of the eventual 1071 rule, along with any alternative approaches the Bureau should consider.

**The elements identified in the outline of onetime and ongoing costs appear accurate, however, the amount of the costs is understated, especially in the area of internal audit activities by staff in preparation and during examination and the external costs for audit and examination.**

**The Bureau cost estimates for both one time and ongoing are significantly understated.  As noted above, the differing models of a reporter will drive costs.  As community lenders loan process is largely driven by in person interactions, it will  be more expensive to implement as compared to self serve online lenders that will incur the costs of development once.  Further, the evaluation does not recognize the cost differential in different markets and the rate of hourly compensation assumes that a non-officer would accomplish most tasks.  We anticipate that much of the responsibility for 1071 will be born by the Commercial Lenders and therefore we estimate our average hourly cost closer to $70**

**Q79.** Are there additional one-time or ongoing cost activities that should be considered in the Bureau's analysis of potential impacts on small entities? Should the structure the Bureau is using to estimate ongoing costs, or the actual magnitude of estimates, differ across institution type or product type, and if so, how?

**See Q78 above**

**Q80.** Is the Bureau's categorization of the "complexity" of an FI's application data processing appropriate and accurate? Are the descriptions of representative FIs consistent with market experience? Is the Bureau appropriately describing the volume of applications processed by example FIs, particularly among small FIs?

**Institution A estimates significantly underestimate the time effort and complexity proposed by 1071 and the cost fo a small institution to comply. The exam and audit cost specifically should be commensurate with the cost for 'B' institutions.**

**Q81.** What kinds of computer systems are currently used that could be used to collect and report data to comply with a future regulation? What kinds of systems could be developed to collect and report data to comply with a future regulation? How much would it cost to purchase or update these systems in order to comply with a future regulation? How do FIs expect the regulation to alter their existing methods for collecting and processing application and origination data?

**I expect after exploring this information for the panel exercise, that if the Bureau does not develop, RCB will creat a template for use for every**

13

AdminRecord-001277

**commercial loan that is completed by a lender/borrower during the application interview and continues to collect data throughout the loan process and ultimate closing.  That information hopefully can be transmitted at closing direct to the CFPB, or alternatively we would need to build or buy a system to house the data until it is ultimately transmitted in bulk to the CFPB.**

**Q82.** How do the Bureau's estimates of ongoing costs by activity and FI complexity compare to your own? Are there specific activities where the Bureau is over- or underestimating the annual ongoing costs?

**Audit and exam costs are significantly underestimated.**

**Q83.** Do FIs expect one-time or ongoing costs to affect the rates/fees offered for credit products, the credit product mix offered, the underwriting standards for credit products, or participation in the small business credit market?

**Banks operate at a margin. If operating expense are increased by staff time, people or systems costs, we will adjust pricing to maintain profitability.  It would not likely be a fixed one time cost, but a change in yield that will manifest itself over time.   Any per loan specific costs that are paid to comply will be included in the closing costs for the loan.**

**Q84.** How does your FI anticipate training staff to comply with an eventual 1071 rule? For example, do you anticipate purchasing training from an external source, developing training in-house, or a combination of both? Other than staff time to attend training, do you anticipate any ongoing costs associated with providing 1071 compliance training to employees on an annual or other periodic basis?

**We would both purchase training from an external source and provide inhouse training for hands on staff.**

Thank you again for the opportunity to participate as a Small Entity Representative for this important rule making effort.  If I can provide any further assistance, please do not hesitate to reach out.


Sincerely,



Julieann M. Thurlow
President and Chief Executive Officer
Reading Co-Operative Bank

cc:    Jennifer A. Smith, U.S. Small Business Administration; Jennifer.smith@sba.gov
       Lindsay M. Abate, Office of Management and Budget; Lindsay.m.abate@omb.eop.gov

14

AdminRecord-001278

November 5, 2020


The Honorable Kathy Kraninger, Director
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

RE: SBREFA SER follow up commons on the outline of Section 1071 of the Dodd Frank Wall
Street Reform & Consumer Protection Act

My name is Sarah Getzlaff. I was selected to be a Small Entity Representative on the most
recent Section 1071 SBREFA panel due to my position as CEO of Security First Bank of North
Dakota, a $200 million community bank in North Dakota. I am a 3rd generation community
banker following in the footsteps of my father and my grandfather. I grew up watching my dad
support our community by donating his time to economic development boards, making financial
donations to community causes and by meeting with customers whenever and wherever they
needed him. I clearly remember him leaving our house late one night to lend a customer cash
out of his own wallet for a medical emergency after the customer called in a panic when he had
reached the daily limit at our only local ATM. Stories like this were a constant part of my
childhood and a tradition I am honored to continue. Stories like this happen daily at community
banks all across the nation.

Security First Bank has five locations, mostly in rural North Dakota, and is very representative of
a typical community bank. We opened our doors in 1925 in New Salem (population ~950), and
just over 50 years later we added locations in Almont (pop. ~120) and Center (pop. ~575). All
three of our small communities have been faced with shrinking populations over the last several
decades, as younger generations tend to gravitate toward larger communities, and all three have
struggling Main Streets. Security First Bank is one of only two financial institutions in New
Salem; the only financial institution in Almont; and not only is it the only financial institution in
Center, it is actually the only financial institution in that county. Our 4th and 5th locations opened
in the last 20 years in Mandan (pop. ~21,000) and Bismarck (pop. ~73,000).

Our family's bank has been a huge supporter of local businesses and those same local businesses
have supported us in return. As a community bank, we know that without Main Street
businesses, there is no need for a community bank. We truly understand small businesses,
because we are a small business. Small town businesses know that if we all support one another,
there is a greater chance our depopulating communities will survive, our businesses will thrive
and our schools will remain open and independent.

130

AdminRecord-001279

During the recent pandemic, small businesses desperately needed help and community bankers responded in droves funding 60% of PPP loans across the county. Our small community bank started funding PPP loans the very first morning the SBA opened its website. We worked around the clock, nights and weekends, to make these loans for our local businesses. We made PPP loans to customers and non-customers. And, we proactively reached out to local businesses who had not yet called. We visited with and met customers at all hours of the day, some even at my own kitchen table, to help them fill out their applications.

Community banks always have and always will go above and beyond to do the right thing for their customers and their communities, regardless of how many regulations are in place. To remain independently owned and stay competitive, our bank needs to continue to grow. The most profitable way for a bank to grow is through loan originations. Community banks have every incentive in the world to make safe and sound loans. Added regulations will not change our behavior or the commitment we have to our communities. If we were to discriminate and treat people unfairly, our reputations in our small communities would be damaged swiftly and irreparably. We would be embarrassed to be at community functions with our families. And, we would be punished through ECOA. Adequately punishing the bad actors who discriminate will accomplish much more than an additional regulation ever could.

**Covered Lenders**   From its own moniker, the Dodd Frank Wall Street Reform and Consumer Protection Act was clearly passed with the intention of reforming Wall Street banks, not community banks. Yet, the proposed asset level exemptions are so low, community banks like mine with a staff of 38 spread between 5 locations will have to spend precious time and resources collecting data that will not change our mission or our actions.

By definition, the SBREFA panel process imposes additional requirements when a rule is expected to have a significant economic impact on a substantial number of small entities. It is clear by existence of this panel, the CFPB understands Section 1071 will have a significant economic impact on small businesses, including my family owned community bank and thousands of other across the nation. I understand that without congressional intervention, Section 1071 must move forward. And, I truly appreciate Director Kraninger's opening comments during our SBREFA panel, recognizing that all of us on the panel represent small businesses that are critical for other small businesses in the communities we serve and I echo her sentiment that the last thing we want, is for this regulation to impede our ability to continue to serve small businesses.

Dodd Frank has rolled out several new regulations that have placed additional burden on my small bank, as well as on the banks owned by my friends and colleagues. Despite these additional burdens, we have been fighting to stay competitive. However, several small banks in North Dakota no longer offer residential real estate loans because of the additional burdens Dodd Frank created with Ability-To-Repay, Qualified Mortgages & TRID. For these banks, the burden of compliance and the risk of non-compliance outweighed the benefits of providing this service. This means there are some communities in North Dakota that do not offer residential real estate loans, which in effect, has allowed larger banks to have a larger piece of the pie. Each year more small banks are giving up and consolidating to gain efficiencies needed to offset

AdminRecord-001280

regulatory burden. Section 1071 is the last piece of Dodd Frank and I am fearful it will be the last nail in the coffin for small community banks.

We need these small banks. The more financing options a consumer has, the more likely they will have access to credit. I strongly believe the asset exemption threshold needs to be higher than $200 million. Please do not add additional burden onto small community banks, which could push our customers to the Wall Street banks – the very banks the Dodd Frank Wall Street Reform act intended to reform. I'm not sure how the proposed $100 or $200 million asset thresholds were derived, but I believe the thresholds should be no less than $600 million, which would exempt banks the SBA itself defines as a small business. Realistically, banks under $1 billion are tiny in the grand scheme of the financial world and would not provide a significant amount of data. Other pieces of Dodd Frank have set a small bank exemption at $10 billion. I realize $10 billion seems like an extremely high threshold, but in other regulations the CFPB has recognized that there is an extremely large difference between the way a community bank operates and the way a Wall Street bank operates.

I would also encourage the CFPB to focus on the number of applications that would be captured at whatever threshold is set, rather than the number of banks that would be covered. If, for example, the threshold was set to capture 80% of the data with a regulation covering 20% of the banks in the United States, wouldn't that be sufficient? Do we really need 99% of the data? And, would it be possible to initially roll Section 1071 requirements out to the largest financial institutions, those with more than $10 billion in assets and then see what works, what needs to be tweaked, how much data is received, how accurate the data is and then determine if there is a benefit to expand the regulation to a greater number of financial institutions?

**Simplicity**  During our panel discussion, there was a lot of discussion around keeping the rule as simple as possible. Part of the reason community bankers have exited the mortgage market is due to the complexity of new mortgage regulations. A lot of comparisons have been made between Section 1071 and HMDA. Our bank spends an excessive amount of time training loan officers on which loans qualify for HMDA reporting. In addition, most of our in-house residential real estate applications have unique features that do not often fit neatly into a HMDA box. We spend way too much time analyzing loans to make sure they are reported accurately. Small business loans are even more unique and will have their own host of issues, making the need to keep the rule simple even more important. The bottom line is, the more complicated the requirements and definitions are, the more room there is for human error and more time banks will need to put into training, research and data review. Allowing for the use of borrower supplied data would also significantly reduce the time spent complying with Section 1071.

**Covered Applicants**  If the goal of Section 1071 is to help small businesses, I think it makes sense to focus the regulation on helping the smallest of small businesses first. Many of our small business loan customers have gross revenues of $1 million or less. Businesses of this size often struggle the most to obtain funding. And, typically larger small businesses have grown to their existing level because they have access to credit.

During our panel, a credit union representative mentioned that credit unions classify business loans under $50,000 as consumer loans for reporting purposes. Regardless of how a credit union

132

classifies these loans on their call report, if they are clearly business loans, they should be reported under 1071, if the credit union is required to report and if the applicant is covered.

**Covered Products**  Term loans and lines of credit make up ~99% of the business credit products we offer, with a minimal number of business credit cards and leases financed.  We do not offer any of the additionally proposed products, but I do believe if they are an extension of credit to a commercial business, they should be included.  However, I am not sure it was the intent of the creators of Dodd Frank to include agricultural production and agricultural real estate loans. Agricultural data is almost always presented separately from non-agricultural data because of its unique characteristics.  For example, the Bureau of Labor Statistics specifically tracks nonfarm wage and salary employment and our bank call report schedules RC-C and RC-C, Part II both separate farm loans from business loans.  I would like the CFPB to strongly consider if there really is a benefit to collecting farm loan data.  And, if so, could sufficient data be collected through Farm Credit Services and the Farm Services Agency?

**Additional Data Points**

**NAICS Codes**  Our bank, like many community banks, does not collect NAICS codes.  We rely on borrower character and experience rather than NAICS statistics.  And, while using data can lead to faster decisions, we believe using qualitative factors like character and experience will often lead to more approvals.  This is especially true for small businesses, who are not necessarily strong on paper.  Also, the PPP loan process made it very evident that most of our borrowers do not know their NAICS code. The smallest businesses we help are often embarrassed that they are not as financially savvy as their banker.  Asking for unnecessary information may lead borrowers to believe the application process is overly complicated, which could discourage borrowers from applying and lead them to find credit through consumer credit cards with higher interest rates or unsecured payday type loans.

**Denial Reasons**  Adding this discretionary field was mentioned during our panel with the thought that it could shed more light on denials.  If this field is collected and released as part of the data disclosure, it could be incredibly humiliating for the borrower.  And, if a borrower believes there is a good chance he/she will be denied, they might be discouraged from applying altogether to save themselves from public humiliation.  Further, adding these fields will not shed enough light on the decision.  If someone wants to understand why businesses are being denied, they would often need to complete a full file review like our examiners do, as it is not usually as simple as a home loan that has standard underwriting qualifications.

**Pricing**  Business loans are a not a commodity.  These loans are unique and present different levels of risk based on a variety of factors, such as: cash flow, collateral value, market conditions, experience, location, management, ability to service debt, business complexity, etc. Examiners require we risk rate every single borrower in our bank, but even within those risk rating tiers, borrowers are not all created equal.  Banks have to be able to price based on risk, it is part of the basic safety and soundness model in banking.  If we were to commoditize business lending and price all loans using a simple matrix, we would end up losing our high-quality credits for overcharging and attracting higher risk credits for undercharging, causing our overall

133

portfolio risk to increase. Risk based pricing aside, the cost of doing business is also not the same from one market to the next.

If banks are required to report pricing information and it is publicly disclosed, it could be very misleading. You could have two seemingly similar businesses with very different rates. If the female-owned business has a higher rate, someone could easily assume discrimination is the cause, when really the male owner might have a wealthy uncle guarantying his loan. Or, the female owner might have less or no collateral. We fear lawyers will be waiting in the wings to bring frivolous lawsuits, similar to the ADA website lawsuits, that will only increase expenses at banks. It would be very easy to look at a limited amount of data and draw incorrect conclusions.

Furthermore, if we are price gouging a business, in our market, another bank would happily make the same loan for less. Our markets are already ultra-competitive, especially for decent quality business loans. If we make a habit of overcharging, we know we will lose customers. With rates at historic lows, our margins have been shrinking while our costs of doing business continues to grow. We cannot afford to lose quality business loans. And, while higher risk loans often come with a higher price, a high-risk loan in a community bank will still be a much less expensive option than merchant cash advances, business pay day loans or factoring.

**Shielding Underwriters** We are a very small bank. Two of our office locations only have one Loan Officer each. Our Loan Officers meet with customers, take a verbal application, request financial information, underwrite the file and make the credit decision. We have no way to separate the data collection from underwriting.

**Costs** while the cost survey was put out by the CFPB, it is very difficult for us to estimate the costs of a rule that has not been fully designed. We don't know how much time it will take to collect data, because we don't know how many fields will be required. And, we believe our largest expense will center on opportunity costs, which cannot be easily quantified. We will be taking up valuable Loan Officer time for training and data collection, time that could be spent originating loans or consulting with small businesses. Our Loan Officers are not simply salespeople, as they are in the largest banks; they truly act as business consultants. This spring one of our Loan Officers worked two full weekends of twelve-hour days helping a start-up restaurant rework its projections, business plan, blueprints and brainstorm additional funding sources. In an office with only one Loan Officer, her plate is already extremely full as she lends to consumers, businesses and farmers, in addition to being the office President.

**Privacy** Privacy is my largest concern with all of 1071. It far exceeds my desire to be exempt based on my asset size. I believe the public disclosure could have massive unintended consequences that could be devastating to rural communities and small businesses. And, no one will be able to measure these unintended consequences or see them on paper, they will just slowly eat away at rural community bank portfolios.

As mentioned earlier, we have a location in Center, ND – population ~575. Center is the only town in all of Oliver County (population ~1,950). We have one dentist, one butcher, one gas station, one restaurant and so on. These same statistics apply to the entire county. If we were required to collect and publicly release data without aggregating with other banks in our state

134

and without significant redaction, it would be incredibly easy for anyone to reverse engineer the data and know exactly who applied for each loan. And, just like that, anyone could find out a small business owner's gross annual revenue, how much of a loan he/she applied for, how much credit he/she was granted, if they were not denied and so on. Small business owners are incredibly private. They value their privacy just as much as a consumer. For the smallest business owners, their gross annual revenue is essentially their gross income.

These small businesses believe their business information is directly tied to their reputation. Will their customers wonder why they needed credit? Will their customers wonder why their revenue is so high, even though it is not an indicator of net income? If they apply for a $100,000 loan, but factors change and they only need $60,000, will people believe they were denied the additional $40,000? Growing up in the small town of Center, a prominent business owner in our community wouldn't move his personal accounts to our bank because he didn't want our staff who were also his customers to know anything about his personal finances. There were other community members who would not bank with us because they were embarrassed about poor credit scores or frequent overdrafts. Privacy rules do not matter to any of these people, perceived judgment matters.

While Center is, of course, an extreme example, as the only town in the entire county, there are rural communities like Center all across the country. I believe if small business owners know their information will become public, they might not want to apply for credit at our community bank. Section 1071 might cause borrowers to feel more comfortable at a larger bank in the next county or in a bigger city to gain anonymity. This already happens in a small town and we use our reputation of taking privacy seriously to combat it. Section 1071 will exacerbate existing privacy concerns, taking them to a whole new level. Even in our larger locations, when it became known that PPP borrowers would be publicly disclosed, we had qualified borrowers decide not to apply. And, we had other borrowers ask about repaying their loans early to be taken off the public disclosure list. These businesses put their privacy above receiving funds they qualified for and actually needed.

**Closing**  In closing, I understand that 1071 must move forward. Overall, I hope it does not unfairly burden small banks who are small businesses. I hope the requirements are kept as simple as possible. And, I hope the privacy of small business owners is kept at the forefront of everyone's minds as this rule is finalized, so Section 1071 does not hurt the very people it was intended to protect.

Sincerely,

Sarah Getzlaff, CEO
Security First Bank of North Dakota

AdminRecord-001284



**Federal**
**Credit**
**Union**
Your Community Credit Union

2100 White Avenue
Knoxville, TN 37916
Phone: (800) 264-1971
Fax: (865) 971-1797
www.utfcu.org

November 3, 2020

Consumer Financial Protection Bureau
Section 1071 SBREFA Panel Input

Dear CFPB,

As a recent participant in the panel discussions for implementation of Section 1071 I wanted to follow-up with a letter to express concerns, thoughts, suggestions, etc.

First, I appreciate the opportunity to be part of the Panel and voice my opinion on various discussion items. By allowing a cross section of selected financial individuals to take part it will help give various opinions and thoughts.

For UT Federal Credit Union, located in Knoxville, TN, we are only $380M in assets so relatively small considering several very large credit unions in this area that are over $2B. Although it continues to be a challenge to compete with the larger credit unions and banks, we feel we can deliver the products and services just a well as the larger financial institutions. In fact, we believe our smaller size allows for more personal contact with our owners (members). We make decisions faster and can often help those that do not fit in the box of the larger institutions.

However, in saying this, we do have a disadvantage in allocation of resources and economies of scale. Therefore, there are a few comments I would like to make concerning the Section 1071 Regulation.

1. Please consider keeping the regulation simple and clear, easy to follow and understand.
2. What is really needed to be collected in order to have a meaningful output that can be used to evaluate small business loans for minorities? There was an overwhelming number of data points that were discussed.
3. Consider the burden on small institutions to collect, report, monitor, etc. the data.
4. Consider the effect of collecting this data could have a negative effect if the borrower feels there is an intrusion of requested personal information. Many minorities do not trust financial institutions and may instead go somewhere else for funds to avoid too many questions.
5. If a borrower is denied funds, they may associate the decision in not getting the loan because certain information had been requested of them.
6. Please consider an exemption for any business loan under $50K to be reported under Section 1071 as with the current exemption for a member busines loan.
7. When the regulation is finalized, please consider a "help desk" or other guidance that financial institutions can turn to for guidance.
8. It is important to have a communication plan to not only the financial institutions but potential borrowers as to what and why there is a Section 1071 Regulation.

Thank you once again for allowing me to be part of this process. As we all know and expect, it is so important that everyone, no matter race, gender, etc., get a fair and impartial opportunity for the ability to secure a loan.

Sincerely,

Debbie H. Jones, CPA
President & CEO
UT Federal Credit Union

136

AT UT FEDERAL CREDIT UNION, YOU'RE MORE THAN A MEMBER...YOU ARE AN OWNER

AdminRecord-001285

# APPENDIX B: LIST OF MATERIALS PROVIDED TO SMALL ENTITY REPRESENTATIVES

In advance of the Panel Outreach Meetings, the Bureau provided each of the SERs with the materials listed below. Each of these items was also made available on the Bureau's website at https://www.consumerfinance.gov/1071-rule/.

- Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking—Outline of Proposals Under Consideration and Alternatives Considered (Sept. 15, 2020).

- High-Level Summary of Outline of Proposals Under Consideration for SBREFA: Small Business Lending Data Collection Rulemaking (Sept. 15, 2020).

- Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking—Discussion Guide for Small Entity Representatives (Sept. 15, 2020).

(See Appendix C, Appendix D, and Appendix E, respectively.)

In addition to the above materials, SERs also received a copy in advance of the presentation materials for the Panel Outreach Meetings. (See Appendix F).

AdminRecord-001286

# APPENDIX C:  OUTLINE OF PROPOSALS UNDER CONSIDERATION AND ALTERNATIVES CONSIDERED

See attached.

AdminRecord-001287

# SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER FINANCIAL PROTECTION BUREAU SMALL BUSINESS LENDING DATA COLLECTION RULEMAKING

## OUTLINE OF PROPOSALS UNDER CONSIDERATION AND ALTERNATIVES CONSIDERED

**September 15, 2020**

Contents

I.     Introduction ............................................................................................................ 3
II.    The SBREFA Process ............................................................................................ 5
III.   Proposals Under Consideration to Implement Section 1071 of the Dodd-Frank Act Regarding Small Business Lending Data Collection, and Alternatives Considered ..................... 8
  A.   Scope of proposed rule ......................................................................................... 8
  B.   Definition of "financial institution" (lender coverage) ..................................... 10
    1.   General definition of "financial institution" ................................................ 10
    2.   Possible exemptions ..................................................................................... 11
      i.    Size-based exemption .............................................................................. 11
      ii.   Activity-based exemption ........................................................................ 12
      iii.  Combined size- and activity-based exemptions ...................................... 13
    3.   Financial institutions that are not the lender of record ................................ 13
  C.   Definition of "small business" applicants .......................................................... 14
  D.   Definitions of "women-owned business," "minority-owned business," and "minority individual" ..................................................................................................... 18
  E.   Product coverage ................................................................................................ 19
    1.   Covered products .......................................................................................... 19
    2.   Products not covered .................................................................................... 20
      i.    Consumer credit used for business purposes ........................................... 20
      ii.   Leases ...................................................................................................... 21
      iii.  Trade credit ............................................................................................. 21
      iv.   Factoring ................................................................................................. 22
      v.    Merchant cash advances .......................................................................... 22
  F.   Definition of an "application" ............................................................................ 22
  G.   Data points ......................................................................................................... 24
    1.   Mandatory data points .................................................................................. 24
      i.    Whether the applicant is a women-owned business, a minority-owned business, and/or a small business ..................................................................................... 25
      ii.   Application/loan number ......................................................................... 26
      iii.  Application date ...................................................................................... 26
      iv.   Loan/credit type ...................................................................................... 26
      v.    Loan/credit purpose ................................................................................ 28

AdminRecord-001288

vi.    Credit amount/limit applied for ............................................................ 28
vii.   Credit amount/limit approved ............................................................... 29
viii.    Type of action taken ........................................................................ 29
ix.    Action taken date ............................................................................... 30
x.    Census tract (principal place of business).......................................... 30
xi.    Gross annual revenue ......................................................................... 31
xii.   Race, sex, and ethnicity of principal owner(s)................................... 32
  2.    Discretionary data points.......................................................................... 33
    i.    Pricing................................................................................................ 33
    ii.    Time in business ................................................................................ 34
    iii.    NAICS code and number of employees............................................. 35
  3.    Timing considerations for collection of certain 1071 data........................ 35
H.    Shielding data from underwriters and other persons (firewall) ......................... 36
  1.    Underwriter access to women-owned and minority-owned business status, and race,
sex, and ethnicity information for principal owners .................................................. 36
  2.    Notification regarding access to information by underwriters and other persons.......... 38
I.    Applicants' right to refuse to provide certain information ................................. 39
J.    Compiling, maintaining, and reporting 1071 data to the Bureau........................ 39
K.    Privacy considerations involving Bureau publication of 1071 data ................... 40
  1.    Balancing test ........................................................................................... 40
  2.    Privacy interests considered under the balancing test................................ 41
  3.    Bureau publication of 1071 data ............................................................... 41
L.    Implementation period ....................................................................................... 42
IV.    Potential Impacts on Small Entities ......................................................................... 43
A.    Overview............................................................................................................. 43
B.    Small entities covered by the proposals under consideration ............................ 44
C.    Using HMDA as a basis for potential impacts of the eventual 1071 rule........................ 46
D.    Types and numbers of 1071 reporters................................................................ 46
E.    Bureau review of compliance processes and costs ........................................... 49
F.    Impacts of the proposals under consideration.................................................... 50
  1.    Overview................................................................................................... 50
  2.    One-time costs........................................................................................... 51
  3.    Changes in ongoing costs.......................................................................... 52
  4.    Analysis of alternatives ............................................................................ 59
  5.    Additional potential impacts of the eventual 1071 rule ............................ 62
    i.    Impacts on product offering and underwriting processes.................. 62
    ii.    Impacts due to publicly available data and reputation risks ................. 62
G.    Impact on the cost and availability of credit to small entities........................... 63
Appendix A: Section 1071 of the Dodd-Frank Act ........................................................ 65
Appendix B: Glossary...................................................................................................... 69
Appendix C: Closely-related Federal statutes and regulations....................................... 71
Appendix D: Summary of data fields and other key information for each data point under
consideration .................................................................................................................. 74

2

AdminRecord-001289

# I.    Introduction

In the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), which was enacted "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system," Congress directed the Consumer Financial Protection Bureau (Bureau or CFPB) to adopt regulations governing the collection of small business lending data.  Specifically, section 1071 of the Dodd-Frank Act (section 1071 or 1071) amended the Equal Credit Opportunity Act (ECOA) to require financial institutions (FIs) to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[1]  Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses.  Under section 1071, the data that FIs are required to compile, maintain, and submit include the type and purpose of the loan, the census tract for the applicant's principal place of business, and the race, sex, and ethnicity of the principal owners of the business, along with a number of other data points.

The Bureau is implementing the section 1071 mandate.  The Bureau held a field hearing on May 10, 2017[2] and published a request for information regarding the small business lending market.[3]  The Bureau also released a white paper setting forth the findings of the Bureau's research on the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses.[4]  In November 2019, the Bureau held a symposium on section 1071 to stimulate a dialogue to assist the Bureau in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376, 2056 (2010) (section 704B of ECOA was added by section 1071 of the Dodd-Frank Act) (codified at 15 U.S.C. 1691c-2).  For ease of reading, this Outline refers to the provisions of 704B in a shorthand expressed in terms of section 1071.  For example, when this Outline refers to "section 1071(a)," it is employing this shorthand to refer to section 704B(a) of ECOA, which is codified at 15 U.S.C. 1691c-2(a).  The full text of section 1071 is included as Appendix A.  See Appendix B for a glossary of defined terms.

The Bureau interpreted section 1071 to mean that obligations for FIs to collect, maintain, and submit data "do not arise until the Bureau issues implementing regulations and those regulations take effect."  See Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), https://www.consumerfinance.gov/policy-compliance/guidance/supervisory-guidance/general-counsel-letter-regarding-section-1071-dodd-frank-act/.

[2] See Bureau of Consumer Fin. Prot., Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing (May 10, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.

[3] Bureau of Consumer Fin. Prot., Request for Information Regarding the Small Business Lending Market, 82 FR 22318 (May 15, 2017), https://www.consumerfinance.gov/policy-compliance/notice-opportunities-comment/archive-closed/request-information-regarding-small-business-lending-market/.

[4] Bureau of Consumer Fin. Prot., Key dimensions of the small business lending landscape (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

3

AdminRecord-001290

government experts in the small business lending arena.[5]  In early 2020, the Bureau released a research report examining small business lending and the Great Recession.[6]  On July 22, 2020, the Bureau issued a survey to collect information about potential one-time costs to FIs to prepare to collect and report data on small business lending.[7]  And now, the Bureau is moving forward with fulfilling its obligations under the Small Business Regulatory Enforcement Fairness Act (SBREFA), which amended the Regulatory Flexibility Act (RFA),[8] to assess the impact on small entities that would be directly affected by the proposals under consideration prior to issuing a proposed rule regarding section 1071.

As the Bureau noted in its May 2017 white paper on small business lending, small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities.[9]  In 2017, small businesses in the United States employed 60 million people, or about 47 percent of the private workforce.[10]  Women-owned and minority-owned small businesses play an important role in supporting their local communities.[11]  According to the Census Bureau, there are more than 27.6 million small businesses in the United States.  More than 7.9 million of these businesses are minority-owned and over 9.8 million are women-owned.[12]

Access to financing is a crucial component to the success of small businesses.  Small businesses—including women-owned and minority-owned small businesses—need access to credit to smooth out business cash flows and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth.  The market these businesses turn to for credit is vast and complex.  Small businesses have many options when it comes to financing, including products and providers.  Using publicly available data and informed by conversations

---

[5] Bureau of Consumer Fin. Prot., *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.

[6] Bureau of Consumer Fin. Prot., *Data Point: Small Business Lending and the Great Recession* (Jan. 2020), https://www.consumerfinance.gov/data-research/research-reports/data-point-small-business-lending-and-great-recession/.

[7] The survey period closes October 1, 2020.

[8] The RFA is codified at 5 U.S.C. 601-612, https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/.

[9] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[10] U.S. Census Bureau 2017 Statistics of U.S. Businesses.  *See generally* https://www.census.gov/programs-surveys/susb.html.

[11] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[12] *See* U.S. Census Bureau Survey of Business Owners (2012).  The Survey of Business Owners provides statistics on non-employer and employer firms.  The Census Bureau's 2018 American Business Survey (ABS) provides more recent statistics only on employer firms.  According to the ABS, there are 5.7 million employer businesses in the United States.  More than one million of these businesses are minority-owned and more than 1.1 million are women-owned.

4

AdminRecord-001291

with market participants, the Bureau estimated in 2017 that the small business financing market at that time was roughly $1.4 trillion.[13]

However, market-wide data on loans to small businesses currently is very limited. The largest sources of information on lending by depository institutions (DIs) are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports) and reporting under the Community Reinvestment Act of 1977 (CRA). Under each of these reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000).[14] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[15] The CRA requires banks and savings associations with assets over a specified threshold (currently $1.305 billion) to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[16] There are no similar sources of information about lending to small businesses by non-DIs.

Appendix C contains a list of Federal statutes and regulations that are closely related to section 1071, including, for example, the CRA.

## II.    The SBREFA Process

The Dodd-Frank Act requires the Bureau to comply with SBREFA, which imposes additional procedural requirements on rulemakings (including this consultative process) when a rule is expected to have a significant economic impact on a substantial number of small entities.[17] The SBREFA consultation process provides a mechanism for the Bureau to obtain input from small entities (in this case, small FIs as opposed to the small businesses that might be recipients of financing provided) early in the rulemaking process. SBREFA directs the Bureau to convene a

---

[13] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[14] *See* Fed. Fin. Insts. Examination Council Reporting Forms 31, 41, and 51, https://www.ffiec.gov/ffiec_report_forms.htm (last visited Aug. 26, 2020).

[15] *See* Nat'l Credit Union Admin. Call Report Form 5300 (June 2020), https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.

[16] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11, 13 (2015), https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf. Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report (TFR) as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11.

[17] *See* 5 U.S.C. 609(b).

AdminRecord-001292

Small Business Review Panel (Panel) when it is considering proposing a rule that could have a significant economic impact on a substantial number of small entities. The Panel includes representatives from the Bureau, the Small Business Administration's (SBA) Chief Counsel for Advocacy,[18] and the Office of Information and Regulatory Affairs in the Office of Management and Budget.

The Panel is required to collect advice and recommendations from small entities or their representatives (referred to as small entity representatives, or SERs) that are likely to be subject to the regulation that the Bureau is considering proposing. For this purpose, the RFA defines "small entities" as small businesses, small organizations, and small governmental jurisdictions. The term "small business" has the same meaning as "small business concern" under section 3 of the Small Business Act (SB Act); thus, to determine whether a business is a small entity the Bureau looks to the SBA's size standards.[19] The term "small organization" is defined as any not-for-profit enterprise which is independently owned and operated and is not dominant in its field. The term "small governmental jurisdiction" is defined as the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than 50,000.[20]

Small entities likely to be directly affected by this rulemaking within the meaning of SBREFA include DIs such as commercial banks, savings associations, and credit unions with assets of $600 million or less.[21]

Non-DIs that may be subject to the regulation that the Bureau is considering proposing include online lenders/platform lenders, non-DI community development financial institutions (CDFIs), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit lenders. The maximum size standard for any of these non-DIs to be considered small is $41.5 million in average annual receipts, though several have lower thresholds.[22]

---

[18] The Office of Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by the Office of Advocacy do not necessarily reflect the views of the SBA or the Administration.

[19] U.S. Small Bus. Admin., *Table of Small Business Standards Matched to North American Industry Classification System Codes* (effective Aug. 19, 2019), https://www.sba.gov/sites/default/files/2019-08/SBA%20 Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.

[20] See 5 U.S.C. 601(3) through (6).

[21] The North American Industry Classification System (NAICS) codes for these types of DIs are 522110, 522120, and 522130. Directly affected entities could potentially also fall into the category of credit card issuing institutions (NAICS 522210); these entities are considered small if they have assets of $600 million or less.

[22] The Bureau believes the types of small non-DIs discussed above are most commonly represented by the following NAICS codes, together with the maximum average annual receipts to be considered a small entity under each NAICS code:

       522220—Sales financing—$41.5 million
       522291—Consumer lending—$41.5 million
       522292—Real estate credit—$41.5 million
       522310—Mortgage and nonmortgage loan brokers—$41.5 million

AdminRecord-001293

During the Panel outreach meeting, SERs will provide the Panel with important advice and recommendations on the potential impacts of the proposals under consideration. They may also provide feedback on regulatory alternatives to minimize these impacts. In addition, the Dodd-Frank Act directs the Bureau to collect the advice and recommendations of SERs concerning whether the proposals under consideration might increase the cost of credit for small entities and alternatives which accomplish the stated objectives of applicable statutes and which minimize any such increase.

Within 60 days of convening, the Panel is required to complete a report on the input received from the SERs during the Panel process. The Bureau will consider the SERs' feedback and the Panel's report as it prepares the proposed rule. Once the proposed rule is published, the Bureau is required to place the Panel's final report in the public rulemaking record. The Bureau also welcomes further feedback from the SERs during the public comment period on the proposed rule.

The Bureau is convening a Panel to obtain input from the selected SERs on proposals under consideration for small business lending data collection pursuant to section 1071 of the Dodd-Frank Act. The Bureau has prepared this Outline of Proposals Under Consideration and Alternatives Considered (Outline) to provide background to the SERs and to facilitate the Panel process. However, the Panel process is only one step in the rulemaking process. No FI will be required to comply with new regulatory requirements before a proposed rule is published, public comment is received and reviewed by the Bureau, a final rule is issued, and the implementation period designated in the final rule concludes. One of the specific questions on which the Bureau seeks input during this SBREFA process is how long small FIs would need to conform their practices to the proposals under consideration.

The Bureau is also conferring with other Federal agencies, including the other prudential regulators, and it is seeking feedback from a wide range of other stakeholders on the proposals under consideration. Stakeholders are welcome to provide written feedback on the Bureau's proposals under consideration by emailing it to 2020-SBREFA-1071@cfpb.gov. The Bureau requests written feedback from SERs by November 9, 2020 in order to be considered and incorporated into the Panel Report.[23] The Bureau requests that other stakeholders wanting to provide feedback do so no later than December 14, 2020.

---

522320—Financial transactions processing, reserve, and clearinghouse activities—$41.5 million
532411—Commercial air, rail, and water transportation equipment rental and leasing—$35.0 million
813410—Civic and social organizations—$8.0 million

As discussed above, a "small organization" is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, and "small governmental jurisdictions" are the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

[23] Written feedback from SERs will be appended to the Panel Report. Feedback from other stakeholders may also be subject to public disclosure. Sensitive personal information, such as account numbers or Social Security numbers, or names of other individuals, should not be included. SERs and other stakeholders considering submitting proprietary or confidential business information should contact 2020-SBREFA-1071@cfpb.gov in advance to discuss whether and how that information should be provided.

AdminRecord-001294

## III. Proposals Under Consideration to Implement Section 1071 of the Dodd-Frank Act Regarding Small Business Lending Data Collection, and Alternatives Considered

Section 1071 requires FIs to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses in accordance with regulations that the Bureau adopts. The purpose of section 1071 is two-fold: (1) to facilitate enforcement of fair lending laws (fair lending purpose), and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses (community development purpose).

In this part III, the Bureau first discusses the overall scope of the proposals it is considering to implement section 1071. The Bureau then discusses several key definitional issues under consideration—what FIs would be covered by the rule, what is a "small business" applicant about which FIs must collect and report information, what are "women-owned businesses" and "minority-owned businesses," what credit products require reporting, and what constitutes an application.

Next, the Bureau discusses the data points enumerated in section 1071 as well as a small number of discretionary data points the Bureau is considering proposing. In addition, the Bureau addresses several other statutory provisions regarding shielding 1071 data from underwriters and other persons; applicants' right to refuse to provide certain information; compiling, maintaining, and reporting 1071 data to the Bureau; and privacy considerations and publication of 1071 data by the Bureau. Finally, the Bureau addresses an implementation period under consideration for the eventual final rule under section 1071.

The purpose of this Outline and the convening of the Panel is to obtain feedback on these proposals under consideration from the selected SERs to inform the Bureau's next major step, a proposed rulemaking to implement section 1071. The Bureau will also consider feedback it receives from other stakeholders outside the SBREFA process as it prepares to issue a proposed rulemaking.

Throughout this Outline, the Bureau lists questions it would like SERs to answer regarding its proposals under consideration and potential alternatives. These questions are numbered sequentially throughout this Outline for ease of reference, and begin here:

Q1.    Are there any relevant Federal laws or rules which may duplicate, overlap, or conflict with the Bureau's proposals under consideration beyond those discussed in Appendix C? How might the Bureau's proposals under consideration for implementing section 1071 impact other aspects of ECOA/Regulation B compliance?

### A. Scope of proposed rule

Section 1071(b) states that "in the case of any application to a financial institution for credit for [a] women-owned, minority-owned, or small business, the financial institution shall—(1) inquire

AdminRecord-001295

whether the business is a women-owned, minority-owned, or small business." That is, the text of section 1071 can be read to include data collection for credit applications for all small businesses as well as for women-owned and minority-owned businesses that are not small.

Most existing businesses, including almost all women-owned and minority-owned businesses, are "small business concerns" as that term is currently defined by the SBA.[24] It is therefore likely that reporting applications for all small businesses would also result in reporting applications for nearly all women-owned and minority-owned businesses. In the U.S. Census Bureau's 2018 Annual Business Survey, 5.7 million firms (99.6 percent of all employer firms) are small, as defined within that survey as having fewer than 500 employees.[25] That same definition covers one million minority-owned employer firms (99.9 percent of all minority-owned firms) and 1.1 million women-owned employer firms (99.9 percent of all women-owned firms).[26] Among non-small businesses (*i.e.*, 0.4 percent of all firms nationally), 10 percent of this small fraction are minority-owned firms and 13 percent are women-owned.[27]

In light of the comprehensive coverage of women-owned and minority-owned businesses within the scope of small businesses, the Bureau is considering proposing that the data collection and reporting requirements of its eventual 1071 rule would apply to any application to an FI for credit only for small businesses, to be defined as discussed in part III.C. The Bureau is concerned that a requirement to collect and report 1071 data on applications for women-owned and minority-owned businesses that are not small businesses could affect all aspects of FIs' commercial lending operations while resulting in limited information beyond what would already be collected and reported about women-owned and minority-owned small businesses. In addition, financing for large businesses can be much more varied and complex than are the products used for small business lending. Thus, under the approach the Bureau is considering proposing, FIs would collect and report lending data for all applicants that satisfy the Bureau's definition of a small business, including identifying women-owned and minority-owned businesses within that pool, but FIs would not be required to collect and report 1071 data for women-owned and minority-owned businesses that are not "small."

    Q2.    Please provide feedback and information on the approach the Bureau is considering regarding the scope of its section 1071 rulemaking particularly the proposal to limit

---

[24] See part III.C below for additional discussion regarding defining the term "small business" for purposes of implementing section 1071.

[25] *See* U.S. Census Bureau, *2018 Annual Business Survey*. *See generally* https://www.census.gov/programs-surveys/abs.html (last visited Aug. 26, 2020).

[26] According to the 2018 Annual Business Survey, there are approximately 1 million minority-owned firms and 1.1 million women-owned firms in the U.S. Approximately 270,000 firms (5 percent of all firms), cannot be classified as to the race, sex, or ethnicity of owners. Firms generally are unclassified because no owners have a 10 percent or greater ownership in the business.

[27] *See* U.S. Census Bureau, *2018 Annual Business Survey*. Approximately 1,100 women-owned firms and approximately 900 minority-owned firms are large (based on a 500-employee threshold). For more on how the Census defines "women-owned" and "minority-owned" for the purposes of the Annual Business Survey, *see* https://www.census.gov/programs-surveys/abs/technical-documentation/methodology.html.

9

AdminRecord-001296

reporting to applicants that satisfy the Bureau's definition of a "small business." Are there any alternative approaches the Bureau should consider?

Q3.    How often does your FI make loans to businesses that are not "small"? Would you anticipate any specific complexities or costs in identifying women-owned and/or minority-owned applicants that are not small businesses, and collecting 1071 data about their applications for credit?

Q4.    Does the credit process at your FI for non-small business applicants differ materially from the process for small business applicants? If so, how does it differ? Are there any other aspects of lending to large businesses that the Bureau should be aware of as it is determining the overall scope of its eventual 1071 rule?

## B. Definition of "financial institution" (lender coverage)

Section 1071 imposes data collection and reporting requirements on FIs with respect to "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business." This part III.B addresses a general definition for the term "financial institution" before addressing the possibility of exemptions based on asset size (for DIs) and/or small business lending activity, and issues specific to FIs that are not the lender of record.

## 1.    General definition of "financial institution"

Section 1071(h)(1) defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." The Bureau is considering proposing a general definition of "financial institution" consistent with the section 1071 definition. The Bureau notes that Regulation B, which implements ECOA, has not otherwise defined this term.

Under this definition, the rule's data collection and reporting requirements may apply to a variety of entities that engage in small business lending—including, potentially, DIs (*i.e.*, banks, savings associations, and credit unions), online lenders/platform lenders, CDFIs (both DI and non-DI), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit non-DI lenders.

The Bureau notes that several other key definitions will determine whether or not an FI has a duty to collect and report data on credit applications under section 1071. In addition to satisfying this general definition of "financial institution," receiving applications (as discussed in part III.F) for covered lending products (part III.E) for small businesses (part III.C) are all necessary to trigger a duty to collect and report data on credit transactions under section 1071.

Q5.    Please provide feedback and information on the approach the Bureau is considering regarding the general definition of "financial institution," along with any alternative approaches the Bureau should consider.

10

AdminRecord-001297

## 2.    Possible exemptions

In light of the regulation's potentially broad application to FIs, the Bureau is considering whether either or both a size-based or activity-based test might be appropriate to determine when an FI must collect and report 1071 data or should be exempt, given section 1071's statutory purposes. The Bureau is concerned that the smallest FIs, or those with the lowest volume of small business lending, might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with an eventual 1071 rule, which could be contrary to the community development purpose of section 1071 and could also be contrary to one of the general purposes of the Bureau, to facilitate access to credit. Specifically, the Bureau is considering whether DIs with assets under a given threshold should be exempt from collecting and reporting (size-based exemption). In addition, the Bureau is considering whether to require FIs to collect and report 1071 data only if they exceed either a specified number or dollar value of small business loans originated in a specified period (activity-based exemption). The Bureau is also considering whether to use a size-based test together with an activity-based test to determine coverage under its 1071 rule. These approaches are addressed in turn below.

Q6.    Please provide feedback and information on the approach the Bureau is considering regarding the possible exemptions for FIs based on size and/or activity, along with any alternative approaches the Bureau should consider.

Q7.    How does your FI currently track applications and/or originations (by number of loans and/or dollars)? Does this differ between DIs and non-DIs? What do you anticipate the potential costs would be to track whether your FI qualifies under an activity-based exemption metric?

Q8.    What compliance costs would cause your FI to stop or decrease your small business lending?

Q9.    Are there certain types of FIs, such as governmental lending entities or non-profit non-DI lenders, that the Bureau should consider not including within 1071's data collection and reporting requirements? If so, why?

### i.    Size-based exemption

The Bureau is considering whether to exempt DIs with assets under a given asset threshold from section 1071's data collection and reporting requirements. This size-based approach could provide a straightforward exemption for very small DIs and avoid the need for those entities to measure or monitor their small business lending activity in order to determine whether they are exempt from the Bureau's 1071 rule. The Bureau is considering the following possible asset-based exemption threshold levels:

- Option A Exemption Level: $100 million in assets

- Option B Exemption Level: $200 million in assets

AdminRecord-001298

For purposes of this exemption, a DI's asset size as of the end of the last calendar year, or the end of both of the last two calendar years, might be proposed.

The Bureau selected these possible exemption levels to obtain feedback as it continues to explore how best to fulfill section 1071's statutory purposes while attempting to minimize compliance burden. Based on 2018 FFIEC and NCUA Call Reports,[28] the Bureau estimates that under the Option A exemption level, roughly 48 percent of all DIs would be excluded from 1071 collection and reporting requirements. However, DIs that would not be exempt under Option A originate, and would report, over 99 percent of small business loans made by DIs (according to Call Reports).[29] Estimates of the number of small DIs that would be covered under each of the thresholds in this part III.B.2.i and in part III.B.2.ii are provided in part IV.B below. (The Bureau does not have data that would allow it to precisely estimate the share of applications that would be covered.) However, an asset-based approach to measuring an FI's size would only be applicable to DIs, where size is determined by reported assets.

> Q10. Please provide feedback and information on the approach the Bureau is considering regarding a size-based exemption, along with any alternative approaches the Bureau should consider. For example, would a different asset size be more appropriate for a size-based exemption and, if so, why? Should the exemption be triggered upon meeting the threshold in one or two consecutive calendar years?

### ii. Activity-based exemption

The Bureau is considering whether only FIs that engage in a certain amount of small business lending activity should be required to collect and report 1071 data. The Bureau is considering several possible activity-based threshold levels, each defined by an FI's annual number of small business loans originated or the FI's annual total dollar value of small business loans originated. (That is, if either measurement is exceeded, then the FI must collect and report 1071 data.) In particular, the Bureau is considering the following three possible activity-based thresholds:

- Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million

- Option 2 Exemption Threshold: originations of at least 50 loans or $5 million

- Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

These possible activity-based thresholds could be based on the FI's lending as of the end of the last calendar year, or the end of both of the last two calendar years. Unlike the potential size-based exemption, an activity-based exemption could apply to DIs and non-DIs alike.

---

[28] It should be noted that, as discussed above, the Call Reports do not provide comprehensive data across all small business lending. The Call Reports cover lending by DIs only; there are no non-DI lending data included. In addition, the bank Call Report uses small loans to businesses as a proxy for loans to small businesses.

[29] For purposes of this Outline, the Bureau used data from the credit union and bank Call Reports that were accessed on June 10, 2020.

AdminRecord-001299

Using the 2018 Call Report data, the Bureau estimates that under the Option 1 Exemption Threshold, roughly half of all DIs would be excluded from 1071 collection and reporting requirements, while the share of small business loan originations by DIs would be in excess of 99 percent. (As noted above, the Bureau does not have data that would allow it to estimate the number of applications that would be covered, or the number/value of loans, or applications, from non-DIs.)

> Q11. Please provide feedback and information on the approach the Bureau is considering regarding an activity-based exemption, along with any alternative approaches the Bureau should consider. For example, would a different number and/or volume of loans be more appropriate for an activity-based exemption and, if so, why? Should the exemption be triggered on meeting the threshold in one or two consecutive calendar years?

### iii. Combined size- and activity-based exemptions

The Bureau is exploring whether to combine the size- and activity-based approaches to possible collection and reporting exemptions for FIs. Under a combined approach, an FI would be required to collect and report 1071 data if it exceeds either a given annual number of small business loans originated or annual total dollar value of small business loans originated during the relevant time period. However, DIs with assets under a given asset threshold would be exempt from reporting, regardless of the number or dollar value of small business loans they originated during the relevant time period.

> Q12. Please provide feedback and information on the approach the Bureau is considering regarding a combined size- and activity-based exemption, along with any alternative approaches the Bureau should consider. For example, would different asset sizes or number and/or volume of loans be more appropriate for a combined size- and activity-based exemption and, if so, why?

## 3.     Financial institutions that are not the lender of record

Section 1071's requirement to collect and report certain data for any "application to a financial institution for credit" could be read as applying to more than one FI when an intermediary provides the application to another institution that takes final action on the application. This broad reading may serve a useful function (such as comprehensive reporting by all FIs involved in a small business lending transaction) but could also generate duplicative compliance costs for FIs and potentially detract from the quality of reported 1071 data, increasing the risk that certain applications are reported multiple times.

The Bureau is considering proposing that in the situation where more than one party is involved on the lender side of a single small business loan or application, section 1071's data collection and reporting requirements would be limited in the same manner as in Regulation C, which implements the Home Mortgage Disclosure Act (HMDA). Under the Regulation C approach, reporting responsibility depends on which institution made the final credit decision. If there was an origination, then the FI making the credit decision approving the application would be responsible for reporting (even if the FI used credit standards set by another party). If more than

13

one FI approved a loan, and the loan was purchased after closing by one of the FIs approving the loan, the purchaser (such as an assignee) would report the loan. If there was no origination and multiple FIs received the same application, then any FI that made a credit decision would be responsible for reporting (even if other FIs also reported on the same potential non-originated application).[30]

> Q13.  Please provide feedback and information on the approach the Bureau is considering regarding treatment of FIs that are not the lender of record, along with any alternative approaches the Bureau should consider.

## C. Definition of "small business" applicants

While part III.B above addresses how the Bureau might define FIs and which of them may be covered by an eventual 1071 rule, this part III.C addresses what is a "small business" applicant for which FIs must collect and report information. Section 1071(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the SB Act (15 U.S.C. 632).[31] The SB Act provides a general definition of a "small business concern," authorizes SBA to establish detailed size standards for use by all agencies, and permits an agency to request SBA approval for a size standard specific to an agency's program. As a general matter, the Bureau is considering proposing to define "small business" by cross-referencing the SBA's general definition of "small business concern," but adopting a simplified size standard for purposes of its section 1071 rule. Consistent with the statutory requirements, the Bureau will seek SBA approval for a simplified size standard if it ultimately decides to take this approach. The Bureau understands that implementing this approach will necessitate close coordination with, and approval from, the SBA.

The SBA's regulations define a "business concern" as "a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor."[32] Thus, FIs would not be required to collect and report 1071 data for not-for-profit applicants, because they are not "organized for profit" and are thus not a "business concern."[33] A business concern may take a number of different legal forms, including a sole proprietorship, partnership, LLC, corporation, joint

---

[30] The Bureau's rules, including any eventual 1071 rule, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

[31] 15 U.S.C. 1691c-2(h)(2).

[32] *See* 13 CFR 121.105.

[33] The Bureau notes that this definition is specifically for business concern. As discussed in part II above, small entities for purposes of the RFA with whom the Bureau must consult via this SBREFA process are small business concerns, small organizations (*i.e.*, not-for-profit enterprises), and small governmental jurisdictions. Thus, while application data for not-for-profit applicants would not be required to be reported under a section 1071 rule if the Bureau were to adopt this aspect of the SBA's definition of "business concern," this definition does not in any way preclude not-for-profit lenders from being subject to 1071.

AdminRecord-001301

venture, trust, or cooperative.[34]  Because the definition is limited to American businesses, if the Bureau adopted this definition for purposes of 1071, loans to foreign companies would be outside the scope of 1071 data collection and reporting requirements.

The SB Act defines a *small* business concern as a business that is "independently owned and operated and which is not dominant in its field of operation"[35] and empowers the Small Business Administrator (Administrator) to prescribe detailed size standards by which a business concern may be categorized as a small business.  These size standards may use number of employees, dollar volume of business, net worth, net income, a combination of these, or other appropriate factors.[36]  For the most part, the industry-specific size standards adopted by the SBA, classified by six-digit North American Industry Classification System (NAICS) codes, are expressed in terms of the average annual receipts or the average number of employees of a business concern.[37]  In determining whether a business concern is "small," the SBA's regulations provide that the average annual receipts or average number of employees, as applicable, must be calculated by adding the average annual receipts/average number of employees of the business concern with the average annual receipts/average number of employees of any affiliates.[38]  Thus, the size of an applicant would be considered together with the size of any affiliates in determining whether the applicant is a small business for purposes of section 1071.

The SB Act provides that Federal agencies other than the SBA may prescribe a size standard for categorizing a business as a small business concern only where certain specific criteria are met.  Among other things, the proposed size standard must provide for determining size based on (1) a manufacturing concern's average employment over the preceding 12 months; (2) a service business's annual average gross receipts over at least 5 years; (3) the size of other business concerns on the basis of data over at least 3 years; or (4) other appropriate factors.  In addition, the proposed size standard must be approved by the Administrator.  Additional procedural requirements are set out in the SB Act and SBA's regulations.[39]

---

[34] 13 CFR 121.105(b).

[35] 15 U.S.C. 632(a)(1).

[36] 15 U.S.C. 632(a)(2)(A) and (B).

[37] *See* 13 CFR 121.201; U.S. Small Bus. Admin., *Table of size standards*, https://www.sba.gov/document/support-table-size-standards (effective as of Aug. 19, 2019).  SBA's methodologies for calculating average annual receipts and average number of employees of a firm are set forth in 13 CFR 121.104 and .106, respectively.

Over one thousand industries are assigned a specific size standard in SBA's regulations.  For example, NAICS code 238160 pertains to roofing contractors, with a size threshold of $16.5 million in average annual receipts.  These industry-specific size standards may be used by Federal agencies to define small businesses for the agencies' purposes without specific SBA approval or separate statutory authority.  *See* 13 CFR 121.201.

[38] 13 CFR 121.104(d)(1) and 121.105(b)(4)(i).

[39] For example, the SBA requires that the agency seeking to adopt an alternate size standard must consult in writing with the SBA's Division Chief for the Office of Size Standards in advance of issuing a notice of proposed rulemaking containing the proposed alternate size standard.  This written consultation must include: (i) what size standard the agency contemplates using; (ii) to what agency program it will apply; (iii) how the agency arrived at this particular size standard; and (iv) why SBA's existing size standards do not satisfy the program requirements. 13 CFR 121.903(a)(2).  The agency must provide a copy of the published proposal to the Division Chief for the Office of Size Standards, and the SBA Administrator must approve the size standard before the agency adopts the

AdminRecord-001302

As a general matter, the Bureau believes that the better approach is to use a simpler, more straightforward approach to the size standard aspect of the "small business" definition for purposes of its 1071 rule. Such an approach would assist both FIs and applicants seeking to quickly understand whether a business is "small" and to employ a workable size standard for 1071 without navigating the potential complexities of determining the appropriate six-digit NAICS code, and then the relevant size standard based on that NAICS code, for each applicant. Adopting a simplified approach will necessitate close coordination with, and approval from, the SBA.

The Bureau is considering three alternative approaches for a simpler size standard. These three approaches to determining whether an applicant is small, described in more detail below, would use: (1) only gross annual revenue; (2) either the number of employees or average annual receipts/gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services; or (3) size standards across 13 industry groups that correspond to two-digit NAICS code industry groupings. The proportions of small businesses covered under each of these alternatives is discussed in part IV.F.4 below. Absent approval from the SBA to adopt one of these alternatives, however, the Bureau would have to use the SBA's existing size standards.

Under the first alternative, the Bureau is considering proposing a size standard using the gross annual revenue of the applicant business in the prior year, with a potential "small" threshold of $1 million or $5 million.

Under the second alternative, the Bureau is considering proposing a size standard of a maximum of 500 employees for manufacturing and wholesale industries and a maximum of $8 million in gross annual revenue for all other industries.[40] The Bureau selected 500 employees as a potential threshold for manufacturing and wholesale industries because that figure is the most common of the SBA's employee-based size standards. The Bureau selected $8 million for all other industries because that figure is the most common size standard threshold for average annual receipts; the Bureau is considering using gross annual revenue, rather than the SBA's average annual receipts, for consistency with the 1071 statutorily required gross annual revenue data point (see part III.G.1.xi below for discussion of this data point).

Under the third alternative, the Bureau is considering proposing a size standard using gross annual revenue or the number of employees based on a size standard in each of 13 two-digit NAICS code categories that applies to the largest number of firms within each two-digit NAICS

---

final rule or otherwise prescribes the size standard for its use. 13 CFR 121.903(a)(5). (Where an agency is developing a size standard for the sole purpose of performing an RFA analysis pursuant to 5 U.S.C. 601(3), however, the agency must consult with SBA's Office of Advocacy to establish an alternate size standard. 13 CFR 121.903(c).)

[40] Specifically, under this approach, the Bureau first considered the total number of employer firms in each NAICS six-digit industry, based on the 2017 Statistics of US Businesses. Next, across all industries, the Bureau determined how many unique size standards are applied and the total number of employer firms to which each unique standard is applied. The simplified standards under this second alternative are the ones that apply to the largest number of firms within manufacturing and wholesale industries (based on number of employees) and for all other industries (based on average annual receipts).

AdminRecord-001303

code category.[41]  Applying the SBA's 2019 size standards, the third alternative would result in eight different size standards across the 13 categories, as follows:

**Table 1: Size standards under the third alternative for each of
13 two-digit NAICS code categories**

| Two-digit NAICS code | Industry description | Type of standard | Size standard |
|---|---|---|---|
| 11 | Agriculture, forestry, fishing and hunting | Receipts | $8 million |
| 21 | Mining, quarrying, and oil and gas extraction | Receipts | $41.5 million |
| 22 | Utilities | Receipts | $30 million |
| 23 | Construction | Receipts | $16.5 million |
| 31–33 | Manufacturing | Employee | 500 |
| 42 | Wholesale trade | Employee | 100 |
| 44–45 | Retail trade | Receipts | $8 million |
| 48–49 | Transportation and warehousing | Receipts | $30 million |
| 51 | Information | Receipts | $35 million |
| 52–53 | Finance and insurance, Real estate and rental and leasing | Receipts | $8 million |
| 54 | Professional, scientific, and technical services | Receipts | $16.5 million |
| 55 | Management of companies and enterprises | Receipts | $22 million |
| 56–81 | Administrative and support and waste management and remediation services; Educational services; Health care and social assistance; Arts, entertainment, and recreation; Accommodation and food services; Other services (except public administration) | Receipts | $8 million |

This third alternative is significantly less complex than the full six-digit NAICS code standard, although it is based on the SBA's existing size standards and the thresholds vary by industry.

The Bureau is not planning to propose requiring that FIs verify information provided by applicants necessary for determining whether an applicant is "small" (such as the total number of employees), regardless of the Bureau's approach to a small business size standard.  Rather, the FI would generally report the information as provided by the applicant.  However, if the FI verifies such information for its own purposes, it would report the verified information to the Bureau.

As noted in part I above, there are a number of Federal statutes and regulations that are closely related to section 1071, including several that define, or employ proxies for, identifying small businesses or loans originated to small businesses.  These are enumerated in Appendix C.

---

[41] Specifically, under this approach, the Bureau first considered the total number of employer firms in each NAICS six-digit industry, based on the 2017 Statistics of US Businesses.  Next, within each NAICS two-digit industry, the Bureau determined how many unique size standards are applied within that two-digit industry and the total number of employer firms to which each unique standard is applied.  The simplified standard for each NAICS two-digit industry is the one that applies to the largest number of firms within that industry.

17

AdminRecord-001304

Q14.  Please provide feedback and information on the approach the Bureau is considering regarding the definition of "small business," along with any alternative approaches the Bureau should consider.  For example, should the Bureau include or exclude applications from particular types of borrowers from the scope of its eventual 1071 rule in addition to or differently than as described herein?

Q15.  What would the costs be to implement a small business definition based on each of the three alternatives above?  (If these potential costs are difficult to quantify, you are invited to describe these costs qualitatively, such as small, medium, or large.)  Are there any particular complexities you anticipate under any of the alternatives presented?

Q16.  Are you familiar with the SBA's six-digit NAICS code-based size standards, and does your FI currently use them for any purpose?  What would the cost be to implement a small business definition based on the SBA's size standards?

## D. Definitions of "women-owned business," "minority-owned business," and "minority individual"

Section 1071 imposes data collection and reporting requirements on FIs with respect to "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business."  Section 1071(h)(6) defines a business as a "women-owned business" if (A) more than 50 percent of the ownership or control is held by one or more women; and (B) more than 50 percent of the net profit or loss accrues to one or more women.  Similarly, section 1071(h)(5) defines a business as a "minority-owned business" if (A) more than 50 percent of the ownership or control is held by one or more minority individuals; and (B) more than 50 percent of the net profit or loss accrues to one or more minority individuals.

Section 1071 does not define the term "minority individual."  However, section 1071(h)(5) does define the term "minority" as having the same meaning as in section 1204(c)(3) of the Financial Institution Reform, Recovery, and Enforcement Act of 1989 (FIRREA).  FIRREA defines "minority" to mean any Black American, Native American, Hispanic American, or Asian American.[42]

The Bureau is considering proposing guidance that would clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino.  This guidance, which would mirror the terminology of HMDA's aggregate categories, would also clarify that a multi-racial person could be considered a minority individual.

The Bureau also is considering proposing clarifications for the definition of "women-owned business" and "minority-owned business" by using simpler language that mirrors the concepts of ownership and control that are set forth in the Financial Crimes Enforcement Network's

---

[42] Section 1204 of Public Law 101-73, 103 Stat. 521.

AdminRecord-001305

customer due diligence (CDD) rule.[43]  The Bureau is also considering proposing simplified applicant-facing materials to aid industry in collecting this information.  Specifically, for these applicant-facing materials and industry clarifications, the Bureau is considering proposing the following definitions: (1) "ownership" to mean directly or indirectly having an equity interest in a business  (*i.e.*, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, owning an equity interest in the business); (2) "control" of a business to mirror the CDD rule, where it means having significant responsibility to control, manage, or direct a business; and (3) the "accrual of net profit or loss" with reference to generally accepted accounting practices and any applicable Internal Revenue Service standards.

Q17.  Please provide feedback and information on the approach the Bureau is considering regarding the definitions of "women-owned business," "minority-owned business," and "minority individual," along with any alternative approaches the Bureau should consider.

Q18.  What are the legal or ownership structures of the businesses that typically apply for small business loans from your FI (*i.e.*, sole proprietorship, partnership, limited liability company, "S" corporation, etc.)?  Do those businesses typically have an indirect ownership structure (*i.e.*, ownership interests are held by other entities)?  What persons or group of persons are typically responsible for the operations of such business (*i.e.*, whether a managing member, two or more partners, a CEO, or some other person or group of persons)?

Q19.  Do you foresee any difficulties in using the CDD standards for purposes of 1071 data collection?  Do your FI and/or your small business applicants routinely apply the concepts of "ownership" or "control" in a manner that does not align with the CDD rule?  If so, what concepts do they use?

## E.  Product coverage

### 1.    Covered products

Section 1071 requires FIs to collect and report information regarding any application for "credit" made by women-owned, minority-owned, and small businesses.  Although the term "credit" is not specifically defined in section 1071, ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."[44]  The Bureau is considering

---

[43] 31 CFR 1010.230.  The CDD rule requires covered financial institutions to establish and maintain policies and procedures that are reasonably designed to identify and verify the identity of beneficial owners of legal entities that open accounts.  Currently, many applicants must respond to questions about who "owns" and who "controls" a business when completing forms or otherwise responding to a covered financial institution's inquiries related to the CDD rule.  The Bureau is considering mirroring the concepts of "ownership" and "control" that are set forth in the CDD rule because most financial institutions and many applicants are likely to be familiar with such concepts.

[44] 15 U.S.C. 1691a(d); *see also* 12 CFR 1002.2(j).

AdminRecord-001306

proposing that a covered product under section 1071 is one that meets the definition of "credit" under ECOA and is not otherwise excluded from collection and reporting requirements.

Specifically, the Bureau is considering proposing that covered products under section 1071 include term loans, lines of credit, and business credit cards. Term loans, lines of credit, and business credit cards meet the definition of "credit" under ECOA. Term loans, lines of credit, and business credit cards, collectively, make up the majority of business financing products used by small businesses and are an essential source of financing for such businesses.[45] As such, inclusion of these products in the Bureau's 1071 rule is important to fulfilling the purposes of section 1071.

The Bureau is considering proposing that the following products not be covered by the 1071 rule, as discussed in part III.E.2 below: consumer credit used for business purposes, leases, trade credit, factoring, and merchant cash advances (MCAs).

Q20.　Please provide feedback and information on the approach the Bureau is considering regarding covered products and use of the ECOA definition of "credit" for purposes of defining covered products under section 1071, along with any alternative approaches the Bureau should consider. Are there any products that should or should not be covered by the Bureau's eventual 1071 rule, and if so why?

Q21.　What challenges would you anticipate if leases, trade credit, factoring, or MCAs or some subset(s) thereof, were included as covered products under the 1071 rule? Do you have suggestions on how to mitigate or resolve those challenges? If a subset of any of these products were included, do you have suggestions on how to define such a subset, what to include, and why (for example, including only capital leases as a covered product or only including a subset of MCAs)?

Q22.　Would the costs to collect, check, and report 1071 data differ across products? If so, why? Would these differences impact one-time costs to set up 1071 reporting, ongoing costs each year, or both?

## 2.　Products not covered

The Bureau is considering proposing that the following products not be covered products under the 1071 rule: consumer credit used for business purposes, leases, trade credit, factoring, and MCAs. These products are discussed in turn below in this part III.E.2.

### i.　Consumer credit used for business purposes

The Bureau is considering proposing to clarify that covered products (including term loans, lines of credit, and business credit cards) are limited to products designated by the creditor as business purpose products (business-designated products), and that covered products under section 1071 do not include products designated by the creditor as consumer purpose products (consumer-

---

[45] *See* Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape*, at 21-22 (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

20

AdminRecord-001307

designated credit). Not including consumer-designated credit as a covered product under a 1071 rule makes it clear that the financing proceeds reported will be used for business purposes. This approach would greatly simplify the regulatory effort necessary to identify, and for FIs to distinguish, business uses of consumer products.

### ii. Leases

A leasing transaction generally refers to an agreement in which a lessor transfers the right of possession and use of a good or asset to a lessee in return for consideration.[46] The Bureau is considering proposing that leases not be a covered product under section 1071 unless the product is a credit sale. For purposes of section 1071, the Bureau is considering proposing a definition of "credit sale" similar to the Regulation Z definition of that term as a transaction in which the lessor is a creditor and the lessee (i) agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and (ii) will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement."[47]

The Bureau is considering this approach since including leases may add additional complexity or reporting burden given the unique structure of the transactions.

### iii. Trade credit

Under Regulation B, trade credit refers to a "financing arrangement that involves a buyer and a seller—such as a supplier who finances the sale of equipment, supplies, or inventory; it does not apply to an extension of credit by a bank or other financial institution for the financing of such items."[48] Thus, trade credit typically involves a transaction in which a seller allows a business to purchase its own goods without requiring immediate payment, and the seller is not otherwise in the financial services business. Businesses offering trade credit generally do so as a means to facilitate the sale of their own goods and not as a stand-alone financing product.

The Bureau is considering proposing that trade credit not be a covered product under section 1071. Trade credit can be offered by entities that are themselves very small businesses; the Bureau is concerned that these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[49]

---

[46] *See* U.C.C. Art. 2A-103(1)(j) (defining a "lease").

[47] *See* 12 CFR 1026.2(16).

[48] Regulation B (12 CFR part 1002) comment 9(a)(3)-2.

[49] *See* Leora Klapper et al., *Trade Credit Contracts*, at 838-67 (The Review of Financial Studies, vol. 25, issue 3, 2012), https://academic.oup.com/rfs/article/25/3/838/1616515; and Justin Murfin & Ken Njoroge, *The Implicit Costs of Trade Credit Borrowing by Large Firms*, at 112-145 (The Review of Financial Studies, vol. 28, issue 1, 2015), https://academic.oup.com/rfs/article/28/1/112/1681329.

AdminRecord-001308

### iv.  Factoring

Under Regulation B, factoring is "a purchase of accounts receivable;"[50] in such arrangements, a business generally sells its unpaid invoices at a discount to a factor.  The Bureau is considering proposing that factoring not be a covered product under section 1071.  As noted in the official interpretations to Regulation B, factoring arrangements are generally not considered subject to ECOA or Regulation B.[51]

### v.  Merchant cash advances

MCAs are a form of short-term financing for small businesses that vary in form and substance.  Under a typical MCA, a merchant receives a cash advance and promises to repay it (plus some additional amount) by either pledging a percentage of its future revenue (such as its daily credit and debit card receipts) or agreeing to pay a fixed daily withdrawal amount to the MCA provider until the agreed upon payment amount is satisfied.  The Bureau is considering proposing that MCAs not be a covered product under section 1071 since including them may add additional complexity or reporting burden given the unique structure of the transactions.

## F.  Definition of an "application"

Section 1071(b) requires that FIs collect and report to the Bureau certain information regarding "any application to a financial institution for credit."  Thus, for covered FIs with respect to covered products, the definition of "application" will trigger data collection and reporting under section 1071.  The term "application," however, is not defined in either section 1071 or ECOA, though it is defined in Regulation B.[52]

The Bureau is considering proposing to define an "application" largely consistent with the Regulation B definition of that term.  That is, as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."[53]  This definition appears to be flexible and may allow creditors to develop individually tailored requirements on what constitutes an "application" that fits within the context of their specific credit processes.  Many creditors also likely will be familiar with this definition based on their experience providing adverse action notices under Regulation B.[54]  In addition, the definition appears to be workable for both FIs that use written or online application forms and those that rely primarily on oral requests for credit.  Finally, this approach could strike an appropriate balance by triggering the 1071 data collection requirement only after there is an actual request for credit (using the procedures defined by an FI, *i.e.*, an "application"), but still

---

[50] Regulation B comment 9(a)(3)-2 ("Factoring refers to a purchase of accounts receivable, and thus is not subject to the Act or regulation.").

[51] *Id.*

[52] 12 CFR 1002.2(f).

[53] *Id.*

[54] *See* 12 CFR 1002.9(a)(1) and (c) (requiring a creditor to provide notice within 30 days of taking adverse action on an incomplete application or within 30 days of receiving an incomplete application).

AdminRecord-001309

early enough in the process to capture incomplete, withdrawn, and denied applications, thus making the reported data more in line with section 1071's statutory purposes.

Although the Bureau is considering proposing a definition of "application" based on the Regulation B definition of that term, the Bureau is also considering proposing to clarify certain circumstances that would not be reportable under section 1071, even if certain of these circumstances are considered an "application" under Regulation B. These include:

- Inquiries/prequalifications: The Bureau is considering not covering inquiry or prequalification requests in the 1071 data collection and reporting requirements, including inquiry and prequalification requests that may constitute an "application" under Regulation B for purposes of its notification requirements.[55] The Bureau is concerned that including inquiry and prequalification requests could pollute the 1071 dataset, thus inhibiting identification of business and community development needs and opportunities. This approach would be consistent with Regulation C, which does not cover prequalifications and inquiries.[56]

- Reevaluation, extension and renewal requests, except requests for additional credit amounts: The Bureau is considering proposing that 1071 data collection and reporting requirements not cover borrower requests to modify the terms and/or duration of an existing extension of credit. Similarly, creditor-initiated reviews of existing credit extensions also would not be reportable. However, the Bureau is considering proposing to require collection and reporting of requests for additional credit amounts (line increases or new money on existing facilities) as these events go directly to the purposes of section 1071.

- Solicitations and firm offers of credit: The Bureau is considering proposing that FIs would not be required to collect and report 1071 data for FI prescreened solicitations or firm offers of credit unless the applicant responds in a manner that triggers an "application."

*Alternative definitions of "application" considered.* The Bureau considered possible alternative definitions of an "application" for purposes of 1071 data collection and reporting. Specifically, the Bureau has considered defining an "application" for purposes of 1071 by using Regulation B's definition of the term "completed application." That is, as an application in which the creditor has received "all the information that the creditor regularly obtains and considers" in evaluating similar products.[57] This definition could exclude incomplete applications and many withdrawn applications, thus making the reported data less in line with section 1071's statutory purposes. The Bureau also considered defining "application" as particular documents or specific data points that, if collected, would trigger a duty to collect and report 1071 data. The Bureau is

---

[55] *See* Regulation B (12 CFR part 1002) comments 2(f)-3 and 9-5. A request for credit that meets the "application" definition considered here would be reportable, even if that application had been preceded at some point in time by an inquiry or prequalification.

[56] Regulation C (12 CFR part 1003) comment 2(b)-2.

[57] 12 CFR 1002.2(f).

AdminRecord-001310

also disinclined to follow this approach as it could create confusion and uncertainty by introducing another definition of "application" to the regulatory landscape, which would require FIs to alter their existing practices, require product-specific definitions and alterations, and could distort lending processes by incenting FIs to delay gathering a particular data point or document in order not to be covered by the 1071 rule.

> Q23.  Please provide feedback and information on the approach the Bureau is considering regarding the definition of "application," along with any alternative approaches the Bureau should consider.

> Q24.  What is your FI's practice for defining applications for credit for small businesses?  Is the Regulation B definition of "application" compatible with your FI's existing practices?  What challenges do you anticipate if the Bureau were to adopt a largely consistent definition, and do you have any suggestions on how to mitigate or resolve those challenges?

## G. Data points

### 1.    Mandatory data points

Section 1071(b) requires FIs to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information.  Section 1071(e)(1) requires each FI to compile and maintain a record of the information provided by any loan applicant pursuant to a request under section 1071(b).  In addition, the statute states that the information compiled and maintained by an FI under section 1071 shall be itemized in order to clearly and conspicuously disclose a number of particular items that are enumerated in the statute.  The Bureau refers to these particular items, together with the response to the inquiry under section 1071(b), as "mandatory data points."  Appendix D provides a chart that summarizes the data fields and other key information for each data point.

In addition to specific questions identified for particular data points below, the Bureau seeks feedback from SERs on the following questions for all the mandatory data points in this part III.G.1:

> Q25.  Please provide feedback and information on the approach the Bureau is considering for each mandatory data point, along with any alternative approaches the Bureau should consider.

> Q26.  What would the costs be for collecting, checking, and reporting each data point?  Do these costs differ by data point and if so, what data points would impose higher costs and why?

> Q27.  For each data point, how should the Bureau address reporting multiple products applied for via a single application?  Should such requests be considered one "application" or multiple "applications"?  If the Bureau required reporting of each

AdminRecord-001311

product separately, how would that affect your FI's costs to collect and report 1071 data?

### i. Whether the applicant is a women-owned business, a minority-owned business, and/or a small business

Section 1071 requires FIs to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. As noted in part III.D above, the Bureau is considering proposing clarifications for some of the terms used in the statutory definitions of women-owned business and minority-owned business as well as simplified applicant-facing materials to aid industry in collecting this information.

The Bureau is considering proposing that collection and reporting of women-owned and minority-owned business status be based solely on applicant self-reporting. If an applicant provides information on its women-owned and minority-owned business status, the FI would report that information and would have no obligation to verify whether the applicant was (or was not), in fact, a women-owned or minority-owned business. Thus, if an applicant does not provide information regarding whether it is a women-owned or minority-owned business, the FI would report that the information was not provided by the applicant. The Bureau is not considering proposing that FIs use visual observation or surname to determine the status of an applicant.

The Bureau is not considering proposing that FIs determine whether an applicant is a women-owned or minority-owned business based on the race, sex, and ethnicity of the applicant's principal owners (see part III.G.1.xii below for more information on this data point), but rather that this data point be self-reported by the applicant only. Section 1071 defines women-owned and minority-owned business status based on ownership *or* control, whereas race, sex, and ethnicity information is specified for principal *owners* only.

With respect to small business status, the Bureau is considering proposing that collection and reporting of whether an applicant for credit is a small business be based on applicant-reported information. If the FI verified the information, it would be required to use the verified information in reporting this data point; if the FI does not verify the information, it would report based on the information as provided by the applicant.

The nature of this inquiry regarding small business status, and the related data point, would depend on the ultimate definition of a small business in the Bureau's eventual 1071 rule. The approaches the Bureau is considering for that definition are discussed in part III.C above. In general, this data would consist of whether an applicant is a small business, and the reason for that determination (*e.g.*, applicant is a small business because it is engaged in manufacturing or wholesale and has fewer than 500 employees). For example, if the Bureau adopted a small business definition based on the second alternative approach under consideration discussed in part III.C above, this data point might be comprised of three data elements: first, whether the applicant is in a manufacturing or wholesale industry (yes or no); second, if yes, does the applicant have fewer than 500 employees (yes or no); and, third, if the applicant is not in a

AdminRecord-001312

manufacturing or wholesale industry, does it have less than $8 million in gross annual revenue (yes or no).

> Q28. In the normal course of processing an application for small business credit, does your FI determine who owns and controls the entity applying for the financing (including the percentage of ownership and degree of control)? If so, at what point in the application process and for what purposes? Does your FI determine to whom an entity's profit and loss accrues or do they rely on ownership percentage? Does an employee of your FI routinely meet with all of the individuals who own and control a small business applying for credit?

### ii. Application/loan number

Section 1071(e)(2)(A) requires FIs to collect and report "the number of the application and the date on which the application was received." (See part III.G.1.iii below for "application date.") The Bureau is considering proposing that FIs report an alphanumeric application or loan number of no more than 45 characters that is unique, within the FI, to the referenced extension (or requested extension) of credit and that remains uniform through the application and origination stages of the process. The FI would assign this number to an application, and the number would be reported as the application number if the credit applied for was not originated. The same number would be reported as the loan number if the credit applied for was originated. The application/loan number may not include any identifying information about the borrower. The Bureau is considering proposing a structure for the method of assigning and reporting the application/loan number under section 1071 to follow HMDA/Regulation C formatting and other requirements, which may reduce initial software development costs.

> Q29. How does your FI assign application/loan numbers for small business credit? How does your FI assign application/loan numbers when a borrower requests multiple credit products at the same time? Are there any circumstances in which you do not assign numbers for applications or originated small business credit?

### iii. Application date

Section 1071(e)(2)(A) requires FIs to collect and report the "date on which the application was received." The Bureau is considering proposing that FIs report the application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application" (as discussed in part III.F above). This approach could provide flexibility and greater certainty for FIs using a form. The Bureau is considering proposing that application date be reported with a day, month, and year. Finally, the Bureau is also considering proposing that FIs have a grace period of several days on either side of the date reported to reduce the compliance burden of pinpointing an exact date on which an application was received.

### iv. Loan/credit type

Section 1071(e)(2)(B) requires FIs to collect and report "the type and purpose of the loan or other credit being applied for" (see part III.G.1.v below for "loan/credit purpose"). The Bureau is considering proposing that FIs report the loan type data point via three sub-components: (1) Type of Loan Product (chosen from a specified list); (2) Type of Guarantee (chosen from a

AdminRecord-001313

specified list); and (3) Loan Term (in months).  For example, an FI might report a certain loan as a secured term loan with a personal guarantee by the business owner and a term of 20 months.  A list of types of loan product and types of guarantee are provided below.  The lists include choices for "Other," "Unknown," or "Other/Unknown," as appropriate, to facilitate compliance.

A separate category for the presence of a guarantee is included in recognition of the fact that a guaranteed loan is often made as a counteroffer for either a requested loan by the applicant or because the applicant does not qualify for a conventional loan.  Having guarantee status captured as a feature of loan type therefore provides useful information from a 1071 data integrity perspective in meeting the statutory requirements of the section.  In addition, some borrowers specifically request a government guaranteed loan program and/or receive a loan from an FI that only participates in such a program.

For reporting when an application requests more than one type of loan, the Bureau is considering whether to propose that (1) FIs choose up to three items from the subcomponent lists for the Loan Type data point if there is only one application and multiple products/guarantees/loan terms were asked for; or (2) FIs report separate applications/originations for each loan type requested or originated.  In addition, the Bureau understands that an originated loan may have more than one guarantee, such as an SBA guarantee and a personal guarantee.  Thus, FIs could choose more than one guarantee for originated or approved but not accepted credit.  For loan product and loan term, however, FIs would report only one of each subcomponent on originated credit or credit approved but not accepted.

Loan Type lists:

- Loan/Credit Product:
    - Term loan—unsecured
    - Term loan—secured
    - Line of credit—unsecured
    - Line of credit—secured
    - Business credit card
    - Other
    - Unknown (for applications)

- Guarantee:
    - Personal guarantee—owner(s)
    - Personal guarantee—non-owner(s)
    - SBA guarantee—7(a) program
    - SBA guarantee—504 program
    - SBA guarantee—other
    - USDA guarantee
    - Other Federal guarantee
    - State or local government guarantee
    - Other guarantee
    - No guarantee
    - Unknown

AdminRecord-001314

- <u>Loan Term</u>: report in number of months, or Not Applicable for products that do not have a loan term (such as a business credit card) and for applications that did not specify a loan term.

### v.  Loan/credit purpose

Section 1071(e)(2)(B) requires FIs to collect and report "the type and purpose of the loan or other credit being applied for" (see part III.G.1.iv above for "loan/credit type"). The Bureau is considering proposing that FIs report the loan purpose data point by choosing one or more purposes from a specified list. A list of loan purposes is provided below. The list includes choices for "Other" or "Unknown" to facilitate compliance, and the Bureau is considering proposing that FIs be allowed to choose up to three purposes when the applicant indicates more than one purpose.

<u>Loan Purpose</u> list:

- Commercial real estate—owner occupied
- Commercial real estate—non-owner occupied (includes investors)
- Motor vehicle (including light and heavy trucks)
- Equipment
- Working capital (includes inventory or floor planning)
- Business start-up
- Business expansion
- Business acquisition
- Refinance existing debt
- Line increase
- Other
- Unknown or unreported by the applicant

Q30.  How does your FI currently document information about loan/credit purpose? Is the list presented for loan/credit purpose workable? Is there anything you recommend be added or subtracted, given the statutory purposes of section 1071?

### vi.  Credit amount/limit applied for

Section 1071(e)(2)(C) requires FIs to collect and report "the amount of the credit or credit limit applied for." The Bureau is considering proposing that FIs report the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the FI's evaluation of the credit request. This method would not require reporting of amounts discussed before an application is made to an FI, but would capture the initial amount requested at the application stage or later, and it would reflect the amount of the request that was evaluated by the FI in making a credit decision.

If the applicant does not request a particular amount, but the FI underwrites the application as being for a specific amount, the FI would report the amount considered for underwriting. If the particular product applied for (such as a business credit card) does not involve a specific amount

AdminRecord-001315

requested or underwritten, the FI would report "Not Applicable" for this data point. When an applicant responds to a "firm offer" that specifies an amount, which may occur in conjunction with a pre-approved credit solicitation, the amount applied for would generally be the amount of the firm offer. (Unless that amount changes before origination, it would also generally be the amount approved or originated.)

> Q31.   When in the application process for small business credit do applicants usually indicate the specific amount that they are applying for? How often does the amount applied for change between the initial application stage and when the application is considered for underwriting?

### vii. Credit amount/limit approved

Section 1071(e)(2)(C) requires FIs to collect and report "the amount of the credit transaction or the credit limit approved for such applicant." The Bureau is considering proposing that FIs report (1) the *amount of the originated loan* for a closed-end origination; (2) the *amount approved* for a closed-end loan application that is approved but not accepted; and (3) the *amount of the credit limit approved* for open-end products (regardless of whether the open-end product is originated or approved but not accepted). In light of the potential meaning of the statutory language, the Bureau is considering proposing different standards for closed-end and open-end products. The FI would report "Not Applicable" for this data point for applications that are denied, closed for incompleteness, or withdrawn by the applicant before a credit decision is made.

> Q32.   For originated closed-end loans, what complexities might FIs face in reporting the amount originated or the amount approved? How often are these two amounts different? How would the costs to collect, check, and report these two measures differ?

> Q33.   What complexities might FIs face in using the method described for reporting open-end credit limits? Is there some other way to report open-end credit that would be less burdensome or more accurately reflect its use in the market?

### viii. Type of action taken

Section 1071(e)(2)(D) requires FIs to collect and report the "type of action taken" on an application. The Bureau is considering proposing five categories for reporting "action taken":

- *Loan originated*—Any originated loan or credit, including applications involving counteroffer(s) where the final counteroffer was accepted and the credit extended.

- *Application approved but not accepted*—The application was approved, but the loan or credit was not originated.

- *Application denied*—The application was denied or the applicant did not accept the creditor's counteroffer.

AdminRecord-001316

- *Incomplete application (closed or denied)*—The application was incomplete regarding information that the applicant could provide and the creditor lacked sufficient data for a credit decision. Includes both denials due to incompleteness as well as if a creditor notifies the applicant of the incompleteness and the applicant fails to timely respond.

- *Application withdrawn by applicant*—The applicant withdrew its application before the creditor issued a decision.

These categories mirror many of the categories set forth in Regulation B (the adverse action notice provision) and Regulation C (action taken codes), with modifications to simplify the reporting categories for purposes of section 1071 in order to potentially reduce reporting errors and ease compliance burden for FIs.[58]

Q34.    How does your FI currently document the actions taken on applications from small businesses?

Q35.    Would FIs prefer reporting denial reasons to help explain the decision on an application? If so, should those reasons be voluntary or mandatory fields?

Q36.    Might the availability of credit be underreported if counteroffers are not separately identified in the 1071 data set? If counteroffers are separately identified, what would be the most cost-effective way to do so (*e.g.*, reported as a separate action taken category or as a counteroffer data flag)? Should multiple counteroffers on a single application be reported? How should the ultimate action taken on a counteroffer be identified (counteroffer accepted, counteroffer rejected, etc.)?

### ix. Action taken date

In addition to requiring FIs to collect and report the type of action they take on an application, section 1071(e)(2)(D) requires FIs to collect and report the "date of such action." The Bureau is considering proposing that the action taken date be reported with a day, month, and year.

Q37.    Do you foresee any potential challenges in identifying the action taken date for any of the "action taken" categories? Do you have suggestions on how to mitigate or resolve those challenges?

### x. Census tract (principal place of business)

Section 1071(e)(2)(E) requires FIs to collect and report "the census tract in which is located the principal place of business of the … applicant." The Bureau is considering proposing that FIs report a geocoded[59] census tract based on an address collected in the application, or during review or origination of the loan. The FI would use the address where the loan proceeds will principally be applied, if that address is known to the FI, which the Bureau believes would be

---

[58] 12 CFR 1002.9(a)(1); 12 CFR 1003.4(a)(8)(i).

[59] For the purposes of the 1071 rulemaking, geocoding is the process of using a particular property address to locate its geographical coordinates and the corresponding census tract.

30

AdminRecord-001317

more useful to carry out the community development and fair lending purposes of section 1071. For example, if an FI makes a loan to a small business to buy or improve commercial real estate, the location of the real estate is more relevant to section 1071's statutory purposes than the location of the main office. If the FI does not possess that information, the FI would use the location of the small business borrower's main office or headquarters. If that, too, is unknown, the FI could use another business address associated with the application. The FI would also report which of these address types it is using, unless that information is unknown:

    (1) the address where the loan proceeds will principally be applied; or

    (2) the location of the small business borrower's main office or headquarters; or

    (3) some other business address, including those for which the FI is unsure about the nature of the address.

Q38.    Does your FI currently geocode addresses for a reporting requirement, such as HMDA, and what geocoder do you use? Would that geocoder be viable for purposes of 1071 data reporting? What are the costs to geocode addresses?

Q39.    How often and in what circumstances does your FI know the address where the borrower's loan proceeds will be used? For example, does your FI have a loan proceeds address for loans other than those related to commercial real estate? How frequently are loan proceeds used at a location other than the applicant's main office? What would the costs be to obtain the loan proceeds address from the applicant, in addition to or instead of other addresses?

### xi. Gross annual revenue

Section 1071(e)(2)(F) requires FIs to collect and report "the gross annual revenue of the business in the last fiscal year … of the applicant preceding the date of the application." The Bureau is considering proposing that FIs report the gross annual revenue of the applicant during its last fiscal year. If during the processing of the application the FI verifies the gross annual revenue provided by the applicant, and bases or would have based its credit decision on that amount, the FI would report the verified amount. If the FI does not verify the gross annual revenue amount, it would report the amount provided by the applicant.

Q40.    Does your FI collect gross annual revenue from applicants? If so, for which types of lending products? Are there any products for which your FI does not collect gross annual revenue? Does your FI verify the gross annual revenue provided by applicants? Are there any situations in which you do not verify the gross annual revenue provided by applicants?

Q41.    How does your FI collect and verify gross annual revenue from applicants? Is the revenue of affiliates included in the gross annual revenue collected, and is that information used for underwriting purposes? Does your FI ever underwrite based on only part of an applicant's revenue, or based on the revenue (or income) of an entity or individual affiliated with the applicant?

AdminRecord-001318

### xii. Race, sex, and ethnicity of principal owner(s)

Section 1071(e)(2)(G) requires FIs to collect and report "the race, sex, and ethnicity of the principal owners of the business." However, section 1071 does not define who is a principal owner of a business or set out what categories should be used when compiling and maintaining the principal owners' race, sex, or ethnicity.

The Bureau is considering proposing to define the term "principal owner" in a manner that is consistent with the CDD rule. Specifically, an individual would be a "principal owner" if the individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the business.

The Bureau is considering proposing that financial institutions use the HMDA aggregate race, sex, and ethnicity categories when requesting that applicants self-report race, sex, and ethnicity information.[60]

Similar to the collection and reporting of women-owned and minority-owned business status, the Bureau is considering proposing that collection and reporting of the race, sex, and ethnicity of small businesses' principal owners be based solely on applicant self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the FI would report this information and would have no obligation to verify it. If an applicant interacts with an FI in person and does not provide a principal owner's race, sex, or ethnicity, the Bureau is not considering proposing that an FI report that information based on visual observation or surname. Instead, the FI would report that the information was not provided by the applicant. The Bureau anticipates that requiring reporting based on visual observation or surname could create unwarranted compliance burdens in the context of small business lending. These burdens may include the costs to create and maintain policies and procedures, costs of applying such policies and procedures in a consistent manner, costs to conduct ongoing training, and costs to audit compliance.

Finally, the Bureau is considering developing a sample collection form to assist industry in collecting this information and to communicate an applicant's right to refuse to provide such information. This sample form would also include the definition of principal owner and clarify that it is possible, depending on the factual circumstances, that no one will be identified as a principal owner.

> Q42. How many owners do small business applicants usually have? What portion of small business applicants are likely to be sole proprietorships or have only one owner?
>
> Q43. How likely is it that a small business applicant would be owned or controlled by one or more minority individuals or women (*i.e.*, would be a minority-owned business or a women-owned business) but would not have at least one minority owner or woman owner, respectively, who owned 25 percent or more of the equity interest of the

---

[60] For race, the categories are: American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White. For sex, the categories are: Female and Male. For ethnicity, the categories are: Hispanic or Latino and Not Hispanic or Latino.

AdminRecord-001319

business (*i.e.*, would not have a principal owner who was a minority individual or a woman)?

Q44.   What are the potential challenges, costs, and benefits of defining principal owners in a manner that is consistent with the CDD rule?

Q45.   To what extent could your FI leverage existing programs, systems, or personnel (including those used for HMDA) when collecting and reporting the race, sex, and ethnicity information of principal owners?

Q46.   What are the potential challenges, costs, and benefits of collecting and reporting the race, sex, and ethnicity of principal owners using aggregate categories?  Although the Bureau is not considering proposing that FIs use disaggregated race and ethnicity categories when collecting and reporting the race and ethnicity of principal owners, what would be the potential challenges, costs, and benefits of such a requirement?

Q47.   Although the Bureau is not considering proposing that FIs report a principal owner's race, sex, or ethnicity based on visual observation or surname, what would be the potential challenges, costs, and benefits of implementing such a requirement for applicants who do not self-report the information?  How would those potential challenges and costs change if reporting based on visual observation or surname was required only if the applicant is a sole proprietor but not if the applicant is an entity?

## 2.   Discretionary data points

In addition to the list of mandatory data points in sections 1071(b) and 1071(e)(2)(A) through (G) discussed above, section 1071(e)(2)(H) requires FIs to collect and report "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]."  The Bureau refers to these as "discretionary data points."  The Bureau is considering proposing to require that FIs report discretionary data points regarding pricing, time in business, NAICS code, and number of employees.  Each of these data points is addressed in turn below.  Appendix D provides a chart that summarizes the data fields and other key information for each data point.

In addition to specific questions identified for particular data points below, the Bureau seeks feedback from SERs on the following questions for all the discretionary data points in this part III.G.2:

Q48.   Please provide feedback and information on the approach the Bureau is considering for each discretionary data point, along with any alternative approaches the Bureau should consider.

Q49.   What would be the potential challenges and costs be for collecting, checking, and reporting each discretionary data point?

### i.   Pricing

The Bureau is considering proposing to include pricing of originated credit and credit that is approved but not accepted as a discretionary data point.  Pricing data could further the fair

AdminRecord-001320

lending purpose of section 1071 as it could enhance the ability to effectively and efficiently enforce fair lending laws. In addition, pricing data could add value in promoting market transparency and new product development opportunities, thus furthering the community development purpose of section 1071. A pricing data point could be reported on the basis of annual percentage rate (APR), total cost of credit (TCC), interest rate and total fees, or some other pricing metric. (Regarding these pricing metrics, the Bureau is interested in discussing the underlying concepts and potential costs of these different methods, not the legal or technical aspects of defining such terms.) At the same time, reporting pricing information across various product types could be complicated to implement, would add implementation costs for FIs, and could possibly impose other costs related to reputational risk as discussed in part III.F.5.ii below.

Q50.   How does your FI calculate pricing for different credit products (*e.g.*, term loans, lines of credit, business credit cards)? If an eventual 1071 rule were to require reporting of pricing information, what pricing metric or metrics would be easiest to report given your FI's pricing methods?

Q51.   What are the potential costs and benefits associated with collecting and reporting pricing using each of these metrics (*i.e.*, APR, TCC, interest rate and total fees)? Could the costs and benefits vary depending on the type of small business credit product about which pricing is being reported? Is there another metric that would be preferable in order to lower reporting burden?

Q52.   Would a requirement to report pricing data impose costs on your FI or on your FI's borrowers besides reporting costs? Would you expect a pricing data point to affect how examiners examine FIs for fair lending compliance? How? Would a pricing data point affect the reputation of your FI? If so, how? How would your FI respond?

### ii.  Time in business

The Bureau is considering proposing to include as a discretionary data point the time in business of the applicant (as of the date of application), expressed in years, or months if less than one year. Time in business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the section 1071 dataset by distinguishing potentially riskier new businesses from less risky established businesses. Time in business information could also provide a better measurement of community development effects, in terms of number of start-ups or other relatively new businesses seeking and obtaining financing. An FI may choose to verify the time in business provided by an applicant as part of its normal course of business. If the FI does not verify the time in business provided by the applicant, the FI would report the time in business provided by the applicant. If the FI does verify the time in business provided by the applicant, it would report the verified information.

Q53.   Does your FI currently collect information about the time in business of small business credit applicants? In what format (years / months / years and months / date established) does your FI request that applicants provide the information? Does your FI obtain or verify this information from a third party such as a business credit bureau? Does your FI separate small businesses by time in business for determining risk in underwriting or eligibility? If so, what time parameters are used? Would

AdminRecord-001321

including a time in business data point help avoid misinterpretation of the 1071 dataset, when a denied application might be explained by relative lack of experience in the business?

### iii. NAICS code and number of employees

As discussed in part III.C above, the SBA's size standards for small businesses are generally based on average annual receipts or number of employees for each industry based on NAICS code.[61]  These metrics are also important for fair lending analysis (allowing separation of dissimilar types of businesses to limit misinterpretations of the data) and assessing community development impacts (allowing better measurement of community development impact in terms of number of jobs affected.  The Bureau is thus considering proposing that FIs collect and report NAICS code and number of employees.  With respect to number of employees, the Bureau is considering proposing that FIs collect and report the number of employees of the applicant.  If the FI verifies the number of employees provided by the applicant, the FI would report the verified number.  If the FI does not verify number of employees, it would report the number provided by the applicant.

Q54.  Does your FI currently collect NAICS code information from any small business applicants?  Do you collect six-digit NAICS codes, or two-, three- or four-digit codes instead?  Does your FI determine what NAICS code is appropriate for a particular applicant or obtain it from an alternative source such as a credit report, or does your FI ask applicants to provide their NAICS codes?  What do you anticipate the potential costs and burdens would be if your FI was required to collect NAICS codes for small business applicants?

Q55.  Does your FI currently collect number of employees from any small business applicants?  Does your FI take any steps to verify this information?  What do you anticipate the potential costs and burdens would be if your FI was required to collect number of employees from small business applicants?

### 3.    Timing considerations for collection of certain 1071 data

Although the definition of "application" triggers an FI's *duty* to collect and report 1071 data, the application definition does not necessarily govern *when* during the application process 1071 data must be collected.  The language and structure of section 1071—which applies to "applications" from "applicants"—indicates that the data must be collected sometime during the application process.[62]  The statute does not, however, provide further direction on when during the

---

[61] The Bureau notes that the third alternative approach that the Bureau is considering for a size standard in the definition of small business would necessitate knowing an applicant's two-digit NAICS code.  Both the second alternative and third alternative approaches would necessitate knowing an applicant's number of employees for certain industries.

[62] *See, e.g.,* section 1071(b) (requiring an inquiry "in the case of any *application* to a financial institution") and section 1071(c) ("[a]ny *applicant* … may refuse to provide any information requested.") (emphasis added).

AdminRecord-001322

application process information should be collected. The Bureau is not currently considering specifying a particular time period in which FIs must seek to collect 1071 data from applicants.

The Bureau is aware of a risk that, absent a designated time period for collection of applicant-provided 1071 data, FIs may not seek to collect women-owned or minority-owned business status or the race, sex, and ethnicity information about principal owners until late in the process when applicants may be less motivated to supply their demographic information.[63] Nonetheless, the Bureau seeks to provide FIs discretion and flexibility to time 1071 data collection at a point during the application process that works best for their processes and relationships with the applicants and to avoid unnecessary costs, while still fulfilling section 1071's purposes.

*Alternative approaches regarding timing considered.* The Bureau considered requiring FIs to seek to collect applicant-provided 1071 data within or by a specified time period, such as simultaneous with the triggering of an "application," before obtaining a "completed application," or before notifying an applicant of action taken on an application. The Bureau is disinclined to take this approach, as it is concerned that specifying a particular time period for collecting 1071 data from applicants could be disruptive to FIs' existing processes.

Q56. Please provide feedback and information on the approach the Bureau is considering with respect to the timing for collection of data points provided by applicants, along with any alternative approaches the Bureau should consider.

Q57. How do you anticipate your FI seeking applicant-provided data (particularly race, sex, and ethnicity information about principal owners) required by section 1071, including the manner (*i.e.,* how information is requested) and timing of the request? How would you anticipate seeking such applicant-provided data if the application is withdrawn, incomplete, or denied before the data is requested?

Q58. If the Bureau does not specify a time period for the collection of applicant-provided data, how frequently are FIs likely to delay gathering such demographic information required by 1071? Could there be issues with data quality? What steps might the Bureau and FIs take to control for those concerns or to otherwise encourage applicants to voluntarily provide 1071 data that is within their control?

## H. Shielding data from underwriters and other persons (firewall)

### 1. Underwriter access to women-owned and minority-owned business status, and race, sex, and ethnicity information for principal owners

Section 1071(d) includes two provisions that limit access to certain information collected under section 1071. First, under section 1071(d)(1), where feasible, loan underwriters or other officers or employees of an FI or its affiliates "involved in making any determination concerning an

---

[63] Applicant-provided 1071 data here primarily refers to the collection of women-owned and minority-owned business status and the race, sex, and ethnicity information for principal owners. FI-supplied data points, such as amount approved or action taken, will necessarily only be available later in the application process.

174

36

AdminRecord-001323

application for credit" cannot have access to "any information provided by the applicant pursuant to a request under subsection (b)." Second, under section 1071(d)(2), if the FI "determines" that an underwriter, employee, or officer involved in making a determination "should have access" to "any information provided by the applicant pursuant to a request under subsection (b)," the FI must provide a statutorily required notice.

The Bureau is considering proposing that FIs need only limit access under section 1071(d) to an applicant's responses to the FI's specific inquiries regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners. The Bureau also is considering proposing that an applicant's response to the 1071(b) inquiry regarding small business status need not be firewalled off from underwriters and others pursuant to 1071(d)(1). Under ECOA, creditors are prohibited from discriminating against an applicant on the basis of race, sex, ethnicity, and other prohibited bases in any aspect of a credit transaction. There is not a similar prohibition against creditors considering small business status, and creditors generally do consider factors relating to small business status as part of a credit transaction. The Bureau is concerned that limiting underwriters' and other persons' access to information that may be relevant and appropriate to make a credit decision could be problematic.

Section 1071(d)(1) indicates an FI would not be required to limit underwriters' and other persons' access to applicants' responses regarding women-owned/minority-owned business status, and the race, sex, and ethnicity of principal owners, if it is not feasible to do so. The Bureau is considering how it might apply this feasibility standard. Additionally, the Bureau is considering proposing to interpret section 1071(d)(2) to permit FIs to give underwriters, employees, and officers access to the responses when the FI determines that such access is needed for the underwriter, employee, or officer to perform his or her usual and regularly assigned job duties. In such circumstances, the FI would need to comply with the requirement to provide a notice, as discussed in part III.H.2 below. An FI could provide the notice to all small business applicants or the specific applicant or applicants whose information will or may be accessed.

Q59. Please provide feedback and information on the approach the Bureau is considering regarding the firewall under section 1071(d)(1), along with any alternative approaches the Bureau should consider.

Q60. Could your FI create and maintain a firewall for an applicant's response to questions regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners? If not, why not? If so, how would your FI create such a firewall? What would the potential costs and challenges be to create and maintain such a firewall? What circumstances might make creating and maintaining such a firewall more costly or more difficult?

Q61. Could your FI create and maintain a firewall that applies to an applicant's response to a question regarding small business status? If not, why not? If so, how would your FI create such a firewall? What would the potential costs and challenges be to create and maintain such a firewall? What circumstances might make creating and maintaining such a firewall more costly or more difficult?

AdminRecord-001324

Q62.   Could your FI create and maintain a firewall that applies to an applicant's responses to all information and data requested pursuant to section 1071?  If not, why not?  If so, how would your FI create such a firewall?  What would the potential costs and challenges be to create and maintain such a firewall?  What circumstances might make creating and maintaining such a firewall more costly or more difficult?

Q63.   What types of employees and officers are involved in making determinations regarding small business credit applications (as noted above, the statutory firewall applies to certain people involved in making any determination regarding an application for credit)?  Are these employees and officers likely to be involved in the collection or reporting of information pursuant to section 1071?

Q64.   What are the potential challenges, costs, and benefits of implementing a standard that allows access to information when needed to perform usual and regularly assigned job duties, but restricting access otherwise?  For example, is your FI likely to know in advance that one or more underwriters, employees, or officers will be involved in making determinations regarding credit applications from small businesses and will need access to the section 1071(b) responses regarding women-owned or minority-owned business status or the principal owners' race, sex, and ethnicity information to perform usual and regularly assigned job duties?

## 2.   Notification regarding access to information by underwriters and other persons

Under section 1071(d)(2), if an FI determines that an underwriter, employee, or officer involved in making a determination "should have access" to "any information provided by the applicant pursuant to a request under [1071(b)]," the FI must provide a notice of "the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information."  The Bureau is considering developing model disclosures that FIs could use when providing this notice.

As with the firewall requirement discussed in III.H.1 above, the Bureau is considering proposing that this notice would not need to include language regarding small business status.  The Bureau is concerned such a notice would be confusing to applicants since—unlike women-owned and minority-owned business status or the race, sex, and ethnicity of principal owners—there is no prohibition on making lending decisions on the basis of small business status, meaning that a statement to the contrary would be false.

Q65.   Please provide feedback and information on the approach the Bureau is considering regarding the notice requirement under section 1071(d)(2), along with any alternative approaches the Bureau should consider.

Q66.   What are the potential challenges and costs associated with providing the notice pursuant to section 1071(d)(2) to particular applicants if your FI determines that an underwriter or other person involved in making any determination concerning an application for credit should have access to information regarding the applicant's 1071(b) responses?

AdminRecord-001325

Q67.   Would your FI prefer to provide the 1071(d)(2) notice regarding anti-discrimination to all applicants, even if not required to do so?

## I.   Applicants' right to refuse to provide certain information

Section 1071(c) states that any applicant may refuse to provide "any information requested pursuant to subsection (b)." The FI can ask but cannot require applicants to provide any information requested pursuant to subsection (b). Both the right to refuse under section 1071(c) and the limited access provisions under section 1071(d) refer to information requested or provided under 1071(b).

The Bureau is considering proposing that the right to refuse under section 1071(c) applies to the FI's specific inquiries regarding women-owned and minority-owned business status in 1071(b), as well as the race, sex, and ethnicity of principal owners, but not to the FI's specific inquiry regarding small business status in 1071(b).[64] Thus, the scope of the right to refuse and the scope of limited access by underwriters (discussed in part III.H.1) and the related notice (part III.H.2) would be the same.

## J.   Compiling, maintaining, and reporting 1071 data to the Bureau

Section 1071(f)(1) provides that "[t]he data required to be compiled and maintained under [1071] by any financial institution shall be submitted annually to the Bureau." The Bureau is considering proposing that 1071 data collection be done on a calendar year basis, and submitted to the Bureau by a specified date following the end of each calendar year.

Section 1071(e)(3) provides that, "[i]n compiling and maintaining any record of information under [section 1071], a financial institution may not include in such record the name, specific address (other than the census tract), telephone number, electronic mail address, or any other personally identifiable information concerning any individual who is, or is connected with, the … loan applicant." The Bureau is considering proposing a prohibition on including certain personally identifiable information about any individuals associated with small business applicants or borrowers in the data that an FI is required to compile, maintain, and report to the Bureau (*i.e.*, other than the information specifically required to be collected and reported pursuant to the Bureau's eventual 1071 rule, such as the race, sex, and ethnicity of principal owners). This prohibition would not extend to information collected by the FI outside of its specific 1071 data records.

Section 1071(f)(2)(A) requires that information compiled and maintained under section 1071 be "retained for not less than 3 years after the date of preparation." In light of the approach the Bureau is considering proposing to implement section 1071(f)(2)(B), which addresses FIs' obligations to make 1071 data available to members of the public upon request, and section 1071(f)(2)(C), regarding the Bureau's annual publication of 1071 data—which are discussed in part III.K.3 below—the Bureau is considering proposing that FIs retain their 1071 data for at least three years after it is submitted to the Bureau.

---

[64] The Bureau is considering using its exception authority in section 1071(g)(2) in order to make this modification.

AdminRecord-001326

Q68.  Please provide feedback and information on the approach the Bureau is considering regarding these data retention and reporting aspects of section 1071, along with any alternative approaches the Bureau should consider.

## K. Privacy considerations involving Bureau publication of 1071 data

In furtherance of section 1071's fair lending and community development purposes, section 1071(f)(2) generally requires that the information compiled and maintained by FIs, and submitted annually to the Bureau, be made available to the public. Publication of these data would fill existing gaps in the public's general understanding of the small business lending environment and help identify potential fair lending concerns regarding small businesses as well as the needs and opportunities for both business and community development.

At the same time, while information that directly identifies individuals, such as name, address, date of birth, or Social Security number would not be collected pursuant to section 1071 requirements, publication of 1071 data under consideration in an unedited, loan-level format potentially could be used to re-identify small business applicants or borrowers and related individuals or potentially harm their privacy interests. Accordingly, the Bureau is examining the privacy implications of FIs' collection, reporting, and disclosure of information pursuant to 1071 and the Bureau's public release of the data.

Congress provided, in section 1071(e)(4), that "[t]he Bureau may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest." The Bureau recognizes that mitigating privacy risks in the 1071 data disclosed to the public may decrease the utility of the data to users and is investigating strategies and techniques to advance privacy interests while maximizing the utility of the data for the purposes of the statute.

### 1.    Balancing test

For purposes of determining whether and how to exercise its discretion to modify or delete 1071 data prior to publication, the Bureau is considering proposing to use a "balancing test" that weighs the risks and benefits of public disclosure. Under this approach, data would be modified or deleted if its disclosure in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071. If the risks of disclosing unmodified data outweigh the benefits under the balancing test, the Bureau would determine whether modifications could bring them into balance.

The Bureau is considering various approaches that would appropriately advance privacy interests while still providing users with data useful to fulfilling the purposes of section 1071. These approaches could include various statistical disclosure limitation techniques when justified under the balancing test, such as those that mask the precise value of data points to prevent the disclosure of certain data elements.

As an alternative to a balancing test, the Bureau considered an approach in which it would modify data if an identified privacy risk crosses some significance threshold, without weighing

AdminRecord-001327

that risk against the benefit of disclosure. That approach, however, could be inconsistent with the express disclosure purposes of the statute.

Q69.    Please provide feedback and information on the approach the Bureau is considering regarding use of a balancing test, along with any alternative approaches the Bureau should consider.

Q70.    What are the benefits of public disclosure to FIs of each of the data points under consideration?

## 2.    Privacy interests considered under the balancing test

Section 1071 provides that the Bureau may, at its discretion, delete or modify data if the Bureau determines that doing so "would advance a privacy interest."[65]  The Bureau is considering proposing to apply the balancing test discussed above to the privacy interests of non-natural persons (*e.g.*, small business entity applicants or borrowers, or FIs) with respect to protecting sensitive commercial information, as well as the privacy interests of natural persons (*e.g.*, individual business owners) with respect to protecting sensitive personal information.

Q71.    Please provide feedback and information on the approach the Bureau is considering regarding the nature and scope of privacy interests of non-natural and natural persons the agency should consider under a balancing test, along with any alternative approaches the Bureau should consider.

Q72.    If the data reported to the Bureau are disclosed to the public, how would that affect the privacy interests of FIs, small business applicants and borrowers, and related individuals, and what costs would they incur to eliminate or mitigate these requirements?  What types of sensitive commercial information of business entities, including FIs, could be exposed by publishing the data points (individually or in combination) under consideration?

Q73.    Are there data points, individually or in combination, that could create significant risk of re-identification of individuals or small business entities if publicly disclosed by linking them to third-party data sources, such as public records, and/or expose particularly sensitive personal or commercial information?  Are there ways to mitigate these concerns?

## 3.    Bureau publication of 1071 data

Section 1071(f)(2)(B) and (C) provides that information compiled and maintained under the statute shall be "made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau," and "annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation."  The Bureau is considering proposing an approach in which FIs could satisfy the requirement to make 1071 data available to the public upon request by referring the public to the

---

[65] 15 U.S.C. 1691c-2(e)(4).

AdminRecord-001328

Bureau's website where 1071 data would be available. Under this approach, the 1071 data would be available with any modifications or deletions required based on the Bureau's application of the balancing test described above. The Bureau also considered requiring FIs to make their own data available to the public directly, upon request. However, the Bureau is concerned that this approach could involve greater burden for FIs, lead to privacy risks resulting from errors by individual FIs implementing any modifications or deletions required by the Bureau, and be less efficient overall.

Q74.    Please provide feedback and information on the approach the Bureau is considering regarding public disclosure of 1071 data by the Bureau on behalf of FIs, along with any alternative approaches the Bureau should consider.

Q75.    Please provide feedback and information on the potential costs and benefits of FIs referring the public to the Bureau's website to access 1071 data.

## L. Implementation period

Section 1071 does not specify an implementation period, though pursuant to section 1071(f)(1) FIs must submit 1071 data to the Bureau on an annual basis. As discussed in part III.J above, the Bureau is considering proposing that 1071 data collection be done on a calendar year basis, and submitted to the Bureau by a specified date following the end of each calendar year.

The Bureau seeks to ensure that FIs have sufficient time to implement the Bureau's eventual 1071 rule. The Bureau is considering proposing that FIs have approximately two calendar years for implementation following the Bureau's issuance of its eventual 1071 rule.[66] This would provide time for loan processing and management vendors to adjust their products and services to accommodate 1071 requirements, and for FIs to update or revise their systems and processes, and make other changes necessary to meet the new 1071 data collection and reporting requirements.

In order to assist industry with an efficient and effective implementation of the eventual 1071 rule, the Bureau intends to provide guidance in the form of plain language compliance guides and aids; technical specifications and documentation; and by conducting meetings with stakeholders to discuss the rule and implementation issues.

Q76.    Please provide feedback and information on the approach the Bureau is considering regarding an implementation period, along with any alternative approaches the Bureau should consider.

Q77.    How much time do you estimate your FI would need to prepare for compliance with the Bureau's eventual 1071 rule? Are there any particular aspects of the Bureau's proposals under consideration that could be particularly time consuming or costly for

---

[66] The Bureau used a similar timeline in implementing the 2015 HMDA Final Rule (80 FR 66127 (Oct. 28, 2015)). The rule was issued in October 2015; since collection of data needed to begin on January 1 of the chosen year, the Bureau made the rule effective January 1, 2018, providing two years and two months of implementation time. Because 1071 data collection and reporting will also occur on a calendar year basis, the Bureau is considering making the effective date January 1 of the year approximately two years after the final rule is issued.

AdminRecord-001329

your FI to implement? Are there any factors outside your FI's control that would affect its ability to prepare for compliance?

## IV.    Potential Impacts on Small Entities

### A. Overview

This portion of the Outline summarizes the Bureau's preliminary assessment of the impacts of the regulatory and operational proposals under consideration on directly affected small entities and the methods used to derive them. The Bureau believes that this information will make it easier for SERs and others to offer the Bureau additional data and information regarding potential impacts. The Bureau encourages contributions of data and other factual information to inform its assessment of potential compliance costs and other impacts on small entities.

As discussed above, section 1071 amended ECOA to require that FIs compile, maintain, and report information regarding applications for credit by women-owned, minority-owned, and small businesses.

The discussion of potential impacts on small entities is structured as follows. Part IV.B discusses which small FIs may be covered by the eventual 1071 rule. Part IV.C discusses the Bureau's use of HMDA as a basis for potential impacts of the eventual 1071 rule. Part IV.D introduces and defines the representative types of FIs potentially covered by the eventual 1071 rule. Part IV.E reviews new compliance processes and costs associated with implementing the Bureau's eventual 1071 rule. Part IV.F presents the impacts of the proposals under consideration, including a discussion of the Bureau's methodology and an analysis of alternatives. Part IV.G concludes with a discussion of the potential impact on the cost and availability of credit to small entities.

The Bureau seeks feedback and information from SERs on the following:

Q78.    The Bureau's overall methodological approach to measuring one-time and ongoing costs of the eventual 1071 rule, along with any alternative approaches the Bureau should consider.

Q79.    Are there additional one-time or ongoing cost activities that should be considered in the Bureau's analysis of potential impacts on small entities? Should the structure the Bureau is using to estimate ongoing costs, or the actual magnitude of estimates, differ across institution type or product type, and if so, how?

Q80.    Is the Bureau's categorization of the "complexity" of an FI's application data processing appropriate and accurate? Are the descriptions of representative FIs consistent with market experience? Is the Bureau appropriately describing the volume of applications processed by example FIs, particularly among small FIs?

Q81.    What kinds of computer systems are currently used that could be used to collect and report data to comply with a future regulation? What kinds of systems could be developed to collect and report data to comply with a future regulation? How much

AdminRecord-001330

would it cost to purchase or update these systems in order to comply with a future regulation?  How do FIs expect the regulation to alter their existing methods for collecting and processing application and origination data?

Q82.  How do the Bureau's estimates of ongoing costs by activity and FI complexity compare to your own?  Are there specific activities where the Bureau is over- or underestimating the annual ongoing costs?

Q83.  Do FIs expect one-time or ongoing costs to affect the rates/fees offered for credit products, the credit product mix offered, the underwriting standards for credit products, or participation in the small business credit market?

Q84.  How does your FI anticipate training staff to comply with an eventual 1071 rule?  For example, do you anticipate purchasing training from an external source, developing training in-house, or a combination of both?  Other than staff time to attend training, do you anticipate any ongoing costs associated with providing 1071 compliance training to employees on an annual or other periodic basis?

## B. Small entities covered by the proposals under consideration

The Bureau identified certain types of small entities that may be FIs subject to the Bureau's eventual 1071 rule for purposes of the RFA.  Any small entity that falls within the statute's definition of "financial institution" and offers covered credit could potentially be affected.  There are two broad categories of entities that may be covered: DIs and non-DIs.

DIs consist of commercial banks, savings associations, and credit unions.  The SBA's threshold for DIs to be considered "small" is $600 million in assets.[67]  According to the December 31, 2018 bank and credit union Call Reports, there were approximately 11,000 DIs in the United States.[68]  Of these, approximately 9,100, have assets below the $600 million threshold and are therefore small entities according to the SBA small entity definition for DIs.

In part III.B above, the Bureau explains that it is considering two potential asset-based exemption threshold levels, of $100 million and $200 million of assets for DIs.  It is also considering an activity-based metric for determining coverage.  The Bureau seeks input on the following three potential thresholds for an activity-based coverage metric:

- Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million
- Option 2 Exemption Threshold: originations of at least 50 loans or $5 million
- Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

Table 2 below presents the number of DIs that the Bureau estimates may be covered by the eventual 1071 rule based on the coverage metrics and thresholds under consideration, based on

---

[67] The 2017 four-digit NAICS code for DIs is 5221.

[68] For purposes of this Outline, the Bureau used data from the credit union and bank Call Reports that were accessed on June 10, 2020.

AdminRecord-001331

data on small loans to businesses of all sizes in 2018.[69]  The Bureau relies on estimates of
originations by DIs because currently no datasets report annual originations by institution for all
DIs.[70]

**Table 2: Small entity depository institutions covered under metrics & thresholds considered**[71]

| Threshold considered | # of small DIs covered | % of small DIs covered |
|---|---|---|
| Originations of 25 loans or $2.5 million | 3,500-4,000 | 40%-45% |
| Originations of 50 loans or $5 million | 3,000-3,500 | 35%-40% |
| Originations of 100 loans or $10 million | 2,000-2,500 | 25%-30% |
| $100 million in assets | 4,000 | 44% |
| $200 million in assets | 2,250 | 25% |

Types of non-DIs that may be covered under the eventual 1071 rule include the following:[72]

- Lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies)
- Commercial finance companies
- Online lenders/platform lenders
- Non-DI CDFIs
- Governmental lending entities
- Non-profit lenders

The Bureau estimates the amount of lending by DIs using information collected by the FFIEC agencies, including the Call Reports for banks and credit unions and the data collected under the CRA.  The Bureau has significantly less information on the amounts of lending by non-DIs.  The Bureau hopes to learn more about the small business lending activity of all types of FIs, but

---

[69] The Bureau uses 2018 as a base year for these estimates because that is the most recent year for which the necessary data are available. In particular, the Bureau relies on CRA data for estimates of DI coverage.

[70] Table 2 presents a range of estimates for the number of DIs covered by activity-based thresholds based on internal Bureau calculations.  The table reports the exact, but rounded, number of DIs covered by the asset thresholds because all DIs report total assets on the bank and credit union Call Reports.

[71] As of December 31, 2018, small DIs accounted for about 85 percent of all DIs.  Under the asset-based exemption thresholds, all non-small DIs would report. Under the activity-based thresholds, at least 60 percent of non-small DIs would report.

[72] See footnote 22 above for a list of the NAICS codes that the Bureau believes most commonly represent these types of non-DIs.

AdminRecord-001332

specifically non-DIs, through the SBREFA process and the one-time cost survey, discussed below.

## C. Using HMDA as a basis for potential impacts of the eventual 1071 rule

The Bureau used previous HMDA rulemaking estimates as a basis for its review of tasks that would impose one-time and ongoing costs associated with 1071 data collection and reporting. In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA rule, the Bureau used interviews with FIs to understand the processes required to comply with a regulation that requires collecting and reporting credit application data and generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data. To analyze the potential impacts of the eventual 1071 rule, the Bureau plans to adapt and build on its methodology from its HMDA rulemaking activities to the small business lending market.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the eventual 1071 rule would be similar to those under HMDA. In many areas, the Bureau expects that there would be much overlap in the activities required. The similarities in data collection and reporting tasks allows the Bureau to leverage its previous rulemaking experience in its analysis of the potential impacts of the eventual 1071 rule.

There are significant differences between the home mortgage and small business lending markets, however. For example, generally small business lending is less automated, and has a wider variety of products, smaller volumes and smaller credit amounts. Using early outreach to FIs, the Bureau has sought to determine how these differences in the market for small business lending would change the tasks required for data collection, checking for accuracy, and reporting. The Bureau additionally hopes to use the SBREFA process to learn more about these differences and changes that could be made to its estimation of the impacts of the proposals under consideration (see Q78, Q79, and Q80 above).

## D. Types and numbers of 1071 reporters

During the HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) the reporting system used; (2) the degree of system integration; (3) the degree of system automation; (4) the tools for geocoding, (5) the tools for performing completeness checks, (6) the tools for performing edits; and (7) the compliance program. The Bureau assumes that FIs will set up their 1071 reporting in a manner similar to how HMDA reporting was implemented.[73] The Bureau requests input from FIs, particularly those who are not currently HMDA or CRA reporters, on how they anticipate they will set up their 1071 reporting process (see Q79 above).

The Bureau found during the HMDA rulemaking process that generally the complexity of an FI's approach across dimensions was consistent—that is, an FI generally would not use less

---

[73] For example, the Bureau assumes that FIs will integrate their small business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.

AdminRecord-001333

complex approaches on some dimensions and more complex approaches on others. This allowed the Bureau to classify FIs, including DIs and non-DIs, into three broad tiers according to the overall level of complexity of their compliance operations. This analysis of impacts of the 1071 rule assumes that complexity across dimensions of an FI's small business lending data collection and reporting system will also be consistent.

Table 3 below summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of FIs based on level of complexity in compliance operations. FIs that are Type A have the lowest level of complexity in compliance operations, while Type B and Type C have the middle and highest level of complexity, respectively.

**Table 3: Typical approach to certain aspects/dimensions of compliance costs based on level of complexity for types of 1071 reporters**

| Aspect/dimension of compliance costs | Typical approach by low complexity FIs (Type A FIs) | Typical approach by medium complexity FIs (Type B FIs) | Typical approach by high complexity FIs (Type C FIs) |
|---|---|---|---|
| **Data storage system used** | Store data in Excel | Use LOS and SBL DMS | Use multiple LOS, central SoR, SBL DMS |
| **Degree of system integration** | (None) | Have forward integration (LOS to SBL DMS) | Have backward and forward integration |
| **Degree of system automation** | Highly manual process for entering and checking data | Use manual edit checks | Have high automation (only verifying edits manually) |
| **Tools for geocoding** | Use FFIEC tool (manual) | Use batch processing | Use batch processing with multiple sources |
| **Tools for completeness checks** | Conduct manual checks and rely on CFPB quality/validity checks | Use LOS, which includes completeness checks | Use multiple stages of checks |
| **Tools for edits** | Use CFPB edits only | Use CFPB and customized edits | Use CFPB and customized edits run multiple times |
| **Compliance program** | Have a joint compliance and audit office | Have basic internal and external accuracy audit | Have in-depth accuracy and fair lending audit |

AdminRecord-001334

Notes: LOS is "Loan Origination System"; SoR is "System of Record"; SBL DMS is "Small Business Lending Data Management System."[74]

The Bureau also found that, for HMDA, the number of loan applications received was largely correlated with overall FI complexity. The Bureau used this observation from HMDA, in addition to early outreach to FIs and data from Call Reports and the CDFI Fund, to generate assumptions about the number of annual small business lending applications processed by each FI type. The Bureau assumes that, on average, Type A FIs receive 75 small business credit applications per year, Type B receive 300 applications per year, and Type C receive 6,000 applications per year. These assumptions will be used to determine costs per application below. The Bureau adapted the volumes used in previous HMDA rulemaking efforts after some initial conversations with DIs that lend to small businesses. For the analysis, the Bureau assumes that one out of three small business applications will result in an origination, and thus the originations for an FI that is Type A, Type B, and Type C are 25, 100, and 2,000, respectively.[75]

In addition to application volume, another factor that may affect the FI's methods of 1071 compliance is the number and variety of the products FIs provide. Those entities that operate on a monoline basis, such as an entity that is exclusively a credit card issuer or a provider of equipment financing, are likely to have limited systems and operating unit impacts. In contrast, entities that support a wide and heterogenous product set may be operating with a multitude of affected systems, including multi-dimensional sales channels and multiple business units involved in supporting 1071 reporting. The consequence is that while volume is an important determinant of 1071 costs, product diversity is also a factor in why institutional costs may not be directly comparable across types of products, even within the FI types discussed above. Nonetheless, the Bureau uses application volume as a rough proxy for complexity to simplify the analysis enough to make it feasible for the Bureau to aggregate costs across the entire small business lending market. Using sources like bank and credit union Call Reports, the Bureau has access to information on loan volume but does not have similarly comprehensive information on product offerings by FIs. The Bureau requests feedback on how product mix complexity may affect implementation and the degree to which higher-volume FIs are more likely to have a more diverse mix of products (see Q79 above).

The Bureau estimates that almost no small DIs as defined by the SBA (*i.e.*, under $600 million in assets) receives more than 6,000 applications per year. As a result, the Bureau focuses on FIs of Types A and B in this Outline. The Bureau assumes that Type A and Type B FIs reflect, respectively, the lower and upper limits of operational complexity of *small* DIs. Through the SBREFA process and additional outreach, the Bureau seeks to obtain data on the compliance

---

[74] The Bureau expects the development of a market for small business data management systems similar to HMDA management systems that FIs will license or purchase from third parties.

[75] The Bureau chose the 1:3 application to origination ratio based on two sources of information. The first source is the *Biz2Credit Small Business Lending Index* (https://cdn.biz2credit.com/appfiles/biz2credit/pdf/report-may-2020.pdf) which shows that, in December of 2019, large banks approved small business loans at a rate of 27.5 percent, while small banks and credit unions had approval rates of 49.9 percent and 40.1 percent. Additionally, and supported by the Bureau's data from supervisory exams, the Bureau chose a 33 percent approval rate as a conservative measure among these estimates.

AdminRecord-001335

operations and costs to small entities and on the relative numbers of Type A FIs and Type B FIs (and Type C FIs, where applicable) that are small entities.

## E. Bureau review of compliance processes and costs

The Bureau categorizes costs required to comply with an eventual rule implementing section 1071 into "one-time" and "ongoing" costs. "One-time" costs refer to expenses that the FI would incur initially and only once as it implements changes required to business operations in order to prepare to comply with the requirements of the new rule. "Ongoing" costs are expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis.

The Bureau has identified the following eight categories of one-time costs that would be incurred by FIs to develop the infrastructure to collect and report data required by the regulation implementing section 1071:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications
5. Training staff and third parties (such as dealers and brokers)
6. Developing policies/procedures
7. Legal/compliance review
8. Post-implementation review of compliance policies and procedures

Bureau conversations with FIs have informed our preliminary understanding of one-time costs. FIs will likely have to spend time and resources reading and understanding the regulation, developing the required policies and procedures for their employees to follow to ensure compliance, and engaging a legal team to review their draft policies and procedures. Additionally, FIs may require new equipment, such as new computer systems that can store and check the required data points; new or revised application forms to collect women-owned/minority-owned business status, and race, sex, and ethnicity information about principal owner(s), and to provide any related disclosures required by the regulation. Some FIs mentioned that they may store, check, and report data using system providers such as Fiserv, Jack Henry, LaserPro, Fidelity Information Systems (FIS), while others may use more manual methods of data storage, checking, and reporting using applications such as Excel. FIs would also engage in a one-time training of all small business lending staff to ensure that employees understand the new policies and procedures. After all new policies and procedures have been implemented and systems/equipment deployed, FIs will likely undertake a final internal review to ensure that all the requirements of the section 1071 regulation have been satisfied.

The Bureau has also identified 15 specific data collection and reporting activities that would impose ongoing costs. Table 4 presents the full list of 15 activities. Activities 1 through 3 can broadly be described as data collection activities: these tasks are required to intake data and transfer it to the FI's small business data entry system. Activities 4 through 10 are related to reporting and resubmission: these tasks are required to collect required data, conduct internal checks, and report data consistent with the eventual 1071 rule. Activities 11 through 13 are related to compliance and internal audits: employee training and internal and external auditing

AdminRecord-001336

procedures required to ensure data consistency and reporting in compliance with the eventual 1071 rule. Finally, activities 14 and 15 are related to 1071 examinations by regulators: these tasks will be undertaken to prepare for 1071-related examinations and assist during regulatory compliance examinations.

**Table 4: 1071 data collection and reporting activities imposing ongoing costs**

| No. | Activity |
|-----|----------|
| 1 | Transcribing data |
| 2 | Resolving reportability questions |
| 3 | Transferring to Data Entry System, Loan Origination System, or other data storage system |
| 4 | Geocoding data |
| 5 | Standard annual edit and internal checks |
| 6 | Researching questions |
| 7 | Resolving question responses |
| 8 | Checking post-submission edits |
| 9 | Filing post-submission documents |
| 10 | Small business data reporting/geocoding software |
| 11 | Training |
| 12 | Internal audit |
| 13 | External audit |
| 14 | Exam preparation |
| 15 | Exam assistance |

## F. Impacts of the proposals under consideration

### 1.    Overview

This part IV.F illustrates the methodology the Bureau intends to use to estimate one-time and ongoing costs for FIs reporting small business loan application data under the eventual 1071 rule. Through the SBREFA process, the Bureau hopes to receive feedback about potential changes to

50

AdminRecord-001337

this methodology that would improve its accuracy. Costs of compliance with collecting and reporting data under section 1071 are broken down into one-time costs and ongoing costs.

In calculating costs in parts IV.F.2 and 3, the Bureau assumes FIs are currently complying with all existing regulations that they are currently subject to, including regulations such as reporting loan data under HMDA or CRA. FIs are assumed not to have implemented policies to begin complying with section 1071. The changes in one-time and ongoing costs therefore illustrate the change in expenses incurred from transitioning from a nonreporting regime for small business lending to reporting under section 1071.

Parts IV.F.2 through 5 are organized as follows: parts IV.F.2 and 3 illustrate the expected one-time and ongoing costs of the Bureau's proposals under consideration as outlined above. For purposes of the analysis in part IV.F, the Bureau assumes the following: an application would be defined generally in alignment with that term as used in Regulation B (as the Bureau has explained it is considering proposing for 1071 in part III.F above); FIs would collect and report all the mandatory data points along with the discretionary data points under consideration (that is, pricing, time in business, industry code, and number of employees) (see part III.G above); and FIs would either implement a firewall or provide a disclosure with respect to collection of women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners (see part III.H above). Part IV.F.3. also discusses the more detailed assumptions that underlie the Bureau's estimates of on-going costs. Part IV.F.4 compares how these one-time and ongoing costs would be different under the principal policy alternatives considered. Part IV.F.5 discusses additional potential impacts of the eventual 1071 rule.

## 2.    One-time costs

As discussed above in part IV.E, the Bureau has identified eight categories of one-time costs that make up the components necessary for an FI to develop the infrastructure to collect and report data required by the eventual 1071 rule. Those categories are: preparation/planning; updating computer systems; testing/validating systems; developing forms/applications; training staff; developing policies/procedures; legal/compliance review; and post-implementation review. The Bureau expects that most, if not all, of these categories of one-time costs will be made up of multiple tasks. For example, the one-time cost category of training staff would include developing initial and ongoing training programs and conducting initial training. The cost to conduct initial training would be calculated based on hourly wage x hours of training x number of loan officers, internal staff, or third parties that need training. (The cost to conduct ongoing training is discussed as part of ongoing costs in part IV.F.3 below.)

The Bureau does not have detailed information about potential one-time costs for small entities to implement the eventual 1071 rule. While HMDA often provides a useful point of reference for section 1071, it is not helpful with respect to estimating one-time costs. HMDA, like section 1071, is a data collection and reporting statute, but FIs have been subject to HMDA's requirements for decades. In its HMDA rulemakings, the Bureau has assessed the costs of making changes to *existing* systems and processes—not the costs associated with developing entirely new systems and processes to implement a new data collection and reporting regime, as it must do here with respect to implementing the eventual 1071 rule.

AdminRecord-001338

The Bureau is conducting a survey regarding one-time implementation costs for section 1071 compliance targeted at FIs who extend small business credit.[76] Estimates from survey respondents of the one-time costs of complying with a 1071 rule will form much of the basis of the Bureau's estimates for one-time costs in assessing the impact of a proposed 1071 regulation. The survey is broadly designed to ask about the one-time costs of reporting data under a regime that only includes mandatory data points, under a reporting structure similar to HMDA, and using the Regulation B definition of an "application." The survey is divided into three sections: Respondent Information, One-Time Costs, and the Cost of Credit to Small Entities.

Through the Respondent Information section, the Bureau will obtain basic information about the FI responding to the survey, including information on the type of institution, its size, and its volume of small business lending. The One-Time Costs section of the survey measures the total hours, staff costs, and non-salary expenses associated with the different tasks comprising one-time costs. Using the reported costs of each task, the Bureau can estimate the total one-time cost for each respondent. The Cost of Credit to Small Entities section deals with the FI's anticipated response to the increased compliance costs in order to understand the impacts of the regulation on the institution's small business lending activity, including any anticipated potential changes to underwriting standards, volume, prices, product mix, or market participation.

The Bureau's analysis of the survey results will be segmented based on institutional characteristics and will estimate the total one-time costs by institution type. For example, the Bureau will need to understand how expected one-time costs vary with the number of small business loan applications an institution processes annually. Additionally, the Bureau is interested in learning how different kinds of FIs (such as DIs and non-DIs) differ in their expected one-time costs. The Bureau will use information gathered from the SERs during the SBREFA process together with information gathered from the survey for purposes of its initial regulatory flexibility analysis under the RFA in its eventual notice of proposed rulemaking.

### 3.    Changes in ongoing costs

The Bureau measures ongoing costs relative to a current baseline. For data collection and reporting under the eventual 1071 rule, the baseline for ongoing 1071 compliance cost is zero dollars, as FIs are currently not reporting small business lending data to the Bureau to comply with section 1071. The Bureau also assumes that small entities are not currently reporting small business credit data according to the CRA, and therefore will not benefit from any cost savings due to eventual overlap between the two data collections.[77] The Bureau also assumes that institutions have not taken any steps towards implementation in anticipation of the finalization of the rule. The collection and reporting tasks explained in part IV.E form the basis of the ongoing cost analysis.

---

[76] This survey was released on July 22, 2020; the response period closes on October 1, 2020. Due to the COVID-19 pandemic, the Bureau was concerned that conducting the one-time cost survey in spring 2020, as it had originally planned, would have put undue burden on respondents and led to low response rates and poor data and instead opted for a later release date.

[77] Similarly, the Bureau assumes that the reporting requirements on bank or credit union Call Reports are not similar enough to the 1071 data reporting requirements to provide significant cost savings.

AdminRecord-001339

Table 5 provides an example of how the Bureau is considering calculating ongoing compliance costs associated with each compliance task. The table shows the calculation for each activity and notes whether the task would be a "variable cost," which would depend on the number of applications the institution receives, or a "fixed cost" that does not depend on the number of applications. Table 5 shows these calculations for a Type A FI, or the institution with the least amount of complexity. Table 6 below summarizes the activities whose calculation differs by institution complexity and shows the calculations for a Type B FI (where they differ from those for a Type A FI).

**Table 5: Ongoing compliance cost calculations for a Type A FI**

| No. | Activity | Calculation | Type |
|---|---|---|---|
| 1 | Transcribing data | Hourly compensation x hours per app. x applications | Variable[78] |
| 2 | Resolving reportability questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 3 | Transfer to Data Entry System | Hourly compensation x hours per app. x applications | Variable |
| 4 | Complete geocoding data | Hourly compensation x hours per app. x applications | Variable |
| 5 | Standard annual edit and internal checks | Hourly compensation x hours spent on edits and checks | Fixed[79] |
| 6 | Researching questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 7 | Resolving question responses | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 8 | Checking post-submission edits | Hourly compensation x hours checking post-submission edits per application | Variable |
| 9 | Filing post-submission documents | Hourly compensation x hours filing post-submission docs | Fixed |

---

[78] In this table, the term "variable" means the compliance cost depends on the number of applications.

[79] In this table, the term "fixed" means the compliance cost does not depend on the number of applications (even if there are other factors upon which it may vary).

53

AdminRecord-001340

| No. | Activity | Calculation | Type |
|---|---|---|---|
| 10 | Small business data reporting/geocoding software | Uses free geocoding software | Fixed |
| 11 | Training | Hourly compensation x hours of training per year x number of loan officers | Fixed |
| 12 | Internal audit | No internal audit conducted by FI staff | Fixed |
| 13 | External audit | One external audit per year | Fixed |
| 14 | Exam preparation | Hourly compensation x hours spent on examination preparation | Fixed |
| 15 | Exam assistance | Hourly compensation x hours spent on examination assistance | Fixed |

Many of the activities in Table 5 require time spent by loan officers and other FI employees. To account for time costs, the calculation uses the hourly compensation of a loan officer multiplied by the amount of time required for the activity. Currently, the mean hourly wage for loan officers, based on data from the Bureau of Labor Statistics, is $36.26.[80] To account for non-monetary compensation, the Bureau scales this hourly wage by 43 percent to arrive at a total hourly compensation of $51.80 for use in these calculations.[81] The Bureau uses assumptions from its analysis for its 2015 HMDA rule, updated to reflect differences between mortgage lending and small business lending, to estimate time spent on data entry.[82] As an example of a time calculation, currently the Bureau estimates that transcribing the required data points would require approximately 4 minutes per application. The calculation multiplies the number of minutes by the number of applications and the hourly compensation to arrive at the total cost, on an annual basis, of transcribing data. As another example, the Bureau currently estimates that ongoing training for loan officers to comply with an institution's 1071 policies and procedures would take about two hours per loan officer per year. The cost calculation multiplies the number of hours by the number of loan officers and by the hourly compensation.

---

[80] This data reflects the mean hourly wage for "loan officers" in the "Credit Intermediation and Related Activities" industry according to the 2019 Occupational Employment Statistics compiled by the Bureau of Labor Statistics. *See* U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages* (May 2019), https://www.bls.gov/oes/current/oes132072.htm.

[81] The March 2020 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation. U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation* (Mar. 2020), https://www.bls.gov/news.release/archives/ecec_06182020.pdf.

[82] Some differences, for example, are reflected in the number of applications, the number of data points per application, and the number of loan officers for the representative institutions.

54

AdminRecord-001341

Some activity costs in Table 5 depend on the number of applications. It is important to differentiate between these variable costs and fixed costs because the type of cost impacts whether and to what extent covered institutions might be expected to pass on their costs to small business loan applicants in the form of higher interest rates or fees. Part IV.G explains why the Bureau expects FIs to pass most of the variable costs on to consumers in the form of higher interest rates and fees. All data collection, as well as reporting and resubmission activities such as geocoding data, standard annual edit and internal checks, researching questions, and resolving question responses are variable costs. All other activities are fixed cost and do not depend on the overall number of applications being processed. An example of a fixed cost calculation is exam preparation, where the hourly compensation is multiplied by the number of total hours required by loan officers to prepare for 1071-related compliance examinations.

Table 6 shows where and how the Bureau assumes Type B FIs differ from Type A FIs in its ongoing cost methodology. Type B FIs use more automated procedures, which result in different cost calculations. For example, for a Type B FI, transferring data to the data entry system and geocoding applications are done automatically by business application data management software licensed annually by the FI. The relevant address is submitted for geocoding via batch processing, rather than being done manually for each application. The additional ongoing geocoding costs reflect the time spent by loan officers on "problem" applications—that is, a percentage of overall applications that the geocoding software misses—rather than time spent on all applications. However, Type B FIs have the additional ongoing cost of a subscription to a geocoding software or service as well as a data management software that represents an annual fixed cost of reporting 1071 application data. This is an additional ongoing cost that less complex institutions who use more manual processes (*i.e.*, Type A FIs) will not incur. The Bureau expects that Type A FIs will use free batch geocoding software made available by the Bureau, which will be a change from the existing free web-based geocoding available from the FFIEC.

Additionally, audit procedures differ between the three representative institution types. The Bureau expects a Type A FI would not conduct an internal audit but would pay for an annual external audit to be conducted. A Type B FI would be expected to conduct a simple internal audit for data checks that requires loan officer time and also pay for an external audit to be conducted on an annual basis.

**Table 6: Differences in ongoing cost calculations for a Type B FI**

| No | Activity | Difference for a Type B FI |
|----|----------|----------------------------|
| 1 | Transfer to Data Entry System | No employee time cost. Automatically transferred by data management software purchased/licensed |
| 2 | Complete geocoding data | Cost of time per application unable to be geocoded by software |
| 3 | Small business data reporting/geocoding software | Uses geocoding software and/or data management software that requires annual subscription |

AdminRecord-001342

| No | Activity | Difference for a Type B FI |
|----|----------|----------------------------|
| 4 | Internal Audit | Hourly compensation x hours spent on internal audit |
| 5 | External Audit | Yearly fixed expense on external audit |

Table 7 shows the total expected ongoing costs as well as a breakdown by the component 18 activities that comprise the ongoing costs for Type A FIs and Type B FIs. Table 7 also provides the Bureau's expected ongoing cost for Type C FIs to provide a more fulsome picture of how the Bureau expects ongoing costs to differ by institution complexity. In the following analysis, however, the discussion is restricted to Type A and Type B FIs for the reasons discussed above. The bottom of the table shows the total estimated annual 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. As discussed above, the Bureau is limiting the cost discussion in this Outline to institutions of types A and B, as it expects most small institutions' small business lending activities to fall somewhere between those of these two types of institutions. To produce the estimates in Table 7, the Bureau makes many assumptions about the inputs into the calculations of Tables 5 and 6 above, such as the amount of time expected for a loan officer to compete a given activity. In the following analysis, the Bureau provides examples of these assumptions for the largest drivers of ongoing costs.

**Table 7: Estimated ongoing costs per compliance task**

| No | Activity | Type A FI | Type B FI | Type C FI |
|----|----------|-----------|-----------|-----------|
| 1 | Transcribing data | 250-500 | 500-1,000 | 10,000-20,000 |
| 2 | Resolving reportability questions | 50-100 | 100-250 | 250-500 |
| 3 | Transfer to 1071 Data Management Software | 250-500 | 0 | 0 |
| 4 | Complete geocoding data | 50-100 | 250-500 | 250-500 |
| 5 | Standard annual edit and internal checks | 250-500 | 5,000-10,000 | 10,000-20,000 |
| 6 | Researching questions | 50-100 | 100-250 | 250-500 |
| 7 | Resolving question responses | 0 | 0 | 0 |
| 8 | Checking post-submission edits | <50 | <50 | 100-250 |
| 9 | Filing post-submission documents | <50 | <50 | <50 |

AdminRecord-001343

| No | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 10 | 1071 Data Management System / geocoding software | 0 | 5,000-10,000 | 10,000-20,000 |
| 11 | Training | 500-1,000 | 1,000-5,000 | 20,000-50,000 |
| 12 | Internal audit | 0 | 250-500 | 100,000-150,000 |
| 13 | External audit | 500-1,000 | 5,000-10,000 | 0 |
| 14 | Exam prep | <50 | 1,000-5,000 | 20,000-50,000 |
| 15 | Exam assistance | 100-250 | 500-1,000 | 1,000-5,000 |
| | **Total** | **$2,000-$4,200** | **$18,700-$43,600** | **$171,850-$316,800** |
| | Per application | $27-$56 | $62-$145 | $29-$53 |
| | Total DI Net Income Per Application | $37,000-$45,000 | $12,000-$13,000 | $1,000-$1,300 |

The Bureau estimates that the lowest complexity institution (*i.e.*, a Type A FI) would incur around $2,500 in total annual ongoing costs, or about $34 in total cost per application processed (assuming an average of 75 applications per year). For FIs of this type, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau expects training, activity number 11, to annually require approximately $620 for 6 representative loan officers to engage in two hours of training. Other time-dependent activities the Bureau expects to cost around $300 each. For example, the Bureau assumes that Type A FIs will spend around 6 hours transferring data to 1071 data management software, activity number 3, based on estimates of the required time to transfer to HMDA data management software. At the assumed hourly compensation, our estimate is around $310 for the FIA institutions to transfer data. An assumption of around 7 total hours to conduct standard annual editing checks, activity number 5, produces a similar sized estimate. Additionally, the Bureau currently estimates that Type A FIs would spend around $500-$1,000 annually for external audits of their small business application data, activity number 13.

The Bureau estimates that a middle complexity institution (*i.e.*, a Type B FI), which is somewhat automated, would incur approximately $29,550 in additional ongoing costs per year, or around $99 per application (assuming an average of 300 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (in the form of an annual software subscription fee), activity number 10, and the external audit of the data, activity number 13. Using interviews of FIs conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be

AdminRecord-001344

comparable in the 1071 context and thus applies that estimate here as well. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and 1071-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000-$10,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($5,000-$10,000), training ($1,000-$5,000), and prepping for examinations ($1,000-$5,000) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination, activity number 14, resulting in a cost of nearly $4,200, and have employees spend around 12 employee hours assisting with an examination, activity number 15, costing nearly $620 annually.

To understand the impacts of these cost estimates on the profits of DIs, the Bureau estimates the average total net income across all products per origination, a measure of profits, for all DIs by type.[83] The results are reported in the last row of table 7. The Bureau estimates that DIs of Type A have a net income per origination between $110,000 and $135,000. Assuming that for each origination there are three applications, then a DI of Type A has a net income per application of approximately $37,000 to $45,000. The Bureau estimates that DIs of Type B have a net income per origination between $35,000 and $40,000 or a net income per application between $12,000 and $13,000. The Bureau estimates that DIs of Type C have a net income per origination between $3,000 and $4,000, or a net income per application between $1,000 and $1,300.

Table 8 breaks down the ongoing costs by the percentage of the total ongoing cost that is either fixed (not dependent on the number of applications processed), or variable (dependent on the number of applications processed). Lower complexity institutions (*i.e.*, Type A FIs) have a smaller percentage (44 percent) of their ongoing costs that are fixed and so do not vary with the number of applications. More complex institutions have higher percentages that are represented in fixed costs (56 percent for a Type B FI) as these institutions spend relatively more of their ongoing costs on data management software, audit, and exam preparation, which do not depend on the number of applications. Type A FIs spend a larger percentage of ongoing costs on data entry, annual data checks, and edits, which depend on the number of applications processed.

**Table 8: Ongoing costs by fixed or variable costs**

| Total ongoing costs | Type A FI | | Type B FI | |
|---|---|---|---|---|
| | Fixed | Variable | Fixed | Variable |
| Contribution to total cost | $1,100 | $1,400 | $16,400 | $13,100 |
| Percentage (%) of total cost | 44% | 56% | 56% | 44% |

---

[83] There are no broadly available data on profit per application for non-DIs. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2018, accessed on July 23, 2020. The Bureau uses the same internal estimates of small business loan originations as discussed in part IV.B and total net income across all products.

AdminRecord-001345

### 4.    Analysis of alternatives

This part IV.F.4 describes how the Bureau expects ongoing costs to differ based on several significant policy alternatives to the proposals under consideration. This part also describes how the Bureau expects coverage of small business applications to change under different approaches to the size standard portion of the small business definition under consideration. Table 9 shows the Bureau's estimates of how the ongoing costs would differ with each policy alternative. Each row compares the alternative to the baseline scenario of the approach the Bureau is considering. Each policy alternative is explained in more detail below the table. The Bureau hopes to learn more about how one-time costs would differ with each choice of policy alternative through the SBREFA process.

**Table 9: Ongoing costs under policy alternatives**

| Alternatives | Type A FI | | Type B FI | |
|---|---|---|---|---|
| | Total cost | Cost per application | Total cost | Cost per application |
| Proposals under consideration | $2,520 | $34 | $29,550 | $99 |
| Statutorily required data points only | $2,280 | $30 | $28,240 | $94 |
| Requiring a "firewall" | $2,520 | $34 | $29,550 | $99 |
| Requiring verification of certain data points | $2,680 | $36 | $30,750 | $103 |

***Reporting of only mandatory data points***

Requiring only the collection and reporting of the mandatory data points would result in $4 and $5 less in ongoing costs per application for a Type A FI and a Type B FI, respectively, than reporting the additional discretionary data points that the Bureau is considering proposing (*i.e.*, pricing, time in business, industry code, and number of employees). These small cost savings result from activities with time cost that depend on the number of data points. Examples of these activities are transcribing data and performing standard edits and internal checks on the data, where additional data points require extra staff time. For example, the Bureau expects that only reporting the mandatory data points would require 5 hours of total employee time instead of the 6 hours required to report full set of data points under consideration for a Type A FI. The Bureau also would expect that reporting only the mandatory data points would reduce the total time Type A FIs spend on standard edits and internal checks from 8 total hours to 6 hours. Reporting only the statutorily required data points may also reduce one-time costs if institutions must pay a one-time cost to upgrade or integrate their data systems in order to capture the additional discretionary data fields. This could be the case, for instance, if the loan origination system the

AdminRecord-001346

institution currently uses does not have the fields to capture the number of employees. The institution may also use separate systems to keep data on pricing for originated loans from the one they use for underwriting and would have to incur a one-time cost to integrate the systems to collect all the data fields considered in this proposal.

***Interpreting "feasible" and "should have access" to require FIs, in nearly all circumstances, to implement a "firewall" to prevent access by underwriters and other persons to women-owned/minority-owned business status and race, sex, ethnicity of principal owners***

The Bureau expects that a stricter "firewall" requirement for all FIs to prevent underwriters and other persons "involved in making any determination concerning an application for credit" (which generally would include loan officers) from viewing the applicant's response to the women-owned and minority-owned status inquiry, and the applicant's demographic information would result in a significant one-time cost. The Bureau expects that the effect on ongoing costs would differ very little from our baseline ongoing cost estimate. The Bureau hopes to use the SBREFA process to learn about the one-time and ongoing costs that would be incurred under different alternatives to the "firewall" (see Q60 above).

***Requiring verification of certain data points***

The Bureau expects that requiring FIs to verify certain data points (such as the gross annual revenue, number of employees, or the industry code of the business) beyond validation that currently occurs today would result in larger ongoing costs than those of the proposals under consideration. Verifying the information that a small business applicant provides on an application may require an FI's employees to spend additional time collecting material from an applicant and examining the response, as well as potential costs of obtaining material directly, such as via business tax returns. The Bureau assumes that requiring verification (beyond whatever verification the FI would do on its own) would make activities that require employee time costs 125% more costly than if verification were not required. Using this methodology, the Bureau expects that verification would increase ongoing costs by $2 an application and $4 an application for Type A FIs and Type B FIs, respectively. Institutions may incur one-time costs associated with requiring verification. One example of a possible one-time cost if verification were to be required would be the additional expense of drafting and implementing policies to develop and standardize the verification procedures within the institution and communicate those to employees. The Bureau seeks to learn about the potential impacts of requiring verification through the SBREFA process (see Q41, Q53, and Q54 above).

***Alternative size standards for the "small business" definition***

In part III.C above, the Bureau discusses three size standards it is considering that could be used as alternative approaches to the SBA's full six-digit NAICS code size standards. The Bureau used data from the U.S. Census's 2012 Statistics of U.S. Businesses (SUSB) to analyze how each

AdminRecord-001347

of the alternative approaches would change the number of businesses defined as "small" relative to the SBA definition.[84]

If all NAICS classifications and size assessments could be done correctly, applying the SBA's full six-digit NAICS code-based size standards would result in perfect coverage of small businesses—all applications by small businesses would be reported (other than those made to financial institutions that qualify for an exemption) and no applications made by non-small businesses would be reported.  To understand the effects of the approaches considered, the Bureau estimated how many firms would be mischaracterized as "small" or "large" under these alternative approaches as compared to the full six-digit NAICS SBA size standards.  For each of the three approaches under consideration, Table 10 shows the number of "small" firms, under the SBA's definition, that would not have their application data reported to the Bureau and the number of "large" firms whose application data would be reported.

**Table 10: Mis-coverage of small businesses under the three size standards considered[85]**

| Size standard alternative | SBA "small" firms whose applications would not be reported to the Bureau | SBA "large" firms whose applications would be reported to the Bureau |
|---|---|---|
| $1 million in gross annual revenue | 1.2 million (23% of all employer firms) | 0 |
| $5 million in gross annual revenue | 270,000 | 4,000 |
| Maximum of 500 employees for wholesale or $8 million in gross annual revenue | 63,000 | 17,000 |
| Most common standard within a two-digit NAICS code | 46,000 | 10,000 |

These various thresholds would affect some industries more than others.  That is, depending on which size standard alternative the Bureau adopts under the eventual 1071 rule, applications for small firms would be reported to the Bureau less from some industries than others.  In general, there will be more firms whose applications would not be reported in larger industries with a higher revenue-based size standard. Under every alternative, the industries most affected by this are the retail trade and construction industries. Other industries that would be disproportionately

---

[84] The 2012 SUSB is the most recent Census product to have categories of revenue and employees granular enough to conduct this analysis. The Bureau constructed the 2012 equivalents of the second and third alternatives due to the vintage of the SUSB data available and used the SBA's 2012 size standards for the analysis.

[85] There are 5.3 million employer firms in the 2012 SUSB.  The 2012 SUSB does not include non-employer firms, of which there were 22.7 million in 2012, according to the Survey of Business Owners by Census.

AdminRecord-001348

affected (depending on which size standard alternative the Bureau adopts) include wholesale trade, health care and social assistance, and professional, scientific, and technical services.

## 5.     Additional potential impacts of the eventual 1071 rule

### i.     Impacts on product offering and underwriting processes

There are characteristics of certain small business lending products that are perhaps unique or distinct from consumer lending, such as lengthier underwriting processes that involve more lender-applicant interaction or a more diverse set of product offerings.  The Bureau conducted several interviews with FIs as part of early outreach efforts to guide its approach to estimating one-time and ongoing costs.  In 2017, the Bureau also issued a Request for Information Regarding the Small Business Lending Market to gather public comments to inform the Bureau's rulemaking efforts.[86]  In both early outreach interviews and public comments, FIs expressed concerns that the requirements to report data under the eventual 1071 rule may lead FIs to reduce the variety of their product offerings or to standardize their underwriting processes.  Compliance costs could lead FIs to move away from products that require significant employee time to underwrite towards more standardized products that require less time and lower labor costs.  The Bureau hopes to learn from the SBREFA process whether FIs would expect to change either the set of small business products that they offer or the underwriting practices they use in response to the implementation of the eventual 1071 rule (see Q83 above).

### ii.     Impacts due to publicly available data and reputation risks

In accordance with the balancing test discussed in part III.K.1, the Bureau expects to publicly release data collected under the eventual 1071 rule, potentially with certain data modified or deleted.  With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose.  Several commenters to the Bureau's request for information expressed concerns, however, about costs related to these analyses.  Depending on the extent of publicly disclosed data, the Bureau expects that some FIs could incur ongoing costs related to responding to reports of disparities in their small business lending practices.  Some FIs could also experience reputational risks associated with high profile reports of existing disparities where more fulsome analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis.  In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some FIs may choose to change their product offerings available to small businesses, underwriting or pricing practices, or overall participation in the small business lending market.  The Bureau hopes to learn more about the potential for impacts in these areas through the SBREFA process (see Q83 above).

---

[86] Bureau of Consumer Fin. Prot., Request for Information Regarding the Small Business Lending Market, 82 FR 22318 (May 15, 2017),  https://www.consumerfinance.gov/policy-compliance/notice-opportunities-comment/archive-closed/request-information-regarding-small-business-lending-market/.

AdminRecord-001349

## G. Impact on the cost and availability of credit to small entities

The Bureau's one-time cost survey includes questions about the expected impact of 1071 compliance costs on business operations. The survey asks questions about whether lenders expect to raise interest rates or fees, change how they underwrite loans, or change the amount or areas of small business lending in response to the eventual 1071 rule. The Bureau anticipates using the results of this survey to refine its estimates of the impact of compliance on the costs and availability of credit for small entities.

Three types of costs (one-time, fixed ongoing, and variable ongoing) will determine the effect of the eventual 1071 rule compliance on price and availability of credit to small entities. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the value of granting an additional loan is equal to the additional cost associated with the FI providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the profitability of extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will be relevant for the number of loans a lender provides.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to remain in the small business lending market or the market for specific small business lending products. The Bureau hopes to learn through the one-time cost survey the extent to which any lenders consider the potential additional one-time compliance costs prohibitive such that they would exit the market or reduce the number of small business loans provided and thus reduce the availability of small business credit to small entities.

The Bureau expects that much of the variable cost component of ongoing costs would be passed on to small business borrowers in the form of higher interest rates or fees. While existing academic literature on small business markets is limited, research on consumer credit products suggests that borrowers are less likely to choose products or credit amounts based on interest rates, which may be due to the difficulty consumers face in shopping for a lower interest rate.[87] Additionally, some existing research suggests that lenders to small businesses significantly adjust

---

[87] Recent economic literature suggests a small response of mortgage demand to interest rates. *See* Neil Bhutta & Daniel Ringo, *The Effect of Interest Rates on Home Buying: Evidence from a Discontinuity in Mortgage Insurance Premiums* (Board of Governors of the Federal Reserve System, Finance and Economics Discussion Series 2017-086), https://doi.org/10.17016/FEDS.2017.086; Anthony A. DeFusco & Andrew Paciorek, *The Interest Rate Elasticity of Mortgage Demand: Evidence from Bunching at the Conforming Loan Limit*, (American Economic Journal: Economic Policy, 2017), https://www.aeaweb.org/articles?id=10.1257/pol.20140108; and Andreas Fuster & Basit Zafar, *The Sensitivity of Housing Demand to Financing Conditions: Evidence from a Survey* (American Economic Journal: Economic Policy), forthcoming, https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr702.pdf. Some recent literature in economics has documented that almost half of all consumers do not shop before taking out a mortgage and there are similarly low levels of shopping in the auto lending market. *See* Alexei Alexandrov & Sergei Koulayev, *No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information* (Office of Research, Bureau of Consumer Fin. Prot., Working Paper No. 2017-01), https://ssrn.com/abstract=2948491; and David Low et al., *Auto Dealer Loan Intermediation: Consumer Behavior and Competitive Effects* (Office of Research, Bureau of Consumer Fin. Prot., Working Paper No. 2020-01), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3568571.

AdminRecord-001350

loan amounts in response to the cost per originated loan.[88]  In light of these two factors, the Bureau expects that the variable ongoing costs would be nearly passed on in full to small business borrowers.

Table 6 in the discussion of ongoing costs above gives the variable ongoing cost of compliance for the three examples of institution complexity.  Per application, the variable costs are approximately $17 and $40 for FIs Types A and B, respectively.  Using a similar methodology as described above, an estimate for Type C FI would be $12.  Even if the variable cost were passed on in full to small business borrowers in the form of higher interest rates or fees associated with a loan or line of credit (or even applicants in the form of application fees), the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business borrower.

---

[88] See small business lending supply estimates from Natalie Bachas et al., *Loan Guarantees and Credit Supply* (Working Paper, 2020), https://cmepr.gmu.edu/wp-content/uploads/2019/08/Bachas-Yannelis-Loan-Guarantees-and-Credit-Supply-1.pdf.

AdminRecord-001351

# Appendix A: Section 1071 of the Dodd-Frank Act

### SEC. 1071. SMALL BUSINESS DATA COLLECTION.

(a) IN GENERAL.—The Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) is amended by inserting after section 704A the following:

### "SEC. 704B. SMALL BUSINESS LOAN DATA COLLECTION.

"(a) PURPOSE.—The purpose of this section is to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

"(b) INFORMATION GATHERING.—Subject to the requirements of this section, in the case of any application to a financial institution for credit for women-owned, minority-owned, or small business, the financial institution shall—

"(1) inquire whether the business is a women-owned, minority-owned, or small business, without regard to whether such application is received in person, by mail, by telephone,

65

AdminRecord-001352

by electronic mail or other form of electronic transmission, or by any other means, and whether or not such application is in response to a solicitation by the financial institution; and

"(2) maintain a record of the responses to such inquiry, separate from the application and accompanying information. "(c) RIGHT TO REFUSE.—Any applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit.

Records.

"(d) NO ACCESS BY UNDERWRITERS.—

"(1) LIMITATION.—Where feasible, no loan underwriter or other officer or employee of a financial institution, or any affiliate of a financial institution, involved in making any determination concerning an application for credit shall have access to any information provided by the applicant pursuant to a request under subsection (b) in connection with such application.

"(2) LIMITED ACCESS.—If a financial institution determines that a loan underwriter or other officer or employee of a financial institution, or any affiliate of a financial institution, involved in making any determination concerning an application for credit should have access to any information provided by the applicant pursuant to a request under subsection (b), the financial institution shall provide notice to the applicant of the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information.

Determination. Notice.

"(e) FORM AND MANNER OF INFORMATION.—

"(1) IN GENERAL.—Each financial institution shall compile and maintain, in accordance with regulations of the Bureau, a record of the information provided by any loan applicant pursuant to a request under subsection (b).

Records.

"(2) ITEMIZATION.—Information compiled and maintained under paragraph (1) shall be itemized in order to clearly and conspicuously disclose—

"(A) the number of the application and the date on which the application was received;

"(B) the type and purpose of the loan or other credit being applied for;

"(C) the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved for such applicant;

"(D) the type of action taken with respect to such application, and the date of such action;

"(E) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan applicant;

"(F) the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application;

"(G) the race, sex, and ethnicity of the principal owners of the business; and

"(H) any additional data that the Bureau determines would aid in fulfilling the purposes of this section.

"(3) NO PERSONALLY IDENTIFIABLE INFORMATION.—In compiling and maintaining any record of information under this

AdminRecord-001353

section, a financial institution may not include in such record the name, specific address (other than the census tract required under paragraph (1)(E)), telephone number, electronic mail address, or any other personally identifiable information concerning any individual who is, or is connected with, the women-owned, minority-owned, or small business loan applicant.

"(4) DISCRETION TO DELETE OR MODIFY PUBLICLY AVAILABLE DATA.—The Bureau may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest.

"(f) AVAILABILITY OF INFORMATION.—

Deadline.

"(1) SUBMISSION TO BUREAU.—The data required to be compiled and maintained under this section by any financial institution shall be submitted annually to the Bureau.

"(2) AVAILABILITY OF INFORMATION.—Information compiled and maintained under this section shall be—

Time period.

"(A) retained for not less than 3 years after the date of preparation;

"(B) made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau;

"(C) annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation.

"(3) COMPILATION OF AGGREGATE DATA.—The Bureau may, at its discretion—

"(A) compile and aggregate data collected under this section for its own use; and

"(B) make public such compilations of aggregate data.

"(g) BUREAU ACTION.—

"(1) IN GENERAL.—The Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section.

"(2) EXCEPTIONS.—The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section.

"(3) GUIDANCE.—The Bureau shall issue guidance designed to facilitate compliance with the requirements of this section, including assisting financial institutions in working with applicants to determine whether the applicants are women-owned, minority-owned, or small businesses for purposes of this section.

"(h) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

"(1) FINANCIAL INSTITUTION.—The term 'financial institution' means any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity.

"(2) SMALL BUSINESS.—The term 'small business' has the same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632).

AdminRecord-001354

"(3) SMALL BUSINESS LOAN.—The term 'small business loan' means a loan made to a small business.

"(4) MINORITY.—The term 'minority' has the same meaning as in section 1204(c)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

"(5) MINORITY-OWNED BUSINESS.—The term 'minority-owned business' means a business—

"(A) more than 50 percent of the ownership or control of which is held by 1 or more minority individuals; and

"(B) more than 50 percent of the net profit or loss of which accrues to 1 or more minority individuals.

"(6) WOMEN-OWNED BUSINESS.—The term 'women-owned business' means a business—

"(A) more than 50 percent of the ownership or control of which is held by 1 or more women; and

"(B) more than 50 percent of the net profit or loss of which accrues to 1 or more women.".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—Section 701(b) of the Equal Credit Opportunity Act (15 U.S.C. 1691(b)) is amended—

(1) in paragraph (3), by striking "or" at the end;

(2) in paragraph (4), by striking the period at the end and inserting "; or"; and

(3) by inserting after paragraph (4), the following:

"(5) to make an inquiry under section 704B, in accordance with the requirements of that section.".

(c) CLERICAL AMENDMENT.—The table of sections for title VII of the Consumer Credit Protection Act is amended by inserting after the item relating to section 704A the following new item:

15 USC 1691 note.

"704B. Small business loan data collection.".

(d) EFFECTIVE DATE.—This section shall become effective on the designated transfer date.

68

AdminRecord-001355

# Appendix B: Glossary

**Administrator** means the manager of the Small Business Administration. The Administrator is appointed by the President. 15 U.S.C. 633(b)(1).

**Depository Institution** or **DI** means any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2.

**Dodd-Frank Act** means the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010). Section 1071 of the Dodd-Frank Act provides the Bureau with the authority to promulgate rules related to the proposals under consideration.

**Equal Credit Opportunity Act** or **ECOA**, 15 U.S.C. 1691 et seq., prohibits creditors from discriminating in any aspect of a credit transaction, including business-purpose transactions, on the basis of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act. Section 1071 is codified in section 704B of ECOA, 15 U.S.C. 1691c-2. ECOA is implemented by the Bureau's Regulation B.

**Financial Institution** or **FI** is defined in Section 1071(h)(1) as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." Section 1071's data collection and reporting obligations apply to financial institutions that receive applications for credit for women-owned, minority-owned, and small businesses. The term "financial institution" is defined for purposes of this Outline in part III.B above. However, the Bureau is seeking feedback and information from SERs as to how it should define this term for purposes of an eventual 1071 rule.

**Loan** or **credit** means, for purposes of this Outline, the covered products discussed in part III.E—term loans, lines of credit, and business credit cards. However, the Bureau is seeking feedback and information from SERs as to how it should define this term for purposes of an eventual 1071 rule.

**Regulatory Flexibility Act** or **RFA**, Pub. L. No. 96-354 (Sept. 19, 1980), codified at 5 U.S.C. 601 through 612, refers to the statute that established the principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to that regulation.

**Small Business Regulatory Enforcement Fairness Act of 1996** or **SBREFA**, Pub. L. No. 104-121 (Mar. 29, 1996), refers to the statute that establishes the Small Business Review Panel process for certain Bureau, Environmental Protection Agency, and Occupational Health and Safety Administration rulemakings. SBREFA amended the RFA.

AdminRecord-001356

**Small Business Review Panel** or **Panel** means a panel formed of representatives from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration, and the Office of Information and Regulatory Affairs in the Office of Management and Budget. A Panel is convened in accordance with SBREFA when a rule under development may have a significant economic impact on a substantial number of small entities. The Panel for the Bureau's Small Business Lending Data Collection rulemaking will prepare a report of its recommendations after discussing with small entity representatives this Outline of Proposals Under Consideration and Alternatives Considered.

**Small Entity** means a small business, small organization, or a small governmental jurisdiction as defined by the Regulatory Flexibility Act. The size standards for determining a business as small vary by industry and are established by the Small Business Administration.

**Small Entity Representative** or **SER** means a representative of a small entity who participates in the SBREFA process to provide input on costs and benefits of the proposals under consideration in a rulemaking.

AdminRecord-001357

## Appendix C: Closely-related Federal statutes and regulations

The Bureau has identified other Federal statutes and regulations that have potentially overlapping or conflicting requirements in order to avoid duplication or conflict with implementing section 1071. The Bureau has identified the following Federal statutes and regulations as closely related to section 1071:

The **Community Reinvestment Act** or **CRA**, implemented by Office of Comptroller of the Currency, Federal Reserve Board, and Federal Deposit Insurance Corporation regulations, requires some institutions to collect, maintain, and report certain data about small business, farm, and consumer lending to ensure they are serving their communities. The purpose of the CRA is to encourage institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions. Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. The Bureau intends to work with CRA regulatory agencies to ensure section 1071 and CRA do not conflict.

The **Equal Credit Opportunity Act** or **ECOA,** implemented by the Bureau's Regulation B (12 CFR part 1002), prohibits creditors from discriminating in any aspect of a credit transaction, including a business-purpose transaction, on the basis of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act.[89] The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.[90]

Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including when it is required by law.[91] Regulation B requires creditors to request information about the race, ethnicity, sex, marital status, and age of applicants for certain dwelling-secured loans and to retain that information for certain periods.[92] Regulation B requires this data collection for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, and requires the data to be maintained by the creditor for 25 months for purposes of monitoring and enforcing compliance with ECOA/Regulation B and other laws.[93]

---

[89] 15 U.S.C. 1691(a)(1).

[90] *See* 15 U.S.C. 1691c.

[91] 12 CFR 1002.5(a), (b), Regulation B (12 CFR part 1002) comment 5(a)-2.

[92] 12 CFR 1002.5(a)(2), 1002.12(b)(1)(i), 1002.13(a).

[93] 12 CFR 1002.12(b)(1)(i), 1002.13(a)(1).

AdminRecord-001358

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to compile, maintain, and submit to the Bureau certain data on credit applications by women-owned, minority-owned, and small businesses.

The Bureau is seeking information on how any of the proposals under consideration for implementing section 1071 might impact other aspects of ECOA/Regulation B compliance. (See Q1 above.)

The **Federal Credit Union Act**, implemented by the National Credit Union Administration (NCUA) (12 CFR part 1756), requires Federal credit unions to make financial reports as specified by the agency. The NCUA requires quarterly reports of the total number of outstanding loans, total outstanding balance, total number granted or purchased year-to-date, total amount granted or purchased year-to-date for commercial loans to members, not including loans with original amounts less than $50,000. The NCUA also requires quarterly reports of the total number and total outstanding balance (including the guaranteed portion) of loans originated under a Small Business Administration (SBA) loan program.

The **Federal Deposit Insurance Act**, implemented by the FDIC (12 CFR part 304), requires insured depository institutions to file Consolidated Reports of Condition and Income (Call Reports) in accordance with applicable instructions. These instructions require quarterly reports of loans to small businesses, defined as loans for commercial and industrial purposes to sole proprietorships, partnerships, corporations, and other business enterprises and loans secured by nonfarm nonresidential properties with original amounts of $1 million or less. In accordance with amendments by the Federal Deposit Insurance Corporation Improvement Act of 1991, the instructions require quarterly reports of loans to small farms, defined as loans to finance agricultural production, other loans to farmers, and loans secured by farmland (including farm residential and other improvements) with original amounts of $500,000 or less.

The **Home Mortgage Disclosure Act** or **HMDA**, implemented by the Bureau's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to report detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. This reported data is a valuable source for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There may be some overlap between what is required to be reported under HMDA and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses.

The **Small Business Act** or **SB Act**, administered through the SBA, defines a small business concern as a business that is "independently owned and operated and which is not dominant in its field of operation" and empowers the Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business. The SBA has adopted more than one thousand industry-specific size standards, classified by six-digit NAICS codes, to determine whether a business concern is "small." In addition, the SB Act authorizes loans for qualified small business concerns for purposes of plant acquisition, construction, conversion, or expansion, including the acquisition of land, material, supplies, equipment, and working capital.

AdminRecord-001359

The SBA sets the guidelines that govern the "7(a) loan program," determining which businesses financial institutions may lend to through the program and the type of loans they can provide.

AdminRecord-001360

# Appendix D: Summary of data fields and other key information for each data point under consideration

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Women-owned business status** | 1071(b)(1): whether the business is a women-owned ... business | FI reports applicant's response as to whether it is a women-owned business. | Applicant's self-reporting of women-owned business status (report one):<br>○ Yes<br>○ No<br>○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Minority-owned business status** | 1071(b)(1): whether the business is a ... minority-owned ... business | FI reports applicant's response as to whether it is a minority-owned business. | Applicant's self-reporting of minority-owned business status (report one):<br>○ Yes<br>○ No<br>○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Small business status** | 1071(b)(1): whether the business is a ... small business | FI reports applicant's response to certain threshold questions/data point(s), which will be used to determine small business status and whether other data points should be collected. | Is the applicant in a manufacturing or wholesale industry?<br>○ Yes<br>○ No<br><br>If yes, does it have fewer than 500 employees?<br>○ Yes<br>○ No<br><br>If the applicant is not in a manufacturing or wholesale industry, does it have less than $8 million in gross annual revenue?<br>○ Yes<br>○ No | The specifics of this data point will depend on the definition of "small business." This is an example based on the second alternative option under consideration. |
| **Application/loan number** | 1071(e)(2)(A): the number of the application ... | FI reports an alphanumeric application or loan number of no more than 45 characters that is unique, within the FI, to | Unique alphanumeric application or loan number of no more than 45 characters. | |

AdminRecord-001361

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | the referenced extension (or requested extension) of small business credit and that remains uniform through the application and origination stages of the process. | | |
| **Application date** | 1071(e)(2)(A): … and the date on which it was received. | FI reports application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application." | Date—reported as day, month, and year. | Grace period of several days on either side of the date reported. |
| **Loan/credit type** | 1071(e)(2)(B): the type … of the loan or other credit being applied for | FI reports loan/credit type in three parts. FI reports (1) loan/credit product and (2) guarantee; both are chosen from specified lists.  FI reports (3) loan term in number of months. | (1) Loan/Credit Product: <br> o Term loan—unsecured <br> o Term loan—secured <br> o Line of credit—unsecured <br> o Line of credit—secured <br> o Business credit card <br> o Other <br> o Unknown (for applications) <br><br> (2) Guarantee: <br> o Personal guarantee—owner(s) <br> o Personal guarantee—non-owner(s) <br> o SBA guarantee—7(a) program <br> o SBA guarantee—504 program <br> o SBA guarantee—other <br> o USDA guarantee <br> o Other Federal guarantee <br> o State or local government guarantee <br> o Other guarantee <br> o No guarantee <br> o Unknown | |

213

AdminRecord-001362

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | (3) Loan Term: (report one, as applicable):<br>○ # of months<br>○ NA (for products that do not have a loan term (such as credit cards) and for applications that did not specify a loan term). | |
| Loan purpose | 1071(e)(2)(B): the … purpose of the loan or other credit being applied for | FI reports loan purpose from a specified list. | Loan purpose (choose up to three):<br>○ Commercial real estate—owner occupied<br>○ Commercial real estate—non-owner occupied (includes investors)<br>○ Motor vehicle (including light and heavy trucks)<br>○ Equipment<br>○ Working capital (includes inventory or floor planning)<br>○ Business start-up<br>○ Business expansion<br>○ Business acquisition<br>○ Refinance existing debt<br>○ Line increase<br>○ Other<br>○ Unknown or unreported by the applicant | |
| Credit amount/limit applied for | 1071(e)(2)(C): the amount of the credit or credit limit applied for | FI reports the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the FI's evaluation of the credit request | Credit amount/credit limit applied for (report one, as applicable):<br>○ $ amount for initial amount of credit/credit limit requested by applicant<br>○ $ amount of a "firm offer," if application is in response to a firm offer that specifies an amount<br>○ $ amount underwritten (if applicant does not request a particular amount but FI underwrites for a specific amount) | Does not require reporting of amounts discussed before an application is made, but would capture the initial amount requested at the application stage or later—would reflect the amount evaluated by the lender in making a credit decision. |

214

AdminRecord-001363

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | o NA (if the product applied for does not involve a specific amount) | |
| **Credit amount/limit approved** | 1071(e)(2)(C): … the amount of the credit transaction or the credit limit approved … | FI reports the credit amount or credit limit approved, using (1) the *amount of the originated loan* for a closed-end origination; (2) the *amount approved* for a closed-end loan application that is approved but not accepted; and (3) the *amount of the credit limit approved* for open-end products. | For approved or originated loans only (report one, as applicable):<br>o $ amount of originated loan (if a closed-end origination)<br>o $ amount approved (if a closed-end application is approved but not accepted)<br>o $ amount of credit limit approved (for open-end loans/applications)<br><br>For applications that are denied, closed for incompleteness, or withdrawn by the applicant, report NA. | |
| **Action taken** | 1071(e)(2)(D): the type of action taken … | FI reports one of five actions taken on the application. | Action taken (choose one):<br>o Loan originated;<br>o Application approved but not accepted;<br>o Application denied;<br>o Incomplete application (closed or denied);<br>o Application withdrawn by applicant. | Actions listed are similar to Reg B and C actions taken, with simplifying modifications |
| **Action taken date** | 1071(e)(2)(D): … the date of such action | FI reports the date the action was taken | Date—reported as day, month, and year. | |
| **Census tract (principal place of business)** | 1071(e)(2)(E): the census tract in which is located the principal place of business … | FI reports a geocoded census tract based on an address collected in the application, or during review or origination of the loan. | Geocoded census tract.<br><br>Nature of the address used to geocode census tract (report one, as applicable):<br>o Address where the loan proceeds will principally be applied.<br>o Location of borrower's main office or headquarters.<br>o Another business address associated with the application. | FI reports census tract based on, first, the address where the loan proceeds will principally be applied, or, second, the location of borrower's main office or headquarters, or third, another business address associated with the application. FI then specifies which type of address it has used. |

215

77

AdminRecord-001364

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Gross annual revenue (GAR)** | 1071(e)(2)(F): the gross annual revenue … in the last fiscal year … | FI reports the GAR of the applicant during the last fiscal year | GAR (report one, as applicable):<br>○ If verified, $ amount of verified GAR.<br>○ If not verified, $ amount of GAR as reported by applicant or otherwise obtained. | |
| **Race of principal owners** | 1071(e)(2)(G): the race … of the principal owners of the business | FI reports applicant's response regarding the race of principal owner(s) | Principal Owner 1 (choose one or more):<br>○ American Indian or Alaska Native<br>○ Asian<br>○ Black or African American<br>○ Native Hawaiian or Other Pacific Islander<br>○ White<br>○ Applicant responded "I do not wish to provide this information" or did not respond<br><br>Principal owners 2, 3, and 4:<br>○ [Same as above] | Self-reporting by applicant only; no verification or visual observation/surname analysis.<br><br>More than one race can be reported for each principal owner.<br><br>Aligns with the aggregate HMDA categories. |
| **Sex of principal owners** | 1071(e)(2)(G): the … sex … of the principal owners of the business | FI reports applicant's response regarding the sex of principal owner(s) | Principal Owner 1 (choose one):<br>○ Male<br>○ Female<br>○ Applicant chose male and female<br>○ Applicant responded "I do not wish to provide this information" or did not respond<br><br>Principal owners 2, 3, and 4:<br>○ [Same as above] | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Ethnicity of principal owners** | 1071(e)(2)(G): the … ethnicity of the principal owners of the business | FI reports applicant's response regarding the ethnicity of principal owner(s) | Principal Owner 1 (choose one):<br>○ Hispanic or Latino<br>○ Not Hispanic or Latino<br>○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis.<br><br>Aligns with the aggregate HMDA categories. |

78

AdminRecord-001365

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | Principal owners 2, 3, and 4:<br>○ [Same as above] | |
| **NAICS code** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the NAICS code for the small business based on information provided by applicant | NAICS code | |
| **Number of employees** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the number of employees of the small business applicant | Number of employees (report one, as applicable):<br>○ If verified, verified number of employees.<br>○ If not verified, number of employees reported by applicant or otherwise obtained. | |
| **Time in business (TIB)** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the time in business of the applicant, expressed in years, or months if less than one year | TIB in years, or months if less than 1 year (report one, as applicable):<br>○ If verified, verified TIB.<br>○ If not verified, TIB reported by applicant or otherwise obtained. | |
| **Pricing** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the pricing of originated credit and credit that is approved but not accepted. | Pricing information. Reporting metric could be APR, total cost of credit, interest rate and total fees, or some other metric. | |

AdminRecord-001366