**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

Case No: 7:23-cv-00144

**JOINT APPENDIX
OF ADMINISTRATIVE RECORD DESIGNATIONS
VOLUME XI**

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
|---|---|
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |

# SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER FINANCIAL PROTECTION BUREAU SMALL BUSINESS LENDING DATA COLLECTION RULEMAKING

## OUTLINE OF PROPOSALS UNDER CONSIDERATION AND ALTERNATIVES CONSIDERED

### September 15, 2020

Contents

I.    Introduction ..................................................................................................... 3
II.   The SBREFA Process ...................................................................................... 5
III.  Proposals Under Consideration to Implement Section 1071 of the Dodd-Frank Act Regarding Small Business Lending Data Collection, and Alternatives Considered ..................... 8
  A.   Scope of proposed rule ................................................................................. 8
  B.   Definition of "financial institution" (lender coverage) ..................................... 10
    1.   General definition of "financial institution" .............................................. 10
    2.   Possible exemptions .............................................................................. 11
      i.    Size-based exemption ....................................................................... 11
      ii.   Activity-based exemption .................................................................. 12
      iii.  Combined size- and activity-based exemptions .................................... 13
    3.   Financial institutions that are not the lender of record ............................. 13
  C.   Definition of "small business" applicants ...................................................... 14
  D.   Definitions of "women-owned business," "minority-owned business," and "minority individual" ........................................................................................................ 18
  E.   Product coverage ........................................................................................ 19
    1.   Covered products .................................................................................. 19
    2.   Products not covered ............................................................................. 20
      i.    Consumer credit used for business purposes ..................................... 20
      ii.   Leases ............................................................................................. 21
      iii.  Trade credit .................................................................................... 21
      iv.   Factoring ........................................................................................ 22
      v.    Merchant cash advances ................................................................... 22
  F.   Definition of an "application" ...................................................................... 22
  G.   Data points ................................................................................................ 24
    1.   Mandatory data points ........................................................................... 24
      i.    Whether the applicant is a women-owned business, a minority-owned business, and/or a small business .............................................................. 25
      ii.   Application/loan number ................................................................... 26
      iii.  Application date ............................................................................... 26
      iv.   Loan/credit type .............................................................................. 26
      v.    Loan/credit purpose ......................................................................... 28

AdminRecord-001559

vi.    Credit amount/limit applied for ........................................................... 28

vii.   Credit amount/limit approved ............................................................ 29

viii.   Type of action taken ...................................................................... 29

ix.    Action taken date ............................................................................ 30

x.     Census tract (principal place of business)........................................ 30

xi.    Gross annual revenue ...................................................................... 31

xii.   Race, sex, and ethnicity of principal owner(s)................................. 32

2.    Discretionary data points ...................................................................... 33

i.    Pricing............................................................................................. 33

ii.    Time in business .............................................................................. 34

iii.   NAICS code and number of employees............................................ 35

3.    Timing considerations for collection of certain 1071 data ....................... 35

H.   Shielding data from underwriters and other persons (firewall) ....................... 36

1.    Underwriter access to women-owned and minority-owned business status, and race, sex, and ethnicity information for principal owners ........................................... 36

2.    Notification regarding access to information by underwriters and other persons.......... 38

I.    Applicants' right to refuse to provide certain information .................................. 39

J.    Compiling, maintaining, and reporting 1071 data to the Bureau....................... 39

K.   Privacy considerations involving Bureau publication of 1071 data ................... 40

1.    Balancing test ........................................................................................ 40

2.    Privacy interests considered under the balancing test................................. 41

3.    Bureau publication of 1071 data ............................................................. 41

L.    Implementation period ..................................................................................... 42

IV.   Potential Impacts on Small Entities ........................................................................ 43

A.   Overview.......................................................................................................... 43

B.   Small entities covered by the proposals under consideration ........................... 44

C.   Using HMDA as a basis for potential impacts of the eventual 1071 rule........................ 46

D.   Types and numbers of 1071 reporters............................................................. 46

E.   Bureau review of compliance processes and costs ......................................... 49

F.   Impacts of the proposals under consideration .................................................. 50

1.    Overview............................................................................................... 50

2.    One-time costs ...................................................................................... 51

3.    Changes in ongoing costs...................................................................... 52

4.    Analysis of alternatives ......................................................................... 59

5.    Additional potential impacts of the eventual 1071 rule ........................... 62

i.    Impacts on product offering and underwriting processes ................ 62

ii.    Impacts due to publicly available data and reputation risks ................... 62

G.   Impact on the cost and availability of credit to small entities........................... 63

Appendix A: Section 1071 of the Dodd-Frank Act ........................................................ 65

Appendix B: Glossary...................................................................................................... 69

Appendix C: Closely-related Federal statutes and regulations ....................................... 71

Appendix D: Summary of data fields and other key information for each data point under consideration .................................................................................................................... 74

AdminRecord-001560

# I.    Introduction

In the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), which was enacted "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system," Congress directed the Consumer Financial Protection Bureau (Bureau or CFPB) to adopt regulations governing the collection of small business lending data.  Specifically, section 1071 of the Dodd-Frank Act (section 1071 or 1071) amended the Equal Credit Opportunity Act (ECOA) to require financial institutions (FIs) to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses.[1]  Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses.  Under section 1071, the data that FIs are required to compile, maintain, and submit include the type and purpose of the loan, the census tract for the applicant's principal place of business, and the race, sex, and ethnicity of the principal owners of the business, along with a number of other data points.

The Bureau is implementing the section 1071 mandate.  The Bureau held a field hearing on May 10, 2017[2] and published a request for information regarding the small business lending market.[3]  The Bureau also released a white paper setting forth the findings of the Bureau's research on the small business lending environment, with a particular emphasis on lending to women-owned and minority-owned small businesses.[4]  In November 2019, the Bureau held a symposium on section 1071 to stimulate a dialogue to assist the Bureau in its policy development process and to receive feedback from experts, including academic, think tank, consumer advocate, industry, and

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376, 2056 (2010) (section 704B of ECOA was added by section 1071 of the Dodd-Frank Act) (codified at 15 U.S.C. 1691c-2).  For ease of reading, this Outline refers to the provisions of 704B in a shorthand expressed in terms of section 1071.  For example, when this Outline refers to "section 1071(a)," it is employing this shorthand to refer to section 704B(a) of ECOA, which is codified at 15 U.S.C. 1691c-2(a).  The full text of section 1071 is included as Appendix A.  See Appendix B for a glossary of defined terms.

The Bureau interpreted section 1071 to mean that obligations for FIs to collect, maintain, and submit data "do not arise until the Bureau issues implementing regulations and those regulations take effect."  See Letter from Leonard Kennedy, General Counsel, CFPB, to Chief Executive Officers of Financial Institutions under Section 1071 of the Dodd-Frank Act (Apr. 11, 2011), https://www.consumerfinance.gov/policy-compliance/guidance/supervisory-guidance/general-counsel-letter-regarding-section-1071-dodd-frank-act/.

[2] See Bureau of Consumer Fin. Prot., *Prepared Remarks of CFPB Director Richard Cordray at the Small Business Lending Field Hearing* (May 10, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-cfpb-director-richard-cordray-small-business-lending-field-hearing/.

[3] Bureau of Consumer Fin. Prot., *Request for Information Regarding the Small Business Lending Market*, 82 FR 22318 (May 15, 2017),  https://www.consumerfinance.gov/policy-compliance/notice-opportunities-comment/archive-closed/request-information-regarding-small-business-lending-market/.

[4] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

AdminRecord-001561

government experts in the small business lending arena.[5]  In early 2020, the Bureau released a research report examining small business lending and the Great Recession.[6]  On July 22, 2020, the Bureau issued a survey to collect information about potential one-time costs to FIs to prepare to collect and report data on small business lending.[7]  And now, the Bureau is moving forward with fulfilling its obligations under the Small Business Regulatory Enforcement Fairness Act (SBREFA), which amended the Regulatory Flexibility Act (RFA),[8] to assess the impact on small entities that would be directly affected by the proposals under consideration prior to issuing a proposed rule regarding section 1071.

As the Bureau noted in its May 2017 white paper on small business lending, small businesses play a key role in fostering community development and fueling economic growth both nationally and in their local communities.[9]  In 2017, small businesses in the United States employed 60 million people, or about 47 percent of the private workforce.[10]  Women-owned and minority-owned small businesses play an important role in supporting their local communities.[11]  According to the Census Bureau, there are more than 27.6 million small businesses in the United States.  More than 7.9 million of these businesses are minority-owned and over 9.8 million are women-owned.[12]

Access to financing is a crucial component to the success of small businesses.  Small businesses—including women-owned and minority-owned small businesses—need access to credit to smooth out business cash flows and to enable entrepreneurial investments that take advantage of, and sustain, opportunities for growth.  The market these businesses turn to for credit is vast and complex.  Small businesses have many options when it comes to financing, including products and providers.  Using publicly available data and informed by conversations

---

[5] Bureau of Consumer Fin. Prot., *Symposium: Section 1071 of the Dodd-Frank Act* (held Nov. 6, 2019), https://www.consumerfinance.gov/about-us/events/archive-past-events/cfpb-symposium-section-1071-dodd-frank-act/.

[6] Bureau of Consumer Fin. Prot., *Data Point: Small Business Lending and the Great Recession* (Jan. 2020), https://www.consumerfinance.gov/data-research/research-reports/data-point-small-business-lending-and-great-recession/.

[7] The survey period closes October 1, 2020.

[8] The RFA is codified at 5 U.S.C. 601-612, https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/.

[9] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[10] U.S. Census Bureau 2017 Statistics of U.S. Businesses. *See generally* https://www.census.gov/programs-surveys/susb.html.

[11] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[12] *See* U.S. Census Bureau Survey of Business Owners (2012).  The Survey of Business Owners provides statistics on non-employer and employer firms.  The Census Bureau's 2018 American Business Survey (ABS) provides more recent statistics only on employer firms.  According to the ABS, there are 5.7 million employer businesses in the United States.  More than one million of these businesses are minority-owned and more than 1.1 million are women-owned.

AdminRecord-001562

with market participants, the Bureau estimated in 2017 that the small business financing market at that time was roughly $1.4 trillion.[13]

However, market-wide data on loans to small businesses currently is very limited. The largest sources of information on lending by depository institutions (DIs) are the Federal Financial Institutions Examination Council (FFIEC) and National Credit Union Administration (NCUA) Consolidated Reports of Condition and Income (Call Reports) and reporting under the Community Reinvestment Act of 1977 (CRA). Under each of these reporting regimes, small loans to businesses of any size are used in whole or in part as a proxy for loans to small businesses. The FFIEC Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000).[14] The NCUA Call Report captures data on all loans over $50,000 to members for commercial purposes, regardless of any indicator about the business's size.[15] The CRA requires banks and savings associations with assets over a specified threshold (currently $1.305 billion) to report loans in original amounts of $1 million or less to businesses; reporters are asked to indicate whether the borrower's gross annual revenue is $1 million or less, if they have that information.[16] There are no similar sources of information about lending to small businesses by non-DIs.

Appendix C contains a list of Federal statutes and regulations that are closely related to section 1071, including, for example, the CRA.

## II.    The SBREFA Process

The Dodd-Frank Act requires the Bureau to comply with SBREFA, which imposes additional procedural requirements on rulemakings (including this consultative process) when a rule is expected to have a significant economic impact on a substantial number of small entities.[17] The SBREFA consultation process provides a mechanism for the Bureau to obtain input from small entities (in this case, small FIs as opposed to the small businesses that might be recipients of financing provided) early in the rulemaking process. SBREFA directs the Bureau to convene a

---

[13] Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape* (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[14] *See* Fed. Fin. Insts. Examination Council Reporting Forms 31, 41, and 51, https://www.ffiec.gov/ffiec_report_forms.htm (last visited Aug. 26, 2020).

[15] *See* Nat'l Credit Union Admin. Call Report Form 5300 (June 2020), https://www.ncua.gov/files/publications/regulations/form-5300-june-2020.pdf.

[16] *See* Fed. Fin. Insts. Examination Council, *A Guide to CRA Data Collection and Reporting*, at 11, 13 (2015), https://www.ffiec.gov/cra/pdf/2015_CRA_Guide.pdf. Small business loans are defined for CRA purposes as loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or Thrift Financial Report (TFR) as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small farm loans are defined for CRA purposes as loans whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland." *Id.* at 11.

[17] *See* 5 U.S.C. 609(b).

5

Small Business Review Panel (Panel) when it is considering proposing a rule that could have a significant economic impact on a substantial number of small entities. The Panel includes representatives from the Bureau, the Small Business Administration's (SBA) Chief Counsel for Advocacy,[18] and the Office of Information and Regulatory Affairs in the Office of Management and Budget.

The Panel is required to collect advice and recommendations from small entities or their representatives (referred to as small entity representatives, or SERs) that are likely to be subject to the regulation that the Bureau is considering proposing. For this purpose, the RFA defines "small entities" as small businesses, small organizations, and small governmental jurisdictions. The term "small business" has the same meaning as "small business concern" under section 3 of the Small Business Act (SB Act); thus, to determine whether a business is a small entity the Bureau looks to the SBA's size standards.[19] The term "small organization" is defined as any not-for-profit enterprise which is independently owned and operated and is not dominant in its field. The term "small governmental jurisdiction" is defined as the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than 50,000.[20]

Small entities likely to be directly affected by this rulemaking within the meaning of SBREFA include DIs such as commercial banks, savings associations, and credit unions with assets of $600 million or less.[21]

Non-DIs that may be subject to the regulation that the Bureau is considering proposing include online lenders/platform lenders, non-DI community development financial institutions (CDFIs), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit lenders. The maximum size standard for any of these non-DIs to be considered small is $41.5 million in average annual receipts, though several have lower thresholds.[22]

---

[18] The Office of Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by the Office of Advocacy do not necessarily reflect the views of the SBA or the Administration.

[19] U.S. Small Bus. Admin., *Table of Small Business Standards Matched to North American Industry Classification System Codes* (effective Aug. 19, 2019), https://www.sba.gov/sites/default/files/2019-08/SBA%20 Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.

[20] See 5 U.S.C. 601(3) through (6).

[21] The North American Industry Classification System (NAICS) codes for these types of DIs are 522110, 522120, and 522130. Directly affected entities could potentially also fall into the category of credit card issuing institutions (NAICS 522210); these entities are considered small if they have assets of $600 million or less.

[22] The Bureau believes the types of small non-DIs discussed above are most commonly represented by the following NAICS codes, together with the maximum average annual receipts to be considered a small entity under each NAICS code:

> 522220—Sales financing—$41.5 million
> 522291—Consumer lending—$41.5 million
> 522292—Real estate credit—$41.5 million
> 522310—Mortgage and nonmortgage loan brokers—$41.5 million

AdminRecord-001564

During the Panel outreach meeting, SERs will provide the Panel with important advice and recommendations on the potential impacts of the proposals under consideration. They may also provide feedback on regulatory alternatives to minimize these impacts. In addition, the Dodd-Frank Act directs the Bureau to collect the advice and recommendations of SERs concerning whether the proposals under consideration might increase the cost of credit for small entities and alternatives which accomplish the stated objectives of applicable statutes and which minimize any such increase.

Within 60 days of convening, the Panel is required to complete a report on the input received from the SERs during the Panel process. The Bureau will consider the SERs' feedback and the Panel's report as it prepares the proposed rule. Once the proposed rule is published, the Bureau is required to place the Panel's final report in the public rulemaking record. The Bureau also welcomes further feedback from the SERs during the public comment period on the proposed rule.

The Bureau is convening a Panel to obtain input from the selected SERs on proposals under consideration for small business lending data collection pursuant to section 1071 of the Dodd-Frank Act. The Bureau has prepared this Outline of Proposals Under Consideration and Alternatives Considered (Outline) to provide background to the SERs and to facilitate the Panel process. However, the Panel process is only one step in the rulemaking process. No FI will be required to comply with new regulatory requirements before a proposed rule is published, public comment is received and reviewed by the Bureau, a final rule is issued, and the implementation period designated in the final rule concludes. One of the specific questions on which the Bureau seeks input during this SBREFA process is how long small FIs would need to conform their practices to the proposals under consideration.

The Bureau is also conferring with other Federal agencies, including the other prudential regulators, and it is seeking feedback from a wide range of other stakeholders on the proposals under consideration. Stakeholders are welcome to provide written feedback on the Bureau's proposals under consideration by emailing it to 2020-SBREFA-1071@cfpb.gov. The Bureau requests written feedback from SERs by November 9, 2020 in order to be considered and incorporated into the Panel Report.[23] The Bureau requests that other stakeholders wanting to provide feedback do so no later than December 14, 2020.

---

522320—Financial transactions processing, reserve, and clearinghouse activities—$41.5 million
532411—Commercial air, rail, and water transportation equipment rental and leasing—$35.0 million
813410—Civic and social organizations—$8.0 million

As discussed above, a "small organization" is any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, and "small governmental jurisdictions" are the governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.

[23] Written feedback from SERs will be appended to the Panel Report. Feedback from other stakeholders may also be subject to public disclosure. Sensitive personal information, such as account numbers or Social Security numbers, or names of other individuals, should not be included. SERs and other stakeholders considering submitting proprietary or confidential business information should contact 2020-SBREFA-1071@cfpb.gov in advance to discuss whether and how that information should be provided.

AdminRecord-001565

## III.  Proposals Under Consideration to Implement Section 1071 of the Dodd-Frank Act Regarding Small Business Lending Data Collection, and Alternatives Considered

Section 1071 requires FIs to compile, maintain, and submit to the Bureau certain data on applications for credit for women-owned, minority-owned, and small businesses in accordance with regulations that the Bureau adopts.  The purpose of section 1071 is two-fold: (1) to facilitate enforcement of fair lending laws (fair lending purpose), and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses (community development purpose).

In this part III, the Bureau first discusses the overall scope of the proposals it is considering to implement section 1071.  The Bureau then discusses several key definitional issues under consideration—what FIs would be covered by the rule, what is a "small business" applicant about which FIs must collect and report information, what are "women-owned businesses" and "minority-owned businesses," what credit products require reporting, and what constitutes an application.

Next, the Bureau discusses the data points enumerated in section 1071 as well as a small number of discretionary data points the Bureau is considering proposing.  In addition, the Bureau addresses several other statutory provisions regarding shielding 1071 data from underwriters and other persons; applicants' right to refuse to provide certain information; compiling, maintaining, and reporting 1071 data to the Bureau; and privacy considerations and publication of 1071 data by the Bureau.  Finally, the Bureau addresses an implementation period under consideration for the eventual final rule under section 1071.

The purpose of this Outline and the convening of the Panel is to obtain feedback on these proposals under consideration from the selected SERs to inform the Bureau's next major step, a proposed rulemaking to implement section 1071.  The Bureau will also consider feedback it receives from other stakeholders outside the SBREFA process as it prepares to issue a proposed rulemaking.

Throughout this Outline, the Bureau lists questions it would like SERs to answer regarding its proposals under consideration and potential alternatives.  These questions are numbered sequentially throughout this Outline for ease of reference, and begin here:

Q1.  Are there any relevant Federal laws or rules which may duplicate, overlap, or conflict with the Bureau's proposals under consideration beyond those discussed in Appendix C?  How might the Bureau's proposals under consideration for implementing section 1071 impact other aspects of ECOA/Regulation B compliance?

### A. Scope of proposed rule

Section 1071(b) states that "in the case of any application to a financial institution for credit for [a] women-owned, minority-owned, or small business, the financial institution shall—(1) inquire

AdminRecord-001566

whether the business is a women-owned, minority-owned, or small business." That is, the text of section 1071 can be read to include data collection for credit applications for all small businesses as well as for women-owned and minority-owned businesses that are not small.

Most existing businesses, including almost all women-owned and minority-owned businesses, are "small business concerns" as that term is currently defined by the SBA.[24] It is therefore likely that reporting applications for all small businesses would also result in reporting applications for nearly all women-owned and minority-owned businesses. In the U.S. Census Bureau's 2018 Annual Business Survey, 5.7 million firms (99.6 percent of all employer firms) are small, as defined within that survey as having fewer than 500 employees.[25] That same definition covers one million minority-owned employer firms (99.9 percent of all minority-owned firms) and 1.1 million women-owned employer firms (99.9 percent of all women-owned firms).[26] Among non-small businesses (*i.e.*, 0.4 percent of all firms nationally), 10 percent of this small fraction are minority-owned firms and 13 percent are women-owned.[27]

In light of the comprehensive coverage of women-owned and minority-owned businesses within the scope of small businesses, the Bureau is considering proposing that the data collection and reporting requirements of its eventual 1071 rule would apply to any application to an FI for credit only for small businesses, to be defined as discussed in part III.C. The Bureau is concerned that a requirement to collect and report 1071 data on applications for women-owned and minority-owned businesses that are not small businesses could affect all aspects of FIs' commercial lending operations while resulting in limited information beyond what would already be collected and reported about women-owned and minority-owned small businesses. In addition, financing for large businesses can be much more varied and complex than are the products used for small business lending. Thus, under the approach the Bureau is considering proposing, FIs would collect and report lending data for all applicants that satisfy the Bureau's definition of a small business, including identifying women-owned and minority-owned businesses within that pool, but FIs would not be required to collect and report 1071 data for women-owned and minority-owned businesses that are not "small."

Q2.    Please provide feedback and information on the approach the Bureau is considering regarding the scope of its section 1071 rulemaking particularly the proposal to limit

---

[24] See part III.C below for additional discussion regarding defining the term "small business" for purposes of implementing section 1071.

[25] *See* U.S. Census Bureau, *2018 Annual Business Survey*. *See generally* https://www.census.gov/programs-surveys/abs.html (last visited Aug. 26, 2020).

[26] According to the 2018 Annual Business Survey, there are approximately 1 million minority-owned firms and 1.1 million women-owned firms in the U.S. Approximately 270,000 firms (5 percent of all firms), cannot be classified as to the race, sex, or ethnicity of owners. Firms generally are unclassified because no owners have a 10 percent or greater ownership in the business.

[27] *See* U.S. Census Bureau, *2018 Annual Business Survey*. Approximately 1,100 women-owned firms and approximately 900 minority-owned firms are large (based on a 500-employee threshold). For more on how the Census defines "women-owned" and "minority-owned" for the purposes of the Annual Business Survey, *see* https://www.census.gov/programs-surveys/abs/technical-documentation/methodology.html.

AdminRecord-001567

reporting to applicants that satisfy the Bureau's definition of a "small business." Are there any alternative approaches the Bureau should consider?

Q3.    How often does your FI make loans to businesses that are not "small"? Would you anticipate any specific complexities or costs in identifying women-owned and/or minority-owned applicants that are not small businesses, and collecting 1071 data about their applications for credit?

Q4.    Does the credit process at your FI for non-small business applicants differ materially from the process for small business applicants? If so, how does it differ? Are there any other aspects of lending to large businesses that the Bureau should be aware of as it is determining the overall scope of its eventual 1071 rule?

## B. Definition of "financial institution" (lender coverage)

Section 1071 imposes data collection and reporting requirements on FIs with respect to "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business." This part III.B addresses a general definition for the term "financial institution" before addressing the possibility of exemptions based on asset size (for DIs) and/or small business lending activity, and issues specific to FIs that are not the lender of record.

### 1.    General definition of "financial institution"

Section 1071(h)(1) defines the term "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." The Bureau is considering proposing a general definition of "financial institution" consistent with the section 1071 definition. The Bureau notes that Regulation B, which implements ECOA, has not otherwise defined this term.

Under this definition, the rule's data collection and reporting requirements may apply to a variety of entities that engage in small business lending—including, potentially, DIs (*i.e.*, banks, savings associations, and credit unions), online lenders/platform lenders, CDFIs (both DI and non-DI), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit non-DI lenders.

The Bureau notes that several other key definitions will determine whether or not an FI has a duty to collect and report data on credit applications under section 1071. In addition to satisfying this general definition of "financial institution," receiving applications (as discussed in part III.F) for covered lending products (part III.E) for small businesses (part III.C) are all necessary to trigger a duty to collect and report data on credit transactions under section 1071.

Q5.    Please provide feedback and information on the approach the Bureau is considering regarding the general definition of "financial institution," along with any alternative approaches the Bureau should consider.

AdminRecord-001568

### 2.    Possible exemptions

In light of the regulation's potentially broad application to FIs, the Bureau is considering whether either or both a size-based or activity-based test might be appropriate to determine when an FI must collect and report 1071 data or should be exempt, given section 1071's statutory purposes. The Bureau is concerned that the smallest FIs, or those with the lowest volume of small business lending, might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with an eventual 1071 rule, which could be contrary to the community development purpose of section 1071 and could also be contrary to one of the general purposes of the Bureau, to facilitate access to credit. Specifically, the Bureau is considering whether DIs with assets under a given threshold should be exempt from collecting and reporting (size-based exemption). In addition, the Bureau is considering whether to require FIs to collect and report 1071 data only if they exceed either a specified number or dollar value of small business loans originated in a specified period (activity-based exemption). The Bureau is also considering whether to use a size-based test together with an activity-based test to determine coverage under its 1071 rule. These approaches are addressed in turn below.

Q6.    Please provide feedback and information on the approach the Bureau is considering regarding the possible exemptions for FIs based on size and/or activity, along with any alternative approaches the Bureau should consider.

Q7.    How does your FI currently track applications and/or originations (by number of loans and/or dollars)? Does this differ between DIs and non-DIs? What do you anticipate the potential costs would be to track whether your FI qualifies under an activity-based exemption metric?

Q8.    What compliance costs would cause your FI to stop or decrease your small business lending?

Q9.    Are there certain types of FIs, such as governmental lending entities or non-profit non-DI lenders, that the Bureau should consider not including within 1071's data collection and reporting requirements? If so, why?

#### i.    Size-based exemption

The Bureau is considering whether to exempt DIs with assets under a given asset threshold from section 1071's data collection and reporting requirements. This size-based approach could provide a straightforward exemption for very small DIs and avoid the need for those entities to measure or monitor their small business lending activity in order to determine whether they are exempt from the Bureau's 1071 rule. The Bureau is considering the following possible asset-based exemption threshold levels:

- Option A Exemption Level: $100 million in assets

- Option B Exemption Level: $200 million in assets

AdminRecord-001569

For purposes of this exemption, a DI's asset size as of the end of the last calendar year, or the end of both of the last two calendar years, might be proposed.

The Bureau selected these possible exemption levels to obtain feedback as it continues to explore how best to fulfill section 1071's statutory purposes while attempting to minimize compliance burden. Based on 2018 FFIEC and NCUA Call Reports,[28] the Bureau estimates that under the Option A exemption level, roughly 48 percent of all DIs would be excluded from 1071 collection and reporting requirements. However, DIs that would not be exempt under Option A originate, and would report, over 99 percent of small business loans made by DIs (according to Call Reports).[29] Estimates of the number of small DIs that would be covered under each of the thresholds in this part III.B.2.i and in part III.B.2.ii are provided in part IV.B below. (The Bureau does not have data that would allow it to precisely estimate the share of applications that would be covered.) However, an asset-based approach to measuring an FI's size would only be applicable to DIs, where size is determined by reported assets.

> Q10. Please provide feedback and information on the approach the Bureau is considering regarding a size-based exemption, along with any alternative approaches the Bureau should consider. For example, would a different asset size be more appropriate for a size-based exemption and, if so, why? Should the exemption be triggered upon meeting the threshold in one or two consecutive calendar years?

### ii. Activity-based exemption

The Bureau is considering whether only FIs that engage in a certain amount of small business lending activity should be required to collect and report 1071 data. The Bureau is considering several possible activity-based threshold levels, each defined by an FI's annual number of small business loans originated or the FI's annual total dollar value of small business loans originated. (That is, if either measurement is exceeded, then the FI must collect and report 1071 data.) In particular, the Bureau is considering the following three possible activity-based thresholds:

- Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million

- Option 2 Exemption Threshold: originations of at least 50 loans or $5 million

- Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

These possible activity-based thresholds could be based on the FI's lending as of the end of the last calendar year, or the end of both of the last two calendar years. Unlike the potential size-based exemption, an activity-based exemption could apply to DIs and non-DIs alike.

---

[28] It should be noted that, as discussed above, the Call Reports do not provide comprehensive data across all small business lending. The Call Reports cover lending by DIs only; there are no non-DI lending data included. In addition, the bank Call Report uses small loans to businesses as a proxy for loans to small businesses.

[29] For purposes of this Outline, the Bureau used data from the credit union and bank Call Reports that were accessed on June 10, 2020.

AdminRecord-001570

Using the 2018 Call Report data, the Bureau estimates that under the Option 1 Exemption Threshold, roughly half of all DIs would be excluded from 1071 collection and reporting requirements, while the share of small business loan originations by DIs would be in excess of 99 percent.  (As noted above, the Bureau does not have data that would allow it to estimate the number of applications that would be covered, or the number/value of loans, or applications, from non-DIs.)

> Q11.   Please provide feedback and information on the approach the Bureau is considering regarding an activity-based exemption, along with any alternative approaches the Bureau should consider.  For example, would a different number and/or volume of loans be more appropriate for an activity-based exemption and, if so, why?  Should the exemption be triggered on meeting the threshold in one or two consecutive calendar years?

### iii. Combined size- and activity-based exemptions

The Bureau is exploring whether to combine the size- and activity-based approaches to possible collection and reporting exemptions for FIs.  Under a combined approach, an FI would be required to collect and report 1071 data if it exceeds either a given annual number of small business loans originated or annual total dollar value of small business loans originated during the relevant time period.  However, DIs with assets under a given asset threshold would be exempt from reporting, regardless of the number or dollar value of small business loans they originated during the relevant time period.

> Q12.   Please provide feedback and information on the approach the Bureau is considering regarding a combined size- and activity-based exemption, along with any alternative approaches the Bureau should consider.  For example, would different asset sizes or number and/or volume of loans be more appropriate for a combined size- and activity-based exemption and, if so, why?

## 3.    Financial institutions that are not the lender of record

Section 1071's requirement to collect and report certain data for any "application to a financial institution for credit" could be read as applying to more than one FI when an intermediary provides the application to another institution that takes final action on the application.  This broad reading may serve a useful function (such as comprehensive reporting by all FIs involved in a small business lending transaction) but could also generate duplicative compliance costs for FIs and potentially detract from the quality of reported 1071 data, increasing the risk that certain applications are reported multiple times.

The Bureau is considering proposing that in the situation where more than one party is involved on the lender side of a single small business loan or application, section 1071's data collection and reporting requirements would be limited in the same manner as in Regulation C, which implements the Home Mortgage Disclosure Act (HMDA).  Under the Regulation C approach, reporting responsibility depends on which institution made the final credit decision.  If there was an origination, then the FI making the credit decision approving the application would be responsible for reporting (even if the FI used credit standards set by another party).  If more than

AdminRecord-001571

one FI approved a loan, and the loan was purchased after closing by one of the FIs approving the loan, the purchaser (such as an assignee) would report the loan. If there was no origination and multiple FIs received the same application, then any FI that made a credit decision would be responsible for reporting (even if other FIs also reported on the same potential non-originated application).[30]

> Q13. Please provide feedback and information on the approach the Bureau is considering regarding treatment of FIs that are not the lender of record, along with any alternative approaches the Bureau should consider.

## C. Definition of "small business" applicants

While part III.B above addresses how the Bureau might define FIs and which of them may be covered by an eventual 1071 rule, this part III.C addresses what is a "small business" applicant for which FIs must collect and report information. Section 1071(h)(2) defines the term "small business" as having the same meaning as "small business concern" in section 3 of the SB Act (15 U.S.C. 632).[31] The SB Act provides a general definition of a "small business concern," authorizes SBA to establish detailed size standards for use by all agencies, and permits an agency to request SBA approval for a size standard specific to an agency's program. As a general matter, the Bureau is considering proposing to define "small business" by cross-referencing the SBA's general definition of "small business concern," but adopting a simplified size standard for purposes of its section 1071 rule. Consistent with the statutory requirements, the Bureau will seek SBA approval for a simplified size standard if it ultimately decides to take this approach. The Bureau understands that implementing this approach will necessitate close coordination with, and approval from, the SBA.

The SBA's regulations define a "business concern" as "a business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor."[32] Thus, FIs would not be required to collect and report 1071 data for not-for-profit applicants, because they are not "organized for profit" and are thus not a "business concern."[33] A business concern may take a number of different legal forms, including a sole proprietorship, partnership, LLC, corporation, joint

---

[30] The Bureau's rules, including any eventual 1071 rule, generally do not apply to motor vehicle dealers, as defined in section 1029(f)(2) of the Dodd-Frank Act, that are predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both. 12 U.S.C. 5519.

[31] 15 U.S.C. 1691c-2(h)(2).

[32] See 13 CFR 121.105.

[33] The Bureau notes that this definition is specifically for business concern. As discussed in part II above, small entities for purposes of the RFA with whom the Bureau must consult via this SBREFA process are small business concerns, small organizations (i.e., not-for-profit enterprises), and small governmental jurisdictions. Thus, while application data for not-for-profit applicants would not be required to be reported under a section 1071 rule if the Bureau were to adopt this aspect of the SBA's definition of "business concern," this definition does not in any way preclude not-for-profit lenders from being subject to 1071.

AdminRecord-001572

venture, trust, or cooperative.[34]  Because the definition is limited to American businesses, if the Bureau adopted this definition for purposes of 1071, loans to foreign companies would be outside the scope of 1071 data collection and reporting requirements.

The SB Act defines a *small* business concern as a business that is "independently owned and operated and which is not dominant in its field of operation"[35] and empowers the Small Business Administrator (Administrator) to prescribe detailed size standards by which a business concern may be categorized as a small business.  These size standards may use number of employees, dollar volume of business, net worth, net income, a combination of these, or other appropriate factors.[36]  For the most part, the industry-specific size standards adopted by the SBA, classified by six-digit North American Industry Classification System (NAICS) codes, are expressed in terms of the average annual receipts or the average number of employees of a business concern.[37]  In determining whether a business concern is "small," the SBA's regulations provide that the average annual receipts or average number of employees, as applicable, must be calculated by adding the average annual receipts/average number of employees of the business concern with the average annual receipts/average number of employees of any affiliates.[38]  Thus, the size of an applicant would be considered together with the size of any affiliates in determining whether the applicant is a small business for purposes of section 1071.

The SB Act provides that Federal agencies other than the SBA may prescribe a size standard for categorizing a business as a small business concern only where certain specific criteria are met.  Among other things, the proposed size standard must provide for determining size based on (1) a manufacturing concern's average employment over the preceding 12 months; (2) a service business's annual average gross receipts over at least 5 years; (3) the size of other business concerns on the basis of data over at least 3 years; or (4) other appropriate factors.  In addition, the proposed size standard must be approved by the Administrator.  Additional procedural requirements are set out in the SB Act and SBA's regulations.[39]

---

[34] 13 CFR 121.105(b).

[35] 15 U.S.C. 632(a)(1).

[36] 15 U.S.C. 632(a)(2)(A) and (B).

[37] *See* 13 CFR 121.201; U.S. Small Bus. Admin., *Table of size standards*, https://www.sba.gov/document/support--table-size-standards (effective as of Aug. 19, 2019).  SBA's methodologies for calculating average annual receipts and average number of employees of a firm are set forth in 13 CFR 121.104 and .106, respectively.

Over one thousand industries are assigned a specific size standard in SBA's regulations.  For example, NAICS code 238160 pertains to roofing contractors, with a size threshold of $16.5 million in average annual receipts.  These industry-specific size standards may be used by Federal agencies to define small businesses for the agencies' purposes without specific SBA approval or separate statutory authority.  *See* 13 CFR 121.201.

[38] 13 CFR 121.104(d)(1) and 121.105(b)(4)(i).

[39] For example, the SBA requires that the agency seeking to adopt an alternate size standard must consult in writing with the SBA's Division Chief for the Office of Size Standards in advance of issuing a notice of proposed rulemaking containing the proposed alternate size standard.  This written consultation must include: (i) what size standard the agency contemplates using; (ii) to what agency program it will apply; (iii) how the agency arrived at this particular size standard; and (iv) why SBA's existing size standards do not satisfy the program requirements.  13 CFR 121.903(a)(2).  The agency must provide a copy of the published proposal to the Division Chief for the Office of Size Standards, and the SBA Administrator must approve the size standard before the agency adopts the

AdminRecord-001573

As a general matter, the Bureau believes that the better approach is to use a simpler, more straightforward approach to the size standard aspect of the "small business" definition for purposes of its 1071 rule. Such an approach would assist both FIs and applicants seeking to quickly understand whether a business is "small" and to employ a workable size standard for 1071 without navigating the potential complexities of determining the appropriate six-digit NAICS code, and then the relevant size standard based on that NAICS code, for each applicant. Adopting a simplified approach will necessitate close coordination with, and approval from, the SBA.

The Bureau is considering three alternative approaches for a simpler size standard. These three approaches to determining whether an applicant is small, described in more detail below, would use: (1) only gross annual revenue; (2) either the number of employees or average annual receipts/gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services; or (3) size standards across 13 industry groups that correspond to two-digit NAICS code industry groupings. The proportions of small businesses covered under each of these alternatives is discussed in part IV.F.4 below. Absent approval from the SBA to adopt one of these alternatives, however, the Bureau would have to use the SBA's existing size standards.

Under the <u>first alternative</u>, the Bureau is considering proposing a size standard using the gross annual revenue of the applicant business in the prior year, with a potential "small" threshold of $1 million or $5 million.

Under the <u>second alternative</u>, the Bureau is considering proposing a size standard of a maximum of 500 employees for manufacturing and wholesale industries and a maximum of $8 million in gross annual revenue for all other industries.[40] The Bureau selected 500 employees as a potential threshold for manufacturing and wholesale industries because that figure is the most common of the SBA's employee-based size standards. The Bureau selected $8 million for all other industries because that figure is the most common size standard threshold for average annual receipts; the Bureau is considering using gross annual revenue, rather than the SBA's average annual receipts, for consistency with the 1071 statutorily required gross annual revenue data point (see part III.G.1.xi below for discussion of this data point).

Under the <u>third alternative</u>, the Bureau is considering proposing a size standard using gross annual revenue or the number of employees based on a size standard in each of 13 two-digit NAICS code categories that applies to the largest number of firms within each two-digit NAICS

---

final rule or otherwise prescribes the size standard for its use. 13 CFR 121.903(a)(5). (Where an agency is developing a size standard for the sole purpose of performing an RFA analysis pursuant to 5 U.S.C. 601(3), however, the agency must consult with SBA's Office of Advocacy to establish an alternate size standard. 13 CFR 121.903(c).)

[40] Specifically, under this approach, the Bureau first considered the total number of employer firms in each NAICS six-digit industry, based on the 2017 Statistics of US Businesses. Next, across all industries, the Bureau determined how many unique size standards are applied and the total number of employer firms to which each unique standard is applied. The simplified standards under this second alternative are the ones that apply to the largest number of firms within manufacturing and wholesale industries (based on number of employees) and for all other industries (based on average annual receipts).

AdminRecord-001574

code category.[41]  Applying the SBA's 2019 size standards, the third alternative would result in eight different size standards across the 13 categories, as follows:

**Table 1: Size standards under the third alternative for each of
13 two-digit NAICS code categories**

| Two-digit NAICS code | Industry description | Type of standard | Size standard |
|---|---|---|---|
| 11 | Agriculture, forestry, fishing and hunting | Receipts | $8 million |
| 21 | Mining, quarrying, and oil and gas extraction | Receipts | $41.5 million |
| 22 | Utilities | Receipts | $30 million |
| 23 | Construction | Receipts | $16.5 million |
| 31–33 | Manufacturing | Employee | 500 |
| 42 | Wholesale trade | Employee | 100 |
| 44–45 | Retail trade | Receipts | $8 million |
| 48–49 | Transportation and warehousing | Receipts | $30 million |
| 51 | Information | Receipts | $35 million |
| 52–53 | Finance and insurance, Real estate and rental and leasing | Receipts | $8 million |
| 54 | Professional, scientific, and technical services | Receipts | $16.5 million |
| 55 | Management of companies and enterprises | Receipts | $22 million |
| 56–81 | Administrative and support and waste management and remediation services; Educational services; Health care and social assistance; Arts, entertainment, and recreation; Accommodation and food services; Other services (except public administration) | Receipts | $8 million |

This third alternative is significantly less complex than the full six-digit NAICS code standard, although it is based on the SBA's existing size standards and the thresholds vary by industry.

The Bureau is not planning to propose requiring that FIs verify information provided by applicants necessary for determining whether an applicant is "small" (such as the total number of employees), regardless of the Bureau's approach to a small business size standard.  Rather, the FI would generally report the information as provided by the applicant.  However, if the FI verifies such information for its own purposes, it would report the verified information to the Bureau.

As noted in part I above, there are a number of Federal statutes and regulations that are closely related to section 1071, including several that define, or employ proxies for, identifying small businesses or loans originated to small businesses.  These are enumerated in Appendix C.

---

[41] Specifically, under this approach, the Bureau first considered the total number of employer firms in each NAICS six-digit industry, based on the 2017 Statistics of US Businesses.  Next, within each NAICS two-digit industry, the Bureau determined how many unique size standards are applied within that two-digit industry and the total number of employer firms to which each unique standard is applied.  The simplified standard for each NAICS two-digit industry is the one that applies to the largest number of firms within that industry.

AdminRecord-001575

Q14.   Please provide feedback and information on the approach the Bureau is considering regarding the definition of "small business," along with any alternative approaches the Bureau should consider. For example, should the Bureau include or exclude applications from particular types of borrowers from the scope of its eventual 1071 rule in addition to or differently than as described herein?

Q15.   What would the costs be to implement a small business definition based on each of the three alternatives above? (If these potential costs are difficult to quantify, you are invited to describe these costs qualitatively, such as small, medium, or large.) Are there any particular complexities you anticipate under any of the alternatives presented?

Q16.   Are you familiar with the SBA's six-digit NAICS code-based size standards, and does your FI currently use them for any purpose? What would the cost be to implement a small business definition based on the SBA's size standards?

## D. Definitions of "women-owned business," "minority-owned business," and "minority individual"

Section 1071 imposes data collection and reporting requirements on FIs with respect to "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business." Section 1071(h)(6) defines a business as a "women-owned business" if (A) more than 50 percent of the ownership or control is held by one or more women; and (B) more than 50 percent of the net profit or loss accrues to one or more women. Similarly, section 1071(h)(5) defines a business as a "minority-owned business" if (A) more than 50 percent of the ownership or control is held by one or more minority individuals; and (B) more than 50 percent of the net profit or loss accrues to one or more minority individuals.

Section 1071 does not define the term "minority individual." However, section 1071(h)(5) does define the term "minority" as having the same meaning as in section 1204(c)(3) of the Financial Institution Reform, Recovery, and Enforcement Act of 1989 (FIRREA). FIRREA defines "minority" to mean any Black American, Native American, Hispanic American, or Asian American.[42]

The Bureau is considering proposing guidance that would clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. This guidance, which would mirror the terminology of HMDA's aggregate categories, would also clarify that a multi-racial person could be considered a minority individual.

The Bureau also is considering proposing clarifications for the definition of "women-owned business" and "minority-owned business" by using simpler language that mirrors the concepts of ownership and control that are set forth in the Financial Crimes Enforcement Network's

---

[42] Section 1204 of Public Law 101-73, 103 Stat. 521.

18

customer due diligence (CDD) rule.[43]  The Bureau is also considering proposing simplified applicant-facing materials to aid industry in collecting this information.  Specifically, for these applicant-facing materials and industry clarifications, the Bureau is considering proposing the following definitions: (1) "ownership" to mean directly or indirectly having an equity interest in a business  (*i.e.*, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, owning an equity interest in the business); (2) "control" of a business to mirror the CDD rule, where it means having significant responsibility to control, manage, or direct a business; and (3) the "accrual of net profit or loss" with reference to generally accepted accounting practices and any applicable Internal Revenue Service standards.

Q17.  Please provide feedback and information on the approach the Bureau is considering regarding the definitions of "women-owned business," "minority-owned business," and "minority individual," along with any alternative approaches the Bureau should consider.

Q18.  What are the legal or ownership structures of the businesses that typically apply for small business loans from your FI (*i.e.*, sole proprietorship, partnership, limited liability company, "S" corporation, etc.)?  Do those businesses typically have an indirect ownership structure (*i.e.*, ownership interests are held by other entities)?  What persons or group of persons are typically responsible for the operations of such business (*i.e.*, whether a managing member, two or more partners, a CEO, or some other person or group of persons)?

Q19.  Do you foresee any difficulties in using the CDD standards for purposes of 1071 data collection?  Do your FI and/or your small business applicants routinely apply the concepts of "ownership" or "control" in a manner that does not align with the CDD rule?  If so, what concepts do they use?

### E.  Product coverage

#### 1.    Covered products

Section 1071 requires FIs to collect and report information regarding any application for "credit" made by women-owned, minority-owned, and small businesses.  Although the term "credit" is not specifically defined in section 1071, ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."[44]  The Bureau is considering

---

[43] 31 CFR 1010.230.  The CDD rule requires covered financial institutions to establish and maintain policies and procedures that are reasonably designed to identify and verify the identity of beneficial owners of legal entities that open accounts.  Currently, many applicants must respond to questions about who "owns" and who "controls" a business when completing forms or otherwise responding to a covered financial institution's inquiries related to the CDD rule.  The Bureau is considering mirroring the concepts of "ownership" and "control" that are set forth in the CDD rule because most financial institutions and many applicants are likely to be familiar with such concepts.

[44] 15 U.S.C. 1691a(d); *see also* 12 CFR 1002.2(j).

AdminRecord-001577

proposing that a covered product under section 1071 is one that meets the definition of "credit" under ECOA and is not otherwise excluded from collection and reporting requirements.

Specifically, the Bureau is considering proposing that covered products under section 1071 include term loans, lines of credit, and business credit cards. Term loans, lines of credit, and business credit cards meet the definition of "credit" under ECOA. Term loans, lines of credit, and business credit cards, collectively, make up the majority of business financing products used by small businesses and are an essential source of financing for such businesses.[45] As such, inclusion of these products in the Bureau's 1071 rule is important to fulfilling the purposes of section 1071.

The Bureau is considering proposing that the following products not be covered by the 1071 rule, as discussed in part III.E.2 below: consumer credit used for business purposes, leases, trade credit, factoring, and merchant cash advances (MCAs).

> Q20. Please provide feedback and information on the approach the Bureau is considering regarding covered products and use of the ECOA definition of "credit" for purposes of defining covered products under section 1071, along with any alternative approaches the Bureau should consider. Are there any products that should or should not be covered by the Bureau's eventual 1071 rule, and if so why?

> Q21. What challenges would you anticipate if leases, trade credit, factoring, or MCAs or some subset(s) thereof, were included as covered products under the 1071 rule? Do you have suggestions on how to mitigate or resolve those challenges? If a subset of any of these products were included, do you have suggestions on how to define such a subset, what to include, and why (for example, including only capital leases as a covered product or only including a subset of MCAs)?

> Q22. Would the costs to collect, check, and report 1071 data differ across products? If so, why? Would these differences impact one-time costs to set up 1071 reporting, ongoing costs each year, or both?

## 2. Products not covered

The Bureau is considering proposing that the following products not be covered products under the 1071 rule: consumer credit used for business purposes, leases, trade credit, factoring, and MCAs. These products are discussed in turn below in this part III.E.2.

### i. Consumer credit used for business purposes

The Bureau is considering proposing to clarify that covered products (including term loans, lines of credit, and business credit cards) are limited to products designated by the creditor as business purpose products (business-designated products), and that covered products under section 1071 do not include products designated by the creditor as consumer purpose products (consumer-

---

[45] *See* Bureau of Consumer Fin. Prot., *Key dimensions of the small business lending landscape*, at 21-22 (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

AdminRecord-001578

designated credit).  Not including consumer-designated credit as a covered product under a 1071 rule makes it clear that the financing proceeds reported will be used for business purposes.  This approach would greatly simplify the regulatory effort necessary to identify, and for FIs to distinguish, business uses of consumer products.

### ii.  Leases

A leasing transaction generally refers to an agreement in which a lessor transfers the right of possession and use of a good or asset to a lessee in return for consideration.[46]  The Bureau is considering proposing that leases not be a covered product under section 1071 unless the product is a credit sale.  For purposes of section 1071, the Bureau is considering proposing a definition of "credit sale" similar to the Regulation Z definition of that term as a transaction in which the lessor is a creditor and the lessee (i) agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and services involved; and (ii) will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement."[47]

The Bureau is considering this approach since including leases may add additional complexity or reporting burden given the unique structure of the transactions.

### iii.  Trade credit

Under Regulation B, trade credit refers to a "financing arrangement that involves a buyer and a seller—such as a supplier who finances the sale of equipment, supplies, or inventory; it does not apply to an extension of credit by a bank or other financial institution for the financing of such items."[48]  Thus, trade credit typically involves a transaction in which a seller allows a business to purchase its own goods without requiring immediate payment, and the seller is not otherwise in the financial services business.  Businesses offering trade credit generally do so as a means to facilitate the sale of their own goods and not as a stand-alone financing product.

The Bureau is considering proposing that trade credit not be a covered product under section 1071.  Trade credit can be offered by entities that are themselves very small businesses; the Bureau is concerned that these entities, in particular, may incur large costs relative to their size to collect and report 1071 data in an accurate and consistent manner.[49]

---

[46] *See* U.C.C. Art. 2A-103(1)(j) (defining a "lease").

[47] *See* 12 CFR 1026.2(16).

[48] Regulation B (12 CFR part 1002) comment 9(a)(3)-2.

[49] *See* Leora Klapper et al., *Trade Credit Contracts*, at 838-67 (The Review of Financial Studies, vol. 25, issue 3, 2012), https://academic.oup.com/rfs/article/25/3/838/1616515; and Justin Murfin & Ken Njoroge, *The Implicit Costs of Trade Credit Borrowing by Large Firms*, at 112-145 (The Review of Financial Studies, vol. 28, issue 1, 2015), https://academic.oup.com/rfs/article/28/1/112/1681329.

AdminRecord-001579

### iv. Factoring

Under Regulation B, factoring is "a purchase of accounts receivable;"[50] in such arrangements, a business generally sells its unpaid invoices at a discount to a factor. The Bureau is considering proposing that factoring not be a covered product under section 1071. As noted in the official interpretations to Regulation B, factoring arrangements are generally not considered subject to ECOA or Regulation B.[51]

### v. Merchant cash advances

MCAs are a form of short-term financing for small businesses that vary in form and substance. Under a typical MCA, a merchant receives a cash advance and promises to repay it (plus some additional amount) by either pledging a percentage of its future revenue (such as its daily credit and debit card receipts) or agreeing to pay a fixed daily withdrawal amount to the MCA provider until the agreed upon payment amount is satisfied. The Bureau is considering proposing that MCAs not be a covered product under section 1071 since including them may add additional complexity or reporting burden given the unique structure of the transactions.

## F. Definition of an "application"

Section 1071(b) requires that FIs collect and report to the Bureau certain information regarding "any application to a financial institution for credit." Thus, for covered FIs with respect to covered products, the definition of "application" will trigger data collection and reporting under section 1071. The term "application," however, is not defined in either section 1071 or ECOA, though it is defined in Regulation B.[52]

The Bureau is considering proposing to define an "application" largely consistent with the Regulation B definition of that term. That is, as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."[53] This definition appears to be flexible and may allow creditors to develop individually tailored requirements on what constitutes an "application" that fits within the context of their specific credit processes. Many creditors also likely will be familiar with this definition based on their experience providing adverse action notices under Regulation B.[54] In addition, the definition appears to be workable for both FIs that use written or online application forms and those that rely primarily on oral requests for credit. Finally, this approach could strike an appropriate balance by triggering the 1071 data collection requirement only after there is an actual request for credit (using the procedures defined by an FI, *i.e.*, an "application"), but still

---

[50] Regulation B comment 9(a)(3)-2 ("Factoring refers to a purchase of accounts receivable, and thus is not subject to the Act or regulation.").

[51] *Id.*

[52] 12 CFR 1002.2(f).

[53] *Id.*

[54] *See* 12 CFR 1002.9(a)(1) and (c) (requiring a creditor to provide notice within 30 days of taking adverse action on an incomplete application or within 30 days of receiving an incomplete application).

AdminRecord-001580

early enough in the process to capture incomplete, withdrawn, and denied applications, thus making the reported data more in line with section 1071's statutory purposes.

Although the Bureau is considering proposing a definition of "application" based on the Regulation B definition of that term, the Bureau is also considering proposing to clarify certain circumstances that would not be reportable under section 1071, even if certain of these circumstances are considered an "application" under Regulation B. These include:

- Inquiries/prequalifications: The Bureau is considering not covering inquiry or prequalification requests in the 1071 data collection and reporting requirements, including inquiry and prequalification requests that may constitute an "application" under Regulation B for purposes of its notification requirements.[55] The Bureau is concerned that including inquiry and prequalification requests could pollute the 1071 dataset, thus inhibiting identification of business and community development needs and opportunities. This approach would be consistent with Regulation C, which does not cover prequalifications and inquiries.[56]

- Reevaluation, extension and renewal requests, except requests for additional credit amounts: The Bureau is considering proposing that 1071 data collection and reporting requirements not cover borrower requests to modify the terms and/or duration of an existing extension of credit. Similarly, creditor-initiated reviews of existing credit extensions also would not be reportable. However, the Bureau is considering proposing to require collection and reporting of requests for additional credit amounts (line increases or new money on existing facilities) as these events go directly to the purposes of section 1071.

- Solicitations and firm offers of credit: The Bureau is considering proposing that FIs would not be required to collect and report 1071 data for FI prescreened solicitations or firm offers of credit unless the applicant responds in a manner that triggers an "application."

*Alternative definitions of "application" considered.* The Bureau considered possible alternative definitions of an "application" for purposes of 1071 data collection and reporting. Specifically, the Bureau has considered defining an "application" for purposes of 1071 by using Regulation B's definition of the term "completed application." That is, as an application in which the creditor has received "all the information that the creditor regularly obtains and considers" in evaluating similar products.[57] This definition could exclude incomplete applications and many withdrawn applications, thus making the reported data less in line with section 1071's statutory purposes. The Bureau also considered defining "application" as particular documents or specific data points that, if collected, would trigger a duty to collect and report 1071 data. The Bureau is

---

[55] *See* Regulation B (12 CFR part 1002) comments 2(f)-3 and 9-5. A request for credit that meets the "application" definition considered here would be reportable, even if that application had been preceded at some point in time by an inquiry or prequalification.

[56] Regulation C (12 CFR part 1003) comment 2(b)-2.

[57] 12 CFR 1002.2(f).

AdminRecord-001581

also disinclined to follow this approach as it could create confusion and uncertainty by introducing another definition of "application" to the regulatory landscape, which would require FIs to alter their existing practices, require product-specific definitions and alterations, and could distort lending processes by incenting FIs to delay gathering a particular data point or document in order not to be covered by the 1071 rule.

Q23. Please provide feedback and information on the approach the Bureau is considering regarding the definition of "application," along with any alternative approaches the Bureau should consider.

Q24. What is your FI's practice for defining applications for credit for small businesses? Is the Regulation B definition of "application" compatible with your FI's existing practices? What challenges do you anticipate if the Bureau were to adopt a largely consistent definition, and do you have any suggestions on how to mitigate or resolve those challenges?

## G. Data points

### 1. Mandatory data points

Section 1071(b) requires FIs to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. Section 1071(e)(1) requires each FI to compile and maintain a record of the information provided by any loan applicant pursuant to a request under section 1071(b). In addition, the statute states that the information compiled and maintained by an FI under section 1071 shall be itemized in order to clearly and conspicuously disclose a number of particular items that are enumerated in the statute. The Bureau refers to these particular items, together with the response to the inquiry under section 1071(b), as "mandatory data points." Appendix D provides a chart that summarizes the data fields and other key information for each data point.

In addition to specific questions identified for particular data points below, the Bureau seeks feedback from SERs on the following questions for all the mandatory data points in this part III.G.1:

Q25. Please provide feedback and information on the approach the Bureau is considering for each mandatory data point, along with any alternative approaches the Bureau should consider.

Q26. What would the costs be for collecting, checking, and reporting each data point? Do these costs differ by data point and if so, what data points would impose higher costs and why?

Q27. For each data point, how should the Bureau address reporting multiple products applied for via a single application? Should such requests be considered one "application" or multiple "applications"? If the Bureau required reporting of each

AdminRecord-001582

product separately, how would that affect your FI's costs to collect and report 1071 data?

### i. Whether the applicant is a women-owned business, a minority-owned business, and/or a small business

Section 1071 requires FIs to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. As noted in part III.D above, the Bureau is considering proposing clarifications for some of the terms used in the statutory definitions of women-owned business and minority-owned business as well as simplified applicant-facing materials to aid industry in collecting this information.

The Bureau is considering proposing that collection and reporting of women-owned and minority-owned business status be based solely on applicant self-reporting. If an applicant provides information on its women-owned and minority-owned business status, the FI would report that information and would have no obligation to verify whether the applicant was (or was not), in fact, a women-owned or minority-owned business. Thus, if an applicant does not provide information regarding whether it is a women-owned or minority-owned business, the FI would report that the information was not provided by the applicant. The Bureau is not considering proposing that FIs use visual observation or surname to determine the status of an applicant.

The Bureau is not considering proposing that FIs determine whether an applicant is a women-owned or minority-owned business based on the race, sex, and ethnicity of the applicant's principal owners (see part III.G.1.xii below for more information on this data point), but rather that this data point be self-reported by the applicant only. Section 1071 defines women-owned and minority-owned business status based on ownership *or* control, whereas race, sex, and ethnicity information is specified for principal *owners* only.

With respect to small business status, the Bureau is considering proposing that collection and reporting of whether an applicant for credit is a small business be based on applicant-reported information. If the FI verified the information, it would be required to use the verified information in reporting this data point; if the FI does not verify the information, it would report based on the information as provided by the applicant.

The nature of this inquiry regarding small business status, and the related data point, would depend on the ultimate definition of a small business in the Bureau's eventual 1071 rule. The approaches the Bureau is considering for that definition are discussed in part III.C above. In general, this data would consist of whether an applicant is a small business, and the reason for that determination (*e.g.*, applicant is a small business because it is engaged in manufacturing or wholesale and has fewer than 500 employees). For example, if the Bureau adopted a small business definition based on the second alternative approach under consideration discussed in part III.C above, this data point might be comprised of three data elements: first, whether the applicant is in a manufacturing or wholesale industry (yes or no); second, if yes, does the applicant have fewer than 500 employees (yes or no); and, third, if the applicant is not in a

25

AdminRecord-001583

manufacturing or wholesale industry, does it have less than $8 million in gross annual revenue (yes or no).

> Q28.   In the normal course of processing an application for small business credit, does your FI determine who owns and controls the entity applying for the financing (including the percentage of ownership and degree of control)?  If so, at what point in the application process and for what purposes?  Does your FI determine to whom an entity's profit and loss accrues or do they rely on ownership percentage?  Does an employee of your FI routinely meet with all of the individuals who own and control a small business applying for credit?

### ii.  Application/loan number

Section 1071(e)(2)(A) requires FIs to collect and report "the number of the application and the date on which the application was received."  (See part III.G.1.iii below for "application date.")  The Bureau is considering proposing that FIs report an alphanumeric application or loan number of no more than 45 characters that is unique, within the FI, to the referenced extension (or requested extension) of credit and that remains uniform through the application and origination stages of the process.  The FI would assign this number to an application, and the number would be reported as the application number if the credit applied for was not originated.  The same number would be reported as the loan number if the credit applied for was originated.  The application/loan number may not include any identifying information about the borrower.  The Bureau is considering proposing a structure for the method of assigning and reporting the application/loan number under section 1071 to follow HMDA/Regulation C formatting and other requirements, which may reduce initial software development costs.

> Q29.   How does your FI assign application/loan numbers for small business credit?  How does your FI assign application/loan numbers when a borrower requests multiple credit products at the same time?  Are there any circumstances in which you do not assign numbers for applications or originated small business credit?

### iii.  Application date

Section 1071(e)(2)(A) requires FIs to collect and report the "date on which the application was received."  The Bureau is considering proposing that FIs report the application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application" (as discussed in part III.F above).  This approach could provide flexibility and greater certainty for FIs using a form.  The Bureau is considering proposing that application date be reported with a day, month, and year.  Finally, the Bureau is also considering proposing that FIs have a grace period of several days on either side of the date reported to reduce the compliance burden of pinpointing an exact date on which an application was received.

### iv.  Loan/credit type

Section 1071(e)(2)(B) requires FIs to collect and report "the type and purpose of the loan or other credit being applied for" (see part III.G.1.v below for "loan/credit purpose").  The Bureau is considering proposing that FIs report the loan type data point via three sub-components: (1) Type of Loan Product (chosen from a specified list); (2) Type of Guarantee (chosen from a

AdminRecord-001584

specified list); and (3) Loan Term (in months).  For example, an FI might report a certain loan as a secured term loan with a personal guarantee by the business owner and a term of 20 months.  A list of types of loan product and types of guarantee are provided below.  The lists include choices for "Other," "Unknown," or "Other/Unknown," as appropriate, to facilitate compliance.

A separate category for the presence of a guarantee is included in recognition of the fact that a guaranteed loan is often made as a counteroffer for either a requested loan by the applicant or because the applicant does not qualify for a conventional loan.  Having guarantee status captured as a feature of loan type therefore provides useful information from a 1071 data integrity perspective in meeting the statutory requirements of the section.  In addition, some borrowers specifically request a government guaranteed loan program and/or receive a loan from an FI that only participates in such a program.

For reporting when an application requests more than one type of loan, the Bureau is considering whether to propose that (1) FIs choose up to three items from the subcomponent lists for the Loan Type data point if there is only one application and multiple products/guarantees/loan terms were asked for; or (2) FIs report separate applications/originations for each loan type requested or originated.  In addition, the Bureau understands that an originated loan may have more than one guarantee, such as an SBA guarantee and a personal guarantee.  Thus, FIs could choose more than one guarantee for originated or approved but not accepted credit.  For loan product and loan term, however, FIs would report only one of each subcomponent on originated credit or credit approved but not accepted.

Loan Type lists:

- Loan/Credit Product:
    - Term loan—unsecured
    - Term loan—secured
    - Line of credit—unsecured
    - Line of credit—secured
    - Business credit card
    - Other
    - Unknown (for applications)

- Guarantee:
    - Personal guarantee—owner(s)
    - Personal guarantee—non-owner(s)
    - SBA guarantee—7(a) program
    - SBA guarantee—504 program
    - SBA guarantee—other
    - USDA guarantee
    - Other Federal guarantee
    - State or local government guarantee
    - Other guarantee
    - No guarantee
    - Unknown

AdminRecord-001585

- <u>Loan Term</u>: report in number of months, or Not Applicable for products that do not have a loan term (such as a business credit card) and for applications that did not specify a loan term.

### v.  Loan/credit purpose

Section 1071(e)(2)(B) requires FIs to collect and report "the type and purpose of the loan or other credit being applied for" (see part III.G.1.iv above for "loan/credit type"). The Bureau is considering proposing that FIs report the loan purpose data point by choosing one or more purposes from a specified list. A list of loan purposes is provided below. The list includes choices for "Other" or "Unknown" to facilitate compliance, and the Bureau is considering proposing that FIs be allowed to choose up to three purposes when the applicant indicates more than one purpose.

<u>Loan Purpose</u> list:

- Commercial real estate—owner occupied
- Commercial real estate—non-owner occupied (includes investors)
- Motor vehicle (including light and heavy trucks)
- Equipment
- Working capital (includes inventory or floor planning)
- Business start-up
- Business expansion
- Business acquisition
- Refinance existing debt
- Line increase
- Other
- Unknown or unreported by the applicant

Q30.  How does your FI currently document information about loan/credit purpose? Is the list presented for loan/credit purpose workable? Is there anything you recommend be added or subtracted, given the statutory purposes of section 1071?

### vi.  Credit amount/limit applied for

Section 1071(e)(2)(C) requires FIs to collect and report "the amount of the credit or credit limit applied for." The Bureau is considering proposing that FIs report the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the FI's evaluation of the credit request. This method would not require reporting of amounts discussed before an application is made to an FI, but would capture the initial amount requested at the application stage or later, and it would reflect the amount of the request that was evaluated by the FI in making a credit decision.

If the applicant does not request a particular amount, but the FI underwrites the application as being for a specific amount, the FI would report the amount considered for underwriting. If the particular product applied for (such as a business credit card) does not involve a specific amount

28

requested or underwritten, the FI would report "Not Applicable" for this data point. When an applicant responds to a "firm offer" that specifies an amount, which may occur in conjunction with a pre-approved credit solicitation, the amount applied for would generally be the amount of the firm offer. (Unless that amount changes before origination, it would also generally be the amount approved or originated.)

> Q31. When in the application process for small business credit do applicants usually indicate the specific amount that they are applying for? How often does the amount applied for change between the initial application stage and when the application is considered for underwriting?

### vii. Credit amount/limit approved

Section 1071(e)(2)(C) requires FIs to collect and report "the amount of the credit transaction or the credit limit approved for such applicant." The Bureau is considering proposing that FIs report (1) the *amount of the originated loan* for a closed-end origination; (2) the *amount approved* for a closed-end loan application that is approved but not accepted; and (3) the *amount of the credit limit approved* for open-end products (regardless of whether the open-end product is originated or approved but not accepted). In light of the potential meaning of the statutory language, the Bureau is considering proposing different standards for closed-end and open-end products. The FI would report "Not Applicable" for this data point for applications that are denied, closed for incompleteness, or withdrawn by the applicant before a credit decision is made.

> Q32. For originated closed-end loans, what complexities might FIs face in reporting the amount originated or the amount approved? How often are these two amounts different? How would the costs to collect, check, and report these two measures differ?

> Q33. What complexities might FIs face in using the method described for reporting open-end credit limits? Is there some other way to report open-end credit that would be less burdensome or more accurately reflect its use in the market?

### viii. Type of action taken

Section 1071(e)(2)(D) requires FIs to collect and report the "type of action taken" on an application. The Bureau is considering proposing five categories for reporting "action taken":

- *Loan originated*—Any originated loan or credit, including applications involving counteroffer(s) where the final counteroffer was accepted and the credit extended.

- *Application approved but not accepted*—The application was approved, but the loan or credit was not originated.

- *Application denied*—The application was denied or the applicant did not accept the creditor's counteroffer.

AdminRecord-001587

- *Incomplete application (closed or denied)*—The application was incomplete regarding information that the applicant could provide and the creditor lacked sufficient data for a credit decision. Includes both denials due to incompleteness as well as if a creditor notifies the applicant of the incompleteness and the applicant fails to timely respond.

- *Application withdrawn by applicant*—The applicant withdrew its application before the creditor issued a decision.

These categories mirror many of the categories set forth in Regulation B (the adverse action notice provision) and Regulation C (action taken codes), with modifications to simplify the reporting categories for purposes of section 1071 in order to potentially reduce reporting errors and ease compliance burden for FIs.[58]

> Q34.    How does your FI currently document the actions taken on applications from small businesses?

> Q35.    Would FIs prefer reporting denial reasons to help explain the decision on an application? If so, should those reasons be voluntary or mandatory fields?

> Q36.    Might the availability of credit be underreported if counteroffers are not separately identified in the 1071 data set? If counteroffers are separately identified, what would be the most cost-effective way to do so (*e.g.*, reported as a separate action taken category or as a counteroffer data flag)? Should multiple counteroffers on a single application be reported? How should the ultimate action taken on a counteroffer be identified (counteroffer accepted, counteroffer rejected, etc.)?

### ix.  Action taken date

In addition to requiring FIs to collect and report the type of action they take on an application, section 1071(e)(2)(D) requires FIs to collect and report the "date of such action." The Bureau is considering proposing that the action taken date be reported with a day, month, and year.

> Q37.    Do you foresee any potential challenges in identifying the action taken date for any of the "action taken" categories? Do you have suggestions on how to mitigate or resolve those challenges?

### x.  Census tract (principal place of business)

Section 1071(e)(2)(E) requires FIs to collect and report "the census tract in which is located the principal place of business of the … applicant." The Bureau is considering proposing that FIs report a geocoded[59] census tract based on an address collected in the application, or during review or origination of the loan. The FI would use the address where the loan proceeds will principally be applied, if that address is known to the FI, which the Bureau believes would be

---

[58] 12 CFR 1002.9(a)(1); 12 CFR 1003.4(a)(8)(i).

[59] For the purposes of the 1071 rulemaking, geocoding is the process of using a particular property address to locate its geographical coordinates and the corresponding census tract.

AdminRecord-001588

more useful to carry out the community development and fair lending purposes of section 1071. For example, if an FI makes a loan to a small business to buy or improve commercial real estate, the location of the real estate is more relevant to section 1071's statutory purposes than the location of the main office. If the FI does not possess that information, the FI would use the location of the small business borrower's main office or headquarters. If that, too, is unknown, the FI could use another business address associated with the application. The FI would also report which of these address types it is using, unless that information is unknown:

(1) the address where the loan proceeds will principally be applied; or

(2) the location of the small business borrower's main office or headquarters; or

(3) some other business address, including those for which the FI is unsure about the nature of the address.

Q38. Does your FI currently geocode addresses for a reporting requirement, such as HMDA, and what geocoder do you use? Would that geocoder be viable for purposes of 1071 data reporting? What are the costs to geocode addresses?

Q39. How often and in what circumstances does your FI know the address where the borrower's loan proceeds will be used? For example, does your FI have a loan proceeds address for loans other than those related to commercial real estate? How frequently are loan proceeds used at a location other than the applicant's main office? What would the costs be to obtain the loan proceeds address from the applicant, in addition to or instead of other addresses?

### xi. Gross annual revenue

Section 1071(e)(2)(F) requires FIs to collect and report "the gross annual revenue of the business in the last fiscal year … of the applicant preceding the date of the application." The Bureau is considering proposing that FIs report the gross annual revenue of the applicant during its last fiscal year. If during the processing of the application the FI verifies the gross annual revenue provided by the applicant, and bases or would have based its credit decision on that amount, the FI would report the verified amount. If the FI does not verify the gross annual revenue amount, it would report the amount provided by the applicant.

Q40. Does your FI collect gross annual revenue from applicants? If so, for which types of lending products? Are there any products for which your FI does not collect gross annual revenue? Does your FI verify the gross annual revenue provided by applicants? Are there any situations in which you do not verify the gross annual revenue provided by applicants?

Q41. How does your FI collect and verify gross annual revenue from applicants? Is the revenue of affiliates included in the gross annual revenue collected, and is that information used for underwriting purposes? Does your FI ever underwrite based on only part of an applicant's revenue, or based on the revenue (or income) of an entity or individual affiliated with the applicant?

AdminRecord-001589

### xii. Race, sex, and ethnicity of principal owner(s)

Section 1071(e)(2)(G) requires FIs to collect and report "the race, sex, and ethnicity of the principal owners of the business." However, section 1071 does not define who is a principal owner of a business or set out what categories should be used when compiling and maintaining the principal owners' race, sex, or ethnicity.

The Bureau is considering proposing to define the term "principal owner" in a manner that is consistent with the CDD rule. Specifically, an individual would be a "principal owner" if the individual directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the business.

The Bureau is considering proposing that financial institutions use the HMDA aggregate race, sex, and ethnicity categories when requesting that applicants self-report race, sex, and ethnicity information.[60]

Similar to the collection and reporting of women-owned and minority-owned business status, the Bureau is considering proposing that collection and reporting of the race, sex, and ethnicity of small businesses' principal owners be based solely on applicant self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the FI would report this information and would have no obligation to verify it. If an applicant interacts with an FI in person and does not provide a principal owner's race, sex, or ethnicity, the Bureau is not considering proposing that an FI report that information based on visual observation or surname. Instead, the FI would report that the information was not provided by the applicant. The Bureau anticipates that requiring reporting based on visual observation or surname could create unwarranted compliance burdens in the context of small business lending. These burdens may include the costs to create and maintain policies and procedures, costs of applying such policies and procedures in a consistent manner, costs to conduct ongoing training, and costs to audit compliance.

Finally, the Bureau is considering developing a sample collection form to assist industry in collecting this information and to communicate an applicant's right to refuse to provide such information. This sample form would also include the definition of principal owner and clarify that it is possible, depending on the factual circumstances, that no one will be identified as a principal owner.

    Q42.   How many owners do small business applicants usually have? What portion of small business applicants are likely to be sole proprietorships or have only one owner?

    Q43.   How likely is it that a small business applicant would be owned or controlled by one or more minority individuals or women (*i.e.*, would be a minority-owned business or a women-owned business) but would not have at least one minority owner or woman owner, respectively, who owned 25 percent or more of the equity interest of the

---

[60] For race, the categories are: American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White. For sex, the categories are: Female and Male. For ethnicity, the categories are: Hispanic or Latino and Not Hispanic or Latino.

AdminRecord-001590

business (*i.e.*, would not have a principal owner who was a minority individual or a woman)?

Q44.   What are the potential challenges, costs, and benefits of defining principal owners in a manner that is consistent with the CDD rule?

Q45.   To what extent could your FI leverage existing programs, systems, or personnel (including those used for HMDA) when collecting and reporting the race, sex, and ethnicity information of principal owners?

Q46.   What are the potential challenges, costs, and benefits of collecting and reporting the race, sex, and ethnicity of principal owners using aggregate categories?  Although the Bureau is not considering proposing that FIs use disaggregated race and ethnicity categories when collecting and reporting the race and ethnicity of principal owners, what would be the potential challenges, costs, and benefits of such a requirement?

Q47.   Although the Bureau is not considering proposing that FIs report a principal owner's race, sex, or ethnicity based on visual observation or surname, what would be the potential challenges, costs, and benefits of implementing such a requirement for applicants who do not self-report the information?  How would those potential challenges and costs change if reporting based on visual observation or surname was required only if the applicant is a sole proprietor but not if the applicant is an entity?

## 2.   Discretionary data points

In addition to the list of mandatory data points in sections 1071(b) and 1071(e)(2)(A) through (G) discussed above, section 1071(e)(2)(H) requires FIs to collect and report "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]."  The Bureau refers to these as "discretionary data points."  The Bureau is considering proposing to require that FIs report discretionary data points regarding pricing, time in business, NAICS code, and number of employees.  Each of these data points is addressed in turn below.  Appendix D provides a chart that summarizes the data fields and other key information for each data point.

In addition to specific questions identified for particular data points below, the Bureau seeks feedback from SERs on the following questions for all the discretionary data points in this part III.G.2:

Q48.   Please provide feedback and information on the approach the Bureau is considering for each discretionary data point, along with any alternative approaches the Bureau should consider.

Q49.   What would the potential challenges and costs be for collecting, checking, and reporting each discretionary data point?

### i.   Pricing

The Bureau is considering proposing to include pricing of originated credit and credit that is approved but not accepted as a discretionary data point.  Pricing data could further the fair

AdminRecord-001591

lending purpose of section 1071 as it could enhance the ability to effectively and efficiently enforce fair lending laws. In addition, pricing data could add value in promoting market transparency and new product development opportunities, thus furthering the community development purpose of section 1071. A pricing data point could be reported on the basis of annual percentage rate (APR), total cost of credit (TCC), interest rate and total fees, or some other pricing metric. (Regarding these pricing metrics, the Bureau is interested in discussing the underlying concepts and potential costs of these different methods, not the legal or technical aspects of defining such terms.) At the same time, reporting pricing information across various product types could be complicated to implement, would add implementation costs for FIs, and could possibly impose other costs related to reputational risk as discussed in part III.F.5.ii below.

Q50.   How does your FI calculate pricing for different credit products (*e.g.*, term loans, lines of credit, business credit cards)? If an eventual 1071 rule were to require reporting of pricing information, what pricing metric or metrics would be easiest to report given your FI's pricing methods?

Q51.   What are the potential costs and benefits associated with collecting and reporting pricing using each of these metrics (*i.e.*, APR, TCC, interest rate and total fees)? Could the costs and benefits vary depending on the type of small business credit product about which pricing is being reported? Is there another metric that would be preferable in order to lower reporting burden?

Q52.   Would a requirement to report pricing data impose costs on your FI or on your FI's borrowers besides reporting costs? Would you expect a pricing data point to affect how examiners examine FIs for fair lending compliance? How? Would a pricing data point affect the reputation of your FI? If so, how? How would your FI respond?

### ii.  Time in business

The Bureau is considering proposing to include as a discretionary data point the time in business of the applicant (as of the date of application), expressed in years, or months if less than one year. Time in business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the section 1071 dataset by distinguishing potentially riskier new businesses from less risky established businesses. Time in business information could also provide a better measurement of community development effects, in terms of number of start-ups or other relatively new businesses seeking and obtaining financing. An FI may choose to verify the time in business provided by an applicant as part of its normal course of business. If the FI does not verify the time in business provided by the applicant, the FI would report the time in business provided by the applicant. If the FI does verify the time in business provided by the applicant, it would report the verified information.

Q53.   Does your FI currently collect information about the time in business of small business credit applicants? In what format (years / months / years and months / date established) does your FI request that applicants provide the information? Does your FI obtain or verify this information from a third party such as a business credit bureau? Does your FI separate small businesses by time in business for determining risk in underwriting or eligibility? If so, what time parameters are used? Would

AdminRecord-001592

including a time in business data point help avoid misinterpretation of the 1071 dataset, when a denied application might be explained by relative lack of experience in the business?

### iii. NAICS code and number of employees

As discussed in part III.C above, the SBA's size standards for small businesses are generally based on average annual receipts or number of employees for each industry based on NAICS code.[61] These metrics are also important for fair lending analysis (allowing separation of dissimilar types of businesses to limit misinterpretations of the data) and assessing community development impacts (allowing better measurement of community development impact in terms of number of jobs affected). The Bureau is thus considering proposing that FIs collect and report NAICS code and number of employees. With respect to number of employees, the Bureau is considering proposing that FIs collect and report the number of employees of the applicant. If the FI verifies the number of employees provided by the applicant, the FI would report the verified number. If the FI does not verify number of employees, it would report the number provided by the applicant.

Q54.  Does your FI currently collect NAICS code information from any small business applicants? Do you collect six-digit NAICS codes, or two-, three- or four-digit codes instead? Does your FI determine what NAICS code is appropriate for a particular applicant or obtain it from an alternative source such as a credit report, or does your FI ask applicants to provide their NAICS codes? What do you anticipate the potential costs and burdens would be if your FI was required to collect NAICS codes for small business applicants?

Q55.  Does your FI currently collect number of employees from any small business applicants? Does your FI take any steps to verify this information? What do you anticipate the potential costs and burdens would be if your FI was required to collect number of employees from small business applicants?

### 3.    Timing considerations for collection of certain 1071 data

Although the definition of "application" triggers an FI's *duty* to collect and report 1071 data, the application definition does not necessarily govern *when* during the application process 1071 data must be collected. The language and structure of section 1071—which applies to "applications" from "applicants"—indicates that the data must be collected sometime during the application process.[62] The statute does not, however, provide further direction on when during the

---

[61] The Bureau notes that the third alternative approach that the Bureau is considering for a size standard in the definition of small business would necessitate knowing an applicant's two-digit NAICS code. Both the second alternative and third alternative approaches would necessitate knowing an applicant's number of employees for certain industries.

[62] *See, e.g.*, section 1071(b) (requiring an inquiry "in the case of any *application* to a financial institution") and section 1071(c) ("[a]ny *applicant* … may refuse to provide any information requested.") (emphasis added).

AdminRecord-001593

application process information should be collected. The Bureau is not currently considering specifying a particular time period in which FIs must seek to collect 1071 data from applicants.

The Bureau is aware of a risk that, absent a designated time period for collection of applicant-provided 1071 data, FIs may not seek to collect women-owned or minority-owned business status or the race, sex, and ethnicity information about principal owners until late in the process when applicants may be less motivated to supply their demographic information.[63] Nonetheless, the Bureau seeks to provide FIs discretion and flexibility to time 1071 data collection at a point during the application process that works best for their processes and relationships with the applicants and to avoid unnecessary costs, while still fulfilling section 1071's purposes.

*Alternative approaches regarding timing considered.* The Bureau considered requiring FIs to seek to collect applicant-provided 1071 data within or by a specified time period, such as simultaneous with the triggering of an "application," before obtaining a "completed application," or before notifying an applicant of action taken on an application. The Bureau is disinclined to take this approach, as it is concerned that specifying a particular time period for collecting 1071 data from applicants could be disruptive to FIs' existing processes.

Q56. Please provide feedback and information on the approach the Bureau is considering with respect to the timing for collection of data points provided by applicants, along with any alternative approaches the Bureau should consider.

Q57. How do you anticipate your FI seeking applicant-provided data (particularly race, sex, and ethnicity information about principal owners) required by section 1071, including the manner (*i.e.*, how information is requested) and timing of the request? How would you anticipate seeking such applicant-provided data if the application is withdrawn, incomplete, or denied before the data is requested?

Q58. If the Bureau does not specify a time period for the collection of applicant-provided data, how frequently are FIs likely to delay gathering such demographic information required by 1071? Could there be issues with data quality? What steps might the Bureau and FIs take to control for those concerns or to otherwise encourage applicants to voluntarily provide 1071 data that is within their control?

## H. Shielding data from underwriters and other persons (firewall)

### 1. Underwriter access to women-owned and minority-owned business status, and race, sex, and ethnicity information for principal owners

Section 1071(d) includes two provisions that limit access to certain information collected under section 1071. First, under section 1071(d)(1), where feasible, loan underwriters or other officers or employees of an FI or its affiliates "involved in making any determination concerning an

---

[63] Applicant-provided 1071 data here primarily refers to the collection of women-owned and minority-owned business status and the race, sex, and ethnicity information for principal owners. FI-supplied data points, such as amount approved or action taken, will necessarily only be available later in the application process.

AdminRecord-001594

application for credit" cannot have access to "any information provided by the applicant pursuant to a request under subsection (b)." Second, under section 1071(d)(2), if the FI "determines" that an underwriter, employee, or officer involved in making a determination "should have access" to "any information provided by the applicant pursuant to a request under subsection (b)," the FI must provide a statutorily required notice.

The Bureau is considering proposing that FIs need only limit access under section 1071(d) to an applicant's responses to the FI's specific inquiries regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners. The Bureau also is considering proposing that an applicant's response to the 1071(b) inquiry regarding small business status need not be firewalled off from underwriters and others pursuant to 1071(d)(1). Under ECOA, creditors are prohibited from discriminating against an applicant on the basis of race, sex, ethnicity, and other prohibited bases in any aspect of a credit transaction. There is not a similar prohibition against creditors considering small business status, and creditors generally do consider factors relating to small business status as part of a credit transaction. The Bureau is concerned that limiting underwriters' and other persons' access to information that may be relevant and appropriate to make a credit decision could be problematic.

Section 1071(d)(1) indicates an FI would not be required to limit underwriters' and other persons' access to applicants' responses regarding women-owned/minority-owned business status, and the race, sex, and ethnicity of principal owners, if it is not feasible to do so. The Bureau is considering how it might apply this feasibility standard. Additionally, the Bureau is considering proposing to interpret section 1071(d)(2) to permit FIs to give underwriters, employees, and officers access to the responses when the FI determines that such access is needed for the underwriter, employee, or officer to perform his or her usual and regularly assigned job duties. In such circumstances, the FI would need to comply with the requirement to provide a notice, as discussed in part III.H.2 below. An FI could provide the notice to all small business applicants or the specific applicant or applicants whose information will or may be accessed.

Q59.   Please provide feedback and information on the approach the Bureau is considering regarding the firewall under section 1071(d)(1), along with any alternative approaches the Bureau should consider.

Q60.   Could your FI create and maintain a firewall for an applicant's response to questions regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners? If not, why not? If so, how would your FI create such a firewall? What would the potential costs and challenges be to create and maintain such a firewall? What circumstances might make creating and maintaining such a firewall more costly or more difficult?

Q61.   Could your FI create and maintain a firewall that applies to an applicant's response to a question regarding small business status? If not, why not? If so, how would your FI create such a firewall? What would the potential costs and challenges be to create and maintain such a firewall? What circumstances might make creating and maintaining such a firewall more costly or more difficult?

AdminRecord-001595

Q62.   Could your FI create and maintain a firewall that applies to an applicant's responses to all information and data requested pursuant to section 1071?  If not, why not?  If so, how would your FI create such a firewall?  What would the potential costs and challenges be to create and maintain such a firewall?  What circumstances might make creating and maintaining such a firewall more costly or more difficult?

Q63.   What types of employees and officers are involved in making determinations regarding small business credit applications (as noted above, the statutory firewall applies to certain people involved in making any determination regarding an application for credit)?  Are these employees and officers likely to be involved in the collection or reporting of information pursuant to section 1071?

Q64.   What are the potential challenges, costs, and benefits of implementing a standard that allows access to information when needed to perform usual and regularly assigned job duties, but restricting access otherwise?  For example, is your FI likely to know in advance that one or more underwriters, employees, or officers will be involved in making determinations regarding credit applications from small businesses and will need access to the section 1071(b) responses regarding women-owned or minority-owned business status or the principal owners' race, sex, and ethnicity information to perform usual and regularly assigned job duties?

## 2.    Notification regarding access to information by underwriters and other persons

Under section 1071(d)(2), if an FI determines that an underwriter, employee, or officer involved in making a determination "should have access" to "any information provided by the applicant pursuant to a request under [1071(b)]," the FI must provide a notice of "the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information."  The Bureau is considering developing model disclosures that FIs could use when providing this notice.

As with the firewall requirement discussed in III.H.1 above, the Bureau is considering proposing that this notice would not need to include language regarding small business status.  The Bureau is concerned such a notice would be confusing to applicants since—unlike women-owned and minority-owned business status or the race, sex, and ethnicity of principal owners—there is no prohibition on making lending decisions on the basis of small business status, meaning that a statement to the contrary would be false.

Q65.   Please provide feedback and information on the approach the Bureau is considering regarding the notice requirement under section 1071(d)(2), along with any alternative approaches the Bureau should consider.

Q66.   What are the potential challenges and costs associated with providing the notice pursuant to section 1071(d)(2) to particular applicants if your FI determines that an underwriter or other person involved in making any determination concerning an application for credit should have access to information regarding the applicant's 1071(b) responses?

AdminRecord-001596

Q67.   Would your FI prefer to provide the 1071(d)(2) notice regarding anti-discrimination to all applicants, even if not required to do so?

## I.   Applicants' right to refuse to provide certain information

Section 1071(c) states that any applicant may refuse to provide "any information requested pursuant to subsection (b)." The FI can ask but cannot require applicants to provide any information requested pursuant to subsection (b). Both the right to refuse under section 1071(c) and the limited access provisions under section 1071(d) refer to information requested or provided under 1071(b).

The Bureau is considering proposing that the right to refuse under section 1071(c) applies to the FI's specific inquiries regarding women-owned and minority-owned business status in 1071(b), as well as the race, sex, and ethnicity of principal owners, but not to the FI's specific inquiry regarding small business status in 1071(b).[64] Thus, the scope of the right to refuse and the scope of limited access by underwriters (discussed in part III.H.1) and the related notice (part III.H.2) would be the same.

## J.   Compiling, maintaining, and reporting 1071 data to the Bureau

Section 1071(f)(1) provides that "[t]he data required to be compiled and maintained under [1071] by any financial institution shall be submitted annually to the Bureau." The Bureau is considering proposing that 1071 data collection be done on a calendar year basis, and submitted to the Bureau by a specified date following the end of each calendar year.

Section 1071(e)(3) provides that, "[i]n compiling and maintaining any record of information under [section 1071], a financial institution may not include in such record the name, specific address (other than the census tract), telephone number, electronic mail address, or any other personally identifiable information concerning any individual who is, or is connected with, the ... loan applicant." The Bureau is considering proposing a prohibition on including certain personally identifiable information about any individuals associated with small business applicants or borrowers in the data that an FI is required to compile, maintain, and report to the Bureau (*i.e.*, other than the information specifically required to be collected and reported pursuant to the Bureau's eventual 1071 rule, such as the race, sex, and ethnicity of principal owners). This prohibition would not extend to information collected by the FI outside of its specific 1071 data records.

Section 1071(f)(2)(A) requires that information compiled and maintained under section 1071 be "retained for not less than 3 years after the date of preparation." In light of the approach the Bureau is considering proposing to implement section 1071(f)(2)(B), which addresses FIs' obligations to make 1071 data available to members of the public upon request, and section 1071(f)(2)(C), regarding the Bureau's annual publication of 1071 data—which are discussed in part III.K.3 below—the Bureau is considering proposing that FIs retain their 1071 data for at least three years after it is submitted to the Bureau.

---

[64] The Bureau is considering using its exception authority in section 1071(g)(2) in order to make this modification.

AdminRecord-001597

Q68.   Please provide feedback and information on the approach the Bureau is considering
       regarding these data retention and reporting aspects of section 1071, along with any
       alternative approaches the Bureau should consider.

## K. Privacy considerations involving Bureau publication of 1071 data

In furtherance of section 1071's fair lending and community development purposes, section 1071(f)(2) generally requires that the information compiled and maintained by FIs, and submitted annually to the Bureau, be made available to the public. Publication of these data would fill existing gaps in the public's general understanding of the small business lending environment and help identify potential fair lending concerns regarding small businesses as well as the needs and opportunities for both business and community development.

At the same time, while information that directly identifies individuals, such as name, address, date of birth, or Social Security number would not be collected pursuant to section 1071 requirements, publication of 1071 data under consideration in an unedited, loan-level format potentially could be used to re-identify small business applicants or borrowers and related individuals or potentially harm their privacy interests. Accordingly, the Bureau is examining the privacy implications of FIs' collection, reporting, and disclosure of information pursuant to 1071 and the Bureau's public release of the data.

Congress provided, in section 1071(e)(4), that "[t]he Bureau may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest." The Bureau recognizes that mitigating privacy risks in the 1071 data disclosed to the public may decrease the utility of the data to users and is investigating strategies and techniques to advance privacy interests while maximizing the utility of the data for the purposes of the statute.

### 1.    Balancing test

For purposes of determining whether and how to exercise its discretion to modify or delete 1071 data prior to publication, the Bureau is considering proposing to use a "balancing test" that weighs the risks and benefits of public disclosure. Under this approach, data would be modified or deleted if its disclosure in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure in light of the statutory purposes of section 1071. If the risks of disclosing unmodified data outweigh the benefits under the balancing test, the Bureau would determine whether modifications could bring them into balance.

The Bureau is considering various approaches that would appropriately advance privacy interests while still providing users with data useful to fulfilling the purposes of section 1071. These approaches could include various statistical disclosure limitation techniques when justified under the balancing test, such as those that mask the precise value of data points to prevent the disclosure of certain data elements.

As an alternative to a balancing test, the Bureau considered an approach in which it would modify data if an identified privacy risk crosses some significance threshold, without weighing

AdminRecord-001598

that risk against the benefit of disclosure.  That approach, however, could be inconsistent with the express disclosure purposes of the statute.

Q69.    Please provide feedback and information on the approach the Bureau is considering regarding use of a balancing test, along with any alternative approaches the Bureau should consider.

Q70.    What are the benefits of public disclosure to FIs of each of the data points under consideration?

## 2.    Privacy interests considered under the balancing test

Section 1071 provides that the Bureau may, at its discretion, delete or modify data if the Bureau determines that doing so "would advance a privacy interest."[65]  The Bureau is considering proposing to apply the balancing test discussed above to the privacy interests of non-natural persons (*e.g.*, small business entity applicants or borrowers, or FIs) with respect to protecting sensitive commercial information, as well as the privacy interests of natural persons (*e.g.*, individual business owners) with respect to protecting sensitive personal information.

Q71.    Please provide feedback and information on the approach the Bureau is considering regarding the nature and scope of privacy interests of non-natural and natural persons the agency should consider under a balancing test, along with any alternative approaches the Bureau should consider.

Q72.    If the data reported to the Bureau are disclosed to the public, how would that affect the privacy interests of FIs, small business applicants and borrowers, and related individuals, and what costs would they incur to eliminate or mitigate these requirements?  What types of sensitive commercial information of business entities, including FIs, could be exposed by publishing the data points (individually or in combination) under consideration?

Q73.    Are there data points, individually or in combination, that could create significant risk of re-identification of individuals or small business entities if publicly disclosed by linking them to third-party data sources, such as public records, and/or expose particularly sensitive personal or commercial information?  Are there ways to mitigate these concerns?

## 3.    Bureau publication of 1071 data

Section 1071(f)(2)(B) and (C) provides that information compiled and maintained under the statute shall be "made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau," and "annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation."  The Bureau is considering proposing an approach in which FIs could satisfy the requirement to make 1071 data available to the public upon request by referring the public to the

---

[65] 15 U.S.C. 1691c-2(e)(4).

AdminRecord-001599

Bureau's website where 1071 data would be available.  Under this approach, the 1071 data would be available with any modifications or deletions required based on the Bureau's application of the balancing test described above.  The Bureau also considered requiring FIs to make their own data available to the public directly, upon request.  However, the Bureau is concerned that this approach could involve greater burden for FIs, lead to privacy risks resulting from errors by individual FIs implementing any modifications or deletions required by the Bureau, and be less efficient overall.

> Q74.  Please provide feedback and information on the approach the Bureau is considering regarding public disclosure of 1071 data by the Bureau on behalf of FIs, along with any alternative approaches the Bureau should consider.

> Q75.  Please provide feedback and information on the potential costs and benefits of FIs referring the public to the Bureau's website to access 1071 data.

## L.  Implementation period

Section 1071 does not specify an implementation period, though pursuant to section 1071(f)(1) FIs must submit 1071 data to the Bureau on an annual basis.  As discussed in part III.J above, the Bureau is considering proposing that 1071 data collection be done on a calendar year basis, and submitted to the Bureau by a specified date following the end of each calendar year.

The Bureau seeks to ensure that FIs have sufficient time to implement the Bureau's eventual 1071 rule.  The Bureau is considering proposing that FIs have approximately two calendar years for implementation following the Bureau's issuance of its eventual 1071 rule.[66]  This would provide time for loan processing and management vendors to adjust their products and services to accommodate 1071 requirements, and for FIs to update or revise their systems and processes, and make other changes necessary to meet the new 1071 data collection and reporting requirements.

In order to assist industry with an efficient and effective implementation of the eventual 1071 rule, the Bureau intends to provide guidance in the form of plain language compliance guides and aids; technical specifications and documentation; and by conducting meetings with stakeholders to discuss the rule and implementation issues.

> Q76.  Please provide feedback and information on the approach the Bureau is considering regarding an implementation period, along with any alternative approaches the Bureau should consider.

> Q77.  How much time do you estimate your FI would need to prepare for compliance with the Bureau's eventual 1071 rule?  Are there any particular aspects of the Bureau's proposals under consideration that could be particularly time consuming or costly for

---

[66] The Bureau used a similar timeline in implementing the 2015 HMDA Final Rule (80 FR 66127 (Oct. 28, 2015)). The rule was issued in October 2015; since collection of data needed to begin on January 1 of the chosen year, the Bureau made the rule effective January 1, 2018, providing two years and two months of implementation time. Because 1071 data collection and reporting will also occur on a calendar year basis, the Bureau is considering making the effective date January 1 of the year approximately two years after the final rule is issued.

AdminRecord-001600

your FI to implement?  Are there any factors outside your FI's control that would affect its ability to prepare for compliance?

# IV.  Potential Impacts on Small Entities

## A. Overview

This portion of the Outline summarizes the Bureau's preliminary assessment of the impacts of the regulatory and operational proposals under consideration on directly affected small entities and the methods used to derive them.  The Bureau believes that this information will make it easier for SERs and others to offer the Bureau additional data and information regarding potential impacts.  The Bureau encourages contributions of data and other factual information to inform its assessment of potential compliance costs and other impacts on small entities.

As discussed above, section 1071 amended ECOA to require that FIs compile, maintain, and report information regarding applications for credit by women-owned, minority-owned, and small businesses.

The discussion of potential impacts on small entities is structured as follows.  Part IV.B discusses which small FIs may be covered by the eventual 1071 rule.  Part IV.C discusses the Bureau's use of HMDA as a basis for potential impacts of the eventual 1071 rule.  Part IV.D introduces and defines the representative types of FIs potentially covered by the eventual 1071 rule.  Part IV.E reviews new compliance processes and costs associated with implementing the Bureau's eventual 1071 rule.  Part IV.F presents the impacts of the proposals under consideration, including a discussion of the Bureau's methodology and an analysis of alternatives.  Part IV.G concludes with a discussion of the potential impact on the cost and availability of credit to small entities.

The Bureau seeks feedback and information from SERs on the following:

Q78.  The Bureau's overall methodological approach to measuring one-time and ongoing costs of the eventual 1071 rule, along with any alternative approaches the Bureau should consider.

Q79.  Are there additional one-time or ongoing cost activities that should be considered in the Bureau's analysis of potential impacts on small entities?  Should the structure the Bureau is using to estimate ongoing costs, or the actual magnitude of estimates, differ across institution type or product type, and if so, how?

Q80.  Is the Bureau's categorization of the "complexity" of an FI's application data processing appropriate and accurate?  Are the descriptions of representative FIs consistent with market experience?  Is the Bureau appropriately describing the volume of applications processed by example FIs, particularly among small FIs?

Q81.  What kinds of computer systems are currently used that could be used to collect and report data to comply with a future regulation?  What kinds of systems could be developed to collect and report data to comply with a future regulation?  How much

AdminRecord-001601

would it cost to purchase or update these systems in order to comply with a future regulation? How do FIs expect the regulation to alter their existing methods for collecting and processing application and origination data?

Q82. How do the Bureau's estimates of ongoing costs by activity and FI complexity compare to your own? Are there specific activities where the Bureau is over- or underestimating the annual ongoing costs?

Q83. Do FIs expect one-time or ongoing costs to affect the rates/fees offered for credit products, the credit product mix offered, the underwriting standards for credit products, or participation in the small business credit market?

Q84. How does your FI anticipate training staff to comply with an eventual 1071 rule? For example, do you anticipate purchasing training from an external source, developing training in-house, or a combination of both? Other than staff time to attend training, do you anticipate any ongoing costs associated with providing 1071 compliance training to employees on an annual or other periodic basis?

## B. Small entities covered by the proposals under consideration

The Bureau identified certain types of small entities that may be FIs subject to the Bureau's eventual 1071 rule for purposes of the RFA. Any small entity that falls within the statute's definition of "financial institution" and offers covered credit could potentially be affected. There are two broad categories of entities that may be covered: DIs and non-DIs.

DIs consist of commercial banks, savings associations, and credit unions. The SBA's threshold for DIs to be considered "small" is $600 million in assets.[67] According to the December 31, 2018 bank and credit union Call Reports, there were approximately 11,000 DIs in the United States.[68] Of these, approximately 9,100, have assets below the $600 million threshold and are therefore small entities according to the SBA small entity definition for DIs.

In part III.B above, the Bureau explains that it is considering two potential asset-based exemption threshold levels, of $100 million and $200 million of assets for DIs. It is also considering an activity-based metric for determining coverage. The Bureau seeks input on the following three potential thresholds for an activity-based coverage metric:

- Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million
- Option 2 Exemption Threshold: originations of at least 50 loans or $5 million
- Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

Table 2 below presents the number of DIs that the Bureau estimates may be covered by the eventual 1071 rule based on the coverage metrics and thresholds under consideration, based on

---

[67] The 2017 four-digit NAICS code for DIs is 5221.

[68] For purposes of this Outline, the Bureau used data from the credit union and bank Call Reports that were accessed on June 10, 2020.

AdminRecord-001602

data on small loans to businesses of all sizes in 2018.[69]  The Bureau relies on estimates of originations by DIs because currently no datasets report annual originations by institution for all DIs.[70]

**Table 2: Small entity depository institutions covered under metrics & thresholds considered[71]**

| Threshold considered | # of small DIs covered | % of small DIs covered |
|---|---|---|
| Originations of 25 loans or $2.5 million | 3,500-4,000 | 40%-45% |
| Originations of 50 loans or $5 million | 3,000-3,500 | 35%-40% |
| Originations of 100 loans or $10 million | 2,000-2,500 | 25%-30% |
| $100 million in assets | 4,000 | 44% |
| $200 million in assets | 2,250 | 25% |

Types of non-DIs that may be covered under the eventual 1071 rule include the following:[72]

- Lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies)
- Commercial finance companies
- Online lenders/platform lenders
- Non-DI CDFIs
- Governmental lending entities
- Non-profit lenders

The Bureau estimates the amount of lending by DIs using information collected by the FFIEC agencies, including the Call Reports for banks and credit unions and the data collected under the CRA.  The Bureau has significantly less information on the amounts of lending by non-DIs.  The Bureau hopes to learn more about the small business lending activity of all types of FIs, but

---

[69] The Bureau uses 2018 as a base year for these estimates because that is the most recent year for which the necessary data are available. In particular, the Bureau relies on CRA data for estimates of DI coverage.

[70] Table 2 presents a range of estimates for the number of DIs covered by activity-based thresholds based on internal Bureau calculations.  The table reports the exact, but rounded, number of DIs covered by the asset thresholds because all DIs report total assets on the bank and credit union Call Reports.

[71] As of December 31, 2018, small DIs accounted for about 85 percent of all DIs.  Under the asset-based exemption thresholds, all non-small DIs would report. Under the activity-based thresholds, at least 60 percent of non-small DIs would report.

[72] See footnote 22 above for a list of the NAICS codes that the Bureau believes most commonly represent these types of non-DIs.

AdminRecord-001603

specifically non-DIs, through the SBREFA process and the one-time cost survey, discussed below.

### C. Using HMDA as a basis for potential impacts of the eventual 1071 rule

The Bureau used previous HMDA rulemaking estimates as a basis for its review of tasks that would impose one-time and ongoing costs associated with 1071 data collection and reporting.  In developing its ongoing cost methodology to estimate the impacts of its 2015 HMDA rule, the Bureau used interviews with FIs to understand the processes required to comply with a regulation that requires collecting and reporting credit application data and generate estimates of how changes to the reporting requirements would impact the ongoing costs of collecting and reporting mortgage application data.  To analyze the potential impacts of the eventual 1071 rule, the Bureau plans to adapt and build on its methodology from its HMDA rulemaking activities to the small business lending market.

The Bureau expects that the tasks required for data collection, checking for accuracy, and reporting under the eventual 1071 rule would be similar to those under HMDA.  In many areas, the Bureau expects that there would be much overlap in the activities required.  The similarities in data collection and reporting tasks allows the Bureau to leverage its previous rulemaking experience in its analysis of the potential impacts of the eventual 1071 rule.

There are significant differences between the home mortgage and small business lending markets, however.  For example, generally small business lending is less automated, and has a wider variety of products, smaller volumes and smaller credit amounts.  Using early outreach to FIs, the Bureau has sought to determine how these differences in the market for small business lending would change the tasks required for data collection, checking for accuracy, and reporting.  The Bureau additionally hopes to use the SBREFA process to learn more about these differences and changes that could be made to its estimation of the impacts of the proposals under consideration (see Q78, Q79, and Q80 above).

### D. Types and numbers of 1071 reporters

During the HMDA rulemaking process, the Bureau identified seven key aspects or dimensions of compliance costs with a data collection and reporting rule: (1) the reporting system used; (2) the degree of system integration; (3) the degree of system automation; (4) the tools for geocoding, (5) the tools for performing completeness checks, (6) the tools for performing edits; and (7) the compliance program.  The Bureau assumes that FIs will set up their 1071 reporting in a manner similar to how HMDA reporting was implemented.[73]  The Bureau requests input from FIs, particularly those who are not currently HMDA or CRA reporters, on how they anticipate they will set up their 1071 reporting process (see Q79 above).

The Bureau found during the HMDA rulemaking process that generally the complexity of an FI's approach across dimensions was consistent—that is, an FI generally would not use less

---

[73] For example, the Bureau assumes that FIs will integrate their small business data management system with their other data systems the same way that similar institutions integrated their HMDA management system.

AdminRecord-001604

complex approaches on some dimensions and more complex approaches on others. This allowed the Bureau to classify FIs, including DIs and non-DIs, into three broad tiers according to the overall level of complexity of their compliance operations. This analysis of impacts of the 1071 rule assumes that complexity across dimensions of an FI's small business lending data collection and reporting system will also be consistent.

Table 3 below summarizes the typical approach to those seven key aspects or dimensions of compliance costs across three representative types of FIs based on level of complexity in compliance operations. FIs that are Type A have the lowest level of complexity in compliance operations, while Type B and Type C have the middle and highest level of complexity, respectively.

**Table 3: Typical approach to certain aspects/dimensions of compliance costs based on level of complexity for types of 1071 reporters**

| Aspect/dimension of compliance costs | Typical approach by low complexity FIs (Type A FIs) | Typical approach by medium complexity FIs (Type B FIs) | Typical approach by high complexity FIs (Type C FIs) |
|---|---|---|---|
| **Data storage system used** | Store data in Excel | Use LOS and SBL DMS | Use multiple LOS, central SoR, SBL DMS |
| **Degree of system integration** | (None) | Have forward integration (LOS to SBL DMS) | Have backward and forward integration |
| **Degree of system automation** | Highly manual process for entering and checking data | Use manual edit checks | Have high automation (only verifying edits manually) |
| **Tools for geocoding** | Use FFIEC tool (manual) | Use batch processing | Use batch processing with multiple sources |
| **Tools for completeness checks** | Conduct manual checks and rely on CFPB quality/validity checks | Use LOS, which includes completeness checks | Use multiple stages of checks |
| **Tools for edits** | Use CFPB edits only | Use CFPB and customized edits | Use CFPB and customized edits run multiple times |
| **Compliance program** | Have a joint compliance and audit office | Have basic internal and external accuracy audit | Have in-depth accuracy and fair lending audit |

AdminRecord-001605

Notes: LOS is "Loan Origination System"; SoR is "System of Record"; SBL DMS is "Small Business Lending Data Management System."[74]

The Bureau also found that, for HMDA, the number of loan applications received was largely correlated with overall FI complexity. The Bureau used this observation from HMDA, in addition to early outreach to FIs and data from Call Reports and the CDFI Fund, to generate assumptions about the number of annual small business lending applications processed by each FI type. The Bureau assumes that, on average, Type A FIs receive 75 small business credit applications per year, Type B receive 300 applications per year, and Type C receive 6,000 applications per year. These assumptions will be used to determine costs per application below. The Bureau adapted the volumes used in previous HMDA rulemaking efforts after some initial conversations with DIs that lend to small businesses. For the analysis, the Bureau assumes that one out of three small business applications will result in an origination, and thus the originations for an FI that is Type A, Type B, and Type C are 25, 100, and 2,000, respectively.[75]

In addition to application volume, another factor that may affect the FI's methods of 1071 compliance is the number and variety of the products FIs provide. Those entities that operate on a monoline basis, such as an entity that is exclusively a credit card issuer or a provider of equipment financing, are likely to have limited systems and operating unit impacts. In contrast, entities that support a wide and heterogenous product set may be operating with a multitude of affected systems, including multi-dimensional sales channels and multiple business units involved in supporting 1071 reporting. The consequence is that while volume is an important determinant of 1071 costs, product diversity is also a factor in why institutional costs may not be directly comparable across types of products, even within the FI types discussed above. Nonetheless, the Bureau uses application volume as a rough proxy for complexity to simplify the analysis enough to make it feasible for the Bureau to aggregate costs across the entire small business lending market. Using sources like bank and credit union Call Reports, the Bureau has access to information on loan volume but does not have similarly comprehensive information on product offerings by FIs. The Bureau requests feedback on how product mix complexity may affect implementation and the degree to which higher-volume FIs are more likely to have a more diverse mix of products (see Q79 above).

The Bureau estimates that almost no small DIs as defined by the SBA (*i.e.*, under $600 million in assets) receives more than 6,000 applications per year. As a result, the Bureau focuses on FIs of Types A and B in this Outline. The Bureau assumes that Type A and Type B FIs reflect, respectively, the lower and upper limits of operational complexity of *small* DIs. Through the SBREFA process and additional outreach, the Bureau seeks to obtain data on the compliance

---

[74] The Bureau expects the development of a market for small business data management systems similar to HMDA management systems that FIs will license or purchase from third parties.

[75] The Bureau chose the 1:3 application to origination ratio based on two sources of information. The first source is the *Biz2Credit Small Business Lending Index* (https://cdn.biz2credit.com/appfiles/biz2credit/pdf/report-may-2020.pdf) which shows that, in December of 2019, large banks approved small business loans at a rate of 27.5 percent, while small banks and credit unions had approval rates of 49.9 percent and 40.1 percent. Additionally, and supported by the Bureau's data from supervisory exams, the Bureau chose a 33 percent approval rate as a conservative measure among these estimates.

AdminRecord-001606

operations and costs to small entities and on the relative numbers of Type A FIs and Type B FIs (and Type C FIs, where applicable) that are small entities.

## E. Bureau review of compliance processes and costs

The Bureau categorizes costs required to comply with an eventual rule implementing section 1071 into "one-time" and "ongoing" costs. "One-time" costs refer to expenses that the FI would incur initially and only once as it implements changes required to business operations in order to prepare to comply with the requirements of the new rule. "Ongoing" costs are expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis.

The Bureau has identified the following eight categories of one-time costs that would be incurred by FIs to develop the infrastructure to collect and report data required by the regulation implementing section 1071:

1. Preparation/planning
2. Updating computer systems
3. Testing/validating systems
4. Developing forms/applications
5. Training staff and third parties (such as dealers and brokers)
6. Developing policies/procedures
7. Legal/compliance review
8. Post-implementation review of compliance policies and procedures

Bureau conversations with FIs have informed our preliminary understanding of one-time costs. FIs will likely have to spend time and resources reading and understanding the regulation, developing the required policies and procedures for their employees to follow to ensure compliance, and engaging a legal team to review their draft policies and procedures. Additionally, FIs may require new equipment, such as new computer systems that can store and check the required data points; new or revised application forms to collect women-owned/minority-owned business status, and race, sex, and ethnicity information about principal owner(s), and to provide any related disclosures required by the regulation. Some FIs mentioned that they may store, check, and report data using system providers such as Fiserv, Jack Henry, LaserPro, Fidelity Information Systems (FIS), while others may use more manual methods of data storage, checking, and reporting using applications such as Excel. FIs would also engage in a one-time training of all small business lending staff to ensure that employees understand the new policies and procedures. After all new policies and procedures have been implemented and systems/equipment deployed, FIs will likely undertake a final internal review to ensure that all the requirements of the section 1071 regulation have been satisfied.

The Bureau has also identified 15 specific data collection and reporting activities that would impose ongoing costs. Table 4 presents the full list of 15 activities. Activities 1 through 3 can broadly be described as data collection activities: these tasks are required to intake data and transfer it to the FI's small business data entry system. Activities 4 through 10 are related to reporting and resubmission: these tasks are required to collect required data, conduct internal checks, and report data consistent with the eventual 1071 rule. Activities 11 through 13 are related to compliance and internal audits: employee training and internal and external auditing

AdminRecord-001607

procedures required to ensure data consistency and reporting in compliance with the eventual 1071 rule. Finally, activities 14 and 15 are related to 1071 examinations by regulators: these tasks will be undertaken to prepare for 1071-related examinations and assist during regulatory compliance examinations.

**Table 4: 1071 data collection and reporting activities imposing ongoing costs**

| No. | Activity |
|-----|----------|
| 1 | Transcribing data |
| 2 | Resolving reportability questions |
| 3 | Transferring to Data Entry System, Loan Origination System, or other data storage system |
| 4 | Geocoding data |
| 5 | Standard annual edit and internal checks |
| 6 | Researching questions |
| 7 | Resolving question responses |
| 8 | Checking post-submission edits |
| 9 | Filing post-submission documents |
| 10 | Small business data reporting/geocoding software |
| 11 | Training |
| 12 | Internal audit |
| 13 | External audit |
| 14 | Exam preparation |
| 15 | Exam assistance |

## F. Impacts of the proposals under consideration

### 1.  Overview

This part IV.F illustrates the methodology the Bureau intends to use to estimate one-time and ongoing costs for FIs reporting small business loan application data under the eventual 1071 rule. Through the SBREFA process, the Bureau hopes to receive feedback about potential changes to

AdminRecord-001608

this methodology that would improve its accuracy. Costs of compliance with collecting and reporting data under section 1071 are broken down into one-time costs and ongoing costs.

In calculating costs in parts IV.F.2 and 3, the Bureau assumes FIs are currently complying with all existing regulations that they are currently subject to, including regulations such as reporting loan data under HMDA or CRA. FIs are assumed not to have implemented policies to begin complying with section 1071. The changes in one-time and ongoing costs therefore illustrate the change in expenses incurred from transitioning from a nonreporting regime for small business lending to reporting under section 1071.

Parts IV.F.2 through 5 are organized as follows: parts IV.F.2 and 3 illustrate the expected one-time and ongoing costs of the Bureau's proposals under consideration as outlined above. For purposes of the analysis in part IV.F, the Bureau assumes the following: an application would be defined generally in alignment with that term as used in Regulation B (as the Bureau has explained it is considering proposing for 1071 in part III.F above); FIs would collect and report all the mandatory data points along with the discretionary data points under consideration (that is, pricing, time in business, industry code, and number of employees) (see part III.G above); and FIs would either implement a firewall or provide a disclosure with respect to collection of women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners (see part III.H above). Part IV.F.3. also discusses the more detailed assumptions that underlie the Bureau's estimates of on-going costs. Part IV.F.4 compares how these one-time and ongoing costs would be different under the principal policy alternatives considered. Part IV.F.5 discusses additional potential impacts of the eventual 1071 rule.

## 2.    One-time costs

As discussed above in part IV.E, the Bureau has identified eight categories of one-time costs that make up the components necessary for an FI to develop the infrastructure to collect and report data required by the eventual 1071 rule. Those categories are: preparation/planning; updating computer systems; testing/validating systems; developing forms/applications; training staff; developing policies/procedures; legal/compliance review; and post-implementation review. The Bureau expects that most, if not all, of these categories of one-time costs will be made up of multiple tasks. For example, the one-time cost category of training staff would include developing initial and ongoing training programs and conducting initial training. The cost to conduct initial training would be calculated based on hourly wage x hours of training x number of loan officers, internal staff, or third parties that need training. (The cost to conduct ongoing training is discussed as part of ongoing costs in part IV.F.3 below.)

The Bureau does not have detailed information about potential one-time costs for small entities to implement the eventual 1071 rule. While HMDA often provides a useful point of reference for section 1071, it is not helpful with respect to estimating one-time costs. HMDA, like section 1071, is a data collection and reporting statute, but FIs have been subject to HMDA's requirements for decades. In its HMDA rulemakings, the Bureau has assessed the costs of making changes to *existing* systems and processes—not the costs associated with developing entirely new systems and processes to implement a new data collection and reporting regime, as it must do here with respect to implementing the eventual 1071 rule.

AdminRecord-001609

The Bureau is conducting a survey regarding one-time implementation costs for section 1071 compliance targeted at FIs who extend small business credit.[76]  Estimates from survey respondents of the one-time costs of complying with a 1071 rule will form much of the basis of the Bureau's estimates for one-time costs in assessing the impact of a proposed 1071 regulation. The survey is broadly designed to ask about the one-time costs of reporting data under a regime that only includes mandatory data points, under a reporting structure similar to HMDA, and using the Regulation B definition of an "application."  The survey is divided into three sections: Respondent Information, One-Time Costs, and the Cost of Credit to Small Entities.

Through the Respondent Information section, the Bureau will obtain basic information about the FI responding to the survey, including information on the type of institution, its size, and its volume of small business lending.  The One-Time Costs section of the survey measures the total hours, staff costs, and non-salary expenses associated with the different tasks comprising one-time costs.  Using the reported costs of each task, the Bureau can estimate the total one-time cost for each respondent.  The Cost of Credit to Small Entities section deals with the FI's anticipated response to the increased compliance costs in order to understand the impacts of the regulation on the institution's small business lending activity, including any anticipated potential changes to underwriting standards, volume, prices, product mix, or market participation.

The Bureau's analysis of the survey results will be segmented based on institutional characteristics and will estimate the total one-time costs by institution type.  For example, the Bureau will need to understand how expected one-time costs vary with the number of small business loan applications an institution processes annually.  Additionally, the Bureau is interested in learning how different kinds of FIs (such as DIs and non-DIs) differ in their expected one-time costs.  The Bureau will use information gathered from the SERs during the SBREFA process together with information gathered from the survey for purposes of its initial regulatory flexibility analysis under the RFA in its eventual notice of proposed rulemaking.

### 3.    Changes in ongoing costs

The Bureau measures ongoing costs relative to a current baseline.  For data collection and reporting under the eventual 1071 rule, the baseline for ongoing 1071 compliance cost is zero dollars, as FIs are currently not reporting small business lending data to the Bureau to comply with section 1071.  The Bureau also assumes that small entities are not currently reporting small business credit data according to the CRA, and therefore will not benefit from any cost savings due to eventual overlap between the two data collections.[77]  The Bureau also assumes that institutions have not taken any steps towards implementation in anticipation of the finalization of the rule.  The collection and reporting tasks explained in part IV.E form the basis of the ongoing cost analysis.

---

[76] This survey was released on July 22, 2020; the response period closes on October 1, 2020.  Due to the COVID-19 pandemic, the Bureau was concerned that conducting the one-time cost survey in spring 2020, as it had originally planned, would have put undue burden on respondents and led to low response rates and poor data and instead opted for a later release date.

[77] Similarly, the Bureau assumes that the reporting requirements on bank or credit union Call Reports are not similar enough to the 1071 data reporting requirements to provide significant cost savings.

AdminRecord-001610

Table 5 provides an example of how the Bureau is considering calculating ongoing compliance costs associated with each compliance task. The table shows the calculation for each activity and notes whether the task would be a "variable cost," which would depend on the number of applications the institution receives, or a "fixed cost" that does not depend on the number of applications. Table 5 shows these calculations for a Type A FI, or the institution with the least amount of complexity. Table 6 below summarizes the activities whose calculation differs by institution complexity and shows the calculations for a Type B FI (where they differ from those for a Type A FI).

**Table 5: Ongoing compliance cost calculations for a Type A FI**

| No. | Activity | Calculation | Type |
|---|---|---|---|
| 1 | Transcribing data | Hourly compensation x hours per app. x applications | Variable[78] |
| 2 | Resolving reportability questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 3 | Transfer to Data Entry System | Hourly compensation x hours per app. x applications | Variable |
| 4 | Complete geocoding data | Hourly compensation x hours per app. x applications | Variable |
| 5 | Standard annual edit and internal checks | Hourly compensation x hours spent on edits and checks | Fixed[79] |
| 6 | Researching questions | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 7 | Resolving question responses | Hourly compensation x hours per app. with question x applications with questions | Variable |
| 8 | Checking post-submission edits | Hourly compensation x hours checking post-submission edits per application | Variable |
| 9 | Filing post-submission documents | Hourly compensation x hours filing post-submission docs | Fixed |

---

[78] In this table, the term "variable" means the compliance cost depends on the number of applications.

[79] In this table, the term "fixed" means the compliance cost does not depend on the number of applications (even if there are other factors upon which it may vary).

AdminRecord-001611

| No. | Activity | Calculation | Type |
|-----|----------|-------------|------|
| 10 | Small business data reporting/geocoding software | Uses free geocoding software | Fixed |
| 11 | Training | Hourly compensation x hours of training per year x number of loan officers | Fixed |
| 12 | Internal audit | No internal audit conducted by FI staff | Fixed |
| 13 | External audit | One external audit per year | Fixed |
| 14 | Exam preparation | Hourly compensation x hours spent on examination preparation | Fixed |
| 15 | Exam assistance | Hourly compensation x hours spent on examination assistance | Fixed |

Many of the activities in Table 5 require time spent by loan officers and other FI employees. To account for time costs, the calculation uses the hourly compensation of a loan officer multiplied by the amount of time required for the activity. Currently, the mean hourly wage for loan officers, based on data from the Bureau of Labor Statistics, is $36.26.[80] To account for non-monetary compensation, the Bureau scales this hourly wage by 43 percent to arrive at a total hourly compensation of $51.80 for use in these calculations.[81] The Bureau uses assumptions from its analysis for its 2015 HMDA rule, updated to reflect differences between mortgage lending and small business lending, to estimate time spent on data entry.[82] As an example of a time calculation, currently the Bureau estimates that transcribing the required data points would require approximately 4 minutes per application. The calculation multiplies the number of minutes by the number of applications and the hourly compensation to arrive at the total cost, on an annual basis, of transcribing data. As another example, the Bureau currently estimates that ongoing training for loan officers to comply with an institution's 1071 policies and procedures would take about two hours per loan officer per year. The cost calculation multiplies the number of hours by the number of loan officers and by the hourly compensation.

---

[80] This data reflects the mean hourly wage for "loan officers" in the "Credit Intermediation and Related Activities" industry according to the 2019 Occupational Employment Statistics compiled by the Bureau of Labor Statistics. *See* U.S. Dept. of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages* (May 2019), https://www.bls.gov/oes/current/oes132072.htm.

[81] The March 2020 Employer Costs for Employee Compensation from the Bureau of Labor Statistics documents that wages and salaries are, on average, 70 percent of employee compensation for private industry workers. The Bureau inflates the hourly wage to account for 100 percent of employee compensation. U.S. Dept. of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation* (Mar. 2020), https://www.bls.gov/news.release/archives/ecec_06182020.pdf.

[82] Some differences, for example, are reflected in the number of applications, the number of data points per application, and the number of loan officers for the representative institutions.

AdminRecord-001612

Some activity costs in Table 5 depend on the number of applications.  It is important to differentiate between these variable costs and fixed costs because the type of cost impacts whether and to what extent covered institutions might be expected to pass on their costs to small business loan applicants in the form of higher interest rates or fees.  Part IV.G explains why the Bureau expects FIs to pass most of the variable costs on to consumers in the form of higher interest rates and fees.  All data collection, as well as reporting and resubmission activities such as geocoding data, standard annual edit and internal checks, researching questions, and resolving question responses are variable costs.  All other activities are fixed cost and do not depend on the overall number of applications being processed.  An example of a fixed cost calculation is exam preparation, where the hourly compensation is multiplied by the number of total hours required by loan officers to prepare for 1071-related compliance examinations.

Table 6 shows where and how the Bureau assumes Type B FIs differ from Type A FIs in its ongoing cost methodology.  Type B FIs use more automated procedures, which result in different cost calculations.  For example, for a Type B FI, transferring data to the data entry system and geocoding applications are done automatically by business application data management software licensed annually by the FI.  The relevant address is submitted for geocoding via batch processing, rather than being done manually for each application.  The additional ongoing geocoding costs reflect the time spent by loan officers on "problem" applications—that is, a percentage of overall applications that the geocoding software misses—rather than time spent on all applications.  However, Type B FIs have the additional ongoing cost of a subscription to a geocoding software or service as well as a data management software that represents an annual fixed cost of reporting 1071 application data.  This is an additional ongoing cost that less complex institutions who use more manual processes (*i.e.*, Type A FIs) will not incur.  The Bureau expects that Type A FIs will use free batch geocoding software made available by the Bureau, which will be a change from the existing free web-based geocoding available from the FFIEC.

Additionally, audit procedures differ between the three representative institution types.  The Bureau expects a Type A FI would not conduct an internal audit but would pay for an annual external audit to be conducted.  A Type B FI would be expected to conduct a simple internal audit for data checks that requires loan officer time and also pay for an external audit to be conducted on an annual basis.

**Table 6: Differences in ongoing cost calculations for a Type B FI**

| No | Activity | Difference for a Type B FI |
|----|----------|----------------------------|
| 1 | Transfer to Data Entry System | No employee time cost.  Automatically transferred by data management software purchased/licensed |
| 2 | Complete geocoding data | Cost of time per application unable to be geocoded by software |
| 3 | Small business data reporting/geocoding software | Uses geocoding software and/or data management software that requires annual subscription |

55

AdminRecord-001613

| No | Activity | Difference for a Type B FI |
|---|---|---|
| 4 | Internal Audit | Hourly compensation x hours spent on internal audit |
| 5 | External Audit | Yearly fixed expense on external audit |

Table 7 shows the total expected ongoing costs as well as a breakdown by the component 18 activities that comprise the ongoing costs for Type A FIs and Type B FIs. Table 7 also provides the Bureau's expected ongoing cost for Type C FIs to provide a more fulsome picture of how the Bureau expects ongoing costs to differ by institution complexity. In the following analysis, however, the discussion is restricted to Type A and Type B FIs for the reasons discussed above. The bottom of the table shows the total estimated annual 1071 ongoing compliance cost for each type of institution, along with the total cost per application the financial institution processes. As discussed above, the Bureau is limiting the cost discussion in this Outline to institutions of types A and B, as it expects most small institutions' small business lending activities to fall somewhere between those of these two types of institutions. To produce the estimates in Table 7, the Bureau makes many assumptions about the inputs into the calculations of Tables 5 and 6 above, such as the amount of time expected for a loan officer to compete a given activity. In the following analysis, the Bureau provides examples of these assumptions for the largest drivers of ongoing costs.

**Table 7: Estimated ongoing costs per compliance task**

| No | Activity | Type A FI | Type B FI | Type C FI |
|---|---|---|---|---|
| 1 | Transcribing data | 250-500 | 500-1,000 | 10,000-20,000 |
| 2 | Resolving reportability questions | 50-100 | 100-250 | 250-500 |
| 3 | Transfer to 1071 Data Management Software | 250-500 | 0 | 0 |
| 4 | Complete geocoding data | 50-100 | 250-500 | 250-500 |
| 5 | Standard annual edit and internal checks | 250-500 | 5,000-10,000 | 10,000-20,000 |
| 6 | Researching questions | 50-100 | 100-250 | 250-500 |
| 7 | Resolving question responses | 0 | 0 | 0 |
| 8 | Checking post-submission edits | <50 | <50 | 100-250 |
| 9 | Filing post-submission documents | <50 | <50 | <50 |

56

AdminRecord-001614

| No | Activity | Type A FI | Type B FI | Type C FI |
|----|----------|-----------|-----------|-----------|
| 10 | 1071 Data Management System / geocoding software | 0 | 5,000-10,000 | 10,000-20,000 |
| 11 | Training | 500-1,000 | 1,000-5,000 | 20,000-50,000 |
| 12 | Internal audit | 0 | 250-500 | 100,000-150,000 |
| 13 | External audit | 500-1,000 | 5,000-10,000 | 0 |
| 14 | Exam prep | <50 | 1,000-5,000 | 20,000-50,000 |
| 15 | Exam assistance | 100-250 | 500-1,000 | 1,000-5,000 |
| | **Total** | **$2,000-$4,200** | **$18,700-$43,600** | **$171,850-$316,800** |
| | Per application | $27-$56 | $62-$145 | $29-$53 |
| | Total DI Net Income Per Application | $37,000-$45,000 | $12,000-$13,000 | $1,000-$1,300 |

The Bureau estimates that the lowest complexity institution (*i.e.*, a Type A FI) would incur around $2,500 in total annual ongoing costs, or about $34 in total cost per application processed (assuming an average of 75 applications per year). For FIs of this type, the largest drivers of the ongoing costs are activities that require employee time to complete. Activities like transcribing data, transferring data to the data management software, standard edits and internal checks, and training all require loan officer time. The Bureau expects training, activity number 11, to annually require approximately $620 for 6 representative loan officers to engage in two hours of training. Other time-dependent activities the Bureau expects to cost around $300 each. For example, the Bureau assumes that Type A FIs will spend around 6 hours transferring data to 1071 data management software, activity number 3, based on estimates of the required time to transfer to HMDA data management software. At the assumed hourly compensation, our estimate is around $310 for the FIA institutions to transfer data. An assumption of around 7 total hours to conduct standard annual editing checks, activity number 5, produces a similar sized estimate. Additionally, the Bureau currently estimates that Type A FIs would spend around $500-$1,000 annually for external audits of their small business application data, activity number 13.

The Bureau estimates that a middle complexity institution (*i.e.*, a Type B FI), which is somewhat automated, would incur approximately $29,550 in additional ongoing costs per year, or around $99 per application (assuming an average of 300 applications per year). The largest components of this ongoing cost are the expenses of the small business application management software and geocoding software (in the form of an annual software subscription fee), activity number 10, and the external audit of the data, activity number 13. Using interviews of FIs conducted to determine compliance costs with HMDA, the Bureau found mid-range HMDA data management systems to be approximately $8,000 in annual costs; the Bureau believes that cost would be

AdminRecord-001615

comparable in the 1071 context and thus applies that estimate here as well. This analysis assumes that the subscription purchase would be separate from HMDA management systems, but the development of a software to jointly manage HMDA and 1071-related data would likely result in cost savings for both products. The Bureau also estimates that a Type B FI would spend around $5,000-$10,000 on external audits of their small business loan application data. The Type B FI incurs employee time-related fixed costs conducting internal checks ($5,000-$10,000), training ($1,000-$5,000), and prepping for examinations ($1,000-$5,000) but saves time and expense on data entry and geocoding by using data management software. As an example, the Bureau expects Type B FIs to have two full-time employees spend 40 hours each to prepare for an examination, activity number 14, resulting in a cost of nearly $4,200, and have employees spend around 12 employee hours assisting with an examination, activity number 15, costing nearly $620 annually.

To understand the impacts of these cost estimates on the profits of DIs, the Bureau estimates the average total net income across all products per origination, a measure of profits, for all DIs by type.[83] The results are reported in the last row of table 7. The Bureau estimates that DIs of Type A have a net income per origination between $110,000 and $135,000. Assuming that for each origination there are three applications, then a DI of Type A has a net income per application of approximately $37,000 to $45,000. The Bureau estimates that DIs of Type B have a net income per origination between $35,000 and $40,000 or a net income per application between $12,000 and $13,000. The Bureau estimates that DIs of Type C have a net income per origination between $3,000 and $4,000, or a net income per application between $1,000 and $1,300.

Table 8 breaks down the ongoing costs by the percentage of the total ongoing cost that is either fixed (not dependent on the number of applications processed), or variable (dependent on the number of applications processed). Lower complexity institutions (*i.e.*, Type A FIs) have a smaller percentage (44 percent) of their ongoing costs that are fixed and so do not vary with the number of applications. More complex institutions have higher percentages that are represented in fixed costs (56 percent for a Type B FI) as these institutions spend relatively more of their ongoing costs on data management software, audit, and exam preparation, which do not depend on the number of applications. Type A FIs spend a larger percentage of ongoing costs on data entry, annual data checks, and edits, which depend on the number of applications processed.

### Table 8: Ongoing costs by fixed or variable costs

| Total ongoing costs | Type A FI | | Type B FI | |
|---|---|---|---|---|
| | Fixed | Variable | Fixed | Variable |
| Contribution to total cost | $1,100 | $1,400 | $16,400 | $13,100 |
| Percentage (%) of total cost | 44% | 56% | 56% | 44% |

---

[83] There are no broadly available data on profit per application for non-DIs. The Bureau uses the FFIEC Bank and NCUA Credit Union Call Report data from December 31, 2018, accessed on July 23, 2020. The Bureau uses the same internal estimates of small business loan originations as discussed in part IV.B and total net income across all products.

AdminRecord-001616

## 4.    Analysis of alternatives

This part IV.F.4 describes how the Bureau expects ongoing costs to differ based on several significant policy alternatives to the proposals under consideration.  This part also describes how the Bureau expects coverage of small business applications to change under different approaches to the size standard portion of the small business definition under consideration.  Table 9 shows the Bureau's estimates of how the ongoing costs would differ with each policy alternative.  Each row compares the alternative to the baseline scenario of the approach the Bureau is considering.  Each policy alternative is explained in more detail below the table.  The Bureau hopes to learn more about how one-time costs would differ with each choice of policy alternative through the SBREFA process.

**Table 9: Ongoing costs under policy alternatives**

| Alternatives | Type A FI | | Type B FI | |
|---|---|---|---|---|
| | Total cost | Cost per application | Total cost | Cost per application |
| Proposals under consideration | $2,520 | $34 | $29,550 | $99 |
| Statutorily required data points only | $2,280 | $30 | $28,240 | $94 |
| Requiring a "firewall" | $2,520 | $34 | $29,550 | $99 |
| Requiring verification of certain data points | $2,680 | $36 | $30,750 | $103 |

### *Reporting of only mandatory data points*

Requiring only the collection and reporting of the mandatory data points would result in $4 and $5 less in ongoing costs per application for a Type A FI and a Type B FI, respectively, than reporting the additional discretionary data points that the Bureau is considering proposing (*i.e.*, pricing, time in business, industry code, and number of employees).  These small cost savings result from activities with time cost that depend on the number of data points.  Examples of these activities are transcribing data and performing standard edits and internal checks on the data, where additional data points require extra staff time.  For example, the Bureau expects that only reporting the mandatory data points would require 5 hours of total employee time instead of the 6 hours required to report full set of data points under consideration for a Type A FI.  The Bureau also would expect that reporting only the mandatory data points would reduce the total time Type A FIs spend on standard edits and internal checks from 8 total hours to 6 hours.  Reporting only the statutorily required data points may also reduce one-time costs if institutions must pay a one-time cost to upgrade or integrate their data systems in order to capture the additional discretionary data fields.  This could be the case, for instance, if the loan origination system the

AdminRecord-001617

institution currently uses does not have the fields to capture the number of employees. The institution may also use separate systems to keep data on pricing for originated loans from the one they use for underwriting and would have to incur a one-time cost to integrate the systems to collect all the data fields considered in this proposal.

***Interpreting "feasible" and "should have access" to require FIs, in nearly all circumstances, to implement a "firewall" to prevent access by underwriters and other persons to women-owned/minority-owned business status and race, sex, ethnicity of principal owners***

The Bureau expects that a stricter "firewall" requirement for all FIs to prevent underwriters and other persons "involved in making any determination concerning an application for credit" (which generally would include loan officers) from viewing the applicant's response to the women-owned and minority-owned status inquiry, and the applicant's demographic information would result in a significant one-time cost. The Bureau expects that the effect on ongoing costs would differ very little from our baseline ongoing cost estimate. The Bureau hopes to use the SBREFA process to learn about the one-time and ongoing costs that would be incurred under different alternatives to the "firewall" (see Q60 above).

*Requiring verification of certain data points*

The Bureau expects that requiring FIs to verify certain data points (such as the gross annual revenue, number of employees, or the industry code of the business) beyond validation that currently occurs today would result in larger ongoing costs than those of the proposals under consideration. Verifying the information that a small business applicant provides on an application may require an FI's employees to spend additional time collecting material from an applicant and examining the response, as well as potential costs of obtaining material directly, such as via business tax returns. The Bureau assumes that requiring verification (beyond whatever verification the FI would do on its own) would make activities that require employee time costs 125% more costly than if verification were not required. Using this methodology, the Bureau expects that verification would increase ongoing costs by $2 an application and $4 an application for Type A FIs and Type B FIs, respectively. Institutions may incur one-time costs associated with requiring verification. One example of a possible one-time cost if verification were to be required would be the additional expense of drafting and implementing policies to develop and standardize the verification procedures within the institution and communicate those to employees. The Bureau seeks to learn about the potential impacts of requiring verification through the SBREFA process (see Q41, Q53, and Q54 above).

*Alternative size standards for the "small business" definition*

In part III.C above, the Bureau discusses three size standards it is considering that could be used as alternative approaches to the SBA's full six-digit NAICS code size standards. The Bureau used data from the U.S. Census's 2012 Statistics of U.S. Businesses (SUSB) to analyze how each

AdminRecord-001618

of the alternative approaches would change the number of businesses defined as "small" relative to the SBA definition.[84]

If all NAICS classifications and size assessments could be done correctly, applying the SBA's full six-digit NAICS code-based size standards would result in perfect coverage of small businesses—all applications by small businesses would be reported (other than those made to financial institutions that qualify for an exemption) and no applications made by non-small businesses would be reported. To understand the effects of the approaches considered, the Bureau estimated how many firms would be mischaracterized as "small" or "large" under these alternative approaches as compared to the full six-digit NAICS SBA size standards. For each of the three approaches under consideration, Table 10 shows the number of "small" firms, under the SBA's definition, that would not have their application data reported to the Bureau and the number of "large" firms whose application data would be reported.

**Table 10: Mis-coverage of small businesses under the three size standards considered[85]**

| Size standard alternative | SBA "small" firms whose applications would not be reported to the Bureau | SBA "large" firms whose applications would be reported to the Bureau |
|---|---|---|
| $1 million in gross annual revenue | 1.2 million (23% of all employer firms) | 0 |
| $5 million in gross annual revenue | 270,000 | 4,000 |
| Maximum of 500 employees for wholesale or $8 million in gross annual revenue | 63,000 | 17,000 |
| Most common standard within a two-digit NAICS code | 46,000 | 10,000 |

These various thresholds would affect some industries more than others. That is, depending on which size standard alternative the Bureau adopts under the eventual 1071 rule, applications for small firms would be reported to the Bureau less from some industries than others. In general, there will be more firms whose applications would not be reported in larger industries with a higher revenue-based size standard. Under every alternative, the industries most affected by this are the retail trade and construction industries. Other industries that would be disproportionately

---

[84] The 2012 SUSB is the most recent Census product to have categories of revenue and employees granular enough to conduct this analysis. The Bureau constructed the 2012 equivalents of the second and third alternatives due to the vintage of the SUSB data available and used the SBA's 2012 size standards for the analysis.

[85] There are 5.3 million employer firms in the 2012 SUSB. The 2012 SUSB does not include non-employer firms, of which there were 22.7 million in 2012, according to the Survey of Business Owners by Census.

AdminRecord-001619

affected (depending on which size standard alternative the Bureau adopts) include wholesale trade, health care and social assistance, and professional, scientific, and technical services.

## 5.    Additional potential impacts of the eventual 1071 rule

### i.    Impacts on product offering and underwriting processes

There are characteristics of certain small business lending products that are perhaps unique or distinct from consumer lending, such as lengthier underwriting processes that involve more lender-applicant interaction or a more diverse set of product offerings. The Bureau conducted several interviews with FIs as part of early outreach efforts to guide its approach to estimating one-time and ongoing costs. In 2017, the Bureau also issued a Request for Information Regarding the Small Business Lending Market to gather public comments to inform the Bureau's rulemaking efforts.[86] In both early outreach interviews and public comments, FIs expressed concerns that the requirements to report data under the eventual 1071 rule may lead FIs to reduce the variety of their product offerings or to standardize their underwriting processes. Compliance costs could lead FIs to move away from products that require significant employee time to underwrite towards more standardized products that require less time and lower labor costs. The Bureau hopes to learn from the SBREFA process whether FIs would expect to change either the set of small business products that they offer or the underwriting practices they use in response to the implementation of the eventual 1071 rule (see Q83 above).

### ii.    Impacts due to publicly available data and reputation risks

In accordance with the balancing test discussed in part III.K.1, the Bureau expects to publicly release data collected under the eventual 1071 rule, potentially with certain data modified or deleted. With the publicly disclosed data, users would be able to assess fair lending risks at the institution and market level, furthering section 1071's fair lending purpose. Several commenters to the Bureau's request for information expressed concerns, however, about costs related to these analyses. Depending on the extent of publicly disclosed data, the Bureau expects that some FIs could incur ongoing costs related to responding to reports of disparities in their small business lending practices. Some FIs could also experience reputational risks associated with high profile reports of existing disparities where more fulsome analysis of its business practices would conclude that the disparities do not support a finding of discrimination on a prohibited basis. In anticipation of needing to respond to outside analysis and potential reputational risks, it is possible that some FIs may choose to change their product offerings available to small businesses, underwriting or pricing practices, or overall participation in the small business lending market. The Bureau hopes to learn more about the potential for impacts in these areas through the SBREFA process (see Q83 above).

---

[86] Bureau of Consumer Fin. Prot., Request for Information Regarding the Small Business Lending Market, 82 FR 22318 (May 15, 2017), https://www.consumerfinance.gov/policy-compliance/notice-opportunities-comment/archive-closed/request-information-regarding-small-business-lending-market/.

AdminRecord-001620

## G. Impact on the cost and availability of credit to small entities

The Bureau's one-time cost survey includes questions about the expected impact of 1071 compliance costs on business operations. The survey asks questions about whether lenders expect to raise interest rates or fees, change how they underwrite loans, or change the amount or areas of small business lending in response to the eventual 1071 rule. The Bureau anticipates using the results of this survey to refine its estimates of the impact of compliance on the costs and availability of credit for small entities.

Three types of costs (one-time, fixed ongoing, and variable ongoing) will determine the effect of the eventual 1071 rule compliance on price and availability of credit to small entities. In a competitive marketplace, standard microeconomics suggests that lenders will extend loans up to the point at which the value of granting an additional loan is equal to the additional cost associated with the FI providing the loan. One-time costs and fixed ongoing costs affect the overall profitability of a lender's loan portfolio but do not affect the profitability of extending an additional loan. Variable ongoing costs, however, affect the profitability of each additional loan and will be relevant for the number of loans a lender provides.

One-time and fixed ongoing costs affect the overall profitability of the loan portfolio and will be considered in the lender's decision to remain in the small business lending market or the market for specific small business lending products. The Bureau hopes to learn through the one-time cost survey the extent to which any lenders consider the potential additional one-time compliance costs prohibitive such that they would exit the market or reduce the number of small business loans provided and thus reduce the availability of small business credit to small entities.

The Bureau expects that much of the variable cost component of ongoing costs would be passed on to small business borrowers in the form of higher interest rates or fees. While existing academic literature on small business markets is limited, research on consumer credit products suggests that borrowers are less likely to choose products or credit amounts based on interest rates, which may be due to the difficulty consumers face in shopping for a lower interest rate.[87] Additionally, some existing research suggests that lenders to small businesses significantly adjust

---

[87] Recent economic literature suggests a small response of mortgage demand to interest rates. *See* Neil Bhutta & Daniel Ringo, *The Effect of Interest Rates on Home Buying: Evidence from a Discontinuity in Mortgage Insurance Premiums* (Board of Governors of the Federal Reserve System, Finance and Economics Discussion Series 2017-086), https://doi.org/10.17016/FEDS.2017.086; Anthony A. DeFusco & Andrew Paciorek, *The Interest Rate Elasticity of Mortgage Demand: Evidence from Bunching at the Conforming Loan Limit*, (American Economic Journal: Economic Policy, 2017), https://www.aeaweb.org/articles?id=10.1257/pol.20140108; and Andreas Fuster & Basit Zafar, *The Sensitivity of Housing Demand to Financing Conditions: Evidence from a Survey* (American Economic Journal: Economic Policy), forthcoming, https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr702.pdf. Some recent literature in economics has documented that almost half of all consumers do not shop before taking out a mortgage and there are similarly low levels of shopping in the auto lending market. *See* Alexei Alexandrov & Sergei Koulayev, *No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information* (Office of Research, Bureau of Consumer Fin. Prot., Working Paper No. 2017-01), https://ssrn.com/abstract=2948491; and David Low et al., *Auto Dealer Loan Intermediation: Consumer Behavior and Competitive Effects* (Office of Research, Bureau of Consumer Fin. Prot., Working Paper No. 2020-01), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3568571.

AdminRecord-001621

loan amounts in response to the cost per originated loan.[88]  In light of these two factors, the Bureau expects that the variable ongoing costs would be nearly passed on in full to small business borrowers.

Table 6 in the discussion of ongoing costs above gives the variable ongoing cost of compliance for the three examples of institution complexity.  Per application, the variable costs are approximately $17 and $40 for FIs Types A and B, respectively.  Using a similar methodology as described above, an estimate for Type C FI would be $12.  Even if the variable cost were passed on in full to small business borrowers in the form of higher interest rates or fees associated with a loan or line of credit (or even applicants in the form of application fees), the Bureau expects that this would comprise a small portion of the total cost of the average loan to the small business borrower.

---

[88] See small business lending supply estimates from Natalie Bachas et al., *Loan Guarantees and Credit Supply* (Working Paper, 2020), https://cmepr.gmu.edu/wp-content/uploads/2019/08/Bachas-Yannelis-Loan-Guarantees-and-Credit-Supply-1.pdf.

AdminRecord-001622

# Appendix A: Section 1071 of the Dodd-Frank Act

### SEC. 1071. SMALL BUSINESS DATA COLLECTION.

(a) IN GENERAL.—The Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.) is amended by inserting after section 704A the following:

### "SEC. 704B. SMALL BUSINESS LOAN DATA COLLECTION.

"(a) PURPOSE.—The purpose of this section is to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.

"(b) INFORMATION GATHERING.—Subject to the requirements of this section, in the case of any application to a financial institution for credit for women-owned, minority-owned, or small business, the financial institution shall—

"(1) inquire whether the business is a women-owned, minority-owned, or small business, without regard to whether such application is received in person, by mail, by telephone,

65

AdminRecord-001623

by electronic mail or other form of electronic transmission,
or by any other means, and whether or not such application
is in response to a solicitation by the financial institution;
and

"(2) maintain a record of the responses to such inquiry,      Records.
separate from the application and accompanying information.

"(c) RIGHT TO REFUSE.—Any applicant for credit may refuse
to provide any information requested pursuant to subsection (b)
in connection with any application for credit.

"(d) NO ACCESS BY UNDERWRITERS.—

"(1) LIMITATION.—Where feasible, no loan underwriter or
other officer or employee of a financial institution, or any affil-
iate of a financial institution, involved in making any deter-
mination concerning an application for credit shall have access
to any information provided by the applicant pursuant to a
request under subsection (b) in connection with such applica-
tion.

"(2) LIMITED ACCESS.—If a financial institution determines      Determination.
that a loan underwriter or other officer or employee of a finan-      Notice.
cial institution, or any affiliate of a financial institution,
involved in making any determination concerning an applica-
tion for credit should have access to any information provided
by the applicant pursuant to a request under subsection (b),
the financial institution shall provide notice to the applicant
of the access of the underwriter to such information, along
with notice that the financial institution may not discriminate
on the basis of such information.

"(e) FORM AND MANNER OF INFORMATION.—

"(1) IN GENERAL.—Each financial institution shall compile      Records.
and maintain, in accordance with regulations of the Bureau,
a record of the information provided by any loan applicant
pursuant to a request under subsection (b).

"(2) ITEMIZATION.—Information compiled and maintained
under paragraph (1) shall be itemized in order to clearly and
conspicuously disclose—

"(A) the number of the application and the date on
which the application was received;

"(B) the type and purpose of the loan or other credit
being applied for;

"(C) the amount of the credit or credit limit applied
for, and the amount of the credit transaction or the credit
limit approved for such applicant;

"(D) the type of action taken with respect to such
application, and the date of such action;

"(E) the census tract in which is located the principal
place of business of the women-owned, minority-owned,
or small business loan applicant;

"(F) the gross annual revenue of the business in the
last fiscal year of the women-owned, minority-owned, or
small business loan applicant preceding the date of the
application;

"(G) the race, sex, and ethnicity of the principal owners
of the business; and

"(H) any additional data that the Bureau determines
would aid in fulfilling the purposes of this section.

"(3) NO PERSONALLY IDENTIFIABLE INFORMATION.—In com-
piling and maintaining any record of information under this

66

AdminRecord-001624

124 STAT. 2058          PUBLIC LAW 111–203—JULY 21, 2010

section, a financial institution may not include in such record the name, specific address (other than the census tract required under paragraph (1)(E)), telephone number, electronic mail address, or any other personally identifiable information concerning any individual who is, or is connected with, the women-owned, minority-owned, or small business loan applicant.

"(4) DISCRETION TO DELETE OR MODIFY PUBLICLY AVAILABLE DATA.—The Bureau may, at its discretion, delete or modify data collected under this section which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest.

"(f) AVAILABILITY OF INFORMATION.—

Deadline.

"(1) SUBMISSION TO BUREAU.—The data required to be compiled and maintained under this section by any financial institution shall be submitted annually to the Bureau.

"(2) AVAILABILITY OF INFORMATION.—Information compiled and maintained under this section shall be—

Time period.

"(A) retained for not less than 3 years after the date of preparation;

"(B) made available to any member of the public, upon request, in the form required under regulations prescribed by the Bureau;

"(C) annually made available to the public generally by the Bureau, in such form and in such manner as is determined by the Bureau, by regulation.

"(3) COMPILATION OF AGGREGATE DATA.—The Bureau may, at its discretion—

"(A) compile and aggregate data collected under this section for its own use; and

"(B) make public such compilations of aggregate data.

"(g) BUREAU ACTION.—

"(1) IN GENERAL.—The Bureau shall prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to this section.

"(2) EXCEPTIONS.—The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section.

"(3) GUIDANCE.—The Bureau shall issue guidance designed to facilitate compliance with the requirements of this section, including assisting financial institutions in working with applicants to determine whether the applicants are women-owned, minority-owned, or small businesses for purposes of this section.

"(h) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

"(1) FINANCIAL INSTITUTION.—The term 'financial institution' means any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity.

"(2) SMALL BUSINESS.—The term 'small business' has the same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632).

67

AdminRecord-001625

"(3) SMALL BUSINESS LOAN.—The term 'small business loan' means a loan made to a small business.

"(4) MINORITY.—The term 'minority' has the same meaning as in section 1204(c)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

"(5) MINORITY-OWNED BUSINESS.—The term 'minority-owned business' means a business—

"(A) more than 50 percent of the ownership or control of which is held by 1 or more minority individuals; and

"(B) more than 50 percent of the net profit or loss of which accrues to 1 or more minority individuals.

"(6) WOMEN-OWNED BUSINESS.—The term 'women-owned business' means a business—

"(A) more than 50 percent of the ownership or control of which is held by 1 or more women; and

"(B) more than 50 percent of the net profit or loss of which accrues to 1 or more women.".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—Section 701(b) of the Equal Credit Opportunity Act (15 U.S.C. 1691(b)) is amended—

(1) in paragraph (3), by striking "or" at the end;

(2) in paragraph (4), by striking the period at the end and inserting "; or"; and

(3) by inserting after paragraph (4), the following:

"(5) to make an inquiry under section 704B, in accordance with the requirements of that section.".

(c) CLERICAL AMENDMENT.—The table of sections for title VII of the Consumer Credit Protection Act is amended by inserting after the item relating to section 704A the following new item:

15 USC 1691 note.

"704B. Small business loan data collection.".

(d) EFFECTIVE DATE.—This section shall become effective on the designated transfer date.

68

AdminRecord-001626

# Appendix B: Glossary

**Administrator** means the manager of the Small Business Administration. The Administrator is appointed by the President. 15 U.S.C. 633(b)(1).

**Depository Institution** or **DI** means any bank or savings association defined by the Federal Deposit Insurance Act, 12 U.S.C. 1813(c)(1), or credit union defined pursuant to the Federal Credit Union Act, as implemented by 12 CFR 700.2.

**Dodd-Frank Act** means the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (July 21, 2010). Section 1071 of the Dodd-Frank Act provides the Bureau with the authority to promulgate rules related to the proposals under consideration.

**Equal Credit Opportunity Act** or **ECOA**, 15 U.S.C. 1691 et seq., prohibits creditors from discriminating in any aspect of a credit transaction, including business-purpose transactions, on the basis of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act. Section 1071 is codified in section 704B of ECOA, 15 U.S.C. 1691c-2. ECOA is implemented by the Bureau's Regulation B.

**Financial Institution** or **FI** is defined in Section 1071(h)(1) as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity." Section 1071's data collection and reporting obligations apply to financial institutions that receive applications for credit for women-owned, minority-owned, and small businesses. The term "financial institution" is defined for purposes of this Outline in part III.B above. However, the Bureau is seeking feedback and information from SERs as to how it should define this term for purposes of an eventual 1071 rule.

**Loan** or **credit** means, for purposes of this Outline, the covered products discussed in part III.E—term loans, lines of credit, and business credit cards. However, the Bureau is seeking feedback and information from SERs as to how it should define this term for purposes of an eventual 1071 rule.

**Regulatory Flexibility Act** or **RFA**, Pub. L. No. 96-354 (Sept. 19, 1980), codified at 5 U.S.C. 601 through 612, refers to the statute that established the principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to that regulation.

**Small Business Regulatory Enforcement Fairness Act of 1996** or **SBREFA**, Pub. L. No. 104-121 (Mar. 29, 1996), refers to the statute that establishes the Small Business Review Panel process for certain Bureau, Environmental Protection Agency, and Occupational Health and Safety Administration rulemakings. SBREFA amended the RFA.

AdminRecord-001627

**Small Business Review Panel** or **Panel** means a panel formed of representatives from the Bureau, the Chief Counsel for Advocacy of the Small Business Administration, and the Office of Information and Regulatory Affairs in the Office of Management and Budget.  A Panel is convened in accordance with SBREFA when a rule under development may have a significant economic impact on a substantial number of small entities.  The Panel for the Bureau's Small Business Lending Data Collection rulemaking will prepare a report of its recommendations after discussing with small entity representatives this Outline of Proposals Under Consideration and Alternatives Considered.

**Small Entity** means a small business, small organization, or a small governmental jurisdiction as defined by the Regulatory Flexibility Act.  The size standards for determining a business as small vary by industry and are established by the Small Business Administration.

**Small Entity Representative** or **SER** means a representative of a small entity who participates in the SBREFA process to provide input on costs and benefits of the proposals under consideration in a rulemaking.

AdminRecord-001628

## Appendix C: Closely-related Federal statutes and regulations

The Bureau has identified other Federal statutes and regulations that have potentially overlapping or conflicting requirements in order to avoid duplication or conflict with implementing section 1071. The Bureau has identified the following Federal statutes and regulations as closely related to section 1071:

The **Community Reinvestment Act** or **CRA**, implemented by Office of Comptroller of the Currency, Federal Reserve Board, and Federal Deposit Insurance Corporation regulations, requires some institutions to collect, maintain, and report certain data about small business, farm, and consumer lending to ensure they are serving their communities. The purpose of the CRA is to encourage institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions. Congress enacted section 1071 for the purpose of facilitating enforcement of fair lending laws and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses. The Bureau intends to work with CRA regulatory agencies to ensure section 1071 and CRA do not conflict.

The **Equal Credit Opportunity Act** or **ECOA,** implemented by the Bureau's Regulation B (12 CFR part 1002), prohibits creditors from discriminating in any aspect of a credit transaction, including a business-purpose transaction, on the basis of race, color, religion, national origin, sex, marital status, age (if the applicant is old enough to enter into a contract), receipt of income from any public assistance program, or the exercise in good faith of a right under the Consumer Credit Protection Act.[89] The Bureau has certain oversight, enforcement, and supervisory authority over ECOA requirements and has rulemaking authority under the statute.[90]

Regulation B generally prohibits creditors from inquiring about an applicant's race, color, religion, national origin, or sex, with limited exceptions, including when it is required by law.[91] Regulation B requires creditors to request information about the race, ethnicity, sex, marital status, and age of applicants for certain dwelling-secured loans and to retain that information for certain periods.[92] Regulation B requires this data collection for credit primarily for the purchase or refinancing of a dwelling occupied or to be occupied by the applicant as a principal residence, where the extension of credit will be secured by the dwelling, and requires the data to be maintained by the creditor for 25 months for purposes of monitoring and enforcing compliance with ECOA/Regulation B and other laws.[93]

---

[89] 15 U.S.C. 1691(a)(1).

[90] *See* 15 U.S.C. 1691c.

[91] 12 CFR 1002.5(a), (b), Regulation B (12 CFR part 1002) comment 5(a)-2.

[92] 12 CFR 1002.5(a)(2), 1002.12(b)(1)(i), 1002.13(a).

[93] 12 CFR 1002.12(b)(1)(i), 1002.13(a)(1).

AdminRecord-001629

Section 1071 of the Dodd-Frank Act amended ECOA to require financial institutions to compile, maintain, and submit to the Bureau certain data on credit applications by women-owned, minority-owned, and small businesses.

The Bureau is seeking information on how any of the proposals under consideration for implementing section 1071 might impact other aspects of ECOA/Regulation B compliance. (See Q1 above.)

The **Federal Credit Union Act**, implemented by the National Credit Union Administration (NCUA) (12 CFR part 1756), requires Federal credit unions to make financial reports as specified by the agency. The NCUA requires quarterly reports of the total number of outstanding loans, total outstanding balance, total number granted or purchased year-to-date, total amount granted or purchased year-to-date for commercial loans to members, not including loans with original amounts less than $50,000. The NCUA also requires quarterly reports of the total number and total outstanding balance (including the guaranteed portion) of loans originated under a Small Business Administration (SBA) loan program.

The **Federal Deposit Insurance Act**, implemented by the FDIC (12 CFR part 304), requires insured depository institutions to file Consolidated Reports of Condition and Income (Call Reports) in accordance with applicable instructions. These instructions require quarterly reports of loans to small businesses, defined as loans for commercial and industrial purposes to sole proprietorships, partnerships, corporations, and other business enterprises and loans secured by nonfarm nonresidential properties with original amounts of $1 million or less. In accordance with amendments by the Federal Deposit Insurance Corporation Improvement Act of 1991, the instructions require quarterly reports of loans to small farms, defined as loans to finance agricultural production, other loans to farmers, and loans secured by farmland (including farm residential and other improvements) with original amounts of $500,000 or less.

The **Home Mortgage Disclosure Act** or **HMDA**, implemented by the Bureau's Regulation C (12 CFR part 1003), requires lenders who meet certain coverage tests to report detailed information to their Federal supervisory agencies about mortgage applications and loans at the transaction level. This reported data is a valuable source for regulators, researchers, economists, industry, and advocates assessing housing needs, public investment, and possible discrimination as well as studying and analyzing trends in the mortgage market for a variety of purposes, including general market and economic monitoring. There may be some overlap between what is required to be reported under HMDA and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses.

The **Small Business Act** or **SB Act**, administered through the SBA, defines a small business concern as a business that is "independently owned and operated and which is not dominant in its field of operation" and empowers the Administrator to prescribe detailed size standards by which a business concern may be categorized as a small business. The SBA has adopted more than one thousand industry-specific size standards, classified by six-digit NAICS codes, to determine whether a business concern is "small." In addition, the SB Act authorizes loans for qualified small business concerns for purposes of plant acquisition, construction, conversion, or expansion, including the acquisition of land, material, supplies, equipment, and working capital.

AdminRecord-001630

The SBA sets the guidelines that govern the "7(a) loan program," determining which businesses financial institutions may lend to through the program and the type of loans they can provide.

AdminRecord-001631

# Appendix D: Summary of data fields and other key information for each data point under consideration

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Women-owned business status** | 1071(b)(1): whether the business is a women-owned … business | FI reports applicant's response as to whether it is a women-owned business. | Applicant's self-reporting of women-owned business status (report one): ○ Yes ○ No ○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Minority-owned business status** | 1071(b)(1): whether the business is a … minority-owned … business | FI reports applicant's response as to whether it is a minority-owned business. | Applicant's self-reporting of minority-owned business status (report one): ○ Yes ○ No ○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Small business status** | 1071(b)(1): whether the business is a … small business | FI reports applicant's response to certain threshold questions/data point(s), which will be used to determine small business status and whether other data points should be collected. | Is the applicant in a manufacturing or wholesale industry? ○ Yes ○ No  If yes, does it have fewer than 500 employees? ○ Yes ○ No  If the applicant is not in a manufacturing or wholesale industry, does it have less than $8 million in gross annual revenue? ○ Yes ○ No | The specifics of this data point will depend on the definition of "small business." This is an example based on the second alternative option under consideration. |
| **Application/loan number** | 1071(e)(2)(A): the number of the application … | FI reports an alphanumeric application or loan number of no more than 45 characters that is unique, within the FI, to | Unique alphanumeric application or loan number of no more than 45 characters. | |

74

AdminRecord-001632

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | the referenced extension (or requested extension) of small business credit and that remains uniform through the application and origination stages of the process. | | |
| **Application date** | 1071(e)(2)(A): … and the date on which it was received. | FI reports application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application." | Date—reported as day, month, and year. | Grace period of several days on either side of the date reported. |
| **Loan/credit type** | 1071(e)(2)(B): the type … of the loan or other credit being applied for | FI reports loan/credit type in three parts. FI reports (1) loan/credit product and (2) guarantee; both are chosen from specified lists.  FI reports (3) loan term in number of months. | (1) Loan/Credit Product: <br> o Term loan—unsecured <br> o Term loan—secured <br> o Line of credit—unsecured <br> o Line of credit—secured <br> o Business credit card <br> o Other <br> o Unknown (for applications) <br><br> (2) Guarantee: <br> o Personal guarantee—owner(s) <br> o Personal guarantee—non-owner(s) <br> o SBA guarantee—7(a) program <br> o SBA guarantee—504 program <br> o SBA guarantee—other <br> o USDA guarantee <br> o Other Federal guarantee <br> o State or local government guarantee <br> o Other guarantee <br> o No guarantee <br> o Unknown | |

75

AdminRecord-001633

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | (3) Loan Term: (report one, as applicable):<br>○ # of months<br>○ NA (for products that do not have a loan term (such as credit cards) and for applications that did not specify a loan term). | |
| **Loan purpose** | 1071(e)(2)(B): the … purpose of the loan or other credit being applied for | FI reports loan purpose from a specified list. | Loan purpose (choose up to three):<br>○ Commercial real estate—owner occupied<br>○ Commercial real estate—non-owner occupied (includes investors)<br>○ Motor vehicle (including light and heavy trucks)<br>○ Equipment<br>○ Working capital (includes inventory or floor planning)<br>○ Business start-up<br>○ Business expansion<br>○ Business acquisition<br>○ Refinance existing debt<br>○ Line increase<br>○ Other<br>○ Unknown or unreported by the applicant | |
| **Credit amount/limit applied for** | 1071(e)(2)(C): the amount of the credit or credit limit applied for | FI reports the initial amount of credit or credit limit requested by the applicant at the application stage, or later in the process but prior to the FI's evaluation of the credit request | Credit amount/credit limit applied for (report one, as applicable):<br>○ $ amount for initial amount of credit/credit limit requested by applicant<br>○ $ amount of a "firm offer," if application is in response to a firm offer that specifies an amount<br>○ $ amount underwritten (if applicant does not request a particular amount but FI underwrites for a specific amount) | Does not require reporting of amounts discussed before an application is made, but would capture the initial amount requested at the application stage or later—would reflect the amount evaluated by the lender in making a credit decision. |

AdminRecord-001634

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | ○ NA (if the product applied for does not involve a specific amount) | |
| **Credit amount/limit approved** | 1071(e)(2)(C): … the amount of the credit transaction or the credit limit approved … | FI reports the credit amount or credit limit approved, using (1) the *amount of the originated loan* for a closed-end origination; (2) the *amount approved* for a closed-end loan application that is approved but not accepted; and (3) the *amount of the credit limit approved* for open-end products. | For approved or originated loans only (report one, as applicable):<br>○ $ amount of originated loan (if a closed-end origination)<br>○ $ amount approved (if a closed-end application is approved but not accepted)<br>○ $ amount of credit limit approved (for open-end loans/applications)<br><br>For applications that are denied, closed for incompleteness, or withdrawn by the applicant, report NA. | |
| **Action taken** | 1071(e)(2)(D): the type of action taken … | FI reports one of five actions taken on the application. | Action taken (choose one):<br>○ Loan originated;<br>○ Application approved but not accepted;<br>○ Application denied;<br>○ Incomplete application (closed or denied);<br>○ Application withdrawn by applicant. | Actions listed are similar to Reg B and C actions taken, with simplifying modifications |
| **Action taken date** | 1071(e)(2)(D): … the date of such action | FI reports the date the action was taken | Date—reported as day, month, and year. | |
| **Census tract (principal place of business)** | 1071(e)(2)(E): the census tract in which is located the principal place of business … | FI reports a geocoded census tract based on an address collected in the application, or during review or origination of the loan. | Geocoded census tract.<br><br>Nature of the address used to geocode census tract (report one, as applicable):<br>○ Address where the loan proceeds will principally be applied.<br>○ Location of borrower's main office or headquarters.<br>○ Another business address associated with the application. | FI reports census tract based on, first, the address where the loan proceeds will principally be applied, or, second, the location of borrower's main office or headquarters, or third, another business address associated with the application. FI then specifies which type of address it has used. |

AdminRecord-001635

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| **Gross annual revenue (GAR)** | 1071(e)(2)(F): the gross annual revenue … in the last fiscal year … | FI reports the GAR of the applicant during the last fiscal year | GAR (report one, as applicable):<br>○ If verified, $ amount of verified GAR.<br>○ If not verified, $ amount of GAR as reported by applicant or otherwise obtained. | |
| **Race of principal owners** | 1071(e)(2)(G): the race … of the principal owners of the business | FI reports applicant's response regarding the race of principal owner(s) | Principal Owner 1 (choose one or more):<br>○ American Indian or Alaska Native<br>○ Asian<br>○ Black or African American<br>○ Native Hawaiian or Other Pacific Islander<br>○ White<br>○ Applicant responded "I do not wish to provide this information" or did not respond<br><br>Principal owners 2, 3, and 4:<br>○ [Same as above] | Self-reporting by applicant only; no verification or visual observation/surname analysis.<br><br>More than one race can be reported for each principal owner.<br><br>Aligns with the aggregate HMDA categories. |
| **Sex of principal owners** | 1071(e)(2)(G): the … sex … of the principal owners of the business | FI reports applicant's response regarding the sex of principal owner(s) | Principal Owner 1 (choose one):<br>○ Male<br>○ Female<br>○ Applicant chose male and female<br>○ Applicant responded "I do not wish to provide this information" or did not respond<br><br>Principal owners 2, 3, and 4:<br>○ [Same as above] | Self-reporting by applicant only; no verification or visual observation/surname analysis. |
| **Ethnicity of principal owners** | 1071(e)(2)(G): the … ethnicity of the principal owners of the business | FI reports applicant's response regarding the ethnicity of principal owner(s) | Principal Owner 1 (choose one):<br>○ Hispanic or Latino<br>○ Not Hispanic or Latino<br>○ Applicant responded "I do not wish to provide this information" or did not respond | Self-reporting by applicant only; no verification or visual observation/surname analysis.<br><br>Aligns with the aggregate HMDA categories. |

AdminRecord-001636

| Data point | Statutory provision | Description | Data elements to be reported | Notes |
|---|---|---|---|---|
| | | | Principal owners 2, 3, and 4:<br>○ [Same as above] | |
| **NAICS code** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the NAICS code for the small business based on information provided by applicant | NAICS code | |
| **Number of employees** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the number of employees of the small business applicant | Number of employees (report one, as applicable):<br>○ If verified, verified number of employees.<br>○ If not verified, number of employees reported by applicant or otherwise obtained. | |
| **Time in business (TIB)** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the time in business of the applicant, expressed in years, or months if less than one year | TIB in years, or months if less than 1 year (report one, as applicable):<br>○ If verified, verified TIB.<br>○ If not verified, TIB reported by applicant or otherwise obtained. | |
| **Pricing** | 1071(e)(2)(H): any additional data that the Bureau determines would aid in fulfilling the purposes of [1071]. | FI reports the pricing of originated credit and credit that is approved but not accepted. | Pricing information. Reporting metric could be APR, total cost of credit, interest rate and total fees, or some other metric. | |

79

Effective March 30, 2023



Consumer Financial
Protection Bureau

# Small Business Lending Rule: Data Points Chart[1]

This chart is intended to be used as a reference tool for data points required to be collected and reported under the small business lending rule (rule). Relevant regulation and commentary sections are provided for ease of reference. The chart also incorporates the Data Points section information found in the 2024 Small Business Lending Rule Filing Instructions Guide (2024 FIG) for each data point, summarizes what information to report when data points are not applicable under the rule, and highlights additional guidance in the rule related to reporting for data points. This chart does not explain how to prepare the small business lending application register (SBLAR) or discuss the information about the financial institution required when registering for the submission platform and submitting the SBLAR. For more information on preparing the SBLAR and registering for the platform, please see www.consumerfinance.gov/data-research/small-business-lending-data/.

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| (1) Unique Identifier | § 1002.107(a)(1), Comments 107(a)(1)-1 and -2 | An alphanumeric application or loan identifier unique within the | Assign and report a unique identifier for each application or extension of credit that: | | **Minimum Length:** Must be at least 21 characters in length. |

---

[1] This is a Compliance Aid issued by the Consumer Financial Protection Bureau. The CFPB published a Policy Statement on Compliance Aids, available at https://www.consumerfinance.gov/policy-compliance/rulemaking/final-rules/policy-statement-compliance-aids/, that explains the CFPB's approach to Compliance Aids.

[2] The data point field numbers correspond to those provided in the Data Points section of the 2024 FIG. However, for ease of reading in this chart, the field names have been shortened and fields may be reordered. Use the field numbers to identify the relevant content in the 2024 FIG.

[3] The "filing instructions" column provides the information from the Data Points section in the 2024 FIG. Further information can be found in the 2024 FIG. Some information may not be presented exactly as in the 2024 FIG in order to fit the format of this document or for summary purposes. This chart is not a substitute for the 2024 FIG, which should be consulted.

[4] The "reporting 'not applicable'" column details the information provided in Regulation B and the 2024 FIG about when a data point is considered not applicable, may be left blank, or otherwise need not be provided. It also details instances where a data point is applicable, but where the applicability may not be obvious, such as when a zero value is required. If more information is needed, please review the rule and commentary specified for the data point and the 2024 FIG. If there is no information in the "not applicable" column, that means that the data point is applicable for all reported applications.

[5] The "other reporting notes" column details additional notes from the rule commentary that relate to reporting requirements. This may include information when previously collected information may be reported, when multiple data records may be applicable for the data point, conditions for the data field, recordkeeping requirements specific to the data point that may impact reporting, or firewall requirements that may impact reporting. The column is not meant to include all commentary on the data point, and the financial institution should still consult the commentary to ensure completeness in understanding.

AdminRecord-001638

Effective March 30, 2023

cfpb Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | financial institution to the specific application. | 1. Begins with the financial institution's Legal Entity Identifier as defined in Comment 109(b)(6)-1.<br><br>2. Follows the Legal Entity Identifier with up to 25 additional characters to identify the covered application, which:<br>• Must be uppercase letters, numerals, or a combination of uppercase letters and numerals;<br>• Must be unique within the financial institution;<br>• Must *not* include dashes, other special characters, or characters with diacritics (e.g., accents); and<br>• Must *not* include any information that could be used to directly identify the applicant or borrower.<br><br>*UID Example:*<br><br>10BX939c5543TQA1144M999143X99<br><br>LEI    Covered Application Identifier | | **Maximum Length:** Cannot exceed 45 characters in length. |

AdminRecord-001639

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| (2) Application Date | § 1002.107(a)(2), Comments 107(a)(2)-1 through -4. | Date the application was received, or the date shown on a paper or electronic application form. | Enter, in numeral form, the date the application was received or the date shown on the application form by year, month, and day, using YYYYMMDD format. *Example:* If the application was received on July 21, 2028, enter 20280721. | | **Safe Harbor:** See § 1002.112(c)(1) and Comment 107(a)(2)-4 for discussion of when a financial institution may receive safe harbor for an error in the application date reported. |
| (3) Application Method | § 1002.107(a)(3), Comment 107(a)(3)-1 | The means by which the application was submitted from the specified list. | Indicate how the applicant submitted the application by entering one (1) of the specified code numbers: • Code 1—In-Person • Code 2—Telephone • Code 3—Online • Code 4—Mail | | |
| (4) Application Recipient | § 1002.107(a)(4), Comment 107(a)(4)-1 | Whether the application was submitted directly to the financial institution (or its affiliate) or | Indicate the application recipient by entering one (1) of the specified code numbers: • Code 1—Directly (The applicant submitted the application directly to the financial institution or its affiliate) | | |

AdminRecord-001640

Effective March 30, 2023



| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | submitted indirectly to the financial institution through a third party. | ▪ Code 2—Indirectly (The applicant submitted the application indirectly to the financial institution via a third party) | | |
| (5) and (6) Credit Type – Credit Product | § 1002.107(a)(5)(i); Comments 107(a)(5)-1 through -6 | The credit product applied for or originated. | **CREDIT PRODUCT TYPE FIELD.** Indicate the credit product applied for or originated. credit product by entering one (1) of the specified code numbers:<br>▪ Code 1—Term Loan - Unsecured<br>▪ Code 2—Term Loan - Secured<br>▪ Code 3—Line of Credit - Unsecured<br>▪ Code 4—Line of Credit - Secured<br>▪ Code 5—Credit Card Account, Not Private-Label<br>▪ Code 6—Private-Label Credit Card Account<br>▪ Code 7—Merchant Cash Advance<br>▪ Code 8—Other Sales-Based Financing Transaction<br>▪ Code 977—Other (specify in the associated free-form text field)<br>▪ Code 988—Not provided by applicant and otherwise undetermined | If the applicant does not indicate what credit product it seeks and the application is denied, withdrawn, or closed for incompleteness before a credit product is identified, the financial institution enters code "**988**" for the Credit Product Type Field and leaves **blank** the Credit Product Free-Form Text Field. Comment 107(a)(5)-4. | **Multiple Product Types:** If an applicant requested more than one type of credit product at the same time, each should be reported as a separate application. If the applicant was seeking only one covered credit transaction but did not decide on a particular credit product type, the financial institution reports the credit product originated (if originated), or the credit product denied (if denied), or the credit product of greater interest to the applicant, if readily determinable. *Multiple product types must <u>not</u> be reported for a single application.* Comment 107(a)(5)-1. See also Comment 107(a)(5)-5 for how counteroffers are reported. |

AdminRecord-001641

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | **CREDIT PRODUCT FREE-FORM TEXT FIELD.** If code "**977**" is reported, the financial institution must specify the credit product in the associated free-form text field. Comment 107(a)(5)-6. Only one credit product is provided for a single application. Comment 107(a)(5)-1. The free-form text field is left blank if code 977 is not used. The maximum number of characters for this field is 300 characters, including spaces. | | |
| (7) and (8) Credit Type – Guarantee Type | § 1002.107(a)(5)(ii), Comment 107(a)(5)-7 | The type or types of guarantees for the credit product. | **CREDIT GUARANTEE TYPE FIELD.** Indicate the type(s) of credit guarantee by entering up to five (5) of the specified code numbers:<br>• Code 1—Personal Guarantee - Owner(s)<br>• Code 2—Personal Guarantee - Non-Owner(s)<br>• Code 3—SBA Guarantee - 7(a) Program<br>• Code 4—SBA Guarantee - 504 Program<br>• Code 5—SBA Guarantee - Other<br>• Code 6—USDA Guarantee<br>• Code 7—FHA Insurance<br>• Code 8—Bureau of Indian Affairs Guarantee<br>• Code 9—Other Federal Guarantee<br>• Code 10—State Government Guarantee<br>• Code 11—Local Government Guarantee | If no guarantee was obtained (or would have been obtained in the case of an application that was not originated) or if the application is denied, withdrawn, or closed for incompleteness before a credit guarantee type is identified, the financial institution enters code "**999**" in the Credit Guarantee Type Field and leaves **blank** the Credit Guarantee Free-Form Text Field. Comment 107(a)(5)-7. | **Multiple Guarantee Types:** If there is more than one type of guarantee, multiple codes may be entered in any order, separated by a semicolon. Comment 107(a)(5)-7. *Maximum of* **five (5)** *guarantee types total for both the specified codes and any other types of guarantees provided in the Credit Guarantee Free-Form Text Field.* For example, a financial institution could enter three specified code numbers, select code "977" for Other, and enter two additional unspecified guarantee |

AdminRecord-001642

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | ▪ Code 977—Other (specify in the associated free-form text field)<br>▪ Code 999—No Guarantee<br><br>**CREDIT GUARANTEE FREE-FORM TEXT FIELD.** If code "977" is reported, the financial institution must specify the credit guarantee type in the associated free-form text field. Comment 107(a)(5)-7. If multiple other credit guarantee types are provided, separate each with a semicolon. The free-form text field is left blank if code "977" is not used. The maximum number of characters for this field is 300 characters, including spaces. | | types in the Credit Guarantee Free-Form Text Field. |
| (9) and (10) Credit Type – Loan Term Flag and Value | § 1002.107(a)(5)(iii), Comment 107(a)(5)-8 | The number of months after which the legal obligation will mature or terminate, measured from the date of origination.<br><br>For transactions involving real | **LOAN TERM FLAG FIELD.** Indicate whether the loan term is applicable for this application or extension of credit by entering one of the specified code numbers:<br>▪ Code 900—Applicable and reported<br>▪ Code 988—Applicable but not provided by applicant and otherwise undetermined<br>▪ Code 999—Not applicable<br><br>**LOAN TERM VALUE FIELD:** If code "900" is reported for the Loan Term Flag Field, report in numerical form the number of months, in whole | If the credit product generally has a loan term, but the application is denied, withdrawn, or closed for incompleteness before a loan term is identified, the financial institution enters code "988" in the Loan Term Flag Field and leaves **blank** the Loan Term Value Field. Comment 107(a)(5)-8.<br><br>If the credit product does not have a term, such as credit card products, | **Whole Month Optionality:** When reporting the Loan Term Value, the financial institution may choose to round the loan term to the nearest full month or may choose to count only full months and ignore partial months. For example, if the product has a loan term of 14 months and 15 days, the financial institution may either report **15**, rounding to the nearest full month, or **14**, ignoring the partial month. For products with |

AdminRecord-001643

Effective March 30, 2023

cfpb Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | property, the term *may* be measured from the date of the first payment period, disregarding the time that elapses, if any, between the settlement of the transaction and the first payment period. | months, in the loan term. The field is **left blank** if code "900" is not reported for the Loan Term Flag field. | the financial institution enters code "**999**" to report not applicable in the Loan Term Flag Field and leaves **blank** the Loan Term Value Field. Comment 107(a)(5)-8.<br><br>If Field 5: Credit Product Type is reported as code "**988**" (Not provided by applicant and otherwise undetermined), the financial institution enters code "**999**" to report not applicable in the Loan Term Flag Field and leaves **blank** the Loan Term Value Field. Comment 107(a)(5)-8. | a loan term of less than 1 month (e.g., 14 days), the financial institution must enter 1. Comment 107(a)(5)-8.<br><br>**MCAs and Other Sales-Based Financing Transactions:** For merchant cash advances and other sales-based financing transactions, the financial institution reports the loan term, if any, that the financial institution estimated or specified in processing, underwriting, or providing disclosures for the application or transaction. If more than one such loan term is estimated or specified for this transaction type, the financial institution reports the one it considers to be most accurate. Comment 107(a)(5)-8. If no loan term has been specified for the application, the financial institution reports Code "**988**". |

AdminRecord-001644

Effective March 30, 2023


Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| (11) and (12) Credit Purpose | § 1002.107(a)(6), Comment 107(a)(6)-1 through -8 | The purpose of the credit applied for or originated. | **CREDIT PURPOSE TYPE FIELD.** Indicate the credit purpose(s) by entering up to three (3) of the specified code numbers:<br>• Code 1— Purchase, Construction/Improvement, or Refinance of Non-Owner-Occupied Real Property<br>• Code 2— Purchase, Construction/Improvement, or Refinance of Owner-Occupied Real Property<br>• Code 3— Purchase, Refinance, or Rehabilitation/Repair of Motor Vehicle(s) (including light and heavy trucks)<br>• Code 4— Purchase, Refinance, or Rehabilitation/Repair of Equipment<br>• Code 5—Working Capital (includes inventory or floor planning)<br>• Code 6—Business Start-Up<br>• Code 7—Business Expansion<br>• Code 8—Business Acquisition<br>• Code 9—Refinance Existing Debt (other than refinancings listed above)<br>• Code 10—Line Increase<br>• Code 11—Overdraft<br>**NOTE:** When overdraft is provided as an aspect of a credit product, code "<u>11</u>" is reported.  Occasional overdraft services offered as part of a deposit account offering | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about credit purpose information, the financial institution enters code "<u>988</u>" in the Credit Purpose Type Field and leaves **blank** the Credit Purpose Free-Form Text Field.  Comment 107(a)(6)-4.<br><br>If the credit product generally has indeterminate or numerous potential purposes, such as with credit card products, the financial institution enters code "<u>999</u>" to report not applicable in the Credit Purpose Type Field and leaves **blank** the Credit Purpose Free-Form Text Field.  Comment 107(a)(6)-5. | **Multiple Credit Purpose Types:** If there is more than one type of credit purpose, multiple codes may be entered in any order in the Credit Purpose Type Field, separated by a semicolon.  *Maximum of 3 codes, including Code 977.*  Do not enter more than one other credit purpose in the Credit Purpose Free-Form Text Field.  If an application has more than three purposes, the financial institution reports any three of those purposes.  Comment 107(a)(6)-2. |

AdminRecord-001645

Effective March 30, 2023

Consumer Financial
Protection Bureau

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | are not reported under the rule.  Comment 107(a)(6)-8.<br>▪ Code 977—Other (specify in the associated free-form text field)<br>▪ Code 988— Not provided by applicant and otherwise undetermined<br>▪ Code 999— Not applicable<br><br>**CREDIT PURPOSE FREE-FORM TEXT FIELD:** If code "**977**" is reported, the financial institution must specify the credit purpose in the associated free-form text field.  If the application has more than one "other" purpose, the financial institution chooses the most significant "other" purpose and only reports that one.  Code "**977**" counts towards the maximum of three (3) codes that may be submitted.  Comment 107(a)(6)-3. If an applicant provides a purpose similar to the language above, the purpose should be matched to the similar code, and code "**977**" is not used.  Comment 107(a)(6)-6.  The free-form text field is **left blank** if code "977" is not used. The maximum number of characters for this field is 300 characters, including spaces. | | |

AdminRecord-001646

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| (13) and (14) Amount Applied For – Flag and Value | § 1002.107(a)(7), Comment 107(a)(7)-1 through -5 | The initial amount of credit or the initial credit limit requested by the applicant. The financial institution is not required to report amounts discussed before an application is made. Comment 107(a)(7)-1 and -2. | **AMOUNT APPLIED FOR FLAG:** Indicate whether the amount applied for is applicable for this application or extension of credit by entering one (1) of the specified code numbers: <br>▪ Code 900—Applicable and reported <br>▪ Code 988—Applicable but not provided by applicant and otherwise undetermined <br>▪ Code 999—Not applicable <br><br>**AMOUNT APPLIED FOR VALUE FIELD:** If code "**900**" is reported, report in numerical form the amount applied for. Comment 107(a)(7)-1. The field is **left blank** if code "900" is not reported for the Amount Applied For Flag field. | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the initial amount requested, the financial institution enters code "**988**" in the Amount Applied For Flag Field and leaves **blank** the Amount Applied For Value Field. Comment 107(a)(7)-5. <br><br>If the particular type of credit product applied for does not involve a specific amount requested, the financial institution enters code "**999**" to report not applicable in the Amount Applied For Flag Field and leaves **blank** the Amount Applied For Value Field. Comment 107(a)(7)-2. | **Multiple Amounts:** If the applicant requests multiple amounts or an amount as a range of numbers, the financial institution reports the midpoint of that range of amounts in the Amount Applied For Value Field. Comment 107(a)(7)-1. <br><br>**Firm Offers:** See Comment 107(a)(7)-3 for what to report if the application originated from a firm offer of credit. <br><br>**Existing Accounts:** See Comment 107(a)(7)-4 for what to report if the amount requested relates to seeking additional amounts for existing credit accounts. <br><br>**No Amount Requested at Application Stage:** If the applicant does not request a specific amount at the application stage, but the financial institution underwrites the application for a specific amount, the |

AdminRecord-001647

Effective March 30, 2023

cfpb Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | | | underwritten amount is reported. Comments 107(a)(7)-2 and 3. |
| (15) Amount Approved or Originated | § 1002.107(a)(8), Comments 107(a)(8)-1 through -6 | The credit amount or credit limit approved or originated. | Enter, in dollars, the amount approved or originated. *Example:* If the amount approved was $10,123.59, enter 10123.59. | If Field 16: Action Taken is reported as codes "3" (denied), "4" (withdrawn) or "5" (closed for incompleteness), the financial institution leaves this Amount Approved or Originated Field **blank** to report not applicable. Comment 107(a)(8)-1. <br><br> If a counteroffer is provided and the applicant does not agree to proceed or fails to respond, the financial institution leaves this Amount Approved or Originated Field **blank** to report not applicable. Comment 107(a)(8)-5. | **Conditions:** A value is only possible if Field 16: Action Taken, below, is reported as codes "1" (originated) or "2" (approved but not accepted). <br><br> **Multiple Values:** If there are multiple amounts offered, the amount reported depends on the transaction type. If a closed-end transaction is originated, the financial institution reports the amount originated. If an open-end transaction is originated, the financial institution reports the credit limit that is established. However, for closed-end transactions where the offer was approved but not accepted, the financial institution reports the highest amount approved by the financial institution. For open-end lines of credit where the offer was approved but not accepted, the financial institution reports the |

AdminRecord-001648

Effective March 30, 2023

cfpb Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | | | highest amount approved by the financial institution. Comment 107(a)(8)-2.<br><br>**Refinancings:** See Comment 107(a)(8)-4 for what to report if the application relates to a refinancing.<br><br>**Existing Accounts:** See Comment 107(a)(8)-6 for what to report if the application relates to an existing credit account, such as an extension of additional credit. |
| (16) Action Taken | § 1002.107(a)(9), Comment 107(a)(9)-1 through -5 | Type of action the financial institution took on the application. | Indicate the action taken on the application by entering one (1) of the specified code numbers:<br>▪ Code 1—Originated<br>▪ Code 2—Approved but Not Accepted<br>▪ Code 3—Denied<br>▪ Code 4—Withdrawn by the Applicant<br>▪ Code 5—Incomplete<br><br>See Comment 107(a)(9)-1 for a discussion of when to report each code. | | **Counteroffers:** See Comment 107(a)(9)-2 for how to report counteroffers.<br><br>**Rescinded Transactions:** See Comment 107(a)(9)-3 for how to report rescinded transactions.<br><br>**Conditional Approvals:** See Comment 107(a)(9)-5 for how to |

AdminRecord-001649

Effective March 30, 2023

cfpb **Consumer Financial Protection Bureau**

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | | | report transactions with conditional approvals. |
| (17) Action Taken Date | § 1002.107(a)(10), Comments 107(a)(10)-1 through -5 | Date the financial institution took action on the application. See Comments 107(a)(10)-1 through -5 for examples. | Enter, in numeral form, the date of action taken by year, month, and day, using YYYYMMDD format.<br>*Example:* If the action taken date is July 21, 2028, enter 20280721.<br><br>The date must occur within the applicable reporting period. | | |
| (18) and (19) Denial Reasons | § 1002.107(a)(11), Comment 107(a)(11)-1 and -2 | The principal reason(s) the application was denied. | **DENIAL REASON TYPE FIELD.** Indicate the principal reason, or reasons, for denial by entering up to four (4) of the specified code numbers:<br>▪ Code 1—Credit Characteristics of the Business<br>▪ Code 2—Credit Characteristics of the Principal Owner(s) Or Guarantor(s)<br>▪ Code 3—Use of Credit Proceeds<br>▪ Code 4—Cashflow<br>▪ Code 5—Collateral<br>▪ Code 6—Time in Business<br>▪ Code 7—Government Loan Program Criteria | If Field 16: Action Taken, above, was not reported as code "3" (denied), the financial institution enters code "**999**" in the Denial Reason Type Field and leaves **blank** the Denial Reasons Free-Form Text Field to report not applicable. Comment 107(a)(11)-2. | **Multiple Types:** If there is more than one denial reason, multiple codes may be entered in any order, separated by a semicolon. Comment 107(a)(11)-1. *Maximum of four (4) denial reasons total for both the specified codes and any other reasons provided in the Denial Reasons Free-Form Text Field.* For example, a financial institution could enter two specified code numbers, and select code "977" for Other and enter two additional unspecified |

AdminRecord-001650

Effective March 30, 2023



Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | ▪ Code 8—Aggregate Exposure<br>▪ Code 9—Unverifiable Information<br>▪ Code 977—Other (specify in the associated free-form text field)<br>▪ Code 999—Not Applicable<br><br>See Comment 107(a)(11)-1 for a discussion of when each code may apply.<br><br>**DENIAL REASONS FREE-FORM TEXT FIELD:** If code "**977**" is reported, the financial institution must specify the denial reason(s) in the associated free-form text field. If the application has more than one "other" denial reason, the financial institution may provide multiple reasons (counted towards the maximum of four total denial reasons), separated by a semicolon. Comment 107(a)(11)-1.x. The free-form text field is **left blank** if code "977" is not used. The maximum number of characters for this field is 300 characters, including spaces. | | denial reasons in the Denial Reasons Free-Form Text Field. |
| (20) Pricing Information – | § 1002.107(a)(12)(i), Comment 107(a)(12)-1 and Comments | The type of interest rate that applies. | Indicate the type of interest rate relevant to this application that was approved but not accepted | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" (withdrawn) or "5" (closed for | **Conditions:** Codes "1" through "6" for this data point are only possible for reporting if Field 16: Action Taken |

AdminRecord-001651

Effective March 30, 2023

cfpb Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| Interest Rate Type | 107(a)(12)(i)-1 through -3. | | or this extension of credit that was originated by entering one (1) of the specified code numbers:<br>• Code 1—The transaction has a variable interest rate and does not have an initial rate period<br>• Code 2—The transaction has a fixed interest rate and does not have an initial rate period<br>• Code 3—The transaction has an initial rate period greater than 12 months, during which the interest rate is variable<br>• Code 4—The transaction has an initial rate period greater than 12 months, during which the interest rate is fixed<br>• Code 5—The transaction has an initial rate period less than or equal to 12 months, after which the interest rate is variable<br>• Code 6—The transaction has an initial rate period less than or equal to 12 months, after which the interest rate is fixed<br>• Code 999—Not Applicable | incompleteness), the financial institution enters code "**999**" in the Interest Rate Type Field. Comment 107(a)(12)-1.<br><br>If Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted), and the product does not have an interest charge (i.e., it is *not* that the product has an interest rate of 0%, but that there is no interest charged for the product), the financial institution enters code "**999**" in the Interest Rate Type Field to report not applicable. | is reported as codes "1" (originated) or "2" (approved but not accepted).<br><br>**Multiple Interest Rates:** If there is more than one interest rate applicable to different credit features, the financial institution reports the interest rate applicable to the amount reported for Field 15: Amount Approved or Originated, above. Comment 107(a)(12)(i)-3. |
| (21) Pricing Information – | § 1002.107(a)(12)(i), Comment 107(a)(12)-1 | The term of any initial rate period. | Enter, as a whole number, the length of the initial rate period expressed in months. | If Field 16: Action Taken, above, the application is reported as codes "3" (denied), "4" (withdrawn) or "5" | **Multiple Interest Rates:** If there is more than one interest rate applicable to different credit |

15    SMALL BUSINESS LENDING RULE: DATA POINTS CHART – VERSION 1, MARCH 30, 2023

AdminRecord-001652

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| Initial Rate Period | and Comments 107(a)(12)(i)-2. | | Comment 107(a)(12)-1. The field is **left blank** if there is no initial rate period. | (closed for incompleteness), the financial institution leaves **blank** the Initial Rate Period Field to report not applicable. Comment 107(a)(12)(i)-1.<br><br>If Field 20: Interest Rate Type is reported as codes "1" (the transaction has a variable interest rate and does not have an initial rate period), "2" (the transaction has a fixed interest rate and does not have an initial rate period) or "999" (not applicable) because the product does not have an initial rate period or does not have an interest rate, the financial institution leaves **blank** the Initial Rate Period Field to report not applicable. | features, the financial institution reports the interest rate applicable to the amount reported for Field 15: Amount Approved or Originated, above. Comment 107(a)(12)(i)-3. |
| (22) Pricing Information – Fixed Interest Rate Value | § 1002.107(a)(12)(i)(A), Comment 107(a)(12)-1 and Comments 107(a)(12)(i)-1 through -3. | If a fixed interest rate applies, that interest rate's value. | Enter the fixed interest rate value, as a percentage, to at least three (3) decimal places. *Example:* If the interest rate is 4.125%, enter 4.125.<br><br>Numbers calculated to beyond three (3) decimal places may either be reported beyond three (3) | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" (withdrawn) or "5" (closed for incompleteness), the financial institution leaves **blank** the Fixed Interest Rate Value Field to report | **Multiple Interest Rates:** If there is more than one interest rate applicable to different credit features, the financial institution reports the interest rate applicable to the amount reported for Field 15: |

AdminRecord-001653



| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | decimal places or rounded or truncated to three (3) decimal places. Decimal place trailing zeros may be either included or omitted.<br><br>If the interest rate is exactly 4.500%, enter 4.5, 4.50, or 4.500.<br><br>Comment 107(a)(12)(i)-1. The field is **left blank** if the requirement is **not applicable**. | not applicable. Comment 107(a)(12)-1.<br><br>If Field 20: Interest Rate Type is reported as codes "**1**" (the transaction has a variable interest rate and does not have an initial rate period), "3" (the transaction has an initial rate period greater than 12 months, during which the interest rate is variable), "5" (the transaction has an initial rate period less than or equal to 12 months, after which the interest rate is variable), or "999" (not applicable) because the product does not have a fixed interest rate under the rule or does not have an interest rate, the financial institution leaves **blank** the Fixed Interest Rate Value Field to report not applicable. | Amount Approved or Originated, above. Comment 107(a)(12)(i)-3.<br><br>**Initial Period**: If there is an initial interest rate period of 12 months or less, the financial institution reports the information for the period *after* the initial rate period ends. If the period is more than 12 months, the financial institution reports the information applicable at origination (i.e., during the initial period). Comment 107(a)(12)(i)-2. |
| (26) Pricing Information – Variable | § 1002.107(a)(12)(i)(B), Comment 107(a)(12)-1 and Comments | If a variable or adjustable interest rate | Enter the interest value, as a percentage, to at least three (3) decimal places. | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial | **Multiple Interest Rates:** If there is more than one interest rate applicable to different credit features, the financial institution reports the |

AdminRecord-001654

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| Index Rate Value | 107(a)(12)(i)-1 through -3, and -5 | applies, the index value. | *Example:* If the interest value is 4.125%, enter 4.125.<br><br>Numbers calculated to beyond three (3) decimal places may either be reported beyond three (3) decimal places or rounded or truncated to three (3) decimal places. Decimal place trailing zeros may be either included or omitted.<br><br>    If the interest value is exactly 4.500%, enter 4.5, 4.50, or 4.500.<br><br>Comment 107(a)(12)(i)-1.  The field is **left blank** if the requirement is not applicable. | institution enters code "**999**" in the Variable Rate Flag Field and leaves **blank** the Variable Rate Index Value Field to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 20: Interest Rate Type is reported as codes "2" (the transaction has a fixed interest rate and does not have an initial rate period), "4" (the transaction has an initial rate period greater than 12 months, during which the interest rate is fixed), "6" (the transaction has an initial rate period less than or equal to 12 months, after which the interest rate is fixed), or "999" (not applicable) because the product does not have a variable interest rate under the rule or does not have an interest rate, the financial institution leaves **blank** the Variable Index Rate Value Field to report not applicable. | interest value for the rate applicable to the amount reported for Field 15: Amount Approved or Originated, above.  Comment 107(a)(12)(i)-3.<br><br>**Initial Period**: If there is an initial interest rate period of 12 months or less, the financial institution reports the information for the period *after* the initial rate period ends.  If the period is more than 12 months, the financial institution reports the information applicable at origination (i.e., during the initial period). Comment 107(a)(12)(i)-2. |
| (23) Pricing Information – | § 1002.107(a)(12)(i) | If a variable interest rate | Enter the margin amount, as a percentage, to at least three (3) decimal places. | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" | **Multiple Interest Rates:** If there is more than one interest rate |

AdminRecord-001655

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| Variable Interest Rate Margin Value | (B), Comment 107(a)(12)-1 and Comments 107(a)(12)(i)-1 through -3. | product has a margin, the amount. | *Example:* If the interest rate is 4% plus 4.125% margin, enter 4.125.<br><br>Numbers calculated to beyond three (3) decimal places may either be reported beyond three (3) decimal places or rounded or truncated to three (3) decimal places. Decimal place trailing zeros may be either included or omitted.<br>    If the margin is exactly 4.500%, enter 4.5, 4.50, or 4.500.<br><br>Comment 107(a)(12)(i)-1.  The field is **left blank** if the requirement is not applicable. | (withdrawn), or "5" (closed for incompleteness), the financial institution leaves **blank** the Variable Rate Margin Value Field to report not applicable.  Comment 107(a)(12)-1.<br><br>If Field 20: Interest Rate Type is reported as codes "2" (the transaction has a fixed interest rate and does not have an initial rate period), "4" (the transaction has an initial rate period greater than 12 months, during which the interest rate is fixed), "6" (the transaction has an initial rate period less than or equal to 12 months, after which the interest rate is fixed), or "999" (not applicable) because the product does not have a variable interest rate under the rule or does not have an interest rate, the financial institution leaves **blank** the Variable Index Rate Value Field to report not applicable. | applicable to different credit features, the financial institution reports the margin for the interest rate applicable to the amount reported for Field 15: Amount Approved or Originated, above. Comment 107(a)(12)(i)-3.<br><br>**Initial Period**: If there is an initial interest rate period of 12 months or less, the financial institution reports the information for the period *after* the initial rate period ends.  If the period is more than 12 months, the financial institution reports the information applicable at origination (i.e., during the initial period). Comment 107(a)(12)(i)-2. |
| (24) and (25) Pricing | § 1002.107(a)(12)(i)(B); Comment 107(a)(12)-1, | The name of the variable interest | **VARIABLE RATE INDEX NAME FIELD.** Indicate the index name for a variable interest | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" | **Multiple Interest Rates:** If there is more than one interest rate |

AdminRecord-001656

Effective March 30, 2023



| Data point field number and name ² | Regulation B (12 CFR 1002) references | Description | Filing instructions ³ | Reporting "Not Applicable" ⁴ | Other reporting notes ⁵ |
|---|---|---|---|---|---|
| Information – Variable Interest Rate Index Name | and Comment 107(a)(12)(i)-4 | rate product's index. | rate product that is an extension of credit that was originated or approved but not accepted by entering one (1) of the specified code numbers:<br>• Code 1—Wall Street Journal Prime<br>• Code 2—6-month CD rate<br>• Code 3—1-year T-Bill<br>• Code 4—3-year T-Bill<br>• Code 5—5-year T-Note<br>• Code 6—12-month average of 10-year T-Bill<br>• Code 7—Cost of Funds Index (COFI) - National<br>• Code 8—Cost of Funds Index (COFI) - 11th District<br>• Code 9—Constant Maturity Treasury (CMT)<br>• Code 10—Internal Index<br>• Code 977—Other (specify in the associated free-form text field)<br>• Code 999—Not Applicable<br><br>**VARIABLE RATE FREE-FORM TEXT FIELD:** If code "<u>977</u>" is reported, the financial institution must specify the index name in the associated free-form text field. Comment 107(a)(12)(i)-4. The free-form text field is **left blank** if code "977" is not used. The maximum number of | (withdrawn), or "5" (closed for incompleteness), the financial institution enters code "<u>999</u>" in the Variable Rate Index Name Field and leaves **blank** the Variable Rate Index Name Free-Form Text Field to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 20: Interest Rate Type is reported as codes "2" (the transaction has a fixed interest rate and does not have an initial rate period), "4" (the transaction has an initial rate period greater than 12 months, during which the interest rate is fixed), "6" (the transaction has an initial rate period less than or equal to 12 months, after which the interest rate is fixed), or "999" (not applicable) because the product does not have a variable interest rate under the rule or does not have an interest rate, the financial institution enters code "<u>999</u>" in the Variable Rate Index Name Field and leaves **blank** the Variable Rate Index Name Free- | applicable to different credit features, the financial institution reports the interest rate applicable to the amount reported for Field 15: Amount Approved or Originated, above. Comment 107(a)(12)(i)-3.<br><br>**Initial Period**: If there is an initial interest rate period of 12 months or less, the financial institution reports the information for the period *after* the initial rate period ends. If the period is more than 12 months, the financial institution reports the information applicable at origination (i.e., during the initial period). Comment 107(a)(12)(i)-2. |

AdminRecord-001657

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | characters for this field is 300 characters, including spaces. | Form Text Field to report not applicable. | |
| (27) Pricing Information – Total Origination Charges | § 1002.107(a)(12)(ii), Comment 107(a)(12)-1, and Comment 107(a)(12)(ii)-1 through -6. | The total amount of origination charges that were or will be charged at origination. See Comment 107(a)(12)(ii)-1, through -5. | For extensions of credit that were originated or approved but not accepted, enter, in dollars, the amount of origination charges. *Example:* If the amount was $1,123.91, enter 1123.91.<br><br>The amount may be negative, for example if the net lender credit is greater than the total origination charges. Comment 107(a)(12)(ii)-6. To report a negative number, enter the "-" symbol before the number. | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution leaves **blank** the Pricing Information – Total Origination Charges Field to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted), but the product does not have any origination charges, the financial institution enters "0" in the Pricing Information – Total Origination Charges Field to report there were no charges. | **Conditions:** A value is required if Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted). |
| (28) Pricing Information – Total Broker Fees | § 1002.107(a)(12)(iii), Comment 107(a)(12)-1, and Comment 107(a)(12)(iii)-1 and -2 | The total amount of broker fees that will be charged at origination. | For extensions of credit that were originated or approved but not accepted, enter, in dollars, the total amount of broker fees. *Example:* If the amount was $1,123.91, enter 1123.91. | If Field 16: Action Taken, above, is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution leaves **blank** the Pricing | **Conditions:** A value is required if Field 16: Action Taken, below, is reported as codes "1" (originated) or "2" (approved but not accepted). |

AdminRecord-001658

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | See Comment 107(a)(12)(iii)-1 and -2. | | | Information – Total Broker Fees Field to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted), but the product does not have any broker fees, the financial institution enters "0" in the Pricing Information – Total Broker Fees Field to report no charges. | |
| (29) Pricing Information – Initial Annual Charges | § 1002.107(a)(12)(iv), Comment 107(a)(12)-1, and Comments 107(a)(12)(iv)-1 through -6 | The total amount of non-interest charges that are scheduled to be imposed during the first annual period. See Comments 107(a)(12)(iv)-1 through -4 and -6. | For extensions of credit that were originated or approved but not accepted, enter, in dollars, the amount of the total non-interest charges scheduled to be imposed over the first annual period (i.e., initial annual charges).<br>*Example:* If the amount was $1,123.91, enter 1123.91. | If Field 16: Action Taken, above, the application is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution leaves **blank** the Pricing Information – Initial Annual Charges Field to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted), but the product does not have any initial annual charges, the financial | **Conditions:** A value is required if Field 16: Action Taken, below, is reported as codes "1" (originated) or "2" (approved but not accepted).<br><br>**Scheduled Charges of Variable Amounts:** For scheduled charges that may vary (for example if certain conditions are met), the financial institution reports the highest amount that may be imposed. Comment 107(a)(12)(iv)-5. |

AdminRecord-001659

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | | institution enters "0" in the Pricing Information – Initial Annual Charges Field to report no charges. | |
| (30) and (31) Pricing Information – MCA/Sales-Based Financing Costs Flag and Value | § 1002.107(a)(12)(v), Comment 107(a)(12)-1, and Comment 107(a)(12)(v)-1. | The amount an applicant will be required to pay in order to receive a merchant cash advance or other sales-based financing transaction. | **MCA/SALES-BASED FINANCING COSTS FLAG.** For an extension of credit that was originated or approved, but not accepted, and was a merchant cash advance or other sales-based financing transaction Indicate, indicate whether there are costs for this type of financing by entering one (1) of the specified code numbers:<br>• Code 900—Applicable<br>• Code 999—Not Applicable<br><br>**MCA/SALES-BASED FINANCING COSTS VALUE FIELD:** If code "**900**" is reported, enter, in dollars, the difference between the amount advanced and the amount to be repaid.<br>*Example:* If the amount was $10,123.91, enter 10123.91.<br><br>The field is **left blank** if code "900" is not reported for the Pricing Information: MCA/Sales-Based Financing Costs Flag field. | If Field 5: Credit Type – Product Type is not reported as codes "7" (Merchant Cash Advance) or "8" (Other Sales-Based Financing Transaction), the financial institution reports code "**999**" and leaves the MCA/Sales-Based Financing Costs Value Field **blank** to report not applicable.<br><br>If Field 16: Action Taken is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution enters code "**999**" and leaves the MCA/Sales-Based Financing Costs Value Field **blank** to report not applicable. Comment 107(a)(12)-1.<br><br>If Field 5: Credit Type – Product Type is reported as codes "7" (Merchant Cash Advance) or "8" (Other Sales-Based Financing | **Conditions:** Code "900" for this data point is only possible for reporting if Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted) and Field 5: Credit Type – Product Type is reported as codes "7" (Merchant Cash Advance) or "8" (Other Sales-Based Financing Transaction). |

AdminRecord-001660

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | | Transaction) and Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted), but the product does not have any additional costs, the financial institution enters code "900" in the MCA/Sales-Based Financing Costs Flag Field and reports "0" in the MCA/Sales-Based Financing Costs Value Field to report no costs. | |
| (32) Pricing Information – Prepayment Penalty Availability | § 1002.107(a)(12) (vi)(A), Comment 107(a)(12)-1, and Comments 107(a)(12)(vi)-1 and -2 | Whether a financial institution *may include* a prepayment penalty on any transaction originated under its policies and procedures at the time the application is received for this transaction. See Comment 107(a)(12)(vi)-1. | For an extension of credit that was originated or approved but not accepted, indicate whether the financial institution could impose a prepayment penalty under current policies and procedures by entering one (1) of the specified code numbers:<br>▪ Code 1—Yes<br>▪ Code 2—No<br>▪ Code 999—Not Applicable | If Field 16: Action Taken is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution enters code "999" in the Pricing Information – Prepayment Penalty Availability Field to report not applicable. Comment 107(a)(12)-1. | **Conditions:** Codes "1" or "2" for this data point are only possible for reporting if Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted). |

AdminRecord-001661



| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| (33) Pricing Information – Prepayment Penalty Included | § 1002.107(a)(12)(vi)(B), Comment 107(a)(12)-1 and Comments 107(a)(12)(vi)-1 and -2 | Whether the terms of the contract *include* a prepayment penalty. | For an extension of credit that was originated or approved but not accepted, indicate whether the terms of the transaction include a prepayment penalty by entering one (1) of the specified code numbers:<br>▪ Code 1—Yes<br>▪ Code 2—No<br>▪ Code 999—Not Applicable | If Field 16: Action Taken is reported as codes "3" (denied), "4" (withdrawn), or "5" (closed for incompleteness), the financial institution enters code "<u>999</u>" in the Pricing Information – Prepayment Penalty Included Field to report not applicable. Comment 107(a)(12)-1. | **Conditions:** Codes "1" or "2" for this data point are only possible for reporting if Field 16: Action Taken is reported as codes "1" (originated) or "2" (approved but not accepted). |
| (34) Census Tract – Address Type | § 1002.107(a)(13); Comment 107(a)(13)-1 through -4. | The address type used to determine the census tract. | Indicate the address or location type used to determine the census tract provided in Field 35 by entering one (1) of the specified code numbers:<br>▪ Code 1—Address or location where the loan proceeds will principally be applied<br>▪ Code 2—Address or location of borrower's main office or headquarters<br>▪ Code 3—Another address or location associated with the applicant<br>▪ Code 988—Not provided by applicant and otherwise undetermined<br><br>The regulation specifies which address the financial institution will use when it has more than one address. See Comment 107(a)(13)-1 and -3 for discussion of when each code may apply. | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the address or location information for an application, the financial institution enters code "<u>988</u>" in the Census Tract – Address Type Field. Comment 107(a)(13)-3. | **Determining the Address Type:** The address used to report Census Tract: Address Type in Field 34 is the address used to determine the Census Tract: Tract Number in Field 35. Comments 107(a)(13)-1.i through -1.iii. |

AdminRecord-001662

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| (35) Census Tract – Tract Number | § 1002.107(a)(13), Comments 107(a)(13)-1 through -4 | The census tract number derived from the applicant's address. | Enter the 11-digit census tract number as defined by the U.S. Census Bureau for the property identified in Field 34.  Do not use decimals.<br>*Example:* Enter 06037264000 for a census tract within Los Angeles County, CA. | If Field 34: Census Tract – Address Type is reported as code "**988**" because the financial institution does not receive a response to all or a portion of the financial institution's inquiry about the address or property location for an application, the financial institution leaves the Census Tract – Tract Number Field **blank** to report not applicable.  Comment 107(a)(13)-3. | **Safe Harbor:** See § 1002.112(c)(2) and Comment 107(a)(13)-4 for discussion of when a financial institution may receive safe harbor for an error in the census tract reported.<br>**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application. § 1002.107(d); Comment 107(d)-5. |
| (36) and (37) Gross Annual Revenue Flag and Value | § 1002.107(a)(14), Comments 107(a)(14) -1 through -4 | The gross annual revenue for the applicant in its preceding fiscal year. | **GROSS ANNUAL REVENUE FLAG.** Indicate whether gross annual revenue is reported by entering one (1) of the specified code numbers:<br>▪ Code 900—Reported<br>▪ Code 988—Not provided by applicant and otherwise undetermined<br><br>**GROSS ANNUAL REVENUE VALUE FIELD.** If code "**900**" is reported, report, in dollars, the applicant's gross annual revenue for its preceding full fiscal year. If a business has no gross annual revenue to report, the financial institution reports "0" as the amount.  Comment | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about an applicant's gross annual revenue, the financial institution enters code "**988**" in the Gross Annual Revenue Flag Field and the Gross Annual Revenue Value Field is **left blank**.  Comment 107(a)(14)-2. | **Affiliate Revenue:** A financial institution is permitted, but not required, to include the revenue of affiliates. Comment 107(a)(14)-3.<br>**Impact of Previous Collection:** A financial institution may reuse previously collected data collected within the calendar year of the application. § 1002.107(d); Comment 107(d)-7. |

AdminRecord-001663

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | 107(a)(14)-4. The field is **left blank** if code "900" is not reported for the Gross Annual Revenue Flag Field. | | |
| (38) and (39) North American Industry Classification System (NAICS) flag and code | § 1002.107(a)(15), Comments 107(a)(15)-1 through -3 | The industry type for the applicant's business. | **NAICS CODE FLAG.** Indicate whether NAICS code is reported by entering one (1) of the specified code numbers: <br>■ Code 900—Reported <br>■ Code 988—Not provided by applicant and otherwise undetermined <br><br>**NAICS CODE VALUE FIELD.** If code "**900**" is reported, enter a 3-digit subsector code for the NAICS code applicable to the applicant and in effect on January 1 of the calendar year applicable to the SBLAR. <br>*Example:* Enter 311 for a business engaged in the Food Processing Sector. | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the NAICS code for an applicant, the financial institution enters code "**988**" for the NAICS Code Flag Field and leaves **blank** the NAICS Code Value Field. Comment 107(a)(15)-2. | **Multiple NAICS Codes:** If multiple NAICS codes may be applicable to the applicant, the financial institution must only report the 3-digit subsector code for one (1) of the applicable NAICS codes. The financial institution may choose which code to report. *Multiple NAICS codes must <u>not</u> be reported for a single application.* <br><br>**Safe Harbor:** See § 1002.112(c)(3) and Comment 107(a)(15)-3 for discussion of when a financial institution may receive safe harbor for an error in the NAICS code reported. <br><br>**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered |

AdminRecord-001664

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | | | application. § 1002.107(d); Comment 107(d)-5. |
| (40) Number of Workers | § 1002.107(a)(16), Comments 107(a)(16)-1 through -3 | The range of non-owner workers working for the applicant. | Indicate the range of the number of workers by entering one (1) of the specified code numbers:<br>• Code 1—Firms with no workers<br>• Code 2—Firms with 1 to 4 workers<br>• Code 3—Firms with 5 to 9 workers<br>• Code 4—Firms with 10 to 19 workers<br>• Code 5—Firms with 20 to 49 workers<br>• Code 6—Firms with 50 to 99 workers<br>• Code 7—Firms with 100 to 249 workers<br>• Code 8—Firms with 250 to 499 workers<br>• Code 9—Firms with 500 workers or more<br>• Code 988—Not provided by applicant and otherwise undetermined | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the number of workers, the financial institution enters code "<u>988</u>" in the Number of Workers Field. Comment 107(a)(16)-3. | **Included:** The number of workers includes full-time, part-time, and seasonal workers as well as contractors working primarily for the applicant. Comment 107(a)(16)-2.<br><br>**Conditionals:** Workers for affiliates of the applicant are only included if the financial institution also includes the affiliates' gross annual revenue, as discussed in Field 37: Gross Annual Revenue Amount, above. Comment 107(a)(16)-2.<br><br>**Not Included:** The number of principal owners and volunteers. Comment 107(a)(16)-2.<br><br>**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered |

AdminRecord-001665

Effective March 30, 2023



Consumer Financial Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | | | application. § 1002.107(d); Comment 107(d)-5. |
| (41) and (42) Time in Business Type and Value | § 1002.107(a)(17), Comments 107(a)(17)-1 through -3 | The range or specified number of years of the applicant's time in the business. See Comment 107(a)(17)-2 for determining "time in business" as a measure. | **TIME IN BUSINESS TYPE.** Indicate the applicant's time in business by entering one (1) of the specified code numbers:<br>▪ Code 1—The number of years the applicant has been in business is collected or obtained by the financial institution (specify in the Time In Business Value Field)<br>▪ Code 2—Applicant has been in business less than two years<br>▪ Code 3—Applicant has been in business two or more years<br>▪ Code 988—Not provided by applicant and otherwise undetermined<br><br>See Comment 107(a)(17)-1 for a discussion of when each code may apply.<br><br>**TIME IN BUSINESS VALUE FIELD.** If code "<u>1</u>" is reported, the financial institution must specify the number of years the applicant has been in business, rounded down to the nearest whole number of years, in the value field. Comment 107(a)(17)-1.i. The field is **left blank** if code "1" is not used. | If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the applicant's time in business, the financial institution enters code "<u>988</u>" in the Time in Business Field and leaves **blank** the Time in Business Value Field. Comment 107(a)(17)-3. | **Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application, provided that the financial institution updates the data to reflect the passage of time. § 1002.107(d); Comments 107(d)-5 and -8. |

AdminRecord-001666

Effective March 30, 2023



| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| (43) Business Ownership Statuses | §§ 1002.107(a)(18), 1002.102(m), 1002.102(s), 1002.102(*l*), and Comments 107(a)(18) -1 through -9. See also Appendix E. | Whether the applicant is a minority-owned business (see § 1002.102(m) for a definition), a women-owned business (see § 1002.102(s) for a definition), or a LGBTQI+-owned business (see § 1002.102(*l*) for a definition). | Indicate whether the applicant identified the business as Minority-Owned, Women-Owned, and/or LGBTQI+-owned by entering up to three (3) of the specified code numbers:<br>▪ Code 1—Minority-owned business<br>▪ Code 2—Women-owned business<br>▪ Code 3—LGBTQI+-owned business<br>▪ Code 955—None of these apply<br>▪ Code 966—The applicant responded that they did not wish to provide this information<br>▪ Code 988—Not provided by applicant | If a financial institution does not receive a response to the financial institution's inquiry about the applicant's business status identifications, the financial institution enters code "<u>988</u>" in the Business Ownership Statuses Field. Comment 107(a)(18)-6.<br>**NOTE:** This code is not used if the applicant responded and indicated they do not wish to provide that information (see code "<u>966</u>"). Comment 107(a)(18)-7. | **Multiple Types:** If there is more than one applicable substantive business status response identified, multiple codes may be entered in any order, separated by a semicolon. *Maximum of four (4) business ownership statuses.* For example, if an applicant provides responses that would qualify as code "1", "2", or "3" and code "955", the financial institution reports all provided substantive responses. Comment 107(a)(18)-1.<br><br>**Firewall.** This data point is subject to the firewall. § 1002.108(b).<br><br>**Recordkeeping:** A financial institution must maintain the record of an applicant's response to the financial institution's inquiries regarding demographic information (e.g., business ownership statuses) separate from the application and accompanying information. Comment 107(a)(18)-5. |

AdminRecord-001667

Effective March 30, 2023



Consumer Financial
Protection Bureau

| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | | | **Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application, provided that the data were previously collected pursuant to the rule. § 1002.107(d); Comments 107(d)-5 and -9.<br><br>**Conflicting Responses:** If an applicant provides responses that would qualify as code "1", "2", "3" or "955" but also provides a response that would qualify as code "966", the financial institution reports the code "**1**", "**2**", "**3**" or "**955**" response, as applicable. Comment 107(a)(18)-8. |
| (44) and (45) Number of Principal Owners Flag and Value | §§ 1002.107(a)(20), 1002.102(o), and Comments 107(a)(20)-1 through -3 | The total number of owners that have at least a 25% direct ownership interest. | **NUMBER OF PRINCIPAL OWNERS FLAG.** Indicate whether the number of principal owners is reported by entering one (1) of the specified code numbers:<br>• Code 900—Reported<br>• Code 988—Not provided by applicant and otherwise undetermined | If the applicant reports that there are no individuals with at least 25% direct ownership interest (i.e., no principal owners), the financial institution reports code "**900**" for Number of Principal Owners Flag | **Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application. § 1002.107(d); Comment 107(d)-5. |

AdminRecord-001668

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| | | | **NUMBER OF PRINCIPAL OWNERS VALUE FIELD.** If code "**900**" is reported, report in numerical form the number of principal owners. The field is **left blank** if code "900" is not reported for the Number of Principal Owners Flag Field. | Field and enters "**0**" in the Number of Principal Owners Value Field.<br><br>If a financial institution does not receive a response to all or a portion of the financial institution's inquiry about the number of principal owners, the financial institution enters code "**988**" in the Number of Principal Owners Flag Field and leaves **blank** the Number of Principal Owners Value Field. Comment 107(a)(20)-3. | |
| (46), (47), (55), (56), (64), (65), (73), and (74) Ethnicity of Principal Owners 1, 2, 3, and 4 | § 1002.107(a)(19), Comments 107(a)(19) - 1 through -13, and -16. See also Appendix E. | Principal owner(s)' ethnicity. | **ETHNICITY OF PRINCIPAL OWNER(S) CATEGORY(S) FIELD.** Indicate the aggregate and disaggregate categorical ethnicity of each principal owner provided by the applicant by entering the specified code(s) below that match:<br>■ Code 1—Hispanic or Latino<br>   o Code 11— Cuban<br>   o Code 12— Mexican<br>   o Code 13— Puerto Rican<br>   o Code 14—Other Hispanic or Latino Ethnicity | If the applicant reports that there are no owners with at least 25% ownership interest (i.e., no principal owners), the financial institution leaves the Ethnicity of Principal Owner(s) Categories and Free-Form Text Fields **blank** to report as not applicable.<br><br>If the applicant does not provide any Ethnicity of Principal Owner(s) Category responses and does not fill out the Ethnicity Free-Form Text | **Multiple Ethnicities:** If there is more than one aggregate ethnicity and/or disaggregated ethnicity subcategory provided, multiple category codes may be entered in any order, separated by a semicolon in the Ethnicity of Principal Owner(s) Category Field for that principal owner. *There is no maximum.* Comment 107(a)(19)-13.iii.<br><br>**Multiple Principal Owners:** If there is more than one principal owner, |

AdminRecord-001669



| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | **NOTE:** If the applicant did not select Code 14 but provided additional information as to an Other Hispanic or Latino Ethnicity(ies) in the **Ethnicity Free-Form Text Field**, the financial institution is *permitted, but not required*, to report Code 14 Ethnicity of Principal Owner(s) Category Field. See below for information about the **Ethnicity Free-form Text Field.**<br>• Code 2—Not Hispanic or Latino<br>• Code 966—Applicant responded they did not wish to provide this information<br>**NOTE:** See Comment 107(a)(19)-7 for discussion of application of this code.<br>• Code 977—Applicant responded in the Free-Form Text Field (specify in the associated Free-Form Text Field)<br>• Code 988—Not provided by applicant<br>**NOTE:** See Comment 107(a)(19)-6 for discussion of application of this code.<br><br>**ETHNICITY FREE-FORM TEXT FIELD.** Enter in the Ethnicity Free-Form Text Field the additional information the applicant provided for each principal owner as a specific other Hispanic or Latino ethnicity. Code "**977**" must also be selected in the Ethnicity of Principal | Field for a principal owner, enter code "**988**" for Ethnicity of Principal Owner(s) Category Field and leave the Ethnicity of Principal Owner(s) Free-Form Text Field **blank** to report as not applicable for that principal owner. Comment 107(a)(19)-6.<br><br>If an applicant has fewer than four principal owners, the financial institution reports the ethnicity information for the number of principal owners that the applicant has identified and leaves Ethnicity of Principal Owner(s) Category and Free-Form Text Field for additional principal owners **blank** to report as not applicable. Comment 107(a)(19)-10.<br><br>If the applicant did not provide any free-form text as to the ethnicity of a principal owner, the financial institution leaves the Ethnicity of Principal Owner(s) Free-Form Text | the financial institution provides the applicable Ethnicity of Principal Owner(s) Category and Free-Form Text data in the respective fields for each owner (i.e., Ethnicity of Principal Owner 1, Ethnicity of Principal Owner 2, Ethnicity of Principal Owner 3, or Ethnicity of Principal Owner 4). *There is a maximum of **four (4)** principal owners.* Comment 107(a)(19)-10, see also § 1002.102(o).<br><br>**Conflicting Responses:** If an applicant provides a substantive response as to the principal owner's ethnicity but also provides a response that would qualify as code "966," the financial institution reports the substantive response. Comment 107(a)(19)-8.<br><br>**Firewall.** This data point is subject to the firewall. § 1002.108(b).<br><br>**Recordkeeping:** A financial institution must maintain the record of an applicant's response to the |

AdminRecord-001670

Effective March 30, 2023

cfpb Consumer Financial Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | Owner(s) Categories Field for that principal owner if the applicant provided this information. If nothing was provided by the applicant, leave this field **blank** for each principal owner the information was not provided. The maximum number of characters for this field is 300 characters, including spaces. | Field for that principal owner **blank** to report as not applicable. | financial institution's inquiries about ethnicity separate from the application and accompanying information. Comment 107(a)(19)-5.

**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application, provided that the data were previously collected pursuant to the rule. If a financial institution reports one or more principal owners' ethnicity information based on previously collected data for the rule, the financial institution does not need to collect any additional ethnicity information for other principal owners (if any) and may leave those fields blank to report as not applicable. Comments 107(a)(19)-11, 107(d)-5 and -9. |
| (48), (49), (50), (51), (52), (57), | § 1002.107(a)(19), Comments 107(a)(19) - 1 through 12, -14, and | Principal owner(s)' race. | **RACE OF PRINCIPAL OWNER(S) CATEGORY(S) FIELD.** Indicate the aggregate and/or disaggregate categorical race of each | If the applicant reports that there are no individuals with at least 25% direct ownership interest (i.e., no | **Multiple Races:** If there is more than one race category reported, multiple category codes may be |

AdminRecord-001671

Effective March 30, 2023


Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| (58), (59), (60), (61), (66), (67), (68), (69), (70), (75), (76), (77), (78), and (79) Race of Principal Owners 1, 2, 3, and 4 | -16.  See also Appendix E. | | principal owner provided by the applicant by entering the specified code(s) below that match:<br>• Code 1—American Indian or Alaska Native<br>NOTE: If the applicant did not select Code 1 but provided the principal owner's American Indian or Alaska Native Enrolled or Principal Tribe(s) in the corresponding **Race Free-Form Text Field** your institution is *permitted, but not required*, to report Code 1 for that principal owner.  Comment 107(a)(19)-14.ii.E.  See below for information about the **Race Free-Form Text**.<br>• Code 2—Asian<br>　○ Code 21—Asian Indian<br>　○ Code 22—Chinese<br>　○ Code 23—Filipino<br>　○ Code 24—Japanese<br>　○ Code 25—Korean<br>　○ Code 26—Vietnamese<br>　○ Code 27—Other Asian Race<br>NOTE: If the applicant did not select Code 27 but provided principal owner's other Asian race(s) in the corresponding **Race Free-Form Text Field**, your institution is *permitted, but not required*, to report | principal owners), the financial institution leaves the Race of Principal Owner(s) Category and Free-Form Text Fields **blank** to report as not applicable.<br><br>If the applicant does not provide any Race of Principal Owner(s) Category responses and does not fill out the Race Free-Form Text Field for a principal owner, enter code "**988**" for Race of Principal Owner(s) Category Field and leave the Race of Principal Owner(s) Free-Form Text Field **blank** to report as not applicable for that principal owner.  Comment 107(a)(19)-6.<br><br>If an applicant has fewer than four principal owners, the financial institution reports the race information for the number of principal owners that the applicant has identified and leaves Race of Principal Owner(s) Category and Free-Form Text Fields for additional principal owners **blank** | entered in any order, separated by a semicolon in the Race of Principal Owner(s) Category Field for that principal owner.  *There is no maximum.*  Comment 107(a)(19)-14.iii.<br><br>**Multiple Principal Owners:** If there is more than one principal owner, the financial institution provides the applicable Race of Principal Owner(s) Category and Free-Form Text data in the respective fields for each owner (i.e., Race of Principal Owner 1, Race of Principal Owner 2, Race of Principal Owner 3, or Race of Principal Owner 4).  *There is a maximum of **four (4)** principal owners.*  Comment 107(a)(19)-10, see also § 1002.102(o).<br><br>**Conflicting Responses:** If an applicant provides a substantive response as to the principal owner's race but also provides a response that would qualify as code "966," the financial institution reports the |

AdminRecord-001672



| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | Code 27 for that principal owner. See below for information about the **Race Free-Form Text Field.**<br><br>▪ Code 3—Black or African American<br> ○ Code 31—African American<br> ○ Code 32—Ethiopian<br> ○ Code 33—Haitian<br> ○ Code 34—Jamaican<br> ○ Code 35—Nigerian<br> ○ Code 36—Somali<br> ○ Code 37—Other Black or African American Race<br>**NOTE:** If the applicant did not select Code 37 but provided principal owner's other Black or African American race(s) in the corresponding **Race Free-Form Text Field**, your institution is *permitted, but not required*, to report Code 37 for that principal owner. See below for information about the **Race Free-Form Text Field.**<br>▪ Code 4—Native Hawaiian or Other Pacific Islander<br> ○ Code 41—Guamanian or Chamorro<br> ○ Code 42—Native Hawaiian<br> ○ Code 43—Samoan | to report as not applicable. Comments 107(a)(19)-10.<br><br>If the applicant did not provide any free-form text for a principal owner, the financial institution leaves the Race Free-Form Text Field for that principal owner **blank** to report as not applicable. | substantive response. Comment 107(a)(19)-8.<br><br>**Firewall.** This data point is subject to the firewall. § 1002.108(b).<br><br>**Recordkeeping:** A financial institution must maintain the record of an applicant's response to the financial institution's inquiries about race separate from the application and accompanying information. Comment 107(a)(19)-5.<br><br>**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application, provided that the data were previously collected pursuant to the rule. If a financial institution reports one or more principal owners' race information based on previously collected data for the rule, the financial institution does not need to collect any additional race information for other principal |

AdminRecord-001673

Effective March 30, 2023



| Data point field number and name[2] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | ○ Code 44—Other Pacific Islander Race<br>**NOTE:** If the applicant did not select Code 44 but provided the principal owner's other Pacific Islander race(s) in the corresponding **Race Free-Form Text Field**, your institution is *permitted, but not required,* to report Code 44 for that principal owner. See below for information about the **Race Free-Form Text Field.**<br>▪ Code 5—White<br>▪ Code 966—The applicant responded that they did not wish to provide this information<br>  **NOTE:** See Comment 107(a)(19)-7 for discussion of application of this code.<br>▪ Code 971—The applicant responded in the free-form text field for American Indian or Alaska Native Enrolled or Principal Tribe (specify in the associated free-form text field)<br>▪ Code 972—The applicant responded in the free-form text field for Other Asian race(specify in the associated free-form text field)<br>▪ Code 973—The applicant responded in the free-form text field for Other Black or | | owners (if any) and may leave those fields blank to report as not applicable. Comments 107(a)(19) -11, 107(d)-5 and -9. |

AdminRecord-001674

Consumer Financial
Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | African race (specify in the associated free-form text field)<br>• Code 974—The applicant responded in the free-form text field for Other Pacific Islander race (specify in the associated free-form text field)<br>• Code 988—Not provided by applicant<br><br>**RACE FREE-FORM TEXT FIELDS.** Enter in the Race Free-Form Text Fields the text the applicant provided for each principal owner as a specific other race. The corresponding codes for the free-form text field (i.e., "**971**", "**972**", "**973**", or "**974**") must also be selected in the Race of Principal Owner(s) Categories Field for that principal owner if the applicant provided this information. If nothing was provided by the applicant, leave this field **blank** for each principal owner the information was not provided. The maximum number of characters for this field is 300 characters, including spaces. | | |
| (53), (54), (62), (63), (71), (72), (80), and (81) Sex/Gender | § 1002.107(a)(19), Comments 107(a)(19) -1 through -12, and -15. See also Appendix E. | Principal owner(s)' sex/gender. | **SEX/GENDER OF PRINCIPAL OWNER(S) FLAG.** Indicate whether the applicant provided the sex/gender of each principal owner by entering: | If the applicant reports that there are no individuals with at least 25% direct ownership interest (i.e., no principal owners), the financial institution leaves the Sex/Gender of | **Multiple Principal Owners:** If there is more than one principal owner, the financial institution provides the applicable Sex/Gender Flag and Free-Form Text data in the |

AdminRecord-001675

Effective March 30, 2023

cfpb Consumer Financial
Protection Bureau

| Data point field number and name² | Regulation B (12 CFR 1002) references | Description | Filing instructions³ | Reporting "Not Applicable"⁴ | Other reporting notes⁵ |
|---|---|---|---|---|---|
| of Principal Owners 1, 2, 3, and 4 | | | ▪ Code 1—The applicant responded in the free-form text field (specify in the associated free-form text field)<br>▪ Code 966—The applicant responded that they did not wish to provide this information<br>NOTE: See Comment 107(a)(19)-7 for discussion of application of this code.<br>▪ Code 988—Not provided by applicant<br><br>**SEX/GENDER FREE-FORM TEXT FIELDS.** Enter in the Sex/Gender Free-Form Text Field the text the applicant provided for each principal owner's sex/gender. Code "1" must also be selected in the Sex/Gender of Principal Owner(s) Flag Field for that principal owner. If nothing was provided by the applicant, leave this field **blank** for each principal owner for which the information was not provided. The maximum number of characters for this field is 300 characters, including spaces. | Principal Owner(s) Flag and Free-Form Text Fields **blank** to report as not applicable.<br><br>If the applicant does not provide any Sex/Gender of Principal Owner(s) Flag responses and does not fill out the Sex/Gender Free-Form Text Field for a principal owner, enter code "988" for Sex/Gender of Principal Owner(s) Flag Field and leave the Sex/Gender Free-Form Text Field **blank** to report as not applicable for that principal owner. Comment 107(a)(19)-6.<br><br>If an applicant has fewer than four principal owners, the financial institution reports the sex/gender information for the number of principal owners that the applicant has identified and leaves the Sex/Gender of Principal Owner(s) Flag and Free-Form Text Fields for additional principal owners **blank** to | respective fields for each owner (i.e., Sex/Gender of Principal Owner 1, Sex/Gender of Principal Owner 2, Sex/Gender of Principal Owner 3, or Sex/Gender of Principal Owner 4). *There is a maximum of **four (4)** principal owners.* Comments 107(a)(19)-10.<br><br>**Conflicting Responses:** If an applicant provides a substantive response but also provides a response that would qualify as code "966," the financial institution reports the substantive response. Comment 107(a)(19)-8.<br><br>**Firewall.** This data point is subject to the firewall. § 1002.108(b).<br><br>**Recordkeeping:** A financial institution must maintain the record of an applicant's response to the financial institution's inquiries about sex/gender separate from the |

AdminRecord-001676

Effective March 30, 2023

cfpb  Consumer Financial
      Protection Bureau

| Data point field number and name[a] | Regulation B (12 CFR 1002) references | Description | Filing instructions[3] | Reporting "Not Applicable"[4] | Other reporting notes[5] |
|---|---|---|---|---|---|
| | | | | report as not applicable. Comments 107(a)(19)-10.<br><br>If the applicant did not provide any free-form text for a principal owner, the financial institution leaves the Sex/Gender Free-Form Text Field for that principal owner **blank** to report as not applicable. | application and accompanying information. Comment 107(a)(19)-5.<br><br>**Impact of Previous Collection:** A financial institution may reuse previously collected data if the data were collected within the preceding 36 months from the current covered application, provided that the data were previously collected pursuant to the rule.  If a financial institution reports one or more principal owners' sex/gender information based on previously collected data for the rule, the financial institution does not need to collect any additional sex/gender information for other principal owners (if any) and may leave those fields blank to report not applicable.  Comments 107(a)(19)-11, 107(d)-5 and -9. |

AdminRecord-001677



U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, DC 20416

March 23, 2023

Rohit Chopra, Director
Consumer Financial Protection Bureau
1700 G Street NW
Washington, D.C. 20552

Dear Director Chopra:

This is in response to your recent letter requesting that the U.S. Small Business Administration (SBA) approve an alternative small business size standard for the Consumer Financial Protection Bureau (CFPB or Bureau) to adopt in a final rule that implements Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 (Dodd-Frank Act). Section 1071 requires financial institutions to collect and report to the Bureau data regarding applications for credit for women-owned, minority-owned, and small businesses. The CFPB is seeking approval from SBA to define a small business as one having gross annual revenue of $5 million or less in its preceding fiscal year, subject to periodic adjustments for inflation. SBA approves the CFPB's $5 million revenue based size standard, as requested.

On October 8, 2021, the CFPB published a notice of proposed rulemaking (NPRM) to implement Section 1071 of the Dodd-Frank Act (86 FR 56356). In the NPRM, the CFPB discussed why SBA's size standards would not be appropriate for purposes of Section 1071 regulations. The CFPB argued that requiring financial institutions to use SBA's size standards would pose risks to the efficient operation of small business lending. Specifically, the CFPB argued that using SBA's size standards, which would require applicants to provide and lenders to review up to five years of revenue or up to two years of employment data after determining the appropriate six-digit North American Industry Classification System (NAICS) industry code, could unnecessarily complicate the process of identifying loans subject to Section 1071 reporting requirements. The CFPB expressed concern that this increased burden may compel financial institutions to raise the cost of credit or originate fewer small business credit transactions as a result.

As part of its initial consultation with SBA, the CFPB had provided evidence that there is wide support for a simplified size standard among stakeholders, including trade associations, governmental organizations, financial institutions, and business community. Commenters to the CFPB's October 2021 proposed rule also expressed wide support for a simplified $5 million size standard. Pursuant to SBA's regulations at 13 CFR § 121.901-903, the CFPB provided to SBA copies of the comments and reply comments that pertain to the proposed $5 million size standard, a written justification for the intended size standard, and a copy of the intended final rule and preamble prior to its publication.

AdminRecord-001810

Director Rohit Chopra
Consumer Financial Protection Bureau
Page 2

SBA estimates that the CFPB's proposed $5 million revenue size standard for all NAICS industries would capture about 95.4% of the nearly 8 million firms currently classified as small under SBA's NAICS-based size standards.  SBA notes that, although a simplified size standard may successfully capture a large percentage of the overall population of small firms under SBA's NAICS-based size standards, the capture rate may still vary significantly by industry — especially in industries with employee-based or large monetary-based size standards.

The Small Business Act provides that SBA's Administrator shall ensure that the size standard varies from industry to industry to the extent necessary to reflect the differing characteristics of the various industries and consider other factors deemed to be relevant by the Administrator (15 U.S.C. 632(a)(3)).  The Small Business Act also provides that Federal agencies may prescribe a size standard for categorizing a business as a small business concern only where certain specific criteria are met.  Among other things, the proposed size standard must provide for determining size based on: (1) A manufacturing concern's average employment over the preceding 24 months; (2) A service business's annual average gross receipts over at least five years; (3) The size of other business concerns on the basis of data over at least three years; or (4) Other appropriate factors.  In addition, the proposed size standard must be approved by the Administrator.

While the CFPB's singular definition of a small business as one having gross annual revenue of $5 million or less in its preceding fiscal year does not allow for determining the size of a manufacturing concern based on average employment over the preceding 24 months, nor the size of a services concern based on annual average gross receipts over at least five years, and also does not require that applicants be considered together with the size of any affiliates in determining whether the applicant is a small business, SBA believes that, under 15 U.S.C. 632 (a)(2)(C)(iv), SBA's Administrator may approve the CFPB's special size standard based on the consideration of other relevant factors.

Therefore, for the reasons discussed above, SBA approves the CFPB's alternative size standard of $5 million gross annual revenue size standard for defining a small business, with periodic adjustments for inflation, for its Section 1071 rulemaking purposes.

We are pleased to work with you to define a small business in implementing requirements under the Dodd-Frank Act.  If we can be of additional assistance, please do not hesitate to contact Khem Sharma, Ph.D., at (202) 205-7189.

Sincerely,

Isabella Casillas Guzman
Administrator

# BANKERS DIGEST

### TEXAS BANKING NEWS, PEOPLE AND IDEAS



Feature

## A Comment on Implementing Section 1071 of the Dodd-Frank Act

December 16, 2021

**BAILEY ALLEN**, PhD Student, Rawls College of Business, Texas Tech University
**MIKE MAULDIN**, Director of the Excellence in Banking Program, Texas Tech University
**DREW WINTERS**, Pickering Chair in Finance, Texas Tech University

The Dodd-Frank Wall Street Reform and Consumer Protection Act (hereafter, Dodd-Frank Act) was created—according to the first paragraph of the act itself: "*To promote the financial stability of the United States by improving accountability and transparency in the financial system, end 'too big to fail,' protect the American taxpayer by ending bailouts, protect consumers from abusive financial services practices and for other purposes.*" However, it is not achieving its objectives. For example, Allen, Cyree, Whitledge and Winters (2018) show that it did not end "Too Big to Fail." [1] Additionally, Cyree (2016) finds an increase in regulatory burden for small banks following the passage of the act. [2]

Recently, the Bureau of Consumer Financial Protection (CFPB) proposed rules to implement section 1071 of the Dodd-Frank Act, "proposing to require covered financial institutions to collect and report to the bureau data on applications for credit for small businesses, including those owned by women or minorities." [3] With the track record of failure and compliance burden from the Dodd-Frank Act, we believe it is important to examine the potential impact on banks from the implementation of section 1071 while the CFPB is still in the comment phase for the rule.

Section 1071 of the Dodd-Frank Act amends the Equal Credit Opportunity Act by creating section 704B titled "Small Business Loan Data Collection." Here is the purpose of the change as stated in Dodd-Frank:

> "*This section is to facilitate enforcement of fair-lending laws and enable communities, governmental entities and creditors to identify business and community development needs and opportunities of women-owned, minority-owned and small businesses.*"

To facilitate enforcement there must be information gathered. The statement on information gathering reads (in part):

AdminRecord-002234

Case 7:23-cv-00144    Document 105-11    Filed on 08/01/24 in TXSD    Page 127 of 164

*"In the case of any application to a financial institution for credit for women-owned, minority-owned or small business, the financial institution shall 1) inquire whether the business is a women-owned, minority-owned or small business, and 2) maintain a record of the responses to such inquiry, separate from the application and accompanying information. Additionally, any applicant for credit may refuse to provide this information."*

The information compiled and maintained shall be itemized to clearly and conspicuously disclose:

- Number of the application and date the application is received;
- The type and purpose of the loan;
- The amount of credit or credit limit applied for and the amount or limit approved;
- The type of action taken with respect to the credit request and the date of the decision;
- The census tract of principal business location;
- Gross annual revenue of the business from the previous fiscal year;
- The race, sex and ethnicity of the principal owners; and
- Any additional information that the CFPB determines will aid in fulfilling the purpose of this section.

Finally, with the data collected, what are the rules for the data?

- Once compiled, the data is submitted to the CFPB annually;
- The data must be retained for not less than three years from the time of compilation;
- The data shall be made available to any member of the public, upon request; and
- The data shall be made available annually by the CFPB.

As a point of clarification, the details in this section come from section 1071 of the Dodd-Frank Act. The CFPB has a proposal for implementing section 1071. Click here for details on the implementation.

Cyree (2016) suggests that the Dodd-Frank Act increased the regulatory burden for small banks. Here, we examine the potential of section 1071 to increase the regulatory burden for small banks. Currently, it is against the law for banks to collect the race and gender of the principal owner(s) applying for a business loan, so we cannot address race and gender. However, bank call reports provide information on small-business loans and we will use this data in our analysis.

Call report (FFIEC 041 and 051) Schedule RC-C provides data on bank loans and leases for banks. Part II of Schedule RC-C provides data on loans to small businesses and small farms. Specifically, it provides the number and amounts outstanding of small-business loans. Part II of the schedule starts: "Report the number and amount currently outstanding as of the report date of business loans with 'original amounts' of $1 million or less and farm loans with 'original amounts' of $500,000 or less."

The first step in our analysis is to consider small-business loans as a percent of total loans and leases by state. *Figure 1* is a national map of states' percentage of small-business loans. There are two main features in the results from the map. First, the percentages vary across states. Second, banks in the center of the country tend to have a larger percentage of their loan portfolio dedicated to small-business loans. These are the states with more small banks, which suggest—consistent with Cyree (2016)—the potential for more burden in small banks from the implementation of section 1071.

*Figure 1*



Small Business Lending Across America

Avg. Small Business Loans to Total Loans and Leases     0.080     0.433

To access the potential burden of section 1071 on small banks more directly, we examine data from Texas banks. We define a Texas bank as any bank that uses a Texas address on its June 30, 2021, call report. We use data from Texas banks without foreign locations. We report results in *Table 1* for our sample and various measures of potential burden. [4]

*Table 1: Texas Banks Loans and Employees*

*Panel A: Total Assets and Total Loans*

AdminRecord-002235

| Group | Size range for group | Number | Average total assets | Average total loans |
|---|---|---|---|---|
| 1 | <= $100 million | 60 | $67.4 million | $26.7 million |
| 2 | $100 million < size <= $500 million | 186 | $248.7 million | $132.1 million |
| 3 | $500 million < size <= $1 billion | 71 | $696.9 million | $420.7 million |
| 4 | $1 billion < size <= $10 billion | 73 | $2.6 billion | $1.6 billion |
| 5 | $10 billion < | 7 | $24.8 billion | $13.3 billion |

*Panel B: Employees*

| Group | Size range for group | Number | Total full-time employees | Average full-time employees |
|---|---|---|---|---|
| 1 | <= $100 million | 60 | 835 | 13.9 |
| 2 | $100 million < size <= $500 million | 186 | 7,665 | 41.2 |
| 3 | $500 million < size <= $1 billion | 71 | 7,734 | 108.9 |
| 4 | $1 billion < size <= $10 billion | 73 | 28,839 | 395.1 |
| 5 | $10 billion < | 7 | 18,265 | 2,609.3 |

*Panel C: Small-business Loan Percentages*

| Group | Non-farm | Farm | Total |
|---|---|---|---|
| 1 | 24 percent | 14.9 percent | 38.9 percent |
| 2 | 23.3 percent | 7.2 percent | 30.5 percent |
| 3 | 20.5 percent | 2.9 percent | 23.4 percent |
| 4 | 15.4 percent | 1.5% percent | 16.9 percent |
| 5 | 11.1 percent | 0.6 percent | 11.7 percent |

*Panel D: Small-Business Loans per Employee*

| Group | Number of loans | Median number of small-business loans per employee |
|---|---|---|
| 1 | 11,256 | 11 |
| 2 | 89,079 | 10.9 |
| 3 | 310,222 | 8.8 |
| 4 | 212,332 | 6.9 |
| 5 | 122,985 | 5.7 |

AdminRecord-002236

*Appendix: U.S. Banks Loans and Employees (Domestic Offices Only)*

*Panel A: Total Assets and Total Loans*

| Group | Size range for group | Number | Average total assets | Average total loans |
|---|---|---|---|---|
| 1 | <= $100 million | 850 | $61.6 million | $32.3 million |
| 2 | $100 million < size <= $500 million | 2,332 | $251.1 million | $149.1 million |
| 3 | $500 million < size <= $1 billion | 750 | $698.4 million | $440.9 million |
| 4 | $1 billion < size <= $10 billion | 799 | $2.6 billion | $1.7 billion |
| 5 | $10 billion < | 107 | $26.5 billion | $16.7 billion |

*Panel B: Employees*

| Group | Size range for group | Number | Total full-time employees | Average full-time employees |
|---|---|---|---|---|
| 1 | <= $100 million | 850 | 10,752 | 12.6 |
| 2 | $100 million < size <= $500 million | 2,332 | 104,288 | 44.7 |
| 3 | $500 million < size <= $1 billion | 750 | 86,867 | 115.8 |
| 4 | $1 billion < size <= $10 billion | 799 | 270,815 | 338.9 |
| 5 | $10 billion < | 107 | 246,477 | 2,303.5 |

*Panel C: Small-business loan percentages*

| Group | Non-farm | Farm | Total |
|---|---|---|---|
| 1 | 19.1 percent | 17.5 percent | 36.6 percent |
| 2 | 22 percent | 8.4 percent | 30.3 percent |
| 3 | 20.1 percent | 3.7 percent | 23.8 percent |
| 4 | 15.7 percent | 1.8 percent | 17.5 percent |
| 5 | 9.6 percent | 0.4 percent | 10 percent |

*Panel D: Small-business Loans per Employee*

| Group | Number of loans | Median number of small-business loans per employee |
|---|---|---|
| 1 | 150,916 | 12.8 |
| 2 | 1,253,294 | 11.5 |
| 3 | 1,701,204 | 8.7 |

AdminRecord-002237

| 4 | 2,553,736 | 7.3 |
| 5 | 3,730,134 | 5.7 |

The purpose of Panel A of *Table 1* is a basic sample description with definitions for our size groupings following our premise that section 1071 is likely more of a burden to small banks. Panel B further describes the sample with the total and average number of full-time equivalent employees. Group 1 (smallest banks) of the sample has an average of about 14 employees, while group 5 (largest banks) has an average of about 2,600 employees. This suggests that any additional reporting required on banks will pose a greater burden on the smallest banks.

Section 1071 requires reporting on small-business loans. Panel C of *Table 1* provides the percentage of a bank's total loan portfolio held in small-business loans. We provide the percentage of non-farm and farm small-business loans. There are a number of interesting insights from Panel C. First, the percentage of non-farm small-business loans is about 24 percent for banks with $500 million or less in total assets. Then the percentage decreases by about 5 percent of the total loan portfolio as we move up bank sizes across the three largest groups. Second, small business farm loans also decline as bank size increases. Additionally, banks above $500 million in total assets are not significant players in farm lending. Finally, total small-business loans as a percentage of total loans decline as bank size increases. For banks with $100 million or less in total assets, small-business loans comprise about 40 percent of their total loan portfolio while for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. The bottom line from Panel C is that smaller banks are the ones in the business of making small-business loans. [5]

Panel D is an attempt to proxy for the burden of section 1071 on small banks. Group 1 banks have 11,256 small-business loans, which is 11 small-business loans per employee. Group 3 banks have 310,222 small-business loans, which is about nine small-business loans per employee. Group 5 banks have 122,985 small-business loans, which is about six loans per employee. Thus, the average employee in the smallest banks will have to do two times the reporting for section 1071 than the average employee in the largest bank. The largest banks with an average of 2,600 employees can have an employee dedicated to section 1071 reporting while one of (on average) 14 full-time employees of the smallest banks will have section 1071 reporting added to their list of tasks. Additionally, small banks are unlikely to have the IT infrastructure needed to automate the data collection and the cost of acquiring technology for this purpose will be more of a burden on small banks.

Implementing any rule creates costs on banks and our analysis shows that the burden is likely to be biggest for the smallest banks. If we are going to increase the burden on small banks, we should clearly understand the public policy benefit of the rule.

The CFPB states: "...proposed rule would create the first comprehensive database of small-business credit applications in the United States. This would include critical information about women-owned and minority-owned small businesses to help regulators and the public identify and address fair lending concerns. The database would also enable a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses. Just as the bureau works in other ways to help foster fairness and opportunity in consumer financial services markets for all consumers, the proposed 1071 rule is structured to realize these same goals for the small-business market—for all small businesses within the scope of the rule, including those that are owned by women and minorities." [6]

This suggests that the CFPB wants the ability to analyze small-business lending discrimination in a manner similar to mortgage loan analysis on HMDA data. However, this is unnecessary and likely of little economic benefit.

Bank regulators already examine banks for compliance with the Community Reinvestment Act (CRA). The CRA encourages banks to make credit available to communities in which they do business, including low- and moderate-income neighborhoods. The regulators evaluate and rate the banks for their performance under the CRA. Cyree and Winters (2021) [7] show that more than 90 percent of banks are rated satisfactory for compliance with CRA for a sample from 2007 to 2016 with about 8 percent of the sample banks rated outstanding. These ratings suggest little, if any, lending discrimination into low- and moderate-income neighborhoods. However, if lending discrimination is suspected, the regulators have direct access to bank loan applications and files for analysis, which would eliminate the reporting proposed under section 1071.

HMDA requires reporting the race and gender of mortgage loan applicants. Cyree and Winters (2021) find that —after a reasonable sets of controls—banks rated outstanding for CRA compliance are less likely to grant a mortgage loan to racial minorities than to whites. This result suggests statistical discrimination. However, with about 240,000 applicants, the sample size makes small differences between groups statistically significant. Additionally, their model has very low explanatory power (adjusted r-square of about 6 percent), which suggests an omitted variable problem. Delis and Papadopoulos (2019) [8] explain that problem as the lack of crucial underlying factors and information on borrowers' creditworthiness, including, but not limited to, credit score variables (e.g., FICO score), LTV ratio, DTI ratio and down-payment size. These criteria are privately

AdminRecord-002238

observed by the lending institutions and play a crucial role when a bank assesses an applicant's riskiness and decides whether or not to originate the loan. In other words, the banks have private information about loan applicants that are not in the HMDA data. The bottom line from the HMDA data is that statistical analysis of a large and incomplete dataset is likely to lead to statistically significant results that lack economic value.

The data requirements for reporting under section 1071 create an omitted variable problem similar to what occurs with the HMDA data. Specifically, the information in the application needed to do a careful credit analysis is stripped from the gender and race data. The proposed data only allow analysis if different groups have a different percentage of loans granted. The data will not allow for an analysis of creditworthiness. Accordingly, the proposed data cannot assist with the stated purpose of section 1071 ("*identify business and community development needs and opportunities for women-owned, minority-owned and small businesses*"), but will create an additional burden, especially for small banks, of increased overhead and nuisance lawsuits.

Our discussion on omitted variables in the proposed data collection under section 1071 should not be read as a need for more data collection under the proposed rule. Small-business financial reports and small-business lending documentation are not standardized, unlike mortgage lending, and the lack of standardization creates statistical issues similar to the omitted variable problem. Additionally, relationships in small-business lending are difficult to quantify for data collection. So, expanding the data collection will not fix the statistical issues for the analysis of the proposed data.

Additionally, the burden from section 1071 on community banks will be important for local economies. Though community banks tend to be relatively small, their small-business lending far exceeds their aggregate lending share. Nationally, community banks represent 15 percent of the industry's total loans, but 30 percent of its CRE loans, 36 percent of small-business loans and 70 percent of agricultural loans. [9] Perhaps a more accurate and recent indicator of the importance of the community banking sector in funding small-business enterprises is their robust participation in the Paycheck Protection Program (PPP). Data from the Small Business Administration (SBA) on this critical lifeline shows the importance of smaller banks in supporting the borrowing needs of small businesses and, by extrapolation, would indicate that the reporting burden of section 1071 would fall disproportionately. This recently reflected in their PPP approvals through May 31, 2021, that $799.83 billion were made in PPP loans. [10] Banks less then $10 billion in size accounted for $335.28 billion or 41.9 percent of PPP loans. [11] This is important when you consider that FDIC data indicates that banks $10 billion and under represent approximately 12 percent of the industry assets. [12] Regardless of how we examine community bank lending, it is abundantly clear that community banks play an outsized role in the small-business lending space and make a disproportionately large percentage of these loans in a variety of categories.

O ur analysis suggests that the implementation of Section 1071 will be an unintended attack on relationship banking that occurs every day in every region of our country. It will create a barrier for credit for the truly small businesses that are less sophisticated, but essential to the community. Specifically, truly small businesses have limited financial data and thus rely on relationship lending from community banks. The limited data will not allow the community (small) banks to protect themselves against lawsuits using section 1071, nor conform to the data requirements of non-community bank (large) lenders.

Another unintended consequence of this one-size-fits-all approach—which is punitive to smaller community banks—to data collection will be the cost of compliance and risk of non-compliance to implement section 1071. A cost-benefit analysis will lead many community banks to cease making small-businesses loans. We find that Texas banks in our sample that are $10 billion and under in total assets have about $32 billion of small-business loans outstanding on their books. A disruption to the small-business loan process, especially as the state is still working through issues that were created by COVID-19, would be devastating to the overall Texas economy and to many underserved rural communities.

Chapter 4 of the 2020 *FDIC Community Banking Study* supports the findings of this research and further strengthens the argument against the implementation of Section 1071 of the Dodd-Frank Act. [13]

-----------------------------------------------------------------------------------------------

[1] Kyle D. Allen, Ken B. Cyree, Matthew D. Whitledge and Drew B. Winters, 2018, "An Event Study Analysis of Too-Big-To-Fail After the Dodd-Frank Act: Who is Too Big to Fail?" *Journal of Economics and Business*, No. 98, pages 19–31.

[2] Ken B. Cyree, 2016, "The Effects of Regulatory Compliance for Small Banks Around Crisis-Based Regulation," *Journal of Financial Research*, No. 39, pages 215–245.

[3] Consumer Financial Protection Bureau, **"Small Business Lending Data Collection Under the Equal Credit Opportunity Act"** (see summary section).

[4] Our discussion focuses on Texas banks. For reference, we provide an appendix that replicates *Table 1* for all U.S. banks (without foreign locations, for direct comparison to *Table 1*). Excluding foreign operations excludes the largest banks, but does not change our results on the burden of section 1071 on small banks.

[5] Large banks lend larger dollar amounts in small-business loans, but these dollar amounts are a much smaller *percentage* of their loan portfolio.

AdminRecord-002239

[6] Consumer Financial Protection Bureau, **"Small Business Lending Data Collection Under the Equal Credit Opportunity Act"** (see page 4).

[7] Ken B. Cyree and Drew B. Winters, 2021, "Investigating Bank Lending Discrimination in the U.S. Using CRA-rated Banks' HMDA Loan Data," working paper.

[8] Manthos D. Delis and Panagiotis Papadopoulos, 2019, "Mortgage Lending Discrimination Across the U.S.: New Methodology and New Evidence," *Journal of Financial Services Research*, No. 56, pages 341–368.

[9] Federal Deposit Insurance Corp., *FDIC Community Banking Study 2020*.

[10] U.S. Small Business Administration, Paycheck Protection Program Report: Approvals Through May 31, 2021.

[11] U.S. Small Business Administration, Paycheck Protection Program Weekly Reports 2021; Paycheck Protection Program: Approvals Through August 8, 2020.

[12] Federal Deposit Insurance Corp., *FDIC Community Banking Study 2020*.

[13] Federal Deposit Insurance Corp., FDIC Community Banking Study 2020, Chapter 4.

SHARE THIS FEATURE:

← Previous | Next →

## MORE FEATURES



**Conference of State Bank Supervisors Updates Ransomware Self-Assessment Tool**



**Building Cardholder Loyalty Through Digital Payments**



AdminRecord-002240



**Challenging Some Traditional Myths in Community Bank Operations**



**What Kind of Banks Do We Need?**

1   2   ...   5   Next >

---

SEARCH

---

**SUBSCRIBE TO BANKERS DIGEST**

*Bankers Digest*'s e-newsletter is distributed three times a month. Sign up today to stay in the loop
—it's free!

NAME

EMAIL

BANK *or* COMPANY

CITY

STATE

SUBSCRIBE

---

**ABOUT**

# BANKERS DIGEST

*Bankers Digest* is your source for Texas banking news and information, including bankers on the
move, bank developments across the state, industry updates, regulations and job opportunities.
**Click here to send us your bank's news or to contact the editorial department.**

 

© 2023 BANKERS DIGEST—
PUBLISHED BY IBAT MARKETING INC.,
A SUBSIDIARY OF THE INDEPENDENT BANKERS ASSOCIATION OF TEXAS

AdminRecord-002241

### Survey: Small Business Compliance Cost Survey

Filling out the following survey will take approximately 2 hours. The Consumer Financial Protection Bureau may receive data that includes direct personal, but this information will be kept private except as required by law. If you have any questions or concerns about the survey, please contact Corinne Candilis at Corinne.Candilis@cfpb.gov.

### Background

Under Section 1071 of the Dodd-Frank Act, the Equal Credit Opportunity Act was amended to require financial institutions, subject to a regulation to be issued by the Bureau of Consumer Financial Protection (the Bureau), to compile, maintain, and report to the Bureau certain information about applications for credit made by women-owned, minority-owned, and small businesses. Section 1071 includes 13 statutorily-mandated data points, and permits the Bureau to require additional data points that would serve the purposes of the section.

The objective of this survey is to solicit, from institutions offering small business credit products that could potentially be covered by this rule, information about potential one-time costs to prepare to collect and report data. This survey does not cover potential on-going costs from actually collecting and reporting data.

The Bureau is in preliminary stages of developing the regulation required by the Dodd-Frank Act, and no policy decisions have been made regarding the institutions and products to be covered and data points to be reported. Your responses to this survey will help the Bureau think about these issues. The fact that you are receiving this survey does not mean that your institution will necessarily be covered by the rule.

### Assumptions

While completing the survey please answer all questions under assumptions that covered institutions would be required to report data at the application level on small business financing that constitutes "credit" for purposes of the Equal Credit Opportunity Act (this includes, for example, term loans, lines of credit and credit cards) for the 13 statutorily-mandated data points (application number, application date, loan type, loan purpose, credit amount requested, credit amount approved, action taken, action date, census tract for the principal place of business, gross annual revenue in the last fiscal year, race, sex, ethnicity of the principal owners of the business) one time per year, and be responsible for validating the accuracy of all data.

For any other potential reporting criteria or requirement, such as the definition of a small business or of a small business loan, please use your institution's internal definition. For purposes of this survey, assume the Regulation B definition of application. Additionally, for purposes of this survey, do not include any of the costs associated with creating a Firewall. For the purposes of this survey, assume a reporting structure similar to that currently under the Home Mortgage Disclosure Act (HMDA). Finally, please use the comment box in the final question if you would like to share any additional assumptions you made when interpreting and answering any of the questions.

1

AdminRecord-004201

**Privacy Act Statement**

**5 U.S.C. 552a(e)(3)**

Your trade association, on behalf of the Consumer Financial Protection Bureau (CFPB), is sending out a survey link that will enable the CFPB to learn about your financial institutions small business credit and estimates of one-time costs.

If you participate in the survey, the CFPB may collect personally identifiable information (PII) such as your name and telephone number from your trade association to facilitate follow up questions to the survey.

Information collected by the CFPB will be treated in accordance with the System of Records Notice ("SORN"), CFPB.022 Market and Consumer Research Records, 83 FR 23435. Although the CFPB does not anticipate further disclosing the information provided, it may be disclosed as indicated in the Routine Uses described in the SORN. Direct identifying information may be used by the CFPB to facilitate the survey and will be kept private except as required by law.

This collection of information is authorized by Pub. L. No. 111-203, Title X, Sections 1013 and 1022, codified at 12 U.S.C. §§ 5493 and 5512.

Participation in this survey is voluntary.

**Paperwork Reduction Act Statement:**

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The OMB control number for this collection is 3170-0032. It expires on 01/31/2023. Comments regarding this collection of information, including the estimated response time, suggestions for improving the usefulness of the information, or suggestions for reducing the burden to respond to this collection should be submitted to Bureau at the Consumer Financial Protection Bureau (Attention: PRA Office), 1700 G Street NW, Washington, DC 20552, or by email to PRA_Comments@cfpb.gov.

**Respondent Information**

1. Which best describes your institution type? (select all that apply)

   a. Bank

   b. Credit Union

   c. Community Development Financial Institution (CDFI)

   d. FinTech Lender

   e. Institution focused on offering Merchant Cash Advances

AdminRecord-004202

    f.   Equipment financing: Financing operation of bank

    g.   Equipment financing: Captive financing company

    h.   Equipment financing: Independent financing company

    i.   Other (please list)

2. Do you primarily serve rural or urban communities or an even mix?
   a. Rural communities

   b. Urban communities

   c. Even mix

3. What changes have you made or plan to make to your small business product line as a result of the coronavirus? (select all that apply)
   a. No changes

   b. Tightened small business lending origination criteria

   c. Additional servicing flexibility to borrowers

   d. Offered new Small Business Administration (SBA) Paycheck Protection Loans

   e. Offered other new products targeted at small businesses

   f. Eliminated staff in small business product line

   g. Other_____

4. How does your institution define a small business for purposes of determining whether an application from a business is considered for a small business lending product? If the definition varies by line of business or entity, base the response on the area with the highest small business lending production in terms of count not dollars. See Appendix at the end of the survey for definitions of terms.

   a. No formal definition
      Note: If this is your response, for all additional survey questions use the CRA definition or any other single definition that would allow you to respond.

   b. Community Reinvestment Act (CRA) definition

   c. Small Business Administration (SBA) definition

   d. Other (please specify all that you consider and the level of the threshold, check the box if you consider NAICS code)

      i. Loan Amount _____

3

AdminRecord-004203

   ii.   Revenue _____

  iii.   Total Exposure- see appendix _____

  iv.   Number of Employees _____

   v.   NAICS Code Check Box

  vi.   Assets _____

4

5. What were your institution's total assets at the end of the last calendar year? For larger institutions with multiple entities or subsidiaries, please report total assets for the primary entities or subsidiaries that engage in small business financing that constitutes "credit" for purposes of the Equal Credit Opportunity Act (this includes, for example, term loans (secured and unsecured), lines of credit and credit cards).

   a. Less than $250 million

   b. $250 million to $600 million

   c. $600 million to $1 billion

   d. $1 billion to $10 billion

   e. $10 billion to $100 billion

   f. $100 billion to $500 billion

   g. Over $500 billion

6. For each of the following product types, approximately how many total applications for small business credit (as you define small business) did you receive last year? If no formal definition of small business is utilized by your institution, use the CRA definition or any other definition that would allow you to respond to all questions. Per the Background section, please use the Regulation B definition of an application.

   | Product | Total Number of Business Loan Applications |
   | --- | --- |
   | Loans | |
   | Lines of Credit | |
   | Commercial Real Estate | |
   | Agriculture | |
   | Credit Cards | |
   | Other (please list) | |

7. For each of the following product types, what was the approximate number and dollar amount of originations for small business credit (as you define small business) last year? Only include originations where your institution made the credit decision, so exclude any purchased loans. In

5

AdminRecord-004205

the event of a financial technology partnership, use the number of originations in which the name of your institution is found on the loan agreement with the borrower.

| Product | Number of Originations | Dollar Amount |
|---|---|---|
| Loans | | |
| Lines of Credit | | |
| Commercial Real Estate | | |
| Agriculture | | |
| Credit Cards | | |
| Other (please list) | | |

8.  What percentage of your institution's overall lending does small business lending (total count of originations of loans, lines of credit and credit cards as you define) comprise?

    a.   0-10%

    b.   11-25%

    c.   26-50%

    d.   51-75%

    e.   76-100%

9.  In general, which of the following levels of automation best describes your overall processes to process, decision and document small business lending transactions for each product? If this varies by loan channel or line of business, base the response on the area with the highest small business lending production in terms of count not dollars. Please see the appendix for examples and clarification on the levels of automation.

| | Highly Automated | Moderately Automated | Minimally Automated |
|---|---|---|---|
| a.  Loans | | | |
| b.  Lines of Credit | | | |
| c.  Commercial Real Estate | | | |
| d.  Agriculture | | | |

6

AdminRecord-004206

    e.  Credit Cards

    f.  Other

10. From the following 10 statutorily-mandated data points, please check the ones that you currently collect in some form. Note that the three statutorily defined data points, race, sex and ethnicity are not included on this list.

    a.  application number

    b.  application date

    c.  loan type

    d.  loan purpose

    e.  credit amount requested

    f.  credit amount approved

    g.  action taken

    h.  action date

    i.  census tract for the principal place of business

    j.  gross annual revenue in the last fiscal year

11. Do you currently report data under:

    a.  HMDA

    b.  CRA

**One-time Costs**

This section focuses only on potential one-time costs to prepare to collect and report data, and does not cover any costs or time spent actually collecting or reporting data. As described above, please assume reporting at the application level for all 13 statutorily-mandated data points, not only those listed in question 8.

7

12. In preparing to collect and report the required data, please estimate the total number of hours senior-level, mid-level, and junior-level staff would spend on each of the following tasks, their average wage, along with non-salary expenses. If your institution would not conduct a specific task, or if a specific staff type would not be involved in a particular task, please record 0 hours.

What is the average hourly wage for each of these specific staff types involved in the 1071-related tasks below?

Senior/Executive     _____
    Mid-level          _____
      Junior           _____

| Tasks | Types of Staff Involved | Estimated Total Hours Required | Non-salary Expenses |
|---|---|---|---|
| **Preparation/Planning**<br>All general planning associated with the implementation of 1071 | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Updating Computer Systems<br>Updating computer systems to compile, maintain, and report 1071 data | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Testing/Validating Systems<br>Testing and validating computing and personnel systems for 1071 data | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Developing forms/applications<br>Developing the relevant materials to facilitate future lending under post-1071 | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Training staff<br>Training staff to comply with new 1071 regulation. | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Developing policies/procedures<br>Developing policies and procedures to facilitate SBL post-1071 | Senior/Executive<br>Mid-level<br>Junior | _____<br>_____<br>_____ | _____ |
| Legal/Compliance review | Senior/Executive | _____ | |

8

| Legal review of all of the relevant processes and systems specified above. | Mid-level Junior | _____ _____ | |
|---|---|---|---|
| | | | _____ |

Post Implementation  Review

| Fair lending review of data. | Senior/Executive Mid-level Junior | _____ _____ _____ | |
|---|---|---|---|
| | | | _____ |

Other (please list)

a.  _____

| | Senior/Executive Mid-level Junior | _____ _____ _____ | |
|---|---|---|---|
| | | | _____ |

13. Please indicate  whether your institution  would likely  purchase or update necessary systems and/or develop/modify  necessary systems in-house.

       Purchase                            Yes/No
       Develop/modify  in-house           Yes/No

14. If your institution  anticipates purchasing  or updating  computer systems, please estimate the total anticipated  3rd party vendor costs related to these purchases and updates.

15. Please indicate  whether your institution  would likely  use an external law firm  or consultant for the Legal/Compliance  Reviews mentioned in question 10 and/or conduct these reviews in-house.

       Hire                                  Yes/No
       Conduct  in-house                Yes/No

16. Please indicate  whether your institution  expects to hire additional  full-time  or part-time employees  to establish compliance  programs or develop  new reporting capabilities.

       Full-time                            Yes/No
       Part-time                           Yes/No

17. Please provide  estimates for any **additional** one-time costs that were not previously  listed that your institution  will  incur as a result of collection.

18. Please provide  your best overall estimate of **total potential one-time costs** in dollars  to prepare to collect and report data. If the rulemaking  might  impact multiple  lines of

9

AdminRecord-004209

business or systems, base your estimate on the total for the entire institution.

**Costs of Credit to Small Entities**

10

AdminRecord-004210

19. How would your institution respond to increased compliance costs if you were required to report data under 1071? Please rank order the responses below from most likely to least likely, where a "1" represents most likely.

    a.   Raise rates or fees on small business products      \_\_\_\_\_

    b.   Raise rates/fees on other credit products      \_\_\_\_\_

    c.   Accept lower profits      \_\_\_\_\_

    d.   Exit some geographic markets      \_\_\_\_\_

    e.   Tighten underwriting standards      \_\_\_\_\_

    f.   Offer fewer or less complex products      \_\_\_\_\_

    g.   No longer offer small business credit products      \_\_\_\_\_

    h.   Reduce "high-touch" relationship lending      \_\_\_\_\_

    i.   Other (please list)

         ➢  _____      \_\_\_\_\_

         ➢  _____      \_\_\_\_\_

20. Comment box for any additional information you would like to share. Please do not include any personally identifiable information (PII) relating to any individual or business, including but not limited to: name of applicants or business names, owners, guarantors, social security numbers, tax identification numbers, addresses, telephone numbers, email addresses, trademarks, images, logos, or account numbers.

11

AdminRecord-004211

**Appendix: Definition of Terms**

CRA definition of Small Business loans

> Loans whose original amounts are $1 million or less and that were reported on the institution's Call Report or TFR as either "Loans secured by nonfarm or nonresidential real estate" or "Commercial and industrial loans." Small-farm loans are defined as those whose original amounts are $500,000 or less and were reported as either "Loans to finance agricultural production and other loans to farmers" or "Loans secured by farmland."

Definitions/Examples of level of automation

|  | Marginally Automated | Moderately Automated | Highly Automated |
|---|---|---|---|
| Systems | Store electronic data in EXCEL | Use Loan Origination System (LOS) | Use multiple LOS and central System of Record (SoR) |
| Integration | None | Have forward integration of systems | Have backward and forward integration of systems |
| Automation | Manually process applications and data collection | Some manual processing and some automation | Highly automated application and processing |
| Compliance Program | Have joint compliance and audit office | Have basic internal and external accuracy audit | Have in-depth accuracy and fair lending audit |

SBA definition of a Small Business

> The SBA provides a set of industry-specific thresholds for average annual receipts and average employment of the business that define a small business. These thresholds are available at https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf

Total Exposure

> The total amount of credit made available to a borrower by a lender. The magnitude of total exposure indicates the extent to which the lender is exposed to the risk of loss in the event of the borrower's default.

12

AdminRecord-004212

NAICS

The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business. The classifications are available at https://www.census.gov/eos/www/naics.

AdminRecord-004213

**As of:** May 04, 2023
**Received:** October 08, 2021
**Status:** Posted
**Posted:** October 12, 2021
**Tracking No.** kui-wmr8-qdlp
**Comments Due:** January 06, 2022
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** CFPB-2021-0015
Small Business Lending Data Collection under the Equal Credit Opportunity Act

**Comment On:** CFPB-2021-0015-0002
Small Business Lending Data Collection under the Equal Credit Opportunity Act

**Document:** CFPB-2021-0015-0083
Comment from United Savings Credit Union

---

## Submitter Information

**Email:** elizabeth@unitedsavingscu.org
**Organization:** United Savings Credit Union

---

## General Comment

Thank you for taking the time to review submitted comments.

---

## Attachments

Comment letter

AdminRecord-014322

Bureau of Consumer Financial Protection

12 CFR Part 1002

Docket No. CFPB-2021-0015

Small Business Lending Data Collection Under Reg B

As the one-person compliance department at an $80 million asset credit union in Fargo, ND with four branches and less than 30 employees, the proposed rule would add significant burden to our institution through increased costs and increased friction in the lending process for our members. While I appreciate the Bureau of Consumer Financial Protection (Bureau) seeking to understand the landscape of lending to small businesses and to detect any violations of fair lending laws, this proposed rule will have a multitude of unintended consequences. The Bureau's goal could be attained with a simplified collection process and a decrease in data points collected if the Bureau refuses to use its exemption authority to exempt credit unions.

**Covered Financial Institution:** A great number of small financial institutions will meet the definition of a covered financial institution as set forth in the proposed rule. Though this may be intended by the Bureau in order to collect information from as many sources as possible, it will lead to many unintended consequences:

- Limited staff in small institutions will have to spend time and financial resources to implement procedures to collect and send this information, taking time away from their other important tasks that help members.
- Friction in the lending process will increase. Small business owners will be asked to complete even more paperwork and many times this is blamed unfairly on the financial institution.
- Some small institutions may consider limiting their small business lending portfolio to avoid becoming a covered financial institution. This is in direct opposition of what small institutions, especially credit unions, are all about: people helping people. At my institution, this may be what we have to contemplate if the proposed rule isn't revised.
- Small institutions are continually being pushed into mergers because they already can't keep up with burdensome regulations. If two small institutions merge that each don't meet the "covered institution" definition, most likely they would then meet the definition and have to comply with this rule. Merging institutions is complex enough that developing a brand new task that neither is familiar with could potentially complicate the merging process.

**Compliance Burden on Small Institutions:** Small institutions usually have limited employees and resources, and therefore are at a disadvantage compared to larger institutions. At my institution, we don't have an attorney on staff, and all training is pretty much done through webinars or e-schools. We have also been unable to find qualified business lending staff so our business lending falls to experienced managers who wear multiple hats. Separating the underwriting from this rule's data collection would prove very difficult. With this rule, they would be stretched further on time, we would have to pay for additional training, resources, and possibly software. In addition, most small institutions, especially credit unions, have a mission to help members, including those borrowers who are rejected by large institutions. Credit unions and other small financial institutions are consistent, sound lenders. Therefore, the probability that they will violate fair lending laws is reduced because they are already

seeking to help women-owned and minority-owned businesses whose owners may not have the best credit or whose businesses are not well-established.

**Solution in search of a problem:** Fair lending laws already exist to protect borrowers. Though a database of small business lending patterns would be helpful in some respects, it potentially will create more problems than it will solve such as privacy issues, additional friction in the lending process, a disadvantage to small institutions, as well as a chilling effect on lending. The Bureau should consider eliminating some of the data collection points such as:

- The method of application
- Applicant recipient
- Number of workers
- Time in business
- Number of principal owners
- Sex of principal owners

Eliminating these points would be a compromise between retaining the most useful data points and eliminating some excessive details, especially if the Bureau does not exempt small institutions, or adjust the loan threshold.

The Bureau should also consider how the extra paperwork will affect the business owners. They will have to provide more information to the government and so they might decide not to share the information, in which case the financial institution will be reporting data that won't help the Bureau (i.e. if the borrower doesn't want to report race, sex, or ethnicity).

We understand and support collecting information on small business lending to ensure there are no violations of fair lending and to provide useful insights to programs whose purpose is to assist small businesses, but this proposed rule will have a negative and unfavorable impact on small financial institutions, especially credit unions, who already help small businesses that large institutions may turn away.

As a not-for-profit, member-owned credit union, my institution may have to rethink the size of our small business lending portfolio to avoid becoming a covered financial institution. This will have a chilling effect on our lending. Or, if we didn't limit our portfolio, we would have to use valuable income to implement processes to comply with this rule instead of putting those funds back into the hands of our members through higher dividend rates, lower interest rates, and lower fees.

The most helpful change to this proposed rule would be to increase the threshold or to implement an asset size qualification so small institutions wouldn't be impacted. Or, if that isn't desirable, than the Bureau should create exemption criteria for certain data points so that small institutions have less information to collect and process.

Thank you for considering the detrimental impacts of this rule.

AdminRecord-014324



3138 10th Street North
Arlington, VA 22201-2149
703.842.2215 | 800.336.4644
f: 703.522.2734
dberger@nafcu.org | nafcu.org

**B. Dan Berger**
President & Chief Executive Officer

**National Association of Federally-Insured Credit Unions**

October 18, 2021

The Honorable Rohit Chopra
Director
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552

RE: **Small Business Lending Data Collection and SBA Direct Lending Authority**

Dear Director Chopra:

On behalf of the National Association of Federally-Insured Credit Unions (NAFCU), I am writing in response to the Consumer Financial Protection Bureau's (the Bureau) proposed rule regarding Small Business Lending Data Collection under the *Equal Credit Opportunity Act*. NAFCU advocates for all federally-insured not-for-profit credit unions that, in turn, serve 127 million consumers with personal and small business financial service products. This letter addresses the Bureau's proposed rule and its likely effects only as they relate to a legislative proposal contained in the *Build Back Better Act* to authorize the Small Business Administration (the SBA) to establish a direct 7(a) lending program. NAFCU will respond more fully to the Bureau's proposed rule within the comment period. However, given the *Build Back Better Act*'s time-sensitive nature, I must make clear now certain material, if not obvious, risks posed to credit unions and small businesses by the interplay of the proposed rule and the legislative proposal.

Stated simply, the legislative proposal lacks the statutory guardrails necessary to prevent credit unions' disintermediation in the increasingly important small dollar segment of the business lending market. Credit unions leverage their demonstrated expertise in small dollar lending to provide significant support to their communities' small businesses. Not only does the legislative proposal risk the SBA becoming credit unions' direct lending competitor, but the legislative proposal also risks fintechs, who have never been permitted to originate 7(a) loans, driving credit unions entirely out of 7(a) lending. And the proposed rule, if adopted as written, would cause many credit unions to exit the business lending market altogether. Operating alongside one another, the legislative proposal and the proposed rule risk greatly damaging the vibrant, robust business lending market without which continued and broader small business successes are impossible.

As the Bureau rightly and often points out, small businesses are a cornerstone of the American economy. Roughly half of all private sector employees work for small businesses, and small businesses have generated nearly two-thirds of net new jobs for decades. Small businesses, particularly in their infancy, find financial strength most often in credit unions and other community-based financial institutions, not through for-profit megabanks or non-depository

AdminRecord-014346

The Honorable Rohit Chopra
October 18, 2021
Page 2 of 3

fintechs. For minority- and women-owned businesses whose founders often lack access to private funding and substantial collateral, tailored, in-community financial support is all the more important.

Under the *Build Back Better Act*, legislators would authorize the SBA to originate and disburse certain small dollar 7(a) loans with or without the involvement of third parties, such as participating SBA credit union lenders. The legislative proposal would also permit fintechs to become participating SBA lenders, a designation that has always been limited to lenders supervised by a Federal financial institution regulator, a state banking regulator, or the SBA.

The legislative proposal ignores credit unions' incredible contributions to the successes of the Paycheck Protection Program (PPP), a clear example of the value of public-private financial services partnerships. Credit unions stepped up for their communities when times were hardest, as they always do. While navigating myriad disruptions to their own operations, credit unions across the country became participating SBA lenders to ensure that small businesses turned away by for-profit banks and fintechs had timely access to PPP funds. During these uniquely challenging times, the SBA was not always able to provide clear direction, but credit unions always ensured their small business borrowers had the support they needed to navigate often uncertain PPP deadlines, limitations, and procedures. The PPP data make clear that credit unions play a significant role in the financial health and resiliency of their communities' small businesses.

The legislative proposal's net effect of increasing private-sector competition for ever fewer SBA lending opportunities will be a rapid consolidation of 7(a) lending to the detriment of small businesses. Neither the SBA nor fintechs can reasonably be expected to provide the tailored, in-community long term support small businesses require to succeed and grow. If credit unions are forced out of this segment of the business lending market, the attendant threat to credit unions' abilities to timely recognize and meet small businesses' needs and, more broadly, the threat to small businesses' long-term financial stability are clear.

As Small Business Advisory Review Panelists indicated, the proposed rule, if adopted, would impose significant one-time and ongoing annual compliance costs that paradoxically risk speeding the consolidation of the business lending market and compounding fair lending issues and concerns. Far from fulfilling section 1071 of the *Dodd-Frank Wall Street Reform and Consumer Protection Act's* laudable dual purposes, a consolidated business lending market would provide all small businesses ever less access to affordable, high-quality credit.

Faced with overwhelming one-time section 1071 compliance costs, some subject credit unions could immediately be forced to abandon their dutiful support of small business members. Other subject credit unions, those more capable of shouldering the initial burden, will certainly face insurmountable competitive pressures. For-profit megabanks and fintechs with greater transactional efficiencies and lower per transaction costs may ultimately drive all but the largest credit unions and other community-based financial institutions from the business lending market. To provide some perspective – in NAFCU's 2021 Federal Reserve Survey, nearly one-third of respondents said they would be somewhat likely or very likely to reconsider their participation in

AdminRecord-014347

The Honorable Rohit Chopra
October 18, 2021
Page 3 of 3

the business lending market if section 1071's small business lending data collection requirements were implemented.

NAFCU supports the enforcement of fair lending laws and appreciates the Bureau's dedication to better supporting small businesses, particularly minority- and women-owned businesses. That the legislative proposal may result in the SBA and fintechs establishing and growing 7(a) lending market share to the detriment of credit unions and small businesses, however, complicates the Bureau's task of balancing its need for data and the health of the overall business lending market. In light of the legislative proposal, NAFCU encourages the Bureau to further consider its own projections that the Bureau could capture nearly all small business loan data by establishing a loan-volume threshold and other parameters that would require only two percent or fewer of credit unions to shoulder the significant one-time and ongoing compliance costs likely to be incurred under the proposed rule.

Sincerely,

B. Dan Berger
President & CEO

AdminRecord-014348

November 3, 2021

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re:    Request for extension of the deadline to file comments to the proposed small business lending
       data collection under the Equal Credit Opportunity Act, Docket No. CFPB-2021-0015; RIN 3170-
       AA09

Dear Director Chopra:

The undersigned trade associations appreciate the opportunity to comment on the Consumer Financial
Protection Bureau's proposed rule amending Regulation B to implement amendments to the Equal
Credit Opportunity Act made by section 1071 of the Dodd-Frank Wall Street Reform and Consumer
Protection Act.[1] The proposal will require covered financial institutions to collect and report to the
Bureau more than 21 data elements on applications for credit by small businesses in order to "facilitate
the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors
to identify business and community development needs and opportunities of women-owned, minority-
owned, and small businesses."[2]

While we appreciate the opportunity to comment, we also believe that such a complex and important
subject merits sufficient time to provide feedback. The *Federal Register* notice announcing the proposed
rule states that comments must be received on or before January 6, 2022. We respectfully urge you to
extend the deadline by an additional 45 days to February 20, 2022.

We welcomed your written and oral testimony last week before the Senate Banking Committee and
House Financial Services Committee, emphasizing the importance of "relationship banking" and noting
that "Preserving relationship banking is critical to our nation's resilience and recovery, particularly in
these times of stress." We also appreciated your acknowledgement that "a lot of rulemaking that occurs
in Washington [is] extremely complicated" and your interest in issuing "simple, bright-line rules" that
are "easy to follow [and] easy to enforce."

We share these goals, and believe that development of a final 1071 rule that achieves its statutory
objectives while also minimizing burden on small lenders is critical to preserving relationship banking.
The proposed rule, however, spans 913 pages and seeks feedback on a broad range of complex and
interrelated definitions, data points, sample forms, and requirements for collecting and reporting the
data. Even a 90-day comment period for analyzing and responding to these requests is inadequate,
increasing the risk that the Bureau will make policy decisions based on flawed or incomplete
information.

---

[1] 86 Fed. Reg. 56356 (Oct. 8, 2021).
[2] 15 U.S.C. §1691o-2.

In last week's testimony, you encouraged financial institutions – and in particular, small institutions – to submit comments on the cost of the proposed data collection. However, the Bureau's estimate of the costs alone extends 75 pages, and understanding or estimating costs requires reading the rule, commentary, sample data collection forms and instructions, which span another 146 pages. Community banks and credit unions do not have staff that can read and respond to the notice within the 90-days provided. Yet accurately measuring anticipated costs and identifying less burdensome alternatives is critical to finalizing a carefully calibrated rule that will help preserve relationship banking.

In addition, the proposal includes a discussion of anticipated privacy risks arising from public disclosure of the data, the proposed balancing test the Bureau intends to apply to balance risks and benefits, and the Bureau's preliminary application of the test to each of the proposed data elements. This discussion spans 107 pages, and the Bureau states that it intends to issue a "policy statement" informed by comments it receives to determine what data will be released to the public. Asking small financial institutions to analyze and respond to these issues (in addition to everything else in the proposal) is unreasonable, and yet this may be the only opportunity they have to provide feedback on these questions that will be critically important to the privacy of their small business borrowers.

As you recognize, small financial institutions play a pivotal role supporting small businesses and their communities, and much of the information the Bureau needs to move forward prudently lies with them. The present timeline does not give these institutions time to communicate through their normal advocacy channels, let alone directly to the Bureau as you have encouraged them to do.

We respectfully request that the Bureau extend the comment period 45 days to February 20. The current comment deadline will preclude the development of a sufficiently broad and complete factual record necessary to support effective policy action in an area that will have significant consequences for small businesses, small banks and credit unions, and the U.S. economy.

Sincerely,

| | |
|---|---|
| Alabama Bankers Association | Colorado Bankers Association |
| Alaska Bankers Association | Community Bankers Association of Georgia |
| American Bankers Association | Community Bankers Association of Illinois |
| Arizona Bankers Association | Community Bankers Association of Kansas |
| Arkansas Bankers Association | Community Bankers Association of Ohio |
| Arkansas Community Bankers | Community Bankers Association of Oklahoma |
| Bluegrass Community Bankers Association | Community Bankers of Iowa |
| California Bankers Association | Community Bankers of Michigan |
| California Community Banking Network | Community Bankers of Washington |

Community Bankers of West Virginia

Connecticut Bankers Association

Credit Union National Association

Delaware Bankers Association

Florida Bankers Association

Georgia Bankers Association

Hawaii Bankers Association

ICBA of New Mexico

Idaho Bankers Association

Illinois Bankers Association

Ind. Bankers Assn of New York State

Ind. Community Bankers of South Dakota

Ind. Community Banks of North Dakota

Independent Bankers Association of Texas

Independent Bankers of Colorado

Independent Banks of South Carolina

Independent Community Bankers of America

Independent Community Bankers of Minnesota

Indiana Bankers Association

Iowa Bankers Association

Kansas Bankers Association

Kentucky Bankers Association

Louisiana Bankers Association

Maine Bankers Association

Maryland Bankers Association

Massachusetts Bankers Association

Michigan Bankers Association

Minnesota Bankers Association

Mississippi Bankers Association

Missouri Bankers Association

Missouri Independent Bankers Association

Montana Bankers Association

Montana Independent Bankers

National Association of Federally-Insured Credit Unions

National Bankers Association

Nebraska Bankers Association

Nebraska Independent Community Bankers

Nevada Bankers Association

New Hampshire Bankers Association

New Jersey Bankers Association

New Mexico Bankers Association

New York Bankers Association

North Carolina Bankers Association

North Dakota Bankers Association

Ohio Bankers League

Oklahoma Bankers Association

Oregon Bankers Association

Pennsylvania Assoc. of Community Bankers

Pennsylvania Bankers Association

Puerto Rico Bankers Association

Rhode Island Bankers Association

South Carolina Bankers Association

South Dakota Bankers Association

Tennessee Bankers Association

Texas Bankers Association

Utah Bankers Association

Vermont Bankers Association

Virginia Association of Community Banks

Virginia Bankers Association

Washington Bankers Association

West Virginia Bankers Association

Wisconsin Bankers Association

Wyoming Bankers Association

Cc.  Grady Hedgespeth

AdminRecord-014372



November 23, 2021

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW Washington, DC 20552

Re: <u>Request for Extension of the Deadline to File Comments to the Notice of Proposed
Rulemaking on Small Business Lending Data Collection, Docket No. CFPB-2021-0015; RIN
3170-AA09</u>

Dear Director Chopra:

The Office of Advocacy of the U.S. Small Business Administration (Advocacy) submits this
letter to request an extension of the comment period for the Bureau of Consumer Financial
Protection's (CFPB) proposed rule on small business lending data collection. The proposed
rulemaking would implement section 1071 of the Dodd-Frank Act. It will require covered
financial institutions, many of which are small, to collect and report to the CFPB several data
elements on applications for credit by women-owned, minority-owned, and small businesses.

Advocacy was established pursuant to Pub. L. 94-305 to represent the views of small entities
before federal agencies and Congress. Advocacy is an independent office within the U.S. Small
Business Administration (SBA), so the views expressed in this letter by Advocacy do not
necessarily reflect the views of the SBA or the Administration. Advocacy performs outreach to
obtain input from small business representatives about the impact of policy initiatives.

On October 8, 2021, the CFPB published the proposed rule on Small Business Lending Data
Collection in the Federal Register. 1 The proposal is over 900 pages and seeks important
information about the potential costs of the proposal. The small entities that will be required to
comply with the regulation are in the best position to provide the CFPB with information about
the potential costs associated with the proposal. This information is crucial for determining the
economic impact of the rule and for considering less costly alternatives as required by the

On November 3, 2021, several trade associations submitted a joint letter outlining the challenges
that small entities will have providing meaningful comments by the current deadline of January
5, 2022. Accordingly, the trade associations requested an extension to February 20, 2022. The

409 3rd Street SW / Washington, D.C. 20416
Phone: (202)-205-6533 / <u>advocacy.sba.gov</u>



Office of Advocacy supports that request. Allowing enough time to provide meaningful comments is beneficial both to small entities and to the CFPB.

On November 9, 2021 the Office of Advocacy held a roundtable to discuss the concerns that small entities may have about the proposed rule. At the roundtable, the attendees confirmed that the 90-day comment period is inadequate considering the length and density of the proposed rule. The roundtable attendees stated that 90 days is not enough time for small financial institutions to collect the information requested and provide meaningful comments.

If you have any questions regarding this request or if Advocacy can be of any assistance, please do not hesitate to contact me or Jennifer Smith at Jennifer.Smith@sba.gov.

Sincerely,

Major L. Clark, III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

Jennifer A. Smith
Assistant Chief Counsel for Economic Regulation & Banking
Office of Advocacy
U.S. Small Business Administration

- 2 -



**Independent
Bankers
Association
of Texas**

**Thomas C. Sellers**
IBAT Chairman
Alliance Bank, Sulphur Springs

**K. Kyle Irwin**
IBAT Chairman-Elect
Western Bank, Gruver

**Christopher C. Doyle**
IBAT Secretary-Treasurer
Texas First Bank, Texas City

**Bradley H. Tidwell**
IBAT Immediate Past Chairman
VeraBank, Henderson

**Justin D. Steinbach**
Chairman
IBAT Leadership Division
Frost Bank, Dallas

**Hazem A. Ahmed**
Chairman
IBAT Education Foundation
Independent Financial, Houston

**Christopher L. Williston VI, CAE**
President and CEO
IBAT, Austin

December 27, 2021

Comment Intake—Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street NW, Washington, DC 20552.

Via Email: 2021-NPRM-1071@cfpb.gov

Re: Docket No. CFPB-2021-0015; RIN 3170-AA09

Ladies and Gentlemen:

The following comments are submitted on behalf of the Independent Bankers Association of Texas ("IBAT"), a trade association representing over 300 independent community banks domiciled in Texas.

The Bureau of Consumer Financial Protection ("Bureau") is proposing to require banks to collect and report 1071 data regarding applications for credit for small businesses, including those that are owned by women and minorities.

When the 2008 financial crisis hit, the U.S. government responded with a bailout for large financial firms and increased regulatory scrutiny for all regulated financial institutions. Lawmakers and regulators focused on holding someone accountable and minimizing any future economic turmoil that could be spurred by the often-reckless behavior of the largest banks and investment firms. In the end, the reach of the Dodd-Frank Act (DFA) sadly extended far beyond just the "big banks" on Wall Street.

Local community banks suddenly had a whole host of additional regulations to comply with at great cost and hinderance to their ability to offer products and services to their customers and communities.

Despite those considerable and growing challenges, community banks have been the primary source of small business lending across the nation, in both good and bad times.

Information available on the FDIC's website indicates that just before the DFA was signed into law on July 21, 2010, there were 7839 banks nationwide (from June 30, 2010 call report data). The most recent call report data reported on September 30, 2021 reflects a 37.2% decline in the number of institutions to 4,923. Consolidations and concentration of assets have accelerated in the past decade, and there is no indication of any abatement of these disturbing trends.

AdminRecord-015652

The ever-increasing regulatory requirements are clearly a contributing factor in the significant decline in the numbers of community banks. The emergence of fintech lenders, favorable tax and regulatory treatment for credit unions, the pressure to consolidate to take advantage of economies of scale and other factors have all negatively affected community banks.

**Community Bank Engagement in Small Business Lending Activities**

Even while facing strong headwinds, community banks provided 77 percent of agricultural loans and over 50 percent of small business loans, according to a Harvard Kennedy School study. What community banks offer small businesses in the lending process is almost intangible – because banks know the community they serve, they are able to provide loans to businesses based on information that isn't just found in a business's financial records and data points, rendering some of that information useless. This important dynamic is frequently referred to as "relationship banking".

To understand the impact small banks have on the communities they serve, below is an excerpt from A Comment on Implementing Section 1071 of the Dodd-Frank Act prepared by the Rawls College of Business at Texas Tech University. In that study, there are a number of interesting insights, including:

*For example, Panel C reflects that the percentage of non-farm small business loans is about 24% for banks with $500 million or less in total assets. The percentage decreases by about 5% of the total loan portfolio as we move up bank sizes across the three largest groups. Second, small business farm loans also decline as bank size increases. Additionally, banks above $500 million in total assets are not significant players in farm lending. Finally, total small business loans as a percentage of total loans declines as bank size increases. For banks with $100 million or less in total assets, small business loans comprise about 40% of their total loan portfolio while for banks with more than $10 billion in total assets small business loans are only about 10% of their portfolios. The bottom line from the study is that smaller banks are the banks in the business of making small business loans.*

One need look no further than the recent Payroll Protection Program (PPP) as an indicator of the role community banks play in small business lending. In a report prepared by the Conference of State Bank Supervisors, Texas Banking Commissioner Charles G. Cooper, who leads the CSBS Covid-19 Recovery Steering Group, commented, "This analysis puts numbers to what we heard from our supervised institutions about the strong relationships they have with their local citizens. It is more proof that state-chartered banks are crucial to their communities in times of economic stress. The success of the PPP program would not have been possible without them." While Commissioner Cooper was speaking specifically about state-chartered banks, the same could be said for all community banks.

Data provided by the Small Business Administration on this important and successful program reflects a total of $799.83 billion in PPP loans, with banks having assets of less than $10 billion accounting for $335.28 billion. These smaller banks represent a mere 12% of total industry assets yet accounted for almost 42% of the dollar amount of PPP loans.

Community banks play a disproportionately significant role in financing small businesses. Small business lending is high touch, high risk and requires a significant level of effort, expertise and expense from the lender. Additionally, cumbersome and costly reporting requirements as proposed will have a significant disparate impact on community banks.

**Sized-Based and Activity-Based Exemption Thresholds**

The Bureau is considering using either, or both, a "size-based" or "activity-based" test to exempt banks from the proposed rules.

•      Option 1 Exemption Threshold: originations of at least 25 loans or $2.5 million
•      Option 2 Exemption Threshold: originations of at least 50 loans or $5 million
•      Option 3 Exemption Threshold: originations of at least 100 loans or $10 million

To understand the impact on small banks, below is another excerpt from <u>A Comment on Implementing Section 1071 of the Dodd-Frank Act</u> prepared by the Rawls College of Business at Texas Tech University.

*Thus, the average employee in the smallest banks will have to do 2 times the reporting for section 1071 than the average employee in the largest bank. The largest banks with an average of 2,600 employees can have an employee dedicated to section 1071 reporting while one of (on average) 14 fulltime employees of the smallest banks will have section 1071 reporting added to their list of tasks. Additionally, small banks are unlikely to have the IT infrastructure needed to automate the data collection and the cost of acquiring technology for this purpose will be more of a burden on small banks.*

We believe that if thresholds are implemented, they should be at the highest level possible to allow flexibility for small banks to continue to serve their communities without artificially limiting extensions of credit to avoid reporting thresholds or increased regulatory burden and costs.

**Exemption Under Section 1022**

While it is no secret that we believe the DFA has had a significantly negative impact on the community banking industry and that our sector of the industry is "collateral damage", we would point out a provision to allow some flexibility for the CFPB to exempt certain "persons" from their rulemaking. Section 1022 clearly allows the CFPB to exempt those "persons" - financial institutions under $10 billion in assets - from any of their rules. While we represent a number of banks larger than $10 billion in assets who operate as traditional community banks and firmly believe they should be exempted as well, one option to consider is the exercise of CFPB authority under section 1022. This rule as proposed will clearly increase the cost to our community banks, limit the availability of credit to small business borrowers and have a significant negative impact upon borrowers in rural areas, especially as the cost and aggravation of additional regulatory burden will prove to be a "tipping point" for a number of smaller banks who will opt to sell to a larger institution.

**Clarification of Intent**

It is important to note that we are responding to the requests for comments on how this program should be set up. As indicated throughout, IBAT has had and continues to have significant concerns with burdening a particular group of banks based merely upon asset thresholds. It has taken the CFPB over ten years to propose rules on section 1071 of the DFA. Unlike "cookie cutter" mortgage, auto or consumer loans, deriving any meaningful or statistically valid conclusions from a comparison of small business loans is simply an impossible goal.

**Definitions**

The Small Business Administration sets numerical definitions, or "size standards," for every small business industry in the U.S. based on the business's number of employees and average annual receipts. The Bureau is seeking to define small business based on whether the business had $5 million or less in gross annual revenue for its preceding fiscal year.

It is our suggestion that the Bureau review and reconsider the definition being used for "small business." Rather than defining a small business based on the Small Business Administration's definition of $5 million or less in gross annual revenues, using a standard already in place for CRA reporting (12 CFR 228.42) where the size is gross annual revenues of $1 million or less would be much more appropriate. Banks have been reporting "small business" and "small farm" loans under this standard for years and the data is readily available.  It would also capture the group of small businesses most vulnerable and seems to more closely follow the intent and purpose of the rule.

The Bureau has proposed to define a "covered application" in a manner that is similar to that in Regulation B but excluding certain actions such as reevaluation requests, extension requests or renewal requests on an existing business credit account (unless additional credit is requested) or inquiries and prequalification requests.  This exclusion is appropriate as including such actions would not provide useful data regarding small business credit.

Further, the definition of "covered credit transaction" excludes incidental credit and does not cover factoring, leases, consumer-designated credit used for business purposes and credit secured by certain investment properties.  These exclusions are appropriate and useful.  Several of these do not directly result from a credit decision by the bank but rather flow from transactions initiated by the small business with others in the chain.

**Remove the Requirement for Race and Ethnicity and Determinations Based on Visual Observation**

Banks must communicate that the applicant is not required to respond to the requests regarding minority-owned business status and women-owned business status. If applicants are not required to respond, and we do not believe they should be required to respond, it will no doubt lead to many applicants declining. The collected information will not provide meaningful data if a significant number of applicants decline to provide the information.  The PPP experience should serve as a model to validate this assertion. Very few applicants completed the PPP form. The Beneficial Ownership Rule experience, from the accountholder's perspective, resulted in significant frustration regarding that level of information gathering. Anecdotal evidence gathered from banks indicates that customers were reluctant to provide the ownership data and expressed anger over the intrusion.

The sample data collection form, identified as Appendix E, includes disclosures similar to those required by Regulation B today. These notices communicate to applicants that the bank is not permitted to discriminate on the basis of an applicant's minority-owned business status, women-owned business status, or any principal owner's ethnicity, race or sex. This non-discrimination notice is required to be provided by the bank at the time the information is requested. Despite assurances, applicants will no doubt be concerned that information will be used in the credit process thus discouraging applications.

If the applicant declines to provide minority-owned business status and women-owned business status information, the bank must report that the applicant declined to provide the information and submit

information based on visual observation. In many cases, an application for small business credit is submitted via channels that do not lend themselves to visual observations and will therefore skew the data.

The Bureau's proposed rule includes a section to limit access to certain data points from underwriters and loan officers. The "firewall" provisions state an employee or officer of a covered bank or affiliate thereof would be prohibited from accessing an applicant's responses to inquiries regarding minority-owned business status, women-owned business status and regarding the ethnicity, race, and sex of the applicant's principal owners, if that employee or officer is involved in making any determination concerning the applicant's covered application. The proposal does allow small banks with limited staff to make a determination that because of size it is impractical to limit access to specific data by underwriters and loan officers. The very fact that those same individuals are required to collect the information makes a "firewall" impractical. In most - if not all small banks - the loan officer is the underwriter. Further, in smaller communities, there are few if any strangers.  Anonymity of an applicant is likely an impossibility.

**Discretionary Datapoints**

The proposed rule currently contains twenty-three (23) data points to be collected and reported for covered applications. IBAT's member banks have noted that the extensive list of elements to be reported is extremely burdensome. While many of these are specified in the DFA, the Bureau has added the following:

- application method
- application recipient
- denial reasons
- extensive pricing information
- NAICS category
- number of workers
- time in business
- number of principal owners

Most of these elements are data that is simply not currently maintained by the typical community bank. Furthermore, approximately 60% of banks responding to a survey of IBAT members reported that they do not use written applications for small business loans.  Often, they collect financial statements, tax records and perhaps already have an account and some credit history with the applicant. According to our survey, the following percentage of responders collected the identified data:

- 80% annual revenue
- 55% number of principal owners (driven now by the beneficial ownership rule)
- 40% time in business
- 37% NAICS category (used in SBA lending)
- 5% number of workers

IBAT urges the CFPB to recognize the futility of collecting the required data, and limit or remove any additional burdensome requirements from the final rule.

**Removal of the NAICS Code Datapoint**

Covered banks will be required to collect data on a calendar-year basis and report their data to the Bureau by June 1st of the following year. In addition, similar to HMDA, banks will be required to disclose the availability of public data on the Bureau's website.

The NAICS category (which is not mandated by statute), coupled with other datapoints, will allow for the identification of specific borrowers operating and borrowing from small banks, especially in rural areas. The publication will raise significant risk of re-identification for small business applicants.

In conclusion, community banks and small businesses are facing numerous challenges yet continue to play a significant role in the overall health and vitality of the economic condition of the country. Steps to place additional burdens and costs upon these important players in the economic ecosystem will be counterproductive and will likely reduce credit availability and capital access for small business borrowers as well as hasten an already untenable level of community bank merger and acquisition activity. Further, each small business loan is unique in every sense and a meaningful comparison based upon data collected is simply not applicable.

Small business lending by community banks epitomizes the term "relationship banking". In testimony before the Senate Committee on Banking, Housing and Urban Affairs on October 28, 2021, CFPB Director Rohit Chopra listed "relationship banking" as one of the top three areas of focus for the CFPB.

*Third, we will look for ways to restore relationship banking in an era of big data. As automation and algorithms increasingly define the consumer financial services market, there is less transparency into how credit decisions are made. In some cases, these practices can unwittingly reinforce biases and discrimination, undermining racial equity. Increasingly, households and businesses have no place to turn to when they need help, especially when they face errors and problems in their financial lives. In markets like credit reporting, consumers are not the customer and lack the leverage to get problems fixed in a timely manner. The inability to cut through red tape and get help in one's financial life can be a major obstacle when seeking a job or when applying for credit. Preserving relationship banking is critical to our nation's resilience and recovery, particularly in these times of stress.*

What may provide statistically significant information in mortgage, automobile or consumer borrowing is wholly inappropriate for a comparison of small business loans. Under this proposed rule, banks will migrate to a "formulaic" approach to small business lending similar to that employed in mortgage, auto and consumer lending. Credit availability - especially for start-up and marginally capitalized entities - will be significantly curtailed.  Implementation of section 1071 will have real and lasting negative implications on both community banking and the small business customers we have served so well.  IBAT implores the CFPB to proceed very carefully in crafting rules to implement this problematic section of federal law.

Sincerely,

Christopher L. Williston, CAE
President and CEO

AdminRecord-015657