# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>*Defendants*. | Case No: 7:23-cv-00144 |

# JOINT APPENDIX
## OF ADMINISTRATIVE RECORD DESIGNATIONS
### VOLUME XII

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
|---|---|
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |



EQUIPMENT LEASING AND FINANCE ASSOCIATION

1625 Eye Street NW        P 202.238.3400
Suite 850                 F 202.238.3401
Washington, DC 20006      www.elfaonline.org

January 4, 2022

Comment Intake
Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552

Docket No. CFPB-2021-0015 or RIN 3170- AA09

To Whom it May Concern:

On behalf of the Equipment Leasing and Finance Association, I am pleased to submit the following comments regarding the Consumer Financial Protection Bureau's (CFPB) notice of proposed rulemaking implementing Section 1071 of the Dodd Frank Wall Street Reform Act.

## Summary

ELFA appreciates the positive relationship that we have built with the CFPB and the work that the CFPB has done regarding the lease exemption and balancing the costs and benefits of making Section 1071 information available to the public.  We do, however, have significant concerns with major portions of the proposed rule and would reiterate all of the comments that we have previously submitted.  We believe that had the CFPB adopted more of the comments ELFA submitted as part of the CFPB's 2017 RFI, this would be a better rule from the borrower's, the lender's, and the CFPB's perspectives.  We would especially highlight the benefit we continue to see in setting up a portal structure whereby small businesses could report their demographic information directly to the CFPB and receive a unique identifying number.  Lenders would then report loan level information associated with any application received from a customer that provides the lender with its identifier number.  It is instructive that in the intervening time since the passage of Dodd-Frank, the regulatory structure for collecting beneficial ownership information shifted from one where the institution was required to collect the information to one where small businesses will soon be required to report their corporate structure directly to the government.  ELFA believes that the government, as a whole, should closely examine whether there are synergies among these regulatory efforts that could be harnessed.

Since ELFA has provided comments extensively in previous submissions in 2017 and 2019, rather than repeat those matters here, ELFA has focused our comments on several areas:

- Definition of a Lease
- Data Availability
- Compliance Deadline
- 1071 Information Collection Timing
- Collection on Customers Who Opt Out

- Ethnicity Surmising
- Exemption for Small Institutions
- Anti-Competitive Issues
- Support for Trade Credit Exemption

A background on ELFA is provided in the penultimate section of this comment submission.

## Definition of Lease

ELFA commends the CFPB for the recognition that leases are a different type of financial product from lending and are not treated as an extension of credit in the U.S. regulatory structure. ELFA also commends the CFPB for the usage of the widely accepted Uniform Commercial Code definition of a lease which clearly delineates what is and what is not a lease for purposes of Section 1071.

## CFPB Database Fulfilling Requirement to Make Data Available

ELFA greatly appreciates that the CFPB has incorporated ELFA's previous comments regarding making collected/submitted data under Section 1071 available to the public upon request. The approach that the CFPB has taken in this regard strikes an appropriate balance between the statutory requirement that the data be available to members of the general public and the burden that making this information available directly would place on financial institutions. Allowing financial institutions to direct members of the general public to the CFPB website accomplishes the same goal that direct provision would, but at a significantly less cost to stakeholders.

## Compliance Deadline

The CFPB has proposed an implementation timeline of 18 months after the rule is published in final form. ELFA believes that this is an insufficient amount of time due to several factors.

The first is that there are too many important provisions of the rule that remain under consideration by the CFPB, thereby preventing its proper implementation as currently written. There are many areas on which the CFPB is asking for further comment that will, by definition, change significantly. It is not realistic to expect institutions to implement such a complex rule in only 18 months given the number of unknowns and unanticipated changes that will occur and which financial institutions will only be seeing for the first time when the rule is made final. One example is that the CFPB is asking for comment on the possibility of collecting sexual orientation information as part of a final rule. This would obviously be a major shift from the statute which did not contemplate the collection of such information, was not contemplated by the SBREFA panel, and is not currently contemplated by the current proposed rule. The implementation of a change of this magnitude in a rule from the NPRM stage to the final rule stage, without an opportunity for comment, would be unprecedented.

The second is that the technical specifications for the transfer of the collected data to the CFPB have not yet been published and, when they are published, should be published in a form that allows for comments. Given that more than 25 million transactions per year will be submitted through this system if the rule is finalized in something approximating its current form, it is

AdminRecord-017200

imperative that the industry be given time to respond to the technical specifications that the CFPB proposes. For this reason, we think that the implementation period needs to be dependent upon the issuance of final technical specifications given that every financial institution subject to Section 1071 cannot reliably begin to build their systems until the specifications are finalized.

ELFA believes that the CFPB should choose January 1st of a year that is approximately two years after the technical specifications are published in final form (following a reasonable opportunity for comment and feedback). A compliance start date of January 1st makes sense for a variety of reasons, including making the lookbacks simple. For example, if the technical specifications were published in November of 2022, we believe that January 1, 2025 should be the earliest date for required compliance with the rule. If, however, the final specifications were published, for example, in February of 2023, it would not be unreasonable for the CFPB to maintain that same January 1, 2025 compliance date.

Lastly, an extended compliance deadline is warranted given that many lenders in the equipment finance space do not have the experience with a federal functional regulator that federally-insured depository institutions have. While ELFA has repeatedly recommended that the CFPB contemplate staged compliance with this rule either by transaction type, institution size, or institution type, the CFPB has chosen not to pursue any of those options, notwithstanding the fact that they have frequently been utilized in other regulatory settings (e.g., the CECL standards). It is an entirely different calculation for a financial institution that has little to no experience with an OCC/Federal Reserve/FDIC compliance regime to implement a rule of the magnitude of, and as complex as, Section 1071. Inasmuch as the CFPB has chosen a single compliance timeframe for all institutions, it is imperative that this timeframe accommodate the institutions that will be challenged the most in building the necessary compliance infrastructure.

Two particular challenges that institutions that are not federally-insured depository institutions will face is the need to conduct training before a 1071 regulatory compliance program is brought on line, and the need to hire staff who can combine existing information technology (IT) systems with a 1071 compliance system that contains compartmentalization and audit capabilities. For a federally-insured depository institution, training requirements that apply across broad swaths of employee classifications already exist for regulatory purposes such as compliance with the Bank Secrecy Act. A financial institution that is not a federally-insured depository institution will need to start this training program from scratch. With regards to the IT systems needs, it is a unique challenge in today's economy to find and hire sufficient staff with coding expertise, and this will be more of a challenge for a company that has no robust regulatory IT systems already in place and the corresponding staff to maintain them. Both of these factors argue for a prolonged implementation period and highlight the wisdom of contemplating a staged compliance timeframe.

<u>**Collection After Application Stage**</u>

In the NPRM, the CFPB indicates that it believes that allowing for collection of the required demographic information after the application has been submitted will reduce the amount of information collected. ELFA believes that the opposite is in fact true. ELFA has commented

formally multiple times to the CFPB that many equipment finance transactions are completed in a matter of minutes and often times the person actually completing the application is neither the business owner nor at all familiar with the specifics of the ownership of the borrower. Examples we have provided include the office manager arranging for office equipment financing and the loading dock manager arranging for materials handling equipment. ELFA believes in those situations that, if the only time the business is given the opportunity to provide the demographic information about borrower ownership is during the application process, very little demographic information will be collected from the borrower due to the importance that the customer places on the speed of the transaction and the fact that the person completing the application may simply not know the information, and furthermore will have no motivation to lengthen the transaction timeline in order to obtain it.

In contrast, if the financial institution had the ability to follow-up via electronic or other means with the borrower, the request could then be directed to the borrower representative in the best position to provide the requested information. ELFA believes that this is especially true in the vendor finance space, where the vendor (which is the "face" to the borrower and collecting the application) has no regulatory requirement to collect the information and, therefore, no incentive to take the time to gather the information and risk further delaying the transaction. For these reasons, ELFA believes that the CFPB should allow for collection of the demographic information after the application stage and, given that credit decisions are very often made within minutes of the application being received, after the credit decision has been made.

### Reporting on Transactions Where Customer Opts Out

Section 1071 clearly sets out a statutory framework that requires financial institutions to *inquire* whether their customers are a small business, women-owned business, or a minority-owned business. Further, Section 1071 clearly intended to allow for customers to decline to participate in this collection effort, when it states, "[a]ny applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit."

The CFPB has proposed a rule that would require financial institutions to report on covered credit applications, even if the customer declined to provide the demographic information in response to the financial institution's inquiry. Requiring collection in this context is problematic on multiple levels, even assuming such requirement is permissible under the statute, which is not at all clear.

It is possible, and potentially likely, that there will be statistical significance to classes of credit applications that will not have demographic information collected. For example, certain types of credit applications are for smaller dollar amounts and completed multiple times per year (e.g., small-ticket construction equipment, office equipment, golf carts, etc.). As ELFA has discussed in previous submissions, the person completing the credit application may not be the business owner or otherwise know the 1071 information being requested, and, therefore, will likely not provide the information out of fear of delaying the transaction by spending the extra time obtaining the information and filling out another form. ELFA believes that combining the data from applications where the customer declines to provide demographic information with

applications where the customer voluntarily provides such information will potentially lead to any conclusions based on such data being inaccurate and misleading.  Just like customer satisfaction surveys are most likely to be filled out by those who are either very satisfied or very dissatisfied, ELFA believes that there will likely be statistically significant differences between those customers that will voluntarily provide the demographic information and those that will not.  Absent the CFPB having looked into these issues more carefully, the CFPB runs a significant risk of creating a database that, at its onset, will contain a significant amount of information that is presumed to be comparable to all of the other information in the database, but which, in reality, is almost certainly not.  For this reason and those that follow, ELFA believes that the CFPB should not collect information regarding applications where the customer has declined to provide any information.

Secondly, ELFA has commented to the CFPB at several stages during the 1071 rulemaking process that many lenders in the equipment finance space do not currently collect, in the normal course of business, many of the data points that are proposed for application-level collection (annual revenues is one of the best examples). This was also borne out during the SBREFA process.  If, in the normal course of business, a financial institution would make a credit decision based upon, for example, business name and address, and the customer declines to provide section 1071 information, the CFPB is creating a significant regulatory challenge for the financial institution by requiring it to submit application level information regarding that application when it will not know for certain whether the business is a small business nor have any reliable way of obtaining annual revenue information absent a third-party provider, which do not exist for many industries.

Lastly, the SBREFA process led by the CFPB clearly delineated a multitude of scenarios where the customer may wish to not have its loan information reported.  For example, the customer may not want its neighbors to know that they need credit, or alternatively, they may not want its competitors to know how well it is doing as shown by annual revenues or interest rates received. In large metropolitan areas, it may be difficult to ferret out which application belongs to which customer, but in more rural areas it will not be difficult to figure out which pipe fitting company applied for financing for a new $500,000 piece of equipment in any given year.  Section 1071 was specifically designed to allow customers to opt out; the CFPB should respect the clear statutory language of Section 1071 and allow customers to decline to have their application-level data collected.

**Ethnicity Surmising**

ELFA believes that the CFPB's proposal to require financial institutions to surmise the ethnicity of principal owners if the customer does not provide demographic information is inherently problematic for many reasons.  As we note above, ELFA believes that, if the customer chooses to opt-out of providing 1071 information, financial institutions should not be required to report on that transaction at all.  If ELFA's comments in that regard are heeded, our comments below on ethnicity surmising are mooted.

AdminRecord-017203

Many family names have been handed down over multiple generations and have no connection to the ethnicity of their current holder. Therefore, any attempt to surmise race or ethnicity based on last name will lead to statistically unreliable data. For example, a Filipino family may carry a last name from generations ago that is Spanish in derivation, leading to that customer being reported as Hispanic rather than Asian.

A particular issue also presents itself for women-owned businesses, as women are statistically more likely than men to have changed their last name at some point in their life. A woman-owned business may be owned by a woman with a last name that leads the institution to assess her ethnicity as that of her husband or that of her father, regardless of whether that matches the ethnicity that she self identifies as, again leading to misleading and unreliable data. This same argument applies to hyphenated names which may have a complicating factor of having lower frequencies in databases of last names when a combination of original ethnicities is combined into a new last name.

More importantly, inherent in the analysis of the issue of surmising race or ethnicity is that Section 1071 clearly intends that a customer's decision of whether to provide Section 1071 information be voluntary. By requiring financial institutions to surmise their customers race and ethnicity, the bureau will have forced financial institutions to insert ethnicity and race related matters into a transaction in which, firstly, the customer chose to not have that information collected, and secondly, the financial institution is inevitably going to get it wrong due to the imprecise nature of race and ethnicity surmising based on an individual's appearance or last name. Lastly, the CFPB has publicly acknowledged that it utilizes surname analysis in its enforcement cases. Since the CFPB will have all the information once it is reported anyway, it is difficult to see the value of having every financial institution do work that the CFPB could easily do on its own once the data has been reported.

Should the CFPB pursue the requirement that financial institutions provide race and ethnicity information through surmising, it is critical that the CFPB provide significant and detailed guidance to financial institutions. There are thousands of financial institutions that are subject to 1071 that have never conducted any regulatory implementation exercise of this magnitude or complexity. The CFPB is now asking them to accurately surmise the ethnicity of surnames that may lead to dramatically different outcomes based on the addition or subtraction of one letter, or other names that lead to ambiguous and inaccurate results. For example, if one looks up the last name "Person" in the Census Bureau's database of last names, there is a 46% chance that they are white, a 36% chance that they are black, and a 12% chance they are Hispanic. Therefore, ELFA believes that should the CFPB pursue the requirement of race/ethnicity surmising, significant and detailed guidance will be necessary to enable financial institutions to address scenarios such as those described above, as well as the types of databases that will be acceptable for them to use for such purpose and those that will not.

It is important to note that this is not just a regulatory challenge for institutions to comply with, there are real costs should an institution guess incorrectly regarding someone's ethnicity. These range from insulting a customer to litigation and compliance risk. In a commercial credit transaction, if the customer declines to provide the 1071 information the institution is expected to

surmise the ethnicity of the person sitting across the table from them. One can easily see situations where the customer sees that the sales representative has filled in additional information immediately after they specifically declined to provide that same information.

Additionally, even if an institution makes a good faith effort to correctly surmise their declining customers' ethnicity, should they get it wrong this information could then be used by regulators to pursue disparate impact cases. Furthermore, this information could be incorrectly interpreted by third parties and used to push litigation at the state level.

Lastly, if a customer can reverse engineer what the financial institution surmised their ethnicity to be, they could pursue a direct discrimination case against the institution whether or not that discrimination actually occurred. Put another way, the customer would bring action against the institution because the institution thought they were not in a protected class even if they were, and vice versa.

### Exemption for Small Institutions

The history of Section 1071 has its genesis in two documents issued in mid-2009. The original Administration's proposal for regulatory reform issued in June of 2009 indicated that the CFPB should have authority to collect information on small business lending, and gave no mention to the collection of information regarding minority-owned or women-owned businesses. A GAO report the following month found challenges to fair lending enforcement efforts due to lenders not being "required to report data on the race, ethnicity, and sex of nonmortgage loan borrowers—such as small businesses, which limits oversight of such lending." Importantly, the GAO report went on to say that "[w]hile requiring lenders to report additional data would impose costs on them, particularly smaller institutions, options exist to mitigate such costs to some degree, such as limiting the reporting requirements to larger institutions."

Section 1071 follows through on the GAO report's recommendations and gives the Bureau wide discretion to "adopt exceptions to any requirement," including "conditionally or unconditionally exempting any financial institution or class of financial institutions" from Section 1071's data collection requirements. ELFA has recommended a series of exemptions in the past, and still believes that those would all be prudent; we would, however, reiterate our recommendation that the CFPB pursue an exemption for small financial institutions.

Small providers of commercial credit are often the very providers who are able to provide financing that larger lenders may shy away from due to their size or possibly the risk profile of the asset class. These entities are also the ones that are the least able to absorb additional regulatory costs. Accordingly, ELFA recommends an exemption for financial institutions with either:

  i.    Less than $500 million in annual new business volume, or

  ii.   Fewer than 500 transactions per year

If this exemption were put into place, ELFA estimates that the 50 largest equipment finance companies would still be required to report under Section 1071. By comparison, ELFA has

approximately 350 members actively engaged in equipment finance, many of them small lenders. ELFA historical data also indicates that these thresholds would capture more than 80% of new business volume in the equipment finance sector.

## Anti-Competitive Issues

There are several areas in the proposed rule that raise issues relating to the antitrust and competitive landscape in the U.S.  For these reasons, ELFA believes that it is imperative that the CFPB not publish pricing information on the public portal that is developed once the rule is implemented.

The United States has a long-standing prohibition on market participants colluding on pricing or agreeing to set prices in an anti-competitive manner.  This is especially true for industries where prices are not placed on a sticker on the physical item for sale for everyone to see.  In equipment finance, a significant amount of the pricing is dependent upon what the financial institution estimates the value of the equipment to be over the term of the loan.  Many times, different institutions will make different assumptions in this regard.  These differences could be based upon different levels of knowledge of the effects of a specific intended usage (e.g., equipment that will be left outside will depreciate faster).  Different institutions may make differing assumptions about market conditions in the future should the equipment be returned. Additionally, different institutions may be more efficient at managing losses when defaults occur through remarketing agreements or effectively managing deal modifications to allow the customer to keep the equipment under modified terms.  Much of this is proprietary and built on years of experience.  By proposing to publish detailed pricing information, the CFPB is upsetting years of the U.S. competition laws and regulations protecting consumers and borrowers in promoting competition by prohibiting companies from colluding on prices, and devaluing the experience and proprietary pricing and valuation models of lenders who have honed their craft over many years.

A secondary and potentially more troublesome issue that the publishing of detailed pricing information creates is the impact on the customer.  Oftentimes there is included in an equipment financing transaction some level of service, which could be anything from maintenance on a piece of heavy equipment to providing toner for a copier.  By publishing detailed pricing information, but no information about what is included for that price, a customer may "shop around" and go with the institution that appears to provide the lowest interest rate, but lose one or more services that they never knew were being offered by another institution.

Ultimately, there may be a belief that disclosing pricing information will lead to borrowers paying less for the same level of service.  History indicates, however, that when costly regulatory burdens are laid upon a highly competitive industry, the costs to the consumer go up and market participants exit.  Additionally, when all market participants know what other participants are charging, the assumption that costs will go down ignores the fact that in many cases the costs will go up because lower cost providers realize they can charge more.  ELFA believes that these anti-competitive aspects of the rule will ultimately lead to borrowers paying more for the same

AdminRecord-017206

level of service.  As such, ELFA would advocate that no pricing information be included in any 1071 data made available to the public.

## Trade Credit

ELFA appreciates that the CFPB has correctly exempted trade credit transactions from reporting under Section 1071 and we strongly encourage the maintenance of this position.  We believe that this exemption will allow manufacturers to continue to provide credit to their customers.  However, it is important that this provision be crafted in a way that it is actually usable by the original equipment manufacturers (OEM).  To this end, we see little distinction between the types of credit transaction that would be deployed by a manufacturer who provides the credit under the same corporate entity and those that may do so under a subsidiary, such as a captive finance company of the manufacturing parent company.  Accordingly, we would encourage the CFPB to broaden their view of trade credit to include captive finance companies when they are financing equipment manufactured by their parent company.  We believe that these companies exist solely to facilitate the acquisition of the OEM's products, and their existence provides the customer a financing option that is intimately familiar with the equipment that they are financing.  Importantly, we believe that this exemption should apply to equipment purchased through a dealer, as long as the financing is provided by the captive finance arm of the OEM.

ELFA also believes that this section should be fleshed out further with several specific transaction examples so that covered financial institutions can readily identify the transactions that they must report on, and those that are exempted.

## Background on ELFA

ELFA is the trade association representing financial services companies and manufacturers in the nearly $1 trillion U.S. equipment finance sector.  Equipment finance not only contributes to businesses' success, but to U.S. economic growth, manufacturing, and jobs. Nearly 8 in 10 U.S. companies (79%) use some form of financing when acquiring equipment, including loans, leases, and lines of credit (excluding credit cards).  Each year American businesses, nonprofits, and government agencies invest nearly $2 trillion in capital goods and software (excluding real estate).  Approximately 50%, or nearly $1 trillion of that investment, is financed through loans, leases, and other financial instruments.  America's equipment finance companies are the source of such financing, providing access to capital.

ELFA represents more than 575 member companies, including many of the nation's largest financial services companies and manufacturers and their associated service providers, as well as regional and community banks and independent, medium, and small finance companies throughout the country.  ELFA member companies finance the acquisition of all types of capital equipment and software, including agricultural equipment; IT equipment and software; aircraft; manufacturing and mining machinery; rail cars and rolling stock; vessels and containers; trucks and transportation equipment; construction and off-road equipment; business, retail, and office equipment; and medical technology and equipment.  The customers of ELFA members range from Fortune 100 companies to small and medium sized enterprises to governments and nonprofits.

ELFA represents virtually all sectors of the equipment finance market and its members see virtually every type of equipment financing transaction conducted in the United States and every type of funding available to providers of equipment finance.  ELFA members who are service providers to the equipment finance industry (such as lawyers, accountants, trustees, and vendors) have a unique vantage point of seeing scores of financial transactions from initial concept to final payout and from the perspective of both the borrower/issuer and lender/investor/funding source. ELFA truly is at the heart of equipment finance in the United States and our member companies provide lease, debt, and equity funding to companies of all sizes.

## Conclusion

ELFA appreciates our positive and cooperative relationship with the CFPB and we look forward to working with the CFPB staff during the implementation of this rule.  Should you have any questions regarding this submission, please address them to Andy Fishburn, ELFA's Vice President of Federal Government Relations, at afishburn@elfaonline.org.

Respectfully Submitted,

*Ralph Petta*

Ralph Petta
President and CEO



January 4, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re:    **Proposed rule -** *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)* **- Docket No. CFPB–2021–0015, RIN 3170–AA09, 86 Fed. Reg. 56336**

The Farm Credit Council ("Council"), on behalf of its membership, appreciates the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)" (the "Proposal").[1]  The Proposal would amend Regulation B to implement an amendment to the Equal Credit Opportunity Act ("ECOA") made by section 1071 of the Consumer Financial Protection Act of 2010.[2]

The Council is the national trade association for the institutions of the Farm Credit System, a nationwide network of customer-owned financial institutions with a specific mission to support rural communities and agriculture.  The Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to better supporting small farming businesses.  As described in detail below, however, we are concerned about some aspects of the Proposal as applied to agricultural-purpose credit generally and the Farm Credit System in particular.  Indeed, much of this letter may be viewed as a response to the Bureau's specific request for "comment on the potential costs and complexities associated with covering" agricultural-purpose credit in the rule.[3]

To be clear, the Farm Credit System does not oppose the collection and reporting of demographic data on our customers, provided that those customers provide such data voluntarily.  The proposed rule, however, goes far beyond simple collection and reporting and would impose significant burden on Farm Credit institutions that would ultimately impose additional costs on Farm Credit customers.

The comments in this letter were developed after soliciting input from all Farm Credit System banks and associations.  Due to the significance of this Proposal to each bank and association, we anticipate that many of them will submit their own comments on various aspects of the Proposal.  Additionally, given the significant impact of the proposed rule on Farm Credit

---

[1]    CFPB, Proposed rule; request for comment, *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (Oct. 8, 2021) ("*Proposal*").

[2]    Section 1071's amendment added § 704B to ECOA, 15 U.S.C. § 1691c-2.

[3]    *Proposal*, 86 Fed. Reg. at 56407.

AdminRecord-017210

customers, we anticipate that some might also provide individual comments. We begin below with some background on the Farm Credit System and how the Proposal would impact the System generally.

## I.    Background

### A.    The Farm Credit System

Congress originally designed the Farm Credit System "to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations."[4] As of January 1 of 2021, the Farm Credit System included four banks and 67 associations, which together provide about 40% of agricultural lending in the United States. These 71 institutions serve all 50 states and the Commonwealth of Puerto Rico. Each institution is structured as a cooperative, owned by its customers — farmers, ranchers, farmer-owned cooperatives and other rural businesses. Each Farm Credit institution has a board of directors chosen by the customers it supports.

Unlike commercial banks and many non-bank lenders, Farm Credit institutions cannot lend to any creditworthy applicant. Federal law limits which customers are "eligible" for credit from a Farm Credit lender as well as the "scope" of lending that may be provided to an eligible customer. In most cases, the applicant must either be, or must somehow be related to, a "bona fide farmer, rancher, or producer or harvester of aquatic products."[5] Federal law also identifies several other classes of eligible Farm Credit borrowers, including agricultural cooperatives, rural infrastructure providers, and some rural home buyers.

The net income that Farm Credit institutions generate can be used in only two ways: (1) retained within the Farm Credit institution as capital to build financial strength to serve customers; or (2) passed on to customer-owners by way of patronage dividends (a practice that effectively reduces those customers' costs of borrowing). Thus, compliance costs are ultimately borne by each institution's customers.

The Farm Credit Administration ("FCA"), an independent federal financial regulatory agency, supervises and examines the Farm Credit System, based on the Farm Credit Act of 1971, as amended, and regulations issued by that agency. With respect to Farm Credit institutions, the FCA also examines and enforces compliance with consumer-finance laws, including ECOA and rules issued thereunder. Thus, when the Proposal is finalized, the FCA will be the agency responsible for examining Farm Credit lenders for compliance with the final rule, and for bringing any administrative actions to enforce compliance with that rule.[6]

---

[4]      12 U.S.C. § 2001(a).

[5]      *See* 12 C.F.R. §§ 613.3000 to 613.3020.

[6]      ECOA specifically provides that with respect to Farm Credit institutions, compliance with ECOA and rules issued thereunder "shall be enforced under … [t]he Farm Credit Act [12 U.S.C. § 2001 et seq.], by the Farm Credit Administration," ECOA § 704(a)(6), 15 U.S.C.

*(continued …)*

AdminRecord-017211

### B.    The Proposal's Coverage of Farm Credit Lenders

To place the Council's comments on the Proposal in context, we note that the Proposal would cover a greater proportion of Farm Credit lenders than any other category of lenders identified in the Proposal.  Different parts of the Proposal estimate the number or percentage of lenders in specific categories that would be covered.  We have put those estimates together into the following table, which makes clear how broadly the Proposal would impact the lenders of the Farm Credit System:

### CFPB Estimates of the Proposed Rule's Coverage[7]

| Type of Lender | Coverage (at 25 small business loans / year) |
| --- | --- |
| All Depository Institutions | 38-40% |
| Banks & Thrifts | 70-73% |
| Credit Unions | 7% |
| Farm Credit Lenders | 100% |

---

§ 1691c(a)(6), as the Proposal recognizes, *Proposal*, 86 Fed. Reg. at 56371 & n.176.  Similarly, the Consumer Financial Protection Act ("CFPA"), which created the CFPB, provides that "[t]he Bureau shall have no authority to exercise any power to enforce [the CFPA] with respect to a person regulated by the Farm Credit Administration."  CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).

The CFPA also provides that "[n]o provision of [the CFPA] shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration."  *Id.* CFPA § 1027(k)(1), 12 U.S.C. § 5517(k)(1).  Separately, in a section describing the CFPB's authority to supervise certain other nondepository institutions, the CFPA provides that "[n]o provision of [the CFPA] may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration."  CFPA § 1024(f), 12 U.S.C. § 5514(f).

[7]    For coverage of depository institutions, *see Proposal*, 86 Fed. Reg. at 56421.  For coverage of Farm Credit institutions, *compare Proposal*, 86 Fed. Reg. at 56369 ("as of December 2019, the Farm Credit System contains a total of 72 banks and associations"), *with id.* at 56570  (estimating that all "72 members of the Farm Credit System (banks and associations)" then in existence would be covered by the proposed rule).  *See also id.* at 56544, 56569 (also estimating that all 72 institutions would be covered).

The Council agrees that every Farm Credit bank and association engaged in retail lending would be covered.  Note that three of the four banks are primarily wholesale lenders and may not be covered.

AdminRecord-017212

One reason why every Farm Credit lender would be covered is that Farm Credit lenders are statutorily structured primarily to provide agricultural-purpose credit, which would be considered "business credit" under the Proposal.[8]  A second reason, further discussed in the next section below, is that the overwhelming majority of Farm Credit borrowers would be "small businesses" under the expansive definition of that term in the Proposal.  In other words, the Proposal as written would not only cover every Farm Credit lender; it also would cover nearly all of each lender's loans.

## II.     Comments

### A.     Definition of "Small Business"

Based on the Proposal's discussion of whether the rule should cover agricultural-purpose credit ("agricultural credit") at all, the Bureau appears to recognize that agricultural credit is different from business-purpose credit ("business credit") generally.[9]  We agree agricultural credit is unique within the broader category of "business credit."  We therefore believe that agricultural credit and other credit to farmers by Farm Credit lenders should be treated differently, particularly in regard to the definition of a "small business."

Under the Proposal, the definition of "small business" largely determines whether a loan (or loan application) will be covered by the rule.[10]  In relevant part, that definition provides that "a business is a small business if, and only if, its gross annual revenue … for its preceding fiscal year is $5 million or less."[11]  As applied to the Farm Credit System, we submit that the $5 million threshold is vastly too high.  For the reasons described in detail below, we urge that in the Farm Credit System, the CFPB's definition of "small business" should align with the FCA's well-settled definition of "small farmer, rancher, or producer or harvester of aquatic products." ("small farmer"): "A farmer, rancher, or producer or harvester of aquatic products who normally generates less than $250,000 in annual gross sales of agricultural or aquatic products."[12]  *Aligning the "small business" and "small farmer" definitions would still mean that about half of all Farm Credit loans would be covered by a final Bureau rule.*  Further, the existing "small farmer" definition could be applied to other providers of credit to farmers.

We have several reasons for proposing this alternative definition of "small business."  First, the profile of "small" agricultural businesses is different from the profile of small businesses generally.  As the Proposal itself reported, nearly 98% of farms in this country are in fact "family farms (where the majority of the business is owned by the operator and individuals related to the operator)."  That is not true of businesses generally.  Moreover, "*[s]mall* family

---

[8]     Reg. B, Proposed § 102(d) (referencing existing Reg. B, § 2(g)).

[9]     *Proposal*, 86 Fed. Reg. at 56406-07 (concluding that the Proposal should cover agricultural-purpose credit but seeking comment "on the potential costs and complexities associated with covering such credit").

[10]     *E.g.*, Proposed § 1002.107(a) ("A covered financial institution shall compile and maintain data regarding covered applications from small businesses.").

[11]     Proposed § 1002.106(b).

[12]     FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

AdminRecord-017213

farms (less than $350,000 in gross cash farm income (GCFI)) accounted for 90 percent of *all U.S. farms*."[13]

Other law already recognizes the difference between farming credit and business credit generally. For example, on bank call reports and in Community Reinvestment Act data, a "small farm loan" is defined to be only half the size of a general "small business loan."[14]

Given the data above, we believe that a $5 million threshold is substantially over-inclusive as applied to the farming community. According to a source cited in the Proposal, the USDA's *2017 Census of Agriculture*, 99.6% of U.S. farms sell less than $5 million in agricultural products per year. Indeed, even a $1 million threshold would be too high: 96% of farms had less than $1 million in annual sales of agricultural products.[15] Informal reviews by Council members of their customer bases — using annual GCFI as the metric — show similarly enormous percentages of borrowers falling within the $5 million and $1 million thresholds, respectively. In sum, both a $5 million and $1 million threshold would likely cover something close to *all* farmers who borrow from Farm Credit institutions, rather than only those that are in fact "small."

To capture only farming enterprises that are "small," then, the dollar threshold in a "small business" definition should be lower than $1 million. And for an alternative "small business" definition to prove workable, it would obviously help if the standard was already in use by compliance professionals and familiar to the agency that will examine for compliance. Considering those factors, the Council suggests that the Bureau adopt for farmers the FCA's pre-existing definition of a "small farmer."

Some background on the concept of "small farmers" in the Farm Credit System would be appropriate here. In the Farm Credit Act, Congress requires Farm Credit lenders to furnish "sound and constructive credit and related services to young, beginning, and *small* ["YBS"] farmers."[16] The category of "small farmers" is independent and distinct from the other two categories ("young" and "beginning") in the statute. The FCA has implemented this statutory

---

[13]  *Proposal*, 86 Fed. Reg. at 56407 (emph. added) (citing Econ. Research Serv., USDA, *Farming and Farm Income* (updated May 10, 2021), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/ ("*ERS Farm Income Report*"))). GCFI is an approximation of "gross annual revenue"; it means "annual gross cash farm income before expenses." *See ERS Farm Income Report* (updated Sep. 2, 2021).

[14]  *Proposal*, 86 Fed. Reg. at 56421 n.474.

[15]  USDA, 2017 Census of Agriculture at 9 (Apr. 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/usv1.pdf. Using GCFI rather than value of products sold, the USDA's Economic Research Service reached a similar conclusion: at least 95% of all U.S. farms have a GCFI of less than $1 million. *ERS Report*. The *ERS Report* does not report the percentage of farms below the higher, $5 million threshold, but that figure obviously would be very high.

[16]  Farm Credit Act of 1971, § 4.19(a), 12 U.S.C. § 2207(a) (emph. added).

AdminRecord-017214

mandate with regulations.[17]   As of December 31, 2020, 49.8% of System loans outstanding were to such "small farmers."[18]

The Council submits that a final small business data collection rule that covers fully half of all loans (on average) made by every Farm Credit lender would more than accomplish Congress' twin aims for the rule:  to "facilitate the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[19]  The Council also submits that adopting the FCA's "small farmer" definition would facilitate compliance because staff at Farm Credit lenders already are very familiar with the standard.  Indeed, we believe that it would be confusing for staff to manage two competing regulatory definitions of "small" customers.  Further, examiners at the FCA — who will also examine for compliance with the Bureau's rule — have years of experience with the "small farmer" definition.[20]

## B.    Demographic Data and the "Firewall" Provision

Particularly if the definition of "small business" can be appropriately tailored to the farming context, we have no objection to collecting appropriate demographic data on covered loans, provided that customers are afforded the option to provide that information on a voluntary basis.

As a cooperative, owned by our customers, we strongly object to any requirement that would require our lenders to override the wishes of a customer to not report their individual ethnicity or race.  We ask the Bureau to reconsider its proposal to require lenders in some cases to report the ethnicity and race of "principal owners" based on visual observation or surname. The inherently subjective nature of identifying a person's ethnicity and race by visual observation or surname will distort the resulting data.

---

[17]     12 C.F.R. § 614.4165.

[18]     FCA, *2020 Annual Report of the Farm Credit Administration*, at 30 (Aug. 2021), https://www.fca.gov/template-fca/about/2020AnnualReport.pdf.  Of new loans made in 2020, 44.8% were made to "small" farmers and ranchers.

[19]     ECOA § 704B(a), 15 U.S.C. § 1691c-2(a).

[20]     In requesting alignment of the "small business" and "small farmer" definitions, we note that the underlying statute gives the CFPB, in drafting this rule, broad authority to take account of the unique characteristics of a particular "class of financial institutions," such as Farm Credit lenders, up to and including the "exempt[ion of] any … class of financial institutions from" the rule entirely.  ECOA § 704B(g)(2) ("The Bureau, by rule or order, may adopt exceptions to any requirement of this section and may, conditionally or unconditionally, exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."), 15 U.S.C. § 1691c-2(g)(2).

AdminRecord-017215

Unlike similar requirements for home mortgage lenders, where the lending relationship is often a one-time transaction, agricultural lending is usually a long-term relationship covering many different loans over a very many years.  The relationship between the customer and the lenders is critical to building the understanding and trust necessary to fulfill the customer's credit needs in a wide range of macro- and micro-economic situations.  Requiring lenders to override a customer's decision to withhold demographic data would be a significant afront to those customers and damage the relationship unnecessarily.

Moreover, the disclosure to every customer in the "Sample data collection form" of the lender's obligation to report by visual observation or surname will be direct notification of the lender's intent to directly contradict the customer's choice.  The desire of Farm Credit customers was made clear on this issue most recently during the lending done by Farm Credit institutions under the Small Business Administration's Paycheck Protection Program, where our customers specifically declined to identify their race or ethnicity for approximately 80% of the PPP loans Farm Credit institutions made.

*Additionally*, the Council strongly urges the Bureau not to adopt proposed § 1002.108, the so-called "firewall" provision for demographic data.

We recognize that the firewall provision largely arises from the underlying statute, ECOA § 704B(d).[21]  We believe, however, that in this instance the Bureau should exercise the separate "exceptions" authority granted by ECOA § 704B, which states that the Bureau "may adopt exceptions to any requirement of this section and may … exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section."[22]

As proposed, the "firewall" provision would create a "prohibit-or-disclose" regime.  It generally would prohibit, where "feasible," any employee of a lender who may "participat[e] in" the credit decision ("underwriters") from having access to applicant responses regarding demographic information.  It generally would not be "feasible" for a lender to restrict an underwriter's access where that employee "may need" to view, refer to or otherwise use an applicant's demographic responses to perform that employee's "assigned job duties."  When it is not "feasible" for a lender to prohibit access to any underwriter, the lender would be required to make the following, "no firewall" disclosure to customers:  "Employees making determinations concerning an application, such as loan officers and underwriters, may have access to the information provided on this form [*i.e.*, the form used to collect demographic information]."[23]

Council members see two substantial obstacles to making the firewall prohibition "feasible."  First, some lenders simply do not have enough lending staff to accomplish the separation-of-functions contemplated by the prohibition.[24]  Second, lenders with larger staffs

---

[21]    15 U.S.C. § 1691c-2(d).

[22]    ECOA § 704B(g)(2), 15 U.S.C. § 1691c-2(g)(2).

[23]    Proposed § 1002.108 & associated commentary.

[24]    We note that of the 72 Farm Credit lenders reviewed by the Bureau, 18 were determined to be "small entities" under the Regulatory Flexibility Act.  *Proposal*, 86 Fed. Reg. at 56569.

-7-

AdminRecord-017216

report that in order to implement the prohibition, they would have to make substantial investments in IT infrastructure to effectively "mask" or segregate demographic responses from all other applicant data viewable by underwriters. Many of those larger lenders, we think, will simply determine a firewall is not "feasible" before they incur substantial IT infrastructure costs that, in the Farm Credit System, would ultimately have to be borne by the borrowers.

As a result of these obstacles, we think that many lenders would be left with no choice but to make the "no firewall" disclosure. It is critical to note that the "no firewall" disclosure would be made in conjunction with the disclosure that the lender "cannot discriminate" on the basis of demographic information. In other words, *a customer will be told what is illegal, then be told that some employees are particularly well-positioned to commit the illegal act.* We think that many reasonable customers, seeing these twin disclosures on the same form, will simply decline to provide demographic information, substantially undermining the objectives of the rule. We also believe that having to make the twin disclosures will harm the disclosing lenders' relationships with their customers. Some customers, particularly minority customers, may even choose to apply for credit elsewhere, reducing customer choice and perhaps access to credit.

We have not been able to devise a workable method for improving the firewall provision's prohibit-or-disclose regime. As a result, we think there is no alternative to the Bureau exercising its statutory "exceptions" authority to eliminate the provision from a final rule. Doing so would align that rule with HMDA, which has required collection of demographic information for decades, without incident to our knowledge, despite the absence of any firewall.

### C.   Non-Demographic Data

#### 1.   Generally:  Reconsider Requiring Data Elements Not Identified in the Statute

In addition to the collection of detailed demographic data, the Proposal would require collection of up to 17 discrete, non-demographic data elements on each covered loan. That is substantially more than the nine elements specified by the underlying statute.[25]

As a general matter, the Council urges the Bureau to reconsider requiring such a substantial array of additional data in an initial final rule, particularly the many non-statutory elements described by the Proposal. The collection of detailed demographic data, alone, will require substantial changes to loan processes, systems, and compliance protocols. Based on the experience of Farm Credit lenders with the analogous data-reporting regime mandated by the Home Mortgage Disclosure Act ("HMDA"), lenders report that adding as many as 17 additional elements to the demographic data will substantially increase the costs of compliance with a final small business rule. In that regard, it is worth noting again that because Farm Credit lenders are customer-owned, the costs of compliance will ultimately be borne by those customers.

In considering the number of non-demographic data elements to require in an initial final rule, we think it is also instructive to review the evolution of HMDA and its implementing rule, Regulation C. As enacted in 1975, HMDA applied only to loans actually originated or purchased. It was not until 1989 that amendments to HMDA and Regulation C expanded the law

---

[25]   ECOA § 704B(e)(2), 15 U.S.C. § 1691c-2(e)(2).

AdminRecord-017217

to cover applications as well.[26]  Further, it was only in 2002 that the Federal Reserve amended Regulation C to require mortgage lenders to report information about the pricing of their loans.[27] It then took another 13 years before the Bureau, responding to a statutory amendment, implemented the full array of HMDA data reporting requirements in existence today.[28]

The Council is not suggesting that the Bureau wait 45 years before requiring small business lenders to report every data element described in the Proposal.  We do, however, counsel against the "all at once" approach envisioned by the Proposal.  We think there is value in beginning with a more modest set of data reporting requirements, to allow small business lenders time to adjust to this new collection-and-reporting regime, and to allow time for consideration of the actual marginal value of expanding that regime further.  The "all at once" approach is particularly burdensome to the majority of Farm Credit lenders that do not make loans subject to HMDA compliance and have not already established those types of compliance systems and procedures.

### 2.    Specific Elements

We urge the Bureau to reconsider imposing the cost of collecting the following data elements that *are not described in the statute*:

- *Pricing information.*  If Farm Credit lenders reported pricing information on their loans, the data would be misleading.  The reason is that the actual cost to the Farm Credit borrowers is usually less the loan's pricing would indicate because the borrowers, as owners of the lender, separately receive patronage dividends from the lender's profits.  Thus, a Farm Credit loan priced more steeply than a bank loan may actually be cheaper for the borrower once patronage dividends are considered.

- *Six-digit NAICS Code.*  We agree with the comments of the small entity representatives, reflected in the Proposal, who uniformly "expressed concern about the difficulties in determining the appropriate NAICS code for businesses." And as the Bureau recognized, this aspect of the Proposal would mean that "all financial institutions subject to reporting would need to gain familiarity with the NAICS code system [and] refer to NAICS classifications for all relevant applications."[29]  We believe that this requirement would slow the loan-application process, placing an unwarranted burden on both customers and lenders.

---

[26]    Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 54 Fed. Reg. 51356 (Dec. 15, 1989).

[27]    Federal Reserve, Final Rule, *Home Mortgage Disclosure*, 67 Fed. Reg. 7222 (Feb. 15, 2002).

[28]    CFPB, Final Rule, *Home Mortgage Disclosure (Regulation C)*, 80 Fed. Reg. 66128 (Oct. 28, 2015).

[29]    *Proposal*, 86 Fed. Reg. at 56467.

AdminRecord-017218

- *Number of non-owner workers*.  Given the prevalence of seasonal and non-U.S. workers in agriculture, it would be administratively very difficult to collect this data in any consistent manner.

   Counting non-owner workers also would be difficult because there are many "non-standard" borrowers in agriculture.  One example would be neighbors, who ordinarily farm separately and separately employ others, deciding to seek credit jointly for a specific project.  Another example would be multiple corporations, partnerships, individuals, and perhaps a trust, all with their own farming operations, forming a partnership to apply for a loan.  It would be very challenging to write guidelines for consistently capturing the number of non-owner workers in the case of joint applicants who also operate farms separately, or in the case of applicants owned by separate farming operations.

- *Time in business*.  If this non-statutory element is not dropped, we suggest that for farming it be tied to an established Farm Credit data point, "Year began farming."  Farm Credit lenders already collect "Year began farming" in connection with the mandate discussed above to serve "beginning farmers," which the FCA defines as a "farmer, rancher, or producer or harvester of aquatic products who has 10 years or less farming, ranching, or aquatic experience as of the loan transaction date."[30]  The Council submits that needless confusion would arise in the context of farming if there were separate and competing definitions of "Time in business" and "Year began farming."

We have one further comment on a specific data element, though this one is mentioned in the statute:  the "*gross annual revenue* of the applicant for its preceding full fiscal year prior to when the information is collected."  The Proposal suggests the following language to elicit this information from an applicant: "What was the gross annual revenue of the business applying for credit in its last full fiscal year?"[31]  For three reasons, we urge the Bureau to use its "exceptions" authority to eliminate this element for farming customers.

First, most farmers in this country only farm on a part-time basis.[32]  As a result, when they apply for agricultural purpose credit, their W-2 and other off-farm income can be and often

---

[30]     FCA, Bookletter BL-040 (REVISED) at 2 (Aug. 10, 2007).

[31]     Proposed § 1002.107(a)(14) & Cmt. 1002.107(a)(14)-1.

[32]     In 2019, 96 percent of farm households derived some income from off-farm sources.  And on average, "small family farms" — which as noted make up 90% of all U.S. farms — derive more than half of their total household income from off-farm income in 2019.  Econ. Research Serv., USDA, *Off-Farm Income a Major Component of Total Income for Most Farm Households in 2019* (updated Sep. 7, 2021), https://www.ers.usda.gov/amber-waves/2021/september/off-farm-income-a-major-component-of-total-income-for-most-farm-households-in-2019/; *see also* Econ. Research Serv., USDA, *America's Diverse Family Farms*, at 3 (Dec. 2020) (on 41.4% of U.S. farms, principal operators report a primary occupation other than farming), https://www.ers.usda.gov/webdocs/publications/100012/eib-220.pdf?v=8038.7; *ERS Farm Income Report* (updated Sep. 2, 2021) ("Most farmers receive off-farm income, but small-scale operators depend on it").

AdminRecord-017219

is more important to the credit decision than any "revenue of the business."  If off-farm income is to be reported in connection with this data element (since the rule text refers to "revenue of the applicant"), we believe the data would paint a misleading picture of the size of the "business" applying for a loan.  But if it is not reported, we believe the data would be misleading from the standpoint of fair lending analysis, for it would show many loans approved to farmers with low "business" revenue (where they have sufficient W-2 income) and other loans denied to farmers with higher "business" revenue (where they have insufficient W-2 income).  Either way, we think this data element is flawed as applied to farming and should be eliminated for that type of credit.

Second, the "gross annual revenue" element would pose substantial challenges given the prevalence of the "non-standard" agricultural borrowers described above, *i.e.*, customers applying jointly even though they have separate farming operations.  Of course, many of those customers will have relevant off-farm income as well, further complicating the picture.

Third, many Farm Credit loans are currently decisioned without considering either off-farm income or revenue from farming; instead, lenders often rely principally on credit scores to decide whether a loan will be offered.

If the Bureau retains an element like "gross annual revenue," we suggest — in line with our comments on the definition of "small business" — that for farming, the appropriate metric should instead be "gross sales of agricultural or aquatic products" in the prior year.

### D.    Reporting When Multiple Institutions are Involved

We urge the Bureau to consider several modifications to § 1002.109(a)(3), which specifies which institution[s] have obligations under the rule when multiple institutions are involved in a credit transaction.

We are particularly concerned with how Proposed § 1002.109(a)(3) could apply to loan participations.  Farm Credit institutions frequently enter into loan participation agreements with a "lead lender," sometimes referred to as an "originating lender."[33]  There can be multiple participants on a lead lender's loan or just one.  Under these agreements, the borrower's contractual relationship remains solely with the lead lender.  Thus, a loan participation is significantly different from the purchase of a loan, as the FCA has explained in detail.[34]

---

[33]    *See* 12 C.F.R. § 614.4325 ("Purchase and sale of interests in loans") and § 614.4330 ("Loan participations").

[34]    In the FCA's words:

> Loan participations are a type of funding arrangement separate and distinct from either partial or whole loan purchases.  The distinction centers around who retains the legal relationship with the borrower. In a loan purchase, part or all of the lending relationship transfers to the purchasing institution.  By definition, a whole loan purchase includes not only the purchase of the asset, but its cashflows, the legal relationship, and the servicing requirements. The relationship in a loan participation, regardless of the participation amount (100

*(continued ...)*

-11-

AdminRecord-017220

We strongly urge the CFPB to clarify that in a loan participation, the obligations imposed by the rule should always rest solely with the lead lender, which FCA regulations define as the "lending institution having a direct contractual relationship with [the] borrower to advance funds, which institution sells or assigns an interest or interests in such loan to one or more other lenders."[35]  There are convincing practical reasons to designate the lead lender for compliance with the rule.  As the only party in a participation with a direct relationship with the applicant or borrower, the lead lender is in the best position by far to collect and report on the demographic and other data specified in the Proposal.  Requiring any participant to collect and report on that data, from its second-hand vantage point, would make little sense and could lead to more inaccuracies in the data.  Indeed, such a requirement would be akin to requiring a trust in a mortgage securitization to report HMDA data.

We note further that a customer never applies for any lender to participate a covered credit transaction; the customer applies for the covered credit transaction itself, solely from the lead lender.  For that reason, another option for addressing loan participations may be to exclude them, along with leases and factoring, from the definition of "covered credit transaction" in Proposed § 1002.104.

We also ask for clarification of the rule with respect to syndicated loans, which differ from participations in that multiple lenders enter into a contractual relationship with the borrower.  On syndicated loans, there is typically an administrative agent, which is primarily responsible for interacting with the applicant or borrower.  For the same reasons provided above with respect to participations, we ask the CFPB to clarify that in the syndicated loan context, the administrative agent is the sole lender with responsibility under the rule.

Lastly on this topic, we ask for confirmation that the rule would not apply at all to any credit decisions made *after* a customer's loan application has been approved.  Farm Credit institutions are required to make an independent "judgment on the creditworthiness of the borrower" even in secondary market transactions,[36] so it would be helpful to make clear that

---

percent or some amount less than 100 percent), consists only of cashflows from the loan and possibly the servicing rights for the loan. The legal lending relationship stays with the originating lender.

… In addition, courts have recognized the legal distinction between participations and loan purchases and the separate legal effects of loan participation agreements.  Finally, other financial regulators recognize the legal distinctions between loan participations and selling whole loans, which involves the transfer of title.

FCA, Final rule, *Loan Policies and Operations; Definitions; Loan Purchases and Sales*, 67 Fed. Reg. 1281, *1282-83 (Jan. 10, 2002) (footnotes omitted).

[35]    12 C.F.R. § 614.4325(a)(2).

[36]    12 C.F.R. § 614.4325(e).

AdminRecord-017221

those judgments are not subject to collection and reporting obligations.  We believe that this point is already implicit in portions of the Proposal.[37]

**E.    Publication of Data**

The Proposal provides that the Bureau would make public the data reported to it under a final rule, "subject to deletions or modifications made by the Bureau, at its discretion, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."[38]  To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, the Bureau is proposing a "balancing test" that would assess the risks and benefits of public disclosure.[39]

As the Bureau refines the balancing test, the Council asks that it consider the impact of publishing the data of smaller institutions in particular.  Smaller Council members are concerned that some customers, recognizing that data about their business will be published, may gravitate to larger lenders on the theory that the additional data about a larger lender will make it more difficult for the public to identify one customer in particular.

The Council also objects to making loan "pricing information" public.  Farm Credit lenders consider pricing information to be commercially sensitive.  In addition, as noted above, Farm Credit lenders believe that the publication of pricing information would be misleading without an appropriate notation that Farm Credit borrowers (unlike borrowers outside the Farm Credit System) also receive off-setting benefits in the form of patronage dividends.

Lastly in regard to publication, the Council believes that published data about Farm Credit lenders should always be accompanied by an appropriate statement indicating that they — unlike many other lenders — can only lend to business that are eligible under the Farm Credit Act and its implementing regulations.  The Council would be pleased to work with the Bureau on an appropriate disclosure of the legal limitations on eligibility.

\*       \*       \*

---

[37]    Most importantly, the Proposal would require compilation only of data "regarding covered applications," and there is no longer an "application" once it is approved.  Proposed § 107(a).  Further, Comment 109(a)(3)-1.i, regarding reporting when multiple institutions are involved, refers to the reporting of approvals "*prior to* closing or account opening" (emph. added).

[38]    Proposed § 1002.110(a).

[39]    *Proposal*, 86 Fed. Reg. at 56510-40.

-13-

AdminRecord-017222

As noted, the Council supports enforcement of fair lending laws and appreciates the Bureau's dedication to improving data collection for loans to small farmers.  We think, however, that a final rule would be improved if the above comments are incorporated.  Please do not hesitate to contact me if the Council may be of further assistance.

Sincerely,

Todd Van Hoose
President & CEO, Farm Credit Council

AdminRecord-017223



January 6, 2022

Comment Intake – Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20552

**Re:     Proposed Rulemaking: Small Business Lending Data Collection Under the Equal Credit**
**Opportunity Act (Regulation B)**
**Docket No. CFPB-2021-0015**
**RIN 3170-AA09**

Dear Sir or Madam,

The Conference of State Bank Supervisors ("CSBS")[1] appreciates the opportunity to comment on the
Notice of Proposed Rulemaking ("NPR" or "Proposal") issued by the Bureau of Consumer Financial
Protection ("CFPB" or "Bureau") titled "Small Business Lending Data Collection Under the Equal Credit
Opportunity Act (Regulation B)" to implement the small business lending data collection requirements set
forth in section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank
Act").

State regulators are charged with protecting consumers and ensuring the safety and soundness of the
financial institutions they supervise. Their proximity to financial institutions and the communities they
serve gives them a unique understanding of the wide variety of market participants operating in the small
business lending space. In addition to their supervisory responsibilities, state regulators are committed to
fostering economic development opportunities within their states.

State regulators recognize that the Bureau is statutorily required to implement the data collection
requirements set forth within section 1071. However, we are concerned that the regulatory burdens and
costs associated with implementing the data collection and reporting requirements, as proposed, will have
a disproportionate impact on smaller financial institutions that provide the majority of small business
credit in rural and underserved areas.

The Bureau's proposal will likely hinder the ability of community banks to continue to serve as an
important source of small business credit in communities across the country. Given this implication of the
Bureau's proposal, CSBS recommends that the Bureau:

- provide an exemption for smaller financial institutions;
- only require the collection of the mandatory data points;
- work with the appropriate federal agencies to align data collection and reporting requirements
  within this rule, the Call Report, and the CRA and HMDA regulations; and
- lengthen the implementation timeframe.

---

[1] CSBS is the nationwide organization of state banking and financial regulators from all 50 states, American Samoa,
the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands. CSBS supports the state banking agencies
by serving as a forum for policy and supervisory process development, by facilitating regulatory coordination on a
state-to-state and state-to-federal basis, and by facilitating state implementation of policy through training,
educational programs, and exam resource development.



**The small business lending process is not standardized.**

During recent testimony before the Senate Committee on Banking, Housing, and Urban Affairs, CFPB Director Rohit Chopra highlighted the importance of relationship banking and emphasized that "preserving relationship banking is critical to our nation's resilience and recovery, particularly in these times of stress."[2] State regulators believe that the Bureau can develop a rule that achieves its statutory objectives while also minimizing the burden on community banks and preserving relationship banking.

The process of lending to small businesses is often an art, rather than a science, as lenders tailor loans to meet the unique credit needs of each small business. Community banks exercise prudent discretion and demonstrate expertise in the small business lending process by crafting loans best suited to the current performance and reasonable operating projections of borrowing entities. Attempts to standardize and homogenize small business lending, while appealing to marketplace lenders that extend credit based on limited data and algorithms, will ultimately impede relationship lenders that employ more nuanced methods of extending credit.[3]

CSBS annually conducts the National Survey of Community Banks through which community bankers have historically expressed increasing concern about their ability to compete with larger institutions that are better positioned to offer loans based on quantitative criteria such as credit scores. However, the 2021 survey revealed that community bankers are optimistic about the prospects for small business lending. More than 40% of bankers expect[ed] the dollar volume of small business loans that are transactional in nature to <u>decline</u> relative to those that are relationship based.[4] If the Bureau does not tailor its proposal, this sentiment will likely reverse, which may lead small businesses to other avenues for credit as opposed to traditional forms of credit. In the sections that follow, CSBS offers several recommendations we ask the Bureau to consider as it implements the 1071 rulemaking.

**The Bureau should provide an exemption for smaller financial institutions.**

State regulators believe the Bureau should reconsider the proposed definition of "covered financial institution"[5] and provide an exemption for smaller financial institutions. During the rulemaking process, the Bureau sought feedback on the necessity of including asset-based or activity-based exemptions for particular categories of financial institutions. Despite several stakeholders advocating for an exemption, the Bureau moved forward with a "one-size-fits-all" approach in which any financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years would be subject to the rule. This was the lowest lending frequency threshold considered by the CFPB during the Small Business Regulatory Enforcement Fairness Act ("SBREFA") Panel process. Small Entity Representatives (SERs) on the Panel offered extensive feedback on exemptions, which should be revisited and given thoughtful consideration prior to finalizing the rule.

The Bureau offers little rationale for selecting 25 loans as a reporting threshold, indicating that a low threshold would subject more institutions to reporting and thus produce more data to review. Further, the Bureau makes no attempt to explain how it plans to use the data to achieve the goals of section 1071. State regulators believe a threshold of 25 credit transactions in each of the two preceding calendar years is too low to provide meaningful statistical value relative to the costs that will be imposed on the smallest reporters. The costs of compliance, estimated to range from $58,400 to $95,200[6] per year, could lead

---

[2] "New Era for Consumer Protection: The Consumer Financial Protection Bureau's Semi-Annual Report to Congress." 117th Cong. 3 (2021) (testimony of The Honorable Rohit Chopra, Director, Consumer Financial Protection Bureau).

[3] *See* CSBS Letter to the Bureau: Request for Information (RFI) regarding the Small Business Lending Market, Docket No.: CFPB-2017-0011 (September 14, 2017) available <u>here</u>.

[4] *See* <u>CSBS National Survey of Community Banks</u>, figure 10.

[5] The Bureau's proposal uses the term ''covered financial institution'' to refer to those financial institutions that would be required to comply with section 1071's data collection and reporting requirements.

[6] 86 FR 56562 (Oct. 8, 2021).



lenders to reduce their small business lending footprint, exit the small business lending market altogether, or consider pursuing a merger partner. For entities that choose to continue providing credit to small businesses, the higher costs will be passed on to small business borrowers, making loans less affordable and ultimately reducing access to credit. In sum, CSBS encourages the Bureau to reconsider the scope of its proposal and provide an exemption for small banks.

**The Bureau should only require the collection of the mandatory data points.**

The Bureau should limit the reportable data to the statutorily mandated data points required by section 1071. The Bureau should refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071.

The Bureau proposes to exercise its discretionary authority to require financial institutions to collect information on pricing, time in business, the North American Industry Classification System (NAICS) code, and the number of workers.[7] While the Bureau believes these data points will better facilitate enforcement of fair lending laws and help identify business and community development needs for small businesses, the Bureau has failed to identify how this additional information will be utilized and disregards the increased burdens the additional data collection will impose on small financial institutions.

First, implementation of the mandatory data points will be burdensome and challenging for reporters. Each data point has several sub-elements, may have to be updated at various stages of the application process, or may be open to various interpretations. For example, the Bureau is proposing section 1002.107(a)(7) which would require financial institutions to collect and report ''the initial amount of credit or the initial credit limit *requested* by the applicant." This data point does not initially seem difficult to collect. However, some applicants may not request an amount or may request a range. Some financial institutions will not require such information at the outset. Mandating reporting of a requested loan amount will impose increased compliance burdens and has the potential to disrupt the relationship aspect of small business lending.

Second, the addition of the discretionary data points will impose additional regulatory burden on reporters. Specifically, the Bureau is proposing in section 1002.107(a)(15) to require that financial institutions collect and report an applicant's 6-digit NAICS code. There are currently 1,057 6-digit NAICS codes. Many financial institutions do not currently collect this information. Applicants may not know their NAICS code or may struggle to determine which code to report especially if the nature of the business changes over time or falls under multiple categories. Moreover, as noted in the proposal, NAICS codes could change based on Small Business Administration (SBA) rulemaking, requiring financial institutions to monitor such developments. The Bureau contends that collecting this information will help them assess community development needs but otherwise fails to explain how the benefits of collecting this data will outweigh the costs and burdens placed on financial institutions. It is particularly noteworthy that elsewhere in the proposal, when defining a "small business," the Bureau specifically recognized that the NAICS code datapoint is unreliable due to the complexity and burden associated with determining the appropriate code. The Bureau purposefully chose not to use the SBA's approach to defining a small business, which bases classification on an applicant's 6-digit NAICS code. At a minimum, the Bureau should be consistent on what data should be collected, regardless of when in the application process the information is obtained.

Overall, the Bureau fails to provide compelling evidence as to why it is necessary at the outset to collect more than the mandatory data points. State regulators urge the Bureau to limit reporting to the mandatory data collection points and to evaluate the usefulness of this information before exercising its discretionary authority to require the reporting of additional data points.

---

[7] ECOA section 704(e)(2)(H) provides the Bureau with authority to require ''any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071].''



AdminRecord-017975



**The Bureau should work with the appropriate federal agencies to align data collection and reporting requirements within this rule, the Call Report, and the CRA and HMDA regulations.**

In its proposal, the Bureau states that while Call Report[8] and Community Reinvestment Act (CRA) data[9] provide some indication of the level of supply of small business credit, the lack of data on small business credit applications makes demand for credit by small businesses more difficult to assess with respect to local markets or protected classes. The Bureau further states that there may be some overlap between what is required to be reported under the Home Mortgage Disclosure Act (HMDA)[10] and what is covered by section 1071 for certain mortgage applications and loans for women-owned, minority-owned, and small businesses. However, the Bureau provides no solution to reconcile instances when similar data will have to be reported for compliance with various regulations.

Overlapping data reporting requests will increase compliance costs, cause confusion for reporters, and diminish the value of the 1071 reporting regime given that in many instances the data already exists. Accordingly, state regulators believe the Bureau should work with the appropriate federal agencies to align data collection and reporting requirements. Aligning the thresholds to those already required by HMDA and CRA could alleviate any inconsistencies and confusion for reporting entities. The Bureau should consider accepting certain CRA or HMDA reporting to substitute for section 1071 reporting to eliminate dual data collection.

The Bureau makes the point that data on small business lending is fragmented, incomplete, and not standardized, making it difficult to conduct meaningful comparisons across products over time. The Bureau further states that the existing data suffer from four material limitations, one of them being the lack of standardization across different agencies. Rather than identifying the deficiency and then proposing an approach that exacerbates the discrepancy, the Bureau should instead work with the appropriate federal agencies to align the data collection and reporting requirements and to reduce the duplication of data collected.

**The Bureau should lengthen the implementation timeframe.**

The Bureau's proposal would require compliance 18 months after a final rule is published. This is less than the two-year implementation period recommended by many SERs on the SBREFA panel. State regulators believe the Bureau should consider lengthening the implementation timeframe so that financial institutions can be better equipped to compile and accurately report the required data points. The Bureau notes that the proposed approach is a compromise between the two-year implementation period considered during the SBREFA, and a one-year implementation period requested by certain stakeholders. The Bureau believes the statutory purposes of section 1071 are better served by an earlier compliance date that would, in turn, result in earlier publication of data.

Some larger financial institutions might have the resources to quickly develop systems to comply with 1071 reporting requirements, but most community banks will not. Community banks have expressed concerns to state regulators about the need to quickly develop new policies and procedures, hire and train new and existing staff, and establish new relationships with vendors to collect and track the required data. In addition, institutions that are not familiar with federal reporting regimes, such as HMDA, might experience more difficulty in the early stages of implementation. Eighteen months is a short period of time to comply with the rule given the multiple time consuming and costly steps in the implementation

---

[8] The Call Report captures banks' outstanding number and amount of small loans to businesses (that is, loans originated under $1 million to businesses of any size; small loans to farms are those originated under $500,000).
[9] The CRA requires banks and savings associations with assets over $1.322 billion in assets to report loans in original amounts of $1 million or less to businesses.
[10] The Bureau is proposing to define a ''covered credit transaction'' as one that meets the definition of business credit under existing Regulation B, with certain exceptions. Loans, lines of credit, credit cards, and merchant cash advances (including such credit transactions for agricultural purposes and those that are also covered by the Home Mortgage Disclosure Act of 1975 (HMDA) would all be covered credit transactions.

AdminRecord-017976



process. State regulators suggest the Bureau meet with bankers and their service providers to understand their limitations and develop a realistic implementation timeframe. Further, the Bureau should also demonstrate its ability to collect the data from all non-bank parties subject to the rule.

**<u>Conclusion</u>**

State regulators are concerned that, as proposed, the small business data collection and reporting requirements will disproportionately impact community banks and could potentially impede access to credit by small businesses.

While state regulators recognize the Bureau is required to promulgate the 1071 rulemaking, we believe the Bureau can achieve the intent of section 1071 without placing unnecessary burdens and costs on community banks. If implemented as written, the rule could have the unintended consequence of making it more difficult for small businesses to obtain credit. We encourage the Bureau to provide an exemption for smaller depository institutions, require only the collection of the mandatory data points, work with the appropriate federal agencies to align data collection and reporting requirements and lengthen the implementation timeframe. We look forward to working with you as you craft a final rulemaking.

Sincerely,

John Ryan

President & CEO

AdminRecord-017977



January 6, 2022

The Hon. Rohit Chopra
Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

> Re:    **Proposed Rule on Small Business Lending Data Collection Under the Equal Credit Opportunity Act, Docket No. CFPB-2021-0015**

Dear Director Chopra:

The American Financial Services Association (AFSA)[1] appreciates the opportunity to comment on the proposed rule to implement the Small Business Lending Data Collection provision of the Equal Credit Opportunity Act (the Rule).[2] AFSA member companies support the Consumer Financial Protection Bureau (the Bureau) in its efforts to enforce fair lending laws and identify business and community development opportunities for small businesses. AFSA also wishes to convey its appreciation for the Bureau's engagement on the Rule and the Bureau's sincere consideration of industry perspectives presented by AFSA and other groups. For example, clarifying that the scope of the requirements of the Rule is limited to small businesses and advancing a clear and simple to apply definition of small business based on annual gross revenue are much appreciated.

As an initial matter, one of the key themes throughout this letter is that this rulemaking should balance the benefits of the additional data with the complexity it will create for business lending transactions. For many financial institutions, the obligations under Section 1071 to inquire, manage, and report on new items of data will be challenging to implement; and we encourage the Bureau not to make it even more difficult by requiring additional information. Some of the additional information required under the Rule is available, but creates concerns that when reported it will not be understood in the proper context (*e.g.*, denial reasons and pricing information). Other additional information required under the Rule is not presently available in typical business credit transactions and would add complexity to the application process (*e.g.*, NAICS codes and number of workers). And finally, other additional information required under the Rule will be completely new to typical commercial lending practices (*e.g.*, sexual orientation and gender identity).[3]

AFSA members and others are aligned with the Bureau's intention for the Rule and support active, competitive, and sustainable credit markets for business customers in order to achieve it. However, for financial institutions offering commercial credit, the resources devoted to designing, building, and operating the processes and systems to effectuate the Rule will be significant. If the compliance burdens prove to be unacceptable, some financial institutions may scale back from engaging in commercial lending or leave the small business lending sector altogether. The Rule states that it is intended to "help small businesses drive inclusive and equitable growth," but overly burdensome data collection requirements that exceed the Congressional mandate could result in a reduction of available credit, which would have the opposite effect. The Rule is broader in scope than what the Bureau

---

[1] Founded in 1916, AFSA is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.
[2] 86 Fed. Reg. 56356 (proposed October 8, 2021).
[3] 86 Fed. Reg. 56482.

AdminRecord-018117

sketched out in the SBREFA outline, which featured a two-year period for implementation. Imposing greater industry burden while affording less time for implementation, just 18 months, does not seem reasonable. As discussed further below in Section IX, we respectfully request a longer implementation period that mandates compliance on January 1 of the first calendar year that begins two years after the effective date of the Rule.

In our comment letter, we will discuss: perspectives on the data fields to be collected under the Rule; issues in implementing the Rule for financial institutions engaged in indirect vehicle finance; considerations for certain commercial finance transactions; questions regarding auctions in the vehicle remarketing context; operational concerns relating to the Rule; treatment of transactions that are reported under the Home Mortgage Disclosure Act (HMDA); consistent treatment for trade credit; and alternative methods of achieving the Rule's aims through a Small Business Database. We will also address specific requests for comment expressed in the Rule. Our letter also includes appendices with information requested by the Bureau in a previous meeting with AFSA and background information on certain transaction types.

## I.    Data Fields to be Collected under the Rule

Under the statutory scheme established by Congress, the small business data collection requirement is limited to specified data fields (collectively, the "statutory fields"). The statutory fields are:

(A) the number of the application and the date on which the application was received;
(B) the type and purpose of the loan or other credit being applied for;
(C) the amount of the credit or credit limit applied for, and the amount of the credit transaction or the credit limit approved for such applicant;
(D) the type of action taken with respect to such application, and the date of such action;
(E) the census tract in which is located the principal place of business of the women-owned, minority-owned, or small business loan applicant;
(F) the gross annual revenue of the business in the last fiscal year of the women-owned, minority-owned, or small business loan applicant preceding the date of the application;
(G) the race, sex,[4] and ethnicity of the principal owners of the business; and
(H) any additional data that the Bureau determines would aid in fulfilling the purposes of this section.[5]

While the statute provides the Bureau with authority to require collection and delivery of additional data (collectively, the "discretionary fields") by financial institutions beyond the statutory fields, that authority is limited to data that aids in fulfilling the purposes of §1071. AFSA urges the Bureau to limit the discretionary fields to what is truly necessary to avoid creating an overly burdensome data collection process for the financial institution and the customer, and also to refrain from creating new discretionary fields for subjects that are beyond the scope of the statute. The full scope of data that the Rule would require financial institutions to collect and deliver is inconsistent with the operation of business credit markets. Furthermore, as discussed further below, the Bureau's plans to publish much of the discretionary field data sought will harm the privacy interests of financial institutions and applicants for business credit alike.[6]

One critical consideration not addressed by the Rule is the comparison between the §1071 data planned to be collected and the data that is sought in connection with actual fair lending enforcement actions and supervisory

---

[4] This letter follows the language of the statute establishing the small business data collection requirement and the Rule in using the term "sex." The Bureau may consider whether the term "gender" is a more suitable term to use in connection with this rulemaking.
[5] 15 U.S.C §1691c-2(e)(2).
[6] We note that were the Bureau to adopt our suggestion to create a Bureau-controlled database as discussed in Section VIII below, then many of these concerns would be alleviated.

interactions. The broad scope of the data contemplated to be collected in the Rule begs the question of what additional data is collected in an actual fair lending action. If these data sets are in fact substantially similar, then the Bureau should justify the commonality. Congress established a limited scope data collection regime in §1071. If Congress intended to require all covered financial institutions to proactively deliver the same data required in fair lending enforcement actions, Congress would have written that into the law.

The Rule embraces the view that the benefits of collection and publication of discretionary fields provide value that is greater than the harms to credit applicants and financial institutions. But the harm to financial institutions is significant: increased costs for programming, training and re-training, data collection (with its inevitable errors that could lead to enforcement actions having nothing to do with financial institution behavior), monitoring, and reporting. These costs must be considered.[7] AFSA urges the Bureau to consider that in the context of business lending, credit applicants and financial institutions have established effective systems of underwriting that eschew inquiries about individual characteristics. The Rule places covered financial institutions in an untenable position of asking business customers probing, personal questions that are outside the scope of business necessity. AFSA members are concerned that such personal and sensitive questions may violate applicants' privacy for reasons that have nothing to do with their credit application.

## II.    Indirect Vehicle Finance Transactions[8]

Many AFSA member companies are financial institutions that are active in the indirect vehicle finance business. As explained in Appendix 1, indirect financing is a three-party process. In this section, we will largely focus on vehicle finance, but many of these comments also apply to other types of indirect financing, including furniture and electronics sales. As we discussed with the Bureau when we met on October 28, 2021, indirect financing, particularly indirect vehicle finance transactions, present unique challenges due to the nature of the transactions and the roles of the parties.

Indirect vehicle finance transactions involve two separate, but related transactions. First, a customer purchases a vehicle from a motor vehicle dealer (dealer), and executes a retail installment sales contract that finances the purchase price and any voluntary protection products the customer elects to purchase. The dealer is the original creditor and negotiates the financing terms with the customer. Second, the dealer communicates with one or more financial institutions to determine which one will purchase the completed retail installment sales contract. The financial institution that purchases the contract takes an assignment of the contract and commences servicing the contract until it is paid in full.

It is imperative that the Bureau address how financial institutions can comply with the Rule because when Congress established the Consumer Financial Protection Bureau, it enacted a provision that prevents the Bureau from:

> … exercis(ing) any rulemaking, supervisory, enforcement or any other authority, including any authority to order assessments, over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.[9]

---

[7] Again, our Bureau database suggestion in Section VIII would alleviate many of these costs and concerns.
[8] See also the more detailed explanation of Indirect Vehicle Finance Transactions in Appendix 1.
[9] 12 U.S.C. §5519(a). For the purposes of this comment letter, assume that dealers fully satisfy the conditions of §1029(b)(2) and is fully excluded from rulemaking, supervision, and enforcement by the Bureau.

AdminRecord-018119

Regulation B, which implements the Equal Credit Opportunity Act (ECOA), provides that financial institutions are specifically prohibited from inquiring about protected class status including "the race, color, religion, national origin, or sex of an applicant or any other person in connection with a credit transaction…"[10] The present rulemaking proposes an amendment Regulation B to permit financial institutions to make §1071 inquiries that are currently prohibited, but because of the limitation in the Bureau's authority, that permission will not extend to dealers.

Taking these provisions into consideration, with regard to the present rulemaking, it appears clear that while Congress intended the Bureau to require financial institutions to make inquiries for certain data elements in connection with applications for credit by women-owned, minority-owned, or small business applicants, the Bureau is limited in its authority to effectuate those requirements to the extent they affect dealers:

1. The Bureau has no authority to impose mandates relating to the small business loan data collection provisions of Dodd-Frank and the present rulemaking upon dealers; and
2. The existing ECOA prohibition on asking about protected class status cannot be amended in the present rulemaking to permit such inquiries by dealers, as the Bureau lacks authority to engage in rulemaking relating to dealers.

The Rule as proposed contemplates that financial institutions will collect §1071 data in connection with an application for credit, which occurs with the dealer in an indirect vehicle finance transaction. Due to the unique nature of indirect vehicle finance transactions, customers who purchase vehicles make their initial credit application to the dealer, who is the original creditor under the terms of the retail installment sales contract. Once the vehicle purchase transaction is closed, the credit application process is over and financial institutions have no authority under ECOA to request §1071 data.

With respect to indirect vehicle finance, AFSA members face the daunting prospects of building systems and processes to request and manage §1071 data in transactions where the original creditor is a dealer with no conceivable obligations for dealers to facilitate such data collection under the present rulemaking. Dealers, being completely exempt from Bureau rulemaking, have no inducement to assist financial institutions who are obligated to make §1071 inquiries. As dealers are the original financial institution in all indirect vehicle finance transactions and take the application first in many such transactions, the dealer might be well-placed to gather §1071 information, but collection of some critical data elements by dealers is impermissible under ECOA, and the Bureau lacks the power to either authorize collection of uncollectible data or compel dealers to do anything.

Therefore, with respect to indirect vehicle finance, the present rulemaking compels financial institutions to build and operate entirely new processes and systems to make §1071 inquiries and process any responsive information without any ability to enlist the aid of dealers in acquiring information responsive to §1071 inquiries.

In order to facilitate orderly implementation of the Rule with respect to transactions involving dealers, AFSA asks the Bureau to delay implementation of the Rule until such time as the Federal Reserve, which has authority to issue rules that are effective on dealers, has issued a rule based on §1071 that will clarify the obligations of dealers that extend credit to small business customers. Such a rule should conform with the Bureau's rulemaking, and both rules should have the same implementation period.[11]

---

[10] 12 C.F.R. §1002.5(b).
[11] To be more specific, the compliance date for indirect vehicle finance companies and dealers should be January 1, two years after the Federal Reserve publishes its rules.

AdminRecord-018120

AFSA strongly encourages the Bureau to refrain from creating an intermediate, limited solution that would require vehicle finance companies to collect some of the data immediately while awaiting a companion rule applicable to dealers from the Federal Reserve. Such a limited solution would not permit collection or reporting of data related to the race, sex, or ethnicity of the principal owners of the business applicant which is fundamental to achieving the dual purposes of §1071 of enforcing fair lending laws and identifying needs and opportunities for women-owned and minority-owned small businesses. In addition, it would place an unreasonable burden on indirect vehicle finance companies to develop technology to meet the intermediate solution only to need to develop another technology when the coordinated rule with the Federal Reserve is finalized. The cost of this two-tiered implementation will far outweigh the very small benefit of collecting limited data that is unrelated to achieving the purpose of §1071.

In the alternative, in Section VIII of this letter, we describe an approach using a government sponsored and maintained database to collect and hold §1071 data. Such a database would eliminate the requirement for dealers to make §1071 inquiries altogether. As such, collection of §1071 data could begin absent a Federal Reserve rule.

In previous conversations between AFSA and the Bureau, the Bureau asked for information regarding the data that financial institutions receive in indirect vehicle finance transactions and data that is not typically available. A summary identifying the data elements under the proposed rule that are typically collected as part of a vehicle finance transaction and the data elements that are not typically collected is provided in Appendix 2.

Indirect vehicle finance transactions share many features with equipment finance and retail sales finance transactions. As many financial institutions who are engaged in these businesses are not currently participating in any federal data collection programs, they have many operational questions about the Rule and compliance after its effective date. AFSA urges the Bureau to engage with financial institutions frequently throughout the implementation period to understand the questions that arise, and to publish compliance aids to address those issues, as it has done in other rulemakings. The Bureau's engagement with industry is very much appreciated.

### III.     Particular Commercial Finance Transactions

Some AFSA members extend credit to businesses to finance real estate acquisitions, business expansion, inventory, or other purposes. In connection with these sectors, AFSA requests additional clarity regarding the application of the Rule.

Some financial institutions offer floor plan financing, which generally allows merchants to stock inventory available for sale without advance payment to the manufacturer or distributor. Such financing programs feature very flexible timing and pricing terms, as merchants' inventory needs are dynamic with shifting and sometimes seasonal demand for goods. Also, floor plan finance companies may be affiliated with the manufacturer or distributor, and therefore have an aligned interest with supporting the merchants' maintaining some level of inventory that necessitates frequent adjustments to the financing and payment terms. With these considerations in mind, AFSA requests clarification that floor plan or other inventory finance products can be considered "trade credit" that is outside the scope of the Rule.

AdminRecord-018121

#### IV.    Clarification regarding Auctions

Vehicle finance companies, other equipment finance companies, other financial institutions, and new and used car dealers use auctions to buy and sell inventory and dispose of personal property that is returned after a lease, or that is taken by the financial institution following an event of default. Reliance on auctions for this function is a well-established process in industry that treats consumers the most fairly and readily comports with Uniform Commercial Code requirements.

While the auction facilitates the sale of the property to a buyer, the auction does not hold legal title to the property being sold. Rather, it provides a facility or platform for the sale to take place and administers the funds. In most instances, the auction pays the seller upon seller's delivery of physical title to the property. Thereafter, the auction looks to the buyer to remit the purchase price. In some cases, the auction allows the buyer to leave the auction facility with the property with payment to be made at a later date. This delayed payment mechanism is similar to the concept of trade credit in the Rule and AFSA members request clarification that auction sales and the delayed payment mechanism are not transactions that trigger §1071 requirements for the auction. AFSA asks that the definition of "trade credit" be modified by including a reference to the business' agent as follows:

(1) Trade credit. A financing arrangement wherein a business acquires goods or services from another business or its agent without making immediate payment to the business or its agent providing the goods or services.[12]

#### V.    Operational Concerns regarding the Rule

AFSA member companies have identified several concerns regarding the Rule and the work that will be necessary to comply with its provisions.

The Rule proposes that financial institutions establish a firewall to isolate three items of §1071 data from any personnel who are involved in making any determination concerning the application for credit.[13] The particular data to be segregated are whether the applicant is a minority-owned business, whether the applicant is a women-owned business, and the ethnicity, race, and sex of the applicant's principal owners.[14] The Rule also provides that if a financial institution determines that it is not feasible to limit the personnel's access to this data, the data need not be segregated if a disclosure is made to the borrower.[15] This creates considerable complexity for financial institutions that will need to develop new technology solutions for separate communication channels and databases to move and store the data required under the Rule that are separate from the existing solutions.

AFSA members agree that the information required to be collected under the Rule is of a very sensitive nature and must be protected. For AFSA members, there is not and has never been a business reason to collect the information regarding the women-owned or minority-owned status of an applicant or the sex of the applicant's principal owners. Such questions could be considered contrary to financial institutions' obligation to serve all customers in a non-discriminatory manner. AFSA notes again that were the Bureau to instead create a database as suggested in Section VIII, this information would not be available to the financial institution or its employees, thus meeting the purpose of the Rule while protecting the sensitive information of the business credit applicants.

---

[12] 86 Fed. Reg. 56577.
[13] §1002.108.
[14] *Id*. AFSA also notes that there will be instances in which a small business may qualify as minority- or women-owned based on the 50% direct and indirect ownership test, yet may not have any women or minority principal owners based on the 25% direct ownership test.
[15] *Id*.

AdminRecord-018122

In addition, the firewall requirement is problematic when combined with the obligations in §1002.107(b) of the Rule requiring verification of applicant-provided information. The rulemaking should distinguish between verification of data that is collected to satisfy the requirements of the Rule and data that is collected as part of the underwriting process. AFSA strongly opposes any requirement to update §1071 data if different data is collected during the underwriting process. This is not only burdensome and complex, it is also inconsistent with the clear expectation of Congress in enacting §1071 that the small business data collection is to be kept separate from the evaluation of the application. The proposed rule should clarify that there is no obligation for a financial institution to update data that it received from the applicant as part of the §1071 information gathering process with data it receives during the underwriting process. The financial institution should have no obligation to compare the data received during underwriting or to compile, maintain, or report that data under the Rule.

AFSA member companies are also concerned that one effect of the Rule is to bring sensitive information about applicants for credit into the financial institution's possession. Financial institutions generally attempt to collect only the minimum amount of data necessary for business purposes. Having more data increases risks of negative outcomes (such as, but not limited to, data breaches) without providing benefit to the customer or the business. In the context of fair lending, financial institutions are concerned that the Rule's mandate to collect and maintain sensitive demographic information about applicants will invite litigation and baseless allegations of discrimination by unscrupulous parties who hope that §1071 data held by financial institutions can be interpreted to substantiate litigation threats.

But for this Rule, financial institutions would not be collecting this information, and AFSA asks the Bureau to consider means by which financial institutions can be shielded from fishing expeditions by plaintiffs and regulatory bodies. To alleviate these concerns, the Bureau could adopt either or both of two AFSA requests: (1) the Bureau should create and maintain a database of small business data as discussed in Section VIII, and/or (2) the Bureau should specifically (i) state the regulation does not create a private cause of action against a financial institution who, but-for the regulation, would never make such inquiries or collect such data and (ii) state that data collected by financial institutions pursuant to this rule is not discoverable in any private-party proceeding or litigation.

After a period of time, the Bureau should consider evaluating the Rule, specifically focusing on: (1) the burden on small business applicants to provide sensitive personal information, (2) the cost for creditors to collect this information, (3) whether the Bureau's sample forms could be improved, (4) the usefulness of the data collected, and (5) the effect of the Rule on the small business credit market.

Finally, in preparing this Rule, it is important for all stakeholders to consider the effect of §1071(c). In setting up the small business loan data collection regime, Congress provided:

> (c) RIGHT TO REFUSE.—Any applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit. [16]

The effect of this provision is clear: all applicants for credit are entitled to decline to provide data requested by financial institutions relating to the small business loan data collection provision of the statute and the Rule.

---

[16] 15 U.S.C. §1691c-2(c).

AdminRecord-018123

In considering the effects of the Rule on applicants and financial institutions, the Bureau must always consider that all applicants for credit can refuse to provide §1071 data. As a result, any §1071 data collected is necessarily incomplete and will not represent the actual attributes of actual credit applicants. The Bureau must consider and explain how it will overcome the inherent inaccuracies that will result from analysis of incomplete and misleading data. Further, §1071 will not be reliable as an indicator of a financial institution's portfolio characteristics because the data will only be provided on a voluntary basis by the applicants.

Furthermore, while the Rule proposes a mechanism to collect information about transactions with small business customers, the Bureau has not articulated how it will acquire data about the broader business credit market. Without a view of the entire market for business credit, it is unclear how the Bureau will be able to make accurate decisions that certain small business credit transactions should be scrutinized for potential violations of fair lending or other laws.

The Rule provides that financial institutions who are not told the race or ethnic background of applicants should make a visual observation of those statuses (if a visual observation is possible based on the manner in which the application for credit is made) and record that when the applicant declines to provide that information. The visual observation requirement is inconsistent with Congress' clear intent to give applicants the right to refuse to provide this sensitive demographic data. AFSA urges the Bureau to refrain from requiring collection and reporting of visual observations because it is subjective and violates the customer's statutory right to not report the data.

Finally, AFSA asks the Bureau to confirm that it will refrain from making enforcement or supervision decisions on the basis of this incomplete and unrepresentative data.

## VI.    Treatment of Transactions that are Reported Under HMDA

As proposed, both the HMDA and §1071 data collection and reporting regimes could be triggered for financial institutions that extend business purpose term loans secured by multi-family and commercial income producing rental properties. It is unnecessarily duplicative and burdensome to require financial institutions to collect from applicants and report to the Bureau two datasets for the same transaction. This would also create a cumbersome application experience for business applicants. The Bureau should exclude all transactions where financial institutions have actually collected and reported data to the Bureau pursuant to Regulation C.

If the Bureau narrowly-tailored this exception to applicants that are reported under HMDA, then institutions not subject to the HMDA reporting regime would still have to report HMDA-eligible applications under §1071 because they would not actually report such applications under HMDA. The fact that these transactions are being captured by either HMDA or §1071 should still facilitate the enforcement of fair lending laws and enable communities, governmental entities, and financial institutions to identify whether all communities are being served with respect to these credit transactions.

## VII.    Consistent Treatment for Trade Credit

The Rule generally excludes trade credit from the definition of a covered credit transaction. The Rule defines trade credit as a "financing arrangement wherein a business acquires goods or services from another business without making immediate payment to the business providing the goods or services."[17] The Proposal further states

---

[17] 86 Fed. Reg. 56577.

AdminRecord-018124

that "an extension of business credit by a financial institution other than the supplier for the financing of such items is not trade credit."[18] Typically trade credit is granted in terms not exceeding one year.

All forms of trade credit with original terms of one year or less, not just in-house trade credit, should be exempt from the Rule's data collection and reporting requirements. Trade credit extended by financial institutions facilitates the very same agreements between the very same businesses. Trade credit offered by financial institutions allows more suppliers to offer trade credit programs, and as a result provides more opportunities for credit access to small businesses. Both forms of trade credit deserve consistent regulatory treatment. This will prevent the creation of an unlevel regulatory playing field that discourages competitive services to develop around the issuance of trade credit.

Uneven regulatory treatment will likely force suppliers to move toward "in-house" solutions in order to accommodate the preference of purchasers who are not accustomed to or amenable to providing this type of information for trade credit. By drawing an arbitrary line between these two forms of trade credit, the Rule forces more business transactions to a less regulated environment without the oversight offered by financial institutions. Not all suppliers, however, will be able to create an in-house program. After all, suppliers are not experts in trade credit and provide these programs as a service for their customers. Additionally, an in-house trade credit program can impact a supplier's cash flow, tying up funds it might otherwise need. When in-house solutions prove too challenging to develop and trade credit offered by financial institutions (accompanied by §1071 data reporting) proves unattractive to would-be purchasers, suppliers will find themselves out of options and the result will likely be a reduction in trade credit access to small businesses.

Additionally, the uneven treatment of trade credit will competitively disadvantage trade credit programs offered by financial institutions. It will allow in-house trade credit providers to offer a lower friction experience for purchasers that will not require §1071 data reporting. Meanwhile, trade credit programs offered by financial institutions that provide the very same service will need to implement changes required by the Rule that purchasers will find unfamiliar and unwelcome.

Finally, the data gathered from only the trade credit programs offered by financial institutions will be less valuable to the Bureau, given that most trade credit is extended "in-house" and will not be subject to the Rule's data collection and reporting requirements. The partial and incomplete data gathered on trade credit will not offer meaningful insights into that market and will not advance the statutory purposes that underlie §1071.

## VIII.   Small Business Database

In AFSA's past comments to the Bureau regarding small business lending data collection, AFSA suggested that the Bureau approach the problem of collecting demographic information in a different way. Rather than enlisting financial institutions to collect and manage new sensitive and personal demographic information regarding borrowers, the Bureau could establish a Small Business Database to facilitate the tasks associated with the Rule. As noted throughout this letter, such a database would significantly alleviate the burdens on financial institutions with no reduction in the effectiveness of the Rule.

---

[18] 86 Fed. Reg. 56589.

AdminRecord-018125

A Small Business Database would allow the following simplified process:

- An applicant for credit would file its demographic and financial information with the Bureau. Once the Bureau has received a completed submission, the Bureau would assign the applicant a unique identifying number.
- When an applicant applies for credit, it would provide this unique identifying number to the financial institution, who would include this as part of the small business lending application register. Once submitted to the Bureau, the Bureau could then correlate the details of the transaction with the attributes of the borrower stored in the Small Lending Database.

This approach would provide many benefits to market participants.

- Applicants for credit would only need to maintain their financial and demographic information in one place, rather than responding to inquiries each time they seek credit.
- Applicants would not be upset in being asked to provide information to financial institutions that clearly is not needed for legitimate business purposes and which, in the applicant's mind, could be used for inappropriate purposes relating to the credit application.
- Financial institutions would be spared the significant costs and burdens of programming, training, collecting, monitoring, and reporting the information required under the Rule that is not needed for business purposes.
- Financial institutions would be relieved from demands to produce the §1071 data in connection with investigations and discovery as financial institutions would not be in possession of the data.
- Financial institutions will neither possess nor have access to sensitive §1071 data held in the database and therefore inappropriate use of the data by financial institutions will not be possible.
- Financial institutions would not have the further risks (including regulatory and litigation) associated with data breaches of this information and concurrent costs of protecting the same.

AFSA observes that the Small Business Administration already maintains a database of small businesses. The Bureau could easily collaborate with other agencies in the federal government on developing the database, or it could work independently to streamline and simplify the tasks of collecting and managing demographic and financial information of small businesses.

## IX.     Responses to Particular Requests for Comment in the Rule

The Rule includes discussion of several aspects of the proposal or alternatives that are being considered by the Bureau. AFSA appreciates the opportunity to share perspectives on the following items.

### a.  Inquiries about sexual orientation

Recently, the U.S. Supreme Court expanded upon the concept of sex as referenced in the context of Title VII protections against employment discrimination.[19] This decision established that protections against sex discrimination also provide protection for discrimination related to sexual orientation and gender identity. Although this ruling said nothing about ECOA, the Bureau issued an interpretive rule articulating that the Bureau considers ECOA's prohibition on sex discrimination will now include sexual orientation discrimination and

---

[19] 140 S.Ct. 1731.

AdminRecord-018126

gender identity discrimination, including discrimination based on nonconformity with sex- or gender-based discrimination.[20]

Neither Congress nor the U.S. Supreme Court has taken specific action to change the scope of the prohibition against sex discrimination in ECOA to include concepts of sexual orientation and gender identity. With this in mind, AFSA urges the Bureau to give financial institutions the option to collect this information without imposing a mandate requiring collection of information relating to the sexual orientation of principal owners.[21]

AFSA urges the Bureau to consider the practical effects of forcing financial institutions to make highly personal inquiries in connection with an effort to collect business information.

### b. Collecting information about incomplete or withdrawn applications

The Bureau asked for comment on whether financial institutions should collect data on incomplete or withdrawn applications.

To serve the purposes of §1071 relating to enforcement of the fair lending laws, the Bureau should focus its attention on applications that lead to consummated transactions, and applications that are declined. Collecting information regarding other scenarios does not serve the purpose of the statute and creates additional operational burdens on financial institutions.

### c. Collecting information on transactions that are not covered credit transactions

The Bureau asked for comment regarding whether reporting should be required for scenarios in which an applicant applies for a covered credit transaction, but the transaction that is consummated falls outside the scope of the Rule.

AFSA agrees with the Bureau's observation that collecting information about transactions that are outside the purview of the Rule will negatively affect data quality. Financial institutions should only be required to collect and manage §1071 data for transactions that are subject to §1071. AFSA also requests clarification that if a financial institution collects §1071 data for a transaction the financial institution anticipates will be a covered financial transaction, such collection of data by the financial transaction has not violated Regulation B if the transaction is not a covered financial transaction when consummated.

### d. Credit line increases and other modifications to business credit accounts

The Bureau asked for comment regarding how the Rule should treat credit line increases.

As discussed above, commercial credit arrangements such as floor plan or inventory finance are specialized programs that feature highly flexible payment terms, including rapid changes to credit limits to respond to business conditions. If such plans will be within the scope of the Rule, AFSA requests clarification that credit line increases and other modifications be excluded from the requirements to collect and manage §1071 information. Such modifications to these accounts are simply too rapid and frequent to accommodate §1071 inquiries.

---

[20] 86 Fed. Reg. 14363 (March 15, 2021).
[21] Yet again, a government-sponsored and maintained database completely alleviates AFSA's concerns.

AdminRecord-018127

Similarly, customer-initiated credit line increases, including those related to credit card accounts, should be excluded from the coverage of the Rule. These credit line increases follow a streamlined application process as compared to new account creation. The processing of credit line increases is typically fast and automated, making them low-risk for discriminatory practices. Introducing §1071 data collection requirements to these transactions would severely slow the process, perhaps reducing the number of financial institutions that would offer customer-initiated line increases. This could negatively impact access to credit, and AFSA asks the Bureau to exempt these transactions from the coverage of the Rule.

### e. Data collection for transactions that are not covered credit transactions

The Bureau seeks comment on whether to permit financial institutions to collect §1071 data for transactions that are not covered by the Rule.

Financial institutions are concerned that opening the door to data collection for transactions that are not covered by the Rule will reduce the quality of data collected. While most financial institutions will only collect the amount required, some may collect more broadly and selectively. This will create an uneven playing field among financial institutions and contribute to misinterpretations of the data by observers.

### f. Leases

AFSA agrees with the exclusion of leases from the Rule. With regard to voluntary reporting of §1071 data for leases, AFSA urges the Bureau issue a rule that treats financial institutions similarly. Allowing some financial institutions to report §1071 data for leases on a voluntary basis will degrade the quality of data collected and lead to misrepresentations of the data.

### g. Consumer-designated credit

AFSA agrees with the Rule's approach to exclude from coverage consumer-designated credit. One area where AFSA asks for additional clarification is with regard to retail installment sales contracts. As discussed above, retail installment sales contracts are entered into between dealers and buyers to finance those transactions.

In determining whether credit is excluded as consumer-designated credit, AFSA asks the Bureau to confirm that financial institutions can rely on the Official Interpretation for the 12 C.F.R. §1002.2(g) definition of Business Credit, which provides that, "a creditor may rely on the applicant's statement of the purpose for the credit requested."

### h. Originations threshold

The Bureau seeks comment regarding whether the Rule's proposed 25 originations threshold is the correct level for triggering the Rule's obligations. AFSA members would prefer the highest possible threshold amount. AFSA asks the Bureau to set the limit at 500 originations to align with the current threshold for HMDA reporting for open-end loans and to focus attention on financial institutions that have a robust amount of business credit originations. Setting the threshold too low will be entirely too costly and burdensome on small institutions, and some may conclude that exiting the business credit market is preferable when compared to the costs and burdens of managing the compliance obligations for a small number of transactions.

AdminRecord-018128

AFSA also asks the Bureau to establish a cut-off for transactions that exceed the Small Business Administration statutory maximum loan size, currently $750,000. Observing this threshold will help financial institutions align their existing processes with the Rule and focus attention on routine credit extensions for small businesses that are critical to their credit needs.

### i. Gross annual revenue trigger

The Bureau seeks comment on its proposed definition of a small business, including the $5 million gross annual revenue size standard. AFSA agrees that the use of gross annual revenue as a measurement is clear and convenient for industry. AFSA members would like to see the $5 million trigger be reduced to $1 million, consistent with the Community Reinvestment Act definition of a small business. A trigger of $1 million is also familiar to financial institutions from the rules for adverse action notices for business credit applicants in Regulation B.[22]

### j. Definition of application recipient

The Rule proposes requiring financial institutions to collect the application recipient, which is not a data field required by the statute. AFSA disagrees that collecting this data point will aid in fulfilling the purposes of §1071. The Bureau's contentions regarding the benefits of having this data fail to consider or address the privacy concerns of businesses that use different strategies to compete for business. Whether or not a financial institution takes applications in-person, electronically, or with the assistance of intermediaries reflects strategic business decisions and investments. Financial institutions will suffer confidentiality and trade-secrets harms if these strategic decisions are made public.

### k. "Incomplete" application status

The Rule proposes several categories for reporting the outcome of credit applications, including "incomplete." The Bureau seeks comments on whether additional subcategories should be established to capture a wider variety of application outcomes. AFSA agrees with the Bureau's proposal to categorize all incomplete applications with the single category of "incomplete." Creating additional subcategories will create additional confusion and difficulty for financial institutions.

### l. Pricing information

The Bureau seeks comment on how to reduce misinterpretations of disparities in pricing that are likely to arise once the Rule is in effect. AFSA commends the Bureau for raising this issue, as it reflects a concern shared by financial institutions. Commercial finance offerings in the United States market have evolved to serve a highly diverse and specialized group of business customers. The financing needs, financial resources, and pace of business activity are different for various business segments, and these differences are reflected in the widely divergent pricing and other terms that characterize business lending.

For example, consider a restaurant that finances kitchen equipment as compared to a powersports dealer that finances snowmobiles for inventory. Both are businesses that rely on access to credit, but the purpose of lending, the collateral, the lending terms, and therefore the pricing will be different. The restaurant will use the financed

---

[22] 12 C.F.R. §1002.9(a)(3)(i).

AdminRecord-018129

equipment steadily for several years, and presumably has a steady cashflow. The powersports dealer needs inventory of snowmobiles to sell during the winter months, but then in spring may pivot to stocking marine equipment.

The commercial finance industry has developed specialized credit programs to meet business needs. These programs are trade secrets and must be confidentially maintained. Once the Rule is in effect, the pricing data will likely show wide variances in pricing due to the unique characteristics of the borrower's business and type of credit sought. Prior to using §1071 data to pursue fair lending claims, AFSA asks the Bureau and others who will analyze published §1071 data to carefully consider the highly specialized nature of business credit to avoid acting based on misleading data. AFSA asks the Bureau to refrain from requiring collection and reporting of pricing data, but, if the Bureau requires the pricing data, then AFSA members would request that the pricing data be limited to the interest rate and origination fees that are required to be paid at the inception of the financing facility and that these data fields be exempt from publication.

### m. Collecting the NAICS code

The Bureau proposes requiring financial institutions to collect the NAICS code that corresponds to the applicant's business. While Congress contemplated that the definition of "small business" would be the same as "small business concern" under the Small Business Act (15 USC 632), which relies on the NAICS code, we think it clear that Congress did not contemplate that the NAICS code would be compiled and maintained by the financial institution.[23] We applaud the action by the Bureau to utilize a gross annual revenue test as the definition for a small business which is consistent with Congressional intent but provides a much simpler test for both the financial institution and the business applicant to apply. We ask that the Bureau not impose the onerous obligations to use NAICS codes in the data collection context. Financial Institutions do not know or collect NAICS codes as part of the application process, and we expect that many small business applicants will not know it either.

The Bureau seeks comment on whether to require delivery of the 6-digit NAICS code with a safe harbor for errors so long as the first two digits are correct, or whether to require delivery of only the first three digits of the NAICS code with no safe harbor. We say neither. The Rule should be clear that there is no requirement upon financial institutions to guess at the applicant's NAICS code. At most, financial institutions should be entitled to rely upon, without verification, the applicant's statement of its NAICS code or to indicate that no NAICS code was provided.

### n. Minority- and women-owned business status questions

The Bureau seeks comment regarding whether applicants for credit are likely to "have difficulty understanding and determining the information they are being asked to provide" regarding minority- and women-owned status. In the context of business credit, asking questions regarding the ethnicity or gender of business owners is completely contrary to the expectations of financial institutions and borrowers alike. It is likely that applicants will be perplexed why such inquiries are being made and they will generally decline to respond. Despite the efforts of the Bureau to create a sample data collection form in the Rule that provides context for these intrusive requests, financial institutions remain concerned that §1071 inquiries will harm relationships between financial institutions and their customers. A government database could alleviate these concerns.

---

[23] Once again, a government database would alleviate the concerns expressed in this paragraph.

Regarding the sample data collection form proposed in the Rule, the Bureau should make revisions to better align the form with the statute and Rule. This form should include as its first point a statement that no applicant for credit is required to provide responses to questions posed. Secondly, the form should ask whether the applicant is a small business based on the gross annual revenue threshold for the applicants and its affiliates. Only if the applicant chooses to complete the form and qualifies as a small business should the form invite the applicant to complete the form.

### o. Collecting sex data

The Bureau is proposing expanding the scope of its collection of sex data for §1071 purposes. AFSA urges the Bureau to take a measured approach when it comes to inserting highly personal questions into business lending processes. Inviting a person to reveal personal, intimate details in the context of a business transaction presents a huge paradigm shift for financial institutions and customers alike, and AFSA urges the Bureau to delay including queries regarding highly personal information until stakeholders have an opportunity to understand the purpose of these questions in connection with business lending.[24]

### p. Collecting ethnicity and race by observation

The Rule proposes that in the event an applicant declines to provide ethnicity and race information and the financial institution meets in person (or virtually in a manner that shares video) with one or more of the applicant's principal owners, the financial institution is obligated to report ethnicity and race information based on visual observation or surname. While similar obligations to visually observe race and ethnicity have been present in the mortgage industry for some time, the implementation of a similar requirement for small business credit is very concerning.

Under the scheme created by Congress, while financial institutions are required to make certain inquiries of small business lending applicants, those applicants have an absolute right to decline to answer those questions. The Rule's proposal to require collection by observation effectively requires a financial institution to disregard and overrule the applicant who chooses, for whatever reason, not to provide §1071 data. Forcing financial institutions to circumvent the will of the customer who chooses not to provide such data is inappropriate and contrary to the customer's statutory rights, regardless of whether similar obligations apply in other contexts where there is no express provision giving applicants the right to refuse to provide the requested data.

### q. Verification of §1071 data

The Rule proposes that financial institutions are able to rely on statements by the applicant regarding responses to §1071 queries. AFSA commends the Bureau for taking this approach. AFSA agrees that requiring verification of §1071 data is very burdensome and provides no business benefit, as §1071 is not used for underwriting purposes. The Bureau also seeks comment regarding whether financial institutions should be required to indicate whether particular data points have been verified. As neither the statute nor the Rule require financial institutions to perform verification of §1071 data received from applicants for credit, the Bureau should not obligate financial institutions to indicate whether data has been verified. As stated above in Section V. of this letter, AFSA asks the Bureau to distinguish between expectations for treatment of data collected in connection with the Rule and data collected for underwriting or other business purposes.

---

[24] Again, the government database wherein the government and not the financial institution is collecting this sensitive data would alleviate these concerns.

AdminRecord-018131

### r. Reporting by multiple financial institutions

The Bureau seeks comment on whether, in the event an application for credit is withdrawn or denied by a given financial institution, the financial institution can determine if another financial institution made the transaction. AFSA members have no ability to determine credit extended by other financial institutions. In the Rule, the Bureau speculated that:

> …if an applicant applies to Financial Institutions A and B, and then withdraws an application with Financial Institution A, then Financial Institution A should be able to ascertain whether the applicant obtained credit from Financial Institution B.[25]

Financial institutions are not privy to data about credit extensions made by competitors and are prohibited under existing law from sharing nonpublic personally identifiable information (including the existence of an account) with other financial institutions absent an exception.[26] This is further compounded in indirect financing transactions in which the original creditor often offers the completed retail contract to multiple financial institutions. Each of those financial institutions would be required to compile, maintain, and submit the data required by the rulemaking. Only one of the financial institutions will ultimately purchase the retail contract, but all of them to whom it is sent will be subject to the obligations of the proposed rule.

### s. Use of third parties to create and submit the annual loan/application register

The Bureau seeks comment on whether third parties such as financial software vendors should be allowed to submit a small business lending application register on behalf of a covered financial institution. AFSA members rely on third party vendors for many important business processes, and the contributions of such companies to support financial institution innovation is important. Third party vendors should be encouraged to develop solutions to assist financial institution clients meet §1071 obligations.

### t. Effective and compliance dates

The Bureau seeks comment on proposed timing for the Rule to go into effect and for financial institutions to come into compliance with the Rule. As the Bureau observed, this Rule imposes obligations on financial institutions who have not previously had Federal data reporting obligations. Also, the Rule requires development of processes, staff training, system development, and comprehensive end-to-end testing in order to operate an effective and reliable §1071 system. Monitoring will be required. In addition, there are several open issues of scope and coverage that are unresolved, such as the involvement of dealers that are exempt from Bureau rulemaking and for whom there is currently no other mechanism to compel participation in §1071 processes.

With these considerations in mind, AFSA strongly urges the Bureau afford more time for implementation than the 18 months proposed. AFSA supported the agency's prior SBREFA proposal of at least two years after the publication of an eventual final rule. The additional discretionary data points and visual observation requirements introduced for the first time in this proposed Rule certainly warrant additional time beyond the two-year minimum. AFSA requests that the Bureau provide a compliance date that is January 1 of the first calendar year that begins two years after the effective date of the Rule. This would allow time for implementation work by financial institutions and allow them time to track originations of covered transactions and small business status

---

[25] 86 Fed. Reg. 56495.
[26] On the other hand, were the Bureau to sponsor and maintain the database AFSA proposes, the Bureau could observe when different financial institutions report applications for or extensions of credit by small businesses.

AdminRecord-018132

of applicants. Most importantly, providing adequate implementation time will allow financial institutions the opportunity to make the changes necessary to achieve the statutory purpose and Bureau's goals for §1071 data collection and reporting.

### u.  Privacy concerns relating to publishing §1071 data

The Rule details the Bureau's plans to make public disclosure of §1071 data collected by financial institutions. AFSA commends the Bureau for identifying the privacy concerns of financial institutions and business customers that are raised by the planned disclosure. AFSA agrees that disclosure of §1071 data may reveal the identity of small businesses and their principal owners, the business strategies of financial institutions, and confidential and secret details of pricing and credit terms relating to actual transactions. In its efforts to create data that supports the goals of §1071 reporting, the Bureau must consider how to protect privacy for small businesses as well as financial institutions' proprietary business strategy, pricing, and risk decisions. Failing to do so will result in leaked trade secrets and confidential information that is harmful to financial institutions and their customers.

Many financial institutions that will be covered by the Rule do not currently participate in another federal data collection program. These financial institutions are concerned with how §1071 data will be safeguarded by the Bureau. AFSA asks the Bureau to explain how it will maintain the confidentiality of §1071 information it receives from financial institutions, especially when external parties request §1071 data through Freedom of Information Act (FOIA) requests, discovery demands in litigation, or through other means. For example, once the Rule is effective, the Bureau will have significant amounts of data regarding individual credit transactions, financial institutions, and their customers, including personal demographic information about small business owners. AFSA members would like to understand how the Bureau will respond to FOIA requests or other demands for information in the Bureau's possession (including information that the Bureau does not plan to publish) regarding financial institutions and/or small business credit applicants.

### v.  Claimed benefits of disclosure of §1071 data

The Rule articulates several potential benefits to users of §1071 data, including facilitating the enforcement of fair lending laws and identifying business and community development needs and opportunities of certain small businesses. While financial institutions fully support the enforcement of fair lending laws and strive to work transparently with governmental regulators, the Rule places too much emphasis on usage of §1071 data by non-governmental entities such as "researchers, economists, industry, and community groups."

The Rule compels financial institutions to ask invasive questions of business customers, and to report proprietary information about private credit transactions in order to create a data source for a wide range of parties. While AFSA understands the legal basis of §1071 and the Bureau's obligation under the statute to create a rule implementing the statute, the current proposal will empower observers to draw critical conclusions about small business lending based on incomplete and misleading data.

One comment from the Rule is particularly illustrative of this point. The Rule states:

AdminRecord-018133

One commenter expressed the view that robust data collection would allow the public to gain a much greater understanding of gaps in lending to borrowers in the marketplace, and easily identify unmet borrowing needs.[27]

While financial institutions understand enforcement of consumer financial protection laws from government agencies tasked with their enforcement, the Rule's emphasis of the benefits to non-governmental organizations suggests that those parties intend to engage in enforcement of fair lending laws themselves, with support by the Bureau as the source of data. This outcome would be very problematic for financial institutions and their customers.

As stated above, business credit markets have evolved over time to offer a wide range of flexible terms in different business segments, for different types of credit, with different collateral, to customers with different levels of credit worthiness, leading to varying pricing terms. Supervision and enforcement by professional governmental agencies, tasked with authority under applicable statutes, is capable of providing appropriate governance to covered institutions. AFSA asks the Bureau to consider the harms to industry and customers of providing data to the general public without context that allows the data to be understood.

### w.  Privacy enhancing tools and techniques

AFSA commends the Bureau for its detailed consideration of tools and techniques it can use to obfuscate certain published §1071 data in order to protect the privacy of borrowers and financial institutions. AFSA urges the Bureau to use such opportunities liberally in order to protect the privacy interests of market participants. AFSA also asks the Bureau to continue frequent consultation with financial institutions as it designs and implements §1071 practices to gather industry perspectives.

### x.  Amount of pricing information collected

AFSA commends the Bureau for its efforts to balance the goals of §1071 with privacy interests of market participants, while recognizing that publication of §1071 will inevitably create misinterpretations of disparities in business finance. The burden of these misinterpretations will fall on financial institutions, who will be wasting resources fighting false accusations of wrongdoing, and customers, who will face fewer options for credit. That being said, the Rule seeks comment on additional information could help reduce misinterpretations of disparities in pricing. While AFSA agrees that fighting these misinterpretations is of critical importance, the best path is not to add information to this compilation of data. The answer is to constrain parties interpreting the data from making assumptions regarding business lending without consultation with market participants to understand the basis for perceived disparities. AFSA asks the Bureau to refrain from requiring financial institutions to collect and report pricing data, but, if the Bureau requires the pricing data, then AFSA members ask that the pricing data be limited to the interest rate and origination fees that are required to be paid at the inception of the financing facility.

### y.  Benefits of presenting pricing information in bins

The Rule asks for comment on modifying pricing data to present data into bins rather than presenting actual values. AFSA agrees that presenting pricing information in bins rather than presenting actual figures will help

---

[27] 86 Fed. Reg. 56515.

AdminRecord-018134

protect the proprietary interests of market participants without harming the value of the data in promoting the goals of §1071.

### z.  Census tract disclosure

The Rule proposes disclosing census tract data attributable to borrowers as part of the §1071 data. While census tract is a data element included in §1071, AFSA urges the Bureau to consider using a different geographic designation that financial institutions already have. As AFSA previously commented, AFSA members do not collect or report the census tract in which the principal place of business of the applicant is located, though they do receive the applicant's address in the credit application. Translating the address to the applicable census tract will be an additional burden on financial institutions with no clear benefit. Given the greater granularity of census tract data compared to other available geographic designations, revealing census tract data of borrowers, along with the other proposed data, raises risks that borrowers will be identified by observers of §1071 data. This outcome is an undesirable side effect of §1071 data publication. In order to prevent this, AFSA supports the Bureau's suggestion that it report geographic data by disclosing at the state level only.

### aa. Gross annual revenue disclosure

The Bureau seeks comment regarding whether it would be advisable to report gross annual revenue data in bins rather than actual amounts. AFSA supports publication of gross annual revenue in bins in order to protect the privacy of market participants.

### bb. NAICS code disclosure

The Bureau seeks comment regarding whether it would be advisable to report the full NAICS code or whether a less specific alternative is preferable. AFSA supports publication of the initial two (2) digits of the NAICS code in order to protect the privacy of market participants.

### cc.  Number of non-owner workers

The Bureau seeks comments regarding plans to disclose the number of non-owner workers employed by small businesses. This information is not particularly useful for drawing conclusions about credit applicants given the difficulties in counting part-time and seasonal employees. Also, the number of employees represents an element of competitive business strategy for credit applicants. AFSA urges the Bureau to refrain from publishing this data. Publication is not necessary to achieve the aims of §1071, and the Bureau should modify the data and publish it in bins rather than directly.

### dd. Time in business disclosure

The Bureau seeks comment regarding plans to disclose the time that small business credit applicants have been in business. AFSA urges the Bureau to refrain from publishing this data, as it is an unnecessary disclosure of applicant's information that may reveal the applicant's identity in conjunction with other data being published. If publication is necessary to achieve the aims of §1071, the Bureau should modify the data and publish it in bins rather than directly.

AdminRecord-018135

### ee. Disclosing responses regarding sex

The Bureau is considering whether to require financial institutions to ask detailed questions regarding the sexual orientation and gender identity of small business owners. As discussed above, this information is outside the scope of lending, and AFSA members are concerned about the privacy implications of such inquiries. When it comes to making public disclosures regarding this information, AFSA asks the Bureau to reconsider and not make any public disclosures along these lines. It is not clear that the Bureau has thoroughly weighed the privacy interests of business owners who may be willing to make intimate disclosures to support the aims of §1071, yet are not fully aware that those responses will be publicly available. AFSA therefore asks the Bureau to consult with small business owners regarding this sensitive area prior to finalizing any publication of sex data. AFSA asks the Bureau to refrain from requiring collection and reporting of this data by financial institutions.

### ff.  Financial institution identifying information

The Rule contemplates publishing financial institution identifying information, such as:

> (1) Its name; (2) its headquarters address; (3) the name and business contact information of a person who may be contacted with questions about the financial institution's submission; (4) its Federal prudential regulator, if applicable; (5) its Federal Taxpayer Identification Number; (6) its LEI; (7) its RSSD ID, if applicable; (8) parent entity information, if applicable; (9) the type of financial institution that it is, indicated by selecting the appropriate type or types of institution from the list provided or entering free-form text; and (10) whether the financial institution is voluntarily reporting covered applications for covered credit transactions.[28]

The Bureau plans to publish most of this information, with the exception of personal contact information in (3) above. In assessing risk and benefits of publishing this information, the Bureau has overlooked how this data could be used for social engineering, identity theft and other cyber attacks. Whether or not this information is available elsewhere, publishing this information creates serious risks to financial institutions as bad actors could use this information to launch phishing campaigns by creating communications that appear to come from legitimate sources. While financial institutions have made great efforts to protect themselves from such attacks, the fact remains that making this information readily available increases risk. AFSA asks the Bureau not to publicly disclose these data elements in light of current and future cyber security risks.

As the Bureau designs the format for publication of 1071 data, AFSA asks that the Bureau engage with financial institutions and other stakeholders to incorporate feedback regarding the manner in which 1071 data will be published.

### gg. Privacy considerations for captive wholesale finance

The Bureau seeks comment regarding whether there are instances in which captive wholesale finance companies lend exclusively to businesses that are branded in a manner that can be easily matched to the identity of the financial institutions. AFSA confirms that this is the case, and that segment of financial institutions should receive additional protection from re-identification risks.

---

[28] 86 Fed. Reg. 56538.

AdminRecord-018136

### hh. Disclosing the name and contact information of individuals

The Bureau seeks comment regarding its proposal to refrain from publishing the name and contact information of individuals who can field questions regarding the financial institution's §1071 data. AFSA agrees with the Bureau's proposal not to publish that information.

### ii.  Disclosing free-form data

The Bureau seeks comment regarding its proposal to refrain from publishing free-form §1071 data in light of the enhanced risk to privacy considerations. AFSA agrees that refraining from publishing free-form data is the correct decision.

### jj.  Litigation and reputational risks to covered financial institutions

The Rule makes several references to concerns about increased litigations and reputational risks to covered financial institutions based on the disclosure of §1071 data. AFSA shares these concerns. The publication of this data will lead to scrutiny based on incomplete and misleading data. The data will be incomplete because credit applicants have a statutory right to decline to provide information in response to §1071 inquiries. The data will be misleading because characteristics of different credit types will be widely divergent based on risk and other economic factors.

### kk. Costs to small businesses

The Bureau seeks comment regarding potential costs to small businesses based on the rule. Both small business applicants and small financial institutions will be affected by this Rule.

Starting with the former, small business applicants will face limited direct costs, as the statute specifically authorizes them to decline to answer §1071 inquiries. However, they will very likely face more limited credit availability, as well as an increased cost of credit. AFSA agrees with the Bureau's assessment that the significant compliance costs for covered financial institutions will increase the costs of credit to small business applicants. In some cases, financial institutions may decide to cease offering small business credit in light of the burdensome nature of compliance obligations under the Rule and the burden of managing scrutiny based on misinterpretations of §1071 data.[29] Moreover, depending on how and what data is released to the public, small business applicants could face privacy violations.

Regarding the latter – small financial institutions – they will have increased costs and challenging compliance burdens, as many small financial institutions discussed during the Bureau's SBREFA panel.

### ll.  Benefits to certain financial institutions

The Bureau seeks comment on the Rule's effects on certain financial institutions with $10 billion or less in total assets. AFSA does not believe the Rule provides any significant benefit to any financial institutions, and will likely harm both financial institutions and borrowers. Commercial lending in the United States market has evolved

---

[29] Again, a government sponsored database alleviates many of these concerns.

over time to support a wide range of business financing needs. Commercial lending is a very competitive business, with established financing sources competing with new entrants vying to attract and retain customers. The Rule as currently proposed will take resources and attention away from extending credit to customers and introduce friction to existing processes. The challenges of building §1071 data collection and reporting systems will fall most heavily on small institutions, who have fewer resources than larger finance sources. For these reasons, AFSA asks the Bureau to refrain from requiring financial institutions with less than $10 billion in total assets to collect and report §1071 data.

###### mm.    Compliance costs to small entities

Compliance costs to small entities will be particularly burdensome. The Rule directs covered financial institutions to capture and manage data that is outside the scope of existing business lending practices. While third-party service providers may, in time, offer products or services to help financial institutions manage §1071 compliance obligations, those providers have not yet had time to develop those offerings. AFSA members have had difficulty making compliance cost estimates due to the novel requirements of the Rule and the brief duration of this comment period.

Generally speaking, implementation of the Rule for a covered financial institution will require:

- Redesign of credit application processes to allow for making §1071 data inquiries,
- Creating firewalled systems to take and hold §1071 data,
- Creating mechanisms to capture discretionary §1071 data from existing business systems (*e.g.,* pricing data) and make it available to firewalled systems for §1071 reporting purposes,
- Testing of systems to ensure the accuracy of §1071 data and suitable access controls,
- Training staff on the originations side to understand §1071 data collection requirements,
- Training staff who will work with the §1071 data to properly collect and manage the data,
- Training staff who will compile the §1071 data for submission to the Bureau,
- Training staff to respond to inquiries, investigative demands, and litigation alleging violations of law by the financial institution based on the §1071 data made available to the public, and
- Training staff to respond to media inquiries based on the §1071 data made available to the public.

All financial institutions falling under the Rule will need to develop or purchase systems to perform the tasks contemplated by the Rule. Small entities will need to devote a relatively larger proportion of their resources to develop the processes and systems necessary to collect and report §1071 information when compared to larger companies who likely have more resources at their disposal.

We again note that many of these concerns are removed by the government sponsoring and maintaining a database, and simply requiring financial institutions to report the applicant's unique identifier and such additional data fields as only the financial institution would know based upon its existing application data collection used for decision making.

AdminRecord-018138

### X.    Conclusion

AFSA appreciates the careful consideration that the Bureau has given this rulemaking. We commend the Bureau for attempting to balance the interests of financial institutions, credit applicants, and others while fulfilling the purposes of §1071. There are many instances in which the Rule strikes the right balance, but also several areas where additional attention is required.

This rule will affect small businesses throughout the country, and it is crucial that it improve their credit availability, not limit it. We look forward to continuing to work with the Bureau on this rulemaking. Please contact me by phone, 202-776-7300, or email, cwinslow@afsamail.org, with any questions.

Sincerely,

Celia Winslow
Senior Vice President
American Financial Services Association

AdminRecord-018139

**APPENDICES**

### 1. Indirect Vehicle Financing

Financial institutions purchase completed retail installment sale contracts entered into between retail customers and motor vehicle dealers for the sale and financing of vehicles. When a customer purchases a vehicle from a dealer, the customer and the dealer agree on the purchase price of the vehicle and the purchase of any insurance, service contracts and other products offered by the dealer. If the customer elects to finance the vehicle with the dealer, the dealer is the original creditor and negotiates the terms of the retail contract with the customer.

Each customer that elects to finance the purchase of a vehicle with the dealer completes a credit application. If the dealer is requesting that a financial institution purchase the retail contract, the dealer submits the information from the credit application electronically to the financial institutions it would like to consider purchasing the retail contract. When a dealer completes a retail contract with a customer, the dealer often does not know which financial institution will purchase it, so the dealer offers it to multiple finance sources which may range from a few to upwards of ten or more. Only one of the financial institutions will ultimately purchase the retail contract, but all of them to whom it is sent by the dealer will have evaluated it for purchase.

The information from the credit application is typically sent to financial institutions through online systems, together with information about the terms of the retail contract. It is important to note that it is not the credit application itself completed by the customer that is submitted, but information from the credit application that the dealer provides to the financial institutions. This information may be submitted by the dealer while completing the retail contract with the customer or it may be submitted after the retail contract has already been completed and the customer has the vehicle.

After the information is obtained, the financial institutions evaluate it to determine whether to purchase the retail contract from the dealer. The decision process is based on an evaluation of the customer, the credit application information, the proposed terms of the retail contract, the credit bureau information, and other information. The evaluation emphasizes the customer's ability to pay and creditworthiness, focusing on payment, affordability, credit history and stability as key considerations. The creditworthiness of any co-buyer or guarantor is evaluated in a similar manner to the customer and is also considered when determining whether to approve the purchase of the retail contract.

If the purchase of the retail contract is approved by the financial institution, the dealers must submit the completed retail contract, signed by both the customer as the buyer and the dealer as the seller/creditor. After the dealer submits a completed retail contract, the financial institution confirms that the terms of the retail contract are consistent with what was approved and checks for errors apparent in the disclosures made by the dealer.

All contracts purchased are entered into the financial institution's originations and receivables systems and assigned a unique account number for their duration.

AdminRecord-018140

## 2. Data Elements Typically Collected in Indirect Vehicle Finance Transactions

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|---|---|---|---|---|
| Unique Identifier | A code identifying the application or extension of credit. | Yes. | Yes. | AFSA members generally do assign application or loan numbers to new credit applications, but not necessarily to credit line increases.<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Application date | The date the application was received or the date on the paper/electronic application form. | Yes. | Yes. | We appreciate the Bureau's proposal of a grace period to reduce the compliance burden of pinpointing an exact date on which an application was received.<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Application method | The means by which the applicant submitted the covered application directly or indirectly to the creditor. | Yes. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Application recipient | Whether the applicant submitted the covered application directly to the financial institution or its affiliate, or whether the applicant submitted the covered application indirectly to the financial institution via a third party. | Yes. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Credit product | The credit product. | Yes. | Yes. | AFSA appreciates the inclusion of the categories, "other," "unknown," and "other/unknown" to facilitate compliance.<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |

---

[30] For vehicle finance, "existing data flows" refers to data transmitted between dealer and finance company via RouteOne, DealerTrack, or similar platforms.

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|---|---|---|---|---|
| Guarantees | The type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction were originated. | No. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Loan term | The length of the loan in months, if applicable. | Yes. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Credit purpose | The purpose or purposes of the credit applied for or originated. | Yes. | Sometimes. | We appreciate the flexibility of being able to select "other" and "unknown or unreported by the applicant." FIs receive limited information on the type and purpose of financing from the applicant. For example, indirect automotive finance companies know from the credit offering whether an applicant is seeking to finance a purchase or a lease and for what vehicle, but not necessarily much else. For other credit products—revolving credit lines, for example—there is no specific purpose. Different FIs collect different information about the "purpose" of the credit. Some FIs may only ask the applicant to designate whether the credit requested is for "personal, family, or household use" or "business, commercial, or agricultural use." The purpose is a factor in determining whether the applicant is eligible for special programs of the FI and determines the scoring model that is used for the applicant. In some cases, the "purpose" is a field on the credit application and/or the contract but may not be tracked as a unique field in the FI's system of record.<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Amount applied for | The initial amount of credit or the initial credit limit requested by the applicant. | Yes. | Sometimes. | As the CFPB recognizes, applicants do not always request a particular amount. Thus, the ability to report "not applicable" is necessary.<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|-------|-------------|---------------------------------------------|-----------------------------------------------|----------|
| Amount approved or originated | (i) For an application for a closed-end credit transaction that is approved but not accepted, the amount approved by the financial institution; or (ii) For a closed-end credit transaction that is originated, the amount of credit originated; or (iii) For an application for an open-end credit transaction that is originated or approved but not accepted, the amount of the credit limit approved. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Generally. | In light of the potential meaning of the statutory language, it is appropriate that the CFPB is considering proposing different standards for closed-end and open-end products. FIs maintain information on whether the financing was approved or denied; whether a counter offer was extended (*e.g.,* the applicant wanted to put 10% down and the FI required 25%; or the applicant wanted a term of 3 years, but the FI countered with 5 years; or the applicant requested $10,000 but the FI offered only $7,500); or whether the application was incomplete (either the application was incomplete or the finance company asked for more information and has not received it).<br><br>*Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Action taken | The action taken by the financial institution on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Action taken date | The date of the action taken by the financial institution. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |

AdminRecord-018143

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|-------|-------------|-----------------------------------------------|-------------------------------------------------|----------|
| Denial reasons | For denied applications, the principal reason or reasons the financial institution denied the covered application. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Pricing information: Interest rate | The following information regarding the pricing of a covered credit transaction that is originated or approved but not accepted, as applicable: (i) Interest rate. (A) If the interest rate is fixed, the interest rate that is or would be applicable to the covered credit transaction; or (B) If the interest rate is adjustable, the margin, index value, and index name that is or would be applicable to the covered credit transaction at origination. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Pricing Information: Total origination charges | The total amount of all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars. | Not part of application data collected by the dealer, but may be included by the finance source as part of the credit application decision response data. | Yes. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |

AdminRecord-018144

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|---|---|---|---|---|
| Pricing Information: Broker fees | The total amount of all charges included in paragraph (a)(12)(ii) of this section that are fees paid by the applicant directly to a broker or to the financial institution for delivery to a broker, expressed in dollars. | No. | When applicable. | *n/a to indirect vehicle transactions* |
| Pricing information: total annual charges | The total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction, expressed in dollars. | No. | When applicable. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Pricing information: Additional cost for merchant cash advances or other sales-based financing | For a merchant cash advance or other sales-based financing transaction, the difference between the amount advanced and the amount to be repaid, expressed in dollars. | N/A | When applicable. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |
| Pricing information: prepayment penalties | Whether the financial institution could have included a charge for paying all or part of the transaction's principal before the date on which the principal is due; and whether the terms of the covered credit transaction do in fact include a charge imposed for paying all or part of the transaction's principal before the date on which the principal is due. | No. | When applicable. | *Financial institutions will have this without needing the Federal Reserve to issue a §1071 rule.* |

AdminRecord-018145

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|---|---|---|---|---|
| Census tract | The census tract in which is located: (i) The address or location where the proceeds of the credit applied for or originated will be or would have been principally applied; or (ii) If the information in (i) above is unknown, the address or location of the main office or headquarters of the applicant; or (iii) If the information in both paragraphs (i) and (ii) is unknown, another address or location associated with the applicant. (iv) The financial institution shall also indicate which one of the three types of addresses or locations the census tract is based on. | No. | No. | AFSA members do not collect or report the census tract in which the principal place of business of the applicant is located, though they do receive the applicant's address in the credit application.<br><br>*Financial institutions do not typically use census tract data for business purposes. Technical and process changes will be necessary to deliver this data.* |
| Gross Annual Revenue | The gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected. | No. | Sometimes. | AFSA members may or may not collect the gross annual revenue of the business in the last fiscal year. In particular for smaller, asset-backed loans, FIs (e.g. floorplan lenders) do not generally collect this information. FIs may just ask for net income, depending on the type of account or creditor. It should also be clear that applicants have no obligation to provide this information.<br><br>*Financial institutions do not all use gross annual revenue as a data point for business purposes. For those who do not, technical and process changes will be necessary to deliver this data.* |

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|---|---|---|---|---|
| NAICS Code | A 6-digit North American Industry Classification System (NAICS) code appropriate for the applicant. | No. | No. | Financial institutions do not collect this information. To do so would be overly burdensome for applicants and very difficult to administer for financial institutions. Applicants would need to be aware of and understand the NAICS regulations. The Table of Small Business Size Standards (the "NAICS Size Standards") is almost 50 pages long and includes hundreds of categories with varying thresholds for determining if an entity is a small business. If an entity has not had reason to review the NAICS Size Standards (e.g., the entity does not bid for government contracts or receive certain government loans), trying to learn and understand them would be a daunting task.<br><br>*Financial institutions do not typically use NAICS Codes for business purposes. In the event an applicant declines to provide its NAICS Code, the financial institution cannot determine it independently. Technical and process changes will be necessary to deliver this data.* |
| Number of workers | The number of non-owners working for the applicant. | No. | No. | FIs do not always collect this information and it is unclear if an applicant would be able to provide it at the time of application. For example, would part-time employees count? What if it's a family business and sometimes one of the children of the owner helps out during the summer?<br><br>*Financial institutions do not typically use number of workers for business purposes. Technical and process changes will be necessary to deliver this data.* |
| Time in business | The time the applicant has been in business, described in whole years, as relied on or collected by the financial institution. | No. | Sometimes. | FIs do not always collect this information.<br><br>*Some financial institutions use time in business for business purposes. For those who do not, technical and business process changes will be necessary to collect this data.* |

AdminRecord-018147

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|-------|-------------|-----------------------------|-----------------------------|----------|
| Minority-owned business status | Whether the applicant is a minority-owned business. | No. | No. | AFSA members do not currently gather or report this information, except the few who do so for HMDA purposes. We agree with the Bureau's proposal that the collection and reporting of women-owned and minority-owned business status be based solely on applicant self-reporting. It should also be clear that applicants have no obligation to provide this information. *Financial institutions cannot collect this information in indirect vehicle finance transactions, as dealers are prohibited under ECOA from asking about race, color, religion, national origin or sex. A §1071 rule by the Federal Reserve will be necessary for dealers to collect this information.* |
| Women-owned business status | Whether the applicant is a women-owned business. . | No. | No. | AFSA members do not currently gather or report this information, except the few who do so for HMDA purposes. We agree with the Bureau's proposal that the collection and reporting of women-owned and minority-owned business status be based solely on applicant self-reporting. It should also be clear that applicants have no obligation to provide this information. *Financial institutions cannot collect this information in indirect vehicle finance transactions, as dealers are prohibited under ECOA from asking about race, color, religion, national origin or sex. A §1071 rule by the Federal Reserve will be necessary for dealers to collect this information.* |

AdminRecord-018148

| Field | Description | Is this data present in existing flows?[30] | Can a financial institution provide this data? | Comments |
|-------|-------------|------------------------------|------------------------------------------------|----------|
| Ethnicity, race, and sex of principal owners | The ethnicity, race, and sex of the applicant's principal owners. The data compiled for purposes of this paragraph shall also include whether ethnicity and race are being reported based on visual observation or surname. | No. | No. | AFSA members do not currently gather or report this information, except the few who do so for HMDA purposes. We agree with the Bureau's proposal that the collection and reporting of women-owned and minority-owned business status be based solely on applicant self-reporting. It should also be clear that applicants have no obligation to provide this information.<br><br>*Financial institutions cannot collect this information in indirect vehicle finance transactions, as dealers are prohibited under ECOA from asking about race, color, religion, national origin or sex. A §1071 rule by the Federal Reserve will be necessary for dealers to collect this information.* |
| Number of principal owners | The number of the applicant's principal owners. | No. | Yes. | *Financial institutions do not typically use number of principal owners for business purposes. Technical and process changes will be necessary to deliver this data.* |

AdminRecord-018149



January 6, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re: <u>Notice of Proposed Rulemaking on Small Business Lending Data Collection, Docket
No. CFPB-2021-0015; RIN 3170-AA09</u>

Dear Director Chopra:

The Office of Advocacy of the U.S. Small Business Administration (Advocacy) submits
this letter in response to the Bureau of Consumer Financial Protection's (CFPB) notice of
proposed rulemaking (NPRM) on small business lending data collection. The proposed
rulemaking would implement section 1071 of the Dodd-Frank Act.

Advocacy recognizes the importance of the goals of Section 1071.  If implemented
properly, the information could provide valuable insight into lending practices and
possibly fill gaps in data describing lending for small, minority or women owned
businesses.  It may also facilitate enforcement of fair lending laws and enable
communities, governmental entities, and creditors to identify business and community
development needs and opportunities of women-owned, minority-owned, and small
businesses.[1] However, Advocacy is concerned that the CFPB's approach may be
unnecessarily burdensome to small entities, may impact the cost of credit for small
businesses and may lead to a decrease in lending to small, minority- and women-owned
businesses.  Advocacy is also concerned that the manner in which the statute is being
implemented may lead to false assumptions and produce skewed results.  In particular,
Advocacy is primarily concerned about the definition of small business, the scope of
coverage, the discretionary data points, the visual identification requirement, the
implementation date, and the cost of credit for small businesses.

---

[1] 15 USC 1691 c-2.

409 3rd Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



**Extension Request**

On November 23, 2021, the Office of Advocacy submitted a request for extension of the comment period for this rulemaking. As noted in the letter, the proposed rule is over 900 pages and seeks important information about the potential costs of the proposal. The small entities that will be required to comply with the regulation are in the best position to provide the CFPB with information about the potential costs associated with the proposal, but the amount of time provided for the comments is insufficient. This information is crucial for determining the economic impact of the rule and for considering less costly alternatives as required by the Regulatory Flexibility Act (RFA). Advocacy reiterates the need for an extension of the comment period for this rulemaking and reserves the right to submit supplemental comments.

<u>Advocacy Background</u>

Advocacy was established pursuant to Pub. L. 94-305 to represent the views of small entities before federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, federal agencies are required by the RFA to assess the impact of the proposed rule on small business and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[4] The agency must include, in any explanation or discussion accompanying the final rule's publication in the Federal Register, the agency's response to written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.[5]

**Section 1071**

In 2010, Congress passed the Dodd-Frank Act. Section 1071 of that Act amended the Equal Credit Opportunity Act (ECOA) to require that financial institutions collect and report to the CFPB certain data regarding applications for credit by women-owned, minority-owned, and small businesses. Section 1071's statutory purposes are to (1) facilitate enforcement of fair lending laws, and (2) enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. Section 1071 specifies a number of data points that financial institutions are required to collect and

---

[2] 5 U.S.C. § 601 et seq.
[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. § 601 et seq.).
[4] Small Business Jobs Act of 2010 (PL 111-240) § 1601.
[5] <u>Id.</u>

Office of Advocacy                                                                                     Page 3

report, and also provides authority for the CFPB to require any additional data that the CFPB determines would aid in fulfilling section 1071's statutory purposes. Section 1071 also contains a number of other requirements, including those that address restricting the access of underwriters and other persons to certain 1071 data, recordkeeping, publication of 1071 data, and modifications or deletions of data prior to publication in order to advance a privacy interest.

Section 1071 directs the CFPB to prescribe such rules and issue such guidance as may be necessary to carry out, enforce, and compile data pursuant to section 1071, and permits the CFPB to adopt exceptions to any requirement or to exempt financial institutions from the requirements of section 1071 as the CFPB deems necessary or appropriate to carry out the purposes of section 1071. The CFPB is proposing to add a new subpart B to Regulation B to implement the requirements of section 1071.3. Key aspects of the CFPB's proposal are summarized below. If finalized, the CFPB's proposed rule would create the first comprehensive database of small business credit applications in the United States. This would include critical information about women-owned and minority-owned small businesses to help regulators and the public identify and address fair lending concerns. The database would also enable a range of stakeholders to better identify business and community development needs and opportunities for small businesses, including women-owned and minority-owned small businesses.

**The Small Business Regulatory Enforcement Fairness Act**

Section 609 of the RFA requires the CFPB to conduct special outreach efforts to ensure that small entity views are carefully considered prior to the issuance of a proposed rule, if the rule is expected to have a significant economic impact on a substantial number of small entities.[6] The Bureau convened a SBREFA panel on small business lending data on October 15, 2020 and conducted a virtual outreach meeting with small entity representatives ("SERs") on October 19-22, 2020.  In advance of the panel outreach meeting, the CFPB, Advocacy, and OIRA held a series of telephone conferences with the SERs to describe the small business review process, obtain important background information about each SER's current business practices, and discuss selected portions of the proposals under consideration.  The panel issued its report on December 14, 2020.[7]

---

[6] Section 609 small business advocacy review panels consist of representatives from the rulemaking agency, the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA), and the Chief Counsel for Advocacy. The panel solicits information and advice from small entity representatives (SERs), who are individuals who represent small entities affected by the proposal. SERs help the panel better understand the ramifications of the proposed rule. The product of a SBREFA panel's work is its panel report and recommendations on the regulatory proposal under review.

[7] *The Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking* (hereinafter "Panel Report"), December 14, 2020.

AdminRecord-018387

**The Proposed Rule**

On October 8, 2021, the CFPB published a notice of proposed rulemaking in the <u>Federal Register</u> entitled *Small Business Lending Data Collection under the Equal Credit Opportunity Act.*[8]  The CFPB is proposing to require financial institutions to collect and report Sec. 1071 data regarding applications for credit for small businesses, including those that are owned by women and minorities. The CFPB is not proposing to require that financial institutions collect and report data regarding applications for women-owned and minority-owned businesses that are not small.

Advocacy is primarily concerned about the costs associated with the proposed rule, the definition of small business, the scope of coverage, the discretionary data points, the visual identification requirement, the implementation date, and the cost of credit for small businesses.

The CFPB prepared an initial regulatory flexibility analysis (IRFA) for the proposed rule. The IRFA provides information about the potential economic impact of the proposed rule and considers alternatives that would minimize that impact.  Advocacy asserts that the economic impact may be underestimated, the rule may be unnecessarily burdensome for small entities, and there may be less costly alternatives.

**The CFPB Underestimated the Costs of the Proposed Rule**

In the IRFA, the CFPB estimates that the overall market impact of one-time costs is between $143 million and $153 million for small depository institutions and $63 million for small non-depository institutions.  The overall market impact of ongoing costs will be between $112 million and $126 million per year for small institutions.

Advocacy asserts that the CFPB may have underestimated the costs of the NPRM. Indeed, the CFPB acknowledges that several SBREFA panel SERs considered its estimate of training costs, for example, to be too low.[9] Given that compliance potentially involves new software, new forms and applications, and new policies and procedures, one-time training hours could be underestimated in Tables 10-12.  Moreover, it is not clear in the analysis who is providing training or how it would be conducted (one-on-one, group, or prerecorded). CFPB should include any cost to provide training either internally or through a vendor.

Furthermore, stakeholders have indicated that other estimated compliance costs are too low.[10] An accurate estimation of the costs associated with the proposed rule is crucial in determining less costly alternatives.  Advocacy encourages the CFPB to give full consideration to the cost information that is already in the record and any cost

---

[8] 86 FR 56356.
[9] 86 FR at 56560.
[10] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the NPRM.

information that may be submitted and to analyze more fully the financial burden of this rulemaking on small entities.

**Scope of Coverage**

The CFPB is proposing to apply the Section 1071 requirements to "covered financial institutions." A "financial institution" would be any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. If a financial institution originated at least 25 credit transactions that would be "covered credit transactions" to "small businesses" in each of the two preceding calendar years, the financial institution would fall within the scope of the proposed rule.[11]

Stakeholders have indicated that the 25 originations threshold is too low, and that sufficient data to satisfy the requirements of the statute can be obtained at a higher threshold. CPFB states in the NPRM that setting a reporting threshold above 25 originations "would result in the elimination of data that are important in fulfilling the purposes of section 1071."[12] However, the CFPB has not analyzed the data fully to determine if a higher threshold would garner an appropriate amount of information. Table 18 shows the number of covered small depository institutions for several possible thresholds.[13] However, this table is incomplete. It may be more meaningful if the CFPB included some estimates of how much data would be foregone (or how much the scope of data would be limited) at each of the origination thresholds.

Moreover, although the CFPB describes an alternative 100-origination threshold, the CFPB could consider other alternatives by supplementing its analysis with an analysis of a 50-origination threshold alternative, a 200-threshold analysis, and a 500 originations analysis. In each case, CFPB should estimate how significant the compliance costs would be for institutions operating at each originations level. Such information would assist in determining a threshold that produces a meaningful amount of data while limiting the burden on small entities.

**Definition of Small Business**

The CFPB is proposing that covered financial institutions collect and report data regarding covered applications from small businesses. The CFPB is proposing to define "small business" by reference to the definitions of "business concern" and "small business concern" as set out in the Small Business Act and Small Business Administration (SBA) regulations. However, in lieu of using the SBA's size standards for defining a small business concern, the CFPB's proposed definition would look to whether the business had $5 million or less in gross annual revenue for its preceding fiscal year.

---

[11] 86 FR at 56573.
[12] Id.
[13] 86 FR at 56574.

AdminRecord-018389

Advocacy has held several roundtables on the topic of 1071 and submitted a comment letter on the CFPB's request for information on section 1071 on September 17, 2017. At that time, Advocacy encouraged the CFPB to perform outreach with small entities and to work with Advocacy and SBA's Office of Size Standards to develop a workable solution.

Moreover, the SBREFA panel SERs generally preferred a simple small business definition and expressed concern that the SBA's approach to defining a small business, which bases classification on an applicant's 6-digit NAICS code, is relatively complex.[14] The Panel recommended that the Bureau seek to adopt a definition of "small business" for Section 1071 purposes that is easy for small business applicants to understand and straightforward for financial institutions to implement, while still collecting comprehensive data regarding lending to small businesses.[15]

Advocacy commends the CFPB for proposing an alternative size standard. At $5 million, approximately 97 percent of small businesses will be covered. However, some stakeholders have indicated that the $5 million definition for a small business may be burdensome for small financial institutions to implement to the extent that some small financial institutions may forgo making business loans. Advocacy encourages the CFPB to analyze other possible definitions to determine if there is a lower amount that will garner a sufficient amount of data without creating a situation where smaller banks may decide to discontinue business loans.

**Data Points**

Pursuant to the Section 1071, a covered financial institution would be required to collect and report certain data regarding covered applications from small businesses. Certain data points such as race, ethnicity, sex, business size, application number, application date, amount applied for, amount approved, loan type, loan purpose, annual gross revenue, census tract, and action taken are required by the Dodd Frank Act. Section 1071 also allows for discretionary data points which are determined by the CFPB.

**Visual Identification**

Section 1071 of the Dodd-Frank Act provides that financial institutions must inquire about whether a business is women-owned, minority-owned or a small business. It further states that an applicant may refuse to provide the information to the financial institution. The NPRM provides that the applicants do not have to provide the information. However, if the applicant does not provide the information, the financial institution must provide it based on visual observation or surname. [16]

---

[14] Panel Report, page 20.
[15] Panel Report, page 47.
[16] 86 FR at 56582.

AdminRecord-018390

During the SBREFA panel, the SERs expressed apprehension about visual observation. The SERs supported applicants' self-reporting of principal owners' race, sex, and ethnicity and strongly preferred that financial institutions not be required to report based on visual observation or surname analysis. Some SERs stated that visual observation is both extremely difficult and ineffective, and that collecting demographic information based on visual observation would make staff uncomfortable. Moreover, the financial institution does not always meet with all principal owners of a business in person and financial institutions occasionally meet with a manager or officer who might not be a principal owner.[17] In such a situation, the visual observation is pointless.

Requiring a loan officer to provide information based on visual observation or surname is problematic. The data collected in this way could be corrupted by bias, whether deliberate or not, or other forms of discrimination, which is in direct opposition to the intent of Section 1071. It is doubtful that this problem can be overcome even with specific sensitivity training – an added cost – and good motive. As it goes against the intent of Dodd-Frank to obtain valid information and even well trained and well-motivated financial institutions could make wrong assumptions and taint the quality of the data, Advocacy recommends that this requirement be deleted.

**Discretionary Data Points**

Section 1071 requires financial institutions to collect and report any additional data that the CFPB determines would aid in fulfilling the purposes of section 1071 such as discretionary data points. The CFPB is proposing several additional data points that rely solely on this authority. Specifically, the CFPB is proposing that financial institutions collect and report data on application channel, application recipient, denial reasons (for denied applications only), pricing information (for applications that are originated or approved but not accepted), NAICS code, number of workers, time in business, and number of principal owners.[18]

The SERs provided detailed feedback on the topic of the costs of discretionary data points. For example, one SER stated that the cost of collecting and reporting the discretionary data points under consideration would be significant, and another SER stated that the CFPB should include as few data points as possible to avoid unnecessary costs.[19]

Several SERs were concerned about the CFPB potentially making public the pricing data it receives and felt that this choice could be costly and challenging to carry out. They were concerned that bad outcomes could result from possible unjustified fair lending concerns, such as distortions to the market through interference with risk-based pricing. Many SERs remarked that pricing is complex and often unique to the applicant's situation, and may involve extra services bundled with the loan, and without adequate context pricing data could lead to inaccurate interpretations and reputational damage to

---

[17] Panel Report, page 33.
[18] 86 FR at 56563.
[19] Panel Report, page 35.

AdminRecord-018391

financial institutions.  Another SER said that pricing for some products may reflect more than just the cost of the loan and may be high relative to other credit products if the covered financial institution is a supportive lender working with less established or higher credit risk applicants over a period of time. Some SERs also expressed privacy-related concerns regarding public disclosure of pricing information.[20]

Stakeholders are also concerned that the discretionary data points will be costly, particularly the pricing data point, because it can lead to invalid assumptions that may damage the reputation of the institution.  Although the CFPB asserts that not collecting pricing information would obscure possible fair lending risk by covered financial institutions,[21] the price may have nothing to do with the race or sex of the applicant.  It may be based on other risk factors such as credit score, time in business, or other factor that may make the applicant a higher risk applicant.  Assuming that it is due to a fair lending violation could harm the institution's reputation and business.

There is also a concern that the discretionary data points may interfere with an applicant's privacy.  The discretionary data points could be reverse engineered to determine what business was denied credit.  This may be especially true in small communities.

Advocacy encourages the CFPB to disregard the discretionary data points. They are not required by the statute, yet they are costly and potentially problematic in terms of privacy. A less costly alternative would be to restrict the collection of data to the statutorily required data points.

**Automobile Dealers**

Advocacy is concerned about the impact of the rule on small dealerships that may issue credit directly in the form of loans or leases.  Those dealerships may be potentially covered by the rulemaking. However, according to the National Automobile Dealers Association, many dealers act as intermediaries between buyers and financial institutions. As such, they may be asked to support financial institutions' compliance with this rule.[22] Advocacy encourages the CFPB to work with small automobile dealers to make the direct and indirect impacts of this rulemaking as least burdensome as possible.

**Cost of Credit for Small Entities**

Pursuant to 5 USC §603 (d)(1) the CFPB must provide the following in its IRFA:
    A description of-
        (A) any projected increase in the cost of credit for small entities;
        (B) any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities; and
        (C) advice and recommendations of representatives of small entities relating to issues described in subparagraphs (A) and (B) and subsection (b).

---

[20] Panel Report, page 35.
[21] 86 FR at 56563.
[22] Letter from NADA to the CFPB, December 14, 2020.

In the IRFA, the CFPB provides a detailed discussion on the impact of the proposal on small entities. In the discussion, the CFPB acknowledges that financial institutions may raise rates or fees on small business products.[23] The CFPB estimates that the additional costs may be $28, $24 or $7, based on the type of financial institution. Advocacy asserts that the additional costs may be underestimated. If financial institutions charge an application fee, the fee may be a disincentive for small businesses to shop for a better priced loan. As such, the overall cost of credit may be higher than indicated.

Advocacy appreciates the fact that the CFPB has acknowledged that this rulemaking will impact the cost of credit for small businesses. However, the CFPB's obligation under the RFA goes beyond simply acknowledging the increase in the cost of credit. As noted above, the CFPB is required to discuss the alternatives which minimize any increase in the cost of credit, as well as include advice and recommendations from representatives of small entities on the issue. Advocacy encourages the CFPB to take the necessary steps to minimize the additional costs and provide a discussion about the alternatives that were considered to minimize the increase in the cost of credit.

**Implementation Date**

The CFPB is proposing that its final rule to implement Section 1071 would become effective 90 days after that final rule's publication in the <u>Federal Register.</u> However, compliance with the final rule would not be required until approximately 18 months after publication in the <u>Federal Register.</u>

SERs generally supported a two-year implementation period. Several SERs with completely online operations felt that two years was sufficient time to implement the eventual 1071 rule; some estimated that they could do it in less time. Some other SERs that do not have primarily online operations and do not have experience with other federal data reporting regimes such as HMDA said it would be hard to project how long implementation would take, but that it could potentially take three years or more. One SER said that two years would not be enough as currently there are no data collection vendors for 1071 compliance.[24]

At Advocacy's roundtable, the participants stated that an 18-month implementation period was inadequate. They indicated that it may take 3 years for small financial institutions to comply with the requirements of 1071. Unlike the implementation of HMDA, the financial institutions are not building on a system that is already in place. Instead, they are developing a new data collection system. As such, sufficient time is necessary for the small financial institutions to comply with the rulemaking. Advocacy encourages the CFPB to consider an implementation period of 3 years or longer.

---

[23] 86 Fed Reg at 56575.
[24] Panel Report, page 39.

Office of Advocacy                                                                    Page 10

**Conclusion**

Advocacy recognizes the importance of the goals of Section 1071.  However, Advocacy is concerned that the CFPB's approach may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses.  Advocacy is also concerned that the manner in which statute is being implemented may lead to false assumptions and produce skewed results. For the reasons noted above, Advocacy encourages CFPB to address these concerns of small businesses; we would be happy to lend any assistance we can in minimizing the impact of this important rule.

Thank you for the opportunity to comment on this important proposal and for your consideration of Advocacy's comments.  If you have any questions regarding these comments or if Advocacy can be of any assistance, please do not hesitate to contact me or Jennifer Smith at (202) 839-5600.

Sincerely,

/s/
Major L. Clark, III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/
Jennifer A. Smith
Assistant Chief Counsel
 for Economic Regulation & Banking

Copy to:        Sharon Block
                Associate Administrator
                Office of Information and Regulatory Affairs
                Office of Management and Budget

AdminRecord-018394



**WASHINGTON, D.C.**

99 M Street SE
Suite 300
Washington, D.C. 20003-3799

**Phone:** 202-638-5777
**Fax:** 202-638-7734

January 6, 2022

Comment Intake
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

      Re: Small Business Lending Data Collection Under the Equal Credit Opportunity Act
(Regulation B); Docket No. CFPB-2021-0015

Dear Sir or Madam:

The Credit Union National Association (CUNA) represents America's credit unions and their 120
million members. On behalf of our members, we are writing in response to the Consumer Financial
Protection Bureau's (CFPB or Bureau) proposed rule (proposal) to implement section 1071 of the
Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act or the Act).[1]

**General Comment**

Credit unions are unique in the financial services industry as not-for-profit financial cooperatives
with a statutory mission to promote thrift and provide access to credit for provident purposes. The
member-owned structure of credit unions ensures they provide products and services to members
in a manner that is fundamentally different than for-profit financial service providers. In fact, in
many cases, the credit union may have been formed to meet the specific financial needs of their
geographic community, select employer group, or other field of membership. As a result, credit
unions have a vested interest in helping the members and small businesses they serve succeed by
meeting their credit needs and providing low-cost financial services.

Section 1071 of the Dodd-Frank Act is intended to facilitate enforcement of fair lending laws and
enable communities, governmental entities, and creditors to identify business and community
development needs and opportunities for women-owned, minority-owned, and small businesses.[2]
Credit unions support the goals of section 1071 and seek to provide all members with fair and
equitable financial opportunities. That said, we are concerned about the potential for unintended
consequences and substantial costs of compliance associated with the creation of a broad data

---

[1] Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B), 86 Fed. Reg.
56356 (Oct. 8, 2021).
[2] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376,
2056 (2010).

AdminRecord-018478

collection where one does not currently exist. In addition, as entities bound to serve a specific field of membership, the data collected from credit unions would likely be incomparable to other lenders that are legally permitted to serve anyone walking through its doors or accessing its websites.

In developing the 1071 rule, the Bureau should keep in mind that credit unions are subject to strict requirements and rules for business lending as compared to for-profit financial institutions. In 1998, Congress passed the Credit Union Membership Access Act, which capped credit unions' ability to offer member business loans (MBLs).[3] While credit unions operate in every U.S. state and provide an array of financial services, not all credit unions provide business loans and the choice to do so is based on the regulatory environment and the individual credit unions' membership. While the National Credit Union Administration (NCUA) and relevant state regulators have made positive changes to business lending rules over the years, credit unions' business loans are nevertheless subject to additional hurdles and limitations that other lenders' business loans are not. Despite these limitations, NCUA has noted credit unions' "long history of meeting [the] business lending needs of their members," and such commitment proved essential during the 2007 financial crisis and its recovery.[4] This trend continues to this day as credit unions have stepped up to serve struggling businesses during the COVID-19 pandemic.

As community-based financial institutions, the section 1071 data collection will likely add substantial strain on credit unions' finite compliance resources but provide an unknown tangible benefit. It is important for the Bureau to keep its rule as manageable and tailored as possible to avoid creating unintended barriers for small business borrowers seeking credit while also ensuring community lenders can maintain the privacy of their members' data.

In the interest of effectively balancing consumer protection and the availability of credit for small businesses, CUNA urges the Bureau to consider several revisions to the proposed rule:

- Increase the covered financial institution threshold to *at least* 500 covered credit transactions in each of the two preceding calendar years and create a size-based exemption for entities of $600 million assets or less;
- Reduce the gross annual revenue threshold used to determine which businesses are "small businesses" for purposes of the rule to *no more than* $1 million in gross annual revenue in the preceding fiscal year;
- Exempt several types of credit transactions from the definition of covered credit transactions, including agriculture-purpose credit, HMDA-reportable transactions, consumer-designated credit, loans under $50,000, and government guaranteed loans;
- Exclude credit line increases from the definition of covered application for purposes of the rule;
- Consider the firewalling requirement's potential for negative impacts on smaller lenders serving business borrowers;
- Reduce the section 1071 data set to only data points that are statutorily required and avoid unnecessary discretionary data points;

---

[3] Credit Union Membership Access Act, Pub. L. 105-219 (August 7, 1998).
[4] 81 Fed. Reg. at 13,532 (stating "while lending at banks contracted during the recent recession, credit unions continued to lend").

2

- Rescind the requirement for covered financial institutions to conduct a visual observation and surname analysis on applicants declining to provide responses to demographic questions;
- Consider the privacy and reidentification concerns in finalizing the rule and conduct a notice and comment period on the Bureau's "balancing test" for publication of 1071 data; and
- Adopt a phased mandatory compliance schedule that begins *no sooner than* three years following the issuance of a final rule.

## Background

Section 1071 of the Dodd-Frank Act requires financial institutions collect and report certain data regarding applications for credit for women-owned, minority-owned, and small businesses. The statutory purposes of this data collection are to (1) facilitate the enforcement of fair lending laws, and (2) to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.[5]

The Act specifies several data points covered financial institutions are required to collect and report and permits – but does not require – the Bureau to collect additional data points consistent with 1071's two statutory purposes. Section 1071 also specifies additional requirements, including restricting the access of underwriters and other persons to certain 1071 data and the publication of 1071 data. In addition, section 1071 permits the Bureau, at its discretion, to modify or delete data prior to publication if it determines that such a deletion or modification would advance privacy interests.

Section 1071 directs the Bureau to prescribe rules and issue guidance necessary to carry out, enforce, and compile data pursuant to its statutory requirements. It also permits the Bureau to adopt exceptions to any requirement or to exempt financial institutions from requirements as the Bureau deems necessary or appropriate to carry out the purposes of section 1071. In addition, section 1071 directs the Bureau to issue guidance designed to facilitate compliance with the rule's requirements.

## Definition of a Covered Financial Institution

As stated in prior letters to the Bureau on section 1071, we believe the Bureau should ensure credit unions remain well-positioned to provide access to safe and affordable loans to small businesses.[6] When the Bureau's rules make it expensive or difficult to access safe and affordable products and services from credit unions, consumers pay the price. As a result, we recommend the CFPB consider taking full advantage of its statutory exemption authority in a meaningful way by exempting all credit unions from collecting and reporting 1071 data. Credit unions have no pattern of unfair lending and alternatively, are seeking ways to provide more business loans to consumers, not fewer.

---

[5] See Proposal, 86 Fed. Reg. at 56356.
[6] CUNA Comment Letter to CFPB in response to the SBREFA Outline, *available at* https://news.cuna.org/articles/print/118841-small-biz-lending-data-collection-likely-to-add-substantial-strain (December 14, 2012).

3

AdminRecord-018480

That said, the Bureau has chosen not to propose exempting credit unions as a class, but rather has proposed in § 1002.105(b) to define the term "covered financial institution" as a financial institution that originated at least 25 covered credit transactions for small businesses, as defined in the rule, in each of the two preceding calendar years.[7] Financial institutions that meet this loan-volume threshold would be required to collect and report small business lending data to the Bureau. While we support the Bureau establishing a clear threshold for exempting smaller lenders from the rule, the proposed 25 covered credit transactions threshold is far too low and would unjustifiably impact many smaller participants, particularly credit unions, in the commercial lending market.

The potential impact on small business borrowers of establishing an unnecessarily low coverage threshold is significant, as smaller lenders are not as easily positioned to absorb the increased costs associated with originating commercial loans and may either reduce offerings, establish minimum loan amounts, or pull out from the market entirely. This type of lending environment, which the Bureau could avoid by establishing a more robust threshold, would clearly limit small lenders' ability to serve the businesses in their communities and drive small business borrowers to higher cost lenders or lenders with dubious track-records of consumer protection.

The Bureau is correct to be concerned that the 1071 rule's cost of compliance may result in a decrease in credit availability for small businesses and establishing an exemption for small lenders is justified to avoid substantial market disruption. However, the Bureau should amend its approach to this exclusion by adopting a "hybrid" exemption as considered in the Small Business Regulatory Enforcement Fairness Act (SBREFA) Outline of Proposals Under Consideration (SBREFA Outline).[8] Specifically, CUNA recommends the Bureau finalize *both* a volume-based exemption of *at least* 500 covered credit transactions in each of the two preceding calendar years *and* a size-based exemption for entities of $600 million assets or less, the standard for a "small" credit union according to the Small Business Administration's (SBA) Table of Size Standards.[9] A financial institution would be excluded from the rule if they fall under *either* of these exemption thresholds.

We believe this hybrid approach would safeguard continued credit availability for small businesses served by community-based lenders. For example, a community-based lender may be over $600 million in assets but, due to a small volume of business loans originated, the cost of compliance on a per loan basis could mean an asset-based exemption alone is insufficient and could cause the lender to reduce its business credit offerings. The same may be true for a mere activity-based exemption alone, which may not properly account for a small-size lender that focuses on meeting the small business lending needs of its members.

---

[7] See Proposal, 86 Fed. Reg. at 56543.
[8] Small Business Advisory Review Panel for Consumer Financial Protection Bureau Small Business Lending Data Collection Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered ("SBREFA Outline"), *available at* https://files.consumerfinance.gov/f/documents/cfpb_1071- sbrefa_outline-of-proposals-under-consideration_2020-09.pdf (Sept. 15, 2020).
[9] *See* Small Bus. Admin., Table of Small Business Size Standards Matched to North American Industry Classification System Codes (effective Aug. 19, 2019), *available at* https://www.sba.gov/sites/default/files/2019-08/SBA%20Table%20of%20Size%20Standards_Effective%20Aug%2019%2C%202019_Rev.pdf.

4

**Definition of Financial Institution**

The Bureau is proposing in § 1002.105(a) to define the term "financial institution" as any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity. Under this definition, the rule's requirements would apply to a broad range of entities engaged in small business lending, including depository institutions (i.e., banks, savings associations, and credit unions), online lenders, platform lenders, community development financial institutions (CDFIs), lenders involved in equipment and vehicle financing, commercial finance companies, governmental lending entities, and nonprofit non-depository lenders. While CUNA's primary preference is for the Bureau to use its statutory exemption authority to exempt credit unions from this rulemaking, we, alternatively, can work with this proposed definition if the rule includes proper exemptions for smaller or less complex lenders such as non-profit credit unions. We agree that the Bureau should ensure all types of for-profit entities offering commercial loans are *initially* covered so as not to favor one business model or charter type over any other.

**Definition of a Small Business**

Under the proposal, lenders would collect and report data, including the identification of women-owned and minority-owned businesses, for all applicants that satisfy the rule's definition of a small business. However, covered financial institutions would *not* be required to collect and report section 1071 data on women-owned and minority-owned businesses that are *not* small businesses, as defined in the rule. We agree a business' status as a "small business" is the most important factor when considering the intent and purpose of section 1071 and we support the Bureau's proposed approach to its section 1071 rule. In addition, given the highly complex nature of lending to businesses that are not "small," we believe the Bureau's rulemaking is better suited focusing exclusively on the small business lending market.

The Bureau is proposing in § 1002.106 to adopt the SBA definitions of "business" and "small business" as set out in the Small Business Act and SBA regulations. The Bureau is also proposing that, notwithstanding the small business size standards established by SBA regulations, for purposes of the proposed rule, a business is a small business if and only if its gross annual revenue is $5 million or less for its preceding fiscal year. The Bureau is seeking SBA approval for this alternate small business size standard pursuant to the Small Business Act but has not yet obtained approval. We support the Bureau's use of a gross annual revenue standard for determining which businesses are considered small and therefore covered under the rule. The revenue approach is preferred to the alternatives considered in the SBREFA Outline such as the irrelevant number of employees standard or the overly complex North American Industry Classification System (NAICS) code groupings.[10]

Nevertheless, we believe the proposed revenue threshold of $5 million or less in the preceding fiscal year is far too high. This threshold would unreasonably classify some clearly large businesses as small for purposes of the rule and vastly increase the size of the 1071 data collection,

---

[10] See SBREFA Outline 16 (providing alternatives under consideration for the definition of "small business" applicants).

AdminRecord-018482

the risk to data privacy, and the costs associated with compliance for covered financial institutions. In the interest of properly scoping the rule, we recommend the Bureau reduce the gross annual revenue standard used to determine which businesses are "small businesses" to no more than $1 million in gross annual revenue in the preceding fiscal year. A $1 million gross annual revenue threshold would be more than sufficient to achieve the goals of the statute without creating the unnecessary drawbacks highlighted above.

In addition, the Bureau should provide clear guidance on how covered financial institutions should treat start-ups with no track record of revenue or other special considerations.

**Covered Credit Transactions**

The Bureau is proposing to require covered financial institutions to collect and report data for all covered applications from small businesses for transactions that meet the definition of business credit under Regulation B, with some exceptions. In particular, the Bureau is proposing § 1002.104(a) define the term covered credit transaction as an extension of business credit that is not expressly excluded under proposed § 1002.104(b). Under this proposed definition, loans, lines of credit, credit cards, merchant cash advances (MCAs), agricultural-purpose loans, and Home Mortgage Disclosure Act (HMDA)-reportable loans would all fall within the scope of the rule. The Bureau is proposing, in § 1002.104(b), to exclude trade credit, public utilities credit, securities credit, and incidental credit. Factoring, leases, consumer-designated credit used for business purposes, and credit secured by certain investment properties would also not be covered credit transactions.

CUNA generally supports the intent behind using Regulation B as a guide for defining business credit in the section 1071 rule. As entities required to comply with the Equal Credit Opportunity Act (ECOA), a covered credit transaction definition aligned with Regulation B would be both familiar to credit unions and represent the most common business credit products aimed at small business borrowers.

However, in the interest of furthering the mission of section 1071, we strongly recommend the Bureau exempt several classes of credit transactions from the definition scope of covered credit transactions:

*Agricultural-purpose credit*

The Bureau states that covering agricultural credit in the 1071 rule is important for both of section 1071's statutory purposes and is not proposing to define covered credit in a way that would exclude agricultural credit from the rule.[11] We urge the Bureau to reconsider this decision and adopt a final rule expressly excluding agricultural credit given the outsized impact the 1071 rule could have on the market for agriculture loans.

Over the past several decades, larger national banks have reduced their presence in the agriculture lending market and community-based lenders – including many credit unions – have stepped up

---

[11] See Proposal, 86 Fed. Reg. at 56433.

AdminRecord-018483

to serve these borrowers. It's become clear that agriculture lending is best served by local community-based financial institutions because these lenders are willing to make the small loans needed by farmers and can assess farmers' financial situations based on information gained from their presence in the community. While the Bureau's intent in including agriculture lending is understandable, the consequences of doing so could result in more harm to this niche market than good – especially considering the proposed *extremely low* threshold for a covered financial institution. Ultimately, the disruption and increased costs associated with section 1071's data collection and reporting requirements would result in a reduction in the availability of credit for farmers. These costs would roll back the progress made by community-based lenders in serving agriculture communities, which are already some of the nation's most underserved areas.

### HMDA-reportable transactions

By adopting Regulation C's definition of dwelling and its commentary regarding investment properties, the Bureau has sought to create consistency and minimize compliance burdens for financial institutions that must also report credit transactions covered by HMDA (that is, HMDA-reportable transactions). According to the Bureau's analysis, the number of HMDA-reportable transactions that would also be covered under section 1071 would be "a relatively small but not insignificant overlap."[12] As a principle of regulatory action, CUNA has encouraged regulators to avoid the creation of duplicative or redundant compliance burdens.

Therefore, CUNA urges the Bureau to exclude all HMDA-reportable transactions from the definition of covered credit transactions under the 1071 rule, to avoid establishing an obviously duplicative reporting requirement. There is no benefit in requiring financial institutions to collect and report data on the same transaction for two separate regulatory data collections. Rather, if the Bureau believes some financial institutions *may* want the option to report these HMDA-reportable transactions in their section 1071 filings, then the Bureau should provide exactly that – a voluntary option to report these loans, not a mandated requirement.

### Consumer-designated credit

The Bureau is proposing the section 1071 rule exclude from its covered credit transactions products designated by the creditor as having a consumer purpose (i.e., consumer-designated credit). Proposed comment 104(b)-3 clarifies that the term covered credit transaction does not include consumer-designated credit used for business purposes, because such transactions are not typically considered business credit.[13] The proposed comment would state that a transaction qualifies as consumer-designated credit if the financial institution offers or extends the credit primarily for personal, family, or household purposes.[14] The Bureau acknowledges that some small business owners may use consumer-designated credit to finance their small businesses—such as taking out a home equity line of credit or charging business expenses on their personal credit cards.

---

[12] *See* Proposal, 86 Fed. Reg. at 56372.
[13] See Proposal, 86 Fed. Reg. at 56408.
[14] For example, an open-end credit account used for both personal and business purposes is not business credit for the purpose of the rule unless the financial institution designated or intended for the primary purpose of the account to be business-related.

7

AdminRecord-018484

Regardless, this use of credit in this manner was not intended to be included within section 1071 and the Bureau's exclusion of consumer-designated credit recognizes that fact.

CUNA agrees with the Bureau's interpretation that section 1071 is not intended to apply to consumer credit used for business purposes. While some of the smallest businesses may blur the line between personal credit and business credit, the inclusion of consumer- designated credit within the rule would dramatically expand the size of the data collected beyond the purpose of section 1071, circumvent the clear intent of Congress, and significantly increase the rule's impact on the availability of credit for all consumers – not just business borrowers.

We also recommend the Bureau draw a clear line in its section 1071 rule and not permit the voluntary reporting of consumer-designated credit when there is reason to believe the credit might be used for business purposes. Such a caveat would create confusion, introduce the possibility of error, and put financial institutions in a position to question their members' intentions. The Bureau should be clear on this distinction and completely exclude personal loans from the rule.

### Voluntary Reporting for Loans under $50,000

The NCUA defines a credit union MBL as any loan, line of credit, or letter of credit (including any unfunded commitments) where the borrower uses the proceeds for the following purposes: commercial, corporate, other business investment property or venture, or agricultural.[15] The NCUA further exempts certain secured loans and loans the total of which to an individual fall under a specified dollar amount. Specifically, under §701.21(h)(1)(i)(C) of NCUA's regulations, a loan, otherwise meeting the definition of an MBL, is not considered a business loan if the loan amount, when added to other business loans of a borrower, is less than $50,000.

The NCUA has interpreted loans less than $50,000 not to be considered MBLs and not reported as such, even if they may be business-purpose loans, for nearly three decades.[16] For most of that time, credit union business loans made for business purposes, but that aggregate to less than $50,000 for a particular borrower, have generally been reported as either consumer loans, mortgage loans, or "other" loans. NCUA refers to these as "business purpose loans" but does not require credit unions to report them in a separate category on the call report.

Because of NCUA's long-standing interpretation, many credit unions do not maintain readily identifiable loan files on business purpose loans falling outside of the definition of an MBL. There has not been any *regulatory* reason to maintain the same sort of detailed data on these loans that credit unions maintain for their MBLs. These loans are treated differently than the business-purpose loans intended to be covered under the section 1071 rule and the Bureau's rule should account for that difference. We believe this is an important issue for three reasons. First, subjecting credit unions' non-MBL loans to section 1071 coverage could potentially affect the availability of these smaller size loans due to the increased costs associated with 1071 regulatory compliance. Second, subjecting these non-MBL loans to section 1071 coverage would create a material inconsistency with NCUA's treatment of these loans – an inconsistency that should be avoided. And lastly, the Bureau's failure to fully account for these non-MBLs may have resulted in a

---

[15] 12 CFR § 723.2.
[16] 58 Fed. Reg. 40,040 (July 27, 1993).

AdminRecord-018485

substantial underestimation of the full impact of an extremely low covered financial institution threshold. The proposal's 25 covered credit transaction threshold may have a much larger impact on credit unions than the Bureau fully understands if loans under $50,000 are included in determining 1071 coverage. As a result, CUNA recommends the Bureau establish an exemption for loans under $50,000 from the definition of covered credit transactions with an option for financial institutions to voluntarily report these loans to the Bureau. If the Bureau is concerned about the effects a *de minimis* loan exemption would have on section 1071 reporting if applied to all classes of covered financial institutions, then it should apply this exemption to only credit union lenders in recognition of the unique laws and regulations governing their commercial lending.

*Government Guaranteed Loans*

The Bureau is proposing complete exclusions for public utilities credit, securities credit, and incidental credit from the definition of a covered credit transaction in proposed § 1002.104(b). However, the Bureau is not proposing to exclude government credit because governmental entities would not constitute small businesses under the proposed rule. We generally support the Bureau's treatment of government credit but urge the Bureau to also exempt business loans guaranteed by governmental entities, especially the SBA.

As proven time and time again, credit unions are eager to serve their members and communities, and they want to help small businesses succeed through partnerships with the SBA and other governmental entities. In particular, the SBA government guaranteed lending programs epitomize a successful public-private partnership. SBA's lending programs, such as the 7(a) Loan Program and the Paycheck Protection Program (PPP), allow small businesses to work with local lenders throughout the loan process. The SBA guarantees these loans ensuring that financial institutions are made whole in an instance of default by the borrower. We witnessed exactly how critical these programs can be in meeting the needs of local businesses when the government turned to financial institutions to assist in rolling out the PPP initiative. The failure to exclude these types of loans within the scope of the rule may ultimately discourage lender participation in these public-private programs in the future and effectively punish lenders for successfully implementing assistance in the best interest of the government, communities, and small business borrowers. We recommend the Bureau exclude certain government guaranteed loans from the definition of a covered credit transaction so these programs can continue to help small businesses.

**Definition of Application**

The receipt of a covered application, as defined in the rule, would trigger the section 1071 data collection and reporting requirements for covered financial institutions. The Bureau is proposing to define a covered application in § 1002.103(a) as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. The proposed definition of a covered application does not include reevaluation, extension, or renewal requests on an existing business credit account and inquiries and prequalification requests. However, these "excluded" events *would* be considered a covered application if the borrower's request seeks additional credit amounts (i.e. line of credit increases).

AdminRecord-018486

We support the Bureau adopting a clear exclusion for inquiries and prequalification requests from the definition of covered applications. The inclusion of these types of events would effectively punish borrowers for inquiring about qualification requirements, available products, or available interest rates. In addition, the Bureau should exclude requests for credit line increases from the definition of covered application under the 1071 rule. Credit line increases are substantially different in process and underwriting from an initial credit request, as these line increases may be based on performance data and the borrower's relationship with the creditor. The Bureau should also avoid disrupting the experience of borrowers by adding additional data collection hurdles for those that have already gone through the application process prior to the 1071 rule's existence.

**Firewall Requirement**

The Bureau is proposing § 1002.108 to implement the requirement in section 1071 that certain data collected be shielded from underwriters and certain other persons; the Bureau refers to this requirement as the "firewall."[17] Under the firewall provision, an employee or officer of a financial institution or a financial institution's affiliate that is involved in making any determination concerning the application would be prohibited from accessing an applicant's responses to inquiries that the financial institution makes pursuant to section 1071 regarding whether the applicant is a minority-owned or women-owned business, and the ethnicity, race, and sex of the applicant's principal owners. However, this prohibition would not apply to an employee or officer if the financial institution determines this limitation is not feasible. In such an instance, the financial institution would be required to provide the applicant with a notice or, alternatively, the financial institution could provide the notice to all applicants whose information could be accessed.

We acknowledge the intent (and statutory requirement) behind requiring a firewall between certain section 1071 information and personnel making credit decisions. However, according to CUNA research, nearly half of all credit unions have five or fewer full-time employees. As a result, credit unions and other community-based lenders may find it difficult to comply with the firewall requirements given their small staff size, and the CFPB's proposed notice requirement may put these smaller lenders at a disadvantage.

We recommend the Bureau provide clear guidance on its understanding of when the firewall may not be "feasible" and how a covered financial institution may determine the feasibility of the firewall requirement. The firewalling requirement is likely to impact a disproportionate number of small financial institutions. Borrowers may be skeptical of a lender that provides the firewall notice and become concerned that their 1071 data could be used to discriminate – despite no specific basis for that concern. This could result in some borrowers seeking alternative entities for credit or declining to provide their 1071 demographic information in the first place. This practical concern highlights the importance of setting the rule's threshold for a covered financial institution at the appropriate level to exempt smaller providers while focusing on lenders better equipped to absorb the rule's costs and implement these provisions as the Bureau envisions.

---

[17] *See generally* Proposal, 86 Fed. Reg. 56380-56381.

AdminRecord-018487

**Data Points**

Section 1071(b) requires lenders to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. If the answer is yes, then the statute requires lenders to clearly and conspicuously collect several items enumerated in the statute. The Bureau refers to these items as "mandatory data points." As a general principle, we believe the Bureau should finalize a rule that sticks to the statutorily required data points and avoid adding discretionary data points that may not further the purposes of section 1071 in a material way.

It is not evident how the proposed discretionary data points would benefit the Bureau or consumers to justify the cost and resources required for their collection. In fact, the addition of unnecessary discretionary data points may ultimately add to the already significant privacy concerns of both lenders and small business borrowers. The Bureau can look as far as recent history, with the 2015 HMDA Rule, to find a situation where the addition of unnecessary discretionary data points created substantial costs of compliance. Those discretionary data points were previously under review for possible reduction or modification.[18]

In developing an entirely new data collection, as a starting point, the Bureau should limit its set to data points that are statutorily required, and not add discretionary data points indiscriminately. In doing so, the Bureau could revisit its data set in the future and, if the collection of additional data proves to be justified, build out additional data points from there. In the alternative, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters – such as the partial data point exemption approach taken in the HMDA context.

*Ethnicity, Race, and Sex of Principal Owners*

The Bureau is proposing to require covered financial institutions to collect and report the ethnicity, race, and sex of the applicant's principal owners. It is also proposing to require financial institution employees to conduct a visual observation or surname analysis to determine the race and ethnicity of an applicant if the applicant declines to respond to the collection request. Proposed Appendix G would also include a requirement that a financial institution inform an applicant that the applicant is not required to respond to the collection questions regarding its principal owners' ethnicity, race, or sex.

We strongly recommend that the Bureau rescind the proposed requirement to conduct a visual observation and surname analysis. In the alternative, the Bureau should implement the approach that was contemplated in the SBREFA Outline and require the collection and reporting of this data to be based *solely* on the applicant's self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the financial institution would be required to report this information and would have no additional obligation to verify that response.

The Bureau's proposed approach would not only create a particularly uncomfortable situation for employees of covered financial institutions required to conduct these visual observations, but it

---

[18] Home Mortgage Disclosure (Regulation C) Data Points and Coverage, 84 Fed. Reg. 20049 (May 8, 2019).

11

AdminRecord-018488

would directly contradict the applicant's wishes to not identify their race or ethnicity. The right for borrowers to refuse answering demographic questions is clearly contemplated in law, and the Bureau's proposal would be an end-run around this right. In addition, a requirement to report based on visual observation or surname would clearly undermine the accuracy of the data reported and the CFPB's analysis of that data.

## Compiling, Maintaining and Reporting 1071 Data to the Bureau

The Bureau is proposing in § 1002.109(a) for section 1071 data to be collected on a calendar year basis and reported to the Bureau on or before June 1 of the following year. We generally support calendar year collecting and reporting. However, we caution the Bureau against aligning the annual reporting dates of section 1071 with the reporting dates for HMDA. The Bureau should recognize that for many small reporters, complying with two large complex data collection and reporting regimes at the same time could strain their finite resources.

*Reporting – Loan Participations*

The Bureau's proposal also addresses collection and reporting requirements of subsidiaries of financial institutions or instances where multiple financial institutions are involved in a transaction. Under the rule, a partial purchase of a loan does not, in itself, generate an obligation for a covered financial institution to report small business lending data. Rather, the financial institution receiving the covered application is the entity originating a covered credit transaction and, therefore, the reporting financial institution for purposes of section 1071. For example, Financial Institution A receives an application for a covered credit transaction and approves the loan, and then Financial Institution A elects to organize a loan participation agreement where Financial Institutions B and C agree to purchase a partial interest. This is a covered credit transaction for Financial Institution A, but it is not a covered credit transaction for Financial Institutions B and C. We generally support the Bureau's approach to loan participations and agree the originating lender is best positioned to obtain the 1071 information from the borrower. In fact, participating lenders would be hard pressed to comply with 1071 given their distance from the borrower, and the data they provide would likely be duplicative of the originating lender.

The Bureau is also proposing to address technical instructions for the submission of data, including information about the Filing Instructions Guide, which the Bureau anticipates later providing for the appropriate year. We appreciate the Bureau recognizing the importance of the technical specifications in preparing for rule compliance and encourage it to publish these specifications quickly and account for the delayed nature of the technical specifications when setting the rule's compliance date.

## Privacy Considerations Involving Bureau Publication of Section 1071 Data

The Bureau is proposing in § 1002.110 to address several issues regarding the publication of section 1071 data. Under the proposal, the Bureau plans to make available to the public, on an annual basis and on the Bureau's website, the data submitted to it by financial institutions. The

AdminRecord-018489

Bureau is proposing to make the data available subject to deletions or modifications made by the Bureau, at its discretion, if it determines that such deletions or modifications would advance a privacy interest. To determine whether and how the Bureau might use its discretion to modify or delete data prior to publication, it has plans to use a "balancing test" that assesses the risks and benefits of public disclosure. However, the Bureau does not plan to permit any notice and comment period on the balancing test itself. We strongly recommend the Bureau publish its planned balancing test methodology after the first year of collecting 1071 data, and provide interested parties an opportunity to comment before determining which data to make public.

In addition, CUNA is greatly concerned about the heightened risks associated with a broad collection of financial data about consumers that could be used in ways not intended by the Dodd-Frank Act. For example, since not all credit unions participate in commercial lending, any localized data made available to the public may be traceable to consumers in certain areas. A consumer seeking a small business loan to create a new business, or for another reason, may have concerns about their information becoming public. To mitigate these concerns, the Bureau should avoid releasing data based on census tract or NAICS code, only publicly release lending data at the state-wide level and in aggregated form, and conduct a robust analysis of reidentification risks prior to releasing data to the public.

Furthermore, requiring the encrypting of this data could present liability and cost concerns to credit unions that could harm their participation in this market. Data breaches and protecting members' privacy are a top priority of credit unions, and new regulations making this issue more complex could negatively impact their ability to serve their members.

**Recordkeeping**

The Bureau is proposing § 1002.111 to require a covered financial institution to retain evidence of compliance with the rule, which includes a copy of its small business lending application register, for at least three years after the register is required to be submitted to the Bureau. The Bureau is also proposing to require a financial institution to maintain, separately from the rest of an application for credit and accompanying information, an applicant's responses to a financial institution's inquiries regarding the applicant's protected demographic information. We recommend the Bureau avoid establishing recordkeeping requirements that would necessitate the acquisition of costly record retention systems and align section 1071's recordkeeping requirement with ECOA's 25-month retention period rather than HMDA's three-year retention period.

**Implementation Period**

The Bureau is proposing in § 1002.114 for the final rule to become effective 90 days after publication in the *Federal Register*, but *compliance* with the final rule would not be required until approximately 18 months after publication in the *Federal Register*. In addition, the Bureau is also proposing to permit covered financial institutions to *begin collecting* protected applicants' demographic information beginning 12 months prior to the compliance date, and would permit financial institutions to use a different time period to determine whether they will be covered by

13

AdminRecord-018490

the rule as of the compliance date. We disagree with the proposed 18-month compliance timeline and strongly urge the Bureau to adopt a compliance period of at least three years.

In the SBREFA Outline, the Bureau considered permitting covered financial institutions to have a period of approximately two calendar years for implementation following the issuance of the section 1071 rule. We generally agreed a two-year timeframe could be sufficient but noted the complexity and scope of the rule would be a relevant factor. Unfortunately, the Bureau has chosen to propose a section 1071 rule that is not only more complex than the SBREA Outline envisioned, but would also cover a substantially larger pool of financial institutions, including smaller lenders. Barring a change of course, CUNA recommends the Bureau adopt a compliance timeframe of no less than three years after publication in the *Federal Register*. Based on feedback from credit unions and vendors, only a three-year timeframe would be sufficient for covered entities to revise their systems and processes in coordination with vendors and to make additional changes necessary to meet the requirements of the new section 1071 rule. The Bureau would also be warranted in adopting a staggered implementation period with the largest lenders being subject to the rule before community-based providers. This staggered implementation strategy has been deployed for complex rules like the Financial Accounting Standards Board's current expected credit loss accounting standard in recognition of certain rules' high one-time costs and the advantages larger financial institutions have in negotiating with vendors.

Regardless, during the period prior to implementation, the Bureau should regularly communicate with vendors and covered entities to ensure compliance preparations are progressing as expected and consider reasonable extensions if issues that could affect industry preparedness arise.

**Conclusion**

On behalf of America's credit unions and their 120 million members, thank you for your consideration of our recommendations and feedback. If you have questions or require additional information related to our comments, please do not hesitate to contact me at (202) 508-3629 or amonterrubio@cuna.coop.

Sincerely,

Alexander Monterrubio
Senior Director of Advocacy & Counsel

AdminRecord-018491



3138 10th Street North
Arlington, VA 22201-2149
703.522.4770 | 800.336.4644
f: 703.524.1082
nafcu@nafcu.org | nafcu.org

**NAFCU**

**National Association of Federally-Insured Credit Unions**

January 6, 2022

Comment Intake
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

**RE: Section 1071 Small Business Lending Data Collection (RIN: 3170-AA09)**

Dear Sir or Madam:

On behalf of the National Association of Federally-Insured Credit Unions (NAFCU), I am writing in response to the Consumer Financial Protection Bureau's (Bureau) Section 1071 Small Business Lending Data Collection Proposed Rule (Proposed Rule). NAFCU advocates for all federally-insured not-for-profit credit unions that, in turn, serve 127 million consumers with personal and small business financial service products. NAFCU and its members appreciate the Bureau's dedication to ensuring small businesses are adequately protected under the *Equal Credit Opportunity Act* (ECOA) and section 1071 of the *Dodd-Frank Wall Street Reform and Consumer Protection Act* (Dodd-Frank Act). NAFCU's members have a proud history of looking beyond traditional financial metrics to serve their communities' small businesses, including many woman- and minority-owned businesses that may not be served by national banks and online-only financial technology companies (fintechs).

However, there is widespread concern that the Proposed Rule's complexity and significant one-time and ongoing compliance costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers. The likely net effect of the Proposed Rule's expansive coverage and intensive data collection and reporting requirements is that the credit unions that have supported millions of small business successes across the country will quickly become uncompetitive and may be forced out of small business lending altogether.

NAFCU urges the Bureau to adopt common sense definitions, right-sized thresholds, and a reasonable, phased mandatory compliance schedule to ensure that credit unions' support of their small business members is not jeopardized by unnecessary section 1071 compliance burdens. NAFCU also recommends that the Bureau delay any further section 1071 rulemaking until it is clear the COVID-19 pandemic has ended. The Bureau cannot accurately assess the likely impacts of an intensive rulemaking until America's "new normal" is established and reliably measurable.

**General Comments**

Section 1071 of the Dodd-Frank Act amended the ECOA to require that covered financial institutions collect and report certain information regarding credit applications made by women-owned, minority-owned, and small businesses. In section 1071, Congress charged the Bureau with

AdminRecord-018499

Consumer Financial Protection Bureau
January 6, 2022
Page 2 of 15

developing and implementing regulation reasonably designed to facilitate the enforcement of fair lending laws and to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses. The Proposed Rule would require covered financial institutions to collect and report on a total of 21 discrete small business lending data points, including eight discretionary data points.

Small businesses, as the Bureau recognizes, are irreplaceably important. The strength and resiliency of our national and local economies fundamentally depend on the diversity of their small businesses and those small businesses having adequate access to affordable, high-quality credit. This access, in turn, depends on the competitiveness and diversity of the small businesses lending market. Congress plainly recognized this relationship when it charged the Bureau with developing regulation that enables small business stakeholders to track the lending outcomes and likely capital needs of communities' small businesses.

Unfortunately, the Proposed Rule, if adopted as written, risks irreparably undermining the competitiveness and diversity of today's small business lending market – a market that has changed significantly since the Dodd-Frank Act's passage more than a decade ago. As the Bureau explains, when the Dodd-Frank Act was passed, credit unions and banks represented nearly all of the small business lending market. Few fintechs even existed, let alone specialized in small business products. In recent years, however, as the Bureau points out, fintechs' small business lending is estimated to have grown by as much as 90 percent year-over-year. Fintechs' partnering with national banks and fervent promotion of invoice factoring as a small business credit alternative further fuel shifts away from more traditional, in-community small business borrowing.

Even if loan originations under the Small Business Administration's (SBA) Paycheck Protection Program (PPP) serve as only a rough indication of small business lenders respective market shares, the program's startling evidence of big banks' and fintechs' pronounced and growing dominance is relevant. JP Morgan Chase Bank, N.A. (JPM Chase) executed in excess of 250,000 PPP loans. BlueVine, a fintech younger than the Bureau, executed roughly 155,000 PPP loans. It is a simple economic fact that any adopted form of the Proposed Rule will raise compliance costs for all covered financial institutions. The net effect of increased compliance costs on different types of covered financial institutions, however, is neither as simple nor uniform. For such firms as JPM Chase and BlueVine, the Proposed Rule's one-time and ongoing costs will be negligible, if noticeable – not only because such behemoths can cost-effectively develop complex compliance tools in-house but because even those costs will be allocated across hundreds of thousands of transactions.

Many credit unions, on the other hand, are themselves small businesses, well below the SBA's $600 million total assets threshold. Some credit unions will not only be forced to purchase comparatively expensive third-party information technology (IT) solutions but will be rendered captive to IT vendors' development, redeployment, and cross-testing timelines over which the credit unions will have no meaningful control. For other credit unions, automated section 1071 compliance tools are likely out of reach, and the process of manually collecting and reporting section 1071 data is likely to result in greater borrower confusion as well as lengthier, more

AdminRecord-018500

Consumer Financial Protection Bureau
January 6, 2022
Page 3 of 15

complicated application processes. Credit unions, too, have little or no capacity to absorb increased compliance costs. 89 percent of respondents to NAFCU's October 2020 *Economic & CU Monitor Survey* said they will be forced to charge higher fees on business products to offset the costs of their collecting and reporting section 1071 data. 44 percent of respondents expected the costs of other credit products to rise as well. Additionally, a majority of respondents indicated that they would expect to change either the set of small business products offered or their underwriting practices in response a section 1071 final rulemaking.

Furthermore, unlike banks and fintechs, federally-insured credit unions are constrained by the *Federal Credit Union Act* (FCU Act) and the *Credit Union Membership Access Act* (CUMAA). The FCU Act provides that a federally-insured credit union may serve only those within the field of membership described in its charter. The CUMAA codified the definition of a member business loan (MBL) and limited a well-capitalized, federally-insured credit union's MBLs to the lesser of either 1.75 times the credit union's net worth or 12.25 percent of its total assets. So constrained, credit unions cannot, unlike banks and fintechs, rapidly ramp up small business lending activities to minimize or wholly offset the Proposed Rule's significant one-time and ongoing costs. The Bureau's ultimate publication of reported section 1071 data also risks credit unions, statutory constrained in whom they may serve and in the scale of their business lending, appearing to run afoul of fair lending laws when no such impropriety, in fact, exists.

Despite many individual credit unions' modest small business lending activity, the credit union industry as a whole brings to bear significant, necessary competitive market pressures that benefit all small business borrowers, not just credit unions' borrowers. For those small businesses in their field of membership, credit unions offer unparalleled in-community support, competitive rates, low fees, and tailored, flexible terms. This nation's credit unions collectively serve roughly one half of all American adults, and the vast majority of American adults not yet served by a credit union are likely eligible for membership in at least one credit union. Credit unions, therefore, represent a real and affordable alternative to big banks and fintechs and, consequently, exert downward pressures on these for-profit lenders' small business loan pricing. NAFCU's *Economic Benefits of the Credit Union Tax Exemption to Consumers, Businesses, and the U.S. Economy*, released in September 2021, shows that the combined benefit to credit union members and bank customers from credit unions' presence in U.S. financial markets was $153 billion over the period 2011 to 2020. In fact, in six of the ten years, benefits to bank customers exceeded benefits to credit unions members, and in two other years, benefits to bank customers and credit unions members were effectively equal.

While the Bureau may regard the prospect of a consolidated and homogenized small business lending market with ambivalence, the Bureau should not assume too much about the ultimate trajectory of small business borrower outcomes under the Proposed Rule. Data collected through the Federal Deposit Insurance Corporation's (FDIC) *Small Business Data Collection Survey* strongly suggests that borrowers satisfaction levels with fintechs is "far lower than with traditional lenders". Fintechs received a net satisfaction score of 33 percent while small depository institutions came in at 73 percent and large depository institutions at 55 percent. In a December 2019 Federal Reserve study of small business borrowers, 63 percent of online lender applicants reported challenges working with their lender. More than half of those respondents reported high interest

AdminRecord-018501

Consumer Financial Protection Bureau
January 6, 2022
Page 4 of 15

rates, and nearly one third of those respondents reported concerns related to unfavorable repayment terms. If the Bureau is to deliver on its section 1071 responsibilities, it must remain careful not to further speed the consolidation and homogenization of the small business lending market.

**Covered Financial Institutions**

While section 1071 defines "financial institution" to include a reasonably expansive list of different types of entities that may engage in small business lending, section 1071 establishes neither a metric nor a threshold by which to identify those from whom Congress anticipated the Bureau would collect small business lending data. Under the Proposed Rule, any entity meeting section 1071's definition of a financial institution that originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years would be a covered financial institution. The Proposed Rule's 25 loan-volume threshold was the lowest, non-zero loan-volume threshold considered by the Bureau in prior section 1071 rulemaking exercises.

The Bureau anticipates it could lower one-time section 1071 compliance costs by roughly $120 million and still collect section 1071 data for approximately 94 to 95 percent of all small business loans made by depository institutions if it establishes a 100 loan-volume threshold. However, it is obvious that a 100 loan-volume threshold is much too low still. For decades, mortgage market stakeholders have drawn statistically significant conclusions about the health and fairness of the mortgage market from data collected and reported subject to the *Home Mortgage Disclosure Act* (HMDA), which, the Bureau has <u>estimated</u>, captures something just shy of 90 percent of all available mortgage data. Establishing a 100 loan-volume threshold or any other loan-volume threshold that operates to capture more section 1071 data than is necessary at the expense of small business borrowers runs perfectly counter to the Bureau's section 1071 responsibilities.

Compounding this concern is the Bureau's reliance on NCUA 5300 Call Report data and similar banking industry data. A great deal of small business lending occurs below the relevant $50,000 reporting thresholds. The Bureau may welcome larger covered financial institutions' being required to report even more section 1071 data than the Bureau now projects. However, the Bureau should be deeply concerned that its overreliance on Call Report data risks the Bureau materially underestimating how many credit unions would likely be covered financial institutions under artificially low 25 and 100 loan-volume thresholds.

NAFCU encourages the Bureau to adopt a covered financial institution loan-volume threshold not lower than 500 covered credit transactions.

*Chilling Effect on New and Modest Small Business Lenders*

The Bureau acknowledges that some credit unions, faced with the Proposed Rule's significant one-time and ongoing compliance costs, may simply be forced to exit small business lending altogether. Other credit unions, the Bureau anticipates, will attempt to manage their small business lending activities so as to narrowly avoid crossing whatever loan-volume threshold the Bureau ultimately adopts. While it is theoretically possible that a credit union or bank could manage its small business lending activity in such a way as to avoid crossing a loan-volume threshold, the

AdminRecord-018502

Consumer Financial Protection Bureau
January 6, 2022
Page 5 of 15

theory quickly erodes when one considers the fluidity and iterative nature of most small business lending.

Small business lending, particularly at credit unions, is often the product of a lengthy, relationship-intensive process that unfolds over weeks, months, and, sometimes, years. Credit unions and entrepreneurs work diligently alongside one another to understand small businesses' strengths and capital needs and identify appropriate small business solutions. Consider the simplest context, one in which a credit union has never engaged in a credit transaction covered by the Proposed Rule. Aware that not all credit applications are approved and not all approved credit applications result in a member accepting the approved terms, the credit union would rationally work to cultivate small business relationships in excess of its targeted loan-volume. During years-long periods in which application approvals and borrower acceptances are above average, or emergencies press a credit union to redouble its commitment to its community, can the credit union truly be expected to abandon or stall its small business members the moment it unexpectedly meets its target loan-volume?

Next, consider one of the thousands of credit unions that may wish to better support their small business members by beginning to offer an affordable small business credit card product. If a credit union was simultaneously managing its small business lending activity to ensure it is not exposed to section 1071 compliance costs it is unable to afford, every new small business credit card account would represent one fewer traditional small business loan it could make, irrespective of a small business member's need. Similar examples are not in short supply, but the effect of each is the same. Credit unions' reliably managing small business lending activity to a specific loan-volume is simply implausible, if not impossible. More likely, these credit unions, too, would be forced to avoid or exit small business lending altogether.

In conversations with members, NAFCU has observed that anxiety regarding section 1071's future costs may already be having a chilling effect on future plans to expand small business lending operations. After the passage of the *Coronavirus Aid, Recovery and Economic Security Act* (CARES Act), credit unions expressed optimism that public awareness of the PPP's funding might enhance general demand for SBA loans. Credit unions who had never previously sought to promote small business loan products also expressed interest in sustaining small business lending even after the PPP was exhausted. However, after the Bureau's section 1071 rulemaking efforts were more widely publicized in September 2020, some credit unions expressed hesitancy about pursuing small business lending due to uncertainties surrounding the costs of section 1071 compliance.

According to a 2011 study from the SBA[1], while banks tend to reduce lending during economic stress, credit unions continue to lend to small businesses. During the Great Recession, credit union lending offset a proportional reduction in bank lending.[2] The Bureau's <u>January 2020 data point</u> found the number of credit unions offering small business lending products doubled since 2004, from 10 percent to 20 percent. As big banks continue to avoid historically-disadvantaged

---

[1] James A. Wilcox, The Increasing Importance of Credit Unions in Business Lending, SBA Office of Advocacy (Sept. 2011).
[2] NCUA, Member Business Loans; Commercial Lending; Final Rule, 81 Fed. Reg. 13530, 13532 (March 14, 2016).

AdminRecord-018503

Consumer Financial Protection Bureau
January 6, 2022
Page 6 of 15

communities and desert short-lived efforts in others and as community banks continue to merge, the Bureau must be keenly aware of the Proposed Rule's ability to chill small business lending by credit unions, sometimes the only in-community option remaining for small businesses.

**Covered Applications**

NAFCU appreciates the Proposed Rule's providing that "a financial institution has latitude to establish its own application process or procedures". Small business lending, particularly at credit unions, is often an iterative process tailored to borrowers' unique needs and not a rote walk-through or fill-in-the-blank template.

NAFCU is, however, concerned by the Proposed Rule's not adopting Regulation B's definition of a "complete application". The Bureau's adopting a "complete application" definition, as opposed to the Proposed Rule's comparatively open-ended definition of an application, would alleviate the significant burden covered financial institutions would have in collecting section 1071 data from unengaged applicants who have no intention of completing the application process. Unnecessary compliance costs that would in short order translate to higher small business borrowing costs would be avoided, and the integrity of valuable section 1071 data on the most important small business lending activity would be protected.

While it may be convenient for the Bureau to have data regarding incomplete applications when it explores fair lending issues related to borrower discouragement, there is no indication that Congress intended for section 1071 to mirror the requirements found in the HMDA and Regulation C. Furthermore, it appears plausible that many incomplete applications could be the product of borrower confusion regarding the need to supply unfamiliar, deeply personal data points rather than the product of borrower discouragement. To the extent that borrower discouragement intersects with more easily measurable fair lending concerns, the Bureau will have more than sufficient section 1071 data, in addition to its existing examination authorities, to investigate ECOA violations involving small business lending products.

**Small Business Definition**

The Proposed Rule would define a small business as any business with prior-year gross annual revenue of $5 million or less. NAFCU supports regulation that enables credit unions to more quickly and confidently support their communities' small businesses. Also, as previously expressed, NAFCU appreciates the obvious benefits of any easy to apply small business definition based on gross annual revenues. However, as discussed more fully in other sections, credit unions generally anticipate being forced to pass along their section 1071 compliance costs to small business borrowers in the form of higher fees.

Small business lending fees are, like many sales taxes, regressive in nature, disproportionately expensive for small businesses borrowing the least. It is altogether possible that fees for the smallest dollar small business lending products could increase to such a proportion that the smallest dollar products altogether disappear from the small business lending market or are offered only by the least scrupulous, least regulated small business lenders. A gross annual revenue

AdminRecord-018504

Consumer Financial Protection Bureau
January 6, 2022
Page 7 of 15

threshold must, therefore, operate to cost-effectively capture only the data reasonably necessary to enable stakeholders to draw statistically significant conclusions about the health and financial needs of truly small businesses.

Based on the underwriting experiences of its members, NAFCU recommends that the Bureau adopt a small business definition based on a $1 million prior-year gross annual revenue threshold.

**Covered Credit Transactions**

The Proposed Rule broadly defines a covered credit transaction to include any extension of business credit other than trade credit, public utilities credit, securities credit, and incidental credit, which are expressly excluded. The Bureau anticipates explaining in the Official Commentary that factoring, leases, consumer-designated credit used for business purposes, and credit secured by certain investment properties are not covered credit transactions. Under the Proposed rule, credit unions' small business loans, lines of credit, and credit cards would all be covered credit transactions. If a credit union offers its small business members a merchant cash advance (MCA) product, that too, would be a covered credit transaction under the Proposed Rule. To gauge the size and distribution of the small business lending market comprised of these products, the Bureau relied on 2019 NCUA Call Report data and similar banking industry data. However, the Proposed Rule offers no *de minimis* threshold below which an otherwise covered credit transaction would not count toward a financial institutions' loan-volume threshold.

NAFCU recommends that the Bureau put its assumptions into practice and establish a *de minimis* threshold applicable to all covered credit transactions that tracks the NCUA Call Report threshold, currently $50,000. Congress' decision to exclude member loans under $50,000 from credit unions' MBL caps and the NCUA's corresponding decision to exclude such loans from Call Reports reflect a general, reasoned understanding that burdensome reporting requirements frustrate very small businesses' access to affordable, high-quality small dollar loans. Small dollar loans are particularly important to sole proprietorships. And, as the Bureau makes extensive note, the majority of women- and minority-owned businesses are sole proprietorships. In the alternative, NAFCU recommends that the Bureau delay any further section 1071 rulemaking until the Bureau is prepared to present a more transparent methodology describing the likely coverage of financial institutions based on lower covered credit transaction thresholds.

NAFCU also recommends that the Bureau expressly exclude small business credit cards from the Proposed Rule's definition of a covered credit transaction. An informal survey of a cross section of NAFCU members suggests that the vast majority of credit unions' new small business credit card account limits are well below the NCUA 5300 Call Report threshold – with median limits hovering tightly around $10,000. NAFCU understands from other industry stakeholders that similar trends persist in nearly every identifiable sub-section of the banking industry.

Under the Proposed Rule, as written, a credit union's approving even marginal small business credit card account limit increases would push the credit union closer toward whatever loan-volume threshold the Bureau ultimately adopts. It seems likely, therefore, that absent the Bureau either establishing a meaningful *de minimis* threshold or expressly excluding small business credit

AdminRecord-018505

Consumer Financial Protection Bureau
January 6, 2022
Page 8 of 15

cards from the Proposed Rule's definition of a covered credit transaction, every credit union that offers even a single small business credit card product will ultimately become a covered financial institution on that basis alone. Furthermore, the Bureau estimates that roughly three-quarters of credit unions do not yet offer a small business credit card product. Any one of that number that subsequently offers its small business members an alternative to high-fee, high-interest small business credit card products pushed by big banks and fintechs would likely find itself soon exposed to the Proposed Rule's extraordinary compliance costs, irrespective of any other small business activities.

NAFCU supports the Bureau's exclusion of consumer-designated credit transactions from the Proposed Rule's definition of a covered credit transaction and recommends that the Bureau further clarify that it will not challenge a credit union's designating an otherwise covered credit transaction to be a consumer-designated credit transaction. NAFCU believes that preserving such discretion is critical to mitigating overall section 1071 compliance risks given covered financial institutions have no reliable method for validating a latent business purpose in an application for a consumer-designated credit transaction.

Finally, because NAFCU believes it is unlikely Congress intended to include commercial real estate loans made to investors within the scope of section 1071, NAFCU again recommends that the Bureau consider expressly exempting such loans from the Proposed Rule's definition of a covered credit transaction rather than rely on the Official Commentary's operation. It is often the case that these loans' relevant data are already reported under the HMDA. Additionally, commercial real estate loans made to investors are typically made to business entities with complex ownership structures that make it difficult for financial institutions to determine even the identity of all of a borrower's principal owners.

**Mandatory Data Points**

*Credit Purpose*

NAFCU recommends that the Bureau further clarify how covered credit transactions should be reported when they are made directly to the sole proprietor of a business, not to the business directly. Credit unions engaged in small business lending to sole proprietors individually may find it confusing to report a loan purpose that implies that the business itself is the recipient.

*Amount Applied For*

NAFCU recommends that the Bureau grant financial institutions the discretion to report an "amount applied for" that is determined at later stage, rather than at the first request of the applicant, because reporting the first initial credit request could inaccurately represent the lending process. Particularly in transactions involving real estate or equipment, many small businesses will request a much higher loan amount than what is ultimately approved after evaluation of collateral. For startups and sole proprietorships, a lack of sophistication can also lead to similarly unrealistic initial requests. In these cases, credit unions work diligently with applicants to arrive at a more reasonable amount, but such education could take place over a period of weeks or months.

AdminRecord-018506

Consumer Financial Protection Bureau
January 6, 2022
Page 9 of 15

*Census Tract*

The geocoding requirement will be a source of significant burden for many credit unions, the vast majority of which do not collect census tract information for small business loans. Although some Community Financial Development Institution (CDFI) credit unions collect census tract information, many are completely unfamiliar with how to collect this information—particularly those that are exempt from the HMDA's reporting requirements. Those credit unions that do not use the Federal Financial Institutions Examination Council's (FFEIC) geocoding tool to collect census-tract information will need to acquire a separate software license from a vendor to implement geocoding. There may also be separate related costs for periodic system upgrades.

The FFIEC geocoding tool also does not permit batch inputs, which further slows more manual application processes at credit unions. For credit unions with limited staff, such a bottleneck could mean losing business as members frustrated by longer approval times look elsewhere. NAFCU, therefore, recommends that the Bureau develop a free tool for use by covered financial institutions that permits batch inputs and better enables covered financial institutions to more efficiently, cost-effectively fulfil their section 1071 responsibilities.

**Protected Demographic Information and Visual Observation**

Under the Proposed Rule, in certain circumstances, a covered financial institution's employee would be forced to determine the ethnicity and race of a small business applicant's principal owner via visual observation.

NAFCU unequivocally opposes the Bureau's adoption of any regulation or examination practice that operates to require that any individual make any visual observation concerning any protected demographic information or similarly sensitive data of a small business applicant's owners. Humans have immense and persistent difficulties accurately and precisely identifying others' race and ethnicity[3]. Routinely inaccurate visual observations of this sensitive data would not only threaten the integrity of other valuable section 1071 data but would add unnecessary friction to small business relationships and give rise to avoidable, unreasonable fair lending risks.

The Proposed Rule's requiring, in certain instances, that a covered financial institution's employee make visual observations of protected demographic information may, too, expose covered financial institutions to compliance costs related to an evolving patchwork of state personal data privacy laws. While some states' personal data privacy laws provide financial institutions an institution-level exemption, at least one state, California, provides financial institutions only an information-level exemption.[4] To the extent protected demographic information is deemed not to be collected "subject to" or "pursuant to" the *Gramm-Leach- Bliley Act*, Californians may have

---

[3] Goldstein, A. G., and Chance, J. (1978). *Judging face similarity in own and other Races*. J. Psychol. 98, 185–193; Meissner, C. A., and Brigham, J. C. (2001). *Thirty years of investigating the own-race bias in memory for faces: a meta-analytic review*. Psychol. Public Policy Law 7, 3–35.
[4] Cal. Civ. Code § 1798.145(c)

AdminRecord-018507

Consumer Financial Protection Bureau
January 6, 2022
Page 10 of 15

certain robust personal data privacy rights with respect to their visually observed protected demographic information collected and maintained by covered financial institutions.

**Discretionary Data Points**

Section 1071(e)(2)(H) requires financial institutions to collect and report "any additional data that the Bureau determines would aid in fulfilling the purposes of [section 1071]." The Proposed Rule would require covered financial institutions to collect and report the following eight discretionary small business lending data: pricing, time in business, North American Industry Classification System (NAICS) code, number of workers, application method, application recipient, denial reasons, and number of principal owners.

In light of the significant one-time and ongoing section 1071 compliance burdens already facing covered financial institutions with respect to their collection and reporting of mandatory data, NAFCU opposes the Bureau's adoption of any discretionary section 1071 data points. The Proposed Rule's discretionary data points represent data that is neither materially useful in fulfilling the ultimate objectives of section 1071 nor reliably obtainable by cost-effective means. NAFCU anticipates that any section 1071 final rulemaking will tend to widen the competitive gulf between credit unions and big banks and fintechs that have the economies of scale and the technological sophistication to automate complex functions. The Bureau's requiring covered financial institutions to collect and report even more, discretionary section 1071 data will only compound credit unions' competitive disadvantages.

For example, NAFCU members who participated in the PPP noted that many small business applicants either did not know what a NAICS code was or how to determine which NAICS code most closely matched their business. Manually collecting just this data point will require a credit union to devote a significant amount of time and resources to ineffective education. One statutory purpose of section 1071 is to facilitate enforcement of fair lending—a goal that is not sector dependent. The identification of business and credit needs can be accomplished without explicit reference to NAICS codes, such as by leveraging already existing data sources and voluntary surveys of business owners. Furthermore, sector-specific analysis of business credit supply and demand is best left to the SBA, which already collects NAICS information through its lending programs.

The risks of the Bureau's collecting the Proposed Rule's discretionary data is not limited to increased compliance costs that drive small business lending costs higher. The Bureau's collection and ultimate reporting of small businesses' time in business, NAICS code, and number of workers, coupled with census tract information, raises serious concerns about small businesses' privacy. Such discretionary data, when made public, could be used to re-identify small business borrowers and help competitors gain impermissible insight into financial information directly bearing on small businesses' long-term financial health and competitive goals.

AdminRecord-018508

Consumer Financial Protection Bureau
January 6, 2022
Page 11 of 15

**Firewall**

Section 1071 generally contemplates the existence of an information firewall between employees handling inquiries about a small business applicant's status as a women-owned, minority-owned, or small business and those employees engaged in underwriting. Under section 1071(d)(2), if a financial institution discovers that an underwriter or others involved in making a determination regarding an application "should have access" to such information, it must provide an applicant a notice of "the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information."

Unfortunately, the Proposed Rule's low loan-volume threshold and expansive covered credit transaction definition will likely operate to require the distribution of the proposed section 1071 information firewall disclosure far more often than Congress intended. Too frequent distribution will produce untenable, negative real-world effects that weigh most heavily on those the regulation is intended to protect.

Many credit unions have small business lending departments comprised of three or fewer employees. Small business lending at such credit unions across the country is more often than not an all-hands-on-deck effort. In operation, the Proposed Rule threatens to create the powerful illusion that these modestly-staffed credit unions are incapable of guaranteeing that protected demographic information will not affect an underwriting decision. The effect will likely be particularly pronounced with respect to women- and minority-owned small businesses, the entrepreneurs of which routinely come face-to-face with the realities of their relative economic disadvantages. A rational entrepreneur of a women- or minority-owned small business would be forced to consider accepting higher interest rates and other onerous credit terms in exchange for the relative peace of mind that a big bank's or fintech's seemingly limitless technology and personnel budgets ensure that protected demographic information remains shielded from underwriters.

The Bureau cannot eliminate the section 1071 information firewall disclosure's giving the appearance that credit unions are incapable of adequately shielding protected demographic information from underwriters. But the Bureau should reduce the need for its distribution by adopting section 1071 regulation with common sense definitions and right-sized thresholds.

**Reputational Risks Related to Statutory Limitations and Future Balancing Test**

As NAFCU has noted more fully in prior comment letters, the publication of small business data from credit unions risks presenting a misleading portrait of overall credit availability due to variables such as field of membership and aggregate MBL limits. As a result of these unique statutory restrictions, credit union lending patterns may not translate easily when compared to other institutions. Accordingly, it is imperative that the Bureau supply a transparent description of the methods and analysis it will apply when evaluating section 1071 data for supervisory purposes.

The Bureau should also recognize that some credit unions may respond to perceived reputational risks associated with data publicization by eliminating certain product offerings or modifying

AdminRecord-018509

Consumer Financial Protection Bureau
January 6, 2022
Page 12 of 15

underwriting practices in a way that reduces the overall diversity of small business products. In such a scenario, small businesses could ultimately find it more difficult to acquire credit on favorable terms if financial institutions seek to flatten pricing artificially because they are concerned by the outward appearance of such discrepancies, even when no discrimination, in-fact, exists.

Credit unions may also need to allocate additional resources to respond to inquiries about section 1071 data from NCUA examiners, who will be performing fair lending analysis of section 1071 data for the first time. To help credit unions better assess possible reputational concerns, the Bureau must also provide a full and complete explanation of any balancing test it intends to use to limit public disclosure of section 1071 data. Merely referencing a conceptual framework and then articulating the full policy later, as the Bureau does in the Proposed Rule and did with the HMDA, will not suffice. For credit unions to accurately assess the full range of privacy and reputational impacts that might be associated with any proposal, there must be a complete understanding of how the balancing test will be applied. For example, credit unions might approach their assessment of the costs of collecting certain data items by considering how it might be used to reidentify a borrower. The risk of reidentification cannot be fully known unless the Bureau provides a complete description of how a balancing test or other methodology for limiting public disclosure works.

**One-Time and Ongoing Compliance Costs**

NAFCU is significantly concerned that the Bureau has materially underestimated the one-time and ongoing costs credit unions are likely to face under the Proposed Rule. While, like others, NAFCU's members have had insufficient opportunity to explore all options, early indications are that third-party training, information technology, and auditing expenses are likely to be several multiples higher than the Bureau's estimates.

The Bureau's estimates with respect to training, for example, tend to reflect a scenario in which the only staff trained on section 1071 compliance are those staff for whom section 1071 data collection and reporting are a primary, largely autonomous job function. Such a scenario may be realistic at the smallest credit unions that have only two or three staff engaged in business lending and at the very largest credit unions with dedicated fair lending compliance departments. However, for credit unions with modest but not minimal staff, such an expectation ignores the fact that it is often the case that all or most employees are trained on all compliance issues to promote cross-functional efficiencies. Expenses may be driven higher still if the Bureau adopts an insufficient mandatory compliance schedule.

**Mandatory Compliance Schedule**

The Proposed Rule's 18-month mandatory compliance schedule would be aggressive even for the largest, most technologically savvy credit unions. As discussed above, the vast majority of credit unions likely to be covered financial institutions under the Proposed Rule will be forced to rely on multiple IT vendors to develop, redeploy, and cross-test section 1071-compliant small business lending programs and tools. Furthermore, many credit unions, because they are exempt from the HMDA's reporting requirements, have no preexisting HMDA software solutions or IT vendor

AdminRecord-018510

Consumer Financial Protection Bureau
January 6, 2022
Page 13 of 15

relationships to leverage. These credit unions will require even more time to come into compliance with robust, technology-intensive section 1071 regulation.

Past experience with the Bureau's implementation of the HMDA suggests that the Bureau is likely underestimating the time required for IT vendors to adapt their products to comply with major rulemakings. Relatedly, many NAFCU members who entered the small business lending market for the first time through the PPP to help local businesses reported having done so by relying on existing resources, not new technologies or other efficiencies. That some credit unions may now provide a more diverse range of products does not necessarily equate to greater sophistication or reduced reliance on manual systems. Credit unions across the country have simply worked harder for longer to support their communities' small businesses during the COVID-19 pandemic.

NAFCU strongly encourages the Bureau to adopt a phased mandatory compliance schedule based on covered financial institutions' loan-volumes that begins no sooner than three years following the Bureau's adoption of a section 1071 final rulemaking. The credit unions, which have the least bargaining power with powerful third-party IT vendors are often the last to receive core system upgrades and must have the time necessary to become fully compliant with a section 1071 final rulemaking.

**Coordination of Examinations**

Unlike mortgages, which are largely homogenous consumer products, small business loans can vary widely in design and purpose. Accordingly, prudential regulators' examiners applying the same analytical techniques and examination approaches applicable to the HMDA's enforcement to small business data may yield erroneous results. Absent a clear description of the methodologies that might be employed to perform fair lending analysis using section 1071 data, there will likely be a period where prudential regulators' examiners' expectations are in flux and, perhaps, materially inconsistent. To the extent that credit unions are subject to section 1071 reporting, the Bureau must coordinate with other FFIEC agencies, including the NCUA, to develop model examination procedures in advance of the Bureau adopting a section 1071 final rulemaking.

**Small Business Lending Data Collection and the SBA**

If the SBA again engages in direct small business lending, as a legislative proposal contained in the *Build Back Better Act* would permit, small business borrowers would face two material, perhaps not obvious, risks – higher borrowing costs and a consolidated small dollar lending market. The Bureau cannot be held responsible for the actions of agencies, but the Bureau must remain keenly aware that its section 1071 rulemaking has significant impacts on a small business lending market shaped by powerful private and public competitive pressures.

First, the Proposed Rule's Official Commentary specifically includes "governmental lending entities" within the definition of a financial institution. While the SBA's balance sheet and reach may more closely resemble those of big banks and fintechs than those of a credit union, the SBA, as the PPP made clear, is significantly reliant on manual information processing and the smooth functioning of the individual offices within its vast network. If the SBA engages in direct lending,

AdminRecord-018511

Consumer Financial Protection Bureau
January 6, 2022
Page 14 of 15

it will no doubt meet the Proposed Rule's definition of a covered financial institution. With the lessons of the last two years firmly in mind, the SBA would likely find it necessary to train nearly all employees on section 1071 compliance to ensure modestly staffed offices can meet their section 1071 responsibilities in times of pronounced small business needs. To offset these and other costs related to the collection and reporting of section 1071 data, the SBA would likely be forced to raise the costs of small business lending products that are, for some borrowers, the best available option.

Second, if the SBA again engages in direct small business lending, the SBA would threaten all credit unions' disintermediation in the increasingly important small dollar segment of the business lending market. Not only does the legislative proposal lack the statutory guardrails to prevent the SBA from becoming credit unions' direct lending competitor, but the legislative proposal also risks fintechs, who have never been permitted to originate 7(a) loans, driving credit unions entirely out of 7(a) lending. The legislative proposal's net effect of increasing private-sector competition for ever fewer private sector SBA lending opportunities will chill credit unions' 7(a) lending and lead to a consolidation of small dollar lending to the detriment of small businesses.

As the Bureau contemplates its section 1071 final rulemaking, NAFCU encourages the Bureau to remain keenly cognizant that its decisions will bear mightily on a profoundly complicated and rapidly changing small business lending market. The Bureau cannot be expected to alleviate all the ill-effects of a potential SBA direct lending program, but the Bureau should ensure that its section 1071 final rulemaking does not unnecessarily compound small dollar lending price increases or speed the small dollar lending market's consolidation.

Relatedly, NAFCU encourages the Bureau to oppose an SBA direct lending program and expressly exclude loans extended by depository institutions and backed by a governmental entity from its section 1071 final rulemaking's definition of a covered credit transaction.

**Conclusion**

NAFCU appreciates the opportunity to comment on the Bureau's Proposed Rule. Section 1071 of the Dodd-Frank Act was written to address economic inequalities much older than even our first form of federal government. That the Bureau approaches such an awesome responsibility at a time when the small business lending market has changed more in the last two decades than in the preceding two centuries makes the Bureau's task all the more challenging. As the Bureau helps this nation move meaningfully along a path to economic inclusion for all, the Bureau must avoid speeding the small business lending market's consolidation and homogenization, particularly at a time when many truly small businesses are only beginning to recover from the shocks of the COVID-19 pandemic.

NAFCU strongly encourages the Bureau to adopt common sense definitions, right-sized thresholds, a reasonable, phased mandatory compliance schedule, and other changes to the Proposed Rule that protect small businesses' access to affordable, high-quality credit from trusted, in-community credit unions.

AdminRecord-018512

Consumer Financial Protection Bureau
January 6, 2022
Page 15 of 15

If you have any questions or concerns, please do not hesitate to contact me at dbaker@nafcu.org
or 703-842-2803.

Sincerely,

Dale R. Baker
Regulatory Affairs Counsel

AdminRecord-018513