# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION;
RIO BANK, MCALLEN, TEXAS; and
AMERICAN BANKERS ASSOCIATION

*Plaintiffs*,

v.

Case No: 7:23-cv-00144

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his official
capacity as Director of the Consumer Financial
Protection Bureau,

*Defendants*.

# JOINT APPENDIX
# OF ADMINISTRATIVE RECORD DESIGNATIONS
# VOLUME XIII

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| | |
|---|---|
| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
|---|---|
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |



Robert M. Fisher, *Chairman*
Brad M. Bolton, *Chairman-Elect*
Russell L. Laffitte, *Vice Chairman*
Gregory S. Deckard, *Treasurer*
Tim R. Aiken, *Secretary*
Noah W. Wilcox, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

*Via Electronic Submission*

January 6, 2022

Comment Intake—Section 1071 Small Business Lending Data Collection
Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC 20552

RE: [Docket No. CFPB-2021-0015] — Small Business Lending Data Collection Under the Equal
Credit Opportunity Act (Regulation B)

Dear Sir or Madam:

The Independent Community Bankers of America ("ICBA")[1] welcomes the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Proposed Rule on Small Business Lending Data Collection ("Proposal"). Among other requirements, Section 1071 of the Dodd Frank Act requires financial institutions ("FIs") to collect certain data regarding applications for credit from women-owned, minority-owned, and small businesses, and to report that data to the Bureau on an annual basis. While ICBA firmly supports the intention behind the Proposal and the desire to expand access to credit for minority-owned, women-owned, and small businesses, we remain deeply concerned that the proposal's overly broad coverage will uniquely disadvantage the business customers of community banks.

Specifically, we believe that the Proposal will threaten the privacy of small business customers, increase the cost of credit, discourage "loan shopping" for the best product, increase

---

[1] *The Independent Community Bankers of America® creates and promotes an environment where community banks flourish. ICBA is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services.*

*With nearly 50,000 locations nationwide, community banks constitute roughly 99 percent of all banks, employ nearly 700,000 Americans and are the only physical banking presence in one in three U.S. counties. Holding nearly $5.9 trillion in assets, over $4.9 trillion in deposits, and more than $3.5 trillion in loans to consumers, small businesses and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation and fueling their customers' dreams in communities throughout America. For more information, visit ICBA's website at www.icba.org.*

*The Nation's Voice for Community Banks.®*

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018557

compliance costs, and most unfortunately – erode the customized, relationship-banking model in which community banks take pride.

<u>**GENERAL COMMENTS**</u>

Small business lending is complex and cannot be "commoditized" in the same way as consumer lending. Each small business loan has customized terms based on an analysis of numerous factors. Complex lending should not be subject to simplified, rigid analysis, which might give rise to unfounded fair lending complaints. For this reason, the proposed rules under Section 1071 will have a chilling effect on community banks' ability to price for risk, unless the Bureau can properly tailor a rule that excludes community banks from coverage.

The application of this consumer protection law is grossly incongruous with the underlying nature of small business lending. Unlike consumer loan products, such as mortgages and credit cards, small business loans are non-homogenous and do not lend themselves to standardized recordkeeping or comparative analysis.

<u>**EXECUTIVE SUMMARY**</u>

As explained more fully below, ICBA has the following main concerns and recommendations.

1. The smallest community banks will inappropriately be covered by the scope of the rule.
   **The CFPB should exclude community banks with assets of $1.3 billion or less from coverage. By providing partial or full exemption from this rulemaking, the Bureau will still overwhelmingly meet the objectives of the law while mitigating the associated costs.**

2. The Proposal's coverage of nearly every existing business will disproportionally increase the cost of, and decrease access to, credit for truly small businesses. **The CFPB should define a "small business" as a business with gross annual revenue of $1 million or less.**

3. Nearly doubling the number of data points will greatly increase the burden of complying with the congressional intent of the law while also increasing the threat to small business applicants' privacy.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018558

**The final rule should only require the collection and reporting of statutorily mandated data points.**

4. The Proposal will unnecessarily risk the privacy of small business applicants. **The CFPB should publish a full privacy balancing test after one year's collection of data and provide an opportunity for notice and comment before determining which data to make public.**

5. Community banks will not have ample time to comply in good faith with this rule. **The final rule should provide at least three years for FIs to comply, or in the alternative, stagger the implementation dates based on asset size.**

6. The firewall requirement cannot feasibly be met by community banks, and the proposed solution will create a chilling effect for community banks, granting larger FIs and fintech companies a competitive advantage. **The inability to firewall information is additional justification to exclude smaller, federally supervised FIs from this rulemaking. Alternatively, the CFPB should establish a platform where applicants can anonymously input their demographic information for all FIs.**

7. Compliance with this rulemaking will be an entirely new environment for many community banks. **While ICBA supports the proposed safe harbors and allowance that bona fide errors are not Equal Credit Opportunity Act ("ECOA") violations, ICBA recommends that the Bureau additionally provide for a 12-month grace period after the compliance date.**

8. Though recordkeeping is a necessary part of any data collection rulemaking, it will nonetheless prove difficult for many community banks. **ICBA recommends that the Bureau provide banks with options to report annually or as loan applications are received.**

9. Verifying small business applicant information presents additional burdens beyond the mere collection of information. **Though ICBA welcomes the Bureau's proposal not to require FIs to verify applicant-provided information, ICBA urges the Bureau not to require FIs to provide separately verified information.**

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018559

## SECTION-BY-SECTION COMMENTS

1) **A coverage threshold of $1.3 billion for federally supervised FIs would collect information for more than 90 percent of all business loans made.**

The Proposal defines a "Financial Institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity that engages in any financial activity."[2] This is a broad definition which covers any bank, credit union, financial technology company, or non-bank lender that is engaged in small business lending. We believe the breadth of this definition is appropriate because it tends towards regulatory parity for larger participants in the small business lending market, regardless of what type of business form they take. **We recommend the adoption of this proposed definition without revision.**

By contrast, we strenuously object to the proposed §1002.105(b), which defines what constitutes a *covered* financial institution, and therefore determines the scope of the rule. **The rule proposes to cover any FI that "originated at least 25 covered credit transactions for small businesses in each of the two preceding calendar years."**[3] In other words, any FI that originated fewer than 25 covered small business loans in the two preceding calendar years is exempt from the rule. **This exemption threshold is inappropriately low; and if §1002.105(b) is implemented as proposed, it will almost certainly raise the cost of credit for the small business borrowers that Section 1071 is designed to protect, as thousands of small lenders would be forced to shoulder the significant compliance costs associated with a major new data collection requirement.**

We have heard from the smallest community banks in the country, and there is significant consternation about the collection and reporting requirements of this rule. Our analysis of publicly available Call Report data substantiates this concern. **If the proposed 25 loan threshold is finalized, we conclude that at least 780 banks with less than $100 million in assets will be subject to the rule,[4] yet would only provide an incremental increase in the number of business loans reported. For context:**

- **the average bank of less than $100 million in assets has 13.1 employees working at 1.6 branches.**

---

[2] 86 Fed. Reg. 56577.

[3] *Id.*

[4] Based on analysis of the number of "loans to small business" reported on Schedule RC-C, part II of the Call Report in the four quarters ending with Q3 2021, this category includes "loans secured by nonfarm nonresidential properties" and "commercial and industrial loans" in amounts less than $1 million. While this is not a perfect match for the requirements of Section 1071 because borrower revenue is not reported (no such data is currently reported), we believe it is a sufficiently close proxy to demonstrate the broad scope of the proposed rule.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018560

- Banks below $200 million in assets have an average 20.8 employees at 2.2 branches.
- Banks below $750 million in assets have an average of 36.4 employees at 3.4 branches.

**To reiterate, the final rule should capture the supermajority of the number of small business loans – more than 90 percent of the market – that burdens the fewest number of community banks.**

a) <u>Asset-Based Thresholds</u>

**We urge the Bureau to exempt all community banks with less than $1.322 billion in assets, which is the current threshold used by the FDIC, the Federal Reserve Board, and the Office of the Comptroller of the Currency to define a "small bank" in the agencies' Community Reinvestment Act ("CRA") regulations.**[5] This threshold is currently recognized by federal banking regulators and within the banking industry as a delineating line between small banks and larger banks with increased compliance capacity and regulatory obligation. Using the CRA threshold would also focus the rule on those banks that already have more advanced compliance systems, particularly for data collection, as the result of their coverage under CRA.

Alternatively, we propose that the Bureau exempt all community banks defined as small businesses under the Small Business Administration's North American Industry Classification System ("NAICS") size standards. Currently, that threshold is set at $600 million in assets.[6] According to the regulations, "SBA's size standards define whether a business entity is small and, thus, eligible for Government programs and preferences reserved for 'small business' concerns."[7] Because Section 1071 is a law designed to protect small businesses, the CFPB should not implement regulations which substantially burden banks below $600 million in assets and are themselves legally defined as small business concerns.

Either of these thresholds would burden many fewer banks than the proposed rule – without substantially altering the data on small business lending reported to the government. **Based on the Call Report data, if the $1.322 billion exemption threshold is used, the CFPB will collect data on 91.27% of all small business loans made by banks.** The actual percentage of small business lending data collected will likely be even greater because the Bureau is also proposing to collect data from non-bank lenders. **If the $600 million threshold is used instead, the CFPB will capture 95.78% of small business lending data.**

---

[5] 12 CFR 345.12; 12 CFR 228.12; 12 CFR 25.12.
[6] 13 CFR 121.201.
[7] 13 CFR 121.101.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018561

**To subject thousands of additional small depository institutions to a complex and costly rule to collect data on 4.22% of the small business lending market is unreasonable.** If the exemption threshold is not raised, this rule will harm small lenders and their borrowers. It will lead to additional compliance costs which the smallest lenders will disproportionately bear and be forced to pass on to customers. It will drive consolidation in underserved and rural areas as lenders clamor for economies of scale. It will lead some banks to scale back or discontinue small business lending. The proposed rule, with its capriciously low exemption threshold, favors large institutions with large compliance teams and has a disproportionate negative impact on small lenders that genuinely understand their communities and local small businesses. **The exemption threshold must be raised to prevent these highly foreseeable negative effects.**

b) <u>Volume-Based Threshold</u>
We do not favor the use of a volume-based threshold for depository institutions and instead favor an asset-based threshold. In general, an asset-based threshold is a better solution because lending volume can vary from year to year, leading to potential uncertainty about whether the bank must comply, or to situations where a bank vacillates between being a covered FI or an exempt one from year to year.

While bank assets can also vary, once a bank crosses an asset threshold, it is less likely to cross below it in subsequent years. Additionally, because banks can forecast when they are likely to surpass an asset threshold well in advance, they are better able to plan and budget for the necessary investments in software, training, and personnel in advance of required compliance.

Community banks are not the "Too Big To Fail" Wall Street banks with compliance staff numbering in the thousands. They are small, locally owned, and locally managed institutions, with a of employees. Many of these employees perform multiple roles within the bank and are already responsible for complying with a myriad of complicated regulations.

The CFPB's proposal is in excess of 200,000 words and fills 251 pages in the Federal Register. Given the complexity of the issue and of the federal rulemaking process, this may be an appropriate length, and we appreciate the depth of the Bureau's analysis. Nevertheless, the reality is that the proposed rule is a massive document that will create significant and ongoing compliance burdens for covered FIs. For community banks, this burden will be particularly onerous and costly, and it may force some institutions to recoup those onerous costs by assessing additional fees to small business borrowers or scale back or eliminate their presence in the small business lending market.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018562

7

**Therefore, in the strongest possible terms, we urge the CFPB to exercise its statutory authority to exempt small community banks from compliance with this proposed regulation.**[8] The CFPB is proposing to utilize this authority to exempt FIs which make less than 25 loans. We oppose this threshold and instead, urge the CFPB to implement an asset-based exemption threshold for small banks. An asset-based exemption is less prone to annual fluctuation than an activity threshold and would allow the Bureau to align its regulations with existing regulatory requirements.

If the Bureau opts to use a volume-based threshold for FIs, we must renew our objection that the proposed threshold of 25 is too low. It would require compliance by many of the smallest banks in America. We recommend a 1,500-loan exemption threshold. This threshold would exempt an average community bank with less than $750 million in assets, while still collecting more than 90% of small business lending data.

c) FI Characteristics

Apart from using asset size or loan volume to determine the rule's coverage, ICBA recommends that the Bureau also consider the underlying characteristics and activities of the FI. Specifically, ICBA recommends that the Bureau provide partial or total exemption for FIs that are (1) community development financial institutions ("CDFI"), (2) Minority Depository Institutions ("MDI"), or (3) located in rural areas or underserved areas.

i) CDFI

CDFIs, accredited by the U.S. Department of the Treasury, are FIs that are committed to community-focused lending but have difficulty raising the capital needed to provide affordable financial services. Among other requirements, a FI with a CDFI designation must demonstrate and prove that it: (1) has a primary mission of promoting community development, (2) primarily serves a target market, such as a predominantly low-and-moderate income ("LMI") community, and (3) maintains accountability to that target market.

The Bureau decided to exempt CDFIs when implementing the Qualified Mortgage ("QM") rule, finding that CDFIs that provide mortgage loans generally employ underwriting guidelines tailored to the needs of LMI consumers.[9] In providing this exemption, the Bureau explained

---

[8] *See* 12 USC 5512(b)(3), which gives the CFPB authority to "unconditionally exempt any class of covered persons … from any provision of this title, or from any rule issued under this title, as the Bureau determines necessary or appropriate to carry out the purposes and objectives of this title." This provision unambiguously gives the CFPB the authority to exempt community banks below a designated asset threshold if the Bureau conducts a cost-benefit analysis and concludes that the cost to community banks and their customers outweigh the benefits of requiring community banks to comply.

[9] 78 Fed. Reg. 35464

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018563

that because CDFIs are more likely to consider non-standard factors and do not typically underwrite to industry-wide standards, that they can better account for the unique credit characteristics of LMI consumers.

At the time, the CFPB exempted CDFIs because LMI consumers "have difficulty obtaining responsible and affordable credit, and that the burdens imposed by the ability-to-repay requirements would significantly impair the ability of these creditors to continue serving this market."[10] The same logic would hold here if the Bureau were to exempt CDFIs from coverage under a 1071 rule. CDFIs should not be additionally burdened by complying with this rule when they are already serving LMI populations. They already document many of the data points being proposed, and if the Bureau does not provide whole exemption, then partial exemption from redundant data points would be prudent.

    ii)  <u>MDI</u>
MDIs were designated under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), when Congress recognized that minority banks can play an important role in serving the financial needs of historically underserved communities and minority populations. The Federal Deposit Insurance Corporation ("FDIC") defines an MDI as any federally insured depository institution for which 51 percent or more of the voting stock is owned by minority individuals or a majority of the board of directors is minority, and the community that the institution serves is predominantly minority.

Since Congress has determined that MDIs already play an important role in serving underserved communities and minority populations, the intent behind Section 1071 is already met by MDIs, and therefore, should not redundantly be applied to this special class of FIs. As such, ICBA urges the Bureau to exempt MDIs from the 1071 rule's coverage.

    iii)  <u>Rural and Underserved Areas</u>
The Bureau should exempt small lending institutions and those operating entirely outside of metropolitan statistical areas ("MSA"), such as community banks that operate in rural or underserved areas. This exemption would mirror the Home Mortgage Disclosure Act's ("HMDA") exemption for similarly situated banks.[11] Exempting these community banks from

---

[10] 78 Fed. Reg. 35464
[11] 12 CFR 1003.2(g)(1)(ii)

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018564

coverage would simplify and maintain congruency between Section 1071 and HMDA. Ultimately, no regulatory compliance is costless, and if these community banks are not exempted from Section 1071, those costs will be passed on to business borrowers. In some cases, this increase may make loans unaffordable and reduce access to credit.

2)  **While ICBA welcomes the use of Gross Annual Revenue as the determining factor of covered business applicants, the threshold should be $1 million rather than $5 million.**
Though the statute uses section 3 of the Small Business Act to define a small business, the CFPB proposes to use a business's gross annual revenue ("GAR") to determine which businesses are covered by the law. The Bureau believes that using a GAR threshold to define a "small business" would facilitate compliance for FIs applying "a simple, broad definition…that would be practical…in the market."[12] The Bureau proposes to define the term as a business with gross annual revenue the preceding fiscal year of $5 million or less.

ICBA supports the Bureau's approach and agrees that using the bright line of a business's GAR is a convenient way for a bank to quickly determine whether an applicant will be covered by the rule. It is an efficient way for banks to comply. ICBA supports adopting a definition that is less complex than Small Business Administration's ("SBA") size standards based on 6-digit NAICS codes. However, ICBA does not support the proposed GAR threshold of $5 million, but instead, urges the Bureau to use a $1 million threshold, which will streamline compliance, cover the vast majority of businesses, and correspond to the public's general understanding of a "small business."

a)  A $1 million threshold promotes simplicity and ease of compliance.
As part of its justification for setting a $5 million GAR threshold, the Bureau notes that larger FIs categorize loans made to businesses based on GAR, with loans to businesses up to $5 million categorized as small/retail customers. If the Bureau was willing to limit the coverage of this rule to those larger FIs, then perhaps a $5 million GAR threshold would be appropriate. However, since the Bureau is proposing to cover smaller FIs, then consideration of how larger FIs treat small business loans should not bear weight on regulations applying to community banks.

Instead of considering how larger FIs categorize their commercial lending, the Bureau should review existing regulations that use a $1 million threshold and align 1071's definition with those requirements. For example, Regulation B uses a $1 million GAR threshold to determine how a bank provides adverse action notifications to business applicants,[13] and CRA regulations use a

---

[12] 86 Fed. Reg. 56426
[13] 12 CFR 202.9(a)(3).

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267              866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378    www.icba.org

AdminRecord-018565

$1 million GAR threshold to determine which commercial loans meet community development loan requirements.[14]

In this analysis, the Bureau rightly focuses on ease of compliance, certainty of coverage, and bright-line assessments. The Bureau should truly prioritize these attributes and create a bright-line GAR of $1 million – in large part, due to the reasons laid out above. It is a threshold that is already widely understood and accounted for by community banks. Existing regulations already hinge on the $1 million GAR threshold. Creating a new "small business" threshold standard will almost certainly create confusion and difficulty with compliance, thus undercutting the benefits the Bureau outlines above.

b) <u>A $1 million GAR threshold covers the vast majority of all businesses.</u>
ICBA contends that not only does a $1 million threshold cover **most <u>small</u> businesses**, but a $1 million definition covers nearly <u>**every**</u> business, which should be more than sufficient to meet Congressional intent.

From the 2012 Census Survey of Business Owners, cited in the Bureau's own research on setting an appropriate threshold, approximately 95 percent of all businesses had less than $1 million in annual revenues.[15] Roughly, 97.7 percent of all minority-owned businesses and 98.3 percent of all women-owned businesses were similarly under $1 million in annual receipts.[16] A portion of this is worth emphasizing – a $1 million threshold would cover 95 percent of <u>**all**</u> firms, not just "small" ones. This context is important when considering the common usage and understanding of "small" businesses, which is discussed below.

c) <u>Common usage of a "small business" implies a GAR of $1 million or less.</u>
Apart from the simplicity and ease of compliance of using a $1 million threshold, the common understanding of a "small business" is one with revenues under $1 million. According to a research poll, commissioned by ICBA and conducted by Morning Consult, nearly 90 percent of respondents indicated that a "small business" is one with GAR of $1 million or less, with the

---

[14] 12 CFR 25.12(g)(3); 12 CFR 195.12(g)(3); and 12 CFR 228.12(g)(3).
[15] U.S. Census Bureau, Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012 More Information 2012 Survey of Business Owners, American Fact Finder, (last visited Feb 27,2017), available at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodTyp e =table/.
[16] *Id.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018566

vast majority of respondents indicating that a small business is one with less than $500,000 in revenue.[17]





As several consumer groups noted in response to the Small Business Regulatory Enforcement Fairness Act ("SBREFA") Outline, the Bureau must align its definition of a "small business" with congressional intent. Although the Bureau is not using the exact definition prescribed in the statute, its approach to use a simple revenue threshold should be lauded, but only as far as it retains a semblance to the general understanding of a "small business." As it deviates further from the common usage of the term "small business," the Bureau tacks father from congressional intent. Indeed, by setting a threshold that covers nearly *every* business, let alone "small," the Bureau diminishes the importance that Congress placed on the modifier "small."

d) <u>Small farm and agricultural loans should be exempt from coverage.</u>

ICBA recommends that the Bureau exclude small farm and agricultural loans from coverage. Not only is it unlikely that Section 1071 was enacted to cover small farm and agricultural lending, but their underwriting criteria are distinct and different from small business loans. The distinction is already codified in several laws and regulations. For example, the definition of small business loans and small farm loans under CRA have two different definitions, revealing the distinction between the two. HMDA also exempts rural lenders located in nonmetropolitan areas.

Because large banks often do not engage in significant agricultural lending, community banks are often the only option for small farms. If the burden of Section 1071 compliance forces small lenders to reduce their lending below the exemption threshold it may limit the access to credit

---

[17] This poll was conducted between November 1st and November 4th, 2021 among a national sample of 1996 voters. The interviews were conducted online, and the data were weighted to approximate a target sample of voters based on age, gender, educational attainment, race, and region. Results from the full survey have a margin of error of plus or minus 2 percentage points.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018567

for these agriculture businesses unless farm loans are exempted from coverage under the definition of "small business."

### 3) The CFPB should limit the compilation of reportable data to that which is required by statute.

Although the statute requires FIs to "compile and maintain" records of information provided by applicants on enumerated data points,[18] the Bureau is using its authority[19] to require additional data points that the Bureau determines would aid in fulfilling the purpose of [section 1071] (hereinafter, "discretionary data points").

The Bureau is proposing to require collection and reporting of discretionary data points that it considered in the SBREFA Outline, including pricing, time in business, NAICS code, and number of workers. Further, the Bureau is proposing several additional discretionary data points that were not considered in the SBREFA Outline nor discussed among small entity representatives ("SERs"), including application method, application recipient, denial reasons, and number of principal owners.

While ICBA supports the Bureau's goal of eliminating illegal discrimination, we are concerned that many of the discretionary data points, such as number of workers, the application method and recipient, are not currently collected by community banks and will be an entirely new burden for them. Not only are many of these discretionary data points not relevant to creditworthiness, ICBA is concerned that the inclusion of these data points will increase the occurrence of misinterpretations or incorrect conclusions drawn from the data. If the Bureau is concerned about fair lending violations, then it should acknowledge that the prudential banking agencies conducting fair lending exams have the majority of these data points, along *with* the contextual information that would correct for otherwise erroneous conclusions. Community banks are already examined for compliance with fair lending laws – the collection of all these data points duplicates, or worse usurps, those prudential agency efforts.

Further, given the unprecedented nature of this regulation, it is uncertain whether the burden of collecting this new information will provide the benefit that the Bureau anticipates. If the Bureau opts to require some or all of the proposed discretionary data points, then ICBA urges

---

[18] Section 704B(e) of the Equal Credit Opportunity Act ("ECOA").
[19] Section 704B(e)(2)(H) of ECOA.

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018568

the Bureau to consider partial collection of data for community banks and other, similarly small FIs that are least likely to afford the additional burden that such collection would create. Requiring all 21 proposed data points for only the largest FIs would provide a mechanism for the Bureau to establish a baseline of data that could better inform future efforts to decide whether greater coverage or applicability to smaller FIs is warranted.

The cost of collecting and reporting the data points will include expensive data quality scrubs to avoid negative examination findings, costs that will be disproportionately borne by smaller FIs, such as community banks.

Given that much of this data is not currently collected by community banks, there are concerns that compliance with this rule will require the standardization and homogenization of small business lending, which is anathema to the customized and relationship-based lending for which community banks are valued. While some FIs already automate and standardize their small business lending departments, community banks will be left with a choice: standardize their small business lending to comply with this proposed rule or incur disproportionate costs to continue their customized and relationship-based approach.

Distinct from larger market participants that base their business models on scale and repeatability, community banks are relationship lenders. Community banks design products and services that are tailored to their small business customers' needs. These unique products and services are near-impossible to standardize, but they are often the only product or service available to small businesses – especially the small businesses that are most vulnerable and in need.

If all the proposed data points are uniformly required of all covered FIs, then many community banks will be forced to choose the standardization route. This harms community bank lending, but it most harms the small businesses that most benefit from the high-touch, relationship-based lending that community banks offer.

    a)  <u>Ethnicity, Race, and Sex of Principal Owners</u>

The Bureau is proposing to require FIs to collect and report the ethnicity, race, and sex of the applicant's principal owners as well as whether this information is being reported based on previously collected data. It is also proposing to require FIs to conduct a visual observation or surname analysis to determine the race and ethnicity of an applicant who declines to respond to the collection request. Proposed appendix G would include a requirement that a FI inform an applicant that the applicant is not required to respond to the FI's questions regarding its principal owners' ethnicity, race, or sex.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018569

ICBA notes that the visual observation and surname analysis for applicants that do not self-report is one of the most controversial provisions of the proposed rule. We strongly recommend that the Bureau rescind the proposed requirement to conduct a visual observation and surname analysis, and instead, implement the approach that was contemplated in the SBREFA Outline.

Specifically, the Bureau should require that the collection and reporting of the race, sex, and ethnicity of small businesses' principal owners be based solely on applicant self-reporting. If an applicant provides a principal owner's race, sex, or ethnicity, the FI would report this information and would have no obligation to verify it.

Not only would this proposed requirement be extraordinarily uncomfortable for the bank employee conducting the visual observation, but it would be in direct contradiction to the applicant's wishes not to identify their race or ethnicity. This right is clearly stipulated in law, and the Bureau's proposed requirement would be an end-run around that right.

Further, and as noted in the SBREFA Outline, requiring reporting based on visual observation or surname could create unwarranted compliance burdens in the context of small business lending. These burdens may include the costs to create and maintain policies and procedures; costs of applying such policies and procedures in a consistent manner; costs to conduct ongoing training; and costs to audit compliance.

Finally, if the public is going to rely upon this dataset for policy decisions and a better understanding of the market, then the Bureau should do its best to ensure that the data is accurate and not subjective. Including guesses and hunches in a dataset do not lead to sound conclusions. ICBA strongly urges the Bureau to rescind its proposed requirement for banks to conduct visual observations and surname analyses of applicants.

The CFPB should allow for self-identification and not require FIs to supplant applicant wishes with their own guesses. Instead, if response rates to demographic inquiries are so low due to fear of discrimination, a better method of gathering data would be to provide the applicants with an online portal to self-identify that ensures their demographic anonymity (discussed further, below, in the firewall section).

  b) Pricing Information
Also not required by statute, the CFPB is proposing to require FIs to report:
    (1) the interest rate that is or would be applicable to the covered credit transaction;
    (2) the total origination charges for a covered credit transaction;

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018570

(3) the broker fees for a covered credit transaction;
(4) the total amount of all non-interest charges that are scheduled to be imposed over the first annual period of the covered credit transaction;
(5) the difference between the amount advanced and the amount to be repaid for merchant cash advances; and
(6) information about any prepayment penalties applicable to the covered credit transaction.

The Bureau is proposing to include these discretionary data points because it believes that heightened risks to fair lending and small business development may arise from different pricing for the same products and the selective marketing of higher-priced or even predatory and unsustainable products.

ICBA has an issue with these proposed data points on two fronts discussed more fully below. First, though different pricing for the same products may evidence predatory or discriminatory lending, the proposed data points will not be gathering pricing for the <u>same products</u>. Second, pricing will not accurately capture the ancillary products and services that community banks offer to their customers, where a pricing premium is acceptable for the higher quality product and services.

     i)   <u>Comparison of heterogeneous commercial products will not yield significant findings.</u>

The Bureau believes pricing data are important because the statutory data points alone offer: (1) limited insight into underwriting disparities and (2) no insight into predatory prices or pricing disparities. The Bureau notes that pricing data in HMDA has been critical in identifying disparate pricing among protected classes.

However, instead of giving the Bureau and researchers the data set to make statistically sound findings, the collection of pricing information is much more likely to increase unsound findings and allegations. Pricing could be publicly reported with the assumption that like products are being compared against other like products, but without contextual information that would explain the pricing variations due to factors such as the nature of the collateral, credit scores, size of down payment, compensating deposit balances, bundled services, etc.

Unlike other types of consumer credit, each small business has its own distinctive characteristics with unique credit needs. Existing business lending practices do not conform to a standard data collection practice and would require extraordinary change to comply. Unlike the residential mortgage market, where there is a standard portfolio of products, each small

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018571

business is different from others, each has its own needs, and as such, each small business loan is similarly distinct from other small business loans.

Discerning discrimination based on pricing for consumer products is a much more established and tenable proposition.  There are many fewer variables, and the market has largely been homogenized and standardized through a robust secondary market. Such a market does not exist to the same degree for commercial lending. ICBA is concerned that efforts to collect pricing data, as well as several other data points in this proposal, will push the industry in that direction. Thus, the customized, high-touch relationship bank model that community banks offer will be eradicated.

    ii) <u>Pricing premium data point would not reflect small business customers' preference for community banks.</u>

Apart from providing credit to their small business customers, community banks overwhelmingly provide valuable ancillary services to their customers, such as acting as advisor or consultant. For example, community banks often know commercial zoning laws in their local community just as well as an official at city hall. They have the familiarity and local knowledge that is unparalleled, and small business customers depend on and benefit from that knowledge. As such, pricing data from a community bank may appear inflated when compared to other FIs, but that price premium includes these ancillary services. This is a data point, that like many other discretionary data points proposed, will lead to erroneous conclusions.

Apart from ICBA's objection to including pricing terms as a data point, ICBA stresses that the Bureau should eliminate pricing data points that are uniformly assessed to all credit applicants, or fees assessed from third parties. For example, if all applicants are charged a $50 annual fee or 0.25 percent broker fee, there is no disparate allocation of those fees, and as such, would not aid the Bureau or the public in determining fair lending violations. Therefore, if certain pricing data will not be useful toward the Bureau's goals, then it should not be collected.

    c) <u>NAICS Code</u>

Even though it is not required by statute, the Bureau is proposing that FIs collect and report an applicant's 6-digit NAICS code. ICBA objects to the inclusion of this data point. Not only is it not required by statute, but it does not provide information that would inform fair lending scrutiny. Further, many community banks have expressed an unfamiliarity with NAICS or do not currently collect it - this would be an additional burden placed upon them.

The Bureau cites the identification of high-risk industries, such as those with high rates of businesses leaving the market or that deal primarily in cash transactions, as potential evidence

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018572

in determining fair lending violations. The Bureau should acknowledge that these decisions are indicative of risk tolerance – not of fair lending violations. Collecting this information could present disparities of lending to industries, but it would not portend disparate treatment of protected classes of borrowers.

Separately, and as discussed below, the combination of NAICS code with statutorily mandated data points is the most significant risk to customer privacy.

d) Application Method

The CFPB is proposing to require FIs to collect and report application method or the means by which the applicant submitted the application to the FI. ICBA strongly opposes this proposed requirement. Not only is this data point not mandated by statute, but it was also not considered in the SBREFA Outline and was only requested by one SER panel participant.

Currently, the vast majority of community banks do not collect nor record the application method. This would be a new data construct if finalized. The complexity of this data point will likely lead to unintentional errors. Additionally, including this data point is unlikely to achieve the CFPB's stated goals. This suggests that the Bureau should remove this proposed data point. This data point is needlessly complex and unlikely to provide the Bureau or public with meaningful evidence of discrimination. Other stated policy goals can be achieved by combining other statutorily mandated data points.

i) Needless Complexity

Though complying with "application method" by selecting in-person, telephone, online, or mail seems simple on its face, the lengthy official comments indicate that compliance will almost certainly not be simple. Proposed comment 107(a)(3)-1 would explain how FIs are to choose which application method to report, including via "waterfall approach" when they have contact with an applicant in multiple ways. The official comments then provide detail in the "waterfall approach" at which point the complexity of compliance becomes apparent.

- Proposed comment 107(a)(3)-1.i would provide that a FI reports the application method as "in-person" if the FI, or another party acting on the FI's behalf, meets with the applicant in person (for example, in a branch office, at the applicant's place of business, or via electronic media with a video component).
- Proposed comment 107(a)(3)-1.ii would provide that a FI reports the application method as "telephone" if the FI, or another party acting on the FI's behalf, did not meet with the applicant in person but communicated with the applicant by telephone or via electronic media, without a video component.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018573

- Proposed comment 107(a)(3)-1.iii would provide that a FI reports the application method as "online" if it, or another party acting on the FI's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone but communicated with the applicant through an online application, electronic mail, text message, and/or some other form of online communication.
- Proposed comment 107(a)(3)-1.iv would provide that a FI reports the application method as "mail" if the FI, or another party acting on the FI's behalf, did not meet with the applicant in person and did not communicate with the applicant by telephone but communicated with the applicant in writing via United States mail, courier or overnight service, or hand-delivery (including hand-delivery of documents via an overnight drop box or at a teller window).
- Proposed comment 107(a)(3)-2 would provide guidance on what application method a FI would report for interactions with applicants, both online and by mail. A FI would report application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners.

Though likely intended to be comprehensive and illustrative, this "waterfall approach" is very complicated and prone to unintended errors. Apart from the subjectivity and differing trigger of "application" from FI to FI, there will undoubtedly be situations where the applicant initially meets with the FI telephonically, "submits the application" via mail or email, but only meets with the FI in-person at some point before a credit decision is made but after the "application" was submitted.

This is an incredibly complex data point that presents limited value. The CFPB should not include this data point in the final rule.

ii)    Unlikely to Provide Evidence of Discrimination from Bad Actors
The Bureau contends that this data point will monitor for discouragement of applicants. This contention is reasonably based on the "bad actor theory" – that certain bad actors will discriminate against protected classes of people based on their appearance, and that correlating certain application methods (in-person or remote) with adverse credit decisions can ferret out that illegal discrimination. That theory, though, is based on the faulty assumption that bad actors will accurately report this data point.

For example, if a bad actor were indeed discouraging certain protected classes of applicants, it is likely that the bad actor would misreport other data points of this rule that would evidence their illegal activity. Only the good actors that do not illegally discriminate will accurately record

*The Nation's Voice for Community Banks.®*

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267              866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378    www.icba.org

AdminRecord-018574

this data point, and therefore, the data is unlikely to show a correlation between application method and discouragement.

The Bureau also explains that data on application method would assist in analyzing data reported under, and assessing compliance with, proposed §1002.107(a)(20), which requires FIs to collect principal owners' ethnicity and race via visual observation or surname in certain circumstances. Yet, here again, the Bureau uses the faulty logic that a bad actor will accurately report the data that will evidence their non-compliance with other portions of the rule.

    iii) <u>Achieving Stated Policy Goals by Combining Already Collected Information</u>
Finally, the Bureau believes that application method may help users of 1071 data analyze the extent to which FIs may be providing access to credit online or by telephone in "credit deserts" where FIs do not have branch operations. However, this data could easily be inferred by matching portions of 1071 statutorily mandated data with other publicly available data.

For example, collecting the census tract of the loan proceeds will indicate whether the loan was indeed originated in a credit desert or in an area where the FI does not have a branch presence. In either such case, the Bureau would be able to analyze the extent to which applicants are receiving credit online or by telephone without creating the additional burdensome data point.

    e) <u>Denial Reasons</u>
Though not required by statute, the Bureau is proposing to require FIs to report the principal reason or reasons the FI denied the covered application. Proposed comment 107(a)(11)-1 explains that a FI complies with proposed §1002.107(a)(11) by reporting the principal reason or reasons it denied the application, indicating up to four reasons. The Bureau notes that its proposed approach for this data point largely mirrors the Regulation C approach for denial reasons.

Apart from the privacy concerns (noted below), ICBA continues to recommend that this data point should not be required but should be optional for FIs. If the Bureau believes that including denial reasons might reduce the risk of erroneous conclusions and fair lending actions, then the Bureau should grant FIs the discretion of including those data points, dependent on their own risk appetite and mitigation strategies.

However, if the Bureau elects to include this data point, ICBA believes that the denials reason categories listed constitute a full picture of reasons that credit is typically denied.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018575

f) <u>Number of Workers</u>

Another data point not required by statute but being proposed by the Bureau is the number of workers that the small business applicant employs. The Bureau believes that this data point would aid in fulfilling the business and community development purpose of section 1071.

Once again, ICBA objects to the proposed inclusion of this discretionary data point. The Bureau is correct in recognizing that many banks that do not originate SBA loans do not typically collect the number of employees in a company. Making this more difficult, the Bureau has changed the SBREFA Outline contemplated "employee" data point and is now proposing "workers," which would include contractors and others that are not necessarily employed by the applicant. This information is not necessarily known by the applicant, will have little value toward enforcing fair lending laws, and will likely generate error and bad data.

If the Bureau proceeds to retain this proposed data point, ICBA recommends that the final rule allow principal owners to report themselves as workers, which would be more in line with common parlance and avoid confusion.

g) <u>Time in Business</u>

Though not required in statute, the Bureau believes that data providing the time in business of a small business applicant would aid in fulfilling both the business and community development and fair lending purposes of section 1071. The proposed rule would require a FI to collect and report the time the applicant has been in business, described in whole years, as relied on or collected by the FI.

The Bureau explains that time in business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the section 1071 dataset. However, this rationale is undercut by the Bureau's proposed requirement for the FI to report time in business using owner or management experience rather than the age of the business itself. Similarly, the Bureau's rationale is diminished by the proposed requirement that the owner with the greatest number of years is reported when the applicant has multiple owners with different numbers of years operating that business.

While ICBA agrees with the Bureau that the inclusion of time in business data could help mitigate the concerns of data misrepresentation, the proposed rule provides an example where data indicating that a small business applicant is a start-up with little experience, or financial history could provide a legitimate business explanation for why the FI denied the application or approved it for less credit than was applied for. ICBA urges the Bureau to make such data optional as a mitigant, not a requirement.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018576

h) <u>Application Recipient</u>

The Bureau is proposing to require FIs to collect and report the application recipient, meaning whether the applicant submitted the covered application directly to the FI or its affiliate, or whether the applicant submitted the covered application indirectly to the FI via a third party. Proposed comment 107(a)(4)-1 would clarify that if a FI is reporting actions taken by its agent consistent with proposed comment 109(a)(3)-3, then the agent is considered the FI for the purposes of proposed §1002.107(a)(4).

Once again, this data point is not required by statute nor was it considered in the SBREFA Outline. The Bureau believes that the proposed collection of application recipient may help users of the data understand whether FIs making credit decisions are directly interacting with the applicant and/or generally operate in the same community as the applicant.

Though the Bureau might believe that this data point would "improve the public's understanding of the structure of small business lending originations across the market," it is a data point that, in the vast majority of cases, is not currently collected by community banks and would be an undue burden to achieve the Bureau's aspirational goal, contrary to the Bureau's belief that this data point should not be difficult to collect and report. Further, application recipient would not be dispositive evidence of fair lending violations. ICBA strongly recommends that the CFPB use their discretionary authority wisely and establish a compelling nexus between the statutory goals and discretionary data points.

i) <u>Credit Type</u>

The Bureau believes that three additional data fields should spring from "credit type," which is explicitly enumerated in statute. The Bureau is proposing to require FIs to collect and report the following information regarding the type of credit applied for or originated: (i) the credit product; (ii) the type or types of guarantees that were obtained for an extension of credit, or that would have been obtained if the covered credit transaction was originated; and (iii) the length of the loan term, in months, if applicable.

Despite the added complexity of requiring three data points for the one listed in statute, ICBA believes that the Bureau has accounted for and addressed some of the concerns that community banks have raised related to this data point. In particular, ICBA appreciates that the data points allow for the simple reporting of counter offers and the ability to mark fields as "not provided by applicant" in the case of incomplete applications.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC        SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267              866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378    www.icba.org

AdminRecord-018577

However, ICBA continues to object to additional credit amounts, such as line increases, counting as a separate credit product. Not only will it be duplicative to capture the same information in a line increase as was captured from the initial origination, but it will also artificially inflate a FI's loan volume activity, thereby significantly increasing the number of community banks that would be covered FIs.

j)  Credit Purpose

Section 1071 requires FIs to collect and report the type and purpose of the loan or other credit for which the applicant is applying. The Bureau is proposing to require that FIs collect and report the purpose or purposes of the credit applied for or originated. The Bureau is also proposing to add "not applicable" to the purposes list for use when an application is for a credit product that generally has indeterminate or numerous potential purposes, such as a credit card. Proposed comment 107(a)(6)-5 would also explain the use of "not applicable" as a response.

ICBA supports the proposed compilation of credit purpose, especially the flexibility of "not applicable" fields or "not provided by applicant and otherwise undetermined" options. ICBA also appreciates that FIs would be able to order the "credit purposes" according to their own discretion. ICBA believes that these accommodations will facilitate compliance while still achieving the policy goals of the law.

k)  Amount Applied for

Section 1071 requires FIs to collect and report "the amount of the credit or credit limit applied for," and the Bureau is proposing in § 1002.107(a)(7) to require that a FI collect and report "the initial amount of credit or the initial credit limit requested by the applicant." Proposed comment 107(a)(7)-1 would explain that a FI is not required to report credit amounts or limits discussed before an application is made but must capture the amount initially requested at the application stage or later.

As ICBA discussed in response to the SBREFA Outline, an applicant will often state a specific amount early in the application process, but the amount will usually change during the process for various appropriate reasons. Arriving at an applied for amount is a complex, iterative process, and the reporting requirement should be flexible. As such, ICBA appreciates that the proposed rule accounts for this iterative process by not requiring FIs to report the amounts discussed before the application is made, thereby accommodating preliminary informal interactions.

*The Nation's Voice for Community Banks.®*

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | 866-843-4222 |
| Suite 900 | P.O. Box 267 | www.icba.org |
| Washington, DC 20036 | Sauk Centre, MN 56378 | |

AdminRecord-018578

However, it should be noted that applicants' stated credit desires can be arbitrary, and comparing the initial amount requested against the amount approved could be misleading and is not a reliable measure of the health or efficacy of small business lending. Though this cannot be addressed in the data reporting field, ICBA stresses that the Bureau should incorporate these concerns when determining which data to publish on a loan-level basis (discussed further, below).

l) <u>Amount Approved or Originated</u>

Section 1071 requires FIs to collect and report "the amount of the credit transaction or the credit limit approved." The Bureau is proposing that the amount approved or originated be collected and reported as follows:

> (i) for an application for a closed-end credit transaction that is approved but not accepted, the FI collects and reports the amount approved by the FI;
> (ii) for a closed-end credit transaction that is originated, the FI collects and reports the amount of credit originated; and
> (iii) for an application for an open-end credit transaction that is originated or approved but not accepted, the FI collects and reports the amount of the credit limit approved.

This proposed treatment closely tracts with what was contemplated in the SBREFA Outline, and as such, ICBA has no suggested changes. It is important to highlight, though, ICBA's support for the proposed treatment of counteroffers pursuant to proposed comment 107(a)(8)-5. The proposed comment explains that if an applicant agrees to proceed with consideration of a counteroffer for an amount or a limit different from the amount for which the applicant applied, and the covered credit transaction is approved and originated, the FI reports the amount granted.

In contrast, if an applicant does not agree to proceed with consideration of a counteroffer or fails to respond, the institution reports the action taken on the application as denied and reports "not applicable" for the amount approved or originated. ICBA believes that this treatment of counteroffers appropriately allows for the negotiations that are prevalent in small business lending.

m) <u>Action Taken</u>

ECOA section 704B(e)(2)(D) requires FIs to report the "type of action taken" on an application. As such, the Bureau is proposing in §1002.107(a)(9) to require reporting of the action taken by

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018579

the FI on the covered application, reported as originated, approved but not accepted, denied, withdrawn by the applicant, or incomplete, which is largely consistent with Regulation C. [20]

ICBA supports the Bureau's proposal to categorize all incomplete applications as a single category of "incomplete," rather than incomplete denials separate from notices of incompleteness. This should provide FIs with easier compliance and less opportunity for error.

Regarding the treatment of counteroffers that are not accepted, ICBA believes that they should be reported as "approved but not accepted," as that classification would appropriately capture the situation where the applicant was approved for credit yet declined to accept the credit offer. This approach also more appropriately reflects the availability of credit in the market.

n) <u>Action Taken Date</u>
ECOA section 704B(e)(2)(D) requires FIs to collect and report the "date of such action." The Bureau is proposing to require "action taken date" to be reported as the date of the action taken by the FI, largely in coordination with Home Mortgage Disclosure Act implementing Regulation C approaches.

While ICBA has no recommendations related to the proposed treatment of "action taken date", ICBA strongly opposes the additional data points contemplated in the section-by-section analysis of the proposed rule. Specifically, ICBA objects to the requirement for FIs to record separate data points for the date the application was approved and the date of disbursement of funds (for term loans) or funds availability (for lines of credit). ICBA believes that to do so, the Bureau would be chasing ever-increasingly de minimis data points that have diminishing value. Reporting the time elapsed between when an application is approved, when the closing occurred or the account was opened, and when the applicant actually received the loan funds or access to funds adds inordinate degrees of complexity that draws out the compliance process much longer than needed to meet the objectives of the law.

o) <u>Census Tract</u>
Section 1071 requires FIs to collect and report "the census tract in which is located the principal place of business of the . . . applicant." The Bureau is proposing to require FIs to collect and report the census tract data point using a "waterfall" approach. Under the Proposal, FIs would report the census tract of the address or location where the proceeds of the credit applied for

---

[20] 12 CFR 1003.4(a)(8).

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018580

or originated will be or would have been principally applied. If that information is unknown, then the FI reports the address or location of the main office or headquarters of the applicant. Finally, if even that information is unknown, then the FI reports another address or location associated with the applicant.

This approach is similar to the one contemplated in the SBREFA Outline and of which ICBA is supportive. It adequately reflects banks' preference to match existing regulatory requirements, such as Regulation C and CRA. ICBA also welcomes the Bureau's proposed safe harbor, which would state that an incorrect entry for census tract is not a violation of ECOA or Subpart B if the FI obtained the census tract by correctly using a geocoding tool provided by the Federal Financial Institutions Examination Council ("FFIEC") or the Bureau. However, as discussed below, ICBA is significantly concerned about the risk to small business customer privacy if census tract and other data points are publicly reported.

p) <u>Gross Annual Revenue</u>

Section 1071 requires FIs to collect and report "the gross annual revenue of the business in the last fiscal year of the . . . applicant preceding the date of the application," and the proposed rule would require reporting of the gross annual revenue of the applicant for its preceding full fiscal year prior to when the information is collected.

ICBA supports the proposed comments that would clarify that a FI need not verify gross annual revenue information provided by the applicant and is permitted – not required – to report the gross annual revenue for the applicant that includes the revenue of affiliates as well.

q) <u>Minority-owned and Women-owned Business Status</u>

Consistent with its approach during the SBREFA process, the Bureau is proposing to require FIs to collect and report whether an applicant is a minority-owned business and/or a women-owned business. Proposed appendix F includes a requirement that a FI inform an applicant that the applicant is not required to respond to the FI's questions regarding the applicant's minority-owned and women-owned business status, and a prohibition on FIs requiring applicants to provide this information. Proposed appendix E, which is a sample data collection form, would include a question about minority-owned and women-owned business status and related information to assist applicants with responding to the question.

ICBA supports the Bureau's proposed approach in collecting this information and particularly welcomes the model forms in appendix F and E. ICBA also appreciates that the Bureau is keeping with the spirit of the law by allowing applicants to refuse to answer the question and permitting FIs to reflect that refusal in the data collection field.

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018581

r) <u>Number of Principal Owners</u>

The Bureau is proposing that FIs collect and report the number of principal owners of a business, defined as a natural person who directly owns 25 percent or more of the equity interests of the business. Additionally, while the ownership interest of a small business may be straightforward in certain cases and specified in a legal organizational document in other cases, certain legal structures make determining ownership equity extremely difficult, at best. ICBA questions the utility of this information, especially in cases that might inadequately describe or erroneously imply the ownership structure of the applicants.

s) <u>Application Date</u>

ECOA section 704B(e)(2)(A) requires FIs to collect and report the "date on which the application was received." Here, the Bureau is proposing to require reporting of the application date as the date the covered application was received by the FI, or the date on a paper or electronic application form. Proposed comments 107(a)(2)-1 and -2 would clarify the need for a FI to take a consistent approach when reporting application date and provide guidance on how to report application date for indirect applications.

Additionally, the Bureau is proposing a safe harbor, which would provide that a FI does not violate proposed subpart B if it reports on its small business lending application register an application date that is within three calendar days of the actual application date.

Given community banks' familiarity with Regulation C, ICBA supports the proposal's treatment of application date. However, while ICBA welcomes safe harbors, the utility of this safe harbor is difficult to envision. For example, it is not clear who would determine, or how it would be determined, that the "actual" application occurred on a date other than the one recorded by the FI. Given that the definition of "application" provides an inherent degree of flexibility and subjectivity, ICBA contends that the date the FI provides is the "actual" date. In the alternative, ICBA requests the Bureau to provide additional official commentary that illustrates how this safe harbor would operate.

t) <u>Unique Identifier</u>

Given that the ECOA section 704B(e)(2)(A) requires FIs to collect and report "the number of the application," the Bureau is proposing to require that FIs report an alphanumeric identifier starting with the legal entity identifier ("LEI") of the FI. This unique alphanumeric identifier would be required to be unique within the FI to the specific covered application and would be required to be usable to identify and retrieve the specific file corresponding to the application for an extension of credit.

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
|---|---|---|
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018582

Community banks have noted their preference not to be required to create this identifier too early in the credit origination process.

**4) The Proposed Rule presents grave concerns regarding customer privacy.**
The Bureau is required to annually make the data it receives from FIs available to the public in such form and in such manner as the Bureau determines by regulation[21]; however, the Bureau may, "at its discretion, delete or modify data collected under [section 1071] which is or will be available to the public, if the Bureau determines that the deletion or modification of the data would advance a privacy interest."

ICBA believes that the Bureau must be aggressive in protecting the privacy interests of small businesses and err on the side of caution. Publishing certain data points in unedited, application-level format will likely lead to the re-identification of small businesses and create risks to the privacy interests of applicants.

a) Sensitivity of Data Points When Combined
After the Bureau receives at least one full year of 1071 data from FIs following the compliance date of the final rule, the Bureau intends to issue a policy statement in which the Bureau would set forth its intended modifications and deletions of data that will be subject to public release. Before conducting the balancing test or collecting a year of data, the Bureau should run preliminary tests to understand the reidentification potential of NAICS codes and census tract data. These data create a unique set of records that can be accurately matched to records in other publicly available datasets identifying an applicant or a related natural person. It is illustrative to provide an example of how powerful the combination of NAICS code and census tract is in reidentifying small businesses.

For example, census tract 9668 has 3,726 residents in which the town of Lewisville, OH is located, with a population of 176 residents. In the town of Lewisville is the "Lewisville Vintage Farmhouse," with a Yelp page that describes it as an antique store. This implies it has a NAICS code of 453310 – used merchandise store. After searching Yelp and US Census Bureau websites, it does not appear as if another business with NAICS code 453310 exists in Lewisville, OH or anywhere else in census tract 9668. Therefore, if "Lewisville Vintage Farmhouse" sought a loan, the combination of its census tract and NAICS code makes reidentification a near certainty,

---

[21] Section 704B(f)(2)(C) of ECOA.

*The Nation's Voice for Community Banks.®*

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW          518 Lincoln Road
Suite 900                 P.O. Box 267          866-843-4222
Washington, DC 20036      Sauk Centre, MN 56378    www.icba.org

AdminRecord-018583

along with the owner's gross annual income, potential reason for denial, and sensitive demographic information.

Once again, the Bureau does not need to collect a year of data to determine the potential of reidentification from certain data points.

b) <u>Opportunity to Comment on the Privacy-Balancing Test</u>

The CFPB states its intention to issue a policy statement that addresses privacy concerns after the rule is in effect for at least one year. The Bureau states it does not intend to allow for or consider public comments in response to the policy statement, but in lieu, asks for comments on a partial and incomplete description of the privacy-balancing test.

A full explanation of the balancing test design and its application would help stakeholders consider the potential reputational risks associated with data disclosure. Additionally, the Bureau should issue the policy statement subject to public comment to provide opportunities for public feedback on privacy issues.

**5) FIs should have a minimum of three years to comply, or the rule should be implemented on a staggered basis.**

The Bureau is proposing a compliance date of 18 months after the rule's effective date. We do not believe 18 months provides community banks sufficient time to comply with a rule this complex. Compliance with Section 1071 will require significant investment in training and technology. For small banks, this process is made more difficult because they will be dependent on third party vendors to develop new systems, platforms and training modules, rather than developing them internally.

In our view, a compliance date three years after the rule's effective date is more appropriate. This will allow banks and their third-party processors to develop compliance systems – a process that they cannot begin in earnest until the rule is final. Having these systems in place will provide banks an opportunity to integrate new systems into their existing frameworks.

In the alternative, we advocate a tiered timeline for compliance. Larger FIs, those with assets in excess of $10 billion, could have a compliance date set two years after the rule's effective date, while smaller, lower volume lenders would be given 36 months to comply with the rule. This approach would allow the Bureau to collect a significant amount of small business data earlier, while also providing third party processors additional time to develop and integrate their compliance products.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018584

**6) The "Firewall" provision demonstrates the need to exclude community banks from coverage.**

ECOA section 704B(d)(1) states that "[w]here feasible," underwriters and other officers and employees of a FI or its affiliates "involved in making any determination concerning an application for credit" cannot have access to any information provided by the applicant pursuant to a request under 704B(b).[22] Additionally, under ECOA section 704B(d)(2), if the FI determines that an underwriter, employee, or officer involved in making a determination "should have access" to any information provided by the applicant pursuant to a request under 704B(b), the FI must provide a notice to the applicant of the underwriter's access to such information.

ICBA is concerned that small community banks will be disproportionately burdened by this firewall provision, as they are the most likely to have a limited sized staff that cannot feasibly firewall the information. Apart from the additional burden, smaller community banks might be adversely impacted from a competitive perspective if they are covered by this rule. For example, the notice to the applicant will presumably not be provided by large FIs or fintechs that could more easily create firewalls, and as such, there might be a perception among applicants that those FIs are less likely to discriminate because they have firewalled the information. This could lead applicants to seek credit only from larger FIs or fintechs.

Similarly, applicants might be uncomfortable in providing demographic information to banks if they receive notice that their information will not be firewalled, resulting in more applicants at community banks opting not to disclose their demographic information, and in turn, more community bank employees having to guess the applicant's race and ethnicity based on visual appearance or surname.

The Bureau should exempt small FIs, such as community banks, from the firewall requirement for the reasons discussed above. Alternatively, the CFPB could require all FIs to provide the notice to all applicants, regardless of whether the information is firewalled. This option would remove the regulatory, market, and misperceived reputational advantage that larger FIs would hold over smaller ones.

---

[22] This includes information regarding the women-owned and minority-owned business status and the race, sex, and ethnicity of the principal owners.

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
|---|---|---|
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018585

ICBA suggests that the Bureau establish an online system or portal, where borrowers could input their sensitive, demographic information that is matched with a unique identifier. The unique identifier is used to match the applicant demographic with loan information.  Not only would such a portal solve for the notice requirements, but it would also solve for the sensitivity of the data, providing applicants with assurance of confidentiality, and promoting self-reporting. If the Bureau chooses to not provide this portal, then it should allow for a private market solution that could facilitate this option that demonstrates compliance with these proposed provisions.

Finally, if the Bureau creates or allows for the use of a portal, it is imperative that FIs be able to match their records with the portal's records after a final decision has been made on the application so that FIs can perform back testing and internal audits to determine whether their operations are complying with fair lending laws. This would support the long-held tenet that self-identification and remediation are encouraged in the supervisory space.

## 7)  Cost-Benefit Analysis
Section 1022 of the Dodd-Frank Act requires the Bureau to consider the costs and benefits of the regulations it prescribes.[23]

Certain regulations run the risk of becoming too costly and burdensome, and therefore frustrating their own purpose. If Bureau regulations impose costs on lenders that are too high, those lenders will inevitably be compelled to (1) pass costs on to consumers and/or (2) exit the market entirely. Both outcomes result in harming the consumers that the Bureau intends to protect and may leave them worse off than if the regulation had never been promulgated.

We do not contend that Section 1022 requires the Bureau to abstain from prescribing a regulation if it concludes that the costs outweigh the benefits. Indeed, as we believe is the case with Section 1071, the Bureau may be required by a separate provision to finalize a rule that results in costs that are self-frustratingly high. However, as a matter of public policy, it is incumbent on the Bureau to minimize the costs associated with implementing the law. **In the case of this rulemaking, that means not requiring the collection of data points that are not statutorily required and exercising its Section 1022(b)(3) authority to exempt certain small institutions that will be disproportionately impacted by new compliance obligations.**

---

[23] *See* 12 USC 5512(b)(2).

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | |
| Suite 900 | P.O. Box 267 | 866-843-4222 |
| Washington, DC 20036 | Sauk Centre, MN 56378 | www.icba.org |

AdminRecord-018586

Having made the preceding general observations regarding the Bureau's cost-benefit analysis requirements, ICBA's comments regarding the analysis of cost and benefits for the Bureau's implementation of Section 1071 follow below.

a) <u>Costs to Covered FIs</u>

We agree with the Bureau's decision to analyze costs in two categories: "one-time" and "ongoing," with one-time expenses defined as "expenses that the FI would incur initially and only once to implement changes required in order to comply with the requirements of the new rule" and ongoing costs defined as "expenses incurred as a result of the ongoing reporting requirements of the rule, accrued on an annual basis."[24] Both categories are significant because the one-time costs of compliance may force existing small business lenders to exit the market and prevent new small business lenders from entering the market, both of which reduce consumer choice. Ongoing costs may also contribute to the decision to exit the small business lending market but are significant because they are most likely to be partially or wholly passed on to consumers in the form of application or origination fees or higher interest rates.

To estimate the cost to FIs, the Bureau relies on its previous experience with HMDA".[25] We agree that the HMDA data collection is the closest existing parallel to Section 1071 data collection but emphasize that there are significant differences between the mortgage lending and small business lending lines of business. Specifically, for community banks with a relationship lending business model, small business lending is likely to be much more individualized than mortgage lending.

Very few community banks have a standard small business application form or process, and every loan is unique. Some small businesses frequently borrow relatively small amounts from community banks. In these cases, so long as the business is healthy and is current on paying its outstanding loans, the amount of paperwork may be very low. On the other hand, where a business is new, or where the loan amount is high, the bank may conduct significant due diligence, far beyond what would be required to originate a home mortgage loan. Because of these differences, the point at which reporting requirements are triggered will vary from loan to loan. Additionally, bankers may collect much of the required information from some

---

[24] 86 Fed. Reg. 56542.
[25] *See* 86 Fed. Reg. 56545.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018587

borrowers already, but not for others. This will require additional data collection from some borrowers, therefore complexifying the application process.

While it is difficult to estimate the one-time costs of compliance, which will vary significantly from institution to institution, the Bureau's estimate of $58,400 for small depository institutions is very likely on the low-end. We believe that one-time costs will likely be in the high-tens to low-hundreds of thousands of dollars for the smallest banks and will cost mid-sized community banks several times more (not less, as the Bureau estimates).[26] **It is likely that a significant portion of these startup costs for small lenders can be avoided if the Bureau exempts community banks under $1.3 billion, provides partial exemption from discretionary data points, or adopts tiered compliance dates, allowing third party providers time to bring their products to market.**

To estimate the ongoing costs of this regulation, ICBA surveyed its membership. Based on this survey, we believe that being required to hire new employees to manage compliance obligations will be the biggest cost associated with Section 1071. In contrast to large banks that employ thousands of employees to manage compliance, approximately 80% of community banks surveyed reported employing 25 or fewer full-time employees ("FTEs") dedicated to small business lending. 50% employed 10 or fewer FTEs in a small business lending role. These small staffs are already stretched thin and will require significant retraining to comply with the proposed rule. As a result, **58% of community banks surveyed reported that they will likely be required to hire additional FTEs to in order comply with the rule.**

If a bank is required to hire even one additional FTE, the cost estimate would exceed the Bureau's own estimated time commitment of 716 staff hours per year for small (Type A) depository institutions.[27] This time estimate amounts to 17.9 weeks of full-time work per year, or about 1/3 of a single FTE. Therefore, we believe the Bureau's estimate significantly understates the cost to small community banks.

b) Costs to Small Businesses

According to the NPR, "[t]he Bureau expects the direct costs of the proposed rule to small businesses will be negligible, especially compared to the overall cost of credit."[28] **We strongly disagree with the Bureau's characterization of the proposed rule's cost to small businesses.** If Section 1071 is implemented as proposed, it will result in fewer credit options for small businesses and a reduction in their ability to shop around for credit. To the extent that Section

---

[26] 86 Fed. Reg. 56556.
[27] *See* 86 Fed. Reg. 56556, Table 10.
[28] 86 Fed. Reg. 56543.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC        SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267           866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378  www.icba.org

AdminRecord-018588

1071 prompts market exit or consolidation, small business borrowers may lose access to local lenders that understand their business and are willing to provide financial advice and tailored loan products. In addition, if lenders implement an application fee to offset the costs of 1071 compliance, borrowers will be less likely and less able to shop around for a loan with the best interest rate. This can result in significant long-run expense for the business.

In our survey of community banks, **64% of bank respondents indicated that they would be likely to charge a small business loan application fee to offset the cost of compliance.** This illustrates that the direct costs to small businesses are very real and not remote and speculative. **Fifty-five percent of bankers, who reported that they would charge an application fee, indicated that the fee would likely need to be $100 or more.** For the smallest businesses, a fee of this size is substantial enough to discourage shopping around for the best rate.

Additionally, small business borrowers will be required to provide additional data about their business which may require significant additional time to compile. Lenders will be unwilling or unable to proceed with loans without collecting the data required for Section 1071 reporting, and a portion of the burden of compiling this information will fall on small businesses themselves. In addition, borrowers will be asked questions about their race and demographic information that they may be uncomfortable with, chilling their desire to seek credit from a regulated institution.

However, the biggest cost to small businesses by far is the reduction of privacy this regulation will create. The data points required to be reported and disclosed by this regulation create the potential for re-identification of small business borrowers and public disclosure of sensitive financial and other information relating to their business. Community banks have repeatedly heard from their small business customers that privacy is a major concern. This concern is evident in the overwhelming pushback from small businesses to the IRS reporting provision recently proposed in Congress and by the Biden Administration, and from bankers' experience with PPP, where rates of compliance with the voluntary demographic disclosure were below 20%.

c) <u>Benefits to Small Businesses and Covered FIs</u>

On the other side of the ledger are the benefits supposedly created by the proposed rule. As the Bureau concedes, "[q]uantifying benefits to small businesses presents substantial

---

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018589

challenges."[29] The NPR goes on to say that the Bureau "is unable to readily quantify any of [the benefits of the proposed regulation] with precision, both because the Bureau does not have the data to quantify all benefits and because the Bureau is not able to assess completely how effective the implementation of section 1071 will be in achieving those benefits."[30]

In our view, the issue is starker. Section 1071 was enacted to ensure the credit needs of women-owned, minority-owned, and small businesses are being met in accordance with fair lending laws. This is a worthy policy objective, but it is poorly served by mandatory collection of demographic information that has been illegal to collect previously and that small business customers may prefer to keep private. We believe this regulation will ultimately decrease the willingness of small business customers to seek credit and increase the cost of credit for the small business borrowers it is intended to protect.

As for the benefits to FIs, we are skeptical of the Bureau's claim that this regulation will help them to "better understand the demand for small business credit products and the conditions under which they are being supplied by other covered FIs."[31] Community banks already have a high understanding of the small business credit markets in their local communities. Disclosure of Section 1071 data will not meaningfully increase this understanding because of the individualized nature of each small business loan. Important information about how competitors made credit decisions will still be missing from Section 1071 disclosures, therefore the additional market insight gained will be limited. Because the Bureau will not capture or publish all significant contextual information – arguably, rightfully so – there's no significant market benefit from the data's publication.

## 8) Enforcement

For banks $10 billion or less in assets, the requirements of Section 1071 will be enforced under Section 8 of the Federal Deposit Insurance Act by the appropriate Federal banking agency.[32] Enforcement actions can include the termination or suspension of deposit insurance, cease and desist orders, the removal, prohibition, or suspension of bank officers, directors, or affiliated parties, and civil money penalties.[33]

While we view these potential enforcement actions as appropriate and in-line with other regulations, we would urge them to be used sparingly in the 12 months following the rule's compliance date. Once systems are developed and integrated into small banks' framework,

---

[29] 86 Fed. Reg. 56543.
[30] *Id.*
[31] 86 Fed. Reg. 56543.
[32] 15 USC 1691c(a)(1).
[33] *See* 12 USC 1818.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018590

good faith errors may occur while they adapt to new complex collection and reporting requirements.

a) 112(b) Bona Fide Errors

The proposed regulation includes a provision that says an error in compiling, maintaining, or reporting data is a bona fide error if it was "unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error."[34] Bona fide errors are not a violation of ECOA. **ICBA supports the inclusion of this provision.**

b) 112(c) Safe Harbors

The Bureau is proposing to provide several safe harbors, creating a set of errors that would not constitute violations of ECOA. These safe harbors are:

i) Incorrect entry for census tract – Listing an incorrect census tract is not a violation if the FI obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. We support the inclusion of this provision but observe that it is quite narrow. It will be difficult to prove whether a geocoding tool was used correctly. Furthermore, we believe that latitude should be given if a census tract is reported for a business where that business has a physical location, even if it is not the business's main address or census tract where loan funds are spent.

ii) Incorrect entry for NAICS code – Entry of the wrong NAICS code is not a violation "provided that the first two digits of the NAICS code are correct and the FI maintains procedures reasonably adapted to correctly identify the subsequent four digits."[35] Once again, we strongly urge the Bureau not to require collection of NAICS data. However, if NAICS data is collected, the proposed tolerance level is appropriate. **We also urge the Bureau to allow lenders to rely on NAICS codes provided by the borrower, even if one of the first two digits of a borrower provided code is incorrect.**

iii) Incorrect determination of small business status – A bank that initially determines that an applicant for a covered credit transaction is a small business, but later concludes the applicant is not a small business does not violate ECOA if it collects information about whether the applicant is a minority-owned business or a women-owned business, or the ethnicity, race, and sex of the applicant's principal owners.

---

[34] 86 Fed. Reg. 56579.
[35] 86 Fed. Reg. 56580.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018591

**ICBA supports the inclusion of this provision as it will prevent punishments for banks that inadvertently collect sensitive demographic information about a larger business. We also urge the CFPB to allow banks to rely on revenue information supplied by borrowers when determining whether data collection under Section 1071 is required.**

iv) Incorrect application date – Banks do not violate ECOA if the application date reported is within three calendar days of the actual application. ICBA believes this safe harbor is appropriate.

## 9) Section 1002.111 – Recordkeeping
### a) 111(a) Record Retention

The small business loan data collected pursuant to the requirements of Section 1071 is required to be: retained for at least three years; made available to the public, upon request, in a form and manner prescribed by the Bureau; and made available to the public annually by the Bureau in a form and manner they prescribe by regulation.[36] According to the Proposal, FIs would be required to "retain a copy of its small business lending application register for three years after the register is submitted to the Bureau."[37] The Bureau is seeking comment on how to implement recordkeeping requirements "in a manner that minimizes cost and burden particularly on small FIs while implementing all statutory obligations."[38]

We believe that the Bureau could minimize the compliance burden on small institutions – while still satisfying all of the requirements imposed by statute – by creating a centralized database of small business loan data to which banks could report in real time. **We propose a system by which banks could, at their option, maintain a small business lending application register internally, reporting annually to the CFPB OR report small business loan applications as they are received through a secure online portal, so that records could be stored and maintained at the CFPB.**

---

[36] *See* 15 USC 1691c-2(f)(2).
[37] 86 Fed. Reg. 56501.
[38] *Id.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018592

Small lenders may favor this latter approach because it would reduce the cost and risk associated with maintaining a register internally. Additionally, reporting small business loan applications to the Bureau could be integrated into the normal course of processing an application, potentially reducing the compliance cost.

Information on an online portal should be analyzed and published annually and not as data is submitted. Because banks cannot control the order that loan applications are submitted, inadvertent disparities may occur in partial year data that would disappear as more applications are submitted. The agency and members of the public should, of course, be able to view and bring actions based on lending data from banks that publish in real time from previous whole years.

Additionally, banks that choose to publish their data in real time should be able to view their own lending data in real time. This would allow them the opportunity to correct erroneous submissions and ensure more accurate data. It would also allow them to view their own record of small business lending and to self-correct before a fair lending violation based on discriminatory effect (also called disparate impact) occurs.

   b)  111(b) Certain Information Kept Separate from the Application
According to the Bureau's interpretation of ECOA section 704B(b)(2),[39] information about "whether the applicant is a minority-owned business or a women-owned business and the ethnicity, race, and sex of the applicant's principal owners"[40] is required to be kept separate from the rest of the application. We agree with the Bureau's interpretation that this statutory provision should be understood to refer to applicants' responses to the inquiries regarding minority-owned and women-owned business status in proposed § 1002.107(a)(18) and (19), as well as the ethnicity, race, and sex of applicant's principal owners in proposed §1002.107(a)(20)."[41]

As the Bureau observes, these data points have no bearing on the creditworthiness of an applicant, and no FI would legally be permitted to inquire about this demographic information but for Section 1071. For institutions that are required to comply with Section 1071, these data points must be kept separate from the rest of the application to comply with the requirements of the statute.

---

[39] 15 USC 1691c-2(b)(2).
[40] 86 Fed. Reg. 56501.
[41] 86 Fed. Reg. 56501-02.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267          866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378   www.icba.org

AdminRecord-018593

The Bureau's proposed regulation notes that "such information could be collected on a piece of paper that is separate from the rest of the application form. To satisfy the requirement in §1002.111(b), an applicant's responses to the FI's request pursuant to §1002.107(a)(18) through (20) need not be maintained in a separate electronic system, nor need they be removed from the physical files containing the application. However, the FI may, nonetheless, need to keep this information in a different electronic or physical file to satisfy the requirements of §1002.108."[42] This section of the proposal is unclear, and we believe that the Bureau should further clarify the requirements around when lenders will need to maintain separate systems.

In considering implementation of this rule, we urge the Board to consider the implications of the requirements noted above for the smallest lenders. When describing such processes, it is easy to reduce, in the mind's eye, the idea of compliance to simply another form or another file. But in reality, the requirement to create and organize additional digital and physical files requires a significant investment of time, technology, and training. This investment of time imposes a real monetary cost, and once such a rule is implemented, the cost never goes away. It recurs, year after year, application after application.

In a rule like this, where the consumer benefit of incremental data collection from small lenders will be minimal, we strongly urge the Bureau not to dismiss these recurring costs to small lenders when conducting their cost-benefit analyses. To the extent that this rule drives consolidation and causes small, local lenders to merge or vanish, we believe a significant cohort of small business borrowers, including women-owned and minority-owned businesses, will be less well-served.

**10) Use of previously collected data will provide efficiencies but will likely provide regulatory advantage to larger FIs and fintechs.**
In the SBREFA Outline, the Bureau emphasized that it was seeking to provide FIs with discretion and flexibility in the timing of 1071 data collection considering their relationships with applicants and the need to avoid unnecessary costs.

Proposed comment 107(b)-1 explains that, depending on the circumstances and the FI's procedures, certain applicant-provided data could be collected without a specific request from

---

[42] 86 Fed. Reg. 56605.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018594

the applicant. For example, gross annual revenue could be collected from tax return documents.

While this proposed comment and provision appears to be an accommodation, ICBA notes that this provision will mostly accrue benefit to the largest FIs and fintechs that are able to employ the use of data intermediaries to automatically populate much of the required data being proposed, thereby quickening the time it will take for a small business applicant to apply for credit compared to a traditional FI that will need to ask for and record every single data field. This essentially creates a competitive advantage for certain FIs, based on nothing more than a regulatory construct. If the Bureau cannot provide an appropriate remedy for this agency-created advantage, then it should serve as another rationale to exempt community banks.

**11) The Bureau should not require the verification of applicant-provided information.**
The Bureau is proposing that the FI would be able to rely on statements of the applicant when compiling data unless it verifies the information provided, in which case it would be required to collect and report the verified information.[43] ICBA proposes that the Bureau remove the second clause of this proposal and limit the requirement to the submission of applicant-provided information, regardless of whether it is verified by the FI.

As the Bureau notes, section 1071 does not speak to verification; rather it refers only to compiling and maintaining a record of certain information provided by an applicant. Though the Bureau believes that requiring FIs to collect and report information that they have already verified would not add operational difficulty, ICBA contests that belief. Requiring the reporting of verified data would increase operational difficulty, in that if data is verified, it would be done at a point in time that could be weeks removed from the date that the information was initially collected on the application. Additionally, information may be collected by different staff for different purposes on different platforms.

Though ICBA appreciates that the Bureau is not requiring FIs to verify information, compliance burdens would greatly be eased if the Bureau's final rule does not require the reporting of subsequently verified information unless the FI opts to do so.

---

[43] § 1002.107(b).

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-018595

### CONCLUSION

While ICBA supports the stated goal and intent of section 1071 and the Bureau's proposed rule, we cannot support this rule in its proposed form. While the concerns we raised are on community banks' behalf, the ramifications of this rule will adversely affect community banks' small business customers. Should you have any questions or would like to discuss this further, please do not hesitate to contact us at Michael.Emancipator@icba.org or Michael.Marshall@icba.org.

Sincerely,

/s/

Michael Emancipator
Vice President and Regulatory Counsel

/s/

Michael Marshall
Director, Regulatory Legal Affairs

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW        518 Lincoln Road
Suite 900               P.O. Box 267                866-843-4222
Washington, DC 20036    Sauk Centre, MN 56378       www.icba.org

AdminRecord-018596



January 6, 2022

The Honorable Rohit Chopra
Director, Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re:    **Proposed rule - *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)* - Docket No. CFPB–2021–0015, RIN 3170–AA09, 86 Fed. Reg. 56336**

The Honorable Rohit Chopra:

Texas Farm Credit Services appreciates the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") proposed rule entitled "Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)" (the "Proposed Rule").[1]

We fully support the comments made by the Farm Credit Council (FCC) on behalf of the Farm Credit System in response to the Proposed Rule. While we support the enforcement of fair lending laws and appreciate the Bureau's dedication to supporting small farming business, for the reasons more fully explained in the FCC's comment letter, we do not believe that the Proposed Rule as currently presented satisfies these objectives and are concerned about the significant burden and cost this rule would impose on Farm Credit institutions and ultimately their customers.

As discussed in the FCC comment letter, the Proposed Rule's expansive definition of "small business" as a business with gross annual revenue of $5 million or less captures an overwhelming majority of Farm Credit borrowers. Texas Farm Credit Services' review of its customer base, using annual gross cash farm income (GCFI) as the metric, shows approximately ninety percent (90%) of loans that include an entity as a borrower falling beneath the $5 million threshold.

Additionally, although Texas Farm Credit Services supports the position of the FCC regarding the Proposed Rule, we have identified the following additional concerns, which we raise for your consideration:

- For Texas Farm Credit Services, it would be extremely difficult, if not impossible, to create a "firewall" that would prohibit underwriters from having access to demographic information. Our retail staff also make credit decisions, collect the application documents, and usually spend time with borrowers in person.

---

[1]    CFPB, Proposed rule; request for comment, *Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56356 (Oct. 8, 2021) ("*Proposal*").



Because of this structure, it would be nearly impossible to construct a firewall. Texas Farm Credit Services would then point to the FCC comment letter regarding the concerns of the disclosure if a "firewall" is not feasible.

For the reasons set forth in the FCC comment letter and as outlined herein, we do not support the Proposed Rule as currently presented.

Accordingly, we respectfully request that the CFPB withdraw the Proposed Rule, or alternatively, we request an opportunity for System representatives and industry experts to meet with CFPB to explore possible improvements that could be made to accomplish the stated objectives of the Proposed Rule

Thank you again for the opportunity to comment on the Proposed Rule, and we hope that our comments herein, as well as those submitted by the FCC and other System institutions, will assist the CFPB in reevaluating the Proposed Rule.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Thomas M. Barker
Director

AdminRecord-018841



January 6, 2022                                        *VIA ELECTRONIC DELIVERY*

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, DC  20552

Re:    Section 1071 Small Business Lending Data Collection,
       Docket No. CFPB-2021-0015

Dear Sir or Madam:

On behalf of approximately 400 banks chartered and doing business in Texas, and the small business customers they serve, thank you for the opportunity to offer our comments on the Bureau's small business lending proposal.  While we were pleased to see the proposed rule covers both depository and non-depository institutions, we are deeply concerned that, if implemented as proposed, this additional layer of excessive regulation will limit the availability of small business credit.  This will harm local economies, adversely affect community banks, and result in driving small business into the non-bank sector, which is not subject to stringent federal regulation like FDIC-insured institutions are.

By way of initial comment, the basis of this proposed rulemaking is premised on a statutory text of less than four (4) pages contained in the Dodd-Frank Act,[1] but the proposal now consists of over 900 pages.  This is indicative of a complex regulatory paradigm that may be designed to target banks but will, ironically, impact consumers.

After the financial crisis leading up to enactment of the Dodd-Frank Act, trillions of dollars in Federal Reserve spending were needed to shore-up the economy.  Dodd-Frank was heralded as an end to the invulnerability of "Too Big To Fail" banks and as a victory for consumers with the creation of a new agency.  Community banks were given the assurance that the new law would not be a problem for them.  Eleven years later, the results of the law have been quite different. The largest institutions have grown larger and there are now twenty-five percent (25%) fewer community banks across the nation.  At the Harvard Kennedy School Mossavar-Rahmani Center for Business and Government, researchers found that in the four years following passage of Dodd-Frank, the community bank share of U.S. banking assets shrank by twelve percent (12%).

As you can see in the chart below, the passage of Dodd-Frank acted as an accelerant to community bank consolidation, which continues at an alarming pace.  The number of banks chartered in Texas dropped thirty-four percent (34%) from 2010 – 2021.

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1691c-2 ("Section 1071").

TBA Comments re: CFPB-2021-0015
Page 2 of 5



Source: FDIC
*The Economist*

In our discussions with bankers that sold or merged their charters over the last 10 years, the common driver was hyper-regulation. Whereas a trillion dollar-bank has the ability to devote significant personnel to each new regulation and have it on desktops in every branch in the country after a few weeks, community banks struggle with only a few people to try to understand the new regulations, pay for the new software, and train their employees. The best example of this is in the area of mortgage lending. The Qualified Mortgage regulation was 600 pages. The combined TILA-RESPA Integrated Disclosure (TRID) involved 1,200 more pages. Many of our community banks exited mortgage lending because of the costs and the potential penalties for noncompliance. These smaller banks did not originate, securitize, or trade in toxic mortgages, yet they have suffered from the regulatory burden brought on by the Act. Especially in rural Texas, many of our communities lost access to local mortgage lenders.

The Bureau now proposes a 900-page regulation based on Section 1071 of the Act. The CFPB waited for over a decade to issue a proposed regulation. This might have been due to the scale of the project, but, more likely, it is the impossibility of creating a HMDA-like regime for a fair lending analysis of small business credit that is responsible for the delay. HMDA requires the collection of race and gender data for mortgage products that are not complex and don't differ much between different types of lenders. An "apples to apples" comparison in mortgage lending is relatively straightforward.

Small business loans, on the other hand, are more complex and differ based on the type of local economies that are served and, to a certain extent, bank business plans. There are likely hundreds of different types of small business and agricultural credit, and the collection and reporting requirements of this regulation cannot give an adequate or realistic picture of small business lending that allows for an accurate analysis of fair lending compliance.

AdminRecord-019174

TBA Comments re: CFPB-2021-0015
Page 3 of 5

Banks of all sizes want to work with the CFPB to enhance small business lending, but we also feel we must point out policies and regulations that will work against that goal. The viability of small business borrowers – and their community bank lenders – is threatened by this new regulation more than any rule the Bureau has issued up to now. Community bank small business and agricultural loans make up a larger percentage of portfolios than the largest banks, and they will disproportionately have to incur the costs for software, training, and new employees. These are all costs that will be borne by the small business community. If the Section 1071 regulation is imposed on the industry, it will accelerate the consolidation of banks at a rate even faster than what we have experienced since the passage of Dodd-Frank. This means that the proposal will have the opposite effect of its stated intent. That is, rather than expand access to credit, it will limit it, particularly in rural, agricultural communities and in urban neighborhoods served by community banks.

Furthermore, we do not believe that the Bureau has done an adequate analysis of how the proposal will be detrimental to smaller banks and the communities they serve. We also are of the opinion that the requirements of the Small Business Regulatory Enforcement Fairness Act have not been met. The SBREFA requires consultation with small entities likely to be affected by a regulatory action, not just a government interagency review. The Bureau assumes that the lending industry will remain static after the regulation is implemented; however, no consideration was given to the likelihood of there being fewer banks and less small business credit.

Researchers at the Texas Tech University Rawls College of Business commented on the Section 1071 proposal and did a statistical analysis of publicly available data. They found that in banks with $100 million in assets or less, small business loans comprise forty percent (40%) of their loan portfolios. Banks with more than $10 billion in assets have less than ten percent (10%) of small business loans in their loan portfolios. Looking at the number of bank employees, the smallest banks have eleven small business loans per employee while the largest banks have six loans per employee. The average employee of the smallest banks will have to do two times the Section 1071 reporting that an employee of one of the largest banks will have to do. Further, small banks are unlikely to have the IT infrastructure needed to automate data collection. Acquiring new technology, training existing employees, and hiring new ones will impose burdens that will fall most heavily on community banks and, therefore, their small business customers.

The Texas Tech analysis concludes that the implementation of the Section 1071 regulation will be an "unintended attack on relationship banking that occurs every day in every region of our country. It will create a barrier for credit for truly small businesses that are less sophisticated, but essential to the community." They add that cost of compliance combined with the risk of non-compliance will lead many community banks to cease making business loans.

Surveys of Texas banks indicate a great amount of uncertainty among bankers about how much changes will cost whether it is due to additional costs from core service providers or the acquisition of new software. Estimates are around $100,000 per community bank; however, the third-party providers have not yet quantified the costs themselves. Bankers expect to have hire

AdminRecord-019175

TBA Comments re: CFPB-2021-0015
Page 4 of 5

new employees and to pay more for training in an environment where there is a shortage of compliance personnel. The reputational risk and the potential for regulatory action or litigation due to disclosed data leads many bankers to believe that will have to pay for outside audits of 1071 data. Because these new mandates go to the heart of what community banks do, we believe that the result will be the further consolidation of the industry.

Further, the proposed rule is replete with requests for data points which would make the borrower feel uncomfortable in terms of providing personal, non-financial information, especially which the borrower has declined to offer and which, under the proposed regulation, would require the lender to provide on the basis of "visual observation." Borrowers have a right to choose not to disclose ethnicity, gender, and race information. It is inappropriate to require a small business lender to make a best guess on race or gender or ethnicity, especially in a circumstance where the borrower explicitly chose not to provide this information.

This point is backed by data. According to Small Business Administration figures from the highly successful Paycheck Protection Program (PPP), approximately 50% of PPP small business borrowers specifically declined to volunteer this type of personal data as part of their PPP application.[2] To say the least, there should be no government requirement to list race, gender, ethnicity, and other protected class information without the consent of the individual involved.

Texas banks have made great strides in recent years to expand services to previously under-banked communities. But we anticipate that, under this proposal, Federal compliance examiners will be using antiquated disparate impact analysis from 2013, among other methods, in the annual assessment of small business lending data. This will paint an inaccurate picture of current small business lending. Further, we have concerns that the proposal's disclosure provisions could lead to potential fraud and the exposure of proprietary business plans to competitors.

The proposed Section 1071 reporting requirements represent just one of many new regimes under discussion that will add new regulatory layers and compliance burdens on small banks, the costs of which will ultimately be passed on to the small business customer. Federal regulators have been clear that climate regulatory reporting is on the way, and Congress is still debating the potential to add new IRS reporting requirements. At what point do community banks get to spend their time, personnel, and resources on lending and expanding access to credit rather than spending them on compliance and reporting to the Federal government? Regulators cannot say on the one hand that they respect the role of community banks and that they want to see them expand access to credit and capital, while, on the other hand, exacting laborious policies that crush the ability of community banks to do just that.

There has to be a better way to approach this subject without the loss of thousands of community bank charters. CRA data shows that ninety percent (90%) of community banks are working with low-and moderate-income communities. Federal examiners have the ability to look at the lending portfolios of small banks under current statute. But the 21 data points and the costs of collection and reporting as proposed will be destructive for community banks and, more

---

[2] See page 9, Small Business Administration Paycheck Protection Program (PPP) Report; Approvals through 05/31/2021.

TBA Comments re: CFPB-2021-0015
Page 5 of 5

importantly, the communities they serve.

Finally, our community banks have demonstrated not only their care, but indispensable effectiveness for their customers during the COVID-19 emergency. The success of the PPP program showed that community banks were dedicated drivers of the efforts to save their local communities during the pandemic. In Texas, hundreds of thousands of small businesses were saved as well as literally millions of jobs. Our banks need the ability to spend more time serving their customers and communities rather than satisfying additional bureaucratic mandates. Without major changes to the scope and applicability of this proposed new regulation, an analogy may be made that this proposal will be a proverbial straw to "break the camel's back," draining resources from lending, limiting access to capital and credit for customers who need it, and accelerating community bank consolidation.

We respectfully request that this proposal be withdrawn, or at the very least, that the period for comment and appropriate small business consultation review be extended so that the wide-ranging impacts of this proposal may be better understood.

Sincerely,

Chris Furlow
President & CEO

January 6, 2022

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**Via Electronic Submission**

> **Re: Docket No. CFPB–2021–0015 or RIN 3170–AA09, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)**

Dear Director Chopra:

The American Bankers Association[1] and 51 state bankers associations, appreciate the opportunity to comment on the Consumer Financial Protection Bureau's notice of proposed rulemaking to implement section 1071 of the Dodd Frank Wall Street Reform and Consumer Protection Act (the proposal).[2] Section 1071 amends the Equal Credit Opportunity Act (ECOA) to require financial institutions to collect and report to the Bureau certain data regarding applications for credit made by small businesses, including women-owned businesses and minority-owned businesses.

**Summary of the Comment**

ABA supports the goals of section 1071, which are to facilitate enforcement of fair lending laws and to help regulators and the public identify opportunities for community development. Our members oppose discrimination in any form, and support enforcement of fair lending laws. Likewise, banks support community development by investing in the neighborhoods they serve, for the improvement of those communities, the businesses that operate there, and the families who live and work there.

However, unless the Bureau revises the proposed rule, it will impose significant costs on banks – costs that will be felt most acutely by community banks – that will negatively affect their small business customers. The proposed rule's scope is unnecessarily far reaching; it would exempt very few community banks, define small businesses so broadly as to include tens of thousands of large businesses, and require institutions to collect and report data on numerous data points in addition to the Congressionally required data points. All of these actions combine to negatively impact community banks and their customers, in stark contrast to Director Chopra's assertions of support for community banks and relationship banking.[3]

---

[1] The American Bankers Association is the voice of the nation's $23.3 trillion banking industry, which is composed of small, regional and large banks that together employ more than 2 million people, safeguard $19.2 trillion in deposits and extend $11 trillion in loans.

[2] 86 Fed. Reg. 56,356 (Oct. 8, 2021).

[3] Press Release, Consumer Fin. Prot. Bureau, Opening Statement of Director Rohit Chopra Before the House Committee on Financial Services, https://www.consumerfinance.gov/about-us/newsroom/opening-statement-director-rohit-chopra-before-house-committee-financial-services/ (Oct. 2021).

AdminRecord-019305

The proposal includes a lengthy, yet largely conjectural, analysis of the costs and benefits of the proposed data collection regime. The Bureau estimates that the one-time costs of implementing the regulation would be between $312 million and $323 million for depository and non-depository institutions, and it estimates ongoing *annual* costs of between $372 million and $392 million, respectively. The Bureau contrasts these costs with the net income per origination and per application, for small business loans, without explaining how it calculated net income. Unsurprisingly, the Bureau concludes that these cost estimates, which experience demonstrates likely understate actual costs, do not outweigh the benefits to fair lending enforcement.

ABA and others have repeatedly expressed concern about the costs of the rule, to little or no avail. Small Entity Representatives (SERs) and other stakeholders told the Bureau its cost estimates for the outline of proposals considered during the Small Business Regulatory Enforcement Fairness Act (SBREFA) review were too low, and yet it has made no changes in response. Instead, the proposal recites feedback received during the SBREFA process indicating that its estimations of certain costs are too low. Similarly, the proposal recites comments on the Bureau's 2017 Request for Information that raised concerns about the cost of implementing 1071. Disappointingly, the proposal simply seeks additional comment without explaining why the comments on costs have been ignored.

The proposal fails to consider the cost of duplicative and burdensome data collection and reporting. For example, covered banks that meet data reporting thresholds for HMDA and CRA will be collecting and reporting data on a single application or loan for all three data reporting obligations, but not in the same way. In addition, the Bureau's cost estimates do not factor in the additional annual costs for fair lending compliance. The 1071 data will offer increased opportunities for examiners to rely on statistical analysis to assert discrimination in small business lending. To be prepared to respond to anticipated disparate impact claims, banks will need to devote considerable additional resources to expanded fair lending compliance programs.

The increased costs associated with the 1071 rule will reduce competition in the small business credit market, despite the Director's statements about the importance of competition in financial services.[4] Over time, the 1071 rule will drive further consolidation, and the gradual loss of community banks. Reduced competition will lead to fewer choices and higher prices for small businesses. Non-banks will absorb some of the small business lending done today by banks, but they will not be able to offer their customers the benefits of a banking relationship and the technical assistance banks provide to their small business customers.

While understating the costs of the rule, the proposal also overstates the rule's benefits for fair lending. Experience with PPP shows that most small business applicants will decline to provide demographic information or leave questionnaires blank; therefore, the data on race and ethnicity of business owners will be flawed. Records with missing demographic data will either be excluded from fair lending analyses, or data users will have to use proxies for race and ethnicity

---

[4] Press Release, Consumer Fin. Prot. Bureau, Statement of CFPB Director Rohit Chopra Member, FDIC Board of Directors December Open Meeting of the Board, https://www.consumerfinance.gov/about-us/newsroom/statement-of-cfpb-director-rohit-chopra-member-fdic-board-of-directors-december-open-meeting-of-the-board/ (Dec. 2021).

AdminRecord-019306

to try to identify fair lending issues. These problems call into question the benefit of the data collection, and whether the costs are justified by the benefits.

The Bureau seeks to address the prospect of missing demographic information by requiring lenders to identify business owners' race and ethnicity by visual observation or surname when the applicant declines to provide the information. This practice is antithetical to section 1071, which clearly expresses Congress' intent for an applicant to have the right to choose whether to provide any of the information requested.[5] It will also yield wildly inaccurate data on race and ethnicity. Nevertheless, regulators, advocates, and investigative reporters will rely on it to target lenders for fair lending concerns.

Small businesses will also see their privacy significantly eroded once the Bureau releases the 1071 data to the public. Under the proposed rule, application-level data submitted by financial institutions will be publicly available on the Bureau's website, subject to modification by the Bureau to protect privacy. There is little question that data users will be able re-identify small businesses with just *two* of the proposed data points—census tract and NAICS code. Publication of other data points may disclose sensitive personal financial information or confidential business information about an applicant. This will undermine small business owners' privacy, increase fraud, and encourage the aggregation, sale, and use of information without small businesses having any ability to control the use of their information.

Although the Bureau proposes to study re-identification risk and to employ a "balancing test" to assess the risks and benefits of public disclosure, it does not plan to allow the public to comment on the study or the decisions the Bureau makes on redaction or modification. ABA strongly recommends that the Bureau reconsider this plan, and urges the agency to initiate an Administrative Procedure Act (APA) compliant rulemaking to determine which data can be publically released without sacrificing small business owners' privacy.

We summarize here our comments on specific provisions of the proposed rule:

- **ABA supports an activity-based exemption from the 1071 rule for community banks; however, the rule should exempt financial institutions with 500 or fewer small business loan originations in each of the two preceding calendar years.** The proposed 25-loan threshold for coverage is much too low and would force many community banks to raise prices, set minimum loan amounts, or even exit banking entirely to avoid the costs of the 1071 rule.

- **ABA supports a simple and clear definition of a small business as one that has $1 million or less in gross annual revenue**. The proposed revenue cap of $5 million will cover larger businesses; the final rule should define a small business as one with $1 million or less in gross annual revenue in the preceding fiscal year.

---

[5] 15 U.S.C. § 1691c-2(c) (2018) ("Any applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit.").

AdminRecord-019307

- **The proposed definition of an application, which triggers data collection and reporting for covered institutions, should be retained in the final rule.** It provides the flexibility needed for a rule that will cover different products, from term loans, lines of credit, and real estate secured transactions.

- **The proposed definition of a covered credit transaction is generally appropriate and we support the inclusion of merchant cash advances**. However, we urge the Bureau to cover trade credit, as excluding it adds to the unlevel playing field between providers of trade credit and banks.

- **The Bureau must address the duplication between 1071 and HMDA by removing all business purpose transactions from HMDA**.

- **The Bureau must work proactively with the banking agencies to eliminate duplicative and inconsistent requirements in 1071 and the CRA data.**

- **ABA supports the proposal to define a "minority individual," for purposes of determining minority-owned status, using only aggregate ethnicity and race categories.** Doing so will help avoid burdening applicants with lengthy lists of subcategories, which would likely be overwhelming and confusing.

- **The final rule should retain the proposed definition of a "principal owner" based on the Customer Due Diligence rules.**  Financial institutions are already familiar with this concept in the CDD rules.

- **ABA opposes the requirement to collect and report the discretionary data points.** The statutorily mandated data points will fulfill the statutory purposes without the need for the discretionary data points. The eight discretionary data points unduly increase the burden on reporting financial institutions and create more opportunities for errors, even with reasonably adapted procedures to avoid errors.

- **The Bureau lacks evidence to add pricing information to the data points.** In addition to compliance burden, the pricing data will be used to draw erroneous conclusions about fair lending, causing needless reputational risk. Over time, banks are likely to employ less flexibility to qualify small businesses, resulting in less credit availability.

- **The final rule should not require collection and reporting of NAICS Codes.** Most small businesses do not know their NAICS Codes; thus, the data are likely to be very inaccurate. Moreover, NAICS Codes, combined with census tract, will make it easy to re-identify a small business.

4

AdminRecord-019308

- **ABA supports the proposal to rely on an applicant's statement that the business is minority- and/or women-owned.** ABA also supports the proposal's definition of a minority individual using only aggregate race and ethnicity categories.

- **ABA opposes collecting race and ethnicity by visual observation or surname.** This requirement is contrary to voluntary data provision, and will lead to inaccurate data, which will lead to erroneous claims of discrimination.

- **ABA supports the proposal not to require collection of the sex of the principal owners by visual observation or surname.**

- **While ABA supports the proposal to allow institutions to rely on applicants' statements for many data points, we oppose the requirement to report verified information if the institution verifies the applicant's statement.**

- **The firewall requirement is unworkable and will impose needless burden on institutions.** The Bureau should provide more flexibility in the use of the exception, where a firewall is infeasible. However, even the exception will cause disruption and put some banks at a competitive disadvantage.

- **The Bureau should exempt financial institutions from the requirement to maintain demographic data separately from other application materials**. The requirement will only frustrate the purposes of 1071 by making it harder to do fair lending analyses and audits for compliance with 1071.

- **ABA supports the proposed bona fide errors provision and the safe harbors; however, the proposed error tolerances are too low and must be revised.**

- **Institutions need three years to implement a rule of the magnitude of section 1071.** The propsed18-month period is inadequate and will result in inaccurate data in the early years of collection.

## Comments

### I. Definitions

### A. Definition of a covered financial institution – §§ 1002.102(h) and 1002.105(b)

The proposed rule defines a covered financial institution as one that originated at least 25 covered transactions in each of the two preceding calendar years. The Bureau is proposing an exemption because although it believes it must collect data from all types and sizes of financial institutions, it is concerned that institutions with the lowest volumes of small business lending

AdminRecord-019309

might reduce or cease their activity because of "fixed costs of coming in to compliance" with the rule. This would "be contrary to the community development purpose" of 1071.[6]

### 1. **ABA supports an activity-based exemption.**

The Bureau believes that an activity-based exemption would provide a simple basis for institutions to know whether 1071 applies to them. Comments on the Bureau's SBREFA outline supported using only originations, and not dollar volume or other metrics in combination with originations.[7]

ABA agrees that an activity-based exemption (without an alternative asset-based exemption) is relatively simple for low-volume lenders to apply. However, the exemption will impose some burden, as most institutions do not track the gross annual revenue of their small business customers.

ABA also supports the Bureau's decision not to base the exemption on applications, and we support a two-year look back period.

### 2. **The proposal lacks empirical support for a 25-loan threshold for coverage.**

ABA appreciates the challenge of establishing an appropriate and defensible threshold for coverage. However, the Bureau has had more than five years to develop data to support its proposed 25-loan threshold, and has not done so. Instead, the Bureau relied on FFIEC Call Reports and the Credit Union reports, which provide data on outstanding loan balances, not originations, to "impute the missing data" on loan originations. The Bureau presents its method for deriving these estimates in its Supplemental Estimation Methodologies published with the proposal.[8] Despite statements by Director Chopra expressing interest in feedback from community banks on the proposal, understanding the "missing data" methodology requires sophisticated understanding of statistical analysis that is accessible only to PhD statisticians and economists.[9]

The Bureau further obfuscates the data it relies on to evaluate the activity-based thresholds under consideration. Rather than publishing the "imputed" data on the number of originations, the preamble presents only a table showing the percentage of loans and depositories covered by triggers of 25, 50 and 100 loans. As for non-depositories, the Bureau states "it has no information for non-depository institutions such that the Bureau could provide similar estimates for comment."[10] Yet, in the Regulatory Flexibility Analysis (RFA), the Bureau is somehow able to

---

[6] 86 Fed. Reg at 56418-19.

[7] Consumer Fin. Prot. Bureau, *Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking*, at 5642 (Dec. 2020), https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa-report.pdf.

[8] Consumer Fin. Prot. Bureau, Supplemental Estimation Methodology for Institutional Coverage and Market-Level Cost Estimates in the Small Business Lending Data Collection Notice of Proposed Rulemaking (Sept. 2021), https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf.

[9] *CFPB Director Concerned About Reg Burden for Small Banks,* ABA Banking J. (Oct. 28, 2021), https://bankingjournal.aba.com/2021/10/cfpb-director-concerned-about-reg-burden-for-small-banks/.

[10] 86 Fed. Reg at 56,422.

AdminRecord-019310

estimate the number of non-depository lenders that would be covered by the proposal, separately showing the number of small non-depository lenders that would be covered.[11]

The proposal's mix of percentages, numbers, and complex formulae for imputing originations from Call Report data make it impossible to comment on the Bureau's assessment that a 25-loan trigger is necessary to achieve the statutory goals. We understand that the FFIEC does not have data on non-depository activity; however, the Bureau has had several years to gather such data from other sources and has, apparently, made no effort to do so beyond asking the public for data.

### 3. The proposal lacks a compelling rationale for a 25-loan threshold.

Not only has the Bureau failed to provide data supporting the proposed threshold for coverage, the proposal lacks a compelling rationale for a 25-loan trigger. The preamble does not explain why a 25-loan trigger is necessary and appropriate to fulfill 1071's purposes, which are to facilitate fair lending enforcement and community development. We do not endorse the 100-loan trigger; however, that trigger would cover 90% of small business lending by depositories, which is surely more than adequate for 1071's purposes.

The Bureau asserts that to fulfill 1071's purposes, it must collect data "from all sizes and types of financial institutions" other than those with low lending volume, "particularly given the variety of entities identified in ECOA section 704B(h)(1)."[12] In addition, the Bureau states that "several SERs" and "many comments" on the SBREFA outline supported a 25-loan threshold. The Bureau indicates that it has rejected, "to this point," the views of many other SERs and stakeholders who supported triggers of 100 loans or more, because it is not convinced that higher triggers are "more necessary or appropriate to carry out the purposes of section 1071."[13]

The Bureau appears to believe that institutions making fewer than 25 loans might reduce access to credit if covered by the rule, frustrating the community development purpose. We agree that a lender making so few small business loans would cease making loans available, given the costs of 1071. But we strongly believe that an institution making 50 or 100 loans would also exit the business or raise prices, given the costs and burdens of 1071 compliance.

As for the Bureau's reliance on ECOA section 704B(h)(1) in stating that the rule must cover institutions of all types and sizes, the Bureau has not explained why it supports a 25-loan trigger. On its face, section 704B(h)(1) merely defines a "financial institution" as any type of organization – partnership, corporation, association, trust or other entity – engaged in financial activity. The most that can be said about section 704B(h)(1) is that the rule should cover all types of *organizations*; it does not address the organizations' activity levels, size or even the charter type of organizations covered.

---

[11] *Id.* at 56,569; tbl. 17.
[12] *Id.* at 56,420.
[13] *Id.*

AdminRecord-019311

**4. The estimates of "institutions subject to reporting" lack critical information on non-depository small business lenders.**

Even if ECOA section 704B(h)(1) requires coverage of different sizes and types of institutions, the section-by-section discussion of covered financial institution does not explain how the 25-loan threshold covers all sizes and types of institutions. Instead, the section-by-section discussion shows that a 25-loan trigger covers 40% of one type of institution—depositories—and 98% of their small business originations.

If the Bureau believes the rule must cover institutions of all sizes and types, it has an obligation to estimate coverage across different types and then clearly share that information with commenters in the section-by-section discussion of the definition of a "covered institution," so that they have a meaningful opportunity to comment. However, there is no such information in the section-by-section discussion of the definition of a covered institution. Instead, the Bureau presents some information in the Regulatory Flexibility Act (RFA) analysis, where it shows the numbers of different institutions that the proposal would cover, including how many of those institutions are "small" under SBA's size standards. However, it is not clear how the Bureau estimated coverage of non-depositories for purposes of the RFA, given that it stated that it does not have data on non-depositories' activity level.

The lack of information on non-depositories in the section-by-section discussion skews the Bureau's estimates of "institutions subject to reporting" at each of the thresholds. This omission makes it *appear* that less than 50% of small business lenders will be covered at even the proposed 25-loan threshold. In reality, 51% of small business owners have applied for credit from a non-depository institution, according to a Federal Reserve survey.[14] If the non-depository data is included, the table would show that even at the highest threshold for reporting considered by the Bureau, the percent of lenders subject to reporting will be more than sufficient to meet the statutory purposes of section 1071.

**5. The final rule should exempt banks making fewer than 500 covered loans in each of the two preceding calendar years.**

Based on ABA's survey of its members and analysis of Call Report data, the final rule should exempt institutions with fewer than 500 covered originations in each of the two preceding calendar years.[15] Such a threshold would achieve the Bureau's stated objective, to collect data from institutions of different sizes and types, without conflicting with section 1071's community development purpose.

We estimate that a 500-loan threshold would result in coverage of 70%, by dollars, of banks' small business lending. That coverage would be in addition to the covered lending of credit

---

[14] *See* The Federal Reserve Banks of Atlanta, et al., The Federal Reserve's Small Business Credit Survey 2021 Report on Employer Firms (2021),
https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/2021-sbcs-employer-firms-report.
[15] ABA conducted a survey of members November 11, 2021, to December 2, 2021, which resulted in responses by 479 banks and savings associations across 40 states. The respondents ranged from banks with assets of less than $500 million to more than $75 billion.

AdminRecord-019312

unions, fintechs, commercial finance companies and other non-bank lenders. Covering 70% of bank lending to small businesses would yield a large and robust data set for regulators and the public to use to fulfill section 1071's purposes.

At the same time, a 500-loan threshold would not subject small community banks to the costs and burdens of the section 1071 rule. These banks have fewer loan originations over which to costs of compliance than larger institutions.

### 6. The Bureau has underestimated the costs of compliance for community banks.

Although Small Entity Representatives (SERs) and others told the Bureau its cost estimates are too low, it has made no changes in response. Instead, the proposal simply recites feedback received during the SBREFA review process indicating that its estimations of certain costs are too low—for example, estimated costs for training, salary estimates for employees too junior for the tasks involved, and costs of transcribing data.[16] However, the Bureau has made no changes to its analysis in response to these concerns and does not explain why it has not done so.

In addition, commenters on the Bureau's 2017 Request for Information stated that lenders would bear costs associated with litigation and reputational harm from "false positive" analyses asserting that lenders have engaged in discrimination.[17] Again, the Bureau simply recites these concerns and "seeks comment on the extent of the possible costs of litigation or reputational harm."[18] ABA also predicted that banks will need to devote additional resources to fair lending compliance programs. However, the Bureau's cost estimates do not appear to factor in this cost.

The Bureau asserts that community banks will not exit the market based on its one-time cost survey. But the Bureau has not made the survey data available to the public for comment, making it hard to evaluate the Bureau's assertions about the impact of the data reporting regime on the cost and availability of small business credit.

In our conversations with members, we found that many are reluctant to say that they will exit the market altogether. We attribute this to the existential threat such an exit poses to the vast majority of community banks. Our survey found that for community banks, on average small business lending makes up 45% of their total lending portfolio. Given the importance of small business lending to these banks, a bank that stops originating small business loans is likely to have to close or merge with another institution.

Most bankers are unwilling to predict they will cease to exist, at least at this time. We also believe that the compliance and fair lending officers who typically fill out surveys would not consider a complete exit from small business lending possible out of concern about the impact on their fair lending and CRA programs.

The Bureau contends that the costs for small institutions are not large comparatively.  The Bureau's analysis suffers from several flaws. First, the Bureau's activity estimates for types A

---

[16] 86 Fed. Reg at 56,560-61.
[17] *Id.* at 56,561.
[18] *Id.* at 56,560.

AdminRecord-019313

and B institutions are significantly lower than the activity reported by community banks in our survey. The Bureau states that type A institutions originate 100 covered loans per year, and that type B institutions originate 200 covered loans per year. In contrast, bank survey respondents with assets under $500 million reported an average of 276 small business loan originations in 2019 by bank, which is more than double the CFPB's estimate. Similarly, bank survey respondents with assets of $500 million to $999.9 billion reported an average of 359 small business loan originations in 2019.[19]

The Bureau's underestimation of community bank activity calls into question its cost estimates, particularly the ongoing costs. The cost of ensuring that each record is accurate rises with the number of records that an institution must scrub for data integrity.

Second, the proposal's estimation of costs appears to have significant gaps. For example, although the Bureau estimates that the one-time costs for Type A and B institutions are $58,400 and $44,500, respectively, it is not clear that those totals included costs associated with hiring new FTEs.[20] In ABA's survey, 88% of respondents stated that they would have to hire more FTEs, with community banks, on average estimating they would hire 2-3 additional FTEs. Some community banks estimated they would need to hire 10 FTEs.

It is also unclear whether and how the Bureau accounted for the salary costs of *existing* FTEs in its estimate of one-time costs. The Bureau only presents the number of staff hours – presumably of existing staff – that will be required to collect and report the data, without any dollar estimates.[21] In our survey, 96% of respondents said they would have to assign new duties to existing staff. Community banks estimated that, on average, 8 to 13 employees would have to take on additional duties. These reassignments impose significant opportunity costs that the Bureau's cost estimates fail to consider.

The Bureau states that even if variable costs are passed on to small businesses in the form of higher rates or fees, "The Bureau expects this would comprise a small portion of the total cost of the average loan to the average small business applicant."[22]

We asked our survey respondents what they would do in response to the one-time and ongoing costs of the rule. They indicated that they would raise rates and fees, both in the near term and over the longer term. This contrasts with the Bureau's assertion that institutions will only pass on variable costs and only in relation to the one-time cost of compliance.

Regarding estimates of ongoing costs, the Bureau did not conduct a survey but instead relied on its estimates for the 2015 HMDA rule, with some adaptations. The proposal estimates that type A institutions would incur $ $7,386 in total annual ongoing costs, or about $74 in total cost per application processed (assuming a representative 100 applications per year). For Type B institutions, the Bureau estimates $35,476 in additional ongoing costs per year, or around $89 per application (assuming a representative 400 applications per year). For

---

[19] ABA's survey focused on 2019 originations, to avoid anomalous results stemming from PPP lending.
[20] 86 Fed. Reg at 56,556, tbl. 9.
[21] *Id.* at 56,556, tbls. 10, 11, and 12.
[22] *Id.* at 56,562.

AdminRecord-019314

Type C institutions, the estimate is $243,266 of annual ongoing costs, or $41 per application (assuming a representative 6,000 applications per year).[23]

The Bureau's estimates of ongoing costs are not even close to being accurate, based on ABA's survey. Among other things, the ongoing cost estimates suffer from the Bureau's underestimation of activity levels for community banks, as discussed above. In addition, we asked respondents to estimate their ongoing costs, using the Bureau's list of tasks in table 14.[24] 62% of the respondents to ABA's survey are HMDA reporters; therefore, they have experience with data collection and reporting. The estimates of these bankers are considerably higher than the Bureau's, as seen in the table below. For example, looking at banks with assets below $500 million, they estimate ongoing costs of $40,162 and banks with assets of $500 million to $999.9 million estimate ongoing costs of $67,089.

## Estimated Average Annual Ongoing Costs Per Compliance Task (Actual Dollars)

| | Less than $500M | $500M to $999.9M | $1B to $9.9B | $10B to $74.9B | $75B or more | All |
|---|---|---|---|---|---|---|
| Transcribing data: | 6,202 (n=47) | 10,395 (n=32) | 16,162 (n=51) | 50,469 (n=11) | 28,843 (n=2) | 14,414 (n=143) |
| Resolving reportability questions: | 2,928 (n=45) | 4,436 (n=32) | 11,169 (n=52) | 28,284 (n=13) | 801 (n=2) | 8,498 (n=144) |
| Transferring to 1071 data management software: | 4,240 (n=39) | 6,974 (n=38) | 6,701 (n=36) | 20,499 (n=10) | - | 7,140 (n=113) |
| Geocoding data: | 2,059 (n=38) | 3,607 (n=27) | 3,729 (n=48) | 6,732 (n=14) | 1,650 (n=2) | 3,505 (n=129) |
| Standard annual edit and internal checks: | 4,465 (n=44) | 9,113 (n=32) | 18,256 (n=49) | 46,606 (n=13) | 26,591 (n=2) | 14,584 (n=140) |
| Researching questions: | 2,297 (n=43) | 5,011 (n=34) | 3,486 (n=50) | 12,532 (n=13) | 1,132 (n=2) | 4,286 (n=142) |
| Resolving question responses: | 2,054 (n=43) | 3,199 (n=23) | 4,607 (n=34) | 11,420 (n=13) | - | 4,451 (n=98) |
| Checking post-submission edits: | 1,904 (n=41) | 4,760 (n=32) | 3,945 (n=48) | 9,897 (n=13) | 298 (n=2) | 4,038 (n=136) |
| Filing post-submission documents : | 1,385 (n=40) | 4,256 (n=31) | 3,824 (n=47) | 4,937 (n=13) | 257 (n=2) | 3,248 (n=133) |
| Small business data reporting/geocoding software: | 6,396 (n=38) | 7,152 (n=29) | 13,908 (n=48) | 62,029 (n=13) | 13,885 (n=2) | 15,017 (n=130) |
| Training: | 4,812 (n=48) | 7,390 (n=33) | 13,687 (n=53) | 30,474 (n=13) | 21,631 (n=2) | 11,005 (n=149) |
| Internal audit: | 3,180 (n=37) | 4,003 (n=30) | 19,858 (n=46) | 45,001 (n=13) | 123,375 (n=2) | 15,492 (n=128) |
| External audit: | 5,134 (n=46) | 3,931 (n=27) | 9,156 (n=46) | 14,548 (n=10) | - | 7,046 (n=129) |
| Exam preparation: | 2,585 (n=45) | 3,552 (n=31) | 8,788 (n=50) | 26,322 (n=12) | 25,183 (n=2) | 7,372 (n=140) |
| Exam assistance: | 1,056 (n=33) | 1,500 (n=27) | 3,115 (n=42) | 18,473 (n=11) | 7,239 (n=2) | 3,686 (n=115) |
| All | 40,152 (n=50) | 67,089 (n=34) | 121,807 (n=54) | 301,815 (n=15) | 250,883 (n=2) | 102,549 (n=155) |

Source: ABA Survey 2021

In addition to underestimating the rule's ongoing costs, the Bureau attempts to make the costs appear even smaller by juxtaposing them with its estimates of the net income from small business lending using Call Report data.[25] We understand that the Bureau does not have net income data for covered financial institutions, but we cannot determine how the Bureau arrived

---

[23] Id. at 56,559-60.
[24] Id. at 56,559.
[25] Id. at 56,560.

AdminRecord-019315

at its estimates of net income; the proposal provides no explanation other than a reference to Call Reports. Moreover, the Bureau had years to seek more concrete information on net income, through surveys or other means, which it could have shared with the public. However, the Bureau did not do so, falling short of its obligation to base its cost analysis on quantitative information.

ABA did not have sufficient time within the comment period allowed, to gather comprehensive data from members on net income. However, information from one community bank with assets under $500 million indicates that the Bureau's estimates are significantly higher than actual net income earned on small business loans. For this bank, the average *gross* income on small business loans it originated in 2021 is $13,500, before subtracting any costs.[26] In contrast, the Bureau states that the average net income for small business originations is $105,000 to $119,000 for Type A banks, and $50,000 to $57,000 for Type B banks.[27]In addition, our community bank's data shows that it makes loans that generate as little gross income as $115 – these are loans that are unlikely be made after the 1071 rule takes effect, limiting credit availability to the small businesses and farms that need it most.

Based on our survey and our discussions with members, we believe the costs of the rule as proposed will be much larger than the Bureau's estimates and that they will be passed on, to the detriment of small businesses seeking credit. Even if banks decide to absorb all or some of the compliance costs, their capacity to lend to small businesses will then be constrained. Small businesses will have fewer choices, resulting in a reduction in competition. Some small businesses will turn to larger financial institutions, including those operating online. In addition, non-banks will absorb some of the small business lending done today by banks, but they will not be able to offer their customers the benefits of a banking relationship and the technical assistance banks provide to their small business customers. Both outcomes are in contrast to the Director's recent statements about the importance of competition and relationship banking.

Moreover, the fair lending benefits the Bureau cites in the proposal are likely overstated.[28] As shown in the table below, experience with PPP shows that most small businesses will not provide demographic information. Any data on race and ethnicity based on visual observation or surname will be inaccurate. And records with missing demographic data will either be excluded from fair lending analyses, or data users will have to use proxies for race and ethnicity to try to identify

---

[26] The data do not include PPP loans originated in 2021.

[27] 86 Fed. Reg at 56,560.

[28] *See, e.g.,* 86 Fed. Reg. 56555: ("Data reported under the proposed rule would allow regulators to prioritize fair lending reviews of financial institutions.."). The lack of reliable demographic data will also undermine the benefits of disclosure, in the CFPB's application of the "balancing test" in determining whether to modify or withhold certain data from the public.

AdminRecord-019316

fair lending issues. These problems call into question the benefit of the data collection, which is troubling in light of the costs the rule would impose.

| PPP Demographic Data Reported[29] | | | |
|---|---|---|---|
| Demographic | 2020 | 2021 | Total |
| Race | 17.4% | 29.5% | 24.2% |
| Ethnicity | 22.5% | 33.0% | 28.5% |
| Gender | 31.8% | 44.0% | 38.7% |

To minimize these negative impacts from the costs of the rule, we urge the Bureau to raise the activity-based exemption threshold from 25 to 500 loans. Doing so will help preserve the relationship lending Director Chopra recognizes is so important to small businesses and small farms and the communities they serve.

**B. Definition of small business – § 1002.102(p)**

The proposal defines a small business as one that meets the Small Business Administration's (SBA) definition, with one clarification. Such a business would only be small for purposes of the 1071 rule if, and only if, it has gross annual revenues of $5 million or less in its most recent fiscal year. The preamble states that the proposal would not apply the SBA's size standards, which rely on the NAICS codes, to define a small business.

**1. ABA supports a revenue-based determination.**

ABA supports a definition of a small business that is simple, objective and relatively easy to apply. Applying the SBA's size standards rules and NAICS codes would be unworkable fin the context of small business lending. We agree with the Bureau that, for the 1071 data collection, an institution must be able to determine quickly and easily whether an applicant is a small business under the rule because they must collect demographic information on covered applications that Regulation B otherwise prohibits.

We also agree with the Bureau that institutions are more likely to obtain demographic information from applicants if they request it earlier in the application process rather than later. Using the NAICS codes to identify small businesses would take much longer, delaying the collection of demographic information. Using the NAICS codes would also impose large training costs on financial institutions.

A definition based on gross annual revenue, as determined by the applicant's statement, will facilitate compliance by allowing institutions to ask for demographic information early in the process and better achieve the purposes of Section 1071.[30]

---

[29] Source: ABA Analysis, SBA data as of June 8, 2021.
[30] *Id.* at 56,433.

AdminRecord-019317

## 2. The Bureau should define a small business as an entity with $1 million or less in gross annual revenue.

ABA urges the Bureau to revise the proposed definition so that the data collection covers only credit applications from small businesses. We recommend that the final rule use $1 million as the limit on the applicant's gross annual revenue, not $5 million in gross annual revenue. The Bureau justifies its proposal of $5 million, stating that it would exclude 270,000 businesses deemed small under SBA size standards (out of 7.2 million small employer firms), and cover 77,000 businesses that are not small under those standards. It appears that the 77,000 businesses are also employer firms, though the preamble is not clear on this point.

Although the Bureau considered a $1 million limit in its SBREFA outline, the proposal states that a $1 million gross annual revenue limit would exclude too many institutions deemed small under SBA's size standards—without indicating how many businesses would be excluded. However, in the SBREFA outline, the Bureau estimated that a $1 million limit would not cover 1.2 million *employer* firms deemed small by SBA, or 23 percent of all employer firms. Significantly, the outline also states that a $1 million limit would exclude *all* employer firms that are not small under SBA's size standards.

The Bureau's reliance on data on employer firms makes it seem that a $1 million limit would result in 23% of all small businesses being excluded from the definition. However, the Federal Reserve Study of Small Businesses indicates that 81% of small businesses are non-employer firms.[31] Moreover, the same study indicates that these firms are more likely to be owned by minorities and women. Yet the Bureau presents no analysis of data on non-employer firms.

The Bureau's 2017 report on small business lending noted, "[A]pproximately 95 percent of all businesses had less than $1 million in annual revenues. Roughly 97.7 percent of all minority-owned businesses and 98.3 percent of all women-owned businesses were similarly under this $1 million in annual receipts threshold."[32] A definition of "small business" that covers 97.7%, and 98.3% of all minority and women owned businesses, and 95% of all businesses, would provide an extremely robust data set for 1071 purposes.

In addition, Regulation B has long recognized that businesses with $1 million or less in gross annual revenue are more vulnerable and need more protection in the form of adverse action notices than larger businesses.[33] Creditors are permitted to provide notices to larger businesses within a reasonable time (as opposed to 30 days for smaller businesses), and need not provide reasons for denial unless the applicant requests such information in writing.

---

[31] The Federal Reserve Banks of Atlanta, et al., Small Business Credit Survey: 2021 Report on Nonemployer Firms (2021), https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/2021-sbcs-nonemployer-firms-report.
[32] Consumer Fin. Prot. Bureau, Key Dimensions of the Small Business Lending Landscape (May 2017), https://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[33] 12 C.F.R. § 1002.9(a)(c)(3)(i) (2021).

AdminRecord-019318

Collecting and reporting data from businesses with gross annual revenues of $1 million or less is also consistent with the Community Reinvestment Act (CRA). Under the current CRA rule, the large bank lending tests focuses, in part, on the bank's record of lending to businesses with gross annual revenues of $1 million or less.[34] In addition, loans to businesses may be eligible for consideration as community development loans, if, among other things, the loan finances businesses that either meet the size eligibility standards of the SBDC or SBIC programs or *have gross annual revenues of $1 million or less*.[35]

The proposed rule covering small businesses that have $1 million or less in gross annual revenue would better fulfill the purposes of 1071 and align with existing regulatory regimes.

## C. Definition of a covered application – §§ 1002.102(f) and 103(a)

Proposed § 1002.102(f) defines a covered application as an oral or written request for a covered credit transaction that is made in accordance with procedures used by a financial institution for the type of credit requested. ABA supports the proposed definition, as it is consistent with the definition of an application in subpart A of Regulation B in § 1002.2(c). Covered financial institutions are familiar with subpart A's definition of an application, which triggers responsibilities for creditors, including the notice requirements in § 1002.9.

### 1. ABA supports giving lenders latitude to set their own application process.

We urge the Bureau to retain comment 103(a)-1, which gives an institution the latitude to establish its own application process and procedures, including designating the type and amount of information it will require. The comment is consistent with longstanding interpretation of Regulation B subpart A, and its flexibility is critical. The proposal covers a variety of small business lending products that require different information from applicants depending on the product. Institutions needs this flexibility to continue to offer their customers the products that best suit their needs.

Although the comment clearly permits an institution to determine its own procedures for applications, the section-by-section discussion may be read to suggest otherwise:

> Pursuant to ECOA section 704B(b)(1), an 'application' triggering data collection and reporting obligations occurs without regard to whether such application is received in person, by mail, by telephone, by electronic mail, or other form of electronic transmission, or any other means.[36]

We urge the Bureau to clarify that an institution is not compelled to accept applications by any means the applicant chooses. Instead, the Bureau should clarify that if an institution has procedures for application by one or more means, it must collect and report data on applications

---

[34] *See, e.g.*, *id.* § 228.22(b)(3)(ii).

[35] *See, e.g.*, *id.* § 228.12(g)(3); *see also* Interagency Questions and Answers, Q&A __.12(g)(3) – 1, 81 Fed. Reg. 48,506 (July 25, 2016).

[36] 86 Fed. Reg. at 56,398.

AdminRecord-019319

made through any one of those methods. This clarification is critical because some banks cannot accept applications online or by mail, and most fintechs cannot accept applications in person.

### 2. ABA supports the exclusion of prequalifications and inquiries from the definition of an application.

We also support proposed comment 110(a)-3, which excludes inquiries and prequalifications from the definition of an application, even if they would otherwise be deemed applications under subpart A. However, the Bureau should amend this comment to clarify that preapprovals are also not considered applications for purposes of 1071. It would also be helpful if the Bureau could provide examples of scenarios that are inquiries, prequalifications, and preapprovals in the commentary. While the section-by-section discussion contains some examples, these examples do not carry the authority of the commentary and are not included in the Code of Federal Regulations.[37]

We also support the Bureau's proposal to exclude renewals and extensions from the definition of an application. We question the value of including credit line increases, given the burden that will be placed on lenders and borrowers who expect a streamlined process. Although we appreciate the Bureau's attempt to address our concerns about line increases by permitting financial institutions to re-use certain data points, a 24-month period would be more reasonable than the 12 months the Bureau has proposed.

### 3. ABA opposes coverage of overdraft lines of credit.

According to the preamble, the Bureau intends to cover overdraft lines of credit. ABA opposes coverage of these lines, as creating even more operational and compliance burden. We believe banks will stop offering these lines of credit, disadvantaging small businesses that need short term credit to cover unexpected expenses.

### 4. We oppose reporting on transactions when an applicant initially seeks a covered credit product but ultimately is offered and accepts a product that is not covered.

ABA believes data on transactions that are not covered should not be reported. It defies logic to require reporting on transactions that the Bureau has decided should not be covered. Moreover, the partial information would likely be of low utility.

---

[37] It is paramount that any examples or interpretations be included in the commentary, rather than left in the section-by-section discussion. The 1071 rules will be subject to interpretation by courts, and courts generally consider only material in the regulation and commentary. More importantly, ECOA section 706(e) provides a safe harbor from civil liability for any act or omission made in "good faith conformity with any official rule, regulation, or interpretation thereof by the Bureau or in conformity with any interpretation or approval by an official or employee of the Bureau . . . duly authorized by the Bureau to issue such interpretations or approvals . . . ."  It is not clear that Bureau statements in a section-by-section analysis would meet the standard for safe harbor.

AdminRecord-019320

### D. Definition of a covered credit transaction – §§ 1002.102(g) and 1002.104(a)

The Bureau proposes to require covered financial institutions report data for all applications for transactions that meet the definition of business credit unless otherwise excluded. Proposed § 1002.104(a) would define the term "covered credit transaction" as an extension of business credit that is not an excluded transaction under § 1002.104(b). Loans, lines of credit, and credit cards, and merchant cash advances (MCAs) would fall within the scope of the proposed rule.

#### 1. There is no need to define loans, lines of credit, and credit cards.

Covered credit transactions would include loans, lines of credit, and credit cards, and the Bureau is not proposing to define such terms. We agree with the Bureau that the Rule does not need to define loans, lines of credit, and credit cards, as these products are already covered by proposed definition of "credit" in § 1002.102(i). Defining these terms would add unnecessary complexities, and these terms are already generally understood in the business lending community.

#### 2. ABA supports inclusion of Merchant Cash Advances.

The SBREFA outline indicated that the Bureau was considering excluding MCAs. The Bureau is now proposing to cover MCAs. We support the Bureau's inclusion of MCAs as covered credit transactions under the proposed rule. We appreciate the Bureau responding to comments made in the SBREFA process, including ABA's, urging the Bureau reconsider exclusion of MCAs. The Bureau appropriately recognizes the increased use of MCAs by small businesses, as well as some problematic aspects of MCAs and the potential for abusive tactics.

The inclusion of MCAs means that the 1071 rule would cover the majority of products that small businesses use to obtain financing, in furtherance of the fair lending and the business and community development purposes of section 1071. Their inclusion would create a more level playing field across financial institutions that provide financing to small businesses as well as create a data set that better reflects demand for such financing.

In addition, we do not believe the Bureau needs to define MCAs or other sales-based financing transactions, as the proposed definition of "credit" covers these terms.

#### 3. The Bureau must address the overlap between 1071 and HMDA, and it must commit to working closely with the banking regulators to address duplication and inconsistency between 1071 and the CRA data collection.

The Bureau proposes that business-purpose loans involving dwellings would be covered credit transactions under 1071 by adopting Regulation C's definition of dwelling and its commentary regarding investment property. The Bureau anticipates a relatively small but not insignificant overlap of HMDA and 1071 that will require duplicative reporting on real estate investment loans.. The Bureau considered excluding all HMDA-reportable transactions from the 1071 rule but believes such an exclusion would add complexity to data analysis and may be at odds with the statutory purposes of section 1071. The Bureau is considering whether it should require

17

AdminRecord-019321

financial institutions to flag applications reported under both regimes for data integrity and analysis purposes.

The proposed overlap between HMDA and 1071 would create significant and unnecessary complexities for covered financial institutions. While the Bureau has made efforts to limit the inconsistencies between HMDA and 1071, differences do exist, and requiring two sets of data to be collected and reported introduces needless complexity and burden. A borrower for a product subject to both reporting regimes will be given Form 1003 and the 1071 data collection form, which is likely to be confusing and frustrating for borrowers. Additionally, reporting and ensuring consistency between both collection regimes will impose substantial burden on covered financial institutions.

The Bureau should address this issue by removing business purpose loans from HMDA's scope. Creating a clear distinction between the two regimes would greatly reduce complexity and burden on financial institutions, as well as minimize confusion for credit applicants. We recognize this would require a new rulemaking, and we ask the Bureau to initiate the HMDA rulemaking on a parallel track so that both rules are finalized and implemented concurrently.

In addition, the 1071 rule will require reporting on transactions that are also reported under CRA rules by banks with assets above $1 billion. The overlap will result in costly duplication and confusion, as the 1071 proposal requires different reporting than CRA. For example, the 1071 proposal differs from CRA with respect to the treatment of renewals and extensions. The Bureau must work closely with the banking agencies working to modernize the CRA rules in order to reduce duplication and the friction caused by the different rules.

### 4. The final rule should list all excluded transactions in the regulatory text.

The Bureau proposes to exclude certain types of transactions from the definition of "covered credit transaction." While we agree with the Bureau's list of exclusions – except trade credit, for the reasons discussed below – we recommend that all of the excluded transactions are listed under § 1002.104(b). As proposed, some of the excluded transactions are listed in the rule text, while others are mentioned only in the official commentary to § 1002.104(b) (e.g., factoring). For clarity, the Bureau should list all exclusions in the rule text, including an exclusion for credit covered by Regulation Z, which covers only consumer-purpose lending.

The rule or commentary also should clearly state that loan purchases are not covered. Although we understand that a purchase does not involve an application for credit, in our experience compliance burden will be reduced if the rule or commentary contains a declaration that purchased loans are not covered.

### 5. ABA recommends that trade credit be a covered credit transaction.

The Bureau should reconsider its decision to exclude trade credit from the rule's coverage. The Bureau states that providers of trade credit are not financial institutions, but that logic is circular. Merchants providing trade credit are providing a financial service to purchasers. Moreover, they are providing it at a steep discount that banks cannot match given their regulatory obligations. The preamble states that these merchants are unlikely to report accurately; however, the Bureau

18

AdminRecord-019322

has tools to address inaccurate reporting. Exempting providers of trade credit because the data collection would be challenging for them only exacerbates the unlevel playing field that currently exists between banks and trade credit providers.

### E.  Definition of minority-owned and women-owned small business – §§ 1002.102(m) and (s) and "minority individual" – § 1002.102(l)

The proposal defines a minority-owned business as one for which (i) more than 50 percent of its net "ownership or control" is held by one or more "minority individuals" and (ii) more than 50 percent of its "net profits or losses accrue" to one or more "minority individual."  A minority individual would be defined as a natural person who is one or more of the following: Hispanic/Latino; Black or African-American; Native Hawaiian or Other Pacific Islander; Native American or Alaska Native; and Asian.

ABA supports the proposal to define a "minority individual," for purposes of determining minority-owned status, using only aggregate ethnicity and race categories. Doing so will help avoid burdening applicants with lengthy lists of subcategories, which would likely be overwhelming and confusing.

### F.  Definition of principal owner – § 1002.102(o)

The proposal defines a principal owner as a natural person who directly owns 25 percent or more of the equity interests of the business.[38] The Bureau notes that this definition is used for the Customer Due Diligence (CDD) rules, and should be familiar to financial institutions. The Bureau states that for 1071, entities would not be considered principal owners, and indirect ownership by individuals would not be considered in determining principal ownership.

ABA supports using the CDD rules to define a principal owner in the 1071 final rule. As the Bureau notes, banks are already familiar with this concept in the CDD rules. ABA also agrees that the 1071 rule should not include entities, and indirect ownership by natural persons. Including entities and indirect ownership would add unnecessary complexity to the 1071 rule.

---

[38] If the Bureau intends to require the institution to provide applicants with the definition of a principal owner, in writing, as comment 102(a)(o)-2 suggests, that requirement should be placed in the regulation at § 1002.107(a)(20), or in the commentary to the data collection portion of the rule. Moreover, the same requirement is repeated in Appendix G, adding length and complexity to the rule. In general, the commentary for principal owner is almost entirely repeated in the Appendix. The Bureau could reduce length and burden by eliminating the repetition.

In addition, Appendix G contains certain statements that appear to be interpretations of the rule and that are not instructions, including a statement that institutions should not collect demographic information for guarantors unless they are also principal owners. If the intent is for Appendix G to provide simple instructions, then interpretations should be moved to the commentary or regulation.

AdminRecord-019323

## II. Data Points - § 1002.107(a)

### A. The final rule should not require covered financial institutions to collect and report the discretionary data points.

Congress mandated the collection and reporting of thirteen data points. Section 1071 gives the Bureau the authority to require any additional data that the Bureau determines would aid in fulfilling the purposes of that section, which as noted previously, is to facilitate enforcement of the fair lending laws and to help identify business and community development needs. The Bureau is proposing to use its discretionary authority to require financial institutions to collect and report eight additional data points. Notably, one of these data points – pricing – includes several additional pieces of information.

The statutorily mandated data points will fulfill the statutory purposes without the need for the discretionary data. The eight discretionary data points unduly increase burden and create more opportunities for errors, even with reasonably adapted procedures to avoid errors.

Many of the discretionary data points mirror data that Congress added to HMDA in the Dodd Frank Act—for example, expanded loan pricing data. However, if loan pricing data were needed to fulfill section 1071's purposes, Congress would have included the data point in section 1071 at the same time that it included expanded pricing data in HMDA.

The Bureau fails to consider the cumulative impact of these discretionary data points on financial institutions in comparison to the minimal benefits they will provide. The rule will require significant changes and additions to loan origination systems and processes, policies and procedures, training, and oversight. While the 2015 HMDA rule expanded an existing data collection and reporting regime, this rule will introduce a completely *new* reporting regime and one that impacts far more lines of business, credit products, and employees than HMDA's reporting obligation.

To comply with section 1071, banks will need to establish new procedures and processes for collecting and maintaining the data for all affected business units, update core systems and loan origination systems (many – almost a third of respondents to our survey – will require new systems), train all employees involved with commercial lending, and finally, test the new process and systems and make necessary adjustments. Banks also will need to hire and train employees to conduct data integrity scrubs and to report the data.

According to our survey, approximately a third of community banks will have to purchase commercial loan origination software to comply with the 1071 rules. In addition, the majority of community banks stated that they would have to update their current LOS, as the table below shows:

AdminRecord-019324



To comply with the proposed 1071 data collection and reporting requirements, our bank will need to <u>update</u> commercial loan origination software (LOS)

Source: ABA Survey 2021

More importantly, the table below from our survey indicates that the Bureau's estimates are much lower than the real cost to update LOS. The Bureau estimated that a type A institution would spend $16,900 for this purpose, and a type B institution would spend $17,200 to update LOS. In our survey, banks with assets of $500 million or less reported costs for updating that average $39,500. Banks with assets over $500 million to $999.9 million reported costs that average $ 61,000.

## Cost estimate to - Update commercial loan origination software (LOS)

| | Mean | Maximum | Median | Minimum | Standard Deviation | Valid N |
|---|---|---|---|---|---|---|
| Less than $500 million in assets | 39,500 | 200,000 | 25,000 | 3,500 | 52,933 | 17 |
| $500 million to $999.9 million in assets | 61,000 | 225,000 | 25,000 | 10,000 | 92,019 | 5 |
| $1 billion to $9.9 billion in assets | 59,583 | 150,000 | 50,000 | 0 | 57,018 | 6 |
| $10 billion to $74.9 billion in assets | 1,300,000 | 2,500,000 | 1,300,000 | 100,000 | 1,697,056 | 2 |
| $75 billion or more in assets | - | - | - | - | - | 0 |
| All | 131,133 | 2,500,000 | 25,000 | 0 | 451,263 | 30 |

Source: ABA Survey 2021

21

AdminRecord-019325

ABA believes that other costs will be incurred to resolve interpretive issues surrounding the data points.  While some data points are straightforward (e.g., loan number), others are open to interpretation. Experience with HMDA demonstrates that even a seemingly straightforward data point such as action taken or action taken date can be difficult to get right without clear guidance from the Bureau. HMDA also has shown the need for clarifications and reinterpretations issued later, which add significantly to implementation costs, burden, and the time frame.

Many of the 1071 discretionary data points will generate interpretive issues and be difficult to report correctly. Indeed, respondents to ABA's survey estimate that they will spend annually an average of $8,498 resolving reportability questions, $4,286 researching questions, and $4,451 resolving question responses. Further, most businesses do not know what their NAICS code is, which makes that data point vulnerable to inaccuracies, despite financial institutions' efforts to correctly report applicant provided data. The Bureau should take an incremental approach and begin with requiring the collection and reporting of only the statutorily-mandated data elements, and then reassess and reevaluate as necessary.

**B.  Comments on Certain Data Points**

### 1. Application Method -- §§ 1002.107(a)(3)

Proposed § 1002.107(a)(3) would require financial institutions to collect and report "application method," defined as the means by which the applicant submitted the covered application directly or indirectly to the financial institution. A financial institution would comply with this by reporting one of the following options: in-person, telephone, online, or mail. If the financial institution has contact with an applicant in multiple ways, it would report the method based on a "waterfall approach." If a financial institution interacts with an applicant both online and by mail, a financial institution would report application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners pursuant to proposed § 1002.107(a)(20).

The application method data point, which is discretionary, will increase the compliance burden for covered financial institutions. In particular, the "waterfall approach" unnecessarily complicates reporting, as often there are several interactions with a small business, and it may be difficult to discern exactly how an application was received. For example, an applicant may provide much of the information for the application in person but then may provide additional information on the telephone or online. Based on the proposed commentary, it is not clear how the financial institution should report the application method in that scenario. Further, while the data point is "the means by which the applicant submitted the covered application" the related commentary discusses when a financial institution "meets with the applicant" or "communicated with the applicant by telephone." This commentary is confusing and does not provide clear guidance on how financial institutions can comply.

Rather than proposing an unnecessary, overly complex waterfall approach for application method, the Bureau should adopt the approach it proposes to use for applications involving both

AdminRecord-019326

mail and online. Under that approach, a financial institution would report the application method based on the method by which it, or another party acting on its behalf, requested the ethnicity, race, and sex of the applicant's principal owners pursuant to § 1002.107(a)(20). The Bureau's stated purposes of gathering and collecting this data point are not furthered by the complex waterfall approach. Instead, a clear standard on how financial institutions should report this method that can be applied for all situations would better meet the Bureau's intent and would reduce the burden on financial institutions.

### 2. Action Taken -- § 1002.107(a)(9)

The Bureau proposes in § 1002.107(a)(9) to require reporting of the "action taken" by the financial institution on the covered application. The actions reported include: originated; approved but not accepted; denied; withdrawn by the applicant; or incomplete. The Bureau proposes to categorize all incomplete applications as a single category of "incomplete."

#### a. The Bureau should ensure that 1071 and HMDA are consistent.

Our chief concern with the action taken data point is its inconsistency with HMDA, particularly for transactions that may need to be reported under both regimes. We understand the Bureau's reasoning for proposing a single category of incomplete, as opposed to the approach under Regulation C, which provides separate categories for denials (including on the basis of incompleteness) and files closed for incompleteness (if the financial institution sent a written notice of incompleteness). We agree with reserving the "denial" action taken category solely for credit-related denials, rather than also including denials that are based on incompleteness. However, the misalignment of action taken categories between these two reporting regimes will cause substantial difficulty for financial institutions. This further supports our recommendation that an application reportable under 1071 should not also be a reportable transaction under HMDA.

#### b. The final rule should not require a flag for counteroffers.

We agree that the rule should not require an action taken category or flag for counteroffers. Regulation C does not include such a flag, and the two rules should be as consistent as possible. In the small business lending context, determining whether an action is a counteroffer is extraordinarily complex, and it is infeasible to capture all the proposed 1071 data fields for every counteroffer negotiated with an applicant. Such a category or flag would overly complicate this data point and likely lead to confusion and data errors.

### 3. Pricing Information -- § 1002.107(a)(12)

The Bureau proposes to use its discretionary authority to require collection and reporting of the following pricing data points: (i) the interest rate, and if adjustable, the margin, index value, and index name; (ii) the total origination charges; (iii) broker fees; (iv) non-interest charges scheduled to be imposed in the first year of the loan or line; (v) costs for MCAs; and (vi) whether the lender could have imposed a prepayment penalty, and whether it did so.

23

### a. The final rule should not include loan pricing information.

ABA strongly opposes requiring institutions to collect and report pricing data. Including pricing data in the initial 1071 data set, without understanding how small business loan pricing works, will restrict the availability of small business credit and negatively impact the economy. The Bureau should use supervision to determine if issues in pricing merit inclusion in the 1071 rule and to evaluate whether reporting the proposed pricing data *can* achieve the statutory objective of facilitating enforcement of the fair lending laws and fostering community development. While the banking industry supports both goals, we have strong concerns that reporting pricing data will achieve neither objective. Small business lending at banks is highly individualized and underwriting and loan pricing depend on many heterogeneous variables that are inherently unsuitable for aggregate analysis to determine whether discrimination occurred.

Small business loan pricing reflects the unique, non-commoditized nature of small business lending. Lenders typically consider certain factors, including but not limited to, cash flow, collateral, loan purpose and type, industry risk, time in business, and timing of receivables and payables, but there is no generally recognized industry standard applied to each of these. This is in stark contrast to residential mortgage lending, where industry and regulators have generally coalesced around certain standards, for example, loans with loan-to-value ratios over 80% are usually deemed riskier, and priced accordingly, than those with ratios below 80%.

Instead, banks assess each underwriting factor on a case-by-case basis to determine risk and price each small business loan. This flexible process allows banks to make more credit available than if there were strict guidelines, benefitting small businesses. However, regulators and the public are bound to view differences in pricing for businesses that appear to be similarly situated as evidence of illegal discrimination, when a closer review of all of the information available to the underwriter would dispel that conclusion. Providing and explaining each credit decision in supervision or enforcement is costly, and to be prepared to respond to anticipated increased claims of discriminatory pricing, banks will need to devote considerable additional resources to expanded fair lending compliance programs.

Advocates will also view the public data set as showing discrimination in pricing. As with HMDA, the data will drive media reports alleging discrimination in pricing, based only on the data, causing unwarranted damage to banks' reputations. Even if banks are given an advance copy of a story and the opportunity to respond, it is impracticable for each bank to defend each of its pricing decisions in media stories.

Over time, pressure from supervision, enforcement, and media reports will incentivize lenders to reduce the flexibility inherent in small business lending decisions. This will make credit harder to get for small businesses that may pose more risk.

AdminRecord-019328

We include a comparison of decisions on three small business applicants, to illustrate our concerns:

| Factor | Business A | Business B | Business C |
|---|---|---|---|
| Loan amount | $65,000 | $62,500 | $67,500 |
| Interest rate | 5.00% | 4.25% | 4.50% |
| Origination fee | 1.00% | 1.00% | 1.00% |
| Term | 84 months | 84 months | 84 months |
| Purpose | Purchase equipment | Purchase equipment | Purchase equipment |
| Type | Standard | Standard | Specialty |
| Reason | End of life replacement | Expand capacity | Enter new (untested) product line |
| Personal guarantee | Yes | Yes | Yes |
| Guarantee strength | Weak | Strong | Good |
| Industry | Food/beverage | Food/beverage | Food/beverage |
| Time in business | 20 years | 15 years | 20 years |
| 2020 revenue | $2,000,000 | $2,000,000 | $2,000,000 |
| Revenue trend | Declining | Increasing | Stable |
| Management stability | Significant turnover | Stable | Stable |

As the table shows, these three applicants might appear similarly situated in the 1071 data. Each is in the same type of business, they are all seeking to purchase equipment, with 84-month terms, and the businesses all have the same amount of revenue in 2020. However, the highlighting shows that there are nuanced differences in risk that fairly and prudently result in different pricing for these businesses.

If the Bureau includes pricing information in the final rule, over time banks will not be willing to make some of these judgments about risk. The result will mean that some small businesses are shut out of the capital market. Section 1071 is intended to foster community development, and the Bureau should use its discretionary authority to fulfill, not frustrate, that purpose.

> **b. ABA opposes collection and reporting of APR.**

ABA opposes requiring collection and reporting of the APR. The Truth in Lending Act (TILA) requires disclosure of an APR for consumer credit, and since TILA's enactment in 1968, business credit has been exempt from TILA. Moreover, Congress has not amended TILA to include business credit. In 2010, when Congress enacted the Dodd Frank Act, it made numerous amendments to TILA and could have expanded it to cover small business lending. Congress did not change TILA's scope, and the Bureau should not abuse its discretionary authority in 1071 to do so now. While some commenters cite state laws requiring disclosure of an APR for business credit, only 2 out of 50 have enacted such laws.

> **c. Collecting and reporting the interest rate will not yield useful data.**

The proposal's attempt to capture interest rates shows the complexity of collecting and reporting pricing data, which the Bureau would add to the already costly process of collecting and reporting the statutory data points. For adjustable rate transactions, the institution must report not

AdminRecord-019329

only the interest rate, but also the margin, index value, and index name "at origination." [39] However, the commentary directs institutions to report the index value at the time the application "was approved" by the financial institution. [40] Often the index value is not at all related to either of these events, and will only add burden without helping data users understand the loan's pricing.

### d. The final rule should not include origination fees.

The proposal defines origination charges as the total amount of all charges "payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit, expressed in dollars." [41] The Bureau notes that the definition mirrors TILA's finance charge definition. As discussed above, Congress has had many opportunities, including in the Dodd Frank Act, to require lenders to calculate a finance charge for small business lending, and has not done so.

The Bureau should not use its discretionary authority to add this requirement to the mandatory data points. Compliance with TILA is challenging, and requires more training, testing, and systems updates than the Bureau has accounted for in its cost estimates. For example, while some third party charges could be excluded from the origination charge, for others it is not clear whether they are excluded. At the same time, the proposal requires institutions to include a broker fee, even though the proposal requires institutions to report broker fees separately. This data point will be inflated, fraught with errors, and will require lenders to constantly check, correct, and retrain staff.

### e. ABA opposes collection of initial annual charges.

For the same reasons as discussed above, ABA opposes reporting of initial annual charges, including those imposed by third parties. Likewise, we do not support including fees the borrower could avoid – e.g., late fees – even if the applicant states their intention to incur avoidable fees. If an institution must report higher initial annual charges because the applicant states that it intends to incur those charges, data users will assume the institution decided to charge that applicant more than others. Recognizing and documenting such statements is operationally unworkable, and the inclusion of these fees would distort the data.

### f. There is no support for including broker fees in the final rule.

ABA opposes requiring institutions to collect and report data on broker fees. The Bureau states that the presence of brokers "creates opportunities for potential practices that inflate the cost of small business credit." [42] However, the Bureau provides no evidence that brokers are inflating the cost of credit.

The Bureau also states that fair lending risks may be "heightened in the small business lending market because applicants lack the substantive protections afforded to consumer credit

---

[39] Proposed § 1002.107(a)(12)(i)(B).
[40] Proposed cmt. 107(a)(12)(i)-4.
[41] Proposed § 1002.107(a)(12)(ii).
[42] 86 Fed. Reg. at 56,459.

26

AdminRecord-019330

applicants, such as the prohibition on basing loan originator compensation on the terms of a transaction."[43] Congress added that prohibition to TILA in the Dodd Frank Act. Had Congress been concerned about broker fees in small business credit, it could easily have extended TILA's prohibition to small business credit. Alternatively, Congress could have added broker fees as a data point in section 1071. The Bureau should not add to the already significant burden of 1071 by requiring a data point without any evidence that broker fees are a problem in the small business lending market.

### g. Prepayment penalties should not be included in the final rule.

ABA opposes requiring institutions to collect and report data on prepayment penalties. Typically, a financial institution's credit policies do not address prepayment penalties, or any rates or fees; credit policies are written generally and not for specific products. The context in which prepayment penalties may be imposed in commercial lending is complex and is specific to a particular transaction.

The burden of collecting this information is high, and the Bureau cites no evidence that institutions are applying prepayment penalties in a discriminatory manner or that they are used to impede community development. The Bureau states that penalties may be large, based on a percentage of the outstanding balance, and "understands there *may* be concern among stakeholders" that certain small businesses "*may* be steered to loans" with penalties.[44] However, the Bureau offers no evidence of steering to support this burdensome discretionary data point. The simple assertion that penalties might be large and a percentage of the outstanding balance does not justify requiring institutions to collect and report the data.

Moreover, the proposal would put most institutions at a disadvantage to MCA providers. The proposal does not require MCA providers to collect and report charges that are, effectively, prepayment penalties for MCAs. Nearly all MCA providers collect a finance charge at prepayment that represents the finance charge for the full term of the loan.[45] The proposal would not cover MCA charges for prepaying, creating an unlevel playing field for small business finance.

### 4. Census Tract -- § 1002.107(a)(13)

The proposal would require financial institutions to collect and report the census tract using a "waterfall" approach, as follows: (i) the address where the proceeds of the credit will be applied; or (ii) if the information in (i) is not available, the applicant's main office or headquarters; or (iii) if the information in both (i) and (ii) is not available, another address or location associated with

---

[43] *Id.*
[44] *Id.* at 56,461.
[45] This practice is described as a "hidden prepayment charge" in the Small Business Borrowers' Bill of Rights. Disclosure of this form of prepayment charge, alongside any traditional prepayment penalty, is required under New York law using the following language:
  "(i) whether the recipient would be required to pay any finance charges other than interest accrued since their last payment. if so, disclosure of the percentage of any unpaid portion of the finance charge and maximum dollar amount the recipient could be required to pay; and
  (ii) whether the recipient would be required to pay any additional fees not already included in the finance charge."

AdminRecord-019331

the applicant. The proposed rule would also require that the financial institution report which one of the three types of addresses it used to determine the census tract reported. An institution would not be required to ask for the address related to (i) through (iii) above; the Bureau states that institutions can use the address that they are currently using for CRA reporting if they are required to report CRA data.

### a. The proposed waterfall approach is needlessly complex.

ABA supports the proposal's flexible approach to reporting census tract, including permitting CRA reporters to use the same address for both data collections. However, the waterfall is unnecessarily complex and requires the institution to determine that information is not available before going to the next step in the waterfall. Instead, we recommend that the final rule give institutions the option to use one of the three addresses to determine the census tract location.

### b. ABA supports a safe harbor for census tract reporting.

The proposal provides a safe harbor in § 1002.112(c)(1), which would state than an incorrect entry for census tract is not a violation of ECOA/subpart B if the institution obtained the census tract by correctly using a geocoding tool provided by the FFIEC or the Bureau. However, the safe harbor would not apply if the FFIEC or Bureau geocoding tool did not return a census tract for the address the institution provided.

We generally support the safe harbor. Despite reasonable efforts to avoid them, geocoding errors are common, particularly in rural areas, and even correct use of the geocoding tool can result in no census tract being identified. We urge the Bureau to adjust the safe harbor to provide protection for reasonable processes to identify and report the census tract when the FFIEC/Bureau tools do not return a census tract.

### 5. NAICS Code -- § 1002.107(a)(15)

Using its discretionary authority, the Bureau proposes to require financial institutions to collect and report a 6-digit NAICS code appropriate for the applicant's business. A financial institution would comply with this requirement if it uses the NAICS codes in effect on January 1 of the calendar year covered by the small business lending application register that it is reporting. When a financial institution is unable to collect or determine the applicant's NAICS code, it reports that the NAICS code is "not provided by applicant and otherwise undetermined."

The Bureau also proposes to permit a financial institution to rely on applicable applicant information or statements when determining and reporting the NAICS code. A financial institution may rely on a NAICS code obtained through the financial institution's use of business information products, such as company profiles or business credit reports, which provide the applicant's NAICS code. And, the proposal would provide a safe harbor for incorrect NAICS codes if the first two digits of the code are correct, the applicant does not provide the code reported, and the institution maintains procedures reasonably adapted to correctly identify the subsequent four digits.

28

Our members are extremely concerned about the challenges of reporting the NAICS code and the accuracy of the NAICS code data. They report that most small businesses do not know their NAICS code, increasing the opportunity for the data to be inaccurate. We also understand that not every business clearly falls within a NAICS code category, and therefore it becomes an interpretive issue for either the small business applicant or the financial institution, furthering the likelihood of inaccuracies. Moreover, the NAICS codes are scheduled to change in 2022, which will increase the chances for inaccuracies, as small businesses may not know their new code or that the SBA made changes to NAICS codes.

ABA appreciates the attempt to reduce burden by offering a safe harbor; however, the safe harbor does not apply when the institution relies on the applicant's statement for the NAICS code. Thus, financial institutions that want the safe harbor would be required to try to determine the NAICS code themselves, a process that is burdensome and still fraught with risk of inaccuracies. For these reasons, we oppose collection and reporting of NAICS codes.

### 6. Minority- and/or women-owned businesses - §§ 1002.107((a)(18) and (19)

The proposed rule requires institutions to ask each covered applicant whether it is minority-owned and/or women-owned. The proposal clearly states that the determination of whether a business is minority or women-owned rests with the applicant, "A financial institution provides the applicant with the definition of a minority owned business [and woman owned business] when asking the applicant to provide its" status . . . but the financial institution is neither permitted nor required to make its own determination regarding the applicant's minority-owned [and women owned] business status."[46]

#### a. Applicants should determine whether the business is minority and/or women owned.

We support the proposal for the applicant, rather than the institution, to determine whether a business is minority and/or women-owned. We appreciate the proposal's clarity that institutions are not required or permitted to determine the business's status. Requiring institutions to determine the business's status would be extremely burdensome and impracticable. We also support the proposed language that can be offered to the applicant to assist them with their determination about minority and/or women-owned status.

We understand comments 102(l)-1 and 102(m)-2, and 102(s)-2 to require the institution to give the applicant the definition of a minority individual, a minority-owned business, and a women-owned business. The Bureau should clarify this by using "shall" or "must" in these comments.

#### b. ABA supports the proposal which would not require institutions to identify minority and women owned status by visual observation or surname.

We strongly support the decision not to require any visual observation or surname requirements in connection with minority or women-owned status. Such a requirement would be unworkable in determining whether a business is minority or women-owned.

---

[46] Proposed comments 102(m)-2 and 102(s)-2.

AdminRecord-019333

### c. ABA supports combined information requests.

We also support permitting the institution to combine questions about ownership status with questions about the race, ethnicity and sex of the principal owners (in App. F, Paragraph 2.)

### 7. Race, ethnicity and sex of the principal owners - § 1002.107(a)(20)

The proposed rule requires an institution to ask the applicant for the race, ethnicity and sex of its principal owners, and the institution must provide the applicant with the definition of a principal owner in §1002.102(o). The institution cannot require the applicant to provide the information. The proposal would also require the institution to inform the applicant that it need not provide the information, and that the institution is prohibited from discriminating against the applicant. When an application is taken in person and the applicant declines to provide the information, the institution must identify the principal owners' ethnicity and race – but not their sex – by visual observation or surname.

The proposed rule would require the institution to use both aggregate and disaggregated subcategories (subcategories) when collecting the principal owners' ethnicity and race. The Bureau states that it "acknowledges" that this might "make data collection more difficult" on the phone and at point-of-sale.[47]

The proposal includes the subcategories used in Regulation C, but would diverge from Regulation C by adding subcategories for Black or African-American. In addition, the Bureau states that it is seeking comment on whether it should require use of subcategories for White and if so, what those subcategories should be. The Bureau also seeks comment on whether the final rule should include an aggregate category for Middle Eastern or Northern African.

In addition, the Bureau asks for comment on whether the collection of race and ethnicity should be combined into a single question, based on the 2015 National Content Test: Race and Ethnicity Report Analysis.

### a. ABA opposes use of disaggregated subcategories for ethnicity and race.

ABA opposes the requirement to use the disaggregated subcategories for ethnicity and race. In its outline of proposals for the SBREFA review, the Bureau acknowledged increased burden as the reason for not considering the subcategories.[48]

Experience with HMDA shows that using the subcategories will be burdensome and frustrating for applicants and lenders. Using the subcategories in 1071 will impose more burden than in mortgage applications, which typically involve no more than two applicants. The 1071 proposal appears to require the institution to use the subcategories for up to *four* principal owners.

---

[47] 86 Fed. Reg. at 56,480.
[48] "The Bureau stated in the SBREFA outline that it anticipated that requiring reporting based on visual observation and/or surname could create unwarranted compliance burdens in the context of small business lending, although the Bureau sought feedback on the potential challenges, costs, and benefits of implementing such a requirement." *Id.* at 56,476.

AdminRecord-019334

The subcategories will add length and friction to the application without providing meaningful benefits to data users. The Bureau states that the subcategories "could be beneficial when attempting to identify potential discrimination or business and community development needs in particular communities."[49] However, the Bureau notes that the data will not be useful if institutions do not have a sufficient number of applicants or borrowers within particular subgroups to permit reliable assessments of whether unlawful discrimination may have occurred . . . ."[50]  The Bureau's own HMDA analyses show that mortgage applicants rarely select these subcategories:

> The vast majority of applicants selected one race, with the exception of applicants who selected American Indian or Alaska Native (in which case only a modest majority selected one race)." For ethnicity, "for most applicants, only one field of ethnicity was used (95.1 percent). Only about five percent used two ethnicity fields."[51]

The Bureau cites no evidence that small business applicants are likely to behave differently than mortgage applicants when confronted with all of the subcategories. Applicants for small business financing are certain to be as frustrated with this process, if not more, than mortgage customers have been. Note that in a telephone application for a mortgage, the institution is required to read aloud all of the subcategories to the applicant. If the Bureau requires the same approach in 1071, for up to four principal owners for each applicant, applicants are likely to react negatively.

The Bureau states that using the subcategories will promote "consistency with existing HMDA requirements."[52] However, the subcategories proposed in the 1071 rule are not consistent with current HMDA collection requirements, as the proposal includes subcategories for Black or African American. If the Bureau's goal is consistency with Regulation C, then it should not add new subcategories.

### b.  ABA opposes adding aggregate categories at this time.

ABA believes that to promote consistency with Regulation C and federal data standards, the Bureau should not add an aggregate category for Middle Eastern or North African at this time. Although the Office of Management and Budget in 2017 proposed to include that category in its Federal Data Standards on Race and Ethnicity, it never finalized that proposal. To avoid greater confusion and burden, the 1071 rule should only require use of the aggregate categories currently used in Regulation C and in OMB's data standards.

### c.  The final rule should not combine the questions about ethnicity and race at this time.

ABA urges the Bureau not to combine the questions about ethnicity and race at this time. The Census Bureau's 2015 study discussed in the preamble indicates that many people who select

---

[49] *Id.* at 56,480.

[50] *Id.*

[51] Consumer Fin. Prot. Bureau, Introducing New and Revised Data Points in HMDA: Initial Observations from New and Revised Data Points in 2018 HMDA 22 (Aug. 2019), https://files.consumerfinance.gov/f/documents/cfpb_new-revised-data-points-in-hmda_report.pdf.

[52] 86 Fed. Reg. at 56,480.

AdminRecord-019335

Hispanic or Latino ethnicity do not select a race because they do not identify with any of the aggregate race categories. However, the Bureau acknowledges that the 2020 Decennial Census did not combine the two questions, and they remain separate questions in Regulation C. At this time, ABA believes the Bureau should maintain consistency across data collection rules and with the Census.  Doing so will ease the burden on institutions collecting the data, and will also make analysis of the data easier for industry, regulators, and fair housing and community development groups.

### d.  ABA opposes collecting race and ethnicity of principal owners by visual observation or surname.

The proposal would require financial institutions to identify the ethnicity and race of the applicant's principal owners by visual observation or surname, if the applicant declines to provide the information. However, the proposal prohibits an institution from identifying the sex of principal owners by visual observation or surname.

ABA opposes a requirement to identify a principal owner's ethnicity and race by visual observation or surname. We support the proposal's requirement that the institution not identify the sex of the principal owners. Although the Bureau does not explain the different rule for sex, we believe a rule that does not require bank staff to guess the sex of a principal owner reflects the correct approach. Employees find this uncomfortable, and we believe most individuals who decline to provide the information would be offended if they knew that an employee was going to select an ethnicity, race and sex for them. Most importantly, the data generated by guessing race and ethnicity are bound to be inaccurate, providing no real benefit in exchange for the drawbacks of the requirement.

As experience with PPP lending shows,  some applicants will decline to provide information on the race, ethnicity and sex of principal owners, and this will undermine the data's usefulness for fair lending analyses. However, the proposed solution - requiring lenders to identify race and ethnicity by visual observation – will not solve the problem.  To encourage applicants to self-identify their race, ethnicity and sex, we recommend that the Bureau engage in a significant and sustained consumer education campaign about the data collection and its purposes.

We note that the extent of the visual observation or surname requirement is unclear. The section-by-section discussion and commentary state that an institution would have to identify *at least one* principal owner by visual observation or surname if the applicant does not provide the race and ethnicity of at least one principal owner.[53] However, the rule states that institutions must collect the "ethnicity, race, and sex of the applicant's principal owners . . . ."[54]  The Bureau also asks for comment on whether, for point-of-sale situations, the race, ethnicity and sex of only one principal owner should be required.[55]

---

[53] *Id.* at 56,483.
[54] Proposed § 1002.107(a)(20).
[55] 86 Fed. Reg. at 56,480.

AdminRecord-019336

### e. The Bureau should consider exemptions for point-of-sale collection.

Based on feedback from SERs and other stakeholders, the Bureau "acknowledges" that compliance with some aspects of the proposed rule may be particularly challenging in certain situations. The Bureau asks whether it should exempt credit applications offered by retailers at point-of-sale from some or all of the proposed rules for collecting the principal owners' race, ethnicity and sex, including the requirement to identify race and ethnicity by visual observation or surname; using the disaggregated subcategories; and collecting information on up to four principal owners.[56]

We support an exemption in the final rule from the collection of demographic information on the small business owners in private label and co-branded credit applications. Requiring collection of sensitive data in a retail environment will discourage small businesses from applying at point of sale, restricting access to credit. Asking an individual to identify the race, ethnicity and sex of a business's principal owners at check out or a customer service desk with other customers and store employees nearby introduces privacy risk that the proposal does not address. We note that recently enacted privacy laws, including California's Consumer Privacy Act, deem race and ethnicity as sensitive personal information (PI) entitled to greater protections than other PI.[57]

Similarly, the proposal to collect demographic information in retail stores is likely to discourage retailers from entering into private label and co-branded arrangements. Merchants need speed and simplicity to offer credit in the store, and private label and co-branded lenders have created processes to meet these needs. Similarly, small businesses also prefer a quick and seamless check out application experience. As a result, applications generally request only that information necessary to make a credit decision.

Moreover, given the sensitivity of the information requested, many applicants will decline to provide the information, and we do not believe retail employees should identify a principal owner's race and ethnicity based on visual observation or surname. As a result, we anticipate the vast majority of small business point of sale credit applications will lack demographic information, even if not exempted in the final rule from collection and reporting this information.

The proposed rule would likely decrease access to private label and co-branded credit, without advancing sections 1071's far lending and community development objectives. The quality of data collected in a retail environment is likely to be poor. Retail employees, who do not work for the lender, will have little incentive to collect accurate and complete information, and training would be extremely expensive given frequent turnover in these positions. As the Bureau notes, FinCEN's CDD rule exempts point-of-sale transactions for retail purchases up to $50,000.

We urge the Bureau to exempt private label and co-branded commercial credit applications from the requirement to collect demographic information.

---

[56] *Id.* at 56,480.
[57] Cal. Civ. Code §§ 1798.121 (2021).

AdminRecord-019337

### f. Collection of sex of principal owners should be revised to refer to gender.

ABA generally supports the Bureau's proposed rule for collecting the sex of the principal owners. As noted, the proposal would not require the institution to collect the principal owners' sex by visual observation or surname, and we believe this is the right approach.

However, we recommend that the Bureau consider substituting "gender" for "sex," as gender is more consistent with modern usage. In addition, the Bureau could provide some additional check boxes for trans and nonbinary in addition to the self-description and free form text line.

### g. The sample data collection form is helpful.

The proposal includes a sample data collection form that explains the purpose of the data collection, defines and collects information on principal owners, and defines and collects information on minority and women-owned status. ABA supports inclusion of the sample form in the final rule. We urge the Bureau to provide sample forms in Spanish and other non-English languages at the time the final rule is issued.

### h. The Bureau should reduce repetition in the rule, commentary, and Appendices F and G and consolidate all mandatory statements in one place.

We appreciate the Bureau's efforts to explain the data collection rules in Appendices F and G. However, there is a lot of repetition between the appendix, commentary and regulation; in addition, the appendices appear to contain mandatory statements that should be in the rule itself. It would be simpler for financial institutions if all of the binding requirements and prohibitions were in one place – preferably in the rule – rather than spread across the rule, commentary and Appendix.

## III. General rules for data reporting

### A. Verification of applicant provided information -- § 1002.107(b)

The proposal does not require institutions to verify applicant-provided information. An institution may rely on an applicant's statements in compiling certain data points. However, under the proposal, if the institution verifies the data, the institution must report the verified information. The Bureau states that applicant provided data is sufficiently accurate to carry out the purposes of section 1071.[58]

### 1. ABA supports permitting institutions to rely on applicants' statements, but opposes the proposed requirements regarding reporting verified information.

As the preamble notes, ECOA section 704B(e)(1) does not require institutions to verify applicant provided information.[59] No SERs or other stakeholders asked the Bureau to require verification of applicant information, according to the Bureau.[60] A requirement to do so would greatly increase the already significant burden that the 1071 rule will impose on institutions. Contrary to

---

[58] 86 Fed. Reg. at 56,485.
[59] *Id.* at 56,484.
[60] *Id.*

AdminRecord-019338

the Bureau's assertion that the requirement to report verified data would not add operational difficulty, having to update the LAR to reflect data points that are verified will increase operational burden, as institutions will have to build processes and train personnel to capture the information and determine whether the LAR should be updated.[61]

### 2. The proposed rule regarding verification is unclear and should be removed.

We also note that the meaning of "verification" is unclear. If an institution asks the applicant for its NAICS code in connection with an application for small business credit, and the institution also asks for the applicant's tax return to verify some other information and notices the NAICS code on the tax return is different, must it report the NAICS code on the tax return? If so, then the proposal imposes more burden than the Bureau has accounted for, as every piece of information on other documents might have to be compared to the information on the application. It is also unclear that this burdensome process would improve data accuracy.

In addition, it is not clear whether verification includes other information about an applicant that an institution might have elsewhere in its files. What if an institution asks the applicant for the NAICS code and does not request a tax return, but happens to have a copy of the applicant's tax return in its system, in connection with another transaction two years ago? Is the institution required to verify the NAICS code based on the old tax return? Such a requirement would be burdensome, requiring institutions to search their systems to determine if they have other information on the applicant, and would not add measurable value to data accuracy.

The Bureau asks for comment on whether the rule should require institutions to indicate whether data points were verified. ABA does not support requiring institutions to report whether given data points have been verified. The Bureau did not provide a rationale for such a requirement, and we do not see any benefit from adding another data field to indicate whether the institution reported data provided by the applicant or has reported verified data. Moreover, the concept and application of the verification requirement are murky and unworkable, and it should not be included in the final rule.

### B. Time and manner of collection -- § 1002.107(c)

The proposal requires an institution to maintain procedures to collect applicant-provided data points at a time and in a manner that is reasonably designed to obtain a response. Comment 107(c)(1)-2 provides that an institution has the latitude to design procedures "that work best for its particular lending model and product offerings" so long as the procedures are reasonably designed to collect the applicant-provided information.

ABA appreciates the flexibility provided to financial institutions. However, the commentary is confusing and should be clarified or eliminated. Comment 107(c)(1)-7 suggests that an institution must report "updated" information, however, it is not clear what "updating" means. For example, if an applicant supplies information without the institution requesting it, must the institution "update" its reporting based on that information? In addition, it is not clear how this

---

[61] *Id.* at 56,485.

AdminRecord-019339

requirement to report updated information relates to the proposal to report verified information. ABA believes these references to updating information should be removed from the final rule.

## IV. Firewall -- § 1002.108

ECOA section 704B(d) states that "[w]here feasible, no loan underwriter or other officer or employee of a financial institution, or any affiliate of a financial institution, involved in making any determination concerning an application for credit shall have access to any information provided by the applicant pursuant to a request under subsection (b) in connection with such application." If the financial institution determines that an underwriter, employee or officer involved in making a determination "should have access" to any information provided by the applicant pursuant to a request under 704B(b), the financial institution must provide a notice to the applicant of the underwriter's access to such information, along with notice that the financial institution may not discriminate on the basis of such information.

### A. The firewall will impose needless burden on institutions.

As ABA stated in comments during the SBREFA review process, ABA's members are concerned with implementing a firewall. The firewall, especially in connection with the requirement for recording and maintaining an applicant's demographic information separate from the application and accompanying information, creates unnecessary burdens on covered financial institutions. The requirement to keep the protected demographic information separate is likely unworkable for many institutions, given the roles of individuals involved in accepting and processing applications. By comparison, HMDA and Regulation C have no such requirement to record and maintain Form 1003 information separate from the consumer's application. Functionally, these requirements will be difficult for many institutions, particularly smaller institutions, to implement.

For many institutions, the individual accepting a small business's application is a loan officer that will be involved in making a decision on that application. This is true at larger institutions as well as smaller ones, as many institutions provide loan officers with decision authority up to a certain dollar amount, meaning these loan officers are involved in making a determination concerning the application.

We appreciate that the Bureau has developed a notice to be used when establishing a firewall is not feasible. However, the rule text should refer to the model language in the notice.

### B. Providing the notice will put some institutions at a competitive disadvantage.

In addition, we are concerned that using the exception, and therefore, providing the notice, may put a financial institution at a competitive disadvantage with an institution that does not need to use the exception. A small business may be troubled by the notice's reference to discrimination and access to demographic information, and as a result, may be encouraged to seek credit from a bank that does not have to provide the notice because it can create a firewall. Therefore, we ask that the Bureau consider exempting smaller financial institutions from the firewall to avoid putting these institutions at an unfair disadvantage compared to others that can establish the firewall.

36

### C. The firewall should not be applied to demographic information based on visual observation or surname.

We urge the Bureau not to expand the firewall provision to information about principal owners' ethnicity and race that is obtained via visual observation and/or surname. The firewall as proposed creates significant practical burdens and expanding it to visual observation and surnames would make it nearly impossible for many to comply.

### D. The Bureau should give institutions more flexibility in determining that the firewall is infeasible.

We appreciate that the proposal would permit a financial institution to determine that several employees or officers should have access to the protected demographic information (e.g., all loan officers). However, we do not understand why an institution could not make that determination for all employees and officers, so long as the exception notice is provided to all applicants. At small institutions, a class of employees (e.g., loan officers or others involved in making a determination on an application), comprise a larger percent of total employees. We do not believe the distinction on how a financial institution can use the exception furthers the purpose of Section 1071. Therefore, we urge the Bureau to give financial institutions latitude to determine how to apply the exception, whether it be a group of employees or officers or all employees or officers.

## V. Reporting Data to the Bureau

### A. Reporting to the Bureau -- § 1002.109(a)

The ABA supports the proposed requirement for institutions to report their data to the Bureau by June 1, however, the Bureau should permit institutions that want to file their data on March 1 to do so.

### B. Reporting when multiple financial institutions are involved in a covered credit transaction – § 1002.109(a)(3)

The proposed rule provides guidance for reporting responsibilities when more than one financial institution is involved in a covered credit transaction. The Bureau appears to intend for the rule to mirror Regulation C's requirements in § 1003.4(a) and commentary.

#### 1. ABA generally supports the proposal but requests clarity when applications do not result in originations.

ABA supports this proposal. However, for applications that do not result in an origination, the rule text states that "any financial covered financial institution that made a credit decision shall report the application." For clarity, we suggest that the rule text match comment 109(a)(3)-1.ii., which appears to require that each covered financial institution that reviewed the application reports the credit decision it made (if it made one), or reports that the application was withdrawn or closed for incompleteness, as appropriate. As currently proposed, the text could be read to mean that as long as one institution reports its decision, then others need not do so.

AdminRecord-019341

### 2. Financial institutions should not be required to determine whether a withdrawn applicant has received credit elsewhere.

In the preamble, the Bureau states:

> Proposed § 1002.109(a)(3) would further provide that if there was no origination, then any covered financial institution that made a credit decision shall report the application. The Bureau is aware that under certain lending models as they operate today, financial institutions may not always be aware of whether another financial institution originated a credit transaction. The Bureau believes that information on whether there was an origination should generally be available, or that lending models can be adjusted to provide this information at low cost. For example, if an applicant applies to Financial Institutions A and B, and then withdraws an application with Financial Institution A, then Financial Institution A should be able to ascertain whether the applicant obtained credit from Financial Institution B.
>
> *****
>
> The Bureau seeks comment on this aspect of its proposal. In particular, the Bureau seeks comment with respect to proposed § 1002.109(a)(3) on whether, particularly in the case of applications that a financial institution is treating as withdrawn or denied, the financial institution can ascertain if a covered credit transaction was originated by another financial institution without logistical difficulty or significant compliance cost.[62]

It is completely impractical for institutions to determine whether an applicant has received credit at another institution. ABA rejects any notion that the rule should require that institutions make such determinations. The burden would be considerable, adding to the already significant burden involved with the data collection in general.

### C. Publication of data - § 1002.110

ABA supports the proposal to have the Bureau provide LARs to the public, rather than each institution doing so.

## VI. Recordkeeping - § 1002.111

Under the proposal, institutions would be required to retain records of compliance, including the LAR, for three years. In addition, the proposal requires institutions to "maintain, separately from the rest of the application and accompanying information," the applicant's statements whether it is minority- and women-owned, and the race, ethnicity and sex of the principal owners. The proposal also requires institutions to ensure that personally identifiable information about an individual is not combined with the 1071 data.

---

[62] *Id.* at 56,495.

AdminRecord-019342

### A. The Bureau should exempt institutions from the requirement to maintain demographic information separately from other applicant information.

For separate maintenance of demographic information, ECOA section 704B(b)(2) states that the institution must "maintain a record of the responses . . . separate from the application and accompanying information." The Bureau should use its exemption authority in ECOA section 704B(g)(1) to exempt institutions from the separate maintenance of demographic information in § 1002.111(b) and its commentary. That authority allows the Bureau to make exceptions and exemptions that are necessary and appropriate to carry out the purposes of section 1071. The proposed requirement will only make examinations and audits for fair lending, 1071 data integrity, and community development needs more cumbersome and costly. If the demographic information must be stored separately, it would have to be retrieved from a separate file and associated with a particular application to perform any analysis and for any test for accuracy.

### B.  The final rule should give institutions flexibility in how they collect demographic information.

In addition, the Bureau's reading of ECOA section 704B(b)(2) is problematic and thus proposed § 1002.111(b) is unclear. Proposed § 1002.111(b) states that institutions must "maintain" the information separately. In the section-by-section discussion, the Bureau states that a commenter asked it to clarify in the 1071 rules that demographic information can be collected on an application form, as is the case in Regulation C. [63] The Bureau does not squarely address the commenter's request, other than to note that HMDA does not contain a provision that mirrors ECOA section 704B(b)(2). The Bureau further acknowledges that prohibiting collection of demographic information on the application itself will interfere with the proposed requirement in § 1002.107(c)(1) that institutions have procedures reasonably designed to obtain applicant-provided data.  Yet, comment 111(b)-1 states that an institution "could" collect the information separately from the application, which suggests that institutions could also choose to collect the information on the application form itself.

However, the Bureau also states that an institution must *not* collect the demographic information on the same form as the rest of the application in the section-by-section discussion of proposed §1002.107(c)(1) (procedures reasonably designed to obtain applicant-provided data points). The Bureau states that asking for applicant-provided information at the time of a covered application "in connection with a written application form" would be more likely to obtain a response, as required by proposed § 1002.107(c)(1), "provided *any collection form* requesting applicants' protected demographic information . . . . *is separate from* the application form and other documents . . . as would be *required* by proposed § 1002.111(b)."[64]

The final rule should not prohibit collecting the demographic information on the same form as the rest of the application. Notably, that prohibition would disrupt SBA's 7(a) loan process, as the Borrower Information Form 1919 for the 7(a) program includes questions on the applicant's

---

[63] *Id.* at 56,501.
[64] *Id.* at 56,487, emphasis added.

AdminRecord-019343

race, ethnicity, and other demographic information, along with other application material.[65] More importantly, the Dodd Frank Act does not prohibit including demographic questions on an application form; it requires "recording" the information separately, which is a requirement we believe the Bureau should waive, as explained above.

Mandating separate collection of demographic information would only complicate the small business application process for no benefit—in fact, it would frustrate the purpose of the 1071 data collection. Our members report that collecting information on a separate page, screen, or email makes it more likely that applicants will skip the questions because they are uncomfortable with these questions, and they want to move through the application quickly.[66] Applicants will be even more likely to skip the questions if the final rule includes the disaggregated subcategories for ethnicity and race.

### D. The Bureau should waive the separate maintenance requirement when the firewall is infeasible.

The Bureau requests comment on whether the separate maintenance requirement should be "waived" when an institution determines that the "firewall" required in § 1002.108(b) is infeasible, because underwriters or other staff need access to the demographic information.[67] The Bureau should waive the separate maintenance requirement when the firewall is infeasible. It will be operationally burdensome, without any benefit, to maintain demographic information separately, and if it is infeasible to maintain a firewall, it is just as infeasible to maintain the information separately from the rest of the application that an underwriter to which the underwriter needs access.

## VII. Bona fide errors

### A. Bona fide errors and safe harbors - § 1002.112 and Appendix H

The Bureau proposes to define a bona fide error in compiling, maintaining, or reporting data with respect to a covered application as an error that was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error. Further, such an error is presumed not to be a violation of ECOA or proposed subpart B if the number of such errors does not exceed the thresholds set forth in proposed Appendix H (the so-called "tolerance thresholds"). However, an error is not a bona fide error if either there is a reasonable basis to believe the error was intentional or there is other evidence that the financial institution did not maintain procedures reasonably adapted to avoid such errors. A financial institution is presumed to maintain procedures reasonably adapted to avoid errors with respect to a given data field if the number of errors found in a random sample of the financial institution's submission for the data field does not equal or exceed a threshold specified by the Bureau for this purpose. An error that

---

[65] U.S. Small Bus. Admin., Borrower Information Form, https://www.sba.gov/document/sba-form-1919-borrower-information-form (last visited Jan. 5, 2022).

[66] It may be that separate collection and maintenance of the demographic information is intended to facilitate the "firewall" between the information and decision makers, but it is needlessly overbroad.

[67] 86 Fed. Reg. at 56,502.

AdminRecord-019344

meets the criteria for one of the four safe harbor provisions would not be counted as an error for these purposes.

### B. The proposed tolerance thresholds are too low for a data collection as challenging as 1071.

We appreciate the Bureau's acknowledgment that bona fide errors may occur despite the maintenance of procedures reasonably adapted to avoid errors. However, we are concerned that the tolerance thresholds are very low. We do not believe that the tolerance thresholds for HMDA reporting provide a fair and appropriate measure for the tolerance thresholds for this rule. First, implementation of 1071 introduces an entirely new data collection and reporting regime. Implementation and oversight of the 1071 rule will be a monumental task for financial institutions, especially smaller institutions, and will require the creation of entirely new policies and processes, along with the necessary staff training and oversight. Second, for most institutions, small business lending involves many different credit products, lines of business, and employees than residential mortgage lending  ABA members will strive to adopt and maintain procedures reasonably adapted to avoid errors in compiling, maintaining and reporting data. Yet, even with these procedures, we believe bona fide errors are likely to occur, especially given the substantial number of data points the Bureau is mandating. We ask that the Bureau increase these tolerance thresholds in recognition of the substantial implementation efforts that financial institutions will undertake.

### C. The Bureau should provide a one-year grace period for errors in the 1071 data.

Additionally, we ask the Bureau to provide a one-year grace period for errors in the compiling, maintaining and reporting of 1071 data. The Bureau provided such a grace period for the 2015 HMDA rule, and it is necessary for the 1071 rule, as well, due to the substantial implementation burden that financial institutions will face.

### D. Errors in data collection during crises such as COVID-19 should not be counted towards error tolerances.

Finally, our recent experience with the COVID-19 emergency has shown that there may be circumstances when financial institutions need to provide credit quickly to their communities. The Paycheck Protection Program (PPP) presented an opportunity for financial institutions to provide relief to small businesses in their communities. However, the short timeframe for implementation, along with the constant flow of new and revised guidance from the SBA created significant challenges to financial institutions. If there is a need for a program similar to PPP in the future, 1071 data collection and reporting may complicate its rollout. Therefore, we ask that application data for special programs such as PPP not be counted for purposes of determining tolerance thresholds.

AdminRecord-019345

## VIII. Implementation

### A. Compliance date - § 1002.114

The proposal would require financial institutions to begin collecting data 18 months after publication of the final rule. Although the SBREFA outline indicated that the Bureau was considering a two-year implementation period, the preamble states that the Bureau "agrees with the stakeholders that asserted that a shorter implementation period is preferable given the length of time that has elapsed since the passage of section 1071 of the Dodd-Frank Act."[68]

### 1. The Bureau should give covered institutions three years to implement the final rule.

The 18 months the Bureau proposes for implementation is completely inadequate for a rule that is both complex and broad in coverage. Not only does the rule require collection of 21 data points, some of which require additional itemization, but also the separate maintenance of demographic information and consideration of whether a firewall is feasible. If a firewall is not always feasible, institutions must build processes to ensure it gives applicants the disclosure..

To ensure compliance with these requirements, financial institutions will need time to draft and/or revise policies and procedures. They will have to hire new employees in production, operations, risk, compliance, and IT, in a tight labor market. They must also buy or upgrade software for loan origination and integrate that software with other systems. Our members state that the work to get all systems in place and integrated is not a one-time task; instead, it is an iterative process of testing, finding problems, and fixing them, and then re-testing.  This process will need to be carried out across multiple lines of business that are covered by the 1071 rule.

Community banks that rely on core system providers must wait for these providers to update their systems, then the bank must test the updates and work with the core to resolve problems, and only after all problems are resolved can their HMDA/CRA vendors begin to adapt their systems to integrate with the core system.

Some community banks use a platform and not their core system provider to originate small business loans. These banks must ensure that, once their core provider has built the fields for all of the data points, that each is mapped individually to the small business lending platform. This requires the creation of multiple APIs, which imposes additional costs and delays.

In addition to banks' reliance on the core providers and platforms, many banks rely on HMDA/CRA vendors to scrub and report their data. These vendors cannot begin their work on 1071 until the cores and platforms are finished changing their systems, and the financial institution has tested those systems. Those banks that do not report HMDA or CRA data will be entering relationships with these vendors for the first time and will not have the experience with the testing process that other banks have.

Training for 1071 compliance will be an extensive undertaking, covering loan officers and other customer-facing staff as well as risk, operations, fair lending, legal and IT employees. Most bank

---

[68] *Id.* at 56,507.

42

staff working in the small business area are not used to collecting data to the accuracy standards the Bureau envisions. Some staff may be familiar with HMDA and CRA; however, the overlap with 1071 will generate confusion, requiring additional training for these staff.

The proposed 18-month implementation period stands in stark contrast to the implementation period for the Bureau's 2015 HMDA rule changes. The Bureau published the final changes to the HMDA rule in October 2015, with the revisions taking effect for data collected on or after January 1, 2018. The 1071 rule is much larger undertaking for financial institutions than the 2015 HMDA rule changes; for 1071, institutions must build an entire data collection regime, whereas for HMDA they were required to make changes to an existing data collection scheme.

Shortchanging the 1071 implementation period will result in inaccurate data for the first few years, limiting its usefulness for fair lending enforcement and community development. The activities described above cannot be bypassed, nor can they be rushed to meet an artificial deadline. While we understand that 1071 was enacted over 10 years ago, that has no bearing on the time it takes to implement a rule as complex and far reaching as 1071. We urge the Bureau to allow three years for the industry to implement the rule, which will facilitate the collection and reporting of better quality data.

### 2. The final rule should require data collection beginning on January 1.

The preamble indicates that collection of 1071 data might begin on the date that is 18 months after the final rule is published, even if that date is not a January 1. ABA opposes starting data collection on a date other than January 1. Having less than a full year's worth of data will not provide regulators and others with a representative and complete data set. In addition, data users will want to make year over year comparisons, and a partial year must be ignored in these efforts. The rule should require that data collection begin on a January 1 just as the Bureau did for changes to HMDA in 2015.

## IX.  Privacy

The Bureau proposes to adopt a balancing test as the method by which it would implement its discretion to delete or modify data before making the data available to the public. Specifically, the Bureau proposes to modify or, as appropriate, delete data fields from the public 1071 data if it concludes that the release of the unmodified data would create risks to the privacy interests of applicants, related natural persons, or financial institutions that would not be justified by the benefits of such release to the public in light of the statutory purposes of section 1071.

The proposal presents only a partial application of the balancing test for public comment. The Bureau states that after it receives at least one full year of 1071 data, the Bureau intends to analyze the data for re-identification risk and then issue a policy statement setting forth its intended modifications and deletions. At this time, the Bureau does not intend to re-propose its balancing test analysis for public comment prior to issuing the policy statement.

AdminRecord-019347

### A. The Bureau's procedure for applying the balancing test is flawed and must be revised.

The Bureau must reconsider its approach to protecting privacy. While the Bureau cannot conduct a full analysis of the potential harms of disclosing 1071 data at this time, without that analysis, the public does not have a meaningful opportunity to comment on this aspect of the rule.

Presumably, the Bureau believes that the data should be published without delay, at the expense of important privacy interests. We disagree. It is in all parties' best interest for the Bureau to fully analyze the re-identification and other privacy risks of 1071 data and then publish that analysis for public comment in order to determine those modifications and deletions that are necessary to protect the privacy and proprietary interests of small business owners and the financial institutions that serve them.

The Bureau's disregard for administrative process and public input in the determination of privacy issues was also on display in 2015 when it issued amendments to Regulation C followed by a policy statement rather than notice and comment rulemaking required by HMDA. However, even then the Bureau published the policy statement for public comment. At a minimum, we urge the Bureau to follow that process in this rulemaking.

However, we disagree with the Bureau's determination that an Administrative Procedure Act (APA) notice-and-comment rulemaking process is not required for decisions about modifying or deleting data prior to making the data public. The statute does not state or otherwise indicate that the Bureau may use this discretion without following an APA rulemaking process. There are two provisions in 1071 that provide the Bureau "discretion:" (1) the authority to "delete or modify data collected under this section which is or will be available to the public"[69] and (2) the authority to "compile and aggregate data collected under this section for its own use; and make public such compilations of aggregate data."[70] The Bureau proposes § 1002.110(b) in this rulemaking to implement the latter provision, but offers no explanation as to why believes it can exercise discretion, without rulemaking, to resolve the significant privacy issues presented by the former. The provisions should be treated the same; both should be implemented through an APA rulemaking process. The future policy statement applying the proposed balancing test is a "rule" under the APA, as it will implement and interpret law and policy. It is not simply a general statement of policy.

### B. Comments on the preliminary application of the balancing test to data points.

ABA has substantial concerns with the Bureau's preliminary application of the balancing test to the proposed data points. For benefits, the analysis provides vague statements that are not clearly linked to the statutory purposes of fair lending enforcement and community development. For example, the Bureau makes the vague statement that the application method "would allow the public to better understand the role of the financial institution as a creditor and would facilitate pricing analyses by helping the public identify potential factors in pricing outcomes."[71] And as

---

[69] 15 U.S.C. § 1691c-2(e)(4) (2018) (ECOA Section 704B(e)(4)).
[70] *Id.* § 1691c-2(f)(3)(A), (B)) (ECOA Section 704(f)(3)(A), (B)).
[71] 86 Fed. Reg. at 56,526.

AdminRecord-019348

discussed above, the demographic information is likely to be missing or inaccurately identified through visual observation or surname, undermining the data's usefulness for fair lending analyses.

We are also concerned about the re-identification risks of certain data points, but without the Bureau's re-identification study, our ability to comment is limited. However, even without such a study, the release of a business' census tract location and NAICS code presents substantial re-identification risk. Notably, the banking agencies do not publish CRA small business data on a loan-by-loan basis, in part because of the ease of re-identifying small business owners based on geography. Our members, SERs, and other stakeholders have consistently expressed concern about the very real potential for any data user to identify a business owner.

While some data may not appear sensitive or harmful, our members note that fraudsters can use any data, no matter how innocuous, to perpetuate fraud. After the SBA released the PPP data, banks experienced fraudulent attempts to access small business customers' accounts through phishing and other techniques. Phishing scams are getting more sophisticated by the day, and if a small business can be re-identified through the 1071 data, the Bureau's decision to release that data will make them even more vulnerable.

Fraud aside, other companies will mine the 1071 data, aggregate it, and sell it to interested parties, which will compromise the privacy of small businesses and their owners. The trend in privacy laws, including the California Consumer Privacy Act (CCPA) and the General Data Protection Regulation (GDPR), is to reduce or restrict companies' ability to gather and sell information about unsuspecting persons. The Bureau must delete or modify many of the data fields to protect small businesses and financial institutions, and it can do so without compromising the objectives of 1071.

### C. Sensitive data points must be modified or redacted.

Certain data points are extremely sensitive for a small business, and if re-identification were to occur, there is a significant potential for a negative impact on that business. For example, the loan purpose may reveal information the small business would consider confidential commercial information, such as plans for a business acquisition or expansion. If that information is made public, it may put the small business at a competitive disadvantage.

The same is true regarding credit amount applied for and the amount approved or originated. Reasonable inferences can be made about a small business's financial status based on this information, if the small business is re-identified. Similarly, the information on action taken and denial would reveal a business's financial status, which would be harmful competitively. Also, if a business is re-identified and the 1071 records show it applied for credit through multiple channels or multiple lenders, and/or was declined, this information may harm a business's prospects for credit.

The most sensitive data is in the pricing information, as that has direct connections to a small business's financial health. Revealing this information about a small business would unquestionably reveal confidential and sensitive competitive information, placing the business at

AdminRecord-019349

a substantial competitive disadvantage. Because many small businesses are sole proprietorships, pricing information also reveals the proprietor's personal financial standing and their competitive position.

### D.  ABA opposes inconsistencies with HMDA disclosure.

We are concerned that, in certain instances, the Bureau is considering making a data point public when the same data point is deleted or modified under HMDA. For example, the Bureau indicates it may modify the application date, which has never been made public under HMDA. The Bureau offers no explanation for this inconsistent treatment. The Bureau should ensure that any data deleted in the HMDA dataset is deleted in the 1071 dataset, including: the unique identifier; the application date; and the action taken date. All of these data points are deleted from the HMDA data before it is made public.

The unique identifier is particularly problematic and must be deleted from the public dataset. The unique identifier often includes the loan number or account number, and therefore, that data point, combined with the financial institution's name, provides a substantial opportunity for fraud. For a line of credit, these two data points (the unique identifier and the financial institution name) can easily provide an opportunity for fraudsters. By comparison, since 1990, the application or loan number has been deleted from the HMDA dataset; and in 2018, the Bureau deleted the universal identifier from the public data set. It must take the same approach with respect to the 1071 data.

### E.  ABA supports redaction of free form text fields.

We agree with the Bureau's proposal to delete all free form text fields from the public dataset. Similar to HMDA, it would not be feasible for the Bureau to review the contents of each free-form text field submitted before disclosing the loan-level data to the public. Deleting these data fields appropriately balances the risks to privacy of involved parties and the benefits of disclosure in light of 1071's purpose.

### **Conclusion**

We appreciate this opportunity to comment on the Bureau's 1071 proposed rule.  If you have any questions about our comments, please contact Kitty Ryan at kryan@aba.com, (202) 663-5478.

Sincerely,


American Bankers Association
Alabama Bankers Association
Alaska Bankers Association
Arizona Bankers Association
Arkansas Bankers Association
Colorado Bankers Association
Connecticut Bankers Association
Delaware Bankers Association

46

AdminRecord-019350

Florida Bankers Association
Georgia Bankers Association
Hawaii Bankers Association
Idaho Bankers Association
Illinois Bankers Association
Indiana Bankers Association
Iowa Bankers Association
Kansas Bankers Association
Kentucky Bankers Association
Louisiana Bankers Association
Maine Bankers Association
Maryland Bankers Association
Massachusetts Bankers Association
Michigan Bankers Association
Minnesota Bankers Association
Mississippi Bankers Association
Missouri Bankers Association
Montana Bankers Association
Nebraska Bankers Association
Nevada Bankers Association
New Hampshire Bankers Association
New Jersey Bankers Association
New Mexico Bankers Association
New York Bankers Association
North Carolina Bankers Association
North Dakota Bankers Association
Ohio Bankers League
Oklahoma Bankers Association
Oregon Bankers Association
Pennsylvania Bankers Association
Puerto Rico Bankers Association
Rhode Island Bankers Association
South Carolina Bankers Association
South Dakota Bankers Association
Tennessee Bankers Association
Texas Bankers Association
Utah Bankers Association
Vermont Bankers Association
Virginia Bankers Association
Washington Bankers Association
West Virginia Bankers Association
Wisconsin Bankers Association
Wyoming Bankers Association

AdminRecord-019351

**Center for Responsible Lending**
**National Association of Latino Community Asset Builders**
**National Coalition for Asian Pacific American Community Development**
**National Alliance of Community Economic Development Associations**
**National Fair Housing Alliance**
**United States Hispanic Chamber of Commerce**
**National Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship**
**National Council of Asian Pacific Americans**
**National Federation of Filipino American Association**
**Main Street Alliance**
**Partner Community Capital**
**League of United Latin American Citizens**
**Small Business for America's Future**
**Empowering Pacific Islanders**

**Comment to the**
**Consumer Financial Protection Bureau**
**on the**
**Notice of Proposed Rulemaking**
**Small Business Lending Data Collection Under the Equal Credit Opportunity Act**
**Regulation B**
**Docket No. CFPB-2021-0015**
**RIN 3170-AA09**

**January 6, 2022**

Submitted electronically to www.regulations.gov

AdminRecord-019967

January 6, 2022

Director Rohit Chopra
Attn: Comment Intake—Section 1071 Small Business Lending Data Collection Bureau of Consumer Financial Protection
1700 G Street NW Washington, DC 20552

**Re: Docket No. CFPB-2021-0015, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B)**

This letter is submitted on behalf of a broad coalition of national and community-based organizations that share a common interest in advocating on behalf of small businesses owned by people of color and women. We appreciate the opportunity to comment on the proposed rule amending Regulation B to implement changes to the Equal Credit Opportunity Act (ECOA) made by section 1071 of the Dodd-Frank Act.

CRL is a non-profit, non-partisan research and policy organization that works to ensure a fair, inclusive financial marketplace. CRL's work focuses on those who may be marginalized or underserved by the existing financial marketplace -- people who often are targeted for unfair and abusive financial products that leave them worse off. CRL is an affiliate of the Center for Community Self Help, a national community development organization which includes two credit unions and a non-profit loan fund all of which seek to help low-wealth borrowers buy homes, start and build businesses, and strengthen community resources, across the United States. We refer to this family of companies as "Self-Help."

NALCAB is a national non-profit membership association of mission-driven opportunity and economic development organizations that serve diverse Latino communities in 40 states, Washington D.C., and Puerto Rico. NALCAB works to strengthen the economy by advancing economic mobility in Latino communities.

National CAPACD is a coalition of nearly 100 community-based organizations spanning 21 states and the Pacific Islands. Its members work in low-income Asian American and Pacific Islander (AAPI) communities and neighborhoods to build social and economic justice for all. National CAPACD supports its member organizations to employ a diverse set of strategies tailored to local community needs, including small business training and technical assistance, housing counseling and financial empowerment services.

CRL, NALCAB, and National CAPACD, along with the eleven undersigned organizations submitting these comments represent a broad and diverse group that includes national community development organizations, credit unions, civil rights advocates, and mission-driven non-profits and share a common interest in advocating on behalf of small businesses owned people of color and women.

AdminRecord-019968

## I.    Introduction

From the Big Tech firms to Main Street shops and restaurants, every business at its inception was a small business. The ability to start and grow a business has been and remains a pathway to economic prosperity for millions of Americans. Next to owning a home, business equity is the second largest source of wealth in the United States. Business owners' wealth is nearly 2.5 times higher than their non-business owning counterparts. This difference in wealth is compounded for men and women of color— for example, the median net worth of Black and Latino business owners is each over ten times higher than the median net worth of Black people and Latinos generally.[1]

But it is challenging to start and even more difficult to scale a business without access to capital. That is especially true for people of color given the enormous wealth gap that exists in the United States.  Thus, it is hardly surprising that businesses owned by people of color are underrepresented relative to their population size especially when it comes to businesses with employees. For instance, Black people represent 13.4 percent of the U.S. population, but Black-owned businesses make up 2.2 percent of the nation's 5.7 million employer businesses; indeed, only 3.8 percent of Black-owned businesses are employer businesses, a rate nearly one-fifth the rate for whites.[2] Similarly, Latino people represent 18.5 percent of the U.S. population, but Latino-owned businesses make up 5.8 percent of the nation's employer businesses, and just 7.8 percent of Latino-owned businesses are employer businesses.[3]

And although Asian-owned businesses are not, in the aggregate, underrepresented in terms of business ownership rate, existing data that treats Asian business owners as a homogenous identity with shared economic realities inadequately captures the immense economic divide across the AAPI population. When viewed as an aggregate, Asians have a higher median household income, $85,800, and a lower likelihood to live in poverty, 10 percent, than the U.S. population at large. However, when looking at individual ethnic groups within the US population, economic prosperity is widely varied. For instance, the median household income for Indian Americans is $119,000, whereas among Hmong Americans' median household income is $68,000. Similarly, while only 6 percent of Indian Americans are living in poverty, 16 percent of Hmong Americans are living in poverty.[4]  Because there is substantial variation of economic outcomes within the AAPI community,  Asian Americans have the greatest level of economic

---

[1] Darity Jr. *et al, What We Get Wrong About Closing the Racial Wealth Gap,*
*https://socialequity.duke.edu/wp-content/uploads/2020/01/what-we-get-wrong.pdf*
[2] Calculations for employer businesses made using the U.S. Census Bureau's 2018 Annual Business Survey "Statistics for Employer and Nonemployer Firms by Industry, Sex, Ethnicity, Race, and Veteran Status for the U.S.: 2018"; population statistics calculated from the U.S. Census Bureau's 2019 American Community Survey "Annual Estimates of the Resident Population by Sex, Age, Race, and Hispanic Origin for the United States".
[3] *Ibid*
[4] Pew Research Center, *Fact Sheets: Asian Americans,*
*https://www.pewresearch.org/social-trends/collection/asians-in-the-united-states/*

AdminRecord-019969

inequality within any racial group in the U.S.[5] By flattening the economic realities of the AAPI community, which consists of 22 million individuals from over 20 different countries, into a singular racial demographic, the economic challenges faced by Asians are hidden within the aggregated data.

Furthermore, without accounting for differences in economic opportunity across ethnic groups, the AAPI community is often perceived as a "model minority" surpassing national averages in wealth building and business ownership. However, viewing Asian American, and Native Hawaiian and Pacific Islander (NHPI) groups as a singular racial designation masks many of the unique barriers to starting and growing businesses faced by these different ethnic groups. For instance, as previously mentioned, some racial groups are underrepresented in terms of business ownership. Often conflated with Asian business ownership rates, when viewed as a separate racial category, NHPI individuals represent 0.25% of the population, but NHPI-owned businesses constitute only 0.12% of the nation's employer owned businesses.[6]

Moreover,  variation in wealth building opportunities to different ethnic groups across the AAPI community is not limited to business ownership. Analyzing disaggregated data from Home Mortgage Disclosure Act (HMDA), the Consumer Financial Protection Bureau found that the factors determining the affordability and likelihood of approval for a mortgage vary across different ethnicities within the AAPI community. For example, NHPI borrowers were less likely to take out a conventional loan than Asian borrowers. Evident of this difference, more than a third of Filipino borrowers took out FHA or VA loans whereas only 4% of Chinese borrowers took out FHA or VA loans.. These differences provide just one example of  how access to credit varies across different ethnicities within the AAPI community.[7]

In addition to there being fewer wealth building opportunities, such as small business ownership, available to people of color, small businesses owned by people of color tend not only to be smaller but also to have lower cash reserves and are more financially fragile than white-owned businesses.  For example, a study by the JP Morgan Chase Institute found that while over half of all US small businesses had more than two weeks of cash reserves, 94% of small businesses in majority Black communities and 89 percent of small businesses in majority Hispanic communities had fewer than two weeks of cash reserves.[8]

---

[5] Pew Research Center, Income Inequality in the U.S. Is Rising Most Rapidly Among Asians,
https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/
[6] Calculations for employer businesses made using the U.S. Census Bureau's 2018 Annual Business Survey "Statistics for Employer and Nonemployer Firms by Industry, Sex, Ethnicity, Race, and Veteran Status for the U.S.: 2018"; population statistics calculated from the U.S. Census Bureau's 2019 American Community Survey "Annual Estimates of the Resident Population by Sex, Age, Race, and Hispanic Origin for the United States".
[7] Consumer Financial Protection Bureau, Data Point: Asian American and Pacific Islanders in the Mortgage Market, https://files.consumerfinance.gov/f/documents/cfpb_aapi-mortgage-market_report_2021-07.pdf
[8] Place Matters: Small Business Financial Health in Urban Communities (jpmorganchase.com)

AdminRecord-019970

The consequences of these inequities played out during the pandemic.  For example, researchers found that during the first four months of the pandemic, the number of active Black business owners dropped by 19% and the number of Latino and Asian business owners dropped by 10% compared to only a 5% drop for white business owners.[9]  Even among those businesses that survived, entrepreneurs of color report experiencing more severe revenue loss as a result of the pandemic than white entrepreneurs; indeed, 79% of Asian-owned firms, 75% of Black-owned firms and 67% of Latino-owned firms report that their businesses are in fair or poor financial condition compared to just over half of white-owned firms.[10]

Because small business owners of color generally have less personal and family wealth on which to draw than white small business owners – according to a study by the JP Morgan Chase Institute, the typical white small business owner has 2.5 times the liquid wealth of the typical Black small business owner and 1.5x time the liquid wealth of the typical Latino small business owner[11] – the credit-granting system has an especially important role to play in enabling businesses founded by people of color to thrive.  There is considerable recent evidence, however, that far from meeting the needs of people of color, lenders are affirmatively discriminating against entrepreneurs of color who seek credit.  Consider the following:

- A 2020 study analyzing data from the Kauffman Firm Survey (KFS) -- the only nationally representative longitudinal dataset that provides data on new businesses' access to capital, employment activities, credit scores, survival rates, and characteristics of the business owners, including race – found that new Black-owned businesses had only one-third of the capital of new white-owned businesses.  After controlling for a wide range of variables, including business characteristics, wealth, and credit score, the authors were able to account for only about one-third of that difference.  Moreover, over the seven-year period covered by the study (2004 to 2011) Black-owned businesses were less able to attract capital than white-owned businesses, which was largely attributable to differences in the ability of Black-owned businesses to obtain bank loans and other forms of bank credit.[12]

---

[9] The impact of COVID-19 on small business owners: Evidence from the first three months after widespread social-distancing restrictions - Fairlie - 2020 - Journal of Economics &amp; Management Strategy - Wiley Online Library

[10] Federal Reserve Banks, *Small Business Credit Survey:  2021 Report on Firms Owned by People of Color,* https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color.  *See also,* Federal Reserve Bank of Philadelphia, *Small Business Credit Survey:  COVID-19 and Disparate Firm Conditions in the Philadelphia Metro Area,* https://www.philadelphiafed.org/-/media/frbp/assets/community-development/reports/110321-sbcs-nj-report-final.pdf

[11] JP Morgan Chase Institute, *Small Business Ownership and Liquid Wealth,* https://www.jpmorganchase.com/institute/research/small-business/small-business-ownership-and-liquid-wealth-report

[12] Fairlie, Robb & Robinson, *Black and Whites:  Access to Capital Among Minority-Owned Startups,* https://www.nber.org/system/files/working_papers/w28154/w28154.pdf

AdminRecord-019971

- Surveys by a consortium of Federal Reserve Banks over the past several years have consistently found large disparities between the ability of white-owned businesses and businesses owned by people of color in obtaining credit.  For example, the most recent survey found that Black-owned firms that applied for financing obtained the financing they sought at one-third the rate of white-owned firms, and Latino-owned and Asian-owned firms at 50% and 75% respectively the rate of white-owned firms.  Even among firms with (self-reported) good credit scores, Black-owned firms were only half as likely as white-owned firms to obtain the financing they sought.[13]

- Analysis of the 2016 Annual Survey of Entrepreneurs found that business owners of color were nearly 50% more likely than white business owners to report that a lack of access to capital and the cost of capital had negatively impacted their business's profits. In particular, NHPI entrepreneurs expressed the highest level of concern among racial groups that their businesses' profits would be negatively impacted due to a lack of affordable capital. For instance, NHPI business owners were nearly two times more likely than white entrepreneurs to indicate that their businesses' profits were negatively impacted by both lack of access to capital and the cost of capital. Moreover, 6 in 10 NHPI business owners reported not seeking additional financing for their business, despite needing it, because they believed that their business loan would not be approved by a lender.[14]

- Studies of the PPP program have found that, as Brookings researchers wrote, "small businesses in communities of color had unequal access to federal COVID-19 relief."[15] Funds flowed to businesses in communities of color later than for businesses in white communities[16] and, consistent with their smaller size, Black-owned businesses obtained only 25% and Latino and Asian owned businesses only 50% of the amount received by white-owned businesses.[17] In the Federal Reserve Banks survey, there was between a 25 and 30 percentage point gap in PPP loan approvals between Black-owned and white-owned firms.[18]  A recent report from Equifax summarizes the multiple factors that

[13] *Small Business Credit Survey:  2021 Report of Firms Owned by People of Color,*
*https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color*
[14] Robb, Alicia & Morelix *Startup Financing Trends by Race: How Access to Capital Impacts Profitability* Available at SSRN: https://ssrn.com/abstract=2859893
[15] Liu & Parilla, *New data shows small businesses in communities of color had unequal access to federal COVID-19 relief,*
*https://www.brookings.edu/research/new-data-shows-small-businesses-in-communities-of-color-had-unequal-access-to-federal-covid-19-relief/*
[16] Fairlie & Fossen, *Did the $660 Billion Paycheck Protection Program and $220 Billion Economic Injury Disaster Loan Program Get Distributed to Minority Communities in the Early Stages of COVID-19,*
*https://www.nber.org/system/files/working_papers/w28321/w28321.pdf*
[17] Howell *et al, Racial Disparities in Access to Small Business Credit:  Evidence from the Paycheck Protection Program,* *https://www.nber.org/system/files/working_papers/w28321/w28321.pdf*
[18] Small Business Credit Survey -2021 Report on Firms Owned by People of Color.pdf (mbda.gov)

AdminRecord-019972

contributed to the fact that "PPP funds were not distributed equitably across race and gender."[19]

- A recent study by the National Community Reinvestment Coalition found that Black and Latino testers inquiring about small business loans were required to produce more documentation about their business than white testers; received less information about fees; and were less likely to be invited to schedule an appointment to apply for a loan.[20]

These recent studies confirm findings from a number of earlier research papers.  For example, a 2010 study commissioned by the Department of Commerce's Minority Business Development Agency found that the denial rates for firms owned by people of color were roughly three times higher than for white-owned firms; white-owned firms obtained loans that were twice as large as firms owned by people of color; and firms owned by people of color that were able to obtain a loan paid higher interest rates on business loans than white-owned firms.[21] A 2015 study, drawing upon data from the Kauffman Firm Survey, found that, controlling for firm characteristics and owner characteristics, white-owned start-ups receive higher business credit scores than Black-owned start-ups and that even after controlling for these (biased) credit scores, white-owned start-ups were more favorably treated than Black, Latino or Asian owned start-ups with respect to access to credit lines.[22]  And several studies using data from the National Survey of Small Business Finances found unexplainable disparities in the approval rates for white-owned firms as compared to firms owned by people of color.[23]

Although these studies are certainly suggestive of deep-seated problems in small business lending, it is nonetheless true that, as the Bureau stated in the proposed rule, "it is not possible with current data to confidently answer basic questions regarding the state of small business lending" and this "limitation is especially the case with regard to the race, sex, and ethnicity of small business owners."[24] The studies just cited are illustrative:  the Kauffman Firm Survey, which provides the most robust longitudinal data, is limited to firms started in 2004 and the data ends in 2011; the Federal Reserve Bank surveys rely on a convenience sample rather than one that is nationally representative; and the PPP studies have had to use proxies to estimate racial disparities because the PPP program initially did not collect data on the race or ethnicity of the

---

[19] Equifax, *Unlocking Entrepreneurship:  The Role of Credit Access in the Small Business Recovery,* *https://www.americanbanker.com/whitepaper/entrepreneurship-role-of-credit-access-in-small-business-recovery*

[20] *Disinvestment, Discouragement and Inequity in Small Business Lending (ncrc.org)*

[21] Fairlie & Robb, *Disparities in Capital Between Minority and Non-Minority Owned Businesses,* *https://archive.mbda.gov/sites/mbda.gov/files/migrated/files-attachments/DisparitiesinCapitalAccessReport.pdf*

[22] Henderson *et al.*, *Credit Where Credit is Due?:  Race, Gender and Dsicrmnaton in the Credit Scores of Business Startups,*  *https://journals.sagepub.com/doi/abs/10.1007/s12114-015-9215-4*

[23] Blanchflower *et al.*, *Discriminaiton in the Small Business Credit Market,* *https://www.nber.org/system/files/working_papers/w6840/w6840.pdf* ; Bostic & Lampani, *Racial Differences in Pattern of Small Business Financing:  The Importance of Local Geography,* *https://www.semanticscholar.org/paper/Racial-differences-in-patterns-of-small-business-of-Bostic-Lampani/a9db6ed82ea68a1122763a99d2fdae85e07e7fed*

[24] 86 Fed. Reg. 56356, 56362 (Oct. 8, 2021).

AdminRecord-019973

owners of the firms seeking PPP assistance.  Indeed, in the PPP dataset released by the Small Business Administration for the first round of funding, demographic data is missing from most loans, with only 25% of  loan records containing a racial or ethnic designation.[25]

To better understand small businesses in predominantly Latino and AAPI communities' relationship with small business lenders, two of the signers of this letter, the National Association of Latino Community Asset Builders (NALCAB) and the National Coalition for Asian and Pacific American Community Development (National CAPACD) distributed a survey to their respective member groups.[26] Those surveyed consisted of CDFIs, CDOs, and other mission-driven nonprofits that seek to economically empower Latino and AAPI communities. Through the collection of this survey data, NALCAB and National CAPACD were able to learn more about their clients' credit needs, types of credit and financial products used, and the unique challenges faced by their members when securing small business loan products.

The surveyed organizations estimate that about 70% of entrepreneurs they serve are underbanked. That is, they utilize mainstream financial institutions but are not necessarily using the variety of products and services these institutions offer. Among those surveyed, they reported that their clients are are most likely to rely on either family and friends/equity partners (60%) or personal credit cards (58%) as sources of credit for their businesses.When asked to identify what financial products their clients are using, survey respondents indicated that among their clients 28% use leasing arrangements, 21% take out traditional business loans from an FI, and 20% use Merchant Cash Advances (MCAs). These survey findings indicate a reliance on personal and non-traditional sources of spending, which is becoming an increasingly common inequity for entrepreneurs and communities of color.

Still, even within the collected survey responses there were noticeable differences between the financial lending experiences of NALCAB and National CAPACD clients. For example, a higher proportion of clients served by NALCAB member organizations, which are disproportionately Latino-owned businesses, take out loans under $50,000. Another key difference between the two survey groups is that clients served by National CAPACD member organizations are more likely to utilize mainstream banks whereas clients of Latino serving organizations are more likely to utilize nonprofit lenders.

---

[25] Small Business Administration,  Paycheck Protection Program (PPP) Loan Data – Key Aspects – Updated August 20, 2020, https://www.sba.gov/sites/default/files/2020-08/PPP%20Loan%20Data%20-%20Key%20Aspects%2008212020-508.pdf

[26] National CAPACD and NALCAB, in partnership with the UCLA Center for Neighborhood, distributed a survey questionnaire in November 2021 to better understand credit access among entrepreneurs of color. The survey was conducted via SurveyMonkey and was distributed to small non-profit organizations that provide services to small businesses only. The reported analysis is based on the survey responses collected with a sample size of n=43.

AdminRecord-019974

Evident within the survey responses is how the impact of COVID-19 on small businesses was exacerbated for small businesses owned by people of color. Relaying their personal experiences, serving small businesses in Latino and AAPI communities, survey respondents noted how pandemic-induced temporary closures, limited access to affordable, non-predatory credit, and a lack of in-language support from lenders offering PPP loans, were the biggest challenges facing their clients. One survey respondent described how  "requests for technical assistance for both accessing relief resources and starting new businesses" tripled. Multiple survey respondents discussed the challenges limited English speakers face when seeking in-language support from their lender.  In relaying these challenges, a respondent shared how one of her clients,  a Vietnamese business owner, sought assistance applying for PPP loan forgiveness. This client was unsure how to find their PPP loan number, required information for a loan forgiveness application, and their lender did not offer any in-language support. One of the many reasons that small businesses are likely to feel "intimidated by banks and prefer smaller, more relationship-based lenders" is because traditional lenders do not provide inclusive customer service, e.g. translated loan documents, to English-limited borrowers.

As previously noted, many survey respondents are increasingly turning to personal and non-traditional sources of funding and assistance, such as friends and financial services outside of mainstream banking institutions. This represents a growing unreached population whose data cannot be officially collected, exacerbating existing inequities. For example, one grocer from Akron, OH,  shared in her survey response that as newly-arrived refugees in the U.S. from Malaysia, "The freedom of being an entrepreneur is what makes me happy. I like being able to work for myself and set my own schedule." She added that she "...always wanted to open a restaurant and own my business but it was scary when we first came over." Undeterred, she took English as a Second Language (ESOL), U.S. citizenship, and sewing classes for a year and was eventually introduced by a friend to ASIA Inc., a linguistically and culturally-competent social service programming organization. ASIA Inc. provided the grocer with technical assistance, translation, and interpretation services necessary to successfully navigate application, loan, licensing, and transactional processes.

This story is echoed by many immigrants; according to the U.S. Current Population Survey, 5.1% of immigrants had their own businesses in comparison to 3.7% of U.S.-born individuals between 2010-2011.[27] As a respondent noted, "A trait of entrepreneurs and immigrants alike is persistence. From navigating taxes to visas, permits and deposits, immigrants develop the resilience necessary to navigate the obstacles of entrepreneurship, where courage and perseverance are often prerequisites for success. Similarly, setbacks when starting a business or selling a product are par for the course for entrepreneurs who must have grit to try again."

---

[27] Immigrant Policy Center, *Immigration Entrepreneurs:  Creating Jobs and Strengthening the Economy,* https://www.americanimmigrationcouncil.org/sites/default/files/research/Hohn_-_Immigrant_Entrepreneurs_012512.pdf

AdminRecord-019975

It is precisely because of the challenges that small businesses, and especially those owned by people of color, experience in accessing financing and the lack of reliable data to dimension those challenges that Congress enacted Section 1071 of the Dodd-Frank Act. The purposes of that section are clearly set forth in § 1071(a): "to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses." And the need for the data that the Bureau's proposal contemplates collecting to achieve these purposes could not be more obvious. Without application-level, lender-level data about the characteristics of the applicant, the credit sought, and the action taken on the application (including both decisions to approve or deny and pricing decisions) it is not possible to begin to identify fair lending violations or, at least, fair-lending concerns that warrant further investigation. And without a comprehensive dataset reflecting the types and location of businesses that are unable to obtain the credit they need at affordable prices, both the public and private sector are severely handicapped in developing targeted programs to address inequities in access to credit and to assure that businesses owned by people of color obtain the support they need to realize their full potential and contribute to closing the enormous wealth gap.

Against this background, we turn to the specifics of the Bureau's proposal and offer our comments on a number of critical issues raised by the proposal.

## II.    The Proposed Rule

The Bureau's proposed rule represents an important step forward in implementing Section 1071, however belated that may be. We appreciate the thought and deliberation that went into crafting the proposal and agree with many – indeed most – of the judgments the Bureau has made along the way. We offer these comments with an eye to lifting up key provisions in the proposal that will have the greatest impact in supporting entrepreneurs of color as well as strengthening the final rule so that it can better achieve the purposes of Section 1071.

In doing so we are mindful that the more than 45 years of experience under HMDA teaches that the development of a data collection and reporting regime is inherently an iterative process. As new products, new underwriting approaches, and new technologies emerge – and as the Bureau gains experience with the data collected under the rule it promulgates – inevitably opportunities will arise to add and refine data points to better achieve the statutory purposes. Thus, we urge the Bureau to approach the rulemaking as the development of version 1.0 of a Section 1071 rule, recognizing that there will be future versions over time.

In concrete terms what this means is that the Bureau should make clear in the preamble to the rule it issues that the judgments it is making are based upon its current understanding and experience and that the Bureau intends to continue to monitor developments in the market and assess the efficacy of the Rule in achieving Section 1071's purposes. By making this clear at the outset the Bureau can lay the groundwork for future evolution of data collection under Section

AdminRecord-019976

1071 without being subject to claims that it is acting arbitrarily or capriciously in adjusting the rule going forward.

This is not to suggest that the Bureau should do anything less than optimize the rule that it promulgates based upon the best available evidence at present. For that reason, we offer the following specific comments with respect to various elements of the proposed rule to enable the rule to better achieve Congress' purposes.

### A. Definition of Small Business

We agree with the Bureau that to facilitate compliance with 1071, the term "small business" needs to be defined in a manner that is relatively easy to operationalize. However, we believe that the second alternative that the Bureau had put forward in its SBREFA Outline – the alternative that encompassed manufacturing businesses with 500 or fewer employees and other businesses with gross revenue up to $8 million – provided an easily-implement definition which covered the vast bulk of small businesses as defined by the SBA without the complexities of the SBA's NAICS-code based definitions. In contrast, the Bureau's current proposal, by its own calculation, excludes 270,000 businesses that the SBA classifies as small businesses which represents approximately 5% of employer small businesses. 86 Fed. Reg. at 56433. Moreover, the Bureau's analysis shows that those businesses are disproportionately located within retail trades and construction, *id.* – industries in which businesses owned by people of color are most likely to be found. We therefore urge the Bureau to adopt the 500 employee/$8 million test as set forth in the SBREFA Outline.

Even if the Bureau were to decide to adhere to a test based solely on revenue, we believe the threshold chosen should align with SBA's definition of small business. SBA's website states that "most non-manufacturing businesses with average annual receipts under $7.5 million, will qualify as a small business."[28] At a minimum, then, the Bureau should adjust its proposed threshold from $5 million to $7.5 million.

### B. Coverage of Merchant Cash Advances

In order for Section 1071 to succeed in achieving its stated objectives as set forth above it is essential that data be collected with respect to the full range of products, and from the full range of institutions, providing financing to small businesses. We view the proposal as an important step forward in this direction. The 25-loan threshold the Bureau has proposed for a financial institution to be exempt from reporting would result in reporting of 98% of loans by depository institutions and even the highest (100-loan) threshold the Bureau has indicated it is considering – while cutting the percentage of depository institutions required to report roughly in half -- would still capture approximately 95% of depository institution small business loans.

---

[28] https://www.sba.gov/federal-contracting/contracting-guide/basic-requirements

AdminRecord-019977

Of particular importance is the Bureau's proposal to include merchant cash advances (MCAs) within the scope of the rule. This represents a substantial improvement over the more cramped approach of the SBREFA Outline.

As the proposal recognizes, even before the pandemic the MCA industry was growing rapidly. This industry offers high-cost credit targeting the most vulnerable businesses, exploiting their difficulties in accessing credit. Indeed, as the proposal notes, the Federal Reserve Banks' 2020 study found that Black-owned small businesses were twice as likely to have applied for an MCA compared to White-owned businesses; Latino-owned and Asian-owned small businesses applied at a rate more than 1.4 times greater than White-owned businesses. Moreover, as the proposal also notes, there is reason to believe that in the wake of the pandemic, businesses owned by people of color – which as previously discussed experienced unique challenges in accessing the PPP program -- are increasingly seeking MCAs to support their recovery from the pandemic. Indeed, in the previously-discussed survey conducted by NALCAB and National CAPACD, twenty percent of respondents' clients used MCAs as a form of credit. Accordingly, understanding the extent to which businesses owned by people of color are dependent upon these predatory products is central to achieving Section 1071's objective.

We do not agree, however, with the Bureau's suggestion, 86 Fed. Reg. 56406, that there is any ambiguity or room for doubt as to whether an MCA constitutes "credit" under the ECOA. ECOA defines credit as "the right granted by a creditor … to incur debts and defer its payment."[29] When a small business obtains an MCA, it incurs a debt: it owes the lender the amount of the advance plus an additional amount calculated by multiplying the advance by the factor rate. The money is not due immediately meaning that payment of that debt is deferred. Accordingly, the transaction falls squarely within ECOA's definition of credit. The fact that the payment schedule may be indeterminate and tied to future sales in no way detracts from the fact that the transaction has created a debt whose payment is deferred. Indeed, that is the way that MCA providers themselves describe their product. For example, the website of one provider helpfully explains, "A cash advance is like a loan in that the lender agrees to give a business owner a certain amount of money up front with the promise of repayment at a future date. That much remains the same between the two. The difference lies in how the forwarded sum is paid back."[30]

Although some MCA providers may attempt to analogize their products to factoring, as the Bureau's proposal notes this analogy is misplaced. A genuine factoring transaction creates a sale of receivables owed to the seller as a result of goods delivered or services provided by the seller to a third party. As the proposal notes, "the transaction … is complete at the time of the sale … meaning no payment is deferred." 86 Fed. Reg. at 56409. Thus, the distinction between MCAs

---

[29] 15 U.S.C. 1691a(d).
[30] https://www.nationalbusinesscapital.com/difference-between-cash-advances-and-loans-2/

AdminRecord-019978

and factoring is clear.  At most, the Bureau should rely on its discretionary interpretive authority as an alternative ground for covering MCAs.

The Bureau's proposal draws upon the distinction between MCAs and factoring to exclude factoring from the proposed rule.  If the Bureau adheres to that position, it should at a minimum make clear that factoring is excluded only where there is a bona fide sale of an accrued right to payment without creating any obligations – contingent or otherwise – on the seller.  In other contexts, lenders have shown great "creativity" in seeking to recharacterize loans as sales or some other contrivance in an attempt to evade their legal obligations.  That risk exists here as well and we encourage the Bureau to establish strong guardrails to prevent evasion. The Bureau should make clear that it will monitor the market for, and take action with respect to, any such evasions.

### C.  Disaggregating Racial and Ethnic Categories

We support the Bureau's proposal that financial institutions request principal owners' ethnicity and race using both aggregate categories as well as disaggregated subcategories, including the disaggregated subcategories with respect to Latino and Asian Americans, Native Hawaiian, and Pacific Islander populations as are used in Regulation C.  Disaggregating the data in that way has proven extremely valuable to uncover disparities within the broader groupings as the Bureau's own research has shown.[31]  These data will be increasingly effective over the years when comparative data is more available in both (1) facilitating enforcement of fair lending laws, and (2) enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses.  Given the proven value of disaggregation, we further support the proposal to include disaggregated categories for Blacks or African American as well.

In order to assure that these data categories are maintained and updated in alignment with OMB Federal Data Standards on Race and Ethnicity the Bureau may want to so provide by rule and allow the specifications to be adjusted in filing instructions that the Bureau issues from time to time rather than limited to those codified in the Official Interpretations.

### D.  Reporting the Identity of the True Lender

Proposed Comment 109(a)(3)-1,2, and 3 seek to assign reporting responsibility for situations in which multiple financial institutions are involved in a covered credit transaction.  Proposed Comment 109(a)(3)-1(i) states a general rule requiring the FI that "made the final credit decision" to report the application, with a sub-rule for cases in which "more than one financial institution approved an application and one of those financial institutions purchased the covered credit transaction after closing."  Proposed Comment 109(a)(3)-3 states a separate rule for

---

[31] CFPB. *Data Point:  Asian Americans and Pacific Islanders in the Mortgage Market Using the 2020 HMDA Data,* *https://files.consumerfinance.gov/f/documents/cfpb_aapi_mortgage-market_report_2021-07.pdf*

AdminRecord-019979

situations in which an FI makes a credit decision "through the action of an agent." Unfortunately, this set of rules does not address the complexity of lending relationships that exist in the market today.

It has become increasingly common for entities which describe themselves as "financial technology" companies or "fintechs" to effectively rent the charter of a depository institution and make loans through what are euphemistically termed "bank partnerships."  A primary purpose of these rent-a-bank "partnerships" is to enable online lenders to evade the limitations of state lending laws, especially usury limits designed to protect against predatory lending, by claiming the benefits of preemption. For example, a company called World Business Lenders, operating through rent-a-bank arrangements with Axos Federal Savings Bank (formerly known as the Bank of the Internet), Bank of Lake Mills, and Liberty Bank  has made small business loans, secured by residential property, at APRs of between 72% and 122%, well outside permitted limits in most states.[32]

The precise terms of these so-called "partnerships" are unknown.  Typically, in these arrangements the so-called "fintech" markets the loans and creates a website through which applications are received and processed using underwriting methods and criteria developed by the non-bank entity, but which are technically approved by the bank.  In order to maintain the veneer of a bank loan, some sophisticated rent-a-bank partners create a structure in which loans are not only originated in the name of the bank but the bank retains technical ownership of the account and even ownership of a small slice of the receivables while substantially all of the receivables are sold on an overnight basis to the non-bank "partner," which assumes substantially all the credit risk and also is responsible for servicing the loans. [33]

From the perspective of the ECOA, in these so-called "bank partnerships" both parties are creditors since Regulation B defines a creditor to include any "person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit" or who "regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made."[34]  It is therefore essential that data collected under 1071 identify both parties or, at a minimum, identify the party that bears the bulk of the credit risk and for all intents and purposes is the driving force in determining whether to extend credit and on what terms, even if the loan is made in the name of the bank and the bank retains ownership of the account.

---

[32] *See* Testimony of Adam J. Levitin Before the Committee on Small Business, U.S. House of Representatives, (Sept. 9, 2020), https://www.creditslips.org/files/house-small-business-testimony-9-9-20.pdf

[33] For an example of such an arrangement in the consumer lending space *see* Elevate Credit Inc., From 10-Q for the period ending Sept. 30, 2019, SEC file no. 001-37680, at 22, 43, https://www.sec.gov/Archives/edgar/data/1413754/000107878219000836/f10q093019_10q.htm

[34] 12 C.F.R. § 1002.2(i).

AdminRecord-019980

We are concerned, however, that the Bureau's proposal will not achieve this objective.  In an age in which underwriting decisions are made by machine on servers housed in the cloud using algorithms developed by technology companies but approved, at least formally, by a depository, it is far from clear what institution "made the final credit decision."  Nor is it necessarily clear which entity is principal and which is agent in these relationships – assuming the principal-agent construct is even meaningful in this context.  And, as noted, clever lawyers have found ways of separating ownership of accounts from ownership of receivables and even of splitting ownership of receivables

What is clear in these cases is with whom the predominant economic interest in the loan – or a contemplated loan – lies.  Thus, one way to solve the problem discussed above would be, with respect to applications as to which more than one covered financial institution is a creditor under ECOA, to assign reporting responsibility to the FI which has the predominant economic interest in  and bears the predominant risk of a loan or that would have had such an interest had the loan been consummated.[35]

An alternative approach would be to add to § 1002.107(a) a new data field, analogous to the "type of purchaser" field required under Regulation C, § 1003.14(a)(11), to capture at the level of the individual application whether the account or receivables have been sold, partially sold, or securitized during the reporting period and, if so, the nature of the transaction and the type of purchaser.  Under this approach, FIs also should be required to report whether an application would have resulted in a sale or securitization had the application resulted in a consummated loan pursuant to a forward flow agreement or similar arrangement.  And, to assure complete transparency, the Bureau should require identification of the purchaser or would-be-purchaser in a text field.

Regardless of which approach the Bureau chooses, we urge the Bureau, in enumerating the "type of purchaser" field, to avoid the term "fintech" and use the phrase "online lender" instead and to define that phrase to mean entities that have little or no physical, retail presence and that secure applications predominantly through the Internet.  The term "fintech" has no fixed definition and, interpreted literally, could refer to any company that delivers financial products or services with the use of technology – which is to say any financial services company.  All sorts of entities are

---

[35] This approach would closely parallel the approach the Bureau has taken in *CFPB v. CashCall,* No. 2-15-cv-07522 (C.D. Cal) in which it successfully argued that CashCall was the "true lender" with respect to loans made in the name of a tribal entity because CashCall took "the financial risk" with respect to such loans.  Memorandum for Partial Summary Judgment at 10.  The proposed approach also would parallel the approach state and federal courts have taken in determining who is the true lender in rent-a-charter arrangements.  *E.g., CashCall v. Morrisey,* 2014 WL 2404300 (W. Va. May 30, 2014); *BankWest v. Oxendine,* 598 S.E.2d 343 (Ga. Ct. App. 2004); *Spitzer v. County Bank of Rehoboth,* 846 N.Y.S.2d 436 (N.Y. App. Div. 2007); *In re Rent-Rite Superkegs West Ltd.,* No 19-cv-01552 (D. Colo. Aug. 12, 2020); *Eul v. Transworld Sys.,* 2017 WL 1178537 (N.D. Ill, March 30,2017); *Flowers v. EZPawn Oklahoma,* 307 F.Supp. 2d 1991 (N.D. Okla. 2004); *Galeta National Bank v. O'Donnell,* 239 F.Supp. 2d 734 (S.D. Ohio 2002).

AdminRecord-019981

claiming the banner of "fintech" because that seems to be a talisman that brings venture capital in its wake. Rather than fueling this trend, we urge the Bureau to substitute the term "online lender."

### E. Reporting of Credit Scores

In its proposal the Bureau recognizes that "Collecting credit score and other credit information could be particularly useful for the fair lending purposes of section 1071," but elected not to require such reporting due to the supposed complexity of doing so. 86 Fed. Reg. at 56437. We strongly disagree and urge the Bureau to reconsider this decision.

It is quite common in small business lending for the lender to pull the personal credit report of the owner(s) of the business. This is almost universally true where the applicant is a sole proprietorship but is also the norm for small business lending generally.

Experience with HMDA shows that whenever data users identify racial disparities in lending – either in terms of approval rates or in terms of pricing – questions are raised as to the adequacy of the analysis if it does not control for credit score. Researchers who conduct fair lending analyses therefore generally seek to use such controls.

The Federal Reserve Banks in their annual small business surveys obtain self-reported information from the respondents as to their credit score and those studies have found large disparities in credit access even after controlling for those self-reported credit scores; for example, in the most recent study, among small businesses with high credit scores, Black- and Latino-owned businesses were only about half as likely to obtain the credit they sought as white-owned businesses and the rate for Asian American-owned businesses was more than twenty percent below the rate for White-owned businesses.[36] But if the 1071 dataset does not include credit scores, such analyses will not be possible and some may even attempt to dismiss conclusions drawn from the data on the ground that there is no credit score control. Given that, and in light of the frequency with which personal credit scores are used for small business lending decisions, it is essential to include within 1071 a data field for a personal credit score (along with a field identifying the scoring model used) where a personal credit score that data is used by the lender in underwriting and/or pricing the loan.

There are now a number of vendors that market business credit scores, i.e. scores that claim to reflect the creditworthiness of business entities separate and apart from the creditworthiness of their owners. However, because there are not yet industry-standard scoring models for businesses, requiring reporting of a business credit score may introduce complexities that outweigh the value of the data. But whatever those complexities may be they do not pertain to

---

[36] *Small Business Credit Survey:  2021 Report on Firms Owned by People of Color,*
*https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color*

AdminRecord-019982

personal credit scores, which can and should be reported where used in deciding either on whether to make a loan or on the terms of the loan (including size, duration, and pricing).

Importantly, credit score reporting already is required under HMDA and in imposing that requirement the Bureau thoughtfully addressed and provided clear rules of the road to govern reporting in situations where multiple scores are pulled (because of co-applicants and/or because of a tri-merge report). Lenders have been complying with those rules for several years. The rules are, in our view, entirely translatable to the 1071 context and therefore should be.

## F. Data Points Related to Pricing

We wholeheartedly supported the Bureau's decision to require lenders to collect and report data not only with respect to their credit decisions but also with respect to the price of the loans that are offered. These data are needed to achieve both of Section 1071's purposes.

The ECOA expressly prohibits discrimination "with respect to any aspect of a credit decision" including not only decisions as to whether to extend credit but also decisions with respect to the terms of any credit offer. Thus, collecting data with respect to loan terms is essential "to facilitate enforcement of fair lending laws"— Section 1071's first stated purpose. This is especially true given the abundant evidence from other markets -- including, for example, residential mortgages[37] and auto lending[38] -- that, when people of color are able to obtain credit, they are on average charged higher prices than white borrowers. Indeed, if the Section 1071 rule did not cover data elements regarding loan pricing, lenders could easily mask discrimination by

---

[37] For example, Federal Reserve researchers, using data from 2004 through 2008, found that during the years leading up to the financial crisis, higher-rate conventional mortgages were disproportionately distributed to borrowers of color, including African-American, Latino, American Indians, Alaskan Natives, Native Hawaiians, Pacific Islanders, and Hispanic borrowers. *See* Avery, Brevoort, and Canner, *Higher-Priced Home Lending and the 2005 HMDA Data,* Federal Reserve Bulletin (September 2006), available at http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf. More recently, the Bureau has reported that in 2020, the interest rate on mortgages for Black and Latino borrowers was .0125% higher than for White borrowers and the closing costs for Black and Latino borrowers was, respectively, $1,636 and $1,864 higher than for White borrowers. CFPB. *Data Point: 2020 Mortgage Market Activity and Trends,* https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activity-trends_report_2021-08.pdf And MIT researchers have found that over the life of a loan, Black homeowners pay almost $54,000 more than White homeowners in mortgage-related costs. Aronowitz, Golding, & Choi, *The Unequal Costs of Black Homeownership,* https://gcfp.mit.edu/mortgage-cost-for-black-homeowners/

[38] Pricing disparities in auto lending were extensively documented as a result of discovery in class action lawsuits which uncovered that Blacks were paying between $330 and $500 more for auto loans. Chen, *Imperfect Competition in Auto Lending: Subjective Markup, Racial Disparity, and Class Action Litigation,* https://law.vanderbilt.edu/files/publications/cohen-imperfect-competition.pdf. The Bureau's investigation of the practices of indirect auto lenders found that large disparities continued long after those class action lawsuits were settled. More recently, researchers have found that among auto loan consumers of comparable creditworthiness, borrowers of color pay 70 basis points more on their auto loans than white borrowers, increasing loan costs on average by an additional $410. Butler, Mayer, & Weston, *Racial Discrimination in the Auto Lending Market,* https://files.consumerfinance.gov/f/documents/cfpb_mayer_racial-discrimination-in-the-auto-loan-market.pdf.

AdminRecord-019983

artificially inflating their "approved but not accepted" rate for minority-owned businesses while offering inferior, unaffordable terms to businesses owned by people of color.

Additionally, data as to loan pricing is needed to "identify business and community development needs and opportunities of women-owned [and] minority-owned" small businesses – Section 1071's second stated purpose.  Although there is abundant evidence that businesses owned by people of color are less likely to obtain the credit they seek than white-owned businesses, there is a dearth of evidence regarding the terms on which credit is extended to these businesses.  To the extent the data were to show patterns of disparate pricing such as exist in other credit markets, that would identify an acute need for fairly priced, affordable credit, even if the disparities were the result of race-neutral criteria that passed the disparate impact test.  This is yet another reason why collecting such data is essential.

In order for the pricing data collected under Section 1071 to achieve these purposes, ideally there would be a common metric that could be used to compare offers across applicants of each lender in order to uncover patterns of discrimination by individual lenders and also to be able to compare pricing across different classes of borrowers to identify classes of businesses being systematically shut out from affordable credit.  In the consumer finance space, APR can serve both of these purposes.   As the proposal notes, several states are now requiring small business lenders to calculate and disclose the APR on their products[39] and legislation recently has been introduced in Congress that would require this nationally.[40]

We recognize that before the Bureau could require reporting of APR as part of a 1071 rule the Bureau would have to define a methodology for calculating APR for products such as MCAs that do not have a ready consumer analog.  The Bureau also would have to determine the extent to which concepts and limitations developed under Regulation Z and/or under the Military Lending Act for defining finance charges should be applied to commercial financing and whether and, if so, how to extend those concepts to types of charges that have no consumer finance analog.  That may be beyond the scope and timeframe of the present rulemaking.  That does not mean however, as the proposal incorrectly asserts, that understanding the components of APR would "provide greater utility to data users," 86 Fed. Reg. at 56456, than would an APR data point. To the contrary, an APR data point, using a methodology defined by the Bureau, would provide a basis for objective comparisons not dependent on the methodology of particular researchers.

Thus, if the Bureau elects not to require APR as a data point at this time, that decision should be predicated squarely on the fact that defining APR for commercial loans is outside the scope and/or timeframe of the present rulemaking.  The Bureau should not denigrate the value of APR

---

[39] *See* 86 Fed. Reg. at 56368 n.132
[40] H.R. 6054, 117th Cong. 1st Sess; S.3235, 117th Cong. 1st Sess.

AdminRecord-019984

or the feasibility of calculating it for small business loans so that, in the future, the Bureau can revisit this issue on a clean slate.

Regardless of whether the Bureau elects to require disclosure of APR along with pricing components or only requires disclosure of pricing components, it is important that the pricing data points that are reported are sufficient to enable data users to conduct the kinds of analyses suggested above regarding pricing disparities and the affordability of credit. The Bureau's proposal makes a good start in this regard but we believe the proposal could be improved in several important respects.

**Capturing the True Cost of Merchant Cash Advances –** As the proposal recognizes, MCAs are high-cost forms of credit targeted to vulnerable small business owners, especially people of color. It is therefore essential that the 1071 data capture the full cost of MCAs in a manner that allows comparison to other forms of credit and thus to identify needs for affordable credit that are not being met. The proposal falls short of achieving this objective in two respects.

*Loan Term* -- For merchant cash advances, the Bureau's proposal requires lenders to report, in dollar terms, the difference between the amount advanced and the amount to be repaid. § 1002.107(a)(12)(v). That is, of course, an important element of the cost of an MCA. However, where the costs of a loan are expressed in dollar terms, to truly understand the loan's price and compare it to other loans, it is necessary to know not just the dollar cost but the duration of the loan. For example, a payday loan that requires the borrower to pay $15 per $100 borrowed in two weeks is quite different than, e.g., a six-month installment loan that also requires the borrower to pay $15 per $100 borrowed.

We recognize, of course, that MCAs differ from traditional loans in that they do not have a fixed term. However, many MCAs made within the course of a reporting year will be repaid within that year and as to those loans the Bureau easily could require that the lender report the time period that elapsed between the time the loan was funded and the time it was repaid.

Furthermore, in determining the factor rate or the holdback percentage for an MCA, lenders typically collect data regarding applicants' historical credit card or debit card sales volume (if payments are tied to those sales) or bank deposits (if payments are tied to deposits). Lenders then, for their own business purposes, estimate the period of time it will take for a given loan to be repaid because that will determine the lender's cost of funds and contribute to the lender's risk. Thus, as to MCAs that are made during the course of the year and still outstanding as of the end of the reporting period, as well as MCA offers that are made but do not result in consummated loans, the Bureau could require MCA lenders to report a projection of the term of the loan or putative loan as calculated for purposes of underwriting the MCA. Alternatively, the Bureau could follow the approach of the recently-proposed federal legislation and require an MCA lender to report estimated loan terms for each application based on the applicant's

19

"historical sales volume over a defined period of time that is used for all sales-based financing transactions by that [MCA] provider." [41]

**Capturing Pricing on All Offers, including Counteroffers** – In order to ferret out discrimination in pricing, it is necessary to have visibility into the pricing not only of originated loans but of offers that are made but not accepted; indeed, to the extent lenders are offering higher-cost loans to businesses owned by people of color, that may be more evident in loan offers that are too expensive for the applicant to accept than in originated loans. Under the Bureau's proposal whether pricing information is required depends on what the lender reports in the "action taken" field: pricing is required with respect to any application for which the action taken is reported as "originated" or "approved but not accepted" but in lieu of pricing information a financial institution shall report "not applicable" if the action taken is reported as "denied," "withdrawn, or incomplete." Official Interpretation § 1071(a)(12) - 1. This creates something of an ambiguity about the reporting of pricing with respect to counter-offers that do not result in originated loans. Proposed Comment 107(a)(9)-2 addresses that situation in a manner that at best creates ambiguity and at worst creates a loophole that would shield the terms of counter-offers from disclosure.

Specifically, the proposed Comment provides: "If a financial institution makes a counteroffer to grant credit on terms other than those originally requested by the applicant (for example for a shorter loan maturity, with a different interest rate, or in a different amount) and the applicant declines the counteroffer or fails to respond, the institution reports the action taken as a denial on the original terms requested by the applicant." In that event, we read the proposal to mean that the lender would not be required to report the terms of the counteroffer given that, as noted above, under the proposed rule the lender reports the term, amount, and pricing as "not applicable" where the reported "action taken" is a denial. [42] However, the proposed Comment provides that if the applicant "agrees to proceed with consideration of the financial institution's counteroffer" and then either accepts or declines the counteroffer, the lender would report the action taken as "originated" or "approved but not accepted" which would then trigger the obligation to report pricing.

This proposed Comment seems to us problematic in several respects. To begin with, the proposed Comment would seem to direct a lender to report that it has denied an application when the lender is prepared to approve the application on different terms than those requested by the applicant, unless the applicant somehow agrees to "proceed with consideration" of the terms of the counteroffer. That would allow lenders to avoid the obligation to report pricing in the situation in which the data is perhaps most important: when the lender is not prepared to make a loan on the terms requested by the applicant but is prepared to make a loan on less desirable

---

[41] *See* n.37 *supra.*
[42] *See* Comments 107(a)(4)-5; 107(a)(8)-1; 107(a)(9)-1

AdminRecord-019986

terms (e.g. by lending a lower amount, for a shorter period, or at a higher rate) which are not acceptable to the borrower.  The same presumably would be true, for example, if the applicant sought an unsecured loan or a loan without a personal guarantee, and the lender counteroffered a secured and/or guaranteed loan.  The terms of such counteroffers would go unreported unless the applicant either accepts those terms or somehow agrees to "proceed with consideration" of the counteroffer but then subsequently decides not to accept it.

Furthermore, although the proposed Comment applies where a lender offers "to grant credit on terms other than those originally requested by the applicant," nothing in the proposed rule requires lenders to solicit from applicants the terms they are seeking other than the amount applied for and the credit type.  As a result, it is not entirely clear under what circumstances a lender's offer of terms that an applicant does not accept would be treated as a denial (without reporting the loan terms) as distinguished from an "approval not accepted" (in which case loan terms must be reported).  This ambiguity is particularly problematic in light of the fact that, in the experience of the Self-Help credit unions (Self-Help), with whom the Center for Responsible Lending is affiliated, borrowers often seek a loan amount but may be less focused on other terms, including how the interaction of the interest rate and loan term affect the payment.

To resolve this uncertainty and assure that the terms of counteroffers are reported, we therefore recommend that whenever a lender makes an offer to an applicant those terms should be reported to the Bureau without regard to whether they conform to the terms requested by the applicant or are a counteroffer.  One way to address this would be to modify the specifications for the actions taken field to include counteroffer accepted and counteroffer rejected as discrete options and then require reporting of pricing information with respect to either of these actions taken.

To be sure, there may be cases of the type seemingly contemplated by the proposed Comment in which a would-be-applicant is interested in a particular type of product (for example, a line of credit) and the lender concludes that the applicant is not eligible for that product and inquires as to whether the applicant would be interested in being considered for an alternative product (e.g., a term loan).  We expect that most often would occur prior to the application stage and thus the inquiry would not itself create a reportable event under the proposed rule.  But if a small business were to apply for a product for which it is not eligible and if the applicant were to elect not to be considered for an alternative product without receiving a counter-offer, then reporting the action taken as a denial would make sense and there would be no pricing information to report.  But to repeat, where a lender offers terms to an applicant we urge the Bureau to require that those terms be reported.

**Capturing Ongoing Costs** – In proposed § 107(a)(12)(iv), the Bureau proposes to require lenders to report scheduled charges during the first year but not thereafter.  The risk here is obvious:  lenders may choose to offer lower costs during the first year than in subsequent years, and under the Bureau's proposal the ongoing costs would not be captured.  The Bureau has asked

AdminRecord-019987

about the likelihood of this being done "specifically in an effort to avoid reporting the charges for the purpose of 1071." 86 Fed. Reg. at 56460. Given the history of evasionary tactics by FIs, that risk is real and material. But even if the Bureau were somehow to conclude that the risk of deliberate evasion is low, that still would not justify limiting the required data to scheduled first-year charges. Aside from a desire to avoid reporting, lenders may choose to offer reduced costs for the first year of a loan and rely on higher back-end pricing as an acquisition strategy to acquire more business. For example, an issuer of business credit cards or other open-end products may elect to waive a first-year annual fee as part of its acquisition strategy; indeed that would be possible even if it meant that the first year would not be profitable as loss-leader pricing is a well-known strategy. Understanding the true cost of these types of loans is important without regard to whether the reason for charging lower first-year cost is to evade reporting or to acquire more customers. Thus, the Bureau should require reporting not only of scheduled first-year costs (which is necessary in order to capture any costs associated with origination that may be made after closing) but also require reporting of any recurring scheduled cost, or costs scheduled for a year other than the first year, even if the cost is not charged during the first year or not charged every year.

Furthermore, the requirement to report only "scheduled" costs – and presumably not unscheduled costs – creates a risk of evasion other than the one identified by the Bureau: a risk that lenders will structure agreements to permit costs to be assessed in the lender's discretion at unscheduled intervals. MCAs, for example, may include a "collateral monitor fee" which easily could be structured as a fee imposed in the lender's discretion (perhaps with a maximum frequency). To avoid such an evasion, all fees that can be imposed in the lender's discretion other than fees triggered by an action by the borrower such as a late fee, should be reported under Section 1071.

**Capturing Prepayment Costs** – The Bureau's proposal soundly requires lenders to report whether an offer includes a charge for paying all or part of the principal before the date on which principal is due. But there is no requirement to report the size of any prepayment penalty that can be assessed. We recommend requiring reporting of the maximum amount of a potential prepayment penalty and the period for which a payment in that amount can be assessed.

Additionally, lenders could evade reporting prepayment penalties by structuring loans such that there is no benefit to the borrower for early payment. This is, of course, the case for MCAs and other alternative finance company products but that same structure could be imported into other commercial financing products as well. Similarly, lenders could (and do) structure loan products such that prepayment does not result in the borrower avoiding all future interest charges without characterizing the resulting cost as a prepayment penalty.[43] We therefore recommend that the

---

[43] For example, some loans offer what is characterized as "prepayment discount," such as in this case where 75% of the outstanding finance charge is assessed as a balloon when a loan is prepaid, discounted from

AdminRecord-019988

specification for the prepayment field make clear that "no prepayment" refers only to a loan with a scheduled term which can be prepaid by paying the principal and accrued finance charges and that term loans for which there is an incremental cost associated with prepayment should be reported as carrying a prepayment penalty even if the loan denominates this incremental amount as a "discount" or something else.

**Separating Third-Party, Pass-Through Costs from Lender Charges --** Proposed § 107(a)(12)(ii) requires lenders to report "all charges payable directly or indirectly by the applicant and imposed directly or indirectly by the financial institution at or before origination as an incident to or a condition of the extension of credit." Proposed Comment 107(a)(12((ii)-2 appropriately states that this includes amounts charged by someone other than the financial institution if the FI either requires the use of the third party or retains a portion of the fee. We recommend, however, that the Bureau provide for disaggregated reporting of third-party charges that are pure pass-through charges. Such disaggregation will provide for more comparability with respect to charges imposed by the lender including origination fees, points and the like as well as lender mark ups of third-party charges.

We acknowledge that such a disaggregation requirement would be a departure from what is required under HMDA. HMDA requires mortgage lenders to report "total origination charges" which combine lender and third-party costs. That data point was taken from the Loan Estimate form which lenders already were required to compute and disclose to consumers pursuant to the TILA-RESPA Integrated Disclosure Rule (TRID). Using that field as the reportable field under HMDA thus facilitated compliance. There is no comparable advantage to combining origination and third party costs for purposes of 1071 and thus we recommend that the Bureau require they be reported separately.

### G. Publication of 1071 Data

It goes without saying that in order to achieve any of Section 1071's purposes it is essential that the data that lenders collect and report to the Bureau be made public in a timely, accessible manner. We offer the following recommendations with respect to what data are made public, when, and how.

**The Bureau should, in the text of the final rule, establish a strong presumption in favor of disclosure; permit modification of a data point only where release of unmodified data would cause significant harm to the privacy interest of a small business or its owners; and permit deletion of a data point only where release would cause significant harm that cannot**

---

100% of the amount that would have been paid had the loan gone to term. *See* Fundera, "OnDeck Business Loans Review for 2021," Nov 26, 2020. https://www.fundera.com/business-loans/lender-reviews/ondeck-reviews (" "OnDeck's loans come with a prepayment discount—if you prepay your short-term loan, OnDeck will forgive 25% of the remaining interest due on your loan." )

AdminRecord-019989

**be mitigated by modification of the data point** – The preamble to the Bureau's proposal contains an extensive discussion of the approach the Bureau proposes to take with respect to the disclosure of 1071 data. In our view, the final rule itself should codify the approach the Bureau will take in order to bind the Bureau and prevent future backsliding with respect to public release. In particular, we believe that there are three elements that should be codified: first, a strong presumption in favor of application-level disclosure in order to achieve Section 1071's purposes; second, a limited exception that would permit data to be modified where such a modification is necessary to avoid compromising the privacy of small businesses or their owners in a manner that would be seriously damaging to them; and third, an even more limited exception that would permit data submitted to the CFPB to be deleted from the public dataset where such damage cannot be mitigated through modification of a data point.[44]

As part of this codification, the Bureau should incorporate a commitment to make public the identity of the financial institution submitting each record. Section 1071 so requires because it imposes disclosure obligations on each individual financial institution with respect to its data if requested by any member of the public.[45] At the same time, the Bureau should make explicit that it will not consider modifying or deleting data from the public dataset merely because data may embarrass, or cause reputational damage to, a particular lender. The very purpose of Section 1071 is to provide the public with access to data that will enable data users to form judgments as to whether particular lenders are, e.g., engaging in redlining or other discriminatory practices or failing to meet their obligations to the communities they are supposed to serve. If data from a particular lender will lead to adverse judgments about that lender, that is all the more reason for the data to be made public. If a lender believes that its 1071 data will provide an incomplete or misleading impression of its business practice, that lender can release additional data to provide greater context. In Justice Brandeis' words, "the remedy to be applied is more speech, not enforced silence."[46]

Indeed, given that Congress, in enacting 1071, already has decided that the identity of each financial institution shall be made public along with its loan application register, we do not believe that the Bureau should give any weight to whatever proprietary or commercial interest financial institutions may claim in seeking to exclude 1071 data from public disclosure. A financial institutions' desire to be shielded from competition, litigation, or adverse publicity is

---

[44] We also urge the Bureau to leave open the possibility that a particular data field might be modified or deleted for some records but not for others. For example, the risk of reidentification may be considerably lower for a census tract with 1,200 residents as compared to one with 8,000 residents; that is even more true if the Bureau were to modify the geographic field in the public dataset given the wide range of sizes of, e.g., counties. (Counties can range in size from under 100 residents to over 10,000,000.) The risk of harm from releasing a particular data field thus may vary from location to location in ways that warrant different approaches to modification/deletion for different locations.

[45] *See* § 1071(f)(2)(B).

[46] *Whitney v. California,* 274 U.S. 357 (1927)(Brandeis, J., concurring).

AdminRecord-019990

not a bona fide privacy interest that needs to be weighed in deciding whether to release particular data fields.

**The Bureau should, in the text of the final rule, commit to releasing the public data by a date certain after its submission.**  The Bureau has proposed to require lenders to report data to the Bureau on a calendar year basis, with reports due on or before June 1st of the succeeding year. Under proposed § 102.110(a), the Bureau will publish such data "on an annual basis" but the proposed rule contains no deadline for such publication.  The intersection of these two provisions creates a risk that by the time the Bureau elects to publish the data, they will be quite stale.  That would, of course, disserve one of the key goals of Section 1071 as it would be difficult to "identify business and community development needs" with data that are not current.

We agree with the Bureau that it would not be feasible to require 1071 reporting to occur concurrently with HMDA reporting.  One way to avoid that while still assuring that the data, when released, are timely, would be to adopt a July 1 – June 30th reporting period.  The Bureau has, however, expressed concerns that doing so "could result in additional challenges for financial institutions in complying with the rule, which could in turn make errors in collecting and reporting data to the Bureau more likely."  86 Fed. Reg. at 56494.

It is not obvious to us, or to our affiliate Self-Help, why it would be more difficult to pull and submit data on applications received during a 12-month period other than a calendar year, especially since any reporting period will have to be programmed as part of the 1071 implementation process.  Indeed, there would seem to be administrative advantages to determining whether a financial institution is required to report on a calendar year basis and to have the reporting period start six months after the calendar year so that institutions that become obligated to start reporting have some time to prepare before data collection must begin.  And a July 1 to June 30th reporting period would mean that the data being submitted would allow the Bureau to require reporting within sixty days after the close of the reporting period as under HMDA and thus provide for more timely data to be submitted than under the Bureau's proposal.

Regardless of whether the Bureau adheres to the proposal's calendar-year reporting period or adopts some other reporting period, we recommend that the Bureau commit itself (and all future CFPB leaders), by rule, to make the 1071 data public by a date certain each year.  For example, under HMDA, each FI's Lending Application Register (LAR) must be submitted by the end of February and made available to the public on a timely request by the end of March[47] and the Bureau, by assuming the responsibility of making HMDA LARs available on behalf of FIs, has effectively committed itself to that deadline.  Similarly, following the HMDA model, the Bureau could commit here to making the individual 1071 LARs available thirty days after the submission deadline (under the proposal by June 30th) and to provide a combined public-use

---

[47] 15 U.S.C. 2803(j)(5).

AdminRecord-019991

dataset within six months of the deadline for submission of reports.  That would assure that, even if reporting is done on a calendar year basis, the data would be reasonably timely and prevent foot-dragging should future leaders of the Bureau be less committed to the Section 1071 mission.

**The Bureau should make the public dataset readily accessible and if any data were to be modified or deleted the Bureau should establish a "bona fide researcher" program to allow researchers to access those data.**  When the Bureau took over collection and reporting of HMDA data from the Federal Reserve Board, the CFPB provided a robust query tool through which data users could generate reports from the data.  The tool the Bureau currently provides to access HMDA data is less robust and allows more limited queries.  In preparing to implement Section 1071, the Bureau should recreate the type of querying tool that it previously provided.

Beyond that, assuming that application of the balancing test leads to modification or deletion of certain data fields, the Bureau should, concurrent with release of the first set of 1071 data, create a program whereby bona fide researchers can access the full dataset.  The privacy risk here arises from the potential to re-identify small businesses by comparing the data in a LAR with other known data and it should not be difficult for the Bureau to identify bona fide researchers who have no interest in doing so and who are prepared to commit to use the data purely for research purposes without attempting to identify individual applicants.  Those researchers should be permitted access to the full data set for research purposes so that the real value of the full data set can be realized.

### H.  Technical Recommendations to Facilitate Compliance and Assure the Integrity and Usefulness of Data Collected Pursuant to Section 1071

Drawing on the experience of CRL's affiliate Self-Help, we offer the following recommendations that we believe will facilitate compliance and better assure the integrity of the data that is collected.

*Covered Application and Credit Product* (§ 103(a) and § 107(a)(5)) – Proposed Comment 103(a)- 4 provides that "if an applicant makes a request for two or more covered credit transactions at the same time, the financial institution reports each request for a covered credit transaction as a separate application."  Proposed Comment 107(a)(5)-1, in turn, identifies seven discrete credit types -- including (i) term loan-unsecured; (ii) term loan-secured; (iii) line of credit-unsecured; and (iv) line of credit-secured – and provides that "If an applicant requests more the one credit product, the financial institution reports each credit product requested as a separate application."  And proposed Comment 107(a)(5)-2  requires lenders to "maintain procedures reasonably designed to collect applicant provided data, which includes credit product."  In our view, the conjunction of these proposed Comments may create confusion in the data that is reported.

26

AdminRecord-019992

We understand Proposed Comment 103(a)-4 to apply in situations in which an applicant is seeking two separate loans – for example, a term loan to purchase equipment and a line of credit to purchase inventory -- and agree that in such instances even if there is a single application that application should result in two separate 1071 records.  However, in some instances an applicant may be seeking to borrow a certain amount of money and may prefer a line of credit but be open to a term loan, or may prefer an unsecured loan but be open to providing security.  It is unclear whether, in such cases, the small business would request multiple credit types in its application and whether the lender's duty to "maintain procedures reasonably designed to collect applicant provided data" would require the lender to instruct the applicant to identify each credit type that would be acceptable.  If so, proposed Comment 107(a)(5)-1 would seem to require the lender to report each credit type requested as a separate application even though in the situation just described the applicant is seeking only one transaction and is open to alternative structures and even though there would be only one action taken and one set of terms.

To ameliorate this potential problem the Bureau may wish to reconsider the enumeration of credit types in proposed Comment 103(a)(5)-1.  For example, it is not clear that there is value in separating out applications for secured and unsecured lines of credit so long as the 1071 data captures whether an offer by a financial institution or an originated loan is secured or unsecured. (Indeed, the Bureau may want to require a separate data field capturing the appraised value of collateral in relation to the loan amount.)  Similarly, with respect to term loans, there may be value in separating out mortgages, auto loans and equipment financing as discrete secured loan types but treating all other term loan applications (including those that may be secured by inventory or receivables) together, rather than treating secured term loans as one category and unsecured term loans as another.

In any event, we urge the Bureau to reconsider the requirement to treat requests for multiple credit types as multiple applications if the applicant is seeking only a single loan.  This would mean that separate records would be required only where, as provided in proposed Comment 103(a)-4 the small business is seeking through one application two or more separate loans/lines.

*Guarantees* (§ 107(a)(5)(ii))  – Proposed Comment 107(a)(5)-4 requires reporting of "the type or types of guarantees that were obtained for an originated covered credit transaction *or that would have been obtained if the covered credit transaction was originated.*"  (Emphasis added).  The italicized language could be problematic in the case of a declined application because the lender would be speculating as to potential guarantees, such as personal guarantees, from owners or non-owners.  We recommend that the Bureau either limit the reporting of this field to offers and counteroffers that are made (i.e. allow financial institutions to report type of guarantee as "not applicable" for declined applications, as is permitted with respect to the loan term and loan pricing data fields[48]) or, for declined applications, require reporting of the guarantee type only if

---

[48] *See* proposed Comment 107(a)(5)-5.

AdminRecord-019993

the requested guarantee were a government or programmatic guarantee (such as an SBA or USDA guarantee or some other third-party guarantee program).

*NAICS Code* (§ 107(a)(15) – Proposed Comment 107(a)(15)-2 provides that lenders shall maintain procedures reasonably designed to collect NAICS codes from applicants but that if an FI "is nonetheless unable to collect or *otherwise determine* the applicant's NAICS code" the FI may report it as "undetermined."  This would appear to impose some obligation on lenders to attempt to seek out the NAICS code where it is not supplied by the borrower.  We agree with such a requirement, at least in cases in which the financial institution interacts with the borrower either in person or over the phone.  However, it may be more feasible in such cases for lenders to reliably determine a three-digit NAICS code than the full six-digit code and we recommend that the rule permit the submission of a three-digit code where the applicant does not provide a six-digit code.  (For applications submitted online or via the mail and processed electronically, requiring lenders to do more than solicit the NAICS code on the application may not be feasible.)

*Number of Principal Owners* (§ 107(a)(21)) – Proposed Comment 107(a)(21)-3 requires FIs to maintain procedures reasonably designed to collect information from applicants as to the number of principal owners.  The Comment goes on to state that "if a financial institution is nonetheless unable to collect or otherwise determine the applicant's number of principal owners" the FI may report the number of principal owners as unknown.  The Bureau should clarify what "otherwise determine" means in this context and, in particular, clarify that an FI can limit its investigation to documents (if any) obtained from the applicant in the normal course, rather than creating an obligation to conduct a due diligence investigation of corporate records to ascertain the number of principal owners.

**Conclusion**

It has now been more than a decade since Congress enacted Section 1071 and directed the Bureau to adopt regulations to implement this section.  The need for these data is even greater now than it was in 2010 when the Dodd-Frank Act was enacted.  The Bureau should therefore proceed as expeditiously as it can to issue a final rule so that implementation can begin and data can be collected and made public.


Sincerely,

CRL- The Center for Responsible Lending
National Association of Latino Community Asset Builders
National Coalition for Asian Pacific American Community Development
National Fair Housing Alliance
United States Hispanic Chamber of Commerce
National Asian/Pacific Islander American Chamber of Commerce and Entrepreneurship

AdminRecord-019994

League of United Latin American Citizens
Main Street Alliance
National Alliance of Community Economic Development Associations
National Council of Asian Pacific Americans
National Fair Housing Alliance
National Federation of Filipino American Association
Partner Community Capital
Small Business for America's Future
Empowering Pacific Islander Communities

AdminRecord-019995

| From: | ashley.hardt@dllgroup.com |
|---|---|
| To: | CFPB_FederalRegisterComments |
| Subject: | Docket No. CFPB-2017-0011 |
| Date: | Wednesday, September 13, 2017 3:55:02 PM |
| Attachments: | image001.png |
| | CFPB RFI 2017-0011_DLL Comments.pdf |

Ms. Jackson,

Good afternoon. We appreciate this opportunity to comment on the Bureau's Request for Information Regarding the Small Business Lending Market. Please find our formal comments attached.

Best regards,

**dLL** financial solutions partner

**Ashley Hardt**
Legal Counsel
T 515 251 2909
M515 289 6597
E ashley.hardt@dllgroup.com

**DLL Finance LLC**
8001 Birchwood Court
Johnston, IA 50131
United States of America
F 515 334 5811

www.dllgroup.com
Follow us on LinkedIn
Please consider the environment before printing.

**See what counts.**

De Lage Landen Financial Services, Inc. has the right to use the DLL®, DLL Financial Solutions Partner℠ and See what counts℠ service marks.
DLL has offices in more than 30 countries throughout Europe, North America, South America, Australia and Asia.
The company is part of the Rabobank Group.

===============================================
The information transmitted via this e-mail is intended only for the person or
entity to which it is addressed and may contain confidential and/or privileged
material. Any review, retransmission, dissemination or other use of, or
taking of any action in reliance upon this information by persons or entities
other than the intended recipient is prohibited. If you received this in error,
please contact the sender and delete the material from any computer

AdminRecord-023460

dLL financial solutions partner

De Lage Landen Financial Services, Inc. | 1111 Old Eagle School Road | Wayne | PA 19087

September 13, 2017

Monica Jackson
Office of the Executive Secretary
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

RE: Docket No. CFPB-2017-0011
Request for Information Regarding the Small Business Lending Market

Dear Ms. Jackson:

DLL is a U.S. vendor finance company that provides asset-based financial solutions in the Agriculture, Food, Healthcare, Clean Technology, Construction, Transportation, Industrial and Office Technology industries. DLL partners with equipment manufacturers, dealers and distributors to support their distribution channels and help grow their businesses. We appreciate this opportunity to comment on the Bureau's Request for Information Regarding the Small Business Lending Market. We concur with the comments written by the Equipment Leasing and Finance Association (ELFA) under its separate comment letter dated on or about September 14, 2017, and we would like to provide additional remarks on some of the data points as they pertain to the vendor finance industry, specifically.

We understand the hurdles that small businesses may face when trying to access financial products, and we can certainly appreciate the difficulty the Bureau has in obtaining sufficient data regarding the small business lending market. It is understandable that the Bureau would consider alternative means of collecting such data; however, placing that responsibility on non-depository financial institutions would be unreasonably burdensome, create confusion, produce inaccurate and misleading information, and drive up costs of providing financial products to customers, including small businesses.

Section 1071 of the Dodd-Frank Act amends the Equal Credit Opportunity Act ("ECOA") to require financial institutions to compile, maintain, and report information concerning credit applications made by women-owned, minority-owned, and small businesses.[1] It defines "financial institution" as "any partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity

---

[1] 82 Fed. Reg. 22318 (May 15, 2017).

**De Lage Landen Financial Services, Inc.**
1111 Old Eagle School Road
Wayne, PA 19087
USA

**T** +1 610 386 5000
www.dllgroup.com

DLL has offices in more than 30 countries throughout Europe, North America, South America, Australia and Asia.
The company is part of the Rabobank Group.

AdminRecord-023461



that engages in any financial activity."[2]  However, section 704B(g) grants the Bureau has authority to exempt a class of financial institutions from Section 1071. Under this authority, we strongly urge the Bureau to exempt non-depository financial institutions from these requirements.

**The Bureau Should Distinguish Between Depository and Non-Depository Financial Institutions for Purposes of Section 1071**

It is important that the Bureau distinguish between depository and non-depository financial institutions when implementing the requirements of Section 1071 as these types of institutions support small business lending in different ways.  Depository financial institutions are relationally-oriented, working with entrepreneurs to support the creation of new businesses and with existing entities to provide working capital for their continued success.  Depository institutions establish lines of credit for operating expenses and other costs associated with starting and growing small businesses.

In contrast, non-depository institutions are transaction-oriented, offering financial products for particular commercial and consumer transactions.  Non-depository institutions focus on industries, working closely with manufacturers, vendors and dealers to approve specific transactions for the sale or purchase of particular goods.  DLL relies on our vendors and dealers to generate lending opportunities for financing their products, and our business is at the mercy of their regions and industries.  Notwithstanding the laudable goal or lending to more women-owned or minority-owned small businesses, we have no way to control or practically encourage the growth of these customer bases due to the nature of our business model and vendor relationships.

**Data Collection Requirements of Section 1071 Will Create Conflict and Confusion**

As a non-depository financial institution, DLL requests a number of data points from our applicants, including income, assets, equity, financials, credit history and ability to pay.  Our primary concerns are whether applicants are financing equipment for commercial or consumer purposes, and whether they will be able to make their payments on time.  The majority of our applications are for small ticket transactions and are auto-decisioned based on a scorecard system.  If an application is automatically declined, it gets referred for manual review before a final credit decision is rendered.  We do not request information about applicants' race, sex or ethnicity as those traits are irrelevant to our credit decisions.  Furthermore, ECOA prohibits credit discrimination on those traits, and not requesting that information from our applicants serves as a safeguard to prevent any appearance of discrimination based on those traits.

Asking information about applicants' race, sex or ethnicity in compliance with Section 1071 would eliminate one safeguard we have in place for ensuring compliance with ECOA.  We would need to take great steps to ensure that our underwriters do not have access to demographic information and that the information truly has no bearing on their decisions.  Requesting that information from applicants may also create the false impression that we do consider those traits in our credit decisions, as applicants' race, sex and ethnicity are irrelevant to our business otherwise.  We would have to invest time and resources educating and reassuring our customers that the information is not used internally and is only collected and reported for government purposes.

Given the transactional nature of our business model, we do not have direct relationships with applicants.  We depend on third-party vendors and dealers to report applicants' information to us and, as a practical matter, we cannot readily control the accuracy of the data they collect.  Inquiring about race, sex and ethnicity could put our dealers and our applicants in uncomfortable positions, especially where such information is immaterial to the applicants' ability to pay. The quality of the data collected may also be questionable because applicants may be multiple races or ethnicities and their sex could change.  It is foreseeable that different parties may answer these questions differently.  For instance, where an applicant is of two or more races, one party may choose to mark the application "two or more races," while another party may simply choose to mark only the primary or most

---

[2] 15 U.S.C. § 1691c–2(h)(1).

AdminRecord-023462



obvious race. "Scrubbing" this information or otherwise verifying that the responses are accurate would be unduly time-consuming and could cause confusion in collecting and reporting. Moreover, applicants may opt not to provide this information at all, resulting in inaccurate and incomplete data.

**Reporting Requirements of Section 1071 Will Produce Misinterpretations and Inaccurate Conclusions from Regulators, Customers and the General Public**

Reports issued pursuant to Section 1071 may not convey an accurate picture of institutions' lending practices. DLL is a U.S.-based company whose concentrations largely depend on our vendors' and dealers' concentrations. Our applicant pool is dictated by the geographic regions in which our dealers are located and the customers and industries that they supply. For instance, according to the U.S. Department of Agriculture's 2012 Census of Agriculture, women and minorities only make up a small percentage of farm operators within the agriculture industry[3] and the number of women in farming is declining.[4] As a lender to the agriculture industry, the number of transactions that we finance for women and minority businesses may also constitute a small percentage proportionately. There are also large variances across states requiring different types of equipment and, therefore, different amounts of credit to finance them. These issues may not be clearly reflected in the annual reports under Section 1071, and parties reviewing those reports could misinterpret them or draw incorrect conclusions from those reports in the absence of these factors.

**The Requirements of Section 1071 Will Delay Funding and Increase Costs to Small Businesses**

The data collection and reporting requirements of Section 1071 would place a significant burden on non-depository financial institutions as it would require the creation of new forms, processes and personnel. Currently, we do not collect any information regarding race, sex or ethnicity. We would need to revise all of our forms to include those new fields and write new procedures and code to restrict our underwriters' access within our systems and screens as such segregation would be required to ensure ECOA compliance. Our forms are created and maintained within proprietary software, and any changes must be made by highly skilled coders and IT personnel. These professionals would have to develop new processes to censor certain fields within the system or to hide the new forms containing that information from our underwriters. The reporting requirements of Section 1071 would necessitate additional personnel to compile and report this data annually to the CFPB and to the public as requested. We would need to conduct additional training to ensure that we collected and maintained the data in strict compliance with complex laws and regulations, while also taking great care to keep such personal information confidential and secure. Implementing those changes would require a great deal of time, money and labor.

The burdens imposed by Section 1071 could also delay the processing and issuance of funds and increase the costs of financial products, thereby negatively impacting small businesses. Applicants are often anxious to receive credit determinations and financing, and having to submit additional information that is not considered as part of our credit decisions would unnecessarily delay that process. Adding new form fields would increase the time required for application submission, review and funding. Because we rely on our vendors and dealers to submit applications, we would need to invest time and resources to train them on collecting and reporting the information required in the new fields. The costs of implementing and fulfilling requirements of Section 1071

---

[3] *See* U.S. Department of Agriculture, 2012 Census of Agriculture, available at https://www.agcensus.usda.gov/Publications/2012/Online_Resources/Race,_Ethnicity_and_Gender_Profiles/cpd99000.pdf (last accessed July 22, 2017).

[4] U.S. Department of Agriculture, 2012 Census of Agriculture, *Highlights: Farm Demographics*, available at https://www.agcensus.usda.gov/Publications/2012/Online_Resources/Highlights/Farm_Demographics/Highlights_Farm_Demographics.pdf (last accessed July 22, 2017).

AdminRecord-023463



would likely have to be passed on to customers, thereby driving up the costs to finance inventory and equipment for these businesses.

**The Bureau Should Exempt Non-Depository Financial Institutions from Section 1071**

Gathering additional data for purposes of surveying the small business lending market and advancing small business access to financial products is a worthy goal; however, requiring this assistance from non-depository financial institutions would be overly burdensome. These institutions are not positioned to collect data about applicants' race, sex or ethnicity, and that data is immaterial to their credit determinations and small business lending. Implementing and carrying out the requirements of Section 1071 would require a substantial amount of work, delay processing, and drive up the costs of financial products for those same small businesses. For these reasons, we respectfully request that the Bureau exempt non-depository financial institutions from the data collection and reporting requirements of Section 1071. We suggest that the collection of this data may be better placed with agencies who have already established procedures for collecting and reporting this information, such as the U.S. Department of Treasury, the Census Bureau, the Bureau of Labor Statistics, Department of Commerce, Small Business Administration, and the Internal Revenue Service.

Thank you for the opportunity to comment on the Bureau's Request for Information Regarding the Small Business Lending Market. If you have any questions concerning our letter, please feel free to contact us at either email address listed below.

Sincerely,

Nelson Wheatley
Chief Compliance Officer
nelson.wheatley@dllgroup.com

Lisa Fleischer
Chief Legal Officer
lfleischer@leasedirect.com

AdminRecord-023464