**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION;<br>RIO BANK, MCALLEN, TEXAS; and<br>AMERICAN BANKERS ASSOCIATION<br><br>                       *Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU; and ROHIT CHOPRA, in his official<br>capacity as Director of the Consumer Financial<br>Protection Bureau,<br><br>                       *Defendants*. | Case No: 7:23-cv-00144 |

**JOINT APPENDIX
OF ADMINISTRATIVE RECORD DESIGNATIONS
VOLUME XIV**

# TBA V. CFPB – JOINT APPENDIX DESIGNATIONS

| Administrative Record Citation | Document Name |
|---|---|
| **VOLUME I** | |
| 1-85 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME II** | |
| 86-170 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME III** | |
| 171-255 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IV** | |
| 256-340 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME V** | |
| 341-422 | Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VI** | |
| 423-507 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) |
| **VOLUME VII** | |
| 508-592 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME VIII** | |
| 593-673 | Proposed Rule, Small Business Lending Data Collection Under the Equal Credit Opportunity Act (Regulation B) *(continued)* |
| **VOLUME IX** | |
| 1055-1069 | CFPB, Small Business Lending Rule—Proposed Data Points Chart (9/1/21) |

| 1147-1217 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices |
| **VOLUME X** | |
| 1218-1366 | Final Report of the Small Business Review Panel on the CFPB's Proposals Under Consideration for the Small Business Lending Data Collection Rulemaking and Select Appendices *(continued)* |
| **VOLUME XI** | |
| 1559-1637 | CFPB, SBREFA - Outline of Proposals Under Consideration and Alternatives Considered (9/15/20) |
| 1638-1677 | CFPB, Small Business Lending Rule—Data Points Chart (3/30/23) |
| 1810-1811 | SBA letter approving size standards (3/23/23) |
| 2234-2241 | Bailey Allen et al, Bankers Digest, Comment on Implementing Section 1071 |
| 4201-4213 | CFPB, Small Business Compliance Cost Survey |
| 14322-14324 | Comment from United Savings Credit Union (10/8/21) |
| 14346-14348 | Comment from National Association of Federally-Insured Credit Unions (10/18/21) |
| 14369-14372 | Comment from American Bankers Association et al. (11/3/21) |
| 14407-14408 | Comment from US Small Business Administration - Office of Advocacy (11/23/21) |
| 15652-15657 | Comment from Independent Bankers Association of Texas (12/27/21) |
| **VOLUME XII** | |
| 17199-17208 | Comment from Equipment Leasing and Finance Association (1/4/22) |
| 17210-17223 | Comment from Farm Credit Council (1/4/22) |
| 17973-17977 | Comment from Conference of State Bank Supervisors (1/6/22) |

| 18117-18149 | Comment from American Financial Services Association (1/6/22) |
| 18385-18394 | Comment from US Small Business Administration - Office of Advocacy (1/6/22) |
| 18478-18491 | Comment from Credit Union National Association (1/6/22) |
| 18499-18513 | Comment from National Association of Federally-Insured Credit Unions (1/6/22) |
| **VOLUME XIII** | |
| 18557-18596 | Comment from Independent Community Bankers of America (1/6/22) |
| 18840-18841 | Comment from Texas Farm Credit Services (1/6/22) |
| 19173-19177 | Comment from Texas Bankers Association (1/6/22) |
| 19305-19351 | Comment from American Bankers Association et al. (1/6/22) |
| 19967-19995 | Comment from Center for Responsible Lending et al. (1/6/22) |
| 23460-23464 | Comment from DLL Finance (9/13/17) |
| **VOLUME XIV** | |
| 23867-23881 | Comment from American Bankers Association et al. (9/14/17) |
| 24291-24310 | Comment from American Financial Services Association (9/14/17) |
| 24979-24981 | Comment from Independent Bankers Association of Texas (12/14/20) |
| 25002-25011 | Comment from American Bankers Association (12/14/20) |
| 25090-25097 | Comment from Credit Union National Association (12/14/20) |
| 25143-25159 | Comment from Independent Community Bankers of America (12/14/20) |



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

September 14, 2017


Ms. Monica Jackson
Office of the Executive Secretary
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, D.C. 20552

Submitted Electronically: FederalRegisterComments@cfpb.gov

**Re: Request for Information Regarding the Small Business Lending Market (Docket No. CFPB-2017-0011)**

Dear Ms. Jackson:

The American Bankers Association[1] appreciates the opportunity to provide comments on the Bureau of Consumer Financial Protection's (Bureau) Request for Information Regarding the Small Business Lending Market (RFI).[2] The RFI is a first step in the process to implement section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Section 1071 amends the Equal Credit Opportunity Act (ECOA) to require banks to collect and report information regarding credit applications by women-owned, minority-owned, and small businesses to "facilitate the enforcement of fair lending laws" and to "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses."[3]

We support the Bureau's decision to begin the implementation process with an RFI seeking information on the small business lending market, the variety of credit products offered and underwriting models used, and the data currently collected by small business lenders. Understanding small business lending and its dissimilarities to consumer lending will be critical to implementation of a rule that does not increase the cost and/or limit the availability of credit to small businesses.

> I. **The Bureau should partner with the Small Business Administration to study whether the data and reporting regime envisioned by Congress can achieve its intended objectives.**

We believe it is equally important throughout the implementation process for the Bureau to reflect on the purposes of section 1071 and critically evaluate whether the proposed data

---

[1] The American Bankers Association is the voice of the nation's $17 trillion banking industry, which is composed of small, regional and large banks that together employ more than 2 million people, safeguard $13 trillion in deposits and extend more than $9 trillion in loans.
[2] Request for Information Regarding the Small Business Lending Market, 82 Fed. Reg. 22318 (May 15, 2017).
[3] 15 U.S.C. § 1691c-2.

AdminRecord-023867



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

collection *can* achieve its statutory objectives of facilitating enforcement of fair lending laws and enabling the identification of community development needs and opportunities of women and minority-owned small businesses. While the banking industry supports both goals, we have strong concerns that section 1071 will achieve neither objective.

Small business lending at banks is highly individualized, and underwriting and loan pricing depend on many heterogeneous variables that are inherently unsuitable for mass-data fair lending analysis. The key to proper fair lending analysis using mass-data is to compare similarly situated borrowers. While that is possible to a limited degree with consumer credit, where products and factors considered in underwriting are more homogenous, the great variations and unique attributes of individual small business loans will make legitimate comparisons excessively difficult, if not impossible.

Yet, once implemented, the data from such a program will create vulnerabilities to statistical engineering to contrive assertions of discrimination in small business lending. Rather than motivating financial institutions to increase their lending to meet the credit needs of small businesses and their communities, the data collection and the anticipated reliance on statistical manipulation in fair lending supervision and enforcement may discourage lending to small business, particularly by community banks that may lack the resources to engage in a statistical duel with regulators to defend against allegations of violations. At the lower end of vulnerability, bank experiences with regulatory data collections, such as those pursuant to Call Reports, the Home Mortgage Disclosure Act (HMDA), and the like, presage the real likelihood of numerous clerical violations given the volume of data to be collected, categorized, and reported.

The banking industry, small business borrowers, and the U.S. economy can little afford this result. Nor can we afford for the rule to be finalized and lenders begin the Herculean task of collecting and reporting data, only to have regulators recognize that the data offer little value to be used to identify genuine fair lending violations. Therefore, ABA urges the Bureau to initiate soon a study that analyzes to what extent the data collection regime could in fact facilitate reliable fair lending supervision and enforcement and support community development. The study should be a predicate to further work on this rulemaking, as the failure to evaluate whether section 1071 can achieve its statutory purposes prior to adoption of a final rule will inevitably call for costly and market-disrupting rule revisions.[4]

In the conduct of such a study we recommend that the Bureau partner with the Small Business Administration (SBA) and use SBA 7(A) and 504 program data that include the race and ethnicity of the borrower as well as the other 1071 data points. Indeed, ABA urges the Bureau to partner with the SBA throughout related rulemaking in order to benefit from that agency's small

---

[4] Major rules finalized by the Bureau to date have evinced a troubling predetermined commitment to preconceived policy choices and inadequate consideration of concerns raised about the likely impact on consumers, resulting in multiple rule revisions. For example, the remittance, ATR/QM, mortgage servicing, TRID, prepaid, and HMDA rules all have been amended, several have undergone multiple revisions, to address concerns raised from the outset during the Small Business Regulatory Enforcement Fairness Act (SBREFA) review and in comments on the proposed rule.

AdminRecord-023868



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

business lending expertise. Although section 1071 assigns responsibility for implementation to the Bureau, nothing in the statute precludes consultation with another agency with experience and institutional proficiencies for understanding commercial lending and gathering data on small businesses, experience which the consumer Bureau lacks.

At the conclusion of the study, the Bureau and SBA should report to Congress on whether small business loan data collection would be likely to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women and minority-owned small businesses. The report should clearly articulate how and to what extent the data collection would serve the statutory objectives.

## II.  Comments on the Request for Information

In response to the Bureau's RFI, we highlight the following observations and recommendations, which are explained further in the proceeding commentary:

- HMDA-like reporting is not appropriate for small business lending, and now is the time for the Bureau to begin estimating the costs of a new reporting regime so that the public can more accurately weigh how these costs will affect small businesses.

- The new analysis regime for small business lending data can be expected to discourage bank lending to small business customers.

- To minimize the disruption of small business lending and the costs of the data collection, the Bureau's rules governing the collection and reporting of the data should not be prescriptive; lenders should be permitted to identify such things as to when they have a *bona fide* application (rather than just an expression of interest, for example) and when and how to collect the data so that the data genuinely and accurately represent the transaction.

- The data collection should be limited to the statutorily-mandated data points.

- The data collection should be limited to women-owned and minority-owned "small business," and the definition of "small business" must be clear and easy to apply at time of application.

- A rule should permit the use of a model disclosure when a firewall is not feasible.

- The Bureau should limit or curtail the public disclosure of certain information to mitigate customer privacy concerns.

---

AdminRecord-023869



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

1. *HMDA-like reporting is not appropriate for small business lending and will impose costs on small business customers.*

Not only is it essential to test whether the proposed data collection will achieve its statutory objective, the Bureau should begin now to assess the cost of implementation of the data collection as well as to estimate ongoing annual operational costs. As the Bureau is aware, section 1022 of the Dodd-Frank Act requires the Bureau to—

> [C]onsider the potential benefits and cost to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products and services resulting from such a rule;[5] and

> [C]onsult with the appropriate prudential regulators or other Federal agencies[6] prior to proposing a rule and during the comment process regarding consistency with prudential, market, or systemic objectives administered by such agencies.[7]

Having credible – and transparent – cost estimates, along with exposing for public review the cost estimates and all of information that was relied upon by the Bureau in making these estimates, will be critical to meeting both of these statutory obligations.

While we recognize that Bureau staff may consider as a model the work that was done to estimate the cost of complying with the recent changes to HMDA data collection and reporting requirements for residential mortgages, we caution that those estimates quantified the operational costs involved with a change to an *existing* data collection and reporting obligation.[8] In contrast, the small business lending data collection will be a completely *new* reporting regime and one that impacts far more lines of business, credit products, and employees than HMDA's reporting obligation. To comply with section 1071, banks will need to establish new procedures and processes for collecting and maintaining the data for all affected business units, update core systems and loan origination systems (many will require new systems), train all employees involved with commercial lending, test the new process and systems, and make necessary adjustments. Banks also will need to hire and train employees to conduct data integrity scrubs and to report the data.

In addition to these costs, the Bureau must factor in the additional costs to be incurred annually on fair lending compliance, inasmuch as the data may be used to engineer statistically-based regulatory assertions of fair lending issues to which the banks will need to respond. To be prepared to respond to such anticipated claims, banks will need to devote considerable additional resources to expanded fair lending regulatory compliance programs.

---

[5] 12 U.S.C. § 5512(b)(2)(A)(i).
[6] We believe "other Federal agencies" would include the prudential regulators, the SBA, OIRA, among any others.
[7] 12 U.S.C. § 5512(b)(2)(B).
[8] Home Mortgage Disclosure (Regulation C); Final Rule, 80 Fed. Reg. 66265 (Oct 28, 2015).

AdminRecord-023870



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

Aggregate implementation and ongoing costs imposed by the new data collection can be expected to be in the hundreds of millions, if not billions, of dollars.

ABA urges the Bureau to begin now to estimate these costs so that the information is available to the public, prudential regulators, the Small Business Administration (SBA), and the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) early in the rulemaking process. Indeed, we believe the Bureau should make the cost information available to the small entity representatives (SERs) that will participate in the Small Business Regulatory Enforcement Fairness Act (SBREFA) review process so that the SERs can react to it and suggest how the changes might affect their business practices and costs and gauge the likely impact on their ability to lend to small businesses.[9]

   2.   *Small business lending promotes economic growth and financial inclusion.*

Small businesses are a key engine of growth and job creation for the U.S. economy. As reported in the Bureau's whitepaper on small business lending, SBA data show that more than 27 million small businesses provide 55% of all jobs in the United States and are responsible for 65% of new job creation.[10] A 2013 Federal Reserve Bank of Atlanta study found that counties with a higher percentage of their workforce employed by small local businesses exhibited positive trends with respect to local incomes, employment rates, and poverty rates.[11]

In order for small businesses to grow, they require safe and reliable funding, which the banking industry offers. Seventy three percent of small business borrowers turn to banks first when seeking financing advice.[12] Bank lending to small business plays an important role in the economic health of local communities. Therefore, it is critical that the Bureau understand the commercial lending process to ensure that the data collection does not impede small business lending.

Many entrepreneurs and small business borrowers contact a banker with little more than a concept for a new business or a proposed expansion of an existing business but lack knowledge of financing options, including how much credit they actually need. Bank lenders work with

---

[9] In preparation for the SBREFA review, ABA urges the Bureau to gather and share with SERs any information from third-party service providers that may be involved in regulatory proposals under consideration. We believe that the Bureau – whose access is far superior to that of small entities – should have an affirmative duty to obtain this information and to provide it to the SERs.

[10] CONSUMER FINANCIAL PROTECTION BUREAU, KEY DIMENSIONS OF THE SMALL BUSINESS LENDING LANDSCAPE, (May 2017), available at http://files.consumerfinance.gov/f/documents/201705_cfpb_Key-Dimensions-Small-Business-Lending-Landscape.pdf.

[11] Anil Rupasingha, *Locally Owned: Do Local Business Ownership and Size Matter for Local Economic Well Being?* (Fed. Res. Bank of Atlanta, Discussion Paper, No. 01-13, 2013), available at https://www.frbatlanta.org/-/media/documents/community-development/publications/discussion-papers/2013/01-do-local-business-ownership-size-matter-for-local-economic-well-being-2013-08-19.pdf.

[12] According to the 2015 Federal Reserve Survey, see Fed. Res. Bank of New York, Atlanta, Boston, Cleveland, Philadelphia, Richmond, and St. Louis, 2015 Small Business Credit Survey: Report on Employer Firms, (March 2016), available at https://www.newyorkfed.org/medialibrary/media/smallbusiness/2015/Report-SBCS-2015.pdf.

AdminRecord-023871



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

small business borrowers to develop a more fulsome business plan, evaluate cash flow needs and debt service capabilities, analyze the market, and suggest the credit product that will best suit the small business. Banks offer their small business customers a wide range of credit products, including but not limited to term loans, lines of credit, business credit cards, equipment leasing loans, asset-based loans, and SBA loans. Importantly, banks tailor small business loans to the unique borrowing needs of their customers. The careful thought, analysis, and counsel that banks provide when working with small businesses is a critical contributor to job growth and financial inclusion in the U.S. economy.

This "high touch" approach is successful because it considers and adapts to the customer's needs and promotes the success of the borrower's business undertaking and repayment of the loan. The simplistic data collection contemplated by section 1071, however, is at odds with the consultative, tailored approach to small business lending. It will tend to encourage standardization and simplification of the commercial loan application, processing, and underwriting processes, which will limit the flexibility that is the key characteristic of successful small business lending, particularly small business lending by community banks.

Traditionally, banks have been willing to rely on their knowledge of local market conditions and their assessment of the borrower's experience and anticipated ability to execute on a business plan to overcome weaknesses in a credit application. However, willingness to consider mitigating factors and make exceptions to underwriting policies may be discouraged by the anticipated fair lending analysis of the data, which tends to apply harsh treatment to exercises of banker judgment. Rather than motivating banks to increase their lending to meet the credit needs of small businesses and neighborhoods, the data collection can be expected to discourage bank lending to small businesses.

Moreover, marginally qualified applicants are more likely to seek loans from non-traditional or even "informal" sources. We believe that public policy should expand access of such borrowers to bank loans rather than make bank lending to these small businesses more difficult.

Along these lines, Farm Credit System (FCS) institutions should have to comply with 1071 standards and be supervised for their compliance with such standards so that banks that seek to serve small agricultural borrowers will not be at a further competitive disadvantage. There are numerous examples of Dodd-Frank requirements for which non-FCS institutions are currently supervised that FCS institutions are either not required to comply with or are not subject to the same level of supervision. Furthermore, failure to ensure that data is collected from FCS institutions will result in significant gaps in 1071 data as it is reasonable to presume that many women-owned and minority-owned small agricultural businesses rely on FCS institutions for credit.

3. *The small business definition must be clear and easy to apply.*

Given the significant costs that will be imposed on banks and their customers, the definition of a "small business" must be clear and easy to apply at the time of application. In addition, the data

AdminRecord-023872



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

collection should be limited to women- and minority-owned small business applicants. We believe the rule should reflect Congress' intent and limit the scope of the collection and reporting regime lending to women-owned and minority-owned small businesses. Any other interpretation could result in the collection of data on lending to all women-owned and minority-owned businesses, regardless of size. The consequence of not limiting the data collection to those that are "small businesses" would be that every borrower would need to be evaluated to determine if it was women-owned or minority-owned, even if the business had revenue, for example, of tens of millions of dollars and/or was publicly traded. It is reasonable to assume that Congress did not intend to have lenders collect data on companies that are not small businesses as the statutory provision is entitled "Section 1071 Small Business Data Collection."

Moreover, a strict interpretation of the statutory language might impose data collection on lending to *all* small businesses, regardless of their ownership. This would significantly increase the data collected, within which a mountain of information on lending to women-owned and minority-owned small business could be lost, inconsistent with the Congress' focus on women-owned and minority-owned small businesses.

Banks and applicants need to be able to determine quickly and easily whether a 1071 data collection need arises in a transaction. Accordingly, a definition of a women-owned and minority-owned small business needs to be easy to apply and leave no ambiguity, so that applicants are able to determine quickly and easily if they belong in either of these categories.

Section 1071 defines "small business" as having the "same meaning as the term 'small business concern' in section 3 of the Small Business Act (15 U.S.C. 632)." That section, in turn, includes a provision that authorizes the SBA to establish industry specific size standards using North American Industry Classification Standards (NAICS). A small business definition relying on industry-specific NAICS codes would require the lender and applicant to review 39 pages of NAICS industry descriptions to determine the applicable size standard. Current industry-specific NAICS code definitions rely on revenue standards for some industries and number of employees standards for other industries, adding additional complexity. Some applications for unsecured credit (e.g., some small business credit cards) do not require the institution to gather information on the annual revenues of the business which would create a problem if the small business size standard for the industry in question relies on revenue. These are perplexing complexities that could frustrate realization of the purposes of the statute.

We support the Bureau's interest in adoption of a simple and more practical definition of "small business" and offer the following definition:

> A small business should be defined as an enterprise (including all parent entities, subsidiaries, and affiliates) that, at time of application, reports the prior year's gross annual revenue as $1 million or less and has requested a loan amount of $1 million or less.

AdminRecord-023873



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

In view of the variety of small business lending programs and products available, both elements of the definition cannot be applied in all cases. To minimize implementation costs and avoid unnecessary disruption of small business lending processes, we urge the Bureau to recognize expressly the following exceptions to the proposed definition above:

- For those credit products for which at the time of application there is no loan amount requested, then revenue of $1 million or less would be the sole determinant.
- For those credit products (some credit cards and other lending products) for which revenue is not collected, the lender may make the determination based on a loan amount requested of $1 million or less exclusively.

This proposed definition would encompass the vast majority of loans to small businesses, including women-owned small businesses and minority-owned small businesses.[13]

To avoid confusion regarding a borrower's revenue size in the event that a borrower has subsidiaries or is itself a subsidiary of one or more entities, gross annual revenue should be that of the enterprise (including all parent entities, subsidiaries and affiliates). Furthermore, gross annual revenue of the enterprise should be self-reported by the applicant to the prospective lender, and the lender should not be obligated to confirm or validate the enterprise's gross annual revenue.

4.    *The Bureau should expressly exclude certain loans from the data collection.*

The scope of section 1071 should be limited to loans for commercial and industrial purposes to business entities where the revenues from the on-going business operations of the business enterprise is the primary source of repayment of the loan. Thus section 1071 should not apply to the following:

a.  Loans primarily for personal, family, and household purposes. If the credit terms specify that the loan proceeds can be used only for personal, family, or household purposes, then institutions should not be collecting 1071 data for such loans. Furthermore, lenders should be permitted to rely on an applicant's stated use for the requested funds. If a borrower starts or invests in a business using the proceeds of a personal loan, it is unlikely that the bank would know (and should not be expected to know) that the use of the proceeds had changed.

b.  Loans secured by real estate other than loans secured by owner-occupied commercial real estate where the primary source of repayment is the cash flow from the ongoing business operations of the owner/operator or an affiliate of the owner of the real estate.

---

[13] As the Bureau noted in its RFI, a definition of small businesses as businesses with annual revenue of $1 million or less covers approximately 95% of all firms, over 97% of all minority-owned firms, and over 98% of all women-owned firms, surely statistically sufficient to satisfy the policy purposes of the statute.

AdminRecord-023874



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

c. Participation loans. Very few small business loans are structured as participations. Reporting on participations would be unnecessarily burdensome as one would have to specify whether the lead underwriting institution would report the participation, the participant, or both. To avoid introducing unnecessary complexity for such a small segment of the market, ABA recommends that loan participations be excluded.

d. Credit applications for trusts other than business trusts.[14] These entities are not for-profit businesses but rather are created for family, investment, or charitable purposes. Collecting 1071 data on these trusts would be inappropriate and complex as it would be difficult to determine on whom the data must be collected. For example, a bank would need to determine if the data should be collected on the settlors, beneficiaries, trustees or some combination thereof. Similarly, determining the "net profit or loss" of the trust and to whom that net profit or loss accrues would be challenging to say the least. Given the challenges involved in capturing data for trusts and the limited utility that collecting these data will have, we request that the Bureau explicitly exempt them.

e. Credit applications for tax-exempt entities.[15] Determining ownership, control, and net profit or loss would, in most cases, be foreign concepts, as these entities are not structured in a way that resembles businesses. Given that tax-exempt entities are not for-profit businesses, we recommend that the Bureau explicitly exempt them.

f. Applications for credit by foreign-owned entities. The Bureau should clarify that 1071 data collection requirements be limited to applications for credit submitted within the United States and U.S. territories, and that applications for credit by foreign-owned entities be exempt from 1071 data collection. Determining beneficial ownership and evaluating net profit or loss for companies subject to different legal and accounting regimes would introduce significant unnecessary complexity for little utility relative to section 1071's statutory purpose.

5. *To minimize the disruption of small business lending and the cost of the data collection, the Bureau should adopt clear and flexible rules governing the collection and reporting of the data.*

Small business customer interactions may be on the phone, at a community event, or through a third party, and the collection of underwriting information about a potential borrower may take place over time and may require iterative interactions between the lender and the borrower. For those lenders that use applications, many are paper-based. However, it is important to recognize that even within a single bank, the application process and collection of information to be used in underwriting may vary by line of business and credit product. To minimize disruption to existing

---

[14] *See* 26 C.F.R. § 301.7701-4.
[15] *See* 26 U.S.C. § 501(a).

AdminRecord-023875



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

processes and to reduce costs, we urge the Bureau to avoid procrustean rules that will dictate when and how the data must be collected.

The ultimate obligor on the requested credit may change as additional guarantors are added or new entities are formed. Unlike consumer credit, the small business credit process evolves over time. Therefore, consistent with safe and sound practices employed by banks, the identification of the borrower may change, and banks should be permitted flexibility in identifying when in the process the 1071 data should be collected, bearing in mind that it should not be *required* to be contemporaneous with the receipt of an application. For example, banks that offer private label credit cards do not interact directly with the customer at the time of application; applications are often taken at point of sale. In these instances, banks may prefer the flexibility to request 1071 data later so that they may interact more directly with their customers to obtain accurate and relevant information.

Institutions also should be given flexibility to determine how they will collect applicant-reported 1071 data points. The Bureau should not explicitly or implicitly mandate use of an application or other form, as small business data collection varies by product and business line. Imposing uniform standards on the process will constrain small business lending to a one-size-fits-all approach that is incompatible with the small business lending process and would therefore undermine the flexibility needed for successful small business lending. Quite unlike residential mortgage lending, different business loan originators emphasize different elements in the credit decision process, and their respective data gathering tools reflect those different criteria.

We encourage the Bureau to apply Regulation B's definition of what constitutes an "application" to the small business data collection. Regulation B defines an application as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."[16] Thus, Regulation B recognizes that the bank should be able to define the information that needs to be gathered (pursuant to the applicable bank underwriting guidelines) to determine what constitutes a completed application and thereby generates the data collection and reporting obligation. For example, preliminary discussions with a customer about possible financing needs should not trigger an application and obligation to collect 1071 data. Similarly, if a customer asks about a particular type of loan, and the bank does not make that type of loan, the bank should not have to report 1071 data.

6.    *The Bureau should adopt clear, simple definitions of the legislatively-mandated data points.*

To further minimize the disruption of small business lending and the cost of the data collection, the Bureau should adopt very clear and simple definitions for the legislatively-mandated data points. We recommend the following definitions:

---

[16] 12 C.F.R. § 202.2(f).

AdminRecord-023876



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

- *Type and purpose* should be defined as closed-end, revolving, or an owner-occupied commercial mortgage. Additional granularity would result in unnecessary burden and confusion, with little value added.

- *Principal place of business* should be defined as the address submitted by applicants as their principal place of business, provided through the bank's normal application process. An alternative definition, which would rely on the census tract in which revenue activities are generated, would be overly confusing and would result in inconsistent reporting, making the potential for data misinterpretations even greater and comparisons of data less straightforward.

- *Amount applied for* is subject to complexity as the extension of small business credit may involve multiple counteroffers. In some cases, the iterative process of small business lending makes it unclear whether a counteroffer has been made and whether the applicant has accepted the counteroffer. Since the loan amount requested by the borrower can change, the clearest possible way to define amount applied for is to report the approved loan amount in the case that the loan is approved and, in all other cases the amount for which the applicant applied (if any), should be reported.

- *Type of action taken* should contain three response options: approved, application denied, or incomplete. Incomplete applications would be those that did not make it to the final underwriting stage for one reason or another. Current HMDA rules specify several more response options that would introduce significant and unnecessary complexity.

Institutions should be permitted to make it very clear to the borrower that the provision of 1071 demographic data is completely voluntary and that the borrower's decision to provide or withhold the information will have no effect on the application. In addition, lenders must be able to rely on the self-reported race, sex, and ethnicity of the principal business owners as indicated by the representative of the small business applicant. The lender should be able to rely on the applicant's answers even if the applicant is not a principal owner. Bankers should not be required to determine an applicant's sex or ethnicity, factors that are and should be irrelevant to the underwriting process. Bankers have been trained for many years to ignore race, ethnicity, and sex in order to ensure all credit applicants are treated fairly in the application process.

Furthermore, the bank should be permitted to rely exclusively on answers provided by a small business-credit applicant representative regarding the gross annual revenue in the last fiscal year and the small business' status as women-owned or minority-owned. There should be no requirement for the institution to verify or validate the information provided independent of what the institution may do as part of their standard underwriting processes. Similarly, there should be no requirement to coach or to urge the applicant to answer, as doing so could jeopardize the customer relationship.

It is important to recognize that the person submitting the credit request may not have ready access to the applicant provided data (e.g., gross annual revenue; race, sex, and ethnicity of the

AdminRecord-023877



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

principal business owners; and minority-owned or women-owned status). Accordingly, a lender should only be required to request the data once, and the lender should simply be required to record the borrower's responses. If an applicant asks to verify some of the requested information with the owners of the business, the lender should be able to record the applicant's non-response and should not have to ask the applicant again. If an applicant subsequently volunteers answers, the lender may update its records.

7. *The data collection should be limited to the statutory data.*

Section 1071 authorizes the collection of the following data:

    a.  the number of the application and the date on which the application was received;
    b.  the type and purpose of the credit applied for;
    c.  the amount of the credit applied for, and the amount of the credit approved;
    d.  the type of action taken on the application, and the date of that action;
    e.  the census tract in which the principal place of business of the loan applicant is located;
    f.  the gross annual revenue of the business in the last fiscal year preceding the date of the application; and
    g.  the race, sex, and ethnicity of the principal owners of the business.

In addition to these data points, the Bureau states that it will consider whether supplementing with a "limited number of discretionary data points would serve the purposes of section 1071, improve the quality of the data for all stakeholders, and reduce the possibility of misinterpretations or incorrect conclusions that might arise from the collection or release of more limited data."

As discussed above, collecting and reporting the statutory data points will impose tremendous costs and produce data that we believe will not achieve the statutory objectives. In fact, the anticipated reliance on statistics in fair lending supervision and enforcement may discourage lending to small businesses, particularly by community and mid-size banks. Expanding the data points beyond those required data points required by statute would only make the problems worse.

8. *Limit 1071 data collection requirements to genuinely new credit to the customer.*

At many institutions, renewal events for certain commercial loan products occur on an annual basis (i.e., not at the customer's *request*), following periodic reviews to ensure that the borrower is still performing as agreed by the contract and the ownership and management structure have not changed. For example, commercial lines of credit are often established for one year but include provisions for annual renewal unless either party gives notice of non-renewal.

We recommend that the 1071 data collection should be required only when a bank extends genuinely new credit to the customer as defined by the receipt of an application (pursuant to the

AdminRecord-023878



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

Regulation B definition of "application" as referenced earlier in this letter). If customer data must be collected for insignificant line increases (or decreases), rate changes, covenant modifications, "business as usual" short-term renewals, or relatively minor modifications of terms, the customer relationship will be significantly disrupted and banks will be required to spend more time complying as opposed to making and managing loans. In addition, the necessary resources required to collect the data will inevitably add to the cost for credit. Yet the additional information gathered would have no meaningful value beyond what was gathered from the original extension of credit.

9.      *Permit use of a model disclosure when a firewall is not feasible.*

Section 1071 contemplates, where feasible, establishment of a "firewall" that prevents loan underwriters from access to information about the race, ethnicity, or sex of the small business applicant (the demographic data). The statute states—

> (d) NO ACCESS BY UNDERWRITERS.— (1) LIMITATION.—Where feasible, no loan underwriter or other officer or employee of a financial institution, or any affiliate of a financial institution, involved in making any determination concerning an application for credit shall have access to any information provided by the applicant pursuant to a request under subsection (b) in connection with such application. (2) LIMITED ACCESS.—If a financial institution determines that a loan underwriter or other officer or employee of a financial institution, or any affiliate of a financial institution, involved in making any determination concerning an application for credit should have access to any information provided by the applicant pursuant to a request under subsection (b), the financial institution shall provide notice to the applicant of the access of the underwriter to such information, along with notice that the financial institution may not discriminate on the basis of such information.

Establishment and maintenance of a firewall will multiply the regulatory burden for all institutions, since it means that the data cannot be collected on the application or during the application process and must be stored in systems or files that the underwriter cannot access. However, many institutions grant underwriting and loan approval authority (under certain loan amounts) to the same staff that is interacting with customers. For many institutions, it would necessitate the hiring of "shadow staff" to collect the demographic data.

Moreover, even providing a disclosure to the applicant that underwriters may see the information will lead the borrower to assume that the information is being used in decision-making, as demonstrated by borrower responses to requests for government monitoring of information on mortgage loan applications.

To avoid these issues, we believe the Bureau should adopt a rule that permits a bank to determine the feasibility of a firewall. The regulation should expressly recognize that maintenance of a firewall is not feasible if it would require the bank to alter its application and or underwriting

AdminRecord-023879



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

process or loan processing systems. Further, under these circumstances, we recommend that the rule include model language that a lender may use (at its discretion) to explain why the lender is requesting information relating to race, ethnicity, and sex of the principal owners, the ability of the applicant not to furnish the information, and an affirmative statement that the lender will not discriminate on the basis of the information or whether the applicant chooses not to furnish it. This approach would be consistent with HMDA.

We understand that the Bureau may be considering use of a third party to collect the data, perhaps requiring a lender to direct a commercial loan applicant to an independent website to provide the demographic data and other applicant-supplied data (i.e., loan amount requested and enterprise gross revenue). Our members believe that involvement of a third party in collecting data from an applicant would disrupt the customer relationship experience.  Furthermore, applicant reporting to a third party would introduce significant data integrity challenges.

10. *Mitigate customer privacy and confidentiality challenges by exempting certain small data sets and by using county-level aggregations for all other data.*

In many communities, information about the annual revenue or demographic data about the principal owners of a small business will disclose private information about the small business and its financing needs. Indeed, the mere fact that a borrower is applying for a loan is something that a borrower may not want publicly disclosed. Many borrowers may be hesitant to apply for a loan if that personal information may be made available to the public. In addition, publication of 1071 data may also encourage aggressive marketing by online lenders that may be unwelcome by the borrower. Finally, it is important to recognize that the type of action taken and the amount approved, among other potential data points, may reveal bank proprietary information that should not be compromised.

The Bureau should establish a minimum size for data sets below which 1071 data would not be publicly disclosed. To maintain public confidence, banks need to be able to assure borrowers that their information will be treated with the utmost confidentiality. Small data sets within a particular geography are highly likely to lead to the public obtaining information that should remain confidential.

Even if small datasets within a geography are exempted, algorithms that cross-reference other publicly available data in "larger" data sets can be used to reverse-engineer a borrower's private information or a bank's proprietary information. To protect borrower privacy, and to preserve confidential bank proprietary information, public disclosure of the applicant/borrower data should not contain loan-level detail but rather should be disclosed consistent with the current county-level aggregation of small business lending data reported pursuant to Community Reinvestment Act regulations.

AdminRecord-023880



**Barry Mills, Jr.**
Senior Regulatory Advisor
Office of Regulatory Policy
202-663-5311
bmills@aba.com

### III.    Conclusion

ABA appreciates the opportunity to provide our comments to the RFI. If you have any questions or would like to discuss anything further, please contact Barry Mills at 202-663-5311.

Sincerely,

*Barry Mills*

Barry Mills
Senior Regulatory Advisor, Office of Regulatory Policy

Cc:    Grady Hedgespeth
        Assistant Director for the Office of Small Business Lending Markets

        Daniel Smith
        Assistant Directory, Office of Financial Institutions and Business Liaison

AdminRecord-023881



Ms. Monica Jackson
Office of the Executive Secretary
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

>    **Re:**    ***Request for Information Regarding the Small Business Lending Market
>             (Docket No.: CFPB-2017-0011)***

Dear Ms. Jackson:

The American Financial Services Association (AFSA)[1] is pleased to respond to the Consumer
Financial Protection Bureau's (CFPB) request for information regarding the small business lending
market (RFI) and to help inform the CFPB's work on the business lending data collection
rulemaking to implement Section 1071 of the Dodd-Frank Wall Street Reform and Consumer
Protection Act (Dodd-Frank Act). Section 1071 amends the Equal Credit Opportunity Act (ECOA)
to require financial institutions to compile, maintain, and report information concerning credit
applications made by women-owned, minority-owned, and small businesses.

At the outset, AFSA emphasizes four key points. First, AFSA supports the CFPB's focus on small
businesses in the development of the business lending data collection implementing rule (the
"Rule"). As the RFI states, "[u]nder nearly any definition of 'small business,' a substantial
percentage of women-owned and minority-owned businesses would be covered."[2] In collecting
data on small businesses, the CFPB will obtain information on many of the women-owned and
minority-owned businesses. As detailed in the body of this response letter, collecting and reporting
the data points specified in Section 1071 (the "Data Points") for small businesses alone will be a
significant undertaking for financial institutions, requiring extensive system and process changes.
Requiring financial institutions to collect and report the Data Points for all women-owned and
minority-owned businesses separate from and in addition to the obligation to report such
information on small businesses would impose increased burdens on financial institutions without
adding value. Thus, it is appropriate for the CFPB to focus on small business data collection, as
opposed to imposing the considerable additional obligations that would be necessary if financial
institutions were required to report information concerning credit applications made by all women-
owned and minority-owned businesses, including large and possibly even publicly-held
businesses, as well as small businesses.

Second, AFSA stresses that the Rule should require financial institutions to collect and report the
Data Points only from applicants that self-identify as business entities at the time of application
and that also meet the small business definition. For example, if a credit applicant self-identifies
as an individual consumer, or self-identifies as a business but does not meet the definition of a

---

[1] Founded in 1916, AFSA is the national trade association for the consumer credit industry, protecting access to credit
and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment
loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.
[2] 82 FR 22319

AdminRecord-024291

small business under the Rule, the financial institution should not be required to collect or submit any Data Points on that applicant. Section 1071 does not permit collection of Data Points from individuals or businesses that are not small businesses—in fact, ECOA actually prohibits the collection of such information.[3] To facilitate compliance with ECOA and satisfy the purpose of Section 1071, the Rule should clarify that financial institutions should collect and report the Data Points only from applicants meeting the small business definition on the face of their applications.

Third, financial institutions should be able to rely on the information submitted by the applicant in its request for credit and should not be subject to any independent verification requirements regarding the information. If the applicant indicates that she is an individual, or that the financing is primarily for personal, family, or household purposes, the financial institution must be able to rely on that designation and not collect the Data Points. Similarly, if the applicant identifies as a business entity and the entity meets the small business definition, the financial institution must be able to rely on that designation and submit the Data Points regarding that application. In part, this is because there are no databases or other mechanisms by which financial institutions can independently verify whether an applicant is a small business. Requiring financial institutions to try to validate information submitted by applicants to determine whether the applicant is a small business will dramatically slow down the credit process and hinder access to credit.

Fourth, as explained in more detail in the response to Question 1, the Rule should define "small business" using a gross annual revenue threshold with the determination made based on the revenue information provided in an applicant's request for credit. Many, if not all, financial institutions ask for revenue information during the credit application process because it is relevant to the applicant's creditworthiness, particularly the ability to repay the debt. Moreover, applicants likely expect financial institutions to request revenue information and are prepared to provide that information during the application process. If applicants have the information on hand when applying for credit, the determination as to whether the applicant is a small business subject to data collection under the Rule can be made early in the application process an d the Data Points can be collected at that time.

AFSA will expand on these points and others in response to the questions below. In the RFI, the CFPB asks a series of questions in five different categories: (1) Small Business Definition; (2) Data Points; (3) Financial Institutions Engaged in Business Lending; (4) Access to Credit and Financial Products Offered to Businesses; and (5) Privacy. In this letter, AFSA will answer the questions that affect its membership.

I.    **Small Business Definition**

*1. What potential challenges and burdens would financial institutions or applicants encounter if a business lending data collection rule defined a "small business" applicant using the SBA's NAICS-specific size regulations?*

Defining a "small business" using the Small Business Administration's (SBA) NAICS-specific size regulations (the "NAICS Regulations") would be overly burdensome for applicants and very difficult to administer for financial institutions. To obtain credit, an applicant would need be aware

---

[3] 12 C.F.R. § 1002.5(b)

2

AdminRecord-024292

of and understand the NAICS Regulations, determine within which category the applicant falls, and decide whether the applicant is a small business based on the applicable threshold (number of employees or average annual receipts). The Table of Small Business Size Standards[4] (the "NAICS Size Standards") is almost 50 pages long and includes hundreds of categories with varying thresholds for determining if an entity is a small business. If an entity has not had reason to review the NAICS Size Standards (e.g., the entity does not bid for government contracts or receive certain government loans), trying to learn and understand them would be a daunting task. In fact, if small businesses are required to know and provide information on where they fall within the NAICS Size Standards, the effect may be the opposite of what Dodd-Frank hopes to accomplish. Instead of ensuring access to credit for small businesses, these businesses may shy away from obtaining credit because they are not familiar with the NAICS Size Standards and do not have the internal resources or means to retain external resources to perform the analysis.

The large number of categories and varying thresholds in the NAICS Size Standards would likely lead to inconsistent application and, in turn, inconsistent data reporting under the Rule. Under the NAICS Size Standards, there is a unique threshold for each industry used to determine if a business within the industry is a small business. This means that two businesses with the same number of employees and same average annual receipts but different NAICS categories could be classified differently—one as a small business and the other not as a small business. Also, businesses may wrongly classify themselves and thus provide the Data Points when they should not do so, or not provide the data when they should. Inconsistent application is contrary to the purpose of Section 1071, in part which is to facilitate enforcement of fair lending laws. The CFPB would not be able to rely on or use the reported data in the aggregate for analysis or otherwise because it would be impossible to know whether the NAICS Size Standards were applied accurately.

Rather than using the NAICS Regulations, which are lengthy, complex, and use varying thresholds for determining whether a business is a small business, AFSA recommends that the CFPB use one bright-line threshold that is easy to apply. A simple gross revenue test based on the entity's previous year's revenue would be easy to apply because revenue (also referred to as "income") is often part of the application process today and would not require reference to or analysis using third-party documents (e.g., the NAICS Size Standards) or additional steps. Gross revenue is also one of the Data Points that financial institutions must submit to the CPFB under Section 1071. Applicants will likely have revenue information for the previous year on hand to provide during the application process, but may not have information beyond the previous year's revenue readily available. Using the gross revenue test, the CFPB could use the Community Reinvestment Act's (CRA) definition of small business; businesses with gross annual revenues of $1 million or less. The CRA definition coincides with the threshold used under the ECOA (the law amended by the Dodd-Frank Act) for the adverse action notifications required for business credit applicants.[5] Thus, using a test of gross annual revenue of $1 million or less would be internally consistent with other provisions of ECOA and with the CRA.

---

[4] U.S. Small Business Administration, *Table of Small Business Size Standards Matched to North American Industry Classification System Codes*. Jan. 1, 2012. Available at
https://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf
[5] 12 C.F.R. § 1002.9(a)(3)

AdminRecord-024293

Some may ask how to apply a gross annual revenue test to new businesses. We ask that the CFPB specify in the Rule that in a "buy/sell" situation where an applicant was involved in an asset sale in the previous year, the new entity's gross annual revenue should not be assessed at zero, but at the level of the previous owner's revenue the previous year. Otherwise, it is possible that large businesses will fall within the small business definition because they do not have income from the prior year. This approach is consistent with the approach in at least one large industry, as financial institutions often base credit decisions for dealerships involved in changes of ownership on the previous owner's gross annual revenue.

Furthermore, using a gross revenue test of $1 million or less to identify small businesses would cover the overwhelming majority of small businesses, minority-owned businesses and women-owned businesses. The RFI states "… a definition of small business as businesses with annual revenue of $1 million or less covers approximately 95% of all firms, over 97% of all minority-owned firms, and over 98% of all women-owned firms."[6] Conversely, using a definition that includes businesses with annual revenues of over $1 million would change the Rule from a "small business" rule to an "every business" rule.

AFSA recommends against using a definition based on number of employees, primarily because that number may not be representative of the size of the business. The number of employees necessary to run a business can vary based on industry. In addition, having different employee volume thresholds for different industries would be overly burdensome to apply for both applicants and financial institutions. Capturing the number of employees adds an unnecessary level of complexity by requiring the business to determine who is an employee (temporary workers, agency employees, part-timers, etc.). Businesses likely do not bring information on the number of employees with them when applying for credit (e.g., the entity likely would not bring that information to a dealership when purchasing a vehicle), and financial institutions do not capture information on the number of employees as it is not relevant to making a credit decision. Requiring applicants to provide information on how many employees they have would slow the credit approval process and hinder access to credit. It is also important to note that it is likely that original creditors involved in indirect lending will push back greatly on increased requests in the credit application process—especially requests for information not relevant to creditworthiness or otherwise required to be submitted under Section 1071. Therefore, instead of using a definition based on the number of employees, the preferred measure is gross annual revenue.

     *2. What definitions of "small business" do financial institutions currently use internally or for external reporting purposes?*

          *a. What factors are used to define a "small business" (such as revenue of the business applicant)? If more than one factor is used, are those factors considered individually or in combination?*
          *b. What minimum or maximum thresholds are used to define a "small business"?*
          *c. Are certain types of small businesses excluded or treated differently under the definitions?*
          *d. Do the definitions take into account entities that are related to the small business applicant (such as parents, subsidiaries, affiliates, etc.)?*

---

[6] 82 FR 22319

AdminRecord-024294

Many nonbank financial institutions do not use a definition of "small business" for internal purposes or external reporting purposes. Banks generally use the CRA definition of a small business.

## II.    Data Points

*3. What data standards regarding information on small business financing are financial institutions currently subject to or using? Data standards are rules by which data is described and recorded using standardized formats and meanings for purposes such as sharing, exchanging and analyzing data. Examples could include governmental reporting or recordkeeping requirements, as well as standards associated with credit bureaus, data repositories, trade associations, accounting standards, or securitization or guarantee programs.*

> *a. What information is being collected, reported, or disclosed using these data standards?*
> *b. Are these data standards applicable at the loan level, on an aggregate basis, or some combination of the two?*

Nonbank financial institutions neither collect nor report data on small business financing. Banks do so in connection with the CRA.

*4. What information concerning the data points specifically identified for reporting under section 1071 by Congress[7] do financial institutions collect and maintain in the ordinary course of business concerning their small business lending?*

Financial institutions, particularly nonbanks, currently collect very few of the Data Points required by Section 1071 in the ordinary course of business. (See the Appendix for an explanation of the indirect auto financing originations process for one captive automotive finance company.) Collecting, maintaining, limiting access to, and reporting this information will require development of new systems and significant changes to existing systems and processes. The cost of these new systems and changes to existing systems and processes will likely be in the multi-millions of dollars for even a small financial institution. Below is a more detailed explanation of what information financial institutions collect.

---

[7] The data points identified for reporting under section 1071 include:
- Application number;
- application date;
- type and purpose of the financing;
- amount applied for;
- amount approved;
- type of action taken and action taken date;
- census tract of the principal place of business;
- gross annual revenue in the last fiscal year of the applicant preceding the date of the application; and
- information about the race, sex, and ethnicity of the business principal owners.

AdminRecord-024295

- **Application number and date**: Some nonbank financial institutions assign offering numbers and capture the date the credit application is received by them as the offering date (as opposed to the date the applicant completed the application). Other financial institutions do not assign application numbers.

- **Type and purpose of financing**: Financial institutions receive limited information on the type and purpose of financing from the applicant. Indirect automotive finance companies know from the credit offering whether an applicant is seeking to finance a purchase or a lease and for what vehicle. Different financial institutions collect different information about the "purpose" of the credit. Some financial institutions may only ask the applicant to designate whether the credit requested is for "personal, family, or household use" or "business, commercial, or agricultural use." The purpose is a factor in determining whether the applicant is eligible for special programs of the finance company and determines the scoring model that is used for the applicant. In some cases, the "purpose" is a field on the credit application and/or the contract but may not be tracked as a unique field in the finance company's system of record.

  Additionally, sometimes an application may be submitted for business credit and ultimately underwritten by the finance company as personal use and vice versa. AFSA recommends the Rule require financial institutions to submit the Data Points on applications submitted for business credit by entities meeting the small business definition at the time the application is submitted to the financial institution for consideration, regardless of how the contract is ultimately underwritten (whether for personal or business use). The determination as to whether the requisite Data Points must be collected from the applicant should be done at one point in time—at the time of application for credit—so that the data collection does not slow down or halt the credit process and there is one consistent point in time at which the data is collected and submitted.

- **Amount applied for and amount approved**: Financial institutions receive information on the amount applied for and maintain information on the amount approved. More specifically, they maintain information on whether the financing was approved or denied; whether a counter offer was extended (e.g., the applicant wanted to put 10% down and the finance company required 25%; or the applicant wanted a term of 3 years, but the finance company countered with 5 years; or the applicant requested $10,000 but the finance company offered only $7,500); or whether the application was incomplete (either the application was incomplete or the finance company asked for more information and has not received it).

- **Type of action taken**: If the CFPB defines "type of action taken" as whether or not the application was approved, withdrawn, cancelled, or denied, then yes, financial institutions do maintain that information. They also maintain the date of the action taken.

- **Census tract of principal place of business**: Financial institutions do not collect information on the census tract of the principal place of business. Financial

6

institutions receive the applicant's address in the credit application. Virtually no financial institutions would know the census tract, and requiring such information would necessitate programming and increased costs of compliance.

- **Gross annual revenue in fiscal year preceding application**: Many, but not all, financial institutions collect gross annual revenue or some variation of income or revenue information.

- **Information about race, sex and ethnicity of business principal owners**: Under ECOA, financial institutions cannot collect information about the race, sex, and ethnicity of applicants.[8]

> *a. What sources of information do financial institutions rely on in obtaining this data, including, for example, applicant self-reporting, specific documents used by financial institutions to obtain this data, or third party sources?*

Financial institutions rely on a combination of self-reporting, documentation and third-party sources, depending on the amount financed and the credit risk. For instance, a finance company may obtain a credit report and credit history on an applicant when financing a lawn tractor for $2,500. But, if the financial institution is financing a fleet of delivery vans for $300,000 and the applicant has marginal credit history, the financial institution may ask for documentation—a tax return, for example.

> *b. What technological or other challenges do financial institutions foresee in collecting and reporting this data (such as the manual compilation of information, the lack of an electronic system for maintaining this information, the potential for this information to be found in multiple systems within a financial institution, etc.)? What steps can the Bureau take within a business lending data collection rulemaking to minimize the challenges?*

One significant challenge is that many AFSA members are financial institutions that engage in indirect lending and thus do not have direct contact with applicants to collect the Data Points. To minimize this challenge, the Rule should require financial institutions to collect and report the Data Points only from applicants that self-identify as businesses and that meet the small business definition at the time of application. Financial institutions also should be able to rely on the information submitted by the applicant in its request for credit and should not be subject to any independent verification requirements regarding the information.

Another challenge is the obligation to keep certain Data Points separate and unavailable to those employees making credit decisions. If the Data Points are collected during the credit application process, financial institutions will have to build the ability to segregate that data in their systems, including in imaging systems if credit applications are imaged. These changes could be very costly and involve significant changes for financial institutions and other parties involved (e.g., auto dealers) in indirect lending situations. One way to address this challenge is to have a unique form

---

[8] 12 C.F.R. § 1002.6(9)

7

AdminRecord-024297

for businesses to fill out to determine whether they are small businesses and to provide the Data Points if they are in fact small businesses. The form could first ask the applicant to provide the information needed to determine whether the entity is a small business (preferably annual gross revenue for the previous year, as explained in more detail earlier in this response letter). Then, there can be the list of Data Points with spaces for the applicant to provide the information. The CFPB could develop a model form for this purpose.

A potential step that the CFPB could take to minimize the challenges to financial institutions is to require applicants to register directly with the CFPB. Under this approach, each business entity applicant would have to register on-line with the CFPB and provide all of the required Data Points. The applicant would then be assigned a unique CFPB business identification number. Financial institutions would then ask applicants: (1) will the credit proceeds be used primarily for a business purpose; and, if the answer is "Yes" (2) provide your CFPB business identification number, or, if you do not have that number, register with the CFPB and get that number. Financial institutions would then report the unique identifier numbers to the CFPB. The CFPB, in turn, would use its records to determine if the reported loan is to a "small business" and all reporting of other data fields on those small business borrowers would be done only by the CFPB.

> *c. With respect to which data points, if any, among those specifically identified by Congress in Section 1071, do financial institutions currently not collect any information?*

Please see the response to Question #4 above.

> *5. The Bureau understands that applications for small business financing may vary both by financial institution and by the business credit product. How do financial institutions integrate data collection into their application process?*

Financial institutions request and collect only the information they need to assess creditworthiness and for underwriting purposes. For financial institutions engaged in indirect auto financing, dealerships usually submit the applicant's information (sorted into data fields) to the financial institution, and the financial institution puts the data through its credit origination system. The financial institution may approve, deny or condition the offering. The financial institution also may request additional information from the dealership (e.g., proof of income). An explanation on how one AFSA member that engages in indirect auto financing obtains information through the credit application process is included in the Appendix.

Financial institutions will have to make significant systems and process changes to collect and submit the Data Points under the Rule.

> *a. When are different data collected in the process (such as at the time of initial application, during the application process, or near the end of the process)?*

The data is collected at the time of initial application. This is especially true for financial institutions who are not original creditors and who purchase contracts initiated by dealers. It is not feasible to go back and collect the Data Points after the application has been submitted and the

8

credit decision made. This is especially true for financial institutions who are not original creditors but will be subject to the Rule. Such financial institutions have no direct contact with the applicants during the application process. In the indirect auto finance industry, auto dealers are the original creditors in the transaction but they are not subject to rulemaking or enforcement by the CFPB. By the time the application is submitted by the dealer to the financial institution, the customer may already have been extended the credit requested. The applicants would have no incentive to cooperate and provide additional information and may even balk at the request for new information—especially that of a sensitive nature (race, sex, ethnicity) —if the credit has already been granted or denied.

> *b. What verification procedures are used?*

In indirect financing, the financial institution does not have direct contact with the applicant during the application process and thus has limited opportunities to verify information provided. The financial institution relies on the entity obtaining the information from the applicant—in indirect auto financing, the dealership—to obtain and verify information from the applicant. Imposing verification requirements on financial institutions would be inconsistent with the indirect lending model. The financial institution is not the original creditor in those transactions and only purchases completed retail contracts and leases. Often the credit is extended prior to the financial institution receiving the application.

> *c. Are certain data not collected or more difficult to collect if the application is not originated and instead is withdrawn, denied, or involves a counteroffer?*

Yes. Once the application is denied or withdrawn, there is no "relationship" between the applicant and the creditor and thus no basis upon which a creditor can ask for additional information and certainly no basis upon which an applicant would have any incentive to provide additional information to the creditor.

> *d. Are different data collected for different types of credit events (such as renewals, line increases, etc.)?*

Yes. See the answer to Question #14 below.

> *e. What systems, whether proprietary or provided by a third party vendor, are used by financial institutions to collect and maintain the data?*

Collecting and reporting the Data Points will require systems changes and potentially new systems for financial institutions and related third parties (e.g., auto dealers in the indirect auto finance space). Financial institutions do not collect all Data Points today and likely d o not have a process to segregate some of the data as required by Section 1071.

> *f. How does data collection differ according to business credit product?*

Data collection is different at the time of first application than for renewals. Again, the process i s outlined more thoroughly in the answer to Question #14.

AdminRecord-024299

*6. Considering the data points specifically identified by Congress for reporting in section 1071:*

> *a. What concerns, if any, do financial institutions have about the possibility of misinterpretations or incorrect conclusions being drawn by regulators from the collection of the data provided for in Section 1071 or by the public from potential release of these data in a manner protective of privacy interests?*
> *b. Are there limited additional data points that could be readily reported and potentially disclosed that would mitigate these concerns and reduce the risk of misinterpretation or help reduce incorrect conclusions?*

Financial institutions have several concerns about the possibility of misinterpretations or incorrect conclusions being drawn by regulators and others from the collection and release of this data. First, the information provided by applicants may be inaccurate. Financial institutions will need to rely on information for the Data Points submitted by credit applicants, but the credit applicants will be under no obligation to report accurate information. Second, the Data Points submitted to the CFPB will show raw approval and denial rates without including any consideration of credit quality. This means that the data could suggest financial institutions are not extending credit to a protected class but will not show the justifiable business reasons why such denials are appropriate—such as a lack of credit history.

And third, in some industries, the data may not be useful or could lead to inaccurate conclusions. For example, the data are highly likely to show a large percentage of financing for agricultural equipment will be made to white men. This is not due to discrimination, but to the fact that most farming in this country is done primarily by white men. According to the U.S. Department of Agriculture, in 2012 of the 2.1 million principal operators in the United States, 288,264 were women, 67,000 were Hispanic, 37,851 were American Indian, 33,371 were Black, and 13,669 were Asian.[9] In other words, almost 80% of farmers are white men.

AFSA has not identified any additional Data Points that could be readily reported and potentially disclosed that would mitigate these concerns, reduce the risk of misinterpretation or help avoid incorrect conclusions.

> *7. What information about the type of business (such as NAICS code or other industry information) of a small business applicant do financial institutions currently collect? What challenges might financial institutions have in potentially collecting this information under section 1071?*

Financial institutions do not collect NAICS code or other industry information from small business applicants. It would be difficult to collect this information because many applicants would not know the applicable code. Please see the response to Question #1 above for details.

---

[9] U.S. Department of Agriculture. *2012 Census Highlights: Farm Demographics - U.S. Farmers by Gender, Age, Race, Ethnicity, and More.* May 2014. Available at:
https://www.agcensus.usda.gov/Publications/2012/Online_Resources/Highlights/Farm_Demographics/

AdminRecord-024300

*8. What information about the number of employees of a small business applicant do financial institutions currently collect? What challenges might financial institutions have in potentially collecting this information under section 1071?*

Financial institutions do not collect information about an applicant's number of employees. There would be no purpose in collecting such information because the number of employees is not relevant to creditworthiness. In fact, collecting this information could harm the applicant by slowing down the application process because the number of employees likely will not be information the applicant has on hand when applying for credit. Please see the response to Question # 1 above for a more detailed explanation.

*9. In section 1071, Congress requires financial institutions to collect and report information on whether an applicant is a women-owned, minority-owned, or small business and the ethnicity, race, and sex of the principal owners of the business. Section 1071 provides for limitations on access to certain information, including an applicant's minority-owned or women-owned business status, by underwriters, where feasible, and provides for limited access in certain circumstances determined by the financial institution with notice to the applicant.*

> *a. What challenges do financial institutions foresee in complying with these requirements with respect to applications by small businesses, including any potential challenges in identifying the principal owners of the business and reporting demographic information about them?*

Financial institutions foresee several challenges in complying with the requirement to report the Data Points, including an applicant's minority-owned or women-owned status and the ethnicity, race and sex of the principal owners of the business. For financial institutions engaged in indirect lending, a significant challenge is that the financial institution does not have direct contact with the applicant during the application process. The Data Points presumably will be collected during the application process, so financial institutions engaged in indirect lending will have to rely on the original creditor (e.g., an auto dealer in the indirect auto finance industry) to collect and provide the requisite Data Points to the financial institution.

Another challenge is that applicants may not want to provide or may be apprehensive about providing the Data Points, especially if they have previously participated in credit transactions in which the Data Points were not requested. A third challenge is that the individual submitting a credit application for a business entity may not be an owner of the business or may not know the ethnicity, race or sex of the business' principal owners. Or, the applicant may provide inaccurate information about the principal owners. This could slow down the credit process and hinder access to credit.

In addition, collecting the Data Points will involve significant system, process, procedure and training changes for financial institutions, particularly with respect to building out a mechanism to obtain and track the Data Points separately from the application process and application documents available to underwriters.

11

AdminRecord-024301

Financial institutions are also concerned about the risk inherent in collecting ethnicity, race and sex data. ECOA prohibits financial institutions from collecting ethnicity, race and sex data. Requiring financial institutions to collect and report such data will be a shift in practice since those Data Points are not collected today to ensure compliance with ECOA. In fact, some financial institutions do not even collect or keep items such as driver's license images to avoid any potential allegations of discrimination on the base of ethnicity, sex, race, or any of the other protected bases. The Rule should recognize that financial institutions, if required to start collecting this demographic information, are potentially going to be subject to increased risk under ECOA. Financial institutions will need to develop and implement processes to mitigate such risk, which will involve a lot of time and money. Ample time will be needed to create systems and processes to adequately segregate race, sex and ethnicity data from the credit decision and underwriting processes.

> *b. In what situations, if any, may it not be feasible to limit underwriter access to this information?*

For some financial institutions engaged in indirect lending, there may be multiple points at which information is coming in to the financial institution. For example, one such financial institution engaged in indirect auto lending uses a two-step process—first, a credit analyst reviews the credit information for an applicant that comes in electronically. It is possible that the original creditor in the transaction, the auto dealer in this example, may wait to extend credit until it receives the decision from the financial institution, or may have already extended the credit to the customer. If the applicant is approved, the dealer then submits the contract documents to the financial institution for review by underwriter discounters. In both cases, the financial institution would need to put systems and processes in place to segregate the Data Points from its employees at both steps in the process.

In the case of traditional installment lenders, with offices staffed by two to three people, and walk-in applicants, it would be impossible to limit an underwriter's access to this information without dramatically increasing the overhead costs and business models of these lenders.

Financial institutions will need to review the proposed Rule to determine in which situations limiting underwriter access may not be feasible since it is u nclear at this stage in the Rulemaking what will be required to be reported and when.

> *c. What steps can the Bureau take to minimize burden on financial institutions and applicants and facilitate compliance with the requirements to identify the principal owners of the business and report demographic information about them?*

The CFPB should permit financial institutions to rely on and report the information provided by applicants or the original creditor without any independent verification by the financial institution. The CFPB should also provide categories from which applicants can select to identify race and ethnicity. And, the CFPB should provide model language that financial institutions can use to tell applicants that the information request is required by federal law, that the applicant does not have to provide the requested information, and that there is no negative consequence to not providing

AdminRecord-024302

the information. This could be similar to the guidance under the Home Mortgage Disclosure Act (HMDA). The CFPB should limit the race/ethnicity categories to those options in HMDA.

### III.    Financial Institutions Engaged in Business Lending

*10. Section 1071 allows the Bureau to exercise exemption authority to exempt certain classes of financial institutions from collecting and reporting pursuant to a business lending data collection rule as the Bureau deems necessary or appropriate to carry out the purposes of section 1071.*

> *a. Should certain classes of financial institutions be exempt from a small business lending data collection rule?*

Financial institutions should be exempt from this Rule if they meet certain criteria. For example, financial institutions could be exempt if they: (1) originate fewer than 100 loans to small businesses, (2) finance fewer than 100 small business customers or (3) are a small business themselves (defined either as a business with fewer than 100 employees or a business that meets the SBA's definition of a small business - $35.5 million in annual receipts for non-depository institutions). It could cost millions of dollars to implement the data collection and reporting requirements required by Section 1071. The information gathered from fewer than 100 loans or customers would not be worth the millions of dollars it would cost to gather and report that information.

Furthermore, because the rulemaking is focused on small business lending, it would be appropriate for the CFPB to exempt financial institutions that only make loans or offer financing for personal, family, or household purposes and do so under statutes governing consumer lending, not commercial lending.

> *b. Are there data or data sources available that could inform the Bureau's decision to exempt certain classes of financial institutions (such as the size, type, or lending characteristics of the financial institution or types of small business credit products offered by the financial institution)?*

AFSA is not aware of a way to obtain this data on non-bank financial institutions.

> *11. What are the roles of lending marketplaces, brokers, dealers and other third parties in the small business lending application process (such as in taking an application and in making a credit decision on an application)?*

AFSA takes this opportunity to reiterate that indirect automotive finance companies do not interact with applicants directly, but rely on the applications submitted by auto dealers (see the Appendix). AFSA understands that the Federal Reserve Board is planning to issue a similar rule under Section 1071 that would apply to dealers. However, there could be a situation where the information is not being provided by dealers. If that is the case, AFSA members should not be deemed in violation of the Rule.

AdminRecord-024303

For traditional installment lenders, the applicant applies directly, either in person on online. Brokers and third-parties are not involved in the origination process other than perhaps informal referrals.

### IV.    Access to Credit and Financial Products Offered to Businesses

> *12. What business credit product types are currently offered to small businesses by financial institutions as defined in section 1071, and for which product types is data collection and reporting most important for furthering the purposes of section 1071?*

Many business credit product types are currently offered to small businesses by financial institutions. AFSA members offer the following credit product types to small businesses: dealership financing (franchise acquisition, facility improvement, wholesale inventory financing, working capital lending, etc.), automotive financing and leasing, chassis financing, equipment financing, parts and services financing, agricultural livestock and crop inputs, and credit card lending. Traditional installment lenders market to consumers and do not lend to businesses. Rather, such loans are for personal, family or household purposes.

> > *a. In addition to term loans, lines of credit, and credit card products, are there other business credit products that are an important source of financing for small businesses?*

Leases are also an important source of financing for small businesses.

> *13. How do financial institutions define an application for business credit products? How, if at all, does a financial institution's definition of an application vary for different types of products offered to small business applicants?*

The applications and application processes significantly vary by credit product type and financial institution. Some products require a formal application be submitted to the financial institution. However, depending on the nature of the product and existing relationship between customer and financial institution, additional credit may be granted without further application.

For instance, dealership financing encompasses several different products. Floorplan financing is a revolving line of credit. These lines of credit get reviewed periodically, but only the initial financing approval requires a formal application process—see the answer to Question #14. A financial institution may allow various dealership financing products (e.g., term loans) to b e requested verbally, with the credit decision occurring without the submission of an application.

Applications for the financing of vehicles may vary depending on whether they are trucks or cars and whether they are leased. Some finance companies have a number of different credit applications for businesses, depending on the type of business and on what the applicant purchases and finances, Others have one application for business credit and another for personal. (See the Appendix for more information.)

AdminRecord-024304

> *a. Under what circumstances are preapproval, prequalification, and similar assessments made and what information is typically collected and evaluated during such assessments?*

Preapproval, prequalification, and similar assessments are not generally made for business applicants.

> *14. Under what circumstances (such as renewal, line increase, etc.) would a credit review occur on an existing credit facility?*
>
> > *a. In what circumstances would the credit review be initiated by the borrower? In what circumstances is the credit review initiated by the financial institution?*
> > *b. For each circumstance, what information is collected as part of the credit review? How would such a credit review differ, if at all, from an application submitted on a new credit facility?*
> > *c. For each circumstance, what are the types of action taken?*

Different financial institutions perform credit reviews on existing credit facilities in different ways. Fleet customers and dealerships with wholesale inventory financing may be subject to annual credit reviews. These customers have lines of credit and each financial institution has its own process for reviewing those lines. Such review may occur without any input or awareness from the customer. Each receivable has an approval process and part of that includes a review of what is in the line.

Other financial institutions offer revolving credit card accounts. Depending on the financial institution, a credit report is pulled each quarter on the customer and a review on the account is completed. A credit review may also happen if the customer asks for a higher credit limit. In that case, the financial institution may pull and review the customer's credit report and review the customer's past performance.

AFSA strongly advises against a Rule requiring financial institutions to collect and report Data Points for customers at each credit review. Instead, AFSA recommends that financial institutions collect and report the Data Points with respect to existing credit facilities once, at the time of account origination. Periodic credit reviews are usually not requested by the customer and may result in no action being taken relative to the customer's account. Reporting these non-events would inundate the CFPB with a massive amount of data that in all likelihood will be extremely repetitive and not very useful. If financial institutions did have to report each time they review a record, it is likely that the application and servicing process for open-end credit would become more complicated and expensive, and, possibly, access to open-end credit could become more limited.

Similarly, data should never have to be collected and reported on payment schedule deferral requests, requests for loan terms modifications or refinancing of existing business loans with no new funds advanced. Requiring collection and reporting for such events would make the servicing of small business loans more difficult and expensive.

15

AdminRecord-024305

*15. What challenges do small businesses face in accessing credit? What obstacles do women-owned or and minority-owned small businesses in particular face in accessing credit?*

The biggest challenge that small businesses face in accessing credit is that they often do not have an established credit history. This is the same challenge that many consumers face as well.

Another challenge is that small businesses are often a credit risk. Running a business can be difficult, and according to USA Today and the SBA, "Roughly 20% of new businesses survive past their first year of operation. … However, around half of all businesses no longer exist after five years. Only one-third make it past their 10th anniversary."[10] Many small businesses cannot be open for business until they get financing. Adding burdensome reporting, with all of its increased costs, to this already risky business, will create additional barriers to small business creation and survival.

### V.    Privacy

*16. What privacy-related concerns for applicants and confidentiality-related concerns of financial institutions are implicated by the statutorily-mandated data points in section 1071? For example, are there particular statutorily-mandated data points or a combination of data points that, if released to the public, may be harmful to applicant privacy or financial institution confidentiality? Are there particular statutorily-mandated data points or a combination of data points that may pose a risk of re-identification if released to the public?*

If combined or if released to the public, the Data Points may be harmful to applicant privacy as well as financial institution confidentiality. Of particular concern is the combination of "census tract of the principal place of business" and the "type and purpose of financing." With those two Data Points, it could be possible to tie the data to a specific small business. Also, if the "type of action taken" is made public, financial institutions may be able to figure out competitors' credit scoring models, and identify which entities were denied credit. For reputation and business purposes, applicants would not want information on financial institutions denying them credit made public.

*17. What steps can the Bureau take to mitigate such privacy or confidentiality-related concerns consistent with the purposes of section 1071?*

To mitigate privacy and confidentiality-related concerns, the Rule should require financial institutions to aggregate the Data Points when submitting them to the CFPB, and the CFPB should further aggregate the Data Points if and when making such information available publicly.

It is important to aggregate the data that is collected. Aggregating the data maximizes the privacy of applicants and borrowers, and furthers the confidentiality interests of financial institutions. The

---

[10] Speights, Keith. *Success Rate: What Percentage of Businesses Fail in Their First Year?* USA Today. May 21, 2017. Available at: https://www.usatoday.com/story/money/business/small-business-central/2017/05/21/what-percentage-of-businesses-fail-in-their-first-year/101260716/

AdminRecord-024306

Rule should require financial institutions to aggregate the Data Points when submitting them to the CFPB, and the CFPB should further aggregate the Data Points if and when making such information available publicly.

## VI.    Conclusion

AFSA appreciates the opportunity to comment on the RFI. We support the CFPB's focus on small businesses lending. At the same time, we stress that the Rule should require financial institutions to collect and report the Data Points only from applicants that self-identify as business entities at the time of application and that meet the small business definition. We also emphasize that financial institutions should be able to rely on the information submitted by the applicant in its request for credit and should not be subject to any independent verification requirements regarding the information. And lastly, we reiterate that the Rule should define "small business" using a gross annual revenue threshold with the determination made based on the revenue information provided in an applicant's request for credit.

Please contact me by phone, 202-466-8616, or e-mail, bhimpler@afsamail.org, with any questions.

Sincerely,

Bill Himpler
Executive Vice President
American Financial Services Association

AdminRecord-024307

## APPENDIX

### I.    *Captive Auto Financing*

Captive auto finance companies purchase completed retail installment sale contracts and leases entered into between retail customers and motor vehicle dealers for the sale and financing or lease of vehicles. When a customer purchases or leases a vehicle from a dealer, the customer and the dealer agree on the purchase price of the vehicle and the purchase of any insurance, service contracts and other products offered by the dealer. If the customer elects to finance or lease the vehicle through the dealer, the customer and the dealer decide on the terms of the retail installment sale contract or lease. For a retail installment sale contract, the amount financed is the purchase price of the vehicle less any vehicle trade-in, down payment and cash payments from marketing programs offered by the manufacturer, plus taxes, additional products such as insurance and service contracts, dealer installed accessories, outstanding balances on turn-in or trade-in vehicles and other fees and charges the dealer agrees to pay on behalf of the customer. It is a similar calculation for the adjusted capitalized cost of a lease.

Each customer that elects to finance or lease through the dealer completes a credit application. If the dealer is requesting that the captive auto finance company purchase the retail installment sale contract or lease, the dealer submits the information from the credit application electronically to the captive auto finance company, typically through online systems, together with information about the proposed terms of the retail installment sale contract or lease. It is important to note that it is not the credit application completed by the customer itself that is submitted, but information from that credit application that is the "application" considered by the captive auto finance company. This information may be submitted by the dealer prior to completing the retail installment contract or lease with the customer or after the contract or lease has already been completed and the customer has the vehicle.

On receipt of the application, the captive auto finance company automatically obtains a credit report on the applicant from a national credit bureau, which includes a credit score and other credit information. In a small number of cases, a credit report is not available because an applicant does not have a sufficient credit history. The captive auto finance company also automatically obtains other information on the applicant including results of compliance and fraud checks, whether the applicant has other active credit applications, whether the applicant is a current or former customer, and in some cases, other available credit information.

The first step the captive auto finance company takes on receipt of the application is to classify the applicant based on whether the vehicle is being financed or leased, whether the applicant is an individual or business entity, the applicant's credit profile and whether the vehicle being financed is new or used. This classification determines the particular origination scoring model to be used. The captive auto finance company's origination scoring models assess the creditworthiness of the applicant using the information in the applicant's credit application, the proposed terms of the retail installment sale contract and the applicant's credit bureau data and other information. The origination scoring models are statistical tools used to differentiate credit applicants based on their probability of paying the amounts due under their contracts.

AdminRecord-024308

After all information is obtained, the captive auto finance company evaluates it to determine whether to approve the application. The decision process is based on a judgmental evaluation of the applicant, the credit application information, the proposed terms of the contract, credit bureau information, and other information. The evaluation emphasizes the applicant's ability to pay and creditworthiness, focusing on payment, affordability, applicant credit history and stability as key considerations. The creditworthiness of any co-applicant or guarantor is evaluated in a similar manner to the applicant and is also considered when determining whether to approve an application.

All applications automatically go into an electronic decision process in order to expedite the review of applications, promote consistent decisions and allow the captive auto finance company to make and communicate decisions to dealers faster and more efficiently. Electronic approval and rejection decisions are made using models that generally replicate the judgmental evaluation that would be applied by an experienced credit analyst based on various combinations of factors that have resulted in credit analyst approval or rejection. Applications that are not electronically approved or rejected are sent to a credit analyst for review.

On receipt of an application, the credit analyst judgmentally evaluates it using uniform system processes and system based decision-making tools in the framework of the captive auto finance company's purchasing standards. Each application is reviewed separately and the credit analyst makes an individual decision based on the credit analyst's assessment of the strengths and weaknesses of the application. The credit analyst may work with the dealer to determine acceptable contract terms for applications that cannot be approved as originally submitted. The credit analyst may condition approval on the addition of a qualified co-applicant or guarantor or on modifications to the financing terms, such as a higher cash down payment or a less expensive vehicle. For less creditworthy applicants, or if there is a discrepancy in the information provided by the applicant, the credit analyst may verify the identity, employment, income, residency and other applicant information.

For approved applications, dealers must submit the retail installment sale contracts and leases, signed by both the customer and the dealer, on paper or electronic forms approved by the captive auto finance company and determined to be in compliance with law and enforceable. After the dealer submits a completed contract or lease, the captive auto finance company confirms that the terms of the contract or lease are consistent with the application approval and checks for errors apparent in the disclosures made by the dealer. If the contract or lease is consistent with the approval but contains minor errors, the captive auto finance company may purchase it and send a correction notice to the customer or obtain a signed modification from the customer. If the contract or lease is not consistent with the approval or has more significant errors, it is returned to the dealer for correction or replacement.

All contracts and leases purchased are entered into the captive auto finance company's originations and receivables systems and assigned a unique account number for their duration.

19

AdminRecord-024309

## II.  Other equipment financing

Captive finance companies purchase retail and lease contracts from dealerships and make direct loans to customers. The customer selects the application for the purpose of the financing (consumer versus commercial use) and for the credit product (installment versus revolving). When the dealership submits a credit application to a captive finance company on behalf of an applicant, it does so electronically. The dealership submits the application in data points—it is not an image of the credit application. When the finance company is making the credit decision on the applicant, the finance company knows whether the retail installment contract or lease is primarily for personal or business purpose. The application document is retained by the dealer.

The finance company may seek additional information from the applicant to make the credit decision (financial statements, etc.). The deal is documented on the finance company's consumer or commercial credit paper provided to the dealer, with all of the required disclosures.

All leasing applicants are required on the application and the lease agreements to confirm that the leased equipment will not be used primarily for personal family or household use and consumer leases are not offered or provided.

## III. Commercial use revolving (credit card) financing

A captive finance company affiliate provides revolving credit (credit card) financing. The customer selects the application for the purpose of the financing (consumer versus commercial use) and for the credit product (equipment use type). When the dealer or other retailer submits a credit application to the captive finance company affiliate on behalf of an applicant, it does so electronically. The dealer or other retailer submits the application in data points—it is not an image of the credit application. When the finance company affiliate is making the credit decision on the applicant, it knows whether the requested revolving account will be primarily for personal or business purpose. The application document is retained by the dealer.

The finance company affiliate may seek additional information from the applicant to make the credit decision (financial statements, etc.). The deal is documented on a consumer or commercial revolving credit application and credit agreement provided to the dealer or other retailer, with all of the required disclosures. Once the account is created, it can be used to finance purchases of small equipment, parts, service, and other eligible goods and services, at thousands of dealers and other retailers nationwide who have signed a merchant agreement with the captive finance affiliate. The customer account is periodically reviewed to determine if the credit limit is appropriate and accounts may be closed or restricted if circumstances warrant.

AdminRecord-024310

**Independent Bankers Association of Texas**

Bradley H. Tidwell
IBAT Chairman
VeraBank, Henderson

Thomas C. Sellers
IBAT Chairman-Elect
Alliance Bank, Sulphur Springs

K. Kyle Irwin
IBAT Secretary-Treasurer
Western Bank, Gruver

Peter Smith
Leadership Division Chairman
American Momentum Bank, Lubbock

Glen C. Thurman
IBAT Education Foundation Chairman
First National Bank of Moody

Richard F. Scanio
Immediate Past Chairman
American Bank, Corpus Christi

Christopher L. Williston VI, CAE
President and CEO
IBAT, Austin

Ursula L. Jimenez, CAE
Chief Operating Officer
IBAT, Austin

Stephen Y. Scurlock
Director of Government Relations
IBAT, Austin

Curt Nelson
Director of Membership
IBAT, Austin

Christy Bussey
Director of Growth and Development
IBAT, Austin

Julie Courtney, CAE, CMP
IBAT Services Inc. President
IBAT, Austin

Esmeralda Gonzalez, CAE
IBAT Education Foundation President
IBAT, Austin

Karen Neeley
General Counsel
IBAT, Austin

December 14, 2020

Consumer Finance Protection Bureau

Small Business Review Panel

Re: Small Business Advisory Review Panel for Consumer Financial Protection Bureau - Small Business Lending Data Collection Rulemaking

Via email - 2020-SBREFA-1071@cfpb.gov

Greetings,

The following comments are submitted on behalf of the Independent Bankers Association of Texas ("IBAT"), a trade association representing more than 350 independent, community banks domiciled in Texas.

The asset-based exemption under consideration would exempt depository institutions with assets less than one of two possible threshold levels, $100 million or $200 million in assets, to be determined either at the end of the last calendar year or the end of both of the last two calendar years.

Both the $100 million and $200 million total asset threshold are far too low. IBAT member banks average $516 million in total assets. To provide meaningful relief for community banks, the asset level threshold should be significantly higher. The Bureau has often used either $1 billion or $2 billion in total assets as a threshold for making a 'small entity' exempt from certain rules and regulations. We would strongly encourage the Bureau to adopt a threshold more in line with previous 'small entity' exemptions.

Additionally, that threshold should be based upon the end of both the previous two calendar years. This will provide a sufficient period for banks that cross that asset threshold to plan for the considerable procedural hurdles posed by a small business data collection requirement. It will also allow for temporary situations like the Payroll Protection Program that was the driving force behind many community banks having a one-time increase in total assets that was <u>not</u> organic growth.

In addition to the asset-based exemption, the Burau is also considering an activity-based exemption for all financial institutions. The activity-based exemption under consideration would exempt financial institutions with small business lending activity that is less than one of three possible threshold levels: originations of at least 25 loans or $2.5 million; originations of at least 50 loans or $5 million; or originations of at least 100 loans or $10 million, to be determined either at the end of the last calendar year or the end of both of the last two calendar years.

AdminRecord-024979

In order to grant the most relief to community banks across the nation, any activity-based exemption should be at least 100 loans or $10 million. And again, that should be based upon the end of both of the last two calendar years.

Section 1071(h) defines a "small business" applicant as having the same meaning as a "small business concern" in the Small Business Act. The Bureau is considering proposing to define "small business" by cross-referencing the SBA's general "small business concern" definition but adopting a simplified size standard for purposes of its Section 1071 rule that uses one of the following three alternative approaches under consideration:

- Gross annual revenues in the prior year of less than $1 million or $5 million
- Maximum of 500 employees for manufacturing and wholesale industries and $8 million in gross annual revenues for all other industries
- A size standard (for which the Bureau would need SBA approval) using gross annual revenues or number of employees that looks to the SBA's industry specific size standards which are expressed in terms of a business's average annual receipts or average number of employees and that would result in eight different size standards and 13 industry categories.

This is overly complicated and will require machinations at 'application' to determine if small business data collection would apply. A single threshold based upon gross annual revenues provides a more workable solution.

Section 1071 does not define the term "application." The Bureau is considering proposing to define an "application" in a way that is largely consistent with Regulation B, which defines an "application" as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." There should be an explicit 'safe harbor' provision that allows a bank to define what an "application" is.

Section 1071(b) requires a financial institution to inquire whether an applicant for credit is a women-owned, minority-owned, or small business and to maintain a record of the responses to that inquiry separate from the application and accompanying information. Banks subject to the Home Mortgage Disclosure Act are allowed to inquire and collect required data points on and with the application. Banks should have that same option with small business data collection requirements. There should be an explicit 'safe harbor' provision for any bank that inquires and collects required data points on or with the application.

Section 1071(e) requires a financial institution to collect and report "the race, sex, and ethnicity of the principal owners of the business" but does not define "principal owner." The Bureau is considering proposing to define the term "principal owner" in a way that is consistent with FinCEN's customer due diligence rule, which makes a individual the "principal owner" of a business if he or she directly or indirectly through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests in the business. While this is cumbersome, community banks have become accustomed to identifying "principal owners" as "beneficial owners" consistent with FinCEN rules and that should not be changed, nor another variable interjected. In accordance with the FinCEN rules, banks should only have to collect and report required data points once based upon the origination of the note.

AdminRecord-024980

Subsequent transactions should not be subject to the rule unless they involve a note that has satisfied and replaced the original note.

Thank you for this opportunity comment.

Sincerely,

Christopher L. Williston, CAE
President and CEO

**Kathleen C. Ryan**
Vice President & Senior Counsel
Regulatory Compliance and Policy
Phone: 202-663-5478
E-mail: kryan@aba.com

December 14, 2020

**Via Electronic Submission**

Kathleen Kraninger, Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

> **Re: Outline of Proposals under Consideration for Small Business Data
> Collection Rulemaking**

Dear Director Kraninger,

The American Bankers Association[1] appreciates the opportunity to comment on the Consumer Financial Protection Bureau's Outline of Proposals under Consideration for its Small Business Data Collection Rulemaking under 1071 of the Dodd Frank Act.

**Summary of Comments**

We support the Bureau's consideration of the costs to small entities of compliance with section 1071.  In this regard, we appreciate the Bureau's preliminary decision to consider a simple and clear definition of a small business based on gross annual revenues, to cover only lending to *small* businesses, and to allow financial institutions to rely on information provided by applicants. These aspects of the outline help address our members' concerns about the burden of compliance with a section 1071 rule.

We summarize our major comments here:

- The Bureau should calibrate the definition of financial institution to avoid undue burden on small institutions, which would ultimately reduce, rather than increase, lending to minority- and women-owned small businesses.  This involves careful analysis of data, and considering significantly larger asset-level and activity-level exemptions for small financial institutions than those presented in the outline of proposals.

- The Bureau should retain its preliminary decision to simplify the definitions of "small business," "minority- or women-owned" small business, and "principal owners." Reliance on the applicant's statement of gross annual revenue is a simple and clear definition of a small business, in contrast with the statute's reliance on the Small Business Administration's definition and the NAICs Codes.

---

[1]  The American Bankers Association is the voice of the nation's $21.1 trillion banking industry, which is composed of small, regional and large banks that together employ more than 2 million people, safeguard nearly $17 trillion in deposits and extend nearly $11 trillion in loans.

AdminRecord-025002

- The outline's flexible approach on timing of data collection is appropriate and should be retained.  A one-size-fits-all approach to data collection would be very unworkable given the range of products and business models covered.

- The Bureau should adjust the covered products to ensure that the data reflects the full range of small business lending.  Merchant cash advance products should be subject to the section 1071 rule.

- We support the Bureau's reliance on Regulation B's definition of an application, as well as the proposed exclusions.  We have some concerns about coverage of customer-requested line increases and renewals with new credit advanced, and urge the Bureau to carefully consider the burden on these streamlined processes with existing borrowers.

- The Bureau should only require reporting of the mandatory data elements, and should provide guidance on these with the final rule. Financial institutions do not collect NAICs codes, number of employees, and other discretionary data elements the Bureau is considering, and doing so will entail significant burden.

- We urge the Bureau to exercise its authority to consider the infeasibility of a firewall between underwriters and the data on minority- or women-ownership, and the race, ethnicity and sex of principal owners. The Bureau should allow institutions to provide a Bureau-developed disclosure to applicants explaining that there may be access to the data and explain that the institution must not discriminate based on the information.

- We support redaction of the 1071 data to protect small businesses' privacy.  The Bureau should not make privacy decisions via a policy statement, as it initially did for the 2015 HMDA data.  It is critical that the Bureau undertake a notice-and-comment rulemaking to decide the privacy protections for section 1071.

- We support a two-year implementation period at a minimum.  To implement a rule of this magnitude, which will apply to multiple credit products and loan operation systems within each bank, will require the development of new policies and procedures, systems acquisitions and changes, and extensive training.

**Discussion**

**1.  The Bureau should calibrate the definition of financial institution to avoid undue burden on small institutions, which would ultimately reduce, rather than increase, lending to minority- and women-owned small businesses.**

The Bureau's outline indicates that the  data collection and reporting requirements may apply to a variety of financial institutions that engage in small business lending, including banks, credit unions, online lenders, community development financial institutions, and lenders involved in equipment and vehicle financing.

However, the Bureau is considering potential exemptions for smaller financial institutions or those with smaller loan volumes.  These options include exempting depository institutions (DIs) with less than $100 million in assets in the previous calendar year; or, DIs with less than $200 million in assets in the previous calendar year (or the previous two calendar years).

In addition, the Bureau's outline discusses a second exemption for DIs and non-DIs, based on the number of loans originated or the dollar volume originated:  Fewer than 25 loans, or less than $2.5 million in loans in the previous calendar year; fewer than 50 loans, or less than $5 million in loans in the previous calendar year; or, fewer than 100 loans or less than $10 million in loans in the previous calendar year.  The Bureau is also considering whether the lookback should be for the previous two calendar years, or only the previous calendar year.

Small institutions are the most vulnerable to leaving the small business lending market if they must collect and report section 1071 data.  Data show that banks, including community banks, are losing market share for small business credit to online lenders and other non-banks that are not subject to prudential supervision by the Federal banking agencies as banks.  Non-banks do not operate under the safety-and-soundness and credit risk standards that banks do, which allows them to offer loan terms that banks cannot.  Therefore, we support limiting any asset exemption to depositories, as non-banks tend to have far fewer assets and operate with lower regulatory costs than depository institutions.

The outline indicates that the Bureau is considering asset-level exemptions of $100 million or $200 million.  The Bureau has not explained how it arrived at these asset levels, noting that it presents them "to obtain feedback as it continues to explore how best to fulfill section 1071's statutory purposes while attempting to minimize compliance burden." The outline states that a $100 million exemption would exempt 48% of depositories; notably, however, the outline also states that the depositories that would be covered originate and would report *over 99 percent* of small business loans made by depository institutions. The outline does not indicate how much data would be reported under a $200 million asset exemption, or any higher exemption.

Similarly, the outline does not indicate how the Bureau arrived at the activity thresholds under consideration.  However, the Bureau states that under the lowest activity threshold – 25 loans or 2.5 million in dollars – 99 percent of small business loans made by depositories would be reported.

The outline's lack of explanation for the asset levels and activity thresholds presented hinders our ability to comment.  However, based on the limited information the Bureau's outline provides, the Bureau should consider a significantly higher asset-level exemption, which would not materially reduce the amount of data on small business lending.  For example, we estimate that if the Bureau exempted banks with assets below $1 billion, approximately 96 percent of bank-originated small business loans by dollars and by number of loans would still be reported. Similarly, the Bureau should consider higher activity thresholds than 100 loans.  Some of our small bank members inform us that they could quickly meet the threshold of 100 loans or $10 million in loans under consideration.

We urge the Bureau to give stakeholders more information in a notice of proposed rulemaking about its analysis and the costs and benefits of any exemptions proposed.  We are mindful of the Bureau's repeated regulatory changes to the HMDA reporting thresholds from 2015 to 2017.  To avoid a repeat of that experience, the Bureau should carefully analyze the benefits and costs and present its analysis and data to the public for comment. Repeated changes to a rule are extremely costly for the Bureau and financial institutions. For the latter, subsequent increases to exemption thresholds mean that resources expended on implementation are wasted by those institutions that can least afford it.

We support the Bureau's consideration of an exemption that considers both asset size and activity together.  Under this approach, a depository institution has to collect and report data in a

AdminRecord-025004

calendar year only if it meets *both* the asset threshold and an activity threshold.  We strongly urge the Bureau to consider a two-year look back for assets, and potentially a longer lookback for any activity threshold.  Small business loan volume is highly variable from one year to the next, unlike residential mortgage lending, arguing for a longer look back than the two years used for HMDA reporting.

We generally support the Bureau's preliminary approach to reporting when multiple financial institutions are involved.  The Bureau is considering requiring the institution that made the credit decision to report data, even if the institution applied another party's credit standards.  We also urge the Bureau to consider flexibility for those institutions that work with third parties to originate small business credit, including loans and credit cards.  For example, some banks work with retailers and other third parties that take applications for credit. We support an approach that allows such a bank, at its option, to have their third party partner(s) submit the data directly to the CFPB on the bank's behalf, rather than requiring the bank to incur the burden of aggregating all of its third party date into one report.

## 2.  The Bureau should retain its preliminary decision to simplify the definitions of "small business," "minority- or women-owned" small business, and "principal owners."

Section 1071 requires the Bureau to use the SBA's definition of a small business, which varies by the type of industry determined by reference to North American Industry Classification System (NAICS) codes.  However, the Bureau is considering adopting a more simplified size standard for purposes of its section 1071 rule**.**  We strongly support the Bureau's preliminary decision to use a simpler standard. The SBA's definition would be unworkable in the lending context, requiring financial institutions to consult more than 30 pages of industry types to determine if an applicant is a small business. In the context of credit applications taken at point of sale by third-party partners, this would present virtually insurmountable challenges.

We support the first option presented, to define a small business as having gross annual revenues of $1 million or less in the preceding fiscal year.  We believe the appropriate revenue limit should be $1 million, not the alternative $5 million, which would better serve the statute's purpose of focusing on small business lending.  We also support allowing financial institutions to rely on the applicant's statement of annual revenue, even for those transactions where verified information later becomes available.

Other options under consideration would present considerably more burden, which may increase the cost of credit and/or reduce credit access, with insufficient benefits in terms of data accuracy.  Under the second option, a business would be defined as "small" if the business has fewer than 500 employees and is in the manufacturing or wholesale industries. If the business is in a different industry, the business can have no more than $8 million in gross annual revenue. Financial institutions do not currently collect the number of employees from business credit applicants, nor do they distinguish applicants by whether they are in manufacturing or wholesale industries versus other industries.

Under the third option, a business would be defined as small if its gross annual revenue or number of employees falls within a size standard in each of two 13 digit NAICS Code categories that apply to the largest number of firms within each two-digit NAICS code category.  *This would result in eight different size standards across the 13 categories.*  For example, a retail trade business would be small if its receipts were under $8 million; however, a construction business would be small if its receipts were under $16.5 million.  This option is too complex and would be far too difficult to administer for most financial institutions.

AdminRecord-025005

We understand that the CFPB believes that the second and third options may result in more data on small business lending than the first option. However, given the complexities and cost of the second and third options, we believe the first option strikes the appropriate balance between the cost of applying the definition and the benefit of getting complete data.

Regarding definitions of "minority-owned" and "women-owned" small businesses, and race, sex and ethnicity of "principal owners," section 1071 requires financial institutions to ask applicants whether the business is minority-owned and/or women-owned. The statute defines ownership as more than 50 percent of ownership or control held by minority individuals or women, respectively, and more than 50 percent of the profit or loss accrues to minority individuals or women, respectively. However, the Bureau is considering a simpler definition that "mirrors the concepts of ownership and control . . . in the FinCEN's customer due diligence rule" (CDD rule). The outline further indicates that the Bureau would permit a financial institution to rely on the applicant's statement whether the business is minority- and/or women-owned—with no obligation to verify the applicant's statement. A "minority individual" would be defined as a natural person who is Black, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino.

In addition, section 1071 requires FIs to collect and report the race, ethnicity and sex of the business's "principal owners." Under the Bureau's outline, the term "principal owner" would be defined consistent with the CDD rule, i.e., a principal owner is one who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the business. The outline indicates that the applicant would voluntarily self-report race, ethnicity and sex of the principal owners—the institution would not be required to verify, or to collect the information through visual observation or surname.

We support the Bureau's approach to whether a business is minority- or women-owned, and for collecting the race, ethnicity and sex of the business' principal owners. Allowing the financial institution to rely on an applicant's statements about ownership, and to define "principal owner" in a manner that is consistent with the CDD rule, will reduce the burden of having to attempt to verify ownership information. We strongly urge the Bureau to retain the optional nature of data on the race, ethnicity and sex of the principal owners. Under the outline, if the applicant declines to provide this information, the financial institution would not be required to identify the race, ethnicity and sex by visual observation or surname.

We acknowledge that some applicants will decline to provide information on the race, ethnicity and sex of principal owners, and this could undermine the data's usefulness for fair lending analyses. To encourage applicants to self-identify their race, ethnicity and sex, we recommend that the Bureau engage in a significant and sustained educational campaign about the data collection and its purposes. This approach may be more successful than simply relying on language in a model collection form about the purposes of the data collection. Applicants typically do not read such information or attend to it.

**3. The outline's flexible approach on timing of data collection is appropriate and should be retained.**

The outline indicates that the Bureau does not intend to specify when a financial institution must request the data from an applicant. We support this flexible approach. Given the wide variety of products, financial institutions, and business models that are potentially in scope, a one-size-fits-all approach is unworkable. For example, banks that offer private label credit cards do not

AdminRecord-025006

interact directly with the customer at the time of application; applications are often taken at point of sale. In these circumstances, banks may need the flexibility to request 1071 data later so that they may interact more directly with their customers to obtain accurate and relevant information.

**4. The Bureau should make some adjustments to covered products to ensure that the data reflects the full range of small business lending.**

The outline indicates that the Bureau is considering covering business-purpose credit products as follows:

- Term loans
- Lines of credit
- Business credit cards

However, the Bureau also is considering excluding the following products from the 1071 rule:

- Consumer-designated credit
- Leases
- Factoring
- Trade credit
- Merchant cash advances

We support the Bureau's preliminary decision to exclude consumer-designated credit. Such credit is outside the scope Congress created in section 1071. For consumer credit, we believe financial institutions should be able to rely on the applicant's stated purpose for the use of loan funds. If a borrower starts or invests in a business using the proceeds of a personal loan, the bank would not know, nor should it be expected to know, that the use of the proceeds has changed.

The Bureau should also exclude the following products from the 1071 rule, for the reasons stated below:

- Loan participations. Reporting on participations—which are not a major product in small business lending—would be burdensome, as each financial institution would have to determine whether the lead underwriting institution is reporting the transaction, or one or more of the participants is doing so.

- Commercial real estate loans. Loans secured by real estate should generally be excluded, unless they are secured by owner-occupied commercial real estate where the primary source of repayment is the cash flow from the ongoing business operations. We do not believe Congress intended to include loans to investors in residential real estate.

- Loans for trusts other than business trusts. These trusts are not businesses; they are created for family, investment or charitable purposes. The value of data on loans to these types of trusts is questionable, and it would be nearly impossible for a bank to determine if the data should be collected from the settlors, beneficiaries, or trustees.

- Applications for credit from foreign-owned entities. The Bureau should clarify that 1071 data collection requirements are limited to applications for credit submitted within the

AdminRecord-025007

United States and U.S. territories, and that applications for credit by foreign-owned entities are exempt. Determining beneficial ownership and evaluating net profit or loss for companies subject to different legal and accounting regimes would introduce significant unnecessary complexity and would not advance section 1071's statutory purpose.

In contrast, we strongly urge the Bureau to reconsider its preliminary decision to exclude merchant cash advance (MCA) products from the section 1071 rule. In merchant cash advance transaction, "a lump sum of cash is taken out as an advance on a borrower's future sales. The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account."[2] Not only is MCA a costly form of credit, but also some MCA lenders have abused the automatic repayment feature to recover more than is owed.[3] MCA agreements may also involve harsh collection tactics that the FTC has deemed unfair in consumer contracts.[4] Given these concerns, we believe MCA should be covered by 1071 to increase transparency in this part of the small business lending arena.

### 5. We support the Bureau's reliance on Regulation B's definition of an application.

We support the CFPB's preliminary decision to rely on Regulation B's definition of an "application," i.e., "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." Section 1071 amended ECOA, which is implemented by Regulation B, thus relying on Regulation B's definition is appropriate. Leveraging the current rule's definition will avoid the burden on financial institutions of having to apply a different/new definition.

However, Regulation B's definition of application can be ambiguous in certain situations. Therefore, we support the Bureau's preliminary decision to exempt some interactions between creditors and applicants, even if they might otherwise meet the definition of an "application:"

---

[2]  National Consumer Law Center, Comment to the OCC on "Exploring Special Purpose National Bank Charters for Fintech Companies," January 2017. Available at https://www.nclc.org/images/pdf/banking_and_payment_systems/fintech/comments-fintech-jan2017.pdf
[3]  https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[4]  Participants in an FTC Forum on small business lending titled *Strictly Business,* held on May 8, 2019, described collection tactics used by some MCA providers, which the FTC later summarized.

> [O]ur panelists and other observers have expressed concerns about the use of potentially abusive collection tactics by MCA providers and their agents against business owners who struggle with repayments. In particular, in recent years, some MCA providers have required that business owners execute a "confession of judgment" ("COJ") — in which the business owner waives his or her right to contest any collection lawsuit to obtain the unpaid MCA amount and collection-related fees. Although the FTC's Credit Practices Rule prohibits the use of COJs in personal credit contracts, it generally does not apply to contracts with small business. The FTC Act, however, applies to any deceptive or unfair conduct.32 For example, if an MCA provider is required by contract to lower a merchant's daily payments if revenue falls, but instead simply declares the merchant to be in default and files a COJ, this conduct could violate the FTC Act. MCA providers should not exercise default remedies – such as enforcing a COJ – in the absence of a default condition.

FTC Staff Perspective, February 2020, citations omitted.

AdminRecord-025008

These include:

- o Inquiries/prequalifications;
- o Reevaluation, extension, and renewal requests, except requests for additional credit amounts;
- o Solicitations and firm offers of credit; and
- o Proactive credit line increases.

We have concerns about how credit line increases and renewals with "additional money advanced" would be treated under the CFPB's section 1071 rule. These advances are designed to be very streamlined, as the bank already has experience with the customer. The Bureau should carefully consider the balance between gathering more data on the same borrower and the streamlined nature of these transactions.

**6. The Bureau should only require financial institutions to report the mandatory data points.**

The outline lists twelve "mandatory" data points, which the Dodd Frank Act mandates that FIs collect and report; these include:

1. Whether the applicant is minority-owned, women-owned, and small business
2. Application or loan number
3. Application date
4. Loan or credit type, consisting of three elements: type of loan product (selected from a list), type of guarantee (selected from a list), and loan term in months
5. Loan or credit purpose, selecting one or more from a list
6. Credit amount or limit applied for
7. Credit amount or limit approved
8. Type of action taken, i.e., loan originated, approved not accepted, denied, incomplete, or withdrawn
9. Date action taken
10. Census tract of principal place of business
11. Gross annual revenue
12. Race, sex, ethnicity of principal owners

Implementing these twelve data elements will be burdensome. Notably, although the outline lists twelve mandatory data elements, nearly all of them include sub-elements, making the total amount of data greater than appears at first glance. While some elements are straightforward, such as loan number, others are open to interpretation. Experience with HMDA shows that even a data element such as the date of action taken, or the action taken, can be difficult to get right without clear guidance and flexibility from regulators. For these reasons, it is critical that the Bureau issue clear guidance *with the final rule*, preferably with an opportunity to comment, so that institutions can begin programming systems and training staff. Experience with HMDA further demonstrates that clarifications and reinterpretations issued later add significantly to implementation costs and burden.

As discussed, the mandatory data elements will be costly to collect and report. We do not believe there is evidence to support requiring the discretionary data points listed in the outline. Moreover, these data elements would be extremely burdensome to collect. Financial

AdminRecord-025009

institutions are not prepared to calculate and report an annual percentage rate for small business loans.  NAICs codes are very problematic, most businesses do not know what their appropriate code is, and the codes number in the thousands.  The Bureau should take an incremental approach, and at this time only require the collection and reporting of the mandatory data elements.

**7. The Bureau should consider an exemption to the firewall requirement.**

The Bureau is considering adopting a feasibility standard to implement the statutory prohibition on underwriter's (or others involved in the decision on an application) access to information on whether the business is minority or women-owned and the race, ethnicity and sex of the business's principal owners.  The firewall would not apply to information on whether the business is a small business.  The Bureau is requesting feedback about how to apply the feasibility standard. If an underwriter or similar person needs access to the information behind the firewall, the Bureau is considering requiring the institution to notify the applicant and explain that the institution must not discriminate based on the information.

Our members are very concerned with implementing a firewall.  Small lenders cannot separate the data from loan officers or others who make decisions on applications.  Even in larger institutions, loan officers are the people who will ask the applicant for the information.  The CFPB should exercise its authority to allow institutions to provide a Bureau-developed disclosure to applicants explaining that there may be access to the data and explain that the institution must not discriminate based on the information. The Bureau should develop and provide the disclosure in Spanish as well as English when it publishes the final section 1071 rule, and add other translations over time.

**8.  We urge the Bureau to determine privacy protections through a notice and comment rulemaking process.**

Section 1071 permits the CFPB to modify or redact the 1071 data before making in public, if doing so would "advance a privacy interest."  Privacy interests would include privacy of commercial information and privacy of natural persons, e.g., business owners.  The CFPB is considering two alternatives:

- A balancing test that weighs the risks to privacy  against the benefits of public disclosure (similar to HMDA) to determine if data should be redacted; or
- Data would be redacted if the privacy risk crosses a privacy significance threshold, without weighing the risk against the benefit of disclosure.

We support protections for applicant and borrower privacy.  Banks in small towns or sparsely populated areas have expressed concerns about the high potential for re-identification of business applicants.  The Bureau should not attempt to make privacy decisions via a policy statement, as it initially did for the 2015 HMDA data.  It is critical that the Bureau undertake a notice-and-comment rulemaking to decide the privacy protections for section 1071.

**9.  We support a two-year implementation period**

The outline indicates that the Bureau is considering giving financial institutions approximately two calendar years for implementation, beginning on the date the Bureau issues a final rule.  The Bureau states that it intends to publish technical specifications for data reporting, and plain language compliance guides.  We support a two-year implementation period at a minimum.  To

AdminRecord-025010

implement a rule of this magnitude, which will apply to multiple credit products and loan operation systems within each bank, will require the development of new policies and procedures, systems acquisitions and changes, and extensive training. Based on our experience with HMDA, we expect many interpretive questions to arise, and strongly urge the Bureau to publish as much guidance, with advance public input, as possible well before the compliance deadline.

We appreciate this opportunity to comment on how the Bureau's outline of proposals under consideration for the small business lending rule. If you have any questions about our comments, please contact Kitty Ryan at kryan@aba.com.

Sincerely,

Kathleen C. Ryan
Vice President and Senior Counsel
American Bankers Association

AdminRecord-025011



**WASHINGTON, D.C.**

99 M Street SE
Suite 300
Washington, D.C. 20003-3799

**Phone:** 202-638-5777
**Fax:** 202-638-7734

December 14, 2020

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Re: CFPB Small Business Lending Data Collection Rulemaking

Dear Sir or Madam:

The Credit Union National Association (CUNA) represents America's credit unions and their 120 million members.  On behalf of our members, we are writing in response to the Consumer Financial Protection Bureau's (CFPB) "Outline of Proposals under Consideration and Alternatives Considered" (the Outline) for its small business lending data collection rulemaking released in September 2020.[1]

**General Comment**

Credit unions are unique in the financial services industry as not-for-profit financial cooperatives with a statutory mission to promote thrift and provide access to credit for provident purposes. The member-owned structure of credit unions ensures we provide products and services to our members in a manner that is fundamentally different than for-profit financial service providers. In fact, in many cases, the credit union may have been formed to meet the specific financial needs of their geographic community, select employer group, or other field of membership. As a result, credit unions have a vested interest in helping the members and small businesses they serve succeed by meeting their credit needs and providing low-cost financial services.

Section 1071 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) is intended to facilitate enforcement of fair lending laws and enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses.[2] Credit unions support the goals of section 1071 and seek to provide all members with fair and equitable financial opportunities. That said, we are concerned about the potential for unintended consequences and substantial costs of compliance associated with the creation of a broad data collection where one does not currently exist. In addition, as entities bound to serve a specific field of membership, the data collected from credit unions would likely be incomparable to other lenders that are legally permitted serve anyone walking through its doors or accessing its websites.

---

[1] Consumer Fin. Protection Bureau, Small Business Review Panel for Small Business Lending Data Collection Rulemaking: Outline of Proposals Under Consideration and Alternatives Considered (September 15, 2020), https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf.
[2] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, section 1071, 124 Stat. 1376, 2056 (2010).

As community-based financial institutions, the section 1071 data collection will likely add substantial strain on credit unions' finite compliance resources but provide an unknown tangible benefit. It is important for the Bureau to keep its rule as simple and tailored as possible to avoid creating unintended barriers for small business borrowers seeking credit while also ensuring community lenders can maintain the privacy of their members' data.

## Special Commercial Lending Considerations for Credit Unions

Credit unions have different requirements and rules for business lending than for-profit financial institutions. In 1998, Congress passed the Credit Union Membership Access Act, which capped credit unions' ability to offer member business loans (MBLs).[3] While credit unions operate in every U.S. state and provide an array of financial services, not all credit unions provide business loans and the choice to do so is based on the regulatory environment and the individual credit unions' membership. While the National Credit Union Administration (NCUA) and relevant state regulators have made positive changes to business lending rules over the years, credit unions' business loans are nevertheless subject to additional hurdles and limitations that other lenders are not.

Despite these limitations, NCUA has noted credit unions' "long history of meeting [the] business lending needs of their members," and such commitment proved essential in the period from 2007 to 2010.[4] This trend continues to this day as credit unions have stepped up to serve struggling businesses during the COVID-19 pandemic.

## Scope of Proposed Rule

Based on the CFPB's Outline, lenders would collect and report lending data for all applicants that satisfy the rule's definition of a small business, including identifying women-owned and minority-owned businesses within that pool, but would not be required to collect and report section 1071 data for women-owned and minority-owned businesses that are not "small." We agree a business' status as a "small business" is the most germane factor when considering the intent and purpose of section 1071 and we support the CFPB's proposed scope. In addition, given the highly complex nature of lending to businesses that are not "small," we believe the Bureau's rulemaking is better suited focusing exclusively on the small business lending market.

## Definition of "Financial Institution" (Lender Coverage)

The Bureau is considering defining "financial institution" in a manner that would extend the rule's data collection and reporting requirements to a variety of entities engaged in small business lending including banks, savings associations, credit unions, online lenders/platform lenders, Community Development Financial Institutions (CDFIs), lenders involved in equipment and vehicle financing, commercial finance companies, governmental lending entities, and non-profit non-depository institution lenders. As a starting point, we support the CFPB's proposed definition of "financial institution." The Bureau's rulemaking should ensure all types of entities offering commercial loans are initially covered so as not to favor one business model or charter type over another, which would create an uneven playing field and affect the lending market.

---

[3] Pub. L. 105-219.

[4] 81 Fed. Reg. at 13,532 (stating "while lending at banks contracted during the recent recession, credit unions continued to lend").

2

AdminRecord-025091

*Exemptions*

As the CFPB moves forward, we believe it should ensure credit unions remain well-positioned to provide access to safe and affordable loans to small businesses. When rules make it expensive or difficult to access safe and affordable products and services from credit unions, consumers pay the price. We recommend the CFPB use its exemption authority in a meaningful way and exempt all credit unions from collecting and reporting 1071 data. Credit unions have no pattern of unfair lending and alternatively, are seeking ways to provide more business loans to consumers, not fewer.

That said, to mitigate its broad approach to lender coverage, the Bureau is considering whether to include a size-based or activity-based exemption for determining when a lender must collect and report 1071 data. The Bureau is – rightfully – concerned that the rule's potentially high cost of compliance may result in a decrease in credit availability for small businesses as smaller lenders pull out of or minimize their presence in the business lending market.

While we believe the CFPB should consider exempting *all* credit unions from the rulemaking, we would support the Bureau adopting an exemption for smaller lenders in the market. In this regard, the best path forward, based on the options offered in the Outline, would be to adopt both Option B (i.e. $200 million in assets) for the size-based exemption and Option 3 (i.e. originations of at least 100 loans or $10 million) for the activity-based exemption. While adopting either of these options would be helpful to small lenders, we believe taking the hybrid approach would safeguard continued credit availability for the small businesses served by community-based lenders. For example, a community-based lender may be over $200 million in assets but, due to a small volume, the cost of compliance on a per loan basis could mean an asset-based exemption alone is insufficient and could cause the lender to reduce its small business credit offerings. The same can be true for an activity-based only exemption, which may not properly account for a small-size lender that focuses on small business lending needs of its members.

In regard to entities that are not the lender of record, the Bureau is considering where more than one party is involved on the lender side of a single small business loan or application, the 1071 requirements would be limited in the same manner as in Regulation C, which implements the Home Mortgage Disclosure Act (HMDA). We caution against the use of HMDA as guide *in this context* because, although familiar to most mortgage lenders, mortgage lending and small businesses lending are completely different product lines with different structures and complexities. In the credit union context, which includes the authority to conduct loan participations, we believe the 1071 requirements should fall on the originating lender which would be in the best position to have relevant information on the borrower. In fact, participating lenders would be hard pressed to comply with 1071 given their distance from the borrower, and the data they provide would likely be duplicative of the originating lender.

## Definition of "Small Business" Applicants

The Bureau is considering three alternative approaches for a simpler size standard to determine the meaning of a "small business." These potential approaches to determining whether an applicant is small include: (1) only gross annual revenue; (2) either the number of employees or average annual receipts/gross annual revenue, depending on whether the business is engaged in either manufacturing/wholesale or services; or (3) size standards across 13 industry groups that correspond to two-digit NAICS code industry groupings. Of the three options currently being considered, Option 3 is preferred. However, if the Bureau chooses to adopt Option 3, then it should provide substantial compliance guidance for determining a business' industry classification and how to classify businesses that may fall into more than one category.

We would be concerned Option 1, gross annual revenue, would not properly account for regional differences in business size. In addition, Option 2 and its use of number of employees or annual

AdminRecord-025092

receipts/gross revenue – depending on the business type – would be overly complex and potentially confusing.

### Definitions of "Women-Owned Business," "Minority-Owned Business," and "Minority Individual"

The Bureau is considering proposing 1071 guidance that would mirror the HMDA aggregate categories and clarify that a minority individual is a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. In this regard, we support the use of HMDA as a guide for developing the 1071 definition of minority individual and encourage the Bureau to create regulatory consistency where appropriate.

Regarding control, the Bureau also is considering clarifying the definition of "women-owned business" and "minority-owned business" by using simple language that mirrors the concepts of ownership and control that are set forth in the Financial Crimes Enforcement Network's (FinCEN) customer due diligence (CDD) rule. As most credit unions are familiar with the CDD rule, we support the use of these concepts to determine ownership and control to create regulatory consistency and ease compliance.

### Product Coverage

The Bureau is considering proposing that a covered product under section 1071 is one that meets the definition of "credit" under ECOA, including term loans, lines of credit, and business credit cards. We support the proposed product coverage as these products represent the most common business financing products used by small businesses and their inclusion would assist in fulfilling the purposes of section 1071.

The proposal also contemplates the express exclusion of consumer credit used for business purposes, leases, trade credit, factoring, and merchant cash advances (MCAs). We agree with the exclusion of these products, especially consumer credit used for business purposes. While some of the smallest businesses may blur the line between personal credit and business credit, the inclusion of consumer credit within the scope of section 1071 could vastly expand the scope of the data collected beyond usefulness and also greatly increase the costs of compliance.

### Definition of an "Application"

Section 1071(b) requires that financial institutions collect and report to the Bureau certain information regarding any application to a financial institution for credit. As a result, the Bureau is considering proposing to define an "application" largely consistent with the Regulation B definition of that term. That is, as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested."[5] We support adopting a definition that is consistent with Regulation B, which would be helpful for training purposes, rather than creating a wholly new definition specific to the 1071 rulemaking.

### Data Points

Section 1071(b) requires lenders to inquire whether an applicant for credit is a women-owned, minority-owned, or small business, and to maintain a record of the responses to that inquiry separate from the application and accompanying information. If the answer is yes, then the statute requires lenders to clearly and conspicuously collect several items enumerated in the statute. The Bureau refers to these items as "mandatory data points."

---

[5] 12 CFR 1002.2(f).

AdminRecord-025093

As a general principle, we believe the Bureau should finalize a rule that sticks to the statutorily required data points and avoid adding discretionary data points that may not further the purposes of section 1071 in a material way.

CUNA has several comments and suggestions for the proposed mandatory data points:

*i.   Whether the applicant is a women-owned business, a minority-owned business, and/or a small business*

Yes, credit unions determine ownership and percentage of ownership for their small business members. This determination usually occurs during the application process and gathering of supporting materials.

*ii.   Application/Loan Number*

Although exact procedures vary among institutions, some credit unions use application numbers that are system-generated. The CFPB should provide some flexibility in satisfying this data point to account for the wide range of practices in the industry. In addition, the CFPB should be cautious not to require the reporting of consumers' personal information.

*iii.   Application Date*

The Bureau is considering proposing that lenders report the application date using either (i) the date shown on a paper or electronic application form; or (ii) the day on which a credit request becomes an "application." We support this proposal and recommend the Bureau adopt a "grace period" of several days on either side of the date to simplify compliance.

*iv.   Loan/Credit Type*

No comment on this mandatory data point. However, the Bureau should provide clear guidance in its rulemaking about how reporters are expected to determine and report this data point.

*v.   Loan/Credit Purpose*

The loan/credit purpose is generally gathered during the application process and referenced in the credit memorandum. However, many credit unions would need to modify systems to create custom fields to capture this data for purposes of section 1071 reporting.  The Bureau would need to clarify the "purpose" information that needs to be captured and reported.

*vi.   Credit Amount/Limit Applied For*

Credit applicants may request a range or "up to," and the final approved amount may depend on appraisals or other factors. We suggest the Bureau adopt several options based on credit ranges as opposed to requiring a specific credit amount to be reported. This data point should also include an option of "not applicable" for instances where a small business borrower does not specify an amount of credit or limit applied for. In addition, we are concerned the "Credit Amount/Limit Applied For" data point could be misconstrued as a denial of the original amount when considered against the approved credit amount/limit.

*vii.   Credit Amount/ Limit Approved*

The Bureau is considering proposing that lenders report: (1) the amount of the originated loan for a closed-end origination; (2) the amount approved for a closed-end loan application that is approved but not accepted; and (3) the amount of the credit limit approved for open-end products (regardless of whether the open-end product is originated or approved but not accepted). For consistency with the "Credit Amount/Limit

5

AdminRecord-025094

Applied For" data point, we suggest the Bureau adopt several options based on ranges as opposed to requiring a specific credit amount/limit to be reported.

*viii.   Type of Action Taken*

The Bureau is considering proposing five categories for reporting "action taken": 1) loan originated; 2) application approved but not accepted; 3) application denied; 4) incomplete application (closed or denied); and 5) application withdrawn by applicant. We believe the Bureau should further explain the difference between Category 3 and 4, which both cover "denied" applications. In addition, the categories should account for other common circumstances, such as when an applicant is merely rate shopping with multiple lenders. We do not support additional reporting of denial reasons as such information could lead to substantial consumer privacy concerns. For example, the borrower could lack sufficient cash flow to support a loan request.

*ix.   Action Taken Date*

The Bureau should permit a "grace period" of several days for reporting the specific "Action Taken Date," similar to the "Application Date" data point, to ease compliance burden.

*x.   Census Tract (Principle Place of Business)*

Many credit unions do not currently capture or track census tract, but location information could be received on certain loans during the appraisal process or be found using free software. However, requiring the reporting of a census tract will add a step to the lending process, and credit unions would need a field created to capture and save this information. Credit unions typically collect a borrower's address of record but in some cases, the funds may be used at a different location. The Bureau would need to clarify which location information needs to be captured and reported.

*xi.   Gross Annual Revenue*

The Bureau is considering proposing that lenders report the gross annual revenue of the applicant during its last fiscal year. In some cases, small businesses serviced by community-based lenders may not know their specific gross annual revenue for section 1071 reporting purposes because either the business is a start-up or the business is extremely small and simple. That said, in many credit unions' loan processes, the borrower often reports gross revenue and the reported figure is usually verified with tax returns or audited financial statements. We recommend the Bureau permit lenders to report revenue based on ranges as opposed to requiring a specific gross annual revenue amount for the borrower to be reported.

*xii.   Race, Sex, and Ethnicity of Principal Owner(s)*

Section 1071(e)(2)(G) requires financial institutions to collect and report "the race, sex, and ethnicity of the principal owners of the business." As stated above, for regulatory consistency and ease of compliance, we support the use of the HMDA aggregate race, sex, and ethnicity categories to define "minority individual" and the FinCEN CDD rule ownership and control requirements to determine "principle owner." In addition, we strongly support this data point being based solely on the applicant's self-reporting, as opposed to visual observation, surname or another less reliable criteria.

## Discretionary Data Points

It is not evident how the proposed discretionary data points would benefit the Bureau or consumers to justify the cost and resources required for their collection. In fact, the addition of unnecessary discretionary data

6

points may ultimately add to the already significant privacy concerns of both lenders and small business borrowers. The Bureau can look as far as recent history, with the 2015 HMDA Rule, to find a situation where the addition of unnecessary discretionary data points created substantial costs of compliance. Those discretionary data points are now under review for possible reduction.[6]

In developing an entirely new data collection, as a starting point, the Bureau should limit its data set to data points that are statutorily required, and not add discretionary data points merely for the sake of collecting more data. In doing so, the Bureau could revisit its data set in the future and, if the collection of additional data proves to be justified, build out additional data points from there. In the alternative, the Bureau could consider providing an exemption from discretionary data point collecting and reporting for certain small 1071 reporters – like the partial data point exemption approach taken in the HMDA context.

**Shielding Data from Underwriters and Other Persons (Firewall)**

Section 1071(d) includes two provisions that require a lender to limit internal access to certain information collected under section 1071. As a result, the Bureau is considering proposing that lenders would need to limit access to an applicant's responses to specific inquiries regarding women-owned and minority-owned business status and the race, sex, and ethnicity of principal owners. The Bureau is also considering proposing that an applicant's response to the 1071(b) inquiry regarding small business status need not be firewalled off from underwriters and others pursuant to 1071(d)(1). Additionally, the Bureau is considering proposing to permit lenders to give underwriters, employees, and officers access to the responses if the individual lender determines that such access is needed for the underwriter, employee, or officer to perform his or her usual and regularly assigned job duties.

We understand the intent behind firewalling certain section 1071 data collection information from any staff considering and making credit decisions. However, credit unions and other community-based lenders may find it difficult to comply with arbitrary firewall requirements given their small staff size. For example, according to CUNA research, nearly half of all credit unions have five or fewer full-time employees. We caution the Bureau against adopting a rulemaking that requires firewalling information without also establishing additional reasonable accommodations for lenders with a small number of employees. Not doing so would require lenders to either hire additional staff, outsource additional duties to vendors, or limit their business lending offerings.

**Compiling, Maintaining and Reporting 1071 Data to the Bureau**

The Bureau is considering proposing that the section 1071 data collection be completed on a calendar year basis and submitted to the Bureau by a specified date following the end of each calendar year. We generally support calendar year collecting and reporting. However, we caution the Bureau against aligning the annual reporting dates for section 1071 with the reporting dates for HMDA – for many small reporters, complying with two large complex data collection and reporting regimes at the same time could ultimately strain finite resources.

**Privacy Considerations Involving Bureau Publication of 1071 Data**

CUNA has concerns about broad collection of financial data about consumers that could be used in ways not intended by the Dodd-Frank Act. For example, since not all credit unions participate in commercial lending, any localized data made available to the public may be traceable to consumers in certain areas. A consumer seeking a small business loan to create a startup, or for another reason, may have concerns about

---

[6] Home Mortgage Disclosure (Regulation C) Data Points and Coverage, 84 Fed. Reg. 20049 (May 8, 2019).

AdminRecord-025096

their information becoming public. For example, this could be a concern if the consumer is employed elsewhere while building their business. To mitigate these concerns, the Bureau should only publicly release lending data at the state-wide level and in aggregated form.

Furthermore, requiring the encrypting of this data could present liability and cost concerns to credit unions that could harm their participation in this market. Data breaches and protecting members' privacy are a top priority of credit unions, and new regulations making this issue more complex could negatively impact credit unions and their members.

### Implementation Period

The Bureau is considering proposing that financial institutions have approximately two calendar years for implementation following the Bureau's issuance of its eventual 1071 rule. Depending on the complexity of the final rule, we believe two years – but no less than two years – could be a sufficient period of time for vendors to adjust their products and services, and for covered entities to update or revise their systems and processes, and make additional changes necessary to meet the requirements of the new section 1071 rule. However, during the period prior to implementation, the Bureau should regularly communicate with vendors and covered entities to ensure compliance preparations are progressing as expected and consider extensions if issues that could affect industry preparedness arise.

### Conclusion

We look forward to working with the Bureau as it continues to develop its small business lending data collection rulemaking. On behalf of America's credit unions and their 120 million members, thank you for your consideration. If you have questions or require additional information related to our feedback, please do not hesitate to contact me at (202) 508-3629 or amonterrubio@cuna.coop.

Sincerely,

Alexander Monterrubio
Senior Director of Advocacy & Counsel

8

AdminRecord-025097



Noah W. Wilcox, *Chairman*
Robert M. Fisher, *Chairman-Elect*
Brad M. Bolton, *Vice Chairman*
Gregory S. Deckard, *Treasurer*
Alice P. Frazier, *Secretary*
Preston L. Kennedy, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

*Via Electronic Mail*

December 14, 2020

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

**RE: 1071 SBREFA Outline of Proposals Under Consideration**

Dear Sir or Madam:

The Independent Community Bankers of America ("ICBA")[1] welcomes the opportunity to comment on the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Outline of Proposals ("Outline") under consideration to implement the small business lending data collection requirements under Section 1071 of the Dodd-Frank Act ("Section 1071"). Among other requirements, Section 1071 requires financial institutions to collect certain data regarding applications for credit for women-owned, minority-owned, and small businesses, and to report that data to the Bureau on an annual basis. The Outline describes proposals that the Bureau is considering to implement, along with the relevant law, the regulatory process, and an economic analysis of the potential impacts of the proposals on directly affected small entities. While the Outline's contemplation of the forthcoming rule seems to genuinely seek an approach that minimizes the compliance burden where possible, its overall scope and coverage is too broad and will unfairly penalize small community banks.

ICBA has repeatedly expressed concerns with Section 1071. Small business lending is complex and cannot be "commoditized" in the same way as consumer lending. Each small business loan has customized terms based on an analysis of numerous factors. Complex lending should not be subject to simplified, rigid analysis, which might give rise to unfounded fair lending complaints.

---

[1] *The Independent Community Bankers of America® creates and promotes an environment where community banks flourish. ICBA is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. With nearly 50,000 locations nationwide, community banks constitute 99 percent of all banks, employ more than 700,000 Americans and are the only physical banking presence in one in three U.S. counties. Holding more than $5 trillion in assets, over $4.4 trillion in deposits, and more than $3.4 trillion in loans to consumers, small businesses and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation and fueling their customers' dreams in communities throughout America. For more information, visit ICBA's website at www.icba.org.*

.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025143

For this reason, the rules under Section 1071 will have a chilling effect on community banks' ability to price for risk, unless the Bureau can properly tailor a rule before implementation and exclude community banks from coverage. Properly tailoring the rule will require substantial analysis. The application of a consumer protection law is grossly incongruous with the underlying nature of small business lending. Unlike consumer loan products, such as mortgages and credit cards, small business loans are non-homogenous and do not lend themselves to standardized recordkeeping or comparative analysis.

ICBA is concerned that community banks would need to revert to a check-the-box system and algorithm where small businesses either meet a predetermined set of standardized credentials or do not. Homogenization of small business lending would drive various small business credit out of small banks and significantly reduce access to credit for the businesses that need it most – small businesses with unique credit needs. Community banks do not use standard applications for small business loans. Unlike other types of consumer credit, each small business has its own distinctive characteristics with unique credit needs. Existing business lending practices do not conform to a standard data collection practice and would require extraordinary change to comply. Unlike the residential mortgage market, where there is a standard portfolio of products, each small business has its own unique characteristics and credit needs, and each small business loan has unique credit terms.

For example, the terms of a loan can vary depending on whether it is collateralized or the nature of that collateral. As a result, there is no standard application for small business loans. The current small business lending process for community banks would not conform to a standard data collection process. If banks were forced to automate their small business loans, many small borrowers that do not meet the standardized underwriting box would miss out on opportunities for credit.

Community banks are dedicated to making small business loans to their communities, as evidenced by their outsized participation in the Paycheck Protection Program ("PPP"). Despite the rapid rollout and complexity of the program, community banks were able to make over 2.8 million PPP loans – amounting to 57.5% of all loans originated under the program. As impressively, community banks originated 72.6% of PPP loans made to non-white small business owners, and 71.5% of PPP loans made to female small business owners.[2] The share of PPP loans made by community banks far exceeds their share of bank assets and many of the small businesses turned to community banks when they were unable to get a loan from larger banks.

Given the value of community banks to their communities, as evidenced by their response to the pandemic and participation in the Paycheck Protection Program, the Bureau must proceed with caution as

---

[2] *See* Noah Yosif, "When the Going Gets Tough, the Tough Get Lending," ICBA Mainstreet Matters Blog (Jul 22, 2020), available at: https://www.icba.org/news/blog-details/main-street-matters---advocacy/2020/07/22/when-the-going-gets-tough-the-tough-get-lending?utm_campaign=MainStreetMattersBlog&utm_content=135338650&utm_medium=social&utm_source=twitter&hss_channel=tw-155954102

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

it considers how to proceed with a rulemaking. The Bureau's proposed rule should acknowledge the unintended consequences of applying this rule to community banks.

## Scope of Proposed Rule

Though the statutory text of Section 1071 applies to "a women-owned, a minority-owned, or a small business," the Bureau is considering proposing that the data collection and reporting requirements only apply to applications made by small businesses. The CFPB justifies this change by explaining that the scope of "small business" would sufficiently cover almost all minority-owned and women-owned businesses. Conversely, the Outline contemplates not requiring financial institutions ("FIs") to collect and report Section 1071 data for women-owned and minority-owned businesses that are not "small," arguing that large organizations may be too complex.

The Bureau's approach here is prudent, as it would simplify coverage thresholds and would avoid the potential discrepancy of collecting data on "women-owned" or "minority-owned" businesses that do not have more than a 25 percent ownership or control by women or minorities (discussed below).

## Definition of "Financial Institution" (Lender Coverage)

The CFPB is considering covering the following entities under the rule: depository institutions, online lenders/platform lenders, community development financial institutions ("CDFIs"), lenders involved in equipment and vehicle financing (captive financing companies and independent financing companies), commercial finance companies, governmental lending entities, and non-profit non-depository lenders. However, the CFPB has the authority to exempt "any class of covered entity" from a Section 1071 rulemaking. These exemptions can be based on an entity's asset size, transaction volume, or other criteria that the Bureau sets. Because the CFPB is concerned that the smallest FIs, or those with the lowest volume of small business lending, might reduce or cease their small business lending activity because of the fixed costs of coming into compliance with an eventual 1071 rule, it is considering exemptions based on the asset size of the FI, the activity of the FI, or an arrangement that considers both the asset size and activity of the FI. ICBA will provide feedback on each of these scenarios but advocates for a simple asset-based exemption threshold of $1 billion.

## Asset-Based Exemption Should Be $1 Billion

Of the options discussed, ICBA believes that an asset-based threshold is the simplest and brightest threshold for community banks to apply and comply with. Most regulations that have coverage exemptions or varying compliance obligations are based on asset size, as the metric is a good proxy for sophistication and availability of resources that covered entities have to dedicate to compliance with the rule. This resource limitation not only includes technology or other hard resources, but also personnel and staff that must be trained and redirected toward compliance with new regulations.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025145

While ICBA contends that an asset-size-based threshold is the most appropriate method to determine exemption from coverage, the asset thresholds proffered are grossly underweighted. The Outline offers two options under its asset-size-based coverage – exempting FIs with assets of less than $100 million (Option A) or $200 million (Option B).

According to Call Report data, approximately 20 percent of banks (1,011) hold less than $100 million in assets and would be exempt under Option A,  yet 99 percent of all small business loans would be captured and covered by the remaining banks (4,064) <u>not</u> excluded from the rule's coverage.[3]

The Outline's analysis of Option A reveals the Bureau's underlying methodological principle for determining an exemption threshold: the principle is to capture as many small business loans as possible, while burdening as few DIs as possible. Though Option A captures 99 percent of the small business loan market, the Bureau has determined that it is not sound public policy to subject nearly 20 percent of the nation's banks to the rule in order to ascertain the remaining one percent of the small business loan market. Simply put – the additional burden placed on 20 percent of banks is not commensurate with the one percent increase in coverage of the market.

Taking this logical chain of thought further, depository FIs under $1 billion in assets should be excluded from coverage under a 1071 rulemaking. According to FDIC research, setting a $1 billion threshold would cover 90 percent of the number of small business loans made, while only burdening 15 percent of this country's banks.[4] Simply put, here, too – the Bureau should not burden the 85 percent of banks that hold less than $1 billion in assets to capture only 10 percent of the number of small business loans made.

ICBA understands that moderately large or even large non-depository FIs, such as title loan and payday loan stores, will always have fewer assets than even the smallest of depository FIs, such as a $50 million bank. However, unlike non-depository FIs, community banks are already subject to regular examination for compliance with fair lending laws and equal credit opportunity mandates, including compliance exams, Community Reinvestment Act ("CRA") exams, and Home Mortgage Disclosure Act ("HMDA") exams. In contrast, non-bank lenders like fintechs or payday lenders are not examined for compliance with these laws. Accordingly, any asset-based sized exemption should be limited to depository FIs, such as community banks.

The Bureau has a long-established precedence of establishing asset-based thresholds for depository FIs. For example, DIs are exempt from establishing escrow accounts for higher-priced mortgage loans and are excluded from several provisions of the Qualified Mortgage Rule if they have assets of less than $2 billion.

---

[3] FFIEC Call Report Data Q2 2020.

[4] *See* Statement Submitted for the Record by Diego Zuluaga for the "CFPB Symposium: 1071 of the Dodd-Frank Act," *available at* https://www.consumerfinance.gov/documents/8182/cfpb_zuluaga-written-statement_symposium-section-1071.pdf, which cites Federal Deposit Insurance Corporation, "Statistics on Depository Institutions," Q2 2019.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025146

**Activity-Based Exemption Threshold**

As an alternative to an asset-based exemption, particularly for non-DIs, the Bureau is exploring whether to use an activity-based exemption. The Outline contemplates three activity-based thresholds for consideration: excluding FIs that originate (A) fewer than 25 loans or less than $2.5 million in small business loans annually, (B) fewer than 50 loans or less than $5 million in small business loans annually, or (C) fewer than 100 loans or less than $10 million in small business loans annually.

Though an activity-based exemption may work for non-DIs, ICBA believes that an activity-based threshold will be less of a bright-line threshold for community banks. Using an asset-based threshold, for example, gives community banks more consistency. When a community bank crosses an asset-size threshold in one year, it is not very common for the bank to dramatically decrease in assets to a point where it is no longer covered the next year. This results in compliance teams at banks having a fair certainty that once their bank passes the asset threshold, they will have to comply with that rule on an on-going basis.

In contrast, lending activity at a bank can vary much more dramatically and more frequently, year-by-year, depending on the regional conditions or economic cycles. Setting the coverage threshold based on an activity-threshold would mean that there is a much greater chance that community banks would either be collecting and reporting data or not on any given year because of the greater fluctuations in small business lending activity. For example, a bank could have a few years where it is below the activity threshold, not needing to comply with the rule only to find itself exceeding the activity threshold the following year triggering collection and reporting requirements. This would result in the bank needing to make an investment in its compliance department and technology only to comply with a rule only for a year or two.

Additionally, setting an activity-based threshold may artificially throttle a bank's business lending department if the bank is getting close to the threshold. A bank may not want to increase its small business lending so as not to cross the loan threshold in order to avoid the additional costs of complying with 1071. This of course would disincentivize lending activity in an area, an undesirable result.

**Combined Size- and Activity-Based Exemptions**

Under this third option, a FI would be required to collect Section1071 data if it exceeds either a given annual number of small business loans or an annual total value of small business loans, but it would not be required to report the data if the FI is less than a given asset size, regardless of dollar value or number of small business loans originated.

While this option presumably seeks to minimize the burden on FIs, the complexity might actually serve to increase the burden and blur the lines for which banks are covered by the rulemaking. Further, this hybrid approach still suffers the same flaw as the pure activity-based threshold. This approach is still subject to active intervention to avoid reporting coverage.

*The Nation's Voice for Community Banks.*®

**WASHINGTON, DC**
1615 L Street NW
Suite 900
Washington, DC 20036

**SAUK CENTRE, MN**
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025147

**Other depository institution characteristics for exemption**

Besides exemption options based on the size or activity of the FI, the Bureau is soliciting comment on whether there are other criteria that should be considered when exempting certain FIs from coverage. ICBA strongly recommends that the Bureau consider exempting FIs that are (1) Community Development Financial Institutions ("CDFI"), (2) Minority Depository Institutions ("MDI"), or (3) those FIs located in rural areas. Many of these exemptions have precedent in other Bureau regulations.

**Community Development Financial Institutions ("CDFI")**

CDFIs are approved by the U.S. Department of the Treasury ("Treasury Department") to receive monetary awards from the Treasury Department's CDFI Fund, which was established to promote capital development and growth in underserved communities. Promoting homeownership and providing safe lending alternatives are among the Fund's main goals. The Treasury Department created the CDFI designation to identify and support small-scale creditors that are committed to community-focused lending but have difficulty raising the capital needed to provide affordable financial services.

The Bureau decided to exempt CDFIs when implementing the Qualified Mortgage ("QM") rule, finding that CDFIs that provide mortgage loans generally employ underwriting guidelines tailored to the needs of low-and-moderate income ("LMI") consumers. Unlike creditors that rely on industry-wide underwriting guidelines, which generally do not account for the unique credit characteristics of LMI consumers, CDFI underwriting requirements include a variety of compensating factors. The Bureau cited several examples, including, "these creditors often consider personal narratives explaining prior financial difficulties, such as gaps in employment or negative credit history. Some creditors also consider a consumer's general reputation, relying on references from a landlord or persons with whom the consumer does business."

In exempting CDFIs from the QM rule, the Bureau noted that CDFIs undergo a screening process related to the ability of applicants to provide affordable, responsible credit to obtain the designation and must operate in accordance with the requirements of these programs, including periodic recertification. The preamble to the final QM rule also noted that CDFIs "serve consumers that have difficulty obtaining responsible and affordable credit, and that the burdens imposed by the ability-to-repay requirements would significantly impair the ability of these creditors to continue serving this market."

Just as the Bureau felt that these characteristics of CDFIs warrant exemption from the QM rule, ICBA urges the Bureau to use the same underlying rationale here and exempt CDFIs from the 1071 rule's coverage.

**Minority Depository Institutions ("MDI")**

MDIs were designated under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), when Congress recognized that minority banks can play an important role in

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267            866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378   www.icba.org

AdminRecord-025148

serving the financial needs of historically underserved communities and minority populations. The Federal Deposit Insurance Corporation ("FDIC") defines an MDI as any federally insured depository institution for which 51 percent or more of the voting stock is owned by minority individuals or a majority of the board of directors is minority, and the community that the institution serves is predominantly minority.[5]

Based on FDIC research, MDIs serve minorities, LMI communities, and rural communities at higher rates than mainstream banks. MDIs are commonly known as "mission-driven banks" because they play a role in transforming the lives of underserved citizens and communities by making loans and providing other vital banking products and services.[6] MDIs provide safe and affordable financial services to residents and businesses in these communities.

Since Congress has determined that MDIs already play an important role in serving underserved communities and minority populations, the intent behind Section 1071 is already met by MDIs, and therefore, should not redundantly be applied to this special class of DIs. As such, ICBA urges the Bureau to exempt MDIs from the 1071 rule's coverage.

**Financial Institutions Located in Rural Areas**
The Bureau should exempt small lending institutions and those operating entirely outside of metropolitan statistical areas ("MSA"), such as community banks that operate in rural areas. This exemption would mirror the HMDA's exemption for similarly situated banks.[7] Exempting these community banks from coverage would simplify and maintain congruency between Section 1071 and HMDA.

Ultimately, no regulatory compliance is costless, and if these community banks are not exempted from Section 1071, those costs will be passed on to business borrowers. In some cases, this increase may make loans unaffordable and reduce access to credit.

**Reducing Duplicative Reporting – Financial Institutions That Are Not the Lender of Record**
There may be instances where a borrower shops for a loan from multiple lenders, but only borrows from one. Or, some lenders may originate a loan, but then quickly sell the entirety or a portion of it to another entity. If each entity reports these interactions and transactions, there is a high risk of duplicative reporting, resulting in bad data. The Outline contemplates a potential solution to this problem.

In order to avoid duplicative reporting, the Bureau is considering taking an approach similar to that under HMDA, where the reporting responsibility depends on which institution made the final credit decision. If more than one FI approved a loan, and the loan was purchased after closing by one of the FIs approving the loan, the purchaser (such as an assignee) would report

[5] https://www.fdic.gov/regulations/resources/minority/mission-driven/guide.pdf
[6] https://www.fdic.gov/regulations/resources/minority/mission-driven/guide.pdf
[7] 12 CFR 1003.2(g)(1)(ii)

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

the loan. If there was no origination and multiple FIs received the same application, then any FI that made a credit decision would be responsible for reporting (even if other FIs also reported on the same potential non-originated application).

ICBA believes that this approach is potentially beneficial in two ways: (1) it treats multi-FI originations in the same manner as HMDA, keeping consistency, and (2) it reduces the burden for FIs that use another bank or third-party to originate credit card loans. However, while this outline discusses "reporting," it does not discuss the associated responsibility of "collecting" the data. The proposed rulemaking should explicitly address which FI bears the burden of not only "reporting" data, but also "collecting" data. The proposed rule should also provide an acceptable mechanism to accurately reflect borrowers that do not accept approved loan terms. Similar to HMDA, Section 1071 reporting should include an option for "approved, not accepted."[8]

### Definition of "Small Business" Applicants

In order to determine which small business loan applicants trigger a lender's collecting and reporting obligation, the Bureau must define "small business." The Outline discusses that the Bureau would not include non-profit small businesses or foreign small businesses as small businesses that trigger Section 1071 requirements upon their application for credit. However, the Bureau is considering three options for using a simple size standard to define "small businesses." It is important to establish a definition of "small business" that is easily and simply ascertainable.

Of the options discussed, ICBA urges the Bureau to adopt the first option, which defines a "small business" as one with gross annual revenue of $1 million or less. This is a simple, bright-line definition that will make it easier for banks to comply. This has the added benefit of a business applicant likely knowing whether it meets that threshold or not. Additionally, a $1 million annual gross revenue threshold would cover 95 percent of all businesses. [9]

Also, though not discussed in the Outline, but something to consider, the Bureau should adjust the asset threshold calculation on a consolidated basis. This would more accurately capture true "small businesses" rather than a conglomeration of affiliated businesses.

Finally, using a gross annual revenue method would align with many banks' existing underwriting methodology, where the gross annual revenue of a business is a key factor in a

---

[8] HMDA specifically explains that "approved but not accepted" is appropriate only when "the financial institution made a credit decision approving the application before closing or account opening, subject solely to outstanding conditions that are customary commitment or closing conditions, but the applicant or the party that initially received the application fails to respond to the financial institution's approval within the specified time, or the closed-end mortgage loan was not otherwise consummated or the account was not otherwise opened.

[9] U.S. Census Bureau, Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012 More Information 2012 Survey of Business Owners, American Fact Finder, (last visited Feb 27,2017), available at
http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodType=table/

*The Nation's Voice for Community Banks.*®

| WASHINGTON, DC | SAUK CENTRE, MN | |
| --- | --- | --- |
| 1615 L Street NW | 518 Lincoln Road | 866-843-4222 |
| Suite 900 | P.O. Box 267 | www.icba.org |
| Washington, DC 20036 | Sauk Centre, MN 56378 | |

credit decision. Tying the definition of a "small business" to information that the bank is likely to glean will make the process easier for both banks and applicants.

In contrast, options 2 and 3 require awareness of the Census Bureau's North American Industry Classification System ("NAICS") system and the code under which a business falls. This is not something that the average small business would know. This is something that the bank is likely unfamiliar with, as well. Unless the bank is an SBA lender, the loan officer and creditor likely do not ask, collect or record a small business NAICS.

Finally, while not contemplated in the Outline, ICBA recommends that the Bureau exclude small farm loans from the definition of "small business." Not only is it unlikely that Section 1071 was enacted to cover small farm lending, but the underwriting criteria for small farm loans are distinct and different from small business loans. The distinction is already codified in several laws and regulations. For example, the definition of small business loans and small farm loans under CRA have two different definitions, revealing the distinction between the two. It is reasonable to explicitly exclude small farm loans from coverage under the definition of "small business."

**Definitions of "Women-Owned Businesses," "Minority-Owned Businesses," and "Minority Individual"**

Section 1071 imposes data collection and reporting requirements on FIs with respect to "any application to a financial institution for credit for [a] women-owned, minority-owned, or small business." The Outline contemplates defining "women-owned business" and "minority-owned business" as one where (A) more than 50 percent of the ownership or control is held by one or more women/minority individuals; and (B) more than 50 percent of the net profit or loss accrues to one or more women/minority individuals (using GAAP standards and/or IRS filings).

The Bureau is also considering to add guidance that would mirror HMDA's interpretation of "minority," which would be a natural person who is Black or African American, Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and/or Hispanic or Latino. Furthermore, the definition of "ownership" and "control" would mirror the terms defined in FinCEN's Customer Due Diligence ("CDD") rule, where "ownership" means directly or indirectly having an equity interest in a business and "control" means having significant responsibility to control, manage, or direct a business. FinCEN's CDD rule also enables the FI to rely on the information submitted by the customer to verify the status of ownership and control.

Using these terms and definitions, which mirror existing regulations with which banks are accustomed, would be simple and objective, further limiting the potential for confusion among community banks. However, the Outline should also mirror FinCEN's CDD rule on verifying the status of the ownership or control of a small business by enabling FIs to rely on the information provided by the customer.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025151

**Product Coverage**

Section 1071 covers "any application to a financial institution for credit." Though not defined in Section 1071 itself, the Equal Credit Opportunity Act ("ECOA") defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."[10] Because products perform differently, rely on different information, and have different risk tolerances, the Bureau will need to account for these differences before establishing data collection requirements. As a prerequisite, the Bureau will have to review the landscape of products that will be covered.

Nearly all of the community banks consulted in preparation for this letter indicated that they require personal guarantees for all business credit products. The personal credit score of significant owners are evaluated, which mitigates risk. Not only is this a standard underwriting practice developed by the bank, but the prudential examiners expect it as a mitigant against safety and soundness risks.

The Outline explains that term loans, lines of credit, and business credit cards, collectively, make up the majority of business financing products used by small businesses and are an essential source of financing for such businesses. As such, the Outline contemplates covering these products under a proposed rule and seeks comment on the approach.

While ICBA believes the approach is a prudent interpretation of "credit," the Bureau should reconsider its exclusion of merchant cash advances ("MCA") and other unconventional products. These products are typically offered by non-depositories and are unsupervised, unlike community banks. The purpose of Section 1071 is to increase transparency and data on small business lending. , Therefore, it should focus its efforts on MCAs and other similar products that do not currently have much transparency or data rather than on products and services that already undergo routine fair lending tests and data reporting requirements.

**Definition of an "Application"**

Section 1071(b) requires that FIs collect and report to the Bureau certain information regarding "any application to a financial institution for credit." Thus, for covered FIs with respect to covered products, the definition of "application" will trigger data collection and reporting under Section 1071. The term "application," however, is not defined in either Section 1071 or ECOA, though it is defined in Regulation B ("Reg B")."[11] The Bureau is considering using a definition of application based on either the Reg B definition of "application" or its definition of "completed application."

---

[10] 15 U.S.C. §1602(f).
[11] SBREFA Outline of Proposals at 22.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025152

Reg B defines "application" as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." Reg B defines "completed application" as one "in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including, but not limited to, credit reports, any additional information requested from the applicant, and any approvals or reports by governmental agencies or other persons that are necessary to guarantee, insure, or provide security for the credit or collateral). The creditor shall exercise reasonable diligence in obtaining such information.[12]

The Bureau would also exclude inquiries/prequalifications, reevaluations, extension and renewal requests, except requests for additional credit amounts, and solicitations and firm offers of credit, which would normally meet the Reg B definition of application.

If the Bureau used the Reg B definition of "application," it would trigger "the 1071 data collection requirement only after there is an actual request for credit (using the procedures defined by an FI, i.e., an "application"), but still early enough in the process to capture incomplete, withdrawn, and denied applications, thus making the reported data more in line with Section 1071's statutory purposes."[13]

By contrast, if the Bureau used the Reg B definition of "completed application" it would apply to applications "in which the creditor has received 'all the information that the creditor regularly obtains and considers' in evaluating similar products. This definition could exclude incomplete applications and many withdrawn applications, thus making the reported data less in line with Section 1071's statutory purposes."[14]

Because the large majority of community banks do not have formal "applications" for credit products, there are no formal "pre-approval" or "pre-qualification" stages. Those that do have an application are blanket applications, applicable to any commercial loan and not product-dependent. Any Bureau regulation that references lending stages would be an entirely new construct that would have to be adopted. Most community banks are concerned that any definition of "application" will make their process too inflexible. Few typically use a formal application for small business loans, and those that have tried to create a more formalized process soon abandoned it because it was cumbersome and duplicative of existing recordkeeping.

Whether the CFPB ultimately opts to choose the Reg B definition of "application" or of "completed application," ICBA believes that either option would be a sound approach that would accommodate existing practices at community banks and mirror definitions already set forth by other regulations.

---

[12] 12 CFR 1002.2(f).
[13] SBREFA Outline of Proposals at 22-23.
[14] SBREFA Outline of Proposals at 23.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC          SAUK CENTRE, MN
1615 L Street NW         518 Lincoln Road
Suite 900                P.O. Box 267            866-843-4222
Washington, DC 20036     Sauk Centre, MN 56378   www.icba.org

AdminRecord-025153

**Mandatory Data Points**
Section 1071 requires the CFPB to collect certain enumerated data points from banks, but the Bureau does have some statutory authority to grant exemptions, where it deems it "necessary or appropriate." In general, by using a limited selection of options or choices, the Bureau appears to have made an earnest effort to ease the process of requesting and collecting the data from covered business applicants. Creating a limited selection of options or choices will speed the information intake process. In addition, ICBA supports the Outline's preferred option of not requiring banks to verify any of the mandatory information provided by the applicant. To do otherwise would put banks in a precarious and difficult situation, especially concerning information related to the race, sex and ethnicity of the applicant.

However, the collection of these data points are likely to alter a bank's existing credit procedures and many of the data points will still be difficult for community banks to collect and report.

**Application Number and Application Date**
Since most community banks do not have applications for commercial loans, they do not currently generate "application numbers" or "application dates." Some banks might generate a loan number when the loans are funded, but often there is no "application number" before this point. Similarly, there are typically no "application dates" but rather dates that mark when loan proceeds were disbursed. Though it seems like a simple process on its face, generating application numbers simply to comply with this mandate does not appear to serve a necessary function.

**Type and Purpose of the Financing**
Community banks have explained that it is not always clear at the time of application how a borrower will use the money – particularly for open ended products (lines of credit, credit cards, etc.). Additionally, the borrower might not know how he or she would like to ultimately use the funds, or might not be willing to disclose. However, it is helpful that the Bureau's contemplated approach would utilize a dropdown menu of options that could make compliance with this requirement easier.

**Amount Applied For and Amount Approved**
Because many credit cards and open-end products do not always have "amounts applied for," ICBA appreciates the Outline's option of a response choice that includes "N/A." This should be an adequate option for small businesses that want a line of credit but do not have a particular amount in mind.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025154

**Census Tract of the Principal Place of Business**

ICBA welcomes the Outline's option to use the census tract where the loan proceeds will be used, rather than recording the census tract of the business. This approach mirrors the method used in CRA, thus reducing the chance for error. This model is also more illustrative as it shows where the money is actually being used/improving the community – not just where the business has its headquarters or principal place of business.

**Information about the race, sex, and ethnicity of the business principal owners**

While ICBA continues to believe that this data element has the high potential to lead to misconstrued conclusions, we welcome the Outline's intent to have this data field be self-reported by the applicant only, and not require the community bank to verify or conduct a visual observation/surname analysis.

**Discretionary Data Points**

In order to better facilitate enforcement of fair lending laws and to enable communities, governmental entities, and creditors to identify business and community development needs and opportunities for women-owned, minority-owned, and small businesses, Section 1071 permits the Bureau to require additional data points to be collected. However, while the Bureau believes that additional data points may help meet the goals of Section 1071, it should be cognizant that the burdens of additional data collection could outweigh the benefits.

ICBA strongly objects to the addition of any discretionary datapoints - additional fields that may increase burden or the risk of misinterpretation. Any data disclosed to the public presents problems with context – unlike regulators, the public's access is limited, and they may make inferences without seeing the full picture of why a loan was denied, or why a given rate was charged.

However, should the Bureau ultimately proceed to pursue discretionary data points despite strong objections, ICBA strongly urges the Bureau to stagger their implementation to a point in time when the mandatory data points have already been acclimated to. ICBA believes that it is better to start with the mandatory data points, allowing banks and the Bureau time to identify and remediate underlying issues with the rule's implementation. Then, the Bureau could proceed with the implementation of discretionary data points, if it believes it is indeed necessary.

**Pricing**

The Bureau is considering proposing to include pricing of originated credit and credit that is approved but not accepted as a discretionary data point. The Outline explains that pricing data could further the fair lending purpose of Section 1071, as it could enhance the ability to effectively and efficiently enforce fair lending laws. The Outline adds that pricing data could add value in promoting market transparency and new product development opportunities, thus furthering the community development purpose of Section 1071. A pricing data point could be reported on the basis of annual percentage rate ("APR"), total cost of credit ("TCC"), interest rate and total fees, or some other pricing metric.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025155

However, ICBA agrees with the pitfall identified in the Outline, noting that reporting pricing information across various product types could be complicated to implement, would add implementation costs for FIs, and could possibly impose other costs related to reputational risk. This is especially true if the pricing is publicly reported without contextual information that explains the pricing variations (i.e., whether one loan had a lower rate than another, due to the better credit score of the borrower).

**Time in Business**
The Bureau is considering proposing to include as a discretionary data point, the time in business of the applicant (as of the date of application), expressed in years, or months if less than one year. Time in business information could help explain differences in underwriting risk among small business applicants and thus avoid misinterpretation of the Section 1071 dataset by distinguishing potentially riskier new businesses from less risky established businesses.

Though this is information that community banks sometimes collect in the course of normal underwriting, it is not uniformly collected across the industry. Therefore, FIs should have the option of reporting this field, but not be required to do so.

**NAICS Code and Number of Employees**
As a discretionary data point, the Bureau is considering proposing that FIs collect and report the business's NAICS code and number of employees. However, ICBA notes that employee count typically has no bearing on the creditworthiness of the applicant and therefore is not a datapoint that banks currently collect on loan applications..

The addition of this datapoint would frustrate small business applicants, particularly if they have to apply full-time employee calculation formulas. This number could also become confusing if a business has seasonal employees, part-time employees, independent contractors, etc.

**Timing Considerations for Collection of Data**
The language and structure of Section 1071—which applies to "applications" from "applicants"—indicates that the data must be collected sometime during the application process. The statute does not, however, provide further direction on when during the application process information should be collected. The Bureau is not currently considering specifying a particular time period in which FIs must seek to collect 1071 data from applicants.

ICBA supports the Bureau's inclination to not specify a particular time period in which FIs must seek to collect 1071 data. As the Outline properly notes, specifying a particular time period for collecting 1071 data from applicants could be disruptive to FIs' existing processes.

**Shielding Underwriters and Other Persons (Firewall)**
Section 1071(d) includes two provisions that limit access to certain information collected under Section 1071. First, under Section 1071(d)(1), where feasible, loan underwriters or other officers

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025156

or employees of an FI or its affiliates "involved in making any determination concerning an application for credit" cannot have access to "any information provided by the applicant pursuant to a request under subsection (b)." Second, under Section 1071(d)(2), if the FI "determines" that an underwriter, employee, or officer involved in making a determination "should have access" to "any information provided by the applicant pursuant to a request under subsection (b)," the FI must provide a statutorily required notice.

Unlike large financial institutions, community banks have small staffs that often perform multiple functions. They cannot afford to hire additional staff to process the data collection on small business credit applications. It is common for the same employee that meets with an applicant and gathers information during the application process to make or participate in the credit decision. As such, it would be extraordinarily costly to segregate the information collection and storage process from the decision-making process.

In addition to increasing staff to ensure the information collection is segregated from the decision-making process, community banks would have to develop a separate database to store and report such information. Community banks would have to create and develop an entirely new small business lending process to accommodate a new data collection and reporting requirement and remove the nuanced and unique nature of community bank small business lending.

**<u>Privacy Considerations Involving Bureau Publication of 1071 Data</u>**

Section 1071 requires financial institutions to compile and maintain a record of certain data points in response to a request for credit made by small businesses and women- and minority-owned businesses. Banks are required to annually submit that record to the Bureau and any information collected under a 1071-rulemaking shall be made available to the public upon request. However, some data points may raise privacy concerns.

Specifically, ICBA is concerned that the type/purpose of the financing and amount applied for/approved are worrisome since they can be reverse engineered to find the identity of the borrower, especially in small or rural towns. Even if the data is not or cannot be reverse engineered to identify specific small business loan applicants, there is likely to be a perception of such risk among small business applicants. This perceived risk could be enough of an incentive for small business loan applicants to seek anonymity by financing with a large FI in another town or an online lender. This would unfairly discriminate against community banks located in small or rural towns, due to no fault of their own.

**<u>Balancing Test</u>**

The Bureau is considering proposing to use a "balancing test" that weighs the risks and benefits of public disclosure. Certain data would be modified or deleted if its disclosure in unmodified form would pose risks to privacy interests that are not justified by the benefits of public disclosure.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025157

As an alternative to a balancing test, the Bureau considered an approach in which it would modify data if an identified privacy risk crosses some significance threshold.

While it is a positive development that the Bureau is considering the privacy concerns of borrowers and the community banks that serve them, it is imperative that the Bureau establish a simple metric or test to exclude public disclosure of borrower information. Again, the best metric would exclude smaller community banks from having to collect and report this data. If data is excluded from public reporting by certain size or types of community banks, then the Bureau should not require the collection of that data. Requiring a bank to collect the data but not report it would create a very costly academic exercise that does not further the goals of 1071.

### Bureau Publication of 1071 Data

The Bureau is considering proposing an approach in which FIs could satisfy the requirement to make 1071 data available to the public upon request by referring the public to the Bureau's website where 1071 data would be available. Under this approach, the 1071 data would be available with any modifications or deletions required based on the Bureau's application of the balancing test.

ICBA recommends that the Bureau pursue this approach, with one modification. ICBA suggests that the Bureau compile and aggregate data collected under this section for its own use and make public such compilations of aggregate data.

### Implementation Period

The Bureau is considering proposing that FIs have approximately two calendar years for implementation following the Bureau's issuance of a final 1071 rule. ICBA believes that two years will likely be an inadequate amount of time for compliance with the rulemaking. Depending on the results of the Bureau's cost-benefit survey, training staff and developing systems to comply with the rule will be costly and likely rife with challenges. It is important that the Bureau give smaller community banks adequate time to come into compliance, perhaps through a staggered implementation or a prolonged period of "good faith compliance" exceptions.

In the past, the CFPB finalizes rules with broad coverage, initially, yet narrows that coverage on subsequent versions of the rule. While exemptions in subsequent iterations is appreciated, FIs have already incurred the costs of complying with the initial version of the rule. A better approach would be to first carefully evaluate a potential rule's effects, stagger the compliance date by requiring larger financial institutions to comply with the rule first, then cover smaller financial institutions after problems have been identified and resolved. Larger banks generally have more resources to dedicate toward compliance with new rulemaking and can serve as early test-cases and lessons learned from compliance with the rule.

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

AdminRecord-025158

In conclusion, ICBA appreciates this opportunity to comment on the Bureau's Outline of Proposals under consideration. While we firmly support the intention behind 1071 and the desire to expand access to credit for small businesses, we remain concerned that demonstrating compliance with a recordkeeping rulemaking will disadvantage community banks that do not currently have the requisite systems or staff. Should you have any questions or would like to discuss this further, please do not hesitate to contact me at Michael.Emancipator@icba.org or at 1- 866-843-4222.

Sincerely,

/s/

Michael Emancipator
Vice President and Regulatory Counsel

*The Nation's Voice for Community Banks.*®

**WASHINGTON, DC**
1615 L Street NW
Suite 900
Washington, DC 20036

**SAUK CENTRE, MN**
518 Lincoln Road
P.O. Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org