# Attachment 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | Civil Action No. 7:23-cv-00144 |
| CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS'/INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

    A.   Section 1071 .................................................................................................. 1

    B.   The Bureau's Small-Business Lending Rule ............................................... 3

    C.   This Litigation ............................................................................................. 6

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT ................................................................................................................... 8

  I.  Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes ....................................................... 8

    A.   Congress Authorized the Bureau to Determine What Additional Data to Collect .... 8

    B.   Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails ............................. 10

  II.  The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes 13

    A.   The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071 .................................................. 14

    B.   Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge ....................................... 16

  III.  The Bureau Reasonably Considered the Rule's Benefits and Costs .................................... 21

    A.   The Bureau Reasonably Evaluated the Costs and Benefits of the Rule ................. 22

    B.   The Bureau Reasonably Assessed the Likely Effects of the Rule ......................... 26

        1.   The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit ............................................................................................... 26

        2.   Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination ................................................... 27

    C.   The Bureau Reasonably Considered Cost Data from Regulated Entities ............... 30

    D.   Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations ................................. 31

  IV.  Plaintiffs' Request for Relief Ignores Basic Severability Principles .................................... 39

  V.  The Bureau's Funding Provides No Grounds for Setting Aside the Rule .......................... 40

CONCLUSION .............................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Amberg v. FDIC*,
   934 F.2d 681 (5th Cir. 1991) ................................................................. 14

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
   826 F.3d 215 (5th Cir. 2016) ................................................................. 14

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ............................................................................... 16

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337, 351 (D.C. Cir. 2019) ..................................................... 39

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022) ..................................... 7, 8, 32, 36, 40

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) ............................................................................... 11

*Clean Water Action v. EPA*,
   936 F.3d 308 (5th Cir. 2019) ......................................................... 8, 22

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ....................................... 7, 22, 30, 36

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ....................................... 8, 30, 33, 36

*Huntington Ingalls, Inc. v. Dir., OWCP*,
   70 F.4th 245 (5th Cir. 2023) ................................................................. 13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*,
   140 S. Ct. 2367 (2020) ........................................................................... 10

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ................................................................. 8

*Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................. 32

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ........................................................................... 40

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ................................................................. 14

ii

**Statutes**

12 U.S.C. § 2801 ............................................................................................................ 2

12 U.S.C. § 5512 .......................................................................................................... 21

15 U.S.C. § 1691c-2 ................................................................................................... 2, 8

15 U.S.C. § 1691c-2(a) ............................................................................................ *passim*

15 U.S.C § 1691c-2(b)(1) ...................................................................................... 2, 8, 11

15 U.S.C. § 1691c-2(c) .................................................................................................. 3

15 U.S.C. § 1691c-2(d) ........................................................................................... 3, 34

15 U.S.C. § 1691c-2(d)(2) ........................................................................................... 34

15 U.S.C. § 1691c-2(e)(1) .............................................................................................. 9

15 U.S.C. § 1691c-2(e)(2) .............................................................................................. 9

15 U.S.C. § 1691c-2(e)(2)(A)-(G) ...................................................................... 3, 8, 25

15 U.S.C. § 1691c-2(e)(2)(H) ........................................................................ 3, 6, 9, 14

15 U.S.C § 1691c-2(f)(1) ............................................................................................... 3

15 U.S.C § 1691c-2(f)(2)-(3), (e)(4) .............................................................................. 3

15 U.S.C. § 1691c-2(g) ................................................................................................ 16

15 U.S.C § 1691c-2(g)(1) ........................................................................................... 3, 9

15 U.S.C § 1691c-2(g)(2) ........................................................................................ 3, 4, 9

15 U.S.C § 1691c-2(h)(1) .............................................................................................. 5

Pub. L. No. 111-203, 124 Stat. 1367 (2010) ................................................................. 2

**Regulations**

12 C.F.R. § 1002.104(b) ................................................................................................ 5

12 C.F.R. § 1002.105(b) ................................................................................................ 5

12 C.F.R. § 1002.106(b) ................................................................................................ 5

12 C.F.R. § 1002.107(a)(1)-(20) .................................................................................. 38

12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20)............................................ 6, 9, 13, 14

12 C.F.R. § 1002.108 ....................................................................................................... 34

12 C.F.R. § 1002.112(b)-(c)............................................................................................... 6

12 C.F.R. § 1002.113 ....................................................................................................... 40

12 C.F.R. § 1002.114(b), (c)(1) ......................................................................................... 5

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule,
    88 Fed. Reg. 35,150 (May 31, 2023) ...................................................................... 2, 4

**Other Authorities**

CFPB, Proposed Rule, Small Business Lending Data Collection under the Equal Credit
    Opportunity Act (Regulation B) (Sept. 1, 2021)........................................................... 4

Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview,
    History, and Current Issues* (updated Mar. 30, 2022) ............................................... 31

S. Rep. No. 111-176 (2010) ............................................................................................. 2

## INTRODUCTION

In 2010, Congress amended the Equal Credit Opportunity Act to create a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses. It adopted those amendments for the dual purposes of facilitating fair lending enforcement, and enabling communities, governmental entities, and creditors to identify business and community development needs and opportunities of such businesses.

To further these aims, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection] Bureau determines would aid in fulfilling the purposes of this section." Congress also required the Bureau to promulgate rules "as may be necessary to carry out, enforce, and compile data pursuant to this section." In 2023, after extensive outreach and study, the Bureau published a rule titled "Small Business Lending Under the Equal Credit Opportunity Act." Among other things, the Rule identifies certain additional data points, the collection of which the Bureau determined would aid in fulfilling Congress's express purposes.

Plaintiffs/Intervenors (collectively "Plaintiffs") now challenge those reasonable determinations. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Their other arguments similarly do not entitle them to any relief: They fail to show that the Bureau's determinations exceeded its statutory authority or were arbitrary and capricious. The Court should grant summary judgment for Defendants, the Consumer Financial Protection Bureau and its Director, Rohit Chopra (collectively "the Bureau").

## BACKGROUND

### A. Section 1071

Congress passed the Consumer Financial Protection Act (CFPA) in 2010 to provide "a

direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. Rep. No. 111-176 at 2 (2010). That crisis and its aftermath disproportionately affected small businesses and lending to small businesses (just as, more recently, both were again hit hard by the COVID-19 pandemic). Small Business Lending Under the Equal Credit Opportunity Act, 88 Fed. Reg. 35,150, 35,153-54 (May 31, 2023) (Administrative Record (A.R.) 1, 4-5). Yet data about the small business lending market has historically been fragmented and incomplete, making it difficult to assess and respond to dynamics in the market. *Id.* at 7-8.

Section 1071 of the CFPA addresses this issue by amending the Equal Credit Opportunity Act (ECOA) to create a system for collecting and publishing information about lending to small businesses. Pub. L. 111-203, § 1071, 124 Stat. 1367, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). That approach mirrors in key respects that of the Home Mortgage Disclosure Act (f), 12 U.S.C. § 2801 *et seq.*, which for decades has shed valuable light on mortgage markets by requiring lenders to report transaction-level information about mortgage applications and loans. Section 1071's express purposes are to (1) "enable communities, governmental entities, and creditors to identify business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws." 15 U.S.C. § 1691c-2(a).

In Section 1071, Congress required financial institutions to gather certain information about their small business lending. Specifically, the statute directs financial institutions to "inquire whether the business is a women-owned, minority-owned, or small business." *Id.* § 1691c-2(b)(1). It also requires financial institutions to compile other distinct data points, such as the amount of credit applied for, the action taken on the application, the census tract where the

applying business is located, the gross annual revenue of the business, and the race, sex, and ethnicity of the business's principal owners. *Id.* § 1691c-2(e)(2)(A)-(G). The statute also requires financial institutions to compile "any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]." *Id.* § 1691c-2(e)(2)(H). The statute gives businesses an express right to refuse to provide certain protected demographic information, including whether the business is women-owned or minority-owned. *Id.* § 1691c-2(c). And it mandates a firewall— *i.e.*, requires that, "[w]here feasible," personnel "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. *Id.* § 1691c-2(d).[1]

The statute directs financial institutions to submit the data they compile to the Bureau each year. *Id.* § 1691c-2(f)(1). And it requires that the Bureau make public the data, subject to deletions or modifications it has discretion to make to protect privacy interests. *Id.* § 1691c-2(f)(2)-(3), (e)(4). The statute also requires the Bureau to issue rules and guidance "to carry out, enforce, and compile data pursuant to" Section 1071, *id.* § 1691c-2(g)(1), and authorizes the Bureau to adopt such exceptions and exemptions from the statutory requirements "as the Bureau deems necessary or appropriate to carry out the purposes of [Section 1071]," *id.* § 1691c-2(g)(2).

## B. The Bureau's Small-Business Lending Rule

The Bureau engaged in several years of outreach and study before proposing a rule to implement Section 1071's requirements. A.R. 22-23. Among many other activities, in 2020 the Bureau conducted a survey of financial institutions to gauge the expected upfront costs of collecting the statutorily enumerated data points and expected institutional responses to

---

[1] In issuing the Rule, the Bureau interpreted the statutory right of refusal (and firewall) to apply not only to if a business is women-owned or minority-owned, but to other related demographic inquiries as well, such as the race, sex, and ethnicity of the owners of the business. A.R. 40-41.

compliance costs. A.R. 23. The same year, it convened a panel, pursuant to the Small Business

Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity

representatives about the potential impact on small businesses of the proposals the Bureau was

considering. *Id.* at 22-23. The Panel included representatives from the Office of Advocacy of the

Small Business Administration, the Office of Management and Budget, and the Bureau, and it

consulted with representatives from 20 small financial institutions likely to be directly affected

by the rule, including community banks, credit unions, and commercial finance companies. *Id.*

After considering all of the feedback received from small entity representatives and other

stakeholders, the Bureau published its proposed rule, and invited all interested parties to submit

relevant information and feedback through the notice and comment process. The Bureau

published its proposed rule online on September 1, 2021, *see* CFPB, *Proposed Rule, Small

Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)* (Sept.

1, 2021), https://www.consumerfinance.gov/rules-policy/notice-opportunities-comment/archive-

closed/small-business-lending-data-collection-under-equal-credit-opportunity-act-regulation-b.

The proposed rule, published in the *Federal Register* on October 8, 2021, contained a

detailed analysis of expected benefits and costs, as well as the Bureau's methodology for

estimating specific categories of one-time and ongoing costs. A.R. 423, 609-632. The Bureau

received approximately 2,100 comments on the proposed rule. After considering comments

received, the Bureau issued the final rule on March 30, 2023, and it was published in the *Federal

Register* on May 31, 2023. 88 Fed. Reg. 35,150 (May 31, 2023) (A.R. 1-422).

The final rule implements Section 1071 by, among other things, defining key terms and

adopting reasonable exemptions from what the statute would otherwise require. *See* 15 U.S.C.

§ 1691c-2(g)(2) (expressly authorizing the Bureau to "adopt exceptions to any requirement of

4

this section" or to "exempt any financial institution or class of financial institutions from the requirements of this section" as the Bureau determines is "necessary or appropriate to carry out the purposes of this section"). For example, Congress defined "financial institution" so expansively in Section 1071 that—absent the Bureau's reasonable exercise of its express exemption authority—the statute's requirements apply to "any … entity that engages in any financial activity." *See id.* § 1691c-2(h)(1). To avoid unwarranted compliance burdens for the smallest financial institutions, the Bureau adopted an exemption under which only financial institutions that originate at least 100 covered credit transactions for two consecutive years are "covered financial institutions" to whom the Rule's reporting requirements apply. 12 C.F.R. § 1002.105(b); *see also* A.R. 99-109 (further explaining this exemption).[2]

Along similar lines, the Rule excludes certain transactions—such as trade credit and insurance premium financing—from the definition of "covered credit transactions," meaning that covered financial institutions need not collect and report information about applications for those types of financing. 12 C.F.R. § 1002.104(b). And with input from and the approval of the Small Business Administration, the Rule adopts a uniform size standard for identifying "small businesses"—rather than one that would vary based on the industry in which the business operates—in order to give financial institutions a simple and easy-to-apply standard. *Id.* § 1002.106(b); *see also* A.R. 111-125 (explaining the size standard); Ltr. from SBA to CFPB Approving Size Standards, A.R. 1810. The Rule also adopts a number of safe harbors[3] that limit

---

[2] The Rule also modified the proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time to prepare to comply with the Rule, and it permits voluntary early collection of demographic data so institutions can test and adjust systems in advance of compliance. 12 C.F.R. § 1002.114(b), (c)(1); A.R. 281-301.

[3] Plaintiffs do not challenge any of these Bureau efforts to alleviate the burden on financial institutions while carrying out the express purposes of Section 1071.

5

liability to financial institutions for certain bona fide errors and inaccuracies in the reported data. 12 C.F.R. § 1002.112(b)-(c); *see also* A.R. 274-81 (explaining these safe harbors).

As specifically contemplated in the statute, the Rule also identifies certain additional data points that the Bureau determined would aid in fulfilling the purposes of Section 1071. *See* 15 U.S.C. § 1691c-2(e)(2)(H). These are: (1) the method by which the application was submitted; (2) whether the application was submitted directly or indirectly; (3) for applications that are denied, the principal reasons for the denial; (4) for applications that are approved, pricing information; (5) a standardized 3-digit code to identify the industry in which the small business operates; (6) the number of workers the small business employs; (7) how long the business has been in operation; (8) whether the small business is LGBTQI+-owned (unless it declines to answer); and (9) the number of principal owners. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20). Certain of these data points, such as the reason an application is denied, do not apply to every application. Some, such as pricing information, include several subcomponents.

In issuing the final rule, the Bureau took account of comments received, including comments about expected compliance costs. Where appropriate, the Bureau made changes from what it had originally proposed. The proposed rule, for example, would have covered financial institutions that originated at least 25 covered credit transactions for two consecutive years. The final rule raised this coverage threshold from 25 to 100, a change the Bureau estimates will exempt approximately 2,200 additional institutions—mostly small banks and credit unions—that would have been covered under the 25-transaction threshold. A.R. 366. The Bureau explained that it expects this change to substantially lower market-level compliance costs. *Id.*

## C.  This Litigation

Plaintiffs Texas Bankers Association, Rio Bank, and American Bankers Association sued

to challenge the Rule. They moved to stay the Rule's compliance dates pending the outcome of *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448 (U.S. argued Oct. 3, 2023) ("*CFSA*"). That case involves an appeal by the Bureau of a Fifth Circuit decision involving a different Bureau regulation. *See CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022). The Fifth Circuit upheld the reasonableness of that regulation, rejecting the challengers' claims that the Bureau had acted arbitrarily and capriciously and exceeded its statutory authority. *Id.* at 626-31. But it set aside the rule because it concluded that the Bureau's funding violated the Appropriations Clause. *Id.* at 635-43. The Supreme Court granted review limited to the Appropriations Clause holding.

This Court granted Plaintiffs' motion for preliminary relief, concluding that the Fifth Circuit's ruling in *CFSA* meant Plaintiffs were likely to succeed on the merits of their funding claim. ECF No. 25 at 12. The Court stayed the Rule's compliance dates as to Plaintiffs and their members pending the Supreme Court's decision in *CFSA*. *Id.* at 16-17.

Several trade associations and their members filed motions to intervene, which the Court granted. The intervenors sought the same preliminary relief for themselves and their members as the Court had granted Plaintiffs. The Court granted those motions and expanded its preliminary relief to all covered financial institutions, pending the outcome in *CFSA*.[4] ECF No. 69.

## LEGAL STANDARD

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021);

---

[4] While Plaintiffs have moved for "summary judgment on their non-constitutional claims" only, *see* Plaintiffs' Consolidated Motion for Summary Judgment (Mot.) at 9, the Bureau does not understand the Court's scheduling orders (ECF Nos. 73, 76) to contemplate multiple rounds of summary judgment briefing. The Bureau moves for summary judgment on all of Plaintiffs' claims, and opposes Plaintiffs' motion for summary judgment (ECF No. 79), while recognizing that supplemental notices may be required to address the Supreme Court's ruling in *CFSA*.

*accord Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). "A rule is arbitrary and capricious if the agency relied on 'impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to the record evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise.'" *CFSA*, 51 F.4th at 629. Judicial review under that standard is "highly deferential," and a court may not substitute its own policy judgment for that of the agency." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th Cir. 2019).

## ARGUMENT

## I. Congress Broadly Empowered the Bureau to Determine what Additional Data Would Aid in Fulfilling the Express Statutory Purposes

### A. Congress Authorized the Bureau to Determine What Additional Data to Collect

In order to (1) "enable … identif[ication of] business and community development needs and opportunities of women-owned, minority-owned, and small businesses" and (2) "facilitate enforcement of fair lending laws," Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. 15 U.S.C. § 1691c-2. This includes whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small businesses' principal owners. *Id.* § 1691c-2(b)(1), (e)(2)(A)-(G).

In setting up this data-gathering rubric in Section 1071, Congress recognized an important role for the Bureau. It required the Bureau to "prescribe such rules and issue such

8

guidance as may be necessary to carry out, enforce, and compile data pursuant to this section," and authorized it to "adopt exceptions to any requirement" and "exempt any financial institution or class of financial institutions from the requirements of this section, as the Bureau deems necessary or appropriate to carry out the purposes of this section." *Id.* § 1691c-2(g)(1)-(2). Congress provided that covered institutions shall compile and maintain information provided by credit applicants "in accordance with regulations of the Bureau." *Id.* § 1691c-2(e)(1). And, in addition to identifying certain categories of data to be collected, Congress expressly authorized the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling the purposes of" Section 1071. *Id.* § 1691c-2(e)(2)(H).

Pursuant to the authority Congress granted, and based on feedback from the SBREFA process, comments on the proposed rule, and other information-gathering, the Bureau identified certain additional data points that it determined would aid in fulfilling the purposes of Section 1071.[5] Notably, of the 20 subsections of the final rule addressing data points to be collected, most (12) are devoted in whole or in part to data that was specifically enumerated by Congress in the statute. With respect to the remaining data points, the Bureau reasonably explained its determination that collection of each would advance the statutory purposes. It thus acted squarely within the authority Congress granted.

Plaintiffs do not challenge the Bureau's general authority under the statute to determine what additional data should be disclosed pursuant to § 1691c-2(e)(2). Nor could they: Section

---

[5] These are: the method by which the application was submitted; whether the application was submitted directly; the principal reason/s for any denial; pricing information for applications that are approved; a 3-digit code to identify the industry in which the small business operates; the number of workers the business employs; how long the business has been in operation; whether the business is LGBTQI+-owned (unless it declines to answer); and the number of principal owners of the small business. 12 C.F.R. § 1002.107(a)(3)-(4), (11)-(12), (15)-(18), (20).

1071 is clear on this point. Instead, Plaintiffs' primary claim—that the Bureau exceeded its authority because, in their view, the Rule will not actually "facilitate fair lending or otherwise advance the purposes of § 1071," Mot. (ECF No. 79) at 13—boils down to a disagreement with the *substance* of the Bureau's determinations, not a dispute about the Bureau's statutory authority to make those determinations. As a result, most of what Plaintiffs have labelled statutory authority arguments are in fact merely claims that the Bureau exercised its clear statutory authority in a way that Plaintiffs say was arbitrary and capricious. *See* Mot. at 6-15. These arguments therefore are addressed below in Section II.

### B.  Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

In their one claim actually related to statutory authority, Plaintiffs attempt to graft an invented "textual constraint" onto the statute that would restrict the data to be collected to only information that financial institutions would otherwise (*i.e.*, in the absence of the statute or regulation) already collect during the credit application process. *See* Mot. at 15-17. But this strained effort is hardly "textual"; indeed, it cannot be reconciled with the statute's text or stated purposes. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts. This principle applies not only to adding terms not found in the statute, but also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140 S. Ct. 2367, 2381 (2020) (cleaned up).

To begin, nothing in the statutory text provides that the "additional data" the Bureau may require financial institutions to compile and report must be limited to information that financial institutions already collect as part of the application process. Section 1691c-2(e)(2) enumerates specific data Congress believed should be disclosed in connection with covered credit applications and further authorizes the Bureau to add "any additional data that the Bureau

10

determines would aid in fulfilling the purposes of this section." That provision requires that the Bureau must determine that the additional data "would aid in fulfilling the purposes of this section," but does not otherwise cabin what additional data might be collected. Had Congress intended the significant additional limitation that Plaintiffs imagine, it could easily have said so. That it did not is the first sign that Plaintiffs have misread the statute. "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (Scalia, J.).

And in fact, the text and structure of the statute directly contradict Plaintiffs' reading. To the extent that Plaintiffs contend that subsection (e) should be read to mean that "all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))," [6] Mot. at 21-22, their reading is contradicted by the statute itself, in which Congress required specific items of information that are not typically obtained by the lender from the application process. For example, subsection (e) covers "the race, sex, and ethnicity of the principal owners of the business"; "the census tract in which is located the principal place of business of the … applicant"; and "the gross annual revenue of the business in the last fiscal year"— information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172 (describing comments that "the vast majority of [credit unions] do not collect census tract

---

[6] Plaintiffs also misread subsection (b) as requiring inquiry into "whether the [applying] business is a woman-owned, minority-owned, or small business . . . *and* whether or not such application is in response to a solicitation by the financial institution." Mot. at 21 (emphasis added). But what subsection (b) actually says is that the financial institution shall "inquire whether the business is a women-owned, minority-owned, or small business . . . *without regard to whether* such application is received in person, by mail . . . or by any other means, and *whether or not* such application is in response to a solicitation by the financial institution." 15 U.S.C. § 1691c-2(b)(1) (emphasis added); *see also* A.R. 25 (reflecting this reading of the statute, which Plaintiffs ignore).

information" and that "many banks that are not da reporters are unfamiliar with census tracts");
A.R. 176 ("industry commenters stated that there are many instances where gross annual revenue
information is not collected in the normal course of business"). In short, the statute itself refutes
Plaintiffs' reading because it requires the collection and reporting of numerous items of
information not already collected during the application process.[7]

Plaintiffs' interpretation would also produce bizarre and unworkable results at odds with
the express purposes of the statute. As Plaintiffs themselves acknowledge, current practices can
differ from sector to sector, and even lender to lender, with respect to what information lenders
collect as part of the application process. *See, e.g.*, Mot. at 15. On Plaintiffs' view, the data that
financial institutions are required to compile and report would depend almost entirely on what
they themselves choose to ask for. That would produce varying and inconsistent data when what
Congress mandated was the collection of usable, comparable information in order to reveal credit
opportunities and needs and facilitate the enforcement of fair lending law. Plaintiffs' reading
would also effectively nullify some of the statutorily enumerated data points—for example, "the
race, sex, and ethnicity of the principal owners of the business"—because lenders rarely if ever
would collect that information as part of their ordinary processes. And Plaintiffs fail to explain
how the limit they would graft onto the statute would be at all consistent with the statutory

---

[7] Presumably to avoid this result, Plaintiffs claim that the limit they would impose applies to "the
CFPB's discretion in subparagraph [(e)(2)](H)"—the provision authorizing the Bureau to
identify "any additional data that the Bureau determines would aid in fulfilling the purposes of []
section [1071]"—and do not address how this would affect the rest of subsection (e)(2), which
also includes the congressionally enumerated data points, some of which are *not* collected during
the application process. *See* Mot. at 21. The path of intra-statutory references Plaintiffs rely on to
devise their putative "textual" limit, though, would apply equally to all of section (e)(2).
Plaintiffs' failure to explain why their interpretation should be limited to one subparagraph, but
not the rest, of subsection (e)(2) is further reason why their interpretation should be rejected.

purposes when it would mean that financial institutions could simply choose not to collect information that Congress itself determined was directly relevant to identifying business and community development needs and opportunities and facilitating fair lending enforcement.

Tellingly, this interpretation appears to have occurred to Plaintiffs for the first time in their summary judgment briefing. And they do not point to anything in the record showing that it occurred to anyone else previously. Not the small business entities who participated in the SBREFA panel. Not the 2,100 commenters on the proposed rule. Not even Plaintiffs themselves in their comment letters or in any of the six complaints and amended complaints they filed.

The Court thus can reject Plaintiffs' reading as contrary to the best reading of the statute, without even needing to defer to the Bureau's interpretation. It would also be appropriate in these circumstances to defer to the Bureau's interpretation of the statute (as not limiting the types of information the Bureau can require financial institutions to compile to only those things they already collect during the application process), because that interpretation is clearly a reasonable one. *See, e.g.*, *Huntington Ingalls, Inc. v. Dir., OWCP*, 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

## II.   The Bureau Reasonably Determined the Added Data Would Advance Statutory Purposes

As explained above, Plaintiffs challenge the substance of the Bureau's determinations that collection of certain additional data points would advance the expressly stated purposes of the statute. Mot. at 11, 19, n.11. But in its rulemaking the Bureau extensively described how each of these data points (enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20), and part of (18)) would aid in fulfilling the statutory purposes. Plaintiffs do not acknowledge, much less substantively address, the Bureau's explanations for each added data point. They merely allege that "the Final Rule's massive expansion of data points will not facilitate fair lending or otherwise advance the purposes of § 1071." Mot. at 13. Plaintiffs'

generalized challenge—much of which applies equally to the statutorily enumerated data points that Congress required as to the additional data points that the Bureau determined would aid in fulfilling the statutory purposes—fails because Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes.

Because the CFPA provides "an express delegation of authority" to the Bureau to determine what additional data would aid in fulfilling the purposes of Section 1071, *see* 15 U.S.C. § 1691c-2(e)(2)(H), rules promulgated pursuant to that authority must be "given controlling weight" so long as they are not "arbitrary, capricious, or manifestly contrary to the statute." *Amberg v. FDIC*, 934 F.2d 681, 687 (5th Cir. 1991). Under the APA, the standard of review for claims that an agency acted arbitrarily or capriciously is "highly deferential" to the agency. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). In assessing whether a rule is "arbitrary [or] capricious," the Court "appl[ies] a presumption of validity" and simply "determine[s] whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (quotations omitted). In so doing, the Court "may not substitute [its] judgment for that of the agency." *Id*. at 220. Plaintiffs cannot prevail under this "highly deferential" standard.

## A.  The Bureau Reasonably Determined That Each Added Data Point Would Aid in Fulfilling the Purposes of Section 1071

Pursuant to the authority granted to it by Congress, the Bureau identified several additional data points that it determined would aid in fulfilling the two express purposes of Section 1071: enabling business and community development and facilitating enforcement of fair lending laws. 15 U.S.C. § 1691c-2(a). These additional data points are enumerated at 12 C.F.R. § 1002.107(a)(3), (4), (11), (12), (15), (16), (17), (20) and part of (18). The Bureau

explained those determinations at length in the Rule. *See, e.g.*, A.R. 132 (adopted data points believed to offer "the highest value" in light of statutory purposes), 129 (data points implemented in way to reduce burden), 135-139, 156-170, 181-186, 192-95, 224-227. Its rationale for each data point was reasonable and well supported by the record before the agency. For example, the Bureau determined that:

- Information about <u>pricing</u> "demonstrate[s] to small businesses the availability of more affordable credit," *id*. at 161, "offer[s] useful insight into underwriting disparities," and is "necessary … to examine predatory pricing or pricing disparities." *Id*. at 160. It thus helps identify business and community development needs and facilitate enforcement of fair lending laws. *Id.* at 161. Because price setting is integral to the functioning of any market, any analysis of the small business lending market that did not include pricing data "would be less meaningful." *Id.* at 160.

- Reporting the <u>method</u> by which a small business applied for credit (*e.g.*, online, in-person) will, among other things, provide "additional context for the … needs of particular geographic regions" and "help analyze the extent to which financial institutions may be providing access to credit online or by telephone in 'credit deserts' where financial institutions do not have branch operations." *Id.* at 136.

- Reporting the <u>NAICS code</u>— a standardized coding system for different industries—will, among other things, help to identify business and community needs and opportunities by revealing whether certain industries are having particular difficulty obtaining credit; facilitate fair lending enforcement by ensuring that analysts are comparing applicants with similar profiles; and will make the data more compatible with other public datasets related to small business lending, which generally use NAICS codes. *Id.* at 183.

- Data on the <u>number of persons working</u> for a small business applicant will provide a better understanding of the job maintenance and creation that small business credit provides, allowing communities, governments, and creditors to better assess business and community needs and opportunities. *Id.* at 185.

- Collection of information about <u>LGBTQI+-owned business status</u> (where the business chooses to provide this information) will have a direct and obvious effect in helping carry out Section 1071's purpose of facilitating fair lending enforcement. The Supreme Court held in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), that sex discrimination (which is, of course, prohibited under fair lending laws) encompasses sexual orientation discrimination and gender identity discrimination. This information therefore will help address an information gap about small business lending and facilitate fair lending enforcement, directly advancing the statutory purposes. A.R. 194.

**B. Plaintiffs' Objections to the Bureau's Determinations Primarily Amount to Objections to the Statute, Which They Do not Challenge**

Plaintiffs do not engage with any of these specific rationales or challenge the Bureau's basis for including any particular data point. Instead, they simply disagree that *any* collection of small business lending data is justified, as when they assert that "no data collection regime could possibly capture the complexity of small business lending." Mot. at 11. But Congress made a different determination when it enacted Section 1071 and required just such a regime. Most of the data points in the Rule were specifically enumerated by Congress in the statute, *see* A.R. 129, and the statute requires the Bureau to issue a rule "to carry out, enforce, and compile data pursuant to this section." 15 U.S.C. § 1691c-2(g). Thus, Plaintiffs' real objection seems to be with the statute Congress enacted and the President signed, but Plaintiffs have not challenged that statute here (and could not on the basis of a mere disagreement with Congress's reasonable

16

policy choices).[8]

Plaintiffs' generalized challenge fails on its own terms as well. Plaintiffs point to HMDA, a statute that has long required certain financial institutions to collect and report data about mortgage credit and credit applications. A.R. 26. They argue that "[the Rule] is based on [the Bureau's] mistaken view that the collection of [small business lending] data (whatever the cost) will allow it to fulfill the purposes of § 1071 . . . in the way that HMDA data is used to advance that statute's similar purposes." Mot. at 11. Plaintiffs further claim that the HMDA context is distinguishable from the small business lending context, and therefore an inappropriate model for the final rule, because (1) mortgage underwriting is more standardized than underwriting in small business lending, and (2) Plaintiffs believe "reporting rates will be far lower under the Final Rule's regime" than under HMDA for the demographic data points—*e.g.*, the ethnicity, race and sex of the applicant's principal owners. Mot. at 16. But Plaintiffs mischaracterize the relationship between HMDA and the Rule, and rely on unsupported speculation about expected response rates, so neither of their arguments are convincing.

<u>Underwriting Factors</u>: The Bureau administers HMDA, and the Bureau's Regulation C, 12 C.F.R. part 1003, implements that statute. Based on its familiarity with HMDA, and "certain similarities between section 1071 and HMDA as data collection and reporting statutes with different markets but similar fair lending enforcement and community development purposes," the Rule "sometimes discusses how similar provisions are addressed in the context of HMDA." A.R. 25. Contrary to Plaintiffs' characterization of the Bureau as "shrug[ging] its shoulders" at

---

[8] Plaintiffs also argue that the addition of some or all of the additional data points (Plaintiffs do not say which) was arbitrary and capricious because they will lead to a decrease in available credit to small businesses. *See* Mot. at 18-20. These arguments simply repeat Plaintiffs' claims, which they make elsewhere in their brief, that the Bureau failed to adequately consider the benefits, costs, and impacts of the Rule. The Bureau addresses these arguments below.

17

differences between the statutes, Mot. at 15, though, the Rule clearly acknowledges that "the markets to which HMDA and section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C," A.R. 25.[9]

While acknowledging that the market to which small businesses (including women-owned and minority-owned small businesses) turn for credit is "vast, varied and complex," A.R. 112, the Bureau also recognized that "market-wide data on credit to small businesses remain very limited" and concluded that the rulemaking implementing Section 1071 "will provide critical data for financial institutions, community groups, policy makers and small businesses." *Id*. As explained above, the Bureau outlined how the Rule's data collection will advance the purposes of the statute even while some factors considered as part of lenders' decisions to extend credit to small businesses may not be expressly covered in the data to be collected.

Notably, as explained above, Plaintiffs' argument—that small business lending is too non-standardized for the collected data to be meaningful—is really an attack on the statute, not the Rule, and does not entitle Plaintiffs to summary judgment based on their challenge to the Rule. Moreover, their concern about the complexity of lending decisions would, if anything, seem to suggest a need for *more* data, not less—and in any event would not be solved by shrinking the data to be collected down to the statutory data points. Plaintiffs thus do not show

---

[9] For example, while the Bureau relied on its experience with HMDA to generate cost estimates, it did not do so uncritically. Rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained those adaptations: "The Bureau used the SBREFA process, NPRM comments, research using publicly available information, and the Bureau's general expertise regarding the small business lending market to determine how these differences [between the home mortgage and small business lending] markets would change the tasks required under the final rule [from those required in the HMDA context]." *Id*. For example, the adaptations included changing the number of loan officers for representative institutions, the number of data points per application, and the estimated number of applications themselves. *See* A.R. 352 n. 942.

that the complexity and variety of small business credit transactions undermines the utility for fair lending purposes of data collected pursuant to the Rule. But even if they had, Plaintiffs completely ignore the other statutory purpose that the Bureau reasonably determined would be advanced by the added data points—identifying business and community development needs and opportunities.

Response Rates: Plaintiffs' argument that the Rule will yield low response rates on the demographic data points, and thus some data they say will be insufficiently representative to be useful to accomplish the statute's fair lending purpose, fares no better. At the outset it is worth noting that Plaintiffs again fail to even acknowledge, let alone grapple with, the other statutory purpose: identifying business and community development needs and opportunities. Plaintiffs also fail to explain why low response rates on the demographic data points (including those that Congress specifically mandated) would render invalid any specific part of the Rule.

And even with respect to the statute's fair lending purpose, Plaintiffs' argument ignores the reasoned response the Bureau offered to commenters who had raised concern about the potential for low applicant response rates to the required inquiries. *See* A.R. 203 (addressing concerns about potential low response rates by, among other things, clarifying requirement that institutions must maintain procedures to collect data at a time and manner reasonably designed to obtain responses; explaining the purposes for the data collection in plain language on the sample data collection form; and explaining the Bureau's intention to develop materials to inform small business owners about the data collection).

Plaintiffs' primary basis for their speculation about response rates is Plaintiff American Bankers Association's (ABA) own comment letter describing the Paycheck Protection Program (PPP), which, Plaintiffs claim, yielded "less than a third of the response rates in mortgage

19

lending [*i.e.*, HMDA]." Mot. at 22. But using one figure from an emergency pandemic assistance program is not sufficient evidence to conclude that response rates will be too low to provide fair lending benefits. The PPP response rates may have been low due to the program's emergency nature and the rush by all parties to submit and process applications, or because the first round of PPP application forms did not explicitly request demographic information. *See* A.R. 19973. Commenters also noted that PPP may not inform likely responses to data collection pursuant to this Rule because PPP covered a wider range of businesses than does the Rule. A.R. 222.

Plaintiffs speculate that the Rule will generate low response rates because (1) small business credit applicants will be informed about their statutory right to decline to provide the demographic information[10] and (2) the Rule does not require lenders to "assess a small business owners' race, sex, or ethnicity based on 'visual observation or [an applicant's] surname'" as HMDA requires them to do. *See* Mot. at 21-22. But speculation based on these aspects of the Rule is unwarranted at this point in light of the measures the Bureau has taken to set up the program for meaningful responses—including providing clarification as to the Rule's requirement that institutions maintain procedures to collect applicant-provided data at a time, and in a manner, that are reasonably designed to obtain responses, informing small business owners about the collection and its purposes, and continuing to assess response rates and ways to improve them (if necessary). A.R. 203, 233, 222, 238. Plaintiffs offer no reason to believe the

---

[10] Confusingly, in a section about expected low response rates, Plaintiffs claim that the Bureau "improperly" limits an applicant's ability to refuse to provide requested information "by restricting the 'opt-out' to only demographic information." Mot. at 22. In any event, Plaintiffs' argument ignores the Bureau's explanation for the coverage of the opt-out. *See* A.R. 40 ("it would have been unreasonable for Congress to have intended that these special protections would apply to any of the other data points … which the financial institution is permitted to request regardless of coverage under section 1071" and "which are not the subject of Federal antidiscrimination law, and many of which financial institutions currently use for underwriting").

20

Bureau's measures might not significantly improve expected response rates. Plaintiffs' speculation is also inappropriate because it is premised on the absence here of the "visual observation" provision that is in HMDA—but Plaintiffs themselves specifically lobbied the Bureau to omit that provision. *See, e.g.*, ABA Letter, A.R. 19333; A.R. 220.

Plaintiffs' speculation about potential low response rates on the demographic data points is based on faulty extrapolation from the PPP, a very different program from the one established by Section 1071 and this Rule; ignores the Bureau's reasoned analysis of this concern; and would apply equally to the data points the statute itself establishes. It does not show that any aspect of the Bureau's reasoning was arbitrary and capricious.

## III.    The Bureau Reasonably Considered the Rule's Benefits and Costs

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

Plaintiffs claim the Bureau failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a decrease in credit availability. But this cannot withstand scrutiny. Nor can Plaintiffs' argument that the Bureau "failed to collect the relevant cost information from lenders." In making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs.

21

At bottom, Plaintiffs simply view the benefits and costs of the Rule differently than the Bureau did. But that sort of run-of-the-mill policy disagreement falls far short of the showing that Plaintiffs must make to establish that some aspect of the Bureau's reasoning was arbitrary and capricious. *See, e.g.*, *Prometheus Radio*, 141 S. Ct. at 1158 ("Judicial review under th[e arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."); *Clean Water Action*, 936 F.3d at 312 ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

### A.  The Bureau Reasonably Evaluated the Costs and Benefits of the Rule

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects.[11] And its proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

As described above, *supra* at 3-4, the Bureau engaged in extensive outreach and study even before proposing a rule, including convening a SBREFA panel specifically intended to understand the potential impact of the rule on small entities, and conducting a survey to assess

---

[11] Plaintiffs even at times criticize the Bureau for having explained itself *too* thoroughly, as when they complain that the Bureau issued "a 900+ page rule." Mot. at 24. (In fact, the Rule itself is about six pages long in the Federal Register. *See* A.R. 378-84. The materials explaining the Bureau's decision-making and the basis for the Rule are slightly over 400 pages.)

one-time implementation costs. A.R. 22-23. When it issued the Rule, the Bureau provided an

extensive account of the expected benefits, costs, and impacts, as well as the Bureau's

methodology for estimating specific categories of one-time and ongoing costs. A.R. 342-377.

The Bureau estimated the specific number of financial institutions likely to be covered by the

Rule, *id.* at 346, and developed a cost methodology estimating both one-time and ongoing costs

likely to be incurred by those institutions, *id.* at 347-354. The Bureau appropriately accounted for

variation in costs by assuming different cost structures based on differences in financial

institutions' level of complexity in compliance operations. *Id.* at 348. The Bureau's estimates

were informed by comments it solicited, received, and considered after specifically seeking

feedback on its methodology for estimating one-time and ongoing costs and the estimates of the

specific costs themselves. *Id.* at 345.

The Bureau's analysis included consideration of all of the relevant factors set out in the

statute along with the information submitted by commenters. The Bureau explained the benefits

of the Rule: Namely, that it will create the most comprehensive dataset on credit availability for

small businesses, which will provide important insight into lending patterns in this market,

yielding benefits for identifying community development needs and opportunities and facilitating

enforcement of fair lending laws (including focusing limited supervisory resources in an efficient

manner). A.R. 354-55. The Bureau determined that increased transparency into financial

institutions' lending practices resulting from the Rule could lead to increased access to credit and

to credit offerings being more closely tailored to small businesses' needs. *Id*. at 356. It found that

communities may use the data to identify gaps in access to credit for small businesses, which can

fuel community development. *Id.* at 355. And it explained that the Rule will give researchers a

greater understanding of small-business credit market trends as well as a clearer window into

possible discrimination and other obstacles to equal access to credit for small businesses. *Id.*

With respect to covered financial institutions, the Bureau noted that the Rule could help institutions better understand the demand for small business credit products and to identify potentially profitable opportunities to extend credit, thereby increasing overall credit availability, and could reduce the compliance burden of fair lending reviews. *Id.* at 344. To assess expected costs, the Bureau calculated, for different types of representative institutions (of varying complexity of compliance operations), three types of expected costs of the Rule (the amount of which would vary with the number of loans originated, among other factors). *See* A.R. 348-369.

With respect to small business applicants for credit, the Bureau explained that it expects direct costs to these applicants—which are not themselves regulated by the Rule—to be negligible. It focused, therefore, on the costs of compliance the financial institutions will pass on to these entities. Relying on economic theory, the Bureau explained that financial institutions would find it worthwhile to keep extending credit so long as the total expected revenue from the chosen quantity of loans is greater than the sum of their ongoing fixed and variable costs. Consistent with this theory, respondents to the Bureau's 2020 cost survey who were presented with options for how they might respond to the Rule ranked "no longer offer small business products" the lowest. A.R. 365. A 2021 survey conducted by Plaintiff ABA yielded similar information.[12] *See* A.R. 19312. The Bureau therefore explained that while it expects certain costs

---

[12] Plaintiffs now try to distance themselves from their earlier analysis, and have asked the Court to consider a new study that ABA conducted only after the summary judgment briefing schedule was already set in this case (more than two years after the deadline for submitting comments about the proposed rule, and almost a year after the final rule was issued). *See* Pls.' Mot. to Supp. Admin. Record (ECF No. 78). This violates basic principles of administrative law, as explained in the Bureau's opposition to Plaintiffs' motion (ECF No. 85). But even if the Court did consider Plaintiffs' submission, it merely reflects their continued disagreement with the Bureau's analysis, not any basis for the Court to conclude that the Bureau's analysis was arbitrary and capricious.

to be passed on to small businesses, it expects these to comprise only a small portion of the total cost of the average small business loan. As a result, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. A.R. 365.

In assessing the benefits and costs of the Rule, the Bureau specifically considered the impact if the Rule were to require the collection of only the data Congress enumerated in 15 U.S.C. § 1691c-2(e)(2)(A)-(G), and not the additional data points the Bureau determined would aid in fulfilling the statutory purposes. A.R. 367-68 (estimating that additional data points raise compliance costs by $2-$7 per application).  The Bureau concluded that requiring the collection and reporting of only the data points in (A) through (G) would reduce the ability of the Rule to support the business and community development needs and opportunities of small businesses, and result in a reduction in the fair lending benefits of the data. A.R. 367. For example, not including pricing information would significantly reduce the ability to understand credit conditions available to small businesses. *Id*.

In assessing the costs and benefits of the Rule, the Bureau also explained measures it took to reduce the regulatory burden, particularly on smaller and lower-volume lenders. In the Final Rule, for example, the Bureau increased the Rule's coverage threshold to institutions originating 100 covered credit transactions for each of the two preceding years, from 25 in the proposed rule, expecting that this "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," *id.* at 290, the Bureau adopted tiered compliance dates that would give smaller financial institutions more time. *Id.* at 291. It also added safe harbors under which certain errors do not constitute violations of ECOA and Regulation B, *id.* at 28, excluded HMDA-reportable transactions, *id.* at 82, omitted verification

and visual identification requirements, *id.* at 129, 220, and provided an additional 12-month grace period, during which the Bureau does not intend to exercise its enforcement and supervisory authorities, assuming good faith compliance efforts, *id.* at. 309.

### B.  The Bureau Reasonably Assessed the Likely Effects of the Rule

Despite the Bureau's thoughtful consideration of the benefits and costs of the Rule, Plaintiffs disagree with the Bureau's assessment of the rule's likely effect on the availability of small business credit. This disagreement animates many of Plaintiffs' claims that the Bureau "exceeded its statutory authority" (*e.g.*, Plaintiffs claim that the rule will result in a decrease in credit availability, thus showing that the additional data points will not aid in fulfilling the statute's purposes, Mot. at 18-20), and that the Bureau's assessment of benefits, costs, and impacts was arbitrary and capricious.

### 1.  The Bureau Reasonably Assessed Whether the Rule Would Reduce Access to Credit

As described above, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. The Bureau estimated that costs per application will not be particularly high: It estimated that representative high complexity institutions would incur $46 in costs per application, medium complexity institutions would incur $100 in costs per application, and low complexity institutions would incur around $83 in costs per application. A.R. 362. In contrast to these low sums, each type of entity is estimated to ultimately net tens of thousands, if not hundreds of thousands, of dollars per origination. *Id*. 363.

Moreover, the Bureau received little evidence indicating that many financial institutions would cease offering small business credit in response to the Rule. *See, e.g.*, A.R. 364. Instead, "[c]omments generally supported the Bureau's expectation that the most likely response to the compliance costs of the final rule will be an increase in interest rates or fees to pass on financial

institutions' ongoing variable costs to small business credit applicants." A.R. 366. While the Bureau "acknowledge[d] the potential for other effects, such as changes in product offerings, changes in loan sizes, increased processing time, tightening of credit standards, or a reduction in market participation by financial institutions," the Bureau explained that it "does not expect these effects to be large enough to significantly impact the availability of small business credit." *Id.*

This is also borne out by the results of the Bureau's 2020 survey regarding one-time compliance costs. The survey results reflect that, out of seven options to describe the impacts of implementation of the data collection, respondents ranked "no longer offering small business credit products" the lowest. *See* A.R. 365. And only one lender told the Bureau that they themselves might consider exiting the market. *Id.* at 366.

Despite not receiving much evidence that the Rule would significantly impact the availability of small business credit, in consideration of the concerns it did receive, the Bureau took measures to reduce the regulatory burden on smaller lenders. For example, it increased the rule's coverage threshold from 25 to 100 covered credit transactions for each of the two preceding years, a change the Bureau estimates will exempt approximately 2,200 additional depository institutions—mostly small banks and credit unions. The Bureau explained that the change "should reduce the likelihood of reduced small business credit supply by financial institutions who originate few loans per year." A.R. 366. Likewise, recognizing that "smaller financial institutions may face particular difficulties," the Bureau implemented tiered compliance dates that would give smaller financial institutions more time. *Id.* at 290-91. *See also supra* 25-26 (other burden-reducing steps that while, not specific to small lenders, will help them).

### 2. Plaintiffs Do Not Demonstrate Any Factors the Bureau Failed to Consider in Making this Reasoned Determination

That Plaintiffs nevertheless assert that the Rule will have a more significant impact on the

availability of small business credit does not demonstrate that the Bureau's analysis was deficient. Plaintiffs rely primarily on conjecture and their own comment letters. *See* Mot. at 18. But their arguments do not identify any relevant factor the Bureau failed to consider.

Notably, Plaintiff ABA's comment letter, which reported the results of a cost survey that the ABA conducted of its members, largely confirms the Bureau's estimates for ongoing costs: The Bureau estimated that representative middle-complexity depository institutions (*i.e.*, among those making 150-999 originations) would incur approximately $40,079 in ongoing costs per year (and that the exact number would depend on how many loans an institution makes). A.R. 362. The ABA's comment letter similarly estimates average annual ongoing costs for financial institutions with assets below $500 million (that, on average, originate 276 loans per year – A.R. 19314) at $40,152.[13] Likewise, the data that Plaintiff ABA provided in its comment is consistent with the Bureau's determination that the Rule is not expected to significantly impact the availability of small business credit. *See* A.R. 365-66. Per that comment, few respondents to the ABA survey indicated that their response to the costs of the Rule would be to exit the small business lending market altogether. A.R. 19313.[14]

---

[13] To the extent Plaintiffs believe that these institutions are more analogous to the low complexity representative institutions described in the Rule (*i.e.*, those that originate 25-149 covered credit transactions), for whom the estimated ongoing costs are significantly lower, most of these institutions will not be covered by the final rule (because they are below the coverage threshold of 100 originations) and will not incur any costs as a result. *See* A.R. 350, n.935.

[14] The costs discussed in the ABA comment letter as contributing to a putative reduction in "competition in the small business credit market" are the "cost[s] of duplicative" data collection (*i.e.*, costs that result from the fact that, under the proposed rule, institutions that meet data reporting thresholds for HMDA and the Community Reinvestment Act (CRA) and the Rule "will be collecting and reporting data on a single application or loan "for all three data reporting obligations, but not in the same way"). A.R. 19306. Importantly, these costs have largely been mitigated in the final rule, which does not require reporting of any HMDA-reportable applications, and further notes that "proposed amendments to CRA regulations would eliminate reporting on small business … to be replaced exclusively by data from this rule." A.R. 37.

Plaintiffs' claim that "one-third of the federally-insured credit unions will seriously consider leaving the business lending market based on [the] rule taking effect," Mot. at 19 (citing A.R. 14347-8), fares no better. Plaintiffs overstate the evidence in the cited letter. And a later letter by the same entity only recounts that a majority of respondents to NAFCU's 2020 survey indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices. A.R. 18500-01. Moreover, because that survey was conducted before even the proposed rule (much less the Final Rule—which contains a higher coverage threshold, exemptions, and other provisions designed to limit the rule's burden on smaller financial institutions) was announced, it is not clear that the survey results remain meaningful. If, for example, most of the respondent credit unions would fall below the Rule's coverage threshold, they would not be subject to its requirements at all. Notably, when the letter discusses "collecting the Proposed Rule's discretionary data," it identifies potential increased costs of credit, not market exit, as the risk. *Id.*

Plaintiffs' reference to a *Bankers Digest* article is similarly unavailing. Plaintiffs claim research discussed in that article shows that a "disruption to the small-business loan process" "would be devastating to the overall Texas economy," Mot. at 20, and that a "cost-benefit analysis will lead many community banks to cease making small-business loans." *Id*. But the article offers no data supporting these conclusions; indeed, the article focuses not on potential market exit, but on calculating the compliance burden per employee of various size institutions and the role that smaller banks have in making small business loans. A.R. 2238. Moreover, the authors noted that "community banks tend to be relatively small," and it is not clear whether the banks being discussed here would fall above or below the Rule's final coverage threshold. *Id*. Obviously, if these banks would not be covered by the Rule, they would not be burdened by it.

29

C.      **The Bureau Reasonably Considered Cost Data from Regulated Entities**

Plaintiffs allege that the Bureau failed to adequately seek and consider data from regulated entities. *See* Mot. at 22-26. But the Rule itself explains how throughout the rulemaking process, the Bureau solicited and considered cost data from regulated entities. For example, the Bureau's 2020 survey on one-time compliance costs was developed based on guidance from industry. And the Bureau worked with trade organizations to promote that survey and recruit members to respond to it. A.R. 349.  The Rule reflects information gleaned from that survey, along with changes that the Bureau made to its cost estimates in response to comments from lenders, industry organizations, and other commenters. *Id*. at 363.

This was more than enough. Indeed, the Supreme Court not long ago emphasized that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" and that agencies may reasonably act even in the absence of "perfect empirical or statistical data." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) (affirming agency action where the agency acknowledged gaps in the data and reasonably relied on the data it had); *accord Huawei Techs. USA., Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021) (affirming agency action where agency based its analysis on the data before it).

Plaintiffs' primary argument to the contrary seems to be that the Bureau did not adopt every policy suggestion proposed by a lender, and that the Bureau did not generate even more evidence than it did. Plaintiff claims the Bureau should have generated more evidence because "the SBA [Small Business Administration] Office of Advocacy not[ed] that trade associations representing small financial institutions could provide 'authoritative information about the costs associated with the NPRM.'" Mot. at 28. But Plaintiffs do not identify what additional cost data they think the Bureau should have sought, or explain why they ignore the specific outreach the

30

Bureau did to lenders and trade associations and the Bureau's reasoned consideration of the data received from these entities. Moreover, Plaintiffs mischaracterize the Office of Advocacy's letter: The actual text of the [footnote in that] letter that Plaintiffs rely on merely states that "[the Office of] Advocacy understands that the trade associations that represent small financial institutions may be submitting authoritative information about the costs associated with the NPRM." In other words, all the letter says is that lenders may submit comments to the Bureau about costs. The letter should not be read to indicate that lenders or trade associations had any additional "authoritative" data that the Bureau should be faulted for not obtaining.[15]

### D. Plaintiffs Do Not Identify Factors the Bureau Failed to Consider or Anything Else Calling into Question the Bureau's Reasoned Determinations

Plaintiffs offer a hodge-podge of remaining claims, none of which undermines the Bureau's reasonable determinations. Plaintiffs' smattering of out-of-context quotes from cases and unsupported rhetoric about the Bureau's analyses cannot disturb the Bureau's reasonable consideration of the costs and benefits of the Rule. The Record demonstrates that the Bureau reasonably considered each of the factors Plaintiffs identify, and Plaintiffs' mere disagreement with the outcome of that consideration does not make it arbitrary or capricious.

"Real World Costs": First, Plaintiffs allege (discussed above) that the Bureau avoided "the real-world cost to the regulated community." Mot. at 23. But the above explanation (specifically about how the Bureau evaluated compliance costs and the likelihood of a decrease in credit availability), and the Record itself, demonstrates that the Bureau did not "simply

---

[15] The Office of Advocacy is an "independent" office within the Small Business Administration with a mandate to advance the "views and concerns of small businesses." *See* Congressional Research Service, CRS Report, R43625, *SBA Office of Advocacy: Overview, History, and Current Issues* (updated Mar. 30, 2022), https://crsreports.congress.gov/product/pdf/R/R43625. The office does not speak for SBA as a whole, and Plaintiffs' repeated reference to the Office of Advocacy as an "agency" are inaccurate.

assume[] compliance costs will be minimal" (*Id.* at 24), or "offer[] only naked hope" (*Id.* at 25). Instead, the Bureau meaningfully gathered information and considered it. A.R. 341-369. To the extent Plaintiffs fault the Bureau for insufficiently considering a commenter's concern that the Rule "would decrease lending to small businesses," this is addressed *supra* at 26-29.

<u>Impact on Small Banks</u>: To the extent Plaintiffs allege that the Bureau failed to consider the conclusion of researchers discussed in the *Bankers Digest* article that "small banks" "were . . . going to be impacted most by the ongoing compliance costs," Mot. at 24-25, Plaintiffs do not explain why addressing the *relative* impact, as opposed to the impact itself, is an important aspect of the Rule that the Bureau must consider. *See Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem"); *CFSA,* 51 F.4th at 629 (holding that "even if the [challenged rule's] limit . . . might send some loans to collections sooner, that possibility is not so 'important' that the Bureau had to consider it specifically").

In any event, the Bureau reasonably considered the impact of the Rule on small financial institutions. *See, e.g.*, A.R. 348 (assessing costs for "Type A" financial institutions that the Bureau assumed would receive fewer than 300 applications per year); *id.* at 368 (analyzing "potential impact on depository institutions and credit unions with $10 billion or less in total assets"); *id.* at 373-77 (describing number of small entities that would be covered by the Rule and the projected costs to those entities). And, recognizing that the impact of the Rule on small banks might differ from the impact on other institutions (for reasons including their level of complexity of operations and compliance systems, as well as the number of product offerings and volume of originations), *id*. at 368, the Bureau took steps to reduce the burden on these smaller institutions. *See, e.g.*, A.R. 356 (excluding financial institutions with fewer than 100

32

originated covered credit transactions); *id.* at 290-91 (modifying proposed compliance schedule, adopting tiered implementation dates that would give smaller financial institutions more time).

Miscellaneous costs: Plaintiffs identify a number of potential costs of the Rule that they allege the Bureau did not consider: (1) "costs related to increased fair lending supervision and enforcement," Mot. at 27, 31; (2) the impact of the Rule on borrowers in rural areas, *id.* at 31 (*i.e.*, "that a large share of rural small businesses will bear all the costs of compliance"); (3) costs associated with the "firewall" requirement, *id.* at 31,—because the Bureau "explicitly instruct[ed] survey respondents to omit such projected amounts from their responses"; and (4) additional costs lenders might incur preparing for, and defending themselves, in meritless lawsuits related to the data collection. *Id.* at 32.

The Bureau reasonably considered all of these costs.

(1) With respect to potentially increased costs of fair lending supervision and enforcement, the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to false positives (*i.e.*, determinations of fair lending violations when none have occurred), that false positives could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. A.R. 363. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id.*; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data).

Significantly, the Bureau also noted that it actually expects the Rule to *lower* "false positive" rates during fair lending prioritization by regulators. With more comprehensive application-level data, regulators will be better able to identify fair lending risks and more

efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the compliance burden of fair lending reviews for lower risk financial institutions. A.R. 357.

(2) Plaintiffs allege (Mot. at 31) that the Bureau ignored that the predominant supplier of rural credit (Farm Credit System, or FCS, lenders) are customer-owned cooperatives whose customers will bear the burden of increased compliance costs, and just "assumed costs would be negligible." But the Bureau actually evaluated the costs that those institutions would incur, noted the possibility that costs would be passed on, and expressly acknowledged that FCS lenders are included in the Rule's coverage. *See* A.R. 368. The Bureau correctly did not separately count any compliance costs as costs for the credit customers who jointly own the cooperatives: these costs had been counted as costs to the institution, and it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives.

(3) With respect to putative costs related to the statutory firewall provision,[16] Plaintiffs allege that the Bureau's survey improperly excluded information about these costs. Mot. at 31. But the fact that the firewall provision was outside the scope of the survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision.

Moreover, the Rule implements a statutory exception from the firewall requirement, *see* 15 U.S.C. § 1691c-2(d)(2), and, as the Bureau explained, it expects many financial institutions to be covered by that exception. *See* A.R. 361 ("it would not be feasible for many financial

---

[16] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

institutions to implement the firewall. In that case, the financial institution would be permitted to determine that one or more employees or officers should have access to protected demographic information and provide a notice to applicants informing them"). Thus, it was reasonable to exclude firewall costs from the survey.[17]

(4) The Bureau considered risks and costs that lenders might incur in connection with "meritless" lawsuits related to the data collection, and explained that a number of provisions of the Rule would serve to limit these, including the bona fide error provision of § 1002.112(b) and the various safe harbors in § 1002.112(c). *See, e.g.*, A.R. 273.

Truth in Lending Act (TILA): Plaintiffs further try to undermine the Bureau's analysis by arguing that "much of the information that must be reported under HMDA is already collected and disclosed by mortgage lenders pursuant to TILA," which is not the case with data to be collected pursuant to the Statute and the Rule, which lenders may have to start collecting for the first time. Mot. at 30. Plaintiffs overstate the overlap between HMDA and TILA. But in any event, the Bureau specifically contemplated that some lenders would need to begin collecting and reporting data pursuant to the Rule that they do not already collect. *See, e.g.*, A.R. 359. And the Bureau incorporated this into its discussion of one-time costs. *Id.*

Methodology: To the extent that Plaintiffs fault the Bureau for using "estimates" (Mot. at 27), for not "quantifying" certain benefits (Mot. at 34), and/or using a survey that was completed by only a "fraction of lenders" and asked only about collection of data expressly enumerated by Congress (Mot. at 7), these methodological complaints are unavailing.

The record demonstrates the care and lengths to which the Bureau went to derive, assess,

---

[17] Commenters also focused on concerns about the ability of institutions that are small or have limited staff to implement a firewall. But many of these institutions are not actually subject to the Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

and evaluate these "estimates." And neither the APA nor the CFPA impose an obligation to obtain or generate specific types of data. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (APA); *CFSA*, 51 F.4th at 629 (finding sufficient Bureau's explanation for why it relied on the data it had). Nor was the Bureau required "to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits" such as, for example, (per A.R. 344) promoting investment in certain underserved markets and promoting competitive markets. *See Huawei*, 2 F.4th at 454-55. The Bureau "made a reasonable predictive judgment based on the evidence it had," and Plaintiffs cannot demand that the agency perform its own empirical or statistical studies, especially when it relies on unquantifiable benefits. *Id.* at 455.

Similarly, that the survey was completed by only a sample of lenders does not undermine its utility. The Bureau reasonably explained how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here should not be credited since Plaintiff ABA employed similar methodology in its survey. Finally, that the Bureau's survey sought information only about the "statutory" data points does not change much as there's little evidence that collecting the additional data points would significantly increase the *one-time, upfront costs* of preparing to comply with the Rule. In any event, the survey was issued before the Bureau even issued its outline of proposals in 2020 and thus before there were specific other data points to ask about.

<u>Consideration of Benefits</u>: Plaintiffs critique the Bureau's assessment of the benefits of the Rule, citing selectively from the Rule and baldly alleging that the Bureau "does not explain how these purported benefits cannot be accomplished by collection of only the statutory data points."[18] Mot. at 35. But throughout the Rule, the Bureau explained why each added data point

---

[18] Plaintiffs' other criticism of the Bureau's assessment of the benefits of the Rule—that expected low reporting rates "will ensure that the data obtained from lenders … will not be

was important for fulfilling the statute's purposes (see above). Moreover, the Bureau expressly addressed why it rejected the alternative of only adopting the statutory data points. A.R. 367-68. It explained that limiting the Rule's data collection to only the data points required under the statute would reduce the ability of the Rule to support the business and community development needs and opportunities of small businesses. For example, not including pricing information would significantly reduce the ability to understand credit conditions available to small businesses. And not including NAICS code or time in business would also reduce the ability of governmental entities to tailor programs that can specifically benefit young businesses or businesses in certain industries. *Id.*

Moreover, the Bureau explained, reporting only the data points enumerated in 15 U.S.C. § 1691c-2(e)(2)(A) through (G) "would result in a reduction in the fair lending benefit of the data compared to the final rule" because, as an example, "not collecting pricing information would obscure possible fair lending risk by covered financial institutions," as potential discriminatory behavior is not limited to the action taken on an application, but also includes the terms and conditions under which applicants can access credit. *Id.* at 367. So if the Bureau did not collect pricing information, it would not be able to evaluate potential discriminatory lending practices.

Plaintiffs also critique the Bureau's assessment that a purported benefit of the Rule is "enhanced transparency," claiming the Bureau said this will only benefit small businesses in "indirect" (presumably, minimal) ways. Mot. at 34. But Plaintiffs' mixing and matching of

---

useful in identifying discriminatory lending patterns . . . nor will it advance opportunities for women-owned, minority-owned, or small businesses" (Mot. at 34)—is addressed above, *supra* at 19-21 (explaining why the record does not support the expectation that response rates will be particularly low). This also mitigates Plaintiffs' allegation that some of the Bureau's determinations are mere "optimistic predictions" and that "the expanded data is not likely to 'lead to a more efficient use of government resources in fair lending laws.'" Mot. at 35.

quotations from different sentences in the Federal Register—so that they distort what the Bureau said—should not be countenanced. While the Bureau acknowledged that "most provisions of the final rule will benefit small businesses in indirect ways," it noted that, "[n]evertheless, the Bureau believes that the impact of enhanced transparency will substantially benefit small businesses." A.R. 344. The Bureau specifically explained that substantial benefit, noting that the enhanced transparency the Rule provides into the small business lending market will facilitate detection (and remediation) of discrimination, promote public and private investment in certain underserved markets and promote competitive markets, all of which benefit small businesses. *Id.*

"*Exponentially/Vastly Expanded Data Collection*": Plaintiffs' final argument, Mot. at 35, which runs throughout the brief, is a claim that the Rule expanded financial institution's data-collection obligations from "13 data points sought by Congress" to a "regulatory behemoth" of "81 points." Mot. at 24; *see also id.* at 35 (alleging CFPB "did not substantiate that the Final Rule's requirement that lenders collect 68 additional data points would serve any benefit").

That is simply not true. As noted, the Rule requires the collection of 20 items of information, not all of which will apply in every instance (*e.g.*, the reason a credit application was denied or the amount of credit granted), some of which include several subparts, and most of which were specifically required by the statute—not added by the Bureau. *See* 12 C.F.R. § 1002.107(a)(1)-(20).

Plaintiffs base their erroneous claim that the Rule requires "81 points" of information—68 more than the statute—on the fact that financial institutions will have 81 *fields* that they can use, as appropriate, to report small business credit application information to the Bureau. *See* CFPB, Small Business Lending Rule: Data Points Chart, A.R. 1638-77. The use of those multiple fields to ensure that data is gathered in a consistent and usable format does not increase

the amount of information lenders must compile. That would be like claiming that having to provide one's name (a single data point) on a form using one field for first name, another for middle initial, and another for last name has tripled the amount of information required. That's not a "three times increase" in the data collected. It is instead simply an efficient and consistent way to collect that data.[19]

Plaintiffs know this: In their comment letter, Plaintiffs ABA and the Texas Bankers Association described the proposed rule as adding "eight discretionary data points," A.R. 19308, —not the 68 they now claim. Yet Plaintiffs have repeated the incorrect claim that the Rule will expand the statutorily enumerated data points to 81 items of information throughout this litigation, and even made it the centerpiece of their case. Whatever else that choice may reveal, it does not suggest that the reasoned analysis underpinning the Rule was in some way arbitrary.

## IV.    Plaintiffs' Request for Relief Ignores Basic Severability Principles

Plaintiffs' motion for summary judgment asks that the Rule "be set aside" in its entirety. *E.g.*, Mot. at 35. But even if Plaintiffs had established that some specific aspect of the Rule was arbitrary, capricious, or in excess of statutory authority (and they do not), Plaintiffs would not have shown their entitlement to the broad relief they describe.

This is because "the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). That principle is consistent with courts' longstanding practice, "when confronting a constitutional flaw in a statute, … to limit the solution to the problem, severing any problematic

---

[19] Plaintiffs' apples to oranges comparison is even less apt because financial institutions will not use all 81 fields for any given application. For example, 36 of the 81 fields are for reporting demographic information about up to four principal owners of a business. Where a business has fewer owners, or declines to provide demographic data, it will not need to use all these fields.

portions while leaving the remainder intact." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020). Should the Court determine that some specific aspect of the Rule were invalid, it would then need to conduct a severability analysis to determine the appropriate remedy, including because the Rule contains an express severability clause. The clause states that, "If any provision …, or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect." 12 C.F.R. § 1002.113.

Plaintiffs fail to grapple with this provision or to justify the broad relief they request. Often, they fail even to explain what specific part of the Rule they object to, instead taking issue with the very idea of collecting and sharing any data about small business credit (despite Congress's choice to enact a statute requiring just that). The Bureau respectfully submits that, if the Court were to hold that some aspect of the Rule is invalid, it should consider whether it would be appropriate to order additional briefing on remedies in order to determine the appropriate relief in this case in light of severability and other remedial principles.

### V.    The Bureau's Funding Provides No Grounds for Setting Aside the Rule

Plaintiffs also claim that the Rule is invalid because the statutory provisions by which Congress chose to fund the Bureau's operations are unconstitutional. *See* Am. Compl. ¶¶ 78-83. While that claim currently draws support from the Fifth Circuit's ruling in *CFSA v. CFPB*, 51 F.4th 616 (5th Cir. 2022), the Supreme Court is currently reviewing that decision and is expected to issue a decision by June. The Bureau respectfully submits that the Fifth Circuit's holding was erroneous for the reasons stated in the Solicitor General's brief to the Supreme Court, *see* Br. of Pet., *CFSA*, 2023 WL 3385418, and that it is ultimately entitled to judgment as a matter of law on this claim. The Bureau will promptly notify the Court of relevant developments in *CFSA*.

### CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

40

Dated:  April 12, 2024                    Respectfully submitted,


                                          */s/ Karen S. Bloom*
                                          Seth Frotman
                                            *General Counsel*
                                          Steven Y. Bressler
                                            *Deputy General Counsel*
                                          Kevin E. Friedl
                                            *Acting Assistant General Counsel*

                                          Karen S. Bloom (NY # 4438917)
                                          Andrea Matthews (MA #693538)
                                            *Senior Counsel*
                                          Consumer Financial Protection Bureau
                                          1700 G Street NW
                                          Washington, DC 20552
                                          (202) 435-7012 (phone)
                                          (202) 435-7024 (facsimile)
                                          karen.bloom@cfpb.gov

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Karen S. Bloom*