# Attachment 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

TEXAS BANKERS ASSOCIATION, *et al.*,

        *Plaintiffs*,

    *v.*

CONSUMER FINANCIAL PROTECTION
BUREAU, *et al.*,

        *Defendants*.

Civil Action No. 7:23-cv-00144

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

**INTRODUCTION** ........................................................................................... 1

**ARGUMENT** .................................................................................................. 2

    **I.   The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes**........................ 2

        **A.  Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected** ........................................................ 2

        **B.  Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails** ....................... 2

        **C.  The Bureau Reasonably Exercised the Authority Congress Granted** ............... 8

    **II.  The Bureau Reasonably Evaluated the Costs of the Rule**.................................. 9

        **A.  The Bureau Thoroughly Analyzed Expected Costs**.............................. 9

        **B.  Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider** 12

    **III. The Bureau Reasonably Evaluated the Benefits of the Rule** ......................... 21

    **IV. The Bureau's Funding Provides No Grounds for Setting Aside the Rule**.................. 25

    **CONCLUSION** ....................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
   826 F.3d 215 (5th Cir. 2016) ................................................................................ 8

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ............................................................................ 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ........................................................................................... 25

*Chamber of Com. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) .............................................................................. 15

*Chamber of Com. of the U.S. v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) ............................................................................ 15

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ........................................................................................... 15

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ........................................................................... 16, 19

*Huntington Ingalls, Inc. v. Dir., OWCP*,
   70 F.4th 245 (5th Cir. 2023) ................................................................................ 5

*Lab. Council for Latin Am. Advancement v. United States Env't Prot. Agency*,
   12 F.4th 234 (2d Cir. 2021) ............................................................................... 13

*Nicopure Labs, LLC v. FDA*,
   266 F. Supp. 3d 360 (D.D.C. 2017) ................................................................... 23

*Rest. L. Ctr. v. DOL*,
   2023 WL 4375518 (W.D. Tex. July 6, 2023) .................................................... 13

*Sw. Elec. Power Co. v. United States Env't Prot. Agency*,
   920 F.3d 999 (5th Cir. 2019) ............................................................................... 8

**Statutes**

12 U.S.C. § 5512 ......................................................................................................... 9

15 U.S.C. § 1691c-2 ................................................................................................... 2

15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G) .................................................................. 2

15 U.S.C. § 1691c-2(e)(2)(H) ................................................................................. 2

15 U.S.C. § 1691c-2(g)(2)-(3) ................................................................................. 8

Pub. L. No. 111-203, § 1071, 124 Stat. 1376 (2010)....................................... 2

**Regulations**

12 C.F.R. § 1002.108 ............................................................................................. 20

# INTRODUCTION

Congress created a system for collecting and publishing information about applications for credit for women-owned, minority-owned, and small businesses to enable identification of business and community development needs, and to facilitate fair lending enforcement. To advance these purposes, in Section 1071 of the Consumer Financial Protection Act, Congress identified certain data that financial institutions must collect, including "any additional data that the [Consumer Financial Protection Bureau] determines would aid in fulfilling the purposes of this section." In their summary judgment briefing, Plaintiffs offer a convoluted reading of Section 1071 that claims, for the first time, that Congress did not authorize the Bureau to require lenders to "collect additional information they do not already possess." But Plaintiffs' interpretation cannot be reconciled with the statute's text, structure, or stated purposes. Perhaps that is why Section 1071 has never before been read in the way Plaintiffs now propose—including by Plaintiffs themselves, whose own comment letter on the Bureau's proposed rule explicitly recognized the discretionary authority they now deny the Bureau has. A.R. 19324.

Plaintiffs' other summary judgment arguments fare no better. Some of their objections really go to the statute Congress enacted, not the Bureau's rule, and so no remedy is available for them here. Plaintiffs also claim the Bureau underestimated the costs of the additional data required by the Rule, but Plaintiffs do not point to any alternate estimates of the marginal cost of collecting or reporting this data, nor do they identify any specific cost estimates in the Record the Bureau failed to consider. Likewise, Plaintiffs simply assert that the Bureau overstated the expected benefits of the additional data points without addressing the Bureau's extensive discussion of how each additional data point would advance the statutory purposes. Finally, Plaintiffs' smattering of out-of-context quotes and unsupported rhetoric about the Bureau's

analyses cannot disturb the Bureau's reasonable consideration of the Rule's costs and benefits.

## ARGUMENT

I.  **The Bureau Reasonably Exercised the Authority Congress Explicitly Granted it to Determine What Data Would Aid in Fulfilling the Statutory Purposes**

### A.  Congress Explicitly Authorized the Bureau to Determine What Additional Data Should be Collected

Congress required financial institutions to collect and report, and for the Bureau to publish (subject to deletions or modifications for privacy), certain information about their small-business lending. Pub. L. No. 111-203, § 1071, 124 Stat. 1376, 2056-59 (2010) (codified at 15 U.S.C. § 1691c-2). This information includes distinct data points identified in the statute, such as whether the business is women-owned, minority-owned, or a small business, as well as information about the amount of credit applied for, the action taken on the application, the census tract where the small business is principally located, the business' gross annual revenue, and the race, sex, and ethnicity of the small business' principal owners. 15 U.S.C. § 1691c-2(b)(1), (e)(2)(A)-(G). Congress also explicitly authorized the Bureau to identify additional data points "that the Bureau determines would aid in fulfilling the purposes of" Section 1071, which financial institutions must compile and disclose. *Id.* § 1691c-2(e)(2)(H).

### B.  Plaintiffs' Attempt to Graft a New Limit onto the Statute Fails

Plaintiffs' summary judgment briefs offer, for the first time,[1] a convoluted reading of the statute that would restrict the Bureau from requiring financial institutions to collect and disclose

---

[1] Plaintiffs' attempt to demonstrate that they raised this interpretation in their Complaint is undermined by that pleading itself. Plaintiffs point to the fact that their Amended Complaint alleges that CFPB acted "in excess of [its] authority and short of statutory right by expanding the 13 data points prescribed in § 1071." Pls.' Reply at 21, n.10. But the Amended Complaint is clear that the alleged illegality there is that the "data now being sought by the expanded Final Rule far outstrip the statute's purposes," ECF No. 12, ¶87, not that the Bureau does not actually have authority under the statute to designate additional data points for collection.

any information that the institution had not already collected. In their opening brief, Plaintiffs relied on a path of intra-statutory references to conclude that "the textual limitation on the CFPB's discretion in subparagraph (H) is that all information disclosed under subsection (e) would be information already obtained by the lender *from the application process* (along with the additional data Congress mandated in subsection (b))." Pls.' Mot. at 21-22.[2]  In their Reply brief, Plaintiffs assert that this means the "CFPB has discretionary authority to require financial institutions to 'itemize . . . additional data' that the financial institution has independently 'compiled and maintained,' [but] it cannot require lenders to make additional 'inquiries' of their applicants." Pls.' Reply at 22. Plaintiffs do not explain why Congress would have empowered the Bureau to identify data points that financial institutions must compile and report, but then leave it up to each financial institution whether to collect that data (as part of an application process) in the first place.

More fundamentally, as explained in the Bureau's opening brief (at 15-17), Plaintiffs' strained attempt to graft this invented "textual constraint" onto the statute is hardly "textual." Indeed, it cannot be reconciled with the statute's text, structure, or purposes. Section 1691c-2(e)(2) enumerates eight categories of data to be disclosed in connection with covered credit applications. The first seven categories (*i.e.,* subsections (A) through (G)) are data that Congress specified, including the applicant's gross annual revenue and the race, sex, and ethnicity of the

---

[2] Plaintiffs' "interpretation" has evolved: Their motion focused on limiting subsection (e) to disclosure of "information already obtained by the lender *from the application process*." Pls.' Mot. at 21-22. After the Bureau pointed out that some of the Congressionally-identified data points in subsection (e)(2)(A)-(G) are *not* generally obtained as part of the *application process*, Plaintiffs' tweaked their theory to (1) limit subsection (e) to "things financial institutions already collect in the normal course," Pls.' Reply at 23; and (2) offer the unsupported assertion that, in any event, it "seems likely that Congress simply assumed the information listed for 'itemization' was being collected in loan applications anyway." *Id*. at 24.

principal owners of the business. The eighth category (clause (H)) is "any additional data that the Bureau determines would aid in fulfilling the purposes of this section." Plaintiffs concede (as they must) that a financial institution must collect and disclose the data that Congress identified in the first seven categories (subsections (A) through (G)), whether or not the financial institution has already collected that information. *See, e.g.*, Pls.' Reply at 19 (discussing "collection" of "statutorily required data points"); A.R. 19324 (comment letter of Plaintiffs ABA, TBA, and others, stating that "Congress mandated the collection and reporting of thirteen data points"). However, Plaintiffs think a very different rule applies to the eighth category of information (*i.e.*, data identified by the Bureau under clause (H)). For clause (H) data, but no other, Plaintiffs say that the Bureau can only require a financial institution to disclose data if the data are otherwise already collected by the institution. Nothing in the statute warrants subjecting one part of subsection (e) to an unarticulated additional requirement that does not apply to other parts of subsection (e).

Plaintiffs' reply brief tries to justify this discrepancy by speculating that "[i]t seems likely that Congress simply assumed the information listed for itemization [in subsections (e)(2)(A)-(G)] was being collected in loan applications anyway." Pls.' Reply at 24. But there is no indication that Congress assumed that every financial institution always collected all of the information Congress itemized in subsection (e)(2)(A)-(G). And, as Plaintiffs otherwise concede, *see* Pls.' Reply at 24 (asserting that "most" of the itemized information is already collected), any such assumption would have been unfounded. Indeed, subsection (e) requires the collection of "the race, sex, and ethnicity of the principal owners of the business" and "the census tract in which is located the principal place of business of the . . . applicant"—information not already collected, or not always collected, during the application process. *See, e.g.*, A.R. 172, 176. For

4

instance, inquiring "whether [a] business is a women-owned, minority-owned, or small business" would not necessarily indicate the race, sex, and ethnicity of each of the principal owners of the business. Because it is implausible to assume that Congress believed that every institution would always voluntarily collect the itemized information in (e)(2)(A)-(G), Plaintiffs cannot escape that their interpretation requires concluding that the terms "compile" and "maintain" in (e)(1) and (2) mean one thing as applied to (e)(2)(A)-(G) and something else as applied to (e)(2)(H). (The alternative, which Plaintiffs disclaim, would be that financial institutions would only have to compile the data that Congress itemized if they choose to collect it). As compared to an interpretation that applies differently to different subsections of the same statute, the better reading is that Congress intended data identified pursuant to (e)(2)(H) to be treated the way Plaintiffs concede the rest of the data identified in subsection (e) should—*i.e.,* that financial institutions must collect and disclose the data identified therein. The court should therefore reject Plaintiff's reading as contrary to the best reading of the statute, even without deferring to the Bureau's interpretation.[3]

Plaintiffs' arguments about the statutory text and context do not warrant departure from this conclusion. They claim, for example, that "[h]ad Congress intended a catch-all provision" granting the CFPB "unfettered discretion" to identify additional data to be collected to advance statutory purposes, "it would be found in subsection (b) [under the heading of "information gathering"], not at the end of subsection (e)." Pls.' Reply at 25. But it makes perfect sense that Congress placed the Bureau's authority to identify additional information to be collected and

---

[3] As the Bureau has noted, CFPB Mot. at 13, it would also be appropriate to defer to the Bureau's interpretation (as not limiting information the Bureau can require financial institutions to compile to only those things already collected), because that interpretation is reasonable. *See, e.g., Huntington Ingalls, Inc. v. Dir., OWCP,* 70 F.4th 245, 252 & n.2 (5th Cir. 2023).

compiled directly after listing the data points that Congress specified would have to be collected and compiled. In any event, subsection (b)[4] *does* contemplate the grant of discretionary authority to the Bureau to identify additional data to be collected—it explicitly provides that the "information gathering" and "inquiry" provided for in subsection (b) shall be conducted "[s]ubject to the requirements of this section" (*i.e.*, pursuant to the other requirements Congress set out in Section 1071, including subsection (e)(2)(H)'s grant of authority to the Bureau to identify other data that would advance statutory purposes)."[5]

Plaintiffs' interpretation is not only inconsistent with the statutory language and context. It is also at odds with how Section 1071 has previously been consistently understood—*i.e.*, as granting the Bureau discretionary authority to designate for collection by financial institutions additional data that the Bureau believes would aid in fulfilling the purposes of Section 1071 (regardless of whether this data is already collected). During the years of outreach and study that the Bureau engaged in before proposing a rule to implement Section 1071's requirements, there is no evidence that anyone challenged the Bureau's authority to identify such information for collection and disclosure. When, in 2020, the Bureau convened a panel, pursuant to the Small Business Regulatory Enforcement Fairness Act (SBREFA), to gather feedback from small-entity representatives about the potential impact on small businesses of the proposals the Bureau was

---

[4] In subsection (b)(1), Congress authorizes financial institutions to make inquiries, in connection with credit applications for women-owned, minority-owned, or small businesses, that would otherwise be prohibited by law (*i.e.*, by 12 C.F.R. § 1002.5(b)'s restriction on creditors "inquir[ing] about the race, color, religion, national origin, or sex of an applicant . . . in connection with a credit transaction"). The rest of subsection (b) provides additional parameters for the data collection.

[5] Plaintiffs' other argument about the "statutory context"—that Congress' grant of authority to the Bureau falls under the statutory header of "itemization" rather than the header of "information gathering" (*i.e.*, subsection b), Pls.' Reply at 23—fails for the same reason. As explained above, subsection b's "information gathering" requirement explicitly contemplates being "[s]ubject to the [other] requirements" of Section 1071.

considering, that panel's report explicitly reflected an understanding of the statute that included Congress' grant to the Bureau of authority to identify for collection additional data points that would aid in fulfilling the statutory purposes. A.R. 22-23, 1150, 1158 (Report of SBREFA Panel[6] stating that "Section 1071(e)(2)(H) requires [financial institutions] to collect and report 'any additional data that the Bureau determines would aid in fulfilling the purposes of [Section 1071]'"). None of the 2,100 commenters on the proposed rule challenged this interpretation, including commenters on whom Plaintiffs rely heavily in their briefing, who explicitly recognized the authority Plaintiffs now try to deny. *See, e.g.*, A.R. 18390-91 (SBA Office of Advocacy stating that "Section 1071 requires financial institutions to collect and report any additional data that the CFPB determines would aid in fulfilling the purposes of Section 1071 such as discretionary data points"). Not even Plaintiffs themselves in their comment letters, or in any of the complaints they filed, claimed—as they do in their summary judgment briefing—that the Bureau did not have authority to identify any additional data points that institutions would have to collect. *See*, *e.g.*, A.R. 19324 (Comment letter submitted by Plaintiffs ABA, TBA, and others, noting that "Congress mandated the collection and reporting of thirteen data points. [And] Section 1071 gives the Bureau the authority to require any additional data that the Bureau determines would aid in fulfilling the purposes of that section"). Plaintiffs' interpretation should be rejected because it is inconsistent with the text, context, and consistent prior understanding of the statute.[7]

---

[6] The SBREFA Panel consisted of the Chief Counsel for Advocacy of the Small Business Administration, a representative from the Office of Information and Regulatory Affairs in the Office of Management and Budget, and a representative of the Bureau.

[7] Plaintiffs' argument about subsection (g) does not change this. They claim this subsection's grant of authority to the Bureau does not undermine their interpretation because subsection (g) "merely directs the Bureau to make rules about how it [the Bureau] carries out" certain

### C.  The Bureau Reasonably Exercised the Authority Congress Granted

Pursuant to the authority Congress actually granted, and based on feedback from the SBREFA process, comments on the proposed rule, and other information-gathering, the Bureau identified certain additional data points that it determined would aid in fulfilling the purposes of Section 1071. The Bureau reasonably explained its determination that collection of each would advance the statutory purposes. It thus acted squarely within the authority Congress granted.[8]

While Plaintiffs' complaints and opening brief primarily challenged what they called "the Final Rule's massive expansion" of the amount of data that would be required by the Rule, as compared to the number of data fields required by Congress," Mot. at 6, 13, the Bureau explained why this claim is incorrect and even Plaintiffs have conceded that the Rule adds less than ten data points. *See* CFPB Mot. at 39. Unsurprisingly, Plaintiffs' Reply brief seems to move away from the quantitative argument. But even in their reply, Plaintiffs do not engage with the Bureau's specific explanations for how each additional data point *does* support the statute's purposes. Plaintiffs contend instead (at 25) that the Bureau's understanding of Section 1071

---

responsibilities, but does not cover regulating conduct of financial institutions. *See* Pls.' Mot. at 24. But even a cursory review of subsection (g) shows this reading is error. The subsection includes granting the Bureau authority to "exempt any *financial institution*" (or class thereof) from the requirements of Section 1071, and issuing guidance designed to facilitate compliance, including by "assisting *financial institutions*" in determining whether applicants are women-owned, minority-owned, or small businesses. 15 U.S.C. § 1691c-2(g)(2)-(3) (emphasis added).

[8] Plaintiffs claim the Bureau's "expansion" of data points will "undermine" the statutory purposes, because, according to some commenters, the Rule "would impair credit access for small businesses." Pls.' Reply at 24. This is not a challenge to the Bureau's authority, but to how it was exercised. And the Rule demonstrates the Bureau reasonably assessed the costs, benefits and likely effects of the Rule. *See infra.* This is all that is required under the "highly deferential" review that is appropriate here, *see Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019), pursuant to which the Court "appl[ies] a presumption of validity" and need only "determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision," without "substitut[ing] [its] judgment for that of the agency." *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 219-20 (5th Cir. 2016) (cleaned up).

would confer "unfettered discretion." But there is no support for this, particularly because the Bureau's discretion is cabined by the determination that the Bureau is required to make (as it did in the Rule) that any additional identified data would advance the statutory purposes.

## II.    The Bureau Reasonably Evaluated the Costs of the Rule

In issuing the Rule, the Bureau was required to, and did, consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," as well as "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas." 12 U.S.C. § 5512. The Bureau conducted this analysis with respect to "consumers and covered persons," as specified in the statute, and also conducted "this same analysis with respect to small businesses and the financial institutions" covered by the Rule. A.R. 343.

### A.  The Bureau Thoroughly Analyzed Expected Costs

The record makes clear that the Bureau thoroughly analyzed the expected benefits, costs, and impacts of the Rule. It took numerous steps to gather relevant evidence, carefully considered feedback from industry and other commenters, and detailed at great length its assessment of the Rule's likely effects. The Bureau's proposed rule included numerous exemptions and exceptions from what the statute would otherwise require that the Bureau expects (and Plaintiffs do not dispute) will significantly lighten the expected costs of complying—particularly for small entities. And in issuing the Rule, the Bureau went even further to alleviate potential burden, including by raising the threshold at which financial institutions would be covered.

Plaintiffs nevertheless claim the Bureau's analysis was flawed because it did not reasonably estimate "the costs of the expanded data collection requirements" (Reply at 4) and failed to consider certain factors, including that the Rule will (according to Plaintiffs) lead to a

decrease in credit availability. But in making these arguments, Plaintiffs ignore or misstate the Record, and their smattering of out-of-context quotations from various cases fail to establish that the Bureau did not reasonably evaluate the relevant benefits and costs. Most significantly, Plaintiffs fail to point to any alternate cost estimates for the discretionary data points (*i.e.*, fail to identify any actual record evidence showing why the Bureau's considered assessment of costs was too low), nor do they identify any specific cost estimates the Bureau failed to consider.

Reviewing the reasonable and thorough steps the Bureau took to calculate and analyze the costs imposed by the final rule highlights the error of Plaintiffs' conclusions. To assess costs, the Bureau analyzed how many financial institutions it expected to be covered by the final rule, and analyzed the types of institutions that will be covered. A.R. 347. It decided to analyze costs by focusing on three representative types of financial institutions, and producing, for each type, reasonable estimates of the costs of compliance with the final rule. The cost estimates covered both <u>one-time costs</u> that financial institutions are likely to incur to develop the infrastructure to collect and report data under the final rule, and <u>ongoing costs</u> that financial institutions will incur from ongoing data collection and reporting activities.

With respect to the one-time costs,[9] the Bureau identified nine categories of one-time costs likely to be incurred to develop the infrastructure to collect and report data under the final rule, and the Bureau calculated the expected amounts to be incurred in each of these categories of costs (for each of the types of financial institutions). A.R. 348-49. The Bureau did so in part based on responses to a 2020 survey it conducted, which sought financial institutions' feedback

---

[9] Based on certain similarities between Section 1071 and HMDA, another data collection and reporting statute that the Bureau administers (and that a Bureau regulation [Regulation C] implements), the Bureau adapted the methodology used in its 2015 HMDA rulemaking to develop a methodology for assessing costs, considering the specific context of small business lending and comments received on the proposed rule. A.R. 347, 352.

about the one-time costs they would expect to incur (*e.g.*, total hours, staff costs, non-salary expenses, etc. associated with each task) from complying with a rule implementing Section 1071. A.R. 349. In calculating estimated costs in the final rule, the Bureau delineated the assumptions it was making for each category of representative financial institutions. *See, e.g.*, A.R. 352-53, 58. As an example, for cost categories that involved wages, the Bureau explained what salary ranges it was using, and the number of each type of employee it expected to be required for each task, for each type of institution. Using this information, the Bureau calculated the total estimated costs for this labor. *See* A.R. 358-364.

With respect to ongoing costs, the Bureau similarly identified 15 data collection and reporting activities that would impose ongoing costs, estimated the time likely to be spent on ongoing tasks, and multiplied the time for each expected activity by the mean hourly wage of loan officers (using wages published by the Bureau of Labor Statistics). *See* A.R. 353. In addition to calculating one-time costs and annual ongoing costs for specific entities, the Bureau also explained the difference between estimated costs of the final rule and estimated costs of a rule that included collection of only the information identified by Congress in § 1691c-2(e)(2)(A)-(G). A.R. 366. With respect to upfront costs, the Bureau expects that "accounting for the additional data points would only increase the one-time cost estimates by a small amount because most of the one-time costs come from a financial institution moving from not reporting 1071 data to being required to report such data" (rather than variations in the specific data that could be collected). A.R. 360. With respect to ongoing costs, the Bureau calculated that the costs of a rule without the discretionary data points would be $7 less per application (and $705 less per year) for the smallest lenders (*i.e.*, those that reported between 25 and 149 originations) as compared to the final rule; $4 less per application (and $1,783 less per year) for mid-sized

11

lenders (*i.e.*, those that reported between 150 and 999 originations), and $2 less per application (and $12,809 less per year) for large lenders (*i.e.*, those that reported over 1000 originations). A.R. 368. The Bureau also generated market-level estimates of the costs the Rule would impose on various types of financial institutions. A.R. 362.

### B. Plaintiffs Do Not Identify Any Relevant Costs the Bureau Failed to Consider

Despite this analysis, Plaintiffs allege that the Bureau insufficiently considered the costs of the Rule. Primarily they claim that the Bureau did not reasonably address the costs or benefits *of the Rule's discretionary data points*.[10] But as the above analysis makes clear, the Bureau analyzed in detail the specific difference in costs that a rule with the discretionary data points might impose, as compared to a rule that did not require the collection of such data. Plaintiffs simply err in saying that the Bureau insufficiently addressed these costs.[11]

1. The comment letters on which Plaintiffs primarily rely do not show costs the Bureau failed to consider

Plaintiffs' challenge relies heavily on their erroneous assertion that the Bureau chose to ignore relevant cost data that plaintiffs "and a federal agency" have "pointed to," and to ignore "warnings" from an "agency of the federal government." Pls.' Reply at 5, n.2, 8-9. But Plaintiffs do not point to specific cost data in the record that contradicts the Bureau's conclusions, nor do they specifically address the Bureau's actual calculations. Instead, they point to generic language in comment letters, and rely heavily on a comment letter from the independent Office of

---

[10] Notably, this is a departure from Plaintiffs' opening brief, which focused more on challenging the Bureau's *overall* analysis of costs and benefits (not just the analysis of the costs and benefits of the discretionary data points).

[11] Plaintiffs claim the Bureau "acknowledge[s] the lack of actual cost estimates for the discretionary data points," but nevertheless "refused to develop non-arbitrary estimates." Pls.' Mot. at 6. But this vastly overstates the Bureau's statement on which it relies, which indicates just that the available data imposed some limits on the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule. A.R. 343

Advocacy within the Small Business Administration ("Advocacy"), an office that, despite Plaintiffs' intimations to the contrary, does not speak on behalf of the Small Business Administration or any other federal agency. A.R. 18386 ("Advocacy is an independent office within the U.S. Small Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration"). Plaintiffs cite this letter no fewer than twelve times in their brief, *see* Pls.' Reply at 1, 4, 5, 6, 8, 9, 19, 26, 27, 29, though the letter provides no support for Plaintiffs' challenge to the final rule.[12]  First, it does not actually point to any specific "cost data," much less important cost data that the Bureau was required to, but failed to, consider. While the letter recounts that some small entity representatives to the SBREFA panel considered the Bureau's early estimate of training costs (presented during the SBREFA process) to be too low, A.R. 18388, the Bureau acknowledged this, and, in response, adjusted upward the training estimates included in the Rule. A.R. 362. Likewise, the other cost comments being discussed in Advocacy's letter are responsive to the early cost estimates presented during the SBREFA process and do not account for the ways the Bureau tried to ease the regulatory burden in the final rule by, for example, (1) increasing the Rule's coverage threshold from 25 to 100 covered credit transactions for each of the two preceding years, a change the Bureau estimates will exempt approximately 2,200 additional depository institutions—mostly small banks and credit unions; and (2) implementing tiered compliance

---

[12] A letter from the Office of Advocacy is hardly the trump card Plaintiffs claim it to be. Plaintiffs cite no authority for the proposition that an agency's rejection of some of that office's suggestions is evidence that the agency acted arbitrarily and capriciously. To the contrary, courts have appropriately rejected such claims. *See, e.g.*, *Rest. L. Ctr. v. DOL*, No. 1:21-cv-1106, 2023 WL 4375518, at *11 (W.D. Tex. July 6, 2023) (upholding agency analysis despite plaintiffs arguing the agency "failed to consider the SBA's Office of Advocacy comments"); *see also Lab. Council for Latin Am. Advancement v. United States Env't Prot. Agency*, 12 F.4th 234, 249 (2d Cir. 2021) (same).

dates that would give smaller financial institutions more time, *id.* at 290-91; *see also* Bureau

Mot. at 25-26 (other burden-reducing steps that while, not specific to small lenders, will help

them). As such, it is not clear that in light of the changes made in the final rule, Advocacy would

still make the recommendations that it did about the proposed rule. Also, while Advocacy

"encourage[d] the CFPB to disregard the discretionary data points" because they are "costly and

potentially problematic in terms of privacy,"[13] A.R. 18392, this is hardly the "warning" Plaintiffs

represent it to be. And, in any event, this is only one of a number of recommendations that

Advocacy made for the Bureau to consider in promulgating its final rule, and the Bureau adopted

or implemented a large number of these. *Compare* A.R. 18389 (recommending raising the 25

originations threshold) *and* A.R. 366 (raising the threshold); A.R. 18389-90 (recommending

using revised and simplified definition of what constitutes a small business) *and* A.R. 55

(adopting simplified definition); A.R. 18391 (recommending deleting visual observation

requirement) *and* A.R. 224 (deleting visual observation requirement); A.R. 18393

(recommending modifying implementation date) *and* A.R. 308 (modifying implementation date).

This further undermines Plaintiffs' attempt to use this letter to show that the Bureau's final rule

is unduly burdensome, fails to consider relevant costs, or disregards relevant "warnings" from a

"federal agency." Finally, while the letter notes in a footnote that "Advocacy understands that the

trade associations that represent small financial institutions **may be submitting** authoritative

information about the costs associated with the NPRM," A.R. 18388, n.10 (emphasis added), this

is hardly evidence that the Bureau did not consider cost data, much less "authoritative cost data,"

as Plaintiffs claim, *see* Pls.' Reply at 6, particularly since no such information was submitted to

---

[13] Notably, Plaintiffs' Reply brief (at 20, 18 and 13) mentions "privacy costs" of the Rule that "cannot be justified," though its opening brief did not mention such putative costs.

the Bureau at any point before the final rule was published (over a year after the Advocacy comment was submitted).[14] It is also not evidence that the Bureau did not obtain "reliable cost data" or "stopped its costs analysis after asserting it had no reliable basis for estimating those costs." Pls.' Reply at 9. The record is replete with the Bureau's attempts to obtain information from regulated entities and its use of the information it did receive from these entities to reasonably calculate costs. *See supra.* It is thus dissimilar to *Chamber of Commerce of the U.S. v. SEC*, which Plaintiffs cite, in which the agency "stopped its cost analysis after asserting it had no reliable basis for estimating those costs." 412 F.3d 133, 144 (D.C. Cir. 2005).

Plaintiffs also (at 8) attempt to distinguish the cost analysis that was upheld in *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021), by claiming that in *Prometheus*, the FCC "repeatedly asked for data on the question at issue (not some prior, fundamentally different version of it)." But the record here too reflects that the Bureau sought data specifically about the costs and impacts of the discretionary data points. *See* A.R. 423 (seeking comments on proposal that included these points); 1320-22 (same). Moreover, to the extent the Fifth Circuit rejected reliance on *Prometheus* in *Chamber of Commerce v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023) because the *Chamber* case did not involve an agency relying both on data it had and an "absence of countervailing evidence," Pls.' Reply at 8, Plaintiffs fail to show how that holding is relevant to this case. They assert that the Bureau "cannot rely on *Prometheus Radio*" because "the data the Bureau had was known to be inadequate and there was countervailing evidence **forthcoming.**" *Id.* (emphasis added). But the vague belief that additional information—not even necessarily concerning the relevant inquiry (the marginal cost of the additional discretionary data

---

[14] While Plaintiffs reference their 2024 survey, the court should not consider that survey for the reasons detailed in the Bureau's opposition to Plaintiffs' motion to supplement the record with the untimely survey. ECF No. 85.

points)—"may be" submitted to the Bureau in the future (especially when such information was not submitted before the Rule was published) is insufficient countervailing evidence to evade *Prometheus*, and Plaintiffs cite no authority to the contrary.

Plaintiffs' attempt (Reply at 8) to distinguish *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 453-54 (5th Cir. 2021), is similarly unavailing.  In *Huawei*, the court upheld the FCC's decision to exclude two Chinese providers from the market because the company challenging the FCC's order could point to no evidence that suggested increased costs would result from taking that action, so the agency "reasonably relied on evidence it had" about the costs of excluding the companies from the market. Like in *Huawei*, the Bureau here reasonably relied on the evidence it had, and challengers do not point to any specific evidence in the record that calls into question the Bureau's reasonable analysis of costs.

>    2.    Plaintiffs do not identify any relevant costs the Bureau failed to consider

In addition to claiming that the Bureau failed to consider certain costs that commenters said would be detailed in the future, Plaintiffs challenge the Bureau's (1) reliance on a "flawed" one-time cost survey (that asked lenders to estimate costs based on collecting the statutorily enumerated data points and allegedly didn't survey a sufficiently broad, representative sample of lenders), Pls.' Reply at 5; (2) ostensible miscalculation of the real-world costs of the Rule "because of the rule's mismatch with HMDA (including the inability of the regulated community to draw data from common sources of information already being collected and disclosed, such as that required by TILA)," *id*. at 10; (3) failure to accurately account for "the expected decrease in small businesses' access to credit even if lenders do not leave the market, *id*; [15] (4) failure to

---

[15] Plaintiffs also claim the Bureau miscalculated "real-world" costs of the Rule because the SBREFA panel provided feedback on a version of the Rule that was more limited than the final rule. Pls.' Reply at 10. But the Bureau's estimates were *not* only based on the SBREFA

consider costs related to reputational harm and increased fair lending litigation that Plaintiffs assert will arise from false positives suggested by the data; (5) failure to account for the impact on rural lenders, *id.* at 5, 9, 11; and (6) insufficient explanation of which institutions will be exempt from the costs of the Rule's firewall requirement. *Id.* at 12. But the Bureau explained in its opening brief why none of these claims show the Bureau's costs analysis was deficient, and Plaintiffs' reiteration does not engage with the Bureau's reasonable explanations. In summary:

Survey: As explained above, the Bureau used information from the 2020 cost survey to inform its calculations of upfront costs of implementing the final rule. Plaintiffs challenge the use of a survey that they claim was completed by only a "fraction of lenders" and asked only about collection of data expressly enumerated by Congress (Pls.' Reply at 6), but these methodological complaints are unavailing. The Bureau reasonably explained (see Bureau Mot. at 36) how it relied on, and extrapolated from, the data it collected. And Plaintiffs' complaint here should not be credited since Plaintiff ABA employed similar methodology in a survey. *Id.*[16] Finally, that the Bureau's survey sought information only about the "statutory" data points does not change much, as there is little evidence that collecting the additional data points would significantly increase the *one-time*, *upfront costs* of preparing to comply with the Rule.[17]

HMDA: Plaintiffs repeatedly point to what they call a "mismatch" with HMDA. *See, e.g.*,

---

feedback, and specifically accounted for the iterative nature of the SBREFA process. Also, Plaintiffs' claim (Reply at 4) that the "SBREFA panel … [was] based on a collection of only the data points identified in the statute" is incorrect. The SBREFA outline of proposals noted the Bureau was considering requiring data points including pricing, NAICS code, number of employees, and time in business. *See* A.R. 1158.

[16] Moreover, the Bureau requested trade organizations' assistance in having their members response to the survey. To the extent there were too few responses, it may be attributable to how well the organizations did so.

[17] This applies equally to the Plaintiffs' complaint (Pls.' Reply at 6, n.10) about the Bureau's methodology of using "estimates."

Pls.' Reply at 10. Contrary to Plaintiffs' characterization of the Bureau as "failing to accurately account for" the differences between the statutes, Pls.' Reply at 10, the Rule clearly acknowledges that "the markets to which HMDA and Section 1071 apply are … different in significant respects, and those differences are reflected between the present rule and Regulation C," A.R. 25. For example, the Bureau did not uncritically rely on its experience with HMDA to generate cost estimates; rather, "the Bureau *adapted* its methodology from its 2015 HMDA rulemaking activities to the small business lending market." A.R. 347 (emphasis added). And it reasonably explained those adaptations. *Id*.; *see also* A.R. 352 n. 942 (explaining adaptations to account for the differences between the two contexts, including changing the number of loan officers for representative institutions and the estimated number of applications themselves).

Expected Decrease in Access to Credit and Impact on Small Lenders: The Bureau's opening brief extensively discussed the impact the final rule could have on access to small business credit. Bureau's Mot. at 26-29. As described there and in the final rule, the Bureau expects the Rule to have only a limited impact on the availability and affordability of small business credit. The Bureau estimated that costs per application will not be particularly high: It estimated that representative high-complexity institutions would incur $46 in costs per application, medium-complexity institutions would incur $100 in costs per application, and low-complexity institutions would incur around $83 in costs per application. A.R. 362. In contrast to these low sums, each type of entity is estimated to ultimately net tens of thousands, if not hundreds of thousands, of dollars per origination. *Id*. 363. Plaintiffs do not engage with these specific calculations, and instead make unsubstantiated claims about how the Bureau did not sufficiently explain why it believes the Rule will not significantly decrease aggregate credit. *See* Pls.' Reply at 11. Similarly, Plaintiffs repeat their claim that the Bureau did not "adequately

consider" the cost the Rule would have on small lenders. *Id*. But this simply ignores all the steps the Bureau took in the final rule to not only consider the costs to small lenders, but also to minimize those costs, including raising the threshold, which changed the number of small depository institutions covered from an estimated 2,900-3,000 (under the NPRM's threshold) to 1,000-1,100, AR 376, and changing the compliance dates to give smaller lenders additional time.

Reputational Harm, Fair Lending Litigation: With respect to potentially increased costs of defending lawsuits brought under ECOA, the Bureau acknowledged comments expressing concern that fair lending analyses on incomplete data could lead to determinations of fair lending violations when none have occurred, that such "false positives" could lead to reputational risk, and that lenders could change their lending behavior to avoid the potential for false positives. A.R. 363; Pls.' Reply at 5, 12. The Bureau noted, though, that these costs are hard to quantify and the commenters who discussed them did not provide any specific estimates for these costs. *Id*.; *cf. Huawei*, 2 F.4th at 453-54 (confirming that agency was not required to address speculative costs raised by some commenters but for which the commenters provided no relevant cost data). While acknowledging that the Rule notes the existence of these costs, Plaintiffs' brief claims the Bureau "fails to account" for these additional costs. They cite no authority to support this notion, nor do they explain what such "accounting" would look like.

In any event, the Rule itself notes that the Bureau actually expects the Rule to *lower* "false positive" rates during fair lending prioritization by regulators. With more comprehensive application-level data, regulators will be better able to identify fair lending risks and more efficiently prioritize their exams and enforcement activities. A.R. 344. This will reduce the compliance burden of fair lending reviews for lower-risk financial institutions. A.R. 357.

Rural Impact: With respect to costs imposed on rural areas, Plaintiffs largely reiterate the

claim in their opening brief about the sufficiency of the Bureau's consideration of the Rule's impacts on rural areas, and ignore the response the Bureau offered, which included explaining that the Bureau correctly did not separately count any compliance costs as costs for the credit-customers who jointly own the cooperative because these costs had been counted as costs to the institution, and that it would literally be double-counting to count the total costs to the institution again as the costs to customers because they are cooperatives. Plaintiffs also newly argue that the Bureau has ignored how the "principal innovation" of the 1071 Rule (*i.e.*, the discretionary data points) would impact rural small businesses. Pls.' Reply at 11. But even setting aside Plaintiffs' attempt to raise a new argument in their reply brief, Plaintiffs do not explain why the Bureau's general assessment of the marginal costs of the discretionary data points would not be appropriate for rural businesses. They also fail to explain why the Bureau's discussion of how to consider costs to these rural collectives does not apply equally to consideration of the costs (and potential double-counting) related to discretionary data points.

Firewall: Plaintiffs continue to claim that the Bureau insufficiently considered the costs of the firewall provision.[18] The Bureau previously explained that the fact that the firewall provision was outside the scope of the 2020 survey—itself just one of many pieces of evidence that the Bureau considered in assessing the benefits and costs of the Rule—does not demonstrate that the Bureau failed to reasonably consider the benefits and costs of its proposal to implement the firewall provision. CFPB Mot. at 34. Moreover, the Bureau previously explained that the Rule implements a statutory exception from the firewall requirement, whereby a financial

---

[18] Section 1691c-2(d) mandates that "[w]here feasible," underwriters and other officers and employees "involved in making any determination concerning an application for credit" cannot have access to protected demographic information provided pursuant to the data collection mandate of the statute. The Rule mirrors this statutory requirement. *See* 12 C.F.R. § 1002.108.

institution can determine that one or more employees or officers should have access to protected demographic information (rather than it being protected by a firewall), and can provide that access, so long as they provide notice to the relevant applicant(s). A.R. 361. Plaintiffs now claim (Reply at 12) that this analysis is deficient because "the Bureau does not explain which institutions will be subject" to the firewall requirement, and, they claim, "CFPB will doubtless expect most of its reporting lenders to abide by the requirement," which will impose additional cost on these financial institutions.[19] But Plaintiffs' unfounded speculation again simply ignores the Rule itself, which says nothing about the Bureau expecting "most" lenders to require a firewall as opposed to availing themselves of the statutory exception. In fact, the Rule itself makes clear that the firewall requirement does not apply to a particular employee or officer *if the financial institution itself* determines that the employee or officer should have access to the relevant information (and provides the relevant notice). A.R. 28. It is hard to see how the cost of complying with the *statutory* "firewall" provision—especially where the Rule provides a clear path whereby financial institutions can avoid attendant costs (when someone has a need to have access to an applicant's protected demographic data)—is, as Plaintiffs' claim, a "significant cost not factored into the … equation" that shows the Bureau's analysis is "arbitrary and capricious."

## III.    The Bureau Reasonably Evaluated the Benefits of the Rule

In terms of the Rule's benefits, the Bureau explained that the data to be collected will be the largest and most comprehensive dataset in the United States on credit availability for small businesses, and that visibility into the lending patterns in this market should provide important benefits for facilitating fair lending enforcement and enabling identification of business and

---

[19] Commenters also focused on concerns about the ability of institutions that are small or have limited staff to implement a firewall. But many of these institutions are not actually subject to the Rule (including its firewall provision) because of the increased originations threshold. A.R. 247.

community development needs and opportunities. It explained that the Rule should lead to increased access to credit (resulting from increased transparency into financial institutions' lending patterns) as well as credit offerings more closely tailored to small businesses' needs. AR 356. It likewise considered that the data disclosed pursuant to the Rule can help creditors identify potentially profitable opportunities to extend credit, and will reduce the false positive rate observed during fair lending prioritization thereby increasing the efficiency of fair lending reviews. A.R. 355. The Bureau specifically explained how each of the specific data points to be collected will advance these goals. *See* CFPB Mot. at 15-16. [20]

Plaintiffs do not directly challenge any of these benefits[21] or the Bureau's analysis of how each data point is important to fulfilling the statutory objectives. They simply reiterate their arguments (without addressing the Bureau's responses) that the Bureau's analysis "overstates" the benefits of the Rule because: (1) the Bureau "just assumes" more data will automatically be useful, Pls.' Reply at 16 and 24, and does not explain *how much more meaningful* the collected

---

[20] The amicus brief submitted by "financial institutions, lenders, and other stakeholders in the small business lending market," Mot. for Leave to File Amicus Brief (ECF No. 94) at 2, offers additional information about how the Rule will provide data necessary for lenders and stakeholders "to identify business and community development needs and opportunities"; bring products responsive to those opportunities and needs to the market; harness market forces to spur the development of better, more inclusive small business financing; shed light on and discourage predatory practices; and provide other benefits. Amicus Brief (ECF No. 94-1) at 5, 10, 13, 15.

[21] To the extent Plaintiffs claim the Rule will *decrease*, rather than increase, credit available to women-owned, minority-owned, and small businesses (Reply at 10, 27), Plaintiffs do not introduce any evidence to support that claim. *See supra* and CFPB Mot. at 26-29. Their speculative arguments rely on comments discussing versions of the Rule that did not account for the efforts the Bureau made to reduce regulatory burden, and ignore data from regulated entities indicating they are unlikely to exit the market in response to the Rule. Also, while Plaintiffs refer (at 7, 27) to an NAFCU survey "indicating a potentially large drop in available credit," no survey indicating this is cited in the later comment letter submitted by the same entity. *See* A.R. 18500-01. The only NAFCU survey referenced there recounts that a majority of respondents indicated that, in response to Section 1071's requirements taking effect, they would expect to change *either* the set of small business products they offer or their underwriting practices.

data would be with information from the discretionary data points, like pricing information, included, *id.* at 14-15; (2) the data being collected will not capture factors that lenders actually consider when underwriting and pricing small business loans, and that data to be collected does not provide "apples to apples" comparisons of commercial loans *id.* at 13-15; and (3) the response rates will be too low for data collected pursuant to the Rule to be sufficiently meaningful, *id*. at 14. None of Plaintiffs' arguments hold up.

First, the Bureau did not "just assume" more data would be useful; it specifically explained why each of the categories of information it proposed having the Rule mandate collection of, would advance the statutory purposes. *See* A.R. 129, 132, 135-39, 156-70, 181-86, 192-95, 224-227. That it did not quantify the value of this information does not make the Rule arbitrary.[22] *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). And contrary to Plaintiffs' suggestion (Reply at 16), no inference should be drawn about a particular data point's ultimate utility to fulfill statutory purposes from the fact that it was not one of the data points initially designated by Congress.[23] After all, Section 1071 explicitly recognizes that there may be other types of data that the Bureau, in its expertise, may add to the categories of data to be collected because their collection advances the statutory purposes.[24]

Second, to the extent Plaintiffs claim the variability among small business loans makes it

---

[22] Plaintiffs rely on *Chamber*, but that case does not stand for the proposition that the Bureau must quantify each of the benefits it identifies.

[23] Also, while Plaintiffs (Reply at 25 n.11) claim the Rule's designation of information about LGBTQI+-owned business status might also be prohibited and is "textual overreach," the Bureau has reasonably explained this designation. *See* CFPB Mot. at 16.

[24] Plaintiffs claim (Reply at 17) the Congressionally-enumerated data points would have been sufficient to identify a complete lack of lending in an area or to minority-owned businesses. But this ignores other types of discrimination. *See* A.R. 160 (the data to be collected can help ferret out conduct such as predatory loan terms and pricing being offered on a discriminatory basis).

inhospitable for data collection and analysis, this, as the Bureau has explained (and Plaintiffs ignore) is an argument with the statute, not the Rule. And while acknowledging that the market to which small businesses turn for credit is "vast, varied and complex," A.R. 112, the Bureau also recognized that "market-wide data on credit to small businesses remain very limited" and concluded that the rulemaking implementing Section 1071 "will provide critical data for financial institutions, community groups, policy makers and small businesses." *Id.* As explained above, the Bureau outlined how the Rule's data collection will advance the statutory purposes even while some factors considered as part of lenders' decisions to extend credit to small businesses may not be expressly included in the data.

Finally, in its opening brief, the Bureau (at 19-21) explained why the data Plaintiffs rely upon for their conclusions about response rates is inapt. In response, Plaintiffs double down on their arguments, essentially claiming that even if their arguments are based on inapplicable data [from the Paycheck Protection Program (PPP)], they should be credited because there is no other evidence in the record about what type of response rates should be anticipated.[25]  *Id.*  But Plaintiffs are wrong that inapt data should be credited just because there is no better data available in the record. And they are wrong that the "only evidence in the record on this point . . . is the experience with the PPP." Pls.' Reply at 18. For example, the Rule specifically notes that "[a]lthough certain commenters cited to the [PPP] as evidence that the collection of demographic

---

[25] Plaintiffs complain (Reply at 18) that the Bureau explained in its brief (but not in the Rule) why the response rates from the PPP data are not applicable to the context of small business lending. But the Bureau did include (and Plaintiffs appear to simply ignore) the Rule's discussion of such reasons. *See, e.g.*, A.R. 222 ("[s]ome suggested that … low response rates . . . [in connection with] the [PPP] experience …were attributable to the program's emergency nature, and the rush by all parties to submit and process applications. Commenters also noted that the Paycheck Protection Program may not inform the likely response rates under this rule because that program covered a wider range of businesses than the Bureau's proposal"); 235 ("the lower response rate for [PPP] applicants is likely due to independent factors").

information at the time of application results in low response rates, the demographic response

rates for Regulation C are significantly higher than for the [PPP], with only 14.3 and 14.7

percent of HMDA respondents not providing a response for race and ethnicity, respectively."

A.R. 235.  In any event, Plaintiffs' argument conveniently discounts the evidence in the record

about the steps the Bureau has taken, and is taking, to increase response rates. A.R. 203.

Plaintiffs offer no reason to believe the Bureau's assessment of likely response rates, particularly

in light of the experience with HMDA, and the steps the Bureau is taking to ensure meaningful

response rates, should not yield sufficiently representative responses.[26] Plaintiffs fall far short of

the showing they must make to establish that some aspect of the Rule is arbitrary.[27]

## IV.    The Bureau's Funding Provides No Grounds for Setting Aside the Rule

The Supreme Court's decision in *CFPB v. Community Financial Services Association of*

*America, Ltd.*, 601 U.S. 416 (2024) (*"CFSA"*) confirms that the Bureau is entitled to judgment

as a matter of law on Plaintiff's claim concerning the Bureau's funding. In *CFSA*, the Court

upheld the validity of the Bureau's funding from the same attack Plaintiffs raise in this case,

concluding that "the requirements of the Appropriations Clause are satisfied" by the Bureau's

statute. *Id.* at 435.

### CONCLUSION

For these reasons, the Court should grant summary judgment to the Bureau on all counts.

Dated:  June 7, 2024                                    Respectfully submitted,

---

[26] There is thus no reason the Bureau should have, as Plaintiffs suggest (Reply at 2), "require[d] only the statutory data points until response rates are known."

[27] The Bureau's opening brief pointed out that Plaintiffs' motion ignored severability principles. ECF No. 90 at 39-40 (noting that the APA permits a court to sever a rule by setting aside only the offending parts of the rule). *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)). Plaintiffs' latest brief offers no response other than effectively conceding that the Court would have to consider these principles in crafting any remedy. *See* Pls.' Reply at 30, n.15.

/s/  *Karen S. Bloom*
Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher J. Deal
  *Assistant General Counsel*

Karen S. Bloom (NY # 4438917)
Kevin E. Friedl (NY #5240080)
Andrea Matthews (MA #694538)
  *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7012 (phone)
(202) 435-7024 (facsimile)
karen.bloom@cfpb.gov

26

CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2024, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to all counsel of record.


/s/  Karen S. Bloom